1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

HUNTERS CAPITAL, LLC, a Washington limited liability company, NORTHWEST LIQUOR AND WINE LLC, a Washington limited liability company, SRJ ENTERPRISES, d/b/a CAR TENDER, a Washington corporation, THE RICHMARK COMPANY d/b/a RICHMARK LABEL, a Washington company, SAGE PHYSICAL THERAPY PLLC, a Washington professional limited liability company, KATHLEEN CAPLES, an individual, ONYX HOMEOWNERS ASSOCIATION, a Washington registered homeowners association, WADE BILLER, an individual, MADRONA REAL ESTATE SERVICES LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS IV LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS VI LLC, a Washington limited liability company, 12TH AND PIKE ASSOCIATES LLC, a Washington limited liability company, REDSIDE PARTNERS LLC, a Washington limited liability company, MAGDALENA SKY, an individual, OLIVE ST APARTMENTS LLC, a Washington limited liability corporation, and BERGMAN'S LOCK AND KEY SERVICES LLC, a Washington limited liability company, on behalf of themselves and others similarly situated,

                              Plaintiffs,

       vs.

CITY OF SEATTLE,
                              Defendant.

Case No.

CLASS ACTION COMPLAINT

JURY DEMAND

CLASS ACTION COMPLAINT - 1

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Plaintiffs hereby allege as follows:

## I.  <u>OVERVIEW</u>

1.     The rights of free speech and to peaceably assemble are enshrined in our constitutional tradition. Plaintiffs support free-speech rights and support the efforts of those like Black Lives Matter who, by exercising such rights, are bringing issues such as systemic racism and unfair violence against African Americans by police to the forefront of the national consciousness. Specifically, Plaintiffs support the free speech rights of many of those who have gathered on Capitol Hill to form what has been called "CHAZ," standing for the "Capitol Hill Autonomous Zone," or "CHOP" for "Capitol Hill Organized Protest" or "Capitol Hill Occupying Protest."[1]

2.     This lawsuit does **not** seek to undermine CHOP participants' message or present a counter-message. Rather, this lawsuit is about the constitutional and other legal rights of Plaintiffs—businesses, employees, and residents in and around CHOP—which have been overrun by the City of Seattle's unprecedented decision to abandon and close off an entire city neighborhood, leaving it unchecked by the police, unserved by fire and emergency health services, and inaccessible to the public at large. The City's decision has subjected businesses, employees, and residents of that neighborhood to extensive property damage, public safety dangers, and an inability to use and access their properties.

3.     On June 8, 2020, the City of Seattle ("the City") abruptly deserted the Seattle Police Department's East Precinct on the corner of Twelfth Avenue and E. Pine Street in Seattle's Capitol Hill neighborhood, leaving behind numerous barriers that had previously been used as a line between police and protesters.

---

[1] This complaint primarily refers to the area as "CHOP," and the people who are participating in CHOP who are not businesses, employees, or residents of the area as "CHOP participants."

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

4.      When the City abandoned the precinct and the nearby barriers, a number of individuals who had been in the area took control of the barriers and used them to block off streets in an area around the East Precinct.

5.      In the days and weeks after the City abandoned the East Precinct, CHOP participants have occupied the public streets, sidewalks, and parks in the area at all hours of the day and night. Rather than seeking to restore order and protect the residents and property owners within CHOP, the City instead chose to actively endorse, enable, and participate in the occupation of CHOP.

6.      The City has provided Cal Anderson Park, a public park located at the center of CHOP, to CHOP for use  as the staging ground supporting CHOP's occupation of the surrounding area. Supported by the City, countless CHOP participants now reside in the park at all times of day and night, having turned it into a tent city. At any given time, hundreds of CHOP participants are camped out in the park. Violence, vandalism, excessive noise, public drug use, and other crimes are rampant within the park.

7.      The City's conduct has resulted in CHOP being blocked off from public access. Among other conduct detailed below, the City recently provided the participants with concrete barriers to use to block the streets, which CHOP participants have indeed used to barricade the streets and create borders. These borders have, at times, been guarded by armed CHOP participants who oversee who can or cannot enter CHOP. As a result, the streets are barred to most all vehicular traffic, making it virtually impossible for residents and businesses to access their buildings, receive deliveries, and provide goods and services to the few customers willing to enter CHOP.

8.      The City's conduct has also resulted in the elimination of basic public safety within CHOP and nearby areas. For example, the City has enacted a policy under which police will not enter the CHOP area except during life-and-death emergencies, and, even in those situations, the response is, at best, muted and late. After a fatal shooting in the early morning of June 20, 2020,

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

for example, officers did not even approach the area of the shooting until approximately 20 minutes after the shooting, and no professional medical response was available for at least 15 minutes. At other times, even during life-and-death emergencies, the police have acquiesced to demands from CHOP participants that they abandon the area. The City has acknowledged the serious safety issues it has created, in particular noting that there are "dangerous conditions" at night, but the City has nonetheless chosen to maintain its policy of providing resources and support to the CHOP occupiers.

9.     The City's conduct has enabled the widespread destruction and vandalism of private property. Graffiti is pervasive throughout CHOP—it is not only on barriers, streets, sidewalks, but also on nearly every private building within CHOP. Graffiti that is painted over almost immediately returns, and property owners have been told by CHOP participants that if they dare to paint over graffiti, their buildings will be more severely vandalized or even burned to the ground. The City has done nothing to prevent this conduct, but, instead, has actively endorsed and supported the ongoing occupation of the CHOP area and the destruction of property that accompanies it. As a result, property owners and their tenants have not been able to fully use their properties. Property owners and tenants have, for instance, had to lock and barricade their garages and loading areas at risk of having CHOP participants entering and vandalizing them.

10.     The property owners, businesses, and residents in the area suffer ever-increasing property damage and economic loss every day that CHOP exists in their neighborhood, all because of the City's active support, encouragement, and endorsement of the occupation. In particular, Seattle Mayor Jenny Durkan has provided the CHOP participants with not just tangible resources but also a de facto stamp of approval. Her tweets, interviews, and other statements have made it clear that the City is fully aware of what is happening, has no plan or timeline for remedying the ongoing harm, and in fact views the occupation of Capitol Hill as something akin to a perpetual block party.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

11.     Plaintiffs and others have repeatedly pleaded with Mayor Durkan and others to cease enabling the destruction of their property and the imminent dangers posed to them and their neighborhood. But the City has not listened, or has not cared, and Plaintiffs have had to resort to litigation to make themselves heard.

12.     Again, this case is not about Plaintiffs' agreement or disagreement with the inspiration for CHOP, or the viewpoints expressed by the people occupying that area. Instead, it is about the City's active, knowing endorsement and support of a destructive occupation of a neighborhood to the detriment of the well-being of those who live and work in that neighborhood.

## II.     PARTIES

13.     Plaintiffs are residents, tenants, property owners, and small businesses in Seattle's Capitol Hill neighborhood that have been harmed by CHOP. Without an injunction restraining the City from continuing its policies of supporting and enabling the occupation of the CHOP area, each of the Plaintiffs will continue to suffer irreparable harm, by, among other things, being subject to acts of violence, harassment, trespass and vandalism; denial of access to their property; loss of police protection and public services, including trash, medical, and fire services; loss of business revenue; loss of the use of public streets, sidewalks, and parks near or adjacent to their property, residence, or premises; reduction in property value; destruction of property; and other economic and non-economic injuries.

14.     Plaintiff Hunters Capital LLC ("Hunters Capital") is a Washington limited liability company with its principal place of business in King County, Washington. Hunters Capital is a real-estate development, investment, and management company, headquartered near Cal Anderson Park in the Capitol Hill neighborhood with offices in the zone occupied by CHOP at 1620 Broadway Seattle, Washington. Hunters Capital owns and manages a portfolio of commercial, multi-family residential, and mixed-use properties in the Capitol Hill neighborhood within and around CHOP, including 500 E. Pike Street, 1517 12th Avenue, 401 E. Pine Street, 1000 E. Pike

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Street, 900 E. Pine Street, 426 15th Avenue East, 415 18th Avenue South, 523 15th Avenue East, 1641 Nagle Place, and 501 E. Pike Street, in addition to other properties in the area it manages. Hunters Capital has suffered, and continues to suffer, economic loss from CHOP. Additionally, its property has been damaged and its tenants and employees have been harassed.

15.     Plaintiff SRJ Enterprises, Inc. d/b/a Car Tender ("Car Tender") is a Washington corporation with its principal place of business in King County, Washington. Car Tender is an automotive repair business. Car Tender's shop is located at 1706 12th Avenue in Seattle, Washington, in the heart of Seattle's Capitol Hill neighbor and directly bordering the zone occupied by CHOP. Car Tender has been a small business since 1971 and currently has 10 employees. Car Tender's shop has been vandalized and broken into by CHOP participants and its employees have been assaulted. With access for customers cut off by CHOP, it has suffered a loss of business.

16.     Plaintiff The Richmark Company d/b/a Richmark Label ("Richmark Label") is a family-owned Washington company with its principal place of business in King County, Washington. Richmark Label is a label printing and manufacturing business located at 1110 E. Pine Street, Seattle, Washington. Richmark Label is one of the largest manufacturing employers on Capitol Hill, with over 70 employees working at its facilities on Pine Street. Due to street blockages and barricades, trucks and delivery vehicles have been unable to access Richmark Label's manufacturing facility. In addition to its manufacturing facility, Richmark Label also owns property, portions of which it leases to other tenants, in or near CHOP.

17.     Plaintiff Northwest Liquor and Wine LLC ("Northwest Liquor and Wine") is a Washington limited liability company with its principal place of business in King County, Washington. Northwest Liquor and Wine operates a specialty liquor, beer, and wine store in the Capitol Hill neighborhood, located on the corner of 12th Avenue and Pine Street at 1605 12th Avenue, Seattle, Washington, directly across from the East Precinct and wholly within CHOP.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Customers cannot access Northwest Liquor and Wine because of CHOP and since the occupation began in early June, the company's sales have been down approximately 70%.

18.    Sage Physical Therapy PLLC ("Sage Physical Therapy") is a Washington professional limited liability company with its principal place of business in King County, Washington. Sage Physical Therapy provides rehabilitative and therapeutic physical therapy to patients from its sole offices on Capitol Hill located at 1125 E. Olive Street, near CHOP. With access for clients cut off by CHOP, it has suffered and continues to suffer a loss of business, in addition to other injuries. Plaintiff Kathleen Caples is the owner of Sage Physical Therapy.

19.    The Onyx Homeowners Association ("Onyx HOA") is a Washington registered homeowners association in King County, Washington. Onyx HOA is an association of, and represents, the residents of the Onyx Condominiums located at 1125 E. Olive Street, Seattle, Washington. Onyx Condominiums, located near the area occupied by CHOP participants on Capitol Hill, has 65 units. The building has suffered property damage and theft because of CHOP, the value of the owners' property has been greatly reduced, and the owners have been harassed and threatened.

20.    Plaintiff Wade Biller is the president of Onyx HOA. He is also a condominium owner in the Onyx building. In addition to the injuries he has suffered as a resident and property owner in CHOP,  Mr. Biller has been physically assaulted by a CHOP participant while attempting to negotiate with CHOP participants in his capacity as President of the HOA.

21.    Plaintiff Madrona Real Estate Services LLC ("Madrona Real Estate Services") is a Washington limited liability company with its principal place of business in King County, Washington. Madrona Real Estate Services is a real-estate development and full-service real-estate management company for both commercial and residential properties. Madrona Real Estate Services owns or manages over 250,000 square feet of real estate in Capitol Hill, including

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

property on Pine street and properties in and around CHOP. Madrona Real Estate Services has suffered, and continues to suffer, economic loss from CHOP, among other injuries.

22.     Plaintiff Madrona Real Estate Investors IV LLC ("Madrona Real Estate Investors IV") is a Washington limited liability company with its principal place of business in King County, Washington. Madrona Real Estate Investors IV is a real-estate investment company, whose holdings include properties located in the Capitol Hill neighborhood, including in or near CHOP on Pike and Pine streets. Madrona Real Estate Investors IV has suffered, and continues to suffer, economic loss from CHOP, among other injuries.

23.     Plaintiff Madrona Real Estate Investors VI LLC ("Madrona Real Estate Investors VI") is a Washington limited liability company with its principal place of business in King County, Washington. Madrona Real Estate Investors VI is a real-estate investment company, whose holdings include properties located in the Capitol Hill neighborhood, including in or near CHOP on Pike and Pine streets. Madrona Real Estate Investors VI has suffered, and continues to suffer, economic loss from CHOP, among other injuries.

24.     12th and Pike Associates LLC ("12th and Pike Associates") is a Washington limited liability company with its principal place of business in King County, Washington. 12th and Pike Associates is a real-estate investment company, whose holdings include properties located in the Capitol Hill neighborhood, including in or near CHOP on Pike and Pine streets. 12th and Pike Associates has suffered, and continues to suffer, economic loss from CHOP, among other injuries.

25.     Plaintiff Redside Partners LLC ("Redside Partners") is a Washington limited liability company with its principal place of business in King County, Washington. Redside Partners is a real-estate investment and management company, with headquarters in CHOP at 1620 Broadway, Seattle, Washington. Redside Partners holds investments in and manages numerous properties in the Capitol Hill neighborhood, including properties in or near CHOP such as 915 E

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    Pine Street. Redside Partners has suffered, and continues to suffer, economic loss from CHOP,

2    among other injuries.

3        26.    Plaintiff Magdalena Sky is a small business owner who owns and operates Tattoos

4    and Fortune. Tattoos and Fortune is a tattoo parlor and Tarot studio with a sole location at 1605

5    12th Avenue Seattle, Washington, within CHOP. Ms. Sky is the sole proprietor of Tattoos and

6    Fortune. With access for clients cut off by CHOP, Ms. Sky, through her business, has suffered and

7    continues to suffer a loss of business, in addition to other injuries.

8        27.    Plaintiff Olive ST Apartments LLC ("Olive ST Apartments") is a Washington

9    limited liability company with its principal place of business in King County, Washington. Olive

10   ST Apartments owns two apartment complexes within and right on the boarder of CHOP, located

11   near Cal Anderson Park at 1703 12th Avenue and 1114 East Olive Street, Seattle, Washington.

12   Olive ST Apartments has suffered, and continues to suffer, economic loss from the CHOP, among

13   other injuries.

14       28.    Plaintiff Bergman's Lock and Key Services LLC ("Bergman's Lock and Key") is

15   a Washington limited liability corporation with its principal place of business in King County,

16   Washington. Bergman's Lock and Key's offices are located at 1714 12th Avenue, Seattle,

17   Washington, in the immediate vicinity of CHOP. Bergman's Lock and Key provides lock and key

18   services for residential and commercial properties, normally attracting customers from around the

19   Puget Sound area to its Capitol Hill locations. Like other small business, Bergman's Lock and Key

20   has suffered, and continues to suffer, economic loss from CHOP, among other injuries.

21       29.    Defendant the City of Seattle ("the City") is a municipality incorporated in the

22   State of Washington. The Seattle Police Department ("SPD") is a division of the City. Jenny

23   Durkan is the Mayor and chief executive of the City, and a policymaker for the City.

24

25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

### III.    JURISDICTION AND VENUE

30.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. §1331 because this action presents federal questions and seeks to redress deprivations of rights under the United States Constitution pursuant to 42 U.S.C. § 1983.

31.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the events giving rise to these claims arose in the Western District of Washington.

### IV.    FACTUAL ALLEGATIONS

**A.  The Creation of CHOP**

32.    On June 8, 2020, with protests ongoing near the East Precinct, the City emptied the East Precinct of all weapons and valuables, and then abandoned it.

33.    The City left behind at the precinct and in the surrounding areas large barriers that had been used in previous days to try to limit the movements of protesters.

34.    Predictably, almost immediately after the SPD abandoned the precinct and the barriers, CHOP participants used the barriers to block off streets in the area and create a "no-cop" zone. Initially, the blocked-off area extended to all streets within one block from the precinct.

35.    Without any police presence, the CHOP participants organized themselves, declared the area "Free Capitol Hill," and stationed guards by the barriers that the City had abandoned, thereby creating borders for the occupied area. The area later expanded, was referred to as CHAZ for several days, and eventually became known as CHOP.

36.    CHOP's unofficial boundaries stretch north to East Denny Way, east to 13th Avenue, south to East Pike Street, and west to Broadway. It encompasses the entirety of Cal Anderson Park and sixteen city blocks in all.

**B.  The Activities of CHOP Participants**

37.    Ever since the SPD vacated Capitol Hill, the CHOP participants have claimed the area as their own with a physical presence and a loose form of governance and justice.

CLASS ACTION COMPLAINT - 10

38.     CHOP participants have maintained borders with barriers and people patrolling the perimeter, as well as vehicles parked in the middle of rights-of-way.

39.     Many CHOP participants live on the streets and sidewalks and in Cal Anderson Park, in tents such as the following:

 

40.     They have painted graffiti on most available surfaces, and if a property owner paints over the graffiti, the graffiti is typically replaced within a few hours. CHOP participants have even

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    threatened business owners with retaliation if they paint over graffiti. Examples of this pervasive

2    graffiti include the following:











LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

41.     CHOP participants have created various unpermitted, ad hoc food dispensaries and stores on public property in front of and near private residences and businesses.

42.     CHOP participants have created a "medical tent" in a private parking lot corner under a festival tent.

43.     On occasion, CHOP participants have acted as a replacement police force, including by demanding that business owners release individuals who were caught committing crimes and by attempting to perform their own crime investigations

44.     CHOP participants occupy the streets and sidewalks 24 hours a day, and have speeches, debates, movies, music, and various other activities—including, in some instances, illegal fireworks shows—on the streets and sidewalks. Disturbances and noise pollution extend well past 10 p.m. and typically into the early morning of the next day.

45.     CHOP participants have been observed carrying guns in the public streets and parks in broad daylight.

46.     Cal Anderson Park is one of the focal points of CHOP. The approximately 7-acre park, which is ostensibly owned by the City, has been entirely handed over to the CHOP participants. The City has supported and enabled CHOP's occupation of the park through providing washing/sanitation facilities, portable toilets, and other material support.

47.     As a result of the City's actions, Cal Anderson Park has been transformed into a massive tent city for CHOP participants, as shown here:

 

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

48.     Members of the public can no longer use Cal Anderson Park. CHOP's control of the park has not abated, as shown in the below pictures taken the afternoon of June 23, 2020 (local residents attempting to take pictures too close to Cal Anderson Park have been threatened by CHOP participants, who have said they will steal their smartphones):

 

49.     CHOP participants have even built makeshift gardens on the park's lawn to grow food for CHOP. The City has handed over public property in the park for this use, as shown here:

 

50.     CHOP's control of Cal Anderson Park is a central nuisance to local residents and businesses. Many of the Plaintiffs' properties overlook, border, or are adjacent to the park. Not only are those residents deprived of their use of the park, but problems from CHOP's encampments in the park spill over into the entire neighborhood. The hundreds of CHOP participants in the park

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

create excessive noise, even late into the night, in violation of the City's ordinances. Participants set off fireworks at all hours of the day and night. Trash, feces, and other refuse have built up in the park, affecting the whole area. Worst of all, Cal Anderson Park has been one of the most violent areas of CHOP. Local residents have seen individuals in Cal Anderson Park carrying firearms.

**C.  The Effects of CHOP on Plaintiffs and the Class**

51.     The impacts on Plaintiffs and the Class have been extensive. The experiences of each Plaintiff are described in detail below. However, all Plaintiffs and Class members have in common at least the following harms: a lack of public safety assistance and substantially impaired access to and use of their properties.

**1.  Lack of public-safety assistance even in life-threatening circumstances**

52.     The City's endorsement and recognition of CHOP has gone so far that the SPD has adopted a policy and practice of not entering the area except in the case of life-threatening crimes, and even then, the SPD response is weak and delayed.

53.     On information and belief, the SPD considers the area from Denny Way to Union Street and Thirteenth Avenue to Broadway to be a "no response" zone where the SPD will not respond to anything but the most serious crimes.

54.     And even in the most serious situations, the SPD's response is unconscionably delayed. As SPD Chief Carmen Best explained on June 11, 2020, as she stood next to Mayor Durkan:

> SPD has a responsibility to provide public safety services to the entire East precinct and the City. The actions of a small group cannot and should not deprive an entire segment of our community from public-safety services. In the first day of the SPD not having access to the precinct, response times for crimes in progress were over fifteen minutes, about three times as long as the average …. If that is your mother, or your sister, your cousin, your neighbor's kid that is being raped, robbed, assaulted, and otherwise victimized, you're not going to want to have to report that it took the police three times longer to get there to provide services to them. The difference in the

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

amount of time could protect someone's life and prevent a violent attack.

55.     Recent events in CHOP demonstrate that if anything, Chief Best was being conservative in her description of the public-safety emergency in CHOP.

56.     At approximately 2:20 a.m. on June 20, 2020, there were two people shot in CHOP. At least one of the shootings happened at or near the intersection of Tenth Avenue and Pine Street, around the corner from the abandoned East Precinct. One of the victims died before reaching the hospital. The second was admitted with life-threatening injuries. No suspects have been identified or taken into custody.

57.     Raw video streamed from the area shortly after that shooting demonstrates the enormity of the risk created by the City for anyone who lives or works in CHOP. That video clearly captured the following:[2]

     a.     The video appears to start a couple of minutes after the shooting.

     b.     One shooting victim was taken to the CHOP "medic tent" located in a parking lot under a festival tent.

     c.     No professional medics arrived until approximately 15 minutes into the video to tend to the first shooting victim.

     d.     No police were in the area until approximately 18 minutes into the video, when cars and lights and can be seen several blocks away, and police can be heard on megaphones demanding that barriers be moved to allow the police to enter.

     e.     Approximately 19 minutes into the video, a small phalanx of approximately 8 police officers entered the area on foot and arrived in the area of the medical tent, apparently for the purpose of trying to locate and extract the first shooting victim.

     f.     The phalanx of officers was immediately surrounded, yelled at, and pursued by CHOP participants.

---

[2] https://www.facebook.com/WWConverge/videos/297548387941384/?v=297548387941384

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

g.      One police car finally entered the area approximately 20 minutes into the video.

h.      The police did not engage with the crowd and promptly left the area, after which CHOP participants created a human chain across the street to bar any further entry.

i.      There was a second shooting victim in CHOP located a couple of blocks away. It appears that no medics or police responded at all to the location of the second victim.

j.      Approximately 35 minutes into the livestream video, the second victim was placed into a plain white cargo van and presumably taken to the hospital. A voice can be heard explaining that Medic One drove by but did not come to the assistance of the person who ended up in the white van.

k.      Shortly after the second victim was driven away, private citizens began looking for bullet casings. No police were on the scene to perform any investigation in the immediate aftermath of the shooting.

58.      On June 21, 2020, another shooting occurred in the area at approximately 11:00 at night. There was no police or medic response, and the shooting victim was transported to the emergency room by private vehicle.

59.      In a press conference with Mayor Durkan on June 22, 2020, Chief Best reiterated the seriousness of the public-safety situation, stating:

> there are countless individuals who are in the CHOP that are there to engage, as the Mayor said earlier, in peaceful demonstrations. But there are also groups of individuals engaging in shootings, a rape, assaults, burglary, arson, and property destruction, and I have their police reports right here. [*Holding up a stack of papers*]  I'm not making it up. These things have happened. We cannot walk away from the truth of what is happening there. This is not about politics

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

and I'm not a politician. This isn't a debate about First
Amendment rights. This is about life or death. So we need a
plan.

**2.   Impeded access to and use of property**

60.    All Plaintiffs and Class members have not had the ability to use public rights of
way, including streets and sidewalks, to access their homes, businesses, and properties.

61.    CHOP participants regularly move the City-provided barriers and other large
objects wherever they wish to block traffic, sidewalks, and all other manner of ingress and egress.

62.    In many cases, this has meant people cannot use public streets and rights-of-way to
enter or exit their homes or businesses, clients cannot visit businesses, and businesses cannot get
deliveries. The difficulties are magnified for the elderly and the disabled.

63.    The barriers and the constant presence of CHOP participants has also meant that
residents, property owners, and businesses do not have full use of their property. If they can access
their property, safety necessitates that many of them have to keep their doors locked. Many
portions of property that are normally freely accessible—such as garages—have to be shut at all
hours or else CHOP participants will vandalize them.

64.    Garbage and recycling cannot enter the area due to the myriad barricades and
CHOP border guards, forcing residents and businesses to pile up refuse without any idea when
they might be able to discard it.

65.    Residents and businesses in the area are unable to receive deliveries at their homes
because delivery companies cannot or will not enter CHOP and the surrounding area because of
barriers and safety concerns.

66.    Residents in and near CHOP are forced to endure loud noises, music, and even
fireworks at all times of the day and night.

67.    Residents in and near CHOP do not have free and safe access in or out of their
homes.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

68.     Businesses are unable to operate normally, or even open, because of blocked access and concerns for the safety of their suppliers, employees, and customers.

69.     All of this is causing extensive economic and other harm to Plaintiffs and all other members of the Class.

**3.     Plaintiffs' individual stories**

70.     The impact of CHOP on residents, businesses, and property owners is best seen through the stories of Plaintiffs, who are suffering from the City's policies every day.

71.     Each Plaintiff and the Class has suffered—and continues to suffer— irreparable economic and non-economic injury as a direct result of CHOP participants' presence on Capitol Hill. The City's support for CHOP enables, aids, and abets the ongoing harm to each of the Plaintiffs and members of the Class. Each Plaintiff and Class member will continue to suffer irreparable harm unless restrained by this Court.

72.     *Plaintiff Car Tender.* Plaintiff Car Tender—a local small business with one location— has suffered a dramatic drop off in its auto-repair business since the establishment of CHOP. Since early June 2020, business revenues have declined around 40% from the prior months of April and May 2020. This drop in sales actually understates Car Tender's losses, however, as April and May's revenues were already lower due to the height of COVID-19 pandemic. In late May 2020, Car Tender's revenues began an upswing coming out of the shutdown, which was suddenly interrupted by the sharp drop in customers caused by CHOP.

73.     Car Tender's loss of business revenue is a direct result of CHOP. Access to the shop has at times been substantially impeded due to barricaded streets. Further, customers have told Car Tender that they will not bring their cars into the shop, out of fear of CHOP located just down the street from Car Tender's location. Customers have even come to the shop only to immediately turn around and leave, because they were fearful to leave their cars at Car Tender's location. Because of the City's enablement of CHOP, Car Tender is struggling to make ends meet.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

74.     Car Tender's premises have also been vandalized by CHOP participants. CHOP participants tore down the fence around Car Tender's car lot, permanently damaging the cement post such that an entire new fence will need to be constructed. They have also painted and vandalized with graffiti the side of Car Tender's building. Car Tender is fearful that if the company tries to cover up the graffiti they will face reprisals from CHOP participants, as CHOP participants have threatened to burn down other properties in the area when owners have attempted to cover or clean up graffiti.

75.     Car Tender's customers are understandably concerned for their safety, and with good reason. Indeed, Car Tender's shop was recently broken into by a man who assaulted the son of one of Car Tender's owners with a knife. The details of the incident demonstrate the extreme risk of harm to which the City has exposed Plaintiffs and the Class.

76.     On June 14th at around 9:30 p.m., a person broke into Car Tender's building, armed himself with a knife and a spike that he found inside the building, and lit a fire in the shop. After receiving a call from a neighbor alerting them to the break-in, Car Tender's owner and son called 9-1-1 and then went to the premises themselves, where they found the shop's garage had been broken into. They found that the property had also been vandalized with Purell hand sanitizer, which the intruder had dumped everywhere to use as fuel for the fire he had started. That fire was still burning when the owner and his son arrived, but they were able to extinguish it. The intruder was still on the premises, however, and he accosted the owner's son with the knife and spike and abruptly assaulted him by hitting him in the chest.

77.     Although blindsided by the intruder's sudden unprovoked attack, the owner and his son were able to wrestle the intruder to the floor in a scuffle. The intruder meanwhile tried to cut the son's femoral artery and landed two large cuts to his clothing on the side of his leg. He also repeatedly attempted to stab the son with the spike.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

78.     After subduing the intruder, Car Tender's owner called 9-1-1 again, reporting the arson, burglary, and assault, requesting police assistance at the scene. Other neighbors also called 9-1-1. But, despite the multiple 9-1-1 calls. the police never responded to the scene that evening.

79.     Several CHOP participants on the street who witnessed the incident approached the shop and demanded the release of the apprehended intruder. Car Tender's owner at first insisted that he was waiting for the police to come to the scene. An angry mob of CHOP participants, perhaps as many as 500 although possibly more, gathered around Car Tender's fence and broke it down, insisting on the release of the intruder. Members of CHOP mob insisted that the police would never dare respond. Faced with a threat of mob violence, Car Tender's owner and son handed the intruder over to CHOP participants.

80.     Because the police refused to protect Car Tender's property from burglary and arson, Car Tender's owner now is forced to sleep at the shop in an effort to protect it. Car Tender's owner has tried to contact Mayor Durkan's office to report his concerns as a resident and small business owner, but has received no response.

81.     Car Tender's experience is not unique. Other local businesses are also suffering from the City's actions.

82.     *Plaintiff Richmark Label*. Plaintiff Richmark Label is a local family-owned business on Capitol Hill that runs label-printing operations out of a manufacturing facility on Pine Street, directly adjacent to CHOP. Richmark Label's business has been negatively affected as a direct consequence of CHOP.

83.     CHOP has frequently blocked access to the 11th Avenue side of Richmark Label's building, where Richmark Label maintains a loading dock for receiving and shipping. Richmark Label must receive deliveries on an ongoing basis in order to maintain its business as well as make shipment of its products. Richmark Label's ability to use its loading dock is substantially impeded, as the 11th Avenue access has frequently been blocked by barricades, participants engaged in

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

intimidation tactics, or other CHOP activities. Some delivery drivers have reported to Richmark Label that they will not even attempt delivery to their building, because it is unsafe. Several delivery drivers who have attempted delivery have been stopped and accosted by CHOP participants. Richmark Label's usual shippers have refused to deliver and UPS recently elected not to come and pick up a pallet of wine labels for shipment, one of Richmark Label's largest sources of business. On other occasions, labels have been shipped late, incurring costs and straining Richmark Label's business relationships with its customers.

84.     Unable to timely supply its customers, Richmark Label will permanently lose its customers unless public safety and regular access on public streets is promptly restored. The City's support of CHOP is putting Richmark Label's business at risk, as well as the livelihood of its over 70 employees.

85.     This loss to business is not the only harm Richmark Label is suffering due to CHOP. Richmark Label owns its facilities, a historic building from 1927, on which the company paid to have an artistic mural painted as a gift to the whole Capitol Hill community. That mural has now been vandalized by CHOP participants beyond repair, whereas before CHOP's occupation there had only been minor instances of occasional graffiti. Now the wall will have to be repaired and repainted, but Richmark Label is fearful of doing so while it is under a continued threat of vandalism.

86.     Richmark Label also owns a parking lot on the 11th Avenue side of the building. It rents the parking spaces during non-business hours. Richmark Label has been forced by CHOP to shut the parking lot down because the roads for accessing the parking lot have frequently been blocked and customers are afraid of entering the area. The company is therefore receiving none of the usual rental income it typically receives from the parking spaces. The parking lot also typically serves as customer parking for Richmark Label and several of its tenants who rent space in the

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

company's building. But, due to CHOP, both Richmark Label and its tenants are now being deprived of customer parking.

87.    Unauthorized cars have also parked in Richmark Label's lot. Richmark Label has contacted towing companies, but all have refused to tow the cars because CHOP makes the area unsafe. Richmark Label has called the police on multiple occasions regarding the unauthorized cars parked on their property, but the police have not acted. Richmark Label has called 9-1-1 regarding the unauthorized cars trespassing on their property, only to be told at least twice that SPD is not responding to calls in the area.

88.    Like Plaintiff Car Tender, Richmark Label has also been threatened with violence by CHOP participants. When CHOP first arose, Richmark Label allowed a local news crew to access its roof to film the protests and CHOP. SPD officers then also accessed Richmark Label's roof to assess the situation, where they were photographed by CHOP participants. Those photographs were then posted online, leading to a social media frenzy against the company. Subsequently, Richmark Label's employees have reported that they do not feel safe coming to work, because of the threat of harassment and violence from CHOP participants. CHOP participants have set up cones across 11th Avenue, which must be crossed to access Richmark Label's building. CHOP participants have been stopping people and requiring them to answer questions about who they are and what they are doing in the area before letting them pass. The result is that customers, shippers, and employees are scared to even enter the area.

89.    Richmark Label has been in contact with the Mayor's office, but the office has not been returning the company's calls, offering any assistance, or providing any opportunity to challenge the City's decision to authorize the ongoing occupation of the CHOP area. The City's support of CHOP through encouragement and material support has enabled CHOP's threat to Richmark Label's business.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

90.     *Plaintiff Northwest Liquor and Wine.* Northwest Liquor and Wine—a one-location store specializing in high-end wine, beer, and spirits—is yet another local small business that has suffered since CHOP occupation began in early June. After record sales in May 2020, the store is having its worst month in June 2020 since opening at that location in 2012. In June 2020, the company's sales have been down approximately 70% from average and sales are continuing to sink, threatening the company's ability to pay its rent.

91.     Customers are unable to visit the store because the surrounding streets have been blocked off to traffic. Northwest Liquor and Wine has access to an adjacent parking garage, but they have been forced to close it to prevent CHOP participants from camping out in it and even starting fires. CHOP barricades have also meant that suppliers have been unable to make deliveries.

92.     The owners and employees do not feel safe, as there have been disturbances in the store and people on the streets nearby carrying guns. Northwest Liquor and Wine normally maintains around 4 to 6 employees. Since CHOP started, its employees have understandably been too scared to come to work out of concern for their safety.

93.     *Plaintiff Sage Physical Therapy.* Plaintiff Sage Physical Therapy ("Sage") is another small business suffering losses because of CHOP. When CHOP started in early June, clients immediately stopped coming, saying that they are scared to come near CHOP. Additionally, the few clients willing to venture near CHOP have found Sage's offices to be inaccessible, as many of the nearby streets have been blocked, and even on the few streets in the area that have not been blocked, the City has ceased enforcing parking restrictions, allowing vehicles to remain parked indefinitely. As a result, there is no parking and Sage's offices are therefore not accessible to its clients. The lack of access if is especially hard on Sage's clientele, as many are seeking therapy for injury and are unable to walk far. Sage's clients have been canceling their appointments, because of CHOP.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

94.     Even one of Sage's patients who resides within walking distance of Sage's offices has been unable to access Sage's building due to CHOP. Sage has a patient who resides in an apartment building inside CHOP. The patient is on crutches from traumatic leg injury. She resides only a short distance from Sage, but the City has enabled CHOP to place barriers across sidewalks, and different barricades pop up near Sage every day. Sage's injured patient is not able to navigate around the barriers and the patient has reported to Sage that she upset about not being able to get to her much-needed therapy appointments.

95.     Sage's owner also fears violence from the presence of CHOP. After CHOP arose, she observed a van parked outside Sage's office with an automatic weapon in the front seat and a plywood barrier and padlock so that the back of the van was not visible. Sage's owner is aware that CHOP participants nearby have reportedly highjacked vehicles. Sage's owner is also aware of an incident involving another local business owner known to Sage's owner. After that business owner's store was closed for the day, a CHOP participant demanded to use the store's restroom, exposed himself to the female owner, and then attempted to assault the business owner, who fortunately was able to flee the scene. These incidents of violence against local businesses, compounded with a loss of business revenue, have caused Sage's owner physical stress, forced her to keep the office door locked at all time making business impossible, and acerbated her hypertension.

96.     One of Sage's clients reported that he was scared to come to his appointment because of CHOP, but decided that because he was in so much physical pain, he needed his therapy treatment. He parked near 11th Avenue for his appointment. He ended his appointment early, however, because he was concerned about a passing protest of CHOP participants. Upon returning to his car, he found that all four tires had been slashed by CHOP participants. He reported to Sage that, even though he suffers from pain and needs treatment, he will not attempt to come to future appointments because of CHOP.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

97.     Adding to Sage's difficulties, Sage's internet cable has been cut, and Sage has been unable to schedule an appointment for a Wave Cable technician to come fix the internet access because of the presence of CHOP. This has put Sage at imminent risk, as Sage's security cameras—much needed under the current circumstances—require internet access and are therefore currently inoperable.

98.     To date, Sage has lost considerable revenue from patient cancellations due to CHOP, which places considerable strain on a small business like Sage. Around 60% of patients have canceled their appointments.

99.     Sage employs three physical therapists and one personal trainer. Their livelihoods are now threatened by CHOP. Sage's company motto is: "Unapologetically fighting for good."  All of its employees are supporters of Black Lives Matter and pride themselves on providing a place of inclusivity and respect. The City has not listened to their concerns.

100.     Sage's owner has written to Mayor Durkan to complain about the current situation, as well as the difficulties CHOP has caused for many of Sage's disabled clients. That letter reads: "My business Sage Physical Therapy is located at the corner of 12th Ave & E. Olive St within the CHAZ footprint. I have patients that live in the CHAZ neighborhood that are on crutches due to their injuries. They need physical therapy but they can't get to my office because they can't navigate the barricades. The sidewalks are blocked with heavy barricades. My patients aren't able to access the disabled parking and loading zones because non-disabled people are parking there. People aren't able to receive the care they deserve. The roads and sidewalks need to be cleared. I would like to remind you about the Americans with Disabilities Act. Blocking the road and sidewalk is against the ADA. This current environment on Capitol Hill is unacceptable!!! Let's not forget about people with disabilities. As a business owner, I feel abandoned by the city. This is unacceptable. The City of Seattle is violating ADA regulations."  The Mayor has not responded.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

101.     *Plaintiff Magdalena Sky (Tattoos and Fortune)*. Plaintiff Magdalena Sky is an activist and supporter of Black Lives Matter. Ms. Sky is the sole proprietor of Tattoos and Fortune. Ms. Sky is autistic and has worked tirelessly for years using her unique artistic skills to support and grow her business. Her business is her own safety net and primary source of income. Now, CHOP is ripping that business out from under her feet.

102.     Like many other local businesses, Tattoos and Fortune is sinking because of the City's support of CHOP. Ms. Sky's tattoo and fortune telling services depend on regular client access to its Capitol Hill studio. Tattoo and Fortune's studio is within CHOP, which has made client access impossible. The barricades and encampments have blocked both vehicle and foot access to the studio, as well as delivery of vital business supplies, just as they have blocked the roads, parking, doorways, and driveways of many local businesses. As a result, Ms. Sky has been forced to close Tattoos and Fortune's doors. Without clients, Tattoos and Fortune cannot generate any revenue. In addition, Tattoos and Fortune is suffering from the lack of trash service, access for emergency services, and police protection. Even if Ms. Sky's clients had access to the studio, many would be fearful to come because of CHOP. To reach her business, her clients would need to cross barricades that CHOP participants have set up, where they might be stopped, questioned, and/or harassed by CHOP participants, as others have been.

103.     Ms. Sky herself has witnessed theft and looting from other local businesses and fears CHOP participants might steal and loot from her business, should she even try to open her studio's doors. On one occasion, Ms. Sky was followed and harassed, like so many others have been due to the rise in harassment and sexual assault in the area since CHOP began. The fear of violence has caused Ms. Sky stress, exacerbated by her autism. The City has ignored her concerns, as with the mental health of many local residents and business owners. Her business—her primary means of livelihood—is losing all its revenue. Some of her clients may never return, as they have already canceled appointments and gone to other businesses.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

104.     Capitol Hill is a diverse neighborhood, known for its minority presence and as a center for Seattle' LGBTQ residents. Many small business owners in the area are minority-owned and suffering loss of property and business from CHOP, just as Tattoos and Fortune is. The City and CHOP have not responded to concerns of small businesses like Ms. Sky's Tattoos and Fortune. Ms. Sky, along with other local business owners, has no forum in which to voice her concerns and try to stem her businesses losses, accruing each day CHOP continues.

105.     *Plaintiff Bergman's Lock and Key.* Plaintiff Bergman's Lock and Key is a small business that has operated on Capitol Hill since 1956.

106.     Bergman's Lock and Key's employees are not safe to come to work due to CHOP. Several on their way to or from work have been followed by CHOP participants wielding baseball bats, who threatened them not to come into the area. To protect its property from CHOP participants, Bergman's Lock and Key has been forced to board up its premises. Its building has been tagged with graffiti and vandalized. Because CHOP becomes more dangerous as the day progresses, the company closes around 3:00 p.m., two and half hours before its normal 5:30 p.m. closing time.

107.     Bergman's Lock and Key is suffering financially. Its customers cannot access the store due to roadblocks, barricades, and lack of parking caused by the City's support of CHOP. Other customers are simply too scared to come, because of Bergman's Lock and Key's proximity to the CHOP zone. Customers have called citing their fears and the company has been forced to refer them to competitor businesses outside of the CHOP area. Bergman's Lock and Key's revenues have already declined this month by 60%, due to CHOP. Bergman's Lock and Key was able to maintain working as an essential business during the COVID-19 shutdown, but now CHOP has stopped nearly all customers from coming in. Business deliveries and shipments are also routinely delayed.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

108.     The City has been actively supporting CHOP participants near Bergman's Lock and Key. The City has provided cleaning stations for CHOP participants, large stainless-steel sinks, and portable toilets.

109.     Bergman's Lock and Key has tried to complain to the City, but has received no response.

110.     *Plaintiff Onyx HOA*. Plaintiff Onyx HOA is an association of Capitol Hill residents and condo owners in the Onyx Condominium building. The HOA and its residents have suffered harm from CHOP. The Onyx Condominium's residents feel unsafe and are constantly barraged by excessive noise, fireworks, and other nuisances. The building has been subject to graffiti and other acts of vandalism at the hands of CHOP participants. The HOA and its residents have called 9-1-1, but have received no response or direction from the City. The HOA's insurer has threatened to raise rates and premiums soon if CHOP is not disbanded. Tenants are already planning to leave, which will only make it harder for the tenants that do remain to fund the HOA. All tenants have lost value in terms of property values as a direct result of the City's support of CHOP.

111.     The Onyx Condominiums are on the border of CHOP. As a result, Onyx Condominium residents' access to their own homes has been impeded, due to barricades on the public streets. For example, the president of Onyx HOA, individual Plaintiff Wade Biller, has been stopped by CHOP participants at the barricades and told he is not allowed to drive through. He has also been stopped by a CHOP participant while trying to drive down 12th Avenue to access his home. At other times, so-called "security" for CHOP has come to the barricades and offered to escort him into the area to access his home so that CHOP participants do not vandalize his car.

112.     CHOP participants recently stole an expensive compact dumpster bin belonging to Onyx HOA. Onyx HOA's president, Mr. Biller, demanded the bin back, but CHOP participants refused to return it. During negotiations for return of the bin, Mr. Biller was assaulted by a CHOP participant who violently kicked him in the back as he tried to leave the scene. The HOA president

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

called the police, but the police did not respond to the incident of battery and assault for more than 90 minutes, by which point the perpetrator was long gone. Eventually, when CHOP participants had access to city-owned barricades to encircle CHOP, the compactor bin was returned.

113.    Onyx HOA has been forced to hire additional security to protect the property and its residents from the CHOP participants. At any time, two to four armed guards must be present, as some CHOP participants in the area have been violent and are themselves armed with guns. The HOA's residents live under constant fear and threat to their wellbeing and property.

114.    Mr. Biller, in his capacity as Onyx HOA's president, wrote to Mayor Durkan on June 11, 2020, about the plight of the building's residents. He wrote: "We are fending for ourselves as residents and businesses in the Capitol Hill neighborhood. We have had to hire private security to help keep tabs on the escalating issues . . . . I ask that you take a strong stance and allow the police to reclaim our streets for the residents who live here and don't [want] to become part of this anti-police and anti-government movement."  Mayor Durkan has not responded or provided any opportunity to challenge the City's policies supporting the occupation of the CHOP area.

115.    *Madrona Real Estate Plaintiffs.* Plaintiffs Madrona Real Estate Services, Madrona Real Estate Investors IV, Madrona Real Estate Investors VI, and 12th and Pike Associates LLC (collectively "Madrona Real Estate") are suffering economic loss from CHOP, including in the form of reduced rents, property damage, and a decline in property values. Their tenants—Capitol Hill's local residents and businesses—are also being harmed and harassed.

116.    Madrona Real Estate owns and/or manages multiple residential and commercial buildings on Capitol Hill in and around CHOP. The presence of CHOP is greatly reducing the value or property in what was, until recently, one of the most popular and expensive neighborhoods in Seattle.

117.    A resident in a building managed by Madrona Real Estate recently called 9-1-1 to respond to an incident of violence near Madrona Real Estate's building at 1414 12th Avenue. The

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

resident had witnessed from her condo's patio a fight in the street occurring at or near the intersection of 12th Avenue and Union. The resident saw what appeared to be a man and a woman fighting over a child, causing the woman to run into a nearby building and barricading the door to block the assaulting man. The resident called 9-1-1, who took her name and number. She waited for hours, but police never responded to the incident or called her back. This is just one example of the lawlessness the City has enabled in the area. The same resident has normally walked her dog in the neighbor, but now is hesitant to leave her residence. She has witnessed CHOP participants openly doing hard drugs on the street around her building with impunity due to the lack of any SPD presence.

118.    The same building at 1414 12th Avenue managed and owned by Madrona Real Estate has been broken into by CHOP participants, who have vandalized the building, pulled out pipes, and even pulled the fire alarm and set off the sprinkler system (causing evacuation of the building's over 100 residents and flooding in the building garage). Residents have also reported that CHOP participants have stolen boxes and other items from residents. CHOP participants have trespassed on the property and defecated in building's lobby.

119.    At other locations in the area, Madrona Real Estate's residents have reported that their condos have been broken into or burglarized by CHOP participants. CHOP participants have harassed residents, vandalized the Madrona Real Estate's property, and left human feces on multiple premises.

120.    SPD has refused to help Madrona Real Estate to protect private property or otherwise to help address these problems. At considerable expense, Madrona Real has had to hire increased private security to protect its residents and property. At the building where the fire system was vandalized, Madrona Real Estate has incurred considerable expense in fixing the damage to property and has even had to pay for a fire watch to be instituted.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

121.    On the morning of June 23, 2020, one of Madrona Real Estate's commercial tenants, a restaurant located at 12th Avenue and Pike Street, near but not directly in the CHOP blockaded area, was attempting to access its location in an effort to try to reopen. However, the entrances and stoop area in front of the restaurant were entirely blocked by an encampment erected by a CHOP participant. The tenant called the police, asking for assistance in removing trespassers from its private property, so that it could access and open up the property. The police said that they would not respond because they "are not allowed to come within two blocks of CHOP".



122.    Clearly, the City's refusal to even respond to assaults in the neighborhood, let alone take any measures to ensure public order and access, is detracting from the area's desirability for current and potential residents and businesses. At a new property Madrona Real Estate has opened in the area with 45 residential units, only 3 have been leased. Up until the emergence of CHOP the area was among the trendiest location for residents, but, since the emergence of CHOP, Madrona

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Real Estate has suddenly had no interest in the 42 unleased units, because no one is interested in moving near CHOP.

123.    Madrona Real Estate's residents and tenants face other hardships as well. Many of the area's millennial residents regularly shop online, but, according to Madrona Real Estate's residents and tenants, Amazon will not deliver packages in area, due the barricaded streets and presence of CHOP participants. The inability to purchase or ship through Amazon is even more acutely felt now in the midst of the COVID-19 pandemic, when many people rely on deliveries to safely deliver food, medicine, and other essential items.

124.    Most of Madrona Real Estate's commercial tenants want to open but are unable to do so, because they are fearful of CHOP, have no way of attracting customers, and/or cannot be accessed due to blocked streets. Unable to generate revenue, many of these tenants are asking Madrona Real Estate for rent relief. Many are small, locally owned stores. Madrona Real Estate has been giving concessions in the form of free rent, resulting in economic loss, but even so many of the small commercial tenants are still facing bankruptcy.

125.    The City's policies with respect to CHOP have resulted in other sources of economic loss to Madrona Real Estate. For example, Madrona Real Estate operates a parking garage near CHOP. But, since the occupation of the CHOP area started, nearly no one is coming to the area to shop or dine. Parking revenue this month is only a small fraction of the average.

126.    Madrona Real Estate has complained to the City and even sent a letter to Mayor Durkan. Mayor Durkan has not responded or even acknowledged the plight of the many residents Madrona Real Estate services, let alone provided any recourse to challenge the City's policies and conduct.

127.    *Plaintiff Hunters Capital.* Plaintiff Hunters Capital is a real-estate company that owns or manages multiple residential, commercial, and mixed-use buildings on Capitol Hill in and around CHOP. Like Madrona Real Estate, the presence of CHOP is causing economic injury to

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Hunters Capital, including loss of revenue, damage to property, and decline in property value. Hunters Capital has recently had investors back out of Capitol Hill development projects, citing CHOP as the reason to withdraw. Every day the City supports the ongoing occupation of CHOP, Hunters Capital incurs further irreparable harm.

128.    Hunters Capital property and employees have also been threatened by CHOP participants. For example, a Hunters Capital maintenance employee was recently attempting to clean up CHOP graffiti at a Hunters Capital building located near 10th Avenue and Pike Street at around 7:00 am in the morning. As he started to paint over the graffiti, the worker was accosted by a group of CHOP participants. The participants ordered him to stop removing the graffiti and threatened to burn the building down if he did not comply. Because of the threats, the maintenance worker left without painting over the graffiti, emotionally distraught due to the threats of violence and arson.

129.    Hunters Capital's residential tenants are finding that the area around CHOP is now unlivable. For example, they have reported numerous noise and safety concerns. Although the City has a noise ordinance, it is not enforced in and around CHOP. CHOP participants are violating the ordinance late into every night, even setting off fireworks into the early hours of the morning. Hunters Capital's residential tenants simply cannot sleep and are being deprived of their right to quiet enjoyment of their homes. Hunters Capital has repeatedly written to the City, but the City has not responded to the concerns or provided any recourse or ability to challenge the City's policies or conduct with respect to CHOP.

130.    Hunters Capital's residential tenants have also reported concern for their physical safety. Many who used the local Cal Anderson Park for recreation or to walk their pets no longer do so because of safety concerns and rampant public drug use. Incidents of assault and harassment have occurred in the area. Hunters Capital's residents recently witnessed a peaceful individual forcefully removed from the area by CHOP mobs. Female renters in particular have reported

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

concerns about their personal safety, in light of numerous reported instances of sexual assault within CHOP. Some residential tenants have threatened to break their leases at properties owned by Hunters Capital because of the extensive problems created by CHOP.

131.    Hunters Capital's commercial tenants are also suffering. Many report that they cannot open, because they fear doing so will expose them to looting and arson. Many tenants have themselves witnessed assault, theft, and looting. These commercial tenants have been forced by CHOP to close and board up their stores in order to protect them. Some commercial tenants physically could not open under any circumstances, as CHOP participant have blocked the store entrances, including by setting up residential areas for CHOP participants on public streets and sidewalks with tents. Unable to open, Hunters Capital's commercial tenants are struggling. Many are small businesses and storefronts that depend on visitors coming to Capitol Hill. Many currently cannot pay their rent as a direct consequence of CHOP.

132.    Other Hunters Capital commercial tenants with office space in the area have reported that they are unable to come to work at their office space, because of blocked access and fear of CHOP participants. Additionally, the commercial office tenants have reported that the noise issues are so serious that they and their employees are unable to use their office space for work. Loud speeches and chanting at all hours of the day simply make normal working conditions impossible. The vast majority of Hunters Capital commercial-office tenants report that they and their employees are simply unable to come to work at all.

133.    Hunters Capital's tenants have already begun to leave because of CHOP, and others cannot pay rent. Every day that passes more of the company's tenants leave the area, at considerable loss to Hunters Capital. Further, there is no interest from prospective tenants. As long as CHOP remains, nearly no one is interested in relocating to the Capitol Hill neighborhood.

134.    *Plaintiff Olive ST Apartments.* Olive ST Apartments is another small business on Capitol Hill that is struggling because of CHOP. Olive ST Apartments owns two apartment

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

buildings close to Cal Anderson Park. Previously a desirable location for renters, life for Olive ST Apartments' tenants has now become unlivable. The tenants have been terrified by CHOP participants carrying guns, in additional to the rampant violence, harassment, and vandalism in the area caused by CHOP. Olive ST Apartments' owner has been videotaped and harassed while trying to move a garbage dumpster several blocks outside of CHOP just so the garbage could get picked up.

135.    Due to safety concerns, Olive ST Apartments has been forced to hire private security. Nevertheless, Olive ST Apartments' buildings have been covered with graffiti multiple times. The company has tried cleaning the graffiti off, only for its buildings to be vandalized again. On several occasions, CHOP participants have attempted to break into its buildings, once breaking the lock box for mail. Olive ST Apartments has called the police, but the police told Olive ST Apartments' security guard that they would not send anyone to the area.

136.    The noise, including from Cal Anderson Park, has also made conditions for Olive ST Apartments' tenants unlivable. The company receives constant complaints about the noise at all times of day and night, including gun shots. Tenants have left to avoid the noise.

137.    In addition to ceding the nearby Cal Anderson Park to CHOP, the City has supported the CHOP participants near Olive ST Apartments by providing them with barricades, lights, toilets, handwashing stations, and fire extinguishers. The City allows CHOP participants to use bright lights at Cal Anderson Park to facilitate CHOP activities there, causing a nuisance to Olive ST Apartments' tenants.

138.    Given the unlivable conditions, it is impossible for the company to rent its apartments. Tenants are already moving out because of the nearby presence of CHOP. No new renters have interest in moving to the area. Each day CHOP continues, Olive ST Apartments incurs further harm and economic loss.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

139.    *Plaintiff Redside Partners*. Plaintiff Redside Partners performs real-estate management services to buildings near CHOP. Its business is also being hurt by CHOP. Redside Partners employees have reported that they do not feel safe coming to work, as the company's offices are near Cal Anderson Park. The company's employees report widespread lawlessness, including vandalism, graffiti, and public drug use affecting the buildings the company manages. CHOP participants have trespassed on Redside Partners's properties, including climbing up fire escapes to get on building roof tops. Redside Partners has complained to the City but has received no response.

140.    Capitol Hill's real-estate companies like Plaintiffs Madrona Real Estate, Hunters Capital, and Redside Partners have invested millions of dollars over the years to turn Capitol Hill into a desirable location, with modern condos, restaurants, and shops. They have made investments in new, state-of-the-art buildings and the restoration of many historic buildings. Over the last several decades, they have helped transform Capitol Hill into one of the nation's most vibrant and architecturally attractive neighborhoods, a diverse melting pot for both local residents as well as tourists, with the City's best boutique shopping, dining, socializing, and urban living. It has fostered a livable community for many new residents and a superstructure for many thriving small businesses, which employ thousands of employees from a diverse set of backgrounds. The immense value and wealth this has created, for Plaintiffs, the Capitol Hill community, and Seattle more generally is actively being destroyed by the City's actions.

**D.  The City Has Actively Supported and Encouraged CHOP the CHOP Participants.**

141.    In the face of all this destruction, City leaders, including Mayor Durkan, have embraced the existence, message, and methods of CHOP and CHOP Participants. They have done this with physical support and extensive verbal support and encouragement that has expressly endorsed the barricading and occupation of City streets and parks.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

142.     Since the day that the City abandoned the East Precinct, the City has had full knowledge of the problems created for businesses and residents in and around CHOP, including property damage, lack of police response, the inability for workers and residents to enter and leave the area, the inability for businesses to receive deliveries, and other adverse impacts on residents, businesses, and property owners in the area. The City has nevertheless adopted a policy supporting the CHOP occupation, acting with deliberate indifference toward those suffering harms from it. Evidence of the City's knowledge includes the following:

a.     At a June 11, 2020 press conference with Mayor Durkan, Chief Best made it clear that the City was fully aware that its 9-1-1 response times had tripled and that there was a serious public-safety crisis for anyone who lives or works in CHOP.

b.     On June 16, 2020, the City stated, via a press release from the Mayor's office:

> Beginning last Tuesday, City officials have been on site on Capitol Hill to work [to] meet community needs including hygiene, sanitation and safety. Utilities including Puget Sound Energy and SPU have been able to respond to the area for service. Seattle Police Chief Carmen Best has visited the site multiple times. Over the past week, conversations continued between City officials, organizers onsite for the CHOP, residents and businesses. … Every day, Seattle Fire Chief Harold Scoggins, Seattle Department of Transportation Director Sam Zimbabwe, and Seattle Public Utilities General Manager Mami Hara have been on site. On Sunday, they held a meeting with onsite organizers, small businesses, and residents to discuss proposed changes to the protest zone.

c.     On information and belief, Mayor Durkan and the SPD have been inundated with complaints about CHOP that describe in detail the extensive property damage, restricted access, and economic loss that residents, businesses, and property owners are suffering.

d.     In response to at least some requests from desperate businesses and residents for her to cease her support of CHOP, Mayor Durkan's office has provided a

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

stock response acknowledging that the City is "maintaining" a space for CHOP, including by, for example, providing a "sturdier concrete barrier" to help CHOP block a public street. The stock response states in part as follows:

Thank you for reaching out.

The Capitol Hill Organized Protest has emerged as a gathering place where community members can demand change of their local, state, and federal government. Capitol Hill and Cal Anderson Park have long been a gathering place for justice. While there have been inaccurate and misleading depictions of the CHOP from the President and some national media, the City believes first amendment activities can continue while also maintaining public safety and allowing access for residents and businesses who operate in the area. Mayor Durkan believes these changes can help ensure any focus of the CHOP and Cal Anderson will allow for peaceful demonstrations to continue.

Beginning last Tuesday, City officials have been on site on Capitol Hill to work [to] meet community needs including hygiene, sanitation and safety. Utilities including Puget Sound Energy and SPU have been able to respond to the area for service. Seattle Police Chief Carmen Best has visited the site multiple times. Over the past week, conversations continued between City officials, organizers onsite for the CHOP, residents and businesses. The City is committed to maintaining space for community to come to together, protest and exercise their first amendment rights. Minor changes to the protest zone will implement safer and sturdier barriers to protect individuals in this area, allow traffic to move throughout the Capitol Hill neighborhood, ease access for residents of apartment building in the surrounding areas, and help local businesses manage deliveries and logistics. Additionally all plans have been crafted with the goal of allowing access for emergency personnel including fire trucks.

Every day, Seattle Fire Chief Harold Scoggins, Seattle Department of Transportation Director Sam Zimbabwe, and Seattle Public Utilities General Manager Marni Hara have been on site. On Sunday, they held a meeting with onsite organizers, small businesses, and residents to discuss proposed changes to the protest zone. In coordination with protesters onsite, work began at 6:30 a.m. on Tuesday to remove a tent barrier at 10th and Pine and replace it with a sturdier concrete barrier to improve public safety. The City has successfully worked with protesters onsite to

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

reconfigure the CHOP to allow for public safety and better access for the local community. That has involved rerouting traffic, freeing up alley access, opened streets, and replacing makeshift barriers with heavy concrete barriers that can be painted.

e.     In addition to the numerous City officers listed above, Mayor Durkan herself has personally visited CHOP and has seen what is happening. In an interview given in her City offices on Facebook Live on June 12, 2020, Mayor Durkan made clear that she had seen the barriers and talked to CHOP participants and apparently approved of them using an individual with behavioral health issues to enforce the perimeter: "It's interesting, when I was at the CHAZ, walking around, similar kind of philosophy, because there's this one guy, some behavioral health issues, and it was like, look, he has some hard times, and he helps on that barricade over there, and then when he starts having a hard time, we just bring him over here, take care of him, feed him. And that's what you gotta do, right?"[3]

f.     On June 22, 2020, Mayor Durkan stated at a press conference:

Over the days, tens of thousands of people have peacefully gathered or visited Capitol Hill. During the day, there have been no major incidents. But we know it is very different at night, particularly in recent nights. The cumulative impacts of the gatherings and protests and the nighttime atmosphere and violence has led to increasingly difficult circumstances for our businesses and residents. Most of them supported protesters' right to gather at the outset. They stand with them in solidarity. But the impacts have increased, and the safety has decreased. Both on Saturday morning and last night there were incidents of gun violence. And that escalating violence concerns me, Chief Best, residents, businesses, and the greater community. All of Capitol Hill has been impacted.

---

[3] https://www.facebook.com/WWConverge/videos/250593506242797/?__tn__=kC-R&eid=ARBT9Zl4Zd0BnqFUyG1bgaapWeIo6meLrp9YI7QgilK36tLAFfNcpij4zHFTEwP0wNzoVQK7O1LPtpa8&hc_ref=ARTeZJ-MVhRABE0ZxnSxzApxaoAJVsmqCzhgB7vaP0wwkcuhf0CtwXnjqpvqfAIKLQk&__xts__[0]=68.ARDhXBScmD_P9GnI4X2NL4z0eUgRkuV8hj_BUWpBgtqxg133nAdZz00w2pqmYlrfVrVanpZgUlgy2rw9hbGAwTWLjcxp1fAPAVjYhDHpvEOpeSmJavdPNPPlK_wodfv_idPwOeVfsbgsB04YjUKfXfnUZvddSThmUspA_o5oqETWWFluP2o_Yh-tP64swtkdKoXl374Vd0zqTxRoapQChSzCt5dXToGlW6ESVGiUVQznk42YXs8U2lpzAwJmp99RXyrNW3fSYzUcPopUKTNN-KP7EBDNdje9UibYcP84111ipRk31bjIk5XrSRcU2rjmqzsd_KjoOwrpoHYKssQd5Vnwe6OvBXCSGW_4ctaQKXmwUcmaTA

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

g.    At the same June 22, 2020 press conference, Chief Best stated that reports to the police demonstrate that some CHOP participants are "engaging in shootings, a rape, assaults, burglary, arson, and property destruction, and I have their police reports right here. I'm not making it up. These things have happened."

143.   Despite having knowledge of exactly what is happening at CHOP by being there every day and in apparently constant contact with area residents and business owners, the City has acted with deliberate indifference toward the safety and property interests of those residents and businesses.

144.   The City has not restored regular policing to the area in or around CHOP or improved 9-1-1 response in or around CHOP.

145.   The City has also enabled the blocking of ingress and egress for businesses and residents in the area, without providing plaintiffs any notice of this deprivation or opportunity to be heard on the matter. Reportedly, the City reached an informal agreement with CHOP participants to allow limited one-way access on Eleventh and Twelfth Avenues starting on June 16, 2020 (Plaintiffs were not invited to participate in these negotiations). However, as part of that agreement, the City actually fortified the rest of CHOP with new barriers (again without providing Plaintiffs notice or an opportunity to be heard on the matter). And even the planned limited access for some streets almost immediately broke down when CHOP participants reestablished impediments. The City's response to this was apparently to do nothing.

146.   At the same time that the City has acted with deliberate indifference to property owners and people who live and work in and near CHOP, the City has physically aided, endorsed, and actively encouraged CHOP participants to continue their occupation of public spaces.

147.   The City has physically aided CHOP participants in their occupation of the area in at least the following ways:

CLASS ACTION COMPLAINT - 41

a.    When the City abandoned the East Precinct on June 8, 2020, it left behind the barriers that had previously blocked street access and protected the East Precinct from protesters. These barriers foreseeably served as the raw materials that allowed CHOP participants to block streets and create CHOP within a very short time.

b.    On June 16, 2020, the City provided even more concrete barriers to CHOP participants so that CHOP participants could replace wooden barriers and fortify their blockages of streets.[4]

c.    The City has provided portable toilets for CHOP participants that are regularly serviced.

d.    The City has provided medical equipment, including beds and other supplies, to the CHOP "medical tent."

148.    The City's policies have effectively authorized the actions of the CHOP participants. The City has communicated clearly to CHOP participants that they may indefinitely continue occupying the streets in the area, maintaining their barricades, and blocking traffic, all without interference from the City. The City has communicated this message in at least the following ways:

a.    On June 11, 2020, during a joint press conference with the Chief of Police, Mayor Durkan stated: "There's not a specific date … because we are trying to do things that are responsible."

b.    On June 12, 2020, in response to a direct question from CNN's Chris Cuomo about how long the City would allow CHOP participants to continue to occupy the neighborhood, Mayor Durkan responded, "I don't know. We could have the Summer of Love."

---

[4] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

c.      On June 16, 2020, the City announced through an official statement from Mayor Durkan that it had negotiated with CHOP participants to adjust some but not all their barriers to allow one-way traffic on Twelfth Avenue.[5] This agreement was an endorsement of CHOP participants' other barriers and its overall occupation of the neighborhood.

d.      In announcing the supposed opening of a one-way corridor, the City made clear in a statement from the Mayor that it was an active participant in maintaining and solidifying CHOP barriers and boundaries:

> The City is committed to maintaining space for community to come together, protest and exercise their first amendment rights. Minor changes to the protest zone will implement safer and sturdier barriers to protect individuals in this area, allow traffic to move throughout the Capitol Hill neighborhood, ease access for residents of apartment building in the surrounding areas, and help local businesses manage deliveries and logistics. [emphasis added][6]

e.      Also on June 16, 2020, Mayor Durkan suggested that the City agreed that police officers will only enter the occupied area for "significant life-safety issues."[7]

f.      On June 22, 2020, Mayor Durkan and Chief Best held a joint press conference in which they expressed concern about the impacts of CHOP but also suggested that there was no specific timeline or plan for lessening those impacts or removing the blockades, barriers, and tents from CHOP.

149.    The City has also made numerous statements indicating that it endorses and will continue to support what CHOP participants are doing in the area, thereby ensuring the continued and indefinite occupation and blockading of the neighborhood, and all the damage it has caused and will cause. The City's statements include at least the following:

---

[5] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/
[6] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/
[7] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

a.     On June 11, 2020, Mayor Durkan posted following on her Twitter page: "The Capitol Hill Autonomous Zone #CHAZ is not a lawless wasteland of anarchist insurrection – it is a peaceful expression of our community's collective grief and their desire to build a better world."

b.     On June 11, 2020, Mayor Durkan also posted on her Twitter page: "For the thousands of individuals who have been on Capitol Hill, I think you've seen what I've seen: the painting of Black Lives Matter along Pine Street, food trucks, spaghetti potlucks, teach-ins, and movies."

c.     On June 11, 2020, Mayor Durkan stated during a joint press conference with the Chief of Police:

> Lawfully gathering and expressing first Amendment rights, and demanding we do better as a society, and providing true equity for communities of color, is not terrorism. It is patriotism. The right to challenge government and authority is fundamental to who we are as Americans. … And for the thousands of individuals who've been on Capitol Hill, many of them, what you'll see is a painting of Black Lives Matter along Pine Street. Food trucks, spaghetti potlucks, teach-ins, movies, free granola bars . . . .

d.     During the same press conference on June 11, 2020, Mayor Durkan also stated:

> The Capitol Hill area—in fact, some of my family is up there right now—… it is not an armed ANTIFA militia no-go zone. It is, a number of people are there, we've had ongoing communications with them, with the businesses, with the residents, and we will make sure that we find some way for people to continue to protest peacefully while also getting ingress and egress. We've had blocks of Seattle in Capitol Hill shut down every summer for everything from Block Party to Pride. This is not really that much of an operational challenge. But we want to make sure that the businesses and residents feel safe and we'll continue to move that forward.

e.     During her Facebook Live interview, Mayor Durkan also stated "I was up there today, walking around, talking to people, and I think we just have to continue to listen to people and figure out a way that there's still a way for people to have that kind

CLASS ACTION COMPLAINT - 44

of free expression, but we need to open up the streets, too, at least 12th so we can get fire through, and like that, so we're going to keep talking to people and listening to them. But I heard a lot of great ideas and I heard a lot of community strength there. That was cool."

      f.     Also on June 12, 2020, during her interview with CNN's Chris Cuomo, Mayor Durkan said, "We've got four blocks in Seattle that just saw pictures of that is more like a block party atmosphere. It's not an armed takeover. It's not a military junta. We will – we will make sure that we can restore this. But we have block parties and the like in this part of Seattle all the time. It's known for that."

      g.    On June 12, 2020, Mayor Durkan endorsed the gardens being planted in Cal Anderson Park on Twitter: "Earlier today I visited the #CHAZ and met Marcus Henderson, the person behind the new community garden popping up in Cal Anderson Park. Read more about Marcus and the work that's gone into creating the gardens: thestanger.com/slog/2020/06/1."

      h.    Mayor Durkan also tweeted on June 12, 2020: "For as long as I can remember, Capitol Hill has been autonomous – it's been a place where people go to express themselves freely. Today at the #CHAZ, I spoke with organizers and community about how we can move forward and keep our communities safe, together."

      i.     Mayor Durkan tweeted on June 16, 2020: "The #CHOP has emerged as a gathering place for community to demand change of their local, state, and federal government."

      j.     On June 19, 2020, Mayor Durkan officially declared that there was no longer a state of emergency in the City because "demonstrations since that day have been and continue be largely peaceful."

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

k.     On June 21, 2020, after two people were shot in CHOP and one of theme died, Mayor Durkan issued a statement indicating that the City still had no plans to cease supporting CHOP and that the City was instead acting to work with and preserve CHOP.

## V.  **CLASS ALLEGATIONS**

150.    Plaintiffs seek to certify a class of similarly situated persons pursuant to Fed. R. Civ. Proc. 23(b)(2) and/or 23(b)(3).

151.    The Class is hereby defined as follows: All persons or entities who own property in, have a business in, or reside in the area in the City of Seattle bounded by the following streets: Denny Way, Union Street, Thirteenth Avenue, and East Broadway. This definition excludes the City of Seattle and any departments or agencies of the City of Seattle, including the Seattle Police Department.

152.    The definition of the Class is unambiguous. Plaintiffs are members of the Class, and all members of the Class can be identified through public records and notified by mail or other means of notification.

153.    The number of Class members makes joinder impractical. Plaintiffs do not know the exact number of members in the Class, but believe the total number of businesses, residents, and property owners in the Class to be in the thousands.

154.    There are numerous questions of law and fact common to the Class that predominate over any individual issues. These issues include the following:

a.  Whether the City has participated in, endorsed, or encouraged the creation, maintenance, and continued existence of CHOP.

b.  All facts regarding the existence and maintenance of CHOP including at least the following:

CLASS ACTION COMPLAINT - 46

        i.   The boundaries and nature of the SPD's "no-go" zone in and around CHOP.

       ii.   All facts and circumstances surrounding the City's participation in, endorsement of, or encouragement of the creation, maintenance, and continued existence of CHOP.

      iii.   The nature and scope of activities of CHOP participants.

c.   Whether Plaintiffs and the Class have legally protected constitutional property rights.

d.   Whether the City has infringed on those property rights by its actions with regard to CHOP.

e.   Whether the City was required to provide notice and a hearing to Class members before infringing on those property rights.

f.   Whether CHOP and CHOP participants are a nuisance within the meaning of RCW 7.48.010, et seq.

g.   Whether the City has participated in the maintenance of that nuisance.

h.   Whether the City has acted with deliberate indifference toward Plaintiffs and the Class.

i.   Whether the harm suffered by Plaintiffs and the Class was foreseeable and obvious.

j.   Whether the City's actions constitute an unlawful gift within the meaning of the Washington Constitution.

k.   Whether Plaintiffs and the Class have suffered a taking without just compensation.

l.   Whether the City's actions were pursuant to a City policy.

m.   Whether the City's actions were ratified by a City policymaker.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

n.   Whether Plaintiffs and the Class are entitled to injunctive relief.

155.   The claims of the Plaintiffs are typical of the members of the Class. All Plaintiffs reside in the Class and have been subject to the same course of conduct by the City.

156.   The Plaintiffs will fairly and adequately represent the Class. Plaintiffs are all members of the Class and have there are no conflicts between Plaintiffs and other Class members. Plaintiffs are well-informed as to the nature of this case and the claims against the City and have retained competent and experienced counsel that intend to prosecute this action vigorously.

157.   The City has acted or refused to act on grounds that apply generally to all Plaintiffs and the Class such that injunctive relief is appropriate respecting the Class as a whole.

158.   The issues that Class members have in common predominate over any individual issues. The City engaged in a common course of conduct giving rise to the harms suffered by Plaintiffs and the Class. A single, common policy is at issue in this case. Individual questions, if any, pale by comparison to the numerous common questions that dominate. The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts.

159.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the City and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. Individual litigation of the legal and factual issues raised by the conduct of the City would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the claims of the members of the Class and the uniform

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

application of Washington and federal law to the claims of Plaintiffs and the members of the Class, the Class's claims can and will be most effectively managed by a class action.

## VI.  CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION – PROCEDURAL DUE PROCESS

#### 42 U.S.C. § 1983

#### On behalf of Plaintiffs and the Class

160.    Plaintiffs incorporate all other allegations in this complaint as if set forth herein.

161.    Plaintiffs and the Class have constitutionally protected property rights, as defined by Washington state law, to exclude others from their property, to the use and quiet enjoyment of their property, and to access their property via public rights-of-way.

162.    The City has infringed on those rights, including by (1) creating, assisting, endorsing, and encouraging an indefinite, unpermitted occupation and blockade of the public streets, sidewalks, and parks in and around CHOP, thereby denying Plaintiffs access to their properties, and (2) creating, assisting, endorsing, and encouraging the pervasive vandalism and trespasses against Plaintiffs' properties, thereby denying Plaintiffs the ability to use their properties and exclude others from them.

163.    The City has infringed on Plaintiffs' constitutionally protected rights without providing Plaintiffs with any due process before depriving them of these rights, or providing any recourse following the deprivation of the rights. In particular, the City provided Plaintiffs with no notice or opportunity to be heard before or after denying the Plaintiffs of their rights to access their properties, use their properties, and exclude others from their properties.

164.    The City has done so pursuant to City policy as created, ratified, and authorized by City policymakers, including Mayor Durkan, without any notice to Plaintiffs or opportunity for them to be heard.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

165.    As a direct result of the City's actions, Plaintiffs and the Class have been denied regular and customary use of, access to, and enjoyment of their property, including the ability to drive or park in CHOP, the ability to walk to their homes or business without obstruction, the ability to accept deliveries to their homes or business, the ability to prevent and remedy vandalism, and the ability to prevent trespasses and theft against their properties.

166.    Plaintiffs and the Class have been harmed by this deprivation, including through loss of revenue, loss of property value, damages to property, and other damages.

## SECOND CAUSE OF ACTION – NUISANCE

### RCW 7.48.010 et seq.

### For injunctive relief only

### On behalf of Plaintiffs and the Class

167.    Plaintiffs incorporate all other allegations in this complaint as if set forth fully herein.

168.    As a direct result of the City's actions, foot and vehicular traffic on the public streets, sidewalks, and other right of ways surrounding Plaintiffs' businesses and residences are physically blocked and/or impeded.

169.    The blocking and impeding of foot and vehicular traffic has substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their properties, including by blocking access to those properties, and has caused harm to Plaintiffs, including by reducing property values and resulting in lost revenues.

170.    The City has directly participated in the creation and maintenance of this nuisance, including by providing concrete barriers to be used for this specific purpose to the CHOP participants.

171.    In addition to blocking public rights-of-way, the City's actions have created and maintained a series of unlawful and/or unreasonable conditions throughout the CHOP area,

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

including excessive noise, public safety hazards, vandalism, and poor health and sanitation conditions.

172.    These conditions have annoyed, injured, and endangered the comfort, repose, health, and safety of Plaintiffs, and rendered Plaintiffs insecure in the use of their properties.

173.    These conditions have substantially and unreasonably interfered with Plaintiffs' use and enjoyment of their properties, including by creating a reasonable fear among Plaintiffs of using their properties, and have caused harm to Plaintiffs, including by reducing property values, inflicting property damage, and resulting in lost revenues.

174.    Plaintiffs seek to enjoin the City to remove these nuisances on behalf of themselves and the Class.

**THIRD CAUSE OF ACTION – SUBSTANTIVE DUE PROCESS**

<u>42 U.S.C. § 1983</u>

<u>On behalf of Plaintiffs and the Class</u>

175.    Plaintiffs incorporate all other allegations in this complaint as if set forth fully herein.

176.    Plaintiffs have a right pursuant to substantive due process to be protected from state-created dangers.

177.    The City 's actions, assistance, endorsements, and encouragements of CHOP and CHOP participants have greatly increased the likelihood of property damage, loss of business revenue and rental income, personal injury, loss of use of property, and other damages to Plaintiffs.

178.    All damages suffered, and still to be suffered, by Plaintiffs were and are foreseeable.

179.    The City has acted with deliberate indifference to the known and obvious harm that would be suffered by Plaintiffs.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

180.    The City has done so pursuant to City policy as created and ratified by City policymakers, including Mayor Durkan.

## **FOURTH CAUSE OF ACTION – UNLAWFUL GIFT**

### Article VIII, Section 7 of Washington State Constitution

### On behalf of Plaintiffs and the Class

181.    Article VIII, Section 7 of the Washington State Constitution provides: "No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation."

182.    In direct violation of Article VIII, Section 7, the City has given away an interest in public property without consideration and with donative intent to CHOP participants.

183.    In particular, the City has ceded to CHOP the public's property interests in Cal Anderson Park, the Seattle Police Department East Precinct building, multiple concrete barriers, and the public streets and thoroughfares of the area occupied by CHOP participants.

184.    The City has granted CHOP participants the right to occupy and use these public properties without interference and to the exclusion of others, in direct contradiction to local law and ordinances. For example, CHOP participants have established themselves in tent encampments and have set up permanent occupation on public premises, including Cal Anderson Park. The City has also given control of the former Seattle Police Department East Precinct, which CHOP participants have renamed. Further CHOP participants have excluded members of the public from public use of Cal Anderson Park and has excluded, even under the threat of violence, SPD from making use of the East Precinct to provide police services in the area.

185.    They City and the Mayor have actively supported and abetted the takeover of public property by CHOP, through active encouragement, endorsement, and material support to CHOP

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

participants. The City's actions have resulted in the effective transfer of the public's property right to CHOP, through granting CHOP exclusive use of this property. Further, the City and Mayor's active encouragement indicates the intent of gifting this public property indefinitely for CHOP's solely private use, without any rent or benefit to the City or public.

186.     The purpose of Article VIII, Section 7 is to prevent public property from being used to benefit private interests where the public interest is not primarily served. The CHOP movement is a private movement with private ideological motives, distinct from the public at large. Indeed, CHOP participants stationed at the boundaries of the CHOP zone have actively prevented some members of the public from entering.

187.     On information and belief, the City has received no remuneration or other benefit in exchange for ceding the right to exclusively occupy public property to CHOP. The City has therefore ceded interest in public property to private individuals without any consideration.

188.     Because the City has received no consideration or remuneration from CHOP participants for the rights to use public property, the intent of the City has been to donate to CHOP participants a private benefit, not conferred on other members of the public more broadly.

189.     Not only is the public interest not served, the City's gift of public property has actively harmed the public, especially the residents of Capitol Hill. CHOP participants have used their newly gifted rights in public property ceded to them by the City as a staging ground for acts of vandalism and trespass against adjacent private property, including the properties of the Plaintiffs. The CHOP encampments in Cal Anderson Park have also facilitated acts of assault, violence, and harassment against private residents and business employees in the surrounding area. The presence of CHOP on public property ceded by the City has also had a negative economic impact, in the form of reduced property values and lost business revenues, in the Capital Hill neighborhood.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

190.     As a direct and foreseeable result of the City gifting an interest in public property to CHOP, Plaintiffs' injuries include but are not limited to: (i) deprivation of their use of that public property in Capitol Hill; (ii) the loss of police protection previously provided through the East Precinct; (iii) limitation on access to their private property; (iv) vandalism and trespass to their private property by CHOP participants; (v) damage to property; (vi) a loss in property value; (vii) a loss of business revenue; (viii) and/or other economic loss. These harms have been caused by CHOP participants residing in Cal Anderson Park and other public property ceded to them by the City.

191.     Plaintiffs have standing to assert a violation of Article VIII, Section 7 because Plaintiffs are property owners, residents, and/or business owners in the areas near Cal Anderson Park and the East Precinct. The City's gift of public property has adversely affected their interest in their adjacent private property, businesses, and/or residences, as described above. Alternatively, Plaintiffs have standing to assert a violation of Article VIII, Section 7 because Plaintiffs are all taxpayers of the City of Seattle.

192.     Plaintiffs are currently being adversely affected, and will continue to be adversely affected, by the City's gift of public property to CHOP in violation of Article VIII, Section 7 of the Washington State Constitution, unless that unlawful gifting is restrained by this Court.

## FIFTH OF ACTION – TAKING

### 42 U.S.C. § 1983

### On behalf of Plaintiffs and the Class

193.     Plaintiffs incorporate all other allegations in this complaint.

194.     Plaintiffs and the Class have constitutionally protected property rights to use and enjoy their properties, to exclude others from their properties, and to access their properties via public rights-of-way.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

195.   The City has deprived Plaintiffs of those rights by affirmatively creating, assisting, endorsing, and encouraging an indefinite, unpermitted invasion, occupation, and blockade of the public rights-of-way that provide access to Plaintiffs' private properties, as well as by affirmatively creating, assisting, endorsing, and encouraging the physical invasion of Plaintiffs' private properties by CHOP participants.

196.   The City has done so pursuant to City policy as created and ratified by City policymakers, including Mayor Durkan.

197.   Plaintiffs have not received compensation for the deprivation of their property rights.

198.   The City's actions constitute an unlawful taking for private use and/or an unlawful taking for public use without just compensation, which has caused Plaintiffs economic harm, including through a loss of property value, loss of business revenue, and a loss of investment-backed expectations.

## VII.   JURY DEMAND

Plaintiffs demand a trial by jury.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.   Judgment in favor of Plaintiffs and against Defendant for actual damages in an amount to be proven at trial;

B.   Prejudgment interest at the maximum rate allowed by law;

C.   Plaintiffs' costs of investigation, costs of suit, and reasonable attorneys' fees; and

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1    D.    All such other and further monetary, injunctive, and declaratory relief as the Court

2  may deem just and proper.

3    DATED this 24th day of June, 2020.

4                    CALFO EAKES LLP

5

6                    By  /s Patty A. Eakes
7                      Patty A. Eakes, WSBA #18888
                       Angelo J. Calfo, WSBA #27079
8                      1301 Second Avenue, Suite 2800
                       Seattle, WA  98101
9                      Phone:  (206) 407-2200
                       Fax:  (206) 407-2224
10                     Email:      pattye@calfoeakes.com
                                   angeloc@calfoeakes.com
11

12                    *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224