1

2                                        THE HONORABLE THOMAS S. ZILLY

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HUNTERS CAPITAL, LLC, a Washington limited liability company, NORTHWEST LIQUOR AND WINE LLC, a Washington limited liability company, SRJ ENTERPRISES, d/b/a CAR TENDER, a Washington corporation, THE RICHMARK COMPANY d/b/a RICHMARK LABEL, a Washington company, SAGE PHYSICAL THERAPY PLLC, a Washington professional limited liability company, KATHLEEN CAPLES, an individual, ONYX HOMEOWNERS ASSOCIATION, a Washington registered homeowners association, WADE BILLER, an individual, MADRONA REAL ESTATE SERVICES LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS IV LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS VI LLC, a Washington limited liability company, 12TH AND PIKE ASSOCIATES LLC, a Washington limited liability company, REDSIDE PARTNERS LLC, a Washington limited liability company, MAGDALENA SKY, an individual, OLIVE ST APARTMENTS LLC, a Washington limited liability corporation, BERGMAN'S LOCK AND KEY SERVICES LLC, a Washington limited liability company, MATTHEW PLOSZAJ, an individual, ARGENTO LLC, a Washington limited liability company, RANCHO BRAVO, INC., a Washington | Case No. 2:20-cv-00983 TSZ<br><br>OPPOSITION TO THE CITY'S MOTION TO DISMISS AND DENY CLASS CERTIFICATION<br><br>Noted: August 21, 2020<br><br>ORAL ARGUMENT REQUESTED |

1   corporation, SWAY AND CAKE LLC, a
    Washington limited liability company,
2   SHUFFLE LLC d/b/a Cure Cocktail, a
    Washington limited liability company, on
3   behalf of themselves and others similarly
    situated,
4
                           Plaintiffs,
5
6           vs.
7   CITY OF SEATTLE,
                           The City.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................... 1

II.    BACKGROUND ..................................................................................... 2

       A.    The Creation of CHOP.................................................................... 2

       B.    The City "Facilitated" CHOP .......................................................... 2

       C.    The City Endorsed and Encouraged CHOP...................................... 3

       D.    The Predictable and Avoidable Result Was Harm to Plaintiffs and the Class ....... 3

       E.    The City Was Fully Aware of the Harm Caused by CHOP but Acted Indifferently
             5

III.   ARGUMENT............................................................................................ 6

       A.    Standard of Review.......................................................................... 6

       B.    The First Amended Complaint Adequately Alleges Municipal Liability............... 6

       C.    Plaintiffs State a Valid Claim of Procedural Due Process ...................... 8

             1.    The City deprived Plaintiffs of the rights to access their properties........... 8

             2.    The City's policies effectively re-zoned the area in and around CHOP..... 9

             3.    The City deprived Plaintiffs of their right to free movement. ................. 10

       D.    Plaintiffs State a Valid Substantive Due Process Claim....................... 11

             1.    The City affirmatively placed Plaintiffs at a greater risk of harm. ........... 11

             2.    The First Amended Complaint adequately pleads deliberate indifference.
                   13

       E.    Plaintiffs State a Valid Equal Protection Claim.................................... 14

             1.    The City treated Plaintiffs differently from others similarly situated....... 14

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - i

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

2. At minimum, the City's unequal treatment was arbitrary and irrational. . 15

3. The City also intentionally discriminated against Plaintiffs. ................... 16

4. The City intended to inhibit Plaintiffs' constitutional rights. ................... 17

F. Plaintiffs State a Valid Takings Claim.................................................................. 19

G. The Court Should Not Dismiss the Class Allegations ......................................... 22

H. If the Court Dismisses Allegations, It Should Grant Leave to Amend................ 24

IV. CONCLUSION........................................................................................................ 24

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

**TABLE OF AUTHORITIES**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013)................................................ 22

*Abel v. City of Algona*, No. C07-956BHS, 2008 WL 4542428 (W.D. Wash. Oct. 8, 2008) ........ 17

*Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) ........................................ 20, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 6

*Basra v. Morgan*, No. 316CV06005RBLJRC, 2017 WL 6767394 (W.D. Wash. Nov. 1, 2017). 17

*Brown v. Dunbar*, No. C07-82Z, 2008 WL 11506719 (W.D. Wash. Nov. 5, 2008).................... 16

*Caquelin v. United States*, 140 Fed. Cl. 564 (2018) .................................................................... 19

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010)............................ 7

*Chong Yim v. City of Seattle*, 194 Wash. 2d 651 (2019) ........................................................... 19

*Christian Gospel Church v. City and Cnty. of San Francisco*, 896 F.2d 1221 (9th Cir. 1990).... 17

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ............................................ 14

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ....................................................... 8

*Connecticut v. Doehr*, 501 U.S. 1 (1991) ..................................................................................... 8

*Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau,* 847 F.2d
    593 (9th Cir. 1988)................................................................................................................... 14

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ........................... 11, 18

*Elliot-Park v. Manglona,* 592 F.3d 1003 (9th Cir. 2010) ........................................................... 18

*Eulitt v. City of San Diego*, No. 18-CV-2721-AJB-WVG, 2020 WL 2555776 (S.D. Cal. May 20,
    2020) ...................................................................................................................................... 18

*Fotinos v. Fotinos*, No. C 12-953 CW, 2013 WL 1195644 (N.D. Cal. Mar. 22, 2013) .............. 15

*Freeman v. City of Santa Ana*, 68 F.3d 1180 (9th Cir.1995)...................................................... 15

*Galen v. Cnty. of Los Angeles*, 477 F.3d 652 (9th Cir. 2007)....................................................... 8

*Gilbrook v. City of Westminister*, 177 F.3d 839 (9th Cir. 1999)................................................. 14

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ **-** iii

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992)..............................................................6

*Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494 (2nd Cir.2001) ...........................17

*Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008)........................................7

*Harris v. Cnty. of Riverside*, 904 F.2d 497 (9th Cir. 1990) .......................................9, 10

*Hassan v. City of New York,* 804 F.3d 277 (3d Cir. 2015) ............................................16

*Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018) ......................... 12, 13, 23

*Hernandez v. City of San Jose*, No. 16-CV-03957-LHK, 2019 WL 4450930 (N.D. Cal. Sept. 17,

2019) ...........................................................................................................................23

*Hickey v. City of Seattle*, 236 F.R.D. 659 (W.D. Wash. 2006).......................................22

*Ingram v. United States*, 296 F.Supp.3d 1076 (N.D. Iowa 2017)..................................15

*Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007)..............................................12

*Keiffer v. King Cnty.*, 89 Wash. 2d 369, 572 P.2d 408 (1977) .......................................8

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) ......................................13

*L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) ..............................................................11

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)..................................................7

*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008) ........................................15

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).........................................................7

*Lum v. Penarosa*, 2 F. Supp. 2d 1291 (D. Haw. 1998)..................................................17

*Martin v. Port of Seattle*, 64 Wash. 2d 309 P.2d 540 (1964)...........................................9

*Martinez v. City of Clovis*, 943 F.3d 1260 (9th Cir. 2019) .............................. 11, 12, 13

*Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067 (9th Cir. 2018) ......................................7

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005).................................................6

*Meyer v. Receivables Performance Mgmt., LLC*, 2013 WL 1914392 (W.D. Wash. May 8, 2013)

.................................................................................................................................22, 23

*Mission Springs, Inc. v. City of Spokane*, 134 Wash. 2d 947 (1998)...............................9

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

*Monarch Insurance Co. v. District of Columbia,* 353 F. Supp. 1249 (D.D.C. 1973)................... 21

*Monell v. Dep't of Soc. Svs.*, 436 U.S. 658 (1978) ........................................................ 6

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998)................................ 17

*Moussouris v. Microsoft Corp.*, 2016 WL 4472930 (W.D. Wash. Mar. 7, 2016) ...................... 22

*Munger v. City of Glasgow Police Dep't.*, 277 F.3d 1082 (9th Cir. 2000)................................. 12

*Neighbors for Notice LLC v. City of Seattle*, No. C12-2098 TSZ, 2013 WL 5211878 (W.D.

    Wash. Sept. 17, 2013) ............................................................................................ 9

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) ................................................... 21

*Northstar Fin. Advs., Inc. v. Schwab Invs.*, 904 F.3d 821 (9th Cir. 2018).................................. 6

*Paroline v. U.S.*, 572 U.S. 434 (2014) (not a § 1983 case).......................................... 8

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)..................................... 20

*Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272 (M.D. Ala. 2014) ...................... 10

*Portman v. Cty. of Santa Clara*, 995 F.2d 898 (9th Cir. 1993)........................................... 8

*Rubin v. City of Santa Monica*, 308 F.3d 1008 (9th Cir. 2002)........................................... 18

*Schwartz v. Uribe*, No. 5:11-CV-1174-MWF-KES, 2018 WL 7825799 (C.D. Cal. Oct. 19, 2018)

    ...................................................................................................................... 15

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662 (9th Cir.2002) .............................. 15

*Sischo-Nownejad v. Merced Cmty. Coll. Dist.,*, 934 F.2d 1104 (9th Cir. 1991) ........................ 17

*State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116 (1928)..................... 10

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302 (2002) .......... 19

*Thornton v. City of St. Helens*, 425 F.3d 1158 (9th Cir. 2005)............................................ 15, 17

*Town of Castle Rock v. Gonzalez*, 545 U.S. 748 (2005)................................................ 11

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004)......................................... 10

*United States v. Jimenez–Perez*, 659 F.3d 704 (8th Cir. 2011) .................................... 16

*United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)................................................ 6

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - v

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

*United States v. Sebastian*, 436 F.3d 913 (8th Cir. 2006)................................................ 16

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ................................. 22

*Van Pool v. City and Cnty. of San Francisco*, 752 F.Supp. 915 (N.D. Cal. 1990)...................... 17

*Vandevere v. Lloyd*, 644 F.3d 957 (9th Cir. 2011) ........................................ 19

*Vasquez v. Rackauckas*, 734 F.3d 1025 (9th Cir. 2013) ................................. 10

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000)................................... 16

*Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005)................................ 8

*White v. Roper*, 901 F.2d 1501 (9th Cir. 1990).................................... 7

*Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989) ................................. 13

**Statutes**

RCW 9A.48.090................................................................................... 9

**Rules**

Rule 23 ................................................................................................ 22

Rule 23(a)(2) ..................................................................................... 22

Rule 23(c)(4)(A) ................................................................................ 22

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - vi

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

**"WHEREAS** in the area around the Seattle Police Department's East Precinct, bounded by Broadway (west), and 13th Ave. E. (east) and E. Denny Way (north) and E. Pike Street (south) … the City [of Seattle] … *facilitated* an ongoing exercise of First Amendment rights and demonstrations by … temporarily allowing obstructions of public parks, streets and sidewalks … [m]odifying [fire and police] response protocols … [and] [m]odifying streets and pedestrian access …"

City of Seattle Executive Order 2020-08, dated June 30, 2020 (emphasis added). *See* First Amended Complaint, ¶ 180 and Appendix A to this Opposition at p. 2.

## I.   <u>INTRODUCTION</u>

For more than 3 weeks in June 2020, Defendant City of Seattle ("the City") facilitated the private occupation of an entire neighborhood in Capitol Hill.  During that occupation, known as the Capitol Hill Occupied Protest, or "CHOP," the neighborhood was a police-free zone, with public streets and sidewalks blockaded by City-provided barriers and the area filled with makeshift street vendors and tent cities.  The occupation received material physical and political support from the City, as well as the full-throated endorsement of Seattle Mayor Jenny Durkan, who took to Twitter, press conferences, and the national media to label CHOP a harmless "Summer of Love" block party.

Unfortunately, the effects on people who call Capitol Hill home were as severe as they were foreseeable.  Vandalism and other property crimes were rampant, residents either could not access their homes or were afraid to, businesses were shuttered or hampered by the inability of customers and suppliers to drive on the streets, and the public-safety response was nonexistent. And the City knew about all of this but chose to facilitate CHOP rather than protect the residents, businesses, and property owners who are now Plaintiffs in this case.

The City's motion to dismiss is nothing more than an attempt to divert the blame and attention to the CHOP participants and away from the City's role in affirmatively aiding and encouraging the harm caused by CHOP.  But in so doing, the City ignores what Plaintiffs have pled.  Plaintiffs have alleged that the City's *affirmative* actions and decisions facilitated CHOP and caused them harm.  Through these allegations, Plaintiffs have stated claims for violations of procedural due process, substantive due process, takings law, and the Equal Protection Clause.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 1

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

They have also adequately stated a plausible basis for class certification.  The City's motion should be denied in its entirety.

## II.    BACKGROUND

### A.    The Creation of CHOP

On June 8, 2020, in the face of large protests in Capitol Hill, the City decided to abandon its police precinct on Capitol Hill and hand over the neighborhood, and dozens of police barricades, to the protesters.  First Amended Complaint ¶¶ 35–36, 179.a.[1]  Within hours, the protesters had blocked off public streets and sidewalks using the City's barricades and declared the area a police-free zone that was initially called the Capitol Hill Autonomous Zone, or "CHAZ," and later called the Capitol Hill Organized (or "Occupied") Protest, known as "CHOP."  ¶¶ 37, 38.  The "official" boundaries of CHOP were between Broadway Avenue and 13th Avenue and between Denny Way and E. Pike Street and encompassed the entirety of Cal Anderson Park.  ¶ 39.

For the next 23 days, this area was occupied by thousands of people who lived in, blocked, and occupied the public streets, sidewalks, and parks at all hours, maintained their own "security" forces, and vandalized local properties.  ¶¶ 40–53.  This caused serious harm to Plaintiffs and others, as described in section II.D, *infra*.  And it was all done with the City's full knowledge, facilitation, and encouragement, as described in sections II.B, C, and E, *infra*.

### B.    The City "Facilitated" CHOP

Despite the City's present assertions, the City publicly admitted in a June 30 emergency declaration that it "facilitated" the existence of CHOP.  ¶ 180; App. A.  This facilitation included (1) providing CHOP participants with public restrooms, wash stations, water, electricity, and garbage service, (2) "allowing" CHOP participants to "obstruct[] public parks, streets, and sidewalks," (3) keeping police and fire out of the area by "modifying . . . response protocols," (4) "modifying streets and pedestrian access routes," (5) providing social services to CHOP participants, and (6) "modif[ying] city services delivery . . . ."  *Id.*

---

[1] All paragraph citations in this brief are to Plaintiffs' First Amended Complaint, Dkt. No. 9.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ **- 2**

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

But that was not even the full extent of the City's facilitation.  The City kept the lights on all night at Cal Anderson Park for the people who declared it their new home.  ¶ 179.e.  The City also provided equipment and supplies to CHOP's makeshift volunteer "medical tent" that had been erected in a restaurant parking lot.  ¶¶ 45, 179.d.  The City even provided "sturdier" barriers to fortify CHOP's boundaries and agreed that CHOP could block streets.  ¶¶ 179.b, 181.d.

The City adopted all of these policies facilitating CHOP without providing Plaintiffs any notice or an opportunity to be heard.  ¶¶ 177, 200, 201.

### C.    The City Endorsed and Encouraged CHOP

The City actively encouraged and endorsed CHOP's existence.  Mayor Jenny Durkan and then-Police Chief Carmen Best repeatedly stated that the City had no plan or timeline for clearing out the area.  ¶¶ 181, 182.k.  In a CNN interview, when pressed for a timeline, Mayor Durkan indicated that it might be a "Summer of Love" on Capitol Hill.  ¶ 181.b.  She tweeted her endorsement of illegal private gardens that had been dug into Cal Anderson Park, ¶ 182.g, and told anecdotes about how CHOP's boundaries were patrolled by unstable people.  ¶ 174.e.  She also announced after a meeting with CHOP organizers that the City would provide stronger barriers to CHOP because "the City is committed to maintaining space for community to come together . . . ." ¶¶ 181.c, d.  She declared that CHOP was "not a lawless wasteland" but rather "a peaceful expression of our community's collective grief," and repeatedly compared the occupation to a block party.  ¶¶ 182.a, c, d, f.

### D.    The Predictable and Avoidable Result Was Harm to Plaintiffs and the Class

As was easily foreseeable, the City's facilitation of CHOP caused substantial harm to those who live, work, and own properties and business in the neighborhood.

To begin with, the City "modified" its police and fire response such that neither would respond to an area within two blocks of CHOP.  ¶¶ 55, 56, 180.  Police Chief Best repeatedly stated that because of CHOP, the time it took police to respond to the area normally served by the East Precinct more than tripled.  ¶¶ 57, 174.h.  She described the increased crime in the area as "lawless

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 3

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

and brutal," ¶ 174.j, acknowledged that residents in the area were being harmed, ¶ 174.i, and stated that CHOP had "cause[d] the crime levels to go up" in the area.  ¶ 174.h.

According to the City, crime in the area increased **525%** over the same period the year before, and firearms were pervasive in CHOP.  ¶ 175; App. A, pp. 2–3.  Calls to 9-1-1 about suicides, stabbings, assaults, break-ins, and robberies either went entirely unheeded or would be discussed by officers only if the victims left CHOP to speak to them.  ¶¶ 87–90, 124–26, 132, 143. Even shootings received virtually no response.  On June 20, two shootings occurred inside CHOP. In one incident, resulting in a fatality, medics responded more than 15 minutes after the shooting, and police did not appear for more than 19 minutes.  ¶ 60.  In the second, there was no public-safety response and the victim was transported in a private van more than 35 minutes later.  *Id.* There was another shooting on June 21, with no medic or police response.  ¶ 61.  There was also a fatal shooting on June 29 that required victims to be transported by private vehicle.  ¶¶ 63–66.

There was also extensive property damage.  As Chief Best stated:

> [Y]ou have seen how absolutely devastating the damage to this neighborhood is. I can tell you personally, after walking through the area, we walked the full perimeter, I was just stunned by the amount of graffiti, garbage, and property destruction. . . .So, we don't even know how much trauma people were experiencing because of what was happening in that area.

¶ 79.  Photographs of the area and Plaintiffs' experiences confirm Chief Best's account.  *E.g.*, ¶¶ 42, 43, 50–52, 85, 96, 117, 135, 154, 161, 165, 170.

Residents were also severely affected by the lack of access to their homes, business and properties.  Streets were blocked, sidewalks and doorways were obstructed, and CHOP participants demanded that people within the occupied zone explain and justify their reasons for being there. *E.g.*, ¶¶ 60–76, 84, 94, 99, 102, 104, 105, 113, 118, 122, 128, 129, 136, 147, 172, 177.  As a result, employees could not come into work, customers could not safely access businesses, some residents even had to live elsewhere because they could not access their homes safely.  *E.g.*, ¶¶ 29, 71, 72, 77, 83, 84, 97, 99, 102, 103, 109, 117, 118, 128, 150, 172.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 4

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

In addition, there was incessant noise and other disturbances at all hours of the day and night, for weeks, with no hope of intervention from the police.  *E.g.*, ¶¶ 6, 47, 53, 75.

### E.   The City Was Fully Aware of the Harm Caused by CHOP but Acted Indifferently

The City knew exactly what was going on, yet it facilitated CHOP for nearly a month.  The City had representatives in the area every day—including Mayor Durkan, Police Chief Best, the Fire Chief, the director of the Seattle Department of Transportation, and the Seattle Public Utilities Manager—who observed CHOP and met with various constituents, including business owners and residents.  ¶¶ 174.b, d, e.

Chief Best was upfront about the City's knowledge of the public-safety crisis.  *E.g.*, ¶ 57 (June 11: "In the first day of the SPD not having access to the precinct, response times to crimes in progress were . . . about three times as long as the average"); ¶ 62 (June 22: "there are . . . groups of individuals engaging in shootings, a rape, assaults, burglary, arson, and property destruction . . . ."); ¶ 174.h (June 29: "They . . . [are] caus[ing] the crime levels to go up . . . .").

In addition to the extensive 9-1-1 calls the City received, the City also received numerous police reports demonstrating increased crime, ¶ 174.g, and extensive complaints from area residents and business owners—including several Plaintiffs.  ¶¶ 91, 100, 111, 120, 139, 152, 155, 162, 165, 174.c.  Mayor Durkan made clear on June 22 that "[a]ll of Capitol Hill has been impacted."  ¶ 174.f.  As the City acknowledged on June 30:

> Resident[s] and businesses in the area have documented incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic to residences and places of business, and multiple lawsuits and claims have been filed against the City by residents and businesses . . . .

¶ 175; App. A, p. 3.

Yet the City simply let it happen.  The City allowed the occupation to persist, and the harm to residents, businesses, and property owners to continue unabated, until July 1, 2020.  On that day, the City finally disbanded CHOP and was met with virtually no resistance.  ¶¶ 183, 184.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 5

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1

### III.   ARGUMENT

2

#### A.  Standard of Review

3

4

5

6

7

8

9

10

11

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to [the plaintiff]." *Northstar Fin. Advs., Inc. v. Schwab Invs.*, 904 F.3d 821, 828 (9th Cir. 2018).  While the Court should review the claims to determine whether they are plausible, that standard is met whenever "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In so doing, the Court can consider documents cited in the complaint, such as the Emergency Order excerpted in ¶ 175 and ¶ 180 of the First Amended Complaint and attached hereto as Appendix A.  *See, e.g.*, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

12

#### B.   The First Amended Complaint Adequately Alleges Municipal Liability

13

14

15

16

17

18

19

The City apparently contends Plaintiffs have not adequately alleged municipal liability pursuant to *Monell v. Department. of Social Services*, 436 U.S. 658 (1978).  However, the City also apparently concedes, as it should, that Plaintiffs have adequately alleged a City policy for the purposes of *Monell*.  A plaintiff can establish a municipal policy for the purposes of liability by demonstrating that the constitutional violation was (1) pursuant to a government policy, (2) committed by a person with policymaking authority, or (3) ratified by a person with policymaking authority.  *See Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

20

21

22

23

24

25

26

27

Plaintiffs have demonstrated all three because Mayor Durkan is a City policymaker.  *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).  Mayor Durkan has been directly involved in all of the alleged constitutional violations.  She has also had full knowledge of the City's actions and inactions and has endorsed and ratified them many times over, in interviews, tweets, press conferences, and official office statements, as described above in II.C and in the First Amended Complaint at ¶ 182.  And Mayor Durkan and the City also ratified the actions via the emergency order that accepted everything the City had done to facilitate CHOP.  ¶¶ 175, 180; App. A.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 6

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    The City's real argument as to municipal liability is to claim Plaintiffs have not sufficiently

2    alleged that the City's actions caused their harm.   But the City is incorrect.   As the City

3    acknowledges, the standard of proximate cause applies under § 1983.  Mtn. at 7.  All proximate

4    cause requires is that "an act or omission played a substantial part in bringing about or actually

5    causing the injury or damage to plaintiffs."   *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026

6    (9th Cir. 2008).  There can be more than one proximate cause of a constitutional injury, and the

7    "touchstone of proximate cause in a § 1983 action is foreseeability."   *Mendez v. Cnty. of Los*

8    *Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018).   The foreseeable intervening acts of other actors,

9    therefore, do not defeat causation.  *See, e.g.*, *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990).

10    Plaintiffs have adequately alleged proximate causation here.   Plaintiffs have alleged both

11   that the City's actions caused them harm and that it was foreseeable that they would be harmed.

12   ¶¶ 10, 182, 183, 202, 206, 207, 215, 230.  It was foreseeable that local residents and businesses

13   would suffer harm if the City provided barriers and supportive services to an indefinite and

14   unpermitted gathering of thousands of people in public streets and sidewalks, and then made public

15   declarations of support for those in the area.   It was also foreseeable that vandalism, property

16   damage, and other crimes would skyrocket if the City facilitated such an occupation by modifying

17   its public-safety response to not enter the area.   And the City knew it was happening and did not

18   intervene.  *See* II.E, *supra*.

19    The cases the City cites on are either inapposite or support Plaintiffs.   In *Caviness v.*

20   *Horizon Community Learning Center, Inc.*, 590 F.3d 806, 817–18 (9th Cir. 2010), for example,

21   the issue was whether a former employee could sue a private school under § 1983 merely because

22   the school was subject to regulatory oversight.   In that case, unlike here, the government was not

23   a defendant, there were no allegations the government had done anything, and proximate cause

24   was not at issue.  *See id.*; *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) (suit

25   against a private party rather than the government); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915

26   (9th Cir. 2012) ("The requisite causal connection can be established . . . by setting in motion a

27   series of acts by others which the actor knows or reasonably should know would cause others to

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 7

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    inflict the constitutional injury."); *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007)

2    (no substantive discussion of causation); *Paroline v. United States*, 572 U.S. 434, 444 (2014) (not

3    a § 1983 case).

4          **C.**     **Plaintiffs State a Valid Claim of Procedural Due Process**

5          The City's motion fails altogether to address Plaintiffs' procedural-due-process claim.

6    Plaintiffs will nonetheless explain how they have adequately stated this claim.  To state a claim

7    for a procedural-due-process violation, a plaintiff must allege (1) a liberty or property interest

8    protected by the constitution; (2) a deprivation of the interest by the government; and (3) a lack of

9    adequate notice and an opportunity to be heard.  *See Cleveland Bd. of Educ. v. Loudermill*, 470

10   U.S. 532, 542 (1985); *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  Even

11   temporary and partial deprivations of protected interests can be actionable.  *See Connecticut v.*

12   *Doehr*, 501 U.S. 1, 12 (1991).  Here, Plaintiffs have alleged three ways that the City violated

13   Plaintiffs' rights, each of which is addressed below.

14         **1.**   **The City deprived Plaintiffs of the rights to access their properties.**

15         The property interests that are protected by the Due Process Clause are created and defined

16   by state law.  *Loudermill*, 470 U.S. at 538.  Washington recognizes that individuals have the right

17   to access their properties via public rights-of-way.  *See Keiffer v. King Cnty.*, 89 Wash. 2d 369,

18   372, 572 P.2d 408 (1977) ("The right of access of an abutting property owner to a public right-of-

19   way is a property right.").  Substantially impairing access to property violates the right; for

20   example, in *Keiffer*, King County impaired a property owner's access rights by installing street

21   curbs in a way that substantially restricted—but did not wholly block—the ability of cars to access

22   the building's parking lot.  *Id.*  To substantially block access to someone's property, therefore, the

23   government must provide adequate process, meaning notice and an opportunity to be heard.  *See,*

24   *e.g.*, *Warren v. City of Athens*, 411 F.3d 697, 709 (6th Cir. 2005) (city violated due process by

25   "erecting barricades across one of the two means of access" to the plaintiff's business without

26   providing any notice or opportunity to challenge the decision).

27

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 8

1  Here, the City provided barriers that were used to block the streets in CHOP.  ¶¶ 179.a,

2  179.b.  And the City did not simply provide the barriers—it *agreed* to the blocking of the streets

3  by CHOP participants.  ¶¶ 177, 180.  These policies deprived Plaintiffs of the right to access their

4  properties, but the City did not provide notice or an opportunity to challenge them.  *Id.* ¶¶ 177,

5  201.

6  ### 2.  The City's policies effectively re-zoned the area in and around CHOP.

7  Washington also recognizes the right of individuals to use and enjoy their properties.  *See*

8  *Mission Springs, Inc. v. City of Spokane*, 134 Wash. 2d 947, 962 (1998) ("The right to use and

9  enjoy land is a property right.").  When government re-zones property to deprive owners of those

10  rights, the government must provide the owners with notice and an opportunity to be heard.  *See*

11  *Harris v. Cnty. of Riverside*, 904 F.2d 497, 501–04 (9th Cir. 1990); *Neighbors for Notice LLC v.*

12  *City of Seattle*, No. C12-2098 TSZ, 2013 WL 5211878, at *6 (W.D. Wash. Sept. 17, 2013) ("[A]

13  county may not deprive a property owner of procedural due process by rezoning land that he owns

14  without notice and an opportunity to be heard . . . .") (Zilly, J.).  Importantly, when examining a

15  government action, it is "the character of the action, rather than its label, [that] determines whether

16  those affected by it are entitled to constitutional due process."  *Harris*, 904 F.2d at 501–02.

17  Here, regardless of the label the City now uses for its conduct, the character of the City's

18  policies was to re-zone the CHOP area into, essentially, a 24-hour, 7-days-a-week block party, in

19  which any level of noise, congestion, or graffiti was permissible.  This decision deprived Plaintiffs

20  of their protected property interests in several ways.  For one, the City deprived Plaintiffs of their

21  right to access their properties.  *E.g.*, ¶¶ 37, 47; III.C.1, *supra*.  The City also deprived Plaintiffs

22  of their rights to use and enjoy their properties free from vandalism.  *E.g.*, ¶ 43; *see also* RCW

23  9A.48.090 (prohibiting vandalism).  Finally, by facilitating excessive noise at all hours of the day

24  and night, the City deprived Plaintiffs of their rights to use and enjoy their properties free of

25  excessive noise.  *E.g.*, ¶¶ 53, 155, 158; *see also Martin v. Port of Seattle*, 64 Wash. 2d 309, 313,

26  391 P.2d 540 (1964) (excessive noise interferes with the rights to use and enjoy property).  As

27

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 9

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

alleged in the First Amended Complaint, each of these policies damaged Plaintiffs' property values and enjoyment of their properties. *E.g.*, ¶ 10. Accordingly, the City was required to provide adequate process to Plaintiffs before it deprived them of their property rights by facilitating CHOP. *See Harris*, 904 F.2d at 503 ("Loss of the use and enjoyment of his land deprived Harris of no less a property interest. He was therefore entitled to constitutional procedural due process before the County deprived him of that property interest."). But the City failed to do so here, providing no notice or opportunity to be heard.

### 3. The City deprived Plaintiffs of their right to free movement.

The City's conduct also deprived Plaintiffs of their "fundamental right of free movement." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1042 (9th Cir. 2013). The City deprived Plaintiffs of that interest here by granting the CHOP participants the authority to decide who could enter and move about within the CHOP area. The Due Process Clause prohibits governments from granting private individuals or entities the "final decision-making authority with regard to others' rights." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1278 (M.D. Ala. 2014); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004) ("When a State delegates its licensing authority to a third party, the delegated authority must satisfy the requirements of due process."). For example, in *State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 122 (1928), the United States Supreme Court invalidated an ordinance that delegated authority over zoning decisions to a private group of landowners, finding it "repugnant to the due process clause of the Fourteenth Amendment."

Here, the City delegated near total autonomy over CHOP to CHOP participants, including the authority to decide who could enter and move about within CHOP. ¶ 199. Plaintiffs have alleged, for example, that the City provided barriers to CHOP participants and agreed to allow CHOP participants to control access to CHOP. ¶¶ 177, 181. CHOP participants used this delegated authority to arbitrarily and capriciously keep Plaintiffs from freely moving throughout the CHOP area. ¶¶ 7, 94, 136, 199. As in *Roberge*, Plaintiffs' rights (here, to move about freely)

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 10

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

were subject to the "will or caprice" of the CHOP participants, who were free to "withhold consent for selfish reasons or arbitrarily." 278 U.S. at 122. This delegation of authority over a fundamental right was indeed "repugnant to the due process clause of the Fourteenth Amendment," and Plaintiffs have therefore sufficiently stated a claim for violation of procedural due process.

### D.   Plaintiffs State a Valid Substantive Due Process Claim

As the City acknowledges, while the Due Process Clause does not provide a general right to be free from crime,[2] there is an exception when the government acts in such a way that a person is placed at a foreseeably increased risk of harm from third parties. Mtn. at 9. The City claims that Plaintiffs have failed to plead that (1) the City affirmatively placed them at a great risk of harm, and (2) that the City was deliberately indifferent. The City is wrong on both counts.

#### 1.   The City affirmatively placed Plaintiffs at a greater risk of harm.

To establish a state-created danger, all Plaintiffs must demonstrate is that the City left them in "situation that was more dangerous than the one" they would have been in absent the City's actions. *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). This requires only that the City took some affirmative action that increased the risk that Plaintiffs would be harmed. *See id.*

Two recent decisions from the Ninth Circuit have clarified this element, and both demonstrate that the City's actions are more than sufficient to state a claim here. In *Martinez*, a man had beaten his domestic partner but officers had not taken him into custody, and he beat her again. She sued under the state-created danger theory, and the Ninth Circuit concluded that there had been an affirmative act placing her in greater danger because, in addition to not arresting the man, an officer upon leaving the scene said to the abuser that his family was "good people." *Id.*

---

[2] The City cites extensively to cases setting forth the general rule (Mtn. at 8), but none of them apply here, as they do not address a case where the government affirmatively placed a person at risk of greater harm, as Plaintiffs have alleged the City did here. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs,* 489 U.S. 189, 201 (1989) (state did nothing in response to complaints of possible abuse; Court noted the case might have been different had the state acted to increase risk of harm); *L.W. v. Grubbs,* 974 F.2d 119, 121-22 (9th Cir. 1992) (plaintiff stated claim because state had taken action to increase risk of harm); *Town of Castle Rock v. Gonzalez,* 545 U.S. 748 (2005) (no affirmative action taken by government).

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    at 1273.  As the Ninth Circuit explained, that statement alone was enough to demonstrate the abuser

2    "felt emboldened to continue his abuse with impunity," thereby giving rise to a § 1983 claim.  *Id.*

3         In *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), attendees of a Trump rally

4    alleged a state-created danger because officers required them to exit the rally through an anti-

5    Trump crowd.  There, it was enough that officers at one exit to the building had not allowed them

6    to leave the rally, and instead required them to exit through the anti-Trump crowd.  *Id.* at 1135.

7         Here, the facts are similar to—and, in fact, exceed—what the Ninth Circuit found sufficient

8    in *Martinez* and *Hernandez*.  As in *Martinez*, CHOP participants were emboldened to continue

9    their occupation by the City's repeated words of agreement, endorsement, and encouragement, and

10   the repeated refusal of City leaders to condemn CHOP or provide any timeline for its cessation.

11   *See* II.C, *supra*.  They were also emboldened by the numerous steps the City took to physically

12   facilitate the occupation, including the City's decision to furnish CHOP with stronger barriers and

13   its agreement to let them continue to block the streets without police interference.  *See* II.B, *supra*.

14        That facilitation is directly parallel to *Hernandez*.  In *Hernandez*, the officers directed rally

15   attendees to traverse a hostile crowd; here, the City's actions ensured that residents of the area

16   would have to live in and traverse CHOP.  This is more than is required to plead the City left

17   Plaintiffs in a more dangerous place than they would have otherwise been in.

18        The City's reliance on *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007), is

19   misplaced.  There, the City adopted a passive plan of crowd management for one night, and the

20   lack of enforcement did not, alone, give rise to a state-created danger.  *Id.* at 636–37, 641.  Here,

21   in contrast, Plaintiffs have pled (and the City has admitted to) extensive affirmative actions to

22   facilitate CHOP.[3]

23        The City also claims, without explication, that Plaintiffs have not alleged a "particularized"

24   danger.  Mtn. at 11.  But Plaintiffs have done so by describing in detail how the City's actions

25

26        [3] The City also relies on *Munger v. City of Glasgow Police Dep't.*, 227 F.3d 1082 (9th Cir. 2000), but that case
     supports Plaintiffs.  *Munger* addressed a situation where an officer had left the plaintiff without transportation in a
27   dangerous neighborhood; this was enough of an affirmative act to give rise to liability.  *See id.*

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 12

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   placed them at a significantly increased risk of property damage, loss of income, noise, impeded

2   access to their properties, and crime of all kinds.  *E.g.*, ¶¶ 10, 202, 206, 207, 215, 230.  These kinds

3   of harms were certainly foreseeable, and the City does not contest otherwise.  *See* Mtn. at 10 n.5.

          **2.  The First Amended Complaint adequately pleads deliberate indifference.**

5        The City also contends Plaintiffs have not adequately pled that the City acted with

6   "deliberate indifference."  But contrary to what the City argues, deliberate indifference does not

7   require that the City intended that Plaintiffs be harmed; all Plaintiffs must establish is "that a

8   municipal actor disregarded a known or obvious consequence of his action."  *Martinez*, 943 F.3d

9   at 1274.

10       Plaintiffs have alleged that the City acted with full knowledge that its actions would and

11   did harm residents, business owners, and property owners such as Plaintiffs.  As set forth in II.E,

12   *supra*, City agents were in the area every day, observing what was going on and meeting with

13   affected residents and businesses.  The City was inundated with formal and informal complaints,

14   lawsuits, and tort claims, and the City repeatedly acknowledged that its actions caused crime and

15   vandalism to increase in the area.  Yet the City let the situation exist for nearly a month before it

16   finally decided to cease its support for CHOP.

17       That is all that is required to establish deliberate indifference: that the City was aware of a

18   danger to Plaintiffs and nonetheless continued to facilitate CHOP.  *See, e.g.*, *Martinez*, 943 F.3d

19   at 1274  (officers knew of a risk of domestic abuse but offered words of encouragement to

20   perpetrator and did not make any arrest); *Hernandez*, 897 F.3d at 1136–37  (officers knew there

21   was a risk of violence, and had seen some, but continued to place plaintiffs at risk of encountering

22   it); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064–65 (9th Cir. 2006) (officer was on notice

23   of husband's violent tendencies but placed the plaintiff at an increased risk of harm anyway); *Wood*

24   *v. Ostrander,* 879 F.2d 583, 588 (9th Cir. 1989) (officer knew he was leaving plaintiff in a high-

25   crime area but did it anyway).  Plaintiffs have adequately pled the City's deliberate indifference.

26

27

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 13

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

### E.       Plaintiffs State a Valid Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985).   To state a claim, Plaintiffs must allege "unequal treatment of people similarly situated." *Gilbrook v. City of Westminister,* 177 F.3d 839, 871 (9th Cir. 1999).  Plaintiffs have done so.

At issue here is the City's unequal treatment of the residents and businesses located in the CHOP area, as compared to other neighborhoods.  ¶¶ 218–21, 225–28.  That unequal treatment was the result of a City policy intended to favor CHOP and disfavor residents of the CHOP area. ¶ 229; *see also* II.B, II.C, *supra.*   To further that policy, the City denied municipal services to the residents within the CHOP, while providing those services to other similarly situated residents in the rest of Seattle.  *E.g.,* ¶¶ 55–56.  Doing so was part of the City's facilitation of CHOP, ¶¶ 180, 221–25, and there was no legitimate reason to deny Plaintiffs services provided to other City residents.  This unequal treatment violates the Equal Protection Clause.

### 1.   The City treated Plaintiffs differently from others similarly situated.

"The first step in equal protection analysis is to identify the [the City's] classification of groups." *Country Classic Dairies, Inc. v. State of Mont., Dep't of Com. Milk Control Bureau,* 847 F.2d 593, 596 (9th Cir. 1988).   The City does not even dispute that the City classified residents in the CHOP area into a distinct group.  Mtn. at 15–16.  Plaintiffs are part of an identifiable group, as they are all residents or businesses within a determinate geographic area whose treatment can be compared to other similar areas.  ¶¶ 13–31, 39.  A distinction by "geographic location [can]

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ **- 14**

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

serve as the basis" of an equal protection claim. *Schwartz v. Uribe*, No. 5:11-CV-1174-MWF-KES, 2018 WL 7825799, at *20 (C.D. Cal. Oct. 19, 2018).[4]

Further, the City's classification "impose[d] different burdens on different classes of people." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). The City does not dispute this either. Mtn. at 15–16. As Plaintiffs have alleged, the City uniquely denied routine services to those in the CHOP zone, especially police protection. ¶¶ 218, 227. Meanwhile, the City provided those service and police protection to other neighborhoods in Seattle—even responding to similar incidents of reported crime—that were denied to those in Plaintiffs' class. *Id.* Here, the City's selective treatment implicates the Equal Protection Clause.[5]

## 2. At minimum, the City's unequal treatment was arbitrary and irrational.

Plaintiffs have pled that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Thornton,* 425 F.3d at 1167 (*quoting SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002). "Under this standard, a State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588–89 (9th Cir. 2008) (citations omitted). Here, the refusal to provide services to the CHOP area based on a geographic classification was an arbitrary distinction without rational basis. *See Ingram v. United States*, 296 F. Supp. 3d 1076, 1083 (N.D. Iowa 2017) (distinction by "'geographic location' is or can be an 'unjustifiable standard' or an 'impermissible motive,' because . . . it is an 'arbitrary classification.'").

---

[4] Of course, Plaintiffs collectively do not constitute a special protected class, but they do not have to be to assert valid equal protection claims. *Fotinos v. Fotinos*, No. C 12-953 CW, 2013 WL 1195644, at *6 (N.D. Cal. Mar. 22, 2013) ("[M]embership in a protected class is not a prerequisite to the entitlement to equal protection . . . .").

[5] Although the City does not argue that it is applicable here (*see* Mtn. at 15), this is not a case where plaintiffs have "conflat[ed] all persons not injured into a preferred class receiving better treatment" than the plaintiffs, nor is it a situation of "different treatment of unlike groups." *Thornton v. City of St. Helens,* 425 F.3d 1158, 1167–68 (9th Cir. 2005). Plaintiffs have alleged that the Capitol Hill neighborhood of the CHOP zone is similarly situated to other neighborhoods, in terms of City's provision of services such as police protection. ¶ 227. Nor are Plaintiffs simply lumping together those injured by the City's classification. The City's classification relates to all businesses and residents within a specific geographic area and does not depend on the fact of injury alone.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 15

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Plaintiffs pled this theory, ¶ 225, but the City does not even attempt to argue that its actions satisfied the bare minimum of rational basis review.  Mtn. at 16.  Instead, the City misstates the law by suggesting that Plaintiffs can succeed only by showing "malice" behind the City's selective refusal of services to residents of the CHOP zone.  Mtn. at 16.  Although malice may certainly result in a violation of equal protection, actions that are simply irrational or arbitrary also fail to satisfy the equal protection analysis.  *Hassan v. City of New York,* 804 F.3d 277, 298 (3d Cir. 2015) ("intentional discrimination" need not be motivated by "ill will, enmity, or hostility").[6]

Tellingly, while the City suggests that selective law enforcement is always "discretionary," it does not, and cannot, point to any actual basis that could justify the geographic distinction here. That is because singling out and designating a certain neighborhood as a "no response" zone is precisely the type of arbitrary classification the Equal Protection Clause prohibits.  *United States v. Sebastian*, 436 F.3d 913, 916 (8th Cir. 2006) ("[I]t is difficult to imagine a sentencing disparity less warranted than one which depends on the accident of the judicial district in which the defendant happens to be arrested.") (citations omitted), *abrogated on other grounds by United States v. Jimenez–Perez*, 659 F.3d 704 (8th Cir. 2011).  At a bare minimum, the First Amended Complaint asserts an equal protection claim due to the City's arbitrary unequal treatment, and the Court should reject the City's attempt to dismiss this claim.

### 3.   The City also intentionally discriminated against Plaintiffs.

Plaintiffs have alleged that the City intentionally discriminated against them.  Although the City is correct that many courts require "discriminatory intent" as part of an equal protection claim, the City is incorrect that allegations of "intent" must expressly include the word "animus."  Mtn. at 15.  In fact, courts have found that the fact that Plaintiffs "were treated differently than those

---

[6] For example in *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000), the Supreme Court found that a state action that was "irrational and wholly arbitrary" was sufficient to assert an equal protection claim "quite apart from the Village's subjective motivation" because irrational and arbitrary state actions "are sufficient to state a claim" without a showing of "subjective ill will" (i.e. malice).  *See also Brown v. Dunbar*, No. C07-82Z, 2008 WL 11506719, at *3 (W.D. Wash. Nov. 5, 2008) ("[T]hough [s]elective enforcement of valid laws, without more, does not make the the defendant's action irrational, there is no rational basis for state action that is malicious, irrational or plainly arbitrary.").

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 16

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

similarly situated" alone is equivalent to alleging "facts plausibly showing that the defendants acted with discriminatory intent." *Basra v. Morgan*, No. 316CV06005RBLJRC, 2017 WL 6767394, at *12 (W.D. Wash. Nov. 1, 2017) (citing *Thornton*, 425 F.3d at 1166–68). As the Ninth Circuit has explained, "[Section] 1983 claims based on Equal Protection violations must plead intentional unlawful discrimination __*or* **allege facts that are at least susceptible of an inference of discriminatory intent**__." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998) (emphasis added).

In other words, all that is required to plead intent is that a plaintiff allege "that similarly-situated classes received different treatment." *Lum v. Penarosa*, 2 F. Supp. 2d 1291, 1293 (D. Haw. 1998) (citing *Christian Gospel Church v. City and Cnty. of San Francisco*, 896 F.2d 1221, 1225 (9th Cir. 1990)). That is what Plaintiffs have alleged (III.E.1, *supra*) and all that is required. *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991) (discriminatory intent can be inferred from different treatment; "very little" circumstantial evidence needed show intent); *Van Pool v. City and Cnty. of San Francisco*, 752 F. Supp. 915, 927 (N.D. Cal. 1990) (§1983 plaintiff must prove purposeful discrimination by "demonstrating that he receiv[ed] different treatment from that received by others similarly situated.").[7]

**4.**

**5.  The City intended to inhibit Plaintiffs' constitutional rights.**

Plaintiffs have also alleged that the City's selective treatment was based on a policy intended to favor the political speech of the CHOP participants at the expense of the free-speech rights of CHOP-area residents.  ¶¶ 218–24.  All Plaintiffs must show is that the City's "selective treatment was based on impermissible considerations such as . . . [an] **intent to inhibit** … the

---

[7] The City has in fact not disputed that the City treated Plaintiffs' class differently, but even if the City did take issue with the allegations that other neighborhoods of Seattle are valid comparators, "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ **-** 17

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

exercise of constitutional rights." *Abel v. City of Algona*, No. C07-956BHS, 2008 WL 4542428, at *12 (W.D. Wash. Oct. 8, 2008) (emphasis added).

It is axiomatic that "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." *Elliot-Park v. Manglona,* 592 F.3d 1003, 1006–07 (9th Cir. 2010); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."). Where different treatment "affects a fundamental right [free speech]," courts apply heightened scrutiny to the government's actions, such that government discrimination must to narrowly tailored to a compelling government interest. *Eulitt v. City of San Diego*, No. 18-CV-2721-AJB-WVG, 2020 WL 2555776, at *2 (S.D. Cal. May 20, 2020); *see also Rubin v. City of Santa Monica*, 308 F.3d 1008, 1019 (9th Cir. 2002).

The City's policy of declining to enforce the laws against CHOP participants because it favored their political viewpoints affected the fundamental right of free speech, which necessarily *disfavored* residents within CHOP. Analogously, bias "in favor" of one racial group has been found to violate the Equal Protection Clause in selective-enforcement cases, precisely because such favoritism necessarily entails *disfavor* to others. *See, e.g.*, *Elliot-Park,* 592 F.3d at 1006–07 (refusal to investigate crime out of favoritism for one racial group).

Plaintiffs have alleged the City's facilitation of CHOP was pursuant to a policy to create an "autonomous" zone in which only certain viewpoints (those favorable to CHOP) could be expressed. ¶¶ 222–24. Plaintiffs, who opposed CHOP's occupation, could not voice their opposition publicly and were even threatened with violence when taking small actions that CHOP participants believed showed inadequate allegiance to the CHOP cause. ¶¶ 154, 224.[8] As a result,

---

[8] In so far as the City suggests (Mtn. at 14) Plaintiffs merely are complaining about the private actions of individuals (the protestors), that assertion fails for the same reason as the due process claim. III.C, *supra*. Furthermore, it clearly is inapplicable to direct actions taken by the City, such as the creation of a "no response" police zone.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 18

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

the City stifled Plaintiffs' ability to speak out against the government's actions in their own neighborhood from their very homes and businesses.  Because the City's conduct selectively favored the CHOP participants and thereby disfavored Plaintiffs on the basis of political speech, and in a way that inhibited the free-speech rights of Plaintiffs, the City must shows that its conduct was narrowly tailored to a compelling government interest, but the City does not even argue it could meet that burden of strict scrutiny here.

F.      Plaintiffs State a Valid Takings Claim

Plaintiffs have alleged two ways in which the City violated the Takings Clause of the U.S. Constitution.  The first way—and the only one the City addresses—was by depriving Plaintiffs of their rights to access their properties.  The second way—which the City ignores—was by enabling CHOP participants to physically invade properties.

In seeking to dismiss these takings claims, the City rests its entire argument on the premise that "[u]nder *Washington law*, temporary interferences with a property right are not constitutional takings of property."  Mtn. at 12 (emphasis added).  But even if this premise is true, it is irrelevant: although state law determines whether a property right exists, it is *federal* law that determines whether the property right was unconstitutionally taken without just compensation.[9]  *See Vandevere v. Lloyd*, 644 F.3d 957, 963–64 (9th Cir. 2011) ("[W]hether a property right *exists* . . . is a question of state law. . . . [W]hether a property right has been *abridged* improperly (taken without just compensation) . . . is a question of federal law." (emphasis in original)).[10]  And, under federal law, a temporary deprivation of property *can* amount to a taking even if the owner was not deprived of all economic use.  *Caquelin v. United States*, 140 Fed. Cl. 564, 578 (2018).  Indeed, as the Supreme Court explained in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional*

---

[9] As explained in III.C, *supra*, Plaintiffs have protected property rights under state law, including the rights to access, use, and enjoy their properties.

[10] Even if state takings law were relevant, cases interpreting federal law would still be more persuasive than the cases cited by the City.  In *Chong Yim v. City of Seattle*, the Washington Supreme Court clarified that there is no state-specific regulatory-takings law and disavowed any prior Washington State precedent that suggested there was.  194 Wash. 2d 651, 662, 451 P.3d 675 (2019) ("[W]e disavow our precedent, adopt the federal definition of regulatory takings.").

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 19

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    *Planning Agency*, 535 U.S. 302, 337 (2002), "the temporary nature of a land-use

2    restriction . . . should not be given exclusive significance one way or the other." *See also Ark.*

3    *Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) ("[G]overnment-induced flooding

4    temporary in duration gains no automatic exemption from Takings Clause inspection.").

5           Rather than relying on categorical rules when analyzing temporary interferences, courts

6    instead rely on situation-specific, factual inquiries. *Id.* at 32; *Penn Cent. Transp. Co. v. City of*

7    *New York*, 438 U.S. 104, 124 (1978). For regulatory takings, this inquiry focuses on three factors:

8    (1) the economic impact of the government action; (2) the extent to which that action "interfered

9    with distinct investment-backed expectations"; and (3) "the character of the governmental action."

10   *Penn Cent.*, 438 U.S. at 124 .

11          Here, Plaintiffs have alleged that the City violated the Takings Clause by depriving

12   Plaintiffs of the right to access their properties. As to the first factor—the economic impact—

13   Plaintiffs have alleged that, even if the lack of access ultimately did prove temporary, they still

14   suffered extensive economic damages from the inability to access their properties. ¶¶ 69–78, 215.

15   As to the second factor—interference with expectations—Plaintiffs have alleged that when many

16   of them invested in their properties, they relied upon the reasonable expectation that customers

17   and suppliers would be able to access them. ¶¶ 83–84, 94, 101–02, 104, 153, 215. And as to the

18   third factor—the character of the government action—as the Supreme Court explained in *Penn*

19   *Central*, "a 'taking' may more readily be found when the interference with property can be

20   characterized as a physical invasion by government, than when interference arises from some

21   public program adjusting the benefits and burdens of economic life to promote the common good."

22   438 U.S. at 124 (citation omitted). Here, the City's conduct can indeed be characterized as a

23   physical invasion, rather than a mere adjusting of the benefits and burdens of economic life. The

24   City's conduct created and enabled an unprecedented physical occupation of the streets and

25   sidewalks throughout CHOP, and it was this physical invasion that blocked access to Plaintiffs'

26   properties. ¶¶ 177–78.

27

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 20

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

For physical takings, the factual inquiry focuses on a similar set of factors: (1) the duration of invasion; (2) whether the government intended the invasion or the invasion was otherwise foreseeable; (3) the character of the land at issue; (4) whether the invasion interfered with reasonable investment-based expectations; and (5) the severity of the interference.  *See Ark. Game*, 568 U.S. at 38–39 .  Here, even though CHOP did prove—in retrospect—to be temporary, the City violated the Takings Clause by enabling CHOP participants to physically invade Plaintiffs' properties.  Plaintiffs have alleged that the City could have foreseen (and actually saw) that its policies would result in property damage and trespasses against Plaintiffs' private homes, storefronts, small businesses, and other properties.  ¶¶173–84, 206, 207.  And the fact that third parties, rather than City employees, invaded Plaintiffs' properties does not immunize the City, as takings claims are frequently premised on a government's decision to allow third parties to access private properties.  *See, e.g.*, *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987) (requiring property owners to allow third parties to cross property is a taking).  The resulting damage was severe and indeed interfered with Plaintiffs' reasonable investment-backed expectations.  *See* II.D, *supra*.

The City attempts to leapfrog these obligatory factual inquiries by citing cases in which the government's efforts to quell civil unrest were found not to be takings. Mtn. at 13–14.  But those cases do not preclude Plaintiffs' claims.  For one, unlike in the cases cited by the City, Plaintiffs here have alleged that the City was not trying to *quell* the unrest created by CHOP, but was instead affirmatively facilitating it.  ¶¶ 180, 212.  And even if the cases cited by the City were on point, Plaintiffs' allegations would still be sufficient under the standard applied in those cases.  As the court explained in *Monarch Insurance Co. v. District of Columbia*, 353 F. Supp. 1249, 1255 (D.D.C. 1973), a government's response to civil unrest is exempt from takings liability if (1) the injured private party was "the particular intended beneficiary of the governmental activity"; or (2) the injured party would have been no better off if the government had provided no form of protection at all.  Neither of those situations applies here.  Plaintiffs were not the intended beneficiaries of the government's actions—the CHOP participants were—and Plaintiffs' injuries

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 21

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    were caused by the government's support for the CHOP participants, not efforts to quell them.  By

2    supporting the CHOP participants, moreover, the City left Plaintiffs worse off than if the

3    government had done nothing at all, as it was the City's facilitation of CHOP that allowed CHOP

4    participants to damage Plaintiffs' properties so pervasively.  ¶¶ 179–80.

5            The Court should deny the City's motion to dismiss Plaintiffs' takings claim.

6    **G.      The Court Should Not Dismiss the Class Allegations**

7            The City has moved the Court for dismissal of the class allegations, but such motions are

8    rarely granted and are appropriate only when it is clear "the claim *could not possibly proceed* as a

9    class." *Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2016 WL 4472930, at *4 (W.D. Wash.

10   Mar. 7, 2016) (emphasis in original).  The City does not even come close to clearing that hurdle.

11           As with all allegations in a complaint, class allegations are entitled to the presumption of

12   truth, and must be upheld if they are plausible.  *See, e.g.*, *Meyer v. Receivables Performance*

13   *Mgmt., LLC*, No. C12–2013RAJ, 2013 WL 1914392, at *2 (W.D. Wash. May 8, 2013).  Plaintiffs'

14   allegations in this case demonstrate that all their alleged harms stem from a singular course of

15   action from the City that created central legal and factual issues common to all Plaintiffs and the

16   Class. ¶¶ 192, 193.

17           The City broadly claims, without support, that civil-rights cases involving varied harms

18   cannot be certified because they cannot satisfy the commonality requirements of Rule 23(a)(2).

19   Mtn. at 18.  That is a misstatement of Rule 23(a)(2) , which requires only that there be a single

20   common issue that, once resolved, will generate an answer apt to drive toward resolution of the

21   litigation.  *See, e.g.*, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013).  Once

22   such an issue is identified, the Court can determine whether to certify all issues of liability and

23   damages, or only certify resolution of the common issues.  *See* Fed. R. Civ. P. 23(c)(4); *Valentino*

24   *v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Rule 23 authorizes the district court

25   in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class

26   treatment of these particular issues.").  Indeed, another judge of this Court has certified a liability-

27

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 22

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

only class in a civil-rights case against the City, and left damages for determination on an individual basis. *See Hickey v. City of Seattle*, 236 F.R.D. 659, 666–67 (W.D. Wash. 2006).

Here, Plaintiffs have identified extensive common issues that support certification of a class. Those include the legal issues raised by the current motion, as well as factual issues such as whether the City affirmatively facilitated CHOP, whether the harm to Plaintiffs and the Class was foreseeable, and the extent of the City's knowledge of and participation in that harm. ¶ 189.

Given the existence of these core common questions, the Court should allow discovery to commence so that it can have a full record before it decides any class-certification motion. *See, e.g.*, *Meyer*, 2013 WL 1914392, at *2 (W.D. Wash. May 8, 2013) ("It is entirely plausible that [plaintiffs], after discovery, will be able to demonstrate not only common questions, but common questions that predominate over individualized inquiries. Perhaps [the defendant] is correct that consent or other issues will ultimately require an individualized inquiry, but there is no way to make that determination now. [The] motion illustrates why courts typically decide class certification after discovery, not on the pleadings.") What matters for present purposes is that Plaintiffs have plausibly pled the existence of common issues and a certifiable class.

The City's reliance on *Hernandez v. City of San Jose*, No. 16-CV-03957-LHK, 2019 WL 4450930 (N.D. Cal. Sept. 17, 2019) is misplaced. Most obviously, that ruling was not on the pleadings, but rather was after discovery. *Id.* at *2–5. And while the court declined class certification, that was largely due to the fact that the plaintiffs in that case (1) based their claims on decisions made by individual officers on the scene rather than a singular policy and (2) sought to certify clearly individualized damages such as personal and psychological injuries. *Id.* at *15, 17. Notably, the plaintiffs apparently did not seek to certify only certain issues or certain types of damages. *See generally id.* at *15–18. In contrast, Plaintiffs in this case point to a singular course of conduct by the City that gives rise to each of their claims and are seeking damages subject to common methods of valuation.

OPPOSITION TO THE CITY'S MOTION TO
DISMISS AND DENY CLASS CERTFICATION
Case No. 2:20-cv-00983 TSZ - 23

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1   It may be that following discovery, Plaintiffs seek to certify only certain issues, certain
2   claims, or certain categories of damages.  The Court should allow that process to play out and not
3   consider class certification without a complete record.  Plaintiffs have plausibly pled the existence
4   of a certifiable class, and the Court should deny the City's preemptive motion.

5   **H.      If the Court Dismisses Allegations, It Should Grant Leave to Amend**

6   If the Court dismisses some or all claims in this case, Plaintiffs request an opportunity to
7   amend the First Amended Complaint to remedy the deficiencies.

8   **IV.      CONCLUSION**

9   For the reasons stated above, Plaintiffs respectfully submit that the Court should deny the
10  City's motion in its entirety.

11  DATED this 17th day of August, 2020.

12                              CALFO EAKES LLP

13

14                              By  */s Patty A. Eakes*
                                  Patty A. Eakes, WSBA #18888
15                                Angelo J. Calfo, WSBA #27079
                                  1301 Second Avenue, Suite 2800
16                                Seattle, WA  98101
                                  Phone:  (206) 407-2200
17                                Fax:  (206) 407-2224
                                  Email:      pattye@calfoeakes.com
18                                            angeloc@calfoeakes.com

19                              *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

APPENDIX A



**City of Seattle**
Mayor Jenny A. Durkan

**Office of the Mayor**
**City of Seattle**
Jenny A. Durkan, Mayor

**Executive Order 2020-08: To provide City departments direction on a coordinated City response with respect to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park.**

*The purpose of this Executive Order is to direct Departments to coordinate the City's response to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park.*

**WHEREAS,** the killing of George Floyd by a police officer in Minneapolis on May 25, 2020, has generated anger and outrage across the United States, resulting in mass demonstrations; and

**WHEREAS,** the City supports the people's right to lawful assembly guaranteed by the Constitution of the United States of America and the Constitution of the State of Washington. Due to the current State of Emergency and the Governor's Stay Home Stay Healthy Order, the City was unable to issue a parade and/or demonstration permits to groups who wished to lawfully assemble to voice their opinions, and plans to escort parades and otherwise assist in the safe and lawful right of speech and assembly; and

**WHEREAS,** the City recognizes that parades and demonstrations which will travel upon public streets and sidewalks, will disrupt and impair pedestrians, motorists and transit, and the City recognizes that some disruption is part of the rights of free speech and lawful assembly which the City will safeguard; and

**WHEREAS**, much of the expression has been peaceful and created community solidarity for Black Lives Matter, including features such as a community garden, public art, and conversation corner; and

**WHEREAS,** to date, City departments have more than reasonably accommodated protestors by offering services and shelter. The City has spent weeks on voluntary efforts to urge people to leave the Cal Anderson Park area given the emerging circumstances and recent shootings; and

**WHEREAS**, in the area around the Seattle Police Department's East Precinct, bounded by Broadway (west) and 13th Ave E. (east) and E Denny Way (north) and E. Pike St. (south) (defined as "Cal Anderson Park Area"), the City has reasonably facilitated on ongoing exercise of First Amendment rights and demonstrations by:

- Providing basic hygiene, water, litter and garbage removal, and electricity;
- Temporarily allowing obstructions of public parks, streets, and sidewalks;
- Modifying SPD and SFD response protocols to meet public safety needs to the extent possible within this area;
- Modifying streets and pedestrian access routes;
- Providing social services outreach and engagement along with referrals for shelter, behavioral health and other supports for individuals in need; and
- Facilitating modified city services delivery to local residents and businesses impacted by the events in this area.

**WHEREAS**, the City's obligations under the First Amendment do not require the City to provide limitless sanctuary to occupy City property, damage City and private property, obstruct the right of way, or foster dangerous conditions; and

**WHEREAS**, after significant national attention, many protestors have left the area but the conditions in the Cal Anderson Park Area have deteriorated to the point where public health, life, and safety are threatened by activities in and around this area, as supported by the following facts:

- On June 20, 2020, the first of three incidents of firearms violent with multiple victims occurred; one individual was shot and killed, and another was shot and seriously injured.
- First responders from the Seattle Fire Department and Seattle Police Department were denied safe access to the area by hostile crowds, including armed individuals, and obstructions.
- On June 22, 2020, a second incident involving firearms violence injured two addition individuals. On June 26, 2020, SDOT employees attempted to remove a limited number of barriers, but unarmed employees were met with hostility and weapons. SDOT could not conduct operations.
- Access by first responders to emergencies have been impeded further. On the morning of June 28, demonstrators moved the concrete barriers to completely restrict access of fire and medics on multiple roads. Demonstrators had previously agreed to open these areas to access for residents, businesses, city services, and fire.
- On June 29, 2020, a juvenile was shot and killed, and another juvenile was seriously injured in the immediate vicinity of this area. Evidence indicates that this murder may have been committed by individual(s) "occupying" the area.
- On June 30, 2020, SDOT removed a limited number of barriers with SPD, but was quickly met with agitated opposition to the removal.
- In addition, SPD has received numerous reports of narcotics use and violent crime, including rape, robbery, assault, and increased gang activity. An increase of 525%, 22 additional incidents, in person-related crime in the area, to include two additional homicides, 6

additional robberies, and 16 additional aggravated assaults (to include 2 additional non-fatal shootings) between June 2nd and June 30th, 2020, compared to the same period of time in 2019.

- Residential and businesses in the area have documented incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic to residences and places of business, and multiple lawsuits and claims have been filed against the City by residents and businesses impacted by the activities in this area.

- Significant damage has been caused by those remaining unlawfully in the area to City property, including Cal Anderson Park and the East Precinct facility.  The full extent of damage to the East Precinct remains an open question until city employees are allowed access to the site in order to make that assessment.

- Open fires and vehicles on the reservoir are placing important regional water infrastructure located within Cal Anderson at risk.

- An alarming recent rise in COVID-19 numbers across the region, coupled with a lack of social distancing in this area, and the daily attraction to this area of outside individuals place the neighborhood at opening businesses at increased risk for outbreaks.

- A pervasive presence of firearms and other weapons has been well-documented.

- Ongoing violations of the Seattle Parks and Recreation's Code of Conduct have been observed, including camping and parking in the park, conduct that unreasonably deprives others of the use of parks, disrupting Seattle Parks and Recreation business, dumping trash and/or creating unsanitary conditions or health hazards that violate public health rules; behaviors that impede restroom use; urinating or defecating, except in designated restroom fixtures, blocking entrances, exits, fire exits, disabled access areas, public walkways; conduct that creates an unreasonable and substantial risk of harm to any person or property; and abusive and harassing behavior; and

**WHEREAS**, significant property damage has been attempted on the East Precinct, to include arson, and the extent of damage has not been fully assessed due to lack of access to the building; and

**WHEREAS**, SPD has observed and is aware of credible threats against other City infrastructure, to include the West Precinct, which houses city-wide 911 communications services; and

**WHEREAS**, the City, recognizing the pivotal momentum and opportunities for social justice and public safety reforms that events following the murder of George Floyd has generated, has attempted in good faith to engage protestors in productive dialogue; and

**WHEREAS**, the City remains committed to re-imagining policing and making significant investments into the community and continuing outreach, engagement, and opportunity for community input in re-examining the role of police and the reform of social services; and

**WHEREAS,** since 12:00 pm on June 30, Cal Anderson Park has been closed pursuant to an emergency rule closing the park to address life safety and property issues; and

**WHEREAS**, while thousands of peaceful people have travelled to the area, police and city employees have encountered hostile and armed individuals in this area who have indicated by their actions and words their intent to resist government intervention with physical violence that have caused concern for the safety of the legal residents and city employee safety if current circumstances persist; and

**WHEREAS**, based on the known ongoing criminal activity in and around the Cal Anderson Park Area, it is anticipated that there will be exigent circumstances that require immediate action by SPD to protect and preserve public safety and welfare.

**NOW, THEREFORE**, I, Jenny A. Durkan, Mayor of Seattle, hereby directs all City departments to work in coordination to respond to the observed and reported exigent life safety, public health, and property issues in and around Cal Anderson Park Area, which is defined as the areas bounded by Broadway (west) and 13th Ave E. (east) and E Denny Way (north) and E. Pike St. (south).

1. Effective at 12:00 pm noon on June 30, 2020, Cal Anderson Park was closed. At 2:00 am on July 1, 2020, the entirety of the Cal Anderson Park Area shall be closed to the public to restore public safety, open roadways, remove obstructions to roadways and public rights of way, and to accomplish full closure and restoration/cleaning of Cal Anderson Park. All departments shall coordinate as follows to accomplish this work.

2. All persons who are unlawfully occupying Cal Anderson Park area who are in public rights of way or the park shall be directed to leave the closed area immediately.

3. The Seattle Police Department shall enforce this closure and provide dispersal orders for anyone refusing to vacate the area immediately. Persons who refuse or intentionally fail to obey this closure order to move and disperse from the area will be subject to arrest.

4. Any use of force shall be consistent with SPD policy and the terms of the Preliminary Injunction issued in *Black Lives Matter v. City of Seattle*, No. 20-CV-887.

5. In coordination with Seattle Parks and Recreation and the Human Services Department, as necessary SPD officers shall in their discretion remove or arrest individuals who are trespassing in the Cal Anderson Park Area in violation of the parks closure and who refuse to leave, including exigent arrests of individuals who may be occupying a tent or other obstruction or created structure in a public right of way, or in the Cal Anderson Park Area.

6. All reasonable efforts will be made by the city departments to assist individuals in accessing necessary services, shelter, or transportation and in packing and/or storing any personal property, including tents.  The City shall take reasonable steps to separate personal property from material that is not personal property, provided the segregation does not pose a danger to the individual segregating the personal property from the other material.

7. Due to the safety risks and ongoing threats to City buildings, SPD is authorized to maintain a reasonable security buffer around the East Precinct and control entry into those areas in order to limit any obstructions to access.

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 5 of 3
June 30, 2020

8.  SDOT is directed to remove all barriers and obstructions that impede foot traffic or vehicular traffic in the Cal Anderson Park area, and to maintain open sidewalks and streets going forward.

9.  Seattle Park and Recreation is directed to begin cleaning, remediation and restoration of Cal Anderson Park.

10. Seattle Public Utilities is directed to inspect and secure all water facilities, and to end any temporary utility service modifications to the area;

11. Seattle Public Utilities, together with Finance and Administrative Services, Office of Economic Development and other Departments as needed shall work with the community to ameliorate all graffiti and property damage;

12. City Light shall be called to inspect any power issues identified during the operation;

13. Department of Human Services is directed to continue providing social services outreach and engagement along with referrals for shelter, behavioral health, and other supports for individuals in need;

**14.** Seattle Parks and Recreation shall engage the community, businesses, residents and protest leaders to develop a parks plan to preserve the public art, create a community garden and other possible features like a conversation corner.

15. This Order shall be limited to ten days or until further notice, whichever comes first.

16. Inquiries regarding this Executive Order should be directed to Senior Deputy Mayor Mike Fong, Office of the Mayor.

Dated this 30th day of June, 2020.

Jenny A. Durkan
Mayor of Seattle