1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

HUNTERS CAPITAL LLC,
NORTHWEST LIQUOR AND WINE
LLC, SRJ ENTERPRISES, THE
RICHMARK COMPANY, SAGE
PHYSICAL THERAPY PLLC,
KATHLEEN CAPLES, ONYX
HOMEOWNERS ASSOCIATION,
WADE BILLER, MADRONA REAL
ESTATE SERVICES LLC,
MADRONA REAL ESTATE
INVESTORS IV LLC, MADRONA
REAL ESTATE INVESTORS VI
LLC, 12TH AND PIKE
ASSOCIATES LLC, REDSIDE
PARTNERS LLC, MAGDALENA
SKY, OLIVE ST APARTMENTS
LLC, BERGMANS LOCK AND
KEY SERVICES LLC, MATTHEW
PLOSZAJ, ARGENTO LLC,
RANCHO BRAVO, INC, SWAY
AND CAKE LLC, & SHUFFLE
LLC,

                    Plaintiffs,

        v.

CITY OF SEATTLE,

                    Defendant.

C20-983 TSZ

ORDER

ORDER - 1

THIS MATTER comes before the Court on the City of Seattle's ("City") Motion to Dismiss and Deny Class Certification ("Motion"), docket no. 11, and its Motion for a Stay of Discovery, docket no. 16.  Having reviewed all papers filed in support of, and in opposition to, the motions, the Court enters the following Order.

**Background**

On June 8, 2020, with nationwide civil rights protests ongoing, the City "abruptly deserted" the Seattle Police Department's ("SPD") East Precinct, located on the corner of Twelfth Avenue and East Pine Street in Seattle's Capitol Hill neighborhood.  First Amended Class Action Complaint ("FAC") at ¶ 3 (docket no. 9).  Almost immediately after the SPD abandoned the East Precinct, protestors declared the area "Free Capitol Hill" to create a "no-cop" zone, and they used large barriers that the City left behind to block off streets within one block of the precinct.  *Id.* at ¶¶ 36–38.  As the zone expanded, it first became known as the "Capitol Hill Autonomous Zone," a.k.a. "CHAZ," and eventually became known as the "Capitol Hill Organized Protest" or "Capitol Hill Occupying Protest," a.k.a. "CHOP" (collectively, "CHOP").  *Id.* at ¶¶ 1, 38.  CHOP's unofficial boundaries stretched north to East Denny Way, east to Thirteenth Avenue, south to East Pike Street, and west to Broadway Avenue, encompassing Cal Anderson Park and 16 city blocks in all.  *Id.* at ¶ 39.

CHOP participants claimed the area as their own, which was allegedly governed by a "loose form of governance and justice" and which they secured by physically barricading and patrolling the area's borders.  *Id.* at ¶¶ 40–41.  Many CHOP participants

1   set up tents and started living on the streets, sidewalks, and in Cal Anderson Park.  *Id.* at

2   ¶ 42.  They allegedly occupied the streets and sidewalks 24 hours per day, hosting

3   speeches, debates, movies, music, and even illegal fireworks shows, causing disturbances

4   and noise pollution well past 10 p.m., and usually into the early hours of the next day.  *Id.*

5   at ¶ 47.  Certain CHOP participants served as a "replacement police force" by demanding

6   that business owners release individuals suspected of crimes and conducting their own

7   crime investigations.  *Id.* at ¶ 46.  Some CHOP participants were observed carrying guns

8   in broad daylight.  *Id.* at ¶ 48.

9          According to Plaintiffs, the City "entirely handed over" the approximately 7-acre

10  Cal Anderson Park to the CHOP participants.  *Id.* at ¶ 49.  The City also allegedly

11  provided CHOP participants with medical equipment, washing/sanitation facilities,

12  portable toilets, nighttime lighting, and other material support.  *Id.* at ¶¶ 49, 179–180.

13  The City further allowed CHOP participants to build makeshift gardens in the park "to

14  grow food for CHOP," *id.* at ¶ 52, with the Mayor tweeting her support for the "new

15  community garden popping up in Cal Anderson Park," *id.* at ¶ 182(g).  Plaintiffs allege

16  that members of the public could not use the park, and if they got too close, CHOP

17  participants threatened them or their property.  *Id.* at ¶ 51.  Moreover, the "hundreds of

18  CHOP participants in the park created excessive noise . . . at all hours of the day and

19  night."  *Id.* at ¶ 53.  "Trash, feces, and other refuse built up in the park, affecting the

20  whole area."  *Id.*  The park was allegedly one of the most violent areas of CHOP, and

21  local residents witnessed individuals carrying firearms in the park.  *Id.*  As a result of the

22

23

City's alleged actions, the park "was transformed into a massive tent city for CHOP participants," *id.* at ¶ 50, as shown below:

 

[Photos provided at FAC at ¶ 51]

On June 11, Mayor Jenny Durkan tweeted that CHOP "is not a lawless wasteland of anarchist insurrection—it is a peaceful expression of our community's collective grief and their desire to build a better world." *Id.* at ¶ 182(a). That same day, during a joint press conference with SPD Chief of Police Carmen Best, the Mayor reiterated that area "is not an armed ANTIFA militia no-go zone" and that "blocks of Seattle in Capitol Hill [have] shut down every summer for everything from Block Party to Pride." *Id.* at ¶ 182(d). The Mayor also stated that the area "is not really that much of an operational challenge[,] [b]ut we want to make sure that the businesses and residents feel safe and we'll continue to move that forward." *Id.* At the time, "the City communicated clearly to CHOP participants that they may continue occupying the area . . . because [the City is] trying to do things that are responsible." *Id.* at ¶ 181. For her part, the Police Chief stated that "SPD has a responsibility to provide public safety services to the entire East

precinct and the City" and that the "actions of a small group cannot and should not deprive an entire segment of our community from public-safety services." *Id.* at ¶ 57. The Police Chief also stated that "[i]n the first day of the SPD not having access to the [East] precinct, response times for crimes in progress were over fifteen minutes, about three times as long as the average." *Id.* The Police Chief said that "[t]he difference in the amount of time could protect someone's life and prevent a violent attack." *Id.*

The next day, on June 12, the Mayor was asked during a CNN interview "how long the City would allow CHOP participants to continue," and the Mayor responded: "I don't know. We could have the Summer of Love." *Id.* at ¶ 181(b). She again stated that CHOP "is more like a block party atmosphere" and that "we will make sure that we can restore this[,]" [b]ut we have block parties and the like in this part of Seattle all the time. It's known for that." *Id.* at ¶ 182(f).

On June 16, the City allegedly "reached an informal agreement" with CHOP participants to allow limited one-way access on certain streets within the area. *Id.* at ¶ 177. As part of that agreement, Plaintiffs allege that "the City actually fortified the rest of CHOP" by providing participants with sturdier concrete barriers. *Id.* at ¶¶ 174(d), 177. Although CHOP participants allegedly reestablished impediments on those limited-access streets, the City's response was "apparently to do nothing." *Id.* at ¶ 177. The City issued a press release that day stating that "City officials have been on site on Capitol Hill to work [to] meet community needs including hygiene, sanitation and safety," and that they had met with CHOP "organizers, small businesses, and residents to discuss proposed changes to the protest zone." *Id.* at ¶ 174(b). That day, the Mayor also suggested that the

City agreed to deploy police to CHOP only for "significant life-safety issues," such as "an active shooter incident, an assault, a structure fire, significant medical emergency, and other incidents that threaten a person's life safety." *Id.* at ¶ 181(e).[1]

Plaintiffs allege that the City "adopted a policy supporting the CHOP occupation, acting with deliberate indifference toward those suffering harms from it." *Id.* at ¶ 174. Plaintiffs also allege that because of the City-provided barriers that CHOP participants used in the streets and sidewalks, local residents could not use public streets, sidewalks, or other rights-of-way to enter their homes or businesses, they could not receive deliveries, and their clients were unable to visit their businesses. *Id.* at ¶¶ 70–71, 74. Plaintiffs allege that garbage and recycling services could not enter CHOP, forcing them to pile up their refuse. *Id.* at ¶ 73. In addition, Plaintiffs allege that they did not have "full use" of their property that was normally freely accessible, including their garages, in order to prevent vandalism to their properties. *Id.* at ¶ 72. Plaintiffs also allege that CHOP participants painted graffiti on most available surfaces in the area. *Id.* at ¶ 43. If a property owner painted over the graffiti, CHOP participants allegedly replaced the graffiti or threatened business owners if they painted over the graffiti. Examples of the allegedly pervasive graffiti are shown below:

---

[1] The Court takes judicial notice of the full press release, *see* FAC at ¶¶ 181(e) & n.7, available at https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/.

ORDER - 6

 

[Photos provided at FAC at ¶¶ 42–43]

Plaintiffs allege, "[o]n information and belief," that the City considered the area from Denny Way to Union Street and Thirteenth Avenue to Broadway Avenue to be a "no response" zone, and it adopted a policy and practice of not entering CHOP except in the case of "the most serious" or "life-threatening crimes"; and even then, SPD's response was allegedly "weak" and "delayed." *Id.* at ¶¶ 55–56; *see id.* at ¶ 181(e).

On June 20, at around 2:20 a.m., two people were shot in CHOP:  One victim died before reaching the hospital, and the other victim was admitted with life-threatening injuries. *Id.* at ¶ 59.  According to Plaintiffs, a video posted on Facebook.com shows that medical personnel responded to the first victim about 15 minutes into the video and that police officers started to arrive three minutes later. *Id.* at ¶ 60.  Once the police arrived, the video allegedly shows that CHOP participants "immediately surrounded, yelled at, and pursued" the officers. *Id.*  CHOP participants also allegedly created a human chain to bar any further entry of the police. *Id.*  That video allegedly shows that no government official responded to the other victim, and that victim was transported to the hospital in "a

ORDER - 7

1   plain white cargo van." *Id*.  The police allegedly did not investigate that crime scene in

2   the aftermath of the shooting, and no suspects have been identified or taken into custody.

3   *Id*.

4   The next day, on June 21, the Mayor allegedly issued a statement indicating that

5   the "City still had no plans to cease supporting CHOP and that the City was instead

6   acting to work with and preserve CHOP."  *Id.* at ¶ 182(k).  That night, at about 11 p.m.,

7   another victim in CHOP was shot and was transported to the hospital by a private vehicle.

8   *Id.* at ¶ 61.

9   On June 22, the Mayor and the Police Chief gave a joint press conference, with the

10   Mayor stating that "[t]he cumulative impacts of gatherings and protests and the nighttime

11   atmosphere and violence has led to increasingly difficult circumstances for our

12   businesses and residents."  *Id.* at ¶ 174(f).  Similarly, the Police Chief stated that some

13   CHOP participants were "engaging in shootings, a rape, assaults, burglary, arson, and

14   property destruction."  *Id.* at ¶ 174(g).

15   On June 29, in early hours, yet another shooting in CHOP occurred, during which

16   more than a dozen shots were fired by "CHOP security" after a white jeep crashed into

17   the barricades.  *Id.* at ¶¶ 63–64.  This shooting left a 16-year-old dead and a 14-year-old

18   in critical condition.  *Id.* at ¶ 63.[2]  According to Plaintiffs, no medical or police personnel

19   responded to the crime scene at that time.  *Id.* at ¶ 65.  Instead, one of the victims was

20

21   [2] Plaintiffs allege that before CHOP was established, there had been no homicides in the entire Capitol
    Hill neighborhood in 2020 and in 2019, there had been only three homicides in the neighborhood.  *Id.* at

22   ¶ 68.

23

1  transported out of CHOP by private vehicle, and the other was taken "to a meeting point

2  with [the] Seattle Fire Department" and then transported to the hospital.  *Id*.  By the time

3  the police reached the crime scene, the police acknowledged that "it was very clear the

4  crime scene had been disturbed" and to date, no suspects have been identified or placed

5  into custody.  *Id.* at ¶ 66.  The Police Chief gave a press conference that day, stating that

6  "everybody in city government has been talking about what we can do to have a

7  reasonable response . . . , but we also recognize that a place where we have seen now two

8  murders, multiple people injured, there needs to be some more action for public safety.  I

9  think everyone can agree on that." *Id.* at ¶ 174(h).  That same night, more shots were

10  fired into the building of Plaintiff Onyx Condominium, possibly in connection with the

11  earlier shooting, and at least one bullet came within a foot of a resident asleep in bed.  *Id.*

12  at ¶ 67.

13          On July 1, the City cleared the area occupied by CHOP.  *Id.* at ¶ 184.  At a press

14  conference, the Police Chief stated that she was "stunned by the amount of graffiti,

15  garbage, and property destruction" in CHOP and that "we don't even know how much

16  trauma people were experiencing because of what was happening in that area."  *Id.* at

17  ¶ 79.  She also stated that "what has happened here on these streets over the last two

18  weeks—few weeks, that is—is lawless and it's brutal and bottom line it is simply

19  unacceptable."  *Id.* at ¶ 174(j).  Plaintiffs allege that the clearing of CHOP was "easily"

20  accomplished and "without violence on either side," demonstrating that the City could

21  have and should have cleared the area much earlier.  *Id.* at ¶ 184.

22

23

ORDER - 9

As a result of CHOP's existence, Plaintiffs allege that they and the proposed class members suffered extensive economic damage and other harm.  *Id.* at ¶ 78.  For example:

- Plaintiff SRJ Enterprises d/b/a Car Tender alleges that since early June 2020, business revenues had declined by 40% from the months prior, *id.* at ¶ 83, and that its premises were vandalized by CHOP participants, including permanent damage to a fence, *id.* at ¶ 85.  On June 14, an individual broke into Car Tender's premises, vandalized and set fire to the shop, and accosted the owner's son with a knife and spike.  *Id.*  at ¶ 87.  Although several 9-1-1 calls were made that night, the police never responded to the crime scene that evening.  *Id.* at ¶ 89.  Car Tender's owner and son apprehended the intruder, but they ultimately handed him over to an "angry mob of CHOP participants" who demanded that they release the intruder.  *Id.* at ¶ 90.

- Plaintiff The Richmark Company d/b/a Richmark Label alleges that it incurred costs related to shipping delays and cancellations and suffered property damage because of CHOP participants.  *Id.* at ¶¶ 94, 96.  Richmark Label also alleges that it is not receiving any "of the usual rental income it typically receives from the parking spaces."  *Id.* at ¶ 97.

- Plaintiff Northwest Liquor and Wine LLC alleges that its average sales were down approximately 70% in June 2020.  *Id.* at ¶ 101.

- Plaintiff Sage Physical Therapy PLLC alleges that approximately 60% of its patients cancelled their appointments after CHOP was established.  *Id.* at ¶ 109.  Sage also alleges that the internet cable in its building was cut, but the technician could not access the building due to CHOP barriers— meaning Sage did not have access to its security cameras during this time period.  *Id.* at ¶ 108.

- Plaintiff Magdalena Sky d/b/a Tattoos and Fortune alleges that CHOP's barricades and encampments blocked vehicle and foot access to its studio, causing it to close its doors and preventing it from generating any revenue.  *Id.* at ¶ 113.

- Plaintiff Bergman's Lock and Key Services LLC alleges that it was forced to shorten its hours and eventually board up its premises due to graffiti and vandalism by CHOP participants.  *Id.* at ¶ 117.  In June 2020, Lock and Key's revenues had allegedly declined by 60% due to CHOP.  *Id.* at ¶ 118.

- Plaintiff Matthew Ploszaj alleges that his apartment was broken into four times during CHOP's existence; each time, Ploszaj contacted the police, but

the police never responded.  *Id.* at ¶ 124.  On one occasion, an officer told Ploszaj that they could not respond to the building because of its location within CHOP and asked Ploszaj to instead meet him eight blocks from his apartment.  *Id.* at ¶ 125.

- Plaintiff Argento LLC allegedly called 9-1-1 four times regarding incidents involving CHOP participants, but was told that the police would not respond to his area unless there was a violent incident.  *Id.* at ¶ 132.

- Plaintiff Onyx Homeowners Association alleges that it and its residents called 9-1-1 to report graffiti and other acts of vandalism by CHOP participants, but they received no response or direction from the City.  *Id.* at ¶ 135.  On June 29, shots were fired into the Onyx Condominium building, with at least one bullet coming within a foot of a resident asleep in bed.  *Id.* at ¶ 140.

- Madrona Real Estate Plaintiffs allege that SPD refused to help protect its property and at considerable expense, it hired increased private security to protect residents and property.  *Id.* at ¶ 146.  On June 23, Madrona Real Estate called the police to assist it in removing trespassers from a property located immediately outside of CHOP's boundaries, but an officer responded that they "are not allowed to come within two blocks of CHOP."  *Id.* at ¶ 147.  In addition, Madrona Real Estate's parking revenue was only "a small fraction of the average" in June 2020.  *Id.* at ¶ 151.

- Plaintiff Hunters Capital LLC alleges that its tenants, who have been sexually harassed and threatened, started to leave because of CHOP, causing it considerable losses.  *Id.* at ¶¶ 156–57, 159.

- Plaintiff Olive ST Apartments LLC similarly alleged that tenants have moved out because of the nearby presence of CHOP and that it has been unable to attract new renters to the area.  *Id.* at ¶ 164.

- Plaintiff Rancho Bravo, Inc. alleges that CHOP participants, without Rancho Bravo's permission, created a "medical tent" in the outside seating areas in front of its restaurant; and CHOP participants allegedly maintained various unpermitted food dispensaries and stores on public property adjacent to its premises.  *Id.* at ¶¶ 31, 44–45, 168.  Rancho Bravo's business dropped precipitously during the occupancy, leading to significant economic losses.  *Id.* at ¶ 170.

After several of the Plaintiffs unsuccessfully attempted to contact the City and the

Mayor's office for assistance, *id.* at ¶¶ 92, 100, 111, 121, 139, 152, 155, 165, they filed

1  this class action against the City.  Complaint (docket no. 1).  On July 10, 2020, Plaintiffs

2  filed the FAC, docket no. 9, asserting four causes of action under 42 U.S.C. § 1983 for

3  violations of (1) procedural due process, (2) substantive due process, (3) unlawful taking,

4  and (4) equal protection.[3]  The City now moves to dismiss Plaintiffs' claims and to deny

5  class certification, docket no. 11.

6  **Discussion**

7        **A.**    **Rule 12(b)(6) Standard**

8        To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

9  complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

10  relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937,

11  173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.

12  Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A claim has facial plausibility when the plaintiff

13  pleads factual content that allows the court to draw the reasonable inference that the

14  defendant is liable for the misconduct alleged." *Id.*

15        **B.**    **Municipal Liability**

16        "Local governing bodies . . . can be sued directly under [42 U.S.C. § 1983] for

17  monetary, declaratory, or injunctive relief where . . . the action that is alleged to be

18  unconstitutional implements or executes a policy statement, ordinance, regulation, or

19  decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of*

20

21

22  [3] The third and fourth causes of action are mislabeled in the FAC as the "fourth" and "fifth" causes of action.  *See* FAC (docket no. 9 at 61–62).

23

ORDER - 12

1   *Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  To prevail on a

2   municipal liability claim, a plaintiff must show that the city "had a deliberate policy,

3   custom, or practice that was the 'moving force' behind the constitutional violation he

4   suffered."  *Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting

5   *Monell*, 436 U.S. at 694–95); *see also Harper v. City of Los Angeles*, 533 F.3d 1010,

6   1026 (9th Cir. 2008) ("To meet this causation requirement, the plaintiff must establish

7   both causation-in-fact and proximate causation.").  "The requisite causal connection can

8   be established not only by some kind of direct personal participation in the deprivation,

9   but also by setting in motion a series of acts by others which the [government] actor

10  knows or reasonably should know would cause others to inflict the constitutional injury."

11  *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (quoting *Johnson v. Duffy*,

12  588 F.2d 740, 743–44 (9th Cir. 1978)).  A municipality's "omi[ssion] to perform an act

13  which [it] is legally required to do" may be sufficient to show that it caused a plaintiff to

14  suffer a deprivation of a constitutional right under § 1983.  *Id.* at 915, 940.

15      Plaintiffs allege facts indicating that the City and the Mayor officially supported

16  the establishment of an autonomous zone within CHOP's boundaries, FAC at ¶¶ 174,

17  177, 181–82; that the City provided concrete barriers, medical supplies,

18  washing/sanitation facilities, portable toilets, lighting, and other material support to

19  CHOP participants, including handing over Cal Anderson Park to them, *id.* at ¶¶ 37–38,

20  49–50, 52, 167, 179(d); and that the City adopted a "no response" policy and practice

21  within CHOP, refusing to send police officers into CHOP unless the 9-1-1 caller reported

22  "significant life-safety issues," *id.* at ¶¶ 55–56, 89, 124–25, 132, 135, 146–47, 181(e).

23

1   Plaintiffs further allege that as a result of the City's CHOP-related policies and practices,

2   their properties were blocked off from access to public streets and rights-of-way, they

3   were otherwise unable to use and enjoy their properties, and they were deprived of basic

4   public-safety services.  *Id.* at ¶¶ 7–8, 50, 81, 202.

5       Plaintiffs plausibly allege that "[t]he City's endorsement and recognition of CHOP

6   went so far that SPD adopted a policy and practice of not entering the area except in the

7   case of life-threatening crimes," thereby creating a "no response" zone within the area.

8   FAC at ¶¶ 55–56.  Clearly, the City's conduct, as alleged by the FAC, may have been the

9   "moving force" behind the alleged constitutional violations, *see Galen*, 477 F.3d at 667,

10  and the causal link between the City's actions and the harm to Plaintiffs would have been

11  foreseeable.  *See, e.g.*, FAC at ¶¶ 57, 174, 182; *see Lacey*, 963 F.3d at 915 (concluding

12  that causation may be established by showing that the government's acts or omissions

13  "set[] into motion a series of acts by others which the [government] knows or reasonably

14  should know would cause others to inflict the constitutional injury").  Plaintiffs'

15  allegations, if proven, would support a claim of municipal liability.

16      C.    **Due Process Violations**

17          1.    **Procedural Due Process Violation — First Cause of Action**

18      The Fourteenth Amendment provides: "[N]or shall any State deprive any person

19  of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

20  To prevail on a procedural due process claim, a § 1983 plaintiff must establish "(1) a

21  liberty or property interest protected by the Constitution; (2) a deprivation of the interest

22  by the government; and (3) lack of process."  *Portman v. County of Santa Clara*, 995

23

F.2d 898, 904 (9th Cir. 1993).  "Property interests, of course, are not created by the

Constitution."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701,

33 L. Ed. 2d 548 (1972).  "Rather they are created and their dimensions are defined by

existing rules or understandings that stem from an independent source such as state law—

rules or understandings that secure certain benefits and that support claims of entitlement

to those benefits."  *Id.*  If a plaintiff is entitled to such benefits, even certain "temporary

or partial impairments of property rights . . . are sufficient to merit due process

protection."  *Connecticut v. Doehr*, 501 U.S. 1, 111 S. Ct. 2105, 115 L. Ed. 2d 1 (1991).

Plaintiffs plausibly allege that they had a protected property interest in the full use

and enjoyment of their property and that the City's affirmative actions in support of

CHOP caused Plaintiffs to suffer a temporary deprivation of those interests.  FAC at

¶¶ 196–97.  Specifically, Plaintiffs allege that from June 8 to July 1, 2020, CHOP

participants used City-provided barriers, with the City's approval, to block access from

their properties to streets, sidewalks, and other public rights-of-way.  *Id.* at ¶¶ 70, 177,

211–13.  Many of the Plaintiffs also allege that because of CHOP's existence, and the

rampant crime and vandalism that ensued, they were deprived of all (or nearly all)

economic use of their properties.  *Id.* at ¶¶ 97, 101, 109, 113–14, 118.  At least one

Plaintiff alleges that CHOP participants physically invaded its premises by setting up,

without permission, a "makeshift medical tent," *id.* at ¶¶ 31, 45, 168, to which the City

provided beds and medical equipment, *id.* at ¶ 179(d).  Those allegations are sufficient to

support Plaintiffs' claim that they were deprived of state-created property interests.  *See*

*Guimont v. Clarke*, 121 Wn.2d 586, 597–98 & n.3, 854 P.2d 1 (1993) (en banc),

*abrogated on other grounds by Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019) (holding that "a regulation that compels a property owner to suffer a 'physical invasion' or 'occupation' of his or her property is compensable no matter how weighty the public purpose behind it or how minute the intrusion" and regardless of whether the invasion was "temporary or permanent"); *Keiffer v. King County*, 89 Wn.2d 369, 372, 572 P.2d 408 (1977) (en banc) (concluding "[t]he right of access of an abutting property owner to a public right-of-way is a property right" under the Washington State Constitution).[4]

Plaintiffs further allege that "the City provided Plaintiffs with no notice or opportunity to be heard before or after depriving Plaintiffs of the freedom of movement, the right to access their properties, the right to use their properties, and the right to exclude others from their properties."  FAC at ¶ 200.  "[I]n the absence of a sufficient countervailing justification for the" City's actions, *Boddie v. Connecticut*, 401 U.S. 371, 380–81, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971), the Court concludes that Plaintiffs plausibly asserted a procedural due process violation.

## 2.    <u>Substantive Due Process Violation — Second Cause of Action</u>

Substantive due process prohibits "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'"  *Zinermon v.*

---

[4] Because the Court concludes that Plaintiffs plausibly alleged deprivations of property interests, it is unnecessary to address Plaintiffs' alternative arguments that the City "effectively re-zoned the area in and around CHOP" or deprived them of a "fundamental right to free movement."  Response (docket no. 12 at 17–18).

ORDER - 16

1  *Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990) (citation omitted).

2  "As a general matter, [the U.S. Supreme Court] has always been reluctant to expand the

3  concept of substantive due process because guideposts for responsible decisionmaking in

4  this unchartered area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503

5  U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992).  Accordingly, the Ninth Circuit

6  has cautioned that "[w]here a particular amendment provides an explicit textual source of

7  constitutional protection against a particular sort of government behavior, that

8  Amendment, not the more generalized notion of substantive due process, must be the

9  guide for analyzing these claims."  *Armendariz v. Penman*, 75 F.3d 1311, 1319 (9th Cir.

10  1996), *overruled in part on other grounds as recognized in Crown Point Dev., Inc. v. City*

11  *of Sun Valley*, 506 F.3d 851, 852 (9th Cir. 2007) (internal quotation marks and citation

12  omitted); *see, e.g.*, *Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 982–83 (9th

13  Cir. 2002) (affirming dismissal of plaintiffs' substantive due process claim because the

14  Takings Clause provided an explicit textual source of constitutional protection against

15  private takings and was therefore the guide in reviewing the claim).

16       Also, "[a]s a general matter, . . . a State's failure to protect an individual against

17  private violence simply does not constitute a violation of the Due Process Clause."

18  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 109 S. Ct. 998, 103

19  L. Ed. 2d 249 (1989).  There are, however, certain exceptions to this general rule.  For

20  example, in *DeShaney*, the Court held that where the local government affirmatively acts

21  to "restrain[] the individual's freedom to act on his own behalf—through incarceration,

22  institutionalization, or other similar restraint of personal liberty," such actions may give

23

1    rise to a substantive due process claim. *Id.* at 200. Likewise, the Ninth Circuit has held

2    that a local government may violate substantive due process if it "'affirmatively places [a

3    plaintiff] . . . in danger by acting with 'deliberate indifference' to a 'known or obvious

4    danger.'" *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting

5    *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011)). To prevail on such a

6    theory, known as the "state-created danger doctrine," a plaintiff must show that (1) "the

7    officers' affirmative actions created or exposed her to an actual, particularized danger

8    that she would not otherwise have faced," (2) "the injury . . . suffered was foreseeable,"

9    and (3) "the officers were deliberately indifferent to the known danger." *Id.*

10         In this case, the Court first considers whether the Takings Clause "provides an

11   explicit textual source of constitutional protection against" the City's alleged conduct.

12   *Armendariz*, 75 F.3d at 1319. According to Plaintiffs, the City's "assistance,

13   endorsements, and encouragements of CHOP greatly increased the likelihood of property

14   damage, . . . personal injury, . . . and other damages to Plaintiffs." FAC at ¶ 206. That is,

15   Plaintiffs allege that in addition to being deprived of certain property interests, they were

16   also deprived of at least one *liberty* interest, i.e., the right "to be protected from state-

17   created dangers." *Id.* at ¶¶ 205–06. Recognizing that Plaintiffs' substantive due process

18   claim rests on deprivations of both property and liberty interests, the Court concludes that

19   the Plaintiffs' takings claim does not subsume or preempt their substantive due process

20   claim. *See Crown Point Dev.*, 506 F.3d at 852–53.

21         Next, turning to whether Plaintiffs have stated a substantive due process claim,

22   Plaintiffs allege that the City's affirmative actions exposed them to actual, particularized

23

1    harm that they otherwise would not have faced.  Specifically, Plaintiffs allege that on or

2    around June 16, 2020, the City adopted in a "no response" strategy with respect to

3    CHOP, after negotiating with CHOP participants.  FAC at ¶¶ 56, 177, 181(c)–(e).  This

4    strategy purportedly resulted in police and other emergency personnel refusing to respond

5    to 9-1-1 calls made from within or near CHOP.  *Id.* at ¶¶ 98, 132, 147.  Some Plaintiffs

6    allegedly called 9-1-1 to report incidents involving personal injuries or threats of personal

7    injury, but they were unable to secure assistance.  *Id.* at ¶¶ 87–89, 126, 135, 140, 143.

8    Plaintiffs likewise allege that the City provided concrete barriers to CHOP participants

9    and allowed them to seal off Plaintiffs' neighborhood from the rest of the city.  *Id.* at

10   ¶¶ 7, 68, 174(d).  Finally, Plaintiffs allege facts suggesting that their injuries were

11   foreseeable, and that the City was deliberately indifferent to this known danger.  *See id.* at

12   ¶¶ 57, 62, 174(h), 182(k).

13           The Court concludes that these allegations are sufficient to state a substantive due

14   process claim under the state-created danger exception.  Plaintiffs plausibly allege that

15   the City's actions—encouraging CHOP participants to wall off the area and agreeing to a

16   "no response" zone within and near CHOP's borders—foreseeably placed Plaintiffs in a

17   worse position than they would have been in absent any City intervention whatsoever.[5]

18   Their allegations are also sufficient to show that the City acted with deliberate

19   _____

20   [5] The City's reliance on *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007) is unpersuasive.  In
     *Johnson*, the Ninth Circuit concluded that the City's "decision to switch from a more aggressive operation
21   plan to a more passive one was not affirmative conduct that placed [the plaintiffs] in danger, because it
     did not place them in any worse position than they would have been in had the police not come up with
22   any operation plan whatsoever."  *Id.* at 641.  Here, however, Plaintiffs have plausibly alleged that they
     would have been better off had the City not intervened at all.

23

ORDER - 19

1  indifference to that danger.  *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1138–39

2  (9th Cir. 2018) (allegations that officers "shepherded [plaintiffs] into a violent crowd of

3  protestors and actively prevented them from reaching safety . . . even though [the

4  officers] knew the mob had attacked" others earlier, were sufficient to state a substantive

5  due process claim).

6  ### D.     Unlawful Taking — Third Cause of Action

7  The Takings Clause, which applies to local governments through the Fourteenth

8  Amendment, provides: "[N]or shall private property be taken for public use, without just

9  compensation."  U.S. Const. amend. V; *see Webb's Fabulous Pharmacies, Inc. v.*

10  *Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980).  To establish a

11  violation of the Takings Clause, a plaintiff must show that "'an independent source such

12  as state law' . . . define[s] the range of interests that qualify for protection as 'property'

13  under the Fifth and Fourteenth Amendments."  *Lucas v. S.C. Coastal Council*, 505 U.S.

14  1003, 1030, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992) (quoting *Roth*, 408 U.S. at 577);

15  *see Vandevere v. Lloyd*, 644 F.3d 957, 963 (9th Cir. 2011).  Once a state-created property

16  right is established, the Court must then determine "whether [that] property right has been

17  *abridged* improperly (taken without just compensation) or whether a plaintiff has given

18  up the right to assert such a claim," which are "question[s] of federal law."  *Vandevere*,

19  644 F.3d at 963–64.

20  Under Washington law, "[t]he right of access of an abutting property owner to a

21  public right-of-way is a property right which if taken or damaged for a public use

22  requires compensation."  *Keiffer*, 89 Wn.2d at 372.  Washington courts generally

23

distinguish between an unlawful taking, which "is a permanent (or recurring) invasion of private property," and a "temporary interference with a private property right, which is not continuous nor likely to be reoccurring," *N. Pac. Ry. Co. v. Sunnyside Valley Irrigation Dist.*, 85 Wn.2d 920, 924, 540 P.2d 1387 (1975) (citations omitted).  This distinction loses force, however, where the government "compels a property owner to suffer a 'physical invasion' or 'occupation' of his or her property."  *Guimont*, 121 Wn.2d at 597–98 & n.3; *see also Lucas*, 505 U.S. at 1030 n.17; *id.* at 1033 (Kennedy, J., concurring).

Both Washington and federal courts "are reluctant to find that a compensable taking occurred where the government temporarily used or destroyed property in times of emergency."  *Citoli v. City of Seattle*, 115 Wn. App. 459, 489, 61 P.3d 1165, 1169 (2002) (citing *Nat'l Bd. of Young Men's Christian Ass'ns v. United States* (*YMCA*), 395 U.S. 85, 89 S. Ct. 1511, 23 L.Ed.2d 117 (1969)).  For example, in *Monarch Ins. Co. v. District of Columbia*, 353 F. Supp. 1249 (D.D.C. 1973), *aff'd sub nom Aetna Ins. Co. v. United States*, 497 F.2d 683 (D.C. Cir. 1974), the district court dismissed the plaintiff's takings claim based on allegations that the government's "riot control program . . . intentionally sacrificed [the plaintiff's] private property."  *Id.* at 1255–56.  There, the court reasoned that "judgments about where . . . police should be stationed and what degree of force should be exerted to provide adequate protection . . . in riot control situations . . . are best left to officials directly responsible to the electorate."  *Id.* at 1256 (quoting *YMCA*, 395 U.S. at 95 (Harlan, J., concurring)).

1    Plaintiffs allege that from June 8 to July 1, 2020, the City allowed and encouraged

2    CHOP participants to block access from Plaintiffs' properties to streets and other public

3    rights-of-way, FAC at ¶¶ 70, 177, 211–13, resulting in the deprivation of all or nearly all

4    economic use of their properties, *id.* at ¶¶ 97, 101, 109, 113–14, 118.  Those allegations

5    support Plaintiffs' assertion that the City's policies and practices related to CHOP

6    deprived them of protected property interests, albeit temporarily, without just

7    compensation.  *See Keiffer*, 89 Wn.2d at 372; *Guimont*, 121 Wn.2d at 597–98 & n.3; *see*

8    *also City of Seattle v. McCoy*, 101 Wn. App. 815, 829, 4 P.3d 159 (2000) ("[T]emporary

9    takings are subject to the same categorical treatment as permanent takings where a

10   regulation denies all use of the property.") (internal quotations and citation omitted);

11   *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–40, 102 S. Ct. 3164,

12   73 L. Ed. 2d 868 (1982) (holding that a New York law requiring the plaintiff and other

13   landlords to allow a third party to place cable facilities in their buildings constituted a

14   taking).[6]

15      The Court acknowledges that judgments about where and to what degree the

16   police should be deployed in these types of emergency situations are best left to the City.

17   *See Monarch Ins.*, 353 F. Supp. at 1255–56.  Under Plaintiffs' theory of the case,

18

19   [6] Even if certain Plaintiffs alleged only partial, temporary interference with property rights, which do not
     amount to "categorical takings," *see Lucas*, 505 U.S. at 1015; *McCoy*, 101 Wn. App. at 829, those
20   Plaintiffs may still proceed under a "regulatory takings" theory, which necessarily requires "ad hoc,
     factual inquires."  *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed.
21   2d 631 (1978); *see Bridge Aina Le'a, LLC v. Land Use Comm.*, 950 F.3d 610, 626 (9th Cir. 2020)
     ("When a regulation places limitations on land that fall short of eliminating all economically beneficial
22   use, a taking nonetheless may have occurred, depending on the *Penn Central* framework.") (internal
     quotations and citation omitted).

23

ORDER - 22

however, the City is not liable under § 1983 simply because its response to the creation of CHOP was "too little, too late," *id.* at 1255, or because the City failed to prevent CHOP participants from physically invading their properties, *cf. Citoli*, 115 Wn. App. at 488.[7] Rather, Plaintiffs plausibly assert that the City's endorsement of, and the provision of material support to, CHOP set in motion a series of acts by certain CHOP participants, who the City knew or reasonably should have known would deprive Plaintiffs of protected property interests.  FAC at ¶¶ 174, 182, 212–13.  These allegations support the claim that the City's conduct was "causally related to [the] private misconduct" and it was "sufficiently direct and substantial to require compensation under the Fifth Amendment."  *YMCA*, 395 U.S. at 93.

### E.  <u>Equal Protection Violation — Fourth Cause of Action</u>

"[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "'Equal protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable."  *Ross v. Moffit*, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974).  Accordingly, the first step in analyzing an equal protection challenge "is to identify the state's classification of groups," i.e., the plaintiff's "classified group" and the "control group . . . composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's

---

[7] Unlike Plaintiffs in this case, the plaintiff in *Citoli* failed to allege a protected property interest.  115 Wn. App. at 489.

challenged policy." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (citation

omitted).  "The groups must be comprised of similarly situated persons so that the factor

motivating the alleged discrimination can be identified."  *Thornton v. City of St. Helens*,

425 F.3d 1158, 1167 (9th Cir. 2005).  "An equal protection claim will not lie by

'conflating all persons not injured into a preferred class receiving better treatment' than

the plaintiff."  *Id.* (citation omitted).  As the court noted in *Squaw Valley Dev. Co. v.

*Goldberg*, 375 F.3d 936 (9th Cir. 2004), *overruled on other grounds by Lingle v.*

*Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005), in any

equal protection analysis, a plaintiff must compare "apples to apples."  *Id.* at 945; *see*

*also Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010)

("Class-of-one plaintiffs must show an extremely high degree of similarity between

themselves and the persons to whom they compare themselves."); *accord Hood Canal*

*Sand & Gravel, LLC v. Brady*, 129 F. Supp. 3d 1118, 1125 (W.D. Wash. 2015).[8]

Plaintiffs appear to identify two classifications of groups that were purportedly

treated differently in violation of the Equal Protection Clause: (1) "areas occupied by

CHOP versus other areas of the City," FAC at ¶¶ 220–21; and (2) Plaintiffs versus CHOP

participants, *id.* at ¶¶ 222, 224.  With respect to the first grouping, Plaintiffs have failed to

plausibly allege that individuals living in "areas occupied by CHOP" are similarly

situated to individuals living in "other areas of the City."  Although Plaintiffs plausibly

---

[8] The City characterizes Plaintiffs' claim as a "class of one" equal protection claim, and Plaintiffs acknowledge that they "pled this theory."  Response (docket no. 12 at 24 & n.6); *see* FAC at ¶ 225.

1   allege that the City treated the two groups differently after CHOP was created, FAC at

2   ¶¶ 226–27, they do not allege any facts suggesting that they are *similarly situated* to the

3   control group, e.g., that the other areas in the city were also occupied by a large group of

4   organizers.  To the contrary, Plaintiffs' allegations emphasize the unprecedented nature

5   of CHOP's creation—that after SPD abandoned the East Precinct, organizers "who

6   gathered on Capitol Hill" "form[ed]" or "created" CHOP.  *Id.* at ¶¶ 1–2, 35–37.  By

7   failing to allege facts showing that other areas of the City were similarly situated to areas

8   occupied by CHOP, Plaintiffs merely conflate all persons not injured outside of CHOP

9   into a preferred class.  *Thornton*, 425 F.3d at 1167; *see Ruston*, 610 F.3d at 60

10   (concluding that none of the alleged control-group properties were similar to plaintiff's

11   proposed development, "let alone so similar that no rational person could see them as

12   different").

13       The second grouping asserted by Plaintiffs—Plaintiffs versus CHOP

14   participants—suffers from similar defects.  Plaintiffs argue that the "bias 'in favor'" of

15   CHOP participants, based on the City's preference for their viewpoints, violates the

16   Equal Protection Clause "because such favoritism necessarily entails *disfavor* to others."

17   Response (docket no. 12 at 26); *see* FAC at ¶¶ 221–22.  The only case that Plaintiffs cite

18   in support of that novel argument is *Elliot-Park v. Manglona*, 592 F.3d 1003 (9th Cir.

19   2010); but in that case, the Ninth Circuit concluded that the plaintiff plausibly asserted an

20   equal protection claim against police officers based on allegations that her perpetrator

21   "was given a pass by the police because of the officers' alleged racial bias *not only in*

22   *favor* of [her perpetrator] as a Micronesian*, but also against* her as a Korean."  *Id.* at 1006

23

ORDER - 25

1   (emphasis added).  Put simply, an allegation that the government favors a certain class or

2   viewpoint, standing alone, is insufficient to show that the government necessarily

3   disfavors the plaintiff's alleged class or viewpoint for purposes of equal protection

4   analysis.  *See Gallinger*, 898 F.3d at 1021 ("Accommodating one interest group is not

5   equivalent to intentionally harming another.").

6          Not only do Plaintiffs fail to allege that they hold a viewpoint that is disfavored by

7   the City, they also allege that they "support the efforts of those like Black Lives Matter

8   who . . . are bringing issues such as systemic racism and unfair violence against African

9   Americans by police to the forefront of the national consciousness" and that they

10  "support the free-speech rights of many of those who gathered on Capitol Hill to form

11  what has been called . . . 'CHOP.'"  FAC at ¶¶ 1, 12.  According to the Plaintiffs, that

12  viewpoint is also favored by the City.  *Id.* at ¶¶ 10, 218, 221–24.

13         Even assuming that the asserted classes are similarly situated, the City's actions

14  are "presumed to be valid and will be sustained if the classification . . . is rationally

15  related to a legitimate state interest."  *Gallinger*, 898 F.3d at 1017; *FCC v. Beach

16  Comms., Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993) ("In areas of

17  social and economic policy, a statutory classification that neither proceeds along suspect

18  lines nor infringes fundamental constitutional rights must be upheld against [an] equal

19  protection challenge if there is any reasonably conceivable state of facts that could

20  provide a rational basis for the classification.").  Plaintiffs argue that the Court should

21  apply heightened scrutiny in this case because the City's alleged actions "affected the

22  fundamental right of free speech."  Response (docket no. 12 at 26–27).  However,

23

ORDER - 26

1   Plaintiffs do not plausibly allege that the City disfavored the Plaintiffs' viewpoint or

2   treated them differently on that basis.  The Court concludes that rational-basis review

3   applies to this case, as currently pleaded.  *See Beach Comms.*, 508 U.S. at 313; *see also*

4   *Squaw Valley*, 375 F.3d at 944.[9]

5         Applying rational-basis review, Plaintiff's allegations are insufficient to overcome

6   the presumption that the City's different treatment of CHOP residents was rational

7   because there is simply no indication that other areas of the city were being "overrun" or

8   "occupied" by a large group of protestors.  *See* FAC at ¶¶ 2–5; *Gallinger*, 898 F.3d at

9   1018–20 (refusing "to second-guess" the government's determination that its unequal

10   treatment advanced legitimate governmental interests, including the protection of retired

11   peace officers and public safety, and affirming the district court's dismissal of the equal

12   protection claim).

13         Absent any allegations indicating that the City intentionally treated Plaintiffs

14   differently than similarly situated individuals, and without any rational basis for doing so,

15   the Court concludes that Plaintiffs did not plead sufficient facts to support their equal

16   protection claim.  The claim is dismissed without prejudice.  *See Lopez v. Smith*, 203 F.3d

17   1122, 1130 (9th Cir. 2000) (concluding that "a district court should grant leave to amend

18   even if no request to amend the pleading was made, unless it determines that the pleading

19   could not possibly be cured by the allegation of other facts") (citation omitted).

20

21

22   [9] Even if the Court were to apply heightened scrutiny, Plaintiffs' conclusory allegation that other groups were similarly situated are nonetheless insufficient to support their equal protection challenge.

23

1    **F.     Class Certification**

2         In determining whether discovery is necessary to establish the existence of a class

3    under Federal Rule of Civil Procedure 23, "the better and more advisable practice for a

4    District Court to follow is to afford the litigants an opportunity to present evidence as to

5    whether a class action was maintainable."  *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d

6    1304, 1313 (9th Cir. 1977).  The federal authority addressing this issue "stand[s] for the

7    unremarkable position that often the pleadings alone will not resolve the question of class

8    certification and that some discovery will be warranted."  *Vinole v. Countrywide Home*

9    *Loans, Inc.*, 571 F.3d 935, 942 & n.6 (9th Cir. 2009); *cf. Wal-Mart Stores, Inc. v. Dukes*,

10   564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (concluding that "Rule 23

11   does not set forth a mere pleading standard" and that "[a] party seeking class

12   certification . . . must be prepared to prove that there are *in fact* . . . common questions of

13   law or fact, etc.").  A district court may deny class certification, without first providing

14   proposed class members an opportunity to conduct discovery, only under limited

15   circumstances—where, for example, they "fail to make even a prima facie showing of

16   Rule 23's prerequisites." *See Doninger*, 564 F.2d at 1313.

17        The Court concludes that it would be improper to decide class certification on the

18   pleadings.  It is entirely plausible that Plaintiffs, after discovery, could present evidence

19   consistent with the allegations in the FAC to make a prima facie showing of Rule 23's

20   prerequisites, including the commonality requirement and the predominance requirement.

21   Fed. R. Civ. P. 23(a)(2), (b)(3).  For example, Plaintiffs' evidence could plausibly show

22   that the City adopted a policy and practice of endorsing CHOP, or that the City knew or

23

should have known that its actions would result in harm to Plaintiffs and the proposed

class members.  FAC at ¶ 189; *see also id.* at ¶¶ 174, 182; *see Dukes*, 564 U.S. at 350

(requiring that class members' claims "depend upon a common contention" and that the

common contention be "capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke").  The Court will therefore afford Plaintiffs an

opportunity to discover evidence to demonstrate whether there are in fact common

questions that predominate over individualized inquires.  *Cf. Doninger*, 564 F.2d at 1313;

*Vinole*, 571 F.3d at 942, 948 (concluding that the district court did not abuse discretion in

granting defendant's motion to deny class certification where plaintiffs "were provided

with adequate time in which to conduct discovery related to the question of class

certification").  At this stage in the proceedings, the City's motion to deny class

certification is DENIED without prejudice pending discovery.

## **Conclusion**

     For the foregoing reasons, the Court ORDERS:

     (1)    The motion to dismiss the fourth cause of action based on equal protection

is GRANTED.  This claim is dismissed without prejudice.  Plaintiffs may electronically

file a second amended complaint via the Case Management and Electronic Case Filing

("CM/ECF") system within fourteen (14) days of the date of this Order.

     (2)    Except as provided in paragraph (1), the motion to dismiss all other causes

of action is DENIED.

1    (3)    The motion to deny class certification is DENIED without prejudice

2 pending discovery for the reasons stated in this Order;

3    (4)    The motion to stay discovery, docket no. 16, is now DENIED as moot; and

4    (5)    The Clerk is directed to send a copy of this Order to all counsel of record.

5    IT IS SO ORDERED.

6    Dated this 16th day of October, 2020.

7

8

9    Thomas S. Zilly
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 30