HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HUNTERS CAPITAL, LLC, et al., | Case No. 20-cv-00983-TSZ |
| Plaintiffs, | STIPULATION AND [PROPOSED] ORDER PERMITTING AMENDMENT OF COMPLAINT AND AMENDING CASE SCHEDULE |
| v. | |
| CITY OF SEATTLE, | **NOTE ON MOTION CALENDAR: June 28, 2021** |
| Defendant. | |

## STIPULATION

The parties have been engaged in extensive and ongoing document production, depositions, and other discovery for more than seven months.  This has included the ongoing review and production of hundreds of thousands of pages of documents by both sides, including documents with difficult technical issues, such as text messages.  During that process, Plaintiffs determined that two entities that are related entities of Hunters Capital LLC should also be named, and seek to amend the complaint to add them as parties.  Plaintiffs' proposed Third Amended Complaint is attached to this filing as Exhibit A, and is redlined against the Second Amended Complaint filed in this action.  The parties agree that allowing this amendment after the deadline in this case for joining additional parties is more efficient for the parties and the Court than requiring the added parties to file a separate proceeding.  The parties stipulate that Plaintiffs

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

should be allowed to file a Third Amended Complaint in the form attached as Exhibit A.

The parties also agree that the addition of these two additional entities, as well as other issues they are working together to address in discovery, warrant a modest extension of the deadlines and trial date in this case to allow both parties to adequately prepare for those deadlines and for trial. The parties believe this extension is shorter than what would be necessary if Plaintiffs were to file a separate action on behalf of the added entities related to Hunters Capital, LLC. The parties agree that no prejudice will be incurred by either side, and judicial economy will be served, if this joint request is granted.

Based on the need for additional time and to avoid scheduling conflicts, the parties therefore jointly request that the Court issue the proposed order set forth below, with a trial date of October 17, 2022, or as soon thereafter as it is convenient for the Court.

STIPULATED AND AGREED TO this 28th day of June, 2021.

CALFO EAKES LLP

By: _s/Tyler S. Weaver_
    Patricia A. Eakes, WSBA #18888
    Angelo J. Calfo, WSBA #27079
    Tyler S. Weaver, WSBA #29413
    Andrew DeCarlow, WSBA #54471
    Henry Phillips, WSBA #55152
    Gabriel Reilly-Bates, WSBA# 52257
    1301 Second Avenue, Suite 2800
    Seattle, WA  98101
    Tel:  (206) 407-2200
    Fax: (206) 407-2224
    pattye@calfoeakes.com
    angeloc@calfoeakes.com
    tylerw@calfoeakes.com
    andrewd@calfoeakes.com
    henryp@calfoeakes.com
    gaber@calfoeakes.com

*Attorneys for Plaintiffs*

PETER S. HOLMES
Seattle City Attorney

    Joseph Groshong, WSBA# 41593
    Assistant City Attorney
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104
    Tel:  (206) 684-8200
    Fax: (206) 684-8284
    Joseph.Groshong@seattle.gov

HARRIGAN LEYH FARMER & THOMSEN LLP

By: _s/Kristin E. Ballinger_
    Arthur W. Harrigan, Jr., WSBA #1751
    Tyler L. Farmer, WSBA #39912
    Kristin E. Ballinger, WSBA #28253
    Caitlin B. Pratt, WSBA #48422
    999 Third Avenue, Suite 4400
    Seattle, WA 98104
    Tel:  (206) 623-1700
    arthurh@harriganleyh.com

tylerf@harriganleyh.com
kristinb@harriganleyh.com
caitlinp@harriganleyh.com

*Attorneys for City of Seattle*

**[PROPOSED] ORDER**

In consideration of the parties' stipulation, the Court grants Plaintiffs permission to file a Third Amended Complaint as described in that stipulation and hereby amends the case schedule as follows:

| JURY TRIAL DATE | Oct. 17, 2022 |
|---|---|
| Length of Trial | 2-3 weeks |
| Any motions related to class certification must be filed by | Nov. 18, 2021 |
| Disclosure of expert testimony under FRCP 26(a)(2) | Apr. 14, 2022 |
| Expert witness rebuttal deadline | May 27, 2022 |
| All motions related to discovery must be filed by | June 2, 2022 |
| All remaining discovery completed by | June 27, 2022 |
| All dispositive motions must be filed by<br>    and noted on the motion calendar no later than the fourth Friday thereafter (see LCR 7(d)) | June 30, 2022 |
| All motions related to expert witnesses (e.g., Daubert motion) must be filed by<br>    and noted on the motion calendar no later than the third Friday thereafter (see LCR 7(d)) | July 21, 2022 |
| All motions in limine must be filed by<br>    and noted for the third Friday thereafter; responses shall be due on the noting date; no reply shall be filed unless requested by the Court | Aug. 25, 2022 |
| Mediation Deadline | July 27, 2022 |
| Agreed Pretrial Order due | Sept. 30, 2022 |
| Trial briefs, proposed voir dire questions, and proposed jury instructions due | Sept. 30, 2022 |
| Pretrial conference to be held at 10:30 a.m. on | Oct. 5, 2022 |

DATED: _____

_____
The Honorable Thomas S. Zilly
UNITED STATES DISTRICT JUDGE

STIPULATION AND [PROPOSED] ORDER
PERMITTING AMENDMENT OF COMPLAINT
AND AMENDING CASE SCHEDULE - 3
(Case No. 20-cv-00983-TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

# EXHIBIT A

1

2                                               THE HONORABLE THOMAS S. ZILLY

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF WASHINGTON
7

8  HUNTERS CAPITAL, LLC, a Washington          Case No. 2:20-cv-00983 TSZ
   limited liability company, HUNTERS
9  PROPERTY HOLDINGS, LLC, a                   ~~SECOND~~ THIRD AMENDED CLASS
   Washington limited liability company;       ACTION COMPLAINT
10 GREENUS BUILDING, INC., a
   Washington corporation; NORTHWEST           JURY DEMAND
11 LIQUOR AND WINE LLC, a Washington
   limited liability company, SRJ
12 ENTERPRISES, d/b/a CAR TENDER, a
   Washington corporation, THE RICHMARK
13 COMPANY d/b/a RICHMARK LABEL, a
   Washington company, ONYX
14 HOMEOWNERS ASSOCIATION, a
   Washington registered homeowners
15 association, WADE BILLER, an individual,
   MADRONA REAL ESTATE SERVICES
16 LLC, a Washington limited liability
   company, MADRONA REAL ESTATE
17 INVESTORS IV LLC, a Washington
   limited liability company, MADRONA
18 REAL ESTATE INVESTORS VI LLC, a
   Washington limited liability company, 12TH
19 AND PIKE ASSOCIATES LLC, a
   Washington limited liability company,
20 REDSIDE PARTNERS LLC, a Washington
   limited liability company, MAGDALENA
21 SKY, an individual, OLIVE ST
   APARTMENTS LLC, a Washington limited
22 liability corporation,  BERGMAN'S LOCK
   AND KEY SERVICES LLC, a Washington
23 limited liability company, MATTHEW
   PLOSZAJ, an individual,  ARGENTO LLC,
24 a Washington limited liability company,

25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1
2
3
4

RANCHO BRAVO, INC., a Washington corporation, SWAY AND CAKE LLC, a Washington limited liability company, SHUFFLE LLC d/b/a Cure Cocktail, a Washington limited liability company, on behalf of themselves and others similarly situated,

5                                             Plaintiffs,

6          vs.

7    CITY OF SEATTLE,

8                                             Defendant.

9

10         Plaintiffs hereby allege as follows:

11                          I.    **OVERVIEW**

12         1.     The rights of free speech and to peaceably assemble are enshrined in our

13  constitutional tradition. Plaintiffs support free-speech rights and support the efforts of those like

14  Black Lives Matter who, by exercising such rights, are bringing issues such as systemic racism

15  and unfair violence against African Americans by police to the forefront of the national

16  consciousness. Specifically, Plaintiffs support the free-speech rights of many of those who

17  gathered on Capitol Hill to form what has been called "CHAZ," standing for the "Capitol Hill

18  Autonomous Zone," or "CHOP" for "Capitol Hill Organized Protest" or "Capitol Hill Occupying

19  Protest."[1]

20         2.     This lawsuit does **not** seek to undermine CHOP participants' message or present a

21  counter-message. Rather, this lawsuit is about the constitutional and other legal rights of

22  Plaintiffs—businesses, employees, and residents in and around CHOP—which were overrun by

23  the City of Seattle's unprecedented decision to abandon and close off an entire city neighborhood,

24  leaving it unchecked by the police, unserved by fire and emergency health services, and

25
---
[1] This complaint primarily refers to the area as "CHOP," and the people who participated in CHOP who are not businesses, employees, or residents of the area as "CHOP participants."

~~SECOND~~ THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 2

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

inaccessible to the public at large. The City's decision subjected businesses, employees, and residents of that neighborhood to extensive property damage, public safety dangers, and an inability to use and access their properties.

3.    On June 8, 2020, the City of Seattle ("the City") abruptly deserted the Seattle Police Department's East Precinct on the corner of Twelfth Avenue and E. Pine Street in Seattle's Capitol Hill neighborhood, leaving behind numerous barriers that had previously been used as a line between police and protesters.

4.    When the City abandoned the precinct and the nearby barriers, a number of individuals who had been in the area took control of the barriers and used them to block off streets in an area around the East Precinct.

5.    In the days and weeks after the City abandoned the East Precinct, CHOP participants occupied the public streets, sidewalks, and parks in the area at all hours of the day and night. Rather than seeking to restore order and protect the residents and property owners within CHOP, the City instead chose to actively endorse, enable, and participate in the occupation of CHOP.

6.    The City provided Cal Anderson Park, a public park located at the center of CHOP, to CHOP for use as the staging ground supporting CHOP's occupation of the surrounding area. Supported by the City, countless CHOP participants resided in the park at all times of day and night, having turned it into a tent city. At any given time, hundreds of CHOP participants camped out in the park. Violence, vandalism, excessive noise, public drug use, and other crimes were rampant within the park.

7.    The City's conduct resulted in CHOP being blocked off from public access. Among other conduct detailed below, the City provided the participants with concrete barriers to use to block the streets, which CHOP participants indeed used to barricade the streets and create borders. These borders, at times, were guarded by armed CHOP participants who oversaw who could or

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

could not enter CHOP. As a result, the streets were barred to most all vehicular traffic, making it virtually impossible for residents and businesses to access their buildings, receive deliveries, and provide goods and services to the few customers willing to enter CHOP.

8.     The City's conduct also resulted in the elimination of basic public safety within CHOP and nearby areas. For example, the City enacted a policy under which police would not enter the CHOP area except during life-and-death emergencies, and, even in those situations, the response was, at best, muted and late. After a fatal shooting in the early morning of June 20, 2020, for example, officers did not even approach the area of the shooting until approximately 20 minutes after the shooting, and no professional medical response was available for at least 15 minutes. At other times, even during life-and-death emergencies, the police acquiesced to demands from CHOP participants that they abandon the area. The City acknowledged the serious safety issues it created, in particular noting that there were "dangerous conditions" at night, but the City nonetheless chose to maintain its policy of providing resources and support to the CHOP occupiers.

9.     The City's conduct enabled the widespread destruction and vandalism of private property. Graffiti was and is pervasive throughout the area—it is not only on barriers, streets, sidewalks, but also on nearly every private building within CHOP. Graffiti that was painted over almost immediately returned, and property owners were told by CHOP participants that if they dared to paint over graffiti, their buildings would be more severely vandalized or even burned to the ground. The City did nothing to prevent this conduct from June 8, 2020 to July 1, 2020, but, instead, actively endorsed and supported the ongoing occupation of the CHOP area and the destruction of property that accompanied it. As a result, property owners and their tenants were not able to fully use their properties. Property owners and tenants, for instance, had to lock and barricade their garages and loading areas at risk of having CHOP participants entering and vandalizing them.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 4

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

10.     The property owners, businesses, and residents in the area suffered ever-increasing property damage and economic loss every day that CHOP existed in their neighborhood, all because of the City's active support, encouragement, and endorsement of the occupation. In particular, Seattle Mayor Jenny Durkan provided the CHOP participants with not just tangible resources but also a de facto stamp of approval. Her tweets, interviews, and other statements made it clear that the City was fully aware of what is happening, had no plan or timeline for remedying the ongoing harm, and in fact viewed the occupation of Capitol Hill as something akin to a perpetual block party, which the City wanted to support because of the viewpoints of CHOP participants.

11.     Plaintiffs and others repeatedly pleaded with Mayor Durkan and others to cease enabling the destruction of their property and the imminent dangers posed to them and their neighborhood. But the City did not listen, or did not care, and it was only after Plaintiffs had to resort to litigation to make themselves heard that the City finally took action to disband CHOP

12.     Again, this case is not about Plaintiffs' agreement or disagreement with the inspiration for CHOP, or the viewpoints expressed by the people occupying that area. Instead, it is about the City's active, knowing endorsement and support of a destructive occupation of a neighborhood to the detriment of the well-being of those who live and work in that neighborhood.

## II.     **PARTIES**

13.     Plaintiffs are residents, tenants, property owners, and small businesses in Seattle's Capitol Hill neighborhood that have been harmed by CHOP.

14.     Plaintiff Hunters Capital LLC ("~~Hunters Capital~~HC") is a Washington limited liability company with its principal place of business in King County, Washington. ~~Hunters Capital~~HC is a real-estate development~~, investment,~~ and management company, headquartered near Cal Anderson Park in the Capitol Hill neighborhood with offices in the zone occupied by CHOP at 1620 Broadway Seattle, Washington. ~~Hunters Capital~~HC ~~owns and~~ manages a portfolio

of commercial, multi-family residential, and mixed-use properties in the Capitol Hill neighborhood within and around CHOP, including 500 E. Pike Street, 1517 12th Avenue, 401 E. Pine Street, 1000 E. Pike Street, 900 E. Pine Street, 426 15th Avenue East, 415 18th Avenue South, 523 15th Avenue East, 1620 Broadway/1641 Nagle Place, and 501 E. Pike Street, in addition to other properties in the area it manages. Hunters Capital has suffered economic loss from CHOP. Additionally, its property was damaged and its tenants and employees were harassed.

15.   Hunters Property Holdings, LLC ("HPH") is a Washington limited liability company. HPH is the sole member of the following single-asset limited liability companies: Dunn Automotive Building, LLC, Lots II, LLC, 900 E. Pine, LLC, Moore Family Building, LLC, Pike Building, LLC, Ballou Wright Building, LLC and Colman Automotive, LLC (collectively "the Hunters LLCs"). The LLCs are the owners of properties, including 501 E. Pike Street, 1517 12th Avenue, 401 E. Pine Street, 1000 E. Pike Street, 426 E. 15th Street, 900 E. Pine Street, and 1620 Broadway/1641 Nagle Place in addition to other properties in the area it manages. HPH has suffered economic loss from CHOP. Additionally, its property was damaged and its tenants anwere harassed. The members of HPH are citizens of New York, California, and Washington.

16.   Greenus Building, Inc., was incorporated in Washington and has its principal place of business in Washington. Greenus Building, Inc. is the sole owner of the Greenus Building, at 500 E. Pike Street. HC, HPH and Greenus Building, Inc. are collectively referred to herein as "Hunters Capital."

15.17.   Plaintiff SRJ Enterprises, Inc. d/b/a Car Tender ("Car Tender") is a Washington corporation with its principal place of business in King County, Washington. Car Tender is an automotive repair business. Car Tender's shop is located at 1706 12th Avenue in Seattle, Washington, in the heart of Seattle's Capitol Hill neighborhood and directly borders the zone occupied by CHOP. Car Tender has been a small business since 1971 and currently has 10 employees. Car Tender's shop was vandalized and broken into by CHOP participants and its

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 6

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

employees were assaulted. With access for customers cut off by CHOP, it suffered a loss of business.

16.18.    Plaintiff The Richmark Company d/b/a Richmark Label ("Richmark Label") is a family-owned Washington company with its principal place of business in King County, Washington. Richmark Label is a label printing and manufacturing business located at 1110 E. Pine Street, Seattle, Washington. Richmark Label is one of the largest manufacturing employers on Capitol Hill, with over 70 employees working at its facilities on Pine Street. Due to street blockages and barricades, and drivers' fear for safety, trucks and delivery vehicles were unable on multiple occasions to access Richmark Label's manufacturing facility. In addition to its manufacturing facility, Richmark Label also owns property, portions of which it leases to other tenants, in or near CHOP.

17.19.    Plaintiff Northwest Liquor and Wine LLC ("Northwest Liquor and Wine") is a Washington limited liability company with its principal place of business in King County, Washington. Northwest Liquor and Wine operates a specialty liquor, beer, and wine store in the Capitol Hill neighborhood, located on the corner of 12th Avenue and Pine Street at 1605 12th Avenue, Seattle, Washington, directly across from the East Precinct and wholly within CHOP. Customers could access Northwest Liquor and Wine because of CHOP and after the occupation began in early June, the company's sales were down approximately 70%.

18.20.    The Onyx Homeowners Association ("Onyx HOA") is a Washington registered homeowners association in King County, Washington. Onyx HOA is an association of, and represents, the residents of the Onyx Condominiums located at 1125 E. Olive Street, Seattle, Washington. Onyx Condominiums, located near the area occupied by CHOP participants on Capitol Hill, has 65 units. The building suffered property damage and theft because of CHOP, the value of the owners' property has been greatly reduced, and the owners were harassed and threatened.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

19.21.    Plaintiff Wade Biller is the president of Onyx HOA. He is also a condominium owner in the Onyx building. In addition to the injuries he has suffered as a resident and property owner in CHOP, Mr. Biller was physically assaulted by a CHOP participant while attempting to negotiate with CHOP participants in his capacity as President of the HOA.

20.22.    Plaintiff Madrona Real Estate Services LLC ("Madrona Real Estate Services") is a Washington limited liability company with its principal place of business in King County, Washington. Madrona Real Estate Services is a real-estate development and full-service real-estate management company for both commercial and residential properties. Madrona Real Estate Services owns or manages over 250,000 square feet of real estate in Capitol Hill, including property on Pine street and properties in and around CHOP. Madrona Real Estate Services suffered economic loss from CHOP, among other injuries.

21.23.    Plaintiff Madrona Real Estate Investors IV LLC ("Madrona Real Estate Investors IV") is a Washington limited liability company with its principal place of business in King County, Washington. Madrona Real Estate Investors IV is a real-estate investment company, whose holdings include properties located in the Capitol Hill neighborhood, including in or near CHOP on Pike and Pine streets. Madrona Real Estate Investors IV suffered economic loss from CHOP, among other injuries.

22.24.    Plaintiff Madrona Real Estate Investors VI LLC ("Madrona Real Estate Investors VI") is a Washington limited liability company with its principal place of business in King County, Washington. Madrona Real Estate Investors VI is a real-estate investment company, whose holdings include properties located in the Capitol Hill neighborhood, including in or near CHOP on Pike and Pine streets. Madrona Real Estate Investors VI suffered economic loss from CHOP, among other injuries.

23.25.    12th and Pike Associates LLC ("12th and Pike Associates") is a Washington limited liability company with its principal place of business in King County, Washington. 12th and Pike

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 8

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

Associates is a real-estate investment company, whose holdings include properties located in the Capitol Hill neighborhood, including in or near CHOP on Pike and Pine streets. 12th and Pike Associates suffered economic loss from CHOP, among other injuries.

24.26.   Plaintiff Redside Partners LLC ("Redside Partners") is a Washington limited liability company with its principal place of business in King County, Washington. Redside Partners is a real-estate investment and management company, with headquarters in CHOP at 1620 Broadway, Seattle, Washington. Redside Partners holds investments in and manages numerous properties in the Capitol Hill neighborhood, including properties in or near CHOP such as 915 E Pine Street. Redside Partners suffered economic loss from CHOP, among other injuries.

25.27.   Plaintiff Magdalena Sky is a small business owner who owns and operates Tattoos and Fortune. Tattoos and Fortune is a tattoo parlor and Tarot studio with a sole location at 1605 12th Avenue Seattle, Washington, within CHOP. Ms. Sky is the sole proprietor of Tattoos and Fortune. With access for clients cut off by CHOP, Ms. Sky, through her business, suffered a loss of business, in addition to other injuries.

26.28.   Plaintiff Olive ST Apartments LLC ("Olive ST Apartments") is a Washington limited liability company with its principal place of business in King County, Washington. Olive ST Apartments owns two apartment complexes within and right on the boarder of CHOP, located near Cal Anderson Park at 1703 12th Avenue and 1114 East Olive Street, Seattle, Washington. Olive ST Apartments suffered economic loss from the CHOP, among other injuries.

27.29.   Plaintiff Bergman's Lock and Key Services LLC ("Bergman's Lock and Key") is a Washington limited liability corporation with its principal place of business in King County, Washington. Bergman's Lock and Key's offices are located at 1714 12th Avenue, Seattle, Washington, in the immediate vicinity of CHOP. Bergman's Lock and Key provides lock and key services for residential and commercial properties, normally attracting customers from around the

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 9

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   Puget Sound area to its Capitol Hill locations. Like other small business, Bergman's Lock and Key

2   suffered economic loss from CHOP, among other injuries.

3   28.30.   Plaintiff Matthew Ploszaj is a Seattle resident who resides in an apartment at 1210

4   E. Pine Street. He was often blocked from accessing his apartment because of CHOP and the

5   actions of CHOP participants and was forced to live elsewhere at various times during CHOP's

6   existence.

7   29.31.   Plaintiff Argento LLC ("Argento") is a Washington limited liability company with

8   its principal place of business in King County. Argento owns and operates Café Argento at 1125

9   Olive Street. Argento has suffered economic loss from CHOP, among other injuries.

10   30.32.   Plaintiff Rancho Bravo, Inc. ("Rancho Bravo") is a Washington corporation with

11   its principal place of business in King County, Washington. Rancho Bravo is a restaurant serving

12   Mexican food and is located at 1001 E. Pine St, Seattle, Washington. The location where Rancho

13   Bravo operates its restaurant was inhabited by CHOP participants who operated a makeshift

14   medical center. Access to its parking lot and the streets surrounding Rancho Bravo was obstructed

15   by CHOP participants. CHOP participants operated an unpermitted food stand on the street near

16   to Rancho Bravo's restaurant.

17   31.33.   Defendant the City of Seattle ("the City") is a municipality incorporated in the

18   State of Washington. The Seattle Police Department ("SPD") is a division of the City. Jenny

19   Durkan is the Mayor and chief executive of the City, and a policymaker for the City.

20   ### III.   JURISDICTION AND VENUE

21   32.34.   This Court has subject-matter jurisdiction over this case under 28 U.S.C. §1331

22   because this action presents federal questions and seeks to redress deprivations of rights under

23   the United States Constitution pursuant to 42 U.S.C. § 1983.

24   33.35.   Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the events

25   giving rise to these claims arose in the Western District of Washington.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 10

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

1

## IV.   FACTUAL ALLEGATIONS

2

### A.  The Creation of CHOP

3      34.36.    On June 8, 2020, with protests ongoing near the East Precinct, the City emptied the

4  East Precinct of all weapons and valuables, and then abandoned it.

5      35.37.    The City left behind at the precinct and in the surrounding areas large barriers that

6  had been used in previous days to try to limit the movements of protesters.

7      36.38.    Predictably, almost immediately after the SPD abandoned the precinct and the

8  barriers, CHOP participants used the barriers to block off streets in the area and create a "no-cop"

9  zone. Initially, the blocked-off area extended to all streets within one block from the precinct.

10     37.39.    Without any police presence, the CHOP participants organized themselves,

11  declared the area "Free Capitol Hill," and stationed guards by the barriers that the City had

12  abandoned, thereby creating borders for the occupied area. The area later expanded, was referred

13  to as CHAZ for several days, and eventually became known as CHOP.

14     38.40.    CHOP's unofficial boundaries stretched north to East Denny Way, east to 13th

15  Avenue, south to East Pike Street, and west to Broadway. It encompassed the entirety of Cal

16  Anderson Park and sixteen city blocks in all.

17  ### B.  The Activities of CHOP Participants

18     39.41.    After the SPD vacated Capitol Hill, the CHOP participants claimed the area as their

19  own with a physical presence and a loose form of governance and justice.

20     40.42.    CHOP participants have maintained borders with barriers and people patrolling the

21  perimeter, as well as vehicles parked in the middle of rights-of-way.

22

23

24

25

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

41.43.    Many CHOP participants lived on the streets and sidewalks and in Cal Anderson Park, in tents such as the following:

 

42.44.    They painted graffiti on most available surfaces, and if a property owner painted over the graffiti, the graffiti was typically replaced within a few hours. CHOP participants even

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 12

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1  threatened business owners with retaliation if they painted over graffiti. Examples of this pervasive

2  graffiti include the following:







SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 13

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    43.45.    CHOP participants created various unpermitted, ad hoc food dispensaries and

2    stores on public property in front of and near private residences and businesses.

3    44.46.    CHOP participants created a "medical tent" at the Rancho Bravo restaurant under

4    a festival tent.

5    45.47.    On occasion, CHOP participants acted as a replacement police force, including by

6    demanding that business owners release individuals who were caught committing crimes and by

7    attempting to perform their own crime investigations.

8    46.48.    CHOP participants occupied the streets and sidewalks 24 hours a day, and had

9    speeches, debates, movies, music, and various other activities—including, in some instances,

10   illegal fireworks shows—on the streets and sidewalks. Disturbances and noise pollution extended

11   well past 10 p.m. and typically into the early morning of the next day.

12   47.49.    CHOP participants were observed carrying guns in the public streets and parks in

13   broad daylight.

14   48.50.    Cal Anderson Park was one of the focal points of CHOP. The approximately 7-acre

15   park, which was ostensibly owned by the City, was entirely handed over to the CHOP participants.

16   The City supported and enabled CHOP's occupation of the park through providing

17   washing/sanitation facilities, portable toilets, nighttime lighting, and other material support.

18   49.51.    As a result of the City's actions, Cal Anderson Park was transformed into a massive

19   tent city for CHOP participants, as shown here:

20
21
22
23
24
25

 

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 14

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

50.52.    Members of the public could not use Cal Anderson Park. CHOP's control of the park continued unabated until July 1, 2020. Local residents attempting to take pictures too close to Cal Anderson Park were threatened by CHOP participants, who have said they would steal their smartphones.




51.53.    CHOP participants even built makeshift gardens on the park's lawn to grow food for CHOP. The City handed over public property in the park for this use, as shown here:




52.54.    CHOP's control of Cal Anderson Park was a central nuisance to local residents and businesses. Many of the Plaintiffs' properties overlook, border, or are adjacent to the park. Not only were those residents deprived of their use of the park, but problems from CHOP's encampments in the park spilled over into the entire neighborhood. The hundreds of CHOP

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 15

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    participants in the park created excessive noise, even late into the night, in violation of the City's

2    ordinances. Participants set off fireworks at all hours of the day and night. Trash, feces, and other

3    refuse built up in the park, affecting the whole area. Worst of all, Cal Anderson Park was one of

4    the most violent areas of CHOP. Local residents saw individuals in Cal Anderson Park carrying

5    firearms.

6    **C.  The Effects of CHOP on Plaintiffs and the Class**

7    53.55.    The impacts on Plaintiffs and the Class were extensive. The experiences of each

8    Plaintiff are described in detail below. However, all Plaintiffs and Class members have in common

9    at least the following harms: a lack of public safety assistance and substantially impaired access to

10   and use of their properties. **Lack of public-safety assistance even in life-threatening**

11   **circumstances.**

12   54.56.    The City's endorsement and recognition of CHOP went so far that the SPD adopted

13   a policy and practice of not entering the area except in the case of life-threatening crimes, and even

14   then, the SPD response was weak and delayed.

15   55.57.    On information and belief, the SPD considered the area from Denny Way to Union

16   Street and Thirteenth Avenue to Broadway to be a "no response" zone where the SPD would not

17   respond to anything but the most serious crimes.

18   56.58.    And even in the most serious situations, the SPD's response was unconscionably

19   delayed. As SPD Chief Carmen Best explained on June 11, 2020, as she stood next to Mayor

20   Durkan:

21              SPD has a responsibility to provide public safety services to the
              entire East precinct and the City. The actions of a small group cannot
22              and should not deprive an entire segment of our community from
              public-safety services. In the first day of the SPD not having access
23              to the precinct, response times for crimes in progress were over
              fifteen minutes, about three times as long as the average .... If that
24              is your mother, or your sister, your cousin, your neighbor's kid that
              is being raped, robbed, assaulted, and otherwise victimized, you're
25              not going to want to have to report that it took the police three times

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 16

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    longer to get there to provide services to them. The difference in the
2    amount of time could protect someone's life and prevent a violent
     attack.

3    ~~57.~~59.   Recent events in CHOP demonstrate that if anything, Chief Best was being

4    conservative in her description of the public-safety emergency in CHOP.

5    ~~58.~~60.   At approximately 2:20 a.m. on June 20, 2020, there were two people shot in CHOP.

6    At least one of the shootings happened at or near the intersection of Tenth Avenue and Pine Street,

7    around the corner from the abandoned East Precinct. One of the victims died before reaching the

8    hospital. The second was admitted with life-threatening injuries. No suspects have been identified

9    or taken into custody.

10   ~~59.~~61.   Raw video streamed from the area shortly after that shooting demonstrates the

11   enormity of the risk created by the City for anyone who lives or works in CHOP. That video clearly

12   captured the following:[2]

13        a.   The video appears to start a couple of minutes after the shooting.

14        b.   One shooting victim was taken to the CHOP "medic tent" located in a

15   parking lot under a festival tent.

16        c.   No professional medics arrived until approximately 15 minutes into the

17   video to tend to the first shooting victim.

18        d.   No police were in the area until approximately 18 minutes into the video,

19   when cars and lights and can be seen several blocks away, and police can be heard on

20   megaphones demanding that barriers be moved to allow the police to enter.

21        e.   Approximately 19 minutes into the video, a small phalanx of approximately

22   8 police officers entered the area on foot and arrived in the area of the medical tent,

23   apparently for the purpose of trying to locate and extract the first shooting victim.

24

25

---

[2] https://www.facebook.com/WWConverge/videos/297548387941384/?v=297548387941384

~~SECOND~~ THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 17

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

f.     The phalanx of officers was immediately surrounded, yelled at, and pursued by CHOP participants.

g.     One police car finally entered the area approximately 20 minutes into the video.

h.     The police did not engage with the crowd and promptly left the area, after which CHOP participants created a human chain across the street to bar any further entry.

i.     There was a second shooting victim in CHOP located a couple of blocks away. It appears that no medics or police responded at all to the location of the second victim.

j.     Approximately 35 minutes into the livestream video, the second victim was placed into a plain white cargo van and presumably taken to the hospital. A voice can be heard explaining that Medic One drove by but did not come to the assistance of the person who ended up in the white van.

k.     Shortly after the second victim was driven away, private citizens began looking for bullet casings. No police were on the scene to perform any investigation in the immediate aftermath of the shooting.

60.62.     On June 21, 2020, another shooting occurred in the area at approximately 11:00 at night. There was no police or medic response, and the shooting victim was transported to the emergency room by private vehicle.

61.63.     In a press conference with Mayor Durkan on June 22, 2020, Chief Best reiterated the seriousness of the public-safety situation, stating:

> there are countless individuals who are in the CHOP that are there to engage, as the Mayor said earlier, in peaceful demonstrations. But there are also groups of individuals engaging in shootings, a rape, assaults, burglary, arson, and property destruction, and I have their police reports right

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 18

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

1
2
3
4

here. [*Holding up a stack of papers*] I'm not making it up. These things have happened. We cannot walk away from the truth of what is happening there. This is not about politics and I'm not a politician. This isn't a debate about First Amendment rights. This is about life or death. So we need a plan.

5   62.64.    In the early hours of June 29, yet another shooting occurred in the area.  This
6   shooting, at 12th and Pike, left a 16-year-old dead and a 14-year-old in critical condition.

7   63.65.    According to reports, the shooting began when "CHOP security" opened fire on a
8   white Jeep that had crashed into the CHOP barricades. Reports indicate that over a dozen shots
9   were fired.

10   64.66.    The City did not provide emergency medical services at the scene of the shooting
11   in the CHOP area. Instead, one of the victims was transported by private vehicle out of the CHOP
12   area and to a hospital. The other had to be taken "to a meeting point with Seattle Fire Department
13   Personnel, who then transported the victim to Harborview Medical Center."

14   65.67.    By the time the police reached the scene of the shooting at 12th and Pike to begin
15   an investigation, much of the key evidence had already been tampered with or lost. As the SPD
16   blotter put it, when police arrived on the scene to inspect the Jeep, "it was clear the crime scene
17   had been disturbed." No suspects have been identified or placed into custody.

18   66.68.    That same night, and possibly in connection with the same incident, bullets were
19   shot into the Onyx Condominium building, with at least one bullet coming within a foot of a
20   resident asleep in bed.

21   67.69.    Over the course of nine days, there were two homicides in CHOP. There had been
22   no homicides in Capitol Hill in 2020 before CHOP started, and in all of 2019, there were only
23   three homicides in the entire Capitol Hill neighborhood.

24
25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

### 2.    Impeded access to and use of property

68.70.    All Plaintiffs and Class members did not have the ability to use public rights of way, including streets and sidewalks, to access their homes, businesses, and properties.

69.71.    CHOP participants regularly moved the City-provided barriers and other large objects wherever they wished to block traffic, sidewalks, and all other manner of ingress and egress.

70.72.    In many cases, this meant people could not use public streets and rights-of-way to enter or exit their homes or businesses, clients cannot visit businesses, and businesses could not get deliveries. The difficulties were magnified for the elderly and the disabled.

71.73.    The barriers and the constant presence of CHOP participants also meant that residents, property owners, and businesses did not have full use of their property. If they could access their property, safety necessitated that many of them keep their doors locked. Many portions of property that were normally freely accessible—such as garages—had to be shut at all hours or else CHOP participants would vandalize them.

72.74.    Garbage and recycling services could not enter the area due to the myriad of barricades and CHOP border guards, forcing residents and businesses to pile up refuse without any idea when they might be able to discard it.

73.75.    Residents and businesses in the area were unable to receive deliveries at their homes because delivery companies could not or would not enter CHOP and the surrounding area because of barriers and safety concerns.

74.76.    Residents in and near CHOP were forced to endure loud noises, music, and even fireworks at all times of the day and night.

75.77.    Residents in and near CHOP did not have free and safe access in or out of their homes.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 20

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    76.78.    Businesses were unable to operate normally, or even open, because of blocked

2    access and concerns for the safety of their suppliers, employees, and customers.

3    77.79.    All of this is caused extensive economic and other harm to Plaintiffs and all other

4    members of the Class.

5    78.80.    As Chief Best stated during a joint press conference with Mayor Durkan on the

6    afternoon of July 1, 2020:

> If you have watched the news footage, you have seen how absolutely
> devastating the damage to this neighborhood is. I can tell you
> personally, after walking through the area, we walked the full perimeter,
> I was just stunned by the amount of graffiti, garbage, and property
> destruction. As we walked around the neighborhood, many people were
> coming out of their apartments and homes and thanking the officers
> profusely for being there and for helping to clean out the area. So, we
> don't even know how much trauma people were experiencing because
> of what was happening in that area.

13   **3.    Plaintiffs' individual stories**

14   79.81.    The impact of CHOP on residents, businesses, and property owners is best seen

15   through the stories of Plaintiffs, who are suffering from the City's policies every day.

16   80.82.    Each Plaintiff and the Class has suffered—and continues to suffer irreparable

17   economic and non-economic injury as a direct result of CHOP participants' presence on Capitol

18   Hill and its aftereffects. The City's support for CHOP enabled, aided, and abetted the ongoing

19   harm to each of the Plaintiffs and members of the Class.

20   81.83.    Although the City cleared CHOP on the morning of July 1, 2020, Plaintiffs and the

21   Class have continued to suffer harm due to restrictions in the area resulting from the existence of

22   CHOP, the continued public perception of the area as dangerous and unstable, and lost business

23   that may never return. Plaintiffs expressly reserve the right to seek recovery for such ongoing

24   harm.

25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

82.84.    *Plaintiff Car Tender.* Plaintiff Car Tender—a local small business with one location— has suffered a dramatic drop off in its auto-repair business since the establishment of CHOP. Since early June 2020, business revenues declined around 40% from the prior months of April and May 2020. This drop-in sales actually understates Car Tender's losses, however, as April and May's revenues were already lower due to the height of the COVID-19 pandemic. In late May 2020, Car Tender's revenues began an upswing coming out of the shutdown, which was suddenly interrupted by the sharp drop in customers caused by CHOP.

83.85.    Car Tender's loss of business revenue is a direct result of CHOP. Access to the shop has at times been substantially impeded due to barricaded streets. Further, customers told Car Tender that they would not bring their cars into the shop, out of fear of CHOP's location just down the street from Car Tender. Customers even came to the shop only to immediately turn around and leave, because they were fearful to leave their cars at Car Tender's location. Because of the City's enablement of CHOP, Car Tender is struggling to make ends meet.

84.86.    Car Tender's premises were also vandalized by CHOP participants. CHOP participants tore down the fence around Car Tender's car lot, permanently damaging the cement post such that an entire new fence will need to be constructed. They painted and vandalized with graffiti the side of Car Tender's building. Car Tender was fearful that if the company tried to cover up the graffiti, they would face reprisals from CHOP participants, as CHOP participants threatened to burn down other properties in the area when owners attempted to cover or clean up graffiti.

85.87.    Car Tender's customers were understandably concerned for their safety, and with good reason. Indeed, Car Tender's shop was recently broken into by a man who assaulted the son of one of Car Tender's owners with a knife. The details of the incident demonstrate the extreme risk of harm to which the City has exposed Plaintiffs and the Class.

86.88.    On June 14th at around 9:30 p.m., a person broke into Car Tender's building, armed himself with a knife and a spike that he found inside the building, and lit a fire in the shop. After

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 22

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   receiving a call from a neighbor alerting them to the break-in, Car Tender's owner and son called
2   9-1-1 and then went to the premises themselves, where they found the shop's garage had been
3   broken into. They found that the property had also been vandalized with Purell hand sanitizer,
4   which the intruder had dumped everywhere to use as fuel for the fire he had started. That fire was
5   still burning when the owner and his son arrived, but they were able to extinguish it. The intruder
6   was still on the premises, however, and he accosted the owner's son with the knife and spike and
7   abruptly assaulted him by hitting him in the chest.

8          87.89.   Although blindsided by the intruder's sudden unprovoked attack, the owner and his
9   son were able to wrestle the intruder to the floor in a scuffle. The intruder meanwhile tried to cut
10  the son's femoral artery and landed two large cuts to his clothing on the side of his leg. He also
11  repeatedly attempted to stab the son with the spike.

12         88.90.   After subduing the intruder, Car Tender's owner called 9-1-1 again, reporting the
13  arson, burglary, and assault, requesting police assistance at the scene. Other neighbors also called
14  9-1-1. But, despite the multiple 9-1-1 calls. the police never responded to the scene that evening.

15         89.91.   Several CHOP participants on the street who witnessed the incident approached the
16  shop and demanded the release of the apprehended intruder. Car Tender's owner at first insisted
17  that he was waiting for the police to come to the scene. An angry mob of CHOP participants,
18  perhaps as many as 500 although possibly more, gathered around Car Tender's fence and broke it
19  down, insisting on the release of the intruder. Members of CHOP mob insisted that the police
20  would never dare respond. Faced with a threat of mob violence, Car Tender's owner and son
21  handed the intruder over to CHOP participants.

22         90.92.   Because the police refused to protect Car Tender's property from burglary and
23  arson, Car Tender's owner was forced to sleep at the shop in an effort to protect it.  Car Tender's
24  owner tried to contact Mayor Durkan's office to report his concerns as a resident and small
25  business owner but received no response.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 23

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

91.93.    Car Tender's experience was not unique. Other local businesses also suffered from the City's actions.

92.94.    *Plaintiff Richmark Label.* Plaintiff Richmark Label is a local family-owned business on Capitol Hill that runs label-printing operations out of a manufacturing facility on Pine Street, directly adjacent to CHOP. Richmark Label's business has been negatively affected as a direct consequence of CHOP.

93.95.    CHOP frequently blocked access to the 11th Avenue side of Richmark Label's building, where Richmark Label maintains a loading dock for receiving deliveries and shipping. Richmark Label must receive deliveries on an ongoing basis in order to maintain its business as well as make shipment of its products. Richmark Label's ability to use its loading dock was substantially impeded, as the 11th Avenue access was frequently blocked by barricades, or because CHOP participants engaged in intimidation tactics, or because of other CHOP activities. Some delivery drivers reported to Richmark Label that they would not even attempt delivery to their building, because it is unsafe. Several delivery drivers who attempted delivery were stopped and accosted by CHOP participants. Richmark Label's usual shippers refused to deliver and UPS recently elected not to come and pick up a pallet of wine labels for shipment, one of Richmark Label's largest sources of business. On other occasions, labels shipped late, incurring costs and straining Richmark Label's business relationships with its customers.

94.96.    The City's support of CHOP put Richmark Label's business at risk, as well as the livelihood of its over 70 employees.

95.97.    This loss to business is not the only harm Richmark Label is suffering due to CHOP. Richmark Label owns its facilities, a historic building from 1927, on which the company paid to have an artistic mural painted as a gift to the whole Capitol Hill community. That mural was vandalized by CHOP participants beyond repair, whereas before CHOP's occupation there had

1  only been minor instances of occasional graffiti. Now the wall will have to be repaired and

2  repainted.

3     96.98.    Richmark Label also owns a parking lot on the 11th Avenue side of the building. It

4  rents the parking spaces during non-business hours. Richmark Label was forced by CHOP to shut

5  the parking lot down because the roads for accessing the parking lot were blocked and customers

6  are and were afraid of entering the area. The company is receiving none of the usual rental income

7  it typically receives from the parking spaces. The parking lot also typically serves as customer

8  parking for Richmark Label and several of its tenants who rent space in the company's building.

9  But, due to CHOP and its aftereffects, both Richmark Label and its tenants are being deprived of

10  customer parking.

11     97.99.    Unauthorized cars also parked in Richmark Label's lot. Richmark Label contacted

12  towing companies, but all refused to tow the cars because CHOP made the area unsafe. Richmark

13  Label called the police on multiple occasions regarding the unauthorized cars parked on their

14  property, but the police would not act. Richmark Label called 9-1-1 regarding the unauthorized

15  cars trespassing on their property, only to be told at least twice that SPD was not responding to

16  calls in the area.

17     98.100.    Like Plaintiff Car Tender, Richmark Label was threatened with violence by CHOP

18  participants. When CHOP first arose, Richmark Label allowed a local news crew to access its roof

19  to film the protests and CHOP. SPD officers then also accessed Richmark Label's roof to assess

20  the situation, where they were photographed by CHOP participants. Those photographs were then

21  posted online, leading to a social media frenzy against the company. Subsequently, Richmark

22  Label's employees reported that they did not feel safe coming to work, because of the threat of

23  harassment and violence from CHOP participants. CHOP participants set up cones across 11th

24  Avenue, which must be crossed to access Richmark Label's building. CHOP participants stopped

25  people and required them to answer questions about who they are and what they were doing in the

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 25

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1   area before letting them pass. The result is that customers, shippers, and employees were scared to

2   even enter the area.

3   99.101.   Richmark Label was in contact with the Mayor's office, but the office did not return

4   the company's calls, offer any assistance, or provide any opportunity to challenge the City's

5   decision to authorize the ongoing occupation of the CHOP area. The City's support of CHOP

6   through encouragement and material support enabled CHOP's threat to Richmark Label's

7   business.

8   100.102.   *Plaintiff Northwest Liquor and Wine*. Northwest Liquor and Wine—a one-location

9   store specializing in high-end wine, beer, and spirits—is yet another local small business that

10  suffered as a result of the CHOP occupation. After record sales in May 2020, the store had its

11  worst month in June 2020 since opening at that location in 2012. In June 2020, the company's

12  sales were down approximately 70% from average.

13  101.103.   Customers are unable to visit the store because the surrounding streets have been

14  blocked off to traffic. Northwest Liquor and Wine has access to an adjacent parking garage, but

15  they have been forced to close it to prevent CHOP participants from camping out in it and even

16  starting fires. CHOP barricades also meant that suppliers were unable to make deliveries.

17  102.104.   The owners and employees did not feel safe, as there were disturbances in the store

18  and people on the streets nearby carrying guns. Northwest Liquor and Wine normally maintains

19  around 4 to 6 employees. Due to CHOP, its employees were understandably too scared to come to

20  work out of concern for their safety.

21  103.105.   *Plaintiff Magdalena Sky (Tattoos and Fortune)*. Plaintiff Magdalena Sky is an

22  activist and supporter of Black Lives Matter. Ms. Sky is the sole proprietor of Tattoos and Fortune.

23  Ms. Sky is autistic and has worked tirelessly for years using her unique artistic skills to support

24  and grow her business. Her business is her own safety net and primary source of income. CHOP

25  ripped that business out from under her feet.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

104.106.    Like many other local businesses, Tattoos and Fortune is sinking because of the City's support of CHOP. Ms. Sky's tattoo and fortune telling services depend on regular client access to its Capitol Hill studio. Tattoo and Fortune's studio is within CHOP, which made client access impossible. The barricades and encampments blocked both vehicle and foot access to the studio, as well as delivery of vital business supplies, just as they blocked the roads, parking, doorways, and driveways of many local businesses. As a result, Ms. Sky was forced to close Tattoos and Fortune's doors. Without clients, Tattoos and Fortune cannot generate any revenue. In addition, Tattoos and Fortune suffered from the lack of trash service, access for emergency services, and police protection. Even if Ms. Sky's clients had access to the studio, many were fearful to come because of CHOP. To reach her business, her clients would have had to cross barricades that CHOP participants set up, where they might be stopped, questioned, and/or harassed by CHOP participants, as others were.

105.107.    Ms. Sky herself witnessed theft and looting from other local businesses and feared CHOP participants might steal and loot from her business, should she even try to open her studio's doors. On one occasion, Ms. Sky was followed and harassed, like so many others have been due to the rise in harassment and sexual assault in the area since CHOP began. The fear of violence caused Ms. Sky stress, exacerbated by her autism. The City ignored her concerns, as with the mental health of many local residents and business owners. Her business—her primary means of livelihood—is losing all its revenue. Some of her clients may never return, as they canceled appointments and began seeking tattoo and fortune services elsewhere.

106.108.    Capitol Hill is a diverse neighborhood, known for its minority presence and as a center for Seattle' LGBTQ residents. Many small business owners in the area are minority-owned and suffering loss of property and business from CHOP, just as Tattoos and Fortune is. The City and CHOP did not respond to concerns of small businesses like Ms. Sky's Tattoos and Fortune.

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 27

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

Ms. Sky, along with other local business owners, had no forum in which to voice her concerns and try to stem her businesses losses accruing each day CHOP and its aftereffects continue.

107.109.    *Plaintiff Bergman's Lock and Key.* Plaintiff Bergman's Lock and Key is a small business that has operated on Capitol Hill since 1956.

108.110.    Bergman's Lock and Key's employees were not safe to come to work due to CHOP. Several on their way to or from work were followed by CHOP participants wielding baseball bats, who threatened them not to come into the area. To protect its property from CHOP participants, Bergman's Lock and Key was forced to board up its premises. Its building was tagged with graffiti and vandalized. Because CHOP became more dangerous as the days progressed, the company closed around 3:00 p.m., two and half hours before its normal 5:30 p.m. closing time.

109.111.    Bergman's Lock and Key is suffering financially. Its customers cannot access the store due to roadblocks, barricades, and lack of parking caused by the City's support of CHOP. Other customers are simply too scared to come, because of Bergman's Lock and Key's proximity to the CHOP zone. Customers called citing their fears and the company was forced to refer them to competitor businesses outside of the CHOP area. Bergman's Lock and Key's revenues declined in June 2020 by 60% due to CHOP. Bergman's Lock and Key was able to continue working as an essential business during the COVID-19 shutdown, but CHOP stopped nearly all customers from coming in. Business deliveries and shipments were also routinely delayed.

110.112.    The City actively supported CHOP participants near Bergman's Lock and Key. The City provided cleaning stations for CHOP participants, large stainless-steel sinks, and portable toilets.

111.113.    Bergman's Lock and Key tried to complain to the City, but received no response.

112.114.    *Plaintiff Matthew Ploszaj*. Plaintiff Matthew Polszaj has lived for approximately 8 years in an apartment he leases at 1210 E. Pine Street. His residence was within CHOP, next to the Seattle Police Department's East Precinct.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

113.115.     During the existence of CHOP, there were several times that Mr. Ploszaj was unable to access his apartment because of obstructions created by CHOP and CHOP participants. Those obstructions included people, physical barriers, camping tents, festival tents, makeshift "storefronts," and other structures on the streets and sidewalks around his apartment building.

114.116.     Because of these obstructions and because he feared for his safety, Mr. Ploszaj was forced on several occasions during the existence of CHOP to leave the area and stay elsewhere in Seattle.

115.117.     Mr. Ploszaj's apartment building was broken into four times during the existence of CHOP, even though it had never been broken into at any other time during his previous 8 years at that address.  The Seattle police were contacted each time the apartment was broken into, but the police did not respond on any of those occasions.

116.118.     On the evening of June 29, 2020, an apartment in Mr. Ploszaj's building was burglarized.  Mr. Ploszaj and his neighbor contacted the police after the burglary, at approximately 10:30 p.m.  Police told them that they would not respond to the building because of its location within CHOP and requested that Mr. Ploszaj and his neighbor meet them at 20th and Madison (more than 8 blocks away) to make a report. One of the residents reported to that location. After an hour had passed since their initial phone call, no police had responded, and Mr. Ploszaj and his neighbor called police again.  They were able to make a report on the phone during this second phone call, but no officers responded to investigate.

117.119.     On June 25, 2020, a CHOP participant climbed atop Mr. Ploszaj's building and threatened to kill himself. Mr. Ploszaj called 9-1-1 numerous times to seek assistance. He was asked whether he wanted to meet an officer somewhere outside CHOP because police would not respond to his address.  Mr. Ploszaj declined and continued to call 9-1-1 several times during the 90 minutes that the individual was threatening suicide. The 9-1-1 operators thanked him for the updates but police never responded to assist.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

118.120.    *Plaintiff Argento LLC*.  Plaintiff Argento owns and operates Café Argento.  Argento suffered lost income and business because of CHOP. During the existence of CHOP, the presence of numerous CHOP participants wielding guns forced Argento to open later and close earlier because of concerns for the safety of Argento employees and customers.

119.121.    Argento customers were also unable to access the café, or were reluctant to come to the café, during the existence of CHOP, because of the numerous blockades and other obstacles on the public streets and sidewalks outside the café. Customers and employees were also harassed on public streets and sidewalks by CHOP participants, and employees were often too afraid to come to work.

120.122.    Access to the café for the disabled was especially difficult because of the numerous blockades and other obstacles placed and created by CHOP participants. Argento's owner, Faizel Khan, contacted the Seattle Department of Transportation about the inaccessibility for disabled persons, but the Department of Transportation did nothing to help improve the access.

121.123.    CHOP participants frequently came into the café in order to pressure Mr. Kahn and his employees to support the political views of CHOP and CHOP participants.

122.124.    CHOP participants regularly demanded to use the café restrooms and often refused to leave, and on occasion left behind used needles in the bathroom.

123.125.    Mr. Kahn called 9-1-1 four times regarding incidents at the café during the existence of CHOP, but he was told that police would not respond to his area unless there was a violent incident.

124.126.    CHOP participants regularly deposited human waste and other waste on and in the streets, sidewalks, buses, patios, doorways, and other areas around Café Argento.

125.127.    During the existence of CHOP, Argento was unable to use City services for trash and recycling, and could not receive package deliveries from UPS, Federal Express, or Amazon.

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 30

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

126.128.    *Plaintiff Onyx HOA*. Plaintiff Onyx HOA is an association of Capitol Hill residents and condo owners in the Onyx Condominium building. The HOA and its residents suffered harm from CHOP. The Onyx Condominium's residents felt unsafe and were constantly barraged by excessive noise, fireworks, and other nuisances. The building was subject to graffiti and other acts of vandalism at the hands of CHOP participants. The HOA and its residents called 9-1-1 but received no response or direction from the City. The HOA's insurer threatened to raise rates and premiums if CHOP was not disbanded. Tenants made plans to leave, threatening the funding of the HOA. All tenants have lost value in terms of property values as a direct result of the City's support of CHOP.

127.129.    The Onyx Condominiums are on the border of CHOP. As a result, Onyx Condominium residents' access to their own homes was impeded, due to barricades on the public streets. For example, the president of Onyx HOA, individual Plaintiff Wade Biller, was stopped by CHOP participants at the barricades and told he was not allowed to drive through. He was stopped by a CHOP participant while trying to drive down 12th Avenue to access his home. At other times, so-called "security" for CHOP came to the barricades and offered to escort him into the area to access his home so that CHOP participants would not vandalize his car.

128.130.    CHOP participants stole an expensive compact dumpster bin belonging to Onyx HOA. Onyx HOA's president, Mr. Biller, demanded the bin back, but CHOP participants refused to return it. During negotiations for return of the bin, Mr. Biller was assaulted by a CHOP participant who violently kicked him in the back as he tried to leave the scene. The HOA president called the police, but the police did not respond to the incident of battery and assault for more than 90 minutes, by which point the perpetrator was long gone. Eventually, when CHOP participants had access to City-owned barricades to encircle CHOP, the compactor bin was returned.

129.131.    Onyx HOA was forced to hire additional security to protect the property and its residents from the CHOP participants. At any time, two to four armed guards had to be present, as

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 31

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

some CHOP participants in the area were violent and armed with guns. The HOA's residents lived under constant fear and threat to their wellbeing and property.

~~130.~~132.   Mr. Biller, in his capacity as Onyx HOA's president, wrote to Mayor Durkan on June 11, 2020, about the plight of the building's residents. He wrote: "We are fending for ourselves as residents and businesses in the Capitol Hill neighborhood. We have had to hire private security to help keep tabs on the escalating issues . . . . I ask that you take a strong stance and allow the police to reclaim our streets for the residents who live here and don't [want] to become part of this anti-police and anti-government movement."   Mayor Durkan did not respond or provide any opportunity to challenge the City's policies supporting the occupation of the CHOP area.

~~131.~~133.   In the early morning hours of June 29, bullets were shot into the Onyx building, with at least one coming within a foot of a resident asleep in bed.

~~132.~~134.   *Madrona Real Estate Plaintiffs.* Plaintiffs Madrona Real Estate Services, Madrona Real Estate Investors IV, Madrona Real Estate Investors VI, and 12th and Pike Associates LLC (collectively "Madrona Real Estate") suffered economic loss from CHOP, including in the form of reduced rents, property damage, and a decline in property values. Their tenants—Capitol Hill's local residents and businesses—were also harmed and harassed.

~~133.~~135.   Madrona Real Estate owns and/or manages multiple residential and commercial buildings on Capitol Hill in and around CHOP. The presence of CHOP greatly reduced the value or property in what was, until recently, one of the most popular and expensive neighborhoods in Seattle.

~~134.~~136.   A resident in a building managed by Madrona Real Estate recently called 9-1-1 to respond to an incident of violence near Madrona Real Estate's building at 1414 12th Avenue. The resident had witnessed from her condo's patio a fight in the street occurring at or near the intersection of 12th Avenue and Union. The resident saw what appeared to be a man and a woman fighting over a child, causing the woman to run into a nearby building and barricading the door to

~~SECOND~~ THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 32

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

block the assaulting man. The resident called 9-1-1, who took her name and number. She waited for hours, but police never responded to the incident or called her back. This is just one example of the lawlessness the City enabled in the area. The same resident normally walked her dog in the neighborhood, but was hesitant to leave her residence. She witnessed CHOP participants openly doing hard drugs on the street around her building with impunity due to the lack of any SPD presence.

135.137.    The same building at 1414 12th Avenue managed and owned by Madrona Real Estate was broken into.  It was vandalized in various ways, including by pulling out pipes.  In one instance, the fire alarm was activated, which set off the sprinkler system (causing evacuation of the building's over 100 residents and causing flooding in the building garage). Residents also reported that boxes and other items were stolen. During the CHOP occupation, an individual trespassed on the property and defecated in building's lobby.

136.138.    At other locations in the area, Madrona Real Estate's residents reported that their condos were broken into or burglarized by CHOP participants. CHOP participants harassed residents, vandalized the Madrona Real Estate's property, and left human feces on multiple premises.

137.139.    SPD refused to help Madrona Real Estate protect private property or otherwise to help address these problems. At considerable expense, Madrona Real had to hire increased private security to protect its residents and property. At the building where the fire system was vandalized, Madrona Real Estate incurred considerable expense in fixing the damage to property and had to pay for a fire watch to be instituted.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 33

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    138.140.    On the morning of June 23, 2020, one of Madrona Real Estate's commercial

2    tenants, a restaurant located at 12th Avenue and Pike Street, near but not directly in the CHOP

3    blockaded area, was attempting to access its location in an effort to try to reopen. However, the

4    entrances and stoop area in front of the restaurant were entirely blocked by an encampment erected

5    by a CHOP participant. The tenant called the police, asking for assistance in removing trespassers

6    from its private property, so that it could access and open the property. The police said that they

7    would not respond because they "are not allowed to come within two blocks of CHOP".



21    139.141.    Clearly, the City's refusal to even respond to assaults in the neighborhood, let alone

22    take any measures to ensure public order and access, detracted from the area's desirability for

23    current and potential residents and businesses. At a new property Madrona Real Estate has opened

24    in the area with 45 residential units, only 3 have been leased. Up until the emergence of CHOP the

25    area was among the trendiest location for residents, but, since the emergence of CHOP, Madrona

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 34

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    Real Estate has suddenly had no interest in the 42 unleased units, because no one is interested in

2    moving to the area.

3        140.142.    Madrona Real Estate's residents and tenants face other hardships as well. Many of

4    the area's millennial residents regularly shop online, but, according to Madrona Real Estate's

5    residents and tenants, Amazon would not deliver packages in area, due the barricaded streets and

6    presence of CHOP participants. The inability to purchase or ship through Amazon is even more

7    acutely felt in the midst of the COVID-19 pandemic, when many people rely on deliveries to safely

8    deliver food, medicine, and other essential items.

9        141.143.    Most of Madrona Real Estate's commercial tenants wanted to open but were unable

10   to do so, because they were fearful of CHOP, had no way of attracting customers, and/or could not

11   be accessed due to blocked streets. Unable to generate revenue, many of these tenants asked

12   Madrona Real Estate for rent relief. Many are small, locally owned stores. Madrona Real Estate

13   has been giving concessions in the form of free rent, resulting in economic loss, but even so many

14   of the small commercial tenants are still facing bankruptcy.

15       142.144.    The City's policies with respect to CHOP have resulted in other sources of

16   economic loss to Madrona Real Estate. For example, Madrona Real Estate operates a parking

17   garage near CHOP. But, since the occupation of the CHOP area started, nearly no one is coming

18   to the area to shop or dine. Parking revenue in June 2020 was only a small fraction of the average.

19       143.145.    Madrona Real Estate complained to the City and even sent a letter to Mayor

20   Durkan. Mayor Durkan did not respond or acknowledge the plight of the many residents of

21   Madrona Real Estate services, let alone provide any recourse to challenge the City's policies and

22   conduct.

23       144.146.    *Plaintiff Hunters Capital.* Plaintiff Hunters Capital is a real-estate company that

24   owns or manages multiple residential, commercial, and mixed-use buildings on Capitol Hill in and

25   around CHOP. Like Madrona Real Estate, the presence of CHOP is causing economic injury to

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 35

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Hunters Capital, including loss of revenue, damage to property, and decline in property value. Hunters Capital has recently had investors back out of Capitol Hill development projects, citing CHOP as the reason to withdraw. Every day the City supported the ongoing occupation of CHOP, Hunters Capital incurred further irreparable harm.

145.147.   Hunters Capital property and employees were also threatened by CHOP participants. For example, a Hunters Capital maintenance employee was recently attempting to clean up CHOP graffiti at a Hunters Capital building located near 10th Avenue and Pike Street at around 7:00 am in the morning. As he started to paint over the graffiti, the worker was accosted by a group of CHOP participants. The participants ordered him to stop removing the graffiti and threatened to burn the building down if he did not comply. Because of the threats, the maintenance worker left without painting over the graffiti, emotionally distraught due to the threats of violence and arson.

146.148.   Hunters Capital's residential tenants found that the area around CHOP was unlivable. For example, they reported numerous noise and safety concerns. Although the City has a noise ordinance, it was not enforced in and around CHOP. CHOP participants violated the ordinance late into every night, even setting off fireworks into the early hours of the morning. Hunters Capital's residential tenants simply could not sleep and were deprived of their right to quiet enjoyment of their homes. Hunters Capital wrote to the City repeatedly, but the City did not respond to the concerns or provide any recourse or ability to challenge the City's policies or conduct with respect to CHOP.

147.149.   Hunters Capital's residential tenants also reported concern for their physical safety. Many who used the local Cal Anderson Park for recreation or to walk their pets could not do so because of safety concerns and rampant public drug use. Incidents of assault and harassment occurred in the area. Hunters Capital's residents recently witnessed a peaceful individual forcefully removed from the area by CHOP mobs. Female renters in particular had reported concerns about

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 36

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

their personal safety, in light of numerous reported instances of sexual assault within CHOP. Some residential tenants have threatened to break their leases at properties owned by Hunters Capital because of the extensive problems created by CHOP.

148.150.     Hunters Capital's commercial tenants are also suffering. Many reported that they could not open, because they feared doing so would expose them to looting and arson. Many tenants witnessed assault, theft, and looting. These commercial tenants were forced by CHOP to close and board up their stores in order to protect them. Some commercial tenants physically could not open under any circumstances, as CHOP participants blocked store entrances, including by setting up residential areas for CHOP participants on public streets and sidewalks with tents. Hunters Capital's commercial tenants are struggling. Many are small businesses and storefronts that depend on visitors coming to Capitol Hill. Many currently cannot pay their rent as a direct consequence of CHOP and its aftereffects.

149.151.     Other Hunters Capital commercial tenants with office space in the area reported that they are and were unable to come to work at their office space, because of blocked access and fear of CHOP participants. Additionally, the commercial office tenants reported that the noise issues were so serious that they and their employees were unable to use their office space for work. Loud speeches and chanting at all hours of the day made normal working conditions impossible. The vast majority of Hunters Capital commercial-office tenants report that they and their employees were simply unable to come to work at all.

150.152.     Hunters Capital's tenants have already begun to leave because of CHOP, and others cannot pay rent. Every day that passes more of the company's tenants leave the area, at considerable loss to Hunters Capital. Further, there has been no interest from prospective tenants. As long as CHOP and its aftereffects remain, nearly no one is interested in relocating to the Capitol Hill neighborhood.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 37

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   151.153.    *Plaintiff Olive ST Apartments.* Olive ST Apartments is another small business on

2   Capitol Hill that struggled because of CHOP. Olive ST Apartments owns two apartment buildings

3   close to Cal Anderson Park. Previously a desirable location for renters, life for Olive ST

4   Apartments' tenants became unlivable. The tenants were terrified by CHOP participants carrying

5   guns, in addition to the rampant violence, harassment, and vandalism within CHOP. Olive ST

6   Apartments' owner was videotaped and harassed while trying to move a garbage dumpster several

7   blocks outside of CHOP just so the garbage could get picked up.

8   152.154.    Due to safety concerns, Olive ST Apartments was forced to hire private security.

9   Nevertheless, Olive ST Apartments' buildings were covered with graffiti multiple times. The

10  company tried cleaning the graffiti off, only for its buildings to be vandalized again. On several

11  occasions, CHOP participants attempted to break into its buildings, once breaking the lock box for

12  mail. Olive ST Apartments called the police, but the police told Olive ST Apartments' security

13  guard that they would not send anyone to the area.

14  153.155.    The noise, including from Cal Anderson Park, also made conditions for Olive ST

15  Apartments' tenants unlivable. The company received constant complaints about the noise at all

16  times of day and night, including gun shots. Tenants left to avoid the noise.

17  154.156.    In addition to ceding the nearby Cal Anderson Park to CHOP, the City supported

18  the CHOP participants near Olive ST Apartments by providing them with barricades, lights, toilets,

19  handwashing stations, and fire extinguishers. The City allowed CHOP participants to use bright

20  lights at Cal Anderson Park to facilitate CHOP activities there, causing a nuisance to Olive ST

21  Apartments' tenants.

22  155.157.    Given the unlivable conditions, it was impossible for the company to rent its

23  apartments. Tenants moved out because of the nearby presence of CHOP. No new renters have

24  interest in moving to the area. Each day CHOP and its aftereffects continue, Olive ST Apartments

25  incurs further harm and economic loss.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

156.158.    *Plaintiff Redside Partners*. Plaintiff Redside Partners performs real-estate management services to buildings near CHOP. Its business has also been hurt by CHOP and its aftereffects. Redside Partners employees reported that they do not feel safe coming to work, as the company's offices are near Cal Anderson Park. The company's employees report widespread lawlessness, including vandalism, graffiti, and public drug use affecting the buildings the company manages. CHOP participants trespassed on Redside Partners's properties, including climbing up fire escapes to get on building roof tops. Redside Partners complained to the City but received no response.

157.159.    Capitol Hill's real-estate companies like Plaintiffs Madrona Real Estate, Hunters Capital, and Redside Partners have invested millions of dollars over the years to turn Capitol Hill into a desirable location, with modern condos, restaurants, and shops. They have made investments in new, state-of-the-art buildings and the restoration of many historic buildings. Over the last several decades, they have helped transform Capitol Hill into one of the nation's most vibrant and architecturally attractive neighborhoods, a diverse melting pot for both local residents as well as tourists, with the City's best boutique shopping, dining, socializing, and urban living. It has fostered a livable community for many new residents and a superstructure for many thriving small businesses, which employ thousands of employees from a diverse set of backgrounds. The immense value and wealth this has created, for Plaintiffs, the Capitol Hill community, and Seattle more generally is actively being destroyed by the City's actions.

158.160.    *Plaintiff Rancho Bravo.* Rancho Bravo is a restaurant well-known for providing quality Mexican food at affordable prices. Its location on Capitol Hill is on 11ᵗʰ and Pine Street, in the center of what became CHOP. In the days following the SPD's abandonment of the East Precinct, Rancho Bravo's owner and others met with city officials, including the Fire Chief, and urged them to remove the barricades that had been left behind. They pointed out that, without the barricades, the CHOP participants could continue their protest activities but would not obstruct

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 39

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   streets or hamper businesses. The next day, the City not only failed to remove the existing

2   barricades which had been used by police during the protests, but the City also provided additional

3   concrete barriers to CHOP participants to set up their "autonomous zone" to keep police and others

4   out.

5   ~~159.~~161.   Also, after the City's decision to abandon the East Precinct, CHOP participants,

6   without asking Rancho Bravo, set up a makeshift medical center in the outside seating areas in

7   front of the restaurant. This "medic station" was in operation for weeks and obstructed customer

8   access to seating.

9   ~~160.~~162.   At one point during the occupancy, CHOP participants set up a vehicle and trailer

10  blocking the northeast access point to the Rancho Bravo parking lot. The participants involved in

11  placing these obstructions set up a food stand on the street near Rancho Bravo serving tacos,

12  burritos, fruit, and other concessions. Rancho Bravo's owner met with the owners of this food

13  stand and asked if they had a permit. He was told that they had no permit but that the CHOP leaders

14  had approved their activities.

15  ~~161.~~163.   During the CHOP occupancy, Rancho Bravo stayed open, believing that its

16  property would be in greater danger had it abandoned the restaurant. Having seen the damage to

17  other buildings in the area, Rancho Bravo was concerned that CHOP participants would vandalize

18  or perhaps even burn down the Rancho Bravo building if it were abandoned. As it was, CHOP

19  participants left extensive graffiti on and around the restaurant building.  Rancho Bravo's business

20  dropped precipitously during the occupancy, leading to significant economic losses.

21  ~~162.~~164.   *Plaintiff Sway and Cake.* Sway and Cake is a clothing store located on 12th Street

22  and Pike Street. Its storefront looked out on barricades placed by CHOP participants at the entrance

23  to CHOP at that intersection. Sway and Cake had been closed due to the public health crisis and

24  was preparing to re-open at the time the protests began. However, once SPD abandoned the East

25  Precinct, and the City discontinued providing police and emergency services to the area, Sway and

~~SECOND~~ THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 40

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1   Cake had to board up its storefront and remain closed despite State orders permitting re-opening.

2   The store feared the possibility of vandalism, arson, or other crimes. Also, the environment in the

3   CHOP, according to the store's owner, was not conducive to her clientele; rather, it was completely

4   lawless and dangerous. Sway and Cake's owner visited the store while CHOP was being occupied

5   and, when approaching the barricades, would be asked by those guarding the barriers why she was

6   entering the area.

7       163.165.   *Plaintiff Shuffle LLC/Cure Cocktail.* Cure Cocktail is a restaurant and bar with

8   windows and a patio overlooking Cal Anderson Park from its location on Nagle Place.  Cure

9   Cocktail's business suffered dramatically once the CHOP occupation began. Access to Nagle Place

10  was blocked by barricades, and the patio, rather than looking over the normally pleasant Cal

11  Anderson Park, now provided a view of, among other things, armed CHOP participants and a tent

12  city. Because of the notoriety of CHOP and the barricades, deliveries of inventory to Cure Cocktail

13  were cancelled. Without police presence, the area was dangerous, and escalated in danger as crime,

14  including shootings, became common. Potential customers no longer wanted to be near the

15  restaurant or the area.  A once vibrant business, even during the health crisis through online orders,

16  Cure Cocktail's revenues declined dramatically. When interacting with Cure Cocktail personnel,

17  CHOP participants would ask questions such as, "Are you for the CHOP or are you for the police?"

18  Even though Cure Cocktail supports Black Lives Matter and other causes, it became fearful in its

19  communications with the protestors over what might happen if they offended CHOP participants.

20  In some communications, they were threatened with "exposure" over Instagram or other social

21  media sites if they did not express support for specific causes.

22      **D.  The City Actively Supported and Encouraged CHOP and CHOP Participants.**

23      164.166.   In the face of all this destruction, City leaders, including Mayor Durkan, embraced

24  the existence, message, and methods of CHOP and CHOP Participants. They did this with physical

25

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 41

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

support and extensive verbal support and encouragement that has expressly endorsed the barricading and occupation of City streets and parks.

165.167.    Since the day that the City abandoned the East Precinct, the City had full knowledge of the problems created for businesses and residents in and around CHOP, including property damage, lack of police response, the inability for workers and residents to enter and leave the area, the inability for businesses to receive deliveries, and other adverse impacts on residents, businesses, and property owners in the area. The City nevertheless adopted a policy supporting the CHOP occupation, acting with deliberate indifference toward those suffering harms from it. Evidence of the City's knowledge includes the following:

      a.    At a June 11, 2020 press conference with Mayor Durkan, Chief Best made it clear that the City was fully aware that its 9-1-1 response times had tripled and that there was a serious public-safety crisis for anyone who lives or works in CHOP.

      b.    On June 16, 2020, the City stated, via a press release from the Mayor's office:

> Beginning last Tuesday, City officials have been on site on Capitol Hill to work [to] meet community needs including hygiene, sanitation and safety. Utilities including Puget Sound Energy and SPU have been able to respond to the area for service. Seattle Police Chief Carmen Best has visited the site multiple times. Over the past week, conversations continued between City officials, organizers onsite for the CHOP, residents and businesses. … Every day, Seattle Fire Chief Harold Scoggins, Seattle Department of Transportation Director Sam Zimbabwe, and Seattle Public Utilities General Manager Mami Hara have been on site. On Sunday, they held a meeting with onsite organizers, small businesses, and residents to discuss proposed changes to the protest zone.

      c.    On information and belief, Mayor Durkan and the SPD have been inundated with complaints about CHOP that describe in detail the extensive property damage, restricted access, and economic loss that residents, businesses, and property owners are suffering.

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1          d.    In response to at least some requests from desperate businesses and

2    residents for her to cease her support of CHOP, Mayor Durkan's office has provided a

3    stock response acknowledging that the City is "maintaining" a space for CHOP,

4    including by, for example, providing a "sturdier concrete barrier" to help CHOP block

5    a public street. The stock response states in part as follows:

6          Thank you for reaching out.

7          The Capitol Hill Organized Protest has emerged as a gathering
          place where community members can demand change of their
8          local, state, and federal government. Capitol Hill and Cal
          Anderson Park have long been a gathering place for justice. While
9          there have been inaccurate and misleading depictions of the CHOP
          from the President and some national media, the City believes first
10         amendment activities can continue while also maintaining public
          safety and allowing access for residents and businesses who
11         operate in the area. Mayor Durkan believes these changes can help
          ensure any focus of the CHOP and Cal Anderson will allow for
12         peaceful demonstrations to continue.

13
          Beginning last Tuesday, City officials have been on site on Capitol
14         Hill to work [to] meet community needs including hygiene,
          sanitation and safety. Utilities including Puget Sound Energy and
15         SPU have been able to respond to the area for service. Seattle
          Police Chief Carmen Best has visited the site multiple times. Over
16         the past week, conversations continued between City officials,
          organizers onsite for the CHOP, residents and businesses. The
17         City is committed to maintaining space for community to come to
          together, protest and exercise their first amendment rights. Minor
18         changes to the protest zone will implement safer and sturdier
          barriers to protect individuals in this area, allow traffic to move
19         throughout the Capitol Hill neighborhood, ease access for
          residents of apartment building in the surrounding areas, and help
20         local businesses manage deliveries and logistics. Additionally all
          plans have been crafted with the goal of allowing access for
21         emergency personnel including fire trucks.

22
          Every day, Seattle Fire Chief Harold Scoggins, Seattle
23         Department of Transportation Director Sam Zimbabwe, and
          Seattle Public Utilities General Manager Marni Hara have been on
24         site. On Sunday, they held a meeting with onsite organizers, small
          businesses, and residents to discuss proposed changes to the
25

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 43

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

protest zone. In coordination with protesters onsite, work began at 6:30 a.m. on Tuesday to remove a tent barrier at 10th and Pine and replace it with a sturdier concrete barrier to improve public safety. The City has successfully worked with protesters onsite to reconfigure the CHOP to allow for public safety and better access for the local community. That has involved rerouting traffic, freeing up alley access, opened streets, and replacing makeshift barriers with heavy concrete barriers that can be painted.

e.   In addition to the numerous City officers listed above, Mayor Durkan herself has personally visited CHOP and has seen what is happening. In an interview given in her City offices on Facebook Live on June 12, 2020, Mayor Durkan made clear that she had seen the barriers and talked to CHOP participants and apparently approved of them using an individual with behavioral health issues to enforce the perimeter: "It's interesting, when I was at the CHAZ, walking around, similar kind of philosophy, because there's this one guy, some behavioral health issues, and it was like, look, he has some hard times, and he helps on that barricade over there, and then when he starts having a hard time, we just bring him over here, take care of him, feed him. And that's what you gotta do, right?"[3]

f.   On June 22, 2020, Mayor Durkan stated at a press conference:

Over the days, tens of thousands of people have peacefully gathered or visited Capitol Hill. During the day, there have been no major incidents. But we know it is very different at night, particularly in recent nights. The cumulative impacts of the gatherings and protests and the nighttime atmosphere and violence has led to increasingly difficult circumstances for our businesses and residents. Most of them supported protesters' right to gather at the outset. They stand

---

[3] https://www.facebook.com/WWConverge/videos/250593506242797/?__tn__=kC-R&eid=ARBT9Zl4Zd0BnqFUyG1bgaapWeIo6meLrp9YI7QgilK36tLAFfNcpij4zHFTEwP0wNzoVQK7O1LPtpa8&hc_ref=ARTeZJ-MVhRABE0ZxnSxzApxaoAJVsmqCzhgB7vaP0wwkcuhf0CtwXnjqpvqfAIKLQk&__xts__[0]=68.ARDhXBScmD_P9GnI4X2NL4z0eUgRkuV8hj_BUWpBgtqxg133nAdZz00w2pqmYlrfVrVanpZgUlgy2rw9hbGAwTWLjcxp1fAPAVjYhDHpvEOpeSmJavdPNPPlK_wodfv_idPwOeVfsbgsB04YjUKfXfnUZvddSThmUspA_o5oqETWWFluP2o_Yh-tP64swtkdKoXl374Vd0zqTxRoapQChSzCt5dXToGlW6ESVGiUVQznk42YXs8U2lpzAwJmp99RXyrNW3fSYzUcPopUKTNN-KP7EBDNdje9UibYcP84111ipRk31bjIk5XrSRcU2rjmqzsd_KjoOwrpoHYKssQd5Vnwe6OvBXCSGW_4ctaQKXmwUcmaTA

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

with them in solidarity. But the impacts have increased, and the safety has decreased. Both on Saturday morning and last night there were incidents of gun violence. And that escalating violence concerns me, Chief Best, residents, businesses, and the greater community. All of Capitol Hill has been impacted.

g.     At the same June 22, 2020 press conference, Chief Best stated that reports to the police demonstrate that some CHOP participants are "engaging in shootings, a rape, assaults, burglary, arson, and property destruction, and I have their police reports right here. I'm not making it up. These things have happened."

h.     At a press conference on June 29, 2020, the morning after yet another fatal shooting in the CHOP area, Chief Best repeatedly emphasized how dangerous the situation is within CHOP, stating:

> [I]t's very unfortunate that we have yet another murder in this area identified as the CHOP. Two African American men dead at a place where they claim to be working for Black Lives Matter. But they're gone. They're dead now. And we've had multiple other incidents – assaults, rape, robbery, and shootings. And so, you know, this is something that is going to need to change. We're asking people to remove themselves from this area for the safety of the people. If they care about people, they're gonna have to try to help us to make it safe. Not opposed to anybody's issue or concern. They certainly can demonstrate, you know, and peacefully any place, but they can't hostilely take over a neighborhood and cause the crime levels to go up like this. Two men are dead. Two men are dead. And a child, a 14-year-old, is hospitalized and we don't know what is gonna happen to that kid.
>
> …
>
> You know, at this point, the East Precinct, while important to us, what's much more important is that this neighborhood is not under siege and that there are not people being victimized. You know, the precinct is a building. The precinct is a building. But people dying, rapes, robbery, assault – that is what we need to deal with. *That's* what we need to deal with.
>
> …

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   I have said this multiple times, it is taking us three and a half times
2   longer to get here. We have a fire station that is less than two blocks
    from here, they cannot go into this area. We have had so many issues
3   and problems. And, you know, I have the police reports, people have
    identified as victims… we need to make sure that we are able to
4   provide public safety. *That* is what needs to happen.

5   …

6   As an African American woman, with uncles and brothers and stuff,
    I wouldn't want them to be in this area. We've had two men killed.
7   And we have a child that's injured from gunfire. So this is a real
    problem. And I would question why we would continue to allow this
8   to happen.

9   …

10  I think everybody in city government has been talking about what
    we can do to have a reasonable response, that limits any issue or
11  danger, but we also recognize that a place where we have seen now
    two murders, multiple people injured, there needs to be some more
12  action for public safety. I think everybody can agree on that.

13  …

14  [T]his situation as you reporters are walking around, you can see
15  that it can be dangerous and unacceptable, and so we're gonna have
    to work through this. This is not safe for anybody. Not anybody.
16  Multiple cases. Two murders. And it's not right. So, thank you for
    your time. I think there will be other times we will get a chance to
17  talk and go over it. But, as you can see, this is not an acceptable
    situation. Thank you.

18

19      i.      At one point during this same press conference, in response to a question

20  about whether the City-provided barriers had saved lives by preventing a Jeep from

21  entering the CHOP area, Chief Best responded:

22      CHIEF BEST: Yeah, I don't agree. I absolutely do not agree with
23      that. I think that is absolutely ludicrous. I'm not gonna let the
        detractors and the naysayers and the agitators be the ones who are
24      the voice here. There are people who live here, there are multiple
        people who are being injured and hurt, and we need to do something
25      about it. It is absolutely irresponsible for this to continue.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1          j.      On July 1, 2020, Chief Best stated in a press conference, "This order and

2    our police response comes after weeks of violence in and around the Capitol Hill Occupied

3    Protest zone, including multiple shootings resulting in many injuries and two deaths. …

4    Our job is to support peaceful demonstrations. But what has happened here on these streets

5    over the last two weeks – few weeks, that is – is lawless and it's brutal and bottom line it

6    is simply unacceptable."

7          166.168.      The extent of the City's knowledge of what was going on in CHOP is demonstrated

8    by the following from Mayor Durkan's emergency order that went into effect on July 1, 2020:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 47

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

**WHEREAS**, after significant national attention, many protestors have left the area but the conditions in the Cal Anderson Park Area have deteriorated to the point where public health, life, and safety are threatened by activities in and around this area, as supported by the following facts:

- On June 20, 2020, the first of three incidents of firearms violent with multiple victims occurred; one individual was shot and killed, and another was shot and seriously injured.
- First responders from the Seattle Fire Department and Seattle Police Department were denied safe access to the area by hostile crowds, including armed individuals, and obstructions.
- On June 22, 2020, a second incident involving firearms violence injured two addition individuals. On June 26, 2020, SDOT employees attempted to remove a limited number of barriers, but unarmed employees were met with hostility and weapons. SDOT could not conduct operations.
- Access by first responders to emergencies have been impeded further. On the morning of June 28, demonstrators moved the concrete barriers to completely restrict access of fire and medics on multiple roads. Demonstrators had previously agreed to open these areas to access for residents, businesses, city services, and fire.
- On June 29, 2020, a juvenile was shot and killed, and another juvenile was seriously injured in the immediate vicinity of this area. Evidence indicates that this murder may have been committed by individual(s) "occupying" the area.
- On June 30, 2020, SDOT removed a limited number of barriers with SPD, but was quickly met with agitated opposition to the removal.
- In addition, SPD has received numerous reports of narcotics use and violent crime, including rape, robbery, assault, and increased gang activity. An increase of 525%, 22 additional incidents, in person-related crime in the area, to include two additional homicides, 6 additional robberies, and 16 additional aggravated assaults (to include 2 additional non-fatal shootings) between June 2nd and June 30th, 2020, compared to the same period of time in 2019.
- Residential and businesses in the area have documented incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic to residences and places of business, and multiple lawsuits and claims have been filed against the City by residents and businesses impacted by the activities in this area.
- Significant damage has been caused by those remaining unlawfully in the area to City property, including Cal Anderson Park and the East Precinct facility. The full extent of damage to the East Precinct remains an open question until city employees are allowed access to the site in order to make that assessment.
- Open fires and vehicles on the reservoir are placing important regional water infrastructure located within Cal Anderson at risk.
- An alarming recent rise in COVID-19 numbers across the region, coupled with a lack of social distancing in this area, and the daily attraction to this area of outside individuals place the neighborhood at opening businesses at increased risk for outbreaks.
- A pervasive presence of firearms and other weapons has been well-documented.
- Ongoing violations of the Seattle Parks and Recreation's Code of Conduct have been observed, including camping and parking in the park, conduct that unreasonably deprives others of the use of parks, disrupting Seattle Parks and Recreation business, dumping trash and/or creating unsanitary conditions or health hazards that violate public health rules; behaviors that impede restroom use; urinating or defecating, except in designated restroom fixtures, blocking entrances, exits, fire exits, disabled access areas, public walkways; conduct that creates an unreasonable and substantial risk of harm to any person or property; and abusive and harassing behavior; and

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 48

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

167.169.     Despite having knowledge of exactly what was happening at CHOP by being there every day and in apparently constant contact with area residents and business owners, the City acted with deliberate indifference toward the safety and property interests of those residents and businesses.

168.170.     The City also enabled the blocking of ingress and egress for businesses and residents in the area, without providing plaintiffs any notice of this deprivation or opportunity to be heard on the matter. Reportedly, the City reached an informal agreement with CHOP participants to allow limited one-way access on Eleventh and Twelfth Avenues starting on June 16, 2020 (Plaintiffs were not invited to participate in these negotiations). However, as part of that agreement, the City actually fortified the rest of CHOP with new barriers (again without providing Plaintiffs notice or an opportunity to be heard on the matter). And even the planned limited access for some streets almost immediately broke down when CHOP participants reestablished impediments. The City's response to this was apparently to do nothing.

169.171.     At the same time that the City has acted with deliberate indifference to property owners and people who live and work in and near CHOP, the City physically aided, endorsed, and actively encouraged CHOP participants to continue their occupation of public spaces.

170.172.     The City physically aided CHOP participants in their occupation of the area in at least the following ways:

        a.     When the City abandoned the East Precinct on June 8, 2020, it left behind the barriers that had previously blocked street access and protected the East Precinct from protesters. These barriers foreseeably served as the raw materials that allowed CHOP participants to block streets and create CHOP within a very short time.

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

b.      On June 16, 2020, the City provided even more concrete barriers to CHOP participants so that CHOP participants could replace wooden barriers and fortify their blockages of streets.[4]

c.      The City provided portable toilets and wash stations for CHOP participants.

d.      The City has provided medical equipment, including beds and other supplies, to the CHOP "medical tent."

e.      The City provided nighttime lighting at Cal Anderson Park.

~~171.~~173.    As the City admitted in Mayor Durkan's July 1, 2020 emergency order, the City "facilitated" CHOP by:

"*   Providing basic hygiene, water, litter, and garbage removal.

*    Temporarily allowing obstructions of public parks, streets, and sidewalks

*    Modifying SPD and SFD response protocols….

*    Modifying streets and pedestrian access routes.

*    Providing social services outreach and engagement….

*    Facilitating modified city services delivery to local residents and businesses impacted by events in this area."

~~172.~~174.    The City's policies effectively authorized the actions of the CHOP participants. The City communicated clearly to CHOP participants that they may indefinitely continue occupying the streets in the area, maintaining their barricades, and blocking traffic, all without interference from the City. The City has communicated this message in at least the following ways:

a.      On June 11, 2020, during a joint press conference with the Chief of Police, Mayor Durkan stated: "There's not a specific date … because we are trying to do things that are responsible."

---

[4] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

b.      On June 12, 2020, in response to a direct question from CNN's Chris Cuomo about how long the City would allow CHOP participants to continue to occupy the neighborhood, Mayor Durkan responded, "I don't know. We could have the Summer of Love."

c.      On June 16, 2020, the City announced through an official statement from Mayor Durkan that it had negotiated with CHOP participants to adjust some but not all their barriers to allow one-way traffic on Twelfth Avenue.[5] This agreement was an endorsement of CHOP participants' other barriers and its overall occupation of the neighborhood.

d.      In announcing the supposed opening of a one-way corridor, the City made clear in a statement from the Mayor that it was an active participant in maintaining and solidifying CHOP barriers and boundaries:

> The City is committed to maintaining space for community to come together, protest and exercise their first amendment rights. Minor changes to the protest zone will implement safer and sturdier barriers to protect individuals in this area, allow traffic to move throughout the Capitol Hill neighborhood, ease access for residents of apartment building in the surrounding areas, and help local businesses manage deliveries and logistics. [emphasis added][6]

e.      Also on June 16, 2020, Mayor Durkan suggested that the City agreed that police officers will only enter the occupied area for "significant life-safety issues."[7]

f.      On June 22, 2020, Mayor Durkan and Chief Best held a joint press conference in which they expressed concern about the impacts of CHOP but also indicated at that time there was no specific timeline or plan for lessening those impacts or removing the blockades, barriers, and tents from CHOP.

---

[5] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/
[6] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/
[7] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 51

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

173.175.    The City also made numerous statements indicating that it endorsed and would continue to support what CHOP participants were doing in the area, thereby ensuring the continued and indefinite occupation and blockading of the neighborhood, and all the damage it has caused and will cause. The City's statements include at least the following:

      a.    On June 11, 2020, Mayor Durkan posted following on her Twitter page: "The Capitol Hill Autonomous Zone #CHAZ is not a lawless wasteland of anarchist insurrection – it is a peaceful expression of our community's collective grief and their desire to build a better world."

      b.    On June 11, 2020, Mayor Durkan also posted on her Twitter page: "For the thousands of individuals who have been on Capitol Hill, I think you've seen what I've seen: the painting of Black Lives Matter along Pine Street, food trucks, spaghetti potlucks, teach-ins, and movies."

      c.    On June 11, 2020, Mayor Durkan stated during a joint press conference with the Chief of Police:

> Lawfully gathering and expressing first Amendment rights, and demanding we do better as a society, and providing true equity for communities of color, is not terrorism. It is patriotism. The right to challenge government and authority is fundamental to who we are as Americans. … And for the thousands of individuals who've been on Capitol Hill, many of them, what you'll see is a painting of Black Lives Matter along Pine Street. Food trucks, spaghetti potlucks, teach-ins, movies, free granola bars . . . .

      d.    During the same press conference on June 11, 2020, Mayor Durkan also stated:

> The Capitol Hill area—in fact, some of my family is up there right now—… it is not an armed ANTIFA militia no-go zone. It is, a number of people are there, we've had ongoing communications with them, with the businesses, with the residents, and we will make sure that we find some way for people to continue to protest peacefully while also getting ingress and egress. We've had blocks of Seattle in Capitol Hill shut down every summer for everything from Block Party to Pride. This is not really that much of an

SECOND THIRD AMENDED CLASS ACTION COMPLAINT
Case No. 2:20-cv-00983 TSZ - 52

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

operational challenge. But we want to make sure that the businesses
and residents feel safe and we'll continue to move that forward.

    e.    During her Facebook Live interview, Mayor Durkan also stated "I was up there today, walking around, talking to people, and I think we just have to continue to listen to people and figure out a way that there's still a way for people to have that kind of free expression, but we need to open up the streets, too, at least 12th so we can get fire through, and like that, so we're going to keep talking to people and listening to them. But I heard a lot of great ideas and I heard a lot of community strength there. That was cool."

    f.    Also on June 12, 2020, during her interview with CNN's Chris Cuomo, Mayor Durkan said, "We've got four blocks in Seattle that just saw pictures of that is more like a block party atmosphere. It's not an armed takeover. It's not a military junta. We will – we will make sure that we can restore this. But we have block parties and the like in this part of Seattle all the time. It's known for that."

    g.    On June 12, 2020, Mayor Durkan endorsed the gardens being planted in Cal Anderson Park on Twitter: "Earlier today I visited the #CHAZ and met Marcus Henderson, the person behind the new community garden popping up in Cal Anderson Park. Read more about Marcus and the work that's gone into creating the gardens: thestanger.com/slog/2020/06/1."

    h.    Mayor Durkan also tweeted on June 12, 2020: "For as long as I can remember, Capitol Hill has been autonomous – it's been a place where people go to express themselves freely. Today at the #CHAZ, I spoke with organizers and community about how we can move forward and keep our communities safe, together."

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1

2

3

      i.     Mayor Durkan tweeted on June 16, 2020: "The #CHOP has emerged as a gathering place for community to demand change of their local, state, and federal government."

4

5

6

      j.     On June 19, 2020, Mayor Durkan officially declared that there was no longer a state of emergency in the City because "demonstrations since that day have been and continue be largely peaceful."

7

8

9

10

      k.     On June 21, 2020, after two people were shot in CHOP and one of them died, Mayor Durkan issued a statement indicating that the City still had no plans to cease supporting CHOP and that the City was instead acting to work with and preserve CHOP.

11

12

13

14

15

16

174.176.   The City changed its tone after it learned that this lawsuit would be filed, and especially after Plaintiffs filed their first complaint. This included finally clearing CHOP of barricades and CHOP participants on July 1, 2020, in the face of an impending motion for a temporary restraining order. But the City's earlier assistance and endorsement of CHOP and CHOP participants caused, and continue to cause, harm to Plaintiffs and the Class that would not have occurred absent the City's actions.

17

18

19

175.177.   The clearing of the area on July 1, 2020, was easily and accomplished without violence on either side, demonstrating that the City could have and should have cleared the area far earlier.

20

## V.  **CLASS ALLEGATIONS**

21

22

176.178.   Plaintiffs seek to certify a class of similarly situated persons pursuant to Fed. R. Civ. Proc. 23(b)(2) and/or 23(b)(3).

23

24

25

177.179.   The Class is hereby defined as follows: All persons or entities who own property in, have a business in, or reside in the area in the City of Seattle bounded by the following streets: Denny Way, Union Street, Thirteenth Avenue, and East Broadway. This definition excludes the

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 54

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    City of Seattle and any departments or agencies of the City of Seattle, including the Seattle Police

2    Department.

3        178.180.    The definition of the Class is unambiguous. Plaintiffs are members of the Class,

4    and all members of the Class can be identified through public records and notified by mail or other

5    means of notification.

6        179.181.    The number of Class members makes joinder impractical. Plaintiffs do not know

7    the exact number of members in the Class, but believe the total number of businesses, residents,

8    and property owners in the Class to be in the thousands.

9        180.182.    There are numerous questions of law and fact common to the Class that

10   predominate over any individual issues. These issues include the following:

11                a.   Whether the City has participated in, endorsed, or encouraged the creation,

12                     maintenance, and continued existence of CHOP.

13                b.   All facts regarding the existence and maintenance of CHOP including at least

14                     the following:

15                        i.   The boundaries and nature of the SPD's "no-go" zone in and

16                             around CHOP.

17                       ii.   All facts and circumstances surrounding the City's

18                             participation in, endorsement of, or encouragement of the

19                             creation, maintenance, and continued existence of CHOP.

20                      iii.   The nature and scope of activities of CHOP participants.

21                c.   Whether Plaintiffs and the Class have legally protected constitutional property

22                     rights.

23                d.   Whether the City has infringed on those property rights by its actions with

24                     regard to CHOP.

25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

e.  Whether the City was required to provide notice and a hearing to Class members before infringing on those property rights.

f.  Whether CHOP and CHOP participants are a nuisance within the meaning of RCW 7.48.010, et seq.

g.  Whether the City has participated in the maintenance of that nuisance.

h.  Whether the City has acted with deliberate indifference toward Plaintiffs and the Class.

i.  Whether the harm suffered by Plaintiffs and the Class was foreseeable and obvious.

j.  Whether the City's actions constitute an unlawful gift within the meaning of the Washington Constitution.

k.  Whether Plaintiffs and the Class have suffered a taking without just compensation.

l.  Whether the City's actions were pursuant to a City policy.

m.  Whether the City's actions were ratified by a City policymaker.

n.  Whether Plaintiffs and the Class are entitled to injunctive relief.

181.183.  The claims of the Plaintiffs are typical of the members of the Class. All Plaintiffs reside in the Class and have been subject to the same course of conduct by the City.

182.184.  The Plaintiffs will fairly and adequately represent the Class. Plaintiffs are all members of the Class and have there are no conflicts between Plaintiffs and other Class members. Plaintiffs are well-informed as to the nature of this case and the claims against the City and have retained competent and experienced counsel that intend to prosecute this action vigorously.

183.185.  The City has acted or refused to act on grounds that apply generally to all Plaintiffs and the Class such that injunctive relief is appropriate respecting the Class as a whole.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 56

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    184.186.    The issues that Class members have in common predominate over any individual

2    issues. The City engaged in a common course of conduct giving rise to the harms suffered by

3    Plaintiffs and the Class. A single, common policy is at issue in this case. Individual questions, if

4    any, pale by comparison to the numerous common questions that dominate. The injuries sustained

5    by the Class members flow, in each instance, from a common nucleus of operative facts.

6    185.187.    A class action is superior to other available methods for the fair and efficient

7    adjudication of this controversy because joinder of all class members is impracticable. The

8    prosecution of separate actions by individual members of the Class would impose heavy burdens

9    upon the courts and the City and would create a risk of inconsistent or varying adjudications of the

10   questions of law and fact common to the Class. A class action would achieve substantial economies

11   of time, effort, and expense, and would assure uniformity of decision as to persons similarly

12   situated without sacrificing procedural fairness. Individual litigation of the legal and factual issues

13   raised by the conduct of the City would increase delay and expense to all parties and to the court

14   system. The class action device presents far fewer management difficulties and provides the

15   benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by

16   a single court. Given the similar nature of the claims of the members of the Class and the uniform

17   application of Washington and federal law to the claims of Plaintiffs and the members of the Class,

18   the Class's claims can and will be most effectively managed by a class action.

19

20

21

22

23

24

25

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 57

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

# VI.   CLAIM FOR RELIEF

## FIRST CAUSE OF ACTION – PROCEDURAL DUE PROCESS

### 42 U.S.C. § 1983

### U.S. Const. amend XIV § 1

### On behalf of Plaintiffs and the Class

186.188.   Plaintiffs incorporate all other allegations in this complaint as if set forth herein.

187.189.   Plaintiffs and the Class have constitutionally protected property interests, as defined by Washington state law, to exclude others from their property, to the use and quiet enjoyment of their property, and to access their property via public rights-of-way.

188.190.   The City has infringed on those constitutionally protected interests, including by (1) creating, assisting, endorsing, and encouraging an indefinite, unpermitted occupation and blockade of the public streets, sidewalks, and parks in and around CHOP, thereby denying Plaintiffs access to their properties, and (2) creating, assisting, endorsing, and encouraging the pervasive vandalism and trespasses against Plaintiffs' properties, thereby denying Plaintiffs the ability to use their properties and exclude others from them.

189.191.   Plaintiffs and the Class also have constitutionally protected liberty interests in the fundamental right of free movement and the right to remain in a public place of one's choosing.

190.192.   The City has infringed on those constitutionally protected liberty interests through its CHOP policies, including by, among other conduct as alleged throughout this Complaint, granting *de facto* autonomy over the CHOP area to the CHOP participants and allowing them to determine who could and could not travel through and within the CHOP area.

191.193.   The City has infringed on Plaintiffs' constitutionally protected interests without providing Plaintiffs with any due process before depriving them of these interests, or providing any recourse following the deprivation of the interests. In particular, the City provided Plaintiffs with no notice or opportunity to be heard before or after depriving Plaintiffs of the freedom of

1    movement, the right to access their properties, the right to use their properties, and the right to

2    exclude others from their properties,

3    ~~192.~~194.    The City has done so pursuant to City policy as created, ratified, and authorized by

4    City policymakers, including Mayor Durkan, without any notice to Plaintiffs or opportunity for

5    them to be heard.

6    ~~193.~~195.    As a direct result of the City's actions, Plaintiffs and the Class have been denied

7    regular and customary use of, access to, and enjoyment of their property, including the ability to

8    drive or park in CHOP, the ability to walk to their homes or business without obstruction, the

9    ability to accept deliveries to their homes or business, the ability to prevent and remedy vandalism,

10   the ability to prevent trespasses and theft against their properties, the ability to freely move about,

11   and the ability to remain in a public place of one's choosing.

12   ~~194.~~196.    Plaintiffs and the Class have been harmed by this deprivation, including through

13   loss of revenue, loss of property value, damages to property, and other damages.

14                   **SECOND CAUSE OF ACTION – SUBSTANTIVE DUE PROCESS**

15                                      42 U.S.C. § 1983

16                                   U.S. Const. amend XIV § 1

17                              On behalf of Plaintiffs and the Class

18   ~~195.~~197.    Plaintiffs incorporate all other allegations in this complaint as if set forth fully

19   herein.

20   ~~196.~~198.    Plaintiffs have a right pursuant to substantive due process to be protected from

21   state-created dangers.

22   ~~197.~~199.    The City's actions, assistance, endorsements, and encouragements of CHOP and

23   CHOP participants greatly increased the likelihood of property damage, loss of business revenue

24   and rental income, personal injury, loss of use of property, and other damages to Plaintiffs. This

25

~~SECOND~~ THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 59

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    subjected Plaintiffs and the Class to harm that they not would have suffered absent the City's

2    actions.

3        198.200.    All damages suffered, and still to be suffered, by Plaintiffs were and are

4    foreseeable, known, and obvious.

5        199.201.    The City acted with deliberate indifference to the known and obvious harm that

6    would be suffered by Plaintiffs.

7        200.202.    The City did so pursuant to City policy as created and ratified by City policymakers,

8    including Mayor Durkan.

9                      **THIRD CAUSE OF ACTION – TAKING**

10                          42 U.S.C. § 1983

11                       U.S. Const. amends. V, XIV

12                    On behalf of Plaintiffs and the Class

13        201.203.    Plaintiffs incorporate all other allegations in this complaint.

14        202.204.    Plaintiffs and the Class have constitutionally protected property rights to use and

15   enjoy their properties, to exclude others from their properties, and to access their properties via

16   public rights-of-way.

17        203.205.    The City deprived Plaintiffs of those rights by affirmatively creating, assisting,

18   endorsing, and encouraging an indefinite, unpermitted invasion, occupation, and blockade of the

19   public rights-of-way that provide access to Plaintiffs' private properties, as well as by affirmatively

20   creating, assisting, endorsing, and encouraging the physical invasion of Plaintiffs' private

21   properties by CHOP participants.

22        204.206.    The City did so pursuant to City policy as created and ratified by City policymakers,

23   including Mayor Durkan.

24        205.207.    Plaintiffs have not received compensation for the deprivation of their property

25   rights.

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 60

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   206.208.   The City's actions constitute an unlawful taking for private use and/or an unlawful

2   taking for public use without just compensation, which has caused Plaintiffs economic harm,

3   including through a loss of property value, loss of business revenue, and a loss of investment-

4   backed expectations.

5   **FOURTH CAUSE OF ACTION – NEGLIGENCE**

6   On behalf of Plaintiffs and the Class

7   207.209.   Plaintiffs incorporate all other allegations in this complaint.

8   208.210.   The City's affirmative acts as described in this complaint placed Plaintiffs and

9   Class members at high and unreasonable risk of foreseeable harm, including but not limited to

10   property damage, lost income and revenue, excessive noise, public safety hazards, vandalism, and

11   decreased or lost access to their homes, properties, and businesses.

12   209.211.   The City had a duty to protect Plaintiffs and Class members from that foreseeable

13   harm.

14   210.212.   The City breached its duty to protect Plaintiffs and Class members from that

15   foreseeable harm.

16   211.213.   The City also owed the Plaintiffs and Class members a duty pursuant to the Seattle

17   Municipal Code, including Chapter 15.52, which required the City to protect Plaintiffs and Class

18   members from unreasonable risks of property damage and other harm and dangers by designating

19   an alternate proposal for those who wished to create and participate in CHOP.

20   212.214.   The City also breached the duty created by the Seattle Municipal Code by not

21   implementing the required procedures, process, and protections.

22   213.215.   The City's breach of its duties proximately caused harm to Plaintiffs and Class

23   members, including but not limited to property damage, lost income and revenue, exposure to

24   excessive noise and public safety hazards, increased expenses for security, and lost property value.

25

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 61

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**FIFTH CAUSE OF ACTION – NUISANCE**

RCW 7.48.010, *et. seq..*

On behalf of Plaintiffs and the Class

214.216.    Plaintiffs incorporate all other allegations in this complaint.

215.217.    As a direct result of the City's affirmative acts, foot and vehicular traffic on the public streets, sidewalks, and other right of ways surrounding the properties, businesses, and residences of Plaintiffs and Class members were physically blocked and/or impeded.

216.218.    The blocking and impeding of foot and vehicular traffic substantially and unreasonably interfered with Plaintiffs' and Class members' use and enjoyment of their properties, including by blocking access to those properties, and has caused harm to Plaintiffs, including by reducing property values and resulting in lost revenues.

217.219.    The City directly participated in the creation and maintenance of this nuisance, including by providing concrete barriers to be used for this specific purpose to the CHOP participants.

218.220.    In addition to blocking public rights-of-way, the City's actions created and maintained a series of unlawful and/or unreasonable conditions, including excessive noise, public safety hazards, vandalism, and poor health and sanitation conditions.

219.221.    These conditions annoyed, injured, and endangered the comfort, repose, health, and safety of Plaintiffs and Class members, and rendered Plaintiffs and Class members insecure in the use of their properties.

220.222.    These conditions substantially and unreasonably interfered with Plaintiffs' and Class members' use and enjoyment of their properties, including by creating a reasonable fear among Plaintiffs and Class members of using their properties, and caused harm to Plaintiffs and Class members, including by reducing property values, inflicting property damage, and causing lost revenues.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

**VII.   JURY DEMAND**

Plaintiffs demand a trial by jury.

**VIII.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.      Judgment in favor of Plaintiffs and against Defendant for actual damages in an amount to be proven at trial;

B.      Prejudgment interest at the maximum rate allowed by law;

C.      Plaintiffs' costs of investigation, costs of suit, and reasonable attorneys' fees; and

D.      All such other and further monetary, injunctive, and declaratory relief as the Court may deem just and proper.

DATED this 30th day of October, 2020.

**CALFO EAKES LLP**

By *_/s Patty A. Eakes_____*
    Patricia A. Eakes, WSBA #18888
    Angelo J. Calfo, WSBA #27079
    Tyler S. Weaver, WSBA #29413
    Andrew DeCarlow, WSBA #54471
    Henry Phillips, WSBA #55152
    1301 Second Avenue, Suite 2800
    Seattle, WA  98101
    Phone:  (206) 407-2200
    Fax:     (206) 407-2224
    Email:  pattye@calfoeakes.com
            angeloc@calfoeakes.com
            tylerw@calfoeakes.com
            andrewd@calfoeakes.com
            henryp@calfoeakes.com

*Attorneys for Plaintiffs*

SECOND THIRD AMENDED CLASS ACTION
COMPLAINT
Case No. 2:20-cv-00983 TSZ - 63

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224