# EXHIBIT 4

# Deposition of 30(b)(6) and Individual Deposition of Samuel Zimbabwe

# Hunters Capital, LLC v. City of Seattle

# October 28, 2021



**206.287.9066  I  800.846.6989**

**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**

**www.buellrealtime.com**

email: info@buellrealtime.com



Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

---

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff,    )
                                )
    vs.            )  No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,         )
                                )
        Defendant.    )

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(SAMUEL ZIMBABWE)

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 28, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

---

Page 2

```
 1          A P P E A R A N C E S
 2  FOR PLAINTIFF:
 3     TYLER S. WEAVER
       GABRIEL REILLY-BATES
 4     Calfo Eakes LLP
       1301 Second Avenue
 5     Suite 2800
       Seattle, WA 98101-3808
 6     206.407.2237
       tylerw@calfoeakes.com
 7     gaber@calfoeakes.com
 8
 9  FOR DEFENDANT:
10     SHANE P. CRAMER
       Harrigan Leyh Farmer & Thomsen LLP
11     999 Third Avenue
       Suite 4400
12     Seattle, WA 98104
       206.623.1700
13     shanec@harriganleyh.com
14  ALSO PRESENT:  CATHY ZAK, videographer
       Buell Realtime Reporting, LLC
15
16          * * * * *
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1          DEPOSITION OF SAMUEL ZIMBABWE
 2          EXAMINATION INDEX
 3  EXAMINATION BY:                       PAGE
 4  30(b)(6) Examination by Mr. Weaver       5
 5  Non-30(b)(6) Examination by Mr. Weaver      53
 6
 7          EXHIBIT INDEX
 8  EXHIBITS FOR IDENTIFICATION            PAGE
 9  Exhibit 1  Amended Notice of Videotaped      8
       Deposition Pursuant to FRCP
10       30(b)(6) to City of Seattle
11  Exhibit 2  5-page Executive Order 2020-08;      9
       SEA_00015070
12
       Exhibit 3  "Re: SFD Protest Zone Response      20
13       Map"; SEA_00020379-384
14  Exhibit 4  Email chain; SEA_00105259      43
15  Exhibit 5  Email chain; SEA_00105029-030      63
16  Exhibit 6  15-page chart titled "Messages"   69
17  Exhibit 7  "11am Update - E Precinct";      84
       SEA_00028170-171
18
       Exhibit 8  Email chain; SEA_00137341-346      111
19
       Exhibit 9  Email chain; SEA-PDR_000398-403      143
20
       Exhibit 10 "2PM Update - E Precinct (see      160
21       notes)"; SEA_00028178-179
22  Exhibit 11 Email chain; SEA_00137366-369      178
23  Exhibit 12 Email chain; SEA_00137350-351      180
24  Exhibit 13 4-page email chain; SEA_00028053      220
25
```

---

Page 4

```
 1          SEATTLE, WASHINGTON; OCTOBER 28, 2021
 2          9:05 a.m.
 3          -o0o-
 4          THE VIDEOGRAPHER:  Good morning.  This is
 5  the deposition of Samuel Zimbabwe in the matter of
 6  Hunters Capital, LLC, et al., v. City of Seattle, Case
 7  No. 20-cv-00983, in the United States District Court,
 8  Western District of Washington, at Seattle, and was
 9  noticed by Calfo Eakes.
10          The time now is approximately 9:05 a.m. on this
11  28th day of October, 2021, and we are convening via
12  Buell Virtual Depositions.
13          My name is Cathy Zak, from Buell Realtime
14  Reporting, LLC, located at 1325 4th Avenue, Suite 1840,
15  in Seattle, Washington 98101.
16          Will counsel please identify themselves for the
17  record.
18          MR. WEAVER:  This is Tyler Weaver, for the
19  plaintiffs, from Calfo Eakes.  And with me I have Gabe
20  Reilly-Bates, who is also participating, is online
21  today.
22          MR. CRAMER:  And Shane Cramer, Harrigan
23  Leyh, on behalf of the Defendant City of Seattle.
24          THE VIDEOGRAPHER:  Thank you.  The court
25  reporter may now swear in the witness.
```

1 (Pages 1 to 4)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 165

1    A. I think -- you know, I -- I recall there being
2    more -- more concern about the -- the level of damage
3    than that it would be something that people would be
4    sort of ongoing.
5        So I think maybe -- maybe permanent in this
6    regard was referring to sort of the -- the permanency of
7    the damage, but it may have been about -- other people
8    may have had a -- a concern about the long-term
9    residential activity within the park.
10   Q. Meaning the tents in the park?
11   A. Yeah.
12   Q. Okay. Do you recall there being discussion
13   about whether to provide porta-potties to the park?
14   A. I do, as -- as indicated here in the notes.
15   I remember there being some discussion about porta-potties
16   versus -- both within the park and in the vicinity
17   because there were a lot of people out for long periods
18   of time, and a lot of businesses closed.
19   Q. What do you recall the discussions being about
20   whether to provide or not provide porta-potty service to
21   the area?
22   A. You know, I don't remember a whole lot about
23   that, but I remember there being some -- some questions
24   about -- about providing porta-potties versus, you know,
25   what -- what it would mean from a -- from a waste

Page 166

1    perspective if we didn't provide porta-potties.
2    Q. Okay. Do you recall anybody expressing
3    concerns about what a -- about what message it might
4    send to provide porta-potties to the area?
5    A. Yeah, I remember some -- some concerns. And
6    again, this is similar to some of the other areas where
7    there wasn't -- there wasn't unanimity of all opinions
8    at all times.
9    Q. Okay.
10   A. There were some folks who felt like that that
11   could -- could encourage people to stay longer than they
12   might otherwise. I don't remember who took which
13   positions, though.
14   Q. Okay. So you don't recall who was talking
15   about them potentially being a problem for long-term
16   residency?
17   A. I -- I -- I --
18       MR. CRAMER: Objection. Form.
19   A. Yeah. I don't. It was a little bit out of
20   my -- my area of expertise, so was maybe not paying as
21   close attention to that as I could have.
22   BY MR. WEAVER:
23   Q. Okay. Did you ever tour the area in and around
24   Cal Anderson and East Precinct in June of 2020 with
25   Mayor Durkan?

Page 167

1    A. I'm trying to remember. I don't remember if I
2    was there with her. I was there with her after the --
3    afterwards. I don't remember. I may have -- there may
4    have been one time where I was there with her, but those
5    are sort of blurring together.
6        And then there was one time when she was -- she
7    came to a meeting with some of the protest leads, which
8    I was not in that meeting, but that was nearby. So I
9    may have been there with her during the protest period
10   too, but I -- I don't remember.
11   Q. What do you recall about the time you were with
12   her there, whether it was during the protests or another
13   time?
14   A. So I recall the time after the protests a
15   little bit more clearly. We -- because we met with some
16   of the business owners and walked around the
17   neighborhood a little bit in looking at recovery from
18   the post -- post-protest activities and what -- you
19   know, where there was still some -- some maintenance or
20   operational issues several months later. And that was,
21   you know, sort of more -- that was a -- listening to
22   folks. This was later summer last year, I think, after
23   the -- after the protests were -- were -- were done.
24   Q. Okay. Who do you recall being at that meeting
25   with you and the mayor?

Page 168

1    A. That, I recall Jesús Aguirre from Seattle Parks
2    and Recreation. I think Mami Hara was there as well. I
3    think there were representatives from Seattle Police
4    Department. It may have been Interim Chief Diaz, but
5    I'm not exactly sure. And I think perhaps Chief
6    Scoggins as well.
7    Q. Okay. And do you recall who was there that
8    wasn't with -- was not a representative of the City?
9    A. Yeah, so I think we -- I remember we met at a
10   restaurant sort of at the corner of 11th -- or 10th
11   and -- 10th and Pike. And then we met, I -- there were
12   a few business owners there, and we met -- we went up to
13   Rachel's Ginger Beer. We sort of walked around through
14   the neighborhood, and then met with folks there in -- in
15   Rachel's Ginger Beer, a couple different business owners
16   there as well.
17   Q. Okay. What do you -- what were you -- what do
18   you recall discussing with the business owners on this
19   tour?
20   A. I think at that point we were talking about
21   sort of long-term recovery of -- of businesses, business
22   activities, what we could do to support the -- the
23   long-term -- sort of what long-term plans for Cal
24   Anderson Park renewal might be.
25       I think there was -- there were concerns raised

42 (Pages 165 to 168)

Hunters Capital, LLC v. City of Seattle                         30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 169

1  about the presence of the ecology block wall around the
2  East Precinct.  And then, you know, just sort of
3  general -- general business outlook and business
4  recovery.
5       Q.  So what do you recall the -- the concerns being
6  about the long-term prospects for Cal Anderson Park?
7       A.  I don't -- I remember there was some support
8  from those business owners about sort of a willingness
9  to participate or -- or sort of support like long-term
10  capital investment in the park and sort of renewing and
11  addressing some of the -- the damage from the -- from
12  the summer as well.
13       Q.  Okay.  So at that point -- so at that point in
14  late summer, you recall that there was still some damage
15  in the park that hadn't been taken care of; is that
16  right?
17       A.  That -- that was what I heard.  You know, I
18  wasn't -- again, parks are outside of my -- my realm of
19  responsibility.  So I don't -- I don't -- I can't -- I
20  don't want to speak to the specifics of what was -- what
21  was going on within the park.
22       Q.  Do you recall whether there was discussion of
23  the fact that there was another encampment that had
24  sprouted up in Cal Anderson Park at that time period?
25       A.  I don't recall that.

Page 170

1       Q.  Do you recall concerns that the -- expressed by
2  the business owners in the area that the area was still
3  suffering from the effects of what had happened in
4  June of 2020?
5       MR. CRAMER:  Objection.  Form.
6       A.  You know, I don't remember exactly when this
7  was, but I think we were still in a lot of those
8  pandemic restrictions.  We hadn't sort of fully gotten
9  back to -- to reopening at that point.
10       I mean, it was probably not until the summer
11  that we were at that point.  So I think there was just
12  general concern about the -- the viability and state
13  of -- of the economy on Capitol Hill.
14  BY MR. WEAVER:
15       Q.  So why, in particular, did you go to the area
16  of -- that you were in for that tour at 10th and Pike
17  and Rachel's Ginger Beer?
18       A.  I don't know.  I got the invite from the
19  mayor's office.  And when I get those invites, I -- I
20  go.  I wasn't -- I didn't -- I wasn't involved in
21  organizing that --
22       Q.  Okay.
23       A.  -- that tour.
24       Q.  So would you agree that the area of 10th and
25  Pike and Rachel's Ginger Beer would be part of the area

Page 171

1  that was affected by the occupation on -- during June
2  2020?
3       A.  Yeah, I think it was some of -- it was some of
4  the same businesses that we had met with during the --
5  the protest period.  It was sort of afterwards, showing
6  some of what we showed before, during, and after the
7  protest period, that there was a long-term commitment
8  from the City to support the community and Capitol Hill.
9       Q.  What do you recall the discussion being about
10  the wall around the precinct?
11       A.  I think there was a desire from residents and
12  businesses for it to go away and to not be a
13  permanent -- permanent fixture.  We all shared
14  that from the City perspective.  We shared that -- that
15  goal.
16       And at that point we had -- we had worked with
17  SPD to install that in order to not have a focal point
18  for continued protests.  So there was a shared
19  commitment to removing it, but not a firm timeline for
20  when that would be done, sort of more a wait-and-see
21  approach and see when -- when it felt like the
22  temperature was right to do that.
23       Q.  Why was there an agreement generally among the
24  City and the -- and the business owners that the wall
25  should be removed?

Page 172

1       MR. CRAMER:  Objection.  Form.
2       A.  Well, so I think that the -- that the East
3  Precinct -- and -- and I think everybody's goal for --
4  for the relationship between police and -- and the
5  community they serve is for there to be sort of a -- an
6  interaction.
7       And it felt like that -- that wall around the
8  precinct didn't create a welcoming front door for the --
9  for the precinct when there may be -- you know, there is
10  a -- there is a need for sort of ongoing engagement
11  between a community and the -- the police present in
12  that community.
13       And so I -- I don't -- yeah, that was a -- an
14  approach that we developed at the end of the -- of -- of
15  June as a way to not have sort of protests as -- as the
16  police came back from an operational perspective into
17  the East Precinct, to not have that become immediately
18  another focus for -- for protest activities.
19       I think even after the -- the, you know,
20  traffic patterns went back to -- to a pre -- pre-protest
21  period, so even into July, I don't remember now how long
22  it continued, but for -- for several months afterwards,
23  we would still get regular rolling protests around --
24  that -- that started out in Capitol Hill, but went to
25  other parts of the city as well, that created temporary

43  (Pages 169 to 172)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 173

1  traffic disruptions with those sort of protest
2  activities.
3       So that was sort of an ongoing thing, but by
4  having the wall around the East Precinct, it really made
5  it so that the East Precinct wasn't an attractive focal
6  point for those protests.
7  BY MR. WEAVER:
8       **Q.  Okay.  Did -- was there concern that the wall**
9  **around the precinct made it -- made the neighborhood**
10 **appear to be unsafe?**
11      MR. CRAMER:  Objection.  Form.
12      A.  Yeah, I don't recall exactly what the concerns
13 were.  I think nobody -- nobody really wanted it to stay
14 like that forever, and I -- and the City -- everybody
15 from the City agreed with that.
16 BY MR. WEAVER:
17      **Q.  Do you recall any discussion about the wall and**
18 **what perception it might create in the general public**
19 **about the area near the East Precinct?**
20      MR. CRAMER:  Objection.  Form.
21      A.  Yeah, I don't really recall whether there
22 was -- like what -- what the specifics of those concerns
23 were.  I will say that the -- it was -- it was a
24 shared -- shared agreement that we shouldn't leave the
25 wall up permanently.

Page 174

1       There also -- we really didn't talk about
2  timeline for when that would -- when that would happen,
3  when it would be removed.  And I think there was a -- it
4  felt, to me, like there was a shared understanding that
5  immediately removing that wall could have some
6  problematic effects in terms of re-creating that focal
7  point for those protests.
8  BY MR. WEAVER:
9       **Q.  Okay.  So you talked about rolling protests**
10 **that occurred for several months after CHOP in the**
11 **Cal -- I'm sorry, in the -- yeah, the Cal Anderson and**
12 **East Precinct area.**
13      **Did I -- did I hear that correctly?**
14      A.  Yes.
15      **Q.  Okay.  Did those --**
16      MR. CRAMER:  Objection.
17 BY MR. WEAVER:
18      **Q.  Did those continue until about the end of the**
19 **year of 2020?**
20      A.  I -- that's -- that's probably a fair
21 assessment of how long they continued.
22      **Q.  Okay.  Was there any discussion that you're**
23 **aware of at the City as to why those protests were**
24 **continuing in that particular area through 2020?**
25      MR. CRAMER:  Objection.  Form, foundation.

Page 175

1       A.  Yeah, I don't remember speculating on that.  I
2  think that it -- because of the -- the summer protests,
3  it became -- it was still a place where people would
4  sort of organize and -- and depart from.
5       I think throughout, both in the midst of the
6  summer and through the -- through the rest of the summer
7  and the fall, people would come from citywide to -- to
8  Capitol Hill for those protest activities, even in the
9  midst -- even when there was -- in June, you know, it
10 wasn't that everybody who was protesting was -- also had
11 a tent in Cal Anderson Park.
12      It was -- people would come there at various
13 points of the day and then leave at various points of
14 the day.  And some people would stay there 24 hours a
15 day, but some people would arrive and -- and depart as
16 they're able to do.
17      So it was not sort of a -- it wasn't solely
18 self-generated of being from within the park and in
19 front of the precinct.  It was -- it -- I think it was
20 more of a citywide and even regional thing, that people
21 would come to Capitol Hill for -- for some of those
22 protest activities.
23 BY MR. WEAVER:
24      **Q.  Okay.  Do you -- do you know whether there was**
25 **any discussion about whether the protest activity in**

Page 176

1  **that area around Capitol Hill and Cal Anderson Park was**
2  **related to the ongoing encampment in Cal Anderson Park?**
3       MR. CRAMER:  Objection.  Form, foundation.
4       A.  I -- I don't remember there being that -- that
5  conversation.  It felt, as we got into the later summer,
6  into the fall, that those were sort of two separate sets
7  of issues.  They may have been related, but they were
8  two separate sets of issues.
9  BY MR. WEAVER:
10      **Q.  Do you -- were you parti-- -- were you involved**
11 **in any discussions about whether the -- whether Cal**
12 **Anderson Park should be cleared out again in December of**
13 **2020?**
14      A.  I was not involved in those discussions in --
15 in -- later in 2020.
16      **Q.  Were you aware of them in -- later in 2020?**
17      A.  Yeah, I -- I -- I was sort of aware that they
18 were happening.  SDOT has a -- has a role, along with
19 Parks, in addressing some of our issues stemming from --
20 from homeless encampments.
21      And we have a long working relationship with
22 Parks on how to do some of the -- the major sort of
23 initiatives that happen at -- related to homeless
24 encampments.
25      And that's primarily because we have some

44 (Pages 173 to 176)

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 177

1   equipment that Parks doesn't have, and so we're able to
2   support some of the larger-scale activities that Parks
3   does with SDOT personnel.
4       Q. So were you -- was SDOT involved with the
5   clearing out of the Cal Anderson Park in December of
6   2020?
7       A. We were from an operational perspective. I
8   would say not from a policy perspective. So I wasn't
9   directly involved, but our -- our maintenance operations
10  teams were part of that -- the sort of large-scale City
11  response to removing that encampment and closing the
12  park.
13      Q. Do you know who at SDOT was directly involved
14  with that particular effort?
15      A. Yeah. I think that Rodney Maxie would have
16  been, and -- and probably our division director for
17  right-of-way maintenance and urban forestry, whose name
18  is Darren Morgan.
19      Q. Okay.
20      A. Again, we were not involved in the -- the
21  policy aspects, the sort of decis- -- the go/no-go
22  decision, but more from an operational perspective, what
23  would be needed to help support Parks in accomplishing
24  what they needed to accomplish.
25      Q. Do you know who was involved in the go/no-go

Page 178

1   decision?
2       A. I don't.
3       Q. Okay. So you don't recall whether you toured
4   the Cal Anderson/East Precinct area prior to July 1,
5   2020, with Mayor Durkan; is that right?
6       A. I'm trying to remember. I -- I don't remember
7   specifically touring with her, but I may have been
8   on-site with her one day. I just -- I just don't
9   remember.
10      Q. Okay. So you don't -- you don't have a recall,
11  as you're sitting here, of what you might have done on
12  that day?
13      A. No.
14          (Exhibit No. 11 marked.)
15  BY MR. WEAVER:
16      Q. I'm trying to get another exhibit here.
17  Maybe I'll eventually get it. You never know.
18          Okay. There's Exhibit 11.
19      A. Okay.
20      Q. So I'm interested in mainly the attachment
21  that's at the end. It starts on Page 3 of this
22  Exhibit -- Exhibit 11.
23      A. Okay.
24      Q. And what's an end of day shift report?
25      A. So these are typical of the way that we -- we

Page 179

1   do responses to incidents like -- sort of major
2   emergency response activations that we have within the
3   department, where as we transition from one -- we
4   typically go to 12-hour shifts, 24/7.
5          We activate an incident commander, or an IC,
6   and we have -- we always have an on-call supervisor or
7   an OSC. When we're transitioning from one shift -- from
8   one 12-hour shift to the next, we document sort of
9   what -- what the state of things is so we can
10  communicate to the next shift that is -- that's coming
11  on, and they start from a place of common understanding
12  and knowledge.
13         So this is a -- a typical end of shift, exactly
14  what it says, but an end of shift report, saying here's
15  what's -- it's sort of an operational report.
16      Q. Okay. So the first bullet point is -- under
17  Notable Activities is, "Per Sam, no SDOT crew are to do
18  any work around the east precinct on June 13th unless
19  notified by Sam or Rodney"; is that correct?
20      A. That's correct.
21      Q. And that was your standing order basically for
22  the period of June 9th through June 30, 2020?
23      A. Yep.
24      Q. It says, Sam --
25      A. If I can offer --

Page 180

1       Q. -- is currently --
2       A. I can offer a little bit, that, you know,
3   there was -- there is -- we -- we continued to communicate
4   that because we would get not -- not just reports
5   related to, you know, where -- what -- the barrier
6   conversation that we'd talked about before, but, you
7   know, we would get reports for other sorts of service --
8   service -- it was sort of hard to filter who was asking
9   for things, and so I wanted to make sure that I
10  understood what was being asked for before we deployed
11  staff to do other things.
12      Q. All right. So it says, "Sam is currently
13  working with TOD."
14          What's TOD?
15      A. TOD is SDOT's Transportation Operations
16  Division. That's the division that Adiam Emery leads --
17      Q. Okay.
18      A. -- that we previously discussed.
19      Q. How about TCP? We're working to develop a TCP?
20      A. Traffic control plan.
21      Q. Okay. And this goes to what we had talked
22  about earlier where you were reviewing various options
23  on what to do with the barriers; is that right?
24      A. Right. Exactly.
25          (Exhibit No. 12 marked.)

45 (Pages 177 to 180)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 237

1      MR. WEAVER:  All right.
2      THE VIDEOGRAPHER:  Going off the record.
3  The time is approximately 4:25 p.m.
4      (Recess from 4:25 p.m. to 4:28 p.m.)
5      THE VIDEOGRAPHER:  We are back on the
6  record.  The time is approximately 4:28 p.m.
7      MR. CRAMER:  And we do not have any
8  additional questions, but we will -- will reserve
9  signature.
10     THE VIDEOGRAPHER:  Thank you.  This
11 concludes today's deposition of Sam -- Samuel Zimbabwe.
12 The time is approximately 4:29 p.m.  Going off the
13 record.
14     (Deposition concluded at 4:29 p.m.)
15     (Reading and signing was requested
16      pursuant to FRCP Rule 30(e).)
17          -o0o-
18
19
20
21
22
23
24
25

Page 238

1          C E R T I F I C A T E
2
3  STATE OF WASHINGTON
4  COUNTY OF PIERCE
5
6      I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Samuel
9  Zimbabwe, having been duly sworn, on October 28, 2021,
10 is true and accurate to the best of my knowledge, skill
11 and ability.
12     IN WITNESS WHEREOF, I have hereunto set my hand
13 and seal this 5th day of November, 2021.
14
15
16     _____
          CINDY M. KOCH, CCR, RPR, CRR
17
18 My commission expires:
19 JUNE 9, 2022
20
21
22
23
24
25

60 (Pages 237 to 238)