# EXHIBIT 5

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiffs,            )
                               )
     vs.            ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,              )
                               )
        Defendant.            )
_____

Videotaped ZOOM 30(b)6 Deposition
Of
JILL CRONAUER
_____

CONTENTS DESIGNATED CONFIDENTIAL

DATE:  Thursday, September 30, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

## Page 2

APPEARANCES

For the Plaintiff:
  GABRIEL REILLY-BATES
  Calfo Eakes
  1301 Second Avenue
  Suite 2800
  Seattle, Washington 9801

For the Defendant:
  TYLER L. FARMER
  ARTHUR W. HARRIGAN, Jr.
  Harrigan Leyh Farmer & Thomsen
  999 Third Avenue
  Suite 4400
  Seattle, Washington

Also Present:  Karl Benitez, Royal Video Productions

--oOo--

## Page 3

INDEX

| EXAMINATION BY | PAGE |
|---|---|
| Mr. Farmer | 7 |

EXHIBIT INDEX

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 56 | E-mail exchange, including August 6, 2020, from Bryan Copley to Jill Cronauer | 32 |
| 57 | Class Action Complaint | 39 |
| 58 | Map | 61 |
| 59 | E-mail dated March 12, 2020, from Jill Cronauer to Michael Malone and others re Economic Impact to Commercial Tenants | 68 |
| 60 | E-mail string dated March 12, 2020, between Jill Cronauer and Lindsey Jensen re Economic Impact to Commercial Tenants | 71 |
| 61 | E-mail dated March 12, 2020, from Michael Oaksmith to Jill Cronauer and others re Economic Impact to Commercial Tenants | 73 |
| 62 | E-mail string, including March 13, 2020, from Jill Cronauer to Steve Hooper and Ethan Stowell | 78 |
| 63 | Excel spreadsheet, CHOP damages by building | 82 |
| 64 | Plaintiff's Answers And Responses to Defendant City Of Seattle's Second Discovery Requests and Proposed Revisions to First Discovery Requests | 86 |
| 65 | Hunters Capital Damages Claim | 143 |
| 66 | List of i-Messages for J. Cronauer | 148 |

## Page 4

EXHIBIT INDEX (Cont.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 67 | Series of e-mails including October 14, 2020 from Jill Cronauer to Michael Malone re Meeting with Mayor Durkan | 150 |
| 68 | E-mail dated September 30, 2020, from Jill Cronauer to Christopher Saites and others | 155 |
| 69 | E-mail string dated August 31, 2020, between Jill Cronauer and Lindsey Jensen, copying Andrea Salazar | 157 |
| 70 | E-mail string, including August 6, 2020, from Jill Cronauer to Lindsey Jensen re plywood | 159 |
| 71 | E-mail dated June 11, 2020, from Lindsey Jensen to Andrea Salazar and attachment | 163 |
| 72 | E-mail dated March 26, 2020, from Nicholas E. to Jill Cronauer | 164 |
| 73 | E-mail dated March 16, 2020, from Karyn Schwarz to Jill Cronauer re Small Business Stabilization Fund | 166 |
| 74 | E-mail string dated March 16, 2020, between Jill Cronauer, Steven Dodobara, and Olivia Collins re Economic Relief Information | 168 |
| 75 | E-mail string dated March 16, 2020, between Jill Cronauer, Kari Brunson, and Olivia Collins re Economic Relief Information | 170 |
| 76 | E-mail dated March 17, 2020, from Peter Aaron to Jill Cronauer re Rent Vacation Request | 172 |
| 77 | E-mail string dated March 17, 2020, between Katie Parsons and Jill Cronauer re Rains Greenus Building Lease | 174 |
| 78 | E-mail string between Jill Cronauer and Amaan Kurji re COVID-19 and 8 Limbs Yoga | 175 |

Page 41

1  A. Yes.
2  Q. Okay. Look at Paragraph 127 on the bottom, and
3  you'll see that it starts "Plaintiff Hunters Capital," and
4  in the second sentence it says: "Like Madrona Real Estate,
5  the presence of CHOP is causing economic injury to Hunters
6  Capital." Do you see that?
7  A. Yes.
8  Q. So my question for you, Ms. Cronauer, is: What
9  did you mean by "the presence of CHOP" at Paragraph 127 of
10 the Hunters Capital Complaint?
11 A. That the occupation of CHOP in the area was
12 causing economic injury to Hunters Capital.
13 Q. Okay. When you say "occupation," what do you
14 mean?
15 A. Its presence.
16 Q. And I want to make sure that we have a clear
17 understanding of the basis for the Complaint. When you say
18 "the presence," do you mean the presence of protesters in
19 the area described as CHOP or something else?
20 A. The -- without limiting my response to, you know,
21 the blocking of access to the area, inability for our
22 tenants, commercial tenants, to be open, our residents
23 being able to enjoy or live without interruption and work
24 and sleep. Those are just some examples.
25 Q. Okay. And since the CHOP barricades were cleared

Page 42

1  on July 1st, has Hunters Capital had any blockage of access
2  to its buildings?
3  A. Yes.
4  Q. Could you tell me when, please?
5  A. So when the police came back in and reoccupied on
6  the 1st, they then shut -- created a perimeter around the
7  area, of which I don't recall the total perimeter, and
8  wouldn't allow anyone in or out for, I believe it was five
9  days; so we weren't able to access our properties or our
10 business. Our residents weren't able to come to their
11 homes. And the continuance of the barricades around the
12 East Precinct, which I don't believe were removed until May
13 of 2021, also impeded access to our property on 12th
14 Avenue, the Ballou Wright building.
15 Q. Can you describe how the barricades around the
16 East Precinct prevented you access to the Ballou Wright
17 building?
18 A. So in trying -- it didn't prevent, but it was
19 difficult to access on foot.
20 Q. Okay. And how so?
21 A. Well, you had to go about two blocks around to
22 access the building because the sidewalks were closed and
23 also the crosswalks, one or two areas of it, so you'd have
24 to do a big circle block around.
25    And also, during the -- once CHOP was, you know,

Page 43

1  like I referenced, if you Wikipediaed when CHOP ended, they
2  would use the -- which I just did, which is interesting --
3  you would -- they would formally say that, you know, it was
4  concluded I think on the 1st of July. But with the
5  occupation of the park, it was very consistent that Nagle
6  Place, which is how you access the parking garage to the
7  Broadway Building for all of our residents and our
8  commercial office tenants, was continually and
9  intermittently restricted and closed down. And that was
10 due to issues occurring in the park.
11 Q. Okay. And what was the time period of that
12 intermittent restriction of access to the parking garage?
13 A. Between about the 6th of July, and I believe the
14 park was cleared on the 12th -- or the 18th of December.
15 Q. Okay. And so we have a clear record for folks
16 who haven't seen photos --
17    (Fire alarm.)
18    THE VIDEOGRAPHER: Should we go off the record?
19    MR. FARMER: Yes, please.
20    THE VIDEOGRAPHER: The time is 11:28 a.m. We are
21 off the record.
22    (Recess taken.)
23    THE VIDEOGRAPHER: The time is 11:32 a.m. We are
24 back on the record.
25 BY MR. FARMER:

Page 44

1  Q. Ms. Cronauer, I wanted to ask you to describe
2  what you mean by referring to the occupation of the park in
3  this time period where there was intermittent restriction
4  of access to the parking garage.
5     MR. REILLY-BATES: Object to the form.
6  A. After the CHOP -- and I say, quote, unquote,
7  ended because, as you know, there was a reoccupation of the
8  East Precinct -- there was almost immediately an occupation
9  of Cal Anderson Park, which was widely publicized. And
10 during that time, there were several incidences, some of
11 them quite shocking and terrible -- murders, deaths,
12 suicides, rapes -- and the -- our access to our property
13 was blocked as the police and medics came to attend to
14 those issues. Also, there were nightly fires and fights
15 and people driving vehicles into the park, at which time
16 first responders would respond and block the park or
17 access, sorry, to Nagle and our property. Those are just
18 some of the -- some of the examples.
19 Q. Okay. And as I understand it --
20 A. And the park was closed, technically -- or I
21 guess officially it was closed, but it was very active with
22 CHOP participants.
23 Q. Okay. And so we have a clear record, by "park"
24 throughout this testimony, you've been referring to Cal
25 Anderson Park; correct?

JILL CRONAUER
9/30/2021

Page 49

1  his July 28th e-mail?
2       MR. REILLY-BATES: Objection. Counsel, could you
3  specify which response you're referring to? There are two
4  e-mails -- or three e-mails on that page.
5       MR. FARMER: Thanks, I should.
6    Q. If you look at the bottom one, it says Wednesday,
7  July 29, 2020, at 1:44 p.m.
8    A. Yes.
9    Q. And do you believe that that's your response to
10 Mr. Copley's e-mail that he sent on what appears to be the
11 night before, July 28th, 2020, at 6:34 p.m.?
12   A. It appears to be.
13   Q. And you wrote: "Of course, you know, Hunters
14 Capital is not responsible for the pandemic or the CHOP.
15 We are looking into relief for our tenants in every area
16 possible, including insurance claim and suing the City,
17 which I think we can agree is much further than most
18 landlords."
19      So as of this point, July 29, 2020, had you filed
20 suit against the City of Seattle?
21   A. It looks -- it appears yes.
22   Q. And that's because Exhibit 57 was filed, it looks
23 like, on June 24th, 2020; correct?
24   A. Correct.
25   Q. And so the e-mail exchange we're looking at in

Page 50

1  Exhibit 56 appears to be about a month after Hunters
2  Capital filed suit.
3    A. Correct.
4    Q. Do you see in the next paragraph, you write to
5  Mr. Copley: "As for the lawsuit, our aim was to help force
6  the City to do its job and open the streets and respond to
7  emergencies." Do you see that?
8    A. Yes.
9    Q. And you write further: "The only financial
10 component is one month of rent at the building (June)."
11      Do you see that?
12   A. Yes.
13   Q. What building were you referring to there?
14   A. The Ballou Wright building.
15   Q. And why was it your understanding as of July 29,
16 2020, that the only financial component to the lawsuit was
17 seeking to recover one month of rent at the Ballou Wright
18 building?
19      MR. REILLY-BATES: Objection. Mischaracterizes
20 the witness' testimony.
21   A. I would say probably for a couple reasons. We
22 were still -- as I explained earlier, when the police East
23 Precinct was reoccupied by the Seattle Police, the effects
24 of CHOP did not go away as we hoped they would, but they
25 continued, and in throughout the neighborhood with the

Page 51

1  occupation -- unfortunately, the occupation of the park --
2  the people did not stay in the park but it branched over;
3  so we had continuing impacts.
4       So when we first sought our claim, we thought
5  that it would be limited our damages to the period of --
6  you know, I go back to the Wikipedia definition of when
7  CHOP started and ended, but it had a really long tail; and
8  so as we continued to suffer the negative impacts of CHOP
9  as it continued in other areas of the neighborhood, we
10 continued to adjust our claim.
11 BY MR. FARMER:
12   Q. And as you continued to observe what you just
13 described as the really long tail of the CHOP impact, did
14 you identify different impacts at the various properties
15 that Hunters Capital owns?
16      MR. REILLY-BATES: Object to the form.
17   A. Can you be more specific and where?
18 BY MR. FARMER:
19   Q. I'll try to be more specific. So you mentioned
20 the intermittent access to the garage located adjacent to
21 Cal Anderson Park.
22   A. Um-hmm.
23   Q. What building is that for?
24   A. The Broadway Building.
25   Q. Okay. Is there any other Hunters Capital

Page 52

1  building that is closer to Cal Anderson Park than the
2  Broadway Building?
3    A. 900 East Pine. They're both -- they're both the
4  same distance.
5    Q. Okay. And those are the two closest, just so
6  that we're clear?
7    A. Um-hmm, yes.
8    Q. And did the 900 East Pine building also have
9  intermittent access --
10   A. Yes.
11   Q. -- at various points?
12   A. Yes.
13   Q. And what's your recollection of why access became
14 intermittent from time to time after the CHOP was cleared
15 on July 1st?
16   A. There was street closures by the City, there were
17 street closures by protesters, there were tenants that did
18 not feel safe coming to their business, and there were
19 tenants who were told by police and other city employees
20 that they could not come to their business.
21   Q. Okay. Let's unpack a little of that. With
22 regard to the tenants who were told by police that they
23 couldn't come to their business, could you please identify
24 them?
25   A. There were several. I could start with our own

13 (Pages 49 to 52)

Electronically signed by Mindy Suurs (101-257-931-8021)    9e3d6b33-f002-450c-bc14-8c4011de23fa

Page 53

employees. I was told they couldn't come, and it took me some convincing to let them allow me in. And I'd have to look back on the dates.
   One of our tenants of Substantial -- which are 900 East Pine -- they phoned us and said the police were not allowing them to access their place of business, so how could they pay rent, how could they do their business if they can't come.
   Those are -- those are for certain, but I would have to -- there were others, but I don't want to speak incorrectly.
   Q. Okay. I know you said you'd have to look at a document to try to get the specific date, but so that we're clear as we go through the facts today, we're talking about a time period later than July 2020?
   A. In July 2020 specifically is when I'm thinking of.
   Q. Okay. And do you have any recollection of you or any other Hunters Capital employees being told by police that you could not access one of your buildings after August 1st, 2020?
   A. I don't recall. Yes, there were occurrences where we could not access our building after August of 2020.
   Q. Okay. What do you have in mind?

Page 54

   A. In September when there was the -- a murder in the park and a suicide, we were not able to access our building. And that was in September.
   There -- and I -- because I wasn't -- I don't have specifics on this, but there was another time where personally I tried to access the building to get my vehicle and there was a demonstration happening or a group of people where I couldn't get my vehicle down the street. That's just two examples.
   Q. Okay. On the occasion of the murder in Cal Anderson Park, how long were you or other Hunters Capital employees unable to go to your office?
   A. I don't recall.
   Q. Do you recall whether it was more than one day?
   A. I don't recall.
   Q. And how about with regard to the demonstration? Do you recall how long the demonstration prevented you from going to the Hunters Capital office?
   A. That one instance was one day.
   Q. And was that you personally?
   A. Yes.
   Q. So did you go back and work from home that day?
   A. I -- I don't recall if I went home.
   Q. As the designee for Hunters Capital to testify regarding its alleged losses due to the City's conduct,

Page 55

have you tried to value the impact on Hunters Capital of the lack of access that you just described in September of 2020?
   A. I'm unsure, but I don't believe so.
   Q. So sitting here now, would you know how you would go about trying to put a loss of access value on either of those two incidents?
   A. I would have to think about that. I don't know off the top of my head.
   Q. Are you able to identify any revenue that was lost by Hunters Capital due to either the lack of access because of the murder in the park or the lack of access because of the demonstrations in September 2020?
   A. I'd say potentially. If we're not in our property, especially on the residential side, if we don't have access to property and also if you're -- if you have -- for instance, on the residential side if you had a tour or you were trying to attract people to come live there, I think it's safe to say that that would be a potential loss of revenue if they could not access the property because there are fire trucks and paramedics removing bodies from the park where they're trying to access to come in the door.
   Q. Right. So to evaluate that, you would want to dig into specific facts regarding what potentially was

Page 56

going on that day?
   A. Correct. And we -- I do not believe any of that is included in our claim.
   Q. You understand that in the Class Action Complaint that we looked at as Exhibit 57 that Hunters Capital seeks to represent a class of residents and owners; correct?
   A. I believe so.
   Q. And is it right that one of the claims advanced in the Class Action Complaint marked as Exhibit 57 is for lack of access to buildings during the CHOP period?
   MR. REILLY-BATES: Object to form. Counsel, do you want to be more specific as to where you -- which section you were referring to?
   MR. FARMER: It's not my Complaint, but I'm happy to get more specific. It's a very general question, and I -- I'll rephrase it. But why don't we do it this way.
   Q. As a representative plaintiff in a class action filed in Federal Court for Western District of Washington, what types of damages do you seek to recover for the class?
   A. I believe we've submitted a detailed document for the losses for Hunters Capital and the individual plaintiffs.
   Q. And sitting here today, do you know what types of damages you seek to recover for the absent class members that Hunters Capital represents in the lawsuit?

JILL CRONAUER
9/30/2021

Page 57

1    A.  I would have to consult my attorney on that.
2    Q.  So you have not worked with any expert to try to
3  develop a construct to develop -- pardon me, I'll ask a
4  better question that doesn't use the word "develop" more
5  than three times.
6    A.  Fine.
7    Q.  Sitting here today, have you worked with any
8  nonlawyer to develop a damages construct so that you can
9  evaluate class members' damages in this lawsuit?
10       MR. REILLY-BATES:  Object to form.
11   A.  Not to my knowledge.
12 BY MR. FARMER:
13   Q.  To your knowledge, you've only worked on damage
14 analysis specific to Hunters Capital; correct?
15   A.  That's correct.
16   Q.  All right.  Let's go back and look at Exhibit 56
17 again.  Going back to Page 1708, and that's the July 29
18 e-mail that you wrote to Mr. Copley.
19   A.  Um--hmm.
20   Q.  And do you see in the second part of the second
21 paragraph, you write:
       REDACTED PURSUANT TO PLAINTIFFS'
       DESIGNATION AS CONFIDENTIAL
25       What were you referring to when you wrote "

Page 58

       REDACTED PURSUANT TO PLAINTIFFS'
       DESIGNATION AS CONFIDENTIAL

7    Q.  Okay.  And how about in the second part of that
8  sentence to Mr. Copley you wrote:
11   A.
       REDACTED PURSUANT TO PLAINTIFFS'
       DESIGNATION AS CONFIDENTIAL

18   Q.  Okay.
20   A.  I do not.
21   Q.  And do you recall whether you encouraged any of
22 your tenants to file such claims?
23   A.  I don't recall.
24   Q.  And so I want to make sure that we close out one
25 topic here under our damages inquiry.  Other than the

Page 59

1  instances that you've just identified, can you identify any
2  other instance where the City impeded Hunters Capital's
3  access to its buildings after July 1st, 2020?
4        MR. REILLY-BATES:  Object to the form.
5    A.  Can you be more specific in identifying when you
6  state that other than what we've discussed?
7  BY MR. FARMER:
8    Q.  Sure.  So -- and I will be as detailed as I can
9  be, but based on my recollection, we've gone through some
10 Cal Anderson Park violence that resulted in intermittent
11 access and a demonstration that resulted in one-day lack of
12 access, and then you've mentioned more generally that the
13 presence of Cal Anderson Park resulted in intermittent
14 access to the parking garage because of responders coming
15 to deal with problems there.  Does that sum up your
16 recollection of the impediments to full access?
17       MR. REILLY-BATES:  Object -- objection.
18 Mischaracterizes the witness' prior testimony.
19 BY MR. FARMER:
20   Q.  And I don't mean to, so please --
21   A.  I do specifically recall saying that there has
22 been other instances, and here are a few examples.
23   Q.  Okay.  And so my better question, I guess, is do
24 you have any other that you can tell us today?
25   A.  I think that I would again point to the -- our

Page 60

1  damages complaint, and there are -- there's a good summary
2  there.
3    Q.  Okay.  Can you identify any instances after
4  July 1st, 2020, where the City police or fire did not
5  respond to emergencies near Hunters Capital buildings?
6    A.  Yes.  Throughout the time from June -- July to I
7  would say -- yes, I can.
8    Q.  Okay.  So after July 1, 2020, what instances do
9  you have in mind?
10   A.  I believe there were several.  One example is
11 there were fires nightly in Cal Anderson Park, and no one
12 would bring garbage and trash and big bonfires, and fire
13 did not respond.  They might have on a couple occasions but
14 not every time they were phoned.
15   Q.  Okay.  And what was the duration of that activity
16 to which you think they should have responded?
17   A.  From in and around July 5th, 2020, through
18 December 18th, 2020.
19   Q.  Okay.  And other than that, can you recall any
20 other instances where Seattle Police Department or Fire
21 Department did not respond to emergencies?
22       MR. REILLY-BATES:  Object to the form.
23   A.  I can't report any specific detail, but I believe
24 that there were several occasions where the police were
25 called to the area and they did not respond.

15 (Pages 57 to 60)

ROUGH & ASSOCIATES INC
office@roughandassociates.com     206.682.1427 3515 SW Alaska St Seattle WA 98126

Page 61

1  BY MR. FARMER:
2     Q.  And sitting here today, can you recall even one
3  specific instance?
4     A.  I -- I -- I don't want to speak -- say anything
5  that's incorrect, but generally speaking, my
6  recollection -- my general recollection from that time that
7  there were instances that would occur, crimes that would
8  occur, we would see weapons, et cetera, and the police did
9  not respond in and around the park.
10    Q.  In and around the park.  When you say "around the
11 park," do you mean within a couple blocks of the park?
12    A.  Say a few blocks.
13    Q.  Let's go ahead and take a look at Exhibit C,
14 which is in Volume I.
15        MR. REILLY-BATES:  Okay, I will get that.
16        MR. FARMER:  I'm sorry, I meant Tab C, which
17 we'll mark as a new exhibit.
18        MR. REILLY-BATES:  That's 58 we're on now?
19        MR. FARMER:  That's right.
20           (Exhibit No. 58 marked for
21            identification.)
22        MR. REILLY-BATES:  One second, we're getting
23 there.  Is this a map?
24    A.  Hello?
25        MR. FARMER:  Oh, I'm sorry, I couldn't hear you.

Page 62

1         MR. REILLY-BATES:  Oh, okay.
2         MR. FARMER:  Yes, it should be an aerial, and Cal
3  Anderson Park should be towards the middle there.
4     Q.  Ms. Cronauer, do you have that in front of you?
5     A.  I do.
6     Q.  Okay.  So I've worked with my colleagues here to
7  try to  accurately list the location of various businesses
8  on this map.  And I won't quiz you as to all of them, but
9  I'd like to ask you about the Hunters Capital buildings if
10 that's okay.
11    A.  Yes.
12    Q.  So if you look under Cal Anderson, if you just go
13 directly down, do you see HC Broadway Building?
14    A.  The colors you've chosen are really hard on the
15 eyes.
16    Q.  I did not choose those.  I'm sorry about that.
17    A.  The red and green is real hard.
18    Q.  So I'll give you a hint.  The HC ones are all in
19 yellow, so they should be easiest.
20    A.  Oh, got Hunters -- HC Broadway Building, found
21 it.  Thank you.
22    Q.  And do you see that it looks like it's across the
23 street from a baseball diamond?
24    A.  Yes.
25    Q.  Is that accurate?

Page 63

1         MR. REILLY-BATES:  Object to the form.
2     A.  It's a little misleading because it's, you know,
3  a larger building than just the dot.
4  BY MR. FARMER:
5     Q.  Okay, and --
6     A.  And it appears to be the approximate location.
7     Q.  Thank you.  And that's all this intends to be.
8  So that appears to be the approximate location of a
9  building which is much larger than the red dot depicted on
10 Exhibit 158?
11    A.  Yes.
12    Q.  Okay.  And if you go down from there, not just
13 using this exhibit, but using your personal knowledge of
14 the area, about how long of a walk is it in minutes from
15 the Broadway Building to the Hunters Capital Ballou Wright
16 Building?
17    A.  Depending on your lights, your -- you know, four
18 or five minutes.
19    Q.  Okay.  And then to what direction would you walk
20 from the Ballou Wright Building to get to the East
21 Precinct?
22    A.  North.
23    Q.  And based on your personal knowledge of the area,
24 are those two depicted approximately accurate fashion on
25 this aerial?

Page 64

1     A.  The -- the HC Ballou Wright Building, the dot is
2  in the alleyway, and I mean it would be more accurate, I
3  would think, for someone who is unfamiliar with this to put
4  them just right on top of each other, right next to each
5  other instead of across.  Does that make sense?  So
6  directly north and south of each other.
7     Q.  Okay.  That makes sense.  All right.  And how
8  about the Seattle Automobile Company building?  Is that
9  approximate location fair, or how would you adjust it?
10    A.  This is not a very good map.  Okay.
11        MR. REILLY-BATES:  Yeah, I'm going to just object
12 to the form.  It is difficult to read this document because
13 the bubbles obscure a lot of the distinguishing
14 characteristics of the map unfortunately, so --
15    A.  And the street.
16        MR. REILLY-BATES:  And the streets, so --
17 BY MR. FARMER:
18    Q.  Maybe we should just grade me on effort, and I'd
19 probably get a C at best since that was the tab number;
20 right?
21    A.  The dot is a little -- well, I don't know is
22 it -- if you're going to do this again, I wouldn't use
23 satellite -- the street -- you know, I can say that the
24 Seattle Automobile Company is on the corner of East Pike
25 and 10th Avenue.

Page 185

1  SIGNATURE
2
3       I declare that I have read my within deposition,
4   taken on Thursday, September 30, 2021, and the same is true
5   and correct save and except for changes and/or corrections,
6   if any, as indicated by me on the "CORRECTIONS" flyleaf
7   page hereof.
8       Signed in _____, Washington,
9   this _____ day of _____, 2021.
10
11
12
13
14       _____
15       JILL CRONAUER
16
17
18
19
20
21
22
23
24
25

Page 186

1       REPORTER'S CERTIFICATE
2
3       I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:
5
6       That the foregoing testimony of JILL CRONAUER
    was given before me at the time and place stated therein
7   and thereafter was transcribed under my direction;
8       That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision, to the best of my ability;
10      That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;
12
        That the witness, before examination, was by me duly
13  sworn to testify the truth, the whole truth, and nothing
    but the truth;
14
        That I am not a relative, employee, attorney, or
15  counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
    thereof;
17
18  DATE:  October 3, 2021
19
20
21
22
23      _____
24      Mindy L. Suurs
        Certified Court Reporter #2195
25

47 (Pages 185 to 186)