THE HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF WASHINGTON

9

10   HUNTERS CAPITAL, LLC, a Washington        Case No. 2:20-cv-00983-TSZ
     limited liability company, HUNTERS
11   PROPERTY HOLDINGS, LLC, a                  PLAINTIFFS' OPPOSITION TO CITY
     Washington limited liability company;     OF SEATTLE'S MOTION FOR
12   GREENUS BUILDING, INC., a                  PROTECTIVE ORDER
     Washington corporation; NORTHWEST
13   LIQUOR AND WINE LLC, a Washington
     limited liability company, SRJ
14   ENTERPRISES, d/b/a CAR TENDER, a
     Washington corporation, THE RICHMARK
15   COMPANY d/b/a RICHMARK LABEL, a
     Washington company, ONYX
16   HOMEOWNERS ASSOCIATION, a
     Washington registered homeowners
17   association, WADE BILLER, an individual,
     MADRONA REAL ESTATE SERVICES
18   LLC, a Washington limited liability
     company, MADRONA REAL ESTATE
19   INVESTORS IV LLC, a Washington
     limited liability company, MADRONA
20   REAL ESTATE INVESTORS VI LLC, a
     Washington limited liability company, 12TH
21   AND PIKE ASSOCIATES LLC, a
     Washington limited liability company,
22   REDSIDE PARTNERS LLC, a Washington
     limited liability company, OLIVE ST
23   APARTMENTS LLC, a Washington limited
     liability corporation, and BERGMAN'S

24

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ)

1  | LOCK AND KEY SERVICES LLC, a
2  | Washington limited liability company, on
   | behalf of themselves and others similarly
3  | situated,

4  |                               Plaintiffs,

5  |        vs.

6  | CITY OF SEATTLE,
   |                               Defendant.

7

## I.   INTRODUCTION

8        The City has moved for a protective order in the hopes of avoiding responding to a set of

9  requests for production aimed at four discrete areas that are highly relevant to Plaintiffs' damages

10 and causation of those damages. Specifically, Plaintiffs seek documents regarding damages that

11 were incurred after the City first "cleared" the Capitol Hill Occupying Protest ("CHOP") because

12 of foreseeable events that were triggered by what the City had done before the "clearing". The

13 relevancy of each of these requests is set forth below in II.B, *supra*, which describes in detail how

14 the City's affirmative actions contributed directly to ongoing problems after July 1, 2020, in the

15 neighborhood that had been occupied by CHOP.

16       These requests are not, contrary to the City's assertion, based on substantive theories of

17 liability beyond those stated in Plaintiffs' complaint; instead, they are based on the theories stated

18 in the complaint, and the applicable causation standards. And the City's claim of excessive burden

19 should be seriously discounted given the factual basis for that argument and the relevant

20 circumstances. The City's motion should be denied in its entirety.

21

22

23

24

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 1

## II.   BACKGROUND FACTS

### A.  There Is No Dispute that Plaintiffs Can Pursue, and Have Pursued, Damages Beyond July 1, 2020

Plaintiffs' legal claims are based on actions the City took to abandon an entire neighborhood of Capitol Hill in June 2020 while at the same time actively supporting the people who took over that neighborhood. But Plaintiffs have always been clear that they allege that the City's actions in supporting CHOP had ongoing impacts even after the area was first "cleared" on July 1, 2020. Plaintiffs made this allegation in their First Amended Complaint that they filed on July 10, 2020:

> 81. Each Plaintiff and the Class has suffered—and continues to suffer [--] irreparable economic and non-economic injury as a direct result of CHOP participants' presence on Capitol Hill and its aftereffects. The City's support for CHOP enabled, aided, and abetted the ongoing harm to each of the Plaintiffs and members of the Class.
>
> 82. Although the City cleared CHOP on the morning of July 1, 2020, Plaintiffs and the Class have continued to suffer harm due to restrictions in the area resulting from the existence of CHOP, the continued public perception of the area as dangerous and unstable, and lost business that may never return. Plaintiffs expressly reserve the right to seek recovery for such ongoing harm.

Dkt. 9 (also ¶¶ 182, 183). *See also* Dkt. 28 (¶¶ 80, 81, 173, 174); Dkt. 47 (¶¶ 82, 83, 175, 176).

Apparently for that reason, the City does not dispute that Plaintiffs can seek discovery about damages that occurred after July 1, 2020, and has conceded that it has no choice but to respond to a request for production (No. 48) seeking City documents discussing ongoing harm to the area related to CHOP. *See* Mtn. at 8. *See also* Declaration of Tyler Weaver ("Weaver Decl."), Ex. 1 (11/18/2020 email setting forth parties' discussions).

But the City has nonetheless moved for a protective order on several of Plaintiffs' other requests on the basis that they could not possibly be related to damages caused by the City's actions in the weeks leading up to July 1, 2020. The City is simply wrong, as demonstrated below.

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 2

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

### B.  All the Requests Bear Directly on Issues of Damages and Causation

The City's objections to Plaintiffs' requests all rest on a convenient, but false, assumption of fact: that after the City had actively allowed and encouraged protesters to hostilely occupy an entire neighborhood for more than three weeks, nothing that happened in the neighborhood during the ensuing months or weeks had a causal relation to the City's prior actions. That is contrary to both common sense and the evidence.

### 1.  Requests seeking documentation related to ongoing problems in Cal Anderson Park (RFP Nos. 45, 47)

Requests 45 and 47 seek information about the encampments or gatherings of protesters that continued in into Cal Anderson Park shortly after the City initially cleared it out on July 1, 2020. This continued occupation was foreseeable and causally related to what the City did in June 2020; a review of what the City did demonstrates this clearly.

On June 8, 2020, the Seattle Police Department vacated the East Precinct, leaving numerous barriers in place that were almost immediately repurposed by protesters to create a "no-police" zone that encompassed several blocks, including Cal Anderson Park and the ballfield located there. The City did not clear this area or the streets; instead it made the affirmative decision to allow it to remain and engaged in negotiations with the occupiers about possibly adjusting, but not removing, some of their barriers. Ex. 2, 198:8-203:6 (October 28, 2021, Videotaped Deposition of Samuel Zimbabwe referred to as "Zimbabwe dep."). Predictably, in less than two days, the City became aware of a level of "permanent activity" at the park, including the erection of tents and the digging of an illegal garden out of the turf. Ex. 3 (SEA_00028178-179).

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 3

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

Rather than take affirmative action to cease this or any of the other numerous illegal activities occurring in the area, the City provided the occupation with raw ingredients it needed to grow and remain in place:

- The City provided 21 portapotties throughout the neighborhood, through outside contractors and at the City's expense, and made sure they were emptied every day that it was safe to do so. Ex. 4, 70:7-75:17 (October 4, 2021, Deposition of Mami referred to as "Hara dep.").

- The City provided the occupiers with several wash stations, including a very large 50-gallon station. Ex. 4, 63:25-64:19 (Hara dep.).

- The City provided the occupiers with dumpsters and garbage service. Ex. 4, 27:4-:22, 29:23-30:24 (Hara dep.).

- Mayor Jenny Durkan tweeted her support of the illegal garden,[1] and the City even allowed the illegal gardeners to use the City's greenhouses. Ex. 5, 184:18-185:4 (October 12, 2021, Deposition of Casey Sixkiller referred to as "Sixkiller dep.").

- The City gave the occupiers use of public water at the park. Ex. 4, 64:10-66:6 (Hara dep.).

- The City left lights on at the park longer than usual, and allowed the occupiers to hack into the power at the park to charge their phones and control the lights. *Id.*, 67:4-68:2 (Hara dep.) and Ex. 5, 173:4-174:2 (Sixkiller dep.).

- Seattle police adopted an official policy that they would not enter the area unless there was a mass casualty event such as an active shooter or a massive structural fire. Ex. 6 (SEA_00019917-918).

As a result of these accommodations, within a matter of days, there were about 200 tents in Cal Anderson Park. Ex. 5, 188:5-189:8 (Sixkiller dep.).[2] And even when, after foreseeable and avoidable shootings and homicides occurred in the area, the City finally decided it was time to clear

---

[1] https://twitter.com/mayorjenny/status/1271653002982469632?lang=en (which is still an active tweet as of 11/24/21).
[2] Photographs of this occupation can be found in Plaintiffs' complaints. *E.g.*, Dkt. 9, ¶¶ 50-52.

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 4

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

1    the area out, the City provided the occupiers with social services and alternative housing

2    arrangements, Ex. 4, 77:12-78:12 (Hara dep.), and offered to (and did) preserve the occupiers' art

3    using City trucks and storage facilities. Ex. 2, 50:17-52:21 (Zimbabwe dep.). The City was so

4    deferential to the occupiers that in late June, Deputy Mayor Casey Sixkiller declared "we're doing

5    all the giving and they aren't doing shit." Ex. 5, 179:21-184:16.

6            This support of an occupation of a public park created a situation where, even after it was

7    initially "cleared," further occupation was inevitable. The City had given the signal that not only

8    would it allow an occupation, but that as long as it contained an element of First Amendment

9    speech, the City would actively assist it. Predictably, another large encampment appeared in Cal

10   Anderson Park in July 2020 and remained there until the City finally cleared it out again in

11   December 2020.

12           As Seattle Department of Transportation head Samuel Zimbabwe testified, an official

13   delegation from the City visited the area "several months" after July 1, 2020, to view the area and

14   discuss "recovery from the … post-protest activities [and the fact that] there was still … some

15   maintenance and operation issues," including concerns about "what long-term plans for Cal

16   Anderson Park renewal might be." Ex. 2, 167:11-168:24 (Zimbabwe dep.). And Deputy Mayor

17   Casey Sixkiller recently testified that in December 2020, there were approximately 75 people

18   camped in Cal Anderson and that "the [renewed] encampment had begun to prohibit the use of the

19   park. [T]he play structure was damaged and compromised, the field – the turf north of the – Bobby

20   Moore's field had been completely destroyed." Ex. 5, 209:16-21. Conditions deteriorated so much

21   that the City determined that the park needed to be a first-priority park in a new cleanup effort. *Id.*,

22   210:20-212:1; *See also* Request No. 45 (seeking related documentation identified by Sixkiller).

23

24

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 5

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

This continued occupation, and the problems it created for the neighborhood, were the direct result of the City's coddling CHOP in June 2020, which created the impression for protesters and the public that Cal Anderson Park and the surrounding neighborhood could be occupied without repercussions. As Mr. Zimbabwe recently testified:

> I think that it – **because of the – the summer protests** [the CHOP geographic area] was still a place where people would sort of organize and – and depart from. I think throughout, both in the midst of the summer and through the – through the rest of the summer and the fall, people would come from citywide to – to Capitol Hill for those protest activities.... … I think it was more of a citywide and even regional thing, that people would come to Capitol Hill for – for some of those protest activities.

Ex. 2, 175:2-:22 (emphasis added).

This, of course, is simply common sense given what the City did with CHOP. And Plaintiffs are seeking discovery about what happened in the continued occupation of the park, to both bolster this common-sense causal connection and demonstrate why the continued occupation caused so much harm. The City understandably wants to deny Plaintiffs the documents necessary to support its case, but to do so requires an acceptance of the fiction that once it originally cleared out the area on July 1, 2020, its actions prior to that date *per se* had no ongoing effect on the neighborhood or how others perceived that neighborhood. The Court should reject this attempt to keep Plaintiffs from proving the City is wrong.

### 2.  Requests seeking documentation related to ongoing protests and street blockages in the neighborhood (RFPs Nos. 47, 49, 50)

For similar reasons, Plaintiffs seek documents about ongoing protests in the neighborhood most directly affected by CHOP, and related street blockages and property damage. Mr. Zimbabwe described these "rolling protests" as follows: "I don't remember how long it continued, but for –

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 6

1    for several months afterwards, we would still get rolling protests … that started out in Capitol Hill,

2    but went to other parts of the city as well, that created temporary traffic disruptions with those sort

3    of protest activities." Ex. 2, 172:22-173:2. And as already discussed above, he stated his

4    understanding that these rolling protests focused on Capitol Hill "because of" what had happened

5    with CHOP. *Id.* at 175:2-3.

6         The fact that the CHOP area continued to be subject to problem protests and street

7    blockages for several months is, again, not surprising given what the City did in the weeks leading

8    up to July 1, 2020. In addition to what was already discussed above in section II.B.1 as to Cal

9    Anderson Park, the City telegraphed philosophical support for the purposes behind the protests,

10   and actively supported and assisted protesters in blocking the streets. The evidence of this is too

11   extensive to recount completely here, but it includes the following:

- From the very start, the City, in an effort spearheaded by Mayor Durkan, was looking to gift property to Black Lives Matter ("BLM") for its headquarters. The City's initial plan was to gift the East Precinct itself to BLM, and then switched to other possible nearby properties. Ex. 5, 30:1-36:6 (Sixkiller dep.).

- Rather than immediately remove the barriers that had been placed across public streets and sidewalks in the area, the City decided to negotiate with the occupiers about moving some barriers to allow for an indefinite period of street blockages in the area. Ex. 2, 198:8-203:6 (Zimbabwe dep.).

- When the City moved the barriers, it removed the flimsiest barriers and replaced them with enormous concrete "eco blocks" that fortified the area with the goal of providing greater protection to the protests occurring in the area. Ex. 2, 102:15-103:21 (Zimbabwe dep.).

- Mayor Durkan repeatedly failed to provide an indication of when the occupation would be forced to end and compared it to a "block party." Dkt. 9, ¶ 182.

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 7

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

- The City's fire chief, transportation director, and head of Seattle Public Utilities were in the area every day to work with the occupiers to try to keep at least some public services available to residents of the area. Ex. 2, 213:4-215:3 (Zimbabwe dep.).

- The City told Google Maps and similar companies to route drivers outside the area and declare it "local access only." Ex. 2, 90:10-93:1 (Zimbabwe dep.).

Plaintiffs contend, and will prove, that this extraordinary support of both the message and the manner of protesters' occupation and blockage of streets and sidewalks in Capitol Hill led to the understandable perception that Plaintiffs' neighborhood was a place where protesters could, and did, create serious public hazards and impediments with impunity. Plaintiffs' Requests Nos. 45, 49, and 50, are aimed at retrieving documents demonstrating this causal connection and the ongoing harm in the neighborhood that was the foreseeable result of what the City did in June 2020.

### 3.   Request seeking documents about the bunker-style wall around the East Precinct (RFP No. 46).

Plaintiffs also seek, in request number 46, documents regarding the construction, necessity, and removal of an enormous bunker-style wall that SDOT built around the East Precinct in early July 2020, immediately after the City cleared Cal Anderson Park. This wall, a photograph of which is attached to the Weaver Decl. as Ex. 7, was constructed of the same eco-barriers that SDOT had moved into the area to protect protesters; the City simply moved them from the streets to the precinct. Ex. 2, 133:19-136:24. The bunker was two concrete blocks deep, four or five blocks high, and topped with a chain link fence up to a height of as much as twelve feet. *Id.* It entirely blocked the sidewalk on all sides of the precinct, even wrapping around a corner, and remained in place until the spring of 2021. *Id.*

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 8

The creation and existence of this wall, on its own, raises serious questions about whether the City truly believes what it is arguing now: that the area had been "cleansed" by its actions on July 1, 2020. For the better part of a year, this wall remained in place due to perceived ongoing threats to the precinct, and apparently the neighborhood, arising out of what happened with CHOP. *Id.* Request number 46 goes directly to exploring the reasons that the City felt it necessary to immediately block off the precinct, and whether further problems were foreseeable.

### 4.   Request seeking crime statistics and analysis (RFP No. 51)

Request number 51 seeks information about the crime rate in the neighborhood at issue in this case after July 1, 2020, and any comparisons the City has done to prior years. This bears directly on whether CHOP had on ongoing effect on the level of crime in the neighborhood. We know from the City itself that CHOP resulted in "an increase of 525% … in person-related crime in the area, to include two additional homicides, 6 additional robberies, and 16 additional aggravated assaults (to include two additional non-fatal shootings) between June 2nd and June 30th, 2020, compared to the same period of time in 2019." Ex. 8, pp. 2-3 (SEA_00015070-074). Plaintiffs are seeking information necessary to determine whether these trends continued in the neighborhood, and any analyses that the City has performed of those same trends. This is directly related to ongoing damages and whether they were caused by the City's actions in June 2020.

### C.   The City's Claim of Excessive Burden is Dubious

The City asserts the Court should also deny Plaintiffs' requests because it will cost the City "some multiple of … $300,000" to collect it. Mtn. at 4. The Court should consider this estimate with skepticism for several reasons.

*First*, Plaintiffs specifically offered to work with City on the scope of any search for documents in response to these requests, including which custodians to search. Ex. 1 (email chain).

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 9

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

1   The City declined this offer, taking the position that it would file the motion unless Plaintiffs

2   abandoned their requests entirely.

3       *Second*, the City's calculations are based on Plaintiffs' prior requests, which were much

4   broader than these current requests both in terms of the documents sought and in terms of custodians

5   with potentially responsive materials. Plaintiffs seek discovery on the discrete issues described

6   above, which even absent agreement with Plaintiffs, will likely have both far fewer relevant

7   custodians, and fewer responsive documents, than the prior requests.

8       *Third*, the City is a public entity. It is therefore under an independent duty to produce any

9   documents sought by any member of the public, without regard to cost (other than a charge for

10  duplication). Plaintiffs have not yet pursued that route, as they believe the present approach is likely

11  to be more efficient for all concerned. But that does not change the fact that Plaintiffs could pursue

12  even completely irrelevant documents from the City, which would have to produce them. Plaintiffs

13  instead have targeted specific areas and attempted to work with the City.

### III.    ARGUMENT

15      As demonstrated above, the requests the City seeks to quash all seek documents that will,

16  or are likely to, lead to information relevant to Plaintiffs' claims that the City's violations of law

17  continued to cause harm well after July 1, 2020. The City's stated reasons all fail on review.

18      First, as to the City's primary argument, that Plaintiffs are seeking information about new

19  theories of liability, that is just not the case. As demonstrated above, these requests seek information

20  about damages and causation of those damages, based on the already pled causes of action.

21      And proximate causation under Plaintiffs' claims requires only that "an act or omission

22  played a substantial part in bringing about or actually causing the injury or damage to plaintiffs."

23  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). There can be more than one

24

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 10

proximate cause of a constitutional injury, and the "touchstone of proximate cause in a § 1983 action is foreseeability." *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018). *See also* Dkt. 23 at 13, *quoting Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) ("The requisite causal connection can be established … by setting in motion a series of acts by others which the [government] actor knows or reasonably should know would cause others to inflict the constitutional injury.")[3] And as Plaintiffs have explained above, the continued occupation of Cal Anderson Park and blockages of the streets was foreseeable given what the City did in June 2020, and the building of the East Precinct bunker has a direct bearing on what was reasonably foreseeable in the City's eyes.

The City nonetheless seeks an order from the Court effectively declaring, as a matter of law, that nothing that happened after July 1, 2020, in Cal Anderson or the surrounding streets could possibly be relevant to whether the City's actions caused ongoing harm. That is flatly inappropriate on a discovery motion, especially a motion based on a tortured misrepresentation of Plaintiffs' causation argument. *Compare* Ex. 1 and II.B., *infra*, *with* Mtn. at 9. Plaintiffs have demonstrated the connection above, and that is enough to require the City to provide responsive documents.

The absurdity of the City's position is elegantly demonstrated by its admission that (1) Plaintiffs may testify about and ask questions about topics ***directly*** related to the topics the City wants to refuse documents about, and (2) the City must and will respond to a request asking for post-July 2020 documents discussing the harm CHOP caused to the neighborhood. Mtn. at 8. Essentially, the City has acknowledged the relevance of what Plaintiffs seek but is trying to force

---

[3] The cases cited by the City are inapposite, as they do not address the liberal standards of discovery, and do not indicate that some different standard of causation applies. *See Reed v. Gardner*, 986 F.3d 1122, 1127 (7th Cir. 1993) (state can be liable for injuries caused by drunk driver even though no direct contact between state and plaintiff); *Martinez v. California*, 444 U.S. 277, 286 (1980) (limited to the facts of the case, and no indication that its "remote" holding had anything to do with the time between the events at issue, as opposed to the duty of the parole board)

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) - 11

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

1  Plaintiffs to grope in the dark without documents on topics that the City's own employees have

2  indicated are relevant to causation and damages on the facts of this case.

3      The City also apparently contends these requests are not well-taken because discovery has

4  been conducted in a "deliberately staged way." Mtn. 10. But there has been no agreement or court

5  order requiring "staged" discovery, limiting the topics of discovery, or limiting requests for

6  production to the first few months of the case. Plaintiffs served the present requests on November

7  8, 2021 – nearly <u>eight months</u> before the scheduled close of discovery on June 27, 2022. There is

8  no reason Plaintiffs cannot serve these requests now, especially given that the City's witnesses

9  testified to these issues just a few weeks ago, in October 2021.

10      Finally, as to the City's claim of excessive burden / lack of proportionality, Plaintiffs refer

11  to their discussion in section II.C, *infra*, and especially the fact that the City declined to even talk

12  about exploring possible ways to reduce the burden these requests might have on the City.

13  Plaintiffs ask the Court to compel full responses to the pending requests.

## IV.     CONCLUSION

15      Plaintiffs ask the Court to deny the City's motion in its entirety.

16  *///*

17

18

19  *///*

20

21

22  *///*

23

24

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) **- 12**

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

DATED this 24th day of November, 2021.

By */s/ Tyler S. Weaver*
    Patricia A. Eakes, WSBA #18888
    Angelo J. Calfo, WSBA #27079
    Tyler S. Weaver, WSBA #29413
    Gabe Reilly-Bates, WSBA #52257
    Andrew DeCarlow, WSBA #54471
    Henry Phillips, WSBA #55152
    1301 Second Avenue, Suite 2800
    Seattle, WA  98101
    Phone:  (206) 407-2200
    Fax:     (206) 407-2224
    Email:  pattye@calfoeakes.com
           angeloc@calfoeakes.com
           tylerw@calfoeakes.com
           gaber@calfoeakes.com
           andrewd@calfoeakes.com
           henryp@calfoeakes.com

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION
TO CITY OF SEATTLE'S
MOTION FOR PROTECTIVE ORDER
(Case No. 2:20-cv-00983-TSZ) **-** 13