THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HUNTERS CAPITAL, LLC, a Washington limited liability company, HUNTERS PROPERTY HOLDINGS, LLC, a Washington limited liability company, GREENUS BUILDING, INC., a Washington corporation, NORTHWEST LIQUOR AND WINE LLC, a Washington limited liability company, SRJ ENTERPRISES, d/b/a CAR TENDER, a Washington corporation, THE RICHMARK COMPANY d/b/a RICHMARK LABEL, a Washington company, ONYX HOMEOWNERS ASSOCIATION, a Washington registered homeowners association, WADE BILLER, an individual, MADRONA REAL ESTATE SERVICES LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS IV LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS VI LLC, a Washington limited liability company, 12TH AND PIKE ASSOCIATES LLC, a Washington limited liability company, REDSIDE PARTNERS LLC, a Washington limited liability company, OLIVE ST APARTMENTS LLC, a Washington limited liability corporation, and BERGMAN'S LOCK AND KEY SERVICES LLC, a Washington limited liability company, on behalf of themselves and others similarly situated, | Case No. 2:20-cv-00983-TSZ<br><br>DECLARATION OF TYLER WEAVER IN SUPPORT OF OPPOSITION TO CITY OF SEATTLE'S MOTION FOR PROTECTIVE ORDER<br><br><br>Noted:  November 26, 2021 |
| Plaintiffs, | |

DECLARATION OF TYLER WEAVER IN
SUPPORT OF OPPOSITION TO CITY OF
SEATTLE'S MOTION FOR PROTECTIVE
ORDER
(Case No. 2:20-cv-00983-TSZ)

1

2        vs.

3    CITY OF SEATTLE,

                          Defendant.

4

5        I, Tyler Weaver, declare as follows:

6        1.    I am an attorney with Calfo Eakes LLP and represent Plaintiffs in the above-

7    captioned action.  I am over eighteen years of age and am competent to testify herein.  I make the

8    following statements based on my personal knowledge.

9        2.    Attached hereto as **Exhibit 1** is a true and correct copy of an email exchange

10   between the parties dated November 18, 2021.

11       3.    Attached hereto as **Exhibit 2** are true and correct copies of excerpts from the

12   Deposition of Samuel Zimbabwe taken on October 28, 2021.

13       4.    Attached hereto as **Exhibit 3** are true and correct copies of Bates stamped

14   documents (SEA_00028178 – SEA_00028179) produced by the City.

15       5.    Attached hereto as **Exhibit 4** are true and correct copies of excerpts from the

16   Deposition of Mami Hara taken on October 4, 2021.

17       6.    Attached hereto as **Exhibit 5** are true and correct copies of excerpts from the

18   Deposition of Casey Sixkiller taken on October 12, 2021.

19       7.    Attached hereto as **Exhibit 6** are true and correct copies of Bates stamped

20   documents (SEA_00019917 – SEA_00019918) produced by the City.

21       8.    Attached hereto as **Exhibit 7** is a true and correct copy of a photograph taken in

22   March 2021 of the Twelfth Avenue side of the Seattle Police Department's East Precinct.

23

24

DECLARATION OF TYLER WEAVER IN
SUPPORT OF OPPOSITION TO CITY OF
SEATTLE'S MOTION FOR PROTECTIVE
ORDER
(Case No. 2:20-cv-00983-TSZ) - 1

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    9.      Attached hereto as **Exhibit 8** are true and correct copies of Bates stamped

2    documents (SEA_00015070 – SEA_00015074) produced by the City.

3    I declare under the penalty of perjury under the laws of the State of Washington that the

4    foregoing is true and correct.

5    DATED this 24th day of November, 2021 at Bainbridge Island, Washington.

6

7                            _s/ Tyler Weaver_
                            Tyler Weaver

DECLARATION OF TYLER WEAVER IN
SUPPORT OF OPPOSITION TO CITY OF
SEATTLE'S MOTION FOR PROTECTIVE
ORDER
(Case No. 2:20-cv-00983-TSZ) - 2

Exhibit 1

| From: | Tyler Weaver |
|---|---|
| To: | Kristin Ballinger |
| Cc: | Florine Fujita; Kellie McDonald; Shane Cramer; Gabe Reilly-Bates; Angelo Calfo |
| Subject: | RE: Request for Meet & Confer re RFPs |
| Date: | Thursday, November 18, 2021 4:28:00 PM |

If the question is whether we will completely forgo the other RFPs because the City has agreed to respond to No. 48, the answer is no, we will not. We feel strongly that we are entitled to explore these areas, and that they are directly related to the claims we have stated and to the ongoing damages Plaintiffs suffered in and after July 2020. The City will, essentially, be asking the Court to rule that what happened in the area after July 2020 could not have any causal relation to what the City did with CHOP. We do not believe the Court will do so. I understand that the City does not want to talk about ways to address any unreasonable burden the City believes it would be under by responding to these RFPs, so I guess we will be responding to the City's motion.

Tyler Weaver

**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
T: 206 407 2237 | www.calfoeakes.com

*Notice: this internet e-mail message may contain confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us immediately at (206) 407-2210 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

**From:** Kristin Ballinger <kristinb@harriganleyh.com>
**Sent:** Thursday, November 18, 2021 1:51 PM
**To:** Tyler Weaver <TylerW@calfoeakes.com>
**Cc:** Florine Fujita <florinef@harriganleyh.com>; Kellie McDonald <KellieM@harriganleyh.com>; Shane Cramer <shanec@harriganleyh.com>; Gabe Reilly-Bates <GabeR@calfoeakes.com>; Angelo Calfo <angeloc@calfoeakes.com>
**Subject:** RE: Request for Meet & Confer re RFPs

Hi Tyler,

Yes, January 25 is fine for Argento.

We have reconsidered, and will agree to respond to RFP 48, as it is tailored to exactly what you address below, i.e., ongoing damages caused by the actions or inactions of the City during the June 8 to July 1 period.  *See* RFP 48 ("All documents dated at any time from June 2020 the present discussing any impacts or effects CHOP had, or continues to have, on any part of the CHOP Zone.").  We will propose search terms, search locations, and custodians in the coming days.  RFPs 45-47 and 49-51 go much farther than RFP 48, seek documents that are not relevant to the claims plead in your complaint, and also are not proportional to the needs of the case.  Please let us know by 4 p.m. if you agree that the City need not respond to RFPs 45–47 and 49–51 in light of our agreement to withdraw our objection to responding to RFP 48.

Thanks,
Kristin

**From:** Tyler Weaver <TylerW@calfoeakes.com>
**Sent:** Wednesday, November 17, 2021 9:21 PM
**To:** Kristin Ballinger <kristinb@harriganleyh.com>
**Cc:** Florine Fujita <florinef@harriganleyh.com>; Kellie McDonald <KellieM@harriganleyh.com>; Shane Cramer <shanec@harriganleyh.com>; Gabe Reilly-Bates <GabeR@calfoeakes.com>; Angelo Calfo <angeloc@calfoeakes.com>
**Subject:** RE: Request for Meet & Confer re RFPs

Kirstin –

I'm following up on our discussion from Monday afternoon. Thanks for extending the deadline for us to respond to the pending discovery requests to December 3 from the current deadline of November 22.

Also, I'm confirming in writing what I said during our call about the Argento Café / Faizel Kahn deposition set for December 1. Mr. Kahn has a personal situation that requires us to reschedule. Is January 25 still available? If so, let's set it for then. We are working on possible dates for the other plaintiffs we have agreed to provide for deposition.

I'm also responding to your stated request that we abandon our requests for production that we filed last week, with the exception of RFPs No. 52 and 53. We will not abandon those requests on the basis that the City has stated – that discovery from the City of documents dated beyond July 10, 2020, is not within the scope of the legal claims stated in our complaint. As I explained on Monday, these requests are not aimed at discovering facts about new, additional, or different claims, but are aimed at exploring and establishing the causal link between the legal claims stated in our complaint and damages that occurred after July 10, 2020. I think you will find, upon an objective review of the RFPs the City has requested that we drop, that they are tailored to issues tied to what the City did in June and July 2020: internal documents about how the occupation affected the neighborhood, analyses of crime in the later months of 2020 as compared to prior years, the wall around the precinct that was erected in June 2020 in direct response to the problems nourished by the City with CHOP, and the problems throughout 2020 in Cal Anderson Park and the neighborhood with regard to additional encampments and protests, which we intend prove are a direct outgrowth of the reputation of the neighborhood and the Park that the City encouraged through its actions concerning CHOP. Certainly there are enough inferences of such causation threads that we are entitled to explore these areas in discovery.

The City has made it abundantly clear that it intends to vigorously defend this case on the basis of causation and damages, and has repeatedly demanded that we not only produce a huge amount of sensitive financial data from our clients, even for relatively small claims, but also that we update financial information through 2021. We have been doing so despite the outsized burden it has created. The City cannot at the same time deny us discovery from the City related to causation and damages incurred as a result of the City's actions that gave rise to the claims as stated in the complaint.

I would encourage the City to rethink its refusal to provide us with this discovery and seek a protective order from the Court. If the City's real issue is one of burden, we might consider a proposed narrowing of the RFPs or limitation to certain custodians, if the City wants to propose something, even though we have already limited these RFPs to specific issues. And regardless of any motion or the outcome of any motion, we could of course seek all of what we have requested through a public-document request. We would prefer not to have to pursue that route, given that we have been able to work relatively collaboratively on discovery to this point, but we will do so if we have to.

Let me know if you want to discuss further. Otherwise, we will look for your motion.

Tyler Weaver
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
T: 206 407 2237 | www.calfoeakes.com

*Notice:  this internet e-mail message may contain confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us immediately at (206) 407-2210 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

---

**From:** Kristin Ballinger <kristinb@harriganleyh.com>
**Sent:** Monday, November 15, 2021 8:44 AM
**To:** Tyler Weaver <TylerW@calfoeakes.com>
**Cc:** Florine Fujita <florinef@harriganleyh.com>; Kellie McDonald <KellieM@harriganleyh.com>; Shane Cramer <shanec@harriganleyh.com>; Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Subject:** RE: Request for Meet & Confer re RFPs

That works.  Let's use this dial in / link (I'll use the link but without video):

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
**Click here to join the meeting**
**Or call in (audio only)**
+1 469-206-8601,,791162122#   United States, Dallas
Phone Conference ID: 791 162 122#
Find a local number | Reset PIN
Learn More | Meeting options

---

**From:** Tyler Weaver <TylerW@calfoeakes.com>
**Sent:** Monday, November 15, 2021 8:03 AM
**To:** Kristin Ballinger <kristinb@harriganleyh.com>
**Cc:** Florine Fujita <florinef@harriganleyh.com>; Kellie McDonald <KellieM@harriganleyh.com>; Shane Cramer <shanec@harriganleyh.com>; Gabe Reilly-Bates <GabeR@calfoeakes.com>

**Subject:** Re: Request for Meet & Confer re RFPs

Me and Gabe can talk at 2 today if that works.


On Nov 13, 2021, at 11:37 AM, Kristin Ballinger <kristinb@harriganleyh.com> wrote:


Hi Tyler,

Please let us know when you are available Monday and Tuesday for a meet and confer concerning your RFPs served earlier this week.

Thanks,
Kristin

---

**From:** Lixi Colmenero <LixiC@calfoeakes.com>
**Sent:** Monday, November 8, 2021 12:53 PM
**To:** Arthur Harrigan <arthurh@harriganleyh.com>; Tyler Farmer <tylerf@harriganleyh.com>; Kristin Ballinger <kristinb@harriganleyh.com>; Caitlin Pratt <caitlinp@harriganleyh.com>; Kellie McDonald <KellieM@harriganleyh.com>; Erin Fujita <erinf@harriganleyh.com>; Florine Fujita <florinef@harriganleyh.com>; Vicky Chinn <vickyc@harriganleyh.com>; Ashley Burman <ashleyb@harriganleyh.com>; Shane Cramer <shanec@harriganleyh.com>; Joseph.Groshong@seattle.gov; Tamara.Stafford@seattle.gov; Belen.Johnson@seattle.gov; Autumn.Derrow@seattle.gov
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Angelo Calfo <angeloc@calfoeakes.com>; Gabe Reilly-Bates <GabeR@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Henry Phillips <HenryP@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>; Nancy Carriaga <NancyC@calfoeakes.com>; Patty Ahearn <PattyA@calfoeakes.com>; Lixi Colmenero <LixiC@calfoeakes.com>
**Subject:** Hunters Capital, LLC, et al. v. City of Seattle

Good afternoon,

On behalf of Calfo Eakes LLP, attached please find the following documents:

- Plaintiffs' Third Set of Interrogatories to Defendant City of Seattle; and
- Plaintiffs' Fourth Set of Requests for Production to Defendant City of Seattle.

A hard copy will not follow.

Please feel free to contact our office should you have any questions.

Thank you,

Lixi Aylin Colmenero | Legal Assistant

**CALFO EAKES LLP**

1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808

T: 206 407-2242 | Email: lixic@calfoeakes.com | **www.calfoeakes.com**

*NOTICE:  This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

Exhibit 2

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
          Plaintiff,             )
                                 )
          vs.                    ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
          Defendant.             )
_____

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(SAMUEL ZIMBABWE)

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 28, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 50

1  mentioned, it was some of -- some of the items were our

2  concern about, you know, being able -- limiting the

3  ability to move those blocks.

4       Some of it was being responsive to some of the

5  requests that we were hearing from -- from protesters

6  about ways to continue some of the positive sort of

7  creative energy that was around some of the protest

8  activities.  And -- and also we saw it as a way to also

9  limit some of the impacts to private properties around

10  in terms of graffiti.

11       So it was a -- it was -- it was a -- and then

12  it was also the creativity of my construction staff to

13  figure out how to -- how to do some of this work.  So it

14  was a -- it was an iterative process that came -- we --

15  you know, again, that sort of non- -- nonstandard

16  response that we figured out how to do.

17       Q.  Okay.  And so part of the reason that they

18  were -- they were constructed for -- for art was, there

19  was a lot of graffiti that had already occurred on

20  public and private properties in the area; is that

21  right?

22       A.  Yes.

23       Q.  Yeah.  And did SDOT provide storage services

24  for the art that had been painted on that plywood once

25  CHOP was -- wound down and was cleared out?

Hunters Capital, LLC v. City of Seattle                  30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 51

1      A.  We did.

2      Q.  Okay.  Can you describe what that process was

3  of preserving that -- that plywood art?

4      A.  Yeah.  I mean, we basically had a roll-off

5  container, like a -- a -- a construction container or a

6  dumpster, but it was enclosed on all four sides.  When

7  we eventually removed the -- the protest zone and -- and

8  all of -- all of the -- that -- that -- those things, we

9  preserved and hauled as much of the -- those plywood

10  pieces to an SDOT facility.

11          And then eventually, I don't know, a few weeks

12  later, the people that had been involved with art there

13  came to that facility, went through it, and decided what

14  they wanted to retain.

15      Q.  Okay.  So where was -- where was that SDOT

16  facility?

17      A.  I believe it was at our Sunny Jim facility,

18  which is along Airport Way, and it houses our signal

19  shop and sign shop, and it also is a place where we have

20  previously -- and we've continued to store private

21  property that is accumulated as -- as -- like in the --

22  in response to homeless encampments and things like that

23  as well.  So it's a place that has some extra space

24  where we've done this type of storage before.

25      Q.  Okay.  Why -- why was it -- why did SDOT

Hunters Capital, LLC v. City of Seattle          30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 52

1   undertake the process of storing -- transporting and

2   storing the art for the protesters?

3           MR. CRAMER:  Objection.  Form.  Outside the

4   scope.

5       A.  You know, we -- part of our -- you know, we --

6   we felt like part of what was -- was -- you know, as --

7   again, in our efforts towards de-escalation, that the --

8   there were certain aspects of what was created during

9   the protests that maintaining and preserving and -- and

10  not destroying would -- would continue that

11  de-escalation even after the summer of 2020.

12          You know, one aspect of that is the Black Lives

13  Matter mural that was painted in -- in the middle of

14  Pine Street.  Another aspect was the -- the other art.

15  I -- I believe that it's been now exhibited post -- post

16  this time period.

17          And so it was sort of a -- an ongoing

18  reflection of, you know, continued -- that continued

19  sort of de-escalation of the -- of the conflict that was

20  occurring, leading up to June 8th, but also sort of

21  throughout the month of June.

22  BY MR. WEAVER:

23      Q.  Was it important to the City or SDOT to make

24  clear that the City was not opposed to the viewpoints

25  expressed in the art and the protests?

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 90

1      Q.  Go ahead.

2      A.  -- if I can just clarify that a little bit, is

3   to say that those non-SDOT barriers were the things that

4   were not typically used as traffic control, but -- and

5   things like the bike rack barriers and other sort of

6   irregular barricades, but to restore a traffic pattern

7   that maintained our core responsibilities around

8   providing public access and -- and ensuring services

9   could be delivered.

10      Q.  Okay.  What -- 1.2 says, "Pivot this into a

11   street closure."

12          Do you understand what that -- what that meant?

13      A.  Yeah.  So I think this was -- you know, we

14   had -- we had -- rather than having -- there was --

15   there were these sort of, again, irregular barricades

16   that were blocking off certain streets, while others

17   remained open in certain ways.

18          So we wanted to turn those irregular things

19   into something that was a more regular traffic pattern.

20   And that's -- there's a couple of reasons for that.

21   One, it's the -- the reason why -- you know, we could --

22   we -- sort of standard materials or other ways that we

23   could put -- sort of regularize those -- the -- the

24   traffic pattern.

25          And then also we communicate regularly out to

6402ce53-89af-4e06-b574-53dbb844f256

Page 91

1   the public and -- through things -- platforms like

2   Google Maps and others about when we have a regular

3   street closure, "This street is closed."  And so that

4   can go into their routing software, that we can sort of

5   push out that information.

6          And we wanted to have a -- a regularized street

7   closure so that we could do those sorts of things and

8   make sure there was public information available to --

9   to enable residents and businesses to be able to --

10  to -- to function normally.

11      Q.  So did SDOT report to Google and other mapping

12  services that there were closures in the area?

13      A.  We did.  I don't know the exact timing of when,

14  but we did -- we did communicate.

15      Q.  Okay.

16      A.  And I would say, again, those -- those -- you

17  know, it was important for us, even -- you know, we

18  discussed previously local access.  If you had a -- a --

19  an address within that area that was local access and

20  you were putting it into a routing software, you could

21  still -- it wouldn't tell you, you can't get to that

22  site.  It would tell you, here's how you get to that --

23  that location.

24          But it also -- in theory, when we -- when we do

25  that, it's not routing people through that area if we've

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 92

1    made it local access.  And we have that sort of ongoing

2    relationship and response- -- you know, working

3    relationship with those software providers.

4          We have a number of streets that, in the midst

5    of the pandemic, we turned into local access only.  We

6    called them "Stay healthy streets."  We communicate.  So

7    those -- those streets are open to people who live on

8    those streets, deliveries and things like that, but

9    they're not -- people aren't routed onto those streets

10   if they're through traffic.  So those mapping providers

11   work with us on -- on communicating that information out

12   to users.

13         Q.  So I just want to be clear.  So if -- with the

14   routing that was done for this particular area in and

15   around East Precinct and Cal Anderson that was local

16   access only, if somebody put in there that they wanted

17   to go to a particular destination, and the normal route

18   would be for them to take 12th Avenue through the Pike

19   and Pine area, the software would route them somewhere

20   else; is that correct?

21         A.  If it was outside.  If it was just -- if they

22   were just through traffic coming through on 12th, you

23   know, from Olive to Union, it would send -- it would

24   send them up to -- I think it was probably sending them

25   to 13th.  But if it was someplace within that area, it

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 93

1   would send them to that area.

2        Q.   Okay.  I'd like you to go down to the second

3   page, and -- where it says, "Stated Department Desired

4   Goals."

5            And it says a couple things by SDOT, which is

6   the first bullet point.

7            Do you see that?

8        A.   Yep.

9        Q.   Okay.  Were these concerns that you stated at

10  this meeting on behalf of SDOT?

11       A.   Yes.

12       Q.   Okay.  So you were a little concerned about

13  sending the teams back in without having a game plan.

14           Do you see that?

15       A.   Yes.

16       Q.   Okay.  What do you recall about that at this

17  point?

18       A.   So on the -- this goes back to some of what we

19  had experienced on June 9th, in going to take out some

20  of the barricades, and then being met with some -- some

21  resistance from folks involved with the protests.

22           So I think we wanted -- and again, some of what

23  we were starting to hear from some of our -- our

24  represented employees through their labor representation

25  around concerns related to -- to not having SPD present

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 102

1      A.  You know, I don't -- I don't remember

2  specifics.  They -- they may have.  I think we were --

3  I -- I -- I -- if they did, I think it was related to

4  the -- not related to sort of operational or access

5  issues.

6           It was -- it was really related to the

7  desire -- the long-term desire that Seattle Police

8  Department had to base operations out of the East

9  Precinct, which they're currently doing again.

10     Q.  Do you recall any discussions with the Seattle

11 Police Department about the -- the use of eco barriers

12 and providing them to the area on June 16th or 17th?

13     A.  I don't know if the police department was

14 involved in the discussions around the ecology blocks.

15     Q.  Okay.  So in the discussions around the ecology

16 blocks and whether to put them in the area or not, and

17 where to put them, do you recall any concerns from

18 anybody at the City, that putting ecology blocks in the

19 area would make it harder to move the protest out of the

20 area in the future?

21     A.  I think there was some -- some -- you know,

22 that people had different opinions in that -- in those

23 discussions about how to -- how to regularize the street

24 traffic patterns.

25           I don't remember who was on -- who was on --

Page 103

1    sort of took which opinions at that point.  I think,

2    from an operational perspective, it took us about two

3    days to install them.  It ended up taking us a couple of

4    days to remove them.

5          So they -- they were a -- they were a

6    compromise in the sense of they were a little bit harder

7    to install and then eventually remove, but they were

8    what we could determine as a way to safely separate

9    protests -- protesters and area for continued First

10   Amendment activities with reopening the streets to

11   traffic and the operational needs that our streets have.

12       Q.  Okay.  So part of the goal of putting the

13   ecology blocks in the area was to protect the

14   protesters; is that right?

15       A.  It was to separate the --

16           MR. CRAMER:  Objection.  Form.

17       Go ahead.

18       A.  It was to separate that -- the area that we

19   expected continued protest activity, that continued sort

20   of First Amendment activity, with regular street traffic

21   and -- and having streets open and accessible.

22   BY MR. WEAVER:

23       Q.  So going back to the discussions and the

24   various viewpoints on whether you should provide ecology

25   blocks, tell me as much detail as you can about those

Page 133

1   well, that were -- were at -- in -- maybe established in

2   the effort to -- that's where the -- the line between

3   protesters and police would typically form on a nightly

4   basis.  And so I think there were some there, and there

5   were some up at -- up at -- in front of the precinct as

6   well.

7        And so I think, when we were removing all the

8   other -- when we were -- our goal was to remove the

9   other barricades, we were also trying to remove some of

10  those -- those other things at 11th and Pine.

11       There may have been some that were -- and I

12  don't remember exactly what the -- the configuration was

13  at the -- at 11th and Pine, but there -- there -- I --

14  they were in various places within that intersection as

15  well.

16       Q.  Do you recall whether you were able to get the

17  eco barriers out on June 9th?

18       A.  We were not.

19       Q.  When were you -- when were you able to finally

20  remove the eco barriers that were there on June 9th?

21       A.  So those -- I don't think any of those got

22  removed until the end of the protest area, so the

23  re-regularization.  And we actually reutilized a lot of

24  those eventually in creating a -- a sort of tall barrier

25  between the precinct and the street, as part of our work

6402ce53-89af-4e06-b574-53dbb844f256

Page 134

1   with SPD.

2         You know, that -- that lasted until, I think,

3   into the spring, until there was able to be put -- some

4   fencing put up around the -- the East Precinct.  So

5   there were -- we put up some of those -- we reutilized a

6   lot of the ecology blocks that we had put out in

7   creating that traffic pattern.  We -- we used those

8   in -- in creating that wall between the precinct and the

9   street.

10      Q.  Okay.  Let me ask you about the wall, while

11  we're on it.

12         So SDO- -- SDOT built that wall sometime --

13      A.  Yes.

14      Q.  -- after July 1, 2020; right?

15      A.  Yep, yep.

16      Q.  When do you recall that wall going in around

17  the East Precinct?

18      A.  It was right in that period, the first week of

19  July.

20      Q.  Okay.  So am I correct in describing it as the

21  wall was on the outside perimeter of the sidewalk around

22  the East Precinct?  Is that correct?

23      A.  Yes.

24      Q.  And it consisted of three or four layers of eco

25  blocks at the bottom; correct?

6402ce53-89af-4e06-b574-53dbb844f256

Page 135

1    A.  I think -- I think there were two thick and

2  three or four tall.

3    Q.  Okay.

4    A.  Four, I think -- four, maybe even five, tall.

5    Q.  So it was two blocks deep; is that right?

6    A.  Yes.

7    Q.  And then four or five tall.  And then on top of

8  that, there was a chain-link fence that went up --

9    A.  Yeah.

10    Q.  How high was the chain-link fence, if you

11  remember?

12    A.  I think it was ten -- you know, the whole --

13  the whole thing would have been up to a height of about

14  ten to twelve feet.

15    Q.  Okay.  And it blocked off the sidewalk at both

16  sides of that wall; correct?

17    A.  It did.

18    Q.  And it wrapped around the corner of 12th and

19  Pine?

20    A.  It did.

21    Q.  What was the purpose of that wall?

22    A.  So the purpose was, you know, part of that

23  continued de-escalation, I would say, that same

24  trajectory, that after the -- the protest area was

25  removed, after the police went back into basing

Page 136

1   operations out of the East Precinct, I think nobody --

2   we, they, the whole city, didn't want to create another

3   flash point for further protests between -- you know,

4   sort of focused on SPD, but using the street.

5         So we -- we did install that wall as a way to

6   sort of create that separation.  They'd had some

7   concerns, and I think some evidence of people attempting

8   to burn down the precinct or throw incendiary devices

9   toward the precinct, and so the wall really limited the

10  ability to do that.

11        We eventually removed the wall after police

12  were -- was able to install a fence right up against

13  the -- the precinct that provided some of that same

14  separation.

15      Q.  Okay.  So it -- that wall that you're talking

16  about, before they got the fencing right next to the

17  building, the wall that took up the sidewalk, that was

18  in place until about April of 2021?

19      A.  Yes.

20      Q.  Okay.  And your understanding was, that was

21  because the police department thought there were threats

22  to the building of the East Precinct during that time

23  period?

24      A.  Yes.

25      Q.  Okay.  Going back to June 9th and 10th and

Page 167

1    A.  I'm trying to remember.  I don't remember if I

2   was there with her.  I was there with her after the --

3   afterwards.  I don't remember.  I may have -- there may

4   have been one time where I was there with her, but those

5   are sort of blurring together.

6        And then there was one time when she was -- she

7   came to a meeting with some of the protest leads, which

8   I was not in that meeting, but that was nearby.  So I

9   may have been there with her during the protest period

10  too, but I -- I don't remember.

11    Q.  What do you recall about the time you were with

12  her there, whether it was during the protests or another

13  time?

14    A.  So I recall the time after the protests a

15  little bit more clearly.  We -- because we met with some

16  of the business owners and walked around the

17  neighborhood a little bit in looking at recovery from

18  the post -- post-protest activities and what -- you

19  know, where there was still some -- some maintenance or

20  operational issues several months later.  And that was,

21  you know, sort of more -- that was a -- listening to

22  folks.  This was late summer last year, I think, after

23  the -- after the protests were -- were -- were done.

24    Q.  Okay.  Who do you recall being at that meeting

25  with you and the mayor?

6402ce53-89af-4e06-b574-53dbb844f256

Page 168

1    A.   That, I recall Jesús Aguirre from Seattle Parks

2    and Recreation.  I think Mami Hara was there as well.  I

3    think there were representatives from Seattle Police

4    Department.  It may have been Interim Chief Diaz, but

5    I'm not exactly sure.  And I think perhaps Chief

6    Scoggins as well.

7    Q.   Okay.  And do you recall who was there that

8    wasn't with -- was not a representative of the City?

9    A.   Yeah, so I think we -- I remember we met at a

10   restaurant sort of at the corner of 11th -- or 10th

11   and -- 10th and Pike.  And then we met, I -- there were

12   a few business owners there, and we met -- we went up to

13   Rachel's Ginger Beer.  We sort of walked around through

14   the neighborhood, and then met with folks there in -- in

15   Rachel's Ginger Beer, a couple different business owners

16   there as well.

17   Q.   Okay.  What do you -- what were you -- what do

18   you recall discussing with the business owners on this

19   tour?

20   A.   I think at that point we were talking about

21   sort of long-term recovery of -- of businesses, business

22   activities, what we could do to support the -- the

23   long-term -- sort of what long-term plans for Cal

24   Anderson Park renewal might be.

25         I think there was -- there were concerns raised

Page 172

1          MR. CRAMER:  Objection.  Form.

2      A.  Well, so I think that the -- that the East

3  Precinct -- and -- and I think everybody's goal for --

4  for the relationship between police and -- and the

5  community they serve is for there to be sort of a -- an

6  interaction.

7          And it felt like that -- that wall around the

8  precinct didn't create a welcoming front door for the --

9  for the precinct when there may be -- you know, there is

10  a -- there is a need for sort of ongoing engagement

11  between a community and the -- the police present in

12  that community.

13          And so I -- I don't -- yeah, that was a -- an

14  approach that we developed at the end of the -- of -- of

15  June as a way to not have sort of protests as -- as the

16  police came back from an operational perspective into

17  the East Precinct, to not have that become immediately

18  another focus for -- for protest activities.

19          I think even after the -- the, you know,

20  traffic patterns went back to -- to a pre -- pre-protest

21  period, so even into July, I don't remember now how long

22  it continued, but for -- for several months afterwards,

23  we would still get regular rolling protests around --

24  that -- that started out in Capitol Hill, but went to

25  other parts of the city as well, that created temporary

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 173

1   traffic disruptions with those sort of protest

2   activities.

3          So that was sort of an ongoing thing, but by

4   having the wall around the East Precinct, it really made

5   it so that the East Precinct wasn't an attractive focal

6   point for those protests.

7   BY MR. WEAVER:

8       Q.  Okay.  Did -- was there concern that the wall

9   around the precinct made it -- made the neighborhood

10  appear to be unsafe?

11          MR. CRAMER:  Objection.  Form.

12      A.  Yeah, I don't recall exactly what the concerns

13  were.  I think nobody -- nobody really wanted it to stay

14  like that forever, and I -- and the City -- everybody

15  from the City agreed with that.

16  BY MR. WEAVER:

17      Q.  Do you recall any discussion about the wall and

18  what perception it might create in the general public

19  about the area near the East Precinct?

20          MR. CRAMER:  Objection.  Form.

21      A.  Yeah, I don't really recall whether there

22  was -- like what -- what the specifics of those concerns

23  were.  I will say that the -- it was -- it was a

24  shared -- shared agreement that we shouldn't leave the

25  wall up permanently.

6402ce53-89af-4e06-b574-53dbb844f256

Page 175

1        A.   Yeah, I don't remember speculating on that.   I
2   think that it -- because of the -- the summer protests,
3   it became -- it was still a place where people would
4   sort of organize and -- and depart from.
5            I think throughout, both in the midst of the
6   summer and through the -- through the rest of the summer
7   and the fall, people would come from citywide to -- to
8   Capitol Hill for those protest activities, even in the
9   midst -- even when there was -- in June, you know, it
10  wasn't that everybody who was protesting was -- also had
11  a tent in Cal Anderson Park.
12           It was -- people would come there at various
13  points of the day and then leave at various points of
14  the day.  And some people would stay there 24 hours a
15  day, but some people would arrive and -- and depart as
16  they're able to do.
17           So it was not sort of a -- it wasn't solely
18  self-generated of being from within the park and in
19  front of the precinct.  It was -- it -- I think it was
20  more of a citywide and even regional thing, that people
21  would come to Capitol Hill for -- for some of those
22  protest activities.
23  BY MR. WEAVER:
24       Q.   Okay.  Do you -- do you know whether there was
25  any discussion about whether the protest activity in

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 198

1      A.  Yeah, I did hear about Parks employees who

2   were -- who were, I think, assaulted within the park.

3      Q.  What did -- what did you hear about those

4   assaults?

5      A.  I heard that they happened.  I didn't hear much

6   detail about what exactly the situations around them

7   were.

8      Q.  All right.  Going back to Exhibit 12, and the

9   third full paragraph, you indicate, "As of today I think

10  our work is largely complete for the time being."

11       Do you see that?

12      A.  Yep.

13      Q.  Okay.  So is it the case that, as of June 18th,

14  that the Seattle -- SDOT didn't have any plans to go in

15  and do anything else with the barriers for the

16  foreseeable future?  Is that right?

17          MR. CRAMER:  Objection.  Form.  Vague.

18      A.  I think that's -- that's correct.

19  BY MR. WEAVER:

20      Q.  Is that -- is that what you were expressing

21  with the phrase "our work is largely complete for the

22  time being"?

23      A.  I -- yeah.  I mean, I -- the time being meaning

24  that at that point indeterminate time, but not that it

25  was a permanent change.  So I think the next sentence,

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 199

1   the "Streets have been reopened to neighborhood traffic,

2   protests have continued, improvised barricades have been

3   largely removed," I think indicates that -- that we

4   were -- that -- that stage of the job was done.

5           And if that traffic control -- you know,

6   assuming that -- that what we put in place were -- were

7   able to support both activities, then we wouldn't --

8   we -- we would -- we would wait and see what our next

9   step was.  We didn't have next steps planned at that

10  point.

11          MR. WEAVER:  Okay.  We've been going for

12  about an hour again.  I don't know.  This thing's flying

13  by.  So let's go off the record.

14          THE VIDEOGRAPHER:  Going off the record.

15  The time is approximately 3:09 p.m.

16          (Recess from 3:09 p.m. to 3:21 p.m.)

17          THE VIDEOGRAPHER:  We are back on the

18  record.  The time is approximately 3:21 p.m.

19          E X A M I N A T I O N (Continuing)

20  BY MR. WEAVER:

21      Q.  So what -- to what extent were you involved

22  in -- personally involved with discussions with

23  protesters about the -- either the barriers, the

24  placement of the barriers, or the need to leave the

25  area?

Page 200

1     A.   So I was directly involved in discussions about

2  the barriers and the placement of the barriers.  I would

3  say I was not involved in the decision -- or the need --

4  and the discussion with them about the need to leave the

5  area.

6          I was involved at -- at various points

7  throughout the period of time, between the placement of

8  the barriers and the decision to remove the barriers,

9  with continuing to explain to protesters that -- that we

10  needed to have the traffic control plans sort of the --

11  have the free flow of traffic, and that there couldn't

12  be even temporary -- temporary issues related to that.

13     Q.   How would you characterize your discussions --

14  your personal discussions with the protesters about the

15  barriers, and what was the content of those discussions?

16     A.   So I'd say that we -- we talked about the

17  placement, the ex- -- I ex- -- I -- what I found to be

18  helpful throughout the involvement was to be very clear

19  with them about what we intended to do, and then try to

20  follow through on that clarity and sort of be

21  transparent.

22          So I -- I would tell them, here's what we

23  intend to do, and here's -- here's what it will look

24  like, and have those conversations because, by telling

25  them that, and then following through, that would sort

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 201

1    of build -- build trust that led to long-term

2    de-confliction, de-escalating of -- de-escalating the

3    conflicts.

4         Q.   So were you under advisement from the mayor or

5    the mayor's office to not talk to them about removing

6    the barriers entirely?

7         A.   I don't know if I quite understand what you

8    mean by that.  We -- when we decided to remove the

9    barriers, we didn't -- we didn't telegraph that decision

10   very much.  We -- we did decide we would -- we were

11   going to come and we were going to remove it.

12        The first attempt that we made at that was when

13   we had that larger conflict.  And so that's -- I think

14   from -- from that point forward is when there was a sort

15   of collective decision to start telling people, hey,

16   I -- we're not -- not we're doing this on this date or

17   at this point, but I think, hey, this has -- this has

18   run its course, and -- and you -- you all probably need

19   to move away from here because we're going to at some

20   point take these barriers out.

21        Q.   Okay.  So you're right; I need to be clearer.

22        So prior to moving the barriers on the 16th or

23   17th of June, and bringing in the eco barriers, do you

24   recall any conversation either in the -- with the mayor

25   or in the cabinet meetings about, we shouldn't be

Page 202

1    changing the barriers; we should be removing them

2    entirely?

3        A.   I think that there various points leading

4    up to the 16th where we, you know -- let me say it this

5    way:  If on the 9th we had been successful in removing

6    barriers, that probably would have been okay.  We -- and

7    that -- that was like the -- in the immediate aftermath.

8    If -- we weren't, and so the -- the barricades were --

9    were there.

10        I think there were multiple perspectives over

11   time, what should we do next.  Should we -- should we

12   install new barriers?  Should we not?  We made a

13   decision to install the -- the ecology blocks and the

14   bar- -- the barriers.

15        We had discussed that plan with protest leaders

16   and also with -- with businesses and residents not in

17   the sense of like, hey, can we get complete consensus on

18   this, but here's what we intend to do.

19        I don't think that at that point we -- we

20   talked details about timeline of exactly when we would

21   do that, but -- but then we did on the 16th and 17th

22   install those, as we had -- in following -- in keeping

23   with the plan that we had discussed with people on the

24   14th and 15th.

25        Q.   And so would you agree that there was a

Page 203

1    cons- -- there was a consensus among the -- the cabinet

2    and the mayor that the barriers should be moved and

3    replaced rather than removed entirely from the area on

4    the 16th and 17th?

5        A.  By the time we got to like the 14th and 15th,

6    yes, there was a consensus at that point.

7        Q.  Okay.  Were you ever involved in any

8    discussions or -- were you ever -- were you ever present

9    for any discussions regarding consideration of whether

10   to give the East Precinct to Black Lives Matter?

11       A.  I was not.

12       Q.  Were you involved in any discussions about

13   whether to make arrangements for Black Lives Matter --

14   Black Lives Matter to have a different property aside

15   from the East Precinct in the general area?

16       A.  I was not.

17       Q.  Okay.  Were you involved in any discussions

18   about trying to pay any protest organizers to leave the

19   area?

20       A.  I was not.

21       Q.  Is it a -- is it a violation of Seattle law for

22   somebody to block off -- to place barriers in an

23   arterial without a City permit to do so?

24           MR. CRAMER:  Objection.  Calls for a legal

25   conclusion.

Page 213

1    A.   Yep.  Yes.

2    Q.   And again, typically at night?

3    A.   Yes.

4    Q.   At some point there was a switch from keeping
5    the modified footprint that existed on June 16th and
6    17th, that you installed on those days, and moving a
7    couple weeks later to move everything out.

8         Do you recall what the impetus was for that
9    movement?

10   A.   I don't know if there was a -- I don't know
11   what -- if there was a specific thing that happened.
12   You know, I think some of -- some of this, the -- the
13   sort of continued shifting of things, you know, it -- it
14   felt like, from my perspective -- I can only speak for
15   myself at this point, but it felt from my perspective
16   like it was un- -- unlikely that we would ever in -- in
17   this -- so this approach reach enough stability and
18   predictability that me, Mami, Chief Scoggins, like we
19   would be able to not engage at the level we were
20   engaging.

21        And the level we were engaging in order to
22   ensure public services was, from my perspective, not
23   sustainable in the long term, that the -- that the level
24   that we were spending -- level of time meant that it was
25   challenging to do the rest of our jobs because we were

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 214

1    committed to ensuring public services and access in

2    Capitol Hill.  There's a whole city that I'm responsible

3    for, not --

4         Q.   Sure.

5         A.   -- three blocks.

6         Q.   So Chief Scoggins is the fire chief for the

7    entire city; right?

8         A.   Right.

9         Q.   And Mami Hara was -- was the director -- I

10   think she's left -- for all of Seattle Public Utilities;

11   right?

12        A.   Right.

13        Q.   And you were the head department -- head of the

14   SDOT for the entire city; right?

15        A.   That's right.

16        Q.   And all three of you were spending either all

17   day or a good portion of your days for about three or

18   four weeks in the Capitol Hill neighborhood around Cal

19   Anderson Park; right?

20        A.   That's right.

21        Q.   And you felt that was necessary to keep

22   services at -- at some sort of reasonable level in the

23   neighborhood; right?

24             MR. CRAMER:  Objection.  Form.

25        A.   I felt like it was important to -- to -- yeah,

6402ce53-89af-4e06-b574-53dbb844f256

Page 215

1  to preserve our -- our public responsibilities of -- of

2  access and -- and services and movement of people and

3  goods.

4  BY MR. WEAVER:

5      Q.  Okay.  And did you notice a change in the shift

6  of the priority to clear out the area after shootings

7  that occurred in the area on June 20th and June 21,

8  2020?

9      A.  I think that that potentially played into it.

10     Q.  How do you think that played into it, and what

11 was your perception of why it played into it?

12     A.  You know, I -- I don't want to -- I don't want

13 to speculate on -- on why it played into it for others.

14 I -- it -- to me, it felt like things at that point --

15 you know, I've talked about how our goal was to -- was

16 continued de-escalation of conflict and looking for sort

17 of a return to regular operations.

18         I think some of those -- there -- there

19 became -- or it seemed like we were heading towards an

20 inflection point where we would not be successful in

21 de-escalating, and there could be opportunities for

22 escalating conflict, whether between -- you know, it

23 started out as between protesters and police.

24         It seemed like perhaps that was changing into

25 among protesters, or a lot of uncertainty about what was

Page 238

1                    C E R T I F I C A T E

2

3     STATE OF WASHINGTON

4     COUNTY OF PIERCE

5

6          I, Cindy M. Koch, a Certified Court Reporter in

7     and for the State of Washington, do hereby certify that

8     the foregoing transcript of the deposition of Samuel

9     Zimbabwe, having been duly sworn, on October 28, 2021,

10    is true and accurate to the best of my knowledge, skill

11    and ability.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13    and seal this 5th day of November, 2021.

14

15

16         _____

           CINDY M. KOCH, CCR, RPR, CRR

17

18    My commission expires:

19    JUNE 9, 2022

20

21

22

23

24

25

6402ce53-89af-4e06-b574-53dbb844f256

Exhibit 3

# 2PM Update - E Precinct (see notes)

| | |
|---|---|
| **Where:** | 701-801-1211; 591-015-294 |
| **When:** | Wed Jun 10 14:00:00 2020 (America/Los_Angeles) |
| **Until:** | Wed Jun 10 15:00:00 2020 (America/Los_Angeles) |
| **Organisers** | "Nelson, Laurel" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=f1bbaebb6f0a4bed808e0303e8b537f0-nelsonl1"> |
| **Required Attendees:** | "Fong, Michael" <michael.fong@seattle.gov> |
| | "Ranganathan, Shefali" <shefali.ranganathan@seattle.gov> |
| | "Sixkiller, Casey" <casey.sixkiller@seattle.gov> |
| | "Formas, Stephanie" <stephanie.formas@seattle.gov> |
| | "Auriemma, Anthony" <anthony.auriemma@seattle.gov> |
| | "Kline, Julie" <julie.kline@seattle.gov> |
| | "Aisenberg, Kathryn - MOS" <kathryn.aisenberg2@seattle.gov> |
| | "Apreza, Ernesto" <ernesto.apreza@seattle.gov> |
| | "Best, Carmen" <carmen.best@seattle.gov> |
| | "Mahaffey, Thomas" <thomas.mahaffey@seattle.gov> |
| | "Diaz, Adrian" <adrian.diaz@seattle.gov> |
| | "Scoggins, Harold D" <harold.scoggins@seattle.gov> |
| | "Aguirre, Jesús" <jesus.aguirre@seattle.gov> |
| | "Hara, Mami" <mami.hara@seattle.gov> |
| | "Goings, Calvin" <calvin.goings@seattle.gov> |
| | "Zimbabwe, Sam" <sam.zimbabwe@seattle.gov> |
| | "Mantilla, Andres" <andres.mantilla@seattle.gov> |
| | "Neafcy, Kenneth" <kenneth.neafcy@seattle.gov> |
| **Optional Attendees:** | "Grove, Kiersten" <kiersten.grove@seattle.gov> |
| | "Reed, Michelle" <michelle.reed@seattle.gov> |
| | "Worcester, Ned" <ned.worcester@seattle.gov> |
| | "Buechler, Chad M" <chad.buechler@seattle.gov> |
| | "Rivera, Maritza" <maritza.rivera@seattle.gov> |
| **Attachments:** | 6-10-20 11 AM E Precinct Call Notes (002).docx (23.81 kB) |

SEA_00028178

**6/10/20 11 AM E Precinct Call Notes**

**NEXT CALL 2:00 PM:**

**Situation Update:** E Precinct doors are locked and the SAID card system working again, but it doesn't sound like this has been verified with eyes on scene. Personal Property and some files remain in the E Precinct Building. There are some reports of group members checking ID or questioning people at checkpoints.

1. Pursue Physical Modifications to Barriers/Footprint
   - Negotiations continue. Non-SDOT metal barrier removal began, but group leaders changed their mind and metal barriers remain. Unknown how much progress with barrier/footprint modification can be made today. Existing street closures remain in place. There is confusion among the group leaders on site as to who can make decisions on footprint/barrier removal.
   - Looking at setting a planter at 10th and Pine
2. Secure the E Precinct Building
   - Personal Property and files remain in the building, it is difficult to inventory everything that remains.
   - SPD is aware that additional police presence could increase tension
   - SPU offered to provide a dumpster accessible by minimal staff that could be removed by a collection vehicle. SPD will pass the offer on to SPD Incident Command.
   - Chief Scoggins and Stephanie Formas past the lobby are still locked. But front doors from the street were "green" and unlocked. The rear door was also "green" and unlocked, but fencing was in place and undamaged. SPD will follow up on reviewing and verifying locked doors.
   - FAS continues to defer to SPD on defueling the generator. Defueling the generator seems to be of lower concern.
3. Encourage conversations between protest groups and the city.
   - Efforts continue, led by the Mayor's Office in response to the requests made by groups on site.
4. Cal Anderson Park Support
   - There are concerns about the level of permanent activity at the park. There are at least 27 tents on site and a group was digging a community garden. The tents appear to be a diverse set of protesters. SPU, Parks, and DM Sixkiller will follow up separately on the portable toilet strategy.

SPU, Parks to address the request for 17 port-a-potties

OEM will follow-up on secondhand information about persons being asked to show IDs.

SEA_00028179

Exhibit 4

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,     )
                                  )
              Plaintiff,          )
                                  )
        vs.                       ) No. 20-cv-00983-TSZ
                                  )
CITY OF SEATTLE,                  )
                                  )
              Defendant.          )
_____

VIDEOTAPED VIDEOCONFERENCE

30(B)(6) AND INDIVIDUAL
DEPOSITION UPON ORAL EXAMINATION OF
MAMI HARA

(CITY OF SEATTLE)

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 4, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

1    that some of them, you know, actually really appreciated

2    and used the large dumpsters that were on the perimeter

3    of the -- of the area.

4        Q.   Okay.   So if you could go under the same email,

5    same page, under "Public waste services," Mr. Van Dusen

6    indicates that, "much of public degree -- debris

7    collected from -- from -- I think he -- he says "form,"

8    but I think he means "'from' bagged consolation [sic] at

9    12th and Pine."

10           So were there piles of bags in certain areas

11   that had been designated where people would just leave

12   their bags of trash for pickup at some point by Seattle

13   Public Utilities?

14       A.   There -- there were probably some designated

15   areas, but we were also -- we regularly picked up the --

16   any bags of trash that were left anywhere so actually --

17   no, now that I recall it, there were -- there were a

18   couple areas that were -- that I remember being

19   designated trash bag collection points, but we also did

20   have a lot of ad hoc litter bags that would be put in

21   different places that -- you know, in piles, and then we

22   would go and pick them up on a daily basis.

23       Q.   Were there some days where you weren't able to

24   go and pick those up because it was determined you

25   should not go in the area at all?

1    the first page.  It's just the paragraph on June 12th

2    that indicates Customer Waste Services.

3         A.  Okay.

4         Q.  And the last sentence of that.  I'm

5    specifically going to ask about the last sentence of

6    that paragraph.  This seems to indicate that there were

7    still customers without their own waste containers in

8    the area.  Is -- was that -- was that accurate, that as

9    of June 12th, there were not -- there were some people

10   who didn't -- still didn't have their garbage cans or

11   dumpsters?

12        A.  I believe that there were some customers

13   that -- whose -- whose containers had been taken, but,

14   you know, we coordinated with them so that their trash

15   would be removed even if their containers were not

16   there.

17        Q.  And part of what -- part of your coordination

18   of that was to provide large shared dumpsters at a

19   couple intersections in the area; is that right?

20        A.  The large dumpsters were a part of an overall

21   strategy to ensure that no debris or, you know, garbage

22   would collect in that area.

23        Q.  So am I understanding you to -- your testimony

24   to be that large amounts of garbage did not accumulate

25   in the area during the period of June 8th to July 1,

Page 30

1    2020?

2         A.   Overnight near the park, because there were

3    several houseless people, or many houseless people in

4    the park, you know, there would be a large pile of

5    garbage at times, you know, in -- near the dumpsters,

6    you know, because there was more than the dumpster- --

7    but we said we up -- we had to upsize the dumpster

8    there.  And that is my -- I believe that's -- that that

9    is the point at which I -- you know, and I think that

10   perhaps that maybe Rio Bravo had so much activity that

11   they might have had some bags next to their dumpsters,

12   but those were always collected.

13        Q.   What do you mean by "upsizing the dumpsters"?

14        A.   The -- at -- down at 12th and -- sorry -- 11th

15   and Olive, I believe that we moved to a larger dumpster

16   at some point that could accommodate the full -- the

17   full need.

18        Q.   For -- and that was for both people who were

19   staying overnight in the area, people who were coming

20   during the day in the area, and then also businesses and

21   residents in the area?  Anybody could use it?

22        A.   Those dumpsters were provided for everyone's

23   use so that no debris or trash would accumulate in the

24   area.

25        Q.   Okay.  Again, is it your testimony that debris

Page 63

1  prevent -- this was during COVID as well, you know,

2  to -- with a large congregation of people from all

3  overcoming in on a daily basis.  It -- you know, our

4  responsibility was also to make sure that we could do

5  what we could to stem any kind of, you know, public

6  health outbreak by providing, you know, services.

7  BY MR. WEAVER:

8       Q.  Okay.  So you can't speak to how

9  facilitating -- how facilitating modified city services

10 delivery reasonably facilitated the ongoing exercise of

11 first amendment activities; correct?

12      A.  I -- like I said, I can't --

13           MR. CRAMER:  Same objection.

14      A.  Yeah, I -- I -- I cannot speak to that because

15 that's -- our -- our -- what drove us was public health

16 management.

17 BY MR. WEAVER:

18      Q.  Okay.  Another topic that you have been

19 designated for is to talk about the provision of basic

20 hygiene, water, litter, and garbage removal to the CHOP

21 area and to the protesters.

22           You're -- and I think we established you're

23 aware that you've been designated for that; right?

24      A.  Yes.

25      Q.  What can you tell me about the water that was

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 64

1   provided to protesters and people living in the area

2   during the period of June 8, 2020, to July 1, 2020?

3        A.  We had a few hand washing stations that had

4   water tanks that needed to be refilled to allow for hand

5   washing, you know, with soap and water.  And we --

6   also -- I don't know that we provided it, but, you know,

7   the water was on -- largely on at the park, you know,

8   and so, you know, they were using our system in order to

9   have the water on at the shelter house for the park.

10       Q.  Okay.  So what water in the park?  Was -- was

11  there a hose, was there a faucet?  What sort of water

12  source was being provided in Cal Anderson Park?

13       A.  In Cal Anderson there was a -- a -- a hand

14  washing station, a durable hand washing station with a

15  50-gallon tank, and that was just for hand washing, and

16  then I believe that just -- because it's there, there's

17  a hose bib at the shelter house that was -- that's

18  normally used for maintaining the grounds, yeah.

19       Q.  Okay.  Were you aware during your trips to the

20  area that the hose was being used for use by a garden

21  that had been dug into the Cal Anderson Park at that

22  time?

23       A.  From -- to -- to -- when the garden was

24  developed in the park, I believe -- you know, that -- I

25  believe that the only access to water that they had was

Page 65

1   the hose bib that was attached to the shelter house.

2       Q.   Do you know whether the water from that hose

3   bib was being used as drinking water or some other water

4   source by people who were occupying the park?

5       A.   No, I'm not -- I'm not aware.

6       Q.   Do you recall at some point that Seattle Public

7   Utilities shut that water source off in the park?

8       A.   There was one instance where we were asked to

9   shut off the water and -- and then restore it shortly

10  thereafter.

11      Q.   Okay.   Do you know why it was restored shortly

12  thereafter?

13      A.   The -- the -- I mean, it's just -- it's a -- to

14  have water when you're -- when you have that many people

15  or, you know -- I'm going to assume that it was just

16  because we needed to ensure that there was -- you know,

17  that there was a supply of -- of fresh drinking water if

18  needed.

19      Q.   There was a concern with -- with the number of

20  people that were in the park, that they wouldn't have

21  drinking water if that water was shut off; correct?

22      A.   You know, just water, you know, for any kind

23  of -- you know, whenever there's a congregation of

24  people is a pretty basic provision.   There was a lot of

25  drinking water because of donations.   There were a lot

 1    of plas- -- there were an insane amount of plastic

 2    drinking water bottles, you know, always there from

 3    community donations, from residents and businesses,

 4    but -- but, you know, we always feel that it's important

 5    when there is -- when there are people, that there

 6    should be access to water.

 7         Q.  Why was the water shut off during that one time

 8    period you discussed in this time period?

 9         A.  If -- if I remember correctly, mayor's office

10    wanted to make sure that -- you know, that there was --

11    that -- that there were -- that the -- I'm trying to

12    remember exactly what their rationale was.  It might

13    have -- if I'm -- I'm trying to remember the date and

14    the time.  Is there an indication of -- in this email of

15    when that was?  Because they may have been trying to

16    initially start to clear the park and, you know, that

17    that would be part of, you know, that work.

18         Q.  I believe from what I've seen -- I'm not sure I

19    have an exhibit here today about it, but I believe what

20    I have seen is the water was shut off somewhere around

21    June 22nd.

22              Was it your understanding that one of the

23    purposes to shut off the water was so that people would

24    leave the area?

25         A.  I don't know exactly what the thought process

1   was, but it seem- -- but if I remember correctly, it was

2   potentially part of a whole set of actions designed to

3   help to clear the park.

4       Q.   Okay.  What do you know about any electricity

5   services that were provided to the area and specifically

6   to Cal Anderson Park that were not normally provided to

7   the area during that time period?

8       A.   There were a lot of requests for additional

9   electrical service to the park.  You know, people wanted

10  to charge their phones and things.  But it was not --

11  but that was not, to my knowledge, in any way, you know,

12  provided.  At additional -- no -- I do not believe that

13  any additional electrical service was provided.

14      Q.   How about additional lighting in Cal Anderson

15  Park during hours that there would not normally be

16  lighting?  Are you aware of anything to that effect?

17      A.   I believe that for safety reasons some of --

18  sometimes the field lights were left on for longer than

19  they would normally be on -- be left on, but those were,

20  you know, kind of existing lights and just management of

21  the hours that those lights were on.

22      Q.   Why -- why was that seen as necessary for

23  safety purposes?

24      A.   It was -- if I remember correctly, it was the

25  request of, you know, folks just feeling like it would

1    be -- it would -- it would feel safer to have the lights
2    on for longer.

3         Q.  Okay.  Who were the people that requested it?

4         A.  I don't know who was requesting it.  I

5    apologize.

6         Q.  Okay.  You didn't get any of those requests

7    yourself, personally?

8         A.  I may have, but I don't remember those -- I

9    mean, I had a lot of requests all the time for all kinds

10   of things.

11        Q.  So you don't know whether it was the people who

12   were in the park overnight who were requesting that the

13   lights be on all night, or longer than usual?

14        A.  I don't remember who asked me or who asked the

15   parks, you know, to manage their light -- that -- the

16   hours of the lights, but it's possible that, you know,

17   people in the park asked, or -- or residents, you know.

18   I'm not sure.

19        Q.  But there -- never mind.  I'll let it go.

20             So what sort of -- did the City provide

21   portable toilets to the area that are not normally there

22   during the period of June -- June 9th to June 30,

23   2020 -- or sorry, June -- June 9th to July 1, 2020?

24        A.  The -- the context for what's normally there is

25   a little -- was a little different at that time because

Page 70

1    many there were before and then during that week.

2                (Exhibit No. 10 marked.)

3    BY MR. WEAVER:

4        Q.   I'm going to drop Exhibit 10 in.  It should be

5    on its way.

6        A.   Okay.  I have it open now.

7        Q.   Okay.  This is an email with an attachment,

8    again from Mr. Van Dusen, and if you could go to the --

9    the second page.  You may need to rotate it, but maybe

10   you're better at reading sideways than I am.

11       A.   I see what you're saying.  This is from

12   June 14th.  Okay.  I'm looking at the map now.

13       Q.   Okay.  So this seems to indicate on the left

14   that there were a total of 21 City Sani-Cans at this

15   point.

16            Do you see that?

17       A.   It says that there are nine, plus eight, plus

18   four around the perimeter of the -- of the site.

19       Q.   Okay.  So that adds up to 21; right?

20       A.   (Witness nods head.)

21       Q.   Okay.  And they were -- were these owned by the

22   City of Seattle or were they contracted out to a third

23   party to provide these services?

24       A.   I believe that the majority of them were -- are

25   owned and managed via contract by Honey Bucket.

Page 71

1    Q.  And it looks like they were -- if I'm reading
2  this correctly, they were -- they were daily pumped --
3  they were pumped out daily during this period in
4  June 2020; is that right?
5    A.  They were pumped out at least daily in
6  June 2020.  I think we may have had some modification
7  based on demand.
8    Q.  And -- and sometimes -- I think we've seen that
9  sometimes there were days where they were told not to go
10 in as well; is that right?
11   A.  Those were rare days, yes, but maybe near the
12 end, but we, you know, freq- -- we -- we worked very
13 hard to make sure that they didn't overflow.
14   Q.  Okay.  How was it determined that there should
15 be 21 Sani-Cans in this general area?
16   A.  You know, we monitored them, and if -- and I
17 mean, this is a little gross, but if they were, you
18 know, at capacity and we were nearing any kind of, you
19 know, real issue with capacity -- if they were -- I
20 mean, I cannot describe to you how many tourists there
21 were.  That, you know, we would -- we would sometimes
22 add some, you know, to accommodate, you know, the -- the
23 additional crowds.  But we also would remove them if
24 they -- you know, if they were -- if they were no longer
25 needed.  So it was really based on monitoring.

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 72

1      Q.  Okay.  Do you -- do you know whether you

2   added -- as of, you know -- this appears to be as of

3   June 12th, or June 14th.  The attachment says June 12th,

4   but I think the email -- the cover email is June 14th.

5          Do you know whether between this period and

6   July 1st there were more Sani-Cans added or whether some

7   were removed prior to July 1st?

8      A.  Yeah, I -- I'm -- I apologize.  I don't

9   remember the dates for, you know, the addition or

10  removal of the different cans, but I -- all I remember

11  is that we were just monitoring them to make sure that

12  we tried to have the right balance in order to ensure

13  public safety, or public health, I mean.

14     Q.  Okay.  Was there ever -- was there ever any

15  discussion or concern that by adding these additional

16  Sani-Cans, and having 21 Sani-Cans in the area would

17  encourage people to continue to occupy the area?

18     A.  If I -- after I answer this -- after I answer

19  this question will we take a restroom break, please?

20     Q.  Sure.  Absolutely.

21     A.  All this potty talk.

22     Q.  All the talking about Sani-Cans, huh?

23     A.  So you know, if I remember correctly, yes, some

24  people -- a few people had that hyp- -- or not even that

25  many.  A couple people had that hypothesis and posed it

1    to -- to me.  You know, I think it was businesses that

2    asked that question.

3              But, you know, our determination was really

4    based on, you know, demand; right?  I mean, our job is

5    to ensure that there -- is -- that urine and feces are

6    not in the street, particularly during COVID, you know,

7    when -- you know, when people knew that human waste

8    was -- is a vector of the disease, you know, along with

9    all of the other, you know, horrible typical things that

10   come with that happening, you know, that -- that is what

11   predicated, you know, how we managed the number.

12             MR. WEAVER:  Okay.  Let's go ahead and take

13   a break.  Let's take what, 15 minutes?  Is that

14   sufficient for people?

15             THE WITNESS:  Yes, that's --

16             MR. WEAVER:  Let's go off the record.

17             THE VIDEOGRAPHER:  Going off the record.

18   The time now is approximately 10:49 a.m.

19             (Recess from 10:49 a.m. to 11:06 a.m.)

20             THE VIDEOGRAPHER:  Going back on the record.

21   The time now is approximately 11:07 a.m.

22             E X A M I N A T I O N (Continuing)

23   BY MR. WEAVER:

24        Q.  So I understand you have something to add to

25   what you previously said about the provision of water;

Page 74

1   is that correct?

2        A.  Yes.  I remembered that at a certain point a

3   kind of like food service developed near the shelter

4   house.  It wasn't there, you know, through -- like all

5   through the period, and they relied on the water most

6   likely from the hose bib in order to wash their hands,

7   you know, and wash -- and wash dishes.  So that would be

8   a -- you know, a use for the water that was -- that was

9   flowing through -- you know, through the Parks property

10  from our system.

11       Q.  Okay.  Any other uses that I haven't -- I

12  haven't heard about yet that you know of?

13       A.  I apologize.  I don't remember everything.  I

14  remember the food service and the garden that were, you

15  know, coming through there, but also, you know,

16  people -- people may have also been using it to wash

17  their hands, you know, if they didn't want to go all the

18  way over to the sinks that we provided.

19       Q.  Okay.  And they may have been using it as

20  drinking water too; is that correct?

21       A.  It's -- it's possible.  It's possible.  I don't

22  remember seeing people doing that, but I -- you know,

23  it's very possible.

24       Q.  Okay.  Going back to Exhibit 10 and the map we

25  were looking at, do you have it in front of you?

 1       A.  I do now.

 2       Q.  So this indicates there were -- at least of

 3   June 12, 2020, 21 Sani-Cans in the area; correct?

 4       A.  Yes.

 5       Q.  Are those -- are those Sani-Cans normally in

 6   the area?

 7       A.  So for context, there were -- I don't know how

 8   many cans there were already in the area prior to the

 9   time period you're discussing, but there were several

10   cans in this area.  I believe there were -- I don't know

11   the exact number, but I believe there were a minimum of

12   six up at -- near 12th and Pine, and that there were a

13   few down at 11th and Olive, as well, you know, and

14   possibly at -- at 11th and Union because of the protests

15   and all of the crowds that had been congregating in

16   Capitol Hill for the entire period of civil unrest that

17   was before this period.

18       Q.  Okay.  So generally the period of late May to

19   June 8th, there were some Sani-Cans in the general

20   vicinity that were provided by the City; is that

21   correct?

22       A.  Yeah, I don't -- I don't remember what date

23   they started to be provided, but they'd -- before --

24   yes, before -- during the period of unrest provoked by,

25   you know, George Floyd's murder, there were -- there

Page 77

1    the park.

2         Q.  Okay.  I'll get to that later.

3              Do you know whether there was any food provided

4    to -- by the City or by contractors on behalf of the

5    City to people in the area during the period we've been

6    talking about?

7         A.  I do not know of any food provided at any scale

8    by the City to protesters.  I mean, somebody may have

9    passed somebody a candy bar, you know -- you know, but I

10   don't think that -- I do not remember any kind of, you

11   know, food being supplied.

12        Q.  I'd like to ask you about the social services

13   outreach that you've been designated to talk about.

14              What can you tell me about the social services

15   outreach that was provided to people in the area during

16   the time we've been talking about?

17        A.  During the -- during that period there were a

18   lot of houseless folks who were living in the park, and

19   so a -- a good deal of the outreach that was provided

20   was to try to get them into other types of housing, you

21   know, and services so that they would have a more

22   viable, you know, way, you know, of living other than

23   being in the park.

24        Q.  Okay.  Do you know when those services started

25   being provided?

Page  78

1      A.   I don't know the date.

2      Q.   Okay.  Was it -- do you know whether it was at

3    the beginning or the end of the CHOP era, so to speak?

4      A.   I don't know whether it was at the -- near the

5    middle, you know, or closer to the end.  I don't -- I

6    think, you know, at the very, very beginning, I don't

7    believe that there were significant social services

8    being provided, but, you know, the effort to move people

9    into, you know, more -- more viable forms of -- of -- of

10   housing were -- were -- you know, I think started to be

11   offered, you know, in an effort to also, you know,

12   make -- you know, to help them get out of the park.

13     Q.   Who offered -- who was specifically involved in

14   offering those services and talking to people about

15   those services?

16     A.   It was a team effort that was coordinated by

17   the Human Services Department.  They had outreach folks

18   there, both inside and outside the park.  They had a

19   table that people could go to right outside the

20   perimeter, and then they had a couple people who would

21   walk the park, and then they also had REACH, which is a

22   service provider of theirs, going into the park -- into

23   the park, and -- and I also helped -- Idris and I also

24   helped to try to connect people to housing and services,

25   and -- at least to HS -- to connect them to HSD.

Page 146

1                C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of MAMI HARA,

9    having been duly sworn, on October 4, 2021, is true and

10   accurate to the best of my knowledge, skill and ability.

11        IN WITNESS WHEREOF, I have hereunto set my hand

12   and seal this 13th day of October, 2021.

13

14

15   _____

16        CINDY M. KOCH, CCR, RPR, CRR #2357

17

18   My commission expires:

19   JUNE 9, 2022

20

21

22

23

24

25

Exhibit 5

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
              Plaintiff,         )
                                 )
         vs.                     ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
              Defendant.         )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

CASEY SIXKILLER

_____


Seattle, Washington


(All participants appeared via videoconference.)




DATE TAKEN:  OCTOBER 12, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 30

1     Q.  Do you recall talking to Mayor Durkan about
2  this -- these documents and this idea of transferring
3  the east precinct to the ownership of Black Lives
4  Matter?
5     A.  I do.
6     Q.  Okay.  What do you remember about that
7  conversation?
8     A.  I -- sorry, I'm just looking at the document.
9  I -- I remember expressing to her that while she may
10  have a strong desire to put this on the table as a
11  conversation point with folks, that it's not ready.
12  That these memos show that this is a really complicated
13  transaction, and that we could not just operationally,
14  you know, snap our fingers and all of a sudden we had
15  the square footage and the equipment that we need to
16  house -- to provide the level of -- of public safety
17  service in that part of the city.
18         You know, and -- and I don't remember if I
19  flat-out opposed continuing this conversation or not,
20  but I do remember being pretty firm in my -- expressing
21  my concern that the timeline that was -- that she wanted
22  to be able to discuss this was -- was challenging.
23     Q.  Was it your understanding that she wanted to
24  transfer it effective July 1, 2020?
25     A.  No.  And, you know, looking at that in this

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 31

1   resolution that you shared, that -- I -- that -- I mean,

2   it's even highlighted.  I think the -- the -- I don't

3   know where that date comes from, other than, you know,

4   I -- Director Goings is a very -- he takes his job very

5   seriously, and he's the ultimate professional and, you

6   know, he's -- he's the one who's the can-do spirit,

7   like, we will figure it out.

8          So it doesn't -- frankly, I can't imagine that

9   anybody actually asked for a resolution to be drafted at

10  the same time.  It doesn't surprise me, coming from

11  Director Goings, that they went that extra step to put

12  it in the -- in the ether for conversation.

13         So I -- that's a long way of saying I don't

14  know where the date July 1st comes from.  As I said, all

15  of this was sort of in the much more longer-term view

16  of, like -- you know, no one wants to go into a

17  conversation and suggest, hey, here's a potential

18  solution, and then it turns out not to be true and it's

19  just -- you know, it's just bad faith.

20     Q.  Do you recall having any discussions with the

21  mayor about why she thought transferring ownership of

22  the east precinct to Black Lives Matter was an option

23  that should be explored?

24     A.  As I said earlier, I think, you know, Mayor

25  Durkan has, you know, been part of -- you know, part --

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 32

1   has been in the city for a long time and has -- has seen

2   different efforts by certain members, communities of

3   color in Seattle who have worked with the City on

4   property transfer, disposal.  And again, I use, you

5   know, the -- Daybreak Star as -- as an example of that,

6   and I think she was sort of thinking about, again, the

7   origin of the east precinct and whether that was

8   something that we should make a commitment to -- to do.

9        But again, I -- the timing is -- just given all

10  the other events at this time -- same time period, I

11  think is purely coincidental.

12       Q.  I'm sorry.  You think the timing was

13  coincidental?

14       A.  In terms of -- yes, in terms of, you know,

15  related operational decisions that the Seattle Police

16  Department made about the east precinct, they are not

17  related to this different thread of conversation, in my

18  view.

19       Q.  Okay.  I just -- so this proposal would have

20  had the police evacuating and leaving permanently the

21  east precinct; is that right?

22            MR. CRAMER:  Objection.  Form.

23       A.  Yeah, I don't agree with the -- with the

24  suggestion -- I don't agree with the word "evacuating."

25  I think what this proposal clearly articulates is that,

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 33

1  you know, we would need to have, you know, done several

2  things, including identifying an alternative location,

3  making sure that location was suitable, making sure we

4  entered into a legal agreement with the property owner

5  if we didn't own it or if we had to lease it.

6         So that -- that's a very -- I mean, this is

7  government, man.  We don't move fast.  So I think we

8  would -- it would take some time.

9         And I think, you know, again, for me it was,

10  you know -- setting aside whether I thought it was a

11  good idea or a bad idea, it was just a -- I just want us

12  to be -- I wanted to make sure, and I think this memo

13  helps underscore that this is a very complicated idea,

14  and it would be a complicated transaction for us to pull

15  off.

16  BY MR. WEAVER:

17     Q.  Okay.  Well, part of the -- part of the

18  resolution that was drafted indicates that the City of

19  Seattle agrees to vacate the property and remove all law

20  enforcement and materials in police-related facilities.

21         Did you see that when you reviewed it?

22     A.  Yeah.  I mean, that's standard; right?

23  Standard -- I mean -- right?  I mean, standard -- I

24  presume is standard language in any real estate

25  transaction; right?  We are relinquishing fee simple

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 34

1   title.

2        Q.   Okay.   So it was going to -- it was also going

3   to remove all the holding cells and take down all law

4   enforcement -- law enforcement insignia; is that right?

5             MR. CRAMER:   Objection.   Form.

6        A.   Yeah, I mean, again, as I said, I don't

7   think -- there had been -- as far as I recall, there had

8   been no sort of firm discussion of what all of this

9   could entail; right?   As I said, it could -- could have

10  been, do you want to explore some sort of new,

11  re-imagined east precinct?   Do you want to explore a --

12  you know, a transfer to your organization or

13  organizations for the future of the east precinct?   And

14  again, this points out that there's a process and it's

15  going to take time, and blah-blah-blah.

16             So I think it would -- I don't -- I don't

17  recall it going much further than that, you know,

18  like -- and again, I think this -- unfortunately, this

19  draft resolution suggests otherwise, but it's not my

20  recollection of the -- of the conversations that were --

21  that were happening at this time.

22  BY MR. WEAVER:

23        Q.   What do you recall about whether this proposal

24  remained in play during the period of June 2020?

25        A.   I -- I couldn't tell you the time frame, but I

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 35

1  recall that at some -- well, number one, I should say I
2  was not involved in any of the conversations with
3  community organizations.  So I -- I can't provide
4  context for those discussions.
5           But two is, at some point, I believe it was
6  Black Lives Matter, or maybe others that -- that -- who
7  were engaged with the City about the east precinct, made
8  it clear that they didn't want the east precinct.  And
9  so there was a point where, you know, the conversations
10 pivoted away from, you know, let's figure out something
11 for the east precinct first, and turned to, all right,
12 we need -- let's figure out an alternative that might
13 make sense as a new commun- -- some sort of community
14 gathering place, whatever that may be.
15     Q.  Okay.  So your understanding was that was
16 because Black Lives Matter indicated they did not want
17 the east precinct.  Is that what I heard?
18     A.  That's my -- that's my recollection, yes.
19     Q.  Okay.  Do you recall what alternatives were
20 explored at that point, once it -- once Black Lives
21 Matter made clear they didn't want the east precinct?
22     A.  I -- if I -- if I remember correctly, I think
23 the -- I think the City volunteered to look at other
24 potential spaces in and around the area that could be
25 used either for, I don't know, office, community

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 36

1   gathering, what have you.

2        Q.  Do you know what other spaces were looked at?

3        A.  I think there was one that was adjacent to the

4   east precinct, but I can't -- I could not tell you if it

5   was on the same block, if it was across the street.  I

6   just don't remember.

7        Q.  Do you recall anything -- any -- by the way,

8   was the mayor involved in these discussions about

9   looking for alternatives?

10       A.  She was being briefed, yes.

11       Q.  Okay.  Do you know whether she was directly

12  involved in any of these transactions to look for

13  alternatives to the east precinct?

14            MR. CRAMER:  Objection.  Form.

15       A.  I -- I have -- my -- I don't know.  I have no

16  knowledge of that.

17  BY MR. WEAVER:

18       Q.  Do you recall anything about a space that was

19  previously leased by an entity known as the Riveter?

20       A.  That name -- yeah, that name sounds familiar.

21       Q.  Okay.  Was that one of the alternatives to the

22  east precinct transfer?

23       A.  Boy, I -- you know, I'd have to see a record

24  to -- I mean, I -- I say that because I -- I remember

25  hearing the Riveter, and there used to be a Riveter up

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 173

1        Q.  Okay.  Page 43, Exhibit 5, just the next text
2   from you in this chain.
3        A.  Yes, I see it.
4        Q.  Okay.  Why were you considering shutting off
5   the power that may have been supplied to people in Cal
6   Anderson Park?
7        A.  First, I don't recall us supplying power.  I
8   believe what happened is -- and unfortunately this
9   happens in many parts of the city.  People had accessed
10  the power panel on -- on the lights in the park and were
11  using it to charge cellphones and other things.
12          You know, my recollection is this piece is --
13  is very similar to turning the water off, is it's --
14  it's time to go.  It's like, please, just go.  We
15  don't...
16       Q.  Okay.  So did you -- did you feel that having a
17  power source, whether it was jerry-rigged or not,
18  available to people, was encouraging them to stay
19  longer?
20       A.  Again, it is an unfortunate situation across
21  our city that people are -- use these power sources not
22  for their intended use.  You know, whether that
23  encouraged people to stay or not, I couldn't speak to
24  that, but I -- I just know, you know, sort of in my
25  head, at least, you know, making clear that these things

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 174

1  were -- were going away was, I thought, an important
2  signal to folks that it was time to go.
3      Q.  You thought if you turned off the power it
4  would be more likely that people would leave the area
5  and the park; is that right?
6      A.  That was our hope, you know, or at least it
7  would encourage some people to leave.
8      Q.  Okay.
9      A.  While we then focused in on what we would need
10 to do to help others leave.
11     Q.  In your next text, at 8:13 a.m., you say, "SPU
12 also held on porta-potty servicing and trash removal."
13         Do you see that?
14     A.  Yes.
15     Q.  Was that also part of your plan to get -- tell
16 people it was time to go, you were going to stop
17 servicing the porta-potties and removing the trash?
18     A.  That's my recollection, yes.
19     Q.  I'd like you to go to Page 51, and on to
20 Page 52, there's a text chain, 2542 between you and Mami
21 Hara later on the day of June 23rd.
22     A.  Uh-huh.
23     Q.  I take it from this and some other documents
24 that you ended up turning the water back on in Cal
25 Anderson that day; is that right?

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 179

1    out of the park is so that permanent residents and

2    businesses in the area could live in peace?

3         A.   What I wanted to do was to, you know, help

4    facilitate a process that allowed us to restore, you

5    know, some sort of, quote/unquote, normalcy to the area.

6    That was what I was focused on.

7         Q.   And so you knew that one way to restore

8    normalcy to the area would be to clear out Cal Anderson

9    Park; is that right?

10        A.   In my -- yeah, that was -- in my belief, yes, I

11   thought that was a component of that strategy.

12        Q.   Okay.   And moving the barriers out of the area

13   would also have helped return the area to normalcy; is

14   that correct?

15        A.   You know, as I -- yes, as I said earlier, I

16   think, you know, ensuring that we had -- you know, that

17   we could, you know, restore and facilitate, you know --

18   you know, clear access across all -- through all of our

19   streets, I thought was really -- was really important,

20   and we'd been trying to do it.

21        Q.   I want you to go further down on the 2542 chat.

22   You say at 12:43 p.m. on June 23rd, "Turn it back on,

23   but I want to be -- it to be -- I want to be

24   acknowledge -- I want it to be acknowledged that it's

25   the time to go, and we will work with Parks to make sure

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 180

1       the garden is watered."

2              Mami says, "Yes, great idea."

3              And then you say, "But there needs to be

4       something from them.  So far we're doing all the giving

5       and they aren't doing shit."

6              Do you see that?

7       A.   I do.

8              MR. CRAMER:  Tyler, is there a question?

9              MR. WEAVER:  I asked him if he sees it.

10             MR. CRAMER:  Oh, he said yes.

11             MR. WEAVER:  Oh, okay.  Sorry.  I -- I

12      didn't hear it.  I don't know if it's the --

13      BY MR. WEAVER:

14      Q.   So why did you say it's your perception that

15      the City was doing all the giving and the other side was

16      doing nothing?

17      A.   You know, as I've said several times today, you

18      know, there was no centralized structure of folks who

19      were in and around this area for us to -- to -- to try

20      to work with to address the range of issues that people

21      were expressing or experiencing, as the case may be.

22      And, you know, if I -- if I remember correctly, I think

23      the farmers had presented us with, like, a 25 list --

24      point list of demands, and I believe we were working

25      through some of those things.

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 181

1       So I think what you're seeing from me is a
2   frustration that, you know, we'd -- every -- at every
3   turn it seemed that some -- I shouldn't say at every
4   turn.  There were times when it felt like the goalposts
5   were always getting moved.  You know, here we are trying
6   to do this peacefully and respectfully and -- and the
7   goalposts keep getting moved on us.
8       Q.  So you were frustrated that the City was doing
9   what it could to make this a peaceful transition, and
10  you felt like you were getting nothing back from the
11  people you were trying to transition out of the area; is
12  that correct?
13      A.  Yeah, I -- I think that we -- again, it just
14  was a level of frustration that we -- you know, that the
15  goalposts continued to move on us, you know.
16      Q.  Okay.  So what was your perception of what the
17  City had been giving to this process?
18      A.  I think in this context it was, you know, to
19  try to continue to support that garden being there and,
20  you know, talking with them about how we could
21  memorialize it, support it, create ways to honor that
22  moment in time.  I think it was probably as -- you know,
23  that was kind of the gist of it, if I remember
24  correctly.
25      Q.  Okay.  So the City had indicated that the

Hunters Capital, LLC v. City of Seattle                      Casey Sixkiller

Page 182

1   garden that had been dug in the -- in the park would

2   re- -- you had indicated -- the City had indicated that

3   that would be allowed to remain permanently at that

4   point; is that correct?

5        A.  I don't know if -- I think what we had talked

6   about -- and again, I was not in these meetings, but I

7   think, you know, it had been discussed what were the

8   ways that we could preserve and/or support the efforts

9   by the individuals who -- who had started and maintained

10  that garden.

11       Q.  Also on June 23rd, the City had also started

12  doing the homeless and relocation outreach that we had

13  talked about earlier; correct?  That was also happening

14  in the park on the 23rd?

15       A.  Yes, based on that email from Director Johnson.

16       Q.  And at that point there were still port-a-

17  potties in the park; right?

18       A.  That's correct, yes.

19       Q.  Okay.  And there was still -- there was still

20  litter being picked up around the area; right?

21       A.  That's my -- yes, that's my recollection.

22       Q.  Okay.  And the power was still on, even though

23  they'd jerry-rigged it; correct?

24       A.  Correct.

25       Q.  Okay.  Did you feel that those were all things

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 183

1    that the City was giving to the protesters in return for

2    nothing?

3         A.   I don't know.  I -- to be honest, I -- I don't

4    know what I -- what I meant in that -- in that moment in

5    time when I sent that text.  I just knew it was my job

6    to try to figure out how to get folks out of Cal

7    Anderson Park.

8         Q.   Okay.  You were -- I mean, the wording was

9    pretty strong that the City was giving them everything

10   and they weren't doing shit.  I mean, I'm not -- that's

11   not an exact quote, but would you agree that that's

12   pretty strong language?

13        A.   Yes, it is very strong language.

14        Q.   You were -- you were very frustrated at that

15   point; correct?

16        A.   That is correct, yes.

17        Q.   And you felt that you were -- that whatever you

18   had negotiated and agreed with with the protesters was

19   never enough; that the City could never please them

20   completely; right?

21             MR. CRAMER:   Objection.   Form.

22        A.   I don't know that I would characterize it that

23   way.  I think it was more of a -- you know, the -- not

24   having clarity on what all the things are that we could

25   have done to -- you know, to resolve the encampment was

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 184

1    frustrating.  I mean, it was -- you know, and -- but I'm

2    glad that's why we had, you know, the Human Services

3    Department fire up its stuff and try to think outside

4    the box of who we could bring to the table to try to

5    help engage, you know, folks who were -- were in the

6    park.

7    BY MR. WEAVER:

8        Q.  Do you know whether at this point the City had

9    also indicated to people in the area that they would

10   preserve the artworks that had been created during the

11   CHOP period of June 8th through the end of June 2020?

12       A.  Yeah, I am aware that there was an effort to

13   store the art.

14       Q.  Okay.  And -- I mean, as of June 23rd, when you

15   wrote this, had the City -- do you know whether the City

16   had been -- had offered that as well to the protesters?

17       A.  I don't remember.

18       Q.  Okay.  Okay.  Going further down this text

19   chain with Mami Hara, on the next page, Page 52, at

20   12:46 p.m., you indicate that -- you say, "I mean, we're

21   offering to store their plants in our greenhouses and

22   water their," all caps, "illegal garden."

23           What was -- what were you -- what was the offer

24   to store plants in the City's greenhouses?

25       A.  It was just that.  We were offering to -- to

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 185

1   store plants in our greenhouse space as a commitment to

2   working with them going forward.

3       Q.  Okay.  Did that end up happening?

4       A.  I think it did.

5       Q.  Okay.

6       A.  But you'd have to ask Parks.  I don't remember

7   off the top of my head, but I believe it did.

8       Q.  Where was the greenhouse where they were --

9   where they were talking about storing them?

10      A.  I don't remember.  You'd have to ask Parks.

11      Q.  Okay.  Do you know whether it was on Cal -- in

12  Cal Anderson, or do you not know at all?

13      A.  I don't know it -- I don't believe it was in

14  Cal Anderson.  I don't think we have a greenhouse in Cal

15  Anderson.

16      Q.  Seems like you were pretty clear that their

17  garden was illegal.  Would you agree with me on that?

18          MR. CRAMER:  Objection.  Form, foundation.

19      A.  I mean, I stated it as -- as such, yes.

20  BY MR. WEAVER:

21      Q.  Okay.  Do you believe their garden was illegal?

22          MR. CRAMER:  Same objection.

23      A.  Yeah, I mean, I -- I -- as I stated -- I'm not

24  going to contradict myself here -- yeah, they tore up

25  part of the park.

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 188

1              MR. CRAMER:  Objection.

2    BY MR. WEAVER:

3        Q.  Go back to Exhibit 5, and Pages 9 to 10.

4        A.  Okay.

5        Q.  And at the bottom there's a text from Mami Hara

6    to a group that includes you, indicating that as of

7    June 24th, tent count was 30 on the play field, 75

8    around the bathrooms, garden, and play structure, 35 on

9    the north side of the park, and 10 tents re-camped

10   around the precinct, and then the next one looks like 50

11   less overall.

12           Do you see that?

13       A.  I do, yes.

14       Q.  Okay.  So my count is that as of June 24th

15   there were -- you'd think I would have done this before,

16   but about 150 tents; is that right?

17       A.  You're better at quick math than I am.

18       Q.  All right.  I mean, do you recall that there

19   were at some point 200 or more tents in and around Cal

20   Anderson and the east precinct towards the end of

21   June 2020?

22       A.  I'm not going to speculate about the -- the --

23   the -- the number of tents, but there -- but there

24   were -- there were a lot of tents in the park, and as

25   indicated here, as well as near the -- near the precinct

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 189

1    itself.

2        Q.   Mami was there every day; right?

3        A.   Mami was there, I think, every day or so, and

4    other folks.  And by this point, on the 24th, right, I

5    believe our -- the navigation team was also on site as

6    well, the Human Services Department's navigation team

7    was on site, which specifically engages in

8    encampments -- in encampment work.

9        Q.   Okay.  Going down further -- actually, it's on

10   the next page, it's actually Text Chain 794, on Page 10.

11       A.   Oh.

12       Q.   Text from Mayor Fong -- or sorry, Mike Fong.

13   It's been a long day.  Saying "The mayor just called and

14   wants the newly constructed barriers up on 12th

15   removed."

16            Do you see that?

17       A.   Yes.

18       Q.   Okay.  What do you recall about during this

19   week, after the mayor said it was time to go home, that

20   there were still new barriers showing up in the area?

21            MR. CRAMER:  Objection.  Form.

22       A.   Can you -- can you ask me that again, please?

23   I'm sorry.

24   BY MR. WEAVER:

25       Q.   During the week of June 22nd, do you recall

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 209

1       Q.   Do you know why Cal Anderson Park was among the
2   first under the new approach, why that particular
3   encampment was chosen?
4       A.   Well, one, it met our criteria, which I -- I
5   cannot go into specifics of all the criteria off the top
6   of my head, but it met criteria, which included -- we
7   had -- we had conducted a site visit, and -- and -- so
8   that's one thing, is it met our criteria for us to -- to
9   be engaged there and make it a -- a priority park for
10  remediation.  Yeah.  Yeah, I think that was the gist of
11  it.
12      Q.   I know you said you can't list all the
13  criteria, but can you tell me generally the areas that
14  you're looking at as part of the criteria, as far as
15  what you're going to do with a particular park?
16      A.   You know, in that instance, at Cal Anderson, is
17  the park -- the encampment had begun to prohibit the use
18  of the park.  I remember going up there, as an example,
19  you know, and the play structure was damaged and
20  compromised, the field -- the turf north of the -- Bobby
21  Moore's field had been completely destroyed.  There had
22  been, as I recall, at least an incident of somebody
23  breaking into or attempting to break into SPU's
24  pumphouse that was on -- that's adjacent to or shares
25  that property.  And as we talked about earlier, that's a

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 210

1    critical asset for the City.

2         So there were -- there were a number of factors

3    that were going on up there at that time.  And I'm

4    really proud of that work.  We got, I think, 62 or 65

5    people inside as a result of that engagement.

6         Q.  So that was -- was that the total -- was that

7    sixty -- were there 62 or 65 people there total, or was

8    there more than that, but you got 62 or 65 into housing

9    from that encampment?

10        A.  As I -- as I recall, on the day of the

11   remove -- on the day of the removal, I would say there

12   probably were less than ten people that did not accept

13   placement into a -- into some form of shelter.

14        Q.  Did the particular location of that encampment,

15   in terms of the neighbor- -- surrounding neighborhood,

16   play a factor in deciding to clear Cal Anderson out as

17   one of the top priorities?

18        A.  No, I don't -- you know, I -- I don't think so.

19   It was -- it was a big encampment.

20        Q.  Did -- did the -- were there any changes in the

21   laws, or was it just a different change -- that led to

22   the approach you've been talking about, or was it just a

23   difference in the City's policy in terms of what it did

24   at Cal Anderson and a couple other places at the end of

25   last year?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 211

1          MR. CRAMER:  Objection.  Form.

2      A.  I'd say it was a couple of things.  One is, as

3  I said at the beginning, we -- we had more shelter

4  capacity that had come on -- that had come online, which

5  had given us the ability to, you know, pair an action

6  with making sure that we were offering people the

7  opportunity to come inside.  And -- you know, and our

8  approach had been evolving in terms of how we were

9  engaging folks in the field, and so that's -- that's --

10  that's a big piece.  And -- yeah, and I -- you know, and

11  again, I think we -- we continued to, you know -- we

12  were continuing to try to balance the extreme need that

13  exists across individuals experiencing homelessness with

14  the amount of shelter that we have available to offer

15  people.

16  BY MR. WEAVER:

17      Q.  Do you -- do you know whether there was a

18  particular document or series of documents created that

19  might indicate the factors that went into choosing Cal

20  Anderson as one of the first areas to be cleared out

21  under this new approach?

22      A.  Yeah, I -- I -- I believe there's a document

23  that lays -- that sort of has a ballpark of how many

24  tents are there, how much time we think it would take

25  for that, and some of the other removals that were

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 212

1   conducted, you know, following Cal Anderson.

2       Q.  Do you have any idea what that doc- -- that

3   sort of document might be called?

4       A.  No.

5       Q.  Do you have -- were the overall costs related

6   to the City response to the encampment in and around Cal

7   Anderson and the east precinct in June 2020, were the

8   City's costs in responding to that tracked in any way

9   that you are aware of?

10      A.  The costs.  I -- I seem to recall there was a

11  press release or a media statement of some kind after

12  that action which discussed how many folks had been

13  referred into -- referred into shelter, how many pounds

14  of debris and trash had been removed, something like

15  that.  I feel like that happened in the beginning of

16  January or so.  But in terms of costs, I'm not sure -- I

17  don't know.  I don't know.

18          MR. CRAMER:  So to clarify, Tyler, was your

19  question about June or --

20          MR. WEAVER:  My question's about June,

21  actually.

22      A.  Oh, I'm sorry.  I thought you said -- I thought

23  you said January.

24  BY MR. WEAVER:

25      Q.  Yeah, I -- I switched up there.  I probably

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 218

1                C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Casey

9    Sixkiller, having been duly sworn, on October 12, 2021,

10   is true and accurate to the best of my knowledge, skill

11   and ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 22nd day of October, 2021.

14

15

16   _____

17       CINDY M. KOCH, CCR, RPR, CRR #2357

18

19   My commission expires:

20   JUNE 9, 2022

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 6

# FW: Edward Sector Calls for Service

**From:**     "Verhoff, Jason" <jason.verhoff@seattle.gov>
**Date:**     Fri, 12 Jun 2020 16:29:43 -0700

Per Assistant Chief Tom Mahaffey:

The map below provides clarity on the boundary established by the group occupying the "Capitol Hill Autonomous Zone" (C.H.A.Z.). My direction for police response within Edward Sector is as follows:

- **Red Zone:** Officers should not respond to calls for service within the red zone, unless the response is to a mass casualty event (e.g. active shooter incident, structural fire likely to endanger human lives etc.). If responding to a mass casualty incident within the red zone, all responding officers should muster with a supervisor outside that zone to evaluate the feasibility of a police response and develop a plan.
  - *For all other calls originating from within the red zone, Communications Section personnel should attempt to coordinate officer contact outside the red zone boundary.*

- **Edward Sector:** I'm requiring a four-officer minimum response to all Edward Sector calls for service outside the red zone.

**Officers should continue to document calls for service that originate from within the red zone, even under circumstances where complainant/victim contact isn't possible.



SEA_00019918

Exhibit 7



Exhibit 8



**City of Seattle**
Mayor Jenny A. Durkan

**Office of the Mayor**
**City of Seattle**
Jenny A. Durkan, Mayor

**Executive Order 2020-08: To provide City departments direction on a coordinated City response with respect to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park.**

*The purpose of this Executive Order is to direct Departments to coordinate the City's response to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park.*

**WHEREAS,** the killing of George Floyd by a police officer in Minneapolis on May 25, 2020, has generated anger and outrage across the United States, resulting in mass demonstrations; and

**WHEREAS,** the City supports the people's right to lawful assembly guaranteed by the Constitution of the United States of America and the Constitution of the State of Washington. Due to the current State of Emergency and the Governor's Stay Home Stay Healthy Order, the City was unable to issue a parade and/or demonstration permits to groups who wished to lawfully assemble to voice their opinions, and plans to escort parades and otherwise assist in the safe and lawful right of speech and assembly; and

**WHEREAS,** the City recognizes that parades and demonstrations which will travel upon public streets and sidewalks, will disrupt and impair pedestrians, motorists and transit, and the City recognizes that some disruption is part of the rights of free speech and lawful assembly which the City will safeguard; and

**WHEREAS**, much of the expression has been peaceful and created community solidarity for Black Lives Matter, including features such as a community garden, public art, and conversation corner; and

**WHEREAS,** to date, City departments have more than reasonably accommodated protestors by offering services and shelter. The City has spent weeks on voluntary efforts to urge people to leave the Cal Anderson Park area given the emerging circumstances and recent shootings; and

SEA_00015070

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 2 of 3
June 30, 2020

**WHEREAS**, in the area around the Seattle Police Department's East Precinct, bounded by Broadway (west) and 13th Ave E. (east) and E Denny Way (north) and E. Pike St. (south) (defined as "Cal Anderson Park Area"), the City has reasonably facilitated on ongoing exercise of First Amendment rights and demonstrations by:

- Providing basic hygiene, water, litter and garbage removal, and electricity;
- Temporarily allowing obstructions of public parks, streets, and sidewalks;
- Modifying SPD and SFD response protocols to meet public safety needs to the extent possible within this area;
- Modifying streets and pedestrian access routes;
- Providing social services outreach and engagement along with referrals for shelter, behavioral health and other supports for individuals in need; and
- Facilitating modified city services delivery to local residents and businesses impacted by the events in this area.

**WHEREAS**, the City's obligations under the First Amendment do not require the City to provide limitless sanctuary to occupy City property, damage City and private property, obstruct the right of way, or foster dangerous conditions; and

**WHEREAS**, after significant national attention, many protestors have left the area but the conditions in the Cal Anderson Park Area have deteriorated to the point where public health, life, and safety are threatened by activities in and around this area, as supported by the following facts:

- On June 20, 2020, the first of three incidents of firearms violent with multiple victims occurred; one individual was shot and killed, and another was shot and seriously injured.
- First responders from the Seattle Fire Department and Seattle Police Department were denied safe access to the area by hostile crowds, including armed individuals, and obstructions.
- On June 22, 2020, a second incident involving firearms violence injured two addition individuals. On June 26, 2020, SDOT employees attempted to remove a limited number of barriers, but unarmed employees were met with hostility and weapons. SDOT could not conduct operations.
- Access by first responders to emergencies have been impeded further. On the morning of June 28, demonstrators moved the concrete barriers to completely restrict access of fire and medics on multiple roads. Demonstrators had previously agreed to open these areas to access for residents, businesses, city services, and fire.
- On June 29, 2020, a juvenile was shot and killed, and another juvenile was seriously injured in the immediate vicinity of this area. Evidence indicates that this murder may have been committed by individual(s) "occupying" the area.
- On June 30, 2020, SDOT removed a limited number of barriers with SPD, but was quickly met with agitated opposition to the removal.
- In addition, SPD has received numerous reports of narcotics use and violent crime, including rape, robbery, assault, and increased gang activity. An increase of 525%, 22 additional incidents, in person-related crime in the area, to include two additional homicides, 6

SEA_00015071

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 3 of 3
June 30, 2020

additional robberies, and 16 additional aggravated assaults (to include 2 additional non-fatal shootings) between June 2nd and June 30th, 2020, compared to the same period of time in 2019.

- Residential and businesses in the area have documented incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic to residences and places of business, and multiple lawsuits and claims have been filed against the City by residents and businesses impacted by the activities in this area.

- Significant damage has been caused by those remaining unlawfully in the area to City property, including Cal Anderson Park and the East Precinct facility. The full extent of damage to the East Precinct remains an open question until city employees are allowed access to the site in order to make that assessment.

- Open fires and vehicles on the reservoir are placing important regional water infrastructure located within Cal Anderson at risk.

- An alarming recent rise in COVID-19 numbers across the region, coupled with a lack of social distancing in this area, and the daily attraction to this area of outside individuals place the neighborhood at opening businesses at increased risk for outbreaks.

- A pervasive presence of firearms and other weapons has been well-documented.

- Ongoing violations of the Seattle Parks and Recreation's Code of Conduct have been observed, including camping and parking in the park, conduct that unreasonably deprives others of the use of parks, disrupting Seattle Parks and Recreation business, dumping trash and/or creating unsanitary conditions or health hazards that violate public health rules; behaviors that impede restroom use; urinating or defecating, except in designated restroom fixtures, blocking entrances, exits, fire exits, disabled access areas, public walkways; conduct that creates an unreasonable and substantial risk of harm to any person or property; and abusive and harassing behavior; and

WHEREAS, significant property damage has been attempted on the East Precinct, to include arson, and the extent of damage has not been fully assessed due to lack of access to the building; and

WHEREAS, SPD has observed and is aware of credible threats against other City infrastructure, to include the West Precinct, which houses city-wide 911 communications services; and

WHEREAS, the City, recognizing the pivotal momentum and opportunities for social justice and public safety reforms that events following the murder of George Floyd has generated, has attempted in good faith to engage protestors in productive dialogue; and

WHEREAS, the City remains committed to re-imagining policing and making significant investments into the community and continuing outreach, engagement, and opportunity for community input in re-examining the role of police and the reform of social services; and

WHEREAS, since 12:00 pm on June 30, Cal Anderson Park has been closed pursuant to an emergency rule closing the park to address life safety and property issues; and

SEA_00015072

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 4 of 3
June 30, 2020

**WHEREAS**, while thousands of peaceful people have travelled to the area, police and city employees have encountered hostile and armed individuals in this area who have indicated by their actions and words their intent to resist government intervention with physical violence that have caused concern for the safety of the legal residents and city employee safety if current circumstances persist; and

**WHEREAS**, based on the known ongoing criminal activity in and around the Cal Anderson Park Area, it is anticipated that there will be exigent circumstances that require immediate action by SPD to protect and preserve public safety and welfare.

**NOW, THEREFORE**, I, Jenny A. Durkan, Mayor of Seattle, hereby directs all City departments to work in coordination to respond to the observed and reported exigent life safety, public health, and property issues in and around Cal Anderson Park Area, which is defined as the areas bounded by Broadway (west) and 13th Ave E. (east) and E Denny Way (north) and E. Pike St. (south).

1.  Effective at 12:00 pm noon on June 30, 2020, Cal Anderson Park was closed. At 2:00 am on July 1, 2020, the entirety of the Cal Anderson Park Area shall be closed to the public to restore public safety, open roadways, remove obstructions to roadways and public rights of way, and to accomplish full closure and restoration/cleaning of Cal Anderson Park. All departments shall coordinate as follows to accomplish this work.

2.  All persons who are unlawfully occupying Cal Anderson Park area who are in public rights of way or the park shall be directed to leave the closed area immediately.

3.  The Seattle Police Department shall enforce this closure and provide dispersal orders for anyone refusing to vacate the area immediately. Persons who refuse or intentionally fail to obey this closure order to move and disperse from the area will be subject to arrest.

4.  Any use of force shall be consistent with SPD policy and the terms of the Preliminary Injunction issued in *Black Lives Matter v. City of Seattle*, No. 20-CV-887.

5.  In coordination with Seattle Parks and Recreation and the Human Services Department, as necessary SPD officers shall in their discretion remove or arrest individuals who are trespassing in the Cal Anderson Park Area in violation of the parks closure and who refuse to leave, including exigent arrests of individuals who may be occupying a tent or other obstruction or created structure in a public right of way, or in the Cal Anderson Park Area.

6.  All reasonable efforts will be made by the city departments to assist individuals in accessing necessary services, shelter, or transportation and in packing and/or storing any personal property, including tents.  The City shall take reasonable steps to separate personal property from material that is not personal property, provided the segregation does not pose a danger to the individual segregating the personal property from the other material.

7.  Due to the safety risks and ongoing threats to City buildings, SPD is authorized to maintain a reasonable security buffer around the East Precinct and control entry into those areas in order to limit any obstructions to access.

SEA_00015073

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 5 of 3
June 30, 2020

8.  SDOT is directed to remove all barriers and obstructions that impede foot traffic or vehicular traffic in the Cal Anderson Park area, and to maintain open sidewalks and streets going forward.

9.  Seattle Park and Recreation is directed to begin cleaning, remediation and restoration of Cal Anderson Park.

10. Seattle Public Utilities is directed to inspect and secure all water facilities, and to end any temporary utility service modifications to the area;

11. Seattle Public Utilities, together with Finance and Administrative Services, Office of Economic Development and other Departments as needed shall work with the community to ameliorate all graffiti and property damage;

12. City Light shall be called to inspect any power issues identified during the operation;

13. Department of Human Services is directed to continue providing social services outreach and engagement along with referrals for shelter, behavioral health, and other supports for individuals in need;

**14.** Seattle Parks and Recreation shall engage the community, businesses, residents and protest leaders to develop a parks plan to preserve the public art, create a community garden and other possible features like a conversation corner.

15. This Order shall be limited to ten days or until further notice, whichever comes first.

16. Inquiries regarding this Executive Order should be directed to Senior Deputy Mayor Mike Fong, Office of the Mayor.

Dated this 30th day of June, 2020.

*Jenny A. Durkan*

Jenny A. Durkan
Mayor of Seattle

SEA_00015074