THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

HUNTERS CAPITAL, LLC, a Washington limited liability company, HUNTERS PROPERTY HOLDINGS, LLC, a Washington limited liability company; GREENUS BUILDING, INC., a Washington corporation; NORTHWEST LIQUOR AND WINE LLC, a Washington limited liability company, SRJ ENTERPRISES, d/b/a CAR TENDER, a Washington corporation, THE RICHMARK COMPANY d/b/a RICHMARK LABEL, a Washington company, ONYX HOMEOWNERS ASSOCIATION, a Washington registered homeowners association, MATTHEW PLOSZAJ, an individual, WADE BILLER, an individual, MADRONA REAL ESTATE SERVICES LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS IV LLC, a Washington limited liability company, MADRONA REAL ESTATE INVESTORS VI LLC, a Washington limited liability company, 12TH AND PIKE ASSOCIATES LLC, a Washington limited liability company, REDSIDE PARTNERS LLC, a Washington limited liability company, OLIVE ST APARTMENTS LLC, a Washington limited

Case No. 2:20-cv-00983-TSZ

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**NOTE ON MOTION CALENDAR:
February 18, 2022**

**ORAL ARGUMENT REQUESTED**

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ)

liability corporation, BERGMAN'S LOCK
AND KEY SERVICES LLC, a Washington
limited liability company, on behalf of
themselves and others similarly situated,
SHUFFLE LLC d/b/a CURE COCKTAIL, a
Washington limited liability company, and
SWAY AND CAKE LLC, a Washington
limited liability company,

     Plaintiffs,

  vs.

CITY OF SEATTLE,

     Defendant.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ)

# TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................1

II.   FACTS ................................................................................................................1

      A.    The Creation of CHOP.............................................................................2

      B.    The City's Active Encouragement and Support of CHOP .......................2

            1.    The City had full and immediate knowledge of the problems.................2

            2.    The City nonetheless physically aided the occupation of the
                  Class Area. ..........................................................................................3

                  a.    "Providing basic hygiene, water, litter and garbage
                        removal, and electricity."................................................4

                  b.    "Temporarily allowing obstructions of public parks,
                        streets, and sidewalks" and "modifying streets and
                        pedestrian access routes."..............................................4

                  c.    "Modifying SFD and SPD protocols to meet public
                        safety needs to the extent possible." .............................6

                  d.    "Providing social services outreach and engagement…"............7

                  e.    "Facilitating modified city services delivery …" .........................7

                  f.    Other facilitation and support of the occupation........................8

            3.    The City also provided verbal and philosophical encouragement
                  to CHOP..............................................................................................8

            4.    The City's Actions Foreseeably Caused Harm. ........................................9

                  a.    Examples of harm experienced in the Class Area. ......................9

                        i.    Blocked vehicular and pedestrian access. .........................9

                        ii.   Increased crime, violence, vandalism, and noise.............9

                        iii.  Property damages and lost revenues ..............................10

                  b.    The impact of CHOP and the City's actions was not only
                        foreseeable, the City actually foresaw it. ...................................11

III.  ARGUMENT ....................................................................................................13

      A.    Plaintiffs Ask the Court to Certify the Class and Three Subclasses. .................13

      B.    The Court Should Certify the Class and Subclasses Pursuant to Rule
            23(c)(4). ................................................................................................14

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - i

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

1.     Courts certify classes pursuant to Rule 23(c)(4) for specific issues if Rule 23(a) is satisfied, common issues predominate over individual ones as to those issues, and certification will materially advance the litigation............................................................15

2.     The proposed Class and Subclasses satisfy Rule 23(a). .........................17

    a.    The Class and Subclasses are sufficiently numerous.................17

    b.    There are numerous issues common to the Class and each Subclass. ...........................................................................17

    c.    Named Plaintiffs are typical of the Class and each Subclass....................................................................................21

    d.    Named Plaintiffs and their counsel are adequate. .......................22

3.     Common Issues Predominate for the Issues to Be Certified.................23

4.     Certification Is Superior to Individual Actions......................................23

IV.    CONCLUSION............................................................................................27

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

1

## TABLE OF AUTHORITIES

2

CASES

3

*Bailey v. Forks,*
    108 Wn.2d 262 (1987) ............................................................................ 20

4

*Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796 (7th Cir. 2013) ........................................................... 15, 25

5

*Cedar Point Nursery v. Hassid,*
6
    141 S. Ct. 2063, 594 U.S. __, 210 L. Ed. 2d 369 (2021) ...................... 19

7

*Comcast Corp. v. Behrend,*
    569 U.S. 27, 133 S. Ct. 1426 (2013) ....................................................... 15

8

*Doe v. BHC Fairfax Hosp., Inc.,*
    2020 WL 4584228, *7 (W.D. Wash., Aug. 10, 2020) .......................... 15

9

*Dunakin v. Quigley,*
10
    99 F. Supp. 3d 1297 (W.D. Wash. 2015) ............................................... 17

11

*Gunnells v. Healthplan Servs., Inc.,*
    348 F.3d 417 (4th Cir. 2003) .................................................................. 23

12

*Hickey v. City of Seattle,*
    236 F.R.D. 659 (W.D. Wash. 2006) ....................................................... 16

13

*In re Chevron U.S.A., Inc.,*
14
    109 F.3d 1016 (5th Cir. 1997) ................................................................ 24

15

*In re Copley Pharm., Inc.,*
    158 F.R.D. 485 (D. Wyo. 1994) ............................................................. 16

16

*In re Deepwater Horizon,*
    739 F.3d 790 (5th Cir. 2014) .................................................................. 16

17

*In re Motor Fuel Temperature Sales Pracs. Litig.,*
    292 F.R.D. 652 (D. Kan. 2013) ......................................................... 15, 23
18

19

*In re Nassau Cty. Strip Search Cases,*
    461 F.3d 219 (2nd Cir. 2006) .................................................................. 23

20

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2015) .................................................................. 22

21

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,*
    722 F.3d 838 (6th Cir. 2013) ........................................................... 15, 25

22

*Keiffer v. King County,*
23
    89 Wn.2d 369 (1977) .............................................................................. 19

24

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ................................................................ 25

*Lilly v. Jamba Juice Co.*,
    308 F.R.D. 231 (N.D. Cal. 2014) ........................................................... 16

*Martinez v. City of Clovis*,
    943 F.3d 1260 (9th Cir. 2011) ............................................................... 18

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) ................................................................. 17

*Musse v. King County*,
    2021 WL 4709875, *2-*5 (W.D. Wash., October 8, 2021) ..................... 21

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................. 22

*Petersen v. Costco Wholesale Co.*,
    312 F.R.D. 565 (C.D. Cal. 2016) ........................................................... 15

*Portman v. County of Santa Clara*,
    995 F.2d 898 (9th Cir. 1993) ................................................................. 19

*Ravenscroft v. Washington Water Power Co.*,
    136 Wn.2d 911 (1998) ........................................................................... 20

*Ruiz Torres v. Mercer Canyons, Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ............................................................... 22

*Stickles v. Atria Senior Living*,
    2021 WL 6117702, *2-*4, *7 (N.D. Cal., Dec. 27, 2021).............. 15, 16, 23

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ........................................................... 15, 23

*Wilbert v. Metro. Park Dist. of Tacoma*,
    90 Wn. App. 304, 950 P.2d 522 (1998) ................................................. 20

**RULES, STATUTES, OTHER**

7B Wright & Miller, *Federal Practice and Procedure* § 1790 ........................ 14

FRCP 23 ................................................................................................. 1, 25

FRCP 37(e) ................................................................................................. 21

Rule 23(a) ...................................................................................... 14, 15, 17

Rule 23(a)(4) .............................................................................................. 22

Rule 23(b)(3) ........................................................................................ 22, 26

Rule 23(c)(4) ..................................................................................... *passim*

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - iv

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

WPI 380.01 Nuisance in General—Definition ........................................................................... 21

WPI 380.01.01 Nuisance—Example of Modified Definition—Interference With Use
        of Street or Highway .................................................................................................. 21

WPI 380.03 Nuisance—Balancing Test .................................................................................. 21

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - v

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

1

## I.      INTRODUCTION

2         From the night of June 8, 2020, to the early morning hours of July 1, 2020, the City of

3    Seattle allowed, aided, encouraged, and supported the hostile takeover of an entire neighborhood

4    in Capitol Hill by a loosely organized group of protesters and others that became known as the

5    Capitol Hill Occupying Protest ("CHOP"). Because of the City's assistance, the occupiers

6    overran a public park, blocked off and impeded access on public streets and sidewalks, caused

     crime and violence in the area to skyrocket, and vandalized and terrorized the entire area.

7         The City's support and encouragement of this behavior injured thousands of property

8    owners, businesses, and legal residents who called Capitol Hill home, and as a result, all of them

9    have claims against the City that are based on the same legal theories, and the same striking

10   evidence about what the City did to place them in harm's way. In this motion, Plaintiffs ask the

11   Court to certify a Class, and three subclasses, to allow all these victims to have their day in court

     on the common factual and legal issues that will be decided in this case.

12        Plaintiffs seek certification of the legal and factual issues bearing on liability that are

13   common to all members of the Class and Subclasses[1] pursuant to FRCP 23(c)(4), which

14   specifically provides for such certification when it will promote judicial efficiency. In this case,

15   issue certification is the most efficient means for managing and resolving this litigation, because

16   the core of every one of Plaintiffs' claims turns on what the City did (or did not do), without

17   reference to anything specific to any class member. Certification is possibly the only realistic

18   way for all harmed by the City's unjustifiable behavior to realistically recover. For that reason,

19   and because Plaintiffs have carried their burden as to all elements for certification under FRCP

     23, the Court should certify the requested Class and Subclasses.

20                                            ## II.      FACTS

21        In order to understand why certification is appropriate in this case, it is important to

22   understand what the City did and how that affected the Class members.

23

24   ---
     [1] As defined in § III.A., *infra*.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 1

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

1

2

## A.     The Creation of CHOP

On the afternoon of June 8, 2020, the Seattle Police Department ("SPD") evacuated guns, ammunition, evidence, and personnel from the East Precinct on the corner of Twelfth Avenue and E. Pine Street. *See* Declaration of Tyler Weaver in Support of Plaintiffs' Motion for Class Certification ("Weaver Decl.")[2], Ex. 4, 38:9-40:9 (Sixkiller Dep.). This evacuation occurred after several contentious and violent confrontations with protesters over the series of several days, *id.*, 49:19-54:6, and the SPD left behind dozens of barriers in the streets that had been used to protect the Precinct and create a line of defense against protesters. Ex. 5, 12:23-13:20 (Zimbabwe Dep.).

Within hours, protesters took command of those barriers, repurposed them to block streets and sidewalks, and then manned them with guards who monitored ingress and egress in the area. *Id.*, 15:13-17:22, 27:9-:17. They declared the area to be their sovereign property, and the area eventually became known as the Capitol Hill Occupying Protest, or CHOP. Ex. 6, 33:12-35:1 (Best Dep.). As the City has acknowledged, this had major ramifications for the area bounded by Broadway Avenue, Denny Way, Thirteenth Avenue, and E. Pike Street. Ex. 7, p. 2. This area is referred to in this brief as the "**Class Area**," and what happened there in the month of June 2020 is summarized below.

## B.     The City's Active Encouragement and Support of CHOP

### 1.     The City had full and immediate knowledge of the problems.

The City knew immediately, and at the highest levels, exactly what was happening in the Class Area, and City executives were on the scene daily and reporting back about what they observed. Starting on the morning of June 9, 2020, Fire Chief Harold Scoggins, Transportation Director Sam Zimbabwe and Seattle Public Utilities CEO Mami Hara were in the area every day observing what was going on, listening to Class members, and working with the occupiers. Ex. 8, 137:19-139:21 (Scoggins Dep.); Ex. 9, 94:6-97:18 (Hara Dep.); Ex. 5, 33:12-34:21, 58:17-60:9, 213:4-215:3 (Zimbabwe Dep.). They shared their observations with the mayor and her deputy

---

[2] All "Ex." references throughout this brief are to exhibits to the Weaver Decl.

mayors. Ex. 8, 141:2-142:5 (Scoggins Dep.); Ex. 9, 98:21-99:24 (Hara Dep.); Ex. 5, 84:4-87:19 (Zimbabwe Dep.); Ex.10, 92:22-95:2 (Durkan Dep.).

The Mayor herself also visited the area to observe for herself, on three official occasions, and a "couple of times" on a bicycle. Ex. 10, 78:22-80:23 (Durkan Dep.). Among the things she heard and observed during her visits were that residents and businesses were having trouble accessing their properties, that there had been disruptions to garbage service, that CHOP was making it more difficult for businesses to recover from the pandemic, that there were barriers in the streets, that there was a significant amount of graffiti, that residents and business owners felt unsafe, that people were concerned that if they spoke out they would become targets of retribution, and that police were not responding to the area. Ex. 10, 83:17-92:12 (Durkan Dep.); Ex. 9, 99:21-115:11 (Hara Dep.). *See also* § II.B.4, *infra*, describing harm suffered.

## 2.   The City nonetheless physically aided the occupation of the Class Area.

There is no dispute that, despite being armed with real-time knowledge of what was happening on the ground, the City "more than reasonably accommodated protesters." Ex. 7, p. 1. The plan from the start was to accommodate that occupation; a meeting of City executives early on June 10 concluded the City's "overall objective[]" was "[c]ontinuing the existing footprint of peaceful demonstration and rights." Ex. 11, p. 2.

To that end, the City "reasonably facilitated [an] ongoing exercise of First Amendment rights and demonstrations" in the Class Area in June 2020 by:

- Providing basic hygiene, water, litter and garbage removal, and electricity;
- Temporarily allowing obstructions of public parks, streets, and sidewalks;
- Modifying SPD and SFD response protocols to meet public safety needs to the extent possible within this area;
- Modifying streets and pedestrian access routes;
- Providing social services outreach and engagement along with referrals for shelter, behavioral health and other supports for individuals in need; and
- Facilitating modified city services delivery to local residents and businesses impacted by the events in this area.

Ex. 7, p. 2. Details as to each of these bullet points are discussed below, in sections which cross-reference each bullet point.

### a.    "Providing basic hygiene, water, litter and garbage removal, and electricity."

The City did not just allow protesters to occupy the area; it actively made their stay as comfortable as possible. The City provided 21 portable toilets throughout the neighborhood, through outside contractors and at the City's expense, and made sure they were emptied daily. Ex. 9, 70:7-75:17 (Hara Dep.); Ex. 12. The City also provided the occupiers with several wash stations, including a 50-gallon station. Ex. 9, 63:25-64:19 (Hara Dep.). The City even provided the occupiers with dumpsters and garbage service, *id.*, 27:4-:22, 29:23-30:24, and allowed protesters to use a hose bibb at Cal Anderson Park for an illegal garden and as a source of drinking water. *Id.*, 63:18-65:18. The City kept lights on beyond normal hours to provide additional safety for people camping in the park, *id.*, 67:4-68:1, and allowed occupiers to access power panels for charging cellphones and other uses. Ex. 4, 173:41-174:10 (Sixkiller Dep.).

### b.    "Temporarily allowing obstructions of public parks, streets, and sidewalks" and "modifying streets and pedestrian access routes."

During CHOP, the City both tolerated and actively participated in the creation of obstacles in Cal Anderson Park, and in the streets and sidewalks of the Class Area. This greatly affected Class members' ability to access their properties, businesses, and homes.

It was clear from the very beginning of the occupation that there was a major, long-term encampment being installed at Cal Anderson Park. Notes from a meeting of City executives on the morning of June 10 noted that "there are concerns about the level of permanent activity at the park. There are at least 27 tents on site and a group was digging a community garden." Ex. 13, p. 2. The City was concerned that "planting a garden could indicate that people were planning to be there for a substantial amount of time," and there was also discussion that providing toilets, water, and electricity could encourage the occupation to take root. Ex. 5, 163:11-166:13 (Zimbabwe Dep.); Ex. 4, 145:17-147:2, 173:4-174:10 (Sixkiller Dep.). But the City proceeded to provide those services anyway, and the number of tents in the park ballooned to perhaps 200 at one point. Ex. 4, 188:5-189:8 (Sixkiller Dep.). This initial tent occupation continued until July 1. Ex. 5, 32:2-:7 (Zimbabwe Dep.); Ex. 4, 196:6-198:9 (Sixkiller Dep.).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 4

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

But the park was not the only blockage the City allowed and assisted. The City was aware of the declared autonomous zone at the break of dawn on June 9 (Ex. 5, 12:23-13:20, 15:13-17:22, 27:9-:17 (Zimbabwe Dep.)), but allowed the blockages to remain in place, contrary to normal policy. *Id.,* 19:21-20:20. While it did remove some of the temporary barriers, that removal was limited to only certain barriers, and the City did so only after communicating with occupiers about what they were going to do. *Id.*, 29:2-31:15.[3]

Even as it removed some barriers, however, the City actively worked with the occupiers to replace them with larger, heavier concrete barriers on a slightly different layout. Mr. Scoggins, Mr. Zimbabwe, and Ms. Hara worked as a team of negotiators "to develop … what we felt was a traffic control plan … [that would] sort of regularize[] a protest area that might stay closed to normal street operations" "for sort of an indeterminate period of time." *Id.*, 33:12-34:21. To that end, on June 16 and 17, the City moved 50 to 100 "ecology" blocks, weighing several hundred pounds each, into the public streets to mark off territory for the occupation and also installed a new stop sign. *Id.,* 15:3-:12, 35:6-37:7. The City also placed signage indicating that the streets were closed and "local access only," in order "to communicate to people … that … if they didn't need to come in that way, … they probably shouldn't." *Id.*, 37:11-39:9. The City even went so far as to install temporary speed bumps to slow traffic and told online map services to indicate the streets were closed and direct drivers elsewhere. *Id.*, 40:14-41:21, 90:10-93:1.

The City also did not move vehicles from the streets when protesters used them to fortify the barriers, allowed tents and makeshift tent vendors to set up shop on public sidewalks, tolerated nearly nightly movements by protesters to move barriers outside of agreed-upon areas, and accepted that protesters and others would regularly congregate in the streets that were supposedly open. *Id.*, 26:20-27:2, 29:15-:21, 39:3-40:12, 44:8-49:20, 120:20-121:14, 211:1-213:3; Ex. 14 (Zimbabwe: "SDOT worked to install barriers to create a protest zone while allowing for street traffic, but there has been continual blocking of access by protesters.").

---

[3] And even these minor removals were largely abandoned because of "substantial resistance" from the occupiers. Ex. 5, 32:8-33:11 (Zimbabwe Dep.).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 5

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

c.   **"Modifying SFD and SPD protocols to meet public safety needs to the extent possible."**

The City also drastically modified its police and fire response to the Class Area so as to avoid any possible confrontation with occupiers, to the point that it did not respond or significantly muted its response to almost all crimes. The SPD declared much of the Class Area to be a "Red Zone" that it would not enter except in the event of a "mass casualty event (e.g. active shooter, structural fire likely to endanger human lives etc.)." Ex. 15, p. 2. Thus, except in "mass casualty" incidents, officers did not respond or required victims to leave the Class Area to provide a report. *Id. See also, e.g.,* Ex. 16, 84:3-91:3 (Ploszaj Dep.); Ex. 17, 36:3-:12, 39:5-40:2 (Wanagel Dep.). This remained the policy until July 1. *E.g.,* Ex. 18, pp. 4, 15.

The SPD also modified its response outside the Red Zone. *All* calls in the Class Area required a minimum of 4 officers to respond, Ex. 15, p. 2, and even then police still did not respond to incidents outside the Red Zone if there was any chance it would require interaction with the occupiers. *E.g.,* Ex. 19, p. 2 ("Car Tender is the … location in which we were unable to respond for a call for service … due to its proximity to the Red Zone … coupled with an ongoing disturbance at the location that include[d] armed participants.").

Further, even when officers did respond to mass-casualty incidents in the Red Zone, they would not immediately enter the area, instead massing in an area outside the Class Area to determine what the response should even be. Ex. 18, p. 4 (policy); Ex. 20, p. 3 (SPD staging location a block west of Broadway).

The Seattle Fire Department ("SFD") had a similar policy and considered the entire Class Area either a "hot/red" or "warm/yellow" zone, where there would be no or significantly modified responses. Ex. 20, p. 3; Ex. 8, 36:5-38:24 (Scoggins Dep.) (full area contiguous with Class Area).[4] Within the "red" portion of the SFD zone, the SFD would not enter the Zone at all without a police escort. Ex. 8, 46:24-47:14 (Scoggins Dep.). And in the "yellow" area, the SFD

---

[4] While the parameters of the SFD's red zone expanded significantly over the month of June 2020 as the situation worsened, the overall boundaries of the area where the SFD modified its response remained the same as the Class Area throughout: the area bounded by Broadway, E. Pike Street, 13th, and Denny. Ex. 8, 48:9-49:13, 57:24-59:12 (Scoggins Dep.). *See also* Ex. 20, p. 3.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 6

required any team entering the area to include a battalion chief, of which there were only six on duty for the entire City. *Id.*, 43:8-:18, 45:2-46:12. Even then, the SFD still did not enter the yellow zone, even with a battalion chief, if there was spillover from the red area that made it unsafe. *Id.,* 69:3-70:3. What this meant in practical terms was that in June 2020, people who lived a block from the Capitol Hill fire station and called 9-1-1 with a stroke or heart attack were told they had to get out of the zone themselves before they could get treatment. *Id.,* 63:1-66:19, 78:9-81:4; Ex. 21; Ex. 22.

And even in cases where there was an event that police and fire would respond under the revised protocols, they were often unable to do so because they "were denied safe access to the area by hostile crowds, including armed individuals and obstructions." Ex. 7, p. 2.

### d.  "Providing social services outreach and engagement..."

When the City finally decided enough was enough and decided it needed to take action to end the occupation, it did not simply clear out the area. Instead, the City spent several days working with the individuals who had taken over the neighborhood by providing them with social services and alternative housing arrangements. Ex. 9, 77:12-78:12 (Hara Dep.).

### e.  "Facilitating modified city services delivery ..."

The City also significantly cut back on regular services such as garbage and electric services in order to avoid disrupting the occupiers. The modifications to garbage services started almost immediately on June 8 or 9 when the City removed most customers' dumpsters indefinitely out of a fear that the dumpsters would be set on fire or used as barriers. Ex. 9, 22:9-24:11 (Hara Dep.). For at least some customers, they were without their dumpsters until July 1, and had to use one of a few dumpsters that the City had set in the area for everyone (including the occupiers) to use or put their garbage in a designated area where garbage bags would be piled. *Id.*, 24:20-27:22. Even then, there were some days where the City did not empty those dumpsters, or clear the bag piles, or perform standard electrical work because the City determined it was unsafe or would be "disruptive to [meetings] to have a trash truck rolling through." *Id.*, 16:24-17:24, 27:23-28:20, 137:16-140:22; Ex. 23. When trucks did enter the area,

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 7

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

Ms. Hara had to negotiate that entry – or, in her words, "concierge" entry – by working with the occupiers. Ex. 9, 38:2-43:6 (Hara Dep.).

### f. Other facilitation and support of the occupation

There were additional ways in which the City facilitated and supported the occupation in addition to those listed in City's emergency order. These included (a) provision of stretchers, people movers, and fire extinguishers by the fire department to the occupiers and their volunteer medical tent, Ex. 8, 9:6-18:20 (Scoggins Dep.); (b) providing transportation to and storage at City facilities for art that occupiers had created during the occupation, Ex. 5, 50:17-52:21 (Zimbabwe Dep.); and (c) allowing occupiers to use City greenhouses to store their plants, Ex. 4, 184:18-185:17 (Sixkiller Dep.).

### 3. The City also provided verbal and philosophical encouragement to CHOP.

In addition to the direct support the City provided, the City also gave the occupiers verbal and rhetorical support, which conveyed to occupiers that the City did not believe the occupation was harmful, and that they had no immediate plans to end it. Foremost in this support was then-Mayor Jenny Durkan. During the first few days of the occupation, she repeatedly compared the occupation to a "block party"[5] and when asked on national news on June 12 about when the occupation might end, she famously replied, "I don't know, we could have a Summer of Love."[6] Mayor Durkan's official Twitter account portrayed the situation as a "peaceful expression of … collective grief"[7] featuring "food trucks, spaghetti potlucks, teach-ins, and movies,"[8] and showed her visit to and support of the illegal garden that had been dug into the Cal Anderson Park turf.[9]

Meanwhile, at the same time, Mayor Durkan was looking to gift property to Black Lives Matter ("BLM") for its headquarters. The City's initial plan was to gift the East Precinct itself to

---

[5] https://www.youtube.com/watch?v=6YHN4fN0cgA, at 21:00 (most recently visited 1/7/2022); https://www.youtube.com/watch?v=JXjvrkmXd4s, at 3:24 (most recently visited 1/7/2022).
[6] https://www.youtube.com/watch?v=JXjvrkmXd4s, at 9:42 (most recently visited 1/7/2022).
[7] https://twitter.com/mayorjenny/status/1271226494858129409?lang=en (most recently visited 1/7/2022).
[8] https://twitter.com/mayorjenny/status/1271226613170966529 (most recently visited 1/7/2022).
[9] https://twitter.com/mayorjenny/status/1271653002982469632?lang=en (most recently visited 1/7/2022).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 8

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

BLM, Ex. 4, 30:1-36:6 (Sixkiller Dep.), Ex. 24, but after BLM rejected that space, the City explored – at the mayor's suggestion – various other options. This included assuming the lease of a shared-workspace business in which Mayor Durkan had been an investor, and then giving the space to BLM. Ex. 10, 123:24-129:2 (Durkan Dep.); Ex. 25.

### 4.     The City's Actions Foreseeably Caused Harm.

There is no real dispute that CHOP harmed residents, property owners, and businesses in the Class Area. And as discussed below, that harm was serious and ongoing, and it was not only foreseeable, but actually foreseen by the City.

#### a.     Examples of harm experienced in the Class Area.

##### i.     Blocked vehicular and pedestrian access.

From the very beginning of the occupation, streets and sidewalks were completely or partially obstructed by repurposed City barriers, improvised barriers, vehicles, people, and general debris. Ex. 8, 167:8-168:8 (Scoggins Dep.); Ex. 5, 64:5-:22 (Zimbabwe Dep.). This situation was fluid, and barriers were fortified and moved regularly to block off more streets and other areas, especially during the nighttime hours. Ex. 8, 48:15-49:5; 190:23-191:19, 195:18-196:13 (Scoggins Dep.); Ex. 5, 211:1-213:3 (Zimbabwe Dep.). That remained the case even after the City attempted to create partial, "local access" routes; streets that had been opened one day would be blocked the next, in a continuous cycle until the streets were finally emptied on July 1. *Id.* This meant that property owners, residents, and businesses could not easily (and often, not safely) access their properties, and that customers and suppliers often could not or would not enter the area. *E.g.,* Ex. 16, 80:3-:6, 139:19-145:15 (Ploszaj Dep.); Ex. 26, 51:1-54:17 (Biller Dep.); Ex. 17, 87:1-88:22, 91:13-100:5 (Wanagel Dep.); Ex. 27, 46:2-50:14 (Donner Dep.).

##### ii.     Increased crime, violence, vandalism, and noise

The City noted in its July 1 emergency order that among the reasons it needed to end CHOP was that there was "a pervasive presence of firearms and other weapons" and "an increase of 525% … in person-related crime in the area, to include two additional homicides, 6 additional robberies, an 16 additional aggravated assaults … between June 2nd and June 30th, 2020,

compared to the same period of time in 2019." Ex. 7, pp. 2-3. And that, of course, was only what was officially reported despite the lack of police response. As the SPD explained, "[t]he CHOP has become a center of lawlessness for our gang members. They all want to go and check it out. They want to see what it is like to be in an area without any police. A number of them are bringing guns with them." Ex. 28, p. 2.

And the increased crime was not limited to "person-related" crime. Graffiti was everywhere – "on the streets, sidewalks, some of the building faces – a lot." Ex. 5, 225:23-226:6 (Zimbabwe Dep.). In Cal Anderson, there were "ongoing violations," "including camping and parking in the park, dumping trash and/or creating unsanitary conditions or health hazards …; urinating or defecating …, blocking entrances, exits, fire exits …; and abusive and harassing behavior." Ex. 7, p. 3.

There was also constant noise, during the day, and especially during the nighttime hours. *Id.*, p. 3 (documentation of "noise disturbances"); Ex. 26, 59:19-60:2 (Biller Dep.). The City received voluminous complaints from Class members about this problem. *E.g.*, Ex. 29 ("Noise - all the time, but particularly late at night keeping residents awake until 4am"); Ex. 30 ("We have been kept up multiple nights by the sound of loud music from CHAZ being played until 3 or 4am … the (literally) constant thumping of bass music is nothing short of torture."); Ex. 31 ("almost a month of being tortured by lack of sleep from constant noise in the park").

Police Chief Carmen Best summed up the situation on the morning of July 1:

> If you have watched the news footage, you have seen how absolutely devastating the damage to this neighborhood is. I can tell you personally, after walking through the area, we walked the full perimeter, I was just stunned by the amount of graffiti, garbage, and property destruction. … So we don't even know how much trauma people were experiencing ….[10]

### iii.      Property damages and lost revenues

The harm caused by the occupation predictably included out-of-pocket costs and lost revenues and rents for business and property owners, as well as lost income for at least some

---

[10] https://www.youtube.com/watch?v=OhtihUGR-xo#action=share, at 14:30 (last visited 1/8/2022).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 10

residents. This included, for example, decreased sales resulting from forced closures and/or lost foot and vehicle traffic (*E.g.,* Ex. 32, 74:17-75:1, 93:18-95:25 (Kilburn Dep.); Ex. 33, 134:7-142:8 (Sheffer Dep.); Ex. 34, 35:3-37:9 (Thompson Dep.); Declaration of John McDermott, ¶ 3), decreased productivity and wage loss caused by time spent having to deal with the impacts of the occupation (*E.g.,* Ex. 27, 87:20-89:11, 94:4-95:18, 181:7-182:15 (Donner Dep.)), rental concessions given by property owners to tenants affected by the occupation (*E.g., id.*, Ex. 27, 166:8-167:14 (Donner Dep.); Declaration of Jill Cronauer ("Cronauer Decl."), ¶ 2), lost income under property management contracts due to decreased revenues for commercial tenants (*E.g.,* Ex. 35, 41:25-43:13, 53:5-54:22 (Swanson Dep.); Declaration of Bradford G. Augustine ("Augustine Decl."), ¶ 4), lost income due to an inability to work in one's office (*E.g.,* Ex. 16, 102:12-106:12 (Ploszaj Dep.)), personal injury and suffering for individual residents (*E.g.,* Ex. 26, 133:23-134:21 (Biller Dep.); Ex. 16, 83:25-93:20 (Ploszaj Dep.)), and out-of-pocket costs related to vandalism and additional security (*E.g.,* Ex. 26, 128:5-:16 (Biller Dep.); Ex. 17, 154:1-156:17 (Wanagel Dep.); Augustine Decl., ¶ 4; Cronauer Decl., ¶ 5; Ex. 27, 102:22-104:11 (Donner Dep.)).

And while the City finally acted to clear the Class Area of barriers, tents, and occupiers on the morning of July 1, 2020, for reasons partially described in Plaintiffs' Opposition to Defendant's Motion for Protective Order, Dkt. No. 56, the fallout from the City's actions and the occupation persisted for months afterward, and in some cases may still be having ramifications.

### b. The impact of CHOP and the City's actions was not only foreseeable, the City actually foresaw it.

It was foreseeable that supporting the occupation of the Class Area and aiding that occupation in blocking streets and taking over parks and sidewalks would result in exactly the type of harm that occurred. Indeed, it was so foreseeable that at the time City executives saw exactly what would happen. As Mayor Durkan herself declared a few hours after a teenager was shot to death in the Class Area, in an email to the fire chief and police chief, "as we discussed at

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 11

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

the outset of the Cap Hill issues … there can be no part of the city where SFD and SPD do not respond. What happened this am was foreseeable and avoidable." Ex. 36.

Chief Best confirmed that from the start she "was extremely concerned about people … occupying the neighborhood and claiming it as their sovereign property" because of the foreseeable potential of violence and other problems for residents and businesses in the area. Ex. 6, 115:12-116:17, 196:1-:23 (Best Dep.). Indeed, as early as June 11, Chief Best announced at a press conference that CHOP had "deprive[d] an entire segment of our community of public-safety services" and caused 9-1-1 response times to triple in the East Precinct's service area.[11]

Also on June 11, Chief Scoggins emailed City executives that the protests had "transitioned from a peaceful protest to a different situation that is unstable." Ex. 37. As Chief Scoggins explained at deposition:

> When people are in the area with weapons, not just one person, multiple people, and they're on the access and egress points of a geographical area, and not allowing people in or out, or vehicles in and out … that is an unstable situation.

Ex. 8, 167:25-168:8 (Scoggins Dep.). And as he also stated, it was evident that as the size of the occupation grew, the potential for violence escalated. *Id.*, 212:16-213:11.

It was also foreseeable that the City's actions would exacerbate the dangerous situation by drawing in even more people. Numerous people at the City accurately predicted that actions such as providing portable toilets, hand sanitizer, water, and garbage service, and allowing the digging of a garden would attract occupiers who planned to stay indefinitely. Ex. 6, 116:18-118:9, 125:18-127:8, 129:9-130:23 (Best Dep.); Ex. 5, 164:13-166:113 (Zimbabwe Dep.); Ex. 4, 145:17-147:2, 171:4-:16, 173:4-174:18 (Sixkiller Dep.); Ex. 9, 72:14-73:14 (Hara Dep.).

The harm was foreseeable and foreseen, but even if it had not been, the City saw it happening in real time, from the very beginning, and not only did not stop it, but continued to aid and support the occupation for more than three weeks. §§ II.B.1., B.2, *supra*.

---

[11] https://www.youtube.com/watch?v=_rE4VMjClqI, at 14:22. (Last visited 1/8/2022.)

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### III.    ARGUMENT

Plaintiffs ask the Court to certify a Class and three Subclasses pursuant to Rule 23(c)(4). As explained below, that rule provides for certification of common issues, and such a certification is not only appropriate in this case, it is the most efficient way to manage this litigation. As also explained in detail below, Plaintiffs seek to certify common issues of liability, as well as the issue of nominal damages under their federal claims, with other damages to be determined in a second phase of proceedings.

### A.    Plaintiffs Ask the Court to Certify the Class and Three Subclasses.

Plaintiffs seek to certify one Class, and three Subclasses, in relation to issues common to each of them, as explained below. For ease of reference, Plaintiffs have also created a chart that sets forth the claims and common issues for each of these groups, Ex. 1.

Han Plaintiffs ask that the Court appoint the following Plaintiffs as class representatives: Hunters Capital LLC, Hunters Property Holdings, LLC, SRJ Enterprises d/b/a Car Tender, The Richmark Company d/b/a Richmark Label, Onyx Homeowners Association, Matthew Ploszaj, Wade Biller, Madrona Real Estate Services, LLC, 12th & Pike Associates LLC, Redside Partners LLC, Olive Street Apartments LLC, Bergman's Lock and Key Services LLC, Shuffle LLC d/b/a Cure Cocktail, and Sway & Cake LLC (collectively, "the Named Plaintiffs"). A chart briefly describing each of these Plaintiffs and the Classes they represent is attached for ease of reference as Ex. 3.

Plaintiffs seek to certify a **Class**, defined as follows:

> All persons or entities who on June 9, 2020 (the "Class Date"), owned or managed real property in, had a licensed business in, or had an indoor residence in a building, in the area in the City of Seattle bounded by the following streets: Denny Way, East Pike Street, Thirteenth Avenue, and East Broadway (the "Class Area"). This definition excludes the City of Seattle and any departments or agencies of the City of Seattle.

For the Class, Plaintiffs seek to certify the issues listed in Ex. 1 regarding their substantive due process, negligence, and nuisance claims. All Named Plaintiffs seek to represent the Class.

Plaintiffs also seek to certify the **Property Owners Subclass**, defined as follows:

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

> All persons or entities who owned real property on the Class Date in the Class Area.

For the Property Owners Subclass, Plaintiffs seek to certify the issues listed in Ex. 1 regarding their takings claims and the portion of the procedural due process claim that specifically identifies the Property Owners Subclass. The Named Plaintiffs who seek to represent this subclass are Hunters Property Holdings, LLC, The Richmark Company d/b/a Richmark Label, Wade Biller, 12th & Pike Associates LLC, and Olive Street Apartments LLC.

Plaintiffs also seek to certify a **Business Owners Subclass**, defined as:

> All persons or entities who owned a licensed business, located in the Class Area on the Class Date, but is not a member of the Property Owners Subclass.

For the Business Owners Subclass, Plaintiffs seek to certify the issues listed in Ex. 1 regarding their takings claims and the portion of the procedural due process claims that specifically identifies the Business Owners Subclass. The Named Plaintiffs who seek to represent this subclass are SRJ Enterprises d/b/a Car Tender, Bergman's Lock and Key Services LLC, Shuffle LLC d/b/a Cure Cocktail, and Sway & Cake LLC.

Plaintiffs also seek to certify the **Residents Subclass**, defined as:

> All persons or entities who had an indoor residence in a building on the Class Date in the Class Area but who is not a member of the Property Owners Subclass.

For the Residents Subclass, Plaintiffs seek to certify the issues listed in Ex. 1 regarding their takings claims and the portion of the procedural due process claim that specifically identifies the Residents Subclass. The Named Plaintiff who seeks to represent this subclass is Matthew Ploszaj.

## B.   The Court Should Certify the Class and Subclasses Pursuant to Rule 23(c)(4).

Plaintiffs ask the Court to certify the Class and Subclasses pursuant to Rule 23(c)(4), which allows the Court to certify for class determination common issues that will materially advance the resolution of the case. "[T]he theory of Rule 23(c)(4)(A) is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis may be secured even though other issues in the case may have to be litigated separately by each

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 14

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

class member." 7B Wright & Miller, *Federal Practice and Procedure* § 1790. This case is especially well-suited for such certification.

    **1.**    **Courts certify classes pursuant to Rule 23(c)(4) for specific issues if Rule 23(a) is satisfied, common issues predominate over individual ones as to those issues, and certification will materially advance the litigation.**

Courts regularly certify classes pursuant to FRCP 23(c)(4), which provides that "an action may be … maintained as a class action with respect to particular issues." Under this rule, a court can certify a class with respect to fewer than all issues in a case if (a) the plaintiffs satisfy the requirements of Rule 23(a), (b) common issues predominate over individual issues with respect to the issues to be certified, and (c) the certification is likely to "significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229, 1234 (9th Cir. 1996). *See also Stickles v. Atria Senior Living,* 2021 WL 6117702, *2-*4, *7 (N.D. Cal., Dec. 27, 2021) (certifying single issue under 23(c)(4); analyzing 23(a); "issue certification requires that common questions predominate over individual questions with respect to only the specific issue that is certified"); *Doe v. BHC Fairfax Hosp., Inc.*, 2020 WL 4584228, *7 (W.D. Wash., Aug. 10, 2020) (plaintiffs must satisfy Rule 23(a) to certify class under 23(c)(4)); *Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 574-75 (C.D. Cal. 2016) (issue classes and subclasses must meet requirements of Rule 23(a)); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 292 F.R.D. 652, 674 (D. Kan. 2013) (Under Rule 23(c)(4), "the requirements of Rule 23(a) and (b) must be satisfied only with respect to those issues.").

    This means that even if a particular case is not appropriate for certification on all issues, the Court can advance key issues on a class basis by certifying a subset of issues. *Valentino*, 97 F.3d at 1229. Most commonly, classes are certified under Rule 23(c)(4) where (as here) the certified issues will resolve key questions bearing on liability, with most damages questions to be resolved in later proceedings, if necessary. *E.g., In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir. 2013) (affirming certification of only liability issues; "[o]nce the district court resolves under Ohio law the common liability questions that are

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 15

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

likely to generate common answers in this case, the court will either enter judgment for Whirlpool or proceed to the question of plaintiffs' damages."); *Comcast Corp. v. Behrend*, 569 U.S. 27, 41, n. *, 133 S. Ct. 1426, 1437 (2013) (dissent) ("a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings"); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("a class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established— the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed"); *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (approving of cases "structured to establish liability on a class-wide basis, with separate hearings to determine – if liability is established – the damages of individual class members."); *Stickles v. Atria Senior Living,* 2021 WL 6117702 at *7 (certifying single liability issue with damages to be resolved in later proceedings); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244-45 (N.D. Cal. 2014) (certifying case only for liability issues); *In re Copley Pharm., Inc.*, 158 F.R.D. 485, 491 (D. Wyo. 1994) (even where "significant issues" would "require individual determination," certification is appropriate if "equally significant common issues" can be resolved).

In fact, this is exactly the approach taken by another judge of this Court in a previous class action against the City. In *Hickey v. City of Seattle*, 236 F.R.D. 659, 663-64 (W.D. Wash. 2006), plaintiffs moved to certify a class of individuals arrested *en masse* in a specific geographic area, on a specific date, pursuant to an allegedly unconstitutional City policy. The Court, after noting that all Class members shared the common factual issue of the reason for the mass arrest, and legal questions such as whether "the Seattle police acted pursuant to a policy or that a decision maker ratified the actions of the arresting police officers in order to demonstrate the liability of the municipal government of Seattle," *id.* at 665, certified the class. However, the court (without citing Rule 23(c)(4)) only certified an initial trial on the common issues regarding liability, with damages to be assessed individually later:

1
2

> The liability stage of this case shall proceed first. During the first stage, the Court will also determine if any common facts exist regarding Plaintiffs' arrests. If the case survives, then the Court will address the damages issues as to each individual Plaintiff separately.

3
4

*Id.* at 667. That case proceeded to a common, class-wide trial on liability, where the plaintiffs prevailed on some, but not all, of their claims. The case settled shortly afterwards.[12]

5
6
7
8

Plaintiffs are seeking similar treatment of this current constitutional-rights class action against the City. And as demonstrated below, certification of the liability issues in this case not only clearly meets the requirements of Rule 23, it will meaningfully and efficiently advance the litigation in stages, just as happened in *Hankin*.

9

> **2.      The proposed Class and Subclasses satisfy Rule 23(a).**

Plaintiffs satisfy Rule 23(a) for both the Class and each Subclass.

10

> **a.      The Class and Subclasses are sufficiently numerous.**

11
12
13
14

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impractical." There is no set number of class members required to meet this requirement, but generally speaking, 40 or more members is sufficient to meet this requirement. *E.g., Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326-27 (W.D. Wash. 2015).

15
16

Plaintiffs estimate that the Class has 5,000 members. This includes approximately 4,000 residents, 300 businesses, and more than 600 owners of real estate. Weaver Decl., ¶ 2. Thus, the Class and each of the Subclasses are sufficiently numerous.

17

> **b.      There are numerous issues common to the Class and each Subclass.**

18
19
20
21
22

Pursuant to Rule 23(a)(2), Plaintiffs must demonstrate only that there is one key question that members of a class or subclass have in common that could be determined for all claims for all class or subclass members in "one stroke." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588-89 (9th Cir. 2012). Plaintiffs easily satisfy this standard here, where there are numerous common factual and legal issues that go directly to the heart of each of their claims. Plaintiffs

23
24

---

[12] https://www.reuters.com/article/us-seattle-wto-protestors/battle-of-seattle-protestors-win-case-against-city-idUSN3038792720070131; https://www.seattletimes.com/seattle-news/city-to-pay-1-million-to-settle-lawsuit-over-wto-arrests/.

have identified, in Ex. 1, issues that they seek to certify for each of their claims, and they discuss below how and why the Class and Subclasses have these issues in common.

_Substantive Due Process_. As the Court recognized in its Order denying the City's motion to dismiss, Plaintiffs' claim for violation of their substantive due process rights turns on whether the City affirmatively placed Plaintiffs in danger by acting with deliberate indifference to a known or obvious danger. Dkt. No. 23 at 18, _quoting Martinez v. City of Clovis_, 943 F.3d 1260, 1271 (9th Cir. 2011). This requires Plaintiffs to prevail on three elements: (1) that the City took affirmative actions that created or exposed Plaintiffs to a danger that they would not have otherwise faced, (2) that the injury Plaintiffs suffered was "foreseeable," and (3) that the City was "deliberately indifferent to the known danger." _Id._

The answer to whether Plaintiffs can satisfy these elements will turn on evidence that is common to all of them and to all Class members. For example, either the Court or a jury will conclude that the City did or did not take affirmative action to create or expose Plaintiffs to the dangers of CHOP through the numerous acts the City took with regard to the occupation, and the numerous statements made by the Mayor and the City about that occupation. _See_ §§ II.B.2, B.3, _supra_. Is it enough that the City offered the occupiers larger and stronger barriers, bathroom and garbage service, water, electricity, revised police and fire response, and other concessions in order to "facilitate" the protest? _Id._ The evidence regarding this issue is common to every Plaintiff and Class member and will be resolved in one fell swoop based on that common evidence.

Similarly, the question of whether it was foreseeable that the City's actions would cause the problems that CHOP actually caused will turn on common evidence, including likely expert testimony and facts such as those outlined in §§ II.B.1, B.2, and B.3, _supra_. All this evidence will again turn be common to the Class.

The same, and related, evidence will serve as the basis for determining whether the City acted with "deliberate indifference" to what it knew was happening on the ground, given that it knew what was happening but continued to support the occupation. _Id._. And the issues of

whether the City's actions were pursuant to City policy, and the entitlement of Class members to nominal damages, will also be based on common evidence, and common legal rulings.

*Takings*. Pursuant to the takings claim, all three Subclasses will allege that the City's actions in encouraging, aiding, and allowing CHOP occupiers to occupy their neighborhood constituted a *per se* taking of their property rights. *See, e.g., Cedar Point Nursery v. Hassid*, __ U.S. __, 141 S. Ct. 2063, 2072-76 (2021) (*per se* taking occurred when government required property owners to grant temporary access to their properties). In addition, as this Court recognized, "'the right of access of an abutting property owner to a public right-of-way is a property right which if taken or damaged for a public use requires compensation.'" Dkt. No. 23 at 20, *quoting Keiffer v. King County*, 89 Wn.2d 369, 372 (1977). And the Property Owners Subclass also alleges the City foreseeably aided and encouraged CHOP occupiers to take their property by painting and vandalizing their buildings. Dkt. No. 23 at 30.

The evidence (and legal analysis) relevant to resolution of this claim will again be common to every Named Plaintiff and class member who has a takings claim. What the City did, what the protesters did, the causal connection between the two (or lack thereof), whether the City's actions constitute a *per se* taking, whether there was a City policy, and whether class members are entitled to nominal damages will all be based on common evidence and common legal argument. That commonality even extends to the City's stated defense of a "civil emergency" – all the evidence supporting or refuting that defense will necessarily be common because the City will apparently base its argument on whether given the entire context of its actions, any taking was justified. *Id.* at 22-33.

*Procedural Due Process*. As the Court has recognized, in its Order denying Defendant's motion to dismiss, Plaintiffs' procedural-due-process claim requires that they prove (a) they had an interest protected by the Constitution, (b) the City deprived them of that interest, and (c) a lack of due process. Dkt. No. 23, pp. 14-15, *citing Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). All three Subclasses will assert that they had a constitutional right to unfettered access to their properties, Dkt. No. 23, pp. 15-16, and the Property Owners and

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 19

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

Business Owners Subclasses will assert that they had a constitutional right to economic use of their properties. *Id.*

The existence (or nonexistence) of those rights will be all be based on law common to each member of each Subclass, and the evidence bearing on whether the City deprived them of that interest without due process will turn entirely on what the City did and did not do. Further, the questions of whether the City's actions were pursuant to City policy, and the entitlement of Subclass members to nominal damages, will also be based on common evidence and rulings.

*Negligence*. Plaintiffs' negligence claim also gives rise to numerous common issues between Named Plaintiffs and the Class. Most prominently, all Named Plaintiffs and Class members must demonstrate that that the City owed them a duty under one of the exceptions to Washington's public-duty doctrine. In particular, there are common questions as to whether (a) the City was required to act by law, and knowingly failed to do with regard to a group of individuals the law was intended to protect (the "failure to enforce" exception), or (b) there is a law applicable to the City that was intended to protect a group that includes the Class (the "legislative intent" exception), and (c) whether the City breached any such duty. *See, e.g., Bailey v. Forks*, 108 Wn.2d 262, 269-70 (1987) (failure to enforce); *Ravenscroft v. Washington Water Power Co.*, 136 Wn.2d 911, 929-30 (1998) (legislative intent). The answers to all these questions will be answered with law and facts that will not vary from one Class member to another. Either the duties exist, or they do not, and either the City breached those duties by its actions with regard to CHOP as to all Class members, or it did not.

Plaintiffs also expect the City will contend that even if it breached a duty imposed on it, it cannot be held liable for the acts of third parties. If so, this simply raises yet another common issue: whether the acts of CHOP occupiers were so outside the realm of what was reasonably foreseeable that the City cannot be held responsible. *See, e.g., Wilbert v. Metro. Park Dist. of Tacoma*, 90 Wn. App. 304, 308, 950 P.2d 522, 524 (1998) ("foreseeability is a jury question and a criminal act [is] unforeseeable as a matter of law only if the occurrence is so highly extraordinary or improbable as to be wholly beyond the range of expectability").

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 20

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

*Nuisance*. Just like the other claims, the key issues at the center of the nuisance claim also turn on common legal issues and common evidence. Central to this claim is whether the City's actions or inaction gave rise to a nuisance: *e.g.,* whether the City endangered Class members' comfort or safety; rendered Class members insecure in the use of property; or obstructed or rendered dangerous any park or public-right of way. WPI 380.01, 380.01.01. These questions will be answered based on consideration of, and application of the law to, evidence of what the City did to encourage and assist the occupation of the neighborhood, and the conditions that resulted. This will necessarily involve evidence and law that will apply to the entire Class.

Further, Plaintiffs assume that given positions the City has already taken, the City will contend that any nuisance was justified because it was reasonable in the circumstances. WPI 380.03. Plaintiffs disagree, but this issue will again require the City to prove its actions were justified based on circumstances and facts that are common to all Class members.

*Deletion of texts*. Another key issue in this case is that there are numerous, key City custodians who are missing texts from June 2020. This includes then-Mayor Jenny Durkan, then-Chief of Police Carmen Best, and Fire Chief Harold Scoggins. Every Plaintiff and every Class member shares the common factual and legal issues of (a) what the exact circumstances are that led to these missing text messages, and (b) what the appropriate remedy is to address the deletion of those texts. FRCP 37(e); *Musse v. King County*, 2021 WL 4709875, *2-*5 (W.D. Wash., October 8, 2021). Possible sanctions will range from allowing evidence regarding the missing information into trial to instructions to the jury or even to a default judgment. *Id.* The evidence and legal analysis will be identical for all members of the Class.

Plaintiffs have demonstrated commonality.

### c.    Named Plaintiffs are typical of the Class and each Subclass.

Named Plaintiffs and their claims are all typical of those of the Class and the Subclasses several of them seek to represent. A plaintiff's claims are typical "if they are reasonably coextensive with those of the absent class members; they need not be substantially identical."

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 21

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

*Ruiz Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016), *quoting Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014).

The Named Plaintiffs easily satisfy this standard. Each of them owned property in, did business in, or resided in the Class Area on the Class Date, Ex. 3, and therefore all of them have claims that will turn on the same common issues discussed in § III.B.2.b., *supra*. The same is true of the Named Plaintiffs who seek to be appointed representatives of the various subclasses. Ex. 3. Plaintiffs therefore satisfy typicality.

> ### d.      Named Plaintiffs and their counsel are adequate.

To determine whether a plaintiff and her counsel are adequate within the meaning of Rule 23(a)(4), the Court needs to answer two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interests with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015). There is no conflict, and Plaintiffs are vigorously prosecuting this case.

Neither the Named Plaintiffs nor their counsel have any conflicts of interest with other class members. All of them share the same claims with the Class and Subclasses and have identical interests in establishing the City's liability under their various claims. And Plaintiffs' counsel has no interest contrary to that of the Class or Subclass. Weaver Decl., ¶ 3.

In addition, Named Plaintiffs and their counsel have demonstrated that they have the expertise, skill, and desire to pursue this case vigorously on behalf of the Class and Subclasses. Plaintiffs' counsel are experienced and successful litigators, with a key member of Plaintiffs' team having more than 20 years of experience in plaintiffs' class-action litigation. Weaver Decl., ¶ 4. And as is evident from both the facts cited above in § II and the supporting materials, as well as the discussion in the City's recent motion for a protective order, Dkt. No. 54, Plaintiffs have already been vigorously prosecuting this case for more than a year, independently of any certification of a class. Named Plaintiffs and their counsel are adequate.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) **- 22**

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### 3.    Common Issues Predominate for the Issues to Be Certified.

Named Plaintiffs also satisfy the predominance requirement of Rule 23(b)(3), as that requirement is applied in the context of Rule 23(c)(4). A plaintiff satisfies predominance on a motion under Rule 23(c)(4) if common issues predominate over individual issues with regard to the issues sought to be certified, as opposed to every issue in the case. *See Valentino*, 97 F.3d at 1234; *Stickles,* 2021 WL 6117702 at *7 ("issue certification requires that common questions predominate over individual questions with respect to only the specific issue that is certified"); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441-45 (4th Cir. 2003); *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 226-27 (2nd Cir. 2006); *In re Motor Fuel*, 292 F.R.D. at 674.

The common issues Plaintiffs seek to certify satisfy this standard. Without exception, as already explained as to commonality in § III.B.2.b., *supra*, the resolution of the common issues identified in Ex. 1, will turn on common evidence and legal argument about what the City did or did not do, the City's knowledge of what was happening in the Class Area, whether the sorts of things that happened in the Class Area were foreseeable, and whether the City's justifications are allow it to escape liability. None of the issues turn on evidence about what any Plaintiff or Class member did or did not do, or what specifically was done or said to any Plaintiff or Class member. The Court and the jury will not have to consider any individual issues to resolve the certified questions, and therefore common issues do and will predominate as to those issues.

### 4.    Certification Is Superior to Individual Actions.

A plaintiff seeking certification of a class pursuant to Rule 23(c)(4) satisfies the "superiority" requirement if the plaintiff demonstrates that certification would "significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency" in a way that individual cases brought by Class members would not. *Valentino,* 97 F.3d at 1229; *Stickles*, 2021 WL 6117702 at * 7.

In this case, certification of the Class and Subclasses would be far more economic and efficient than individual cases because of the large number of legal and factual issues that can be resolved on a common basis, using common evidence. Plaintiffs have drafted a proposed trial

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 23

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

plan that is set out separately in Ex. 2, but the essence of Plaintiffs' approach is that at the upcoming trial scheduled for October and the associated pre-trial deadlines for summary judgment and other proceedings, the parties will litigate and the Court and the jury will decide: (1) the common factual and legal issues certified by the Court, and (2) the individual issues regarding Plaintiffs' specific damages. Following that trial, the parties will engage in a second process whereby any Class member will have the opportunity to pursue any damages claims that Class member has on claims that have succeeded on the common questions of liability.

This will serve many purposes and avoid inefficient, repetitive individual lawsuits on issues that could have been tried together. First, after the initial trial, all parties and the Court will know which, if any, of the claims have succeeded, and any Class member who has not opted out following notice will be bound by that resolution. This will prevent repeated re-litigation of issues that can and should be resolved in one fell swoop, in one trial, and the associated costs and wasted time for the Court, the City, and Class members.

Second, and at least equally important, the trial of the claims of the diverse group of Plaintiffs will serve as a guidepost as to what type and amount of damages can be realistically expected by Class members in any subsequent proceeding. Named Plaintiffs are a diverse group of people and entities: the group includes property owners and managers, a condominium owner, an apartment tenant, a women's clothing shop, a label manufacturer, a car-maintenance garage, and a bar. Ex. 3. This diverse group of Plaintiffs means that the first trial will not only resolve common issues, but also serve as a bellwether damages trial for virtually every member of the Class. And bellwether trials are, of course, recognized for their ability to help manage and resolve complex cases. *E.g., In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one ….").

Following the first trial, the Court and the parties will know which claims have succeeded, as well as a realistic scope of the types of damages that Class members could reasonably expect to recover if they were to seek damages. If the parties were unable to resolve

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278

the remainder of the case despite having that extensive information, the Court and parties would proceed to the damages phase for Class members who chose to pursue additional damages from the City. This could be a series of short trials, possibly in groups of similarly positioned individual entities, or an alternate process agreed to by the parties or directed by the Court.

This is the most efficient possible way to resolve not only the claims of the Named Plaintiffs, but also the thousands of individuals who have the same claims, many of whom have indicated to Plaintiffs' counsel that they are interested in pursuing their own claims but are waiting to see what the outcome of class certification is in this case. Weaver Decl. ¶¶ 2, 6. It is also an approach expressly contemplated by the Advisory Committee and adopted by courts in other cases. *See, e.g.,* FRCP 23 Adv. Comm. Note ("[In a fraud or similar case, the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims."); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("It is true that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability. … [But] damages could feasibly and efficiently be calculated once the common liability questions [were] adjudicated."); *In re Whirlpool*, 722 F.3d at 861 ("[o]nce the district court resolves under Ohio law the common liability questions that are likely to generate common answers in this case, the court will … proceed to the question of plaintiffs' damages."); *Butler*, 727 F.3d at 800 ("a class action limited to determining liability on a class-wide basis, with separate hearings to determine … the damages of individual class members … will often be the sensible way to proceed").

The alternative to certification of the common issues is that any Class member who wishes to sue the City will have to start from scratch. This is a recipe for confusion, duplicative and mushrooming costs, and massive judicial inefficiency. Instead of a single decision or series of decisions binding on all Class members who have not opted out, the Court would face the prospect of dozens or hundreds of individual lawsuits against the City, at least some of which would probably not have the same plaintiffs' counsel. These individuals would not be bound by

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200  FAX: (206) 407-2278

any negative rulings reached in this case and might well attempt to reopen certain issues in discovery. In theory, some costs might be avoided by court orders limiting discovery beyond what has been pursued in this case, but there would an inevitable multiplication of costs for both the parties and the Court, as well as a potential administrative morass for the Court. We know that the City has already spent more than $300,000 gathering and producing documents in this case (Dkt. No. 54), more than $400,000 to analyze issues related to missing texts,[13] and an as-yet-untold amount in attorneys' fees. These costs would balloon if the Court were to require individual actions rather than the procedure Plaintiffs propose.

It would also mean that some Class members would have no realistic opportunity to pursue their claims, given that many Class members are unlikely to have sufficient damages on their own to warrant bringing an individual lawsuit. While some Class members may have damages high enough to warrant an individual action, many of them likely have damages of only a couple thousand or a few hundred dollars (such as residents whose only damages are problems accessing their homes, or the costs of temporarily living elsewhere). This is not likely to be enough for an attorney to be able to realistically file an individual case on their behalf, and likely is not enough to justify a plaintiff being subjected to the kind of extensive, highly sensitive discovery demands the City has made of the Named Plaintiffs. This is another factor that weighs heavily in favor of certifying the Class as Plaintiffs suggest. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231 (in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all"); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (noting that "[i]f plaintiffs cannot

---

[13] *E.g.*, https://www.newsweek.com/costly-report-about-missing-texts-outgoing-seattle-mayor-during-2020-protests-limbo-1656058.

proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover"). Plaintiffs' proposed certification is superior to individual actions, and in fact may be the only means to efficiently resolve this litigation for everyone with the same claims that they have.

## CONCLUSION

Plaintiffs respectfully ask the Court to certify the Class and Subclasses pursuant to Rule 23(c)(4).

DATED this 13th day of January, 2022.

CALFO EAKES LLP

By: */s/ Angelo J. Calfo*
    Patricia A. Eakes, WSBA #18888
    Angelo J. Calfo, WSBA #27079
    Tyler S. Weaver, WSBA #29413
    Gabe Reilly-Bates, WSBA #52257
    Andrew DeCarlow, WSBA #54471
    Henry Phillips, WSBA #55152
    1301 Second Avenue, Suite 2800
    Seattle, WA 98101
    Phone: (206) 407-2200
    Fax: (206) 407-2278
    Email: pattye@calfoeakes.com
           angeloc@calfoeakes.com
           tylerw@calfoeakes.com
           gaber@calfoeakes.com
           andrewd@calfoeakes.com
           henryp@calfoeakes.com

    *Attorneys for Plaintiffs*

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION
(Case No. 2:20-cv-00983-TSZ) - 27

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL: (206) 407-2200   FAX: (206) 407-2278