# Exhibit 1

## PLAINTIFFS' STATEMENT OF COMMON ISSUES

**Procedural Due Process (First Cause of Action) – All Three Subclasses**

- Did the three Subclasses have a constitutionally protected interest in unfettered access to their property via public rights-of-way?

- Did the Property Owners Subclass and Business Owners Subclass have a constitutionally protected interest in economic use of their properties?

- Did the City act to deprive Class members of those constitutionally protected interests? [for all Subclasses]

- Did the deprivation occur without due process? [for all Subclasses]

- Is the deprivation without due process justified by a sufficient countervailing justification? [for all Subclasses]

- Was the deprivation pursuant to City policy under 42 U.S.C. § 1983? [for all Subclasses]

- Are members of each of the three Subclasses entitled to nominal damages?

**Substantive Due Process (Second Cause of Action) – Entire Class**

- Did the City's affirmative actions or statements create or expose the Class to an actual, particularized danger the Class would not have otherwise faced?

- Was the City deliberately indifferent to the known dangers?

- Was it foreseeable that the types of injuries suffered by the Class would be suffered?

- Were the City's actions and statements pursuant to City policy under 42 U.S.C. § 1983?

- Are Class members entitled to nominal damages?

**<u>Takings (Third Cause of Action) – All Three Subclasses</u>**

- Did the City's actions constitute a *per se* taking of the rights of the members of the Subclasses?

    o Did the City's actions interfere with the ability to access properties?

    o Did the City's actions interfere with the ability to exclude others from properties?

- What this taking justified by an "emergency"?

- Were the City's actions and statements pursuant to City policy under 42 U.S.C. § 1983?

- Are members of the Subclasses entitled to nominal damages?

**<u>Negligence (Fourth Cause of Action) – Entire Class</u>**

- Did the City owe a duty to the Class?

    o Does the failure-to-enforce exception to the public-duty doctrine apply?

    o Does the legislative-intent exception to the public-duty doctrine apply?

- Did the City breach its duty?

- Were the acts of third parties so highly extraordinary or improbable as to be wholly beyond the range of expectability?

**<u>Nuisance (Fifth Cause of Action) – Entire Class</u>**

- Did a City act or failure to act give rise to a nuisance?

    o Did the act or failure annoy, injure, or endanger the comfort, repose, health, or safety of the Class?

    o Did the act or failure to act make any park or street dangerous for passage, obstruct or tend to obstruct any park or street**,** or constitute a hazard to vehicles or persons using any park or traveling on any street?

- o   Did the act or failure render other persons insecure in life, or in the use of property?

- Was any nuisance reasonable in the circumstances?

**<u>Issues Related to Missing Texts</u>**

- What were the circumstances surrounding the deletion of responsive texts for Mayor Jenny Durkan, Chief of Police Carmen Best, Fire Chief Harold Scoggins, and other City custodians?

- What effect does the deletion of these texts have on the City's ability to defend this case, and on the evidence to be presented at trial?

# Exhibit 2

## PLAINTIFFS' PROPOSED TRIAL PLAN

Plaintiffs hereby set forth their proposed plan for the trial of identified common issues, the full claims of the Plaintiffs, and the trial and ultimate resolution of Class members' claims.

1. **Adjudication of (a) Certified Claims and Issues and (b) Damages of Plaintiffs**

Under Plaintiffs' proposal, following certification of the identified common issues, the parties would proceed to a trial that would encompass both resolution of the certified claims, as well as all remaining issues to be tried on the individual claims of each Plaintiffs, including whether they are entitled to recover substantive damages in addition to any nominal damages that they may have been found to be entitled to.

Prior to this trial, the parties will have full discovery on all common issues, as well as the individual claims of each Plaintiff, and all appropriate pre-trial motions such as summary judgment and motions to exclude expert testimony.

At the conclusion of this trial the Court and the jury will resolve the core, key common issues on every claim in this case, ***and*** the damages claims for all Plaintiffs, which include numerous business owners, property owners and residents.

2. **Adjudication of Remaining Damage and Causation Questions**

Following the initial trial, for any claims where Plaintiffs and the Class prevailed on the relevant common questions, individual Class members could decide whether to pursue substantive damages claims in subsequent proceedings. These decisions would presumably be heavily informed by the outcomes for the individual Plaintiffs in the first trial, and whether a particular Class member could document damages beyond nominal damages. These trials could be individual or grouped proceedings. Plaintiffs also anticipate that based on the outcome of the first trial of common issues and Plaintiffs' individual damages claims, it might also become clear that certain additional damages issues could be certified, or that the parties could agree to a framework for resolution of these claims that would not require full successive trials.

Exhibit 3

**CHART OF NAMED PLAINTIFFS**

| Named Plaintiff | Location | Type of Plaintiff | Class/Subclass Represented | Supporting Documentation |
|---|---|---|---|---|
| 12th & Pike Associates LLC | 12th and E. Pike | Property owner | Class Property Owners Subclass | Declaration of Bradford G. Augustine |
| Bergman's Lock and Key Services LLC | 1714 12th Avenue | Lock-and-key services provider | Class Business Owners Subclass | Ex. 34, 10:6-11:24, 35:3-37:9 (Thompson dep.) |
| Wade Biller | 1125 E. Olive Street | Condominium owner, resident | Class Property Owners Subclass | Ex. 26, 9:1-:25, 51:1-54:17, 59:19-60:2, 128:5-:16, 133:23-134:21 (Biller dep.) |
| Hunters Capital LLC | 1620 Broadway Avenue, Suite 200 | Property management company | Class | Declaration of Jill Cronauer |
| Hunters Property Holdings LLC | 1620 Broadway, Suite 200 | Property owner | Class Property Owners Subclass | Declaration of Jill Cronauer |
| Olive Street Apartments | 1703 Twelfth Avenue | Property owner | Class Property Owners Subclass | Ex. 17, 10:3-11:2, 12:19-13:18, 36:3-12, 39:5-40:2, 85:5-95:6, , 87:1-88:22, 91:13-100:5, 154:1-156:17 (Wanagel dep.) |
| Onyx Homeowners Association | 1125 E. Olive Street | Condominium Association | Class | Ex. 26, 9:1-:25, 51:1-54:17, 59:19-60:2, 128:5-:16, 133:23-134:21 (Biller dep.) |
| Madrona Real Estate Services, LLC | Manages building at 12th Avenue and E. Pike | Property management company | Class | Declaration of Bradford G. Augustine |
| Matthew Ploszaj | 1210 E. Pine Street | Resident/Tenant | Class Residents Subclass | Ex. 16, 66:6-:10, 80:3-:6, 83:25-93:20, 84:3-91:3, 102:12-106:12, 139:19-145:17 (Ploszaj dep.) |

| Named Plaintiff | Location | Type of Plaintiff | Class/Subclass Represented | Supporting Documentation |
|---|---|---|---|---|
| Redside Partners | 1620 Broadway, Suite 201 | Property management company | Class | Ex. 35, 12:18-13:4, 15:11-:15, 41:25-43:13, 53:5-54:22 (Swanson dep.) |
| Richmark Company, d/b/a Richmark Label | 1110 E. Pine Street | Property owner, label manufacturer | Class Property Owners Subclass | Ex. 27, 10:7-13:16, 46:21-50:14, 87:20-89:11, 94:4-95:18, 102:22-104:11, 166:8-167:14, 181:7-182:15 (Donner dep.) |
| Shuffle LLC d/b/a Cure Cocktail | 1641 Nagel Place | Bar / restaurant | Class Business Owners Subclass | Ex. 33, 30:5-32:10, 134:7-142:8 (Sheffer dep.) |
| SJC Enterprises, d/b/a Car Tender | 1710 Twelfth Avenue | Car repair garage | Class Business Owners Subclass | Declaration of John McDermott |
| Sway & Cake LLC | 1124 E. Pike Street | Women's clothing store | Class Business Owners Subclass | Ex. 32, 10:23-11:16, 14:23-15:18, 74:17-75:1, 81:7-82:6, 93:18-95:25 (Kilburn dep.) |

Exhibit 4

Hunters Capital, LLC v. City of Seattle                                        Casey Sixkiller

---

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiff,          )
                                )
      vs.                       ) No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

CASEY SIXKILLER

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 12, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

---

Page 2

```
 1            A P P E A R A N C E S
 2  FOR PLAINTIFF VIA VIDEOCONFERENCE:
 3        TYLER S. WEAVER
          GABRIEL REILLY-BATES
 4        Calfo Eakes LLP
          1301 Second Avenue
 5        Suite 2800
          Seattle, WA 98101-3808
 6        206.407.2237
          tylerw@calfoeakes.com
 7        gaber@calfoeakes.com
 8
    FOR DEFENDANT VIA VIDEOCONFERENCE:
 9
          SHANE P. CRAMER
10        ARTHUR W. HARRIGAN, JR.
          Harrigan Leyh Farmer & Thomsen LLP
11        999 Third Avenue
          Suite 4400
12        Seattle, WA 98104
          206.623.1700
13        shanec@harriganleyh.com
          arthurh@harriganleyh.com
14
15  ALSO PRESENT VIA VIDEOCONFERENCE:
          TYLER TODISH, videographer
16        Buell Realtime Reporting, LLC
                * * * * *
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1            DEPOSITION OF CASEY SIXKILLER
 2                 EXAMINATION INDEX
 3  EXAMINATION BY:                        PAGE
 4  Mr. Weaver                              5
 5  Mr. Cramer                            215
 6
 7                 EXHIBIT INDEX
 8  EXHIBITS FOR IDENTIFICATION           PAGE
 9  Exhibit 1  Email chain; SEA_00102554-565    28
10  Exhibit 2  Email chain; SEA_00058827        41
11  Exhibit 3  "11am Update - E Precinct";      80
              SEA_00028170-171
12
    Exhibit 4  "2PM Update - E Precinct (see    98
13             notes)"; SEA_00028178-179
14  Exhibit 5  54-page chart titled "Messages." 100
15  Exhibit 6  Email chain; SEA_00080108-109   109
16  Exhibit 7  Email chain; SEA_00102602-608   115
17  Exhibit 8  Email chain; SEA_00043191-192   128
18  Exhibit 9  Email chain; SEA_00082659-660   153
19  Exhibit 10 Email; SEA_00125617            154
20  Exhibit 11 Email chain; SEA_00082667-669  160
21  Exhibit 12 5-page Executive Order 2020-08; 201
              SEA_00015070
22
    Exhibit 13 Email chain; SEA_00080115-117  213
23
24
25
```

---

Page 4

```
 1       SEATTLE, WASHINGTON; OCTOBER 12, 2021
 2       9:22 a.m.
 3            -o0o-
 4       THE VIDEOGRAPHER:  Good morning.  This is
 5  the deposition of Casey Sixkiller in the matter of
 6  Hunters Capital, LLC, et al., vs. City of Seattle,
 7  Cause No. 20-cv-00983-TSZ, in the United States District
 8  Court, Western District of Washington at Seattle, and
 9  was noticed by Patty Eakes.
10       The time now is approximately 9:22 a.m. on this
11  12th day of October, 2021, and we are convening via
12  videoconference.
13       My name is Tyler Todish from Buell Realtime
14  Reporting, LLC, located at 1325 4th Avenue, Suite 1840,
15  in Seattle, Washington 98101.
16       Starting with the taking attorney, will counsel
17  please identify themselves for the record.
18       MR. WEAVER:  My name is Tyler Weaver.  I'm
19  with Calfo Eakes, and with me on this call is Gabe
20  Reilly-Bates, also of Calfo Eakes.
21       MR. CRAMER:  Shane Cramer from Harrigan Leyh
22  on behalf of the City of Seattle.
23  ////
24  ////
25  ////
```

Hunters Capital, LLC v. City of Seattle                          Casey Sixkiller

---

Page 29

1    mayor at her request.
2         Do you recall learning about that at some
3    point?
4         A.  I do.  I recall learning at it -- about it on
5    Monday, June 8th, whenever this email came into my inbox
6    from Calvin.
7         Q.  Okay.  So you hadn't heard about it before
8    then?
9         A.  No.
10        Q.  You forwarded this to the other deputy mayors.
11   Do you recall having a discussion with them about this
12   after having seen this document?
13        A.  I remember having a conversation with -- with
14   folks after having received these documents.  I could
15   not tell you who specifically -- who specifically that
16   was, you know.  And in terms of why I forwarded to the
17   two other deputy mayors, I think it was more for
18   situational awareness than anything else.
19        Q.  Do you remember talking to -- well, first of
20   all, let me ask you, who's Calvin Goings?
21        A.  Calvin Goings is the director of the Department
22   of Finance and Administrative Services.  So they are in
23   the -- within the City family FAS runs all of our
24   buildings and is the City -- essentially the City's real
25   estate agent as well.

Page 30

1         Q.  Do you recall talking to Mayor Durkan about
2    this -- these documents and this idea of transferring
3    the east precinct to the ownership of Black Lives
4    Matter?
5         A.  I do.
6         Q.  Okay.  What do you remember about that
7    conversation?
8         A.  I -- sorry, I'm just looking at the document.
9    I -- I remember expressing to her that while she may
10   have a strong desire to put this on the table as a
11   conversation point with folks, that it's not ready.
12   That these memos show that this is a really complicated
13   transaction, and that we could not just operationally,
14   you know, snap our fingers and all of a sudden we had
15   the square footage and the equipment that we need to
16   house -- to provide the level of -- of public safety
17   service in that part of the city.
18        You know, and -- and I don't remember if I
19   flat-out opposed continuing this conversation or not,
20   but I do remember being pretty firm in my -- expressing
21   my concern that the timeline that was -- that she wanted
22   to be able to discuss this was -- was challenging.
23        Q.  Was it your understanding that she wanted to
24   transfer it effective July 1, 2020?
25        A.  No.  And, you know, looking at this in this

Page 31

1    resolution that you shared, that -- I -- that -- I mean,
2    it's even highlighted.  I think the -- the -- I don't
3    know where that date comes from, other than, you know,
4    I -- Director Goings is a very -- he takes his job very
5    seriously, and he's the ultimate professional and, you
6    know, he's -- he's the one who's the can-do spirit,
7    like, we will figure it out.
8         So it doesn't -- frankly, I can't imagine that
9    anybody actually asked for a resolution to be drafted at
10   the same time.  It doesn't surprise me, coming from
11   Director Goings, that they went that extra step to put
12   it in the -- in the ether for conversation.
13        So I -- that's a long way of saying I don't
14   know where the date July 1st comes from.  As I said, all
15   of this was sort of in the much more longer-term view
16   of, like -- you know, no one wants to go into a
17   conversation and suggest, hey, here's a potential
18   solution, and then it turns out not to be true and it's
19   just -- you know, it's just bad faith.
20        Q.  Do you recall having any discussions with the
21   mayor about why she thought transferring ownership of
22   the east precinct to Black Lives Matter was an option
23   that should be explored?
24        A.  As I said earlier, I think, you know, Mayor
25   Durkan has, you know, been part of -- you know, part --

Page 32

1    has been in the city for a long time and has -- has seen
2    different efforts by certain members, communities of
3    color in Seattle who have worked with the City on
4    property transfer, disposal.  And again, I use, you
5    know, the -- Daybreak Star as -- as an example of that,
6    and I think she was sort of thinking about, again, the
7    origin of the east precinct and whether that was
8    something that we should make a commitment to -- to do.
9         But again, I -- the timing is -- just given all
10   the other events at this time -- same time period, I
11   think is purely coincidental.
12        Q.  I'm sorry.  You think the timing was
13   coincidental?
14        A.  In terms of -- yes, in terms of, you know,
15   related operational decisions that the Seattle Police
16   Department made about the east precinct, they are not
17   related to this different thread of conversation, in my
18   view.
19        Q.  Okay.  I just -- so this proposal would have
20   had the police evacuating and leaving permanently the
21   east precinct; is that right?
22        MR. CRAMER:  Objection.  Form.
23        A.  Yeah, I don't agree with the -- with the
24   suggestion -- I don't agree with the word "evacuating."
25   I think what this proposal clearly articulates is that,

8 (Pages 29 to 32)

Hunters Capital, LLC v. City of Seattle                                        Casey Sixkiller

Page 33

1    you know, we would need to have, you know, done several
2    things, including identifying an alternative location,
3    making sure that location was suitable, making sure we
4    entered into a legal agreement with the property owner
5    if we didn't own it or if we had to lease it.
6        So that -- that's a very -- I mean, this is
7    government, man.  We don't move fast.  So I think we
8    would -- it would take some time.
9        And I think, you know, again, for me it was,
10   you know -- setting aside whether I thought it was a
11   good idea or a bad idea, it was just a -- I just want us
12   to be -- I wanted to make sure, and I think this memo
13   helps underscore that this is a very complicated idea,
14   and it would be a complicated transaction for us to pull
15   off.
16   BY MR. WEAVER:
17       Q.  Okay.  Well, part of the -- part of the
18   resolution that was drafted indicates that the City of
19   Seattle agrees to vacate the property and remove all law
20   enforcement and materials in police-related facilities.
21       Did you see that when you reviewed it?
22       A.  Yeah.  I mean, that's standard; right?
23   Standard -- I mean -- right?  I mean, standard -- I
24   presume is standard language in any real estate
25   transaction; right?  We are relinquishing fee simple

Page 34

1    title.
2        Q.  Okay.  So it was going to -- it was also going
3    to remove all the holding cells and take down all law
4    enforcement -- law enforcement insignia; is that right?
5        MR. CRAMER:  Objection.  Form.
6        A.  Yeah, I mean, again, as I said, I don't
7    think -- there had been -- as far as I recall, there had
8    been no sort of firm discussion of what all of this
9    could entail; right?  As I said, it could -- could have
10   been, do you want to explore some sort of new,
11   re-imagined east precinct?  Do you want to explore a --
12   you know, a transfer to your organization or
13   organizations for the future of the east precinct?  And
14   again, this points out that there's a process and it's
15   going to take time, and blah-blah-blah.
16       So I think it would -- I don't -- I don't
17   recall it going much further than that, you know,
18   like -- and again, I think this -- unfortunately, this
19   draft resolution suggests otherwise, but it's not my
20   recollection of the -- of the conversations that were --
21   that were happening at this time.
22   BY MR. WEAVER:
23       Q.  What do you recall about whether this proposal
24   remained in play during the period of June 2020?
25       A.  I -- I couldn't tell you the time frame, but I

Page 35

1    recall that at some -- well, number one, I should say I
2    was not involved in any of the conversations with
3    community organizations.  So I -- I can't provide
4    context for those discussions.
5        But two is, at some point, I believe it was
6    Black Lives Matter, or maybe others that -- that -- who
7    were engaged with the City about the east precinct, made
8    it clear that they didn't want the east precinct.  And
9    so there was a point where, you know, the conversations
10   pivoted away from, you know, let's figure out something
11   for the east precinct first, and turned to, all right,
12   we need -- let's figure out an alternative that might
13   make sense as a new commun-- some sort of community
14   gathering place, whatever that may be.
15       Q.  Okay.  So your understanding was that was
16   because Black Lives Matter indicated they did not want
17   the east precinct.  Is that what I heard?
18       A.  That's my -- that's my recollection, yes.
19       Q.  Okay.  Do you recall what alternatives were
20   explored at that point, once it -- once Black Lives
21   Matter made clear they didn't want the east precinct?
22       A.  I -- if I -- if I remember correctly, I think
23   the -- I think the City volunteered to look at other
24   potential spaces in and around the area that could be
25   used either for, I don't know, office, community

Page 36

1    gathering, what have you.
2        Q.  Do you know what other spaces were looked at?
3        A.  I think there was one that was adjacent to the
4    east precinct, but I can't -- I could not tell you if it
5    was on the same block, if it was across the street.  I
6    just don't remember.
7        Q.  Do you recall anything -- any -- by the way,
8    was the mayor involved in these discussions about
9    looking for alternatives?
10       A.  She was being briefed, yes.
11       Q.  Okay.  Do you know whether she was directly
12   involved in any of these transactions to look for
13   alternatives to the east precinct?
14       MR. CRAMER:  Objection.  Form.
15       A.  I -- I have -- my -- I don't know.  I have no
16   knowledge of that.
17   BY MR. WEAVER:
18       Q.  Do you recall anything about a space that was
19   previously leased by an entity known as the Riveter?
20       A.  That name -- yeah, that name sounds familiar.
21       Q.  Okay.  Was that one of the alternatives to the
22   east precinct transfer?
23       A.  Boy, I -- you know, I'd have to see a record
24   to -- I mean, I -- I say that because I -- I remember
25   hearing the Riveter, and there used to be a Riveter up

Hunters Capital, LLC v. City of Seattle                                    Casey Sixkiller

Page 37

1   in -- up in Fremont, and I remember someone going, "No,
2   no, no, there's another location."  But I --
3       Q.  Yeah, there was more than one.
4       A.  Yeah, so I -- and that's just where my
5   knowledge of that kind of stuff doesn't really -- I
6   don't really -- I can't -- I don't remember.
7       Q.  Okay.  Well, with regard to the space, whatever
8   the space was, what was your understanding of what
9   the -- of what the idea was that would happen with that
10  particular use of a different property for Black Lives
11  Matter?  And I can -- let me just -- let me just re-ask
12  that.
13      So what was your understanding of what was
14  going to -- what the terms of any space as -- that might
15  be used as an alternative to transferring of the east
16  precinct to Black Lives Matter might be?
17      A.  I -- again, I don't -- if you have a record to
18  share with me that shows, I don't recall off the top of
19  my head.  As I said, I was not in the discussions
20  directly or indirectly with -- with Black Lives Matter,
21  so I couldn't -- I couldn't speculate beyond, you
22  know --
23      Q.  Okay.
24      A.  -- what I've already said.
25      Q.  Do you know who was involved in those

Page 38

1   discussions with Black Lives Matter?
2       A.  Other mayor's office staff, but I -- but again,
3   I don't -- I just can't remember.
4       Q.  Sure.
5       A.  Yeah.  Sorry.  I just don't --
6       Q.  That's okay.
7       A.  So many other things going on at the same time.
8       Q.  I understand.  You weren't involved.
9       So going back to the date of this document,
10  which -- Exhibit 1, which was June 8th, in the
11  afternoon, do you recall anything else that was going on
12  with the east precinct on the afternoon of June 8, 2020?
13      A.  If I -- if I recall, June 8th is -- is when the
14  Seattle -- is right around the time that the Seattle
15  Police Department began leaving the east precinct, but I
16  don't have a -- I'm sorry, I've not committed these
17  dates to -- to memory.
18      Q.  Well, I think -- and, you know, Shane can tell
19  me if we can't, but I think we can agree that June 8th
20  was the day that --
21      A.  Okay.
22      Q.  -- they were moving.
23      What do you recall about -- when did you first
24  learn that the -- the Seattle Police Department was
25  moving materials out of the east precinct?

Page 39

1       A.  At some point on the 8th of June, when I was
2   standing in the Emergency Operations Center.
3       Q.  Okay.  And did that come as a surprise to you,
4   that they were moving ammunition and evidence and that
5   sort of thing out of the precinct?
6       A.  Yeah, it did.  Yes, it did.
7       Q.  Okay.  And so you think you learned that
8   after -- after they had done it, sometime in the
9   afternoon or evening of June 8th?
10      A.  Can you -- can you ask that question again?
11      Q.  So do you think you learned about -- when were
12  you in the Emergency Operations -- when -- at what time
13  of day were you in the Emergency Operations Center, that
14  you found out that they were moving ammunition and
15  evidence and other documents and materials out of the
16  precinct?
17      A.  Well, I was in the Emergency Operations Center
18  for, I don't know, several hours on that day.  I was
19  there quite a bit during this period of time.  And if I
20  remember correctly, I -- you know, the Emergency
21  Operations Center has a lot of different monitors, and
22  we were monitoring that -- you know, including traffic
23  cams and news sources and other things.  And I
24  remember -- if I remember correctly, I remember standing
25  in the -- in the Emergency Operations Center and seeing

Page 40

1   a van or a truck or something outside of the -- or
2   adjacent to the east precinct and saying, "What are they
3   doing?"
4       Q.  So was that in the afternoon or evening hours,
5   or do you recall what time of day that was?
6       A.  I would -- I would say it's probably in the
7   afternoon.  I remember it still being daylight.
8       Q.  All right.  And when -
9       A.  Which is long at that time of year.
10      Q.  It is.  When do you recall learning that they
11  were going to evacuate all personnel from the east
12  precinct?
13          MR. CRAMER:  Objection.  Form.
14      A.  I don't ever remember the Seattle Police
15  Department informing me that they had made a decision to
16  do that.  I remember learning of it, both by what I saw,
17  you know, on these monitors, and two of my colleagues
18  literally going up to the east precinct with their own
19  eyes and going, "What are you guys doing?"
20      So, you know -- yeah.  So I don't -- I was
21  never given a memo that said on this time we're going to
22  do blah-blah-blah.  I -- I saw it in real time.
23  BY MR. WEAVER:
24      Q.  So you learned sometime on June 8th that that
25  was what they were doing; is that correct?

10  (Pages 37 to 40)

Hunters Capital, LLC v. City of Seattle                                     Casey Sixkiller

Page 49

1   remember, we were -- you know, we watched a police
2   precinct burn down in Minneapolis, we had all kinds of,
3   you know, various intel coming in from the various law
4   enforcement community, the east precinct could be a
5   target.  So -- and at the same time -- at the same time,
6   I believe it's in this meeting, where Chief Scoggins
7   reminded us all that because of the placement of the
8   east precinct, if a fire were to break out there, it
9   likely would engulf the entire block.  So it was sort
10  of -- again, I think, like, all right, well, how do
11  we -- what are the options?  You know, what is it --
12  this doesn't seem to be working.  What are the
13  alternatives?
14          And again, I think part of the idea, as I
15  recall, was, you know, if we get people moving, like
16  just let's not create a place -- let's not create a
17  people-made barrier that just sort of continues to fuel
18  night after night.
19      **Q.  What was it that the police department wanted**
20  **to do as of the meeting that you had with them on**
21  **June 8th?**
22          MR. CRAMER:  Objection.  Foundation.
23      A.  I don't know that we ever really -- in my
24  meeting ever really got to that.  You know, our
25  meeting -- again, my meeting was more focused on, you

Page 50

1   know, we -- we're -- we are in this together.  You know,
2   we need to work together.  We need to be honest with
3   ourselves that something -- we've got to do something to
4   get people off this one corner.  And, you know, at some
5   point there were conversations about, well, maybe we
6   should just let them march by.  Maybe we should move the
7   barrier up a little bit and create some more space.
8           And -- and SPD, if I remember correctly, had
9   tried moving the barriers, the -- the -- the barrier a
10  couple of times in the previous days to see if that
11  helped, and -- so we talked through that a little bit.
12          And -- you know, and I -- but -- but again, I
13  think that meeting in particular was very much like, we
14  need to all be on the same team.  And -- and I would
15  offer that, you know, SPD was very focused on the
16  protection of the building, and -- you know, and -- and
17  that's why, you know, I have said, you know, the -- was
18  like, we -- you know, we've got to get out of the bunker
19  mentality here.  You know, like, it's -- it's -- how are
20  we -- how are all of these pieces working together.  And
21  there were some strong opinions in the room.
22  BY MR. WEAVER:
23      **Q.  Can you describe to me more what you mean by**
24  **"bunker mentality"?**
25      A.  There were at times -- in my opinion, at times

Page 51

1   I felt that the department was, you know, more focused
2   on the -- on the precinct itself as a focal point,
3   rather than as a component of a -- of a -- of a more
4   comprehensive approach to -- to both de-escalating the
5   situation and getting folks moving through the area.
6           And -- you know, and insofar as, you know, I --
7   I remember having a conversation in which I said, you
8   know, like -- you know, I was accu- -- you know, I was
9   reminded by SPD that, you know, well, it's -- you know,
10  we can't lose the precinct.
11          And I remember saying, "No one's suggesting we
12  lose the precinct.  I am saying, what are we doing to
13  de-escalate this area?"
14          And, you know -- and again, you know, Chief
15  Scoggins sitting there saying if a fire breaks out the
16  whole block was going down was, you know, a pretty big
17  reality check, I think, for all of us.
18          But anyway, but we had the meeting and then --
19  but we did not get -- I don't remember us getting into
20  specifics.  I remember at some point, the SPD command
21  staff went to a different conference room at the
22  Emergency Operations Center and -- and had a convers- --
23  separate conversation with Deputy Mayor Fong, and I
24  believe the mayor's chief of staff, Stephanie Formas, of
25  which I was not part of.

Page 52

1       **Q.  How were you proposing, in this meeting, to**
2   **de-escalate the situation around the east precinct on**
3   **June 8th?**
4       A.  I don't remember putting forward a specific
5   proposal.  Again, what I was trying to do was get us all
6   to be on the same page about why we needed a different
7   course of action, and what the shared objectives would
8   be of a different course of action.  And whatever that
9   might be.  You know, if it was marching by, different
10  bar- -- whatever that thing may be.  I didn't -- you
11  know, I don't view my role as predetermining those
12  outcomes.  We were all in this together.  We had all
13  been going on no sleep, or very little sleep and, you
14  know, I think it's important to remember, too, that, you
15  know, there were still other protests in other parts of
16  the city and, you know, it was -- you know, so that --
17  that was stretching all of us, all of our resources and
18  brain power.  So, you know -- but, you know, my
19  understanding of the subsequent meeting was that
20  their -- SPD was going to come up with some options that
21  they felt comfortable with.  That's what I recall.
22      **Q.  So in the meeting you were in, you said there**
23  **were strong opinions.  Can you tell me what some of**
24  **those strong opinions were?**
25      A.  Well, as I said, there were, you know, strong

13  (Pages 49 to 52)

Hunters Capital, LLC v. City of Seattle                                    Casey Sixkiller

Page 53

1   opinions that ranged from, hey, the reality is if a fire
2   breaks out anywhere it's going to engulf the entire
3   block, so we need to be mindful of that.
4         There were strong opinions about the various
5   kinds of intelligence that was coming in to -- to the
6   City with respect to threats or potential threats on the
7   building.  There was a -- you know, I -- in some ways,
8   like, we need to fortify the east precinct so that
9   it's -- it can't be, you know, overtaken, I guess.  And,
10  you know, ranging to, you know, we should, you know --
11  you know, wait it out, you know, and -- and then, as I
12  said earlier, you know, or remove the barriers and
13  create some sort of movement in and around that area so
14  we weren't just, you know, all clustered up every night.
15        So I -- I would just say that, you know, there
16  was a range of -- of opinions.  And I -- again, I think
17  the friction point, to the extent that there was one,
18  was about, you know -- you know, the mayor's, you know,
19  objective or direction to us in this -- for this meeting
20  was, like, everyone needs to be on the same page.  Let's
21  come up with a plan.  What the approach has been the
22  last few nights is clearly not working, it's not
23  de-escalating the situation.  So, like, what -- what
24  else can we do?
25        And I think the difference, again, from some in

Page 54

1   the room was, you know, well, we need to solve for the
2   east precinct.  And I just -- I did not -- I did not
3   share that opinion.  As a -- as I said, as a component
4   of whatever our plan or strategy might have been, but
5   not the organizing principle.  I was worried about the
6   whole block.
7         Q.  Do you recall advocating during this meeting
8   that ammunition, evidence, and firearms should be
9   removed from the precinct?
10        A.  I -- and this is where I get confused on the
11  timing of this email.  I -- I remember -- or I think
12  it's fair to -- to suggest that I said at some point in
13  this meeting, if you're so worried about firearms and
14  ammunition, why don't we just remove it?  We can supply
15  you from the west precinct.  Like, if that's the big
16  thing, like, let's just remove that factor.  And then we
17  just kind of -- if I remember correctly, we just kind of
18  moved on.
19        My point being, I was trying to take away, you
20  know -- strip away some of the argument so we could stay
21  focused on what I thought our -- our mission was, which
22  was to come up with an overall approach.
23        Q.  Do you recall any discussions at that meeting
24  about whether it would make sense for all or most of the
25  personnel to also leave the building that day?

Page 55

1         A.  Can you say that again?  I'm sorry.
2         Q.  Do you recall any discussions at that meeting
3   that you were at about most or all of the Seattle Police
4   Department personnel also leaving the building?
5         A.  No.  In fact, the opposite.  You know, there
6   was a conversation or statement made about, you know,
7   the signal it would send if the precinct were abandoned.
8   And I said, no one's talking about that.  No one's
9   talking about -- what are you talking about?  That is
10  not what we're talking about.
11        Q.  So who -- who raised that -- who raised the
12  concept of people -- personnel possibly leaving?
13        A.  Again, I don't want to suggest -- I want to be
14  careful not to suggest that it was a proposal.  It was
15  not.  It was much more in the theoretical of -- and not
16  even the theoretical in terms of operational, but more
17  of a, you know, atmospheric impression that that could
18  make, and -- and we quickly moved on from that.
19        I brought us back around to, like, that's
20  not -- that's not what we're here to -- we're here to
21  talk about a plan for de-escalating.
22        Q.  Who raised it as a theoretical possibility?
23        A.  If I recall -- if I recall, it was -- it was --
24  I think it was Chief No-- -- Assistant Chief Nollette.
25        Q.  And so what -- what was the concern about the

Page 56

1   perception that might cause in that theoretical
2   situation?
3         A.  I -- I don't -- I don't recall.  To be honest,
4   I shut -- we shut it down -- I shut it down so quickly
5   that it was sort of like, we're not even going to talk
6   about this.
7         Q.  Well, what was your concern -- what was your
8   concern about the signal it might send?
9         A.  I just -- I never saw it as an option.  Like it
10  wasn't even in my -- in my head of like -- it's just --
11  again, as I said, if the concern was about guns and
12  ammunition being in the building that could contribute
13  to -- you know, be used as -- could become flammable
14  materials, maybe we should explore taking those out.
15  But again, I think it's important to -- to underscore
16  that, you know, I -- I did not -- I'm not someone who
17  likes to take just one thing.  It's like, we got to,
18  like, okay, that's a thing.  We can solve -- how do we
19  solve for that, but in the context of whatever the
20  broader plan or objective is.
21        Q.  Okay.  I thought I heard you say earlier that
22  the idea -- I'm sorry.  I -- if you have more, go ahead.
23        A.  No, no.  I'm good.
24        Q.  So I thought you were saying earlier, and
25  correct me if I'm wrong, that you were saying that

14  (Pages 53 to 56)

Hunters Capital, LLC v. City of Seattle                                    Casey Sixkiller

---

Page 145

1    time, and ability to have clean hands, was a really
2    important thing.  So trying to balance all of those
3    pieces, you know, was -- was -- was challenging.
4         Q.  Do you recall that more porta-potties and hand
5    washing facilities were moved to the park on or after
6    June 10th of 2020?
7         A.  I remember more porta-potties moving into the
8    park at some point, but I could not tell you what day
9    that was.
10        Q.  Do you know how often they were serviced?
11        A.  I believe we serviced them every day, or
12   whatever the schedule -- whatever the normal schedule is
13   for -- for servicing them and, you know, that usually
14   comes in the form of a recommendation from the service
15   provider who tells us, you know, based on the level we
16   need to come more often or less often.
17        Q.  Do you recall there being any discussion among
18   you and the parks or Seattle Public Utilities about
19   whether providing additional porta-potties would make it
20   more likely that more people would show up and camp in
21   Cal Anderson and remain in the area?
22        A.  Yeah, I do remember having a conversation along
23   those lines.
24        Q.  Okay.  What do you recall that conversation
25   being?

---

Page 146

1         A.  Again, trying to -- the need to attempt to
2    achieve a balance between, you know, what the literal
3    human needs are, realizing that, again, also in a global
4    pandemic, not a lot of restaurants were letting folks
5    use their bathrooms, and so from a -- you know, from a
6    public health perspective we needed to be responsive to
7    that, plus COVID.
8             And then, you know, I think another element was
9    just, you know, from my perspective, you know, trying
10   not to -- trying not to do anything that would encourage
11   the growth of the encampment.
12        Q.  So you were concerned that providing
13   porta-potties would encourage growth of the encampment;
14   is that right?
15            MR. CRAMER:  Objection.  Form.
16        A.  I -- I was -- I was -- I raised concerns about
17   us -- about needing to have a -- a more comprehensive
18   strategy for how we were going to deal with the
19   encampment.
20   BY MR. WEAVER:
21        Q.  Okay.  Specific to the porta-potties, what was
22   your concern about how the number of porta-potties might
23   increase the size of the encampment?
24        A.  You know, it -- it -- in my view it had the
25   potential to suggest that -- to support folks wanting to

---

Page 147

1    stay than saying, jeez, I can't even go to the bathroom.
2    We've got to go.
3         Q.  Okay.  How about -- I believe you said Seattle
4    Public Utilities was under your supervision as well; is
5    that correct?
6         A.  Yes.
7         Q.  Okay.  So were you aware that there were
8    dumpsters provided at Cal Anderson Park for use by any
9    members of the public during the -- during June 2020?
10        A.  I don't remember specifically having dumpsters
11   placed in Cal Anderson Park, but I do -- I do, you
12   know -- I do remember having conversations about the
13   need for us to make sure we could keep up with, you
14   know, trash -- meet the trash and needs of just -- the
15   trash needs of the area.
16        Q.  Okay.  So do you recall them being placed in
17   areas around or near Cal Anderson Park in June of 2020,
18   dumpsters, that is.
19        A.  No, not specifically.
20        Q.  Do you recall any similar conversation around
21   dumpsters that might be available to the public, and a
22   concern that that might also encourage more people to
23   come to the area to have garbage service?
24        A.  You know, again, I would just stress that, you
25   know, it's all a balancing act; right, of -- of in

---

Page 148

1    particular public health, and, you know, it is -- it is
2    something -- trash in our parks is something we
3    struggled very much, not just at Cal Anderson, but
4    across the entire parks system, with the onset of COVID
5    and through the end of the year last year.  So, you
6    know, there are many theories about dumpsters, but I
7    will just tell you that the -- the -- from a public
8    health perspective, making sure people had ways to put
9    their trash -- get rid of their trash was important.
10        Q.  Do you recall whether it was part of that
11   discussion that you had, whether it was considered or
12   discussed whether having dumpsters might encourage
13   growth in the encampments?
14        A.  No, I don't.
15        Q.  So I'd like to go back to Exhibit 5, which is
16   your texts, and go to Page 40, which is part of your
17   texts with Mayor Durkan.
18        A.  40.
19        Q.  Which I believe we have every text in here
20   from -- between you and Mayor Durkan, that we got.
21        A.  Okay.  Page 40.
22        Q.  Page 40, and I'd like you to look at your text
23   of -- on June 20th, on -- at 6:14 a.m.
24        A.  Okay.
25        Q.  So what do you recall about the events that

---

37 (Pages 145 to 148)

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 169

1  time of this experience, there were folks who were there
2  to demonstrate and exercise their first amendment
3  rights.  As we get closer to this point in time, you
4  know, there were folks that began to blend in and take
5  advantage of that situation, and to contribute to the
6  concerns that Deputy Mayor Fong articulated in this
7  email.
8      Q.  Were there specific events that you can recall
9  that raised nighttime public safety concerns and issues
10 on or before June 22, 2020?
11     A.  Well, certainly the shooting, which we
12 discussed a few minutes ago, and reports of property
13 damage in and around this area.  You know, I think those
14 are two examples of -- of things that were occurring.
15 Whether they were related or not, I think is -- I don't
16 think anyone knows.
17     Q.  What sort of property damage are you referring
18 to?
19     A.  It's my recollection that, you know, folks
20 had -- had filed reports of broken or damaged windows,
21 graffiti.  I think those were sort of the -- the big
22 ones.
23     Q.  Any others that you can think of, whether they
24 were big or not?
25     A.  Not off the top of my head.

Page 170

1      Q.  How long after this email on June 22, 2020, did
2  the park closure -- when did it finally happen?
3      A.  I -- I honestly can't tell you off the top of
4  my head, although it's a public record.  I can't tell
5  you.  I don't know.
6      Q.  Do you think it was a -- does about a week
7  later sound right to you?
8      A.  Yeah, that sounds about right.  I mean, I think
9  wasn't our official -- wasn't our action the -- the 30th
10 or -- I don't know, 29, 30, 31, something like that.  So
11 it would have been somewhere in that zone, I assume.
12     Q.  Okay.  I'd like to go back to Exhibit 5, which
13 is the texts.
14     A.  Okay.
15     Q.  Page 43.
16     A.  Okay.
17     Q.  And this is Chat No. 2499, and at the top of
18 Page 43 your text of June 23, 2020, at 8:12 a.m.
19         Do you see that?
20     A.  Yes.
21     Q.  Okay.  You say, "I had SPU cut the water off."
22     A.  Yes.
23     Q.  Okay.  What do you recall about having SPU cut
24 the water off on June 23rd?
25     A.  You know, we made a couple of attempts to try

Page 171

1  to get -- try to nudge folks along, and if I recall
2  correctly, cutting water off was one of those
3  strategies.
4      Q.  Okay.  So did you order the water cut off
5  because you thought that that might encourage people to
6  leave the park, Cal Anderson Park?
7      A.  Yes.
8      Q.  Okay.  So were you concerned that the -- the
9  provision of water and allowing people to use the water
10 was encouraging them to stay longer in Cal Anderson Park
11 than they would have without water?
12     A.  I don't know about that.  All I know is we
13 were -- again, we were trying to send every signal we
14 could to folks that it -- it was -- the time has come
15 for them to move on, and this was one thing that we did
16 in attempt to do that.
17     Q.  Okay.  Do you know why you hadn't tried
18 shutting off the water before June 23, 2020?
19         MR. CRAMER:  Objection.  Form.
20     A.  I think we had -- I can't remember.  I thought
21 that we had -- this is where the days all squish
22 together.  I thought that we had -- we had either talked
23 about or even briefly cut the water off before, but it
24 may -- it may just have been here on the 23rd.
25 ////

Page 172

1  BY MR. WEAVER:
2      Q.  Would the reasons for cutting off the water
3  have been the same earlier, if you did it earlier?
4          MR. CRAMER:  Objection.  Form.
5      A.  I -- I believe so, yes.
6  BY MR. WEAVER:
7      Q.  Do you know what -- what use the people in Cal
8  Anderson Park or in the area around Cal Anderson Park
9  who were not permanent residents, do you know what use
10 they were putting the water to?
11     A.  One use was demonstrators had created a -- what
12 they referred to as a community garden, and they were
13 using water to support -- to support that.
14     Q.  That was a garden that was dug out of Cal
15 Anderson turf; is that correct?
16     A.  That's correct, yes.
17     Q.  Do you know other uses that the water was being
18 put to in Cal Anderson Park?
19     A.  I don't -- I don't remember.
20     Q.  Going down to your next text at 8:12, this is
21 just a few seconds later, on June 23rd, you say, "I
22 think at some point we cut whatever power there may be,
23 but not yet."
24         Do you see that?
25     A.  I'm sorry; I lost you here.

43 (Pages 169 to 172)

Hunters Capital, LLC v. City of Seattle                                          Casey Sixkiller

Page 173

1    Q.  Okay.  Page 43, Exhibit 5, just the next text
2  from you in this chain.
3    A.  Yes, I see it.
4    Q.  Okay.  Why were you considering shutting off
5  the power that may have been supplied to people in Cal
6  Anderson Park?
7    A.  First, I don't recall us supplying power.  I
8  believe what happened is -- and unfortunately this
9  happens in many parts of the city.  People had accessed
10  the power panel on -- on the lights in the park and were
11  using it to charge cellphones and other things.
12    You know, my recollection is this piece is --
13  is very similar to turning the water off, is it's --
14  it's time to go.  It's like, please, just go.  We
15  don't...
16    Q.  Okay.  So did you -- did you feel that having a
17  power source, whether it was jerry-rigged or not,
18  available to people, was encouraging them to stay
19  longer?
20    A.  Again, it is an unfortunate situation across
21  our city that people are -- use these power sources not
22  for their intended use.  You know, whether that
23  encouraged people to stay or not, I couldn't speak to
24  that, but I -- I just know, you know, sort of in my
25  head, at least, you know, making clear that these things

Page 174

1  were -- were going away was, I thought, an important
2  signal to folks that it was time to go.
3    Q.  You thought if you turned off the power it
4  would be more likely that people would leave the area
5  and the park; is that right?
6    A.  That was our hope, you know, or at least it
7  would encourage some people to leave.
8    Q.  Okay.
9    A.  While we then focused in on what we would need
10  to do to help others leave.
11    Q.  In your next text, at 8:13 a.m., you say, "SPU
12  also held on porta-potty servicing and trash removal."
13    Do you see that?
14    A.  Yes.
15    Q.  Was that also part of your plan to get -- tell
16  people it was time to go, you were going to stop
17  servicing the porta-potties and removing the trash?
18    A.  That's my recollection, yes.
19    Q.  I'd like you to go to Page 51, and on to
20  Page 52, there's a text chain, 2542 between you and Mami
21  Hara later on the day of June 23rd.
22    A.  Uh-huh.
23    Q.  I take it from this and some other documents
24  that you ended up turning the water back on in Cal
25  Anderson that day; is that right?

Page 175

1    A.  I do remember the water being turned back on,
2  but I don't remember what day or what time it was.
3    Q.  Okay.  Why did you decide that the water should
4  be turned back on?
5    MR. CRAMER:  Objection.  Form.
6    A.  I'm sorry.  Can you ask the question again?
7  BY MR. WEAVER:
8    Q.  Why did you decide that the water should be
9  turned back on?
10    A.  Well, without the benefit of being able to
11  review these records, which are all sitting here, I
12  would say that it is likely that it became clear we were
13  not going to be successful in getting folks to
14  voluntarily remove themselves.  And then, again, we had
15  to begin to balance the public health issues, and given
16  the fact that it -- you know, this is the middle of
17  June in the summertime in Seattle.
18    Q.  Okay.  So in 2542 there's a -- right before you
19  ask, "Should we turn it back on," to Mami -- or is it
20  Mami?  I'm still not sure.
21    A.  It's Mami.
22    Q.  Okay.  "This has been retweeted 70 times in a
23  short period and is picking up steam," and "For your
24  awareness, this has been retweeted 70 times and is
25  picking up steam."

Page 176

1    Do you recall that there was an outcry among
2  protesters that the -- or people living in the park,
3  that the water had been turned off in Cal Anderson?
4    A.  Yes.  I remember.
5    Q.  Okay.  And you recall some tweets about it?
6    A.  I'm not on Twitter, but I -- you know, I
7  remember people saying people were tweeting about it.
8    Q.  Okay.  And was it those posts on Twitter that
9  led you to reconsider your decision to shut off the
10  water in the park?
11    A.  I don't -- I don't believe so.
12    Q.  Okay.  What do you think was the reason?
13    A.  As I stated a moment ago, I think it was --
14  again, without the benefit of recollection here, is we
15  had -- it had become clear that we were not going to get
16  the voluntary relocation that we were hoping for that
17  day.
18    Q.  So how many hours had the water been off by the
19  point you decided it should be turned back on?
20    A.  I don't -- I don't remember.
21    Q.  Okay.  So these texts with Mami Hara appear to
22  be about 12:41, 12:40 on the 23rd, and the ones we were
23  looking at earlier with Jesús Aguirre, it looks like
24  that was 8:12 in the morning that you told him that you
25  had them shut off.  Do you remember if it was just a

44 (Pages 173 to 176)

Hunters Capital, LLC v. City of Seattle                                    Casey Sixkiller

Page 181

1    So I think what you're seeing from me is a
2    frustration that, you know, we'd -- every -- at every
3    turn it seemed that some -- I shouldn't say at every
4    turn.  There were times when it felt like the goalposts
5    were always getting moved.  You know, here we are trying
6    to do this peacefully and respectfully and -- and the
7    goalposts keep getting moved on us.
8         **Q.  So you were frustrated that the City was doing**
9    **what it could to make this a peaceful transition, and**
10   **you felt like you were getting nothing back from the**
11   **people you were trying to transition out of the area; is**
12   **that correct?**
13        A.  Yeah, I -- I think that we -- again, it just
14   was a level of frustration that we -- you know, that the
15   goalposts continued to move on us, you know.
16        **Q.  So what was your perception of what the**
17   **City had been giving to this process?**
18        A.  I think in this context it was, you know, to
19   try to continue to support that garden being there and,
20   you know, talking with them about how we could
21   memorialize it, support it, create ways to honor that
22   moment in time.  I think it was probably as -- you know,
23   that was kind of the gist of it, if I remember
24   correctly.
25        **Q.  Okay.  So the City had indicated that the**

Page 182

1    **garden that had been dug in the -- in the park would**
2    **re- -- you had indicated -- the City had indicated that**
3    **that would be allowed to remain permanently at that**
4    **point; is that correct?**
5         A.  I don't know if -- I think what we had talked
6    about -- and again, I was not in these meetings, but I
7    think, you know, it had been discussed what were the
8    ways that we could preserve and/or support the efforts
9    by the individuals who -- who had started and maintained
10   that garden.
11        **Q.  Also on June 23rd, the City had also started**
12   **doing the homeless and relocation outreach that we had**
13   **talked about earlier; correct?  That was also happening**
14   **in the park on the 23rd?**
15        A.  Yes, based on that email from Director Johnson.
16        **Q.  And at that point there were still port-a-**
17   **potties in the park; right?**
18        A.  That's correct, yes.
19        **Q.  Okay.  And there was still -- there was still**
20   **litter being picked up around the area; right?**
21        A.  That's my -- yes, that's my recollection.
22        **Q.  Okay.  And the power was still on, even though**
23   **they'd jerry-rigged it; correct?**
24        A.  Correct.
25        **Q.  Okay.  Did you feel that those were all things**

Page 183

1    **that the City was giving to the protesters in return for**
2    **nothing?**
3         A.  I don't know.  I -- to be honest, I -- I don't
4    know what I -- what I meant in that -- in that moment in
5    time when I sent that text.  I just knew it was my job
6    to try to figure out how to get folks out of Cal
7    Anderson Park.
8         **Q.  Okay.  You were -- I mean, the wording was**
9    **pretty strong that the City was giving them everything**
10   **and they weren't doing shit.  I mean, I'm not -- that's**
11   **not an exact quote, but would you agree that that's**
12   **pretty strong language?**
13        A.  Yes, it is very strong language.
14        **Q.  You were -- you were very frustrated at that**
15   **point; correct?**
16        A.  That is correct, yes.
17        **Q.  And you felt that you were -- that whatever you**
18   **had negotiated and agreed with with the protesters was**
19   **never enough; that the City could never please them**
20   **completely; right?**
21             MR. CRAMER:  Objection.  Form.
22        A.  I don't know that I would characterize it that
23   way.  I think it was more of a -- you know, the -- not
24   having clarity on what all the things are that we could
25   have done to -- you know, to resolve the encampment was

Page 184

1    frustrating.  I mean, it was -- you know, and -- but I'm
2    glad that's why we had, you know, the Human Services
3    Department fire up its stuff and try to think outside
4    the box of who we could bring to the table to try to
5    help engage, you know, folks who were -- were in the
6    park.
7    BY MR. WEAVER:
8         **Q.  Do you know whether at this point the City had**
9    **also indicated to people in the area that they would**
10   **preserve the artworks that had been created during the**
11   **CHOP period of June 8th through the end of June 2020?**
12        A.  Yeah, I am aware that there was an effort to
13   store the art.
14        **Q.  Okay.  And -- I mean, as of June 23rd, when you**
15   **wrote this, had the City -- do you know whether the City**
16   **had been -- had offered that as well to the protesters?**
17        A.  I don't remember.
18        **Q.  Okay.  Okay.  Going further down this text**
19   **chain with Mami Hara, on the next page, Page 52, at**
20   **12:46 p.m., you indicate that -- you say, "I mean, we're**
21   **offering to store their plants in our greenhouses and**
22   **water their," all caps, "illegal garden."**
23             **What was -- what were you -- what was the offer**
24   **to store plants in the City's greenhouses?**
25        A.  It was just that.  We were offering to -- to

46 (Pages 181 to 184)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                          Casey Sixkiller

---

Page 185

1  store plants in our greenhouse space as a commitment to
2  working with them going forward.
3       Q.  Okay.  Did that end up happening?
4       A.  I think it did.
5       Q.  Okay.
6       A.  But you'd have to ask Parks.  I don't remember
7  off the top of my head, but I believe it did.
8       Q.  Where was the greenhouse where they were --
9  where they were talking about storing them?
10      A.  I don't remember.  You'd have to ask Parks.
11      Q.  Okay.  Do you know whether it was on Cal -- in
12  Cal Anderson, or do you not know at all?
13      A.  I don't know it -- I don't believe it was in
14  Cal Anderson.  I don't think we have a greenhouse in Cal
15  Anderson.
16      Q.  Seems like you were pretty clear that their
17  garden was illegal.  Would you agree with me on that?
18          MR. CRAMER:  Objection.  Form, foundation.
19      A.  I mean, I stated it as -- as such, yes.
20  BY MR. WEAVER:
21      Q.  Okay.  Do you believe their garden was illegal?
22          MR. CRAMER:  Same objection.
23      A.  Yeah, I mean, I -- I -- as I stated -- I'm not
24  going to contradict myself here -- yeah, they tore up
25  part of the park.

---

Page 186

1  BY MR. WEAVER:
2       Q.  Okay.  Do you -- do you think that was a
3  citable offense?
4          MR. CRAMER:  Same objection.
5       A.  I don't know.  I'm not going to -- I don't
6  know.
7  BY MR. WEAVER:
8       Q.  Do you know whether there were any charges
9  filed for the creation of the illegal garden?
10      A.  I don't know.
11          MR. WEAVER:  Okay.  Let's go off the record.
12          THE VIDEOGRAPHER:  Going off the record.
13  The time now is approximately 3:48 p.m.
14          (Recess from 3:48 p.m. to 4:03 p.m.)
15          THE VIDEOGRAPHER:  Going back on the record.
16  The time now is approximately 4:03 p.m.
17          E X A M I N A T I O N  (Continuing)
18  BY MR. WEAVER:
19      Q.  Okay.  So do you recall that it was on
20  June 22nd that the mayor declared in a public press
21  conference that it was time for people to go home, or
22  something along those lines?
23      A.  I don't remember the day, but I do remember her
24  doing that, yes.
25      Q.  Okay.  All right.  Is it safe to say that not

---

Page 187

1  everybody went home from the area around Cal Anderson
2  and the east precinct following the mayor's order, or
3  declaration?
4       A.  Yes.
5       Q.  In fact, there were still shootings and
6  violence in the week after -- in the area around Cal
7  Anderson and the east precinct after her declaration;
8  correct?
9       A.  I'm --
10          MR. CRAMER:  Objection.  Form.
11      A.  Yeah, I'm aware -- I mean, there continued to
12  be troubling activity in and around the area, yes.
13  BY MR. WEAVER:
14      Q.  Okay.  What do you mean by "troubling
15  activity"?
16      A.  You know, I -- my understanding that, you know
17  there were -- in addition to demonstrations happening in
18  other parts of the city, including in this area, there
19  also was, if I recall, reports of property damage.  I
20  can't remember the -- the timing of shootings or shots
21  fired.  I just don't remember, but...
22      Q.  How many tents were still on the -- in the --
23  in the Cal Anderson Park in the week after the mayor
24  indicated it was time for everybody to go home?
25      A.  I -- I don't know.

---

Page 188

1          MR. CRAMER:  Objection.
2  BY MR. WEAVER:
3       Q.  Go back to Exhibit 5, and Pages 9 to 10.
4       A.  Okay.
5       Q.  And at the bottom there's a text from Mami Hara
6  to a group that includes you, indicating that as of
7  June 24th, tent count was 30 on the play field, 75
8  around the bathrooms, garden, and play structure, 35 on
9  the north side of the park, and 10 tents re-camped
10  around the precinct, and then the next one looks like 50
11  less overall.
12          Do you see that?
13      A.  I do, yes.
14      Q.  Okay.  So my count is that as of June 24th
15  there were -- you'd think I would have done this before,
16  but about 150 tents; is that right?
17      A.  You're better at quick math than I am.
18      Q.  All right.  I mean, do you recall that there
19  were at some point 200 or more tents in and around Cal
20  Anderson and the east precinct towards the end of
21  June 2020?
22      A.  I'm not going to speculate about the -- the --
23  the -- the number of tents, but there -- but there
24  were -- there were a lot of tents in the park, and as
25  indicated here, as well as near the -- near the precinct

---

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                                    Casey Sixkiller

Page 189

1  itself.
2      Q.  Mami was there every day; right?
3      A.  Mami was there, I think, every day or so, and
4  other folks.  And by this point, on the 24th, right, I
5  believe our -- the navigation team was also on site as
6  well, the Human Services Department's navigation team
7  was on site, which specifically engages in
8  encampments -- in encampment work.
9      Q.  Okay.  Going down further -- actually, it's on
10 the next page, it's actually Text Chain 794, on Page 10.
11     A.  Oh.
12     Q.  Text from Mayor Fong -- or sorry, Mike Fong.
13 It's been a long day.  Saying "The mayor just called and
14 wants the newly constructed barriers up on 12th
15 removed."
16         Do you see that?
17     A.  Yes.
18     Q.  Okay.  What do you recall about during this
19 week, after the mayor said it was time to go home, that
20 there were still new barriers showing up in the area?
21         MR. CRAMER:  Objection.  Form.
22     A.  Can you -- can you ask me that again, please?
23 I'm sorry.
24 BY MR. WEAVER:
25     Q.  During the week of June 22nd, do you recall

Page 190

1  that there were new barriers showing up overnight in
2  areas where they had not previously been?
3      A.  I re-- I recall barriers showing up.  Whether
4  or not they had not been there before or not, I couldn't
5  tell you.
6      Q.  Okay.
7      A.  Based on my own memory.
8      Q.  Do you recall them being moved around in this
9  time period by the protesters, or by people in the area?
10         MR. CRAMER:  Objection.  Form.
11     A.  That is my -- that is my recollection, yes,
12 that some of these were -- were moved around at times.
13 BY MR. WEAVER:
14     Q.  Okay.  Go back to 7 -- sorry -- Page 4, 786.
15 At the bottom of the page of -- of Page 4 there is a
16 text from you on June 25th.  I'm sorry.  What's funny?
17     A.  I'm sorry.  I just -- I'm a little punchy, and
18 I'm reading my text message at the same time.
19     Q.  Okay.  So you indicate there's some new cars in
20 the park.
21         Do you see that?
22     A.  Yes.
23     Q.  Okay.  And that was -- that was what Mami had
24 told you as she was reporting from the area, as you
25 recall?

Page 191

1      A.  Yes.
2      Q.  Okay.  And why was it a concern that there were
3  new cars in the park on June 25th?
4      A.  You know, at this point, as the -- in the text
5  string we just looked at, in reference to Deputy Mayor
6  Fong's text message about barricades, by this point, you
7  know, a number of departments were working on tactical
8  plans to remove -- to remove all the barriers and remove
9  the encampment and materials from Cal Anderson Park and
10 Bobby Moore's field.
11         So part and parcel to that, you know, I -- we
12 all wanted sort of a continuous update on what we were
13 seeing on the ground to ensure that whatever -- you
14 know, if something changed, that our -- that it didn't
15 compromise the tactical plans that were being drawn up,
16 reviewed, prepared, whatever.
17     Q.  Okay.  And were there more tents arriving in
18 the area as well, in and around Cal Anderson and the
19 east precinct, on June 25th?
20     A.  If I recall, what -- what was happening was we
21 were making really good progress in the park itself, and
22 getting folks to voluntarily remove themselves by
23 accepting services.  But as this email -- or text
24 message, pardon me -- indicates, there were some tents
25 that popped up, new tents that popped up, up around the

Page 192

1  precinct.  But I -- I seem to remember that once the
2  navigation team was on site and other contracted service
3  providers, that we did begin to make quite a bit of
4  progress on addressing individuals in Cal Anderson Park.
5          And I remind you that we also were just -- you
6  know, as the navigation team was there and other service
7  providers, you know, realizing again that, you know,
8  some percentage of these tents were, in fact, abandoned.
9      Q.  What did you mean by "Burning Man going
10 strong"?
11     A.  Well, as you know, as I've said, you know,
12 throughout this deposition, there -- you know, this area
13 attracted lots of different people, you know, that were
14 there to demonstrate, some that were there to be
15 tourists, some that were there to -- to experience it, I
16 guess, or whatever.  But there was a -- a -- a
17 contingent up on the northern part of Cal Anderson, who
18 I can't remember who dubbed them this, but I -- I
19 remember one of us saying -- it might have even been me
20 saying, you know, these guys, they -- they got no
21 connection to anything here.  These guys are basically
22 having their Burning Man moment and, you know, hanging
23 out.  They're -- they are -- they're here because
24 they -- they're just here, but they're kind of -- my
25 recollection being they were sort of harmless, they were

48 (Pages 189 to 192)

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

---

Page 193

1  sort of like, hey, look, there's a party going on and
2  we're going to hang out and...
3      Q. When do you recall the Burning Man
4  contingent -- when do you recall noticing the Burning
5  Man contingent?
6      A. Before -- before this date, for sure. I don't
7  remember when they -- I don't remember when I or
8  somebody else coined the phrase.
9      Q. Do you think there was any particular reason
10 that the area around Cal Anderson Park and the east
11 precinct became a magnet for various types of groups,
12 such as the Burning Man contingent or homeless people in
13 June of 2020?
14     MR. CRAMER: Objection. Form.
15     A. Well, I -- I mean, I think that there's, you
16 know, probably a lot of different reasons why that
17 occurred. You know, again, you know, we're in the
18 middle of a global pandemic. People have been cooped up
19 for weeks and months. Whether we like it or not, this
20 entire experience was national news. You had the
21 president of the United States and the attorney general
22 of the United States issuing statements condemning
23 Seattle as a whatever, a socialist state of some kind.
24 You know, our encampment team met people who were living
25 in the park who had just come in on the bus from -- or

Page 194

1  the plane from New York, wanted to be here as part of
2  this. You know, so -- and at the same time -- at the
3  same time you have people that were come -- that live in
4  Seattle that were coming there to demonstrate, right,
5  and to, you know paint the Black Lives Matter mural, who
6  were there to talk and engage with others about the
7  moment in time that our country was experiencing. So
8  it's -- I think this -- therein lies the complexity of
9  this entire thing. There are just so many different
10 elements, both in terms of people who were there and
11 also just the factors that we were all trying to weave
12 through, balance, understand, and -- and I just think
13 it -- that -- and it evolved over time.
14 BY MR. WEAVER:
15     Q. Do you think, based on everything you know
16 about what was happening in Capitol Hill in June 2020,
17 that the lack of a police presence in the east precinct
18 encouraged various groups to seek out the area in and
19 around the precinct and Cal Anderson Park --
20     MR. CRAMER: Object to form.
21 BY MR. WEAVER:
22     Q. -- as opposed to being a camp?
23     A. No, I don't.
24     Q. Why is that?
25     A. In part, there are -- you know, there are

Page 195

1  encampments that exist all across our city. Crime
2  exists all across our city. As this past summer has
3  showed us, shots fired and victims of gun violence
4  happen all across our city. And so I -- I -- so no, I
5  don't -- I don't believe that -- I don't believe that
6  that contributed to the events that occurred in June of
7  20 in this area.
8      Q. Do you know whether crime increased in the area
9  in and around Cal Anderson Park and the east precinct
10 during the time of June 2020?
11     A. I think that's a question you'll have to ask
12 Chief Best. I don't have that -- I don't have the crime
13 data --
14     Q. Sure.
15     A. -- in my head.
16     Q. Do you know what happened to 911 response times
17 in the area in and around Cal Anderson Park and the east
18 precinct in June of 2020?
19     A. I recall that not just around Cal Anderson, but
20 throughout the entire area serviced by the east precinct
21 that 911 calls -- the response times to 911 calls
22 increased, but the fraction by which, I could not tell
23 you.
24     Q. Okay. So you indicated earlier that as of the
25 last week of June of 2020, there were plans for multiple

Page 196

1  departments to clear out the area of people and
2  barricades, meaning the area in and around Cal Anderson
3  Park and the east precinct.
4      Do you remember that?
5      A. Yes.
6      Q. Okay. What, from your perception, caused the
7  delay in actually clearing out the park and the -- and
8  the streets in that area until July 1, 2020?
9      MR. CRAMER: Objection. Form.
10     A. I -- I think there are -- I think number one,
11 it was a very complex -- it was a complex environment,
12 and, you know, I think we were trying to balance and
13 work through several things. You know, in the park, as
14 we've discussed, the navigation team was up there, the
15 homelessness service providers were up there, and there
16 was, you know, a combination of people who -- as an
17 example, who were experiencing homelessness that were
18 known to our service providers as experiencing
19 homelessness in the Capitol Hill area, and we were able
20 to connect them to services and -- and, you know, get
21 them out of the park.
22     There were others who, despite being given the
23 opportunity to come inside, the opportunity to get, you
24 know -- have financial support to go home, wherever home
25 was, refused. And I say that because I think it's

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 197

1  important, you know, throughout this period, you know,
2  we're -- we're -- we're constantly trying to reduce the
3  footprint; right?  We're trying to -- we're trying to --
4  we start -- start a couple weeks before this, and we try
5  to get all these barriers removed, we get rebuffed.
6          We have a smaller plan, and the whole time
7  we're trying to -- you know, to reduce the size of the
8  footprint, again, with respect to Cal Anderson Park, is
9  really get a sense of how many people are actually
10 there?  How many of these tents are actually, you know,
11 being used by someone who's experiencing homelessness,
12 or are in fact abandoned?  And, you know, all of that
13 takes time, it takes a lot of coordination.
14         And at the same time, you know, we wanted to
15 get it right; right?  We didn't want to have -- you
16 know, what I've said several times throughout this
17 deposition, that, you know, we were trying really hard
18 to not create new opportunities to have a negative
19 interaction between, or flash point between, the Seattle
20 Police Department and -- and nonpolice personnel.  And
21 frankly, I think that we succeeded at that.  And, you
22 know, unlike earlier, in late May, where we had, you
23 know, mutual aid from other law enforcement agencies, by
24 the end of June we did not.  And I'm sure that Chief
25 Best will -- will at some point talk about the

Page 198

1  complexity that added to her planing and execution of
2  her tactical plan.
3          But -- so there was a -- there was a lot to --
4  to -- to work through, and -- and again, you know,
5  our -- the mayor's focus was on, you know, the safety of
6  everyone involved, and -- and -- and trying to resolve
7  this entire situation as expeditiously, peacefully, as
8  possible, and I -- I -- I think on the day of the
9  operation that planning and that commitment worked out.
10 BY MR. WEAVER:
11         Q.  So you were concerned -- you said the mayor was
12 concerned about the safety of everyone.  Was the mayor
13 concerned about -- in this late June 2020 time period,
14 concerned about the safety of residents and business
15 owners in the area around Cal Anderson and the east
16 precinct?
17         MR. CRAMER:  Objection.  Form.
18         A.  Yeah, I think you'd have to ask -- you know, I
19 think that's a question for Mayor Durkan.
20 BY MR. WEAVER:
21         Q.  Okay.  How do you know the mayor was, in your
22 words, concerned about the safety of everyone?
23         A.  Well, I described it as everyone, and you asked
24 me about a subpopulation of everyone.  So my definition
25 of everyone is everyone.  You're -- you want to ask a

Page 199

1  question about a specific subpopulation, you need to ask
2  the mayor.
3         Q.  Okay.  Did she tell you she was concerned about
4  the safety of everyone?
5         A.  Yeah.
6         Q.  Okay.  What do you recall about that
7  conversation and the safety?
8         A.  Again, I think it goes back to, you know, we
9  want to make sure that we are -- you know, we've done
10 the right planning, we've done all the things we can to
11 get people inside, to get people to exit the park, to
12 exit the area, for folks to know that this -- this --
13 this is over.  Like it's time for folks to -- to go
14 home, to exercise their first amendment rights in a
15 different way, in a different place, and -- and allow
16 us, the City, the opportunity to -- to begin to restore
17 the park and all the other pieces that had been impacted
18 over the previous four weeks, and to do that in a way
19 that, you know, didn't -- didn't result in -- in harm
20 to -- to people, whether that was, you know, residents,
21 city personnel, visitors, or police or fire, or City
22 employees.
23         Q.  At some point did you learn that this lawsuit
24 had been filed by business owners and residents in the
25 area in late June 2020?

Page 200

1         A.  I was aware that -- that a lawsuit had been
2  filed, but I can't -- I certainly -- I don't -- I don't
3  know what -- I don't remember who it -- who filed it.
4         Q.  Well, I can tell you it was -- it was us.
5         A.  I surmised that.  That I -- that I figured out,
6  yes.
7         Q.  It was not just me, but it was -- I was
8  involved.
9          So do you recall the existence of a lawsuit
10 causing an acceleration of the desire to clear the
11 streets and park in June of 2020?
12         A.  No, I don't.
13         Q.  What discussion do you recall there being about
14 the lawsuit?
15         MR. CRAMER:  And I'll advise the deponent
16 not to testify to conversations you had with the City
17 attorneys.  That's privileged.
18         A.  I -- I do not remember having a conversation
19 about the lawsuit and its bearing or not bearing on any
20 of the operational decisions we were making at that
21 time.  I just remember being informed there was -- a
22 lawsuit had been filed.
23 BY MR. WEAVER:
24         Q.  When do you recall the final decision was made
25 that the City was going to close the park, the City was

50 (Pages 197 to 200)

Hunters Capital, LLC v. City of Seattle                                    Casey Sixkiller

```
                                           Page 217
 1              (Deposition concluded at 4:59 p.m.)
 2              (Reading and signing was requested
 3               pursuant to FRCP Rule 30(e).)
 4                        -o0o-
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                           Page 218
 1              C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON
 4   COUNTY OF PIERCE
 5
 6        I, Cindy M. Koch, a Certified Court Reporter in
 7   and for the State of Washington, do hereby certify that
 8   the foregoing transcript of the deposition of Casey
 9   Sixkiller, having been duly sworn, on October 12, 2021,
10   is true and accurate to the best of my knowledge, skill
11   and ability.
12        IN WITNESS WHEREOF, I have hereunto set my hand
13   and seal this 22nd day of October, 2021.
14
15
16        _____
17            CINDY M. KOCH, CCR, RPR, CRR #2357
18
19   My commission expires:
20   JUNE 9, 2022
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Exhibit 5

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al., )
                              )
         Plaintiff,   )
                              )
vs.          ) No. 20-cv-00983-TSZ
                              )
CITY OF SEATTLE,          )
                              )
         Defendant.   )

_____

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(SAMUEL ZIMBABWE)

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 28, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

1          A P P E A R A N C E S
2    FOR PLAINTIFF:
3       TYLER S. WEAVER
        GABRIEL REILLY-BATES
4       Calfo Eakes LLP
        1301 Second Avenue
5       Suite 2800
        Seattle, WA 98101-3808
6       206.407.2237
        tylerw@calfoeakes.com
7       gaber@calfoeakes.com
8
     FOR DEFENDANT:
9
        SHANE P. CRAMER
10      Harrigan Leyh Farmer & Thomsen LLP
        999 Third Avenue
11      Suite 4400
        Seattle, WA 98104
12      206.623.1700
        shanec@harriganleyh.com
13
14   ALSO PRESENT:  CATHY ZAK, videographer
                Buell Realtime Reporting, LLC
15
16           * * * * *
17
18
19
20
21
22
23
24
25

## Page 3

1          DEPOSITION OF SAMUEL ZIMBABWE
2             EXAMINATION INDEX
3    EXAMINATION BY:                PAGE
4    30(b)(6) Examination by Mr. Weaver      5
5    Non-30(b)(6) Examination by Mr. Weaver      53
6
7             EXHIBIT INDEX
8    EXHIBITS FOR IDENTIFICATION          PAGE
9    Exhibit 1  Amended Notice of Videotaped      8
        Deposition Pursuant to FRCP
10       30(b)(6) to City of Seattle
11   Exhibit 2  5-page Executive Order 2020-08;      9
        SEA_00015070
12
     Exhibit 3  "Re: SFD Protest Zone Response      20
13       Map"; SEA_00020379-384
14   Exhibit 4  Email chain; SEA_00105259      43
15   Exhibit 5  Email chain; SEA_00105029-030      63
16   Exhibit 6  15-page chart titled "Messages"      69
17   Exhibit 7  "11am Update - E Precinct";      84
        SEA_00028170-171
18
     Exhibit 8  Email chain; SEA_00137341-346      111
19
     Exhibit 9  Email chain; SEA-PDR_000398-403      143
20
     Exhibit 10 "2PM Update - E Precinct (see      160
21       notes)"; SEA_00028178-179
22   Exhibit 11 Email chain; SEA_00137366-369      178
23   Exhibit 12 Email chain; SEA_00137350-351      180
24   Exhibit 13 4-page email chain; SEA_00028053      220
25

## Page 4

1          SEATTLE, WASHINGTON; OCTOBER 28, 2021
2          9:05 a.m.
3          -o0o-
4          THE VIDEOGRAPHER:  Good morning.  This is
5    the deposition of Samuel Zimbabwe in the matter of
6    Hunters Capital, LLC, et al., v. City of Seattle, Case
7    No. 20-cv-00983, in the United States District Court,
8    Western District of Washington, at Seattle, and was
9    noticed by Calfo Eakes.
10         The time now is approximately 9:05 a.m. on this
11   28th day of October, 2021, and we are convening via
12   Buell Virtual Depositions.
13         My name is Cathy Zak, from Buell Realtime
14   Reporting, LLC, located at 1325 4th Avenue, Suite 1840,
15   in Seattle, Washington 98101.
16         Will counsel please identify themselves for the
17   record.
18         MR. WEAVER:  This is Tyler Weaver, for the
19   plaintiffs, from Calfo Eakes.  And with me I have Gabe
20   Reilly-Bates, who is also participating, is online
21   today.
22         MR. CRAMER:  And Shane Cramer, Harrigan
23   Leyh, on behalf of the Defendant City of Seattle.
24         THE VIDEOGRAPHER:  Thank you.  The court
25   reporter may now swear in the witness.

1 (Pages 1 to 4)

Hunters Capital, LLC v. City of Seattle                 30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 9

1   BY MR. WEAVER:
2       **Q. -- provision of barriers -- I'm sorry.**
3           MR. WEAVER:  Did somebody say something?
4           MR. CRAMER:  I think it was added to the
5   chat before I logged in.  Can you re-add it to the chat?
6           MR. WEAVER:  Oh, sure.  Yep.
7           MR. CRAMER:  Thanks.
8   BY MR. WEAVER:
9       **Q. So my understanding is, you're going to be**
10  **talking about the City's provision of barriers and any**
11  **other physical resources that SDOT provided; is that**
12  **correct?**
13      A. That's my understanding, yes.
14      **Q. Okay.  And then with regard to Topic 36, which**
15  **is down at the bottom of that page and runs on to the**
16  **next page, you're also going to be talking about the 36,**
17  **subparagraph -- Subsection 2 and 4; is that correct?**
18      A. Yes, that's correct.
19          (Exhibit No. 2 marked.)
20  BY MR. WEAVER:
21      **Q. All right.  So with regard to that, I want to**
22  **drop into the chat Exhibit 2.**
23      **I take it you've seen Exhibit 2 before?**
24      A. It hasn't quite come in yet.
25      **Q. Okay.  All right.**

Page 10

1           MR. CRAMER:  I have not received it either,
2   so I don't know if it's --
3           MR. WEAVER:  All right.  Well, let me try --
4   let me try again.  For some reason, it didn't come
5   through, it looks like, so -- all right.
6   BY MR. WEAVER:
7       **Q. Try it now.**
8       A. Okay.  And your question was, have I -- am I
9   familiar with this document?
10      **Q. Yeah, yeah.**
11      A. Yes, I am.
12      **Q. Okay.  So if you could go to the top of Page 2**
13  **of this Exhibit 2.**
14      **So my understanding is, you're -- you're here**
15  **to provide testimony about the factual basis for the**
16  **second bullet point in that first paragraph, which is,**
17  **"Temporarily allowing obstructions of public parks,**
18  **streets, and sidewalks."**
19      **And I was wondering if you could tell me your**
20  **understanding of -- of what the obstructions of public**
21  **parks, streets, and sidewalks were in the area that's**
22  **being discussed in this paragraph.**
23      A. Sure.  Well, there were some -- during the time
24  of the protests, there were some temporary and then we
25  changed some of the traffic patterns in order to

Page 11

1   separate pedestrians and people protesting from
2   vehicular traffic, and that modified some of the
3   underlying traffic conditions in the area, I would say,
4   between 10th Avenue and 12th Avenue, and between Olive
5   and Pike.
6       **Q. Okay.  So first let's break that down.  So the**
7   **time period that we're -- you're talking about, is that**
8   **the night of June 8th through the morning of July 1,**
9   **2020?**
10      A. The SDOT involvement, I would say, started
11  really the -- I think the morning of July -- I mean
12  June 9th.
13      **Q.**
14      A. In terms of our involvement in -- in some of
15  the traffic pattern changes.
16      **Q. Well, let's talk about some of the**
17  **things that were -- were obstructed.  First you said**
18  **there were some temporary barriers.  What were you**
19  **referring to there?**
20      A. Well, I was -- I guess -- I think I was -- I
21  meant that there were some temporary -- so when -- when
22  they were -- before June 8th, when there were ongoing,
23  active protests that were temporary in nature, there
24  would be times when traffic patterns were obstructed by
25  the protest activities.

Page 12

1       The -- after -- and as part of the crowd
2   control approach, prior to June 8th, there were some
3   typical traffic control barriers, what we call water
4   filled barriers.
5       They're the generally orange and white barriers
6   that we use on a regular basis.  And they're plastic,
7   they get filled with water, and they become sort of
8   immovable.  They can -- they can help separate vehicles
9   from pedestrians.
10      So those were -- SDOT had provided those,
11  worked with -- with Seattle Police Department to provide
12  those as part of the crowd control approach prior to
13  June -- June 8th.
14      After June 9th, there were -- and really there
15  were -- not for another few days, we did provide some
16  other barrier -- barriers that were intended to provide
17  some regular traffic patterns between the area that
18  people were protesting and areas that were open for
19  vehicular traffic.
20      And those included some concrete blocks that we
21  commonly refer to as ecology blocks, and then some other
22  traffic control devices.
23      **Q. Okay.  So there were -- there had been some**
24  **protests prior to June 8th or June 9th in the area**
25  **around the East Precinct in Cal Anderson Park; right?**

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 13

1    A.  That's right.
2        Q.  Okay.  And there had been some barriers that
3    had been used by the City and the police department in
4    that area as well with relation to those prior protests;
5    right?
6        A.  That's right.
7        Q.  Okay.  And those included -- those included the
8    water filled barriers that you were talking about?
9        A.  Yes.
10       Q.  So were those -- are those large orange
11   barriers that are filled with water typically?
12       A.  Yes.
13       Q.  Okay.  About how big are there?
14       A.  They're about six feet long each, and about
15   two and a half to three feet tall.
16       Q.  Okay.
17       A.  They're similar in size to what a Jersey
18   barrier -- you know, a concrete Jersey barrier would be,
19   but they are more easily moved.  And then once they're
20   filled with water, they're generally not as movable.
21       Q.  Okay.  What's the difference between a Jersey
22   barrier and an ecology block?  I've been trying to
23   figure this out, but you're the man, so --
24       A.  Yeah.  Sure.  So Jersey barriers are -- are
25   concrete barriers that are often used in a highway

Page 14

1    situation that provide some barrier between, you know,
2    fast-moving traffic in general and something else,
3    whether that's other fast-moving traffic or pedestrians.
4    They're what you would typically see along the center of
5    a highway.
6        Ecology blocks -- oh, sorry.  Go ahead.
7        Q.  Are the Jersey barriers, are they concrete?
8        A.  They are.
9        Q.  Okay.  But they're not as large as the ecology
10   blocks; is that correct?
11       A.  They're -- they're a slightly different shape,
12   and they're engineered to -- again, they're really
13   engineered for high-speed vehicular traffic.  And when a
14   vehicle crashes into them, it sort of pushes the vehicle
15   back into the -- the lane that it was coming from.
16       It sort of -- it's a -- designed -- I'm not
17   a -- I'm not a traffic engineer to -- to understand
18   exactly the -- the physical dynamics of it, but it's, in
19   general, intended for that higher -- higher speed
20   condition, and it -- it responds to how vehicles would
21   crash into it.
22       An ecology block is more of a rectangular block
23   that is -- can be used as a traffic control -- as part
24   of traffic control, but is often used stacked on top of
25   of -- you know, they're -- they can be stacked on top of

Page 15

1    each other and used as sort of a retaining wall sort
2    of -- part of a retaining wall deployment.
3        Q.  Okay.  How -- how large and heavy are the
4    ecology blocks?
5        A.  So the ecology blocks are -- they come in some
6    different sizes, but they're typically about two feet
7    tall, three feet long, and two feet deep.
8        Q.  Okay.  Do you know how heavy they are?
9        A.  They're multiple hundred pounds.  I mean, we --
10   when we move them, we use a piece of construction
11   equipment to move them.  They're not something that
12   individuals can move.
13       Q.  Okay.  Okay.  So going back to before we were
14   clarifying what kind of barriers we're talking about,
15   so -- so prior to the evening of June 8th, were -- there
16   were -- were there -- were there Jersey barriers in the
17   area of the East Precinct?
18       A.  You know, I believe that there were a few
19   ecology blocks that had been provided by SDOT very close
20   to the precinct itself, but not as part of the crowd
21   control approach.
22       Q.  Okay.  What were they -- what were they there
23   for?
24       A.  You know, I'm -- I'm not exactly sure what they
25   were there for.  But they were, you know, very close to

Page 16

1    the precinct itself.
2        Q.  Okay.  And were there other things that had
3    been used as barriers that were in the area on the night
4    of June 8th, like bicycle racks and that sort of thing?
5        A.  Yeah, I believe that there had been some what
6    are commonly called bicycle rack barriers.  Those are
7    the sort of metal fencing that I think are -- are pretty
8    standard crowd control -- also used in crowd control
9    situations, but they can be used as bicycle racks as
10   well.
11       And then I believe that there were some other
12   sort of black metal concert -- barriers that are
13   typically used for concert fencing, that were not SDOT
14   provided, but they were -- they were present there.
15       Q.  Okay.  And on the night of June 8th into
16   June 9th, those barriers that were there had been moved
17   by people in the area; is that correct?
18       A.  That's correct.
19       Q.  And they were blocking certain streets and
20   sidewalks at that point, on the morning of June 9th?
21       A.  Yeah.  So at -- at the point -- you know, I --
22   I went to that area for the first time on June 9th.
23   When I arrived there, there were all sort of -- all sort
24   of manner of barricades that had been set up by -- by
25   both protest groups and individuals.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle

30(b)(6) and Individual Deposition of Samuel Zimbabwe

---

Page 17

1          And they included the materials that we've
2    talked about, and then they included some other -- other
3    things as well.  I think there were some bleachers from
4    Cal Anderson Park that had moved -- been moved into
5    various places.
6          There were some dumpsters that had been moved
7    around.  There was a variety of different things that
8    were -- had been moved into -- into creating sort of
9    barricades that blocked different places within the --
10   that area.
11        Q.  Okay.  So there were streets -- areas that were
12   blocked off included streets and sidewalks; is that
13   right?
14        A.  Yeah, I -- you know, I don't remember there
15   being sidewalks that were blocked off.
16        Q.  Okay.
17        A.  And there were certain -- certain streets that
18   were blocked off, and then there were certain streets
19   that were -- remained open.
20        Q.  And we're -- we're still talking about the
21   morning of June 9th; right?
22        A.  Yes.
23        Q.  Okay.  At some point did -- were there
24   blockages of sidewalks in the month of June, between
25   June 9th and July 1, 2020?

---

Page 18

1        A.  You know, I don't remember there being
2    blockages of sidewalks, but there -- there may have been
3    at -- at various points.  I don't remember there being
4    barricades blocking sidewalks.
5        Q.  How about other things blocking sidewalks,
6    other than barricades?
7            MR. CRAMER:  Objection.  Form.
8        A.  I think --
9            MR. CRAMER:  You can go ahead and answer.
10           THE WITNESS:  Oh, okay.
11       A.  I don't recall there being blockages of
12   sidewalks.  There may have been temporary, but I don't
13   remember there being either on the morning of June 9th or
14   at -- at other points.
15   BY MR. WEAVER:
16       Q.  So do you know why the order that we're
17   referring to as Exhibit 2 talks about obstructions of
18   sidewalks in the area defined in the first paragraph?
19       A.  I mean, I -- there were times when there were
20   large crowds of people, which would have -- would have
21   made it challenging to pass through.  And so I -- you
22   know, I wouldn't want to speculate too much, but I -- I
23   can imagine that that's what went into the drafting of
24   the -- of a temporary obstruction of sidewalks from
25   the -- from -- by protest -- by protest activities.

---

Page 19

1        Q.  Do you know whether there were tents that were
2    occasionally on the sidewalks in the area during June
3    2020?
4        A.  Yes.  That's a -- that's a fair -- fair point.
5    There were -- I think there probably were some tents at
6    various points.  I don't know whether they fully
7    obstructed sidewalks, but there definitely were times
8    where there were tents on the sidewalks.
9        Q.  How about tents in the -- do you recall tents
10   in Cal Anderson Park?
11       A.  You know, I -- I do recall tents in Cal
12   Anderson Park.  The park itself is not part of SDOT's
13   jurisdiction, and so I didn't spend very much time at
14   all inside of Cal Anderson Park.  So I wouldn't want to
15   speculate too much on -- on what the conditions were
16   inside of Cal Anderson Park.
17       Q.  Okay.  So are you able to testify about
18   temporary obs- -- temporary obstructions of public
19   parks?
20       A.  I'm not.
21       Q.  Okay.  What does the order that's Exhibit 2
22   mean when it says that the City temporary -- temporary
23   allowed these obstructions?  What does it mean to allow
24   the obstructions?
25       A.  You know, if we -- you know, I think typically

---

Page 20

1    if -- if a -- if a private entity obstructs a street, we
2    have -- with -- with materials or -- or things like
3    that, we have a group of street use inspectors, they're
4    called.  They're people who enforce the -- the rules of
5    occupancy of the right-of-way and -- so if a
6    construction site, for example, would have blocked a
7    street without a permit to do so, we would have -- we
8    would have our street use inspectors take enforcement
9    action.
10           And that's a progressive step, from first
11   initially communicating with people and allowing them to
12   rectify the situation, to then eventually issuing
13   notices of violation to the entities that have -- that
14   have blocked a -- you know, occupied a street in some
15   way.
16       Q.  Okay.  And so I suppose what you -- so the
17   allowing means that you did not take that enforcement
18   activity that you normally would in this area in June of
19   2020?
20       A.  That's right.
21           (Exhibit No. 3 marked.)
22   BY MR. WEAVER:
23       Q.  I'm going to mark something as Exhibit 3, to go
24   back to the sidewalk issue.
25       A.  Okay.

---

5 (Pages 17 to 20)

Hunters Capital, LLC v. City of Seattle      30(b)(6) and Individual Deposition of Samuel Zimbabwe

---

Page 25

1  BY MR. WEAVER:
2      Q.  Why were you asking them not to be there on a
3  regular basis during that time?
4      A.  Because their activities could be -- their
5  activities could be interrupted by some of the protest
6  activities.  And so, you know, just as a way to not have
7  them have their daily work interrupted by -- by being in
8  the midst of a -- of a protest, we sort of re- --
9  reallocated what they were asked to do.
10      Q.  Okay.  In addition to the barriers that we
11  already talked about and things that were obstructing
12  the area at that time, do you recall there being -- do
13  you recall there being barriers such as cars that were
14  added to the area?
15          MR. CRAMER:  Objection.  Form.
16  BY MR. WEAVER:
17      Q.  Do you recall there being cars parked in the
18  street, that were blocking the streets?
19      A.  Not by the City.  There were --
20      Q.  No, I'm -- I'm not talking about from -- by the
21  City.
22      A.  Okay.  Yeah, there were times when there were
23  cars put in -- in the way of street traffic by the -- by
24  the folks protesting.
25      Q.  By the way, who -- who were the -- do you know

---

Page 26

1  who the street inspectors were that were assigned to the
2  Cal Anderson and East Precinct area in the month of June
3  2020?
4      A.  I don't.  But -- I -- I don't recall.  It's a
5  regular assignment.  It wasn't anything unusual.  And
6  they're -- just to make sure I clarify, our inspectors
7  are not assigned to parks facilities.  So our inspectors
8  are responsible for the SDOT right-of-way, the
9  transportation right-of-way, not for any park
10  activities.
11      Q.  Sure.  So when I -- when I talk about the area
12  around the East Precinct and the -- and Cal Anderson
13  Park, I'm not -- you know, I'll -- I understand -- thank
14  you for the clarification -- that doesn't -- your
15  jurisdiction doesn't include the park, but there's
16  obviously streets around the park as well.  So that --
17      A.  Sure.
18      Q.  -- that's included when I'm saying that,
19  just -- just to be clear.
20      So do you -- do you recall also seeing, during
21  the month of June 2020, what I guess I will say are
22  market booths that had been set up, private market
23  booths on the streets and sidewalks in that area?
24      A.  Yes, I do.
25      Q.  So those were in the streets and the sidewalks

---

Page 27

1  as well?
2      A.  Yes.
3      Q.  Okay.  Do you recall there being people around
4  these various barriers in the streets and sidewalks as
5  well?
6          MR. CRAMER:  Objection.  Form.
7      A.  I do.  There were people that -- yes, I do.
8  BY MR. WEAVER:
9      Q.  Do you recall that there were people who
10  appeared to be appointed as guards of the various
11  barriers in the area?
12      A.  I think there were -- yes.  I would say there
13  were people who were assigned as sort of -- to -- to
14  watch what had been established by a protest group as
15  sort of a -- an area around the East Precinct.  "Guards"
16  is maybe a little bit of an overstatement, from what I
17  saw.
18      Q.  Okay.  Were some of them armed, that you saw?
19      A.  I don't recall if they were armed.  You know,
20  I -- there were a few times when I did see firearms in
21  the -- in the area that we're talking about, but not --
22  not brandished in any way.  So -- but there were --
23  there were times when people were open carrying.
24      Q.  Okay.  What sort of weapons did you see open
25  carried in the June 2020 --

---

Page 28

1      A.  I --
2          MR. CRAMER:  Objection.  Form.  Outside the
3  scope.
4      Go ahead.
5      A.  I -- you know, I saw a sidearm or -- or two.
6  BY MR. WEAVER:
7      Q.  Any assault rifles?
8          MR. CRAMER:  Same objection.
9      A.  I did not.
10  BY MR. WEAVER:
11      Q.  Okay.  I'd like to talk about the barriers that
12  the City pro- -- by the way, were there any other
13  obstructions that you haven't talked about, that you know
14  of, that were allowed by the City in the area in the --
15  in -- in order -- in Exhibit 2 during the time period of
16  June 8th to July 1, 2020?
17          MR. CRAMER:  Objection.  Form.
18      A.  I do not recall any -- any other items present
19  as barriers.  I would say, of the ones that we've talked
20  about there, I guess I would not say that we allowed all
21  of the ones that we've talked about.
22      So if we want to go back and clarify which ones
23  were allowed versus which ones were present, we can --
24  we can do that, if you'd like.
25  ////

---

7 (Pages 25 to 28)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 29

1    BY MR. WEAVER:
2        Q.  Okay.  Which ones was -- which ones did the
3    City allow?
4        A.  So there -- there were -- this is not on
5    June 9th.  This is -- or June 11th.  This was after we
6    regularized a traffic pattern for -- for the area in
7    order to -- to -- to provide a regular, standard traffic
8    pattern.
9            There were City-provided barriers, the ecology
10   blocks, some of the other traffic control devices that
11   were present, that we allowed.  Other things that were
12   not -- not -- not those regular devices, using things
13   like cars to temporarily block a street or something
14   like that, were not at any point allowed by the City.
15       Q.  Okay.  Did the City remove things such as the
16   cars that were parked in the area?
17       A.  We did not prohibit any parking in the area.
18       Q.  Okay.  Including in the middle of a street; is
19   that correct?
20       A.  We did not remove vehicles from the middle of
21   the street.
22       Q.  Okay.  What obstructions of the streets and
23   sidewalks did the City remove?
24       A.  So we did remove the -- there -- some of those
25   initial items that had been rearranged by protesters,

Page 30

1    like the water filled barriers and some of the other
2    barricades that had been established in various places.
3    We did remove those -- those items.
4            And I would say, when -- if we ever encountered
5    a vehicle that was parked in the middle of the street
6    that was intended to be open for traffic, we did talk
7    with the occupants or -- or talk with protesters about
8    removing that barrier and enabling the free flow of
9    traffic in the places that were intended for -- for
10   vehicular use.
11       Q.  Okay.  And prior to July 1, 2020, the barriers
12   that SDOT removed were removed after agreement with the
13   people in the area; is that correct?
14       A.  I would say, after communication with the --
15   the people in the area.  There wasn't always full
16   agreement, but there was communication.
17       Q.  Okay.  Why -- why do you say there wasn't
18   agreement?
19       A.  Well, you know, I felt like our role in that
20   was -- you know, we -- we -- after June 8th, there was a
21   substantial amount of conflict between people who were
22   protesting and -- and the Seattle Police Department.
23           And after June 8th, I felt like our role, as --
24   my role, as the director of SDOT, was to maintain access
25   for people and goods in the -- in the vicinity, but also

Page 31

1    work on behalf of the City to de-escalate the conflict
2    that was present in order to return to regular
3    operations of all of the streets.
4            The -- so in balancing those things, I was
5    continually looking for opportunities to de-escalate the
6    conflict that was -- that was present there.
7            So, you know, we would communicate with people
8    present on behalf -- who were representing or on behalf
9    of protesters, but it was -- we weren't seeking their
10   consent.  We were still taking our City
11   responsibilities.
12           So we were taking the input or the -- the
13   concerns, the feedback, of people protesting, but also
14   the conversations that I was having with residents and
15   businesses around the area as well.
16       Q.  Okay.  But the area wasn't completely cleared
17   of barriers, people, and cars in the street by the City
18   until July 1, 2020; is that correct?
19           MR. CRAMER:  Objection.  Form.  Compound.
20       A.  The area -- the entire area, but we were
21   working continuously from -- from June 9th until that
22   July 1st time to make sure that we had a regular traffic
23   pattern that enabled access for people, goods, and I
24   would say services is part of that as well, and
25   continually de-escalating the conflict.

Page 32

1    BY MR. WEAVER:
2        Q.  Okay.  When did SDOT finally clear out all the
3    barriers in the streets in and around Cal Anderson and
4    the East Precinct?  Was that July 1, 2020?
5        A.  I believe that it was July 1st.  And there may
6    have been a few activities that lasted into July 2nd,
7    but I believe it was July -- mostly July 1st.
8        Q.  Okay.  Was there action taken before then to
9    clear out all the barriers in the streets and sidewalks
10   prior to July 1, 2020?
11       A.  There were some -- there were efforts as soon
12   as June 9th to remove barriers from -- from that -- that
13   area.  And at those -- at various points, we were met
14   with substantial resistance from -- from protesters.  So
15   there was an effort on June 9th to remove some of the --
16   the places where -- where there had been sort of
17   makeshift barricades created by protesters.
18           There was another instance after we had
19   provided our regular traffic control where we did intend
20   to reopen streets to traffic and were met with
21   substantial resistance from people protesting.
22       Q.  I think we'll get into this more later, but
23   what do you mean by "substantial resistance"?
24       A.  So we had people lie down in front of
25   construction equipment.  We had people trying to climb

8  (Pages 29 to 32)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 33

1    into construction equipment that our operators were --
2    were operating.  We had people lie on top of some of
3    those ecology block barriers and -- and sort of block
4    access to what the construction equipment needed to
5    attach to.
6              We had some crowds forming around -- around
7    some of our construction workers seeking to do -- do
8    their work, and they would -- we would sort of get
9    followed around some of the -- the site, being yelled at
10   and things like that.  Not -- not physical assault on
11   our employees.
12          Q.  So you talked earlier about how there was a
13   removal of some barriers and some addition of eco
14   barriers to the area by SDOT.
15              Do you recall that?
16          A.  Yes.
17          Q.  Okay.  What do you recall about that process?
18          A.  So what I recall is that, the morning of
19   June 9th, myself, Fire Chief Harold Scoggins, the
20   general manager of Seattle Public Utilities Mami Hara,
21   and I, and maybe a few other people sort of all came to
22   the 12th and Pine intersection to survey the -- the
23   area, to understand what was going on, what the
24   conditions were.  That's what led to Chief Scoggins'
25   email, the email that we discussed, Exhibit 3.

Page 34

1              Over the course of the next few days, leading
2    through the weekend, that weekend, we worked to develop
3    a -- what we felt was a traffic control plan that would
4    meet all of the City's and the adjacent property owners'
5    needs for services and property access, but also sort of
6    regularized a protest area that might stay closed to
7    normal street operations for the period that the
8    protests would be active.
9              And at that point we were continually working
10   to -- to de-escalate the conflict, and so we didn't have
11   a fixed timeline of how long that would need to be put
12   in place.
13              So we felt like it was a -- an operation that
14   would need to potentially operate in this form for sort
15   of an indeterminate period of time as we worked on
16   de-escalating the situation.
17              So that plan was developed over the course of
18   that week, and there were a series of meetings that
19   included protest leaders and some conversations with
20   businesses and residents in the area as well.  And there
21   were some informal and formal meetings of those groups.
22          Q.  Okay.  There was a lot there, so I'm going to
23   ask you -- I'm going to ask you a few follow-ups.  Okay?
24          A.  Yes.
25          Q.  So about the indeterminate period of time, when

Page 35

1    the City went in and changed the footprint of the
2    protest area, was there any discussion about how long it
3    was anticipated that that might be in place?
4          A.  I don't recall there being a discussion of
5    that.
6          Q.  Was there any discussion about a deadline by
7    which the barriers that had just been placed would need
8    to be removed?
9          A.  The -- and just to make sure we're on the --
10   we're talking about the same thing, I'm talking about
11   the -- when SDOT provided ecology blocks and sort of
12   regularized the traffic control, we did not have a
13   deadline by which that would be removed.
14              And so in creating that traffic control plan,
15   we worked to make sure that all of the driveways and
16   business access could be maintained without need for any
17   special kind of operations.
18              It was all sort of within a regular -- what we
19   would have determined if -- if there were a need for a
20   long-term closure for construction activities or some
21   other -- some other activity beyond protests, it would
22   have been fine for the streets to operate in that way.
23          Q.  So I -- yeah, that's what I was talking about.
24   And my understanding is that those changes were made on
25   June 16th or 17th, or maybe both; is that correct?

Page 36

1          A.  Yeah, that's -- that's my recollection as well.
2          Q.  Okay.  And so tell me what that specific
3    process of creating that area and -- and those barriers
4    on the 16th and 17th, what that entailed, the physical
5    process.
6          A.  The -- maybe -- okay.  Let me make sure I --
7    the physical process.  So we -- you know, what we did --
8    let me -- let me just talk through a little bit of what
9    the traffic pattern was, and then we can talk about how
10   we did it.
11              So when we -- what we regularized still
12   included some street closures.  So Pine Street remained
13   closed between 10th and 11th Avenues.  11th Avenue did
14   not connect across Pine any longer.  It was sort of a
15   temporary blockage of the intersection through.  And
16   then Pine, between 11th and 12th Avenues, was turned
17   into a one-way street westbound, from being a two-way
18   street prior.
19              Other than that, all -- all streets reopened to
20   vehicular access.  In the process of doing that, we --
21   we brought to the site and installed the concrete
22   ecology block barriers.
23              We also installed some new traffic control.  We
24   installed, I believe, a stop sign at 12th and Pine,
25   which previously would have been controlled by a traffic

9  (Pages 33 to 36)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 37

1   signal, some one-way signs, some other -- other signage
2   that went into the area that regularized that traffic
3   control plan.
4        Q.  Okay.  How many ecology blocks did SDOT move
5   into the area on June 16th or 17th?
6        A.  I don't recall the specific number, but it
7   was -- it would have been 50 to 100 ecology blocks.
8        Q.  Okay.
9        A.  I mean, I'm sure we can provide a precise
10  number, but I don't -- I don't recall.
11       Q.  The streets that were one-way in the area
12  and -- were they local access only?
13       A.  We did have signs that said local access only,
14  and those were a standard sign that we provide.  It's
15  called a Type 3 barrier, that has -- that says "Street
16  closed" and "Local access only."
17            And the purpose of that, for us, is to
18  communicate to people driving that they should only go
19  through if they -- if they need to, but if they have
20  business within that area, that's what local access
21  means, that it's open for local access.
22       Q.  Okay.  So where were the local access only
23  signs, if you recall?
24       A.  So they were at the perimeter of -- of, you
25  know, where -- where we were -- where we had changed

Page 38

1   some of the traffic patterns.  So I recall them being
2   at -- on the north side, they would have been at Olive,
3   so at 11th and 12th and Olive.
4        Q.  Uh-huh.
5        A.  There may have been one set that was one block
6   farther north.  The -- there were some at Pike, at both
7   11th and 12th.  There may have been one at 13th and
8   Pine.  And then there may have been one at 10th and Pike
9   as well.
10       Q.  Why -- why was the area declared local access
11  only?
12            MR. CRAMER:  Objection.  Form as to "area."
13       A.  So, you know, we were -- what we -- we were
14  trying to limit the amount and the opportunity for
15  vehicle and pedestrian conflict, even after that
16  June 16th timeline.
17            There were times of day and times of protest
18  activity where there were a lot of pedestrians that were
19  sort of too many people for the sidewalks to contain.
20  And so we -- and we had an incident, I think before
21  June 8th, where a vehicle had driven into a crowd of
22  protesters.
23            And so we were trying, again, as part of that
24  approach to de-escalating and reducing some of the
25  conflict, to maintain that separation between vehicles

Page 39

1   that didn't need to be in the area and those -- those
2   protest activities.
3            And so the local access was just another way
4   to -- to communicate that to people who maybe didn't
5   know what area of the city they were in, that they
6   didn't -- if they didn't need to come through that way,
7   that they -- they didn't -- they -- that they probably
8   shouldn't.  While also saying, if you have something to
9   do here, you're freely welcome to come in.
10  BY MR. WEAVER:
11       Q.  Okay.  So there was a recognition that, despite
12  the footprint of the barrier, there was probably going
13  to be spillover as far as pedestrians and protests
14  outside those barriers at certain times as well; is that
15  correct?
16       A.  That's what we experienced in the days leading
17  up to that -- you know, in that first week, when there
18  were no real traffic control separations, that we -- we
19  did see some of that activity happening.  So yes.
20       Q.  Okay.  And you were anticipating that was going
21  to continue to happen; correct?
22       A.  That there was the possibility of that, yes.
23       Q.  And did it -- did that in fact happen after the
24  barriers were shuffled around and added on June 16th and
25  17th?

Page 40

1            MR. CRAMER:  Objection.  Form.
2        A.  I mean, you know, I would -- I would come to
3   the site pretty frequently throughout that whole month
4   of June, or for -- starting on June 9th, and there were
5   times when I saw a lot of people there, and there were
6   times when, you know, the -- the areas even that we had
7   set aside for sort of more ongoing protest activities
8   weren't sufficient to contain the number of pedestrians
9   and people protesting.
10            And so I do think that having the streets be
11  local access only limited the ability for
12  vehicle-pedestrian conflicts.
13  BY MR. WEAVER:
14       Q.  Okay.  Did SDOT also put into place speed bumps
15  in the area in and around the East Precinct and Cal
16  Anderson?
17       A.  We did.  They -- you know, they were not
18  traditional speed bumps.  They were -- they -- we --
19  they're what's called a quick curb that served the
20  purpose of what a speed hump would do, but were
21  something that was -- you know, our typical speed humps
22  are done with asphalt and have a more substantial
23  construction impact and eventual removal impact.
24            We didn't anticipate that those would stay
25  forever, and so we used a sort of temporary approach to

Page 41

1  those, but we did have a few places where we -- we did
2  install those, particularly around the intersection of
3  12th and Pine.
4      Q.  Okay.  Do you recall other areas where you had
5  temporary speed humps?
6      A.  I don't.
7      Q.  Okay.  Why, in particular, were they around
8  12th and Pine?
9      A.  So 12th and Pine has a traffic signal usually.
10  We had put in a stop sign instead.  We did see -- and
11  that's where we had the sort of ecology block barriers,
12  and we changed some of the -- the directionality of the
13  streets.
14      We did see some vehicles, as we opened those
15  streets back up to traffic, driving quickly, so we
16  don't -- we didn't need to -- we wanted people to drive
17  slowly and anticipate that there could be more
18  pedestrians that they weren't expecting to be in the --
19  the -- you know, crossing the street.  And we had
20  changed the traffic pattern to have that stop sign
21  rather than a -- traffic signal.
22      MR. WEAVER:  Okay.  I can't believe it.
23  We've been going about an hour.  Want to take a
24  ten-minute break?
25      MR. CRAMER:  Yeah.  Yeah, let's take ten.

Page 42

1  It did fly by.
2      MR. WEAVER:  All right.
3      THE VIDEOGRAPHER:  Going off the record.
4  The time is approximately 10:00 a.m.
5      (Recess from 10:00 a.m. to 10:10 a.m.)
6      THE VIDEOGRAPHER:  We are back on the
7  record.  The time is approximately 10:10 a.m.
8      E X A M I N A T I O N (Continuing)
9  BY MR. WEAVER:
10      Q.  So would you agree that -- that SDOT, by moving
11  the barriers into -- by moving the ecology blocks into
12  the area on June 16th and 17th, was creating a protest
13  zone?
14      MR. CRAMER:  Objection.  Form.
15      A.  We were trying to make sure that there were the
16  continued ability for First Amendment activities and
17  have a -- as I mentioned before, a regular traffic
18  pattern as well.
19  BY MR. WEAVER:
20      Q.  Is it your understanding, though, that you were
21  creating a protest zone?
22      MR. CRAMER:  Objection.  Form.  Asked and
23  answered.
24      A.  We were working to -- to continue to allow the
25  protests that were happening in front of the East

Page 43

1  Precinct and understand that those may continue for
2  certain -- a certain amount of time and -- and, as I
3  mentioned, have a regular traffic pattern.
4      (Exhibit No. 4 marked.)
5  BY MR. WEAVER:
6      Q.  Okay.  So I'm going to drop into the chat
7  Exhibit 4.
8      A.  Got it.
9      Q.  So there's an email from you on June 20th --
10  June 29th, I'm sorry, 2020, that was forwarded to
11  Lorelei Williams.
12      Do you see that?
13      A.  Yes.
14      Q.  Okay.  Who's Lorelei Williams?
15      A.  Lorelei Williams was a deputy director at SDOT.
16  She was the deputy director for capital project
17  delivery.
18      Q.  Okay.
19      A.  And she left City employment in, I believe,
20  January of this year, of 2021.
21      Q.  Okay.  And were you drafting -- had you drafted
22  in your email on June 29th talking points regarding
23  Capitol Hill?
24      A.  Yeah.  She had -- she was representing SDOT at
25  a -- I don't remember what forum, but she had asked me

Page 44

1  what -- she had not been involved in the -- outside of
2  her area of -- of responsibilities within SDOT, but she
3  was representing SDOT with external stakeholders, and
4  asked me what -- if it came up, what she should say.
5      Q.  Okay.  And so you drafted these talking points
6  for her; is that right?
7      A.  I did.
8      Q.  Okay.  So in the fourth bullet point of your
9  talking points, you say, "SDOT worked to install
10  barriers to create a protest zone."
11      And then in the sixth bullet point, you say,
12  "Definitely new activities for our crews in terms of
13  creating this zone."
14      What did you mean by "creating this zone" and
15  "create a protest zone"?
16      MR. CRAMER:  Objection.  Form.
17      A.  So I guess, going back to my previous answer on
18  this, we worked to create some additional pedestrian
19  space or -- that was used for protest activities.
20  Again, centered on the East Precinct, but also including
21  some of the areas adjacent to Cal Anderson Park, that
22  were -- that, you know, sort of expanded the -- the
23  pedestrian space, while also creating that separation
24  between vehicular traffic.
25      In terms of the sixth bullet and new activities

11 (Pages 41 to 44)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 45

1   for our crews, the -- I don't think that we've done
2   anything similar to this before or since.  Typically,
3   when we've used things like water filled barriers to
4   create some of these separations or we've done temporary
5   street closures or things like that, we've had an
6   expectation that those materials that we use and provide
7   and install will stay in the pattern that -- that we've
8   installed them.
9        What we saw prior to June 16th and 17th was
10  that materials that we had -- had deployed for those --
11  you know, for the -- the crowd control and things like
12  that had moved -- had been moved, and additional
13  materials added.
14       So we didn't want to -- we wanted to -- we --
15  we needed to find some new vocabulary of -- of
16  separation that would be -- would -- would accomplish
17  our -- our goal of de-escalation and creating some of
18  that additional area for protests -- protests to happen
19  without being redeployed and moved in ways that we
20  hadn't intended.
21  BY MR. WEAVER:
22       Q.  Okay.  And that -- the moving in area -- in
23  ways that you had not intended, as far as the barriers
24  that were there, that continued after June 16th and
25  17th, as well; correct?

Page 46

1        A.  It did at various points, and -- yeah, there --
2   there were various times when -- when -- when --
3   when that would happen.  You know, I think that the --
4   that is -- you know, that -- that's, like -- that was
5   one of the -- the challenges that we faced in terms of
6   how -- you know, creating that regularized traffic
7   pattern, while -- while we -- you know, so it was really
8   intermittent.
9        I think that this -- this email also sort of
10  highlights some of that, that there were some
11  intermittent challenges that -- that could be resolved
12  with -- with conversation and -- and discussion about --
13  but not -- but that -- that created ongoing operational
14  challenges for us as a department.
15       Q.  So there were ongoing operational challenges
16  because at some -- at some points various barriers would
17  show up in areas that they had not previously been
18  placed; is that right?
19       A.  Yeah, you know, there would be sort of minor
20  moving of barriers.  The -- the ecology blocks didn't
21  really -- didn't move until sort of the -- the very,
22  very end of the time when the -- they were -- they were
23  deployed out there.  They're very challenging to move.
24  But there were other -- other materials that would get
25  sort of moved around on a -- on a regular basis.

Page 47

1        Q.  What were -- what were some of those materials
2   that would get moved around?
3        A.  So as part of the installation on June 16th and
4   17th, we also installed some plywood boxes or covers
5   around the ecology blocks, and those were intended to
6   serve a few purposes.
7        The first was that they were -- they were
8   opportunities for art to happen, and sort of canvass, if
9   you will, for some of the -- the protest art.  And that
10  was something that, as we talked to the protest leaders
11  that we -- we were communicating with in the lead-up to
12  that, they felt like the art was a positive aspect of
13  the -- what was -- what was happening in that protest
14  area and was an opportunity.
15       We also -- you know, there had been a lot of
16  graffiti and lots of -- on lots of private buildings,
17  and so this was also part of our attempt to attract some
18  of that activity to -- off of private property and
19  buildings into -- into this.  So those plywood boxes
20  were serving some of that function.
21       The second function is that the -- the easiest
22  way to move an ecology block is, there's a sort of metal
23  ring that's on the top, is set into the concrete, that
24  you attach a chain from a construction -- a piece of
25  construction equipment, and that -- you're able to lift

Page 48

1   it up.
2        So the -- some of the plywood box was intended
3   to limit access to those -- those rings, which are the
4   easiest way to move a -- move an ecology block and make
5   it sort of so that other people couldn't come and access
6   that in a very easy way.
7        And then I think there were -- there were some
8   members of the protest group who were concerned that
9   outside -- outside actors wished them harm, wished --
10  you know, they were -- there was a lot of -- among some
11  of them, there was a lot of concern that people were
12  going to come and try to do harm to the people
13  protesting.
14       And so there was a -- the ecology block
15  barriers are very low.  They're about two feet tall.
16  And so the plywood barriers helped to prevent a little
17  bit of, like, being able to see into the -- into the
18  area where people were -- were protesting and -- and,
19  you know, sometimes sleeping overnight and things like
20  that.
21       So that was the -- the purpose of those.  Those
22  plywood barrier -- plywood components, eventually the
23  protesters sort of figured out how they could remove
24  those from some of the barrier -- the ecology blocks,
25  and -- and those sort of boxes would get moved around at

12  (Pages 45 to 48)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 49

1    various points.
2        Q.  So those boxes would be used as barriers.  Is
3    that what you're saying?
4        A.  Yeah.  They were then -- you know, it was a --
5    a couple sheets of plywood that were about two feet --
6    you know, two feet by three feet by another two or --
7    two feet tall or so.  And so those are pretty easily
8    movable to move into a place and then to also move out
9    of a -- you know, move away from -- from any kind of
10   obstruction.
11       Q.  Okay.  So I just want -- just want to be clear
12   for the visual aspect of it.  Okay?  So when the ecology
13   blocks were moved in on June 16th and 17th, they also
14   had plywood sheaths over the top of them; right?
15       A.  That's right.
16       Q.  And that was a constructed box that had four
17   sides around it, and then a -- another piece of plywood
18   on top?
19       A.  Most of them had a top on them.  Some of them
20   did not.
21       Q.  Okay.  And was it the protesters' suggestion,
22   or was it the -- was it SDOT's recommendation, that
23   those be placed there?
24       A.  I think we came to that through some
25   conversations.  I think it was -- it was -- as I

Page 50

1    mentioned, it was some of -- some of the items were our
2    concern about, you know, being able -- limiting the
3    ability to move those blocks.
4        Some of it was being responsive to some of the
5    requests that we were hearing from -- from protesters
6    about ways to continue some of the positive sort of
7    creative energy that was around some of the protest
8    activities.  And -- and also we saw it as a way to also
9    limit some of the impacts to private properties around
10   in terms of graffiti.
11       So it was a -- it was -- it was a -- and then
12   it was also the creativity of my construction staff to
13   figure out how to -- how to do some of this work.  So it
14   was a -- it was an iterative process that came -- we --
15   you know, again, that sort of non- -- nonstandard
16   response that we figured out how to do.
17       Q.  Okay.  And so part of the reason that they
18   were -- they were constructed for -- for art was, there
19   was a lot of graffiti that had already occurred on
20   public and private properties in the area; is that
21   right?
22       A.  Yes.
23       Q.  Yeah.  And did SDOT provide storage services
24   for the art that had been painted on that plywood once
25   CHOP was -- wound down and was cleared out?

Page 51

1        A.  We did.
2        Q.  Okay.  Can you describe what that process was
3    of preserving that -- that plywood art?
4        A.  Yeah.  I mean, we basically had a roll-off
5    container, like a -- a -- a construction container or a
6    dumpster, but it was enclosed on all four sides.  When
7    we eventually removed the -- the protest zone and -- and
8    all of -- all of the -- that -- that -- those things, we
9    preserved and hauled as much of the -- those plywood
10   pieces to an SDOT facility.
11       And then eventually, I don't know, a few weeks
12   later, the people that had been involved with art there
13   came to that facility, went through it, and decided what
14   they wanted to retain.
15       Q.  Okay.  So where was -- where was that SDOT
16   facility?
17       A.  I believe it was at our Sunny Jim facility,
18   which is along Airport Way, and it houses our signal
19   shop and sign shop, and it also is a place where we have
20   previously -- and we've continued to store private
21   property that is accumulated as -- as -- like in the --
22   in response to homeless encampments and things like that
23   as well.  So it's a place that has some extra space
24   where we've done this type of storage before.
25       Q.  Okay.  Why -- why was it -- why did SDOT

Page 52

1    undertake the process of storing -- transporting and
2    storing the art for the protesters?
3        MR. CRAMER:  Objection.  Form.  Outside the
4    scope.
5        A.  You know, we -- part of our -- you know, we --
6    we felt like part of what was -- was -- you know, as --
7    again, in our efforts towards de-escalation, that the --
8    there were certain aspects of what was created during
9    the protests that maintaining and preserving and -- and
10   not destroying would -- would continue that
11   de-escalation even after the summer of 2020.
12       You know, one aspect of that is the Black Lives
13   Matter mural that was painted in -- in the middle of
14   Pine Street.  Another aspect was the -- the other art.
15   I -- I believe that it's been now exhibited post -- post
16   this time period.
17       And so it was sort of a -- an ongoing
18   reflection of, you know, continued -- that continued
19   sort of de-escalation of the -- of the conflict that was
20   occurring, leading up to June 8th, but also sort of
21   throughout the month of June.
22   BY MR. WEAVER:
23       Q.  Was it important to the City or SDOT to make
24   clear that the City was not opposed to the viewpoints
25   expressed in the art and the protests?

13 (Pages 49 to 52)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbawbe

Page 57

1  the Department of Finance and Administrative Services in
2  adding plywood to the -- to the first floor of the East
3  Precinct.
4        There were sort of various other sort of
5  coordination with Seattle Police Department in response
6  to the -- the protests and the clashes between police
7  and protesters that were happening.
8        Q. So why was the plywood being put up on the --
9  on the precinct?
10       A. I don't know if I can speak to that directly.
11 I think it was a request that came to SDOT from the
12 Seattle Police Department.
13       Q. Okay.
14       A. But to support that and -- you know, the
15 building -- SDOT isn't responsible for the building, but
16 we were working, you know, in response to some of the
17 earlier protests and vandalism across the city,
18 downtown, in Chinatown, in the International District.
19       We had been working alongside Parks -- Parks
20 staff I think primarily, but addressing some of those
21 issues of vandalism and supporting -- supporting small
22 businesses in adding plywood to prevent further
23 vandalism.
24       Q. You said you went there -- went to the area
25 around the East Precinct on the morning of June 9, 2020;

Page 58

1  is that right?
2        A. That's right.
3        Q. What had changed that made it so that you went
4  to the area that you had not been to previously?
5        A. You know, I think I was -- I was monitoring the
6  protest activities and the -- and sort of what was going
7  on, but the -- you know, what I -- what I read and --
8  and heard in sort of the news reports and some of the
9  responses was that the protests had -- protesters had
10 taken over streets, and I felt like it was my -- part of
11 my responsibilities, as the director of SDOT, to have a
12 firsthand account of that and understand what the
13 situation was on the ground.
14       Q. So did anybody from the mayor's office or
15 anybody else in the City ask you to go down there?
16       A. I don't believe so.
17       Q. So what did -- what did you do -- what did --
18 for -- what did you do when you went to the area on --
19 on the morning of June 9th?
20       A. So I went there and walked into the -- the area
21 that had sort of been occupied by protesters overnight,
22 June 8th to June 9th, and tried to get a sense for what
23 was -- what was going on.
24       I believe that Fire Chief Harold Scoggins and
25 SPU general manager Mami Hara and I all sort of got

Page 59

1  there around the same time, and we connected with each
2  other.
3        You know, we are the three -- three agencies
4  that are the largest set of public responsibilities in
5  terms of services and access and emergency response.
6  And so I think the three of us all felt like it was
7  something -- something important for us to understand.
8        This was a -- you know, not something that any
9  of the three of us had had to -- well, I can't speak for
10 them, but not something that I had had to experience
11 in -- in my previous experience with the City or even
12 in -- in some of my previous employment. I've dealt
13 with a lot of First Amendment activities and -- and
14 protests and various things, but not something of this
15 nature.
16       Q. Okay. What did you see that was different than
17 what you had dealt with previously in your career?
18       A. So the use of -- you know, the use of
19 improvised barricades to block off streets was -- was
20 something that was very new. You know, my experience
21 with protest activities in particular has been that
22 there's a -- you know, a designated route or
23 communication about where those -- where those
24 activities are going to be, and then sort of a temporary
25 accommodation of those, sometimes with traffic control

Page 60

1  devices and sometimes not, that provides some regularity
2  and predictability.
3        And this was improvised and -- and sort of
4  not -- wouldn't have met our -- what our -- what our
5  standard response was to a -- to a protest. And the --
6  again, I'm specifically talking about like the morning
7  of June 9th.
8        Q. What would your standard response to a protest
9  would have been?
10       A. Yeah, so, you know, I think we -- if -- if we
11 are aware of where a protest is going to happen, then
12 we -- you know, we can work with -- and there's a sort
13 of organized leadership of a protest, we could work with
14 that.
15       We do -- we permit street closures very
16 frequently for community gatherings or events or things
17 like that. So we could work with that entity in sort of
18 providing that regular -- more regular approach to
19 traffic control.
20       Q. So there was no permitting process for the
21 blockage of the streets on June 9th through July 1,
22 2020; is that right?
23       A. That's correct.
24       Q. Okay. Was there ever any discussion of
25 requiring the people in that area to have a permit to

15 (Pages 57 to 60)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 61

1  protest and occupy the area?
2       MR. CRAMER:  Objection.  Foundation.
3       A.  I don't -- I -- I did not participate in any
4  conversation like that.
5  BY MR. WEAVER:
6       Q.  Okay.  Were you involved in any permitting
7  process in that time period for this area?
8       A.  (No verbal response.)
9       Q.  Just so you -- just so you know, you have to --
10 you have to actually speak it so the court reporter can
11 get it.
12      A.  No, I was not.
13      Q.  Okay.  I'm going to pull up an exhibit.  Just
14 give me a minute.
15          While I'm doing that, did you talk to anybody
16 on the -- on the morning of the 9th who was a -- who you
17 considered to be a protester?
18      A.  I believe I did, yep.  Yes.
19      Q.  Okay.  What did you talk to them about?
20      A.  You know, I -- my purpose in those
21 conversations from June 9th, anytime I was there
22 throughout the month of June, was making sure that we
23 had streets open and that people, goods, and services
24 could access that area.
25          And then communicating my desire for continued

Page 62

1  de-escalation of -- of the conflict, and that SDOT and
2  myself weren't -- you know, we weren't on the side of --
3  of the things that had led to conflicts, but that we
4  were there in our role as -- as public service
5  providers.
6       Q.  How often were you there, you personally?
7       A.  I was there pretty frequently over the course
8  of the month of -- you know, from June 9th onwards.  You
9  know, there was both -- I felt like it was important for
10 me to have firsthand understanding of -- of the
11 situation on a day-to-day basis.
12          And then I felt like, when our construction
13 crews were doing the various work that they were being
14 asked to do within that area, that it was also important
15 that I, as the director of the department, was present
16 for that.
17      Q.  Okay.  So when you were there, did you also
18 talk to people who lived or had business in the area?
19      A.  I did.  Yes, I did.
20      Q.  Okay.  How often was that?
21      A.  It was -- it was pretty frequent.  I think, you
22 know, I handed out a lot of business cards and a lot
23 of -- I talked to -- to a lot of -- a lot of people.
24 People would -- I think people started to get to know
25 who I was, and they would approach me, and I talked to a

Page 63

1  lot of folks.
2       (Exhibit No. 5 marked.)
3  BY MR. WEAVER:
4       Q.  Okay.  Let's go to Exhibit 5, which I put in
5  the chat.  Then if you could scroll down to the bottom,
6  there is an email from you on June 9th.
7       A.  Yep.  Got it.
8       Q.  And you indicate here that you were working
9  with protesters on establishing a road closure zone and
10 setting -- and setting traffic control.
11          Do you see that?
12      A.  Yes.
13      Q.  What did you mean by that, that you were
14 working on establishing a road closure zone with the
15 protesters?
16      A.  So on the morning of June 9th, there were
17 improvised barricades that were using that traffic
18 control -- those previous water filled barriers,
19 other -- other things, as I mentioned, up to and
20 including, like, bleachers from Cal Anderson Park, that
21 had been moved into places that were -- were blocking
22 streets.
23          And so from that June 9th, sort of immediately
24 June 9th, we were there, working to provide a -- a set
25 of traffic controls that would allow for property

Page 64

1  access, service access, people and goods to move freely
2  throughout the area, but also set some -- you know,
3  modify traffic patterns in a way that also worked with
4  the protest organizers.
5  ==Q.  So on June 9th, when you first went and saw it,==
6  ==would you agree that there were -- there was blocked==
7  ==access to a number of roads in the area?==
8  ==     MR. CRAMER:  Objection.  Form.  Vague.==
9  ==     A.  So there were -- yeah, you know, as I said,==
10 ==when I got there on June 9th, I walked into the area==
11 ==unimpeded.  I did see places where streets were either==
12 ==completely or partially blocked with that sort of debris==
13 ==and improvised -- improvised barricades.==
14 ==BY MR. WEAVER:==
15 ==     Q.  Okay.  So the streets were blocked to vehicular==
16 ==traffic; is that correct?==
17 ==     MR. CRAMER:  Objection.  Form.==
18 ==     A.  Yeah, and I would say that it was -- it was --==
19 ==I don't -- you know, I'm not sure I recall exactly the==
20 ==traffic pattern at the time, but there were some streets==
21 ==that were completely blocked, and there were others that==
22 ==were partially open or -- or completely open.==
23 BY MR. WEAVER:
24      Q.  Okay.  I don't think we talked about it before,
25 but were there dumpsters that were also being used at

16 (Pages 61 to 64)

Hunters Capital, LLC v. City of Seattle                  30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 81

1    Q. Are you aware that there were -- that the
2  police department and the fire department had certain
3  policies about not going into the area except for
4  certain reasons?
5        MR. CRAMER: Objection. Form.
6    A. Yeah, I wasn't aware of -- of that. My
7  conversations with Chief Scoggins centered on -- on
8  how -- how they would respond to various emergencies,
9  and where fire trucks and ambulances would have to
10 access the area.
11 BY MR. WEAVER:
12   Q. Were there lanes that you felt were opened up
13 so that they could -- so that the fire department could
14 access the area completely at any time during June 2020,
15 from June 8th through July 1st?
16       MR. CRAMER: Objection. Form.
17   A. Can I -- can I clarify your question?
18 BY MR. WEAVER:
19   Q. Sure.
20   A. Are you asking, were there -- did we have an
21 understanding of how Fire would respond to incidents?
22   Q. Was it your understanding that Fire would
23 respond to incidents, and they had room to do so, during
24 the entire period of June 9th through July 1, 2020, in
25 the area in and around the East Precinct and Cal

Page 82

1  Anderson Park?
2    A. From a physical access perspective, from how we
3  set our traffic control, how we worked for -- to provide
4  street access, the physical -- I think the physical
5  features would be necessary for a fire truck or an
6  ambulance to access the area were provided.
7    Q. After June 17, 2020, you mean?
8    A. I have even before -- before that. There
9  were -- you know, there were still -- you know, you know,
10 12th Avenue had access. As I mentioned, I believe that
11 traffic services were provided each and every day.
12 Those same -- you know, trash truck and a fire truck
13 have similar clearance requirements in terms of getting
14 into a -- to an area to access.
15   Q. What do you know about what was required to get
16 trash access into the area on any particular day in
17 June of 2020?
18   A. That's outside of SDOT's area of
19 responsibility, trash collection, so that's really a --
20 a question that SPU would have to speak to.
21   Q. Okay. And what do you know about what SPU had
22 done with dumpsters during this time period of June 9th
23 to July 1, 2020?
24   A. You know, I -- I was aware of some -- some
25 modifications that they'd made, but I couldn't speak to

Page 83

1  specifics.
2    Q. Do you know anything specific about the trash
3  collection in the area in and around Cal Anderson Park
4  from June 9th to July 1, 2020?
5    A. I -- I don't. You know, my conversations
6  with -- with Mami Hara were focused on making sure that
7  we could do that. And -- and as we talked about the
8  traffic patterns, it was my understanding that they --
9  that they could use those traffic patterns and respond
10 and make trash collection.
11   Q. Okay. But you don't know specifically what
12 happened; is that right?
13   A. No.
14   Q. Okay.
15       MR. CRAMER: We've been going for about an
16 hour. I don't know if you're at a --
17       MR. WEAVER: Yeah, we have. If you want to
18 take another ten minutes.
19       MR. CRAMER: Sure.
20       MR. WEAVER: All right.
21       THE VIDEOGRAPHER: Going off the record.
22 The time is approximately 11:13 a.m.
23       (Recess from 11:13 a.m. to 11:23 a.m.)
24       THE VIDEOGRAPHER: We are back on the
25 record. The time is approximately 11:23 a.m.

Page 84

1        (Exhibit No. 7 marked.)
2        E X A M I N A T I O N (Continuing)
3  BY MR. WEAVER:
4    Q. All right. I am going to bring another
5  document into the chat in a second here. This will be
6  Exhibit 7.
7        Let me know when you have it up.
8    A. I have it up.
9    Q. Okay. So first of all, do you recognize this
10 document?
11   A. Yes. I believe this is an email from Laurel
12 Nelson, who was acting director of Office of Emergency
13 Management, including myself and a number of other
14 cabinet members.
15   Q. Okay. Around this time, June 9th, June 10th,
16 June 11th, were you involved in regular cabinet meetings
17 with the mayor's office and other department heads?
18   A. Yes.
19   Q. Okay. And about how frequently were you having
20 these meetings in that time period?
21   A. They were -- they would be pretty frequent. I
22 think they were somewhat regular. Then we would have
23 some -- sometimes when -- it wasn't -- wasn't daily
24 always, but there would be some -- some times when it
25 was multiple times a day, even.

21 (Pages 81 to 84)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 85

1    Q.  And so that continued throughout June of 2020?
2    A.  Yes.
3    Q.  What was your understanding of the purpose of
4  these meetings?
5    A.  The purpose of these meetings was to share
6  information and really report out on -- on what
7  activities were going on among -- among all the
8  departments that were responding, and to make sure that
9  there was understanding with the -- with the mayor's
10  office, as well, about what was -- what was happening.
11    Q.  Okay.  So do you recall being in any meetings
12  in which Mayor Durkan, herself, participated during
13  June 9th to July 1, 2020?
14    A.  Yes, I do.
15    Q.  Okay.  About how many times do you think that
16  was?
17    A.  You know, I -- I couldn't -- I don't remember
18  that with that specificity.  It was certainly not
19  every -- every meeting that we would have.  And, you
20  know, these meetings are very similar to the way that we
21  respond to any kind of citywide emergency, a snowstorm
22  or, you know, things of that nature.  So it's a very
23  typical operational strategy that we have as a city.
24  And that includes times when the mayor joins those
25  conversations as well.

Page 86

1    Q.  Sure.  Can you give me an estimate of how many
2  times you talked to the mayor about things related to
3  the protests and the CHOP area between June 9th and
4  July 1, 2020?
5    A.  I would say maybe around a dozen times, if I
6  had to -- if I had to put a number on it.
7    Q.  Okay.  Did you ever talk to the mayor directly,
8  one-on-one, at any point?
9    A.  I did.
10    Q.  Okay.  What -- what did you talk about with the
11  mayor when you met?
12    A.  The few times that I talked to her directly
13  were around the specific SDOT-related actions that we
14  were taking.  So I believe on the -- the morning of
15  June 16th, I think I spoke directly with her.
16    There were, you know, a couple of times when we
17  were taking some of those direct actions with, you know,
18  installing the ecology blocks or as -- and when we got
19  to the point of removing them, I did speak directly with
20  the mayor.
21    Q.  Okay.  Just to let her know what was going on
22  and what was the plan?
23    A.  Yes.
24    Q.  Okay.  Do you recall what her reactions were,
25  for example, about the plan on June 16th?

Page 87

1    A.  You know, I think specifically on June 16th, it
2  was -- it was really status updates of when -- when
3  things were going to be happening and when -- when we
4  were -- when we were going to be operating.  I don't --
5  I don't recall her reaction to the -- to the plan.
6    Q.  Okay.  How about, what were your conversations
7  with her later on, after June 16th, about what SDOT was
8  doing in the area?
9    A.  You know, I think we were -- we were continuing
10  to -- to keep her abreast of what -- what activities
11  were.  I did participate in some of the -- there was,
12  like, conversations about where -- you know, where
13  things were going, what the -- you know, what -- what
14  our activities as a city were.  And those tended to be
15  these larger group conversations.
16    Q.  Okay.  Do you recall talking to her, yourself,
17  about what you'd been hearing from residents and
18  businesses in the area?
19    A.  I don't.
20    Q.  Okay.  Do you recall communicating that to
21  anybody in the mayor's office, what you'd been hearing?
22    A.  I know I probably did.  There were probably
23  some -- there were some -- some group discussions along
24  with Chief Scoggins and -- and Mami Hara, where we were
25  relating our -- our series of conversations.  I don't

Page 88

1  know if I recall specifics of -- of when and how.
2    Q.  So let's go -- let's go to Exhibit 7.  And do
3  you happen to recall whether there was a phone call of
4  the cabinet at 6:00 a.m. on June 10th?
5    A.  Yes, I believe there was.
6    Q.  Okay.  And was it your understanding that
7  Laurel Nelson was taking notes of those meetings and
8  then distributing them at that time?
9    A.  Yes.
10    Q.  Okay.  So I'd like you to go to Page 2 of this
11  document.  I want to ask you about a few things on it.
12    So in the middle in a larger font, it says,
13  "Overall Objectives:  Continuing the existing footprint
14  of peaceful demonstration and rights."
15    Do you see that?
16    A.  Yes.
17    Q.  Okay.  Do you recall a discussion about that
18  during this cabinet meeting on June 10th?
19    A.  I -- I do.  I mean, this -- these notes sort of
20  reflect that, but yes.  The -- there was sort of a --
21  a -- this was the day after that June 9th date of -- of
22  being there.
23    And so at that point, you know, there was a
24  sort of regular -- there was a group of people who were
25  pretty committed to staying in front of the East

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 89

1  Precinct and continuing the protest activities right
2  there.
3      Q.  Okay.  So whose objective was it to continue
4  the existing footprint?
5      A.  I think in a shared City-wide objective
6  in -- in that conversation of -- in that direction
7  towards de-escalation of making sure the people were --
8  had that continued opportunity for protests, and that
9  we -- that that could be done in a safe way.
10     Q.  Okay.  Paragraph 1 are -- are a few items here
11  that indicate that was the lead -- SDOT was the lead.
12         Do you see that?
13     A.  Umm --
14     Q.  1.1 and 1.2, paragraphs there?
15     A.  Right.  So we were the lead on the physical
16  modifications to the footprint as the responsible
17  parties for the right-of- -- you know, the street
18  right-of-way.  We were -- we were the lead on those
19  physical modifications.
20     Q.  And so was the City's goal at this point to
21  remove the non-SDOT barriers and replace them with SDOT
22  barriers?
23     A.  Yes.
24     Q.  Okay.  And --
25     A.  You know, I just -- sorry --

Page 90

1      Q.  Go ahead.
2      A.  -- if I can just clarify that a little bit, is
3  to say that if those non-SDOT barriers were the things that
4  were not typically used as traffic control, but -- and
5  things like the bike rack barriers and other sort of
6  irregular barricades, but to restore a traffic pattern
7  that maintained our core responsibilities around
8  providing public access and -- and ensuring services
9  could be delivered.
10     Q.  Okay.  What -- 1.2 says, "Pivot this into a
11  street closure."
12         Do you understand what that -- what that meant?
13     A.  Yeah.  So I think this was -- you know, we
14  had -- we had -- rather than having -- there was --
15  there were these sort of, again, irregular barricades
16  that were blocking off certain streets, while others
17  remained open in certain ways.
18         So we wanted to turn those irregular things
19  into something that was a more regular traffic pattern.
20  And that's -- there's a couple of reasons for that.
21  One, it's the -- the reason why -- you know, we could --
22  we -- sort of standard materials or other ways that we
23  could put -- sort of regularize those -- the -- the
24  traffic pattern.
25         And then also we communicate regularly out to

Page 91

1  the public and -- through things -- platforms like
2  Google Maps and others about when we have a regular
3  street closure, "This street is closed."  And so that
4  can go into their routing software, that we can sort of
5  push out that information.
6         And we wanted to have a -- a regularized street
7  closure so that we could do those sorts of things and
8  make sure there was public information available to --
9  to enable residents and businesses to be able to --
10  to -- to function normally.
11     Q.  So did SDOT report to Google and other mapping
12  services that there were closures in the area?
13     A.  We did.  I don't know the exact timing of when,
14  but we did -- we did communicate.
15     Q.  Okay.
16     A.  And I would say, again, those -- those -- you
17  know, it was important for us, even -- you know, we
18  discussed previously local access.  If you had a -- a --
19  an address within that area that was local access and
20  you were putting it into a routing software, you could
21  still -- it wouldn't tell you, you can't get to that
22  site.  It would tell you, here's how you get to that --
23  that location.
24         But it also -- in theory, when we -- when we do
25  that, it's not routing people through that area if we've

Page 92

1  made it local access.  And we have that sort of ongoing
2  relationship and response- -- you know, working
3  relationship with those software providers.
4         We have a number of streets that, in the midst
5  of the pandemic, we turned into local access only.  We
6  called them "Stay healthy streets."  We communicate.  So
7  those -- those streets are open to people who live on
8  those streets, deliveries and things like that, but
9  they're not -- people aren't routed onto those streets
10  if they're through traffic.  So those mapping providers
11  work with us on -- on communicating that information out
12  to users.
13     Q.  So I just want to be clear.  So if -- with the
14  routing that was done for this particular area in and
15  around East Precinct and Cal Anderson that was local
16  access only, if somebody put in there that they wanted
17  to go to a particular destination, and the normal route
18  would be for them to take 12th Avenue through the Pike
19  and Pine area, the software would route them somewhere
20  else; is that correct?
21     A.  If it was outside.  If it was just -- if they
22  were just through traffic coming through on 12th, you
23  know, from Olive to Union, it would send -- it would
24  send them up to -- I think it was probably sending them
25  to 13th.  But if it was someplace within that area, it

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                     30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 93

1  would send them to that area.
2      Q. Okay. I'd like you to go down to the second
3  page, and -- where it says, "Stated Department Desired
4  Goals."
5          And it says a couple things by SDOT, which is
6  the first bullet point.
7          Do you see that?
8      A. Yep.
9      Q. Okay. Were these concerns that you stated at
10 this meeting on behalf of SDOT?
11     A. Yes.
12     Q. Okay. So you were a little concerned about
13 sending the teams back in without having a game plan.
14         Do you see that?
15     A. Yes.
16     Q. Okay. What do you recall about that at this
17 point?
18     A. So on the -- this goes back to some of what we
19 had experienced on June 9th, and then being met with some -- some
20 of the barricades, and then being met with some -- some
21 resistance from folks involved with the protests.
22         So I think we wanted -- and again, some of what
23 we were starting to hear from some of our -- our
24 represented employees through their labor representation
25 around concerns related to -- to not having SPD present

Page 94

1  in those activities.
2          We felt like having SPD present as -- as sort
3  of, quote/unquote, security in that -- that environment
4  would have potent- -- had the potential to re-escalate
5  the con-- -- the larger conflict, but so we were -- we
6  didn't have exactly that game plan in place for how to
7  do some of those -- that work, removing barricades,
8  without -- and sort of getting to the operational plan
9  at that point.
10         This was -- again, this was 6:00 a.m. on
11 June 10th, so we were still in the process of
12 formulating what that -- what that operational plan
13 would look like.
14     Q. So at this point, on June 10th, were you
15 concerned that it was unsafe for your people to remove
16 barriers in the area without an SPD escort?
17     A. No. You know, I was -- I was present on
18 June 9th and June 10th. I was -- I -- I personally was
19 not concerned, but I did hear and respect that concern
20 that we were hearing from our -- our -- the -- the folks
21 actually doing that physical labor.
22     Q. Okay. You weren't personally removing the
23 barriers, yourself; right?
24     A. I was not personally doing that myself.
25     Q. What was your communication like with anybody

Page 95

1  from the police department at this point, the June 9th,
2  10th, and 11th time frame?
3      A. I think it was fairly minimal. I don't recall
4  specifics of that -- of communication with members of
5  the Seattle Police Department. There were -- you
6  know -- and I don't remember -- some of the timeline
7  gets a little bit fuzzy for me, but there was -- you
8  know, this -- as this notes, that there was a goal from
9  them to go back into the -- into the area.
10         I think that they actually did go back into the
11 building at some point around this timeline. But I
12 wasn't -- I wasn't -- I don't recall too much direct
13 communication with members of Seattle Police Department.
14     Q. So how about later on, during the June 9th to
15 July 1, 2020, time frame? Do you recall being in
16 communication with the police department about what to
17 do?
18     A. I do. Yeah, I do. You know, as we got farther
19 along -- and this was really -- as we got towards
20 removing barriers, at the -- at the end of June, we --
21 I -- I did feel like it was necessary at that point that
22 we had coordination of support from Seattle Police
23 Department.
24     Q. So did you have -- did you have direct contact
25 with Carmen Best during the period of June 9th through

Page 96

1  July 1, 2020, about this or anything else?
2      A. I did. There was a -- I think there was a day
3  in which she and I were both present on-site, and I
4  think we had a conversation. She came and she talked to
5  some members of the media, and I was nearby. And -- and
6  after that, she and I had a conversation about what --
7  what we were seeing. And I don't recall too much the --
8  the details of that.
9          When we got towards the removal plans, I don't
10 recall really having a -- a detailed conversation with
11 her.
12     Q. Of the conversation you had with her, what --
13 what time period do you think that that occurred?
14 What -- do you -- do you have a rough estimate of the
15 day?
16     A. You know, I don't, and I would hesitate to
17 speculate. I remember that we were -- we were both
18 present at the intersection of 12th and Pine. She
19 talked to members of the media. So that date's probably
20 reported. When -- when that date was, she and I had
21 sort of a sidebar conversation out there that date that
22 she was on-site, and I was there as well.
23     Q. What, generally, do you recall discussing with
24 her during that sidebar?
25     A. I think we were talking about sort of ways that

Hunters Capital, LLC v. City of Seattle                 30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 117

1    Q.  There were some barriers around there too, as
2    well, right, in the road?
3    A.  I think there were some barriers at that point
4    on the -- on the road.  But the -- but the trash trucks
5    were moving through, so I -- and the trash trucks had to
6    get to that same alley.
7    Q.  Okay.  So you don't know whether or not -- with
8    regard to trash trucks, whether there had to be
9    negotiated entries at various barriers, do you?
10   A.  I don't.
11   Q.  Okay.
12   A.  I don't.  I wasn't part of that.
13   Q.  Okay.  I think we established before, you don't
14   know how the trucks got in and out of the area; correct?
15   A.  That's correct.
16   Q.  Okay.  So you would agree that there were a lot
17   of people in the streets on the 9th, the 10th, and the
18   11th, in and -- inside and outside the barriers that had
19   been put up; is that correct?
20       MR. CRAMER:  Objection.  Form.
21   A.  Yeah, the -- and again, I'd say at this point
22   that, when we talk about barriers, it was -- the
23   protesters had moved various things into creating
24   barricades.  This was before the City, SDOT, created a
25   regular traffic pattern between protesters and -- and

Page 118

1    vehicles.
2    BY MR. WEAVER:
3    Q.  Okay.
4    A.  Yeah.
5    Q.  So you say regular traffic pattern.  So even --
6    you're talking about after June 16th and June 17th;
7    right?
8    A.  Yes.
9    Q.  Okay.  So the -- the area we had talked about
10   earlier was local access only; correct?
11   A.  Yes.
12   Q.  There were signs up saying "Local access only"?
13   A.  Yes.
14   Q.  And there were -- there were still lanes of
15   traffic blocked off; is that correct?
16   A.  There were -- on -- in certain places, yes,
17   there were.
18   Q.  Okay.  And the protesters were periodically
19   moving barriers, especially at night, to areas where
20   they had not previously been put; is that correct?
21   A.  That was -- yes.  That was my experience.
22   Q.  And -- lost my train of thought.  Sorry.
23       But you -- you considered that to be regular
24   access to the area?
25   A.  You know, I think my goal in -- in -- over the

Page 119

1    course -- between the 9th and when -- until we got to
2    the 16th, was to try to find a way for there to be
3    regular access.  Was there unimpeded, 24/7, complete,
4    you know, normal access?  I -- I don't -- I think it
5    was -- it was a more fluid situation on the ground than
6    that.
7        I think that there were -- my goal, in talking
8    with protesters, in trying to move barricades, in trying
9    to set up what we eventually did install on the 16th,
10   was to preserve those important property access, goods
11   movement, service -- services, and have a -- a sort of
12   predictable, regular pattern that people could know what
13   to expect when they -- when they came to that area.
14       Because it was -- you know, it was -- before
15   that point, on the 16th, it was -- it was sort of
16   constantly changing, and it was hard to know, as a
17   resident, as a business, exactly what to expect.
18       That said, I don't know that -- I don't -- I
19   don't know personally that people didn't have access.
20   I -- it just wasn't -- it wasn't what I would consider
21   to be regular and sort of typical of how we would -- we
22   would set that up if it was a -- a -- an ongoing
23   activity.
24   Q.  Okay.  And even with the barriers that had been
25   put in place, protesters were still periodically in the

Page 120

1    streets outside the area that had been designated by
2    the -- by the eco barriers; is that right?
3        MR. CRAMER:  Objection.  Vague.
4    A.  There were -- there were a lot of people there
5    at various points especially.  And so -- I mean, the --
6    there were people that would be walking or -- but, you
7    know, people are also sort of allowed to cross the
8    street in various places.  Once the signals weren't
9    operating, people can cross in the midpoint of the
10   block.  It's not -- it's not jaywalking at that point.
11       So yeah, there were people -- there were a lot
12   of people there at various points, and there were people
13   sort of in -- in various places.  I'd say once we had
14   a -- a more regular traffic pattern, it was -- it was --
15   it was more predictable for how it -- how it was all
16   operating.  But it was a -- you know, it was a pretty --
17   it was a pretty fluid situation for, I'd say, the whole
18   month of June, or in that area.
19   BY MR. WEAVER:
20   Q.  Okay.  Just as an example, you mentioned a
21   press conference that you were at with Carmen Best.
22       Do you recall talking about that?
23   A.  I was -- I was nearby.  I wasn't --
24   Q.  Okay.
25   A.  -- with her.  She -- she talked to the -- she

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                     30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 121

1    talked to some members of the media.  I was nearby --
2         Q.  Okay.
3         A.  -- not part of the -- not part of the --
4         Q.  You were present for her press conference;
5    right?
6         A.  Yes.
7         Q.  Okay.
8         A.  Yeah, that's correct.
9         Q.  And you said that was at 12th and Pine.
10        Do you remember that?
11        A.  Yes.
12        Q.  Okay.  Do you recall that it was outside the
13   barriers, but in the middle of the street?
14        A.  Yeah, I -- I believe so.
15             MR. WEAVER:  We've been going about another
16   hour, so let's go -- let's go ahead and go off the
17   record.
18             THE VIDEOGRAPHER:  Going off the record.
19   The time is approximately 12:19 p.m.
20             (Recess from 12:19 p.m. to 1:05 p.m.)
21             THE VIDEOGRAPHER:  We are back on the
22   record.  The time is approximately 1:05 p.m.
23             E X A M I N A T I O N (Continuing)
24   BY MR. WEAVER:
25        Q.  So I want to ask you, with regard to anything

Page 122

1    that SDOT did in the area in and around Cal Anderson and
2    the East Precinct between June 9th and June 30 -- and
3    July 1, 2020, do you believe that SDOT took any steps or
4    actions in that area that were not approved of by the
5    mayor?
6              MR. CRAMER:  Objection.  Form.
7         A.  Yeah, without being overly broad, because I
8    feel like we do lots of things that are not directly,
9    you know -- the mayor doesn't sign off on every
10   individual action that we take, I think the -- the
11   larger -- larger-scale things were done in consultation
12   with -- with the mayor, and were done in consultation
13   with the professional expertise and judgment of -- of
14   myself and -- and SDOT staff as well.
15   BY MR. WEAVER:
16        Q.  Okay.  So what were the larger-scale things
17   that you're talking about that you're confident were
18   done with the approval of the mayor?
19        A.  So I think our -- our -- our traffic pattern,
20   our -- our -- the -- the -- so June 16th, June 17th, our
21   regularization of the traffic patterns and the eventual
22   removal of the ecology block barriers were all done
23   in -- in consultation through that -- through that
24   process.
25        Q.  Okay.  So at any point during the period of

Page 123

1    June 8, 2020, to July 1, 2020, did the mayor ever tell
2    you that she thought STOD [sic] should do something
3    differently than they had been doing?
4         A.  I think there were -- you know -- I'm trying to
5    remember.  The -- I think there were -- you know, some
6    of those operational times, I think she wanted us to
7    maybe start a little bit earlier than we did on -- on
8    one -- one or two of those days.
9              I -- I think that we had some -- some
10   discussions about the traffic pattern, but I think it
11   was largely the -- the recommendation and the advice
12   from -- and the plan developed by SDOT in consultation
13   with other departments.
14             We were -- you know, it was a -- it was a
15   consultation process, not a -- you know, I don't think
16   there was a -- a vast disagreement between us and the
17   mayor.
18        Q.  So what -- what was your impression about the
19   things that we wanted to start earlier?
20        A.  Oh, some of our work -- you know, it was
21   hard -- there was a -- there was -- when we were going
22   to do some of that work with installing ecology blocks,
23   it took some pre-staging of -- of sort of things within
24   our -- our yard, when people had to come there, get
25   those things, come up to -- to Capitol Hill and -- and

Page 124

1    then do that work.
2              And there's only so much you can accomplish in
3    the day, and I think there was a desire at some points
4    to start earlier and accomplish more within one day.
5         Q.  Okay.  How about the clearing out of the area?
6    Did she want that to happen sooner than it did too?
7         A.  Again, I think that was a -- it was -- there
8    were some -- and this is -- this is not exclusive to
9    what happened in this area in June of last year, but
10   there are times when -- when the mayor has desires for
11   certain operational outcomes, and it's a healthy
12   dialogue between us and the mayor about what's possible
13   from an operational perspective and -- and where she
14   wants -- wants to see us doing things.
15             So she -- I mean, there may have been oppor- --
16   times when she wanted things to happen faster or -- but
17   that's not dissimilar to other -- other things that I
18   interact with her on.
19        Q.  Do you recall anytime, during that period of
20   June 9th to June 20, 2020, the mayor expressing
21   displeasure with anything that SDOT had done in the
22   area?
23        A.  Not to me.
24        Q.  Okay.  I think earlier you were talking about
25   the balancing of -- the City was trying to balance First

31 (Pages 121 to 124)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

---

Page 161

1  permanent count capabilities.
2     Q. Do you know whether Google or Waze or any of
3  those sorts of providers that you work with might have
4  that data that they share with the City?
5     A. Not that -- I know that they don't really have
6  that information. They have -- what they do is, they
7  approximate a total based on, you know, the number of
8  people who -- there's certain data providers that sort
9  of aggregate a bunch of different data sets and then
10  give an approximation.
11     But it's -- it's not -- it's -- it's more
12  useful at the sort of aggregate level, relative traffic
13  volumes, when we compare it to other sort of more
14  traditional traffic counting measures because it doesn't
15  capture everybody. It sort of captures a stream of
16  users based on whether they have a cellphone or whether
17  they're using a certain service that allows location
18  services.
19     Q. So does the City of Seattle have access to that
20  data for a particular area or particular time period?
21     A. I don't believe that we do.
22     Q. How are you aware that they have that
23  capability?
24     A. That's through ongoing conversations with those
25  data providers, and -- and, you know, there's certain --

Page 162

1  certain services that -- that offer that -- offer us
2  that service at various points. So there's some sales
3  pitches involved.
4     Q. Okay. So has the City ever paid for that
5  data -- sort of data?
6     A. Not at the -- not at a citywide level. We may
7  have had -- for -- for certain projects or things like
8  that.
9     Q. Do you know whether that data has ever been
10  purchased or looked at with regard to Capitol Hill in
11  the June 2020 time frame?
12     A. I don't think that we have any of that sort of
13  data for Capitol Hill in the June 2020 time frame.
14     Q. Do you know whether there were any manual
15  traffic counts done by SDOT in Capitol Hill in June
16  2020?
17     A. I -- I don't know if there were.
18     Q. What usually triggers a manual count of traffic
19  flow by SDOT?
20     A. So we have a regular count program where we
21  count some similar intersections at the same time every
22  year to -- for part of our annual traffic report.
23     We also do project-specific data collection, if
24  we're looking to make a -- you know, a safety change in
25  a -- in a project. Then we collect data for making sort

Page 163

1  of long-term capital project planning decisions as well.
2     So some of those come from community requests,
3  some of those come from our own internal needs, and then
4  some of them are just regular ongoing counting of
5  vehicles primarily for -- for like our annual reporting
6  purposes.
7     Q. Do you know whether there were any manual
8  counts done in June of 2020 in and around the Cal
9  Anderson and East Precinct area?
10     A. I don't believe that there were, but I can't be
11  definitive in that.
12     Q. Okay. All right. Let's go to Exhibit 10,
13  which is a series of notes from a later meeting on
14  June 10th. And if you go down to the bottom -- or --
15  yeah, it's the bottom of the email, there's a
16  Paragraph 4 that says, "Cal Anderson Park Support."
17     A. Yes.
18     Q. Do you recall there being discussions at a
19  cabinet meeting on June 10th about concerns about the
20  level of permanent activity at Cal Anderson Park?
21     A. Yes. This -- yeah, I -- I recall this -- this
22  discussion.
23     Q. Okay. What do you recall about that
24  discussion?
25     A. You know, what's, I think, reflected in the

Page 164

1  notes here about having tents on-site, digging a
2  community garden, which I think meant removing some
3  parks infrastructure. I don't know what exactly, but
4  there was some concern about creating a new community
5  garden.
6     Q. Okay. Why was that -- why did that raise
7  concerns, that activity in the park?
8     A. I -- my recollection, it was about the -- the
9  long-term changes to what is in the park, of sort of
10  park infrastructure.
11     Q. Was there --
12     A. Plantings --
13     Q. Was there also concern that this meant that it
14  appeared that the protesters were planning for a long
15  period of time to be in that area?
16     MR. CRAMER: Objection. Form.
17     A. Yeah, I -- I think it was just the amount of --
18  I think that was sort of -- sort of more -- more about
19  the damage and the -- you know, I think that planting a
20  garden could indicate that people were planning to be
21  there for a substantial amount of time.
22  BY MR. WEAVER:
23     Q. Do you recall that being a discussion at -- at
24  this -- at either this cabinet meeting or another
25  cabinet meeting?

41 (Pages 161 to 164)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 165

1    A.  I think -- you know, I -- I recall there being
2    more -- more concern about the -- the level of damage
3    than that it would be something that people would be
4    sort of ongoing.
5        So I think maybe -- maybe permanent in this
6    regard was referring to sort of the -- the permanency of
7    the damage, but it may have been about -- other people
8    may have had a -- a concern about the long-term
9    residential activity within the park.
10   Q.  Meaning the tents in the park?
11   A.  Yeah.
12   Q.  Okay.  Do you recall there being discussion
13   about whether to provide porta-potties to the park?
14   A.  I do, as -- as indicated here in the notes.  I
15   remember there being some discussion about porta-potties
16   versus -- both within the park and in the vicinity
17   because there were a lot of people out for long periods
18   of time, and a lot of businesses closed.
19   Q.  What do you recall the discussions being about
20   whether to provide or not provide porta-potty service to
21   the area?
22   A.  You know, I don't remember a whole lot about
23   that, but I remember there being some -- some questions
24   about -- about providing porta-potties versus, you know,
25   what -- what it would mean from a -- from a waste

Page 166

1    perspective if we didn't provide porta-potties.
2    Q.  Okay.  Do you recall anybody expressing
3    concerns about what a -- about what message it might
4    send to provide porta-potties to the area?
5    A.  Yeah, I remember some -- some concerns.  And
6    again, this is similar to some of the other areas where
7    there wasn't -- there wasn't unanimity of all opinions
8    at all times.
9    Q.  Okay.
10   A.  There were some folks who felt like that that
11   could -- could encourage people to stay longer than they
12   might otherwise.  I don't remember who took which
13   positions, though.
14   Q.  Okay.  So you don't recall who was talking
15   about them potentially being a problem for long-term
16   residency?
17   A.  I -- I -- I --
18       MR. CRAMER:  Objection.  Form.
19   A.  Yeah.  I don't.  It was a little bit out of
20   my -- my area of expertise, so was maybe not paying as
21   close attention to that as I could have.
22   BY MR. WEAVER:
23   Q.  Okay.  Did you ever tour the area in and around
24   Cal Anderson and East Precinct in June of 2020 with
25   Mayor Durkan?

Page 167

1    A.  I'm trying to remember.  I don't remember if I
2    was there with her.  I was there with her after the --
3    afterwards.  I don't remember.  I may have -- there may
4    have been one time where I was there with her, but those
5    are sort of blurring together.
6        And then there was one time when she was -- she
7    came to a meeting with some of the protest leads, which
8    I was not in that meeting, but that was nearby.  So I
9    may have been there with her during the protest period
10   too, but I -- I don't remember.
11   Q.  What do you recall about the time you were with
12   her there, whether it was during the protests or another
13   time?
14   A.  So I recall the time after the protests a
15   little bit more clearly.  We -- because we met with some
16   of the business owners and walked around the
17   neighborhood a little bit in looking at recovery from
18   the post -- post-protest activities and what -- you
19   know, where there was still some -- some maintenance or
20   operational issues several months later.  And that was,
21   you know, sort of more -- that was a -- listening to
22   folks.  This was late summer last year, I think, after
23   the -- after the protests were -- were -- were done.
24   Q.  Okay.  Who do you recall being at that meeting
25   with you and the mayor?

Page 168

1    A.  That, I recall Jesús Aguirre from Seattle Parks
2    and Recreation.  I think Mami Hara was there as well.  I
3    think there were representatives from Seattle Police
4    Department.  It may have been Interim Chief Diaz, but
5    I'm not exactly sure.  And I think perhaps Chief
6    Scoggins as well.
7    Q.  Okay.  And do you recall who was there that
8    wasn't with -- was not a representative of the City?
9    A.  Yeah, so I think we -- I remember we met at a
10   restaurant sort of at the corner of 11th -- or 10th
11   and -- 10th and Pike.  And then we met, I -- there were
12   a few business owners there, and we met -- we went up to
13   Rachel's Ginger Beer.  We sort of walked around through
14   the neighborhood, and then met with folks there in -- in
15   Rachel's Ginger Beer, a couple different business owners
16   there as well.
17   Q.  Okay.  What do you -- what were you -- what do
18   you recall discussing with the business owners on this
19   tour?
20   A.  I think at that point we were talking about
21   sort of long-term recovery of -- of businesses, business
22   activities, what we could do to support the -- the
23   long-term -- sort of what long-term plans for Cal
24   Anderson Park renewal might be.
25       I think there was -- there were concerns raised

42 (Pages 165 to 168)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 209

1      MR. CRAMER: Objection. Form.
2      A. So I'm -- I'm not sure I would characterize it
3   quite as negotiations. I think they were engagement
4   conversations. There was -- there was not -- I didn't
5   feel like there was a -- a negotiation in the sense of
6   we were offering something and they were offering
7   something in return.
8      We were explaining our position and engaging
9   about what the -- what we felt the long-term -- or
10  the -- the sort of future of the protest area needed to
11  be from our -- from our public responsibilities.
12     We -- we asked them to nominate people who
13  could speak on behalf of the -- of the protest group,
14  but I would -- I would say that that -- those folks who
15  were put forward for those conversations, if we had
16  said, okay, here's your enforcement letter, would have
17  said, "I don't speak on behalf of this group."
18     I mean, as it was, it was a little bit
19  challenging to figure out who consistently could --
20  could be called on for that role of any kind of
21  representation.
22  BY MR. WEAVER:
23     Q. So in a circumstance where -- let's go back to
24  one that you talked about before, where there's a
25  construction project that's blocking a lane of traffic

Page 210

1   and they haven't been permitted -- they -- it's not in
2   their permit that they're -- they're allowed to do that.
3      A. Okay.
4      Q. If the -- if the construction owner doesn't
5   remove the blockage, what does the Department of
6   Transportation do to correct the situation?
7      MR. CRAMER: Objection. Objection. Form.
8      A. So we will tell them to correct it. And if
9   they don't within 24 hours, they will -- we will issue a
10  notice of violation typically, and it will carry a
11  financial -- a small financial penalty.
12  BY MR. WEAVER:
13     Q. At any point does the Department of
14  Transportation go in and remove the barrier themselves?
15     A. Not typically.
16     Q. Is it your understanding that you would have
17  the authority to do that if you chose to exercise that
18  authority?
19     A. Yes, that's my understanding.
20     Q. So I'd like to go to -- back to Exhibit 6,
21  which is your texts, and Page 7, and this is Chat 288.
22  This is June 19th with you and a series of other people.
23     A. Okay.
24     Q. Do you see that?
25     A. Yep.

Page 211

1      Q. I just want to make sure you're on -- okay. So
2   you indicated this about 7:00 in the morning on
3   June 19th, that they had a couple water barriers across
4   Pine between 11th and 12th.
5      What were you referring to there, if you
6   recall?
7      A. So yeah, this is something that would -- would
8   happen occasionally, sort of that there would be some
9   things sort of moved in the -- in -- into -- in the way
10  of traffic.
11     And -- and it was like -- you know, I think I
12  say, that last sentence, "They are still soft closing
13  streets overnight." And I think this would be -- you
14  know, people would put some things into the street.
15     You could -- you could move them -- like, I
16  could walk up and just move them out of the way. But
17  they -- they could have been perceived as -- as not
18  allowing access.
19     But they weren't -- they weren't act- -- they
20  were not filled with water. They were -- I could move
21  them out of the way myself. But that would happen in
22  different places at different times, and it would tend
23  to happen when it was -- in the sort of overnight hours.
24     Q. So it was typically overnight that they would
25  do these soft closings?

Page 212

1      A. Yes.
2      Q. Okay. And -- I mean, if somebody didn't go up
3   to the barrier and try to move it, they wouldn't
4   understand that it could be moved; is that right?
5      MR. CRAMER: Objection. Speculation.
6      A. That's -- that's probably right. You know, it
7   also was -- they sometimes would -- you would -- you
8   could drive through, but you had to sort of be a bit
9   more circuitous.
10     So I don't -- I don't remember exactly how
11  they -- like what the configuration was of -- of some of
12  those things, but -- and it -- it was different in
13  different places at different times.
14  BY MR. WEAVER:
15     Q. Did you find that typically, when they were
16  moved overnight, they would be into lanes of traffic
17  that had previously been attempted to be open?
18     A. Sometimes, and sometimes it would be over one
19  lane, but not the second lane, or one direction, but not
20  the other direction of travel. I -- it was -- it was
21  a -- I think it was a consistently evolving situation
22  through that whole week.
23     Q. Okay. And so we talked about the plywood too.
24  Would the plywood be basically placed in the same areas
25  that the orange water barriers might?

53 (Pages 209 to 212)

Hunters Capital, LLC v. City of Seattle

30(b)(6) and Individual Deposition of Samuel Zimbabwe

---

Page 213

1    A.  Yep.  Yes.
2    Q.  And again, typically at night?
3    A.  Yes.
4    Q.  At some point there was a switch from keeping
5  the modified footprint that existed on June 16th and
6  17th, that you installed on those days, and moving a
7  couple weeks later to move everything out.
8       Do you recall what the impetus was for that
9  movement?
10    A.  I don't know if there was a -- I don't know
11  what -- if there was a specific thing that happened.
12  You know, I think some of -- some of this, the -- the
13  sort of continued shifting of things, you know, it
14  felt like, from my perspective -- I can only speak for
15  myself at this point, but it felt from my perspective
16  like it was un-- -- unlikely that we would ever in -- in
17  this -- so this approach reach enough stability and
18  predictability that me, Mami, Chief Scoggins, like we
19  would be able to not engage at the level we were
20  engaging.
21       And the level we were engaging in order to
22  ensure public services was, from my perspective, not
23  sustainable in the long term, that the -- that the level
24  that we were spending -- level of time meant that it was
25  challenging to do the rest of our jobs because we were

Page 214

1  committed to ensuring public services and access in
2  Capitol Hill.  There's a whole city that I'm responsible
3  for, not --
4    Q.  Sure.
5    A.  -- three blocks.
6    Q.  So Chief Scoggins is the fire chief for the
7  entire city; right?
8    A.  Right.
9    Q.  And Mami Hara was -- was the director -- I
10  think she's left -- for all of Seattle Public Utilities;
11  right?
12    A.  Right.
13    Q.  And you were the head department -- head of the
14  SDOT for the entire city; right?
15    A.  That's right.
16    Q.  And all three of you were spending either all
17  day or a good portion of your days for about three or
18  four weeks in the Capitol Hill neighborhood around Cal
19  Anderson Park; right?
20    A.  That's right.
21    Q.  And you felt that was necessary to keep
22  services at -- at some sort of reasonable level in the
23  neighborhood; right?
24       MR. CRAMER:  Objection.  Form.
25    A.  I felt like it was important to -- to -- yeah,

Page 215

1  to preserve our -- our public responsibilities of -- of
2  access and -- and services and movement of people and
3  goods.
4  BY MR. WEAVER:
5    Q.  Okay.  And did you notice a change in the shift
6  of the priority to clear out the area after shootings
7  that occurred in the area on June 20th and June 21,
8  2020?
9    A.  I think that that potentially played into it.
10    Q.  How do you think that played into it, and what
11  was your perception of why it played into it?
12    A.  You know, I -- I don't want to -- I don't want
13  to speculate on -- on why it played into it for others.
14  I -- it -- to me, it felt like things at that point --
15  you know, I've talked about how our goal was to -- was
16  continued de-escalation of conflict and looking for sort
17  of a return to regular operations.
18       I think some of those -- there -- there
19  became -- or it seemed like we were heading towards an
20  inflection point where we would not be successful in
21  de-escalating, and there could be opportunities for
22  escalating conflict, whether between -- you know, it
23  started out as between protesters and police.
24       It seemed like perhaps that was changing into
25  among protesters, or a lot of uncertainty about what was

Page 216

1  going on with some of -- some of those incidents, that
2  our original goal of de-escalating may not be long-term
3  successful in the current -- in the -- in the
4  configuration that we had out there at that point.
5    Q.  Okay.  So I'd like you to look at your texts
6  again, on Page 6.  At the top there's a chat, 278.  It's
7  June 21st at about 11:30 at night.
8    A.  Uh-huh.
9    Q.  At this -- at this point do you remember
10  whether there had been shootings at that point, on the
11  20th and 21st, in the area?
12    A.  You know, I don't remember the dates of those
13  incidents, but that -- but that -- from that text
14  message, that sounds --
15    Q.  Okay.
16    A.  -- that sounds reasonable.
17    Q.  Okay.  So Deputy Mayor Fong indicates that,
18  "Given the shootings near the CHOP this evening, I feel
19  strongly we need to plan now assuming a significant
20  mobilization of City resources tomorrow to start
21  clearing out the area."
22       Do you see that?
23    A.  I do.
24    Q.  Does that refresh you as to whether there was a
25  new urgency to clear out the area because there had been

Hunters Capital, LLC v. City of Seattle | 30(b)(6) and Individual Deposition of Samuel Zimbabwe

---

Page 225

1  was sort of part of -- a lot of what went into that
2  operational planning.
3      Q.  Okay.  So there's been about -- I think you
4  said 50 to 100 ecology blocks that had been moved in
5  about five days earlier?
6      A.  I think that's right.  Something like that.
7      Q.  And so those needed --
8      A.  And it was probably closer to --
9      Q.  Go ahead.
10     A.  It was probably closer to 100.  I just --
11     Q.  Okay.
12     A.  -- I don't remember exactly now.
13     Q.  Okay.  And so those all had to be cleared out
14 after having been placed five days ago; right?
15     A.  Some of them remained on-site to be used for
16 the eventual separation between the precinct and the
17 street, but some of them were removed and -- a lot of
18 them were damaged also.  The -- the protesters had cut
19 some of those rings, and so they became hard to move
20 around without picking them up and --
21     Q.  Okay.
22     A.  -- putting them onto -- onto trucks.
23     Q.  There were also -- there was a lot of graffiti
24 in the area too; is that right?
25     A.  There was.

Page 226

1      Q.  Okay.  Like what -- what volume of graffiti, if
2  you could describe it, did you see in the area around
3  the -- around the 22nd?
4      A.  There was a lot.  There was graffiti in --
5  on -- on the streets, sidewalks, some of the building
6  faces.  A lot.
7      Q.  And did you go into Cal Anderson -- I know
8  you -- that was not your area, but did you go in there
9  and see the graffiti in there at all?
10     A.  I didn't.
11     Q.  And there were -- there were a significant
12 number of people living in the area at that point who
13 were temporary residents between -- in the park and the --
14 and around the East Precinct; is that right?
15     A.  That's -- yeah, that's correct.
16     Q.  And I think there were -- there were, like, I
17 think -- forgive me for not recalling the exact
18 number -- about 20 or 23 porta-potties in the area?
19     A.  Within the whole area, that may be correct.
20 There were maybe ten within the streets that I remember.
21     Q.  All right.  And there was trash in the area;
22 right?
23     A.  Yeah, I mean, there was some trash.  There was
24 still -- there was continuous trash service.  So what is
25 trash versus people's belongings is always a -- a bit of

Page 227

1  a gray area, but there was a substantial amount of trash
2  and debris.
3      Q.  And there was, I guess, you know, 50 to 100
4  plywood sheaths that you were going to -- that you had
5  to try to preserve; right?
6      A.  That's right.
7      Q.  How many people did the team decide it was
8  going to take altogether, among the various departments,
9  if you know, to clean out the area?
10     A.  I don't remember.  I remember we had a pretty
11 substantial deployment of SDOT personnel, probably --
12 well, on the -- the -- the final sort of full removal
13 day, and there were probably 40 or even -- even upwards
14 of 40 SDOT staff that were there, and that included
15 truck drivers, equipment operators, our signs and
16 markings, our maintenance laborers, other people who --
17 it was -- the idea was also to do as much as possible as
18 quickly as possible to sort of not have to continually
19 come back.
20     Q.  Okay.  So you had people there who were
21 removing the plywood; correct?
22     A.  Uh-huh.
23     Q.  You had people there who were removing the
24 barriers?
25     A.  (Witness nods head.)

Page 228

1      Q.  SDOT -- did SDOT have people who were removing
2  the speed humps?
3      A.  Yeah.  Those were pretty easy -- the same
4  people who were removing barriers and things like that.
5      Q.  Okay.  Were they also the same people that were
6  removing the signs that had been put up around the area?
7      A.  Yep.
8      Q.  And that -- that took -- with that group of 40
9  or maybe more people, it still took a couple days to
10 clean it up; right?
11     A.  It took most of one day, and then I think there
12 was a little bit of work the next day.  And -- and then
13 we came back sort of over the next few weeks and -- and
14 power washed a lot of the streets and removed the
15 graffiti.
16        And then we came back a few months later --
17 actually, I think it even lasted somewhat into the
18 spring and -- and addressed some of the other damage to
19 the rainbow crosswalks and things like that.  There had
20 been some fires set on them at some point, so...
21     Q.  Fires set on --
22     A.  On going -- we -- we've continued to --
23 continued to invest in repair and maintenance activities
24 in the whole of Capitol Hill.
25     Q.  So there were fires set on the rainbow

57 (Pages 225 to 228)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 237

1        MR. WEAVER:  All right.
2        THE VIDEOGRAPHER:  Going off the record.
3   The time is approximately 4:25 p.m.
4        (Recess from 4:25 p.m. to 4:28 p.m.)
5        THE VIDEOGRAPHER:  We are back on the
6   record.  The time is approximately 4:28 p.m.
7        MR. CRAMER:  And we do not have any
8   additional questions, but we will -- will reserve
9   signature.
10       THE VIDEOGRAPHER:  Thank you.  This
11  concludes today's deposition of Sam -- Samuel Zimbabwe.
12  The time is approximately 4:29 p.m.  Going off the
13  record.
14       (Deposition concluded at 4:29 p.m.)
15       (Reading and signing was requested
16        pursuant to FRCP Rule 30(e).)
17              -o0o-
18
19
20
21
22
23
24
25

Page 238

1          C E R T I F I C A T E
2
3   STATE OF WASHINGTON
4   COUNTY OF PIERCE
5
6        I, Cindy M. Koch, a Certified Court Reporter in
7   and for the State of Washington, do hereby certify that
8   the foregoing transcript of the deposition of Samuel
9   Zimbabwe, having been duly sworn, on October 28, 2021,
10  is true and accurate to the best of my knowledge, skill
11  and ability.
12       IN WITNESS WHEREOF, I have hereunto set my hand
13  and seal this 5th day of November, 2021.
14
15
16       _____
             CINDY M. KOCH, CCR, RPR, CRR
17
18  My commission expires:
19  JUNE 9, 2022
20
21
22
23
24
25

60  (Pages 237 to 238)

Exhibit 6

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff(s),    )
                                )
vs.                     ) 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,        )
                                )
        Defendant(s).   )

VIDEOTAPED VIDEOCONFERENCE
DEPOSITION UPON ORAL EXAMINATION OF
CARMEN BEST

Witness located in
Seattle, Washington
(All participants appearing via Zoom videoconference.)

DATE TAKEN:  NOVEMBER 9, 2021
REPORTED BY:  PATSY D. JACOY, CCR 2348

---

Page 2

1          A P P E A R A N C E S
2
3   PRESENT VIA ZOOM FOR THE PLAINTIFFS:
4     PATRICIA A. EAKES
       TYLER S. WEAVER
5      GABE REILLY-BATES
       Calfo Eakes LLP
6      1301 Second Avenue, Suite 2800
       Seattle, WA 98101
7      206.407.2200
       pattye@calfoeakes.com
8      tylerw@calfoeakes.com
       gaber@calfoeakes.com
9
10  PRESENT VIA ZOOM FOR THE DEFENDANTS:
11    JOSEPH GROSHONG
       Assistant City Attorney
12     Seattle City Attorney's Office
       701 Fifth Avenue, Suite 2050
13     Seattle, WA 98104
       206.684.8200
14     joseph.groshong@seattle.gov
15
       SHANE P. CRAMER
16     TYLER L. FARMER
       ARTHUR W. HARRIGAN JR.
17     Harrigan Leyh Farmer & Thomsen LLP
       999 Third Avenue, Suite 4400
18     Seattle, WA 98104
       206.623.1700
19     shanec@harriganleyh.com
       tylerf@harriganleyh.com
20     arthurh@harriganleyh.com
21
       PRESENT VIA ZOOM FOR CARMEN BEST:
22
       DENISE ASHBAUGH
23     Arete Law Group
       1218 Third Avenue, Suite 2100
24     Seattle, WA 98101
       206.428.3250
25     dashbaugh@aretelaw.com

---

Page 3

1          A P P E A R A N C E S (cont'd)
2
3   PRESENT VIA ZOOM VIDEOGRAPHER:
4     BROOK YOUNG
       Buell Realtime Reporting, LLC
5
6   ALSO PRESENT VIA ZOOM:
7     NANCY CARRIAGA, Paralegal
       Calfo Eakes LLP
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1          DEPOSITION OF CARMEN BEST
2              EXAMINATION INDEX
3
4
5   EXAMINATION BY:                PAGE(S)
6     BY MS. EAKES                    8
7
8              EXHIBIT INDEX
9   EXHIBITS FOR IDENTIFICATION         PAGE
10  Exhibit 1   Reducing Crime podcast    20
11              transcript
12  Exhibit 2   6/8/2020 email string    69
13              SEA_00058827
14  Exhibit 3   June 2020 email string with   82
15              attachments
16              SEA_00102554-565
17  Exhibit 4   6/21/20 email from Durkan   94
18              to Fong and others
19              SEA_00040208
20  Exhibit 5   11am Update - E Precinct   123
21              SEA_00028170-172
22  Exhibit 6   Edward Sector Calls for   139
23              Service
24              SEA_00019917-
25

Hunters Capital, LLC v. City of Seattle                                    Carmen Best

---

Page 33

1   Kerlikowske came, when he came on board at the
2   department because he's the one who brought me up to be
3   a supervisor and -- in public affairs, but I'm -- I
4   can't quite remember the year that that was, to be
5   honest with you.
6       Q.  Okay.  How many years were you there as a
7   sergeant do you think?
8       A.  Well, maybe about three.
9       Q.  Three?
10      A.  Oh, East Precinct, yeah, probably -- yeah,
11  probably about a couple years, couple three years.
12      Q.  Okay, great.  All right.  So can you just tell
13  me from your perspective, I mean, what -- what were the
14  events that kind of led to the creation of what
15  ultimately became the CHOP, officially CHAZ?
16          MS. ASHBAUGH:  Object to the form.
17          MR. CRAMER:  Same objection.
18      A.  Go ahead and answer, though?
19      Q.  (BY MS. EAKES)  Yeah.
20          MS. ASHBAUGH:  Yes.
21      A.  So, you know, what I can tell you is that we
22  were -- we had a number of demonstrations that had been
23  going on, and then at some point, you know, we --
24  eventually we -- the precinct was evacuated, the East
25  Precinct was evacuated with the purp -- intent of

Page 34

1   having it be a temporary evacuation.  The next -- I
2   don't remember the date exactly, but the next day, as
3   we were trying to come back into the precinct, the
4   people who were entering -- were trying to enter the
5   area were stopped by folks who had removed the police
6   barricades -- or the police barricades -- or had put
7   barricades around the precinct and told them
8   essentially to leave the area and leave their sovereign
9   property as I recall.
10          So we really didn't know what it was at that
11  point, but, you know, as far as I can tell therein lied
12  the beginning of the -- what was at that time was known
13  as the Capitol Hill Autonomous Zone, so I believe it
14  was one captain and acting lieutenant.  I was later
15  notified -- when I went in it was still dark in the
16  morning.  I was later notified of the encounter, but
17  really didn't know, you know, what to make of it, to be
18  honest with you.
19          We later -- and I don't remember the exact
20  time frame were -- it was determined that they were
21  there and they were -- had created an autonomous zone.
22  I really wasn't sure what that was.  We were trying to
23  figure out what we were dealing with, but I would say
24  it was right after that last set of demonstrations.
25  And so therein lied that zone and then -- then we

Page 35

1   started working to see what it was we had really.
2       Q.  Great.  So let me -- let's start by talking
3   about the protests before the precinct -- before you
4   left the precinct.
5       A.  Sure.
6       Q.  Do you remember -- so I think the date that
7   you left the precinct was June 8th, if that helps, of
8   2020.
9       A.  Okay.
10      Q.  So prior to that I understand there were a
11  number of protests up in and around the East Precinct
12  following George Floyd's death and then after the
13  protests.  Were you -- were you up at the East Precinct
14  at any point prior to the abandonment of the precinct
15  for those protests?
16      A.  Yes, I was.
17          MR. CRAMER:  Object to the form.
18          THE WITNESS:  Oh, I'm sorry.
19          MR. CRAMER:  I'm going to object to the
20  form; misstates testimony.  Go ahead.
21      Q.  (BY MS. EAKES)  You were --
22          MR. CRAMER:  Go ahead, you can answer.
23      A.  I'm sorry.  Okay.  So, yes, I -- I had been at
24  the precinct, you know, during the protest time.
25      Q.  (BY MS. EAKES)  Tell us about that.  What was

Page 36

1   your experience?  What did you see in terms of what was
2   happening with the protesters?
3       A.  Yeah, there were multiple days -- am I okay to
4   go ahead?
5       Q.  Yeah.
6       A.  Okay.  There were multiple days of protests.
7   You know, I as a chief was there many nights.  I don't
8   remember the exact number, but I was there quite a bit.
9   I felt like my role specifically was to, one, make sure
10  that, you know, that we were lining up with the
11  incident action plan, but additionally to talk to the
12  commanders and to talk to the troops on the ground, and
13  I did that.
14          On occasion, I don't remember which nights,
15  one night I know I went out onto the front line where
16  it was particularly loud and volatile, and so I walked
17  out to talk to some of the people on the front line.
18  On the other side of that line I remember there were
19  several City councilmembers there who I spoke to while
20  they were there as well.  Many nights I was within the
21  precinct and just standing by, you know, while the
22  protests were occurring, would go out on different
23  occasions, would drive around the area with my driver
24  to see, you know, what -- you know, to get a -- you
25  know, a bird's-eye -- not a bird's-eye view, but a line

9 (Pages 33 to 36)

Hunters Capital, LLC v. City of Seattle                                      Carmen Best

---

Page 113

1    MS. ASHBAUGH:  Object to form.
2    A.  Yeah, I only know -- honestly I only know what
3  we were dealing with.  You know, our plan was to move
4  back in.  I didn't hear any objection to that or
5  anything otherwise for us to go back into the precinct.
6  Clearly that wasn't -- we weren't able to do that the
7  next day.
8    Q.  (BY MS. EAKES)  And what was the mayor's
9  office reaction when you told them about what happened
10 with your lieutenant and your captain showing up and
11 being turned away by the armed protesters or armed
12 people in the CHOP?
13   MR. CRAMER:  Objection to form.
14   MS. ASHBAUGH:  Object to the form.
15   A.  Yeah, and I -- I really can't answer that.  I
16 mean, I just -- I don't know.  I do remember relaying
17 the information.  Wasn't necessarily looking for a
18 reaction, but more or less providing, you know, the
19 details as we knew them and trying to make sure that
20 people kept apprised of what was happening as it was
21 evolving.
22   Q.  (BY MS. EAKES)  And what – at some point did
23 you become aware of the mayor supporting the -- an
24 occupation of the area so to speak?
25   MR. CRAMER:  Objection; form.

---

Page 114

1    A.  Yeah, I -- I -- I can't say "supporting" -- I
2  just -- that.  I know she was aware of it and aware of
3  what was happening.  We were trying to keep her
4  apprised of it.
5    Q.  (BY MS. EAKES)  Well, what was your
6  understanding about whether or not the mayor supported
7  the occupation of the area?
8    A.  Well, my -- as far as I could tell, everybody
9  was taking a wait-and-see approach to what was
10 occurring.  Again, I keep saying this, but it was just
11 so unprecedented and so foreign of a -- of a situation
12 that there was more of a wait-and-see approach to how
13 we were going to address the occupiers.  People were,
14 you know, categorizing it as, you know, a protest.  I
15 wasn't so sure, but I -- I wasn't -- I didn't know.
16   Q.  Can you take a look at the podcast again,
17 Exhibit 1, at page 20?
18   A.  I would gladly do that.
19   Q.  And if you just look at the second from the
20 top that says Carmen Best.
21   MR. CRAMER:  Sorry, Patty, which page
22 did you say?
23   MS. EAKES:  20.
24   A.  20, okay, almost there.  Where it starts:  But
25 the City?

---

Page 115

1    Q.  (BY MS. EAKES)  Yes.  And you might want to
2  look at the one right above that.
3    A.  Okay.  (Witness reading document.)
4    MR. CRAMER:  And can you re-ask your
5  question on this page, Patty?
6    Q.  (BY MS. EAKES)  Just let me know when you're
7  done reading it.
8    A.  Sure will.  Just give me one second.
9    Q.  Sure.
10   A.  (Witness reading document.)  Okay, I've read
11 it.
12   Q.  So in the first section that says Carmen Best
13 you said:  I got to tell you, though, we were pretty
14 clear.  I just thought it was terrible and that we had
15 a real problem and we needed to get on this and figure
16 this out.
17        What -- tell me what you meant by that.  What
18 was terrible?  What was the big problem that you saw?
19   A.  Well, from my own perspective I was extremely
20 concerned about people coming into a neighborhood and
21 occupying the neighborhood and claiming it as their
22 sovereign property, so I was very concerned about it,
23 you know, and so that was a real problem.  I thought it
24 was a real problem and definitely wanted to understand
25 where we were with this and what was happening and

---

Page 116

1  figure out what people were doing and why they were
2  there and what their intention was, what the public
3  safety aspects of people being there in that capacity
4  and what it might entail for others in the area.
5    Q.  And did you think that -- that it could
6  potentially lead to violence and problems for the
7  businesses and the residents of that area that had been
8  occupied?
9    A.  Well, I thought that the potential was there
10 for -- you know, who knows how it could come out, but
11 there was obviously potential for it to go bad.  There
12 was also the potential for it to go well, but, you
13 know, as a police chief you're much concerned about the
14 contingencies for a negative -- for a negative outcome
15 than anything -- more so than anything else, you know,
16 planning for the worst but hoping for the best so to
17 speak.
18   Q.  And in the second paragraph that says Carmen
19 Best it says:  And there was no one that I could really
20 turn to and say, "Does anybody see how bad this is and
21 how this is going to be a problem?"
22        Tell me about that.  What -- what were you
23 trying to convey there?
24   A.  Well, you know, I would say this:  There was
25 obviously a difference of opinion about the approach,

---

Hunters Capital, LLC v. City of Seattle                                    Carmen Best

Page 117

1   my interpretation and you'll have to talk to others
2   about what -- you know, was that -- it was more of a
3   wait-and-see approach and clearly, you know, I had some
4   concerns about it.  You know, I think everybody was
5   concerned about what was happening, but how to approach
6   it was -- we weren't all on -- you know, fully on the
7   same page about that, but I recognize that, you know,
8   that's compromising too in these situations.
9       Q.  Were you and the mayor on the same page in
10  terms of how to approach it?
11          MR. CRAMER:  Objection; form,
12  foundation.
13      A.  Yeah, give me -- give me a little more there.
14  What do you mean?
15      Q.  (BY MS. EAKES)  Well, I mean, you said there
16  was a difference of opinion and I'm -- as to how to
17  approach it, so was your opinion different from -- I
18  mean, did you and the mayor have different opinions
19  about how to approach the problem?
20          MR. CRAMER:  Objection to form.
21      A.  Well, the reason I'm saying that, you know,
22  I'm not delineating that to one person, but clearly I
23  go on to talk about the fact that, you know, I was not
24  necessarily in agreement with some of the responses
25  about -- you know, about the porta potties and that

Page 118

1   sort of thing.  I think that, you know, I had some
2   concern there and I think that, you know, the City
3   wanted to take a more measured approach than I did.
4       Q.  And what were your concerns about the porta
5   potties and those other things that you referred to
6   later?
7           MR. CRAMER:  Objection; form, vague.
8       A.  Yeah, just generally speaking I thought that
9   that might be something that would entice people to
10  stay rather than leave.
11      Q.  (BY MS. EAKES)  Okay.  So you were concerned
12  that the City was -- by doing some of those things was
13  signifying or endorsing that people should stay in the
14  area as opposed to leave; is that right?
15          MR. CRAMER:  Object to form.
16      A.  Yeah, I thought that might be an outcome if we
17  brought -- if the City brought in porta potties that
18  some would take that as an invitation to stay longer
19  because they have facilities there.
20      Q.  (BY MS. EAKES)  So you said that, you know,
21  SPD's plan was to reoccupy the East Precinct following
22  the next -- the next day basically after the
23  evacuation, right?
24      A.  Yes.
25      Q.  When did that plan change?

Page 119

1       A.  Well, when we weren't physically able to get
2   back to the precinct and we were met with armed folks
3   that we realized that this was -- we were dealing with
4   a different situation, again, unprecedented.  No way
5   could we have foreseen that people would show up armed
6   and put barricades around the perimeter in the area.
7   It had never happened before and it was just an
8   unprecedented circumstance and, again, it really wasn't
9   clear what the intention was, but we -- but we knew
10  that we needed to sort of figure out what was going on
11  there and it was very concerning.
12      Q.  And did you have discussions, you or your
13  command, with the mayor's office about, "Hey, what's
14  the plan about when we can get back into the East
15  Precinct?"
16      A.  Yeah, I think there were a lot of discussions
17  about, you know, what -- with the people who were
18  occupying and also about how to get back in the
19  precinct.  I can't overemphasize my desire to have the
20  officers having a place to respond from and being back
21  in a sense of normalcy.  So we had a lot of discussions
22  about many of the aspects of what was happening there
23  and how best to address it, and it wasn't just, you
24  know, the police department.  There were other city
25  departments involved in those discussions about how to

Page 120

1   move forward.
2       Q.  Going back to the transcript that we just
3   looked at of the podcast, you also said right before
4   the last sentence I read to you:  Seattle Public
5   Utilities and bringing in porta potties for these folks
6   and I think the mayor was quoted as saying summer of
7   love.
8           Tell me about that.  I mean, I asked you
9   earlier about whether or not the mayor had a -- a
10  different view about whether or not to support the
11  continued occupation of the area.  When did you hear or
12  see that comment?
13      A.  I don't -- I don't really remember when it
14  was.  I do remember seeing it and, again, my -- my
15  concern was the potential for -- you know, I wanted
16  people out of the area, just to be honest, and was --
17  and was concerned about that and I think that, you
18  know, there were different perspectives about, you
19  know, what was happening there.  And -- and obviously
20  in the beginning, you know, it was just problematic
21  simply because of the occupation and the lack of our
22  ability to get into the precinct, and over time that
23  got a little more challenging.
24      Q.  And you said you just wanted people out of the
25  area.  Why did you want people out of the area, Carmen?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                                    Carmen Best

Page 125

1    I will note that, you know, under SPD it
2  was -- the objective was to get the officers back into
3  the building.  So I do -- I do know what our objective
4  was, and that -- that seems to be stated clearly there.
5  I'm not sure about the rest of it.
6        Q.  Sure.  Did -- did you have an opinion about
7  whether or not you thought it was wise to just try to
8  continue to maintain the existing footprint?
9        A.  You know, I -- this document looks like it was
10  written on January -- I'm sorry, on June 10th, which is
11  just a few days after, you know, the CHOP or CHAZ
12  began, so early on, you know, I think we were just
13  trying to figure out what we had and so those -- maybe
14  early on that may have made sense.  I think probably as
15  things evolved that may not have made sense as we got
16  further down into -- you know, further along the time
17  line.
18        Q.  What other services or conveniences are you
19  aware of that the City provided to the protesters --
20           MS. ASHBAUGH:  Object to the form.
21        Q.  (BY MS. EAKES)  -- besides the porta potties?
22           MS. ASHBAUGH:  Sorry, object to the
23  form.
24           MR. CRAMER:  Same objection.
25        A.  Well, I think we all know that there were

Page 126

1     porta potties being delivered and some of the agencies
2  were providing, you know, some -- I don't know what we
3  would call it -- you know, some things -- you know,
4  hand sanitizer and other things, maybe water, and that
5  at some point, I don't remember exactly when, there was
6  a garden being built in the park that was allowed to
7  occur.
8        So those are things that come to mind.  Again,
9  the things I was most concerned about were the things
10  that were -- that might -- you know, that might delay
11  people leaving the area.
12        Q.  (BY MS. EAKES)  Okay.  And what were the
13  things that you thought might delay the people leaving
14  the area?
15        A.  Providing, you know, the porta potties was a
16  concern because that -- that in my view -- and that --
17  there are different perspectives here, of course, but
18  in my view that sent a message that you're going to be
19  here a while, you know, at least long enough to have
20  facilities, and, you know, then maybe handing out water
21  and other things also was an indication to me that it
22  might be enabling people to stay longer.
23        Again, there were a lot of negotiations, I
24  have to caveat that, but there were so many
25  negotiations going on, a lot of unprecedented things

Page 127

1     happening, people really trying to grapple with, you
2  know, what to do and how to move forward.  So, you
3  know, I just -- I recognize that it was just a fastly
4  moving and evolving situation on all fronts and we were
5  all doing the best we could to figure out what needed
6  to be done, and as with any circumstances, we all
7  didn't necessarily agree about which approach to use
8  when.
9        Q.  Okay.  And did you think that allowing them to
10  dig -- the protesters or some people to dig a garden in
11  Cal Anderson Park might encourage people to stay also
12  or was sending a message that they could stay longer?
13        A.  I -- I did personally think that because a
14  garden takes time to grow, so that's not something that
15  they can dig and leave the next day.  So I was a little
16  concerned about that -- about that premise, but again,
17  you know, I think that there was so much happening and
18  so much going on there that we were all trying to
19  figure out what to do, and I was really laser focused
20  on, you know, getting officers back into the precinct.
21        Q.  What about providing lights in the park, was
22  that a concern that it would encourage the
23  protesters to stay?
24           MR. CRAMER:  Objection; form.
25        A.  Yeah, and I don't recall even -- even thinking

Page 128

1     about that, to be honest with you.  I don't remember
2  that being a specific thing that I even had a thought
3  about, but some of the other things I mentioned, yes.
4        Q.  (BY MS. EAKES)  What about providing the big
5  concrete barriers to the CHOP participants to replace
6  the weaker barriers, were you concerned about that?
7           MR. CRAMER:  Objection; form.
8           MS. ASHBAUGH:  Same objection.
9        A.  I don't even recall that, Patty, to be honest
10  with you.
11        Q.  (BY MS. EAKES)  Okay.  What about providing
12  plywood that was used to create additional barricades,
13  do you remember that?
14           MR. CRAMER:  Objection; form.
15        A.  Yeah, I don't.  I really don't remember that.
16  Yeah, what I remember is that, the main points, is that
17  we were not there in the precinct.  There were people
18  occupying the area around the precinct and that they
19  had set up their own barricades and that in some -- you
20  know, and that planting a vegetable garden in my view
21  might be an indication that they weren't planning on
22  leaving any time soon.  So those -- those are the main
23  things I recall at this point being mostly concerned
24  about.  The other things I -- you know, it's in my
25  rearview mirror.  I just don't even remember it, to be

32  (Pages 125 to 128)

Hunters Capital, LLC v. City of Seattle                           Carmen Best

Page 129

1  honest with you.
2      Q. (BY MS. EAKES)  Do you remember whether the
3  mayor tweeted or made any comments about the planting
4  of the garden that you found – or do you remember if
5  she made any comments about that?
6      A. I don't know.  She may have.
7      Q. Okay.
8      A. Yeah.
9      Q. Did you feel like the mayor was -- or did you
10 believe the mayor was by her conduct or her statements
11 encouraging people to stay in the area or potentially
12 encouraging people to stay in the area initially?
13     MR. CRAMER:  Object to form.  Objection,
14 object to form.
15     A. Yeah, that's -- you know, I think that --
16 that, you know, that some of the things that -- some of
17 the strategies weren't pushing people -- weren't going
18 to push people to move out of the area.  I definitely
19 felt that and there were -- you know, there were a
20 number of people, you know, that were sort of
21 contributing to that, but that's just my perspective.
22     Again, I have to caveat all of the stuff, you
23 know, as looking back on hindsight being 20/20 that it
24 was just very dynamic and very unprecedented, and so
25 people were, one, not wanting to antagonize the

Page 130

1  occupiers and incite, you know, anything, I didn't want
2  to do that either, but I also -- for me felt like it --
3  we needed to, you know, halt it sooner to get the
4  officers back into the precinct, you know, and like I
5  said, you know, a number of people dealing with
6  unprecedented circumstances, we all weren't going to
7  agree on every aspect of what -- of the approach.
8      Q. (BY MS. EAKES)  Did you share your views about
9  the things you disagreed with in terms of the strategy
10 and the things that were being provided to the
11 protesters, did you share your views with the mayor's
12 office about those things?
13     MR. CRAMER:  Objection; form.
14     A. Yeah, I think there were a lot of
15 conversations around what was being done and what was
16 happening.  You know, I certainly would have questioned
17 the need -- you know, the -- you know, the need for
18 porta potties and things.  If that, you know, other
19 people had other reasoning about why that was a
20 necessary strategy moving forward.  Again, we just
21 sometimes have to agree to disagree on these things and
22 move forward as best we can, you know, under, again,
23 unprecedented circumstances.
24     Q. (BY MS. EAKES)  Sure.  And I don't want to put
25 words in your mouth.  I want to make sure I've got that

Page 131

1  correctly, but it sounds like at least you were sharing
2  your personal view, whether people agreed with you or
3  not, your personal view of the wisdom of some of those
4  things; is that fair?
5      A. That's fair.
6      Q. Okay.  And did -- were you also aware that
7  they were provided -- that the protesters were provided
8  a dumpsters and garbage service?
9      MR. CRAMER:  Objection; form.
10     A. I think at some point I recollect that they
11 were, you know, cleaning out, you know, cleaning up the
12 garbage that was in the area.
13     Q. (BY MS. EAKES)  Did you have concerns about
14 whether or not that was encouraging the protesters to
15 stay?
16     A. At this point I can't remember that with any
17 level of specificity.  You know, I wasn't thinking of
18 the -- the totality of the circumstances and the
19 totality of what we were looking at and concerned
20 that -- you know, that, you know, that they might --
21 that whatever was happening there from the City's, you
22 know, perspective might not encourage people to leave.
23 So can I say with a level of specificity that I
24 specifically focused on the garbage and garbage
25 removal?  No, but generally speaking, I didn't want the

Page 132

1  potential for people to think this was a long-term
2  occupation because we weren't able to get into our
3  precinct.
4      Q. Okay.  And did you feel like the conduct of the
5  conduct of the mayor herself might be sending the
6  message that this could be a long-term occupation?
7      MS. ASHBAUGH:  Objection to form.
8      MR. CRAMER:  Same objection.
9      A. Yeah, and, you know, I really wasn't -- I
10 really wasn't focused on the conduct of the mayor, the
11 mayor that I never even saw her down there.  It was
12 mostly the City's response, you know, I had some
13 concerns about it, to be honest with you, but I also
14 recognized that we all aren't going to agree on how to
15 move forward, and the fact that I really wanted the
16 officers back in the precinct was much more paramount
17 to me, I believe, than it was to maybe some of the
18 other city departments.
19     Q. (BY MS. EAKES)  Did you ever see the mayor
20 down in the CHOP when you were down there?
21     A. Not when I was there that I can recall.  I'm
22 sure that she probably did go, but I -- I really don't
23 know.
24     Q. How often did you visit the CHOP zone after
25 the abandonment of the precinct on the 8th until it was

33 (Pages 129 to 132)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                                    Carmen Best

Page 193

1   police department because hearsay, we can't act on
2   hearsay.  We have to act on, you know, somebody
3   reporting an actual crime that occurred or announcing
4   themselves as a victim and we really weren't -- we
5   really weren't seeing that in the official context, but
6   anecdotally, yes, so that's why we made the request
7   that if this is happening to you, please report it to
8   police.
9        Q.  And so as you were taking reports from people
10  within the CHOP reporting various crimes, were those
11  things being shared with the mayor's office?
12            MR. CRAMER:  Objection; form.
13       A.  I -- I'll just go back to say we were trying
14  to keep them apprised and updated on as much as
15  possible that was going on with the CHOP.  There were a
16  number of crimes, you know, and -- you know, the types
17  of calls for service we were responding to and response
18  times and we weren't trying to not -- to not share the
19  information.
20       Q.  (BY MS. EAKES)  And were you frustrated at all
21  with the response you got from the mayor's office as
22  you were reporting what you were hearing from people in
23  the CHOP about what they were experiencing?
24       A.  I just wanted to, you know, to share the
25  information and develop a strategy for us to minimize

Page 194

1   the negative impacts that we were seeing.  So, you
2   know, frustration probably isn't the right word, you
3   know -- well, you might categorize it as that.  I just
4   wanted to really work with the mayor's office and any
5   other entities to develop a strategy to minimize, you
6   know, the increased calls -- the increased response
7   times to calls for service and the ability, you know,
8   again, for the officers to get back into the precinct.
9            MS. EAKES:  Will you drop 35, our 35.
10  What will we call that, what number will it be?
11            MS. CARRIAGA:  17.
12            MS. EAKES:  Okay.  So we're going to put
13  another one in the chat room for you.
14            (Exhibit No. 17 was marked.)
15            MS. EAKES:  Or did you want to take a
16  break, Shane, or not?
17            MR. CRAMER:  No, I'm fine.
18       Q.  (BY MS. EAKES)  Okay.  Carmen, are you okay?
19       A.  Yeah, I am.  I have -- I have a hard stop at
20  like at least 5:20.  Is that going to be feasible?
21       Q.  Try and get it done, yes.
22       A.  Okay, thank you.
23       Q.  No problem.  Let me know when you've got it
24  and can look at it.
25       A.  Oh, okay, which number was that?

Page 195

1        Q.  17.
2        A.  Oh, yeah, I'm sorry, I do have it.  Okay.
3        Q.  Can you tell me what was your reaction to this
4   email from the mayor?
5        A.  I don't -- I don't recall specifically what
6   the reaction was, but -- I don't recall specifically,
7   but clearly, you know, the request in this email is
8   your teams need to develop a true -- develop true
9   operational plans so there's not a repeat and that they
10  need to reflect ground truths and your best thinking of
11  de-escalation and positive response.  So, again, you
12  know, this is totally reflective in nature.  I don't
13  remember this email, but I would imagine that I would
14  just follow through with the request as it was being
15  presented.
16       Q.  Do you agree with the mayor's statement that
17  what happened, meaning -- and this was after the first
18  homicide -- was foreseeable and avoidable?
19            MR. CRAMER:  Objection to form.
20            MS. ASHBAUGH:  Objection to form.
21       A.  Yeah, far -- far be it from me to, you know,
22  speculate on, you know, what the mayor was saying here,
23  but --
24       Q.  (BY MS. EAKES)  And I'm not asking you --
25       A.  Yeah.

Page 196

1        Q.  -- that, just to be clear, Carmen.  I just
2   want to know do you agree with what she says here.  I
3   mean, the email says what it says.  Do you agree with
4   her statement that it was foreseeable and avoidable?
5        A.  Well, I think --
6            MR. CRAMER:  Objection to form.
7        A.  Yeah, I think she's talking about the murder
8   that happened that morning, right?
9        Q.  (BY MS. EAKES)  Right, right.
10       A.  So, you know, I don't know that we could
11  foresee a murder happening of a -- of a young man, but
12  we certainly could see the escalation, you know.  We
13  knew there had been escalation in -- in crime and
14  activity, hence trying to make sure that we were able
15  to get back into the precinct and have a -- you know,
16  and mitigate the circumstances.
17       Q.  So if I understand you correctly, maybe not
18  foreseeable a specific murder of this person, but
19  certainly foreseeable that there was increased violence
20  and crime going on?
21       A.  Yes.
22            MR. CRAMER:  Object to the form.
23       A.  Sorry.  Yes.
24       Q.  (BY MS. EAKES)  And what about the statement
25  that it was avoidable, do you agree with that?

49 (Pages 193 to 196)

Hunters Capital, LLC v. City of Seattle                                    Carmen Best

Page 229

1  questions going back to your phones and text messages.
2  Have you learned anything since you handed your phone
3  in about what might have happened to your text messages
4  on your City phone?
5        MR. CRAMER:  Objection; form.
6     A.  No.
7     Q.  (BY MS. EAKES)  Okay.  And do you know if your
8  assistant might have deleted any messages before you
9  turned in your phone, any text messages, I should say?
10       MS. ASHBAUGH:  Object to form.
11    A.  Yeah, not that I'm aware of.  You know, no.
12    Q.  (BY MS. EAKES)  Do you know if it was her
13  practice to delete things, your text messages from your
14  phone?
15    A.  That was not her practice.
16       MS. EAKES:  All right.  I think that's
17  all I have -- that's all I have.  Thank you very much
18  for your time.
19       THE WITNESS:  Thank you.
20       MS. EAKES:  I don't know if Shane has
21  any questions.  I assume not, but...
22       MR. CRAMER:  I have no questions.  Thank
23  you very much for your time, Chief.
24       THE WITNESS:  Okay.  Thank you all, I
25  appreciate it.

Page 230

1        MR. CRAMER:  Denise, do you want to
2  reserve signature?
3        MS. ASHBAUGH:  Yeah, we're going to
4  reserve.
5        MS. EAKES:  Okay.
6        MR. CRAMER:  Thanks, everybody.
7        VIDEO OPERATOR:  This concludes the
8  deposition of Carmen Best.  The time now is
9  approximately 5:08 p.m.  Going off the record.
10       (Deposition concluded at 5:08 p.m.)
11       (Reading and signing was requested
12        pursuant to FRCP Rule 30(e).)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 231

1            C E R T I F I C A T E
2
3  STATE OF WASHINGTON  )
                        )
4  COUNTY OF KING       )
5
6        I, Patricia D. Jacoy, a Certified
7  Shorthand Reporter in and for the State of Washington,
8  do hereby certify that the foregoing transcript of the
9  deposition of CARMEN BEST taken on November 9, 2021 is
10 true and accurate to the best of my knowledge, skill
11 and ability.
12
13
14 _____
15       Patricia D. Jacoy, CSR 2348
16
17
18
19
20
21
22
23
24
25

58 (Pages 229 to 231)

Exhibit 7



**City of Seattle**
Mayor Jenny A. Durkan

**Office of the Mayor**
**City of Seattle**
Jenny A. Durkan, Mayor

**Executive Order 2020-08: To provide City departments direction on a coordinated City response with respect to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park.**

*The purpose of this Executive Order is to direct Departments to coordinate the City's response to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park.*

**WHEREAS,** the killing of George Floyd by a police officer in Minneapolis on May 25, 2020, has generated anger and outrage across the United States, resulting in mass demonstrations; and

**WHEREAS,** the City supports the people's right to lawful assembly guaranteed by the Constitution of the United States of America and the Constitution of the State of Washington. Due to the current State of Emergency and the Governor's Stay Home Stay Healthy Order, the City was unable to issue a parade and/or demonstration permits to groups who wished to lawfully assemble to voice their opinions, and plans to escort parades and otherwise assist in the safe and lawful right of speech and assembly; and

**WHEREAS,** the City recognizes that parades and demonstrations which will travel upon public streets and sidewalks, will disrupt and impair pedestrians, motorists and transit, and the City recognizes that some disruption is part of the rights of free speech and lawful assembly which the City will safeguard; and

**WHEREAS**, much of the expression has been peaceful and created community solidarity for Black Lives Matter, including features such as a community garden, public art, and conversation corner; and

**WHEREAS,** to date, City departments have more than reasonably accommodated protestors by offering services and shelter. The City has spent weeks on voluntary efforts to urge people to leave the Cal Anderson Park area given the emerging circumstances and recent shootings; and

---

SEA_00045264

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 2 of 3
June 30, 2020

**WHEREAS**, in the area around the Seattle Police Department's East Precinct, bounded by Broadway (west) and 13th Ave E. (east) and E Denny Way (north) and E. Pike St. (south) (defined as "Cal Anderson Park Area"), the City has reasonably facilitated on ongoing exercise of First Amendment rights and demonstrations by:

- Providing basic hygiene, water, litter and garbage removal, and electricity;
- Temporarily allowing obstructions of public parks, streets, and sidewalks;
- Modifying SPD and SFD response protocols to meet public safety needs to the extent possible within this area;
- Modifying streets and pedestrian access routes;
- Providing social services outreach and engagement along with referrals for shelter, behavioral health and other supports for individuals in need; and
- Facilitating modified city services delivery to local residents and businesses impacted by the events in this area.

**WHEREAS**, the City's obligations under the First Amendment do not require the City to provide limitless sanctuary to occupy City property, damage City and private property, obstruct the right of way, or foster dangerous conditions; and

**WHEREAS**, after significant national attention, many protestors have left the area but the conditions in the Cal Anderson Park Area have deteriorated to the point where public health, life, and safety are threatened by activities in and around this area, as supported by the following facts:

- On June 20, 2020, the first of three incidents of firearms violent with multiple victims occurred; one individual was shot and killed, and another was shot and seriously injured.
- First responders from the Seattle Fire Department and Seattle Police Department were denied safe access to the area by hostile crowds, including armed individuals, and obstructions.
- On June 22, 2020, a second incident involving firearms violence injured two addition individuals. On June 26, 2020, SDOT employees attempted to remove a limited number of barriers, but unarmed employees were met with hostility and weapons. SDOT could not conduct operations.
- Access by first responders to emergencies have been impeded further. On the morning of June 28, demonstrators moved the concrete barriers to completely restrict access of fire and medics on multiple roads. Demonstrators had previously agreed to open these areas to access for residents, businesses, city services, and fire.
- On June 29, 2020, a juvenile was shot and killed, and another juvenile was seriously injured in the immediate vicinity of this area. Evidence indicates that this murder may have been committed by individual(s) "occupying" the area.
- On June 30, 2020, SDOT removed a limited number of barriers with SPD, but was quickly met with agitated opposition to the removal.
- In addition, SPD has received numerous reports of narcotics use and violent crime, including rape, robbery, assault, and increased gang activity. An increase of 525%, 22 additional incidents, in person-related crime in the area, to include two additional homicides, 6

SEA_00045265

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 3 of 3
June 30, 2020

additional robberies, and 16 additional aggravated assaults (to include 2 additional non-fatal shootings) between June 2nd and June 30th, 2020, compared to the same period of time in 2019.

- Residential and businesses in the area have documented incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic to residences and places of business, and multiple lawsuits and claims have been filed against the City by residents and businesses impacted by the activities in this area.
- Significant damage has been caused by those remaining unlawfully in the area to City property, including Cal Anderson Park and the East Precinct facility.  The full extent of damage to the East Precinct remains an open question until city employees are allowed access to the site in order to make that assessment.
- Open fires and vehicles on the reservoir are placing important regional water infrastructure located within Cal Anderson at risk.
- An alarming recent rise in COVID-19 numbers across the region, coupled with a lack of social distancing in this area, and the daily attraction to this area of outside individuals place the neighborhood at opening businesses at increased risk for outbreaks.
- A pervasive presence of firearms and other weapons has been well-documented.
- Ongoing violations of the Seattle Parks and Recreation's Code of Conduct have been observed, including camping and parking in the park, conduct that unreasonably deprives others of the use of parks, disrupting Seattle Parks and Recreation business, dumping trash and/or creating unsanitary conditions or health hazards that violate public health rules; behaviors that impede restroom use; urinating or defecating, except in designated restroom fixtures, blocking entrances, exits, fire exits, disabled access areas, public walkways; conduct that creates an unreasonable and substantial risk of harm to any person or property; and abusive and harassing behavior; and

WHEREAS, significant property damage has been attempted on the East Precinct, to include arson, and the extent of damage has not been fully assessed due to lack of access to the building; and

WHEREAS, SPD has observed and is aware of credible threats against other City infrastructure, to include the West Precinct, which houses city-wide 911 communications services; and

WHEREAS, the City, recognizing the pivotal momentum and opportunities for social justice and public safety reforms that events following the murder of George Floyd has generated, has attempted in good faith to engage protestors in productive dialogue; and

WHEREAS, the City remains committed to re-imagining policing and making significant investments into the community and continuing outreach, engagement, and opportunity for community input in re-examining the role of police and the reform of social services; and

WHEREAS, since 12:00 pm on June 30, Cal Anderson Park has been closed pursuant to an emergency rule closing the park to address life safety and property issues; and

SEA_00045266

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 4 of 3
June 30, 2020

**WHEREAS**, while thousands of peaceful people have travelled to the area, police and city employees have encountered hostile and armed individuals in this area who have indicated by their actions and words their intent to resist government intervention with physical violence that have caused concern for the safety of the legal residents and city employee safety if current circumstances persist; and

**WHEREAS**, based on the known ongoing criminal activity in and around the Cal Anderson Park Area, it is anticipated that there will be exigent circumstances that require immediate action by SPD to protect and preserve public safety and welfare.

**NOW, THEREFORE**, I, Jenny A. Durkan, Mayor of Seattle, hereby directs all City departments to work in coordination to respond to the observed and reported exigent life safety, public health, and property issues in and around Cal Anderson Park Area, which is defined as the areas bounded by Broadway (west) and 13th Ave E. (east) and E Denny Way (north) and E. Pike St. (south).

1. Effective at 12:00 pm noon on June 30, 2020, Cal Anderson Park was closed. At 2:00 am on July 1, 2020, the entirety of the Cal Anderson Park Area shall be closed to the public to restore public safety, open roadways, remove obstructions to roadways and public rights of way, and to accomplish full closure and restoration/cleaning of Cal Anderson Park. All departments shall coordinate as follows to accomplish this work.

2. All persons who are unlawfully occupying Cal Anderson Park area who are in public rights of way or the park shall be directed to leave the closed area immediately.

3. The Seattle Police Department shall enforce this closure and provide dispersal orders for anyone refusing to vacate the area immediately. Persons who refuse or intentionally fail to obey this closure order to move and disperse from the area will be subject to arrest.

4. Any use of force shall be consistent with SPD policy and the terms of the Preliminary Injunction issued in *Black Lives Matter v. City of Seattle*, No. 20-CV-887.

5. In coordination with Seattle Parks and Recreation and the Human Services Department, as necessary SPD officers shall in their discretion remove or arrest individuals who are trespassing in the Cal Anderson Park Area in violation of the parks closure and who refuse to leave, including exigent arrests of individuals who may be occupying a tent or other obstruction or created structure in a public right of way, or in the Cal Anderson Park Area.

6. All reasonable efforts will be made by the city departments to assist individuals in accessing necessary services, shelter, or transportation and in packing and/or storing any personal property, including tents.  The City shall take reasonable steps to separate personal property from material that is not personal property, provided the segregation does not pose a danger to the individual segregating the personal property from the other material.

7. Due to the safety risks and ongoing threats to City buildings, SPD is authorized to maintain a reasonable security buffer around the East Precinct and control entry into those areas in order to limit any obstructions to access.

SEA_00045267

Executive Order 2020-08 (Directive on Cal Anderson Park Area)
Page 5 of 3
June 30, 2020

8. SDOT is directed to remove all barriers and obstructions that impede foot traffic or vehicular traffic in the Cal Anderson Park area, and to maintain open sidewalks and streets going forward.

9. Seattle Park and Recreation is directed to begin cleaning, remediation and restoration of Cal Anderson Park.

10. Seattle Public Utilities is directed to inspect and secure all water facilities, and to end any temporary utility service modifications to the area;

11. Seattle Public Utilities, together with Finance and Administrative Services, Office of Economic Development and other Departments as needed shall work with the community to ameliorate all graffiti and property damage;

12. City Light shall be called to inspect any power issues identified during the operation;

13. Department of Human Services is directed to continue providing social services outreach and engagement along with referrals for shelter, behavioral health, and other supports for individuals in need;

**14.** Seattle Parks and Recreation shall engage the community, businesses, residents and protest leaders to develop a parks plan to preserve the public art, create a community garden and other possible features like a conversation corner.

15. This Order shall be limited to ten days or until further notice, whichever comes first.

16. Inquiries regarding this Executive Order should be directed to Senior Deputy Mayor Mike Fong, Office of the Mayor.

Dated this 30th day of June, 2020.

*Jenny A. Durkan*

Jenny A. Durkan
Mayor of Seattle

SEA_00045268

Exhibit 8

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff,              )
                                )
    vs.                         ) No. 20-cv-00983
                                )
CITY OF SEATTLE,                )
                                )
        Defendant.              )
_____

VIDEOTAPED VIDEOCONFERENCE 30(B)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(HAROLD SCOGGINS)

_____

***PORTIONS OF THIS TESTIMONY ARE DESIGNATED
CONFIDENTIAL AND ARE SEALED
UNDER A SEPARATE COVER.***

Seattle, Washington
(All participants appeared via videoconference.)

DATE TAKEN:  SEPTEMBER 14, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

```
 1                 A P P E A R A N C E S
 2   FOR PLAINTIFF:
 3          TYLER S. WEAVER
            GABRIEL REILLY-BATES
 4          Calfo Eakes LLP
            1301 Second Avenue
 5          Suite 2800
            Seattle, WA 98101-3808
 6          206.407.2237
            tylerw@calfoeakes.com
 7          gaber@calfoeakes.com
 8
 9   FOR DEFENDANT:
10          TYLER L. FARMER
            CAITLIN B. PRATT
11          ARTHUR W. HARRIGAN, JR.
            Harrigan Leyh Farmer & Thomsen LLP
12          999 Third Avenue
            Suite 4400
13          Seattle, WA 98104
            206.623.1700
14          tylerf@harriganleyh.com
            caitlinp@harriganleyh.com
15          arthurh@harriganleyh.com
16          JOSEPH G. GROSHONG
            Seattle City Attorney's Office
17          701 Fifth Avenue
            Suite 2050
18          Seattle, WA 98104-7095
            206.684.8200
19          joseph.groshong@seattle.gov
20
     ALSO PRESENT:  CATHY ZAK, videographer
21          Buell Realtime Reporting, LLC
22
               * * * * *
23
24
25
```

## Page 3

```
 1              DEPOSITION OF HAROLD SCOGGINS
 2                  EXAMINATION INDEX
 3   EXAMINATION BY:                          PAGE
 4   30(b)(6) Examination by Mr. Weaver         6
 5   Non-30(b)(6) Examination by Mr. Weaver      94
 6
 7                   EXHIBIT INDEX
 8   EXHIBITS FOR IDENTIFICATION             PAGE
 9   Exhibit 1  Amended Notice of Videotaped    7
                Deposition Pursuant to FRCP
10              30(b)(6) to City of Seattle
11   Exhibit 2  Email; SEA_00092040           19
12   Exhibit 3  Email chain; SEA-PDR_002283-284  20
13   Exhibit 4  5-page Executive Order;        25
                SEA_00015070
14
15   Exhibit 5  PowerPoint, NHSC Presentation  34
                August - 2021
16   Exhibit 6  Email and attachment;         51
                SEA_00104722-731
17
18   Exhibit 7  Email chain; SEA-PDR_002188-190  53
19   Exhibit 8  Incident Report; SEA-SFD_000046-047  63
20   Exhibit 9  Email chain; SEA_00091963-964  67
21   Exhibit 10 Email; SEA-PDR_002386         72
22   Exhibit 11 Email chain; SEA_00091919     78
23   Exhibit 12 Email chain; SEA-PDR_002192-194  85
24   Exhibit 13 Email chain; SEA_00092599-601  88
25   Exhibit 14 Email; SEA_00104741-744       125
```

## Page 4

```
 1              EXHIBIT INDEX (Continuing)
 2   EXHIBITS FOR IDENTIFICATION             PAGE
 3   Exhibit 15 3-page meeting request;       142
                SEA_00028044
 4
              Exhibit 16 3-page meeting request;   146
                SEA_00028170-171
 5   Exhibit 17 Meeting request; SEA_00028178-179  156
 6   Exhibit 18 Email chain; SEA_00020291-293  165
 7   Exhibit 19 3-page chart titled "Messages"  171
 8   Exhibit 20 Video recording              183
 9   Exhibit 21 Email; SEA_00092314-315      198
10   Exhibit 22 Spreadsheet                  198
11   Exhibit 23 Spreadsheet                  199
12   Exhibit 24 Email; SEA_00125617          206
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Hunters Capital, LLC v. City of Seattle                                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 9

1     A. As far as I know, that's the full scope.
2     Q. All right. Great. I mean, I will ask
3  you about other things, but this is what you've been
4  designated for specifically as the representative of the
5  City.
6        So first I'd like to ask you about what
7  materials the fire department provided to protesters
8  during the -- during the CHOP time period that we'll
9  refer to as June 8th through July 10th, 2020.
10       What materials do you recall that the fire
11 department provided to protesters or the medics in the
12 CHOP zone area during that time period?
13    A. Sure. And just for a point of clarification.
14    Q. Sure.
15    A. I don't know for volunteer EMS personnel, I
16 don't know if they were medics, paramedics or EMTs --
17    Q. Okay.
18    A. -- or some other sort of medical professionals.
19 They were just identified as volunteer EMS.
20    Q. Okay.
21    A. So we provided fire extinguishers, stokes
22 baskets with wheels on it, and also canvas letter
23 carriers, for lack of a better term.
24    Q. So -- so fire extinguishers, what -- can you
25 describe to me the fire extinguishers.

Page 10

1     A. Sure. When you say -- well, I'm not sure --
2  when you say describe to you the fire extinguishers,
3  what exactly do you mean?
4     Q. Well, how many fire extinguishers? Were they
5  just standard, like, kitchen variety fire extinguishers?
6  What kind of fire extinguishers were they, and how many?
7     A. I don't know the exact number. There's
8  probably several, maybe around three or four. They were
9  at least, you know, 2A, 10BC type extinguishers that we
10 carry, you know, but the exact model number, I can't
11 speak to that.
12    Q. Okay. And who did you give those to
13 specifically, the fire department?
14    A. The volunteer EMS personnel.
15    Q. And so the volunteer EMS personnel, as I
16 understand it, those were people who were -- had a --
17 I'll call it an improvised medic station on -- was it
18 Pine? Is that -- is that correct? Is that who you were
19 referring to?
20    A. Yeah, I think it was at 10th and Pine, in the
21 parking lot of the Mexican restaurant. I think that's
22 where it was.
23    Q. Rancho Bravo Tacos?
24    A. Yes.
25    Q. Okay. Just across the street from Cal Anderson

Page 11

1  Park?
2     A. Correct.
3     Q. Okay. And why did the fire department provide
4  the fire extinguishers?
5     A. We were getting reports of small fires in the
6  park. It could have been a garbage fire or -- you know.
7  So we were getting those reports, and so when we talked
8  to them about it, they wanted to assist with problem
9  solving, and we knew it would be a bit of a challenge to
10 navigate through all the people to get to a small trash
11 fire.
12    Q. Okay. So it was so that they could put out
13 fires that had been started within the CHOP area that
14 the fire department was not going to be able to put out;
15 is that correct?
16    MR. FARMER: Objection. Objection.
17 Misquotes testimony.
18 BY MR. WEAVER:
19    Q. You can answer unless Mr. Farmer tells you you
20 can't. So --
21    A. Oh, okay. There were -- you know, we get
22 reports of fires every day, you know, sometimes they're
23 in encampment, sometimes they're in a trash can. It was
24 these types of fires. It wasn't, you know, building
25 fires or vehicle fires or anything like that.

Page 12

1     Q. Is it common practice for the Seattle Fire
2  Department to provide fire extinguishers to groups of
3  protesters to put out fires?
4     A. It's not a common practice, but it is a common
5  practice for events and -- and different things like
6  that, for us to help with supplies if they need them.
7  It's a common practice for the fire department to
8  provide fire and life safety for the entire city,
9  whether it's mount your fire extinguisher in your
10 apartment building or your business, or things -- things
11 like that, so that is a common practice for us.
12    Q. Okay. So these fire extinguishers were owned
13 by the City of Seattle; is that correct?
14    A. Yes.
15    Q. Okay. And can you think of another time that a
16 City of Seattle-owned fire extinguisher was given to a
17 group of protesters to put out fires in a park?
18    A. I can't.
19    Q. So you mentioned a -- and I'm just trying to
20 remember -- a basket -- did you say you also provided
21 a -- baskets?
22    A. Stokes. It's a Stokes basket.
23    Q. A Stokes basket. Okay. What is a Stokes
24 basket?
25    A. A Stokes basket is a tool that we use to

3 (Pages 9 to 12)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 13

1  package a patient if we need to transition them to a
2  location where they can be received by our EMS
3  personnel.
4        Q.  And --
5        A.  This particular basket had wheels on the side
6  so you can roll it.
7        Q.  Okay.  So is that -- what's the difference
8  between a Stokes basket and a stretcher?
9        A.  A stretcher is -- goes in the back of our aid
10 cars and medic units.  It has mounting mechanisms.  It's
11 able to go up and down.  It can, you know, have a lot
12 more weight on it.  So it's a tool that's used in all of
13 our aid cars and medic units, and it locks in for
14 transport.
15       Q.  Okay.  So the Stokes basket, again, it was
16 owned by the City of Seattle; is that correct?
17       A.  Yes.
18       Q.  And trying to -- I'm trying to picture the
19 Stokes basket.  So is it -- is it -- is it big enough to
20 lay somebody down on -- and then wheel them out of an
21 area?  Is that what we're talking about?
22       A.  Yes.
23       Q.  Okay.  Is it the same or different from a
24 MegaMover?
25       A.  Different.

Page 14

1        Q.  What's a MegaMover?
2        A.  If you can imagine the -- you go to Home Depot
3  and you see like a 4-by-4 canvas tarp, and it has -- but
4  the MegaMover has -- MegaMover has a handle on each end.
5  So four firefighters, one can -- they can grab each
6  handle to move a person in a rapid manner, but you're
7  carrying them physically.
8        Q.  Okay.  So the main difference is it doesn't
9  have wheels?  Is that the main difference --
10       A.  No.
11       Q.  -- between a MegaMover and a Stokes basket?
12       A.  No.
13       Q.  Okay.
14       A.  No.  A Stokes basket -- let's see.  Let me see
15 if I can help here.  There was a rescue this past
16 weekend, and they showed it on the news, and they
17 hoisted the lady who was injured up in a basket to the
18 helicopter and they rescued her off of a mountain trail
19 where she were -- was injured.
20       Q.  Okay.
21       A.  So it's a -- it's a wire frame, it's
22 structurally sound, it's used in rescues like that.  So
23 it's -- it's more stable, and it's -- and it's a framed
24 basket.
25            The MegaMover is more of a canvas -- you fold

Page 15

1  it up when you're done, throw it in the compartment, you
2  know, so -- am I helping there?
3        Q.  That helps a lot.  That helps a lot.
4            Okay.  Did you also provide -- did the fire
5  department also provide MegaMovers to the protesters?
6        A.  Yes.
7        Q.  Okay.  So how many Stokes baskets did the
8  volunteer EMS people get from the fire department?
9        A.  I think it was at least two.  I'm not exactly
10 sure on the number.
11       Q.  And about how many MegaMovers?
12       A.  It was probably at least two.  I'm not exactly
13 sure on the numbers.
14       Q.  And why did the fire department give City-owned
15 Stokes baskets and MegaMovers to the volunteer EMS
16 people?
17       A.  Well, our goal was to help facilitate patient
18 care, and these would be tools that these volunteer EMS
19 personnel could use to transport someone who was injured
20 to a location where we could receive the patient.
21       Q.  Okay.  So is it fair to say that it was so that
22 the -- the volunteer EMS people could move them to an
23 area where the Seattle Fire Department felt comfortable
24 receiving that patient?
25       A.  Where it was safe for the Seattle Fire

Page 16

1  Department to receive the patient.  It wasn't a matter
2  of comfort.  I think it was a matter of safety.
3        Q.  Okay.  So the fire department didn't feel safe
4  bringing its own Stokes baskets and MegaMovers into the
5  area where the volunteer EMS was during --
6        MR. FARMER:  Objection.  Vague.
7            (Simultaneous cross-talk.)
8        MR. WEAVER:  -- in 2020; is that correct?
9        MR. FARMER:  Objection.  Vague.
10       You can answer, Chief.
11       THE WITNESS:  Oh, okay.
12       A.  Well, it depends.  This was an area that
13 evolved over the time period you just mentioned.  So
14 there were -- there were areas where the fire department
15 needed to focus on safety of our personnel, and so
16 that's why we gave them the tools to help facilitate the
17 patient care.
18 BY MR. WEAVER:
19       Q.  Okay.  Do you know when the fire department --
20 what date the fire department gave the volunteer EMS
21 people the Stokes baskets?
22       A.  I don't remember the exact date.
23       Q.  Okay.  Was it early June, mid-June?  Do you
24 remember?
25       A.  It was mid to late June.

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 17

1    Q. Okay.
2       A. The items that have been mentioned, the fire
3    extinguishers, the MegaMovers, and the Stokes basket,
4    they weren't transitioned all on the same date. This
5    was an evolving situation, I think, as you know. So as
6    reports of fire calls came in, small trash fires and
7    things like that, then we met with them and we said,
8    hey, what can we do to reduce the number of fires. So
9    the fire extinguishers.
10      And then the second piece of equipment was the
11   MegaMovers.
12      And then the third -- these are all different
13   times, but along that 22-day period, that's when these
14   transitions took place.
15      Q. Okay. So can you think of another instance in
16   which the City has provided Stokes baskets or MegaMovers
17   to a group of private individuals to move patients out
18   of an area?
19      A. I can't. The context becomes important.
20   We hadn't had another situation where we couldn't have
21   complete access to the scene. So that kind of played a
22   part in the decision making. So we hadn't been faced
23   with that scenario before.
24      Q. Okay. Have you been faced with one since then?
25      A. You mean like the CHOP last summer? No.

Page 18

1       Q. Okay. Well, a situation where you -- you
2    provided MegaMovers or Stokes baskets to the -- to a
3    group of private individuals to move them out of the
4    area.
5       A. We -- we hadn't been faced with one since then,
6    but on the fire extinguisher front, we have had
7    conversations over the last several years about
8    deploying fire extinguishers into the encampments so
9    the -- the large encampments, so individuals, if there
10   is a fire there, they can use them. Because we go on a
11   lot of those fires. So we have had similar type
12   discussions with a different layout, but not for the
13   MegaMovers or the Stokes basket, but we have had
14   conversations for the fire extinguishers.
15      Q. Okay. So you say you've had conversations.
16   Have you actually provided them, the Seattle Fire
17   Department, in those situations?
18      A. We have not.
19      Q. Okay.
20      A. We have not.
21      Q. Do you recall whether the City refilled the
22   fire extinguishers for the -- for the people who were
23   occupying the area in and around Cal Anderson Park?
24      A. I don't.
25      Q. Okay. I think you mentioned in the first --

Page 19

1    very early on, in addition to the fire extinguishers and
2    the Stokes baskets, was there a third thing that you
3    recall that was provided?
4       A. It's the MegaMovers.
5       Q. Oh, the MegaMovers. Okay.
6       A. That's the canvas -- it's like a carryall to
7    move patients.
8       Q. Okay. I'm going to drop another document into
9    the chat here hopefully. Bear with me. Lovely tech.
10      A. No worries.
11      (Exhibit No. 2 marked.)
12   BY MR. WEAVER:
13      Q. Yep. All right. Should be there.
14      A. Yes. It's an email? Is that what you just
15   dropped in?
16      Q. It's an email. Yes.
17      And who's Jon Ehrenfeld, if I pronounced that
18   correctly?
19      A. Sure. He's -- Jon Ehrenfeld is our mobile
20   integrated health manager.
21      Q. Okay. In this email to you and a couple other
22   people, he indicates that he talked to the people at the
23   medical tent, and that they asked for major trauma
24   supplies, such as chest seals, tourniquets, and a
25   stretcher.

Page 20

1       Do you see that, the bottom of the first full
2    paragraph, at the end of the first full paragraph?
3       A. Yes, I do.
4       Q. Do you know whether that request from the
5    volunteer EMS people was filled?
6       A. I would take the assumption that it was filled.
7    I don't know that, but if Jon put that in an email, I
8    would -- I would think that he followed up.
9       (Exhibit No. 3 marked.)
10   BY MR. WEAVER:
11      Q. Okay. Here's another document that I'd like to
12   mark. That one should -- just for the court reporter,
13   that one should be labeled Exhibit 3, but you can go
14   ahead and open that. That's another email. Let me know
15   when you have it up. Do you have it?
16      A. Not yet.
17      MR. FARMER: We're working on it.
18      MR. WEAVER: Okay. All right. No problem.
19      MR. FARMER: Tyler, I'm sorry. Could you
20   drop it in the chat again?
21      MR. WEAVER: Yeah. Hold on here.
22      MR. FARMER: Thanks very much.
23      MR. WEAVER: And I will try to label it
24   correctly this time.
25      And is that 3, Cindy?

5  (Pages 17 to 20)

Hunters Capital, LLC v. City of Seattle

30(b)(6) and Individual Deposition of Harold Scoggins

Page 33

1  Department policy for scenes of violence," it starts off
2  there?
3      Q.  Yes.  Yes, and then the second sentence says,
4  "This is in place for scenes of violence and currently
5  for the CHOP area."
6          Do you understand that to mean that at least
7  what she was saying here is the CHOP area was a scene of
8  violence?
9      A.  I don't understand it to say that.
10     Q.  So what do you understand --
11     A.  This is -- well, it says, "This is in place for
12 scenes of violence and currently for the CHOP area for
13 the safety of our crews."
14         So "and for the CHOP area," she's identified
15 the geographical space.  And the scenes of violence,
16 the is -- well, in the first sentence it talks about
17 "our Seattle Fire Department policy for scenes of
18 violence is to wait for law enforcement to secure the
19 scene before sending crews in to respond."
20         So it's relate -- the relationship is with an
21 incident.  So we're going to an incident, we stage at a
22 location, wait for law enforcement, and then we're able
23 to access the incident.
24         But for the CHOP area, because it was a static
25 location for 22 days, we weren't always waiting for law

Page 34

1  enforcement because there weren't always incidents.  So
2  scenes of violence is tied to an incident.
3          MR. WEAVER:  Okay.  I'm going to drop
4  another document into the chat, and I guess I have to
5  get out of it first.  This is the PowerPoint, it's a
6  little bit large.  It may take a minute.  And we'll mark
7  this as Exhibit 5.
8          Okay.  It's -- looks like it's uploaded.  Let
9  me know when you have it.
10         (Exhibit No. 5 marked.)
11         THE WITNESS:  It's loading.  Okay.  We have
12 it.
13 BY MR. WEAVER:
14     Q.  Okay.  Do you recognize this document?
15     A.  I do.
16     Q.  Okay.  Did you create it?
17     A.  I did.
18     Q.  And what was the -- why did you create this
19 document?
20     A.  To present lessons learned to our fire service
21 professionals.
22     Q.  Okay.  So this particular presentation was
23 internal to the Seattle Fire Department; is that
24 correct?
25     A.  No.  Well, no.  I presented it to other fire

Page 35

1  service professionals.
2      Q.  Okay.  So what -- which fire service
3  professionals?
4      A.  Let's see.  Well, there's a -- do I need to
5  accept this license agreement here?
6          So for example, this presentation is the
7  National Homeland Security Conference.  So that's fire
8  and law enforcement professionals.
9      Q.  Okay.
10     A.  And generally the way that works is, if there's
11 a challenging event the leader of the organization will
12 share the challenges so others can learn from them.
13         For example, I think we all remember the mass
14 shooting in Las Vegas a few years ago at the concert
15 there, where the gunman shot many people.  We invited
16 the fire chief of that department to present lessons
17 learned so we can learn from those experiences.
18         So we share similar experiences so -- in case
19 any of our departments are placed in those situations,
20 hopefully we've learned something.
21     Q.  Okay.  So I'd like you to turn to Slide 9.
22     A.  Okay.
23     Q.  Can you tell me what this slide depicts?
24     A.  Sure.  It has the red, or the hot zone, and it
25 has the yellow zone.  It has our response makeup for

Page 36

1  different types of BLS, ALS, and fire calls.  SPD --
2  protest response zone, SPD to secure the area, SPD to
3  escort SFD.  So it's a -- it's a quick overview of how
4  we would respond in and around this area.
5      Q.  Okay.  So is this what we were talking about
6  before, this is the actual depiction on a map of the
7  yellow or warm zone, and the red or hot zone?
8      A.  Yes.
9      Q.  And this was as of June 8th; is that correct?
10     A.  Yes.
11     Q.  Okay.  So what was the process by -- by which
12 it was determined that this should be the warm and hot
13 zone for this particular event?
14     A.  Sure.  There were physical barriers preventing
15 access and egress in and around the red zone.
16     Q.  And how about the -- how about the size
17 and boundary of the yellow zone?
18     A.  I think what our team put together was an area
19 that made sense, where responding to any call in the
20 yellow zone we need to have situational awareness
21 because of the activities in the red zone.
22     Q.  Okay.  So I mean, that area depicted on this
23 map is bounded by Denny, Union, Broadway, and 13th; is
24 that correct?
25     A.  Yes.

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 37

1    Q.  And on the left part of this slide, it
2  designates that area as the protest response zone; is
3  that correct?
4    A.  Yes.
5    Q.  Okay.  And so on June 8th, within that area, is
6  this slide indicating that anywhere in that area, that
7  the SPD had -- that the SFD had to wait for the Seattle
8  Police Department to secure the area before they would
9  enter?
10   A.  Anywhere in the red zone.
11   Q.  Okay.  That didn't include the yellow area; is
12  that correct?
13   A.  It did not.
14   Q.  Okay.  I understand this slide as defining the
15  protest response zone as the yellow area.
16       Do you feel -- do you feel otherwise?
17   A.  I do.  The yellow identifies the warm zone.
18  The protest response zone is the red, and it's written
19  in there, "protest hot zone."
20   Q.  Okay.  I'd like you to look at the left where
21  it says "Protest response zone," colon, and then it has,
22  Denny, Union, Broadway, and 13th.
23       Do you see that?
24   A.  Yes.
25   Q.  Okay.  I understand that as indicating that the

---

Page 38

1  protest response zone was that area, Denny, Union,
2  Broadway, and 13th.
3       Do you have a different understanding?
4    A.  I do.  That's our warm zone, and this gave our
5  folks situational awareness for this protest hot zone.
6  And so here's some of the challenges, for example, and
7  reason why we have to lay this out a little wider.  Just
8  navigating around that area in our vehicles are very
9  challenging just when you look at the red zone that's
10  outlined there.  So all of our folks need to have
11  situational awareness for a larger area.
12   Q.  Okay.  And that larger area was Denny, Union,
13  Broadway, and 13th; is that right?
14   A.  Yes.
15   Q.  And why -- why do they need to have additional
16  situation -- why do they need to have additional
17  situational awareness within that area?
18   A.  Because one never knows what spills outside of
19  the hot zone.  So our folks need to really be paying
20  attention.  This was on June 8th, so this is the first
21  day that the landscape kind of changed for us.  So our
22  folks needed to have situational awareness so you
23  never know what you're going to, you know, come upon in
24  any of these streets around -- around there.
25   Q.  It potentially could be unsafe within that --

---

Page 39

1  that area -- within the -- within the yellow area for
2  the fire department to respond; correct?
3    A.  It could be.  Just like any other warm zone
4  that we would set up geographical boundaries for, yes.
5    Q.  Okay.  And so was it within that sit- -- within
6  that yellow zone you had modified -- the City modified
7  its response for basic life support and advanced life
8  support.  I can ask it different -- I can ask that
9  question differently if it -- if it would be clearer for
10  you, which -- let's just re-ask it.
11       So is it the case that within that yellow area,
12  the entire yellow area, bounded by Denny, Union,
13  Broadway and 13th, the Seattle Fire Department had a
14  modified response for basic life support and advanced
15  life support on June 8, 2020?
16   A.  Yes.
17   Q.  Okay.  And as indicated on -- and you spoke a
18  little bit about this earlier, but so for basic life
19  support it required one aid car, one engine, and one
20  battalion chief to respond to that; is that correct?
21   A.  Yes.
22   Q.  Okay.  What's -- what's an aid car?
23   A.  An aid car is two firefighter EMTs on an
24  ambulance, basically.  Our terminology is to call it an
25  aid car so we can differentiate between an aid car and a

---

Page 40

1  medic unit, which is two firefighter paramedics in an
2  ambulance.
3    Q.  Okay.
4    A.  So the level of training is different.
5    Q.  Okay.  And a battalion chief, can you -- can
6  you kind of describe to me where in the hierarchy a
7  battalion chief sits?
8    A.  A battalion chief is the first level of fire
9  management.  The rank structure in the organization,
10  from battalion chief it goes up to deputy chief, then
11  transitions to assistant chief, and then to fire chief.
12  The rank and file, the labor side, is firefighter -- we
13  have firefighter drivers, we have all of our technical
14  teams, we have lieutenants, and we have captains.  So
15  battalion chief is above the captain level.
16       So in the city, we have the city broken up into
17  five geographical boundaries, and each geographical
18  boundary has a battalion chief that's in charge of
19  between six and eight fire stations, so they're
20  basically the manager in charge of that geographical
21  boundary.
22   Q.  Okay.  So how many battalion chiefs are there
23  in the city of Seattle?
24   A.  Let's see.  I believe 24.
25   Q.  Okay.

---

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 41

1    A.  Maybe -- well, we just added another one to
2  training, so --
3    Q.  How many were there in -- how many were there
4  in June 2020?  Twenty-four?
5    A.  I believe 24.  Let me -- let me think through
6  this.  No, 20.
7    Q.  Okay.  Twenty.
8    So -- and that would be -- you would have a
9  battalion chief -- would there be a battalion chief for
10  each shift, so you would have somebody on a day shift
11  and then a night shift, for example?
12    A.  No.  We work -- we work 24-hour shifts.
13    Q.  Okay.
14    A.  So the crews that came on this morning at 8:00,
15  they get off tomorrow morning at 8:00.  So we have five
16  battalion chiefs on duty each day, and we have four
17  different platoons.  We have A, B, C, and D.  So each
18  day we come on we have five battalion chiefs.
19    Now, we have a deputy chief that's a 24-hour
20  platoon duty also, and the deputy chief is our on-duty
21  citywide commander.  So we have big fires that break
22  out, and the deputy chief takes over as the citywide
23  commander.
24    Q.  Okay.  So at any given time during June 2020,
25  would there have been five battalion chiefs available in

Page 42

1  the City of Seattle --
2    A.  Yes.
3    Q.  -- to respond to a basic life event in CHOP?
4    A.  Well, I have to clarify a little bit.  On a
5  normal BLS call, a battalion chief doesn't respond.
6    Q.  Sure.
7    A.  So I'm just -- you asked if --
8    Q.  Okay.
9    A.  -- any time during June 2020 would there have
10  been a battalion chief on duty to respond in the city of
11  Seattle.
12    Q.  Well, my question is -- we'll get to how things
13  were different in a minute, but I appreciate that.
14    A.  Okay.  I got it.
15    Q.  So it's the case that for any -- for any period
16  during June -- on June 8, 2020, there were -- there were
17  only five battalion chiefs working in the city of
18  Seattle?
19    A.  That -- that's not correct.  We staffed up.
20  Just like we do for large protests and events.  That's
21  what I was talking about, the staffing up additional
22  resources.
23    Q.  So what -- and was that done for the entire
24  month of June 2020, the staffing up?
25    A.  I would have to follow up, but it was done for

Page 43

1  most of June 2020, because the protests from May 30th up
2  to June 8th, they happened, and then they kind of stood
3  down, you know, the crowds dissipated.  And then we
4  stand our resources down.  So that's how it normally
5  works.  But June 8th, we maintained, I believe, a higher
6  level of staffing for the balance of the month.  And I
7  can follow up there to be sure.
8    Q.  Okay.  Do you know how many battalion chiefs
9  were on duty during that staffed-up period in June of
10  2020, at any given time?
11    A.  For field operations I believe we staffed up
12  one additional battalion chief.
13    Q.  Okay.
14    A.  So there's five -- like on duty today, for
15  example, there's five on duty today.
16    Q.  Sure.
17    A.  During this period I believe we staffed up one
18  additional one.
19    Q.  Okay.  What is the difference between basic
20  life support and advanced life support?
21    A.  Sure.  So basic life support is for minor
22  medical emergencies that may require a transport to an
23  emergency room.  You broke your leg, maybe your stomach
24  hurts, or maybe your back went out.  Maybe you have a
25  laceration, but it's -- it hasn't hit any arteries or

Page 44

1  anything like that.
2    Advanced life support will require higher level
3  of medical intervention, and those are the ones that our
4  paramedics respond to.  They're able to intubate a
5  patient, they're able to push drugs.  Their training is
6  a lot more intense.  They -- a person having a stroke, a
7  person having a seizure, a cardiac arrest, those are
8  higher medical emergencies.
9    Q.  Okay.  So for basic life support, what is the
10  normal response to a person who's needing basic life
11  support?
12    A.  Well, that's a -- that's a pretty loaded
13  question.  We have a lot of levels.  We have what we
14  call emergency medical dispatching protocols.  So
15  depending on what the caller says on the phone, we try
16  to fit the right response to go and seek help -- seek to
17  help that person.  It could be anything from a single
18  aid car, alone, with no engine.  It can be an aid car
19  and an engine.  Or it could be a direct transfer of that
20  call as a pass-through to AMR, and AMR will send two of
21  their EMTs because it's a really lower level call based
22  on our protocols.
23    What the difference on the response piece is,
24  you don't normally get a battalion chief on a BLS call
25  because that is -- that's one of the biggest differences

11 (Pages 41 to 44)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 45

1    there.
2        Q.  So you're talking about the difference between
3    typical protocol and what the protocol was for this
4    yellow zone on Slide 10 of Exhibit 5 -- or Slide 9 of
5    Exhibit 5, sorry.
6        A.  Correct.
7        Q.  Okay.  And it was all basic life support within
8    that area on July 8th that required an aid car, engine,
9    and a battalion chief; is that correct?
10       A.  That is correct.
11       Q.  Okay.  And then for advanced life support
12   within the yellow area on June 8th, required an aid car,
13   a medic, an engine, and a battalion chief; is that
14   correct?
15       A.  That's correct.
16       Q.  Okay.  And this has the addition of a medic for
17   advanced life support.  What -- what is a medic, and do
18   they have their own vehicle?
19       A.  Yes.  Our paramedics, that's the higher level
20   of EMS training that I spoke to earlier, and they do
21   have their own vehicle.  It's an ambulance with two
22   paramedics inside.
23       Q.  And how was the -- how was the response
24   different for the area within the yellow zone, as
25   opposed to other areas of Seattle on that same day for

Page 46

1    an advanced life support situation?
2        A.  Sure.  So outside of this area that we're
3    talking about, if a person was having a cardiac arrest,
4    that would be a defined set of units to go and help that
5    person because that's an ALS call.  If a person is
6    having a stroke -- you wouldn't have a battalion chief
7    tied to a medic -- an ALS call.  That is one of the --
8    the biggest differences in all of these protocols right
9    here, is the battalion chief, and having a manager,
10   having a chief on scene who's paying attention to
11   situational awareness and can immediately call for
12   additional resources if they were needed.
13       Q.  And it's the case that even within this yellow
14   zone there were certain areas where there might be, for
15   example, somebody having a heart attack, where the --
16   the fire department would not even send the enhanced
17   team to respond; is that correct?
18       MR. FARMER:  Objection.  Vague and assumes
19   facts not in evidence.
20       A.  So --
21   BY MR. WEAVER:
22       Q.  Let me ask -- let me ask another -- I can tell
23   I confused you.
24       So within this area, within the yellow area,
25   were there some areas where the fire department on

Page 47

1    June 8th, for example, was -- would not respond to an
2    advanced life support situation even with the -- the --
3    the addition of a battalion chief, if they were
4    responding to an advanced life support situation?
5        MR. FARMER:  Objection.  Incomplete
6    hypothetical.
7        You may answer.
8        THE WITNESS:  Sure.
9        A.  So in the area between Olive and Pike and 13th
10   and 11th, for example, that would be a response inside
11   of that red zone that we would rendezvous or meet up
12   with SPD, and we would need an escort.  But any of those
13   other areas in the yellow area, the warm zone, our units
14   could respond on June 8th.
15   BY MR. WEAVER:
16       Q.  Okay.  So I think that's all the questions I've
17   got on this slide.  We've been going about an hour.  I'm
18   happy to keep going, but I want to ask whether you want
19   a break, or whether you want to keep pushing through.
20   It's up to you.
21       A.  It's up to the team.  Do we need a break?
22       MR. FARMER:  Keep going.
23       THE WITNESS:  Okay.  Let's keep -- let's
24   keep going.
25   ////

Page 48

1    BY MR. WEAVER:
2        Q.  All right.  So I'd like to take you now to
3    the -- to Slide 11.
4        A.  Okay.
5        Q.  Okay.  And this looks to be depicted as the --
6    the map that existed on June 12, 2020; is that correct?
7        A.  I think that's -- yes, that's the date on the
8    slide, yes.
9        Q.  Okay.  Do you know whether June 12th was the
10   date that barriers changed, or why -- why is this map
11   different from June 8th?  Let me ask that.
12       A.  I don't know the exact date that the
13   geographical boundaries changed, but this map reflects
14   change.
15       Q.  Okay.  One of the changes it reflects is that
16   the red area has increased in geographical size; is that
17   correct?
18       A.  Yes.
19       Q.  Why was the red area increasing in size?
20       A.  Because the physical barriers around the
21   perimeters had been pushed out.
22       Q.  Okay.  What do you mean by "physical barriers"?
23       A.  The barriers that were being used by those
24   occupying this area, meaning dumpsters, metal bike
25   racks, water barriers, vehicles, had been pushed out to

---

12 (Pages 45 to 48)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 49

1   a further perimeter.  So when the landscape changed we
2   often modify our -- our maps.  If we had a wildfire
3   today and it started in one area, but it -- it's quickly
4   moving towards another, we quickly modify those maps to
5   give our people situational awareness.
6       Q.  Okay.  Now, one thing that didn't change
7   between July 8th and July -- or sorry -- June 8th and
8   June 12, 2020, was the boundaries of the warm area; is
9   that correct?
10      A.  That is correct.
11      Q.  Okay.  That still remained Denny to Union and
12  Broadway to 13th; correct?
13      A.  Yes.
14      Q.  Okay.  This also depicts on here where the --
15  where Fire Station 25 is; correct?
16      A.  Yes.
17      Q.  And that's at about 13th and Pine?
18      A.  Yes.
19      Q.  And do you recall anyone referring to the area
20  within the area that was within this yellow area, but
21  not within the red area, as a grab-and-go zone?
22      A.  An area within the yellow, but not within the
23  red?
24      Q.  Yes.
25      A.  I don't recall that exact terminology, but it

Page 50

1   may have been used.
2       Q.  Let me -- I'm looking for something.  Hold on
3   here.  All right.  While I'm dropping this into the
4   chat, does the fire department ever use the term
5   grab-and-go to describe an area?
6       A.  I'm -- I'm sure we -- I'm sure we do.
7       Q.  What would you understand "grab-and-go" to
8   mean?
9       A.  That would be a place where we can receive a
10  patient, get them inside of one of our units, and either
11  go to another location to do an assessment, or go
12  directly to the hospital.
13      Q.  Okay.  And is that generally done because the
14  area that's called the grab-and-go area is not
15  considered safe for medics to stay and treat the person?
16      A.  It --
17          MR. FARMER:  Objection.  Argumentative.
18      You can answer.
19          THE WITNESS:  Sure.
20      A.  It could be.
21  BY MR. WEAVER:
22      Q.  Okay.
23      A.  And, you know, another example would be if we
24  had a traumatic vehicle accident, that may be a patient
25  that soon as we got them extricated we want to grab

Page 51

1   them, get them on the -- on the gurney, get them in the
2   back and get them en route to the hospital because of
3   the type of injuries.  So it could be.
4           MR. WEAVER:  So I've dropped a document into
5   the chat as Exhibit 6.  Let me know when you have it up.
6           (Exhibit No. 6 marked.)
7           THE WITNESS:  Okay.
8   BY MR. WEAVER:
9       Q.  What is this -- what is this document?
10      A.  Well, it looks like an email from Bryan
11  Hastings, who is our assistant chief of operations.
12  He's in charge of all of our field personnel on all four
13  platoons.  And this document is Just in Time Training
14  Package 14.
15      Q.  Okay.  So was this the sort of document that
16  would be sent out to the entire fire department for
17  their information?
18      A.  It could be.  It looks like it was sent to a
19  particular group, but yes, it could be.
20      Q.  Okay.  So a lot of this has -- a lot of this
21  particular document has to do with COVID, but I'd like
22  you to turn to -- it's the third page of the document.
23  It says in the upper right-hand corner, "Page 2 of 9."
24      A.  Okay.
25      Q.  Okay.  I'd like you to -- the area -- the first

Page 52

1   section of this page is called Department Updates, do
2   you see that?  And it starts, "The area around the east
3   precinct."
4       A.  I do.
5       Q.  And it indicates in the area of Union to Denny
6   and 13th to Broadway, "In the yellow zone, 'grab-and-go'
7   with patients and limit firefighting to extinguishment
8   only," if you look at the third paragraph down there, or
9   the third line at the bottom.
10      A.  Third line at the -- you're talking about the
11  first paragraph.
12      Q.  In the yellow -- just if you could look at
13  No. 3.
14      A.  Oh, I got you.
15      Q.  Do you see that?
16      A.  "In the yellow zone 'grab-and-go' with
17  patients, and limit firefighting to extinguishment
18  only."  Yes, I see that.
19      Q.  So am I correct that your understanding of the
20  grab-and-go in this case is to get the patient, if
21  possible, move them out of the yellow or warm zone area;
22  is that correct?
23          MR. FARMER:  Objection.  Vague.
24      A.  That's the way this reads, yes.  And this is
25  the situational awareness piece again.  So that's what

13 (Pages 49 to 52)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 57

1    assistant chief of operations would get all the on duty
2    chiefs and captains, and they would do conference calls
3    twice a day to make sure everyone had situational
4    awareness with the planning.  But everyone also
5    understood that these were very dynamic situations and
6    they would shift based on the information that came in
7    through the dispatch center.
8        Q.  Okay.  So it was changing maybe day to day, or
9    twice a day, as far as what the exact parameters and
10   policies were; is that correct?
11       A.  Well, I don't know if it was actually changing
12   hourly or day to day, but we were doing our best to keep
13   our folks informed with the current situational
14   awareness.
15       Q.  Okay.
16       A.  But -- but it's -- and I'll keep saying this.
17   It's important for us to mention that the dynamics and
18   the situation changed based on the information the
19   callers provided us.  So we -- we -- we have a great
20   plan, and we think it's the best plan, but if the caller
21   calls us and tells us, they're on the far east side of
22   our plan and it doesn't make sense to go to the casualty
23   collection point, then we adjust the plan.
24       Q.  Okay.  So if you go to the -- to the third page
25   of this Exhibit 7, I think this demonstrates what you

Page 58

1    were talking about earlier, which is that the red zone
2    continued to grow through the -- the time of the --
3    during the time of July 8th -- or sorry -- June 2020; is
4    that correct?
5        A.  Yes.  Yes.
6        Q.  Okay.  All right.
7        A.  It continued to grow.
8        Q.  Yeah.  So -- so there's two gray shaded --
9    different gray shaded areas here.  Is the darker gray
10   area where as of June 30, 2020, it would have been the
11   red or hot zone?
12       A.  Let's see here.  There's not a -- let me look
13   for a date here.  But I think that's what it represents
14   because this email is based on the June 30th date.
15   So -- and the map, I guess they'd have to shift it, but
16   you can see 13th Avenue, for example.  The red now goes
17   all the way up to 13th and all the way over to Olive,
18   and then all the way over to Pike.  But it also comes
19   down Pine all the way to Broadway.
20       Q.  Sure.
21       A.  And then over to Pike.  And then you can see
22   Cal Anderson Park pretty much goes all the way over to
23   Denny, and that's because that whole area was occupied
24   on June 30th.
25       Q.  Okay.

Page 59

1        A.  So that's how much it grew.
2        Q.  Okay.  So -- and then the -- it looks that the
3    complete area of both the warm zone and the hot zone is
4    still Denny to Union and Broadway to 13th; is that
5    correct?
6        A.  Correct.
7        Q.  Do you know if those boundaries changed at all
8    for the yellow or warm zone area during the period of
9    June 8th to June 30, 2020?
10       A.  I don't think they did.  Based on the maps, I
11   don't think they did.  But -- yeah, I don't think they
12   did.
13       Q.  Okay.  Okay.  So if you scroll down to the
14   bottom, and again, this -- this -- you know, the -- the
15   justification -- or the -- you know, it would be better
16   if we could turn this clockwise, but at the bottom
17   there's a staging -- at the bottom of this page there's
18   a staging -- it says "Staging," and then it has the logo
19   for the SFD.
20           Do you see that?
21       A.  Well, I can ro- -- I can rotate it.  Are you
22   okay if I do that.
23       Q.  You can rotate it if you want.  I'm not going
24   to rotate mine, but if it's easier for you to look at
25   it, go ahead and rotate it.

Page 60

1        A.  Right.  Yes, I see the staging area, yes.
2        Q.  Okay.  What's the staging area?
3        A.  That's where our units would stage on the
4    western end of this area.  So we get a call to the CHOP,
5    or to this area, and -- and that's where our units that
6    were coming from west to east, that would be their
7    staging area.  Now, generally, Fire Station 25, which is
8    at 13th and Pine, they would basically pull out on their
9    ramp on the -- on the -- on the ramp of the station and
10   sit in their equipment and then wait for additional
11   information.  So we had units on the east side at Fire
12   Station 25, and we had units on the west side at the
13   staging area.
14       Q.  Okay.  So would the fire department stage at
15   one of those two areas for any call within the yellow or
16   red areas?
17       A.  Any call within the red area.
18       Q.  The staging was not for the yellow --
19       A.  Not for the warm zone.
20       Q.  Okay.  All right.
21       A.  And context is important here, and -- and so
22   maybe I'll provide a little bit.  So the date of this
23   communication is June 30th.
24       Q.  Uh-huh.
25       A.  So earlier on our units were staged a lot

15 (Pages 57 to 60)

Hunters Capital, LLC v. City of Seattle      30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 61

1 closer, but because of the aggressiveness of the
2 protesters, that's why we backed our units that were
3 staging further out. That's why we did that. But
4 earlier on we were -- because the red zone wasn't as big
5 either, so we were closer to the edges. So that's the
6 dynamic of this changing environment that we were
7 facing.
8      **Q. Okay. At some point do you recall whether**
9 **there was a staging area at 15th and Madison?**
10      A. 15th and --
11      **Q. Which would not be on this --**
12      A. Yes, I think that's the church. Is that First
13 AME Church's parking lot?
14      **Q. I honestly have not gone and looked and seen**
15 **what exactly is at 15th and Madison, but --**
16      A. Yeah, well, I -- so this is coming back to me,
17 so I'm going to do my best. But as we backed out this
18 staging area, I think we pushed out the staging area on
19 the east side on Fire Station 25. I think that's when
20 we started sending them to the parking lot at 15th and
21 Madison. I think it's First AME Church right there, and
22 the back parking lot right there is the -- was the area
23 we were actually staging in by the end of this.
24      **Q. Okay. And so the reason that you were staging**
25 **out further was that if you were too close in, the**

---

Page 62

1 **people within the red or warm area could -- could see**
2 **the fire department; is that correct?**
3      A. Not just see. Because Fire Station 25 was on
4 the edge --
5      **Q. Sure.**
6      A. -- throughout the entire situation. But the
7 aggressiveness became more when there was a -- an
8 incident unfolding.
9      **Q. Okay. And you wanted to -- the fire department**
10 **wanted to reduce the possibility that there was going to**
11 **be conflict between the fire department and the people**
12 **inside the warm and red -- warm and hot areas; is that**
13 **correct?**
14      A. We wanted to get our people to a safe area
15 where they can stage until we got information from PD
16 that the scene was secure for us to go in. So we made
17 adjustments as -- as the days went on here.
18      **Q. Okay.**
19      A. It was all about safety.
20      **Q. I'm sorry; what?**
21      A. It was all about safety.
22      MR. WEAVER: Okay. Are we on Exhibit 8?
23      THE COURT REPORTER: Yes.
24      MR. WEAVER: Okay. So I've dropped this one
25 into the chat.

---

Page 63

1      (Exhibit No. 8 marked.)
2 BY MR. WEAVER:
3      **Q. Let me know when you have it.**
4      A. Uh-huh. It's up.
5      **Q. Okay. So what do you understand this page to**
6 **be?**
7      A. It looks like the details from one of our
8 incident reports, Incident 58386 in 2020, on June 14th.
9      **Q. Okay. And where do you understand that this**
10 **incident report would have been printed from? Is there**
11 **a particular database that it might have come from?**
12      A. This probably came from our CAD system,
13 computer-automated dispatch center system.
14      **Q. Okay. So I want you to look at the initial and**
15 **final location, up near the top, on the left.**
16      A. 1221 East Olive Street, Apartment 203. And
17 final location, Senia -- 12 --
18      **Q. The initial is the same as the final.**
19      A. Oh, okay.
20      **Q. So the -- do you recall whether 1221 Olive**
21 **Street was in the yellow area or the red area, or was**
22 **outside both?**
23      A. You know, it's probably right on the fringes
24 because 12th and Olive, there on that -- let's see. On
25 the eastern side, southeast corner, there's a pretty

---

Page 64

1 large residential -- I don't know if it's apartments or
2 condos. And then across the street there are also
3 units. But it's right on the fringes, is what I think.
4 I'm not 100 percent sure unless I looked at a map.
5      **Q. So I'd like you to go down to the dispatcher**
6 **comments. And would these be comments that were**
7 **transcribed by the 911 dispatcher, to your knowledge?**
8 **Is that typically where these come from?**
9      A. Yes, that's where this would come from.
10      **Q. Am I reading this correctly, that there was an**
11 **adult male with stroke symptoms that was calling to**
12 **report that their arm was numb?**
13      A. That's -- yes. Uh-huh.
14      **Q. Okay. And No. 4 seems to indicate that the**
15 **dispatcher believed it was in the red zone. Is that**
16 **your understanding as well?**
17      A. That's what it says right there.
18      **Q. And -- well, first of all, let me -- how far is**
19 **1221 Olive from the -- from Fire Station 25?**
20      A. It's -- so Fire Station 25's on 13th and Pine.
21 So if you went one block north and one block west,
22 you're at 12th and Olive.
23      **Q. Okay. And it seems to indicate here that the**
24 **patient was told or indicated that they would try to**
25 **walk to Station 25; is that correct? Is that what you**

---

16 (Pages 61 to 64)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 65

1    read this to say?
2        A.  Let's see.  "In red zone.  Patient to try to
3    walk to Station 25 or get a ride in about a half hour."
4    That's what it says.
5        Q.  So if the dispatcher was correct and this was
6    in the red zone, would the Seattle Fire Department on
7    June 14, 2020, have responded to this call on -- on 12th
8    and Olive?
9        A.  I -- I guess it would depend on situational
10   awareness, but it looks like the dispatcher gave the
11   caller instructions, and by reading this, it seems to be
12   the patient was alert and oriented times four.  They
13   were able to communicate that they had arm numbness, so
14   this is a snapshot of the call, but it looks like there
15   was a conversation taking place.
16       Q.  Okay.  So if the caller was in the red zone,
17   and if the caller was having -- had had a recent stroke
18   and had a right -- had a right arm that was numb, and
19   the dispatcher told the person to walk outside the red
20   zone to Station 25, would that have been consistent with
21   the policies that were in place on June 14, 2020?
22       MR. FARMER:  Objection.  Vague, and assumes
23   facts not in evidence.
24       A.  Yeah, and I'm just taking an assumption that
25   the dispatcher was trying to provide as much information

Page 66

1    to the caller as possible to get them help.  And here's
2    an example:  Many times we'll get a 911 call from a
3    person, whether it's an encampment or in an apartment
4    building, and based on what the caller says, our
5    dispatcher may say, "Well, can you go out to the street
6    and meet our folks when -- when -- so when they arrive
7    on scene they will see you," or things like that.  So
8    that's not uncommon for our dispatchers to try to give
9    instructions to the person based on the conversation
10   they're having.
11   BY MR. WEAVER:
12       Q.  On June 14, 2020, was it the policy of the fire
13   department to have people who were inside the red zone
14   walk outside the red zone before they could get
15   treatment from the fire department?
16       A.  Well, it looks like that this was the
17   instructions that we were given, that we gave a caller.
18   I wouldn't say it was our policy.  Our dispatcher was
19   trying to facilitate care to the patient.
20       Q.  Okay.  So is it safe to say that it was --
21   there were a lot of changes going on in areas that were
22   being responded to and not over the period of June 8th
23   through June 30, 2020?
24       MR. FARMER:  Object to the form of the
25   question.

Page 67

1        You may answer, Chief.
2        A.  I -- I think it is safe to say that.  The
3    landscape was changing, yes.
4    BY MR. WEAVER:
5        Q.  Is it possible that a 911 dispatcher might have
6    been confused as to what the particular areas were for
7    the red zone and the yellow zone on a particular day?
8        MR. FARMER:  Objection.  Foundation.
9        A.  I think I would be guessing if I gave that
10   answer.  I know our dispatchers do an amazing job to try
11   to get people to a place where they can be received and
12   get the care they need, but whether they were unaware or
13   not, I can't -- I can't speak to that.
14       (Exhibit No. 9 marked.)
15   BY MR. WEAVER:
16       Q.  Let me ask you about another issue here,
17   another document.  While I'm asking, do you recall
18   something -- a business called Car Tender that had an
19   issue during -- on June 14, 2020?
20       A.  What's the address, and what type of business?
21       Q.  It was a car repair company.  I believe it was
22   at 1706 12th, and there's a related document that I just
23   put into the chat.
24       A.  Yes, I see the document.
25       Q.  Okay.  Do you recall the incident at Car Tender

Page 68

1    on July 14, 2020, or sorry, June 14, 2020?
2        A.  The "Business Car Tender...area was broken into
3    last night...someone started a small fire and stole some
4    items."
5        Yes, I -- I remember this incident.
6        Q.  Okay.  What do you remember about it?
7        A.  Basically there was a small fire, and I don't
8    remember the part about stole some items, but I went to
9    that location the next day or this day and talked to the
10   business owner myself.
11       Q.  Okay.  What do you recall about that
12   conversation?
13       A.  I asked what happened, and they went over the
14   events that took place, and I think I asked our -- I may
15   have asked our investigators to go out and take a look
16   because I'm not sure if they did that night or that day,
17   whatever time this incident was.  There's no incident
18   time in here.
19       Q.  Well, my recollection -- and we will get to
20   this later.  It's -- I'm not going to deal with it in
21   the 30(b)(6) portion, but it happened the night of
22   June 14, 2020.  Okay?
23       So go up to the first -- so this -- this is an
24   email you sent, actually, that -- but if you go up to
25   the -- at the very top of the first page, do you recall

17 (Pages 65 to 68)

Hunters Capital, LLC v. City of Seattle ⎪ 30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 69

```
 1   writing this email?
 2       A.  Yes, I think I do.  It's from me.  Yes.
 3       Q.  Okay.  So you indicate that you looked up the
 4   address of Car Tender, and that it was outside the red
 5   zone.
 6           Is that what this says?
 7       A.  That's pretty much what it says.
 8       Q.  And -- so outside the red zone, but inside the
 9   yellow zone, it was the policy that the -- that the fire
10   department could go in without waiting for the police;
11   is that correct, at this time?
12       A.  That is correct.
13       Q.  Okay.  Were you surprised to find out that even
14   though it was outside the red zone, that the Seattle
15   Fire Department had not responded?
16       A.  Initially, I was.
17       Q.  Okay.  When did that change?
18       A.  When I talked to the business owner and they
19   explained to me the large crowd of people that was there
20   while they were there and how aggressive they were, so
21   that would change the dynamic of the layout for our
22   folks.  That's not something that we do, is go into
23   hostile crowds.  That -- that's -- it's not a safe place
24   for our folks.  So when the business owner explained
25   that to me and how hostile the crowd was, then the --
```

Page 70

```
 1   the situational awareness comes into play.  That becomes
 2   very important.  Because we can't put our folks in the
 3   middle of a hostile crowd.
 4       Q.  Okay.  Did you, as part of your investigation
 5   and talking to Car Tender, figure out whether the police
 6   department responded?
 7       A.  Well, for clarity, I didn't do an
 8   investigation.  I had a conversation to understood what
 9   happened.  But I don't think they told me that PD
10   responded.  I don't think they told me that.  And I
11   don't know if I asked that, but I don't think they told
12   me that.  I mean, clearly from my email, I was concerned
13   about why we didn't respond because I said it's an area
14   outside of the red, where we should have.  So I went
15   down there, myself, and talked to the business owner,
16   and when they explained to me the situational awareness,
17   then I had more understanding.  I can't speak to whether
18   the PD responded or not.
19       Q.  Okay.  So I just want to be clear.  Did you do
20   anything to look into this, other than talk to the owner
21   of Car Tender?
22       A.  I know I communicated with my team in a
23   conversation because I had clarity now on the why.  But
24   anything other than that, no, I don't think I did.
25       Q.  Okay.  What did you --
```

---

Page 71

```
 1       A.  Because these are --
 2       Q.  I'm sorry.  I didn't mean to talk over you.
 3       A.  No, no.  That's okay.
 4       Q.  Okay.  So what did you speak to your team
 5   about?
 6       A.  About what the business owner communicated to
 7   me.
 8       Q.  Okay.  Do you know if any part of your --
 9   any -- anyone else on your team went and talked to the
10   Car Tender business owner?
11       A.  I don't know.  I think our arson investigators
12   may have gone out, but I'm not 100 percent sure there.
13       Q.  Okay.  Okay.  I'm going to mark this as
14   Exhibit 10.
15           MR. FARMER:  Tyler, it's just past 11:00.
16   Would this be a good time for, say, a five- to
17   ten-minute break?
18           MR. WEAVER:  Sure.  I was just looking at
19   it, and I was actually going to suggest that after this
20   document, but let's go ahead and take a break.  How long
21   do you need?  Ten minutes?
22           THE WITNESS:  Sure.
23           MR. FARMER:  Great.
24           THE VIDEOGRAPHER:  Going off the record.
25   The time is approximately 11:03 a.m.
```

Page 72

```
 1           (Recess from 11:03 a.m. to 11:20 a.m.)
 2           THE VIDEOGRAPHER:  We are back on the
 3   record.  The time is approximately 11:20 a.m.
 4           (Exhibit No. 10 marked.)
 5       E X A M I N A T I O N (Continuing)
 6   BY MR. WEAVER:
 7       Q.  Hello, Chief.  I dropped some exhibits into the
 8   chat, rather clumsily, I might admit, but if you could
 9   look at the one that's marked Exhibit 10, bring that up.
10       A.  Yes.  It's up.
11       Q.  Okay.  Who is Reba Gonzales at the fire
12   department?
13       A.  Reba Gonzales is one of our deputy chiefs.  So
14   we have A, B, C, and D platoon.  So she's in charge of
15   one of the platoons, D platoon.
16       Q.  Okay.  So does she report directly to you?
17       A.  No.  She reports to Assistant Chief Bryan
18   Hastings.
19       Q.  Okay.  So I'd like you to look at the portion
20   of her email that she has labeled as 3, and this is
21   on -- just for reference, this is June 22, 2020, is the
22   date on this email.
23       A.  And number --
24       Q.  Number 3.
25       A.  Got it.
```

---

18 (Pages 69 to 72)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 77

1   Seattle Fire Department treated somebody during the
2   period of June 8th through June 30, 2020, within the red
3   zone; is that right?
4       A.  Right.  I -- I can say we entered with law
5   enforcement to treat a patient.  I'm just not 100
6   percent sure on the geographical boundaries.
7       Q.  Okay.  Was it the case for incidents within the
8   red zone, whatever it was on a particular day, that the
9   Seattle Fire Department could not go into the area and
10  would not go into the area unless the police department
11  determined that it would go into the area?
12      MR. FARMER:  Object to the form of the
13  question.
14      You may answer.
15      A.  Sure.  In the area that was identified as the
16  red or the hot zone, it was our practice to partner up
17  with law enforcement, make sure that we had proper
18  support, and then go in if we needed to.  But that would
19  be similar to a shooting or a stabbing injury.  We would
20  pause, wait for law enforcement to clear the scene, and
21  then we would go into the scene.  So that's our --
22  that's our standard practice.
23  BY MR. WEAVER:
24      Q.  Was it the practice that for any area or any
25  call within the red zone, as it existed on any day from

---

Page 78

1   June 8th to June 30, 2020, that it was the policy of the
2   Seattle Police -- Fire Department to not enter the area
3   unless the Seattle Police Department accompanied them?
4       MR. FARMER:  Objection.  Asked and answered.
5   Chief, you may answer again.
6       A.  Oh, yes, that was our operational plan.
7       (Exhibit No. 11 marked.)
8   BY MR. WEAVER:
9       Q.  And -- all right.  I'll leave it there for now.
10  So if you could go to what I've introduced as
11  Exhibit 11.  It's in the chat already.
12      A.  11.
13      Q.  So do you have it up?
14      A.  Yes.
15      Q.  Okay.  So there was an email that was written,
16  that was then forwarded to you.
17      Do you recall the incident discussed in this --
18  in this email from Dale Watanabe?
19      A.  Right.  I'll take a look.
20      Q.  Okay.
21      A.  Yes, I've -- I've read that.
22      Q.  Okay.  Do you recall that incident?
23      A.  I don't recall the incident, but after reading
24  it, it does hit the refresh button a bit.
25      Q.  Okay.  So what was your understanding of what

---

Page 79

1   an MI is?  There's a reference to an MI.
2       A.  Myocardial infarction.
3       Q.  Okay.  So a heart attack?
4       A.  Yes.
5       Q.  Was what was -- is what's described in this
6   email from Dale Watanabe, and the directions that were
7   given to the person who reported they were having a
8   myocardial infarction, consistent with the policy that
9   was in place on June 20, 2020?
10      MR. FARMER:  Object to the form of the
11  question.
12      A.  Well, this is a real-time situation that the
13  dispatcher -- because Dale Watanabe is one of our
14  dispatchers -- gave a caller in the 911 system
15  information to get to fire station one block east of
16  your location, Fire Station 25.
17      So I don't know what else was said on that
18  call.  I don't know what other ailments the individual
19  may have had.  But the dispatcher apparently felt
20  comfortable enough to ask the person to walk to the fire
21  station one block away.  But that's all I'm seeing here.
22  That's not the situation we wanted.
23  BY MR. WEAVER:
24      Q.  Okay.  So Dale Watanabe is a dispatcher, you
25  said.  Is he -- okay.

---

Page 80

1       So do you read his email as saying that --
2   indicating that he was comfortable telling the person to
3   walk to the fire station?
4       MR. FARMER:  Objection.  Sorry.  Objection.
5   Calls for speculation.
6       A.  No, I don't read that statement in his email,
7   no.
8   BY MR. WEAVER:
9       Q.  Okay.  What is your understanding of what the
10  policy would be today if somebody at 6 -- 1660 12th
11  Avenue called the fire department, indicated that they
12  were having symptoms of a cardiac arrest -- is it your
13  understanding in that situation that it would have been
14  consistent with the current policy, today, to tell them
15  to walk to Fire Station 25?
16      A.  No.
17      Q.  And why is that?
18      A.  Today?  We wouldn't have any obstructions
19  blocking our units from actually making it to this
20  address location, 1660 12th Avenue.  What is it, just
21  north of the east precinct.  So this is probably the
22  building that is right on 12th, on the east side of the
23  street there.  But we wouldn't have any obstructions
24  blocking our units from getting there.
25      Q.  Okay.  So your understanding is that in this

---

20 (Pages 77 to 80)

Hunters Capital, LLC v. City of Seattle

30(b)(6) and Individual Deposition of Harold Scoggins

Page 81

1   case the same -- if you got the same call today, it
2   would be the policy of the fire department to go to this
3   person's apartment; is that correct?
4        A.  Correct.
5        Q.  So part of the 30(b)(6) notice talks about --
6   that you've been designated to talk about is how -- how
7   response times to events were -- by the Seattle Fire
8   Department in the area were affected or changed during
9   the period of June 8th through June 30, 2020.  And do
10  you -- is there any study or analysis that has been done
11  to indicate how those response times changed for
12  addresses within the warm or yellow area during that
13  period?
14       A.  There hasn't been a study done.  I know our
15  team has looked at the response times, and it's been
16  difficult to discern for this reason:  Our response time
17  stamps -- the call comes through the dispatch center;
18  when the unit is dispatched; when the unit actually hits
19  a button inside of the fire engine, ladder truck, or aid
20  or medic unit -- when they go en route, they're actually
21  driving to the call; and then when they're on scene, so
22  they get on scene.  They're not necessarily at the
23  patient.
24       So even today, if we're at 999 Third Avenue,
25  for example, if we had a full fire response that came

Page 82

1   to -- what floor are we on here?  Forty --
2        MR. FARMER:  44.
3   BY MR. WEAVER:
4        Q.  I don't know.
5        A.  So we're on the 44th floor.  So our units came
6   to 999 Third Avenue, they would actually hit on scene
7   where -- when they're on the street, but it's probably
8   going to take them several minutes to navigate to the
9   44th floor.
10       So that is the gap that we haven't been able to
11  put together is when our folks who got on scene actually
12  connected up with the patient.  That -- that is --
13  because we don't track that.
14       Q.  Okay.  What's -- but was there -- there was an
15  attempt to get that information; is that correct?
16       A.  There was an attempt, yes.  Our team looked at
17  how long it took our folks to go en route and to go on
18  scene.  And the on scene may have been a staging
19  location, it may have been at the casualty collection
20  point.  You know, so there's a lot of variables to that
21  on scene stamp.
22       Q.  Okay.  When did your team look at that issue?
23       A.  Oh, I think sometime after June 30th.  I think
24  that there was information pulled together.
25       Q.  Okay.  And why was -- why was your team looking

Page 83

1   at that issue after June 30th?  And I assume you mean
2   June 30, 2020, first -- let me -- is that correct?
3        A.  June 30, 2020.
4        Q.  And why was your team looking at that after
5   June 30, 2020?
6        A.  Because we were trying to understand the
7   question you just asked, were our response times longer.
8        Q.  And was there any conclusion reached on the
9   data, problematic as it was?
10       A.  Yes, there was a conclusion reached, that our
11  response times were longer, but it was hard to discern
12  all of the variables.  And here's an example:  If
13  there's a protest today, for our units to find the right
14  location to the person in the protest that needs medical
15  assistance because of the -- the large gathering of
16  people is often complicated.  If there's a -- medical
17  response around the Seahawks game, for example, trying
18  to find the person and locate them on scene is often
19  difficult.  We had about 30 days of that, trying to find
20  the person that was actually in need.  So the
21  determination was our response times were longer, and
22  there were a lot of variables to the why.
23       Q.  Okay.  So I just want to be clear.  The
24  conclusion was that the response times were longer
25  during the period of June 8th to June 30th in the yellow

Page 84

1   zone or warm zone; is that correct?
2        A.  Well, in the red -- in the red or the hot zone,
3   for sure, but in and around the yellow zone, we would
4   have to do more study and analysis.  And here's why I
5   say that:  Fire Station 25 is on 13th and Pine.  If they
6   got a call at Denny and -- and 12th, it's -- whether the
7   protesters are there or not, it's still a pretty
8   straight shot.  They would go down 13th and then make a
9   left, or westbound, on Denny to get to that location.
10  So that access route was still open.  But if they had a
11  response on the other side, on Broadway, with all the
12  people and -- congregating around the area, their normal
13  route would have been they would go straight down Pine,
14  and they would hang a right on Broadway, and they would
15  be right at Seattle College, for example.  So it just
16  depends on where the call was, but there were calls that
17  were longer.  So overall, we -- we take the assumption
18  that some calls did take longer for us to get there.
19       Q.  Okay.  But there was no analysis to how long
20  the calls took for the yellow zone as opposed to the red
21  zone; is that correct?
22       A.  I think we -- we put them all on a spreadsheet
23  and reviewed it, but it was -- it was a review, not a
24  detailed analysis.  I'm thinking.  Our IT guys may have
25  mapped them.

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 137

1  chief of the fire department about what that might mean
2  for access to the area?
3       A. I did.
4       Q. And what were those concerns?
5       A. Access and egress in the area.
6       Q. Okay. Were you con- -- were you concerned that
7  you weren't going to be able to get in -- your fire
8  trucks or any response equipment into the area, past
9  those barriers?
10      A. Yes.
11      Q. Did you have any concern at that point about
12  what it might mean for businesses or residents who lived
13  or operated in that area?
14      A. Yes.
15      Q. What were those concerns?
16      A. Well, from the fire department perspective was
17  how were we -- how were we going to navigate the
18  landscape to serve those in that part of the community.
19      Q. At some point did you become part of a team of
20  people who were going to the area around the east
21  precinct and Cal Anderson on a daily basis?
22      A. Yes.
23      Q. Was one of the people you traveled there with
24  regularly Mami Hara?
25      A. Yes.

---

Page 138

1       Q. Was another person you regularly traveled with
2  there Sam Zimbabwe?
3       A. Well, let me provide a little clarification.
4       Q. Okay. Go ahead.
5       A. We didn't travel there together.
6       Q. Okay.
7       A. We organically met there. So we were there
8  pretty much daily together, but we didn't travel there
9  together.
10      Q. All right. Poor questioning on my part. Thank
11  you.
12         What time of day were you typically in the
13  area?
14      A. A lot. I -- during that period of time, I
15  would go there. You know, on the first day that this
16  was formed overnight, June 9th, I went there. I didn't
17  go to the office.
18      Q. You were there for the full day?
19      A. Pretty much.
20      Q. Okay. At any point were you personally there
21  overnight?
22      A. No.
23      Q. Okay.
24      A. You mean did I sleep there?
25      Q. Were you in the area during the night hours?

---

Page 139

1       A. Oh, I was in the area during the night hours.
2  Not -- not a lot, but yeah.
3       Q. Okay. So the first day you went there,
4  June 9th, had you -- had you been appointed as a liaison
5  to the area by the mayor, or how did that come about?
6       A. No, I wasn't appointed as a liaison to the
7  area. It came about because I saw a need, that we had
8  to figure out a way to navigate this landscape in case
9  there was an emergency and we needed to get our
10  resources in there.
11      Q. So what did you do on that first day to try to
12  navigate the area to figure out that situation?
13      A. Well, the first thing I did was I walked the
14  area. I needed to survey it, myself, you know, with
15  boots on the ground. So I walked the entire area, and
16  talking to people, trying to understand who -- who
17  was -- who was moving the crowd, you know, who was the
18  person in charge. And that first morning is when Mami
19  Hara showed up down there, and Sam Zimbabwe also. But I
20  think we all had concerns that focused on the services
21  that we provide to the community.
22      Q. So did you -- so you talked to the protesters
23  in the area. I'm using "protesters" to mean the people
24  generally in the area, who didn't -- who weren't
25  residents or businesses there. I'm just going to use

---

Page 140

1  that as shorthand for -- is that acceptable to you, to
2  use the term "protesters" for that?
3       A. I think it's acceptable to use the term, but I
4  am not sure if some of the residents from that area were
5  not protesting.
6       Q. Okay.
7       A. That's the part I'm not sure about.
8       Q. Fair enough.
9         So did you ever find out whether there was a
10  particular leader of the protesters?
11      A. No, I did not. And we consistently asked that
12  question, and there was never a person. As a matter of
13  fact, they would say "There is no leader."
14      Q. When you went down to the area were you
15  typically wearing your uniform that you're wearing right
16  now?
17      A. Yes.
18      Q. So were you -- were you often approached by
19  people who lived in the area?
20      A. Yes.
21      Q. People who owned businesses in the area, did
22  they come up and talk to you?
23      A. Yes.
24      Q. And people who owned property in the area,
25  would they have come and talked to you?

---

35 (Pages 137 to 140)

Hunters Capital, LLC v. City of Seattle
30(b)(6) and Individual Deposition of Harold Scoggins

Page 141

1    A.  Yes.
2    Q.  Okay.  Do you think you were there every day
3  from June 8th -- I'm sorry -- June 9th through July 1,
4  2020?
5    A.  Probably so.
6    Q.  Okay.  And what communications did you have
7  back with the mayor's office about what you were seeing
8  and experiencing and hearing in that area during that
9  time period?
10   A.  We had our -- our check-in calls or in-person
11  meetings.  So that's where we relayed information.  And
12  generally that information showed up in the daily
13  snapshot reports.
14   Q.  Okay.  So that communication would have been
15  with the mayor's executive staff and with the mayor,
16  herself?
17   A.  Yes.
18   Q.  Okay.  And that would have -- that would have
19  included information that you were hearing from
20  protesters; right?
21   A.  Yes.
22   Q.  And information that you were hearing from
23  residents; right?
24   A.  Yes.
25   Q.  And information that you were hearing from

Page 142

1  businesses; right?
2    A.  Yes.
3    Q.  And property -- and also property owners;
4  correct?
5    A.  Yes.
6    Q.  Okay.  Was one of your goals on June 9th to try
7  to keep protesters from fortifying the area with
8  stronger barriers and more defined boundaries?
9        MR. FARMER:  Objection.  Vague.
10  You may answer, Chief.
11   A.  I think the goal was to try to create an access
12  path for our resources.
13       MR. WEAVER:  Okay.  I'm going to mark an
14  exhibit, 15.
15       (Exhibit No. 15 marked.)
16  BY MR. WEAVER:
17   Q.  All right.  It should be coming up shortly.
18  Let me know when you have it open.
19   A.  Yes, it's open.
20   Q.  Okay.  So are these minutes from a meeting that
21  you had with the mayor's office, and the cabinet that we
22  talked about earlier, on June 9?
23   A.  Yes.
24   Q.  I'd like you to scroll down to the
25  objections -- objectives for de-escalation.  And under

Page 143

1  No. 1 it says remove -- I'm sorry.  Go ahead.
2    A.  No, I've read it.  Yep.
3    Q.  Okay.  "Remove concrete barriers and replace
4  with orange water barriers, including a traffic
5  management plan."  And the lead on that was SDOT and
6  fire.
7        Was that your recollection, that you -- the
8  fire department and the Department of Transportation
9  were lead on that particular objective?
10   A.  It is, because we both have -- had a vested
11  interest.  For the fire department, as I mentioned,
12  creating an access and egress path was in our interest
13  to serve the community.
14   Q.  Okay.  So what were you trying to do to remove
15  the concrete barriers and replace them with orange water
16  barriers on June 9th?
17   A.  I believe we were trying to have a conversation
18  with the protesters to try to make that happen.
19   Q.  What was the -- what was the purpose in trying
20  to replace the concrete barriers with orange water
21  barriers?
22   A.  Sure.  If we had a major incident in that area
23  and there were the orange water barriers, you can drain
24  those barriers pretty quick, and they also slide pretty
25  easy.  So we would have been able to navigate the

Page 144

1  landscape in case of an emergency.
2    Q.
3    A.  With the other barriers it was a bit more
4  challenging.
5    Q.  Were you --
6    A.  It was just a water container that's filled
7  with -- I don't know how much water's in it.
8    Q.  Yeah.  So were you successful in achieving that
9  objective on June 9th?
10   A.  I don't think we were.  I'm not sure, though,
11  unless you're going to show me another slide of success.
12   Q.  Do you recall any point at which concrete
13  barriers were replaced with orange water barriers
14  between June 9th and July 1, 2020?
15   A.  I don't recall the exact connecting of dots of
16  what we replaced with what, but over that period of
17  time, June 9th to June 30th, there was a -- there was a
18  transition in the landscape.
19   Q.  Okay.  We'll get to that.
20       I'd like to go down to -- scroll down to
21  Item 5, which is right -- it starts on the first page
22  and goes on to the second.  So that's "Develop a
23  communication plan between community site leaders and
24  City service providers," and it has as the lead the
25  mayor's office and fire.

36 (Pages 141 to 144)

Hunters Capital, LLC v. City of Seattle

30(b)(6) and Individual Deposition of Harold Scoggins

Page 165

1        Do you see that?
2        A. I do.
3        Q. Okay.  Do you recall what the concerns about
4    the level of permanent activity at the park were?
5        A. "27 tents on site...digging a community
6    garden."
7        I think the concerns were the damage to the
8    park, and I do think that there is a water system or a
9    reservoir under there.  So that was a concern.
10        Q. Okay.  Was there also a concern that the more
11    the group dug in, the harder it would be to get them to
12    leave?
13        A. The more people showed up, yes.
14        Q. Okay.  So at this point it says there were
15    about 27 tents in Cal Anderson.
16        Did that number grow quite a bit?
17        A. I think it did.  I was never counting the
18    tents, but as you survey the landscape on June 8th or
19    9th versus later on in the month, clearly the number of
20    tents had grown.
21        (Exhibit No. 18 marked.)
22    BY MR. WEAVER:
23        Q. Okay.  So I'd like to go to what I marked and
24    uploaded earlier as Exhibit 18.  I also uploaded it a
25    couple times without that number on it.  Let me know

Page 166

1    when you have it up.
2        A. Will do.  You've already downloaded that one?
3        Q. 18, I believe so.  Let me -- if I haven't, I
4    will here.
5        A. Oh, yeah.  Yeah, it's here.
6        Q. Yeah.  Like I said, it was not the prettiest.
7        A. So it's open now.
8        Q. Okay.  One question before I move on was, did
9    you receive complaints from businesses that they were
10    not able to get deliveries to their business -- places
11    of business?
12        A. Yes.
13        Q. All right.  Okay.  So Exhibit 18 is some emails
14    that you sent on June 11, 2020.
15        Do you remember these emails?
16        A. I don't, but I can read them.
17        Q. Okay.  Go ahead.
18        A. I guess I should have checked my spelling and
19    wording, first off.
20        Q. We'll get there.
21        A. Yes.  I've read this, yes.
22        Q. Okay.  So do you remember sending these emails?
23        A. Not specifically, but this -- these were my
24    concerns.
25        Q. Okay.  So I want you to scroll down.  I don't

Page 167

1    know if you reviewed this one, but at the bottom of the
2    second page it's actually an email that you sent, and
3    then you replied all to that email with more comments.
4    So I want to ask you first about the one June 11th at
5    8:57 in the morning.
6        Do you see it?
7        A. Yes.
8        Q. So you state here that you're -- you were
9    concerned knowing there were individuals in the crowd
10    with weapons, and that you see that this has
11    transitioned from a peaceful protest to a different
12    situation that is unstable, and this could compromise
13    the safety of your personnel.
14        At what point did you -- did you notice that
15    the protest had transitioned?
16        A. When people showed up with weapons and were not
17    allowing access to the area.
18        Q. Okay.  And that had happened -- that had -- did
19    that happen on like the 9th or the 10th of June?
20        A. I believe it happened on June 8th.
21        Q. Okay.  And it continued -- that -- those
22    particular aspects continued through the month of June;
23    is that right?
24        A. Correct.
25        Q. What do you mean by the situation was unstable?

Page 168

1    What did you mean by that?
2        A. When people are in the area with weapons, not
3    just one person, multiple people, and they're on the
4    access and egress points of a geographical area, and not
5    allowing people in or out, or vehicles in and out --
6    because there was a lot of foot traffic actually walking
7    in and out all day long, but not allowing vehicles in or
8    out, to me that is an unstable situation.
9        Q. Okay.  So going back to your -- up above, the
10    email you sent -- you replied all to your own email
11    about an hour later, on June 11th, at 9:14 in the
12    morning.  And the second sentence talks about, "If the
13    City is to allow this group to continue to protest," and
14    I want to ask you about -- was it your perception that
15    the City was allowing the group to continue to protest
16    throughout June 2020?
17        A. It was my perspective.
18        Q. Okay.  And you believed at that point that
19    certain conditions needed to be met if that was going to
20    happen; is that right?
21        A. I did.
22        Q. And why did you believe that certain conditions
23    needed to be met if the City was going to allow the
24    protest to continue?
25        A. Because from fire's perspective, trying to

42 (Pages 165 to 168)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 189

1    trying to survive right now, and we're not allowing
2    traffic through here so they can survive?  Do you recall
3    that?
4        A.  I don't recall saying that, but that makes
5    sense, and the context is important.  So during this
6    time many businesses had been closed because of COVID,
7    so businesses were really working hard to survive.  So
8    that would be a reference point and the context that
9    would make sense that I could possibly use.
10       Q.  Okay.  So was it your perception that
11   businesses were having a harder time surviving because
12   of the occupation of the streets in the area around the
13   east precinct and Cal Anderson Park?
14           MR. FARMER:  Objection.  Vague.
15       A.  I think that would be really difficult for me
16   to discern because at that point in time our community
17   was basically shut down, and so there -- it had been a
18   long road for all of our businesses in the community
19   because of COVID.  Now, this was on top of that.  I
20   don't know if the community was fully reopened during
21   this period of June 2020.  So I do know the businesses
22   were having a really difficult time because of the
23   pandemic.
24   BY MR. WEAVER:
25       Q.  And I think you said -- and correct me if I'm

Page 190

1    wrong -- that you would -- would agree that there was --
2    in addition to the pandemic, that there was the
3    additional problem of the streets and the park being
4    occupied in the area around the precinct and the park,
5    for businesses?
6        A.  Yeah.  And because that would make sense, but I
7    don't know which businesses remained open --
8        Q.  Sure.
9        A.  -- and which businesses had to close during
10   this period from June 8th to June 30th.  As I was in
11   there, there were a number of businesses that were open
12   and operating during this period of time, and there were
13   some pretty heavy volumes of foot traffic.  So it would
14   be hard for me to try to discern -- you know, the ones
15   that were completely closed, clearly they weren't going
16   to be able to reopen in the midst of these events that
17   were taking place, but there were some open and
18   operating, and that's the part that I don't know.  But
19   it would make sense that they had a difficult time.
20       Q.  Would you agree that the barriers had gotten
21   more fortified over the period of the first few days
22   after the police left the -- scratch that question.
23       ==Would you agree that in the -- in the days==
24   ==following the Seattle Police Department leaving the east==
25   ==precinct, that the barriers became increasingly==

Page 191

1    ==fortified where the protesters had placed those==
2    ==barriers?==
3    ==        MR. FARMER:  Object to the form of the==
4    ==question.  Assumes facts not in evidence.==
5    ==        Chief Scoggins, you may answer.==
6    ==    A.  Okay.  I do agree that more obstacles appeared==
7    ==to show up around the intersections where the initial==
8    ==water barriers and the gate-type barriers and bike racks==
9    ==were, as the days started to tick on.  So yes.==
10   ==BY MR. WEAVER:==
11   ==    Q.  Do you recall the protesters started fortifying==
12   ==the barriers with vehicles that were parked near or in==
13   ==front of the barriers?==
14   ==    A.  I do agree that that occurred.==
15   ==    Q.  Okay.  And when did you notice that beginning==
16   ==to occur?==
17   ==    A.  I think that occurred pretty early on.==
18   ==    Q.  Like in the first few days of the occupation?==
19   ==    A.  I think so.==
20       Q.  Do you recall at this meeting on June 13th a
21   discussion of changes to the placement and type of
22   barriers that might be provided to the protesters?
23       A.  I missed the first part of what you said.  It
24   was something and type of barriers.
25       Q.  The placement and type of barriers.

Page 192

1        A.  Yes, there was a conversation regarding that.
2        Q.  Do you recall getting out a map and drawing on
3    it with the protesters to indicate possible barriers
4    that might be established in the area following this
5    meeting?
6        A.  I do -- I remember the conversation.  I don't
7    remember, you know, where I drew on the map.
8        Q.  Okay.  Do you recall touring the area
9    afterwards with Sam Zimbabwe and Mami Hara and the
10   protesters to talk about the types of barriers and the
11   placement of those barriers that the City might agree to
12   with them?
13       A.  I do remember those conversations took place,
14   and from the fire department's perspective, you know,
15   our goal was to get the side of the street that had the
16   fire hydrants on them, to get access to those points, so
17   if there was a -- you know, a large fire, we didn't have
18   the fire hydrants buried behind any of the barriers.  So
19   we viewed the way the water mains were running, we
20   viewed where the hydrants were, and that's how we kind
21   of sketched out the map.
22       Q.  So after this meeting and after the tour, did
23   you have an agreement with the protesters as far as the
24   parameters of a change in the footprint and a change in
25   the type of barriers going forward?

48 (Pages 189 to 192)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 193

1    MR. FARMER: Object to the form of the
2  question.
3        Chief, you may answer.
4        A. You know, I -- we had agreements. They didn't
5  always hold because new faces would come into the
6  conversation that would object, but after -- you know, I
7  remember early on, I thought we had an agreement. We
8  were going to work to change the landscape. And then
9  that all fell apart on us pretty quick.
10  BY MR. WEAVER:
11        Q. What do you mean, it fell apart on you pretty
12  quick?
13        A. When we started the process to change the
14  landscape, another group or -- I don't know the
15  different groups within the group, but became, you know,
16  angry and upset about changing of the landscape. I
17  remember one of the big -- I think the skip loader
18  trucks came in, and you had, you know, someone lay down
19  in front of it on the street. And we were trying to do
20  all this without police participation. So you had
21  Department of Transportation employees. I was down
22  there with a couple of my folks. So we were trying to
23  manage a very tense situation, and then it -- it fell
24  apart, and then we -- we worked through it again.
25        Q. Why were you trying this without police

Page 194

1  participation?
2        A. Well, we were trying to work with what we had.
3  We knew the situation became volatile when they were
4  added to the conversation. So we were trying to work
5  with what we had and solve the problems without bringing
6  back up the temperature in the water again.
7        If you remember, prior to June 8th, the
8  protesters and the police -- it was a pretty challenging
9  time.
10        Q. So at some point after this meeting were
11  there -- was -- were there replacements of barriers that
12  the protesters had been using with larger, heavier,
13  concrete barriers?
14        A. Sometime after that meeting the transition
15  started from the earlier barriers, which were the gates
16  and the water barriers, dumpsters and bike racks and
17  vehicles, to the ecology blocks, which are the large
18  blocks of concrete. But it took a couple of fits and
19  starts to actually get that moving.
20        Q. Okay. And the ecology -- help -- I mean, I can
21  ask Mr. Zimbabwe about this, but the ecology blocks,
22  how -- they weigh a few hundred pounds; is that correct?
23        A. I think they probably weigh a few thousand
24  pounds.
25        Q. Okay. A few thou- -- they have to be moved by

Page 195

1  machinery; right?
2        A. Yes.
3        Q. And so the Department of Transportation
4  provided those blocks and brought those blocks into the
5  area; is that correct?
6        A. That is correct.
7        Q. And the barriers that had been drawn with
8  the -- pursuant to the agreement reached with the
9  protesters, did those barriers -- did those barriers --
10  revised barriers -- well, let me try again.
11        So you had an agreement to change the footprint
12  with the protesters; right?
13        MR. FARMER: Objection. Misstates prior
14  testimony.
15        A. We worked through changing the landscape with
16  the protesters.
17  BY MR. WEAVER:
18        Q. Okay. And at some point, certain portions of
19  certain roads were opened up one way; is that correct?
20        A. That is correct.
21        Q. Okay. Did those openings hold, or did the
22  protesters move some of the barriers again following the
23  opening up of those areas?
24        A. The landscape that we shifted held for a number
25  of days. I can't tell you how many. Because one of the

Page 196

1  things we were trying to accomplish was if we were going
2  to open up these lanes for vehicle traffic, we needed to
3  create, lack of a better term, a barrier between the
4  vehicles and where people were going to be. So that was
5  a part of the mindset, and when we shifted the landscape
6  and how we shifted it.
7        Q. Okay. But at some point after several days
8  that -- that all changed because the protesters
9  moved some barriers and blocked things that had
10  previously been open; is that correct?
11        A. That is correct. It was dynamic. I don't know
12  exactly how many days. But I know it was an ongoing
13  work in progress.
14        Q. Okay. I'd like to go back to Exhibit 19. It's
15  the first text in that chain. And it's a text from you
16  that is simply a YouTube link. And I can tell you that
17  there's -- there's no text before or after it indicating
18  why you were sending this link.
19        This was sent on, it looks like, 2:00 on
20  June 15, 2020. The link goes to -- and you might be
21  able to hit the hyperlink there and see what I'm talking
22  about. The link goes to footage of what had happened at
23  Car Tender on the night of the 14th.
24        A. Do you want me to hit the link?
25        Q. You can hit the link if you want, just to see

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

---

Page 209

1    A.  I don't recall the details of the exact
2  conversation, but I do know that that was discussed.
3  BY MR. WEAVER:
4    Q.  Okay.  What do you recall -- what were your
5  discussions in June of 2020 with Carmen Best, Chief
6  Best, about whether the -- whether the police department
7  wanted to get back into the east precinct?
8    A.  I don't know if Chief Best and I had
9  intentional, detailed discussions about wanting to get
10  back into the east precinct.  I know they did.  That's
11  one of their precinct buildings.  It would be like the
12  fire department wanting to get back into one of our fire
13  stations.  But we didn't have detailed conversations.
14  Maybe it was just a feeling of knowing that that was the
15  intent.
16    Q.  Do you recall at any point Chief Best or other
17  members of the police department suggesting that the
18  area should be cleared of protesters sooner than the
19  mayor's office wanted that to happen?
20    A.  I don't recall the exact conversations, but I
21  know conversations like that took place.
22    Q.  So tell me what you remember about those
23  conversations.
24    A.  Wanting to clear the area and get back into the
25  building.

---

Page 210

1    Q.  And either the -- either Chief Best or the
2  other members of the police department received pushback
3  from the mayor's office that they could not get back in
4  there as soon as they wanted to?  Was that part of the
5  discussions?
6    A.  I didn't witness pushback from the mayor's
7  office if they communicated that they would like to get
8  back into the building from the mayor's office.  And the
9  mayor's office may not have been in, you know, all of
10  these conversations.  So if we're reviewing our
11  operational plan and trying to get in alignment with
12  PD -- because that was the goal of this, was to try to
13  get in alignment, so if there was another event.
14    Q.  Did you ever talk to Chief Best about her
15  opinions with regard to whether the police department
16  should have stayed in the east precinct on June 8, 2020,
17  instead of leaving it?
18    A.  I don't know if we had intentional
19  conversations on that topic.
20    Q.  Did you get an impression from your discussions
21  you did have with her whether she believed that they
22  should have left on June 8, 2020?
23    A.  I think I did.
24    Q.  Okay.  What do you remember about that
25  conversa- -- what do you remember about the impressions

---

Page 211

1  you got?
2    A.  Well, one morning her and I were down in the --
3  in the area, and she did an interview live, and I think
4  she communicated some of those points in the interview.
5  It was just her and I, and, you know, the protesters,
6  and there was one of the -- one of the local TV
7  stations.
8    Q.  Okay.  And what were the points that you heard
9  her talk about?
10    A.  Well, I'm -- I'm generalizing.
11    Q.  Okay.
12    A.  But I think wanting to get back in the
13  building, wanting to clear the area and things like
14  that.
15    Q.  Okay.  Was there ever discussion in the cabinet
16  meetings about how it was not wise to clear the area as
17  of, say, June 15, 2020?
18    A.  I don't know.  I don't recall that.  I'm not
19  saying there -- they couldn't have happened.  I just
20  don't remember them happening.
21    Q.  If the mayor and everybody wanted to clear the
22  area, why was it not done prior to the morning of
23  July 1, 2020?
24    MR. FARMER:  Objection.  Foundation, calls
25  for speculation.

---

Page 212

1    A.  I don't know.
2  BY MR. WEAVER:
3    Q.  Okay.  I'd like to go back to the email which
4  is Exhibit 24, and the middle of this email Mayor Durkan
5  says, "What happened this morning" -- she says
6  "this a.m." -- "was foreseeable and avoidable."
7    Do you agree that what had happened that
8  morning was foreseeable and avoidable?
9    MR. FARMER:  Objection.  Vague.
10    A.  I don't know.  For a young man to lose his
11  life, I would never like to think that I saw that
12  coming.  Was this a -- a very different situation?  It
13  was.  But I can't say that I saw this young man getting
14  ready to lose his life.  I cannot say that.
15  BY MR. WEAVER:
16    Q.  Do you believe it was foreseeable that there
17  would be increased violence in an area where there was
18  modified police and fire response for a period of weeks?
19    MR. FARMER:  Objection.  Object to the form.
20    You may respond, Chief.
21    A.  I think as the days went on, we started to
22  learn more.  So we became more informed of the
23  situations on the ground, and we were better able to
24  understand how this was going to challenge our
25  resources.

---

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 213

1    BY MR. WEAVER:
2         Q.  What do you mean by you started to learn more?
3         A.  Well, this was a pretty violent event.  The
4    crowds were growing significantly, and we had challenges
5    reaching this patient.  We learned a lot in this event,
6    so we learned a great deal.  So we modified our plans a
7    bit more, we tried to become better coordinated.  But as
8    the crowd size grew, that was a part of the learning.
9         Q.  What were you learning from the fact that the
10   crowds -- the crowd size was growing?
11        A.  The potential of violence was escalating.
12        Q.  I'm getting close, but I need to take a break.
13   Can we go off the record, please?
14        THE VIDEOGRAPHER:  Going off the record.
15   The time is approximately 4:29 p.m.
16        (Recess from 4:29 p.m. to 4:41 p.m.)
17        THE VIDEOGRAPHER:  We are back on the
18   record.  The time is approximately 4:41 p.m.
19        E X A M I N A T I O N (Continuing)
20   BY MR. WEAVER:
21        Q.  So Chief, are the cabinet meetings with -- that
22   we've talked about with the mayor's office and the other
23   chiefs of staff, are they ever recorded in any way that
24   you know of?
25        A.  I don't think so.

Page 214

1         Q.  Other than somebody takes -- is there somebody
2    designated at these meetings to take notes?
3         A.  Yes.  That's what we're seeing in the snapshot
4    reports.
5         Q.  And who -- who is that, that takes the notes of
6    those meetings, if you know?
7         A.  Well, so most of the documents that you have
8    displayed are tied to our emergency operations center.
9    So generally there's a member of the EOC team who's
10   designated to take the notes and capture the notes of
11   that meeting.
12        Q.  Okay.  Did you have any -- going back to
13   October 8, 2020, did you have any emails or other
14   documentation of your trip to the Apple store?
15        A.  I don't think -- well, I guess I should get
16   clarity.  You mean emails to Apple that I'm coming over,
17   or what do you mean there?
18        Q.  Any emails that you might have with Apple
19   regarding your claim, or any -- any emails or other
20   communications with Apple.
21        A.  I don't have any communications with Apple, no.
22        Q.  You said you have a Apple watch; is that
23   correct?
24        A.  I do.
25        Q.  All right.  I thought you were pointing to it.

Page 215

1         Okay.  So you do -- is that the same Apple watch you had
2    a year ago?
3         A.  Same one.
4         Q.  Okay.  Has it been backed up?
5         A.  I didn't know you can back up a Apple watch.
6    It connects with your phone.
7         Q.  Sometimes I ask questions because I've been
8    told to ask them, so just a little hint, I have no idea
9    if it can actually be backed up.
10        A.  I don't know.
11        Q.  Okay.  Do you know if it has been cleared or
12   reset at any time in the last year?
13        A.  I don't think I've ever cleared the Apple
14   watch.  I wouldn't even know how to do that.  When you
15   reconnect it with the phone or there is an IOS software
16   update, it kind of resets itself on those updates, I
17   think.  But I don't know.
18        Q.  Okay.  So was it your understanding that it was
19   always the mayor's desire, starting on June 8, 2020,
20   to -- to clear out the protests from the area around the
21   east precinct and Cal Anderson Park?
22        A.  It would be hard for me to speak about the
23   mayor's desire.  I do believe that it was one of our
24   shared goals.
25        Q.  Okay.  And what was -- what is your

Page 216

1    understanding that it was a shared goal based on?
2         A.  All of the conversations that we had on how to
3    transition the landscape, how to, from the fire
4    department's perspective, create access and egress.  So
5    based on all of those conversations, it -- it appeared
6    to be the priority for the group.
7         Q.  For the group or for the mayor?
8         A.  Well, I think it was -- like I said, it would
9    be hard for me to speak about the mayor's desire, but it
10   seemed that that was in alignment with what we were
11   trying to do.
12        Q.  Okay.  Do you recall ever getting a directive
13   from the mayor or the mayor's office prior to June 20,
14   2020, to develop a plan to clear out the area with the
15   police department -- with -- and with DOT.
16        MR. FARMER:  Object to the form of the
17   question.
18        You may answer.
19        A.  Sure.  I don't recall getting a directive.
20   That's not to say I didn't get an email of some sort, I
21   guess.
22   BY MR. WEAVER:
23        Q.  Okay.  So you don't recall in an email or
24   meeting an instance where the mayor or the mayor's
25   office told you before the morning of January [sic] 20,

54 (Pages 213 to 216)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 221

1    Q.  The City renting a space?
2    A.  Oh, I don't know.
3    Q.  Okay.  You don't know anything about Mayor
4  Durkan and a business called the Riveter?  Do either of
5  those -- does that ring a bell with you at all?
6    A.  No.
7    Q.  Okay.
8    A.  And it's not to say that those conversations
9  didn't take place, but it -- it would not have been one
10  that impacted the fire department.
11    Q.  Okay.  Yeah, I -- I'm just making sure.  I
12  didn't expect that you did, but -- can you give me
13  another five minutes?  I might be done.  I just want to
14  look at my notes.  So if we could go off the record for
15  five minutes.
16    THE VIDEOGRAPHER:  Going off the record.
17  The time is approximately 4:53 p.m.
18    (Recess from 4:53 p.m. to 4:57 p.m.)
19    THE VIDEOGRAPHER:  We are back on the
20  record.  The time is approximately 4:57 p.m.
21    E X A M I N A T I O N (Continuing)
22  BY MR. WEAVER:
23    Q.  Okay.  I do have a few just brief questions.
24    So with regard to Cal Anderson after July 1st
25  through the end of 2020, do you know of any instances

Page 222

1  where there were yellow or red zones created in or
2  around the park during that time?
3    A.  I don't.  I don't think we created any in or
4  around the park, but I'm not 100 percent sure, but I
5  don't think we did.
6    Q.  Do you recall whether there were any scenes of
7  violence declared in the -- in or around the park during
8  the same time period?
9    A.  Are you talking about the time period after
10  the demobilization --
11    Q.  Yeah, July 1st to the end of the year of 2020.
12    A.  Oh, I'm not sure.  That's a pretty long time
13  period, so there could have been.
14    Q.  Okay.  Has anybody, to your knowledge,
15  attempted to see if they can get any of your previous
16  messages by using your Apple watch as a -- as a source?
17    A.  No.
18    Q.  Is that a City-issued Apple watch?
19    A.  No.
20    Q.  But it is -- it's synced with your City phone;
21  is that right?
22    A.  Yes.  Only my City phone.
23    Q.  Okay.  At any time -- in June of 2020, was your
24  personal email linked to your phone?
25    A.  No.

Page 223

1    Q.  Your City phone, I mean.
2    A.  No.
3    Q.  Okay.  And do you have a personal email address
4  that you use?
5    A.  I do.
6    Q.  What's -- what's the email address?
7    [--- Confidential     ---]
8    MR. FARMER:  Cindy, we would -- I'm sorry,
9  Mr. Weaver.  Cindy, we would ask that you mark the last
10  question and answer as confidential under the protective
11  order in the case, please.
12    MR. WEAVER:  And we have no objection to
13  that.  I expected that, so -- I was actually going to
14  mention that we would keep that confidential.
15    So unless your attorney has questions, I am
16  done.
17    MR. FARMER:  No questions.
18    Cindy, we'll reserve signature.  Thank you.
19    THE VIDEOGRAPHER:  Thank you.  This
20  concludes today's deposition of Harold Scoggins.  The
21  time is approximately 5:00 p.m.  Going off the record.
22    (Deposition concluded at 5:00 p.m.)
23    (Reading and signing was requested
24    pursuant to FRCP Rule 30(e).)
25    -o0o-

Page 224

1    C E R T I F I C A T E
2
3  STATE OF WASHINGTON
4  COUNTY OF PIERCE
5
6    I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Harold
9  Scoggins, having been duly sworn, on September 14, 2021,
10  is true and accurate to the best of my knowledge, skill
11  and ability.
12    IN WITNESS WHEREOF, I have hereunto set my hand
13  and seal this 23rd day of September, 2021.
14
15
16
17  _____
18    CINDY M. KOCH, CCR, RPR, CRR
19  My commission expires:
20  JUNE 9, 2022
21
22
23
24
25

56 (Pages 221 to 224)

Exhibit 9

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
          Plaintiff,   )
                               )
     vs.        ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,          )
                               )
          Defendant.   )
_____

VIDEOTAPED VIDEOCONFERENCE

30(B)(6) AND INDIVIDUAL
DEPOSITION UPON ORAL EXAMINATION OF
MAMI HARA

(CITY OF SEATTLE)
_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 4, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Page 3

```
 1            DEPOSITION OF MAMI HARA
 2               EXAMINATION INDEX
 3   EXAMINATION BY:              PAGE
 4   30(b)(6) Examination by Mr. Weaver      6
 5   Non-30(b)(6) Examination by Mr. Weaver   86
 6
 7               EXHIBIT INDEX
 8   EXHIBITS FOR IDENTIFICATION        PAGE
 9   Exhibit 1  Amended Notice of Videotaped
             Deposition Pursuant to FRCP
10           30(b)(6) to City of Seattle
11   Exhibit 2  SPD Blotter/Update;        11
             SEA_00015069-070
12
13   Exhibit 3  Email chain; SEA_00102780-788    17
14   Exhibit 4  Email; SEA_00121366        33
15   Exhibit 5  Email chain; SEA_00043770-774    43
16   Exhibit 6  Email chain; SEA_00082989-991    46
17   Exhibit 7  Email; SEA_00082986        48
18   Exhibit 8  Email chain; SEA_00083076     51
19   Exhibit 9  Email chain; SEA_00092041-045    57
20   Exhibit 10 Email; SEA_00136841-842      70
21   Exhibit 11 Email chain; SEA_00043193     79
22   Exhibit 12 16-page chart titled "Messages"   119
23   Exhibit 13 18-page chart titled "Messages"   125
24   Exhibit 14 Email chain; SEA-PDR_002277-282    136
25   Exhibit 15 Email chain; SEA_00093002-003    137
```

Page 2

```
 1           A P P E A R A N C E S
 2   FOR PLAINTIFF VIA VIDEOCONFERENCE:
 3       TYLER S. WEAVER
         GABRIEL REILLY-BATES
 4       Calfo Eakes LLP
         1301 Second Avenue
 5       Suite 2800
         Seattle, WA 98101-3808
 6       206.407.2237
         tylerw@calfoeakes.com
 7       gaber@calfoeakes.com
 8
 9   FOR DEFENDANT VIA VIDEOCONFERENCE:
10       SHANE P. CRAMER
         Harrigan Leyh Farmer & Thomsen LLP
11       999 Third Avenue
         Suite 4400
12       Seattle, WA 98104
         206.623.1700
13       shanec@harriganleyh.com
14   ALSO PRESENT VIA VIDEOCONFERENCE:
         TYLER TODISH, videographer
15       Buell Realtime Reporting, LLC
16                * * * * *
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        EXHIBIT INDEX (Continuing)
 2   EXHIBITS FOR IDENTIFICATION        PAGE
 3   Exhibit 16 Email; SEA_00093087-090      140
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 13

1    you understand that we're talking about the time period
2    of June 9, 2020, to July 1, 2020?
3        A.  I am.
4        Q.  Okay.  And we're talking about the delivery of
5    city services within the area described in the first
6    paragraph on Page 3 of Exhibit 2.  Is that correct?
7        A.  Yes.  I -- we are talking about that -- the
8    area that's bounded by those parameters.
9        Q.  Okay.
10       A.  And so -- yeah, I was talking about the
11   modified delivery of city services --
12       Q.  Sure.
13       A.  -- and that generally it entailed a
14   modification of the time at which things would be
15   completed.
16       Q.  So how about electricity services or
17   electricity repairs?  Do you recall whether there were
18   any modifications to those services within that area
19   during that time period?
20       A.  You know, I -- I facilitated the entry of all
21   of the other utilities into the area.  I do not recall
22   that there were any notable changes to electrical
23   services, although we did -- I did facilitate City
24   Light's and -- and also -- well, I -- City Light's entry
25   into the area for --

Page 14

1            (Simultaneous cross-talk.)
2    BY MR. WEAVER:
3        Q.  -- about any issues with meter readers going
4    into the area during that time period?
5            THE COURT REPORTER:  I'm sorry.  You were
6    speaking at the same time.  She was still speaking --
7            MR. WEAVER:  All right.
8            THE COURT REPORTER:  -- and so the beginning
9    of your question didn't come through.  Can you please
10   just repeat?
11           MR. WEAVER:  Yeah.
12   BY MR. WEAVER:
13       Q.  So how about any issues with meter readers
14   during that same time period in that area?
15       A.  There may have been -- yeah, actually, I do --
16   I do remember that there were -- there was a time or two
17   that I asked for the meter readers to hold off because
18   of other departments' activities in the area.
19       Q.  Um --
20       A.  But I do want to add, though, that they did
21   manage to, you know, read the meters, you know, at some
22   other point.
23       Q.  Do you recall that, whether there was access to
24   the area for various city services, varied from day to
25   day?

Page 15

1        A.  Could you repeat your question, please?
2        Q.  Do you recall the access and the delivery of
3    city services, such as trash, recycling, and other
4    services, varied from day to day depending on the
5    conditions in the area?
6        A.  Is your question whether the schedule for
7    modifying the pickup times was irregular, or that it --
8    you know, on a daily basis, or can you -- can you refine
9    your question a little bit so I understand what you're
10   asking?
11       Q.  Do you recall making assessments on a daily
12   basis whether it was safe for SPU employees to go into
13   the area?
14       A.  My responsibility during that time was to go in
15   every morning and, you know -- and to do an assessment
16   to make sure that the roadways were open and -- you
17   know, and -- and that, you know, everything was in -- in
18   good condition for the city vehicles to enter, and I --
19   yes.  Yes, I did an assessment every morning.
20       Q.  And were there some days where you determined,
21   based on your assessment, that it was not safe for city
22   vehicles to enter the area?
23       A.  If I remember properly, there may have been
24   a -- a rare occasion that I made that assessment, but it
25   was largely, if I remember correctly, based on the kind

Page 16

1    of -- the activities that were going on from a number of
2    different parties, yeah.
3        Q.  What sort of activities would have led to a
4    determination that people should not go into the area?
5        A.  When I would sometimes know that there were
6    different city services -- other city activities going
7    on that might raise some -- you know, elevate
8    temperatures, you know, I might say let's hold off and
9    pick up a little bit later, or tomorrow.
10       Q.  What sort of activities would have raised
11   temperature?
12       A.  For example, if the city were, you know, intent
13   on cleaning up the park or moving barriers, those kinds
14   of things might have -- might have raised the
15   temperature.
16       Q.  Why would those things have raised the
17   temperature?
18       A.  From my perspective, and this is just my
19   assessment, people don't like change.  And so it was
20   just, you know, me being extra cautious to make sure
21   that -- you know, and -- that -- that, you know, that
22   we -- that our services were not in any way complicating
23   any discussions that might be going on.
24       Q.  Were you concerned that there might be pushback
25   or even violence from -- by the people in the area if

4 (Pages 13 to 16)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 17

1  you came in and did certain services on certain days?
2      MR. CRAMER:  Objection.  Form.
3      A.  My concern really was not around violence, per
4  se, against our city -- against, you know, our -- our
5  workers.  Our workers, you know, were -- their services
6  were accepted and, you know, they didn't have any
7  issues.  I just -- from -- from my perspective, it was
8  just better for us not to be, you know, in the middle
9  of, you know, whatever discussions or coordination may
10  be going on on the part of others.  You know, it's kind
11  of disruptive to have a trash truck rolling through, you
12  know, a meeting, you know.  It was just really not -- I
13  do not recall being concerned about -- about violence.
14  BY MR. WEAVER:
15      Q.  So you're saying that the primary concern in
16  not sending the garbage trucks through the area on
17  certain days or times was because you were worried about
18  upsetting certain discussions in the protest area?
19      A.  Just -- the -- there were a lot of people there
20  at some points in the protest area, not just protesters.
21  There were tourists, there were city officials, there
22  were a lot of different people, and there were -- and --
23  and during times of change it felt -- you know, it felt
24  just really wise to not be part of the mix.
25          (Exhibit No. 3 marked.)

Page 18

1  BY MR. WEAVER:
2      Q.  Okay.  I would like to put another something in
3  the chat here.  And this will be Exhibit 3.
4      A.  I don't see anything yet.
5      Q.  It's coming.  It should be there in just a
6  second.  Do you have it?
7      A.  I have it open.
8      Q.  All right.  So this is a series of emails from
9  Hans Van Dusen.
10          Do you see that?
11      A.  (Witness nods head.)
12      Q.  Who is Hans Van Dusen?
13      A.  Hans Van Dusen is our contract manager for our
14  solid waste services.
15      Q.  Okay.  And what was -- what was his role in
16  sending out updates like the ones we see here in this --
17  in this email chain?
18      A.  So Seattle Public Utilities began sending these
19  kinds of updates internally well before the period that
20  we're discussing.  We started doing this during the --
21  the -- the city protests in order to keep tabs of all of
22  our responsibilities and our actions during the period
23  of protest.  So this is -- this -- this -- this format
24  is a continuation of the one that -- that Hans started
25  to coordinate.

Page 19

1      Q.  Okay.  So you're talking -- you started -- I
2  just want to get clear.  So you're saying you started
3  doing this in late May and earlier in June?
4      A.  I don't know the date that Hans started doing
5  this.
6      Q.  Okay.
7      A.  But Seattle Public Utilities was asked to
8  (audio distortion) pre and post protest activities.
9          THE COURT REPORTER:  I think you broke up
10  there.  So I just have, "But Seattle Public Utilities
11  was asked to pre and post activities."  There's a word
12  missing, I think.
13          THE WITNESS:  Sorry.  I apologize.  What's
14  the --
15          THE COURT REPORTER:  It's not your fault.  I
16  think there's a word missing.  There was a word that
17  was --
18      A.  Oh, we were asked to -- we were asked to
19  conduct a lot of pre and post protest activities, you
20  know, cleanup mostly.
21  BY MR. WEAVER:
22      Q.  Who asked you to do -- who asked Seattle Public
23  Utilities to do that?
24      A.  When the city started to experience a lot of
25  protests, the mayor's office and the Emergency

Page 20

1  Operations Center coordinated discussions to make sure
2  that we were -- you know, that everybody was -- was, you
3  know, pulling together to -- to make sure that the city
4  stayed as safe and clean as possible.
5      Q.  Okay.  This email chain is titled, "SPU Support
6  for 'March for Justice' Events."
7          Do you see that?
8      A.  Yes.
9      Q.  Was SPU's role during this time period in
10  June of 2020 to support the March for Justice events?
11          MR. CRAMER:  Objection.  Form.
12      A.  Our responsibility around the different
13  protests were if you -- if I may, just to do things like
14  make sure that we removed any projectiles or any kinds
15  of, you know, things that might be problematic in the
16  right-of-way, to empty dumpsters and litter cans, and,
17  you know, and be -- prior to protest, and then
18  afterwards to clean up the litter.
19  BY MR. WEAVER:
20      Q.  Did you view your role as chief of Seattle
21  Public Utilities as supporting the protests?
22          MR. CRAMER:  Objection.  Form.
23      A.  Our -- my job at Seattle Public Utilities is to
24  ensure public health and -- you know, and whatever
25  aspects of public health contribute to public safety

5 (Pages 17 to 20)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 21

```
 1   as -- as well as I possibly can.
 2   BY MR. WEAVER:
 3       Q.  So were you doing that in support of the
 4   protests?
 5       A.  My -- I -- our work is conducted in support of
 6   our -- of our city, our customers, our rate payers, and
 7   our community.  And so all of our activities are in
 8   order to keep -- to uphold public health, not nec- --
 9   not -- not necessarily to support, you know, protests,
10   per se, but to -- if those things happen, for us to make
11   sure that they are conduct -- that we do our part to
12   make sure they are safe and that public health is
13   upheld.
14       Q.  If you could scroll down on -- on this email,
15   the fourth page, there is an email from Mr. Van Dusen on
16   June 9th at 7:38 a.m.?
17       A.  Okay.  All right.
18       Q.  And if you scroll down, again, to the top of
19   the next page where it says "Flammable and Container
20   Reduction."
21          Do you see that?
22       A.  Uh-huh.  What do you want me to read on this,
23   please?
24       Q.  The first paragraph on the fifth page, which is
25   Flammable and Container Reduction, that paragraph.  Do
```

Page 22

```
 1   you -- I just want to make sure you see it.
 2       A.  (Witness nods head.)
 3       Q.  Okay.  By the way, so you know, the court
 4   reporter can't pick up head nods, so it's -- if you say
 5   "yes" it will actually show up on the record, but I'm
 6   just letting you know.
 7       A.  Yes, I have -- I have read the first paragraph.
 8       Q.  Okay.  All right.
 9          So this indicates that most business dumpsters
10   from the block around the east precinct were removed at
11   the request of the Seattle Police Department.
12          Do you recall that they were removed on the 8th
13   or 9th?
14       A.  I -- if they -- I -- I'm sure they were.  I do
15   not recall the specific date that we removed them
16   because they were -- we -- Seattle Public Utilities
17   removed many dumpsters and returned many dumpsters at
18   different periods depending on, you know, the need to
19   reduce the potential for -- for -- for fires in
20   dumpsters.
21       Q.  Okay.  Why was there a concern about fires in
22   dumpsters at that time period?
23       A.  Whenever there are protests in this city and
24   other cities, it is a -- you know, there's always the
25   potential for -- for fires in dumpsters to occur.  So it
```

Page 23

```
 1   is, you know, common practice for Seattle Public
 2   Utilities in case of any kind of, you know, large
 3   protest to -- to manage dumpsters and to be thoughtful
 4   about, you know, how to manage them.
 5       Q.  Okay.  So would you say it was constant during
 6   the period of June 8th to July 1, 2020, in the area
 7   we've been talking about, that dumpsters not be left
 8   unmanaged for fear that they might be set on fire?
 9          MR. CRAMER:  Objection.  Form.  Misstates.
10       A.  The -- it was -- you know, the -- it is
11   possible that there could have been fires, and so it
12   was, you know -- it was our responsibility to ensure
13   public health as much as we could if there were
14   unmanaged dumpsters for lots of reasons; right?  And so,
15   you know, we were just very carefully monitoring the
16   trash and litter and dumpster situation throughout that
17   area and -- and other protest areas in the city.
18   BY MR. WEAVER:
19       Q.  Sure.  And the -- but in this area you were
20   concerned about fires over a period of three and a half
21   weeks or so; is that right?
22          MR. CRAMER:  Objection.
23       A.  If I could clarify, it is really -- this --
24   it's really for any kind of protest, if there are going
25   to be any kind of known large ac- -- protest activities
```

Page 24

```
 1   or gatherings, Seattle Public Utilities in all parts of
 2   the city, including this one, you know, does manage to
 3   make sure that there's no risk of -- of -- of, you know,
 4   garbage -- too much garbage or -- and also -- also
 5   fires.
 6   BY MR. WEAVER:
 7       Q.  Okay.  Well, specifically in this area, from
 8   June 8th through July 1, 2020, was the city concerned
 9   about dumpster fires?
10       A.  We -- we were concerned at points that there
11   might be the potential for dumpster fires, yes.
12       Q.  Okay.  And -- and as a result you moved and
13   then sometimes moved back and then sometimes maybe moved
14   again certain people's dumpsters in the area?
15       A.  We -- we did have some customers who had some
16   trouble just making sure that their dumpsters were taken
17   inside or properly locked and managed, so, you know, we
18   would work with them for -- with alter- -- for
19   alternative approaches, yes.
20       Q.  Okay.  Were there some people in the area, some
21   customers, who didn't have dumpsters at all during this
22   time period of June 8th to July 1st?
23       A.  I would have to go over the record to know if
24   there were any that didn't have any at all, but we had
25   provision -- we provided for there to be large dumpsters
```

6  (Pages 21 to 24)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 25

```
 1   available for anyone all along -- along the perimeter of
 2   the area just in case folks didn't have, you know,
 3   access to their own dumpster at any given point.  And
 4   so -- and so we managed those on a daily basis and made
 5   them well -- well known to folks, and would -- would
 6   sometimes help them to, you know, move those things,
 7   move -- move their -- move their trash or to just pick
 8   it up in, you know, pickup bags instead.  Definitely we
 9   picked -- we had -- we had a lot -- a lot of bag
10   collection in the -- in the zone.
11        Q.  Okay.  Okay.  If you could go up to
12   Mr. Van Dusen's -- the top, the first page.  His update
13   on June 12th at 3:00 p.m.?
14        A.  Okay.  I'm there.
15        Q.  Okay.  Great.  With regard to what he says
16   about customer waste services, he indicates that -- SPU
17   calling and visiting with businesses and residential
18   customers within the -- and near the zone to clarify any
19   service changes.
20        Do you recall what that would have been, or do
21   you know?
22        A.  So what is your question?
23        Q.  What exactly the -- was going on with service
24   changes that were requiring calls and visits to
25   customers in the area.
```

Page 26

```
 1        A.  On June 12th specifically?
 2        Q.  On June -- let's start with June 12th, if you
 3   remember June -- if you know anything about June 12th
 4   specifically.
 5        A.  So June 12th specifically, I don't know
 6   exactly, you know, what the -- you know, I would have to
 7   look at the record to see which dumpsters we had taken
 8   and which ones we were returning, but when I -- when I
 9   read this, you know, what I -- what I remember, you
10   know, from that time is that we were always aiming to
11   make sure that if a con- -- if a customer could safely
12   store their containers, then we would, you know,
13   absolutely return them and have designated times for
14   pickup.
15        If they did not have containers that they could
16   safely store, we were working with them and calling them
17   to provide for alternative approaches that would -- you
18   know, such as bagging their garbage, and then we would
19   have a regular pickup for -- for all of -- all of those
20   bags.
21        Q.  Where would the bags be picked up?
22        A.  For some of them, from in front of their
23   properties and, you know, some preferred, you know, a
24   designated away -- area away from their properties, I
25   believe.  And we also -- I do also, you know, remember
```

Page 27

```
 1   that some of them, you know, actually really appreciated
 2   and used the large dumpsters that were on the perimeter
 3   of the -- of the area.
 4        Q.  Okay.  So if you could go under the same email,
 5   same page, under "Public waste services," Mr. Van Dusen
 6   indicates that, "much of public degree -- debris
 7   collected from -- from -- I think he -- he says "form,"
 8   but I think he means "'from' bagged consolation [sic] at
 9   12th and Pine."
10        So were there piles of bags in certain areas
11   that had been designated where people would just leave
12   their bags of trash for pickup at some point by Seattle
13   Public Utilities?
14        A.  There -- there were probably some designated
15   areas, but we were also -- we regularly picked up the --
16   any bags of trash that were left anywhere so actually --
17   no, now that I recall it, there were -- there were a
18   couple areas that were -- that I remember being
19   designated trash bag collection points, but we also did
20   have a lot of ad hoc litter bags that would be put in
21   different places that -- you know, in piles, and then we
22   would go and pick them up on a daily basis.
23        Q.  Were there some days where you weren't able to
24   go and pick those up because it was determined you
25   should not go in the area at all?
```

Page 28

```
 1        A.  If -- there -- there were a couple days that I
 2   remember that, you know, I -- I had to call it off, but
 3   it -- but I do remember that on the whole, that we were
 4   able to keep things very clean because I was there and
 5   would sometimes move the bags to the large dumpsters, or
 6   other people from Seattle Public Utilities would be
 7   there, and so I do not remember a large accumulation
 8   of -- of litter or trash bags.
 9        Q.  But you do recall that there were some days
10   where you couldn't go in and get the trash at all; is
11   that correct?
12        A.  That we would just leave it there for a -- a
13   day?  I -- I'm trying to remember an accumulation where
14   we would leave it for a whole day, and I don't -- I
15   don't recall -- I don't recall that, but if we -- that
16   we wouldn't do anything.  But, you know, it -- it's
17   possible that there might have been, but, you know, we
18   made -- we did our level best to make sure that all
19   litter and garbage was picked up that was, you know, in
20   bags on the -- you know, in the right-of-way.
21        Q.  Okay.  Going back up to the customer waste
22   services and the last section in that paragraph --
23        A.  Could you go -- tell me what page you want me
24   to go to?
25        Q.  The same -- the same page that we've been on,
```

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 29

1 the first page.  It's just the paragraph on June 12th
2 that indicates Customer Waste Services.
3       A.  Okay.
4       Q.  And the last sentence of that.  I'm
5 specifically going to ask about the last sentence of
6 that paragraph.  This seems to indicate that there were
7 still customers without their own waste containers in
8 the area.  Is -- was that -- was that accurate, that as
9 of June 12th, there were not -- there were some people
10 who didn't -- still didn't have their garbage cans or
11 dumpsters?
12      A.  I believe that there were some customers
13 that -- whose -- whose containers had been taken, but,
14 you know, we coordinated with them so that their trash
15 would be removed even if their containers were not
16 there.
17      Q.  And part of what -- part of your coordination
18 of that was to provide large shared dumpsters at a
19 couple intersections in the area; is that right?
20      A.  The large dumpsters were a part of an overall
21 strategy to ensure that no debris or, you know, garbage
22 would collect in that area.
23      Q.  So am I understanding you to -- your testimony
24 to be that large amounts of garbage did not accumulate
25 in the area during the period of June 8th to July 1,

Page 30

1 2020?
2       A.  Overnight near the park, because there were
3 several houseless people, or many houseless people in
4 the park, you know, there would be a large pile of
5 garbage at times, you know, in -- near the dumpsters,
6 you know, because there was more than the dumpster -- --
7 but we said we up -- we had to upsize the dumpster
8 there.  And that is my -- I believe that's -- that that
9 is the point at which I -- you know, and I think that
10 perhaps that maybe Rio Bravo had so much activity that
11 they might have had some bags next to their dumpsters,
12 but those were always collected.
13      Q.  What do you mean by "upsizing the dumpsters"?
14      A.  The -- at -- down at 12th and -- sorry -- 11th
15 and Olive, I believe that we moved to a larger dumpster
16 at some point that could accommodate the full -- the
17 full need.
18      Q.  For -- and that was for both people who were
19 staying overnight in the area, people who were coming
20 during the day in the area, and then also businesses and
21 residents in the area?  Anybody could use it?
22      A.  Those dumpsters were provided for everyone's
23 use so that no debris or trash would accumulate in the
24 area.
25      Q.  Okay.  Again, is it your testimony that debris

Page 31

1 and trash did not accumulate in the area during the
2 period of June 8th to July 1, 2020?
3       MR. CRAMER:  Object to form.
4       A.  I feel like that question is ambiguous for me.
5 I don't know exactly what you mean.  If you mean, like,
6 did -- was there ever a garbage bag on the street, then
7 garbage bags were put on the street for collection.  And
8 so I don't know if that defines an accumulation.  I'm
9 not sure -- could you -- maybe you could define for me
10 what you mean for, like -- is -- do you mean for like a
11 duration, a period of time?  Like could -- could you
12 be -- could you -- I -- I -- because I know that you --
13 you want me to answer this question.  I really want to
14 help you.
15 BY MR. WEAVER:
16      Q.  Okay.  So there was -- let me ask you this:
17 There was -- on July 1, 2020, do you agree with me the
18 park was closed on July 1, 2020, Cal Anderson Park?
19      A.  What do you mean?  Do you mean like it was
20 closed by the Parks Department?  Is that what you mean?
21      Q.  Closed by the City on July 1, 2020.  Do you --
22 do you agree with that?
23      A.  I would have to look at the notes just to
24 confirm the exact date was July 1st.
25      Q.  Okay.  So let me ask you this:  When -- when

Page 32

1 the park was initially cleared after CHOP had been there
2 and the barricades were removed from the streets, do you
3 recall whether there was any trash in the area that had
4 to be cleaned up?
5       A.  After July 1st?
6       Q.  Once --
7       A.  Or --
8       Q.  -- once the barriers had been cleared from the
9 streets and the people had been moved from the park.
10      A.  If I recall, I received -- I received a -- a
11 complaint from Nagle Place where a -- it's an alley that
12 has a lot of construction, and there were houseless
13 folks in the area, and there were -- just -- there was
14 just a lot of activity on the alley, and so I received a
15 complaint that there had been some trash accumulating,
16 and we addressed it -- I believe we addressed it that --
17 immediately that day.
18      I -- after the park was cleared, you know, it's
19 possible that there were also garbage bags at the
20 entrance to the park for the Parks Department to clear
21 if houseless folks were still in the park.
22      Q.  How about garbage that wasn't in bags or in
23 dumpsters?  Did you ever observe that while you were in
24 the zone between June 8th and July 1, 2020?
25      A.  If I recall correctly, the -- the area was

8 (Pages 29 to 32)

Page 37

1  reconnaissance, you know, I, you know, just had
2  different -- different information to provide to the
3  City.
4      Q.  Okay.  And what was that assessment, do you
5  recall, that you did on that day, and whether it changed
6  from what it -- what Mr. Buechler had sent to people?
7      A.  My -- my assessment, you know, in that early
8  period was that the protesters were very willing to
9  allow city services to flow through the area, that they
10  understood our public health mission, which I, you know,
11  explained to everybody on site and, you know -- not --
12  not individually every single person, but I did -- you
13  know, I did a lot of communication about what our
14  responsibilities were and the need to make sure that
15  trash and garbage and, you know, no other kinds of
16  refuse, you know, were in the area, and, you know, they
17  understood it and, you know -- you know, were -- were --
18  were happy to see us come through.
19      And so -- you know, and I, you know, checked
20  around to see if it looked like it was dangerous and,
21  you know, assessed that if, you know, as long as I can
22  make sure that there was, you know, just eyes on the --
23  on the street and, you know, that I could make sure that
24  the people could go through, that it was -- that --
25  that -- that there was enough for city ser-- it was a

Page 38

1  safe enough area for us to continue to provide services.
2      Q.  Was it the case that sometimes you had to
3  personally stand guard at an entrance to the area so
4  that trucks could come in and out of the zone?
5      MR. CRAMER:  Objection.  Form.
6      A.  I wouldn't use the word "guard," per se.  I
7  think I did have a couple days where there was a little
8  bit of delay -- you know, just con-- I think
9  miscommunication if there was somebody doing dispatch if
10  Chad wasn't there that, you know, I just needed to make
11  sure that it was -- all of the coordination was
12  happening as fluidly as possible, and there might have
13  been a -- you know, a hiccup or two.  But generally, you
14  know, I -- I don't think that "guard" -- I did not -- I
15  did not provide guard services.  I might have to go to,
16  you know, say, someone who had a barrier up and say,
17  hey, just -- you know, you -- that doesn't need to be
18  there during the day.  You have to -- or at all, you
19  know.  Just please -- please remove it.  And people were
20  always very compliant and understood, you know, the need
21  for services to flow.
22  BY MR. WEAVER:
23      Q.  Do you recall times where you were standing at
24  a barrier waiting for trucks so that you could ensure
25  that they could get into the area?

Page 39

1      A.  I do remember standing at barriers just to make
2  sure that all the services were concierged well to come
3  in and out of the area.
4      Q.  Why did you feel it was necessary for you to
5  stand at the barriers to ensure that would happen?
6      A.  It's a very -- that -- you know, when you look
7  at an area like that where there's no, you know, real
8  organization, there are sometimes different people who
9  are in different spots who don't know about our
10  services, who are, you know, maybe new, had just come in
11  and didn't understand our public mission yet and so, you
12  know, sometimes I had to go and talk to them and
13  explain, you know, that, you know, city services needed
14  to continue to flow through, and -- you know, so it was
15  more kind of education relationship building and then
16  also, you know, concierging the entrance in and out so
17  that everybody could see each other and, you know,
18  develop the relationships necessary so that if a -- you
19  know, so that traffic could continue to flow through
20  from our services.
21      Q.  Is that something that you typically do in your
22  job as the head of Seattle Public Utilities?
23      A.  It is -- my job has a lot of different demands,
24  and -- and I have to be flexible and modify what I do
25  based on the demands of any given time.  This has been a

Page 40

1  really stressful time with COVID and, you know, the
2  civil unrest and, you know, all kind -- you know, this
3  has been an extraordinary period.  And so in my role at
4  Seattle Public Utilities, I constantly have to adapt and
5  do what is needed to ensure that our -- that our
6  services continue to all of our -- our customers and our
7  community.
8      Q.  Can you recall another time in your times -- I
9  mean, you've been at the City for about five years now;
10  right?
11      A.  That's correct.
12      Q.  Can you recall another time in your job, your
13  current job, where you spent the better part of three or
14  four weeks conciergeing entry into a certain area for
15  your garbage trucks?
16      A.  I can say without a doubt I have not had to
17  spend that amount of time conciergeing that particular
18  service, but there have been other times when I have
19  been on the ground and, you know, gone to talk to
20  businesses and, you know, tried to coordinate things to
21  make sure that, you know, our community knows that
22  we're -- we're -- that we're there for them and doing
23  whatever we can.
24      Q.  So have you had to concierge entry of garbage
25  trucks in an area at any other time, even if it was once

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 41

1    or twice, during your time as director of Seattle Public
2    Utilities?
3        A.  There -- I'm trying to think.  I can't remember
4    a time right now, but there have been times when I've
5    had to, you know, personally, you know, go into the
6    field and ask crews to -- you know, say there was an
7    event, you know, like a parade or a -- you know, some
8    kind of protest, you know, to -- to, you know, just
9    help -- help our crews and the community, you know, come
10   to an agreement about timing and location, and so, you
11   know, in a way concierging our services, yes, is not --
12   is not -- is not something I have not done before.
13       Q.  Okay.  Have you ever done it for more than one
14   day for any particular event?
15       A.  I don't recall doing that.
16       Q.  Why did you feel it was necessary for you to be
17   on site every day, except for a couple days where you
18   were out of town, from July [sic] 8th to July 1, 2020?
19       A.  Because it -- well, I -- this was a situation
20   that was a very unprecedented situation.  You know, with
21   the period beforehand and the -- you know, all of the
22   civil unrest, all of the -- you know, the protest
23   activities, you know, it just -- it was -- it -- it --
24   it just -- to -- you know, it was very fluid; right?
25   There were a lot of -- there were a lot of things going

Page 42

1    on, and it felt like the right thing to do in order to
2    make sure that, you know, we could have as much
3    continuity as -- as we possibly could and to make sure
4    that the residents and the businesses, everybody who was
5    there, you know, felt as safe and cared for in terms of
6    their, you know, services as possible, in terms of
7    their, you know, utility services as possible.
8        Q.  Were you concerned that if you were not there
9    in a personal role to concierge entry, that there would
10   be conflict between Seattle Public Utility workers and
11   people who were manning the barriers in the area?
12       A.  So, you know, as I said before, in that
13   situation there were sometimes people who were
14   unfamiliar with our services.  I don't know that there
15   would necessarily have been -- that I was worried about,
16   you know -- you know, con- -- you know, any kind of
17   serious conflict, but I -- I do feel that it was, you
18   know -- it was important to try to make sure that
19   everybody was as calm and -- you know, and -- and things
20   went as smoothly as possible, and that, you know, that
21   we -- that our -- that -- that the people hauling waste
22   wouldn't have to, you know, worry at all about, you
23   know, having a conversation or, you know, just that it
24   was -- but I think that at times -- lots of times, you
25   know, I -- I -- I mean, I can't be at every single

Page 43

1    entrance every single time that services did flow, and
2    there were -- there were no conflicts, you know.  So I
3    don't -- it was not -- it was not an overwhelming, you
4    know, worry.  It was just something that I just wanted
5    to make sure that there would not have to -- you know,
6    that everything was smooth.
7        Q.  Okay.
8            MR. CRAMER:  Tyler, some of these --
9            MR. WEAVER:  What's that?
10           MR. CRAMER:  Some of these are verging kind
11   of outside of the 30(b)(6) as to how, you know, how Mami
12   was personally --
13           MR. WEAVER:  I understand that, but some of
14   these questions -- some of these answers, I have to -- I
15   can't just let them sit.  I'm trying to keep it focused
16   on the 30(b)(6) to the extent I can.  I do appreciate
17   that.
18           (Exhibit No. 5 marked.)
19   BY MR. WEAVER:
20       Q.  I have dropped into the chat an Exhibit 5, and
21   again, this is an email chain.
22       A.  I have it open now.
23       Q.  Okay.  I'd like you to scroll down to June 10,
24   2020.  There's an email from Jana Elliott at the bottom
25   of Page 3.

Page 44

1        A.  Bottom of Page 3.  Is it the one where it
2    says -- that goes into Page 4, it says, "Due to
3    continued activity tonight"?
4        Q.  Yes.
5            Who is Jana Elliott, if I'm pronouncing it
6    correctly?
7        A.  If I go to her -- her signature page, I -- I do
8    not believe that I've met Jana.  She is -- she -- she
9    has some overlap in responsibilities with Chad.  She
10   handles emergency management and facil- -- it says that
11   she's the director of Facilities Security Emergency
12   Management at, I believe, City Light.
13       Q.  Okay.  Is Seattle City Light part of Seattle
14   Public Utilities?  Does that come under the umbrella?
15       A.  No, no.  A lot of people make that -- are
16   confused about that, but we are separate departments.
17       Q.  Okay.  All right.  I won't ask you anything
18   else about Exhibit 5 then.
19           But do you know -- but I will ask you
20   generally, are you aware of whether Seattle City Light
21   was having service issues within the area that we've
22   been talking about during the time period?
23       A.  I don't think I can speak to that because that
24   would just be speculation on my part.
25       Q.  Okay.  So you don't know whether there were

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 61

1   right?
2       A. I think there were a couple of occasions when
3   there were -- a stage was erected on the side of the
4   street next to the east precinct, and so I don't know
5   how much the stage was intruding into the -- you know,
6   into the right-of-way -- or into the car way.
7       Q. How did the provision of -- how did the
8   modification of City -- City services to businesses and
9   residents in the area facilitate the exercise of first
10  amendment activity in that area?
11      A. Could you repeat your question?
12      Q. All right. If you can go back to Exhibit 2.
13  And at the top of Page 3 of that exhibit, Page 2 of the
14  order.
15      A. Page 3 of this exhibit?
16      Q. Page 3 of the exhibit, yep.
17      A. All right.
18      Q. This indicates that in the area defined here,
19  the City has reasonably facilitated an ongoing exercise
20  of first amendment rights and demonstrations by, among
21  other things, facilitating modified services delivery to
22  local residents and businesses.
23          Do you see that?
24          MR. CRAMER: So objection. Outside the
25  scope of the 30(b)(6) with respect to testimony

Page 62

1   regarding the ongoing exercise of first amendment
2   rights. That's not in the topics, but she can answer as
3   to her personal understanding.
4       A. So for Seattle Public Utilities, our job is to
5   uphold public health and safety as related to, you know,
6   sanitation and, you know, the provision of our
7   service -- essential services. And so, you know, our
8   work was related to, you know, our core mission, you
9   know, which was to -- to ensure public health.
10  BY MR. WEAVER:
11      Q. So you can't speak to how the modified city
12  services delivery to local residents and businesses
13  facilitated the ongoing exercise of first amendment
14  activity in the area; is that right?
15          MR. CRAMER: Same objection. It's outside
16  the scope of the 30(b)(6) Topic No. 36.
17      A. Again, we -- the reason that Seattle Public
18  Utilities was engaged was in order to uphold public
19  health, to make sure that feces didn't accumulate in the
20  street, that garbage and litter was picked up, that
21  there were no vermin. You know, it was -- you know, it
22  was really our -- you know, that -- that -- that is our
23  task. If -- wherever people are and those risks are
24  there, it -- you know, we aim to try to, you know --
25  to -- to -- to provide the necessary services to

Page 63

1   prevent -- this was during COVID as well, you know,
2   to -- with a large congregation of people from all
3   overcoming in on a daily basis. It -- you know, our
4   responsibility was also to make sure that we could do
5   what we could to stem any kind of, you know, public
6   health outbreak by providing, you know, services.
7   BY MR. WEAVER:
8       Q. Okay. So you can't speak to how
9   facilitating -- how facilitating modified city services
10  delivery reasonably facilitated the ongoing exercise of
11  first amendment activities; correct?
12      A. I -- like I said, I can't --
13          MR. CRAMER: Same objection.
14      A. Yeah, I -- I -- I cannot speak to that because
15  that's -- our -- our -- what drove us was public health
16  management.
17  BY MR. WEAVER:
18      Q. Okay. Another topic that you have been
19  designated for is to talk about the provision of basic
20  hygiene, water, litter, and garbage removal to the CHOP
21  area and to the protesters.
22          You're -- and I think we established you're
23  aware that you've been designated for that; right?
24      A. Yes.
25      Q. What can you tell me about the water that was

Page 64

1   provided to protesters and people living in the area
2   during the period of June 8, 2020, to July 1, 2020?
3       A. We had a few hand washing stations that had
4   water tanks that needed to be refilled to allow for hand
5   washing, you know, with soap and water. And we --
6   also -- I don't know that we provided it, but, you know,
7   the water was on -- largely on at the park, you know,
8   and so, you know, they were using our system in order to
9   have the water on at the shelter house for the park.
10      Q. Okay. So what water in the park? Was -- was
11  there a hose, was there a faucet? What sort of water
12  source was being provided in Cal Anderson Park?
13      A. In Cal Anderson there was a -- a -- a hand
14  washing station, a durable hand washing station with a
15  50-gallon tank, and that was just for hand washing, and
16  then I believe that just -- because it's there, there's
17  a hose bib at the shelter house that was -- that's
18  normally used for maintaining the grounds, yeah.
19      Q. Okay. Were you aware during your trips to the
20  area that the hose was being used for use by a garden
21  that had been dug into the Cal Anderson Park at that
22  time?
23      A. From -- to -- to -- when the garden was
24  developed in the park, I believe -- you know, that -- I
25  believe that the only access to water that they had was

16 (Pages 61 to 64)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 65

1   the hose bib that was attached to the shelter house.
2        Q.  Do you know whether the water from that hose
3   bib was being used as drinking water or some other water
4   source by people who were occupying the park?
5        A.  No, I'm not -- I'm not aware.
6        Q.  Do you recall at some point that Seattle Public
7   Utilities shut that water source off in the park?
8        A.  There was one instance where we were asked to
9   shut off the water and -- and then restore it shortly
10  thereafter.
11       Q.  Okay.  Do you know why it was restored shortly
12  thereafter?
13       A.  The -- the -- I mean, it's just -- it's a -- to
14  have water when you're -- when you have that many people
15  or, you know -- I'm going to assume that it was just
16  because we needed to ensure that there was -- you know,
17  that there was a supply of -- of fresh drinking water if
18  needed.
19       Q.  There was a concern with -- with the number of
20  people that were in the park, that they wouldn't have
21  drinking water if that water was shut off; correct?
22       A.  You know, just water, you know, for any kind
23  of -- you know, whenever there's a congregation of
24  people is a pretty basic provision.  There was a lot of
25  drinking water because of donations.  There were a lot

Page 66

1   of plas- -- there were an insane amount of plastic
2   drinking water bottles, you know, always there from
3   community donations, from residents and businesses,
4   but -- but, you know, we always feel that it's important
5   when there is -- when there are people, that there
6   should be access to water.
7        Q.  Why was the water shut off during that one time
8   period you discussed in this time period?
9        A.  If -- if I remember correctly, mayor's office
10  wanted to make sure that -- you know, that there was --
11  that -- that there were -- that the -- I'm trying to
12  remember exactly what their rationale was.  It might
13  have -- if I'm -- I'm trying to remember the date and
14  the time.  Is there an indication of -- in this email of
15  when that was?  Because they may have been trying to
16  initially start to clear the park and, you know, that
17  that would be part of, you know, that work.
18       Q.  I believe from what I've seen -- I'm not sure I
19  have an exhibit here today about it, but I believe what
20  I have seen is the water was shut off somewhere around
21  June 22nd.
22           Was it your understanding that one of the
23  purposes to shut off the water was so that people would
24  leave the area?
25       A.  I don't know exactly what the thought process

Page 67

1   was, but it seem- -- but if I remember correctly, it was
2   potentially part of a whole set of actions designed to
3   help to clear the park.
4        Q.  Okay.  What do you know about any electricity
5   services that were provided to the area and specifically
6   to Cal Anderson Park that were not normally provided to
7   the area during that time period?
8        A.  There were a lot of requests for additional
9   electrical service to the park.  You know, people wanted
10  to charge their phones and things.  But it was not --
11  but that was not, to my knowledge, in any way, you know,
12  provided.  At additional -- no -- I do not believe that
13  any additional electrical service was provided.
14       Q.  How about additional lighting in Cal Anderson
15  Park during hours that there would not normally be
16  lighting?  Are you aware of anything to that effect?
17       A.  I believe that for safety reasons some of --
18  sometimes the field lights were left on for longer than
19  they would normally be on -- be left on, but those were,
20  you know, kind of existing lights and just management of
21  the hours that those lights were on.
22       Q.  Why -- why was that seen as necessary for
23  safety purposes?
24       A.  It was -- if I remember correctly, it was the
25  request of, you know, folks just feeling like it would

Page 68

1   be -- it would -- it would feel safer to have the lights
2   on for longer.
3        Q.  Okay.  Who were the people that requested it?
4        A.  I don't know who was requesting it.  I
5   apologize.
6        Q.  Okay.  You didn't get any of those requests
7   yourself, personally?
8        A.  I may have, but I don't remember those -- I
9   mean, I had a lot of requests all the time for all kinds
10  of things.
11       Q.  So you don't know whether it was the people who
12  were in the park overnight who were requesting that the
13  lights be on all night, or longer than usual?
14       A.  I don't remember who asked me or who asked the
15  parks, you know, to manage their light -- that -- the
16  hours of the lights, but it's possible that, you know,
17  people in the park asked, or -- or residents, you know.
18  I'm not sure.
19       Q.  But there -- never mind.  I'll let it go.
20           So what sort of -- did the City provide
21  portable toilets to the area that are not normally there
22  during the period of June -- June 9th to June 30,
23  2020 -- or sorry, June -- June 9th to July 1, 2020?
24       A.  The -- the context for what's normally there is
25  a little -- was a little different at that time because

17 (Pages 65 to 68)

Page 69

1  there had been a lot of protests.  There were two things
2  that were going on that kind of changed the normal
3  context for that area and the provision of -- of -- of
4  porta potties, is that there had been a lot of protests
5  there and a lot of people -- you know, just hundreds, if
6  not thousands of people in that area nightly for
7  protests, and then also, I believe that the bathroom at
8  the shelter house in Cal Anderson had been broken.
9        And so there had been some porta potties down
10  near 11th and Olive already, and then we -- and then the
11  City also had some up near -- like between 12th and 11th
12  and Pine already.  And so even before the period that
13  you indicated there were -- there -- there had been
14  porta potties resident in the area.
15        And then with the number of people constantly
16  flowing through the area, we provided additional
17  porta potties to make sure that there wouldn't be a
18  public health, you know, outbreak, or any -- you know,
19  or -- you know, or an exacerbation of the pandemic.
20    **Q.  Do you recall how many porta potties were in
21  the area that we've been talking about?**
22    A.  That first --
23        MR. CRAMER:  Objection to form.
24    A.  I don't remember exactly how many were in that
25  area, but we have service records that can tell you how

Page 70

1  many there were before and then during that week.
2        (Exhibit No. 10 marked.)
3  BY MR. WEAVER:
4    **Q.  I'm going to drop Exhibit 10 in.  It should be
5  on its way.**
6    A.  Okay.  I have it open now.
7    **Q.  Okay.  This is an email with an attachment,
8  again from Mr. Van Dusen, and if you could go to the --
9  the second page.  You may need to rotate it, but maybe
10  you're better at reading sideways than I am.**
11    A.  I see what you're saying.  This is from
12  June 14th.  Okay.  I'm looking at the map now.
13    **Q.  Okay.  So this seems to indicate on the left
14  that there were a total of 21 City Sani-Cans at this
15  point.**
16        **Do you see that?**
17    A.  It says that there are nine, plus eight, plus
18  four around the perimeter of the -- of the site.
19    **Q.  Okay.  So that adds up to 21; right?**
20    A.  (Witness nods head.)
21    **Q.  Okay.  And they were -- were these owned by the
22  City of Seattle or were they contracted out to a third
23  party to provide these services?**
24    A.  I believe that the majority of them were -- are
25  owned and managed via contract by Honey Bucket.

Page 71

1    **Q.  And it looks like they were -- if I'm reading
2  this correctly, they were -- they were daily pumped --
3  they were pumped out daily during this period in
4  June 2020; is that right?**
5    A.  They were pumped out at least daily in
6  June 2020.  I think we may have had some modification
7  based on demand.
8    **Q.  And -- and sometimes -- I think we've seen that
9  sometimes there were days where they were told not to go
10  in as well; is that right?**
11    A.  Those were rare days, yes, but maybe near the
12  end, but we, you know, freq- -- we -- we worked very
13  hard to make sure that they didn't overflow.
14    **Q.  Okay.  How was it determined that there should
15  be 21 Sani-Cans in this general area?**
16    A.  You know, we monitored them, and if -- and I
17  mean, this is a little gross, but if they were, you
18  know, at capacity and we were nearing any kind of, you
19  know, real issue with capacity -- if they were -- I
20  mean, I cannot describe to you how many tourists there
21  were.  That, you know, we would -- we would sometimes
22  add some, you know, to accommodate, you know, the -- the
23  additional crowds.  But we also would remove them if
24  they -- you know, if they were -- if they were no longer
25  needed.  So it was really based on monitoring.

Page 72

1    **Q.  Okay.  Do you -- do you know whether you
2  added -- as of, you know -- this appears to be as of
3  June 12th, or June 14th.  The attachment says June 12th,
4  but I think the email -- the cover email is June 14th.
5        Do you know whether between this period and
6  July 1st there were more Sani-Cans added or whether some
7  were removed prior to July 1st?**
8    A.  Yeah, I -- I'm -- I apologize.  I don't
9  remember the dates for, you know, the addition or
10  removal of the different cans, but I -- all I remember
11  is that we were just monitoring them to make sure that
12  we tried to have the right balance in order to ensure
13  public safety, or public health, I mean.
14    **Q.  Okay.  Was there ever -- was there ever any
15  discussion or concern that by adding these additional
16  Sani-Cans, and having 21 Sani-Cans in the area would
17  encourage people to continue to occupy the area?**
18    A.  If I -- after I answer this -- after I answer
19  this question will we take a restroom break, please?
20    **Q.  Sure.  Absolutely.**
21    A.  All this potty talk.
22    **Q.  All the talking about Sani-Cans, huh?**
23    A.  So you know, if I remember correctly, yes, some
24  people -- a few people had that hyp- -- or not even that
25  many.  A couple people had that hypothesis and posed it

Page 73

1  to -- to me.  You know, I think it was businesses that
2  asked that question.
3      But, you know, our determination was really
4  based on, you know, demand; right?  I mean, our job is
5  to ensure that there -- is -- that urine and feces are
6  not in the street, particularly during COVID, you know,
7  when -- you know, when people knew that human waste
8  was -- is a vector of the disease, you know, along with
9  all of the other, you know, horrible typical things that
10  come with that happening, you know, that -- that is what
11  predicated, you know, how we managed the number.
12      MR. WEAVER:  Okay.  Let's go ahead and take
13  a break.  Let's take what, 15 minutes?  Is that
14  sufficient for people?
15      THE WITNESS:  Yes, that's --
16      MR. WEAVER:  Let's go off the record.
17      THE VIDEOGRAPHER:  Going off the record.
18  The time now is approximately 10:49 a.m.
19      (Recess from 10:49 a.m. to 11:06 a.m.)
20      THE VIDEOGRAPHER:  Going back on the record.
21  The time now is approximately 11:07 a.m.
22      E X A M I N A T I O N  (Continuing)
23  BY MR. WEAVER:
24  Q.  So I understand you have something to add to
25  what you previously said about the provision of water;

Page 74

1  is that correct?
2  A.  Yes.  I remembered that at a certain point a
3  kind of like food service developed near the shelter
4  house.  It wasn't there, you know, through -- like all
5  through the period, and they relied on the water most
6  likely from the hose bib in order to wash their hands,
7  you know, and wash -- and wash dishes.  So that would be
8  a -- you know, a use for the water that was -- that was
9  flowing through -- you know, through the Parks property
10  from our system.
11  Q.  Okay.  Any other uses that I haven't -- I
12  haven't heard about yet that you know of?
13  A.  I apologize.  I don't remember everything.  I
14  remember the food service and the garden that were, you
15  know, coming through there, but also, you know,
16  people -- people may have also been using it to wash
17  their hands, you know, if they didn't want to go all the
18  way over to the sinks that we provided.
19  Q.  Okay.  And they may have been using it as
20  drinking water too; is that correct?
21  A.  It's -- it's possible.  It's possible.  I don't
22  remember seeing people doing that, but I -- you know,
23  it's very possible.
24  Q.  Okay.  Going back to Exhibit 10 and the map we
25  were looking at, do you have it in front of you?

Page 75

1  A.  I do now.
2  Q.  So this indicates there were -- at least of
3  June 12, 2020, 21 Sani-Cans in the area; correct?
4  A.  Yes.
5  Q.  Are those -- are those Sani-Cans normally in
6  the area?
7  A.  So for context, there were -- I don't know how
8  many cans there were already in the area prior to the
9  time period you're discussing, but there were several
10  cans in this area.  I believe there were -- I don't know
11  the exact number, but I believe there were a minimum of
12  six up at -- near 12th and Pine, and that there were a
13  few down at 11th and Olive, as well, you know, and
14  possibly at -- at 11th and Union because of the protests
15  and all of the crowds that had been congregating in
16  Capitol Hill for the entire period of civil unrest that
17  was before this period.
18  Q.  Okay.  So generally the period of late May to
19  June 8th, there were some Sani-Cans in the general
20  vicinity that were provided by the City; is that
21  correct?
22  A.  Yeah, I don't -- I don't remember what date
23  they started to be provided, but they'd -- before --
24  yes, before -- during the period of unrest provoked by,
25  you know, George Floyd's murder, there were -- there

Page 76

1  were San- -- there were cans provided to accommodate all
2  of the crowds in that zone.
3  Q.  Okay.  Were there cans provided in that area
4  prior to the George Floyd protests in May of 2020?
5  A.  Don't know.  But they -- I believe the ones in
6  the park were, or the ones adjacent to the park were
7  provided because the shelter house bathroom facilities
8  were broken.  So there were cans there.
9  Q.  Okay.  Other than that, do you know of any cans
10  that were provided and paid for by the City in the area
11  prior to the George Floyd protests?
12      MR. CRAMER:  Objection.  Outside the scope.
13  Go ahead.
14  A.  I don't know.
15  BY MR. WEAVER:
16  Q.  Okay.  Do you know whether these cans remained
17  in place after July 1, 2020?
18      MR. CRAMER:  Objection.  Form as to vague,
19  "these cans."
20  A.  Do you mean the -- the 21 that are on the map?
21  BY MR. WEAVER:
22  Q.  The 21 on this map, yes.
23  A.  I know that a lot of them were removed, but I
24  don't know if all of them were removed because, you
25  know, of the park need, you know, the -- the demand at

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 77

1   the park.
2       Q.  Okay.  I'll get to that later.
3           Do you know whether there was any food provided
4   to -- by the City or by contractors on behalf of the
5   City to people in the area during the period we've been
6   talking about?
7       A.  I do not know of any food provided at any scale
8   by the City to protesters.  I mean, somebody may have
9   passed somebody a candy bar, you know -- you know, but I
10  don't think that -- I do not remember any kind of, you
11  know, food being supplied.
12      Q.  I'd like to ask you about the social services
13  outreach that you've been designated to talk about.
14          What can you tell me about the social services
15  outreach that was provided to people in the area during
16  the time we've been talking about?
17      A.  During the -- during that period there were a
18  lot of houseless folks who were living in the park, and
19  so a -- a good deal of the outreach that was provided
20  was to try to get them into other types of housing, you
21  know, and services so that they would have a more
22  viable, you know, way, you know, of living other than
23  being in the park.
24      Q.  Okay.  Do you know when those services started
25  being provided?

Page 78

1       A.  I don't know the date.
2       Q.  Okay.  Was it -- do you know whether it was at
3   the beginning or the end of the CHOP era, so to speak?
4       A.  I don't know whether it was at the -- near the
5   middle, you know, or closer to the end.  I don't -- I
6   think, you know, at the very, very beginning, I don't
7   believe that there were significant social services
8   being provided, but, you know, the effort to move people
9   into, you know, more -- more viable forms of -- of -- of
10  housing were -- were -- you know, I think started to be
11  offered, you know, in an effort to also, you know,
12  make -- you know, to help them get out of the park.
13      Q.  Who offered -- who was specifically involved in
14  offering those services and talking to people about
15  those services?
16      A.  It was a team effort that was coordinated by
17  the Human Services Department.  They had outreach folks
18  there, both inside and outside the park.  They had a
19  table that people could go to right outside the
20  perimeter, and then they had a couple people who would
21  walk the park, and then they also had REACH, which is a
22  service provider of theirs, going into the park -- into
23  the park, and -- and I also helped -- Idris and I also
24  helped to try to connect people to housing and services,
25  and -- at least to HS -- to connect them to HSD.

Page 79

1       Q.  Who -- do you know who first said that we --
2   who first directed that there should be a focus on
3   social services to people in the area?
4       A.  I -- I -- I don't know how it was phrased or --
5   you know, or what the approach was or who -- who made
6   the determination.
7       Q.  Do you know whether it was pursuant to a
8   directive from the mayor's office?
9       A.  I apologize.  I don't know where the direction
10  came from, but certainly the mayor's office was aware
11  that there -- and, you know, supportive of the idea of
12  trying to help folks who were in the park move on from
13  the park and get into other forms of housing.
14          (Exhibit No. 11 marked.)
15  BY MR. WEAVER:
16      Q.  Okay.  I'm going to drop another exhibit in
17  here.  Exhibit 11 should be there.
18      A.  And this is just one page.
19      Q.  Do you know who Kevin -- do you know who Kevin
20  Mundt is?
21      A.  I'm sorry, I don't know who Kevin is.  I do
22  know the folks -- the other folks on this email chain.
23      Q.  Okay.  Who are the other people on this email
24  chain?
25      A.  Jason Johnson used to be the City's director of

Page 80

1   the Human Services Department.
2           Will Lemke is a communications specialist who
3   at that point, I believe that he -- I -- I can't -- he
4   used to work for the mayor's office at one point, and I
5   don't know when he transitioned to another department, I
6   believe it was Human Services.
7           Tara Beck was in charge of, you know, several,
8   I think, aspects of homelessness services in the Human
9   Services Department.
10          Casey Sixkiller was the deputy mayor over
11  operations.
12          And Tess Colby was a mayoral advisor on
13  homelessness.
14      Q.  Okay.  This email, originally from Mr. Mundt,
15  seems to indicate that there was outreach done between
16  June 23rd and July 2nd.  Do you recall whether there
17  was -- or know whether there was outreach done for these
18  sorts of services prior to June 23rd?
19      A.  I -- I don't recall the date that services
20  were -- where -- where we began -- where the City began
21  to try to provide outreach and ser-- you know,
22  services to houseless folks.  I don't -- I don't know
23  the date.
24      Q.  Okay.
25      A.  But I -- I do feel that there was a lot of

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 93

1    Q. Okay. How did you find out?
2    A. I wish I could remember. It was either
3  through -- probably -- most likely through the Emergency
4  Operations Center, I believe.
5    Q. Okay. At some point did you hear that
6  protesters had repurposed barriers that had previously
7  been in the area and moved them into the surrounding
8  streets?
9    A. I think that that was concurrent with my
10  finding out about the -- the first issue.
11    Q. Do you know anything about the decision making
12  that went into the decision to evacuate people and items
13  from the east precinct?
14    MR. CRAMER: Objection. Form.
15    A. Is your question did I know anything in advance
16  if some -- if that kind of decision making was
17  happening?
18  BY MR. WEAVER:
19    Q. I think you've made it clear you didn't know
20  anything in advance. I'm wondering if since then,
21  whether you have learned, from talking to people or
22  reviewing documents, what happened that led to the
23  evacuation of the east precinct?
24    A. I've read the articles that have come out
25  recently.

Page 94

1    Q. Okay. Other than general news articles, you
2  don't know anything?
3    A. Those articles reveal a lot, so yeah, I mean --
4    Q. Okay.
5    A. I feel like I know a lot now.
6    Q. Okay. When did you first visit the area after
7  the police had evacuated the precinct?
8    A. As soon as I learned, and I think it would --
9  let's see. I'm not sure. You know, and -- you know, I
10  just -- I just went over. I just got in my car and went
11  over.
12    Q. Okay. That was on your own initiative?
13    A. Yeah.
14    Q. Okay.
15    A. Yeah, I just -- I mean, I -- I am responsible
16  for ensuring, you know, public health and the continuity
17  of essential services. And if it was in any way a
18  problematic situation, I needed to do it myself so that
19  I didn't ask a staff person to do it.
20    Q. Okay. So at some point you decided you were
21  going to go there every day; right?
22    A. Uh-huh.
23    Q. When did you make that decision?
24    A. I don't know if I really decided that I would
25  go every day. It wasn't like, oh, I'm going to be

Page 95

1  there -- like, you know, that I just knew in advance. I
2  mean, it just -- in a situation that is unusual -- this
3  was a really unusual, unprecedented situation. I just
4  felt that it was important for me to -- you know, if I
5  was going to be responsible for providing essential
6  services, that, you know, I should be able to really
7  understand the situation, you know, in real time and
8  make sure that, you know, we were doing a good job.
9    Q. At some point were you asked either by somebody
10  in the mayor's office or someone else to engage in
11  discussions with the protesters?
12    A. Well, you know, it's funny, if you're there all
13  the time, right, because I was there about 12 hours a
14  day, I got to know the businesses and the residents and
15  the -- and the protesters and, you know, everybody who
16  was there, and -- you know, and really trying to, you
17  know, just make sure that things were as -- you know,
18  going well as possible in order to provide our services.
19    And so, you know, the mayor's office, I think
20  at some point realized that, you know, I had
21  constructive, respectful relationships with -- with
22  everybody that was there, and so they would ask me to,
23  you know, help coordinate different -- different things.
24    Q. Okay. And were you there -- how often was
25  Idris Beauregard there with you?

Page 96

1    A. Not at the beginning. I would say not for the
2  first maybe ten days, but then after that -- you know,
3  the couple days that I had to go away he took over
4  completely for me. And so before that, you know, we did
5  some, you know, kind of acculturation, where I
6  introduced him to everybody, you know, businesses,
7  residents, you know, protesters, everybody that I could
8  so that, you know, they all had a degree of familiarity
9  with him, so -- before I went away, and then -- you
10  know, and then -- and then he stayed on with me after
11  that.
12    Q. Okay. Is Idris an employee of Seattle Public
13  Utilities?
14    A. He is, he is. At the -- at the time he was the
15  director for our Clean City program.
16    Q. How did it come about that you were
17  working with Idris on this interaction and monitoring of
18  the area?
19    A. It was a logical selection on -- on my part
20  because the Clean City program is the program that
21  handles the litter abatement program and also -- you
22  know, and was, you know, whose vendors and staff were
23  helping to, you know, keep the area clean. And Idris
24  is -- you know, has excellent people skills and
25  prioritizes customer service, you know -- you know, and

24 (Pages 93 to 96)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 97

1  so it was just a -- a good, logical choice in terms of,
2  you know, someone who was, like, really going to
3  prioritize delivery.
4      Q.  Okay.  Were you also there frequently with Fire
5  Chief Scoggins and Department of Transportation head Sam
6  Zimbabwe?
7      A.  Yes, both of them would -- would stop by and,
8  you know, check in, check in with people, you know,
9  conduct other activities to try to ensure their
10  continuity of services.
11      Q.  Okay.  What was -- what was your interaction
12  with -- with those two in particular, Scoggins and
13  Zimbabwe, over this time period?
14      A.  We kept in, you know, close communication about
15  the status of -- you know, of events, and we would act
16  as a team, you know, to work on any City objectives.
17  You know, we were -- we were just -- we were a team,
18  helping each other out.
19      Q.  What were some of the City objectives that you
20  were working on with them?
21      A.  Well, they both wanted to -- you know, they
22  were both prioritizing the flow of circulation, you
23  know, through the area, and so, you know, if they needed
24  assistance with talking to folks in order to coordinate,
25  you know, any of those -- any changes to circulation or

Page 98

1  any kinds of modifications to the right-of-way, you
2  know -- you know, I would -- they would -- they would
3  ask me to help out.
4      Q.  Okay.  What sort of negotiations were you
5  involved in with Chief Scoggins and Mr. Zimbabwe?
6      A.  The -- well, we would sometimes, you know, talk
7  to groups of -- of folks to explain the -- you know, the
8  proposals that SDOT had developed in order to maintain
9  cont-- you know, continuity of circulation.  We would
10  sometimes -- there were a couple of occasions when we
11  would meet with, say, the mayor and some of the
12  protesters, you know, or with just the protesters to
13  just hear, you know, what they were aiming for, and
14  what -- and to express what the City objectives were,
15  and to, you know, try to effect a -- you know, just a
16  peaceful transition to a more, you know, kind of -- I
17  don't know what the right word is, normal -- I mean,
18  to -- you know, to get back to -- you know, to -- to
19  regular -- to regular kind of continuity -- regular
20  scheduling of things and regular access.
21      Q.  How regularly were you in communication at this
22  time, meaning just, you know, June 8th through July 1,
23  2020, how often were you in communication with the
24  mayor's office?
25      A.  I believe I checked in with the mayor's office

Page 99

1  every day in some way.
2      Q.  Were you ever on what's known as cabinet
3  meetings with other department heads and the mayor?
4      A.  Infrequently if I did -- if I did, you know,
5  because I was in the field, so I would, you know, with
6  the mayor's office permission, you know, miss a lot of
7  the cabinet meetings.
8      Q.  What do you recall during that same time period
9  of June 8th to July 1, 2020, your inter- -- what do you
10  recall your interactions being, if any, with Mayor
11  Durkan, herself?
12      A.  I -- I believe the mayor came to the area
13  and -- on one occasion, and I walked her around, you
14  know, so that she could, you know, see it for herself.
15  She may have already been there, but I was just showing
16  her, you know, around, and introducing her to, you know,
17  people.  There was another occasion where the mayor came
18  and we talked to business owners, you know, and spent a
19  good part of a day, you know, listening to their
20  concerns and needs.  I believe that was most of it.
21      Q.  Okay.  So it sounds like you were with the
22  mayor in the -- in the zone on two separate occasions;
23  is that right?
24      A.  I -- if I remember it correctly, yes.
25      Q.  Okay.  So let's talk about the first one where

Page 100

1  you were showing her around the area.  Okay?  Where did
2  you take the mayor during her visit on that day?
3      A.  I don't remember all of the -- the -- the
4  places.  You know, just -- I think it was a walk through
5  the -- the whole -- like through the park and, you know,
6  through some of the streets, yeah.  So I don't remember
7  all of the stop points.
8      Q.  Okay.  Do you recall her having conversations
9  with some of the people in the area during her visit?
10      A.  I think she did -- she did stop and chat with
11  people who -- who recognized her, yes?
12      Q.  Do you recall taking her to the garden that had
13  been dug out in Cal Anderson Park?
14      A.  Yes, that's in the park, so yes, she saw that.
15      Q.  Okay.  Do you recall her seeing the barriers
16  that were in the streets at that time?
17      A.  Yes, she saw that.  I don't know if she saw all
18  of them.
19      Q.  Okay.
20      A.  But I'm sure -- I'm sure that she encountered
21  at least one.
22      Q.  Do you recall her speaking with any of the
23  people who were manning the barriers when she showed up
24  that day?
25      A.  I don't remember that.

25 (Pages 97 to 100)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 101

1    Q.  Do you recall whether the mayor saw any open
2  carry guns on her visit?
3    A.  I do not remember see- -- that.
4    Q.  Okay.  Do you remember generally that there
5  were people openly carrying weaponry in this period of
6  June 8th to July 1, 2020, in the area?
7    A.  It was -- it was not a persistent thing that I
8  would cite.  There was the John Brown club, which is a
9  group of white abolitionists, you know, I think were --
10  were there on occasion.  There was, you know, another
11  person named Rick who -- you know, who, you know, had
12  a -- who had a gun.  But, you know, I did not see a lot
13  of guns.
14    Q.  You saw some, though; is that correct?
15    A.  Yeah, everybody explained to me that Washington
16  State is an open carry state.  I'm not from an open
17  carry state, and so, you know, it took a lot of
18  education for me to understand, you know, that that
19  was -- that -- that was a -- a legal thing here, in --
20  in Washington State.  I was -- I was surprised because I
21  had not seen guns that often here, but now I -- now I --
22  now that I know it is an open carry state, I see them
23  more, I notice them more often.
24    Q.  Okay.  Going back to your trips with the mayor,
25  you said there was another day where you took the mayor

Page 102

1  and talked to some businesses and residents.
2        Do you recall that?
3    A.  Yes.
4    Q.  Okay.  What do you recall about -- can you be
5  more specific about what those interactions were, and
6  who you talked to with her?
7    A.  You know, and I -- I wish I could remember the
8  date, you know, like kind of where it fell, you know,
9  because that would help me to kind of -- at least kind
10  of remember more.  But we definitely -- Joey Burgess,
11  the owner of Queer Bar, you know, was present with us
12  most of the time, and the owner of Elliott Bay Bookstore
13  was with us most of the time.  We went to stop at
14  Rachel's Ginger Beer.  We talked to -- we -- we stopped
15  at a number of business -- businesses.
16    Q.  Okay.
17    A.  Yeah, we just -- we -- we -- you know, I think
18  we first started at Elliott Bay Bookstore, and a bunch
19  of different business owners came to that site and, you
20  know, we did a walk-around, and, you know, went from
21  place to place.
22        We stopped at a restaurant that was -- I can't
23  remember the name of the restaurant, but it was on Pike
24  and 11th, as well.
25        So those are -- those are three stops that I

Page 103

1  remember.
2    Q.  Okay.
3    A.  The restaurant, the Elliott Bay, and the
4  Rachel's Ginger Beer.
5    Q.  Do you recall talking to anybody who lived in
6  the area while the mayor was with you?
7    A.  Yes.
8        MR. CRAMER:  Objection to form.
9        THE WITNESS:  Oh.
10        MR. CRAMER:  Go ahead.
11    A.  There were several people who worked and lived
12  in Capitol Hill who were part of the discussions.
13  BY MR. WEAVER:
14    Q.  Okay.  Do you recall who those people were?
15    A.  There were -- there were people who run some of
16  the buildings, like -- I think the real- -- I can't
17  remember her name, the really nice woman who runs the
18  buildings, like Sunset Electric and some other
19  buildings, I think she lives in the area as well.
20  One -- the -- this -- the -- the manager for the --
21  one -- a large apartment building at Olive and 11th was
22  there and is a resident.  There were -- there were --
23  there were -- there were a lot of people, you know, if
24  you kind of think of the whole list of them, and I'm
25  sure that in my email chain I have a list of them.  I --

Page 104

1  you know, I -- you know, and I could provide that to
2  you.
3    Q.  Okay.  So I want to ask whether you heard --
4  whether --
5    A.  And sorry, Miki from Pettirosso, she's a
6  business owner and a resident, I believe.
7    Q.  So at the interactions during this day when you
8  were speaking with businesses and residents with the
9  mayor, I want to know whether you heard any of these
10  sorts of complaints aired by the people you spoke to:
11        Did you hear anything about an inability to
12  access apartments or apartment driveways?
13    A.  I think I didn't hear you.  I'm sorry.
14    Q.  Did you hear anything about inability or
15  difficulty entering apartments or apartment parking
16  lots?
17    A.  I remember -- oh, now that you speak of -- I
18  remember a woman who -- she was -- she lived in the
19  building right behind the east precinct, and that
20  alleyway sometimes, you know, I think that she was --
21  she said that she had some real -- she had some
22  difficulties getting in and out of that building.  Yes,
23  I remember her mentioning that.
24    Q.  Okay.  And while the mayor was with you, did
25  you hear anything about inability for businesses to

26  (Pages 101 to 104)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

---

Page 105

1  operate normally due to the -- the occupation of the
2  area?
3      A. I remember a wide variety of comments and
4  responses. It was -- I was really struck by the
5  heterogeneity of the responses that all of the
6  businesses had. There was -- one of the business
7  owners, you know, he owned a large bar, and he was,
8  like, oh, you know, we've been closed the whole time, so
9  this is not affecting me at all or, you know, my -- you
10  know -- you know, or -- or people like us whose
11  businesses have been closed. I think that there was --
12  there were some that were just unhappy by -- you know,
13  because they felt that there were, you know, just -- you
14  know, that there -- that they didn't -- they didn't --
15  they just felt like the graffi- -- some of the graffiti
16  that was not, you know, welcome.
17      They were -- and some -- some were like, we've
18  seen -- you know, we've -- yes, we've been busy, you
19  know, it's been -- you know, there have been a lot of
20  people in and out, but, you know, this is -- this is a
21  really strange time.
22      So it was a wide variety of -- of comments.
23      Q. Do you recall, while you were with the mayor,
24  any of these businesses indicating that they believed
25  they had lost revenue as a result of the occupation?

---

Page 106

1      A. I don't remember exactly about who -- who --
2  who might have said that.
3      Q. Do you recall that someone said that?
4      A. I mean, I -- I -- I honestly don't remember
5  specific inc- -- incid- -- incidents of that, but it's
6  possible.
7      Q. Did you hear that at other times, maybe when
8  the mayor wasn't there? Did you hear that at other
9  points, that businesses were losing revenue?
10      MR. CRAMER: Go ahead.
11      A. There was one business owner who told me that
12  their -- their revenues at their liquor store were down,
13  yeah.
14      THE COURT REPORTER: I'm sorry. Mr. Cramer,
15  I only heard "go ahead." So if you said "objection"
16  before that, it didn't come through.
17      MR. CRAMER: I think it was just form.
18      THE COURT REPORTER: Okay. Thank you.
19  BY MR. WEAVER:
20      Q. Do you recall, when you were with the mayor on
21  this tour of businesses and talking to residents,
22  anybody voicing the concern that the protesters on or
23  near the barriers were intimidating towards people
24  entering the area?
25      A. This is another -- this is a situation where

---

Page 107

1  there were also varied perspective on this. You know,
2  some people told me that they had no issues whatsoever
3  and felt like it was safer there than it used to be.
4  And then there were people who felt that it was -- you
5  know, that -- that they didn't feel like they could just
6  move easily because of, you know, how they felt about
7  all of this, and -- and maybe they had interactions that
8  I -- you know, that I can't speak to, that -- you know,
9  because I wasn't there in those in- -- you know, but --
10  you know, it's hard for me to really untangle what was
11  real- -- what was real and what was perception.
12      Q. Do you remember hearing complaints when you
13  were with the mayor that -- that people were, in fact,
14  scared for their safety because of what was going on in
15  the streets?
16      A. That -- I do not recall that being a
17  predominant topic of the discussion or a major strand of
18  the -- their -- their -- their own physical safety.
19  Yeah. Although -- yeah.
20      Q. Well, whether or not it was a dominant topic of
21  discussion, did you hear people voice that while you
22  were with the mayor?
23      A. With the mayor? I think -- it's possi- -- it
24  is possible that the business owner at -- that -- that
25  one of them mentioned that. I just can't remember what

---

Page 108

1  she said exactly, and if it was about her own physical
2  safety or she was -- just a general kind of concern.
3      Q. Do you recall at other times when you were in
4  the area, not with the mayor, people expressing to you
5  that they did not feel the area was safe to be present
6  in?
7      A. You know, I heard from people that at night,
8  that people felt that it could be -- get -- feel -- that
9  it felt unsafe sometimes, to some people.
10      Q. Do you recall, while you were with the mayor,
11  going back to the meeting before, hearing from people
12  who were either businesses or permanent residents in the
13  area that the conditions in the area would deteriorate
14  in the late hours of the evening and into the night?
15      A. I -- I heard that more later, you know,
16  afterwards, that people said, oh, wow, at night it would
17  be very different, you know, or somewhat different for
18  some people. Because I would not -- normally not be
19  there at night except for, you know, I think I was there
20  a night or two. And, you know, myself, I didn't
21  perceive the -- maybe it was just the time that I was
22  there, it was not as different --
23      Q. Okay.
24      A. -- or it wasn't very different.
25      Q. What can you tell me about what you recall

---

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 109

1    hearing from people about the conditions being worse at
2    night?
3         A. That the paranoia level, you know, around, you
4    know, potentially Proud Boys coming in was a little bit
5    higher, and so the barricades, you know, would be a
6    little bit more, you know, reinforced, and not as porous
7    to, you know, traffic, but they would let people in.
8    But, you know -- and that there would -- at the end, you
9    know, that there was more partying, you know, and -- you
10   know, kind of just loud -- loud partying at night.
11        Q. Okay. Was it the case that often at night
12   protesters would move, or somebody would move barriers
13   back to where -- to areas they had not been previously
14   or areas that they had been previously. Let me --
15   that's a dirty -- that's a messy question. Let me
16   just -- do you recall that sometimes at
17   night barriers would be moved from the location they had
18   been in during the day?
19        A. The barriers generally stayed, you know, where
20   they were, you know, in general. But, you know, on
21   occasion there would be changes.
22        Q. And what -- what changes did you observe?
23        A. Well, let's see. At the -- you know, at the
24   very end somebody -- there -- I think that what really
25   kind of made the whole thing kind of just -- you know,

Page 110

1    made it clear that circulation couldn't work was that
2    there was -- somebody moved one of the concrete barriers
3    that had been put up by -- you know, put up to divide
4    Pine Street, you know, to allow for circulation to
5    continue, somebody had blocked that, and that was, I
6    think, the most -- you know, the -- the big -- the
7    biggest moving of the barriers that -- you know, that --
8    that we encountered.
9         Q. And by circulation --
10        A. Most impactful, I should say.
11        Q. But there were other less impactful moving and
12   adjusting of the barriers that would happen overnight;
13   is that right?
14        A. Not regularly. I think that there might have
15   been a -- you know, a few -- a -- a -- occasionally, you
16   know, like a move, like -- but it wasn't -- it wasn't as
17   though it was, like, perpetually expanding or anything.
18        Q. Okay. And I just want to be clear for the
19   record. By "circulation," do you mean vehicle traffic
20   circulation in the area?
21        A. Yes. Because SDOT had created a pattern where,
22   you know, circulation could -- vehicular circulation
23   could still continue and flow down Pine Street.
24        Q. Do you know whether -- do you recall hearing
25   reports that -- not necessarily barriers, but people

Page 111

1    would be standing in the street at night, blocking
2    access to streets that had meant to be circulating?
3         A. Yeah, I think that that -- that is -- I mean, I
4    had heard that that would happen.
5         Q. Okay.
6         A. I don't know if they were blocking it, per se,
7    but that there would be people in the street.
8         Q. Okay.
9         A. And, you know, I think that people were just --
10   you know, just worried about cars going by, you know,
11   and attacking them.
12        Q. Okay. Meaning people who were manning the
13   street -- man -- in the streets, your understanding is
14   they were concerned about people coming in and shooting
15   them?
16        MR. CRAMER: Objection. Form.
17        A. I think they were just worried about, you know,
18   kind of the -- what I heard was that they were worried
19   about the ultra right, you know -- you know, just coming
20   to provoke some kind of conflict.
21   BY MR. WEAVER:
22        Q. Okay. Going back to your -- your meeting with
23   the mayor, and your going around talking to the
24   businesses and residents, just to set the stage, do you
25   recall anyone expressing to you or the mayor that they

Page 112

1    were concerned about retribution if they spoke out about
2    being dis-- dis-- dissatisfied with the protests and
3    what was going on?
4         A. A few --
5         MR. CRAMER: Object to form.
6         A. Is your -- when you say retribution if they
7    spoke out, what -- by -- like retribution against mom?
8    BY MR. WEAVER:
9         Q. Did you ever hear, when you were with the
10   mayor, anyone express concerns that if they spoke out
11   against the protests or against the occupation, that
12   they would be targeted by the protests and the
13   protesters?
14        A. I -- I do believe that there were some folks
15   who felt -- who -- who were just, you know, scared in
16   that situation, yeah, that if -- they didn't
17   know -- they didn't know the people, they didn't know
18   what would happen if they -- you know, based on whatever
19   they said about them, you know. I don't know that it
20   was founded in anything, but you know, they -- they
21   expressed that they were like, you know, concerned.
22        Q. Okay. Do you recall, when you were with the
23   mayor on the tour we've been talking about, any -- any
24   complaints or stories that were told to you about people
25   having to present ID in order to enter the area?

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

---

Page 113

1    A. If I remember correctly, the story about the
2  IDs was an early rumor. It had actually been the police
3  during a period that had asked for IDs. But I believe
4  that the -- that the folks who were, you know, kind of
5  in the zone were not asking for IDs from anyone.
6    Q. Do you ever -- while you were -- while you were
7  with the mayor, do you recall ever getting -- ever
8  hearing complaints that protesters were not necessarily
9  asking for ID, but were asking for the person's purpose
10  for being in the area?
11    A. I -- no, I don't remember a ton of
12  conversation -- I don't remember a conversation about --
13  about that. Yeah, I don't. I'm trying to think if
14  somebody was like -- complained about -- it's possible,
15  but I don't remember.
16    Q. Okay. Do you remember hearing that sort of
17  thing when you weren't with the mayor?
18    A. I think that somebody did say to me that they
19  had been asked why they were going in, and they were
20  like, I work here, you know, I live here, and it could
21  have just been like -- I mean, I don't know how frequent
22  that could have been, you know, if it was like most
23  people, you know, came in and out very freely.
24    Q. Do you recall when you were with the mayor
25  hearing complaints from businesses and residents about

---

Page 114

1  inconsistent provision of garbage services?
2    A. Oh, about schedule disruptions, you know, or
3  change -- modifications? Is that what you're asking
4  about?
5    Q. Either scheduling modifications or, you know,
6  lack of a dumpster, you know, anything related to
7  garbage services.
8    A. Well, people take their garbage services really
9  seriously so, you know, that -- you know, I'm sure that,
10  you know, people were like, oh, you know, I don't like
11  these new hours, but, you know, we really tried to, you
12  know, really concierge every single interaction and make
13  sure that everybody, you know, had what they needed and,
14  you know, I personally -- if somebody had an -- any kind
15  of impediment, you know, I would personally go over and,
16  you know, ensure that they had continuity of services.
17    Q. Do you recall hearing complaints about that
18  while you were with the mayor?
19    A. No. I don't remember.
20    Q. Do you recall hearing complaints when you were
21  with the mayor about vandalism or graffiti?
22    A. Definitely graffiti, definitely. There were --
23    Q. What did -- what did --
24    A. People were --
25    Q. What did you and the mayor hear --

---

Page 115

1    A. And there was a lot of --
2    Q. Sorry. What did you and the mayor hear about
3  graffiti?
4    A. That people didn't like the graffiti and they
5  wanted to have it removed.
6    Q. Okay. Did you hear anything while you were
7  with the mayor from businesses and residents about the
8  lack of a police response to the area?
9    A. I think so, yeah. I think that they -- I think
10  that people definitely probably mentioned that there
11  were no police in the area.
12    Q. Okay. How about when you were with the mayor,
13  did you hear anything about a lack of medic response to
14  the area?
15    A. Maybe. I'm not -- I'm not sure.
16    Q. Do you recall meeting on one or two occasions
17  with protesters and Mr. Zimbabwe and Chief Scoggins
18  about adjustments that could or should be made to the
19  barriers in the areas?
20    A. We -- Chief Scoggins, Sam Zimbabwe, and I had
21  several conversations with the protesters in the area to
22  talk about modifications to allow for continuous flow of
23  traffic throughout the day.
24    Q. Okay. What was the City's goal in those
25  negotiations?

---

Page 116

1    MR. CRAMER: Objection. Form.
2    A. You know, this is really -- I mean, I think
3  it's best to talk to Sam Zimbabwe about the -- all of
4  the different circulation-related goals.
5  BY MR. WEAVER:
6    Q. Okay. Well, was the goal in those discussions
7  to get people to leave the area?
8    MR. CRAMER: Same objection.
9    A. I think I don't understand your question.
10  Before you asked did I -- if I heard you correctly, you
11  asked me did I meet with Sam Zimbabwe, Chief Scoggins,
12  and protesters to talk about circulation changes.
13  BY MR. WEAVER:
14    Q. Yes.
15    A. And now you're asking --
16    Q. You had meetings with protesters --
17    A. If those -- if those -- if those questions --
18  if those meetings about circulation changes were
19  intended to get people out of there?
20    Q. Yes.
21    A. I mean, like, are -- are you saying are
22  there -- were there other, separate conversations to ask
23  people to leave?
24    Q. I'm asking about conversations during the
25  June 13th, 14th, 15th time frame that you had with

---

29 (Pages 113 to 116)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 137

1  were met with significant resistance by protesters, who
2  grew increasingly agitated and aggressive towards City
3  workers from, among other things, SPU.
4       Do you recall that incident?
5    A. I don't, and it -- I don't know if it's
6  accurate.  Because we were not there, that I know of.
7    Q. You were not there on the 26th?
8    A. No, to remove the barriers; right?  Like -- I
9  mean, it's like -- I -- I -- is that --
10   Q. Okay.  So you don't have any memory of this?
11   A. No.
12   Q. Okay.
13   A. Sorry.
14       (Exhibit No. 15 marked.)
15  BY MR. WEAVER:
16   Q. I'd like you to look at Exhibit 15.  This is an
17  email that you wrote to Mr. Buechler and copied a couple
18  other people on June 27th.  You indicate, "Tomorrow no
19  services AT ALL," with "at all" in all caps.
20       Do you --
21   A. Where am I supposed to be looking?  I'm
22  sorry --
23   Q. In your email dated June 27th, the -- I guess
24  it's the third paragraph.  There's no indentation, but
25  it's about halfway down your email.

Page 138

1    A. How does it start?  Which -- which -- just --
2  just "Tomorrow no services AT ALL"?
3    Q. You might as well go ahead and look at the next
4  three sentences there, just that -- that portion of your
5  email.
6    A. Yeah.  I think that was -- I had a hard day
7  that day.  I was really, really wet that day, and there
8  was a service gap on our part, I think, because -- not a
9  service gap, but like a -- like a communication gap, I
10  mean, because somebody else besides Chad was
11  coordinating that day, so I had just gotten really --
12  really wet talking about -- I was talking about -- I was
13  talking about the day before.  I was talking about the
14  day before.
15   Q. So -- but this day you're saying tomorrow no
16  services at all because of what was going on in the
17  zone; is that right?
18   A. Yeah.  It's just -- people were -- now I re- --
19  now I remember, yeah.  People -- I think that, you know,
20  people were -- knew that the barriers were coming down
21  and were a bit agitated, but -- and -- you know, and I
22  was like, I think, having a really bad day.
23   Q. So you were concerned about the safety of your
24  crews; right?
25       MR. CRAMER:  Objection.

Page 139

1    A. I think it's more --
2       MR. CRAMER:  Form.
3    A. Yeah, it says -- it says -- what I wrote here
4  is they do not care for the psychological safety of our
5  crews.  I think more just, like -- I just -- you know, I
6  think because of the tension that was there.  You know,
7  I always just want to make sure that everybody feels
8  totally comfortable and safe, and that it just feels,
9  like, positive, you know, when they're doing their work.
10  And I don't know that I was concerned about their
11  physical safety as much as just, like, you know, the --
12  maybe the protesters there were just being kind of irate
13  and, you know...
14  BY MR. WEAVER:
15   Q. Okay.  What did you -- what did you know about
16  them developing composting toilets?  Was that in Cal
17  Anderson?
18   A. That was -- I was being sarcastic.  They were
19  not going to develop a composting toilet.  There was
20  some -- one of them -- one of the -- just -- it was just
21  one protester that was like, yeah, we don't need -- we
22  don't need you guys to take care of public -- public
23  health, you know, we can handle it all, we'll develop a
24  composting toilet.  So I was being more -- I was being
25  more sarcastic with -- with Chad.

Page 140

1    Q. Okay.  Were you concerned about your
2  contractors and staff being trapped inside if they
3  provided services in the area?
4    A. Well, my -- throughout -- throughout this
5  entire time, it was always really important to me that
6  there were multiple ways in and out.  Not that there was
7  going to be an issue -- so -- so the -- I -- I do
8  remember that the -- the protesters were like, it's no
9  problem.  They can just come in.  They just have to go
10  out the same way, and -- you know, so we're -- we're
11  just going to guard more entry points and -- during the
12  day.
13       And I was like, that doesn't work.  They all --
14  so my philosophy was always during the day all the
15  barriers -- at least when I'm here, all these 12 hours,
16  they always have to be all down; right?  So that
17  everybody can get in and out freely; right?
18       And I just wasn't going -- like, I just wasn't
19  going to negotiate that.  That was a no negotiation
20  thing for -- for -- for -- for -- for me.  Because if I
21  was driving a truck, I would want to just make sure I
22  can just use the streets freely.
23       (Exhibit No. 16 marked.)
24  BY MR. WEAVER:
25   Q. Okay.  If you could look at Exhibit 16, I have

35 (Pages 137 to 140)

30(b)(6) and Individual Deposition of Mami Hara - 10/4/2021

Page 145

1   yet, please.
2          THE VIDEOGRAPHER:  I'll go ahead and read us
3   off.  This concludes the --
4          MR. WEAVER:  All right.  Sorry.
5          THE VIDEOGRAPHER:  This concludes the
6   deposition of Mami Hara.  The time now is approximately
7   1:01 p.m.  Going off the record.
8          (Deposition concluded at 1:02 p.m.)
9          (Reading and signing was requested
10          pursuant to FRCP Rule 30(e).)
11              -o0o-
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146

1          C E R T I F I C A T E
2
3   STATE OF WASHINGTON
4   COUNTY OF PIERCE
5
6          I, Cindy M. Koch, a Certified Court Reporter in
7   and for the State of Washington, do hereby certify that
8   the foregoing transcript of the deposition of MAMI HARA,
9   having been duly sworn, on October 4, 2021, is true and
10   accurate to the best of my knowledge, skill and ability.
11          IN WITNESS WHEREOF, I have hereunto set my hand
12   and seal this 13th day of October, 2021.
13
14
15   _____
16          CINDY M. KOCH, CCR, RPR, CRR #2357
17
18   My commission expires:
19   JUNE 9, 2022
20
21
22
23
24
25

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Exhibit 10

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,  )
                              )
        Plaintiff,            )
                              )
    vs.                       )  No. 20-cv-00983
                              )
CITY OF SEATTLE,              )
                              )
        Defendant.            )

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

MAYOR JENNY A. DURKAN

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  DECEMBER 8, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

```
 1              A P P E A R A N C E S
 2   FOR PLAINTIFF:
 3        TYLER S. WEAVER
          GABRIEL REILLY-BATES
          Calfo Eakes LLP
 4        1301 Second Avenue
          Suite 2800
 5        Seattle, WA 98101-3808
          206.407.2237
 6        tylerw@calfoeakes.com
          gaber@calfoeakes.com
 7
 8
 9   FOR DEFENDANT:
10        ARTHUR W. HARRIGAN, JR.
          SHANE P. CRAMER
          KELLIE MCDONALD, paralegal
11        Harrigan Leyh Farmer & Thomsen LLP
          999 Third Avenue
12        Suite 4400
          Seattle, WA 98104
13        206.623.1700
          arthurh@harriganleyh.com
14        shanec@harriganleyh.com
15        JOSEPH G. GROSHONG
          Seattle City Attorney's Office
16        701 5th Avenue
          Suite 2050
17        Seattle, WA 98104-7095
          206.684.8200
18        joseph.groshong@seattle.gov
19
     ALSO PRESENT:  MICHAEL TAKOS, videographer
20               Buell Realtime Reporting, LLC
21
22            * * * * *
23
24
25
```

## Page 3

```
 1            DEPOSITION OF JENNY A. DURKAN
 2            EXAMINATION INDEX
 3   EXAMINATION BY:               PAGE
 4   Mr. Weaver              6
 5
 6            EXHIBIT INDEX
 7   EXHIBITS FOR IDENTIFICATION        PAGE
 8   Exhibit 1  Executive Order 2020-08;    48
          SEA_00045264-268
 9
     Exhibit 2  Email to multiple recipients from   64
10        Mayor Durkan dated 6/20/2020;
          SEA_00125617
11
     Exhibit 3  Email chain; SEA_00058827     102
12
     Exhibit 4  Email chain and attachments;    110
13        SEA_00102554-565
14   Exhibit 5  Email to multiple recipients from   129
          Mayor Durkan dated 6/21/2020;
15        SEA_00040208
16   Exhibit 6  Spreadsheet containing text    132
          messages
17
     Exhibit 7  "2 PM Call Notes & Map";    153
18        SEA_00002472-474
19   Exhibit 8  "11am Update - E Precinct";    154
          SEA_00028170-171
20
     Exhibit 9  Not introduced
21
     Exhibit 10 Photo of tweets         164
22
     Exhibit 11 Photo of tweet with photo     164
23
     Exhibit 12 Photo of tweet with photo     178
24
     Exhibit 13 Email chain; SEA_00028176-177    189
25
```

## Page 4

```
 1         EXHIBIT INDEX (Continuing)
 2   EXHIBITS FOR IDENTIFICATION        PAGE
 3   Exhibit 14 Email chain; SEA_00140722-728    208
 4   Exhibit 15 Email to Derek Broughten from    221
          Mayor Durkan dated 6/19/2020;
 5        SEA-PDR_011629 - 631
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Hunters Capital, LLC v. City of Seattle                      Mayor Jenny A. Durkan

Page 77

1    Regularly that would include Chief Best and
2 Chief Scoggins, but really, really important we thought
3 that there would be this information going to the public
4 on where we were, what we were doing, and why we were
5 doing it.
6    Q.  Why didn't you say, in any of those previous
7 press events, that it was time for people to go home?
8    A.  I'd have to look at all the previous ones.  I
9 may have said things like that, or what our expectations
10 were.  But again, it was an evolutionary process.  You
11 know, you had thousands of people protesting for Black
12 lives against the police.
13    And it wasn't just here in Seattle.  It was in
14 every major city in America.  And we saw in other cities
15 those protests devolve into nightly violence and
16 conflict, you know, whether it was Portland.  They had
17 shootings in Louisville.
18    I was talking to mayors in Atlanta, Louisville,
19 Los Angeles, to compare notes on what were people doing
20 and how do we address this.  And for us in Seattle, what
21 we really wanted to do, again, was balance those
22 competing interests.
23    It was important that people protest the -- the
24 killing of George Floyd.  That was part of our national
25 dialogue.  But at the same time, in -- in ensuring that

Page 78

1 right to protest, we also had to be realistic about how
2 do we make sure that we can provide for the public
3 safety of those protesters, for the businesses and
4 residents, and for all the other residents of Seattle or
5 other places that may come there.
6    At the same time, we're -- we're, you know,
7 looking out for the whole city in the middle of a global
8 pandemic.  And so at every step of the way, we were
9 trying to adjust what we're saying, and I was trying to
10 address in my press statements where -- where we were at
11 that moment in time.
12    Once we got to the point that the Seattle
13 Police Department thought they knew what they needed to
14 be successful, that meant we needed to have fewer
15 people.  So we made a concerted effort to try to reduce
16 the profile and the number of people in and around
17 Capitol Hill so we could be successful.
18    Q.  How many times did you personally visit CHOP?
19    A.  If -- between June 8th and July 1st, I think I
20 was there maybe four or -- I think four times.  It might
21 have been five.
22    Q.  How many of those were what I'll call official
23 visits, and how many of those were visits that you made
24 in a disguise?
25    A.  I made, I think, three official visits that I

Page 79

1 can recall.  One was shortly after the -- the area was
2 established, I went and met with protesters and to see
3 what was happening.  I think that was maybe the 8th or
4 9th.
5    I had a subsequent meeting, and actually there
6 may have been an additional because I was up there at
7 least twice, meeting with businesses and residents, and
8 walking and talking to businesses and residents about
9 what their concerns were and what the City could do to
10 address them.
11    And then I had another meeting where I was
12 twice in one day at the First AME Church there, which
13 the first meeting was with a number of Black clergy
14 to -- to get their assistance and help and hear their
15 views on how we could move forward as a City on a range
16 of issues, but including what was happening right on
17 their doorstep.
18    And then later that day, with some of those
19 Black ministers, met with some of the people who
20 identified themselves as -- as protest leaders, to see
21 if we could get them to get people to go home.  And so
22 those were the official meetings.
23    And then I went unofficially a couple times.  I
24 just rode my bike up there, and -- and looked around.
25    Q.  On the -- on the unofficial visits where you

Page 80

1 rode your bike up there, do you recall when those visits
2 were made?
3    A.  I don't recall the exact dates of them, but
4 they obviously were made in that time frame.
5    Q.  What did you do on those unofficial visits?
6    A.  I just rode my bike up and then walked around
7 the area to see what was happening.  You know, when I --
8 when I come in an official capacity, it -- it, one,
9 people respond differently, and -- because you're the
10 mayor.
11    It also requires that I have security with me,
12 which are police officers, which can be a complicating
13 factor, particularly during these events.  And so when I
14 went by myself, I was able to, you know, not have that,
15 and just see for myself what was happening.
16    Q.  So what time of day did you go on your
17 unofficial visits?
18    A.  I think it was late afternoon, early evening.
19    Q.  And what did you see while you were there?
20    A.  I saw -- you know, that's a broad question.  I
21 rode my bike around all of the parts, went in and out of
22 Cal Anderson, went in a couple of businesses, and -- and
23 so I saw a lot of things.
24    Q.  How many tents did you see in Cal Anderson Park
25 on any of your visits?

20  (Pages 77 to 80)

Page 81

1    A. You know, I didn't -- I didn't count the tents
2  at that -- there was the two visits.  At one point there
3  were -- there were tents in and around the play field.
4  Those had been removed, I think, by the second visit,
5  and they had cleared that out, so the people were using
6  it for soccer and the types of things.
7    I noticed where the tents were, and, you know,
8  obviously knew that there had been people experiencing
9  homelessness in other tents there.  So I didn't count
10 the tents, but obviously there were a number of tents
11 there.
12   Q.  Where did you notice the tents were?
13   A. You know, they were -- the ones that I recall,
14 they were in the northeast kind of quadrant, which is,
15 you know, kind of by where the fountain is, but -- but
16 that area that is -- is that John there?  So that part
17 was where I saw most of the tents.
18   Q.  You're talking about Cal Anderson Park now?
19   A. Right, in Cal Anderson Park.
20   Q.  Did you see tents other places in the area,
21 like around the East Precinct?
22   A. There were some other tents around the East
23 Precinct.
24   Q.  Did you notice the location of any barriers in
25 the area?

Page 82

1    A. I did not -- I don't recall noticing the
2  barriers, but, you know, it's -- the -- the areas that
3  tended to be kind of where the barriers were is the
4  Pike/Pine corridor, one block short of Broadway and
5  12th-ish.
6    Q.  Do you know whether those barriers were in
7  places that had -- where the Seattle Department of
8  Transportation had placed them, during your visits
9  there?
10   A. No, I don't know that.
11   Q.  So on your official visits, you said you talked
12 to businesses and residents in the area.  I assume you
13 mean permanent residents of the area; is that correct?
14   A. That is correct.  I think including your
15 client.
16   Q.  Which client?
17   A. Hunters Capital actually arranged one of them,
18 and so there were representatives from Hunters Capital
19 that I met with, and then I think at least one of them
20 walked with me in some areas.
21   And then I was in a second meeting that I
22 believe that a Hunters Capital person was there.  They
23 may have only been in the first visit, but -- but they
24 were there both as -- as you know, they have varied
25 business interests there.

Page 83

1    Mike Malone has been one of the people who
2  really has restored the Pike/Pine corridor and done a
3  lot of development in that area, and they -- also they
4  have some relation, I think, to some of the apartment
5  complexes there.  So we were hearing from, you know,
6  some of the small businesses and -- and some of the
7  resident organizations.
8    Q.  Okay.  Do you recall, other than Hunters
9  Capital, who you met with?
10   A. I -- I may conflate -- I think there were two
11 visits; I'm not positive.  On at least one of the
12 visits, we had people from Elliott Bay Books, from Queer
13 Bar, from Rachel's Ginger Beer, two of the apartment
14 complexes, the person who owns or runs Rhein Haus
15 Brewery.  There probably were others, but those were the
16 ones I recall speaking with.
17   Q.  Do the dates June 11th and June 12th sound like
18 when you may have visited the area?
19   A. It -- that's possible.  I think that that -- I
20 think there was a second visit too, but I -- but there
21 was earlier on, I think, one visit.  I would have placed
22 it later than that, but that is possible.
23   Q.  Okay.  So I want to ask you whether, during
24 these meetings you had with residents and businesses in
25 the area, and also in other conversations you had, so

Page 84

1  let's say during the first week of CHOP, so like between
2  June 8th and June 15th, do you recall hearing these
3  types of complaints?  Do you recall hearing that people
4  had -- were having difficulty accessing their
5  apartments?
6    A. I don't recall apartments, but there were --
7  look, it was -- there's no question the reason I was
8  there was, it was a challenging time, and that the, you
9  know, businesses felt like it was impacting their
10 businesses.
11   You know, they'd already been closed down
12 because of the pandemic.  Many of them were still
13 closed, but were hoping to open them up.  There was --
14 you know, we had a lot of issues that we talked to them
15 about.
16   I brought with me the heads of my department
17 because I wanted the people who were going to be able to
18 fix things be there and hear it first, so Seattle
19 Department of Transportation, Public Utilities.
20   We talked about garbage and garbage pickup.  We
21 talked about recycle.  We talked about access to getting
22 to buildings.  And so, you know, there was a range of
23 concerns that people had.
24   Q.  Okay.  So I mean, I heard in that, that you
25 were aware that there were access problems for some

Hunters Capital, LLC v. City of Seattle                                    Mayor Jenny A. Durkan

Page 85

1  people in the area; is that right?
2       A. I think that's fair to say.
3       Q. Okay. And you were aware that there were --
4  there had been some disruptions to garbage service in
5  the area for some people; is that right?
6       A. I think that -- correct.
7       Q. Okay. And at least you heard that some
8  businesses were complaining that they were losing
9  revenues because of what was going on in the area at
10 that time?
11      MR. HARRIGAN: Objection. Vague.
12      A. My best recollection is a little bit different
13 than that, is, remember, we're still in the governor's
14 stay home order and most businesses were closed, and
15 that we were getting to that point where we were
16 thinking about, how do we reopen the economy, and the
17 same businesses that had suffered, you know, having to
18 shut down during the pandemic was just so, so hard on
19 every business, not just on Capitol Hill, but in our
20 city, and that it was really about how -- how are we
21 going to survive in this -- in this reopening phase and
22 what's the plan for us, is my recollection. But that
23 may not be, you know, what they felt they were saying.
24 BY MR. WEAVER:
25      Q. So do you recall hearing concerns that --

Page 86

1  during that first week, that CHOP was making it even
2  harder on businesses than they -- on top of what had
3  happened with COVID and the pandemic?
4       MR. HARRIGAN: Objection. Vague.
5       A. Yeah, so I think that's right, but I think you
6  have to kind of pull it back even further. Because what
7  I heard from people was not just what was happening then
8  because of the protesters and the protest area, but
9  remember, for the week before that, from, you know,
10 May 31st-ish, all the protests really moved to Capitol
11 Hill and Cal Anderson Park.
12      And there were thousands of people there on a
13 daily basis, and we had to address all the same types of
14 issues. How do we collect the garbage and trash? How
15 do we keep people safe? How do we, you know, do those
16 range of things?
17      And so those businesses and residents were
18 impacted, you know, from those protests that occurred
19 before June 8th. And so we're looking at the totality
20 of that, and we know it's going to be some period of
21 time before we're going to be able to, you know, clear
22 people out. And so what can we do to address what's
23 happening to the people in that neighborhood and
24 community?
25      And that was really important to me. You know,

Page 87

1  it had impacts. And we wanted to be able to address
2  those impacts, keep people safe. At the same time, we
3  were balancing these really difficult and dynamic other
4  factors.
5       And so it's the reason I went up there
6  personally. You know, I had my staff working with
7  people on an ongoing basis, but I wanted to go
8  personally so people could say it to me, and I could let
9  them know that we're going to do what we can.
10 BY MR. WEAVER:
11      Q. Okay. Did you hear concerns, during that first
12 week of June 5th to June 8th -- June 8th to June 15th,
13 that people were being intimidated by protesters or
14 guards at the barriers in the CHOP area?
15      A. I don't recall anyone raising that with me when
16 I visited them.
17      Q. Do you recall hearing that people had
18 complained about that during those first days of CHOP?
19      A. My recollection on what I heard was that --
20 that Chief Best had received some reports of that
21 anecdotally, but then when they asked people to come
22 forward with the information that would provide that,
23 they weren't able to get it.
24      So -- so I personally didn't have information
25 about that, and am not aware of us being able to

Page 88

1  document that, but I have no doubt that, you know, some
2  people have said that occurred.
3       Q. Well, is it your understanding that Chief Best
4  was investigating whether people had to give ID in order
5  to go into the area?
6       A. I really think you have to ask Chief Best about
7  that. My understanding is, is that those were
8  preliminary anecdotal reports that Chief Nollette had
9  referenced, and Chief Best had heard. But then when
10 they -- they asked for more information, investigation,
11 I don't think they substantiated them, but again, you'd
12 have to ask Chief Best.
13      Q. Do you recall in your visits, on at least one
14 of your visits, talking to protesters who were assigned
15 to man the barriers that were erected in the area, in
16 the CHOP area?
17      A. I don't recall any of the protesters I met
18 with, that that was what their -- their job duties, for
19 lack of a better description, was.
20      Q. Do you recall seeing people manning barriers in
21 the area when you were there?
22      A. When I -- when I was there, I don't recall --
23 actually, I do not recall that at all. And when I was
24 there on my bike, I don't recall there being people
25 manning barriers.

22 (Pages 85 to 88)



Page 89

1    Q.  Were you ever -- while you were there on an
2  unofficial basis, were you ever asked why you were in
3  the area by anybody?
4    A.  No.  People really didn't pay any attention to
5  me, which was the goal.
6         MR. HARRIGAN:  Is this a logical stopping
7  place?
8         MR. WEAVER:  Let me -- just give me five
9  minutes, Art.  Thanks for reminding me.  I've lost track
10 of time.
11 BY MR. WEAVER:
12    Q.  Do you recall hearing complaints that there was
13 a lot of noise -- again, referring to the, you know,
14 June 8th to June 15th period, that there was a lot of
15 noise in the late hours of the night from CHOP?
16    A.  I don't recall that, but it's -- I have some
17 recollection, and it would not surprise me that people
18 may have had that complaint.
19    Q.  Do you recall hearing complaints or hearing
20 reports that there were late night parties going on in
21 Cal Anderson Park during the period of June 8th to
22 June 15th?
23    A.  I do not recall that.
24    Q.  Okay.  Do you recall hearing at any point
25 during CHOP that the conditions were worse at night than

Page 90

1  they were during the day?
2    A.  I do recall people saying that towards the end,
3  in the final weeks, that the people felt that there was
4  a different atmosphere in the evening hours than there
5  were in the daytime hours.
6    Q.  You don't recall hearing that early on, earlier
7  on than that, though?
8    A.  I do not recall.  I do recall it in the later
9  weeks.
10    Q.  Okay.  Did you see any signs of graffiti on any
11 of your visits?
12    A.  Yes, absolutely.
13    Q.  How would you describe the amount of graffiti
14 that you saw in the CHOP area on your visits?
15    A.  You know, I think it varied, depending on where
16 you were.  There was a -- there was more graffiti in and
17 around the East Precinct itself, and then on different
18 buildings, there was some graffiti.
19         It's one of the reasons why one of the things
20 we had as part of our planning in our clearing planning
21 was standing by our graffiti rangers, so that we could
22 go in and address that.
23         I think there were some attempts, during the
24 period of time from the 8th until the 30th, the three
25 weeks that the protesters were in that area, to see what

Page 91

1  we could do to address that, but there -- there clearly
2  was a fair amount of graffiti in and around Capitol
3  Hill.
4         We had experienced that since the beginning of
5  the pandemic.  There was significant graffiti in Pioneer
6  Square and Chinatown International District that we had
7  to address throughout the pandemic, and in fact have to
8  address today because it's been an ongoing problem.  But
9  no question that during this period of time, that there
10 was graffiti in and around the Capitol Hill and Cal
11 Anderson area.
12    Q.  Do you know whether -- or were you aware that
13 the graffiti became so voluminous in CHOP that the City
14 actually stopped trying to clean it up?
15    A.  I'm not aware of that.  I do know that when
16 we -- you know, in -- in planning our operational plan
17 for when we could be successful to move everyone out of
18 the area, one of the things that we wanted to be able to
19 do immediately was remediate graffiti, and indeed did
20 so.
21         So I know it was a significant issue.  And --
22 and just as importantly, in trying to kind of restore
23 the area for the community, we wanted to address all of
24 those issues cohesively.
25         And so, you know, we had the Parks Department

Page 92

1  people who could look at restoring Cal Anderson Park and
2  deal with some of the maintenance and graffiti issues
3  there.  We had the graffiti people who were going to
4  come and address the businesses.  We had Public
5  Utilities there to do additional trash and litter
6  cleanup, in addition to removing all of the tents and
7  other things that accumulated.
8         So the plan had to be a holistic one.  I was
9  not -- I had not heard at any point that the City had
10 done that, but, you know, Mami Hara would be in the best
11 position to -- to say what those efforts had been and
12 whether they were successful.
13         MR. WEAVER:  Okay.  So let's go ahead and
14 take -- let's go off the record.
15         THE VIDEOGRAPHER:  Off record.  Time now,
16 11:10 a.m.
17         (Recess from 11:10 a.m. to 11:24 a.m.)
18         THE VIDEOGRAPHER:  Back on the record.  The
19 time now is 11:24 a.m.
20          E X A M I N A T I O N  (Continuing)
21 BY MR. WEAVER:
22    Q.  So we talked about your personal visits to
23 CHOP.  I think you mentioned that some of your staff was
24 also visiting the area between June 8th and June 30th;
25 is that correct?

23  (Pages 89 to 92)

Hunters Capital, LLC v. City of Seattle                              Mayor Jenny A. Durkan

Page 93

1    A. Yes. There -- there was -- members of my staff
2    were up and around that area, I think, frequently.
3        Q. Okay. So what members of your staff were
4    there, that you know of?
5        A. I think it varies, depending on the day, but
6    during that period of time, I know that Deputy Mayor
7    Sixkiller was there, my chief of staff Stephanie Formas,
8    Deputy Mayor Ranganathan. Those are the ones in the
9    mayor's office.
10        I also had business outreach people during that
11   period of time that changed a little bit, but it was a
12   woman by the name of Sabrina who was reaching out
13   regularly to businesses, and I think visiting them.
14        I think we also had people from Department of
15   Neighborhoods go at occasional times. But those are the
16   people that I recall from my office being in the area
17   and Capitol Hill during that period of time.
18        Q. Did you receive reports back from those people
19   about what they were observing during their time at
20   CHOP?
21        A. Yeah, I'm not sure I'd call them reports.
22   There wasn't anything written or formal. But it would
23   be, you know, feedback. As you know, we were -- I was
24   getting updates, and it would kind of give me an update
25   on where we were, what the issues were, and so I would

Page 94

1    get those kinds of reports back.
2        Q. Was that roughly on a daily basis that you'd
3    hear from somebody about what -- where you were and what
4    was going on up in CHOP?
5        A. You know, I don't know -- I wouldn't say if it
6    was on a daily basis, and sometimes it could probably --
7    people would tell me what was going on more than once in
8    a day.
9        I think it really depended not just on what was
10   going on in Capitol Hill, but what was happening in
11   other parts of the city that was taking my attention.
12   It was -- during that period of time, there was a lot
13   going on.
14        And so obviously we devoted the resources.
15   That's why members of my staff were reaching out
16   directly and helping there, but there were other things
17   that I was required to do, everything from, you know,
18   pandemic planning to some of the activities that we were
19   afraid that the president was going to do. So it was a
20   really busy time.
21        Q. Did you ever feel like you had a lack of
22   information or that you wanted more information than you
23   were getting about what was happening on the ground in
24   CHOP?
25        A. I don't think that I had a lack of information.

Page 95

1    I think, you know, the one reason I rode my bike up
2    there is, I always like to see things myself.
3        Q. So we talked a little bit about the
4    pre-June 8th protests. What was your understanding of
5    what those protests were about primarily?
6        A. So the -- the primary focus of those protests,
7    you know, was obviously in -- came out of the murder of
8    George Floyd. And you saw those protests not just here
9    in the city of Seattle, but -- and not just nationally,
10   but globally.
11        And the -- really, the center of it, I think,
12   was, is that it was a -- in support of Black lives and
13   how we could change our society's, you know, longtime
14   established practices that really had excluded
15   African-Americans from so much of the opportunity in our
16   country. And that, while it was focused on policing,
17   the topics were so much broader than that.
18        And the meetings I was having with community
19   was really generational disinvestment and lack of
20   opportunity, everything from access to healthcare, to
21   housing, to educational justice, to employment.
22        And so the protests were, you know, Black Lives
23   Matter. It started because of police conduct, but it
24   really went to where we were as a society about all the
25   systemic racial inequity barriers that had existed for

Page 96

1    generations and denied people opportunity.
2        Q. And was it your understanding or perception
3    that that theme of the protests continued as well into
4    the -- into CHOP and what the main message was that
5    people were trying to get through with CHOP?
6        A. I think you'd have to -- you know, which
7    people? There is -- there is no time through 2020 or
8    even today that that message of a fight for Black lives
9    and equal opportunity doesn't continue to resonate and
10   doesn't continue to be raised.
11        And so I think that absolutely throughout June,
12   and throughout the summer, that that was something that
13   I was very focused on as mayor, is to how we could -- at
14   the same time, you know, I was a person who believed we
15   could not de-fund our police by 50 percent, but also
16   believed we have to make generational investments into
17   our communities of color, particularly our Black
18   community. And so that message continues to this day,
19   and that policy and that important goal of our society
20   never stopped.
21        Q. Okay. Is it safe to say that you were
22   concerned that there had been a significant number of
23   clashes between protesters and police near the East
24   Precinct in the days leading up to June 8, 2020?
25        A. Yes.

24 (Pages 93 to 96)

Hunters Capital, LLC v. City of Seattle                                    Mayor Jenny A. Durkan

Page 121

1   already raised the demand or request or aspiration,
2   whatever you want to call it, that the East Precinct
3   become a community center, and that that was also being
4   articulated by one or more councilmembers.
5        And so again, my best recollection is, is that
6   coming out of those series of meetings and knowing that
7   we could be looking at an ordinance passed that required
8   it, what would that look like and could it accomplish.
9        So my guess is, someone said to Calvin -- it
10  could have been me; I don't recall saying it -- hey,
11  look, what would we need to do this?  Can you get us
12  something?  And he took it upon himself to kind of
13  create this packet.  But again, this does not come
14  anywhere near what we would -- how you would go about
15  that.
16       **Q.  Do you recall at some point that you had**
17  **discussions with Black Lives Matter in which they**
18  **indicated they actually did not want the East Precinct?**
19       A.  No.  I think that the -- you know, like there's
20  a lot of dynamic events in and around the time, and we
21  were having a lot of discussions with Black Lives Matter
22  Seattle-King County throughout that period of time on a
23  whole range of issues, and at the same time they're
24  the -- the plaintiff that is suing the Seattle Police
25  Department in the -- Judge Jones' courtroom.

Page 122

1        And so there was a range of issues that we
2   addressed with them, including the ones in the meeting I
3   talked to you about with Public Health on what we could
4   do to address some of the issues there.
5        And so I recall -- my best recollection is, is
6   that, as this demand evolved, and as Chief Best had made
7   clear, she also made clear to -- to people in the
8   community, we did, that she believed, and I support and
9   concurred with that, that the police needed to be in the
10  precinct to provide the police services.
11       And so there -- there came a time when, after
12  we got the June 15th letter, in discussions, my
13  recollection is, is like, what do you want this center
14  to be?  What's the purpose of it?
15       And it was both kind of as a symbol that -- you
16  know, to kind of remove policing as an obstacle for
17  community, which had a very powerful symbolic meaning
18  for -- for many in community, but then also to have a
19  place where you could have community-based organizations
20  that serve primarily the Black community, and kind of
21  a -- a place where you could have opportunity zone kind
22  of things where you had an incubator, small businesses,
23  you know, entrepreneurialships, kind of a place that
24  could become a center of brilliance and activity for the
25  Black community.

Page 123

1        So our discussions then shifted with Black
2   Lives Matter Seattle-King County, is like, what would
3   that look like and what purposes do you need.  And then
4   how do you kind of make sure that we satisfy both why the
5   community wants it, but then also can take the precinct
6   off the table.
7        And the solution ended up being that Black
8   Lives Matter Seattle-King County was able to designate a
9   longtime community member person who had worked in and
10  around policing issues, Reverend Harriett Walden, who
11  was a very strong supporter of keeping the precinct as a
12  precinct.  They were willing to put her as the person
13  who would work with the City on the future of the
14  precinct, and that gave us what we needed.
15       Then we had the community support to return
16  policing to the precinct, and community support to
17  create this other kind of center of -- of activity for
18  things.  But we had to deal with all of those things at
19  the same time.
20       You know, without community support, there's no
21  doubt in my mind that the city council may have just
22  acted to require that become a community center, and
23  then we would have had incredible challenges.
24  **Q.  What were some of the other areas for the**
25  **community center that the City explored for a Black**

Page 124

1   **Lives Matter headquarters?**
2       A.  You know, over time there was a number of
3   places.  We looked at the -- the -- a location directly
4   adjacent to the precinct, in the -- The Riveter location
5   that had gone.  We'd looked at -- there was a building
6   across the street from Mount Zion church.  There was
7   some discussion at one point as to whether we could
8   utilize Miller Community Center for some or all of these
9   purposes.
10      So -- and that changed over time too in terms
11  of what -- what the Black Lives Matter Seattle-King
12  County itself wanted, whether they were going to buy a
13  building, whether they were going to lease a building,
14  whether -- and so it was a -- it was an evolving
15  discussion.
16      **Q.  So what was the Mount Zion church location?**
17      A.  There's a small building that is west of Mount
18  Zion church that I believe was being used as kind of a
19  youth support services at the time, and they were
20  exiting the building, and that it might be -- you know,
21  it's a -- really a place of historic importance for the
22  Black community, not just because of the location of
23  Mount Zion, but because of the location in the Central
24  District.
25      I can't remember the exact address, but it

31 (Pages 121 to 124)

Hunters Capital, LLC v. City of Seattle

Mayor Jenny A. Durkan

Page 125

1    was -- that was a building there.  I think we looked at
2    it at some point in time and it was determined that
3    maybe it might not be suitable.  There was ongoing
4    discussions with that.
5         And again, you know, at one point there was
6    some discussion about whether the Miller Community
7    Center could be utilized by some of the Black-led
8    organizations.
9         Q.  So with regard to the Mount Zion location, or
10   the building near or in Mount Zion, what was -- what
11   options were explored there?  Would the City buy the
12   location?  Would the City assume a lease for that
13   location?  What was -- what was the plan there?
14        A.  I don't -- I don't recall specifically because
15   it was really iterative.  For a while there was focus on
16   that, and I can't remember exactly what time frame.  My
17   recollection of the framework was, is that the entity
18   itself would purchase it, but that it might be supported
19   by contracts to the organizations who were there through
20   the Human Services Department, or that it may be a
21   co-location for those people that we already had
22   contracts with supporting.  It was -- you know, I would
23   get pretty summary oral reports back at different times
24   on where we were.
25        Q.  Was this in June of 2020 that this -- those

Page 126

1    discussions were going on with Mount Zion?
2         A.  No, it wasn't Mount Zion.  It was near Mount
3    Zion.
4         Q.  Okay.
5         A.  Yeah.  I don't recall the time frame.  I -- you
6    know, the -- I -- I can't tell you the answer to that.
7    I know that the discussions with Black Lives Matter
8    Seattle-King County Chapter, you know, continued on for
9    a period of time, and so I couldn't give you an exact
10   time frame on that.
11        Q.  How about The Riveter space that you mentioned?
12   How did that come up to be a possible location?
13        A.  That came up because the -- you know, as I
14   said, we -- we very much knew we needed to keep the
15   police in the police precinct.  But there was a huge
16   desire and need by members of the Black community and
17   other communities of color to actually have physical
18   space that represented what I talked about before, a
19   place that you could have maybe a truth and
20   reconciliation center to work on those issues about
21   policing in the Black community, support the Black-led
22   organizations like Community Passageways, which deals
23   with violence and eruption, or Choose 180, which does
24   the same thing for youth.
25        And so there was a discussion about what would

Page 127

1    that look like.  And I happen to know that the space in
2    there was vacant, or I thought it was, and so we -- we
3    looked at that space.
4         I think I made an introduction to my team to
5    the -- I can't remember if it was to The Riveter itself
6    first or to the landlord, but made those introductions.
7    And I knew because I -- I knew the people who started
8    The Riveter.  I had been an investor early on, and knew
9    the space was empty, and it was perfect in many ways
10   because it was built just for that kind of thing.
11        It's a space that was like a We Works.  It had
12   lots of different rooms it had used for kind of
13   entrepreneurial presentations and businesses and
14   start-ups, and physically would be good.
15        And it was right next to the precinct, so you
16   could have that truth and reconciliation, you know, the
17   first in the nation to have this kind of almost
18   co-located spot between the police department and Black
19   Lives Matter Seattle-King County.  Could have been super
20   exciting, and so that's where the -- the kind of idea
21   for that came.
22        Q.  So it was -- you were the one that initially
23   identified The Riveter space as a possibility; is that
24   correct?
25        A.  That's correct.

Page 128

1         Q.  And then you contacted The Riveter, the people
2    you knew previously from The Riveter --
3         A.  Yeah, just to see if the space was actually
4    still empty, and whether they -- they had a lease or
5    what the status of it was.
6         Q.  And what did you find out?
7         A.  My under- -- my recollection is, is that, yes,
8    they still had the lease, and the landlord was Hunters
9    Capital.  And so I introduced the people on my senior
10   team -- I don't remember who it was -- to them, and I
11   actually -- I think I spoke with Mike Malone of Hunters
12   Capital to say, you know, this is an idea we have, you
13   know.  Is it something that you would be willing to at
14   least explore?  Not to be -- you know, promise that they
15   could go forward.
16        And then I stepped out of all the discussions
17   and negotiations.
18        Q.  Why did you step out from the negotiations?
19        A.  We had contacted the Seattle Ethics and
20   Elections.  Because I had made an initial investment in
21   The Riveter, wanted to make sure that there wouldn't be
22   either an actual conflict or the appearance of a
23   conflict.
24        And it was their best recommendation, because
25   there could be an appearance of some benefit, that I

32 (Pages 125 to 128)

Hunters Capital, LLC v. City of Seattle                              Mayor Jenny A. Durkan

Page 129

1    step out and not have any involvement in the ongoing
2    discussions and negotiations.
3          Q.  And so -- and you were still -- were you still
4    friends with the owners of The Riveter?
5          A.  I -- we were never friends, social friends.  I
6    knew them, and I knew Mike Malone, who was also a
7    friend.
8          Q.  And was -- were the -- were the owners of The
9    Riveter, did they ever contribute to your campaigns,
10   that you know of?
11         A.  I have no idea.  The person I contacted was Amy
12   Nelson, who was the founder, and that's -- you said
13   owners, plural, but she's the only person that I
14   contacted.
15         (Exhibit No. 5 marked.)
16         MR. WEAVER:  Okay.  I've dropped an exhibit
17   in there, Exhibit 5.
18         MR. HARRIGAN:  If we're changing the
19   subject, is this a good time for lunch?  It's up to you.
20         MR. WEAVER:  We aren't changing the subject.
21   If I can get ten minutes, I think we can get done with
22   this, and then we can take lunch --
23         MR. HARRIGAN:  Okay.
24         MR. WEAVER:  -- if that's okay.
25         MR. HARRIGAN:  Okay.

Page 130

1    BY MR. WEAVER:
2          Q.  So this is an email you sent to Calvin Goings
3    and Michael Fong, with a copy to Chief of Staff Formas,
4    removing yourself from the negotiations with regard to
5    The Riveter; is that right?
6          A.  That's correct.  And that's what I said before,
7    is that because of the app- -- any appearance issue, it
8    was the recommendation of Seattle Ethics that I do that,
9    so I stepped out of it.
10         Q.  Okay.  So this was sent on the morning of
11   June 21st; is that right?
12         A.  That's what it states.  I don't recall that
13   independently, but it -- yes.
14         Q.  Okay.  Do you know whether -- you mention
15   toward the end of here that Chief Best could be
16   involved.
17         Do you know whether Chief Best was ever
18   involved in any of the discussions regarding The
19   Riveter?
20         A.  I doubt it.  And I -- I don't know -- there
21   would be no reason for her to be so.  I think I added
22   this at the end because Chief Best does know Mike
23   Malone, and one of the things that -- if -- this ended
24   up not working either, but if it was going to work, you
25   know, obviously he would have to have some confidence

Page 131

1    that there was a -- you know, this was a step to, one,
2    getting back into the East Precinct, and two, because I
3    think he trusted her judgment as to what community
4    groups could be trusted and what their kind of -- their
5    work was.
6          And so I think I said, you know, Chief Best and
7    I could be available, and I think that was solely that
8    if there was -- you know, if -- if Mr. Malone needed
9    some additional assurances that Black Lives Matter
10   Seattle-King County was, you know, a really strong,
11   reputable organization that had done tremendous amount
12   of good.
13         I mean, in my brief conversation that I had
14   with him, you know, his voiced concern when I was making
15   the introductions was, he didn't want to just -- he
16   thought at first it was taking the actual protesters
17   from the Capitol Hill and Cal Anderson Park and putting
18   them in his building, and that was never the intent.
19         Q.  Do you recall speaking to Mike Malone and
20   Hunters Capital after sending this email about The
21   Riveter transaction?
22         A.  I recall talking to him.  I couldn't tell you
23   without looking at something whether it was before or
24   after or right around the same time, but I did speak to
25   him.

Page 132

1          Q.  And did you also speak to Jill Cronauer, who
2    worked for him?  Were you on that call?
3          A.  I don't recall having conversations with her,
4    but it's -- it -- I don't recall having conversations
5    with her, but it's possible she was on a call.
6          MR. WEAVER:  Okay.  Hold on here.  Whoops.
7    Okay.  That will be -- what I dropped in there, Court
8    Reporter, that should be marked as Exhibit 6.  It's a
9    spreadsheet.  I can renumber it if we need to do that,
10   but -- okay.
11         (Exhibit No. 6 marked.)
12   BY MR. WEAVER:
13         Q.  So if you can open this, this is an Excel
14   spreadsheet that we received of some of our texts that
15   were recovered from other custodians.  And it's pretty
16   cumbersome to go through.  I'm not going to lie.
17         So this is not every text that we got.  I mean,
18   that was -- went back to 2017, I believe.  This is
19   everything we got from the first production of recovered
20   emails, just so Counsel knows, for the period of
21   June 8th through, I believe, of mid-July.
22         And if you could go to the -- if you look at
23   Column I, which is the time of the various texts, and if
24   you could go down to -- or up to, depending on how it
25   is, to June 21st?

33 (Pages 129 to 132)

Hunters Capital, LLC v. City of Seattle                    Mayor Jenny A. Durkan



Page 273

1      4:55 p.m.
2              (Deposition concluded at 4:55 p.m.)
3              (Reading and signing was requested
4          pursuant to FRCP Rule 30(e).)
5                  -o0o-
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 274

1          C E R T I F I C A T E
2
3      STATE OF WASHINGTON
4      COUNTY OF PIERCE
5
6          I, Cindy M. Koch, a Certified Court Reporter in
7      and for the State of Washington, do hereby certify that
8      the foregoing transcript of the deposition of Jenny A.
9      Durkan, having been duly sworn, on December 8, 2021, is
10     true and accurate to the best of my knowledge, skill and
11     ability.
12         IN WITNESS WHEREOF, I have hereunto set my hand
13     and seal this 29th day of December, 2021.
14
15
16
17     _____
18         CINDY M. KOCH, CCR, RPR, CRR
19
20     My commission expires:
21     JUNE 9, 2022
22
23
24
25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Exhibit 11

# 11am Update - E Precinct

| | |
|---|---|
| **Where:** | 701-801-1211; 591-015-294 |
| **When:** | Wed Jun 10 11:00:00 2020 (America/Los_Angeles) |
| **Until:** | Wed Jun 10 12:00:00 2020 (America/Los_Angeles) |
| **Organisers** | "Nelson, Laurel" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=f1bbaebb6f0a4bed808e0303e8b537f0-nelsonl1"> |
| **Required Attendees:** | "Nelson, Laurel" <laurel.nelson@seattle.gov> |
| | "Fong, Michael" <michael.fong@seattle.gov> |
| | "Ranganathan, Shefali" <shefali.ranganathan@seattle.gov> |
| | "Sixkiller, Casey" <casey.sixkiller@seattle.gov> |
| | "Formas, Stephanie" <stephanie.formas@seattle.gov> |
| | "Auriemma, Anthony" <anthony.auriemma@seattle.gov> |
| | "Kline, Julie" <julie.kline@seattle.gov> |
| | "Aisenberg, Kathryn - MOS" <kathryn.aisenberg2@seattle.gov> |
| | "Apreza, Ernesto" <ernesto.apreza@seattle.gov> |
| | "Best, Carmen" <carmen.best@seattle.gov> |
| | "Mahaffey, Thomas" <thomas.mahaffey@seattle.gov> |
| | "Diaz, Adrian" <adrian.diaz@seattle.gov> |
| | "Scoggins, Harold D" <harold.scoggins@seattle.gov> |
| | "Aguirre, Jesús" <jesus.aguirre@seattle.gov> |
| | "Hara, Mami" <mami.hara@seattle.gov> |
| | "Goings, Calvin" <calvin.goings@seattle.gov> |
| | "Zimbabwe, Sam" <sam.zimbabwe@seattle.gov> |
| | "Mantilla, Andres" <andres.mantilla@seattle.gov> |
| | "Neafcy, Kenneth" <kenneth.neafcy@seattle.gov> |
| **Optional Attendees:** | "Grove, Kiersten" <kiersten.grove@seattle.gov> |
| | "Reed, Michelle" <michelle.reed@seattle.gov> |
| | "Worcester, Ned" <ned.worcester@seattle.gov> |
| | "Buechler, Chad M" <chad.buechler@seattle.gov> |
| **Attachments:** | 2020-06-10 6am Call Notes.docx (23.91 kB) |

6/10 6AM Call Notes

NEXT CALL: 11AM

**Overnight:** There were about 15-30 people in front of the precinct overnight.   Yesterday, there was a larger protest at Cal Anderson that ended with a march to City Hall and back to Cal Anderson.

**This morning:** There are about 50 people there this morning. Early morning crowd very calm and welcomes the boarding up of the 2nd floor and the defueling the tank.   There is no trash on the street.   The site is very clean.   They are very invested in having a peaceful atmosphere. They would like to have the rear door on Pine Ave locked (currently unlocked) and have been manning it to keep people out.   There are no new perimeter barriers.  There are a row of 10 tents on 12th ave and a couple on 13th

There was some discussion about bringing in a professional negotiator.

More large protests expected this weekend

## OVERALL OBJECTIVES:  Continuing the existing footprint of peaceful demonstration and rights

1. Pursue physical modifications to the footprint
   1.1. Get out non-SDOT barriers.  Ensure coordination with SPD to remove the bike racks and rented barriers and replace them with orange barricades/water barriers (LEAD: SDOT)
   1.2. Pivot this into a street closure.  Make it into a regular street closure (so they don't feel like they need to guard the edges)  (LEAD: SDOT)
2. Secure the building.  See what is going on in the building.
   2.1. Assess if there is anything that needs to be retrieved inside the building. (LEAD: SPD)
   2.2. Provide the City team any information on armed individuals and if they are still there. (LEAD; SPD)
   2.3. Have fire do a life safety check inside the building making sure the fire suppression inside the building is operational. (Lead: SCOGGINS) HOLDING
   2.4. Have FAS  secure the building and defuel the generator. (Lead: FAS)  HOLDING.
3. Encourage conversations between protest groups and/or the City.  One group has released list of 25 demands.  None of which includes the East Precinct.  City needs to help encourage the conversation between the group that provided the demand and other protest groups.
   3.1. Identity who should be on the strategy session. (LEAD: CASEY)
   3.2. Identify clear parameters for City's position to negotiate. (LEAD: CASEY)
   3.3. Have an internal discussion about the list of demands.  (LEAD: CASEY)
   3.4. Identify the protest leaders. (LEAD: CASEY)
   3.5. Should we bring in a negotiator or is the City the right intermediary?

SEA_00028171

## STATED DEPARTMENT DESIRED GOALS

- SDOT: a little concerned about sending their teams back in without having a game plan. Would like to get lights back on and barriers/barricades removed.
- Fire:  Access and egress.  Be able to navigate that area.
- FAS:  Concerns in sending staff into area.  Remediate the diesel and secure the building.
- SPD:  Get Officers back in the building. Get any items left inside the building.
- SPR:  Don't move them to the park.

Exhibit 12

# RE: SPU Support on 'March for Justice' events

**From:**   "VanDusen, Hans" <hans.vandusen@seattle.gov>
**To:**   "Hara, Mami" <mami.hara@seattle.gov>
**Cc:**   "Fowler, Jeff" <jeff.fowler@seattle.gov>; "Worcester, Ned" <ned.worcester@seattle.gov>;
"Buechler, Chad M" <chad.buechler@seattle.gov>; "Hare, David" <david.hare@seattle.gov>;
"Beauregard, Idris" <idris.beauregard@seattle.gov>; "Barrett, Ty" <ty.barrett@seattle.gov>
**Date:**   Fri, 12 Jun 2020 15:17:50 -0700

**3pm Fri June 12**

**Citywide marches** – Large march activity this afternoon for Capital Hill, Beacon Hill and throughout the City.

**East Precinct Zone** – Protestor-established barricades remain at street ends for appx 7 blocks around SPD East Precinct as shown in prior map. SPU GM and others continue to monitor onsite to support safe access for City staff and contractors. Recommended access hours for services within zone are 8am-10am, with primary access at 12th and Pike barricade. Perimeter customers and services available throughout the day.

**SPD building** – SPD visited Thursday to assess and address interior items. Minimal activity today. No additional request for city departments.

**Debris** – SPU contractors collected bagged and consolidated debris each morning at collection points in the zone. Minimal scattered litter in zone.

**Customer waste services** – SPU calling and visiting with business and residential customers within and near the zone to clarify any service changes. SPU able to return some containers that were removed earlier in the week, if customers can safely store and retain. SPU focusing pickup in the zone for Mon, Wed, Fri at 8-10am. SPU providing large shared dumpsters at 13th & Pine and 10th & Pike for customers still without their own waste containers.

**Public waste services –** Parks to begin daily service of dumpster 11th & Olive in CA Park. Recycling container also at 11th & Olive. SPU distributing bags for public clean-up and servicing consolidation points. As described, much of public debris collected form bagged consolation at 12th & Pine and other pile locations.

**Public toilets** – All toilets pumped at appx 10am. 3 private sponsored toilets removed that were not being serviced. SPU SPU wash station water supply replenished. City sani-cans consolidate to:
- 9 at 11th & Olive on street (2 ADU) with 2 wash stations
- 8 at 12th & Pine with wash station
- 4 at 11th & Union

**Graffiti** – Continued graffiti near East Precinct on private buildings. No action  by SPU and SDOT within zone. Continued abatement outside of zone.

SEA_00102780

**Broken window boarding** – SDOT dispatched to board broken window at Hillcrest Market 110 E Summit.

**Preventive boarding** –  None.

**CID Deboarding** – Future plans TBD.

**EOC Support** – Hans continues remote operational coordination, through the weekend. OEM providing onsite EOC support and SPU liaison as needed. Clean City and GM providing onsite response in zone.

Let me know any questions.

---

**From:** VanDusen, Hans
**Sent:** Wednesday, June 10, 2020 3:02 PM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>; Buechler, Chad M <Chad.Buechler@seattle.gov>; Hare, David <David.Hare@seattle.gov>; Beauregard, Idris <Idris.Beauregard@seattle.gov>; Barrett, Ty <Ty.Barrett@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events


<u>3pm Wed June 10</u>

(Some redundancy with Chad update)

**East Precinct Zone** – New barricades continue to adjust at street ends in blocks around SPD East Precinct. See map. City department directors and staff on-site to coordinate fire and emergency access, site hygiene and other public needs.

**SPD building** – FAS second story boarding canceled. FAS Fuel removal from basement generator postponed. EOC and SPD coordinating door security and further item removal.

**Debris** – Minimal scattered debris this morning. Litter had been consolidated and set-out at barricade street-ends. SPU contractors collected street ends and other internal debris piles this morning.

**Business Waste services** and container reduction – SPU & contractors coordinated service adjustments to respond to both: 1. Restricted zone access and 2. Appx 50 containers removed Monday for fire safety. SPU and Recology informing customers with options and revisions, including set-out times in zone, early am, to provide access for service. SPU providing large dumpsters at 13th & Pine and 10th & Pike for customers that had their own containers removed. SPU reviewing individual container for return to area if can be secured.

**Public waste services** – Parks dumpster provide at CA Park. As described, SPU contractors collection debris piles street ends, litter cans and other locations.

**Public toilets** – SPU supported servicing at current toilets. SPU coordinated FAS delivery of 5 new toilets at 11th and Olive, adjacent to east entrance to Cal Anderson Park. SPU will install washing station at this location. SPU will continue to review with Parks and MO future adjustments. Current toilets:

- 5 at 11th & Olive on street (FAS),
- 3 in CA Park near 11th & Olive (Parks)
- 8 at 12th & Pine (FAS)
- 4 at 11th & Union (SPU)

**Graffiti** – Continued graffiti near East Precinct on private buildings. SPU and SDOT directed to hold off on near-term abatement within the nearby zone.

**Broken window boarding** – None.

**Preventive boarding** –  None.

**CID Deboarding** – OED, Arts and others continue to engage with CID groups and artists on plans, options, needs and timing for potential future deboarding. Plans are TBD.

**EOC Support** – Hans continues as weekday on-call. Chad as night on-call. Dave as weekend day on-call. But all 3 plenty involved in Ops.

Let me know any questions.

SEA_00102782



**From:** VanDusen, Hans
**Sent:** Tuesday, June 9, 2020 7:38 AM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>;
Buechler, Chad M <Chad.Buechler@seattle.gov>; Hare, David <David.Hare@seattle.gov>;
Beauregard, Idris <Idris.Beauregard@seattle.gov>; Barrett, Ty <Ty.Barrett@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events

**7:30am Tue June 9**

**Debris** – Minor debris near East Precinct. SPU awaiting confirmation from SPD to access adjacent
streets for debris pickup. As you know, barriers and police presence was pulled at 5pm Mon.

**Graffiti** – Major graffiti on private buildings. SPU and SDOT will hold off on abatement near East
Precinct due to access and rain conditions limiting abatement success. We will access for priority
hate, race, vulgar graffiti to follow-up later.

SEA_00102783

**Flammable and container reduction** – Most business dumpsters from the block around East Precinct were removed yesterday afternoon, per SPD request. A few more that were not accessible, due to pm crowds, will be removed today. SPU will be coordinating with Recology and relevant independent vendors on service plans for businesses whose containers were removed.

**Broken window boarding** – 1 burglary reported with boards removed at 5th and Pike. SPU confirming if re-boarding assistance is needed.

**Preventive boarding** – SDOT completed additional preventative boarding of lower level of East Precinct yesterday and installation of chain-link fence adjacent to building. FAS is coordinating contractor to install 2nd story boarding.

**Fuel removal –** FAS coordinating removal of fuel from East Precinct basement generator by contractor today.

**EOC Activation** – EOC activation now 4-10pm. SPU requested as on-call 11am-10pm, but not requested at EOC. Hans is current SPU on-call. SWLOB and EM will confer on on-call coverage.

Let me know any questions.

---

**From:** VanDusen, Hans
**Sent:** Monday, June 8, 2020 7:12 AM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>; Buechler, Chad M <Chad.Buechler@seattle.gov>; Hare, David <David.Hare@seattle.gov>; Beauregard, Idris <Idris.Beauregard@seattle.gov>; Barrett, Ty <Ty.Barrett@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events

<u>7am June 8</u>

**Debris** – Major debris again near East Precinct. Area was not cleared for clean-up assessment and entry until appx 5:30am. SDOT, SPU Recology and SPU Elmgrove cleaning litter and debris this morning. SDOT heavy equipment will be onsite to address concrete, metal and large items. Recology to relocate dumpsters and litter cans from the street, some burned. No debris reported at other sites.

**Graffiti** – Major amounts of graffiti on private buildings, including brick. SPU and SDOT will continue to address priority hate, race, vulgar graffiti on private surfaces. Significant volumes of graffiti on private surfaces will likely need to wait for robust public-private after event sweep in future. SPU, SDOT and Parks removing priority tags on public assets today near East Precinct. No graffiti reported at other gathering areas.

**Flammable and container reduction** – No new action.

**Broken window boarding** – None reported or observed for dispatch today.

**Preventive CID boarding** – SDOT was asked to preventatively board up lower level of East Precinct. SPD potentially interested in higher pre-boarding at East Precinct and maybe West Precinct in future but still needs to be confirmed.

**EOC Activation** – EOC currently scheduled through Sun June 14. SPU EM and SWLOB will provide staffing plan.

Let me know any questions.

---

**From:** VanDusen, Hans
**Sent:** Sunday, June 7, 2020 8:05 AM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>; Buechler, Chad M <Chad.Buechler@seattle.gov>; Hare, David <David.Hare@seattle.gov>; Beauregard, Idris <Idris.Beauregard@seattle.gov>; Barrett, Ty <Ty.Barrett@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events

8am June 7

**Debris** – Major debris in Cap Hill near East Precinct, area after significant Sat night activity. SDOT, Recology and Elmgrove cleaning this morning. No significant debris reported yet for other protest gatherings.

**Graffiti** – SPU, SDOT and Parks dispatching today for removal near Cal Anderson. No reports yet on other gathering areas.

**Flammable and container reduction** – No new action.

**Broken window boarding** – 1 reported near Cap Hill and dispatched today.

**Preventive CID boarding** – Project completed Friday night.

Let me know any questions.

---

**From:** VanDusen, Hans
**Sent:** Saturday, June 6, 2020 7:17 AM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>; Buechler, Chad M <Chad.Buechler@seattle.gov>; Hare, David <David.Hare@seattle.gov>; Beauregard, Idris <Idris.Beauregard@seattle.gov>; Barrett, Ty <Ty.Barrett@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events

7am June 6

**Debris** – No major debris reported. Most cleaned-up overnight by SPU contractors and protestors.

**Graffiti** – Medium. SPU, SDOT and Parks scheduled for removal today, especially near Cal Anderson, near 23rd & Jackson protest site, and march route between.

**Flammable and container reduction** – SPU will continue focus on potential Saturday protest sites

**Broken window boarding** – 1 re-boarding reported overnight and dispatched today. (Ross downtown had boards removed for looting that will be replaced.)

**Preventive CID boarding** –  SDOT and FAS completed final 6 sites yesterday on last day of City preventive boarding project. Young artists (younger than me), many from the community hosted, an impressive mural painting event on the CID plywood yesterday. I'll send some pictures later.

Let me know any questions.

Hans Van Dusen
Solid Waste Contracts Manager
(206) 310-0341

---

**From:** VanDusen, Hans
**Sent:** Friday, June 5, 2020 8:20 AM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>; Buechler, Chad M <Chad.Buechler@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events

<u>8am June 5</u>

**Debris** – Small litter and full litter cans at Thursday protest sites with SDOT & Recology responding this morning

**Graffiti** – Medium. Graffiti removal scheduled today, mostly Cal Anderson area again – with SDOT & Parks

**Flammable and container reduction** – SPU will focus on potential Friday sites and prepare for the larger weekend protest events.

**Broken window boarding** – Dispatched 1 site today with broken glass today (on MLK South near the Othelo protest site but possibly note related)

**Preventive CID boarding** – Dispatched final 6 sites today to small SDOT crew for early board up prior to community murals event today. Final tally should tally should by appx 230 CID sites. An impressive One City commitment to the community, culminating with another heroic late night Thursday shift by SPU warehouse, PDB and DWW crews.

Let me know any questions.



Hans Van Dusen
Solid Waste Contracts Manager
City of Seattle, Seattle Public Utilities
O: 206-684-4657 |M: 206-310-0341
Facebook |Twitter

**From:** VanDusen, Hans
**Sent:** Thursday, June 04, 2020 9:24 AM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>
**Subject:** RE: SPU Support on 'March for Justice' events

9:00 am June 4

**Debris removal** –Mostly litter, not large debris last night. Clean-up & litter cans completed this morning for Wed protest or march areas, including Cal Anderson, Pike/Pine corridor, City Hall - with SDOT, Recology and Clean City

**Graffiti abatement –** Medium. Graffiti removal scheduled today, mostly Cal Anderson area – with SDOT & Parks

**Flammable and container reduction –** Continue to monitor remove containers and excess materials around Cal Anderson

**Broken window boarding –** Dispatched 0 sites with broken glass today

**Preventive CID boarding –** Dispatched appx 20 sites to SDOT and SPU today. Should be nearly complete on all requests today. I expect small deployment tomorrow.
Total closed out to date = 192; Total open requests = 24; Total open and closed requests = 216

Let me know any questions.



Hans Van Dusen
Solid Waste Contracts Manager
City of Seattle, Seattle Public Utilities
O: 206-684-4657 |M: 206-310-0341
Facebook |Twitter

**From:** VanDusen, Hans
**Sent:** Wednesday, June 03, 2020 3:45 PM
**To:** Hara, Mami <Mami.Hara@seattle.gov>
**Cc:** Fowler, Jeff <Jeff.Fowler@seattle.gov>; Worcester, Ned <Ned.Worcester@seattle.gov>
**Subject:** SPU June 3 Support on 'March for Justice' events

**Debris removal** – Significant debris clean-up & dumpster recovery for on Capitol Hill during the night and early morning - with SDOT, Recology and Clean City

**Graffiti abatement** – Graffiti removal, mostly Cal Anderson, plus City Hall and other locations

**Flammable and container reduction** – Removed containers and excess materials around Cal Anderson prior to today's rally

**Broken window boarding** – Dispatched 2 sites with broken glass

**Preventive CID boarding** – Dispatched appx 30 sites to appx 38 staff in field (Parks, FAS, SDOT)
*(I'll check on our latest boarding tallies)*

Hans Van Dusen
(206) 310-0341
Seattle Public Utilities

SEA_00102788

Exhibit 13

# 2PM Update - E Precinct (see notes)

| | |
|---|---|
| **Where:** | 701-801-1211; 591-015-294 |
| **When:** | Wed Jun 10 14:00:00 2020 (America/Los_Angeles) |
| **Until:** | Wed Jun 10 15:00:00 2020 (America/Los_Angeles) |
| **Organisers** | "Nelson, Laurel" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=f1bbaebb6f0a4bed808e0303e8b537f0-nelsonl1"> |
| **Required Attendees:** | "Fong, Michael" <michael.fong@seattle.gov> |
| | "Ranganathan, Shefali" <shefali.ranganathan@seattle.gov> |
| | "Sixkiller, Casey" <casey.sixkiller@seattle.gov> |
| | "Formas, Stephanie" <stephanie.formas@seattle.gov> |
| | "Auriemma, Anthony" <anthony.auriemma@seattle.gov> |
| | "Kline, Julie" <julie.kline@seattle.gov> |
| | "Aisenberg, Kathryn - MOS" <kathryn.aisenberg2@seattle.gov> |
| | "Apreza, Ernesto" <ernesto.apreza@seattle.gov> |
| | "Best, Carmen" <carmen.best@seattle.gov> |
| | "Mahaffey, Thomas" <thomas.mahaffey@seattle.gov> |
| | "Diaz, Adrian" <adrian.diaz@seattle.gov> |
| | "Scoggins, Harold D" <harold.scoggins@seattle.gov> |
| | "Aguirre, Jesús" <jesus.aguirre@seattle.gov> |
| | "Hara, Mami" <mami.hara@seattle.gov> |
| | "Goings, Calvin" <calvin.goings@seattle.gov> |
| | "Zimbabwe, Sam" <sam.zimbabwe@seattle.gov> |
| | "Mantilla, Andres" <andres.mantilla@seattle.gov> |
| | "Neafcy, Kenneth" <kenneth.neafcy@seattle.gov> |
| **Optional Attendees:** | "Grove, Kiersten" <kiersten.grove@seattle.gov> |
| | "Reed, Michelle" <michelle.reed@seattle.gov> |
| | "Worcester, Ned" <ned.worcester@seattle.gov> |
| | "Buechler, Chad M" <chad.buechler@seattle.gov> |
| | "Rivera, Maritza" <maritza.rivera@seattle.gov> |
| **Attachments:** | 6-10-20 11 AM E Precinct Call Notes (002).docx (23.81 kB) |

SEA_00028178

## 6/10/20 11 AM E Precinct Call Notes

==NEXT CALL 2:00 PM:==

**Situation Update:** E Precinct doors are locked and the SAID card system working again, but it doesn't sound like this has been verified with eyes on scene. Personal Property and some files remain in the E Precinct Building. There are some reports of group members checking ID or questioning people at checkpoints.

1. Pursue Physical Modifications to Barriers/Footprint
   - Negotiations continue. Non-SDOT metal barrier removal began, but group leaders changed their mind and metal barriers remain. Unknown how much progress with barrier/footprint modification can be made today. Existing street closures remain in place. There is confusion among the group leaders on site as to who can make decisions on footprint/barrier removal.
   - Looking at setting a planter at 10th and Pine
2. Secure the E Precinct Building
   - Personal Property and files remain in the building, it is difficult to inventory everything that remains.
   - SPD is aware that additional police presence could increase tension
   - SPU offered to provide a dumpster accessible by minimal staff that could be removed by a collection vehicle. SPD will pass the offer on to SPD Incident Command.
   - Chief Scoggins and Stephanie Formas past the lobby are still locked. But front doors from the street were "green" and unlocked. The rear door was also "green" and unlocked, but fencing was in place and undamaged. SPD will follow up on reviewing and verifying locked doors.
   - FAS continues to defer to SPD on defueling the generator. Defueling the generator seems to be of lower concern.
3. Encourage conversations between protest groups and the city.
   - Efforts continue, led by the Mayor's Office in response to the requests made by groups on site.
4. Cal Anderson Park Support
   - There are concerns about the level of permanent activity at the park. There are at least 27 tents on site and a group was digging a community garden. The tents appear to be a diverse set of protesters. SPU, Parks, and DM Sixkiller will follow up separately on the portable toilet strategy.

SPU, Parks to address the request for 17 port-a-potties

OEM will follow-up on secondhand information about persons being asked to show IDs.

Exhibit 14

## RE: TPs on Capitol Hill

| | |
|---|---|
| **From:** | "Williams, Lorelei" <lorelei.williams@seattle.gov> |
| **To:** | "Zimbabwe, Sam" <sam.zimbabwe@seattle.gov> |
| **Date:** | Mon, 29 Jun 2020 11:32:17 -0700 |

Very helpful. Thank you.

Lorelei Williams, P.E.
O: 206.684.5178

---

**From:** Zimbabwe, Sam <Sam.Zimbabwe@seattle.gov>
**Sent:** Monday, June 29, 2020 10:49 AM
**To:** Williams, Lorelei <Lorelei.Williams@seattle.gov>
**Subject:** TPs on Capitol Hill

- We've tried to maintain a safe area for protest activities while de-escalating the tensions around Seattle Police Department budgets.
- The East Precinct became a flash point for protests in the week after George Floyd's murder and was the site of nightly showdowns between police and protestors.
- While a national image of the protest zone has been one of fortification, City staff have been on the ground each day, trying to work with protest organizers to ensure emergency vehicle access and services like garbage collection.
- SDOT worked to install barriers to create a protest zone while allowing for street traffic, but there has been continual blocking of access by protestors, especially overnight.
- There is a very different feeling to the area during the day, when it is a pedestrian-friendly area and open to protest activities, art, etc, and at night, when there is a different feeling of access and "security". This part of Capitol Hill has long been a challenge in nighttime hours, but emergency response has been hampered.
- Definitely new activities for our crews in terms of creating this zone and working with an amorphous and consistently changing group of protest leaders.

Let me know if you need any more.

Sam



**Sam Zimbabwe** (he/him/his)
Director
City of Seattle, Department of Transportation
O: 206-684-5000 | sam.zimbabwe@seattle.gov
Sr. Executive Assistant: Jessica Alinen | jessica.alinen@seattle.gov | 206-684-5026
Web | Blog | Facebook | Twitter | Instagram | YouTube | Flickr | Customer Service

Exhibit 15

# FW: Communications: Response protocol notification for East Precinct (red zone) and protests

| | |
|---|---|
| **From:** | "Mahaffey, Thomas" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=98f176694cde45f6843407e4d8e7c3b8-mahafft"> |
| **To:** | "Best, Carmen" <carmen.best@seattle.gov> |
| **Date:** | Sun, 14 Jun 2020 20:12:02 -0700 |
| **Attachments:** | 2020-06-15 June 15 Events FINAL IAP.PDF (881.28 kB) |

Chief,

If other City agencies are successful at getting the barricades that are set up removed, then I can consider adjusting our current response protocols.  As of now, there are too many unknown conditions that adversely impact officer safety to send our officers into the blockaded area unless it is a critical life safety emergency.   We have numerous incidents over the past several days of calls placed that we are not able to verify that seem to be an effort to instigate a police response into the protest zone.

TM

---

**From:** SPD Events <SPDEvents@seattle.gov>
**Sent:** Sunday, June 14, 2020 7:54 PM
**To:** SPD Dispatch <SPDDispatch@seattle.gov>; SPD_Comm_Supervisors <SPD_Comm_Supervisors@seattle.gov>
**Cc:** Edwards, Michael <Michael.Edwards@seattle.gov>; Swank, Keith <Keith.Swank@seattle.gov>; Grenon, Bryan <Bryan.Grenon@seattle.gov>; Grossman, Kevin <Kevin.Grossman@seattle.gov>; Williams, Joel <Joel.Williams@seattle.gov>; Kelley, Christopher <Christopher.Kelley@seattle.gov>; Mahaffey, Thomas <Thomas.Mahaffey@seattle.gov>; Danielson, James <James.Danielson@seattle.gov>; Davis, Tyrone <Tyrone.Davis@seattle.gov>; Litsjo, Stacy <Stacy.Litsjo@seattle.gov>
**Subject:** Communications: Response protocol notification for East Precinct (red zone) and protests
**Importance:** High

FYI
The below was added to today's IAP as a contingency.
For your awareness.

## Demonstration Events/Street Marches

**With the current demonstration response protocol, the Department will continue to monitor events on a daily basis however we will not deploy police resources to demonstration or protest-related events except to address a life-safety emergency.**

**Patrol Task Force will be prepared to deploy to any event citywide as directed by an on-duty Patrol lieutenant or above to address a life-safety emergency that exceeds the capacity of a regular Patrol response.**

## Red Zone Response (East Precinct)

**For any calls or incidents within the "Red Zone" in the East Precinct:**

- For all calls originating from **within the red zone**, Communications Section personnel should attempt to coordinate officer contact outside the red zone boundary.

- Officers should not respond to calls for service within the red zone, unless the response is to a mass casualty event (e.g. active shooter incident, structural fire likely to endanger human lives etc.). If responding to a mass casualty incident within the red zone, all responding officers should muster with a supervisor outside that zone to determine the police response, develop a plan, and deploy with needed resources. Coordination with SFD or any other city resources should take place outside of the Red Zone perimeter.

- **Edward Sector: Requires a four-officer minimum response to all Edward Sector calls for service outside the red zone.**

\*\*Officers should continue to document calls for service that originate from within the red zone, even under circumstances where complainant/victim contact isn't possible.

- **Communications will immediately notify SPOC of the following**:
  - **Any Mass Casualty event i.e: Active Shooter, structural fire likely to endanger human lives.**
  - **Any large protests within the city**
- SPOC will remain activated 24/7 until further notice.
- SPOC will notify the designated On Call Duty Captain of the above incidents.

- Schedule is below:

| Sunday, June 14 | Swank |
|---|---|
| Monday, June 15 | Swank |
| Tuesday, June 16 | Wilske (as the regular on duty captain) |
| Wednesday, June 17 | Edwards |
| Thursday, June 18 | Edwards |
| Friday, June 19 | Edwards |
| Saturday, June 20 | Edwards |
| Sunday, June 21 | Edwards |

Exhibit 16

MATTHEW PLOSZAJ
6/10/2021

---

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
        Plaintiffs,        )
    vs.            ) No. 20-cv-00983-TSZ
CITY OF SEATTLE,        )
        Defendant.        )
_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION
OF
MATTHEW PLOSZAJ
_____

10:30 a.m.
June 10, 2021

*** This transcript is marked confidential. ***

REPORTED BY:  Pat Lessard, CCR #2104

---

Page 2

1           A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4        MR. GABE REILLY-BATES
5        Calfo Eakes
6        1301 Second Avenue, Suite 2800
7        Seattle, WA 98104
8        206.294.7440
9        gaber@calfoeakes.com
10
11   FOR THE DEFENDANTS:
12       MS. CAITLIN PRATT
13       Harrigan Leyh Farmer & Thomsen
14       999 Third Avenue, Suite 4400
15       Seattle, WA 98104
16       206.673.1700
17       caitlin@harriganleyh.com
18
19
20
21
22
23
24
25

---

Page 3

1            E X A M I N A T I O N
2    ATTORNEY                    PAGE
3    BY MS. PRATT:                 5
4    BY MS. PRATT:                63
5            E X H I B I T   I N D E X
6    No.        DESCRIPTION         PAGE
7    Exhibit 54  1/12/21 form from Employment    64
8        Security Department for Matthew
9        Ploszaj.
10   Exhibit 55  Map of Ploszaj neighborhood.    66
11   Exhibit 49  Plaintiff's Answers and Responses   107
12       to Defendant City of Seattle's
13       Second Discovery Requests and
14       Proposed Revisions to First
15       Discovery Requests.
16   Exhibit 8   Plaintiffs' Initial Disclosures.    135
17
18
19
20
21
22
23
24
25

---

Page 4

1        THE VIDEOGRAPHER:  We are now on the record.
2    Today is June 10th, 2021.  The time is now
3    10:31.
4        This is volume number one, media number one,
5    in the Deposition of Matthew Ploszaj in the matter of
6    Hunters Capital, LLC, et al., versus the City of
7    Seattle.
8        We are recording via Internet using Zoom
9    video conferencing.
10       My name is Karl Benitez and I'm representing
11   Royal Video Productions on behalf of Rough &
12   Associates.
13       Today's court reporter is Pat Lessard.
14       At this time I would like to ask all counsel
15   present to identify themselves.
16       MS. PRATT:  This is Caitlin Pratt from
17   Harrigan Leyh Farmer & Thomsen and we represent the
18   City.
19       MR. REILLY-BATES:  This is Gabe Reilly-Bates
20   from Calfo Eakes.  We represent the plaintiffs in this
21   matter.
22
23
24
25

---

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Pat Lessard (601-142-526-6610)                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 65

1      Q.  Please tell me when you have it open.
2      A.  I'm saving it and I'm going to click to
3   Open.  Open.  Okay.
4      Q.  Can you tell me what Exhibit 54 is?
5      A.  It is the Employment Security Department
6   form from Washington State dated January 13, 2021.
7         It looks like a tax statement.  Is that
8   this?  Yeah, yeah, unemployment compensation.
9      Q.  And that's a Form 1099-G, right?
10     A.  I am looking for some sort of identifier
11  here.
12        So I'm not -- okay, I see it at the bottom.
13  Yes, IRS.gov/Form 1099-G, yes.
14     Q.  Does the number reflected in box one of
15  $26,548 reflect the total government assistance that
16  you received other than your stimulus checks between
17  March or April of 2020 and September of 2020?
18     A.  Yes.
19     Q.  And the stimulus checks that you received
20  would have been in addition to this amount, right?
21     A.  I believe so, yeah.  Because this is
22  unemployment related, correct.
23     Q.  Do you remember how much stimulus you
24  received?
25     A.  Whatever the first check was, the full

Page 66

1   amount, what was that, maybe around 1200, I believe.
2         And then later in the year -- I can't
3   remember if it was even last year or this year, but we
4   got a second check that was around $600.  And I got
5   that full amount, too.
6      Q.  Where do you live currently?
7      A.  1210 East Pine Street.
8      Q.  How long have you lived there?
9      A.  Plus or minus eight years, nine years, eight
10  years.
11     Q.  Let me show you another exhibit which has
12  bee marked 55.
13        (Marked Deposition Exhibit No. 55.)
14        Let me know when you see it.
15     A.  Okay.  I see it.  I'm going to click to
16  download, save it.  Saving, click to open here.
17        Okay.  It looks like a map of my
18  neighborhood with a red dot on Matthew Ploszaj which
19  looks to be about where I live.
20     Q.  (By Ms. Pratt) Okay.  Great.
21        So that's exactly what I was going to ask
22  you.  Does the red dot and the broad text in a black
23  box with your name in it approximately reflect where
24  your apartment is located?
25     A.  Yes.

Page 67

1      Q.  To the best of your knowledge of the area is
2   this an accurate map of the area surrounding your
3   apartment?
4      A.  Yeah, yeah.  It looks about right.  I see
5   Cal Anderson, sure.
6      Q.  So do you rent your apartment at 1210 East
7   Pine Street?
8      A.  Yes.
9      Q.  And do you have a lease?
10     A.  Yes.
11     Q.  What's the term of your lease?
12     A.  I believe it's a year term and after the
13  year it auto renews monthly.
14        And I believe I last signed it for the first
15  term, I think that dates back a few years ago, so
16  maybe 2017.
17     Q.  You've been month to month since
18  approximately 2017?
19     A.  Yeah.  And before that it would have been
20  the same and we re-signed in 2017.
21     Q.  What's your monthly rent?
22     A.  950.  And if I pay early 925.
23     Q.  Do you have any roommates?
24     A.  No roommates.
25     Q.  So that 950 or 925 is the rent for your

Page 68

1   entire apartment?
2      A.  For my entire apartment, that is correct,
3   yes.
4      Q.  And has that been your rent since you last
5   signed a lease in approximately 2017?
6      A.  Correct, yes.
7      Q.  Why did you choose to live at 1210 East Pine
8   Street?
9      A.  I had a roommate way back in the day.  It
10  was time to move out.  His girlfriend was pregnant.
11        So I was reaching out to people and reached
12  out to my friend.  He mentioned he had an apartment
13  that was opening up at said location.  And I viewed
14  it, liked it and signed on at that point and have been
15  there since.
16     Q.  Your friend owned the apartment?
17     A.  Correct.
18     Q.  And he still owns the apartment?
19     A.  Correct.
20     Q.  Who is your friend?
21     A.  Hal Columbo.
22     Q.  What's the name of the building?
23     A.  I'm not aware that it has a name.  It's a
24  house.
25     Q.  Is Mr. Columbo involved in this lawsuit at

17  (Pages 65 to 68)

Electronically signed by Pat Lessard (601-142-526-6610)                                   72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 77

1    Q.  (By Ms. Pratt)  Why do you say the George
2  Floyd event?
3    A.  You asked me if there was an event.
4    Q.  You mean the killing or the murder of George
5  Floyd?
6    A.  Yes.
7    Q.  Starting with the murder of George Floyd
8  what did you observe in terms of protests near your
9  apartment on East Pine Street?
10    A.  Could you be more specific?
11    Q.  What was your experience of the protests
12  that began around the time that George Floyd was
13  murdered?
14    A.  It was very heated.  There were several cop
15  cars burned, destroyed.  Police were out on the
16  streets responding, using tear gas.  The protestors
17  were likewise responding.  And that -- yes.
18    Q.  How did that affect your experience of life
19  at your apartment on East Pine Street?
20    A.  How did it?
21    Q.  Yes.
22    A.  It was hard to breathe, hard to sleep.
23    Q.  Why was it hard to breathe?
24    A.  We don't have the best sealed windows in our
25  apartment so the tear gas seeps in when that was used.

Page 78

1    Q.  Why was it hard to sleep?
2    A.  There were people on my street every night
3  shouting into a bullhorn until odd hours of the
4  morning.
5    Q.  Were the protests localized at the East
6  Precinct around the time when they began in May of
7  2020?
8    A.  Largely, yes.  However, I'm aware there were
9  protests throughout the city and oftentimes the
10  protests would move around.
11      But it was a nightly occurrence around the
12  East Precinct in addition to whatever else was
13  occurring.
14    Q.  Other than making it hard to breathe and
15  hard to sleep were there other ways that the protests
16  in May of 2020 regarding the George Floyd murder
17  affected your experience of living at your East Pine
18  Street apartment?
19    A.  I'm sorry.  Could you repeat that, please?
20    Q.  Other than your description that the
21  protests affected your life because it was hard to
22  breathe and hard to sleep, were there other ways that
23  the protests that started in May 2020 affected your
24  life?
25    A.  Yes.

Page 79

1    Q.  How else?
2    A.  Well, they evolved into CHOP.
3    Q.  Before it evolved into CHOP were there other
4  ways that the George Floyd murder affected your life
5  at your East Pine Street apartment?
6    A.  I had to show ID to enter the area.
7      MR. REILLY-BATES:  You're talking about
8  before CHOP?
9      THE WITNESS:  Correct, correct.
10      MS. PRATT:  Counsel, if your client needs a
11  clarification he can ask for it.
12    Q.  (By Ms. Pratt)  Who asked you to show ID
13  during that time period?
14    A.  Officers, police officers.
15    Q.  Where were you asked to show ID?
16    A.  Thirteenth and Pine, Pike and 12th, other
17  arteries.
18    Q.  Was this all day during that time period?
19    A.  I can't recall if this was all day all the
20  time.  As things went on it was the case.
21    Q.  Other than that it was hard to breathe, hard
22  to sleep and that you had to show ID to police
23  officers, were there other ways that the protests that
24  started in approximately May 2020 affected your life
25  at your East Pine Street apartment?

Page 80

1    A.  Not that I can articulate at this point but
2  I'm sure in some way it had.
3    Q.  Was your access to your apartment restricted
4  in any other way other than having to show ID?
5    A.  I would have to walk through crowds to get
6  to the point where I could show my ID.
7    Q.  Do you have a car?
8    A.  I do.
9    Q.  Do you park at your apartment?
10    A.  No.
11    Q.  Where do you park the car?
12    A.  Behind Langston Manor Apartments at 19th and
13  Republican.
14    Q.  How long have you parked your car there?
15    A.  I don't remember specifically but it's fair
16  to say maybe five or six years.
17    Q.  So when you were working through crowds to
18  show your ID to get to your apartment in May of 2020,
19  were you working through those crowds on foot?
20    A.  Correct.
21    Q.  Were there any barriers or other
22  obstructions apart from the crowds that affected your
23  ability to access your building at East Pine Street?
24    A.  Not before CHOP, no.
25    Q.  Where did you live before you moved to the

20  (Pages 77 to 80)

Electronically signed by Pat Lessard (601-142-526-6610)    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 81

1   apartment on East Pine?
2       A.  1727 Northwest 57th Street.
3       Q.  Do you plan to stay at your current
4   apartment?
5       A.  Yes.
6       Q.  Why?
7       A.  I have no other plans at the moment.
8       Q.  Have you ever considered leaving that
9   apartment?
10      A.  Yes.
11      Q.  When?
12      A.  Many times.  Could you be more specific?
13      Q.  When was the last time considered leaving
14   that apartment?
15      A.  Within the past month.
16      Q.  And why have you considered leaving it?
17      A.  I don't know, maybe it came up in
18   conversation and people asked if I planned to live
19   there.
20      Q.  Where else would you live?
21      MR. REILLY-BATES:  Objection; vague.  Calls
22   for speculation.
23      Q.  (By Ms. Pratt)  Go ahead.
24      A.  Down the street, Chicago, New York,
25   Argentina, Italy.

Page 82

1       Q.  Where down the street would you consider
2   living?
3       A.  Anywhere that looked inviting.
4       Q.  Would you consider sharing your current
5   apartment?
6       A.  Could you be more specific?
7       Q.  Do you have renters insurance at your
8   current apartment?
9       A.  I do.
10      Q.  Who is your policy through?
11      A.  I believe Geico.
12      Q.  When did you get that policy?
13      A.  At some point this year.
14      Q.  Did you have a different policy before this
15   year?
16      A.  No.
17      Q.  Why did you choose to get renters insurance
18   this year?
19      A.  I don't know exactly why.  It's always been
20   on my mind but for some reason I made the move.
21      Q.  Have you made a claim on your renters
22   insurance?
23      A.  I have not.
24      Q.  You're claiming damages in this case,
25   correct?

Page 83

1       A.  Correct.
2       Q.  What damages are you claiming?
3       A.  Emotional, lost productivity, lost
4   opportunity.
5       Q.  What else?
6       A.  I'm not sure I follow.
7       Q.  Are there any other things for which you're
8   claiming damages?
9       A.  I don't believe so.  I believe those three
10   are good.
11      Q.  How much are you claiming for emotional
12   damages?
13      A.  30,000.
14      Q.  How much for lost productivity?
15      A.  Ten, 15.
16      Q.  How about lost opportunity?
17      A.  Five, ten.
18      Q.  What's the basis for your claim of $30,000
19   in emotional damages?
20      MR. REILLY-BATES:  Objection; calls for
21   legal conclusion.
22      Q.  (By Ms. Pratt)  Go ahead.
23      A.  I don't understand what you mean by what's
24   the basis.
25      Q.  What's the factual basis for your claim that

Page 84

1   the City should pay you $30,000 for emotional damages?
2       A.  Do you want me to recount the facts?
3       Q.  I want you to tell me what you understand is
4   the factual basis for your claim of $30,000 in
5   emotional damages against the City.
6       A.  Yeah, emotionally distraught by CHOP,
7   everything that happened.  I've had my life
8   threatened.  I've had -- still have had my life
9   threatened.  I'm still not sure if it's even safe to
10   live in Capital Hill.  I certainly need help sorting
11   that out.
12      But I am even now shaken up thinking about
13   confronting people who have broken into my apartment.
14   It gets my fight or flight response stirred.
15      We had someone jump on our roof, threaten to
16   kill themselves, threaten to kill us in the building.
17      When someone broke into our apartment I
18   still saw him on the streets every day post CHOP.
19      My activities living there put a mark on
20   myself and my neighbors.
21      And we've had our trash cans burned multiple
22   times.  We've had threats to us spray painted on the
23   sidewalk that continue on.  People still know we live
24   there post CHOP.
25      Even to all the protests that happened post

21 (Pages 81 to 84)

Electronically signed by Pat Lessard (601-142-526-6610)                                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

**Page 85**

1  CHOP, they all started at Cal Anderson.  And so I
2  would walk through Cal Anderson and there would always
3  be a handful of people who were going to take place in
4  those protests, and they would lock eyes on me as I'm
5  walking through the park.
6        They don't take their eyes off me as I walk
7  through the park.  They look very menacing and
8  threatening to myself as I continue on.
9        As a week ago we've seen new tagging in
10  the neighborhood repeating last summer saying "Kill
11  Cops," saying "Same fight, different summer."
12        So these people are still there and we're
13  still a target.  You know, we haven't moved or gone
14  anywhere.
15        So I'm shaken, I'm shaken now.  It's still
16  hard to sit down and do work.  It's still hard to
17  stand at the office.  Every time I hear the gate open
18  and close, even if it's my neighbor, I still look out
19  the window to see who it is.
20        Anytime I hear anything loud, a firecracker
21  or something, or a car back fires or madness on the
22  streets I get shaken up and stirred.
23        I get worried that another person was shot
24  and killed just a block away.
25        I'm very shaken up by it still.  It's been

**Page 86**

1  very hard to -- it was impossible to work during CHOP
2  and it's been impossible to work after CHOP, being
3  shaken up.
4        Somehow I pulled myself together to
5  interview eventually successfully for a position.  But
6  even working on the streets when people make eyes at
7  me, it's hard to know if they're just being honest and
8  kind or if they're one of the protestors that has it
9  out for me or burned our trash cans or wrote "Fuck
10  you, Cam" on our sidewalk.
11        So that's extremely disturbing to me.  I am
12  really stirred up by that, so that's part of it.
13        Knowing that the police left, having myself
14  confronted, someone burglarizing our property.  Seeing
15  them, scaring them off, being shaken up, calling the
16  police.  Having them say "We're not going to come or
17  show up.  There's nothing we can do.  It's not life
18  threatening."
19        So that got me going, really shaken up, not
20  knowing if it's safe to live, safe to walk in and out
21  of the property.
22        And then having brought it up with CHOP
23  security, "Hey, there's this guy there, you know, the
24  police aren't doing anything.  What should we do?"
25        The fact that I went to CHOP security and

**Page 87**

1  mentioned it was a little bit unnerving and
2  frightening.  I don't know if it is a good thing or a
3  bad thing that I went to them and there was nothing
4  they can do.
5        And the next day I'm out on the street and
6  the same person who broke into our property and saw me
7  on the street, he now looks at me when I go onto the
8  street during CHOP, making eye contact at me.
9        At one point he started walking towards me
10  so I walked beck into my building.  He broke in
11  again.
12        Same thing, called the police.  It was very,
13  very startling, unnerving.
14        Yeah, I still haven't gotten over that, so I
15  have a lot of that to deal with.
16        There's trying to reach out to the City to
17  report it to anyone, letting them know, knowing a
18  handful of times, you know -- what, three days in I
19  woke up and it's like 5:00 in the morning and there's
20  madness going on out in the streets.  People are
21  shouting and fighting.
22        And so I go out to see what's going on and
23  people are breaking into the East Precinct.  Other
24  protestors are fighting with them to not break in.
25        A fight breaks out among them.  Some of them

**Page 88**

1  yank the other ones out of the precinct.
2        I knew it didn't look good from the very
3  beginning.  I called the police right away.  Shortly
4  after I wrote the mayor and that's troubling.
5        And then not far after that a young teenager
6  of color gets shot and killed on the streets of CHOP
7  and that's disturbing to me.
8        And I'm still living there, at night, 2:00,
9  3:00, 4:00 in the morning hearing fireworks and gun
10  shots and not being able to decipher between them.
11        Knowing that it's a possibility, it seems
12  likely, that CHOP protestors killed another teenager
13  of color near the end.  That's extremely disturbing.
14        Still living there knowing that there is
15  still protestors that come out on a fairly regular
16  basis.
17        And not the protests that used to happen on
18  Capital Hill.  These are people blocking the streets,
19  lighting fires, burning our trash cans, confronting
20  the people who live there.  It gets you shaken up
21  pretty bad.
22        I've had emotional stress since then.  I've
23  had some body issues that I've had to deal with.  I
24  have a really bad knee and it's a good chance that
25  that's related -- I mean I've been in great shape

22  (Pages 85 to 88)

Electronically signed by Pat Lessard (601-142-526-6610)                                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 89

1  forever.  And I didn't do anything different.  But
2  there's like a chance that that knee being hurt and
3  all that, there's a good chance that that has occurred
4  due to all my emotional stress, because I can't think
5  of any other reason.
6        You know, living there now -- all my
7  neighbors have moved out.  So, you know, I used to
8  feel at least comforted knowing a lot of the people,
9  neighbors in the building, neighbors in the building
10  next to ours.  But they've moved out, so that's hard.
11        And so to see and talk to someone that's,
12  you know, that's going to be a challenge to see.
13      Q.  Do you have new neighbors?
14      A.  I do have some new neighbors, yes.
15      Q.  Are there vacant units in your building?
16      A.  Not in my building at the moment, no.
17      Q.  Why are the consequences that you've just
18  described the City's fault?
19      A.  Well, I can't imagine who else didn't decide
20  to intervene when someone broke into my apartment but
21  the City.
22        The City up and left.  They put
23  porta-potties in there.  They knew what was going to
24  happen going into the events of CHOP, so they set it
25  up.

Page 90

1        It was the City's barricades that kept
2  people out after.  It was the City's concrete blocks
3  that the protestors moved around that I know the City
4  knew about because I called and showed them video.
5  And they surely knew what was going on.
6        The City supported it 100 percent of the
7  way.  They wouldn't come in.  They wouldn't do
8  anything when someone jumped on our roof, and when I
9  called the City, and was threatening to kill us and
10  kill themselves.
11        In a life-threatening scenario the police --
12  three times I called them and they just thanked me for
13  the update.  The fire department didn't come in and
14  help.  So that happened.
15        The protestors met and gathered on City
16  parks after, during.  So, you know, the City let them
17  block the streets, let them camp in the parks and
18  gather at the parks during CHOP and post CHOP.
19        That's the City's 100 percent consequence.
20  I mean when we want to know -- we neighbors brought it
21  to the attention of CHOP leaders in public assemblies
22  and town halls.  Myself and a couple of neighbors had
23  some concerns, very reasonable, you know, there's some
24  loud music going on in the quiet hours.
25        There were compromised people in our

Page 91

1  building, how are we going to get services to them in
2  an emergency?  What do we do about our trash?  All
3  very reasonable concerns.
4        Myself and my neighbors just got booed down,
5  shouted down, called very nasty things.
6        So, you know, we wouldn't be having these
7  discussions had the streets not been abandoned by the
8  police, by the City.  You know, it took the City 23
9  days to do anything about it.
10        Post CHOP, same thing.  The City let people
11  run the streets, block traffic, burn things on the
12  streets without any consequences or anything to it.
13        And so they're involved.  They're burning
14  our trash cans.  We go without garbage service for
15  months, so now the garbage is piling up right on our
16  sidewalks.
17        And the City, one, is tolerating the
18  behavior, but, two, not getting us fresh trash cans
19  while picking it up.
20        There's more of the City -- even now, you
21  know, it's -- yeah, the City abandoned the streets,
22  you know.
23        Who else could it have been?  I mean how
24  many calls did I make?  How many letters did I write?
25  And, you know, no response.

Page 92

1        And then the other reason it's clear was the
2  City was -- when things did turn around, you know, it
3  wasn't because the protestors let themselves out of
4  the neighborhood.  The City came in.
5        The killings didn't stop, the shootings
6  didn't stop until the City intervened.
7        So when the City left, people started
8  breaking into our apartment.  People started getting
9  shot and killed.  People started getting raped in the
10  park.  And that continued on unabated.
11        And then the City finally came back in and
12  we haven't had a break-in since.  We haven't had these
13  things happen.
14      Q.  Is your $30,000 in emotional damages from
15  the period between when the East Precinct was
16  evacuated and when the park was cleared at the
17  beginning of July of 2020?
18        MR. REILLY-BATES:  Objection; vague.
19      Q.  (By Ms. Pratt)  Go ahead.
20      A.  I'm sorry.  Can you repeat that or be a
21  little more specific or elaborate?
22      Q.  The damages -- the $30,000 in emotional
23  damages that you're claiming from the City, what
24  period of time do those damages relate to?
25      A.  It relates from CHOP.  It relates from when

23  (Pages 89 to 92)

Electronically signed by Pat Lessard (601-142-526-6610)                                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 93

1  it started, when the police abandoned to when they
2  came back and then everything that happened since.
3       But it's that period, those three-ish weeks,
4  those three weeks and then some that this occurred.
5       Q.  Okay.  So you said everything that happened
6  since and I'm just trying to get a clearer answer.
7       Are the $30,000 in emotional damages from
8  that CHOP period or from the CHOP period and then
9  some?
10      A.  I'm sorry.  The money like -- yeah, it's
11  from CHOP, right.  There are threats that came in and
12  it hasn't gone away, so.
13      Q.  Right.  So that's what I'm trying to clarify
14  with you.
15      Are your damages from the period where the
16  CHOP was in place or are your damages from a broader
17  period of time?
18      A.  No, they're from when CHOP was in place.
19      Q.  Okay.
20      A.  For emotional.
21      Q.  I believe you described some events that
22  happened outside of those three plus weeks.
23      Am I correct that you are not claiming
24  emotional damages related to things that happened
25  outside of those three plus weeks?

Page 94

1       MR. REILLY-BATES:  Objection; vague to the
2  extent you're not referring to the things.
3       He described a lot of things.
4       MS. PRATT:  Right.  Thank you, Counsel.
5       I really don't need your speaking objections
6  and I think it's inappropriate to coach your client
7  during a deposition.
8       Q.  (By Ms. Pratt)  So Mr. Ploszaj, if you need
9  clarification, please let me know.  Otherwise, I would
10  ask you to answer the question.
11      A.  Can you repeat the question, please?
12      Q.  Sure.  I'm just trying to clarify whether
13  you are claiming emotional damages for events that
14  occurred outside of the three plus week period of
15  CHOP?
16      A.  No.
17      Q.  Okay.  The other form of damages or the next
18  damages I believe you mentioned was lost productivity.
19      Can you please explain what the factual
20  basis for your claim for damages from lost
21  productivity are.
22      A.  Yeah.  It's impossible to get any work done
23  when people are breaking into your building and you're
24  shaken up.
25      You've got your heart racing.  There are gun

Page 95

1  shots going on at night.  You can't sleep.
2       So then in the day you try to work and do
3  anything, but I mean you're tired, you're exhausted,
4  your heart is raising, it's hard to focus -- it's
5  impossible to focus.
6       So that's my factual, impossible to work, to
7  get anything done when someone is jumping on your
8  roof.  When people are blaring music until 3:00 in the
9  morning, when someone is shouting down your neighbor,
10  you know, and yelling at them, calling them some
11  pretty derisive terms.  But that's impossible, you
12  know, you can't get work done.
13      Meanwhile I'm trying to get my feet on the
14  ground and find some meaningful employment in addition
15  to what I'm doing.  Yeah, I couldn't get anything
16  done.
17      I had several interviews during CHOP.  It's
18  really hard to get an interview going on when people
19  are fighting outside your front door, and you look in
20  your garden and someone has broken in there several
21  times and is breaking in again.
22      Q.  What interviews did you have during that
23  time?
24      A.  I believe I had a third-round interview with
25  the University of Washington.  I think there were a

Page 96

1  couple others that I can't recall the specifics of.
2       Q.  What do you recall about the others?
3       A.  It was really hard to interview and answer
4  their questions and try and come off professional and
5  not be fidgety or disturbed with it.
6       Q.  You said there were issues with attention
7  and focus in general?
8       MR. REILLY-BATES:  Objection; argumentative.
9       A.  I had no -- I recently graduated from
10  college the second time.
11      Q.  (By Ms. Pratt)  Do you have a general
12  tendency to be fidgety?
13      A.  No.
14      Q.  Do you believe you've been fidgety today?
15      MR. REILLY-BATES:  Objection; argumentative.
16      I'm not going to tolerate this kind of
17  questioning of my client.  I don't appreciate you
18  bullying him this way.
19      Now if you could move on, please, Counsel.
20      MS. PRATT:  I'm not going to move on.  I'm
21  not bullying your client nor would I.
22      This is entirely relevant to the basis of
23  his claim, so I'm going to continue asking him.
24      And if you want to stop the deposition that
25  is a position that you will have to take.

24  (Pages 93 to 96)

MATTHEW PLOSZAJ
6/10/2021

Page 101

1    I don't know what right now.
2         MS. PRATT:  Okay.  We can go off, Karl.
3         THE VIDEOGRAPHER:  The time is 2:48 p.m.
4    We are off the record.
5         (Recess.)
6         THE VIDEOGRAPHER:  The time is 2:58 p.m.
7    We're back on the record.
8         Q.  (By Ms. Pratt)  One form of damages that you
9    mentioned experiencing from the CHOP is lost
10   opportunity.
11        Can you describe the factual basis for that
12   claim?
13        A.  Yeah.  I had a really hard time applying for
14   meaningful work, putting together cover letters,
15   interviewing for positions during CHOP and then after
16   CHOP, all stemming from the events of CHOP.
17        Q.  How did you arrive at the figure of five to
18   $10,000 for that?
19        A.  Sure.  It's roughly the salary I would have
20   been making at that time.  I couldn't meaningfully
21   apply -- I should have been able to pick up a job
22   pretty quickly and easily, especially with the number
23   of recruiters I was talking to leading up to that and
24   interviews I was having and everything that I was
25   having up until then.

Page 102

1         So, you know, to July, August, and then
2    finally September I was able to get to someplace where
3    I could meaningfully start applying for work again.
4         Q.  All right.  So how did you reach that
5    figure?
6         MR. REILLY-BATES:  Objection; asked and
7    answered.
8         A.  I should -- there were four months of --
9    three months I should have -- you know, the amount of
10   time and money I should have been making that's that
11   figure that I'm claiming.
12        Q.  (By Ms. Pratt)  The five to $10,000 is
13   compensation that you should be making in June, July
14   and August of 2020?
15        A.  Yes.
16        Q.  And it's based off of your current monthly
17   salary?
18        A.  The going rate of my skillset.
19        Q.  What's the going rate of your skillset?
20        A.  At the time 45 to 60 an hour.
21        Q.  And how did you reach the figure of ten to
22   $15,000 damages in lost productivity?
23        A.  Yeah.  That's the work I was doing and that
24   didn't get done, getting paid a going rate, my going
25   rate.  I would have been billing clients at that rate.

Page 103

1         Q.  So you're again claiming damages of the
2    going rate for June, July and August?
3         A.  No.  Those were two different things.  You
4    said lost opportunity but then you mentioned what I
5    claimed as damages for --
6         Q.  Lost productivity?
7         A.  -- lost productivity, correct.
8         Q.  So say again, how did you arrive at the ten
9    to $15,000 figure for lost productivity?
10        A.  Take all the hours of CHOP I would have been
11   working, multiply that by 45 to 60, and you get into
12   the ballpark of ten to 15.
13        Q.  How is that different from what you're doing
14   for lost opportunity?
15        A.  Sure.  Lost opportunity I didn't -- I
16   couldn't look for a job at all during CHOP.  And
17   because of CHOP it took me a few months to get back
18   into the game.  And so when I should have work being
19   meaningfully employed I didn't.
20        Q.  Right.  And you calculate that loss how?
21   Like what numbers are you multiplying or, you know,
22   otherwise what formula are you using to get to that
23   five to $10,000 for lost opportunity?
24        A.  Yeah, sure.  Forty-five to 60, multiply that
25   by two months, give or take.  I suppose I'm being

Page 104

1    conservative in my estimates.
2         Q.  So you got the ten to $15,000 in lost
3    productivity by multiplying 45 to $60 times the number
4    of hours that you would have worked during just CHOP,
5    during just June?
6         A.  You get about ten just for June.  And post
7    CHOP, because of CHOP, you get some productivity back.
8    Not much.  You get another five.
9         Q.  And that five spans July and August?
10        A.  Correct.
11        Q.  But the lost opportunity is also by
12   multiplying 45 to 60 times the income that you -- or
13   excuse me.
14        You get the lost opportunity by multiplying
15   45 to $60 per hour times the hours that you would have
16   worked for two months, right?
17        A.  Correct.
18        Q.  And how many hours would you have worked in
19   two months?
20        A.  Eighty hours.
21        Q.  Eighty hours total in two months?
22        A.  Well, I'm off on that.
23        MS. PRATT:  Counsel, you should not be
24   talking to your client while he's answering my
25   question.  That's entirely inappropriate.

26  (Pages 101 to 104)

Electronically signed by Pat Lessard (601-142-526-6610)                                          72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

---

Page 105

1    MR. REILLY-BATES:  Counsel, I wasn't
2  talking.  I didn't say anything.
3    MS. PRATT:  I saw your mouth moving.  I
4  heard you on the microphone.
5    Q.  (By Ms. Pratt)  So can you tell me,
6  Mr. Ploszaj, how many hours are you claiming damages
7  for in the two months that you have included in your
8  lost opportunity?
9    A.  Forty hours of workweek times two months,
10  eight weeks.
11    Q.  Okay.  So when you said 80 hours earlier,
12  you were mistaken?
13    A.  That is correct.
14    Q.  Okay.  So you're using the same hourly rate,
15  $45 to $60 per hour, and the same number of hours per
16  week as damages for potentially your lost productivity
17  and your lost opportunity, right?
18    A.  Repeat that, please.
19    Q.  If I'm understanding you correctly, and
20  that's what I'm trying to figure out from you, to
21  reach your damage calculations for lost productivity
22  and separately for lost opportunity you are using the
23  same 45 to $60 per hour and 40 hours per week as
24  what -- you multiply those and you get what you lost,
25  right?

---

Page 106

1    A.  That sounds accurate, correct.
2    Q.  Okay.  And your lost productivity is for
3  June 2020 plus or -- excuse me.  $10,000 of your
4  claimed lost productivity is for June 2020 only,
5  right?
6    A.  Correct.
7    Q.  And $5,000 of your lost productivity is for
8  July and August combined?
9    A.  Correct.
10    Q.  And for lost opportunity it is for July and
11  August?
12    A.  Correct.
13    Q.  Okay.  In terms of lost productivity, you
14  were working for Floop at the time, right?
15    A.  Correct.
16    Q.  And you were not making an hourly wage,
17  right?
18    A.  Correct.
19    Q.  Do you remember claiming in May of this year
20  that your damages were estimated at $50,000?
21    A.  In May of this year 2021?
22    Q.  Correct.
23    A.  Roughly, yes.
24    Q.  Let me show you what's previously been
25  marked as Exhibit 49.

---

Page 107

1    (Referred Deposition Exhibit No. 49.)
2    Q.  (By Ms. Pratt)  All right.
3    A.  I'm downloading and saving and we're going
4  to open.  And so I see what looks like a legal
5  document.
6    Q.  (By Ms. Pratt)  Can you tell me the date of
7  that legal document?
8    A.  I am looking for it.  I see -- can you give
9  me a little clue as to where that date be?
10    Q.  I'm looking at page twelve or, excuse me, 13
11  of the PDF.
12    A.  Dated the 10th day of May 2021.
13    Q.  And if you look at page twelve you see at
14  the top where it says "Answer as to Matthew Ploszaj"?
15    A.  Yes.
16    Q.  And do you see that it says you
17  preliminarily estimate your damages at $50,000?
18    A.  Yes.
19    Q.  And do you intend for your estimate that
20  we've discussed thus far, your $30,000 in emotional
21  damages, your ten to 15 in lost productivity and your
22  five to ten in lost opportunity, do you believe those
23  add up to the $50,000?
24    A.  Yes.
25    Q.  Okay.  Do you recall estimating in September

---

Page 108

1  2020 that your damages were $20,000?
2    A.  Yes.
3    Q.  Did you understand at that time that it was
4  important to be accurate to the best of your ability?
5    A.  Yes.
6    Q.  Why did you reach a damages estimate of
7  $20,000 at that time?
8    A.  We had to come up with -- we were thinking
9  of damages and the numbers -- I hadn't given much
10  thought at the time, but I knew for sure my lost
11  productivity at the time and I knew for sure I needed
12  some emotional damages, too.
13    And so I came up with a vague estimate based
14  on the hours I lost directly during CHOP for lost
15  hours of work of productivity and then my
16  understanding at the time of the extent of the damages
17  I had received emotionally.
18    Q.  What was the difference in your
19  understanding in September 2020 of your damages
20  emotionally versus your understanding in May 2021?
21    A.  Yeah.  I've had a half a year to live with
22  it and understand how deeply affected I am.
23    I walk by Cal Anderson Park with various
24  protestors from CHOP still in there, for whatever
25  reason, doing whatever they did, but eyeing me.  I've

---

27  (Pages 105 to 108)

Electronically signed by Pat Lessard (601-142-526-6610)                                  72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 137

1    Q.  I didn't ask about photos that time.  I
2  didn't intend to.
3       I think what I asked was what documentation
4  of your damages do you have.
5    A.  Yeah.  I believe those are what's listed
6  there.  Yeah, letters, photos, videos, text messages.
7    Q.  And how are those documentation of your
8  damages?
9    A.  How are they documentation of my damages?
10      I don't know if I'm equipped to answer that.
11  They're documents -- how are they documentation of my
12  damages?
13      They show the threats we've received.  They
14  show our property defaced, what happened in the
15  neighborhood.
16      Am I on the right track?  I'm not sure I'm
17  getting -- it doesn't seem you are being very
18  responsive on that.  I'm not sure I'm answering the
19  question.
20    Q.  Do you have any documents that reflect
21  specific amounts of damages?
22    A.  Can you be specific on specific amounts of
23  damages?
24    Q.  No.  Do you have any documents that reflect
25  amounts of damages?

Page 138

1       MR. REILLY-BATES:  Objection; asked and
2  answered.
3    A.  Yeah.  There's for sure that photo of fecal
4  matter right at our property on our stuff.  There's a
5  big letter saying "Fuck you, Cam," a yellow "Fuck you"
6  in front of our property.
7       I believe there's also documents of us
8  covering that up.
9       So I don't know, you can probably scale
10  that, but that's like the side of the sidewalk.
11    Q.  (By Ms. Pratt)  Sorry.  I meant monetary
12  figures of damages.
13      Do you have any documents that you have
14  produced or records that you have produced that
15  specifically reflect monetary damages by amounts?
16    A.  I don't believe I ever billed the City.  No,
17  I don't think -- I mean monetary is my W-2s.  I think
18  I put some pay stubs in there.
19    Q.  Well, you provided pay stubs and W-2s.
20    A.  Okay.
21    Q.  What other financial documents did you
22  provide?
23    A.  I don't recall off the top of my head.  I
24  don't have any of that with me right now.
25       MS. PRATT:  I'll just say for the record I

Page 139

1  previously emailed counsel about videos that
2  Mr. Ploszaj has testified about that we have not
3  received.
4       We also haven't received pay stubs or W-2s
5  and we will have to keep the deposition open for that
6  reason.
7       MR. REILLY-BATES:  Okay.  Are you done with
8  your questioning?
9       MS. PRATT:  No.
10    Q.  (By Ms. Pratt)  Other than providing pay
11  stubs -- actually, what were the pay stubs related to?
12    A.  Gee, I think work at Tillicum Place Cafe.  I
13  don't know.
14       I guess I'm not clear on what pay stubs
15  you're referring to.
16    Q.  The same ones you referred to.
17       So which W-2s did you provide?
18    A.  I don't know specifically.
19    Q.  Were there barriers or barricades blocking
20  any of your access to your building during the CHOP
21  period?
22    A.  Yes.
23    Q.  Where were they?
24    A.  At 13th and Pine at -- I think it's Olive
25  Street that is parallel and north of Pine and 12th, at

Page 140

1  12th and Pike.
2       Further down the way there's some other
3  streets on Pine but I would not feel confident saying
4  the names of those streets without looking at a map
5  and seeing the name of them.
6       There were physical concrete barricades also
7  in the street along 12th and various times moved up in
8  along Pine Street at various locations.
9    Q.  The barricades on Pine, when to the best of
10  your recollection were they in place and specifically
11  where on Pine?
12    A.  The earliest I can remember when the police
13  left CHOP at, give or take, the corners of 13th and
14  Pine.  And the concrete barriers, somewhere between --
15  maybe halfway between 12th and 13th on Pine.
16    Q.  And during what period of time were the
17  concrete barriers present?
18    A.  I don't know the specifics of that but I'm
19  sure we could look that up.
20    Q.  How would you look it up?
21    A.  How would I look that up?  Like a reasonable
22  person.
23    Q.  What does that mean to you?
24    A.  Well, a reasonable person, if asked that
25  question, would do reasonable things.  I don't know.

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Pat Lessard (601-142-526-6610)                                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 141

1  You could Google it.  You could -- there's many ways
2  to look it up.
3      Q.  Do you have any personal knowledge or any
4  document personal to you that you could reference to
5  know specifically when concrete barriers were in
6  place?
7      A.  Do I have documents known to me?
8      Q.  Specific to you.
9      A.  Specific to me.  Meaning I own them?  I
10  believe I have some of that, yeah.
11     Q.  What documents do you have?
12     A.  I believe I have video.  I believe I have a
13  photo.  I also believe there's news articles that also
14  document that so that could easily be in my possession
15  with a swipe of the phone.
16     Q.  Are they the same videos and photos that you
17  produced in this matter?
18     A.  To the best of my knowledge.
19     Q.  Okay.  So you don't know specifically when
20  concrete barriers were in place on Pine, right?
21        MR. REILLY-BATES:  Objection; misstates the
22  witness's prior testimony.
23     Q.  (By Ms. Pratt)  Is that right?
24     A.  How specific would you like me to get?
25     Q.  As specific as you can.

Page 142

1      A.  In the morning of June-ish week-ish into
2  CHOP.
3      Q.  So the morning about a week into CHOP in
4  June, is that what you said?
5      A.  That sounds roughly correct.
6      Q.  And those were the concrete barriers between
7  12th and 13th on Pine?
8      A.  That sounds accurate.
9      Q.  Where do you believe the concrete barriers
10  were on Pine that were installed approximately the
11  morning a week into CHOP in June?
12        MR. REILLY-BATES:  Objection; asked and
13  answered.
14     A.  Where do I think were the barriers that were
15  installed on Pine?  I don't think they were installed
16  on Pine.
17     Q.  (By Ms. Pratt)  Okay.  So where were there
18  barriers on Pine?
19     A.  Are you talking about the concrete barriers?
20     Q.  You said there were barriers at the corner
21  of 13th and Pine, right?
22     A.  Okay.  Those are not the concrete barriers,
23  but those were there from day one.
24     Q.  Okay.  And then you talked about the
25  concrete barriers.

Page 143

1      A.  Yes.
2      Q.  Those are the ones that were in place
3  approximately one week into CHOP in June, right?
4      A.  Correct.
5      Q.  Okay.  Where were those?
6      A.  When?
7      Q.  When they were installed where were they?
8      A.  When they were installed they were installed
9  on 12th Avenue, and I believe on Pine Street west of
10  the median of 12th.
11     Q.  Did that change?
12     A.  Yes.
13     Q.  Where did they go to next?
14     A.  I don't know where all of them went, but I
15  know a good portion of them were moved onto --
16  perpendicular of where they were onto Pine Street, in
17  between 12th and 13th.
18     Q.  When did that happen?
19     A.  Oh, perhaps a week or two later.  I don't
20  remember specifically.
21     Q.  There were also barriers you said on Pike,
22  correct?
23     A.  I don't know if they actually hit Pike
24  Street but roughly to the cross section.  They might
25  have stopped shy.

Page 144

1      I'm sorry, I keep getting confused between
2  concrete and regular barriers.  I don't think there
3  were regular barriers on Pike Street but I think they
4  got up to Pike Street.
5      Q.  You say they got up to Pike Street, so where
6  were they?
7      A.  The regular barriers were on 12th Avenue
8  roughly up to Pike Street.  And I believe some of the
9  other streets parallel and west of 12th Street.
10     Q.  Will you open the exhibit that you have
11  already looked at marked 55, I think.
12     A.  Okay.  Opening 55, the map.
13     Q.  Yeah.  Okay.  I'm thinking of any type of
14  barrier using the streets on the map as reference.
15     A.  Yes.
16     Q.  Can you tell me each area where you remember
17  there being barriers during CHOP?
18     A.  Roughly on Pike Street, around Pike and
19  Broadway, roughly around that spot.  Roughly around
20  13th and Pike -- I'm sorry, not Pike, Pine and
21  Broadway, as well as 13th and Pine.
22        On 12th Avenue roughly halfway between Pine
23  and the street north of Pine, which it may be Olive --
24  I can't remember the name of the street -- or Howell,
25  but the next street north of Pine.  As well as south

36 (Pages 141 to 144)

Electronically signed by Pat Lessard (601-142-526-6610)                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 145

1   onto Pike -- again, somewhere along that stretch
2   closer to Pike.
3         Now following Pine from 12th Avenue we go
4   looking left or west there were barricades on that
5   street before you hit Pike and at some point going
6   into paralleling Cal Anderson.  I can't remember the
7   specific location but that one street that is north
8   one block of Pine.
9         And then I believe there was another barrier
10  that I recall moving west, so now two blocks west of
11  12th Avenue.  Again, in between Pine and Pike I
12  believe there was another barrier.
13      Q.  Which barriers affected your access to your
14  building?
15      A.  All of them.
16      Q.  How did the barrier at Pine and Broadway
17  affect your access to your building?
18      A.  There was no way I could go around it.
19      Q.  Could you access your building by car?
20      A.  No.
21      Q.  Could you access your building by foot?
22      A.  Sometimes.
23      Q.  When couldn't you access your building by
24  foot?
25      A.  When a handful of occurrences within CHOP at

Page 146

1   times.
2       Q.  What prevented you from accessing your
3   building by foot?
4       A.  CHOP security.
5       Q.  Your testimony is that on a handful of
6   occasions CHOP security prevented you from entering
7   your building?
8       A.  That is correct.
9       Q.  When did that occur?
10      A.  Roughly the night someone jumped on my
11  building.  Perhaps a week into CHOP, maybe two weeks
12  into CHOP.
13      Q.  Did anyone from the City ever prevent you
14  from accessing your building?
15      A.  No.
16      Q.  Was your trash picked up during the time
17  period of CHOP?
18      A.  Never, that I recall.
19      Q.  Did you have electrical service during the
20  time period of CHOP at your building?
21      A.  Yes.
22      Q.  Did you have other utilities in your
23  building during the time period?
24      A.  Did I have other utilities?
25      Q.  Yes.

Page 147

1       A.  Yes.
2       Q.  You mentioned contacting law enforcement
3   during the CHOP time period.
4         Can you tell me each time you contacted law
5   enforcement during that period?
6       A.  Roughly three days into CHOP, I believe it
7   was a Sunday, perhaps at five-ish in the morning, when
8   protestors broke into the East Precinct I called
9   roughly --
10      Q.  Sorry.  I'm going to stop you.
11        And what was the substance of your
12  communication when you called about the East Precinct
13  incident?
14      A.  Communicating the events that took place.
15      Q.  Did the dispatcher say anything to you?
16      A.  Of course.
17      Q.  And what did the dispatcher say to you?
18      A.  I don't remember the specifics.
19      Q.  Do you remember anything that the dispatcher
20  said?
21      A.  Roughly "Thank you for the information."
22      Q.  When was the next time you contacted law
23  enforcement during the CHOP time period?
24      A.  I think within about a week, the first --
25  within a week of CHOP starting.

Page 148

1       Q.  Why did you call law enforcement on that
2   occasion?
3       A.  We had a burglar break into our building.
4       Q.  And what was the substance of your
5   communication with law enforcement on that occasion?
6       A.  There was someone who had broken into our
7   building and they have our property and communicating
8   that with them.
9       Q.  And do you recall any communication from the
10  dispatcher to you on that occasion?
11      A.  They offered to send a cop out several
12  blocks from CHOP that I could meet at some point in
13  time.
14      Q.  Do you recall where they offered to send the
15  police officer to?
16      A.  No.
17      Q.  And did you take the dispatcher up on the
18  offer to send out a law enforcement official?
19      A.  I believe so.
20      Q.  Did you ever meet with the police officer
21  about the break-in at your apartment?
22      A.  No.
23      Q.  Why not?
24      A.  I believe in this instance I never got a
25  call back.

37  (Pages 145 to 148)

Electronically signed by Pat Lessard (601-142-526-6610)                                                72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 161

```
 1          C E R T I F I C A T E
 2    STATE OF WASHINGTON  )
                           ) ss.
 3    COUNTY OF KING       )
 4         I, the undersigned Washington Certified Court
 5    Reporter, hereby certify that the foregoing deposition upon
 6    oral examination of MATTHEW PLOSZAJ was taken
 7    stenographically by me on June 10, 2021, and transcribed
 8    under my direction;
 9         That the witness was duly sworn by me pursuant to
10    RCW 5.28.010 to testify truthfully; that the transcript of
11    the deposition is a full, true, and correct transcript to
12    the best of my ability; that I am neither attorney for nor
13    relative or employee of any of the parties to the action or
14    any attorney or counsel employed by the parties hereto, nor
15    am I financially interested in its outcome.
16         I further certify that in accordance with
17    CR 30(e) the witness was given the opportunity to examine,
18    read and sign the deposition within 30 days upon its
19    completion and submission, unless waiver of
20    signature was indicated in the record.
21         IN WITNESS WHEREOF, I have hereunto set my hand this
22    15th day of June, 2021.
23
              Pat Lessard
24            Pat Lessard,
              pat@court-reporter.com
25
```

41 (Page 161)

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427 3515 SW Alaska St Seattle WA 98126

Exhibit 17

JOSEPH WANAGEL
5/21/2021

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiffs,   )
                               )
    vs.            )  No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,        )
                               )
        Defendant.   )

Zoom Video Deposition Upon Oral Examination

Of

JOSEPH WANAGEL

30(b)6  Olive ST Apartments

DATE:  Friday, May 21, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

## Page 2

    A P P E A R A N C E S

For the Plaintiff:
  HENRY PHILLIPS
  Calfo Eakes
  1301 Second Avenue
  Suite 2800
  Seattle, Washington 98101

For the Defendant:
  CAITLIN B. PRATT
  Harrigan Leyh Farmer Thomsen
  999 Third Avenue
  Suite 4400
  Seattle, Washington 98104

    Also Present:  Bryan Gaver, Royal Video Productions

        --oOo--

## Page 3

            I N D E X
EXAMINATION BY             PAGE
Ms. Pratt           5, 196
Mr. Phillips          196

            EXHIBIT INDEX
NO.   DESCRIPTION         PAGE
40   Aerial map          37
41   2016-2019 Operating Statements for Olive ST   65
     Apartments LLC

42   Olive Street Apartment rents       119

43   Rentometer document          122

44   Other expenses for 1114 East Olive Street/   149
     1703 12th Ave. document
45   Olive ST apt. Costs to date, March 1, 2021   158
46   Security expenses for 1114 East Olive   153
     Street/1703 12th Ave. document

47   Letter from Mr. Wanagel requesting       167
     reimbursement

Questions marked for counsel - Instruction not to answer

Page/Line      Page/Line

  7/25        112/14
  8/25        113/12
  35/13       116/17

## Page 4

        Friday, May 21, 2021
        9:01 a.m.

        --oOo--

        THE VIDEOGRAPHER:  We are now on record.  Today's
date is May 21st, 2021.  The time is now 9:01 a.m.  This is
Volume 1, Media 1 in the deposition of Joseph Wanagel in
the matter of Hunters Capital, LLC, et al., versus City of
Seattle.  We are recording via the internet using Zoom
video conferencing.

        My name is Bryan Gaver, and I am representing
Royal Video Productions on behalf of Rough & Associates.
Today's court reporter is Mindy Suurs.

        At this time I would like to ask all counsel
present to identify themselves.

        MS. PRATT:  My name Caitlin Pratt from Harrigan
Leyh Farmer & Thomsen.  We represent the City of Seattle.

        MR. PHILLIPS:  My name is Henry Phillips.  I'm
from Calfo Eakes.  I represent the plaintiffs.

        THE VIDEOGRAPHER:  Wonderful.  Thank you,
counsel.

        And would our court reporter please swear in the
witness.

        1  (Pages 1 to 4)

Electronically signed by Mindy Suurs (101-257-931-8021)                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 9

1  attorney work product and instruct the witness not to
2  answer.
3       MS. PRATT:  Mr. Phillips, I'm asking for anything
4  he reviewed in preparation for his deposition; I didn't ask
5  him for anything having to do with his communications with
6  you nor anything that would reveal your mental impressions.
7  I'm simply asking what documents he reviewed.
8       MR. PHILLIPS:  Yeah, I've made my objection.  We
9  would have reviewed documents as we communicated with him,
10  and that would reveal our work product.
11       MS. PRATT:  Well, Mr. Phillips, I'll just let you
12  know that Mr. Weaver permitted every other deponent to
13  answer that question.  Moreover, it's standard practice to
14  answer it.
15       We can take this up with the Court later if you
16  are going to stand on that objection, but I would ask you
17  to please confer with your colleagues at a break.
18       Q.  So Mr. Wanagel, I just want to confirm you're
19  going to follow your attorney's advice not to answer what
20  documents you reviewed in preparation for your deposition?
21       A.  Yes, I follow my attorney's advice.
22       Q.  Great.  Did you write any notes during your
23  preparation for this deposition?
24       A.  No.
25       Q.  And did you review any notes during your

Page 10

1  preparation for this deposition?
2       A.  No.
3       Q.  Okay.  Who is your current employer?
4       A.  Me.
5       Q.  Okay.  And how long have you been self-employed?
6       A.  18 years.
7       Q.  And in your self-employment, what type of
8  business have you done?
9       A.  I own, manage, and maintain apartment buildings.
10       Q.  What apartment buildings specifically?
11       A.  The one in this case that we're specifically
12  talking about is 1114 East Olive Street.  Separate address
13  of the same parcel is also 1703 12th Avenue.
14       Q.  Did you say 1703 12th Avenue?
15       A.  Yes, and those are both in Seattle.
16       Q.  And justify to clarify, are there two buildings
17  on the same parcel, or is it just two addresses for one
18  building?
19       A.  Two buildings:  A four-unit and a 20-unit.
20       Q.  And they're right next to each other?
21       A.  That's correct.
22       Q.  Do you own any other buildings?
23       A.  I do.
24       Q.  What buildings are those?
25       A.  I own a handful of buildings in the Seattle area

Page 11

1  and then also some up north in Snohomish County and then
2  one in Tennessee.
3       Q.  Tennessee building is the wild card.
4       Tell me specifically which other buildings in
5  Seattle you own.
6       A.  You want me to list the addresses?
7       Q.  Yes, please.
8       A.  4059 Eighth Avenue Northeast, Seattle,
9  Washington; 3929 Aurora Avenue North; 3939 Wallingford
10  Avenue North; 718 27th Avenue in Seattle, Washington; and
11  3501 Albion Place North in Seattle, Washington.  Those are
12  all my Seattle buildings as I recall.
13       Q.  I suspect this may come up later, so will you
14  spell Albion, please?
15       A.  A-l-b-i-o-n.
16       Q.  Wonderful.  And before I ask you to list out the
17  addresses, how many apartment buildings do you own in
18  Snohomish County?
19       A.  Well, it's a combination of houses and
20  apartments.
21       Q.  Okay.  Thank you for clarifying.  How many rental
22  properties do you own in Snohomish County?
23       A.  Let me count them in my head here.  Six.
24       Q.  What cities are they in?
25       A.  Bothell and Everett.

Page 12

1       Q.  How many are in Bothell?
2       A.  Four.
3       Q.  Does that leave two in Everett?
4       A.  Correct.
5       Q.  In Bothell how many are houses?
6       MR. PHILLIPS:  Objection to form.
7  BY MS. PRATT:
8       Q.  You can still answer.
9       A.  Oh, Henry said objection to form.
10       MS. PRATT:  Yes --
11       MR. PHILLIPS:  You can still answer though.
12       A.  Okay.  So one property has two houses on it, one
13  property has one house on it, one property is a triplex,
14  and one property is seven units.  Three of those I own
15  personally, and one of them I own under the business.
16  BY MS. PRATT:
17       Q.  What business are you referring to?
18       A.  Olive ST Apartments LLC.
19       Q.  So that LLC owns more than just the Olive Street
20  Apartments; is that right?
21       MR. PHILLIPS:  Objection to form.
22  BY MS. PRATT:
23       Q.  You can still answer.
24       A.  Olive ST Apartments -- to be clarified, it's not
25  Olive Street Apartments, it's Olive ST Apartments LLC --

3  (Pages 9 to 12)

Electronically signed by Mindy Suurs (101-257-931-8021)                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 13

1    and then also Olive ST Apartments LLC owns more than just
2    1114 East Olive Street and 1703 12th Avenue.
3        Q.  How many properties are owned under that LLC?
4        A.  I'm counting, give me a second.
5            I believe it's six.
6        Q.  And how many of those six are properties in
7    Seattle?
8        A.  There -- I believe it's four of them.
9        Q.  Which of the four Seattle properties you
10   mentioned earlier are owned by the LLC?
11       A.  So let me just go through the addresses to make
12   sure we get the correct number and the correct addresses.
13   First building under county records is 1114 East Olive
14   Street.  Another building is 4059 Eighth Avenue Northeast,
15   718 27th Avenue; 3929 Aurora Avenue North; and 3939
16   Wallingford Avenue North.  So does that come out to five?
17   That might come out to five.  So five in Seattle owned by
18   Olive ST Apartments LLC.
19       Q.  And how many -- you said it owns six properties
20   overall; is that right?
21           MR. PHILLIPS:  Objection to form.
22       A.  Olive ST Apartments LLC -- I think I got that
23   number wrong.  So we're at five in Seattle, then we have
24   two in Snohomish County, so it would be seven total.
25   BY MS. PRATT:

Page 14

1        Q.  And how many properties does that leave you
2    owning individually?
3            MR. PHILLIPS:  Objection to form.
4        A.  Just give me a second to make sure I get this
5    correct.  Properties, you're saying, not units?  And then
6    are you including my house in these properties or just the
7    rentals?
8    BY MS. PRATT:
9        Q.  How many rental properties do you own personally?
10           MR. PHILLIPS:  Objection to form.
11       A.  I believe it's six.  It's hard for me to do it
12   without going through addresses.
13   BY MS. PRATT:
14       Q.  Why don't we do that.  Why don't we go through
15   the addresses.  So tell me the addresses of the rental
16   properties you own personally.
17       A.  I have 23021 Second Avenue Southeast; 18920 25th
18   Avenue Southeast; 3214 Lombard Avenue; 23624 23rd Avenue
19   West; and then the Tennessee property, which I believe is
20   761 McAdoo Street.
21       Q.  Will you spell McAdoo?
22       A.  M-c-A-d-o-o.
23       Q.  Why do you choose to own some properties
24   personally and others via the LLC?
25           MR. PHILLIPS:  Objection to form.

Page 15

1        A.  Well, so typically what you do is if you have one
2    to four units, you often own that personally, and then
3    five-plus is considered commercial or commercial loans.  So
4    typically you would do five-plus in an LLC and one to four
5    personally.
6    BY MS. PRATT:
7        Q.  And is that the rule that you follow?
8        A.  In general.
9        Q.  What exceptions are there to that rule in your
10   rental holdings?
11           MR. PHILLIPS:  Objection to form.
12       A.  Personally I own 3501 Albion Street North --
13   Albion Place North, and that's six units.  That was one of
14   my earlier properties, so -- been doing it 18 years.
15   BY MS. PRATT:
16       Q.  Okay.  Other than that Albion Place property, do
17   you own any other place with five-plus units via the LLC?
18       A.  So I guess clarify the question.
19       Q.  So you mentioned that you owned the Albion Place
20   property personally even though it has six units; right?
21       A.  Yes.
22       Q.  Are there any other properties with five or more
23   units that you own personally?
24       A.  No.  I mean I guess the only correction to that
25   is the McAdoo property in Tennessee.  We're dealing with

Page 16

1    some stuff, so it's a question of how many units it will
2    be.  So that would be hard to answer exactly.
3        Q.  I'm going to go through your properties.  How
4    long have you owned the Olive, East Olive Street building?
5        A.  Since 2006.
6        Q.  How about the Eighth Avenue building?
7        A.  You're testing my memory on these.  Approximately
8    2007 or '8.
9        Q.  I believe it's 27th Avenue.  Is that --
10       A.  Yes.
11       Q.  And how long have you owned that property?
12       A.  2014.
13       Q.  And how about the Aurora Avenue property?
14       A.  I would say 2009.
15       Q.  The Wallingford Ave. property?
16       A.  2012.
17       Q.  Second Avenue?
18       A.  2007, I believe.
19       Q.  25th Avenue?
20       A.  I want to that was in 2007 as well.
21       Q.  Lombard Street?
22       A.  2003.
23       Q.  23rd Avenue?
24       A.  That one I believe was 2017 or '18.
25       Q.  How about the McAdoo address?

4  (Pages 13 to 16)

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)
f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 33

1    A.  I would consider the CHOP the day the East
2  Precinct was abandoned all the way through December of 2020
3  into January of 2021.
4  BY MS. PRATT:
5    Q.  And why do you say that it continues into
6  January -- or December 2020 or January 2021?
7    A.  Because I was told by the police that they could
8  not enter that area, and I was physically attacked all the
9  way through December 2020.
10    Q.  Sorry that happened.  You said you were told by
11  police that they could not enter that area.  What area are
12  you talking about?
13    A.  It varied between several blocks in that
14  neighborhood to sometimes just being confined to the park
15  and immediately adjacent to the park.
16    Q.  Can you tell me when it was several blocks in the
17  neighborhood?
18    A.  Certainly from when the East Precinct was
19  abandoned until the beginning of July 2020 was definitely
20  several blocks.  After that, it varied on and off how much
21  area was considered unsafe and the police would not enter.
22  But it always included the park and the streets immediately
23  around it.
24    Q.  When you say "the streets immediately around it,"
25  which streets specifically do you mean?

Page 34

1    A.  So 11th Avenue and even my street, East Olive
2  Street, were also points of contention.
3    Q.  Are you aware of any other areas that were often
4  points of contention?
5    A.  Certainly the police precinct area.  You know, I
6  didn't walk the area very much.  I typically stayed away
7  from the area because I was being told by the police to not
8  go in that area and that it was unsafe for them to enter
9  that area, so I mostly am just familiar with the street
10  right in front of my building at 1114 East Olive Street,
11  which several times throughout the year, I was told it was
12  unsafe and that the police were not going in that area.
13    Q.  You said you didn't walk the area much.  When you
14  said that, what area did you mean?
15    A.  Directly into the park.  I tried to stay as
16  confined to my building as possible because you often would
17  get attacked if you were -- the closer you got to the park.
18    Q.  You said you often would get attacked the closer
19  you get to the park.  How do you know that?
20    A.  I had bricks thrown at me.
21    Q.  When?
22    A.  In December of 2020, and there were some other
23  instances of unsafe situations.
24    Q.  What other instances?
25    A.  During the CHOP, I saw assault rifles, I had my

Page 35

1  life threatened, I had people tell me they're going to hit
2  me with a stick, was told more than probably 50 times I was
3  going to be killed, told me to get back to my building, was
4  chased by several human beings at one point.  I mean the
5  list goes on and on.
6    I would like to take a break if that's okay.
7    Q.  Absolutely.  We can go off.
8    THE VIDEOGRAPHER:  Okay.  The time is now
9  9:54 a.m., and we are going off record.
10    (Recess taken.)
11    THE VIDEOGRAPHER:  The time is now 10:10, and we
12  are back on record.
13    MS. PRATT:  Mr. Phillips, I just want to revisit
14  with you, are you still going to instruct your client not
15  to answer the question of what documents he reviewed in
16  preparation for his deposition?
17    MR. PHILLIPS:  Yes.
18    MS. PRATT:  Okay.  Can you also just make sure
19  you have e-mail access during any breaks and lunch in case
20  we need to arrange a time to call the Court?
21    MR. PHILLIPS:  Sure.
22    MS. PRATT:  All right.
23    Q.  So Mr. Wanagel, I want to go back to talking
24  about your experience in the CHOP, and you were talking
25  about having instances between June and December when it

Page 36

1  was -- it felt unsafe to you; is that right?
2    A.  Yes.
3    Q.  And that feeling of lacking safety -- is that the
4  reason why you consider the CHOP extending from June until
5  either December 2020 or January 2021?
6    A.  The feeling of lack of safety and the cops
7  telling me it was unsafe to be there and they were
8  instructed to not go into the park or some of the streets
9  adjacent or even my street at times.
10    So basically, people are threatening your life
11  and the police aren't coming and telling you they're not
12  coming.
13    Q.  I want to -- so first, you've mentioned the
14  streets around the park and then your street a couple of
15  times.  Do you consider your street as a street around the
16  park?
17    A.  I would say yes because you can directly see the
18  park right there, and so there's -- there's the park,
19  there's a street that goes parallel to it, and my street
20  directly tees off of it.  So from standing in front of 1114
21  East Olive Street and the distance from there to the park
22  is maybe 100 feet.
23    Q.  All right.  I'm going to mark our first exhibit
24  today, and what I'm going to do is I'm going to drop the
25  exhibit into the Chat feature on Zoom and you should be

9 (Pages 33 to 36)

Electronically signed by Mindy Suurs (101-257-931-8021)                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 37

1  able to open it that way.  In the past, I know Mr. Phillips
2  hasn't been here, but Mr. Weaver has had his client right
3  click and save it and then open it from wherever it's saved
4  to the extent that's helpful.
5      So let's see.  This will be marked -- I have
6  we're starting at Exhibit 40.  Does anyone have any
7  information to contradict -- okay, Mindy is saying yes,
8  okay.  So this is going to be marked Exhibit 40.  I'm
9  dropping it into the Chat now.  Please let me know when you
10 see it.
11          (Exhibit No. 40 marked for
12          identification.)
13     A.  It says: "Caitlin shared a feel here."  Click on
14 that?
15 BY MS. PRATT:
16     Q.  Do you see a file that just says 40?
17     A.  I see Chat with a 1 next to it, but I don't see
18 any files or 40.
19     MS. PRATT:  Okay.  Mr. Phillips, can you provide
20 any assistance?
21     MR. PHILLIPS:  Sure.  I'm just going to go to the
22 Chat here and I'm going to right click and save as.  Okay,
23 we have it open.
24 BY MS. PRATT:
25     Q.  Okay.  Mr. Wanagel, do you recognize what's

Page 38

1  pictured in Exhibit 40?
2      A.  Yes.
3      Q.  What is that?
4      A.  I see a aerial picture of the Capitol Hill
5  neighborhood including Cal Anderson Park with my building
6  with a little red dot on it with sort of a hashtag "Olive
7  ST Apartments."
8      Q.  And is your building correctly labeled on that
9  map?
10     A.  It looks like it's more labeling the larger
11 building and not so much the smaller building, but it is
12 clearly labeling the larger building of the two buildings.
13 The one directly next to it, which is a four-plex, is also
14 a part of that.
15     MR. PHILLIPS:  I apologize, I'm just going to --
16 Ms. Pratt, let me know if you object, but Joe, you can
17 manipulate the exhibit as you need to be able to review
18 it.  You can click on it, make it bigger, move up and down,
19 just so you know.
20 BY MS. PRATT:
21     Q.  Yes, you can.  Please do.
22     Okay.  So can you use this map to describe --
23 well, I'm going to withdraw that.  Let me start again.
24 When you're looking at the map on Exhibit 40, do you see
25 there are white boxes with red text?

Page 39

1      A.  Yes.
2      Q.  And are those labeling the streets correctly, to
3  your understanding, of Capitol Hill?
4      A.  I believe so.
5      Q.  Okay.  So using the streets that are marked with
6  the red text and the white boxes, can you describe what
7  streets you are talking about when you say that there were
8  more issues from June to December 2020 or January 2021 on
9  the streets around the park?
10     MR. PHILLIPS:  Object to form.
11     A.  So basically during the -- after the East
12 Precinct was left and until beginning of July, pretty much
13 everything in this map was not safe and the police would
14 tell you they were not going there.  After July, it seemed
15 to kind of contract and expand depending on the day, but
16 typically the majority of the time, Cal Anderson Park and
17 the streets all the way around it and any arterials
18 directly off of that, to my knowledge, were no-go zones,
19 meaning that the police would often tell you they wouldn't
20 even go there, and certainly after July, there were people
21 that were murdered in Cal Anderson Park.
22     And -- but I'm most familiar with my street,
23 which is East Olive Street there, which all the way through
24 December 2020 I was told on several occasions that it was
25 not safe to be there and they certainly would not enter the

Page 40

1  park and were very hesitant to even go on my street, if at
2  all, depending on the day.
3  BY MS. PRATT:
4      Q.  You mentioned the arterials right off the park.
5  Is that what you said?
6      A.  Yeah.
7      Q.  So if you use your street, Olive Street, as an
8  example, what area does that extend to?
9      MR. PHILLIPS:  Objection to form.
10     A.  Once again, I'm mostly just familiar with the
11 streets directly around my building because, once again,
12 the police were typically telling me it was unsafe to be in
13 that area; so I didn't venture very far, but I would say
14 anything within probably three or four blocks from when the
15 East Precinct was left until July, the police were not
16 entering.  After July all the way through December 2020, it
17 was a little bit hit and miss but probably closer to a
18 block and a half around there that the police might tell
19 you they wouldn't show up.
20     Q.  And your building, Olive Street Apartments, is
21 about a block off the park; is that right?
22     A.  It's a half block to a full block off of the
23 park.
24     Q.  Okay.  You mentioned that during -- from the time
25 when the East Precinct was left through the beginning of

10  (Pages 37 to 40)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 85

1  would roam the neighborhood with weapons would be the
2  police.  So we were sort of -- the burden of our own safety
3  was put on our own shoulders being that the police was
4  not -- vocally voiced that they're not showing up.
5      Q.  Other than your security, your hired security,
6  and police officers, was there anyone in your neighborhood
7  who open carried weapons but did not use them in a
8  threatening manner toward you?
9          MR. PHILLIPS:  Objection to form.
10     A.  Are you asking if I saw that or if that happened?
11 BY MS. PRATT:
12     Q.  If you experienced that.
13         MR. PHILLIPS:  Same objection.
14     A.  I guess typically I was feeling quite threatened
15 by all the people carrying around guns, which I did not
16 know who they were because I know that people were being
17 murdered on a fairly regular basis during that time.  With
18 guns.
19     Q.  Right.
20     A.  So it's people walking around with bunch of
21 guns -- did that feel abnormal and unsafe?  Yes.  When
22 people are getting murdered several times, kind of like a
23 war zone.
24     Q.  And this occurred between June and July of 2020?
25     A.  So it was at the worst from when the East

Page 86

1  Precinct was abandoned until the beginning of July, and
2  then it kind of was worse -- it was still terrible all the
3  way through December of 2020.
4      Q.  Between that June and July period, did you ever
5  have access to your building restricted?
6      A.  Yes.
7      Q.  How?
8      A.  They put barricades in the street.
9      Q.  Who's "they"?
10     A.  That's an excellent question.  It was people that
11 I did not recognize putting barricades up that, if you
12 asked them questions, they would cuss and swear and
13 threaten you.  They were unidentified and would refuse to
14 identify themselves.
15     Q.  Where specifically were those barricades put?
16         MR. PHILLIPS:  Objection to form.
17     A.  They were on East Olive Street and there were
18 some on 12th Avenue and several other spots, but those are
19 the ones specifically at my building.
20 BY MS. PRATT:
21     Q.  Exactly where on East Olive Street were those
22 barricades?
23         MR. PHILLIPS:  Objection to form.
24     A.  On the street and on the sidewalk.
25 BY MS. PRATT:

Page 87

1      Q.  So we looked at that aerial map earlier -- and we
2  can pull it up if that would be helpful to you, just let me
3  know -- but I'm trying to get a sense of which blocks had
4  barricades in the streets.
5      A.  I would say it varied a little bit from time to
6  time.  There was even a time I tried to move one and got
7  attacked, and they would continually try and claim more
8  territory.  So I was kind of right on the border of where
9  barricades were coming up and down.  So East Olive Street
10 was commonly barricaded off, but sometimes it got pushed
11 back a little bit by residents and myself because I wanted
12 the garbage to get emptied, but they would commonly try and
13 reclaim area.
14         MR. PHILLIPS:  I need to register my objection to
15 the form of the question.
16 BY MS. PRATT:
17     Q.  Let me know if this is a fair characterization:
18 That the barricades were generally about halfway between
19 Cal Anderson and that corner of 12th and Olive Street.  Is
20 that what you're saying?
21         MR. PHILLIPS:  Objection to form.
22     A.  In general, I don't think that's a fair
23 characterization because often they were right on the --
24 like where the crosswalk would be to cross East Olive
25 Street on 12th Ave.  And sometimes they'd even try and

Page 88

1  claim more than that.  So I don't know if you can
2  generalize.  It was kind of a day-to-day thing.
3  BY MS. PRATT:
4      Q.  Okay.  And so where is your trash access that you
5  could try to move the barriers so that trash could be
6  picked up?
7      A.  So my trash is on East Olive Street.  Between the
8  four-unit building and the 20-unit building, there's like a
9  little alley there, and that's where my trash is.
10     Q.  And so sometimes the barriers would be behind
11 that area so that your trash could be picked up?
12     A.  So I don't know if you've ever driven a garbage
13 truck, but you can't turn around in a street easily at all,
14 so you would typically come on 12th Ave. going towards the
15 precinct, take a right onto East Olive, stop there, empty
16 the garbage, then go towards the park, turn a right next to
17 the park on 11th, and then drive on from there.  They have
18 their routes, but that's an example of what you would do
19 with a garbage truck.  You would never try and turn around
20 in a tight street with a garbage truck.  In most cases it
21 wouldn't even be possible in Seattle without severe damages
22 to cars lining the street.
23     Q.  So during the June to July time frame of when I
24 think you described the CHOP as being its most intense, how
25 was your trash collected?

22  (Pages 85 to 88)

Electronically signed by Mindy Suurs (101-257-931-8021)                f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 89

1    A.  Often it wasn't.
2    Q.  How many times was trash pickup missed?
3        MR. PHILLIPS:  Objection to form.
4    A.  I -- I don't have exact number.  My remembrance
5  is it mostly did not get picked up.  So -- yeah, for
6  whatever amount of weeks that was, it didn't really get
7  picked up.  They tried one day to clear it so they could
8  get through, but I don't think they picked it up that day
9  either.
10  BY MS. PRATT:
11   Q.  Other than the interruption of your trash service
12  as you just described, did you have an interruption in any
13  of your other utility services between June and July 2020?
14   A.  So PSE was scheduled -- Puget Sound Energy, the
15  gas service -- was scheduled to do essential work on the
16  gas meters, and they were not able to do it during that
17  time.
18   Q.  Did they reschedule that work?
19   A.  They did.
20   Q.  When was it completed?
21   A.  A month or -- it was after July.  I want to say
22  mid July.  It was after the height of the CHOP.  I want to
23  say mid July.
24   Q.  Did you have any impact to your tenants based on
25  the delay in that work on the gas meters?

Page 90

1        MR. PHILLIPS:  Objection to form.
2    A.  Was there impact -- just to clarify the question,
3  was there impact to the tenants due to the work not being
4  done on the gas meters?
5  BY MS. PRATT:
6    Q.  Let me rephrase my question.  I'll withdraw that
7  first one and just say:  What impact did it have on you
8  that the work on your gas meters was delayed?
9    A.  Well, so basically, PSE was coming in to replace
10  meters and piping in the main gas room because they were
11  old and they were fearing of leaks, so luckily my building
12  did not blow up during that time.
13   Q.  Does that mean that it didn't have an impact?
14       MR. PHILLIPS:  Objection to form.
15  BY MS. PRATT:
16   Q.  You can --
17   A.  I guess it -- I would say the impact was work --
18  when work should have been done, it probably should have
19  been done then for safety reasons, and so you increased
20  safety risks during that time by postponing that work.  To
21  what percent or level, you would have to ask the Puget
22  Sound Energy.  It was not at the level where they decided
23  it was at the point where the building should have been
24  shut down altogether.
25   Q.  So other than the trash collection and the PSE

Page 91

1  delay in the work on your gas meters, did you have any
2  other city services that were interrupted between June and
3  July of 2020?
4    A.  Not that I know of.  I mean certainly, you know,
5  you weren't going to get your Comcast guy to come in or
6  your phone guy to come in, but you would have to talk to
7  the specific tenants on those specific problems.
8    Q.  Did you hear from tenants that any of those
9  problems arose?
10   A.  They mostly mentioned the problems with their
11  safety.  They didn't get into too many other issues during
12  that time.
13   Q.  You mentioned there were barriers on -- street
14  barriers on 12th.  Where on 12th were those barriers?
15   A.  Usually that barrier would -- where you would
16  have considered the crosswalk would have been right on that
17  East Olive Street and 12th Ave.  Once again, they often
18  would try and expand the area.
19   Q.  So am I understanding you correctly that traffic
20  could have traveled from north to south on 12th but it
21  could not have traveled west between your buildings and the
22  park?
23       MR. PHILLIPS:  Objection to form.
24   A.  I -- I guess I -- I'm a little confused with the
25  east/west scenario, but if you're on 12th going towards the

Page 92

1  precinct, you most likely would not have been able to turn
2  right onto East Olive Street, but you probably could have
3  gotten off and you could have gotten all the way to East
4  Olive Street.
5  BY MS. PRATT:
6    Q.  Okay.  And what would happen when you hit East
7  Olive Street?
8    A.  There was a bunch of junk in the road.  The City
9  had actually even put up a sign for the CHOP saying you
10  can't pass this.  So my answer would be the City provided
11  bolted in barricades into the street to prevent you
12  entering into the CHOP.
13   Q.  You know, I think it actually would be helpful to
14  look at Exhibit 40 again.  Can you open that?
15   A.  Let me see.  I'm going to get Henry to help me
16  real quick.
17   Q.  Okay.  So are you looking at Exhibit 40?
18   A.  Yes.
19   Q.  Okay.  So I understand what you're saying is if
20  you're on Olive Street, it would have been blocked right at
21  that corner of 12th and Olive and you couldn't have
22  traveled any further toward the park; is that right?
23   A.  Typically, yes.  Like I said, it was kind of off
24  and on at that part.  It was kind of off and on.
25   Q.  And if you were traveling from Denny and 12th

23  (Pages 89 to 92)

Electronically signed by Mindy Suurs (101-257-931-8021)                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 93

1    south, where on 12th would you hit -- typically hit a
2    barrier?
3        A.   So I can tell you where the City provided
4    barricades --
5            MR. PHILLIPS:  Objection to form.
6        A.   So the barricade that the City provided the CHOP
7    was right there at the corner of 12th Ave. and East Olive
8    Street.  Now, the CHOP folks would just throw stuff
9    wherever they wanted to whenever they wanted to.
10   BY MS. PRATT:
11       Q.   So then there would have been -- if you were
12   traveling south on 12th from Denny and you hit the corner
13   of Olive and 12th, the only way you could turn would be
14   east; is that right?
15       A.   Yes.
16       Q.   Okay.  And Olive was generally blocked, you said,
17   between 12th and Olive and the park; correct?
18       A.   No, it was off and on there.  Once again, that
19   was sort of a -- there's a couple times I tried to move
20   barriers there and then, you know, got attacked, and -- and
21   so occasionally -- so there was times you could drive down
22   there and then there was times you couldn't.
23       Q.   Okay.  And how far on 12th was blocked?
24           MR. PHILLIPS:  Objection to form.
25       A.   So where the barricades end south of where that

Page 94

1    City-provided barricade was?
2    BY MS. PRATT:
3        Q.   Yes.
4        A.   I -- I don't recall exactly.  I want to say it
5    was on Pike Street.
6        Q.   Are you aware of the location of any firm
7    barriers on the west side of the park?
8            MR. PHILLIPS:  Objection to form.
9        A.   I want to say the west barricades were almost on
10   Broadway off of like East Pike and East Pine.
11   BY MS. PRATT:
12       Q.   And how do you remember that?
13       A.   I -- I -- when you're going up and seeing these
14   barricades, you kind of had to drive around to try and get
15   as close to your building as you could at times, so -- and
16   also just to see what's going on I drove around couple
17   times, and then I did walk the area once or twice.
18       Q.   And north of that Pike, Pine area, were there any
19   barriers on Broadway?
20       A.   So we --
21           MR. PHILLIPS:  Objection to form.
22       A.   So where you see the park and like -- you see
23   East Broadway, Broadway East, and then there's some
24   buildings and then there's kind of like a road right
25   between Cal Anderson Park and those buildings?

Page 95

1        Q.   Uh-huh.
2        A.   That was kind of all encompassed by CHOP.  I'm
3    not exactly sure exactly all the barriers and everything
4    were there, but it was certainly occupied there.  Now,
5    Broadway itself, from what I can remember, you could
6    typically drive down Broadway.
7        Q.   We were talking about barriers that were present
8    between June and July of 2020.  Could you describe where
9    there were barriers other than between June and July of
10   2020?
11           MR. PHILLIPS:  Objection to form.
12       A.   Were there barriers after July?
13   BY MS. PRATT:
14       Q.   Yes.
15       A.   You know, they were stealing garbage cans all the
16   time and throwing them in the streets.  There were
17   certainly, you know, barriers around the precinct for, oh,
18   I don't know -- til a couple weeks ago really.  So off and
19   on there certainly were things impeding access, including
20   dumpsters on fires and concrete blocks around the precinct.
21   And certainly around the precinct you couldn't use the
22   sidewalk until about a couple weeks ago.  And then during
23   that whole time from after the height of the CHOP until the
24   end of December, you know, there would be times where there
25   would be, certainly around the park, several things you

Page 96

1    couldn't do.  And, you know, from time to time they'd
2    travel out and set dumpsters on fires and throw it in the
3    street and whatnot.
4        Q.   In that post-July 20 -- or post-July 1st, 2020,
5    period, did you ever have access to your building blocked?
6        A.   I would say yes but not consistently.  Like it
7    was definitely off and on whether you had a burning
8    dumpster out there or, you know, some people throwing some
9    trash out there or if there were just simply people in the
10   street.
11       Q.   How often was it blocked in any of those ways?
12       A.   I guess -- there certainly would I would check the
13   news and what tenants were saying, decide whether I'd go
14   down there on a day-to-day basis.  And often I'd go down
15   there and I would see that things were going on that were
16   real bad and I would leave.  To tell you a specific
17   percentage or how often that was -- that would be very hard
18   for me to give you an exact.
19       Q.   How many times did you try to access your
20   building but have your access blocked after July 1st, 2020?
21           MR. PHILLIPS:  Objection to form.
22       A.   Once again, it would be hard for me to give you
23   exact number.  Directly my building, I had fairly decent
24   access when I was going down there, other than the fact
25   that, you know -- you know, might get bricks thrown at you

24  (Pages 93 to 96)

JOSEPH WANAGEL
5/21/2021

Page 97

1    or something.  Typically I would not go towards the park at
2    all; I'd turn around and go back out the other way.  I
3    would say it was all right but extremely unsafe.
4    BY MS. PRATT:
5        Q.  Did you ever have a tenant report to you that
6    access to your buildings, the Olive Street Apartments --
7    that they had their access to those buildings blocked?
8        A.  Yes.
9        Q.  When did you receive those reports?
10       A.  Certainly there was a lot of complaints of that
11   during the height of it, and after that, all the way
12   through December, you know, you would get different texts
13   on different days, you know, which I believe I provided.
14   You know, pictures of a dumpster on fire or people marching
15   down the streets or garbage being thrown in the street.  To
16   give you specific dates and times would be difficult for
17   me.  But certainly it continued to happen all the way
18   through 2020.
19       Q.  And I just want to make sure that we're on the
20   same page.  So you had tenants report to you that they were
21   physically prevented from accessing your apartment
22   buildings in that post-July period?
23       A.  I guess I would have you clarify "physically."
24       Q.  In the period after July 1st, 2020, did you have
25   a tenant report to you that they were prevented from

Page 98

1    accessing your buildings?
2        A.  There are certainly times when they told me that
3    there was garbage in the streets, march goings on, things
4    on fire.  Were there times that they probably would have
5    had to crash into something or drive on the sidewalk or
6    find some alternative route to get to the building?  Yes.
7    Sidewalk access -- would it have been possible to get
8    there?  Yes.  Would they have been at risk, I mean of
9    physical harm, I would say likely.
10       I guess it's really a matter of like, okay, so if
11   there's a bunch of people yelling "kill cops" and there's a
12   dumpster on fire, are they -- is that -- is that physically
13   stopping you from getting somewhere?
14       Q.  Right.  So what I'm talking about is an actual
15   physical barrier that would have prevented access to your
16   building, and it sounds like that did not occur, to your
17   knowledge; right?
18       MR. PHILLIPS:  Objection to form.
19       A.  I guess the answer actual physical -- there were
20   certainly times when there was trash in the street, so if
21   you consider that a physical barrier, the answer would be
22   yes -- like dumpsters and garbage cans, like that was a
23   normal thing for them to do -- is throw dumpsters and
24   garbage cans in the streets, which would -- you would
25   physically have to move something to get to the building.

Page 99

1    BY MS. PRATT:
2        Q.  You mentioned that there were bolted-in barriers
3    that were implemented by the City.
4        A.  Yes.
5        Q.  Am I correct that those were at 12th and Olive on
6    the Pine side of the street?
7        MR. PHILLIPS:  Objection to form.
8        A.  Yes.  There were more around the area, like the
9    City kind of cordoned off a specific area that they gave
10   them physical barriers to the CHOP, and some of them were
11   bolted in by the City.
12   BY MS. PRATT:
13       Q.  Talking about those physical -- those bolted-in
14   barriers specifically, was there still walking traffic
15   beyond those barriers?
16       A.  Was it possible to walk around?  Yes.  I would
17   say yes.  I mean during the height of the CHOP, it wasn't
18   uncommon to get stopped by so-called CHOP security and even
19   asked for your I.D.
20       Q.  At those barriers?
21       A.  Kind of wherever CHOP decides to do that.  And
22   often they would be holding weapons or guns during that
23   time.
24       Q.  And when were those bolted-in City barriers
25   present?

Page 100

1        MR. PHILLIPS:  Objection to form.
2        A.  I don't know when they originally put them in,
3    but they were not taken out until the July 1st when the
4    police showed up to kind of supposedly clear the CHOP out
5    for a very short period of time.
6    BY MS. PRATT:
7        Q.  And they were never reaffixed in that area?
8        MR. PHILLIPS:  Objection to form.
9        A.  If we're talking about the specific in-the-road
10   ones, they weren't reaffixed, but the concrete blocks
11   impeding the sidewalk, even somewhat partially the street,
12   were around the precinct until a couple weeks ago and they
13   spray painted part of the road, which is still blocked off
14   and has now decided to be a permanent fixture.
15   BY MS. PRATT:
16       Q.  How else did the CHOP affect you?  And by "you,"
17   I mean your business in the Olive Street Apartments.
18       A.  Affected -- it affected the business financially,
19   certainly terrorized its employees, it terrorized its
20   tenants, it certainly -- there's certainly vandalism,
21   there's attempted break-ins, faith in the City in general.
22   I feel there's health things that happened.  There's
23   certainly employees of Olive Street had to clean up pretty
24   disgusting things during that time.  I mean I don't know
25   what else to say but all those things.

25  (Pages 97 to 100)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

Page 153

```
 1     Q.  You got it.  So my question is:  Are any of the
 2   amounts that you're claiming in Exhibit 44 reflected in the
 3   expenses on Exhibit 41?
 4     A.  I would have put like the expense of fire
 5   extinguishers, repairs and maintenance, and, you know,
 6   materials cost, like lacquer thinner to get the graffiti
 7   off of the building.  I would have put it in there, but
 8   that's not really going to be reflecting my time, I guess.
 9     Q.  So on Exhibit 44, the 24 hours of administrative
10   time and the hourly rate for graffiti removal -- those
11   would not be reflected in the expenses listed on
12   Exhibit 41; right?
13     A.  Correct.
14     Q.  But the miscellaneous safety equipment is
15   reflected in Exhibit 41?
16     A.  I would say yes.
17        (Exhibit No. 46 marked for
18         identification.)
19   BY MS. PRATT:
20     Q.  Okay.  I'm going to resubmit Exhibit 46.  I know
21   that I've skipped 45.  We'll go back to that.  Do you see
22   46?
23     A.  Yep, loading and saving and opening.  Hold on.
24        "Security Expenses for 1114 East Olive
25   Street/1703 12th Ave. during CHOP."
```

Page 154

```
 1     Q.  Okay.  That's Exhibit 46, and can you describe
 2   each of the listed expenses for me.
 3     A.  So I have Dauntless Security, which I've
 4   submitted an invoice from them.  I have Iconic Global,
 5   which I've submitted for 860, which I submitted an invoice
 6   for, and then I have Iconic Global cash paid, 5,000, no
 7   receipt.  I don't have a receipt for that one.  I handed
 8   them 5,000 in cash.
 9     Q.  At whose request did you pay them cash?
10        MR. PHILLIPS:  Objection to form.
11     A.  Iconic Global.
12   BY MS. PRATT:
13     Q.  Yeah, let me rephrase the question.  Were you
14   requested to pay Iconic Global the $5,000 in cash?
15     A.  I asked them what would be a good payment form,
16   and that's what he suggested.
17     Q.  And what does that $5,000 reflect?
18        MR. PHILLIPS:  Objection to form.
19     A.  Security services.  You know, I was doing
20   anything I could to keep security there because actually
21   even getting security to go into the CHOP was not the
22   easiest thing in the world, including the City tried to
23   hire security, of which disappeared very quickly, being
24   that typically what security would do would keep an eye on
25   things and if something went wrong, they would call the
```

Page 155

```
 1   police; but in this case the police were not coming.
 2   BY MS. PRATT:
 3     Q.  How do you know the City tried to hire security?
 4     A.  Both through research on the internet and through
 5   the news and from people in the neighborhoods telling me.
 6     Q.  So the $5,000 reflected security services
 7   provided; is that right?
 8     A.  Yes.
 9     Q.  Do you know how many hours?
10     A.  They were there a lot.  We didn't really exactly
11   like -- under the receipt I believe they're at $40 an hour;
12   so hopefully the 5,000 got me -- I guess that would be
13   a-hundred-and-some hours of help.  But they were there on
14   and off, they were doing security for other people, it was
15   primarily to not only help in my building but kind of the
16   neighborhood too because a lot of people were hiring
17   security at that time.
18     Q.  Do you know what time period that $5,000 applied
19   to?
20     A.  That would have been in the heat of the CHOP.  I
21   realized quite clearly the Friday before people started
22   getting murdered in the height of the CHOP it was becoming
23   evident to me that it was getting -- like people's lives
24   were at stake, so I immediately got somebody out there.
25   And honestly, thank God I did because people got murdered.
```

Page 156

```
 1     Q.  What's the difference in the security provided by
 2   Dauntless Security and Iconic Global?
 3     A.  Dauntless Security was hired by a few people in
 4   the neighborhood and it was spot checks, whereas Iconic
 5   Global was typically showing up for extended period of
 6   times.
 7     Q.  And all of the time that Iconic Global was there
 8   was during -- you described it as the height of the CHOP;
 9   is that right?
10     A.  Yes, between the time the -- there was about a
11   week after the East Precinct was abandoned, things went
12   down exceedingly quickly to the point where it was quite
13   clear to me that someone was going to get murdered, at
14   which point we hired them and then they were there pretty
15   often until after the beginning of July and then even after
16   that, I saw them around the neighborhood a little bit, but
17   I did not hire them after that.
18     Q.  The expenses that are itemized in Exhibit 46 --
19   are those reflected in Exhibit 41 on Page 6?
20     A.  So the expenses for security -- are they on -- I
21   don't think the cash is on there.
22     Q.  So Exhibit 41 shows 6,928 for security; is that
23   right?
24        MR. PHILLIPS:  I'm just going to make sure that
25   Joe understands that there's that tab there you can click
```

39 (Pages 153 to 156)

Electronically signed by Mindy Suurs (101-257-931-8021)                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

JOSEPH WANAGEL
5/21/2021

Page 197

1       A.  I'm not a lawyer, so I don't know what I'm
2   entitled to altogether, but I feel strongly what I have
3   provided -- I'm definitely entitled to those I feel.  My
4   opinion is I'm definitely entitled to the things I
5   provided, but I don't know if there's additional things
6   allowable by law that I could ask for because I'm not a
7   lawyer.
8       MS. PRATT:  Okay.  So like I said, we'll hold
9   this open, continue this for now, and we can go off.
10      MR. PHILLIPS:  And I'll register -- before we go
11  off, I'll register once again my objection to continuing it
12  and holding it open.
13      MS. PRATT:  Okay.  We can we can go off.
14      THE VIDEOGRAPHER:  All right.  The time is now
15  4:18, and we are going off record.
16
17              (The deposition concluded at
18              4:18 p.m.)
19              (Signature was reserved.)
20
21
22
23
24
25

Page 198

1           S I G N A T U R E
2
3       I declare that I have read my within deposition,
4   taken on Friday, May 21, 2021, and the same is true and
5   correct save and except for changes and/or corrections, if
6   any, as indicated by me on the "CORRECTIONS" flyleaf page
7   hereof.
8       Signed in _____, Washington,
9   this _____ day of _____, 2021.
10
11
12
13
14
15
16       _____
17       JOSEPH WANAGEL
18
19
20
21
22
23
24
25

Page 199

1   REPORTER'S CERTIFICATE
2
3       I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:
5
6       That the foregoing testimony of JOSEPH WANAGEL
    was given before me at the time and place stated therein
7   and thereafter was transcribed under my direction;
8       That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision, to the best of my ability;
10      That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;
12
        That the witness, before examination, was by me duly
13  sworn to testify the truth, the whole truth, and nothing
    but the truth;
14
15      That I am not a relative, employee, attorney, or
    counsel of any party to this action or relative or employee
16  of any such attorney or counsel and that I am not
    financially interested in the said action or the outcome
17  thereof;
18  DATE:  May 28, 2021
19
20
21
22
23
24  Mindy L. Suurs
25  Certified Court Reporter #2195

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                    f7fa7911-1915-4b46-b6f0-71dc79b11fe7

Exhibit 18

**Property of the Seattle Police Department**
**\*\* OFFICIAL LAW ENFORCEMENT USE ONLY \*\***

# June 29 Events

## Incident Action Plan



# 6/29/2020

## 0000 - 2400 hrs

| Activity ID | Resource Category |
|---|---|
| SP20MY279 | 403 |

This record is exempt from disclosure under RCW Section 42.56.420(1)(a) of the Public Disclosure Act, RCW 42.56.420 et seq. This record has been prepared, assembled or is maintained to prevent, mitigate or respond to criminal terrorist acts. This record is a specific and unique vulnerability assessment, or response or deployment plan, or is compiled underlying data collected in preparation of, or that is essential to, such an assessment or plan. Public disclosure of this record would have a substantial likelihood of threatening public safety.

**DO NOT DUPLICATE**                    **DESTROY BY SHREDDING**

SEA_00007766

**COMMANDERS INTENT:**

During this operational period, we will ensure the safety of police personnel and integrity of police facilities.   An infrastructure protection detail shall be assigned to the West Precinct to ensure the security of the police facility and the City's 911 call center.  Patrol will be dispatched and respond to calls for service in the East Precinct, outside of the protest area that has been designated the Red Zone.

**For any calls or incidents within the "Red Zone" in the East Precinct:**

• For all calls originating from **within the red zone**, Communications Section personnel should attempt to coordinate officer contact outside the red zone boundary.

• **Officers should not respond to calls for service within the red zone, unless the response is to critical life safety emergency.  If responding to a life safety emergency  within the red zone, all responding officers should muster with a supervisor outside that zone to determine the police response, develop a plan, and deploy with needed resources. Coordination with SFD or any other city resources should take place outside of the Red Zone perimeter.**

Officers should continue to document calls for service that originate from within the red zone, even under circumstances where complainant/victim contact isn't possible.

We will allow unpermitted marches to occur and deploy police resources only as needed based on an assessment made by an on-duty commander. If there is any danger to public safety risk or significant property destruction being caused, we will muster sufficient resources and formulate a plan in accordance with our incident objectives and my commander's intent.

**Critical Commander Information Requirements: ***Must immediately notify SPOC if any of the  below actions occur.*****

**-Injury to an SPD Officer requiring any medical treatment.**
**-Significant injury to a citizen caused by police action during crowd control or crowd management actions.**
**-Attack or attempted incursion of a police or government facility.**
**-FIT callout or notification related to protest management event.**
**-Significant and on-going property damage or looting.**
**-Any Patrol Task Force mobilization to a significant occurrence.**
**-Any Emergency response within the boundaries of the East Precinct protest zone.**

**Logistics:**

There will be no dedicated logistics for this operational period.

ICS-201

4

SEA_00007769



# 2020 June Protests
# Contingency Plans



## Demonstration Events/Street Marches

**With the current demonstration response protocol, the Department will continue to monitor events on a daily basis however we will not deploy police resources to demonstration or protest-related events except to address a life-safety emergency.**

**Patrol Task Force will be prepared to deploy to any event citywide as directed by a Watch Commander, Precinct Area Commander or above to address a life-safety emergency that exceeds the capacity of a regular Patrol response.**

## Red Zone Response (East Precinct)

**For any calls or incidents within the "Red Zone" in the East Precinct:**

- For all calls originating from **within the red zone**, Communications Section personnel should attempt to coordinate officer contact outside the red zone boundary.

- Officers should not respond to calls for service within the red zone, unless the response is to critical life safety emergency (e.g. active shooter incident, structural fire likely to endanger human lives etc.). If responding to a life safety emergency within the red zone, all responding officers should muster with a supervisor outside that zone to determine the police response, develop a plan, and deploy with needed resources. **Coordination with SFD or any other city resources should take place outside of the Red Zone perimeter.**

- **Edward Sector: Requires a four-officer minimum response to all Edward Sector calls for service outside the red zone.**

\*\*Officers should continue to document calls for service that originate from within the red zone, even under circumstances where complainant/victim contact isn't possible.

15

SEA_00007780

Exhibit 19

# Situation Report - June 16th, 2020

**From:** "Davis, Tyrone" <tyrone.davis@seattle.gov>
**To:** "Mahaffey, Thomas" <thomas.mahaffey@seattle.gov>; "Best, Carmen" <carmen.best@seattle.gov>; "Cordner, Lesley" <lesley.cordner@seattle.gov>
**Cc:** "Grossman, Kevin" <kevin.grossman@seattle.gov>; "Edwards, Michael" <michael.edwards@seattle.gov>; "Verhoff, Jason" <jason.verhoff@seattle.gov>; "Barden, Eric" <eric.barden@seattle.gov>; "Danielson, James" <james.danielson@seattle.gov>; "Williams, Joel" <joel.williams@seattle.gov>; "Kelley, Christopher" <christopher.kelley@seattle.gov>; "Truscott, Lauren" <lauren.truscott@seattle.gov>; "Grenon, Bryan" <bryan.grenon@seattle.gov>
**Date:** Tue, 16 Jun 2020 05:39:06 -0700

Asst. Chief Mahaffey,

Status

Captain Swank (Car 27) is the current Incident Command for this event.

Multiple surveillance cameras and social media "live streams" appear to show approximately 10 visible in the immediate area surrounding the East Precinct. There are also several occupied tents on the sidewalk adjacent to the East Precinct. Dozens of tents remain in Cal Anderson based on livestream footage.

Currently, there are no other event-related demonstrations in the city.

There were no arrests related to the event.

There were no officer injuries.

The event is no being staffed and monitored on Zone 3 / TAC 9. However, the frequency and a dispatcher are still available to staff it if needed.

Incidents

Last night, about 100 protester marched from the Red Zone to the West Precinct, arriving at 2030 hours. They chanted and some participants made speeches for about 25 minutes before resuming their march. Livestream footage broadcasted the protestors intentions to "hijack" the freeway for 5 minutes. WSP was notified immediately. They marched onto the entrance ramp for southbound I-5 at Stewart St. One WSP Trooper arrived and urged them to leave the freeway. However, they continued to block traffic for approximately 5 minutes before exiting the freeway to resume to their march back to the Red Zone.

The footage also captured their future intentions. They demanded police reform or they promise to be at the West Precinct every night until their demands are met. They also promised to block I-5 traffic and stated they will extend their time on the freeway, every night until their demands are met.

WSP was notified and their liaison stated that he may choose to assist us in SPOC today's event.



**Car Tender Incidents – 1706 12th Ave**

Event – 2020-188751 –INFO ONLY - 1706 12 AV (Car Tender)- Called in at 2135 hours -  Caller reports 20-30 people in auto shop parking lot holding semi-automatic rifles and pistols. Wearing body armor with "officer" written on the back. Part of this incident was viewed by SPOC via livestream.

Event – 2020-188860 – FOUND PROP - 1706 12 AV (Car Tender) – Called in at 0341 hours – "Chaz security" brought the owner/complainant a full bag of ammunition and a rifle after they watched a subject stash those items at 12th Ave and E Pine St.  Officer have just arrived on this call for service.

Note:  Car Tender is the same location in which we were unable to respond to a call for service on the night of 06-14-2020.  Patrol did not respond due its proximity to the Red Zone (2020-188030), coupled with an ongoing disturbance at the location that include armed participants.  It should be noted that King 5 did a story, including an interview with the shop's owner about that incident.

https://www.king5.com/article/news/local/seattle-business-owner-says-police-never-responded-to-a-burglary-at-his-shop-in-the-chop/281-8cdad6b9-87ce-45cb-8fa7-05871d1bbe56

Ty

Acting Lieutenant Tyrone Davis #6633
SPOC – Blue Shift - Operations
Main: 206-684-5090
tyrone.davis@seattle.gov