Exhibit 20

**To:**     Goto, Alan[Alan.Goto@seattle.gov]; Richards, James[James.Richards@seattle.gov]; Melkers, Paul[Paul.Melkers@seattle.gov]; Goodner, Gene[Gene.Goodner@seattle.gov]; Patterson, Stuart[Stuart.Patterson@seattle.gov]; Pedras, Dave[DaveM.Pedras@Seattle.Gov]; Drathman, Zachary[Zachary.Drathman@seattle.gov]; Larson, Michael[Michael.Larson@seattle.gov]; Pierce, Jason[Jason.Pierce@seattle.gov]; Smith, Bryan[Bryan.Smith@seattle.gov]; Stewart, Andrew C[Andrew.Stewart@seattle.gov]; Westfall, Paul[Paul.Westfall@seattle.gov]
**From:**   Curtis, James
**Sent:**   Tue 6/30/2020 4:32:57 PM
**Subject:**  FW: CHOP Response Guidelines D-SHIFT 06/30/2020
CHOP response guidelines 3.0 06_30_2020.docx

Please review. Call with questions. Thanks. -JC

---

**From:** Gonzales, Reba
**Sent:** Tuesday, June 30, 2020 07:41
**To:** Cox, Alan <Alan.Cox@seattle.gov>; Havner, J <J.Havner@seattle.gov>; O'Brien, Williamb <WilliamB.OBrien@seattle.gov>; Feher, Ferenc <Ferenc.Feher@seattle.gov>; Andrus, Joel <Joel.Andrus@seattle.gov>; Sutey, Debra <Debra.Sutey@seattle.gov>; Curtis, James <James.Curtis@seattle.gov>; Watanabe, Dale <Dale.Watanabe@seattle.gov>
**Subject:** CHOP Response Guidelines D-SHIFT 06/30/2020

Current CHOP Response Guidelines

**Deputy Chief Reba Gonzales**
Seattle Fire Department
Operations Division - D Platoon
301 2nd Avenue South
Seattle, WA  98104

Reba.gonzales@seattle.gov

Phone: 206-386-1481
Cell: 206-465-5706
Fax: 206-615-1302



## SFD RESPONSES TO ALARMS ORIGINATING WITHIN THE CHOP 6/30/2020

Civilians in the CHOP have been listening to SFD communications on SOV and other alarms in the CHOP. This is causing interference in these alarms, ranging from armed CHOP persons approaching and harassing SFD units at the staging area to vehicles (with patients) pursuing responding units aggressively and attempting to make them pull over.

Additionally, the staging area for SPD is generally distal to the SFD staging area, resulting in SFD units staging between the people designated as our protection and the people they are to protect us from.

To that end, the following protocols will be in effect for EMS incidents that originate within the CHOP:

1.   **All alarms located within the boundaries of the CHOP will be dispatched to 12 Ave E/E Pine Street.** This location is the heart of the CHOP, and will alert units dispatched that the alarm takes place within those boundaries. The staging location will not be mentioned on Channel 4, which is not encrypted.

2.  **All alarms located within the boundaries of the CHOP will be dispatched on Zone 1/Channel 10.** This is the only channel in the SFD radio template that is encrypted and cannot be monitored via civilian scanner.

3.  **Units responding to alarms in the CHOP will respond to Bellevue Avenue between E Pine Street and E Olive Street and stage there until the scene is secure.** This location is remote enough from the CHOP to avoid "walk ups" and puts the Police staging area (Harvard Avenue and E Pine Street) between SFD resources and the CHOP.

4.  **The CCP (Casualty Collection Point) will be at Broadway and E Pine Street.**

5.  **Firefighters will don ballistic wear for all responses to alarms that originate within the CHOP boundaries.**

## SFD RESPONSES TO ALARMS IN THE WARM ZONE

Protocols for responses originating in the warm zone remain unchanged:

**BLS:** 1 Aid Car + 1 Engine + 1 Battalion Chief

**ALS:** 1 Aid Car + 1 Medic Unit + 1 Engine + 1 Battalion Chief

**FIRE:** 2 Engines + 1 Battalion Chief



SEA-PDR_002190

Exhibit 21

## Incident Report

Print Report

INCIDENT # **F200058386**
INCIDENT DATE:  **6/14/2020   11:17:40 hrs**

Agency:  **SFD**
Jurisdiction:  **SFD**

## Incident Overview

| | | | |
|---|---|---|---|
| **Initial Location:** | Same as Final | | |
| **Final Location:** | 1221 E Olive St Apt. 203 | **City:** | Seattle, WA 98122 |
| **Initial Problem Type:** | .Triage | **Final Problem Type** | ADV- Advised |
| **Initial Alarm Level:** | 1 | **Final Alarm Level:** | 1 |
| **Units Assigned:** | A25 | **Response Area:** | Battalion 2 |
| **Disposition:** | 2) Code Green | **Taken By:** | Overall, Gary M |

## Location Information

| | | | |
|---|---|---|---|
| **Location Name:** | SENIA MARA APTS | **Cross Streets:** | 12TH AV/13TH AV |
| **Map Reference:** | 97C | **Call Back Phone:** | (707)235-0698 |

## Call-Taking Info

| Taken By: | Time Phone Pickup | Time Call Entered Queue | Terminal | EMD |
|---|---|---|---|---|
| | 11:17:34 | 11:18:06 | SP105 | 17/1/1 |

## Dispatcher Comments

| | |
|---|---|
| 1. [1] [Notification] Problem changed from .Triage to AID - Aid Response | 11:18:58 |
| 2. [2] ADULT MALE - STROKE SYMPTOMS - INITIAL REPORT OF STROKE SYMPTOMS | 11:19:07 |
| 3. [3] CALLER HAD RECENT STROKE. NOW RIGHT ARM IS NUMB. | 11:20:14 |
| 4. [4] IN RED ZONE. PT TO TRY TO WALK TO ST 25 OR GET RIDE IN ABOUT A HALF AN HOUR. | 11:27:33 |

## Units Assigned   ( * Primary Unit)

| Unit | Assigned | Enroute | Arrived | Transport | Trans. Complete | Complete | Cancel Reason | ETA |
|---|---|---|---|---|---|---|---|---|
| A25* | 11:19:12 | 11:20:37 | | | | 11:21:02 | | 0:25 |
| **Disp. By:** | Overall, Gary M | Mobile1 | | | | Buck, Mark E | | |

## Unit Line-Up Info

| Unit | SFD ID | Name | Rank |
|---|---|---|---|

SEA-SFD_000046

| A25 | 2396 | Christenson, Hans | FF |
|-----|------|-------------------|-----|
| A25 | 1887 | O'Connor, James T | FF |

*****   END OF REPORT   *****

SEA-SFD_000047

Exhibit 22

# FW: RE: inc 60567 & 60572 bad situation

**From:**    "Mondragon, Ronald" <ronald.mondragon@seattle.gov>
**To:**       "Scoggins, Harold D" <harold.scoggins@seattle.gov>; "Barrington, Willie"
             <willie.barrington@seattle.gov>; "Hastings, Bryan" <bryan.hastings@seattle.gov>; "Munnis,
             Timothy" <timothy.munnis@seattle.gov>; "Fitzpatrick, Helen" <helen.fitzpatrick@seattle.gov>;
             SFDPIO <sfdpio@seattle.gov>
**Date:**    Sat, 20 Jun 2020 18:09:04 -0700

FYI.

I will try to work on this with the CHOP Medics.

Deputy Chief Ron Mondragon
Operations, Deputy 1B
301 Second Avenue South
Seattle, WA 98104
ronald.mondragon@seattle.gov
206-386-1481 (office)
206-255-8535 (mobile)

---

**From:** Watanabe, Dale
**Sent:** Saturday, June 20, 2020 17:57
**To:** Mondragon, Ronald <Ronald.Mondragon@seattle.gov>; Sharp, Michael
<Michael.Sharp@seattle.gov>
**Cc:** Lombard, Christopher <Christopher.Lombard@seattle.gov>; Foerster, Paul
<Paul.Foerster@seattle.gov>; Barokas, Michael <Michael.Barokas@seattle.gov>
**Subject:** RE: inc 60567 & 60572 bad situation

Ch Mondragon,

We took a call from 1660 12 av room 311 (just north of the east precinct), F/64 hx of MI a few years
ago.  Caller says the symptoms are the same as a couple of years ago when she had the MI and
according to the call taker was crying with a fear of impending doom.  FAC calltaker had to tell the
caller we will not be responding, try and get to the fire station 1 block east of your location.  Upon
arrival at Station 25 a still alarm was sent and request for a medic unit which then transported to
Virginia Mason.

Here we have a caller that lives in the CHOP/CHAZ zone with no known ties to the protest but could
have been a tragic victim of circumstance that definitely would have made the news and left
everyone involved with egg on their face.  This is the run that the mayor, city council need to be
made aware of before it's too late.

Dale

Exhibit 23

# RE: For tomorrow...

| | |
|---|---|
| **From:** | "Buechler, Chad M" <chad.buechler@seattle.gov> |
| **To:** | "Hara, Mami" <mami.hara@seattle.gov> |
| **Cc:** | "Hulsman, Sally" <sally.hulsman@seattle.gov>; "Beauregard, Idris" <idris.beauregard@seattle.gov> |
| **Date:** | Sun, 28 Jun 2020 06:42:38 -0700 |

Thank you Mami,

I've notified our infrastructure response partners regarding today's situation.

Chad

**From:** Hara, Mami <Mami.Hara@seattle.gov>
**Sent:** Saturday, June 27, 2020 11:13 PM
**To:** Buechler, Chad M <Chad.Buechler@seattle.gov>
**Cc:** Hulsman, Sally <Sally.Hulsman@seattle.gov>; Buechler, Chad M <Chad.Buechler@seattle.gov>; Beauregard, Idris <Idris.Beauregard@seattle.gov>
**Subject:** Re: For tomorrow...

Any issues I had were unwarranted.  These are spectacularly usual times.
Any potential unhappiness was exacerbated by my experience standing in the rain for 5 hours waiting for the vendors so that I could ensure their safety and comfort. I was really wet and cold and had a safety window that I was holding with my own body, between any threats and the access point but perhaps everyone in an interim role had not been properly briefed.
Also, I've been spoiled by everyone's teamwork, responsiveness and concern for my safety this whole time. Yes, I was left out there in the rain and cold for only one morning but no one was hurt, so no issues and no hard feelings.
Tomorrow, no services AT ALL. The entries have been blocked off. Only emergencies are ok and we will need Fire to confirm access.  I'm not going over to renegotiate access as they have said they will block all access to the area except one point that they will temporarily open (our contractors and staff cannot be trapped inside), they will develop composting toilets tomorrow (they can't even ensure safety), they do not care for the psychological safety of our crews and contractors (reiterated various ways multiple times, and are doing great on their own).
Water stays on but our teams are not safe tomorrow.  Sorry about that.
Will talk with all tomorrow.


Sent from my iPhone

---

**From:** Buechler, Chad M <Chad.Buechler@seattle.gov>
**Sent:** Saturday, June 27, 2020 12:14 PM
**To:** Hara, Mami
**Subject:** For tomorrow...

Hi Mami,

I feel terrible that you weren't able to get timely response in the zone this morning and I do not want that to happen again. I know you spoke with Sally, but I also followed up with her on a couple things to ensure we are on top of things moving forward.

1. In all the calls and texts this morning, there was an inkling of confusion on who dispatched Elmgrove. I clarified that this would continue to be Idris and he would take care of their deployment based on zone notification.
2. Sally knows that the morning email, usually sent between 6:30 and 7:30 AM, serves as the primary and first notification that the zone is open for access. I will also ensure that she is on any text notification and that we have points of contact engaged early in the day. She will communicate services status via text message or call as we have today and is committed to being available.

Last, I've got contacts for Honeybucket and just reached out to Sally for some other contacts to have as backup. In case something happens to other service leads, I want to be able to function more effectively to support service delivery at the CHOP.

I think we're now in a more solid place moving forward. Let me know if there's anything else I can do.

 **Chad Buechler**
Strategic Advisor, Emergency Management
City of Seattle, Seattle Public Utilities
O: 206-684-8393 | M: 206-735-5563 | chad.buechler@seattle.gov
Facebook | Twitter

SEA_00093003

Exhibit 24

# FW: Requests

| | |
|---|---|
| **From:** | "Sixkiller, Casey" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=2a241f350004414593ce62126d8ec299-sixkilc"> |
| **To:** | "Fong, Michael" <michael.fong@seattle.gov>; "Ranganathan, Shefali" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=122ab63308df4c3dbb5779b2c875ed08-rangans"> |
| **Date:** | Tue, 09 Jun 2020 07:18:02 -0700 |
| **Attachments:** | Resolution Language_DRAFT_East Precinct Transfer.docx (51.66 kB); EastPrecinct_Draft Resolution_Attachment A.docx (29.34 kB); Site Relocation of East Precinct 060820.docx (53.07 kB); Site Relocation_Exhibit A East Precinct Service Area.docx (156.37 kB); Site Relocation_Exhibit B East Precinct Market Survey 6.8.2020.xlsx (21.21 kB); Site Relocation_Exhibit C East Precinct Properties .xlsx (31.34 kB); Move Contents from East Precinct 060820.docx (57.8 kB) |

Ummm….



Casey Sixkiller
Deputy Mayor
(He/Him/His)
Office of Mayor Jenny A. Durkan | City of Seattle
O: 206-233-7939 | M: 206-437-7437 | casey.sixkiller@seattle.gov
Facebook | Twitter | Subscribe to the Mayor's Newsletter

---

**From:** Goings, Calvin <Calvin.Goings@seattle.gov>
**Sent:** Monday, June 8, 2020 3:10 PM
**To:** Durkan, Jenny <JAMD@Seattle.Gov>
**Cc:** Sixkiller, Casey <Casey.Sixkiller@seattle.gov>; Fong, Michael <Michael.Fong@seattle.gov>; Ranganathan, Shefali <Shefali.Ranganathan@seattle.gov>; Formas, Stephanie <Stephanie.Formas@seattle.gov>
**Subject:** Requests
**Importance:** High

Good afternoon Mayor,

Please see the attached documents as requested.

Please let me know if you have any questions or concerns.

*Thank you,*
*Calvin*



Calvin W. Goings
Department Director
City of Seattle, Department of Finance and Administrative Services (FAS)
calvin.goings@seattle.gov

---

**From:** Grove, Kiersten <Kiersten.Grove@seattle.gov>
**Sent:** Monday, June 08, 2020 3:04 PM

**To:** Goings, Calvin <Calvin.Goings@seattle.gov>
**Subject:** Follow Up

Calvin,

Attached please find three documents and supporting materials:

1. A draft memo and resolution transferring the East Precinct. Please note that this is drafted as a resolution as significant legal analysis will need to be done to ensure that this is executed as intended.
2. A memo and supporting materials that outline options within the East Precinct boundaries for relocating the facility. Please note that for any of these options there will be some set up time required, including for any portables. In the current form, the Precinct would require dozens of portables which may not provide sufficient security for data or other law enforcement materials.
3. A memo outlining the process for relocating the Precinct functions.



Kiersten Grove
Deputy Department Director
City of Seattle, Department of Finance and Administrative Services
O: 206.727.3967 M:206.900.6713
kiersten.grove@seattle.gov

SEA_00102555

EAST PRECINCT SERVICE AREA



SEA_00102556

Document Produced As Native

SEA_00102557

East Precinct Market Survey                                              6/8/2020

| Property Name | Property Address | Total Available Space (SF) |
|---|---|---|
| Capitol Hill Office | 464 12th Ave | 9,187 |
| Ballou Wright Building | 1517 12th Ave | 6,448 |
| Micheal Reese Building | 200 Broadway | 1,581 |
| Jefferson Bldg | 1401 E Jefferson St | 4,047 |
| Madison Ridge Office Bldg | 2014 E Madison St | 4,265 |
| | 2811 E Madison St | 3,000 |
| Madison Park | 4126-4128 E Madison St | 297 |
| Six Arms Bldg | 300 E Pike St | 4,646 |
| | 1000 E Pike St | 7,470 |
| OddFellows Building | 911-921 E Pine St | 15,437 |
| | 2100 E Spruce St | 10,553 |
| Yesler Place | 1404 E Yesler Way | 1,539 |
| South Central Cmnty College Annex | 1500-1534 Broadway | 2,651 |
| | 1204 E Columbia St | 4,183 |
| Chophouse Row | 1424 11th Ave | 6,633 |
| Kelly Springfield Building | 1525 11th Ave | 11,839 |
| Pacific Rim Center | 900 S. Jackson | 1,165 |
| Piston & Ring Building | 1429 12th Ave | 4,979 |
| CJJ Building | 1618 S. Lane | 3,220 |
| | 229 Broadway East | 3,446 |
| Cabrini Medical Tower | 901 Boren | 3,538 |
| M Street | 805 Madison | 6,763 |
| Pike Medical Works | 714 E Pike | 4,285 |
| Elmer J. Nordstrom Medical Tower | 1229 Madison | 36,337 |

Document Produced As Native

SEA_00102558

| City_Owned | PMA_Num | PMA_Name | Juris_Dept | Primary_Use | Use_Class | Address | Status | Dept_Name | Polygon_SquareFeet |
|---|---|---|---|---|---|---|---|---|---|
| Owned | | 43 Horiuchi Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 156 Boren Ave | Fully Utilized | Seattle Parks and Recreation | 12503.2253301271 |
| Owned | | 101 Madrona-Sally Goldmark Branch Library | SPL | Library | Library/Community/Cultural Facilities | 1134 33rd Ave | Fully Utilized | Seattle Public Library, The | 10001.6032710929 |
| Mixed Ownership | | 121 Fire Station No. 22- Part Esmt | FAS | Fire Facility | Primary City Operating Facility | 901 E Roanoke St | Fully Utilized | Seattle Fire & Administrative Services | 15923.5484228885 |
| Owned | | 123 Fire Station No. 25 | FAS | Fire Facility | Primary City Operating Facility | 1300 E Pine St | Fully Utilized | Seattle Fire & Administrative Services | 23076.1087245659 |
| Owned | | 131 Fire Station No. 34 | FAS | Fire Facility | Primary City Operating Facility | 633 32nd Ave E | Fully Utilized | Seattle Fire & Administrative Services | 12334.8471868605 |
| Owned | | 155 Freeway Park Parking Garage- Lease to WSCTC | FAS | Parking | Roadways, Excess ROW, Tidelands, Vacant | 1300 Hubbell Pl | Fully Utilized | Seattle Finance & Administrative Services | 54535.7232896197 |
| Owned | | 227 Douglass-Truth Branch Library | SPL | Library | Library/Community/Cultural Facilities | 2300 E Yesler Way | Fully Utilized | Seattle Public Library, The | 28879.8291447247 |
| Owned | | 228 Capitol Hill Branch Library | SPL | Library | Library/Community/Cultural Facilities | 425 Harvard Ave E | Fully Utilized | Seattle Public Library, The | 11875.8145464897 |
| Owned | | 256 Langston Hughes Cultural Arts Center | Parks | Cultural/Entertainment Facility | Library/Community/Cultural Facilities | 104 17th Ave S | Fully Utilized | Seattle Parks and Recreation | 52604.2135178754 |
| Owned | | 263 Leschi Natural Area | Parks | Greenbelts/Natural Area | Parks and Open Space | 3525 E Terrace St | Fully Utilized | Seattle Parks and Recreation | 164941.246047416O |
| Owned | | 296 Madison Hillside | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 3001 E Madison St | Fully Utilized | Seattle Parks and Recreation | 14385.5568023544 |
| Owned | | 312 Jim Ellis Freeway Park- Air Rights | Parks | Downtown Parks | Parks and Open Space | 1227 9th Ave | Fully Utilized | Seattle Parks and Recreation | 228791.789840905O |
| Owned | | 345 Powell Barnett Park | Parks | Neighborhood Parks | Parks and Open Space | 2760 E Alder St | Fully Utilized | Seattle Parks and Recreation | 189779.982433069O |
| Owned | | 346 Belmont Place | Parks | Neighborhood Parks | Parks and Open Space | 703 Belmont Pl E | Fully Utilized | Seattle Parks and Recreation | 760.779574878l |
| Owned | | 349 Boylston Place | SDOT | Park/Playground/Viewpoint | Parks and Open Space | 815 Broadway | Fully Utilized | Seattle Dept of Transportation | 199.7036634788 |
| Owned | | 351 Firehouse Mini Park | Parks | Neighborhood Parks | Parks and Open Space | 712 18th Ave | Fully Utilized | Seattle Parks and Recreation | 14506.8999794442 |
| Owned | | 353 Garfield Playfield & Community Center | Parks | Recreation Areas | Parks and Open Space | 537 25th Ave | Fully Utilized | Seattle Parks and Recreation | 367441.463735039O |
| Owned | | 354 Grand Army of the Republic Cemetary | Parks | Neighborhood Parks | Parks and Open Space | 1200 E Howe St | Fully Utilized | Seattle Parks and Recreation | 124541.708661114O |
| Owned | | 356 Harrison Ridge Greenbelt | Parks | Greenbelts/Natural Area | Parks and Open Space | 138 32nd Ave E | Fully Utilized | Seattle Parks and Recreation | 171047.147968036O |
| Owned | | 357 Prentis I. Frazier Park | Parks | Neighborhood Parks | Parks and Open Space | Harrison St | Fully Utilized | Seattle Parks and Recreation | 15895.4585196351 |
| Owned | | 359 Howell Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | Howell Pl | Fully Utilized | Seattle Parks and Recreation | 37590.4597965154 |
| Owned | | 362 Boren Park | Parks | Neighborhood Parks | Parks and Open Space | 1606 15th Ave E | Fully Utilized | Seattle Parks and Recreation | 315080.356128518O |
| Owned | | 363 Flo Ware Park | Parks | Neighborhood Parks | Parks and Open Space | 2800 S Jackson St | Fully Utilized | Seattle Parks and Recreation | 21521.6489353824 |
| Owned | | 365 Lakeview Park | Parks | Neighborhood Parks | Parks and Open Space | Lake Washington Bl E | Fully Utilized | Seattle Parks and Recreation | 196007.963975447O |
| Owned | | 366 Lakeview Place | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 1042 Lakeview Bl E | Fully Utilized | Seattle Parks and Recreation | 185.3171083503 |
| Owned | | 367 Leschi Park | Parks | Neighborhood Parks | Parks and Open Space | 100 Lakeside Ave S | Fully Utilized | Seattle Parks and Recreation | 745661.398609352O |
| Owned | | 369 Madison Park | Parks | Community Parks | Parks and Open Space | 4201 E Madison St | Fully Utilized | Seattle Parks and Recreation | 360582.202028779O |
| Owned | | 370 Madrona Park | Parks | Community Parks | Parks and Open Space | 853 Lake Washington Bl | Fully Utilized | Seattle Parks and Recreation | 1375730.0048014000 |
| Owned | | 371 Madrona Playground | Parks | Recreation Areas | Parks and Open Space | 917 34th Ave | Fully Utilized | Seattle Parks and Recreation | 77013.5382245359 |
| Owned | | 373 Miller- Pendleton-Miller Playfield /Community Ctr | Parks | Recreation Areas | Parks and Open Space | 301 20th Ave E | Fully Utilized | Seattle Parks and Recreation | 329292.219405019O |
| Owned | | 374 E Montlake Park | Parks | Neighborhood Parks | Parks and Open Space | 2802 E Park Dr E | Fully Utilized | Seattle Parks and Recreation | 16735.8229874617 |
| Owned | | 375 W Montlake Park | Parks | Neighborhood Parks | Parks and Open Space | 2899 W Park Dr E | Fully Utilized | Seattle Parks and Recreation | 122893.777439701O |
| Owned | | 376 Montlake Playfield & Community Center | Parks | Recreation Areas | Parks and Open Space | 1618 E Calhoun St | Fully Utilized | Seattle Parks and Recreation | 1163355.346517870O |
| Mixed Ownership | | 377 South Passage Point Park- Part Lease | Parks | Mini Parks/Pocket Parks | Parks and Open Space | Fairview Ave E | Fully Utilized | Seattle Parks and Recreation | 38761.9576105204 |
| Owned | | 378 Peppis Playground | Parks | Neighborhood Parks | Parks and Open Space | 3233 E Spruce St | Fully Utilized | Seattle Parks and Recreation | 99715.1507843166 |
| Owned | | 379 Roanoke Park | Parks | Neighborhood Parks | Parks and Open Space | 10th Ave E & E Roanoke St | Fully Utilized | Seattle Parks and Recreation | 94016.5347485659 |
| Owned | | 381 Spring Street Mini Park | Parks | Neighborhood Parks | Parks and Open Space | 1506 E Spring St | Fully Utilized | Seattle Parks and Recreation | 14296.8738422497 |
| Owned | | 383 Summit Place | Parks | Mini Parks/Pocket Parks | Parks and Open Space | Belmont Ave E & E Bellevue Pl | Fully Utilized | Seattle Parks and Recreation | 766.6125216092 |
| Owned | | 384 Tashkent Park | Parks | Neighborhood Parks | Parks and Open Space | 511 Boylston Ave E | Fully Utilized | Seattle Parks and Recreation | 20513.6981454123 |
| Owned | | 385 William Grose Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 1814 30th Ave | Fully Utilized | Seattle Parks and Recreation | 18038.3718301149 |
| Owned | | 386 Thomas Street Mini Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | Bellevue Ave E & E Thomas St | Fully Utilized | Seattle Parks and Recreation | 10781.5511670865 |
| Owned | | 387 Plum Tree Park | Parks | Neighborhood Parks | Parks and Open Space | 1717 26th Ave | Fully Utilized | Seattle Parks and Recreation | 14402.1592870772 |
| Owned | | 390 Pratt Park | Parks | Community Parks | Parks and Open Space | 201 20th Ave S | Fully Utilized | Seattle Parks and Recreation | 237926.160034909O |
| Owned | | 392 Frink Park | Parks | Greenbelts/Natural Area | Parks and Open Space | 34th Ave S | Fully Utilized | Seattle Parks and Recreation | 720411.611931290O |
| Owned | | 393 Washington Park Arboretum | Parks | Special-Use Parks/Specialty Gardens/ELC's | Parks and Open Space | Lake Washington Bl | Fully Utilized | Seattle Parks and Recreation | 8019522.0790503000 |
| Owned | | 395 Dr. Blanche Lavizzo Park | Parks | Neighborhood Parks | Parks and Open Space | 2200 S Jackson St | Fully Utilized | Seattle Parks and Recreation | 96023.5547688471 |
| Mixed Ownership | | 397 Judkins Park and Playfield- Part Lease | Parks | Recreation Areas | Parks and Open Space | 2150 S Norman | Fully Utilized | Seattle Parks and Recreation | 806177.643359865O |
| Owned | | 399 Volunteer Park | Parks | Regional Parks/Large Urban Parks | Parks and Open Space | 1400 E Prospect St | Fully Utilized | Seattle Parks and Recreation | 2104404.8297186000 |
| Owned | | 412 Lake Washington Boulevard North | Parks | Boulevards/Green Streets/Greenways/Trails | Parks and Open Space | 2521 Lake Park Dr S | Fully Utilized | Seattle Parks and Recreation | 140926.168992604O |
| Owned | | 634 Capitol Substation Site | SCL | Parking | Roadways, Excess ROW, Tidelands, Vacant | 324 15th Ave E | Interim Use | Seattle City Light | 4955.5646313358 |
| Owned | | 637 Bellevue Substation Site | SCL | Vacant (Undeveloped) | Utility Facilities/ROW & Maintenance | 210 Bellevue Ave E | Underutilized | Seattle City Light | 11759.0188422092 |
| Owned | | 639 Mercer Substation Site | SCL | Vacant (Undeveloped) | Roadways, Excess ROW, Tidelands, Vacant | 611 E Mercer St | Unused | Seattle City Light | 2694.6052042595 |
| Owned | | 806 Fire Station No. 6 | FAS | Public Safety Facility | Primary City Operating Facility | 405 Martin Luther King Jr Way S | Fully Utilized | Seattle Fire & Administrative Services | 15308.2540278698 |
| Owned | | 1471 Pathway Set Aside from Yesler-Atlantic Project | OH | Multi-Use Trail | Miscellaneous/Multiple Use/Unknown | 2098 S Lane St | Fully Utilized | Seattle Office of Housing | 2402.4127549631 |
| Owned | | 1594 Yakima Ave S Property | OH | Vacant (Undeveloped) | Roadways, Excess ROW, Tidelands, Vacant | 1310 Yakima Ave S | Fully Utilized | Seattle Office of Housing | 16476.1372484065 |
| Owned | | 1600 Parcel at 1323 29th Ave S | FAS | Vacant (Undeveloped) | Roadways, Excess ROW, Tidelands, Vacant | 1323 29th Ave S | Excess | Seattle Finance & Administrative Services | 4002.6715183418 |
| Mixed Ownership | | 2848 St Marks Green Space- Part Esmt | Parks | Green Space/Natural Area | Parks and Open Space | 1500 Lakeview Bl | Fully Utilized | Seattle Parks and Recreation | 261298.923327430O |
| Owned | | 2856 Madrona Ravine | Parks | Greenbelts/Natural Area | Parks and Open Space | 3799 E Spring St | Fully Utilized | Seattle Parks and Recreation | 36862.0278472858 |
| Owned | | 3023 Interlaken Park | Parks | Greenbelts/Natural Area | Parks and Open Space | 2451 Delmar Dr E | Fully Utilized | Seattle Parks and Recreation | 2283035.1660259300 |
| Owned | | 3098 Viretta Park | Parks | Neighborhood Parks | Parks and Open Space | E Denny Blaine Pl | Fully Utilized | Seattle Parks and Recreation | 79938.5696114016 |
| Owned | | 3102 Cal Anderson Park- Part MOA | Parks | Regional Parks/Large Urban Parks | Parks and Open Space | 1635 11th Ave | Fully Utilized | Seattle Parks and Recreation | 480830.995197915O |
| Owned | | 3115 Garfield Playfield Auxiliary Parking | Parks | Parking | Roadways, Excess ROW, Tidelands, Vacant | 499 23rd Ave | Fully Utilized | Seattle Parks and Recreation | 5895.8967288874 |
| Owned | | 3116 Boren Place | SDOT | Park/Playground/Viewpoint | Parks and Open Space | 321 Broadway | Fully Utilized | Seattle Dept of Transportation | 1158.3981590166 |
| Owned | | 3117 Spruce Mini Park | Parks | Neighborhood Parks | Parks and Open Space | 21st Ave E & E Spruce St | Fully Utilized | Seattle Parks and Recreation | 31991.8122312468 |
| Owned | | 3695 Harvard-Miller | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 2301 Broadway Ave E | Fully Utilized | Seattle Parks and Recreation | 6398.7489823624 |
| Owned | | 3905 Hyde Place | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 3811 E Madison St | Fully Utilized | Seattle Parks and Recreation | 385.1328966223 |
| Owned | | 3906 Lambert Place | Parks | Park/Playground/Viewpoint | Parks and Open Space | 3800 E Madison St | Fully Utilized | Seattle Parks and Recreation | 1355.2001851274 |
| City Use on Non-City Ppty | | 3910 First Hill Park- Lease | Parks | Neighborhood Parks | Parks and Open Space | 1201 University St | Fully Utilized | Seattle Parks and Recreation | 9450.9819018299 |
| Owned | | 3913 TT Minor Park- Lease | Parks | Neighborhood Parks | Parks and Open Space | 1608 E Union St | Fully Utilized | Seattle Parks and Recreation | 57226.5484238806 |
| Owned | | 3914 Alvin Larkins Park | Parks | Neighborhood Parks | Parks and Open Space | 1504 34th Ave | Fully Utilized | Seattle Parks and Recreation | 28509.9438511230 |
| Owned | | 3980 Denny Blaine Lake Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 1898 Madrona Dr | Fully Utilized | Seattle Parks and Recreation | 8159.8113305446 |
| Owned | | 3981 Stevens Triangle | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 3809 E John St | Fully Utilized | Seattle Parks and Recreation | 3097.8058338302 |
| Owned | | 3982 Denny Blaine Park | Parks | Neighborhood Parks | Parks and Open Space | Lake Washington Bl E & E Denny Blaine | Fully Utilized | Seattle Parks and Recreation | 9354.4072929712 |
| City Use on Non-City Ppty | | 4000 Plymouth Pillars Park- WSDOT R/W Agmt | Parks | Downtown Parks | Parks and Open Space | 1050 Pike St | Fully Utilized | Seattle Parks and Recreation | 27237.6115092401 |
| Owned | | 4006 Bagley Viewpoint | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 2598 11th Ave E | Fully Utilized | Seattle Parks and Recreation | 9280.2293467402 |
| Owned | | 4008 McGilvra Place | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 1425 E Madison St | Fully Utilized | Seattle Parks and Recreation | 2647.8436185679 |
| Owned | | 4013 McGilvra Boulevard | Parks | Boulevards/Green Streets/Greenways/Trails | Parks and Open Space | 1099 McGilvra Bl E | Fully Utilized | Seattle Parks and Recreation | 21461.7343410329 |
| Owned | | 4015 Miller Triangle | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 222 20th Ave E | Fully Utilized | Seattle Parks and Recreation | 12810.4039818120 |
| Owned | | 4016 Williams Place | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 199 15th Ave E | Fully Utilized | Seattle Parks and Recreation | 5684.8386596899 |
| Owned | | 4021 Montlake Boulevard Center Strip | Parks | Boulevards/Green Streets/Greenways/Trails | Parks and Open Space | 2811 Montlake Bl E | Fully Utilized | Seattle Parks and Recreation | 11667.5902760919 |
| City Use on Non-City Ppty | | 4022 Bellevue Place- WSDOT R/W Agmt | Parks | Neighborhood Parks | Parks and Open Space | 799 Bellevue Pl E | Fully Utilized | Seattle Parks and Recreation | 5420.2601072922 |
| Owned | | 4033 Volunteer Parkway | Parks | Boulevards/Green Streets/Greenways/Trails | Parks and Open Space | 899 14th Ave E | Fully Utilized | Seattle Parks and Recreation | 112218.223624017O |
| City Use on Non-City Ppty | | 4082 S Day Street Boat Ramp- WSDOT R/W Agmt | Parks | Boulevards/Green Streets/Greenways/Trails | Parks and Open Space | 1400 Lakeside Ave S | Fully Utilized | Seattle Parks and Recreation | 171095.225228789O |
| City Use on Non-City Ppty | | 4164 Madison Park Dock- Use Agmt w/King Co | Parks | Boat Moorage | Parks and Open Space | 4399 E Madison St | Fully Utilized | Seattle Parks and Recreation | 47296.0439275065 |
| Owned | | 4169 12th Avenue Arts- East Precinct Garage- Lease | FAS | Parking | Roadways, Excess ROW, Tidelands, Vacant | 1601 12th Ave | Fully Utilized | Seattle Finance & Administrative Services | 29060.0611600897 |
| Owned | | 4228 Montlake Branch Library | SPL | Library | Library/Community/Cultural Facilities | 2401 24th Ave E | Fully Utilized | Seattle Public Library, The | 13507.7616960002 |
| Mixed Ownership | | 4241 E Portal Viewpoint- Part Agmt | Parks | Neighborhood Parks | Parks and Open Space | 1400 Lake Washington Bl | Fully Utilized | Seattle Parks and Recreation | 317908.567737980O |
| City Use on Non-City Ppty | | 4242 Sam Smith Park- Agmt Agmt | Parks | Recreation Areas | Parks and Open Space | 1400 Martin Luther King Jr Way S | Fully Utilized | Seattle Parks and Recreation | 940752.658002639O |
| City Use on Non-City Ppty | | 4244 Judge Charles M Stokes Overlook- WSDOT R/W Agmt | Parks | Neighborhood Parks | Parks and Open Space | 1199 Hiawatha Pl S | Fully Utilized | Seattle Parks and Recreation | 22057.5274286200 |
| City Use on Non-City Ppty | | 4245 Benvenuto Viewpoint- WSDOT R/W Agmt | Parks | Neighborhood Parks | Parks and Open Space | 1401 23rd Ave S | Fully Utilized | Seattle Parks and Recreation | 72483.4074907477 |
| Owned | | 4330 Parcel at 100 MLK Jr Way S | Parks | Landscaping | Parks and Open Space | 100 Martin Luther King Jr Way | Excess | Seattle Finance & Administrative Services | 4062.9941373035 |
| Owned | | 4335 Parcel at 2710 S Main St (Estelita's Library) | FAS | Landlord Lease(s) | Leased to Non-City Tenant | 2710 S Main St | Interim Use | Seattle Finance & Administrative Services | 2127.8600685662 |
| Owned | | 4403 Nora's Woods | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 702 29th Ave | Fully Utilized | Seattle Parks and Recreation | 15161.4214257133 |
| Owned | | 4426 Homer Harris Park | Parks | Neighborhood Parks | Parks and Open Space | 2401 E Howell St | Fully Utilized | Seattle Parks and Recreation | 21621.4068327532 |
| Owned | | 4427 Mount Baker Ridge Viewpoint | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 1411 31st Ave South | Fully Utilized | Seattle Parks and Recreation | 5043.7102608024 |
| Owned | | 4441 Madison Park North Beach | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 2330 43rd Ave E | Fully Utilized | Seattle Parks and Recreation | 195526.051064387O |
| Owned | | 4446 I-5 Colonnade- Part Lease | Parks | Community Parks | Parks and Open Space | 1717 Lakeview Bl E | Fully Utilized | Seattle Parks and Recreation | 372351.099105870O |
| Owned | | 4461 Summit Slope Park | Parks | Neighborhood Parks | Parks and Open Space | 200 Summit Ave E | Fully Utilized | Seattle Parks and Recreation | 9605.3721455992 |
| Owned | | 4466 Seven Hills Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 16th Ave E & E Howell | Fully Utilized | Seattle Parks and Recreation | 17329.8113490839 |
| Owned | | 4467 12th Ave Square Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 564 12th Ave | Fully Utilized | Seattle Parks and Recreation | 7316.2126918189 |
| Owned | | 4474 Broadway Hill Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 500 Federal Ave E | Fully Utilized | Seattle Parks and Recreation | 11955.9532134497 |
| Owned | | 4478 Cayton Corner Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 1831 E Madison St | Fully Utilized | Seattle Parks and Recreation | 4560.1508732535 |
| Owned | | 4486 Washington Park | Parks | Park/Playground/Viewpoint | Parks and Open Space | 1001 Lake Washington Bl E | Fully Utilized | Seattle Parks and Recreation | 547056.112662795O |
| City Use on Non-City Ppty | | 4584 I-5 East Lake Landscaping- Maint Agmt | SDOT | Landscaping | Parks and Open Space | I-5, E Hamlin St to E Martin St | Fully Utilized | Seattle Dept of Transportation | 185665.271146885O |
| Mixed Ownership | | 4609 Katharine Bullitt Life Estate | Parks | Residential | Non-City Leased Use | 1125 Harvard Ave E | Interim Use | Seattle Parks and Recreation | 6900O.157823839O |
| City Use on Non-City Ppty | | 4625 Garfield Teen Life Center- Lease | Parks | Recreational Facility/Community Center | Library/Community/Cultural Facilities | 428 23rd Ave | Fully Utilized | Seattle Parks and Recreation | 8814.4720549421 |
| Owned | | 4627 Julia Lee's Park | Parks | Mini Parks/Pocket Parks | Parks and Open Space | 2701 E Harrison St | Fully Utilized | Seattle Parks and Recreation | 10880.4799193701 |
| Owned | | 4628 Streissguth Gardens | Parks | Green Space/Natural Area | Parks and Open Space | 1650 Broadway E | Fully Utilized | Seattle Parks and Recreation | 30892.0370303541 |
| City Use on Non-City Ppty | | 4633 Central Area NSC- Lease | FAS | Office Space | Primary City Operating Facility | 464 12th Ave | Fully Utilized | Seattle Finance & Administrative Services | 500.4844632989 |



**City of Seattle**
Mayor Jenny A. Durkan

**NON-COVID-19 Pipeline Memo**

| | |
|---|---|
| **To:** | Mayor Jenny A. Durkan |
| **Date:** | June 8, 2020 |
| **Subject:** | Proposed Resolution Language |
| **From:** | Calvin W. Goings, Department Director, Finance and Administrative Services |
| **CC:** | Deputy Mayor Casey Sixkiller |

**Purpose:** Propose language for a resolution, granting transfer of the East Precinct to BLM Seattle-King County.

**Background and Options:** Attached, in Attachment A, is proposed language that the Mayor could use for a resolution to transfer the property from the City to BLM-Seattle-King County

**Next Steps:** Before moving forward with transferring, FAS recommends:

- Working with the Law Department to draft real-property transfer documents
- Work with the Law Department to ensure that all tax implications for BLM Seattle-King County have been considered prior to transferring a multi-million-dollar property to them.

[APG]

**WHEREAS** *The recent murder of George Floyd shows once again the generational impacts of systemic racism, shining a light on hundreds of years of racism and injustice that has haunted our past and present.*

**WHEREAS** *There have been black and brown people killed by police here in Seattle. John T. Williams, Che Taylor, Charleena Lyles and so many more. Their lives have been cut short due to the unfortunate interactions with the police.*

**WHEREAS** *Our collective failure to address racism and inequality is not just in policing in America. It is in housing, health, education, and economic opportunity.*

**WHEREAS** *Millions around the world are expressing their dismay in the streets by continuing to center community through peacefully protesting and calling for an end to police violence and the systemic structures that perpetuate it.*

**WHEREAS** *This is a moment that summons the City of Seattle to do more and to do better.  The City can build true, intentional, and sustainable justice and change. The City has opportunity to build on the lasting systemic changes that can transform policing and the department. The City must bring the same intensity, commitment to serving the people, and commitment to cure the illness of racism that we have brought to COVID-19.*

**WHEREAS** *The Black community wants their voice heard and centered.*

**WHEREAS** *The City of Seattle must be intentional in investments that will make a difference in the lives of people of color in our city, support resilient communities, and undo systemic and structural racism. The City of Seattle needs to adjust priorities and must do that with our dollars.*

**WHEREAS** *The City of Seattle will develop a plan with community for a new police budget. The City of Seattle will change how we think of policing.  The City will invest in programs like our civilian Community Services Officers, our Crisis Intervention Team, and the Community Policing Bureau.*

**WHEREAS** *The City is committed to identifying at least $100 million to invest in neglected communities. The City will invest in community-based and community-driven programs that invest in black youth and adults, employment programs, black owned businesses and providing alternatives to arrest and incarceration.*

**WHEREAS** *The East Precinct, located at 1519 12th Avenue, Seattle WA is located in the heart of Seattle's Capitol Hill neighborhood, a neighborhood known for its diversity and social activism. This precinct houses Seattle Police officers who patrol Seattle's Central District neighborhood and has been seen as a symbol of police oppression in one of Seattle's historically Black neighborhoods. This property is valued in excess of $5,000,000.*

**WHEREAS** *Black Lives Matter Seattle-King County is a grassroots, volunteer-run, social-justice nonprofit organization focused on the empowerment and liberation of Blacks and other people of color through advocacy and direct action. BLM Seattle centers leadership on Black femmes, women, and queer people organizing and taking direct action to dismantle anti-black systems and policies of oppression. The core activists and organizers of BLM Seattle King County is a group of Black and other people of color focused on dismantling anti-black systems and policies of oppression.*

SEA_00102560

***NOW THEREFORE****:*

*The City transfers permanent use of/ownership of 1519 12th Avenue, Seattle, WA 98122, also known as the East Precinct to Black Lives Matters Seattle-King County Chapter, <mark>effective July 1, 2020.</mark>*

*The City of Seattle agrees to vacate the property and remove all law-enforcement materials and police-related facilities, such as holding cells and all police insignia, from the building before vacating.*

*The City of Seattle commits to the ongoing maintenance of the building as needed, to be determined to Black Lives Matters Seattle-King County Chapter.*

SEA_00102561



**City of Seattle**
Mayor Jenny A. Durkan

NON-COVID-19 Pipeline Memo

**To:**       Mayor Jenny A. Durkan
**Date:**    June 8, 2020
**Subject:** Relocation of SPD East Precinct
**From:**   Calvin W. Goings, Department Director, Finance and Administrative Services
**CC:**      Deputy Mayor Casey Sixkiller

**Purpose:** Propose options for relocation of the SPD East Precinct from its location on Capitol Hill to create options for the City to utilize the facility and/or land in a different manner.

**Summary:** Currently, the East Precinct has 61,254 SF of office space and 42,085 SF for vehicle parking. The latter is located one half block away in the basement of the 12th Ave Arts Building and has 54 fleet vehicles housed within the location with additional SF believed to be used for SPD personal vehicles. Industry standard practice is 1000 SF (includes spaces and drive aisles) of parking per vehicle.

**Background and Options:** The East Precinct service area is attached as Exhibit A, which would guide a property search.

A 24-hour search (for expediency) revealed no single office properties in the service area available for lease have comparable square footage. There are properties that could accommodate individual portions of the office needs; a listing of available properties is attached as Exhibit B.  There are 2 office properties for sale, each under 5,000 SF.

A search of City-owned or City-leased property in the service area is attached as Exhibit C. There are approximately 100 properties, excluding drainage and wastewater properties, Mutual and Offsetting Benefit properties, select substations, and smaller parcels such as street ends and P-patches. The listed City-owned or City-leased properties could be considered for property to host portable facilities. If portables are identified as the solution, there is a significant amount of time for temporary trailer stand up based upon site conditions.

Another option to consider could be the purchase/lease of a building specifically for community use in the Capitol Hill area. This could be faster to accomplish due to the reduced parking and programmatic needs.

**Financial Considerations:**  The East Precinct is a City-owned property and leasing or purchasing a new site would present additional costs. The available properties would be

[APG]

SEA_00102562

assembled for a costing exercise. This listing cost and may be negotiable. Additional costs would include any needed tenant improvements, relocation costs, equipment, and security.

**RSJI Considerations:** A proposal to relocate SPD's East Precinct to provide optimized investment into communities could assist race and social justice purposes by optimizing the real estate for community-identified purposes.

**Recommendation(s):** More time is needed for better review of alternatives, and FAS recommends such review.

**Next Steps:** Upon approval, FAS would engage a broker for a search of suitable alternatives.

**Appendix:**  Map of East Precinct (Exhibit A); East Precinct Market Search (Exhibit B); List of City Properties (Exhibit C)

[APG]

SEA_00102563



**City of Seattle**
Mayor Jenny A. Durkan

**NON-COVID-19 Pipeline Memo**

| | |
|---|---|
| **To:** | Mayor Jenny A. Durkan |
| **Date:** | June 8, 2020 |
| **Subject:** | Move Contents from SPD East Precinct |
| **From:** | Calvin W. Goings, Department Director, Finance and Administrative Services |
| **CC:** | Deputy Mayor Casey Sixkiller |

**Purpose:** Propose options for moving the contents of the SPD East Precinct to an alternate location(s).

**Summary:** The East Precinct has 61,254 SF of office space which holds a large variety of contents that would ideally be moved in a planned, coordinated transition to other site(s) or could more quickly be triaged and relocated if required.

**Background and Options:** The contents of the East Precinct include a wide variety of material ranging from typical office furniture, fixtures and equipment to sensitive material such as paper files, IT data and equipment, munitions, firearms and evidence. The most expeditious way to execute a move would be to engage one the City's existing B-vendor contractors that is large enough to scale up and handle most aspects of the effort with their own transportation resources. If portables are identified as the solution, there is a significant amount of time for temporary trailer stand up.

- Furniture, Fixtures and Equipment: The vendor would quickly assess and inventory the contents to determine what is worth salvaging from the building. Office systems furniture would be cataloged and disassemble for reuse.  All other materials would be tagged for reuse or abandoned in place.
- IT Data and Equipment: ITD would lead the effort to dismantle, transport and reinstall things such as computers, drives, monitors, servers, batteries, radios, antenna, etc. A specialty vendor may be needed to assist.
- Paper Files: SPD would secure and supervise the transport of these materials by the moving vendor. PODS moving and storage systems could also be employed.
- Munitions, Firearms and Evidence: SPD would lead the effort to secure and transport these materials and provide the necessary chain of custody. The moving vendor could assist with transportation with the appropriate supervision and escort.
- SPD has 54 patrol cars and other vehicles. FAS Fleet Management can assist SPD in the moving of any vehicles that SPD cannot support at this time.

[APG]

**Financial Considerations:**  A planned and coordinated move during business hours would be most cost effective, but afterhours moves are available.  Blanket vendors have been pre-screened through City procurement processes.

**RSJI Considerations:** The two existing B-vendor furniture contractors are WMBE firms.

**Recommendation(s):** If a move is called for, scale up the effort by using contracted resources to the maximum extent possible.

**Next Steps:** Upon approval, FAS would engage a blanket vendor contractor to begin an assessment of the contents of the East Precinct and associated spaces to develop a strategy and plan to remove all items.

[APG]

Exhibit 25



# City of Seattle
Mayor Jenny A. Durkan

June 24, 2020

*TRANSMITTAL VIA EMAIL*

Jill Cronauer
Hunters Capital Real Estate, LLC
1620 Broadway, Suite 200
Seattle, WA 98122

Amy Nelson
The Riveter, LLC
1517 12th Ave., Suite 101
Seattle, WA 98122

> Re:  *Letter of Intent ("LOI") - The Riveter Co-work Space,*
> *1517 12th Ave., Suite 101, Seattle, WA 98122*

Dear Ms. Cronauer and Ms. Nelson,

The purpose of this letter is to inform you that the City of Seattle ("City') intends to enter into negotiations on the terms and conditions to assume the Commercial lease dated February 14, 2017 between Ballou Wright Building, LLC ("Lessor") and The Riveter, LLC ("Lessee") for the property located at 1517 12th Ave, Suite 101 referenced above.  The City has been in discussions with the current Lessee and Lessor about the terms and conditions for complete legal assignment of the lease from The Riveter, LLC to the City of Seattle in order to lease the property for public purposes and replace the current Lessee and release them of their legal obligations under the lease, at which point The Riveter, LLC would no longer be a party to the lease.

As you know, the City as Lessee intends to sublease the property to Black Lives Matter Seattle-King County ("BLMSKC"), a non-profit 501c(3), which has indicated that it intends to use this approximately 11,000 sq ft space for community building and to advance its mission and policy priorities.

The City believes this Letter of Intent serves to demonstrate its commitment to work with the Lessor and Lessee to arrive at terms and conditions regarding the assignment of the lease that

CHOP-0000718

is mutually acceptable to all parties in the coming weeks.  If you have any questions then please do not hesitate to contact me or Steven Shain, Real Estate Strategic Advisor on next steps. We look forward to working with you.

Sincerely,

Mike Fong
Senior Deputy Mayor
Office of Mayor Jenny A. Durkan

Exhibit 26

WADE BILLER
12/10/2021

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,  )
                               )
          Plaintiffs,          )
                               )
     vs.                       )   No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
          Defendant.           )

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

WADE BILLER - ONYX HOMEOWNERS ASSOCIATION

DATE:  Friday, December 10, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Page 2

1
2        A P P E A R A N C E S
3
4    For the Plaintiff:
        GABE REILLY-BATES
5        Calfo Eakes
         1301 Second Avenue
         Suite 2800
6        Seattle, Washington 98101
7
     For the Defendant:
8
        SHANE P. CRAMER
9        Harrigan Leyh Farmer Thomsen
         999 Third Avenue
10       Suite 4400
         Seattle, Washington 98104
11
12   For the City of Seattle:
13      JOSEPH GROSHONG
         Assistant City Attorney
14       Seattle City Attorney's Office
         701 Fifth Avenue
15       Suite 2050
         Seattle, Washington 98104
16
17
18
19
20
21
22
23   Also Present:  Videographer: Bryan Gaver, Royal Video
24
25              --oOo--

Page 3

1               I N D E X
2    EXAMINATION BY                     PAGE
3    Mr. Cramer                   6
4
5          EXHIBIT INDEX
6    NO.   DESCRIPTION                  PAGE
7    107   Google map                   12
8    108   E-mails between Florian Hall and Wade Biller  79
           re: Onyx - Gunfire Rounds on South Side of
9          Building
10   109   Third Amended Class Action Complaint    106
11   110   Series of e-mails including July 2, 2020,   121
           from Devin Wakefield to Wade Biller
12
13   111   Dauntless Security Group, Inc. Invoice No.   138
           Onyx-1189
14   112   Dauntless Security Group, Inc. Invoice No.   143
           Onyx-1258
15
16   113   Dauntless Security Group, Inc. Invoice No.   148
           Onyx-1415
17   114   E-mails between Ken Erickson and Wade Biller  155
           re What is Going On?
18
19   115   Dauntless Security Group, Inc., Invoice    157
           No. Onyx-1500
20   116   Dauntless Security Group, Inc., Invoice    157
           No. Onyx-1552
21
22   117   Goodbye Graffiti Invoice dated 7/1/2020    167
23   118   Goodbye Graffiti Proposal dated October 20,   171
           2020
24
25

Page 4

1          EXHIBITS (Cont.)
2
3    NO.   DESCRIPTION                  PAGE
4    119   Goodbye Graffiti Invoice dated 11/6/2020    174
5    120   McLeod Construction Invoice dated 11/23/2020  175
6    121   Original Restoration Company invoice dated    181
           2/22/21
7
8    122   Information in State of Washington vs. Ernanda  199
           Bendtsen
9    123   Excel spreadsheet containing Signal data    215
10   124   E-mail from Wade Biller to Argento Cafe dated  230
           October 30, 2020, re Stephanie's remarks
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  (Pages 1 to 4)

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126
Electronically signed by Mindy Suurs (101-257-931-8021)                    0af986c2-353b-4f08-885c-10b65a3454ef

WADE BILLER
12/10/2021

Page 9

1  Q.  Do you typically -- so in the pre-COVID time, did
2  you work from home or did you work at a T-Mobile office?
3      A.  It was in the office prior to COVID.
4      Q.  And during the summer of 2020 time period, were
5  you working at home or in the office?
6      A.  At home.
7      Q.  And are you still working at home?
8      A.  We began last month going in once a week, so I've
9  been going in on Wednesdays.  That's optional.  There are
10 folks that are still working primarily at home.
11     Q.  Tell me where you live.
12     A.  I live at 1125 East Olive Street in Seattle.
13     Q.  Is that the Onyx?
14     A.  Correct.
15     Q.  And how long have you lived at the Onyx?
16     A.  Since 2008, early -- first of 2008.
17     Q.  Is that when the Onyx was built?
18     A.  No, that's after it was converted into condos.
19 It was converted in 2007 from apartments.  It was built in
20 2001.
21     Q.  Okay.  And are you currently on the homeowner's
22 association board of the Onyx?
23     A.  Correct.
24     Q.  And how long have you been on the board?
25     A.  Since 2013.

Page 10

1      Q.  And how many people are on the board of the Onyx?
2      A.  There's currently five, including myself.
3      Q.  And is that the standard number of directors that
4  there always are?
5      A.  That's the number allowed.  In the past we've had
6  three was default, and we changed the bylaw -- or we
7  changed the declaration to allow five for better
8  representation.
9      Q.  And when did you change the declaration?
10     A.  I would say three years ago maybe.  I don't know
11 right offhand.
12     Q.  But before summer of 2020?
13     A.  Absolutely, yes.
14     Q.  And who were the five -- who were the four other
15 directors besides you?
16     A.  I don't know their names exactly.  I know there's
17 Faizel Khan, there is Devin Wakefield, there is Clint
18 Zaner, and then there is another gentleman -- I can never
19 pronounce his name correctly, so I'm not going to mess it
20 up here.
21     Q.  What is --
22     A.  I can't --
23     Q.   -- so that I can figure out who it is?
24     A.  Demas, D-e-m-a-s.
25     Q.  And that's first name or last name?

Page 11

1      A.  That's the first name.
2      Q.  And when -- can you recall when the elections for
3  directors are?
4      A.  It's once a year, and it changes depending on,
5  you know, ongoing events that particular year.  This year
6  it's in December.  Typically it's -- we have it the first
7  quarter, so typically it's by March, but the board can
8  decide to have it after that.
9      Q.  And are the five directors whose names you
10 provided me, which includes you -- are those the same five
11 directors who were in place in June 2020?
12     A.  No, we've picked up two directors since then:
13 The Clint Zaner and the gentleman I mentioned as his first
14 name being Demas.
15     Q.  So prior to the three directors, were you, Devin
16 Wakefield, and Faizel Khan?
17     A.  Faizel Khan.
18     Q.  Faizel Khan?
19     A.  Correct.
20     Q.  And what's your role on the board?  Do you have
21 positions?
22     A.  We do have positions:  Secretary, president, and
23 treasurer currently.
24     Q.  What is your your role?
25     A.  My role is president.

Page 12

1      Q.  And what is Mr. Khan's role?
2      A.  He's actually serving as secretary.
3      Q.  And who is the treasurer?
4      A.  That would be Devin Wakefield.
5      Q.  And are those the roles that the three of you had
6  in June 2020?
7      A.  Correct.
8      Q.  What is the role of the president of the
9  homeowner association?
10     A.  Well, primarily it's just another vote on the
11 board, but the president is able to speak on behalf of the
12 board with conference and communication coordination with
13 the association board members, but other than that, I'm
14 strictly just another voter, and I -- just strictly another
15 voter.
16     Q.  I'm going to mark as Exhibit 1 a document that I
17 will drop into the chat, so hold on one sec.  And I
18 misspoke; I'm going to mark this as Exhibit 107 because
19 we've been marking them as we go across all of the
20 depositions.
21         (Exhibit No. 107 marked for
22         identification.)
23     MR. REILLY-BATES:  Shane, just give us a moment
24 to pull this up.  It's the first time.
25     A.  Okay, I'm reviewing the item now -- 107.

3  (Pages 9 to 12)

Electronically signed by Mindy Suurs (101-257-931-8021)                    0af986c2-353b-4f08-885c-10b65a3454ef

WADE BILLER
12/10/2021

Page 49

1  before the -- it was before the unmarked car came out to do
2  a report.
3      Q.  So it was sometime the same overnight --
4      A.  Right.
5      Q.  -- that it was moved into the street?
6      A.  That someone had moved it back.
7      Q.  Did you contact 911 at any other point during
8  June 2020?
9      A.  A number of times, yes.
10     Q.  How many times?
11     A.  During June, it was likely I called them a half a
12 dozen times if not more.
13     Q.  And what did you call 911 for?
14     A.  I believe the first time I called them after the
15 dumpster would have been for Car Tender, diagonal across
16 from where I live.  So they are on the northeast corner of
17 12th and Olive.  I had called them -- the police regarding
18 a large crowd developing, and they were -- there were a
19 number of people on the -- the gate to the parking lot of
20 that business, and they were attempting to knock the gate
21 down as far as I could tell or knock it -- it seemed like
22 they had knocked it off the -- the rails at that point as I
23 was calling into 911.  And the group continued to grow.  It
24 looked like anywhere close to 80 people or more.
25     Q.  And did someone -- did a 911 operator take the

Page 50

1  call?
2      A.  They did take the call.
3      Q.  And what did you report to them?
4      A.  I reported that there was a large group forming,
5  that they looked intent on breaking into the Car Tender
6  parking lot.
7      Q.  And what did the 911 operator say to you about
8  that if you recall?
9      A.  They said they had a number of other people
10 calling.  They were trying to understand or get a better
11 impression of the group size.  They had told me that it was
12 smaller.  They said, "Are you sure?  We're getting calls
13 saying 60." I'm like, yeah, I can see where that may have
14 been reported, but it's continuing to grow.
15     Q.  Did the police respond to the incident at Car
16 Tender, as far as --
17     A.  I have never -- I never seen any police respond,
18 whether it was an unmarked car or any other response from
19 what I could identify as police.
20     Q.  What is the next time that you called 911?
21     A.  It was likely during -- it was in the day, asking
22 about having the randomly placed barricades moved, and I
23 don't know what day that was.  I called them a few times
24 just to get some sense of when they planned on getting back
25 to normal response.

Page 51

1      Q.  And what did 911 say when you called them about
2  barricades, randomly placed barricades, if you remember?
3      A.  They said that I need to take it up with the
4  mayor and the city council.
5      Q.  And how many times did you call about the
6  randomly placed barricades, as you put it?
7      A.  I would say, you know, two to three times.  I
8  know I called at least twice.
9      Q.  And on both calls they said take it up with the
10 mayor and city council?
11     A.  Right.
12     Q.  Did they indicate that a SPD officer would be
13 dispatched?
14     A.  No.
15     Q.  Do you believe that calling 911 -- that the
16 placement of the barriers was an emergency situation?
17     A.  It was because we know that we're not able to get
18 down that street as far as ambulance or fire and that they
19 would have to come from another direction, and at that time
20 it would only be from north 12th or back on Olive Street
21 between 12th and 13th; but we also knew that because at
22 that point I had reports from Kathleen indicating she had
23 seen rifles or weapons in a vehicle parked in front of her
24 business.  And so the behavior of the protesters became
25 more -- it seemed more like it was strategic to a long-term

Page 52

1  event as we continued to see more people organizing in the
2  area and larger groups were forming over time, it became
3  more of a concern of if we're not able to get the streets
4  open again, it's going to continue to get worse and more
5  obstructions would be in the forseen future.  And so we
6  were wanting to avoid that.
7      Q.  And what days were -- you said there were at
8  least two calls.  Do you know what dates those were?
9      A.  I do not.
10     Q.  Do you know what part of June they were?  Were
11 they before or after the City put in the eco blocks?
12     A.  I believe they were before.
13     Q.  And did you ever talk to those -- the -- anyone
14 not affiliated with the City -- so protesters -- about
15 moving those barricades that you called about?
16     A.  No.  I didn't necessarily have to talk to the
17 protesters before it became a hostile situation.  I
18 typically would walk around my building and off streets and
19 would get confronted by random people that would ask me
20 what I was doing in the area.  And these were people I'd
21 never seen before.  And one gentleman, in fact, was in a
22 vehicle with Oregon plates on it wearing tactical gear head
23 to toe, and he was very confrontational and he wanted me to
24 talk to him.
25         He offered me water, and I said I'm not

13  (Pages 49 to 52)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0af986c2-353b-4f08-885c-10b65a3454ef

WADE BILLER
12/10/2021

Page 53

1  interested in water, and he says what are you doing here
2  and I said it's -- I live here, it's none of your business
3  to be asking me this.
4      I came to a point where I was concealed carrying
5  at that time.  It became obvious to me that he was going to
6  continue to be aggressive, and so I just kind of navigated
7  my way out of that situation, saying never mind, you know,
8  whatever, carry on.  I -- you know, I'm just hanging out
9  here, and I moved on.  I was hoping not to escalate it
10 because at that point it seemed like, you know, he was
11 basically giving me a check in my own neighborhood.
12     Q.  So my question was:  Did you ever ask any of the
13 protesters at any of the barriers to move them?
14     A.  You know, I moved them myself -- that would be
15 no.  Let's put it that way.  I had no reason to.  I was
16 not -- they were -- they didn't seem like they were
17 reasonable people, so --
18     Q.  Did you observe the barriers being moved so that
19 cars could drive by them?
20     A.  On occasion.  It depend -- it really depended on
21 how that conversation went with that individual person.
22     Q.  You don't have any knowledge of the -- those
23 individual conversations; right?
24         MR. REILLY-BATES:  Object to the form,
25 foundation.

Page 54

1      A.  I had a number of conversations with people
2  blocking the road where barriers were placed and my attempt
3  to drive through, they stopped me and asked me questions.
4  BY MR. CRAMER:
5      Q.  And then did they allow you -- were you able to
6  drive past?
7      A.  At some point.  It took some negotiation.
8      Q.  Were you ever turned around and not allowed to
9  pass?
10     A.  Not by -- not by any of the -- not by any of the
11 occupied barriers, no.
12     Q.  So you -- okay.
13     A.  But I would add that that's because I didn't make
14 demands saying "Let me through"; it was more like "I need
15 to get over here," and they would be like "Why?"  So they
16 would eventually move stuff; it was a matter of
17 negotiating.
18     Q.  And are you aware of anybody who was not allowed
19 to pass?
20     A.  No.  I'm certain there are scenarios.
21     Q.  But you are not aware of any?
22     A.  I'm not personally aware.
23     Q.  Do you recall the -- strike that.
24         Did you ever speak with anyone from the Seattle
25 Department of Transportation regarding the removal or

Page 55

1  relocation of barriers?
2      A.  I did not.
3      Q.  Did you ever speak with anybody from Seattle
4  Department of Transportation about anything relating to the
5  CHOP or CHAZ area?
6      A.  I did not.
7      Q.  Did you ever speak with anyone from the City
8  on-site in the area about CHOP or CHAZ?
9      A.  Could you give me a time frame and then reask the
10 question?
11     Q.  Sure.  So in the June time period, did you ever
12 talk to anybody from the City who was on-site in the
13 neighborhood?
14     A.  I was not aware that they were on-site and
15 available.  I know that there were some negotiations with
16 the protesters with the City officials, but I did not go to
17 any of those negotiations.
18     Q.  But did you talk to individuals from the City
19 about garbage pickup or recycling or anything of that
20 nature?
21     A.  Not -- not during the June time frame.
22     Q.  Was -- was the garbage and recycling at Onyx
23 generally picked up as scheduled during the June time
24 period?
25     A.  It was hard to tell because the dumpsters would

Page 56

1  come up missing and then get returned and sometimes they
2  were empty.  So overnight they would get moved and then
3  they would reappear the next morning.
4      Q.  Did any of the unit owners complain about garbage
5  not being available -- the garbage dumpsters not being
6  available?
7      A.  They are primarily recycle.  The one compactor --
8  the compactor unit the residents are not aware of.  It
9  doesn't impact them directly.  Their recycle bins -- there
10 may have been questions asked about it, but it's not
11 uncommon for them to be on the street, and they typically
12 pile up the recyclables inside the garage anyway when that
13 occurs, so --
14     Q.  I guess more generally, was the Onyx garbage and
15 recycling generally picked up and dealt with in a somewhat
16 timely fashion during June?
17     A.  I didn't -- I was not under the impression that
18 there was any -- any service disruption during June.
19     Q.  Did any homeowners complain to you about access
20 issues with the garage during June 2020?
21     A.  No, but we did put up notice informing people to
22 ensure that be on the watch to make sure that people did
23 not attempt to block the driveway or put in barriers.  We
24 didn't have that type of activity taking place at the
25 garage entrance during June.

14  (Pages 53 to 56)

Electronically signed by Mindy Suurs (101-257-931-8021)                    0af986c2-353b-4f08-885c-10b65a3454ef

Page 57

1    Q.  Did you get the sense generally that more people
2  in the Onyx were working from home in that time period due
3  to COVID than otherwise would have been?
4        MR. REILLY-BATES:  Objection.  Vague, foundation.
5    A.  Honestly, I wasn't getting that sense.  I thought
6  I would, but it seemed like I'd seen less people at the
7  Onyx during June.  In fact, it seemed like we saw there
8  were less people at the Onyx the rest of the year.  And I
9  don't know if that's -- what that's related to; that's just
10  my impression.  I can't speak to it specifically.
11    Q.  Were there any other -- so I think you testified
12  previously that you made -- that you can recall two 911
13  calls regarding barricades in the roads.  What times of day
14  would those calls have been made?
15        MR. REILLY-BATES:  Object to the form to the
16  extent it misstates witness's prior testimony.
17        You may answer.
18    A.  I understood it to be during the day, midday,
19  midafternoon.
20  BY MR. CRAMER:
21    Q.  And did you also testify earlier that you may
22  have made one or more additional calls just to ask when
23  things were going to go back to normal?
24    A.  Yes, but I honestly cannot recall what dates or
25  the conversations.

Page 58

1    Q.  Do you recall how many calls there would have
2  been?
3    A.  No.
4    Q.  Do you recall calling 911 on any other occasions
5  during June 2020?
6    A.  No.
7    Q.  Did you ever call the police department non-911
8  during June 2020 for anything?
9    A.  Not -- not that I recall, no.
10    Q.  Did you ever call the fire department for
11  anything?
12    A.  No.
13    Q.  Did you ever call any other City departments
14  during June 2020?
15    A.  I called the mayor's office and left a voice
16  mail.
17    Q.  And when did you do that?
18    A.  I don't remember the day.
19    Q.  And did you ever -- did the mayor's office or
20  anyone on behalf of the mayor's office call you back?
21    A.  No.
22    Q.  Did you ever meet with anyone from the City
23  during June 2020 when the City -- strike that.
24        Did you ever meet with anyone from the City
25  during June 2020?

Page 59

1    A.  Not of any authority.
2    Q.  Who did you meet with that had no authority?
3    A.  There may have been some minor conversations with
4  City Light or something like that.  That's not uncommon
5  because of the building or --
6    Q.  Okay.  Were you aware at the time that the mayor
7  made at least two trips to the Cal Anderson area to meet
8  with businesses and residents?
9    A.  I was aware that she made a visit to the park for
10  planting of sorts for putting in a garden.  That was my
11  only understanding.
12    Q.  And who did you get that understanding from?
13    A.  Neighbors, media source, I don't recall.
14    Q.  Have you heard from anyone that any other
15  businesses in the area -- that they met with the mayor
16  during June 2020 to talk about issues surrounding that
17  area?
18    A.  No, I did not.
19    Q.  Did you meet with any other businesses in the
20  area during June 2020 about the circumstances and things
21  that were going on in the neighborhood?
22    A.  Yes.
23    Q.  And when -- how many times did you do that?
24    A.  Maybe twice.  There was probably a prelude to
25  getting together as far as what are next steps to resolve

Page 60

1  the barricades and the ongoing nightly noise and random
2  gunfire, but I don't have a date.
3    Q.  Do you know --
4    A.  Sorry, a lot of those conversations were just
5  kind of ad-lib; they weren't like a meeting of businesses
6  at all; we were more or less just trying to string together
7  a group at that time.
8    Q.  And were those -- where did those -- how did
9  those conversations occur?  In person?  Over e-mail?  By
10  text?
11    A.  They took place in person or over text or over
12  Signal.
13    Q.  Okay.  And the ones that were in person -- do you
14  recall how many of those there were?
15    A.  No.  They were sporadic.  It was anytime we had a
16  chance to meet them, if they were on a corner.  You know,
17  we didn't constantly talk to each other via text; it was
18  more like we're outside, we bump into each other, or we're
19  potentially going outside to see what's going on or we
20  would go out to -- to try to understand with more clarity
21  and if other people were having the same concerns.
22        So it wasn't like -- it wasn't -- we were texting
23  around telling people we had concerns.  It was trying to,
24  you know, gauge -- gauge the circumstances to understand
25  if -- what -- if we were being reasonable or our concerns

15  (Pages 57 to 60)

WADE BILLER
12/10/2021

Page 125

1    Q.  But again, Mr. Wakefield wasn't made aware of it
2  until after the lawsuit had already been filed; right?
3        MR. REILLY-BATES:  Objection, vague.
4    A.  Wasn't aware of the no cost or potential cost?
5  BY MR. CRAMER:
6    Q.  The potential cost because he wasn't aware of the
7  lawsuit until it had been filed; right?
8    A.  That being the case, no, he wouldn't know.
9    Q.  And is that what you meant in the next paragraph
10  when you said that you took the, quote, forgiveness
11  approach to be able to expedite this lawsuit, end quote?
12    A.  Well, as far as getting the ducks lined up in a
13  row, I pulled the -- I pulled the trigger on it before
14  maybe everything was lined up on our side to -- to normal
15  expectation, I would say.
16    Q.  Are you -- do you have monthly board meetings?
17    A.  We typically do prior to COVID.  We attempt to
18  have monthly Zoom meetings now.
19    Q.  Is this lawsuit something that's discussed at
20  those meetings?
21    A.  It isn't now.  It was after our first -- our
22  first meeting after CHOP.  I don't even know if we had a
23  meeting during CHOP, to be honest with you.
24    Q.  Okay.  So do you know if this is -- if the
25  lawsuit has ever been discussed at a homeowners association

Page 126

1  meeting?
2    A.  It was discussed at some level since its
3  inception, and there's been -- there was a follow-up with
4  an open meeting with all owners at the end of the year to
5  see if they wanted to join in addition or had any
6  additional concerns.  Many people -- many owners said is
7  there anything we can do to help.
8    Q.  And have you asked any of those owners to collect
9  their documents relating to CHOP/CHAZ or the June 2020 time
10  period?
11    A.  I had asked one person which offered.  Hasn't
12  been -- a request has not been sent to each owner looking
13  for individual damages.
14    Q.  And I'm not talking about damages; I'm just
15  asking about the preservation and production of potentially
16  relevant documents.  Did you send a litigation hold to the
17  members of the association instructing them not to delete
18  texts, e-mails, documents that might be relevant?
19    A.  I don't know if that took place or not.
20    Q.  Did you receive a litigation hold telling you not
21  to delete or destroy any e-mails, texts, relevant
22  documents?
23    A.  I did, yeah, but I don't recall having one -- I
24  don't recall getting a request for individual owners.
25    Q.  Did -- did Mr. Wakefield get a litigation hold

Page 127

1  telling him not to delete or destroy any documents
2  (inaudible) e-mails?
3    A.  No.
4    Q.  And Mr. Wakefield's been a director of the board
5  the whole time?
6    A.  Right.
7    Q.  And Mr. Khan -- did he get a litigation hold?
8        MR. REILLY-BATES:  Objection, lack of foundation.
9  BY MR. CRAMER:
10    Q.  Do you know whether Mr. Khan got a litigation
11  hold?  It's a fair objection.  Do you know whether Mr. Khan
12  got a litigation hold instructing him to --
13    A.  Based on conversations with him, I would say yes.
14        MR. CRAMER:  I want to mark another exhibit.
15        (Exhibit No. 111 marked for
16          identification and later
17          withdrawn.)
18  BY MR. CRAMER:
19    Q.  Mr. Biller, this is Plaintiffs' Initial
20  Disclosures.  I can represent to you that what this is a
21  pleading that your counsel put together, and one of the
22  things that it's supposed to take into account is the
23  damages being claimed by each of the plaintiffs, and so I
24  want to ask you, if you flip to the top of Page 6 -- or
25  sorry, I want to go further -- to the bottom of Page 14.

Page 128

1    A.  Okay.
2    Q.  Do you see where it says "Onyx Homeowners
3  Association"?
4    A.  Yes.
5    Q.  It says:  "Onyx Homeowners Association presently
6  estimates its to-date financial losses due to CHAZ/CHOP and
7  its aftermath to $4,299 due to increased security costs and
8  the costs of building cleaning."
9        Now, I -- I understand that you have submitted
10  invoices since this time that increase that amount, but in
11  terms of types of damages, is this -- does this still
12  accurately reflect the types of damages that Onyx is
13  seeking, meaning increased security costs and costs of
14  building cleaning?
15    A.  This is still true today.  This would have been
16  for private security as well as the graffiti removal.
17    Q.  Are there any categories of costs that Onyx
18  Homeowners Association is seeking that are not included in
19  this disclosure, in this paragraph?
20    A.  From a financial losses perspective, there's
21  nothing in addition to this.
22    Q.  Are there any nonfinancial losses that Onyx is
23  seeking?  And that's just triggered by your answer.  You
24  said these are the only financial losses; I'm curious if
25  you're leaving something out that you think is also should

32 (Pages 125 to 128)

Electronically signed by Mindy Suurs (101-257-931-8021)                0af986c2-353b-4f08-885c-10b65a3454ef

WADE BILLER
12/10/2021

Page 133

1    Q.  Are you seeking damages as part of this class
2  action relating to when you were kicked on June 8th?
3    A.  No.
4    Q.  Are you seeking emotional distress damages due to
5  CHOP or CHAZ?
6    A.  Yes.
7    Q.  As part of this -- this class action?
8    A.  I honestly think that falls under the
9  constitutional aspect of it -- me personally -- that's how
10  I'm looking at it.  I'm not looking for, you know, some
11  psychiatric costs -- costs to be considered.  So I don't
12  have a dollar amount from any -- you know, any -- any
13  mental health professionals or anything like that.  That's
14  not my take on it.
15    Q.  Well, so let's take a look at Page 14 of
16  Exhibit 111.
17    MR. REILLY-BATES:  Is it 107, Shane, or is it
18  111?
19    MR. CRAMER:  I'm sorry, it's No. 8.  Exhibit
20  No. 8, which I -- it's the one that I --
21    (Discussion off the record.)
22    A.  And what line?
23    Q.  Where it says "Wade Biller" and then "Present
24  Estimate of Financial Damages.  Mr. Biller may have
25  personal and/or emotional damages due to CHAZ/CHOP and its

Page 134

1  aftermath."
2    A.  Yes, so the personal damages would be the
3  out-of-pocket expense.
4    Q.  Okay.  The -- this was provided to us -- this
5  document was served in a lawsuit on September 28th, 2020,
6  so the -- this reference to personal damages as it relates
7  to the injuries that you suffered when you were cut by the
8  machete on September 8th.  Is that what your testimony is?
9    A.  Correct.
10    Q.  Okay.  And the emotional damages -- what -- do
11  those -- what do those relate to?
12    A.  I would say the circumstances that were allowed
13  to unfold due to the standoffish nature of deescalating
14  demonstrators by the City.
15    Q.  And how much -- what dollar figure are you
16  seeking in this lawsuit to compensate you for your alleged
17  emotional damages?
18    A.  I'm not seeking a dollar amount in regards to the
19  emotional damages and/or -- I'm only seeking the
20  reimbursement for out-of-pocket for personal medical bills
21  in regards to that particular instance.
22    Q.  And as a putative class representative on behalf
23  of other residents in the Cal Anderson area, are you -- is
24  it your belief that none of the residents in the Cal
25  Anderson area are seeking emotional distress damages in

Page 135

1  connection with this lawsuit?
2    MR. REILLY-BATES:  Objection.  Lack of
3  foundation, calls for legal conclusion.
4    You may answer.
5    A.  Honestly, I don't know what else people may have
6  in the pipeline.  I'll be as transparent as I can.  I would
7  assume there's more, but who's going to come forward by
8  whatever reasons they have to come forward or not come
9  forward -- that's something I can't answer.
10  BY MR. CRAMER:
11    Q.  Would you agree with me that whether someone has
12  suffered emotional distress as a result of CHOP or CHAZ
13  is something that differs from person to person?
14    MR. REILLY-BATES:  Objection, calls for legal
15  conclusion.
16    A.  I -- I think everybody's involvement was
17  different based on their location or whether they were, you
18  know -- whether they were residing in the area at the time
19  or had they left or whether they were out at night or
20  during the day or what maybe their normal day activities
21  may have consisted of or whether they'd made some
22  significant changes, so I really can't answer that.
23  BY MR. CRAMER:
24    Q.  There are, I think you said, 62 or so different
25  units in the --

Page 136

1    A.  There's 65 total, and 62 are residential.
2    Q.  Would you agree with me that, even amongst those
3  people, individuals' perspective on what was going on in
4  the neighborhood is different?
5    MR. REILLY-BATES:  Objection to the extent it
6  calls for legal conclusion, vague.
7    You may answer.
8    A.  No one came to me with any emotional or personal,
9  physical, I guess, or anything like that.  They didn't
10  report any circumstances that they were involved in.
11  BY MR. CRAMER:
12    Q.  But I guess the question is slightly different.
13  Your -- you've put yourself forward to be a class
14  representative on behalf of the residents in the Capitol
15  Hill area, and my question and your counsel has disclosed
16  that one of the types of damages that you're seeking is
17  emotional distress damages.  And you've told me now that
18  you're not.  And that's correct; right?
19    A.  Well, I'm trying to -- I'm trying to decipher my
20  claim as an individual and then the association's claim
21  because I'm not claiming damages or security directly on
22  behalf of myself or graffiti removal; that's on the
23  association's behalf.
24    Q.  Right, and in this document, so you're listed --
25  it's alphabetical, and you're listed as the third entry,

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                    0af986c2-353b-4f08-885c-10b65a3454ef

WADE BILLER
12/10/2021

Page 233

1      S I G N A T U R E
2
3          I declare that I have read my within deposition,
4      taken on Friday, December 10, 2021, and the same is true
5      and correct save and except for changes and/or corrections,
6      if any, as indicated by me on the "CORRECTIONS" flyleaf
7      page hereof.
8          Signed in _____, Washington,
9      this _____ day of _____, 2021.
10
11
12
13
14          _____
15          WADE BILLER
16
17
18
19
20
21
22
23
24
25

Page 234

1      REPORTER'S CERTIFICATE
2
3          I, Mindy L. Suurs, the undersigned Certified Court
       Reporter, pursuant to RCW 5.28.010, authorized to
4      administer oaths and affirmations in and for the State of
       Washington, do hereby certify:
5
6          That the foregoing testimony of WADE BILLER  was given
       before me at the time and place stated therein and
7      thereafter was transcribed under my direction;
8          That the sworn testimony and/or proceedings were by me
       stenographically recorded and transcribed under my
9      supervision, to the best of my ability;
10         That the foregoing transcript contains a full, true,
       and accurate record of all the sworn testimony and/or
11     proceedings given and occurring at the time and place
       stated in the transcript;
12
13         That the witness, before examination, was by me duly
       sworn to testify the truth, the whole truth, and nothing
       but the truth;
14
15         That I am not a relative, employee, attorney, or
       counsel of any party to this action or relative or employee
       of any such attorney or counsel and that I am not
16     financially interested in the said action or the outcome
       thereof;
17
       DATE:  December 20, 2021
18
19
20
21
22     Mindy L. Suurs
23     Certified Court Reporter #2195
24
25

59 (Pages 233 to 234)

Electronically signed by Mindy Suurs (101-257-931-8021)                    0af986c2-353b-4f08-885c-10b65a3454ef

Exhibit 27

BILL DONNER
11/16/2021

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiffs,         )
                                )
        vs.                     )   No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

BILL DONNER - RICHMARK LABEL

_____

CONTAINS CONFIDENTIAL PORTIONS

DATE:  Tuesday, November 16, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

---

**Page 2**

```
 1           A P P E A R A N C E S
 2
 3   For the Plaintiff:
 4     TYLER S. WEAVER
       Calfo Eakes
 5     1301 Second Avenue
       Suite 2800
 6     Seattle, Washington 98101
 7
       For the Defendant:
 8
       SHANE P. CRAMER
 9     Harrigan Leyh Farmer Thomsen
       999 Third Avenue
10     Suite 4400
       Seattle, Washington 98104
11
12   For the City of Seattle:
13     JOSEPH GROSHONG
       Assistant City Attorney
14     Seattle City Attorney's Office
       701 Fifth Avenue
15     Suite 2050
       Seattle, Washington 98104
16
17
18
19
20
21
22
23
24
25     Also present:  Karl Benitez, Royal Video Productions
```

---

**Page 3**

```
 1                    I N D E X
 2   EXAMINATION BY                     PAGE
 3   Mr. Cramer             6
 4
 5               EXHIBIT INDEX
 6   NO.   DESCRIPTION                  PAGE
 7   83   Amended Deposition Notice for Richmark      7
 8   84   Photograph                 13
 9   85   Google map of the area         25
10   86   E-mails including June 11, 2020, from Bill   44
          Donner to Alan Anderson re meeting
11
12   87   E-mails including June 17, 2020, from Bill   57
          Donner to Sam Zimbabwe re street traffic
13   88   E-mails including June 17, 2020, from Bill   72
          Donner to Michael Oaksmith re Yesterday's
14        Meeting
15   89   E-mail dated June 26, 2020, from Bill Donner  74
          to Michelle Esteban re One More Thing
16
17   90   E-mails including June 12, 2020, from Bill   75
          Donner to Gary Volchok
18   91   Spreadsheet CHOP Total Losses to Date      80
          (Assuming CHOP Ends Tomorrow)
19
20   92   Richmark Estimated Damages, April 14, 2021   84
21   93   E-mail dated June 25, 2020, from Bill Donner  104
          to Kassandra Brown re ASAP
22   94   Series of e-mails dated July 1, 2020, between  111
          Bill Donner and Tamara Floyd re We're Back
23
24   95   FedEx invoice            137
25   96   Pacific Paper Tube Invoice No. 312580    137
```

---

**Page 4**

```
 1               EXHIBITS (Cont.)
 2   NO.   DESCRIPTION                  PAGE
 3   97   Pacific Paper Tube Invoice No. 313071    137
 4   98   List of attempted deliveries      137
 5   99   E-mails between Mark Mathieson and Barry   143
          Cosme re Pacific Paper Tube Freight
 6
 7   100   Diamond Parking Services rental report   154
 8   101   Richmark Label General Ledger     158
 9   102   Series of e-mails between Barry Cosme,   168
          Kassandra Brown, and Bill Donner re Vortex
10        Managers in Suite 18
11   103   Series of e-mails between Barry Cosme, Eddie,  174
          and Bill Donner re Northwest Liquor rent
12   104   E-mail from Jeff Scott dated July 2, 2020,   185
          Re June 2020, "Heretofore known as the age of
13        CHOP"
14   105   Richmark Label Balance Sheet as of January 1,  203
          2020
15
16   106   Richmark Label Profit & Loss, May-August 2020  208
17
18
19
20
21
22
23
24
25
```

---

1 (Pages 1 to 4)

Electronically signed by Mindy Suurs (101-257-931-8021)                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 9

1     Q.  Yes.  And just look through those and let me know
2  whether you're prepared to testify with respect to those
3  today.
4     A.  Okay.
5        Well, I have gone over these in the past, and my
6  CFO prepared some of the documents.  He knows more
7  particulars than I do, but I can address the issues with
8  you.
9     Q.  Okay.  And what did you do specifically in
10  advance of today's deposition to prepare to answer the
11  questions under these topics?
12     A.  Well, I saw the questions and we went back over
13  our memory and all of our information with my CFO, with our
14  lawyers to come up with the best answers that we could.
15     Q.  Okay.  And when did you do that?
16     A.  I do not remember specifically.  In the past,
17  there have been a number of times we were going to have my
18  deposition taken and then it got canceled, so we've done it
19  more than once.  I haven't tracked the dates.
20     Q.  Okay.  Have you done it in the past week, or are
21  we talking earlier than that?
22     A.  We did go over this in the last week.
23     Q.  Who's your CFO?
24     A.  Barry Cosme, C-o-s-m-e.
25     Q.  And did you look at any documents to get yourself

Page 10

1  prepared to testify to these topics?
2     A.  I've looked at the documents that he prepared and
3  supplied our counsel.
4     Q.  And what -- just generally, what type of
5  documents were those?
6     A.  Spreadsheets.
7     Q.  Can you describe for me what Richmark is, what
8  kind of a company that is?
9     A.  Richmark manufactures pressure sensitive labels,
10  the types of labels that you put on packaging, wine,
11  liquor, retail products.  We peel them off a liner and
12  they're applied to another surface.
13     Q.  And just looking at the deposition notice, is the
14  company technically Richmark Company, or is it Richmark
15  Label?
16     A.  It's The Richmark Company, dba Richmark Label.
17     Q.  And I understand that Richmark Company owns a
18  building on 11th and Pine; is that correct?
19     A.  Correct.
20     Q.  And do you also lease part of that building out
21  to tenants?
22     A.  Yes.
23     Q.  And the entity that is the landlord or does that
24  is also Richmark Company; is that right?
25     A.  Correct.

Page 11

1     Q.  What's that?
2     A.  Correct.
3     Q.  So the one company has both the labeling business
4  as well as serves as the landlord and owns the building?
5     A.  Yes.
6     Q.  How long has Richmark been doing business?
7     A.  Over 70 years.
8     Q.  And when did you -- strike that.
9        You're the owner of Richmark; is that correct?
10     A.  Yes.
11     Q.  Did you start the company?
12     A.  No.
13     Q.  Who started the company?
14     A.  My father.
15     Q.  And what is your title?
16     A.  President.
17     Q.  And how long have you been the president of
18  Richmark?
19     A.  51 years.
20     Q.  And has Richmark always been located at the 11th
21  and Pine address?
22     A.  No.
23     Q.  Where was it before?
24     A.  Originally 3131 Western Avenue, then it went to
25  1505 Western Avenue, and we -- Richmark leased the space

Page 12

1  where we are right now in 1970.
2     Q.  And so since 1970, has Richmark been at its
3  current location?
4     A.  Yes.
5     Q.  And I understand that Richmark also owns the
6  building where Northwest Liquor & Wine is located?
7     A.  That's correct.  It's the upper floor.
8     Q.  Okay, that was my question.  Is it all part of
9  the same building?
10     A.  Yes, it is.
11     Q.  And I'm familiar with your building.  I am less
12  familiar with where the tenants are located.  Can you
13  describe where the labeling business is and then, you know,
14  where the spaces are that you lease out?
15     A.  The building is between 11th and 12th Avenues.
16  The south side is Pine Street.  Okay, you can enter
17  Richmark from doors on Pine Street between 11th and 12th.
18  We have a parking lot, customer parking, trucks come in and
19  out on 11th Avenue.  All the tenants, including Northwest
20  Liquor, enter from 12th Avenue, and there is no connection
21  between where the tenants are on the floor above us and
22  where Richmark is.
23     Q.  So is it fair to say that the labeling business,
24  the Richmark labeling business is the first floor and
25  everything on the second floor is tenant space?

3  (Pages 9 to 12)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 13

1    A.  Correct.
2    Q.  And are there windows on the labeling space, or
3  is that fully enclosed without windows?
4    A.  There are no windows on the 11th Avenue side.
5  Pine Street has glass double doors that people come in and
6  out of but no windows.
7    Q.  And in terms of I think you mentioned a parking
8  lot on 11th.  Is there also a parking garage?
9    A.  The -- mentioned the first and second floors
10  of the building.  There is a basement, and we have employee
11  parking in the basement for Richmark, and it also parks on
12  the -- parking lot on 11th Avenue.  On 12th Avenue where
13  the liquor store and the tenants enter, it was a automobile
14  dealership; so to the right of the doors where cars used to
15  go in and out, that is employee parking for Richmark and
16  customer parking for the liquor store.
17    Q.  Sorry, I'm going to drop another document into
18  the chat.
19        (Exhibit No. 84 marked for
20        identification.)
21    MR. WEAVER:  Let me know if you need help getting
22  it up.
23    A.  Am I supposed to be doing something now?
24    MR. WEAVER:  Yeah, I mean -- yes.
25    A.  I have no idea what you want done.  I am not a

Page 14

1  tech person, so I apologize in advance.
2  BY MR. CRAMER:
3    Q.  Did you see in the chat, which is the white part
4  on the right, a document that's numbered 84?
5    A.  Okay, right there.  Click on it?
6    MR. WEAVER:  Click on it and save and then you
7  have to click on it again after you've saved it to open it,
8  but it should open.  And there you go.
9    A.  Okay.
10  BY MR. CRAMER:
11    Q.  And so what I've dropped into the chat is
12  Exhibit 84.  It's a photograph.  Do you recognize what it's
13  a photograph of?
14    A.  Yes.
15    Q.  Okay.  And what is it a photograph of?
16    A.  Okay, it's -- the street is 11th Avenue.  To --
17  there is a truck parked against the building.  If you go
18  about 50 feet to the right, which you can't see is Pine
19  Street, the windows up above that you can see on the second
20  floor -- that is where the tenants are.  That's the tenant
21  floor.  Richmark is down below.  You can see the loading
22  dock -- do you see where Richmark Label is on the building?
23  That is an open door for trucks to come in and out of.  On
24  both those doors, it's where customer parking is.  We have
25  a few spots for it, and all our employees park in that

Page 15

1  parking lot.
2    Q.  And you said that there's parking in the
3  basement.  Thank you for describing the photo.  I was just
4  trying to get a sense of the layout for Richmark.  You said
5  that there's a basement with parking.  How do you access
6  the basement?
7    A.  Okay.  You see where that -- the truck is against
8  the building?
9    Q.  Yes.
10    A.  Okay.  If you go about 10 feet to the right of
11  that, there's an overhead door, and you, from that, go in
12  and out of the basement.
13    Q.  Okay.  So then there is -- and the basement
14  parking you said is for employees of Richmark?
15    A.  Correct.
16    Q.  And then this parking lot that we see on Exhibit
17  84 -- that's also -- that's customer parking and employee
18  parking?
19    A.  Yes.
20    Q.  Okay.  And then the garage that you described on
21  12th is parking for the liquor store and additional
22  Richmark parking or is that tenant parking?
23    A.  Richmark parking, yes.
24    Q.  And the loading docks for Richmark -- those are
25  the two loading docks that are visible in the photograph

Page 16

1  that's 84; is that right?
2    A.  Yes.
3    Q.  Can you describe for me what Richmark's -- what
4  the labeling company's typical hours are?
5    A.  We operate two shifts about 20 hours a day,
6  Monday through -- Monday through Thursday for production,
7  Monday through Friday for the rest of the building.  The
8  days -- do you want the details?
9    Q.  I do, thank you.
10    A.  Okay.  The day shift starts -- we get there
11  around 4:45.  People come in in production between 4:45 and
12  6:00.  Office people come in -- drift in -- because we deal
13  on East coast and West Coast -- will come in from 5:30,
14  6:00, up through 8:00.
15      So we get in around 4:45, employees come in from
16  then until -- production until around 6:00.  Trucks that
17  deliver product that we have to print -- picking up and
18  delivering starts as early as 6:00.
19    Q.  And when did those -- when do the trucks that
20  picking up and dropping off -- when do those --
21    A.  All day long.  We don't -- we get materials in
22  frequently during the day.  Trucks will come in to drop
23  things off.  It's very random.  But there are trucks there
24  every hour.  How many, it varies, but they come in and out.
25  Primarily they're bringing things to us.  When we ship

4  (Pages 13 to 16)

Electronically signed by Mindy Suurs (101-257-931-8021)                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 45

1   meeting?
2       A.  No.
3       Q.  And the -- taking a look at the bottom e-mail on
4   this thread, it looks like you were contacted by
5   Sabrina Bolieu --
6       A.  Let me scroll down and make sure I'm seeing what
7   you're seeing here.  Yeah, the one that's addressed to Mike
8   signed by me.  Okay.  What was the question again?
9       Q.  It says that you were contacted by Sabrina
10  Bolieu.
11      A.  Right, and you mentioned that earlier.
12      Q.  And do you know why she was reaching out to you?
13      A.  Not that I can remember.  She -- not that I can
14  remember.
15      Q.  Was it in relation to what was going on in
16  Capitol Hill, I assume?
17      A.  Yes.
18      Q.  And do you remember how Ms. Bolieu got your
19  contact information or how you got hers?
20      A.  No, I don't.
21      Q.  And June 11th -- that's three days after the --
22  the precinct was vacated?
23      A.  I'm sorry, was that a question?
24      Q.  Is that correct?
25      A.  I don't remember the dates.

Page 46

1       Q.  And after the -- do you recall anything that
2   Mr. Malone told you about that meeting that they had?
3       A.  No.
4       Q.  Did you ask him what happened at the meeting?
5       A.  When we talked, I'm sure we discussed what was
6   going on, but I can't now remember anything concrete coming
7   out of it.  I don't remember anything concrete coming out
8   of any discussions during the month with anybody.
9       Q.  So the top e-mail here, you write "I love
10  Malone."  Do you know -- first, who's Alan Anderson?
11      A.  Oh, he works for me.
12      Q.  And do you know why you wrote "I love Malone"?
13      A.  I have no idea.
14      Q.  Is it because Mike Malone was bringing up the
15  idea of a massive class action lawsuit against the mayor
16  and the City?
17      A.  I don't remember.  I've known Mike Malone since
18  about 1970, I've had a lot of interactions with him and --
19  friendly and otherwise.  So I just at this point can't
20  remember anything specific about it.
21      Q.  At some point is it your belief that some sort of
22  blockages were placed on some of the streets in and around
23  Cal Anderson?
24          MR. WEAVER:  Objection.
25          Answer if you can.

Page 47

1       A.  Can I tell you about the blockages in and around
2   that area that I am familiar with?
3   BY MR. CRAMER:
4       Q.  Yes.
5       A.  Okay.  I don't want to bore you with it, but at
6   some point in the month, they blocked off Pine Street.  The
7   11th Avenue where -- you mentioned before on the exhibit --
8   where our loading docks are, the trucks would come down
9   11th, get almost to Pine, and then back in.  Okay?  They
10  couldn't get out in traffic on Pine.  So the business
11  activity happened along 11th.  There were no cars, nothing
12  was happening on Pine Street.  It was blocked off
13  completely at some point during the month, and the trucks
14  would try and get in and out.  There were barricades by the
15  protesters in addition to the cement blocks blocking 11th
16  Avenue at that corner on 11th and Pine.  My loading docks
17  may be 100 feet, 150 feet in from -- on 11th Avenue from
18  that side.  Okay.
19          The park and the playfield filled up, and our
20  real problems getting in and out and fears were on the 11th
21  Avenue side, not the Pine Street side because the 11th
22  Avenue is where people were living and congregating during
23  the day.  And then, as I said, most of the time by late in
24  the day, they would get over to Pine, and those -- the what
25  I call metal barricades were put up.

Page 48

1       Q.  And were there barricades or blockages anywhere
2   else on 11th?
3       A.  The north corner of our block is Olive, 11th and
4   Olive.  Okay?  For a good portion of the month, I would
5   call them protesters -- I don't know what else to call
6   them -- would take garbage cans, metal posts, railings,
7   furniture and block off 11th Avenue.  But they may have
8   gone a block north of Olive.  I wasn't up there much;
9   oftentimes I saw it was open.  But I would come down 11th
10  Avenue, you know, 4:45 in the morning, they would stop me,
11  pretend they weren't going to let me through.  I said,
12  look, we've got the business on the corner, trucks were
13  coming in.  Couple of days I had to drive on the sidewalks
14  to get around, get into the lot, come back, talk to them.
15          And generally the protesters helped us at some
16  point move some of the barricades, most of the time I'm not
17  the first person in my factory at 4:45, so I would get
18  other employees and we'd come out and we'd talk to people
19  and try and move what we could so that the trucks could get
20  in and our people could get into our parking lot, park and
21  work.
22      Q.  And the people that you say were at 11th and
23  Olive -- did they ever tell you why the streets were being
24  blocked?
25      A.  I did not engage them.  I didn't know them

12  (Pages 45 to 48)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 49

1  personally.  I didn't know what their beliefs, attitude.  I
2  didn't know if they were belligerent.  The best thing to do
3  was just say nice, polite -- please, thank you, can you
4  help us move so we can get in.  They generally did, but
5  they moved barricades back enough so that a car, sometimes
6  a truck could get in.
7       We -- I'd have some of my employees and me stay
8  out there, tell employees, truck, yeah, you can come in.
9  Most of the time during the month trucks did get in, people
10 came in.  There were some truck drivers, their company said
11 they didn't have to, they were afraid.  They were
12 intimidated.  So there were times when we didn't get
13 shipment in or we didn't get shipments out.
14      Customers -- there were no press checks then.
15 People just -- if they didn't have to deal with what was
16 going on up there, people didn't come up.
17      Q.  The protests or the people on 11th and Olive --
18 they were generally very polite; is that right?
19      MR. WEAVER:  Objection.
20      A.  To my best recollection, most of the time, yes.
21 BY MR. CRAMER:
22      Q.  And they moved the blockages when -- when you
23 asked them to move them?
24      A.  Some would.  Some -- some of them were heavy.
25 Sometimes they would go get a couple other people, so my

Page 50

1  people and those people -- we have to move a couch, we'd
2  move the barricades.  We got -- we managed.  We managed.
3  Some days were much tougher than other days.
4       Q.  But every day you were able to get to your
5  business?
6       A.  Yeah.  Sometimes not exactly when we needed to.
7  Sometimes it was a half hour later, sometimes the
8  barricades were heavier, took more of us to move them.
9  There were a couple of times when one of the protesters
10 went and got several other people to help move some of the
11 stuff out of the way.  So there was only one woman one
12 time -- school teacher from Puyallup -- who threatened
13 Mr. Zimbabwe and me.  And that was one time, one morning
14 out of the entire month.
15      Q.  And so it seems like Mr. Zimbabwe was there, too,
16 assisting you?
17      A.  Not in moving things, but he was in the area.  I
18 don't know how often.  He didn't come to see me all the
19 time.  I was not, you know, the focus of his attention, but
20 he was as everybody else, very polite, sympathetic, no
21 promises.  You know, I would ask everybody if they heard
22 anything, please let me know, especially around eventually
23 when it came time that the assumption was made by me, my
24 employees that this couldn't go on forever and we just
25 wanted to know about it.

Page 51

1       Q.  And at some point did the SDOT, Seattle
2  Department of Transportation, made a more formal access
3  plan for the area around your business; is that right?
4       MR. WEAVER:  Objection.
5       A.  No, I don't know anything about that.
6  BY MR. CRAMER:
7       Q.  Did Mr. Zimbabwe come out and see you and talk
8  about how you could use the loading dock and make sure
9  there was access for the loading dock?
10      A.  If I saw him, which I did -- I don't remember how
11 many times I saw him -- if I saw him, with him and
12 everybody else, I would just ask, "Is there anything you
13 can do to help me?"  But nobody in the City was going to
14 confront, based on the people I talked to -- I shouldn't
15 say nobody in the City -- the people I talked to had no
16 intention of confronting any of the protesters.
17      And as I say, when Mr. Zimbabwe and I walked up,
18 I just remember it's the one thing I remember because it
19 stuck out in my mind about the school teacher from
20 Puyallup.  She said, "I'm not moving it and there's nothing
21 you can do to make me do it."  And we just said, "Thank you
22 very much" and walked away.
23      Q.  And did you get a sense for what concerns the
24 City had about for why they weren't clearing the area
25 sooner?

Page 52

1       MR. WEAVER:  Objection.
2       A.  No, I didn't have any idea that they had any
3  concerns at all.  As you say, they put up the porta
4  potties, they put up the barriers.  The activity on the
5  streets grew during the month of June unabated, as far as I
6  could tell, so I wasn't aware that the City had any plans
7  to do anything.
8  BY MR. CRAMER:
9       Q.  And you don't know why they provided the porta
10 potties; right?
11      A.  No.
12      Q.  They could have provided them, you know, because
13 there were no other businesses with bathrooms open?
14      A.  I don't know.
15      MR. WEAVER:  Objection.
16 BY MR. CRAMER:
17      Q.  Could have provided them as a public health --
18 for public health reasons?
19      MR. WEAVER:  Objection.
20      A.  I don't know.
21 BY MR. CRAMER:
22      Q.  And so you don't recall Seattle Department of
23 Transportation coming out to modify the street access
24 plans?
25      MR. WEAVER:  Objection.

13 (Pages 49 to 52)

Electronically signed by Mindy Suurs (101-257-931-8021)                              834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 85

1  now want to mark another document -- we'll mark it as 92 --
2  which I believe is an updated damages estimate that
3  Richmark provided, so that should be coming to you in the
4  chat.
5      A.  I don't have that strip on the side of my screen.
6      MR. WEAVER:  Let me pull that up.
7      A.  Okay.  Okay, 92.
8  BY MR. CRAMER:
9      Q.  Do you recognize this document?
10      A.  Just a second.  I'm just -- hang in there one
11  second.
12      Q.  And at least on my screen I need to increase the
13  size, so feel free to do that on yours if you --
14      A.  No, I can read it, I just have to scroll -- no,
15  I'm okay.  I'm squinting, but I'm fine.
16          Okay, yeah, this looks -- yeah, okay.
17      Q.  So is this the one that you -- is this the
18  damages estimate that you reviewed in advance of today's
19  deposition?
20      A.  Yeah, this is one -- I apologize for the other.
21  I mean it was just --
22      Q.  It was not you; it was on our end, but we all are
23  on the same page now.
24          Before I ask you substantive questions about the
25  estimates themselves, I want to ask you who are the various

Page 86

1  employees that are listed here.  Like who is Employee E?
2      A.  I have no clue.  But what we did was this:  I
3  mean we have a variety of people with a variety of names,
4  and my -- because I talked to my CFO about it, and he did
5  not -- again, nobody gave me information one way or
6  another -- did not feel it was necessary that you know
7  everybody's name other than they exist, and each one is
8  somebody who has an hourly rate and taxes and they are
9  people in the production area.
10          What they did to help in the time they used has
11  no bearing on what they normally do for a job.  It's just
12  everybody pitched in.  So I mean we can get you if you want
13  names, but it really -- I mean this was not done to, you
14  know, hide anything.  He just chose to do it this way
15  because he didn't think you would want or should have
16  individuals' names.
17      Q.  Well, we can follow up on that.  We will want the
18  individuals' names, but just so I'm clear and the record's
19  clear, Employee E does refer to a specific employee of
20  Richmark?
21      A.  Correct.
22      Q.  Okay.  Are any of these employees referring to
23  you?
24      A.  No.
25      Q.  Are all of these employees referring to hourly

Page 87

1  employees?
2      A.  May I take a second, please?
3      Q.  Yeah.
4      A.  I am there separately named, if you saw on there,
5  about a third of the way from the top.
6      Q.  Okay.  Where are you referred to --
7      A.  It's about a third of the way from the top, it
8  starts -- first name on the left is Bill, Bill Donner and
9  CFO -- do you see that?  You extend over to the right and
10  the number is 42,846.
11      Q.  Right, but that is not a -- that's not
12  referencing your time -- right? -- or your hourly rate?
13      A.  Correct.
14      Q.  That's just a description of that $42,000 entry?
15      A.  Okay, I'm looking -- I'm looking through this
16  right now.  Just a moment.  Let me go down a little bit
17  more.  Just a second.  I'm talking to myself, I apologize.
18  I haven't looked at this for a while, I apologize.  I'm
19  trying to sort it out.
20      Q.  Well, let me ask you a different question.  The
21  top entry:  "Extraordinary employees management by CFO and
22  department managers, $5,700 --" what does that mean?  Like
23  what does that include?
24      A.  Extra work done by the managers.  Anything having
25  to do with what was going on -- talking to employees,

Page 88

1  calming them down, working with it, doing things that would
2  not normally be -- that would take away from their
3  productivity and their time.  And these are the hours --
4  you see the rates per hour, hours, and the salaries.
5      Q.  And how did you keep track of those hours that
6  you contend were associated with those activities?
7      A.  Well, as I mentioned before, when we had to do
8  this, we sat down -- several of us -- and went over the
9  month -- what we did, took notes, and the CFO compiled this
10  from them.  I don't remember any of the particular
11  discussions other than there were a lot of them and that we
12  spent some time and I think we had gone back and we revised
13  it.  The idea was to make it as conservative and yet
14  accurate and not, you know, put in numbers that were, you
15  know, grossly inflated at all.
16          So they are simply our best estimate of the time
17  we put in to work with people when we weren't doing
18  Richmark business.
19      Q.  And so the -- do you normally break out hours
20  that are spent during the work day doing things that are
21  non-Richmark business?
22      A.  No, just -- it was exceptional.  What we normally
23  do when the people are there, they work on Richmark things:
24  Current, planning, everything having to do with Richmark.
25  As I say, none of this would exist had the month of June

22  (Pages 85 to 88)

Electronically signed by Mindy Suurs (101-257-931-8021)                                834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 89

1  not happened.
2      Q.  And are these five people here -- do they bill
3  hourly?
4      A.  No.
5      Q.  Okay, so what is this hourly rate?
6      A.  He apparently converted it to an hourly rate.  If
7  anybody is paid by the month, you can take a look at -- you
8  can come up with a rate just by dividing it up.  You're not
9  paying them by the hourly.  In fact, if you're paying them
10  for a month, my salary, you know, divided up, you can come
11  up with an hourly rate; I just don't get paid by the hour.
12      Q.  And so for Employee E, for example, the rate per
13  hour is their annual salary divided down to an hour?
14      A.  I believe so.  Again, I -- if you've got
15  questions, I will have to go back to Barry.  I thought I
16  was a little bit more clear than I am.  I can tell you
17  about -- I am clear about the process.  I can't tell you
18  who Employee E, F, H, I, or J is.  If I did, I could tell
19  you a little bit about they're done.  I just know that
20  managers, manage people, plan for the future.  It's an
21  evolving business every day.  We're always looking at new
22  things.  We do things that are current that day; we also
23  have meetings, discussions about what where we're going.
24      So that's what sets -- obviously during the month
25  of June, we spent a lot of time, I spent a lot of time,

Page 90

1  other people spent a lot of time hunting for information --
2  as I told you when I was outside or talking to -- or
3  e-mailing, all of this time taken away from the business is
4  what this represents.
5      Let me scroll down, see what the total is.  So I
6  see that basically we've got the rental, which totals, I
7  think, 11,000 and breaks we gave people.  We took --
8      Q.  I'll ask you --
9      A.  Oh, I'm sorry, okay, yes.
10      Q.  It's not your testimony that people, your
11  employees don't spend time during the work day doing
12  non-Richmark things; right?
13      A.  Absolutely.
14      Q.  So they talk about their weekends, they, you
15  know, talk to each other about what's going on outside of
16  work?
17      A.  They don't take blocks of time away from
18  business.  If they take lunch, they talk to somebody.  If
19  they're standing and working with somebody, I can't vouch
20  for every word that comes out of every person's mouth, but
21  they don't take breaks, blocks of time away to do personal
22  things or nonproductive things.  For the future, it's a lot
23  of collaboration, a lot of talking, a lot of brainstorming.
24  And I can't tell you if people are so strict that they
25  never say anything to each other that they shouldn't.

Page 91

1      Q.  And these hours that you have here -- these are
2  hours where you're saying these employees were not also
3  doing their work during these same time periods?
4      A.  Richmark is managed -- management by walking
5  around.  We walk around, we look, we see.  We will talk to
6  people, take care of our employees.  We run a very good
7  company, we think.  Okay?  And if we're outside moving
8  cars, parking, we're talking to tenants, we're talking to
9  some of the employees that are a little nervous, they say,
10  what do you know and they start talking about that, that's
11  for the benefit of Richmark.  It's valuable.  You want your
12  employees taken care of, you want them calm.
13      A lot of people were not real productive or as
14  productive as they would be in the month of June because
15  their minds were elsewhere.
16      Q.  Okay.
17      A.  And part of the job of management, if I'm not
18  moving a dumpster, is to make sure everybody can be
19  productive.  That's what we do, one of the things that we
20  do in management.
21      Q.  And who was involved in putting together this
22  estimated damages summary dated April 14, 2021?
23      A.  Sales manager, CFO, two key people on the
24  production floor, my assistant in the office, and me.
25      Q.  So what are those people's names?

Page 92

1      A.  Okay.  Jeff Scott -- you want the name -- Jeff
2  Scott, Alan Anderson, Barry Cosme, Marty Shilley, and David
3  Boyd, B-o-y-d.  And I'm pretty sure those would be the only
4  people that we would have all collaborated with to come up
5  with something.  And not all of them were equal.
6      Q.  And did you ask Employee E how many hours
7  Employee E thought that they had devoted to this?
8      A.  I do not know by letter which person is which.
9      Q.  Okay.  But did you ask -- did this group ask any
10  of the employees, the five employees listed by letter, how
11  many hours they spent working on employee issues during
12  CHOP?
13      A.  As I said before, I'm sure it was a collaborative
14  effort talking and people giving their best estimate.
15      Q.  And that would have occurred around April 2021?
16      A.  It was done upon request when we had to produce
17  this document.
18      Q.  Okay.  So is it fair to say, though, because the
19  document's dated April 14, 2021, that it happened around
20  that time period?
21      A.  I can't tell you for sure.
22      Q.  Would you guys --
23      A.  Whenever the request came in to start putting it
24  together -- now, this is a revised -- as we mentioned, this
25  was a revision, so when I say it's ongoing or we were

23  (Pages 89 to 92)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

Page 93

1   taking a look at it as questions would come in, we went
2   back, we talked to ourselves; and as you see, this was not
3   the first document. Okay? Did we make mistakes? Did we
4   go back over it? Were we more careful this time when we
5   thought we'd been careful the first time? Probably. I
6   just can't get in the minds of everybody there, other than
7   we had to produce this, we did it, and we -- like I say, we
8   made it as conservative and something that -- when I say
9   defend, we're all comfortable with it. Was more time than
10  this spent? Half hour? An hour? I -- none of us can
11  truly tell you exactly. This was our very best estimates.
12     Q. And what was the time period for which you were
13  looking at the time spent by management on when you call
14  extraordinary employee events?
15     A. If I'm understanding the question correctly, this
16  is the month of June in 2020.
17     Q. So it's for the whole month of June?
18     A. Yes.
19     Q. It doesn't include any ongoing time?
20     A. Not that I'm aware of. Once they cleared it and
21  we went -- my best recollection is once they cleared and we
22  went back to work, the pressure was off. Were there ever
23  employees worried is this going to start up again, did we
24  answer some questions, not enough that I would, you know,
25  add 12 minutes to discussing it.

Page 94

1       As far as we know, once they cleared it and the
2  pressure was off, to the best of my recollection, we were
3  pretty much back to business as usual.
4     Q. And this time that you've allocated in this
5  category -- this is not related to anything having to do
6  with, you know, moving dumpsters or dealing with trash; is
7  that correct?
8     A. All of this time was what everybody -- you know,
9  you can see there are a lot of employees by letter --
10     Q. I just want to -- sorry to interrupt you, but I'm
11  focused just on the top -- so the way that you've broken
12  this down -- and correct me if I'm wrong -- is that if I go
13  down the right-hand column, there are different amounts,
14  and each of those amounts relates to the category that
15  appears to the left of the amount. And so I'm just focused
16  right now on the -- the $5,700 amount, and that 5,731 that
17  appears in the upper right -- that is made up and relates
18  to the 5,700 -- $5,730.59 there; right?
19     A. Those would be managers. I don't -- I'm not sure
20  they're all salaried, but I'm pretty sure because I'm
21  looking at the number of hours involved. I apologize, this
22  is a long time ago, but when you get to 25, 30 hours, 18
23  hours, I may be in there, David Boyd would be in there,
24  Marty Shilley is in there. Again, they're not hourly
25  employees, but they also are there very early. Three of us

Page 95

1  are there very, very early in the morning and just helping.
2  We try to direct the hourly people.
3     Q. But what types of activities are covered in this
4  $5,700?
5     A. We are just like -- we were just like all the
6  other laborers, having employees move cars, figuring out
7  where to go, going outside, talking to David Boyd, charge
8  of -- a lot of -- in charge of production -- not solely,
9  but in charge -- coming outside with me, going to talk with
10  one person at one end of the block while I'm talking to
11  someone -- whatever we had to do at the moment in the
12  mornings during the day we did, and every day it was
13  something different. I mean generally every day we had to
14  do something to move blockades on the street. Sometimes it
15  took one of us, sometimes two, sometimes I was the only
16  one. Sometimes I would go in and get one of the employees
17  and it would take three of us to move something. Managers
18  there do more than just manage.
19     Q. And so those activities are covered in the
20  Extraordinary Employees Management By CFO and Department
21  Managers category?
22     A. My CFO decided to use the word "extraordinary,"
23  yeah, and it's not normal course of the business, so I
24  think that's a fair explanation.
25     Q. Take a look at Exhibit 91. So it probably is

Page 96

1  still open --
2     A. I'm sorry, which exhibit?
3     Q. 91.
4     A. I don't have it on my --
5     Q. You can reopen it from the chat. It's still
6  there.
7     A. Okay.
8     MR. WEAVER: It's not in his chat anymore, but
9  right here you can get it.
10     A. All right. The one called "CHOP Total Losses to
11  Date"? Is that the --
12  BY MR. CRAMER:
13     Q. So if you go to the -- so this is -- you
14  testified earlier this was the original damages estimate
15  that you provided?
16     A. Yeah, and that is one where we are not talking in
17  terms of damages for which we're trying to collect. We did
18  not lose revenue. This is about expenses, management, time
19  away when things should have been being done by other -- by
20  employees, other things.
21     But as I say, that's why I looked at this and it
22  didn't make any sense and we had to go back because that
23  was -- sales loss looked like revenue, and we are not
24  asking for anything to do with revenue, in terms of
25  Richmark. The revenue and the parking is something else

Electronically signed by Mindy Suurs (101-257-931-8021)    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 101

1   more maybe afraid to come to work and talked to them.  I
2   did not talk to him every day what did you say to every
3   employee to date.  We did not know how long this would go,
4   we did not know we were going to be in the position we are
5   right now dealing with this, so there was no ongoing
6   compilation during the month of June.  So as I said before,
7   it is everybody's very best estimate.
8        Q.  (Inaudible) we'll move along.  So Jeff Scott is a
9   sales manager --
10       A.  Correct.
11       Q.  -- so (inaudible.)
12       A.  I'm sorry, what was that?
13       Q.  Is he like the head of the sales department?
14       A.  Yes.
15       Q.  What is Alan Anderson's role?
16       A.  He is head of the tech department and my
17  right-hand person.
18       Q.  And what does the tech department do?  Is that
19  IT?
20       A.  No, it's not IT.  It's -- in what we manufacture,
21  there are lots of machinery, ways to do things, processing
22  it, quoting, ordering dyes, parts.  It's not rocket
23  science, but it's complicated, and that's why we have a
24  tech department because it's too difficult for salespeople
25  to figure this out, and that's why we have a group

Page 102

1   dedicated to it.
2        Q.  Barry Cosme you said CFO?
3        A.  Correct.
4        Q.  Who is Marty Shilley?
5        A.  He is our -- he is my key person in charge of
6   equipment, making repairs, handling things.  He'll deal
7   with outside vendors involved with equipment.  He's been
8   with me close to 40 years.  So he has technical abilities
9   that I don't have, and it usually involves equipment,
10  electrical, the building, et cetera.
11       Q.  And David Boyd.  Who is David Boyd?
12       A.  He is the floor manager of the production area.
13       Q.  Did any of those individuals receive any, you
14  know, workplace reprimand for not being as productive as
15  they should have been during CHOP?
16       A.  No.
17       Q.  Did anyone receive any reprimand for not being as
18  productive as you think they should have been?
19       A.  No.  No, we just did the exact opposite.  We
20  thanked everybody for doing the best they could in a very,
21  very difficult situation.
22       Q.  The next category is Security Services Paid.  Do
23  you see that for $8,000?
24       A.  Which -- are we on 91 still?
25       Q.  Looking at document 92.

Page 103

1        A.  Just a second.  I think I -- no, that is -- okay,
2   this is 92.  Yeah, we got rid of 91?  All right.  Thank
3   you.  Okay, where are you looking?
4        Q.  The next category down starting on the left says
5   "Security Services Paid."  Do you see that?
6        A.  Okay, yes, I see that.
7        Q.  Do you know what that category of damages refers
8   to?
9        A.  There is a person whose name I cannot remember at
10  the moment -- who works on Capitol Hill. He's got a
11  security firm. He's got a couple people working for him --
12  can't remember the name of it -- but he's very familiar
13  with City employees, the police department.  His name was
14  given to me, and those are -- represents the total in
15  checks paid to him.
16       He sort of had -- he had his pulse on what was
17  going on in the neighborhood.  They were spotting people
18  that were coming up from Portland around.  He just sort of
19  knew many of the protesters, he knew the people, he -- I
20  won't say one of them because he had a security firm, but
21  he would -- was hired to let me know if I heard anything,
22  if there was anything to the building, any security for the
23  building we need to worry about.  He had some people out at
24  night sometimes looking over things.  Nothing ever
25  happened.  But again, I wanted as much information as I

Page 104

1   could about what was going on during the month so that I
2   could protect the business, the company, the building, the
3   employees.
4        Q.  And so -- and it's your testimony that this
5   individual was paid $8,000 for those services?
6        A.  That's correct.
7        Q.  How did you find the -- is this person Barry
8   Hearns?  Does that name --
9        A.  Yes.  That's correct, thank you.  Somebody knew
10  him, gave me the name, telephone number, I contacted him,
11  and this is what he was paid for the whole project.
12       Q.  And this $8,000 -- this was for more months than
13  just June; correct?
14       A.  Yes.
15       Q.  What months was this --
16       A.  I stopped paying when we no longer -- and I don't
17  remember what month that was -- we no longer felt that
18  there was immediate concern about the safety of the
19  building.
20       MR. CRAMER:  I'm going to drop another document
21  into the chat.
22       (Exhibit No. 93 marked for
23       identification.)
24       A.  Okay.
25  BY MR. CRAMER:

26 (Pages 101 to 104)

Electronically signed by Mindy Suurs (101-257-931-8021)                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

Page 165

1    A.  What document are we on now?
2    Q.  We're back on 92, sorry.
3    A.  Okay, got it.  Okay, rental concessions.
4    Q.  Well, sorry, one last question on the parking.
5  Why did you feel like it was a better metric to compare
6  June 2020 to June 2019 as opposed to June 2021?
7        MR. WEAVER:  Objection.
8    A.  I don't know.  As I say, there are -- you keep
9  bringing up the COVID.  I understand that.  There were a
10  lot of other factors.  I just -- you know, that was one
11  where there was nothing in the way.  There was nothing
12  negative that we could think about.  There are a number of
13  things that possibly could have depressed the revenue after
14  that, including CHOP, parking, the playfield -- which is
15  playfield, CHOP.  And I don't know.  We put the number in.
16  We chose not to give the explanations that we don't know
17  anything about.
18  BY MR. CRAMER:
19    Q.  So do you think it's more accurate to -- that
20  2021 is a better analogy to 2020 given the ongoing concerns
21  about COVID and restaurants and that type of thing?
22    A.  If we --
23        MR. WEAVER:  Objection.
24    A.  Excuse me, if we had more information to look at
25  that we all could look at and all said this makes sense,

Page 166

1  then I could see coming up with a number based on having
2  more information.  This was done with the only thing we
3  knew.  We could point to that and say, hey, we don't know
4  about any problems or anything.  After that -- the Capitol
5  Hill has not been the same since CHOP, so I just don't --
6  but we can't tell you now.
7  BY MR. CRAMER:
8    Q.  Okay.  So rental concessions, which is the next
9  category, who is Tenant A1?
10    A.  Okay, based on the numbers -- okay, I'm sorry,
11  I'm being indirect.  I don't know the answer to the
12  question.  I'm sorry.
13    Q.  Is it Vortex Travel?
14    A.  If that is -- I'm guessing.  If that is -- I'm
15  guessing, if that's all right with you, then if that's our
16  maybe second largest tenant, that would make sense.
17    Q.  I'm going to --
18    A.  Because based on the -- also, most of the places
19  up there rent for very little money.  If that is a break-in
20  rent then it's large enough for a month that it makes sense
21  that it's that customer.  I don't know that for a fact.
22  Again, I can find out for you.
23    Q.  And did -- did any other tenants -- strike that.
24        Did any tenants ask you for rent waivers due to
25  COVID?

Page 167

1    A.  Not to my knowledge, no.
2    Q.  Did any ask you for rent waivers or deferrals due
3  to CHOP?
4    A.  These are the two that Barry supplied.  If we had
5  given breaks, knocked off some payments to any others, they
6  would also be listed here.
7    Q.  And how many units are there?  How many suites?
8    A.  I don't know the exact number.  Probably well
9  over 20.
10    Q.  And so of the total number of tenants, two asked
11  for rent waivers or deferrals in this time period that
12  you're aware of?
13    A.  According to this list.  Nobody was turned down
14  that I'm aware of.  And it would have come to me.
15    Q.  And so the others -- did they have -- did they
16  make any complaints to you about security in the area?
17        MR. WEAVER:  Objection.
18    A.  Barry Cosme dealt with the tenants.  Nobody moved
19  out.  If nobody expressed concern, they would have been the
20  only people on Capitol Hill.  Everybody on Capitol Hill was
21  concerned in that area.  It would have been absolutely
22  normal to hear from every single one of them -- what do we
23  think is going on, what do we know -- because we're the
24  landlord.  If anybody knew something, it would be us rather
25  than the individual tenants.  Did every single one of them

Page 168

1  ask Barry?  I have no idea, but those are the ones that we
2  gave a break to.  If any others had wanted a break, it
3  would have been given.
4    Q.  And the Vortex -- did they -- they also asked for
5  a deferral the month before because of the pandemic; right?
6    A.  I only see what's on this record.  I don't know
7  of anything else.  I know what's on that record, but just
8  to add, this wasn't a deferral.  We gave them this money.
9  We did not get this money back and then put in a claim for
10  it.
11    Q.  Right.  But the -- they were seeking a refund of
12  this rent both because of the CHOP and because of the
13  pandemic; right?
14        MR. WEAVER:  Objection.
15    A.  Not that I'm aware of.  If this happened in that
16  month of June, there's only one reason it happened.
17  BY MR. CRAMER:
18    Q.  Can you take a look at Exhibit No. 102, which is
19  in the --
20        (Exhibit No. 102 marked for
21        identification.)
22    A.  Okay, got it.
23  BY MR. CRAMER:
24    Q.  And if you scroll down --
25    A.  Just a second.  Okay.

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 181

1    A.  Just a second.  Are you -- Employee F?
2    Q.  No, I'm talking the one under "Security Services
3  Paid," where it says "Employee productivity reduction of 10
4  percent."  Do you see that?
5    A.  Yes.  Just a second.  I know the category; I'm
6  just trying to find it.  Yeah, okay.  Okay.
7    Q.  So who determined that productivity was reduced
8  by 10 percent for the month of June?
9    A.  Probably Marty, Dave Boyd, Barry, me, Jeff Scott,
10  and Greg White, all of the people that have employees
11  working under them.  Since we -- none of us manage all of
12  the people, it would had to have been a collaborative
13  effort.  And again, it's the very best approximation we
14  could come up with.
15    Q.  And what data did you look at to come up with a
16  10 percent reduction as the right number?
17    A.  Richmark is managed, almost exclusively, but
18  management by walking around, and that simply means that
19  we're not staring at people all the time, but we are
20  walking around.  All the managers are working managers.
21  They do things, they manage, and it's a -- for us, for my
22  company, it's a very good way to assess people and how it's
23  going.
24        The interactions between people and departments
25  is absolutely enormous, and there's really no other way

Page 182

1  that I've ever known in 50 years to do it but the way we're
2  doing it.  And people's concerns, productivity, going
3  slower, once in a while you'd see somebody looking out at
4  the parking lot, door -- there's a door open on 11th
5  Avenue, seeing what's going on out there.
6        People's concentration for the month of June was
7  pretty bad.  Okay?  I can't get in between somebody's ears;
8  I can just say all of us looked and none of us thought it
9  was going particularly well.  We didn't go out of business,
10  okay, and we did ship product, but there were a lot of
11  things during the month besides just manufacturing the
12  label that day that just weren't done.  And it wasn't half,
13  it wasn't hundreds of thousands.  It's -- 10 percent was
14  the number we put.  If you wanted to fight me on it, say 8,
15  you know, I couldn't prove otherwise.
16    Q.  And why did you bump it up from 5 percent in your
17  first damage estimate, which was --
18    A.  I'll give you the same answer I did last time.
19  I'm not sure that we did a -- you know, hey, if I was you
20  in looking at that, it does not look like we did a really
21  good job the first time, and I cannot explain why.  If we
22  do this again, believe me, I will get the answers.
23    Q.  So when you did it closer to June 2020, if you
24  look at Exhibit 91, you believed that there was a 5 percent
25  productivity decrease; is that correct?

Page 183

1    A.  We would not have come up with the second one if
2  we didn't reevaluate the first one.  And I was not a
3  participant in all of the discussions on it.
4    Q.  So in Exhibit 91, the first damage estimate you
5  did, you included -- you included a 5 percent reduction,
6  and --
7    A.  I don't know where Barry got it.
8    Q.  And what were the discussions about why you
9  decided that 5 percent wasn't accurate and it should be 10?
10      MR. WEAVER:  Objection.
11    A.  I do not remember what instigated the change in
12  format.  I don't remember.
13  BY MR. CRAMER:
14    Q.  And some of the alleged lack of productivity --
15  isn't that captured in the other work that you claim all ten
16  of these employees were doing instead of being productive?
17    A.  Well, it's -- it's broken up -- okay, the
18  managers were not included in that 10 percent lack of
19  productivity.  The managers -- managers don't do exactly
20  the same things as the manufacturing staff does.
21    Q.  But it says "Reduction of 10 percent of total
22  monthly payroll."  So total monthly payroll would include
23  everyone; correct?
24      MR. WEAVER:  Objection.
25    A.  I'm not now 100 percent sure.

Page 184

1  BY MR. CRAMER:
2    Q.  Okay.  And you've already told me that the
3  employees under "Garbage and Vendor Management" -- that
4  those aren't all managers.
5    A.  No.
6    Q.  Okay, so you're double counting.
7      MR. WEAVER:  Objection.  Is that a question?
8  Accusation?
9        Just wait for a question.
10    A.  Okay.
11  BY MR. CRAMER:
12    Q.  You'd agree with me that there's double counting
13  here; correct?
14    A.  No.
15    Q.  Okay.  Extraordinary employees management
16  category that you told me earlier -- that's when you had to
17  do things other than be productive; right?
18      MR. WEAVER:  Objection.
19    A.  At this point, as I said before, I need greater
20  clarification.  I thought when I walked in here, apparently
21  not seeing both things side by side, I missed that.
22  BY MR. CRAMER:
23    Q.  Okay.  So let me rephrase the earlier question.
24  There is potentially overcounting among -- double
25  counting -- strike that -- there is a potentially double

46  (Pages 181 to 184)

Electronically signed by Mindy Suurs (101-257-931-8021)                                834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

BILL DONNER
11/16/2021

Page 213

1      A.  I believe so.  It sounds familiar.  I'm not sure.
2          MR. CRAMER:  I don't have any other questions.
3          MR. WEAVER:  I don't have any questions.
4          THE VIDEOGRAPHER:  The time is 4:51 p.m.  We are
5      off the record.
6
7
8                    (The deposition concluded at
9                    4:51 p.m.)
10                   (Signature was reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 214

1              S I G N A T U R E
2
3          I declare that I have read my within deposition,
4      taken on Tuesday, November 16, 2021, and the same is true
5      and correct save and except for changes and/or corrections,
6      if any, as indicated by me on the "CORRECTIONS" flyleaf
7      page hereof.
8          Signed in _____, Washington,
9      this _____ day of _____, 2021.
10
11
12
13
14          _____
15          BILL DONNER
16
17
18
19
20
21
22
23
24
25

Page 215

REPORTER'S CERTIFICATE

I, Mindy L. Suurs, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
administer oaths and affirmations in and for the State of
Washington, do hereby certify:

That the foregoing testimony of BILL DONNER was given
before me at the time and place stated therein and
thereafter was transcribed under my direction;

That the sworn testimony and/or proceedings were by me
stenographically recorded and transcribed under my
supervision, to the best of my ability;

That the foregoing transcript contains a full, true,
and accurate record of all the sworn testimony and/or
proceedings given and occurring at the time and place
stated in the transcript;

That the witness, before examination, was by me duly
sworn to testify the truth, the whole truth, and nothing
but the truth;

That I am not a relative, employee, attorney, or
counsel of any party to this action or relative or employee
of any such attorney or counsel and that I am not
financially interested in the said action or the outcome
thereof;

DATE: November 23, 2021

Mindy L. Suurs
Certified Court Reporter #2195

54  (Pages 213 to 215)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

Exhibit 28

## Gang Unit info

| | |
|---|---|
| **From:** | "Nollette, Deanna" <deanna.nollette@seattle.gov> |
| **To:** | "Best, Carmen" <carmen.best@seattle.gov>; "Mahaffey, Thomas" <thomas.mahaffey@seattle.gov>; "Hirjak, Stephen" <stephen.hirjak@seattle.gov>; "Cordner, Lesley" <lesley.cordner@seattle.gov>; "Diaz, Adrian" <adrian.diaz@seattle.gov> |
| **Date:** | Tue, 30 Jun 2020 11:32:51 -0700 |
| **Attachments:** | Ganginfo6302020.docx (20.18 kB) |

Updates from the Gang unit.  No real new info but a good summary.

Deanna



Deanna Nollette
Assistant Chief
Investigations Bureau
Seattle Police Department
(206) 615-0956

# Gang Intelligence 06/29/20

This is a summary of concerns that have been brought to my attention by several informants and other concerned people in the community.  None of these people wish to be identified for fear of retaliation against them and/or their families.

The CHOP has become a center of lawlessness for our gang members.  They all want to go and check it out.  They want to see what it is like to be in an area without any police.  A number of them are bringing guns with them.  The problem is that existing beefs between groups out on the street still exist within the CHOP.  Now there are different rival groups that might not come across each other are running into each other in a confined geographic area.  This is causing some of the shootings and other crimes that are occurring within the CHOP.  Since there are no officers in the area, there is nothing to stop explosions of violence between rival gangs.

Two main Central District gangs are claiming the CHOP as their area.  They are the East Union Street Hustlers and the Deuce 8's.  They are both Gangster Disciples and are closely aligned.  Other South End gangs are coming to the CHOP to check things out and almost immediately getting into altercations with the CD gangs.  For example, the first homicide victim was from Union and the shooter was from 44 Holly.  There is a power struggle going on within the CHOP for who gets to control the drug trade which at this time is including cocaine, heroin, meth, and marijuana.

The gang members are also noticing a lack of patrol officers anywhere in the city.  They are feeling emboldened and think they can pretty much do anything without fear of being arrested.

SEA_00036005

Exhibit 29

# CHOP/CHAZ -1111 East Olive Apartments, Seattle- copy of formal complaint

**From:** Judy Whitcomb <judyw@indigorealestate.com>
**To:** "Diaz, Adrian" <adrian.diaz@seattle.gov>
**Cc:** Chris McEver <chrism@indigorealestate.com>; Donna Roberts
<donnar@indigorealestate.com>
**Date:** Tue, 23 Jun 2020 15:01:40 -0700

> **CAUTION: External Email**

Hi Adrian,

I submitted a formal complaint today with the city on their online form on behalf of 1111 East Olive Apartments. I want you to know that we appreciate your responsiveness and thought it would be fair to send you a copy. We know this is an especially tough for law enforcement and we miss you very much at the East Precinct!

Dear Seattle Leaders,

I am the Investment Manager overseeing 1111 East Olive Apartments and we have several concerns about what has been going on in the CHOP/CHAZ.

Our building is located on 11th Avenue and East Olive Street and has been significantly impacted.

1. Street closures- our parking garage is off 11th and our residents have been having a hard time getting in and out of the parking garage. It is very intimidating to have to check in with CHAZ/CHOP each time. On Friday, June 12th (after several days of barricades and barriers being up), we asked CHOP/CHAZ to move the barriers past our parking garage so that the residents could come and go freely. We came in the next day to retaliatory graffiti on our front entry doors that said, "MOVE TF OUT" and the north side near the front entry "FUCK RICH PPLE", "FUCK GENTIFICATION". And those are just the highlights.

2. Noise -all the time, but particularly late at night keeping residents awake until 4am. Loudspeakers and people outside with no regard to the neighbors. We have at least (2) different residents sleeping in their bathrooms at night. Some staying in hotels or with friends and family. Many are making sure they leave for the weekend.

3. Graffiti has been out of control- we have spent hours and hundreds of dollars covering up the graffiti. Some of which was very threatening to our residents.

4. Lack of services & area being unsafe:
   a. Lack of emergency services (SPD and fire department). The fire department also cannot get to water access to our building due to street barriers.
   b. Hired Guards- We currently have a guard scheduled from 6pm to 9am each day. We have had issues with CHOP/CHAZ people trying to get into our building through the front door and have tried to follow our residents in through the parking garage as well. We are now looking to have (2) guards 24x7. In addition,

we have a separate patrol that comes by the building 3x per night and walks the entire building. This will be an expense of over $53K per month.

c. Couriers are not delivering packages or food orders to our resident (FedEx, UberEats, DoorDash, etc.) since the area is considered unsafe.

d. Trash pickup is being impacted. Waste Management has been working with us to pick up trash at a designated time.

e. Cost to upgrade camera system (TBD) – working on this week.

f. Concern for the safety of our residents and employees.

5. Resident concerns:

   a. Safety and the area being now known as a free for all with no police presence.

   b. Residents have been harassed and threatened outside of the building.

   c. Noise all hours, especially from 11pm to 4am it seems to get the loudest.

   d. Afraid to be near their windows at night.

   e. Residents try to be home before dark, so they have given themselves a curfew.

   f. Not being able to come and go from the parking garage as they please.

6. Occupancy- in 2 weeks possible occupancy drop 15%:

   a. We have (4) residents have given their notice to move out due to CHOP/CHAZ.

   b. We have (5) residents who asked about moving out and will likely move out.

   c. We have had (3) apartments who were supposed to move in, cancel their move in.

   d. Our building is 80 units and in (2) weeks, that is a potential loss of (12) homes or a 15% drop in occupancy.

   e. Although legally residents are bound to a lease termination fee equal to (2) month's rent; and we have gone back and forth about just letting residents out of their leases. We have determined that we are charging residents 50% of their lease break fee to move out. That is a big ask from somebody who is being chased out of their home. Many of our residents have lived on Capitol Hill for years and support BLM.

What I am hearing from nearby businesses is that they are afraid to reach out and afraid of retaliation. I encourage you to reach out to the businesses and residents in CHOP/CHAZ. I know we are not alone.

We fear that we will lose half our residents this Summer. These are residents that love Capitol Hill, love 1111 East Olive Apartments and our onsite management team (Stephanie and Velid). CHOP/CHAZ is chasing people out of the neighborhood.

The city needs to step in and fix this. I can be reached anytime by phone or email.

Thank you for your time Adrian!

Warm regards,

**Judy Whitcomb** | Investment Manager

SEA_00021698

**Indigo Real Estate Services, Inc.**
5415 California Ave SW | Seattle, WA 98136
D: 206-232-7181
judyw@indigorealestate.com | www.indigorealestate.com

SEA_00021699

Exhibit 30

## FW: Resident safety concerns

| | |
|---|---|
| **From:** | Michael Oaksmith <moaksmith@hunterscapital.com> |
| **To:** | "Lee, Bobby" <bobby.lee@seattle.gov> |
| **Cc:** | "Bolieu, Sabrina" <sabrina.bolieu@seattle.gov> |
| **Date:** | Fri, 19 Jun 2020 13:45:53 -0700 |

<div style="border:1px solid; text-align:center;">

**CAUTION: External Email**
</div>

Another great email from today.

---

**From:** Alex Harris <aeharris@me.com>
**Sent:** Friday, June 19, 2020 1:28 PM
**To:** pm.broadway <pm.broadway@hunterscapital.com>
**Subject:** Resident safety concerns

Broadway Building & Hunters Capital,

My name is Alexandra Harris. I am a resident of the Broadway Building where I have lived for about a year with my boyfriend. Our apartment is on the side facing Nagle Place and Cal Anderson Park. I am writing to express our joint frustration about our living experience over the past few weeks. Currently we are staying with relatives in Texas because we have been forced out of our home.

The presence of the Capitol Hill Autonomous Zone or "CHAZ" means that we do not feel safe, comfortable, or welcome in our own neighborhood. Incidents of violence and the presence of guns within the CHAZ are well documented. We have been assured that the police will respond to emergency calls from the Broadway Building, but this does not offer us any comfort if we step outside onto Nagle. We are also entirely unable to use Cal Anderson. Access to the park is one of the main reasons that we chose to live in this building. Throughout the Covid-19 pandemic we've used the park as our main way of getting fresh air, exercising, and walking our dog. Now we are unable to do any of these things. We have also had difficulty entering or exiting the apartment by car due to the amount of foot traffic around the blockade near Pine/Nagle. We have also had difficulty having packages and food delivered. The effect in total is that we are restricted from being able to come and go from the apartment; we feel that we are trapped inside.

We have been kept up multiple nights by the sound of loud music from CHAZ being played until 3 or 4am. We are also regularly woken up by music as early as 5am, and the music continues on and off throughout the day. We are used to some degree of noise in the area, but the (literally) constant thumping of bass music is nothing short of torture. My boyfriend and I have been kept up multiple nights in a row, only to be woken up early the next morning. The accumulated lack of sleep has taken a toll on our physical and mental health. These distractions are also impacting our professional lives.

SEA_00045020

We have tried using white noise machines and ear plugs but neither are effective at blocking the volume of sound we are forced to deal with.

We have enjoyed our time at the Broadway Building, and we know the current situation is not necessarily your fault. However, the fact of the matter is that we are paying a large amount of money for an apartment that is currently nothing short of unlivable. We are not able to rest or sleep in our home. We are not able to come and go as we please. We do not feel safe leaving our home or walking through our neighborhood. We have had to incur additional costs to buy plane tickets to fly out-of-state because we have been forced out of our home with nowhere else to go. I want to be clear as well that we are not happy to be in Texas; Coronavirus cases are spiking here and we are concerned for our health in that regard. We support the goals of the Black Lives Matter movement, but the city's decision to allow CHAZ to remain is nothing short of an outrage. We recently renewed our lease but if the CHAZ situation is not resolved in the coming weeks then I see no other choice than to terminate the lease, and we are prepared to take legal action to do so if necessary.

We are hopeful that the Broadway Building and Hunters Capital will join us in pushing for the City of Seattle to address the growing threat that CHAZ poses to the safety and well-being of your residents.

Sincerely,

Alex Harris

SEA_00045021

Exhibit 31

# Capitol Hill Resident Safety Concerns

**From:**     Alex Harris <aeharris@me.com>
**To:**       "Durkan, Jenny" <jenny.durkan@seattle.gov>
**Date:**     Mon, 22 Jun 2020 14:50:12 -0700

> **CAUTION: External Email**

Jenny Durkan,

My name is Alexandra Harris. Normally I am a resident of the Capitol Hill Area of Seattle City District 3.

Regardless of the political messaging of CHOP or whatever positives may have come out of it, the fact of the matter is that it is ruining the neighborhood for residents. I am disgusted that Jenny Durkan still tries to defend what's happening as a "summer of love" when multiple people have been shot in the area and emergency services are unable to reach victims. I have seen multiple instances of people walking around Cal Anderson with guns and even AR-15s. I am a small, young woman and normally I feel relatively safe in my neighborhood but not anymore. I am unable to enjoy the park and neighborhood that I pay taxes for because it has been turned into a homeless camp; there is graffiti and trash everywhere, benches have been stolen, dozens of tents and even cars cover Cal Anderson. Recent events in Cal Anderson on June 19th even specifically banned white people from entering the park. How is any of this acceptable?! This in addition to almost a month of being tortured by lack of sleep from constant noise in the park. I am a student at the UW School of Law and I had no choice other than to drop all my courses for this semester because the constant noise and distraction disrupted my studying so severely that I couldn't prepare for final exams.

Never in a million years did I think I would have to flee my home in Seattle over safety concerns, but that is what I have recently done. I support the BLM movement and believe in the importance of police reform. However, the importance of these causes does not entitle CHOP to disrespect the residents and businesses of the Capitol Hill community. If CHOP is not disbanded soon myself and my boyfriend will be forced to move out of the neighborhood, and I am sure we are not the only ones.

Shame on you! Shame on Jenny Durkan! As a resident of Seattle I am DEMANDING that the city take action to disband CHOP, not to "work together" with CHOP, DISBAND IT. CHOP MUST GO. CHOP IS NOT WELCOME IN CAPITOL HILL.

Sincerely,

Alex Harris

Exhibit 32

KILBURN TAMARA
5/13/2021

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,    )
        Plaintiffs,       )
    vs.               ) No. 20-cv-00983-TSZ
CITY OF SEATTLE,           )
        Defendant.          )

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION
OF
TAMARA KILBURN
SWAY AND CAKE 30(b)(6)

9:00 a.m.
May 7, 2021

*** Contains Confidential Testimony and Exhibits ***

REPORTED BY:  Pat Lessard, CCR #2104

Page 2

1              A P P E A R A N C E S
2
3        FOR THE PLAINTIFFS:
4          MR. TYLER S. WEAVER
5          Calfo Eakes
6          1301 Second Avenue, Suite 2800
7          Seattle, WA 98104
8          206.294.7440
9          tylerw@calfoeakes.com
10
11       FOR THE DEFENDANT:
12         MS. CAITLIN PRATT
13         Harrigan Leyh Farmer & Thomsen
14         999 Third Avenue, Suite 4400
15         Seattle, WA 98104
16         206.673.1700
17         caitlin@harriganleyh.com
18
19       ALSO PRESENT:
20         MR. KARL BENITEZ, Videographer
21         MS. LINDA ROUGH, Moderator
22
23
24
25

Page 3

1              E X A M I N A T I O N
2       ATTORNEY                    PAGE
3       BY MS. PRATT:                  6
4       BY MS. PRATT:                 97
5
6              E X H I B I T   I N D E X
7       No.        DESCRIPTION        PAGE
8       Exhibit 10  Google map.          16
9       Exhibit 11  CHOP Damages.          49
10      Exhibit 12  2018 Orders and Gross Sales.     59
11      Exhibit 13  2019 Orders and Gross Sales.     59
12      Exhibit 14  2020 Orders and Gross Sales.     59
13      Exhibit 15  2017 Orders and Gross Sales.     59
14      Exhibit 16  Homestreet Bank document.       84
15      Exhibit 17  2/12/21 email from Tamara Kilburn   97
16          to Andrea Augustine.
17      Exhibit 18  5/9/2020 Homestreet Bank document.  100
18      Exhibit 19  Homestreet Bank Basic Business    100
19          Checking information.
20      Exhibit 20  June-December Losses 2020.       102
21      Exhibit 21  Plaintiff Sway and Cake, LLC's     140
22          Answers and Responses to Defendant
23          City of Seattle's First Discovery
24          Requests.
25

Page 4

1              E X H I B I T   I N D E X
2       No.        DESCRIPTION        PAGE
3       Exhibit 22  Amended Notice of Video Deposition  140
4          of Sway and Cake, LLC, Pursuant to
5          Federal Rule of Civil Procedure
6          30(b)(6).
7       Exhibit 23  State of Washington Information.    149
8       Exhibit 24  Sway and Cake daily numbers May to  160
9          August 2019
10      Exhibit 25  Sway and Cake Daily numbers 2020.  160
11      Exhibit 26  Contingency Fee Agreement.       169
12          Confidential and Attorney's Eyes
13          Only.
14      Exhibit 27  Sway and Cake Instagram reopening  173
15          announcement.
16          REFERRED EXHIBIT INDEX
17      Exhibit 8  Plaintiffs' initial disclosures.   143
18
19
20
21
22
23
24
25

1  (Pages 1 to 4)

Electronically signed by Pat Lessard (601-142-526-6610)                    5395ce1c-6887-4399-8d86-2776917d4c80

KILBURN TAMARA
5/13/2021

**Page 9**

```
1        MS. PRATT:  That's me typing.
2        So I think, Karl, that -- bear with me,
3   Ms. Kilburn.  We can go off for this, if you want.
4        THE VIDEOGRAPHER:  The time is 9:06 a.m.
5   We are off the record.
6        (Discussion off the record.)
7        THE VIDEOGRAPHER:  Stand by.
8        The time is 9:07 a.m.  We are back on the
9   record.
10   Q.  (By Ms. Pratt)  Ms. Kilburn, I apologize for
11   the interruption there.
12        So you said that you looked over the
13   information that was requested of you as part of your
14   preparation for this deposition, is that right?
15   A.  Yes.
16   Q.  And what were those documents?
17   A.  The documents that I had prepared that were
18   requested were any kind of communications I've had or
19   any kind of financials or any kind of photos or
20   anything that would be relevant to what we're talking
21   about today.
22   Q.  Do you know if all of the documents that you
23   reviewed were actually produced in this case?
24   A.  The things that were produced were the
25   things that I had.
```

**Page 10**

```
1   Q.  So then am I understanding you correctly
2   that anything you looked at in preparation for today
3   has been produced in this case?
4   A.  Correct.
5   Q.  Okay.  So other than reviewing those
6   documents and sort of trying to center yourself for
7   the deposition experience did you do any other form of
8   preparation?
9   A.  A good night's sleep.
10   Q.  Nice to know.
11        You mentioned the documents that you
12   reviewed included communications.  Do you recall what
13   communications those were?
14   A.  I was asked if I had any communications in
15   reference to text messages or anything that would
16   pertain to anything happening in my neighborhood at
17   the time.
18   Q.  And did you find any?
19   A.  No, I didn't have any.
20   Q.  So when you said you reviewed documents that
21   did not include any communications?
22   A.  No.
23   Q.  Okay.  All right.  So you're the owner of
24   Sway and Cake, right?
25   A.  Right.
```

**Page 11**

```
1   Q.  And how long have you owned the business?
2   A.  It was started in 2002.
3   Q.  And has your involvement in the business
4   changed since 2002?
5   A.  Over the years, yes.  Yeah -- yes, it has.
6   It's a small boutique business so you wear many hats.
7   Q.  Tell me more about how it's changed over the
8   years.
9   A.  It's just we've had some growth.  I mean
10   2002, so we're coming on 20 years, so there's been
11   growth.  There's been change.  It's a fashion business
12   so there's been evolvement with that.
13        As I've gotten older my roles have changed
14   so that it's more of a mentor and development role.
15   But mostly just with anything that grows and changes,
16   it's just kind of I'm active where I'm needed.
17   Q.  So when the business started in 2002 what
18   was your day-to-day role?
19   A.  I did everything.  I was my sole employee.
20   Really, everything.
21   Q.  When was the first major change such that
22   you didn't have to do everything anymore?
23   A.  I've always been really involved; I think
24   that's the success of it.  Retail is not an easy
25   business so I've always had a higher level of
```

**Page 12**

```
1   involvement.
2        So I mean I think certain roles have changed
3   but I've always been really, really deeply involved in
4   the everyday workings of the business.
5   Q.  You said that retail is not an easy
6   business.  What did you mean by that?
7   A.  I just mean it's something that you have to
8   have passion for and drive.  And you really have to --
9   just like any small business you really have to invest
10   in the overall vision of its success.
11   Q.  And what are the sort of downside risks with
12   owning a small business?
13        MR. WEAVER:  Objection.  Go ahead.
14   A.  I mean if you're really passionate about it
15   the downsides aren't -- it's not -- it can be
16   different for different people.
17        I haven't experienced -- the only downsides
18   I've ever really experienced have been, I would say,
19   maybe just dealing with the day-to-day employees and
20   things like that.
21        But kind of -- I think with any business as
22   an owner that those things are just kind of out of
23   your control.
24   Q.  (By Ms. Pratt)  How about financial risk?
25   A.  I've had a pretty successful run, I would
```

3  (Pages 9 to 12)

Electronically signed by Pat Lessard (601-142-526-6610)                                    5395ce1c-6887-4399-8d86-2776917d4c80

KILBURN TAMARA
5/13/2021

Page 13

1  say, being here so long.
2       But there's also financial risk in business.
3  I mean it's always a risk, I believe, if you start
4  your own business.
5       Q.  So if you are thinking about early 2020,
6  what did your role at Sway and Cake look like at that
7  time?
8       A.  Early 2020, so basically my role at that
9  time is I oversee the general operations, and I
10 oversee product purchasing, the buy for the store.
11      I also oversee just overall management of
12 people, budget.  More in the, I would say, looking at
13 it, I was doing more of the back end.
14      Q.  What did you do before owning Sway and Cake?
15      A.  Before Sway and Cake I was a fashion stylist
16 and photographer.
17      Q.  In Seattle?
18      A.  In New York.
19      Q.  How long did you do that?
20      A.  Oh, about nine years from start to finish.
21      Q.  How did you bring that work into what you do
22 at Sway and Cake?
23      A.  I'm sorry?  What was the question again?
24      Q.  How did you bring your work as a fashion
25 photographer and stylist into what you do at

Page 14

1  Sway and Cake?
2       A.  Are you asking me how I incorporated that
3  into what I do now or then?
4       Q.  Yes.  Thank you for asking for
5  clarification.  Yes, that is right.
6       A.  Okay.  You know, when I moved back to
7  Seattle -- the nicest way to put this is it's not a
8  fashion town.  I don't think it is.
9       So those types of things were pretty
10 obsolete to use as a career.  I'm sure it was there
11 but it wasn't like New York.
12      So I basically, in a nutshell, took all of
13 my contacts and started a retail business because it
14 would seem like a natural fit for me.
15      And so as far as incorporating the styling,
16 those go very well together if you're buying and
17 curating product.  So there's that.
18      As far as photography, I really kind of --
19 that kind of fell to the wayside.  This will date me,
20 but e-commerce wasn't bustling quite then.  So I used
21 it when needed but mostly the stylist part was the
22 most role that was incorporated.
23      Q.  You definitely touched on it but I'm not
24 sure I exactly asked you, but can you describe what
25 kind of business Sway and Cake is?

Page 15

1       A.  Sway and Cake is a women's specialty retail
2  store.
3       Q.  And what does that mean?
4       A.  Well, first of all, we only carry women's
5  clothing.  It's -- a current term is "on-trend,"
6  meaning current trends that are today, current today.
7  Also defining -- I have a younger clientele so we
8  cater to a certain age group, if that makes sense.
9       And when I say on-trend, "trend" means a lot
10 of different things, but I would say on-trend in the
11 Instagram youth market, I would say 35 and under.
12      Q.  So when you said that you have a younger
13 clientele, that's what you mean, 35 and under?
14      A.  Correct.
15      Q.  And you have a storefront, is that right?
16      A.  Yes.
17      Q.  Where is that?
18      A.  It's on the corner of Pike -- Pike and 12th.
19      Q.  Okay.  We're going to try our first exhibit
20 now.
21      And so what I'm going to do is I'm going to
22 drop an exhibit into the Chat function and I'll let
23 you know when it should be there for you.
24      MR. WEAVER:  This is the Chat function.
25      THE WITNESS:  Okay.

Page 16

1       MR. WEAVER:  You can use the mouse over
2  there and click on the Chat.
3       MS. PRATT:  This exhibit, as I understand --
4  as I counted it last time, Mr. Weaver, we're on 10
5  now.
6       Do you have the same count?
7       MR. WEAVER:  I didn't check but I believe
8  that's correct.
9       MS. ROUGH:  That is correct.
10      MS. PRATT:  Thank you, Linda.
11      I have marked the next exhibit as
12 Exhibit 10.
13      (Marked Deposition Exhibit No. 10.)
14      MR. WEAVER:  Double click on it and then
15 Save.
16      Q.  (By Ms. Pratt)  Do you recognize what this
17 exhibit is?
18      A.  It's a map of my neighborhood.
19      Q.  What neighborhood is that?
20      A.  Capital Hill.
21      Q.  There are streets marked on this map.
22      To your knowledge are those streets marked
23 correctly?
24      A.  Is she asking me if these are --
25      Are you asking me if it's correct where I'm

4 (Pages 13 to 16)

Electronically signed by Pat Lessard (601-142-526-6610)                                                    5395ce1c-6887-4399-8d86-2776917d4c80

KILBURN TAMARA
5/13/2021

Page 73

1     A.  Yes.  She did not work there, though,
2  during -- I think she started, I want to say, towards
3  the latter half of 2020.  And she was part-time at the
4  time and now she's just part-time, if that makes
5  sense.
6     I do also have someone named Nikki Cloud who
7  works for me but she works remotely and she's in
8  Portland.
9     Q.  Other than Ally, Hannah, Nikki and you, does
10 anyone else work at Sway and Cake?
11    A.  No.
12    Q.  Okay.  Let's look at Exhibit 14 which you
13 already had in the window.
14    Let me know when you have that open.
15    Do you have it open?  Sorry.
16    A.  Yes.
17    Q.  Okay.  Great.
18    So is Exhibit 14 your monthly gross sales
19 for 2020?
20    A.  Yes.
21    Q.  For all of 2020 your gross sales were less
22 than half of your gross sales for 2019, right?
23    A.  It looks like that.
24    Q.  Do you have any information that would lead
25 you to think that that is incorrect?

Page 74

1     A.  No.
2     Q.  So you think it is correct?
3     A.  Yes.
4     Q.  To what do you attribute the more than 50
5  percent reduction in your gross sales for 2020 to?
6     MR. WEAVER:  Objection.
7     A.  I attribute -- I can't say for every, the
8  whole entire year, but Covid played a part in some of
9  the sales and the CHOP finished -- kind of started
10 after Covid.
11    And after that it's, you know, I've been
12 kind of digging out.
13    Q.  (By Ms. Pratt)  When you say that Covid
14 played a part, which part do you see Covid playing?
15    A.  I see Covid playing mostly when we finally
16 had closure.
17    Q.  When was that?
18    A.  We were closed March, March starting mid
19 March, March 13th.  We were closed April -- we were
20 April, closed May and we were closed in June.
21    Q.  You were closed entirely for June?
22    A.  We were open for appointments but the
23 physical location was still shuttered to the public.
24    Q.  So when did you open for appointments?
25    A.  Sporadically we had appointments towards the

Page 75

1  latter half, like, of June.  And there were very few.
2     Q.  So you closed in March due to Covid, right?
3     A.  Yes.  I believe it was mandated for
4  everyone.
5     Q.  And you just never opened through when?
6     A.  In July we slowly started opening, like
7  actually -- like people could see our windows.  We
8  started with, the first week or two I believe we only
9  had the -- we just took the paper down when we were
10 open and put it back up at night.
11    And then August I believe the paper was down
12 full-time.
13    Q.  When you say you took the paper down, what
14 do you mean?
15    MR. WEAVER:  We have a call coming in.
16    All right.  It's done.  Go ahead.
17    Q.  (By Ms. Pratt)  When you say you took the
18 paper down, what do you mean?
19    A.  We kept the store papered up so the public
20 could not see inside of the business.
21    Q.  When did you do that?
22    A.  We papered up March 13th, starting from the
23 beginning.
24    Q.  And when in July do you remember did you
25 start to take the paper down?

Page 76

1     A.  I would want to say the second week of July
2  we started taking -- we first started taking the paper
3  down on the window to our store.  It's all windows,
4  both sides of the street.
5     So we took the paper down on the Pike side
6  first because we didn't want the paper down on the
7  side that had been occupied.
8     And then slowly, as we felt a little bit
9  more comfortable, we started taking the paper down but
10 we continued to put it up at night.
11    Q.  Do you know when in July you fully opened?
12    A.  I don't have the exact date but I would feel
13 comfortable saying we were operating more hours the
14 second -- more towards the end of the first week,
15 beginning of the second week.
16    Q.  And is there anything you could look at to
17 figure out exactly when in July you started opening or
18 you opened?
19    A.  I didn't take any notes as far as the actual
20 time.  I don't have anything like that.
21    Q.  Do you have weekly schedules with your
22 employees?
23    A.  At the time it was just myself and Ally.
24 And I am there every day except weekends, so I
25 didn't -- as far as having a structured schedule, that

19 (Pages 73 to 76)

Electronically signed by Pat Lessard (601-142-526-6610)                                    5395ce1c-6887-4399-8d86-2776917d4c80

Page 81

1 of through the year. It was heavier in the summer
2 because of the weather -- when nice weather is out,
3 more people are out.
4 But the reputation of the neighborhood took
5 a huge hit so it was kind of trying to resuscitate its
6 destinational quality.
7 Q. What do you think the reputation of the
8 neighborhood was before June 2020?
9 A. I mean it was a fun destination to go. It
10 was close to a few universities. It's close to
11 downtown. It's got a ton of fantastic restaurants.
12 You know, it was definitely a place to go
13 for -- there's a lot of -- I mean there's a lot of
14 tourist traffic. A lot of parents visiting their
15 children or bringing their kids for college. I mean
16 there's nice private schools in the neighborhood.
17 So it was kind of a hip, shall we say,
18 neighborhood.
19 Q. And what do you think its reputation was in
20 July of 2020?
21 A. I think it was still like -- I don't even
22 know what to say about that. It was like the
23 aftermath. Like I said, some people were still
24 boarded up. There's no police presence, you know.
25 Yeah, people are living in the park, you

Page 82

1 know. They were living in the park all the way to
2 December.
3 I mean it wasn't a place people were wanting
4 to go.
5 Q. And you attribute that to CHOP?
6 A. Yes.
7 Q. Have you driven around the Westlake area
8 recently?
9 A. I can't say I have. I'm from the Eastside
10 so I just go back and forth from Capital Hill to the
11 Eastside.
12 Q. Do you know if other parts of Seattle are
13 still boarded up?
14 MR. WEAVER: Objection.
15 A. I mean I do know that there are still parts
16 of my neighborhood that are boarded up.
17 Q. (By Ms. Pratt) By your neighborhood you
18 mean Capital Hill?
19 A. Yes.
20 Q. And they're boarded up through now, May
21 2021?
22 A. Yes.
23 Q. And you're not aware of whether other
24 neighborhoods in Seattle are boarded up?
25 A. I don't really have a reason to, so I don't.

Page 83

1 Q. If other neighborhoods in Seattle were still
2 boarded up that didn't have CHOP, can you think of
3 reasons why those neighborhoods would still have
4 windows boarded?
5 MR. WEAVER: Objection. If you can answer
6 that one, go ahead.
7 A. I don't. I just -- primarily my focus is
8 more on my surroundings.
9 Q. (By Ms. Pratt) When you opened in July did
10 you have a limitation on the number of customers that
11 could be in the store at any given time?
12 A. There was a mandate, I believe it was 25
13 percent capacity for retail. And I can't say for
14 restaurants, but mainly retail.
15 Q. And did that change the way that you ran
16 your business?
17 A. I mean there were a few times that we had to
18 regulate, you know, who could come in as people would
19 come out.
20 But for the most part the flow was in a way
21 where there was no -- there was never a given time
22 where there was like 50 people or something.
23 So the ebbs and flows worked fine; we were
24 able to operate at 25 and meeting the masks and
25 sterilization and everything else to stay open.

Page 84

1 Q. Have you applied for any government aid
2 between February of 2020 and now?
3 A. Can you specify what type of aid?
4 Q. Have you applied for a PPP loan?
5 A. Yes.
6 Q. And did you receive one?
7 A. Yes.
8 Q. What was the basis for requesting a PPP
9 loan?
10 A. I don't have the exact recollection of what
11 the guidelines were. I know that you had to show a
12 decrease in revenue and you also had to use funds to
13 keep employment moving.
14 And so those were the things that they were
15 used for.
16 MS. PRATT: I have another exhibit. This
17 will be marked Exhibit 16.
18 (Marked Deposition Exhibit No. 16.)
19 Q. (By Ms. Pratt) It's in the Chat now. Let
20 me know when you have it open.
21 Do you have it open?
22 A. Yes.
23 Q. Can you tell me what is Exhibit 16?
24 A. I believe it's a document from Homestreet
25 Bank for a round of PPP.

21 (Pages 81 to 84)

Electronically signed by Pat Lessard (601-142-526-6610)                                    5395ce1c-6887-4399-8d86-2776917dac80

KILBURN TAMARA
5/13/2021

Page 93

1    A.  Yes.
2    Q.  When you were in and out of your location
3  during those protests, other than observing the
4  atmosphere of tension and anger and anxiety, did you
5  see any other changes to your neighborhood from the
6  protests?
7        MR. WEAVER:  Objection.  Answer if you can.
8    A.  I mean it was -- it was like a boarded-up
9  neighborhood.  I mean it was not -- it didn't feel
10  like I was in the same neighborhood.
11    Q.  (By Ms. Pratt) Did that change as June, you
12  know, at the start of June and as June continued?
13        Are you there?
14    A.  Yes.
15        MR. WEAVER:  We had a reboot so we were
16  waiting for the next question.  We didn't realize we
17  were gone.
18    Q.  (By Ms. Pratt) Okay.  So as May turned into
19  June did you notice any changes in your
20  neighborhood -- any further changes in your
21  neighborhood?
22        MR. WEAVER:  Objection.  Answer if you can.
23    A.  Yeah.  I mean, first of all, it was called
24  CHAZ and then it was CHOP.  The police left and then
25  various groups took over and blocked off streets.

Page 94

1        Q.  (By Ms. Pratt) And how was the atmosphere
2  that you described earlier?  Did the atmosphere
3  change?
4    A.  I don't even know if I'd use the word
5  "atmosphere" at that point.  It was different.  There
6  was like -- okay.  There were streets blocked off, no
7  police.  It was various groups that were there
8  primarily to cause problems.
9        There were makeshift shelters and garbage
10  and graffiti and broken stuff.  And it -- yeah, it was
11  completely -- it was like, yeah.  And, you know, I did
12  not stay around that often because I just went and did
13  what I had to do to ship and then I left.
14        I had children with me.  Schools were not
15  open yet so I didn't feel safe or comfortable being
16  there with kids.  So it was a quick exchange and then
17  I was off.
18    Q.  And when did that continue to?
19    A.  Again, I don't have the whole dates, but
20  June was pretty much a full takeover month and it
21  didn't seem that it would dissipate anytime soon, so.
22  Restrooms were provided, food, shelter.
23        It didn't seem like -- if anything, it
24  seemed like it was encouraged.
25    Q.  I'm sorry.  I asked when did that continue

Page 95

1  to?
2        MR. WEAVER:  Objection.  You can answer if
3  you can as far as what she's asking about.
4    A.  I don't -- I'm not completely clear but I do
5  know that it was blocked off most, if not all, of
6  June.
7    Q.  (By Ms. Pratt) Did you try to open at any
8  point in June?
9    A.  No.
10    Q.  You said various groups took over and
11  blocked off the streets.
12        What streets were blocked off?
13    A.  I don't know all of the streets, but the
14  ones that affected me directly, half of my store was
15  in the occupied area on 12th.  There were barriers up
16  to my window that you could not cross unless you
17  wanted to enter the Zone.
18        And I believe that that continued down Pike
19  on each thoroughfare until maybe Broadway -- I wasn't
20  sure if it went all the way to Broadway -- and then on
21  Pike and then the park.  I don't know exactly where it
22  ended exactly.
23        But I didn't really feel comfortable
24  venturing around in there all the time.  So I just
25  went in when I needed to document and then I left.

Page 96

1        THE VIDEOGRAPHER:  Sorry for the
2  interruption.
3        Is everything okay on your end with Zoom,
4  Mr. Weaver?
5        MR. WEAVER:  I just had another in and out,
6  for some reason.  But it's spontaneously leaving and
7  coming back, so I mean I can -- it's just going
8  through Tamara so I can hear everything.
9        But our lunches are here.
10        MS. PRATT:  That's what I was going to say.
11  Why don't we go off and take lunch and
12  hopefully that will fix it.
13        THE VIDEOGRAPHER:  The time is 12:14 p.m.
14  and we're off the record.
15        (Recess.)
16
17
18
19
20
21
22
23
24
25

24  (Pages 93 to 96)

KILBURN TAMARA
5/13/2021

Page 173

1  business?
2      A.  No.
3          MS. PRATT:  I'm going to mark, hopefully,
4  one more exhibit, Exhibit 27.
5          (Marked Deposition Exhibit No. 27.)
6      Q.  (By Ms. Pratt)  Let me know when you see
7  that.  Do you see the exhibit?
8      A.  Yes.
9      Q.  Okay.  What is Exhibit 27?
10     A.  It is an Instagram post.
11     Q.  And did Sway and Cake open on June 8th?
12     A.  I'm sorry.  Did we open on June 8th?
13     Q.  Oh, I brought in the wrong one.
14         Well, in any case.  Yeah.
15         So on June 8th you announced -- sorry, you
16  announced that you're going to reopen?
17     A.  Yes.
18     Q.  Did you actually reopen?
19     A.  No.
20     Q.  Okay.  So into June 8th you planned to
21  reopen on June 11th, but you didn't?
22     A.  Correct.
23         MS. PRATT:  Okay.  I think I am done for the
24  day.  I appreciate your time.  I'm sure this was no
25  fun.

Page 174

1          THE WITNESS:  Thank you.  I appreciate your
2  time, too.
3          MS. PRATT:  And, Tyler, I'm just going to
4  remind you one more time that contingency fee
5  agreement is in there, so when it's time to designate
6  I want to make sure that we're both on top of it,
7  right?
8          MR. WEAVER:  Okay.
9          MS. PRATT:  We can go off.
10         THE VIDEOGRAPHER:  The time is 3:45 p.m.
11  We are off the record.
12         (Deposition recessed at 3:45 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 175

1              S I G N A T U R E
2          I declare under penalty of perjury under the
3  laws of the State of Washington that I have read my within
4  deposition, and the same is true and accurate, save and
5  except for changes and/or corrections, if any, as indicated
6  by me on the CHANGE SHEET flyleaf page hereof.
7          Signed in _____, Washington,
8  this _____ day of _____, 2021.
9
10
11  ---------------------------
12  TAMARA KILBURN
13  Taken:  May 7, 2021
14
15
16
17
18
19
20
21
22  Re:  HUNTERS CAPITAL
    Cause No.:  20-CV-0083-TSZ
23  Pat Lessard, CCR 2104
24
25

Page 176

1              C E R T I F I C A T E
2  STATE OF WASHINGTON  )
                          ) ss.
3  COUNTY OF KING        )
4      I, the undersigned Washington Certified Court
5  Reporter, hereby certify that the foregoing deposition upon
6  oral examination of TAMARA KILBURN was taken
7  stenographically by me on May 7, 2021, and transcribed under
8  my direction;
9      That the witness was duly sworn by me pursuant to
10  RCW 5.28.010 to testify truthfully; that the transcript of
11  the deposition is a full, true, and correct transcript to
12  the best of my ability; that I am neither attorney for nor
13  relative or employee of any of the parties to the action or
14  any attorney or counsel employed by the parties hereto, nor
15  am I financially interested in its outcome.
16     I further certify that in accordance with
17  CR 30(e) the witness was given the opportunity to examine,
18  read and sign the deposition within 30 days upon its
19  completion and submission, unless waiver of
20  signature was indicated in the record.
21     IN WITNESS WHEREOF, I have hereunto set my hand this
22  11th Day day of May, 2021.
23
24  Pat Lessard,
    pat@court-reporter.com
25

44  (Pages 173 to 176)

Exhibit 33

SEAN SHEFFER
5/18/2021

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,   )
                              )
        Plaintiffs,    )
                              )
    vs.        ) No. 20-cv-00983-TSZ
                              )
CITY OF SEATTLE,          )
                              )
        Defendant.    )

Zoom Video Deposition Upon Oral Examination

Of
SEAN SHEFFER
Shuffle LLC  30(b)6

*** Contains Confidential Testimony and Exhibits ***

DATE:  Tuesday, May 18, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

**Page 2**

1         A P P E A R A N C E S
2
3    For the Plaintiff:
4      TYLER S. WEAVER
       Calfo Eakes
5      1301 Second Avenue
       Suite 2800
6      Seattle, Washington 98101
7
8    For the Defendant:
9      CAITLIN B. PRATT
       Harrigan Leyh Farmer Thomsen
10     999 Third Avenue
       Suite 4400
11     Seattle, Washington 98104
12
13
14
15
16
17
18
19
20
21
22
23   Also Present:  Karl Benitez, Royal Video Productions
24
25         --oOo--

**Page 3**

1                I N D E X
2  EXAMINATION BY                      PAGE
3  Ms. Pratt                    5
4
5
6
7         EXHIBIT INDEX
8  NO.   DESCRIPTION              PAGE
9  28   Business Opportunity Purchase & Sale      19
       Agreement
10
    29   Aerial map               38
11
    30   Public announcement re move       79
12
    31   Reddit post          88
13
    32   Purchase and Sale Agreement between Orizume   93
14       and Shuffle
15   33   Shuffle P & L for 2020          115
16   34   Shuffle P & L for 2019          115
17   35   Shuffle P & L for 2018          115
18   36   Cure Cocktail daily sales spreadsheet for   117
         2020
19
    37   Remedium daily sales for May-Dec 2020    118
20
    38   Point of sale for Cure, Nagle location    119
21
    39   Cure Estimated Damage Total spreadsheet   154
22
23
24
25

**Page 4**

1            Tuesday, May 18, 2021
2                9:00 a.m.
3
4              --oOo--
5         THE VIDEOGRAPHER:  We are now on the record.
6   Today is May 18, 2021.  The time is now 9:00 a.m.  This is
7   Volume No. 1, Media No. 1 in the deposition of Shuffle LLC
8   30(b)6 representative Sean Sheffer, in the matter of
9   Hunters Capital LLC, et al., versus City of Seattle.
10        We are recording via the internet using Zoom
11  video conferencing.  My name is Karl Benitez.  I'm
12  representing Royal Video Productions on behalf of Rough &
13  Associates.  Today's court reporter is Mindy Suurs.  At
14  this time I would like to ask all counsel present to
15  identify themselves.
16        MS. PRATT:  Good morning.  My name is Caitlin
17  Pratt from Harrigan Leyh Farmer & Thomsen.  We represent
18  the City of Seattle in this matter.
19        MR. WEAVER:  Tyler Weaver from Calfo Eakes on
20  behalf of the plaintiffs.
21        THE VIDEOGRAPHER:  Thank you very much.
22        Madam court reporter, would you please swear in
23  the witness.
24
25

1  (Pages 1 to 4)

Electronically signed by Mindy Suurs (101-257-931-8021)                    36f5bcb4-9f90-43df-bf20-cf99bbc6a5d6

SEAN SHEFFER
5/18/2021

Page 29

```
 1   numbers that you saw?
 2       A.  Yes, I did.  I saw that they were about 1000,
 3   2000 they kept it around, just to say it wasn't in the
 4   negatives.  And so seeing that it wasn't in the negatives,
 5   I looked at the payroll numbers and thought that that would
 6   be good wages for any staff.
 7       Q.  And in particular, the staff you were thinking of
 8   was your stepbrother; right?
 9       A.  Yes.
10       Q.  And did you have an understanding of what would
11   happen to any net income that was earned by the business?
12       A.  Yeah, any net income would be reported on my K-2
13   and taxed under my Microsoft income.  They call it a --
14   like a tax passover to a regular filing.
15       Q.  Okay.  So just to clarify, you would have
16   received any of the net income; right?
17       A.  I would have, correct, or net loss.
18       Q.  Or net loss.  So am I understanding correctly
19   that essentially starting the business or purchasing Cure
20   was a way to have your stepbrother employed full time doing
21   bartending like he was trained to do and you could have a
22   benefit of net income or you could write off any losses
23   from the business?
24           MR. WEAVER:  Objection.
25       A.  Bringing it back, I bought Cure to just pursue
```

Page 30

```
 1   Joe's and my dream of running a bar and hoping that I could
 2   pay his wages versus his wages in Las Vegas and make a net
 3   income at the end of the day.
 4   BY MS. PRATT:
 5       Q.  And so you purchased the business, and when did
 6   you actually start running Cure?
 7       A.  About two weeks after we -- like middle of
 8   November, like November 17th of 2017.
 9       Q.  And -- let me see.  Hold on.  So you said you
10   started running Cure about two weeks after you purchased
11   it; right?
12       A.  Yes.
13       Q.  And where is Cure or where was Cure located at
14   the time you purchased it?
15       A.  1641 Nagle Place, Suite 006, 98122.  That's the
16   zip code.
17       Q.  And what was attractive to you about a location
18   in Capitol Hill?
19       A.  We wanted to run a successful bar.  Capitol Hill
20   has a lot of great bars.
21       Q.  And does it still have a lot of great bars?
22           MR. WEAVER:  Objection.  Go ahead.
23       A.  It has -- your question was at the time, so we
24   wanted a place that has great bars.
25   BY MS. PRATT:
```

Page 31

```
 1       Q.  Does it still have them?
 2       A.  Of course.
 3       Q.  Cure is no longer located at 1641 Nagle Place; is
 4   that right?
 5       A.  Yes, it's no longer located there.
 6       Q.  Where is it located now?
 7       A.  1449 East Pine Street, 98122.
 8       Q.  When did you move to that location?
 9           MR. WEAVER:  Objection.
10       A.  What was the question?
11   BY MS. PRATT:
12       Q.  When did you move to that location at 1449 East
13   Pine Street?
14       A.  Oh, we moved there about in May.
15       Q.  In May of 2021?
16       A.  May of 2020.  Like we opened Cure Cocktail May
17   2020.
18       Q.  Okay.  Just want to make sure I understand.  So
19   you purchased Cure at 1641 -- when it was located at 1641
20   Nagle Place; right?
21       A.  Yes.
22       Q.  And you started running Cure at that location in
23   2017, at the end of 2017; right?
24       A.  Yes.
25       Q.  And it was located at that same location until
```

Page 32

```
 1   when?
 2       A.  I see the -- I see your question.  It was
 3   located -- Cure Cocktail was located 1641 Nagle Place in
 4   2017 and it was located there until the end of the lease in
 5   the end of -- in March 2021.
 6       Q.  Okay.  So Cure Cocktail maintained its storefront
 7   at 1641 Nagle Place until March 2021?
 8       A.  Correct.  It still stands there this day.
 9       Q.  But it's no longer open there?
10       A.  It's closed.
11       Q.  It's closed, okay.  Now, you mentioned that Cure
12   Cocktail is currently located at 1449 East Pine; right?
13       A.  The trade name, yes.
14       Q.  What do you mean?
15       A.  When you file for Shuffle LLC, you can have
16   dba's, so the trade names are Cure Cocktail and Remedium
17   Grill.
18       Q.  So you purchased Cure, and you also owned the
19   trade name Cure; is that right?
20       A.  We actually purchased the trade name, the rights
21   to the trade name.  So the Haldane Group had Cure --
22   Haldane Group LLC had a dba and trade name registered as
23   Cure.  After I bought it, they released that trade name and
24   Shuffle LLC was able to put Cure as their trade name.
25       Q.  Now, you mentioned Cure Cocktail.  Is that a
```

8  (Pages 29 to 32)

Electronically signed by Mindy Suurs (101-257-931-8021)                                                    36f5bcb4-9f90-43df-bf20-cf99bbc6a5d6

SEAN SHEFFER
5/18/2021

Page 133

1    Q.  Differences in what?
2    A.  Differences in sales for physical location and
3  then versus 2020, 2019, and 2018.
4    Q.  So you compared your 2020 sales to your 2018 and
5  2019 sales?
6    A.  Yes.
7    Q.  And you accounted for your losses by taking the
8  difference of those sales?
9    A.  I considered that method in the other exhibit.
10  It's a different method.
11    Q.  In what other exhibit?
12    A.  There's a Cure damages Excel, and I try -- I used
13  some averages on there rather than just a pure subtraction
14  of revenues on there.
15    Q.  Okay.  But you were comparing your sales in 2020
16  to your sales in 2018 and 2019; is that right?
17    MR. WEAVER:  Objection.
18    A.  No, I compared it to -- when we review it, I
19  compared it to the weeks of April and May of 2020.
20    MS. PRATT:  Okay.
21    MR. WEAVER:  You have a spreadsheet that might
22  clear some things up if you want clear testimony on it.
23  BY MS. PRATT:
24    Q.  I'm going to show you Exhibit 8.  It's been
25  previously marked.  Let me know when you have that open.

Page 134

1    A.  It's open.
2    Q.  All right.  If you go to Page -- let's see -- 15.
3    A.  Tyler, how do I know I'm on Page 15?
4    MR. WEAVER:  Go here.
5    A.  Oh, okay.  Okay.
6  BY MS. PRATT:
7    Q.  It says -- well, you know, let's go down to on
8  Page 16 just really quick.  So this was submitted in
9  September of 2020; right?
10    A.  Yes.
11    Q.  September 28, 2020?
12    A.  Yes.
13    Q.  And it says on Page 15 associated with Shuffle
14  LLC, Cure Cocktail.  Cure Cocktail presently estimates its
15  to-date financial losses due to CHAZ, CHOP, and its
16  aftermath as 93,468; that is right?
17    A.  Yes.
18    Q.  This is due to lost sales revenue; is that right?
19    A.  Yes.
20    Q.  Where did you get that number?
21    A.  I calculated the average like run rate, average
22  sales per week we were making before -- before CHOP and
23  after CHOP, and I averaged -- go ahead.
24    Q.  No, you go ahead.  You averaged --
25    A.  Yeah, I averaged weekly sales, then I averaged

Page 135

1  the weekly sales after CHOP, calculated the differences,
2  and I multiplied that by the number of weeks.
3    Q.  What number of weeks?
4    A.  I need to see the Excel file specifically.  I
5  think at the time the number of weeks goes out in this
6  document to September 20th, 2020, so the period between mid
7  June to September 2020.
8    Q.  When was CHOP?
9    MR. WEAVER:  Objection.  Answer if you can.
10    A.  CHOP, middle of June.  I'm thinking, around
11  June 8th, middle of June.
12  BY MS. PRATT:
13    Q.  Okay.  Do you associate CHOP with SPD leaving the
14  East Precinct?
15    MR. WEAVER:  Objection.  Answer if you can.
16    A.  I associate CHOP with the dangers in the area
17  with lack of police entering or servicing that area.
18  BY MS. PRATT:
19    Q.  And you've said that was middle of June?
20    MR. WEAVER:  Objection.  He gave a specific date.
21  BY MS. PRATT:
22    Q.  You can answer me.
23    A.  Oh, middle of June, like first week of June.
24    Q.  Okay.  And when did it end?  When did CHOP end?
25    MR. WEAVER:  Objection.

Page 136

1    A.  I can't put a date when CHOP ended.  Its
2  presence -- I'm not the expert.  Its presence is still --
3  has its effect.
4  BY MS. PRATT:
5    Q.  Explain that.
6    A.  There's still -- there's still people like
7  tenants interested in -- in the area, like running a bar
8  there, who still know that that area was associated with
9  CHOP, as referenced in my hard time selling the lease even
10  as far as out as in just like November, December 2020.
11    Q.  Okay.  So you don't believe that CHOP has ended?
12    A.  I think the physical presence of the CHOP
13  community in terms of persons are no longer there, but
14  the -- just to say the conversations or the effects or how
15  people reference the area has -- is still changed.
16    Q.  And who do you hear having conversations or
17  referencing the area related to CHOP?
18    MR. WEAVER:  Objection.
19    A.  Looking at potential new tenants to move into the
20  Cure location, talking to the biz brokers themselves.
21  BY MS. PRATT:
22    Q.  Did you talk to new tenants about this?
23    A.  No, I just showed the area and toured it to show
24  the equipment working.
25    Q.  So you haven't heard of any potential new tenants

34 (Pages 133 to 136)

Electronically signed by Mindy Suurs (101-257-931-8021)
36f5bcb4-9f90-43df-bf20-cf99bbc6a5d6

SEAN SHEFFER
5/18/2021

**Page 137**

1   talking about the Nagle area as CHOP.
2       A.  I don't want to argue semantics, but
3   colloquially, I've heard from conversations with my biz
4   broker that, once they see where our bar was located, they
5   understand, oh, this is where CHOP is and we're not
6   interested, and I didn't get those offers.  I know that I
7   didn't get any other offers besides the two.
8       Q.  And you attribute that to CHOP?
9       A.  Yes.  I attribute it to the dangers of the area
10  where we were afraid that people, whoever they may be,
11  would vandalize our location without any repercussions or
12  any, let's just say, City resources to stop any vandalism
13  from happening.
14      Q.  Why do you believe that there was a time when
15  your location could be vandalized without any City
16  resources to stop it?
17      A.  Many nights I was there, Caitlin.  I stayed in my
18  van and I watched Cure with Joe, having people put their
19  hands like this on my car window, making sure I wasn't, you
20  know, recording or anything and spray painting the column
21  between Rock Box and Cure.  There were times where Cure was
22  vandalized.  Cure Cocktail was painted -- on the wall they
23  spray painted over the words "Cocktail."
24          I was there many nights, and I saw retailers like
25  Game Stop get broken into, and there was, yeah, no -- no

**Page 138**

1   response or I -- they came and went.  I was very -- every
2   night I was there just watching, hoping that they wouldn't
3   break my windows because those are very expensive, and it's
4   a -- yeah.  I didn't want anyone to break in and steal my
5   inventory.
6       Q.  And when did that continue to?
7       A.  I stayed there, you know, after -- in the
8   nighttime as much as I could in my van just watching, I
9   would say for few -- a few weeks, and come the October
10  time, November time, December time, yeah, I thought I could
11  relax and then it indeed did happen.
12      Q.  So you stayed in your van around Cure in the
13  evenings for a few weeks starting in early June; is that
14  right?
15      A.  Yes.
16      Q.  And Cure actually didn't suffer any actual damage
17  during that time?
18      A.  While I was watching, no, it was tagged, like I
19  said, the column next to our door and the Cure Cocktail,
20  "Cocktail" was covered over, but during those times when I
21  was watching, I didn't see anything else besides those two
22  incidences up until December.
23      Q.  When did those two incidents happen?
24      A.  I can't recall specifics, but it would have been
25  between June and July, and then the other just spray paint

**Page 139**

1   graffiti would have been probably in July to August.
2       Q.  Do you know if there was graffiti or tagging
3   happening at other places in the city?
4           MR. WEAVER:  Objection.
5       A.  I don't know.  I was really trying to save my
6   Nagle location and watching it.
7   BY MS. PRATT:
8       Q.  You said earlier that, come the end of June or
9   July, there were too many police officers around your
10  location; right?
11      A.  I would say like near July when we didn't have
12  customers because of the -- before July, when we didn't
13  have customers because of just the people avoiding it
14  because it was just so dangerous or people knew that -- or
15  people assumed that cops wouldn't come and enter and that's
16  when we felt people avoided it because the area was
17  dangerous.  And then even come July, it even got -- people
18  couldn't come because the police blockades.  So I would say
19  it was both.
20      Q.  So in July when there were too many police
21  officers there, was it still dangerous?
22          MR. WEAVER:  Objection.
23      A.  You can define dangerous, but cops were there on
24  July 4th, let's just say, to clear the park, and in what
25  felt -- it felt like the environment could change very

**Page 140**

1   rapidly to more crowds forming in the area and that the
2   danger persisted with or without a cop blockade.
3   BY MS. PRATT:
4       Q.  But the City was devoting resources to your area;
5   right?
6           MR. WEAVER:  Objection.
7       A.  I don't know exactly what they approved or didn't
8   approve.
9   BY MS. PRATT:
10      Q.  Right, but you said that there were too many
11  officers around; right?  They were blocking access to your
12  business?
13          MR. WEAVER:  Objection.
14      A.  On that certain date and time frame.  But even --
15  my understanding, cops were there, blockade, clear the
16  park, and then kind of, you know, it opened up again
17  because they -- the City installed -- the City gave like
18  blockades or something like that.  It was down the street,
19  if that's your definition of any resources.  But people
20  still avoided the area with or without cops because it's
21  just not a place you want to walk by at nighttime or the
22  evening when cocktails are served.
23  BY MS. PRATT:
24      Q.  Okay.  So with or without cops, people avoided
25  your area in the evening; is that right?

35 (Pages 137 to 140)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    36f5bcb4-9f90-43df-bf20-cf99bbc6a5d6

SEAN SHEFFER
5/18/2021

Page 141

1       MR. WEAVER:  Objection.
2       A.  Yes.
3  BY MS. PRATT:
4       Q.  And that continued until now even; right?
5       MR. WEAVER:  Objection.
6       A.  The cops aren't blockading the area anymore, and
7  the area was -- I don't know about now because I'm not in
8  the location, but they avoided it because they knew how --
9  they could see, you know, the news going on or the tagging
10 of the park right across from us, Cal Anderson -- yeah,
11 they could see that the area had let's just say not been as
12 lively as it was in 2019 and '18.
13 BY MS. PRATT:
14      Q.  So when did it harm you that others avoided the
15 area around Cal Anderson?
16      MR. WEAVER:  Objection.
17      THE WITNESS:  Answer?
18      MR. WEAVER:  Yeah.
19      A.  I think the clearest one, to my knowledge, is
20 gunshots, when the first gunshots started, occurred.
21 That's when people avoided because they didn't want to get
22 shot.
23 BY MS. PRATT:
24      Q.  Sorry, I should have been clearer.  Okay, so I
25 understand that you are saying that for several weeks or a

Page 142

1  few weeks between early June and July, there were not
2  enough officers near your location on Nagle; right?
3       A.  I'm not sure where the officers' proximity was.
4  The crimes there -- we don't know -- it was chaotic at the
5  park, or at that area, but we knew that there was an
6  increased amount of people tagging and then there was
7  gunshots and just -- with no response or anything.  It was
8  just me and Joe and the van and watching Cure.
9       Q.  Did you call police?
10      A.  Called the police on the December incident, but,
11 as stated earlier, no, because we were thankfully at the
12 time not broken into.
13      Q.  Okay.  So you never called police in that period
14 when you were afraid police wouldn't come; right?
15      A.  No.
16      Q.  And you did call police in December; right?
17      A.  Yes.
18      Q.  And police came?
19      A.  They did.
20      Q.  And to be clear, you're claiming harm, damages
21 from the cops from what period?
22      MR. WEAVER:  Objection.  Answer if you can.
23      A.  Mid June.  I would say closer to the first
24 gunshot.
25 BY MS. PRATT:

Page 143

1       Q.  Through when?
2       A.  Through the end of my lease.
3       Q.  And how are those damages starting after the Cal
4  Anderson Park was cleared in July 1st through the end of
5  your lease, how are those related to CHOP?
6       MR. WEAVER:  Objection.
7       A.  When you hear gunshots in an area, I believe it
8  was like once, twice, maybe three times, the effects of
9  people understanding that that area plus the police
10 blockades that are -- that were still up as of, you know --
11 they know that that area is one to avoid.  And just lack
12 of -- there's a lot of graffiti and tagging still in some
13 areas, so they want to avoid the area.
14 BY MS. PRATT:
15      Q.  When do you think the police blockades were up
16 until?
17      A.  They were moved this year.  They stayed up
18 throughout all 2020.
19      Q.  And where were those blockades?
20      A.  In front of the police station.
21      Q.  Where specifically?
22      A.  Wherever the Seattle East Precinct exact location
23 is.  Pine and 12th or 13th.  I don't know the exact address
24 of the East Precinct.
25      Q.  Isn't your new location closer to that than Nagle

Page 144

1  Street?
2       A.  That one's on 15th and Pine.
3       Q.  Right.  Aren't they about the same distance from
4  the East Precinct as one another?
5       A.  Yes.  I'd argue -- yes, they are about the same
6  distance.
7       Q.  But the blockades at the East Precinct somehow
8  harmed your Nagle location but didn't harm your new
9  location?
10      MR. WEAVER:  Objection.
11      A.  I'm referencing the physical blockades, mainly
12 to -- just to just say that the police didn't operate that East
13 Precinct.  I'm not saying those physical blockades
14 physically blocked customers from entering my business.
15 BY MS. PRATT:
16      Q.  So when do you think the East Precinct wasn't
17 staffed?
18      MR. WEAVER:  Objection.
19      A.  It wasn't staffed when -- when news articles came
20 out showing the police actually taking out all their AV
21 equipment and just not being there.
22 BY MS. PRATT:
23      Q.  When do you think that it was staffed again?
24      MR. WEAVER:  Objection.
25      A.  I don't even think it was staffed in 2020.

36 (Pages 141 to 144)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    36f5bcb4-9f90-43df-bf20-cf99bbc6a5d6

SEAN SHEFFER
5/18/2021

Page 209

1      A.  No.
2      Q.  So what is the basis for your opinion that only
3  those businesses were affected by your perceived decrease
4  in safety?
5      MR. WEAVER:  Objection.
6      A.  My other location grew in sales.
7  BY MS. PRATT:
8      Q.  So you don't think that businesses located, for
9  example, where your other location is located would show
10  any decrease in sales in 2020; is that right?
11      MR. WEAVER:  Objection.
12      A.  Yes.
13      MS. PRATT:  Okay.  All right.  I think that's
14  everything that I have for today.  I'll get back to you
15  about some of the documents that have been discussed.
16      THE VIDEOGRAPHER:  Should we go off the record?
17      MR. WEAVER:  I don't have any questions.
18      THE VIDEOGRAPHER:  The time is 5:43 p.m.  We are
19  off the record.
20
21
22                  (The deposition concluded at
23                  5:45 p.m.)
24                  (Signature was reserved.)
25

Page 210

1          S I G N A T U R E
2
3      I declare that I have read my within deposition,
4  taken on Tuesday, May 18, 2021, and the same is true and
5  correct save and except for changes and/or corrections, if
6  any, as indicated by me on the "CORRECTIONS" flyleaf page
7  hereof.
8      Signed in _____, Washington,
9  this _____ day of _____, 2021.
10
11
12
13
14
15          _____
16          SEAN SHEFFER
17
18
19
20
21
22
23
24
25

Page 211

1          REPORTER'S CERTIFICATE
2
3      I, Mindy L. Suurs, the undersigned Certified Court
4  Reporter, pursuant to RCW 5.28.010, authorized to
   administer oaths and affirmations in and for the State of
   Washington, do hereby certify:
5
6      That the foregoing testimony of SEAN SHEFFER  was
   given before me at the time and place stated therein and
7  thereafter was transcribed under my direction;
8      That the sworn testimony and/or proceedings were by me
   stenographically recorded and transcribed under my
9  supervision, to the best of my ability;
10      That the foregoing transcript contains a full, true,
   and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
   stated in the transcript;
12
13      That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing
   but the truth;
14
15      That I am not a relative, employee, attorney, or
   counsel of any party to this action or relative or employee
16  of any such attorney or counsel and that I am not
   financially interested in the said action or the outcome
17  thereof;
18  DATE:  May 23, 2021
19
20
21
22
23          *Mindy L. Suurs*
24          Mindy L. Suurs
25          Certified Court Reporter #2195

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)          36f5bcb4-9f90-43df-bf20-cf99bbc6a5d6

Exhibit 34

LONNIE THOMPSON
5/4/2021

---

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al., )
                             )
        Plaintiffs,     )
                             )
    vs.        ) No. 20-cv-00983-TSZ
                             )
CITY OF SEATTLE,        )
                             )
        Defendant.    )

Zoom 30(b)6 Video Deposition Upon Oral Examination
Of
LONNIE THOMPSON

DATE:  Tuesday, May 4, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

---

Page 2

 1              A P P E A R A N C E S
 2
 3    For the Plaintiff:
 4      TYLER S. WEAVER
        Calfo Eakes
 5      1301 Second Avenue
        Suite 2800
 6      Seattle, Washington 98101
 7
 8    For the Defendant:
 9      CAITLIN B. PRATT
        KRISTIN E. BALLINGER
10      TYLER L. FARMER
        Harrigan Leyh Farmer Thomsen
11      999 Third Avenue
        Suite 4400
12      Seattle, Washington 98104
13
14    For the City of Seattle:
15      JOSEPH GROSHONG
        Assistant City Attorney
16      Seattle City Attorney's Office
        701 Fifth Avenue
17      Suite 2050
        Seattle, Washington 98104
18
19
20
21
22    Also present:  Karl Benitez, Royal Video Productions
23
24
25              --oOo--

---

Page 3

 1
 2              I N D E X
 3    EXAMINATION BY              PAGE
 4    Ms. Pratt              5
 5
 6
 7          EXHIBIT INDEX
 8    NO.   DESCRIPTION              PAGE
 9    1    Google map              12
10    2    Bergman's Lock and Key Service, LLC, Profit   38
         and Loss, May 1, 2020
11
12    3    Summary of profit and loss information     46
13    4    Annual Profit and Loss Statements from 2016   47
         through 2020
14    5    Bergman's Lock and Key Service, LLC, Profit   56
         and Loss, May 1, 2020
15
16    6    Bergman's Lock and Key Service, LLC, Profit   57
         and Loss, May 1, 2019
17    7    Estimated Losses for Bergman's Lock & Key     89
18    8    Plaintiffs' Initial Disclosures     93
19    9    Photos              108
20
21
22
23
24
25

---

Page 4

 1              Tuesday, May 4, 2021
 2              9:10 a.m.
 3              --oOo--
 4
 5        THE VIDEOGRAPHER:  We are now on the record.
 6    Today is May 4th, 2021.  The time is now 9:10 a.m.  This is
 7    Volume No. 1, Media No. 1 in the deposition of Bergman's
 8    Lock and Key Services, LLC, 30(b)6 representative Lonnie
 9    Thompson in the United States District Court Western
10    District of Washington at Seattle in the matter of Hunters
11    Capital, LLC, versus City of Seattle, Case
12    No. 20-cv-00983-TSZ.  We are recording via the internet
13    using Zoom video conferencing.
14        My name is Karl Benitez.  I'm representing Royal
15    Video Productions, Inc., of Issaquah, Washington 98027 by
16    invitation of Rough & Associates.
17        At this time I would like to ask all counsel
18    present to identify themselves.  Please state your name,
19    the firm you're working for, and whom you're representing
20    in this matter.
21        MS. PRATT:  My name is Caitlin Pratt.  I work for
22    Harrigan Leyh.  We represent the City of Seattle.  I'm
23    joined on this call by Kristin Ballinger, also with my
24    firm, and Joe Groshong of the City of Seattle.
25        MR. WEAVER:  My name is Tyler Weaver.  I'm at

---

1 (Pages 1 to 4)

Electronically signed by Mindy Suurs (101-257-931-8021)                         25b1dea6-5462-4263-95dd-96b16ceea9a7

LONNIE THOMPSON
5/4/2021

Page 9

1        A.  I was studying mostly my financials, just to go
2    through them to make sure that my thought process was
3    correct, and then my notes of what we went through a year
4    ago.
5        Q.  And you said you have notes.  When did you write
6    those notes?
7        A.  During the protests.
8        Q.  And have you produced those notes in this case?
9        A.  No.
10       Q.  Can you produce them?
11       A.  No.
12       Q.  Why not?
13       A.  Because they're my personal notes to recall my
14   memory.
15       Q.  Okay.  So if I understand you correctly, you're
16   saying you rely on those notes to refresh your memory about
17   the circumstances related to this case?
18       A.  That is correct.
19       Q.  Okay.  And counsel, I don't think we need to
20   spend time on this on the record, but we'll be following up
21   with you about the notes.
22       MR. WEAVER:  I'm sure.
23   BY MS. PRATT:
24       Q.  Okay.  And other than your notes and the PMLs and
25   the deposition subpoena, did you review any other documents

Page 10

1    in preparation for today?
2        A.  No.
3        Q.  So other than studying those documents, did you
4    do any other form of preparation for your deposition?
5        A.  No.
6        Q.  Who's your current employer?
7        A.  I am the owner of Bergman's Lock and Key.
8        Q.  How long have you owned Bergman's?
9        A.  Over 13 years.
10       Q.  Where did you work before you started Bergman's?
11       A.  I worked for Bergman's -- I've worked for
12   Bergman's Lock and Key for over 20 years, and I was
13   employed with Mr. Bergman and then purchased the company
14   later on.
15       Q.  So before you owned the company, when you worked
16   for it, what was your role?
17       A.  I was the lead locksmith.
18       Q.  And was Bergman's your first locksmith job?
19       A.  Yes.
20       Q.  So you said you purchased Bergman's approximately
21   13 years ago; is that correct?
22       A.  Yes.
23       Q.  But the company existed prior to you purchasing
24   it; is that correct?
25       A.  That is correct.

Page 11

1        Q.  When was the company actually formed?
2        A.  1956.
3        Q.  And it's been a locksmithing business that entire
4    time?
5        A.  Yes.
6        Q.  Who started the company?  Do you know?
7        A.  Mr. Al Bergman.
8        Q.  And that's who you worked for as well?
9        A.  Yes.
10       THE VIDEOGRAPHER:  Pardon the interruption, but
11   Tyler Farmer is joining the meeting right now.
12       MS. PRATT:  Thank you.  I appreciate it.
13       Q.  Does Bergman's own -- do you mind if I call it
14   Bergman's for short?
15       A.  Sure.
16       Q.  Great.  Do you have any storefronts?
17       A.  Yes.
18       Q.  Where are they?
19       A.  On Capitol Hill.
20       Q.  Is it just one storefront?
21       A.  Yes.
22       Q.  Where on Capitol Hill is the store located?
23       A.  The physical address is 1714 12th Avenue.  It is
24   pretty much right in the middle of Olive and Howell.
25       Q.  I'm going to show you our first exhibit for the

Page 12

1    day.  We'll mark this Exhibit 1.
2            (Exhibit No. 1 marked for
3            identification.)
4        MS. PRATT:  And Tyler -- Tyler Weaver --
5    Mr. Weaver, we're hoping to sequentially number our
6    exhibits.  Does that work for you?
7        MR. WEAVER:  That's fine.  Are you talking about
8    over the -- sorry -- talking about over the course of the
9    depositions?
10       MS. PRATT:  All of the depositions, right.
11       MR. WEAVER:  That's fine.
12       MS. PRATT:  Great.
13       Q.  So I'm going to introduce our first exhibit for
14   the day, which will be marked Exhibit 1, through the chat
15   function in Zoom.  I'm not sure if you were able to
16   (inaudible) it earlier, but --
17       MR. WEAVER:  Here's the chat function.
18   I'm assisting, just so you know, so he knows
19   where to go.
20       Just click on that.
21   BY MS. PRATT:
22       Q.  So Mr. Thompson, I just introduced Exhibit 1 into
23   the Zoom chat feature.  You should be able to right click
24   and save that exhibit to open it.  Please let me know once
25   you do get that open.

3  (Pages 9 to 12)

LONNIE THOMPSON
5/4/2021

---

Page 33

1 business.
2    Q.  When you say health insurance, do you mean
3 employee health insurance?
4    A.  Yes.
5    Q.  And then the liability insurance is for the
6 business?
7    A.  That is correct.
8    Q.  Have you made any insurance claims since the
9 beginning of 2020?
10    A.  No, I have not.
11    Q.  Do you recall when the last insurance claim you
12 made was?
13    A.  No, I do not.
14    Q.  Do you know that you've made a liability claim
15 previously?
16    A.  Not that I'm aware of.
17    Q.  Okay.  Would anyone else make a claim on behalf
18 of Bergman's?
19    A.  Not without me knowing.
20    Q.  And to your knowledge no such claim has been made
21 on your liability insurance; is that right?
22    A.  That is correct.
23    Q.  Great.  You touched on this earlier, but what
24 geographic area do you serve?
25    A.  We actually service the state of Washington,

---

Page 34

1 east -- west of the Cascades.
2    Q.  So the state west of the pass; is that right?
3    A.  That's correct.
4    Q.  Do you have an estimate of what percentage of
5 your business is made up of work in the city of Seattle?
6    A.  80 percent.
7    Q.  And of that 80 percent, do you have an estimate
8 of what percentage of the business is in Capitol Hill?
9    A.  I'd say 50 percent of it's on the hill.
10    Q.  You mentioned that your employees take their work
11 vehicles home; is that right?
12    A.  Yes.
13    Q.  Do any of your employees live within, say, half a
14 mile of Bergman's?
15    A.  No.  I do have a coworker that lives about a half
16 mile.  He's about a -- he's a bench tech that works inside
17 the storefront.
18    Q.  You said he lives about half a mile away?
19    A.  Yep.
20    Q.  And he doesn't have a vehicle; is that right?
21    A.  He does not have a service vehicle.
22    MR. WEAVER:  Caitlin, we've been going for about
23 an hour.  Do you want to take a break?
24    MS. PRATT:  Yeah, I have like one more question
25 to finish up this section.  Does that work okay for you?

---

Page 35

1    MR. WEAVER:  That's fine.
2    MS. PRATT:  Great.
3    Q.  So did the percentage of revenue that you earned
4 each month from walk-ins to the storefront stay about the
5 same between March and November of 2020?
6    MR. WEAVER:  Objection.  Go ahead.
7 BY MS. PRATT:
8    Q.  Go ahead, Mr. Thompson.
9    A.  No.
10    Q.  Why not?
11    A.  During the CHOP zone or during the CHOP, the
12 revenue dropped substantially.
13    Q.  You said your revenue dropped generally.  Do you
14 mean that your revenue from walk-ins dropped?
15    A.  Yes.
16    MR. WEAVER:  Objection, misstates testimony.
17 BY MS. PRATT:
18    Q.  And how do you know this?
19    A.  Because nobody walked through the door.  There
20 would be days that we saw one person.
21    Q.  And you know this because you were there; is that
22 right?
23    A.  That is correct.
24    Q.  When did this start?
25    MR. WEAVER:  Objection.  Go ahead.

---

Page 36

1    A.  It had been after June, late May, and it would be
2 well into the protests.  It was just -- my memory's kind of
3 vague on it, but I think it was after the barriers went up.
4 Actually, I know it was after the barriers went up is when
5 the customers quit walking in the door.
6 BY MS. PRATT:
7    Q.  And do you have a memory about whether it's late
8 May or June when that happened?
9    A.  I'm going to say it was in June, probably the
10 first week, somewhere in there.  It was -- it -- I don't
11 know the dates, but I do know that when the precinct was
12 evacuated and the barriers went up, that's when everything
13 stopped, everything just shut down.
14    Q.  Did this eventually change?
15    MR. WEAVER:  Objection.  You can answer.
16    A.  Yeah, it was changed after they cleared Cal
17 Anderson.
18 BY MS. PRATT:
19    Q.  Okay.  So it's your testimony that people started
20 coming into the storefront again after they cleared -- and
21 by "they," the City -- cleared Cal Anderson?
22    MR. WEAVER:  Objection, vague.
23    A.  We started seeing more people come in once the
24 CHOP zone was closed down and they moved in and swept that
25 out, but as long as Cal Anderson was occupied by the

---

9 (Pages 33 to 36)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    25b1dea6-5462-4263-95dd-96b16ceea9a7

LONNIE THOMPSON
5/4/2021

Page 37

1   campers or homeless, whatever you want to call it, we
2   didn't really see a pickup in front counter work or
3   front -- storefront work until December.
4   BY MS. PRATT:
5       Q.   And that's because there were still -- you didn't
6   see a pickup in front counter work until December because
7   there were still homeless people occupying Cal Anderson; is
8   that right?
9       A.   Yes.
10      MR. WEAVER:  Objection.
11      Just pause for just a second.
12      A.   Sorry.
13      MR. WEAVER:  That's okay.  You're doing fine.
14      MS. PRATT:  Okay.  That was much longer than the
15  one question I thought I had, so why don't we take a -- do
16  you want to do 15 minutes, Tyler?
17      MR. WEAVER:  That's fine.
18      MS. PRATT:  Okay.  Let's go off the record.
19      THE VIDEOGRAPHER:  The time is 10:14 a.m.  We are
20  off the record.
21      (Recess taken.)
22      THE VIDEOGRAPHER:  The time is 10:31 a.m.  We are
23  back on the record.
24  BY MS. PRATT:
25      Q.   So Mr. Thompson, I'm going to drop another

Page 38

1   exhibit into the chat.  This one will be Exhibit No. 2, and
2   please let me know when you receive it.
3       MR. WEAVER:  Let me know if you need help with
4   it.
5       A.   Okay, I can see it.
6       (Exhibit No. 2 marked for
7       identification.)
8   BY MS. PRATT:
9       Q.   And can you tell me is this your monthly -- or
10  excuse me, your daily profit and loss statements for the
11  month of May of 2020?
12      A.   Yes, it is.
13      Q.   Great.  So if you would, could you skip to
14  Page 29 of that PDF?
15      A.   Okay.
16      Q.   And are you looking at the profit and loss
17  statement for May 29?
18      A.   Yes, I am.
19      Q.   What I would like to do -- let's see -- bear with
20  me.  My orientation has changed on me.
21      Okay.  So looking at that May 29th profit and
22  loss statement, I want to ask you about the line under --
23  so the first line says "Ordinary Income/Expense"; right?
24      A.   Yes.
25      Q.   And then it says "Income"; is that right?

Page 39

1       A.   Yes.
2       Q.   And below that, "Service Sales"?
3       A.   Yes.
4       Q.   What does service sales mean in this context?
5       A.   My -- I do not know exactly what it means, but my
6   instinct tells me it's the sales on the road.
7       Q.   So you think that service sales means sales on
8   the road, and would that mean any sale by a service tech?
9       A.   Yes.
10      Q.   What would you need to know for sure which
11  numbers are included in the service sales?
12      A.   I think I would have to talk to Lorie to get
13  clarification with that.
14      Q.   Lori, your accountant; right?
15      A.   That is correct.
16      Q.   How about the next line there -- "Merchandise
17  Sales"?  Do you know what's included in merchandise sales?
18      A.   That would be the merchandise sold in the shop
19  and on the road because we do sell equipment out of the
20  vehicle.
21      Q.   Is there any way for you to tell looking at that
22  number as it appears on the profit and loss statement what
23  percentage of those merchandise sales were on the road
24  versus what percent was in store?
25      A.   Not by looking at this I can't.  I'm unable to

Page 40

1   tell.  I would have to talk it over with Lorie.
2       Q.   And is this also an area where those invoices and
3   the other document that you mentioned -- I'm sorry, it's
4   escaping me -- where they could inform your understanding
5   of how this merchandise sale breaks down?
6       A.   Yes.
7       Q.   Could you remind me -- I know it's the invoices,
8   and what was the other type of document you might look at?
9       A.   The service orders.
10      Q.   And your total income that's reflected on this
11  May 29th profit and loss statement -- is that the total of
12  service sales and merchandise sales?
13      A.   Yes.
14      Q.   And is it fair to characterize that total income
15  as your revenue?
16      A.   I guess you could, yeah.
17      Q.   And all I mean by that is:  Is it fair to say
18  that that total income number is the amount of money you
19  brought in on May 29th into Bergman's?
20      A.   Yes.
21      Q.   The next line says -- well, the next two lines
22  say "Cost of Goods Sold."  What does that mean?
23      A.   I would think it's material, cost of goods --
24  yeah, that's material merchandise.  That's -- this is not
25  my -- this is not my forte, the whole figuring out exactly

10  (Pages 37 to 40)

Electronically signed by Mindy Suurs (101-257-931-8021)                    25b1dea6-5462-4263-95dd-96b16ceea9a7

LONNIE THOMPSON
5/4/2021

Page 113

1　can keep it open on the record.
2　　　MS. PRATT:  All right.  Well, we'll keep it open,
3　we'll continue it, and you and I will continue our
4　discussions.
5　　　Mr. Thompson, again, I really appreciate your
6　time.  Thank you.
7　　　THE WITNESS:  Thank you.
8　　　THE VIDEOGRAPHER:  Counsel, any redirect
9　questions?
10　　MR. WEAVER:  I do not have any questions.
11　　THE VIDEOGRAPHER:  Should we go off the record?
12　　MS. PRATT:  Yes.
13　　MR. WEAVER:  That's fine.
14　　THE VIDEOGRAPHER:  The time is 2:19 p.m.  We are
15　off the record.
16
17　　　　　(The deposition adjourned at
18　　　　　2:19 p.m.)
19　　　　　(Signature was reserved.)
20
21
22
23
24　　S I G N A T U R E
25

Page 114

1　　　I declare that I have read my within deposition,
2　taken on Tuesday, May 4, 2016, and the same is true and
3　correct save and except for changes and/or corrections, if
4　any, as indicated by me on the "CORRECTIONS" flyleaf page
5　hereof.
6　　　Signed in _____, Washington,
7　this _____ day of _____, 2016.
8
9
10
11　　　　_____
12　　　　LONNIE THOMPSON
13
14
15
16
17
18
19
20
21
22
23
24　　REPORTER'S CERTIFICATE
25

Page 115

1　　　I, Mindy L. Suurs, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
2　administer oaths and affirmations in and for the State of
Washington, do hereby certify:
3
4　　　That the foregoing testimony of LONNIE THOMPSON
was given before me at the time and place stated therein
5　and thereafter was transcribed under my direction;
6　　　That the sworn testimony and/or proceedings were by me
stenographically recorded and transcribed under my
7　supervision, to the best of my ability;
8　　　That the foregoing transcript contains a full, true,
and accurate record of all the sworn testimony and/or
9　proceedings given and occurring at the time and place
stated in the transcript;
10
　　　That the witness, before examination, was by me duly
11　sworn to testify the truth, the whole truth, and nothing
but the truth;
12
　　　That I am not a relative, employee, attorney, or
13　counsel of any party to this action or relative or employee
of any such attorney or counsel and that I am not
14　financially interested in the said action or the outcome
thereof;
15
16　DATE:  May 6, 2021
17
18
19
20
21　　　_Mindy L. Suurs_
22　　　Mindy L. Suurs
　　　Certified Court Reporter #2195
23
24
25

29 (Pages 113 to 115)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    25b1dea6-5462-4263-95dd-96b16ceea9a7

Exhibit 35

CRAIG SWANSON
6/1/2021

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
HUNTERS CAPITAL, LLC, et al.,  )
                               )
            Plaintiffs,   )
                               )
      vs.            ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,          )
                               )
            Defendant.    )
_____

Zoom Video Deposition Upon Oral Examination

Of

CRAIG SWANSON

30(b)6  Redside Partners LLC

_____

**Contains Confidential Testimony and Exhibits**

DATE:  Tuesday, June 1, 2021
REPORTED BY:  Mindy L. Suurs, CSR 2195

---

Page 2

1        A P P E A R A N C E S
2
3    For the Plaintiff:
4      HENRY PHILLIPS
       Calfo Eakes
5      1301 Second Avenue
       Suite 2800
6      Seattle, Washington 98101
7
8    For the Defendant:
9      CAITLIN B. PRATT
       Harrigan Leyh Farmer Thomsen
10     999 Third Avenue
       Suite 4400
11     Seattle, Washington 98104
12
13
14
15
16
17
18
19
20
21
22
23    Also Present:  Karl Benitez, Royal Video Productions
24
25            --oOo--

---

Page 3

1                 I N D E X
2    EXAMINATION BY                    PAGE
3    Ms. Pratt                    5
4
5
6
7            EXHIBIT INDEX
8    NO.    DESCRIPTION                PAGE
9    48    Aerial map                17
10   49    Plaintiffs Answers And
     responses to        52
          Defendant City of Seattle's Second Discovery
11        Requests and Proposed Revisions to First
          Discovery Requests
12
13   50    Excel spreadsheet computation of damages    61
14
15   51    Redside Partners Combined Profit and Loss   82
16   52    E-mail dated 9/29/20 to Allison Hodgins from  118
          Craig Swanson re Cal Anderson Park
16   53    E-mail dated 10/19/20 to several City of  118
          Seattle officials from Craig Swanson re Tents
17        and homelessness at Miller Playfield on
          Capitol Hill
18
19
20   8    (Previously marked.)            140
21
22
23
24
25

---

Page 4

1            Tuesday, June 1, 2021
2                 9:02 a.m.
3
4               --oOo--
5        THE VIDEOGRAPHER:  We are now on the record.
6    Today is June 1st, 2021.  The time is now 9:02 a.m.  This
7    is Volume No. 1, Media No. 1 in the deposition of Redside
8    Partners, LLC, 30(b)6 representative Craig Swanson in the
9    matter of Hunters Capital, LLC, et al., versus City of
10   Seattle.
11       We are recording via the internet using Zoom
12   video conferencing.  My name is Karl Benitez.  I'm
13   representing Royal Video Productions on behalf of Rough &
14   Associates.  Today's court reporter is Mindy Suurs.  At
15   this time I would like to ask all counsel present to
16   identify themselves.
17       MS. PRATT:  Good morning.  My name is Caitlin
18   Pratt from Harrigan Leyh Farmer & Thompson.  We represent
19   the City in this matter.
20       MR. PHILLIPS:  My name is Henry Phillips.  I'm
21   with Calfo Eakes, and we represent the plaintiffs.
22       THE VIDEOGRAPHER:  Thank you.
23       Madam Court Reporter, please swear in the
24   witness.
25

1  (Pages 1 to 4)

Electronically signed by Mindy Suurs (101-257-931-8021)                                    8e28a3c9-1d34-4639-b264-de454946c00b

CRAIG SWANSON
6/1/2021

Page 9

1  you.
2  BY MS. PRATT:
3      Q.  What was the purpose of reviewing that
4  spreadsheet?
5      A.  To make sure I could answer your questions.
6      Q.  Did you review any other documents?
7      A.  No.
8      Q.  Who's your current employer?
9      A.  I'm self-employed.
10     Q.  And through what entity are you self-employed?
11     A.  A variety, most of -- significantly of which is
12 Redside Partners.
13     Q.  What other entities employ you?
14     A.  None.
15     Q.  Okay.  So you don't make any W-2 income from any
16 entity?
17         MR. PHILLIPS:  Objection to form.
18 BY MS. PRATT:
19     Q.  You can still answer.
20     A.  I am wondering is it W-2?  No, I think they're
21 all K-1s.
22     Q.  They're all K-1s, okay.  So what entities do you
23 have an ownership interest in?
24     A.  Alpine Villa Partners; Tree Top, LLC, Tree Top
25 Way, LLC; Broadway State, LLC; Carlton Allentown, LLC.

Page 10

1      Q.  Can I ask you to just slow down a little bit?  So
2  I heard Alpine and then two Tree Tops.  Would you continue
3  from there?
4      A.  Tree Top Way, LLC; Broadway State, LLC,
5  Oddfellows, LLC; Carlton Allentown, LLC; 36th & Woodland,
6  LLC; T Princess, LLC.  There may be others, but that's all
7  I'm remembering off the top of my head.
8      Q.  Okay.  And other than being an owner in those
9  entities that you just listed, do you have any other role
10 with them?
11     A.  No.
12     Q.  What's the nature of the business of those LLCs
13 you just listed?
14         MR. PHILLIPS:  Objection to form.
15     A.  They are owners of real estate.
16 BY MS. PRATT:
17     Q.  Okay.  So real estate is held in each one of
18 those LLCs; is that right?
19     A.  Correct.
20     Q.  And does each LLC own a different set of real
21 estate holdings?
22     A.  Correct.
23     Q.  So for example, one building would be entirely
24 held under 36 Woodland, LLC?
25     A.  In theory, yes.  It's not -- it's more detailed

Page 11

1  than that, but in theory, yes.
2      Q.  Okay.  Can you explain the detail to me?
3      A.  Sure.  36th & Woodland has three buildings.  It's
4  located in one location, and those three buildings all push
5  up into that LLC.
6      Q.  Okay.  How many buildings are owned by Redside
7  Partners?
8      A.  None.
9      Q.  So what is the nature of Redside's business?
10     A.  Property management, most of which is third-party
11 property management, most of which is buildings that I do
12 not hold an interest in through the LLCs that I just
13 provided to you.
14     Q.  Does Redside manage any of the buildings that you
15 hold an interest in?
16     A.  It does.
17     Q.  Which ones?
18     A.  All of the ones I just gave to you.
19     Q.  So Redside manages all of the LLCs that you
20 listed earlier; right?
21     A.  Correct.
22     Q.  But there are other LLCs that Redside manages as
23 well?
24     A.  Correct.
25     Q.  And there are other LLCs that you own part of

Page 12

1  that aren't managed by Redside?
2      A.  No, Redside manages all those.
3      Q.  Who else is an owner of Redside?
4      A.  Until this year, it was just 100 percent myself,
5  and now I have a profits interest plan whereby there's a
6  couple of other people who manage the -- the building.
7      Q.  Is that noise on your end, Mr. Swanson?
8      A.  It is.
9         MS. PRATT:  Okay.  Can we go off?
10     A.  What's that?
11         MS. PRATT:  Can we go off, Karl?
12         THE VIDEOGRAPHER:  Yeah, the time is 9:15 a.m.
13 We are off the record.
14         (Recess taken.)
15         THE VIDEOGRAPHER:  The time is 9:16 a.m.  We are
16 back on the record.
17 BY MS. PRATT:
18     Q.  Mr. Swanson, you were saying -- you were talking
19 about the ownership of Redside.  Would you please repeat
20 who owns Redside?
21     A.  Redside is owned by myself until January 1st of
22 this year.  About 7 percent are owned by employees, and 93
23 percent is owned by me.
24     Q.  So currently you own 93 percent of it but
25 employees own 7 percent; is that right?

3  (Pages 9 to 12)

Electronically signed by Mindy Suurs (101-257-931-8021)                    8e28a3c9-1d34-4639-b264-de454946c00b

CRAIG SWANSON
6/1/2021

Page 13

1     A.   Correct.
2     Q.   But before the 1st of this year, you owned 100
3   percent?
4     A.   Correct.
5     Q.   Okay.  Thank you.  And as far as the LLCs that
6   you mentioned earlier -- Alpine, two Tree Tops, Broadway
7   State, Oddfellows, Carlton Allentown, and Woodland and T
8   Princess -- do you own all of those entities?
9     A.   I'm an owner in those entities, of which there
10   are multiple owners.
11     Q.   Do the same -- or does the same group of owners
12   own each of those entities?
13     A.   No.
14     Q.   Do you own the same percentage in each of them?
15     A.   No.
16     Q.   Are you employed in any other way other than
17   being an owner of property holdings and also property
18   management company?
19     A.   No.
20     Q.   And how long have you been in your current
21   business?
22     A.   19 years -- Redside's been around for 19 years;
23   I've managed property prior to establishing Redside for
24   upward of 25 years.
25     Q.   And what property management company did you work

Page 14

1   for before that?
2     A.   I started Redside and didn't have -- it was not a
3   property management company before.
4     Q.   Okay.  Did I understand you correctly that you
5   said you managed property for over 25 years?
6     A.   I'm sorry, yes, you did.  I did that on my own.
7   I worked in my day job 20-plus years ago was in tech.
8     Q.   I see, okay.  You're a plaintiff in a lawsuit
9   against the City; right?
10     A.   Correct.
11     Q.   And by "you're," I mean Redside in this case;
12   right?
13     A.   Correct.
14     Q.   And are there any other entities that you're a
15   part owner of that are plaintiffs in this lawsuit?
16     A.   No.
17         MR. PHILLIPS:  Objection to form.
18   BY MS. PRATT:
19     Q.   No?
20     A.   No.
21     Q.   And why aren't any of your other entities that
22   you are part owner of plaintiffs in the lawsuit?
23         MR. PHILLIPS:  Objection to form.
24         And Craig, in answering this question, if you
25   can, do not reveal any communications you've had with your

Page 15

1   attorneys.
2     A.   Why -- the question again, Caitlin, was?
3   BY MS. PRATT:
4     Q.   Why aren't any of the other entities that you are
5   an owner of plaintiffs in this lawsuit?
6         MR. PHILLIPS:  Same objection, same instruction.
7         You can answer if you can, Craig.
8     A.   This is the simplest way to be a plaintiff in the
9   lawsuit.
10   BY MS. PRATT:
11     Q.   And what do you mean by it was the simplest?
12     A.   My office is at 1620 Broadway, some would argue
13   in what was the epicenter of CHOP last year.  The entities
14   that I've rattled off beforehand are not at the epicenter
15   of the CHOP.
16     Q.   Why does it matter that they weren't at the
17   epicenter?
18         MR. PHILLIPS:  Objection.  Calls for conclusion.
19         Same instruction as before:  Don't reveal any
20   communications with counsel.  You can answer if you can.
21     A.   I don't know how familiar you are with -- I
22   assume you are -- with where CHOP was last year, but --
23   what I'm defining or what most of us would define as CHOP
24   last year, but typically it's -- my way of getting to the
25   office was to drive down Pine Street, take a right on

Page 16

1   Nagle, and then take a left into the parking garage where
2   my office is, as would the people who came into the office
3   last year; and we were unable to do so without making some
4   significant alterations to our way of getting into the
5   office, and hence, Redside Partners is part of this and not
6   the other LLCs that we've previously discussed.
7   BY MS. PRATT:
8     Q.   Okay.  So does that mean that the other LLCs we
9   previously discussed didn't have that same sort of physical
10   complication in accessing them?
11         MR. PHILLIPS:  Objection to form.
12     A.   In many ways, yes, they didn't have the same
13   physical -- some are in Ballard or Woodland or so on and so
14   forth.
15   BY MS. PRATT:
16     Q.   So were the other entities, the LLCs that you, as
17   you said, rattled off earlier -- were they impacted by
18   CHOP?
19         MR. PHILLIPS:  Objection to form.
20     A.   Some of them were, yes.
21   BY MS. PRATT:
22     Q.   Which ones?
23         MR. PHILLIPS:  Objection to form.
24     A.   I'm not sure how that's relevant because I'm
25   not -- they're not plaintiffs, but Oddfellows, LLC, 100

4  (Pages 13 to 16)

Electronically signed by Mindy Suurs (101-257-931-8021)                    8e28a3c9-1d34-4639-b264-de454946c00b

CRAIG SWANSON
6/1/2021

Page 41

1    Q.  So let's break this down.  What financial impacts
2 have you seen on the two commercial buildings that you're a
3 part owner of?
4        MR. PHILLIPS:  Objection to form.
5 BY MS. PRATT:
6    Q.  That is Oddfellows and Broadway.
7        MR. PHILLIPS:  Same objection.
8    A.  Lower rents, concessions, and higher expenses.
9 BY MS. PRATT:
10    Q.  How about the mixed-use building at 14th and
11 Pine?
12        MR. PHILLIPS:  Same objection.
13    A.  Lower rents, concessions, and we did not board up
14 the windows there or have any graffiti of note, so I --
15 without looking at the details, I would say not necessarily
16 higher expenses.
17 BY MS. PRATT:
18    Q.  And so when you said there were higher expenses
19 for the two commercial buildings -- the Oddfellows and the
20 Broadway buildings -- were you talking about expenses
21 related to boarding up and graffiti removal?
22        MR. PHILLIPS:  Objection, form.
23    A.  Yes, plus additional security.
24 BY MS. PRATT:
25    Q.  And those expenses are incurred by the buildings

Page 42

1 or by Redside?
2    A.  Not by Redside.  They're incurred by the
3 buildings.  They're also borne to some degree by the
4 tenants directly -- or paid, I should say.  And once again,
5 we're differentiating now between myself as an owner in
6 those two properties and Redside specifically.
7        So the money -- the monies that I earn from those
8 two properties has decreased.  That doesn't have --
9 Redside's revenue was only decreased by virtue of the fact
10 that we've had lower rents and/or concessions in those
11 properties.
12    Q.  How do lower rents or concessions in any of the
13 properties that Redside manages affect its revenue?
14    A.  Property -- as I understand it, property
15 management's revenues are derived as a percentage of the
16 rents received from our tenants, be they commercial or
17 residential.
18        So as rents -- as an example, if a tenant is
19 paying $1,000 and our management fee is 5 percent,
20 as agreed upon with the ownership of that property, we
21 would make $50 a month -- Redside would.
22        So as concessions are made and, as an example, we
23 have to go out to a tenant and say we're going -- we'll
24 concede that you don't have to pay rent this month or you
25 can get a lower rent or the space is vacated and because of

Page 43

1 the area that it's in now, it's getting a lower rent than
2 other areas in the city, Redside's revenues are adversely
3 impacted.
4 BY MS. PRATT:
5    Q.  Who makes the decision to give the concession to
6 a tenant?
7        MR. PHILLIPS:  Objection to form.
8    A.  Typically the management company in conjunction
9 with the owners.  And I would also say it depends upon
10 whether that's a commercial tenant or a residential tenant
11 insofar as that a residential concession is typically a
12 smaller dollar amount, and so that decision might just be
13 made exclusively by Redside or its personnel.
14 BY MS. PRATT:
15    Q.  And so you are a part owner of the Oddfellows
16 Building and the Broadway building; right?
17    A.  And the Upper Pine building that we also
18 discussed, yep.
19    Q.  And all three of those were negatively impacted
20 by CHOP you said; right?
21    A.  To various degrees, yes.
22    Q.  But none of them are plaintiffs in this lawsuit;
23 right?
24    A.  That's correct.
25    Q.  Okay.  And for those entities specifically, why

Page 44

1 did you choose not to engage -- or involve them as
2 plaintiffs in this lawsuit?
3        MR. PHILLIPS:  Objection to form.  Same
4 instruction:  Don't reveal anything that you talked about
5 with your lawyers.
6    A.  Okay.  I would say simplicity and -- more than
7 anything else, our intent here is to keep it simple.  And
8 my intent is to keep it simple, and Redside -- Redside
9 partners was the most simple and logical answer as opposed
10 to complicating it with multiple plaintiffs.
11 BY MS. PRATT:
12    Q.  Can you explain how involving other plaintiffs
13 would make it less simple or logical?
14        MR. PHILLIPS:  Objection to form.  Same
15 instruction.
16    A.  Without trying to sound flippant, they all would
17 have to sit through depositions like this and provide a
18 great amount of detail and may or may not have had interest
19 in doing so, and therein lies the -- and I'm not a majority
20 owner.  I'm a majority owner of the Broadway and State
21 building, I guess, is one way of measuring it but the other
22 two I'm not, so that was not my decision.
23 BY MS. PRATT:
24    Q.  Were there other owners of the Oddfellows
25 Building or the 14th and Pine Building who did --

11  (Pages 41 to 44)

CRAIG SWANSON
6/1/2021

Page 53

1      A.  Yes.
2      Q.  And did you understand it was supposed to be
3  accurate?
4      A.  Yes.
5      Q.  You said that you endeavored to be complete to
6  the best of your knowledge.  When talking about information
7  you provided about damages suffered by Redside, how did you
8  make sure that the information you were providing was
9  complete?
10      MR. PHILLIPS:  Objection to form.
11      A.  We took the buildings in and around the areas
12  that we previously discussed that we manage that does not
13  include the buildings that we just went over -- the
14  buildings we just went over on the map is not an exhaustive
15  list of the buildings that I included in our estimation of
16  damages.
17      We then looked at the rents from March of 2020
18  for those buildings.  I'm not looking at that list now,
19  Caitlin.  I'm going to say it was a dozen buildings.  We --
20  so we added the rents up for 12 buildings for March of
21  2020.  We then compared those rents to March of 2021.
22  For -- as -- by way of an example, let's say that number
23  was 500,000 last year and it was 400,000 this year, so
24  our -- the rents went down by $100,000.  We then applied an
25  average management fee to that $100,000.  5 percent of

Page 54

1  $100,000 would be $5,000 of lost revenue to Redside in that
2  regard.
3      We then took the buildings that we manage in --
4  in the greater outlying area for that because there's
5  obviously also been an impact of rents relative to COVID,
6  and we took that group of buildings and we applied similar
7  math to it.  We then took the difference between the impact
8  to those outlying buildings to the buildings around Capitol
9  Hill and subtracted it and came up with a number that I
10  think actually was 11,000 or 11,500, and understanding that
11  it's a difficult equation to get -- to pinpoint down to the
12  cents, said $10,000.
13      I should also add that that only went through
14  March of 2021, and it's a very difficult to fully quantify
15  equation, but there's still a lagging effect from the CHOP
16  as we've discussed in those buildings and their
17  desirability in that location.
18      And so I guess my point there is I could
19  extrapolate that farther, but I think that just -- farther
20  into the future, that makes -- that would make it even more
21  difficult for both you and I to go through the details of
22  that calculation.
23  BY MS. PRATT:
24      Q.  So you think that is your response to how you
25  attempted to be complete.  Did you do anything else to make

Page 55

1  sure your information was accurate?
2      MR. PHILLIPS:  Objection to form.
3      A.  I think that's a pretty comprehensive outline of
4  how we came up with -- with our numbers.
5  BY MS. PRATT:
6      Q.  Okay.  So looking at the document that you
7  provided -- or excuse me, that you are looking at as
8  Exhibit 49 then, do you see on Page 12 of 14 it says:
9  "Answer as to Redside Partners"?
10      A.  Yeah.
11      Q.  And it says in part:  "Redside preliminarily
12  estimates its damages as $10,000"; right?
13      A.  Right.
14      Q.  And that's approximately the number that you just
15  discussed?
16      A.  Right.  The only thing I should add though,
17  Caitlin, there is the number that we discussed and its
18  relevance to the addresses above it in the first sentence
19  are -- the $10,000 is not directly correlated just to those
20  three buildings.  As a matter of fact, we didn't include
21  any losses in 915 East Pine Street.  It's a commercial
22  building, and commercial buildings -- the leases don't roll
23  over as quickly as they do in residential buildings, so
24  that's more difficult to quantify, and thus, we
25  conservatively kept it out of the equation.

Page 56

1      Q.  Are you aware whether there were any losses
2  suffered by Redside relative to the 915 Pine building?
3      MR. PHILLIPS:  Objection to form.
4      A.  Yes, we've discussed those.  It took more effort,
5  so our losses would have been time-related.  We had to
6  spend more time for less results as a result of boarding
7  up, managing the tenants and their fears about their
8  safety, managing the graffiti removal, and managing the
9  security than we otherwise would if CHOP hadn't ever
10  happened.
11  BY MS. PRATT:
12      Q.  So I understand that you said you did not include
13  losses in your $10,000 damages estimate related to 915 Pine
14  because it's a commercial building and its losses are more
15  difficult to quantify.  Did that accurately summarize your
16  testimony?
17      A.  Correct.
18      Q.  Did you attempt to quantify your losses for that
19  building?
20      A.  No.
21      Q.  And are you -- do you intend -- are you currently
22  or do you intend to claim losses related to that building
23  in this case?
24      MR. PHILLIPS:  Objection to form.
25      A.  I'm not sure.

14  (Pages 53 to 56)

CRAIG SWANSON
6/1/2021

Page 145

1  you're claiming is the $10,000 that we have discussed in
2  testimony and that you provided as an estimate in another
3  filing in this case?  I'll give you the exhibit soon.
4        MR. PHILLIPS:  Objection to form.
5     A.  That's currently my best estimate as to damage.
6  BY MS. PRATT:
7     Q.  Okay.  And that was Exhibit 49 where you listed
8  $10,000.  Okay.
9        I am done for the day.  I'm going to continue the
10 deposition for the text message production, but I really
11 appreciate your time today.  Thank you.
12       THE WITNESS:  Okay, great.  Thank you.
13       THE VIDEOGRAPHER:  Mr. Phillips, any cross-exam
14 questions?
15       MR. PHILLIPS:  No, no questions for me, thank
16 you.
17       THE VIDEOGRAPHER:  Should we go off the record?
18       MS. PRATT:  Yes, please.
19       THE COURT:  The time is 3:12 p.m.  We are off the
20 record.
21                  (The deposition concluded at
22                  3:12 p.m.)
23                  (Signature was reserved.)
24
25

Page 146

1        S I G N A T U R E
2
3        I declare that I have read my within deposition,
4  taken on Tuesday, June 1, 2021, and the same is true and
5  correct save and except for changes and/or corrections, if
6  any, as indicated by me on the "CORRECTIONS" flyleaf page
7  hereof.
8        Signed in _____, Washington,
9  this _____ day of _____, 2021.
10
11
12
13
14
15        _____
16        CRAIG SWANSON
17
18
19
20
21
22
23
24
25

Page 147

1        REPORTER'S CERTIFICATE
2
3     I, Mindy L. Suurs, the undersigned Certified Court
   Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations and for the State of
   Washington, do hereby certify:
5
6     That the foregoing testimony of CRAIG SWANSON
   was given before me at the time and place stated therein
7  and thereafter was transcribed under my direction;
8     That the sworn testimony and/or proceedings were by me
   stenographically recorded and transcribed under my
9  supervision to the best of my ability;
10    That the foregoing transcript contains a full, true,
   and accurate record of all the sworn testimony and/or
11 proceedings given and occurring at the time and place
   stated in the transcript;
12
      That the witness, before examination, was by me duly
13 sworn to testify the truth, the whole truth, and nothing
   but the truth;
14
      That I am not a relative, employee, attorney, or
15 counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
16 financially interested in the said action or the outcome
   thereof;
17
18 DATE:  June 6, 2021
19
20
21
22
23        _Mindy L. Suurs_
24        Mindy L. Suurs
          Certified Court Reporter #2195
25

Exhibit 36

# [No Subject]

| | |
|---|---|
| **From:** | "Durkan, Jenny" <"/o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=de71e1801f964bccb03328024b2eadfa-durkanj"> |
| **To:** | "Best, Carmen" <carmen.best@seattle.gov>; "Scoggins, Harold D" <harold.scoggins@seattle.gov> |
| **Cc:** | "Fong, Michael" <michael.fong@seattle.gov>; "Sixkiller, Casey" <casey.sixkiller@seattle.gov> |
| **Date:** | Sat, 20 Jun 2020 08:34:28 -0700 |

Chiefs --

I know this has been a very difficult time for each of you, and appreciate your work.  I know we are setting a call for later this am, to be briefed on options (with operational plans) SFD and SPD and the other city departments have been developing  for Capitol Hill and normalizing the area, so residents and businesses can reclaim their community.

But as we discussed at the outset of the Cap Hill issues, and as you told the public: there can be no part of the city where SFD and SPD do not respond.

What happened this am was foreseeable and avoidable.  It cannot be repeated.  So as a stand alone -- your teams also need to develop  true operational plan(s) so we do not get a repeat of that again.  They need to reflect ground truths and your best thinking on de-escalation, and positive response.

Since Chief Best is out of town, Casey is also working with Adrian Diaz.  But this is going to have to be decided and directed by you Chiefs.

Thanks,

Jenny

SEA_00125617

Exhibit 37

# RE: SFD Protest Zone Response Map

| | |
|---|---|
| **From:** | "Scoggins, Harold D" <harold.scoggins@seattle.gov> |
| **To:** | "Sixkiller, Casey" <casey.sixkiller@seattle.gov>; "Fong, Michael" <michael.fong@seattle.gov>; "Formas, Stephanie" <stephanie.formas@seattle.gov>; "Ranganathan, Shefali" <shefali.ranganathan@seattle.gov>; "Zimbabwe, Sam" <sam.zimbabwe@seattle.gov>; "Hara, Mami" <mami.hara@seattle.gov>; "Best, Carmen" <carmen.best@seattle.gov>; "Mahaffey, Thomas" <thomas.mahaffey@seattle.gov>; "Cordner, Lesley" <lesley.cordner@seattle.gov>; "Diaz, Adrian" <adrian.diaz@seattle.gov> |
| **Cc:** | "Hastings, Bryan" <bryan.hastings@seattle.gov> |
| **Date:** | Thu, 11 Jun 2020 09:14:14 -0700 |
| **Attachments:** | [Untitled].pdf (4.71 MB) |

Hello All,

To add clarity to this info.  If the city is to allow this group to continue to protest, I believe the follow conditions need to be met:

- There can be now weapons on the site.
- Maintain access points widths for Fire and EMS responses.
- Remove barriers for entry and replaces with barriers recommended by SDOT.
- Create a health, hygiene and sanitation plan recommended by SPU to prevent the build up of waste.
- The perimeter needs to be reduced to allow first responders. residents and businesses access and egress.
    - The alley way on Pine (West side of the East Precinct)
    - One half block East of 12th on Pine.
    - One half block North of Pine on 12th
    - One half block South of Pine on 12th



HDS

---

**From:** Scoggins, Harold D
**Sent:** Thursday, June 11, 2020 08:57
**To:** Sixkiller, Casey <Casey.Sixkiller@seattle.gov>; Fong, Michael <Michael.Fong@seattle.gov>; Formas, Stephanie <Stephanie.Formas@seattle.gov>; Ranganathan, Shefali <Shefali.Ranganathan@seattle.gov>; Zimbabwe, Sam <Sam.Zimbabwe@seattle.gov>; Hara, Mami <Mami.Hara@seattle.gov>; Best, Carmen <Carmen.Best@seattle.gov>; Mahaffey, Thomas <Thomas.Mahaffey@seattle.gov>; Cordner, Lesley <Lesley.Cordner@seattle.gov>; Diaz, Adrian <Adrian.Diaz@seattle.gov>
**Cc:** Hastings, Bryan <Bryan.Hastings@seattle.gov>
**Subject:** SFD Protest Zone Response Map

Good Morning All,

I have attached the SFD Protest Zone Response Map.  Our concerns surround knowing there are individuals in the crowd with weapons.  We see this has transitioned from a peaceful protest to a different situation that is unstable and this could compromise the safety of our personnel.

The yellow area identifies our response protocols around the perimeter of the protest zone.  The red area identifies the area in the protest zone that SFD units will not enter without an SPD escort.

HDS

SEA_00020292