HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HUNTERS CAPITAL, LLC et al, | Case No. 20-cv-00983 TSZ |
| Plaintiffs, | **CITY OF SEATTLE'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| v. | |
| CITY OF SEATTLE, | **NOTED ON MOTION CALENDAR: February 18, 2022** |
| Defendant. | **ORAL ARGUMENT REQUESTED** |
| | **FILED UNDER SEAL** |

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ........................................................................................... i

3

I.     INTRODUCTION ........................................................................................... 1

4

II.    FACTS ........................................................................................................... 2

5

     A.    Many of the Economic Harms Plaintiffs and the Putative Class and Subclasses Members Claim to Have Suffered Were Caused by Covid-19; Not CHOP. .............. 2

6

     B.    Individual Issues Defeat Plaintiffs' Proposed Subclasses. ......................... 4

7

8

     C.    The City Did Not Foresee CHOP, But Swiftly Moved to De-escalate Protest Activity, Re-occupy the East Precinct, and Clear the CHOP. .................. 8

9

10

     D.    Plaintiffs' Allegations Do Not Support Class Certification.................... 14

11

III.   ARGUMENT ............................................................................................... 15

12

     A.    Plaintiffs Fail to Satisfy Rule 23's Requirements. ................................. 15

13

     B.    Plaintiffs Cannot Meet their Burden Under Rule 23(a). ......................... 16

14

15

          1.    No commonality:  Dissimilarities within the proposed class and subclass frustrate common answers. ......................... 16

16

17

          2.    No typicality: The plaintiffs have not shown that proposed subclass members suffered the same or similar injury as the proposed subclass representatives................................................................................. 23

18

19

          3.    No adequacy: The plaintiffs cannot fairly and adequately protect absent class members. ......................................................................... 24

20

     C.    Plaintiffs Failed to Demonstrate Compliance with Rule 23(b).............................. 26

21

          1.    No predominance: Any City liability requires individualized determinations. ....................................................... 26

22

          2.    No superiority: Putative class and subclass members have an incentive to pursue their claims against the City on an individualized basis. ................. 28

23

24

     E.    Plaintiffs Have Failed to Establish that Putative Class Members Have Standing. .. 33

25

IV.   CONCLUSION............................................................................................. 35

26

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - i

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

# TABLE OF AUTHORITIES

## Cases

*Alves v. United States,*
    133 F.3d 1454 (Fed. Cir. 1998)...................................................................................16

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)..........................................................................................28, 32

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds,*
    568 U.S. 455 (2013)................................................................................................16

*Berry v. Transdev Servs., Inc.,*
    No. C15-01299-RAJ, 2019 WL 117997 (W.D. Wash. Jan. 7, 2019) ...............................30

*Bridge v. Phx Bond & Indem. Co.,*
    553 U.S. 639 (2008)..........................................................................................32, 33

*Bunch v. Nationwide Mut. Ins. Co.,*
    No. 12-1238 JLR, 2013 WL 6632025 (W.D. Wash. Dec. 17, 2013).................................33

*Burton v. Nationstar Mortg., LLC,*
    No. 13-00307, 2014 WL 5035163 (E.D. Cal. Oct. 8, 2014)...........................................23

*Butler v. Sears, Roebuck and Co.,*
    727 F.3d 796 (7th Cir. 2013) ..................................................................................31

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) ...................................................................................26

*Cedar Point Nursery v. Hassid,*
    141 S. Ct. 2063 (2021)...........................................................................................16

*Cole v. Gene by Gene, Ltd.,*
    322 F.R.D. 500 (D. Alaska 2017) ...........................................................................28

*Colman v. Theranos, Inc.,*
    325 F.R.D. 629 (N.D. Cal. 2018).......................................................................27, 28

*Cummings v. Connell,*
    402 F.3d 936 (9th Cir. 2005)  .................................................................................17

*Duncan v. Nw. Airlines, Inc.,*
    203 F.R.D. 601 (W.D. Wash. 2001) ........................................................................27

*Ehrhart v. King Cnty.,*
    460 P.3d 612 (Wash. 2020)....................................................................................18

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - i

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

*Ferguson v. Randy's Trucking, Inc.*,
    No. 15-00697, 2016 WL 4082900 (E.D. Cal. Mar. 11, 2016) ............................23

*Fishburn v. Pierce Cnty. Planning & Land Servs. Dep't*,
    250 P.3d 146 (Wash. Ct. App. 2011) ...............................................................18

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .........................................................................27

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ...........................................................................22

*Hickey v. City of Seattle*,
    236 F.R.D 659 (W.D. Wash 2006) .....................................................................1

*In re: Lamictal Direct Purchaser Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020) ............................................................................34

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)..............................................................26

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 214 (2d Cir. 2006)............................................................................31

*In re Whirlpool*,
    722 F.3d 838, 861 (6th Cir. 2013) ...................................................................31

*K.M. v. Regence Blueshield*,
    No. 13-1214 RAJ, 2014 WL 801163 (W.D. Wash. Feb. 27, 2014)...................33

*Leyva v. Medline Indus., Inc.*,
    *716 F.*3d 510 (9th Cir. 2013) .........................................................................31

*Mayfield v. Dalton*,
    109 F.3d 1423 (9th Cir. 1997) .........................................................................24

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) ...........................................................................33

*McLaughlin v. American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) .....................................................................26, 32

*Morrison v. Esurance Ins. Co.*,
    C18-1316 TSZ, 2020 WL 583824 (W.D. Wash. Feb. 6, 2020)........................28

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)............................................................................34

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC,*
    993 F.3d 774 (9th Cir. 2021) ........................................................................33

*O'Neill v. Gourmet Sys. of Minnesota, Inc.,*
    219 F.R.D. 445 (W.D. Wis. 2002) ................................................................23

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)........................................................................................32

*Osborn v. Mason Cnty.,*
    134 P.3d 197 (Wash. 2006)............................................................................18

*Portman v. Cnty. of Santa Clara,*
    995 F.2d 898 (9th Cir. 1993) .........................................................................20

*Rahman v. Mott's LLP,*
    693 F. App'x 578 (9th Cir. 2017) ..................................................................15

*Russell v. Educ. Comm'n for Foreign Med. Graduates,*
    15 F.4th 259 (3d Cir. 2021) ...........................................................................15

*Schumacher v. Inslee,*
    No. 18-5535 MJP, 2021 WL 1019823 (W.D. Wash. Mar. 17, 2021)...................24

*Southwell v. Mortg. Invs. Corp. of Ohio,*
    No. C13-1289 MJP, 2014 WL 3956699 (W.D. Wash. Aug. 12, 2014)..........14, 15

*Spokeo, Inc. v. Robbins,*
    578 U.S. 330 (2016)........................................................................................33

*Sprague v. General Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) .........................................................................23

*State v. Farmers Union Grain Co., Paccar Auto.,*
    908 P.2d 386 (Wash. Ct. App. 1996).............................................................17

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) .........................................................................24

*Stickles v. Atria Senior Living, Inc.,*
    No. C20-09220 WHA, 2021 WL 6117702 (N.D. Cal. Dec. 27, 2021) ...............25

*Stoudt v. E.F. Hutton & Co.,*
    121 F.R.D. 36 (S.D.N.Y. 1988) .....................................................................28

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.,*
    308 F.R.D. 630 (N.D. Cal. 2015)................................................30, 31, 32, 35

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - iii

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................32, 33

*Truesdell v. Thomas*,
    889 F.3d 719 (11th Cir. 2018) ...........................................................................28

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ......................................................................................26, 33

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ...........................................15, 26, 27, 30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...........................................................2, 14, 15, 19, 27

*Washburn v. City of Fed. Way*,
    310 P.3d 1275 (Wash. 2013) ...........................................................................18

*Yee v. City of Escondido, Cal.*,
    503 U.S. 519 (1992) .....................................................................................16, 19

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...........................................................28, 29, 30

## Statutes and Rules

28 U.S.C. § 2072(b) ......................................................................................32, 33

Fed. R. Civ. P. 23 ..................................................................................................31

Fed. R. Civ. P. 23(b)(3) .......................................................................................28

Fed. R. Civ. P. 23(b)(3)(A) .................................................................................28

Fed. R. Civ. P. 23(b)(3)(B) .................................................................................28

Fed. R. Civ. P. 23(b)(3)(D) .................................................................................28

RCW 9A.46.020 ....................................................................................................18

## Other Authorities

1 *McLaughlin on Class Actions*, § 4:43 (14th ed.)) ....................................... 26

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - iv

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

## I.  INTRODUCTION

2      Plaintiffs' Motion for Class Certification (Dkt. 65), which seeks to create 30 issues classes

3  and three subclasses regarding the CHAZ/CHOP, fails for at least six reasons.  First, Plaintiffs fail

4  to meet Rule 23(a)(2)'s commonality requirement.  Second, the claims of Plaintiffs' class

5  representatives are not "typical" of those in the proposed class as required by Rule 23(a)(3).  Third,

6  because the claims of the proposed representatives are not typical of claims of the alleged class,

7  Plaintiffs cannot show that the proposed representatives "will fairly and adequately protect the

8  interests of the class" as required by Rule 23(a)(4).  Fourth, Plaintiffs cannot satisfy Rule 23(b)(3),

9  because common questions of law or fact (if any) do not "predominate over any questions

10  affecting only individual members," nor is "a class action . . . superior to other available methods

11  for fairly and effectively adjudicating the controversy."  Fifth, Plaintiffs cannot show that their

12  resort to Rule 23(c)(4) and (5) is "appropriate"; it is advanced on behalf of many who have no

13  underlying claim.  Lastly, Plaintiffs' proposed subclasses include many individuals and entities

14  with no viable claims—i.e., they lack standing.

15      Use of Rule 23 is reserved for matters where numerous parties have experienced the same

16  or similar impact from the same action, making class treatment comparatively more efficient than

17  multiple individual actions.  It is not a device to allow a few plaintiffs to testify about their unique

18  experiences and impacts to establish a defendant's liability to a host of parties who either could not

19  establish liability on their own or had no loss.  Plaintiffs' proposed classes are entirely different

20  from the class certified by this Court in *Hickey v. City of Seattle*, 236 F.R.D 659 (W.D. Wash.

21  2006), where every class member did exactly the same thing (protested in a designated no protest

22  zone) and was subjected to exactly the same action with the same impact (arrest at the same time).

23  The Supreme Court's directive could not be clearer:

24          What matters to class certification . . . is not the raising of common 'questions'—
            even in droves—but rather, the capacity of a class-wide proceeding to generate
25          common *answers* apt to drive the resolution of the litigation.  Dissimilarities
            within the proposed class are what have the potential to impede the generation of
26          common answers.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

1    *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted).

2          The City has uncovered no case where Rule 23 was used to certify a class with interests

3    and impacts as diverse (or non-existent) as those here.  Plaintiffs' motion should be denied.

4                                     **II.      FACTS**

5    **A.      Many of the Economic Harms Plaintiffs and the Putative Class and Subclasses
6             Members Claim to Have Suffered Were Caused by Covid-19; Not CHOP.**

7          On March 23, 2020, Governor Inslee issued Washington's "Stay Home, Stay Healthy"

8    order which required all non-essential businesses to close "no later than midnight on March 25,

9    2020" due to the Covid-19 pandemic.  Farmer Decl., Ex. 1 at ¶ 3(a);[1] Ex. 2 (Kilburn Dep. 43:22-

10   24).  On May 4, 2020, Governor Inslee announced Washington's "phased-in approach to re-

11   opening."  Farmer Decl., Ex. 3; *see also* Ex. 4.  Because of infection rates, King County remained

12   in Phase 1 (all non-essential businesses closed) until June 4, 2020.  At that point, the County

13   moved to a modified Phase 1:  restaurants could resume outdoor dining at 50 percent of capacity

14   and indoor dining at 25 percent (provided seating was more than 6 feet apart); non-essential retail

15   activities could resume at 15 percent capacity; and personal services (hairstylists, tattoo artists,

16   etc.) and professional services (accountants, engineers, etc.) could resume at 25 percent capacity.

17   Farmer Decl., Ex. 5.  King County could not enter Phase 2 of reopening until June 19, 2020,

18   (Farmer Decl., Ex. 6), approximately a week and a half after the formation of the CHAZ/CHOP.

19   Phase 3, which did not occur until March 22, 2021, permitted, among other activities, indoor gyms

20   to resume operation at less than 50 percent capacity and bars at less than 25 percent capacity.

21   Farmer Decl., Ex. 4; Ex. 7.  Night clubs could not open until Phase 4.  Farmer Decl., Ex. 4.

22         Because of these Covid-19 restrictions and/or the threat of contracting or spreading Covid-

23   19, some members of the alleged class were either required to, or decided to, keep their businesses

24   closed or operating at limited capacity through some or all of June and July 2020.  8 oz. Burger &

25   Co., for example, located just outside the Class Area, decided on June 16, 2020 "to stay in the 'to-

26

---

[1] Exhibits referenced herein are attached to the Declaration of Tyler L. Farmer (hereinafter "Farmer Decl."), filed February 7, 2022 in support of the City of Seattle's Opposition to Motion for Class Certification.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 2

go/delivery' model for the foreseeable future" "even though [it was] allowed to have customers physically back in [the] restaurant," citing the "health and well-being of our staff, community, and our small business" given the "many unknowns about this virus." Farmer Decl., Ex. 8.[2]  Unicorn Bar, located within Plaintiffs' Class Area at 1118 Pike Street, but beyond any barrier locations, was unable to open under the applicable Covid-19 rules until mid-August 2020, when it was able "to change [its] licensing over from a Nightclub License to a regular Bar/Restaurant License" and thus could "reopen before Phase 4."[3]  Nevertheless, Unicorn Bar's landlord, Plaintiff Madrona, is seeking damages in this case for ███████ in lost rent from the Unicorn Bar, claiming CHOP (and not Covid-19) led to Unicorn Bar's inability to pay rent starting when it was still closed in June and for roughly six months thereafter.  Farmer Decl., Ex. 11 (Augustine Dep. at 54:10-55:25); Ex. 12.  Rock Box, too, stayed closed until October/November 2020 for pandemic-related reasons.  Farmer Decl., Ex. 13.  Yet Plaintiff Hunters Capital is seeking more than $3.7 million in damages in this class action, largely based on claimed lost rent from tenants like Rock Box.  *See* Farmer Decl., Ex. 14 (Cronauer Dep. at 101:2-20); Ex. 88.

Solely because of Covid-19, some individuals and business owners in the proposed Class Area either broke or decided not to renew their leases, or simply stopped paying their rent.  In some cases, this occurred before June 9, 2020, Plaintiffs' "Class Date."  *See* Dkt. 65 at p. 20.  For example, The Riveter, a member of Plaintiffs' proposed Business Owners Subclass, gave Plaintiff Hunter Capital notice it likely would need to terminate its lease prior to June 9, 2020.  Farmer Decl., Ex. 14 (Cronauer Dep. at 101:2-20, 178:13-178:13-22); Ex. 15.[4]  In 2020, more than $37 million in relief money was granted to King County residents under the Eviction Prevention and

---

[2] *See also* Farmer Decl., Ex. 9, (Capitol Cider's June 23, 2020 Facebook post: "…we're opening our doors tomorrow WEDNESDAY, JUNE 24th" after shuttering because of Covid-19) (emphasis in original).

[3] Farmer Decl., Ex. 10, (Unicorn Bar's August 14, 2020 Facebook post: "We have reached the end of week 21 of quarantine and have some exciting news on the horizon!  We have been given the opportunity to change our licensing over from a Nightclub License to a regular Bar/Restaurant License, so we can reopen before Phase 4!!!").

[4] *See also* Farmer Decl., Ex. 91 (April 13, 2020 letter to Hunters Capital from member of Business Owner Subclass requesting rent deferral relief because of Covid-19); Ex. 92 (March 11, 2020 email from Ethan Stowell Restaurants informing Hunters Capital that it will "be suspending all . . . rent payments" effective April 1, citing a "precipitous drop in business" due to Covid-19).

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 3

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

Rent Assistance Program (EPRAP) established to help area tenants having difficulty paying rent due to the Covid-19 pandemic.  The Class Area was not different from other surrounding areas: paying rent was an issue for many because of "unemployment, lost wages, or health crises as a result of Covid-19."  Farmer Decl., Ex. 16.  Separately, other businesses in the Class Area requested rent abatement not because of Covid-19- or CHOP-related impacts, but because they were failing or poorly managed businesses.  *See* Farmer Decl., Ex. 84 (Oaksmith Dep. at 151:4-153:5, 154:9-20).

Named Plaintiff Richmark Label's designated 30(b)(6) witness testified that only two of Richmark Label's more than 30 commercial tenants sought rent concessions related to CHOP: a commercial travel agent tenant and Northwest Liquor, a former named Plaintiff in this suit.  *See* Farmer Decl., Ex. 18; Ex. 19 (Donner Dep. at 167:2-14; 176:12-17); Ex. 20.  Although the commercial travel agent tenant requested rent relief due in part to "the pandemic," Richmark Label now claims that the refund was fully attributable to the CHOP.  *See* Farmer Decl., Ex. 17; Ex. 89.  In other words, at most, only two of Richmark Label's commercial tenants align with the "class" claims.

**B.      Individual Issues Defeat Plaintiffs' Proposed Subclasses.**

The situations, attitudes, and experiences of members within the three subclasses Plaintiffs ask this Court to certify differed widely during the CHOP period.  Some members of the Resident Subclass, including subclass representative Matthew Ploszaj, publicly spoke out against CHOP. Farmer Decl., Ex. 21 (Ploszaj Dep. at 154:9-11).  But other putative class members, like the residents of 12th Ave Arts, a Community Roots Housing program, supported the protests and CHOP.  Farmer Decl., Ex. 22 ("Since the police left, things have been peaceful.  We can only conclude that the police were the problem.").[5]  Some Resident Subclass members joined in the

---

[5] *See also* Farmer Decl., Ex. 23 (Antolin & Tarbet: "remov[al]" of SPD "from the East Precinct" caused them to feel "safest in this neighborhood"); Ex. 24; Ex. 22 (Packard building residents, located across the street from the East Precinct: "We felt a strong sense of increased safety as the police forces abandoned the East Precinct and our streets. Since then, the well-intentioned creation CHOP has provoked inspiring community conversations, innovative protest

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

protests and CHOP.  *Id.* ("We look forward to working with [the organizers and demonstrators

working to end systemic racism and militarized policing] as the demonstrations continue to

unfold.").  It also is a near certainty that members of the Resident Subclass left their homes and

were absent for June and July 2020 (or longer) because of the Covid-19 pandemic and resulting

remote work options.  Farmer Decl., Exs. 25-27.  As named plaintiff Wade Biller, a member of the

putative Resident Subclass, testified when asked how putative class members might have been

affected differently by CHOP:

> A.      I would have to agree.  I would use myself as an example on both sides of
> that consideration because I don't – I know that I have gone through a lot of
> mental and emotional trauma, but it's – it's kind of a badge of honor, it's kind of
> unfortunate.[6]  *And also I know that there are other folks that maybe didn't have
> the same experience that may have felt more traumatized or had other
> experiences where they didn't perceive harm at all or didn't have any trauma or
> circumstances that they didn't see as negative, depending on when they went to
> CHOP, in CHOP, or whether they could leave the area.*
>
> Q.      It's kind of – it depends on the individual.  Is that—
>
> A.      Exactly, right.

Farmer Decl., Ex. 28 (Biller Dep. at 208:6-19) (emphasis added).

        The same applies to the Business Owners and Property Owners Subclass members.  Some

spoke out against protest activity near Cal Anderson Park and the CHOP.[7]  Others publicly

supported demonstrations and CHOP,[8] including Vermillion by offering "a relief, aid, and

---

strategies and a thorough list of organized demands focused on community-based ideals that support healthy, equitable communities.").

[6] Mr. Biller was slashed in the arm by a woman carrying a machete in September 2020, more than two months after the CHOP was cleared.  Farmer Decl., Ex. 28 (Biller Dep. at 188:3-7).

[7] Business Owners:  Farmer Decl., Ex. 29 (Sheffer Dep. at 162:9-19) (conceding "people were quite upset with the public stance made [toward CHOP] through Cure").  Property Owners: Farmer Decl., Ex. 21 (Ploszaj Dep. at 69:18-20) (testifying his landlord was, at best, "neutral" toward CHOP).

[8] Business Owners:  Farmer Decl., Ex. 30 (35th North Skate Shop June 7, 2020 Instagram post: "we will be opening up sometime soon but for now we are just feeling so fortunate to be on this block, in this city.  For the last 9 days we have been surrounded by voices of inspiration, education, passion . . . #blacklivesmatter"); Ex. 31 (35th North Skate Shop June 19, 2020 Instagram post: "Curbside pick up not available today.  Lots of stuff going on today, get out and support!"); Ex. 32 (Capitol Cider June 21, 2020 Facebook post: "Capitol Cider stands firmly as an ally with the black community to end violence against black lives, to demand and work to create a just society, and to call for reparations in recognition of our country's history of injustice against black people."); Ex. 33 (Rock Box June 16, 2020 Facebook

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

1   donation station for the duration of the protest occurring on Capitol Hill" (Farmer Decl., Ex. 37)

2   and Sunset Electric Apartments, located next door to the East Precinct, which opened its doors to

3   protest leadership and prominent activists (Farmer Decl., Ex. 38).  Some, including Rancho Bravo

4   (until February 7, 2022, a named Plaintiff)[9] and class representative Richmark Label (both of

5   which are located close to Cal Anderson Park and the East Precinct), reported an increase in

6   revenue in June 2020.  In fact, Rancho Bravo had more revenue in June 2020 than it did for any

7   other month from the start of the pandemic through the end of 2020.  Farmer Decl., Ex. 39.  And

8   Richmark Label was internally celebrating June as an incredibly successful month, while now

9   seeking more than $100,000 in business damages for June 2020, allegedly caused by the CHOP:

> [C]ongratulations on making it through June 2020!  What a month.  There's not a
> lot of people who can say they've been through what we just went through and
> not only did you make it through, but we closed 40 new accounts and we were up
> over 10% for the month compared to last June!

Farmer Decl., Ex. 40.  Some businesses declined to join this lawsuit, independently pursuing

claims against the City.  Farmer Decl., Exs. 41-42.  Others, like Unicorn Bar, were closed by

Covid-19 Stay Safe orders, or elected not to be open because of Covid-19, for all of June/July

2020.  *See supra* n.3; *see also* Farmer Decl., Ex. 46 (Hara Dep. at 104:24-107:11) (describing

"heterogeneity" of comments from businesses, from those who were "closed the whole time" to

those who "had no issues whatsoever and felt like it was safer than it used to be").

The putative class members' experiences in June 2020 also differed materially based on

location.  Plaintiffs' Class Area runs from Broadway to 13th Avenue, and Denny to Pike Street.

---

post: "There is much more we can and MUST do to support the black community . . . ."); Ex. 34 (Unicorn Bar June 1, 2020 Facebook post: "We see you.  We hear you.  We stand with you.  #blacklivesmatter").  Property Owners: Farmer Decl., Ex. 35 (Central Lutheran Church June 7, 2020 Facebook post: "We stand with [the protestors] and firmly believe Black Lives Matter!"); Ex. 36 (Hunters Capital June 19, 2020 Facebook post: "Let's continue to put in the work and uplift black voices, everywhere, across all industries, but especially on Juneteenth.").

[9] To date, six named Plaintiffs, including most recently Rancho Bravo, have voluntarily dismissed (some with prejudice) their claims against the City, further demonstrating that alleged harms suffered by members of the putative class are not at all common to every member of the class.  *See* Dkts. 26 (Sage Physical Therapy PLLC, Kathleen Caples), 42 (Magdalena Sky), 59 (Argento LLC), 71 (Northwest Liquor and Wine LLC), and 72 (Rancho Bravo, Inc.).

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 6

1    *See* Appendix A.[10]  Many of Plaintiffs' complaints revolve around the supposed "abandonment" of

2    this area by Seattle Police and Fire Departments.  But, in fact, the Police "Red Zone" where

3    Plaintiffs' claim SPD would not respond covers only a slice of Plaintiffs' Class Area.  Entire

4    blocks in which many Plaintiffs and putative class members lived and worked were outside the

5    Red Zone, and thus unaffected by the claimed Red Zone limitations during June 2020.  Appendix

6    A; Farmer Decl., Ex. 43 (Mahaffey Dep. at 36:22-38:23); Ex. 93.



(Excerpt from Appendix A, SPD Red Zone)          (Excerpt from Appendix B, SFD Red Zone (6/12–29))

19         The same is true of SFD.  To protect its firefighters from potential harm, SFD implemented

20   its standard "Scene of Violence" protocols, identifying a small area around Cal Anderson Park and

21   the East Precinct as a "Red Zone," where, to avoid undue risk to its personnel, SFD instructed its

22   firefighters to wait for law enforcement before entering.  Farmer Decl., Ex. 44 (Scoggins Dep. at

23   77:7-22, 76:19-23 ("geographic boundaries" of Red Zone "change[d]" over time depending on

24   SFD's assessment of conditions)).  Fire Chief Scoggins testified that service outside the "Red

25   Zone" (i.e., the "Yellow Zone") was not affected, remaining as it was before June 2020.  Appendix

---

[10] For the Court's convenience, the City has attached four appendices to this brief as Appendices A-D.  Paragraphs 96-99 of the Farmer Declaration describe the appendices and identify the documents used to create each.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 7

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   B; Farmer Decl., Ex. 44 (Scoggins Dep. at 37:5-13); Ex. 45.

2       Plaintiffs also claim that the City "significantly cut back on regular services such as

3   garbage and electric services." Dkt. 65 at p. 14. But this is simply false. As SPU Director Mami

4   Hara confirmed, garbage was picked up regularly throughout the period; any service interruptions

5   were minimal. Farmer Decl., Ex. 46 (Hara Dep. at 27:23-30:12); *see also* Ex. 47 (McDermott

6   Dep. at 221:15-17); Ex. 28 (Biller Dep. at 56:14-18). Evidence that anyone within the Class Area

7   experienced utility service disruptions in June and July 2020 is absent. *See, e.g.*, Farmer Decl., Ex.

8   47 (McDermott Dep. at 222:5-9). And any light and noise pollution from Cal Anderson Park (*see*

9   Dkt. 47 at ¶ 220), would have affected putative class members differently, or perhaps not at all,

10  based on their distance from the park. Those nearly two and a half blocks from the park near 13th

11  and Pike or Denny had vastly different experiences from those near the park.

12      The protestors' placement and movement of barriers had a widely varying, or often no,

13  impact on putative class members. Some businesses and residences, like Bergman's Lock and

14  Key, Car Tender, and Onyx Homeowners Association, were outside the barriered area during the

15  entire CHOP. Farmer Decl., Ex. 48 (Thompson Dep. 76:2-11, 77:4-14); Appendix C. Other

16  businesses or residences might have been within the barriers one day, and outside them the next.

17  Farmer Decl., Ex. 49 (Zimbabwe Dep. at 118:18-21) (testifying protesters moved barriers

18  "periodically"). Even individuals who were sometimes inside the barriers were not affected

19  uniformly, or at all. Bill Donner, owner of Richmark Label, testified that individuals at the barriers

20  were generally "very polite," and always let people pass. Farmer Decl., Ex. 19 (Donner Dep. at

21  49:17-50:14, 53:13-54:17, 137:4-17); Ex. 50 ("[t]he protestors let everyone past their barricades";

22  "[t]hey let everyone pass and trucks for deliveries").

23  **C.   The City Did Not Foresee CHOP, But Swiftly Moved to De-escalate Protest Activity,
         Re-occupy the East Precinct, and Clear the CHOP.**

24      On May 25, 2020, George Floyd, a 46-year-old Black man, was killed in Minneapolis, after

25  a police officer knelt on Mr. Floyd's neck for over nine minutes while Mr. Floyd was in police

26  custody. Farmer Decl., Exs. 51-52. Protests erupted nationwide, including in Seattle beginning

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 8

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    Friday, May 29.  *Id.*  Many of these protests, quickly turned violent, with protestors setting fire to

2    and ultimately destroying the Minneapolis Third Police Precinct on May 28 (Farmer Decl., Exs.

3    53-55) and, in Seattle, committing violent acts and assaults, mainly targeting police officers and

4    destroying property, including setting fire to citizen and police vehicles.  Farmer Decl., Exs. 56-57.

5        By early June, the area around SPD's East Precinct and near the police line established at

6    11th Avenue and Pine Street had become the focal point of the Seattle protests.[11]  The protests

7    became more violent and confrontational in the first week of June.  On Saturday, June 6, SPD

8    "deploy[ed] pepper spray and blast balls" to control the crowd immediately outside the East

9    Precinct. Farmer Decl., Ex. 60.  Several SPD officers were injured, some seriously.  *Id.*

10       This violence persisted into Saturday, June 7.  Protestors pushed, punched, and threw

11   projectiles like rocks, bottles, and commercial grade fireworks at SPD officers.  Farmer Decl., Ex.

12   43 (Mahaffey Dep. at 75:6-23).[12]  They breached SPD's metal fencing and encroached upon the

13   precinct.  *Id.* at 79:9-80:12.  A man drove a vehicle into a group of protestors before shooting

14   someone in the crowd.  *Id.*  After warning the crowd to step back from the police line outside the

15   East Precinct, SPD deployed non-lethal crowd control tools in an effort to quell the unrest.  *Id.*

16       When the June 7 protest wound down, the City and SPD decided that SPD's protest

17   response should change to avoid further violent confrontations on the police line and consequent

18   risks of injury or death, which in turn could aggravate conditions even more.

19       On June 8, after (1) considering options for managing the ongoing protests; (2) holding in-

20   depth consultations involving SPD Command Staff and high level City executives; (3) being

21   briefed by the FBI on credible external threats of arson to the East Precinct; and (4) analyzing

22   alternate approaches to protecting the East Precinct, the surrounding buildings, SPD officers

23   themselves, and the Capitol Hill community, the City decided to remove the barriers in front of the

---

[11] Farmer Decl., Ex. 21 (Ploszaj Dep. at 78:11-13) ("But it was a nightly occurrence around the East Precinct in addition to whatever else was occurring"); *see also* Farmer Decl., Ex. 58 ("Monitoring crowd from Downtown that has moved near the East Precinct."); *id.* ("Will continue to monitor the situation and allow demonstrators to exercise their rights."); Ex. 59.

[12] *See also* Farmer Decl., Ex 62 (email from SPD officer who was injured while protecting the East Precinct on June 7 to Assistant Chief Mahaffey stating he was "terrified" and "believe[d] the worst is yet to come").

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 9

East Precinct, open the street, and permit protesters to march past the East Precinct.  Farmer Decl.,

Ex. 44 (Scoggins Dep. at 133:2-20); Ex. 63 (Durkan Dep. 104:25-105:9); Ex. 64 (Best Dep. 62:8-

10); Exs. 65-66.  This decision was a judgment call made in unprecedented circumstances.

　　　　Mayor Durkan explained that her decision was based on the need to "reduc[e] the tension"

and "de-escalat[e]" the interactions between SPD and the protestors.  Farmer Decl., Ex. 67.  The

Mayor's Office did not direct SPD in the operational details of managing the "open street"

scenario; SPD Command Staff exercised its discretion in the specific steps of addressing this fluid

situation.  Farmer Decl., Ex. 43 (Mahaffey Dep. at 73:3-15, 80:18-24).

　　　　Later that day, after assessing the fluid situation and weighing the First Amendment

interests of the protestors against the need to reduce violence and secure the precinct, police

resources, and the safety of SPD officers and people in the area, SPD Command Staff decided how

to proceed.  It gave the order to temporarily evacuate the East Precinct and re-stage nearby.  *Id.* at

73:3-15.[13]  Chief Mahaffey explained the decision to temporarily leave the East Precinct:

> A.  Well, there's a lot that went into that decision.  It was not easily made. The
> overarching concern was, the need to de-escalate would have been going on the
> previous week, which was a constant focus on the precinct by the protesters, to
> the point that the precinct had become inoperable.
>
> We had nearly nightly clashes with protesters involving significant amounts of --
> we had to use force to deal with the crowd.  We had force used against us by the
> crowd.
>
> We had officers injured.  We had members of the protest crowd injured, and it
> was seemingly not going to end. So that was the overall goal, was to prevent any
> further clashes with the crowd and injuries to officers.
>
> There was also concerns about the building being attacked and destroyed. We had
> information from the FBI. I knew that a precinct had been burned in Minneapolis,
> Minnesota, as a result of protests they had there. I had information other
> government buildings were being attacked.
>
> So I had a great concern that based on what had been occurring the previous
> weeks, that the East Precinct would be another target, which, based on where it

---

[13] *See also* Farmer Decl., Ex. 68 (email from Assistant Chief Mahaffey to SPD officer:  ". . . I never wanted us to give up one of our precincts.  I, along with the other commanders assigned to the events over the past week realized we could not continue going toe to toe with the crowed at 11 and Pine every night.  We were getting too many officers hurt and had no support for our tactics.").

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 10

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

sits on the block, there's really only two ways in and out of it.

And overall, … that was my greatest concern, was keeping … people safe, and not being able to keep people in there, as we were not going to be able to use the tactics, which was using police officers directly to manage and address the crowd.

So that was the course of action that I felt was the best to prevent confrontation, to de-escalate, prevent injury, and keep police officers and the public safe.

*Id.* at 73:20-75:5.

When SPD decided to leave the East Precinct building on June 8, its plan was to re-occupy it later that night or early the next day.  There is no dispute on this point.  But when SPD officers returned to the East Precinct at approximately 5:30 a.m. on June 9, they were met with protesters who "appear[ed] to ha[ve] dug in and [we]re planning to stay for some duration."  Farmer Decl., Ex. 69.  SPD officers reported that "[s]ome" of the protesters "were reasonable," but that "others were extremely confrontational," including "[o]ne individual, in particular" who "was open-carry armed with a handgun and exhibited behavior that would warrant an ERPO [Extreme Risk Protection Order]," and demanded SPD "get off their sovereign land."  *Id.*

At that point, the officers on site made the judgment call to retreat, rather than to initiate a likely violent confrontation that could have aggravated the overall situation.  The goal was to avoid explosive outcomes that could lead to a conflagration of violence—which occurred in other cities dealing with similar conditions.  *See* Farmer Decl., Ex. 63 (Durkan Dep. at 77:6-78:17).

On June 11, SPD made another effort to establish operations at the East Precinct, but was forced to leave after individuals started fires outside the precinct later that night, making officers feel endangered.  Farmer Decl., Ex. 43 (Mahaffey Dep. at 97:2-98:11).  That same day, this District issued a temporary restraining order, limiting SPD's ability to deal with protestors via less-lethal tools.  Farmer Decl., Ex. 70.  To both comply with the court order and address the increasing violence of some protestors, SPD devised a demonstration response protocol designed to protect officers, demonstrators, and the public from injury while devising methods to de-escalate the

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 11

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

situation and ultimately to clear the CHOP.[14]  As Mayor Jenny Durkan stated:

> [I]t's a phased approach, we knew we had to try to de-escalate and calm things
> down.  We then had to try to shrink the number of people who were there at the
> same time that the [SPD] had to come up with a plan that they thought could
> work, because we knew from experience, watching that when the police entered
> that area, it could escalate things immediately because they were protests against
> the police. . . .  [R]emember, this came about because of a nightly skirmish at the
> police line between police and protesters.  And so we had to be realistic . . . .

Farmer Decl., Ex. 63 (Durkan Dep. at 184:24-185:10).

The City's approach from this point forward was to work to de-escalate the CHOP, to use
mechanisms to shrink the protestor population, to have several City departments ready themselves
to pitch in when the time came, to enhance the police capability, and to formulate a specific plan—
all in order to be in a position to "clear" the CHOP without a potentially disastrous, violent
confrontation.  *Id.* at 162:13-16.

During this period, Mayor Durkan and other City leaders participated in daily briefings
aimed at achieving these goals.  Farmer Decl., Ex. 63 (Durkan Dep. at 62:3-6, 162:22-25); Ex. 43
(Mahaffey Dep. at 94:5-11); Ex. 49 (Zimbabwe Dep. at 84:15-85:10); Ex. 94.  SDOT Director Sam
Zimbabwe was on-site nearly daily, working to remove or shift barriers in order to shrink the
footprint of the CHOP Zone.[15]  On June 10, SDOT had removed enough barriers so that the City
could access and provide services to every part of the CHOP.  Farmer Decl., Ex. 75; Appendix C.
By June 17, the City had created a regularized traffic pattern that provided public access to every
business and residence in the area, while continuing to provide separation between vehicles and
protestors in order to prevent another vehicular assault.  Farmer Decl., Ex. 76; Appendix D.

---

[14] Farmer Decl., Ex. 71 ("As of now, there are too many unknown conditions that adversely impact officer safety to
send our officers into the blockaded area unless it is a critical life safety emergency.  We had numerous incidents over
the past several days of calls placed that we are not able to verify that seem to be *an effort to instigate a police
response into the protest zone*." (emphasis added)).

[15] Plaintiffs likely will cite to Call Notes from June 10, 2020 at 6:00 a.m. which lists "[c]ontinuing the existing
footprint of peaceful demonstration and rights" as evidence that the City was not trying to shrink the footprint of the
CHOP Zone.  Farmer Decl., Ex. 72.  But the language immediately below that statement (e.g., "Pursue physical
modifications to the footprint," "Get out non-SDOT barriers"), *id.*, and from emails sent right before and after the Call
Notes shows the City's goal was to shrink the CHOP Zone footprint, Farmer Decl., Ex. 73 ("be on site and come up
with a plan . . . for access and reopening streets"); Ex. 74 ("Pursue Physical Modifications to Barriers/Footprint").

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

SPU Director Mami Hara was also in the CHOP almost daily from June 9 through July 1, coordinating service for the businesses, residents, protesters, and visitors in the area.  She made sure that any blockages that had sprung up overnight were removed each morning, and that businesses and residences around Cal Anderson Park received regular garbage and recycling service throughout the month of June.  Farmer Decl., Ex. 46 (Hara Dep. at 15:11-19); Ex. 47 (McDermott Dep. 221:15-17); Ex. 28 (Biller Dep. at 56:14-18).

As of June 2020, Covid-19 was still a new and evolving problem.  The City was concerned about the influx of large crowds into the Cal Anderson Park area.  So, the City made the judgment call to provide port-a-potties and sanitation stations to the area.  Other options were not available.  Businesses in the area, if they were even open, were not making their bathrooms available to the public because of the pandemic.  The permanent Cal Anderson bathrooms were out of service.  *See* Farmer Decl., Ex. 46 (Hara Dep. at 68:20-69:19).  These public health concerns also led SPU to provide dumpsters, garbage bags, and garbage service near Cal Anderson on a daily basis.  *Id.* at 26:10-20, 27:10-22, 32:22-33:8.

These efforts continued after a person was shot and killed on June 20.  On Monday, June 22, Mayor Durkan, Chief Best, and Black community leaders responded to the increasing violence by "urg[ing] demonstrators to leave Cal Anderson Park for their safety and the safety of those living and working nearby."  Farmer Decl., Ex. 77.

On June 26, Mayor Durkan met with and again urged CHOP participants to disperse.  *Id.*; *see also* Famer Decl., Ex. 78.  That same day, SDOT and other City agencies, supported by SPD personnel in a subordinate role, attempted to clear the streets of the barriers near the East Precinct, but were met with a hostile crowd, which prevented SDOT from completing that work—including "people lying down in front of [the] construction equipment" needed to remove the barriers, "lying on top of barriers," and "forming crowds around [SDOT staff] and . . . shouting down the idea that [SDOT] would be removing the barriers."  Farmer Decl., Ex. 49 (Zimbabwe Dep. at 184:20-186:10); Ex. 79.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    By late June, the City's evolving efforts had begun to bear fruit.  The number of people in

2    the park dropped to a level that allowed SPD and other City officials to implement the plan they

3    had been constructing.  *See* Farmer Decl., Ex. 63 (Durkan Dep. at 70:6-72:1).  On June 30, Mayor

4    Durkan issued EO 2020-08, which, among other things, ordered everyone "unlawfully occupying"

5    the "Park area" to leave immediately and coordinated City departments' efforts to clear the CHOP.

6    Farmer Decl., Ex. 80.  As of July 1, the areas around the East Precinct and Cal Anderson Park were

7    cleared of all unauthorized occupants and barriers, and SDOT had begun cleaning and debris

8    removal work.  Farmer Decl., Ex. 43 (Mahaffey Dep. at 189:14-192:10); Ex. 77.  SPD moved back

9    into the East Precinct that same day, and has operated out of the precinct consistently since.  *See*

10   Farmer Decl., Ex. 81; Ex. 84 (Oaksmith Dep. at 226:23-228:2) (July 1, 2020 email from Mike

11   Malone of named Plaintiff Hunters Capital to Chief Best: "Thank you, you've done a great job

12   under the most difficult of circumstances!").

13   **D.      Plaintiffs' Allegations Do Not Support Class Certification.**

14           According to Plaintiffs, the City's conduct in responding to the "unique and unprecedented

15   situation" (Farmer Decl., Ex. 64 (Best Dep. at 174:18-19)) presented by the CHOP constituted

16   negligence and nuisance under Washington state law, and an unlawful taking and due process

17   violation under the United States Constitution.  Dkt. 47 at pp. 62-68.

18           Plaintiffs' motion asks this Court to certify 15 issues under their substantive due process,

19   negligence, and nuisance claims, and three subclasses (a Property Owners Subclass, a Business

20   Owners Subclass, and a Residents Subclass) and 13 issues under their procedural due process and

21   takings claims.  Plaintiffs also (and improperly) ask this Court to certify two issues relating to a

22   discovery dispute.  Dkt. 65 at pp. 20-21; Dkt. 66-1 at pp. 2-4.  None of these issues merits

23   certifying a class, much less one including every resident, property owner, and business in the

24   Class Area on a single day, June 9, 2020.

25

26

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2

### III.   ARGUMENT

#### A.   Plaintiffs Fail to Satisfy Rule 23's Requirements.

3

4

5

6

7

8

9

10

11

12

13

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart*, 564 U.S. at 348 (citation omitted). "Class certification is proper if and only if 'the trial court is satisfied, *after a rigorous analysis*,' that Plaintiffs have met their burden under Rule 23."  *Southwell v. Mortg. Invs. Corp. of Ohio*, No. C13-1289 MJP, 2014 WL 3956699, at *1 (W.D. Wash. Aug. 12, 2014) (citation omitted).  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart*, 564 U.S. at 350.  Instead, Plaintiffs must establish by a preponderance of the evidence that all of Rule 23's requirements have been met.  *Southwell*, 2014 WL 395669, at *1 ("While the Ninth Circuit has yet to enunciate an evidentiary benchmark . . . , this Court . . . chooses to align itself with the emerging trend in other districts toward the adoption of a preponderance of the evidence standard for facts necessary to establish the existence of a class.").

14

15

16

17

18

19

20

21

22

Plaintiffs request that the Court certify its proposed class under Rule 23(c)(4) as to 30 separate "issues" and Rule 23(c)(5) as to three subclasses.  Dkt. 66-1 at pp. 2-4, 8-9.[16]  A party seeking to use Rule 23(c)(4) or (5) first must meet all four requirements of Rule 23(a) and show that the identified issues and subclasses are maintainable under Rule 23(b)(1), (2), or (3).  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 266-67 (3d Cir. 2021), *cert. pending*.  Even if the requirements of Rule 23(a) and (b) are met, use of Rule 23(c) to resolve less than an entire case is "appropriate" only "if it 'materially advances the disposition of the litigation as a whole,'"  *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017) (citation omitted).

23

Plaintiffs fail to meet these requirements for at least the below six reasons.

24

25

26

---

[16] Plaintiffs' motion does not cite to Rule 23(c)(5) but should have: Plaintiffs request certification of subclasses.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 15

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

**B.      Plaintiffs Cannot Meet their Burden Under Rule 23(a).**

2

**1.      No commonality:  Dissimilarities within the proposed class and subclass
            frustrate common answers.**

3

4

Commonality requires that the "determination of [the] truth or falsity" of a "common

5

contention . . . will resolve an issue that is central to the validity of each one of the claims in one

6

stroke." *Wal-Mart*, 564 U.S. at 350.  It is not enough that there are "common questions," as "[a]ny

7

competently crafted class complaint literally raises common 'questions.'" *Id.* at 349 (citation

8

omitted).  Rather, "[w]hat matters to class certification . . . [is] the capacity of a class-wide

9

proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350

10

(citation omitted) (Rule 23(a)(2) requires plaintiffs "to demonstrate that the class members 'have

11

suffered the same *injury*'" (citation omitted) (emphasis added)).  "Dissimilarities within the

12

proposed class are what have the potential to impede the generation of common answers." *Id.*

13

(citation omitted).

14

Here, Plaintiffs identify a host of questions they claim are common to their proposed class

15

and subclasses.  But the answers to those 30 questions are not common to the proposed class and

16

subclasses in the way that Rule 23(a)(2) requires.  That is, and as explained below, those answers

17

will not result in the putative issues classes "prevail[ing] or fail[ing] in unison." *Amgen Inc. v.*

18

*Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 460 (2013).  Because of the many dissimilarities

19

among class members within the same issues classes and subclasses, "the individual circumstances

20

of particular class members [will] bear on the inquiry," *id.*, making this case unfit for class

21

treatment.

22

*Takings (three subclasses)*:  Not one of the "common issues" Plaintiffs identify with

23

respect to their takings claim is "common."  To prove a *per se* taking, a plaintiff must establish "a

24

physical appropriation of property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).

25

Plaintiffs must also establish, *inter alia*, that the City itself effected that appropriation. *Alves v.*

26

*United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998) ("[t]here clearly can be no taking when

whatever acts complained of are those of private parties, not the government"); *see also Yee v. City*

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 16

1    *of Escondido, Cal.*, 503 U.S. 519, 527 (1992).  The answer to Plaintiffs' first takings issue, whether

2    "the City's actions constitute a *per se* taking of the rights of the members of the Subclasses" (Dkt.

3    66-1 at p. 3), requires an individualized inquiry:  whether each putative subclass member was

4    deprived of his ability to access or use his property or of the ability to exclude others from his

5    property because of something the City did.

6         Because of clear dissimilarities among putative class members within the same subclass,

7    the answers to these questions will not be the same.  In order to establish a "blocked access" claim,

8    Plaintiffs must show that the City cut off ingress or egress to each class member's property.  This

9    question is unique for each class member.  So is the generalized claim that protestors physically

10   occupied Plaintiffs' properties via barriers or otherwise.  Some putative class members never were

11   inside any barriers; others were.  *See* Appendix C.  For others, any barrier effects varied by date

12   and time.  No Plaintiffs has provided any evidence that a driveway was blocked; others readily

13   admit that they always had access.  Farmer Decl., Exs. 47 (McDermott Dep. 164:5-6), 48

14   (Thompson Dep. at 76:2-10).  Not every building within the proposed Class Area was vandalized

15   or broken into.  Farmer Decl., Ex. 48 (Thompson Dep. at 111:5-15).  Some class members are

16   lessors and some are lessees, each of whose property interests are different and depend in

17   significant part on the specific terms of their individual rental contracts.  *See State v. Farmers*

18   *Union Grain Co., Paccar Auto.*, 908 P.2d 386, 389 (Wash. Ct. App. 1996) ("It is a matter of

19   contract; the parties are free to contract away any rights they may have under general law."

20   (citation omitted)).  In short, the question whether any class or subclass member had its property

21   unlawfully taken because of City action will (1) require individualized inquiry and (2) often (if not

22   always) be answered "no."

23        Plaintiffs' remaining takings issues (*see* Dkt. 66-1 at p. 3) also cannot be answered with

24   generalized proof.  For example, Plaintiffs' last takings issue ("Are members of the Subclass

25   entitled to nominal damages?")—like their last procedural and substantive due process issues—is

26   simply another way of asking whether the City's alleged actions violated the putative class and

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 17

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

subclass members' Fifth Amendment rights.  While it is true that "[w]here a plaintiff proves a violation of constitutional rights, nominal damages must be awarded as a matter of law," *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005), *amended* 2005 WL 1154321, the putative class and subclass members' "entitle[ment]" to nominal damages first requires the plaintiffs to prove that "every member of the class suffered the *same* deprivation of rights," *id.* (emphasis added).  For the reasons stated above, this question can be answered only based on how specific events, unfolding in different ways over a wide area, impacted or did not impact each class member.

   *Negligence (entire class)*:  The answers to Plaintiffs' negligence claims (*see* Dkt. 66-1 at p. 3) also require individual inquiry as to each purported class member.  Under the public duty doctrine, "a public entity—like any other defendant—is liable for negligence only if it has a statutory or common law duty of care."  *Osborn v. Mason Cnty.*, 134 P.3d 197, 202 (Wash. 2006).  The legislative intent exception to that doctrine provides that a duty may exist where the government fails to comply with a statute or ordinance that mandates government action.  *Washburn v. City of Fed. Way*, 310 P.3d 1275, 1287 (Wash. 2013).  The exception for failure to enforce also provides that a duty may exist where, *inter alia*, legislation "create[s] a mandatory duty" that governmental agents "take specific action to correct a violation" of which they have "actual knowledge," *Fishburn v. Pierce Cnty. Planning & Land Servs. Dep't*, 250 P.3d 146, 156 (Wash. Ct. App. 2011); *Ehrhart v. King Cnty.*, 460 P.3d 612, 619-20 (Wash. 2020).  Plaintiffs have identified three chapters of the Seattle Municipal Code to which they claim the City failed to adhere, and over 30 state statutes and ordinances they claim the City failed to enforce during the proposed Class Period.  Farmer Decl., Ex. 82.

   But the questions whether any one of those statutes created a duty and whether the City breached any such duty are not answerable on a class-wide basis.  For example, assuming RCW 9A.46.020 requires law enforcement to take into custody all individuals committing harassment (it does not), a duty under the failure to enforce exception does not arise unless a plaintiff can show

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

that law enforcement had "actual knowledge" of the specific harassment.  Thus, that SPD may

have known about an instance of harassment that occurred in Cal Anderson Park to Class Member

A on June 10 creates no duty enforceable in tort with respect to an incident of harassment that

occurred on the corner of 13th and Denny to Class Member B on June 25 involving a different

perpetrator; "actual knowledge" of the harassment to Class Member B first must be established to

give rise to a duty.  Likewise, Class Member C could not rely on law enforcement's failure to

intervene when Class Member A and Class Member B were harassed to prove that law

enforcement did not intervene when he was harassed (i.e, to establish breach).  Nor could Class

Member D rely on law enforcement's breach of a duty under RCW 9A.46.020 to establish that the

City breached a duty owed to Class Member D under SMC 11.25, SMC 15.52, or any other statute

or ordinance Plaintiffs identified in discovery.  Each alleged instance of negligence is inherently

individualized and would require the Court to analyze which of the more than 30 statutes each

Plaintiff is alleging was not enforced as to that Plaintiff, and whether that statute presents an

exception to the public duty doctrine.

   *Nuisance (entire class)*:  Plaintiffs allege that the City's affirmative acts or failures to act

caused several different types of nuisances, including "block[ed] public rights-of-way," "excessive

noise," "public safety hazards," "vandalism," and "poor health and sanitation conditions."  Dkt. 47

at ¶ 220.  They also have advanced an assertion that resolution of their identified nuisance issues

(i.e., whether the City's actions "g[a]ve rise to a nuisance" and whether "any nuisance" was

"reasonable in the circumstances" (Dkt. 66-1 at pp. 3-4)) "will involve evidence and law" that is

"common to all [putative] Class members."  Dkt. 65 at p. 28.

   This conclusory assertion is unsupported and wrong.  As the Supreme Court stated in *Wal-Mart*, the mere allegation that all putative class members "have all suffered a violation of the same

provision of law," 564 U.S. at 350, is not enough to satisfy Rule 23(a)(2)'s commonality

requirement:

> Title VII, for example, can be violated in many ways—by intentional
> discrimination, or by hiring and promotion criteria that result in disparate impact,
> and by the use of these practices on the part of many different superiors in a single

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 19

1

2

company.  Quite obviously, the mere claim by employees of the same company
that they have suffered a Title VII injury, or even a disparate-impact Title VII
injury, gives no cause to believe that all their claims can productively be litigated
at once.

3

4

*Id.*

5

Plaintiffs have not put forward any evidence showing that all putative class members

6

suffered the same type of nuisance (if any) during the Class Period.  Nor can they.  Those class

7

members living and working near 13th and Denny (i.e., over two blocks from the park) may not,

8

for example, have experienced the same "excessive noise" or light generated at the park as those

9

closer, if at all.  Nor would those same class members have suffered any nuisance arising from

10

"block[ed] public rights-of-way."  Barriers were never present in that part (or many other parts) of

11

the Class Area.  Farmer Decl., Ex. 48 (Thompson Dep. at 76:2-11; 77:4-14); Appendix C.  Nor is

12

there any evidence that those outside the barriers ever experienced "public safety hazards,"

13

"vandalism," or "poor health and sanitation conditions."[17]  Plaintiffs cannot prove their nuisance

14

claim on a class-wide basis.

15

*Procedural due process (three subclasses)*:  Plaintiffs assert—without citing a single

16

document or deposition—that resolution of their procedural due process issues (Dkt. 66-1 at p. 2)

17

will be based on "law" and "evidence" "common to each member of each Subclass." Dkt. 65 at p.

18

27.  This is a wholly unsupported assertion.  It is insufficient as a matter of law and, as a matter of

19

fact, incorrect.

20

As shown above, (1) the proposed Class Area includes blocks that were within and outside

21

any barriered area, with no evidence that those putative class members outside the barriers had

22

CHOP-related impediments accessing their buildings, businesses, or residences; (2) SPD and

23

SFD's response policies were dynamic throughout the Class Period and also differed between

24

zones/areas within the Class Area[18]; (3) the protestors' activities were largely isolated to areas

25

26

[17] Plaintiffs' nuisance claim for "poor health and sanitation conditions" is difficult to square with their current argument that the City's delivery of port-a-potties and sanitation stations to the area in order to maintain public health is one of the primary bases of their claims.

[18] Farmer Decl., Ex. 44 (Scoggin Dep. at 37:5-13, 77:7-22); Ex. 43 (Mahaffey Dep. at 36:22-38:23).

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 20

1    immediately in or near Cal Anderson Park and the East Precinct, blocks away from parts of the

2    Class Area; and (4) because of Covid-19 protocols and remote work opportunities, many

3    businesses within the Class Area remained closed and some residents temporarily relocated

4    elsewhere for the entirety of the Class Period or simply worked from home unaffected by any

5    CHOP-related activity.

6         The fact of any deprivation, the type of deprivation, and the part the City's actions played

7    in that deprivation (if any) cannot be established on a class- (or here, subclass-) wide basis.  *See*

8    *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

9         *Substantive due process (entire class)*:  The vast differences among the putative class

10   members and in the application of the City's alleged conduct within the Class Area also mean that

11   Plaintiffs' five substantive due process issues cannot be resolved on a class-wide basis.  As this

12   Court set forth in its October 16, 2020 order, to succeed Plaintiffs must prove, among other things,

13   that the City's "affirmative actions created or exposed" Plaintiffs and the putative class members

14   "to an actual, particularized danger that [they] would not otherwise have faced."  Dkt. 65 at p. 25

15   (citing Dkt. 23 at p. 18).

16        The answers to these questions cannot be ascertained through generalized proof.  Activities

17   within the CHOP varied within the Class Area and also varied by the specific date and time

18   between June 9 and July 1.  The City's response to the CHOP and the unprecedented, dynamic,

19   unfolding set of circumstances it presented thus also varied greatly both temporally and

20   geographically.  *See* Farmer Decl., Ex. 64 (Best Dep. at 174:18-19).  For instance, the protest zone

21   was largely contained to Cal Anderson Park and the area immediately around the East Precinct.

22   *See* Appendices A-D.  The City's activities in attempting to de-escalate the protests while also

23   protecting the protestors' First Amendment rights were also largely focused on these same areas.

24   The City has already established that several of the businesses within the Class Area were closed

25   and/or operating at limited capacity during the Class Period due to Covid-19 restrictions and that a

26   significant number of residents were either out of town or supported the protest activity during the

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 21

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   Class Period.  *See supra* Section II.A.  Consequently, to what extent, if any, the City exposed any
2   of the putative class members to the same, particularized danger cannot be answered on a class-
3   wide basis.

4        *Discovery disputes*:  Contrary to Plaintiffs' assertions, the issues related to the missing texts
5   must also be resolved on an individual basis.  As noted, several businesses remained closed and
6   several residents were living elsewhere due to Covid-19 throughout June and July 2020.  Issues
7   related to the missing texts therefore are irrelevant to those putative class members; they were not
8   injured by the City's actions, including any alleged deletion of text messages.

9        To the extent discovery issues are relevant to class certification at all, those issues
10  demonstrate that Plaintiffs are in different positions and have different levels of alleged spoliation
11  exposure as well.  Several Plaintiffs have conceded that they deleted or lost text messages relating
12  to CHOP after the litigation began and have made no efforts to recover them.  Farmer Decl., Ex. 48
13  (Thompson Dep. at 104:16-106:13); Ex. 19 (Donner Dep. at 197:20-24, 199:4-14); Ex. 28 (Biller
14  Dep. at 74:7-15, 211:9-14).  Additionally, Plaintiff Wade Biller testified that businesses in the Cal
15  Anderson area, including some Plaintiffs here, set up a group message board on the encrypted
16  messaging app, Signal, in order to discuss the CHOP.  But instead of preserving the messages and
17  producing them in the litigation, some Plaintiffs and businesses intentionally changed their settings
18  so that the messages would be deleted and not produced in the litigation:

19       Q:  Did anybody ever say anything about having set their setting to not retain the
         messages on Signal?
20
21       A:  People did change their settings to shorter settings from time to time
         depending on their comfort level.  I know LaRisa [of Northwest Liquor] was one
22       later in the game, just recently.  That was never the concern initially.  It became
         more of a concern as more people became aware that the information was being
23       shared with attorneys and people had concerns.

24  Farmer Decl., Ex. 28 (Biller Dep. at 74:7-15).  These missing text messages deprive the City of
25  statements made by the named Plaintiffs and putative class members that could illuminate other
26  differences between the putative class members' situations, including statements that could be

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 22

relevant to opposing certification of the many issues and subclasses Plaintiffs are asking this Court to certify.

### 2. No typicality: The plaintiffs have not shown that proposed subclass members suffered the same or similar injury as the proposed subclass representatives.

"The purpose" of Rule 23(a)'s typicality requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (citation omitted).

Plaintiffs argue, without any elaboration, that they "easily satisfy this standard" because each named Plaintiff "owned property in, did business in, or resided in the Class Area on the Class Date." Dkt. 65 at p. 29. This statement is wrong and woefully inadequate to establish that anyone in Plaintiffs' three proposed subclasses even suffered an injury, much less (1) an injury that was the "same or similar" to the injury allegedly suffered by the proposed subclass representative or (2) that any "same or similar" injury suffered was the result of the same course of conduct—a prerequisite under Rule 23(a)'s typicality requirement. As the *Sprague v. General Motors Corp.* court held, typicality is not present where a "named plaintiff who proved his own claim would not necessarily have proved anybody else's claim. The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." 133 F.3d 388, 399 (6th Cir. 1998) (citation omitted).

Here, for each of Plaintiffs' claims, each Plaintiff and each putative class or subclass member must prove (1) an action by the City that (2) caused that person or entity harm. Doing so will require individualized proof to establish the *fact* of injury, and also the *cause* of the alleged injury. Only some of the putative class and subclass members (assuming they were even present during the CHOP) lived, worked, and/or owned property within the SPD and SFD Red Zones of the Class Area, and the experiences of people inside and outside that zone were vastly different.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 23

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

Plaintiffs' proposed Property Owners Subclass representative Hunters Capital is even claiming

damages for properties many blocks *outside* the Class Area.  Farmer Decl., Ex. 84 (Oaksmith Dep.

at 144:8-146:1).

Typicality "is not satisfied" "[w]here some of the class members have not suffered any

injury, though the class representative has." *Ferguson v. Randy's Trucking, Inc.*, No. 1:15-00697,

2016 WL 4082900, at *10 n.7 (E.D. Cal. Mar. 11, 2016).[19]  Here, Rancho Bravo, which until

February 7, 2022, was a named Plaintiff, actually saw an increase in revenue during the

approximately three-week time period between June 9, 2020 and the date the City cleared Cal

Anderson Park and the surrounding area.  Farmer Decl., Ex. 39.  So, too, did Plaintiff Richmark

Label.  Farmer Decl., Ex. 40.  King County's Covid-19 protocols also affected different members

of the putative Business Owners class differently.  Some businesses within the Class Area, like

Unicorn Bar but unlike the proposed Business Owners Subclass representatives, were required to

remain closed by the Covid-19 rules for the duration of the Class Period.  Many members of the

putative Residents and Business Owners Subclasses actively supported the protests, with several

members of the putative Business Owners Subclass posting messages in support of the protests on

social media and some members of the putative Residents Subclass participating in the protests or

otherwise voicing their support.  *See supra* at p. 8 & n.5.  Plaintiffs fail to satisfy Rule 23(a)(3)

typicality.

### 3.   No adequacy: The plaintiffs cannot fairly and adequately protect absent class members.

As Plaintiffs acknowledge (Dkt. 65 at p. 29), the "determin[ation] as to "whether the

adequacy prong is satisfied" requires that "courts consider two questions: '(1) Do the

representative plaintiffs and their counsel have any conflicts of interest with other class members,

and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf

---

[19] *See also Burton v. Nationstar Mortg., LLC*, No. 1:13-00307, 2014 WL 5035163, at *11 (E.D. Cal. Oct. 8, 2014) (same), *report and recommendation adopted*, 2014 WL 5528140 (E.D. Cal. Oct. 31, 2014); *O'Neill v. Gourmet Sys. of Minn., Inc.*, 219 F.R.D. 445, 453 (W.D. Wis. 2002) (no typicality where "it is likely that many of the members of plaintiff's proposed classes have suffered *no injury at all*").

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   of the class?'" *Schumacher v. Inslee*, No. C18-5535 MJP, 2021 WL 1019823, at *2 (W.D. Wash.

2   Mar. 17, 2021) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003)).  An

3   irreconcilable conflict preventing class certification exists when some members of the class

4   support the defendant's conduct and or/goals at issue.  *See Mayfield v. Dalton*, 109 F.3d 1423,

5   1427 (9th Cir. 1997) (finding impermissible intra-class conflict with class members "who did not

6   oppose the" conduct at issue "and who, in fact, approved of it and wished the policies fully

7   enforced"); *Schumacher*, 2021 WL 1019823, at *3 ("the Plaintiffs cannot represent those who

8   approve of the Union and its activities").

9         Here, the opinions of the putative subclass members were and are deeply divided about the

10   propriety, legality, and wisdom of the City's actions at issue in this lawsuit.  Many disagree with

11   Plaintiffs' decision to sue.  One putative Class member wrote to her landlord (Hunters Capital) on

12   June 17, 2020:

13         Over the past couple weeks, it has become increasingly clear that Ryan and my
          personal political views and those of Hunters Capital and the Broadway Building
14         are not aligned.  We fully support Black Lives Matter, disagree with your
          statement that "civil disobedience is not the answer" in reference to the CHOP,
15         and it is not hyperbole to say that I have felt safest in this neighborhood in the
          past week and a half that SPD has been removed from the East Precinct.
16
          We would like to make a request that when Hunters Capital and the Broadway
17         Building engage in talks with the city, SDOT, and SPD that you not speak on our
          behalf politically or lump our views in with those of our organizations. . . .
18
19         . . . [W]e feel it is necessary that we voice our support of the CHOP . . . .

20   Farmer Decl., Ex. 23.  Others reacted similarly, approving the City's decision to withdraw from

21   confrontations with protesters.  Farmer Decl., Ex. 24; Ex. 83.

22         The owner of Poquitos, a restaurant just one block from the East Precinct and well within

23   the Class Area, opted not to join this lawsuit stating, "Other than being closed for the two days out

24   of concern for the staff and losing a limited number of sales due to doing take out sales, which was

25   our choice, it's nothing worse than what we were dealing with with the protests and nightly

26   dispersals."  Farmer Decl., Ex. 41.  Instead, Poquitos pursued its own claim for $123.32 for a

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 25

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

1    broken window against the City (Farmer Decl., Ex. 42), further confirming that a class action is not

2    necessary for redress.  Plaintiffs' adequacy arguments fail.

3    **C.      Plaintiffs Failed to Demonstrate Compliance with Rule 23(b).**

4           **1.      No predominance: Any City liability requires individualized determinations.**

5           Although Rule 23(b)(3)'s predominance inquiry does not apply in quite the same way in

6    the context of an issue class, *see Stickles v. Atria Senior Living, Inc.*, No. C 20-09220 WHA, 2021

7    WL 6117702, at *7 (N.D. Cal. Dec. 27, 2021) ("[i]ssue certification requires that common

8    questions predominate over individual questions with respect to only the specific issue[s] that [are]

9    certified"), courts have warned against the "overly aggressive application of Rule 23(c)(4)"

10   precisely because that overly aggressive application "would nullify Rule 23(b)(3)'s predominance

11   requirement." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 464

12   (S.D.N.Y. 2018) (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996 ("[T]he

13   result would be automatic certification in every case where there is a common issue, a result that

14   could not have been intended."))).  "'[A] class action movant cannot gerrymander predominance

15   by suggesting that only a single issue be certified for class treatment (in which, by definition, it

16   will "predominate")' when more substantial individual issues remain." *Id.* (quoting 1 *McLaughlin

17   on Class Actions*, § 4:43 (14th ed.)); *see also Valentino*, 97 F.3d at 1234 (error not to consider

18   predominance).

19          Here, Plaintiffs attempt to satisfy Rule 23(b)(3)'s predominance requirement by arguing

20   that the issues they seek to certify will "[w]ithout exception" "turn on common evidence and legal

21   argument": "None of the issues turn on evidence about what any Plaintiff or Class member did or

22   did not do, or what specifically was done or said to any Plaintiff or Class member."  Dkt. 65 at p.

23   30.  This is untrue.  And it is based on a misunderstanding of the law.  Plaintiffs' position is that,

24   because they have pointed to anecdotal and often isolated instances of vandalism, uncollected or

25   accumulated trash, violent acts by third parties, etc. that occurred somewhere within the 16-block

26   Class Area at some point during the three-week period between June 9 and July 1, 2020, they have

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 26

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

1   satisfied Rule 23(b)(3)'s predominance requirement as to the City's liability with respect to each of

2   the 30 issues they seek to have this Court certify.  Not so.

3        To establish predominance, Plaintiffs must produce evidence that is capable of use at trial

4   in individual—not just class action—cases.  *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442,

5   456 (2016) (representative evidence is permissible to establish predominance if "each class

6   member could have relied on that sample to establish liability if he or she had brought an

7   individual action."). This is the rule because plaintiffs and defendants cannot have "different rights

8   in a class proceeding than they could have asserted in an individual action."  *Id.* at 458.  If

9   evidence could not be "relied on . . . to establish liability" in an "individual action," *id.* at 455, then

10   it cannot establish predominance at the class certification stage.

11        Here, Plaintiffs cannot satisfy the predominance requirement because the evidence

12   Plaintiffs will put forward in an attempt to establish the City's liability on a class-wide basis would

13   not be sufficient to establish liability in the context of individual actions, regardless of the subclass

14   in which the putative class member would fall.  *See supra* Section III.B.1.  No putative class

15   member, for example, could rely of Madrona's claim for ▮▮▮▮▮▮▮▮ in lost rent from

16   Unicorn Bar in order to prove that they too have a claim against the City based on the City's

17   actions regarding the CHOP; the evidence establishes that all of that lost rent was because Covid-

18   19 protocols prevented Unicorn Bar from opening until mid-August 2020, and not because of the

19   CHOP.  Farmer Decl., Ex. 10.  Nor could any putative class member cite to the alleged graffiti or

20   other physical damage to named Plaintiff Hunters Capital's Dunn Motors Building, Greenus

21   Building, or Colman Building (*see* Farmer Decl., Ex. 84 (Oaksmith Dep. at 144:8-146:1)) to prove

22   their claims against the City; those three buildings all are located more than three blocks away

23   from the Class Area.  *See* Appendix A; *see also, e.g.*, *Duncan v. Nw. Airlines, Inc.*, 203 F.R.D.

24   601, 602 (W.D. Wash. 2001) ("a negligence claim . . . requires an individualized examination of

25   causation and proof of present injury").  Common issues do not predominate here, even as parsed

26   by Plaintiffs.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 27

1
2

### 2.     No superiority: Putative class and subclass members have an incentive  to pursue their claims against the City on an individualized basis.

"The superiority inquiry under Rule 23(b)(3) requires determining whether the objectives of the particular class action procedure will be achieved in the particular case," and thus "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998), *overruled on other grounds*, *Wal-Mart*, 564 U.S. 338; *see also Valentino*, 97 F.3d at 1234-35 (class action superior only "if no realistic alternative exists").  In making that determination, courts "assess[ ] . . . the non-exclusive factors listed in Rule 23(b)(3)," *Hanlon*, 150 F.3d at 1023, including (1) "the class members' interests in individually controlling the prosecution or defense of separate actions," Fed. R. Civ. P. 23(b)(3)(A); (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," Fed. R. Civ. P. 23(b)(3)(B); and (3) "the likely difficulties managing a class action," Fed. R. Civ. P. 23(b)(3)(D).  Application of those factors here makes plain that class treatment of Plaintiffs' claims is not "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To the contrary, class certification is not necessary to allow putative class and subclass members to pursue their claims against the City on an individualized basis, whether administratively or through litigation.

First, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citation omitted); *see also Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (first 23(b)(3) factor "weighs in favor of certifying a class action . . . [w]here damages suffered by each putative class member are not large").  Consequently, actions involving larger claims susceptible to individual proof weigh against certification.  *See, e.g.*, *Zinser*, 253 F.3d at 1190-91 (denying certification where minimum damages claim for each plaintiff/class member exceeded $50,000).[20]

---

[20] *Colman*, 325 F.R.D. at 651 (denying certification of class of "sophisticated" investors "with claims that range from $15,000 to as much as $17,350,200"); *Cole v. Gene by Gene, Ltd.*, 322 F.R.D. 500, 508 (D. Alaska 2017) (individual

The same is true for actions providing for the availability of attorney fees. *See, e.g.*, *Morrison v. Esurance Ins. Co.*, C18-1316 TSZ, 2020 WL 583824, at *6 (W.D. Wash. Feb. 6, 2020); *Truesdell v. Thomas*, 889 F.3d 719, 723 (11th Cir. 2018) (superiority requirement not met where law at issue "encourages individual litigation by offering liquidated damages and attorney's fees").

Here, the "large dollar values" of Plaintiffs' estimated damages claims and the availability of attorney fees pursuant to federal law (*see* Dkt. 47 at p. 68 (praying for attorney fees)) "shows that individual actions are a logically and economically viable alternative to class treatment." *Colman v. Theranos, Inc.*, 325 F.R.D. at 629, 651 (N.D. Cal. 2018).  Indeed, Plaintiffs' preliminary damages estimates,[21] summarized immediately below, confirm that all but four of the named Plaintiffs seek damages of over $50,000, with Hunters Capital seeking more than $3.7 million in damages:

| Plaintiffs' Estimated Damages (May 10, 2021) | |
|---|---|
| Plaintiff | Damages Amount |
| Argento | $68,950 |
| Bergman's Lock and Key Services | $19,800 |
| Wade Biller | (unquantified) |
| Hunters Capital, LLC | $3,787,423 |
| Madrona Entities | $209,816 |
| Olive St. Apartments LLC | $71,505 |
| Onyx Homeowners Association | $9,505 |
| Matthew Ploszaj | $50,000 |
| Redside Partners | $10,000 |
| Richmark Company | $217,135 |
| Shuffle LLC (d/b/a Cure Cocktail) | $397,443 |
| SRJ (d/b/a Car Tender) | $240,000 |
| Sway and Cake | $169,765 |
| **TOTAL** | **$5,764,562** |

Farmer Decl., Ex. 14 (Cronauer Dep. at 89:7-18); Ex. 82; Exs. 85-90.

Second, the several other legal actions pending against the City seeking protest-related

---

claim for $100,000 "weighs strongly against class certification"); *Stoudt v. E.F. Hutton & Co.*, 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (superiority defeated where plaintiff "possesse[d] sufficient wealth to benefit from a tax shelter and [sought] recovery in the amount of 'at least' $60,000").

[21] Some Plaintiffs revised their claimed damages during deposition discovery; their May 10, 2021 discovery responses remain a fair benchmark of their estimated damages for purposes of this motion practice.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 29

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   damages also weigh against class certification.  As the Ninth Circuit stated in *Zinser*, "the

2   existence of [other] litigation indicates that some of the interested parties have decided that

3   individual actions are an acceptable way to proceed, and even may consider them preferable to a

4   class action," which in turn indicates that "a class action may not be appropriate."  253 F.3d at

5   1191 (citation omitted).  Not including Plaintiffs, over 85 claimants have filed notices of tort

6   claims for various protest-related damages allegedly caused by the City in and around the Class

7   Area.  Farmer Decl., Ex. 42.   And over 50 of those claims are being prosecuted as individual tort

8   actions in state and federal court.  *Id.*  Plaintiffs also concede that "dozens" of putative class and

9   subclass members "are interested in pursuing their own lawsuits against the City" and have

10  indicated they would be willing to "file their own case" (Dkt. 66 at p. 3 ¶ 6; Dkt. 65 at p. 32), thus

11  demonstrating that the issues Plaintiffs seek to have certified can be and are being litigated on

12  individual bases.

13          Finally, the difficulties and inefficiencies in managing a class action which typically weigh

14  against certification are not only "likely," but instead certain to occur in this case.  "[A] class

15  action is not 'superior'" under Rule 23(b)(3)(4) "[i]f each class member has to litigate numerous

16  and substantive separate issues to establish his or her right to recover individually."  *Zinser*, 253

17  F.3d at 1192.[22]  Here, and as discussed in more detail in the next section, even if all 30 of

18  Plaintiffs' proposed issue classes were certified, additional and significant issues necessary to

19  establish the City's liability would remain unresolved.  Plaintiffs' own proposed trial plan makes

20  that plain.  In addition to deferring the adjudication of class members' "Causation Questions" to

21  "subsequent proceedings," Plaintiffs' proposed trial plan also acknowledges that additional

22  discovery on issues of the City's liability to all unnamed class members also would need to be

23  taken following trial of the certified claims: "Prior to this trial, the parties will have full discovery

24  on all *common* issues . . . ."  Dkt. 66-1 at p. 6 (emphasis added).  Class treatment is not superior.

25

26  _____

[22] *See also Berry v. Transdev Servs., Inc.*, No. C15-01299-RAJ, 2019 WL 117997, at *7 (W.D. Wash. Jan. 7, 2019)
    (denying certification where "class action would be unmanageable given the predominance of the individual issues
    necessary to establish [defendants'] liability"); *Tasion*, 308 F.R.D. at 640 (superiority requirement not met where
    "certification . . . of an issue would resolve only one of many issues necessary to establish liability").

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 30

1   **D.    Plaintiffs Have Failed to Comply with Rule 23(c).**

2          Even if Plaintiffs had satisfied Rules 23(a) and (b)(3), they have failed to show that

3   certification of any of the proposed issues or subclasses is "appropriate," i.e., would "materially"

4   or "significantly" "advance th[is] litigation," as Rules 23(c)(4) and (c)(5) require.  *Valentino*, 97

5   F.3d at 1229; *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal.

6   2015).  Certification of Plaintiffs' proposed issues classes and subclasses will not "achieve[]

7   judicial economy and efficiency."  *Valentino*, 97 F.3d at 1229.  The opposite in fact: certifying

8   Plaintiffs' multiple subclasses and issue classes will leave unresolved many issues necessary to

9   establish the City's liability to any putative class member, in addition to any damages owed.

10         The "typical" Rule 23(c)(4) case is one in which certification resolves all of the issues

11  "necessary to establish . . . liability," "leaving only damages to be litigated on an individual bases."

12  *Tasion*, 308 F.R.D. at 640 (citing *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 214, 226 (2d

13  Cir. 2006) (Rule 23(c)(4) may be used "to separate the issue of liability from damages")); *accord*

14  Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment ("the action may retain its 'class'

15  character only through the adjudication *of liability to the class*; the members of the class may

16  thereafter be required to come in individually and prove *the amounts* of their respective claims"

17  (i.e., not whether they have a claim) (emphasis added)).  This is also true of the cases Plaintiffs cite

18  on page 32 of their opening brief.[23]

19         This case, however, is not the typical Rule 23(c)(4) or (5) case.  Even if Court certified

20  each of the proposed issues and subclasses, and the Court and jury were to resolve in Plaintiffs'

21  favor each of the 30 issues they identify at the first proposed trial, the question of the City's

22  liability to the putative class and subclass members could not be answered on a class basis with

23  respect to each of the five claims Plaintiffs have brought against the City.  These unresolved issues

24

25  [23] *See* Dkt. 65 at p. 32 (citing *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (reversing denial of
    certification, where district court "based its manageability concerns on the need to individually calculate damages"); *In*
26  *re Whirlpool*, 722 F.3d 838, 861 (6th Cir. 2013) (certifying class where "resol[ution]" of "the common liability
    questions" would allow the court to "either enter judgment for [the defendant] or proceed to the question of plaintiffs'
    damages"); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (certifying two subclasses, where
    "[t]here [wa]s a single, central, common issue of liability: whether the Sears washing machine was defective")).

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 31

1  of liability would include, without limitation (1) for Plaintiffs' procedural and substantive due

2  process claims, whether the individual class/subclass member (as opposed to some other putative

3  class/subclass member) was deprived of a constitutional right because of the City's actions or

4  statements; (2) for Plaintiffs' takings claim, whether the City's actions deprived the individual

5  class/subclass member all or nearly all of their use or access to their property and whether the

6  individual class/subclass member has standing to pursue a takings claim under the terms of their

7  respective lease; (3) for Plaintiffs' negligence claim, the key issues of causation and harm; and (4)

8  for Plaintiffs' nuisance claim, whether the individual class/subclass member experienced the

9  particular nuisance caused by the City's conduct.  In addition, each putative class/subclass member

10  claiming economic harm damages would also have to prove that the City's actions were both the

11  cause-in-fact and proximate cause of that economic harm, as opposed to, for example, the result of

12  Covid-19 concerns and protocols.

13  Courts have declined to certify issues classes and subclasses in cases presenting

14  circumstances similar to those outlined above.  In *McLaughlin v. American Tobacco Co.*, for

15  example, the Second Circuit declined to "employ Rule 23(c)(4) to certify a class as to common

16  issues that do exist," reasoning:

> Nevertheless, in this case, given the number of questions that would remain for individual adjudication, issue certification would not 'reduce the range of issues in dispute and promote judicial economy.'  Certifying, for example, the issue of defendants' scheme to defraud, would not materially advance the litigation because it would not dispose of larger issues such as reliance, injury, and damages.

21  522 F.3d 215, 234 (2d Cir. 2008) (citation omitted), *abrogated on other grounds*, *Bridge v. Phx.*

22  *Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Tasion*, 308 F.R.D. at 640 (declining to certify a

23  Rule 23(c)(4) class where, as here, "certification . . . would resolve only one of many issues

24  necessary to establish only liability").  In light of the number of issues that would remain

25  unresolved in this case, certification of Plaintiffs' proposed issues and subclasses is inconsistent

26  with the requirements of Rules 23(c)(4) and (5).

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 32

1   **E.      Plaintiffs Have Failed to Establish that Putative Class Members Have Standing.**

2          Finally, even if Plaintiffs otherwise satisfy Rule 23's requirements, certification of the

3   proposed issues and subclasses is inappropriate: some members of Plaintiffs' putative class and

4   subclasses lack the requisite Article III standing.  *See Amchem*, 521 U.S. at 612-13 (while

5   "appropriate to reach [class certification issues] first" because they are "logically antecedent to the

6   existence of any Article III issues," courts also must be "mindful" of "Article III constraints, and

7   with the Rules Enabling Act," 28 U.S.C. § 2072(b)); *accord Ortiz v. Fibreboard Corp.*, 527 U.S.

8   815, 845 (1999).

9          Plaintiffs, as the party invoking federal jurisdiction, "bear the burden of demonstrating

10  standing," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), i.e., that they (1) "suffered

11  an injury in fact," (2) "the injury is fairly traceable to the challenged conduct," and (3) the injury

12  "is likely to be redressed by a favorable judicial decision," *Mazza v. Am. Honda Motor Co., Inc.*,

13  666 F.3d 581, 594 (9th Cir. 2012) (citations omitted); *see also Spokeo, Inc. v. Robbins*, 578 U.S.

14  330, 340 (2016) ("an injury in fact must be both concrete *and* particularized").  In the context of a

15  class action, the Supreme Court in *TransUnion* established that "[e]very class member must have

16  Article III standing in order to recover individual damages."  141 S. Ct. at 2208 ("Article III does

17  not give federal courts the power to order relief to any uninjured plaintiff, class action or not."

18  (quoting *Tyson Foods*, 577 U.S. at 466 (Roberts, C.J., concurring))); *see also* 28 U.S.C. § 2072(b)

19  (no court rule, including Rule 23, "shall . . . abridge, enlarge or modify any substantive right").

20  While the Supreme Court has not "address[ed] the distinct question whether every class member

21  must demonstrate standing *before* a court certifies a class," *TransUnion*, 141 S. Ct. at 2208 n.4

22  (emphasis added), the Ninth Circuit has: "[N]o class may be certified that contains members

23  lacking Article III standing," *Mazza*, 666 F.3d at 594 (citation omitted); *see also Bunch v.*

24  *Nationwide Mut. Ins. Co.*, No. C12-1238JLR, 2013 WL 6632025, at *5 (W.D. Wash. Dec. 17,

25  2013) ("Under controlling Ninth Circuit law, the court may not certify a proposed class containing

26

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1  members who cannot establish an Article III case or controversy.").[24, 25]

2        Plaintiffs' proposed subclasses include all individuals and businesses who on a single day,

3  June 9, 2020, were either property owners, held business licenses, or were residents in the Class

4  Area.  Dkt. 65 at p. 20.  This group includes the absent property owners who leased their property

5  to tenants who continued to pay their rent during the Class Period (the vast majority); the

6  businesses that were closed, not because of CHOP, but because of Covid-19-related restrictions or

7  concerns; the residents who were out of town during CHOP; the property owners who closed on

8  the sale of their property after June 9 based on a purchase and sale agreement entered into before

9  that date; the numerous proposed class members who did not experience restricted access or other

10  adverse impacts due to the CHOP; the "licensed" business owners whose licensed businesses were

11  outside the CHOP (the address associated with a Seattle business license is often not the location

12  of the actual business); and those proposed class members who actually participated in or assisted

13  the CHOP protests about which Plaintiffs complain.  None of these listed individuals or businesses

14  would have Article III standing, as they did not experience any "injury-in-fact":

15           We have consistently distinguished injury from damages.  *See, e.g.*, *Newton v.*
16           *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 188 (3d Cir. 2001)
            ("Proof of injury (whether or not an injury occurred at all) must be distinguished
17           from calculation of damages (which determines the actual value of the injury).")
            This is significant, as we apply a more lenient predominance standard for
18           damages than for injury.  While every plaintiff must be able to show . . . injury
            through evidence that is common to the class, . . . damages need not be
19           "susceptible of measurement across the entire class for purposes of Rule
            23(b)(3)."
20
21  *In re: Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (citations

22  omitted).

23

24  _____

25  [24] *But see K.M. v. Regence Blueshield*, No. C13-1214RAJ, 2014 WL 801163, at *3 (W.D. Wash. Feb. 27, 2014) (but relying on dicta).

26  [25] The City also notes that the Ninth Circuit's pending en banc opinion in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774 (9th Cir. 2021), *reh'g en banc granted*, 5 F.4th 950, may provide additional, definitive guidance regarding the extent to which, if at all, a proposed class that contains uninjured parties, may be certified.  Those standing arguments were briefed and argued to the en banc panel.

CITY OF SEATTLE'S OPP'N MOTION CLASS CERTIFICATION
(Case No. 20-cv-00983 TSZ) - 34

If class members themselves do not believe they suffered an "injury in fact," let alone one "fairly traceable" to the City's decisions on how to manage the situation in the Class Area in June and early July 2020, then those putative class members lack Article III standing and a case cannot be prosecuted on their behalf.  Here, the evidence confirms that some of the proposed class members either participated in the CHOP or assisted those who participated.  These class members include residents of the 12th Ave Arts, residents of the Packard building, certain tenants of Hunters Capital, the Sunset Electric Apartments, and several business owners within the Class Area.  *See supra* p. 5 & n.8.  These are hardly the responses of individuals or businesses believing themselves harmed by the City's decision to allow CHOP protesters to exercise their First Amendment rights while managing the City's response in a way intended to maintain safety and avoid violence in the area.

Plaintiffs cannot be permitted to pursue claims on behalf of imputed class members who could not bring an action themselves because they suffered no "injury in fact."

### IV.    CONCLUSION

Plaintiffs have "stretch[ed]" Rule 23 "beyond its intended application."  *Tasion*, 308 F.R.D. at 639.  Consequently, and for the foregoing reasons, the City requests that the Court decline to certify any of Plaintiffs' proposed issues or subclasses and dismiss the class allegations.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    DATED this 7th day of February, 2022.

2   Ann Davison                          HARRIGAN LEYH FARMER & THOMSEN LLP
    Seattle City Attorney
3

4   By: _s/ Joseph Groshong_____       By: _s/ Arthur W. Harrigan, Jr._____
        Joseph Groshong, WSBA #41593     By: _s/ Tyler L. Farmer_____
5       Assistant City Attorney          By: _s/ Shane P. Cramer_____
        Seattle City Attorney's Office   By: _s/ Bryn R. Pallesen_____
6       701 Fifth Avenue, Suite 2050     By: _s/ Erica Iverson_____
        Seattle, WA 98104                    Arthur W. Harrigan, Jr., WSBA #1751
7       Tel:  (206) 684-8200                 Tyler L. Farmer, WSBA #39912
        Joseph.Groshong@seattle.gov          Shane P. Cramer, WSBA #35099
8                                            Bryn R. Pallesen, WSBA #57714
9                                            Erica Iverson, *Pro Hac Vice*
                                             999 Third Avenue, Suite 4400
10                                           Seattle, WA 98104
                                             Tel:  (206) 623-1700
11                                           arthurh@harriganleyh.com
12                                           tylerf@harriganleyh.com
                                             shanec@harriganleyh.com
13                                           brynp@harriganleyh.com
                                             ericai@harriganleyh.com
14

15                       *Attorneys for the City of Seattle*

16

17

18

19

20

21

22

23

24

25

26

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

# APPENDIX A



## SPD Red Zone and Named Plaintiffs' Locations

### Locations Inside the Red Zone

1. Argento LLC
2. HC: The Ballou Wright Building
3. HC: The Pike Building
4. 12th & Pike Associates LLC
5. Northwest Liquor and Wine LLC
6. Olive Street Apartments LLC
7. Onyx Homeowners Association
8. Matthew Ploszaj
9. Redside: Oddfellows Building
10. Richmark Company DBA Richmark Label
11. Sway and Cake LLC
12. Wade Biller

### Locations Within Class Area but Outside Red Zone

13. Bergman's Lock and Key Services LLC
14. HC: The Broadway Building
15. HC: The 900 Pine Building
16. Redside: 1715 12th Ave
17. Shuffle LLC DBA Cure Cocktail
18. SRJ Enterprises DBA Car Tender

### Locations Outside the Class Area

19. HC: The Dunn Motors Building
20. HC: The Greenus Building
21. HC: The Colman Building
22. Madrona Real Estate Investors VI LLC
23. Madrona Real Estate Investors IV LLC
24. Madrona Real Estate Services LLC
25. Redside: 1323 E. Pine Street

Class Area    SPD Red Zone

# APPENDIX B



**SFD Red Zone (June 12–29, 2020) and Named Plaintiffs' Locations**

**Locations Inside the Red Zone**

1. Argento LLC
2. HC: The Ballou Wright Building
3. HC: The Pike Building
4. 12th & Pike Associates LLC
5. Northwest Liquor and Wine LLC
6. Olive Street Apartments LLC
7. Onyx Homeowners Association
8. Matthew Ploszaj
9. Redside: Oddfellows Building
10. Richmark Company DBA Richmark Label
11. Sway and Cake LLC
12. Wade Biller

**Locations Within Class Area but Outside Red Zone**

13. Bergman's Lock and Key Services LLC
14. HC: The Broadway Building
15. HC: The 900 Pine Building
16. Redside: 1715 12th Ave
17. Shuffle LLC DBA Cure Cocktail
18. SRJ Enterprises DBA Car Tender

**Locations Outside the Class Area**

19. HC: The Dunn Motors Building
20. HC: The Greenus Building
21. HC: The Colman Building
22. Madrona Real Estate Investors VI LLC
23. Madrona Real Estate Investors IV LLC
24. Madrona Real Estate Services LLC
25. Redside: 1323 E. Pine Street

Class Area   — — SPD Red Zone

# APPENDIX C



**Barriers (June 10, 2020)**

1. Argento LLC
2. HC: The Ballou Wright Building
3. HC: The Pike Building
4. 12th & Pike Associates LLC
5. Northwest Liquor and Wine LLC
6. Olive Street Apartments LLC
7. Onyx Homeowners Association
8. Matthew Ploszaj
9. Redside: Oddfellows Building
10. Richmark Company DBA Richmark Label
11. Sway and Cake LLC
12. Wade Biller
13. Bergman's Lock and Key Services LLC
14. HC: The Broadway Building
15. HC: The 900 Pine Building
16. Redside: 1715 12th Ave
17. Shuffle LLC DBA Cure Cocktail
18. SRJ Enterprises DBA Car Tender
19. HC: The Dunn Motors Building
20. HC: The Greenus Building
21. HC: The Colman Building
22. Madrona Real Estate Investors VI LLC
23. Madrona Real Estate Investors IV LLC
24. Madrona Real Estate Services LLC
25. Redside: 1323 E. Pine Street

Class Area | Hard Closure (No Vehicle Access) | Soft Closure (Local Access) | City-Related Service Vehicles Only | Local Access Only

# APPENDIX D

SEA-SPD_006804

Option 3: Closing Pine from 10th to 11th, Half Street Closure from 11th to Alley

