# EXHIBIT 19

BILL DONNER
11/16/2021

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
          Plaintiffs,          )
                               )
     vs.                       )  No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
          Defendant.           )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

BILL DONNER - RICHMARK LABEL
_____

CONTAINS CONFIDENTIAL PORTIONS

DATE:  Tuesday, November 16, 2021

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

1  personally.  I didn't know what their beliefs, attitude.  I
2  didn't know if they were belligerent.  The best thing to do
3  was just say nice, polite -- please, thank you, can you
4  help us move so we can get in.  They generally did, but
5  they moved barricades back enough so that a car, sometimes
6  a truck could get in.
7         We -- I'd have some of my employees and me stay
8  out there, tell employees, truck, yeah, you can come in.
9  Most of the time during the month trucks did get in, people
10 came in.  There were some truck drivers, their company said
11 they didn't have to, they were afraid.  They were
12 intimidated.  So there were times when we didn't get
13 shipment in or we didn't get shipments out.
14        Customers -- there were no press checks then.
15 People just -- if they didn't have to deal with what was
16 going on up there, people didn't come up.
17     Q.   The protests or the people on 11th and Olive --
18 they were generally very polite; is that right?
19          MR. WEAVER:  Objection.
20     A.   To my best recollection, most of the time, yes.
21 BY MR. CRAMER:
22     Q.   And they moved the blockages when -- when you
23 asked them to move them?
24     A.   Some would.  Some -- some of them were heavy.
25 Sometimes they would go get a couple other people, so my

BILL DONNER
11/16/2021

Page 50

1   people and those people -- we have to move a couch, we'd
2   move the barricades.  We got -- we managed.  We managed.
3   Some days were much tougher than other days.
4        Q.   But every day you were able to get to your
5   business?
6        A.   Yeah.  Sometimes not exactly when we needed to.
7   Sometimes it was a half hour later, sometimes the
8   barricades were heavier, took more of us to move them.
9   There were a couple of times when one of the protesters
10  went and got several other people to help move some of the
11  stuff out of the way.  So there was only one woman one
12  time -- school teacher from Puyallup -- who threatened
13  Mr. Zimbabwe and me.  And that was one time, one morning
14  out of the entire month.
15       Q.   And so it seems like Mr. Zimbabwe was there, too,
16  assisting you?
17       A.   Not in moving things, but he was in the area.  I
18  don't know how often.  He didn't come to see me all the
19  time.  I was not, you know, the focus of his attention, but
20  he was as everybody else, very polite, sympathetic, no
21  promises.  You know, I would ask everybody if they heard
22  anything, please let me know, especially around eventually
23  when it came time that the assumption was made by me, my
24  employees that this couldn't go on forever and we just
25  wanted to know about it.

BILL DONNER
11/16/2021

Page 53

1      A.   I do believe I remember at least once when
2  some -- Department of Transportation truck came in to haul
3  away some garbage, but I can't tell you how many times,
4  what time of day or anything.  That seems to be a
5  recollection I have.
6  BY MR. CRAMER:
7      Q.   And did anyone from the City ever talk to you
8  about how trucks -- the plan for the roads would make it
9  possible for trucks coming to Richmark to go north on 11th?
10          MR. WEAVER:  Objection.
11     A.   No.
12 BY MR. CRAMER:
13     Q.   So how did trucks access Richmark during that
14 time period?
15     A.   Most would come south on 12th Avenue, take a
16 right on Olive, the north corner of our block, a left onto
17 11th, and some also got in from -- on John Street, which is
18 a couple blocks further north at the north end of the
19 park -- no, beyond the north end of the park -- some would
20 come down that for a while.  I could come down that.  I
21 normally would come Pine to come to work, but I switched
22 over to John and could come straight down 11th.
23          So some trucks came down 11th all the way from
24 John, some went 12th, but they all entered going south on
25 11th from Olive, the north corner of the building -- of the

Page 54

1    block, rather.
2         Q.   And I think you said earlier that there were a
3    few occasions where trucks couldn't get there, but
4    generally, trucks were able to access Richmark Label during
5    the entire time period; right?
6              MR. WEAVER:   Objection.
7         A.   Most of the time, yes.
8    BY MR. CRAMER:
9         Q.   And were they able to utilize the parking lot on
10   11th?  Is that where trucks come in and out of?
11        A.   At 11th -- you saw the picture of the loading
12   dock.  Okay?  From that picture to the left is where our
13   employees parked.  They come in the driveway to the loading
14   dock.  There were a couple of times -- the trucks would, as
15   I say, come south on 11th and they'd have to go just
16   slightly past the loading dock to back in.  These were
17   fairly substantial trucks.
18             There were some occasions -- I don't remember the
19   number -- where protesters had to help move makeshift
20   barricades so that the trucks coming south could go far
21   enough south to back up, and then it was also awkward for
22   them because sometimes they would have protesters parking
23   right across the street, which made it really difficult for
24   trucks to then get back out again and make the turn.  It
25   always ended up happening that trucks got out, but

BILL DONNER
11/16/2021

Page 137

1  labels not going out on time.  I can't tell you how many
2  days Fed Ex and UPS did not come, but it's probably -- that
3  sounds to me like a very small number.
4       Q.   And I think you said earlier that the road --
5  there are -- strike that.  There were no days when the
6  access was prohibited; it's just that UPS or Fed Ex
7  instructed their drivers not to go a couple of days; is
8  that right?
9            MR. WEAVER:  Objection.
10      A.   There was UPS, Fed Ex, other freight companies.
11 We get semi trucks, very large trucks coming in.  If they
12 open the road but the truck driver said it wasn't wide
13 enough, couldn't get through, whatever excuse a driver
14 said, you know, we're in no position to challenge it.
15           So as far as we were concerned, in most cases
16 they could have gotten in; some simply didn't for safety
17 reasons.
18 BY MR. CRAMER:
19      Q.   I'm going to mark this series of documents.  And
20 I don't have many questions about these, but I just want to
21 make sure we're talking about the same thing.  So I think
22 the first one is 95.
23                  (Exhibits No. 95-98 marked for
24                  identification.)
25      A.   95, okay, just a second.  Opening it.

BILL DONNER
11/16/2021

Page 167

```
 1        A.    Not to my knowledge, no.
 2        Q.    Did any ask you for rent waivers or deferrals due
 3   to CHOP?
 4        A.    These are the two that Barry supplied.  If we had
 5   given breaks, knocked off some payments to any others, they
 6   would also be listed here.
 7        Q.    And how many units are there?  How many suites?
 8        A.    I don't know the exact number.  Probably well
 9   over 20.
10        Q.    And so of the total number of tenants, two asked
11   for rent waivers or deferrals in this time period that
12   you're aware of?
13        A.    According to this list.  Nobody was turned down
14   that I'm aware of.  And it would have come to me.
15        Q.    And so the others -- did they have -- did they
16   make any complaints to you about security in the area?
17              MR. WEAVER:  Objection.
18        A.    Barry Cosme dealt with the tenants.  Nobody moved
19   out.  If nobody expressed concern, they would have been the
20   only people on Capitol Hill.  Everybody on Capitol Hill was
21   concerned in that area.  It would have been absolutely
22   normal to hear from every single one of them -- what do we
23   think is going on, what do we know -- because we're the
24   landlord.  If anybody knew something, it would be us rather
25   than the individual tenants.  Did every single one of them
```

BILL DONNER
11/16/2021

Page 176

1  not sure my terminology is perfect in the e-mail. I could
2  just know that, from the looks of that, we're going to see
3  what the outcome is. If nobody gets anything, he gets to
4  keep it. If he collects, then he's going to pay us and
5  we're not going to collect. Had I figured out how that was
6  going to work with all of this, that's putting the cart
7  before the horse. No, I had not thought about it. You're
8  bringing up a very valid point that nobody had thought
9  about how actually it would play out and get done. But I'm
10 sure the City would have noted.
11 BY MR. CRAMER:
12     Q.  Let's move -- so I think you've covered it, but
13 that is all of the costs -- strike that. That is all of
14 the rent-related items that Richmark is claiming as damages
15 in the lawsuit?
16     A.  That's (inaudible) -- he got -- Barry got
17 correct. Those are the numbers, just those two.
18     Q.  Let's look at the next one, "Extraordinary
19 Property Management." What is --
20     A.  I'm back on 92?
21     Q.  Back on 92.
22     A.  Okay. Okay. Barry is the property manager. I
23 mean that's -- he manages the property. It's not his
24 title, but he manages it.
25         So he said he had spent a lot of time with all of

ROUGH & ASSOCIATES INC
office@roughandassociates.com   206.682.1427 3515 SW Alaska St Seattle WA 98126

1   since I've been here today.
2       Q.   Okay.  10/21 of '21?
3       A.   Yeah.
4       Q.   Of 2021?  Okay.
5       A.   Yeah.
6       Q.   And it's my understanding that you texted with
7   people about CHOP?
8            MR. WEAVER:  Objection.
9       A.   I probably did with friends.  I don't use --
10  rarely if ever use my texting for business.  I'm not in
11  sales.  I don't have a lot of people calling me.  I've got
12  a couple machinery manufacturers.  I don't deal with
13  salespeople.  I would text friends.  I had -- CHOP was on
14  the news a lot.  I got a lot of phone calls from friends or
15  text messages, which I would answer.  But if it was -- it
16  related to CHOP, as you saw with Malone, the e-mails that
17  you brought up -- I e-mail that stuff.  I don't do business
18  texts of any consequence.
19  BY MR. CRAMER:
20      Q.   But you did text with friends, family about CHOP?
21      A.   Oh, yeah.
22      Q.   And you then deleted those texts; is that
23  correct?
24      A.   Correct.  As I did all other texts.
25      Q.   Were you -- did you know when you were deleting

Page 199

1   A.   I don't remember.
2   Q.   Did you file it before the park was cleared out?
3   A.   I don't remember.
4   Q.   Did you text with anyone about CHOP after
5   June 11th, 2020, so in the latter part of June when the
6   protest was ongoing?
7   A.   Oh, absolutely.  I would have friends, family
8   text me how's it going up there.  I mean, again, we were --
9   we were a very big item in Seattle, and I'm in the center
10  of it, as you know where the building is.
11  Q.   And you deleted those texts after -- at some
12  point?
13  A.   Just like I do normally with all texts, or
14  virtually all texts.
15  Q.   What type of things did you text with friends and
16  family about?
17  A.   What's going on up here.  How is it -- is it --
18  okay, are you worried, are people safe, what's going on, we
19  saw on the news such-and-such.  I probably talked to a
20  couple people and said -- when -- that I got, you know,
21  threats.  How's it going up there?  Well, we let the police
22  on the roof and we got threats from it.  To me, that's like
23  conversation.
24  Q.   And have you taken any steps to see if any other
25  people that you texted with might have copies of those

1                REPORTER'S CERTIFICATE

2

3       I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:
5

6       That the foregoing testimony of BILL DONNER was given
    before me at the time and place stated therein and
7   thereafter was transcribed under my direction;

8       That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision, to the best of my ability;

10      That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;
12
        That the witness, before examination, was by me duly
13  sworn to testify the truth, the whole truth, and nothing
    but the truth;
14
        That I am not a relative, employee, attorney, or
15  counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
    thereof;
17

18  DATE: November 23, 2021

19

20

21

22

23  _____
    Mindy L. Suurs
24  Certified Court Reporter #2195

25