# EXHIBIT 21

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____
HUNTERS CAPITAL, LLC, et al.,    )
    Plaintiffs,           )
  vs.                          ) No. 20-cv-00983-TSZ
CITY OF SEATTLE,              )
    Defendant.            )
_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION
OF
MATTHEW PLOSZAJ
_____

10:30 a.m.
June 10, 2021

\*\*\* This transcript is marked confidential. \*\*\*

REPORTED BY: Pat Lessard, CCR #2104

Page 2

```
 1              A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4        MR. GABE REILLY-BATES
 5        Calfo Eakes
 6        1301 Second Avenue, Suite 2800
 7        Seattle, WA 98104
 8        206.294.7440
 9        gaber@calfoeakes.com
10
11    FOR THE DEFENDANTS:
12        MS. CAITLIN PRATT
13        Harrigan Leyh Farmer & Thomsen
14        999 Third Avenue, Suite 4400
15        Seattle, WA 98104
16        206.673.1700
17        caitlin@harriganleyh.com
18
19
20
21
22
23
24
25
```

Page 3

```
 1              E X A M I N A T I O N
 2   ATTORNEY                                PAGE
 3   BY MS. PRATT:                              5
 4   BY MS. PRATT:                             63
 5              E X H I B I T   I N D E X
 6   No.          DESCRIPTION                PAGE
 7   Exhibit 54  1/12/21 form from Employment  64
 8       Security Department for Matthew
 9       Ploszaj.
10   Exhibit 55  Map of Ploszaj neighborhood.  66
11   Exhibit 49  Plaintiff's Answers and Responses  107
12       to Defendant City of Seattle's
13       Second Discovery Requests and
14       Proposed Revisions to First
15       Discovery Requests.
16   Exhibit 8   Plaintiffs' Initial Disclosures.  135
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        THE VIDEOGRAPHER:  We are now on the record.
 2        Today is June 10th, 2021.  The time is now
 3   10:31.
 4        This is volume number one, media number one,
 5   in the Deposition of Matthew Ploszaj in the matter of
 6   Hunters Capital, LLC, et al., versus the City of
 7   Seattle.
 8        We are recording via Internet using Zoom
 9   video conferencing.
10        My name is Karl Benitez and I'm representing
11   Royal Video Productions on behalf of Rough &
12   Associates.
13        Today's court reporter is Pat Lessard.
14        At this time I would like to ask all counsel
15   present to identify themselves.
16        MS. PRATT:  This is Caitlin Pratt from
17   Harrigan Leyh Farmer & Thomsen and we represent the
18   City.
19        MR. REILLY-BATES:  This is Gabe Reilly-Bates
20   from Calfo Eakes.  We represent the plaintiffs in this
21   matter.
22
23
24
25
```

MATTHEW PLOSZAJ
6/10/2021

Page 69

```
 1  all?
 2      A.  I don't believe he is.  I don't believe so.
 3      Q.  Does he know you're involved in this
 4  lawsuit?
 5      A.  It's possible.
 6      Q.  Have you told him you're involved in this
 7  lawsuit?
 8      A.  Not to my knowledge, no.
 9      Q.  Why not?
10      A.  I don't know if it ever came up or if it was
11  ever relevant when I was chatting with him to bring it
12  up.
13      Q.  Did you talk to Mr. Columbo about the CHOP?
14      A.  On many occasions.
15      Q.  How did you communicate with Mr. Columbo
16  about the CHOP?
17      A.  In person, text and phone.
18      Q.  Are you aware of what Mr. Columbo's opinion
19  is on the CHOP?
20      A.  I'm not clear.  I would say maybe neutral.
21  I don't know.
22      Q.  Do you have any reason to believe he
23  supported the CHOP?
24      A.  That is a bit vague.  I know he supports
25  equality and equal rights.
```

Page 70

```
 1      I don't think he supported what led to the
 2  deaths of a few people as well as some of the other
 3  unfortunate events.
 4      Q.  Do you know Mr. Columbo's opinion on the
 5  East Precinct being evacuated?
 6      A.  I do not.
 7      Q.  Did you ever speak to him about that?
 8      A.  Not that I'm aware of.
 9      Q.  What do you recall discussing about the CHOP
10  with Mr. Columbo?
11      A.  I called him -- I recall directly talking
12  with him when a CHOP protestor had jumped on our roof,
13  threatened to kill themselves, threatened to kill us
14  in the building.  I talked to him that night.
15      I recall the subsequent morning about the
16  graphic graffiti spray painted on our sidewalk
17  threatening myself and my neighbor.
18      He had mentioned at one time that he was in
19  contact with a person inside of Jenny Durkan's office.
20      Q.  Do you recall who that person is?
21      A.  A spokesperson of some sort.  I don't.
22      Q.  What do you understand his contact with that
23  person was?
24      A.  Related to his being a concerned landlord
25  and in particular concerned about his renters there,
```

Page 71

```
 1  myself and my fellow cohabitants in the building, and
 2  his concern for our lives and safety.
 3      Q.  Were you ever told that the person who
 4  Mr. Columbo was in contact with made any promises or
 5  other representations to Mr. Columbo?
 6      A.  No.
 7      Q.  Did you ever rely on anything that was
 8  allegedly told to Mr. Columbo by this spokesperson?
 9      A.  No.
10      Q.  You said that Mr. Columbo supports equality
11  and equal rights.
12      Do you mean that he supports the Black Lives
13  Matter movement?
14      A.  That's not what I mean and I don't know his
15  stance on the movement.  It's -- yeah.
16      Q.  What specifically did you understand was his
17  position or opinion, excuse me, on CHOP?
18      A.  I'm sorry.  I think that's just -- I don't
19  know.  That's too vague of a question because there
20  are so many elements of CHOP.
21      And as you introduced BLM there's many
22  loaded parts to that as well.
23      Q.  What is loaded about the Black Lives Matter
24  movement?
25      MR. REILLY-BATES:  Objection; vague.
```

Page 72

```
 1      A.  I don't know if you're referring to the
 2  movement, the organization or the statement in
 3  general.
 4      Q.  (By Ms. Pratt)  What is loaded about the
 5  Black Lives Matter movement?
 6      MR. REILLY-BATES:  Objection; asked and
 7  answered.
 8      Q.  (By Ms. Pratt)  Go ahead.
 9      A.  It's too vague.  I don't know if you mean
10  the movement, the organization or the expression
11  itself.
12      Q.  I have said twice the movement.
13      A.  I'm lost.  I apologize.
14      Q.  Do you support the Black Lives Matter
15  movement?
16      A.  I'm neutral.
17      Q.  Why don't you support it?
18      A.  I didn't say I don't support it.
19      Q.  What makes you neutral rather than
20  supporting the Black Lives Matter movement?
21      A.  I don't know enough about it to support it
22  or not support it either way.
23      Q.  What attempt have you made to understand it?
24      MR. REILLY-BATES:  Objection; argumentative.
25  Vague.
```

18 (Pages 69 to 72)

ROUGH & ASSOCIATES INC
office@roughandassociates.com   206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Pat Lessard (601-142-526-6710)                                72496f8b-e6f9-4b75-88ac-1c19f363e4b2

Page 77

1    Q.   (By Ms. Pratt)  Why do you say the George
2    Floyd event?
3    A.   You asked me if there was an event.
4    Q.   You mean the killing or the murder of George
5    Floyd?
6    A.   Yes.
7    Q.   Starting with the murder of George Floyd
8    what did you observe in terms of protests near your
9    apartment on East Pine Street?
10   A.   Could you be more specific?
11   Q.   What was your experience of the protests
12   that began around the time that George Floyd was
13   murdered?
14   A.   It was very heated.  There were several cop
15   cars burned, destroyed.  Police were out on the
16   streets responding, using tear gas.  The protestors
17   were likewise responding.  And that -- yes.
18   Q.   How did that affect your experience of life
19   at your apartment on East Pine Street?
20   A.   How did it?
21   Q.   Yes.
22   A.   It was hard to breathe, hard to sleep.
23   Q.   Why was it hard to breathe?
24   A.   We don't have the best sealed windows in our
25   apartment so the tear gas seeps in when that was used.

Page 78

1    Q.   Why was it hard to sleep?
2    A.   There were people on my street every night
3    shouting into a bullhorn until odd hours of the
4    morning.
5    Q.   Were the protests localized at the East
6    Precinct around the time when they began in May of
7    2020?
8    A.   Largely, yes.  However, I'm aware there were
9    protests throughout the city and oftentimes the
10   protests would move around.
11   ==But it was a nightly occurrence around the==
12   ==East Precinct in addition to whatever else was==
13   ==occurring.==
14   Q.   Other than making it hard to breathe and
15   hard to sleep were there other ways that the protests
16   in May of 2020 regarding the George Floyd murder
17   affected your experience of living at your East Pine
18   Street apartment?
19   A.   I'm sorry.  Could you repeat that, please?
20   Q.   Other than your description that the
21   protests affected your life because it was hard to
22   breathe and hard to sleep, were there other ways that
23   the protests that started in May 2020 affected your
24   life?
25   A.   Yes.

Page 79

1    Q.   How else?
2    A.   Well, they evolved into CHOP.
3    Q.   Before it evolved into CHOP were there other
4    ways that the George Floyd murder affected your life
5    at your East Pine Street apartment?
6    A.   I had to show ID to enter the area.
7         MR. REILLY-BATES:  You're talking about
8    before CHOP?
9         THE WITNESS:  Correct, correct.
10        MS. PRATT:  Counsel, if your client needs a
11   clarification he can ask for it.
12   Q.   (By Ms. Pratt)  Who asked you to show ID
13   during that time period?
14   A.   Officers, police officers.
15   Q.   Where were you asked to show ID?
16   A.   Thirteenth and Pine, Pike and 12th, other
17   arteries.
18   Q.   Was this all day during that time period?
19   A.   I can't recall if this was all day all the
20   time.  As things went on it was the case.
21   Q.   Other than that it was hard to breathe, hard
22   to sleep and that you had to show ID to police
23   officers, were there other ways that the protests that
24   started in approximately May 2020 affected your life
25   at your East Pine Street apartment?

Page 80

1    A.   Not that I can articulate at this point but
2    I'm sure in some way it had.
3    Q.   Was your access to your apartment restricted
4    in any other way other than having to show ID?
5    A.   I would have to walk through crowds to get
6    to the point where I could show my ID.
7    Q.   Do you have a car?
8    A.   I do.
9    Q.   Do you park at your apartment?
10   A.   No.
11   Q.   Where do you park the car?
12   A.   Behind Langston Manor Apartments at 19th and
13   Republican.
14   Q.   How long have you parked your car there?
15   A.   I don't remember specifically but it's fair
16   to say maybe five or six years.
17   Q.   So when you were working through crowds to
18   show your ID to get to your apartment in May of 2020,
19   were you working through those crowds on foot?
20   A.   Correct.
21   Q.   Were there any barriers or other
22   obstructions apart from the crowds that affected your
23   ability to access your building at East Pine Street?
24   A.   Not before CHOP, no.
25   Q.   Where did you live before you moved to the

20 (Pages 77 to 80)

Page 153

1  Q. Who was out there to meet them?
2  A. Johnny Catchings.
3  Q. Johnny Catchings?
4  A. Yes.
5  Q. Would you spell Catchings?
6  A. I believe it's C A T C H I N G S.
7  Q. Who is Johnny Catchings?
8  A. Who is Johnny Catchings?
9  Q. Yes.
10 A. He was my neighbor who lived underneath me
11 at 1210 East Pine.
12 Q. And was Mr. Catchings the only person who
13 met with law enforcement?
14 A. He never met with law enforcement. He went
15 out to meet law enforcement.
16 Q. And why didn't he meet with law enforcement?
17 A. They never showed.
18 Q. During the CHOP time period did you stay
19 anywhere other than your apartment?
20 A. Yes.
21 Q. When?
22 A. I don't remember specifically but a week or
23 two in on a couple different nights, maybe even that
24 last week one or two nights.
25 Q. Where did you stay?

Page 154

1  A. At an acquaintance's house in Renton.
2  Q. Why didn't you stay longer?
3  A. I didn't want to leave our house for too
4  long. I was worried about not having someone there.
5     Also I didn't want to overstay any welcome I
6  may have had.
7     It's not comfortable, not living at your
8  home in such circumstances.
9  Q. During the CHOP time period you spoke to the
10 media on several occasions, correct?
11 A. Correct.
12 Q. Why did you choose to speak to the media?
13 A. Because no one else would speak to me. I
14 was worried; we needed something to be done.
15 Q. When you say no one else, who do you mean?
16 A. The City mostly, the people I tried
17 contacting. Police officers, CHOP people, protestors.
18 Q. Did speaking to the media attract any
19 unwanted attention?
20 A. Yes.
21 Q. What was that?
22 A. People knew I had -- people I know saw it
23 and now asked me about it. I know people in CHOP had
24 likely seen it and had been influenced or could put
25 myself and my building in harm's way.

Page 155

1  Q. And yet you continued to speak to the media
2  until the end of CHOP, right?
3  A. Yes. Unfortunately two people were killed
4  and nothing was being done.
5  Q. You spoke to the media during the workday,
6  correct?
7  A. Correct.
8  Q. How did you prepare for each of your media
9  appearances?
10 A. I put on clothes, I put on a mask and I went
11 and met them wherever we were going to meet.
12 Q. After the end of CHOP were there still
13 people living in Cal Anderson?
14 A. Yes.
15 Q. Were people living in Cal Anderson before
16 the CHOP?
17 A. No.
18 Q. Were the people living in Cal Anderson after
19 the CHOP the same people as were there for the CHOP?
20    MR. REILLY-BATES: Objection; calls for
21 speculation.
22 A. I can only confidently speak, there were
23 definitely some that I recognized from both times.
24 Q. (By Ms. Pratt) Are you familiar with other
25 unhoused people in the City of Seattle?

Page 156

1     MR. REILLY-BATES: Objection; vague.
2  A. What do you mean by familiar, or I'm
3  familiar? Whatever, familiar, I'm not sure how you
4  phrased that.
5  Q. (By Ms. Pratt) Are you aware that there are
6  unhoused people in other areas of Seattle?
7  A. Yes.
8  Q. Did you see other unhoused people elsewhere
9  in Seattle?
10    MR. REILLY-BATES: Objection; vague.
11 A. When?
12 Q. (By Ms. Pratt) The summer of 2020, had you
13 seen unhoused people in Seattle other than at
14 Cal Anderson?
15 A. In the summer of 2020 had I seen unhoused
16 people, yes. At other times, sure.
17 Q. Since that time, since the summer of 2020,
18 have you seen other unhoused people in Seattle not in
19 Cal Anderson?
20 A. Yes.
21 Q. Where have you seen them?
22 A. On the streets downtown, random spots on
23 Capital Hill. Many places.
24 Q. What's the difference between the people who
25 were at Cal Anderson after the CHOP and the other

39 (Pages 153 to 156)

```
 1              C E R T I F I C A T E
 2       STATE OF WASHINGTON  )
                              ) ss.
 3       COUNTY OF KING       )
 4            I, the undersigned Washington Certified Court
 5       Reporter, hereby certify that the foregoing deposition upon
 6       oral examination of MATTHEW PLOSZAJ was taken
 7       stenographically by me on June 10, 2021, and transcribed
 8       under my direction;
 9            That the witness was duly sworn by me pursuant to
10       RCW 5.28.010 to testify truthfully; that the transcript of
11       the deposition is a full, true, and correct transcript to
12       the best of my ability; that I am neither attorney for nor
13       relative or employee of any of the parties to the action or
14       any attorney or counsel employed by the parties hereto, nor
15       am I financially interested in its outcome.
16            I further certify that in accordance with
17       CR 30(e) the witness was given the opportunity to examine,
18       read and sign the deposition within 30 days upon its
19       completion and submission, unless waiver of
20       signature was indicated in the record.
21          IN WITNESS WHEREOF, I have hereunto set my hand this
22       15th day of June, 2021.
23
                  Pat Lessard
24              Pat Lessard,
                pat@court-reporter.com
25
```