# EXHIBIT 28

WADE BILLER
12/10/2021

## Page 1

```
          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
                    AT SEATTLE
_____
HUNTERS CAPITAL, LLC, et al.,  )
                               )
          Plaintiffs,          )
                               )
     vs.          ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
          Defendant.           )
_____

     ZOOM 30(b)6 Deposition Upon Oral Examination

                        Of

     WADE BILLER - ONYX HOMEOWNERS ASSOCIATION
_____












DATE: Friday, December 10, 2021
REPORTED BY: Mindy L. Suurs, CSR No. 2195
```

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   For the Plaintiff:
 4    GABE REILLY-BATES
       Calfo Eakes
 5     1301 Second Avenue
       Suite 2800
 6     Seattle, Washington 98101
 7
     For the Defendant:
 8
      SHANE P. CRAMER
 9     Harrigan Leyh Farmer Thomsen
       999 Third Avenue
10     Suite 4400
       Seattle, Washington 98104
11
12   For the City of Seattle:
13    JOSEPH GROSHONG
       Assistant City Attorney
14     Seattle City Attorney's Office
       701 Fifth Avenue
15     Suite 2050
       Seattle, Washington 98104
16
17
18
19
20
21
22
23   Also Present: Videographer: Bryan Gaver, Royal Video
24
25              --oOo--
```

## Page 3

```
 1                         I N D E X
 2   EXAMINATION BY                           PAGE
 3   Mr. Cramer                                6
 4
 5             EXHIBIT INDEX
 6   NO.   DESCRIPTION                        PAGE
 7   107   Google map                          12
 8   108   E-mails between Florian Hall and Wade Biller  79
           re: Onyx - Gunfire Rounds on South Side of
 9         Building
10   109   Third Amended Class Action Complaint     106
11   110   Series of e-mails including July 2, 2020,  121
           from Devin Wakefield to Wade Biller
12
     111   Dauntless Security Group, Inc. Invoice No.  138
13         Onyx-1189
14   112   Dauntless Security Group, Inc. Invoice No.  143
           Onyx-1258
15
     113   Dauntless Security Group, Inc. Invoice No.  148
16         Onyx-1415
17   114   E-mails between Ken Erickson and Wade Biller  155
           re What is Going On?
18
     115   Dauntless Security Group, Inc., Invoice      157
19         No. Onyx-1500
20   116   Dauntless Security Group, Inc., Invoice      157
           No. Onyx-1552
21
     117   Goodbye Graffiti Invoice dated 7/1/2020      167
22
     118   Goodbye Graffiti Proposal dated October 20,  171
23         2020
24
25
```

## Page 4

```
 1              EXHIBITS (Cont.)
 2
 3   NO.   DESCRIPTION                        PAGE
 4   119   Goodbye Graffiti Invoice dated 11/6/2020    174
 5   120   McLeod Construction Invoice dated 11/23/2020  175
 6   121   Original Restoration Company invoice dated   181
           2/22/21
 7
     122   Information in State of Washington vs. Ernanda  199
 8         Bendtsen
 9   123   Excel spreadsheet containing Signal data     215
10   124   E-mail from Wade Biller to Argento Cafe dated  230
           October 30, 2020, re Stephanie's remarks
```

1 (Pages 1 to 4)

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Page 53

1    interested in water, and he says what are you doing here
2    and I said it's -- I live here, it's none of your business
3    to be asking me this.
4         I came to a point where I was concealed carrying
5    at that time.  It became obvious to me that he was going to
6    continue to be aggressive, and so I just kind of navigated
7    my way out of that situation, saying never mind, you know,
8    whatever, carry on.  I -- you know, I'm just hanging out
9    here, and I moved on.  I was hoping not to escalate it
10   because at that point it seemed like, you know, he was
11   basically giving me a check in my own neighborhood.
12        Q.  So my question was:  Did you ever ask any of the
13   protesters at any of the barriers to move them?
14        A.  You know, I moved them myself -- that would be
15   no.  Let's put it that way.  I had no reason to.  I was
16   not -- they were -- they didn't seem like they were
17   reasonable people, so --
18        Q.  Did you observe the barriers being moved so that
19   cars could drive by them?
20        A.  On occasion.  It depend -- it really depended on
21   how that conversation went with that individual person.
22        Q.  You don't have any knowledge of the -- those
23   individual conversations; right?
24             MR. REILLY-BATES:  Object to the form,
25   foundation.

Page 54

1        A.  I had a number of conversations with people
2    blocking the road where barriers were placed and my attempt
3    to drive through, they stopped me and asked me questions.
4    BY MR. CRAMER:
5        Q.  And then did they allow you -- were you able to
6    drive past?
7        A.  At some point.  It took some negotiation.
8        Q.  Were you ever turned around and not allowed to
9    pass?
10       A.  Not by -- not by any of the -- not by any of the
11   occupied barriers, no.
12       Q.  So you -- okay.
13       A.  But I would add that that's because I didn't make
14   demands saying "Let me through"; it was more like "I need
15   to get over here," and they would be like "Why?"  So they
16   would eventually move stuff; it was a matter of
17   negotiating.
18       Q.  And are you aware of anybody who was not allowed
19   to pass?
20       A.  No.  I'm certain there are scenarios.
21       Q.  But you are not aware of any?
22       A.  I'm not personally aware.
23       Q.  Do you recall the -- strike that.
24            Did you ever speak with anyone from the Seattle
25   Department of Transportation regarding the removal or

Page 55

1    relocation of barriers?
2        A.  I did not.
3        Q.  Did you ever speak with anybody from Seattle
4    Department of Transportation about anything relating to the
5    CHOP or CHAZ area?
6        A.  I did not.
7        Q.  Did you ever speak with anyone from the City
8    on-site in the area about CHOP or CHAZ?
9        A.  Could you give me a time frame and then reask the
10   question?
11       Q.  Sure.  So in the June time period, did you ever
12   talk to anybody from the City who was on-site in the
13   neighborhood?
14       A.  I was not aware that they were on-site and
15   available.  I know that there were some negotiations with
16   the protesters with the City officials, but I did not go to
17   any of those negotiations.
18       Q.  But did you talk to individuals from the City
19   about garbage pickup or recycling or anything of that
20   nature?
21       A.  Not -- not during the June time frame.
22       Q.  Was -- was the garbage and recycling at Onyx
23   generally picked up as scheduled during the June time
24   period?
25       A.  It was hard to tell because the dumpsters would

Page 56

1    come up missing and then get returned and sometimes they
2    were empty.  So overnight they would get moved and then
3    they would reappear the next morning.
4        Q.  Did any of the unit owners complain about garbage
5    not being available -- the garbage dumpsters not being
6    available?
7        A.  They are primarily recycle.  The one compactor --
8    the compactor unit the residents are not aware of.  It
9    doesn't impact them directly.  Their recycle bins -- there
10   may have been questions asked about it, but it's not
11   uncommon for them to be on the street, and they typically
12   pile up the recyclables inside the garage anyway when that
13   occurs, so --
14       Q.  ==I guess more generally, was the Onyx garbage and==
15   ==recycling generally picked up and dealt with in a somewhat==
16   ==timely fashion during June?==
17       A.  ==I didn't -- I was not under the impression that==
18   ==there was any -- any service disruption during June.==
19       Q.  Did any homeowners complain to you about access
20   issues with the garage during June 2020?
21       A.  No, but we did put up notice informing people to
22   ensure that be on the watch to make sure that people did
23   not attempt to block the driveway or put in barriers.  We
24   didn't have that type of activity taking place at the
25   garage entrance during June.

Page 73

1  there, but no, I was never made aware that they're on
2  Signal.
3    Q.  Okay, or Michael Oaksmith?
4    A.  He's not on Signal, to my knowledge.  Not our
5  group or not amongst -- yeah.
6    Q.  Understood.  And when you downloaded it, do you
7  remember who told you to download it or, you know, told you
8  that there was the group and that you should download it?
9    A.  I was made aware through LaRisa.  She had created
10 a group and then was adding folks as we came out of the
11 woodwork or, you know, the neighbors in the area for
12 whatever reason, she asked if they were interested and she
13 would add them if they showed interest.
14    Q.  Do you know if any of the lawyers in this case
15 were in this Signal group?
16    A.  No.
17    Q.  No, they weren't or you don't know?
18    A.  They were -- not to my knowledge.  I would not
19 think so, I'm not aware of them being.  I could be wrong,
20 someone could have snuck in, but not to my knowledge.
21    Q.  And did LaRisa indicate why this group was
22 forming on Signal as opposed to some other platform?
23    A.  At the time it was to ensure it was private.
24    Q.  Did anyone tell you or suggest to you that the
25 messages sent on Signal could be or should be retained for

Page 74

1  a certain period of time?
2    A.  No.
3    Q.  Did anyone suggest that anyone not keep their
4  messages or delete the messages after a certain period of
5  time?
6    A.  We were never instructed in that manner, no.
7    Q.  Did anybody ever say anything about having set
8  their settings to not retain the messages on Signal?
9    A.  People did change their settings to shorter
10 settings from time to time depending on their comfort
11 level.  I know LaRisa was one later in the game, just
12 recently.  That was never a concern initially.  It became
13 more of a concern as more people became aware that the
14 information was being shared with attorneys and people had
15 concerns.  Another case would be I think some people were
16 just trying the settings out to see if, you know, you get
17 rid of them after two days.  I don't necessarily want to
18 plug my phone up -- I think there was an attempt to do
19 that.  But it wasn't a practice that everyone was doing.  I
20 think it was a couple one-offs.
21    Q.  And the discussions about changing settings --
22 was that a discussion that occurred on Signal?
23    A.  No.
24    Q.  So how did you learn that LaRisa had decided to
25 change her settings?

Page 75

1    A.  It -- there's a message that shows that one of
2  the members had changed their setting to automatically
3  delete after a particular time, so it just -- it shows the
4  entire group.  If someone leaves or changes their settings,
5  their retention settings, it shows that.
6    Q.  Okay.  And is there -- you know, I've asked you
7  about a set of names.  Do you recall any other names of
8  people who are involved in the Signal group or have been at
9  any time?
10    A.  I know Robert Flagg was part of that group.
11    Q.  And who's Robert Flagg?
12    A.  Robert Flagg is a neighbor across the street.  He
13 lives at the 12th Avenue Arts building.
14    Q.  And what about Mr. Khan, Faizel?
15    A.  No, he's not part of the Signal.  He never was.
16 He didn't want to get caught up in it.
17    Q.  And what about Devin Wakefield?  I think that's
18 the other director.
19    A.  There's no director outside of Onyx -- there was
20 nobody in addition to myself at the Onyx on Signal.
21    Q.  What -- what is it that you believe the City did
22 or that you contend the City did that would make the City
23 liable to you in this lawsuit?
24        MR. REILLY-BATES:  Objection.  Vague, calls for
25 legal conclusion, calls for a narrative response.

Page 76

1  BY MR. CRAMER:
2    Q.  You can answer.
3    A.  Understood.  You know, I -- I feel that there's
4  an obligation.  I understand there should be an obligation
5  for law enforcement and that we shouldn't be having to take
6  the matters into our own hands for our benefit and everyone
7  else's.  It became a serious safety concern.
8        If we're left to basically deal with an armed
9  group -- and I say armed group because we were aware --
10 became aware to some degree that a number of people were
11 armed and we had no understanding of at what point it was
12 going to end, that the negotiations the City was having, to
13 my understanding, were not at the level of law enforcement
14 but how to -- do we continue to support these what I called
15 an occupation.  It seemed to be an occupation.  It didn't
16 seem like the message was, you know, we -- we want to
17 ensure social justice; it became primarily an anti-police
18 and anti-government and the demands didn't seem as a
19 protest; they seemed more like they were going to get what
20 they wanted at whatever means necessary.  That strikes me
21 as not even the fact that the police were gone, but the
22 fact that the City was negotiating with people to this
23 degree I found very concerning.
24    Q.  So it was -- I think you just said it wasn't
25 necessarily that the police were gone, it was the fact that

19 (Pages 73 to 76)

Page 185

1  broke out and they're a half a -- they're a block away --
2  I've never seen anything like that.
3      Q.  Okay.  But you -- you don't know whether the
4  response time would be any different in a different
5  neighborhood; right?
6          MR. REILLY-BATES:  Objection, calls for
7  speculation.
8  BY MR. CRAMER:
9      Q.  You don't know, do you?
10     A.  I don't know what other items they had on their
11 plate.  I know that they were attempting to follow and stay
12 watch of that particular demonstration.  I don't know if
13 there were other demonstrations happening in the area that
14 had their attention also, so I don't know their bandwidth.
15 I have no concept of that.
16     Q.  And you have no reason to believe that they
17 delayed coming out to take the report for any reason other
18 than they didn't have the bandwidth to get to it earlier?
19     A.  Correct.
20     Q.  Was anyone injured when the windows were broken?
21     A.  No, thankfully.
22     Q.  And when -- so the date of the invoices is
23 February 22nd, 2021.  Do you know when the windows would
24 have been broken?
25     A.  It was December 31st.

Page 186

1      Q.  And how do you remember that?
2      A.  New Year's.
3      Q.  That's what I assumed, but I thought I would ask
4  the question.
5      A.  It was a strange New Year's present, yeah.
6      Q.  Those are the only window-related damages of
7  which I'm aware that the homeowners association has
8  claimed.  Is that accurate?
9      A.  Correct.
10     Q.  Looking at the note that you have in front of you
11 regarding the HOA's claimed damages, are there any that we
12 haven't gone over relating to security, graffiti, or
13 windows being boarded up?
14     A.  This is for up through end of December.  That's
15 all we're claiming.
16     Q.  Okay.  Are there any other categories of damages,
17 economic damages, that you are claiming that are listed in
18 that list?
19     A.  Not from a financial standpoint, not that would
20 be categorized as security, graffiti, or boarding up, or
21 any other physical damages.  There's none to the building.
22     Q.  Okay.  So the only other category is what you
23 described earlier as the constitutional claims.  Is that
24 fair to say?
25     A.  Correct.

Page 187

1      Q.  I have -- I'm going to switch gears now.  I want
2  to talk to you about the incident that occurred with your
3  arm, but if we want to take five before we get into that,
4  it seems like a good time to do it.
5          MR. REILLY-BATES:  That does sound (inaudible.)
6          MR. CRAMER:  4:00.
7          MR. REILLY-BATES:  And Shane, before we go off
8  the record, I just wanted to take one thing up.  Is it
9  possible for the videographer to redact the section of the
10 video in creating this where my client unfortunately
11 displayed a work product privilege note?
12         THE VIDEOGRAPHER:  Yeah.
13         MR. CRAMER:  Yeah, I thought about that as well.
14 I was going to ask you, so (inaudible) for bringing that
15 up.
16         MR. REILLY-BATES:  Shane, do you have any
17 objections to doing that?
18         MR. CRAMER:  My only statement on it is that I
19 couldn't read it.  It seems super blurry.  But that's fine.
20         MR. REILLY-BATES:  Yeah, but, you know, you might
21 be able to read it with a -- you know, upon view, so --
22         THE VIDEOGRAPHER:  The time is now 3:54 p.m., and
23 we're going off record.
24         (Recess taken.)
25         THE VIDEOGRAPHER:  The time is now 4:03 p.m., and

Page 188

1  we are back on record.
2  BY MR. CRAMER:
3      Q.  Mr. Biller, it's my understanding that you were
4  involved in an incident on or about September 8th where a
5  woman cut your arm with a long knife or a machete; is that
6  correct?
7      A.  Correct.
8      Q.  And where were you when that occurred?
9      A.  I was inside 12th Avenue Arts.
10     Q.  And walk me through what occurred that led to her
11 slashing your arm.
12     A.  So I am at my building, which is on the opposite
13 street, 12th Avenue Arts being on the east side of 12th,
14 and it's closer towards the police department.
15         I was out checking the doors at my building just
16 do a, just a small parameter check and whatnot.  I was
17 going to go back in, but I heard some commotion on the
18 other side of the street, so I was going to go check it
19 out; and then I realized that my friends from 12th Avenue,
20 or at least one of them, Vernesta was out, talking and was
21 out with her dog; and so I -- of course it takes the
22 crossing of the sidewalk to get over there, so I acrossed
23 the street, walked towards them, but before I get to them,
24 I'm pretty much in front of 12th Avenue Arts entrance at
25 the entertainment there, the main entrance to the building

Page 205

1  citizens have no control over.
2  BY MR. CRAMER:
3      Q.  Do you have -- are you pursuing a lawsuit against
4  anyone else ariseing out of the activities that led to
5  your -- you being slashed?
6      A.  I am not.
7      Q.  And are you aware of anyone else who was cut on
8  the arm in the Cal Anderson area at any time during June
9  2020?
10     A.  I am.  I'm aware of the person that was axed in
11 the leg.
12     Q.  When did that occur?
13     A.  That happened the night the two kids were shot in
14 front of the East Precinct in the white Jeep.
15     Q.  So -- and -- are there -- do you know whether
16 they -- strike that.  Let me ask a different question.
17         Do you know firsthand what the circumstances were
18 around that?
19     A.  That personal story was shared with me directly
20 in person by the victim of that hatchet attack.
21     Q.  And who was the person who was struck with the
22 hatchet?
23     A.  Well, so I have not gotten permission from them
24 to provide that information.
25     Q.  Who was the person who was struck with the

Page 206

1  hatchet?
2         MR. REILLY-BATES:  You have to answer the
3  question unless it's --
4      A.  I would have to get a last name for you, but
5  Chris -- I forget.  I don't have his last name.
6  BY MR. CRAMER:
7      Q.  Okay.  How do you know Chris?
8      A.  Pardon?
9      Q.  How do you know Chris?
10     A.  He's a neighbor.  He lives at the Franklin, just
11 north of me on the same side of the street.
12     Q.  Did he file a police report against whoever
13 struck him with a hatchet?
14     A.  I don't know that.
15     Q.  Did he go to the hospital?
16     A.  Yes.
17     Q.  And where -- and this occurred on the street?
18     A.  My understanding it took place behind his
19 apartment building, which is on -- facing 12th and behind
20 his building is the 11th Street next to Cal Anderson, and
21 that's where I understood it to take place where his
22 vehicle was at when they took the vehicle from him.
23     Q.  What are the deductibles that you're seeking to
24 recover from the City?
25     A.  The deductibles are from physical therapy.  I

Page 207

1  believe it's -- there's a $50 deductible for some of the
2  visits, and so those were the only out-of-pocket expenses
3  that I had.
4      Q.  And so you're not seeking as part of this lawsuit
5  pain and suffering related to the incident involving your
6  arm?
7      A.  No.
8      Q.  And you're not seeking any damages relating to
9  emotional distress as a result of the attack you suffered
10 from that lady?
11     A.  No.
12     Q.  And on behalf of the class, are you seeking
13 emotional distress damages relating to anyone else who's
14 incurred physical injury as part of CHOP?
15     A.  I think that goes back to the constitutional
16 aspect of it.  I don't know that I'm representing, per se,
17 the emotional or physical beyond the ones I've already
18 mentioned and aware of.
19     Q.  Are you -- are the class members who you are
20 seeking to represent seeking pain and suffering from any of
21 the personal injuries they suffered as a result of CHOP?
22         MR. REILLY-BATES:  Objection, calls for legal
23 conclusion.
24     A.  I'm -- I'm -- I don't -- I can't speak to that.
25 I'm not informed enough or -- or know what direction that

Page 208

1  might take.
2      Q.  And would you agree with me that different people
3  might have different amounts of pain and suffering from --
4  depending on the physical injuries they may have incurred
5  at CHOP?
6      A.  I would have to agree.  I would use myself as an
7  example on both sides of that consideration because I
8  don't -- I know that I have gone through a lot of mental
9  and emotional trauma, but it's -- it's kind of a badge of
10 honor, it's kind of unfortunate.  And also I know that
11 there are other folks that maybe didn't have the same
12 experience that may have felt more traumatized or had other
13 experiences where they didn't perceive harm at all or
14 didn't have any trauma or circumstances that they didn't
15 see as negative, depending on when they went to CHOP, in
16 CHOP, or whether they could leave the area.
17     Q.  It's kind of -- it depends on the individual.  Is
18 that --
19     A.  Exactly, right.
20     Q.  I want to move to the last, I think, thing I want
21 to talk to you about.  You said that you received a
22 litigation hold in connection with the case.  Do you know
23 when you would have gotten that?
24     A.  It seemed shortly after the suit was filed.
25     Q.  And did that come from the law firm?

WADE BILLER
12/10/2021

Page 209

1  A. That's how I received it.
2  Q. Gabe's law firm.
3  A. Correct.
4  Q. And did you understand that you weren't supposed
5  to delete any e-mails or text messages or other documents
6  relating to the case?
7  A. That was clear to me. It's not the first time I
8  have had to hold details and information of that type for
9  legal reasons.
10 Q. Have you ever been involved in a lawsuit in the
11 past?
12 A. I have not been dragged into and involved at this
13 level. I have been asked to hold and maintain materials
14 because of possible litigation going forward, but it hasn't
15 been -- I haven't been -- that information hasn't been
16 called for retrieval.
17 Q. And what lawsuit, what kind of a lawsuit is that?
18 A. Well, I work in telecom, so people have -- they
19 look for responsibility of how they've lost their number
20 and what impact it may have on their business if they don't
21 regain it or if it's a hospital number, how soon to get it
22 back into service, it may be impacting their clients or to
23 many degrees it comes down to potential safety concerns or
24 financial costs and burdens to their business and stuff
25 like that. So people usually are looking for someone to

Page 210

1  take accountability when they lose their number, phone
2  number, or get disconnected.
3  Q. So any potential lawsuits that you're thinking
4  about that don't relate to your work at T-Mobile?
5  A. No. I mean being on the board has gotten me
6  involved in some possible, but they didn't really gain any
7  ground or take off.
8  Q. And did you -- we may have covered this earlier,
9  but I think you said that you did text with individuals
10 about CHOP in the June time period; is that correct?
11 A. I did to some degree. I did minimal texting
12 trying to connect people with other people. It wasn't
13 necessarily a line of communication where we had
14 discussions over text.
15 Q. But you did text with individuals about this?
16 A. Yeah, correct.
17 Q. Did you ever text with Faizel about CHOP?
18 A. Yes.
19 Q. How often did you text with Faizel about CHOP?
20 A. I would say in -- maybe once a week, five times a
21 month, six times a month, maybe more. It really -- it
22 really would have been around -- because he's on the board,
23 it would be from a security standpoint -- you know, what
24 are your feelings, what are your concerns about the
25 likelihood of your windows being broke, stuff like that.

Page 211

1  Q. Did you text with any of the other business
2  owners or residents in the area about CHOP?
3  A. I text with Stephanie at the Hugo House. And her
4  last name's escaping me for some reason.
5  Q. Is her last name Mores (phonetic) or something
6  like that?
7  A. Yeah, sorry, that is -- yeah, Moore, not Mores.
8  I think it's just Moore, but I could be wrong.
9  ==Q. Did you ever delete any of your texts about==
10 ==anything?==
11 ==A. No, I don't believe I did, not regarding CHOP. I==
12 ==know in the past I've certainly deleted texts to clear out==
13 ==my inbox, but there was no deletion of any texts associated==
14 ==to CHOP or during CHOP or after CHOP.==
15 Q. And when did you -- I think you said you got your
16 new phone, the Apple iPhone that you have, around Christmas
17 2020. Is that fair?
18 A. I believe so, yes, that's --
19 Q. Is that when you stopped using your android
20 phone?
21 A. Right. Once that number got changed over, it was
22 repointed to the new device.
23 Q. When did you provide your phone to counsel in
24 connection with this case?
25 A. I don't have that date. I turned the phone off

Page 212

1  after I got the new phone and put it in the drawer and
2  didn't turn it back on until I was asked about retrieving
3  particular messages, so I didn't -- I didn't pull
4  everything out of my phone when I got the new phone, I just
5  turned it off.
6  Q. Did you reset it and delete the contents on it at
7  that point?
8  A. No. In fact, I couldn't even boot it. I --
9  after I got the new phone, I turned it off, and it stayed
10 off in my drawer until it was time to turn it over and
11 ensure it was working. At that point it wouldn't boot up.
12 It just -- that was the message on the phone.
13 Q. So the phone wouldn't power on?
14 A. It would power on, but it goes to default
15 message. Part of the booting protocol to load the
16 operating system -- it fails at the initial startup.
17 Q. And just so that I'm clear, from the time
18 period -- from the date that the lawsuit was filed in June
19 2020 through when you stopped using the android, you didn't
20 provide it to counsel in those six months; is that correct?
21 A. It had not been turned over yet.
22 Q. And since you provided it to counsel, have you
23 seen it -- have you seen it since you -- scratch that.
24    Have you seen it since you handed it off to
25 counsel?

53 (Pages 209 to 212)

ROUGH & ASSOCIATES INC
office@roughandassociates.com   206.682.1427 3515 SW Alaska St Seattle WA 98126

WADE BILLER
12/10/2021

Page 233

SIGNATURE

I declare that I have read my within deposition, taken on Friday, December 10, 2021, and the same is true and correct save and except for changes and/or corrections, if any, as indicated by me on the "CORRECTIONS" flyleaf page hereof.

Signed in _____, Washington, this _____ day of _____, 2021.

_____
WADE BILLER

Page 234

REPORTER'S CERTIFICATE

I, Mindy L. Suurs, the undersigned Certified Court Reporter, pursuant to RCW 5.28.010, authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify:

That the foregoing testimony of WADE BILLER was given before me at the time and place stated therein and thereafter was transcribed under my direction;

That the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability;

That the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

That I am not a relative, employee, attorney, or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

DATE: December 20, 2021

_Mindy L. Suurs_
Mindy L. Suurs
Certified Court Reporter #2195

59 (Pages 233 to 234)

ROUGH & ASSOCIATES INC
office@roughandassociates.com   206.682.1427 3515 SW Alaska St Seattle WA 98126



206.682.1427    fax 206.937.6236

Please record any changes or corrections on this sheet, indicating page number, line number, and reason for the change.

| Page | Line | Correction and Reason |
|------|------|------------------------|
| 10   | 18   | Clint Zaner is correctly spelled Clint Saner |
| 11   | 13   | Clint Zaner is correctly spelled Clint Saner |
| 30   | 4    | Q indicating Question should actully be A indicating Answer |
| 200  | 6    | Bernesta is correctly spelled Vernesta |
| 222  | 10   | oh, Mari is correctly spelled Omari |
| 228  | 15   | Lamon is correctly spelled Malone |

_____
(Signature here and on deposition)

Page 233

1   S I G N A T U R E

2

3        I declare that I have read my within deposition,
4   taken on Friday, December 10, 2021, and the same is true
5   and correct save and except for changes and/or corrections,
6   if any, as indicated by me on the "CORRECTIONS" flyleaf
7   page hereof.
8            Signed in  Seattle                  , Washington,
9   this  27th      day of  December            , 2021.
10
11
12
13
14                          _____
15                          WADE BILLER
16
17
18
19
20
21
22
23
24
25