# EXHIBIT 43

Page 1

```
                UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
                        AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
         Plaintiff,            )
                               )
     vs.            ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
         Defendant.            )
_____

    VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION

              UPON ORAL EXAMINATION OF

                    CITY OF SEATTLE

                  (THOMAS MAHAFFEY)
_____


              Seattle, Washington

       (All participants appeared via videoconference.)



    DATE TAKEN:  JANUARY 26, 2022
    REPORTED BY: CINDY M. KOCH, RPR, CRR, CCR #2357
```

Page 2

```
 1                A P P E A R A N C E S
 2   FOR PLAINTIFF:
 3          TYLER S. WEAVER
            Calfo Eakes LLP
 4          1301 Second Avenue
            Suite 2800
 5          Seattle, WA 98101-3808
            206.407.2237
 6          tylerw@calfoeakes.com
 7
     FOR DEFENDANT:
 8
            SHANE P. CRAMER
 9          ARTHUR W. HARRIGAN, JR.
            Harrigan Leyh Farmer & Thomsen LLP
10          999 Third Avenue
            Suite 4400
11          Seattle, WA 98104
            206.623.1700
12          shanec@harriganleyh.com
            arthurh@harriganleyh.com
13
            JOSEPH G. GROSHONG
14          Seattle City Attorney's Office
            701 5th Avenue
15          Suite 2050
            Seattle, WA 98104-7095
16          206.684.8200
            joseph.groshong@seattle.gov
17
18   ALSO PRESENT: LINDSAY HITCHCOCK, videographer
                   Buell Realtime Reporting, LLC
19
20             * * * * *
21
22
23
24
25
```

Page 3

```
 1           DEPOSITION OF THOMAS MAHAFFEY
 2                  EXAMINATION INDEX
 3   EXAMINATION BY:                          PAGE
 4   30(b)(6) Examination by Mr. Weaver         6
 5   Non-30(b)(6) Examination by Mr. Weaver    73
 6
 7                    EXHIBIT INDEX
 8   EXHIBITS FOR IDENTIFICATION              PAGE
 9   Exhibit 1  Amended Notice of Videotaped    8
               Deposition Pursuant to FRCP
10             30(b)(6) to City of Seattle
11   Exhibit 2  Email with attachment;         10
               SEA-SPD_005983-984
12
     Exhibit 3  June 29 Events Incident Action 25
13             Plan; SEA_00007766-787
14   Exhibit 4  June 24 Events Incident Action 32
               Plan; SEA-SPD_007528-550 (CONFIDENTIAL)
15
     Exhibit 5  Email chain; SEA_00020853-858  33
16
     Exhibit 6  Email; SEA_00022828-830        41
17
     Exhibit 7  Seattle PD SuperForm; SEA_00156958- 45
18             960
19   Exhibit 8  Email; SEA_00000868-869        49
20   Exhibit 9  Printout of details related to 49
               Exhibit 8
21
     Exhibit 10 Excel spreadsheet              51
22
     Exhibit 11 Email chain; SEA_00023588-589  58
23
     Exhibit 12 Executive Order 2020-08;       63
24             SEA_00045264-268
25
```

Page 4

```
 1             EXHIBIT INDEX (Continuing)
 2   EXHIBITS FOR IDENTIFICATION              PAGE
 3   Exhibit 13 Email; SEA_00036004-005       119
 4   Exhibit 14 Email, July 4 Events Incident 156
               Action Plan; SEA_00007505-545
 5
     Exhibit 15 Email chain; SEA-SPD_006803-804 167
 6
     Exhibit 16 Email chain; SEA_00028176-177 170
 7
     Exhibit 17 Email containing Executive Order 184
 8             2020-08; SEA_00019316-319
 9   Exhibit 18 Email chain; SEA_00021402-404 185
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Page 33

1  specified -- specific?  I don't who it was sent to
2  directly.
3        MR. WEAVER:  Okay.  I'm going to drop
4  another document in the chat.  We're getting -- we're
5  getting fast and furious on the -- on the documents
6  already, so...
7        (Exhibit No. 5 marked.)
8        THE WITNESS:  Okay.
9  BY MR. WEAVER:
10    Q. All right.  So is this an email you sent on
11 June 16th?
12    A. Just blow it up here a little bit.
13       Yes.
14    Q. Okay.  So in the first sentence, you say, "For
15 clarification, this is what I approved and was sent out
16 department-wide last Friday," and then it appears to
17 have the text of the email from Exhibit 2 down below,
18 towards the bottom of the first page.  Is -- am I
19 understanding that correctly?
20    A. That appears correct, yes.
21    Q. Okay.  So does that refresh you as to whether
22 the Exhibit 2 was sent out to the entire department?
23    A. That's what I said in the email.  But like I
24 said, I don't -- specifically I don't recall who it was
25 sent out to, but that's what I'm saying in this email,

Page 34

1  yes.
2     Q. Okay.  So I'd like to go back to Exhibit 4,
3  which is the June 24th IAP.  And if you could scroll
4  down to -- I think it may be 15 of this one as well.
5  So -- yes, it's 15.  I'm sorry.  It's 16.  Bates
6  No. 7543.
7        This appears to have similar language to what
8  we've been talking about, but it uses the term "mass
9  casualty event" rather than "critical life safety
10 emergency."
11       Do you see that?
12    A. Yes.
13    Q. So this was June 24th of 2020.  Does this
14 refresh you at all as to when there might have been a
15 change to the wording of "critical life safety
16 emergency"?
17        MR. CRAMER:  Objection.  Form.
18    A. Sorry.  You said Exhibit 4 says mass casualty
19 event, or am I on the wrong exhibit or --
20 BY MR. WEAVER:
21    Q. I believe it does, on Page 16, if you -- you
22 can look at it, yourself.
23    A. I'm looking at Exhibit 4, and it's -- says
24 "mass casualty event" on Page 16.
25    Q. Okay.  So it appears that on June 24th there

Page 35

1  were IAPs being sent out with the wording of "mass
2  casualty event."
3        Does that help you remember at all when it
4  was -- when the wording was changed to "critical life
5  safety emergency"?
6        MR. CRAMER:  Objection.  Form.
7     A. It doesn't.  I will say one thing, with IAPs,
8  especially during this time, we were having -- the
9  operations center was having to produce so many,
10 sometimes getting the language caught up or getting
11 things changed, because of everything else that was
12 going on from the planning perspective, sometimes they
13 weren't as timely as they could have been, with getting
14 changes put into them.
15 BY MR. WEAVER:
16    Q. Was it your understanding that there was any
17 difference in the -- in the substance of the directive
18 between the directive that used the term "mass casualty
19 event" and the directive that used the term "critical
20 life safety emergency"?
21    A. Sorry; I'm not quite following your question
22 there.
23    Q. Okay.  Was the change from "mass casualty
24 event" to life -- "critical life safety emergency" meant
25 to convey a change in department policy or directive?

Page 36

1     A. No.  Again, I think it was just meant to
2  clarify the wording, and really the -- the premises that
3  we were operating under, I think it just -- and the
4  things that we were briefed kind of every day, I think
5  it was just providing more clarity.
6     Q. And I'd like you to go to the bottom of the
7  last page on Exhibit 4.  This again is a map showing
8  the -- what's -- what were the boundaries of the red
9  zone; is that right?
10    A. Correct.
11    Q. And were those the same that they had been in
12 the directive that went out department-wide on June 12th
13 in Exhibit 2?
14       MR. CRAMER:  Objection.  Asked and answered.
15    A. Yes.  They -- they look the same.  I don't see
16 any significant changes in either map.
17 BY MR. WEAVER:
18    Q. Let me ask you, with regard to -- and we can
19 go -- we can go to any -- I guess go back up to 16 on
20 Exhibit 4, Page 16.
21    A. Okay.
22    Q. Okay.  So with regard to Edward Sector, it
23 indicates that a required -- requires a four officer
24 minimum response to all Edward Sector calls for service
25 outside the red zone.

Page 37

1  What does -- what did that mean?
2  A.  For any response for police service, that we
3  were going to send, again, as it indicates, a minimum of
4  four officers to that call.
5  Q.  So prior to June 2020, what was the minimum
6  response for a call in the Edward Sector?
7  A.  It would depend on the type of call, again,
8  with -- what the actual details of the incident were.
9  But it could be as little as one officer for a
10 nonpriority event with no suspect on the scene, to many
11 multiple of officers for some type of ongoing life
12 safety emergency.
13 Q.  So what -- what was the least number of
14 officers for a particular call that would be a minimum
15 required to respond to a call prior to June 2020?
16 A.  The fewest would be one for a low priority
17 response.
18 Q.  Okay.  And during the -- during the pendency of
19 these directives in June of 2020, even those low
20 priority calls would still require a four officer
21 response?  Is that correct?
22 A.  That is correct, yes.
23 Q.  And why was that?
24 A.  Due to just the conditions that we hadn't faced
25 before, based on -- I will describe it as the negative

Page 38

1  feelings and animosity towards Seattle police officers
2  at that time that was particularly concentrated in that
3  area of the city.
4       Officers were going to seemingly routine calls
5  and being accosted by people seeking confrontation even
6  in routine situations.  So again, in just working
7  through some of these unprecedented circumstances that
8  were dealt with, again, officer safety being the most --
9  the thing that was most foremost on my mind during this
10 period, we determined that this was the best course of
11 action to take.
12 Q.  Okay.  So within the Edward Sector, but outside
13 the red zone, were there cases in which there might be a
14 mass casualty event or a critical life safety emergency,
15 that it would be appropriate under your directive for
16 officers not to respond?
17      MR. CRAMER:  Objection.  Form.  Calls for
18 speculation.
19 A.  No.  But again, depending on the criticality of
20 the incident, I want them to formulate a thoughtful and
21 considered response before going in, again, to ensure
22 their safety, de-escalate, minimize the potential use of
23 force, and keep the public safe.
24 BY MR. WEAVER:
25 Q.  So when you indicate that it was -- you were

Page 39

1  trying to keep the public safe by not responding to
2  calls, how was not responding to calls keeping the
3  public safe?
4       MR. CRAMER:  Objection.  Form.
5  A.  That's not what I mean by that.  It's, again,
6  to -- we're responding to calls.  It's just that we're
7  doing it in a way that allows us to provide service in
8  the best way that we can.
9       We're just considering the -- again, the
10 unprecedented circumstances that we were facing at the
11 time, and the scrutiny, and threat to officer safety
12 that we were having to deal with.
13      That's what the -- really considerations that I
14 had to -- to deal with at the time and how we were going
15 to still provide police services while dealing with all
16 these other issues that were swirling around us.
17 BY MR. WEAVER:
18 Q.  So going back to Exhibit 5, in the second
19 paragraph of this email you sent on June 16th, you're
20 asking whether the -- first of all, you sent this to
21 Carmen Best, and then who's Christopher Fisher?
22 A.  He was the chief's -- I believe his title was
23 strategic advisor.
24 Q.  And you say, "Please let me know if this should
25 be altered or clarified in anyway if it is creating a

Page 40

1  messaging issue or confusion internally or externally."
2       Do you see that?
3  A.  Yes.
4  Q.  Do you remember asking for that, for any
5  clarification they wanted?
6  A.  Reading this email, that -- now it's bringing
7  up I did ask that, yes.
8  Q.  Do you recall whether either Chief Best or
9  Officer Fisher indicated that your policy should be
10 altered or clarified in any way?
11 A.  I don't specifically, no.
12 Q.  And you also indicate down below that,
13 "Depending" -- you were going to talk with
14 representatives from the City's department involved in
15 barricade removal, and that, "Depending on how that
16 operation went, I may be able to adjust the current
17 response protocol to the area."
18      Do you recall whether the -- you adjusted the
19 current response protocol to the area after barricade
20 removal?
21 A.  It wasn't adjusted because the barricades -- if
22 this is still June 12th, my recollection, the
23 barricades -- or June 16th, excuse me, the barricades
24 were not removed.  So protocols were not adjusted.
25 Q.  So the protocols were not adjusted until all

Page 73

1  you, just Chief Mahaffey.
2  BY MR. WEAVER:
3     Q.  So I think we talked just briefly about the
4  evacuation of materials and personnel from the East
5  Precinct on the night of June 8th or the afternoon of
6  June 8, 2020.
7     Was that your decision, to evacuate personnel
8  from the East Precinct?
9     A.  Ultimately, that was my decision, yes.  I made
10  it in -- I had consultation with my commanders I had
11  working that day, but yes, ultimately, that decision
12  was -- was mine.
13     Q.  Did you make any consultation with Chief Best?
14     A.  I did call her and let her know how we'd be
15  proceeding that evening, yes.
16     Q.  And you told Chief Best before you had --
17  before the evacuation; is that correct?
18     A.  Yes.  I -- yes.  Before we implemented the
19  actual plan, yes, I let her know.
20     Q.  Okay.  And what was the basis for your decision
21  to evacuate personnel from the East Precinct?
22     A.  Well, there's a lot that went into that
23  decision.  It was not easily made.  The overarching
24  concern was, the need to de-escalate would have been
25  going on the previous week, which was a constant focus

Page 74

1  on the precinct by the protesters, to the point that the
2  precinct had become inoperable.
3     We had nearly nightly clashes with protesters
4  involving significant amounts of -- we had to use force
5  to deal with the crowd.  We had force used against us by
6  the crowd.
7     We had officers injured.  We had members of the
8  protest crowd injured, and it was seemingly not going to
9  end.  So that was the overall goal, was to prevent any
10  further clashes with the crowd and injuries to officers.
11     There was also concerns about the building
12  being attacked and destroyed.  We had information from
13  the FBI.  I knew that a precinct had been burned in
14  Minneapolis, Minnesota, as a result of protests they had
15  there.  I had information other government buildings
16  were being attacked.
17     So I had a great concern that based on what had
18  been occurring the previous weeks, that the East
19  Precinct would be another target, which, based on where
20  it sits on the block, there's really only two ways in
21  and out of it.
22     And overall, the -- that was my greatest
23  concern, was keeping -- keeping people safe, and not
24  being able to keep people in there, as we were not going
25  to be able to use the tactics, which was using police

Page 75

1  officers directly to manage and address the crowd.
2     So that was the course of action that I felt
3  was the best to prevent confrontation, to de-escalate,
4  prevent injury, and keep police officers and the public
5  safe.
6     Q.  You said there was force used against officers
7  by people who were protesting or who were mixed in among
8  the protesters.
9     What sort of force was being used?
10     A.  So there was physical body force consisting of
11  pushing, shoving, punching.  We also had objects thrown
12  at us:  rocks, pieces of cement, bottles, garbage.
13  Commercial grade fireworks were used on officers as
14  well.
15     And then we had reports of people in the crowd
16  with Molotov cocktails, which is a bottle filled with
17  gasoline with usually a rag soaked in some type of
18  accelerant on top as well.
19     So those were some of the issues that we
20  were -- we were dealing with.  We'd also get reports of
21  armed people in the crowd from time to time, but we did
22  not have firearms directly used against police officers,
23  thankfully.
24     Q.  And so your expectation on June 8th, that that
25  was probably going to keep happening regularly on the

Page 76

1  night of June 8th and later; is that correct?
2     MR. CRAMER:  Form.
3     Go ahead.
4     A.  Continuing with our same deployment model, yes,
5  I felt that was the likely -- likely outcome.
6  BY MR. WEAVER:
7     Q.  So to what extent was the mayor's office or the
8  mayor herself involved in discussions about what to take
9  out of the precinct and when to take it out of the
10  precinct?
11     MR. CRAMER:  Objection.  Form.
12     A.  My recollection, I think sometime --
13     THE WITNESS:  That wasn't me, I hope, on
14  the -- on the --
15     MR. CRAMER:  I think someone -- I think
16  someone joined.
17     Go ahead.
18     I'm sorry.  Tyler, do you want to re-ask it
19  just so we're -- or have the court reporter read it
20  back.
21     MR. WEAVER:  I can ask it again.
22  BY MR. WEAVER:
23     Q.  So to what extent was the mayor herself or the
24  mayor's office involved in discussions about moving
25  materials or people out of the East Precinct on

Page 77

1  June 8th?
2       MR. CRAMER: Same objection.
3       A. I don't know about the mayor's direct
4  involvement. There was some discussion with some of
5  other staff about having a plan in place, about if we --
6  about moving, what articles would have to be moved out
7  of the precinct potentially. I think that occurred on
8  June 7th or 8th.
9  BY MR. WEAVER:
10      Q. So what were the discussions with the mayor's
11 staff about what should be moved out?
12      A. I'm sorry; you cut out in the last part of
13 that.
14      Q. What were the discussions with the mayor's
15 staff about what should be moved out of the precinct, I
16 think you said on either June 7th or June 8th?
17      A. I don't know if I'd characterize it as a
18 discussion. I think it was -- my recollection, it more
19 was asking for a plan about what items would have to be
20 taken out.
21      Q. Okay. What do you recall about those
22 discussions?
23          MR. CRAMER: Objection. Form. Misstates
24 testimony.
25      A. Just we were asked for some plans. I think it

Page 78

1  was over email. I don't remember about that particular
2  topic specific face-to-face discussions that I was
3  involved in.
4  BY MR. WEAVER:
5       Q. Okay. Were you in -- were you involved in
6  face -- face-to-face discussions on June 8th with
7  anybody from the mayor's office about the East Precinct
8  and the protests outside?
9       A. Yes, I was.
10      Q. Can you tell me about the nature of those
11 meetings and who was there?
12      A. Yes. There was a meeting in the Seattle
13 Emergency Operations Center at around noon on June 8th.
14 From the police department, Chief Best was there; I was
15 there; Assistant Chief Cordner, Assistant Chief
16 Nollette, Assistant Chief Diaz, Assistant Chief Hirjak,
17 I believe Assistant Chief Greening as well. So
18 essentially the entire -- we call it the command staff,
19 the sworn command staff, which is the chief and her
20 assistant chiefs.
21         From the mayor's office was Deputy Mayor Fong;
22 Stephanie Formas, who's chief of staff; and Deputy Mayor
23 Sixkiller. Those are the three I remember.
24         And then I think there were representatives
25 from some other City agencies there. They may have been

Page 79

1  director level. I don't remember specifically, but that
2  would have been SDOT, I believe Fire Chief Scoggins was
3  there, potentially somebody from Public Utilities,
4  but -- so it was police, mayor's office, and some other
5  department heads.
6       Q. Okay. What were the nature of those
7  discussions? What was the topic of the discussions that
8  was going on there?
9       A. So on the night of the 7th, we had had another
10 significant incident involving the -- well, two, really.
11 The -- the evening had started out where a person had
12 driven a car down 10th Avenue from Pike Street, came out
13 of the car -- shot somebody, came out of the car, went
14 through the crowd. Police took them into custody. So
15 that started the evening.
16         And then towards the end of the evening, we had
17 a significant removal of barricades that we had -- 11th
18 and Pine Street was kind of where we had the most
19 significant involvement nightly.
20         We had -- I had ordered some better metal
21 fencing, what we thought would be better metal fencing,
22 but really, almost as soon as it was installed,
23 protesters were looking for ways to take it down.
24         They had taken it down. There was an
25 encroachment on the precinct. All our attempts to

Page 80

1  de-escalate verbally had failed. We had reports of
2  people with firearms in the crowd.
3          We ended up using some less lethal munitions to
4  disperse the crowd, making numerous arrests, having
5  officers and members of the public injured. That's the
6  night of -- into the early morning of June 7th and the
7  early morning of June 8th.
8          And that leads to this meeting on the 12th to
9  discuss really what the plan would be, moving forward,
10 in an effort to avoid further conflict and confrontation
11 with the crowds that were gathering nightly around the
12 East Precinct.
13         THE VIDEOGRAPHER: Mr. Mahaffey, would you
14 mind either leaning back or pushing your -- the audio on
15 the camera is having trouble. Thank you.
16         THE WITNESS: Sure.
17 BY MR. WEAVER:
18      Q. So at any point during the conversations on the
19 8th that involved the deputy mayors and the chief of
20 staff Formas, do you recall there being a suggestion
21 from either the deputy mayors or Stephanie Formas that
22 the police should be -- the police should evacuate
23 personnel from the East Precinct?
24      A. No, I don't recall her saying that.
25      Q. Do you recall that there were discussions among

Page 93

1  I took that information back to the chief and others on
2  the command staff and started discussing what our next
3  plans would be.
4      Q. Okay. Tell me as much as you can about those
5  discussions that you had with the chief and other
6  personnel about the next steps to take.
7      A. Well, it was collaborative effort, and
8  ultimately the decision was going to be left to the
9  chief. And my preference was to gather as much
10 information as we could, determine if it was viable for
11 us to move back in immediately, and then formulate a
12 plan to sustain us being back in there, knowing that
13 there would probably be pushback from crowds again that
14 night on the precinct, so how were we going to sustain
15 it if we got back -- back into the building.
16       So that's kind of what was at the forefront of
17 my mind, that's what we talked about. And I think it
18 was the chief -- don't remember specifically, but I
19 think it was, you know, going to be in consultation with
20 the executive branch, to start determining the next
21 steps forward.
22     Q. So by the "executive branch," you mean the
23 mayor's office; is that correct?
24     A. Yes.
25     Q. Okay. Were you involved with discussions

Page 94

1  between the Seattle Police Department and the mayor's
2  office about whether the police department should try to
3  reoccupy the East Precinct on June 9th?
4      A. Not that I recall specifically on that day, no.
5      Q. Do you recall having those discussions with the
6  mayor's office at any time after June 9th, during the
7  month of June 2020?
8      A. Yes. There was a very regular tempo of
9  meetings involving the mayor's office, police, fire, a
10 lot of other City agencies on a daily basis, and I was
11 involved in many of those.
12     Q. Okay. So would you say you were involved every
13 day in those meetings, or was it just periodically?
14     A. I don't know. I'm trying to be circumspect.
15 It was certainly more than periodically. I just don't
16 remember if it was every day, but it was -- I mean, I
17 was working seven days a week, and there were frequently
18 a variety of meetings every day that certainly involved
19 the mayor's staff and others as well.
20     Q. So who do you recall being in these meetings
21 with the mayor's staff? I mean, it sounds like, you
22 know, fire department, Seattle Public U- -- you know --
23 give me -- I'll give you a list and you can tell me.
24       So was -- was Seattle Public Utilities at this
25 meeting -- at these meetings?

Page 95

1      A. At many of them, yes.
2      Q. How about Sam Zimbabwe from the Department of
3  Transportation?
4      A. I remember either he or a designee were --
5  would be involved in many of them.
6      Q. And I think you mentioned the fire chief was
7  there?
8      A. Chief Scoggins, yes.
9      Q. Okay. And then representatives from the
10 mayor's office; correct?
11     A. It seems like who I dealt with, with the
12 mayor's office, was either Deputy Mayor Sixkiller, or
13 Deputy Mayor Fong less so, and then Julie Kline, who was
14 the public safety advisor.
15     Q. How often were you in communication with Julie
16 Kline during the month of June 2020 about what was going
17 on, on Capitol Hill?
18     A. Several times a week.
19     Q. What were the nature of your communications
20 with her during that time period?
21       MR. CRAMER: Objection. Form. Vague as to
22 "nature."
23     A. Yeah, I don't know if I can generalize about
24 them. It was just about whatever the issue or topic was
25 that we were having to deal with.

Page 96

1  BY MR. WEAVER:
2      Q. During these meetings of the group that we
3  talked about, or with Julie Kline specifically, do you
4  recall having discussions about whether the police
5  department could or should return to the East Precinct?
6       MR. CRAMER: Objection. Form. Vague.
7      A. Yes, I'm sure that came up.
8  BY MR. WEAVER:
9      Q. What was your personal opinion about whether
10 the police department should attempt to reoccupy the
11 East Precinct in June of 2020?
12       MR. CRAMER: Objection. Vague as to time.
13     A. I was committed to getting us back in the
14 building as soon as it was practical, safe, feasible,
15 and something that we could sustain without having to
16 get back into the tempo or the situation that we were in
17 earlier the month -- earlier in the month.
18       That's the way I thought about it. Getting
19 back in may have been feasible at some point, but there
20 certainly would have been a force component, I think,
21 associated with that in the early days.
22       And then as we saw, when we went back with
23 Chief Best on June 11th, the sustainment was going to be
24 something we'd have to spend time thinking through.
25 ////

24 (Pages 93 to 96)

Page 97

BY MR. WEAVER:
Q. What happened on June 11th that you're referring to?
A. I believe that's the correct date. Chief Best and some -- myself and some other officers went back up to the precinct. We were able to go inside, inspect the building, make sure that it hadn't been broken into, nothing had been damaged or taken.
   I think the thought is that we would remain there. We'd put some resources in the building, but then there was an attempt -- there was a fire lit out -- outside of the building that made the officers feel unsafe.
   They left, unfortunately, without notifying anybody until the next morning. And so then we didn't have any more resources in there, so again, it was the sustainment piece that was going to be difficult once we'd lost that foothold.
Q. Okay. I just want to make sure I understood -- understood what you said. So on June 11th, you went in -- and I think it was June 11th, but -- on June 11th or thereabouts, you went -- you went into the precinct with Chief Best and some other officers, with the goal of leaving some people manned at the precinct; is that correct?

Page 98

A. That's accurate, yes.
Q. And those officers left sometime thereafter because they were concerned for their safety; is that right?
A. Yeah. A different team of officers actually came in late -- later in the afternoon or early evening and replaced those -- myself and others that had already been there throughout the day.
   And then after midnight the next day, let's say that was the 12th, that's when an incident occurred that caused them to leave the building.
Q. Okay. Were there other attempts to move personnel back into the East Precinct prior to July 1, 2020?
   MR. CRAMER: Objection. Form.
A. Not -- no, not like that, that we just talked about, or there were no other efforts that I recall that were made after that initial one.
BY MR. WEAVER:
Q. Okay. I want to go back to the discussions that we talked about earlier on June 8th, and I think -- am I correct that you were having discussions between you and some of your subordinate officers about whether to evacuate personnel from the East Precinct? Is that correct?

Page 99

A. On the 8th, yes, that's accurate.
Q. And was there discussion, either among that group or with your later conversation with Chief Best, about what might happen if officers were not able to return to the East Precinct within 24 hours?
A. No. We didn't consider that contingency. The thing -- the things that we thought would happen was, one, the people would march by and that would be it, and we'd move back in; or based on what I spoke to earlier about what had happened in Minneapolis, the information that we received from the FBI about government facilities and the precinct being a target, that there would be an effort to, you know, attack and destroy it potentially.
   We thought the danger for fire was significant, for lighting it on fire, and that's what we had planned to address, not that the occupation, for lack of a better word, that occurred would happen. We didn't consider that as a contingency plan. So we -- we weren't -- we hadn't thought that through.
Q. Were you aware, at the time you made your decision to evacuate the precinct on June 8th, that the mayor was considering whether to give the East Precinct to Black Lives Matter?
   MR. CRAMER: Objection. Form.

Page 100

A. I was not aware of that.
BY MR. WEAVER:
Q. When did you first become aware of that?
   MR. CRAMER: Same objection. Assumes evidence.
A. Sometime later on. I don't know if it was June or July. Chief Best had told me that there had been -- she was aware of a conversation between Black Lives Matter and the mayor's office about turning over the precinct.
BY MR. WEAVER:
Q. Okay. What do you -- can you tell me anything else about that conversation you had with Chief Best about that?
A. Yeah, I just remember being in her office. I don't know specifically what we were talking about. She told me -- Chief Best is very well connected to many communities in Seattle, especially the African-American community.
   And she had told me that people that she knew, I believe -- my recollection is in the Black Lives Matter movement, had told her about conversations they had had -- I don't remember specifically with the mayor or her office -- about making the precinct -- turning it over to them and allowing it to be some type of a

25 (Pages 97 to 100)

Page 189

1   incidents being brought to our attention"?
2       A. I'm wondering if that's referring -- and I'm
3   sorry; I'm looking down through these emails, if there's
4   anything specific incident-wise being mentioned in here.
5       So the email from the end from Sergeant
6   Fiorini, who's bringing forth some calls, or a concern
7   to us that people were -- especially at night, were
8   trying to lure police into the area potentially by
9   calling in significant incidents.
10      So I think Lieutenant -- or Sergeant Fiorini is
11  bringing that to our attention, and just that we have an
12  awareness of that, and then plan for that as a
13  contingency to deal with.
14      Q. What was your involvement, if anything, in the
15  operation on the morning of July 1, 2020, to clear the
16  protest area of people, barricades, and tents?
17      A. My involvement on that day is that I was the
18  overall incident commander for our response.
19      Q. Were you present on Capitol Hill for that?
20      A. Yes. I made a makeshift field command post at
21  the fire station that's roughly around about 13 or 14th
22  and Pine Street, Fire Station 25. That's where I was
23  located.
24      Q. And how many officers were involved in the
25  operation to clear the area?

Page 190

1       A. A couple hundred officers.
2       Q. Why was it determined that you should have 200
3   officers?
4       A. Well, first of all, it was the area that we had
5   to clear was fairly large, and it was kind of a
6   two-pronged approach. We had -- by that point we had a
7   lot of tents that had established in front of the
8   precincts, which we weren't sure of the exact amount
9   they were occupied. So that was phase one, so that was
10  going to require a significant amount of officers to
11  manage that.
12      And then the second area or issue that we had
13  to address with -- was Cal Anderson, which had an
14  encampment established as well too, that had an unknown,
15  but we suspected a significant amount of people in it,
16  that would require a good deal of officers to deal with.
17      So it was, again, just to manage those two
18  contingencies, and then just to have enough resources to
19  deal with this event and any eventualities that might
20  pop up. We just make sure we had enough people to deal
21  with things that we knew we would face and anything that
22  might pop up as a contingency.
23      Q. So was there a particular order or -- was there
24  a particular place in which the operation first started,
25  as far as police were concerned, in the area to -- to

Page 191

1   clear that area out first, or were they done
2   simultaneously?
3       A. The area in front of the precinct was the first
4   that we moved on, so that was the primary, but it was
5   fairly soon thereafter. Once we had started moving on
6   to the precinct, we had that stabilized, under control,
7   that we moved on to Cal Anderson.
8       Q. And how many people did you have to clear out
9   from the area around the East Precinct and in Cal
10  Anderson?
11      MR. CRAMER: Objection. Form. Foundation.
12      A. Around the precinct specifically, I -- two,
13  three dozen is my recollection. More than that in Cal
14  Anderson, but I don't -- I don't recall what the
15  specific number was.
16  BY MR. WEAVER:
17      Q. How long did the operation take for just
18  clearing the people out of that area?
19      MR. CRAMER: What area, Tyler? Both, or one
20  of the two?
21      MR. WEAVER: East Precinct and Cal Anderson.
22      A. I think the main portion of that operational
23  phase was done with- -- within two hours.
24  BY MR. WEAVER:
25      Q. And what was the next phase of the operation,

Page 192

1   from the police standpoint?
2       A. So then it was getting back into the building,
3   clearing out what needed to be cleared out from around
4   the building, include the tents, which I think the other
5   agency, I think it was Parks took care of, and then
6   removing the barricades from around the precinct, which
7   was SDOT's job with the heavy equipment, taking down
8   some of the -- we had put some fencing and boarding
9   around the precinct. I think we worked about taking
10  some of that down and getting back into the building.
11      So it was doing all those logistical things,
12  and then the sustainment portion of it, because we did
13  the actual operation, I think we were on-site by 5:00 in
14  the morning.
15      Most of the protest activities in early
16  June would happen in the evening, so the next phase of
17  the plan was preparing for that eventuality, that now
18  we'd moved back into the precinct, that there would be
19  protest activity directed at it later that night, so we
20  had other resources scheduled to come in later in the
21  day to manage that.
22      Q. So was there protest activity directed at the
23  East Precinct later that night, on the 1st?
24      A. There may have been, but not -- I don't
25  specifically recall if there was, and what our response

Page 197

1  adjourned at 3:40.
2          (Deposition concluded at 3:40 p.m.)
3          (Reading and signing was requested
4           pursuant to FRCP Rule 30(e).)
5                  -o0o-

Page 198

1          C E R T I F I C A T E
2
3  STATE OF WASHINGTON
4  COUNTY OF PIERCE
5
6       I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Thomas
9  Mahaffey, having been duly sworn, on January 26, 2022,
10 is true and accurate to the best of my knowledge, skill
11 and ability.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13 and seal this 2nd day of February, 2022.
14
15
16 _____
      CINDY M. KOCH, CCR, RPR, CRR
17
18 My commission expires:
19 JUNE 9, 2022