# EXHIBIT 44

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff,              )
                                )
    vs.                         ) No. 20-cv-00983
                                )
CITY OF SEATTLE,                )
                                )
        Defendant.              )
_____

VIDEOTAPED VIDEOCONFERENCE 30(B)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(HAROLD SCOGGINS)
_____

***PORTIONS OF THIS TESTIMONY ARE DESIGNATED
CONFIDENTIAL AND ARE SEALED
UNDER A SEPARATE COVER.***

Seattle, Washington
(All participants appeared via videoconference.)

DATE TAKEN:  SEPTEMBER 14, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

```
    A P P E A R A N C E S
FOR PLAINTIFF:
        TYLER S. WEAVER
        GABRIEL REILLY-BATES
        Calfo Eakes LLP
        1301 Second Avenue
        Suite 2800
        Seattle, WA 98101-3808
        206.407.2337
        tylerw@calfoeakes.com
        gaber@calfoeakes.com

FOR DEFENDANT:

        TYLER L. FARMER
        CAITLIN B. PRATT
        ARTHUR W. HARRIGAN, JR.
        Harrigan Leyh Farmer & Thomsen LLP
        999 Third Avenue
        Suite 4400
        Seattle, WA 98104
        206.623.1700
        tylerf@harriganleyh.com
        caitlinp@harriganleyh.com
        arthurh@harriganleyh.com

        JOSEPH G. GROSHONG
        Seattle City Attorney's Office
        701 Fifth Avenue
        Suite 2050
        Seattle, WA 98104-7095
        206.684.8200
        joseph.groshong@seattle.gov

ALSO PRESENT:  CATHY ZAK, videographer
        Buell Realtime Reporting, LLC

            * * * * *
```

## Page 3

```
          DEPOSITION OF HAROLD SCOGGINS
                EXAMINATION INDEX
EXAMINATION BY:                              PAGE
30(b)(6) Examination by Mr. Weaver             6
Non-30(b)(6) Examination by Mr. Weaver        94

                EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION                  PAGE
Exhibit 1  Amended Notice of Videotaped        7
           Deposition Pursuant to FRCP
           30(b)(6) to City of Seattle
Exhibit 2  Email; SEA_00092040                19
Exhibit 3  Email chain; SEA-PDR_002283-284    20
Exhibit 4  5-page Executive Order;            25
           SEA_00015070
Exhibit 5  PowerPoint, NHSC Presentation      34
           August - 2021
Exhibit 6  Email and attachment;              51
           SEA_00104722-731
Exhibit 7  Email chain; SEA-PDR_002188-190    53
Exhibit 8  Incident Report; SEA-SFD_000046-047  63
Exhibit 9  Email chain; SEA_00091963-964      67
Exhibit 10 Email; SEA-PDR_002386              72
Exhibit 11 Email chain; SEA_00091919          78
Exhibit 12 Email chain; SEA-PDR_002192-194    85
Exhibit 13 Email chain; SEA_00092599-601      88
Exhibit 14 Email; SEA_00104741-744           125
```

## Page 4

```
            EXHIBIT INDEX (Continuing)
EXHIBITS FOR IDENTIFICATION                  PAGE
Exhibit 15 3-page meeting request;           142
           SEA_00028044

Exhibit 16 3-page meeting request;           146
           SEA_00028170-171
Exhibit 17 Meeting request; SEA_00028178-179  156
Exhibit 18 Email chain; SEA_00020291-293      165
Exhibit 19 3-page chart titled "Messages"    171
Exhibit 20 Video recording                   183
Exhibit 21 Email; SEA_00092314-315           198
Exhibit 22 Spreadsheet                       198
Exhibit 23 Spreadsheet                       199
Exhibit 24 Email; SEA_00125617               206
```

1 (Pages 1 to 4)

Page 37

1   Q. And on the left part of this slide, it
2   designates that area as the protest response zone; is
3   that correct?
4       A. Yes.
5       Q. Okay. And so on June 8th, within that area, is
6   this slide indicating that anywhere in that area, that
7   the SPD had -- that the SFD had to wait for the Seattle
8   Police Department to secure the area before they would
9   enter?
10      A. Anywhere in the red zone.
11      Q. Okay. That didn't include the yellow area; is
12  that correct?
13      A. It did not.
14      Q. Okay. I understand this slide as defining the
15  protest response zone as the yellow area.
16          Do you feel -- do you feel otherwise?
17      A. I do. The yellow identifies the warm zone.
18  The protest response zone is the red, and it's written
19  in there, "protest hot zone."
20      Q. Okay. I'd like you to look at the left where
21  it says "Protest response zone," colon, and then it has,
22  Denny, Union, Broadway, and 13th.
23          Do you see that?
24      A. Yes.
25      Q. Okay. I understand that as indicating that the

Page 38

1   protest response zone was that area, Denny, Union,
2   Broadway, and 13th.
3           Do you have a different understanding?
4       A. I do. That's our warm zone, and this gave our
5   folks situational awareness for this protest hot zone.
6   And so here's some of the challenges, for example, and
7   reason why we have to lay this out a little wider. Just
8   navigating around that area in our vehicles are very
9   challenging just when you look at the red zone that's
10  outlined there. So all of our folks need to have
11  situational awareness for a larger area.
12      Q. Okay. And that larger area was Denny, Union,
13  Broadway, and 13th; is that right?
14      A. Yes.
15      Q. And why -- why do they need to have additional
16  situation -- why do they need to have additional
17  situational awareness within that area?
18      A. Because one never knows what spills outside of
19  the hot zone. So our folks need to really be paying
20  attention. This was on June 8th, so this is the first
21  day that the landscape kind of changed for us. So our
22  folks needed to have situational awareness because you
23  never know what you're going to, you know, come upon in
24  any of these streets around -- around there.
25      Q. It potentially could be unsafe within that --

Page 39

1   that area -- within the -- within the yellow area for
2   the fire department to respond; correct?
3       A. It could be. Just like any other warm zone
4   that we would set up geographical boundaries for, yes.
5       Q. Okay. And so was it within that sit- -- within
6   that yellow zone you had modified -- the City modified
7   its response for basic life support and advanced life
8   support. I can ask it different -- I can ask that
9   question differently if it -- if it would be clearer for
10  you, which -- let's just re-ask it.
11          So is it the case that within that yellow area,
12  the entire yellow area, bounded by Denny, Union,
13  Broadway and 13th, the Seattle Fire Department had a
14  modified response for basic life support and advanced
15  life support on June 8, 2020?
16      A. Yes.
17      Q. Okay. And as indicated on -- and you spoke a
18  little bit about this earlier, but so for basic life
19  support it required one aid car, one engine, and one
20  battalion chief to respond to that; is that correct?
21      A. Yes.
22      Q. Okay. What's -- what's an aid car?
23      A. An aid car is two firefighter EMTs on an
24  ambulance, basically. Our terminology is to call it an
25  aid car so we can differentiate between an aid car and a

Page 40

1   medic unit, which is two firefighter paramedics in an
2   ambulance.
3       Q. Okay.
4       A. So the level of training is different.
5       Q. Okay. And a battalion chief, can you -- can
6   you kind of describe to me where in the hierarchy a
7   battalion chief sits?
8       A. A battalion chief is the first level of fire
9   management. The rank structure in the organization,
10  from battalion chief it goes up to deputy chief, then
11  transitions to assistant chief, and then to fire chief.
12  The rank and file, the labor side, is firefighter -- we
13  have firefighter drivers, we have all of our technical
14  teams, we have lieutenants, and we have captains. So
15  battalion chief is above the captain level.
16          So in the city, we have the city broken up into
17  five geographical boundaries, and each geographical
18  boundary has a battalion chief that's in charge of
19  between six and eight fire stations, so they're
20  basically the manager in charge of that geographical
21  boundary.
22      Q. Okay. So how many battalion chiefs are there
23  in the city of Seattle?
24      A. Let's see. I believe 24.
25      Q. Okay.

Page 73

1    Q. She is proposing that from sunset to dusk the
2  CHOP red zone expand to the outline of the warm zone for
3  safety.
4       Do you see that?
5    A. I do see that.
6    Q. Do you know whether that was -- that proposal
7  was ever adopted into policy at the fire department?
8    A. Into our planning, our operational planning.
9    Q. Yes.
10   A. I'm trying to think of that last map because
11 for most areas it looked like it eventually did expand.
12 I don't know on June 22, 2020, if it expanded that day.
13   Q. Then the bullet point between 1 and 2 in this
14 email indicates that the fire department was giving B2
15 chiefs the flexibility to recon and gather information
16 to help with the decisions about staging and when entry
17 is safe.
18      Is that -- do you see that, first of all?
19   A. Yes, I do see that 2.
20   Q. And is that an accurate description of what
21 was -- the sort of discretion that was given to the
22 chiefs in June 2020, with regard to this area?
23   A. Yes. We -- we normally give that type of
24 flexibility to our chiefs to gain situational awareness
25 so they can share information that would help us with a

Page 74

1  safer response.
2    Q. So would you say the exact boundaries of the
3  red zone could fluctuate depending on what the exact
4  circumstances in a particular incident were?
5    A. Correct. That goes back to our scenes of
6  violence situations. So if they spill out, whether
7  they're outside of this area or in another part of the
8  city, the response personnel can make those real-time
9  calls on where to push pause until we have proper
10 support.
11   Q. Then in her No. 2, a couple lines there, she
12 indicates that as of the time of this email, June 22,
13 2020, non-SOV events, such as cardiac, are currently
14 treated in the same -- treated the same in the red zone
15 as SOVs.
16      Do you see that?
17   A. I do.
18   Q. Okay. And SOV refers to scene of violence; is
19 that correct?
20   A. Yes.
21   Q. So what do you -- first of all, is her
22 statement of -- is her statement of what was going on on
23 the scene accurate, in your understanding of what was
24 going on with responding to events in the red zone?
25      MR. FARMER: Objection. Vague as to policy

Page 75

1  versus actual incidents.
2    A. I think our folks on the ground were making
3  real-time decisions based on what was in front of them,
4  but if a scene of violence or a cardiac event happened
5  inside of the red zone, the responding units would have
6  to make those real-time decisions to meet up with law
7  enforcement and then go to where they needed to go to
8  treat the patient.
9  BY MR. WEAVER:
10   Q. Do you know of any instance from June 8th
11 through June 30, 2020, where the fire department went
12 into the red zone with the police and either put out a
13 fire or assisted a victim?
14   A. I don't know. I would have to look at our
15 response information, but I don't think that there were
16 any significant fires during this period of time that we
17 would have needed to go put out a fire. I think it may
18 have been more of a medical issue, but I'd have to
19 follow up on that. I don't know.
20   Q. Okay. With regard to the medical issues, do
21 you recall any instance in which the fire department
22 went in with the police during the period of June 8th to
23 June 30, 2020, to address a medical issue in the red
24 zone?
25   A. I don't -- I don't recall because I'm not sure

Page 76

1  if there was a response to a location inside of the red
2  zone for us to actually respond to. For example, at
3  12th and Pine, I'm not sure if we got a response to go
4  to 12th and Pine for a medical emergency. I'm not sure
5  if that actually happened. So I -- I can't be 100
6  percent sure on that one.
7    Q. Do you recall that there were some medical
8  emergencies from June 8th through June 30, 2020, that
9  were reported in the red zone?
10   A. I can take that assumption that there probably
11 was. It's a busy area, a lot of people there.
12   Q. Do you recall any shootings that occurred
13 during that time period within the red zone?
14   A. Yes.
15   Q. Do you recall whether for any of those
16 shootings the Seattle Fire Department entered the area
17 to treat victims within the red zone with the Seattle
18 Police Department?
19   A. ==I do believe we entered the area with the==
20 ==Seattle Police Department on occasions to treat a==
21 ==victim. I'm just not sure of the geographical==
22 ==boundaries based on the day because it was always==
23 ==changing.==
24   Q. Okay. But you don't recall -- you can't sit
25 here and say that you know of an instance where the

19 (Pages 73 to 76)

Page 77

1  Seattle Fire Department treated somebody during the
2  period of June 8th through June 30, 2020, within the red
3  zone; is that right?
4      A.  Right.  I -- I can say we entered with law
5  enforcement to treat a patient.  I'm just not 100
6  percent sure on the geographical boundaries.
7      Q.  Okay.  Was it the case for incidents within the
8  red zone, whatever it was on a particular day, that the
9  Seattle Fire Department could not go into the area and
10 would not go into the area unless the police department
11 determined that it would go into the area?
12         MR. FARMER:  Object to the form of the
13 question.
14         You may answer.
15     A.  Sure.  In the area that was identified as the
16 red or the hot zone, it was our practice to partner up
17 with law enforcement, make sure that we had proper
18 support, and then go in if we needed to.  But that would
19 be similar to a shooting or a stabbing today.  We would
20 pause, wait for law enforcement to clear the scene, and
21 then we would go into the scene.  So that's our --
22 that's our standard practice.
23 BY MR. WEAVER:
24     Q.  Was it the practice that for any area or any
25 call within the red zone, as it existed on any day from

Page 78

1  June 8th to June 30, 2020, that it was the policy of the
2  Seattle Police -- Fire Department to not enter the area
3  unless the Seattle Police Department accompanied them?
4         MR. FARMER:  Objection.  Asked and answered.
5  Chief, you may answer again.
6      A.  Oh, yes, that was our operational plan.
7         (Exhibit No. 11 marked.)
8  BY MR. WEAVER:
9      Q.  And -- all right.  I'll leave it there for now.
10 So if you could go to what I've introduced as
11 Exhibit 11.  It's in the chat already.
12     A.  11.
13     Q.  So do you have it up?
14     A.  Yes.
15     Q.  Okay.  So there was an email that was written,
16 that was then forwarded to you.
17        Do you recall the incident discussed in this --
18 in this email from Dale Watanabe?
19     A.  Right.  I'll take a look.
20     Q.  Okay.
21     A.  Yes, I've -- I've read that.
22     Q.  Okay.  Do you recall that incident?
23     A.  I don't recall the incident, but after reading
24 it, it does hit the refresh button a bit.
25     Q.  Okay.  So what was your understanding of what

Page 79

1  an MI is?  There's a reference to an MI.
2      A.  Myocardial infarction.
3      Q.  Okay.  So a heart attack?
4      A.  Yes.
5      Q.  Was what was -- is what's described in this
6  email from Dale Watanabe, and the directions that were
7  given to the person who reported they were having a
8  myocardial infarction, consistent with the policy that
9  was in place on June 20, 2020?
10         MR. FARMER:  Object to the form of the
11 question.
12     A.  Well, this is a real-time situation that the
13 dispatcher -- because Dale Watanabe is one of our
14 dispatchers -- gave a caller in the 911 system
15 information to get to fire station one block east of
16 your location, Fire Station 25.
17        So I don't know what else was said on that
18 call.  I don't know what other ailments the individual
19 may have had.  But the dispatcher apparently felt
20 comfortable enough to ask the person to walk to the fire
21 station one block away.  But that's all I'm seeing here.
22 That's not the situation we wanted.
23 BY MR. WEAVER:
24     Q.  Okay.  So Dale Watanabe is a dispatcher, you
25 said.  Is he -- okay.

Page 80

1       So do you read his email as saying that --
2  indicating that he was comfortable telling the person to
3  walk to the fire station?
4         MR. FARMER:  Objection.  Sorry.  Objection.
5  Calls for speculation.
6      A.  No, I don't read that statement in his email,
7  no.
8  BY MR. WEAVER:
9      Q.  Okay.  What is your understanding of what the
10 policy would be today if somebody at 6 -- 1660 12th
11 Avenue called the fire department, indicated that they
12 were having symptoms of a cardiac arrest -- is it your
13 understanding in that situation that it would have been
14 consistent with the current policy, today, to tell them
15 to walk to Fire Station 25?
16     A.  No.
17     Q.  And why is that?
18     A.  Today?  We wouldn't have any obstructions
19 blocking our units from actually making it to this
20 address location, 1660 12th Avenue.  What is it, just
21 north of the east precinct.  So this is probably the
22 building that is right on 12th, on the east side of the
23 street there.  But we wouldn't have any obstructions
24 blocking our units from getting there.
25     Q.  Okay.  So your understanding is that in this

Page 133

1    A. No.
2    Q. Did there become a time around June 7th or
3  June 8, 2020, that the fire department and the police
4  department were concerned that there might be a fire set
5  to the building that houses the east precinct?
6    A. There was.
7    Q. And what was the source of that information?
8    A. I believe it was the FBI.
9    Q. Did you talk to the FBI, yourself, about --
10 about that issue?
11   A. I did.
12   Q. Okay. Can you describe your conversation or
13 conversations with them about that issue?
14   A. Sure. Vaguely, he expressed that there was
15 a -- a credible threat to burn the building, and that's
16 what we talked about.
17   Q. Was that on June 8, 2020? Do you recall?
18   A. I'm not sure if it was on June 8th, but if it
19 wasn't, it was leading up to. I'm not sure of the exact
20 date and time.
21   Q. So what steps did the -- did the fire
22 department take with that information to protect or try
23 to protect the east precinct?
24   A. Well, when you say try to protect the east
25 precinct, I'm not sure what that means.

Page 134

1    Q. From being burned down. Did you do anything in
2  particular?
3    A. We don't do pre-deployment of, I don't know,
4  chemicals -- like you see in the wild lands, for
5  example.
6    Q. Sure.
7    A. If a wildfire is coming you can predeploy
8  things on the structures, but that's not what we do. We
9  did an assessment. We revealed the building
10 construction, we reviewed the contiguous walls to the --
11 we were trying to understand the lay of the land there
12 with the businesses that were to the south. We reviewed
13 the distance in that alleyway to the west, to that next
14 building, to understand, you know, if there was a fire,
15 what would be the fire spread, what would be our
16 opportunities and challenges. We reviewed the water
17 systems and things like that.
18   Q. Did you have men and equipment on the ready to
19 fight a fire at that particular location on that day?
20   A. As we do every day.
21   Q. Okay. There was no special precautions for
22 that area on that day; is --
23   A. Well, the precautions that we talked about, the
24 additional resources and things like that, that we -- we
25 had that almost every day during this time period. Fire

Page 135

1  Station 25 was literally one block --
2    Q. Sure.
3    A. -- up the street. But each and every day
4  our 33 stations are staffed and ready to go.
5    Q. Okay. So I'd like you to look again at
6  Exhibit 14, and look at -- look at the notes under
7  Slide 10.
8    A. Uh-huh.
9    Q. And where it says, "June 8 -- June 8 decision
10 tipping point when SPD left its precinct," were you
11 involved in the decision made by the Seattle Police
12 Department to vacate the east precinct on June 8th?
13   A. No.
14   Q. When did you hear that the Seattle Police
15 Department had made a decision to vacate the east
16 precinct on June 8th?
17   A. I don't know exactly, but I'm sure it was
18 sometime that morning, as we watched the activity around
19 the precinct.
20   Q. How did you find out about it?
21   A. It was -- I'm not sure exactly, whether it was
22 in the meeting or watching the activities that were
23 unfolding earlier that afternoon. I'm not sure which
24 came first.
25   Q. Did you -- yeah. Sorry. We just talked over

Page 136

1  again.
2    So what did you mean by that it was a tipping
3  point when they left the precinct?
4    A. Sure. So when they left the precinct, the
5  protesters initially marched by the precinct, and many
6  of us thought, okay, well, that -- they'll just have a
7  new route. But at some point they made a U-turn and
8  came back into the space, and the tipping point was
9  repurposing the water barriers and the gate barriers,
10 and staying in the space. So that changed the landscape
11 immediately.
12   Q. Okay. What did they repurpose the barriers
13 for?
14   A. To not -- to not allow traffic north, south,
15 east, or west on the streets around the east precinct.
16       MR. WEAVER: Can we go off the record for a
17 minute?
18       THE VIDEOGRAPHER: Going off the record.
19 The time is approximately 1:54 p.m.
20       (Pause in proceedings.)
21       THE VIDEOGRAPHER: We are back on the
22 record. The time is approximately 1:55 p.m.
23 BY MR. WEAVER:
24   Q. When you saw that the protesters had repurposed
25 the barriers, did you have any concerns as a -- as the

Page 221

1  Q. The City renting a space?
2  A. Oh, I don't know.
3  Q. Okay. You don't know anything about Mayor
4  Durkan and a business called the Riveter? Do either of
5  those -- does that ring a bell with you at all?
6  A. No.
7  Q. Okay.
8  A. And it's not to say that those conversations
9  didn't take place, but it -- it would not have been one
10 that impacted the fire department.
11 Q. Okay. Yeah, I -- I'm just making sure. I
12 didn't expect that you did, but -- can you give me
13 another five minutes? I might be done. I just want to
14 look at my notes. So if we could go off the record for
15 five minutes.
16       THE VIDEOGRAPHER: Going off the record.
17 The time is approximately 4:53 p.m.
18       (Recess from 4:53 p.m. to 4:57 p.m.)
19       THE VIDEOGRAPHER: We are back on the
20 record. The time is approximately 4:57 p.m.
21       E X A M I N A T I O N (Continuing)
22 BY MR. WEAVER:
23 Q. Okay. I do have a few just brief questions.
24 So with regard to Cal Anderson after July 1st
25 through the end of 2020, do you know of any instances

Page 222

1  where there were yellow or red zones created in or
2  around the park during that time?
3  A. I don't. I don't think we created any in or
4  around the park, but I'm not 100 percent sure, but I
5  don't think we did.
6  Q. Do you recall whether there were any scenes of
7  violence declared in the -- in or around the park during
8  the same time period?
9  A. Are you talking about the time period after the
10 demobilization --
11 Q. Yeah, July 1st to the end of the year of 2020.
12 A. Oh, I'm not sure. That's a pretty long time
13 period, so there could have been.
14 Q. Okay. Has anybody, to your knowledge,
15 attempted to see if they can get any of your previous
16 messages by using your Apple watch as a -- as a source?
17 A. No.
18 Q. Is that a City-issued Apple watch?
19 A. No.
20 Q. But it is -- it's synced with your City phone;
21 is that right?
22 A. Yes. Only my City phone.
23 Q. Okay. At any time -- in June of 2020, was your
24 personal email linked to your phone?
25 A. No.

Page 223

1  Q. Your City phone, I mean.
2  A. No.
3  Q. Okay. And do you have a personal email address
4  that you use?
5  A. I do.
6  Q. What's -- what's the email address?
7  [--- Confidential        ---]
8       MR. FARMER: Cindy, we would -- I'm sorry,
9  Mr. Weaver. Cindy, we would ask that you mark the last
10 question and answer as confidential under the protective
11 order in the case, please.
12      MR. WEAVER: And we have no objection to
13 that. I expected that, so -- I was actually going to
14 mention that we would keep that confidential.
15      So unless your attorney has questions, I am
16 done.
17      MR. FARMER: No questions.
18      Cindy, we'll reserve signature. Thank you.
19      THE VIDEOGRAPHER: Thank you. This
20 concludes today's deposition of Harold Scoggins. The
21 time is approximately 5:00 p.m. Going off the record.
22      (Deposition concluded at 5:00 p.m.)
23      (Reading and signing was requested
24       pursuant to FRCP Rule 30(e).)
25           -o0o-

Page 224

1           C E R T I F I C A T E
2
3  STATE OF WASHINGTON
4  COUNTY OF PIERCE
5
6       I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Harold
9  Scoggins, having been duly sworn, on September 14, 2021,
10 is true and accurate to the best of my knowledge, skill
11 and ability.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13 and seal this 23rd day of September, 2021.
14
15
16
17      _____
18      CINDY M. KOCH, CCR, RPR, CRR
19 My commission expires:
20 JUNE 9, 2022



# DECLARATION

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 9/14/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Harold Scoggins with Confidential Excerpt

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
30(b)(6) and Individual Deposition of
Harold Scoggins with Confidential Excerpt

Signed on the __22__ day of __October__, 2021.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066    Tacoma 253.235.0111
e-mail info@buellrealtime.com    www.buellrealtime.com



# ERRATA

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 9/14/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Harold Scoggins with Confidential Excerpt

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|---|---|---|---|

I have reviewed the entire document and focused on my answers. They all seem correct, but it was hard to determine my exact answers vs. the words on the paper without having the audio to play back. I think the intent and context is correct.

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com