# EXHIBIT 46

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff,              )
                                )
    vs.                         ) No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
        Defendant.              )
_____

VIDEOTAPED VIDEOCONFERENCE

30(B)(6) AND INDIVIDUAL
DEPOSITION UPON ORAL EXAMINATION OF
MAMI HARA

(CITY OF SEATTLE)
_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 4, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

           A P P E A R A N C E S
FOR PLAINTIFF VIA VIDEOCONFERENCE:
        TYLER S. WEAVER
        GABRIEL REILLY-BATES
        Calfo Eakes LLP
        1301 Second Avenue
        Suite 2800
        Seattle, WA 98101-3808
        206.407.2237
        tylerw@calfoeakes.com
        gaber@calfoeakes.com

FOR DEFENDANT VIA VIDEOCONFERENCE:

        SHANE P. CRAMER
        Harrigan Leyh Farmer & Thomsen LLP
        999 Third Avenue
        Suite 4400
        Seattle, WA 98104
        206.623.1700
        shanec@harriganleyh.com

ALSO PRESENT VIA VIDEOCONFERENCE:
        TYLER TODISH, videographer
        Buell Realtime Reporting, LLC
           * * * * *

## Page 3

            DEPOSITION OF MAMI HARA
                EXAMINATION INDEX
EXAMINATION BY:                          PAGE
30(b)(6) Examination by Mr. Weaver          6
Non-30(b)(6) Examination by Mr. Weaver     86

                EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION              PAGE
Exhibit 1   Amended Notice of Videotaped    9
            Deposition Pursuant to FRCP
            30(b)(6) to City of Seattle
Exhibit 2   SPD Blotter/Update;            11
            SEA_00015069-070
Exhibit 3   Email chain; SEA_00102780-788  17
Exhibit 4   Email; SEA_00121366            33
Exhibit 5   Email chain; SEA_00043770-774  43
Exhibit 6   Email chain; SEA_00082989-991  46
Exhibit 7   Email; SEA_00082986            48
Exhibit 8   Email chain; SEA_00083076      51
Exhibit 9   Email chain; SEA_00092041-045  57
Exhibit 10  Email; SEA_00136841-842        70
Exhibit 11  Email chain; SEA_00043193      79
Exhibit 12  16-page chart titled "Messages" 119
Exhibit 13  18-page chart titled "Messages" 125
Exhibit 14  Email chain; SEA-PDR_002277-282 136
Exhibit 15  Email chain; SEA_00093002-003  137

## Page 4

            EXHIBIT INDEX (Continuing)
EXHIBITS FOR IDENTIFICATION              PAGE
Exhibit 16  Email; SEA_00093087-090       140

Page 13

1  you understand that we're talking about the time period
2  of June 9, 2020, to July 1, 2020?
3      A. I am.
4      Q. Okay. And we're talking about the delivery of
5  city services within the area described in the first
6  paragraph on Page 3 of Exhibit 2. Is that correct?
7      A. Yes. I -- we are talking about that -- the
8  area that's bounded by those parameters.
9      Q. Okay.
10     A. And so -- yeah, I was talking about the
11 modified delivery of city services --
12     Q. Sure.
13     A. -- and that generally it entailed a
14 modification of the time at which things would be
15 completed.
16     Q. So how about electricity services or
17 electricity repairs? Do you recall whether there were
18 any modifications to those services within that area
19 during that time period?
20     A. You know, I -- I facilitated the entry of all
21 of the other utilities into the area. I do not recall
22 that there were any notable changes to electrical
23 services, although we did -- I did facilitate City
24 Light's and -- and also -- well, I -- City Light's entry
25 into the area for --

Page 14

1      (Simultaneous cross-talk.)
2  BY MR. WEAVER:
3      Q. -- about any issues with meter readers going
4  into the area during that time period?
5      THE COURT REPORTER: I'm sorry. You were
6  speaking at the same time. She was still speaking --
7      MR. WEAVER: All right.
8      THE COURT REPORTER: -- and so the beginning
9  of your question didn't come through. Can you please
10 just repeat?
11     MR. WEAVER: Yeah.
12 BY MR. WEAVER:
13     Q. So how about any issues with meter readers
14 during that same time period in that area?
15     A. There may have been -- yeah, actually, I do --
16 I do remember that there were -- there was a time or two
17 that I asked for the meter readers to hold off because
18 of other departments' activities in the area.
19     Q. Um --
20     A. But I do want to add, though, that they did
21 manage to, you know, read the meters, you know, at some
22 other point.
23     Q. Do you recall that, whether there was access to
24 the area for various city services, varied from day to
25 day?

Page 15

1      A. Could you repeat your question, please?
2      Q. Do you recall the access and the delivery of
3  city services, such as trash, recycling, and other
4  services, varied from day to day depending on the
5  conditions in the area?
6      A. Is your question whether the schedule for
7  modifying the pickup times was irregular, or that it --
8  you know, on a daily basis, or can you -- can you refine
9  your question a little bit so I understand what you're
10 asking?
11     **Q. Do you recall making assessments on a daily**
12 **basis whether it was safe for SPU employees to go into**
13 **the area?**
14     **A. My responsibility during that time was to go in**
15 **every morning and, you know -- and to do an assessment**
16 **to make sure that the roadways were open and -- you**
17 **know, and -- and that, you know, everything was in -- in**
18 **good condition for the city vehicles to enter, and I --**
19 **yes. Yes, I did an assessment every morning.**
20     Q. And were there some days where you determined,
21 based on your assessment, that it was not safe for city
22 vehicles to enter the area?
23     A. If I remember properly, there may have been
24 a -- a rare occasion that I made that assessment, but it
25 was largely, if I remember correctly, based on the kind

Page 16

1  of -- the activities that were going on from a number of
2  different parties, yeah.
3      Q. What sort of activities would have led to a
4  determination that people should not go into the area?
5      A. When I would sometimes know that there were
6  different city services -- other city activities going
7  on that might raise some -- you know, elevate
8  temperatures, you know, I might say let's hold off and
9  pick up a little bit later, or tomorrow.
10     Q. What sort of activities would have raised
11 temperature?
12     A. For example, if the city were, you know, intent
13 on cleaning up the park or moving barriers, those kinds
14 of things might have -- might have raised the
15 temperature.
16     Q. Why would those things have raised the
17 temperature?
18     A. From my perspective, and this is just my
19 assessment, people don't like change. And so it was
20 just, you know, me being extra cautious to make sure
21 that -- you know, and -- that -- that, you know, that
22 we -- that our services were not in any way complicating
23 any discussions that might be going on.
24     Q. Were you concerned that there might be pushback
25 or even violence from -- by the people in the area if

Page 25

1  available for anyone all along -- along the perimeter of
2  the area just in case folks didn't have, you know,
3  access to their own dumpster at any given point. And
4  so -- and so we managed those on a daily basis and made
5  them well -- well known to folks, and would -- would
6  sometimes help them to, you know, move those things,
7  move -- move their -- move their trash or to just pick
8  it up in, you know, pickup bags instead. Definitely we
9  picked -- we had -- we had a lot -- a lot of bag
10 collection in the -- in the zone.
11     Q. Okay. Okay. If you could go up to
12 Mr. Van Dusen's -- the top, the first page. His update
13 on June 12th at 3:00 p.m.?
14     A. Okay. I'm there.
15     Q. Okay. Great. With regard to what he says
16 about customer waste services, he indicates that -- SPU
17 calling and visiting with businesses and residential
18 customers within the -- and near the zone to clarify any
19 service changes.
20     Do you recall what that would have been, or do
21 you know?
22     A. So what is your question?
23     Q. What exactly the -- was going on with service
24 changes that were requiring calls and visits to
25 customers in the area.

Page 26

1     A. On June 12th specifically?
2     Q. On June -- let's start with June 12th, if you
3  remember June -- if you know anything about June 12th
4  specifically.
5     A. So June 12th specifically, I don't know
6  exactly, you know, what the -- you know, I would have to
7  look at the record to see which dumpsters we had taken
8  and which ones we were returning, but when I -- when I
9  read this, you know, what I -- what I remember, you
10 know, from that time is that we were always aiming to
11 make sure that if a con- -- if a customer could safely
12 store their containers, then we would, you know,
13 absolutely return them and have designated times for
14 pickup.
15     If they did not have containers that they could
16 safely store, we were working with them and calling them
17 to provide for alternative approaches that would -- you
18 know, such as bagging their garbage, and then we would
19 have a regular pickup for -- for all of -- all of those
20 bags.
21     Q. Where would the bags be picked up?
22     A. For some of them, from in front of their
23 properties and, you know, some preferred, you know, a
24 designated away -- area away from their properties, I
25 believe. And we also -- I do also, you know, remember

Page 27

1  that some of them, you know, actually really appreciated
2  and used the large dumpsters that were on the perimeter
3  of the -- of the area.
4     Q. Okay. So if you could go under the same email,
5  same page, under "Public waste services," Mr. Van Dusen
6  indicates that, "much of public degree -- debris
7  collected from -- from -- I think he -- he says "form,"
8  but I think he means "'from' bagged consolation [sic] at
9  12th and Pine."
10    So were there piles of bags in certain areas
11 that had been designated where people would just leave
12 their bags of trash for pickup at some point by Seattle
13 Public Utilities?
14    A. There -- there were probably some designated
15 areas, but we were also -- we regularly picked up the --
16 any bags of trash that were left anywhere so actually --
17 no, now that I recall it, there were -- there were a
18 couple areas that were -- that I remember being
19 designated trash bag collection points, but we also did
20 have a lot of ad hoc litter bags that would be put in
21 different places that -- you know, in piles, and then we
22 would go and pick them up on a daily basis.
23    Q. Were there some days where you weren't able to
24 go and pick those up because it was determined you
25 should not go in the area at all?

Page 28

1     A. If -- there -- there were a couple days that I
2  remember that, you know, I -- I had to call it off, but
3  it -- but I do remember that on the whole, that we were
4  able to keep things very clean because I was there and
5  would sometimes move the bags to the large dumpsters, or
6  other people from Seattle Public Utilities would be
7  there, and so I do not remember a large accumulation
8  of -- of litter or trash bags.
9     Q. But you do recall that there were some days
10 where you couldn't go in and get the trash at all; is
11 that correct?
12    A. That we would just leave it there for a -- a
13 day? I -- I'm trying to remember an accumulation where
14 we would leave it for a whole day, and I don't -- I
15 don't recall -- I don't recall that, but if we -- that
16 we wouldn't do anything. But, you know, it -- it's
17 possible that there might have been, but, you know, we
18 made -- we did our level best to make sure that all
19 litter and garbage was picked up that was, you know, in
20 bags on the -- you know, in the right-of-way.
21    Q. Okay. Going back up to the customer waste
22 services and the last section in that paragraph --
23    A. Could you go -- tell me what page you want me
24 to go to?
25    Q. The same -- the same page that we've been on,

Page 29

1  the first page. It's just the paragraph on June 12th
2  that indicates Customer Waste Services.
3      A. Okay.
4      Q. And the last sentence of that. I'm
5  specifically going to ask about the last sentence of
6  that paragraph. This seems to indicate that there were
7  still customers without their own waste containers in
8  the area. Is -- was that -- was that accurate, that as
9  of June 12th, there were not -- there were some people
10 who didn't -- still didn't have their garbage cans or
11 dumpsters?
12     A. I believe that there were some customers
13 that -- whose -- whose containers had been taken, but,
14 you know, we coordinated with them so that their trash
15 would be removed even if their containers were not
16 there.
17     Q. And part of what -- part of your coordination
18 of that was to provide large shared dumpsters at a
19 couple intersections in the area; is that right?
20     A. The large dumpsters were a part of an overall
21 strategy to ensure that no debris or, you know, garbage
22 would collect in that area.
23     Q. So am I understanding you to -- your testimony
24 to be that large amounts of garbage did not accumulate
25 in the area during the period of June 8th to July 1,

Page 30

1  2020?
2      A. Overnight near the park, because there were
3  several houseless people, or many houseless people in
4  the park, you know, there would be a large pile of
5  garbage at times, you know, in -- near the dumpsters,
6  you know, because there was more than the dumpster- --
7  but we said we up -- we had to upsize the dumpster
8  there. And that is my -- I believe that's -- that that
9  is the point at which I -- you know, and I think that
10 perhaps that maybe Rio Bravo had so much activity that
11 they might have had some bags next to their dumpsters,
12 but those were always collected.
13     Q. What do you mean by "upsizing the dumpsters"?
14     A. The -- at -- down at 12th and -- sorry -- 11th
15 and Olive, I believe that we moved to a larger dumpster
16 at some point that could accommodate the full -- the
17 full need.
18     Q. For -- and that was for both people who were
19 staying overnight in the area, people who were coming
20 during the day in the area, and then also businesses and
21 residents in the area? Anybody could use it?
22     A. Those dumpsters were provided for everyone's
23 use so that no debris or trash would accumulate in the
24 area.
25     Q. Okay. Again, is it your testimony that debris

Page 31

1  and trash did not accumulate in the area during the
2  period of June 8th to July 1, 2020?
3      MR. CRAMER: Object to form.
4      A. I feel like that question is ambiguous for me.
5  I don't know exactly what you mean. If you mean, like,
6  did -- was there ever a garbage bag on the street, then
7  garbage bags were put on the street for collection. And
8  so I don't know if that defines an accumulation. I'm
9  not sure -- could you -- maybe you could define for me
10 what you mean for, like -- is -- do you mean for like a
11 duration, a period of time? Like could -- could you
12 be -- could you -- I -- I -- because I know that you --
13 you want me to answer this question. I really want to
14 help you.
15 BY MR. WEAVER:
16     Q. Okay. So there was -- let me ask you this:
17 There was -- on July 1, 2020, do you agree with me the
18 park was closed on July 1, 2020, Cal Anderson Park?
19     A. What do you mean? Do you mean like it was
20 closed by the Parks Department? Is that what you mean?
21     Q. Closed by the City on July 1, 2020. Do you --
22 do you agree with that?
23     A. I would have to look at the notes just to
24 confirm the exact date was July 1st.
25     Q. Okay. So let me ask you this: When -- when

Page 32

1  the park was initially cleared after CHOP had been there
2  and the barricades were removed from the streets, do you
3  recall whether there was any trash in the area that had
4  to be cleaned up?
5      A. After July 1st?
6      Q. Once --
7      A. Or --
8      Q. -- once the barriers had been cleared from the
9  streets and the people had been moved from the park.
10     A. If I recall, I received -- I received a -- a
11 complaint from Nagle Place where a -- it's an alley that
12 has a lot of construction, and there were houseless
13 folks in the park, and there were -- just -- there was
14 just a lot of activity on the alley, and so I received a
15 complaint that there had been some trash accumulating,
16 and we addressed it -- I believe we addressed it that --
17 immediately that day.
18     I -- after the park was cleared, you know, it's
19 possible that there were also garbage bags at the
20 entrance to the park for the Parks Department to clear
21 if houseless folks were still in the park.
22     Q. How about garbage that wasn't in bags or in
23 dumpsters? Did you ever observe that while you were in
24 the zone between June 8th and July 1, 2020?
25     A. If I recall correctly, the -- the area was

Page 33

1  incredibly clean. It was, you know, people -- lots of
2  residents and businesses noted to me that it was cleaner
3  than it had ever been because there were people
4  continually cleaning the area. So while there may have
5  been an instance or two when overnight, you know, after
6  a protest that there may have been litter on the street,
7  you know, we -- we aimed to continually pick it up on a
8  daily basis.
9       Q. But you didn't necessarily pick it up every day
10 on a daily basis; is that right?
11         MR. CRAMER: Objection. Form.
12      A. You know, I was there every day, and I don't
13 remember a large accumulation of garbage on the street.
14 And if I had seen a lot of garbage, I would have
15 addressed it or people that I was with would have
16 addressed it. Even if we had called off garbage
17 services, we still had people on foot who were still,
18 you know, monitoring and addressing issues.
19         (Exhibit No. 4 marked.)
20 BY MR. WEAVER:
21      Q. All right. I'm going to mark and drop into the
22 chat Exhibit 4. It should be there.
23      A. Oh, I should note, though, there was a short
24 period of time that I did have to leave town and Idris
25 Beauregard had -- had to pick up from -- you know,

Page 34

1  picked up my on-site assessments, you know, assessments
2  and work, but I was there almost every day.
3       Okay. I have opened up your attachment.
4       Q. Okay. Who is Chad Buechler? And let me know
5  if I'm pronouncing that correctly.
6       A. At that time Chad was an advisor to our
7  emergency management group, or not -- I mean, he was a
8  staff person. He is currently now the head of our
9  emergency management group at Seattle Public Utilities.
10      Q. Okay. What was his role during this time
11 period of June 8th to July 1st with regard to providing
12 updates on whether people should go into the zone or
13 not?
14      A. Chad did not make those determinations. Chad's
15 role from Seattle Public Utilities is to -- well, is
16 generally and during that time, is to coordinate with
17 the City's Emergency Operations Center, our Operations
18 Response Center, and at that time with me directly. And
19 so the assessments about whether -- what we would do
20 would come from -- from -- from me based on my -- my
21 field assessment every morning.
22      Q. And then Chad -- was Chad's role to then take
23 what that decision was and then let everybody in the
24 department know what the situation was?
25      A. It was, and it's also his responsibility to

Page 35

1  keep everybody apprised of any emergency operations
2  re- -- Emergency Operations Center or other point of
3  contact notifications or advice.
4       Q. Okay. So with regard to this specific email,
5  Exhibit 4, do you recall that initially it was
6  determined from the operations center that there should
7  be a four-block radius no-go zone around the east
8  precinct?
9       A. This email is from, I think, just -- just as
10 a -- very beginning, this is based on Seattle Police
11 recommendation, but also, I think, you know, there was
12 some ambiguity about their recommendation about whether
13 it meant that, you know, what -- exactly what they
14 meant, and so this -- this -- this prompted me to do an
15 on-site assessment, myself. I believe -- you know,
16 because our -- our services are essential and, you know,
17 we need to continue to manage public health and provide
18 our services.
19         So, you know, this was -- I believe this was
20 just based -- this -- this is just Chad relaying what
21 police was providing based on their interpretation, and
22 so, you know, he was communicating that to everybody,
23 but that was not -- kind of a -- you know, a -- a
24 directive from -- from me or from my assessment.
25      Q. So you don't think you were involved in this

Page 36

1  particular email before it was sent? Is that what
2  you're saying?
3       A. You know, I might have asked Chad to share. I
4  don't remember exactly. But I might have asked Chad to
5  always make sure to share whatever the police or others
6  were providing; right? But -- yeah. I mean, this is --
7  this is -- this is Chad's relay of the police's
8  assessment.
9       Q. Okay. So you were -- you were copied on this
10 email, it appears. Did you indicate to people, well,
11 we're not going to follow the police. I'm going to go
12 in and reassess it and let you know if you should go in,
13 or did people just not go in?
14      A. On that day?
15      Q. On that day.
16      A. So can you remind me exactly which -- what was
17 the date that the -- that the protesters put barriers
18 up?
19      Q. My understanding is that happened the night of
20 June 8th, when the -- the police left the station on
21 June 8th.
22      A. You know, I don't think that I just said,
23 don't -- disobey what the police are saying. What I did
24 was I just went over to do my own reconnaissance to --
25 to assess the situation. And then based on my own

Page 65

1  the hose bib that was attached to the shelter house.
2  Q. Do you know whether the water from that hose
3  bib was being used as drinking water or some other water
4  source by people who were occupying the park?
5  A. No, I'm not -- I'm not aware.
6  Q. Do you recall at some point that Seattle Public
7  Utilities shut that water source off in the park?
8  A. There was one instance where we were asked to
9  shut off the water and -- and then restore it shortly
10 thereafter.
11 Q. Okay. Do you know why it was restored shortly
12 thereafter?
13 A. The -- the -- I mean, it's just -- it's a -- to
14 have water when you're -- when you have that many people
15 or, you know -- I'm going to assume that it was just
16 because we needed to ensure that there was -- you know,
17 that there was a supply of -- of fresh drinking water if
18 needed.
19 Q. There was a concern with -- with the number of
20 people that were in the park, that they wouldn't have
21 drinking water if that water was shut off; correct?
22 A. You know, just water, you know, for any kind
23 of -- you know, whenever there's a congregation of
24 people is a pretty basic provision. There was a lot of
25 drinking water because of donations. There were a lot

Page 66

1  of plas- -- there were an insane amount of plastic
2  drinking water bottles, you know, always there from
3  community donations, from residents and businesses,
4  but -- but, you know, we always feel that it's important
5  when there is -- when there are people, that there
6  should be access to water.
7  Q. Why was the water shut off during that one time
8  period you discussed in this time period?
9  A. If -- if I remember correctly, mayor's office
10 wanted to make sure that -- you know, that there was --
11 that -- that there were -- that the -- I'm trying to
12 remember exactly what their rationale was. It might
13 have -- if I'm -- I'm trying to remember the date and
14 the time. Is there an indication of -- in this email of
15 when that was? Because they may have been trying to
16 initially start to clear the park and, you know, that
17 that would be part of, you know, that work.
18 Q. I believe from what I've seen -- I'm not sure I
19 have an exhibit here today about it, but I believe what
20 I have seen is the water was shut off somewhere around
21 June 22nd.
22    Was it your understanding that one of the
23 purposes to shut off the water was so that people would
24 leave the area?
25 A. I don't know exactly what the thought process

Page 67

1  was, but it seem- -- but if I remember correctly, it was
2  potentially part of a whole set of actions designed to
3  help to clear the park.
4  Q. Okay. What do you know about any electricity
5  services that were provided to the area and specifically
6  to Cal Anderson Park that were not normally provided to
7  the area during that time period?
8  A. There were a lot of requests for additional
9  electrical service to the park. You know, people wanted
10 to charge their phones and things. But it was not --
11 but that was not, to my knowledge, in any way, you know,
12 provided. At additional -- no -- I do not believe that
13 any additional electrical service was provided.
14 Q. How about additional lighting in Cal Anderson
15 Park during hours that there would not normally be
16 lighting? Are you aware of anything to that effect?
17 A. I believe that for safety reasons some of --
18 sometimes the field lights were left on for longer than
19 they would normally be on -- be left on, but those were,
20 you know, kind of existing lights and just management of
21 the hours that those lights were on.
22 Q. Why -- why was that seen as necessary for
23 safety purposes?
24 A. It was -- if I remember correctly, it was the
25 request of, you know, folks just feeling like it would

Page 68

1  be -- it would -- it would feel safer to have the lights
2  on for longer.
3  Q. Okay. Who were the people that requested it?
4  A. I don't know who was requesting it. I
5  apologize.
6  Q. Okay. You didn't get any of those requests
7  yourself, personally?
8  A. I may have, but I don't remember those -- I
9  mean, I had a lot of requests all the time for all kinds
10 of things.
11 Q. So you don't know whether it was the people who
12 were in the park overnight who were requesting that the
13 lights be on all night, or longer than usual?
14 A. I don't remember who asked me or who asked the
15 parks, you know, to manage their light -- that -- the
16 hours of the lights, but it's possible that, you know,
17 people in the park asked, or -- or residents, you know.
18 I'm not sure.
19 Q. But there -- never mind. I'll let it go.
20    So what sort of -- did the City provide
21 portable toilets to the area that are not normally there
22 during the period of June -- June 9th to June 30,
23 2020 -- or sorry, June -- June 9th to July 1, 2020?
24 A. The -- the context for what's normally there is
25 a little -- was a little different at that time because

17 (Pages 65 to 68)

Page 69

1  there had been a lot of protests.  There were two things
2  that were going on that kind of changed the normal
3  context for that area and the provision of -- of -- of
4  porta potties, is that there had been a lot of protests
5  there and a lot of people -- you know, just hundreds, if
6  not thousands of people in that area nightly for
7  protests, and then also, I believe that the bathroom at
8  the shelter house in Cal Anderson had been broken.
9      And so there had been some porta potties down
10 near 11th and Olive already, and then we -- and then the
11 City also had some up near -- like between 12th and 11th
12 and Pine already.  And so even before the period that
13 you indicated there were -- there -- there had been
14 porta potties resident in the area.
15     And then with the number of people constantly
16 flowing through the area, we provided additional
17 porta potties to make sure that there wouldn't be a
18 public health, you know, outbreak, or any -- you know,
19 or -- you know, or an exacerbation of the pandemic.
20     Q.  Do you recall how many porta potties were in
21 the area that we've been talking about?
22     A.  That first --
23     MR. CRAMER:  Objection to form.
24     A.  I don't remember exactly how many were in that
25 area, but we have service records that can tell you how

Page 70

1  many there were before and then during that week.
2       (Exhibit No. 10 marked.)
3  BY MR. WEAVER:
4       Q.  I'm going to drop Exhibit 10 in.  It should be
5  on its way.
6       A.  Okay.  I have it open now.
7       Q.  Okay.  This is an email with an attachment,
8  again from Mr. Van Dusen, and if you could go to the --
9  the second page.  You may need to rotate it, but maybe
10 you're better at reading sideways than I am.
11      A.  I see what you're saying.  This is from
12 June 14th.  Okay.  I'm looking at the map now.
13      Q.  Okay.  So this seems to indicate on the left
14 that there were a total of 21 City Sani-Cans at this
15 point.
16         Do you see that?
17      A.  It says that there are nine, plus eight, plus
18 four around the perimeter of the -- of the site.
19      Q.  Okay.  So that adds up to 21; right?
20      A.  (Witness nods head.)
21      Q.  Okay.  And they were -- were these owned by the
22 City of Seattle or were they contracted out to a third
23 party to provide these services?
24      A.  I believe that the majority of them were -- are
25 owned and managed via contract by Honey Bucket.

Page 71

1       Q.  And it looks like they were -- if I'm reading
2  this correctly, they were -- they were daily pumped --
3  they were pumped out daily during this period in
4  June 2020; is that right?
5       A.  They were pumped out at least daily in
6  June 2020.  I think we may have had some modification
7  based on demand.
8       Q.  And -- and sometimes -- I think we've seen that
9  sometimes there were days where they were told not to go
10 in as well; is that right?
11      A.  Those were rare days, yes, but maybe near the
12 end, but we, you know, freq- -- we -- we worked very
13 hard to make sure that they didn't overflow.
14      Q.  Okay.  How was it determined that there should
15 be 21 Sani-Cans in this general area?
16      A.  You know, we monitored them, and if -- and I
17 mean, this is a little gross, but if they were, you
18 know, at capacity and we were nearing any kind of, you
19 know, real issue with capacity -- if they were -- I
20 mean, I cannot describe to you how many tourists there
21 were.  That, you know, we would -- we would sometimes
22 add some, you know, to accommodate, you know, the -- the
23 additional crowds.  But we also would remove them if
24 they -- you know, if they were -- if they were no longer
25 needed.  So it was really based on monitoring.

Page 72

1       Q.  Okay.  Do you -- do you know whether you
2  added -- as of, you know -- this appears to be as of
3  June 12th, or June 14th.  The attachment says June 12th,
4  but I think the email -- the cover email is June 14th.
5          Do you know whether between this period and
6  July 1st there were more Sani-Cans added or whether some
7  were removed prior to July 1st?
8       A.  Yeah, I -- I'm -- I apologize.  I don't
9  remember the dates for, you know, the addition or
10 removal of the different cans, but I -- all I remember
11 is that we were just monitoring them to make sure that
12 we tried to have the right balance in order to ensure
13 public safety, or public health, I mean.
14      Q.  Okay.  Was there ever -- was there ever any
15 discussion or concern that by adding these additional
16 Sani-Cans, and having 21 Sani-Cans in the area would
17 encourage people to continue to occupy the area?
18      A.  If I -- after I answer this -- after I answer
19 this question will we take a restroom break, please?
20      Q.  Sure.  Absolutely.
21      A.  All this potty talk.
22      Q.  All the talking about Sani-Cans, huh?
23      A.  So you know, if I remember correctly, yes, some
24 people -- a few people had that hyp- -- or not even that
25 many.  A couple people had that hypothesis and posed it

Page 101

1  Q. Do you recall whether the mayor saw any open
2  carry guns on her visit?
3  A. I do not remember see- -- that.
4  Q. Okay. Do you remember generally that there
5  were people openly carrying weaponry in this period of
6  June 8th to July 1, 2020, in the area?
7  A. It was -- it was not a persistent thing that I
8  would cite. There was the John Brown club, which is a
9  group of white abolitionists, you know, I think were --
10 were there on occasion. There was, you know, another
11 person named Rick who -- you know, who, you know, had
12 a -- who had a gun. But, you know, I did not see a lot
13 of guns.
14 Q. You saw some, though; is that correct?
15 A. Yeah, everybody explained to me that Washington
16 State is an open carry state. I'm not from an open
17 carry state, and so, you know, it took a lot of
18 education for me to understand, you know, that that
19 was -- that -- that was a -- a legal thing here, in --
20 in Washington State. I was -- I was surprised because I
21 had not seen guns that often here, but now I -- now I --
22 now that I know it is an open carry state, I see them
23 more, I notice them more often.
24 Q. Okay. Going back to your trips with the mayor,
25 you said there was another day where you took the mayor

Page 102

1  and talked to some businesses and residents.
2      Do you recall that?
3  A. Yes.
4  Q. Okay. What do you recall about -- can you be
5  more specific about what those interactions were, and
6  who you talked to with her?
7  A. You know, and I -- I wish I could remember the
8  date, you know, like kind of where it fell, you know,
9  because that would help me to kind of -- at least kind
10 of remember more. But we definitely -- Joey Burgess,
11 the owner of Queer Bar, you know, was present with us
12 most of the time, and the owner of Elliott Bay Bookstore
13 was with us most of the time. We went to stop at
14 Rachel's Ginger Beer. We talked to -- we -- we stopped
15 at a number of business -- businesses.
16 Q. Okay.
17 A. Yeah, we just -- we -- we -- you know, I think
18 we first started at Elliott Bay Bookstore, and a bunch
19 of different business owners came to that site and, you
20 know, we did a walk-around and, you know, went from
21 place to place.
22     We stopped at a restaurant that was -- I can't
23 remember the name of the restaurant, but it was on Pike
24 and 11th, as well.
25     So those are -- those are three stops that I

Page 103

1  remember.
2  Q. Okay.
3  A. The restaurant, the Elliott Bay, and the
4  Rachel's Ginger Beer.
5  Q. Do you recall talking to anybody who lived in
6  the area while the mayor was with you?
7  A. Yes.
8     MR. CRAMER: Objection to form.
9     THE WITNESS: Oh.
10    MR. CRAMER: Go ahead.
11 A. There were several people who worked and lived
12 in Capitol Hill who were part of the discussions.
13 BY MR. WEAVER:
14 Q. Okay. Do you recall who those people were?
15 A. There were -- there were people who run some of
16 the buildings, like -- I think the real- -- I can't
17 remember her name, the really nice woman who runs the
18 buildings, like Sunset Electric and some other
19 buildings, I think she lives in the area as well.
20 One -- the -- this -- the -- the manager for the --
21 one -- a large apartment building at Olive and 11th was
22 there and is a resident. There were -- there were --
23 there were -- there were a lot of people, you know, if
24 you kind of think of the whole list of them, and I'm
25 sure that in my email chain I have a list of them. I --

Page 104

1  you know, I -- you know, and I could provide that to
2  you.
3  Q. Okay. So I want to ask whether you heard --
4  whether --
5  A. And sorry, Miki from Pettirosso, she's a
6  business owner and a resident, I believe.
7  Q. So at the interactions during this day when you
8  were speaking with businesses and residents with the
9  mayor, I want to know whether you heard any of these
10 sorts of complaints aired by the people you spoke to:
11    Did you hear anything about an inability to
12 access apartments or apartment driveways?
13 A. I think I didn't hear you. I'm sorry.
14 Q. Did you hear anything about inability or
15 difficulty entering apartments or apartment parking
16 lots?
17 A. I remember -- oh, now that you speak of -- I
18 remember a woman who -- she was -- she lived in the
19 building right behind the east precinct, and that
20 alleyway sometimes, you know, I think that she was --
21 she said that she had some real -- she had some
22 difficulties getting in and out of that building. Yes,
23 I remember her mentioning that.
24 Q. Okay. And while the mayor was with you, did
25 you hear anything about inability for businesses to

26 (Pages 101 to 104)

Page 105

1  operate normally due to the -- the occupation of the
2  area?
3       A.  I remember a wide variety of comments and
4  responses.  It was -- I was really struck by the
5  heterogeneity of the responses that all of the
6  businesses had.  There was -- one of the business
7  owners, you know, he owned a large bar, and he was,
8  like, oh, you know, we've been closed the whole time, so
9  this is not affecting me at all or, you know, my -- you
10 know -- you know, or -- or people like us whose
11 businesses have been closed.  I think that there was --
12 there were some that were just unhappy by -- you know,
13 because they felt that there were, you know, just -- you
14 know, that there -- that they didn't -- they didn't --
15 they just felt like the graffi- -- some of the graffiti
16 that was not, you know, welcome.
17      They were -- and some -- some were like, we've
18 seen -- you know, we've -- yes, we've been busy, you
19 know, it's been -- you know, there have been a lot of
20 people in and out, but, you know, this is -- this is a
21 really strange time.
22      So it was a wide variety of -- of comments.
23      Q.  Do you recall, while you were with the mayor,
24 any of these businesses indicating that they believed
25 they had lost revenue as a result of the occupation?

Page 106

1       A.  I don't remember exactly about who -- who --
2  who might have said that.
3       Q.  Do you recall that someone said that?
4       A.  I mean, I -- I -- I honestly don't remember
5  specific inc- -- incid- -- incidents of that, but it's
6  possible.
7       Q.  Did you hear that at other times, maybe when
8  the mayor wasn't there?  Did you hear that at other
9  points, that businesses were losing revenue?
10      MR. CRAMER:  Go ahead.
11      A.  There was one business owner who told me that
12 their -- their revenues at their liquor store were down,
13 yeah.
14      THE COURT REPORTER:  I'm sorry.  Mr. Cramer,
15 I only heard "go ahead."  So if you said "objection"
16 before that, it didn't come through.
17      MR. CRAMER:  I think it was just form.
18      THE COURT REPORTER:  Okay.  Thank you.
19 BY MR. WEAVER:
20      Q.  Do you recall, when you were with the mayor on
21 this tour of businesses and talking to residents,
22 anybody voicing the concern that the protesters on or
23 near the barriers were intimidating towards people
24 entering the area?
25      A.  This is another -- this is a situation where

Page 107

1  there were also varied perspective on this.  You know,
2  some people told me that they had no issues whatsoever
3  and felt like it was safer there than it used to be.
4  And then there were people who felt that it was -- you
5  know, that -- that they didn't feel like they could just
6  move easily because of, you know, how they felt about
7  all of this, and -- and maybe they had interactions that
8  I -- you know, that I can't speak to, that -- you know,
9  because I wasn't there in those in- -- you know, but --
10 you know, it's hard for me to really untangle what was
11 real- -- what was real and what was perception.
12      Q.  Do you remember hearing complaints when you
13 were with the mayor that -- that people were, in fact,
14 scared for their safety because of what was going on in
15 the streets?
16      A.  That -- I do not recall that being a
17 predominant topic of the discussion or a major strand of
18 the -- their -- their -- their own physical safety.
19 Yeah.  Although -- yeah.
20      Q.  Well, whether or not it was a dominant topic of
21 discussion, did you hear people voice that while you
22 were with the mayor?
23      A.  With the mayor?  I think -- it's possi- -- it
24 is possible that the business owner at -- that -- that
25 one of them mentioned that.  I just can't remember what

Page 108

1  she said exactly, and if it was about her own physical
2  safety or she was -- just a general kind of concern.
3       Q.  Do you recall at other times when you were in
4  the area, not with the mayor, people expressing to you
5  that they did not feel the area was safe to be present
6  in?
7       A.  You know, I heard from people that at night,
8  that people felt that it could be -- get -- feel -- that
9  it felt unsafe sometimes, to some people.
10      Q.  Do you recall, while you were with the mayor,
11 going back to the meeting before, hearing from people
12 who were either businesses or permanent residents in the
13 area that the conditions in the area would deteriorate
14 in the late hours of the evening and into the night?
15      A.  I -- I heard that more later, you know,
16 afterwards, that people said, oh, wow, at night it would
17 be very different, you know, or somewhat different for
18 some people.  Because I would not -- normally not be
19 there at night except for, you know, I think I was there
20 a night or two.  And, you know, myself, I didn't
21 perceive the -- maybe it was just the time that I was
22 there, it was not as different --
23      Q.  Okay.
24      A.  -- or it wasn't very different.
25      Q.  What can you tell me about what you recall

27 (Pages 105 to 108)

Page 145

```
 1   yet, please.
 2           THE VIDEOGRAPHER:  I'll go ahead and read us
 3   off.  This concludes the --
 4           MR. WEAVER:  All right.  Sorry.
 5           THE VIDEOGRAPHER:  This concludes the
 6   deposition of Mami Hara.  The time now is approximately
 7   1:01 p.m.  Going off the record.
 8           (Deposition concluded at 1:02 p.m.)
 9           (Reading and signing was requested
10            pursuant to FRCP Rule 30(e).)
11                  -o0o-
```

Page 146

```
 1           C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON
 4   COUNTY OF PIERCE
 5
 6       I, Cindy M. Koch, a Certified Court Reporter in
 7   and for the State of Washington, do hereby certify that
 8   the foregoing transcript of the deposition of MAMI HARA,
 9   having been duly sworn, on October 4, 2021, is true and
10   accurate to the best of my knowledge, skill and ability.
11       IN WITNESS WHEREOF, I have hereunto set my hand
12   and seal this 13th day of October, 2021.
13
14
15           _____
16           CINDY M. KOCH, CCR, RPR, CRR #2357
17
18   My commission expires:
19   JUNE 9, 2022
```



# E R R A T A

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 10/4/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Mami Hara

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 61 | 6 | car way | Cartway |
| 76 | 5 | don't know | I don't know |
| 101 | 8 | cite | see |
| 112 | 7 | mom | I'm sure I didn't say "mom" |
| 140 | 20 | for--for--for--for | I doubt I said "for" four times |
| 141 | 6 | There's different zones | I would never say "there's different zones" |
| 143 | 10 | extens- | extensive |
| 144 | 23 | It was -- alright | This doesn't make sense |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**   Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:**  10/4/2021

**WITNESS:**       30(b)(6) and Individual Deposition of Mami Hara

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
30(b)(6) and Individual Deposition of Mami Hara

Signed on the \_\_\_30th\_\_\_ day of _____November_____, 2021.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com