# EXHIBIT 48

LONNIE THOMPSON
5/4/2021

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiffs,    )
                               )
        vs.            ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,       )
                               )
        Defendant.     )
_____

Zoom 30(b)6 Video Deposition Upon Oral Examination
Of
LONNIE THOMPSON
_____

DATE: Tuesday, May 4, 2021
REPORTED BY: Mindy L. Suurs, CSR No. 2195

## Page 2

APPEARANCES

For the Plaintiff:
  TYLER S. WEAVER
  Calfo Eakes
  1301 Second Avenue
  Suite 2800
  Seattle, Washington 98101

For the Defendant:
  CAITLIN B. PRATT
  KRISTIN E. BALLINGER
  TYLER L. FARMER
  Harrigan Leyh Farmer Thomsen
  999 Third Avenue
  Suite 4400
  Seattle, Washington 98104

For the City of Seattle:
  JOSEPH GROSHONG
  Assistant City Attorney
  Seattle City Attorney's Office
  701 Fifth Avenue
  Suite 2050
  Seattle, Washington 98104

Also present: Karl Benitez, Royal Video Productions

--oOo--

## Page 3

INDEX
EXAMINATION BY                              PAGE
Ms. Pratt                                    5

EXHIBIT INDEX
NO.   DESCRIPTION                                  PAGE
1     Google map                                    12
2     Bergman's Lock and Key Service, LLC, Profit   38
      and Loss, May 1, 2020
3     Summary of profit and loss information        46
4     Annual Profit and Loss Statements from 2016   47
      through 2020
5     Bergman's Lock and Key Service, LLC, Profit   56
      and Loss, May 1, 2020
6     Bergman's Lock and Key Service, LLC, Profit   57
      and Loss, May 1, 2019
7     Estimated Losses for Bergman's Lock & Key     89
8     Plaintiffs' Initial Disclosures               93
9     Photos                                       108

## Page 4

           Tuesday, May 4, 2021
                9:10 a.m.
                --oOo--

        THE VIDEOGRAPHER:  We are now on the record.
Today is May 4th, 2021.  The time is now 9:10 a.m.  This is
Volume No. 1, Media No. 1 in the deposition of Bergman's
Lock and Key Services, LLC, 30(b)6 representative Lonnie
Thompson in the United States District Court Western
District of Washington at Seattle in the matter of Hunters
Capital, LLC, versus City of Seattle, Case
No. 20-cv-00983-TSZ.  We are recording via the internet
using Zoom video conferencing.
        My name is Karl Benitez.  I'm representing Royal
Video Productions, Inc., of Issaquah, Washington 98027 by
invitation of Rough & Associates.
        At this time I would like to ask all counsel
present to identify themselves.  Please state your name,
the firm you're working for, and whom you're representing
in this matter.
        MS. PRATT:  My name is Caitlin Pratt.  I work for
Harrigan Leyh.  We represent the City of Seattle.  I'm
joined on this call by Kristin Ballinger, also with my
firm, and Joe Groshong of the City of Seattle.
        MR. WEAVER:  My name is Tyler Weaver.  I'm at

Page 73

1  longer was working out of the East Precinct; is that right?
2     A. Yes.
3     Q. Can you tell me how your -- the operation of
4  Bergman's changed starting June 8th?
5     A. We had to set up a new game plan, or I had to
6  create a new game plan because of the -- what do I want to
7  say? -- the disruption, the -- I call them the
8  antagonizers, the people that were trying to get you to
9  yell back at them or create issues, as I call it. And they
10 were walking up and down the streets always chanting,
11 playing their trumpets, yelling and screaming, whatever,
12 and some of the customers didn't feel safe coming in. So
13 two of us just kind of manned the phones and routinely we'd
14 get a phone call, "Is it safe?" "Is it okay if we come
15 by?"
16        We have a back alleyway that sometimes we could
17 meet people, but of course nobody even wanted to be within
18 a hundred yards of the place. So we started doing the
19 window thing where we have a side window that we would
20 start doing work out of talking to people and customers,
21 and we just kept the front door locked and you'd have to be
22 buzzed in before you even came in, before you were welcome
23 to come in because it was not uncommon for somebody that
24 wasn't exactly sober or in the right state of mind to just
25 come pounding on the doors or the windows, and with the

Page 74

1  window open, they would yell and scream.
2        So we were all kind of on edge. So it was one of
3  those things where I made it very clear with every one of
4  my coworkers that if you did not feel safe, you need to let
5  me know this and we need to either make arrangements or we
6  need to figure something out.
7        And everybody did pretty well. We had our
8  moments, it got kind of rough, but even though we were open
9  until 3:00, it was not unusual for me to get them out the
10 door by 1:00. Everybody was to be off the hill -- my goal
11 was to make it so everybody was off the hill by 1:00, 2:00.
12 I would remain -- me and Lorie would remain at the shop
13 after 2:00. At 2:00 we would throw the plywood up and we
14 would remain at the shop getting work done behind the scene
15 but keeping an eye on the cameras, making sure we were
16 safe. And I would make it a point to come in super early
17 in the morning, 6:30 or so, and just make sure the workload
18 was ready to go so as soon as a service tech would walk in,
19 he would walk out within 20 minutes and just get everybody
20 in, get everybody out, take care of the customers as they
21 were knocking or calling, and yeah.
22    Q. And so couple of things. Your service techs --
23 your service techs are the ones in the Bergman vehicles;
24 correct?
25    A. Correct.

Page 75

1     Q. And so they stopped by the storefront every
2  morning?
3     A. We would -- it wouldn't be at the front
4  storefront -- well, I mean we could if we wanted to. Yeah,
5  we usually -- they usually come into the alley because we
6  have a small parking area in the back alley that we could
7  come in and out of, but it's not a public access.
8     Q. And so they usually used the alley, which isn't a
9  public access, when they stopped by each morning; is that
10 right?
11    A. That's right. Our normal routine is you would
12 show up at the -- normally what happens in the morning is
13 all the techs are at the shop first thing and then they're
14 sent on the road for the day.
15    Q. So the techs were able to come in in the morning
16 still, but you expedited their time there; is that right?
17    A. Yes.
18    Q. Okay. And they were able to drive those work
19 vehicles into the alley; right?
20    A. Yes.
21    Q. Okay. And you chose not to have them drive their
22 vehicle in front of the store; is that right?
23    A. Yes, that is correct.
24    Q. The window setup you talked about -- is it like a
25 drive-through window that you have on your building?

Page 76

1     A. No, it's a walk-up window. It's on the sidewalk.
2     Q. So customers could drive and park in your parking
3  lot but walk up to the window; is that right?
4     A. Park on the street because there is no parking
5  lot available for anybody.
6     Q. Oh, okay.
7     A. Yeah.
8     Q. So they would park on the street in front of
9  Bergman's or wherever they could find parking and then they
10 would walk up to the walk-up window?
11    A. Yes.
12    Q. You said there were a few moments where it was
13 tough. What did you mean by that?
14    A. When I say it's tough, I meant it was kind of
15 nerve-racking because we're not sure what was going to
16 happen next. And when I say that, you name it, it was
17 happening on the hill: People were yelling and screaming
18 and throwing -- I mean yeah, all you had to do was go
19 outside and you could be scared for your safety, you know.
20    Q. The people who were on the hill engaging in the
21 behaviors that you described -- do you have any reason to
22 believe that any of those were City-affiliated people?
23    A. They weren't City workers if that's what you're
24 saying, anybody that's affiliated with the City, no.
25    Q. Okay. So we talked a little bit about the access

19 (Pages 73 to 76)

Page 77

1  to your storefront. Was the road in front of you -- 12th,
2  I believe; correct?
3      A. Correct.
4      Q. Was 12th in front of your storefront blocked off
5  to traffic?
6      A. At Olive, yes, would be about 50 yards south of
7  our door.
8      Q. But it was not blocked off in front of your door;
9  is that right?
10     A. No, it was not.
11     Q. And that's why those service tech vehicles could
12 have driven in front of the building if you had chosen
13 that -- you know, to ask them to do that; right?
14     A. Yes.
15     Q. So you said the street was blocked off at 12th
16 and Olive. When was that blocked off?
17     A. It would be after June 8th. That's to my best of
18 knowledge.
19     Q. What was it blocked by?
20     A. The concrete barricades.
21     Q. And is your memory that there's concrete
22 barricades were there through the time when the park was
23 cleared out on June 30th, or July 1st, excuse me?
24     A. Yeah.
25     Q. Are you aware of any other areas where the road

Page 78

1  was blocked off?
2         MR. WEAVER: Objection. Go ahead and answer.
3      A. No, I mean it's just kind of my little
4  neighborhood there. That was kind of what I paid attention
5  to.
6  BY MS. PRATT:
7      Q. When you say that 12th at Olive was blocked off
8  after June 1st -- or excuse me, after June 8th with
9  concrete barricades, what do you mean that it was blocked
10 off?
11     A. It was not possible for car traffic to get
12 through.
13     Q. Could pedestrian traffic get through?
14     A. Oh, yes.
15     Q. You mentioned that some customers had made it
16 clear that they did not feel safe; is that right?
17     A. Yes.
18     Q. Do you remember what they said specifically?
19     A. No. They were on the phone, several of them. As
20 soon as they found out where we were at, the -- yeah.
21     Q. I'm sorry, were you finished with your sentence?
22     A. Yes.
23     Q. Oh, okay, sorry. So other than you having the
24 impression that they did not feel safe, what did they
25 actually say?

Page 79

1      A. Oh, I can't go out there, it's not safe up there.
2  You're in that -- you're in that zone? Yes. Oh, okay. Is
3  there any way you can help -- you know, yeah.
4      Q. They said, "Is there any way you can help --"
5      A. Help us out, yes. And we would. We would find
6  some way. We can't make everybody happy, but you would do
7  your best. That's what we do.
8      Q. So for the customers who didn't feel safe, you
9  made alternative arrangements; is that right?
10     A. Yeah, sometimes I referred them to other lock
11 companies that were just as friendly and as knowledgeable.
12     Q. How many times did that happen?
13        MR. WEAVER: Objection, vague.
14     A. I couldn't keep track of that.
15 BY MS. PRATT:
16     Q. Can you estimate?
17     A. At least over ten times.
18     Q. Are you aware of anytime when a customer wasn't
19 able to reach your business -- not that they didn't feel
20 comfortable but that they physically weren't able to reach
21 it?
22        MR. WEAVER: Objection. Answer if you can,
23 Lonnie.
24     A. I wouldn't be aware of. Can you ask me -- can
25 you ask me the question again?

Page 80

1  BY MS. PRATT:
2      Q. Yeah, absolutely. So are you aware of a time
3  when a customer of Bergman's was actually unable to access
4  the storefront because of the CHOP?
5         MR. WEAVER: Same objection. Go ahead.
6      A. I never heard from any of our customers directly
7  saying, hey, we could never get there, but there were many
8  times the street was blocked off with marchers and
9  protestors and people that were angry that wouldn't leave
10 and -- yeah.
11 BY MS. PRATT:
12     Q. When you say "the street," what do you mean?
13     A. 12th Avenue.
14     Q. Is that 12th Avenue at Olive?
15     A. No, that would be between Olive and Howell.
16 We're right in the middle of Olive and Howell. And the
17 people didn't stay inside the barricades; they were
18 everywhere, so --
19     Q. Do I understand you that the only times that the
20 street in front of Bergman's was unpassable by vehicular
21 traffic was because there were actual live people moving in
22 and out of that street?
23     A. Yes.
24        MR. WEAVER: Objection.
25 BY MS. PRATT:

20 (Pages 77 to 80)

Page 101

1  MR. WEAVER: Objection. Answer if you can.
2  A. No, the protesting in front of the shop before
3  the 8th when the precinct closed down -- that was a more
4  solid Black Lives Matter march. Everybody had a purpose.
5  Things were somewhat friendly. It was more organized,
6  considerate, respectful, whatever you want to call it.
7  After the precinct closed, it was unhinged. It was, I
8  mean, crazy. Yeah, that was just out of control.
9  Q. I take your point that there was a different tone
10 to it, you say, before the precinct wasn't occupied, but
11 didn't you say that there were protests down 12th that
12 would block traffic on 12th before the precinct closed?
13 A. Oh, yes, oh, yes.
14 Q. Okay. So we've received, as we discussed at some
15 length today, lots of profit and loss statements from you.
16 What efforts did you take to search for and collect
17 documents that were related to your claims in this case?
18 A. When you say "search for," my financials and my
19 documents?
20 Q. Yeah, let me just reask the question. What
21 efforts have you gone to to look for and collect records
22 that are relevant to your claims that you're making?
23 A. When you said records to my claim that I'm
24 making, is this for the legal -- legal side of it or is
25 this the financial side of it? Or all of it?

Page 102

1  Q. All of it in general. What -- what have you done
2  to look for documents that you would provide to the City in
3  this case?
4  A. I've looked through all of my documents at the
5  shop, the financials that I've been asked for and the
6  documents that -- that were asked for for this proceeding.
7  I've pretty much collected everything that I have, that
8  I -- I mean I don't know any more that I can get.
9  Q. So what did you understand was asked for?
10 MR. WEAVER: Objection. Again, I'm going to
11 instruct you to the extent you can answer this question
12 without getting into attorney-client communications that
13 you've had with me or anybody else on this topic, you can
14 answer; but to the extent it's related to communications
15 you've had with this firm, I instruct you not to answer
16 that, but answer to the best of your ability without
17 getting into attorney-client information.
18 A. Okay. I seem to be really simple because all I
19 did was gather documents for this proceeding, and all the
20 documents that I gathered were in my office on our
21 software. Yeah.
22 Q. By "our software," you mean QuickBooks?
23 A. QuickBooks, I'm sorry.
24 Q. So have you seen our document requests?
25 A. Yes.

Page 103

1  Q. And did you look for any e-mails?
2  A. Oh, yeah. I don't have any e-mails. I don't
3  have any texts.
4  Q. How do you know?
5  A. I don't have time for that. And I know that
6  sounds terrible, but I'm trying to run a company, and I
7  don't -- No. 1, I don't want to have to relive the
8  situation that we went through because it was tough and,
9  No. 2, I really, truly don't. I'm father of three trying
10 to run a business, keeping kids in school, and at full
11 steam I barely have -- I'm impressed I'm here, so --
12 Q. And when you say you don't have time for that,
13 let me just clarify. You mean you never created the
14 e-mails or the texts in the first place?
15 A. Exactly. I listen to what's going on in the
16 neighborhood from my coworkers here and the little chitter
17 chatter that everybody talks about -- hey, did you hear,
18 hey, did you hear -- that's it. I don't usually want to be
19 involved because I need to stay focused on my two
20 priorities: The job and my family.
21 Q. So you looked through the documents that you had
22 in QuickBooks that resulted in the profit and loss
23 statements that we've seen; right?
24 A. Yes.
25 Q. Did you look for invoices for that period of time

Page 104

1  or no?
2  A. No, I did not.
3  Q. So you didn't text any of your employees related
4  to the protests?
5  A. No, the only texting that would have been done
6  would have been, "Don't bother coming to the shop, I'll get
7  this to you this way or coast is clear, things are looking
8  good" kind of thing. It was more directed to what's
9  happening right there at the shop.
10 Q. So you may have texted about the situation around
11 the shop during the CHOP time period; is that right?
12 A. But it wouldn't be of any relevance. You know
13 what I mean? Would have been, "Shop's open, don't worry
14 about it" kind of thing. It was all about our safety to
15 each other, or for each other.
16 Q. Do you delete your texts, or do you still have
17 them?
18 A. I'm not a very savvy phone user, and I know I've
19 already lost two phones in the last year.
20 Q. When you lose a phone, do you lose all of the
21 information that was on the last one?
22 A. Unless my son is able to get it for me, you are
23 correct, I would have lost them.
24 Q. Have you checked to see whether you have any
25 texts from the time period of the CHOP, June to July of

Page 105

1   2020?
2       A. I think I did check a while back when I was asked
3   about it, and I think I -- actually, I know I did. I
4   checked a while back to see if I had anything and I don't.
5       Q. Do you remember if you had texts from that time
6   period at all?
7       A. I would have got it to everybody here as they
8   needed it.
9       Q. Do you remember if you still have any texts from
10  that time period at all?
11      A. No, I do not.
12      Q. No, you don't remember or no, you don't have
13  them?
14      A. No, I do not have texts from back then.
15      Q. Okay. So you know that they're gone?
16      A. I'm 90 percent sure they're gone.
17      Q. Okay. When did you lose phones in the last two
18  years?
19      A. My first one I lost in Lake Washington, and that
20  was in October before I put the boat away for the year, and
21  the last one I lost was in January, and that was when we
22  were up in the mountains hiking.
23      Q. Were you able to recover the phone that dropped
24  in the lake?
25      A. No. No.

Page 106

1       Q. Did you see it fall, or what were the
2   circumstances?
3       A. I jumped in the water because I was playing with
4   my kids and it was in my front pocket, and when I dove
5   in --
6       Q. Waterlogged?
7       A. I don't know. Haven't seen it since.
8       Q. Oh. How about in January? What happened to your
9   phone then?
10      A. I have no idea. It had to have come out of the
11  back pocket of my backpack and we were hiking high in the
12  snow and by the time I realized it was gone, it was way too
13  late.
14      Q. You did provide us some photos, but I didn't see
15  any photos related to your business. Do you have any
16  photos that show your business or the CHOP zone during June
17  and July of 2020?
18      A. I don't recall providing photos. I may have had
19  a coworker that did, but I don't recall providing any from
20  me. There was the young -- the gentleman that was chased
21  out of the park with a baseball bat, and he would have been
22  the only one that I know of that would have photos. But I
23  don't recall of any photos in our -- yeah, I don't recall
24  of any photos.
25      Q. Who was the gentleman who was chased out with the

Page 107

1   baseball bat?
2       A. That would be Matt Oliver.
3       Q. Is he an employee of yours?
4       A. Yes, he is.
5       Q. What happened?
6       A. He's the one that lives a half mile from the
7   shop, and he was walking to work and walked through the
8   park and was unwelcomed and ended up calling us at the shop
9   telling us what was going on, and so we went and picked him
10  up at another location so they didn't know he worked at the
11  shop.
12      Q. Did you ask your employees whether they have any
13  texts or documents or pictures related to the CHOP or the
14  protests in the summer of 2020?
15      A. I am sure I've been through this before, and I'm
16  pretty sure we didn't have anything between us.
17      Q. Do you remember asking them or no?
18      A. Oh, yes, I do remember asking and talking about
19  it, and nobody seemed to care or wanted anything to do with
20  it.
21      Q. Does that mean that they don't have any records
22  though?
23      A. Yes, that means no. I don't -- nobody -- I
24  remember asking -- this was a while ago when we did this,
25  but I remember asking and nobody seemed to have anything.

Page 108

1       Q. Okay. Do your employees have work e-mail
2   addresses?
3       A. Only three of us do.
4       Q. Who are those three?
5       A. Be myself, Lonnie; my coworker, Lorie; and Craig.
6       Q. Do you communicate with other employees through
7   their personal e-mail addresses?
8       A. No.
9       Q. And did you look for e-mails related to this case
10  in Lonnie -- I mean in your, Lorie, and Craig's e-mail
11  accounts?
12      A. I did not look. I asked. Most of our e-mails at
13  the shop are for customers that we deal with personally
14  one-on-one.
15      Q. I'm going to show you a document that will be
16  marked as Exhibit 9.
17              (Exhibit No. 9 marked for
18              identification.)
19  BY MS. PRATT:
20      Q. All right, it's in the chat. Let me know when
21  you can see it.
22      A. I got it. I can see it.
23      Q. Do you remember providing these pictures?
24      A. No, I don't.
25      Q. Did you collect documents from anyone else that

LONNIE THOMPSON
5/4/2021

Page 109

1  could have provided them related to Bergman's?
2      A.  I think I might have got these from Matt, one of
3  our -- one of my coworkers actually.  This was a while ago.
4  This was -- yeah.
5      Q.  But none of these show Bergman's; correct?
6      A.  Not our shop, no.
7      Q.  And do you have pictures of your shop from this
8  time period?
9          MR. WEAVER:  Asked and answered, objection.
10         Go ahead.
11     A.  No, I do not.
12 BY MS. PRATT:
13     Q.  And do you know if any of your employees,
14 including Matt, have pictures of Bergman's during the CHOP
15 time period?
16     A.  I'm going to say no because I've already asked
17 once.
18         MS. PRATT:  Let's go off.
19         THE VIDEOGRAPHER:  The time is 2:02 p.m.  We are
20 off the record.
21         (Recess taken.)
22         THE VIDEOGRAPHER:  The time is 2:13 p.m.  We are
23 back on the record.
24 BY MS. PRATT:
25     Q.  I just want to ask you a couple more questions

Page 110

1  about Exhibit 9.  That was the photos that you showed us --
2  or the photos that I showed you that you provided.  Do you
3  have Exhibit 9?
4      A.  I do.
5      Q.  Do you recognize -- if you go to the first and
6  second pictures, you see a Ferrari sign.  Do you see what
7  I'm looking at?
8      A.  I do.
9      Q.  Do you know where that Ferrari -- is it a Ferrari
10 dealership?  Are you familiar with that business?
11     A.  Yes, I am.
12     Q.  Okay.  Do you know where it's located?
13     A.  Yes, I do.
14     Q.  Where is it?
15     A.  It's on the corner of 12th and Union and Madison.
16 It's right on the triangle.
17     Q.  And do you have an understanding of how the
18 building and the image was damaged?
19     A.  From the looks of it, the windows are broken and
20 they got them boarded up.
21     Q.  And why did you provide these with your documents
22 for this case?
23         MR. WEAVER:  Objection, foundation.
24     A.  I don't recall providing those documents.  I
25 promise it wouldn't have been from me, so it would have to

Page 111

1  been -- and it would had to been pictures that I got from
2  somebody else and forwarded it to -- forwarded it into the
3  pack.
4  BY MS. PRATT:
5      Q.  Are you aware of businesses in the Capitol Hill
6  area, say on the other side of Madison, that sustained this
7  sort of broken windows damage during the CHOP time period?
8          MR. WEAVER:  Objection.  Answer if you can.
9      A.  On the other side of Madison would be south of
10 Madison?
11 BY MS. PRATT:
12     Q.  Right.
13     A.  I'm unaware of anybody over there.  I didn't go
14 looking, but I'm unaware of anybody that would have had
15 damages.
16     Q.  Are you familiar with the damage to the building
17 with the Ferrari sign?
18     A.  Yes.
19     Q.  And it was your understanding that that damage
20 was related to the CHOP protests?
21     A.  Yes.
22     Q.  Okay.  Did you ever submit a claim form to the
23 City for the damages that you're claiming related to the
24 CHOP?
25     A.  I personally did not and I don't know if the

Page 112

1  legal team has, but I personally have not.
2      Q.  Do you remember approving one or reviewing one?
3      A.  No, I do not.
4      Q.  And you didn't produce one with your documents in
5  this case; is that right?
6      A.  That is correct.
7          MS. PRATT:  Okay.  So Mr. Thompson, I appreciate
8  your time today.  And Tyler, I don't have any further
9  questions now, but we're ending early, and what I would
10 like to do is I'm going to continue the deposition to have
11 the rest of our questions answered once we've received the
12 documents that were referenced but not provided, that being
13 the invoices we discussed and Mr. Thompson's notes, whether
14 by this designee or another.
15         MR. WEAVER:  We won't -- I mean you can keep it
16 open.  I think it's best if we talk about whether it
17 warrants additional questions once we see the notes and the
18 painting invoices, whether that warrants additional
19 questioning or not, but --
20         MS. PRATT:  I just want to be clear, I mean the
21 sales invoices, merchandise invoices.
22         MR. WEAVER:  Okay.  You'll have to tell me
23 specifically what you want and we'll have to discuss that
24 and again, whether it's worthwhile or not.  But I'm willing
25 to talk to you about it I guess is what I'm saying.  You

Page 113

1  can keep it open on the record.
2      MS. PRATT:  All right.  Well, we'll keep it open,
3  we'll continue it, and you and I will continue our
4  discussions.
5      Mr. Thompson, again, I really appreciate your
6  time.  Thank you.
7      THE WITNESS:  Thank you.
8      THE VIDEOGRAPHER:  Counsel, any redirect
9  questions?
10     MR. WEAVER:  I do not have any questions.
11     THE VIDEOGRAPHER:  Should we go off the record?
12     MS. PRATT:  Yes.
13     MR. WEAVER:  That's fine.
14     THE VIDEOGRAPHER:  The time is 2:19 p.m.  We are
15  off the record.
16
17          (The deposition adjourned at
18           2:19 p.m.)
19          (Signature was reserved.)
20
21
22
23
24       S I G N A T U R E
25

Page 114

1      I declare that I have read my within deposition,
2  taken on Tuesday, May 4, 2016, and the same is true and
3  correct save and except for changes and/or corrections, if
4  any, as indicated by me on the "CORRECTIONS" flyleaf page
5  hereof.
6      Signed in _____, Washington,
7  this _____ day of _____, 2016.
8
9
10
11       _____
12       LONNIE THOMPSON
13
14
15
16
17
18
19
20
21
22
23
24       REPORTER'S CERTIFICATE
25

Page 115

1    I, Mindy L. Suurs, the undersigned Certified Court
   Reporter, pursuant to RCW 5.28.010, authorized to
2  administer oaths and affirmations in and for the State of
   Washington, do hereby certify:
3
4    That the foregoing testimony of LONNIE THOMPSON
   was given before me at the time and place stated therein
5  and thereafter was transcribed under my direction;
6    That the sworn testimony and/or proceedings were by me
   stenographically recorded and transcribed under my
7  supervision, to the best of my ability;
8    That the foregoing transcript contains a full, true,
   and accurate record of all the sworn testimony and/or
9  proceedings given and occurring at the time and place
   stated in the transcript;
10
     That the witness, before examination, was by me duly
11 sworn to testify the truth, the whole truth, and nothing
   but the truth;
12
     That I am not a relative, employee, attorney, or
13 counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
14 financially interested in the said action or the outcome
   thereof;
15
16 DATE:  May 6, 2021
17
18
19
20
21       _Mindy L. Suurs_
           Mindy L. Suurs
22         Certified Court Reporter #2195
23
24
25

29 (Pages 113 to 115)

Page 114

1          I declare that I have read my within deposition,
2    taken on Tuesday, May 4, ~~2016~~ 2021, and the same is true and
3    correct save and except for changes and/or corrections, if
4    any, as indicated by me on the "CORRECTIONS" flyleaf page
5    hereof.
6          Signed in ____Seattle____, Washington,
7    this __17th__ day of ____May____, ~~2016.~~ 2021

                    _____
                         LONNIE THOMPSON


24                REPORTER'S CERTIFICATE
25



206.682.1427   fax 206.937.6236

Please record any changes or corrections on this sheet, indicating page number, line number, and reason for the change.

Page   Line                              Correction and Reason

_(Signature here and on deposition)_