# EXHIBIT 49

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
         Plaintiff,              )
                                 )
    vs.                          ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
         Defendant.              )
_____

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(SAMUEL ZIMBABWE)
_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 28, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

            A P P E A R A N C E S
FOR PLAINTIFF:

       TYLER S. WEAVER
       GABRIEL REILLY-BATES
       Calfo Eakes LLP
       1301 Second Avenue
       Suite 2800
       Seattle, WA 98101-3808
       206.407.2237
       tylerw@calfoeakes.com
       gaber@calfoeakes.com

FOR DEFENDANT:

       SHANE P. CRAMER
       Harrigan Leyh Farmer & Thomsen LLP
       999 Third Avenue
       Suite 4400
       Seattle, WA 98104
       206.623.1700
       shanec@harriganleyh.com

ALSO PRESENT:  CATHY ZAK, videographer
               Buell Realtime Reporting, LLC

          * * * * *

## Page 3

                DEPOSITION OF SAMUEL ZIMBABWE
                    EXAMINATION INDEX
EXAMINATION BY:                               PAGE
30(b)(6) Examination by Mr. Weaver              5
Non-30(b)(6) Examination by Mr. Weaver         53

                     EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION                   PAGE
Exhibit 1  Amended Notice of Videotaped         8
           Deposition Pursuant to FRCP
           30(b)(6) to City of Seattle
Exhibit 2  5-page Executive Order 2020-08;      9
           SEA_00015070
Exhibit 3  "Re: SFD Protest Zone Response      20
           Map"; SEA_00020379-384
Exhibit 4  Email chain; SEA_00105259           43
Exhibit 5  Email chain; SEA_00105029-030       63
Exhibit 6  15-page chart titled "Messages"     69
Exhibit 7  "11am Update - E Precinct";         84
           SEA_00028170-171
Exhibit 8  Email chain; SEA_00137341-346      111
Exhibit 9  Email chain; SEA-PDR_000398-403    143
Exhibit 10 "2PM Update - E Precinct (see      160
           notes)"; SEA_00028178-179
Exhibit 11 Email chain; SEA_00137366-369      178
Exhibit 12 Email chain; SEA_00137350-351      180
Exhibit 13 4-page email chain; SEA_00028053   220

## Page 4

            SEATTLE, WASHINGTON; OCTOBER 28, 2021
                      9:05 a.m.
                       -o0o-
         THE VIDEOGRAPHER:  Good morning.  This is the deposition of Samuel Zimbabwe in the matter of Hunters Capital, LLC, et al., v. City of Seattle, Case No. 20-cv-00983, in the United States District Court, Western District of Washington, at Seattle, and was noticed by Calfo Eakes.
         The time now is approximately 9:05 a.m. on this 28th day of October, 2021, and we are convening via Buell Virtual Depositions.
         My name is Cathy Zak, from Buell Realtime Reporting, LLC, located at 1325 4th Avenue, Suite 1840, in Seattle, Washington 98101.
         Will counsel please identify themselves for the record.
         MR. WEAVER:  This is Tyler Weaver, for the plaintiffs, from Calfo Eakes.  And with me I have Gabe Reilly-Bates, who is also participating, is online today.
         MR. CRAMER:  And Shane Cramer, Harrigan Leyh, on behalf of the Defendant City of Seattle.
         THE VIDEOGRAPHER:  Thank you.  The court reporter may now swear in the witness.

Page 81

1  **Q. Are you aware that there were -- that the**
2  **police department and the fire department had certain**
3  **policies about not going into the area except for**
4  **certain reasons?**
5      MR. CRAMER: Objection. Form.
6      A. Yeah, I wasn't aware of -- of that. My
7  conversations with Chief Scoggins centered on -- on
8  how -- how they would respond to various emergencies,
9  and where fire trucks and ambulances would have to
10 access the area.
11 BY MR. WEAVER:
12     **Q. Were there lanes that you felt were opened up**
13 **so that they could -- so that the fire department could**
14 **access the area completely at any time during June 2020,**
15 **from June 8th through July 1st?**
16     MR. CRAMER: Objection. Form.
17     A. Can I -- can I clarify your question?
18 BY MR. WEAVER:
19     **Q. Sure.**
20     A. Are you asking, were there -- did we have an
21 understanding of how Fire would respond to incidents?
22     **Q. Was it your understanding that Fire would**
23 **respond to incidents, and they had room to do so, during**
24 **the entire period of June 9th through July 1, 2020, in**
25 **the area in and around the East Precinct and Cal**

Page 82

1  **Anderson Park?**
2      A. From a physical access perspective, from how we
3  set our traffic control, how we worked for -- to provide
4  street access, the physical -- I think the physical
5  features that would be necessary for a fire truck or an
6  ambulance to access the area were provided.
7      **Q. After June 17, 2020, you mean?**
8      A. I think even before -- before that. There
9  were -- you know, there were still -- you know,
10 12th Avenue had access. As I mentioned, I believe that
11 traffic services were provided each and every day.
12 Those same -- you know, trash truck and a fire truck
13 have similar clearance requirements in terms of getting
14 into a -- to an area to access.
15     **Q. What do you know about what was required to get**
16 **trash access into the area on any particular day in**
17 **June of 2020?**
18     A. That's outside of SDOT's area of
19 responsibility, trash collection, so that's really a --
20 a question that SPU would have to speak to.
21     **Q. Okay. And what do you know about what SPU had**
22 **done with dumpsters during this time period of June 9th**
23 **to July 1, 2020?**
24     A. You know, I -- I was aware of some -- some
25 modifications that they'd made, but I couldn't speak to

Page 83

1  specifics.
2      **Q. Do you know anything specific about the trash**
3  **collection in the area in and around Cal Anderson Park**
4  **from June 9th to July 1, 2020?**
5      A. I -- I don't. You know, my conversations
6  with -- with Mami Hara were focused on making sure that
7  we could do that. And -- and as we talked about the
8  traffic patterns, it was my understanding that they --
9  that they could use those traffic patterns and respond
10 and make trash collection.
11     **Q. Okay. But you don't know specifically what**
12 **happened; is that right?**
13     A. No.
14     **Q. Okay.**
15     MR. CRAMER: We've been going for about an
16 hour. I don't know if you're at a --
17     MR. WEAVER: Yeah, we have. If you want to
18 take another ten minutes.
19     MR. CRAMER: Sure.
20     MR. WEAVER: All right.
21     THE VIDEOGRAPHER: Going off the record.
22 The time is approximately 11:13 a.m.
23     (Recess from 11:13 a.m. to 11:23 a.m.)
24     THE VIDEOGRAPHER: We are back on the
25 record. The time is approximately 11:23 a.m.

Page 84

1      (Exhibit No. 7 marked.)
2      E X A M I N A T I O N (Continuing)
3  BY MR. WEAVER:
4      **Q. All right. I am going to bring another**
5  **document into the chat in a second here. This will be**
6  **Exhibit 7.**
7      **Let me know when you have it up.**
8      A. I have it up.
9      **Q. Okay. So first of all, do you recognize this**
10 **document?**
11     A. Yes. I believe this is an email from Laurel
12 Nelson, who was acting director of Office of Emergency
13 Management, including myself and a number of other
14 cabinet members.
15     **Q. Okay. Around this time, June 9th, June 10th,**
16 **June 11th, were you involved in regular cabinet meetings**
17 **with the mayor's office and other department heads?**
18     A. Yes.
19     **Q. Okay. And about how frequently were you having**
20 **these meetings in that time period?**
21     A. They were -- they would be pretty frequent. I
22 think they were somewhat regular. Then we would have
23 some -- sometimes when -- it wasn't -- wasn't daily
24 always, but there would be some -- some times when it
25 was multiple times a day, even.

Page 85

1   Q. And so that continued throughout June of 2020?
2   A. Yes.
3   Q. What was your understanding of the purpose of
4   these meetings?
5   A. The purpose of these meetings was to share
6   information and really report out on -- on what
7   activities were going on among -- among all the
8   departments that were responding, and to make sure that
9   there was understanding with the -- with the mayor's
10  office, as well, about what was -- what was happening.
11  Q. Okay. So do you recall being in any meetings
12  in which Mayor Durkan, herself, participated during
13  June 9th to July 1, 2020?
14  A. Yes, I do.
15  Q. Okay. About how many times do you think that
16  was?
17  A. You know, I -- I couldn't -- I don't remember
18  that with that specificity. It was certainly not
19  every -- every meeting that we would have. And, you
20  know, these meetings are very similar to the way that we
21  respond to any kind of citywide emergency, a snowstorm
22  or, you know, things of that nature. So it's a very
23  typical operational strategy that we have as a city.
24  And that includes times when the mayor joins those
25  conversations as well.

Page 86

1   Q. Sure. Can you give me an estimate of how many
2   times you talked to the mayor about things related to
3   the protests and the CHOP area between June 9th and
4   July 1, 2020?
5   A. I would say maybe around a dozen times, if I
6   had to -- if I had to put a number on it.
7   Q. Okay. Did you ever talk to the mayor directly,
8   one-on-one, at any point?
9   A. I did.
10  Q. Okay. What -- what did you talk about with the
11  mayor when you met?
12  A. The few times that I talked to her directly
13  were around the specific SDOT-related actions that we
14  were taking. So I believe on the -- the morning of
15  June 16th, I think I spoke directly with her.
16      There were, you know, a couple of times when we
17  were taking some of those direct actions with, you know,
18  installing the ecology blocks or as -- and when we got
19  to the point of removing them, I did speak directly with
20  the mayor.
21  Q. Okay. Just to let her know what was going on
22  and what was the plan?
23  A. Yes.
24  Q. Okay. Do you recall what her reactions were,
25  for example, about the plan on June 16th?

Page 87

1   A. You know, I think specifically on June 16th, it
2   was -- it was really status updates of when -- when
3   things were going to be happening and when -- when we
4   were -- when we were going to be operating. I don't --
5   I don't recall her reaction to the -- to the plan.
6   Q. Okay. How about, what were your conversations
7   with her later on, after June 16th, about what SDOT was
8   doing in the area?
9   A. You know, I think we were -- we were continuing
10  to -- to keep her abreast of what -- what activities
11  were. I did participate in some of the -- there was,
12  like, conversations about where -- you know, where
13  things were going, what the -- you know, what -- what
14  our activities as a city were. And those tended to be
15  these larger group conversations.
16  Q. Okay. Do you recall talking to her, yourself,
17  about what you'd been hearing from residents and
18  businesses in the area?
19  A. I don't.
20  Q. Okay. Do you recall communicating that to
21  anybody in the mayor's office, what you'd been hearing?
22  A. I know I probably did. There were probably
23  some -- there were some -- some group discussions along
24  with Chief Scoggins and -- and Mami Hara, where we were
25  relating our -- our series of conversations. I don't

Page 88

1   know if I recall specifics of -- of when and how.
2   Q. So let's go -- let's go to Exhibit 7. And do
3   you happen to recall whether there was a phone call of
4   the cabinet at 6:00 a.m. on June 10th?
5   A. Yes, I believe there was.
6   Q. Okay. And was it your understanding that
7   Laurel Nelson was taking notes of those meetings and
8   then distributing them at that time?
9   A. Yes.
10  Q. Okay. So I'd like you to go to Page 2 of this
11  document. I want to ask you about a few things on it.
12      So in the middle in a larger font, it says,
13  "Overall Objectives: Continuing the existing footprint
14  of peaceful demonstration and rights."
15      Do you see that?
16  A. Yes.
17  Q. Okay. Do you recall a discussion about that
18  during this cabinet meeting on June 10th?
19  A. I -- I do. I mean, this -- these notes sort of
20  reflect that, but yes. The -- there was sort of a --
21  a -- this was the day after that June 9th date of -- of
22  being there.
23      And so at that point, you know, there was a
24  sort of regular -- there was a group of people who were
25  pretty committed to staying in front of the East

Page 117

1    Q. There were some barriers around there too, as
2  well, right, in the road?
3    A. I think there were some barriers at that point
4  on the -- on the road.  But the -- but the trash trucks
5  were moving through, so I -- and the trash trucks had to
6  get to that same alley.
7    Q. Okay.  So you don't know whether or not -- with
8  regard to trash trucks, whether there had to be
9  negotiated entries at various barriers, do you?
10   A. I don't.
11   Q. Okay.
12   A. I don't.  I wasn't part of that.
13   Q. Okay.  I think we established before, you don't
14 know how the trucks got in and out of the area; correct?
15   A. That's correct.
16   Q. Okay.  So you would agree that there were a lot
17 of people in the streets on the 9th, the 10th, and the
18 11th, in and -- inside and outside the barriers that had
19 been put up; is that correct?
20       MR. CRAMER:  Objection.  Form.
21   A. Yeah, the -- and again, I'd say at this point
22 that, when we talk about barriers, it was -- the
23 protesters had moved various things into creating
24 barricades.  This was before the City, SDOT, created a
25 regular traffic pattern between protesters and -- and

Page 118

1  vehicles.
2  BY MR. WEAVER:
3    Q. Okay.
4    A. Yeah.
5    Q. So you say regular traffic pattern.  So even --
6  you're talking about after June 16th and June 17th;
7  right?
8    A. Yes.
9    Q. Okay.  So the -- the area we had talked about
10 earlier was local access only; correct?
11   A. Yes.
12   Q. There were signs up saying "Local access only"?
13   A. Yes.
14   Q. And there were -- there were still lanes of
15 traffic blocked off; is that correct?
16   A. There were -- on -- in certain places, yes,
17 there were.
18   **Q. Okay.  And the protesters were periodically**
19 **moving barriers, especially at night, to areas where**
20 **they had not previously been put; is that correct?**
21   A. That was -- yes.  That was my experience.
22   Q. And -- lost my train of thought.  Sorry.
23       But you -- you considered that to be regular
24 access to the area?
25   A. You know, I think my goal in -- in -- over the

Page 119

1  course -- between the 9th and when -- until we got to
2  the 16th, was to try to find a way for there to be
3  regular access.  Was there unimpeded, 24/7, complete,
4  you know, normal access?  I -- I don't -- I think it
5  was -- it was a more fluid situation on the ground than
6  that.
7        I think that there were -- my goal, in talking
8  with protesters, in trying to move barricades, in trying
9  to set up what we eventually did install on the 16th,
10 was to preserve those important property access, goods
11 movement, service -- services, and have a -- a sort of
12 predictable, regular pattern that people could know what
13 to expect when they -- when they came to that area.
14       Because it was -- you know, it was -- before
15 that point, on the 16th, it was -- it was sort of
16 constantly changing, and it was hard to know, as a
17 resident, as a business, exactly what to expect.
18       That said, I don't know that -- I don't -- I
19 don't know personally that people didn't have access.
20 I -- it just wasn't -- it wasn't what I would consider
21 to be regular and sort of typical of how we would -- we
22 would set that up if it was a -- a -- an ongoing
23 activity.
24   Q. Okay.  And even with the barriers that had been
25 put in place, protesters were still periodically in the

Page 120

1  streets outside the area that had been designated by
2  the -- by the eco barriers; is that right?
3        MR. CRAMER:  Objection.  Vague.
4    A. There were -- there were a lot of people there
5  at various points especially.  And so -- I mean, the --
6  there were people that would be walking or -- but, you
7  know, people are also sort of allowed to cross the
8  street in various places.  Once the signals weren't
9  operating, people can cross in the midpoint of the
10 block.  It's not -- it's not jaywalking at that point.
11       So yeah, there were people -- there were a lot
12 of people there at various points, and there were people
13 sort of in -- in various places.  I'd say once we had
14 a -- a more regular traffic pattern, it was -- it was --
15 it was more predictable for how it -- how it was all
16 operating.  But it was a -- you know, it was a pretty --
17 it was a pretty fluid situation for, I'd say, the whole
18 month of June, or in that area.
19 BY MR. WEAVER:
20   Q. Okay.  Just as an example, you mentioned a
21 press conference that you were at with Carmen Best.
22       Do you recall talking about that?
23   A. I was -- I was nearby.  I wasn't --
24   Q. Okay.
25   A. -- with her.  She -- she talked to the -- she

30 (Pages 117 to 120)

Page 181

1  BY MR. WEAVER:
2     Q. Technology. You gotta love it.
3        All right. Exhibit 12 I've dropped into the
4  chat. And it looks like the second email down is an
5  email from you to various people, dated June 18, 2020.
6        Do you see that?
7     A. Yes.
8     Q. And was this an update that you drafted to send
9  to these people?
10    A. Was this an update that I drafted --
11    Q. Did you personally -- did you personally write
12 this email?
13    A. I did.
14    Q. Okay. And who was the -- just generally, who
15 is the group that you were sending this to, and why were
16 you sending it to them?
17    A. So this is a group that constitutes our -- our
18 labor representation within SDOT. So the -- the union
19 representation that represents S- -- represents SDOT
20 staff, and my executive leadership team, so the team --
21 so my deputies, chief of staff, and head of -- of HR
22 and -- and then people in culture, that we -- since the
23 start of the pandemic, we started meeting very regularly
24 with the -- with our labor partners because we had a lot
25 of operational issues and challenges that we needed to

Page 182

1  have sort of more consistent broad communication than we
2  had previously. So we -- we would -- we were meeting
3  first every week, and then we moved to biweekly
4  around -- around June.
5     Q. Okay. So in this particular update, you were
6  updating them on what had -- what had happened on
7  June 16th and 17th with the barrier change-out; is that
8  right?
9     A. That's right.
10    Q. Okay. So let me -- go to the second page,
11 first full paragraph. Actually, second full paragraph.
12 You say that your crew had to endure a few tense moments
13 when protesters attempted to provoke reactions and when
14 someone attempted to interfere with their work.
15       What did you mean by that? What were you
16 describing?
17    A. So there were a few incidents over the course
18 of that day. We had somebody try to climb into the cab
19 of a -- of one of our large pieces of construction
20 equipment that was move- -- he was moving the ecology
21 blocks into place, and the -- a guy -- you know, there
22 were a lot of people -- there were people who were
23 protesting, and then there were a lot of people up there
24 who had sort of other, I would say, mental challenges
25 going on. And so this guy was, like, very upset that we

Page 183

1  were moving some things around, and he really was -- was
2  very concerned.
3        And so I -- I tried to de-escalate the
4  situation. I talked to him. I sort of pulled him away
5  so our guy could do -- do this work, but he kept coming
6  back and sort of eventually tried to climb into the cab.
7  We even, like, really got him sort of moved away and
8  enabled our crew to do work.
9        And then there was another case where I think
10 somebody, like, sort of reached out, trying to hit one
11 of our employees, but didn't really -- wasn't successful
12 in doing that.
13    Q. And so you said there were some people with
14 mental challenges. What were your observations that
15 lead you to say that?
16    A. Well, this -- this person in particular, like,
17 wasn't, I think, 100 percent lucid or -- or operating on
18 the same view of reality that I had, and was sort of
19 very concerned about us moving some of the -- the --
20 moving things around out there, and just having a tough
21 time with -- with -- with reality.
22    Q. Okay. How about -- how about the person who
23 tried to hit one of your employees, but failed? What do
24 you recall about that?
25    A. You know, I think they were -- they were sort

Page 184

1  of yelling at us, saying that we should -- we should --
2  we shouldn't be there. We shouldn't be doing this work,
3  and then, like, tried to initiate contact, and our
4  person just sort of moved away, and -- and that was it.
5     Q. Did you -- at other times that you were up
6  there with crews, did you have similar run-ins with
7  people who were mentally unstable?
8     A. Yeah, I think some of it was -- was -- yeah, I
9  mean, I think, when we were then removing the barriers,
10 we made one attempt to remove barriers sort of in the --
11 a couple -- really about a week or a little bit more
12 than a week later, and -- and really were met with a lot
13 of concern and resistance.
14       I think some of those people were very
15 committed to the protest movement and some people had
16 some mental illness con- -- issues going on with them.
17    Q. Okay. So let's talk about that. About a week
18 later, you said you moved in to try to remove barriers
19 without police support; is that right?
20    A. ==Well, we originally -- so I -- the date -- I==
21 ==don't have the precise date. I think it was -- started==
22 ==around the -- the -- I want to say like the 25th or the==
23 ==26th, where we were going to remove barriers.==
24       ==We had police sort of present, but behind our==
25 ==staff. They were sort of providing support, sort of==

Page 185

1  if -- if we felt we needed support. We ended up seeing
2  that resistance from -- from people. We were starting
3  to fall back and -- and sort of de-conflict and move
4  away.
5      And then people saw the police and they became
6  a focal point of some of the -- the protests and
7  concerns and conflict. So we didn't -- we didn't do
8  that work without police support, but we weren't -- it
9  wasn't, I would say, police forward.
10      The police were there in support if we needed
11  it. And we ended up, you know, needing some -- some
12  engagement, but really it was in a de-conflicting, sort
13  of moving away at that point, perspective.
14      Q. Okay. What was the nature of the resistance
15  that you encountered on this later attempt?
16      A. So that was when we had people lying down in
17  front of our construction equipment, lying on top of
18  barriers and sort of blocking access for us to be able
19  to remove them. And then crowds forming around us and
20  sort of shouting down the idea that we would be removing
21  barriers.
22      Q. Were there threats of physical violence made by
23  anybody in the crowd?
24      MR. CRAMER: Objection. Form, foundation.
25      A. Yeah, I don't feel like we were -- I wasn't

Page 186

1  concerned that we were actually going to get to a point
2  of physical violence, and I don't think anybody sort of
3  said things in a -- in such a threatening way that we
4  would credibly believe that they were going to do us
5  harm at that point.
6      If we had proceeded and we had not sort of
7  de-escalated at that point, it's a little bit hard to
8  speculate on what -- what would have happened if we had
9  said, You know what? We're going to do this anyway,
10  over and above everybody's objections.
11  BY MR. WEAVER:
12      Q. So I was going to ask you about that. You
13  backed off because you were concerned that there -- it
14  might lead to violence if you continued to try to remove
15  the barriers at that point; is that right?
16      A. I think that's fair to say, that we didn't want
17  to get into an escalation of -- of conflict. We wanted
18  to de-escalate.
19      Q. Okay. And you said at some point they noticed
20  the police were hanging back behind you at some
21  distance.
22      What changed about the crowd when they saw the
23  police?
24      A. So I think they got a bit more agitated, and
25  they -- more people started coming -- we started this

Page 187

1  very early in the morning, 5:00 or 6:00 a.m. More
2  people started coming towards -- towards us. And then
3  once they saw the police there, they -- you know, even
4  more -- sort of larger crowds started to form. And
5  people took more -- sort of more of a defensive posture
6  around some of the barriers in the -- the area that
7  people had been -- like around the East Precinct.
8      Q. So what were the -- some of the defensive
9  postures that people in the crowd took?
10      A. I mean, they were just like, you know -- like
11  lying down on top of the barriers, trying to block
12  access and -- and things like that.
13      Q. Okay. So were they doing anything to try to
14  block access, other than lying down?
15      A. No, I don't -- I mean, I don't remember them
16  doing anything other than that.
17      Q. Okay. You said you went in at 5:00 or
18  6:00 a.m. Why did you choose to go in at 5:00 or
19  6:00 a.m.?
20      A. That was a time when it was generally quieter.
21  That was the earliest that we could mobilize our -- our
22  staff and recognize that this would be a sort of full
23  department response in terms -- or not full department,
24  but full -- full crew response in terms of accomplishing
25  the activities within the course of a day.

Page 188

1      And whenever we sort of waited until later
2  morning or even into the afternoon to sort of start
3  activities, we would have a hard time having a full
4  complement of staff available, and we'd have sort of
5  more people around.
6      And we'd learned that from the installation of
7  the traffic control plan on June 16th and 17th, we'd
8  sort of learned it throughout our engagement over the
9  month of June.
10      Q. That generally going --
11      (Simultaneous cross-talk.)
12  BY MR. WEAVER:
13      Q. That generally going in early in the morning,
14  you were likely to have less of the conflict that you'd
15  have later in the day or in the night; is that right?
16      A. Right. Right.
17      Q. So --
18      A. Also, in the sense of -- just -- you know, just
19  to clarify that just a little bit, you know, some of
20  this was also that, when there were fewer people there,
21  we had a little bit of an easier time communicating with
22  people that spoke on behalf of the protest organizers;
23  that, when there were more people there, there were more
24  people who would sort of step in and say, well, you
25  didn't talk about this with me. You only talked about

47 (Pages 185 to 188)

Page 237

1    MR. WEAVER: All right.
2    THE VIDEOGRAPHER: Going off the record.
3    The time is approximately 4:25 p.m.
4       (Recess from 4:25 p.m. to 4:28 p.m.)
5    THE VIDEOGRAPHER: We are back on the
6    record. The time is approximately 4:28 p.m.
7    MR. CRAMER: And we do not have any
8    additional questions, but we will -- will reserve
9    signature.
10   THE VIDEOGRAPHER: Thank you. This
11   concludes today's deposition of Sam -- Samuel Zimbabwe.
12   The time is approximately 4:29 p.m. Going off the
13   record.
14      (Deposition concluded at 4:29 p.m.)
15      (Reading and signing was requested
16       pursuant to FRCP Rule 30(e).)
17              -o0o-

Page 238

1           C E R T I F I C A T E
2
3    STATE OF WASHINGTON
4    COUNTY OF PIERCE
5
6       I, Cindy M. Koch, a Certified Court Reporter in
7    and for the State of Washington, do hereby certify that
8    the foregoing transcript of the deposition of Samuel
9    Zimbabwe, having been duly sworn, on October 28, 2021,
10   is true and accurate to the best of my knowledge, skill
11   and ability.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13   and seal this 5th day of November, 2021.
14
15
16   _____
         CINDY M. KOCH, CCR, RPR, CRR
17
18   My commission expires:
19   JUNE 9, 2022



# ERRATA

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 10/28/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Samuel Zimbabwe

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Sam Zimbabwe (Nov 19, 2021 09:23 PST)

Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# DECLARATION

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 10/28/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Samuel Zimbabwe

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
Sam Zimbabwe (Nov 19, 2021 09:23 PST)
30(b)(6) and Individual Deposition of Samuel Zimbabwe

Signed on the __19th__ day of __November__, 2021.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com