# EXHIBIT 64

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

---

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff(s),           )
                                )
    vs.                         )  20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
        Defendant(s).           )

---

VIDEOTAPED VIDEOCONFERENCE
DEPOSITION UPON ORAL EXAMINATION OF
CARMEN BEST

---

Witness located in
Seattle, Washington
(All participants appearing via Zoom videoconference.)

DATE TAKEN:  NOVEMBER 9, 2021
REPORTED BY:  PATSY D. JACOY, CCR 2348

## Page 2

APPEARANCES

PRESENT VIA ZOOM FOR THE PLAINTIFFS:
  PATRICIA A. EAKES
  TYLER S. WEAVER
  GABE REILLY-BATES
  Calfo Eakes LLP
  1301 Second Avenue, Suite 2800
  Seattle, WA 98101
  206.407.2200
  pattye@calfoeakes.com
  tylerw@calfoeakes.com
  gaber@calfoeakes.com

PRESENT VIA ZOOM FOR THE DEFENDANTS:
  JOSEPH GROSHONG
  Assistant City Attorney
  Seattle City Attorney's Office
  701 Fifth Avenue, Suite 2050
  Seattle, WA 98104
  206.684.8200
  joseph.groshong@seattle.gov

  SHANE P. CRAMER
  TYLER L. FARMER
  ARTHUR W. HARRIGAN JR.
  Harrigan Leyh Farmer & Thomsen LLP
  999 Third Avenue, Suite 4400
  Seattle, WA 98104
  206.623.1700
  shanec@harriganleyh.com
  tylerf@harriganleyh.com
  arthurh@harriganleyh.com

PRESENT VIA ZOOM FOR CARMEN BEST:
  DENISE ASHBAUGH
  Arete Law Group
  1218 Third Avenue, Suite 2100
  Seattle, WA 98101
  206.428.3250
  dashbaugh@aretelaw.com

## Page 3

APPEARANCES (cont'd)

PRESENT VIA ZOOM VIDEOGRAPHER:
  BROOK YOUNG
  Buell Realtime Reporting, LLC

ALSO PRESENT VIA ZOOM:
  NANCY CARRIAGA, Paralegal
  Calfo Eakes LLP

## Page 4

DEPOSITION OF CARMEN BEST
EXAMINATION INDEX

EXAMINATION BY:                           PAGE(S)
  BY MS. EAKES                              8

EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION               PAGE
Exhibit 1   Reducing Crime podcast         20
            transcript
Exhibit 2   6/8/2020 email string          69
            SEA_00058827
Exhibit 3   June 2020 email string with    82
            attachments
            SEA_00102554-565
Exhibit 4   6/21/20 email from Durkan      94
            to Fong and others
            SEA_00040208
Exhibit 5   11am Update - E Precinct      123
            SEA_00028170-172
Exhibit 6   Edward Sector Calls for       139
            Service
            SEA_00019917-

Page 61

1    A. It was Chief Cordner and she's a -- she was
2    our primary -- our primary liaison to the EOC,
3    well-experienced, you know, all of those things. At
4    some point during the day she said, "Hey, they're going
5    to need -- they're asking for an evacuation plan," and
6    I was like, "Okay, well, we -- let's -- you know, let's
7    have a plan but, you know, it's not our intent to leave
8    the precinct." At least at that point it certainly
9    wasn't.
10   Q. Was Mayor Durkan involved in any of the
11   discussions where you said you had, you know, kind of
12   pros and cons of moving the barriers and evacuating the
13   precinct?
14   A. She --
15        MR. CRAMER: Objection; form.
16   A. Yeah, she was not physically at the EOC, so,
17   you know, I would -- I'm making a presumption that her
18   staff that was all there was keeping her apprised of
19   everything that was happening.
20   Q. (BY MS. EAKES) Okay. But did you have any
21   meetings directly with the mayor that you can recall
22   about the idea of removing the barricades or
23   abandoning -- or evacuating the precinct?
24   A. On that day I just don't -- I don't know that
25   I spoke to her or that I -- that we sat and talked

Page 62

1    about it that day. I just --
2    Q. What about other days?
3    A. We could have. I certainly was keeping her
4    abreast of what was happening as routinely as I could,
5    so if there was -- if there were things that were
6    happening I would have definitely tried to make sure
7    that she was aware of it.
8    **Q. And did you have any information from the FBI**
9    **about any threats to the precinct?**
10   **A. I did.**
11   Q. Can you tell me about that?
12   A. There was a document that was provided, a
13   confidential form, by the FBI talking about threats to
14   various government facilities up to and including, you
15   know, precincts and other government facilities. I
16   spoke with, you know, our folks about that, you know,
17   and so we were very concerned. They had already at
18   that point I think run a precinct to the ground in
19   Minneapolis, so there was -- but we knew that there was
20   threats not only in Washington, but Oregon and Idaho as
21   well -- maybe not Idaho, but I know Oregon and
22   Washington for sure.
23   Q. Okay. And did you speak to somebody at the
24   FBI also or was it just the confidential document you
25   referred to?

Page 63

1    A. At some point I did. Again, the timeline is
2    going to be murky at this point, but at some point I
3    definitely spoke to the SAC, Ray Duda, of the FBI about
4    these potential -- potential threats and verified
5    because there was -- there were people who were
6    questioning the validity of that, something I had never
7    seen before, like the FBI puts out a confidential
8    statement and folks were wondering if, in fact, it was
9    made up or we just -- just pulled it out of the air,
10   but we did not. It was -- and then I actually spoke to
11   the SAC there who verified that and who verified that
12   publicly, I believe, with one of the news stations that
13   there had been threats to the precinct and it was a
14   viable target. We already knew that it had been
15   demonstrated at for several nights on end.
16   Q. And who was it that was questioning the
17   validity of the FBI's information about the threat to
18   the precinct?
19   A. Well, at some point I know that I was on a
20   conference call with the City council, some City
21   councilmembers who wanted to -- you know, who had
22   concerns about where it came from and --
23   Q. Your light went off?
24   A. Yeah.
25   Q. Mine goes off all the time.

Page 64

1    A. Yeah, it goes back on. So about this to --
2    you know, about what that was, and so we just wanted to
3    make sure -- I think I got a -- a phone call from
4    Representative Jayapal asking about, you know, the
5    potential threats, if they were valid, and so I, you
6    know, let her know that they were from my perspective,
7    and that was essentially it. You know, I definitely
8    briefed the mayor on it at some point just to let her
9    know that that was -- that was out there.
10   Q. Was the mayor or the mayor's office
11   questioning the validity of the FBI information about
12   the threat to the precinct?
13        MR. CRAMER: Objection; form.
14   A. Yeah, well, I wouldn't say -- what I can tell
15   you is that I made sure that -- that -- you know, I
16   showed her or talked to her about it, you know, just so
17   that she could rest assured based on what -- you know,
18   that there was no -- that these were actual legitimate
19   threats that we were receiving from the FBI.
20   Q. (BY MS. EAKES) What was your perception,
21   though, in talking to Mayor Durkan about whether or not
22   she believed those to be credible threats?
23   A. Yeah, you know, far be it for me to, you know,
24   try to guess what's going on in the mayor's head. I
25   can just tell you that I just wanted to make sure

16 (Pages 61 to 64)

Page 173

1  was made aware that there were -- there were crimes
2  occurring inside the CHOP. I think I even gave a press
3  conference well prior to this to talk about, you know,
4  what we were experiencing and the reports that had been
5  taken out of the area that we -- you know, known as the
6  red zone or the CHOP, I'm not sure, you know,
7  specifically, but in that area where we had responded
8  to everything that was delineated, you know.
9       Q. And -- but in this press conference it sounds
10 like you're kind of drawing out that area compared to
11 other areas of the city.
12      A. Well --
13      Q. Were you seeing something -- go ahead, yeah.
14      A. Yeah, well, I would say yes, I was talking
15 about that area specifically because we had just
16 employed about, what, over 300 officers to clear it
17 out. I mean, it was pretty much an international
18 event, you know, in terms of -- of doing this, you
19 know, act in this unprecedented situation that we were
20 in and so, yeah, I was talking specifically about it,
21 but that doesn't change the fact that, you know, it
22 wasn't as if there weren't, you know, rapes or
23 robberies occurring in Edward sector prior to, but
24 certainly not in the same circumstances that we were
25 dealing with while the CHOP was there.

Page 174

1       Q. Sure. And I guess that's what I'm getting at.
2  I mean, understanding that there were crimes like rapes
3  and robberies and homicides that happen all over
4  Seattle, this was a concentrated area of just the CHOP
5  where those things were happening which was an unusual
6  circumstance, wasn't it?
7       A. Yes.
8            MR. CRAMER: Objection; form.
9       A. Oh, yes.
10      Q. (BY MS. EAKES) Is there any other -- any
11 other occasion in all the years that you were an SPD
12 officer, chief, assistant chief, etcetera, that you're
13 aware of of any kind of concentrated area like that
14 where you saw this kind of crime level?
15           MR. CRAMER: Objection to form.
16      A. Yeah, you know, Patty, that's going to be too
17 broad for me to answer. I mean, the CHOP, you know,
18 ==we've already discussed that the CHOP was a unique and==
19 ==unprecedented situation we've never dealt with before,==
20 but, you know, honestly there were places like
21 encampments that would develop and we would see large
22 spikes in crime with concentrated people living in
23 those areas too.
24           So we've -- we've dealt with some of that
25 circumstance and other things, you know, bad family

Page 175

1  moves into the neighborhood and suddenly the crime goes
2  up, you know, and -- and those things do happen, but
3  for the CHOP itself it would -- that high level of
4  concentration, that quite that high level of
5  concentration for such a prolonged period was -- was
6  unique.
7       Q. (BY MS. EAKES) Okay. Now, you made reference
8  to the fact that you had given a press conference
9  earlier about kind of the crime and the response time.
10 So let's take a look at Best -- what we have as 18,
11 which I think is now going to be Number 9, which is
12 another video. This is from the June 11th press
13 conference. I just want to make sure this is the one
14 you're referring to starting at 14:22.
15      A. It's actually not the one I'm referring to,
16 but I'll -- I'll watch it.
17      Q. (BY MS. EAKES) Okay. I'll ask you just about
18 this one first. Maybe you can tell me about the other
19 one you're thinking about.
20           (Video playing.)
21      Q. (BY MS. EAKES) So that's not the one
22 you're -- you're thinking of in terms of your comment
23 about the crimes in the CHOP?
24      A. Yeah, no, it wasn't, but -- yeah, but that's
25 fine.

Page 176

1       Q. Do you -- do you agree with all the statements
2  that you made there? Do you believe them still to be
3  accurate what you said there?
4       A. Yeah, well --
5            MR. CRAMER: Objection.
6       Q. (BY MS. EAKES) Go ahead.
7       A. Yeah, well, what I can tell you is that, yeah,
8  I -- I think that taking three times longer to -- was
9  not -- was not what we wanted to see and I was
10 presenting examples to really try to support, if you
11 will, the fact that we needed to -- to return to the
12 precinct and clear out the CHOP, and I think that while
13 there were a number of differing opinions about what
14 was happening, I felt a level of responsibility, and
15 apparently -- I'm working with the mayor so she agreed
16 that we needed to point out some of the issues that we
17 were dealing with in the zone, increased response
18 times, you know, and the fact that, you know, we wanted
19 to see that situation mitigated.
20      Q. And did it get mitigated? Because that was
21 just three days after the -- leaving the precinct,
22 right? And already you're seeing three times as long
23 to get there and -- and you're warning about that. Did
24 that change, the -- in terms of response times?
25      A. Yeah, I think --

Page 229

1  questions going back to your phones and text messages.
2  Have you learned anything since you handed your phone
3  in about what might have happened to your text messages
4  on your City phone?
5       MR. CRAMER:  Objection; form.
6    A.  No.
7    Q.  (BY MS. EAKES) Okay.  And do you know if your
8  assistant might have deleted any messages before you
9  turned in your phone, any text messages, I should say?
10      MS. ASHBAUGH:  Object to form.
11   A.  Yeah, not that I'm aware of.  You know, no.
12   Q.  (BY MS. EAKES) Do you know if it was her
13  practice to delete things, your text messages from your
14  phone?
15   A.  That was not her practice.
16      MS. EAKES:  All right.  I think that's
17  all I have -- that's all I have.  Thank you very much
18  for your time.
19      THE WITNESS:  Thank you.
20      MS. EAKES:  I don't know if Shane has
21  any questions.  I assume not, but...
22      MR. CRAMER:  I have no questions.  Thank
23  you very much for your time, Chief.
24      THE WITNESS:  Okay.  Thank you all, I
25  appreciate it.

Page 230

1       MR. CRAMER:  Denise, do you want to
2  reserve signature?
3       MS. ASHBAUGH:  Yeah, we're going to
4  reserve.
5       MS. EAKES:  Okay.
6       MR. CRAMER:  Thanks, everybody.
7       VIDEO OPERATOR:  This concludes the
8  deposition of Carmen Best.  The time now is
9  approximately 5:08 p.m.  Going off the record.
10      (Deposition concluded at 5:08 p.m.)
11      (Reading and signing was requested
12       pursuant to FRCP Rule 30(e).)

Page 231

1               C E R T I F I C A T E
2
3   STATE OF WASHINGTON  )
                         )
4   COUNTY OF KING       )
5
6       I, Patricia D. Jacoy, a Certified
7  Shorthand Reporter in and for the State of Washington,
8  do hereby certify that the foregoing transcript of the
9  deposition of CARMEN BEST taken on November 9, 2021 is
10 true and accurate to the best of my knowledge, skill
11 and ability.
12
13
14      _____
15        Patricia D. Jacoy, CSR 2348