# EXHIBIT 84

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

HUNTERS CAPITAL, LLC, et al.,)

Plaintiffs,)

vs.) No. 20-cv-00983-TSZ

CITY OF SEATTLE,)

Defendant.)

---

ZOOM VIDEO-RECORDED CR 30(b)(6) DEPOSITION UPON ORAL

EXAMINATION OF HUNTERS CAPITAL, LLC, HUNTERS PROPERTY

HOLDINGS, LLC, AND GREENUS BUILDING, INC.

DESIGNEE:MICHAEL OAKSMITH

---

ATTENDANCE OF ALL PARTICIPANTS VIA

ZOOM VIDEO CONFERENCE

---

9:05 a.m.

January 20, 2022

REPORTED BY:Lauren G. Harty, RPR, CCR #2674

Page 144

1   Tavolata, how many minutes would it take us to walk
2   over to Cal Anderson Park?
3       A.   I thought about this on the break, the rest
4   of the buildings.  It would be about the same as -- as
5   the -- as Coleman, maybe one extra minute.  So I'll
6   give it five minutes.
7       Q.   Okay.
8            And do you recall whether the -- the Dunn
9   Building was ever vandalized at all?
10      A.   Yes --
11      Q.   Okay.
12      A.   -- it was.
13      Q.   Could you tell us about the vandalism in the
14  Dunn Building and --
15      A.   Well --
16      Q.   -- then --
17      A.   -- I just -- I remember talking to the
18  maintenance supervisor down there, Chris, and I recall
19  the amount of graffiti that was going up.  So the --
20  the -- 70 percent of the Dunn Building is built out of
21  this kind of special sandstone stuff.  We wanted to
22  really dress it up down there.  It's a historic
23  facade.  And then the -- the building is built behind
24  the fac -- historic facade.
25           And he was talking about how hard it is --

Page 145

 1   with this kind of nightly graffiti going on, you know,
 2   how hard it is to clean off this old sandstone because
 3   it gets soaked into the sandstone.  And so he -- he
 4   was just mentioning, you know, how often he was
 5   cleaning it every day.  It took forever.  Can we do
 6   anything.
 7            And -- and I thought about actually building
 8   a plywood wall around the entire facade for the time
 9   being just to, you know, ease, you know, all the time
10   and effort Chris was putting in.  And that never came
11   to fruition.  We just -- it was kind of unfeasible.
12   It would have been really expensive.  And we just kept
13   on doing our best to clean it and repaint and --
14   and -- et cetera.
15      Q.   Okay.
16            And the -- the graffiti damage to the
17   sandstone that you had to repair, is that part of
18   Hunters Capital claim against the City in this
19   lawsuit?
20            MR. REILLY-BATES:  Objection; outside the
21   scope.  This witness is not designated to talk about
22   damages issues.
23      A.   I would say --
24      Q.   (By Mr. Farmer)  You --
25      A.   -- I -- I would assume it is.  Or at least

1     the time it took, the extra time.
2         Q.    Okay.
3         A.    I didn't put together the spreadsheet, so --
4         Q.    Right.
5               And if -- if that graffiti expense hadn't
6     have to be made back in June of 2020, then your
7     overall revenue for that time period would have been
8     higher -- pardon me -- your -- your profit would have
9     been higher, correct?
10        A.    Yeah.
11        Q.    Okay.  Let's keep our neighborhood tour
12    going here.
13        A.    Perfect.
14        Q.    Let -- let -- let's -- according to my
15    notes, we took care of the Coleman, but I don't think
16    we've talked at any length about Greenus.  So --
17        A.    Yeah.
18        Q.    -- could you tell us where the Greenus
19    Building is?
20        A.    Well, that's going to be easy.  It's -- it's
21    on Pike and Summit as well.  It's on the northeast
22    corner of Pike and Summit.  And so your walk to Cal
23    Anderson Park is about 15 seconds shorter.
24        Q.    Okay.
25        A.    We'll -- we'll call it 4.45.

Page 151

1    Studios was not profitable when I purchased the
2    company on January 15th."  Do you see that?
3        A.    Yep.
4        Q.    Do you -- do you recall that that tenant
5    wasn't profitable as of early in 2020?
6              MR. REILLY-BATES:  Objection; foundation.
7        A.    I don't recall.  And I would not take his
8    comments -- I would have to ask him direct.  I'll
9    just -- that's -- I'll comment that much on who he is
10   and how much you can take these comments for truth.
11       Q.    (By Mr. Farmer)  Do you -- do you think that
12   Mr. Kurji has a credibility issue when it comes to his
13   financial information?
14       A.    I -- I -- what I'll say on the matter is I
15   think -- I -- I would suspect that Limbs company was
16   profitable right up through the sale.  That's what
17   I'll say.  And --
18       Q.    Okay.
19       A.    -- I don't know -- I -- I would -- I just --
20   that's what I suspect.
21       Q.    Okay.
22             So separate from your opinion regarding the
23   profitability of Limbs, do you have -- do you have an
24   opinion or a basis on which to assess Mr. Kurji's
25   credibility?

Page 152

 1      A.      He had -- in my opinion, he had no business
 2   owning a yoga studio.
 3      Q.      Why's that?
 4      A.      He doesn't know anything about yoga.  He
 5   didn't have any yoga background.  He thought it was
 6   just going to kind of run on its own and he was going
 7   to hire yoga instructors and this was going to be a
 8   profitable business.
 9              And within the first time of meeting him I
10   came back to the office and I commented that this is
11   not going to work out for us as far as a long-term
12   tenancy.  Those were my observations in meeting this
13   operator.
14      Q.      And that was before COVID.
15      A.      Yeah.
16      Q.      Okay.
17              If you look down at the -- the next
18   paragraph after the one I just alluded to, you see he
19   writes, "We will continue to pay monthly expenses as
20   we agreed, but hoping and requesting Hunters will
21   consider a rent abatement for April.  Once we know the
22   outcome of the PPP loan, we can discuss May with you."
23   Do you see that?
24      A.      Yep.
25      Q.      Do you -- do you recall whether or not this

```
 1   tenant was able to obtain a PPP loan?
 2        A.    I don't.  I don't know.
 3        Q.    Okay.
 4              Do you recall whether or not Hunters Capital
 5   agreed to a rent abatement?
 6              THE VIDEOGRAPHER:  Lauren, can you hear me?
 7              THE REPORTER:  This is the court reporter.
 8   Everyone is frozen.
 9              MR. REILLY-BATES:  I -- I can --
10              THE WITNESS:  I can hear you.
11              MR. REILLY-BATES:  We can hear you, yeah.
12              THE VIDEOGRAPHER:  Can we go off the record
13   briefly?
14              MR. REILLY-BATES:  Oh.  There he is.
15              MR. FARMER:  Yeah.  Usually when something
16   freezes I turn off the video to see if that will fix
17   things, but --
18              THE WITNESS:  We can -- we got you.
19              MR. REILLY-BATES:  Yeah.  We can see you and
20   hear you.
21              THE VIDEOGRAPHER:  Stand by.
22              MR. FARMER:  Okay.
23              THE VIDEOGRAPHER:  Stand by, Tyler.
24              Lauren, are you still there?
25              THE REPORTER:  Yes.
```

```
 1                THE VIDEOGRAPHER:  Okay.
 2                Is it working every -- well for everyone?
 3     It -- it briefly glitched out for me, and now I see
 4     everyone and it seems to be fine.  Should we keep
 5     going?
 6                MR. REILLY-BATES:  Yes, please.
 7                THE WITNESS:  Yep.
 8                THE VIDEOGRAPHER:  Okay.
 9          Q.    (By Mr. Farmer)  I -- I think I had asked
10     whether or not you -- Hunters had agreed to a rent
11     abatement for April.
12          A.    Yeah.  I -- I don't know, but I would assume
13     so.
14          Q.    Okay.
15          A.    We were -- either an abatement or a
16     deferred.  Those were kind of the two operating roads
17     that Jill was operating on.
18          Q.    And that was pretty typical in the early
19     part of COVID.  Fair?
20          A.    That was, yep.
21          Q.    Okay.
22                On the topic of PPP loans, did Hunters
23     Capital apply for any of that federal relief?
24          A.    We did.  We applied for two PPP loans.
25          Q.    And did you obtain those loans?
```

```
 1   fires around that area?
 2        A.   Yep.
 3        Q.   Just for clarification, the subject here is,
 4   "Illegal Bomb Fire..."  Do you believe that -- that's
 5   meant to be illegal bonfire?
 6        A.   Yeah.  I believe it's -- it's probably
 7   somebody that lived through a lot of noise and a lot
 8   of crap airing her frustration and -- and -- and
 9   mistyping in her -- in her quick email.
10        Q.   Okay.
11             MR. FARMER:  Let -- let's take a look at --
12   at UU.
13        A.   Okay.  Got it.  Downloading.
14             MR. REILLY-BATES:  Tyler, I -- I've got
15   about five minutes left on my timer here.  Just an
16   FYI.
17        A.   Go ahead.
18        Q.   (By Mr. Farmer)  Okay.  I think UU is
19   Exhibit 155.
20             MS. McDONALD:  156.
21        Q.   (By Mr. Farmer)  I'm sorry.  156.  The bottom
22   right page is CHOP 16627.
23             Mr. Oaksmith, who's Carmen Best as of
24   July 1st?
25        A.   Well, I'm assuming she's our Police Chief.
```

```
 1      Q.     Do you recall being with Mr. Malone watching
 2   the police clear the CHOP on July 1st, 2020?
 3      A.     I don't.
 4      Q.     Do you -- do you see the bottom e -- email
 5   where Mr. Malone writes to Chief Best, and she says,
 6   "Carmen" -- pardon me.  He writes, "Carmen, Nice work
 7   Carmen!!!  Thank you so very much!  I'm watching from
 8   the roof of our apartment building.  Now, let's get
 9   our ladies and gentlemen back in their building!!
10   Thank you, you've gone a great job under the most
11   difficult of circumstances!"  Do you see that?
12      A.     Yep.
13      Q.     Okay.
14             So you said earlier that Mr. Malone was more
15   familiar with SPD than you are.  Sitting here today do
16   you have any reason to disagree with his observation
17   that Chief Best had gone a great job under the most
18   difficult of circumstances?
19             MR. REILLY-BATES:  Object to the form;
20   foundation.
21      A.     I -- I would -- I have no knowledge of how
22   good or bad she did.  I really don't.  I've never
23   talked to her.  I only -- I only have followed along
24   what I see in the -- in the news.  I've never actually
25   even seen her in person, and I was there like almost
```

Page 228

1  every day.  So I would be biased by what type of news
2  I'm watching.
3         MR. FARMER:  All right.  I've got no further
4  questions.  Thanks for your time, Mr. Oaksmith.
5  Appreciate it.
6         THE WITNESS:  Appreciate it.  Thank you.
7         MR. REILLY-BATES:  Thanks.
8         If we could just go off the record for just
9  a minute, Tyler.  I -- I -- I just want to see if --
10 if I have any follow-up.
11        MR. FARMER:  No problem.
12        MR. REILLY-BATES:  All right.
13            (Discussion off the record.)
14        THE VIDEOGRAPHER:  It's 3:13 p.m.  We are
15 off the record.
16            (Recess.)
17        THE VIDEOGRAPHER:  The time is 3:18 p.m.  We
18 are back on the record.
19        MR. REILLY-BATES:  Thanks.
20        We have no further questions on redirect.
21        THE VIDEOGRAPHER:  Anything else on the
22 record or should we go off the record?
23        MR. FARMER:  All set.  Thanks, Karl.
24        THE VIDEOGRAPHER:  The time is 3:18 p.m.  We
25 are off the record.

```
 1                    C E R T I F I C A T E
 2     STATE OF WASHINGTON    )
                              ) ss.
 3     COUNTY OF KING         )
 4           I, the undersigned Washington Certified Court
 5     Reporter, hereby certify that the foregoing deposition
 6     upon oral examination of DESIGNEE:  MICHAEL OAKSMITH
 7     was taken before me on January 20, 2022, and
 8     transcribed under my direction;
 9           That the witness was duly sworn by me pursuant
10     to RCW 5.28.010 to testify truthfully; that the
11     transcript of the deposition is a full, true, and
12     correct transcript to the best of my ability; that I
13     am neither attorney for nor a relative or employee of
14     any of the parties to the action or any attorney or
15     counsel employed by the parties hereto, nor am I
16     financially interested in its outcome;
17           I further certify that in accordance with
18     CR 30(e), the witness was given the opportunity to
19     examine, read, and sign the deposition within 30 days
20     upon its completion and submission, unless waiver of
21     signature was indicated in the record.
22           IN WITNESS WHEREOF, I have hereunto set my hand
23     this 22nd day of January, 2022.
24                                  _____
25                                  LAUREN G. HARTY, CCR #2674
```