Exhibit 44

Hunters Capital, LLC v. City of Seattle                                    30(b)(6) Thomas Mahaffey

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

---

HUNTERS CAPITAL, LLC, et al., )
                             )
          Plaintiff,    )
                             )
     vs.          ) No. 20-cv-00983-TSZ
                             )
CITY OF SEATTLE,          )
                             )
          Defendant.    )

---

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION

UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(THOMAS MAHAFFEY)

---

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  JANUARY 26, 2022
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

---

**Page 2**

```
 1                A P P E A R A N C E S
 2   FOR PLAINTIFF:
 3        TYLER S. WEAVER
          Calfo Eakes LLP
 4        1301 Second Avenue
          Suite 2800
 5        Seattle, WA 98101-3808
          206.407.2237
 6        tylerw@calfoeakes.com
 7
     FOR DEFENDANT:
 8
          SHANE P. CRAMER
 9        ARTHUR W. HARRIGAN, JR.
          Harrigan Leyh Farmer & Thomsen LLP
10        999 Third Avenue
          Suite 4400
11        Seattle, WA 98104
          206.623.1700
12        shanec@harriganleyh.com
          arthurh@harriganleyh.com
13
          JOSEPH G. GROSHONG
14        Seattle City Attorney's Office
          701 5th Avenue
15        Suite 2050
          Seattle, WA 98104-7095
16        206.684.8200
          joseph.groshong@seattle.gov
17
18   ALSO PRESENT:  LINDSAY HITCHCOCK, videographer
                    Buell Realtime Reporting, LLC
19
20                    * * * * *
21
22
23
24
25
```

---

**Page 3**

```
 1              DEPOSITION OF THOMAS MAHAFFEY
 2                  EXAMINATION INDEX
 3   EXAMINATION BY:                      PAGE
 4   30(b)(6) Examination by Mr. Weaver       6
 5   Non-30(b)(6) Examination by Mr. Weaver  73
 6
 7                  EXHIBIT INDEX
 8   EXHIBITS FOR IDENTIFICATION          PAGE
 9   Exhibit 1  Amended Notice of Videotaped    8
                Deposition Pursuant to FRCP
10              30(b)(6) to City of Seattle
11   Exhibit 2  Email with attachment;        10
                SEA-SPD_005983-984
12
     Exhibit 3  June 29 Events Incident Action  25
13              Plan; SEA_00007766-787
14   Exhibit 4  June 24 Events Incident Action  32
                Plan; SEA-SPD_007528-550 (CONFIDENTIAL)
15
     Exhibit 5  Email chain; SEA_00020853-858   33
16
     Exhibit 6  Email; SEA_00022828-830        41
17
     Exhibit 7  Seattle PD SuperForm; SEA_00156958-  45
18              960
19   Exhibit 8  Email; SEA_00000868-869        49
20   Exhibit 9  Printout of details related to  49
                Exhibit 8
21
     Exhibit 10 Excel spreadsheet             51
22
     Exhibit 11 Email chain; SEA_00023588-589  58
23
     Exhibit 12 Executive Order 2020-08;       63
24              SEA_00045264-268
25
```

---

**Page 4**

```
 1              EXHIBIT INDEX (Continuing)
 2   EXHIBITS FOR IDENTIFICATION          PAGE
 3   Exhibit 13 Email; SEA_00036004-005      119
 4   Exhibit 14 Email, July 4 Events Incident  156
                Action Plan; SEA_00007505-545
 5
 6   Exhibit 15 Email chain; SEA-SPD_006803-804  167
 6
     Exhibit 16 Email chain; SEA_00028176-177  170
 7
     Exhibit 17 Email containing Executive Order  184
 8              2020-08; SEA_00019316-319
 9   Exhibit 18 Email chain; SEA_00021402-404  185
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

---

Page 9

1     Q.  Okay.  Is there anything else you understand
2  that you've been designated for, other than those
3  topics?
4     A.  No.  To the best of my understanding, those are
5  what I've been designated to talk about.
6        MR. CRAMER:  And, Tyler, let me clarify
7  something.
8        MR. WEAVER:  Go ahead.
9        MR. CRAMER:  For 36, it's Subsection iii, as
10  that relates to SPD, which I think was probably obvious
11  and what you meant.  We've also designated the chief for
12  37, and specifically each of the subtopics, but
13  primarily Subsection iv.
14        MR. WEAVER:  Okay.  All right.
15        MR. CRAMER:  And that's the extent of it.
16  And I think that covers the topics that you wanted to
17  pursue at this point in the litigation with the City.
18        MR. WEAVER:  Thanks, Shane.  That helps.
19  BY MR. WEAVER:
20     Q.  So I'm going to try to keep this first part,
21  just for subject of -- sake of clarity, to the 30(b)(6)
22  topics.  And can you -- I -- for the purpose -- let's
23  also set this for the purposes of the deposition, just
24  so that we're clear going forward and for the -- for the
25  transcript and the record.

---

Page 10

1        What is your understanding of the term "CHOP"
2  as it relates to this case?
3        MR. CRAMER:  Objection.  Form.
4     A.  Well, it's an acronym that I understand to mean
5  Capitol Hill -- I think is it occupied protest?  I think
6  then zone was often found on the end of that.  That's
7  what I relate to it as.
8  BY MR. WEAVER:
9     Q.  Let me just go down a different -- a different
10  route.
11        So in June of 2020, you were the -- you were
12  the assistant chief in charge of the patrol operations;
13  is that correct?
14     A.  That's correct.
15     Q.  Okay.  Do you recall a point at which the
16  Seattle Police Department modified its 911 response
17  procedures within an area on Capitol Hill, roughly
18  around the area of Cal Anderson Park and the East
19  Precinct?
20     A.  I guess I'd ask what you mean by "modified."
21        MR. WEAVER:  Okay.  Let me pull up a
22  document so that we can get on track here.  Bear with
23  me.  My apologies.  I'm having a bit of technical
24  difficulties here.
25        (Exhibit No. 2 marked.)

---

Page 11

1  BY MR. WEAVER:
2     Q.  Okay.  You should have something that's coming
3  up in the ex- -- that's coming up in the chat that's
4  marked Exhibit 2.  Let me know when you've got it up.
5     A.  I have it.
6     Q.  Okay.  So do you recognize this document?
7     A.  Yes, I do.
8     Q.  Okay.  So was this a policy that you announced
9  for the police department on June 12, 2020?
10     A.  I wouldn't have characterized it as a policy.
11  It was just some direction given to officers.
12     Q.  Okay.  This was a direction you gave to
13  officers in the police department on June 12, 2020; is
14  that right?
15     A.  Yes, that's correct.  That's the date it was
16  sent out.
17     Q.  Okay.  Do -- was -- and was this a modification
18  of -- from -- was this different than the normal
19  operating procedures within the area of Capitol Hill?
20     A.  Yes.  Based on the circumstances we were
21  facing, I felt it was necessary to give some guidance to
22  officers.
23     Q.  What do you mean by the circumstances that you
24  were facing?
25     A.  There had been significant protests for the

---

Page 12

1  week prior to this.  Now we have an area that has some
2  barricades placed around it.  We're no longer in our
3  precinct.  We had seen, and reports of, armed people at
4  this barricade.
5        We'd actually had a lieutenant and a sergeant
6  that were confronted by armed people early -- earlier in
7  the week as well.  So based on all that was going on,
8  some guidance was required for responses in the area to
9  keep officers and the public safe.
10     Q.  So let me ask you about -- first of all, what's
11  the Edward Sector?
12     A.  That is one of our patrol sectors.  Each
13  precinct is divided into sectors.  Edward Sector is in
14  the East Precinct, and the area generally covers in --
15  the neighborhood we call Capitol Hill.
16     Q.  Okay.  And let me ask you, on this document --
17  first of all, did you -- who's Jason Verhoff?
18     A.  He is a lieutenant on the Seattle Police
19  Department.
20     Q.  And had you written this out for Mr. Verhoff,
21  or had you dictated it to him to be sent out?
22     A.  I don't recall specifically.  So he was part of
23  the group -- command group in our operations center.
24  And as we're recognizing, then formulating plans to deal
25  with issues that come up, that was one of his

---

3  (Pages 9 to 12)

Hunters Capital, LLC v. City of Seattle

30(b)(6) Thomas Mahaffey

---

Page 33

1  specified -- specific?  I don't who it was sent to
2  directly.
3      MR. WEAVER:  Okay.  I'm going to drop
4  another document in the chat.  We're getting -- we're
5  getting fast and furious on the -- on the documents
6  already, so...
7      (Exhibit No. 5 marked.)
8      THE WITNESS:  Okay.
9  BY MR. WEAVER:
10     Q.  All right.  So is this an email you sent on
11 June 16th?
12     A.  Just blow it up here a little bit.
13 Yes.
14     Q.  Okay.  So in the first sentence, you say, "For
15 clarification, this is what I approved and was sent out
16 department-wide last Friday," and then it appears to
17 have the text of the email from Exhibit 2 down below,
18 towards the bottom of the first page.  Is -- am I
19 understanding that correctly?
20     A.  That appears correct, yes.
21     Q.  Okay.  So does that refresh you as to whether
22 the Exhibit 2 was sent out to the entire department?
23     A.  That's what I said in the email.  But like I
24 said, I don't -- specifically I don't recall who it was
25 sent out to, but that's what I'm saying in this email,

Page 34

1  yes.
2      Q.  Okay.  So I'd like to go back to Exhibit 4,
3  which is the June 24th IAP.  And if you could scroll
4  down to -- I think it may be 15 of this one as well.
5  So -- yes, it's 15.  I'm sorry.  It's 16.  Bates
6  No. 7543.
7      This appears to have similar language to what
8  we've been talking about, but it uses the term "mass
9  casualty event" rather than "critical life safety
10 emergency."
11     Do you see that?
12     A.  Yes.
13     Q.  So this was June 24th of 2020.  Does this
14 refresh you at all as to when there might have been a
15 change to the wording of "critical life safety
16 emergency"?
17     MR. CRAMER:  Objection.  Form.
18     A.  Sorry.  You said Exhibit 4 says mass casualty
19 event, or am I on the wrong exhibit or --
20 BY MR. WEAVER:
21     Q.  I believe it does, on Page 16, if you -- you
22 can look at it, yourself.
23     A.  I'm looking at Exhibit 4, and it's -- says
24 "mass casualty event" on Page 16.
25     Q.  Okay.  So it appears that on June 24th there

Page 35

1  were IAPs being sent out with the wording of "mass
2  casualty event."
3      Does that help you remember at all when it
4  was -- when the wording was changed to "critical life
5  safety emergency"?
6      MR. CRAMER:  Objection.  Form.
7      A.  It doesn't.  I will say one thing, with IAPs,
8  especially during this time, we were having -- the
9  operations center was having to produce so many,
10 sometimes getting the language caught up or getting
11 things changed, because of everything else that was
12 going on from the planning perspective, sometimes they
13 weren't as timely as they could have been, with getting
14 changes put into them.
15 BY MR. WEAVER:
16     Q.  Was it your understanding that there was any
17 difference in the -- in the substance of the directive
18 between the directive that used the term "mass casualty
19 event" and the directive that used the term "critical
20 life safety emergency"?
21     A.  Sorry; I'm not quite following your question
22 there.
23     Q.  Okay.  Was the change from "mass casualty
24 event" to life -- "critical life safety emergency" meant
25 to convey a change in department policy or directive?

Page 36

1      A.  No.  Again, I think it was just meant to
2  clarify the wording, and really the -- the premises that
3  we were operating under, I think it just -- and the
4  things that we were briefed kind of every day, I think
5  it was just providing more clarity.
6      Q.  And I'd like you to go to the bottom of the
7  last page on Exhibit 4.  This again is a map showing
8  the -- what's -- what were the boundaries of the red
9  zone; is that right?
10     A.  Correct.
11     Q.  And were those the same that they had been in
12 the directive that went out department-wide on June 12th
13 in Exhibit 2?
14     MR. CRAMER:  Objection.  Asked and answered.
15     A.  Yes.  They -- they look the same.  I don't see
16 any significant changes in either map.
17 BY MR. WEAVER:
18     Q.  Let me ask you, with regard to -- and we can
19 go -- we can go to any -- I guess go back up to 16 on
20 Exhibit 4, Page 16.
21     A.  Okay.
22     Q.  Okay.  So with regard to Edward Sector, it
23 indicates that a required -- requires a four officer
24 minimum response to all Edward Sector calls for service
25 outside the red zone.

9 (Pages 33 to 36)

Hunters Capital, LLC v. City of Seattle

30(b)(6) Thomas Mahaffey

Page 37

1    What does -- what did that mean?
2        A.  For any response for police service, that we
3    were going to send, again, as it indicates, a minimum of
4    four officers to that call.
5        Q.  So prior to June 2020, what was the minimum
6    response for a call in the Edward Sector?
7        A.  It would depend on the type of call, again,
8    with -- what the actual details of the incident were.
9    But it could be as little as one officer for a
10   nonpriority event with no suspect on the scene, to many
11   multiple of officers for some type of ongoing life
12   safety emergency.
13       Q.  So what -- what was the least number of
14   officers for a particular call that would be a minimum
15   required to respond to a call prior to June 2020?
16       A.  The fewest would be one for a low priority
17   response.
18       Q.  Okay.  And during the -- during the pendency of
19   these directives in June of 2020, even those low
20   priority calls would still require a four officer
21   response?  Is that correct?
22       A.  That is correct, yes.
23       Q.  And why was that?
24       A.  Due to just the conditions that we hadn't faced
25   before, based on -- I will describe it as the negative

Page 38

1    feelings and animosity towards Seattle police officers
2    at that time that was particularly concentrated in that
3    area of the city.
4           Officers were going to seemingly routine calls
5    and being accosted by people seeking confrontation even
6    in routine situations.  So again, in just working
7    through some of these unprecedented circumstances that
8    were dealt with, again, officer safety being the most --
9    the thing that was most foremost on my mind during this
10   period, we determined that this was the best course of
11   action to take.
12       Q.  Okay.  So within the Edward Sector, but outside
13   the red zone, were there cases in which there might be a
14   mass casualty event or a critical life safety emergency,
15   that it be appropriate under your directive for
16   officers not to respond?
17           MR. CRAMER:  Objection.  Form.  Calls for
18   speculation.
19       A.  No.  But again, depending on the criticality of
20   the incident, I want them to formulate a thoughtful and
21   considered response before going in, again, to ensure
22   their safety, de-escalate, minimize the potential use of
23   force, and keep the public safe.
24   BY MR. WEAVER:
25       Q.  So when you indicate that it was -- you were

Page 39

1    trying to keep the public safe by not responding to
2    calls, how was not responding to calls keeping the
3    public safe?
4           MR. CRAMER:  Objection.  Form.
5        A.  That's not what I mean by that.  It's, again,
6    to -- we're responding to calls.  It's just that we're
7    doing it in a way that allows us to provide service in
8    the best way that we can.
9           We're just considering the -- again, the
10   unprecedented circumstances that we were facing at the
11   time, and the scrutiny, and threat to officer safety
12   that we were having to deal with.
13          That's what the -- really considerations that I
14   had to -- to deal with at the time and how we were going
15   to still provide police services while dealing with all
16   these other issues that were swirling around us.
17   BY MR. WEAVER:
18       Q.  So going back to Exhibit 5, in the second
19   paragraph of this email you sent on June 16th, you're
20   asking whether the -- first of all, you sent this to
21   Carmen Best, and then who's Christopher Fisher?
22       A.  He was the chief's -- I believe his title was
23   strategic advisor.
24       Q.  And you say, "Please let me know if this should
25   be altered or clarified in anyway if it is creating a

Page 40

1    messaging issue or confusion internally or externally."
2        Do you see that?
3        A.  Yes.
4        Q.  Do you remember asking for that, for any
5    clarification they wanted?
6        A.  Reading this email, that -- now it's bringing
7    up I did ask that, yes.
8        Q.  Do you recall whether either Chief Best or
9    Officer Fisher indicated that your policy should be
10   altered or clarified in any way?
11       A.  I don't specifically, no.
12       Q.  And you also indicate down below that,
13   "Depending" -- you were going to talk with
14   representatives from the City's department involved in
15   barricade removal, and that, "Depending on how that
16   operation went, I may be able to adjust the current
17   response protocol to the area."
18          Do you recall whether the -- you adjusted the
19   current response protocol to the area after barricade
20   removal?
21       A.  It wasn't adjusted because the barricades -- if
22   this is still June 12th, my recollection, the
23   barricades -- or June 16th, excuse me, the barricades
24   were not removed.  So protocols were not adjusted.
25       Q.  So the protocols were not adjusted until all

10  (Pages 37 to 40)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

---

Page 41

```
 1    the barricades were removed on the morning of July 1,
 2    2020; is that right?
 3         MR. CRAMER:  Objection.  Form.
 4         A.  To the best of my recollection, that's correct.
 5         MR. WEAVER:  We've been going an hour.  I
 6    don't know if you want to take a break or -- Shane,
 7    or --
 8         MR. CRAMER:  Yeah, that works.
 9         MR. WEAVER:  Okay.
10         MR. CRAMER:  Come back in ten?
11         THE VIDEOGRAPHER:  Going off the record at
12    10:01.
13         (Recess from 10:01 a.m. to 10:11 a.m.)
14         THE VIDEOGRAPHER:  We are back on the record
15    at 10:11.
16         E X A M I N A T I O N (Continuing)
17    BY MR. WEAVER:
18         Q.  So do you recall an incident involving a
19    business called Car Tender on, I believe it was,
20    June 14, 2020?
21         A.  I don't.
22         MR. WEAVER:  I'm going to pull something up
23    here, in case you're wondering.
24         THE WITNESS:  Okay.
25         (Exhibit No. 6 marked.)
```

---

Page 42

```
 1    BY MR. WEAVER:
 2         Q.  Exhibit 6 should be there, or coming shortly.
 3         A.  Okay.  I have it.
 4         Q.  So do you recognize this document?
 5         A.  Yes.  It's an email, but it's -- it looks like
 6    it's an overnight situation report that was sent to me
 7    on June 16th.
 8         Q.  And who's Tyrone Davis?
 9         A.  He at the time sergeant, now he's lieutenant,
10    but he's still with the Seattle Police Department.  He
11    was working overnights in the police operations center,
12    which we were running 24/7 at this time.
13         Q.  Okay.  And the point was to give you an update
14    of what had happened over the previous 12 hours?  Was
15    that -- or whatever the previous shift was?  Is that --
16         A.  It was overnights, so it may run 11:00 to
17    midnight through the -- through the next morning.
18         Q.  What shifts were you working during this period
19    of June -- you know, during the time of June 2020?
20         A.  It might be easier to say when I wasn't
21    working.  I was -- I didn't really have a shift.  I
22    mean, I generally start fairly early in the morning.
23    Depending on what was going on, I'd be there until late
24    at night, 11:00, 12:00, sometimes 1:00 a.m., just
25    depending on what was happening.
```

---

Page 43

```
 1         Q.  Okay.  If you could go down to the bottom of
 2    Lieutenant Davis's email.  There's a section called "Car
 3    Tender Incidents."
 4         A.  Yes, I see it.
 5         Q.  Okay.  Specifically, I'd like you to look at
 6    the third paragraph under there called "Note," and then
 7    it says, "Car Tender is the same location."  If you
 8    could just take a minute to read that.
 9         A.  Okay.  I've read it.
10         Q.  Does that ring any bells for you, as far as Car
11    Tender?
12         MR. CRAMER:  Objection.  Form.
13    BY MR. WEAVER:
14         Q.  And the incident on June 14, 2020?
15         MR. CRAMER:  Same objection.
16         A.  I'm reading everything through here, and there
17    was so much happening during that time, I don't recall
18    this specific.
19    BY MR. WEAVER:
20         Q.  Okay.  So I just want to ask you, so Car Tender
21    was at a location at -- it's indicated here, 1706 12th
22    Avenue.
23         A.  Yes, that's what it says.
24         Q.  Do you recall whether that was inside or
25    outside the red zone?
```

---

Page 44

```
 1         A.  If you don't mind, I'll just look at a map
 2    again.
 3         Q.  Sure.
 4         A.  Let me get the blocks down.  If I remember my
 5    addresses correctly, it would be just -- 1700 block of
 6    12th would be just north of Olive Street, I believe, so
 7    it would be on the border --
 8         Q.  You're correct.
 9         A.  It would be right -- right on the border of the
10    red zone.
11         Q.  On the -- on the outside of that border; is
12    that correct?
13         A.  It looks like maybe one block --
14         MR. CRAMER:  Objection.  Form.
15         A.  It's the block -- it's a block just north of
16    the northern boundary on East Olive Street and 12th
17    Avenue, is the 1700 block.
18    BY MR. WEAVER:
19         Q.  So I want you to go back to the paragraph we
20    were looking at on Exhibit 6, and Lieutenant Davis says,
21    "Patrol did not respond due to its proximity to the red
22    zone," and then it lists a -- I think it's a cause
23    number, "coupled with an ongoing disturbance at the
24    location that include armed participants."
25         Do you see that?
```

11 (Pages 41 to 44)

Hunters Capital, LLC v. City of Seattle

30(b)(6) Thomas Mahaffey

---

Page 45

1    A. I do.
2    Q. If Lieutenant Davis was correct in his
3  description, would that have been consistent with the
4  directives you gave about the red zone and the Edward
5  Sector and police responses?
6    MR. CRAMER: Objection. Form. Foundation,
7  calls for speculation.
8    A. I would need to know more of the context of the
9  incident. We'd given direction to our folks of how we
10  wanted them to respond. Ultimately, they have
11  discretion in the field about how they're going to
12  approach an incident based on the directive and the
13  parameters that we had given them.
14    But the idea was, is that's why we would get
15  these situation reports, knowing that we would have
16  incidents that would come up, that we couldn't plan for
17  every contingency, and if things came up, how are we
18  going to adjust our responses, moving forward, if --
19  if -- if that was necessary.
20    MR. WEAVER: Okay. I'm going to drop
21  Exhibit 7 into the chat.
22    (Exhibit No. 7 marked.)
23    THE WITNESS: Okay.
24  BY MR. WEAVER:
25    Q. And if you can just take a moment to read

Page 46

1  through Page 2 of this document, Bates No. 156959.
2    A. Okay. I've read it.
3    Q. All right. Does that -- does that refresh any
4  recollection you might have about what was alleged to
5  have happened at Car Tender on June 14, 2020?
6    A. It doesn't. I mean, like I say, a lot happened
7  during that time. There were a lot of incidents or
8  events, and this lays out very clearly what occurred,
9  though, in the statement of probable cause.
10    Q. Okay. So if the facts in this statement of
11  probable cause are accurate and the police did not
12  respond to this reported situation, would that have been
13  consistent with the directive that you had given the
14  police department on how to respond to incidents within
15  the Edward Sector?
16    MR. CRAMER: Objection. Form and
17  foundation, calls for speculation.
18    A. Again, the officers have to have latitude and
19  discretion based on directives I gave them. I'm reading
20  this. It says it's just outside the periphery of the
21  zone. And there are some concerning elements of this
22  regarding some of the actions of the crowd taken.
23    But I know at some point during this, either
24  before or after this event -- I don't recall the
25  specifics -- that we set up and we designated specific

Page 47

1  teams each night that would be able to respond to those
2  events that are laid out in the directive.
3    And again, this was a very dynamic event and we
4  were every day reviewing. That's why these reports --
5  situation reports were put out every night. We reviewed
6  them every morning to help us better determine and
7  coordinate our response to the event, based on -- or the
8  area of the red zone, based on what we were seeing.
9    Again, we were building this airplane while we
10  were flying it, essentially, and we were really
11  committed to, again, trying to avoid force,
12  confrontation, keep the public and our officers safe.
13  BY MR. WEAVER:
14    Q. Within the meaning of the directives that were
15  in the IAP and your -- and what was sent out
16  department-wide on June 12th, would the events as
17  described here in Exhibit 7 be a mass casualty event?
18    MR. CRAMER: Objection. Form.
19    A. Again, as I think I said before, that wording
20  was unfortunate, and we went to change it. And it
21  was -- examples were provided of what an event was, but
22  again, the officers, the supervisor, the commander on
23  the ground have to make those in-the-moment, on-the-spot
24  tactical decisions about how they're going to respond to
25  particular events.

Page 48

1  BY MR. WEAVER:
2    Q. Okay. Would this be within the meaning of the
3  June 29th IAP, a critical life safety emergency?
4    MR. CRAMER: Objection. Form. Asked and
5  answered.
6    A. There's certainly details in here that, if the
7  officers had known at the time, I would have wanted them
8  to have considered about, are there life safety or other
9  elements there that they need to respond to and address,
10  whether it's with the resources they have there or
11  calling in more resources to address it. I just don't
12  know if they had all of these facts available to them at
13  the time.
14  BY MR. WEAVER:
15    Q. What particular details?
16    A. Let me read through this again quickly.
17    MR. CRAMER: And objection. Form.
18  Foundation, calls for speculation.
19    A. They claim there was a fire lit inside the
20  building, so that would be information I think it would
21  be important for them potentially to have, and make an
22  assessment of what the safety ramifications were to
23  that.
24    Let me just read through some more of the
25  details so I just state them correctly. It says here

12 (Pages 45 to 48)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey



Page 197

1    adjourned at 3:40.
2         (Deposition concluded at 3:40 p.m.)
3         (Reading and signing was requested
4         pursuant to FRCP Rule 30(e).)
5                   -o0o-
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 198

1         C E R T I F I C A T E
2
3    STATE OF WASHINGTON
4    COUNTY OF PIERCE
5
6         I, Cindy M. Koch, a Certified Court Reporter in
7    and for the State of Washington, do hereby certify that
8    the foregoing transcript of the deposition of Thomas
9    Mahaffey, having been duly sworn, on January 26, 2022,
10   is true and accurate to the best of my knowledge, skill
11   and ability.
12        IN WITNESS WHEREOF, I have hereunto set my hand
13   and seal this 2nd day of February, 2022.
14
15
16   _____
          CINDY M. KOCH, CCR, RPR, CRR
17
18   My commission expires:
19   JUNE 9, 2022
20
21
22
23
24
25

50 (Pages 197 to 198)