# Exhibit 45

JOHN MCDERMOTT
1/19/2022

## Page 1

```
             UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
                       AT SEATTLE
_____
HUNTERS CAPITAL, LLC, et al.,  )
                               )
         Plaintiffs,           )
                               )
     vs.          ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
         Defendant.            )
_____

       ZOOM 30(b)6 Deposition Upon Oral Examination

                           of

           SRJ dba CAR TENDER - JOHN McDERMOTT
_____
```

DATE: Wednesday, January 19, 2022
REPORTED BY: Mindy L. Suurs, CSR No. 2195

## Page 2

```
1              A P P E A R A N C E S
2
   For the Plaintiff:
3
   TYLER S. WEAVER
4  Calfo Eakes
   1301 Second Avenue
5  Suite 2800
   Seattle, Washington 98101
6
7  For the Defendant:
8  ERICA IVERSON
   Harrigan Leyh Farmer Thomsen
9  999 Third Avenue
   Suite 4400
10 Seattle, Washington 98104
...
23 Also Present: Karl Benitez, Royal Video Productions
24
25          --oOo--
```

## Page 3

```
1                   I N D E X
2  EXAMINATION BY                         PAGE
3  Ms. Iverson                              5
4              EXHIBIT INDEX
5  NO.    DESCRIPTION                     PAGE
6  125    Google map                        37
7  126    E-mail dated June 11, 2021, from Durk Edwards  43
          at Pro-Vigil
8
   127    E-mail dated 6/24/2020 from Joseph Beynon to    71
9         John McDermott re Shoreline
10 128    2017 Financial Statement prepared by Victoria   90
          Holden
11
   129    2018 Financial Statement prepared by Victoria  102
12        Holden
13 130    2019 Financial Statement prepared by Victoria  109
          Holden
14
   131    2020 Financial Statement prepared by Victoria  119
15        Holden
16 132    Financial Statement for the month ending       139
          November 30, 2021, prepared by Victoria Holden
17
   133    Summary Report 5/1/19 to 8/31/19               147
18
   134    Summary Report 5/1/20 to 8/31/20               147
19
   135    E-mail dated 6/15/2020 from Terri Nakamura     207
20        to John McDermott re I'm sorry
21 136    Statement of John McDermott on damages         256
22 137    Statement of John McDermott on damages         256
```

## Page 4

```
1                Wednesday, January 19, 2022
2                        9:10 a.m.
3
4                          --oOo--
5        THE VIDEOGRAPHER:  We are now on the record.
6  Today is January 19, 2022.  The time is now 9:10 a.m.  This
7  is Volume No. 1, Media No. 1 in the deposition of John
8  McDermott in the matter of Hunters Capital, LLC, et al.,
9  versus City of Seattle.  We are recording via the internet
10 using Zoom video conferencing.  My name is Karl Benitez.
11 I'm representing Royal Video Productions on behalf of Rough
12 & Associates.  Today's court reporter is Mindy Suurs.
13       At this time I would like to ask all counsel
14 present to identify themselves.
15       MS. IVERSON:  Morning.  Erica Iverson on behalf
16 of the City of Seattle.
17       MR. WEAVER:  And this is Tyler Weaver on behalf
18 of the plaintiffs.  As requested off the record, I am off
19 camera at the moment due to some technical issues involving
20 a second computer that hopefully we will resolve later.
21 But I am in the same room as Mr. McDermott.
22       THE VIDEOGRAPHER:  Thank you very much.
23       Madam Court Reporter, please swear in the
24 witness.
25
```

Page 129

1  the pandemic.  There's still people fearful of the pandemic
2  that don't go out.  So to see the numbers dip and then to
3  see them start to rise and then, you know -- and based on
4  conversations with other shops that weren't in the CHOP,
5  people's ability to come back stronger than they were
6  before during the pandemic -- there's numerous shops that
7  have reported that to me and asked me the question, well,
8  why are your numbers still down, you know, because there
9  are, you know, business communities that you compare
10  numbers with.
11      Q.  Right, but I'm just talking about your numbers
12  for now.  That's --
13      A.  You asked the question; I'm answering it.
14      Q.  I think we've --
15      A.  The reason our numbers did not recover was
16  because of CHOP, because we had to move our business.  The
17  reason we had to move our business -- and I don't know if
18  you've ever had anybody point a gun at you or had 10 or 20
19  or 30 guns pointed at you.  It's not a very comforting
20  feeling, and --
21      Q.  So just --
22      A.  -- to ask people to come to that environment --
23  they don't what to come see us.
24      Q.  Okay.  So focus on --
25      A.  We had customers that would drive to our shop to

Page 130

1  get their car repaired, realize where it was, turn around
2  and leave.
3      Q.  Uh-huh.  Okay.  And so in February to March, you
4  were saying that, because of the pandemic, there were fewer
5  cars on the road in March of 2020; right?
6      A.  And fewer people that wanted to get their cars
7  repaired.
8      Q.  Okay, and fewer people that wanted to get their
9  cars repaired.  So -- and March, April, May monthly sales
10  in 2020 were all sort of around the same number?  Do you
11  agree with that?
12          MR. WEAVER:  Objection.
13      A.  Let me look.  I can't remember.
14  BY MS. IVERSON:
15      Q.  So we can go -- you can just go down one page
16  to --
17      A.  Yeah --
18      Q.  -- scroll all the way down to that other page.
19  This is just one page down from where we were.  So March,
20  April, May 2020, we can focus again on total sales since we
21  are talking about sales.
22      A.  I mean for the individual months, I mean it went
23  obviously down from March to April, and they opened things
24  back up, it's kind of end May, and then it started picking
25  back up in June and then the CHOP hit and that's kind of

Page 131

1  where it ended up.
2      Q.  Okay.  So is it fair to say that the decrease in
3  total sales in March, April, and May of 2020 is
4  attributable to COVID?
5      A.  Sure.
6      Q.  Okay.  And then just looking at June 2020, so I
7  know -- I know you mentioned CHOP.  You used a couple of
8  dates, so I think you said earlier May 29th.  Is that the
9  date that you consider CHOP to have started?
10      A.  Basically because that's when all the riots
11  started happening.  That's not the date that they installed
12  the barriers, but that's when the City started allowing all
13  the rioting and all that stuff to go on.
14      Q.  Okay.  And so based on -- and we'll get to that,
15  but fair to say that CHOP was ongoing in June of 2020;
16  correct?
17      A.  Without question.
18      Q.  And was the pandemic still ongoing at that point?
19      A.  Last I checked when I got up this morning, it's
20  still ongoing today.
21      Q.  So is that a yes?
22      A.  It would be a yes.
23      Q.  And you mentioned earlier that you had an
24  employee who left in 2018 -- he got injured and he left;
25  right?

Page 132

1      A.  Correct.
2      Q.  And you hadn't replaced him --
3      A.  Correct.
4      Q.  -- as of June 2020; right?  Okay.  So you had
5  this same employee was gone for all of 2019, and he was
6  gone at least up until --
7      A.  I think in February of 2020 they determined that
8  he was permanently disabled.
9      Q.  Okay, but so --
10      A.  I mean I'd have to look and find out.  I can't
11  remember.
12      Q.  Right, and you hadn't replaced him; right?
13      A.  No.
14      Q.  Okay.  So it looks like in June of 2020, your
15  total sales were $101,955; is that right?
16      A.  According to the statement, I'd say yes.
17      Q.  And obviously that's higher than what they were
18  in May of 2020; correct?
19      A.  Correct.
20      Q.  Okay.  And then if we could just turn back to
21  Exhibit 130, please.
22      A.  You know, the other thing you have to understand
23  too is part of, you know, per our previous conversation
24  that, you know, we could have repaired those cars in May
25  and they might not have left until June, and they could

JOHN MCDERMOTT
1/19/2022

Page 169

1  A. Right at the corner of 12th and Olive.
2  Q. Okay, was it perpendicular to the parking lot, as
3  in did the barrier stretch across --
4  A. It was -- it was -- they did stretch across 12th
5  Avenue and they were perpendicular to one edge of the lot
6  or parallel to one edge as well.
7  Q. Perpendicular to --
8  A. So this is perpendicular.
9  Q. Uh-huh.
10 A. This is parallel. And I think my lot parallels
11 Olive, one edge of my lot parallels 12th, so it was equally
12 perpendicular and parallel.
13 Q. Okay. So it was more than one barrier?
14 A. There was multiple barriers, yeah.
15 Q. Do you know how many?
16 A. I believe there was two. There may have been
17 three.
18 Q. Okay. So one of them was in the intersection
19 of --
20 A. Yeah, I didn't take pictures of them, so I can't
21 remember how many.
22 Q. Oh, okay. But you observed them being put up;
23 right?
24 A. Yep, yep.
25 Q. -- were there every day from that point forward;

Page 170

1  right? Okay.
2  A. Yep.
3  Q. And so -- but you just -- you don't know how many
4  it was?
5  A. I don't.
6  Q. Okay. And so they were -- but there were at
7  least two?
8  A. I believe it was three, minimum two.
9  Q. Okay. So two to three?
10 A. Yep.
11 Q. Okay. And was one of them in the intersection --
12 were they in the crosswalk? Where were they placed?
13 A. They were before the crosswalk.
14 Q. Okay, before the crosswalk. And did they stretch
15 from the west to the east side of the street?
16 A. Yep.
17 Q. On 12th Avenue?
18 A. Yep.
19 Q. Okay, and they stretched from the north to the
20 south side of the street on Olive?
21 A. They did not on Olive. They did not. They did
22 not put them on Olive.
23 Q. They were not on Olive, okay. So the barriers
24 that you're talking about were only on 12th Avenue.
25 A. Yeah.

Page 171

1  Q. Okay. And so did the barriers in front of Car
2  Tender block access to Olive street at all?
3  A. Yes, I mean if -- have you looked at a map where
4  they placed the barriers?
5  Q. I -- I am asking --
6  A. Do you have access to that?
7  Q. I'm just asking for your description of where the
8  barriers were placed. If you can't answer it, that's fine,
9  just let me know.
10 A. I can, it's just -- I mean -- anyways, yes, they
11 were on 12th Avenue.
12 Q. Okay. They were on 12th Avenue, but they weren't
13 on Olive Street?
14 A. At my location.
15 Q. Sorry.
16 A. At my location.
17 Q. Olive Street at Car Tender's location, okay. And
18 so once those barriers were -- once the 12th Avenue barrier
19 was put up --
20 A. Once the main access to Car Tender was blocked
21 off, yeah.
22 Q. Uh-huh, so did you change the access point to the
23 parking lot?
24 A. No.
25 Q. Okay. So how -- how did customers get into --

Page 172

1  drive -- sorry, did customers then drive their cars into
2  Car Tender's parking lot?
3  A. Yes, only way they could get there was from the
4  north.
5  Q. Okay. So from the north on 12th Avenue?
6  A. Yes.
7  Q. Okay. And then so when that -- at that point, so
8  June 8th, you watched the barriers get put up; is that
9  right?
10 A. Yes.
11 Q. Okay. And then did you at any point after that
12 change your store hours?
13 A. No, we were still there normal hours.
14 Q. Okay, normal hours. So normal at that time
15 was --
16 A. 8:00 to 5:00.
17 Q. Okay, got it. And then I know -- so you talked
18 about some customer -- customer impacts. At that point,
19 June 8th and beyond, did any customers come to your store
20 in the month of June?
21     MR. WEAVER: Objection, asked and answered.
22 A. After the 8th, yes.
23 BY MS. IVERSON:
24 Q. And what about in July?
25 A. I mean you can see obviously in July customers

43 (Pages 169 to 172)

JOHN MCDERMOTT
1/19/2022

Page 269

```
 1              REPORTER'S CERTIFICATE
 2
         I, Mindy L. Suurs, the undersigned Certified Court
 3  Reporter, pursuant to RCW 5.28.010, authorized to
    administer oaths and affirmations in and for the State of
 4  Washington, do hereby certify:
 5
         That the foregoing testimony of JOHN McDERMOTT
 6  was given before me at the time and place stated therein
    and thereafter was transcribed under my direction;
 7
         That the sworn testimony and/or proceedings were by me
 8  stenographically recorded and transcribed under my
    supervision, to the best of my ability;
 9
         That the foregoing transcript contains a full, true,
10  and accurate record of all the sworn testimony and/or
    proceedings given and occurring at the time and place
11  stated in the transcript;
12       That the witness, before examination, was by me duly
    sworn to testify the truth, the whole truth, and nothing
13  but the truth;
14       That I am not a relative, employee, attorney, or
    counsel of any party to this action or relative or employee
15  of any such attorney or counsel and that I am not
    financially interested in the said action or the outcome
16  thereof;
17
    DATE:  January 25, 2022
18
19
20
21
22  _____
    Mindy L. Suurs
23  Certified Court Reporter #2195
24
25
```