# Exhibit 47

### Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
        Plaintiff,               )
                                 )
vs.                              ) No. 20-cv-00983
                                 )
CITY OF SEATTLE,                 )
                                 )
        Defendant.               )
_____

VIDEOTAPED VIDEOCONFERENCE 30(B)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(HAROLD SCOGGINS)
_____

***PORTIONS OF THIS TESTIMONY ARE DESIGNATED
CONFIDENTIAL AND ARE SEALED
UNDER A SEPARATE COVER.***

Seattle, Washington
(All participants appeared via videoconference.)

DATE TAKEN:  SEPTEMBER 14, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

### Page 2

            A P P E A R A N C E S
FOR PLAINTIFF:
        TYLER S. WEAVER
        GABRIEL REILLY-BATES
        Calfo Eakes LLP
        1301 Second Avenue
        Suite 2800
        Seattle, WA 98101-3808
        206.407.2337
        tylerw@calfoeakes.com
        gaber@calfoeakes.com

FOR DEFENDANT:
        TYLER L. FARMER
        CAITLIN B. PRATT
        ARTHUR W. HARRIGAN, JR.
        Harrigan Leyh Farmer & Thomsen LLP
        999 Third Avenue
        Suite 4400
        Seattle, WA 98104
        206.623.1700
        tylerf@harriganleyh.com
        caitlinp@harriganleyh.com
        arthurh@harriganleyh.com

        JOSEPH G. GROSHONG
        Seattle City Attorney's Office
        701 Fifth Avenue
        Suite 2050
        Seattle, WA 98104-7095
        206.684.8200
        joseph.groshong@seattle.gov

ALSO PRESENT:  CATHY ZAK, videographer
        Buell Realtime Reporting, LLC

            * * * * *

### Page 3

DEPOSITION OF HAROLD SCOGGINS
EXAMINATION INDEX
EXAMINATION BY:                            PAGE
30(b)(6) Examination by Mr. Weaver           6
Non-30(b)(6) Examination by Mr. Weaver      94

EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION                PAGE
Exhibit 1  Amended Notice of Videotaped       7
           Deposition Pursuant to FRCP
           30(b)(6) to City of Seattle
Exhibit 2  Email; SEA_00092040               19
Exhibit 3  Email chain; SEA-PDR_002283-284   20
Exhibit 4  5-page Executive Order;           25
           SEA_00015070
Exhibit 5  PowerPoint, NHSC Presentation     34
           August - 2021
Exhibit 6  Email and attachment;             51
           SEA_00104722-731
Exhibit 7  Email chain; SEA-PDR_002188-190   53
Exhibit 8  Incident Report; SEA-SFD_000046-047  63
Exhibit 9  Email chain; SEA_00091963-964     67
Exhibit 10 Email; SEA-PDR_002386             72
Exhibit 11 Email chain; SEA_00091919         78
Exhibit 12 Email chain; SEA-PDR_002192-194   85
Exhibit 13 Email chain; SEA_00092599-601     88
Exhibit 14 Email; SEA_00104741-744          125

### Page 4

        EXHIBIT INDEX (Continuing)
EXHIBITS FOR IDENTIFICATION                PAGE
Exhibit 15 3-page meeting request;          142
           SEA_00028044
Exhibit 16 3-page meeting request;          146
           SEA_00028170-171
Exhibit 17 Meeting request; SEA_00028178-179  156
Exhibit 18 Email chain; SEA_00020291-293    165
Exhibit 19 3-page chart titled "Messages"   171
Exhibit 20 Video recording                  183
Exhibit 21 Email; SEA_00092314-315          198
Exhibit 22 Spreadsheet                      198
Exhibit 23 Spreadsheet                      199
Exhibit 24 Email; SEA_00125617              206

Page 9

1  A. As far as I know, that's the full scope.
2  Q. Okay. All right. Great. I mean, I will ask
3  you about other things, but this is what you've been
4  designated for specifically as the representative of the
5  City.
6      So first I'd like to ask you about what
7  materials the fire department provided to protesters
8  during the -- during the CHOP time period that we'll
9  refer to as June 8th through July 10th, 2020.
10     What materials do you recall that the fire
11 department provided to protesters or the medics in the
12 CHOP zone area during that time period?
13 A. Sure. And just for a point of clarification.
14 Q. Sure.
15 A. I don't know for volunteer EMS personnel, I
16 don't know if they were medics, paramedics or EMTs --
17 Q. Okay.
18 A. -- or some other sort of medical professionals.
19 They were just identified as volunteer EMS.
20 Q. Okay.
21 A. So we provided fire extinguishers, stokes
22 baskets with wheels on it, and also canvas letter
23 carriers, for lack of a better term.
24 Q. So -- so fire extinguishers, what -- can you
25 describe to me the fire extinguishers.

Page 10

1  A. Sure. When you say -- well, I'm not sure --
2  when you say describe to you the fire extinguishers,
3  what exactly do you mean?
4  Q. Well, how many fire extinguishers? Were they
5  just standard, like, kitchen variety fire extinguishers?
6  What kind of fire extinguishers were they, and how many?
7  A. I don't know the exact number. There's
8  probably several, maybe around three or four. They were
9  at least, you know, 2A, 10BC type extinguishers that we
10 carry, you know, but the exact model number, I can't
11 speak to that.
12 Q. Okay. And who did you give those to
13 specifically, the fire department?
14 A. The volunteer EMS personnel.
15 Q. And so the volunteer EMS personnel, as I
16 understand it, those were people who were -- had a --
17 I'll call it an improvised medic station on -- was it
18 Pine? Is that -- is that correct? Is that who you were
19 referring to?
20 A. Yeah, I think it was at 10th and Pine, in the
21 parking lot of the Mexican restaurant. I think that's
22 where it was.
23 Q. Rancho Bravo Tacos?
24 A. Yes.
25 Q. Okay. Just across the street from Cal Anderson

Page 11

1  Park?
2  A. Correct.
3  Q. Okay. And why did the fire department provide
4  the fire extinguishers?
5  A. We were getting reports of small fires in the
6  park. It could have been a garbage fire or -- you know.
7  So we were getting those reports, and so when we talked
8  to them about it, they wanted to assist with problem
9  solving, and we knew it would be a bit of a challenge to
10 navigate through all the people to get to a small trash
11 fire.
12 Q. Okay. So it was so that they could put out
13 fires that had been started within the CHOP area that
14 the fire department was not going to be able to put out;
15 is that correct?
16     MR. FARMER: Objection. Objection.
17 Misquotes testimony.
18 BY MR. WEAVER:
19 Q. You can answer unless Mr. Farmer tells you you
20 can't. So --
21 A. Oh, okay. There were -- you know, we get
22 reports of fires every day, you know, sometimes they're
23 in encampment, sometimes they're in a trash can. It was
24 these types of fires. It wasn't, you know, building
25 fires or vehicle fires or anything like that.

Page 12

1  Q. Is it common practice for the Seattle Fire
2  Department to provide fire extinguishers to groups of
3  protesters to put out fires?
4  A. It's not a common practice, but it is a common
5  practice for events and -- and different things like
6  that, for us to help with supplies if they need them.
7  It's a common practice for the fire department to
8  provide fire and life safety for the entire city,
9  whether it's mount your fire extinguisher in your
10 apartment building or your business, or things -- things
11 like that, so that is a common practice for us.
12 Q. Okay. So these fire extinguishers were owned
13 by the City of Seattle; is that correct?
14 A. Yes.
15 Q. Okay. And can you think of another time that a
16 City of Seattle-owned fire extinguisher was given to a
17 group of protesters to put out fires in a park?
18 A. I can't.
19 Q. So you mentioned a -- and I'm just trying to
20 remember -- a basket -- did you say you also provided
21 a -- baskets?
22 A. Stokes. It's a Stokes basket.
23 Q. A Stokes basket. Okay. What is a Stokes
24 basket?
25 A. A Stokes basket is a tool that we use to

3 (Pages 9 to 12)

Page 173

1  A. -- things were pretty tense, and we all needed
2  a smile at some point.
3  Q. Well, yes. I'm sure you can understand why I'm
4  asking you about it.
5  A. I think I do. But I didn't share any potlucks
6  with the protesters.
7  Q. Well, it sounds like you weren't invited,
8  actually, so --
9  A. Well, we weren't even -- I wasn't invited, at
10 least, so...
11 Q. So going back to Exhibit 18, this was on
12 June 11th, and there were a couple comments that Mayor
13 Durkan's -- stated on June 11th, that were public at the
14 time. One was that there was no specific date by which
15 they -- the City was going to move people out of the
16 area, and she compared it to the Capitol Hill block
17 party.
18    Do you remember those comments?
19 A. I don't specifically.
20 Q. Okay. Do you remember talking to anybody in
21 the area in the days and hours that you were there? Do
22 you remember hearing from any residents or businesses
23 about anything that Mayor Durkan had said in the media
24 at the time?
25 A. I don't. I think I heard more along the lines

Page 174

1  of the complaints, and not complaints about what the
2  mayor said in the media, at least not that I can
3  remember. There -- there could have been. I mean, I --
4  there was a lot going on.
5  Q. Do you remember ever hearing -- or talking to
6  either protesters, residents, or businesses about the
7  mayor's comment, I believe on June 12th, that -- that
8  referenced a summer of love?
9  A. I think I heard that on one of the news
10 outlets. I think that's where I heard that. I think
11 one of the news outlets may have repeated it or
12 something.
13 Q. Do you recall hearing anything from residents
14 or businesses about that comment?
15 A. It may have come up in -- in one of the
16 community meetings, but, you know, the mindset that I
17 took into those meetings was to try to filter out what
18 could we actually help with. I knew when we walked in
19 the room, you know, what we were going to be getting.
20 There were a lot of people who wanted the landscape
21 change, and that would bring a very aggressive tone
22 towards us. And I knew that. But I was trying to focus
23 on, okay, what can I actually help with. So I'm sure
24 some of those comments were said in the meeting, but I
25 was really trying to filter and thin slice on the things

Page 175

1  that we can help with.
2  Q. And the reason you knew, and expected that
3  going into the meetings, is because you had heard all
4  those statements from people on the street prior to
5  those meetings; correct? Maybe not the same people, but
6  people in general?
7  A. Yeah. I mean, when people approach me, I stop
8  to talk. I talked to a lot of people. So I knew it
9  was -- there was a lot of anger, anxiety. It was very
10 tense. So going into a room with a group of people who
11 felt that same way, yeah, I'd heard some of the comments
12 on the street.
13 Q. Okay. So when you heard the "summer of love"
14 comment from the mayor on the news, were you concerned
15 about how that might affect dynamics on the ground in
16 the area?
17    MR. FARMER: Object to the form of the
18 question.
19    You may answer.
20 A. You know, I -- I wasn't concerned. You know,
21 we knew we had a very tough situation on the ground. I
22 knew one comment by anyone, and there were a lot, was
23 not going to, you know, change the landscape overnight.
24 So I tried not to focus on that. I tried to focus on
25 what we could actually do.

Page 176

1  BY MR. WEAVER:
2  Q. So do you recall a meeting with protesters on
3  the morning of June 13th, which was a Saturday?
4  A. Can you be more specific?
5  Q. Okay. If you go back to the Exhibit 19.
6  A. Yes, I'm there.
7  Q. Okay. So in the same chat, 1164, that includes
8  a number of people, including Sam Zimbabwe, you, and
9  people from the mayor's office, and Mami Hara, Sam
10 Zimbabwe's talking about his -- he's coming. You ask
11 whether you can mention the 100 million, and urge people
12 to pull up Omari's live feed. Does this ring a bell at
13 all?
14 A. It does. I -- it's interesting, when you said
15 the date and time, I probably couldn't tell you what day
16 or what time. I knew that meeting happened, but I
17 didn't know what time it was because it's on YouTube.
18 ==Q. Okay. And who's Omari?==
19 ==A. Omari Salisbury is with Converge Media. So he==
20 ==was the -- kind of the reporter on the ground throughout==
21 ==this entire period.==
22 ==Q. What was the 100 million you were referring to,==
23 ==and asking for permission to discuss?==
24 ==A. I have to think through that a little bit, but==
25 ==there was mention by the mayor, I think, that there was==

Page 177

1  going to be a large amount of money moved or put towards
2  the community.  I'm not sure of the exact details.
3      Q.  So going into this meeting, now that you recall
4  it, what was -- was there a specific plan in mind, in
5  meeting with the protesters, on that date?
6      A.  There was.  I think our goal was to change the
7  landscape of the street, of all the streets, and to
8  acknowledge the things that were already done or the
9  things that were already in play, and to listen and take
10 back those things that they raised.
11     Q.  So had the mayor or the mayor's office given
12 you, Mami, or Sam any guidance on what you could
13 negotiate with the protesters or any things that you
14 could not negotiate with them?
15     A.  I don't think so because we weren't coming to
16 decision points in that room.  So the conversation would
17 be had, we would take that back, and then we would bring
18 that back.  So it was more of listening, capturing the
19 information, and then taking it back and discussing it.
20 So, you know, the $100 million, for example, Mami, Sam,
21 or I, we weren't decision makers in that.  It was
22 another conversation that was taking place.
23     Q.  Okay.  Were you -- did you have guidance that
24 your goal -- you should try to get the protesters out of
25 the streets going into this meeting?

Page 178

1      A.  There was always guidance on that.  Our over --
2  our goal was to get the area reopened.  That's what we
3  were trying to work towards in every conversation on
4  every -- well, at least in every conversation I had, and
5  I'm sure Sam and Mami felt the same way.
6      Q.  Did the mayor's office in this rough time
7  period of, let's say, June 8th through June 19th, have
8  concern that they didn't want to be seen as pushing out
9  the protesters from the area?
10     A.  You know, I -- I didn't get that sense of
11 concern that they didn't want -- no one wanted it to
12 be -- I didn't get that sense of concern, but the
13 concern was -- for all is no one wanted this to escalate
14 into something that would be a national tragedy.  So
15 that's why I think we were trying to take it slow in the
16 steps that we took because you had armed people around
17 the perimeter, it was a high tension, you know, from --
18 from some of the protesters.  So no one wanted it to be
19 that scenario, and I think that's -- at least in my
20 mind, personally, that was playing in my mind, and that
21 was very important to me because that -- that is not
22 what anyone want -- the way anyone wanted this to end.
23     Q.  Okay.  So I'm going to try sharing my screen,
24 and we'll see how this goes.  Okay.  Can you see this --
25 can you see the video?

Page 179

1      A.  I can.
2      Q.  Okay.
3      A.  It looks like I have my face mask on my pins
4  there, also.
5      Q.  Okay.  So that's you, I assume.
6      A.  Uh-huh.
7      Q.  Correct?
8      A.  Yes.
9      Q.  Okay.  And where -- where were -- where were
10 you at the time of this -- at the time this video was
11 taken?  Where were -- where were you physically located?
12     A.  Sure.  So the building directly west of the
13 east precinct on Pine at 10th -- no, at 11th and Pine,
14 there was a room on the first floor off of Pine that --
15 it was a studio apartment maybe.  I don't know whose it
16 was, but that's where we were.
17         MR. WEAVER:  Okay.  So -- now, you may need
18 to turn up your volume.  I will say that the only
19 modification that we have made to this video is try to
20 boost the volume a little bit so that everyone can hear
21 it.  I have it turned up as high as I can get it, but
22 you may need to have it a little amplified on your end.
23 And I'm just going to play the first -- so I'm starting
24 at the zero minute mark, although it doesn't show that,
25 and -- and I will try to keep for the record clear as

Page 180

1  far as where we are when I stop it.
2         (Video played.)
3  BY MR. WEAVER:
4      Q.  Okay.  I'm pausing it at 11 seconds, just
5  wondering if you can -- if you can hear the sound.
6      A.  I can hear it.  It's a bit muffled.
7         MR. WEAVER:  Yeah.  Okay.  So I'm going to
8  keep playing it.
9         (Video played.)
10 BY MR. WEAVER:
11     Q.  So are you able to see the video?
12     A.  It's frozen.
13     Q.  Okay.  Have you seen any -- have you seen any
14 video at all?
15     A.  No.  Our screen is showing me standing on the
16 screen.
17     Q.  All right.  You were able to hear it, at least?
18     A.  Yeah.  It's muffled.  I -- I can't -- oh, now
19 the video just came on.
20     Q.  Okay.  I had moved it, so okay.  We -- but
21 here -- okay.  So there were introductions of some
22 people in the room who I would say are -- I -- they're
23 protesters, but how -- how did you guys decide who you
24 were going to talk to and who you were going to bring
25 into this room for the discussion?

Page 185

1   A. -- that offhand.
2   Q. Okay. Would you -- how about 503.4.2?
3   A. I couldn't tell you that offhand.
4   Q. Do you believe the -- the Seattle Fire
5   Department has the authority to identify blocked access
6   under the fire code and to remedy that problem?
7   A. I believe the Seattle Fire Department has the
8   authority to identify the problems, but we don't have
9   the enforcement arms to -- for all of the remedies that
10  could be needed.
11       The remedies in this situation is different
12  than our fire inspectors going into a building and doing
13  an inspection where there's noncompliance, and there
14  would be a fine. This requires a different level of
15  enforcement to remedy the situation, and we don't have
16  those means in the Seattle Fire Department.
17  **Q. Is it your understanding that the fire code**
18  **requires the police department -- or the fire department**
19  **to open the roads for access for fire vehicles?**
20  **A. Yes.**
21  Q. Do you recall telling this group of protesters
22  that -- after they refused to give up the barricades and
23  barriers that were around the east precinct, that if
24  they didn't want people to get run over they should get
25  out of the street?

Page 186

1   A. I don't recall saying that. I'm -- I could
2   have.
3   Q. Was it your opinion, your personal opinion, at
4   this point, that the protesters should move to the park
5   and get out of the streets, rather than occupy the
6   streets and sidewalks in the area?
7   A. Well, as the fire chief, our goal was to get
8   the streets open so we had access and egress for life --
9   fire and life safety issues.
10  Q. Was it your personal feeling that the
11  protesters should protest in the park and not in the
12  streets or the sidewalks?
13  A. Well, my participation here wasn't about my
14  personal opinions or wants or needs. This was -- I was
15  there in a professional capacity, trying to do my job to
16  get the streets opened so our firefighters could respond
17  if needed. I didn't view this as my personal opinions
18  needed to be voiced with this group.
19  Q. Did you have a personal opinion at the time?
20  A. Well, my personal opinion and my professional
21  opinion are in alignment because I've spent almost the
22  last 32 years in fire and life safety, and that's what
23  our goal is, is to try to provide fire and life safety.
24  Q. Was it your professional opinion that these
25  people should move out of the streets and sidewalks and

Page 187

1   into the park?
2   A. It is my -- it is and probably was, because
3   that would have got the streets opened.
4   Q. And it would have resolved some of the safety
5   issues for them as well; is that right?
6   A. It would have.
7   Q. So do you recall talking to these protesters at
8   this meeting about the block party, the Capitol Hill
9   block party?
10  A. I don't recall that.
11  Q. Do you recall talking to these protesters, or
12  any other group of protesters, that you met with during
13  this time in June of 2020, about how the City always
14  requires rules of access for any event that is partially
15  or completely occupying the streets?
16  A. I don't recall that, but if I used the Capitol
17  Hill block party as a reference point for that last
18  statement, that -- that would make sense because we do
19  have requirements.
20  Q. I'm sorry; you have requirements for what?
21  A. We have requirements for access and egress.
22  Q. Okay. So typically -- would you agree that
23  typically as part of the permitting process for public
24  events that would occupy the streets, there's a
25  requirement that the streets be open at least partially

Page 188

1   for fire and police response?
2   A. There is a requirement, and it's -- it's agreed
3   upon during the permitting process, but -- a for example
4   would be if there's an event that's going to take place
5   on Pine, from Broadway to 13th, as an example, we may
6   not require a fire lane that goes north and south -- I'm
7   sorry, east or west, but we may require access points
8   through all the arterials, where we can still serve the
9   communities. But there's an agreement that's generally
10  made through the permitting process so we can gain
11  access.
12  Q. Okay. And there was no permitting process with
13  this particular group of people that were occupying the
14  streets in June of 2020; is that right?
15  A. To my knowledge, there was no permitting
16  process.
17  Q. Okay. Was there ever any discussion in any of
18  the meetings you had with the mayor about whether they
19  should go through the permitting process?
20  A. I don't recall that. I mean, it could have
21  been, but I don't recall that.
22  Q. Do you recall telling these -- this group of
23  protesters that one of the reasons you needed to open up
24  the area was that businesses in the area had expressed
25  significant concern over the barricades, that they're

47 (Pages 185 to 188)

Page 221

1  Q. The City renting a space?
2  A. Oh, I don't know.
3  Q. Okay. You don't know anything about Mayor
4  Durkan and a business called the Riveter? Do either of
5  those -- does that ring a bell with you at all?
6  A. No.
7  Q. Okay.
8  A. And it's not to say that those conversations
9  didn't take place, but it -- it would not have been one
10 that impacted the fire department.
11 Q. Okay. Yeah, I -- I'm just making sure. I
12 didn't expect that you did, but -- can you give me
13 another five minutes? I might be done. I just want to
14 look at my notes. So if we could go off the record for
15 five minutes.
16      THE VIDEOGRAPHER: Going off the record.
17 The time is approximately 4:53 p.m.
18      (Recess from 4:53 p.m. to 4:57 p.m.)
19      THE VIDEOGRAPHER: We are back on the
20 record. The time is approximately 4:57 p.m.
21      E X A M I N A T I O N (Continuing)
22 BY MR. WEAVER:
23 Q. Okay. I do have a few just brief questions.
24      So with regard to Cal Anderson after July 1st
25 through the end of 2020, do you know of any instances

Page 222

1  where there were yellow or red zones created in or
2  around the park during that time?
3  A. I don't. I don't think we created any in or
4  around the park, but I'm not 100 percent sure, but I
5  don't think we did.
6  Q. Do you recall whether there were any scenes of
7  violence declared in the -- in or around the park during
8  the same time period?
9  A. Are you talking about the time period after the
10 demobilization --
11 Q. Yeah, July 1st to the end of the year of 2020.
12 A. Oh, I'm not sure. That's a pretty long time
13 period, so there could have been.
14 Q. Okay. Has anybody, to your knowledge,
15 attempted to see if they can get any of your previous
16 messages by using your Apple watch as a -- as a source?
17 A. No.
18 Q. Is that a City-issued Apple watch?
19 A. No.
20 Q. But it is -- it's synced with your City phone;
21 is that right?
22 A. Yes. Only my City phone.
23 Q. Okay. At any time -- in June of 2020, was your
24 personal email linked to your phone?
25 A. No.

Page 223

1  Q. Your City phone, I mean.
2  A. No.
3  Q. Okay. And do you have a personal email address
4  that you use?
5  A. I do.
6  Q. What's -- what's the email address?
7  [--- Confidential           ---]
8      MR. FARMER: Cindy, we would -- I'm sorry,
9  Mr. Weaver. Cindy, we would ask that you mark the last
10 question and answer as confidential under the protective
11 order in the case, please.
12      MR. WEAVER: And we have no objection to
13 that. I expected that, so -- I was actually going to
14 mention that we would keep that confidential.
15      So unless your attorney has questions, I am
16 done.
17      MR. FARMER: No questions.
18      Cindy, we'll reserve signature. Thank you.
19      THE VIDEOGRAPHER: Thank you. This
20 concludes today's deposition of Harold Scoggins. The
21 time is approximately 5:00 p.m. Going off the record.
22      (Deposition concluded at 5:00 p.m.)
23      (Reading and signing was requested
24      pursuant to FRCP Rule 30(e).)
25      -o0o-

Page 224

1  C E R T I F I C A T E
2
3  STATE OF WASHINGTON
4  COUNTY OF PIERCE
5
6  I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Harold
9  Scoggins, having been duly sworn, on September 14, 2021,
10 is true and accurate to the best of my knowledge, skill
11 and ability.
12 IN WITNESS WHEREOF, I have hereunto set my hand
13 and seal this 23rd day of September, 2021.
14
15
16
17 _____
18 CINDY M. KOCH, CCR, RPR, CRR
19 My commission expires:
20 JUNE 9, 2022