# Exhibit 49

BILL DONNER
11/16/2021

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiffs,    )
                               )
    vs.            ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,           )
                               )
        Defendant.    )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

BILL DONNER - RICHMARK LABEL
_____

CONTAINS CONFIDENTIAL PORTIONS

DATE:  Tuesday, November 16, 2021
REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Page 2

APPEARANCES

For the Plaintiff:
 TYLER S. WEAVER
 Calfo Eakes
 1301 Second Avenue
 Suite 2800
 Seattle, Washington 98101

For the Defendant:

 SHANE P. CRAMER
 Harrigan Leyh Farmer Thomsen
 999 Third Avenue
 Suite 4400
 Seattle, Washington 98104

For the City of Seattle:
 JOSEPH GROSHONG
 Assistant City Attorney
 Seattle City Attorney's Office
 701 Fifth Avenue
 Suite 2050
 Seattle, Washington 98104

Also present:  Karl Benitez, Royal Video Productions

Page 3

I N D E X
EXAMINATION BY                          PAGE
Mr. Cramer                              6

EXHIBIT INDEX
NO.   DESCRIPTION                          PAGE
83    Amended Deposition Notice for Richmark    7
84    Photograph                              13
85    Google map of the area                  25
86    E-mails including June 11, 2020, from Bill   44
      Donner to Alan Anderson re meeting

87    E-mails including June 17, 2020, from Bill   57
      Donner to Sam Zimbabwe re street traffic
88    E-mails including June 17, 2020, from Bill   72
      Donner to Michael Oaksmith re Yesterday's
      Meeting
89    E-mail dated June 26, 2020, from Bill Donner   74
      to Michelle Esteban re One More Thing

90    E-mails including June 12, 2020, from Bill   75
      Donner to Gary Volchok
91    Spreadsheet CHOP Total Losses to Date      80
      (Assuming CHOP Ends Tomorrow)

92    Richmark Estimated Damages, April 14, 2021    84

93    E-mail dated June 25, 2020, from Bill Donner   104
      to Kassandra Brown re ASAP
94    Series of e-mails dated July 1, 2020, between  111
      Bill Donner and Tamara Floyd re We're Back

95    FedEx invoice                            137

96    Pacific Paper Tube Invoice No. 312580      137

Page 4

EXHIBITS  (Cont.)
NO.   DESCRIPTION                          PAGE
97    Pacific Paper Tube Invoice No. 313071   137
98    List of attempted deliveries            137
99    E-mails between Mark Mathieson and Barry   143
      Cosme re Pacific Paper Tube Freight

100   Diamond Parking Services rental report   154

101   Richmark Label General Ledger           158

102   Series of e-mails between Barry Cosme,    168
      Kassandra Brown, and Bill Donner re Vortex
      Managers in Suite 18

103   Series of e-mails between Barry Cosme, Eddie,  174
      and Bill Donner re Northwest Liquor rent
104   E-mail from Jeff Scott dated July 2, 2020,   185
      Re June 2020, "Heretofore known as the age of
      CHOP"
105   Richmark Label Balance Sheet as of January 1,  203
      2020

106   Richmark Label Profit & Loss, May-August 2020  208

1 (Pages 1 to 4)

Page 129

1   later.
2           MR. WEAVER:  Objection.
3       A.  If you would like, I will go back and submit all
4   of the answers to you that I cannot answer now.
5   BY MR. CRAMER:
6       Q.  The vendors that would be covered by this,
7   vendors is just the recycling compost garbage folks?
8       A.  There's recycling and then there's actual waste
9   pickup.  They're two different companies.
10      Q.  But no other vendors are included in this?
11      A.  Not to my knowledge.
12      Q.  And do you use the City's contracted waste
13  management provider, or do you use someone independent of
14  that?
15      A.  I believe it's the City's.  I do not deal with
16  that, so I cannot give you an answer.
17      Q.  And whose responsibility is it at Richmark for
18  interfacing with the waste management and recycling vendors
19  normally?
20      A.  I believe most of the time, if not all of the
21  time, it's Marty Shilley.
22      Q.  And for these employees -- strike that.
23          Do any of your employees have hourly rates that
24  are actually billed to clients?  Is that how your business
25  works at all?

Page 130

1       A.  No.
2       Q.  How is revenue determined for your business?  Is
3   it just cost of labels?  You know, like the cost of a pack
4   of labels is blank?
5       A.  We bill labels, we bill for prepress work, which
6   is to prepare artwork, various things so that we can print
7   the labels.  So you have -- in the labels you have the cost
8   of labor, cost of materials, inks, various things, and we
9   bill for it and then we get, oftentimes, most often, the
10  cost per thousand labels, a cost for prepress preparation,
11  artwork preparation, and we quote people and that's how we
12  bill them.
13      Q.  And so the labor cost -- I guess that would be
14  the one part that you said where I think there might -- is
15  there not an hourly rate associated with that labor cost?
16      A.  When we quote -- okay.  Okay, I'm going to have
17  to digress for a second.  I've run it for about 52 years.
18  We have numbers that we use that don't mean anything to
19  anybody but us, and they're relative to things in the past,
20  making adjustments.
21          So when we do a quote, we will estimate how long
22  a job will take to run, and we will then put in how many
23  hours we think it will take, and depending on the equipment
24  and the people -- and the number -- say number of people
25  involved, we'll put in an hourly rate we would like to get

Page 131

1   plus the cost of material plus the cost of waste.  Most of
2   these things are approximate.  In over 52 years, they have
3   worked out for us.
4       Q.  And are those the hourly rates that you used
5   here?
6       A.  Those are salaries.  There's -- we're not looking
7   for any compensation for revenue.  That would be what I
8   just described to you.  These are people.  Every press
9   person or dip person has different hourly rate based on
10  skill level, number of years with us, and those are not
11  attributed to any order at all.  They work for us because
12  they might do any job at any time.  It's an internal number
13  that wouldn't mean anything to anybody else.
14      Q.  And they get that -- that salary regardless of
15  what type of activity you're asking them to do?
16      A.  That is correct.  When they help with the garbage
17  and he gets 50 to $40 an hour, whatever, when we needed
18  help for that, people help out.  Where everybody's
19  cross-trained, they can do more than one thing and it's a
20  very collaborative work environment.
21      Q.  Did you have any overtime associated with any of
22  the garbage or vendor management and handling activity?
23      A.  Barry would know that if he assigned numbers to
24  it.  Our overtime is based on how busy we are and what we
25  get done in a non-overtime day.  Because of what we sell

Page 132

1   and how fast we have to produce it and who uses it, we have
2   what we call spikes -- daily, weekly, monthly -- in terms
3   of how much time we have to work.  We have to deliver
4   labels when the customers need them.  If we get swamped
5   with work and we have to work overtime, we pay for the
6   overtime.  It's not then charged to the customer.  We quote
7   them when we do, we try and work it out.
8           During that month, supervisors weren't doing
9   things -- there were people -- there were mistakes made.
10  Okay?  ==They didn't all get out to the customers.  We try==
11  ==and catch mistakes internally when we can.  But when==
12  ==people -- and you can't see the presses.  It's hard.  It's==
13  ==computerized, mechanical, and it's people; and it's very,==
14  ==very easy with the speed things go to make mistakes.==  If
15  people are not concentrating, distracted, they're going to
16  make mistakes.
17          How much was thrown into the garbage that we
18  caught because they weren't paying attention for that
19  month, we don't know.
20          We have some overtime periodically, and it's
21  sporadic.  If a press operator was not paying close
22  attention and makes mistakes and we had to run longer in
23  the day, we'd have overtime; but it can't necessarily be
24  attributed to anything other than maybe if he hadn't have
25  made the mistake, we would have finished it in 40 hours.

Page 145

1  can't tell you. I mean the people -- the people running
2  around, what the protesters were doing -- you know, when
3  does a person not feel safe? Truck drivers wouldn't come
4  in; they didn't feel safe. They felt threatened.
5      Q. But what was it about this one specific day that
6  caused you --
7      A. It could have been a lot worse than the other
8  days. You know what? I do not remember. Certainly I was
9  there, I was in town the whole time. I can't tell you
10  about that date, but it was apparently serious enough that
11  it was just -- we just as soon pay people to get them out
12  of there.
13      Q. Was it the day that the City tried to clean out
14  the -- clear out the park?
15      A. I don't have it down here, so I can't tell you.
16      Q. How did you determine the amount of wages that
17  you would claim for this?
18      A. According to this, it said: Complete closure
19  based upon total salary payments for June divided by 22
20  working days in the month.
21      Q. Does this include hourly employees or just
22  salaried employees?
23      A. Those are salary employees. And I'm reading what
24  you are there, and I can't give you a breakdown beyond
25  that.

Page 146

1      Q. Okay. So you don't know anything more about this
2  category than what is written here?
3      A. That's correct. It made sense to me when I saw
4  it and --
5      Q. Okay. So did you look to see how many people
6  would have been scheduled to work that day in coming up
7  with this estimate?
8      A. No. I mean he knows -- he prepared it. He knows
9  who the people are, he's got the payroll, and he knows the
10  people, so I assume he figured the correct people.
11      Q. Would you account for saved overhead or anything
12  from having closed that day?
13          MR. WEAVER: Objection.
14      A. It doesn't quite work that way.
15  BY MR. CRAMER:
16      Q. Okay. So the fact that you were -- did you make
17  any allocation for decreased costs associated with not
18  having to have the business open that day?
19          MR. WEAVER: Objection.
20      A. Not sure that we had -- what decreased costs? We
21  paid the rent, paid the utilities, we just didn't pay the
22  wages, but everything else existed. We have to pay for
23  water, lights, heat.
24      Q. Even if they're not used that day?
25      A. Taxes. Absolutely. I mean -- okay, some of us

Page 147

1  were there. The lights were on. We can't figure out for a
2  few hours how much less water we would use; it just doesn't
3  get measured that way. Taxes, real estate taxes, all of
4  that -- it's all the same.
5      Q. So which -- who of you were there that day?
6      A. Well, undoubtedly I was, and I don't know who
7  else. I probably popped in to look. I'm not sure I did
8  because I don't remember the date. Again, that varied.
9  Mr. Cosme, those were the people and not there. You know,
10  I might not have. It's a long time ago.
11      Q. And are the production folks primarily hourly
12  wages?
13      A. Yes.
14      Q. Okay. And I think you told me earlier, but who
15  were the salaried individuals?
16      A. Barry Cosme, Marty Shilley, Greg White, Alan
17  Anderson, Jeff Scott, and Elle Lochett. Not all of those
18  were responsible for all types of decisions, but you asked
19  who the salaried people were, and those would be included.
20      Q. And none of them came to work at all that day?
21      A. That's according to what Barry Scott, so I assume
22  it to be true.
23      Q. And can any work be done from outside of the --
24  is anybody at Richmark able to do work from home?
25      A. No. We don't do remote work.

Page 148

1      Q. "Repair, Preparation, and Painting the Building"
2  is the next category, and it's $50,000. What's the basis
3  for that estimate?
4      A. The painting the building, which -- have you seen
5  what it looks like or what it originally looked like?
6      Q. Well, let's -- yeah, let's talk about that --
7      A. It was done by a substantial group of artists.
8  One of the artists (inaudible) I think her last name now --
9  contacted me after she saw the destruction, and she's moved
10  on, she had her own company, and she just started out and
11  she wanted to know if she could have the job of repainting.
12  And I said, you know, we weren't ready, we didn't know when
13  we would be ready.
14          And I asked her just, you know, based on what
15  you've seen, the damage that had been done at that point,
16  and she said, "I don't know. At least $50,000." Her
17  guess. She'd not been in business a long time. It wasn't
18  meant to be an estimate. She wasn't hired.
19          The damage is now much, much greater than it was
20  at the time she talked to me, which was in June of 2020.
21  So we put it in, it's the only thing we had, we have no
22  paperwork to back it up. Because of the way it's painted
23  and the nature, the number of people involved, really don't
24  know. Also, we are going to have to put -- if we were to
25  do it again, put it back the way it was, it's -- which she

BILL DONNER
11/16/2021

Page 149

1  did not figure on -- it had a protective coat on it, but it
2  only went up about six to eight feet from the ground so
3  that you could wash some -- most of the time you could wash
4  some graffiti off of it.
5       When you look at the building now, what she
6  thought would be possible or would be sufficient isn't
7  going to cover it.  As I said, you would have to see a
8  picture of it now to see how much more extensive the damage
9  is.
10      Q.  And when was it painted originally?  2015; is
11 that right?
12      A.  I think '14, '15, over a two-year period.
13      Q.  And how much did it cost when it was painted
14 originally?
15      A.  We had some volunteer work and some who paid for
16 it and I don't know.  The company that managed the
17 volunteers -- they wanted -- I think it's Seattle Urban
18 Art.  I believe that was the name.  It's no longer in
19 existence now.  Some of the painters were locals, some
20 weren't.  I didn't contract with any of them, so I can't
21 tell you about who did it, how much they charged, whether
22 they did or not.  They gave us a break.  Some of it was
23 volunteer, some of it we paid for.
24      Q.  How much did you pay for it?
25      A.  I don't know the exact number.

Page 150

1       Q.  Was it also a 4 Culture sponsored project?
2       A.  What does 4 Culture mean?
3       Q.  Like the county arts --
4       A.  This is in the -- Seattle Urban Art at that time
5  was a nonprofit and existed onto itself, and I'm told now
6  it's no longer in existence.
7       Q.  What was it -- was there -- what did the building
8  look like before it was painted in 2015?  Was it a more
9  standard paint job?
10      A.  It was a -- one single color.
11      Q.  And had you experienced graffiti prior to June
12 2020 on the building?
13      A.  Very, very little.  And the only -- we do not
14 know exactly why, but the neighborhood liked it and the
15 graphic artists appreciated what was done.  It was no other
16 building like it on Capitol Hill.  People had their
17 pictures taken there, wedding pictures in front of it, it
18 was in magazines go there and have the picture taken; so it
19 was -- we didn't like the way it looked before, so we
20 decided -- we put our money, Richmark's money, into it to
21 paint it this way.
22       By the way, after we paint it, we never sold a
23 label because of the paint job.  So it was just for our own
24 gratification.  And so that cost us to try to put it back.
25 But until they get in and do it, we're not going to know

Page 151

1  exactly how much it is.
2       Q.  And was there graffiti -- the graffiti that
3  existed on it before June 2020 -- was that all cleaned off?
4       A.  Oh, yeah, we were always able to take care of it
5  because it was very, very little and it was at street level
6  and we were able to get it off, no problem.  I mean we had
7  it for -- okay, if the destruction took place in 2020 and
8  we did it in '14, '15 and didn't have a problem, so what
9  are we talking about -- five, six years when it just looked
10 like it looked and it was great and we didn't have a
11 problem.  Once they started going at it, they went to
12 extraordinary lengths to add graffiti to it.
13      Q.  And that occurred before the precinct was vacated
14 as well; right?
15      A.  I don't know the exact date they started marking
16 the building.  For -- I would not be surprised to say that,
17 when they started the protests, couple people with spray
18 cans might have done something; but again, it was low, it
19 was minor.  The protests were mostly in the late afternoon.
20 It got worse -- as the protests grew and the number of
21 people stayed in the streets and stayed in the area, it
22 just grew and grew and got worse and worse.
23      Q.  And did you ever contact the police about the
24 graffiti?
25      A.  Do you know the way the City works on graffiti?

Page 152

1  You have graffiti on your building, under normal times,
2  which this is not, they give you a certain amount of time
3  to take care of it.  It's your problem, not the City's.
4       Q.  Okay.  But did you ever contact the police about
5  the graffiti on your building?
6       A.  No.  I was not under the impression that police
7  guard buildings against people spray painting it.
8       Q.  And you're obviously not claiming that the City
9  spray painted your building; right?
10      A.  No, but -- and I did not -- I'm not sure it's
11 their job to protect private property.  Maybe a fire or
12 something, but not from spray paint.
13      Q.  And did you put up a fence or anything around
14 your property during the June 2020 time period?
15      A.  No, that was -- that would not be reasonable.  I
16 mean every place in the area boarded their -- most of the
17 places, I should say -- it doesn't -- boarded up their
18 windows.  Okay?  They didn't protect the walls; they board
19 up the windows.  We on that main floor street level have no
20 windows, so they just spray painted the buildings.  So
21 whereas windows were broken and have physical damage, we're
22 not putting in for any physical damage to the building,
23 just painting.
24      Q.  What was the artist's name who you said gave you
25 the --

38 (Pages 149 to 152)

Page 177

1    the tenants -- calming them down, trying to make sure that
2    they didn't move out.  I was not party to one single
3    discussion that he had with the tenants, but if he said he
4    spent that much time, then I believe he spent that much
5    time.  He didn't punch a time clock.
6        Q.   And is managing the dealings with the tenants
7    part of his job responsibility in his current role?
8        A.   Yes.
9        Q.   And this is managing the tenant concerns; right?
10       A.   Correct.
11       Q.   So why are these concerns outside the scope of
12   any other concern that a tenant might have?
13       A.   From reading this and knowing Barry, he breaks
14   things up according to what function he's doing or people
15   are doing.  Okay.  He divided up -- if you just wanted to
16   say as CFO, how many hours did I devote to CHOP, then you
17   would have gotten one single number.  It's just Barry.
18   Knowing Barry as well as I do, I'm saying it's just his
19   style.
20       Q.   And how would these communications have been
21   handled?  I mean -- strike that.
22       A.   He talks to people all the time up there.
23       Q.   And so --
24       A.   They were in our building, so he just walks
25   around.  He can talk -- they will sometimes come down our

Page 178

1    front door, they'll ask for Barry, they'll talk to him
2    about things -- they lose a key, they need something
3    rekeyed.  He oversees all Richmark's tenants.
4        Q.   Did he work overtime in June 2020?
5        A.   He's salaried.
6        Q.   And do you know how many hours he worked in June
7    2020?
8        A.   He's salaried.  We don't track hours of salaried
9    employees.
10       Q.   You just have to do whatever needs to get done?
11       A.   Pretty much what happens when you're salaried.
12       Q.   So we skipped a couple at the top that we need to
13   go back to.  What is employee parking and management?
14       A.   That would be Barry breaking out the time spent
15   shoveling -- moving cars around -- okay, somebody who
16   normally parks in a lot, they finally get down 11th Avenue,
17   they did it, there's no place to park.  They come and they
18   ask, we go out, Marty goes out, helps them.  Some of them
19   sometimes had to go in the basement.  Sometimes we stacked
20   them in the aisles.  We had to make sure there was room for
21   trucks.  It's whatever we had to do on every day to get the
22   employees in and out.
23           Also, the employees do not all start at the same
24   time.  So somebody who comes in early has their car
25   blocked -- his or her car blocked -- pardon me -- and we

Page 179

1    have to take care of it.  Marty or one of us may have moved
2    it so an employee could continue working and a supervisor
3    could have gone and moved the person's car to let another
4    employee out.  It's -- it was not a lot of fun, and it was
5    difficult.
6        Q.   And so -- and so what is the calculation that's
7    done there?
8        A.   Barry took a look at the hours -- and again, it
9    was the same for everything else.  Hours were approximated
10   as close as we could -- who was involved, salaries -- and
11   again, they're all -- I believe -- there's no two ways that
12   I know that he would go about calculating this.
13       Q.   And so what did he look at to figure out the
14   hours that were spent on this?
15       A.   We talked to the people.  I mean he talked to
16   Marty, did he talk to me, what did I do, what did David
17   Boyd do in the morning.  I mean you had to be there from a
18   quarter to 5:00 to close to 8:00.  Every single day it was
19   a little bit different, and it was all managers or people
20   going out and doing things so that we could keep operating
21   as smoothly as possible.
22       Q.   And who did he talk to?  Who were the employees
23   that he talked to for this one?
24       A.   Me, Dave Boyd, Marty -- Marty Shilley, Dave Boyd,
25   myself.  That could probably be of all.  I can't think off

Page 180

1    the top of my head of anybody else who was involved a lot.
2    There could have been other people involved.  Again, it all
3    depended on the magnitude of the problem and what we did.
4            If employees had to go out and move their own
5    car, that means they stopped producing.  But we didn't take
6    a look -- as far as I know, we did not look at, if one
7    employee went out and was out for seven or eight minutes
8    moving a car, I don't think that's on this sheet.
9        Q.   So why is it that on Exhibit 91, when you
10   estimated the -- your damages closer to June 2020, you
11   estimated that only five hours were spent managing employee
12   parking, but then when you looked at it eight or nine
13   months later in April '21, you decided that more than 40
14   hours had been spent on employee parking and management?
15       A.   Frankly, as his boss, manager, and the owner, I'd
16   say he didn't do a really good job the first time and they
17   cleaned up their act and looked at it.  Why he made a
18   mistake or why they had a problem the first time or what
19   might have been forgotten, you would have to ask or I could
20   ask Barry Cosme.  Because as I've said before when you've
21   asked, I can't answer that.
22       Q.   The last -- the last category on here:  Employee
23   Productivity Reduction of --
24       A.   Are we back on 92?
25       Q.   Yep.

BILL DONNER
11/16/2021

Page 185

```
 1   counting in these categories based on production; is that
 2   right?
 3       A.   I can't answer that until I talk to Barry.  I
 4   won't say yes and I won't say no because I do not know.
 5   It's not like -- let's just say I've dealt with him a long
 6   time, he's a very honest person.  I need to get more
 7   information, and I apologize for not having it.
 8       Q.   And did you earlier say in June 2020
 9   productivity-wise was not a great month?
10       A.   Correct.
11           MR. CRAMER:  I'm going to go ahead and mark 104.
12                (Exhibit No. 104 marked for
13                identification.)
14       A.   Go to 104?  Oh, no, it's not up yet.
15           Okay, just a second.
16   BY MR. CRAMER:
17       Q.   So take a look at this e-mail and let me know
18   when you've had a chance to look at it.
19       A.   Okay.  Two -- okay, that's from -- okay, just a
20   second.
21       Q.   Was Jeff Scott correct when he wrote that you
22   closed 40 new accounts in June and that you were up over 10
23   percent for the month compared to the previous June?
24       A.   If he put it, I'll assume he's accurate.  When we
25   get accounts, it takes anywhere from maybe a month to two
```

Page 186

```
 1   years to close an account.
 2           Do you want me to go into how we sell, to know
 3   that because looking at that number, you have an entirely
 4   wrong -- wrong opinion.  You basically don't understand.
 5       Q.   So were you up over 10 percent for the month over
 6   the previous June?
 7       A.   If he said so, then yes.
 8       Q.   You were more productive and --
 9       A.   No, we were up more.  Those are not the same
10   thing.
11       Q.   Was your gross revenue or gross income higher in
12   June 2020 than it was in --
13       A.   If Jeff said it was, it was.  It has nothing to
14   do with productivity.
15       Q.   So how much would you have had to have been up
16   for productivity to have gone up?
17       A.   We don't measure it that way.  We measure it by
18   what we get -- what we bill and what we can do to progress
19   the company, which we do every month.  Could we have done a
20   little bit more?  Did we -- okay, that -- by the way, that
21   revenue also includes credits, errors, assisting as
22   material gets thrown -- getting thrown away, errors that
23   don't get out to the customer -- they just disappear.  We
24   don't see them.  There's no accounting for that.  But as I
25   say, when we talk as managers walking around, what was
```

Page 187

```
 1   doing, the salespeople -- even I saw them -- were
 2   periodically, you know, talking on cells, worrying, some
 3   were more worried than others.
 4           How they spend their time matters.  If we're
 5   up -- we might have been up 20 percent if they had actually
 6   been concentrating on what they're doing.  So are you going
 7   to decide for me what's good and what's bad for Richmark?
 8   I don't think so.  Doesn't work that way.  And productivity
 9   doesn't either.
10           New accounts is the same.  When we sell them, it
11   happens over months and sometimes years.  If something
12   closes -- by the way, we have customers in all 50 states.
13   If something closes, then we get the sale, but we started
14   it two years or six months prior.  It happened to have
15   closed that and the salesperson sitting at his or her desk,
16   but it's not due to work necessarily that they did during
17   the month.
18       Q.   How many new accounts do you close, does Richmark
19   close in an average month?
20       A.   It can go from the twenties to once a year maybe
21   50.  So --
22       Q.   So 40's a good --
23       A.   40's a good month.
24       Q.   40's a good month, okay.
25       A.   40's a good month.  By the way, and the month
```

Page 188

```
 1   before could be 28 or after, and it won't have anything --
 2   much to do with what they actually did during the month.
 3       Q.   But you also don't know that it doesn't have
 4   anything to do with --
 5       A.   Yes, I do, because I know my business after 50
 6   years.
 7       Q.   What's the -- the decline in productivity -- did
 8   it contribute to any decline in sales?
 9           MR. WEAVER:  Objection.
10       A.   It's possible.
11   BY MR. CRAMER:
12       Q.   Do you have any evidence that it contributed to a
13   decline in sales?
14           MR. WEAVER:  Objection.
15       A.   No, but I can't prove that, had they been working
16   more, we wouldn't have done much better.  It goes both
17   ways.
18   BY MR. CRAMER:
19       Q.   And they were all working full time; right?
20       A.   They were in the building.
21       Q.   And were there any orders that didn't get
22   fulfilled in that time period?
23       A.   On time that shipped, as you saw, some did not go
24   out on the correct day; they went -- we have not provided
25   you -- it wasn't asked for -- how much overtime we worked
```

47 (Pages 185 to 188)

BILL DONNER
11/16/2021

Page 213

1  A.  I believe so.  It sounds familiar.  I'm not sure.
2      MR. CRAMER:  I don't have any other questions.
3      MR. WEAVER:  I don't have any questions.
4      THE VIDEOGRAPHER:  The time is 4:51 p.m.  We are
5  off the record.
6
7
8           (The deposition concluded at
9            4:51 p.m.)
10          (Signature was reserved.)

Page 214

1           SIGNATURE
2
3      I declare that I have read my within deposition,
4  taken on Tuesday, November 16, 2021, and the same is true
5  and correct save and except for changes and/or corrections,
6  if any, as indicated by me on the "CORRECTIONS" flyleaf
7  page hereof.
8      Signed in _____, Washington,
9  this _____ day of _____, 2021.
10
11
12
13
14         _____
15         BILL DONNER

Page 215

1           REPORTER'S CERTIFICATE
2
3      I, Mindy L. Suurs, the undersigned Certified Court
   Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations in and for the State of
   Washington, do hereby certify:
5
6      That the foregoing testimony of BILL DONNER was given
   before me at the time and place stated therein and
7  thereafter was transcribed under my direction;
8      That the sworn testimony and/or proceedings were by me
   stenographically recorded and transcribed under my
9  supervision, to the best of my ability;
10     That the foregoing transcript contains a full, true,
   and accurate record of all the sworn testimony and/or
11 proceedings given and occurring at the time and place
   stated in the transcript;
12
13     That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing
   but the truth;
14
15     That I am not a relative, employee, attorney, or
   counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
16 financially interested in the said action or the outcome
   thereof;
17
18 DATE: November 23, 2021
19
20
21
22
23         *Mindy L. Suurs*
           Mindy L. Suurs
24         Certified Court Reporter #2195
25

54 (Pages 213 to 215)

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)    834cc13c-c5d2-4cbd-8245-3b3bc0b4be28