1         UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                )
4                               )
     HUNTERS CAPITAL, LLC, a     )  C20-00983-TSZ
5    Washington limited liability)
     company, et al.,            )  Seattle, Washington
6                               )
                    Plaintiffs,  )  April 20, 2022
7                               )  10:04 a.m.
     v.                          )
8                               )  Motion for Class
     CITY OF SEATTLE,            )  Certification
9                               )
                    Defendant.   )
10   _____

11            VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE THOMAS S. ZILLY
12            UNITED STATES DISTRICT JUDGE

13   _____

14   APPEARANCES:

15     For the Plaintiffs:    ANGELO J. CALFO
                              TYLER S. WEAVER
16                            Calfo Eakes, LLP
                              1301 Second Ave., Ste. 2800
17                            Seattle, WA 98101

18
       For the Defendant:    TYLER L. FARMER
19                            ARTHUR W. HARRIGAN, JR.
                              Harrigan Leyh Farmer & Thomsen
20                            999 Third Avenue, Suite 4400
                              Seattle, WA 98104
21
                              JOSEPH G. GROSHONG
22                            Seattle City Attorney's Office
                              701 Fifth Avenue, Suite 2050
23                            Seattle, WA 98104

24        Proceedings stenographically reported and transcript
25            produced with computer-aided technology

1           I N D E X

2         April 20, 2022

3

4   PROCEEDING                                    PAGE

5   MOTION FOR CLASS CERTIFICATION
       Argument by Mr. Calfo........................    5
6      Argument by Mr. Farmer.......................   35
       Argument by Mr. Calfo........................   67
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

April 20, 2022

1                          *   *   *   *   *   *

2              THE COURT:  Would the clerk please call the calendar?

3              THE DEPUTY CLERK:  Thank you, Your Honor.  Case

4    Number CV20-983-TSZ, Hunters Capital, LLC, et al. versus City

5    of Seattle.

6         Counsel, please stand and make your appearances for the

7    record.

8              MR. CALFO:  Good morning, Your Honor.  Angelo Calfo

9    and Tyler Weaver on behalf of the plaintiffs.

10             THE COURT:  Good morning, Mr. Calfo.  Good morning,

11   Counsel.

12             MR. FARMER:  Good morning, Your Honor.  Art Harrigan,

13   from Harrigan Leyh Farmer & Thomsen, representing the City of

14   Seattle.

15             MR. FARMER:  Good morning, Your Honor.  Tyler Farmer,

16   of Harrigan Leyh firm, along with Joe Groshong on behalf of

17   City of Seattle.  We are also joined by our paralegal, Kellie

18   McDonald, and various colleagues.

19             THE COURT:  Good morning.

20        I am going to ask that presenters take their masks off

21   when they're presenting from the podium.  Given the nature of

22   the COVID crisis we've got, I'm going to ask everyone else to

23   keep their masks on during the course of the hearing.

24        This matter comes before the Court on the plaintiffs'

25   motion for class certification in this very interesting and

1    challenging case that we have before us.  I've entered two

2    minute orders recently that ask the lawyers to focus on

3    certain things.

4        The first minute order, Docket Number 90, asks some

5    specific questions of the plaintiffs dealing particularly

6    with named plaintiffs who are outside the class area that's

7    being proposed to be certified and asking about specific

8    plaintiffs in that regard.  I also asked the parties to focus

9    on commonality and typicality requirements of Rule 23(a), and

10   finally, I asked the parties to address how we manage this

11   case if I deny class certification.

12       We entered a second minute order just a couple of days ago

13   asking you to be sure to read and be ready to talk about the

14   Ninth Circuit case in *Olean v. Bumble Bee Foods*, because it's

15   hot off the press from the Ninth Circuit, and it pretty much

16   tells us the landscape with respect to class certifications.

17   I also ask you in the minute order recently to talk about the

18   predominance requirement of 23(c)(4), and finally, how should

19   we manage this case if we do certify a class on particular

20   issues, because case management is obviously a very important

21   issue for the Court to determine.  This is a complicated,

22   involved case with lots of issues, and so I think it's

23   necessary and certainly will be helpful to me if you can

24   address the management issues, whether or not I certify a

25   class.

1      All right.  It's the motion of the plaintiff to certify,

2  so I'm going to permit the plaintiff to go first and last.

3  I'm going to suggest a time limit of not more than an hour

4  per side.  Plaintiff can reserve whatever they wish.  As the

5  lawyers know, I ask a lot of questions during oral argument,

6  so your time may be used up with some questions from time to

7  time, but plaintiff may proceed.

8      Mr. Calfo, I haven't seen you for a long time.  You used

9  to come into this court on a regular basis.  Welcome back.

10          MR. CALFO:  Yes, Your Honor.  I had to look around

11  and find out where I could get to your courthouse, but I

12  remember, it used to be at the old courthouse, I recall.

13          THE COURT:  Right.

14          MR. CALFO:  That was a lot easier for me to get to.

15      Your Honor, Angelo Calfo on behalf of plaintiffs.  I

16  wanted to give the Court an idea of what I plan to do during

17  my argument to begin with.  I'm going to start with a

18  discussion, a brief discussion, of the facts, of the

19  foundational facts that I think give rise to our meritorious

20  request to the Court that it certify certain issues in this

21  case for class treatment.  Then I'm going to go directly to

22  the Court's minute orders, because I know these are the

23  things that the Court has on its mind, and I am going to

24  address each of them.

25      Following that, Your Honor, if there are any cleanup

1   issues -- I have a couple of things I want to address, but

2   I'll clean up at the end of that.  I doubt I'll take an hour,

3   Your Honor, but who knows?  Maybe, with the questions, I'll

4   end up at that time.  I always say I am going to take less

5   time than I do, as you know, Your Honor.

6        So, Your Honor, this is a case about City policy.  It's a

7   case about a course of conduct by the City.  That's really

8   important to this issue of class sort of issues.  It was that

9   course of conduct and it was that policy that led to,

10  essentially, a takeover of a 16-block area of Capitol Hill, a

11  takeover that was facilitated by the City.

12       And what kind of effects did that takeover have?  Well, we

13  know it resulted in the blocking of public access to streets,

14  blocking of access to private property, to a park, to

15  sidewalks.  We know that it resulted in a lack of public

16  safety.  We know that the takeover occupants had their own

17  security force, and the City essentially ceded security to

18  this group.  They did not respond to requests from residents,

19  property owners, and businesses in this area to reports of

20  violence.  The chief of police talked about rapes and

21  robberies and assaults that went unresponded to.

22       Your Honor, that's why the City's conduct harmed thousands

23  of residents, businesses, and property owners.  We've

24  estimated there's about 5,000 members of the class, and we've

25  also identified, I think, Your Honor, the types of harm that

1    resulted from what the City did in our papers.

2         Now, when it comes to City policy, Your Honor, I don't

3    think there's a mystery here.  The City laid out its policy

4    in writing.  It laid out its policy in statements from the

5    Mayor, from the police chief and the fire chief.

6         And I point the Court, in particular, to Exhibit 7 of the

7    Weaver declaration on our motion.  This is the emergency

8    order that the City issued in July of 2020.  And in terms of

9    describing what happened here and what the City's policy was

10   and how it facilitated the occupation, I couldn't have

11   written it better myself.  They used the word "facilitation."

12   They used the words, "We blocked access to public streets,"

13   "We didn't respond to public safety reports from the area."

14   They detail in every way the way they facilitated the

15   occupation by providing hygenic materials, by providing

16   barriers to allow -- to block access to public property and

17   rights-of-way and a variety of other things that they did,

18   Your Honor.  It's all right there in Exhibit 7, and this has

19   nothing to do with any plaintiffs.  This has entirely to do

20   with the conduct of the City and its policies.

21        Your Honor, the City's also admitted that it caused

22   widespread damage to the residents of this neighborhood.  We

23   don't have to look any farther than the police chief.  The

24   police chief's statement on July 1st of 2020 talks about how

25   she walked around the area, and I was taken by her own

1    description and how important it is to the facts of this case

2    and this class motion.  She says, when she walked through,

3    she was absolutely -- she saw absolute devastation,

4    devastating damage to the neighborhood.  She was stunned --

5    stunned -- by the amount of graffiti, garbage, and property

6    destruction.  These are her words.  She said, "We don't even

7    know how much trauma people were experiencing."

8        So, Your Honor, what we have is the existence of policies

9    that are provable independent of anything that any plaintiff

10   did, and we have the admission of harm to the class from the

11   police chief, herself.  I mean, this is just -- these are

12   just examples, Your Honor.  There's a lot of other evidence

13   that we've adduced and put into our motion papers that show

14   the existence of policy, the existence of facilitation, the

15   existence of harm.

16       Your Honor, on the plaintiffs' side, we've presented

17   evidence from -- in the form of narratives from the named

18   plaintiffs.  This is a wide group of -- or a diverse group, I

19   should say, of named plaintiffs.  They include people who

20   resided in the area; they include people who are business

21   owners; they include property owners.  I mean, you read these

22   narratives, Your Honor --

23           THE COURT:  Well, take a moment and answer one of the

24   questions I asked about what your position would be with

25   respect to plaintiffs outside the class area that you have

April 20, 2022

1   designated.  There are about six or seven of them.  How do

2   they fit into this puzzle?  Are they going to just be

3   separate plaintiffs, the Dunn Motors Building, the Greenus

4   Building, the Colman Building, the Madrona Real Estate

5   Investors transactions?  Some of these buildings are several

6   blocks away from your class area.  What are we doing with

7   those?

8          MR. CALFO:  Your Honor, I'm going to submit to Your

9   Honor that this is not a complicated problem and it can be

10  solved pretty easily.  Just to set the stage, Your Honor,

11  what the -- there are three plaintiffs that are not members

12  of the proposed class or named class members.  That's Madrona

13  Real Estate Investors IV, Madrona Real Estate Investors VI,

14  and the Greenus Building, so they are plaintiffs, and they

15  aren't members of the proposed class.  That's three

16  plaintiffs.  Your Honor --

17         THE COURT:  I'm sorry, Madrona VI, the Greenus

18  Building, and what was the other one?

19         MR. CALFO:  Madrona IV, Your Honor.

20      So you have those three.  And then you have named

21  plaintiff capital -- Hunters Capital that had buildings --

22  they had buildings inside the area, and they had buildings

23  outside the area.  The buildings outside the area are Dunn

24  Motors, Greenus, and Colman, and Redside has a building at

25  1323 Pine, which is outside the area.

1      So the question is, what do we do -- if the Court were to

2   certify these questions, what do we do with these plaintiffs

3   at trial?  And we submit, Your Honor, that these plaintiffs

4   can go forward at the same time as the class plaintiffs, and

5   the reason is, is that there's complete overlap between what

6   they have to prove at this upcoming trial and what the class

7   members have to prove.  They have to prove the City policy;

8   they have to prove the course of conduct; they have to prove

9   all the common questions that we've listed in our Exhibit 1

10  to our motion.

11      THE COURT:  Well, then, let me ask you a different

12  question, related.

13      MR. CALFO:  Yes.

14      THE COURT:  Why isn't the class area that you're

15  proposing larger than -- how do you draw a line as you've

16  proposed?  What about the people in the next block or the

17  block after that?  A couple of these are five, six blocks

18  away.  The Colman Building is the furthest away.  How do you

19  rationalize drawing these lines in such an arbitrary way?

20      MR. CALFO:  Well, Your Honor, we didn't do it in an

21  arbitrary way, with all respect.  I think what we did was we

22  took the City's definition of the zone and we applied it to

23  the class.  This is what the City said the CHOP neighborhood

24  was in its emergency order and in other promulgations, and we

25  felt that in order to -- you know, in defining the class in

1    the way that best fits the case, that it would be appropriate

2    to use the City's definition.  And I, again, would point to

3    Exhibit 7, which is the emergency order that references that

4    specifically, but there's a lot of other evidence where this

5    is what the City said the zone is that they facilitated.

6        So I would say, Your Honor, you know, the Court has the

7    discretion to widen the barrier.  We don't think that's the

8    right thing to do.  We think it might be better, Your Honor,

9    in this instance, to allow all the claims to go forward at

10   the same time, because I think there's substantial overlap of

11   issues.

12       Another option, if the Court's concerned about that, would

13   be to bifurcate those issues out.  We don't think that's

14   necessary.  We think it would be more efficient to just try

15   them at the same time.  I don't think it's a burden to the

16   class members.  It's not a conflict.  I don't think it's a

17   significant burden to the City once the class is certified.

18       So, I mean, these folks outside the area are going to have

19   a different damage claim, because they're going to have to

20   show that the effects inside the area also affected them

21   outside, but any claim outside the area is going to have to

22   include evidence of what was going on inside the area anyway,

23   so there's really no difference in proof when it comes to --

24   if these folks were to bring their own claims individually,

25   they're going to end up having to bring in evidence of what

1   was going on in the area defined by the City as "CHOP."

2          THE COURT:  Well, another alternative, of course,

3   would be, assuming there was a class case, to make it the Red

4   Zone, which is a slightly different and less of an area than

5   your proposed class.  What would be your views on that?

6          MR. CALFO:  Well, Your Honor, again, I think the

7   evidence tends to show that where the obstruction was with

8   respect to public rights-of-way, where the impact was in

9   terms of economic harm and other kinds of harm was in the

10  zone defined by the City as the "CHOP."  This was the zone

11  where there was limited public safety response or no response

12  at all and where there was, over time, blocking of public

13  rights-of-way and blocking of private property.

14     So we think that -- our basic premise is, Your Honor, we

15  think it's best to use the definition that the City used for

16  the CHOP neighborhood for what it facilitated, for where it

17  says the harm occurred; for example, Police Chief Best's

18  statements and those kinds of things.  It seems to match up

19  best with our proof when it comes to harm and facilitation.

20         THE COURT:  All right.  Go ahead.

21         MR. CALFO:  Your Honor, I was talking about the

22  City's admissions and talking about the City's policy and its

23  admission as to its policy and the harm to the people in the

24  class and the narratives that we presented from each of the

25  plaintiffs that talk about the harm they experienced.

1    Now, another thing we did here, Your Honor, is we

2    submitted the declaration of Rich Fox.  He was the owner of

3    Poquitos.  And I want to point that out in particular,

4    because the City, in its opposition, made Mr. Fox the poster

5    child of class members that didn't support this lawsuit and

6    who believe there was little business impact to the

7    neighborhood resulting from CHOP.

8        Your Honor, when you look -- we went out and talked to

9    Mr. Fox after the City pointed him out.  We obtained the

10   declaration that's there, and he describes a chaotic and

11   threatening environment.  He describes men walking around

12   with machine guns strapped to their backs, extensive damage

13   to property, the need to close his restaurant because of the

14   unsafe environment, extortion of businesses.  This is the

15   person that they picked out as the one who's going to show

16   that there's diversion between the class members and the

17   plaintiffs, and this just didn't bear out, Your Honor, so I

18   think that's worth pointing out.

19       Your Honor, finally, on the facts, the text issue.  What

20   we have discovered in the course of discovery is that the

21   Mayor, the police chief, the fire chief, and many other heads

22   of the police department destroyed all their texts related to

23   this time period.  I mean, it's astounding.  They've all got

24   silly and inconsistent stories about how it happened, but

25   you've got a course of conduct here where these texts are

1    missing.

2             THE COURT:  Do you know of any case that has

3    certified a class issue dealing with a discovery matter or an

4    evidentiary issue?

5             MR. CALFO:  Yes, Your Honor.

6             THE COURT:  What would be your case or cases that

7    would support making that an issue, a class issue?

8             MR. CALFO:  Your Honor, the *Olean* case, I think, is

9    probably the best case to look at.

10            THE COURT:  It's certainly the most recent, isn't it?

11            MR. CALFO:  It is, Your Honor.

12            THE COURT:  I'm sure that all the lawyers saw that

13   case immediately when it came out last week, but to be sure

14   all of you were familiar with it, we made that sure by the

15   minute order.  I think that *Olean* helps you with that.

16       Isn't the problem or the issue with respect to these

17   missing texts that the solution is perhaps going to be some

18   sort of spoliation ruling or instruction, but that doesn't

19   move the needle forward one bit with respect to the merits of

20   all of these issues that you've also teed up.  I don't see an

21   evidentiary issue like that being a class question or a

22   reason to certify or not certify a class.  So show me in

23   *Olean* how you think that issue would be a class issue.

24            MR. CALFO:  Well, Your Honor, I think what I'm

25   thinking of is that what they say in *Olean* is that the common

1    issues don't have to relate to an element of the cause of

2    action, and they -- *Olean* makes the -- gives an example of a

3    wage-and-hour class action where there's a question about how

4    much time a worker spent donning on and off his equipment,

5    and what the court said was that was a perfectly appropriate

6    class factual issue to certify under 23(c)(4).

7          And I guess what I -- what I'd submit to Your Honor is

8    that the Court could, similarly, just like *Olean* suggested

9    you could, is certify this factual issue about what it is the

10   City did.  What were the circumstances surrounding the

11   deletion of these texts, and what should be the sanction that

12   results from that?

13              THE COURT:  Well, but it also -- the *Olean* court says

14   that a common question will resolve an issue that's central

15   to the validity of each one of the claims in one stroke,

16   citing *Wal-Mart*.

17         How would the text issue resolve a central issue with

18   respect to each of the different claims?  You've got a

19   procedural due process, a substantive due process, a taking,

20   a negligence, and a nuisance claim.  All of them have

21   different elements.  How would this particular issue

22   essentially move the ball forward with respect to all of

23   those claims?

24              MR. CALFO:  Well, Your Honor, it depends on the

25   Court's -- the outcome.  So if the outcome is that the Court

1    finds that it's going to issue a sanction against the City on

2    liability, it will advance the case.  Your Honor, you're

3    going to be pretty shocked when you hear what we're finding

4    when it comes to the deletion of these texts.

5              THE COURT:  Give me a two-minute heads-up.

6              MR. CALFO:  Well, Your Honor, the Mayor, in her

7    deposition, said that she lost -- the texts were lost because

8    she was walking on the beach on July 4th and dropped her

9    phone into the water, and somehow that resulted in the phone

10   going, you know, haywire.  But then, somehow, she took the

11   phone back to her home and was able to go onto an iCloud

12   platform, and she deleted the backup at that time of all of

13   her texts from the relevant time period and replaced it with

14   an older backup.

15     We then talked to the technicians at the City who were

16   involved in managing the phone after it allegedly went into

17   the water, and the technicians in the City were never told by

18   the Mayor that the phone went into the water or that the

19   water had anything to do with the deletion of the texts or

20   the phone not working.

21     They also said -- the technicians -- that had the Mayor

22   told them that at or about the time the texts were missing,

23   they could have recovered the texts.  I mean, I don't know,

24   Your Honor, I mean, that's -- then, okay, so the Mayor's

25   texts are all gone.

1    Then, the fire chief says, after we sent our letter to the

2    City, on the day we filed the Complaint, and we said,

3    "Preserve the texts."  I'm not joking, Your Honor.  Exact

4    words:  "Preserve the texts of the Mayor, the fire chief, and

5    the police chief."  That simple.  And months after we sent

6    that letter, the fire chief goes into the Apple store and has

7    his phone reset.

8        How about the police chief?  The police chief says her

9    texts are all missing, too.  Why did that happen?  Well, the

10   police chief says she -- when she turned her phones in, the

11   texts were there.  When she turned her phones in to the City

12   after she left, the texts were there.  She may have deleted a

13   few texts here and there, yeah, but she had no explanation

14   for what happened to the texts between the time they were

15   submitted on her resignation until the time we obtained them.

16       I mean, it's outrageous, really.  And you know, there's a

17   series of other police officers, you know, high up in the

18   police department that also had missing texts from the time

19   period.  We don't have their texts from the whole period of

20   time from CHOP.

21       I mean, Your Honor, you know I was a prosecutor for a long

22   time.  I can tell you --

23           THE COURT:  I do remember that, Mr. Calfo.

24           MR. CALFO:  -- I don't -- I never saw a destruction

25   of evidence of this nature when I was a criminal prosecutor.

1   So I told -- and I've said this -- I'm going to get to the

2   bottom of it, and we have.  We've hired an expert.  The

3   report is currently in the hands of the City.  I haven't even

4   had a chance to look at it yet, but that expert has taken a

5   look at what the City did to investigate that.  It issued the

6   most vanilla, milk-toast report on what happened to these

7   things, but our expert has that report, analyzed it, analyzed

8   the phones, and another report will be coming out after the

9   City reviews it for privilege.  And I think -- you know, I

10  don't know what's going to happen, but based on the

11  coincidences and the circumstances, I suspect we're going to

12  get some really interesting information from our review of

13  the phones.

14          THE COURT:  Would that review -- one of the questions

15  I have, a lot of the -- you've teed up almost 30 different

16  questions that you say are common.  I have dealt with many of

17  them, but are there some that should be teed up in the motion

18  practice before we decide class certification?

19          MR. CALFO:  Oh, yeah, Your Honor, I think, if the

20  issues are certified, we intend to move on several of them.

21          THE COURT:  Well, as a practical matter, Mr. Calfo,

22  whether or not the case is certified as a class, if you move

23  and if I decide on some of these issues as you would hope I

24  would, the City's bound and everyone who's got a claim would

25  have the benefit of that ruling; would they not?

1          MR. CALFO:  The same in *Olean*, Your Honor.

2          THE COURT:  Well, what's the difference?

3          MR. CALFO:  Well, what I'm saying is that, in *Olean*,

4     the same would be true.  If the named plaintiffs went to

5     trial and they got a favorable verdict, then all of the other

6     indirect and direct purchasers would be able to use that,

7     wouldn't they?  So, I mean, it sort of undermines the entire

8     concept of the class to rely on collateral estoppel.

9          The other side of it is, if we lose, from the Court's

10    perspective and the City's perspective, then those class

11    members' claims are cut off, and this is one of the reasons

12    why we have the class action vehicle, is because it can both

13    benefit the class members and it can also benefit the Court

14    in terms of judicial efficiency.  It can benefit the

15    defendant in order to have class claims resolved to their

16    favor as opposed to dealing with a bunch of individualized

17    claims.

18          THE COURT:  Let me ask you this:  You, as I've

19    indicated, described or listed approximately 30 of these

20    different questions.  What if I were to conclude that there

21    were a handful of issues that would move the case forward in

22    a sense that would, perhaps, justify class certification with

23    respect to those issues --

24          MR. CALFO:  Yes, Your Honor.

25          THE COURT:  -- but that there were another 25 or so

1    questions which would not be certified.  The *Olean* case has

2    some language in it, and I want to read it to you and ask you

3    what you think.

4          MR. CALFO:  Yes, Your Honor.

5          THE COURT:  But it says -- I'm on page 6 of my

6    Westlaw's printout, but it's at II, A, second paragraph.  "A

7    common question must be of such a nature that it is capable

8    of classwide resolution -- which means that determination of

9    its truth or falsity will resolve an issue that is central to

10   the validity of each one of the claims in one stroke."

11        And then, on the next page, it goes on and says, "By

12   contrast, an individual question is one where members of the

13   proposed class will need to present evidence that varies from

14   members to members."  Setting aside this cell phone problem

15   and the texts, aren't most of the issues that you've

16   attempted to describe as questions common to the case really

17   individual questions where evidence will vary from member to

18   member?

19        In other words, take your due-process claim or your taking

20   claim.  I mean, the interference is clearly different from

21   plaintiff to plaintiff, and if we had a class, it would be

22   individual to everyone in the class; would it not?

23         MR. CALFO:  Your Honor, I don't think so.

24         THE COURT:  Why not?

25         MR. CALFO:  Well, first of all, let me just, as a

1    background --

2            THE COURT:  Let me ask first.

3            MR. CALFO:  Yes.

4            THE COURT:  If I concluded -- I realize you have a

5    different view.

6            MR. CALFO:  Yes, Your Honor.

7            THE COURT:  But if I concluded there's a handful of

8    questions that could be certified, but there are many others

9    that you've proposed which I could not certify, does that

10   prevent class certification, or can I move forward with a

11   limited number of these questions?

12           MR. CALFO:  Yes, Your Honor.  Let me answer that

13   question directly.  It's really raising a predominance issue,

14   it sounds like, to me.  And this is a really important point

15   for our motion, really important, and that is the holding in

16   *Valentino* that was affirmed by *Olean*, and that is, when you

17   look at predominance, the issue of predominance in a 23(c)(4)

18   case, you only look at predominance as to the particular

19   issue that is being certified.

20       So the answer to your question is, yes, if the Court found

21   one issue in here that was common to the class and would

22   advance the litigation, it should certify it whether or not

23   it certifies the other two dozen, because that's what the

24   Court -- that's what the law is under the Ninth Circuit.

25           THE COURT:  You've listed lots of questions you want

1    me to certify.  What do you think your four or five strongest

2    questions are?

3              MR. CALFO:  Well, Your Honor, just as a general

4    matter, what we tried to do in every instance was focus on

5    questions that had entirely to do with the City's policy and

6    course of conduct, because that's what we're focusing on.

7    And if we agree with you, Your Honor, if we start getting

8    into the conduct of individuals, harm to individuals, we're

9    talking about the damages phase.  And *Olean*, of course, says,

10   you can deal with liability issues and damages later.

11        And I will submit to Your Honor that the variations that

12   you're referencing all go to damages, but to answer the

13   Court's question -- and I think it would be hard for me to do

14   that in a way, because I'm picking and choosing among my

15   own -- you're making me negotiate against myself.  But let's

16   just take -- let's just take the third cause of action to

17   start with.  This is the takings clause action.  Now, Your

18   Honor, I think really important on this one is that we are

19   seeking a ruling that the City's actions constituted a per se

20   taking of rights of the members of the subclasses.

21        So we're not asking you -- and we are not going to ask the

22   jury -- for class purposes, to look at individual takings

23   that may have occurred.  We have cited the Supreme Court case

24   in our briefing where the Court says that if an organization

25   or if the government institutes a policy that gives the

1    opportunity for third parties to invade the private property

2    rights of the plaintiff, that is a taking.

3        Now, the City may disagree with our interpretation of the

4    law, but that just makes it more of a common question.

5    That's just an issue that can be resolved on a class basis

6    whether our per se taking theory is valid.

7            THE COURT:  Would that taking theory also require us

8    to look at -- is a temporary interference with one's property

9    or access always a taking under the Constitution?

10           MR. CALFO:  Under this case, Your Honor, it's a per

11   se taking, and we're entitled to nominal damages.

12           THE COURT:  When you say "this case," what case are

13   you referring to?

14           MR. CALFO:  Well, Your Honor, I can -- let me give

15   you the case.  One second.  I can get that case for you, Your

16   Honor.  It's cited in our briefings.

17           THE COURT:  Perhaps on your rebuttal you can give me

18   the cite.

19           MR. CALFO:  Yes, Your Honor, thank you.  But that's

20   an example.

21       The other issue on that same thing is, was the taking

22   justified because of an emergency, and this is an issue that

23   the City raises with respect to a number of our causes of

24   action that we are seeking -- the issues that we're seeking

25   to certify.  And this is where I think *Olean* is also very

1    instructive, Your Honor, because what I think *Olean* said is

2    that, look, plaintiffs can raise a classwide issue, and the

3    Court may think it's not that strong, you know, or they won't

4    prevail, and the City may come up with its own conclusion or

5    rebuttal to that theory, but the fact -- it isn't a question

6    of the validity of the claim.  The issue is whether or not

7    the resolution of it will advance the litigation as to that

8    common question.

9          So, when it comes to whether or not what the City did here

10   was justified either as an emergency under our takings

11   theory, our per se takings theory, or under our substantive

12   due process theory where they also claim that what they did

13   was justified, that's an issue that can be resolved on a

14   classwide basis.  And that's going to really advance the

15   litigation for all the class members, because if this jury

16   were to find that the City did act in a way that its policy

17   was a per se taking and if the jury were to find that their

18   emergency justification was invalid, well, then, you've

19   really -- all you've got is damages left, essentially, at

20   that point and individual damage claims as to the extent of

21   deprivation.

22         So that's an example, Your Honor.  And I think, again,

23   we're focused entirely on the conduct of the City and its

24   City policy and the City's arguments justifying its behavior.

25   Those are all things that have nothing to do with variations

1 in the class or personal experiences of plaintiffs or class

2 members.

3      Another --

4      THE COURT:  And help me understand your per se

5 argument or what you're saying is a per se violation.

6      MR. CALFO:  The example -- the case that I cited --

7 and it's called *Cedar Point*, Your Honor -- that case involved

8 a situation where the government required -- I mean required

9 a defendant to allow union representatives to come onto its

10 property to advocate for the union.  The court found that was

11 a per se taking, because there was a policy initiated by a

12 government agency that permitted -- that allowed -- the

13 deprivation of property, and that case found that it was a

14 per se taking.

15      We think that's very much like the situation here where

16 the City has admitted that it's facilitating, encouraging,

17 aiding in the takeover of this zone in a manner just like

18 the union representatives going onto someone's private

19 property, which is a far less impactful type of taking

20 than --

21      THE COURT:  But that case -- that one issue was

22 really dispositive of the case; was it not?  In other words,

23 whether or not the regulation or the ruling that allowed the

24 union organizer to go on the plaintiffs' property was or was

25 not a taking.  That seems, to me, a fairly limited issue.

 1    How does it apply in this case?

 2            MR. CALFO:  Well, Your Honor, I think it's directly

 3    analogous, because just like the union individuals that were

 4    going on the property and -- you know, they were permitted by

 5    policy of the government to go onto the property.  Here,

 6    you've got the City facilitating a large group of individuals

 7    to occupy an area to the detriment of the property rights of

 8    everybody inside the zone.  I mean, I think it's directly

 9    analogous.

10        And again, Your Honor, I just want to emphasize that

11    whether you think our argument is good or bad, it's common.

12    If you resolve that issue against us, it's common.  If you

13    resolve that issue in our favor, or if the jury does, it

14    advances the litigation on the takings theory.

15        There may be other takings theories that are presented,

16    but this is the one that we're seeking to certify, because it

17    does not -- it doesn't depend on variations of experiences of

18    class members, and that's why we think it's a common question

19    that can be certified under 23(c)(4).

20        You know, another example, Your Honor, is to look at the

21    substantive due process claim.  We ask you to certify, "Did

22    the City's affirmative actions or statements create or expose

23    the class to an actual particularized danger the class would

24    not have otherwise faced?"  And as the Court said in its

25    order on the motion to dismiss, it thought that, sure, I can

1  understand how that would be a common question, and indeed,

2  our evidence has shown that it is.  You know, when you're

3  talking about the particularized dangers, you're talking

4  about types of dangers.  You're not talking about individual

5  experiences.  The City's affirmative actions and statements

6  led to taking -- you know, the loss of property rights,

7  economic loss, business interruption, emotional trauma.

8  These are all types of harms that the City's conduct, as

9  expressed in this particular issue, caused.

10      Another one, Your Honor:  "Was the City deliberately

11  indifferent to the known dangers?"  There is no issue

12  relating to any individual plaintiff that is going to bear on

13  that common issue, and that is, "Was the City deliberately

14  indifferent to the known dangers?"  No plaintiff can say a

15  thing.  No plaintiff's experience is going to change whether

16  or not the City was deliberately indifferent.

17      The same is true with foreseeability, Your Honor.  You

18  have an email from the Mayor -- an email from the Mayor --

19  where she says, at the outset, I told you, fire chief and

20  police chief, that if you don't have to let public safety

21  agencies respond to that area, this kind of action -- that

22  was a homicide -- are foreseeable and preventable.  Her

23  words.

24      Now, what evidence can the plaintiffs shed on that issue?

25  It's all the Mayor.  She said it.  She admitted it.  And

1    there's other evidence just like it.  We'll show deliberate

2    indifference from the City's conduct that has nothing to

3    do -- we'll show foreseeability from the City's conduct and

4    their state of mind and what they contemplated.  Nothing to

5    do with any plaintiff.  That's why these are common questions

6    that 23(c)(4), I think, contemplates can be certified.  And

7    they'll give the Court and future class members, if we're

8    successful, the ability to use that liability finding -- and

9    we think there will be one -- to obtain compensation they

10   wouldn't otherwise be able to obtain but for the class

11   vehicle.

12        "Were the City's actions and statements pursuant to

13   policy?"  Your Honor, that's our fourth one under substantive

14   due process.  Again, this relates entirely to City conduct.

15   It relates entirely to evidence of what the City did or

16   didn't do.  Did they have a policy?  Well, look at Exhibit 7,

17   the City's emergency order.  I couldn't -- as I mentioned,

18   Your Honor, I don't think the policy could be any more

19   clearly laid out than the Mayor and the City did itself in

20   that document.

21        And then, of course, the last one under nominal damages,

22   that's clearly a --

23             THE COURT:  Well, I mean, you list that as the

24   nominal damages issue, but if you recover under a 1983 claim,

25   doesn't the law say you get nominal damages if you can't

```
1    prove actual damages?
2             MR. CALFO:  Yes, Your Honor.
3             THE COURT:  I mean, there's nothing to talk about
4    there, is there?  Why would I certify such an issue?
5             MR. CALFO:  Well, Your Honor, because then the case
6    will be over as to that issue and it won't matter whether or
7    not there are actual damages, or not.
8             THE COURT:  But why would I certify an issue that I
9    don't imagine that the City is going to have a different view
10   of?  Isn't the law clear that if you establish liability, but
11   you can't -- some of your clients can't establish actual
12   damages, they get nominal damages?  Is that the law or not?
13            MR. CALFO:  I believe it is, Your Honor.
14            THE COURT:  Well, then, why would we certify that as
15   a common question?
16            MR. CALFO:  Well, because it is, but, Your Honor, you
17   know what?  I'm not going to die on the mountain for that
18   issue, okay?  Let's look at the first four.  I mean, it's
19   pretty clear.  If you don't like nominal damages, just cut it
20   out, but I don't think it harms anybody, but I do think the
21   first four issues that are referenced in the substantive due
22   process claim all relate to the City's conduct and are
23   certifiable under 23(c)(4).
24        Your Honor, I think the same is true with respect to these
25   other issues.  You know, just as a general statement, Your
```

1    Honor, there's almost a concern raised that we have so many

2    issues that we're trying to certify, but in a sense, the

3    larger the number of issues that can be certified as a common

4    question, the greater the advancement in the litigation.  So,

5    I mean, the desire to identify all of the common issues that

6    can advance the litigation I think is a positive.

7         And I think what I'd ask the Court to do is, as it looks

8    at these questions, it asks -- the Court asks, "Does it

9    really matter what a plaintiff experienced or not for me to

10   be able to answer that?"  Because that's what -- that seems

11   to be the focus of the City.  Well, we don't know what --

12   this person says this, and this person says that.  Well,

13   fine.  It doesn't really matter, because we're talking about

14   the City's policy; we're talking about whether the City was

15   deliberately indifferent; we're talking about whether the

16   City foresaw the danger; we're talking about whether there

17   was a per se taking; we're talking about whether the City's

18   conduct blocked right-of-ways, not having anything to do with

19   the plaintiffs.

20             THE COURT:  Take a moment to tell me how you would

21   manage the case if I certify a class and how long that trial

22   would take on liability, because damages would be bifurcated,

23   presumably.  And if I did not certify a class, what are we

24   talking about?

25             MR. CALFO:  Well, Your Honor, if you do certify a

1    class, we intend to go to summary judgment, and we'll further

2    narrow the issues for trial.  And then there will be common

3    questions to present to the jury for the named plaintiffs,

4    and we submit the Court should hold a trial on damages at

5    that same time.

6        So what you are going to get as a result of that is an

7    enormous advancement in the litigation.  You're going to get

8    jury verdicts on all the common questions, and you're going

9    to get the reaction of the jury in terms of damages as to

10   residents, as to business owners, and as to property owners.

11   And that's going to inform the Court on how it's going to

12   conduct further damages trials, because we're going to be

13   able to find out how much the damages are, what kinds of

14   proof is going to be required, and the like.  So the Court

15   may decide after we win on the first trial that we can try 50

16   residents at a time.  I don't -- you know, it just depends on

17   how the proof comes out.

18       The other important thing, Your Honor, is that -- and this

19   is recognized in the case law -- it's going to be a

20   bellwether trial to determine what the damages are likely to

21   be.

22            THE COURT:  And how long is this bellwether trial

23   going to take?

24            MR. CALFO:  Well, Your Honor, I don't think it's

25   going to take that long, to tell you the truth.  I mean --

April 20, 2022

1            THE COURT:  Well, that's not helpful.

2            MR. CALFO:  Well, we're not talking about a

3    three-month trial.  I think we've estimated four weeks.

4        Your Honor, you know, a lot of these issues, I think --

5    we're not going to overtry this case.  A lot of this comes

6    right out of the mouth of the City, and we're going to focus

7    on damages.  The City has spent all of its time in discovery

8    picking apart our clients' damage claims.  I mean, they

9    raised -- it's one of the reasons not to certify the class,

10   is because their clients have huge damages claims on the one

11   hand, and on the other, their position is, we don't have any

12   damages.  So, I mean, they're focused on damages.

13       The question is going to be whether, for businesses, for

14   example, it was COVID or whether it was CHOP.  We think we're

15   going to prevail on that issue.  There are questions about

16   individual experiences in the CHOP that are going to have to

17   be sorted out, but like I said, Your Honor, I think it would

18   be a four-week trial.

19       But our goal, Your Honor, is once that trial is done, I

20   think the Court can -- we can regroup, and we can figure out

21   how to deal with the rest of the class claims.  Some

22   claimants may not want a trial or want to make further

23   claims, but when we get the additional claims, we can figure

24   out how many more people there are to address and how we're

25   going to best resolve them.

1      And I guess I'd point back to *Olean*.  Imagine what the

2  damage phase of those trials are going to be like if it goes

3  to trial.  That didn't prevent the Ninth Circuit, en banc,

4  from saying this is a good way of managing a class action.

5          THE COURT:  But the issue there was fairly

6  straightforward.  There were three different classes in

7  *Olean*, but they really all focused on the expert witness

8  testimony and what would be believed in terms of antitrust

9  influence, if you will, whether there was a conspiracy or

10  not.  It's a fairly clean, simple case compared to your

11  claim, which involves three different classes, you say -- I

12  want to ask you about that in a minute -- but really

13  separate, diverse claims.  It seems to me it's a much more

14  complex case, this one.

15          MR. CALFO:  I'm not sure, Your Honor, because when I

16  read the -- first of all, we don't know all the facts from

17  the opinion.  I want to look at the complexity of it as it's

18  presented, but I notice, for example, that the defendants

19  were saying, look, these larger companies can negotiate down

20  prices, and they have a -- there's a different damage theory

21  with respect to them.  And I'm sure there would be lots of

22  other variations with respect to -- depending on the size of

23  the purchaser and the nature of their claims.

24          THE COURT:  So let me ask you this about your various

25  classes that you've outlined.  In your plaintiffs' statement

```
 1   of common issues filed at Docket 66-1, you list all of those
 2   common issues, but you don't explain why you need subclasses,
 3   because in each instance, you describe -- for example,
 4   procedural due process, you say it applies to all three
 5   subclasses.  And then, the substantive, you say "entire
 6   class," and you either say "all three subclasses" or "entire
 7   classes," so my question:  Why would we need more than one
 8   class?
 9           MR. CALFO:  That's a good question, Your Honor.  I
10   think the idea was to identify the different types of harm
11   that these folks suffered, and you'll notice that one of the
12   things we did is identified whether the subclasses under the
13   third cause of action are entitled to nominal damages.  But
14   if the Court is not going to certify that, it's not necessary
15   for --
16           THE COURT:  Well, I'm just trying to understand
17   why -- if I certify a class, what would be the benefit or the
18   need to certify subclasses?  Isn't that making it more
19   complicated?
20           MR. CALFO:  Well, Your Honor, I think it's really for
21   purposes of the follow-on trials.  You are going to have
22   subclasses of people that have different types of harm.
23           THE COURT:  That would be the damage part.  We could
24   certainly bifurcate, ultimately, in some way, but with
25   respect to liability, it seems to me that all of these
```

1   plaintiffs and everyone in your proposed class, or some area,

2   have got -- there's no difference in terms of the issues

3   you've raised.

4           MR. CALFO:  Well, Your Honor, I'm in favor of getting

5   from point A to point B in the best way possible, and if the

6   Court thinks you don't need the subclasses to certify, I'm

7   fine with that.  I think we were thinking that, to address

8   questions of variations among the class when it comes to

9   takings and procedural due process, that it might be helpful

10  to distinguish between the types of harm these different

11  folks suffered, but again --

12          THE COURT:  All right.  You've got about 10 minutes

13  left.  Do you want to reserve?

14          MR. CALFO:  I do, Your Honor.  Thank you very much.

15          THE COURT:  Thank you.

16          MR. FARMER:  Good morning, Your Honor.

17          THE COURT:  Good morning, Counsel.

18          MR. FARMER:  As I mentioned at the outset, my name is

19  Tyler Farmer, and I'm at the law firm Harrigan Leyh,

20  representing Defendant City of Seattle.

21      Your Honor, we've got some maps that we want to look at

22  this morning, because we think that maps are important.  The

23  16 area --

24          THE COURT:  Is this the notebook that you presented?

25  I assume --

1           MR. FARMER:  Yes.

2           THE COURT:  -- you gave Mr. Calfo's team a copy of

3     this?

4           MR. FARMER:  Yes, Your Honor, we provided a copy.  We

5     also have it available on the screens.

6           THE COURT:  All right.

7           MR. FARMER:  And all of the content in here are from

8     exhibits either presented by plaintiff in their supporting

9     declaration of Mr. Weaver or with our opposition brief.

10          THE COURT:  Keep your voice up a little.

11          MR. FARMER:  Slide 2 is from Appendix A.  This shows

12    plaintiffs' proposed class area and the borders here in

13    yellow.  It also shows the Red Zone that Your Honor

14    referenced earlier.

15      Your Honor, in your March 17th minute order, which is

16    Docket 90, you asked several questions.  And while we

17    understand that they were directed to the plaintiff, we'd

18    like to address those as well, because we think that they

19    bear on issues relevant to the motion before you today.

20      You asked whether plaintiffs intended to include Greenus,

21    Madrona Real Estate Investors IV, and Madrona Real Estate

22    Investors VI within the class, and as you pointed out, some

23    of these businesses are located outside of the proposed class

24    area.

25      If you look at Greenus, it's Number 20, over at Summit and

April 20, 2022

 1    East Pike Street, several blocks from the proposed class
 2    area.  The Madrona entities are over to the east of the
 3    proposed class area, much closer -- in fact, on the same
 4    block and some just across the street.
 5         Plaintiff did not include these properties in the class,
 6    presumably, based on their location, but they allege the
 7    identical claims as all other named plaintiffs, including the
 8    other properties owned by Hunters Capital and Madrona
 9    affiliates.  Those claims are taking, nuisance, negligence,
10    and substantive due process, as well as procedural due
11    process violations.
12         And in the list of common issues that plaintiffs have
13    filed with the Court, which you discussed earlier, they refer
14    to some of the issues that must be discussed as follows:  For
15    takings, did the City's actions interfere with the ability to
16    access properties?  Did the City's actions interfere with the
17    ability to exclude others from properties?
18              THE COURT:  Well, Mr. Farmer, let me ask you this:
19    Some of these properties are outside their class area that
20    they're proposing, but even if I certified a class and they
21    weren't in that class, they've got a claim in this case; do
22    they not?  We'd have to have their trial at some point,
23    either together with the class or separate, but they've got
24    claims; do they not?  They've got the same claims that
25    everyone else has that are in the class area; isn't that

1  right?

2          MR. FARMER:  That's correct, Your Honor, and --

3          THE COURT:  So they're not going to go away if I

4  certify a narrower class.  How do we deal with that?

5          MR. FARMER:  We should deal with that exactly as we

6  should deal with all of the claims of the plaintiffs within

7  the class area, and that is to deny certification and proceed

8  to trial in October.

9      The reason why there should be individual --

10         THE COURT:  And let me ask you this:  Let's assume I

11  denied the class.  Do they all go to trial at the same time?

12         MR. FARMER:  Your Honor, first, of course, there

13  would be dispositive-motion practice, and for those

14  plaintiffs with any claims that survive the

15  dispositive-motion practice, we think that they should all go

16  to trial at the same time.  And the reason, again, goes back

17  to, all of these plaintiffs have made the same claims against

18  the City.  All of these plaintiffs, whether they're in the

19  class area or outside, have predicated those claims on

20  identical factual allegations.

21         THE COURT:  But you have three different -- totally

22  different kinds of plaintiffs here.  You've got the property

23  owners, you've got the businesses, and you've got the

24  individuals who reside in the area.  Is that manageable to

25  try all of those at the same time in the same trial?

1          MR. FARMER:  Your Honor, we think that it is, and

2     there are two individual named plaintiffs.  There are a

3     handful of property owners, and most of those are actually

4     owned by Hunters Capital, which, of course, is the lead named

5     plaintiff, and we believe all of those could efficiently be

6     tried as to the individual claims.  And the reason why that's

7     important is right here on the map.  If I can go to Slide

8     Number 3, what we've done here is placed boxes around the

9     plaintiffs that are outside of the class area, and those are

10    on the bottom left and bottom right.  Those are in red.

11         THE COURT:  We didn't need the boxes to see that, did

12    we?

13         MR. FARMER:  No, Your Honor, but it's fancy

14    technology.  I apologize.

15         THE COURT:  So let's move on, then.

16         MR. FARMER:  So, Your Honor, if you look to the top

17    right of the class area, you also have a block there between

18    12th and Howell, and the northern boundary of that is Denny

19    Street.  Our point is that you can't prove liability as to

20    Building 21, which is over on the left, by evidence that

21    there was some interference of access at Building 15,

22    directly adjacent to Cal Anderson Park.  The fact that

23    they're not --

24         THE COURT:  Well, the fact that the damages are

25    different, there may still be proof of -- or evidence that

April 20, 2022

1    Building 21 was interfered with in some way.  I haven't heard
2    the evidence, but it's possible that that's true, right?
3              MR. FARMER:  Your Honor, that's true, and I'd like to
4    make a clear distinction.  I'm not talking about damages.
5    I'm talking about the specific common issues of fact that
6    plaintiff has identified here, the interference of ability to
7    access properties, which is one of the takings, three
8    subclasses, that they would like, one of the common issues.
9              THE COURT:  Well, let's talk about the substantive
10   due process and the policy at the City.  Does the City
11   concede that there was established some sort of policy as to
12   how they were going to deal with this area?
13             MR. FARMER:  By "this area," Your Honor, you're
14   referring --
15             THE COURT:  Well, let's take the red dotted lines.
16   That was the area -- didn't they limit what type of fire or
17   police response would occur in that area?
18             MR. FARMER:  Yes, Your Honor.  That's the Red Zone.
19             THE COURT:  Was that a policy?
20             MR. FARMER:  That was a specific-response policy for
21   the Seattle Fire Department.
22             THE COURT:  It was a no-response policy, wasn't it?
23             MR. FARMER:  Your Honor, that's not the case.  It's
24   important to note that there was a response policy, which was
25   that, in order to make sure that the situation was stabilized

1   on the ground, SPD had to go there first, and that's

2   consistent with a policy that's implemented citywide,

3   frankly.  And for this specific area, because of the

4   unveiled -- pardon me -- because of the unprecedented events

5   that were unfolding, the Seattle Fire Department asked to

6   make these specific borders.  Chief Scoggins, in his

7   deposition, testified clearly that that modified response was

8   only for this Red Zone.  And it's important to note that --

9           THE COURT:  And the Red Zone is the dotted lines?

10          MR. FARMER:  Yes, Your Honor, that's correct.  And --

11          THE COURT:  Was that always the same -- the dotted

12   lines reflect an area where that policy was in effect for

13   what period of time?  Did that go into effect on the 1st or

14   on the 16th of June?

15          MR. FARMER:  Your Honor, it wasn't at the very

16   beginning.  On the 1st, the police declared a riot during the

17   protest, and then there was a shooting subsequent to that.  I

18   believe it was on June 6th.  And someplace in between

19   June 6th and June 16th, this Red Zone was implemented in

20   order to make sure that the fire department didn't go into an

21   unsafe situation and make it worse.

22          THE COURT:  And when did that go into effect?

23          MR. FARMER:  Your Honor, I believe it was the middle

24   of the month, but I don't have the --

25          THE COURT:  I think it was the 16th of June,

1    actually.  And it ended on July 1?

2         MR. FARMER:  Yes, Your Honor.

3         THE COURT:  So for that 16-day period or 15- or

4    14-day period, there was a policy by the City as what the

5    police and the fire department would do in this area; is that

6    right?

7         MR. FARMER:  With respect to the response time, but

8    there's no allegation from any of the plaintiffs -- and

9    there's been no evidence in discovery -- that any of the

10   plaintiffs were affected whatsoever by that policy.  There's

11   none.  And --

12        THE COURT:  Well, but when we're dealing with whether

13   to certify a class, we shouldn't be concerned about

14   differences in damages, should we?  I mean, if they can't

15   prove the damages, they can't prove the damages, but that

16   doesn't mean that there wouldn't be certain issues which

17   would be common that would help us resolve this litigation;

18   isn't that true?

19        MR. FARMER:  Your Honor, this doesn't go to damages.

20   Again, this goes to proving liability, and in order to prove

21   liability under either of the due process claims, the Court

22   necessarily will need to evaluate individual facts specific

23   to the location of the plaintiffs.  And even within the Red

24   Zone, there's evidence -- whether it's access or emergency

25   response time -- there's evidence that shows there's a wide

1  variety of conditions depending on the location, the date,

2  and the circumstances.

3          THE COURT:  Well, you know, one of the parties --

4  perhaps the plaintiffs -- cited the *Hickey* case, which was

5  the WTO riot and Judge Pechman's certification on an issue.

6  How does that case relate to our case?

7          MR. FARMER:  Your Honor --

8          THE COURT:  If it does.

9          MR. FARMER:  -- there's no relation whatsoever.

10  Counsel, earlier, described this as being a 16-block

11  takeover, but that's not what happened.  This was not a

12  sci-fi movie with huge gates put up and everyone cordoned off

13  and stuck in 16 blocks.  This is not *Hickey*, where you have a

14  specific government action with a specific population.

15          THE COURT:  Well, you had all of the protesters in a

16  particular area that were made into a class, were they not,

17  in *Hickey*?

18          MR. FARMER:  In *Hickey*, yes.

19          THE COURT:  Yes.  Why isn't that analogous to this

20  case?

21          MR. FARMER:  Well, in *Hickey*, the class of persons

22  and their activities were identical.  In *Hickey*, the

23  government action taken vis-a-vis those people was identical

24  across the board.

25      In this case --

1           THE COURT:  Well, but their damages weren't

2    identical.  They had different -- what happened to *Hickey,* I

3    mean, after Judge Pechman's order?  Was it ultimately settled

4    by the City?

5           MR. FARMER:  Your Honor, I believe so, but I don't

6    know, standing here.  I apologize.

7           THE COURT:  All right.  Well, I don't know either,

8    but I -- well, I'll look it up.  But what's the difference?

9           MR. FARMER:  The difference is that, in that case,

10   the factual allegations were common, and that case was

11   susceptible to being proven in one fell swoop.  There's

12   either liability or there's not.  Here -- and importantly,

13   we're not talking about damages.  We're not talking at all

14   about proving damages.  We're talking about establishing

15   causation, which is an essential element of each of the

16   causes of action.  And --

17          THE COURT:  Well, there's substantive due process,

18   the second cause of action.  One of the proposed issues is

19   whether there was actions or statements taken pursuant to a

20   City policy.  That's a pretty common question that would move

21   the case along, would it not, with respect to substantive due

22   process?

23          MR. FARMER:  Your Honor, I think that it's true that

24   you could look at the discrete question of whether there were

25   actions or policies, but that's totally removed from whether

April 20, 2022

1   or not those actions or policies created any actual

2   particularized or foreseeable danger.  And that element of

3   the claim requires going back to the map and going to the

4   specific location, the specific time, and the circumstance

5   experienced by the property owner.

6        THE COURT:  Why couldn't I certify that question as

7   well then, whether or not the policy resulted in or created

8   or exposed a class to an actual particularized danger that

9   the class would not have otherwise faced?  I mean, why isn't

10  that a common question?

11       MR. FARMER:  Your Honor, it's a common question in

12  theory, but applied to the 16 blocks at issue, it can only be

13  answered on an individualized basis.  So, for example, if

14  you're at Location 12, which is where Plaintiff Wade Biller

15  resides in an apartment, he may have experienced some sort of

16  impact from protesters that's completely different than

17  anything experienced, hinted at, threatened at people who

18  were up at 12th and Howell.

19       THE COURT:  But aren't you essentially arguing that I

20  can't certify common questions because the damages either

21  might not exist or would be different in character or amount?

22  Is it really -- you're saying you can't certify these

23  questions because damages are different?

24       MR. FARMER:  No, Your Honor, I'm not saying that at

25  all.  I'm saying you can't certify these because each of the

1    claims requires individualized proof of action, causation,

2    not damages.  And going back to --

3            THE COURT:  But what does "causation" mean?  Caused

4    damages.  Isn't that what the causation prong is all about?

5            MR. FARMER:  Your Honor, there needs to be some sort

6    of deprivation of right.  This can't be, "I don't like bike

7    lanes," and therefore, because there are bike lanes on 4th

8    Avenue, I've got a constitutional law claim against the City.

9    This has to show an actual impact.  This is a particularized

10   danger, and here, the plaintiffs have not actually tried to

11   put any evidence in.

12       And to go back to the case we discussed earlier, the Ninth

13   Circuit's en banc decision in *Olean* is instructive on two

14   points that bear noting.  First, on this motion, plaintiffs

15   bear the burden of proving facts necessary to establish that

16   the prerequisites of Rule 23 are satisfied.  They've got to

17   do so by a preponderance of the evidence.

18       *Olean* also stands for the proposition that, in order to

19   obtain certification, plaintiffs must be able to prove harm

20   on a classwide basis.

21           THE COURT:  Is there any issue on standing here?

22           MR. FARMER:  Your Honor, I think that that actually

23   does get us into Article III standing, because at the outset

24   of this case, in June of 2020 -- I think they filed on

25   June 24th -- you had a bunch of very upset property owners,

1    business people, and residents.  They filed as a class

2    action, and initially, they threatened to go get a TRO.  They

3    wanted equitable relief.  Since then, they've obviously

4    abandoned those claims.  They're looking for damages.

5        In order to maintain a class action for something other

6    than equitable relief, you need to show that each class

7    member has standing, and there's no evidence before the Court

8    that shows that.

9            THE COURT:  Well, first, we dealt with standing, I

10   believe, in the motion to dismiss, but more importantly, when

11   this motion for class certification was raised, Mr. Calfo's

12   office, in their brief, talked about standing.  I don't think

13   your opposition brief talked about standing at all.  It

14   wasn't mentioned in your response.

15           MR. FARMER:  Your Honor --

16           THE COURT:  I mean, that seems to me to suggest that

17   the City concedes there's standing there.

18           MR. FARMER:  Your Honor, the City does not concede

19   that there's standing here, because --

20           THE COURT:  You would normally put that in your

21   brief, wouldn't you?

22           MR. FARMER:  Yes, Your Honor, that should be included

23   in our brief, and I'm glad that it came up today, because the

24   City's position, crystal clear, is there's not evidence that

25   demonstrates that each and every class member has standing at

1    this point.

2              THE COURT:  Well, but each and every class member --

3    does each and every class member need standing?  Don't we

4    have -- if there's a class, if one or more people have

5    standing, we've got Article III standing and I can hear the

6    case.  You're not suggesting that I have to throw this case

7    out because there's no Article III standing for any of these

8    plaintiffs, are you?

9              MR. FARMER:  No, Your Honor, I'm not suggesting that.

10             THE COURT:  All right.  I didn't think so, so let's

11   move on.

12      What cases do you think are most favorable to your

13   position with respect to the fact that we should not certify

14   a class here?

15             MR. FARMER:  Your Honor, I would start with the

16   recent Ninth Circuit decision from *Olean*, because I think

17   that that stands clearly for the proposition that the

18   plaintiffs must be able to prove harm on a classwide basis.

19   They have to prove it in unison, and in this case, that's not

20   possible.

21      In *Olean*, they presented expert evidence, the Statistical

22   Regression Model, and that was evaluated by the District

23   Court over a three-day evidentiary hearing.  In this case, we

24   have nothing.  We have nothing except anecdotes of people,

25   businesses mostly in the zone very close to Pine Street and

1    11th.

2      On the record before you today, there is not a single

3    piece of evidence of any impact going north of there, not

4    any, and that does not carry the burden that the plaintiffs

5    have on this motion.

6          THE COURT:  Well, but they've only asked for class

7    certification on issues of liability.  They did not ask for

8    certification on damages; isn't that right?

9          MR. FARMER:  That's correct, Your Honor, but issues

10   of liability, as again set forth in their own summary of

11   common questions, include answering individualized inquiries

12   regarding whether or not a property owner had its rights

13   interfered with.  And if we go through the evidence, we'll

14   see that there's no evidence whatsoever that property owners,

15   in probably half of the class area, no evidence that any of

16   those property owners experienced any deprivation of access,

17   any loss of rights.

18         THE COURT:  Well, let's take the other half, then.

19   What you're suggesting is that maybe there's some property

20   owners in this proposed class area that did experience some

21   sort of deprivation of their property rights because of

22   this -- I'm going to call it -- "policy."  I guess the City

23   called it a policy.

24         MR. FARMER:  So, Your Honor, two things:  First, I

25   don't think that the City had any policy of allowing people

April 20, 2022

1    to go onto private property whatsoever.  That's not the case.

2        Now, what the City did throughout this time period is --

3            THE COURT:  Well, the City had a policy of what they

4    were going to do and what they were going to allow in this

5    area, and they had a policy, did they not, with respect to

6    response times and how they were going to deal with problems

7    that occurred?

8            MR. FARMER:  Your Honor, the City had a policy with

9    regard to the Seattle Fire Department protocol.  With regard

10   to the rest of this incredibly-evolving situation, the City

11   and the various employees who worked literally night and day

12   over that month, they formulated a plan to try to de-escalate

13   to avoid violence, to avoid arson and damage to property

14   while also providing and respecting First Amendment rights of

15   protesters.  And it's important to note that all of this is

16   happening in the context of COVID-19, where people had been

17   shut down in terms of businesses, working remotely, not even

18   going into the office, and the City was trying to do their

19   best under the most difficult circumstances.

20       And in that context, whether or not you could call it a

21   "policy," I don't think so.  What the plaintiffs have done is

22   try to throw up 30 different ordinances, saying this one

23   wasn't enforced here, this one wasn't enforced there, but

24   again, that's 30 different questions.  And what they haven't

25   done is show any evidence of common impact to all of these

1   5,000 putative class members.  What they haven't done is show

2   a single policy that impacted each and every one of these

3   5,000 class members.

4           THE COURT:  But do they need to do that?  In other

5   words, in order to certify a common question, they don't need

6   to show, do they, that that question -- that everyone in

7   their proposed class were impacted, would have damages.

8   Doesn't *Olean* tell us that the fact that some people in the

9   class don't have any damages doesn't defeat certifying a

10  class and issues to be determined on a classwide basis?

11          MR. FARMER:  Your Honor, you're correct, that's what

12  *Olean* says.  And they talk about --

13          THE COURT:  So how is it that the fact that -- let's

14  say that half of them had no damage at all.  Some of them

15  even liked what happened.  How does that prevent the Court

16  from certifying a class of common issues so that we can get

17  to the bottom of this?  Isn't that a better way to handle

18  this case than to certify nothing?

19          MR. FARMER:  No, Your Honor, for several reasons.

20  First, if you were to say that half of the people were not

21  impacted -- again, I'm not talking about damages, I'm talking

22  about impact -- half of these putative plaintiffs never had

23  anyone come close to their property, then that would, on its

24  face, I believe, violate the rule that *Olean* is saying.

25  *Olean* is saying it's okay if you have this massive class,

1    even though there are going to be some, let's call them,

2    false positives among this otherwise massive class, you can

3    still certify it, and there are lots of reasons why that

4    makes sense, because you've got the bulk, the actual mass,

5    directing the ship.  In this case, you'd have the opposite.

6    You would have all of these different groups with different

7    experiences, and you'd be certifying things that would be

8    dominated by individual questions of fact going forward, and

9    that would include all sorts of things on this complete waste

10   of space in terms of thousands of businesses, residents, and

11   property owners who were nowhere near anything that was going

12   on.

13        And it's important, Your Honor, to focus, again, on Pine

14   Street, 11th and 12th Avenue on our map.

15             THE COURT:  All right.  We're back to your exhibit on

16   the screen?

17             MR. FARMER:  Yes, Your Honor.

18             THE COURT:  All right.  I've asked too many questions

19   already, so I'll let you go ahead with your presentation.

20             MR. FARMER:  Thank you, Your Honor.  So, Your Honor,

21   our point is that, even within the closest proximity to East

22   Pine and 11th, even within the closest proximity to the East

23   Precinct, the plaintiffs' own evidence shows that different

24   individuals had different experiences based, again, on their

25   location, the time, and the circumstances.

1      So, here, on Slide 5, we have the testimony of

2  Mr. McDermott, who was the owner of Car Tender, and as to the

3  point of access, he's asked -- they blocked the sidewalks --

4  "Okay, did they block the driveway to get into the parking

5  lot?"  And his answer is, "As I stated, they did not block

6  the driveway to access our parking lot."  So we have these

7  allegations in a Complaint, and then we have evidence that

8  does not match up to it.  We have evidence that instead shows

9  that individual plaintiffs very close to the main areas of

10  protest activity actually did have the access that

11  plaintiffs' counsel claims was denied.

12         THE COURT:  Well, but even if we were here sitting at

13  summary judgment stage and you presented the evidence of one

14  person who said, "Well, they didn't block my access," that

15  doesn't get you summary judgment.  That just gets you, maybe

16  that plaintiff doesn't have any recourse, any damages; isn't

17  that right?

18         MR. FARMER:  That's correct, Your Honor, and --

19         THE COURT:  But there are lots of other people that

20  would be in this class area who might have a different view.

21  We have to wait for that evidence, don't we?

22         MR. FARMER:  Your Honor, this class certification

23  motion was filed on an agreed-upon schedule.  We're almost

24  two years down the road from when the lawsuit was filed.

25  It's not the City's burden.  This is not a motion for summary

1    judgment.  It's the plaintiffs' burden to prove that there

2    are common questions of fact that can be resolved in one fell

3    swoop.  And so the point of that excerpt is to show that,

4    even amongst the plaintiffs' themselves, even amongst those

5    people who were closest to the epicenter of all of this crazy

6    activity, there is not commonality.  There are differences.

7    There are differences in who gets in a driveway, there are

8    differences in who could go to their work, there are

9    differences in interactions with protesters.  This myriad of

10   complexity is exactly why this class cannot be certified.

11           THE COURT:  All right, go ahead.

12           MR. FARMER:  So, Your Honor, again, a named plaintiff

13   at Slide 6 -- this is Matthew Ploszaj -- and I believe on

14   Slide 6, at the bottom, highlights -- the question was, "Was

15   your access to your apartment restricted in any other way

16   than having to show ID?"  And he answers, "I would have to

17   walk through crowds to get to the point where I could show my

18   ID."

19           THE COURT:  Was he the only proposed class

20   representative for the third class, the individual, or are

21   there others?

22           MR. FARMER:  Your Honor, I believe that there's a

23   gentleman named Wade Biller who was also a resident.

24       And so, Your Honor, going back again to Mr. Ploszaj's

25   testimony, in his June 10th deposition, he's asked, "Could

1   you access your building by car?"  "No."  He's asked, "Could

2   you access your building by foot?"  "Sometimes."

3        And I won't belabor the point, but his own access depended

4   on what happened on specific days, and his best evidence is

5   that, on a handful of occasions, he was prevented from

6   entering his building.  The City does not diminish that

7   concern whatsoever.  That's a serious concern, but that

8   doesn't make it a class question, because it doesn't tell us

9   anything about what happened to the apartment building two

10  doors down, and it certainly can't tell us anything that

11  happened four blocks north, just as the plaintiff, when they

12  try to prove up --

13        THE COURT:  Why isn't that a damage issue as opposed

14  to the common question of whether or not there was a taking

15  of and whether the City's actions interfered with people in

16  the class area from accessing their properties?

17        MR. FARMER:  Your Honor, it's not a damages claim,

18  because it's an essential element of proving liability.  It's

19  not a damages claim because, under the Supreme Court case

20  that was referenced earlier, an essential element of proving

21  a taking is to prove that you were prevented or that --

22  prevented from accessing or that your property was, quote,

23  misappropriated.  It was taken away.  And so in order to

24  establish liability against the City, Mr. Ploszaj needs to

25  show that his property was taken away, and the evidence that

1    he must put forward to do that is, by definition, individual

2    to him and his experience.  It's not the same as the owners

3    of the Greenus Building, who are three blocks away.  It's not

4    the same as the owners of Car Tender.  Each of these named

5    plaintiffs had a different experience.  Each of the 5,000

6    putative class members will have a different experience, and

7    for liability on each of the claims, that must be done on an

8    individualized basis.

9          THE COURT:  Would you ever have a class -- you're

10   always going to have differences in damages, aren't you, in

11   class certifications?  I mean, take the buyers of the tuna in

12   *Olean*.  You have three different groups.  They're all going

13   to have different experiences.  Some of them may not have

14   tried to buy tuna during that class period, some of them may

15   have only bought a little bit of tuna.  I mean, isn't that

16   always going to be the case?

17         MR. FARMER:  Your Honor, it's not always the case,

18   because there could be things like a cell phone overcharge

19   where every class member was overcharged a buck 50, and you

20   can look it up in the records.  But in many, many class

21   actions, there will be differences in individual damages.

22       However, that's not the issue on this motion.  At issue on

23   this motion, even by plaintiffs' own summary of the relevant

24   common questions, is whether there was interference with the

25   ability to access properties, whether there was interference

```
 1   with the ability to exclude others.  These are not damages
 2   questions.  These are core liability questions, and they must
 3   be addressed on an individual basis for each of the 5,000
 4   class members.
 5            THE COURT:  One of the cases that was cited by the
 6   parties -- I don't know if it was your brief or the other
 7   brief -- was Jimenez v. Allstate Insurance, Ninth Circuit,
 8   765 F.3d.  Can you tell me about that case?  The District
 9   Court certified a class with respect to unpaid overtime and
10   said the payments -- and unfair competition.  And the Ninth
11   Circuit allowed three questions to be certified.  Are you
12   familiar with the case?
13            MR. FARMER:  Your Honor, I've read it.  I'm sorry, I
14   don't have my summary in front of me.
15            THE COURT:  All right.  Well, they said the three
16   questions were:  Did they work overtime, did Allstate know
17   that the work was unpaid overtime, and did the defendant
18   stand idly by and allow this off-the-clock claim under
19   California law?  And the court said that they were common
20   questions apt to drive the resolution of the litigation.
21   Why isn't that kind of a case important in deciding whether
22   we have class certification?
23            MR. FARMER:  Your Honor, that case is closer to
24   Hickey than where we are today.  Your Honor, that -- the
25   Jimenez case is closer to Hickey, where you have a defined
```

1  set of people.  Here, you're talking about employees.  This

2  is basically fishing in a small pond when you look at that

3  case.  If you take it to where we are here, we're out in the

4  Puget Sound.  You've got 5,000 putative plaintiffs, each with

5  very important claims, but there's no possible way to resolve

6  those claims in one fell swoop.

7        THE COURT:  Well, you know, Mr. Calfo has selected

8  his proposed class area, but the whole City of Seattle was

9  affected by what happened in that area; isn't that true?

10        MR. FARMER:  Your Honor, in June of 2020, the City of

11  Seattle convulsed.  The entire country convulsed.  We all

12  were affected throughout the City, and we had been affected

13  earlier than that with COVID, and we saw the increased number

14  of people without homes and graffiti and --

15        THE COURT:  You better be careful, Mr. Calfo will

16  want to expand his class to the City of Seattle.

17    All right.

18        MR. FARMER:  Your Honor, if I may proceed, I'd like

19  to make just a few points.

20        THE COURT:  Yes.

21        MR. FARMER:  Again, while the plaintiffs have

22  complained vehemently about conditions adjacent to their

23  properties, they've not focused with much success on any

24  specific policy that caused harm common to all the putative

25  class members.  Three of the areas where they've complained

1    the most are services.  They complain that the City didn't
2    provide trash collection services for the entire class area.
3    They complain again about the Seattle Fire Department
4    protocol that we discussed earlier, and they also complain
5    about barriers.  And if you dig into each one of these
6    different areas of complaint, you find very near the surface
7    all of these differences based on the location, the time, and
8    the individual plaintiff and how they were affected or
9    weren't affected.  That's very important here.

10       In order to certify a class, you have to find that there
11   could be common proof of impact for each of these claims, and
12   that's the who, what, when, where.  It's like a newspaper
13   story.  And right now, no one's done anything to address,
14   were people even there because of COVID-19?  Before we even
15   get to the "what," were they there when whatever happened
16   happened, and we don't know what happened.  These are all
17   vacant from the pleadings before you.  There's no evidence of
18   classwide impact, and at this juncture, that merits denial of
19   their motion.

20       THE COURT:  But your argument -- I'm just looking
21   forward to the motion practice we're going to have.  You are
22   going to be moving to dismiss all of these claims for various
23   reasons, but haven't you just told me that there's a factual
24   issue as to whether there were damages or whether these
25   services were interrupted or whether the property access was

1    interrupted?  Aren't I going to have to decide that there's

2    factual issues on all of these questions?

3              MR. FARMER:  Your Honor, at the motion for summary

4    judgment stage, you may find that there are factual issues on

5    all of these questions.  The evidence that I'll go through

6    now actually would show you that, as to any plaintiff who

7    claims that they were damaged because they were deprived

8    trash service, we probably have evidence sufficient to show

9    that summary judgment should be granted as to that, but we

10   are here today on class certification.

11       And the point of this evidence is that even the named

12   plaintiffs closest to the epicenter actually had different

13   experiences regarding whether or not their trash got picked

14   up, and that's because whether it's barriers that get moved

15   twice a week or four times a week or trash service that

16   misses a Tuesday but shows up on Thursday, all of this is

17   incredibly dynamic.  These facts are literally burping up

18   from the springs as things happen, and that is a fact pattern

19   that is not suited for class action.

20       There is no case anywhere -- and we scoured Westlaw --

21   there's no case with facts like this.  There are so many

22   moving pieces here and 5,000 different class members.  As

23   Mr. Calfo said, they have a diverse group of representative

24   plaintiffs.  We have something exponentially more diverse

25   when you get into the different class members, 5,000, spread

1    across 15 city blocks.  I would submit to you, Your Honor,

2    that there's no way of classwide proof for any of these

3    claims, just as the plaintiffs acknowledge that the classwide

4    proof shouldn't include their own buildings, some of them two

5    blocks away, some of them one block away from the class area.

6    This is powerful evidence that there is no way to answer

7    these questions with common evidence.

8           THE COURT:  Well, how would you -- if I did not

9    certify a class, how would we try this case?

10          MR. FARMER:  Your Honor, we've got --

11          THE COURT:  We've got 26 plaintiffs, give or take.

12          MR. FARMER:  So, Your Honor --

13          THE COURT:  They're all going to come in and have

14   different diverse theories and claims and damages.  How long

15   would that case take to try?

16          MR. FARMER:  Your Honor, I think that case would take

17   a month to try, but it could be shorter, depending on the

18   dispositive-motion practice, and the City intends to bring

19   dispositive motions based on some of the evidence we've got

20   in our briefing.  Today's question, again, goes back to

21   certification, and the plaintiff has not met their burden of

22   putting forth evidence showing the common questions, showing

23   there's common proof available.

24          THE COURT:  Well, Rule 23 contemplates that a motion

25   for class certification will be promptly brought early in the

April 20, 2022

1  litigation.  Do you know of anything that would counsel for

2  or against deferring a ruling on class certification and

3  going to motion practice and seeing where we were?

4          MR. FARMER:  Your Honor, I don't know of any legal

5  authority, but my grasp of the facts in this case tells me

6  that that's not going to tell us anything about class

7  certification.  The evidence before you tells us everything

8  we need to know.  The plaintiffs' own declaration with

9  various deposition transcripts tells you all of the

10  variations among the named plaintiffs, not just the 5,000

11  class members, within the named plaintiffs.

12      So, on this record, after nearly two years, when we have

13  expert reports to be exchanged next week, we ought to saddle

14  up and get to trial in October and take care of that.  And

15  they'll have their day in court for each of the named

16  plaintiffs, and these are not insignificant claims.  The

17  Hunters Capital folks claim over $3 million in damages.  So

18  we can have the trial in October and resolve these issues in

19  a very fair way, but what we shouldn't do is get sidetracked

20  by trying to sweep up some 4,900 people when we don't know

21  where they were, when they were there, or what happened.

22          THE COURT:  All right.  Go ahead.

23          MR. FARMER:  Your Honor, I'll wrap it up here.

24      I wanted to point out one issue.  Earlier, you heard about

25  Mr. Fox, who put in a declaration, and Mr. Fox is the owner

1  of Poquitos, which is a shop and I think a tenant of the

2  Plaintiff Hunters Capital, and here I am at Slide 23.  And

3  this, again, was the Farmer Declaration, Exhibit 41,

4  submitted with our opposition.  I apologize that the type is

5  small.

6       Your Honor, in this email exchange between Mr. Fox and

7  Ms. Cronauer, who's, I think, the COO of Hunters Capital,

8  they discuss whether or not to file a lawsuit.  That's not

9  important.  What's important is that Mr. Fox here, on

10  June 14th -- so this is less than a week after the class

11  date -- he writes to his landlord in the second highlighted

12  sentence, "Other than being closed for the two days out of

13  concern for the staff and losing a limited amount of sales

14  due to doing take-out sales, which was our choice, it's

15  nothing worse than we're dealing with the protests and

16  nightly dispersals."

17       If you go down to Ms. Cronauer's email to him, written the

18  day before, June 13th -- and again, this is the chief

19  operating officer of Hunters Capital -- she writes to him,

20  "After visiting the CHOP today, it seems best to wait on

21  filing the lawsuit.  As you are well aware, the neighborhood

22  saw more positive energy today than in the last nine months.

23  People came from far and wide to the only festival allowed

24  for the foreseeable future, which created a very inviting and

25  safe vibe, which has been shared widely in the media."

1      Your Honor, this isn't summary judgment evidence that they

2    don't have claims.  We take the claims very seriously.  But

3    this shows that on that day, in that place, in this class

4    area, there were no particularized dangers.  There were no

5    threats, and self-evidently, there was no impairment of

6    access.

7         THE COURT:  Well, but what this shows is that this

8    one person writing this email on that particular day had that

9    opinion.  It doesn't really tell us anything else, does it,

10   about what other people were incurring in the way of

11   consequences as a result of all this disruption up there in

12   the CHOP area?

13        MR. FARMER:  Your Honor, that's exactly right.  This

14   is her individual experience based on where she was.  It

15   tells us nothing about what was happening two blocks north,

16   just like the allegations, and even a copy of the City policy

17   issued afterwards tells us nothing of whether there was

18   deprivation of rights, intervention of access, and other

19   problems.  All of those are individualized inquiries.  The

20   class cannot be certified.  Thank you, Your Honor.

21        THE COURT:  If I do not certify a class -- that's

22   your position -- do you think the case can be tried in a

23   month with respect to all of these plaintiffs?

24        MR. FARMER:  Yes, Your Honor.

25        THE COURT:  And are you saying two weeks a side?

April 20, 2022

1           MR. FARMER:  Yes, Your Honor.  I think that we would

2     be put on a clock, and if we do it diligently, we'd cooperate

3     with co-counsel and --

4           THE COURT:  You'd be put on a clock.  That is a

5     certainty.

6        So if we had a class trial, how long would it take?

7           MR. FARMER:  Your Honor, I think that would depend a

8     little bit on the class, but once your order comes out on

9     that, the parties may well decide that there might need to be

10    some degree of additional discovery, but I think that it

11    would probably make the trial at least another 50 percent

12    longer.

13          THE COURT:  Why?

14          MR. FARMER:  Why?  Because I think we would have to

15    bring in each of the individuals and test their evidence

16    regarding liability, which I guess we would have to do that

17    in either case, but --

18          THE COURT:  And would we bifurcate damages, or would

19    we try damages -- regardless of what the Court does, would we

20    try damages at the same time?

21          MR. FARMER:  I don't think that that's practical to

22    do if there were a class, but it's certainly something we can

23    do in October based on the named plaintiffs' extant claims.

24          THE COURT:  There are 26 different plaintiffs.  The

25    damages conceivably could be fairly extensive with respect to

1    these various 26 plaintiffs.  Would that not be true?

2          MR. FARMER:  Well, Your Honor, I think to both

3    parties' credit, discovery has dug into the individual

4    damages, and we've got fairly detailed accounts of their

5    records.  That's, of course, not part of this hearing, but I

6    think that that's something that suggests we can do it on a

7    more efficient basis.

8          THE COURT:  If it was a class trial, could we

9    bifurcate damages?

10          MR. FARMER:  Yes, Your Honor, I think that you would

11   have discretion to do so, but for all the reasons I mentioned

12   earlier, I don't think that there could be a class.

13       The other point I'd like to --

14          THE COURT:  I understand your position there.

15          MR. FARMER:  I'm sorry, I don't mean to beat the drum

16   too much.  Your Honor, you had mentioned in your more recent

17   minute order whether or not issue certification under

18   23(c)(4) would be appropriate, and we don't believe that that

19   would advance the case, because -- and there's case law

20   supporting the proposition -- if you're not going to

21   materially advance the case, that you shouldn't put off the

22   difficult decisions regarding whether or not there are common

23   questions of fact.  So, under our agreed schedule and under

24   the briefing that we have today, you have squarely in front

25   of you that difficult question of whether or not there are

1    common questions of fact, and the answer is no.

2           THE COURT:  All right.  I think I understand your

3    position.  Thank you.

4           MR. FARMER:  Thank you, Your Honor.

5           THE COURT:  Mr. Calfo, you've got 10 minutes, I

6    think.

7           MR. CALFO:  Thank you, Your Honor.  I think the

8    fundamental problem with the City's argument is that it's

9    working from the ground up, talking about different

10   experiences of plaintiffs or class members, and our motion

11   works from the bottom down -- or from the top down, because

12   what we're doing is we're saying, Judge, these are the common

13   issues.  Let's look at the issues themselves and ask

14   ourselves whether or not those issues can be decided without

15   reference to the divergence of experiences of individual

16   class members of plaintiffs.  That's what we would ask the

17   Court to do when it analyzes this case, and I know it will.

18   When you look at those questions, as I went over in my

19   opening argument and I won't repeat here, our goal was to

20   frame them so that it entirely focused or materially focused

21   on the conduct of the City or the City's policies, not on the

22   experiences of individual plaintiffs.

23       I think, with respect to these differences in opinion over

24   what the facts are going to show, it doesn't really bear on

25   our 23(c)(4) issue.  I mean, Mr. Ploszaj, for example, who

1    was highlighted in the City's brief, this individual, his

2    home was broken into four times, and the police didn't come

3    on any of the occasions.  They told him to go to 23rd and

4    Martin Luther King to meet them there and he could talk to

5    the police, and then they never showed up.  I mean, he's not

6    a good person for them to be highlighting as someone who

7    wasn't harmed here.  He was really devastatingly harmed and

8    experienced threats of assault and burglary while he was

9    experiencing the CHOP.

10        And, Your Honor, you know, the City can say whatever it

11   wants here, but I go back to the emergency order.  Not only

12   does the emergency order go over -- first of all, it defines

13   the area.  So you can -- it's interesting to see these maps

14   they're putting together, but when the City was doing its

15   work in the emergency order, it defined the area that was

16   affected as the class area that we're proposing.

17        Now, they can try and argue -- I don't know -- at trial or

18   whatever that, really, the area that we said was affected

19   wasn't the one we affected or they can say, well, the area

20   that we put in our emergency order isn't really the area that

21   we facilitated, but I don't think they're going to get very

22   far.  And this emergency order not only goes over all the

23   harm, the general harm, to people who were in this area they

24   defined, it talked about a lack -- a modifying of police

25   response protocols.

1      And by the way, the City officials said, regardless of

2  whether it was red or warm, our evidence is going to show the

3  police didn't come at all.  And on many occasions, the fire

4  department couldn't even get into the warm zones because the

5  police weren't responding.  We have individual plaintiffs who

6  say, "I called the police, and they said, 'We're not coming

7  to your area at all.'"

8      Car Tenders is an example.  Mr. McDermott was assaulted

9  with a blunt instrument in his business.  500 people from the

10  occupants came charging in saying you have to release this

11  person who's burglarizing your place.  They called the

12  police, and they didn't come.  I mean, this idea that somehow

13  there wasn't the general impact that the City, itself, said

14  in the emergency order is really not -- it's a gross

15  mischaracterization of what the evidence will be.

16      But the thing about the emergency order is it not only

17  describes what the City says is the zone that it facilitated,

18  it not only describes the things that happened to everybody,

19  like not having, you know, police response and obstructions

20  to public parks, streets, and sidewalks -- that's what it

21  says -- it also describes, in detail, some of the impacts on

22  the neighborhood, like SPD has received numerous reports of

23  narcotics use and violent crime, an increase of 525 percent

24  in crime in the CHOP zone.  And we're talking about whether

25  somebody got onto their sidewalk on a particular day, got

1    blocked?

2       I mean, this -- again, Your Honor, the notion that we

3    haven't shown harm to these folks, economic harm, harm from

4    lack of public safety, a lack of access to properties, is

5    really just -- it's just -- it doesn't characterize the facts

6    correctly, and the City's own evidence and the statements

7    from the police chief all show that to be the case.

8       But the real issue here -- and this is just like *Olean*,

9    Your Honor.  You know, you had the tuna folks, the Bumble

10   Bees of the world, saying that, you know, this isn't a class

11   because, well, with respect to Wal-Mart, they had a higher

12   negotiating position.  These mom-and-pop stores are really

13   different, they had a really different experience than the

14   big Wal-Marts, and the court said, no, that doesn't defeat

15   class cert.

16      I mean, there's going to be a divergence in the

17   experiences of the class members, and we will deal with those

18   at the damage phase.  And you can argue as much as you want,

19   tuna manufacturers, but you're really just arguing facts, and

20   when you're dealing with a 23(c)(4) case, the issue isn't

21   whether or not the tuna manufacturers are right or the

22   purchasers are right, the question is, if we resolve the

23   common questions that have been identified, is it going to

24   advance the litigation.

25      So maybe the City will be right.  Maybe they'll show there

1   wasn't deprivation, but in the end, that serves the purpose

2   of 23(c)(4), because that issue will be resolved for all

3   members of the class, and that's why these arguments over

4   what the facts show don't really matter to our motion.

5        Now, Your Honor, you asked about whether you should

6   certify the class now or later, and I think, from our

7   perspective, it will be important to certify the class now,

8   particularly before summary judgment, because then your

9   summary judgment rulings will be, you know, class-based

10  summary judgment motions.  If there's no class before, then

11  we wouldn't have that opportunity.

12       The other thing, Your Honor, that I'd note is you have

13  broad discretion going forward to modify the definition of

14  the class or how this case is tried.  I think we've made the

15  showing we need to make to show that the common questions

16  we've identified ought to be certified.  As we finish with

17  discovery or through summary judgment, I think the Court has

18  the discretion to ask for briefing on whether or not the

19  class definition should be modified or other aspects of our

20  class certification should be modified, should the Court

21  grant our motion.

22            THE COURT:  Let me ask you this, Mr. Calfo.  I think

23  we have a trial date mid October.  Is that realistic given

24  that motion practice is going to follow regardless of what I

25  do with these class certifications?  It sounds like we are

1    going to have a lot of motion practice.  Realistically, when

2    do you think this can be ready for trial?

3              MR. CALFO:  Well, Your Honor, I think you make a good

4    point, and I think we could be ready in October, but I'd have

5    no objection, to allow for orderly decisionmaking on the

6    summary judgments, for it to be moved.

7              THE COURT:  Refresh my memory on when the dispositive

8    motion cutoff is.  Do you know?

9              MR. WEAVER:  It's the end of June, Your Honor.

10             THE COURT:  Thank you.  That's when they need to be

11   filed?

12             MR. WEAVER:  Yes.

13             THE COURT:  End of June?

14             MR. WEAVER:  Yes.

15             THE COURT:  No doubt there will be many motions filed

16   regardless of what I do here on the class certification.  And

17   if they need to be filed at the end of June, they won't be

18   briefed until end of July or mid August.  We're not going to

19   decide those motions -- I mean, we won't have all the

20   briefing until August.

21             MR. CALFO:  Yes, Your Honor.  And we also have the

22   motion on the texts.  There will be a motion related to the

23   missing texts.

24             THE COURT:  Say it again.

25             MR. CALFO:  We'll also have motions relating to the

1   missing texts and the consequences of that.

2          THE COURT:  Is the discovery done on that?  Can you

3   move those motions up?  Should we address those, get those on

4   a fast track of some sort?

5          MR. CALFO:  Well, Your Honor, our expert report is

6   due shortly, and I do -- we do want to promptly make the

7   motion.  We want to make sure we have all the information we

8   need to make the motion.

9          THE COURT:  Have you done all your discovery on that

10  issue, both sides?

11         MR. CALFO:  Your Honor, I think there may be some

12  things to wrap up, but I think it's going to be soon, so...

13         THE COURT:  Well, that sounds like an important

14  issue.  Should we agree that motions with respect to that

15  issue should be brought in the next month or six weeks?  Or

16  you tell me.

17         MR. CALFO:  Your Honor, may I suggest that, after the

18  hearing, I get together with Mr. Harrigan's team and that we

19  figure out a good schedule for that?

20         THE COURT:  It just seems like October is going to be

21  a -- you've got a lot of work to do.  We all have a lot of

22  work to do if we're talking about -- is it mid October?  If I

23  remember, it's like the 17th or something.  Does that sound

24  right?

25         MR. CALFO:  Yes, Your Honor.  I don't know that it

April 20, 2022

1   matters, Your Honor, but I have a three-month trial starting

2   on September 19th.  It may go away.  I don't know.  So, from

3   my perspective, it would be fine to move that, if it's

4   benefitting both, benefitting Your Honor's ability to get the

5   matters resolved in an orderly way, so...

6           THE COURT:  All right.  Anything else from a

7   case-management standpoint that we can discuss today from

8   your standpoint?

9           MR. CALFO:  No.  Only, Your Honor, I think to

10  emphasize that, if the Court goes forward and does certify

11  the class and we do try damages at the same time, which is I

12  think what we ought to do, the Court will -- I think that

13  it's important that we will get a lot of information out of

14  that trial about how to try future damage cases, if we're

15  successful, and of course, we think we will be.

16       It will also be a bellwether to try and resolve this case

17  overall, and that's the history and practice in reality of

18  the way these things work.  I think that damages trial, I

19  think, is important to include in any trial that comes up in

20  October, if the Court does certify the class.  We think that

21  the certification --

22          THE COURT:  Well, as I understood your comments

23  earlier, you thought we should try damages together with

24  liability whether or not I certify; is that right?

25          MR. CALFO:  That's right, Your Honor, but I'm

1    emphasizing that, if there is a certification, I think it

2    won't add -- it's not going to add appreciably to the length

3    of the trial if we try damages at the same time as it would

4    if we had no certification.  And I think, including a damages

5    aspect to the trial, if there are certification of issues is

6    going to materially advance the litigation in the ways I've

7    discussed, including by providing bellwether damage awards

8    that might help us resolve the case overall.

9            THE COURT:  All right.  Thank you.

10           MR. CALFO:  Thank you, Your Honor.

11           THE COURT:  Anything further from the City?

12           MR. FARMER:  Nothing on case management.  Thank you,

13   Your Honor.

14           THE COURT:  All right.  Well, I certainly appreciated

15   all the briefing that I received and the arguments today.

16   We'll take the matter under advisement, and we'll issue an

17   order as soon as we can.  We'll be in recess.  Have a nice

18   day, folks.

19                 (Proceedings concluded.)

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5      I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8

9

10    */s/ Sheri Schelbert*

11    SHERI SCHELBERT
      COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25