1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

HUNTERS CAPITAL, LLC;
HUNTERS PROPERTY
HOLDINGS, LLC; GREENUS
BUILDING, INC.; SRJ
ENTERPRISES d/b/a CAR
TENDER; THE RICHMARK
COMPANY d/b/a RICHMARK
LABEL; ONYX HOMEOWNERS
ASSOCIATION; WADE BILLER;
MADRONA REAL ESTATE
SERVICES LLC; MADRONA REAL
ESTATE INVESTORS IV LLC;
MADRONA REAL ESTATE
INVESTORS VI LLC; 12TH AND
PIKE ASSOCIATES LLC; REDSIDE
PARTNERS LLC; OLIVE ST
APARTMENTS LLC; BERGMAN'S
LOCK AND KEY SERVICES LLC;
MATTHEW PLOSZAJ; SWAY AND
CAKE LLC; and SHUFFLE LLC
d/b/a CURE COCKTAIL;

C20-983 TSZ

ORDER

8

9

10

11

12

13

14

15

16

17

18

Plaintiffs,

19

v.

20

CITY OF SEATTLE,

21

Defendant.

22

23

ORDER - 1

THIS MATTER comes before the Court on Plaintiffs' motion for class certification, docket no. 65.  Having reviewed all papers filed in support of, and in opposition to, the motion, and having considered the oral arguments of counsel, the Court DENIES Plaintiffs' motion for the reasons stated in this Order.

**Background**

**1.     The Protest**

Plaintiffs are property owners, businesses, and residents in Seattle's Capitol Hill neighborhood who claim that they were harmed during the Capitol Hill Organized Protest or Capitol Hill Occupying Protest (collectively, "CHOP").  Third Amended Class Action Complaint ("TAC") at ¶ 13 (docket no. 47).  Plaintiffs allege that the City of Seattle ("City") "abruptly deserted" the Capitol Hill neighborhood on June 8, 2020, and left it unattended until July 1, 2020.  TAC at ¶¶ 3 & 9.  On June 8, 2020, the City evacuated the East Precinct of the Seattle Police Department ("SPD") amid ongoing civil rights protests, leaving behind barriers that had been used to separate police from protesters. *See* Sixkiller Dep. at 38:9–40:9, Ex. 4 to Weaver Decl. (docket no. 66-1); Zimbabwe Dep. at 12:23–13:20, Ex. 5 to Weaver Decl. (docket no. 66-1).  Almost immediately after SPD abandoned the East Precinct, protestors declared the area "Free Capitol Hill," and used the barriers to block off streets within one block of the precinct to create a "no-cop" zone.  TAC at ¶¶ 37–39; *see also* Zimbabwe Dep. at 16:15–17:22.  According to former SPD Chief Carmen Best, the City intended to reenter the East Precinct the following day, but protesters declared the area their "sovereign property," or an "autonomous zone," and denied the City access.  Best Dep. at 33:12–35:1, Ex. 6 to Weaver Decl. (docket no. 66-

ORDER - 2

1).  CHOP participants claimed the area as their own, and secured it by physically

barricading and patrolling the area's borders.  TAC at ¶¶ 41–42.  As the zone expanded, it

first became known as the "Capitol Hill Autonomous Zone," also known as "CHAZ,"

and finally became known as CHOP.  *Id.* at ¶¶ 1 & 39.  The area of protest around the

East Precinct eventually expanded to a sixteen-block portion of the Capitol Hill

neighborhood, bounded by East Denny Way (to the north), Thirteenth Avenue (to the

east), East Pike Street (to the south), and Broadway (to the west).  *See* Exec. Ord. 2020-

08, Ex. 7 to Weaver Decl. (docket no. 66-1).  This area was also referred to as the "Cal

Anderson Park Area" in former Mayor Jenny Durkan's June 30, 2020, executive order.

*See id.*

Plaintiffs allege that, instead of restoring order to the area, the City actively

endorsed, enabled, and encouraged the occupation of CHOP.  TAC at ¶ 5.  In contrast,

Mayor Durkan's executive order explained that the City reasonably facilitated the

exercise of First Amendment rights and demonstrations in the area by:

- Providing basic hygiene, water, litter and garbage removal, and electricity;
- Temporarily allowing obstructions of public parks, streets, and sidewalks;
- Modifying SPD and [Seattle Fire Department ("SFD")] response protocols to meet public safety needs to the extent possible within this area;
- Modifying streets and pedestrian access routes;
- Providing social services outreach and engagement along with referrals for shelter, behavioral health and other supports for individuals in need; and
- Facilitating modified city services delivery to local residents and businesses impacted by the events in this area.

ORDER - 3

Exec. Ord. 2020-08 (docket no. 66-1 at 63).  Despite these measures, conditions in the area deteriorated throughout June 2020, "to the point where public health, life, and safety [were] threatened by activities in and around [the] area."  *Id.*  SPD designated a large portion of the area as the "Red Zone," and prohibited officers from entering the zone except to respond to reports of mass casualty events, such as active shooters or other life-threatening emergencies.  *See* Ex. 15 to Weaver Decl. (docket no. 66-1); *see also* Ex. 18 to Weaver Decl. (docket no. 66-1).  Violent crime increased in the area, including two fatal shootings, and the City received numerous reports of rape, robbery, assault, and increased gang activity.  *See* Exec. Ord. 2020-08, Ex. 7 to Weaver Decl.  Residents and businesses in the area also reported increased incidents of harassment, graffiti, excessive noise, and the obstruction of vehicular and pedestrian traffic.  *See id.*  On June 30, 2020, the City announced that it would close the area and remove any remaining individuals occupying City property or obstructing public rights of way.  *Id.*

Plaintiffs allege that they suffered numerous economic and non-economic injuries as a result of the City's actions, including reduced property values, extensive property damage, reduced access to emergency services, public safety dangers, exposure to excessive noise, and an inability to use and access their properties.  TAC at ¶¶ 2 & 6.  The City responds that many of these harms were caused by the COVID-19 pandemic or third parties, and not CHOP.  *See generally* Exs. 1–6 to Farmer Decl. (docket nos. 75-1, 75-2, 75-3, 75-4, 75-5 & 75-6).  Plaintiffs bring five causes of action against the City on behalf of themselves and the proposed class:  (i) violation of procedural due process;

1    (ii) violation of substantive due process; (iii) unlawful taking of their property;

2    (iv) negligence; and (v) nuisance.  TAC at ¶¶ 188–222.

3    **2.      The Proposed Class**

4          Pursuant to Federal Rule of Civil Procedure 23(c)(4), Plaintiffs move for

5    certification of an issues class solely for purposes of liability.  Rule 23(c)(4) provides that

6    "*[w]hen appropriate*, an action may be brought or maintained as a class action with

7    respect to particular issues."  Fed. R. Civ. P. 23(c)(4) (emphasis added).  Issue

8    certification is appropriate when "adjudication of the certified issues would significantly

9    advance the resolution of the underlying case, thereby achieving judicial economy and

10   efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996).

11   Rule 23(b)(3), however, still requires that common issues predominate over individual

12   issues and that class certification be superior to other litigation alternatives.  *Id.*

13         In this case, Plaintiffs propose an issues class comprised of one class, three

14   subclasses, and twenty-eight "particular issues" bearing on the City's liability, as well as

15   the issue of nominal damages with respect to Plaintiffs' federal claims.[1]  *See* Ex. 1 to

16   Weaver Decl. (docket no. 66-1).  Plaintiffs also request that the Court certify two issues

17   related to a discovery dispute regarding certain City officials' missing text messages.  *See*

18   *id.*  The Court has previously provided Plaintiffs with an opportunity to conduct class

19   discovery.  *See* Order (docket no. 23).

20   _____

21   [1] Plaintiffs' proposed issues address only the City's liability and class members' entitlement to nominal
     damages.  Thus, even if a class were certified, class members would be required to pursue their claims for
22   individual damages, if any, in subsequent proceedings.  *See* Ex. 2. to Weaver Decl. (docket no. 66-1).

23

Plaintiffs ask the Court to certify a class defined as:

> All persons or entities who on June 9, 2020 (the "Class Date"),[2] owned or managed real property in, had a licensed business in, or had an indoor residence in a building, in the area in the City of Seattle bounded by the following streets:  Denny Way, East Pike Street, Thirteenth Avenue, and East Broadway (the "Class Area").  This definition excludes the City of Seattle and any departments or agencies of the City of Seattle.

Mot. (docket no. 65 at 20).  At oral argument, Plaintiffs explained that they selected this "Class Area" because it is the sixteen-block area referenced in Mayor Durkan's June 30, 2020, executive order.  *See* Exec. Ord. 2020-08, Ex. 7 to Weaver Decl.  Plaintiffs also seek certification of three subclasses under Rule 23(c)(5), the:  (i) Property Owners Subclass, (ii) Business Owners Subclass, and (iii) Residents Subclass.[3]

The following map shows where Plaintiffs[4] are located in relation to the proposed Class Area and the SPD Red Zone, discussed above:

---

[2] Plaintiffs' Class Date is used to identify members of the putative class.  An individual, for example, who rented an apartment in the Class Area on June 10, 2020, would not be in the class.  Although the Class Date is a single day, Plaintiffs allege that the class suffered harm for the duration of CHOP, June 8, 2020, through July 1, 2020, and thereafter.  TAC at ¶¶ 3 & 9.

[3] Plaintiffs have not sufficiently explained why subclasses would be "appropriate," *see* Fed. R. Civ. P. 23(c)(5), in this case.  The Court finds that subclasses would serve no purpose in this action.  At oral argument, Plaintiffs' counsel was unable to articulate any meaningful rationale for the three subclasses.

[4] For ease of reference, the Court has included numbers throughout this Order immediately following plaintiffs' names.  These numbers correspond to the numbers in the map showing plaintiffs' locations in relation to the proposed Class Area.

ORDER - 6



App. A to Def.'s Resp. (docket no. 74 at 44).[5]

Hunters Property Holdings, LLC (14), The Richmark Company d/b/a Richmark Label (10), Wade Biller (12), 12th and Pike Associates LLC (4), and Olive Street Apartments LLC (6) seek to represent the Property Owners Subclass.  Mot. (docket

_____

[5] As of the date of this Order, plaintiffs Argento LLC (1), *see* docket no. 59, and Northwest Liquor and Wine LLC (5), *see* docket no. 71, have voluntarily dismissed their claims against the City.  Although Madrona Real Estate Services LLC (24) is physically located outside of the proposed Class Area, it is a member of the putative class because it manages a building within the area.  *See* Ex. 3 to Weaver Decl. (docket no. 66-1) (explaining that Madrona Real Estate Services LLC manages a building at 12th Avenue and East Pike Street).  At oral argument, Plaintiffs conceded that Greenus Building, Inc. (20), Madrona Real Estate Investors IV LLC (23), and Madrona Real Estate Investors VI LLC (22) are not members of the putative class because these entities are located outside of the proposed Class Area.  *See also* Pls.' Resp. to Def.'s 2d Interrogs. No. 9, Ex. 82 to Farmer Decl. (docket no. 75-82).  Hunters Capital, LLC (2, 3, 14, 15, 19, 20 & 21) and Redside Partners LLC (9, 16 & 25) are members of the putative class because they own and/or manage properties within the Class Area.  *See* Ex. 3 to Weaver Decl.  Nevertheless, they also seek damages for three properties located outside of the area, specifically, the Dunn Motors Building (19), the Colman Building (21), and a building at 1323 East Pine Street (25).  *See* Pls.' Resp. to Def.'s 2d Interrogs. No. 9.  Plaintiffs have requested that the claims associated with these properties proceed alongside the claims of the putative class, if certified.

no. 65 at 21).  SRJ Enterprises d/b/a Car Tender (18), Bergman's Lock and Key Services LLC (13), Shuffle LLC d/b/a Cure Cocktail (17), and Sway and Cake LLC (11) seek to represent the Business Owners Subclass.  *Id.*  Finally, Matthew Ploszaj (8) seeks to represent the Residents Subclass.[6]  *Id.*

**Discussion**

**1.      Standard for Class Certification**

Rule 23 operates as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  To maintain a class action, a plaintiff must "affirmatively demonstrate" compliance with Rule 23.  *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  The prerequisites of Rule 23 are not mere pleading standards, but rather are evidentiary thresholds.  *See Wal-Mart*, 564 U.S. at 350.  "Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under [Rule 23(c)(4)] and proceed with class treatment of these particular issues."  *Valentino*, 97 F.3d at 1234.  The Ninth Circuit's approval of issues classes under Rule 23(c)(4) does not obviate the need to meet the requirements of Rules 23(a) and (b).

---

[6] Hunters Capital, LLC (2, 3, 14, 15, 19, 20 & 21), Onyx Homeowners Association (7), Madrona Real Estate Services LLC (24), and Redside Partners LLC (9, 16 & 25) request appointment only as representatives of the main class.  Mot. (docket no. 65 at 20).  These plaintiffs do not seek to represent any of the three proposed subclasses.  *See* Ex. 3 to Weaver Decl. (docket no. 66-1).

ORDER - 8

*See Amador v. Baca*, No. 10-cv-01649, 2016 WL 6804910, at *3 (C.D. Cal. July 27, 2016). Plaintiffs bear the burden, by a preponderance of the evidence, *see Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, No. 19-56514, 2022 WL 1053459, at *5 (9th Cir. Apr. 8, 2022), to prove that there are questions of law or fact common to class members that "will resolve an issue that is central to the validity of each one of the claims in one stroke," *see Walmart*, 564 U.S. at 350.

Here, Plaintiffs bear the burden of proving that all four criteria of Rule 23(a) are satisfied, namely that: (i) the class is so numerous that joinder of all members is impracticable; (ii) questions of law or fact common to the class exist; (iii) Plaintiffs' claims are typical of the claims of the class; and (iv) Plaintiffs will fairly and adequately protect the interests of the class, *see* Fed. R. Civ. P. 23(a). If all Rule 23(a) criteria are met, Plaintiffs must also establish that the proposed class qualifies under at least one of the three provisions of Rule 23(b). *See Comcast*, 569 U.S. at 33. With these standards in mind, the Court turns to the requirements of Rule 23(a).

**2.     Rule 23(a) Requirements**

  **a.     Numerosity**

Plaintiffs estimate that the Class Area contains at least 4,500 to 5,000 putative class members, comprised of approximately 4,000 residents, 300 businesses, and 600 property owners. Weaver Decl. at ¶ 2 (docket no. 66); *see also* Fed. R. Civ. P. 23(a)(1) (requiring that a proposed class be "so numerous that joinder of all members is impracticable"). The City appears to concede that Rule 23(a)(1)'s numerosity

1   requirement is satisfied in this case.[7]  Accordingly, the Court concludes that the proposed

2   class is sufficiently numerous.

3   **b.    Commonality**

4   To satisfy Rule 23(a)(2)'s commonality requirement, Plaintiffs must demonstrate

5   that the claims of all potential class members depend on a common question of such

6   nature as "is capable of classwide resolution."  *Olean*, 2022 WL 1053459, at *4 (quoting

7   *Wal-Mart*, 564 U.S. at 350).  The test is whether the determination of the truth or falsity

8   of the common question "will resolve an issue that is central to the validity of each one of

9   the claims in one stroke."  *Id.* at *4 (quoting *Wal-Mart*, 564 U.S. at 350).  As the

10  Supreme Court has explained:

11          What matters . . . is not the raising of common 'questions'—even in
            droves—but, rather the capacity of a class-wide proceeding to generate
12          common *answers* apt to drive the resolution of the litigation.  Dissimilarities
            within the proposed class are what have the potential to impede the
13          generation of common answers.

14  *Wal-Mart*, 564 U.S. at 350 (emphasis in original, quoting Richard A. Nagareda, *Class*

15  *Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).  In

16  contrast, an individual question is one where putative class members must present

17  evidence that varies from member to member.  *Olean*, 2022 WL 1053459, at *4 (citing

18  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

19  The City argues that dissimilarities within the proposed class frustrate common

20  answers to the particular issues Plaintiffs seek to certify under Rule 23(c)(4).  To prove

21  _____

22  [7] The City does not address numerosity in its response to Plaintiffs' motion.

23

ORDER - 10

1    the issues are common questions of law or fact central to the validity of their claims,

2    Plaintiffs must establish that the proposed issues "are capable of being established

3    through a common body of evidence, applicable to the whole class." *See id.* at *6.  The

4    Court must engage in a "rigorous assessment" of the available evidence and the method

5    by which Plaintiffs intend to prove the common questions in one stroke.  *See id.* at *7

6    (citation omitted).  The Court's inquiry will necessarily "entail some overlap with the

7    merits" of the underlying claims because class certification considerations are generally

8    "enmeshed" in the factual and legal issues associated with the causes of action being

9    pursued.  *See Wal-Mart*, 564 U.S. at 351; *see also Comcast*, 569 U.S. at 33–34.  The

10   Court must, therefore, examine the elements of Plaintiffs' claims and the particular issues

11   for which class certification is sought.

12                            **i.        Procedural Due Process**

13            Plaintiffs' first cause of action alleges a violation of procedural due process.

14   TAC at ¶¶ 188–96.  Under Rule 23(c)(4), Plaintiffs desire to certify the following

15   particular issues as to their procedural due process claim:

16   - Did the three Subclasses have a constitutionally protected interest in
       unfettered access to their property via public rights-of-way?
17   - Did the Property Owners Subclass and Business Owners Subclass have
       a constitutionally protected interest in economic use of their properties?
18   - Did the City act to deprive Class members of those constitutionally
       protected interests?
19   - Did the deprivation occur without due process?
20   - Is the deprivation without due process justified by a sufficient
       countervailing justification?
21   - Was the deprivation pursuant to City policy under 42 U.S.C. § 1983?
       - Are members of each of the three Subclasses entitled to nominal
22       damages?

23

ORDER - 11

1 | Ex. 1 to Weaver Decl. (docket no. 66-1).

2 |      The Fourteenth Amendment provides:  "[N]or shall any State deprive any person

3 | of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

4 | To prevail on a Section 1983 claim based upon procedural due process, Plaintiffs must

5 | prove three elements:  (i) a liberty or property interest protected by the Constitution;

6 | (ii) governmental deprivation of that interest; and (iii) lack of process.  *Portman v.*

7 | *County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  "Property interests, of course,

8 | are not created by the Constitution."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564,

9 | 577 (1972).  "Rather they are created and their dimensions are defined by existing rules

10 | or understandings that stem from an independent source such as state law . . . ."  *Id.*

11 |      The proposed issues Plaintiffs have identified for certification under Rule 23(c)(4)

12 | cannot be answered with generalized proof on a class-wide basis.[8]  Rather, these

13 | questions require the class to present evidence that varies from member to member.  *See*

14 | *Olean*, 2022 WL 1053459, at *4.  For example, whether the City acted to deprive the

15 | class of a purported "interest in unfettered access to their property via public rights-of-

16 |

---

17 | [8] The Court notes that the first two questions are questions of law regarding constitutionally protected

18 | interests in property.  Plaintiffs ask whether: (i) the members of the three Subclasses have a constitutionally protected interest in unfettered access to their property via public rights-of-way, and (ii) the members of the Property Owners Subclass and the Business Owners Subclass have a

19 | constitutionally protected interest in the economic use of their properties.  Ex. 1 to Weaver Decl.  The Court recognizes that these questions might generate common answers concerning one or more of the property interests of individuals and entities in the Class Area.  Certification of these issues under Rule

20 | 23(c)(4), however, is not appropriate.  As discussed above, issue certification is appropriate only when the certified issues would "significantly advance the resolution of the underlying case."  *Valentino*, 97 F.3d at

21 | 1229.  Certification of these two questions alone will not advance the resolution of Plaintiffs' procedural due process claim because the questions do not reach the core issues of the claim, that is, whether and to

22 | what extent the City deprived the putative class members of a property interest without due process.

23 |

ORDER - 12

way" requires individualized proof of an actual deprivation.  The owner of Car Tender
(18) testified that protesters blocked the sidewalks around its business but never blocked
access to its parking lot.  *See* McDermott Dep. at 164:3–6, Ex. 47 to Farmer Decl.
(docket no. 75-47).  Similarly, Richmark Label (10) was always able to access its
business, though "[s]ometimes not exactly when [it] needed to."  *See* Donner Dep. at
49:17–50:14, Ex. 19 to Farmer Decl. (docket no. 75-19).  But commonality requires proof
that all class members have suffered the same injury.  *Wal-Mart*, 564 U.S. at 349–50
("This does not mean merely that [class members] have all suffered a violation of the
same provision of law.").  12th and Pike Associates LLC (4), a plaintiff in this case, seeks
damages for lost rent from one of its tenants, Unicorn Bar, a putative class member
located within the proposed Class Area at 1118 East Pike Street.  *See* Ex. 12 to Farmer
Decl. (docket no. 75-12).  Unicorn Bar remained closed throughout the protest due to
COVID-19 restrictions.  *See* Ex. 10 to Farmer Decl. (docket no. 75-10).  To establish that
the City caused an alleged deprivation, Car Tender (18) and Richmark Label (10) must
rely on different evidence than Unicorn Bar, which remained closed for reasons unrelated
to the protest.  The question whether the City acted to deprive the class of purported
property interests requires every class member to produce evidence of their individual
rights and how the City caused an alleged deprivation.

Whether the deprivation was pursuant to City policy under 42 U.S.C. § 1983,
occurred without due process, or was justified, *see* Ex. 1 to Weaver Decl., are also
incapable of classwide resolution because the answers to these questions requires
individualized proof that the City caused a deprivation of the class members' rights.  The

1  questions are whether *the deprivation* occurred without process, was pursuant to City

2  policy under 42 U.S.C. § 1983, and justified under the circumstances of the ongoing civil

3  rights protest during the class period.  The existence of a City policy or a lack of process,

4  standing alone, does not advance Plaintiffs' procedural due process claim if the class

5  members were not deprived of any constitutionally protected right.[9]  Thus, the Court

6  concludes that Plaintiffs have not demonstrated commonality as to the particular issues

7  for their procedural due process claim.

8                          **ii.       Substantive Due Process**

9          Plaintiffs' second cause of action alleges a violation of substantive due process.

10  TAC at ¶¶ 197–202.  Plaintiffs ask the Court to certify the following particular issues for

11  their substantive due process claim:

12  • Did the City's affirmative actions or statements create or expose the Class
        to an actual, particularized danger the Class would not have otherwise
13       faced?
    • Was the City deliberately indifferent to the known dangers?
14  • Was it foreseeable that the types of injuries suffered by the Class would
        be suffered?
15  • Were the City's actions and statements pursuant to City policy under
        42 U.S.C. § 1983?
16  • Are Class members entitled to nominal damages?

17  Ex. 1 to Weaver Decl.

18

19  _____

20  [9] The question of nominal damages is not appropriate for certification under Rule 23(c)(4) because it does
    not "significantly advance the resolution" of this action.  *Valentino*, 97 F.3d at 1229.  When a plaintiff
    proves a violation of his or her constitutional rights, nominal damages are "awarded by default until the
21  plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory
    damages."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021).  The parties do not dispute that a
22  plaintiff who prevails on his or her constitutional claims is entitled to nominal damages in the absence of
    actual damages.

23

ORDER - 14

1    To establish a substantive due process claim a plaintiff must show:

2 (i) governmental deprivation of life, liberty, or property; and (ii) "conscience shocking

3 behavior by the government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).

4 "The Due Process Clause is a limitation on state action and is not a 'guarantee of certain

5 minimal levels of safety and security.'" *Martinez v. City of Clovis*, 943 F.3d 1260, 1271

6 (9th Cir. 2019) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S.

7 189, 195 (1989)).  Because "the Fourteenth Amendment's Due Process Clause generally

8 does not confer any affirmative right to governmental aid, even where such aid may be

9 necessary to secure life, liberty, or property interests," government actors are usually not

10 required to protect individuals from third parties.  *Patel v. Kent Sch. Dist.*, 648 F.3d 965,

11 968 (9th Cir. 2011).  The Ninth Circuit has recognized two exceptions to this general

12 rule:  (i) "a special relationship between the plaintiff and the state may give rise to a

13 constitutional duty to protect," and (ii) a duty to protect may arise from a state-created

14 danger.  *Martinez*, 943 F.3d at 1271–72.  Only the state-created danger exception is at

15 issue in this case.[10]

16    Under the state-created danger exception, a state may violate substantive due

17 process if it "'affirmatively places [a plaintiff] . . . in danger by acting with 'deliberate

18 indifference' to a 'known or obvious danger.'"  *Martinez*, 943 F.3d at 1271 (quoting

19 *Patel*, 648 F.3d at 971–72).  This exception requires proof that:  (i) an officer's

20 _____

21 [10] The special-relationship exception is not at issue in this case, and Plaintiffs have not addressed it in
their motion or reply.  Moreover, plaintiffs' proposed issues do not ask whether the City and the putative
22 class had a special relationship sufficient to establish a constitutional duty to protect.

23

ORDER - 15

1   affirmative actions created or exposed the plaintiff to an actual, particularized danger that

2   he or she would not otherwise have faced, (ii) the plaintiff suffered a foreseeable injury,

3   and (iii) the officer was deliberately indifferent to the known danger.  *Id.*  A plaintiff's

4   burden is high because proof of deliberate indifference requires a culpable mental state.

5   *Id.* at 1274.  Thus, a plaintiff must show that a state actor recognized "an unreasonable

6   risk and actually intend to expose the plaintiff to such risks without regard to the

7   consequences to the plaintiff."  *Id.* (citation omitted).  "In other words, the defendant

8   'knows that something *is* going to happen but ignores the risk and exposes [the plaintiff]

9   to it.'"  *Patel*, 648 F.3d at 974 (alteration and emphasis in original, quoting *L.W. v.*

10  *Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

11          In this case, Plaintiffs fail to demonstrate commonality as to the proposed

12  particular issues because the issues cannot be answered through generalized proof.

13  Whether the City exposed class members to an actual, *particularized* danger will require

14  evidence that varies from member to member.  Plaintiffs allege the City's actions greatly

15  increased the likelihood that members of the putative class would experience many

16  diverse harms, including property damage, loss of business revenue, personal injury, and

17  the loss of use of property, among other harms.  TAC at ¶ 199.  But Plaintiffs have not

18  presented evidence to support that the putative class members were exposed to or

19  experienced the same dangers.

20          In *Wal-Mart*, a leading case on class certification, the plaintiffs alleged

21  discrimination in violation of Title VII of the Civil Rights Act of 1964.  564 U.S. at 343.

22  The plaintiffs desired to litigate the Title VII claims of all female employees at Wal–

23

Mart's stores in a nationwide class action; however, class certification was not consistent

with Rule 23(a)(2)'s commonality requirement.  As the Court explained:

> [P]roof of commonality necessarily overlaps with [plaintiffs'] merits contention that Wal–Mart engages in a *pattern or practice* of discrimination. That is so because, in resolving an individual's Title VII claim, the crux of the inquiry is "the reason for a particular employment decision," *Cooper v. Fed. Rsrv. Bank of Richmond,* 467 U.S. 867, 876 (1984).  Here [plaintiffs] wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*.

*Id.* at 352 (emphasis in original).  Similarly, Plaintiffs in this case have not demonstrated

how examination of their individual experiences during CHOP are sufficient to establish

the City's liability as to the entire putative class.  Plaintiff Matthew Ploszaj (8) alleges

that protestors broke into his apartment during CHOP.[11]  Ploszaj Dep. at 84:17–18,

Ex. 16 to Weaver Decl. (docket no. 66-1).  Although Ploszaj will likely contend that the

City's actions in creating or encouraging CHOP exposed him to that danger, his

experience cannot be used to establish that the City violated the substantive due process

rights of putative class members who remained secure in their homes or businesses

throughout the protest.  Other class members might argue, for example, that the City

violated their substantive due process rights in some other way, such as increasing the

risk of graffiti on their properties.  These distinct injuries demonstrate that Plaintiffs'

issues are not susceptible to generalized proof and will not generate common answers

---

[11] The Court questions whether the City is liable under these circumstances for the conduct of the third party.

1   necessary to satisfy Rule 23(a)(2).  *See Wal-Mart*, 564 U.S. at 349–50.  Many persons

2   who resided in the Class Area presumably suffered no loss of their rights during this

3   period.  For example, as the City referenced during oral argument, the one-block portion

4   of the Class Area bounded by East Denny Way (to the north), Thirteenth Avenue (to the

5   east), East Howell Street (to the south), and Twelfth Avenue (to the west) was not near

6   the barriers or within the SPD Red Zone.  Plaintiffs have not presented evidence

7   sufficient to show that persons in this area were exposed to the same dangers as Plaintiffs

8   or other members of the putative class.

9           **iii.**         **Takings**

10         Plaintiffs' third cause of action alleges a violation of the Fifth Amendment's

11   Takings Clause, TAC at ¶¶ 203–08, which applies to local governments through the

12   Fourteenth Amendment.  *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155,

13   160 (1980).  The Fifth Amendment provides:  "nor shall private property be taken for

14   public use, without just compensation."  U.S. Const. amend. V.  When the government

15   physically acquires private property for public use, a "physical taking" has occurred.

16   *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).  If the government imposes

17   regulations that restrict a landowner's use of his or her own property, it might commit a

18   "regulatory taking."  *Id.* at 2072.  A temporary interference with the use of property can

19   be considered a regulatory taking.  *Penn Cent. Transp. Co. v. New York City*, 438 U.S.

20   104, 124 (1978); *see also Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610,

21   626 (9th Cir. 2020).  Whether a regulation amounts to a regulatory taking requires a court

22   to engage in "ad hoc, factual inquiries."  *See Penn Cent.*, 438 U.S. at 124 (explaining that

23

a court considers multiple factors such as the economic impact of the regulation and the extent to which the regulation has interfered with a plaintiff's investment-backed expectations).

Washington and federal courts "are reluctant to find that a compensable taking occurred where the government temporarily used or destroyed property in times of emergency." *Citoli v. City of Seattle*, 115 Wn. App. 459, 489, 61 P.3d 1165 (2002) (citing *Nat'l Bd. of Young Men's Christian Ass'ns (YMCA) v. United States*, 395 U.S. 85, 92–93 (1969)).  Where the "necessities" of civil disturbance require injury to private property, "the resulting losses must be borne by the owners of the property."  *Id.*  Action taken for the purpose of, and reasonably necessary to, public safety does not generally give rise to a compensable taking.  *Id.* at 491 ("Citoli effectively asks us to substitute either his judgment or our judgment for that of trained police officers on the best way to handle a building takeover situation.  This we decline to do.").

Under their takings claim, Plaintiffs allege the following:

> The City deprived Plaintiffs of [the rights to use and enjoy their properties, to exclude others from their properties, and to access their properties via public rights-of-way] by affirmatively creating, assisting, endorsing, and encouraging an indefinite, unpermitted invasion, occupation, and blockade of the public rights-of-way that provide access to Plaintiffs' private properties, as well as by affirmatively creating, assisting, endorsing, and encouraging the physical invasion of Plaintiffs' private properties by CHOP participants.

TAC at ¶ 205.  Plaintiffs allege that the City's actions caused them "economic harm, including through a loss of property value, loss of business revenue, and a loss of investment-backed expectations."  *Id.* at ¶ 208.  These allegations are broad in nature and

ORDER - 19

will necessitate an individual inquiry into whether and to what extent a taking occurred, and whether the police action was justified under all the circumstances.  Plaintiffs appear to recognize the broad nature of their allegations and have attempted to narrow the issues for certification by relying solely on the theory of a per se physical taking.  Although a regulation that goes too far might be categorized as a regulatory taking, "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point*, 141 S. Ct. at 2072.  A per se taking occurs whenever a regulation results in the physical appropriation of property.  *Id.*  Under this theory, Plaintiffs have identified the following particular issues for certification:

- Did the City's actions constitute a *per se* taking of the rights of the members of the Subclasses?
  - Did the City's actions interfere with the ability to access properties?
  - Did the City's actions interfere with the ability to exclude others from properties?
- Was this taking justified by an "emergency"?
- Were the City's actions and statements pursuant to City policy under 42 U.S.C. § 1983?
- Are members of the Subclasses entitled to nominal damages?

Ex. 1 to Weaver Decl.

At oral argument, Plaintiffs claimed that this action is similar to *Cedar Point*, where the Supreme Court held that a California regulation granting union organizers a right to temporarily access agricultural employers' properties constituted a per se physical taking.  141 S. Ct. at 2080.  The California regulation did not restrict an owner's use of its own property, rather, the regulation appropriated the owner's right to exclude third-party union organizers from its land.  *Id.* at 2072–74.  In *Cedar Point*, there was no

1    question that the California regulation permitted union organizers to access private land

2    for a specified period of time, or that the union organizers actually entered an owner's

3    property.  *Id.* at 2069–70.

4            In this case, Plaintiffs have not presented sufficient evidence to prove that all class

5    members were unable to access their properties or were deprived of the ability to exclude

6    others from their land.[12]  The evidence establishes that protesters regularly moved

7    barriers to obstruct vehicular and pedestrian traffic in the area.  *See*, *e.g.*, Zimbabwe Dep.

8    at 16:15–25, Ex. 5 to Weaver Decl.; Scoggins Dep. at 190:23–191:19, Ex. 8 to Weaver

9    Decl. (docket no. 66-1); Hara Dep. at 109:11–21, Ex. 9 to Weaver Decl. (docket no. 66-

10   1).  No evidence, however, shows that every class member found themselves inside the

11   area obstructed by the barriers, or that class members outside the barriers were unable to

12   access their properties.  Ploszaj (8) claims that protestors broke into his apartment, *see*

13   Ploszaj Dep. at 84:17–18, Ex. 16 to Weaver Decl. (docket no. 66-1), but Plaintiffs have

14   not presented evidence that the entire class experienced a similar invasion.  Further,

15   Plaintiffs have not presented sufficient evidence to suggest that Plaintiffs or the putative

16   class were unable to exclude others from their properties.  The majority of Plaintiffs'

17   allegations focus on protestors' occupation of public spaces.  *See* TAC at ¶ 5 ("CHOP

18   participants occupied the public streets, sidewalks, and parks in the area at all hours of

19   _____

20   [12] Under Plaintiffs' theory of a per se taking, the class must also prove that the City appropriated their
     private property, either for itself or a third party.  *See id.* at 2071; s*ee also Yee v. City of Escondido*, 503

21   U.S. 519, 527–28 (1992) (holding that a local rent control ordinance did not amount to a physical taking
     because the government had not required any physical invasion of petitioners' property).  For example,

22   the California regulation at issue in *Cedar Point* was a physical taking because the regulation granted
     labor organizations a "right to take access" to an agricultural employer's property.  141 S. Ct. at 1069.

23

1  the day and night.").  Despite Plaintiffs' contention, individual issues remain, and the

2  putative class members must rely on individualized evidence to prove that they were

3  deprived of access to their properties or of the ability to exclude others from their

4  properties.  Therefore, the Court finds that the proposed issues cannot be answered in one

5  stroke, as Rule 23(a)(2) requires.

6         **iv.        Negligence**

7         Plaintiffs' fourth cause of action alleges that the City was negligent in its handling

8  of CHOP.  TAC at ¶¶ 209–15.  Plaintiffs ask to the Court to certify the following issues

9  under Rule 23(c)(4):

10       • Did the City owe a duty to the Class?
              o Does the failure-to-enforce exception to the public-duty doctrine
11              apply?
              o Does the legislative-intent exception to the public-duty doctrine
12              apply?
         • Did the City breach its duty?
13       • Were the acts of third parties so highly extraordinary or improbable as to
            be wholly beyond the range of expectability?
14
15  Ex. 1 to Weaver Decl.

16        To prevail on a negligence claim, a plaintiff must show:  (i) the existence of a

17  duty to the plaintiff; (ii) a breach of that duty; (iii) a resulting injury; and (iv) the breach

18  as the proximate cause of the injury.  *Ehrhart v. King County*, 195 Wn.2d 388, 396, 460

19  P.3d 612 (2020).  "Whether the defendant is a governmental entity or a private person, to

20  be actionable, the duty must be one owed to the injured plaintiff, and not one owed to the

21  public in general."  *Id.* at 396–97 (quoting *Taylor v. Stevens County*, 111 Wn.2d 159,

22  163, 759 P.2d 447 (1988)).  This principle is known as the public duty doctrine.  The

23

1   essence of the doctrine is that "a duty to all is a duty to no one." *Taylor*, 111 Wn.2d at

2   163 (citation omitted); *see also Mull v. City of Bellevue*, 64 Wn. App. 245, 251, 823 P.2d

3   1152 (1992) ("[U]nder the public duty doctrine, a plaintiff cannot recover from a

4   municipal corporation unless he or she can show that the city owed a duty to the plaintiff

5   as an individual and not merely to the public in general.").  Washington courts recognize

6   four exceptions to the doctrine:  (i) legislative intent, (ii) failure to enforce, (iii) special

7   relationship, and (iv) the rescue doctrine.  *Ehrhart*, 195 Wn.2d at 400.  In this case,

8   Plaintiffs' proposed issues address only two of the four exceptions, the failure-to-enforce

9   and legislative-intent exceptions.[13]

10          The failure-to-enforce exception "recognizes that some statutes impose on [the]

11   government a duty owed to a particular class or category of individuals, such that the

12   failure to enforce those statutes breaches a duty that can sustain an action in tort." *Id.* at

13   402.  To prove that this exception applies, a plaintiff must show that:  "[i] governmental

14   agents responsible for enforcing statutory requirements possess actual knowledge of a

15   statutory violation, [ii] fail to take corrective action despite a statutory duty to do so, and

16

17   ─────────────────

18   [13] In their responses to the City's interrogatories, Plaintiffs have identified three chapters of the Seattle
     Municipal Code and numerous state statutes, *see* Pls.' Resp. to Def.'s 2d Interrogs. Nos. 3–4, Ex. 82 to
     Farmer Decl. (docket no. 75-82), which allegedly evidence governmental intent to protect the putative
19   class.  Plaintiffs, however, have not addressed these provisions in their motion or reply.  The legislative
     intent exception applies "when the terms of a legislative enactment evidence an intent to identify and
     protect a particular and circumscribed class of persons." *Bailey v. Town of Forks*, 108 Wn.2d 262, 268,
20   737 P.2d 1257 (1987).  The intent must be "clearly expressed within the provision—it will not be
     implied." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 930, 969 P.2d 75 (1998).  Plaintiffs
     have not presented sufficient evidence to show that any of the identified provisions were enacted to
21   protect the putative class.  Because Plaintiffs have not addressed the particular provisions at issue, the
     Court cannot determine whether the legislative-intent exception should even be applied in this case, or
22   whether application of the exception will generate common answers under Rule 23(a)(2).

23

ORDER - 23

1  [iii] the plaintiff is within the class the statute intended to protect."  *Id.* (citing *Bailey*, 108

2  Wn.2d at 268 (finding that the failure-to-enforce exception applied when a police officer,

3  who knew or should have known that an individual was intoxicated, allowed the

4  individual to operate a vehicle which later caused injuries to plaintiff)).

5      In this case, Plaintiffs allege that the City failed to enforce numerous state statutes

6  and Seattle Municipal Code provisions.  Pls.' Resp. to Def.'s 2d Interrogs. Nos. 3–4,

7  Ex. 82 to Farmer Decl.  Whether any of these provisions impose a duty on the City, and

8  whether the City breached that duty, cannot be resolved with generalized proof.  Even if

9  the Court assumes that Plaintiffs have identified state statutes or municipal provisions

10  that impose a duty on the City to take corrective action, to establish liability under the

11  failure-to-enforce exception, Plaintiffs must show that the City had "actual knowledge of

12  a statutory violation."  *Ehrhart*, 195 Wn.2d at 402.  But the proposed Class Area is large,

13  stretching from Broadway in the west to Thirteenth Avenue in the east, and from East

14  Denny Way in the north to East Pike Street in the south.  Plaintiffs estimate that this area

15  contains at least 4,000 residents, 300 businesses, and 600 property owners.  Weaver Decl.

16  at ¶ 2.  Knowledge of a particular statutory violation at the intersection of Broadway and

17  East Pike Street would not impose a duty on the City with respect to a separate statutory

18  violation near East Denny Way and Thirteenth Avenue for which the City had no

19  knowledge.  Thus, the failure-to-enforce exception cannot be applied on a class-wide

20  basis in this action.

21

22

23

### v.      Nuisance

Plaintiffs' fifth cause of action alleges that the City's affirmative acts, or failures to act, caused several types of nuisance.  TAC at ¶¶ 216–22.  "Nuisance is 'a substantial and unreasonable interference with the use and enjoyment of land.'"  *Grundy v. Thurston County*, 155 Wn.2d 1, 6, 117 P.3d 1089 (2005) (quoting *Bodin v. City of Stanwood,* 79 Wn. App. 313, 318 n.2, 901 P.2d 1065 (1995)); *see also* RCW 7.48.010.  Plaintiffs propose the following issues for certification under Rule 23(c)(4):

- Did a City act or failure to act give rise to a nuisance?
    - Did the act or failure annoy, injure, or endanger the comfort, repose, health, or safety of the Class?
    - Did the act or failure to act make any park or street dangerous for passage, obstruct or tend to obstruct any park or street, or constitute a hazard to vehicles or persons using any park or traveling on any street?
    - Did the act or failure render other persons insecure in life, or in the use of property?
- Was any nuisance reasonable in the circumstances?

Ex. 1 to Weaver Decl.

The particular issues for Plaintiffs' nuisance claim also fail to generate common answers.  Plaintiffs allege that the City "created and maintained a series of unlawful and/or unreasonable conditions including excessive noise, public safety hazards, vandalism, and poor health and sanitation conditions" that "annoyed, injured, and endangered the comfort, repose, health, and safety of" Plaintiffs and the putative class.  TAC at ¶¶ 220–21.  Plaintiffs also allege that the City's actions resulted in the blocking of public rights-of-way.  *Id.* at ¶ 217.  Plaintiffs, however, have provided no evidence that putative class members all suffered the same type of nuisance.

1       The evidence shows that protesters periodically moved barriers that blocked

2   access to public streets and some individuals and entities found themselves outside the

3   area bounded by the barriers for the duration of the protest.  *See*, *e.g.*, App. C to Def.'s

4   Resp. (docket no. 74 at 47–48).  Some properties that were within the area cordoned off

5   by barriers were still accessible throughout the protest period.  *See* McDermott Dep. at

6   164:3–6, Ex. 47 to Farmer Decl.; Donner Dep. at 49:17–50:14, Ex. 19 to Farmer Decl.;

7   Thompson Dep. at 76:2–11 & 77:4–14, Ex. 48 to Farmer Decl. (docket no. 75-48).  Other

8   plaintiffs claim that they were unable to access their properties at certain times.  *See*, *e.g.*,

9   Ploszaj Dep. at 145:16–146:8, Ex. 16 to Weaver Decl.  But a putative class member who

10  was never affected by the barriers is unlikely to have experienced a nuisance arising from

11  blocked streets.

12      Similarly, a putative class member who was not exposed to excessive noise cannot

13  have experienced a noise-related nuisance.  Ploszaj (8) resided in an apartment in the

14  Class Area during the protest.  TAC at ¶ 30.  Ploszaj alleges that he experienced difficulty

15  sleeping every night due to individuals on the street "shouting into a bullhorn until odd

16  hours of the morning."  Ploszaj Dep. at 77:18–78:4.  Plaintiff Sway and Cake LLC (11) is

17  a clothing store located on Twelfth Avenue and East Pike Street.  TAC at ¶ 164; *see also*

18  Kilburn Dep. at 14:23–15:2, Ex. 32 to Weaver Decl. (docket no. 66-2).  Due to CHOP,

19  Sway and Cake LLC decided to board up its storefront and remain closed during the

20  protest.  Kilburn Dep. at 74:17–75:1 (explaining that the physical location was "shuttered

21  to the public" in June 2020 except for limited individual appointments in the second half

22  of the month).  Because the business remained closed throughout the protest, it was not

23

1    harmed by the excessive noise Ploszaj experienced.[14]  Plaintiffs ask the Court to certify a

2    series of questions to establish the City's liability for a class-wide nuisance without first

3    identifying the nature of the alleged nuisance.  This approach will not generate common

4    answers as required Rule 23(a)(2).

5         **c.    Typicality**

6         Rule 23(a)(3) requires that a plaintiff's claims or defenses be "typical of the claims

7    or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality

8    requirement is to assure that the interest of the named representative aligns with the

9    interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

10   "The test of typicality 'is whether other members have the same or similar injury,

11   whether the action is based on conduct which is not unique to the named plaintiffs, and

12   whether other class members have been injured by the same course of conduct.'"  *Ellis v.*

13   *Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (quoting *Hanon*, 976 F.2d at

14   508).  "Typicality refers to the nature of the claim or defense . . . not to the specific facts

15   from which it arose or the relief sought."  *Id*.

16        The City does not argue that Plaintiffs' claims or defenses are atypical of the

17   claims or defenses of putative class.  Instead, the City contends that Plaintiffs have failed

18   to establish typicality because they have not shown that putative class members suffered

19   the same or similar injury as Plaintiffs, or any injury at all.  "Where some of the class

20

21   _____

22   [14] Additionally, businesses that close in the evenings were not exposed to the same excessive noise at
     night.

23

ORDER - 27

members have not suffered any injury, though the class representative has, the typicality

requirement of Rule 23(a) is not satisfied." *Ferguson v. Randy's Trucking, Inc.*, No. 15-

cv-00697, 2016 WL 4082900, at *10 n.7 (E.D. Cal. Mar. 11, 2016) (citing *O'Neill v.*

*Gourmet Sys. of Minn., Inc.*, 219 F.R.D. 445, 453 (W.D. Wis. 2002)).  Essentially, the

City argues that Plaintiffs have defined the class so broadly that it is impossible to

conclude that Plaintiffs' claims and experiences are typical of those of the putative class

members.

        The Court agrees that Plaintiffs have failed to demonstrate typicality in this case.

Plaintiffs have not presented evidence that their experiences and injuries are reasonably

co-extensive with those of the putative class members.  For example, in the context of

Plaintiffs' nuisance claim, Plaintiffs have not shown that Ploszaj's (8) experience in his

apartment, *see* Ploszaj Dep. at 77:18–78:4, Ex. 16 to Weaver Decl., is similar to the

experience of someone residing blocks away.  Similarly, Plaintiffs have not shown that

Car Tender's (18) experience, *see generally* McDermott Dep., Ex. 47 to Farmer Decl., is

similar to the experience of other businesses in the area, such as Unicorn Bar, which

remained closed in June 2020 due to applicable COVID-19 restrictions.  *See* Ex. 10 to

Farmer Decl.; *see also* Ex. 9 to Farmer Decl. (docket no. 75-9) (showing that another

local business, Capitol Cider, did not reopen until June 24, 2020 due to pandemic-related

issues).[15]  An entity or individual located within the area obstructed by the barriers, *see*,

---

[15] Some plaintiffs claim that they suffered economic injury from lost rental income due to CHOP.  But the available evidence suggests that lost rental income was sometimes the result of COVID-19.  The Riveter, a putative class member, gave Hunters Capital, LLC notice on April 1, 2020, that it needed to renegotiate its lease due to the effects of COVID-19 on its business operations.  *See* Cronauer Dep. at 101:2–20 &

1    *e.g.*, Wanagel Dep. at 86:4–87:13, Ex. 17 to Weaver Decl. (docket no. 66-1), might have

2    suffered different injuries than a putative class member located outside the barriers, if

3    they suffered any injuries at all.  The same is true for all of Plaintiffs' claims.  The

4    proposed class will capture thousands of property owners, business owners, and residents

5    in the Class Area.  Plaintiffs contend that they, and the putative class, have suffered harm.

6    *See generally* Weaver Decl. (docket no. 66-1); McDermott Decl. (docket no. 67);

7    Cronauer Decl. (docket no. 68); Augustine Decl. (docket no. 69); 2d Weaver Decl.

8    (docket no. 81); Pak Decl. (docket no. 82); Fox Decl. (docket no. 83).  The Court,

9    however, having reviewed the evidence, cannot conclude that Plaintiffs and the putative

10   class experienced similar circumstances, or that whether members of the putative class

11   might have suffered harm could be decided on a class-wide basis.

12         **d.    Adequacy**

13         Plaintiffs must further show that they will "fairly and adequately protect the

14   interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under

15   Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class

16   they seek to represent."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  To

17   determine adequacy, the Court "resolve[s] two questions: '(1) do the named plaintiffs and

18   their counsel have any conflicts of interest with other class members and (2) will the

19   named plaintiffs and their counsel prosecute the action vigorously on behalf of the

20   _____

21   178:13–22, Ex. 14 to Farmer Decl. (docket no. 75-14); Ex. 15 to Farmer Decl. (docket no. 75-15).
     Notably, during the proposed class period, Richmark Label (10) saw an increase in revenue in June 2020.

22   *See* Ex. 40 to Farmer Decl. (docket no. 75-40).

23

1  class?'"  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019)

2  (citation omitted).

3       The City argues that Plaintiffs have failed to establish adequacy because some

4  putative class members' opinions concerning CHOP are divided.  The Court finds these

5  alleged conflicts, if any, to be trivial.  *See In re Online DVD-Rental Antitrust Litig.*, 779

6  F.3d 934, 942 (9th Cir. 2015) (explaining that a district court does not "abuse its

7  discretion [under Rule 23(a)(4)] when conflicts are trivial").  "Only conflicts that are

8  fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from

9  meeting the Rule 23(a)(4) adequacy requirement."  *Id.* (quoting 1 William B. Rubenstein

10  et al., NEWBERG ON CLASS ACTIONS § 3.58 (5th ed. 2011)).  "A conflict is fundamental

11  when it goes to the specific issues in controversy," *see id.*, or "where some [class

12  members] claim to have been harmed by the same conduct that benefited other members

13  of the class," *AdTrader, Inc. v. Google LLC*, No. 17-cv-07082, 2020 WL 1922579, at *6

14  (N.D. Cal. Mar. 24, 2020) (quoting *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d

15  1181, 1189 (11th Cir. 2003)).  For example, a district court might find a fundamental

16  conflict exists if a proposed class representative seeks to limit the class's recovery to

17  advance his or her own interests.  *Id.* (citation omitted).

18       To show that Plaintiffs are not adequate representatives of the class, the City refers

19  to Poquitos, a restaurant located within the proposed Class Area at 1000 East Pike Street.

20  Instead of joining this lawsuit, Poquitos pursued its own claim for damages against the

21  City.  *See* Ex. 42 to Farmer Decl. (docket no. 75-41) (showing that the City settled a

22  claim with Poquitos for $123.32); *but see* Fox Decl. at ¶¶ 7–8 (docket no. 83) (a

23

ORDER - 30

1  declaration from Poquitos' owner explaining that the business suffered thousands of

2  dollars in damages as a result of CHOP and the $123.32 claim against the City was for a

3  broken window).  The City also cites a June 17, 2020, email in which a resident of the

4  Broadway Building (14) expressed support for CHOP, *see* Ex. 23 to Farmer Decl. (docket

5  no. 75-23), and a letter from a group of residents at an apartment building across the

6  street from SPD's East Precinct, explaining that some residents felt a "strong sense of

7  increased safety as the police forces abandoned the East Precinct and our streets," Ex. 22

8  to Farmer Decl. (docket no. 75-22 at 5).  Support for CHOP among some putative class

9  members, however, is not a fundamental conflict of interest in this case, and Plaintiffs

10 also support the free speech rights of many CHOP participants.  TAC at ¶ 1.  The City

11 has not provided any reason to believe that Plaintiffs and their counsel could not

12 prosecute this action vigorously on behalf of any putative class.  Therefore, the Court

13 concludes that Plaintiffs have demonstrated adequacy under Rule 23(a)(4).

14 **3.     Rule 23(b)(3) Requirements**

15        **a.     Predominance**

16        Even if Plaintiffs had satisfied the requirements of Rule 23(a), certification of the

17 proposed issues is still inappropriate because "questions affecting only individual

18 members" predominate.  Fed. R. Civ. P. 23(b)(3).  In the context of Rule 23(c)(4), issue

19 certification requires only that common questions predominate over individual questions

20 with respect to the specific issues that are certified, as opposed to every issue in the case.

21 *See Stickles v. Atria Senior Living, Inc.*, No. C20-09220, 2021 WL 6117702, at *7

22 (N.D. Cal. Dec. 27, 2021) (citing *Valentino*, 97 F.3d at 1234).  "The predominance

23

ORDER - 31

inquiry asks whether the common, aggregation-enabling, issues . . . are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Olean*, 2022 WL 1053459, at *5 (quoting *Tyson Foods*, 577 U.S. at 453).  As discussed above, all of Plaintiffs' particular issues are not susceptible to common proof.  The issues necessarily require individualized inquiry into a class member's circumstances, such as the effects of COVID-19 regulations on member businesses, a class member's location within the Class Area and presence throughout the protest, the nature of a class member's alleged injuries, and the City's knowledge of specific dangers.[16]

Plaintiffs argue that this case is similar to *Hickey v. City of Seattle*, 236 F.R.D. 659, 660–61 (W.D. Wash. 2006), where this District certified a class of protesters who sued the City following their arrest at the World Trade Organization ("WTO") conference on December 1, 1999.  Class members in *Hickey* alleged that the City violated their constitutional rights when it arrested them en mass without individualized probable cause determinations.  *Id.* at 661.  In certifying a class, the court found that plaintiffs satisfied the predominance requirement under Rule 23(b)(3) and explained that the litigation would be phased as follows:

> In the first stage of the litigation, the Court will examine whether or not there was a policy or action ratified by a qualified Seattle government decision maker that makes liability imputable to the municipal Defendants in this matter.  In the first stage, the Court will also determine the common facts of Plaintiffs' arrests, if such common facts exist . . . .  If this action survives to the second stage of the litigation, the Court will then make individualized

---

[16] *See Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 640 (N.D. Cal. 2015) (declining to certify an issues class under Rule 23(c)(4) where "certification . . . of an issue would resolve only one of many issues necessary to establish only liability").

damages determinations regarding whether or not each individual's rights were actually violated on December 1, 1999, and to what extent.

*Id.* at 666–67.  Plaintiffs ask the Court to adopt this phased approach, but this case is entirely distinguishable from *Hickey*.  Here, the proposed class is comprised of thousands of individuals, businesses, and property owners in the Capitol Hill neighborhood, whereas every class member in *Hickey* was a protester arrested in a designated "no protest zone."  *Id.* at 661.  Plaintiffs in this case claim they were subject to diverse harms (violence, vandalism, harassment, blocked streets and sidewalks, excessive noise, and reduced business revenue) caused by the City's actions, or inaction, in relation to CHOP, while every plaintiff in *Hickey* was subject to the same allegedly unlawful harm (mass arrest without probable cause).  *Id.*  In this case, Plaintiffs have not made the requisite showing that common questions of law or fact predominate over individual ones.  *See* Fed. R. Civ. P. 23(b)(3).

> **b.    Superiority**

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  "A class action is the superior method for managing litigation if no realistic alternative exists."  *Valentino*, 97 F.3d at 1234–35.  A class action is not the superior method in this case because individualized factual issues make it difficult to manage a class and undesirable to concentrate the litigation of all claims in one forum.  *See* Fed. R. Civ. P. 23(b)(3)(C) & (D).  Furthermore, class treatment is not superior because it would not resolve all of Plaintiffs' claims or the claims of individuals and entities located inside or outside the Class Area.

1    Plaintiffs concede that Greenus Building, Inc. (20), Madrona Real Estate Investors IV

2    LLC (23), and Madrona Real Estate Investors VI LLC (22) are not even members of the

3    putative class, and Hunters Capital, LLC (2, 3, 14, 15, 19, 20 & 21) and Redside Partners

4    LLC (9, 16 & 25) seek damages for three properties located outside of the proposed Class

5    Area.  Although Plaintiffs propose that the claims associated with these entities proceed

6    alongside the claims of the class, all other property owners, businesses, and residents

7    located outside the Class Area would be required to pursue new, individual suits.[17]  The

8    proposed Class Area encompasses a large portion of Seattle's Capitol Hill neighborhood,

9    but it also excludes all individuals or entities located outside its boundaries.  Therefore,

10   the Court concludes that, with respect to the issues identified, certifying a class is neither

11   a superior means of "fairly and efficiently adjudicating" this controversy, Fed. R. Civ. P.

12   23(b)(3), nor is it consistent with Rule 23(c)(4).[18]

13   **4.      City Officials' Missing Text Messages**

14           Finally, Plaintiffs ask the Court to certify under Rule 23(c)(4) the following

15   "particular issues" concerning City officials' missing text messages:

16

17   _____

18   [17] The City represented to the Court that many claimants have already filed tort claims against the City,
     *see generally* Ex. 42 to Farmer Decl. (docket no. 75-42), demonstrating that individual actions are an

19   acceptable way to proceed.

20   [18] Given the diverse group of plaintiffs in this case (property owners, businesses, and residents), the Court
     asked the parties to address at oral argument proposed methods for case management in the event the
     Court denied Plaintiffs' motion for class certification.  Plaintiffs and the City believe that it is manageable

21   to try this action (for both liability and damages) in a single proceeding with the existing plaintiffs.
     Plaintiffs and the City believe a four-week trial would be required.  Although the Court has serious

22   questions about case management moving forward, the certification of class issues would not benefit the
     litigants or the Court in managing this action.

23

ORDER - 34

- What were the circumstances surrounding the deletion of responsive texts for Mayor Jenny Durkan, Chief of Police Carmen Best, Fire Chief Harold Scoggins, and other City custodians?
- What effect does the deletion of these texts have on the City's ability to defend this case, and on the evidence to be presented at trial?

Ex. 1 to Weaver Decl.  Class certification of a discovery issue is a unique request.  At oral argument, Plaintiffs represented to the Court that they sent a letter to the City on the day they filed their initial complaint in this action, June 24, 2020, demanding that the City preserve text messages from the Mayor, the fire chief, and the police chief. According to Plaintiffs, Mayor Durkan testified at her deposition that she dropped her phone into the water while visiting a beach.  This occurred sometime after the City received Plaintiffs' letter.  Plaintiffs allege that Mayor Durkan then accessed her iCloud account and deleted a backup that contained all of her text messages from the relevant time period.  When Plaintiffs spoke with City technicians who were involved in managing the Mayor's phone, the technicians indicated that Mayor Durkan never informed them that she dropped her phone into the water.  The technicians also indicated that they could have recovered her text messages had Mayor Durkan informed them of the issue at or near the time that the text messages went missing.

Plaintiffs also allege that SFD Chief Harold Scoggins's text messages were destroyed when he reset his iPhone at an Apple Store approximately one month after the City received Plaintiffs' letter concerning the preservation of text messages in this action. Furthermore, Plaintiffs allege that former Chief Best's text messages went missing after she returned her phone to the City following her resignation.  During her deposition, Chief Best testified that her text messages from the relevant time period were still on her

1   phone when she returned it.  She did not know what happened to the messages after she

2   returned her phone to the City.[19]

3           Plaintiffs argue that these issues satisfy class certification requirements under

4   Rule 23(a) and (b)(3), but they have not provided any authority for class certification of

5   discovery-related issues.  The only case Plaintiffs cite does not involve a class action.

6   *See Musse v. King County*, No. C18-1736, 2021 WL 4709875, at *2–5 (W.D. Wash. Oct.

7   8, 2021) (discussing the imposition of sanctions under Rule 37 for failing to preserve

8   evidence).  Plaintiffs' allegations are certainly troubling, and will no doubt be the subject

9   of future motion practice, but the severity of Plaintiffs' allegations is not the standard for

10  issues class certification under Rule 23(c)(4).  These issues do not satisfy the

11  commonality requirement under Rule 23(a)(2) because they will not resolve, "in one

12  stroke," an issue that is central to the validity of Plaintiffs' claims.  *Wal-Mart*, 564 U.S. at

13  350.  Nor is certification of these issues appropriate under Rule 23(c)(4) because their

14  resolution (i.e., potential sanctions if appropriate) is unlikely to materially advance the

15  underlying case.  *See Valentino*, 97 F.3d at 1229.  The Court declines to certify the issues

16  related to the missing text messages.  The issue of spoliation related to the City's and

17  Plaintiffs' missing text messages, and the availability of potential remedies, if

18  appropriate, must await further motion practice.[20]

19  _____

20  [19] The issue of spoliation is not limited to the City's records.  The City argues that Plaintiffs have also lost

21  or deleted relevant text messages in this case.  *See*, *e.g.*, Thompson Dep. at 104:16–106:13, Ex. 48 to
    Farmer Decl.; Donner Dep. at 197:20–24 & 199:4–14, Ex. 19 to Farmer Decl.

22  [20] To the extent Plaintiffs are successful in obtaining a favorable ruling in regard to their spoliation claim,
    such a ruling will be binding on the City, whether or not the Court were to certify the class.

23

**__Conclusion__**

For the foregoing reasons, the Court ORDERS:

(1)     Plaintiffs' motion for class certification, docket no. 65, is DENIED. Plaintiffs have not shown by a preponderance of the evidence that the particular issues they desire to certify satisfy the commonality and typicality requirements of Rule 23(a)(2) and (3), or the predominance and superiority requirements of Rule 23(b)(3).

(2)     The parties are DIRECTED, on or before May 27, 2022, to meet and confer and file a Joint Status Report proposing methods for case management in this action.  The parties should explore the possible trial of three or four representative plaintiffs (to be selected by the parties and/or the Court), or other ways to address the complex nature of this action given the variety and number of named plaintiffs.  The parties should also address whether amendment to the case schedule and trial date will be necessary.  *See* Order (docket no. 46).  The Court will schedule a status conference to address case management after it reviews the parties' Joint Status Report.

(3)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 9th day of May, 2022.

Thomas S. Zilly
United States District Judge

ORDER - 37