# EXHIBIT 1

THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLACK LIVES MATTER SEATTLE-
KING COUNTY, ABIE EKENEZAR,
SHARON SAKAMOTO, MURACO
KYASHNA-TOCHA, ALEXANDER
WOLDEAB, NATHALIE GRAHAM,
AND ALEXANDRA CHEN,

          Plaintiffs,

   v.

CITY OF SEATTLE,

          Defendant.

No. 2:20-cv-887

COMPLAINT

JURY DEMAND

    Plaintiffs Black Lives Matter Seattle-King County, Abie Ekenezar, Sharon Sakamoto, Muraco Kyashna-tochá, Alexander Woldeab, Nathalie Graham, and Alexandra Chen submit this Complaint against Defendant City of Seattle and allege as follows:[1]

## I.    INTRODUCTION

    1.    This case is about the policy, practice, and custom of the City of Seattle (the "City") to allow the Seattle Police Department ("SPD") to deploy unnecessary violence against peaceful demonstrators who are speaking out against discriminatory police brutality.

---

[1] The articles, pictures, videos, and other online sources cited in this Complaint are best accessed by copying and pasting the cited links into a web browser.

COMPLAINT (No. ) –1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

148463513.5

2.     Notably, Seattle Mayor Jenny Durkan and SPD Chief Carmen Best have "apologized for instances in which they said officers may have failed to deescalate tense moments, used disproportionate force against demonstrators and deployed less-than-lethal weapons too quickly."[2] Plaintiffs seek injunctive relief because their apologies have not prevented and will not prevent the City's ongoing violation of plaintiffs' constitutional rights.

3.     On May 25, 2020, George Floyd was murdered in Minneapolis, Minnesota by the police. Mr. Floyd, a Black man, was accused of a non-violent offense. During his arrest, Mr. Floyd fell to the ground, handcuffed and restrained. Minutes later, for no discernible reason, a police officer placed his knee—and the weight of his body—on Mr. Floyd's neck as Mr. Floyd lay pinned to the ground.

4.     For nearly nine excruciating minutes, the officer pressed his knee into Mr. Floyd's neck as Mr. Floyd struggled to breathe and pleaded for both mercy and his mother. Rather than allow Mr. Floyd to breathe, other officers held his legs or stood by, watching as Mr. Floyd began to die. Among Mr. Floyd's last words were, "please, please, please, I can't breathe."

5.     Mr. Floyd died at the scene, a victim of excessive use of force by the police.

6.     Mr. Floyd was not the first victim of such force. His final words echo those spoken by Eric Garner in 2014, before he died at the hands of a New York police officer who put him in a chokehold during an arrest for a non-violent offense: "I can't breathe." Like Mr. Floyd, Mr. Garner struggled to breathe as police officers at the scene watched him die.

7.     More recently, Breonna Taylor, a Black woman, was shot eight times and killed in March 2020 by three plainclothes Louisville police officers who entered her home in the middle of the night to execute a no-knock warrant.

8.     The words "I can't breathe" have become a rallying cry for those seeking racial justice and an end to discriminatory police practices.

---

[2] *Man Shot on Capitol Hill After Gunman Drives Car into George Floyd Protest*, Seattle Times (June 7, 2020), https://www.seattletimes.com/seattle-news/crime/man-shot-after-gunman-drives-car-into-capitol-hill-protesters/.

COMPLAINT (No. ) – 2

148463513.5

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

9.      Despite a global pandemic, groups of demonstrators throughout the country and the world, including in Seattle, have gathered to protest the systemic injustices perpetrated by law enforcement against Black people and other people of color.

10.     In response to these protests, the SPD has exercised an overwhelming and unconstitutional use of force to discourage these protesters from exercising their constitutional rights.  On an almost nightly basis, the SPD has indiscriminately used excessive force against protesters, legal observers, journalists, and medical personnel.  For example, SPD has repeatedly sprayed crowds of protesters with tear gas and other chemical irritants—including as recently as Monday, June 8, just days after the City pledged a 30-day moratorium on the use of tear gas.

11.     The City of Seattle has its own history of excessive force used by its police department against people of color.  Some of the incidents of excessive force led the City to acknowledge some of the problems after the Department of Justice investigated the City and concluded that reasonable cause existed to believe that SPD engages in a pattern or practice of using unnecessary or excessive force in violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 14141.[3]

12.     The purpose and effect of this excessive force described in Paragraph 10 has been to restrict, frustrate, and deter protesters from exercising their rights under the First Amendment to the United States Constitution to peacefully assemble, petition for redress of grievances, exercise freedom of speech, and exercise freedom of the press—and the Fourth Amendment to be free from unwarranted seizures by the government.

13.     Plaintiffs have been, and want to continue to be, part of the protest movement to protect black lives.  They want to participate in demonstrations against police brutality in Seattle without being exposed to the less-lethal weapons regularly deployed by the SPD against

---

[3] The Settlement Agreement and Consent Decree and other supporting documents can be found here:  https://www.seattle.gov/police/about-us/professional-standards-bureau/settlement-agreement-history.

COMPLAINT (No. ) – 3

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

protesters as a method of crowd control. Plaintiffs bring this action to restrain the City of Seattle from continuing to respond to peaceful protest with unconstitutional and indiscriminate force.

**A.     SPD's "Less-Lethal" Weapons and "Crowd Control" Arsenal**

14.     The weapons SPD uses for "crowd control" purposes during demonstrations, sometimes referred to as "non-lethal" weapons, are more appropriately called "less-lethal" weapons, as many government entities and human rights NGOs have recognized.[4]

15.     The "less-lethal" weapons the SPD deployed at protests this month include chemical irritants, batons, kinetic impact projectiles, and weapons intended to stun with light and sound.

16.     The chemical irritants released on protesters by the SPD this month include tear gas ("CS gas") and oleoresin capsicum spray ("OC" or "pepper" spray).

17.     SPD has deployed chemical irritants both by targeting specific protesters with handheld devices and by launching canisters of chemical irritants into a crowd from a distance, releasing the irritants indiscriminately in every direction.

18.     SPD has also hit protesters with batons and shot kinetic impact projectiles such as rubber bullets at protesters.

19.     In addition, SPD has deployed flash-bang grenades and blast balls against protesters. When these weapons detonate, they generate loud noise and bright light. Blast balls also release chemical irritants.

20.     Tear gas can be lethal. It is known that high-dose exposure in an enclosed space can "lead to the development of airway edema, non-cardiogenic pulmonary edema, and possibly respiratory arrest."[5] Though this kind of exposure in an enclosed space is rare, more generally,

---

[4] U.S. Dep't of Just., Office of the Inspector General, Evaluation and Inspections Division, Review of the Department of Justice's Use of Less-Lethal Weapons (May 2009), https://oig.justice.gov/reports/plus/e0903/final.pdf; United Nations Guidance on Less Lethal Weapons in Law Enforcement (2020), https://www.ohchr.org/Documents/HRBodies/CCPR/LLW_Guidance.pdf.
[5] Toxic Syndrome Description, Riot Control Poisoning, Centers for Disease Control and Prevention, https://emergency.cdc.gov/agent/riotcontrol/agentpoisoning.asp.

COMPLAINT (No. ) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

148463513.5

tear gas exposure can have more severe effects on those with asthma such that it can trigger a

fatal asthma attack.[6]  The death on May 30 of a 22-year-old protester in Ohio who had asthma

and who passed away after being sprayed with tear gas is currently being investigated.[7]

21.     Pepper spray can be lethal.  Between 1990 and 1995, at least 61 in-custody deaths

followed police use of pepper spray on suspects.[8]  A 1994 study of 63 in-custody fatalities

concluded that pepper spray was a contributing cause of death in 2 cases of people with asthma.[9]

Though this study found that positional asphyxia and other causes contributed to the deaths of

61, the study cautioned that the precise role of pepper spray in the deaths could not be

determined.[10]

22.     Even when not directly lethal, exposure to tear gas has been shown to increase the

risk of developing acute respiratory illnesses.  A study conducted in 2012 of 6,723 U.S. Army

recruits demonstrated that recruits who were exposed to tear gas had a significantly higher

chance of getting an acute respiratory illness such as influenza, bronchitis, and pneumonia than

those recruits who weren't exposed.[11]

**B.      Heightened Risks of COVID-19 Transmission from Less-Lethal Weapons**

23.     People who have been exposed to chemical irritants are more vulnerable to

COVID-19, an acute respiratory illness.

---

[6] How Tear Gas and Pepper Spray Affect the Body, Healthline,
https://www.healthline.com/health-news/how-tear-gas-and-pepper-spray-affect-the-body#What-to-know-about-tear-gas.
[7] Jim Letizia, Columbus Investigating Claims Protester Died After Being Exposed to
Tear Gas, https://www.wcbe.org/post/columbus-investigating-claims-protestor-died-after-being-exposed-tear-gas.
[8] Mark I. Pinsky, If Pepper Spray Isn't Lethal, Why All the Deaths?, L.A. Times (June
18, 1995), https://www.latimes.com/archives/la-xpm-1995-06-18-mn-14572-story.html.
[9] Office of Justice Programs, U.S. Dep't of Just., The Effectiveness and Safety of Pepper
Spray (Apr. 2003), https://www.ncjrs.gov/pdffiles1/nij/195739.pdf.
[10] Id. at 11.
[11] Joseph J. Hout, et al., o-Chlorobenzylidene Malonotrile (CS Riot Control Agent)
Associated Acute Respiratory Illnesses in a U.S. Army Basic Combat Training Cohort, 179
Military Medicine 7:793 (2014),
https://academic.oup.com/milmed/article/179/7/793/4259353#101149356.

COMPLAINT (No.  ) – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

24.     When people with COVID-19 are exposed to chemical irritants during a demonstration, this exposure may also increase the likelihood that COVID-19 will spread to other people because of the immediate effect both tear gas and pepper spray have on those who are exposed.  By design, part of the incapacitating effect of tear gas and pepper spray is that both can cause lung irritation that makes you cough, spit, and/or vomit.[12]  In addition, people exposed to tear gas or pepper spray suffer from eye irritation that leads them to rub their eyes.  Coughing, spitting, vomiting, and rubbing eyes can all lead to the spread of viruses.

25.     A petition signed by over 2,000 health professionals—led by doctors at the University of Washington—expresses precisely these concerns.[13]  Infectious disease physician Rachel Bender Ignacio states, "Exposure to chemical irritants certainly makes the airways more susceptible to infection . . . .  If people are coughing from any of these chemical irritants, then that increases their risk of spreading [COVID-19] to fellow protesters and to law enforcement as well."[14]

26.     Indeed, Dr. Jeffrey Duchin, the head of King County Public Health Department, has publicly denounced the use of "respiratory irritants" like tear gas as a crowd control method because of the "potential to increase COVID-19 spread."[15]

---

[12] Facts About Riot Control Agents Interim Document, Centers for Disease Control and Prevention, https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.

[13] Open letter advocating for an anti-racist public health response to demonstrations against systemic injustice occurring during the COVID-19 pandemic, available at https://drive.google.com/file/d/1Jyfn4Wd2i6bRi12ePghMHtX3ys1b7K1A/view (last visited June 7, 2020).  *See also* John Ryan, Quit the Tear Gas, Doctors Tell Cops.  It Might Exacerbate the Pandemic, KUOW (June 4, 2020), https://www.kuow.org/stories/disease-specialists-to-cops-stop-the-tear-gas.

[14] John Ryan, *Quit the Tear Gas, Doctors Tell Cops.  It Might Exacerbate the Pandemic*, KUOW (June 4, 2020), https://www.kuow.org/stories/disease-specialists-to-cops-stop-the-tear-gas.

[15] Alex Bartick, *Mayor Durkan Announces Temporary Ban on the Use of Tear Gas by SPD at Demonstrations*, KOMO News (June 5, 2020) (quoting Dr. Jeffrey Duchin of Public Health, Seattle and King County).

COMPLAINT (No.    ) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

27.     The use of other less-lethal weapons that cause panic and injury also create the potential for increased COVID-19 spread by compressing large groups of people as protesters and bystanders attempt to flee from the use of force.

28.     Seeking medical care for injuries caused by police presents another opportunity for COVID-19 spread, as injured people and people delivering medical care come into close physical contact with one another.

## II.     PARTIES

29.     Each of the Plaintiffs wishes to participate in demonstrations against police brutality without being subject to less-lethal force by the SPD.  Without an injunction restraining the City from using less-lethal force to control protesters, each of these Plaintiffs will be forced to choose between exercising their constitutional rights and avoiding exposure to dangerous less-lethal weapons.

30.     Plaintiff Black Lives Matter Seattle-King County is a nonprofit organization operating in Seattle, Washington.

31.     Plaintiff Abie Ekenezar is a Washington resident who attended protests every day from May 29 through June 6, 2020, either in Seattle or Tacoma.

32.     Plaintiff Sharon Sakamoto is a Washington resident who would like to attend the Seattle protests but has not done so out of fear from the negative health effects of tear gas and other chemical agents the SPD has been deploying.

33.     Plaintiff Muraco Kyashna-tochá is a Washington resident who attended protests in Seattle every day from May 29 through June 6, 2020.

34.     Plaintiff Alexander Woldeab is a Washington resident who attended protests in Seattle every day from May 30 through June 6, 2020, except for June 4.

35.     Plaintiff Alexandra Chen is a Washington resident who attended protests in Seattle on May 30, 2020, and June 1 through June 6, 2020.

COMPLAINT (No. ) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

36.     Defendant the City of Seattle ("the City") is a municipality incorporated in the State of Washington.

### III.     JURISDICTION AND VENUE

37.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress the deprivation of rights under the First and Fourth Amendment to the U.S. Constitution and pursuant to 42 U.S.C. § 1983.

38.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the events giving rise to the claims took place in the Western District of Washington.

### IV.     FACTUAL ALLEGATIONS

**A.     Protesters Demonstrating against Police Brutality Are Met with Brutality by the SPD**

39.     After the killing of George Floyd, demonstrators began to gather around the City of Seattle on a daily and nightly basis to protest police brutality against Black Americans.

40.     With limited exceptions, these protesters have been overwhelmingly peaceful. But nearly every night, City law enforcement tactics to deter these protests have escalated in severity.  The SPD arrested protesters and used force on many others who were not arrested. SPD has hit protesters with batons and shot them with rubber bullets, released chemical irritants, and thrown "blast balls" and flash-bang grenades into crowds, often with little or no warning.

41.     SPD's actions have been consistent with the directive of a State trooper deployed with the SPD:  don't "kill" protesters but "hit them hard."[16]

42.     Simply put, in response to protests *against* police brutality, the police chose to *engage* in brutality.

---

[16]     *Washington State Patrol apologizes for officer's 'Don't kill them, but hit them hard' instruction regarding Seattle protesters*, Seattle Times (June 3, 2020), https://www.seattletimes.com/seattle-news/washington-state-patrol-apologizes-after-officer-tells-his-team-dont-kill-them-but-hit-them-hard-in-reference-to-seattle-protesters/ (with embedded video).

COMPLAINT (No. ) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

**B.    Timeline of Excessive Police Force at Protests**

43.      On Friday, May 29, the first day of protests in Seattle, SPD officers in riot gear responded to protesters by deploying chemical irritants and flash-bang devices to disperse crowds and arresting others.[17]

44.      On Saturday, May 30, SPD officers continued their use of chemical irritants and flash-bang devices on protesters and engaged in other violent tactics, including pepper-spraying a child and punching a man as he was being held on the ground.[18]

45.      The violence by SPD continued as the weekend wore on.  On Sunday, May 31, the SPD again deployed flash-bang devices, OC spray, and blast balls against protesters and militarized the streets of downtown Seattle.[19]

46.      In response to police brutality during the first weekend of protests (May 29-31), the Seattle Office of Police Accountability received about 12,000 individual complaints of

---

[17]      *Sparked by death of George Floyd, Seattle protestors clash with police*, Seattle Times (May 29, 2020), https://www.seattletimes.com/seattle-news/protesters-break-windows-clash-with-police-in-downtown-seattle/.

[18]      *Seattle Protest Updates:  The city reacts to the death of George Floyd*, Seattle Times (May 30, 2020), https://www.seattletimes.com/seattle-news/protest-updates-as-the-country-reacts-to-the-death-of-george-floyd-follow-the-latest-developments-in-seattle-and-elsewhere/ (SPD "faced questions for its tactics, including the use of flash bangs as it dispersed people Saturday, and for a videotaped incident Friday night of at least one officer punching a man as he was held on the ground"); *Seattle mayor, police face questions over response to George Floyd protests, downtown turmoil*, Seattle Times (May 30, 2020), https://www.seattletimes.com/seattle-news/politics/seattle-mayor-police-face-questions-over-response-to-george-floyd-protests-downtown-turmoil/ ("Durkan and Police Chief Carmen Best faced questions over the city's response to the turmoil, as some nonviolent protesters described escalations by officers early in the afternoon" including multiple reports that "officers would throw a flash bang or tear gas just randomly into the crowd" and that officers without warning shot pepper spray into the faces of protesters, including a young girl).

[19]      Lynda V. Mapes, *Seattle demonstrations vent anguish at death of George Floyd and more, for a 'grieving nation'* Seattle Times (May 31, 2020), https://www.seattletimes.com/seattle-news/seattle-demonstrations-vent-anguish-at-death-of-george-floyd-and-more-for-a-grieving-nation/ ("There were a couple of tense moments, with police setting off flash bangs and pepper spray on Fourth Avenue, but the protests were mostly peaceful as of Sunday evening"); *see also Seattle area protest updates:  City reacts to George Floyd killing, Bellevue imposes curfew amid protests*, Seattle Times (May 31, 2020), https://www.seattletimes.com/seattle-news/seattle-protest-updates-on-day-2-of-curfew-the-city-reacts-to-the-death-of-george-floyd/.

COMPLAINT (No. ) – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

1    abusive conduct by SPD.  For all of 2019, the Office of Police Accountability received just 928

2    complaints.[20]

3         47.    Among the ten most common incidents reported in these complaints are "[p]epper

4    spraying a young girl"; "[p]epper spraying peaceful protesters"; and "[t]he use of flash-bangs,

5    including causing a significant thumb injury."[21]

6         48.    On Monday, June 1, SPD unleashed tear gas, OC spray, and blast balls on largely

7    peaceful protesters in Capitol Hill after failing to give dispersal orders to allow for protesters to

8    leave the area.[22]

9         49.    Video shows police escalating the confrontation by grabbing a protester's

10   umbrella just before deploying chemical irritants into the crowd.[23]

11        50.    On Tuesday, June 2, SPD followed the same playbook, again deploying tear gas,

12   OC spray, blast balls, flash-bang grenades, and rubber bullets, causing protesters to flee in fear.[24]

13        51.    The SPD's tactics have been so excessive that the City's own director for the

14   Office of Civil Rights, Mariko Lockhart, wrote an open letter stating that she had "heard from

15   other City leadership and employees that they fear for their personal safety, (not because of other

16

17

18        [20] *See* Seattle Office of Police Accountability, Office of Police Accountability processing
     12,000 complaints after weekend demonstrations (June 1, 2020),
19   http://www.seattle.gov/Documents/Departments/OPA/PressReleases/06-01-20_OPA-Press-
     Release-Following-Demonstrations.pdf.
20        [21] *Id.*
          [22] *Seattle area protests:  Police declare a riot as demonstrators gather for fourth day to
21   call for police accountability*, Seattle Times (June 1, 2020),
     https://www.seattletimes.com/seattle-news/george-floyd-protests-continue-in-seattle-area-
22   demonstrators-expected-to-gather-for-fourth-day-to-call-for-racial-justice/ ("videos of the
     officers spraying the crowd and deploying flash bangs quickly spread on social media; many of
23   those who shared them said the footage showed the police were escalating the confrontation").
          [23] *See id.* ("[a] police officer at the front of the crowd can be seen grabbing a protester's
24   umbrella just before other officers deploy pepper spray into the crowd"); Declaration of Omari
     Salisbury ("Salisbury Decl.") ¶ 3 (June 1 video).
25        [24] *See* Salisbury Decl. ¶ 4 (June 2 video starting at 0:04:00); Seattle Police Department
     Blotter, Timelines of Police Responses to Demonstrations (June 7, 2020 1:51 p.m.),
26   https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
     (stating that SPD used pepper spray, blast balls, flash-bangs, and tear gas at 11:36 p.m.).

COMPLAINT (No. ) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1 protesters but because of the police."[25]  Ms. Lockhart went on to call for the City to immediately

2 "[c]ease the use of flash grenades, rubber bullets, and tear gas against community protesters."

3      52.     Those excessive tactics have also led to condemnation by many City, County, and

4 State elected officials.  In fact, on June 7, over two dozen leaders signed an open letter

5 condemning "the police tactics used in daily protests," and made clear they are "concerned that

6 the response of the Seattle Police Department (SPD) is escalating the conflict in the streets of

7 Seattle, particularly in Capitol Hill and in communities of color, with their inappropriate use of

8 force."[26]

9      53.     This letter urges the City "to change [its] tactics," and makes clear that "continued

10 violence by the police will only polarize this necessary conversation in unproductive ways," and

11 "to end the damage that SPD has caused by overreaction to mostly peaceful protests."[27]  The

12 letter goes on to make the following observations about the harmful effects of SPD's use of force

13 against protesters:

14 > This harms the relationship between law enforcement and the
> community, harms our city, and harms law enforcement officers
15 > and their families in the form of emotional trauma.  Physical
> violence is being perpetrated against members of our community
16 > by SPD.  Emotional trauma and extraordinary racial aggression is
> being inflicted.  Constitutional rights are at risk.  Police tactics are
17 > exacerbating health risks amidst a devastating respiratory
> pandemic.  The public health crisis of law enforcement anti-black
18 > violence is so extreme as to have eclipsed the previous disease that
> gripped our city.
19
20 > It is well-documented that peaceful protests are being targeted by
> law enforcement and turned into violent conflict.  No amount of
21 > secondary illegal activity has happened that warrants this response.
> We will have time in the future to discuss necessary reforms for
22 > future such conflicts, but for now, the violence must stop.
> Deploying police in riot gear to form a wall of officers positioned

23

24    [25] Letter from M. Lockhart to Seattle Office of Civil Rights (June 5, 2020), *available at*
https://www.documentcloud.org/documents/6938155-Lockhart-Letter.html.

25    [26] Chase Burns, *Washington Electeds to Mayor Durkan and Chief Best:  Direct SPD to*
*"Change Their Tactics Immediately*," The Stranger (June 7, 2020), *available at*
thestranger.com/slog/2020/06/07/43862996/seattle-electeds-to-mayor-durkan-and-chief-best-
26 direct-spd-to-change-their-tactics-immediately (last viewed June 7, 2020).
   [27] *Id.*

COMPLAINT (No. ) – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

against peaceful protesters is not conducive to de-escalation and healing; a moratorium on tear gas that is then replaced with pepper spray is not de-escalation.[28]

54.     The letter is signed by Seattle City Councilmembers Lorena Gonzalez, Teresa Mosqueda, Tammy Morales, and Lisa Herbold, and they are joined by King County Councilmembers Girmay Zahilay, Joe McDermott, and Rod Dembowski and several state legislators.

55.     A majority of the Seattle City Council has come out against SPD's tactics and use of force against protesters.

56.     The backlash from the public and from local leaders is no surprise because it is apparent from the extensive available video footage of the protests that the SPD is not using less-lethal weapons out of a need to defend themselves or others against imminent harm, or even to prevent significant property damage.  Instead, the City is using these tools and tactics to suppress demonstrations against the police.

57.     On Saturday, June 6, 2020, police repeatedly deployed flash-bang grenades and pepper spray canisters against protesters, including a protester in a wheelchair.[29]

58.     The SPD's attacks on those documenting the protests is not limited to protesters. In fact, accredited journalists have also reported being gassed or subjected to flash-bang devices by the SPD simply for being present and documenting the protest for the public.  For instance, on June 1, and NBC News correspondent, Jo Ling Kent, was live on air when she was hit by a flash-bang grenade fired by the SPD.[30]  That same reporter recalled that "[s]everal people were hit with rubber bullets in the arm, in the back and in the head."[31]

---

[28] *Id.*
[29] *See* Salisbury Decl. ¶ 5 (June 6 video).
[30] A video of this incident is available online.  *See* Maura Hohman, *NBC News' Jo Ling Kent hit by flash-bang grenade at Seattle protest live on air*, Today.com (June 2, 2020), *available at* https://www.today.com/news/nbc-news-jo-ling-kent-hit-flash-bang-grenade-seattle-t183067 (last visited June 7, 2020).
[31] *Id.*

COMPLAINT (No. ) – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

59.     On June 6, a KOMO news reporter was hit in the leg with a flash-bang as he was reporting from the front of a protest in Capitol Hill.  According to his account, before the police began using "flash bangs to disperse the crowd," the "[p]rotesters hadn't thrown or done anything it seems to provoke this [police reaction]."[32]

60.     Eyewitnesses have reported that SPD has also appeared to target medics on site to provide medical assistance to injured protesters.

61.     On June 6, one medic was wearing a shirt that clearly and objectively identified him as a medical professional on the scene to assist protesters with medical issues.  This medic was repeatedly targeted with blast balls and OC spray, preventing him from administering medical assistance to those affected by the SPD's unconstitutional use of this weapon.

## C.     SPD's Claimed Voluntary Ban on Tear Gas

62.     On Friday, June 5, 2020, Seattle Mayor Jenny Durkan and SPD Chief Carmen Best jointly announced that SPD would stop using tear gas on protesters for the next 30 days.[33] The City made clear that this "temporary ban only applies to tear gas" and that SPD would continue to use "flash-bang grenades, pepper spray and other crowd-control tools and tactics."[34]

63.     On Saturday, June 6, the SPD responded to a peaceful protest in the Seattle neighborhood of Capitol Hill by unleashing violence to disperse protesters exercising their constitutional rights.  The SPD did so by throwing blast balls and canisters of OC spray at the crowd to indiscriminately gas the entire crowd.

64.     Various videos of the incident show that the police began throwing blast balls and gas into the crowd not because of any imminent threat to their public safety, but because they wanted a large crowd to collectively move back five feet.  Setting aside the logistical

---

[32] Cole Miller (KOMO News), Twitter (June 6, 2020 7:41 p.m.), https://twitter.com/ColeMillerTV/status/1269459355288494592.

[33] *See* Lewis Kamb and Daniel Beekman, *Seattle mayor, police chief agree to ban use of tear gas on protesters amid ongoing demonstrations*, Seattle Times (June 5, 2020), *available at* https://www.seattletimes.com/seattle-news/watchdog-groups-to-seattles-mayor-and-police-chief-spd-should-stop-using-tear-gas-on-demonstrators/ (last visited June 7, 2020).

[34] *Id.*

COMPLAINT (No. ) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

impossibility of having a large crowd move back together five feet, the protesters' overall delay or reluctance in moving back did not justify the gratuitous and excessive force that the police employed.  The police faced no threat of physical harm to themselves, others, or property.[35]

65.     On June 7, Chief Best did not disavow the extreme police violence of June 6, responding only that SPD would be considering changes to its "footprint," "format," and "posture."[36]

66.     On Sunday, June 7, the City broke its own voluntary 30-day ban on tear gas, two days after announcing it.  Sunday night and into the early morning on Monday, June 8, SPD made heavy use of flash-bang grenades and canisters of tear gas and OC spray to suppress a demonstration near 11th Avenue and Pine Street.[37]

**D.     The City's Illegal Actions Caused and Are Causing Injuries to Plaintiffs**

67.     The City has all but acknowledged SPD's use of excessive force against protesters:  on June 4, the City withdrew its motion asking Judge James L. Robart to find SPD in compliance with its constitutional-policing mandates in a 2012 consent decree with the federal government.

68.     Plaintiffs have suffered and will continue to suffer injury as described below unless and until SPD's unlawful conduct is enjoined.

---

[35] For videos of this incident, see Chase Burns and Rich Smith, *SPD Disperses Crowd with Blast Balls, "Chemical Agents," on Eighth Day of Protests Against Police Brutality*, https://www.thestranger.com/slog/2020/06/06/43857405/spd-disperses-crowd-with-blast-balls-chemical-agents-pepper-spray-on-eight-day-of-protests-against-police-brutality (last visited June 7, 2020).

[36] Press Conference with SPD Chief Carmen Best at 1:06, June 7, 2020, https://www.facebook.com/Q13FOX/videos/252009629404175/.

[37] *See* Salisbury Decl. ¶ 6 (June 7 video, starting at 1:29:00); Seattle Police Department, Twitter (June 7, 2020, 12:18 a.m.), https://twitter.com/SeattlePD/status/1269891637448019968; Jemima McEvoy, *Seattle Police Use Tear Gas Against Protestors Despite City Ban*, Forbes (June 8, 2020), available at https://www.forbes.com/sites/jemimamcevoy/2020/06/08/seattle-police-use-tear-gas-against-protestors-despite-city-ban/#791c43415b4b.

COMPLAINT (No. ) – 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

69.     Demonstrations protesting police brutality and the killing of Black people in America are planned to continue this week, including a statewide general strike and silent march on Friday, June 12.

70.     Without an injunction restraining their unconstitutional use of force, SPD will continue to deploy the same abusive and illegal tactics it has deployed over the last ten days, threatening the constitutional rights and physical safety of Plaintiffs and others who have been, and will continue to be, harmed by SPD's protest response tactics.

### 1.     Black Lives Matter Seattle-King County

71.     Black Lives Matter Seattle-King County ("BLMSKC") is a grassroots nonprofit organization focused on the empowerment and liberation of Black people and other people of color through advocacy and direct action.

72.     Until recently, BLMSKC has not called on its members to join Seattle protests because of the heightened risk to communities of color from COVID-19.  But many of BLMSKC issued a "Protestor Safety Guide" to assist those who wished to participate in protests notwithstanding the potential health risks.[38]

73.     BLMSKC's safety guide cautions protesters to "[p]repare for pepper spray, mace, and tear gas."[39] BLMSKC's leaders are aware that the use of chemical agents like tear gas and OC spray may increase susceptibility to, and spread of, COVID-19.  This concern about the heightened danger that the use of chemical agents presented to protesters was one of the reasons that had led its leaders to not call on its members to join Seattle protests to this point.

74.     BLMSKC has called for a general strike and silent march in Seattle on Friday, June 12.[40]

---

[38]     Black Lives Seattle, Protestor Safety Guide, https://blacklivesseattle.org/protest-safety-guide/.

[39]     Black Lives Seattle, Protestor Safety Guide, https://blacklivesseattle.org/protest-safety-guide/.

[40]     *E.g.*, Rich Smith, *Black Lives Matter Seattle Calls for a Statewide Silent March Friday*, The Stranger (June 6, 2020),

COMPLAINT (No.  ) – 15

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

75.     BLMSKC aims to reduce the threat of COVID-19 transmission by encouraging protesters to remain silent.  BLMSKC hopes that police will be less likely to deploy weapons against marchers who are exercising their right to express themselves symbolically rather than vocally.

76.     BLMSKC's leaders and members nonetheless fear that law enforcement will meet future protests with continued violence.

77.     The time and effort BLMSKC has expended due to the City's conduct has reduced its capacity to plan events and programming consistent with its mission, curtailing the organization's capacity to fulfill its mission of effecting community change through peaceful demonstrations.

78.     Two of BLM's board members participated in Seattle protests this month when SPD used OC spray, and they experienced the negative effects of it.  BLM has called on SPD to stop its use of all chemical agents in response to protesters.

**2.      Abie Ekenezar**

79.     Abie Ekenezar is a veteran of the United States Army and works at the Department of Veterans Affairs.

80.     Ms. Ekenezar has asthma and a spinal disability.

81.     On May 30 and June 6, Ms. Ekenezar joined the protests in Seattle against police brutality.

82.     Her spinal disability required her at times to use a knee scooter while protesting, which limits her mobility.

83.     During the protest on the evening of May 30, Ms. Ekenezar was peacefully protesting—alongside other peaceful protesters—when SPD officers unleashed a chemical agent

---

https://www.thestranger.com/slog/2020/06/06/43857190/black-lives-matter-seattle-calls-for-a-statewide-silent-march-friday.

COMPLAINT (No. ) – 16

148463513.5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

on the crowd, including on Ms. Ekenezar.  The dispersal of the chemical agent was not localized and went far beyond the immediate area where it was deployed.

84.     During her time serving in the military, Ms. Ekenezar participated in tear-gas drills and is familiar with the effects of tear gas.  Based on that experience, she believes that the chemical agent the SPD used on her and other protesters on May 30 was tear gas.

85.     The tear gas stung Ms. Ekenezar's eyes and triggered her asthma.

86.     SPD officers also deployed flash-bang grenades in Ms. Ekenezar's presence at the Westlake protest on May 30.  Ms. Ekenezar also saw an SPD officer use mace on a young girl at the protest.

87.     On June 6, Ms. Ekenezar participated in the Capitol Hill protest against police brutality.

88.     Although protesters were being peaceful, SPD started asking protesters to move back from the police barricade.  Because the crowd was large, people could not move back.

89.     The chemical agent again stung Ms. Ekenezar's eyes and caused them to water.  It also caused Ms. Ekenezar to develop a cough that lasted at least through the following day.

90.     Ms. Ekenezar plans to attend other protests scheduled in Seattle this week, and she is worried not only about again being subjected to chemical agents deployed by the SPD or others acting at its direction but also about being unable to escape the police brutality because of her limited mobility.

**3.     Sharon Sakamoto**

91.      Sharon Sakamoto is a Japanese American woman who survived internment as a child during World War II.

92.     Because of her history as a survivor of internment and deep racial hostility, Ms. Sakamoto is deeply committed to advancing civil rights and racial justice.

93.     Ms. Sakamoto is a retired attorney who provided community services and legal aid primarily to the underserved Japanese American community.

COMPLAINT (No. ) – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

94.     Ms. Sakamoto had planned to participate in the recent Seattle protests—even in light of the COVID-19 public-health crisis—but decided not to once she learned of SPD's use of chemical irritants.

95.     Ms. Sakamoto was frightened away from joining the protests because of the SPD's use of violence against the protesters in Seattle.

96.     If SPD stopped its use of tear gas, OC spray, blast balls, and flash-bang grenades, Ms. Sakamoto would attend a protest.

**4.      Alexander Woldeab**

97.     Alexander Woldeab is a videographer, graphic designer, and Seattle resident.

98.     Mr. Woldeab has joined the protests against police brutality in Seattle every day from May 30 through June 6.

99.     On May 30, Mr. Woldeab participated in the protest at Westlake in downtown Seattle.  He and his partner arrived at the protest at about 3:00 p.m. and joined the peaceful protest organized by Not This Time and Andre Taylor, whose brother Che Taylor was killed by SPD officers in 2016.

100.     At about 3:45 p.m., Mr. Woldeab heard loud sounds that he understood to be flash-bang grenades.

101.     A few minutes later, as Mr. Woldeab and other protesters were walking with their hands up and peacefully chanting "hands up, don't shoot," the SPD deployed tear gas.

102.     Mr. Woldeab experienced burning eyes and shortness of breath from the tear gas.

103.     On June 1, Mr. Woldeab and his partner again joined one of the protests in Seattle, this time in the Capitol Hill neighborhood.

104.     At about 9:00 p.m. that evening, as Mr. Woldeab and his partner were returning to the area near SPD's police barricade, they were immediately met with flash-bang grenades and tear gas.  Mr. Woldeab received no warning that SPD was going to deploy those weapons.

COMPLAINT (No. ) – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

148463513.5

105.     The tear gas caused Mr. Woldeab to temporarily lose his sight and feel like he was suffocating.  Shortly after the incident, Mr. Woldeab and his partner were able to make their way to an aid table where a civil medic doused their eyes with milk and water.

106.     On June 2, Mr. Woldeab again attended the protest in the Capitol Hill neighborhood.  That evening, he witnessed the SPD again use flash-bang grenades and tear gas against protesters.

107.     Despite being subjected to chemical agents and flash-bang grenades by the SPD and experiencing significant anxiety as a result, Mr. Woldeab plans to join in the upcoming Seattle protests about police brutality.

**5.     Muraco Kyashna-tochá**

108.     Muraco Kyashna-tochá is a 60-year-old woman who participated in the protests every day from May 30 through June 6.

109.     On June 1, Ms. Kyashna-tochá attended a protest in the Capitol Hill neighborhood in which she went to the front of the police barricade created by law enforcement.  From her vantage point, the protests appeared peaceful and non-violent.

110.     At about 9:00 p.m. that evening, SPD officers began using OC spray on the crowd, including Ms. Kyashna-tochá.  Police also deployed flash-bang grenades and tear gas.

111.     Ms. Kyashna-tochá did not hear the officers issue any verbal warnings that they planned to deploy chemical irritants.

112.     The chemical irritants affected Ms. Kyashna-tochá's sight and required her to seek medical attention in an area of the protest informally designated for medical assistance.  She had to immediately remove her mask that she was wearing to protect against COVID-19, as it was soaked in OC spray.  She had to take a two-hour shower when she returned home that night to get the irritants off her body.

COMPLAINT (No. ) – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

113.    Ms. Kyashna-tochá has participated in over 100 protests, but she has never participated in a protest in which the police deployed chemical irritants without first warning the crowd.

114.    Ms. Kyashna-tochá plans to protest police brutality again in Seattle.

**6.    Alexandra Chen**

115.    Alexandra Chen is a first-year student at Seattle University School of Law and lives in the Capitol Hill neighborhood of Seattle.

116.    Ms. Chen attended a protest in downtown Seattle in the afternoon on Saturday, May 30 and was subject to SPD's use of tear gas.

117.    Ms. Chen was marching along with other protesters when the group stopped in front of the SPD headquarters at the intersection of Fifth Avenue and Cherry Street.

118.    Although Ms. Chen estimates approximately five to ten of the group of hundreds was throwing objects like water bottles at the police line in front of SPD headquarters, the rest of the protesters were peaceful and calm.

119.    SPD deployed flash-bang grenades at the group, causing protesters to panic and flee in fear.  Ms. Chen slipped twice while trying to flee the grenades.

120.    About 30 seconds later, the SPD deployed tear gas.  The tear gas caused her eyes and skin to burn, and she had trouble seeing and breathing.  The gas became trapped under the mask Ms. Chen was wearing to protect against exposure to COVID-19, causing even greater irritation to her skin.  Ms. Chen located an off-duty medic who flushed her eyes with saline solution.

121.    Ms. Chen experienced some form of skin irritation for several days.

122.    Ms. Chen did not hear the SPD give any dispersal order or warning that they would be deploying weapons against the crowd.

COMPLAINT (No. ) – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

123.    On June 1, Ms. Chen joined the protest in the Capitol Hill neighborhood. Because she feared being gassed again by the SPD, she did not participate at the front of the protest near the police barricade.

124.    The SPD again deployed flash-bang grenades and tear gas.  Ms. Chen again experienced effects from the tear gas, including burning eyes and skin irritation.

125.    After she heard that the SPD again deployed chemical agents and flash-bang grenades on protesters the night of June 6, she headed to the protest scene to stand in solidarity with other protesters.  She arrived about 15 minutes after the SPD released a chemical agent and saw protesters coughing and in great discomfort.

126.    Although Ms. Chen's anxiety about protesting has increased because of the SPD's actions, Ms. Chen plans to continue joining the protests against police brutality in Seattle.

### 7.    Nathalie Graham

127.    Nathalie Graham is a journalist with *The Stranger*.

128.    On May 30, Ms. Graham "saw a group of protesters peacefully kneeling in the intersection as a speaker addressed them," but the police used so much tear gas up the street that these protesters who "had been completely peaceful," were "also impacted by the tear gas." Declaration of Nathalie Graham ("Graham Decl."), ¶ 4.  Ms. Graham wanted to continue reporting, but the gas was so powerful she had to leave the scene.  *Id.*  That same day, she observed law enforcement throw a flash-bang grenade into a crowd without warning and with no provocation.  *Id.* at ¶ 6.

129.    Ms. Graham was "shocked and frightened by the consistently unprovoked, aggressive use of force by law enforcement officers on multiple different groups of peaceful protesters."  *Id.* at ¶ 8.  She "saw no evidence that any of these severe crowd-dispersal tactics were warranted, and there was never any warning before they were deployed."  She had to stop reporting on the scene because she feared for her safety—not because of the protesters, but because of the police tactics being deployed *against* the protesters.  *Id.* at ¶ 9.  "There was tear

COMPLAINT (No. ) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

1   gas everywhere, flash-bang grenades exploding in the street, and I was anxious that the police

2   would further escalate their tactics." *Id.*

3         130.    A similar incident occurred on June 2, 2020, when Ms. Graham was trying to

4   report on the unfolding scene at 11th and Pine.  The sheer amount of gas that the SPD deployed

5   against the peaceful protesters forced her to retreat to *The Stranger's* office and close the

6   windows.  "The ground below was so immersed in gas that [she] couldn't see the road.  Some of

7   it began to seep in to [her] office, despite the closed windows, and [she] began to cough."

8         131.    The City's actions have had a profound impact on Ms. Graham's role as a

9   journalist.  "Witnessing the aggressive, indiscriminate deployment of chemical agents and flash-

10   bang grenades by police at these protests has made me reconsider how I approach my

11   assignments.  There is a new element of trepidation, anxiety, and fear to my experience of being

12   a journalist.  I am determined to assert my rights and do my job, so I will continue reporting—

13   but I would not be surprised if other journalists felt that their ability report from the ground was

14   significantly impaired by these law enforcement tactics.  They are deeply disturbing."

15   **E.**    **The City's Policy, Practice, and Custom**

16         132.    The violations of Plaintiffs' First and Fourth Amendment rights are a direct result

17   of the City's policy, practice, and custom of authorizing SPD to use less-lethal weapons to

18   control and suppress protests.

19         133.    Mayor Jenny Durkan and Police Chief Carmen Best are final decision-makers

20   with respect to authorization of the use of force against protesters.

21         134.    SPD policymakers including Mayor Durkan and Chief Best have acted with

22   deliberate indifference to the constitutional rights of protesters and would-be protesters by

23   authorizing, both explicitly and implicitly, the use of less-lethal force against protesters who do

24   not pose any safety threat; by failing to properly train, supervise, and discipline SPD officers

25   regarding appropriate use of force against protesters; and by failing to rectify the SPD's

26   unconstitutional custom of using less-lethal force to control and suppress demonstrations.

COMPLAINT (No. ) – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

135.    After the killing of George Floyd, both Mayor Durkan and Chief Best have publicly authorized the use of less-lethal force for "crowd control" at protests.

136.    Both Mayor Durkan and Chief Best have received ample notice that the SPD is using less-lethal force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 12,000 complaints about the SPD in one weekend, condemnation from City Council members, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

137.    Despite receiving ample notice that SPD officers were using less-lethal force to control and suppress demonstrations in the absence of any immediate threat to safety, Mayor Durkan and Chief Best failed to take action sufficient to remedy the ongoing violations of protesters' constitutional rights by SPD officers, including by failing to train, supervise, or discipline SPD officers or issue corrective policies to prevent further violations.

138.    They have continued to authorize the use of less-lethal force to control demonstrations even while acknowledging that the majority of protesters have been peaceful. On May 31, for example, Mayor Durkan noted that "[f]or most of [May 30], people came and they were peaceful as they expressed their grief, as they built community, as they expressed their anger and demanded greater justice."

139.    In addition, Mayor Durkan and Chief Best, in apologizing for the conduct of SPD officers, as much as admitted that officers "used disproportionate force against demonstrators and deployed less-than-lethal weapons too quickly."[41]

## V.    FIRST CAUSE OF ACTION

### Violation of the First Amendment

140.    The City's policy, practice, and custom of using less-lethal weapons to control and suppress demonstrations has deprived Plaintiffs of their rights under the First Amendment to

---

[41] *Man Shot on Capitol Hill After Gunman Drives Car into George Floyd Protest*, Seattle Times (June 7, 2020), https://www.seattletimes.com/seattle-news/crime/man-shot-after-gunman-drives-car-into-capitol-hill-protesters/.

COMPLAINT (No. ) – 23

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

the United States Constitution, and the chilling effect is stopping Plaintiffs from exercising the First Amendment rights which they had otherwise planned to exercise in the immediate future.

141.    The SPD's use of less-lethal force against protesters can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

142.    Indeed, the SPD's use of less-lethal force against protesters has had the purpose and the effect of suppressing large, continuous protests.

143.    The City's policy, practice, and custom of using less-lethal weapons to control and suppress demonstrations is not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Plaintiff Class's First Amendment protected activity.

144.    Upon information and belief, the City's authorization of the use of less-lethal force against protesters was motivated by the viewpoint being expressed by the demonstrators.

145.    The City has acted with deliberate indifference to the First Amendment rights of Plaintiffs and the Plaintiff Class.

## VI.    SECOND CAUSE OF ACTION

### *Violation of the Fourth Amendment*

146.    The use of less-lethal weapons to control and suppress demonstrations in the absence of an immediate safety threat constitutes excessive force in violation of the Fourth Amendment, and the facts here show that the use of excessive force is stopping Plaintiffs from exercising their constitutional rights they otherwise planned to exercise.

147.    The City's policy, practice, and custom of allowing the SPD to deploy less-lethal weapons to control and suppress demonstrations in the absence of an immediate safety threat reflects deliberate indifference to protesters' rights under the Fourth Amendment to be free from excessive force.

## VII.    PRAYER FOR RELIEF

148.    WHEREFORE, Plaintiffs pray for the following relief:

COMPLAINT (No. ) – 24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

148463513.5

A. An order temporarily restraining the City and all agencies under its direction and from which it has requested assistance with regard to the protests from further violating the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

B. An order preliminarily enjoining the City and all agencies under its direction and from which it has requested assistance with regard to the protests from further violating the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

C. An order permanently enjoining the City and all agencies under its direction and from which it has requested assistance with regard to the protests from further violating the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

D. A declaration that the City has violated the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

E. For judgment against the City for Plaintiffs' costs of suit, including Plaintiffs' reasonable attorney fees;

F. For such other relief as the Court may deem just and proper.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

DATED:  June 9, 2020

By:  s/ David A. Perez
David A. Perez, WSBA No. 43959
s/ Joseph M. McMillan
Joseph M. McMillan, WSBA No. 26527
s/ Mallory Gitt Webster
Mallory Gitt Webster, WSBA No. 50025
s/ Carolyn Gilbert
Carolyn Gilbert, WSBA No. 51285
s/ Nitika Arora
Nitika Arora, WSBA No. 54084
s/ Heath Hyatt
Heath Hyatt, WSBA No. 54141
s/ Paige L. Whidbee
Paige L. Whidbee, WSBA No. 55072

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Fax:  206.359.9000
E-mail:  DPerez@perkinscoie.com
E-mail:  JMcMillan@perkinscoie.com
E-mail:  MWebster@perkinscoie.com
E-mail:  CGilbert@perkinscoie.com
E-mail:  NArora@perkinscoie.com
E-mail:  HHyatt@perkinscoie.com
E-mail:  PWhidbee@perkinscoie.com

By:  s/ Molly Tack-Hooper
Molly Tack-Hooper, WSBA No. 56356
s/ Nancy L. Talner
Nancy L. Talner, WSBA No. 11196
s/ Lisa Nowlin
Lisa Nowlin, WSBA No. 51512
s/ Breanne Schuster
Breanne Schuster, WSBA No. 49993
s/ John Midgley
John Midgley, WSBA No. 6511

**American Civil Liberties Union of
Washington Foundation**
P.O. Box 2728
Seattle, WA 98111
Telephone:  (206) 624-2184
E-mail:  mtackhooper@aclu-wa.org
E-mail:  talner@aclu-wa.org
E-mail:  lnowlin@aclu-wa.org
E-mail:  bschuster@aclu-wa.org

COMPLAINT (No. ) – 26

148463513.5

E-mail: jmidgley@aclu-wa.org


By: s/ Robert S. Chang
Robert S. Chang, WSBA No. 44083

**Fred T. Korematsu Center for Law and
Equality**
Ronald A. Peterson Law Clinic
Seattle University School of Law
1112 E. Columbia Street
Seattle, WA 98122
Telephone: 206.398.4025
Fax: 206.398.4077
E-mail: changro@seattleu.edu

*Attorneys for Plaintiffs Black Lives Matter
Seattle-King County, Abie Ekenezar, Sharon
Sakamoto, Muraco Kyashna-tocha, Alexander
Woldeab, Nathalie Graham, and Alexandra
Chen*

COMPLAINT (No. ) – 27

148463513.5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# EXHIBIT 2

**Mayor's Office Best Practices**

June 19, 2020

The Public Records Act is a WA state law, requiring public access to **all** records from state and local agencies. It was passed as a ballot initiative by voters in 1972 and revised several times by the state legislature.  We have 5 business days to respond to requester advising the date they can expect their records. The law ensures that we keep them updated regularly regarding the status of their request. Under the PRA we are must conduct an adequate search for records and provide access to "identifiable public records".

**This law is based on three important principles:**

The people of this state do not yield their sovereignty to the agencies that serve them.

- The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know.
- The people insist on remaining informed so that they may maintain control over the instruments that they have created.

**Deliberative Exemption:**

This exemption only applies while the issue is in the deliberative process. Once the issue is resolved the exemption is lifted and records (including drafts) become public, unless there is another legal exemption applies – i.e. Attorney Client Privilege. When working on a deliberative issue, please mark your records – Deliberative. This is very helpful for us in PDR reviews and for the Law department for litigation purposes. Based on the court case "*Hearst Corp. v. Hoppe*" Based on the standards developed through this case, for this exemption to apply, an agency must show the following:

- The records contain predecisional opinions or recommendations expressed as part of a deliberative process;
- Disclosure would be injurious to the deliberative or consultative function of the process;
- Disclosure would inhibit the flow of recommendations, observations, and opinions;
- The records reflect policy recommendations and opinions and not raw factual data on which a decision is based; and
- That the deliberative process is ongoing (i.e., no policy or decision has been adopted)

**Text Messages:**

It is the responsibility of each City employee to retain public records, including those on City-owned or personal smartphones and mobile devices. Retention of text messages is based on the content of the message and the function it documents, not the method of transmission.  Retention policies can range from immediate deletion for transitory records to several years based on the content.

Employees should avoid using City-owned smartphones and mobile devices to send or receive personal text messages. If the City receives a public records request for smartphones and mobile device records,

SEA_00144659

and records of a personal nature exist on a City-owned device, those records must be retained until the City responds to the request. Personal records on a City-owned mobile device will be disclosed in response to a PRA request unless a specific exemption to the PRA applies.

If only a small portion of the text message is responsive out of the complete string, the whole string will be produced and reviewed for any exemptions. This also applies to email strings.

The case of O'Neill v. City of Shoreline, 170 Wn. 2d 138, 240 P.3d 1149 (2010), provides direction that email messages of public officials or employees must search personal devices if used for City business.

**Other helpful reminders:**

- Public records may include records "used" by an agency but created by consultants ("*Cedar Grove Composing, Inc. v. City of Marysville*"
- Responsive records in email strings – the whole string is provided (cannot just provide responsive portions)
- When creating public records on personal devices you should immediately forward to your city device. Be mindful that your private email address is not exempt.
- An entire record cannot be withheld if only part of it is exempt (can only redact portions that are exempt).
- A specific exemption must apply to withhold or redact a record. There is no general privacy exemption. Remember to only collect data on individuals that is necessary for the public, being mindful of their right to privacy. There is no "draft" exemption. Drafts must be provided (unless they are deliberative at the time.
- Having an attorney with privilege (e.g., Michelle Chen), does not necessarily make it privileged. You must be asking for or receiving attorney advice or passing on attorney information. An email is not privileged unless an attorney is included on the email string. Please label the subject line A/C Privileged Communication.
- Bcc emails. The city discourages using Bcc. If you do, me mindful that the person you bcc'd will show up in the email search.

# EXHIBIT 3



**Patty Eakes**
pattye@calfoeakes.com
(206) 407-2211

June 24, 2020

*Via Email and Hand Delivery*

Mayor Jenny Durkan
*jenny.durkan@seattle.gov*
City of Seattle
600 4th Ave., Seventh Floor
Seattle, WA 98104

> Re:   *Hunters Capital LLC, et al. v. City of Seattle* (W.D. Wash.)

Dear Mayor Durkan:

I am writing on behalf of my clients, all of whom are business owners, residents, and property owners in or near the Capitol Hill Occupied Protest, or CHOP. As you may be aware, today we filed the attached complaint in the Western District of Washington seeking both equitable relief and damages arising out of the City's endorsement and encouragement of CHOP and the people participating in the occupation of Capitol Hill.

We are presently deciding whether to seek immediate injunctive relief to compel the City to disband CHOP and staff the East Precinct or otherwise discontinue the constitutional and statutory violations engaged in by the City. We have seen your recent statements, including your press conference on Monday the 22nd, in which you have stated that the City believes it is time for CHOP to disband. However, we have not seen that there is any timeline for CHOP to disband, nor any plan for how the City plans to dismantle CHOP if – or when – it does not voluntarily dissolve. Nor have we seen any timeline or plan for the Seattle Police Department to resume normal policing in the area, much less resume residency in the East Precinct.

We would appreciate answers to the following questions so that we can decide whether we need to move the Court for injunctive relief to compel the City to protect our clients and their neighborhood:

- Does the City have a date by which barricades and barriers must be removed from the streets and sidewalks in CHOP?  If so, what is that date?

CONFIDENTIAL

Mayor Jenny Durkan
June 24, 2020
Page 2

- Does the City have a date by which people currently residing and gardening in Cal Anderson Park must leave the area?  If so, what is that date?

- If neither of these actions occur by the set date (if any), will the City require either one to take place, and if so, what is the plan for doing so?

- When will the City resume normal policing for the area, such that officers will respond timely to 9-1-1 calls and respond to normal calls for assistance?

- When will the Seattle Police Department resume residence in the East Precinct?

We will look for your response by the close of business on Friday, June 26. We will assume that a failure to respond means that our clients will have no choice other than to file for injunctive relief.

Sincerely,

CALFO EAKES LLP

Patty A. Eakes

Enclosure
PAE:jpa

CHOP-0015813

# EXHIBIT 4



**Patty Eakes**
pattye@calfoeakes.com
(206) 407-2211

June 27, 2020

*Via Email Only*

*joseph.groshong@seattle.gov*
*carolyn.boies@seattle.gov*

Joseph Groshong
Carolyn Boies
Assistant City Attorneys
Seattle City Attorney's Office, Civil Division
701 Fifth Ave., Suite 2050
Seattle, WA 98104

      Re:    *Hunters Capital LLC, et al. v. City of Seattle* (W.D. Wash.)

Dear Joseph & Carolyn:

      Thank you for speaking with us yesterday regarding our clients' lawsuit against the City of Seattle seeking to stop the City's unconstitutional endorsement and support of those occupying what is called the Capitol Hill Occupied Protest, or "CHOP." We wrote to Mayor Durkan last Wednesday after filing the lawsuit and requested that she promptly advise our clients of the City's plan to discontinue the constitutional violations so that we could assess the need for injunctive relief.

      In our call yesterday, we asked you for the City's response to our letter to the Mayor. You stated that you were not in a position to state whether the City had a specific plan relative to CHOP, and, even assuming the City did have such a plan, you said that you would not disclose any details because doing so could endanger City employees by giving notice to the protestors, who might then obstruct the City's effort. Considering your representation, we offered to enter into a confidentiality agreement under which we would be prohibited from disclosing to the public or any third party the City's plan or its timeline. You stated that you would consider our request but that it was highly unlikely that the City would agree to make disclosures even pursuant to a confidentiality agreement.

      We want to bring to your attention that, despite your claim that disclosing the City's plan or its timeline could endanger City employees or public safety, there are multiple media reports

CHOP-0052235

Mayor Jenny Durkan
June 27, 2020
Page 2

this morning that Mayor Durkan met with groups of protestors last night to "negotiate" removal of occupants and barriers from the CHOP area.  Following that meeting, protest group leaders who had met with the Mayor announced to the media that Mayor Durkan had told them that the City plans to remove by Sunday at least some of the City-owned and City-provided barricades that had been given to CHOP occupants.  Other details of Mayor Durkan's disclosures to protest group leaders are not available, but there is no indication that the City required the protestors to enter into a confidentiality agreement relative to the City's plans.

It is apparent that the City is willing to disclose its plans and its timeline to CHOP protest leaders but refuses to offer the same to our clients, who are the residents, employees, and businesses of this area in Capitol Hill and most of whom have lived and worked in the neighborhood for many, many years.  This concerns us because it directly conflicts with the representations you made to us yesterday.  It can't be a security risk to disclose the City's plans to our clients but somehow not be a security risk to disclose the City's plans to the leaders of loose groups of protestors—presumably the very individuals that you told us the City was concerned might obstruct the City's plans, if provided advance notice of them.  In our view, the City's policy of providing CHOP participants with advance notice and an opportunity to be heard on the City's Plans, while denying our clients any notice at all on the future of their neighborhood and their property rights, constitutes a continuation of the City's sponsorship and endorsement of the occupation of our clients' neighborhood and the resulting constitutional violations.

Given Mayor Durkan's representations to the protestors that the City will make substantial progress toward removing barricades on Sunday morning, we will certainly wait to apply for injunctive relief unless it becomes clear that the City is unwilling to follow through with its plans.  Our clients were disappointed in the City's token effort to remove barriers and take other actions on Friday morning.  We hope the City acts with greater resolution on Sunday morning and thereafter.

One final thing.  We asked on Friday whether the City had taken steps to preserve evidence potentially relevant to our clients' claims.  You stated that your office had not done so, noting that the City has a mandatory 30-day hold on email.  As you know, a variety of communications and public documents beyond email are likely relevant to our claims.  While we will follow up with a more specific preservation request letter, we believe the City has an independent obligation to ensure that evidence related to our lawsuit is not discarded or destroyed; for example, text messages on the business or personal phones of the Mayor and her staff, the Chief of Police and other high-level managers of the police department, the head of the Seattle Department of Transportation and its high-level managers, and the Fire Chief and high-level managers of the fire department, all of whom, according to media reports, have been involved in CHOP issues, will likely be relevant to our claims.

Mayor Jenny Durkan
June 27, 2020
Page 3


        Thank you and we look forward to hearing from you on Monday.


                        Sincerely,

                        CALFO EAKES LLP


                        Patty A. Eakes


cc:     Angelo Calfo

PAE:pae

# EXHIBIT 5



**Patty Eakes**
pattye@calfoeakes.com
(206) 407-2211

June 30, 2020

*Via Email Only*

joseph.groshong@seattle.gov
carolyn.boies@seattle.gov

Joseph Groshong
Carolyn Boies
Assistant City Attorneys
Seattle City Attorney's Office, Civil Division
701 Fifth Ave., Suite 2050
Seattle, WA 98104

Re:     *Hunters Capital LLC, et al. v. City of Seattle* (W.D. Wash.)- Preservation Notice

Dear Joseph & Carolyn:

As you know, our clients filed a class action complaint against the City of Seattle (the "City") on June 24, 2020 in the United States District Court for the Western District of Washington (Case No. 2:20-cv-00983-TSZ) (the "lawsuit"). The lawsuit alleges that the City's support of those occupying what is called the Capitol Hill Occupied Protest (or "CHOP") violates the law and the U.S. Constitution. In particular, the lawsuit alleges that: (i) the City's support of CHOP is actively violating the constitutional rights to procedural and substantive due process of the residents, property owners, and business in the areas of Capitol Hill effected by the CHOP occupation and seeks relief for those violations pursuant to 42 U.S.C. §1983; (ii) the City's handover of public property to the CHOP, including Cal Anderson Park and the East Precinct, constitutes an unlawful gift in violation of Article VIII, Section VII of the Washington State Constitution; and (iii) the City's actions have created a nuisance in violation of RCW 7.48.010 et seq..

Information and documents in possession of the City, including its departments, agencies, executives, employees, and other agents, may be relevant to the lawsuit. This includes electronically stored information ("ESI"). It also likely includes information contained on both personal and City-owned emails and cell phones (such as voice mails and text messages). We therefore write to request that you act to ensure that all potentially relevant documents, communications and/or information are preserved.

City Attorney's Office
June 30, 2020
Page 2


Please do not destroy or alter any documents, communications, or information that may relate to the lawsuit. The laws and rules prohibiting destruction of evidence apply to ESI in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified or corrupted. Accordingly, we request that you take every reasonable step to preserve this information until the final resolution of this matter.

Documents relevant to the lawsuit may include, without limitation, the following categories of documents, from May 1, 2020, to the present:

- All documents concerning or referring to the CHOP, CHAZ (Capitol Hill Autonomous Zone), or conditions in the Capitol Hill neighborhood;

- All complaints the City, its employees, or the Mayor have received related to or referencing the CHOP/CHAZ;

- All communications, documents, and complaints (including text messages, voice messages, emails, memoranda and meeting minutes) to, from, in the possession of, or involving the following individuals or organizations and relating to the CHOP/CHAZ or the conditions on Capitol Hill:

    o Mayor Jenny Durkan, the Mayor's office and members of the Mayor's staff;
    o Sabrina Bolieu and other business liaison staff;
    o Bobby Lee, Michael Wells, and the Office of Economic Development and its staff;
    o Peter Holmes, the City Attorney's Office and its staff;
    o Seattle Public Utilities ("SPU"), Director Mami Hara and her staff, and SPU's leadership;
    o The Seattle Department of Transportation ("SDOT"), Director Sam Zimbabwe and his staff, and SDOT's leadership, staff, and employees;
    o Adrienne Thompson and other City policy staff;
    o The Seattle Police Department ("SPD"), Chief Carmen Best and her office or staff, and SPD's leadership, staff, and employees;
    o The Seattle Fire Department ("SFD"), Chief Harold Scoggins and his office or staff, and SFD's leadership, staff, and employees;
    o The Seattle City Attorney's Office, including, but not limited to Peter Holmes and his assistants;

- All 9-1-1, fire, police, or other emergency calls related to or referencing the CHOP/CHAZ or incidents occurring at or near the CHOP area.

- All communications, orders, and directions given to SPD officers and employees related to or referencing the CHOP/CHAZ or incidents occurring at or near the CHOP area;

City Attorney's Office
June 30, 2020
Page 3

- All communications, orders, and directions given to SFD firepersons and employees related to or referencing the CHOP/CHAZ or incidents occurring at or near the CHOP;

- All communications, order, and directions given to SDOT employees related to or referencing the CHOP/CHAZ or incidents occurring at or near the CHOP.

We thank you in advance for your cooperation in preserving documents and information relevant to the lawsuit.  I am available to speak with you further should you have any questions or concerns.

Sincerely,

CALFO EAKES LLP

Patty A. Eakes

cc:     Angelo Calfo

PAE:jpa

# EXHIBIT 6

# Expert Report of Brandon Leatha

### Regarding the Inspection of Certain City-Issued
### Cellular Telephones Used by Specific City of Seattle Officials

**Hunters Capital, et al. v. City of Seattle**
Case No. 20-983 TSZ (W.D. Wash.)

## Table of Contents

1   Background & Materials Considered ................................................................................. 2

2   Qualifications ..................................................................................................................... 2

3   Summary of Findings ........................................................................................................ 3

4   Device Summary ............................................................................................................... 6

5   Text Message Retention Settings ..................................................................................... 7

6   Communication Applications ........................................................................................... 9

7   Evidence of Devices Having Been Factory Reset ............................................................. 9

8   Evidence of Failed Credentials ........................................................................................ 9

9   Evidence of File Deletion ................................................................................................ 10

10     Evidence of Data Wiping and Hiding ........................................................................... 11

11     Evidence of ESI Available from Other Sources ............................................................ 11

12     Assessment of Forensic Extractions and Backups ....................................................... 11

13     Evaluation of Devices Used by City Officials ............................................................... 12

    13.1   Former Mayor Durkan ............................................................................................. 12

    13.2   Former Chief Best .................................................................................................... 15

    13.3   Chris Fisher .............................................................................................................. 17

    13.4   Kenneth Neafcy ....................................................................................................... 20

    13.5   Chief Scoggins ......................................................................................................... 23

    13.6   Idris Beauregard ...................................................................................................... 25

    13.7   Assistant Chief Greening ......................................................................................... 27

# 1   Background & Materials Considered

I was retained by counsel for Plaintiffs in this action to provide expert digital forensics services related to the analysis of electronically stored information ("ESI") produced by the City of Seattle, and to report on and provide testimony about my findings.

I understand that Hunters Capital filed a lawsuit against the City of Seattle ("City") on June 24, 2020, and sent letters on June 27 and June 30 requesting the preservation of text messages, among other types of ESI.  The City disclosed that it was unable to produce some or all text messages for certain City officials ("City Officials").  On October 19, 2021, the Court ordered the City to provide the data collected from the impacted City Officials' cellphones, including Mayor Jenny Durkan, former Police Chief Carmen Best, Fire Chief Harold Scoggins, Idris Beauregard, Christopher Fisher, Ken Neafcy, and Eric Greening.  On October 31, 2021, the City's vendor provided the data collected from each of the seven City Officials' cellphones and associated cloud accounts.  This report details the results of my analysis of the cellphone data provided and the availably of text messages for each of the City Officials.

In preparation of this report and my opinions expressed herein, I have relied on my training, education, and over 22 years of experience performing eDiscovery and digital forensic investigations.  The materials that I have considered include certain text message productions made by the City, the FRCP 26(a)(2)(B) Expert Report of Kevin T. Faulkner, letters and interrogatory responses from the City, deposition transcripts, and the forensic extractions and backups of cellular phones and associated cloud accounts used by the City Officials.  A list of the materials that I have considered is included as Exhibit A to this report and a table with details about the source devices that I analyzed is included in the "Device Summary" section below.

I am being compensated at an hourly rate of $450 for my services.  My work in this matter is ongoing and I reserve the right to update my report and opinions as I continue my investigation or receive new information.

# 2   Qualifications

I am the Founder and CEO of Leatha Consulting LLC, an expert services and consulting firm that provides digital forensics, electronic discovery, expert testimony, and technology consulting services.  Prior to my current role, I was a Director at iDiscovery Solutions ("iDS") and the Director of ESI Consulting and Data Analysis at Electronic Evidence Discovery ("EED").

I have more than 22 years of experience performing digital forensic investigations, incident response, and electronic discovery services.  I provide services and consult with clients on the collection, preservation, analysis, and production of electronically stored information.  I have extensive experience and expertise in the examination of email, documents, and other electronically stored information ("ESI") in a litigation context, including ESI maintained on personal computers, servers, enterprise applications, databases, cellular phones, tablets, mobile devices, IOT devices, cloud storage applications, social media, and other internet-based services.

I have a Bachelor of Arts in Environmental Studies from the University of Washington, a certificate in Computer Forensics from the University of Washington, and I am a GIAC Certified Forensic Examiner ("GCFE") and GIAC Certified Incident Handler ("GCIH").

I am on the Board of Directors of the Computer Technology Investigators Network ("CTIN"), the Board Vice President of the Puget Sound chapter of the Information Systems Security Association ("ISSA"), and on the Advisory Board for the SANS Institute's Global Information Assurance Certification ("GIAC") program.  I have been a member of the Sedona Conference since 2005 and have participated in the Working Groups on Electronic Document Retention and Production ("WG1") and Data Security and Privacy Liability ("WG11").

I have testified in both state and federal cases as a fact witness, as a FRCP Rule 30(b)(6) witness, and as an FRCP 26(a)(2)(B) expert witness.  I have provided electronic discovery and digital forensics services to both plaintiffs and defendants, and I have been a court appointed neutral expert. My qualifications as well as a list of the cases for which I have testified are included in my CV attached as Exhibit B to this report.

## 3   Summary of Findings

I have analyzed the information collected from the cellphones of the seven City Officials and found that actions taken after the lawsuit was filed resulted in a significant loss of text messages from each of their cellphones.  The post-lawsuit actions which resulted in the loss of text messages include the following:

**Mayor Jenny Durkan**

- Mayor Jenny Durkan's iPhone 8 Plus (FirstNet) was factory reset on July 4, 2020, and again on September 17, 2020.  *See* "Factory Reset (former Mayor Durkan)" section below.

- Mayor Jenny Durkan's iPhone was configured to automatically delete text messages older than 30-days. Her text message retention settings were changed from "Forever" to "30 Days" sometime between July 4, 2020, and July 26, 2020.  *See* "Text Message Retention Settings (former Mayor Durkan)" section below.

- All of Mayor Jenny Durkan's text messages were deleted from her iCloud account using the "Disable & Delete" function on July 4, 2020.  *See* "Evidence of File Deletion (former Mayor Durkan)" section below.

- 5,937 text messages were deleted from Mayor Jenny Durkan's iPhones between July 4, 2020, and November 16, 2020.  Of the 5,937 deleted text messages, 191 were deleted manually and were not the result of the 30-day message retention setting.  *See* "Evidence of File Deletion (former Mayor Durkan)" section below.

**Chief Carmen Best**

- Chief Carmen Best's iPhone was configured to automatically delete text messages older than 30-days.  *See* "Text Message Retention Settings (former Chief Best)" section below.

- 27,138 text messages were deleted from Chief Carmen Best's iPhone.  When her phone was returned to the City on or around September 2, 2020, only 15 text messages remained on the device.  *See* "Evidence of File Deletion (former Chief Best)" section below.

**Chris Fisher**

- Chris Fisher's iPhone was configured to automatically delete text messages older than 30-days.  *See* "Text Message Retention Settings (Chris Fisher)" section below.

- 15,843 text messages were deleted from Chris Fisher's iPhone.  When the City collected data from his iPhone 7 on February 22, 2021, only 16 messages remained on the device.  *See* "Evidence of File Deletion (Chris Fisher)" section below.

- Chris Fisher's iPhone 7 was restored from a backup on November 3, 2020, a process which first requires the phone to be erased, or factory reset.  *See* "Evidence of Devices Having Been Factory Reset (Chris Fisher)" section below.

- Chris Fisher used at least two other iPhones between June 1, 2020, and October 31, 2020, neither of which were disclosed in response to the October 19, 2021, Stipulated Digital Examination Agreement and Order.  *See* "Evidence of ESI Available from Other Sources (Chris Fisher)" section below.

**Ken Neafcy**

- Ken Neafcy's iPhone XS was factory reset on October 27, 2020, resulting in the loss of all text messages dated between March 19, 2020, and October 28, 2020.  *See* "Evidence of Devices Having Been Factory Reset (Kenneth Neafcy)" section below.

**Chief Harold Scoggins**

- Chief Harold Scoggins iPhone 8 Plus was factory reset on October 8, 2020, resulting in the loss of all text messages prior to that date.  *See* "Evidence of Devices Having Been Factory Reset (Chief Scoggins)" section below.

**Idris Beauregard**

- Idris Beauregard's iPhone 8 was factory reset on October 9, 2020, resulting in the loss of all text messages prior to that date.  *See* "Evidence of Devices Having Been Factory Reset (Idris Beauregard)" section below.

**Asst. Chief Eric Greening**

- Asst. Chief Eric Greening's Samsung Galaxy S8 was factory reset on approximately October 26, 2020, resulting in the loss of all text messages prior to that date. *See* "Assistant Chief Greening" section below.

The actions outlined above each resulted in the loss of text messages that the City had an obligation to preserve. If a technical issue prevented the City Officials from accessing their phones, a temporary replacement should have been issued instead of factory resetting and deleting all the data. A qualified digital forensic vendor could then have assisted with preserving the data. The following timeline shows the events which resulted in the loss of text messages for each of the seven City Officials. *See* Figure 1 below.



**Figure 1. Timeline of events resulting in the loss of text messages**

# 4   Device Summary

On October 31, 2021, I received notice from Kevin Faulkner of Palo Alto Networks Unit 42, one of the City's forensic vendors, that forensic extractions and backups of cellular phones used by certain City Officials were available for me to download from a secure network location.  I completed the download of approximately 114GB of data, which included backups, forensic extractions, and other information about the cellular phones outlined in the DEA.  On November 1, 2021, the City provided an "ESI Log" which included additional details about the forensic extractions and backups provided by the City.  The following table summarizes the data provided by the City.  *See* figure 2.

| Evidence ID | Custodian | Extraction Type[1] | Source Date[2] | Source Description |
|---|---|---|---|---|
| E033A | Beauregard, Idris | CB Adv Logical | 3/9/2021 | Apple iPhone 8; SN: Redacted |
| E055A | Beauregard, Idris | Elcomsoft EPB | 10/28/2021 | iCloud Backup |
| E055B | Beauregard, Idris | Elcomsoft EPB | 10/28/2021 | iCloud Synced |
| E055C | Beauregard, Idris | Elcomsoft EPB | 10/28/2021 | iCloud Synced |
| E009A | Best, Carmen | CB Adv Logical | 2/24/2021 | iPhone XS Max; SN: Redacted |
| E004A2 | Durkan, Jenny | iTunes Backup | 8/29/2019 | iPhone 8 Plus (Verizon); SN: Redacted |
| E004A1 | Durkan, Jenny | iTunes Backup | 8/21/2020 | iPhone 11 (FirstNet); SN: Redacted |
| E002A | Durkan, Jenny | Magnet Acquire | 9/18/2020 | iPhone 8 Plus (FirstNet); SN: Redacted |
| E003A | Durkan, Jenny | Magnet Acquire | 10/15/2020 | iPhone 11 (FirstNet); SN: Redacted |
| E001A | Durkan, Jenny | Axiom Cloud | 11/16/2020 | iCloud Files; Apple ID: Redacted |
| E001B | Durkan, Jenny | Elcomsoft EPB | 11/16/2020 | iCloud Backup; Apple ID: Redacted |
| E001C | Durkan, Jenny | Elcomsoft EPB | 11/16/2020 | iCloud Synced; Apple ID: Redacted |
| E001D | Durkan, Jenny | Elcomsoft EPB | 11/16/2020 | iCloud Files; Apple ID: Redacted |
| E005A | Durkan, Jenny | CB Adv Logical | 11/19/2020 | iPhone 8 Plus (FirstNet); SN: Redacted |
| E008A | Durkan, Jenny | CB Adv Logical | 11/19/2020 | iPhone 11 (FirstNet); SN: Redacted |
| E010A | Durkan, Jenny | CB Adv Logical | 7/2/2021 | iPhone 8 Plus (Verizon); SN: Redacted |
| E005C | Durkan, Jenny | CB Full FS | 7/7/2021 | iPhone 8 Plus (FirstNet); SN: Redacted |

---

[1] The City and its vendors utilized specialized software to download, backup, or extract information from the City's cellphones and accounts.  The extraction type describes the type of data backed up and the software or method used for the backup.

[2] The Source Date reflects when the backup, download, or extraction was created and does not necessarily reflect when the specific device was last used.

| E010B | Durkan, Jenny | CB Full FS | 7/7/2021 | iPhone 8 Plus (Verizon); SN: Redacted |
| E008B | Durkan, Jenny | Belkasoft Full FS | 7/8/2021 | iPhone 11 (FirstNet); SN: Redacted |
| E047B | Durkan, Jenny | Elcomsoft EPB | 9/9/2021 | iCloud Synced; Apple ID: Redacted |
| E016A | Fisher, Christopher | CB Adv Logical | 2/22/2021 | Apple iPhone 7; SN: Redacted |
| E022A | Greening, Eric | CB Adv Logical | 3/1/2021 | Samsung Galaxy S8; IMEI: Redacted |
| E054A | Greening, Eric | CB Adv Logical | 10/27/2021 | Samsung Galaxy S8; IMEI: Redacted |
| E054B | Greening, Eric | CB Full FS | 10/27/2021 | Samsung Galaxy S8; IMEI: Redacted |
| E050 | Neafcy, Ken | iTunes Backup | 3/1/2021 | iPhone 6s; SN: Redacted |
| E045A | Neafcy, Ken | iTunes Backup | 8/17/2021 | iPhone XS; SN: Redacted |
| E049A | Neafcy, Ken | Passware Full FS | 10/27/2021 | iPhone 6s; SN: Redacted |
| E056A | Neafcy, Ken | Elcomsoft EPB | 10/28/2021 | iCloud Backups; Apple ID: Redacted |
| E056B | Neafcy, Ken | Elcomsoft EPB | 10/28/2021 | iCloud Synced; Apple ID: Redacted |
| E056C | Neafcy, Ken | Elcomsoft EPB | 10/28/2021 | iCloud Files; Apple ID: Redacted |
| E049B | Neafcy, Ken | CB Adv Logical | 10/30/2021 | iPhone 6s; SN: Redacted |
| E052A | Scoggins, Harold | Elcomsoft EPB | 2/13/2021 | Apple iPhone 8 Plus (iCloud Backup); SN: Redacted |
| E052B | Scoggins, Harold | Elcomsoft EPB | 2/16/2021 | Apple iPhone 8 Plus (iCloud Backup); SN: Redacted |
| E051 | Scoggins, Harold | iTunes Backup | 3/9/2021 | Apple iPhone 11; SN: Redacted |

**Figure 2. Table of forensic extractions and backups provided by the City**

# 5   Text Message Retention Settings

Certain settings can be applied to cellphones which affect the retention of text messages, iMessage chat, and other electronic chat messages.  By default, an Apple iPhone retains messages indefinitely.  However, a user can configure the iPhone to delete all messages older than 30 days, or all messages older than one year.  To change the settings, the user must select *Settings > Messages > Keep Messages,* and change the setting from "Forever", to "30 days" or "1 Year".  *See* Figure 3.



**Figure 3. iPhone message retention settings**

When the user changes the setting from "Forever" to "30 Days" or "1 Year", a warning message notifies the user that older messages will be permanently deleted.  The user can then choose to "Cancel" or confirm the change by selecting the "Delete" option.  *See* Figure 4.



**Figure 4. Warning message seen when the iPhone message retention setting is changed**

Once the setting has been applied, messages that meet the specified age will continue to be deleted, or "expire", nightly on a rolling basis.  Even if the "Keep Messages" configuration is set to "Forever" a user can still manually delete messages and conversation threads.

The current message retention setting, as well as the number of times the message retention setting has been changed, are stored in the **com.apple.MobileSMS.plist** configuration file.  The current message retention setting is stored in a key named **KeepMesageForDays**, and the values are "0" for Forever, "30" for 30 Days, and "365" for 1 Year retention.  The number of times the phone's message retention setting has been changed is stored in a key named **KeepMessagesVersionID**.  While the phone does track how many times the message retention setting was changed, it does not track when the settings were changed or what the prior values were.  If the **KeepMesageForDays** and **KeepMessagesVersionID** are not found in the **com.apple.MobileSMS.plist** configuration file, this indicates that the phone was configured with the default "Forever" retention setting.

If a user gets a new iPhone, they can optionally transfer certain settings and data from their prior phone. If this is done, the **KeepMesageForDays** retention setting and **KeepMessagesVersionID** are typically

transferred to the new phone.  The City's forensic expert, Kevin Faulkner, investigated other configuration changes that can be made to an iPhone that may also cause the **KeepMessagesVersionID** value to increment by 1.  For example, when turning "Messages in iCloud" on or off, the **KeepMessagesVersionID** is incremented by 1.  *See* Faulkner, 20-21.

## 6   Communication Applications

Cell phones and other mobile devices support various forms of communication, including email, text, chat, voice and video.  Apple iPhones and Android phones typically include standard applications for sending and receiving email, text messages, and phone calls.  However, a user can install any number of additional communications applications, including applications for services such as Facebook Messenger, Skype, Signal, and Telegram, among others.  Each of the backups provided by the City were evaluated to determine which communication applications were installed and used.

## 7   Evidence of Devices Having Been Factory Reset

When a phone is factory reset, all the data maintained on the device is deleted and is irrecoverable from the reset device.  When an Apple iPhone is factory reset, the phone automatically restarts after the reset process completes.  Examining certain forensic artifacts on the reset phone can provide information about when the reset process finished and the phone first restarted.[3]

Depending on the type of backup or forensic extraction, some of the artifacts may not be present.  A 0 byte file named **.obliterated** is typically created in the **/private/var/root** folder of an iPhone that has been factory reset.  The date that the **.obliterated** file was created reflects when the iPhone first started after the factory reset process.  A configuration file named **com.apple.purplebuddy.plist** contains entries about when an iPhone was first set up, including the setup activities which occur after a factory reset.  The **GuessedCountry**[4] key typically reflects when the setup process began, and the **SetupLastExit** key typically reflects when the setup process was completed.  In some cases, an iPhone can be used without the setup process being completed, and thus the **SetupLastExit** date may be later than the **GuessedCountry** key.  The first entries in the **ZPROCESS** and **ZLIVEUSAGE** tables from the **DataUsage.sqlite** typically reflect the first activities on the iPhone after it first restarts.  Additionally, the dates that certain database and configuration files were created can be used to confirm when the device was first restarted after a factory reset.

## 8   Evidence of Failed Credentials

Access to iPhones can optionally be protected by a passcode.  If a passcode is set, certain iPhone models support "Touch ID", which unlocks the device with a fingerprint, or "Face ID", which unlocks the device with facial recognition.  If a user forgets a password or passcode, it may not be possible for the user to

---

[3] A Cellebrite blog article that describes various methods to determine if and when an iPhone was factory reset can be found at: https://cellebrite.com/en/upgrade-from-null-detecting-ios-wipe-artifacts/

[4] The **GuessedCountry** key from the **com.apple.purplebuddy.plist** configuration file contains a sub-key named "at" which stores the date that the "Country or Region" information is selected during the iPhone setup process.

access the information on the device or account.  The City reported that multiple City Officials forgot the passcode to their iPhones and became locked out.  In all instances, the iPhones were factory reset prior to being sent to a forensic vendor for inspection and forensic extraction, and thus no data was available which could confirm the events that occurred prior to the phones being factory reset.  Depending on the model of iPhone and the version of the iOS operating system, certain software and forensic services could have bypassed the screen lock to gain access to and preserve the data stored on the phone.

## 9  Evidence of File Deletion

As described in the "Text Messages Retention Settings" section above, an iPhone can be configured to automatically delete text messages after 30 days or after one year.  The user can also manually delete text messages by selecting individual messages or by selecting an entire conversation thread.  An inspection of the information remaining in the iPhone's **sms.db** text message database can provide details about the deletion events, such as how many messages were deleted, the time period of the deleted messages, and possibly how the messages were deleted.

The City's expert provides a detailed explanation describing how to determine if a message deletion was performed by the configured "30 day" message retention setting, by the user selecting individual messages to delete, or by the user deleting an entire conversation thread.  If the chat entry exists without any associated messages, the message deletion was performed by the configured retention setting or by manually deleting individual messages.  However, if the chat entry is missing, the entire conversation thread was manually deleted by the user.  *See* Faulkner, 23-24.

One can also use the ROWID in the **message** and **chat** tables in the **sms.db** to identify "gaps" or missing messages and conversation threads.  When messages are sent or received by an iPhone, they are stored sequentially in the **message** table, where each subsequent message receives the next **ROWID**[5].  Likewise, each new chat is assigned the next available **ROWID**.   By identifying the gaps in the sequential **ROWID** found in the **message** and **chat** tables, one can determine how many messages and chats are missing.  One can also use the date of the preceding and subsequent messages to determine a date range for the missing message(s).  The deleted messages identified using this process were manually deleted, either by selecting individual messages or by selecting an entire conversation thread at a time.  If the messages were deleted by the iPhone message retention settings, all messages older than the configured expiration date ("30 days" or "1 Year") would be missing and the gaps would not exist.

The **sqlite_sequence** table in the **sms.db** keeps track of the next available ID for certain tables.  The **seq** column stores the next available **ROWID** for the **deleted_messages** and **sync_deleted_messages** tables, and the current value reflects the number of messages and chats that have been deleted from the phone.  The number of "missing" or deleted chats and messages can also be confirmed by subtracting the number of entries found in the chat and message tables from the maximum **ROWID** in each table.

---

[5] The City's expert provides a detailed description about when messages are restored from iCloud, the restored messages are downloaded from newest to oldest, and thus the message **ROWID** in the **sms.db** would be assigned in reverse order.  See Faulkner, 29.  However, after the historic messages were restored iCloud, new messages sent or receive from the iPhone would be assigned the next greater **ROWID** for each new message.

## 10 Evidence of Data Wiping and Hiding

When an iPhone is factory reset, the device is essentially "wiped", and the data cannot be recovered from the device directly.  Details regarding the factory reset process for each device is discussed in the "Evaluation of Devices Used by City Officials" section below.

I did not find evidence that specialized software or applications were used to wipe or hide information from the devices subject to the DEA.

## 11 Evidence of ESI Available from Other Sources

Information from iPhones and other mobile devices can be stored in many locations, including iCloud backups, iTunes backups, prior forensic extractions, previously used devices, and information synchronized to other devices, such as an iPad or Apple computer connected to the same iCloud account.

When information is downloaded from a user's iCloud account using the Elcomsoft forensic software, information about each device connected to the same iCloud account is saved in the **devices.json** and **trusted_devices.json** file.  Evaluating this information may show that other devices were connected to the same iCloud account and could have data, such as text messages, synchronized to the device.

By inspecting certain configuration files found in an iPhone backup, one can determine when the device was last backed up.  The **com.apple.madrid.plist** configuration file includes keys such as **CloudKitInitialStartDate**, which tracks when the device was first configured to store "Messages in iCloud", and **CloudKitSyncingEnabled**, which tracks if the phone was configured to store "Messages in iCloud" at the time the device was backed up.  The **com.apple.mobile.ldbackup.plist** configuration file includes keys such as **LastiTunesBackupDate**, which indicates the date of the last iTunes backup, **LastCloudBackupDate**, which indicates the date of the last iCloud backup, and **CloudBackupEnabled**, which indicates if iCloud backups were enabled.  If "Messages in iCloud" was enabled at the time of an iCloud backup, the messages are excluded from the backup.  Conversely, if "Messages in iCloud" is not enabled at the time of a backup, the backup includes the messages from the device.  The **iTunesPrefs** file contains names of computers that the device had be previously connected to, as well as the computer's "user account" in use when the device was connected.  This forensic artifact can be used to identify computers that may contain the contents of prior iTunes backups.

## 12 Assessment of Forensic Extractions and Backups

This section evaluates the methods used by the City and its vendors to backup or extract information from the City officials' phones, cloud accounts, and other sources of ESI.  A variety of methods exist to backup or extract information from iPhones, iCloud accounts, and other mobile devices. Some methods provide a more complete forensic backup, typically referred to as a full file system extraction, but these use specialized software and may require the use of "jailbreak" software to bypass the device security.

The timing of when information is downloaded from iCloud accounts is important because backups and synchronized data can expire or be overwritten.  Apple typically saves the two most recent backups for a

configured device, and each time a new backup is created, the oldest backup is eliminated.  If a device is no longer backed up to iCloud, Apple typically deletes the last remaining backup after 180 days.  If the "Messages in iCloud" feature was once enabled, and subsequently disabled, the messages would be available in iCloud for 30 days after the feature was turned off.

# 13  Evaluation of Devices Used by City Officials

## 13.1  Former Mayor Durkan

**Text Message Retention Settings (former Mayor Durkan)**

The City provided backups for three different iPhones used by Durkan between April 10, 2018 and November 19, 2020.  At the time each of the backups was created, the phone was configured to retain messages forever.  However, the City's forensic expert concluded that sometime between July 4, 2020, and July 26, 2020, Durkan's iPhone was configured to delete all messages older than 30 days.  *See* Faulkner, 33-34.  Faulkner was not able to determine if the 30-day retention setting was first applied on the iPhone 8 Plus (FirstNet) that Durkan used until July 9, 2020, or the iPhone 11 (FirstNet) that replaced it.  The following table provides additional detail about the text message retention settings found on each of Durkan's iPhone backups provided by the City.  *See* figure 5.

| Device | Use Date (Start) | Use Date (End) | Backup Date | Message Retention Setting | Message Retention Version |
|---|---|---|---|---|---|
| iPhone 8 Plus (Verizon) | 4/10/2018 | 10/30/2019 | 8/29/2019 | Forever | 0 |
| iPhone 8 Plus (Verizon) | 4/10/2018 | 10/30/2019 | 7/2/2021 | Forever | 1 |
| iPhone 8 Plus (Verizon) | 4/10/2018 | 10/30/2019 | 7/7/2021 | Forever | 1 |
| iPhone 8 Plus (FirstNet) | 10/30/2019 | 7/9/2020 | 9/18/2020 | Unknown, Phone was factory reset | |
| iPhone 8 Plus (FirstNet) | 10/30/2019 | 7/9/2020 | 11/19/2020 | Unknown, Phone was factory reset | |
| iPhone 8 Plus (FirstNet) | 10/30/2019 | 7/9/2020 | 7/7/2021 | Unknown, Phone was factory reset | |
| iPhone (unknown) | Between 7/4/2020 and 7/26/2020 | | | 30 | 3 |
| iPhone 11 (FirstNet) | 7/9/2020 | 11/19/2020 | 8/21/2020 | Forever | 4 |
| iPhone 11 (FirstNet) | 7/9/2020 | 11/19/2020 | 10/15/2020 | Forever | 4 |
| iPhone 11 (FirstNet) | 7/9/2020 | 11/19/2020 | 11/19/2020 | Forever | 5 |
| iPhone 11 (FirstNet) | 7/9/2020 | 11/19/2020 | 7/8/2020 | Forever | 5 |

**Figure 5. Durkan's text message retention settings**

**Communication Applications (former Mayor Durkan)**

The standard iPhone Mail, iMessage, and Phone applications were located on each of the backups of Durkan's iPhones.

The full file system extraction from Durkan's iPhone 11 (FirstNet) contained a database of Microsoft Teams messages.  The **ZSMESSAGE** table found in the **SkypeSpacesDogfood-78e61e45-6beb-4009-8f99-359d8b54f41b.sqlite** database contained 1,799 entries.  An analysis of the Teams content showed that the database contained 653 messages and 490 "Event/Call" records dated between April 15, 2020, and November 17, 2020.

I did not find evidence of other communication applications having been downloaded, installed, or used on the backups and forensic extractions provided for Durkan.

**Factory Reset (former Mayor Durkan)**

On July 4, 2020, Durkan's iPhone 8 Plus (FirstNet) was restored from an iCloud backup of itself.  *See* Faulkner, 27-28.  According to Apple[6], in order to restore from an iCloud backup, the iPhone must first be erased, or factory reset, indicating that the iPhone 8 Plus (FirstNet) must have been factory reset on July 4, 2020.

On September 17, 2020, Durkan's iPhone 8 Plus (FirstNet) was factory reset a second time. This is evidenced by examining the full file system extraction of Durkan's iPhone 8 Plus (FirstNet) that was created on July 7, 2021.  As discussed in the "Evidence of Devices Having Been Factory Reset" section above, certain forensic artifacts provide information about when an iPhone was factory reset.  The July 7, 2021, backup of Durkan's iPhone 8 Plus (FirstNet) contained an **.obliterated** file that was created on September 17, 2020, at 6:56pm PDT.  This special 0 byte file was found in the **/private/var/root/** folder and provides an indication of when the device was factory reset. The **containermanagerd.log.0**[7] file also included an entry describing when the iPhone was started up and confirms that Durkan's iPhone 8 Plus (FirstNet) completed the factory reset process on September 17, 2020, at 6:56pm PDT.

**Evidence of Failed Credentials (former Mayor Durkan)**

On November 16, 2020, one of the City's forensic vendors attempted to collect text messages that were synchronized with and stored on Durkan's iCloud account.  Text messages, among other data types, are stored on iCloud with end-to-end encryption[8].  In order to download the text messages from a user's iCloud account, the passcode for one of the user's connected devices must first be entered.  According to the City's November 1, 2021, ESI Log, the end-to-end encrypted or "protected data", including Durkan's text messages, was not downloaded "due to authentication issues".  The City did not successfully collect text messages from Durkan's iCloud account until September 9, 2021.

**Evidence of File Deletion (former Mayor Durkan)**

When Durkan's iPhone 8 Plus (FirstNet) was factory reset and subsequently restored from an iCloud backup on July 4, 2020, approximately 5,911 messages were restored from her iCloud account.  After the messages were restored to her iPhone 8 Plus (FirstNet), the "Messages in iCloud" feature was turned off and the "Disable & Delete" option was selected on July 4,2020, at 5:19pm PDT.  *See* Faulkner,

---

[6] *See* "Restore your device from an iCloud backup", https://support.apple.com/en-us/HT204184
[7] The "containermanagerd.log.0" is located at **/private/var/root/Library/Logs/MobileContainerManager** and is typically only found in full filesystem extractions.
[8] *See* https://support.apple.com/en-us/HT202303 for information regarding the end-to-end encryption used by Apple's iCloud service.

28-29.  This action resulted in nearly 6,000 text messages being deleted from Durkan's iCloud account 30 days later, on August 4,2020.  *Id*.

Sometime between July 4, 2020, and July 26, 2020, Durkan's iPhone was configured to delete all text messages older than 30 days.  *See* Faulkner, 33-34.  The City's expert provides a detailed description of how text messages are sequentially numbered using the **ROWID** field found in **message** and **chat** tables in the iPhone's **sms.db** text message database. *Id.*, 28-29.  An assessment of the text message database from Durkan's iPhone 11 (FirstNet) indicates that the first and newest message that was downloaded from iCloud after the phone had been factory reset was dated July 4, 2020, at 11:44am PDT, and was assigned **ROWID**  1.  The oldest remaining message was dated June 25, 2020, at 10:38am PDT and assigned **ROWID** 165.  The first remaining message that was received after Durkan's phone was restored was dated July 4, 2020, at 8:18pm PDT and assigned **ROWID** 5,912.  All messages between **ROWID** 165 and 5,912 are missing, indicating that the 30-day retention setting deleted 5,746 messages that were dated prior to June 25, 2020, at 10:38am PDT.

In addition to the 30-day retention setting which automatically deleted messages, I found evidence that messages were manually deleted as well.  The City's expert concluded that the 30-day retention setting was turned off on approximately July 25, 2020.  *See* Faulkner, 33-34. As a result, the only messages deleted by the 30-day retention setting would have been dated prior to June 25, 2020, at 10:38am PDT, the oldest remaining message.  Since messages received on an iPhone are added to the **sms.db** text message database sequentially, one can look for gaps in the message table's **ROWID** to identify manually deleted messages.  An assessment of the text message database found in the July 8, 2021, collection of Durkan's iPhone 11 (FirstNet) includes gaps in the **message** table **ROWIDs**, indicating that messages were manually deleted.  The missing messages may have been deleted individually, one message at a time, or may have been the result of entire conversation threads having been deleted by a single action.  My analysis of the **ROWID** gaps in the **message** table shows that an additional 191 messages were manually deleted between June 25, 2020, and November 16, 2020.  Adding the 191 manually deleted messages to the 5,746 messages deleted by the 30-day retention setting yields 5,937 messages that were deleted after the iPhone 8 Plus (FirstNet) was factory reset on July 4, 2020.  This is confirmed by the **sqlite_sequence** table in the **sms.db** text message database found on the July 8, 2021, collection of Durkan's iPhone 11 (FirstNet).  In this table, both the **sync_deleted_messages** and **deleted_messages** values were set to 5,937.  A table detailing the number of deleted messages, the date range for which each of the missing messages was sent or received, and the method of deletion is provided as Exhibit C to this report.

The table below summarizes the contents of the **message** table found in the **sms.db** text message database for each of the collections of Durkan's iPhones.  "Total Messages" is the maximum **ROWID** and reflects the number of messages sent or received.  "Messages Remaining" is a count of the messages remaining in the **message** table.  "Deleted Messages" is calculated by subtracting the number of "Messages Remaining" from the "Total Messages".  "Deleted Messages as % of Total" is calculated by dividing the number of "Deleted Messages" by the number of "Total Messages".  *See* figure 6.

| Phone | Backup Date | Total Messages | Messages Remaining | Deleted Messages | Deleted Messages as % of Total |
|---|---|---|---|---|---|
| iPhone 8 Plus (Verizon) | 8/29/2019 | 4,722 | 3,643 | 1,079 | 22.9% |
| iPhone 8 Plus (Verizon) | 7/2/2021 | 4,938 | 3,845 | 1,093 | 22.1% |
| iPhone 11 (FirstNet) | 8/21/2020 | 6,875 | 1,006 | 5,869 | 85.4% |
| iPhone 11 (FirstNet) | 10/15/2020 | 7,635 | 1,702 | 5,933 | 77.7% |
| iPhone 11 (FirstNet) | 11/19/2020 | 8,162 | 2,225 | 5,937 | 72.7% |
| iPhone 11 (FirstNet) | 7/8/2021 | 8,162 | 2,225 | 5,937 | 72.7% |

**Figure 6. Evaluation of messages deleted from Durkan's iPhones**

While I cannot determine the exact date that each message was deleted, I can compare the **sms.db** text message databases from each successive backup of Durkan's iPhone 11 (FirstNet) and determine that 64 messages were deleted between August 21, 2020, and October 15, 2020, and another 4 messages between October 15, 2020, and November 19, 2020.  In total, 191 text messages were manually deleted from Durkan's iPhone between July 4, 2020, and November 19, 2020.

**Evidence of Data Wiping and Hiding (former Mayor Durkan)**

See "Evidence of File Deletion" section above.

**Evidence of ESI Available from Other Sources (former Mayor Durkan)**

I did not identify any additional sources of data likely to contain Durkan's missing text messages that had not been collected and identified on the ESI Log provided by the City.

**Assessment of Forensic Extractions and Backups (former Mayor Durkan)**

The forensic extractions and backups provided for Durkan's iPhones and iCloud account were consistent with what I would expect to obtain; however, had data been collected from Durkan's iCloud account prior to it expiring, the City should have been able to recover most of the 5,937 deleted text messages.

## 13.2 Former Chief Best

**Text Message Retention Settings (former Chief Best)**

The City provided one backup of Best's iPhone XS Max that she used between October 1, 2019, and September 2, 2020.  When the backup was created on February 24, 2021, the phone was configured to delete all messages older than 30 days.  The following table provides additional detail about the text message retention settings found on Best's iPhone.  *See* figure 7.

| Device | Use Date (Start) | Use Date (End) | Backup Date | Message Retention Setting | Message Retention Version |
|---|---|---|---|---|---|
| iPhone XS Max | 10/1/2019 | 9/2/2020 | 2/24/2021 | 30 | 2 |

**Figure 7. Best's text message retention settings**

**Communication Applications (former Chief Best)**

In addition to the default iPhone Mail, iMessage, and Phone applications, the Microsoft Teams, Twitter, Facebook, and LinkedIn applications were also installed on Best's iPhone XS Max.  However, I did not locate recoverable messages or other forms of communication sent or received by these applications.

**Evidence of Devices Having Been Factory Reset (former Chief Best)**

Best's iPhone XS Max was first set up by transferring data from her prior iPhone 8 Plus on October 1, 2019.  *See* Faulkner, 37-38.  I did not find evidence that her iPhone XS Max had been factory reset since it was first used on October 1, 2019.

**Evidence of Failed Credentials (former Chief Best)**

I did not find evidence that failed credentials impacted the City's ability to access or collect information from Best's iPhone XS Max.

**Evidence of File Deletion (former Chief Best)**

The February 24, 2021, collection of Best's iPhone XS Max only included 15 text messages, all of which were received on September 2, 2020, the last day the phone was used.  In addition to the 15 remaining messages, there were another 49 entries related to group chats found in the **message** table of the **sms.db** text message database.  *See* Faulkner, 41. None of the 49 entries included message text.  The maximum **ROWID** for the **message** table was 27,202, and subtracting the 15 messages and 49 chat entries from the maximum **ROWID** indicates that 27,138 messages had been deleted from Best's iPhone XS Max.  The number of deleted messages is confirmed by an entry in the **sqlite_sequence** table where the **deleted_messages** value was also set to 27,138.

It appears that nearly all the 27,138 messages deleted from Best's iPhone XS Max were deleted manually, as opposed to having been automatically deleted by the configured 30-day message retention setting.  Only 28 out of 5,133 entries remain in the **chat** table, indicating that messages associated with the 5,105 missing chat entries were deleted manually.

The following table summarizes the contents of the **message** table found in the **sms.db** text message database from the collection of Best's iPhone XS Max.  "Total Messages" is the maximum **ROWID** and reflects the number of messages sent or received.  "Messages Remaining" is a count of the messages remaining in the **message** table.  "Deleted Messages" is calculated by subtracting the number of "Messages Remaining" from the "Total Messages".  "Deleted Messages as % of Total" is calculated by dividing the number of "Deleted Messages" by the number of "Total Messages".  *See* figure 8.

| Phone | Backup Date | Total Messages | Messages Remaining[9] | Deleted Messages | Deleted Messages as % of Total |
|---|---|---|---|---|---|
| iPhone XS Max | 2/24/2021 | 27,202 | 64 | 27,138 | 99.8% |

**Figure 8. Evaluation of messages deleted from Best's iPhone XS Max**

**Evidence of Data Wiping and Hiding (former Chief Best)**

See "Evidence of File Deletion" section above.

**Evidence of ESI Available from Other Sources (former Chief Best)**

An inspection of the **com.apple.mobile.ldbackup.plist** file shows that the last iCloud backup was completed on October 1, 2019, and that the phone had not been backed up to iTunes.  The October 1, 2019, backup would have expired and been automatically deleted from her iCloud account after 180 days.

I did not identify any additional sources of data likely to contain Best's missing text messages that had not been collected and identified on the ESI Log provided by the City.

**Assessment of Forensic Extractions and Backups (former Chief Best)**

The forensic extractions and backups provided for Best's iPhones and iCloud account were consistent with what I would expect to obtain.

## 13.3 Chris Fisher

**Text Message Retention Settings (Chris Fisher)**

The City provided one backup of Fisher's iPhone 7 that he used between October 1, 2019, and September 2, 2020.  When the backup was created on February 22, 2021, the phone was configured to delete all messages older than 30 days.  The following table provides additional detail about the text message retention settings found on Fisher's iPhone.  *See* figure 9.

| Device | Use Date (Start) | Use Date (End) | Backup Date | Message Retention Setting | Message Retention Version |
|---|---|---|---|---|---|
| iPhone 7 | 11/2/2020[10] | 12/9/2020 | 2/22/2021 | 30 | 1 |

**Figure 9. Fisher's text message retention settings**

---

[9] The **sms.db** - **message** table has 64 entries remaining, however only 16 were actual text messages and contained content.
[10] Fisher's iPhone 7 appears to have been restored from an iCloud backup on 11/2/2020 at 4:52PM PST.  *See* "Factory Reset" section below for more detail.

**Communication Applications (Chris Fisher)**

In addition to the default iPhone Mail, iMessage, and Phone applications, Microsoft Teams was also installed on Fisher's iPhone 7; however, I did not locate recoverable messages or other forms of communication sent or received by the Microsoft Teams application.

**Evidence of Devices Having Been Factory Reset (Chris Fisher)**

The **com.apple.MobileBackup.plist** configuration file contained a **RestoreDate** key set to "11/3/2020 12:52:14 AM" and the **WasCloudRestored** key set to "True".  This combination of values indicates that Fisher's iPhone 7 was restored from an iCloud backup on November 2, 2020, at 4:52PM PST. To restore an iPhone from an iCloud backup, it would first need to be erased or "factory reset".[11]

**Evidence of Failed Credentials (Chris Fisher)**

The City reported that on approximately December 3, 2020, Fisher experienced an issue with the facial recognition functionality on his iPhone 7, and that he did not remember his passcode[12].  This resulted in Fisher becoming locked out of his iPhone 7, and ultimately it was factory reset.

The iPhone 7 does not support facial recognition, or more specifically, "Face ID".  Either the explanation was incorrect, or the incident that Fisher described was with a different phone.  As described in the "Evidence of ESI Available from Other Sources" section below, Fisher appears to have used an iPhone XS and iPhone 12 Pro, both of which support apple Face ID.  However, no data was provided from either of these phones.

**Evidence of File Deletion (Chris Fisher)**

The February 22, 2021, collection of Fisher's iPhone 7 only included 16 text messages, all of which were received between December 3, 2020, and December 8, 2020.  The maximum **ROWID** for the **message** table was 15,859 and subtracting the 16 messages indicates that 15,843 messages had been deleted from Fisher's iPhone 7.  The number of deleted messages is confirmed by an entry in the **sqlite_sequence** table where the **deleted_messages** value was also set to 15,843.

The following table summarizes the contents of the **message** table found in the **sms.db** text message database for Fisher's iPhone 7.  "Total Messages" is the maximum **ROWID** and reflects the number of messages sent or received.  "Messages Remaining" is a count of the messages remaining in the **message** table.  "Deleted Messages" is calculated by subtracting the number of "Messages Remaining" from the "Total Messages".  "Deleted Messages as % of Total" is calculated by dividing the number of "Deleted Messages" by the number of "Total Messages".  *See* figure 10.

---

[11] *See* "Restore your device from an iCloud backup", https://support.apple.com/en-us/HT204184
[12] *See* City's Aug. 31, 2021, Supplemental Response to Plaintiffs' Second Set of Interrogatories to Defendant City of Seattle.

| Phone | Backup Date | Total Messages | Messages Remaining | Deleted Messages | Deleted Messages as % of Total |
|---|---|---|---|---|---|
| iPhone 7 | 2/22/2021 | 15,859 | 16 | 15,843 | 99.9% |

**Figure 10. Evaluation of messages deleted from Fisher's iPhone 7**

**Evidence of Data Wiping and Hiding (Chris Fisher)**

See "Evidence of File Deletion" section above.

**Evidence of ESI Available from Other Sources (Chris Fisher)**

The iPhone 7 backup provided for Fisher included photos that were restored from his iCloud account. Within the individual photos is metadata, or information that describes when the original photo was taken, the model of camera used to take the photo, as well as other details about the photo.  Of the photos restored from Fisher's iCloud account, 2,955 were taken with three different models of iPhones between October 10, 2016, and December 6, 2020[13].  *See* figure 11.

| iPhone Model | First Photo | Last Photo | Count of Photos |
|---|---|---|---|
| iPhone 7 Plus | 10/10/2016 | 9/21/2018 | 1,187 |
| iPhone XS | 9/22/2018 | 10/23/2020 | 1,720 |
| iPhone 12 Pro | 10/31/2020 | 12/6/2020 | 48 |

**Figure 11. iPhone models used to take photos restored from Fisher's iCloud account**

This metadata shows that Fisher likely used an iPhone XS between September 22, 2018, and October 23, 2020, and switched to an iPhone 12 Pro after that.  Additionally, the iPhone used to take the photos between October 10, 2016, and September 21, 2018, is listed as an "iPhone 7 Plus", not the "iPhone 7" that was the source of the February 22, 2021, backup provided by the City.

A review of the text messages produced by the City for former Mayor Durkan and former Chief Best include text messages that were sent to Fisher using the ▇Redacted▇ phone number; however, when Fisher's iPhone 7 was backed up on February 22, 2021, the last phone number used by the phone was ▇Redacted▇.  The **CellularUsage.db** shows that the **subscriber_mdn** was set to "▇Redacted▇".  The **chat** table in the **sms.db** text message database shows that the "account_login" for the iPhone 7 was set to "P:+12067754995" and "E:▇Redacted▇".  However, the "last_addressed_handle" in the **chat** table shows that both the "▇Redacted▇" and "+▇Redacted▇" phone numbers were used over time.  There are a variety of possible explanations for this scenario, such as switching the SIM card used in the phone; however, it appears that Fisher may have sources of text messages that were not collected.

---

[13] Fisher's iCloud Photos backup include another 76 photos that were taken with several other iPhone models; however, these were likely received from another user via text message, email, or another transfer method and saved to his device.

Based on my review of the evidence provided, it appears that Fisher used an iPhone XS and iPhone 12 Pro during the relevant time period.  Data from the iPhone XS and iPhone 12 Pro was not provided and is a likely source of relevant information.

**Assessment of Forensic Extractions and Backups (Chris Fisher)**

Fisher's iPhone 7 was backed up by the City's vendor on February 22, 2021.  At that time, the last successful iCloud backup for the iPhone 7 was on December 2, 2020.[14]  This backup, and one from the prior week, should still have been available at the time the phone was collected on February 22, 2021.  Since the phone was not configured to synchronize messages with iCloud[15], any messages remaining on the phone as of December 2, 2020, would have been stored in the iCloud backup.  However, since more than 180 days has elapsed, it is likely that the iCloud backup for this phone has expired and is no longer available on Fisher's iCloud account.

## 13.4 Kenneth Neafcy

**Text Message Retention Settings (Kenneth Neafcy)**

The City provided backups of two different iPhones used by Neafcy, an iPhone 6s and an iPhone XS.  The phone that Neafcy used between approximately March 20, 2020, and October 27, 2020, was factory reset, and thus the text message retention settings configured for this phone are not known.  Neafcy began using an iPhone 6s after the iPhone XS was reset, and the iPhone 6s was configured to retain text messages forever.  The following table provides additional detail about the text message retention settings found on each of Neafcy's iPhones.  *See* figure 12.

| Device | Use Date (Start) | Use Date (End) | Backup Date | Message Retention Setting | Message Retention Version |
|---|---|---|---|---|---|
| iPhone XS | Approx. 3/20/2020 | 10/27/2020[16] | 8/17/2021 | Unknown, Phone was factory reset | |
| iPhone 6s[17] | 10/29/2020 | 3/1/2021 | 3/1/2021 | Forever | 0 |
| iPhone 6s | 10/29/2020 | 3/9/2021 | 10/27/2021 | Forever | 0 |
| iPhone 6s | 10/29/2020 | 3/9/2021 | 10/30/2021 | Forever | 0 |

**Figure 12. Neafcy's text message retention settings**

---

[14] The **LastCloudBackupDate** key from the **com.apple.ldbackup.plist** configuration file shows that the last successful iCloud backup was at 2020-12-02 21:20:17 UTC.

[15] The **CloudKitSyncingEnabled** key from the **com.apple.madrid.plist**  configuration file was set to "False", indicating that the messages in iCloud feature was not used.

[16] Neafcy's iPhone XS appears to have been factory reset on 10/27/2020 at approximately 10:26pm.  It is unclear when he started to use the iPhone XS; however, it is likely that he began using it on approximately 3/20/2020, after he stopped using his iPhone 6s.  *See* the "Factory Reset" section below for additional detail.

[17] Neafcy used the iPhone 6s from 10/29/2020 – 3/9/2021, after his iPhone XS was factory reset.  It appears that he had used the same iPhone 6s between 6/15/2017 - 3/20/2020, prior to his use of the iPhone XS.

**Communication Applications (Kenneth Neafcy)**

In addition to the default iPhone Mail, iMessage, and Phone applications, the Microsoft Teams and Facebook applications were also installed on Neafcy's iPhone 6s. However, I did not locate recoverable messages or other forms of communication sent or received by the Microsoft Teams or Facebook applications.

**Evidence of Devices Having Been Factory Reset (Kenneth Neafcy)**

The City reported that Neafcy became locked out of his iPhone XS and ultimately, it was factory reset. An inspection of the databases and log files found on the August 17, 2021, backup of his iPhone XS shows that the factory reset likely occurred on October 27, 2020, at 3:26pm PT.  The first entries in the **ZPROCESS** and **ZLIVEUSAGE** tables from the **DataUsage.sqlite** database reflect this time, as do the creation times for the **sms.db**, **Accounts3.sqlite**, and other system databases that are typically created when a phone first boots after a factory reset.

**Evidence of Failed Credentials (Kenneth Neafcy)**

The City reported that Neafcy became locked out of his iPhone XS and ultimately, it was factory reset.

**Evidence of File Deletion (Kenneth Neafcy)**

Neafcy's iPhone XS was factory reset on October 27, 2020, resulting in the loss of all text messages that he sent or received between March 19, 2020, and October 28, 2020[18].  Since the phone was factory reset, I am not able to inspect the **sms.db** text message database and determine how many messages were lost.

The following table summarizes the contents of the **message** table found in the **sms.db** text message database for the two collections of Neafcy iPhone 6s.  "Total Messages" is the maximum **ROWID** and reflects the number of messages sent or received.  "Messages Remaining" is a count of the messages remaining in the **message** table.  "Deleted Messages" is calculated by subtracting the number of "Messages Remaining" from the "Total Messages".  "Deleted Messages as % of Total" is calculated by dividing the number of "Deleted Messages" by the number of "Total Messages".  *See* figure 13.

| Phone | Backup Date | Total Messages | Messages Remaining | Deleted Messages | Deleted Messages as % of Total |
|---|---|---|---|---|---|
| iPhone 6s | 10/27/2021 | 2,540 | 2,498 | 42 | 1.7% |
| iPhone 6s | 3/1/2021 | 2,472 | 2,430 | 42 | 1.7% |

**Figure 13. Evaluation of messages deleted from Neafcy's iPhone 6s**

---

[18] An inspection of the message table from the sms.db backed up from Neafcy's iPhone 6s on March 1, 2021, shows a gap of messages between March 19, 2020, at 5:28pm PDT, and October 28, 2020, at 2:37pm PDT.

**Evidence of Data Wiping and Hiding (Ken Neafcy)**

See "Evidence of File Deletion" section above.

**Evidence of ESI Available from Other Sources (Ken Neafcy)**

The City reported that Neafcy "tried to recover the phone from iCloud, but it sent the passcode to the phone that was locked so he could not view it."[19]  An inspection of Neafcy's iPhone 6s shows that his iCloud account was associated with his [Redacted] email address[20].  The October 27, 2021, backup of his iPhone 6s included two emails from Apple Support.  The first message reported that the password associated with his iCloud account was changed on March 1, 2021, and the second reported that an iPhone XR was used to sign into his iCloud account on March 6, 2021.  *See* Figures 14 and 15.



> ## Your Apple ID information has been updated.
>
> Dear Kenneth Neafcy,
>
> The following changes to your Apple ID, kenneth.neafcy@seattle.gov were made on March 1, 2021 at 9:43:24 AM PST:
>
> Password
>
> If you did not make these changes or you believe an unauthorized person has accessed your account, you should change your password as soon as possible from your Apple ID account page at https://appleid.apple.com.
>
> Apple Support
>
> Apple ID | Support | Privacy Policy
> Copyright © 2021 One Apple Park Way, Cupertino, CA 95014, United States All rights reserved.

**Figure 14. March 1, 2021, email from Apple Support reporting that the password for Neafcy's [Redacted] iCloud account was changed**

---

[19] *See* City's Aug. 31, 2021, Supplemental Response to Plaintiffs' Second Set of Interrogatories to Defendant City of Seattle.

[20] The **ZUSERNAME** field in the **Accoutns3.sqlite** database found on the backups of Neafcy's iPhone 6s was set to [Redacted] for various Apple services, indicating this was the currently configured Apple ID.



**Figure 15. March 6, 2021, email from Apple Support reporting that Neafcy signed into his iCloud account with an iPhone XR**

It is unclear how long Neafcy lost access to his iCloud account; however, if his iPhone XS was backed up to his iCloud account before it was factory reset on October 27, 2020, that backup would have been kept for 180 days and would still have been available when data was collected from his iPhone 6s on March 1, 2021.

**Assessment of Forensic Extractions and Backups (Ken Neafcy)**

*See* "Evidence of ESI Available from Other Sources" section above.

## 13.5 Chief Scoggins

**Text Message Retention Settings (Chief Scoggins)**

The City provided backups of two different iPhones used by Chief Scoggins.  Chief Scoggins' iPhone 8 Plus was factory reset on October 8, 2020, and thus the text message retention settings prior to the reset date are unknown.  Between October 8, 2020, and February 16, 2021, the iPhone 8 Plus was configured to retain messages forever.  On February 17, 2021, files and settings from Chief Scoggins iPhone 8 were transferred to a new iPhone 11[21].  The iPhone 11 was also configured to retain text

---

[21] The **com.apple.MobileBackup.plist** found on Scoggins' iPhone 11 contained a **RestoreDate** key set to "2/18/2021 12:42:24 AM" UTC,  a **WasCloudRestore**  key set to "False", and a **SourceDeviceUDID** key set to "6198ec80e016c39394d59e4687b191edc6112c1d", which matches the unique id of Scoggins' iPhone 8 Plus.  This

messages "Forever" when it was last backed up on March 9, 2021.  The following table provides
additional detail about the text message retention settings found on each of Chief Scoggins' iPhones.
*See* figure 16.

| Device | Use Date (Start) | Use Date (End) | Backup Date | Message Retention Setting | Message Retention Version |
|---|---|---|---|---|---|
| iPhone 8 Plus | 10/8/2020 | 2/12/2021 | 2/13/2021 | Forever | 0 |
| iPhone 8 Plus | 10/8/2020 | 2/16/2021 | 2/16/2021 | Forever | 0 |
| iPhone 11 | 2/17/2021 | 3/9/2021 | 3/9/2021 | Forever | 1 |

**Figure 16. Chief Scoggins' text message retention settings**

**Communication Applications (Chief Scoggins)**

In addition to the default iPhone Mail, iMessage, and Phone applications, the Microsoft Teams and
Twitter applications were also installed on Scoggins' iPhone 8 Plus and iPhone 11.  However, I did not
locate recoverable messages or other forms of communication sent or received by these applications.

**Evidence of Devices Having Been Factory Reset (Chief Scoggins)**

The City reported that Chief Scoggins became locked out of his iPhone 8 Plus on October 8, 2020, and as
a result, his phone was factory reset.  An inspection of the February 16, 2021, iPhone 8 Plus iCloud
backup provided by the City confirms that the phone had been factory reset and the first subsequent
use began on October 8, 2020.  The first entries in the **ZPROCESS** and **ZLIVEUSAGE** tables from the
**DataUsage.sqlite** database are October 8, 2020, at 4:15pm PDT and 4:16pm PDT respectively.  The first
messages were found in the **sms.db** text message database just over an hour later at 5:22pm PDT on
October 8, 2020.

**Evidence of Failed Credentials (Chief Scoggins)**

The City reported that Chief Scoggins had forgotten his iPhone passcode and became locked out his
iPhone 8 Plus on October 8, 2020, and the phone was subsequently factory reset.

**Evidence of File Deletion (Chief Scoggins)**

Chief Scoggins iPhone 8 Plus was factory rest on October 8, 2020, resulting in the loss of all text
messages prior to that date.

The following table summarizes the contents of the **message** table found in the **sms.db** text message
database from the collections of Scoggins' iPhone 8 Plus and iPhone 11.  "Total Messages" is the
maximum **ROWID** and reflects the number of messages sent or received.  "Messages Remaining" is a
count of the number of messages remaining in the **message** table.  "Deleted Messages" is calculated by
subtracting the number of "Messages Remaining" from the "Total Messages".  "Deleted Messages as %
of Total" is calculated by dividing the number of "Deleted Messages" by the number of "Total
Messages".  *See* figure 17.

---

combination of keys indicates that Scoggins' iPhone 8 Plus was transferred to his new iPhone 11 on February 17,
2021, at 4:42pm PST.

| Phone | Backup Date | Total Messages | Messages Remaining | Deleted Messages | Deleted Messages as % of Total |
|---|---|---|---|---|---|
| iPhone 8 Plus | 2/13/2021 | 2,829 | 2,827 | 2 | 0.1% |
| iPhone 8 Plus | 2/16/2021 | 2,948 | 2,946 | 2 | 0.1% |
| iPhone 11 | 3/9/2021 | 3,335 | 3,333 | 2 | 0.1% |

**Figure 17. Evaluation of messages deleted from Scoggins' iPhones**

**Evidence of Data Wiping and Hiding (Chief Scoggins)**

See "Evidence of File Deletion" section above.

**Evidence of ESI Available from Other Sources (Chief Scoggins)**

Chief Scoggins iPhone 8 Plus and iPhone 11 were both configured to backup to his iCloud account and the City provided two restored iCloud backups for his iPhone 8 Plus. Included with the backups was a configuration file named ███████████Redacted███████████ that was created by the forensic software used to download the backups. The "last_snapshot_date" values for the iPhone 8 Plus were February 13, 2021, at 1:19:44, and February 16, 2021, at 22:07:40. The **com.apple.mobile.ldbackup.plist** found in the backup of his iPhone 11 had the key **LastCloudBackupDate** set to "2021-03-09 05:57:46.0000000 Z"[22] and the key **CloudBackupEnabled** set to "True". Had Chief Scoggins iPhone 8 Plus been configured to backup to iCloud at the time it was factory reset on October 8, 2020, the same process could have been used to download the backup from his iCloud account. However, since the same iPhone 8 Plus was configured to backup to the same iCloud account after it was factory reset, it is likely that the iCloud backups of the newly configured phone would have overwritten any existing backups within a few weeks.

**Assessment of Forensic Extractions and Backups (Chief Scoggins)**

The City's forensic vendor did not collect data from Chief Scoggins' iCloud account until July 15, 2021. At this time, his iCloud account had two backups for his iPhone 8 Plus, one from February 13, 2021, and the other from February 16, 2021. Had the City collected data from Chief Scoggins' iCloud account shortly after his iPhone 8 Plus was factory reset on October 8, 2020, the messages lost due to the factory reset may have been recovered.

## 13.6 Idris Beauregard

**Text Message Retention Settings (Idris Beauregard)**

The City provided one backup of the iPhone 8 used by Idris Beauregard. Beauregard's iPhone 8 was factory reset on October 9, 2020, and thus the text message retention settings prior to the reset event are unknown. An inspection of the **com.apple.MobileSMS.plist** file found on the March 9, 2021 backup

---

[22] Dates can be stored in many different formats. The **LastCloudBackup** key is stored in Apple Absolute Time, which is the number of seconds that have elapsed since "2001-01-01 00:00:00 Z". This numeric value can be converted to a human readable date using a specific formula.

of Beauregard's iPhone 8 did not contain entries for the **KeepMessageForDays** and **KeepMessagesVersionID** keys.  This is consistent with the iPhone 8 having the default text message retention setting of "Forever".  *See* figure 18.

| Device | Use Date (Start) | Use Date (End) | Backup Date | Message Retention Setting | Message Retention Version |
|---|---|---|---|---|---|
| iPhone 8 | 10/9/2020 | 3/9/2021 | 3/9/2021 | Forever | 0 |

**Figure 18. Beauregard's text message retention settings**

**Communication Applications (Idris Beauregard)**

In addition to the default iPhone Mail, iMessage, and Phone applications, the Microsoft Teams application was also installed on Beauregard's iPhone 8.  However, I did not locate recoverable messages or other forms of communication sent or received by the Microsoft Teams application.

**Evidence of Devices Having Been Factory Reset (Idris Beauregard)**

The City reported that Beauregard had forgotten his iPhone 8 passcode and became locked out on October 9, 2020, and the phone was subsequently factory reset.  An inspection of the **com.apple.purplebuddy.plist** configuration file shows that the "GuestCountry" - "at" key was set to October 9, 2020, at 1:51pm PDT and the "SetupLastExit" key was set to October 9, 2020 at 2:17pm PDT.  The oldest entry in the **ZPROCESS** table found in the **DateUsage.sqlite** database was set to October 9, 2020, at 1:50pm PDT.  These artifacts are consistent with the factory reset process completing at approximately 1:50pm PDT on October 9, 2020.

**Evidence of Failed Credentials (Idris Beauregard)**

The City reported that Beauregard had forgotten his iPhone 8 passcode and became locked out on October 9, 2020, and the phone was subsequently factory reset.

**Evidence of File Deletion (Idris Beauregard)**

Beauregard's iPhone 8 was factory reset on October 9, 2020, resulting in the loss of all text messages prior to that date.  The **sms.db** text message database from Beuregard's iPhone 8 included 3,682 text messages that were sent and received between October 9, 2020, and March 9, 2021.  Of the 3,682 messages, 388 messages were manually deleted from the phone.  The maximum **ROWID** for the **message** table was 3,682, and subtracting the 3,294 remaining messages from the maximum **ROWID** indicates that 388 messages had been deleted from Beauregard's iPhone 8.  This is confirmed by the **deleted_messages** and **sync_deleted_messages** values from the **sqlite_sequence** table, both of which were set to 388.  Since Beauregard's iPhone 8 was configured to keep messages "Forever", the deletions must have been performed manually.

The following table summarizes the contents of the **message** table found in the **sms.db** text message database collected from Beauregard's iPhone 8.  "Total Messages" is the maximum **ROWID** and reflects the number of messages sent or received.  "Messages Remaining" is a count of the messages remaining in the **message** table.  "Deleted Messages" is calculated by subtracting the number of "Messages

Remaining" from the "Total Messages".  "Deleted Messages as % of Total" is calculated by dividing the number of "Deleted Messages" by the number of "Total Messages".  *See* figure 19.

| Phone | Backup Date | Total Messages | Messages Remaining | Deleted Messages | Deleted Messages as % of Total |
|---|---|---|---|---|---|
| iPhone 8 | 3/9/2021 | 3,682 | 3,294 | 388 | 10.5% |

**Figure 19. Evaluation of messages deleted from Beauregard's iPhones**

**Evidence of Data Wiping and Hiding (Idris Beauregard)**

See "Evidence of File Deletion" section above.

**Evidence of ESI Available from Other Sources (Idris Beauregard)**

Since Beauregard's iPhone 8 was factory reset, I am not able to determine if his phone had been backed up using iTunes or iCloud before it was reset on October 9, 2020.  However, when his iPhone 8 was collected on March 9, 2021, the **com.apple.mobile.ldbackup.plist** configuration file had the **CloudBackupEnabled** key set to "True", indicating that it was configured to backup to iCloud.[23]  If his phone was backed up to iCloud prior to October 9, 2020, the backup would only have been available for 180 days and would have expired by approximately April 7, 2021.

**Assessment of Forensic Extractions and Backups (Idris Beauregard)**

See "Evidence of ESI Available from Other Sources" section above.

## 13.7 Assistant Chief Greening

The City provided three backups of Greening's Samsung Galaxy S8 phone.  Greening was the only one of the City Officials subject to the October 29, 2021 Digital Examination Agreement and Order that used an Android device.  The process to extract information from an Android device is different than that of an iPhone, as are the forensic artifacts used to determine the configuration of the phone and past activity. The provided forensic extractions were limited, and while the content of the available text messages was included, the **mmssms.db** text message database and other configuration files were not.  This is consistent with the capabilities of a standard forensic extraction.  Extracting additional data from the phone, including the **mmssms.db** text message database, would have required "rooting" the phone to bypass the device security or using specialized software or tools only available in some forensic labs.

The City reported that Greening became locked out of his Samsung Galaxy S8 on October 26, 2020, and as a result, the phone was factory reset.  An analysis of the available data shows that the oldest text

---

[23] The **com.apple.mobile.ldbackup.plist** configuration file had the **CloudBackupEnabled** key set to "True".  The **LastCloudBackupDate** did not exist, indicating that an iCloud backup had not yet been completed.  This may be because the iCloud backup setting was enabled shortly before data was extracted from his phone on March 9, 2021, or because he did not have enough available storage in his iCloud account.

message was dated October 27, 2020, at 8:28AM PDT, and the oldest call record was dated October 26, 2020, at 12:43pm PDT.  The oldest files, including the **SamsungAnalyticsPrefs.xml** configuration file, were dated October 26, 2020, at 9:14AM PDT.  This is consistent with the phone having been factory reset on the morning of October 26, 2020, prior to 9:14AM PDT.

Respectfully submitted,

Brandon Leatha

April 28, 2022

## Exhibit A – Materials Considered

- Documents Produced by the City of Seattle

    o BEST_00000002 – Text messages between Carmen Best and Chris Fisher from May 18, 2021 to June 8, 2021

    o CONFIDENTIAL_Durkan_Jenny_messages_supplemental_V2.xls (a partial reconstruction of Jenny Durkan's text messages)

    o CONFIDENTIAL_Durkan_Jenny_messages_supplemental_V3.xls (a partial reconstruction of Jenny Durkan's text messages)

    o CONFIDENTIAL_HC_Durkan_Jenny_messages_supplemental.xls (a partial reconstruction of Jenny Durkan's text messages)

    o CONFIDENTIAL_HC-Best_Carmen_messages_supplemental.xls (a partial reconstruction of Carmen Best's text messages)

    o CONFIDENTIAL_Scoggins_Harold_messages 01.xls (a partial reconstruction of Harold Scoggins's text messages)

    o CONFIDENTIAL_Scoggins_Harold_messages 02.xls (a partial reconstruction of Harold Scoggins's text messages)

    o CONFIDENTIAL_Scoggins_Harold_messages 03.xls (a partial reconstruction of Harold Scoggins's text messages)

    o SEA_00144347 – March 4, 2021 Whistleblower Complaint by Stacy Irwin and supporting materials

    o SEA_00145711 – Phone Log for Mayor Durkan's work phone

- 2021-07-13 The City of Seattle's Objections and Responses to the Plaintiffs' Second Set of Interrogatories to Defendant City of Seattle

- 2021-08-03 Letter from Shane P. Cramer to Plaintiffs' Counsel re Durkan Text Messages

- 2021-08-31 The City of Seattle's Objections and Supplemental Responses to Plaintiff's Second Set of Interrogatories to Defendant City of Seattle

- 2021-10-19 Stipulated Digital Examination Agreement (DEA) and Order Signed by Judge Zilly (Dkt. No. 50)

- 2021-11-01 ESI Log Produced Pursuant to the Stipulated Digital Examination Agreement

- 2022-02-11 Expert Report of Kevin T. Faulkner Dated February 11, 2022

- Deposition Transcript of Jenny A. Durkan Dated March 1, 2022, in the case of Seattle Times Co. v. City of Seattle, Case No. 21-2-07268-9 SEA, 92 - 105

Exhibit B – Leatha CV



# Brandon Leatha

Founder and CEO, Leatha Consulting LLC

## SUMMARY

Brandon Leatha, the Founder and CEO of Leatha Consulting LLC, is an expert in digital forensics, e-Discovery, and data analytics.  With over 22 years of technology consulting experience, he advises clients on digital forensic investigations, e-Discovery, information governance, and cybersecurity.  Mr. Leatha has experience with on premise and cloud-based enterprise software platforms, such as email, database, and industry specific business applications.  He has performed forensic investigations on hundreds of devices ranging from computers and enterprise servers, to smartphones and IOT devices. He has developed solutions to identify, preserve, and produce relevant information from a variety of challenging data sources, including social media, mobile applications, cloud-based applications, and legacy systems.  He also has extensive experience designing and implementing data preservation plans, as well as assessing and remediating potential data loss situations.

Mr. Leatha has been a corporate 30(b)(6) witness, a court-appointed neutral computer forensics expert, and has testified on numerous electronic discovery and computer forensics issues.  He has a certificate in computer forensics from the University of Washington and has earned both the GIAC Certified Incident Handler (GCIH) and GIAC Certified Forensic Examiner (GCFE) certificates.  He serves on the Board of Directors for the Computer Technology Investigators Network ("CTIN"), is the Board Vice President of the Puget Sound chapter of the Information Systems Security Association ("ISSA"), and on the Advisory Board for the SANS Institute's Global Information Assurance Certification ("GIAC") program.  He has been a member of the Sedona Conference since 2005 and has participated in the Working Groups on Electronic Document Retention and Production ("WG1") and Data Security and Privacy Liability ("WG11").  Prior to his current role, he was a Director at Washington DC based iDiscovery Solutions (iDS) and the Director of ESI Consulting and Data Analysis at Electronic Evidence Discovery (EED).

## SELECT CONSULTING EXPERIENCE

- Managed the cross functional team that performed the data restoration, processing, analysis, hosted review, and production for one of the largest civil discovery disputes in history.
- Performed a covert collection and intellectual property theft investigation consisting of over 30 servers and workstations.  Investigation resulted in the identification, quarantine, and secure deletion of the misappropriated intellectual property.
- Performed a forensic analysis of multiple computers and mobile devices to identify the installation and use of software that intercepted electronic communications.
- Performed the collection and production of relevant information originating from over 20 different social media accounts, many of which were not supported by industry standard forensic collection software and required the development, testing, and implementation of customized solutions.
- Responded to a targeted phishing attack which resulted in the compromise of multiple user credentials and significant financial loss.  Led the incident response activities, including the planning, identification, containment, eradication, and remediation in a rapid and cost-effective manner.

Exhibit B – Leatha CV



- Performed the collection, preservation, and production of incident information stored in legacy databases including DBII, Oracle, and SQL Server.  Performed data conversion, normalization, and de-duplication to ensure the complete and non-duplicative production of relevant information.  The resulting database allowed the client to quickly respond to discovery requests that were previously very costly and time consuming.
- For a public utility, performed an incident response investigation into the alleged theft and destruction of intellectual property which included the analysis of workstations, servers, security camera footage, and access control systems.  Analysis required the correlation of evidence from multiple systems and locations over a multi-day period.
- Managed a team that collected, processed, and supported a multi-year hosted review of a significant volume of data onsite within an international corporation based in the EU.

## COURT APPOINTED NEUTRAL

- Court Appointed Neutral, Forensic Expert; TCS & Starquest Expeditions v. Distant Insights, PTC., LTD, Case No. 18-2-07338-3 SEA, Washington State Superior Court, King County; 2018-2021
- Court Appointed Neutral, Forensic Expert; Earthbound Corporation et al v. MiTek USA Inc et al, US District Court, Central District of California, Case No. 2:16-cv-07223-DMG-JPR; 2016-2017
- Court Appointed Neutral, Forensic Expert; Roger M. Belanich et al. v. Employers' Fire Insurance Co. et al., Superior Court of Washington for King County, Case No. 12-2-14368-4 SEA; 2014-2015

## TESTIMONY

- Expert report; Masood Khan v. The Greenspan Company, et al., Case No. 1100110442, Judicial Arbitration and Mediation Services, San Francisco Office; April 2022
- Expert report; Douglas Withers v. Boeing Employees' Credit Union, et al., Case No. 21-2-11224-9, Washington State Superior Court, King County; February 2022
- 30(b)(6) Deposition; St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc. et al., Case No. 3:18-cv-00988, United States District Court for Middle District of Tennessee, Nashville Division; December 2021
- Declaration; City of Chicago v. Purdue Pharma L.P., et al., Case No. 14-CV-04261, United States District Court for the Northern District of Illinois, Eastern Division; July 2021
- Declaration; Pinkstaff v. Tidewater Barge Lines, Inc., Case No. 19-CV-54217, Oregon State Circuit Court, Multnomah County; May 2021
- Declaration; Pinkstaff v. Tidewater Barge Lines, Inc., Case No. 19-CV-54217, Oregon State Circuit Court, Multnomah County; May 2021
- Expert witness testimony, jury trial; John E. Traster v. NUGS LLC, Case No. 18-2-13981-3, Washington State Superior Court, King County; March 2021
- Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; January 2021
- Declaration; John E. Traster v. NUGS LLC, Case No. 18-2-13981-3, Washington State Superior Court, King County; December 2020
- Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; December 2020
- Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; November 2020

Exhibit B – Leatha CV



- Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; October 2020
- Expert witness testimony, evidentiary hearing; Masood Khan v. The Greenspan Company, et al., Case No. CGC-19-581129, Superior Court of California, San Francisco County; October 2020
- Declaration; Masood Khan v. The Greenspan Company, et al., Case No. CGC-19-581129, Superior Court of California, San Francisco County; October 2020
- Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; September 2020
- Expert witness deposition; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; August 2020
- Declaration; Griffin Maclean, Inc. v. Hites and Neville, Case No. 18-2-28257-8, Washington State Superior Court, King County; August 2020
- Declaration; Griffin Maclean, Inc. v. Hites and Neville, Case No. 18-2-28257-8, Washington State Superior Court, King County; July 2020
- Declaration; Griffin Maclean, Inc. v. Hites and Neville, Case No. 18-2-28257-8, Washington State Superior Court, King County; June 2020
- Expert report; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; April 2020
- Electronic Discovery, Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 18-2-00806-29, Washington State Superior Court, Skagit County; January 2020
- Declaration; Evergreen Point Development, LLC v. Halvorson Construction Group, LLC, et al., Case No. 19-2-05329-1 SEA, Washington State Superior Court, King County; December 2019
- Declaration; Pacific Woodtech Corporation v. Daniel Semsak, Case No. 2:19-CV-01984, United States District Court for the Western District of Washington; December 2019
- Declaration; AGC Flat Glass Company North America, Inc. v. Jason Perryman, an individual, Case No. 19-CV-28663, Oregon State Circuit Court, Washington County; December 2019
- Declaration; Commercial Cold Storage, Inc. v. The City of Mt. Vernon, Washington, Case No. 19-2-00162-29, Washington State Superior Court, Skagit County; November 2019
- Declaration; Evergreen Point Development, LLC v. Halvorson Construction Group, LLC, et al., Case No. 19-2-05329-1 SEA, Washington State Superior Court, King County; November 2019
- Expert witness testimony, evidentiary hearing; Miller Construction Co., LTD v. Department of Transportation & Public Facilities, Southcoast Region, OAH No. 19-0088-CON, Alaska Office of Administrative Hearings; September 2019
- Affidavit; Law Offices of Herssein & Herssein PA v. United Services Automobile Association et al., Case No. 2015-15825-CA, Eleventh Judicial Circuit Court of Florida; August 2019
- Expert witness deposition; RJB Wholesale, Inc. v. Jeffrey Castleberry, et al., Case No. 2:16-cv-1829, United States District Court for the Western District of Washington; May 2018
- Expert report; RJB Wholesale, Inc. v. Jeffrey Castleberry, et al., Case No. 2:16-cv-1829, United States District Court for the Western District of Washington; January 2018
- Expert report; RJB Wholesale, Inc. v. Jeffrey Castleberry, et al., Case No. 2:16-cv-1829, United States District Court for the Western District of Washington; December 2017
- Affidavit; Law Offices of Herssein & Herssein PA v. United Services Automobile Association et al., Case No. 2015-15825-CA, Eleventh Judicial Circuit Court of Florida; October 2017

Exhibit B – Leatha CV



- Affidavit; Law Offices of Herssein & Herssein PA v. United Services Automobile Association et al., Case No. 2015-15825-CA, Eleventh Judicial Circuit Court of Florida; August 2017
- Expert report; Horizon Tire Inc. (A Texas Corporation) v. Benjamin Shan, Sylvia Hermosillo, Haitao Zhang, and Flagship Tire & Wheel, LLC, Case No. 2016-03707, 127th Judicial District Court of Harris County Texas; August 2017
- Expert report; Kruger Industries, Inc. v. Sound Propeller Services, Inc., Case No. 15-2-14142-8, Washington State Superior Court, Pierce County; November 2016
- 30(b)(6) Deposition; In Re: Actos (Pioglitazone) Products Liability Litigation, MDL No. 6:11-md-2299; United States District Court for the Western District of Louisiana; March 2015
- Declaration; Shareholder Insite, Inc. v. WTAS LLC, Case No. 13-2-26202-9 SEA, Washington State Superior Court, King County; September 2013
- Declaration; In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010; MDL 2179 Section J, United States District Court for the Eastern District of Louisiana; December 2012
- Declaration; In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010; MDL 2179 Section J, United States District Court for the Eastern District of Louisiana; December 2011
- Expert report; In re the Marriage of Sara Stephenson and Shata Stephenson; Case No. 10-2-06746-2, Washington State Superior Court, King County; April 2011
- 30(b)(6) Deposition, In RE: Intel Corporation Microprocessor Antitrust Litigation; MDL No. 05-1717-JJF, United States District Court for the District of Delaware; March 2010
- Declaration; In RE: Intel Corporation Microprocessor Antitrust Litigation; MDL No. 05-1717-JJF, United States District Court for the District of Delaware; March 2010
- 30(b)(6) Deposition, In RE: Intel Corporation Microprocessor Antitrust Litigation; MDL No. 05-1717-JJF, United States District Court for the District of Delaware; October 2009
- Declaration; American Airlines, Inc. v. Yahoo! Inc. et al.; Case No. 4:08-CV-626-A, United States District Court for the Northern District of Texas; August 2009
- Declaration; Jerry Ryan, et al. v. Flowserve Corporation, et al.; Case No. 3:03-CV-01769-B, United States District Court for the Northern District of Texas; September 2006

## EDUCATION, CERTIFICATIONS AND LICENSES

- B.A., Environmental Studies, University of Washington, 1999
- Certificate in Computer Forensics, University of Washington, 2007
- ITIL V3 Foundation Certificate in IT Service Management, 2008
- GIAC Certified Forensic Examiner (GCFE), License 2735, 2016 – 2024
- GIAC Certified Incident Handler (GCIH), License 29294, 2017-2025

## PUBLICATIONS AND SPEAKING ENGAGEMENTS

- LegalWeek 2021; "Mitigating the eDiscovery Risks of Remote Workforces"; July 2021
- Webinar, Smarsh Inc.; "On-the-Go-Workforce: How to Stay Compliant with Mobile"; July 2020
- USSS Seattle Electronic Crimes Task Force and Washington State HTCIA; Bellevue, WA; "Cloud Forensics"; October 2019
- Webinar, Smarsh Inc.; "The Time Is Now: Understanding the Mobile Landscape"; October 2019

Exhibit B – Leatha CV



- PREX Actionable Strategies for In-House Ediscovery; Chicago, IL; "The Changing Communication Landscape and its Impact on Ediscovery"; September 2019
- Webinar, Smarsh Inc.; "Collaboration & E-Discovery: Addressing the Challenge of Interactive Content"; May 2019
- CTIN Digital Forensics Conference at Microsoft; Redmond, WA; "Cloud Forensics"; May 2019
- Seattle University School of Law; Expert Witness Class; Mock Expert Testimony; March 2019
- CTIN General Membership Meeting; Washington State Criminal Justice Training Commission; Burien, WA; "Free and Open-Source Forensics Tools"; June 2018
- CLE; Betts Patterson Mines; Seattle, WA; "Computer forensics and eDiscovery:  How to identify, preserve, review, and produce relevant sources of electronically stored information"; February 2018
- University of Washington's OASIS:  OWASP Academic Summit for Information Security; Bothell, WA; "Forensics"; May 2017
- CTIN Digital Forensics Conference at Microsoft; Redmond, WA; "Investigating Data Exfiltration"; March 2017
- CLE; King County Bar Association, Young Lawyers Division; Seattle, WA; "Investigating the Theft of Trade Secrets:  The role of computer forensics in investigating the theft of trade secrets and other business confidential information"; January 2017
- Interview; The Metropolitan Corporate Counsel, "BYOD Brings Both Risks & Rewards:  Considering the information governance implications of BYOD"; January 2017
- Article; The Metropolitan Corporate Counsel, "10 Key Legal Considerations for Cloud Solutions: There will be investigations and e-discovery request, are you ready?", November 2016
- CLE Webinar; The Knowledge Group; "Social Media eDiscovery in Civil Litigation: What You Need to Know", November 2016
- CLE Webinar; Clear Law Institute; "Behind the Curtain: What else is hidden in your social media?", November 2016
- CLE Webinar; Cost Effective eDiscovery Solutions at Lewis Brisbois; "E-Discovery Trends, Rules and Tips"; May 2016
- CTIN 2016 Digital Forensics Conference; Washington State Criminal Justice Training Commission; Burien, WA; "Windows Event Log Forensics"; March 2016
- CLE; King County Bar Association, Young Lawyers Division; Seattle, WA; "Digital Evidence: How Electronically Stored Information May Impact Your Next Case"; January 2016
- CLE Webinar, The Knowledge Group; "Emerging Issues: Reconsidering Intellectual Property in Cloud Computing in 2016"; November 2015
- CLE Webinar, Cost Effective eDiscovery Solutions at Lewis Brisbois; San Francisco, CA; "Effective preservation, analysis and review of data stored on mobile devices", October 2015
- CTIN Digital Forensics Conference; Washington State Criminal Justice Training Commission; Burien, WA; "IP Theft Investigations; A detailed look at the tools and techniques used for intellectual property theft investigations", March 2015
- CLE; King County Bar Association, Young Lawyers Division; Seattle, WA; "General Discussion on Social Media and Its Impact on e-Discovery"; December 2014
- CLE; Bracewell & Giuliani LLP; Seattle, WA; "General Discussion on Social Media and Its Impact on e-Discovery"; October 2014
- CTIN Digital Forensics Conference; Washington State Criminal Justice Training Commission; Burien, WA; "Mobile Device Forensics:  Application Analysis Tools and Techniques", March 2014

Exhibit B – Leatha CV



- The Masters Conference; San Francisco, CA; "Cloud Computing and Mobile Devices: How to be Prepared for Litigation", March 2014
- CLE; Bingham McCutchen; San Francisco, CA; "Cloud Computing and Mobile Devices: How to be Prepared for Litigation", March 2014
- Article; The Metropolitan Corporate Counsel, "Mobile Device Forensics: The New Frontier", January 2014
- Computer Technology Investigators Network, Webinar; "Analysis of Email Metadata", June 2011
- Washington State Association for Justice (WSAJ) CLE; Seattle, WA; "Looking in the Right Places: Uncovering where companies keep electronic information", October 2009
- Texas State Bar CLE, Electronic Discovery and Digital Evidence Institute; Houston, TX; "Focus on E-Mail Evidence" and "Panel Discussion: Q & A on Search", April 2009
- West LegalWorks CLE; Chicago, IL; "E-Discovery Searching Techniques and Tools", October 2005

## PROFESSIONAL AFFILIATIONS

- Sedona Conference Working Group on Electronic Document Retention and Production (WG1); 2005 – present
- Sedona Conference Working Group on Data Security and Privacy Liability (WG 11); 2014 - present
- Computer Technology Investigators Network (CTIN); 2009 – present
- Board Member, Computer Technology Investigators Network (CTIN); 2014 – present
- SANS GIAC Advisory Board; 2016 – present
- Information Systems Security Association (ISSA), Puget Sound Chapter; 2016 – present
- Board Vice President, Information Systems Security Association (ISSA), Puget Sound Chapter; 2020 – present

**Exhibit C – Former Mayor Durkan's Deleted Text Messages**

| Deleted Message Count | Previous Message Date (PT) | Following Message Date (PT) | Deletion Type |
|---|---|---|---|
| 5746 | Unknown | 6/25/20 10:38:48 AM | 30-day Retention Setting |
| 11 | 6/25/20 12:33:43 PM | 6/26/20 6:43:14 AM | Manual User Deletion |
| 1 | 6/26/20 9:08:57 AM | 6/26/20 10:41:09 AM | Manual User Deletion |
| 4 | 6/30/20 8:38:02 AM | 6/30/20 12:07:09 PM | Manual User Deletion |
| 7 | 6/30/20 12:07:52 PM | 6/30/20 9:27:21 PM | Manual User Deletion |
| 3 | 7/1/20 11:45:10 AM | 7/2/20 12:16:00 AM | Manual User Deletion |
| 1 | 7/2/20 9:49:06 AM | 7/2/20 9:58:34 AM | Manual User Deletion |
| 2 | 7/2/20 9:58:34 AM | 7/2/20 6:28:56 PM | Manual User Deletion |
| 1 | 7/5/20 11:59:58 AM | 7/6/20 2:10:07 PM | Manual User Deletion |
| 3 | 7/6/20 10:45:12 PM | 7/7/20 8:22:59 AM | Manual User Deletion |
| 1 | 7/7/20 8:24:15 AM | 7/7/20 8:28:15 AM | Manual User Deletion |
| 1 | 7/7/20 8:28:15 AM | 7/7/20 8:28:51 AM | Manual User Deletion |
| 3 | 7/7/20 8:28:51 AM | 7/7/20 8:37:38 AM | Manual User Deletion |
| 4 | 7/7/20 8:43:46 AM | 7/7/20 1:19:31 PM | Manual User Deletion |
| 1 | 7/7/20 1:38:56 PM | 7/7/20 5:04:18 PM | Manual User Deletion |
| 4 | 7/7/20 5:05:31 PM | 7/7/20 8:33:04 PM | Manual User Deletion |
| 4 | 7/8/20 6:48:13 AM | 7/8/20 8:36:35 PM | Manual User Deletion |
| 5 | 7/10/20 8:54:35 AM | 7/10/20 10:00:54 AM | Manual User Deletion |
| 4 | 7/10/20 11:28:49 AM | 7/11/20 6:50:45 AM | Manual User Deletion |
| 1 | 7/11/20 7:28:12 PM | 7/12/20 12:00:55 PM | Manual User Deletion |
| 1 | 7/12/20 1:03:08 PM | 7/12/20 1:04:14 PM | Manual User Deletion |
| 1 | 7/17/20 5:52:41 AM | 7/17/20 11:43:38 AM | Manual User Deletion |
| 10 | 7/19/20 5:02:45 PM | 7/20/20 8:56:19 AM | Manual User Deletion |
| 4 | 7/20/20 10:43:35 AM | 7/20/20 11:04:28 AM | Manual User Deletion |
| 1 | 7/21/20 1:45:36 PM | 7/21/20 3:48:13 PM | Manual User Deletion |
| 1 | 7/21/20 3:59:27 PM | 7/21/20 11:54:23 PM | Manual User Deletion |
| 5 | 7/22/20 5:01:30 AM | 7/22/20 8:05:03 AM | Manual User Deletion |
| 1 | 7/22/20 8:05:03 AM | 7/22/20 8:45:45 AM | Manual User Deletion |
| 6 | 7/22/20 8:45:45 AM | 7/22/20 10:16:24 AM | Manual User Deletion |
| 6 | 7/22/20 10:17:15 AM | 7/22/20 12:54:05 PM | Manual User Deletion |
| 1 | 7/22/20 12:55:07 PM | 7/22/20 1:13:47 PM | Manual User Deletion |
| 13 | 7/22/20 2:15:28 PM | 7/22/20 6:03:04 PM | Manual User Deletion |
| 1 | 7/23/20 5:41:10 PM | 7/23/20 7:02:28 PM | Manual User Deletion |
| 1 | 7/27/20 8:27:19 PM | 7/27/20 8:29:53 PM | Manual User Deletion |
| 4 | 7/28/20 1:13:51 PM | 7/28/20 4:06:23 PM | Manual User Deletion |
| 1 | 7/29/20 10:24:09 AM | 7/29/20 11:36:03 AM | Manual User Deletion |
| 2 | 8/1/20 8:36:45 PM | 8/1/20 11:07:58 PM | Manual User Deletion |
| 4 | 8/2/20 9:19:32 PM | 8/2/20 10:24:38 PM | Manual User Deletion |
| 2 | 8/2/20 10:24:38 PM | 8/3/20 8:35:06 AM | Manual User Deletion |
| 11 | 8/3/20 10:38:24 AM | 8/4/20 8:21:03 AM | Manual User Deletion |

**Exhibit C – Former Mayor Durkan's Deleted Text Messages**

| Deleted Message Count | Previous Message Date (PT) | Following Message Date (PT) | Deletion Type |
|---|---|---|---|
| 2 | 8/5/20 4:34:21 PM | 8/5/20 6:08:55 PM | Manual User Deletion |
| 2 | 8/13/20 9:05:30 PM | 8/14/20 10:40:24 AM | Manual User Deletion |
| 1 | 8/19/20 6:44:57 AM | 8/19/20 9:50:07 AM | Manual User Deletion |
| 1 | 8/25/20 10:10:21 AM | 8/25/20 8:03:17 PM | Manual User Deletion |
| 1 | 8/25/20 8:03:17 PM | 8/26/20 9:55:13 PM | Manual User Deletion |
| 9 | 8/26/20 9:57:56 PM | 8/29/20 2:20:36 PM | Manual User Deletion |
| 5 | 8/29/20 9:39:59 PM | 8/29/20 10:37:08 PM | Manual User Deletion |
| 1 | 8/31/20 4:57:40 PM | 9/1/20 7:57:45 AM | Manual User Deletion |
| 1 | 9/1/20 4:32:11 PM | 9/1/20 4:43:43 PM | Manual User Deletion |
| 3 | 9/1/20 5:23:38 PM | 9/1/20 5:56:05 PM | Manual User Deletion |
| 1 | 9/2/20 8:59:14 PM | 9/2/20 9:32:17 PM | Manual User Deletion |
| 3 | 9/3/20 9:43:56 AM | 9/3/20 2:10:38 PM | Manual User Deletion |
| 2 | 9/4/20 7:04:03 AM | 9/5/20 8:31:42 AM | Manual User Deletion |
| 1 | 9/5/20 8:35:11 AM | 9/6/20 3:13:42 PM | Manual User Deletion |
| 8 | 9/8/20 9:40:21 PM | 9/9/20 2:12:42 PM | Manual User Deletion |
| 1 | 9/9/20 2:12:42 PM | 9/9/20 2:13:27 PM | Manual User Deletion |
| 1 | 9/9/20 2:15:32 PM | 9/9/20 2:16:14 PM | Manual User Deletion |
| 8 | 9/9/20 2:19:06 PM | 9/9/20 6:51:53 PM | Manual User Deletion |
| 1 | 9/22/20 8:59:46 AM | 9/22/20 9:03:24 AM | Manual User Deletion |
| 1 | 10/21/20 8:05:47 AM | 10/21/20 8:15:28 AM | Manual User Deletion |
| 1 | 11/16/20 12:32:23 PM | 11/16/20 2:27:39 PM | Manual User Deletion |

# EXHIBIT 7

HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
8  WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
9

HUNTERS CAPITAL, LLC, et al.,
10
Plaintiffs,          Case No. 20-cv-00983
11
v.                    PLAINTIFFS' SECOND SET OF
12                                     INTERROGATORIES TO DEFENDANT
CITY OF SEATTLE,                        CITY OF SEATTLE **AND THE CITY'S**
13                                     **OBJECTIONS AND FIRST**
Defendant.          **SUPPLEMENTAL RESPONSES THERETO**
14

15          Defendant City of Seattle ("City") hereby responds to Plaintiffs' Second Set of

16  Interrogatories to Defendant City of Seattle.

17          <u>**GENERAL OBJECTIONS AND RESERVATIONS**</u>

18          Defendant makes the following General Objections to Plaintiffs' Second Set of

19  Interrogatories.  These general objections are incorporated into the specific objections to each

20  Interrogatory below.  The assertion of the same or additional objections to any individual

21  interrogatory does not waive other general objections that are not specifically repeated in the

22  specific objections.  The objections set forth below are based on information presently available to

23

24

25

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    admissible evidence to the extent it refers to a time period before June 8, 2020 or after July 1,

2    2020.

3            7.      Defendant objects to the Second Set of Interrogatories, and the definitions and

4    instructions that accompany them, to the extent that they mischaracterize or misstate facts,

5    circumstances, events and/or obligations.

6            8.      No incidental or implied admissions are intended by the objections asserted herein.

7    The assertion of any objection to the second set of interrogatories is not intended to be taken as an

8    admission that Defendant accepts or admits the existence of any facts set forth or assumed by any

9    interrogatory.

10           9.      Defendant's failure to object to an interrogatory on a particular ground shall not be

11   construed as a waiver of Defendant's right to object on that ground or any additional ground at any

12   time.

13   **INTERROGATORIES**

14       **INTERROGATORY NO. 23:**  Identify all of the City's personnel, including, without

15   limitation, any IT staff, any third-party computer forensics vendor, and any staff of a third-party

16   computer forensics vendor, who collected, investigated or reviewed data from Electronic Devices

17   belonging to the Individuals.  For each person so identified, state the dates that they were involved

18   with the collection, investigation or review of the Individuals' Electronic Devices.

19       **OBJECTION**:  Defendant incorporates by reference each of its general objections as

20   though set forth herein.  Defendant further objects to this interrogatory because it seeks

21   information that is protected by the work product doctrine.  Defendant further objects to this

22   interrogatory as premature to the extent it seeks information regarding Defendant's litigation

23   consultants who have not been identified as testifying experts pursuant to FRCP 26(b) or who

24   Defendant does not intend to identify as testifying experts.  FRCP 26(b)(4)(D).  Plaintiffs are not

25   entitled to know the identity of such consultants at this time.  Defendant also objects to this

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 3
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

Evan Ward at SFD on or around March 9, 2021.  Thereafter, once the image had been processed by the City's e-discovery vendor, the City's counsel discovered that Scoggins' phone did not have texts on it pre-dating October 8, 2020.  The City's counsel began investigating the reasons why this was and working to see whether any of those text messages could be recovered.  The following City employees were involved in that process.  Counsel met with Chief Scoggins on several occasions, including to review the iCloud account associated with his iPhone.  Additionally, Ward and Melodi Drake (also from SFD) met with counsel on a handful of occasions and helped to facilitate the City's investigation into the circumstances around Chief Scoggins' missing texts.

**Idris Beauregard:**  The City's counsel collected Beauregard's phone from him on or about March 9, 2021.  Once the phone had been imaged by the City's e-discovery vendor, counsel discovered that Beauregard's phone did not have texts on it pre-dating October 9, 2020.  The City's counsel began investigating the reasons why this was and working to see whether any of those text messages could be recovered.  As part of this effort, the City's counsel has met with Beauregard on multiple occasions between March 2021 and the present.

**Kenneth Neafcy:**  The City's counsel obtained an image of Neafcy's phone from him on or about March 1, 2021.  Thereafter, counsel discovered that Neafcy's phone did not have texts on it pre-dating approximately October 26, 2020.  The City's counsel began investigating the reasons why this was and working to see whether any of those text messages could be recovered.  As part of this effort, the City's counsel has met with Neafcy on multiple occasions between April 2021 and the present.

**Assistant Chief Eric Greening:**  The City's counsel collected Greening's phone from SPD in or around late February 2021.  Once the phone had been imaged by the City's e-discovery vendor, counsel discovered that Greening's phone did not have texts on it pre-dating approximately October 26, 2020.  The City's counsel began investigating the reasons why this was and working to see whether any of those text messages could be recovered.  As part of this effort,

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 5
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1  the City's counsel has met with Greening on multiple occasions between April 2021 and the

2  present.  The City also worked with SPD IT personnel, Chris Steele and Brian Kennedy, on

3  multiple occasions as part of its investigation into the missing text messages of SPD employees.

4      **Chris Fisher:**  The City's counsel collected Fisher's phone from SPD in or around late

5  February 2021.  Once the phone had been imaged by the City's e-discovery vendor, counsel

6  discovered that Fisher's phone did not have texts on it pre-dating approximately December 3,

7  2020.  The City's counsel began investigating the reasons why this was and working to see

8  whether any of those text messages could be recovered.  As part of this effort, the City's counsel

9  has met with Fisher on multiple occasions between April 2021 and the present.  The City also

10  worked with SPD IT personnel, Chris Steele and Brian Kennedy, on multiple occasions as part of

11  its investigation into the missing text messages of SPD employees.

12      **Mayor Durkan:**  Michelle Chen, former counsel to the Mayor, discovered on or about

13  August 21, 2020, that text messages from before June 25, 2020, were missing from the iPhone 11

14  the Mayor was using at that time.  From that point until early October 2020, the following City

15  personnel worked to try to investigate and recover the Mayor's missing texts:

16         • Michelle Chen, former legal counsel to the Mayor

17         • Kim Ferreiro and Stacy Irwin, PRA staff in the Mayor's Office

18         • Emmanuel Arhu and Regi Alencastro, IT personnel assigned to the Mayor's Office

19         • Susy DeMers, the City's liaison with cellular phone providers

20         • Braden Heil, a City forensic examiner.

21      The City understands that other employees in the Mayor's Office, including Stephanie

22  Formas, Colleen O'Reilly Bernier, and Julie Kline also have been involved in efforts to locate the

23  Mayor's missing text messages, including by looking for and ultimately finding, the iPhone 8 Plus

24  that the Mayor used until October 2019.  The City's counsel has met with several of these

25  individuals on multiple occasions from April 2021 through the present as part of its efforts to

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 6
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

Defendant's investigation is ongoing and Defendant specifically reserves the right to supplement its answer to this interrogatory as its investigation proceeds, in compliance with Rule 26(e).

**INTERROGATORY NO. 27:**  Identify the date when counsel for the City first became aware that any text messages were not available on any of the Individuals' phones.

**OBJECTION**:  Defendant incorporates by reference each of its general objections as though set forth herein.  Defendant objects to this interrogatory because it seeks information protected by the attorney client privilege and/or work product doctrine.  Defendant also objects that several aspects of this interrogatory are vague and ambiguous, that it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and because it seeks discovery on discovery.

**ANSWER**:  Subject to and without waiving any objections, Defendant states that the answer to this interrogatory is protected by the attorney-client privilege and/or work product doctrine.

**FIRST SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 27**:  Subject to and without waiving any objections, the City responds as follows:

- Idris Beauregard (March 2021)
- Carmen Best (March 2021)
- Mayor Durkan (October 2020)[1]
- Chris Fisher (March 2021)
- Eric Greening (March 2021)
- Kenneth Neafcy (March 2021)
- Chief Scoggins (Late February 2021)

**INTERROGATORY NO. 28:**  Identify all of the locations and Electronic Devices that the

---

[1] Michelle Chen was technically employed by the City Attorneys' Office but assigned to the Mayor's Office.  The City does not characterize her as "counsel for the City" for purposes of answering this interrogatory.

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 11
(Case No. 20-cv-00983)

1    **ANSWER**:  Subject to and without waiving any objections, the City identifies Abbie

2    Poynter, Arthur E. Campbell-Husted Co., as the adjuster for evaluating property damage claims

3    relating to protest activity within the City's boundaries.

4

5    **INTERROGATORY NO. 31:**  State whether the City has determined that any data has

6    been deleted from Mayor Jenny Durkan, former Police Chief Carmen Best, Fire Chief Harold

7    Scoggins and Idris Beauregard's Electronic Devices since June 25, 2020, and the factual bases for

8    those conclusions, if any.

9    **OBJECTION**:  Defendant incorporates by reference each of its general objections as

10   though set forth herein.  Defendant objects that this interrogatory is vague, ambiguous, and overly

11   broad, including but not limited to with respect to the terms "data," "determined," and "deleted."

12   Defendant further objects to this interrogatory as premature to the extent it seeks information

13   regarding Defendant's litigation consultants who have not been identified as testifying experts

14   pursuant to FRCP 26(b) or who Defendant does not intend to identify as testifying experts.  FRCP

15   26(b)(4)(D).  Plaintiffs are not entitled to know the identity of such consultants at this time.

16   **ANSWER**:  Subject to and without waiving any objections, Defendant answers that its

17   investigation is ongoing and that it would be premature for the City to have determined what data,

18   if any, data has been "deleted" from the Individuals' Electronic Devices.

19        Pursuant to Rule 33(d), Defendant also directs Plaintiffs to Defendant's response to

20   Request for Production 34, which requested the production of copies of the digital forensic images

21   that were collected from the Individuals' phones, upon execution by the parties of a Digital

22   Examination Agreement.

23        Defendant's investigation is ongoing and Defendant specifically reserves the right to

24   supplement its answer to this interrogatory as its investigation proceeds, in compliance with Rule

25   26(e).

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 18
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    **FIRST SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 31:**  Subject to

2  and without waiving any objections, the City further answers that it has determined that text

3  messages from each of the Affected Custodian's gap periods are no longer available.  Based on

4  information presently available to it, the City believes the facts and circumstances pertinent to each

5  of the Individual's missing text messages are as follows:

6    **Chief Scoggins:**  During the relevant period, Chief Scoggins used an iPhone 8.  On

7  October 8, 2020, Chief Scoggins reported to the City's IT department and an assistant that he had

8  been locked out of his phone.  The City understands that, because of pre-existing City of Seattle

9  security protocols, Chief Scoggins was required to enter a passcode in order to access the phone.

10  Chief Scoggins entered what he believed to be the correct passcode, but it did not gain him access

11  to the phone.  He asked IT if they could help him unlock his phone, access to which is vital given

12  his role as Fire Chief, and was advised to attempt to recover his iPhone from iCloud.  As the City

13  understands the situation, ultimately, he was not successful because the authentication code

14  required to recover the phone was sent to the phone, which he still could not access.

15    The City understands that Chief Scoggins tried to unlock his phone using other methods

16  suggested but could not gain access.  Ultimately, the City understands that Chief Scoggins then

17  took his iPhone to the Apple Store at University Village to see if they could help him gain access

18  to it.  Because of Apple's Covid-19 policies at the time, Chief Scoggins was not allowed to enter

19  the store to observe the Apple Store employees' efforts to gain access.  The Apple Store was able

20  to gain access to the phone, but it appears that the Apple Store employee did so by resetting it,

21  which caused all of Chief Scoggins' text messages to be lost.  Contemporaneous documents

22  regarding these events are being produced in discovery.

23    **Carmen Best:**  Carmen Best's last day as a City employee was September 2, 2020.  The

24  City took possession of her phone on or around that same date and preserved it for purposes of

25  various ongoing lawsuits.  The City imaged Best's phone at the same time it was imaging the

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

phones of the other custodians, at the end of 2020 or beginning of 2021.  After imaging the phone, the City discovered that Best's phone had no text messages on it dated before September 2.  All questions concerning what happened to Best's messages should be directed to Best, as she is represented by separate counsel.  The City's forensic review of her device is ongoing and not yet complete.

**Assistant Chief Greening:**  During the relevant period, Assistant Chief Greening used a Galaxy S8 phone.  The City understands that Greening typically used the biometric (facial or finger recognition) feature of the phone to gain access.  Greening was out on vacation the week of October 19, 2020.  It is the City's understanding that at some point while he was out of the office or when he returned on Monday, October 26, the City's security protocols required that he input a passcode instead of using the biometric access feature.  Greening made a few attempts to gain access using what he thought was his passcode to the phone, but none of the passcodes worked.  Worried that the phone would reset if he tried too many times, Greening asked his assistant, Celina Villa, to take his phone to IT to see if they could gain access.  He recalls providing her with the phone and receiving it back later that day or the next day.  At that point, he was able to access the phone, but his text messages from before that date were no longer available.  The City's belief is that SPD IT had to reset his phone because of the passcode issue.  Contemporaneous documents regarding these events are being produced in discovery.

**Kenneth Neafcy:**  During the relevant period, Neafcy was using an iPhone X.  On or about October 26, 2020, Neafcy was prompted by the City's periodic security protocol installed on his iPhone that he needed to change his passcode for accessing the phone.  Neafcy followed the instructions to reset the passcode.  He then tried to access the phone using the passcode that he had just input, but it did not work.  He is not sure whether he mistyped the passcode when he set it or whether another issue with his phone occurred.  After he was not able to access his phone, he contacted IT and asked for assistance.  IT proposed ways to access the phone, but none of them

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 20
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1  was successful.  He tried to recover the phone from iCloud, but it sent the passcode to the phone

2  that was locked so he could not view it.  Because of the upcoming November 2020 election and the

3  need for others to reach him, Neafcy removed the SIM card from his iPhone X and inserted it into

4  an old iPhone 8, allowing him to go back to using his iPhone 8 for work purposes.  The City has

5  imaged the iPhone X, and concluded that no text messages exist from the period during which

6  Neafcy was using it.  Contemporaneous documents regarding these events are being produced in

7  discovery.[2]

8      **Idris Beauregard:**  During the relevant period, Beauregard used an iPhone 8.  The City

9  understands that on October 9, 2020, Beauregard attempted to access his phone, but his passcode

10  would not work.  He does not believe that he had the wrong information for the passcode, as it was

11  the one he had previously used.  When he could not access his phone, he called IT and submitted a

12  request for assistance (called a heat ticket).  The City understands that Beauregard was informed

13  by IT that, because it was an iPhone, he should contact Apple to see if they had a work-around that

14  he could use.  Apple informed him that because he did not have iTunes, he could not gain access to

15  the phone.  He left his phone on his desk with the idea that he would work to gain access the next

16  day.  However, the City understands that when he looked at his phone the next day, he saw that his

17  iPhone screen showed a spiral icon.  Once the spiraling stopped the phone reset itself.  None of his

18  text messages pre-dating the phone's automatic reset were available after the phone reset itself.

19  Contemporaneous documents regarding these events are being produced in discovery.

20      **Chris Fisher:**  During the relevant period, Fisher used an iPhone 7.  On approximately

21  December 3, 2020, Fisher attempted to gain access to his phone using the facial recognition

22  functionality that he usually used to access his phone.  Due to the City's security protocols, his

23  iPhone required him to log in using his passcode to access his phone.  Fisher input the passcode he

24
25  [2] The City notes that the circumstances described in this paragraph with respect to Neafcy differ slightly from the circumstances described in the City's July 30, 2020 letter, and reflect further investigation and clarification of the circumstances by the City.

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 21
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1  believed he had previously set for his phone, but it was incorrect.  He attempted some other

2  passcodes that he had previously used that he thought might still work, but they did not.  Fisher

3  then reached out to IT to see if there was an alternative way to access the phone.  It is our

4  understanding that IT informed him that there was no way to access the phone without resetting it

5  to its factory settings.  Ultimately, Fisher followed this guidance.  The City is searching for

6  contemporaneous documents regarding this event and will produce any that we collect.

7       **Mayor Durkan:**  The City is still conducting its investigation into the circumstances

8  surrounding the missing texts from Mayor Durkan's phone(s).  It is the City's understanding that

9  the Mayor did not intentionally delete any messages from her phone and did not direct anyone to

10  intentionally delete any messages from her phone.  The City anticipates supplementing this

11  response after its litigation consultant completes its analysis.

12       **Shanon Anderson and Valarie Anderson:**  Last winter, SPD moved all of its cellphones

13  to AT&T/FirstNet.  As part of that transition, both Shanon Anderson and Valarie Anderson turned

14  in the phones they had been using during summer 2020.  The phones were collected and

15  maintained by SPD IT.  When the City accessed their phones in order to image them, the City

16  found that both phones were password protected and the City could not access them using the

17  passwords that they had provided when they turned in the phones.  After trying multiple times to

18  access the phones, the City chose to stop so as to not inadvertently trigger the phones' automatic

19  reset function.  The City is working with an outside vendor to try to circumvent the passcode issue

20  to gain access to the phones.  The City will advise Plaintiffs whether it is successful in this attempt.

21

22       **INTERROGATORY NO. 32:**  Identify any instant messaging platforms that the

23  Individuals used from June 1, 2020 – July 8, 2020, to discuss any issues relating to CHOP or the

24  CHOP zone.

25

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 22
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

1   messages.  The SMARSH app has now been installed on certain City employees' Electronic

2   Devices, including Chief Scoggins' and Mayor Durkan's current iPhones.

3       The City believes that each current City employee took steps to comply with the litigation

4   hold notice once they received it and did not thereafter knowingly take any actions to delete texts

5   in a manner that would result in them not being preserved in some form.  While the City has no

6   knowledge that former City employees acted differently, questions regarding what steps they

7   might have taken to preserve responsive materials should be directed at them directly or via their

8   counsel.

9       **FIRST SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 34:**  Subject to

10  and without waiving any objections, the City further answers as follows.

11      Plaintiffs filed their complaint on June 24, 2020, and served the City on June 26.  Based on

12  the information then available to the City, including the Complaint, Plaintiffs' June 27 and June 30

13  letters, and the City's understanding of the relevant events, the City began issuing litigation holds

14  to City employees.  A list of City employees to whom litigation holds were sent in this action, and

15  the dates on which they were issued, is set forth in Attachment A to these supplemental answers.

16  The City also issued litigation holds in two other protest-related actions that cover materials

17  relating to the CHOP/CHAZ – *Estate of Taylor v. City of Seattle*, Case No. 20-2-14351-1 SEA

18  (King Cnty. Sup. Ct.), and *Black Lives Matter Seattle-King County, et al v. City of Seattle*, Case

19  No. 2:20-cv-887 (W.D. Wash.).  The list of hold recipients in these cases and the dates they

20  received the hold also is set forth in Attachment A.

21      The litigation hold notice issued in this action (and the *Taylor* and *BLM* cases) contained a

22  description of the case, and listed categories of documents that each recipient needed to preserve.

23  Among the types of documents that the litigation hold instructed employees to preserve were text

24  messages, emails, memoranda, and meeting minutes.  The litigation hold also included a FAQ

25  attachment instructing employees to not delete documents that again referenced text messages on

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 25
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

employees' mobile devices.  Finally, the litigation hold directed employees to search devices and locations where potentially relevant documents might exist, including their city-issued cell phones, to determine whether any such responsive documents were existed on the various devices and locations.

During the relevant time period, the City's policy for the retention of text messages was for employees to retain them in place, on their phones, once they had received a litigation hold notice. If the employee was not under litigation hold, the employee's retention obligations were as set forth in the standard document retention schedules issued by the Washington Secretary of State. It was the City's understanding that all of the employees were retaining their texts and other records as directed by the City.

In or around November 2020, the City of Seattle entered a contract with SMARSH to begin implementing automatic text message preservation for certain high level City personnel, including Mayor Durkan, Chief Diaz, and Chief Scoggins, each of whom implemented it at some point after the City started utilizing SMARSH.

**INTERROGATORY NO. 35:**  Identify all instances in which any of the Individuals have undergone training or instruction of their obligations under the Public Records Act, (the "PRA"), RCW 42.56.001, et seq. and any investigations that are being conducted into the City's document preservation obligations under the PRA relating to any of the Individuals since January 1, 2019.

**OBJECTION**:  Defendant incorporates by reference each of its general objections as though set forth herein.  Defendant objects that this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence as the City's PRA obligations are separate and apart from, and not relevant to, any claims alleged in this lawsuit.  Defendant also objects that the phrases "training or instruction" and "investigations that are being conducted into" are vague and

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 26
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

1    ambiguous.  Defendant objects to this interrogatory to the extent any investigation would be

2    confidential or privileged.

3          **ANSWER**:  Subject to and without waiving any objections, Defendant states that PRA

4    training is often a component part of various trainings that employees are required to take, and that

5    it would be unduly burdensome for the City to be required to list every occasion where a City

6    employee participated in a formal or informal training that touched on the PRA.  Defendant also

7    answers that separate and apart from formal trainings, City personnel regularly receive informal

8    instruction on their obligations under the PRA.

9          Further, pursuant to Rule 33(d), Defendant will produce copies of certificates documenting

10   the formal training sessions that various Individuals took during the relevant period, from which

11   responsive information may be obtained.

12         The only investigation of which the City is aware regarding the City's preservation

13   obligations under the PRA that arguably relates to any of the Individuals during the specified time

14   period is SEEC Case NO. 21-WBI-0304-1.  Should the City become aware of any other responsive

15   investigations, it will supplement this answer in compliance with Rule 26(e).

16         **FIRST SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 35:**  Subject to

17   and without waiving any objections, the City clarifies its initial answer by stating that the only

18   investigation of which the City is aware regarding the City's preservation obligations under the

19   applicable retention schedules and statutory requirements that arguably relates to any of the

20   Individuals during the specified time period is SEEC Case No. 21-WBI-0304-1.

21

22         **INTERROGATORY NO. 36:**  State all actions taken by Mayor Jenny A. Durkan and / or

23   the Mayor's Office's compliance with the PRA since January 1, 2017, including the preservation,

24   collection, archiving and review of electronically stored data on Mayor Jenny A. Durkan's phone

25   and other Electronic Devices.  Include in your answer any directions that Mayor Jenny A. Durkan

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 27
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    **FIRST SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 36:**  Subject to

2    and without waiving any objections, the City further responds that the iPhone 8 Plus that Mayor

3    Durkan was using in Summer 2019 was backed up by Michelle Chen to Chen's work computer on

4    or around August 29, 2019.  The City was able to use that back-up to obtain the Mayor's messages

5    from prior to the date of that back-up.  The iPhone 8 Plus was replaced on or about October 30,

6    2019.  In early July 2021, Colleen O'Reilly Bernier at the Mayor's Office located this phone in a

7    pouch in a desk drawer.  The City was able to obtain texts through October 30, 2019 from this

8    phone.

9            On or about August 21, 2020, Michelle Chen backed up the iPhone 11 that the Mayor was

10   using at that time to her (Chen's) work computer.  This process created an image from which the

11   City was able to access messages from June 25, 2020 forward.  Because Chen's work computer

12   needed updates to both iTunes and iExplorer, she asked one of the Mayor's Office IT staff, Regi

13   Alencastro, to assist her in facilitating this back up.

14           After discovering during that back-up process that Mayor Durkan's phone only had texts

15   from June 25 forward, Chen, Kim Ferreiro and Stacy Irwin (Mayor's Office PRA employees), and

16   Alencastro and Emmanuel Arhu (Mayor's Office IT), investigated and tried to recover the missing

17   texts.  IT staff analyzed the Mayor's "cracked screen" iPhone 8 Plus that she had used until July 9,

18   2020, but the City understands that that phone had been factory reset by the Mayor's Office IT in

19   or around early August.  It was their practice at the time to reset phones approximately a month

20   after a new phone was provided, so the old phone could be disposed of or put back into circulation.

21           Thereafter, on or about September 18, 2020, one of the City's forensic analysts, Braden

22   Heil, also took an image of the iPhone 8 Plus to see if he could locate any of the missing texts.  He

23   could not.

24

25           **INTERROGATORY NO. 37:**  Identify all of the applications downloaded on the

PLAINTIFFS' SECOND SET OF INTERROGATORIES
TO THE CITY AND THE CITY'S OBJECTIONS AND FIRST
SUPPLEMENTAL ANSWERS THERETO - 29
(Case No. 20-cv-00983)

1      DATED this 31st day of August, 2021.

2                        HARRIGAN LEYH FARMER & THOMSEN LLP

3

4                    By:  *s/ Caitlin B. Pratt*
                        Arthur W. Harrigan, Jr., WSBA #1751

5                         Tyler L. Farmer, WSBA #39912
                        Kristin E. Ballinger, WSBA #28253

6                         Caitlin B. Pratt, WSBA #48422
                        999 Third Avenue, Suite 4400

7                         Seattle, WA 98104
                        Tel:  (206) 623-1700

8                         arthurh@harriganleyh.com
                        tylerf@harriganleyh.com

9                         kristinb@harriganleyh.com
                        caitlinp@harriganleyh.com

10

11                         *Attorneys for the City of Seattle*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

## Attachment A – Litigation Hold Recipients

| Hunters Capital, et al. v. City of Seattle Case No. 20-cv-00983 (W.D. Wash.) | |
| --- | --- |
| **Name** | **Date Lit. Hold Issued** |
| Aguirre, Jesús | 7/22/2020 |
| Alencastro, Regi | 3/29/2021 |
| Alspaugh, Pamela | 9/29/2020 |
| Anderson, Shanon | 9/29/2020 |
| Anderson, Valarie | 7/27/2020 |
| Arhu, Emmanuel | 3/29/2021 |
| Auriemma, Anthony | 9/11/2020 |
| Baird, Laura | 7/22/2020 |
| Baird, Mark | 7/27/2020 |
| Beauregard, Idris | 10/20/2020 |
| Beck, Tara | 10/30/2020 |
| Best, Carmen | 7/27/2020 |
| Boatright, Rebecca | 7/27/2020 |
| Bolieu, Sabrina | 10/12/2020 |
| Byers, Susan | 9/22/2020 |
| Canceko, Lyle | 3/29/2021 |
| Chen, Michelle | 7/22/2020 |
| Cordner, Lesley | 7/27/2020 |
| Diaz, Adrian | 7/27/2020 |
| Durkan, Jenny | 7/22/2020 |
| Everett, Joseph | 7/22/2020 |
| Fields, Michael | 7/27/2020 |
| Fisher, Christopher | 7/27/2020 |
| Fong, Michael | 7/22/2020 |
| Formas, Stephanie | 9/29/2020 |
| Friedhoff, Andrea | 3/29/2021 |
| Furuto, Joey | 9/29/2020 |
| Goings, Calvin | 9/29/2020 |
| Greening, Eric | 7/27/2020 |
| Hara, Mami | 7/22/2020 |
| Hastings, Bryan | 7/22/2020 |
| Hightower, Kamaria | 9/29/2020 |
| Hirjak, Stephen | 7/27/2020 |
| Holmes, Peter | 7/22/2020 |
| Kennedy, Brian | Will supplement |
| Kline, Julie | 7/22/2020 |
| Landino, Gina | 7/22/2020 |

| | |
|---|---|
| Lee, Bobby | 9/29/2020 |
| Longanecker, Mindy | 7/22/2020 |
| Mahaffey, Thomas | 7/27/2020 |
| Maxie, Rodney | 9/22/2020 |
| Morgan, Darren | 9/22/2020 |
| Neafcy, Kenneth | 9/29/2020 |
| Nelson, Laurel | 9/29/2020 |
| Nollette, Deanna | 7/27/2020 |
| O'Reilly Bernier, Colleen | 3/29/2021 |
| Quirk, Patti | 9/22/2020 |
| Ranganathan, Shefali | 7/22/2020 |
| Rose-Akins, Nyjat | 7/22/2020 |
| Scoggins, Harold | 7/22/2020 |
| Sixkiller, Casey | 7/22/2020 |
| Socci, Angela | 7/27/2020 |
| Steel, Chris | Will supplement |
| Thompson, Adrienne | 7/22/2020 |
| Waters, Donna | 9/29/2020 |
| Wells, Michael | 10/12/2020 |
| Westphal, Meagan | 7/22/2020 |
| Williams, Christopher | 9/29/2020 |
| Zimbabwe, Sam | 7/22/2020 |

| *Estate of Taylor, et al. v. City of Seattle*<br>**Case No. 20-2-14351-1 SEA (King Cnty. Sup. Ct.)** | |
|---|---|
| **Name** | **Date Lit. Hold Issued** |
| Aagard, Lori | 3/18/2021 |
| Adams, David | 3/18/2021 |
| Adams, Westin | 7/20/2021 |
| Aguirre, Daniel | 3/18/2021 |
| Aguirre, Jesús | 3/19/2021 |
| Alcantara, Lora | 3/18/2021 |
| Aldrich, Newell | 3/18/2021 |
| Allen, David | 7/26/2021 |
| Allen, Matthew | 3/18/2021 |
| Allsopp, Darren | 3/18/2021 |
| Alspaugh, Pamela | 3/19/2021 |
| An, Noah | 3/18/2021 |
| Anderson, Carl | 3/18/2021 |
| Anderson, Shanon | 3/18/2021 |
| Anderson, Valarie | 3/18/2021 |
| Apreza, Ernesto | 3/18/2021 |

| | |
|---|---|
| Arana, Gabriele | 3/18/2021 |
| Arata, James | 3/18/2021 |
| Archuleta, Zayla | 3/18/2021 |
| Arulaid, Stephan | 6/2/2021 |
| Auderer, Daniel | 7/26/2021 |
| Auriemma, Anthony | 3/18/2021 |
| Avery, Monique | 3/18/2021 |
| Baird, Laura | 3/18/2021 |
| Baird, Mark | 3/18/2021 |
| Ballingham, Grant | 3/18/2021 |
| Balter, Lauren | 4/12/2021 |
| Banez, Joselito | 7/26/2021 |
| Barokas, Michael | 3/19/2021 |
| Barrington, Willie | 12/7/2020 |
| Barron, Lisa | 3/19/2021 |
| Basu, Aretha | 3/18/2021 |
| Bauer, Joseph | 3/18/2021 |
| Bauer, Nathan | 4/12/2021 |
| Beauregard, Idris | 3/19/2021 |
| Beck, Tara | 3/18/2021 |
| Behn, Demethra | 3/18/2021 |
| Belgarde, Anthony | 3/18/2021 |
| Benner, Devon | 3/18/2021 |
| Bergerson, Ethan | 3/18/2021 |
| Bergmann, Trent | 3/18/2021 |
| Beseler, Eric | 3/18/2021 |
| Best, Carmen | 3/18/2021 |
| Bettesworth, Anne | 3/19/2021 |
| Bissell, Ashlie | 3/18/2021 |
| Blackburn, Matthew | 6/25/2021 |
| Boatright, Rebecca | 3/18/2021 |
| Bolieu, Sabrina | 3/18/2021 |
| Bolton, Donald | 4/23/2021 |
| Bonesteel, Richard | 3/18/2021 |
| Bourdon, Jorge | 3/18/2021 |
| Bourns, Richard | 3/18/2021 |
| Braxton, Karissa | 3/18/2021 |
| Brewer, Alexander | 3/18/2021 |
| Briskey, Azrielle | 6/2/2021 |
| Britt, James | 3/18/2021 |
| Brooks, John | 3/18/2021 |
| Brown, Kamilah | 3/19/2021 |
| Brown, Robert | 3/18/2021 |
| Brownlee, Christopher | 3/18/2021 |
| Burgess, Nicholas | 3/18/2021 |

| | |
|---|---|
| Burk, Nicholas | 3/18/2021 |
| Butenhoff, Dillon | 3/18/2021 |
| Byers, Susan | 3/18/2021 |
| Byrd, Samuel | 3/18/2021 |
| Campbell, Anthony | 4/12/2021 |
| Campbell, Jared T | 3/18/2021 |
| Campbell, Ronald | 4/12/2021 |
| Carpenter, Colin | 3/18/2021 |
| Caulfield, Riley | 3/18/2021 |
| Charnley, Laura | 6/2/2021 |
| Chen, Michelle | 3/18/2021 |
| Chesney, John | 3/18/2021 |
| Chin, Jonathan | 7/26/2021 |
| Christman, Christopher | 6/2/2021 |
| Clancy, Amy | 3/18/2021 |
| Clardy, Alex | 3/18/2021 |
| Clark, Matthew | 3/18/2021 |
| Clark, Molly | 3/18/2021 |
| Claxton, Justin | 3/18/2021 |
| Cleaves, Ernest | 6/2/2021 |
| Clenna, Bryan | 3/18/2021 |
| Cockbain, Daniel | 3/18/2021 |
| Coe, Sarah | 6/2/2021 |
| Consalvi, Elizabeth | 6/2/2021 |
| Cook, Linda | 4/12/2021 |
| Coomer, Benjamin | 3/18/2021 |
| Coonradt, Thomas | 7/26/2021 |
| Cooper, Michelle | 3/18/2021 |
| Copodonna, Robert | 7/26/2021 |
| Corcoran, Kyle | 7/26/2021 |
| Cordner, Lesley | 3/18/2021 |
| Costa-C, Rick-c | 3/18/2021 |
| Couet, Christopher | 3/18/2021 |
| Coutsoubos, Christena | 3/19/2021 |
| Cox, Alan | 3/19/2021 |
| Crooks, Danni | 7/26/2021 |
| Crumb, John | 6/2/2021 |
| Cuerpo, David | 12/7/2020 |
| Cuevas, Faride | 3/18/2021 |
| Culbertson, Sean | 3/18/2021 |
| Curtis, Daniel | 6/2/2021 |
| Dahline, Dennis | 3/19/2021 |
| DAlessandro, Julie | 3/19/2021 |
| Daly, Pat | 6/2/2021 |
| Danne, Carter | 3/18/2021 |

| | |
|---|---|
| Daranciang, Mikael | 7/26/2021 |
| Davis, Pierre | 6/2/2021 |
| Davis, Tyrone | 3/18/2021 |
| Davisson, George | 6/2/2021 |
| Dawson, Parker | 3/19/2021 |
| DeBella, Ernest | 7/26/2021 |
| Derrick, Anthony | 3/18/2021 |
| Diaz, Adrian | 3/18/2021 |
| Dickson, Jack | 7/26/2021 |
| Didier, Matthew | 3/18/2021 |
| Dietrich, Seth | 6/2/2021 |
| Dike, Tim | 3/18/2021 |
| Do, Jessica | 3/19/2021 |
| Domholt, Jason | 4/12/2021 |
| Dory, Mary | 3/19/2021 |
| Doss, Greg | 3/18/2021 |
| Downing, Brian | 6/2/2021 |
| Drummond, Jason | 3/18/2021 |
| Dunlap, Laurie | 3/19/2021 |
| Durkan, Jenny | 3/18/2021 |
| Dyment, James | 3/18/2021 |
| Eastgard, Erik | 4/12/2021 |
| Eastman, Michael | 3/18/2021 |
| Ebinger, Sina | 3/18/2021 |
| Eder, Dan | 3/18/2021 |
| Edison, Simon | 3/18/2021 |
| Edwards, Everett | 3/18/2021 |
| Edwards, Michael | 3/18/2021 |
| Eggers, Brandon | 3/18/2021 |
| Ellis, Randy | 3/18/2021 |
| Englund, Stephen | 3/18/2021 |
| Erickson, Lynn | 3/19/2021 |
| Estrada, Abraham | 7/26/2021 |
| Evans, Nicholas | 4/23/2021 |
| Everett, Joseph | 3/18/2021 |
| Farmer, LaKecia | 3/18/2021 |
| Feher, Ferenc | 3/19/2021 |
| Fields, Michael | 3/18/2021 |
| Finnell, Anthony | 3/19/2021 |
| Fiorini, Nadia | 7/26/2021 |
| Fischer, Raymond | 4/23/2021 |
| Fisher, Christopher | 3/18/2021 |
| Fitzpatrick, Helen | 12/7/2020 |
| Flick, Vanessa | 3/18/2021 |
| Flores, Bryan | 7/26/2021 |

| | |
|---|---|
| Floyd, Tamara | 3/18/2021 |
| Foley, Kyle | 3/18/2021 |
| Follette, Garrett | 6/2/2021 |
| Fong, Michael | 3/18/2021 |
| Formas, Stephanie | 3/18/2021 |
| Forst, Jordan | 4/12/2021 |
| Foy, Corey | 7/20/2021 |
| Frank, Tim | 3/19/2021 |
| Franz, Jesse | 3/18/2021 |
| Freese, Diana | 3/18/2021 |
| Freese, Michael | 3/18/2021 |
| Frieler, Benjamin | 7/26/2021 |
| Furuto, Joey | 3/19/2021 |
| Gaedcke, Anthony | 3/18/2021 |
| Gaffney-Bills, Gregory | 3/18/2021 |
| Garth Green, Marc | 3/18/2021 |
| Geoghagan, Jeff | 3/18/2021 |
| George, Janis | 7/26/2021 |
| Girello, Joshua | 3/18/2021 |
| Goings, Calvin | 3/18/2021 |
| Gonzales, Reba | 3/19/2021 |
| Gonzalez, Intern | 3/18/2021 |
| Gonzalez, Lorena | 3/18/2021 |
| Goodwin, Jonathan | 3/18/2021 |
| Gordillo, Canek X | 3/18/2021 |
| Gore, Michael | 3/18/2021 |
| Graesch, Jenifer | 4/23/2021 |
| Grant, Brandy | 3/18/2021 |
| Graves, Tobin | 3/19/2021 |
| Gray-McVey, Tay | 7/26/2021 |
| Grayson, Sandlin | 6/2/2021 |
| Grba, Mark | 3/19/2021 |
| Greene, Chris | 3/19/2021 |
| Greening, Eric | 3/18/2021 |
| Grenon, Bryan | 3/18/2021 |
| Griffin, Mike | 4/12/2021 |
| Griffin, William | 7/26/2021 |
| Grossman, Kevin | 3/18/2021 |
| Guzman, Kira | 4/12/2021 |
| Hackett, Colleen | 3/19/2021 |
| Hancock, Andrew | 3/18/2021 |
| Hancock, Robert | 3/18/2021 |
| Hanley, Thomas | 3/18/2021 |
| Hara, Mami | 3/19/2021 |
| Harmon, Mika | 3/18/2021 |

| | |
|---|---|
| Harris, Alexandra | 7/26/2021 |
| Hastings, Bryan | 12/7/2020 |
| Havner, J | 3/19/2021 |
| Hay, Garret | 3/18/2021 |
| Hay, Kyle | 3/18/2021 |
| Hay, Phillip | 5/19/2021 |
| Hayes, John | 3/18/2021 |
| Hazard, Mark | 3/18/2021 |
| Hendry, Dawn | 6/2/2021 |
| Herbold, Intern | 3/18/2021 |
| Herbold, Lisa | 3/18/2021 |
| Hevly, Willa | 6/25/2021 |
| Hewitt, Brian | 4/12/2021 |
| Hightower, Kamaria | 3/18/2021 |
| Hill, Travis | 3/18/2021 |
| Hilton, Shaun | 6/2/2021 |
| Hirjak, Stephen | 3/18/2021 |
| Hoang, Anh | 3/18/2021 |
| Hockett, David | 7/26/2021 |
| Hogg, Hayden | 3/18/2021 |
| Hohlfeld, Amanda | 3/18/2021 |
| Holmes, Peter | 3/18/2021 |
| Holt, Kendall | 3/18/2021 |
| Hopper Manole, Theodore | 6/2/2021 |
| House, Erin | 3/18/2021 |
| Howard, Caleb | 3/18/2021 |
| Hughey, Benjamin | 3/18/2021 |
| Hunt, Brian | 7/26/2021 |
| Hurst, Samuel | 6/2/2021 |
| Huserik, Randall | 3/18/2021 |
| Hutton, Kate | 3/18/2021 |
| Israel, Gina | 3/18/2021 |
| Ivanov, Ilya | 3/18/2021 |
| Jackson, Justin | 6/2/2021 |
| Jackson, Nathan | 7/26/2021 |
| James, Mark | 7/26/2021 |
| Jandoc, Steven | 3/18/2021 |
| Jay, Tanner | 7/26/2021 |
| Jimenez, Jose | 3/18/2021 |
| Johnson, Aaron | 3/18/2021 |
| Johnson, Dion | 3/18/2021 |
| Johnson, Lorisa | 4/12/2021 |
| Johnson, Russell | 3/18/2021 |
| Jones, Abigail | 3/18/2021 |
| Jones, Nick | 3/18/2021 |

| | |
|---|---|
| Jones, Timothy | 3/18/2021 |
| Jordon, Travis | 3/18/2021 |
| Joy, Andrew | 3/18/2021 |
| Joyce, Dustin | 7/26/2021 |
| Juarez, Debora | 3/18/2021 |
| Juarez, Eli | 3/18/2021 |
| Juarez, Intern | 3/18/2021 |
| JuarezTwo, Intern | 3/18/2021 |
| Judge, Lisa | 3/19/2021 |
| Kamkar, Negheen | 3/18/2021 |
| Kang, Hudson | 7/26/2021 |
| Keating, Aaron | 3/18/2021 |
| Keating, Tyler | 4/12/2021 |
| Kebba, Michael | 3/18/2021 |
| Keller, Jared | 3/18/2021 |
| Kelley, Christopher | 3/18/2021 |
| Kellogg, Chelsea | 3/18/2021 |
| Kennedy, Brian | 6/2/2021 |
| Kerby, Matthew | 3/18/2021 |
| Kibbee, Todd | 3/18/2021 |
| Klatt, Walter | 3/18/2021 |
| Kline, Julie | 3/18/2021 |
| Knapp, Stephen | 3/18/2021 |
| Knick, Jennifer | 5/19/2021 |
| Knight, Joshua | 3/18/2021 |
| Komadina, Stephen | 3/19/2021 |
| Komljenovic, Marko | 7/26/2021 |
| Kraus, Brian | 5/19/2021 |
| LaClaire, Aimee | 3/18/2021 |
| Laina, Alan | 3/18/2021 |
| Lakin, Macaully | 3/18/2021 |
| Lancaster, Ryan | 3/18/2021 |
| Landino, Gina | 3/18/2021 |
| Lang, Chriseley | 3/18/2021 |
| Lang, Tadeo | 7/20/2021 |
| Lapierre, Scott | 3/18/2021 |
| Lasswell, Lori | 7/26/2021 |
| Lee, Bobby | 3/18/2021 |
| Lee, Enoch | 3/18/2021 |
| Lee, Jason | 7/26/2021 |
| Legaspi, Jonard | 3/18/2021 |
| Legault, Jeanne | 3/18/2021 |
| Legg, Brandon | 3/18/2021 |
| Lemke, Will | 3/18/2021 |
| Leung, Sekfai Paul | 3/18/2021 |

| | |
|---|---|
| Lewis, Andrew | 3/18/2021 |
| Lewis, Intern | 3/19/2021 |
| Lilje, Matthew | 3/18/2021 |
| Lockhart, Mariko | 3/18/2021 |
| Long, Ryan | 7/26/2021 |
| Longanecker, Mindy | 3/18/2021 |
| Longley, Larry | 3/18/2021 |
| Loux, Kent | 3/18/2021 |
| Lu, Jacky | 3/19/2021 |
| Luckie, Scott | 3/18/2021 |
| Maehler, Jamison | 3/18/2021 |
| Mahaffey, Thomas | 3/18/2021 |
| Maier, Mae | 3/18/2021 |
| Maks, Paige | 5/19/2021 |
| Malenchenko, Aleksandr | 7/26/2021 |
| Mantilla, Andres | 3/18/2021 |
| Marion, John | 3/18/2021 |
| Marshall, Aaron | 3/18/2021 |
| Martin, Marcus | 3/18/2021 |
| Maxie, Rodney | 3/18/2021 |
| Mayer, Grant | 3/18/2021 |
| McGehee, Alexandra | 3/19/2021 |
| Mckee, Vaughn | 3/18/2021 |
| McLean, Alyson | 3/18/2021 |
| McMullen, Joshua | 3/18/2021 |
| Meyer, Timothy | 3/18/2021 |
| Meza, Miroslava | 3/19/2021 |
| Miller, Austin | 3/18/2021 |
| Miller, Charles | 3/18/2021 |
| Miller, Matt | 3/19/2021 |
| Miller, Rene | 3/18/2021 |
| Miller, William | 3/18/2021 |
| Mills, Bryan | 3/18/2021 |
| Milstead, Brett | 3/18/2021 |
| Mondragon, Ronald | 3/19/2021 |
| Monreal, Esteban | 3/18/2021 |
| Monroe, Susanna | 3/18/2021 |
| Mooney, Thomas | 6/2/2021 |
| Moore, Sean | 3/18/2021 |
| Morales, Intern | 3/19/2021 |
| Morales, Tammy | 3/19/2021 |
| Morasco, Anthony | 3/18/2021 |
| Moreland, Taylor | 3/18/2021 |
| Morgan, Darren | 3/18/2021 |
| Morrison, Ben | 3/18/2021 |

| | |
|---|---|
| Mosqueda, Intern | 3/18/2021 |
| Mosqueda, Teresa | 3/18/2021 |
| Moss, Scott | 3/18/2021 |
| Mudd, Jeffery | 6/2/2021 |
| Munnis, Timothy | 12/7/2020 |
| Muoio, Brian | 3/18/2021 |
| Murray, Wade | 4/23/2021 |
| Myerberg, Andrew | 3/19/2021 |
| Neafcy, Kenneth | 3/18/2021 |
| Nelson, Daniel | 3/18/2021 |
| Nelson, Dylan | 3/18/2021 |
| Nelson, Laurel | 3/18/2021 |
| Ness, Brehon | 3/18/2021 |
| Nesteruk, Liliya | 3/18/2021 |
| Newburn, Tori | 4/12/2021 |
| Nguyen, Peter | 3/18/2021 |
| Nguyen, Vy | 3/18/2021 |
| Nicholson, Erin | 6/2/2021 |
| Nollette, Deanna | 3/18/2021 |
| Norton, Andrew | 3/18/2021 |
| Nyland, Kelsey | 3/18/2021 |
| Oakland, Nathaniel | 6/2/2021 |
| Olson, Peter | 3/18/2021 |
| Olson, Todd | 3/18/2021 |
| Osborne, Joseph | 3/18/2021 |
| Othon, Loren | 3/18/2021 |
| Owens, Sara | 6/2/2021 |
| Page, Jeffrey | 3/18/2021 |
| Palyu, Cheryl | 6/2/2021 |
| Parikh, Sejal | 3/18/2021 |
| Passarella, David | 3/18/2021 |
| Patterson, Nathan | 3/18/2021 |
| Pearson, Joshua | 3/19/2021 |
| Pecore, Jason | 3/18/2021 |
| Pedersen, Alex | 3/18/2021 |
| Pedersen, Intern | 3/19/2021 |
| Perkins, Grainne | 3/18/2021 |
| Persun, Terry | 3/18/2021 |
| Peterson, Richard | 5/19/2021 |
| Phillips, Kalae | 7/26/2021 |
| Pieper, Peter | 7/20/2021 |
| Pirak, Dwayne | 3/18/2021 |
| Pitts, Dan | 3/19/2021 |
| Pleasant-Brown, Amanda | 3/18/2021 |
| Powell, Marc | 3/18/2021 |

| | |
|---|---|
| Qualls, Jacob | 7/26/2021 |
| Quirk, Patti | 3/18/2021 |
| Raas, Andreas | 3/19/2021 |
| Radcliffe, Todd | 7/26/2021 |
| Ranganathan, Shefali | 3/18/2021 |
| Ray, Mackenzie | 3/18/2021 |
| Read, Sam | 3/18/2021 |
| Rees, Brian | 3/18/2021 |
| Register, Sabrina | 3/19/2021 |
| Reiter, Cody | 3/18/2021 |
| Renner, Michael | 3/18/2021 |
| Reyes Jr, Daniel | 4/12/2021 |
| Reyes, Felix | 3/18/2021 |
| Rezentes, Stephanie | 7/26/2021 |
| Richards, Alan | 3/18/2021 |
| Ridlon, Anthony | 3/18/2021 |
| Robinson, Deanna | 7/26/2021 |
| Rogers, Matt | 3/19/2021 |
| Rogers, Shauna | 6/2/2021 |
| Rose-Akins, Nyjat | 3/18/2021 |
| Rosenblum, Jonathan | 3/18/2021 |
| Runolfson, Kevin | 3/18/2021 |
| Rurey, Joshua | 3/18/2021 |
| Rusher, Eric | 7/26/2021 |
| Safranek, Kristofer | 3/18/2021 |
| San Miguel, Shelley | 3/18/2021 |
| Santos, Chris | 3/19/2021 |
| Sather, James | 3/18/2021 |
| Satterwhite, Patrick | 7/26/2021 |
| Sausman, Aaron | 3/18/2021 |
| Sawant, Kshama | 3/18/2021 |
| Schmanke, Kim | 12/7/2020 |
| Schoenberg, Brett | 3/18/2021 |
| Schreckengost, Jay | 3/19/2021 |
| Schulkin, Rachel | 3/18/2021 |
| Scoggins, Harold | 12/7/2020 |
| Seelig, Shannan | 3/18/2021 |
| Selfridge, Ty | 6/25/2021 |
| Shank, Gabriel | 4/12/2021 |
| Sharp, Michael | 3/19/2021 |
| Shea, Michael | 3/18/2021 |
| Shepherd, Jaraea | 7/20/2021 |
| Shier, Christopher | 6/2/2021 |
| Silvernail, Devin | 3/19/2021 |
| Simbeck, Paul | 7/26/2021 |

| | |
|---|---|
| Sims, Katherine | 3/19/2021 |
| Sixkiller, Casey | 3/18/2021 |
| Socci, Angela | 3/18/2021 |
| Solan, Michael | 3/18/2021 |
| Somer, Sasha | 3/18/2021 |
| Souriall, Jordan | 3/18/2021 |
| Spady, Kelly | 3/18/2021 |
| Specht, Samuel | 3/18/2021 |
| Speer, Tyler | 7/20/2021 |
| St John, Pamela | 3/18/2021 |
| Stampfl, Brian | 3/18/2021 |
| Steel, Chris | 6/2/2021 |
| Stewart, Steven | 3/18/2021 |
| Stoltz, Aaron | 3/18/2021 |
| Stone, Steven | 3/18/2021 |
| Strauss, Dan | 3/23/2021 |
| Strauss, Daniel | 3/18/2021 |
| Strauss, Intern | 3/19/2021 |
| Stribling, Anne | 3/18/2021 |
| Sullivan, Brendan | 3/18/2021 |
| Sullivan, Jennifer | 3/18/2021 |
| Sweeney, David | 3/18/2021 |
| Swift, BrynDel | 3/18/2021 |
| Sylvester, David | 3/18/2021 |
| Tebeau, Lena | 3/18/2021 |
| Teeter, Michael | 3/18/2021 |
| Terrell, Robert | 4/23/2021 |
| Terry, David | 3/18/2021 |
| Thaler, Toby | 3/19/2021 |
| Thomas, Brianna | 3/18/2021 |
| Thometz, Casey | 3/18/2021 |
| Thompson, Aaron | 3/18/2021 |
| Thompson, Adrienne | 3/18/2021 |
| Thorpe, Jacob | 3/19/2021 |
| Tietjen, Michael | 3/18/2021 |
| Tinsley, Kristin | 12/7/2020 |
| To, Jeffrey | 4/12/2021 |
| Todorov, Kalin | 3/18/2021 |
| Toman, Christopher | 3/18/2021 |
| Tomlinson, Greg | 3/18/2021 |
| Touch, Darozyl | 3/19/2021 |
| Truscott, Lauren | 3/18/2021 |
| Tsai, Amy | 3/19/2021 |
| Turla, Alexis | 3/19/2021 |
| Tuttle, Heidi | 7/26/2021 |

| | |
|---|---|
| Tyler, Trevor | 6/2/2021 |
| Underwood, Yvonne | 3/18/2021 |
| Upton, Nathan | 3/18/2021 |
| Vaaga, Joshua | 3/18/2021 |
| Vallier, Cara | 3/19/2021 |
| Vega, Henry | 3/18/2021 |
| Vergara, Sergio | 3/18/2021 |
| Virdone, Ted | 3/18/2021 |
| Waldorf, Kirk | 3/18/2021 |
| Waldorf, Kirk | 7/26/2021 |
| Walsh, Tom | 12/7/2020 |
| Walter, Eric | 3/18/2021 |
| Ward, Daniel | 3/18/2021 |
| Warnock, David | 3/18/2021 |
| Washington, Quindelia | 3/18/2021 |
| Waters, Donna | 3/19/2021 |
| Watkins, Cole | 7/26/2021 |
| Weber, Bryan | 3/18/2021 |
| Wells, Michael | 3/18/2021 |
| West, Andrew | 3/18/2021 |
| Westphal, Meagan | 3/18/2021 |
| Whicker, Brian | 3/18/2021 |
| Wigoda, Gabriella | 7/26/2021 |
| Willenberg, Trevor | 3/18/2021 |
| Williams, Christopher | 3/19/2021 |
| Williams, Corey | 3/18/2021 |
| Williams, Joel | 3/23/2021 |
| Willis, Ronald | 3/18/2021 |
| Wilske, Steve | 3/18/2021 |
| Wong, Mark | 3/18/2021 |
| Woollum, Mary | 3/18/2021 |
| Worstman, Mark | 6/2/2021 |
| Wright, Nicholas | 4/23/2021 |
| Yuen, Mae | Will supplement |
| Yurczyk, Scott | 3/19/2021 |
| Zech, Roxanne | 3/18/2021 |
| Zentner, Chad | 3/18/2021 |
| Zieger, Kerry | 5/19/2021 |
| Ziemer, Joshua | 3/18/2021 |
| Ziemkowski, Adam | 3/18/2021 |
| Zimbabwe, Sam | 3/18/2021 |
| Zwaschka, Andrew | 3/18/2021 |

***Black Lives Matter Seattle-King County, et al v. City of Seattle***

| Case No. 2:20-cv-887 (W.D. Wash.) | |
| --- | --- |
| **Name** | **Date Lit. Hold Issued** |
| Aagard, Lori | 7/8/2020 |
| Adams, David | 7/8/2020 |
| Alcantara, Lora | 7/8/2020 |
| Aldrich, Newell | 7/23/2020 |
| Allen, Matthew | 7/8/2020 |
| Allsopp, Darren | 7/24/2020 |
| An, Noah | 7/23/2020 |
| Anderson, Shanon | 7/8/2020 |
| Apreza, Ernesto | 7/23/2020 |
| Arata, James | 7/8/2020 |
| Archuleta, Zayla | 7/24/2020 |
| Ballingham, Grant | 7/8/2020 |
| Barokas, Michael | 7/23/2020 |
| Barron, Lisa | 7/23/2020 |
| Basu, Aretha | 7/23/2020 |
| Bauer, Joseph | 7/8/2020 |
| Bergmann, Trent | 7/8/2020 |
| Best, Carmen | 7/8/2020 |
| Bettesworth, Anne | 7/23/2020 |
| Boatright, Rebecca | 7/8/2020 |
| Britt, James | 7/8/2020 |
| Brooks, John | 7/8/2020 |
| Brown, Robert | 7/8/2020 |
| Byrd, Samuel | 7/8/2020 |
| Carpenter, Colin | 7/8/2020 |
| Chen, Michelle | 7/23/2020 |
| Clancy, Amy | 7/21/2020 |
| Clardy, Alex | 7/23/2020 |
| Clenna, Bryan | 7/21/2020 |
| Cooper, Michelle | 7/8/2020 |
| Cordner, Lesley | 7/8/2020 |
| Costa-C, Rick | Will supplement |
| Cox, Alan | 7/23/2020 |
| Cuerpo, David | 7/23/2020 |
| Cuevas, Faride | 7/23/2020 |
| Dahline, Dennis | 7/23/2020 |
| DAlessandro, Julie | 7/23/2020 |
| Davis, Tyrone | 7/8/2020 |
| Derrick, Anthony | 7/23/2020 |

| | |
|---|---|
| Diaz, Adrian | 7/21/2020 |
| Didier, Matthew | 7/8/2020 |
| Dike, Tim | 7/8/2020 |
| Dory, Mary | 7/23/2020 |
| Doss, Greg | 7/23/2020 |
| Durkan, Jenny | 7/23/2020 |
| Dyment, James | 7/8/2020 |
| Eastman, Michael | 7/8/2020 |
| Ebinger, Sina | 7/8/2020 |
| Eder, Dan | 7/23/2020 |
| Edwards, Michael | 7/8/2020 |
| Erickson, Lynn | 7/23/2020 |
| Farmer, LaKecia | 7/23/2020 |
| Feher, Ferenc | 7/23/2020 |
| Finnell, Anthony | 7/23/2020 |
| Fisher, Christopher | 7/8/2020 |
| Fitzpatrick, Helen | 7/23/2020 |
| Floyd, Tamara | 7/8/2020 |
| Fong, Michael | 7/23/2020 |
| Formas, Stephanie | 7/23/2020 |
| Frank, Tim | 7/23/2020 |
| Freese, Diana | 7/8/2020 |
| Freese, Michael | 7/21/2020 |
| Gaedcke, Anthony | 7/21/2020 |
| GarthGreen, Marc | 7/21/2020 |
| Geoghagan, Jeff | 7/8/2020 |
| Gonzales, Reba | 7/23/2020 |
| Gonzalez, Intern | 7/23/2020 |
| Gonzalez, Lorena | 7/23/2020 |
| Gordillo, Canek X | 7/8/2020 |
| Gore, Michael | 7/21/2020 |
| Graves, Tobin | 7/23/2020 |
| Grba, Mark | 7/23/2020 |
| Greene, Chris | 7/23/2020 |
| Greening, Eric | 7/8/2020 |
| Grenon, Bryan | 7/8/2020 |
| Grossman, Kevin | 7/8/2020 |
| Hastings, Bryan | 7/23/2020 |
| Havner, J | 7/23/2020 |
| Hayes, John | 7/8/2020 |
| Herbold, Intern | 7/23/2020 |

| | |
|---|---|
| Herbold, Lisa | 7/23/2020 |
| Hightower, Kamaria | 7/23/2020 |
| Hill, Travis | 7/8/2020 |
| Hirjak, Stephen | 7/8/2020 |
| Hohlfeld, Amanda | 7/23/2020 |
| House, Erin | 7/23/2020 |
| Israel, Gina | 7/8/2020 |
| Johnson, Aaron | 7/21/2020 |
| Jones, Nick | 7/23/2020 |
| Juarez, Debora | 7/23/2020 |
| Juarez, Intern | 7/23/2020 |
| JuarezTwo, Intern | 7/23/2020 |
| Judge, Lisa | 7/23/2020 |
| Kamkar, Negheen | 7/23/2020 |
| Kebba, Michael | 7/21/2020 |
| Kelley, Christopher | 7/8/2020 |
| Kellogg, Chelsea | 7/23/2020 |
| Kibbee, Todd | 7/8/2020 |
| Kline, Julie | 7/23/2020 |
| Komadina, Stephen | 7/23/2020 |
| Lang, Chriseley | 7/8/2020 |
| Legault, Jeanne | 7/23/2020 |
| Leung, Sekfai Paul | 7/8/2020 |
| Lewis, Andrew | 7/23/2020 |
| Lockhart, Mariko | 7/24/2020 |
| Luckie, Scott | 7/8/2020 |
| Mahaffey, Thomas | 7/8/2020 |
| McGehee, Alexandra | 7/23/2020 |
| McLean, Alyson | 7/23/2020 |
| Meza, Miroslava | 7/23/2020 |
| Miller, Austin | 7/23/2020 |
| Miller, Matt | 7/23/2020 |
| Mondragon, Ronald | 7/23/2020 |
| Moore, Sean | 7/8/2020 |
| Mosqueda, Intern | 7/23/2020 |
| Mosqueda, Teresa | 7/23/2020 |
| Moss, Scott | 7/8/2020 |
| Myerberg, Andrew | 7/23/2020 |
| Nelson, Daniel | 7/21/2020 |
| Nguyen, Peter | 7/24/2020 |
| Nguyen, Vy | 7/23/2020 |

| | |
|---|---|
| Nollette, Deanna | 7/8/2020 |
| Nyland, Kelsey | 7/23/2020 |
| Osborne, Joseph | 7/8/2020 |
| Page, Jeffrey | 7/8/2020 |
| Parikh, Sejal | 7/23/2020 |
| Pearson, Joshua | 7/23/2020 |
| Pedersen, Alex | 7/23/2020 |
| Perkins, Grainne | 7/23/2020 |
| Pleasant-Brown, Amanda | 7/24/2020 |
| Raas, Andreas | 7/23/2020 |
| Ranganathan, Shefali | 7/23/2020 |
| Rees, Brian | 7/21/2020 |
| Reiter, Cody | 7/23/2020 |
| Renner, Michael | 7/8/2020 |
| Rogers, Matt | 7/23/2020 |
| Rosenblum, Jonathan | 7/23/2020 |
| Runolfson, Kevin | 7/8/2020 |
| Santos, Chris | 7/23/2020 |
| Sather, James | 7/8/2020 |
| Sawant, Kshama | 7/23/2020 |
| Schmanke, Kim | 7/23/2020 |
| Schreckengost, Jay | 7/23/2020 |
| Sharp, Michael | 7/23/2020 |
| Somer, Sasha | 7/23/2020 |
| Stampfl, Brian | 7/21/2020 |
| Strauss, Daniel | 7/23/2020 |
| Sullivan, Jennifer | 7/8/2020 |
| Sweeney, David | 7/8/2020 |
| Swift, BrynDel | 7/23/2020 |
| Sylvester, David | 7/8/2020 |
| Tebeau, Lena | 7/23/2020 |
| Teeter, Michael | 7/8/2020 |
| Thomas, Brianna | 7/23/2020 |
| Thompson, Adrienne | 7/23/2020 |
| Tietjen, Michael | 7/8/2020 |
| Tinsley, Kristin | 7/23/2020 |
| Toman, Christopher | 7/8/2020 |
| Truscott, Lauren | 7/8/2020 |
| Tsai, Amy | 7/23/2020 |
| Underwood, Yvonne | 7/8/2020 |
| Upton, Nathan | 7/8/2020 |

| | |
|---|---|
| Virdone, Ted | 7/23/2020 |
| Williams, Joel | 7/8/2020 |
| Wilske, Steve | 7/8/2020 |
| Yurczyk, Scott | 7/23/2020 |
| Ziemer, Joshua | 7/8/2020 |
| Ziemkowski, Adam | 7/23/2020 |

# EXHIBIT 8



**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON**

# FRCP 26(a)(2)(B) Expert Report of Kevin T. Faulkner

**HUNTERS CAPITAL, LLC, et al**
**vs.**
**CITY OF SEATTLE,**

**Case No. 2:20-cv-00983 TSZ**

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

# Introduction

## Engagement Background

Palo Alto Networks, Inc. ("Palo Alto Networks") was initially retained by outside counsel on behalf of its client, the City of Seattle (the "City") on November 5, 2020, to provide digital forensic investigative services in connection with pending and anticipated litigation, including *Hunters Capital, LLC, et al v. City of Seattle*, No. 2:20-cv-00983 (W.D. Wash. 2020). The Unit 42 Security Consulting group ("Unit 42") at Palo Alto Networks, formerly known as Crypsis, performed the services in this engagement.

Unit 42 initiated its investigation on November 5, 2020, beginning with a remote investigation and then an on-site collection of data on November 19, 2020.

I, Kevin T. Faulkner, have been asked to prepare a report describing this investigation, and hereby submit the following report pursuant to FRCP 26(a)(2)(B). When I refer to actions taken by myself or Unit 42 in this report, those actions were taken by me and/or Unit 42 personnel who were working at my direction. All dates and times discussed in this report are presented in Coordinated Universal Time ("UTC"), unless otherwise noted.

## Experience and Qualifications

I am a vice president in the Unit 42 Security Consulting group at Palo Alto Networks. Unit 42 Security Consulting specializes in digital forensic investigations, data breach and computer crime response, and digital risk management services. In my capacity as a vice president, I lead and perform digital forensic and incident response investigations and other risk management engagements on behalf of Palo Alto Networks' clients. I regularly supervise and perform digital forensic acquisitions and examinations of laptop and desktop computers, email and file servers, handheld/mobile devices, backup tapes, and network logs in civil and criminal cases, internal investigations, and cybercrime engagements.

Palo Alto Networks acquired The Crypsis Group in September of 2020 and merged the team from Crypsis with the Unit 42 team under the name Unit 42 Security Consulting.

Prior to my employment by Crypsis and Palo Alto Networks, I served as a managing director and head of the national digital forensics and incident response practice at Stroz Friedberg, where I co-managed the firm's technical operations in the areas of digital forensics and incident response.

I have over 18 years of experience in digital forensics and incident response, and over 23 years of experience in technology consulting. I have attained a number of certifications in digital forensics, computer security, and information technology including: Certified Computer Examiner ("CCE"), EnCase Certified Examiner ("EnCE"), GIAC Certified Forensic Examiner ("GCFE"), Payment Card Industry ("PCI") Qualified Security Assessor ("QSA"), CompTIA Linux+, and Microsoft Certified Professional ("MCP").

I have testified and submitted affidavits, declarations, witness statements, and/or expert reports in my capacity as a digital forensic expert approximately 70 times. In the last 10 years I have offered testimony in the following courts:

- Connecticut Superior Court, Hartford, Complex Litigation
- District Court of Rotterdam
- Kosciusko County Superior Court 4, State of Indiana
- New Jersey Superior Court, Somerset County - Law Division
- Superior Court of The State of California, County of Los Angeles, Central District

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

- Supreme Court of The State of New York, County of New York

- The United States Bankruptcy Court, District of Delaware

- The United States District Court for the District of Massachusetts

- The United States District Court for the Eastern District of New York

- The United States District Court for the Eastern District of Pennsylvania

- The United States District Court for the Northern District of California

- The United States District Court for the Northern District of New York

- The United States District Court for the Southern District of New York

- The United States International Trade Commission, Washington D.C.

Attached to this report as Exhibit 1 is a true and correct copy of my curriculum vitae, which sets forth a detailed list of my background, qualifications, and testimony experience.

## Compensation

Palo Alto Networks is being compensated for my work on this case at the rate of $550 per hour for my professional services in this matter. Certain members of my team at Unit 42 who are working at my direction on this matter are billing between $300 and $550 per hour. Palo Alto Networks also charges $700 per hour for expert testimony. Neither Palo Alto Networks' nor my compensation depends in any way on the outcome of this matter or the substance of my opinions or testimony.

## Materials Considered

The materials that I considered in forming the opinions set forth in this report include my over 18 years of experience as a digital forensics expert, all references cited in this report, and the list of materials attached as Exhibit 2 to this report.

## Reservation of Rights

I reserve the right to supplement or amend my opinions or this report at any time prior to the expert disclosure deadlines in the case, in response to opinions expressed by other experts, or in light of any additional evidence, testimony, discovery, court rulings, or other information that may be provided to me after the date of this report. In addition, I reserve the right to consider and testify about issues that may be raised by fact witnesses and experts at trial.

In connection with any testimony that I am asked to provide in this matter, I may use as exhibits various documents produced in this matter that refer or relate to the topics discussed in this report. In addition, I reserve the right to use animations, demonstratives, enlargements of exhibits, and other information to convey my opinions and the bases for them, as appropriate.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

# Executive Summary

## Purpose of Our Engagement

The City identified that a number of mobile phone text messages could not be found on mobile devices issued by the City to former Seattle Mayor Jenny A. Durkan ("Mayor Durkan") and former Seattle Police Chief Carmen Best ("Chief Best").[1] The time frame in which text messages initially could not be located for Mayor Durkan was between August 29, 2019, and June 25, 2020 (the "Initial Missing Durkan Text Messages"). During this time frame, extending to when Unit 42 began assisting with this investigation, Mayor Durkan used three different mobile phones at different points in time, which are described in this report in the section entitled, "Devices Used by Mayor Durkan." The time frame in which text messages could not be located for Chief Best was prior to September 2, 2020 (the "Missing Best Text Messages"). During the time period from October 1, 2019, to September 2, 2020, Chief Best used one City-issued mobile phone.

The goals of this investigation were to:

1. Attempt to recover or otherwise locate the missing text messages of Mayor Durkan and Chief Best.

2. Determine what happened to cause the text messages of Mayor Durkan and Chief Best to be missing.

One aspect that was not a focus of this investigation was to assess who made any changes to settings on the mobile phones of Mayor Durkan and Chief Best that may have been made. Data extracted from mobile phones can typically reveal to forensic investigators how the device was configured. In some instances, there is information that may show when certain changes were made. But, typically, digital forensic evidence would not show what specific person made any changes. Therefore, investigating who made changes was outside the scope of Unit 42's investigation.

## Summary of Findings

### Mayor Durkan

During the course of Unit 42's investigation, the iPhone 8 Plus (Verizon) (as later defined), which initially could not be located, was found by City employees on June 28, 2021, and provided to Unit 42 for analysis. Locating the iPhone 8 Plus (Verizon) filled in some of the Initial Missing Durkan Text Messages being sought, specifically from August 29, 2019, through October 30, 2019. Accordingly, following Unit 42's investigation, the time frame in which text messages have not been located or recovered is October 30, 2019, through June 25, 2020 (the "Missing Durkan Text Messages").

Unit 42 determined that the Missing Durkan Text Messages (those sent or received between October 30, 2019, and June 25, 2020) were not recoverable from Mayor Durkan's mobile devices and could not be found in the data sources related to Mayor Durkan. The sources of data related to Mayor Durkan that were examined in this investigation are detailed in the section of this report entitled "Mayor Durkan Data Sources" and include backups of mobile devices taken at different points in time, data from Apple iCloud, and multiple forensic extractions of mobile devices from different points in time that were created using multiple forensic tools.

Artifacts from Mayor Durkan's data sources indicate that, at an unknown point in time on or after July 4, 2020 PDT, and before the next configuration change occurred between July 22, 2020 PDT and July 26, 2020 PDT,[2] the "Message History" setting on either Mayor Durkan's iPhone 8 Plus (FirstNet) or her iPhone

---

[1] When the City initially retained Unit 42 in November 2020, the scope of work was only to investigate the Initial Missing Durkan Text Messages. Later, when the City discovered that Chief Best was missing text messages as well, our scope of work expanded to include Chief Best.

[2] The artifacts Unit 42 reviewed are consistent with the "Message History" setting having changed from "30 Days" to "Forever" between July 23, 2020, at 06:11:47 UTC and July 26, 2020, at 10:00:00 UTC, (July 22, 2020, at 23:11:47

 

11 (FirstNet) (as later defined) likely had been set to "Keep Messages" for "30 Days." Then, between July 22, 2020 PDT and July 26, 2020 PDT, the "Message History" setting on the iPhone 11 (FirstNet) likely was reconfigured to "Keep Messages" "Forever." When the setting is configured to "Keep Messages" for "30 Days," any text messages older than 30 days stored locally on an iPhone are automatically deleted by the iPhone on a nightly, rolling basis. We investigated whether there were any events that could have changed the text message retention settings without manual intervention, and to date have not identified any that apply. This investigation did not assess who may have changed settings on Mayor Durkan's phones, as digital forensic evidence regarding who made changes does not typically exist on mobile devices.

Mayor Durkan's iPhone 8 Plus (Verizon), in use from April 2018 to October 2019, contained text messaging data from November 18, 2017, to October 30, 2019. A backup of Mayor Durkan's iPhone 11 (FirstNet), in use since July 2020, was identified on the computer of Michelle Chen ("Ms. Chen"), a City employee working in the Mayor's office. This backup was dated August 21, 2020, and contained text messaging data from June 25, 2020, to August 21, 2020. The Missing Durkan Text Messages fall in the date range between these two data sets (October 30, 2019, to June 25, 2020) for which no additional data sources containing text messages related to Mayor Durkan's iPhones have been identified. Text messaging data from June 25, 2020, and forward has been preserved through multiple collections of data.

### Chief Best

Analysis of the Best iPhone XS Max (as later defined) led to the identification of two backups of older iPhones used by Chief Best; however, none of the data sources found filled in any of the Missing Best Text Messages from the summer of 2020, which Unit 42 understands to be the relevant time period for this litigation. The two backups did provide some text messages from 2017 and 2019, but no additional messages from 2020.

The sources of data related to Chief Best that were examined in this investigation are detailed in the section of this report entitled "Chief Best Data Sources." These data sources include backups of mobile devices taken at different points in time and forensic extractions from the iPhone Chief Best most recently used.

Ultimately, our analysis showed that Chief Best's iPhone XS Max contained information in the text message database that was consistent with her deposition testimony that she deleted text messages periodically.

## Devices Used by Mayor Durkan

### Mobile Devices

Unit 42 understands that Mayor Durkan used three different mobile devices from April 2018 to November 2020. This understanding is based on analysis of the devices, analysis of backups from the devices, and statements made by City employees. Unit 42 currently has custody of these three mobile devices, which are stored in our evidence storage facility. Details about the three mobile devices are provided below:

1. An iPhone 8 Plus, model: A1864, serial number: F17WDNB4JCLM, on the Verizon cellular network, used from April 10, 2018, through October 30, 2019, (the "**iPhone 8 Plus (Verizon)**")

2. An iPhone 8 Plus, model: A1897, serial number: FD1XR5Y8JCM2, on the FirstNet cellular network built with AT&T, used from October 30, 2019, through July 9, 2020, (the "**iPhone 8 Plus (FirstNet)**")

3. An iPhone 11, model: A2111, serial number: F4GCQQ6PN72Q, on the FirstNet cellular network built with AT&T, used from July 9, 2020, through November 19, 2020, (the "**iPhone 11 (FirstNet)**")

---

PDT and July 26, 2020, at 03:00:00 PDT). The "Message History" setting was set to "30 Days" between the point in time when the "Disable & Delete" function was used on July 4, 2020 PDT, and the point in time when it was set back to "Forever" between July 22, 2020 PDT and July 26, 2020 PDT.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

Unit 42 further understands that Mayor Durkan was provided a new mobile device on November 19, 2020, when Unit 42 took custody of the iPhone 11 (FirstNet). This new mobile device has not been examined by Unit 42.

The following image depicts a timeline of the iPhone mobile devices used by Mayor Durkan from early 2018 to late 2020 with pins showing the dates when devices went into or were taken out of use.



Figure 1 - Timeline of Durkan Mobile Device Usage

## Computer Devices

In addition to the mobile devices, Mayor Durkan used two computer laptop/tablet devices provided by the City. Details about these two devices are provided below:

1. A Microsoft Surface Pro 4, serial number: 048165462053, which was described as the tablet Mayor Durkan uses from home for City-related work

2. A Microsoft Surface Pro 7, serial number: 030612294353, which was described as the tablet Mayor Durkan uses from the office for City-related work

## On-Site Inspection and Collection

Unit 42 vice president, Kevin T. Faulkner, traveled to Seattle and on November 19, 2020, met with team members from the City, collected data and devices, and inspected other devices not necessary for collection.

Mr. Faulkner took custody of two of Mayor Durkan's iPhones on November 19, 2020. At the time of Mr. Faulkner's visit, the iPhone 11 (FirstNet) was Mayor Durkan's current phone. The City's IT team provided Mayor Durkan with a new iPhone and transferred data from the iPhone 11 (FirstNet) to the new iPhone. Once the City's IT team completed transferring data onto the new iPhone, Mr. Faulkner took custody of the iPhone 11 (FirstNet). While on-site, Mr. Faulkner also took custody of the iPhone 8 Plus (FirstNet), which Mayor Durkan used prior to the iPhone 11 (FirstNet). The iPhone 8 Plus (Verizon) was not collected while Mr. Faulkner was on-site, as the City team was still working to identify its location.

On November 19, 2020, Mr. Faulkner also inspected the two City-owned Microsoft Surface Pro computers assigned to Mayor Durkan, looking for any evidence of iPhone backups on those two computers. Neither computer was found to have the Apple iTunes software installed and no iPhone backups were found on either of these two computer systems.

On June 28, 2021, a City employee located Mayor Durkan's iPhone 8 Plus (Verizon). It was shipped to Unit 42's forensics lab and was received by the Unit 42 team on July 2, 2021.

## Mayor Durkan Data Sources

For the three mobile devices used by Mayor Durkan, there were multiple sources of data that Unit 42 collected and analyzed in this investigation, which were provided to plaintiffs and/or their expert. This section describes all of the sources of data related to Mayor Durkan that were considered in this investigation, which are collectively referred to in this report as the "Durkan Data Sources." In addition to data extracted directly from the mobile devices, Unit 42 also collected and analyzed backup preservations

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

of the devices created with iTunes. Ms. Chen had indicated during prior meetings that her computer likely contained backups of potentially relevant iPhone devices from Mayor Durkan. In order to capture the potentially relevant backups along with information sufficient to analyze how and when backups were taken and what may have been done with the data, Unit 42 forensically imaged Ms. Chen's computer using a Logicube Falcon-Neo forensic imaging device on November 19, 2020.

These Durkan Data Sources are described below, grouped by the mobile device to which the data source relates. It is important to note that the date that data was collected does not necessarily represent the date that is reflected in that data source. For example, if a backup was collected three months after it was taken, the data source represents the configuration and data on that mobile device as of the date the backup was taken, not when the backup was collected. Similarly, if a mobile device was taken out of use and then collected over a year later, the data source may represent the configuration and data on that mobile device when it was taken out of use rather than when it was actually collected.

## iPhone 8 Plus (Verizon)

- An iTunes backup dated August 29, 2019, was identified on Ms. Chen's computer. Unit 42 preserved a forensic image of Ms. Chen's computer while on-site on November 19, 2020. The backup represents the configuration and data on the phone as of the date the backup was taken, August 29, 2019.

- On July 2, 2021, after receiving the iPhone 8 Plus (Verizon), Unit 42 created an advanced logical data extraction[3] using forensic software from Cellebrite. This data extraction represents the configuration and data on the iPhone 8 Plus (Verizon) as of October 30, 2019, because that is the date when the phone was taken out of use.

- On July 7, 2021, Unit 42 created a full file system[4] data extraction using forensic software from Cellebrite. This data extraction also represents the configuration and data on the iPhone 8 Plus (Verizon) as of October 30, 2019, because that is the date when the phone was taken out of use. A full file system data extraction contains additional information and data from a mobile device not captured in an advanced logical data extraction.

The following image depicts a timeline when the iPhone 8 Plus (Verizon) was in use from April 10, 2018, through October 30, 2019. The red pins represent when data preservations exist, reflecting the phone's configuration and data as of August 29, 2019, and October 30, 2019.



**Figure 2 - Timeline of iPhone 8 Plus (Verizon) Durkan Data Sources**

---

[3] An advanced logical extraction was performed using Cellebrite. This method collects a subset of data, such as text/chat messages, call history, photos, contacts, and configuration information.

[4] A full file system extraction was performed using Cellebrite with the checkm8 method, allowing a deeper level of access to the system partition, application data, and other files that would not typically be accessible for preservation with an advanced logical extraction.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

## iPhone 8 Plus (FirstNet)

- On November 17, 2020, Unit 42 received a mobile preservation that was performed by an "Information Security Engineer" with the City on September 18, 2020. The preservation was performed using forensic software from Magnet Forensics Inc., named "Magnet ACQUIRE." The City's "Information Security Engineer" reported that they had received the iPhone 8 Plus (FirstNet) in a factory-reset state and had to complete the setup of the device, which they did, in order to extract data. This preservation represents the configuration and data of the iPhone 8 Plus (FirstNet) on September 18, 2020, after the device had been factory reset and subsequently set up. Because this device was in a factory-reset state, any settings or data related to prior use of this phone were no longer present on the device and were therefore not captured in this data extraction.

- While on-site in Seattle on November 19, 2020, Unit 42 created an advanced logical extraction using forensic software from Cellebrite. This preservation effectively represents the data and configuration of the iPhone 8 Plus (FirstNet) on September 18, 2020, because that is when the device was set up after an earlier reset. Because this device was in a factory-reset state, any settings or data related to prior use of this phone were no longer present on the device and were therefore not captured in this data extraction.

- On July 7, 2021, Unit 42 created a full file system data extraction of the iPhone 8 Plus (FirstNet) using forensic software from Cellebrite. This preservation effectively represents the data and configuration of the iPhone 8 Plus (FirstNet) on September 18, 2020, because that is when the device was set up after an earlier reset. Because this device was in a factory-reset state, any settings or data related to the prior use of this phone were no longer present on the device and were therefore not captured in this data extraction. A full file system data extraction contains additional information and data from a mobile device not captured in an advanced logical data extraction.

- None of the forensic extractions of data from the iPhone 8 Plus (FirstNet) (neither the collection on September 18, 2020, the advanced logical extraction on November 19, 2020, nor the full file system data extraction on July 7, 2021) contained any information from the device when it was in use by Mayor Durkan because the device had been factory reset. Furthermore, no backups for the iPhone 8 Plus (FirstNet) were located within any other Durkan Data Sources. Analysis by Unit 42 did confirm that, on July 9, 2020, data from the iPhone 8 Plus (FirstNet) was transferred to the iPhone 11 (FirstNet). Therefore, any information found on the iPhone 11 (FirstNet) that predates July 9, 2020, is actually data from the iPhone 8 Plus (FirstNet) that was transferred over when the iPhone 8 Plus (FirstNet) was replaced. For this reason, all of the Durkan Data Sources listed below for the iPhone 11 (FirstNet) may also be considered as data sources for the iPhone 8 Plus (FirstNet) to the extent that information can be identified as something that had been transferred over from before July 9, 2020.

The following image depicts a timeline when the iPhone 8 Plus (FirstNet) was in use from October 30, 2019, through July 9, 2020, and further to September 18, 2020. The red pin represents when data preservations exist reflecting the phone's configuration and data as of September 18, 2020.



**Figure 3 - Timeline of iPhone 8 Plus (FirstNet) Durkan Data Sources**

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

## iPhone 11 (FirstNet)

- An iTunes backup of the iPhone 11 (FirstNet) dated August 21, 2020, was identified on Ms. Chen's computer. Unit 42 preserved Ms. Chen's computer on November 19, 2020. The backup represents the configuration and data on the iPhone 11 (FirstNet) as of August 21, 2020.

- On November 17, 2020, Unit 42 received a mobile preservation that was performed by an "Information Security Engineer" with the City on October 15, 2020. The preservation was performed using Magnet ACQUIRE. This preservation represents the configuration and data on the iPhone 11 (FirstNet) as of October 15, 2020.

- While on-site in Seattle on November 19, 2020, Unit 42 created an advanced logical extraction using forensic software from Cellebrite. This preservation represents the configuration and data on the phone as of November 19, 2020, when the phone was taken out of use after transferring its data to a new iPhone.

- On July 8, 2021, Unit 42 created a full file system extraction using the unc0ver jailbreak and forensic software from Belkasoft LLC.[5] This collection represents the configuration and data on the phone as of November 19, 2020, as the phone was taken out of use on that day. A full file system data extraction contains additional information and data from a mobile device, not captured in an advanced logical data extraction.

The following image depicts a timeline when the iPhone 11 (FirstNet) was in use from July 9, 2020, through November 19, 2020. The red pins represent when data preservations exist reflecting the phone's configuration and data as of August 21, 2020, October 15, 2020, and November 19, 2020.



**Figure 4 - Timeline of iPhone 11 (FirstNet) Durkan Data Sources**

## iCloud Account

- On November 16, 2020, Unit 42 collected data from Mayor Durkan's iCloud account that was used on all three of Mayor Durkan's iPhones used from 2018 to the time Unit 42 became involved in this investigation in November 2020. This iCloud account was examined, and data was collected on November 16, 2020, using Magnet Forensics Inc. AXIOM Cloud and Elcomsoft Ltd. Phone Breaker. These collections did not include text messages in iCloud, as the process to access text messages in iCloud using forensic software was producing an error due to the additional security around text messages in iCloud.

- On September 9, 2021, Unit 42 collected additional data from Mayor Durkan's iCloud account that was used on all three of Mayor Durkan's iPhones used from 2018 to the time Unit 42 became involved in this investigation in November 2020, as well as the new phone in use as of September 9, 2021. This iCloud account was examined, and data was collected on September 9, 2021, using Elcomsoft Phone Breaker. This collection included only account data and text messages in iCloud

---

[5] Performing the jailbreak process with unc0ver and acquiring the iPhone 11 (FirstNet) with Belkasoft was a different process for obtaining a full file system than was used on the two iPhone 8 Plus devices. This different process was necessary because the process used on the two iPhone 8 Plus devices was not compatible with iPhone 11 hardware.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

to supplement the earlier collection on November 16, 2020.[6] The text message data collected from iCloud covered the date range of June 25, 2020, through September 9, 2021.

## Computer Devices

- No data was collected from the two Microsoft Surface Pro computers issued by the City to Mayor Durkan. These devices were inspected on November 19, 2020, on-site in Seattle, and, because no mobile phone backups were found, no data was collected from these devices.

## Pinnacle Data Extraction

- Pinnacle is a centralized database that receives billing and usage information from cellular provider companies used by the City. Unit 42 received an extraction of information from Pinnacle that contains, among other things, dates, times, and recipient information for traditional cellular network "SMS" text messages, but not for Apple proprietary "iMessage" text messages. The extraction contained records from the beginning of January 2020 through the end of August 2020 for Mayor Durkan's mobile phone number.

# Devices Used by Chief Best

## Mobile Devices

Unit 42 found that Chief Best used at least three different mobile devices from July 2016 to September 2020. This finding is based on the analysis of Chief Best's most recent iPhone and the analysis of backups from two older devices. Unit 42 currently has custody of Chief Best's most recent device that was used during the summer of 2020, which is stored in our evidence storage facility. Details about the three mobile devices are provided below:

1. An iPhone 6s Plus, model: A1687, serial number: F2LRMBLFGRWV, on the Verizon cellular network, used from July 18, 2016, through at least November 15, 2017, the date the backup of this device was taken, (the "**Best iPhone 6s Plus**").

2. An iPhone 8 Plus, model: A1864, serial number: FD6W12T6JCLY, on the Verizon cellular network, used from November 5, 2018, until October 1, 2019, (the "**Best iPhone 8 Plus**").

3. An iPhone XS Max, model: A1921, serial number: F2LZ5ANGKPHC, on the Verizon cellular network, used from October 1, 2019, through September 2, 2020, (the "**Best iPhone XS Max**").



**Figure 5 - Timeline of Best Mobile Device Usage**

# Chief Best Data Sources

For the mobile devices used by Chief Best, there were multiple sources of data that Unit 42 collected and analyzed in this investigation. This section describes the sources of data related to Chief Best considered in this investigation, which are collectively referred to in this report as "Best Data Sources." Unit 42

---

[6] Text message data in iCloud was obtained by authenticating with the additional security required to access text message data.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

understands that Chief Best's last date of employment with the City was September 2, 2020, and that she turned in her City-issued iPhone on that day.

On February 24, 2021, ArcherHall, LLC. ("ArcherHall"), one of the City's vendors, collected an advanced logical data extraction using forensic software from Cellebrite from the mobile device last used by Chief Best. On October 22, 2021, Epiq Systems, Inc. ("Epiq"), another of the City's vendors, preserved a City-owned computer used by Chief Best's assistant, Tricia Colin ("Ms. Colin"). Unit 42 analyzed the forensic image of Ms. Colin's computer and identified two iTunes backups related to Chief Best.

These Best Data Sources are detailed below. It is important to note that the date that data was collected does not necessarily represent the date that is reflected in that data source. For example, if a backup was collected three months after it was taken, the data source represents the configuration and data on that mobile device as of the date the backup was taken, not when the backup was collected. Similarly, if a mobile device was taken out of use and then collected over a year later, the data source may represent the configuration and data on that mobile device when it was taken out of use, rather than when it was actually collected.

### Best iPhone 6s Plus

- An iTunes backup of the Best iPhone 6s Plus dated November 15, 2017, was identified on a computer used by Ms. Colin. Epiq preserved Ms. Colin's computer on October 22, 2021. The backup represents the configuration and data on the Best iPhone 6s Plus as of November 15, 2017.

### Best iPhone 8 Plus

- An iTunes backup of the Best iPhone 8 Plus dated October 1, 2019, was identified on a computer used by Ms. Colin. Epiq preserved Ms. Colin's computer on October 22, 2021. The backup represents the configuration and data on the Best iPhone 8 Plus as of October 1, 2019.

### Best iPhone XS Max

- Unit 42 received an advanced logical data extraction performed by ArcherHall with forensic software from Cellebrite on February 24, 2021. This data extraction represents the configuration and data on the Best iPhone XS Max as of September 2, 2020, Chief Best's last date of employment, as that is when the iPhone went out of use.

- On November 8, 2021, Unit 42 created an additional advanced logical data extraction using forensic software from Cellebrite.

### Computer Devices

- Analysis of the Best iPhone XS Max identified a connection to a computer named OC510093 with the username "colint." This computer was found to have been used by Ms. Colin, assistant to Chief Best, and was imaged by Epiq. The acquisition logs show that the hard drive from Ms. Colin's computer was a Seagate model ST500DM002, 500GB drive with the serial number ZA418CY4. Analysis of this computer found two iPhone backups related to two mobile devices used by Chief Best, specifically the Best iPhone 6s Plus and Best iPhone 8 Plus. Analysis also showed that the Best iPhone XS Max was connected to Ms. Colin's computer on October 1, 2019, the same day the Best iPhone 8 Plus was backed up, and that the Best iPhone XS Max was initially set up through a restore of data from the Best iPhone 8 Plus. There were no backups of the Best iPhone XS Max on this computer.

## Background and Foundational Information

### Information from People Knowledgeable

Unit 42 understands from discussions with Mayor Durkan's team that she used the iPhone 8 Plus (Verizon) until October 30, 2019, when it was replaced by the iPhone 8 Plus (FirstNet) in an attempt to get better

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

cellular reception at her home by switching carriers. She then used the iPhone 8 Plus (FirstNet) until July of 2020 when she reported that her phone was submerged in salt water for some period of time on July 4, 2020, causing problems with the phone, after previously having cracked the screen.[7] On July 9, 2020, the iPhone 8 Plus (FirstNet) was replaced with the iPhone 11 (FirstNet), which Mayor Durkan used until Unit 42 took custody of the device on November 19, 2020. This timeline is consistent with the Durkan Data Sources.

We also understand that Ms. Chen had a process whereby she backed up Mayor Durkan's iPhones at different points in time. Ms. Chen confirmed that she had performed her backup process on multiple phones in use by Mayor Durkan, over a period of time, but she did not have a regular cadence for making those backups. Ms. Chen's account of events is consistent with the timestamps observed within the Durkan Data Sources.

Unit 42 requested that the City's IT resources provide any backups or other data captures, to the extent any such backups exist, from Mayor Durkan's phones and learned that other than what Unit 42 collected as described herein, no additional backups had been made. Unit 42 understands that the City IT team's customary practice when migrating a user in the Mayor's office from one phone to another using the "Quick Start" feature was to create an iCloud backup of the source phone prior to performing the migration. We also understand that after the data was transferred from the iPhone 8 Plus (FirstNet) to the iPhone 11 (FirstNet), the City IT team reset the iPhone 8 Plus (FirstNet) to factory defaults, as was its customary practice, which would have removed all prior configuration settings and data from the device, about one month after the Mayor switched to the iPhone 11 (FirstNet).

Unit 42 also learned that a system called Pinnacle may contain limited metadata related to text messaging. Pinnacle is a centralized database that receives billing and usage information from cellular provider companies used by the City. For some cellular providers, this usage information includes the dates and times of text messages routed over the cellular provider's network, along with the phone numbers involved in the text message exchanges.

## Mobile Device Forensic Artifacts

Mobile devices, such as the iPhones used by Mayor Durkan and Chief Best, do not generally keep a log detailing the history of everything that happened on that device. Forensic investigators must analyze numerous configuration files, logs, databases, and other information to piece together or infer what happened on a mobile device. A forensic artifact is a piece of data that can be used to understand the configuration of a setting or the occurrence of something that happened. Each of the forensic artifacts relied upon to attempt to reconstruct and understand what happened on the mobile devices issued to Mayor Durkan and Chief Best often consist of just one entry, or a few entries, in a file with dozens or hundreds of other entries.

This section of the report describes many of the forensic artifacts used in the analysis of Mayor Durkan's and Chief Best's iPhones, and describes what those artifacts are called, where they are stored, how they work, and how the meaning of their values can be interpreted. If other artifacts come to light or additional analysis of these or other artifacts identifies any new findings or changes any conclusions, Unit 42 reserves the right to supplement or amend this report.

### iPhone Setup Information

On an iPhone, a configuration file named "com.apple.MobileBackup.plist" contains information related to the setup or "restore" of the device. An iPhone, when being set up, can be configured as a new, blank device, or it can be restored with data from another iPhone in multiple ways, including from an iTunes backup on a computer, an iCloud backup[8] stored on Apple's servers, or by "Quick Start," which transfers

---

[7] Mayor Durkan 12/8/2021 Dep. Tr. at 255:7-259:24.
[8] For more information about the iCloud backup process, see https://support.apple.com/en-us/HT207428.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

data from one iPhone directly to another.[9] The file "com.apple.MobileBackup.plist" is typically located in the "/private/var/root/Library/Preferences" folder. Depending on the restore options selected during setup, different key and value pair combinations will exist in the "com.apple.MobileBackup.plist" file.

The "RestoreDate" key contains a value that represents the last date and time that a restore occurred. The "WasCloudRestore" key has a value of "True" if the device was restored from an iCloud backup or "False" if it was not. If data was transferred using the "Quick Start" feature, a key named "SourceDeviceUDID" will exist, and its value records a unique device identifier for the source iPhone from which data was transferred to the destination iPhone. Another value, "FileTransferStartDate," records the start date and time of the data transfer.

The figure below shows a limited preview of the contents of the "com.apple.MobileBackup.plist" configuration file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), which was identified on Ms. Chen's computer.

```
dict = {
  ▶  RemoteConfiguration : dict = {
  ◢  DeviceTransferInfo : dict = {
        BytesTransferred : integer = 1028307323
        RestoreDuration : integer = 16
        FileTransferDuration : integer = 20
        PreflightDuration : integer = 12
        SourceDeviceProtocolVersion : integer = 1
        BuildVersion : AsciiString = 17F80
        FileTransferStartDate : date = 7/9/2020 7:58:59 PM
        RestoreStartDate : date = 7/9/2020 7:59:19 PM
        SourceDeviceBuildVersion : AsciiString = 17F80
        FilesTransferred : integer = 2110
        PreflightStartDate : date = 7/9/2020 7:58:46 PM
        SourceDeviceUDID : AsciiString = 51d7744ec8caef13591bc3781180dfd37eb85455
  ◢  RestoreInfo : dict = {
        BackupBuildVersion : AsciiString = 17F80
        RestoreDate : date = 7/9/2020 7:59:36 PM
        WasCloudRestore : boolean = False
        DeviceBuildVersion : AsciiString = 17F80
```

**Figure 6 - A screenshot of a limited preview of the "com.apple.MobileBackup.plist" file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

Another configuration file, "com.apple.purplebuddy.plist," has a key/value pair named "SetupLastExit," which records the date that the setup application completed. This configuration file is typically located in the "/private/var/mobile/Library/Preferences" folder.

The following figure shows a limited preview of the contents of the "com.apple.purplebuddy.plist" configuration file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), which was identified on Ms. Chen's computer.

---

[9] This Apple article details options for transferring data from one iPhone (or Android device) to another iPhone: https://support.apple.com/en-us/HT202033.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

```
◢  GuessedCountry : dict = {
    ◢  countries : array = [
            AsciiString = US
        at : date = 7/9/2020 8:00:38 PM
    RestoreChoice : boolean = True
    TrueTonePresented : boolean = True
    WebKitAcceleratedDrawingEnabled : boolean = False
    WebDatabaseDirectory : AsciiString = /var/mobile/Library/Caches
    KeychainSync3Presented : boolean = True
 ▶  SSDeviceType : dict = {
    WebKitOfflineWebApplicationCacheEnabled : boolean = True
    AssistantPHSOffered : boolean = True
    SetupLastExit : date = 7/9/2020 8:03:32 PM
```

**Figure 7 - A screenshot of a limited preview of the "com.apple.purplebuddy.plist" file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

Additionally, a configuration file named "com.apple.mobileSMS.plist" records information related to the "Messages in iCloud" feature, but some of the key/value pairs in this file can also relate to how the device was set up. This configuration file is typically located in the "/private/var/mobile/Library/Preferences" folder.

The "IMDSavedDeviceStateDidRestoreFromCloudBackupKey" key has a value of "True" or "False" to indicate whether or not a key needed for synchronizing message data was retrieved from an iCloud backup. If the value is "True," another key, named "IMDSavedDeviceStateDateKey," records when the event occurred. Additionally, the key "IMDSavedDeviceStateDidMigrateFromDifferentDeviceKey" will have a value of "True" or "False" to indicate if the iCloud backup that was restored was from the same (True) or a different (False) device. These artifacts can be used to determine if/when a device was restored from an iCloud backup, when the restore occurred, and whether or not it was a restore of a backup from a different device.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

The figure below captures the contents of the "com.apple.mobileSMS.plist" configuration file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet) which was identified on Ms. Chen's computer.

```
▲  dict = {
    ▲  IMDCKBackupControllerBackupDeviceStateKey : dict = {
            IMDSavedDeviceStateDidMigrateFromDifferentDeviceKey : boolean = False
            IMDSavedDeviceStateDidUpgradeKey : boolean = False
            IMDSavedDeviceStateIsMigratingKey : boolean = False
            IMDSavedDeviceStateDateKey : date = 7/4/2020 11:51:25 PM
            IMDSavedDeviceStateDidMigrateKey : boolean = True
            IMDSavedDeviceStateDidRestoreFromCloudBackupKey : boolean = True
            IMDSavedDeviceStateDidRestoreFromBackupKey : boolean = True
            IMDSavedDeviceStateBuildVersionKey : AsciiString = Version 13.5.1 (Build 17F80)
        IMDCKBackupControllerTimebombStartUserDefaultsKey : date = 10/30/2019 8:18:48 PM
        IMDCKBackupControllerWrittenQuotaRecordKey : boolean = True
        IMDCKBackupControllerWrittenQuotaRecordKeyV2 : boolean = True
```

**Figure 8 - A screenshot of the "com.apple.mobileSMS.plist" file from the August 21, 2020 iTunes backup of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

## Text Message Database

On an iPhone, the built-in application for text messaging is the "Messages" application. Data for the "Messages" application is stored in a SQLite database file named "sms.db," typically found in the "/private/var/mobile/Library/SMS" folder. Within this database, text messaging data is split across multiple database "tables." The two main tables considered in this analysis were the "chat" table and the "message" table. The "chat" table contains records of conversation threads that occurred on the iPhone. The "message" table contains records of individual messages that can be grouped into the conversation threads listed in the "chat" table. The "message" table, among others, assigns a unique, auto-incrementing, primary key, named the "ROWID." This value starts at "1," and increments by 1 for each additional record added to the "message" table. When a text message associated with a specific ROWID is deleted from a phone, that row is removed from the "message" table and the ROWID is eliminated, but the remaining rows in the table retain their existing ROWID values. As a result, an analysis of the "message" table can identify gaps in the sequential numbering of "ROWID" values, which would represent missing/deleted text messages.

The ROWID in the "message" table is used to link messages with conversation threads in the "chat" table, as well as to link messages with information in other tables. Each conversation thread in the "chat" table is also assigned a unique and sequential "ROWID" used for linking with information in other tables.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

The following graphics are intended to help demonstrate how information in the "message" table links up with information in the "chat" table. The first graphic shows an exemplary conversation in the Messages application as seen on an iPhone.



**Figure 9 - A screenshot of an exemplary conversation in the Messages application**

The next graphic shows how items in the "message" table link to a conversation thread in the "chat" table through an intermediary table named "chat_message_join."



**Figure 10 - A high level representation of select columns from three tables in the "sms.db" database based on the exemplary conversation shown above in Figure 9 (Time codes displayed are in UTC.)**

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

In addition to text messages being stored locally on an iPhone in the "sms.db" file, text messages can also be stored in iCloud in two different ways.[10] First, a user can utilize the "Messages in iCloud" feature to synchronize messages to iCloud. Second, a user can store text messages in iCloud backups. However, only one of the iCloud storage methods may be used at a given time. Text messages are not stored in iCloud backups if the "Messages in iCloud" feature is enabled. Similarly, if the "Messages in iCloud" feature is disabled, then iCloud backups do contain text messages.

### "Messages in iCloud" Synchronization Settings

On an iPhone, settings related to the "Messages in iCloud" feature are stored in a configuration file named "com.apple.madrid.plist." The "com.apple.madrid.plist" file is typically located in the "/private/var/mobile/Library/Preferences" folder on an iPhone. The "CloudKitSyncingEnabled" key has a value of "True" or "False." "True" indicates that text messages are configured to synchronize to iCloud using the "Messages in iCloud" feature. "False" indicates that text messages are configured not to synchronize to iCloud using the "Messages in iCloud" feature. Furthermore, if "Messages in iCloud" is enabled, the "CloudKitInitialStartDate" key will have a value that reflects the date and time this feature was enabled.[11] When the "Messages in iCloud" feature is enabled, text messages are automatically synchronized to, and stored in, iCloud but are not included in any iCloud backups created while "Messages in iCloud" remains enabled.[12]

The following figure shows a limited preview of the contents of the "com.apple.madrid.plist" configuration file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), which was identified on Ms. Chen's computer.

```
LastChatSyncTime : date = 7/5/2020 12:00:34 AM
CloudKitIsInExitState : boolean = True
CloudKitExitDate : date = 7/5/2020 12:19:44 AM
AHDAgentLastSyncAttemptInfo : AsciiString = isOnWifiAndPower YES, Is charging YES , isOnWifi YES , lastSyncDate (null) lastCompleteSyncedDBDate (null)
IMCloudKitStartingInitialSync : boolean = False
AttachmentReuploadDate : date = 2/8/2020 6:36:46 AM
IMCloudKitStartingDisableDevices : boolean = False
createdChatZone : boolean = True
IMCloudKitAppleIDSecurityLevelHSA2 : boolean = True
enableCKSyncingV2 : boolean = True
CoreduetLastFullSyncAttemptDate : date = 2/9/2020 6:45:04 AM
AHDAgentLastSyncAttemptDate : date = 8/21/2020 10:49:17 AM
▶ IMCloudKitAnalyticSyncDatesDictionary : dict = {
CKMOCAccountsMatch : boolean = True
CloudKitSyncingEnabled : boolean = False
```

**Figure 11 - A screenshot of a limited preview of the "com.apple.madrid.plist" file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

---

[10] Text messages stored in iCloud can include the traditional "SMS" text messages, as well as Apple proprietary iMessage text messages.

[11] The "CloudKitInitialStartDate" key will have a value associated with the date and time that "Messages in iCloud" was last enabled on the device and not the first time "Messages in iCloud" was enabled on the device if it was turned on and off and on again multiple times.

[12] Apple's documentation in Footnote 2 of this page (https://support.apple.com/en-us/HT207428) confirms this to be accurate. The following page (https://support.apple.com/guide/icloud/messages-mm0de0d4528d/icloud) adds additional context.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

Unit 42 is aware of two ways in which a user can choose to disable "Messages in iCloud," neither of which affects the storage of text messages on the phone; just in iCloud. The "Messages" toggle can be turned off within the "iCloud" menu of the "Settings" application, or "Messages in iCloud" can be turned off via the "Disable & Delete" feature within "iCloud Storage." Notably, turning off "Messages in iCloud" with the "Disable & Delete" feature causes two keys, named "CloudKitExitDate" and "CloudKitIsInExitState" to be created in the "com.apple.madrid.plist" file. The key "CloudKitIsInExitState" will have a value of "True" if the "Disable & Delete" function was used. The key "CloudKitExitDate" will have a value representing the date and time the "Disable & Delete" function was used. These two keys are created only when using "Disable & Delete"; they are not created when turning off "Messages in iCloud" via the toggle in the "iCloud" menu. Neither of these functions delete messages from an iPhone, but rather stop the synchronization of messages to iCloud and for the "Disable & Delete" function, also delete the synchronized messages from iCloud after 30 days. A screenshot of the steps taken to disable "Messages in iCloud," as it appears on an iPhone, is shown in the following figure.



**Figure 12 - Screenshots of the "iCloud" menu. The "Messages in iCloud" feature can be disabled by sliding the "Messages" toggle in the "iCloud" menu (shown above with a red arrow) to the left and selecting "Disable and Download Messages"**

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

The steps to "Disable & Delete" "Messages in iCloud" are shown in the following screenshots.



**Figure 13 - Screenshots of the "iCloud," "iCloud Storage," and "Messages" menus. "Messages in iCloud" can be disabled by clicking "Disable & Delete" on the "Messages" menu**

## iCloud Backup Settings

On an iPhone, settings related to iCloud backups are stored in a configuration file named "com.apple.mobile.ldbackup.plist." The "com.apple.mobile.ldbackup.plist" file is typically located in the "/private/var/mobile/Library/Preferences" folder. The "CloudBackupEnabled" key has a value of "True" to indicate that the iPhone was configured to automatically backup to iCloud. "False" indicates that the iPhone was configured not to backup to iCloud. In this same configuration file, the "LastCloudBackupDate," if it exists, has a value that reflects the date and time of the last iCloud backup. If this key does not exist, an iCloud backup of this device has not previously been performed.

If iCloud backup is enabled, then the iPhone will automatically backup to iCloud when it is connected to a power source, connected to a Wi-Fi network, and the screen is locked. A user can also navigate to a menu option to manually initiate a backup at any time. If iCloud backup is disabled, then the iPhone will not automatically backup, and there will not be an option to manually initiate a backup.

When iCloud backups are performed, the contents of the backups are stored in iCloud on Apple's servers. If a device that was previously backing up to iCloud stops backing up, the existing backups in iCloud will be held for 180 days. After 180 days, iCloud backups of a device that is no longer backing up to iCloud will be automatically deleted by Apple.[13]

The figure below shows the contents of the "com.apple.mobile.ldbackup.plist" configuration file from the July 7, 2021, full file system data extraction of the iPhone 8 Plus (Verizon). The date values in this configuration file are stored in Apple Absolute Time.[14]

---

[13] For more information, see https://support.apple.com/en-us/HT207428 and https://www.apple.com/legal/internet-services/icloud/en/terms.html Section II, C (Backup).

[14] Apple Absolute time uses integers that represent the number of seconds since January 1, 2001, at 00:00:00 UTC to store dates/times. (https://developer.apple.com/documentation/corefoundation/1543542-cfabsolutetimegetcurrent).

© 2022—Unit 42 by Palo Alto Networks, Inc.

 



**Figure 14 - A screenshot of the "com.apple.mobile.ldbackup.plist" file from the July 7, 2021 full file system data extraction of the iPhone 8 Plus (Verizon) as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Time codes displayed are in UTC.)**

A SQLite database, named "cloudkit_cache.db," records data related to recent iCloud backups. This database is typically located in the "/private/var/root/Library/Caches/Backup" folder on an iPhone. This database contains a table, named "Snapshots," which records recent iCloud backups of a given device. Each "Snapshot" represents an iCloud backup. The "created" date listed for each snapshot records the date and time that the backup was taken.[15]



**Figure 15 - A screenshot of an entry in the "Snapshots" table of the database "cloudkit_cache.db" from the July 8, 2021, full file system data extraction of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.48.1.3) (Times codes displayed are in UTC)**

The "snapshot" field contains configuration information about the iCloud backup, as shown in part in the following figure. The complete set of configuration information is very lengthy, so a partial screenshot was captured to show many of the more relevant key/value pairs.

---

[15] This date is in UNIX epoch time, which is represented in seconds since January 1, 1970, 00:00:00 UTC.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

```
MBCKSnapshot = {
    BackupType : integer = 0
    ProductVersion : AsciiString = 14.1
    ManifestChecksums : NSMutableArray = [
    CameraRollBackupState : integer = 2
    BackupProperties : bplist = {
        Version : AsciiString = 9.1
        Date : date = 11/19/2020 7:47:04 PM
        SystemDomainsVersion : AsciiString = 24.0
        AppleIDs : dict = {
        WasPasscodeSet : boolean = True
        ActiveAppleID : AsciiString = durje.mos@gmail.com
        BudyStashData : protobuf = {
        Lockdown : dict = {
        SnapshotHMACKey : data = 67 E0 92 5F 27 DE DB 24 8F FD 8A 54 0D A6 71 47 F8 E5 0B 37
    SnapshotCommitted : boolean = True
    SnapshotQuotaUsed : integer = 0
    SnapshotCreated : NSDate = 11/19/2020 7:47:58 PM
    BuildVersion : AsciiString = 18A8395
    DeviceUUID : AsciiString = 118e4228e871c3ad496b8b9dcd0da42110cf1cdf
    SystemFields : bplist = {
    BackupReason : integer = 1
    SnapshotID : AsciiString = A171FF75-B8F2-4EF0-AA5F-A1A9CC1A0C4C
    SnapshotModificationDate : NSDate = 11/19/2020 7:47:59 PM
    RequiredProductVersion : AsciiString = Null
    ManifestIDs : NSMutableArray = [
    DeviceName : UnicodeString = Jenny's iPhone
```

**Figure 16 - A limited screenshot of the binary plist configuration data stored in the "snapshot" field, from the "Snapshots" table of the database "cloudkit_cache.db" from the July 8, 2021, full file system data extraction of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.48.1.3) (Times displayed are in UTC.)**

## Text Message Retention Settings

On an iPhone running any of the versions of Apple's iOS operating system in use on Mayor Durkan's or Chief Best's multiple iPhones examined by Unit 42, the Message History settings are stored in a configuration file named "com.apple.MobileSMS.plist." Unit 42 has confirmed through testing on test devices that the default Message History setting for how long to "Keep Messages" is "Forever."

Once the Message History settings controlling how long to "Keep Messages" is changed, the key "KeepMessageForDays" is written to the configuration file "com.apple.MobileSMS.plist." This key will have a numeric value of "365" to keep messages for one year, a value of "30" to keep messages for 30 days, or a value of "0" to keep messages "Forever." On a newly setup iPhone or on an iPhone that has never had this setting changed, the key is not present in the configuration file, which also means that the default option of keeping messages "Forever" is active. The key "KeepMessageForDays" is set to "0" when the option has been set to something other than keeping messages forever, and later, the setting has been changed back to keep forever. Enabling "Messages in iCloud" or using the Messages "Disable & Delete" function also explicitly sets the Message History settings to "Keep Messages" "Forever" which, in turn, creates the key. While it is possible to determine if the Message history setting "Keep Messages" has been changed, iPhones do not track, log, or otherwise document the timing of when such changes are made.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

Another key, "KeepMessagesVersionID," is added to the configuration file "com.apple.MobileSMS.plist," when a user updates the Message History settings. The "KeepMessagesVersionID" contains a numeric value that increments each time the Message History setting is updated. This key is not present on a newly setup iPhone or on an iPhone that has never had the Message History settings controlling how long to "Keep Messages" changed from the default option of keeping messages "Forever." Each time the "Keep Messages" setting is changed, this "KeepMessagesVersionID" numeric value increments by 1, as confirmed by testing performed by Unit 42 on test devices. In addition to changing the Message History setting manually, enabling "Messages in iCloud" or using the Messages "Disable & Delete" function to disable and delete "Messages in iCloud" increments the "KeepMessagesVersionID" numeric value by 1 as they both set Message History to "Forever" even if "KeepMessageForDays" is already set to "0." That is, even if Message History is set to "Forever," enabling "Messages in iCloud" or using "Disable & Delete" will increment the "KeepMessagesVersionID" by 1. To date, Unit 42 is not aware of any other changes to other settings related to Messages that will increment this number. Should Unit 42 later learn of any such settings it reserves the right to supplement or amend this report.

The figure below shows a limited preview of the contents of the "com.apple.MobileSMS.plist" configuration file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), stored on Ms. Chen's computer.

```
dict = {
    __CK_clearTextInputContextIdentifierKey : boolean = True
    KeepMessageForDays : integer = 0
    SuspendTime : date = 10/14/2019 4:09:05 AM
    MMS : dict = { }
    CAMUserPreferenceTimerDuration : integer = 0
    DidCheckForDuplicateChats : integer = 3
    MMSRelayEnabled : boolean = True
    Scrutiny : dict = {
    HandwritingAutoDisplayV2 : boolean = True
    kCKBrowserSelectionControllerVersionDictionaryKey : dict = {
    kCKMediaObjectManagerDefaultsUTITypes : dict = {
    CAMUserPreferencePortraitModeLastCapturedEffectFilterType : integer = 16
    CAMUserPreferenceDesiredFlashMode : integer = 2
    CAMUserPreferencePortraitModeLightingEffectType : integer = 1
    CAMUserPreferenceFlashAndHDRConflictingControl : integer = 0
    DisabledApps : array = [ ]
    ReadReceiptSettingsConfirmed : boolean = True
    kCKBrowserSelectionControllerSeenDictionaryKey : dict = {
    KeepMessagesVersionID : integer = 4
```

**Figure 17 - A screenshot of a limited preview of the "com.apple.MobileSMS.plist" file from the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet) as viewed in Cellebrite Physical Analyzer (v7.47.0.49)**

## Manual Deletion of Messages

In the "Messages" application, when a user manually deletes one or more individual messages, the corresponding entries are deleted from the "message" table, but a record of the conversation will remain in the "chat" table even if the individual messages deleted are the last messages in the conversation thread. The deletion of entries from the "message" table, (but not the "chat" table) also occurs if a user opens a

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

conversation thread and manually chooses the "Delete All" option to delete all messages in that conversation thread. The corresponding entry in the "chat" table will remain in this scenario as well.

The following figure shows screenshots of the process to manually delete one, more than one, or all messages within a conversation thread. As depicted by the red arrows in the following figure, to delete one or more messages, one would open the corresponding conversation thread and then press and hold (also called "long press") on any one of the individual messages (Figure 18a). That will bring up the reactions and menu, where one can choose "More" to bring up options to forward or delete messages (Figure 18b). One can then use the check boxes to select one or more messages, click the "Trash Can" in the bottom left corner (Figure 18c), and then select "Delete Message(s)" (Figure 18d). Alternatively, to delete all messages in this conversation thread, one would select the "More" menu option followed by "Delete All" in the upper left corner (Figure 18e) and then select "Delete Conversation" (Figure 18f). This process will delete each selected message, up to all messages within the given conversation thread, by deleting the associated entries from the "message" table but will not delete any entries from the "chat" table.



**Figure 18 - Manual deletion of one or more text messages**

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

However, when a user manually deletes an entire conversation thread, the corresponding entry is deleted from the "chat" table, and all associated messages are deleted from the "message" table.

The following figure shows screenshots of the process to manually delete a conversation thread. As depicted by the red arrows in the following figure, to delete a conversation thread, one would press and swipe left on the corresponding conversation thread. Then, one would choose "Delete" from the menu that is revealed for that conversation thread and then select "Delete" on the subsequent prompt. This process will delete the selected conversation thread, including all associated messages, by deleting the associated entries from the "message" table as well as the "chat" table.



**Figure 19 - Manual deletion of a conversation**

### Deletion of Messages Based on "Message History" Settings

When the Message History setting "Keep Messages" is changed to keep 30 days or one year of messages, the entries in the "message" table older than the selected retention period are deleted.[16] As time progresses, any messages older than the configured time to keep messages are subsequently deleted, and their entries are removed from the "message" table. This setting not only removes older messages beyond the retention threshold initially when the setting is configured, but also removes any messages on a nightly, rolling basis when they exceed the configured retention period, until the setting is changed to a longer retention period. Changing the setting to "Keep Messages" "Forever" will end the deletion process altogether.

Unit 42 has confirmed through testing on test devices that, if the date of every message in a conversation thread exceeds the configured time to keep messages, then the database entries for all messages from that conversation thread are deleted from the "message" table. The associated entries in the "chat" table, however, are not automatically removed, even if all messages associated with that conversation thread are deleted for exceeding the configured retention period. Therefore, the "chat" table will retain records of conversation threads that are older than the message retention settings. The actual text of the conversations will not be retained, however, because message contents are stored in the "message" table. This pattern is also seen with the manual use of the "Delete All" option within a conversation thread but differs from activity associated with the manual deletion of conversation threads, in which case the entries from both the "message" and "chat" tables would be deleted.

---

[16] For more information, see https://support.apple.com/en-us/HT201287.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

Thus, messages deleted automatically by the Message History settings leave behind entries in the "chat" table, while manually deleted conversation threads do not leave behind these records. The presence of entries in the "chat" table to which no messages are associated may indicate that those deletions occurred automatically as a result of the Message History settings rather than representing manual deletions performed by a user.[17]

The Message History settings only provide three options that may be configured on an iPhone. The options are to "Keep Messages" for "30 Days," for "1 Year," or "Forever." Having a number of entries in the "chat" table with no associated messages is consistent with the "Keep Messages" setting having been configured to either "30 Days" or "1 Year" at some point in time.



**Figure 20 - A screenshot of the "Keep Messages" menu options and the message displayed when changing from the "Forever" option to the "30 Days" option**

## Resetting an iPhone

When an iPhone is "reset to factory defaults" using the "Erase All Content and Settings" option, all data, content, settings, and configurations are erased from the iPhone.[18] No information present before the factory reset occurred will remain on the iPhone. Multiple forensic artifacts are created during the process, which can be used to identify when the factory reset occurred. In particular, a file named ".obliterated" will be created, typically in the "/private/var/root" folder, available only in a "full filesystem" extraction of data from an iPhone. The creation date and time of this file reflects the first time that the iPhone booted up after the factory reset occurred. However, because this first boot happens automatically once the factory reset process completes on an iPhone, this date also can be associated with the factory reset process. Additional artifacts can also help establish when a factory reset occurred, such as the creation of certain databases and system files, as well as entries in certain log files.

---

[17] Entries in the "chat" table to which no messages are associated may also indicate manual deletion of all messages within each conversation thread using the "Delete All" function or by individually selecting each message and deleting them. For these situations—entries in the "chat" table for which there are no associated messages—there is typically no forensic artifact, log, or record indicating whether the messages were deleted manually or because of the Message History settings. When a large number of "chat" table entries are not associated with any messages, one could infer that it was the result of a Message History setting, because to complete that process through manual deletion would entail a systematic, lengthy, and burdensome process by someone with access to the iPhone. Conversely, when a small number of "chat" table entries are not associated with any record in the "messages" table, it may be difficult to infer the deletion method employed.

[18] For more information, see https://support.apple.com/guide/iphone/erase-iphone-iph7a2a9399b/14.0/ios/14.0.

 

# Mayor Durkan's iPhone 8 Plus (Verizon) Analysis and Findings

## iPhone Setup Information

In both the August 29, 2019, backup and the full file system collection representing this iPhone's configuration as of October 30, 2019, the configuration file "com.apple.MobileBackup.plist" contains the "RestoreDate" key with a value that represents April 10, 2018, at 17:13:32. Additionally, the "WasCloudRestore" key in the same configuration file had a value of "True," indicating that the iPhone 8 Plus (Verizon) was set up by a restoration from an iCloud backup on April 10, 2018, at 17:13:32.

## Text Message Retention Settings

In the August 29, 2019, backup, the configuration file "com.apple.MobileSMS.plist" does not contain the keys "KeepMessageForDays" or "KeepMessagesVersionID." The absence of these keys indicates that this iPhone was configured to keep its messages forever and that at no point in time was this setting changed to any other Message History value between the time that the phone was provisioned and the time the backup was taken.

In the full file system collection performed by Unit 42 on July 7, 2021, the configuration file "com.apple.MobileSMS.plist" contained the "KeepMessageForDays" key and had a value set to "0," which means that messages will be kept forever. The presence of this key indicates that the setting was updated at one point in time. The "KeepMessagesVersionID" key has a value set to "1," which indicates that this setting was changed just one time between August 29, 2019, and on October 30, 2019, when the device was decommissioned and user activity on the device ceased. Taken together, these artifacts indicate that the "KeepMessages" setting was set to "Forever" sometime between August 29, 2019, and October 30, 2019. As explained below, "Messages in iCloud" was enabled on this phone on October 30, 2019, at 19:40:35, which would have set "KeepMessages" to "Forever" (even though "KeepMessages" was already set to "Forever") and would account for the existence and values of the "KeepMessageForDays" and "KeepMessagesVersionID" keys.

Analysis showed that this iPhone was set to "KeepMessages" "Forever" at all times the phone was in use.

## Synchronizing Messages to iCloud Settings

In the August 29, 2019, backup, the configuration file "com.apple.madrid.plist" contains the "CloudKitSyncingEnabled" key with a value of "False," indicating that text messages were not configured to synchronize with iCloud using the "Messages in iCloud" feature, at the time of the backup.

In the full file system collection performed by Unit 42, the configuration file "com.apple.madrid.plist" contained the "CloudKitSyncingEnabled" key and had a value set to "True," indicating that text messages were configured to synchronize with iCloud using the "Messages in iCloud" feature. Specifically, the change from "False" to "True" must have occurred on October 30, 2019, at 19:40:35 when "Messages in iCloud" was enabled based on the date of the "CloudKitInitialStartDate" key. This explains why the "KeepMessagesVersionID" value was set to "1," and the KeepMessagesForDays to "0," because, as explained above, when an iPhone is initially set up, the "KeepMessagesForDays" key is initially nonexistent. A value of "0" in that key and a "KeepMessagesVersionID" of "1" is consistent with turning on the "Messages in iCloud" feature, which would populate the "KeepMessagesforDays" key with a "0" (i.e., retaining messages "Forever"), and increment the "KeepMessagesVersionID" by 1.

## Backup Setting

In both the August 29, 2019, backup and the full file system collection of the iPhone 8 Plus (Verizon), the configuration file "com.apple.mobile.ldbackup.plist" contains the "CloudBackupEnabled" key and has a value set to "False," indicating that the device was not configured to automatically backup to iCloud at the time the collections were performed.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

In the August 29, 2019, backup, the configuration file "com.apple.mobile.ldbackup.plist" contains the "LastCloudBackupDate" key with a value representing the date August 29, 2019, at 05:51:20. Because this iCloud backup occurred earlier the same day the device was backed up to iTunes, Unit 42 infers that iCloud backup was disabled that day, as backups to iCloud can only occur with the setting enabled.

In the full file system collection, the "LastCloudBackupDate" value reflected the date October 30, 2019, at 19:41:50, indicating that another iCloud backup had occurred. This October 30, 2019, iCloud backup also suggests that iCloud backup was enabled, the backup was taken, and then iCloud backup was disabled again, as backups to iCloud can only occur with the setting enabled.

On November 16, 2020, Unit 42 inspected and preserved data from the iCloud account associated with this device and determined that no iCloud backups were available in the iCloud account. This is consistent with Apple's policy to delete iCloud backups for devices that have not backed up to iCloud in more than 180 days.[19]

The "LastiTunesBackupDate" key in the "com.apple.mobile.ldbackup.plist" file contains values representing the last date on which an iTunes backup was created. In the August 29, 2019, iTunes backup, this value represented the date May 24, 2019, at 22:56:38 and, in the full file system collection performed by Unit 42, the value was August 29, 2019, at 21:36:37, which was the date and time of the August 29, 2019, iTunes backup identified on Ms. Chen's computer.

### Text/Chat Message Analysis

The August 29, 2019, backup contains 3,643 active text messages from November 18, 2017, to August 29, 2019 (the date of the backup). The full file system collection contains 3,845 active text messages from November 18, 2017, to October 30, 2019, the date the device was taken out of use. The full file system collection captured unique text messages between August 29, 2019, and October 30, 2019, that had not been found in other sources.

## Mayor Durkan's iPhone 8 Plus (FirstNet) Analysis and Findings

Unit 42 reviewed the three different collections of the iPhone 8 Plus (FirstNet) and identified that no text messages or historical configurations were recoverable from this device. This is consistent with Unit 42's understanding that the City's IT personnel reset the device to factory defaults after the phone was decommissioned.

On July 9, 2020, the iPhone 8 Plus (FirstNet) was used to configure the iPhone 11 (FirstNet) using the "Quick Start" method, and, as a result, some of the artifacts on the iPhone 11 (FirstNet) were derived or transferred from the iPhone 8 Plus (FirstNet). The findings mentioned below are primarily from iPhone 11 (FirstNet) data sources that include information attributable to the iPhone 8 Plus (FirstNet).

### iPhone Setup Information

Unit 42 understands that the iPhone 8 Plus (FirstNet) was in use from October 30, 2019, until July 9, 2020. Because the data on the iPhone 8 Plus (FirstNet) was transferred to the iPhone 11 (FirstNet) on July 9, 2020, and the iPhone 8 Plus (FirstNet) was subsequently reset to factory defaults, Unit 42 could not analyze this phone directly to determine how it had originally been set up.

To determine how the iPhone 8 Plus (FirstNet) was set up, Unit 42 analyzed the full file system extractions of the iPhone 8 Plus (Verizon) and the iPhone 11 (FirstNet). Analysis of data extractions from these iPhone devices, used just before and after the iPhone 8 Plus (FirstNet), respectively, showed that data from the iPhone 8 Plus (Verizon) was present on the iPhone 8 Plus (FirstNet), which was then transferred to the iPhone 11 (FirstNet). Specifically, the "ZLIVEUSAGE" and "ZPROCESS" tables in the DataUsage.sqlite database on the iPhone 11 (FirstNet) contained entries with dates prior to October 30, 2019, that matched entries in the same tables and database from the iPhone 8 Plus (Verizon). Because the iPhone 11 (FirstNet)

---

[19] For more information, see https://www.apple.com/legal/internet-services/icloud/en/terms.html.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

was set up with the "Quick Start" method from the iPhone 8 Plus (FirstNet), and because the DataUsage.sqlite database does not synchronize with iCloud, this demonstrates that data from the iPhone 8 Plus (Verizon) was indeed transferred to the iPhone 8 Plus (FirstNet) as opposed to being present simply because the same iCloud account was signed in on both devices. These findings are consistent with Unit 42's understanding that the iPhone 8 Plus (FirstNet) was set up with the data from the iPhone 8 Plus (Verizon). Furthermore, based on the "timestamp" and "data" columns in the "keybag" table from multiple databases named backup.sqlite3 found in subfolders under the "/private/var/root/Library/Application Support/com.apple.sbd/EC5F4ACF-D770-43DD-961B-808BD8C56F2C" directory on the iPhone 8 Plus (Verizon), the iPhone 8 Plus (FirstNet) was associated with Mayor Durkan's iCloud account around October 30, 2019, at 20:09:41. This is roughly 30 minutes after the last iCloud backup was created on the iPhone 8 Plus (Verizon) on October 30, 2019, at 19:41:50. This information is consistent with the iPhone 8 Plus (FirstNet) having likely been set up by restoring the iCloud backup of the iPhone 8 Plus (Verizon).

## Restore from iCloud on July 4, 2020

Unit 42 understands that the iPhone 8 Plus (FirstNet) was submerged in salt water on July 4, 2020, and, as a result, the phone was ultimately restored from an iCloud backup of itself on that date. As described below, the forensic data is consistent with the phone having been restored from an iCloud backup.[20]

In the August 21, 2020, iTunes backup and October 15, 2020, forensic extraction of the iPhone 11 (FirstNet), the configuration file "com.apple.mobileSMS.plist" contains multiple keys related to "Messages in iCloud," including "IMDSavedDeviceStateDidRestoreFromCloudBackupKey," "IMDSavedDeviceStateDidMigrateFromDifferentDeviceKey," and "IMDSavedDeviceStateDateKey." The "IMDSavedDeviceStateDidRestoreFromCloudBackupKey" key has a value set to "True." The "IMDSavedDeviceStateDidMigrateFromDifferentDeviceKey" has a value set to "False." The "IMDSavedDeviceStateDateKey" key has a value set to 7/4/2020 23:51:25.

The combination of these keys and values are consistent with the iPhone 8 Plus (FirstNet) being restored from an iCloud backup of itself on July 4, 2020, at 23:51:25 UTC (16:51:25 PDT) in which "Messages in iCloud" is enabled. Other more commonly used artifacts that could show that an iPhone had been restored from iCloud were not available because of the subsequent transfer of data to the iPhone 11 (FirstNet). However, there are numerous core system files, databases, and log files that contain the July 4, 2020, date and further support that the iPhone 8 Plus (FirstNet) was restored on this date.

There are indications that the iCloud backup of the iPhone 8 Plus (FirstNet) used for the restore on July 4, 2020, was taken in early-to-mid February 2020.

On the iPhone 11 (FirstNet), Unit 42 identified several logs and a database with regularly occurring entries dated up to and around February 9, 2020, followed by a gap in entries until July 4, 2020. One example is the "DataUsage.sqlite" database located in the "/private/var/wireless/Library/Databases" folder. Two tables in this database, "ZLIVEUSAGE" and "ZPROCESS," collectively record network metrics associated with different processes on the iPhone. In the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), the "ZLIVEUSAGE" table has 1,116 total entries that all include a "ZTIMESTAMP" column with numbers representing dates between November 17, 2017, and August 21, 2020. Among those entries, there are 596 entries associated with dates between November 17, 2017, at 00:49:01 and February 6, 2020, at 10:33:56. There is then a gap until July 4, 2020, at 23:51:54. Similarly, the "ZPROCESS" table has 368 total entries that all include a "ZTIMESTAMP" column with numbers representing dates between November 11, 2017, and August 21, 2020. Among those entries, there are 255 entries associated with dates between November 17, 2017, at 00:28:31 and February 9, 2020, at 06:57:30. There is then a gap until July 8, 2020, at 23:38:32.

Based on analysis of the exemplary database described above, as well as other log files from the iPhone 11 (FirstNet), there are indications that an iCloud backup of the iPhone 8 Plus (FirstNet) was taken in early-to-mid February 2020. After this early-to-mid February 2020 iCloud backup, the iPhone 8 Plus (FirstNet)

---

[20] Mayor Durkan 12/8/2021 Dep. Tr. at 255:7-256:17.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

appears to have stopped backing up to iCloud. This is based on the fact that Apple only retains a very limited number of backups and an iPhone that was continuing to back up on a regular basis would have overwritten a backup from early-to-mid February 2020 by July 4, 2020, if the iPhone had continued to backup.

According to Apple's policy regarding iCloud backups, "If a device has not backed up to iCloud for a period of one hundred and eighty (180) days, Apple reserves the right to delete any backups associated with that device."[21] Because it is our experience that Apple deletes backups as allowed by this policy, i.e., at or around 180 days, we conclude that the early-to-mid February 2020 backup from the iPhone 8 Plus (FirstNet), was available for 180 days (i.e., until early-to-mid August 2020) and, therefore, was available to restore on July 4, 2020, but not available to restore after early-to-mid August 2020 (or in November 2020, when Unit 42 examined the relevant iCloud account for any iCloud backups).

## Text Message Retention Settings

In the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), the configuration file "com.apple.MobileSMS.plist" contains the "KeepMessageForDays" key and has a value set to "0," which indicates that messages will be kept forever.

The "KeepMessagesVersionID" key has a value set to "4," which is consistent with the text message retention setting having been changed three times between October 30, 2019, (the date the iPhone 8 Plus (Verizon) was decommissioned and the "KeepMessagesVersionID" key had a value of "1") and August 21, 2020.

The "KeepMessageForDays" and "KeepMessagesVersionID" keys are retained when one iPhone is backed up and restored to another or transferred using the "Quick Start" method. Therefore, Unit 42 infers that the iPhone 8 Plus (FirstNet) started with the "KeepMessagesVersionID" key having a value of "1," inherited from the previous iPhone, the iPhone 8 Plus (Verizon).

After the iPhone 8 Plus (FirstNet) was restored from an iCloud backup on July 4, 2020, as discussed above, artifacts on the iPhone 8 Plus (FirstNet) indicate that the "Messages" "Disable & Delete" function in the iCloud Storage settings menu was used, also on July 4, 2020 PDT, as more fully described below. This "Messages" "Disable & Delete" function, among other things, sets "KeepMessages" to "Forever" (even if "KeepMessages" was already set to "Forever") thus incrementing the "KeepMessagesVersionID" key. Assuming the "KeepMessagesVersionID" key had not changed before this time, this action would have incremented the "KeepMessagesVersionID" key from a value of "1" to "2."

Further analysis based on forensic artifacts and testing is provided in the "Accounting for changes to iPhone Message History" section in this report because we cannot determine from the forensic artifacts or testing whether the changes described were made to the iPhone 8 Plus (FirstNet) or the iPhone 11 (FirstNet).

## Synchronizing Messages to iCloud Settings

Based on the forensic artifacts from the iPhone 11 (FirstNet) device, Unit 42 determined that "Messages in iCloud" was enabled on the iPhone 8 Plus (FirstNet) before the "Disable & Delete" function for "Messages" in "iCloud Storage" was used on July 5, 2020, at 00:19:44 UTC (July 4, 2020, 17:19:44 PDT). Based on artifacts in the "com.apple.mobileSMS.plist" configuration file, as discussed above, Unit 42 inferred when and how the iPhone 8 Plus (FirstNet) was restored on July 4, 2020. The existence of these keys in the "com.apple.mobileSMS.plist" also confirm that "Messages in iCloud" was enabled in the iCloud backup that was used for the restore.

Therefore, Unit 42 infers that as of early-to-mid February 2020, when the iCloud backup that was later restored had been taken, "Messages in iCloud" was enabled on the iPhone 8 Plus (FirstNet).

---

[21] For more information, see https://www.apple.com/legal/internet-services/icloud/en/terms.html.

© 2022—Unit 42 by Palo Alto Networks, Inc.



Because the iPhone was restored on July 4, 2020, from an iCloud backup that Unit 42 infers had "Messages in iCloud" enabled, Unit 42 found that the unique ROWID values in the "message" table of the iPhone Message's application database, "sms.db," were renumbered and reordered. As described previously in this report, each successive message sent or received by the device is assigned a unique integer as the ROWID, which is incremented one higher than the previous message. Therefore, newer messages have sequentially higher ROWIDs. When an iCloud backup is restored with "Messages in iCloud" enabled, however, the messages are synchronized down to the iPhone from iCloud beginning in reverse order (i.e., the newest message is assigned the smallest ROWID and the oldest message receives the highest ROWID). Although this process occurred on the iPhone 8 Plus (FirstNet), Unit 42 derived this finding by examining the "sms.db" database on the iPhone 11 (FirstNet), which was set up using data transferred from the iPhone 8 Plus (FirstNet). These artifacts indicate that approximately 5,911 messages were synchronized from iCloud onto the iPhone 8 Plus (FirstNet) when it was restored on July 4, 2020, the majority of which Unit 42 believes are separately available from the iPhone 8 Plus (Verizon).

This means that as of July 4, 2020, before the iPhone 8 Plus (FirstNet) was submerged, "Messages in iCloud" was enabled on the iPhone 8 Plus (FirstNet), because text messages from that time frame could only be synchronized with the iPhone 8 Plus (FirstNet) after the restore process if they had first been synchronized with iCloud beforehand.

Also, when the iPhone 8 Plus (FirstNet) was restored from an iCloud backup on July 4, 2020, "Messages in iCloud" remained enabled at that time because this setting is part of the configuration that was restored onto the device.

Given the number of messages added to the phone during the initial synchronization with iCloud, the date range of the messages synchronized was likely the full time frame for which Mayor Durkan possessed City provided mobile phones, from November 2017 to July 4, 2020. This would also mean that the majority of these messages are also still available from the iPhone 8 Plus (Verizon).

The "com.apple.madrid.plist" configuration file on the iPhone 11 (FirstNet) contains a key, named "CloudKitExitDate," whose value represents the date July 5, 2020, at 00:19:44 UTC (July 4, 2020, at 17:19:44 PDT). Based on testing on test devices, Unit 42 determined that this date is associated with the use of the "Messages" "Disable & Delete" function in the "iCloud Storage" menu. The "Messages" "Disable & Delete" function would have caused the iPhone 8 Plus (FirstNet) to stop synchronizing messages to iCloud and set all messages stored in iCloud to be deleted from iCloud (but not from the iPhone itself) in 30 days, on August 4, 2020 UTC (August 3, 2020 PDT). Using the "Disable & Delete" function also sets the text message retention setting on the iPhone to "Forever" (even if it is already set to "Forever"), and, as a result, increments the "KeepMessagesVersionID" key in the "com.apple.MobileSMS.plist" configuration file by 1.

Unit 42 infers, then, that as of July 4, 2020, at 17:19:44 PDT, "Messages in iCloud" was disabled, and remained disabled for the rest of the time this phone was in use. When this iPhone's configuration and data were transferred to the iPhone 11 (FirstNet) through the "Quick Start" feature, the setting disabling "Messages in iCloud" was included in that transfer.

## Backup Settings

Because the iPhone 8 Plus (FirstNet) was reset to factory defaults, Unit 42 could not determine exactly when the iPhone 8 Plus (FirstNet) was last backed up to iCloud. Unit 42 identified artifacts confirming that the iPhone 8 Plus (FirstNet) was restored on July 4, 2020 from an iCloud backup of itself taken in early-to-mid February 2020. Had more recent backups existed in iCloud, they would have overwritten the early-to-mid February 2020 backup. Therefore, iCloud backup functionality was likely disabled shortly after the iCloud backup was taken in early-to-mid February 2020.

In the August 21, 2020, and October 15, 2020 collections of the iPhone 11 (FirstNet), the configuration file "com.apple.mobile.ldbackup.plist" does not contain the "LastCloudBackupDate" key. Unit 42 confirmed through testing on test devices that the "LastCloudBackupDate" key does transfer from one phone to

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

another when a phone is set up using the "Quick Start" feature, but not when restoring a phone from an iCloud backup. From this testing, Unit 42 infers that had an iCloud backup been taken when the data from the iPhone 8 Plus (FirstNet) was transferred to the iPhone 11 (FirstNet), the "LastCloudBackupDate" key should have been created noting the date of that backup and the key should have transferred to the iPhone 11 (FirstNet). Unit 42 understands that the City IT team's customary practice when migrating a user in the Mayor's office from one phone to another using the "Quick Start" feature was to create an iCloud backup of the source phone prior to performing the migration. We have found no evidence that an iCloud backup of the iPhone 8 Plus (FirstNet) was taken just prior to transferring data to the iPhone 11 (FirstNet).

Because the iPhone 8 Plus (FirstNet) was reset to factory defaults after it was decommissioned, Unit 42 also could not determine if or when the iPhone 8 Plus (FirstNet) was backed up to a computer with iTunes, prior to it having been factory reset. The "LastiTunesBackupDate" from the "com.apple.mobile.ldbackup.plist" file on the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet) related to a backup of the iPhone 11 (FirstNet) and not the iPhone 8 Plus (FirstNet).

Because Ms. Chen's computer contained iTunes backups of the iPhone 8 Plus (Verizon) taken on August 29, 2019, and the iPhone 11 (FirstNet) taken on August 21, 2020, Unit 42 examined Ms. Chen's computer for evidence of any backups taken of the iPhone 8 Plus (FirstNet). Unit 42 searched for, but did not find, any backups of the iPhone 8 Plus (FirstNet), but did locate an Apple file named "iPodDevices.xml" in the folder path "C:\ProgramData\Apple Computer\iTunes\." The iPodDevices.xml file keeps a list of each Apple device connected, details about the device including the Serial Number, and a "Use Count" reflecting how many times each device was connected, among other things. Records existed in the iPodDevices.xml file for the iPhone 8 Plus (Verizon) and the iPhone 11 (FirstNet), but the file did not contain a record for the iPhone 8 Plus (FirstNet).

This indicates that the iPhone 8 Plus (FirstNet) was not connected or backed up to Ms. Chen's computer.

## Text/Chat Message Analysis

The oldest text messages from the iPhone 11 (FirstNet) were dated June 25, 2020. Since the iPhone 11 (FirstNet) was not configured until July 9, 2020, it can be inferred that the text messages between June 25, 2020, and July 9, 2020, were stored on the iPhone 8 Plus (FirstNet), and transferred over on July 9, 2020, when the iPhone 8 Plus (FirstNet) was used to configure the iPhone 11 (FirstNet) through the "Quick Start" process.

It can also be inferred that because artifacts indicate approximately 5,911[22] messages were synchronized to the iPhone 8 Plus (FirstNet) as part of the July 4, 2020 restore process, the "30 Days" text message retention setting must have not been turned on prior to the iCloud restore when messages were added to the iPhone 8 Plus (FirstNet) through synchronization with iCloud. This is because the quantity of messages synchronized from iCloud after the restore, based on the average message volume observed, was far too large to represent only a 30-day period. If the "30 Day" setting had been enabled prior to the restoration and synchronization from iCloud, then only 30 days of messages would have been available to synchronize. The number of messages synchronized from iCloud indicates that the date range of the messages synchronized was likely the entire time frame for which Mayor Durkan possessed City-provided mobile phones, from November 2017 to July 4, 2020. From this information, Unit 42 infers that the "30 Day" Message History setting was set after the restoration and synchronization of messages from iCloud.

As discussed in more detail in the "Accounting for Changes to iPhone Message History," the "30 Days" text message retention must have been turned on after "Messages in iCloud" was disabled by the "Disable & Delete" function. Otherwise, the change would have resulted in a higher "KeepMessagesVersionID" than was found because "30 Days" would have to have been specified twice; once after the restore and before "Disable & Delete" and once again after "Disable & Delete" as "Disable & Delete" sets text message retention to "Forever." Furthermore, this hypothetical second configuration of the Message History settings

---

[22] Unit 42 believes the majority of these 5,911 messages are separately available from the iPhone 8 Plus (Verizon).

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

to "30 Days" could not be skipped because, in that scenario, the oldest text messages would have dated back to June 4, 2020, which they do not.

Additionally, when "Messages in iCloud" is enabled, several entries are created in the "sqlite_sequence" table of the Messages application database, "sms.db." After "Messages in iCloud" is enabled, an entry named "sync_deleted_messages" is created and stores a running counter of the number of deleted messages that have been synchronized with iCloud. This number includes messages deleted by the Message History settings having been configured to keep messages for "30 Days" and manual deletions of text messages. Even if "Messages in iCloud" is later disabled, this value not only persists but will continue to be updated even though messages are no longer synchronizing with iCloud.

In the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), the value of the "sync_deleted_messages" counter is "5869." This indicates that 5,869 messages, believed to date back to November 2017, were deleted between July 4, 2020, when the iPhone 8 Plus (FirstNet) was restored and this counter was reset to "0," and August 21, 2020 (the date of the iTunes backup in which this copy of the "sms.db" file was captured).

Because the deleted messages are believed to date back to November 2017, a majority of the deleted messages separately exist on the iPhone 8 Plus (Verizon), from which 3,845 active text messages from November 18, 2017, to October 30, 2019 were identified.

## Evidence of Factory Reset

Unit 42 understands that after the phone was decommissioned, a member of the City's IT department factory reset the iPhone 8 Plus (FirstNet) in August 2020, as was the IT department's customary practice. Unit 42 analyzed the iPhone 8 Plus (FirstNet) and confirmed that it had been reset and set up as described by the City "Information Security Engineer." The iPhone 8 Plus (FirstNet) did not contain any recoverable text messages related to Mayor Durkan.

# Mayor Durkan's iPhone 11 (FirstNet) Analysis and Findings

## iPhone Setup Information

In all four of the different collections from the iPhone 11 (FirstNet), the configuration file "com.apple.MobileBackup.plist" contains the "RestoreDate" key and has a value representing the date July 9, 2020, at 19:59:36, indicating that a restore occurred on July 9, 2020. Furthermore, the same configuration file shows that the iPhone 11 (FirstNet) was set up from an iPhone with the "SourceDeviceUDID" of "51d7744ec8caef13591bc3781180dfd37eb85455." This is a unique identifier from the iPhone 8 Plus (FirstNet) phone and indicates the iPhone 11 (FirstNet) was set up via the "Quick Start" method from the iPhone 8 Plus (FirstNet).

## Text Message Retention Settings

In all four collections of data from the iPhone 11 (FirstNet), the configuration file "com.apple.MobileSMS.plist" contains the keys "KeepMessageForDays" and "KeepMessagesVersionID."

In each of these data sources, the "KeepMessageForDays" key has a value set to "0," which indicates that messages will be kept forever.

In the August 21, 2020, backup and the October 15, 2020, collection, the "KeepMessagesVersionID" keys have a value of "4." A value of "4" indicates that the Message History setting was updated four times.

The "KeepMessageForDays" and "KeepMessagesVersionID" keys are retained when one iPhone is backed up and restored to another or transferred using the "Quick Start" method. Therefore, Unit 42 inferred that the iPhone 11 (FirstNet) started with the "KeepMessageForDays" and "KeepMessagesVersionID" keys having values inherited from the previous iPhone, the iPhone 8 Plus (FirstNet).

 

In both of the collections performed by Unit 42, the "KeepMessageForDays" has a value of "0" and "KeepMessagesVersionID" has a value of "5," which means the "Keep Messages" setting was updated between October 15, 2020, and November 19, 2020. On November 19, 2020, "Messages in iCloud" was enabled before the iPhone 11 (FirstNet) was provided to and preserved by Unit 42, which would set "KeepMessages" to "Forever" (even if "KeepMessages" was already set to "Forever") and would increment the "KeepMessagesVersionID" from a value of "4" to "5."

Further analysis based on forensic artifacts and testing is provided in the "Accounting for Changes to iPhone Message History" section in this report because we cannot determine from the forensic artifacts or testing whether the changes described were made to the iPhone 8 Plus (FirstNet) or the iPhone 11 (FirstNet).

## Synchronizing Messages to iCloud Settings

In the August 21, 2020, backup and the October 15, 2020, collection, the configuration file "com.apple.madrid.plist" contains the "CloudKitSyncingEnabled" key and has a value set to "False," indicating that text messages were not configured to synchronize with iCloud using the "Messages in iCloud" feature. When the iPhone 11 (FirstNet) was set up, the configurations and data were transferred from the iPhone 8 Plus (FirstNet) through the "Quick Start" feature. The setting controlling "Messages in iCloud" was included in that transfer, so the iPhone 11 (FirstNet) was initially set up with "Messages in iCloud" disabled.

In both the collections of the iPhone 11 (FirstNet) performed by Unit 42, the configuration file "com.apple.madrid.plist" contains the "CloudKitSyncingEnabled" key and has a value set to "True," indicating that text messages were configured to synchronize with iCloud using the "Messages in iCloud" feature. Specifically, the change from "False" to "True" occurred on November 19, 2020, at 19:38:33 when "Messages in iCloud" was enabled based on the value of the "CloudKitInitialStartDate" key in the same configuration file.

This means that on November 19, 2020, before the iPhone 11 (FirstNet) was collected by Unit 42, the "Messages in iCloud" feature was enabled.

## Backup Settings

In the August 21, 2020, and October 15, 2020 collections of the iPhone 11 (FirstNet), the configuration file "com.apple.mobile.ldbackup.plist" contains the "CloudBackupEnabled" key that is set to "False," indicating that the device was not configured to automatically backup to iCloud at the time these two collections were performed. In these two collections, the configuration file "com.apple.mobile.ldbackup.plist" does not contain the "LastCloudBackupDate" key, indicating that the iPhone 11 (FirstNet) had not backed up to iCloud on or prior to October 15, 2020.

On November 16, 2020, Unit 42 inspected and preserved the iCloud account associated with this device and determined no iCloud backups for the iPhone 11 (FirstNet) or any other device were present in the iCloud account.

In both of the collections performed by Unit 42, the configuration file "com.apple.mobile.ldbackup.plist" contains the "CloudBackupEnabled" key set to "True," and the "LastCloudBackupDate" key has a value representing the date November 19, 2020, at 19:47:58. This backup, created on November 19, 2020, is the first iCloud backup created for the iPhone 11 (FirstNet). Unit 42 confirmed this by reviewing the "Snapshots" table of the "cloudkit_cache.db" database located in the "/private/var/root/Library/Caches/Backup" folder. This table only listed one entry, and the "SnapshotsIDidx" index records the "Snapshots_rowid" for this entry as "1" indicating it was the first entry in the "Snapshots" table. The "Snapshots" entry had a "created" column with a value that also represented the date November 19, 2020, at 19:47:58.

This means that the iPhone 11 (FirstNet) was initially not configured to back up to iCloud. However, on November 19, 2020, before the iPhone was collected by Unit 42, back up to iCloud was enabled.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

The "LastiTunesBackupDate" key in the "com.apple.mobile.ldbackup.plist" file contained values representing the last date on which an iTunes backup was created. In the August 21, 2020, and October 15, 2020, collections of the iPhone 11 (FirstNet), the "LastiTunesBackupDate" key contained a value representing the date August 21, 2020, at 19:29:09, the date of the iTunes backup of the iPhone 11 (FirstNet) identified on Ms. Chen's computer. In the collections performed by Unit 42, the value was October 15, 2020, at 20:23:02, which is the date of the collection created by the "Information Security Engineer" with the City.

## Text/Chat Message Analysis

The August 21, 2020, backup contained active text messages dated from June 25, 2020, to August 21, 2020. The fact that, as of August 2020, the earliest text messages are dated June 25, 2020, is useful in determining which of the Message History settings led to the deletion of the Missing Durkan Text Messages. Had the "1 Year" setting been enabled, this backup should have contained active text messages dated at least one year prior, which would be August 2019. The fact that active messages only date back to June 25, 2020, is consistent with the "30 Days" option having been selected at one point but later changed back to keep messages "Forever," between July 22, 2020 PDT and July 26, 2020 PDT. The "chat" table located in the "sms.db" contained 325 active entries, of which 240 "chat" table entries had no associated messages in the "message" table. The backup of this phone having nearly 74 percent of entries in the "chat" table no longer associated with any messages is consistent with the Message History settings having been configured to retain either 30 days or one year of messages at some point in time. However, the dates of the messages still active in the "sms.db" are inconsistent with selection of the "1 Year" setting. Based on this information, Unit 42 infers that the "30 Day" setting was configured sometime on or after July 4, 2020 PDT, and before it was configured back to "Forever" between July 22, 2020 PDT and July 26, 2020 PDT.

# Mayor Durkan Additional Analysis and Findings

## Analysis of Data Sources Did Not Find the Missing Durkan Text Messages

Unit 42 analyzed the available data from all the sources collected in this matter related to Mayor Durkan's mobile devices, including iPhone data, iPhone backups, and iCloud data. None of these data sources filled in the Missing Durkan Text Messages between October 30, 2019, and June 25, 2020.

## Timing of Retention Settings Changes

iPhones do not track, log, or otherwise record the timing when changes are made to the Message History setting "Keep Messages." The available data is consistent with the "30 Days" option having been set sometime on or after July 4, 2020 PDT, when the Disable & Delete messages function was used on the iPhone 8 Plus (FirstNet) and before the "Keep Messages" setting was changed back to keep messages "Forever" between July 22, 2020 PDT and July 26, 2020 PDT. The specific date in this time frame on which the "30 Days" option was set is not known and cannot be determined from the available data sources.

The window of time in which the "Keep Messages" setting would have been changed back to keep messages "Forever" can be inferred from the available data. This change could not have taken place later than 30 days after the oldest active text message (or more specifically, the time when that message would have been deleted had the "30 Days" setting remained active), otherwise that text message would have been automatically deleted by the "30 Days" setting. The oldest active text message is dated June 25, 2020, at 17:38:48 UTC. Thirty days later is July 25, 2020, at 17:38:48 UTC. After the initial deletion that occurs when setting the "Keep Messages" setting to "30 Days," automatic deletions by the Message History settings occur nightly at 03:00:00 local time. Therefore the "Keep Messages" setting must have been changed back to keep messages "Forever" prior to the next scheduled deletion event after July 25, 2020, at 17:38:48 UTC, which would be July 26, 2020, at 10:00:00 UTC (July 26, 2020, at 03:00:00 PDT). Furthermore, there is an entry in the "chat" table that has no associated messages, which is consistent with a chat that has had its associated messages deleted by the "Keep Messages" for "30 Days" option. The "chat" table indicates that the most recent message associated with this chat was dated June 23, 2020, at 06:11:47 UTC, from which Unit 42 infers that the "Keep Messages" setting was changed back to keep

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

messages "Forever" later than thirty days after this date, i.e., sometime after July 22, 2020, at 23:11:47 PDT (July 23, 2020, at 06:11:47 UTC).

Thus, while the precise date and time when the "Keep Messages" setting was changed from "30 Days" to "Forever" is not known, it can be deduced that the change occurred in the nearly 76-hour window (just over three days) between July 22, 2020, at 23:11:47 PDT and July 26, 2020, at 03:00:00 PDT. Throughout this report, references to the Message History being changed back to "Forever" "between July 22, 2020 PDT and July 26, 2020 PDT" and references to the "30 Day" setting changing after "July 4, 2020 PDT and before the configuration change between July 22, 2020 PDT and July 26, 2020 PDT" more precisely relate to the time range of July 22, 2020, at 23:11:47 PDT to July 26, 2020, at 03:00:00 PDT which listed in UTC would be July 23, 2020, at 06:11:47 UTC to July 26, 2020, at 10:00:00 UTC.

## Accounting for Changes to iPhone Message History

Unit 42 was able to infer the actions that would have caused each change to the "KeepMessagesVersionID" based on analysis of the data sources from Mayor Durkan's iPhone 8 Plus (Verizon) and iPhone 11 (FirstNet) and testing performed by Unit 42 on test devices to understand how functions related to "Messages in iCloud" affect text message retention. In the configuration file, "com.apple.MobileSMS.plist," the keys "KeepMessageForDays" and "KeepMessagesVersionID" exist once the text message retention setting has been updated, either to "Forever" (the default value) or to "30 Days" or "1 Year." When the text message retention setting is first updated, the "KeepMessagesVersionID" key will be created and its value set to "1." That value is incremented by "1" with each successive update to the text message retention setting. The "KeepMessageForDays" key will have a value of "0," "30," or "365" to reflect the number of days corresponding to the text message retention setting. Other than manually updating the text message retention setting, Unit 42 also determined in its testing that enabling "Messages in iCloud" or selecting "Disable & Delete" for "Messages" within the "iCloud Storage" menu also updates the text message retention setting to "Forever," (even if that was already the current setting) and also increments the value of "KeepMessagesVersionID."

On the iPhone 8 Plus (Verizon), the "KeepMessageForDays" and "KeepMessagesVersionID" keys did not exist at the time of the August 29, 2019, iTunes backup. The absence of these keys means that the text Message History setting had never been updated as of August 29, 2019. When Unit 42 collected the iPhone 8 Plus (Verizon) on July 2, 2021, the "KeepMessageForDays" and "KeepMessagesVersionID" keys had values of "0" and "1," respectively. This indicates that, prior to the phone being decommissioned on October 30, 2019, the text message retention setting was updated. Unit 42 found that "Messages in iCloud" was enabled on October 30, 2019. Enabling "Messages in iCloud" results in the Message History setting being updated to "Forever," even if that is already the configured setting, thereby updating the "KeepMessageForDays" value and incrementing the "KeepMessagesVersionID" value.



**Figure 21 - A figure representing the presence and values of the "KeepMessageForDays" and "KeepMessagesVersionID" keys for the iPhone 8 Plus (Verizon)**

In the August 21, 2020, iTunes backup of the iPhone 11 (FirstNet), the "KeepMessageForDays" and "KeepMessagesVersionID" keys had values of "0" and "4," respectively. This indicates that the Message History setting had been updated three times between October 30, 2019, the decommission date of the iPhone 8 Plus (Verizon) on which "KeepMessagesVersionID" already had a value of "1," and August 21, 2020.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

When the iPhone 11 (FirstNet) was preserved by an "Information Security Engineer" with the City on October 15, 2020, the "KeepMessageForDays" and "KeepMessagesVersionID" keys had the same values of "0" and "4," respectively, as they did in the August 21, 2020, data source. When Unit 42 preserved the iPhone 11 (FirstNet) on November 19, 2020, the "KeepMessageForDays" and "KeepMessagesVersionID" had values of "0" and "5," indicating that there had been one additional update to the Message History setting between October 15, 2020, and November 19, 2020. Unit 42 found that "Messages in iCloud" was enabled on November 19, 2020, which would have resulted in the Message History setting being updated to "Forever," even if that was already the configured setting, thereby updating the "KeepMessageForDays" and "KeepMessagesVersionID" values.



**Figure 22 - A figure representing the presence and values of the "KeepMessageForDays" and "KeepMessagesVersionID" keys for the iPhone 11 (FirstNet)**

The following figure and table depict the inferences of Unit 42 concerning when the "KeepMessagesVersionID" key values were incremented based on analysis of configuration changes on Mayor Durkan's iPhones and the message gap between October 30, 2019, and June 25, 2020. The "KeepMessagesVersionID" key did not exist until October 30, 2019, at 19:40:35, when "Messages in iCloud" was enabled on the iPhone 8 Plus (Verizon), thereby creating the key and setting its value to "1." Based on Unit 42's analysis, on July 4, 2020, at 17:19:44 PDT, the "Messages" "Disable & Delete" function was used on the iPhone 8 Plus (FirstNet) which Unit 42 infers set the Message History setting to "Forever," even if that was the current setting, and incremented the "KeepMessagesVersionID" key from "1" to "2." After July 4, 2020, at 17:19:44 PDT and before the next configuration change between July 22, 2020 PDT and July 26, 2020 PDT, the Message History was set to "30 Days." This setting change increments the "KeepMessagesVersionID" key. Unit 42 infers that "KeepMessagesVersionID" incremented from "2" to "3" between July 4, 2020 PDT and the next configuration change between July 22, 2020 PDT and July 26, 2020 PDT, as depicted in the red box between these dates in the figure below. Unit 42 infers that the Message History was set to "Forever" between July 22, 2020 PDT and July 26, 2020 PDT which incremented "KeepMessagesVersionID" from "3" to "4." Lastly, on November 19, 2020, at 19:38:33, "Messages in iCloud" was enabled on the iPhone 11 (FirstNet) which incremented "KeepMessagesVersionID" from "4" to "5."



| Date | Device | Action | KeepMessagesVersionID |
|------|--------|--------|----------------------|
| 10/30/2019 | iPhone 8 Plus (Verizon) | "Messages in iCloud" Enabled | N/A → 1 |
| 07/04/2020 | iPhone 8 Plus (FirstNet) | "Messages" "Disable & Delete" | 1 → 2 |

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

| Date | Device | Action | KeepMessagesVersionID |
|---|---|---|---|
| 07/04/2020 to 07/22-26/2020 | iPhone 8 Plus (FirstNet) / iPhone 11 (FirstNet) | Message History set to "30 Days" | 2 → 3 |
| 07/22-26/2020 | iPhone 11 (FirstNet) | Message History set to "Forever" | 3 → 4 |
| 11/19/2020 | iPhone 11 (FirstNet) | "Messages in iCloud" Enabled | 4 → 5 |

**Figure 23 - KeepMessagesVersionID Changes**

Analysis of the text message database led Unit 42 to infer that the Message History setting had been changed to "30 Days" between July 4, 2020 PDT, after the "Disable & Delete" function had been used, and when the Message History setting had been changed to "Forever" between July 22, 2020 PDT and July 26, 2020 PDT. The precise date when the Message History setting changed to "30 Days" is unknown, so it has not been determined if that change occurred on the iPhone 8 Plus (FirstNet) or the iPhone 11 (FirstNet). On whichever device this change to the Message History occurred, the "KeepMessageForDays" key would have been set to "30," which indicates that messages will be kept for 30 days, and the "KeepMessagesVersionID" key would have incremented from a value of "2" to "3."

## Inspection and Collection of iCloud Account

The first data source that Unit 42 collected in this matter was Mayor Durkan's iCloud account, which was connected to all three of Mayor Durkan's iPhones used from 2018 to the time Unit 42 was engaged, in November 2020. This iCloud account was examined, and data was collected on November 16, 2020, using forensic software from Magnet Forensics Inc. and Elcomsoft Ltd.

Data from Mayor Durkan's iCloud account was collected first using the Magnet AXIOM Cloud forensic software. The software authenticated to the account and downloaded all available data. The AXIOM Cloud software downloaded data which showed that iCloud Drive contained no files. However, iCloud Photos did contain 230 images, which were all downloaded and preserved. No other data was available from Mayor Durkan's iCloud account using the AXIOM Cloud software.

Next, additional collections of Mayor Durkan's iCloud account were performed using Elcomsoft software to help ensure a thorough collection of available data. Using Elcomsoft, the iCloud account was examined for three types of data: backups, synchronized data, and files. Examination of the available backups shows that this iCloud account was not storing any backups of iPhones or other devices. Apple states that they only retain iCloud backups for 180 days after a device stops backing up to iCloud.[23] Finding no backups of any phones used within 180 days of examining the iCloud account would be consistent with those devices not being configured to save backups to iCloud. Any iPhones that went out of use more than 180 days before the examination of the iCloud account may or may not have been configured to backup to iCloud as any backups would have been automatically deleted by Apple after 180 days of inactivity.

Unit 42 sought to preserve synchronized data stored in the iCloud account. Synchronized data includes a number of types of data that are kept the same between an iPhone and an iCloud account, and are stored separately from any backups. Accessing some of the synchronized data, including any synchronized text messages, requires additional authentication steps to be performed. The additional authentication requires the input of a passcode from a trusted iPhone or other Apple device that is also synchronizing its "Keychain." In November 2020, multiple attempts were made to access and download the synchronized data including the data requiring additional authentication, but iCloud would not accept the supplied passcode for additional authentication as valid. Any synchronized data that did not require additional authentication was

---

[23] For more information, see https://support.apple.com/guide/icloud/back-up-your-ios-and-ipados-device-mmab848634c8/icloud and https://www.apple.com/legal/internet-services/icloud/en/terms.html.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

collected, but after multiple failed attempts to supply a correct passcode, Unit 42 halted the additional authentication attempts in order to prevent the iCloud account from locking and preventing access to any additional data that might be collected. In September 2021, after confirming that the iPhone in use by Mayor Durkan at that time was configured to synchronize its "Keychain," Unit 42 reattempted the preservation of any synchronized text messages using software from Elcomsoft. The account data and text messages were successfully preserved from Mayor Durkan's iCloud account at that time. Examination of the synchronized text messages preserved from iCloud showed that they included messages from June 25, 2020 through the date of the collection, September 9, 2021.

Finally, Unit 42 inspected and collected any files stored in the iCloud account. iCloud Drive contained no standard user files, but any available files were collected and preserved.

## Pinnacle System

Unit 42 discussed the Pinnacle system with City IT resources and analyzed the Pinnacle Data Source provided by the City. Pinnacle is a custom-built application that the City uses to gather billing information from cellular phone providers in a centralized database. Unit 42 analyzed the Pinnacle Data Source and confirmed it to include data from January 2020 through the end of August 2020 for Mayor Durkan's mobile phone number. Analysis also confirmed that the Pinnacle Data Source included metadata for SMS text messages, but not Apple proprietary iMessage text messages. The Pinnacle Data Source provided no information on which we relied in completing our analysis of the goals described in this report (section titled Purpose of Our Engagement) other than confirming that Mayor Durkan sent and received messages during the time period from January 2020 through the end of August 2020.

# Chief Best's iPhone XS Max Analysis and Findings

## iPhone Setup Information

In the advanced logical collection representing Chief Best's iPhone XS Max, and its configuration as of September 2, 2020, the configuration file "com.apple.MobileBackup.plist" contains the "RestoreDate" key and has a value that represents October 1, 2019, at 18:27:45, as seen in the following figure. Additionally, the "WasCloudRestore" key in the same configuration file has a value of "False," indicating that the Best iPhone XS Max was not set up by a restoration from an iCloud backup, but rather a restoration from another phone, specifically the Best iPhone 8 Plus.

```
⊿    dict = {
            RemoteConfigurationExpiration : date = 9/2/2020 7:23:50 AM
            AirTrafficFinishedRestoring : boolean = True
            FetchMissingKeysAtNextUnlock : boolean = False
    ⊿    RestoreInfo : dict = {
                BackupBuildVersion : AsciiString = 16G102
                WasCloudRestore : boolean = False
                DeviceBuildVersion : AsciiString = 17A861
                RestoreDate : date = 10/1/2019 6:27:45 PM
```

**Figure 24 - A screenshot of a limited preview of the "com.apple.MobileBackup.plist" file from the advanced logical collection of the Best iPhone XS Max as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

Also in the advanced logical collection, the configuration file "com.apple.purplebuddy.plist," contains the "GuessedCountry" key which has a subkey named "at," that has a value that represents December 1, 2019,

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

at 10:12:19, the date the "Select Your Country or Region" option was selected. The "SetupLastExit" key has a value that represents December 1, 2019, at 14:21:37, the date that the setup application was last completed. This sequence of events is consistent with the phone having been restored from the previous phone on October 1, 2019, yet the setup process was last completed on December 1, 2019. This pattern is consistent with a phone that was set up initially through restoration from a previous phone, but then completed the setup routine again, as is encountered for example, after installing a major update to the Apple iOS operating system. The following figure shows an excerpt of the "com.apple.purplebuddy.plist" configuration file.

```
⊿  GuessedCountry : dict = {
    ▶    countries : array = [
         at : date = 12/1/2019 10:12:19 AM
    RestoreChoice : boolean = True
    TrueTonePresented : boolean = True
    WebKitAcceleratedDrawingEnabled : boolean = False
    WebDatabaseDirectory : AsciiString = /var/mobile/Library/Caches
    KeychainSync3Presented : boolean = True
▶  SSDeviceType : dict = {
    WebKitOfflineWebApplicationCacheEnabled : boolean = True
    AssistantPHSOffered : boolean = True
    SetupLastExit : date = 12/1/2019 2:21:37 PM
    UserInterfaceStyleModePresented : boolean = True
    Payment2Presented : boolean = True
    ControlCenterOnBoardingPresented : boolean = True
    AutoUpdatePresented : boolean = True
```

**Figure 25 - A screenshot of a limited preview of the "com.apple.purplebuddy.plist" file from the advanced logical collection of the Best iPhone XS Max as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

## Text Message Retention Settings

The configuration file "com.apple.MobileSMS.plist," as seen in the following figure, contains the "KeepMessageForDays" key, which has a value of "30," indicating any text messages older than 30 days stored locally on this iPhone would be automatically deleted by the iPhone on a nightly, rolling basis.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

```
▲   dict = {
          __CK_clearTextInputContextIdentifierKey : boolean = True
          KeepMessageForDays : integer = 30
          qrCodeBadgingEnabled : boolean = False
          SuspendTime : date = 10/1/2019 4:42:08 PM
          MMS : dict = { }
          DidCheckForDuplicateChats : integer = 3
          MMSRelayEnabled : boolean = False
      ▶  AMSDeviceType : dict = {
          HandwritingAutoDisplayV2 : boolean = False
      ▶  kCKBrowserSelectionControllerVersionDictionaryKey : dict = {
      ▶  kCKMediaObjectManagerDefaultsUTITypes : dict = {
```

**Figure 26 - A screenshot of a limited preview of the "com.apple.MobileSMS.plist" file from the advanced logical collection of the Best iPhone XS Max as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

## Synchronizing Messages to iCloud Settings

The configuration file "com.apple.madrid.plist" contains the "CloudKitSyncingEnabled" key and has a value set to "False," indicating that text messages were not configured to synchronize with iCloud using the "Messages in iCloud" feature. The same configuration file also has keys, such as "CloudKitSyncDate," "CloudKitInitialStartDate," and "LastChatSyncTime," that have values representing dates between April 2019 and May 2019. This indicates that at no time would the Best iPhone XS Max have been configured to synchronize with iCloud using the "Messages in iCloud" feature, as these dates predate the initial set up of this phone. All of these keys, as well as others, can be seen in the following figure.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 



**Figure 27 - A screenshot of a limited preview of the "com.apple.madrid.plist" file from the advanced logical collection of the Best iPhone XS Max as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

## Backup Settings

The configuration file "com.apple.mobile.ldbackup.plist" contains the "CloudBackupEnabled" key with a value of "True," indicating that the device was configured to automatically backup to iCloud at the time this phone went out of use. However, the same configuration file contains the "LastCloudBackupDate" key with a value that represents October 1, 2019, at 18:23:38. This date and time is a few minutes earlier than the setup of this iPhone. A "LastCloudBackupDate" date predating the setup of the phone is consistent with this date having been carried over from the previous phone when data was restored onto the Best iPhone XS Max. This means that the Best iPhone XS Max was never backed up to iCloud, even though it was configured to do so, possibly due to a lack of available storage space in the iCloud account. These keys can be seen in the following figure.

 

```
◢  dict = {
        LastCloudBackupDate : integer = 591647018
        Version : AsciiString = 2.0
        WillEncrypt : boolean = True
        LastCloudBackupTZ : AsciiString = PDT
        CloudBackupEnabled : boolean = True
        RequiresEncryption : integer = 1
```

**Figure 28 - A screenshot of a limited preview of the "com.apple.mobile.ldbackup.plist" file from the advanced logical collection of the Best iPhone XS Max as viewed in Cellebrite Physical Analyzer (v7.47.0.49) (Times displayed are in UTC.)**

## Text/Chat Message Analysis

In the advanced logical collection, the "sms.db" file contains 64 entries in the "message" table. Of those entries, only 15 have an "item_type" of "0," which signifies standard text messages. The remaining 49 entries in the "message" table have an "item_type" of "1," which are internal database entries created when group chats occur. These 49 entries do not have any message text and are not visible to a user. While there may be 64 total entries in the "message" table, the total number of text messages is 15. These 15 messages are all dated September 2, 2020, from 8:26:30 PDT to 12:27:21 PDT. The following figure shows a portion of the "message" table in the "sms.db" database where these 15 and 49 entries, 64 in total, can be seen.

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

| ROWID | guid | text | date | item_type | service | handle_id | other_handle |
|---|---|---|---|---|---|---|---|
| 25985 | 2C98168B-067B-4979-8D40-16DFD086445A | | 8/3/2020 9:46:55 PM | 1 | iMessage | 3728 | 3728 |
| 25986 | A3FBE857-1406-45BB-9438-31455D80A47D | | 8/3/2020 9:46:55 PM | 1 | iMessage | 3728 | 3784 |
| 26026 | 69F4E8F2-3480-4D5A-A110-78205C7986EA | | 8/4/2020 3:21:03 PM | 1 | iMessage | 64 | 1423 |
| 26027 | 3B705518-8465-432B-801B-206F4AC5FA7E | | 8/4/2020 3:21:03 PM | 1 | iMessage | 64 | 65 |
| 26028 | 5D6CB671-5800-475A-BFA5-42F87B8002EE | | 8/4/2020 3:21:03 PM | 1 | iMessage | 64 | 64 |
| 26029 | A570F2DC-3852-4A0F-8BF6-1A3620896F55 | | 8/4/2020 3:21:03 PM | 1 | iMessage | 64 | 66 |
| 26339 | 9FA8C844-5D6F-4092-AA82-3919F48DBF3F | | 8/10/2020 3:41:30 PM | 1 | iMessage | 64 | 65 |
| 26340 | 0EFF660A-88C6-4A22-B80A-191DFEAD26B6 | | 8/10/2020 3:41:30 PM | 1 | iMessage | 64 | 64 |
| 26341 | 73C09E52-7483-4BA0-B640-F1D02EB2E469 | | 8/10/2020 3:41:30 PM | 1 | iMessage | 64 | 66 |
| 26381 | 90894A2D-2C75-4AC5-BD1E-103CCA68AD6C | | 8/11/2020 4:24:21 AM | 1 | iMessage | 3441 | 34 |
| 26382 | 4ECE2246-BA0C-4239-9E1A-00C31914BB73 | | 8/11/2020 4:24:21 AM | 1 | iMessage | 3441 | 3441 |
| 26494 | 0FBD5647-953F-4C15-87FE-6A7AC75B3DEB | | 8/11/2020 5:24:12 PM | 1 | iMessage | 3410 | 34 |
| 26495 | FB020359-B2A5-4337-8485-798418967560 | | 8/11/2020 3:38:10 PM | 1 | iMessage | 3410 | 3410 |
| 26522 | 68144DD5-9242-48B6-B8C5-2C42A9671D8F | | 8/11/2020 5:24:12 PM | 1 | iMessage | 2562 | 919 |
| 26523 | 3FBE2DDD-D81B-4543-AC68-6D0437822005 | | 8/11/2020 5:24:12 PM | 1 | iMessage | 2562 | 2562 |
| 26604 | 8D58F95A-8879-4019-A892-C776627FCB84 | | 8/12/2020 6:05:45 PM | 1 | iMessage | 3926 | 3927 |
| 26605 | 80A87968-EC17-439C-8960-C34218B5D573 | | 8/12/2020 6:05:45 PM | 1 | iMessage | 3926 | 3926 |
| 26680 | D549829B-96D9-4559-AE00-51C6DA41EFCD | | 8/13/2020 4:56:03 AM | 1 | iMessage | 919 | 1423 |
| 26681 | B187BFA8-802E-42FE-881B-FD31044DD984 | | 8/13/2020 4:56:03 AM | 1 | iMessage | 919 | 919 |
| 26682 | 7724C1C3-8716-476E-B033-9A919D8DAEF4 | | 8/13/2020 4:56:03 AM | 1 | iMessage | 919 | 3936 |
| 26683 | 28432067-FFC7-49AA-824F-284F5AB644A0 | | 8/13/2020 4:56:03 AM | 1 | iMessage | 919 | 66 |
| 26708 | 19E753AA-A9EB-4357-890A-0B0385279A75 | | 8/13/2020 9:56:43 PM | 1 | iMessage | 919 | 1423 |
| 26709 | C6C43CDA-07A5-4C7E-87DB-2DEEED235D73 | | 8/13/2020 9:56:43 PM | 1 | iMessage | 919 | 65 |
| 26710 | 3DE3994D-67B8-44AC-B9E0-FC062F072610 | | 8/13/2020 9:56:43 PM | 1 | iMessage | 919 | 66 |
| 26711 | E38C426A-FF93-4D96-9888-80C5872D66E7 | | 8/13/2020 9:56:43 PM | 1 | iMessage | 919 | 919 |
| 26712 | 250696B2-F2F8-476D-87BE-BA0A5B6938DD | | 8/13/2020 9:56:43 PM | 1 | iMessage | 919 | 66 |
| 26779 | 8DD62AA9-932C-447C-814A-49998CB22AEE | | 8/15/2020 10:30:58 PM | 1 | iMessage | 66 | 2683 |
| 26780 | A51A27FD-D382-44CD-AD95-33F3CA8FC20D | | 8/15/2020 10:30:58 PM | 1 | iMessage | 66 | 66 |
| 26781 | 36F7EA75-3308-4714-94D0-DFA69D14AAA3 | | 8/15/2020 10:30:58 PM | 1 | iMessage | 66 | 65 |
| 26782 | 08221C01-7525-407C-861D-2C7023DC2FF0 | | 8/15/2020 10:30:58 PM | 1 | iMessage | 66 | 2501 |
| 26783 | CE355ED8-335F-4DF1-A3E2-144AC989FCE0 | | 8/15/2020 10:30:58 PM | 1 | iMessage | 66 | 919 |
| 26784 | 6C14DA21-88B9-41C2-858A-564AF627748B | | 8/15/2020 10:30:58 PM | 1 | iMessage | 66 | 623 |
| 26824 | 86F017C2-EE8D-4F2E-A150-36CC46BD8FE6 | | 8/16/2020 11:30:56 PM | 1 | iMessage | 919 | 1423 |
| 26825 | FFF20A9E-A9AE-411A-8153-11B616B068FE | | 8/16/2020 11:30:57 PM | 1 | iMessage | 919 | 919 |
| 26826 | E441FB09-5929-4927-A5F6-1AADDF86BE34 | | 8/16/2020 11:30:57 PM | 1 | iMessage | 919 | 3936 |
| 26827 | 9D558882-14D3-415F-BAAF-92137BAC52C8 | | 8/16/2020 11:30:57 PM | 1 | iMessage | 919 | 66 |
| 26840 | 5DAD49C4-886E-418B-88DC-CFC7B97FC812 | | 8/17/2020 3:21:39 PM | 1 | iMessage | 65 | 2683 |
| 26841 | D09C2766-2654-43C9-840E-A27B420DEDC5 | | 8/17/2020 3:21:39 PM | 1 | iMessage | 65 | 65 |
| 26842 | AAD1C8A6-D66D-48D3-8DEF-9E3943C9484F | | 8/17/2020 3:21:39 PM | 1 | iMessage | 65 | 919 |
| 26843 | EF815160-C144-47D8-95D7-F2E7DAEF9A36 | | 8/17/2020 3:21:39 PM | 1 | iMessage | 65 | 66 |
| 26945 | 3C576A12-86EA-4179-A4D3-16D16C9900C7 | | 8/21/2020 1:45:29 AM | 1 | iMessage | 3973 | 3974 |
| 26946 | 5E5CED89-7002-4C4F-8C90-F80BEFFD895F | | 8/21/2020 1:45:29 AM | 1 | iMessage | 3973 | 3973 |
| 26956 | 8E5889FD-5C08-4569-8088-ED998623D55D | | 8/21/2020 12:12:51 PM | 1 | iMessage | 3410 | 1218 |
| 26957 | 6E51686A-832E-435E-B298-3F204CCB9EDA | | 8/21/2020 12:12:51 PM | 1 | iMessage | 3410 | 3784 |
| 26958 | 55BB51C0-0A99-46FA-A55A-CDFB6875C6CE | | 8/21/2020 12:12:51 PM | 1 | iMessage | 3410 | 3410 |
| 27027 | 82D234DE-C130-4077-A808-E3D18C003FA5 | | 8/26/2020 12:10:02 AM | 1 | iMessage | 3441 | 34 |
| 27028 | 6BBB52AD-A5C8-4A39-8289-111BC99F3F13 | | 8/26/2020 12:16:29 AM | 1 | iMessage | 3441 | 3441 |
| 27031 | 1D26F489-08F6-4A86-88E3-51231DC6D111 | | 8/26/2020 12:16:29 AM | 1 | iMessage | 3441 | 34 |
| 27032 | 8D92065A-C6CA-4176-8783-2CD075AA37C2 | | 8/26/2020 12:16:29 AM | 1 | iMessage | 3441 | 3441 |
| 27188 | 37484E1C-7A88-7537-A4F1-1428BE6516BF | Shooting  9026 Seward PK Ave S[atlantic boat ramp  1 Person shot, suspect outstanding 3R 20... | 9/2/2020 4:48:21 PM | 0 | SMS | 4039 | 0 |
| 27189 | 6DC75226-AF2D-432D-8B78-386EA84ABA6D | ASLT - IP//O - PERSON SHOT OR SHOT AT  20:17:34 RAINIER AV S / S KENYON ST[NORTH OF... | 9/2/2020 7:27:19 PM | 0 | SMS | 4040 | 0 |
| 27190 | 4EEE563B-7C73-78A5-C748-E917DF7DA52D | Stabbing  200 Lake WA BV E  1 person stabbed suspect outstanding  3Q 206-889-2374  #6139 | 9/2/2020 7:27:19 PM | 0 | SMS | 4039 | 0 |
| 27191 | 24CEC7DC-4198-418A-8137-14C145A67D3B | The call type for call # 256171 has been changed from SHOTS1 to SHOOT1 Sent by: WD | 9/2/2020 7:27:20 PM | 0 | SMS | 4041 | 0 |
| 27192 | ACE48E2F-7C91-8183-318F-829BDE77A8B0 | Shots Fired 3 Av & Yesler Wy Gunshots in area. Shell casings and blood drops found.  Checkin... | 9/2/2020 7:27:20 PM | 0 | SMS | 4039 | 0 |
| 27193 | C3BCCA53-6D05-48AF-AF35-9E9AC19913B3 | ASLT - IP//O - PERSON SHOT OR SHOT AT  22:46:16 325 9 AV  Dt G  Zne: G3  Gid: 4043 HMC A... | 9/2/2020 7:27:20 PM | 0 | SMS | 4042 | 0 |
| 27194 | 3AD06BAD-D409-435B-8EED-F379A57E1658 | ASLT - IP//O - PERSON SHOT OR SHOT AT  23:08:33 700 MINOR AV  Dt E  Zne: E3  Gid: 6245, S... | 9/2/2020 7:27:20 PM | 0 | SMS | 4043 | 0 |
| 27195 | 85F8940A-E0B8-6A29-5B90-585951527269 | Follow Up to Shots Fired 3 Av & Yesler Wy 2 gunshot victims arrived at HMC & Swedish. Appe... | 9/2/2020 7:27:20 PM | 0 | SMS | 4039 | 0 |
| 27196 | F732B66D-D867-4090-AF2E-90A71160F427 | ASLT - IP//O - PERSON SHOT OR SHOT AT  23:33:29 925 SENECA ST  Dt E  Zne: E3  Gid: 3519 V... | 9/2/2020 7:27:20 PM | 0 | SMS | 4044 | 0 |
| 27197 | C06AA69E-8FA7-3120-B079-D96710B92A3A | Happy last day, Chief. It's been an honor. I hope you get all the fun and joy and space in your r... | 9/2/2020 7:27:20 PM | 0 | SMS | 4045 | 0 |
| 27198 | 321AEEBC-8583-0717-1B53-6A67D986EFCF | Hi there Carmen, before your departure today I just want to touch base to thank you for your l... | 9/2/2020 7:27:20 PM | 0 | SMS | 4046 | 0 |
| 27199 | EEBD0D2-DF0E-0045-34A2-8CFC167711644 | I personally wanted to reach out to  you with possible future opportunities where you can coo... | 9/2/2020 7:27:21 PM | 0 | SMS | 4046 | 0 |
| 27200 | ADBBC34D-79FB-4289-AF25-DB93CCAAD750 | Congratulations on a well-deserved retirement and for handling these past three months with... | 9/2/2020 3:26:30 PM | 0 | SMS | 4047 | 0 |
| 27201 | 6201BF52-C4B5-4968-BDF9-89731A5A1A7D | Happy last day, Chief. It's been an honor. I hope you get all the fun and joy and space in your r... | 9/2/2020 4:35:34 PM | 0 | SMS | 4048 | 0 |
| 27202 | 61C45768-3CA7-41FA-B9A2-96EBB63E45FB | ASLT - IP//O - PERSON SHOT OR SHOT AT  19:40:14 9026 SEWARD PARK AV S  Dt S  Zne... | 9/2/2020 4:48:19 PM | 0 | SMS | 4049 | 0 |

**Figure 29 - A screenshot of a limited preview of the "message" table in the "sms.db" database from the advanced logical collection of the Best iPhone XS Max as viewed in Cellebrite Physical Analyzer (v7.49.0.28) (Times displayed are in UTC.)**

As previously discussed in this report, when the "30 Days" text message retention setting causes an iPhone to automatically delete messages older than the configured retention period, the corresponding entries in the "sms.db" "message" table are removed, but the related entries in the "chat" table are left in place. The "sms.db" file on the Best iPhone XS Max has a total of 28 entries in the "chat" table, 11 of which related to the 15 active text messages. The remaining 17 entries in the "chat" table are not associated with any entries in the "message" table. These 17 entries are consistent with messages related to these "chat" entries having been deleted by the "30 Days" setting. The maximum "ROWID" in the "chat" table was 5,133. This number indicates that there were a total of 5,133 entries created into the "chat" table from November 5, 2018 (when the Best iPhone 8 Plus was set up) to September 2, 2020 when the Best iPhone XS Max went out-of-use.

Had Chief Best been sending and receiving text messages with the "30 Days" retention setting configured and had she left those text messages to exist past 30 days, messages would have been deleted

© 2022—Unit 42 by Palo Alto Networks, Inc.

 

automatically due to the retention setting and a large number of entries in the "chat" table that were not associated with any entries in the "message" table would have resulted. In contrast, the artifacts reviewed on the Best iPhone XS Max are consistent with periodic deletion over time rather than a bulk deletion. The very low number of entries in the "chat" table that do not relate to entries in the "message" table is consistent with Chief Best's testimony in her deposition;[24] that she deleted text messages periodically.

Dated: February 11, 2022                    Respectfully submitted,

                                            Kevin T. Faulkner

---

[24] Chief Best 11/9/2021 Dep. Tr. at 212:13-213:2, 213:17-214:11, 214:21- 216:4-16, and 217:5-15.

© 2022—Unit 42 by Palo Alto Networks, Inc.

  

# Kevin Faulkner

**PALO ALTO NETWORKS (Formerly Crypsis; Acquired in 2020)**
**Vice President,** February 2019 to Present
New York, NY

Lead teams in digital forensic and cybersecurity incident response investigations in connection with internal investigations, data breach incidents, civil or criminal litigation, and regulatory matters.

**STROZ FRIEDBERG**
**Managing Director,** March 2017 to December 2018
**Vice President,** November 2015 to March 2017
**Director, Digital Forensics,** November 2014 to October 2015
New York, NY

Head of the New York digital forensics lab. Co-managed the firm's technical operations in areas of digital forensics, electronic discovery, and incident response. Supervised and performed digital forensic acquisitions and examinations on laptop and desktop computers, e-mail and file servers, handheld/mobile devices, backup tapes and network logs. Maintained an active case load of digital forensics engagements in internal investigations and civil, criminal, and regulatory matters as well as cybercrime engagements. Types of analysis included (but were not limited to) document authentication, the theft or misappropriation of intellectual property or other data, database analytics, loss of data under legal hold, computer hardware forensics and data recovery, and investigations into computer intrusions or hacking.

Significant casework included:

- Led a team of forensic examiners and incident responders in an investigation into a data breach where the records of a healthcare company were identified by a third party on the "Dark Web". Analysis consisted of determining the original system the attacker used to penetrate the network, determining that other systems were accessed, what data may have been exfiltrated, and confirming which systems actually contained sensitive PII and PHI data.
- Performed analysis of primary central database for large retailer in connection with the sale of assets. Database needed to have certain customer and sales information removed prior to being delivered to buyer, involving the searching and correlation of hundreds of millions of records.
- Led a team responding on short notice to a security incident for a large retailer involving sophisticated file-less malware running on several dozen company servers, workstations, and laptops. Performed memory analysis, captured and analyzed network traffic, and pieced together forensic artifacts to understand what the attacker was doing, what systems they accessed, and what data may have been taken.
- Led a team to inventory, collect, and acquire technology for two related companies in bankruptcy. Identified several hundred computers, hard drives, servers, virtual servers, and other technology and worked with restructuring team to prioritize and create an efficient process for collection and imaging. Helped team locate and extract useful data for ongoing financial analysis and investigation.
- Assisted financial institution with several thousand backup tapes to attempt to locate data required to respond to inquiries from the federal government. Many tapes were from systems no longer in use at the client, where both the technology and staff related to the tapes were no longer with the company. Analyzed written and digital tape information to narrow down and locate potentially relevant information.
- Examined embedded credit card skimmer in point-of-sale device for a hospitality company. Identified the components used as pieces from a commercial handheld skimmer. Created custom process to recover password protecting the stored card data. Successfully accessed stored card swipe data and provided actionable information to client.
- Analyzed one commercial hand-held credit card skimmer and one pin-pad overlay skimmer for a major retailer. Performed hardware analysis to determine the local storage capacity of skimmer devices and the methods available for retrieving stored data, both by the attacker and by our team. Removed memory chip in a "chip-off" procedure and successfully accessed stored card swipe information. Identified storage format of card swipe data to provide actionable data to client.
- Oversaw the analysis of voice recording systems at a large energy company to determine the extent and cause of calls being over-recorded, leading to potential issues with regulators.
- Led teams of forensic examiners in investigation and eDiscovery response for large industrial products distributor in response to FTC investigation. Coordinated collections from custodians located around the continental U.S. Managed custom processing specifications to locate and process information beyond the scope of standard eDiscovery projects. Consulted with counsel to help ensure compliance and create good will with FTC investigations team.

  

- Consulted with in-house computer security team at large software solutions and services company providing one of the largest credit application networks in North America. Led forensic investigation and malware analysis in a network intrusion where an attacker had gained access to a network device and deployed malware to be used for DDOS purposes.
- Investigated authenticity of email messages purportedly sent in a business deal with China involving hundreds of billions of U.S. dollars. Was able to identify indicators consistent with email messages having been modified.
- Led team of forensic examiners in a data remediation matter where a high-level individual in the insurance industry went to a competitor after over a decade with his former employer. Established protocol for data identification and remediation to protect former employer's information and executed protocol on multiple personal devices.
- Acted as quality assurance on an important document forgery case by completing an independent analysis on the forensic images of computers that had been previously analyzed by another firm. Identified forensic indicators that led to the discovery of additional devices storing potentially relevant information and completed analysis of all devices still in existence.

## MESIROW FINANCIAL CONSULTING
**Senior Vice President**, August 2012 to November 2014
New York, New York

Led the Technology Advisory Services (TAS) practice, a team of experts that focused on Computer Forensics, Electronic Discovery, Computer Security, and Data Analytics / Data Transformation. Helped clients in litigation, bankruptcy, or with internal security or investigative matters, understood and balanced the risks with cost saving options to get clients to a better resolution. Utilized years of technology and legal experience to help clients navigate the challenges that arose and found creative, intelligent solutions.

## PROTIVITI
**Director, Computer Forensics and eDiscovery**, March 2006 to June 2012
New York, NY

Key component of the Computer Forensics, Electronic Discovery, and Records Management team. Continued work as an expert in the courts and expanded to include State, Federal, Chancery, and Bankruptcy courts. Prepared affidavits, declarations, and expert reports, and offered testimony in deposition, at hearings, and as an expert witness at trial in courts across the country. Functioned as a third-party neutral expert and handled sensitive data to help resolve issues of spoliation.

Significant matters included:

- Significantly expanded Computer Security incident response and investigation capabilities and achieved Qualified Security Assessor (QSA) certification from the PCI Security Standards Council.
- Led the Computer Forensics and Electronic Discovery team in Protiviti's New York office and expanded the group's capabilities in Chicago, Orlando, Dallas, Los Angeles, London, Paris, Frankfurt, Beijing, Hong Kong, New Delhi, Hyderabad, and Tokyo.
- Offered data collection, eDiscovery processing, and forensic / security investigation services utilizing a mix of local and remote resources to provide clients with the best combination of expertise and cost savings, resulting in exceptional value.
- Led evidence preservation effort in April 2011 for the Sony PlayStation Network attack by the hacker group Anonymous. Was first responder on-site. Technically challenging preservation required adherence to both legal and PCI (Payment Card Industry) standards due to possibility of credit card breach. Successfully navigated technical and legal / regulatory challenges and developed method for evidence preservation used going forward.
- Led forensic analysis and investigation in 2011 into Confidential Foreign Government's computer systems after attack by an unknown, outside attacker or group using advanced and custom malware in an APT (Advanced Persistent Threat). Identified method of attack, method of data transmission, and numerous additional affected computer systems not originally thought to be included in the attack. Helped client identify some of the stolen information and developed a remediation plan to address ongoing security concerns.
- Inspected computer systems at Raritan's payroll vendor ADS in 2011 in relation to Gannett Satellite v. Borough of Raritan, Docket No. L- 001798-09 (N.J. Super. Ct. Law Div. Oct. 06, 2009). Filed expert report and testified as expert witness for April 2012.

  

**PG LEWIS & ASSOCIATES**
**Forensic Examiner and Case Manager**, December 2003 to March 2006
Whitehouse Station, NJ

Performed forensic acquisitions or collections and successfully extracted and captured data while following forensic protocols. Assisted in investigations and forensic examinations. Became the highest level technical resource on the team, having gained significant skill in using EnCase from Guidance Software, FTK from AccessData, and other forensic tools. Led forensic investigation and electronic discovery projects, consulted with clients and their legal counsel, managed teams of people on the acquisition and examination, and provided the final level of review before materials went to the client. Worked as an expert in state and federal courts. Deposed, authored affidavits, declarations, and expert reports on multiple matters as well as attended hearings and trial.

**FIDELIA TECHNOLOGY**
**Support Engineer**, February 2003 to December 2003
Princeton, NJ

Aided with all aspects of monitoring product, from consulting with the programming team and leadership on product development, to assisting in the sales cycle as a technical expert, to supporting existing clients and performing implementations. Maintained the company's IT infrastructure in their Princeton, NJ headquarters.

**MEASURABLE SOLUTIONS**
**Systems and Network Management Consultant**, July 2000 to August 2002
Rockaway, NY

Consulted with clients to understand their technology infrastructure and identify the components that were business critical. Helped clients choose from amongst the best of breed monitoring products and helped them implement and integrate the products together into an overall monitoring solution.

**MAINTECH / VOLT INFORMATION SCIENCES**
**Systems and Network Management Consultant**, July 2000 to July 2000
Warren, NJ

Designed, implemented, supported, and repaired networks, servers, and PCs. Continued to build the depth of technical skills as well as gained broad experience with the technologies involved in large datacenters and vast wide area networks.

**MC²**
**Network Services Engineer,** July 1998 to April 1999
Warren, NJ

Worked on computer systems of all types and sizes from PCs and small networks to large datacenters. Designed, implemented, supported, and repaired networks, servers, and PCs on the east coast.

## CERTIFICATIONS AND AFFILIATIONS

2004 to 2023: EnCase Certified Examiner (EnCE), OpenText (formerly Guidance Software)
2005 to 2022: Certified Computer Examiner (CCE), International Society of Forensic Computer Examiners
2014 to 2024 : GIAC Certified Forensic Examiner (GCFE), Global Information Assurance Certification
2011 to 2012: PCI Qualified Security Assessor (QSA), Payment Card Industry (PCI) Security Standards Council
2006 – Present: CompTIA Linux+, CompTIA
1999 to Present: Microsoft Certified Professional including Windows XP, NT4 Server, Windows 95, Microsoft
Member, Sedona Conference WG1 & WG6 & WG11
Member, Association of Certified Fraud Examiners (ACFE)
Member, International Society of Forensic Computer Examiners (ISFCE)

  

## TRAINING

**Stroz Friedberg Internal Cyber Training Program**
Participate in regular in-house training presentations on current digital forensics, cybercrime response, computer security, desktop, and network forensic tools in conjunction with relevant legal and industry matters

## PUBLICATIONS

July 2013: *Changing Risks In eDiscovery*, eDiscovery Compendium issue, eForensics Magazine

## TESTIMONY

November 2021: Provided expert response to a witness statement regarding technology issues in extracting data from email archives in *Biomet c.s. v. Heraeus Medical GmbH*, District Court of Rotterdam, The Netherlands, Case No. C/10/581437 / HA ZA 19/0817

August 2021 to October 2021: Submitted two expert reports and testified in deposition related to allegations of theft of trade secrets, in the matter of, *Comet Technologies USA Inc., et al. v. XP Power LLC.*, The United States District Court for the Northern District of California, Case No. 5:20-cv-06408-NC

May 2021 to July 2021: Provided rebuttal expert report, declaration, and testified in deposition regarding allegations of theft of trade secrets during the M&A due diligence process in *TransPerfect Global, Inc. v. Lionbridge Technologies, Inc., et al.*, The United States District Court for the Southern District of New York, Case No. 1:19-cv-03283-DLC

April 2021 to June 2021: Submitted two declarations and testified at two evidentiary hearings regarding how Apple devices lock to iCloud accounts, how one iPhone became factory reset, and deletion patterns and message retention settings for iPhones in a False Claims Act case, *United States ex rel. Purcell v. Gilead Sciences, Inc.*, The United States District Court for the Eastern District of Pennsylvania, Case No. 2:17-cv-3523-MAK

March 2021 to April 2021: Provided rebuttal expert report and deposition testimony in a case involving allegations of trade secret misappropriation in *Zimmer Biomet v. Heraeus Medical, LLC, et al.*, Kosciusko County Superior Court 4, State of Indiana, Case No. 43D04-1802-PL-000021

January 2021: Affidavit covering mobile forensic issues regarding text messaging data produced by opposing side in *Mariah Carey v. Lianna Shakhnazarian (a/k/a Lianna Azarian)*, Supreme Court of The State of New York, County of New York, Index No. 0650290/2019

August 2020 to October 2020: Provided rebuttal expert report, testified in deposition as well as at the trial-type official administrative hearing in a case involving allegations of trade secret misappropriation in the matter of, *Certain Bone Cement and Bone Cement Accessories*, United States International Trade Commission, Washington D.C., Investigation No. 337-TA-1175

July 2020: Provided declaration regarding efforts to access encrypted data from mobile devices in *Lianna Shakhnazaryan v. Mirage Entertainment, Inc., Mariah Carey, et al.*, Superior Court of The State of California, County of Los Angeles, Central District, Case No. 19STCV01308 and 19STCV02516

May 2020: Provided expert analysis and a declaration for a third party subpoenaed for records in litigation in *Chevron Corporation v. Steven Donziger, et al.*, The United States District Court for the Southern District of New York, Case No. 1:11-cv-00691-LAK-RWL

September 2019: Submitted an affidavit in support of an application for a temporary restraining order and preliminary injunction in a matter where a former employee was accessing sensitive data from their former company and publishing it publicly, Supreme Court of The State of New York, County of New York, No case number, pre-litigation

August 2019: Provided written testimony in the form of a rebuttal expert report in a matter involving alleged trade secret misappropriation in *SS&C Technologies, Inc. v. Clearwater Analytics, LLC,* Connecticut Superior Court, Hartford, Complex Litigation, Case No. X07-HHD-CV-16-6070536-S

August 2018 to October 2018: Provided written testimony in the form of a rebuttal expert report, declaration, and testified in deposition regarding forensic analysis and expert opinions of computer systems used by one engineering team in *Synopsys, Inc. v. Ubiquiti Networks, Inc. et al.,* The United States District Court for the Northern District of California, Case No. 3:17-cv-00561-WHO

April 2017 to January 2018: Provided written testimony in the form of several declarations, multiple expert reports, and testified in three depositions on the collection and search processes used to preserve and search digital evidence regarding allegations of theft of trade secrets in *Waymo LLC v. Uber Technologies, Inc. et al.,* The United States District Court for the Northern District of California, San Francisco Division, Case No. 3:17-cv-00939-WHA

August 2017: Submitted declaration about wiping of devices by a departing employee in *International Business Machines Corporation v. Smith,* The United States District Court for the Southern District of New York, Case No. 7:17-cv-05808-CS-PED

 

August 2016 to October 2016: Provided written testimony in the form of a report and declaration regarding the wiping of data and rebuttal of another expert in *Schreiber v. Friedman et al.*, The United States District Court for the Eastern District of New York, Case No. 1:15-cv-06861-CBA-JO

February 2016: Provided a report as a court appointed expert in digital forensics centered around the analysis of artifacts on a mobile phone related to the creation and deletion of video and picture files in *Pagan v. The City of New York et al.*, The United States District Court for the Eastern District of New York, Case No. 1:15-cv-05825-LDH-RLM

May 2015: Testified in deposition about large-scale database analysis for cellular phone providers in *RS Legacy Corporation fka RadioShack Corporation*, The United States Bankruptcy Court, District of Delaware, Case No. 1:15-bk-10197-BLS

January 2015: Submitted declaration on behalf of a subpoenaed third party discussing analysis of their systems to identify files potentially taken from Plaintiff in a thief of intellectual property case, *Applied Materials, Inc. v. Burks*, The United States District Court for the Northern District of New York, Case No. 1:14-cv-01346-GTS-CFH

November 2013: Testified at arbitration as a digital forensics expert regarding analysis of messages from mobile devices in *MLB Players Association v. Office of the Commissioner of Baseball*, The Major League Baseball Arbitration Panel, Grievance No. 2013-2 (Alexander Rodriguez)

June 2012: Submitted an affidavit relating to the plaintiff's spoliation of data after forensically examining the plaintiff's computer evidence in an alleged copyright infringement case, *Gordon v. DreamWorks Animation SKG, Inc., et al.*, The United States District Court for the District of Massachusetts, Case No. 1:11-cv-10255-JLT

December 2011 to April 2012: Submitted an expert report, declaration, and testified at trial as a digital forensics expert regarding computer systems, payroll process and data in *Gannett Satellite v. Borough of Raritan*, New Jersey Superior Court, Law Division, Case No. L-001798-09

February 2012: Functioned as a third-party neutral expert, helped to refine and execute a search protocol to provide needed data to the right parties without disclosing confidential information in a theft of intellectual property matter, *CBR Systems, Inc., v. Christopher Deigan*, New Jersey Superior Court, Chancery Division, Case No. BER-C-383-11

November 2011: Testified in deposition on the evidence preservation process for the Thornburg Mortgage Chapter 11 bankruptcy, *Joel Sher v. SAF Financial, Inc. et al.*, The United States District Court for the District of Maryland, Case No. 1:10-cv-01895-RDB

September 2009: Submitted expert report and testified in deposition and at trial as a third-party neutral digital forensics expert on the potential destruction of data, comparison of sets of data, and other digital forensic issues in *T R Investors LLC v. Arie Genger*, Court of Chancery of the State of Delaware, Civil Action No. 3994-VCS

May 2009 to July 2009: Provided written testimony in the form of multiple declarations on the process used and conclusions reached by the opposing expert. Worked as the expert for the U.S. Attorney's Office who handled the defense because Cino was an employee of the Department of Transportation, *Omogbehin v. Cino*, The United States District Court for the District of New Jersey, Case No. 1:06-cv-04581-JEI-JS

January 2009 to June 2009: Submitted two declarations regarding the search for and remediation of intellectual property from a former employer in a pre-litigation matter.

October 2007 to November 2007: Provided written testimony in the form of a declaration and an expert report opining on web-based postings of sensitive information in *Saffran, M.D., Ph.D., v. Boston Scientific Corporation*, The United States District Court for the Eastern District of Texas, Case No. 2:05-cv-00547-TJW

August 2005 to April 2007: Submitted multiple affidavits and expert reports. Testified in deposition and at trial as an expert witness in digital forensics on findings and opinions resulting from computer forensic analysis in a copyright infringement matter, *Merchant Transaction v. Nelcela Incorporated, et al.*, The United States District Court for the District of Arizona, Case No. 2:02-cv-01954-NVW

November 2006: Provided written testimony in the form of a certification regarding deletion of information from multiple computer systems in *Samsung America Inc. v. Park*, New Jersey Superior Court, Chancery Division, Case No. C-379-06

November 2005 to July 2006: Submitted multiple affidavits and expert reports regarding lost or destroyed evidence and analysis of several Windows and AIX UNIX computers. Testified at trial as an expert on findings and opinions resulting from investigation of computer evidence in *United States v. Duronio*, The United States District Court for the District of New Jersey, Case No. 2:02-cr-00933-JLL

August 2005 to December 2005: Submitted multiple affidavits related to cost shifting and presented opinions at court conference in *Quinby v. WestLB AG*, The United States District Court for the Southern District of New York, Case No. 1:04-cv-07406-WHP-HBP

July 2004 to January 2005: Provided written testimony in the form of declarations and expert reports, as well as oral testimony in deposition regarding computer forensic analysis of data in an intellectual property matter, *Judy DiBattisto, et al. v. PSS World Medical, Inc.*, The United States District Court for the District of Nevada, Case No. 2:03-cv-00998

## AWARDS AND RECOGNITION

March 2014: Consulting Magazine, The Rising Stars of the Profession – 35 under 35

FAULKNER EXHIBIT 2 — MATERIALS CONSIDERED

## Case Materials

All documents cited in my report that are not cited herein.

Forensic image of Ms. Chen's computer using a Logicube Falcon-Neo forensic imaging device dated November 19, 2020, by Unit 42.

An iTunes backup of Mayor Durkan's iPhone 8 Plus (Verizon), model: A1864, serial number: F17WDNB4JCLM dated August 29, 2019, located on the forensic image of Ms. Chen's computer.

A Cellebrite advanced logical data extraction of Mayor Durkan's iPhone 8 Plus (Verizon), model: A1864, serial number: F17WDNB4JCLM dated July 2, 2021, by Unit 42.

A Cellebrite full file system extraction of Mayor Durkan's iPhone 8 Plus (Verizon), model: A1864, serial number: F17WDNB4JCLM dated July 7, 2021, by Unit 42.

A Magnet ACQUIRE data extraction of Mayor Durkan's iPhone 8 Plus (FirstNet), model: A1897, serial number: FD1XR5Y8JCM2 dated September 18, 2020, by an "Information Security Engineer" with the City.

A Cellebrite advanced logical data extraction of Mayor Durkan's iPhone 8 Plus (FirstNet), model: A1897, serial number: FD1XR5Y8JCM2 dated November 19, 2020, by Unit 42.

A Cellebrite full file system extraction of Mayor Durkan's iPhone 8 Plus (FirstNet), model: A1897, serial number: FD1XR5Y8JCM2 dated July 7, 2021, by Unit 42.

An iTunes backup of Mayor Durkan's iPhone 11 (FirstNet), model: A2111, serial number: F4GCQQ6PN72Q, dated August 21, 2020, located on the forensic image of Ms. Chen's computer.

A Magnet ACQUIRE data extraction of Mayor Durkan's iPhone 11 (FirstNet), model: A2111, serial number: F4GCQQ6PN72Q, dated October 15, 2020, by an "Information Security Engineer" with the City.

A Cellebrite advanced logical data extraction of Mayor Durkan's iPhone 11 (FirstNet), model: A2111, serial number: F4GCQQ6PN72Q, dated November 19, 2020, by Unit 42.

A full file system extraction, using unc0ver jailbreak and forensic software from Belkasoft LLC, of Mayor Durkan's iPhone 11 (FirstNet), model: A2111, serial number: F4GCQQ6PN72Q, dated July 8, 2021, by Unit 42

Data collection from Mayor Durkan's iCloud account "durje.mos@gmail.com" using Magnet AXIOM Cloud and Elcomsoft Phone Breaker dated November 16, 2020, by Unit 42.

Data collection of account data and text messages in iCloud from Mayor Durkan's iCloud account "durje.mos@gmail.com" using Elcomsoft Phone Breaker dated September 9, 2021, by Unit 42.

An inspection on November 19, 2020, by Unit 42, of a Microsoft Surface Pro 4, serial number: 048165462053, which was described as the tablet Mayor Durkan uses from home for City-related work.

**EXPERT REPORT OF KEVIN T. FAULKNER – EXHIBIT 2 – FEBRUARY 11, 2022**

**FAULKNER EXHIBIT 2 — MATERIALS CONSIDERED**

An inspection on November 19, 2020, by Unit 42, of a Microsoft Surface Pro 7, serial number: 030612294353, which was described as the tablet Mayor Durkan uses from the office for City-related work.

An extraction from Pinnacle, the centralized database that receives billing and usage information from cellular providers used by the City, containing records from the beginning of January 2020 through the end of August 2020 for Mayor Durkan's mobile phone number.

A Cellebrite advanced logical data extraction of Chief Best's iPhone XS Max, model: A1921, serial number: F2LZ5ANGKPHC, dated February 24, 2021, by ArcherHall.

A Cellebrite advanced logical data extraction of Chief Best's iPhone XS Max, model: A1921, serial number: F2LZ5ANGKPHC, dated November 8, 2021, by Unit42.

Forensic image of Tricia Colin's computer using a Logicube Falcon-Neo forensic imaging device dated October 22, 2021, by Epic.

An iTunes backup of Chief Best's iPhone 8 Plus, model: A1864, serial number: FD6W12T6JCLY, dated October 1, 2019, located on the forensic image of Tricia Colin's computer.

An iTunes backup of Chief Best's iPhone 6s Plus, model: A1687, serial number: F2LRMBLFGRWV, dated November 15, 2017, located on the forensic image of Tricia Colin's computer.

A document titled "Smartphone Backup Process."

## Deposition Transcripts

Deposition Transcript of Carmen Best, dated November 9, 2021

Deposition Transcript of Mayor Jenny A. Durkan, dated December 8, 2021

## Production Documents

SEA_00144252

SEA_00145700

SEA_00145708

SEA_00145710

"PLAINTIFFS' SECOND SET OF INTERROGATORIES TO DEFENDANT CITY OF SEATTLE **AND THE CITY'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES THERETO**" dated August 31, 2021.

## Websites

https://support.apple.com/en-us/HT207428

**EXPERT REPORT OF KEVIN T. FAULKNER – EXHIBIT 2 – FEBRUARY 11, 2022**

**FAULKNER EXHIBIT 2 — MATERIALS CONSIDERED**

https://support.apple.com/en-us/HT202033

https://support.apple.com/guide/icloud/messages-mm0de0d4528d/icloud

https://developer.apple.com/documentation/corefoundation/1543542-cfabsolutetimegetcurrent

https://support.apple.com/en-us/HT201287

https://support.apple.com/guide/iphone/erase-iphone-iph7a2a9399b/14.0/ios/14.0

https://www.apple.com/legal/internet-services/icloud/en/terms.html

https://support.apple.com/guide/icloud/back-up-your-ios-and-ipados-device-mmab848634c8/icloud

**EXPERT REPORT OF KEVIN T. FAULKNER – EXHIBIT 2 – FEBRUARY 11, 2022**

# EXHIBIT 9

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
              Plaintiff,         )
                                 )
         vs.                     ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
              Defendant.         )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

KEVIN T. FAULKNER

_____

New York, New York

(All participants appeared via videoconference.)

DATE TAKEN:  AUGUST 17, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 36

1    A.  I believe they did, at least attempt to make a

2    backup.  I'm not sure if the backup ended being the

3    successful transfer method or the quick start

4    phone-to-phone transfer, but I recall them saying they

5    were trying one, having issues, and then trying the

6    backup.  I don't know what they ultimately did that

7    succeeded.

8    Q.  Okay.  So they told you that they -- they were

9    going to attempt the backup, and they ultimately did

10   succeed in transferring the data; correct?

11   A.  Yes, I believe that's fair.

12   Q.  So you have no reason to -- to assume that they

13   didn't create a backup during that conversion of the

14   data from the old phone to the new phone in November of

15   2020; correct?

16   A.  I'd say that, yeah, I believe that's fair.

17   Q.  And did they tell you, then, that it was their

18   normal practice to back up a user's phone before they

19   replaced it with a new phone?

20   A.  I do recall hearing from them that that was

21   their standard practice, but I don't recall if it was

22   then when I met them in person as opposed to phone calls

23   later on.

24   Q.  Okay.  What was the purpose of the subsequent

25   phone calls that you had with them?

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 70

BY MR. REILLY-BATES:

1

2      Q.  Does -- does Palo Alto Networks ever do that

3  for any phones that it's attempting to forensically

4  examine?

5                MR. CRAMER:  Objection.  Form.  Foundation.

6          You can testify as to what you know.

7      A.  I don't know any case where we've ever examined

8  a phone to determine whether or not it had been damaged

9  by saltwater.

10 BY MR. REILLY-BATES:

11     Q.  Okay.  And specifically with respect to this

12 case, you don't recall taking any steps to determine

13 whether it had been damaged by saltwater or not;

14 correct?

15     A.  Again, I don't -- don't recall that being a --

16 a question or an issue that was raised to me to even

17 look into.  So I -- no.  I don't believe we did anything

18 to look into whether or not there was actually saltwater

19 present.

20     Q.  When you got the phone, could you power the

21 phone on?

22     A.  I can't recall if I had to charge the battery

23 first or not, but then -- other than that, yes, it could

24 turn on.

25     Q.  And was the phone in -- in working fashion?

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 72

1          Go ahead.
2          A.   Yeah, I would say that replacing a screen on an
3     iPhone is not terribly expensive or difficult.  However,
4     the back glass on an iPhone is much more difficult.
5     There are -- there are much fewer places that can repair
6     that kind of damage.
7     BY MR. REILLY-BATES:
8          Q.   Did you ever ask the City or try to find out
9     from either Mayor Jenny Durkan, Emmanuel Arhu, or Regi
10    Alencastro why they didn't simply repair the phone, as
11    opposed to replacing the phone?
12         A.   No.
13         Q.   And they -- in fact, they never told you any
14    reasons why the phone had to be replaced; correct?
15              MR. CRAMER:  Objection.  Form.
16         A.   I mean, I recall something about a concern that
17    the mayor could cut her finger on the phone.  That may
18    warrant replacement, but that's all that comes to mind.
19    BY MR. REILLY-BATES:
20         Q.   So the mayor -- the mayor -- the fact that the
21    mayor could cut her phone -- finger on the phone was a
22    reason, but the fact that the -- the phone was not
23    working was not a reason that was provided to you as a
24    reason for replacing the phone; correct?
25              MR. CRAMER:  Objection.  Misstates

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 109

1    believe I recovered anything from June 1st till later in
2    June, no.
3        Q.   And you also didn't recover any text messages
4    from Chief Best's phone from June 1st through June 25,
5    2020, that were to Mayor Durkan; isn't that correct?
6        A.   I don't believe I recovered any texts for
7    Chief Best in that time frame.  I didn't evaluate what
8    might have been between any two individuals.  I just
9    looked for data at all.
10            But since I -- I don't believe I found any in
11   that time frame at all, then there would be none between
12   those two individuals.
13       Q.   Okay.  So it's fair to assume that there are no
14   recoverable text messages between Chief Best and
15   Mayor Durkan from June 1, 2020, through June 25, 2020;
16   wouldn't you agree?
17            MR. CRAMER:  Objection.  Form.
18       A.   I don't --
19            MR. CRAMER:  Calls for speculation.
20       A.   I -- sorry.  I can't agree with that.  I didn't
21   recover any off of their phones, but I know those
22   weren't the only data sources that were included in this
23   case.  There were data sources that I never looked at
24   that were used in discovery, and so I don't know if any
25   of those sources recovered any such messages.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 110

1    BY MR. REILLY-BATES:

2        Q.  And what data sources are you referring to that

3    could potentially contain messages solely between

4    Chief Best and Mayor Durkan between June 1, 2020, and

5    June 25, 2020?

6        A.  Your previous question did not say "solely."

7    So --

8        Q.  Okay.

9        A.  -- understanding that there could be messages

10   between them and other individuals, those texts could be

11   recovered from the phones of those other individuals.

12   Between them solely, I'm not aware of any data sources,

13   but I don't know the full list of all data sources

14   included in the City's efforts to recover texts from

15   other people.

16       Q.  Okay.  That's a fair enough observation.  So

17   let me just restate this.

18           So you were unable to recover any text messages

19   that were solely between Mayor Jenny Durkan and

20   Chief Carmen Best between June 1, 2020, and June 25,

21   2020; isn't that correct?

22       A.  I would say again, I believe I didn't recover

23   any text messages from either of their devices or

24   backups in that time frame.  So therefore, I expect

25   there would not be any between them, if I recovered none

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 111

1    in total.

2         Q.   Okay.  So I'm going to give you a yes or no

3    question, and I'd like you to give me a yes or no

4    answer, please.

5              So can you confirm whether or not Mayor Durkan

6    has no text messages that were solely from her to

7    Chief Carmen Best, or vice versa, for the time period of

8    June 1, 2020, through June 25, 2020?  Yes or no?

9              MR. CRAMER:  Objection.  Asked and answered.

10        A.   I would say it's not something I looked at.

11   BY MR. REILLY-BATES:

12        Q.   Was that -- was that yes?

13        A.   It was -- I can't say either way.  It's not

14   something I looked at, to give just a yes or no answer.

15   I looked at what text messages in total could be

16   recovered, but I've never looked specifically at any

17   messages solely between them.  I am inferring that there

18   are no messages between them because I got no messages

19   in total.

20        Q.   Okay.  So the question is -- is whether you

21   were able to recover any text messages through your

22   efforts, whatever they were, between Mayor Jenny Durkan

23   and Chief Best, that were solely between the two of

24   them, between June 1, 2020, and June 25, 2020?  Yes or

25   no?

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                Kevin T. Faulkner

Page 115

1    I do recall I didn't recover texts for June of 2020, or

2    early to June 28 -- 25th or so.

3         But for the other custodians, I don't recall

4    what data was or wasn't there right now.  I'd have to

5    take a look back at the information in the reports.

6    BY MR. REILLY-BATES:

7         Q.  So sitting here today, can you tell me whether

8    or not you were able to recover any text messages that

9    were solely between Mayor Durkan and Chief Harold

10   Scoggins for the period of June 1, 2020, through

11   June 25, 2020?

12        A.  I don't recall the -- the date range of text

13   messages that were recovered for Harold Scoggins without

14   looking at some document to refresh my recollection.  So

15   I can't say either way.

16        Q.  You're aware that he reset his phone -- he

17   factory reset his phone on August -- or October 8, 2020,

18   aren't you?

19             MR. CRAMER:  Objection.  Misstates the

20   evidence.  There's no evidence that he reset his phone.

21   BY MR. REILLY-BATES:

22        Q.  Or that his phone was factory reset -- pardon

23   me -- on October 8, 2020?

24        A.  I recall that his phone was reset.  I did not

25   recall the date.  If you are representing that as the

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 116

1   date, I have no reason to --

2       Q.  I'm sorry; we lost the last bit.  You froze,

3   sir.

4           THE WITNESS:  Am I back?

5   BY MR. REILLY-BATES:

6       Q.  Yeah, you are.

7       A.  I was -- do you want to ask that again, I'll

8   answer again?

9           MR. REILLY-BATES:  Court Reporter, can you

10  read that back?

11          THE COURT REPORTER:  I'll read back the

12  question and the portion of the answer before he froze.

13          (A portion of the testimony was read back.)

14          THE COURT REPORTER:  And then he froze.

15      A.  No reason to disagree with it.

16  BY MR. REILLY-BATES:

17      Q.  And are you aware that Chris Fisher had factory

18  reset his phone in November of 2020?

19          MR. CRAMER:  Objection.  Form.  Misstates

20  the record.

21          Go ahead.

22      A.  Again, I don't recall the dates of any resets

23  that occurred for the other custodians, including

24  Mr. Fisher, but I have no reason to disagree with that

25  date, if it is the right date.

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 117

1    BY MR. REILLY-BATES:

2        Q.  Well, have you been able to recover any text

3    messages for Mr. Fisher, sent from his phone from

4    June 1, 2020, through June 25, 2020?

5        A.  If the date that you mentioned in the previous

6    question, in November, was indeed the date it was reset,

7    then the answer would be no.  But I don't remember the

8    date range of each custodian's recovered texts.

9             As I was saying before, I recovered it and

10   provided the data off to Counsel.  I didn't dive into,

11   you know, what -- you know, what was the earliest date

12   and latest date for each one, that I can recall.

13       Q.  Okay.  And looking at the second goal on Page 3

14   of your report, it says, "Determine what happened to

15   cause the text messages of Mayor Durkan and Chief Best

16   to be missing."

17            What did you determine to be the cause of

18   Chief Best's missing text messages?

19       A.  I recall Chief Best's phone had artifacts

20   consistent with deletion by the 30-day retention

21   setting, as well as artifacts consistent with periodic

22   deletion of text messages.

23       Q.  And when you say that there were some messages

24   that were deleted by the 30-day retention setting, I

25   believe you're referring to a very small number of

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 119

1   deal with the interaction of group chat membership.

2           So for example, when a new person joins a group

3   chat and a little message appears on the screen saying,

4   this person has just joined the chat, that creates the

5   item type one messages.

6           There were those types of messages from

7   sometime before September of 2020, but I don't recall

8   any messages with user content in them before that date.

9   BY MR. REILLY-BATES:

10      Q.  Okay.  So all of the messages with user content

11  before September 2, 2020, that existed on Chief Best's

12  phone were either deleted manually or by the 30-day

13  delete setting having been turned on; correct?

14              MR. CRAMER:  Objection.  Form.

15      A.  I would say that the artifacts on Chief Best's

16  phone are consistent with all of the user messages from

17  before September 2, 2020, having been deleted either

18  from manual deletion or the 30-day setting.

19  BY MR. REILLY-BATES:

20      Q.  Based on your 18 years of professional

21  experience, could you give us an estimate of the

22  percentage of text messages that were deleted through

23  manual deletion and the messages that were deleted by

24  the 30-day auto delete setting, or is that impossible to

25  do based on what you have?

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                Kevin T. Faulkner

Page 120

1          MR. CRAMER:  Objection.  Form.

2     Go ahead.

3     A.  I mean, that's -- it's really impossible to

4 tell.  Yeah, it's -- it can't be determined.

5 BY MR. REILLY-BATES:

6     Q.  Okay.  There's no -- there's no data source or

7 investigation you could conduct to determine that

8 information?

9     A.  Not unless a new data source came to light that

10 still had some of the messages.  You might be able to

11 piece together some things from that, but there's no

12 data source that I know of in this litigation that I

13 could look at to figure that out, no.

14     Q.  All right.  Please go to Page 27 of your

15 report, Exhibit 2.

16     A.  Okay.  I'm on printed Page 27.

17     Q.  Okay.  And go to the section, start with

18 Restore from iCloud on July 4th.

19          Do you see that?

20     A.  I see that section, yes.

21     Q.  Okay.  Now, you concluded that the mayor's

22 phone was restored and backed up on July 4, 2020;

23 correct?

24     A.  I would say that I found a number of artifacts

25 consistent with it having been restored on July 4, 2020.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 122

1    admission, but I recall a discussion with her in which

2    she said that she had restored her phone from a backup.

3         Q.  And did you ever -- do you recall discussing

4    the specific time that you discussed this -- do you

5    recall discussing the specific time that she conducted

6    the restoration of her phone on July 4th?

7         A.  Not a precise time, no.

8         Q.  Now, do you share Brandon Leatha's opinion,

9    that in order to restore an iPhone, that the phone has

10   to be factory reset before it can be restored?

11             MR. CRAMER:  Objection.  Form.  Vague.

12        A.  I would say that a phone would need to be

13   either factory reset or new out of the box in order to

14   then restore a backup from iCloud.

15   BY MR. REILLY-BATES:

16        Q.  Okay.  So would it be fair to assume that

17   Mayor Jenny Durkan's iPhone 8 Plus FirstNet was factory

18   restored before -- or factory reset before it was

19   restored on July 4, 2020?

20        A.  Yes, I believe that's fair.

21        Q.  Now, did you determine that Mayor Jenny

22   Durkan's phone was reset more than once during the

23   summer of 2020?

24        A.  Sorry.  To be clear, we're talking about this

25   iPhone 8 Plus FirstNet?  Is your question related to

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 131

1    that.  There is an artifact for the time when that
2    function was used, and that's where I retrieved that
3    time.
4    BY MR. REILLY-BATES:
5        Q.  Now, is this a function that can be changed
6    remotely, or does it actually have to be done on the
7    phone directly?
8        A.  As of today, I have not found a way to do it
9    remotely.  I don't know if any sort of MDM softwares
10   could do it or not.
11       Q.  Okay.  And I believe you testified earlier that
12   Mayor Durkan did not have any MDM software installed on
13   her phone, that you're aware of, at that time; correct?
14       A.  None that I'm aware of.
15       Q.  And would you agree that if the phone was only
16   in the possession of former Mayor Jenny Durkan on
17   July 4, 2020, that she was the person who pushed the
18   disable and delete function for messages in iCloud --
19           MR. CRAMER:  Objection -- objection.
20   Assumes facts, outside the scope of his expertise, lack
21   of foundation, incomplete hypothetical.
22           Go ahead.
23       A.  I would say that I don't know.  I don't know
24   what happened to that phone.  I don't know if -- if she
25   pushed that function or not.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 138

1    record.   The time now is 3:27 p.m.

2              (Recess from 3:27 p.m. to 3:36 p.m.)

3              THE VIDEOGRAPHER:   We are back on the

4    record.   The time is 3:36 p.m.

5              E X A M I N A T I O N (Continuing)

6    BY MR. REILLY-BATES:

7         Q.   Mr. Faulkner, you understand you're still under

8    oath; correct?

9         A.   Yes, I understand.

10        Q.   Okay.   Now, before the break, I showed you a

11   message that one would receive if they clicked the

12   disable and delete function.

13             Do you recall that?

14        A.   Yes, I recall.

15        Q.   And that message says, "This will disable

16   messages in iCloud and delete all your messages stored

17   in iCloud"; correct?

18        A.   I believe that's part of what it said.

19        Q.   Right.   And then it also continues, "You have

20   30 days to undo the action.   Your device will

21   automatically download your messages."

22             Does that refresh your recollection?

23        A.   Let me take a look here.

24        Q.   That was Page 18.

25        A.   That is some more of what it says, and then it

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 139

1    further says, "Your device will automatically download

2    your messages."

3         Q.   Okay.

4         A.   Yes, that's the complete message.

5         Q.   So assuming that Mayor Durkan was the one who

6    selected the disable and delete function on July 4th of

7    2020, she likely would have received a message similar

8    to the message we just -- we just discussed; correct?

9         A.   I'd say, hypothetically, if she was the one

10   that used the function, then she would see a message

11   like that, yes.

12        Q.   And did you have an opportunity to have a

13   conversation with her about who selected this disable

14   and delete function on her phone?

15        A.   I think that's a question that came up in -- in

16   discussion with her, yes, and that she said she didn't

17   recall using that function.

18        Q.   Did you ask her who else that was with her at

19   that time could have enabled that function?

20        A.   I believe I asked something to the effect, yes.

21        Q.   And what was her explanation?

22        A.   That she didn't give her phone to anyone else

23   to work on the recovery, or get her phone running on

24   that day, something like that.

25        Q.   Now, the mayor replaced her old phone -- iPhone

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                   Kevin T. Faulkner

Page 161

1      MR. CRAMER:  Again, I'll instruct the

2  witness not to testify to any conversations of that

3  nature that he may have had -- may or may not have had

4  with any attorneys for the City.

5      To the extent that you had any such

6  conversations with people at the City who were not

7  attorneys, feel free to testify.

8      A.  I had no conversations with anyone who's not an

9  attorney about such topics.

10  BY MR. REILLY-BATES:

11     Q.  And with respect to City attorneys, I'm just --

12  I'm just asking if you had a conversation with them

13  about collecting personal devices, not any of the

14  content of -- of those conversations.

15      MR. CRAMER:  I think that the instruction

16  still holds.  I'll allow him to answer the question if

17  you'll agree that it's not a waiver of any privilege

18  over the substance of the communication.

19      MR. REILLY-BATES:  That's fine.

20      MR. CRAMER:  Go ahead.

21      A.  I believe so, yes.

22  BY MR. REILLY-BATES:

23      Q.  Okay.  Did you ever -- did you ever examine

24  Chief Best's personal cellphone with regards to text

25  messages stored on her personal cellphone?

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 162

1      A.  I don't believe so, no.

2      Q.  Has anybody informed you that Chief Best's

3  personal cellphone was factory reset after she visited

4  an Apple store in May of 2021?

5      A.  I don't recall hearing that before, no.

6      Q.  Okay.  Are you aware of the City making any

7  changes to its policies with respect to City employees

8  with respect to personal cellphones since June of 2020?

9      A.  I'm not aware of City policy changes, no.

10          MR. REILLY-BATES:  Okay.  I think it would

11  be a good idea to take a five-minute -- let's take a --

12  go off the record here.

13          THE VIDEOGRAPHER:  We're going off the

14  record.  The time now is 4:22.

15          (Recess from 4:22 p.m. to 4:33 p.m.)

16          THE VIDEOGRAPHER:  We're back on the record.

17  The time is 4:33 p.m.

18          E X A M I N A T I O N (Continuing)

19  BY MR. REILLY-BATES:

20      Q.  Okay.  Thank you.

21          Mr. Faulkner, you understand you're still under

22  oath; correct?

23      A.  Yes, I understand.

24      Q.  Okay.  Let's turn to Exhibit 3, the rebuttal

25  report, your rebuttal report.  And if you could turn to

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 175

1    by the City was ongoing.

2         Q.  Okay.

3         A.  I don't know if they've recovered any

4    additional ones since I did that analysis or not.

5         Q.  So as you sit here today, though, you have not

6    received any indication that the City has recovered more

7    text messages that would increase that number from 131

8    up to a higher number; correct?

9              MR. CRAMER:  Objection.  It misstates what

10   the rebuttal report says.

11             Go ahead.

12        A.  I -- I have not received any notification of

13   additional text messages being recovered that I have

14   been asked to consider or analyze.

15   BY MR. REILLY-BATES:

16        Q.  Okay.  Now, were you aware of these 191 manual

17   deleted messages when you prepared your report in

18   February of 2022?

19        A.  I think I recall seeing some gaps in row IDs

20   that are consistent with manual deletion, but I don't

21   know if I knew of each of them or anything like that.

22        Q.  Okay.  And did you -- did you describe the

23   manual deletion of any of the mayor's text messages in

24   your expert report that was issued in February of 2022?

25        A.  Not that I recall.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 176

1    Q.  Why not?

2    A.  It wasn't something I was asked to look into

3    and opine on.  I was looking for other sources of data

4    that could have and recover text messages, or trying to

5    figure out what happened with them.

6    Q.  Okay.  Let's go back to Exhibit 2, which is

7    your February 2022 report.  If I could direct your

8    attention to -- one second -- Page 3, please.

9    A.  I am on Page 3.

10   Q.  And the goals of the investigation were to

11   attempt to recover or otherwise locate the missing text

12   messages of Mayor Durkan and Chief Best, and number two,

13   determine what happened to cause the text messages of

14   Mayor Durkan and Chief Best to be missing.

15        I'm focusing on the second of those goals.

16   Wouldn't manual deletion fall under the goal of

17   determining what happened to text messages of

18   Mayor Durkan?

19   A.  I, again, don't think there was any question

20   around that.  The question was around the June 25, 2020,

21   and back text messages, trying to understand what

22   happened to those.

23        And that's why I have defined terms in the

24   report, specifying the initial missing Durkan text

25   messages, and then later on, once we recovered some of

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 227

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Kevin T.

9    Faulkner, having been duly sworn, on August 17, 2022, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 18th day of August, 2022.

14

15

16

17

18   _____

     CINDY M. KOCH, CCR, RPR, CRR

19

20   My commission expires:

21   JUNE 9, 2026

22

23

24

25

2ac29120-0136-4c4c-90b7-fabf50578964

# EXHIBIT 10

SEA_00145702

🗑 Delete   ⋯

(No subject)

DJ   Durkan, Jenny
     Sat 7/4/2020 8:52 PM
     To: Friedhoff, Andrea; OReilly Bernier, Colleen; Benbow, Laura
     Cc: Formas, Stephanie

Can one of you send me the password for the MOS calendar account. My phone died but I was able to reset and backup from cloud
. But don't have that pw

Sent from my iPhone

**Reply**   **Reply all**   **Forward**

# EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff,           )
                                 )
        vs.                      )  No. 20-cv-00983
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )

---

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

MAYOR JENNY A. DURKAN

---

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:   DECEMBER 8, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

Hunters Capital, LLC v. City of Seattle          Mayor Jenny A. Durkan

Page 256

1   my data from the iCloud, but had a hard time restoring

2   my calendar.  So I was able to get the messages, had

3   some problems with the mail, but got the mail on there,

4   and -- but had trouble getting the calendar to load.

5        Q.  Did you reset your phone?

6        A.  I don't recall whether I reset it or whether

7   it -- because if it crashed, it reset, but my

8   recollection is, there's that screen where you can say,

9   you know, do you want to start your phone as a new phone

10  or restore it from the cloud, and I chose from the

11  cloud, and then restored it from the iCloud backup for

12  the phone.

13       Q.  Okay.  And as far as you know, you were able to

14  get all of your messages --

15       A.  Yes.

16       Q.  -- restored from the cloud onto your phone?

17       A.  Yes, as far as I know.

18       Q.  Did you --

19       A.  And the messages were on there.  I mean, I tend

20  to look just at the top messages.  But it took a while

21  for the phone to update to get the messages and the

22  mail.  The calendar, I had a little bit more difficulty

23  with because I had to get a password from another

24  assistant, but finally got the calendar to load too.

25       Q.  So who did -- who did you talk to at the City

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

Hunters Capital, LLC v. City of Seattle          Mayor Jenny A. Durkan

Page 259

1   And -- and like I said, it was Fourth of July,
2   so I was cooking dinner.  We did fireworks, and I don't
3   remember the exact time that I got the password to it,
4   whenever I -- I think there's an email they sent it to
5   me by, and whenever they sent it, but when I read it, I
6   was able to enter it, and then the calendar was able to
7   load too.
8       Q.  Okay.  At some point did you get a replacement
9   phone for the phone that had been dropped in the
10  saltwater?
11      A.  I did.  So, you know, part of what I was trying
12  to do was, you know, get the phone to limp along.  I
13  knew I'd be back in Seattle, and that IT could either
14  see if the phone was suitable or I needed a new one.
15  They made the decision to replace the phone.
16  The phone that I dropped in the water, also the screen
17  had cracked on it.  And so they issued a replacement
18  phone for me.  I think it was around July 9th.  There
19  was a little bit of a delay be- -- getting the phone
20  ordered, and then they gave me the new phone.
21      Q.  Okay.  So did the phone crack at the same time
22  you dropped it into the water?
23      A.  No.  We'd already had a cracked screen, and I
24  don't remember how it got there.
25      Q.  Okay.  So when you got your new phone, what

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

Hunters Capital, LLC v. City of Seattle          Mayor Jenny A. Durkan

Page 261

1    to get those contacts loaded on there.

2         Q.  At some point did you discover or hear that

3    your phone had a 30-day delete -- your new phone had a

4    30-day delete setting that had been turned on, for

5    messages?

6         A.  I did hear that after this whole issue had

7    developed.

8         Q.  Okay.  When did you hear that, and who told

9    you?

10        A.  To the best of my recollection, I heard it --

11   I -- to the best of my recollection, I wasn't aware that

12   there was an issue with -- related to the -- the text

13   messages not being on the phone until probably, I want

14   to say it was September or October.

15        I knew that they needed my phone, and I knew

16   that they -- that there were texts they were looking

17   for, but it was not until that later time frame that I

18   realized that there were a greater number of text

19   messages that were not on my phone.

20        And it wasn't until, I think, much later,

21   probably the spring, that it was identified that the

22   issue could have been that the -- the retention setting

23   for messages on the phone was set, for some period of

24   time, to 30 days instead of infinity.

25        Q.  Do you know or have you heard who turned on the

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

Hunters Capital, LLC v. City of Seattle          Mayor Jenny A. Durkan

Page 262

1   30-day delete function on your new phone?

2        A.   No, I do not, and have not heard.

3        Q.   Do you know who discovered that it was on and

4   turned it off?

5        A.   No.  I'm not sure -- I'm not sure what you're

6   asking.

7        Q.   My understanding is that you have texts from

8   June 25th onward, but that the texts before that date

9   have been deleted, apparently due to the 30-day

10  function, although I don't know exactly what the

11  official story is right now, which leads me to conclude

12  that somebody determined in late July that there was a

13  30-day -- 30-day delete and turned it off.

14            Are you aware of that?

15       A.   Oh, if that's -- do I know that in July who may

16  have done something with the retention settings?

17       Q.   Yeah.  Do you know who may have turned the

18  30-day settings off, or who first discovered that it was

19  on in the first place?

20       A.   No, I do not.

21            MR. HARRIGAN:  Objection.  Assumes facts not

22  established.

23            Go ahead.  But you can -- sorry.  I overrode

24  your answer, so you probably should say it again.

25       A.   Sorry.  Sorry.  No, I do not.

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

Hunters Capital, LLC v. City of Seattle                Mayor Jenny A. Durkan

Page 274

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Jenny A.

9    Durkan, having been duly sworn, on December 8, 2021, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 29th day of December, 2021.

14

15

16

17       _____

18       CINDY M. KOCH, CCR, RPR, CRR

19

20   My commission expires:

21   JUNE 9, 2022

22

23

24

25

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

# EXHIBIT 12

Jenny A. Durkan                                   March 1, 2022

Page 1

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
COUNTY OF KING

_____
                              )
SEATTLE TIMES COMPANY,        )
                              )
          Plaintiff,          )
                              )
     vs.                      ) No. 21-2-07268-9 SEA
                              )
CITY OF SEATTLE,              )
                              )
          Defendant.          )
_____)_____

          REMOTE DEPOSITION UPON ORAL EXAMINATION OF

                    JENNY A. DURKAN
_____


                 Tuesday, March 1, 2022
                 1:02 p.m. to 5:13 p.m.




REPORTED BY:          VERB8M REPORTING, INC.
                      Jeanne M. Gersten, RDR, CCR 2711
                      Registered Diplomate Reporter
                      (206) 467-0800
                      Jeanne@Verb8m.net
                      Info@Verb8m.net

Electronically signed by Jeanne Gersten (001-357-668-4110)          b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 72

 1   A     I don't know.

 2   Q     I'm sorry, I called it an email, and I meant a text

 3   message.

 4   A     I do not know.

 5   Q     Okay.  And so did you ever decline or refuse to

 6   produce text messages requested by The Seattle Times?

 7   A     No.

 8   Q     Okay.

 9   A     There could have -- Actually, a caveat.  There could

10   be a case that I'm not aware of where there would have

11   been a text message that was determined to be exempt and

12   wasn't produced; but I took your question to mean did I

13   personally refuse to produce information, and the answer

14   is no.

15   Q     Right.  Okay.  Have you ever as Mayor deleted any

16   message on a device issued to you by the City of Seattle?

17   A     And by message, you mean text message?

18   Q     Yes.

19   A     Okay.  So as I said before, there were occasions

20   when I would get text messages that would be like phishy

21   things where I would delete.  There -- I won't say there

22   wasn't any occasion it happened, but my practice was to

23   keep all of my text messages on my phone, even those that

24   were, "Call me," or, you know, just very brief

25   non-substantive text messages.

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                        March 1, 2022

Page 93

1    A      I have no recollection of seeing that prompt or

2    clearing that prompt.

3    Q      Well, could anyone else have done it on that day

4    when you were at the beach?

5    A      No.

6    Q      So is it fair to assume that you did it?

7            MR. LAWRENCE:  Objection, argumentative.

8    A    No.  I think the -- You know, describing exactly

9    what happened, my focus was on restoring the data to my

10   phone and so was able to restore from an iCloud backup the

11   messages to my phone.

12       And in that process, you know, I was not -- I had

13   trouble restoring other items, like the calendar and the

14   email, and so those things in the iCloud setting.  I have

15   no recollection of seeing the prompt that you refer to or

16   clearing that prompt.

17   Q      (By Ms. George)  Okay.  Can you explain your

18   testimony that you were focusing on restoring?  Do you

19   mean you were trying to restore the data on the phone

20   after you found it in the water?

21   A    Correct.  As I said, it was pixilated, so I shut it

22   down.  I took it back, put it in a bag of rice, left it

23   there for a period of time, and then went to get it, the

24   data on the phone, and ended up having to restore from

25   iCloud.

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 73

1   Q      Okay.  And what do you mean by phishy things?

2   A      Oh, sorry.  Phishing is -- There's a lot of scams

3   where people will say, you know, "This is Chase Bank.

4   Your account is overdrawn.  Click here immediately."

5          Or more sophisticated ones that will actually use

6   your name and ask you to respond, and by doing that they

7   then get access to your phone with malware.  And so

8   anything that looks suspicious like that.  We had -- There

9   was periodically a number of people in the City, including

10  myself, there was concerted activity on that front.  So

11  there would be -- It would go in waves.

12  Q      Okay.  So you would delete phishy things, but not

13  other text messages from your City phones; is that

14  correct?

15  A      My practice was to keep everything.

16  Q      Okay.  And did you ever send business messages or,

17  you know, city-related text messages on a personal device?

18  A      We talked about that earlier, that there would be

19  occasions when that occurred, and we would search the

20  device for responsive messages and produce them.

21  Q      And have you ever deleted a business or city-related

22  message on a personally owned device?

23  A      Again, my practice was if it was City related and

24  substantive, I would keep it.

25  Q      And was that always the case?

Jenny A. Durkan                        March 1, 2022

Page 95

1    A    Yeah, the report indicates that that occurred during

2    that process, and -- But I -- And shows what the prompt

3    you would get.  I have no recollection of seeing or

4    clearing that prompt in that process.

5         I do recall having trouble getting my calendar to

6    load and trying to get it to load, and in the iCloud

7    settings trying to see if the getting calendar to load up

8    I could do that.  I have no recollection of seeing any

9    prompt about messages, and I got my messages.

10   Q    Okay.  Was anyone else handling the phone that day

11   after it fell in the water?

12   A    No.

13   Q    Okay.  So the forensic report says that the message

14   retention on either the iPhone 8 Plus FirstNet or the

15   iPhone 11 was set at 30 days at some point between

16   July 4th and whenever the forever setting was restored

17   between July 22nd and July 26th, and my question is -- a

18   long and convoluted one -- did you set the retention at

19   30 days?

20   A    No.

21   Q    Okay.  And your testimony is you don't know who did?

22   A    That's correct.

23   Q    Okay.  Who had possession of your iPhone 8 Plus

24   FirstNet between July 4th and July 26th?

25   A    So I don't know all the individuals, but the IT

Seattle Times Company v. City of Seattle
VERB8M REPORTING, INC.  (206) 467-0800

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

                                                        Page 94

1          And so there's -- My best recollection is there's a

2     screen that says, "Do you want to set this up as a new

3     phone, or do you want to restore from iCloud?"  I chose

4     restore from iCloud, and that's what then it took me to my

5     iCloud and was able to download the backup to my phone.

6          And so that restored to my phone the data that was

7     there, and I think that's reflected in the report.  It

8     says there was a successful restoration of the data to the

9     phone on July the 4th.  And so I was focused on making

10    sure that I could restore and get my phone back working

11    again and getting it to limp along, knowing that I would

12    be able to give it back to IT, you know, within a couple

13    days.

14    Q    So you were able to download a previous backup.  Do

15    you know what the date of that backup was?

16    A    I don't have an independent information.  As I read

17    the forensic report, they inferred the backup was a

18    February backup.

19         When I did it I just selected back up from iCloud

20    and was able to restore data to the phone.

21    Q    I see.  Okay.  So is it possible that in the process

22    of trying to restore from iCloud that you activated the

23    disable and delete function?

24              MR. LAWRENCE:  Objection, calls for

25    speculation, otherwise to the form.

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                          March 1, 2022

Page 96

1   Department had my phone four times during that period.

2   Q     And --

3   A     When I came back from the long weekend I was in the

4   office.  I believe it was on July the 6th they took my

5   phone.

6         At that point they determined -- and I told them

7   that it had crashed.  The phone, I still had problems

8   sending email and problems updating the calendar.  They

9   took the phone.  And it also had a bad cracked screen.  So

10  they took the phone, and they decided that they were going

11  to replace the phone instead of repairing it.

12        They then gave me back the phone.  I don't know what

13  they did in that interim time.

14        And then they took the phone again on July the 9th

15  to give me the new phone, the replacement phone.  So they

16  took the old phone and then brought me back the new phone;

17  and it continued to have some problems, so I gave it back

18  to them to address some problems because I couldn't get

19  contacts on my -- I continued not to be able to have

20  contacts.

21        And so they took the phone back twice during that

22  week of July -- I think the Friday was the 24th or 25th.

23  They took it like on the Wednesday.  It still wasn't

24  working.  And I gave it back to them on a Friday.

25  Q     I'm sorry.  You said IT took it twice.  Which week

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                March 1, 2022

Page 97

1   was that?

2   A      I think it was the 21st, and then whatever the -- I

3   think that Friday -- I can't remember if that Friday in

4   July was the 24th or 25th, but whatever the Friday was.

5          It was a -- one of many very long and memorable

6   days.

7   Q      Okay.

8   A      In the morning -- And just to give you an idea on

9   that day, in the morning I had a meeting with a number of

10  people because the President was going to order troops

11  into the City of Seattle, and we were determining what we

12  would do and whether we would bring litigation.  I had a

13  cabinet meeting.  I had a variety of meetings related to

14  some significant things in the pandemic.

15         And then the judge in the Consent Decree called a

16  hearing on whether a certain -- on the TRO to stop the

17  lethal weapons ban.  He had a late night hearing that went

18  until 9:00 p.m.  So it was a long day, and part of it was

19  on that day I went to make --

20         I was supposed to have a telephone conference.  I

21  had to call the person to tell them the telephone

22  conference was going to be delayed, and the contact wasn't

23  on my phone.  And so I gave it back to them to say, "We've

24  got to get the contacts so I can call this person to delay

25  our call," so --

Seattle Times Company v. City of Seattle
VERB8M REPORTING, INC.   (206) 467-0800

Electronically signed by Jeanne Gersten (001-357-668-4110)                     b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 98

1    Q      Okay.  So that's why you remember about the problems

2    with accessing your contacts?

3    A      Yes.

4    Q      Okay.  So who had -- So I believe you've just been

5    discussing your iPhone 8 Plus FirstNet; is that right?

6    A      That's correct.

7    Q      Okay.  And who had you --

8    A      What I thought was the -- I -- That FirstNet wasn't

9    until the 9th, and then it was the iPhone 11 for that

10   third week of July, the 21st and the 25th.  That was the

11   replacement iPhone 11 that still had problems, and IT took

12   it back on two occasions.

13   Q      Oh, I see.  Okay.

14   A      They had the FirstNet phone two times and the

15   iPhone 11 two times.

16   Q      Oh, boy.  Okay.  And so who had your iPhone 11 when

17   it wasn't with the IT Department?

18   A      Are you saying am I the person that usually had it

19   if they didn't, or --

20   Q      Right.  Just specifically during that time period

21   between --

22   A      Yeah, I mean, when I would return it to them I would

23   give it to my assistant or my office manager, so they

24   would have it for some, you know, transitory period of

25   time to get it to IT; but other than that, it would be

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 99

1    myself.

2    Q     Okay.  Okay.  So did you change the setting back to

3    forever retention between July 22nd and July 26th?

4    A     No.

5    Q     Okay.  Do you know who did?

6    A     No, I do not.

7    Q     Okay.  So I want to go back to your testimony that

8    you understood the iPhone 8 Plus Verizon had been

9    misplaced and then found.  I'm not sure -- and I apologize

10   if I missed it -- what was the place that it was supposed

11   to be in?

12   A     I don't know the answer to that.  I think there --

13   and I don't have personal knowledge of this.  My

14   understanding is there was a disparate communication

15   between IT and my assistant and office manager on where

16   the phone was; and then a search was done, and they found

17   the phone.

18         So I don't have personal knowledge of it.

19   Q     Okay.  And that miscommunication resulted in the

20   phone being unavailable to Unit 42 from November until

21   June; is that correct?

22   A     That's what the report says.  I don't have personal

23   information about that.

24   Q     Okay.

25              MS. GEORGE:  So I've also posted in the

Electronically signed by Jeanne Gersten (001-357-668-4110)                b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                          March 1, 2022

```
                                                    Page 100
 1   chat Exhibit 10.  Can we please call this Exhibit 10?

 2                 THE REPORTER:  Yes.  No. 10 designated.

 3            (Durkan Exhibit No. 10 introduced.)

 4                 MR. LAWRENCE:  So Kathy, you did not mark

 5   the forensic report; is that correct?

 6                 MS. GEORGE:  Oh, can we please mark the

 7   forensic report Exhibit 9.

 8                 THE REPORTER:  Yes.  No. 9 designated as

 9   well.

10                 MS. GEORGE:  Thank you.

11            (Durkan Exhibit No. 9 designated.)

12   Q    (By Ms. George) So I've actually highlighted on this

13   article, Exhibit 10, the quotes I want to ask you about.

14   If you could please look at page 2, the highlighted

15   section where it says -- it starts, "In an email Durkan

16   asserted," et cetera.

17        Do you see that?

18   A    I do see that.

19   Q    Okay.  So my question is did you make those

20   statements that are attributed to you?

21   A    I made those statements, but they are not a complete

22   rendition of the statement that we gave to The Seattle

23   Times for the questions that we asked them.  So they --

24        Those statements are not the whole conversation back

25   and forth.
```

Seattle Times Company v. City of Seattle
VERB8M REPORTING, INC.  (206) 467-0800

Jenny A. Durkan                                    March 1, 2022

Page 101

1   Q    Okay.  Well, I wanted to ask in particular about the

2   statement, "The forensic report confirms my actions did

3   not delete messages from the phone."  I wanted to ask what

4   part of the report do you believe confirms that?

5   A    Yeah, I think it's two parts of the report.  It's

6   what we just discussed, that if the disable and delete

7   prompt was cleared when I was restoring data to the phone,

8   the report makes very clear that that did not affect

9   messages on the phone.  It did not delete any messages

10  from the phone.

11  Q    Did it --

12  A    And I think --

13  Q    Well, okay.

14  A    There's a line -- It's made, I think, in multiple

15  places in the report, says that that would not delete

16  messages from the phone, and that is the quote you just

17  asked me about.

18  Q    I see.  Okay.  So in other words, "My actions"

19  refers to the disable/delete?

20  A    The process of restoring the phone, and if that

21  disable/delete prompt did occur as they believed it

22  occurred and I cleared it, that still would not have

23  affected any messages on the phone.  And they made that --

24  Q    Okay.

25  A    And they made that very clear.

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

                                                        Page 102

1    Q     Okay.  Did it delete --

2    A     And they also -- They also --

3    Q     Oh.

4    A     Go ahead.  Sorry.  I cut you off.  I apologize.

5    Q     Oh, well, I didn't mean to interrupt you.  I was

6    just going to clarify did that delete messages from

7    iCloud?

8    A     Based on what I've read in the report, the prompt

9    says that those messages will be kept for 30 days.  And

10   it's my understanding that the normal procedure for the

11   IT Department when they take my phone to give me a new

12   phone is to back up the phone to the iCloud so that you

13   will get all of the messages and information that are on

14   the phone to the iCloud; to check the settings, including

15   the sync messages setting, which if reactivated those

16   would not be deleted from the cloud, and then to make sure

17   that all of the content that was on the old phone has

18   transferred over to the new phone, including text

19   messages.

20   Q     And so this process that you just described that

21   would normally happen, do you know if, in fact, that did

22   happen in July of 2020?

23   A     I don't have personal knowledge of that.

24   Q     Okay.  So when you say here, "I believe the

25   electronic data from all City devices was being retained

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 103

1    and archived, including text messages," what was the basis

2    of that belief?

3    A     Yeah, when I came on as Mayor I asked the question

4    as to whether the electronic information, including our

5    text messages, was being backed up, and I was told that it

6    was in the process.

7          In hindsight now, my -- my guess is they were

8    thinking we backed it up to the iCloud.  I believed that

9    there was -- the City had its own process, but that was

10   not the case.  And when I found that out, that is why one

11   of the things that I did immediately was to have the IT

12   Department to find both short- and long-term solutions to

13   make sure that the City could capture, retain and archive

14   and produce text messages.

15         And so we had a third party vendor that we hired.  I

16   was the first person to go on it, and my staff, and then

17   rolled it out to other senior executives so that the

18   phones would have this software that sat on them.  It

19   would collect and back up as a third party provider.

20         We also instituted a device management protocol that

21   would prevent the loading of other message systems, like

22   Signal or WhatsApp that would be unauthorized on a phone.

23   I think we're the first City in the state that's taken

24   those kinds of things to manage their devices.

25         I don't know what the current status of that is.  I

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                      March 1, 2022

                                                     Page 104
1    know it was a pilot and that it was being evaluated.
2    Q    Okay.  And are you describing actions that -- Well,
3    I'll come back to that.
4         I just wanted to make sure I understood what you
5    said about the effect on iCloud of the delete/disable or
6    disable/delete function.  I thought you said something
7    about 30 days, and I wanted to ask you to explain that.
8    A    Based on -- My understanding, based on the report,
9    the prompt that you would get is that if you -- if you
10   click -- If you choose yes on the prompt on disable and
11   delete, the message says that these messages will be kept
12   for 30 days.
13        And it's my understanding anytime in those 30 days
14   if the message sync function is turned on again, then
15   those messages automatically continue to sync to the
16   phone.  But that's something that, you know, you'd have
17   to -- That's what I read in this report, but it would be
18   best addressed to someone else.
19   Q    Okay.
20   A    But in those 30 days again, you know, my phone
21   was -- went through both a review by the IT Department
22   four times, and they issued a new phone.
23   Q    I see.  Okay.
24   A    And just for the record, Kathy, so it's clear, a
25   description of that prompt is on page 18 that says that

Electronically signed by Jeanne Gersten (001-357-668-4110)            b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 105

1    there will be the 30 days that those messages are kept in

2    the iCloud, which is separate from the retention setting

3    we were talking about before.

4    Q    Okay.  The report says that the phone was backed up

5    on August 21st, 2020, and that was by -- that backup was

6    done by Michelle Chen; is that correct?

7    A    That's what's the report says.  That's correct.

8    Q    Okay.  And do you know whether Michelle Chen deleted

9    messages herself before she backed up the phone?

10   A    I have no knowledge of that.

11   Q    Do you know if anyone looked into that or asked her

12   about it?

13   A    I don't, but the report seems to indicate -- and

14   separately I have information -- I believe that that

15   backup was done according to what we discussed before, the

16   collection of my phone for backup.

17        And the usual protocol would be just to take the

18   phone and plug it into the system and download it so it

19   could be searched for public records.  There would be no

20   reason to be doing anything on the phone, but I have no

21   knowledge of how that occurred or what happened on that

22   occasion.

23   Q    Okay.

24            MS. GEORGE:  I've just posted Exhibit 11.

25   Can we please mark this as Exhibit 11.

Seattle Times Company v. City of Seattle
VERB8M REPORTING, INC.  (206) 467-0800

Jenny A. Durkan                                    March 1, 2022

Page 106

 1              THE REPORTER:  Yes.  No. 11 designated.

 2              (Durkan Exhibit No. 11 introduced.)

 3   Q     Have you seen this before?

 4   A     I have.

 5   Q     And what is this?

 6   A     This is a copy of a letter that I wrote to Wayne

 7   Barnett dated July 2nd, 2021, in response to his letter to

 8   me related to an investigation that he did in conjunction

 9   with Ramsey Ramerman.

10   Q     Okay.  And do you see on page 1 where it says, "I

11   also agree that the underlying actions fell short of the

12   obligations under the PRA"?

13   A     I do.

14   Q     And why did you say that?

15   A     Because I thought it was important -- The beginning

16   of that was the importance of being accountable to the

17   people, and I think in any area that we operate one of the

18   important things for us to do is if we don't get something

19   right, to acknowledge it.

20         And so I wasn't thinking about the legal standards

21   or litigation there.  I was thinking about should we have

22   done it better and could we have done it better, and the

23   answer is yes, we should have.  And that's why I took the

24   concrete steps that I outlined in the letter because this

25   showed one problem, but it really reflected a larger

Electronically signed by Jeanne Gersten (001-357-668-4110)                    b6ed5cbc-dc0d-41a3-8724-aba671cfa1ad

Jenny A. Durkan                                    March 1, 2022

Page 144

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON      )
                              )  SS
3    County of King           )

4         I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to
5    administer oaths and affirmations in and for the State of
     Washington, do hereby certify:
6         That the annexed and foregoing deposition of the
     witness named herein was taken stenographically before me
7    and reduced to typewritten form under my direction.
          I further certify that the witness examined will be
8    given an opportunity to review and sign their deposition
     after the same is transcribed, unless indicated in the
9    record that the parties and witness waived the signing.
          I further certify that all objections made at the
10   time of said examination to my qualifications or the
     manner of taking the deposition or to the conduct of any
11   party have been noted by me upon the deposition.
          I further certify that I am not a relative or an
12   employee or attorney or counsel of any of the parties to
     said action, or a relative or employee of any such
13   attorney or counsel, and that I am not financially
     interested in the said action or the outcome thereof.
14        I further certify that the witness before examination
     was by me duly sworn to testify the truth, the whole
15   truth, and nothing but the truth.
          I further certify that the deposition, as
16   transcribed, is a full, true and correct transcript of the
     testimony, including questions and answers and all
17   objections, motions and exceptions of counsel made and
     taken at the time of the foregoing examination and was
18   prepared pursuant to Washington Administrative Code
     308-14-135, the transcript preparation format guideline.
19
          IN WITNESS WHEREOF, I have hereunto set my hand this
20   11th day of March, 2022.

21   _____

22   Jeanne M. Gersten, RDR, CCR
     Registered Diplomate Reporter
23   Washington CCR No. 2711
     License effective until April 2, 2022
24   Residing at Seattle, Washington

25

Seattle Times Company v. City of Seattle
VERB8M REPORTING, INC.  (206) 467-0800

# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
              Plaintiff,         )
                                 )
         vs.                     ) No. 20-cv-00983
                                 )
CITY OF SEATTLE,                 )
                                 )
              Defendant.         )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

REGINALD ALENCASTRO

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  MARCH 3, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle                Reginald Alencastro

Page 15

1        Q.  Okay.

2        A.  So the last swap-out I wasn't involved in.

3        Q.  So are you referring to the phone -- the iPhone

4   8 Plus with the cracked screen?  Was that one of the

5   phones that you were involved in replacing?  It was

6   replaced on or about July 9th.

7        A.  I don't think I was involved in that one.  I

8   don't recall being involved in that one.

9        Q.  Okay.  Were you involved in the two phones

10  prior to that then?

11       A.  Correct.

12       Q.  So one phone was replaced in October of 2019;

13  is that correct?

14       A.  Let's see.  October 2019.  The dates are not

15  clear to me.  I'm sorry.  So October 2019, and the other

16  one you mentioned was July 2019?

17       Q.  Correct.

18       A.  Yeah.

19       Q.  Do you know whether Julie Kline had any

20  involvement in the replacement of -- someone named Julie

21  Kline was involved in the replacement of any of the

22  mayor's phones?

23       A.  Yeah, I -- I do know the name, and she was --

24  she was never involved, to my knowledge, replacing the

25  phones.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle                 Reginald Alencastro

Page 49

1    A.   Correct.

2    Q.   Okay.  Now, tell me about how you learned that

3   the mayor's phone had crashed in early July.  I'm sorry.

4   Strike that.

5         Did you learn that the mayor's phone had

6   crashed in early July of 2020?

7    A.   So by "crashed," you mean it just stopped

8   working entirely, or that it had -- because I recall

9   there was a phone that had gotten cracked, and so it

10  needed to be replaced, and -- but I don't recall the

11  exact days on those.

12   Q.   Okay.

13   A.   Yeah.

14   Q.   So -- so the phone that needed to be replaced,

15  was -- was it -- was the reason that was given to you

16  for the replacement because the phone was -- had a

17  cracked screen?

18         MR. CRAMER:  Objection.  Form.

19   A.   Yeah, there was a phone I replaced due to -- or

20  I -- I helped replace due to a cracked screen, and I

21  don't remember the -- the date with that.

22  BY MR. REILLY-BATES:

23   Q.   Okay.  So who contacted you to tell you about

24  the phone that had a cracked screen?

25   A.   I'm almost sure it would have been either

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle                Reginald Alencastro

Page 50

1    Colleen or Andrea.

2         Q.  Okay.

3         A.  One of those two.

4         Q.  And they -- they told you that the phone was --

5    had a cracked screen; correct?

6         A.  I believe so, yes.

7         Q.  And did they state that that was the reason why

8    it needed to be replaced?

9         A.  I don't remember the exact conversation, but,

10   you know, the normal procedure for us is, you know, if

11   it's cracked, you know, we don't -- we definitely don't

12   want them to risk getting cut or something like that.

13   So we -- we'd just replace it.

14            You know, we have -- at the time I believe we

15   had 99 cent replacements for some of these iPhones, so

16   it was -- you know, it was pretty easy to just, you

17   know, get a replacement.  It wasn't a big deal.

18        Q.  Okay.  Did they -- did Andrea or Colleen

19   provide any other explanation for why the phone needed

20   to be replaced when it was replaced?

21        A.  No.  No, not -- not for that cracked screen

22   one, that I recall.

23        Q.  And when we're referring to the cracked

24   screen -- the phone -- cracked screen phone, we're

25   referring to an iPhone 8 Plus that was on Verizon; is

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle                Reginald Alencastro

Page 51

1    that correct?

2        A.  I would be guessing as to the exact model, but

3    I know she had a Plus because she always wanted the big

4    screen.  So it's possible that it was an 8 Plus, yes.

5        Q.  Okay.  So nobody -- nobody told you that the

6    phone had been dropped in saltwater; is that a fair

7    statement?

8        A.  I don't recall if that was -- if that was

9    disclosed in the conversation.  It may have been, but I

10   just -- I just don't remember it.

11       Q.  Did you ever learn that -- that the mayor's

12   phone with the cracked screen was dropped in saltwater?

13       A.  I believe it was mentioned at some point.

14       Q.  And who mentioned that?

15       A.  I don't remember that.

16       Q.  So you have no recollection as to when you

17   received an explanation that the mayor's phone with the

18   cracked screen had been dropped in saltwater; is that

19   fair?

20       A.  Yes.

21       Q.  Did anybody tell you in writing that the phone

22   had been dropped in saltwater?

23       A.  Not that I can recall.

24       Q.  Did the mayor ever talk to you personally about

25   the phone that needed to be replaced with the cracked

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 52

1    screen, the Verizon 8 -- iPhone 8 Plus?

2        A.  I don't -- I don't recall her ever talking to

3    me directly about it.  The conversation would have

4    primarily gone through Colleen or Andrea.

5        Q.  Okay.  Did you ever talk to anybody from the

6    Executive Protection Unit about what happened to the

7    mayor's phone?

8        A.  No.  Those guys don't really talk about those

9    requests.  So I -- I don't recall talking to them about

10   it.

11       Q.  Okay.  So you never talked to Rodney Strong or

12   Aaron Kamalu about the mayor's phone?

13       A.  Oh, yeah.  I mean, we would -- they would --

14   sometimes they would be out in the field, and if I

15   recall, there might be something missing on her phone,

16   like her email, or some calendar issue or something on

17   her phone that she would want help with.  So -- but

18   normally it would go through Colleen.

19       Q.  Okay.

20       A.  If they were -- often they would be out in the

21   field or at an event, and it -- it -- the request may

22   come through them as well.  And -- but as far as that

23   conversation about the damaged phone, I don't really

24   remember them being involved.

25       Q.  So you never provided the mayor with any advice

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Reginald Alencastro

Page 58

1      A.  Yes.
2      Q.  Okay.  Prior to today were you aware that the
3  mayor had restored her iPhone on July 4, 2020?
4      A.  That she had restored it herself, like on a
5  different -- on a different handset?  I was -- I was
6  unaware of that.
7      Q.  Okay.  So nobody told you that -- that the
8  mayor had, herself, restored from an iCloud backup on
9  July 4, 2020; right?
10      A.  I -- I don't recall that.
11      Q.  And do you have any reason to doubt the
12  accuracy of -- of this statement?
13      A.  No, I have no reason to doubt it if he's -- if
14  he's looking at the key values on the phone itself.
15  He's reporting what he sees there.
16      Q.  Okay.  And did you -- did you ever -- ever hear
17  that the mayor's phone had been submerged in saltwater,
18  and that it caused -- that that had caused the mayor's
19  phone to crash?
20      A.  I vaguely remember something like that, but I
21  don't remember the details of -- of that particular
22  incident.
23      Q.  And who -- what is the basis of your vague
24  memory?  Who did you hear that from?
25      A.  See, I don't -- I don't remember.  I mean,

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle                    Reginald Alencastro

Page 74

1      A.  Yeah, I'm -- I'm unaware of that 30-day
2  timeframe.
3  BY MR. REILLY-BATES:
4      Q.  Okay.  And again, nobody informed you that a
5  disable and delete function had been selected with
6  respect to the mayor's Messages in iCloud; correct?
7      A.  Correct.  No one ever told me that.
8      Q.  And you certainly didn't instruct anybody to --
9  to use this disable and delete function; correct?
10     A.  Absolutely not.
11     Q.  And you would never advise Emmanuel Arhu or
12 anybody else at IT to -- to disable and delete their
13 Messages in iCloud when you were under an obligation to
14 preserve text messages; correct?
15             MR. CRAMER:  Objection.  Form.
16     A.  Yeah, I'd never do that.  Never did do that.
17 BY MR. REILLY-BATES:
18     Q.  And you also never advised the mayor to back up
19 her phone using a backup from February 2020, did you?
20     A.  I don't recall ever doing that.
21     Q.  Do you understand that restoring a phone to a
22 backup from February of 2020 would remove text messages
23 that were from June of 2020?
24             MR. CRAMER:  Objection.  Assumes facts.
25 There's no fact in the record that that was what would

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle        Reginald Alencastro

Page 75

1   occur.  Lack of foundation, calls for speculation.

2        A.  Yeah, I don't know.  I don't know.  I don't

3   know if that was the case, or if that would occur that

4   way.

5   BY MR. REILLY-BATES:

6        Q.  Now, you mentioned that -- when I was asking

7   you these questions about the disable and delete

8   function for Messages in iCloud, you mentioned that you

9   would never do that on your phone.

10       A.  Uh-huh.

11       Q.  Why -- why is that?

12            MR. CRAMER:  Objection.  Form.

13       A.  Well, just personally, I just -- I'll --

14   I'll -- I would normally just like to keep them forever.

15   That's just my personal preference.

16   BY MR. REILLY-BATES:

17       Q.  You -- and you never advised the mayor or

18   anyone in the mayor's office to change a Keep Messages

19   setting from forever to 30 days; is that correct?

20       A.   That is correct.

21       Q.  And would you ever advise a City official to

22   change their Keep Messages setting from forever to 30

23   days?

24       A.  I would never do that in a million years.

25       Q.  Why not?

Hunters Capital, LLC v. City of Seattle                    Reginald Alencastro

Page 77

1    days"?

2             MR. CRAMER:  Objection.  Lack of foundation.

3         Testify to what you have in your personal

4    knowledge, but not what's been presented to you in the

5    expert report.

6    BY MR. REILLY-BATES:

7         Q.  Can you answer the question, Regi?

8         A.  Can you repeat the question again?

9         Q.  Sure.  If somebody changes their settings to 30

10   days, before they are able to change the setting they

11   will receive a message -- a warning message similar to

12   the message depicted in the right-hand pane, which says,

13   "This will permanently delete all text messages and

14   message attachments from your device that are older than

15   30 days"?

16             MR. CRAMER:  Same objection.

17        A.  This is a setting that I've never changed

18   myself, so I don't -- I can't attest to whether that

19   pop-up is what comes up --

20   BY MR. REILLY-BATES:

21        Q.  And why have --

22        A.  -- in the phone.

23        Q.  Oh, I apologize for interrupting.

24        A.  Oh, yeah.  Yeah, I just -- I don't know -- I

25   don't know if -- if that pop-up comes up because I've

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 90

1          THE COURT REPORTER:  -- computer
2    notification there.
3       A.  Yeah, I said I don't recall the exact details.
4    We may have talked about it.  But he is the one who
5    handled that.  So I don't -- I don't -- I don't remember
6    those -- those specifics, whether it was, you know, she
7    received a backup phone temporarily for three days, then
8    received the permanent one.  I don't know.
9    BY MR. REILLY-BATES:
10      Q.  Okay.  Later, when -- when the City was looking
11   for the mayor's old phones, did anybody ask for that
12   loaner phone that the mayor used during these three
13   days?
14          MR. CRAMER:  Objection.  Misstates
15   testimony.
16      A.  I don't -- I don't remember that.
17   BY MR. REILLY-BATES:
18      Q.  Well, do you know why the decision -- do you
19   know who made the decision to replace the mayor's iPhone
20   8 Plus that had been on FirstNet with the cracked
21   screen?
22      A.  It would have been, like, basically a
23   collective decision.  So it would have been myself,
24   Emmanuel, Andrea.  We would have been talking about,
25   yes, this is -- this phone is not usable; we have to

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 91

1    replace it.  And, you know, we're, you know -- usually
2    if -- if Andrea would -- would request a replacement,
3    and we don't -- we wouldn't argue it.  We would just get
4    it.
5        Q.  Did -- in this instance did Andrea request a
6    replacement, or did you recommend that it should be
7    replaced?
8        A.  I think we just decided it would be replaced
9    because it was cracked and, you know, there's no way
10   to -- to use that long-term.
11       Q.  Did you consider whether you could just replace
12   the -- the screen of the iPhone?
13       A.  No, we nev- -- we never do that.  We never do
14   that because it's -- the cost is -- you know, we'd have
15   to wait for it to be shipped back to us and everything.
16   We -- we just replace it.
17       Q.  Was the phone still usable when it was
18   replaced?
19           MR. CRAMER:  Objection.  Foundation.
20       A.  I don't recall that.  Probably Emmanuel can
21   answer that better than I could.
22   BY MR. REILLY-BATES:
23       Q.  Well, could --
24       A.  Because I wasn't -- like I said, I wasn't the
25   one that -- I wasn't the one that did the swap-out in

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 93

1   left it with her.

2        Q.  And did -- did the screen still operate on the

3   phone when it was replaced?

4              MR. CRAMER:  Objection.  Calls for

5   speculation, lacks foundation.

6        A.  Yeah, I don't -- I don't remember that.

7   BY MR. REILLY-BATES:

8        Q.  Can you describe the cracks that existed in the

9   phone?

10       A.  It was a pretty big crack, kind of along the

11  side, almost half the length of the phone.

12       Q.  Okay.

13       A.  It was -- it was multiple cracks.  It wasn't

14  just one crack.  It was the kind of crack where, you

15  know, little shards could come off.

16       Q.  Did -- did the crack in the screen cause any of

17  the data to be lost, to your knowledge?

18       A.  Not to my -- not to my knowledge, no.

19       Q.  Do you know, did you back up the mayor's

20  cracked screen iPhone before it was replaced with the

21  iPhone 11?

22       A.  Yeah, I don't remember doing that.

23       Q.  Do you know if Emmanuel did that?

24       A.  I don't.

25       Q.  And you testified earlier that it was your

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle            Reginald Alencastro

Page 94

1   normal policy to make a backup before replacing a phone;

2   isn't that correct?

3        A.   Right.

4        Q.   Did you ever back a phone up to iTunes to make

5   sure that you had a copy that was not in the cloud?

6             MR. CRAMER:  Objection.  Form.

7        A.   I don't -- I don't recall ever doing an iCloud

8   backup.

9   BY MR. REILLY-BATES:

10       Q.   Okay.  So tell me what you know --

11       A.   I'm sorry.  I meant an iTunes backup, is what I

12   meant to say.

13       Q.   Tell me what you know about what Emmanuel did

14   to transfer data over to the new phone, the iPhone 11

15   that the mayor started using on July 9, 2020.

16       A.   Well, I remember talking about it, and I wasn't

17   physically there, so I -- I don't know physically what

18   he did.  But, you know, he did confirm that, you know,

19   he did the iCloud back- -- or the -- sorry, the

20   side-by-side backup and restore, the bump -- the -- via

21   bluetooth that we would normally do.

22       Q.   Did he do anything else?

23            MR. CRAMER:  Objection.  Form, foundation,

24   calls for speculation.

25   ////

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 102

1   the 30-day Keep Messages setting on the mayor's iPhone?
2       A.  Yeah, we've -- we've talked about it a few
3   times throughout this.
4       Q.  Okay.
5       A.  And it was always like, you know, who changed
6   it?  And we would always say, "I didn't change it."  He
7   would say he didn't change it, and that was pretty much
8   the discussion.
9       Q.  Did -- during those discussions did you ever
10  discuss who possibly could have made that change?
11      A.  No.
12      Q.  Did he ever indicate to you that he knew who --
13  who made that change?
14      A.  No.
15      Q.  Who do you think could have made that change?
16          MR. CRAMER:  Objection.  Foundation, calls
17  for speculation.
18      A.  Yeah, I have no idea.  It would be me guessing,
19  and I -- yeah, don't know.
20  BY MR. REILLY-BATES:
21      Q.  Well, do you think that the mayor could have
22  made those changes -- that change?
23          MR. CRAMER:  Objection.  Form, calls for
24  speculation.
25      A.  Yeah, I don't know.  I can't really effectively

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 104

BY MR. REILLY-BATES:

Q.   So at some point you were aware that the mayor's phone with the cracked screen, the iPhone 8 Plus, was factory reset; is that correct?

A.   Yeah.

Q.   Do you know when that happened?

A.   I don't remember the exact day.  I didn't do it, but it should have been probably a month after we delivered the replacement.

Q.   And did -- did Emmanuel -- is Emmanuel the person who did the factory reset --

A.   Yes.

Q.   -- on this cracked screen phone?

Did he --

A.   On the cracked phone, yeah.  On the old one, yeah.

Q.   Did you -- did you instruct him to perform the factory reset on -- on the cracked screen phone?

A.   No.

Q.   Did the mayor instruct him to perform a factory reset on the cracked screen phone?

MR. CRAMER:  Objection.  Form, foundation.

A.   Not that I'm aware.

BY MR. REILLY-BATES:

Q.   Did anybody else instruct Emmanuel to factory

Hunters Capital, LLC v. City of Seattle                    Reginald Alencastro

Page 105

1    reset the phone before -- before he did?

2             MR. CRAMER:   Same objection.

3        A.  Not that I'm aware.

4    BY MR. REILLY-BATES:

5        Q.  Did he inform you that he was going to reset

6    the phone before he reset the phone?

7        A.  I don't recall that.

8        Q.  Did he tell you after he had reset the phone

9    that he had done it?

10       A.  After -- right after he had done it?  No.  No,

11   I don't think so.

12       Q.  Tell me everything that you know about the

13   phone being factory reset.

14       A.  So for that particular phone I don't know much,

15   other than that it happened maybe four weeks after it

16   was picked up.  Yeah, I mean, he didn't -- he didn't --

17   we didn't really talk about it.

18       Q.  And you testified earlier that there wasn't any

19   firm -- or any policy in the mayor's office to factory

20   reset phones.  It was up to the -- the choice of the --

21   the specific user; correct?

22            MR. CRAMER:   Objection.   Form, misstates

23   testimony.

24       A.  Yeah, I believe -- yeah, I don't -- I don't

25   remember if there was a policy surrounding that.

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 106

BY MR. REILLY-BATES:

1

2      Q.  But sitting there today, you -- you don't know

3  whether there was a policy to -- to factory reset a

4  phone that had been handed in?

5      A.  Correct.

6          MR. CRAMER:  Objection.

7      A.  Yeah, I --

8          MR. CRAMER:  Vague as to "policy."

9      A.  Yeah, I don't -- I don't remember that.

10  BY MR. REILLY-BATES:

11     Q.  What was the -- do you know what was to be

12  accomplished by resetting the phone?

13     A.  The main thing we want to do is just not have

14  someone's data just floating around in someone's drawer,

15  you know, in an old, expired phone that's no longer in

16  use, right?  So it's -- it's about data privacy mostly.

17     Q.  And have you -- have you personally ever --

18  ever factory reset a phone that had been turned in or

19  replaced?

20     A.  Yes.

21     Q.  And prior to performing that factory reset did

22  you make sure that the phone was backed up to iCloud?

23     A.  I ensured it was -- the iCloud was turned on

24  for the new user.

25     Q.  Okay.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

15664662-ae5a-4807-940a-4c18ed880f36

Hunters Capital, LLC v. City of Seattle          Reginald Alencastro

Page 125

1    A.   Who what?  Who in -- who in the --

2    Q.   Who at the City attorney's office did you talk

3    to?

4    A.   The first -- well, the first meeting, I think

5    Shane was there.  But everybody had their camera off, so

6    I don't remember really who was in there, so -- but

7    it's -- it was -- it was probably at least five or six

8    people.  Yeah, I don't remember who -- who they were.

9    Q.   Okay.  And was that -- would that have been

10   back in October of 2020?

11   A.   I don't now recall that, the exact date,

12   unfortunately.

13   Q.   Did you ever learn any facts that -- about who

14   turned the Keep Messages setting from forever to 30-day,

15   and then back from 30-day to forever, about who did

16   that?

17            MR. CRAMER:   Objection.   Asked and answered,

18   assumes evidence.

19   A.   Yeah, I never learned anything about that.

20            MR. REILLY-BATES:   Okay.  I'm going to drop

21   another document.

22            MR. CRAMER:   And Gabe, just -- just for the

23   record, is Exhibit 2, the text messages we've been

24   looking at, are those the text messages that we provided

25   from Regi's phone, or are they from somebody else's

15664662-ae5a-4807-940a-4c18ed880f36

Page 138

1                          C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6            I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Reginald

9    Alencastro, having been duly sworn, on March 3, 2022, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12           IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 9th day of March, 2022.

14

15

16   _____

17   CINDY M. KOCH, CCR, RPR, CRR #2357

18

19   My commission expires:

20   JUNE 9, 2022

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

# EXHIBIT 14

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,      )
                                   )
               Plaintiff,          )
                                   )
          vs.                      ) No. 20-cv-00983
                                   )
CITY OF SEATTLE,                   )
                                   )
               Defendant.          )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

EMMANUEL ARHU

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:   MARCH 3, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 26

1    something that we used to help ourselves and update as
2    we go on, but I don't -- I don't know if you would call
3    that policy, something that we put together ourselves.
4    BY MR. REILLY-BATES:
5        Q.   Okay.  Was that something that was written down
6    in a -- a checklist or a document?
7        A.   Yeah.
8        Q.   Yes?  Okay.
9             And where -- where would that have been kept?
10   Was that something on ShareFile, or SharePoint?
11       A.   Yes.
12       Q.   Okay.  And can you recall, as best as you can,
13   what -- what that policy required regarding replacement
14   of a phone or a mobile device?
15       A.   Again, so that's a -- I'll say it's a standard
16   operating procedure.  So it helps us with pretty much --
17   it's updated -- we keep updating that, but it was a
18   process of how to do things, so how to do something -- a
19   backup, or how to restore a phone from one device to
20   another.
21       Q.   Okay.
22       A.   And as our technology changes, we keep that up
23   to date as we can.
24       Q.   In 2020, in July of 2020, to the best of your
25   recollection, can you tell me what -- what that

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 27

1   checklist or policy had in it?  What were the steps that

2   you should -- were required to take?

3       A.  In what scenario?

4       Q.  Regarding the replacement of -- of an iPhone.

5       A.  So -- okay.  That would require have -- if you

6   have both devices, having -- creating a -- maybe a

7   backup for us to start with so as to have something to

8   fall back on.  And then --

9            THE COURT REPORTER:  I'm sorry.  I didn't

10  understand a word there.

11      A.  I'm saying creating a backup to have something

12  to fall back on, and then with -- since we're dealing

13  with Apple devices, Apple has a built-in tool that helps

14  to copy content from one device to another.

15           Pretty much you turn on the new phone, and then

16  there's a prompt that comes on.  You can hold it over

17  the old phone, and that begins -- there's prompts to

18  follow on the screen, of course.  I can't remember all

19  of that.

20      Q.  Okay.  What next?

21      A.  So when the copy completes, there's also a

22  process of checking to make sure that the data is

23  correct and you have both -- the application that you

24  want to check on both phones, just make sure the

25  applications match up, and then also there are a few

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                          Emmanuel Arhu

Page 30

1       A.   The decision would be made by the mayor's

2   office to get a new phone, so that -- they place the

3   order, and that comes to IT.

4       Q.   So they place the order.  It's not like you --

5   you got the phone and took a look at it to see whether

6   it was salvageable.  They -- they just told you,

7   we're -- we need a new phone.  Is that a correct

8   understanding?

9       A.   Yeah, my understanding was it was a cracked

10  screen, so they -- yeah, they put in the order and then

11  when the new phone comes in, that's when we pick that up

12  for them.

13      Q.   Did -- did anybody at the mayor's office give

14  you any more details about what had happened to damage

15  the phone --

16      A.   No.

17      Q.   -- besides the fact that it had been cracked?

18      A.   No.

19      Q.   In July of 2020 did anybody ever tell you that

20  the mayor had dropped her phone in saltwater?

21      A.   No.

22      Q.   And when you saw -- when you recovered the

23  old -- old phone, did you see any evidence that the

24  phone had been dropped in water?

25      A.   No.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 31

1      Q.   Now, what did you do to -- to look at the
2    function of the phone when you received the old phone
3    with the -- the cracked screen?
4      A.   I did not look at the function.  The phone was
5    cracked, as noticeable.  That was my understanding, it
6    was damaged, and she needed a new one.
7      Q.   So -- so you -- you didn't look at whether the
8    phone was functioning because the mayor's office had
9    given you an order to replace the phone.  Is that a fair
10   statement?
11     A.   That's correct.  Because yeah, the new phone
12   came in, so it's already been bought.  I wasn't part of
13   the decision to do that.
14     Q.   Yeah.  Did you have -- around that time did you
15   have any conversations with anybody at the mayor's
16   office about the -- the old phone with the cracked
17   screen?
18     A.   No.
19     Q.   Did -- did anybody from the mayor's office tell
20   you that -- that the mayor had restored the iPhone with
21   the cracked screen to a backup?
22         MR. CRAMER:  Objection.  Form.
23     A.   No.
24   BY MR. REILLY-BATES:
25     Q.   Did anybody tell you that the mayor's phone had

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 32

1    crashed?

2         A.   Crashed?

3         Q.   Crashed, was not functioning properly?

4         A.   Not that -- no, not that I recall.

5         Q.   Subsequent to July 2020, have you ever heard

6    the mayor's explanation that her phone was dropped in

7    water and that is why it's not working?

8         A.   No, not that I recall.

9         Q.   So you didn't discuss that with Regi at any

10   point?

11        A.   No, I don't recall any.

12        Q.   Could you describe the cracks that were -- were

13   in the phone?  Were they -- just what they looked like?

14        A.   I believe it was on the corner.  I can't

15   remember whether the right or left corner.  And I guess

16   the -- it could be risky, maybe, sliding and getting

17   herself cut, something like that.

18        Q.   Okay.  All right.  I'd like to show you a

19   document that I will -- I'm going to drop into the chat.

20        A.   Okay.

21        Q.   So what you'll need to do is just click on this

22   to save it, Emmanuel, and then you can open -- open the

23   document.

24        A.   Okay.

25        Q.   And this is -- this is the expert report of

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 48

1    BY MR. REILLY-BATES:

2         Q.  Okay.  Did you ever learn that -- that this

3    function had been performed on the mayor's phone that

4    you were asked to replace?

5         A.  No.

6         Q.  So nobody in the mayor's office told you that

7    the disable and delete function had been enacted or

8    toggled before you were provided with the phone, did

9    they?

10        A.  No.

11        Q.  Do you think that that's some important

12   information that could have been useful in helping you

13   save text messages --

14            MR. CRAMER:  Objection.  Form, calls for

15   speculation.

16   BY MR. REILLY-BATES:

17        Q.  -- had you known about it?

18            MR. CRAMER:  Same objection.  Assumes facts.

19        A.  Because had I known about it, I -- I don't know

20   what I'd do with that information in the first -- in the

21   first place.

22   BY MR. REILLY-BATES:

23        Q.  Okay.  Well, the warning here, assuming that

24   it's true, says you have 30 days to undo this action.

25   Assuming that's true, you could have gone into iMessages

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                Emmanuel Arhu

Page 54

1   used it.  So I don't know what would happen, but if I
2   was to assume, the assumption is it says to keep
3   messages for 30 days.
4   BY MR. REILLY-BATES:
5       Q.  Okay.  And in fact, the -- on the right side of
6   this demonstrative it shows what happens if you click on
7   30 days, and it says, "Delete Older Messages?  This will
8   permanently delete all text messages and message
9   attachments from your device that are older than 30
10  days."
11              MR. CRAMER:  Objection.  Lack of foundation.
12              MR. REILLY-BATES:  I'm just asking him if
13  that's what it says.
14      A.  That's what it says.  Yeah, that's where I see
15  it.
16  BY MR. REILLY-BATES:
17      Q.  Okay.  And is that your understanding, too, of
18  what would happen after -- if somebody selected 30
19  days -- a 30-day Keep Messages retention setting on
20  their iPhone?
21      A.  Yeah.
22      Q.  Now, would you ever advise somebody in the City
23  to select this retention setting for a City-owned
24  device?
25      A.  No.

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 55

1    Q.  And why not?

2    A.  Why?  Because they're supposed to retain

3    messages as part of our Public Disclosure Act, so we

4    can't delete.

5    Q.  And have you ever advised any -- anybody in the

6    mayor's office, or anybody else, a City employee, to --

7    to change their Keep Messages settings from anything

8    other than forever?

9    A.  No.

10   Q.  So for example, in July of 2020, you did not

11   advise the mayor to -- to turn her phone from a forever

12   message setting to a 30-day message setting; right?

13   A.  That's correct.

14   Q.  And Regi also did not advise the mayor to do

15   that; correct?

16   MR. CRAMER:  Objection.  Foundation, calls

17   for speculation.

18   A.  Not that I know of.

19   BY MR. REILLY-BATES:

20   Q.  And nobody asked you whether that would be

21   permissible, or asked your advice as to whether they

22   could do that; right?

23   A.  That's correct.  Nobody asked me.

24   Q.  Are you aware that at a certain point in

25   July of 2020, that the message retention settings was

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                Emmanuel Arhu

Page 56

1    switched to 30 days on the mayor's phone?

2         A.   No, not that I'm aware.

3              MR. CRAMER:   Objection.   Assumes facts.

4    BY MR. REILLY-BATES:

5         Q.   Were you -- I'm sorry.   Were you aware in 2020

6    that that setting had been changed?

7              MR. CRAMER:   Objection.   Assumes --

8         A.   No, I --

9              MR. CRAMER:   Facts.

10        A.   -- wasn't aware.

11             MR. CRAMER:   Wait for me to give my

12   objection, and then go ahead and answer.   Thanks.

13   BY MR. REILLY-BATES:

14        Q.   Okay.   And after July 2020, did you ever become

15   aware that somebody had changed the message retention

16   settings on the mayor's phone to 30 days?

17             MR. CRAMER:   Same objection.

18        Go ahead.

19        A.   After July 2020?   No, I wasn't aware.

20   BY MR. REILLY-BATES:

21        Q.   If you had been made aware of that by someone

22   in the mayor's office that this message retention

23   setting had been turned on, what would you have done

24   to -- to try to retrieve messages that may have been

25   deleted?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 58

1   BY MR. REILLY-BATES:
2       Q.  Okay.  And nobody in the mayor's office
3   mentioned that -- that this 30-day setting had been
4   enabled; right?
5       A.  Yes.  Nobody in -- let me know about that.
6       Q.  Okay.  So when you were --
7           MR. REILLY-BATES:  I'd like to mark -- I'd
8   like to show you another exhibit here.  I'm going to
9   drop another document into the chat in a moment.
10          This is -- let the record reflect this is a
11  Celebrite report marked SEA_00145712.  And Court
12  Reporter, please mark this as Exhibit 2.
13          One second.  I'm just getting us to the place
14  that...
15          (Exhibit No. 2 marked.)
16  BY MR. REILLY-BATES:
17      Q.  Okay.  Emmanuel, I'm going to share my screen
18  with you.  This is Exhibit 2.  This is a Celebrite
19  report of your -- showing text messages between you and
20  Regi and other people in the mayor's office.  This was
21  produced by the City.
22          And I want to direct your attention -- so on --
23  on the very left-hand side there are row numbers.  Do
24  you see those?  They're marked blue.
25      A.  Yeah.

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 63

1    can't tell whether that completed or not.  But I didn't
2    end up using that backup because I did the direct
3    phone-to-phone copy.  So, yeah, I didn't need a backup,
4    so I can't tell if that completed or not.
5         Q.   So -- but before you -- you -- you used the
6    phone-to-phone contact, did you make a backup of the
7    cracked screen iPhone 8 Plus to make sure that there
8    would be a copy of the mayor's data after you
9    transferred it to the new phone?
10             MR. CRAMER:  Objection.  Form, asked and
11   answered.
12        A.   No, not that I recall.
13   BY MR. REILLY-BATES:
14        Q.   Okay.  So you don't recall making a backup
15   before you did the transfer; correct?
16        A.   I don't recall that correctly.
17        Q.   Did you -- have you ever made a -- a backup
18   using iTunes, like a computer iTunes, for the mayor's
19   phone?
20        A.   No.
21        Q.   Do you know whether the mayor ever made a
22   backup of her phone using iTunes?
23        A.   Not that I'm aware of.
24        Q.   Okay.  So describe to me what the process --
25   what you did once the new phone came in on July 7th,

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 71

1    settings on the phone?

2         A.  Not that I recall, no.

3         Q.  Did she -- did anybody in the mayor's office

4    ever mention to you that -- in late July that somebody

5    had turned the 30-day keep message retention setting on

6    so that messages were being deleted?

7              MR. CRAMER:  Object -- objection.  Asked and

8    answered.

9         A.  Not that I recall.

10   BY MR. REILLY-BATES:

11        Q.  Okay.  So now I'd like to switch gears and --

12   and talk about the -- the iPhone 8 Plus that you had

13   replaced.  After you did the restore, what did you do

14   with the old iPhone with the cracked screen?

15        A.  So I'm -- for our -- our policy, I guess --

16   yeah, our standard operating procedure, I just hold on

17   to it, and that's what we do pretty much with everyone

18   else in the City that we work on their devices.  We hold

19   on to it for a few weeks just to make sure that

20   everything works for them, so -- in case they come back

21   to ask for something, we can go back and verify.

22              So I held on to it for, I believe, about four

23   weeks.  That's what we normally do before wiping them.

24        Q.  Okay.  And so before you wiped it, did -- did

25   you ask for any permission to -- to wipe that phone?

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 73

1        A.   No.

2        Q.   And did Colleen tell you, when you gave her the

3   new phone, that -- that you needed to -- to hold on to

4   the -- the old phone?

5        A.   No.

6        Q.   And you told her that you were going to do a

7   factory reset of the old phone?

8        A.   I did told her that, yeah, I'm going to have it

9   for a while, so if anything -- just to give them some

10  comfort that we holding on to it at least so they don't

11  feel like they're losing anything.

12       Q.   Okay.  And the decision that you made to

13  factory reset the phone, that wasn't pursuant to any

14  policy that the mayor's office has; that was just your

15  own personal decision; correct?

16       A.   That's --

17            MR. CRAMER:  Objection.  Form.

18            Go ahead.

19       A.   Yeah, that's not from the mayor's office.

20  That's our standard operating procedure how we -- before

21  we recycle a device we have to make sure that it's

22  wiped.

23  BY MR. REILLY-BATES:

24       Q.   Okay.  But normally you -- you give the --

25  the -- the person who had the phone the option of

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 74

1   holding on to that phone; isn't that correct?

2        A.  If they request it, yeah, we give it back to

3   them.

4        Q.  And did you give Colleen the option of holding

5   on to the -- the mayor's old phone in this instance?

6             MR. CRAMER:  Objection.  Form.

7        A.  There have been instances where they've asked

8   for phone back, but I don't -- yeah, she knew -- we did

9   told her about it, but no, she did not request that.

10  BY MR. REILLY-BATES:

11       Q.  Okay.  And in fact, the mayor's previous phone

12  that was replaced in October 2019, the mayor did request

13  to hang on to that old phone, and you did not factory

14  reset that phone before giving it back to the mayor in

15  that instance?

16       A.  Colleen requested it, yeah.

17       Q.  Okay.  So there is no City policy that mandates

18  that -- that a old phone that has been replaced must

19  be -- must be factory reset; in fact, they had the

20  option of holding on to that -- that old phone and

21  keeping it; correct?

22             MR. CRAMER:  Objection.  Form, misstates

23  testimony.

24       A.  Not -- not that I'm aware of.  Again, with --

25  how every department operates is different, so...

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 75

1   BY MR. REILLY-BATES:

2       Q.  Okay.  Before you factory reset the phone, what

3   did you do to -- if anything, to examine what was on --

4   on that cracked screen iPhone?  Or did you just go in

5   and factory reset it?

6       A.  After -- I mean, at the time where -- where I

7   was doing the factory reset, no, I didn't examine it for

8   anything else.

9       Q.  Okay.  So -- and you didn't make a backup of --

10  of the -- the cracked screen iPhone 8 Plus before you

11  factory reset it; right?

12          MR. CRAMER:  Objection.  Form.

13      A.  Of the cracked screen?

14  BY MR. REILLY-BATES:

15      Q.  That's right.

16      A.  No, because I had enabled the backup on the new

17  phone, which I believed had exact -- same exact copy.

18      Q.  Now, this policy of doing a factory reset on

19  the iPhone, or the -- not policy, but the practice of

20  doing that, is -- is that -- is that stopped when the

21  mayor's office becomes aware that there's a lawsuit

22  pending that might request data that is on one of those

23  devices?

24          MR. CRAMER:  Objection.  Form, foundation.

25      A.  So are you asking if it's stopped?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 76

1    BY MR. REILLY-BATES:

2        Q.  Right.  Do you -- do you set aside your normal

3    procedure of -- of -- of wiping an old phone if you're

4    aware of a lawsuit that is pending that might require

5    that phone?

6        A.  If we are aware of, yeah, a litigation hold on

7    someone's account, yeah, we do keep all their devices.

8        Q.  Okay.  So if you had been made aware that

9    there -- there was a lawsuit pending in August of 2020,

10   when you wiped the phone, you would have definitely

11   saved the phone and not factory reset it.  Is that a

12   fair statement?

13            MR. CRAMER:   Objection.  Foundation, calls

14   for speculation, assumes facts, and that it's an

15   incomplete hypothetical.

16       A.  If I knew about it, I'm sure, yeah, the mayor's

17   office would hold on to the device or whoever, our

18   law -- in our law department will probably ask for it.

19   BY MR. REILLY-BATES:

20       Q.  So -- but I'm asking what you would have done.

21   If you had known that there was a lawsuit pending, or a

22   litigation hold, would you have gone ahead with the

23   factory reset at that time?

24       A.  No.

25            MR. CRAMER:  Wait.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 77

1          Objection.  Foundation, calls for speculation.

2          MR. REILLY-BATES:  Thank you, Mr. Arhu.

3     BY MR. REILLY-BATES:

4          Q.  Okay.  Now, I think we just touched on briefly

5     the fact that in -- in August of 20 -- August 21st of

6     2020, Michelle Chen started looking into the issue of

7     whether there were text messages on the mayor's phone.

8     And I'm not asking you to tell me anything that -- that

9     Michelle Chen told you because that -- that is

10    privileged, but do you recall her looking into that

11    issue?

12         A.  Yes.

13         Q.  And did you have any direct communication with

14    her?

15         A.  Yes.

16         Q.  Okay.  And -- and how about, was Regi aware of

17    that issue?

18         A.  Yes.

19         Q.  Okay.  Tell me about your conversations that

20    you had with Regi only about what the concern was about

21    the mayor's text messages.

22         A.  So when we got to know that the messages were

23    not there, initially we just went through -- we thought

24    about if we -- could it have been something that we did

25    wrong, I in particular, because I did the back -- I did

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 78

1    the restore.

2              So we did some tests just to make sure that the

3    process that we've been using did not fail.  And also we

4    started looking at efforts to try to recover anything

5    that was lost.  And that included contacting Susy, who's

6    our wireless coordinator, to contact the carrier, the

7    mobile carrier, to see if they can recover any messages.

8              We also tried to back up and restore.  That's

9    when we noticed there was no backup.

10             And also we did check with some of the people

11   in the mayor's office that do PDR requests to see if

12   they've ever connected the mayor's phone to their

13   computer to do a backup before.

14        Q.  Okay.  Anything else that you can remember?

15        A.  And also, I guess, our in-house forensics

16   person also did try to do a recovery before Crypsis came

17   in.

18        Q.  Gotcha.  Tell me about the PDR folks.  That

19   would be Stacy Irwin and Kim Ferreiro; right?

20        A.  Yes.

21        Q.  And what -- what did you talk to them about?

22   What was your conversation with them about?

23        A.  I asked them if they've ever connected the

24   mayor's phone to their computer, or if they've ever

25   done -- they used an application to extract text

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 108

1                     C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6          I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Emmanuel

9    Arhu, having been duly sworn, on March 3, 2022, is true

10   and accurate to the best of my knowledge, skill and

11   ability.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 9th day of March, 2022.

14

15

16   _____

17   CINDY M. KOCH, CCR, RPR, CRR #2357

18

19   My commission expires:

20   JUNE 9, 2022

21

22

23

24

25

# EXHIBIT 15

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et        )
al.,                            )
                                )
            Plaintiffs,         )
                                ) Case No.
    vs.                         ) 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )


VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

ANDREA FRIEDHOFF

_____


8:56 a.m.

SEATTLE, WASHINGTON

(All participants appeared via videoconference.)




DATE TAKEN:  JUNE 30, 2022

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle          Andrea Friedhoff

Page 34

1   know why, but that we needed to -- one of them needed
2   to look at it and get it fixed.
3       Q.  Okay.  What did you do to determine whether or
4   not her phone needed to be replaced?
5       A.  That was not my determination.  My job was to
6   take the phone and hand it to the IT folks, and they
7   were to make that determination if it was fixable or
8   needed to be replaced.
9       Q.  Okay.  And what did they determine?
10                  MR. CRAMER:  Objection.  Foundation.
11      Q.  About the phone?
12      A.  I don't know.
13      Q.  Well, the phone was ultimately replaced,
14  correct?
15      A.  At some point, yes, but I couldn't
16  specifically say if I was present when the phone was
17  replaced or not.
18      Q.  So is it accurate to state that you had no
19  input in determining whether or not the phone should be
20  replaced or not?
21      A.  I believe that's correct.
22      Q.  Okay.  In July of 2020 did you ever hear an
23  explanation that the phone -- the mayor's phone had
24  been dropped in salt water and that's why it was not
25  working?

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle          Andrea Friedhoff

Page 35

1    A.  No, I don't remember, and I don't remember the
2    timing.
3    Q.  Okay.  Subsequent to July of 2020 did you ever
4    learn that -- or hear of an explanation that the
5    mayor's phone had been dropped in salt water?
6    A.  I don't know.  I mean, it -- I may have read a
7    speculative report in the news, but it wasn't -- I
8    don't remember it being from like a very authoritative
9    source.
10    Q.  So you heard about the explanation of the
11    mayor's phone being dropped in salt water from a news
12    story?
13    A.  I wouldn't call it an explanation.  There was
14    speculation, and I don't recall.  It may have been the
15    news, but it wasn't like from somebody in the mayor's
16    office, I don't believe.
17    Q.  Okay.  So you didn't have any conversations
18    with anybody at the mayor's office about how the phone
19    was damaged; is that accurate?
20    A.  Regi or Emmanuel asked me if I knew what had
21    happened, and I said I didn't, but just that it was
22    broken and she needed them to look at it.
23    Q.  So to the best of your understanding, did Regi
24    and Emmanuel also not know how the phone had been
25    damaged?

Hunters Capital, LLC v. City of Seattle                Andrea Friedhoff

Page 40

1    phone to factory settings means?

2        A.  Yes, at a very superficial high level, yes.

3        Q.  Okay.  Please tell me what your understanding

4    of that is.

5        A.  Factory reset goes back to the way it was

6    before anyone logged in or set it up or whatever they

7    do to make it city specific.

8        Q.  Okay.  And would a factory reset wipe out any

9    text messages on a phone to the best of your

10   understanding?

11       A.  I don't know.

12       Q.  Okay.  In July of 2020 when you received the

13   phone from the mayor, had the mayor explained to you

14   that she had turned her messages in iCloud feature off?

15               MR. CRAMER:  Objection.  Assumes facts.

16   Misstates the record.

17       Q.  You can answer the question.

18       A.  There was no conversation about the messages.

19       Q.  Okay.  Did she tell you that she had selected

20   a disable and delete function that would remove all of

21   her text messages from iCloud?

22       A.  No, she did not.

23       Q.  And did she ask you for any help in trying to

24   recover or back up text messages when she gave you the

25   phone?

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 59

1          Q.   Okay.   So and you're referring to the message
2      that's included in row 8260 of Exhibit 4, correct?
3          A.   That's correct.
4          Q.   Okay.   And did she say anything else besides
5      the fact that her calendar wouldn't update and couldn't
6      send out emails?
7                     MR. CRAMER:   I just couldn't hear you,
8      Gabe.   Did you say, "Did you say anything more" or "Did
9      she say anything more"?
10         Q.   I'm sorry.   Did she say anything more besides
11     the fact that her calendar wouldn't update and she
12     couldn't send out emails when you got the phone from
13     her?
14         A.   That I don't know.
15         Q.   So she didn't tell you that she had dropped
16     her phone on a beach in salt water, correct?
17                    MR. CRAMER:   Objection.   Asked and
18     answered.
19         A.   I don't know.
20         Q.   Can you answer my question yes or no?   Did she
21     tell you whether or not she had dropped her phone on
22     the beach in salt water when you picked up the phone
23     from her?   Yes or no?
24                    MR. CRAMER:   Objection.   Asked and
25     answered.   You can answer if you know or if you recall.

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 60

1      A.  No.  I -- no.
2      Q.  Okay.  Did you subsequently -- at some point
3  in time subsequently learn that she had stated that she
4  had dropped her phone in salt water and that was the
5  reason why it was no longer working?
6              MR. CRAMER:  Objection.  Asked and
7  answered multiple times this morning already.  You can
8  answer again.
9      A.  No.  She did not say that to me specifically.
10  I only was aware of the water theory through the news.
11  It was not directly from her ever.
12      Q.  Okay.  And that was my question, whether you
13  subsequently became aware of that explanation?
14      A.  A theory.  I don't know if it's an
15  explanation.
16      Q.  Okay.  And do you have any information that
17  would cause you to doubt that explanation at all?
18      A.  I don't know.  It's a theory.  I don't know.
19      Q.  The question is whether you have any reason to
20  believe that the explanation that her phone was
21  dropped -- was no longer working because it was dropped
22  in the water was inaccurate?  Do you have any
23  information to challenge that or to question that
24  theory?
25      A.  I have no thoughts on that.

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 63

1    return of the mayor's new iPhone 11 to her after Regi

2    or Emmanuel set it up, or did they get the phone to her

3    directly?

4                 MR. CRAMER:  Objection.  Assumes facts.

5        A.  I don't know.

6        Q.  Are there any documents that you could think

7    of that would help refresh your recollection?

8        A.  I don't know unless there's texts here that

9    reference how she got it back, but I don't know after

10   like the interaction of giving Regi the phone on

11   July 6th what happened afterwards.

12       Q.  So and at no time after you gave the phone to

13   Regi on July 6 did you have the mayor's phone; is that

14   correct?

15       A.  I don't think I had her phone after July 6th.

16       Q.  Okay.  And so there was no way that you could

17   have made any changes to the settings on the mayor's

18   phone after July 6, correct?

19       A.  Yeah, nothing -- I don't -- no.

20       Q.  And specifically there's no way that you made

21   any changes to the settings on her -- the mayor's phone

22   that would cause text messages to be deleted after

23   30 days; is that correct?

24       A.  Correct.

25       Q.  Okay.  And at the end of July, from July 20th

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 64

1    to July 31st, you also wouldn't have -- you did not

2    have any contact with the phone to be able to turn the

3    30-day delete function off on her phone; is that

4    correct?

5        A.   That's correct.

6        Q.   Were you aware -- ever made aware that

7    somebody in the mayor's office or somebody had turned a

8    setting on the mayor's phone that would cause text

9    messages to be deleted after 30 days?

10                 MR. CRAMER:   Objection.   Assumes facts.

11   Misstates the record.

12       Q.   You can answer.

13       A.   Not someone.   There wasn't a reference in my

14   recollection of somebody in the mayor's office or

15   anybody generally who would have changed the settings.

16   I was aware at one point later in the year that the

17   text messages were missing.

18       Q.   Okay.   And how did you become aware that the

19   text messages were missing?

20       A.   At some point later in the year, I believe it

21   was Michelle Chen who made me aware that they were

22   missing.

23       Q.   Okay.   Besides Michelle Chen, I can't ask you

24   about your conversations with her, did you have any

25   conversations with anybody else about the fact that the

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 69

1       A.   Yes, it looks like I did.

2       Q.   Do you know who placed a ticket to order a new

3   phone for the mayor?

4       A.   I don't know.

5       Q.   And but you weren't involved in placing that

6   ticket, correct?

7       A.   I don't believe I was.

8       Q.   All right.   And you weren't involved in the

9   decision to order the new phone, correct?

10      A.   I -- no, I don't think so.

11      Q.   And Regi did not -- when he picked up the

12  phone, he did not check the mayor's text messages in

13  your presence, correct?

14      A.   I don't know.

15      Q.   He didn't check the retention settings for

16  text messages in your presence, correct?

17      A.   I don't know.  I don't know what he did.

18      Q.   He didn't tell you that he had made any

19  changes to the mayor's settings, did he, ever?

20      A.   No, I don't think so.

21      Q.   Okay.

22      A.   Ever, no.

23      Q.   Were you involved at all in the process of

24  backing up and restoring data to the mayor's new iPhone

25  11 in July of 2020?

a064d1af-669a-4b79-b825-d50a68113c73

Hunters Capital, LLC v. City of Seattle                    Andrea Friedhoff

Page 85

1                    REPORTER'S CERTIFICATE

2

3          I, LORRIE R. CHINN, the undersigned Certified Court

4    Reporter, pursuant to RCW 5.28.010 authorized to administer

5    oaths and affirmations in and for the State of Washington, do

6    hereby certify:

7          That the sworn testimony and/or remote proceedings, a

8    transcript of which is attached, was given before me at the

9    time and place stated therein; that any and/or all witness(es)

10   were duly sworn remotely to testify to the truth; that the

11   sworn testimony and/or remote proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the foregoing

14   transcript contains a full, true, and accurate record of all

15   the sworn testimony and/or remote proceedings given and

16   occurring at the time and place stated in the transcript; that

17   a review of which was requested; that I am in no way related

18   to any party to the matter, nor to any counsel, nor do I have

19   any financial interest in the event of the cause.

20         WITNESS MY HAND AND DIGITAL SIGNATURE this 14th day

21   of July, 2022.

22

23   _____

24   LORRIE R. CHINN, RPR, CCR
     Washington State Certified Court Reporter No. 1902
     Oregon State Certified Court Reporter No. 97-0337
25   lorrie.chinn@chinncourtreporting.com

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989