# EXHIBIT 16

Hunters Capital, LLC v. City of Seattle                    Stephanie Formas

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
               Plaintiff,        )
                                 )
         vs.                     ) No. 20-cv-00983
                                 )
CITY OF SEATTLE,                 )
                                 )
               Defendant.        )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

STEPHANIE FORMAS

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:   APRIL 30, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

d15eacad-04a8-433a-be11-7d77327bd610

Hunters Capital, LLC v. City of Seattle                Stephanie Formas

Page 238

1  specifically related to what happened on July 5th and

2  4th?

3     A.  I don't recall what days or what types of

4  conversations we may have had.

5     Q.  All right.  At any time, whether in July or

6  later?

7     A.  No.  I just -- I don't have a specific

8  recollection of a specific memory or a day when I talked

9  to the mayor about her phone.

10    Q.  All right.  Were you involved at all in getting

11  her a replacement phone?

12    A.  I don't believe so.  I believe I may have been

13  made aware that that was occurring, but I was not

14  involved in the process, nor -- I don't know if I would

15  have been copied on the email, but again, I do not

16  believe that I would -- had been aware of -- or I would

17  have been involved in any part of the process.

18    Q.  All right.  Were you involved in or aware --

19  were -- first of all, were you aware of -- in July of

20  2020, at any point that the mayor's phone had been set

21  to a 30-day delete setting?

22         MR. CRAMER:  Objection.  Form.

23    Go ahead.

24    A.  Yes, I was made aware of that.  And to clarify,

25  did you say, was I made aware of that in July?

d15eacad-04a8-433a-be11-7d77327bd610

Hunters Capital, LLC v. City of Seattle                    Stephanie Formas

Page 239

1  BY MR. WEAVER:

2      Q.  When were you made aware of it, if you recall?

3      A.  I don't recall when I was made aware of it, but

4  I was made aware of it.

5      Q.  Were you at all involved in either setting that

6  delete setting on her phone or discovering it and

7  changing it?

8      A.  Absolutely not.

9           MR. CRAMER:  I want to make sure that the

10  record is clear.

11           THE WITNESS:  Okay.

12           MR. CRAMER:  Were you aware of that in July

13  of 2020.

14           THE WITNESS:  No.  So yes, to clarify, I was

15  not -- I thought the question was, was I made aware of

16  the events of -- of the setting change from July 2020.

17  Yes, I was made aware.  But I was not aware in July of

18  2020.

19  BY MR. WEAVER:

20      Q.  Do you have any idea of when you first became

21  aware of that fact?

22      A.  I believe it would have been later in the fall

23  or winter of 2020.

24      Q.  Did you ever find out in July of 2020 that that

25  setting had been changed?

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

d15eacad-04a8-433a-be11-7d77327bd610

Hunters Capital, LLC v. City of Seattle                Stephanie Formas

Page 248

1       Q.  Okay.  All right.  I was going to say

2    congratulations, but I don't know -- I guess he won,

3    so --

4       A.  Yes.

5       Q.  So congratulations.

6           So do you recall any conversations from July

7    2020 to the present with Mayor Durkan about her phone,

8    about what happened to it in July of twenty -- oh, man,

9    you're frozen again.

10              MR. REILLY-BATES:  That's okay.  I think we

11   can just come back another day.

12              MR. WEAVER:  Well -- okay.  Nope, you're

13   frozen again now.

14              THE COURT REPORTER:  Can we go off the

15   video -- oh, well...

16              MR. WEAVER:  We can see you now.

17              THE WITNESS:  Can you see and hear me okay?

18              MR. WEAVER:  For now.

19   BY MR. WEAVER:

20       Q.  Okay.  So I think we're still on the record, so

21   were there any -- can you recall any conversations with

22   the mayor about -- from July 2020 to the present about

23   her phone, about her missing texts, or the various

24   settings that were on her iCloud or her phone regarding

25   retention of texts?

d15eacad-04a8-433a-be11-7d77327bd610

Hunters Capital, LLC v. City of Seattle                    Stephanie Formas

Page 249

1        MR. CRAMER:   And I'll instruct the witness,
2   to the extent that there were communications involving
3   the city attorney's office about those, don't testify to
4   those.
5        But to the extent that there were
6   communications about those outside of communications
7   with the city attorney's office or our office, go ahead
8   and testify to them.
9      A.   I don't recall any specific conversations with
10  her outside of what would have been meetings with the
11  city attorney's office.
12            MR. WEAVER:  Okay.  I'm going to drop a
13  document into the chat and hope it doesn't send you
14  haywire.
15            MR. CRAMER:  And I turned off my video to
16  hopefully save bandwidth.  If that's objectionable to
17  anybody, let me know.
18            MR. WEAVER:  No.  In fact, I was going to
19  suggest, if this keeps happening, that we turn off
20  Ms. Formas's video as well, but -- we're getting close,
21  I promise.
22            (Exhibit No. 18 marked.)
23  BY MR. WEAVER:
24      Q.  So this is a large group of texts that should
25  be there, although I'm having a problem opening it.  All

d15eacad-04a8-433a-be11-7d77327bd610

Hunters Capital, LLC v. City of Seattle                    Stephanie Formas

Page 256

1               C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Stephanie

9    Formas, having been duly sworn, on April 30, 2022, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 9th day of May, 2022.

14

15

16

17

18   _____

19             CINDY M. KOCH, CCR, RPR, CRR

20

21   My commission expires:

22   JUNE 9, 2026

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

# EXHIBIT 17

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al., )
                              )
            Plaintiffs,       )
                              )
       v.                     ) Case No. 20-cv-00983-TSZ
                              )
CITY OF SEATTLE,              )
                              )
            Defendant.        )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
                    EXAMINATION

OF

COLLEEN O'REILLY BERNIER

_____

(All participants appearing via Zoom videoconference.)

Taken at

Seattle, Washington

DATE TAKEN:  July 27, 2022

REPORTED BY:  KATHLEEN HAMILTON, RPR, CRR, CCR 1917

Hunters Capital, LLC v. City of Seattle          Colleen O'Reilly Bernier

Page 50

1    when I did finally see the email, I didn't respond,

2    because they had taken care of it.

3        Q.   Okay.  And we'll -- we'll get to that -- that

4    email.

5            Did -- did the mayor decide that she needed a

6    replacement phone in July of 2020?

7                MR. CRAMER:  Objection.  Foundation.

8                You can answer if you know.

9                THE WITNESS:  I don't know.

10   BY MR. REILLY-BATES:

11       Q.   In July of 2020, did the mayor ever tell you

12   that she had dropped her phone on the beach and the

13   saltwater had covered the phone?

14       A.   She did not.

15       Q.   Did you have any conversations with the mayor

16   about her phone in July of 2020?

17       A.   Not that I recall.

18       Q.   Okay.  Did you have any other conversations with

19   anybody else besides the mayor about the mayor's phone?

20                MR. CRAMER:  Objection.  Vague as to

21   "conversations".

22                Go ahead.

23                THE WITNESS:  Not that I recall.

24   BY MR. REILLY-BATES:

25       Q.   Did the mayor ever tell you that she had reset

cb2e0255-de68-4429-9e15-23597663329e

Hunters Capital, LLC v. City of Seattle          Colleen O'Reilly Bernier

Page 69

1    A.    Not that I recall.

2    Q.    Okay.

3    A.    No, I did not.

4    Q.    Okay.  So you didn't turn a setting on her phone

5    that would cause messages to delete after 30 -- after

6    they were 30 days old, did you?

7    A.    I don't -- I did not.

8    Q.    And you were not the one who discovered that

9    that setting was turned on at the end of July 2020, were

10   you?

11   A.    I was not.

12   Q.    Do you know... if anybody in the mayor's office

13   did discover that that setting was turned on?

14   A.    I have no idea.

15   Q.    Did the mayor ever tell you that she had

16   accidentally turned that setting on and then turned it

17   off?

18   A.    She did not.

19   Q.    Did you ever have any conversation with anybody

20   or see any documents that provided any information about

21   who turned that setting on and off on the mayor's phone

22   in July of 2020?

23              MR. CRAMER:   Objection.  Assumes facts.

24              Go ahead.

25              THE WITNESS:   No.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

cb2e0255-de68-4429-9e15-23597663329e

Hunters Capital, LLC v. City of Seattle                    Colleen O'Reilly Bernier

Page 119

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF KING

5

6        I, Kathleen Hamilton, a Certified Shorthand

7    Reporter and Notary Public in and for the State of

8    Washington, do hereby certify that the foregoing

9    transcript of the deposition of COLLEEN O'REILLY

10   BERNIER, having been duly sworn, on JULY 27, 2022, is

11   true and accurate to the best of my knowledge, skill and

12   ability.

13       IN WITNESS WHEREOF, I have hereunto set my hand

14   and seal this 3RD day of AUGUST, 2022.

15

16

17

18

19

20   _____

     KATHLEEN HAMILTON, RPR, CRR, CCR #1917

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

# EXHIBIT 18

## Re: Mayor new phone

**From:**  "OReilly Bernier, Colleen" <colleen.oreillybernier@seattle.gov>
**To:**  "Arhu, Emmanuel" <emmanuel.arhu@seattle.gov>
**Cc:**  "Friedhoff, Andrea" <andrea.friedhoff@seattle.gov>, "Alencastro, Regi"
        <regi.alencastro@seattle.gov>
**Date:**  Wed, 08 Jul 2020 12:19:09 -0700

Thanks Emmanuel.  The Mayor will be in tomorrow.

Sent from my iPhone

> On Jul 8, 2020, at 12:04 PM, Arhu, Emmanuel <Emmanuel.Arhu@seattle.gov> wrote:
>
>
> Hello Colleen,
>
> I picked up the phone for the mayor today. When will be a good time for me to swap it out for her?
>
> Emmanuel Arhu
> IT Client Device Support Engineer
> SEATTLE INFORMATION TECHNOLOGY
> O: 206.684.7246 | M: 206.295-9845 | emmanuel.arhu@Seattle.gov
>
> **Best-in-Class Digital Services**
> Facebook | Twitter | E-Newsletter
>
> ---
>
> **From:** OReilly Bernier, Colleen <Colleen.OReillyBernier@seattle.gov>
> **Sent:** Tuesday, July 7, 2020 12:17 PM
> **To:** Alencastro, Regi <Regi.Alencastro@seattle.gov>
> **Cc:** Friedhoff, Andrea <Andrea.Friedhoff@seattle.gov>; Arhu, Emmanuel
> <Emmanuel.Arhu@seattle.gov>
> **Subject:** Re: Mayor new phone
>
> Thanks Regi - most likely will be tomorrow as we're all remote today.
>
> Sent from my iPhone
>
>> On Jul 7, 2020, at 12:16 PM, Alencastro, Regi <Regi.Alencastro@seattle.gov> wrote:
>>
>>
>> It has arrived – please let us know when she  can give up her phone for a few hours so we can
>> backup /  restore her data to the new phone.
>>
>>
>> Thank you,

SEA_00145708

Regi Alencastro
Desktop Services
SEATTLE INFORMATION TECHNOLOGY
O: 206.684.0945 | M: 206.473.0276 | regi.alencastro@seattle.gov
**Best-in-Class Digital Services**
Facebook | Twitter | E-Newsletter

SEA_00145709

# EXHIBIT 19

Estate of Taylor, et al. v. City of Seattle and King County                                    Mayor Jenny Durkan

Page 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY
_____

The Estate of SUMMER JOLIE   )
WILLIAMS TAYLOR, by and   )
through MATTHEW D. TAYLOR,   )
Personal Representative, ZOE   )
ADBERG, SARA ANDERSON, MEGAN )  20-2-14351-1 SEA
BUSS, GRACE CARMACK, LEANNA   )
CARR, AISLING COONEY, ABIE   )
EKENEZAR, EDWARD FARMER,   )
NIMA FORGHANI, NOAH FOWLER,   )
ZACHARY GARDNER, IAN GOLASH, )
GRACE GREGSON, MIRANDA   )
HARDY, LEXUS HARTLEY,   )
CLAYTON HOLLOBAUGH, JASON   )
SCHIERER as guardian ad   )
litem for minor MALICHI HOWE )
a.k.a. BRYAUNA HOWE, JESSE   )
HUGHEY, AUBREANNA INDA, MARY )
JURGENSEN, TIMOTHY KAUCHAK,  )
JOHN W. KELLIHER, JENNA   )
KINYON, BEN KOENIGSBERG,   )  **Caption continued**
JACOB KOENIGSBERG, SETH   )
KRAMER, ERIC LOOK, DANIEL   )
LUGO, JACOB MARTIN, JOSHUA   )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
EXAMINATION OF
MAYOR JENNY DURKAN

(All participants appearing via Zoom videoconference.)

Witness located in
Seattle, Washington

DATE TAKEN:  FEBRUARY 28, 2022
REPORTED BY:  PATSY D. JACOY, CCR 2348

Page 2

1    MATNEY, CHLOE MERINO, LOGAN
     MILLER, TONI MILLS, ALESSANDRA
2    MOWRY, KELSEY MURPHY-DUFORD,
     WESLEY PEACOCK, JORDAN A.
3    PICKETT, CHARLES PIERCE, DANIEL
     PIERCE, CONOR POULL, RENEE
4    RAKETTY, JAVIER RIZO, ALEXANDER
     RUEDEMANN, MICHAUD SAVAGE,
5    CAROLYN STERNER, SEAN SWANSON,
     MEGHAN THOMPSON, BRUCE TOM,
6    TIFFANY VERGARA-MADDEN, ALIYE
     VOLKAN, STEVEN WIDMAYER, JOSEPH
7    WIESER, GILLIAN WILLIAMS, QUINN
     ZOSCHKE, and DOES 1-40;
8
            Plaintiff(s),
9
       vs.
10
     CITY OF SEATTLE, a governmental
11   entity, and KING COUNTY, a
     governmental entity;
12
            Defendant(s).
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       A P P E A R A N C E S
2    PRESENT VIA ZOOM FOR THE PLAINTIFFS:
3       KAREN K. KOEHLER
        LISA BENEDETTI
4       GEMMA ZANOWSKI
        MELANIE NGUYEN
5       FRED RABB
        FURHAD SULTANI
6       ALYSHA KOEHLER
        DRADIN KREFT
7       SARAH LIPPEK
        KRISTIN MICHAUD
8       Stritmatter Kessler Koehler Moore
        3600 15th Avenue W, Suite 300
9       Seattle, WA 98119
        206.448.1777
10      karen@stritmatter.com
        lisa@stritmatter.com
11      gemma@stritmatter.com
        melanie@stritmatter.com
12      fred@stritmatter.com
        furhad@stritmatter.com
13      kristin@stritmatter.com
14
15   PRESENT VIA ZOOM FOR THE DEFENDANT CITY OF SEATTLE:
16      JOSEPH G. GROSHONG
        Seattle City Attorney's Office
17      701 Fifth Avenue, Suite 2050
        Seattle, WA 98104
18      296.684.8200
        joseph.groshong@seattle.gov
19      G. WILLIAM SHAW
        RYAN J. GROSHONG
20      IVAN L. ASCOTT
        BENJAMIN C. WOODRUFF
21      K&L Gates LLP
        925 Fourth Avenue, Suite 2900
22      Seattle, WA 98104
        206.623.7580
23      bill.shaw@klgates.com
        ryan.groshong@klgates.com
24      ivan.ascott@klgates.com
        ben.woodruff@klgates.com
25

Page 4

1       A P P E A R A N C E S (cont'd)
2
3    PRESENT VIA ZOOM FOR DEFENDANT KING COUNTY:
4       ANN M. SUMMERS
        King County Prosecutor's Office
5       1191 Second Avenue, Suite 1700
        Seattle, WA 98101
6       206.477.1909
        ann.summers@kingcounty.gov
7
8    VIDEOGRAPHER:
9       JASON NEUERBERG
        Buell Realtime Reporting, LLC
10
11   ALSO PRESENT:
12      GRACE CARMACK
        GRACE GREGSON
13      SETH KRAMER
        TONI MILLS
14      DANIEL PIERCE
        RENEE RAKETTY
15      MICHAUD SAVAGE
        JOSEPH SAVAGE
16      SEAN SWANSON
        NOAH WICK
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Estate of Taylor, et al. v. City of Seattle and King County

Mayor Jenny Durkan

Page 193

1   through public records training?
2        A.  To the best of my knowledge, that's correct.
3        Q.  So as mayor, when you learned that your texts
4   were deleted, who do you say has responsibility for the
5   deletion of your texts?
6        MR. SHAW:  Objection; form, foundation.
7        A.  Again, I can't speculate as to who that is,
8   but I did make sure that they wanted to take some --
9   some actions, one, before this happened it was my
10  understanding that the City backed up and archived all
11  of its electronic data, including text messages.  When
12  through this we learned that wasn't the case, so we put
13  in a pilot program to start making sure that we could
14  collect all text messages from my phone, my senior
15  team's and then move that pilot out to key people.
16       Second, we wanted to review all of our
17  practices not just in terms of retention of electronic
18  evidence, but how we produced that and also created a
19  transparency advisory group to ensure that we could
20  have the best practices in place and that has media
21  representatives as well as some transparency experts.
22       So as mayor that's what was really important
23  to me was, one, both how do we make sure this doesn't
24  happen again, but then how do we improve our ability to
25  maintain, collect and produce electronic records, and

Page 194

1   as you know, electronic records have grown
2   significantly and they grew even more significantly
3   during this period of time because we moved to a
4   work-from-home setting and as a result it had some
5   negative impacts on our abilities to produce public
6   records.
7        MS. KOEHLER:  I'm going to move to
8   strike as nonresponsive.
9        Q.  (BY MS. KOEHLER)  So as a lawyer, if I make a
10  mistake, I'm responsible.  If my staff makes a mistake,
11  I'm responsible.  And my question to you is, you had a
12  duty under the public records act to maintain your
13  texts.  They're gone, they're deleted.  Do you accept
14  responsibility for the fact that your texts were
15  deleted?
16       MR. SHAW:  Objection; form, foundation.
17       A.  Again, Ms. Koehler, I think you're trying to
18  make a legal conclusion and I was trying to answer the
19  factual question which is when I hear who's responsible
20  it means who did it, and it was my intent as mayor to
21  always maintain all of our electronic data and that was
22  what I tried to do.
23       Q.  (BY MS. KOEHLER)  Do you agree that you are
24  responsible for your texts being deleted?
25       MR. SHAW:  Objection; calls for a legal

Page 195

1   conclusion, form, foundation.
2        A.  Again, I think you're trying to create a legal
3   standard when I think that we're looking for a factual
4   standard.
5        Q.  (BY MS. KOEHLER)  I'm just looking for, you
6   know, you're -- you're the leader of the City.  Aren't
7   you -- doesn't the buck stop with you?
8        MR. SHAW:  Objection; form, foundation,
9   calls for a legal conclusion.
10       A.  Is that a question?
11       Q.  (BY MS. KOEHLER)  It was.
12       A.  Okay.  Obviously as the mayor of the City of
13  Seattle many responsibilities end at my desk, and it's
14  my job as an individual in the City to preserve public
15  records which we did.  I believed that all public
16  records and electronic records were being maintained.
17  Apparently that wasn't the case.  But through this --
18  endeavors of the litigation and others we actually have
19  been able to recover the vast majority of those text
20  messages.
21       Q.  Oh, my gosh, at an incredible cost to the
22  taxpayers, though.  I mean, this has -- this has just
23  been enormously expensive, hasn't it?  I mean, $500,000
24  just for the forensic report on your phone.  That would
25  have gone a long way to feed people that have low

Page 196

1   income.
2        MR. SHAW:  Object to form.
3        Q.  (BY MS. KOEHLER)  I mean, it's been a terrible
4   thing, right?  This -- this has not been a great thing.
5   You would agree with me on that?
6        MR. SHAW:  Objection; form, foundation.
7        A.  I would agree it has not been a positive
8   thing.
9        Q.  (BY MS. KOEHLER)  All right.  Well, here's a
10  question that I was wondering:  Why do you use texts in
11  your role as mayor?  I was surprised.  Because I'm not
12  political, obviously I'm too blunt, like -- but we have
13  Teams in our office.  We have different software
14  solutions.  Why texts?  Is that just widely used within
15  city government?
16       MR. SHAW:  Objection; form, foundation.
17       A.  I think actually if you look at the texts that
18  have been produced you see that it was my standard
19  practice not to conduct substantive business by text
20  message and it was used primarily as a communication
21  tool to touch base to say, "Hey, we should talk?  Or
22  "Call me," and that I -- maybe because it's
23  generational or maybe because I think it's more
24  effective, when I conduct City business I try to be in
25  the same room with someone or talk to them on the

49 (Pages 193 to 196)

Estate of Taylor, et al. v. City of Seattle and King County                                    Mayor Jenny Durkan

Page 201

1  were recovered or not?
2          MR. SHAW: Objection; form, foundation.
3      A. I don't know the answer to that.
4      Q. (BY MS. KOEHLER) In the report and in
5  statements Chief Best stated that she periodically
6  personally deleted text messages routinely. Did you
7  ever do that?
8      A. No.
9      Q. Was that something that you learned was proper
10  to do when you went through public records training, to
11  delete messages off of your City-issued phones?
12         MR. SHAW: Objection; form, foundation.
13     A. It was my practice to keep everything on the
14  phone unless it was, you know, like a clear phishing
15  attempt or spam, but as you know, there is -- there is
16  a different obligation if something is clearly
17  transitory, if -- and that can be deleted. So I don't
18  know what -- what messages the chief did delete. I
19  don't have any personal knowledge or information about
20  it. It was my practice to keep things on my phone.
21     Q. (BY MS. KOEHLER) What was your role with
22  regard to the Palo Alto Networks Unit 42 investigation
23  which commenced when you were mayor on November 5,
24  2020?
25     A. I did not have a role with them. I think they

Page 202

1  were retained by counsel.
2      Q. Okay. Did the mayor's office have any role in
3  that investigation other than cooperating when asked
4  questions?
5          MR. SHAW: Objection; foundation, form.
6      A. No, I think it's -- it's fair to say that
7  that -- that we cooperated when asked to give them
8  either the devices or information.
9          MS. KOEHLER: All right. The next
10  exhibit is Exhibit Number 42.
11         (Exhibit No. 42 was marked.)
12     Q. (BY MS. KOEHLER) This is that report. This
13  is not Bates stamped yet. It just was released -- we
14  probably should have the Bates-stamped version. We'll
15  substitute the Bates-stamped version for this version
16  of Exhibit 42.
17         MR. SHAW: Bear with me. I'm -- I'm
18  sorry.
19         MS. KOEHLER: Yes.
20         MR. SHAW: I'm looking for a hard copy.
21         MS. KOEHLER: Sure.
22         MR. SHAW: 61? Thank you. There it is.
23  Thank you.
24     Q. (BY MS. KOEHLER) Page 4, this identifies the
25  missing texts as existing between October 30, 2019 and

Page 203

1  June 25, 2020. Is that correct?
2      A. Could you just -- I'm just trying to find the
3  document. Can I -- hold on just a second.
4      Q. Sure.
5      A. Which tab was it?
6      Q. Yes.
7          MR. SHAW: And you want us on page 4,
8  correct?
9          MS. KOEHLER: Yes.
10     A. Okay, I see where you are now. What's the
11  question?
12     Q. (BY MS. KOEHLER) Am I correct that the period
13  of the missing texts was October 30, 2019 through
14  June 25, 2020?
15     A. I believe that's correct, that's when there
16  were -- the texts were missing.
17     Q. Have you reviewed this report since it came
18  out?
19     A. I have reviewed it. As you said, it's very
20  technical in spots so I would not pretend to be an
21  expert, but I have reviewed the report.
22     Q. Page 31 calculates that approximately 5,911
23  text messages were deleted between -- this goes back in
24  time -- November 2017 and July 4, 2020.
25     A. Can you -- what page is that on?

Page 204

1          MR. SHAW: Page 31.
2      Q. (BY MS. KOEHLER) That is page 31.
3          MR. SHAW: It's actually 30 in the
4  document. 31 of the PDF.
5      A. Okay, so what's the question?
6      Q. (BY MS. KOEHLER) It says here -- let me get
7  this right. It can be inferred that because artifacts
8  indicate approximately 5,911 messages were synchronized
9  to the iPhone 8 Plus, FirstNet, as part of the July 4,
10  2020 process.
11         Do you see that -- that paragraph?
12     A. I do see that, yep.
13     Q. Have you reviewed this document before?
14         MR. SHAW: Objection; form, foundation.
15     A. Again, I think I've said that I reviewed it,
16  but it is fairly technical.
17     Q. (BY MS. KOEHLER) And it --
18     A. I -- sorry, I'll wait for the question.
19     Q. Going back to, let's say, page 27, I'll show
20  you my attempt at math. This is my attempt at math.
21  On page 27, it states that between November 18, 2017 to
22  August 29, 2019 that they identified 3,643 active text
23  messages during that period of time.
24     A. Could you point where that is again? I'm --
25     Q. Right under text/chat message analysis.

51 (Pages 201 to 204)

Estate of Taylor, et al. v. City of Seattle and King County                    Mayor Jenny Durkan

Page 265

```
 1              THE WITNESS:  Thank you.
 2              MR. SHAW:  No questions.  Thank you.
 3              THE WITNESS:  Thank you very much.
 4              VIDEO OPERATOR:  This concludes the
 5   deposition.  The time now is 5:01 p.m.  We are going
 6   off the record.
 7              (Deposition concluded at 5:01 p.m.)
 8              (Signature was reserved.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 266

```
 1              C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON  )
                          )
 4   COUNTY OF KING       )
 5
 6              I, Patricia D. Jacoy, a Certified
 7   Shorthand Reporter in and for the State of Washington,
 8   do hereby certify that the foregoing transcript of the
 9   deposition of MAYOR JENNY DURKAN taken on
10   February 28, 2022 is true and accurate to the best of
11   my knowledge, skill and ability.
12
13
14   _____
15              Patricia D. Jacoy, CSR 2348
16
17
18
19
20
21
22
23
24
25
```

67 (Pages 265 to 266)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

# EXHIBIT 20

Source App: Native Messages
Body:
I think you should just put the focus and on letting Colleen grab the Mayor's phone and get you the 2 face authentication code
----------------------------
From: +12062959845 Oit Emmanuel
Timestamp: 9/4/2020 4:11:12 PM(UTC-7)
Source App: Native Messages
Body:
You u can see if you can get anything from the iCloud backup
----------------------------
From: +12064730276 +1 (206) 473-0276 (owner)
Timestamp: 9/4/2020 8:01:10 PM(UTC-7)
Source App: Native Messages
Body:
I know especially since you wiped the cracked one .  Still have it since they can't seem to let it go?
----------------------------
From: +12062959845 Oit Emmanuel
Timestamp: 9/5/2020 4:35:09 PM(UTC-7)
Source App: Native Messages
Body:
Yea
----------------------------
From: +12062959845 Oit Emmanuel
Timestamp: 9/15/2020 9:44:08 AM(UTC-7)
Source App: Native Messages
Body:
Are you going to the office today?
----------------------------
From: +12064730276 +1 (206) 473-0276 (owner)
Timestamp: 9/15/2020 11:38:33 AM(UTC-7)
Source App: Native Messages
Body:
Not today but Thursday
----------------------------
From: +12062959845 Oit Emmanuel
Timestamp: 9/15/2020 11:49:14 AM(UTC-7)
Source App: Native Messages
Body:
Ok
----------------------------
From: +12064730276 +1 (206) 473-0276 (owner)
Timestamp: 9/16/2020 10:09:30 AM(UTC-7)
Source App: Native Messages
Body:
Hey Colleen says she has the Mayor's phone. Can I call her?
----------------------------
From: +12062959845 Oit Emmanuel
Timestamp: 9/17/2020 11:37:00 AM(UTC-7)
Source App: Native Messages
Body:
FYI, there is a meeting request from Kim, with Michelle on it for 4:30pm
----------------------------
From: +12062959845 Oit Emmanuel
Timestamp: 9/17/2020 12:52:57 PM(UTC-7)
Source App: Native Messages

# EXHIBIT 21

## MEMORANDUM

**Date:**     9/25/2020

**To:**        City Attorney's Office

**From:**     Ginger Armbruster, Chief Privacy Officer
Jim Loter, Director, Frontline Digital Services
Michelle, Chen, Legal Counsel to Mayor Jenny A. Durkan
Kimberly Ferreiro, Public Disclosure Officer, Mayor's Office

**Cc:**        Saad Bashir, Chief Technology Officer

**Subject:**  Attorney Client Privilege/Work Product



Attorney Client Privilege/Work Product



Attorney Client Privilege/Work Product

SEA_00144623

Attorney Client Privilege/Work Product

SEA_00144624

# EXHIBIT 22



# City of Seattle

**Ethics & Elections Commission**

May 6, 2021

**<u>BY E-MAIL ONLY</u>**

Mayor Jenny Durkan
7th Floor, City Hall
Seattle, WA

Dear Mayor Durkan:

I received a complaint under the Whistleblower Protection Code two months ago alleging violations of the Public Records Act by your Legal Counsel, Michelle Chen. The alleged violations occurred in the context of your Legal Counsel's efforts to keep from public view the fact that your text messages from August 28, 2019 to June 25, 2020 no longer exist on your City phone or in any cloud-based account associated with your City phone.

After receiving the complaint, I asked the City Attorney's Office to engage Ramsey Ramerman, a recognized authority on the Public Records Act, to conduct an independent investigation and legal analysis for me in accordance with my duties under the Whistleblower Protection Code. He accepted the assignment and was retained by the City Attorney's Office.

As you can see from the attached report, which I am transmitting to you pursuant to SMC 4.20.830.D.4, I believe your Counsel's efforts violated the Public Records Act by narrowly interpreting requests to exclude your text messages, and violated best practices by failing to inform requestors about the fact that ten months of texts from your phone were unavailable for review or production. Pursuant to SMC 4.20.830.E, please let me know within 60 days what action has been taken to address the conduct.

Very truly yours,

*Wayne Barnett*

Wayne Barnett
Executive Director

cc:     Council President Lorena Gonzalez
        City Attorney Pete Holmes*
        Mayor's Legal Counsel Michelle Chen*
        Public Records Officer Stacy Irwin*
        Former Public Records Officer Kim Ferreiro

\*Portions of the report contain material that constitutes attorney-client privileged communications provided in the context of an attorney-client relationship with the City Attorney's Office. I have redacted those portions from the public version of the report; only you, City Attorney Holmes, Ms. Chen, and Ms. Irwin are receiving unredacted versions of the report, and that unredacted version should be treated as attorney-client privileged material unless privilege is waived by the Mayor's Office.

700 Fifth Avenue, Suite 4010, PO Box 94729, Seattle, WA  98124-4729
Tel:  (206) 684-8500, Fax (206) 684-8590, E-Mail: ethicsandelections@seattle.gov, Web: www.seattle.gov/ethics
An equal employment opportunity, affirmative action employer.  Accommodations for people with disabilities provided upon request.

Case No. 21-WBI-0304-1

Investigative Report dated May 6, 2021

On March 4, 2021, the Executive Director of the Ethics and Elections Commission received a Whistleblower Complaint from one of the Mayor's Office's Certified Public Records Officers[1], Stacy Irwin, regarding how the Mayor's Legal Counsel Michelle Chen had directed Irwin and her fellow CPRO Kim Ferreiro[2] to process various Public Records Act requests for the Mayor's text messages. Irwin and Ferreiro have agreed to allow their names to be used in this report.

In late August 2020, Chen, Irwin and Ferreiro learned that approximately ten months' worth of the Mayor's text messages (from August 28, 2019 to June 25, 2020) had not been retained on her city-issued phone or in any cloud-based account associated with her city phone. The reasons why those text messages were not retained was not part of the Complaint, and will not be addressed in this Report, except to note that there is no evidence Chen, Irwin or Ferreiro had any knowledge that the text messages were missing prior to the discovery in late August, 2020. Instead, in the Complaint, Irwin makes several allegations that potentially qualify as "improper governmental action" as defined in SMC 4.20.805 related to how the Mayor's Office responded to public records request for those text messages after the loss was discovered. The "improper governmental action" alleged in the Complaint is conduct that potentially violated the Public Records Act, Chapter 42.56 RCW.

The Complaint alleged that:

1. Irwin and Ferreiro were directed by Chen not to inform requesters that the Mayor's text messages had not been retained and the text messages the City was producing in response to their PRA requests were actually copies of the text messages obtained from persons who had sent text messages to or received text messages from the Mayor. These were referred to as "recreated" text messages.

2. Irwin and Ferreiro were directed by Chen to narrowly interpret 48 pending requests that Irwin and Ferreiro had identified as requesting the Mayor's text messages so that the Mayor's text messages were only responsive to 20 of those pending requests. Irwin and Ferreiro were also directed not to inform requestors that their requests were being interpreted to exclude the Mayor's text messages. As a result, at least three requests were closed without the requestors being informed regarding the Mayor's Office's narrowed interpretation.

3. Chen had proposed altering the "recreated" text messages to mask the fact that these versions of the messages did not come from the Mayor's phone.

The Complaint also includes a fourth claim regarding the interpretation of exemptions, but the events relating to this fourth claim occurred more than 12 months before the Complaint was filed, and given the factual circumstances regarding the application of those exemptions, there is no public interest that justifies reviewing them at this time. See SMC 4.20.830(A) (restricting any investigation to events that occurred within 12 months of the Complaint unless the Executive Director determines that the public interest justified an investigation of those older claims).

The Whistleblower Protection Code governs investigation of complaints of "improper governmental action." Under SMC 4.20.830, the SEEC's Executive Director is charged with

---

[1] The public Records Officers are certified by the Washington Association of Public Records Officers.
[2] While Ferreiro did not sign the Complaint, she has stated that she assisted Irwin in preparing it and fully supports its claims. She has also fully cooperated with this investigation.

investigating Whistleblower Complaints.  In this instance, after completing a preliminary investigation, the Executive Director launched a formal investigation into the allegations in Irwin's Complaint.  Because these allegations involve the legal requirements of the Washington State Public Records Act, chapter 42.56 RCW, the Executive Director asked the Seattle City Attorney's Office to retain attorney Ramsey Ramerman to conduct the investigation and assist the Executive Director in preparing this report.  Ramerman is a recognized authority on the PRA and currently is the co-editor-in-chief of the Washington State Bar Association's Public Records Act Deskbook.

When the Executive Director conducts an investigation and determines that improper governmental action, as defined by SMC 4.20.850(C)(1), has occurred, he is required to provide a written report detailing that determination to complainant (Irwin), to head of the department where the subject of the complaint works (here, the Mayor and City Attorney), and to such other officials as the Executive Director deems appropriate.  When the allegations implicate a department head, the Executive Director shall provide the report to the Mayor and the City Council.

## SUMMARY CONCLUSIONS

1.      The decision by Chen not to inform requestors that the Mayor's text messages had been lost and the City was producing an incomplete set of recreated text messages violated "best practices" for responding to PRA requests but did not necessarily violate the letter of the law. ███████████████████████ but there was no evidence establishing any bad faith.  Thus, this allegation, while founded, does not qualify as "improper governmental action."

2.      Chen's decision to narrowly interpret the majority of the 48 pending PRA requests for communications from the Mayor's Office so those requests were not requesting the Mayor's text messages violated the PRA's statutory mandate to provide "adequate responses" to PRA request.  See RCW 42.56.520.  Moreover, the evidence demonstrates that the decision to narrowly interpret these requests was a change of the normal practice in the Mayor's Office that was specifically made because 10-months of the Mayor's text messages had been lost.  This decision to narrowly interpret the requests was a violation of the PRA and qualifies as improper governmental action.

3.      While it would have been a violation of the PRA to alter the "recreated" text message in the manner proposed by Chen, this investigation has determined that unbeknownst to Irwin or Ferreiro, Chen did not follow through with this proposal, and the recreated texts were produced without alteration.  Moreover, Chen's justification for this proposal was not unreasonable – she explained that certain "call detail" information was not part of the original text message, and therefore not responsive to the request.  Thus, this allegation, while founded, does not qualify as improper governmental action because the Mayor's Office did not follow through with the proposal.

**DISCUSSION**

On or about August 21, 2020, while gathering records to respond to various PRA requests, the Mayor's Office[3] discovered that approximately 10 months' worth of the Mayor's text messages[4] had not been retained, starting from August 28, 2019 to June 25, 2020.  The Mayor's Office promptly contacted the IT department to seek help recovering the lost text messages.  After it was determined that the Mayor's copies of those text messages could not be recovered, the Mayor's Office obtained a log of all of the Mayor's texts from the City's telecom provider and contacted all of the persons at the City who had exchanged text messages with the Mayor to see if the missing text messages could be "recreated" from those other copies.  As of November 6, 2020, the Mayor's Office had identified 48 PRA requests that implicated the Mayor's text messages.

In addition to those PRA requests for the Mayor's text messages, the City was also involved in litigation where the City's opponents had made discovery requests for the Mayor's text messages.  On October 6, 2020, the Mayor's Office informed the City Attorney's Office about this issue.  This prompted the City Attorney's Office to hire an outside entity to conduct a forensic search of the Mayor's phones[5] to determine if any remnants of the missing text could be recovered and why the messages had not been retained.

The Whistleblower Complaint does not make any allegations regarding the cause of the lost text messages and this Report does not address that issue.  Instead, the allegations relate to how Chen directed Irwin and Ferreiro to respond to PRA requests submitted to the Mayor's Office that requested those text messages.  While Chen claims in a May 4 letter that two CPROs exercised relative autonomy, the emails provided with the Complaint show Chen was closely managing all of the requests that sought the Mayor's texts and had directed the CPROs to allow her to review any installments before they were released.

1. **Failure to Inform Requestors About the Lost Texts and to Explain that the Text Messages that Were Produced Were Recreated Text Messages Obtained from Persons Other than the Mayor.**

After it was determined that the Mayor's text messages could not be recovered from her phones, the Mayor's Office sought to obtain copies of the Mayor's text messages from persons in the City who had exchanged text messages with the Mayor.  These were referred to as "recreated" text messages.  The City was only able to obtain "recreated" copies of some of the Mayor's missing text messages.

When preparing to produce these recreated text messages, Irwin and Ferreiro explained to Chen they believed that when the City produced the recreated text messages, the City also needed to inform the requestors that these were recreated text messages, and that the Mayor's original text messages had been lost.  Irwin and Ferreiro's position is documented in their emails to Chen that were provided with the

---

[3] Irwin, Ferreiro and Chen worked closely together as a unit when responding to PRA requests on behalf of the Mayor's Office.  Therefore, when this report refers to actions taken by the "Mayor's Office," it is referring to actions taken by one or more of these three persons that do not implicate fault for the allegations in the Complaint.
[4] In this report, the "Mayor's texts" refers to text messages sent or received by the Mayor on a city-issued phone.
[5] The Mayor's city-issued phone was replaced in October 2019 and again in July 2020, but the forensic investigation could not determine whether the loss of the text messages was related to the replacement of the Mayor's phones.

SEEC Case No. 21-WBI-0304-1

Complaint.  Despite their objections, Chen directed Irwin and Ferreiro to produce the recreated text messages without any explanation and they complied.  At least one requestor has noted that the texts were not from the Mayor's phone and filed an appeal challenging the adequacy of the City's response.

When interviewed, Chen stated that she had made this decision not to provide requestors with an explanation regarding the lost texts ████████████████████████████████████████
████████████████  As of October 6, 2020, the Mayor's Office and IT were still trying to determine if the text messages could be recovered or if other copies of those messages could be obtained from other sources. ████



In response to the allegations, Chen notes in her May 4 letter that in March 2021, she did agree with Ferreiro's suggestion about providing an explanation when producing the recreated texts.  But documentation provided with the Complaint shows that prior to March 2021, Chen rejected similar advice and directed the two CPROs to produce the recreated records without any explanation.  Chen's claim that she directed the CPROs to wait to produce text messages until the forensic search was completed is refuted by the same documentation.

## 2.  Decision to Narrowly Interpret Pending PRA Requests to Exclude the Mayor's Text Messages.

By November 6, 2020, the Mayor's office had at least 48 pending PRA requests that Irwin and Ferreiro had determined were seeking the Mayor's text messages and had therefore been kept open while the Mayor's Office, IT and the City Attorney's office investigated the missing text messages and sought to obtain recreated text messages from other sources.  Most of these requests were considered "past due" based on the targeted response times that the Mayor's Office had set for itself.  The oldest request had been submitted in January 2020.

As documented in several emails and a spreadsheet listing the 48 requests, on or about November 6, 2020, Chen decided to re-interpret the pending requests narrowly, with the result that only 20 of the 48

---

[6] In March 2021, the City notified opposing counsel about the lost text messages.

SEEC Case No. 21-WBI-0304-1

requests were requesting the Mayor's text messages.  As memorialized in the "Notes" column in the November 6 spreadsheet, Chen determined that text messages were not responsive to the other 28 requests by determining (1) that request for the Mayor's Office's communication were not requests for the Mayor's text messages unless the Mayor was specifically identified; and (2) that requests for "correspondence" (as opposed to communications) were only requests for letters or emails but not text messages.

Here are a few examples taken from that spreadsheet, with the request in the "Summary" column and Chen's direction on how to interpret the requests in the "Notes" column:

| <u>**Summary of Request**</u> | <u>**Notes by Chen**</u> |
|---|---|
| • Request C064208:  all correspondence between Mayor or Deputy Mayor and/or their office staff and 'Tacoma Buffalo Soldiers Museum' and 'Historic Seattle' regarding 'Discovery Park' and 'The Discovery Park Fort Lawton Historic District' | • No - this request asks for correspondence not texts. |
| • Request C059261:  Any and all documents, emails, texts, voice messages, etc. surrounding the decision to withdraw from the SPD East Precinct Building between May 25th, 2020 and the present. | • No - this does not specifically ask for JAMD texts.  Does not apply to her. |
| • Request C059414:  I request emails and communications from June 6, 2020 to the current date related to the "retreat" "tactical retreat" "surrender" "abandonment" "evacuation" or similar terms regarding the Seattle Police Department's exit from the East Precinct. I also request the "operational plan" (mentioned by Chief Best in public statements) to evacuate the East Precinct. And, lastly, I request all emails and communications from the Mayor's office since June 6, 2020 that mention the East Precinct. | • No - this does not specifically ask for JAMD texts.  Does not apply to her. |
| • Request C059884:  Please provide me with any records or communications (memos, letters, emails, text messages, voicemails, etc.) that reference an FBI-reported threat to the east precinct or any other police department facilities or staff. Please also provide me with any incoming and outgoing communications with staff of the FBI or any communications that refer the FBI at all. Conduct your search between May 25 and present day | • N - this request doesn't even mention MO. |

Documentation provided with the complaint shows that the latter three requests were fulfilled and closed based on the narrowed interpretation.

The decision to narrowly interpret these requests represented a change in how the Mayor's Office had interpreted the scope of similarly worded request.  Prior to Fall 2020, when the Mayor's Office received a PRA request for its communications, it interpreted "communications" to include the Mayor's text messages and emails, even if the request did not specifically identify the Mayor herself.  Under this

SEEC Case No. 21-WBI-0304-1

practice, the Mayor's text messages would have been responsive to all 48 pending requests.  Beginning in early 2021, the Mayor's Office reverted to this prior practice of interpreting new PRA requests for communications to include the Mayor's text messages.

When first interviewed, Chen explained that she made the decision to narrowly interpret the requests in an effort to reduce the backlog of pending requests, which was historically high for the Mayor's Office.  This explanation is consistent with the explanation she provided to Irwin and Ferreiro on November 9, when she explained that she adopted the narrowed interpretation because the duty to conduct "an adequate search" had to be balanced with the "competing interest" in responding to requests in a "timely and responsive" manner.  The documentation provided with the Complaint shows Chen made this decision over the objections of Irwin and Ferreiro.  No documentary evidence was provided that showed Chen consulted with the City Attorney's Office regarding these narrowed interpretations prior to February 2021 (after at least three of requests were closed using the narrowed interpretations).

In her May 4 letter, Chen claims that her notes in the November 6 spreadsheet only reflected her "initial" attempt to interpret the requests, and Chen identifies a second spreadsheet that she emailed the CPROs on February 10, in which she claims she adopted a broader interpretation the requests in the notes column so that the Mayor's texts were responsive to those requests.  Chen further claims that she did not direct the CPROs to close any requests based on the narrowed interpretations in the November 6 spreadsheet.

Chen's assertion that the notes in the November 6 spreadsheet was only intended to be an initial interpretation that she did not intend the CPROs to act on, and that the notes in the February 10 spreadsheet reflected her final interpretation is not credible.  First, in a November 9 email, Chen unequivocally told the CPROs that "The Notes column [in the November 6 spreadsheet] explains what I think should happen next."  While Chen may have changed her mind at some later date, it is clear that as of November 9, Chen expected the CPROs to take actions based on her interpretations in the November 6 spreadsheet.   This is further confirmed by two email exchanges between Chen and the CPROs on December 2.  In the first email exchange (provided by Chen), Chen notes that there were only six or seven requests that were being held open while the forensic search was being completed.  Given that there were 48 requests in the November 6 spreadsheet, Chen's December 2 email suggests that she believed the remaining requests were resolved based on her narrow interpretation of many of those requests.  Nothing in that email suggests that the CPROs should delay responding to the requests that Chen had determined were not requesting the Mayor's texts.  In the second exchange, Ferreiro raises her and Irwin's concerns about Chen's direction to narrowly interpret the requests and in response, and Chen responds by telling Ferreiro not to expect any change of course.  Thus, as of at least December 2, Chen was still standing by her direction in the November 6 spreadsheet.

Moreover, Chen's February 10 spreadsheet does not show that Chen had directed the CPROs to abandon the narrow interpretations of 28 of the pending requests in the November 6 spreadsheet.  First, Chen sent a follow-up email on February 11 providing guidance to Ferreiro on what requests should be included on the spreadsheet:  "In terms of guidance for determining which PDRs request Mayor's text messages, I have selected only PDRs that specifically mention Mayor in the PDR request summary and specifically say 'texts', 'all electronic communications', 'all communications,' or 'all records' between mayor and …."  In other words, Chen was instructing Ferreiro to update the spreadsheet using a narrow interpretation that had not changed from Chen's guidance on November 6 in any material way.  This guidance from Chen on the 11th conflict with the boarder interpretations Chen had made in notes column

SEEC Case No. 21-WBI-0304-1

in the February 10 spreadsheet, suggesting that Chen did not intend the CPROs to apply those broader interpretations.

Second, the February 10 spreadsheet only contained 10 of the 28 requests and Chen does not claim that she had also reinterpreted the scope of the requests not contained on the February 10 spreadsheet.   Third, it is not clear that Chen actually notified the CPROs regarding her broader interpretation.  The "notes" column with modified interpretations the February 10 version of the spreadsheet was "hidden" and both CPROs assert that they never saw those modified interpretations.  The CPRO's claim is supported by the fact that when Ferreiro updated the February 10 spreadsheet on February 11, she did not "unhide" the notes column, she removed the 10 remaining requests that had been narrowly interpreted in the November 6 spreadsheet, and she added six new requests without updating the hidden notes column.  These actions are all consistent with Ferreiro's claim that she had not seen the revised "notes" column in the February 10 spreadsheet, and suggest that it is likely that the CRPOs were not informed of any boarder interpretation.  Collectively, this evidence undermines Chen's assertion that she had intended the Mayors' office to interpret the request using the boarder interpretation in the February 10 spreadsheet.  But even if that was her intent, by February 10, the City had already fulfilled at least three requests using the narrow interpretations in the November 6 spreadsheet.

Chen also challenges the claim that she directed the CPROs to exclude the Mayor's texts from the latter three requests identified above.

With regards to Request C059414, Chen claims that when she directed Irwin to close the request on December 22, 2020, she had assumed that the responsive text messages from the Mayor's office had already been produced, and therefore was not intending Irwin to close the request based on the narrowed interpretation.  Chen's claim is refuted by the documents she provided with her May 4 letter.  First, when Chen directed Irwin to close the request, she was responding to Irwin's email, where she asked Chen, "Do you want me to go ahead and close it [Request C059414] because he specifically doesn't call out the mayor …?"  In other words, Irwin was asking if Chen stood by the narrowed interpretation of the request in November 6 spreadsheet.  Chen's response – "Please close it" – demonstrates that Chen did still intend Irwin to use the narrowed interpretation.  Second, Chen notes in her May 4 letter that she did not direct the CPROs to start searching and producing the Mayor's recreated texts until February 9, 2021, so it would have been unreasonable for her to assume on December 22 that Irwin had already produced the Mayor's recreated texts in earlier installments.  Third, the emails Chen produced along with her May 4 letter shows that Irwin had previously provided Chen with copies of the earlier installments, so Chen knew (or should have known) that the Mayor's texts had not been included in earlier installments.

With regards to Request C059261, Chen notes in her May 4 letter that she sent Irwin an email on November 9 directing her not to close this request.  But the documentation provided with the Complaint shows that Chen directed Irwin to produce the final installment without waiting for the Mayor's text messages on December 11, 2020, a full month after this November 9 email.  And while Chen does direct Irwin to hold off closing the request in that November 9 email, it was only because of two unanswered questions that had nothing to do with the question of whether or not the Mayor's text were responsive to the request.  Moreover, in that same November 9 email, Chen responds to concerns Irwin raised about the narrowed interpretation of the request by reminding Irwin that the duty to search for records had to be balanced with the duty to provide prompt responses.  Thus, nothing in this email exchange refutes the documented assertion in the Complaint that Chen directed Irwin to produce the final installment to this request without including the Mayor's text messages.

SEEC Case No. 21-WBI-0304-1

With regards to Request C056884, Chen claims in her May 4 letter that Irwin unilaterally closed this request without consulting with Chen. Not only does documentation provided with the Complaint conflict with this claim, but all of the records reviewed as part of this investigation show that Chen was closely monitoring all of the requests for the Mayor's texts, and it is not credible to believe that Irwin would have made the unilateral decision to exclude the Mayor's texts when producing the responsive records.

In summary, the documentation reviewed in this investigation demonstrates that at Chen's direction, the Mayor's office relied on Chen's narrowed interpretation of the requests as documented in the November 6 spreadsheet to exclude the Mayor's text messages when fulfilling those requests, resulting in the requests being closed without producing the Mayor's texts.

### 3. Proposal to Alter the Recreated Text Messages to Remove Nonresponsive Information.

When the City was able to locate copies of the Mayor's text messages on the phones of other employees, the City used software that extracted the text message along with call-detail information, including the phone number of the phone the message was extracted from. The software combined the substance of the text and the call-detail information into a single document. This meant that when the City produced one of the "recreated" text messages, it would also have to produce the call-detail information. The call-detail information would allow the requestor to see that the copies of the Mayor's text messages being produce were obtained from someone other than the Mayor.

When the Mayor's Office first produced the recreated text messages to one of the pending requests in December 2020 (without explaining that these were recreated texts or what had happened to the original copies of the texts), the City also produced the call-detail information. But in mid-February 2021, Chen proposed to Irwin that the City remove the call-detail information, reasoning that the call-detail information was not responsive to the pending requests, and would not have been included in the record if the City had been using a more primitive method of obtaining the texts, such as making an "old fashion photocopy" of the message on the screen of the phone.

Irwin objected, and ultimately Chen decided to continue to produce the recreated text messages without removing any call-detail information.

### ANALYSIS

### 1. Providing Explanations to Requestors Regarding the Lost and Recreated Text Messages

When the Mayor's Office determined that the Mayor's text messages had been lost and could not be recovered, it properly attempted to obtain copies of those text message from other sources. Compare Neighborhood Alliance v. Spokane County, 172 Wn.2d 702, 723 (2011) (agency violated PRA when it failed to search for missing record on employee's old, recently replaced computer when the agency determined that the requested record was not located on the employee's current computer) with West v. Dep't of Natural Resources, 163 Wn. App. 235, 244-46 (2011) (no PRA violation where emails were inadvertently lost before request was made, and agency made a good-faith effort to recover the lost emails).

SEEC Case No. 21-WBI-0304-1

Normally, when an agency produces the requested records, the PRA does not require the agency to provide any explanation regarding those records. <u>Bonamy v. City of Seattle</u>, 92 Wn. App. 403, 409 (1998). But when an agency cannot produce all of the specific records that had been requested because some of the records were not retained or could not be located, the best practice is for the agency to "explain, at least in general terms, the place searched." <u>Neighborhood Alliance</u>, 172 Wn.2d at 723; <u>see also Fisher Broadcasting v. City of Seattle</u>, 180 Wn.2d 515, 523 (2014) ("When an agency denies a public records request on the grounds that no responsive records exist, its response should show at least some evidence that it sincerely attempted to be helpful.").

The <u>Neighborhood Alliance</u> case is instructive because it also included a "recreated" record. In that case, the plaintiff made a PRA request after it was provided with a leaked but undated county seating chart that assigned cubicles to a "Ron" and a "Steve" for two open positions that had not been posted. It was believed that "Steve" was Steve Harris, the son of a county commissioner, and "Ron" was Ron Hand, a former employee. After posting the positions, the County in fact did end up hiring Steve Harris and Ron Hand for those two positions.

In an effort to prove the County was engaged in illegal hiring practices, the Plaintiff made a PRA requests for two categories of documents: (1) a log from the computer used by the person who had prepared the seating chart that identified the date the seating chart was created; and (2) documents that identified the "Ron" and "Steve" that were listed on the seating chart.

Shortly after the first media story appeared about the leaked seating chart, the employee who had prepared the seating chart was assigned a new computer. When content of her old computer was copied onto her new computer, this had the effect of changing the "creation date" of all of her documents – including the seating chart – to the date of this transfer. To fulfill the request for the log, the County took the log from the new computer, which meant it contained the incorrect "creation date" for the seating chart. The County not only failed to search the old computer, it made no effort to explain to the requestor that the log was not generated from the actual computer that had been used to draft the seating chart or otherwise address the issue of the erroneous date.

All of these facts eventually came out after the Plaintiff sued and engaged in discovery. Ultimately, the Supreme Court ruled that the County violated the PRA by failing to search the old computer to obtain an accurate log, but it also noted that the County should have informed the Plaintiff that the log it provided was essentially as recreated record, and was not the log actually requested. <u>Neighborhood Alliance</u>, 172 Wn.2d at 723.

While the Supreme Court's statements in <u>Neighborhood Alliance</u> and <u>Fisher</u> regarding whether an agency needs to provide an explanation are arguably "dicta," and therefore non-binding, it is unquestionably a best practice for an agency to explain any such anomaly that materially impacts what records are produced, and the failure to provide an explanation could be a factor in any penalty determination. See also RCW 42.56.100 (requiring agencies to provide the "fullest assistance" to requestors); PUBLIC RECORDS ACT DESKBOOK: WASHINGTON'S PUBLIC DISCLOSURE AND OPEN PUBLIC MEETINGS LAWS § 6.4(5) at 6-21-22 (WSBA 2d ed. 2014) (noting the importance to communicating with requestors).

Here, Irwin and Ferreiro were correct when they informed Chen that the City should explicitly inform requestors that the Mayor's Office was producing "recreated" text message obtained from other

SEEC Case No. 21-WBI-0304-1

sources and why this was necessary. 

the investigation did not uncover any evidence that Chen's decision not to provide an explanation when producing the recreated text was not made in a good-faith effort

Chen's claim in her May 4 letter that she had directed the CPROs to wait for the results of the forensic search before responding to requests that sought the Mayor's text messages is refuted by her own statements documented in the emails provided with the Complaint and therefore is not credible. Likewise, Chen's claim that the CPROs were exercising any independent discretion when responding to the requests for the Mayor's text messages is also refuted by contemporaneous emails and therefore not credible.

While this first allegation in the Whistleblower Complaint raises a valid concern based on best practices, the failure to provide an explanation does not violate any express statutory requirement in the PRA.  And because Chen made this decision not to provide an explanation based on

Chen's actions regarding the first claim did not amount to "improper governmental action" as defined in SMC 4.20.805.

2.      **Narrowly Interpreting Certain Requests to Exclude the Mayor's Text Messages.**

When responding to PRA requests, agencies are required to provide "the fullest assistance to inquirers," which requires agencies to "respond with reasonable thoroughness and diligence."  Andrews v. Wash. State Patrol, 183 Wn. App. 644, 653 (2014).  When a request is unclear and could be interpreted broadly or narrowly, and the agency intends to interpret the request narrowly, then the agency should inform the requestor about that interpretation so the requestor has an opportunity to clarify if the requestor intended a broader interpretation.  See, e.g., Gale v. City of Seattle, 2014 Wash. App. LEXIS 346, at *30-*32 (Wash. App. Feb. 20, 2014) (unpublished) (City properly limited scope of its search to certain terms where City told the requestor what search terms it planned to use and invited the requestor to provide additional terms).  But when an agency adopts an interpretation of a request for the purpose of excluding certain records from the scope of the request without proving the requestor the opportunity to clarify, the agency violates the PRA.  See, e.g., Neighborhood Alliance, 172 Wn.2d at 721 n.10, 727 (holding agency's unilateral, narrow interpretation of the plaintiff's request violated the PRA and justified an increased penalty award);  see also Cedar Grove Composting, Inc. v. City of Marysville, 188 Wn. App. 695, 727-728 (2015) (agency violated the PRA when it intentionally interpreted a request narrowly to avoid producing certain records).

For example, in Neighborhood Alliance, in response to the plaintiff's request for records that identified the "Ron" and "Steve" on the leaked "seating chart," the County interpreted it as specifically requesting documents that contained all three categories of information:  the term "seating chart" and information that identified Ron and Steve.  The County adopted this interpretation knowing that the County did not use the term "seating chart," and instead referred to the documents like the leaked document as a "floor plan" or "cubicle layout."  In other words, the County adopted an interpretation that the County knew would exclude the records the requestors were trying to obtain.  Neighborhood Alliance,

172 Wn.2d at 721 n.10.  The Court held that held that this narrowed interpretation violated the PRA, especial when it effectively allows an agency to "silently withhold" the records the requestor is seeking.  See Neighborhood Alliance, 172 Wn.2d at 721 n.10, 724, 727 & n.16.

Here, Irwin's Complaint regarding Chen's direction to narrowly interpret the request is well taken.  First, there is no principled basis for excluding the Mayor's text messages from the scope of requests for all communications with the Mayor's Office, or from requests for the Mayor's "correspondence."  See West v. City of Tacoma, 12 Wn. App. 2d 45, 80-81 (2020) (rejecting city's argument that the requestor should have requested "communications" if he wanted emails instead of just requesting "records").  The Mayor is of course part of the Mayor's Office, and text messages are a form of correspondence.  It is also noteworthy that the Mayor's emails were not excluded from requests for all communications with the Mayor's Office.

Second, Chen's narrowed interpretation marked a change in practice for the Mayor's Office that cannot be justified by the wording in the requests or any change in the law.  Prior to Fall 2020, the Mayor's Office had interpreted similar requests to include the Mayor's text messages.  Moreover, in recent months, the Mayor's Office has returned to that interpretation.  This is strong evidence to show that the narrowed interpretation was adopted to limit the number of requests that could be impacted by the lost text messages.  While Chen has stated that she adopted this narrowed interpretation to help comply with another mandate of the PRA – the duty to provide a prompt response – there is no basis for silently narrowing the scope of a request to meet that obligation.

Finally, if Chen believed the intended scope of the requests was in fact unclear, at the very least Chen should have directed Irwin or Ferreiro to inform the requestors that the City had interpreted the request to exclude the Mayor's text messages.  See Canha v. DOC, 2016 Wash. App. LEXIS 836 at *9 to*10 (Wn. App. Apr. 25, 2016) (unpublished) (rejected claim that agency interpreted request too narrowly when agency informed requestor of its interpretation and requestor did not provide any clarification before filing suit).  Had this been done, it would have given the requestors the opportunity to clarify or to make new requests for those text messages.

Chen's claim that the narrowed interpretations recorded in the "Notes" column in the November 6 spreadsheet was only an initial interpretation and that by February 10 she had adopted a broader interpretation does not excuse her conduct.  First, by February 10, the City had already closed at least three of the requests based on the narrowed interpretation, so the revised interpretations came too late.  Second, although the "notes" column in the February 10 spreadsheet contained broader interpretations of 10 of the requests, that column was "hidden" and remained hidden in Ferreiro's updated February 11 spreadsheet, demonstrating that Ferreiro was not aware of Chen's revision to her interpretations of the request.  Third, Chen directed Ferreiro on February 11 to update the spreadsheet using a narrowed interpretation, not the broader interpretation in the hidden "notes" column.  Thus, the February 10 spreadsheet does not establish that Chen had rescinded her prior direction to narrowly interpret certain request before those requests were completed.

Chen's claim that she was not responsible for the narrowed interpretation of the three request that were closed is not credible in light of the documentary evidence that shows Chen was closely monitoring all of the requests that implicated the missing text messages.[7]

---

[7] Chen has also complained that she was not given sufficient time to review her records to respond to the allegations in the Complaint.  Chen was notified about the Complaint on April 6, and when she was interviewed on April 9, she was informed of the specific allegations, including the allegation that she had narrowly interpreted the request in the

SEEC Case No. 21-WBI-0304-1

In summary, Chen's decision to narrowly interpret requests to exclude the Mayor's text messages, and her direction to Irwin and Ferreiro to fulfill at least three of those requests based on this narrowed interpretation without informing the requestor about the text messages violated the PRA. As a result, Chen's actions qualify as "improper governmental action" as defined in SMC 4.20.805.

### 3.   Proposal to Remove Non-Responsive Information from Recreated Text Messages.

Under Washington Law, once an agency determines that a particular record is responsive to a PRA request, an agency can only redact information from that record based on a valid exemption. Mechling v. City of Monroe, 152 Wn. App. 830, 854-55 (2009). In other words, Washington Courts have effectively rejected a practice common at federal agencies where federal agencies regularly redact information in records responsive to Freedom of Information requests based on the determination that the information was not responsive to the request. See, e.g., Conti v. Dep't of Homeland Sec., 2014 U.S. Dist. LEXIS 42544 at *75 (S.D.N.Y Mar. 24, 2014) (holding agency properly redacted nonresponsive information in response to FOIA request). Thus, Irwin's allegation regarding Chen's proposal to remove the call-detail information is based on an accurate reading of the Washington law.

But because the Mayor's Office ultimately decided not to follow this plan and instead chose to produce the text messages without removing the call-detail information, there was no violation of the PRA and thus no improper governmental action. Nor was there evidence demonstrating that Chen made this proposal in bad faith. As Chen explained, the call-detail information was not part of the substantive text message and would not have been part of the response if the City could produce the Mayor's copies of the text messages. Nor would the call-detail information have been included if the City had chosen to recreate the lost text messages by photocopying the screen of the other employee's phones.

### SUMMATION

First, while the failure to explain to some requestors that the City was producing recreated copies of the Mayor's text messages was contrary to best practices, it did not clearly violate the law, and thus did not amount to improper governmental action.

Second, Chen's decision to narrowly interpret pending PRA requests to avoid the need to disclose to those requestors information that could lead that discovery that 10-months' worth of the Mayor's text messages were not retained violated the Public Records Act and amounts to improper governmental action.

Third, because the Mayor's Office ultimately did not carry through with the plan to redact call-detail information from the recreated text messages that was not responsive, there was no improper governmental action based on this claim.

The records reviewed during this investigation show that Irwin and Ferreiro were knowledgeable public records officers who strived to follow best practices when responding to PRA requests. It is recommended that the Mayor's Office give full consideration to the opinions of and guidance from its

---

November 6 spreadsheet. This allowed Chen adequate time to obtain and review her documents and to respond to the allegations. Chen nevertheless waited until April 26 to request her records from IT. Thus, if she was not able to fully review those documents, it is because of her own decision not make this request to IT until this later date. Moreover, the documentation Chen did provide establishes at the very least that Chen knew Ferreiro was applying Chen's narrow interpretation of Request C059414 when Chen directed her to close that request, and that direction alone amounts to "improper governmental conduct." Therefore, additional records could not change that conclusion.

SEEC Case No. 21-WBI-0304-1

public records officers in the future and consider consulting with the public records unit at the City Attorney's Office before disregarding any advice the public records officers might provide.

By:  _____          _____
     Wayne Barnett                        Ramsey Ramerman
     Executive Director                   Special Counsel to the Director
     Seattle Ethics & Elections Commission

13

# EXHIBIT 23

March 4, 2021

Dear Wayne,

My name is Stacy Irwin and I am a Public Disclosure Advisor (PDO) for the City of Seattle Mayor's Office. I would like to make an official whistleblower complaint against my supervisor, Michelle Chen. I started working for Michelle in December 2018, after Ian Warner resigned. It has been a turbulent couple of years to say the least. Deputy Mayor Fong is aware of this, as well as Dr. Khan in the Ombudsman's office. From day one of working under Michelle my co-worker Kim Ferreiro and I have never been what Michelle wanted; she had a different plan for what kind of team she wanted. This is a documented fact. I state this fact because I have knowingly broken the law following Michelle's advice and while I tried to push back, ultimately she has proven her power.

My work as a Public Disclosure Advisor is guided by the Washington State Public Records Act (PRA). On occasion, Michelle has asked me to take legal risks and do things that I felt were not ethical, legal and went against my personal moral judgement. I have tried to stand in the guidance of the PRA, my subject matter expertise, and when needed I requested guidance from the Law department, only to relay that guidance back to Michelle and still be told to conduct an action that is in my opinion wrong. This is documented in the attached exhibits. I have always been willing to do this for her, mostly because I am in constant fear of losing my job. Michelle is a fear-based leader and occasionally likes to remind us that we work at the will of the mayor, which to us was a subtle reminder that they could let us go at any time. However, with recent events, things have taken a sharp turn and I feel like Michelle is ruining my reputation as a Public Disclosure Advisor. I am no longer willing to do unethical or illegal tasks for her.

In August of 2020, we found out that the Mayor had "lost" 9 months of text messages. To be exact, the timeframe of lost texts is August 28, 2019 through June 25, 2020. This put me in a tough situation because I was directed to not let our requesters know that text records they were seeking were actually messages that were recreated from other members of the office. The recreation of the records is not the issue, because under the PRA this is called "fullest assistance." However, you must advise the requester that they are receiving "recreated" records. This of course would have opened up the question, "why aren't the Mayor's text messages being provided?" We believe if we would have just told the truth from the very beginning (I am fully aware of the political lens on this) we would not be in this horrible situation. Instead of telling our requesters the truth, Michelle either had us re-create text messages from other staff members phones to make it look like it was the Mayor's texts, or even worse, for requests that did not specifically call out the mayor, she just had us close the requests and tell our requesters that there were no responsive records. I am also scared that we are going to end up being deposed in future litigation once this information becomes public. Law is working on a lawsuit right now from Hunter Capital where they will be advised in discovery soon that messages are gone and are being recreated. The MO should have ~~Attorney Client Privilege/Work Product~~ ~~Attorney Client Privilege/Work Product~~ ~~Attorney Client Privilege/Work Product~~ The answer was that a switch had been manually toggled and text messages were not retained. Obviously, I will tell the truth, but it will be extremely embarrassing to admit that I went along with the cover-up and did unethical things. I feel like this could ruin our careers. No employer wants to hire anyone when then know they have been unethical in their job.

SEA_00144347

We have a public records request from a constituent for 6 months of the mayor's text messages. Because we do not have any records for this timeframe, Michelle asked me to go through the E-team's text messages and recreate records to make it look like they are the Mayor's records. She sent me an email (in attached documents) that said **Attorney Client Privilege/Work Product**

**Attorney Client Privilege/Work Product**

Attorney Client Privilege/Work Product After I re-created the records, I gave them to Michelle to review. She came back and said she wanted me to take out the parts of the record that include the phone details. For example, the export details show whose phone the text messages are from and it is apparent that it is not the mayor. I emailed her back and told her that under the PRA, we are not allowed to alter the records, and this would be very risky. Michelle then emailed me back and said she did not consider it part of the record. This is when I stopped communicating with her. She would have kept manipulating me until I did what I was told. The email string and the actual records are included in Exhibit A and B, respectively.

In summary, I cannot continue to work for someone that asks me to do things that are unethical or illegal. It is tarnishing my reputation. I plan to stay in the public sector until I retire, and I do not want this black mark on my record. Who would want to hire me? I have good working relationships with our staff, constituents, and media and have a reputation as a SME in the City's PDR world. If this gets out, how will they ever trust us again? Our office already has serious transparency issues and the media is well aware of this because we have seen tweets and articles in the paper; sometimes they even called us out by name.

Michelle is an attorney, legal counsel to the Mayor and my supervisor. I look to her for guidance, support and legal advice. Instead, I'm physically ill over what I have been asked to do. I hope the records I have provided illustrate a clear picture of what has been going on over the past two years.

I appreciate your consideration and look forward to finding the truth.

With respect,

Stacy Irwin

SEA_00144348

# EXHIBIT 24

**Local News**

# The Seattle Times

---

## ...e knew for months Durkan's pho... ...to vanish, emails show

*...dated Aug. 20, 2021 at 10:02 am*



📷 **1 of 3** | Officials knew for months why texts from Mayor Jenny Durkan's phone were gone and when they disappeared. (Sylvia Jarrus / The Seattle Times)

By Lewis Kamb 🐦, Daniel Beekman 🐦 and Jim Brunner 🐦

When the public learned in May that 10 months of Seattle Mayor Jenny Durkan's text messages were missing, her office initially attributed the loss to an "unknown technology issue" with one

of three phones she used during the period in question.

But officials already had known for months why the texts were gone and when they disappeared, internal emails appear to show. And City Attorney Pete Holmes says the initial explanation from Durkan's office was misleading.

Durkan's texts were set to automatically delete on a phone she started using in July 2020, shortly after racial justice protests had rocked the city, according to an email exchange between the mayor's office and the city attorney's office in January 2021.

That and other emails — among hundreds of pages of records that formed the basis for an ethics investigation that found the mayor's office had broken the state Public Records Act (PRA) — also indicate that Durkan's chief of staff was involved in keeping the public in the dark about the missing texts.

The mayor's office declined to answer specific questions about the emails, which The Seattle Times obtained in July through a public records request to the Seattle Ethics and Elections Commission.

Instead, Durkan spokesperson Anthony Derrick said "litigation involving the city," including a lawsuit filed by The Times over alleged violations of the PRA, "is expected to produce forensic information, tens of thousands of documents and information from numerous individuals."

Derrick added: "As is usual with such cases, until that thorough and systematic work can be done, it is rarely accurate to make assumptions based on individual records."

But Holmes, in a recent interview, said his office warned Durkan's office that publicly attributing the loss to an undetermined tech issue was "untrue."

"Someone changed the mayor's settings from retain to delete — that is a deliberate act," Holmes said.

Under state law and guidelines, local elected officials' texts and other communications about public business must be kept for at least two years before being transferred to the state archives for further assessment. Anyone who willfully destroys a public record that's supposed to be kept is guilty of a felony, the law says. A forensic report on the missing texts is currently overdue.

Seattle could end up paying out "tens of millions of dollars in damages and fees" to resolve lawsuits over the Durkan administration's handling of last year's protests, and "those damned missing text messages" are complicating the city's legal defense, Holmes added.

## Forensic analysis overdue

The ethics commission learned about the missing texts in February, when a public records officer in the mayor's office filed a whistleblower complaint. The records officer, Stacy Irwin, said she had been directed not to inform records requesters that the texts were missing and to "recreate" certain messages from the phones of people with whom the mayor had been texting.

The matter became public in May after the ethics commission issued an investigation report, determining that the legal counsel for Durkan's office, Michelle Chen, had broken the PRA.

The requesters — including four Times reporters — had sought details about how officials handled the Black Lives Matter protests, the Seattle Police Department's evacuation of its East Precinct and the Capitol Hill Organized Protest, or CHOP. At least 48 requests touched on Durkan's missing texts, the investigation found.

A lawyer representing Chen criticized the investigation as rushed and unfair. A retired judge subsequently hired by the mayor's office determined it was conducted appropriately.

The city ethics commission's investigation, carried out by public records lawyer Ramsey Ramerman, focused on how records requests for the texts were handled, rather than how the texts had been lost.

The city attorney's office hired the Crypsis Group, a private contractor, last year to conduct a forensic analysis on that question. The work has cost the city $201,000 as of July 31. The contractor's report, initially expected in late June, has yet to be released.

"It isn't done yet, no," Dan Nolte, a spokesperson for Holmes, said in an email last week. "The work remains ongoing."

Derrick said the emails recently obtained by The Times have been examined by Ramerman and retired Judge Bruce Hilyer. The Durkan administration is conducting a systemic review of public records practices, is spending nearly $2 million this year to modernize that work and piloting solutions for storing and retaining text messages, Derrick added.

## Not acting alone

The mess began midway through 2020, when Irwin and another public records officer in the mayor's office, Kimberly Ferreiro, found out that the mayor's texts from late August 2019 to June 25, 2020, were missing. For months, they conferred with Chen and with lawyers in the city attorney's office about how to handle records requests for the texts.

Since the ethics investigation report was issued, Chen has received the bulk of the blame. Responding to the report last month, Durkan acknowledged that "the underlying actions fell short" and said Chen had been removed from public records duties.

But the documents recently obtained by The Times indicate Chen wasn't acting alone.

In a Dec. 2, 2020, email exchange, Chen told Ferreiro that responses to requests for Durkan's texts would require approval from above.

"This is too high profile and too much at stake that I need to run this up and get formas or fong's sign-off," Chen wrote, referring to Chief of Staff Stephanie Formas and Deputy Mayor Mike Fong.

Chen mentioned that she already had been "emailing formas" about the matter, including what "verbiage" to use in responses to records requesters about "the messages that we can't recreate.

Irwin and Ferreiro also were in touch with the city attorney's office about the texts.

In a partly redacted string of emails from Jan. 14 and Jan. 15, 2021, Irwin forwarded to Assistant City Attorney Aaron Valla a disclosure Chen had made to her: "What I learned was that the new phone was set to 30 days for texts but the setting was changed to Forever after it was discovered. This is why there is a missing range of texts."

The 30-day "keep messages" setting that Durkan's phone was set to is the shortest of three standard text-retention options on iPhones, along with "1-year" and "forever" retention choices.

Durkan's office has said that she switched phones on Oct. 30, 2019, to gain access to a first-responder network, and got a third phone on July 9, 2020, due to a cracked screen and water damage.

If the 30-day setting on the mayor's latest phone was at some point discovered and switched off, that must have occurred in late July; otherwise, the mayor's texts from June 9 to June 25 would have been retained.

The mayor's office and the city's information technology department have declined to answer direct questions about who was responsible for the 30-day setting.

Last week, Nolte said the city attorney's office "will defer to the forensic analysis" to answer specific questions about the retention-setting on the mayor's phone.

## "A big problem"

The emails obtained by The Times were among hundreds of pages of records reviewed during the city ethics commission's whistleblower investigation.

Other records disclosed include phone logs documenting more than 500 text messages sent and received by Durkan from mid-January through August 2020, Ramerman's handwritten notes and the March 4 letter Irwin sent to ethics commission Executive Director Wayne Barnett that sparked the investigation and informed him of the missing texts.

A "switch had been manually toggled and text messages were not retained," Irwin's letter stated. "I will tell the truth, but it will be extremely embarrassing to admit that I went along with the cover-up and did unethical things."

Other emails within the underlying documents show that, as early as Aug. 25, 2020, a city IT staff member who couldn't find one of the mayor's old phones wanted to get an authorization code from Durkan's new phone to assess whether the missing texts had been backed up on the cloud and could be restored

By Sept. 8, when emails show the mayor's executive assistant still hadn't located Durkan's old phone, Chen opined in one email: "Ok, I think this could be a big problem."

More than a month later, with deadlines approaching to respond to public records requests and legal discovery requests in lawsuits against the city, Chen still was trying to get the mayor's new phone turned over to IT analysts for an assessment, emails exchanged from Oct. 5-13, 2020, show.

Durkan's office declined to answer written questions about whether Formas or Fong approved the responses to public record requests that Ramerman's investigation later deemed improper; whether attributing the loss of the mayor's texts to an unknown technology issue was misleading; and when the mayor's new phone was turned over for assessment.

Nolte confirmed last week that the mayor's old phones eventually were found and turned over for the pending forensic analysis.

In the fallout of the city ethics commission investigation, Chen, who had been working for Durkan on loan from the city attorney's office, was recommended to receive a written reprimand and pulled off public records work. Chen submitted her resignation from the city attorney's office on Aug. 9, Nolte said.

Irwin and Ferreiro, the records officers, have since left their jobs and filed hostile work environment claims against the city.

**Lewis Kamb:** *206-464-2932 or* lkamb@seattletimes.com*; on Twitter:* @lewiskamb*.*

**Daniel Beekman:** *206-464-2164 or* dbeekman@seattletimes.com*; on Twitter:* @dbeekman*. Seattle Times staff reporter Daniel Beekman covers Seattle city government and local politics.*

**Jim Brunner:** *206-515-5628 or* jbrunner@seattletimes.com*; on Twitter:* @Jim_Brunner*. Seattle Times political reporter Jim Brunner covers state, local and regional politics.*

💬 View 91 Comments

# EXHIBIT 25

## [No Subject]

**From:**   "Durkan, Jenny" <"/o=exchangelabs/ou=exchange administrative group
(fydibohf23spdlt)/cn=recipients/cn=de71e1801f964bccb03328024b2eadfa-durkanj">
**To:**   "Best, Carmen" <carmen.best@seattle.gov>; "Scoggins, Harold D"
<harold.scoggins@seattle.gov>
**Cc:**   "Fong, Michael" <michael.fong@seattle.gov>; "Sixkiller, Casey" <casey.sixkiller@seattle.gov>
**Date:**   Sat, 20 Jun 2020 08:34:28 -0700

Chiefs --

I know this has been a very difficult time for each of you, and appreciate your work.  I know
we are setting a call for later this am, to be briefed on options (with operational plans) SFD
and SPD and the other city departments have been developing  for Capitol Hill and
normalizing the area, so residents and businesses can reclaim their community.

But as we discussed at the outset of the Cap Hill issues, and as you told the public: there can
be no part of the city where SFD and SPD do not respond.

What happened this am was foreseeable and avoidable.  It cannot be repeated.  So as a
stand alone -- your teams also need to develop  true operational plan(s) so we do not get a
repeat of that again.  They need to reflect ground truths and your best thinking on de-
escalation, and positive response.

Since Chief Best is out of town, Casey is also working with Adrian Diaz.  But this is going to
have to be decided and directed by you Chiefs.

Thanks,

Jenny

SEA_00125617

# EXHIBIT 26

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,     )
                                  )
              Plaintiff(s),       )
                                  )
      vs.                         )   20-cv-00983-TSZ
                                  )
CITY OF SEATTLE,                  )
                                  )
              Defendant(s).       )
_____

VIDEOTAPED VIDEOCONFERENCE

DEPOSITION UPON ORAL EXAMINATION OF

CARMEN BEST

_____

Witness located in

Seattle, Washington

(All participants appearing via Zoom videoconference.)

DATE TAKEN:   NOVEMBER 9, 2021

REPORTED BY:  PATSY D. JACOY, CCR 2348

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 131

1   correctly, but it sounds like at least you were sharing

2   your personal view, whether people agreed with you or

3   not, your personal view of the wisdom of some of those

4   things; is that fair?

5        A.   That's fair.

6        Q.   Okay.  And did -- were you also aware that

7   they were provided -- that the protesters were provided

8   a dumpsters and garbage service?

9             MR. CRAMER:  Objection; form.

10       A.   I think at some point I recollect that they

11  were, you know, cleaning out, you know, cleaning up the

12  garbage that was in the area.

13       Q.   (BY MS. EAKES)  Did you have concerns about

14  whether or not that was encouraging the protesters to

15  stay?

16       A.   At this point I can't remember that with any

17  level of specificity.  You know, I wasn't thinking of

18  the -- the totality of the circumstances and the

19  totality of what we were looking at and concerned

20  that -- you know, that, you know, that they might --

21  that whatever was happening there from the City's, you

22  know, perspective might not encourage people to leave.

23  So can I say with a level of specificity that I

24  specifically focused on the garbage and garbage

25  removal?  No, but generally speaking, I didn't want the

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                Carmen Best

Page 132

1    potential for people to think this was a long-term

2    occupation because we weren't able to get into our

3    precinct.

4         Q.   Okay.  And did you feel like any of the

5    conduct of the mayor herself might be sending the

6    message that this could be a long-term occupation?

7                    MS. ASHBAUGH:  Objection to form.

8                    MR. CRAMER:  Same objection.

9         A.   Yeah, and, you know, I really wasn't -- I

10   really wasn't focused on the conduct of the mayor, the

11   mayor that I never even saw her down there.  It was

12   mostly the City's response, you know, I had some

13   concerns about it, to be honest with you, but I also

14   recognized that we all aren't going to agree on how to

15   move forward, and the fact that I really wanted the

16   officers back in the precinct was much more paramount

17   to me, I believe, than it was to maybe some of the

18   other city departments.

19        Q.   (BY MS. EAKES)  Did you ever see the mayor

20   down in the CHOP when you were down there?

21        A.   Not when I was there that I can recall.  I'm

22   sure that she probably did go, but I -- I really don't

23   know.

24        Q.   How often did you visit the CHOP zone after

25   the abandonment of the precinct on the 8th until it was

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 133

1    cleared out on July 1?
2                   MR. CRAMER:   Objection; form.
3         A.   Yeah, and I -- and I don't really know.   I
4    mean, I did go down there, I -- I went early on, you
5    know, I went and talked to some of the occupiers before
6    it got really robust.   I went in again the first time
7    that we were able to get back into the precinct for a
8    short amount of time and I was down there then, and
9    obviously I clearly drove through and around it, you
10   know, at times to get a boots on the ground sort of
11   view into what was occurring there.   I don't know --
12        Q.   (BY MS. EAKES)   Would you say --
13        A.   I don't know the number of times, though, to
14   be honest with you.
15        Q.   Okay.   Were you there on a daily basis?
16        A.   Probably not daily, but, you know, fairly
17   frequently, I guess, to -- you know, not every single
18   day, but a lot of days, just -- I just don't know the
19   number.
20        Q.   And you made reference to the occupation kind
21   of being more robust.   Did it -- did it grow after the
22   initial -- the 8th when the precinct -- when you left
23   the precinct?
24        A.   Yeah, it did.
25        Q.   Okay.   And you've mentioned several times that

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 134

1    you were concerned about the officers getting in --

2    back into the precinct and into that area.  Were you

3    concerned about the businesses and the residents of the

4    CHOP zone?

5                 MS. ASHBAUGH:  Object to form.

6                 MR. CRAMER:  Same objection.

7         A.  Again, I was -- you know, I was concerned

8    and -- you know, about every stakeholder.  I mean,

9    clearly I'm going to be concerned about the officers

10   getting back to the precinct so they could provide, you

11   know, a routine level of public safety service, but

12   again, everything that was happening in the area was of

13   concern, you know.

14              And it was in the midst of a pandemic, so many

15   of the businesses weren't even operating, fully

16   functioning.  You know, there was a concern about, you

17   know, safety of the facilities, but also the safety of

18   people in and around the area and the residents and

19   even the people who were within -- occupying within the

20   zone what could be happening and occurring to them.

21              So that -- everything was a concern at all

22   times and, again, we really were trying to get a handle

23   on what we had before us and how best to address it.

24        Q.  (BY MS. EAKES)  And do you remember which city

25   departments, if any, opposed SPD reoccupying the East

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 212

1   provide any responsive texts, how did that work?

2              MR. CRAMER:  Objection to form.

3        A.  I usually just -- yeah, I usually just gave it

4   to my assistant to pull the messages out, whatever was

5   there.

6        Q.  (BY MS. EAKES)  Okay.  And I'll represent to

7   you that -- that we have been told by the City that the

8   phone that you turned in when you retired had zero, no

9   texts on it at all.  Do you know why that would be?

10             MR. CRAMER:  Objection; misstates

11  evidence and facts.

12       A.  Yeah, I don't know.

13       Q.  (BY MS. EAKES)  Did you delete any texts from

14  your phone before you turned it in?

15             MS. ASHBAUGH:  Object to form.

16             MR. CRAMER:  Objection; form.

17       A.  Yeah, I can tell you that, you know, I

18  periodically would go in and delete transitory

19  messages.  You know, my understanding was that the City

20  was holding on to all that stuff anyway so it wasn't

21  like I was conducting any -- you know, other than

22  transitory stuff mostly on my phone, so if the

23  implication is that there was, you know, some -- it was

24  just on time periodically I would delete stuff from my

25  phone, you know.  It was like I do, you know, my

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 213

1   personal phone from time to time.  I imagine everybody
2   does that.
3        Q.  (BY MS. EAKES)  Sure.  Well, and just to be
4   more specific, did you -- when you said that it was
5   your understanding that the City kept those things or
6   had those things, what did you mean by that?
7        A.  I really mean that I thought that there was
8   some sort of record that they could go in and get, you
9   know, old messages and stuff off of the phones if they
10  needed to.  Obviously we deal with a number of cases,
11  you know, homicides and others where we pull up old
12  messages and look at what gang members were saying to
13  one another.  So I assume the City had that same
14  capability of doing that, especially with a litigation
15  hold and the holds they had on really all of our
16  communications.
17       Q.  So I guess -- and to be clear, what we were
18  told by the City was that you had -- on your phone that
19  there were no texts dated prior to September 2nd, so do
20  you -- meaning there are no texts from you, and you've
21  probably read this in the paper also -- during the time
22  frame of CHOP that there are no texts on your phone
23  from that time frame.  Were you aware of that?
24       A.  When I read it in the paper.
25       Q.  Okay.  And what was your reaction to that,

334bfd08-a328-4547-9c6b-4745f62726ec

Page 214

1   Carmen, when you read that in the paper?

2        A.  Well, you know, I had no reason to dispute it

3   or anything like that or to -- you know, one way or the

4   other, but I can -- I do know that periodically text

5   messages were deleted but, you know, I did -- I really

6   didn't know what the -- what the major concern was.  I

7   figured the City had the ability to get anything that

8   it wanted out of the City property and, you know,

9   there's -- there's really nothing substantive.  You

10  know, this is transitory messages for the most part

11  that I recall at any given time.

12       Q.  So I just want to understand.  So did you go

13  in and delete any messages that you had with Jenny

14  Durkan?

15            MR. CRAMER:  Objection; form.

16       Q.  (BY MS. EAKES)  For any period of time?

17            MR. CRAMER:  Objection; form.

18            MS. ASHBAUGH:  Object to form.

19       A.  I missed the last part of that.  Did I delete

20  any messages from Jenny Durkan what?  That --

21       Q.  (BY MS. EAKES)  At any point did you go in and

22  delete messages that you had with Jenny Durkan?

23            MS. ASHBAUGH:  Object to form.

24            MR. CRAMER:  Same objection.

25       A.  Yeah, well, I can't say specifically, but, you

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 215

1  know, periodically I would delete -- you know, delete
2  transitory messages from my phone.  So could some of
3  them have been from the mayor?  Sure.  Could they have
4  been from any other number of people?  Absolutely.  It
5  wasn't like -- there's no targeted, you know, anything
6  like -- I didn't have a routine of, you know, every
7  Tuesday, just periodically I would, you know, take the
8  messages off that were old and -- and that was it,
9  really.  And the first I heard of any of this about the
10 phone was when, you know, well after I had retired and
11 long walked away from the department.
12       Q.  (BY MS. EAKES)  So I know that -- I mean, I
13 can show it to you, but the litigation hold you got was
14 actually back in July of 2020, so it would have been,
15 you know, immediately after these events and you had
16 another one in early July when Black Lives Matter filed
17 the federal case in front of Judge Jones.  Are you
18 saying that you deleted a -- transitory emails or --
19 excuse me, transitory texts with Mayor Durkan after you
20 received those lit holds?
21       A.  I'm saying I don't know.  I have no
22 recollection of, you know, a text or what was there, I
23 just know that, you know, if there were transitory ones
24 that they could have been deleted or apparently were
25 deleted and that there was nothing -- you know, most of

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 218

1      Q.  And when was that that you talked to her about
2  it that you said that?
3      A.  Oh, I don't know, during one of our, you know,
4  eight or so conversations.
5      Q.  After you retired?
6      A.  Yes, after.
7      Q.  Do you -- I mean, you may not remember this,
8  but from June to September of 2020, to your memory did
9  SPD respond to any PRA requests seeking your text
10 messages?
11     A.  I don't know.
12     Q.  Who would have been your assistant during that
13 time?
14     A.  Tricia Colin -- or Tricia Fuentes now, but she
15 was Tricia Colin.
16     Q.  Okay.  And just so we're clear, did you make a
17 point of deleting all of your texts before you turned
18 your phone in on September 2nd or prior to
19 September 2nd?
20     A.  I did -- I did not.
21     Q.  Okay.  So you turned it in with whatever was
22 on it at the time; is that right?
23     A.  Yes, that's my recollection.  I mean,
24 there's -- I just -- I turned my phone in, I turned my
25 laptop in, I turned -- you know, everything was there

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 224

1     the City or somebody that Denise arranged?

2              MS. ASHBAUGH:  Somebody I arranged.

3         Q.  (BY MS. EAKES)  Okay, all right.  And did you

4     have -- Denise had provided us with information about

5     you having some sort of a lockout on your phone, on

6     your personal phone.  Can you tell me about that when

7     that happened, what happened?

8         A.  I don't remember exactly when it was in the

9     year, but at some point my phone just stopped working.

10    I went into panic mode because, you know, all my

11    calendar and all that stuff is on my phone, and so I

12    took it to the -- to Bellevue Square to the iPhone

13    store there and they did some sort of a reset for me

14    and got my phone back working.  I mean, it was

15    completely locked up and I just don't remember what

16    time of the year it was.  All I cared about was getting

17    the phone back working, so I couldn't give you a date.

18    They might have that at the store, you know, of when I

19    came in and got it -- got it fixed.

20        Q.  Okay.  And did you ever -- on your personal

21    phone did you intentionally delete any text messages

22    you might have had on your personal phone?  Because

23    it's our understanding that there were no text messages

24    available on your personal phone prior to May 2021.

25        A.  So that probably is when I took my phone in to

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 225

1   get it redone, but -- yeah.  So yeah, there was no --
2   there was no reason for me to -- other than my normal
3   routine of deleting messages periodically is -- is all
4   that I had and so there was no other attempt to do
5   anything other than get my phone fixed when it broke,
6   that was it.
7        Q.  Okay.  Did you get any emails or anything
8   about your appointment at the Apple store that might
9   help you pinpoint the time when you took the phone in?
10       A.  I don't think I got emails, but I had to
11   pay -- I think I paid like 6 or $700, so I might be
12   able to dig up the bill.  I think there was a bill that
13   went along with that and I'll see if I can find it.
14       Q.  Okay.  That would just help kind of pinpoint
15  the date of when you took it in for the reset.  And you
16  said it just kind of locked up on you.  So it wasn't --
17  sounds like it wasn't that you forgot your pass code or
18  something.
19       A.  No.
20       Q.  But it just like stopped working?
21       A.  Just stopped working.
22       Q.  Okay.  And do you remember when you first
23  learned that there was a subpoena for your personal
24  phone, for information from your personal phone?
25       A.  I don't remember.

334bfd08-a328-4547-9c6b-4745f62726ec

Hunters Capital, LLC v. City of Seattle                    Carmen Best

Page 231

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON   )
                           )
4    COUNTY OF KING        )

5

6              I, Patricia D. Jacoy, a Certified

7    Shorthand Reporter in and for the State of Washington,

8    do hereby certify that the foregoing transcript of the

9    deposition of CARMEN BEST taken on November 9, 2021 is

10   true and accurate to the best of my knowledge, skill

11   and ability.

12

13

14   _____

15              Patricia D. Jacoy, CSR 2348

16

17

18

19

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

334bfd08-a328-4547-9c6b-4745f62726ec

# EXHIBIT 27

Page 330

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

```
The Estate OF SUMMER JOLIE        )
WILLIAMS TAYLOR, by and           )
through MATTHEW D. TAYLOR,        )
Personal Representative,          )
                                  )
        Plaintiffs,               )
                                  ) No. 21-2-07115-1 SEA
    vs.                           )
                                  )
CITY OF SEATTLE, a                )
governmental entity; STATE        )
OF WASHINGTON, a                  )
governmental entity; and          )
DAWIT KELETE, a single man,       )
                                  )
        Defendants.               )

        AND

THE ESTATE OF SUMMER JOLIE        )
WILLIAMS TAYLOR, by and           )
through MATTHEW D. TAYLOR,        )
Personal Representative,          )
ZOE ADBERG, SARA ANDERSON,        )
MEGAN BUSS, GRACE CARMACK,        )
LEANNA CARR, AISLING              ) No. 20-2-14351-1 SEA
COONEY, ABIE EKENEZAR,            )
EDWARD FARMER, NIMA               )
FORGHANI, NOAH FOWLER,            )  VIDEO-RECORDED
ZACHARY GARDNER, IAN              )  VIDEOCONFERENCE
GOLASH, GRACE GREGSON,            )  DEPOSITION OF
MIRANDA HARDY, LEXUS              )  CARMEN BEST
HARTLEY, CLAYTON                  )  VOLUME II
HOLLOBAUGH, JASON SCHIERER,       )
as guardian ad litem for          )
minor MALICHI HOWE a.k.a.         )
BRYAUNA HOWE, JESSE HUGHEY,       )
AUBREANNA INDA, MARY              )  *CAPTION
JURGENSEN, TIMOTHY KAUCHAK,       )  CONTINUES*
JENNA KINYON, BEN                 )
```

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

Page 331

```
 1      KOENIGSBERG, JACOB            )
 2      KOENIGSBERG, SETH KRAMER,     )
        ERIC LOOK, DANIEL LUGO,       )
 3      JACOB MARTIN, JOSHUA          )
        MATNEY, CHLOE MERINO,         )
 4      LOGAN MILLER, TONI MILLS,     )
        ALESSANDRA MOWRY, KELSEY      )
 5      MURPHY-DUFORD, WESLEY         )
        PEACOCK, JORDAN A.            )
 6      PICKETT, CHARLES PIERCE,      )
        DANIEL PIERCE, CONOR          )
 7      POULL, RENEE RAKETTY,         )
        JAVIER RIZO, ALEXANDER        )
 8      RUEDEMANN, MICHAUD SAVAGE,    )
        CAROLYN STERNER, SEAN         )
 9      SWANSON, MEGHAN THOMPSON,     )
        BRUCE TOM, TIFFANY            )
10      VERGARA-MADDEN, ALIYE         )
        VOLKAN, STEVEN WIDMAYER,      )
11      JOSEPH WIESER, GILLIAN        )
        WILLIAMS, QUINN ZOSCHKE,      )
12      and DOES 1-40,                )
                                      )
13              Plaintiffs,           )
                                      )
14          vs.                       )
                                      )
15      CITY OF SEATTLE, a            )
        governmental entity, and      )
16      KING COUNTY, a                )
        governmental entity,          )
17                                    )
                Defendants.           )
18
19      VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION
                        OF
20                  CARMEN BEST
                    VOLUME II
21
22                  12:04 p.m.
                SEATTLE, WASHINGTON
23      (All participants appeared via videoconference.)

24      DATE TAKEN:  MAY 24, 2022
25      REPORTED BY:  LORRIE R. CHINN, RPR
```

Page 332

```
 1          R E M O T E   A P P E A R A N C E S
 2
 3      FOR THE PLAINTIFFS (via videoconference):
 4          KAREN KOEHLER
            LISA BENEDETTI
 5          GEMMA N. ZANOWSKI
            MELANIE NGUYEN (also videographer)
 6          Stritmatter Kessler Koehler Moore
            3600 15th Avenue West, Suite 300
 7          Seattle, Washington 98119
            206.448.1777
 8          karen@stritmatter.com
            lisa@stritmatter.com
 9          gemma@stritmatter.com
            melanie@stritmatter.com
10
        FOR THE DEFENDANT CITY OF SEATTLE (via
11      videoconference):
12          G. WILLIAM SHAW
            IVAN L. ASCOTT
13          K&L Gates LLP
            925 Fourth Avenue, Suite 2900
14          Seattle, Washington 98104-1158
            206.370.7667
15          bill.shaw@klgates.com
            ivan.ascott@klgates.com
16
            GHAZAL SHARIFI
17          Seattle City Attorney's Office
            701 Fifth Avenue, Suite 2050
18          Seattle, Washington 98104
            206.684.8200
19          ghazal.sharifi@seattle.gov
        FOR THE DEFENDANT STATE OF WASHINGTON (via
20      videoconference):
21
            RICHARD STEVEN PUZ
22          Office of the Attorney General
            7141 Clearwater Drive SW
23          P.O. Box 40126
            Olympia, Washington 98504-0126
24          360.586.6316
            steve.puz@atg.wa.gov
25
```

Page 333

```
 1      R E M O T E   A P P E A R A N C E S (Cont'g)
 2
 3      FOR THE DEFENDANT KING COUNTY (via videoconference):
 4          ANN MARIE SUMMERS
            King County Prosecutor's Office
 5          1191 Second Avenue, Suite 1700
            Seattle, Washington 98101-2996
 6          206.477.1909
            ann.summers@kingcounty.gov
 7
        FOR THE WITNESS (via videoconference):
 8          DENISE L. ASHBAUGH
            Arete Law Group
 9          1218 Third Avenue, Suite 2100
            Seattle, Washington 98101-3094
10          206.428.3250
            dashbaugh@aretelaw.com
11
12
        ALSO PRESENT (via videoconference):
13          KELSEY MURPHY-DUFORD
            GRACE GREGSON
14          ALYSHA FUNG KOEHLER
            DRADIN KREFT
15          TONI MILLS
            CHARLES PIERCE
16          RENEE RAKETTY
            SEAN SWANSON
17
18
19
20
21
22
23
24
25
```

1 (Pages 330 to 333)

Case 2:20-cv-00983-TSZ   Document 105-2   Filed 09/28/22   Page 70 of 99

Estate of Taylor, et al. v. City of Seattle, et ano. / City of Seattle, et al.                    Carmen Best - Vol. II

Page 366

1 of Seattle over your handling of the protests between
2 May and September of 2020?
3         MR. SHAW: Objection.
4    A. We did not have a serious disagreement.
5    Q. I'm going to ask you the same question with
6 respect to the city council.  Did you have a serious
7 disagreement with the city council between May and
8 September of 2020?
9         MR. SHAW: Objection.  Foundation.
10    A. Yeah.  Under what context, ma'am?
11    Q. I should have said -- did you have a serious
12 disagreement with the city council over your handling
13 of the protests between May and September of 2020?
14         MR. SHAW: Vague.
15    A. Yeah, I am having difficulty answering that.
16 Let me just -- maybe I can answer to say that the
17 council expressed, you know, that they had disagreement
18 with some of the decision making.  The council did
19 not -- for the most part there was very limited
20 communication between myself and the council
21 specifically about it.
22         But, you know, obviously through papers and
23 other ways, you know, they expressed concerns about,
24 you know, the handling of the protest.
25    Q. All right.  Who expressed their concerns to

Page 367

1 you over your handling of the protests from the city
2 council?
3         MR. SHAW: Vague.  Foundation.
4    A. I'm trying to remember exactly how I was made
5 aware.  Again, there wasn't a whole lot of one-on-one
6 communication, so it may have been through, you know,
7 media or their news releases or their twitter or other
8 ways that the council was relaying their concern.
9    Q. So was the answer that you don't know?  You
10 don't know who brought concerns to you from the city
11 council regarding the way that you were handling the
12 protests?
13    A. I'm just not --
14         MR. SHAW: Compound.
15    A. I'm not recollecting a specific conversation
16 with a specific council member.  That's all.
17    Q. All right.  My recollection is that there were
18 concerns that you had with respect to the East Precinct
19 and feeling that you were being ordered out of it and
20 not to return.  That's general.  Don't quote me on
21 that, but this is a topic that I want to talk about
22 right now.
23         Did you have disagreements with the mayor of
24 Seattle over the East Precinct during the protest
25 period?

Page 368

1         MR. SHAW: Objection.  Compound and
2 vague.
3    A. Did I have -- you're asking did I have a
4 disagreement with the mayor over the East Precinct?
5    Q. During the protest period.
6    A. During the protest period, which is May to
7 June or throughout the summer or during CHOP and CHAZ,
8 or what are you considering the protest period?
9    Q. May through September 2020.
10    A. Okay.  I can say that, you know, we
11 definitely, you know -- there were times -- we had a
12 discussion with the mayor's office.  I don't know if it
13 was myself and the mayor specifically, but the mayor's
14 office, about whether or not to remove the barricades
15 from the front of the East Precinct.
16    Q. Am I correct, did you want to remove the
17 barricades?  Were you on that side?
18    A. No.
19    Q. You were on the side that wanted --
20    A. I did not want to.
21    Q. -- to leave the barricades up?
22    A. I did not want to move -- remove the
23 barricades from in front of the precinct on 11th
24 Avenue, no.
25    Q. All right.  So there's been a lot of

Page 369

1 discussion about the fact that various texts -- not
2 just of you, but of the mayor, chief of the fire
3 department also, that your texts were not saved.  I
4 don't want to spend a lot of time on this, but I want
5 to ask you a couple of questions about it.  All right?
6    A. (Nodding head.)
7    Q. In your own words, why were texts deleted from
8 your phone?
9    A. On occasion I would delete texts, you know,
10 periodically when there was, you know, a buildup of
11 texts on my phone.  You know, my understanding is that,
12 you know, transitory texts could be deleted as long as
13 they weren't decision making or anything of that
14 nature.  So periodically, you know, I deleted those
15 texts, again, with transitory information.
16    Q. How periodically did you delete them?
17    A. No specific cadence to that at all.
18    Q. And how much gig or whatever did you have
19 available on your phone?  Why did you think you needed
20 to do that?
21         MR. SHAW: Objection.  Compound.
22    A. Yeah.
23    Q. It was compound.
24    A. I have no idea.
25    Q. Let me go back.  It was compound.  Why did you

Case 2:20-cv-00983-TSZ  Document 105-2  Filed 09/28/22  Page 71 of 99

Estate of Taylor, et al. v. City of Seattle, et ano. / City of Seattle, et al.                    Carmen Best - Vol. II

Page 370

1  delete them?
2  A.  Just periodically when there's a buildup of
3  messages, you know, I would just delete them.  They
4  were transitory and no reason to keep them on the
5  phone.  No particular cadence to that, just as I do now
6  with my personal phone.
7  Q.  What's a transitory text?  What does that
8  mean?
9  A.  Transitory means just basic not policy making,
10  no decision -- not policy making, not decision making,
11  not, you know, anything specific to that nature.
12  Typically just informational, you know, transitory
13  communication.
14  Q.  From whom?
15  A.  It didn't really matter.  I got all kinds of
16  texts from all sorts of folks that, you know, from --
17  you know, from community members, from, you know, other
18  staff, you know, all -- you know, a number -- a wide
19  variety of people, you know, would send me messages
20  that are, again, transitory in nature.
21  Q.  Do you understand --
22  A.  I wasn't doing -- I wasn't doing policy making
23  on texts.  I'll put it that way.
24  Q.  Why would you think that you could delete
25  anything as a public employee off of a public phone?

Page 371

1  A.  That's always been my understanding, that
2  transitory messages do not need to be retained.
3  Q.  Were you trained in that?
4  A.  I don't know if we had specific training, but
5  that was my understanding based on, you know, whoever
6  was providing that information.
7  Q.  Do you understand that the fact that you
8  deleted your texts reflects poorly on the issue of
9  transparency of the Seattle Police Department?
10  MR. SHAW:  Objection.
11  MS. ASHBAUGH:  Objection.
12  Argumentative.
13  MR. SHAW:  Form.  Argumentative.
14  A.  Yeah.  Well, I'm certainly aware after the
15  fact that people were vastly interested.  I'll put it
16  that way.
17  Q.  If you had to do it again, would you keep
18  deleting those texts or not?
19  MR. SHAW:  Objection.  Foundation.
20  A.  Probably wouldn't even keep a phone at this
21  point if I had to do it all again.  But, again, at the
22  time my understanding was that transitory messages did
23  not need to be maintained on our phones.
24  Q.  So if the mayor sent you a transitory message,
25  you would delete that?

Page 372

1  MR. SHAW:  Objection.  Vague.
2  A.  To my -- you know, just periodically I deleted
3  messages in bulk.  I don't -- I didn't look through
4  specific -- any specific message.  I mean, just if
5  they're transitory, you know, at some point I just
6  would delete those off, and that was it.  Again, I
7  wasn't targeting any specific person or anything like
8  that.
9  Q.  So if the mayor sent you a message that you
10  believe was transitory, then the mayor's message would
11  have been deleted under your system; is that correct?
12  A.  Yes, it would have been.
13  Q.  All right.  We're going to get to some
14  documents here pretty soon.  I have another set of
15  questions for you.  After you left, it came to light
16  that members of your police department had engaged in a
17  false narrative meant to, I guess, instill fear in the
18  protesters and discourage them from some type of
19  action.  And that involved claiming that the Proud Boys
20  had arrived on Capitol Hill.
21  Are you familiar with that?
22  MR. SHAW:  Objection.  Compound.
23  Speculation.  Foundation.
24  A.  I was made aware of it, yes.
25  Q.  Were you made aware of that while you were

Page 373

1  still chief?
2  A.  Not that I recall.
3  Q.  Because it looks to us like the investigation
4  was going on for quite a while before it became public.
5  So did you know that there was an investigation into
6  the issue of whether or not you knew any of the
7  details?
8  MR. SHAW:  Objection.  Vague.  Compound.
9  A.  Again, I don't recall anything about that, but
10  there are -- you know, OPA will investigate -- you
11  know, most of the -- I'm not aware of most of the
12  investigations.  Typically they're brought to my
13  attention if there is a sustained finding.  You know,
14  as the chief, if there was a sustained finding, I was
15  made aware of it.
16  Q.  So this -- they call it -- well, I call it the
17  Proud Boy hoax.  But in order for your -- members of
18  your department to do the hoax, isn't it -- weren't it
19  they supposed to have gotten permission?
20  MR. SHAW:  Objection.  Vague.
21  Speculation.
22  A.  Yes.  Yes.  You know, that's really hard to say.  I
23  don't know all the specifics around it.  Again, I
24  didn't -- it wasn't necessary for me to authorize.  I
25  know that a hoax legally can be done, you know, under

11 (Pages 370 to 373)

Estate of Taylor, et al. v. City of Seattle, et ano. / City of Seattle, et al.                    Carmen Best - Vol. II



Page 438

1          REPORTER'S CERTIFICATE

2

3          I, LORRIE R. CHINN, the undersigned Certified Court

4    Reporter, pursuant to RCW 5.28.010 authorized to administer

5    oaths and affirmations in and for the State of Washington, do

6    hereby certify:

7          That the sworn testimony and/or remote proceedings, a

8    transcript of which is attached, was given before me at the

9    time and place stated therein; that any and/or all witness(es)

10   were duly sworn remotely to testify to the truth; that the

11   sworn testimony and/or remote proceedings were by me

12   stenographically recorded and transcribed under my

13   supervision, to the best of my ability; that the foregoing

14   transcript contains a full, true, and accurate record of all

15   the sworn testimony and/or remote proceedings given and

16   occurring at the time and place stated in the transcript; that

17   a review of which was requested; that I am in no way related

18   to any party to the matter, nor to any counsel, nor do I have

19   any financial interest in the event of the cause.

20         WITNESS MY HAND AND DIGITAL SIGNATURE this 2nd day of

21   June, 2022.

22

23

     LORRIE R. CHINN, RPR, CCR .

24   Washington State Certified Court Reporter No. 1902

     Oregon State Certified Court Reporter No. 97-0337

25   lorrie.chinn@chinncourtreporting.com

28  (Page  438)

# EXHIBIT 28

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

<table>
<tr><td>HUNTERS CAPITAL, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.: 20-cv-00983-TSZ</td></tr>
</table>

## SUBPOENA TO PRODUCE DOCUMENTS

To:        Carmen Best, c/o Denise Ashbaugh of Arete Law Group, 1218 3rd Ave., Ste. 2100,
dashbaugh@aretelaw.com

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   **See Attached Rider**

<table>
<tr><td>Place: Calfo Eakes LLP<br>        1301 Second Avenue, Suite 2800<br>        Seattle, WA 98101</td><td>Date and Time:<br><br>06/14/2021 5:00 pm</td></tr>
</table>

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

<table>
<tr><td>Place:</td><td>Date and Time:</td></tr>
</table>

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: <u>May 24, 2021</u>

<table>
<tr><td><i>CLERK OF COURT</i></td><td>OR</td><td></td></tr>
<tr><td>_____<br><i>Signature of Clerk or Deputy Clerk</i></td><td></td><td>_____<br><i>Attorney's signature</i></td></tr>
</table>

The name, address, e-mail address, and telephone number of the attorney representing (*name of party*) Plaintiffs
Hunters Capital, LLC, et al.            , who issues or requests this subpoena, are: Gabe Reilly-Bates, Calfo Eakes
LLP,1301 2nd Ave., Ste. 2800, Seattle, WA 98101, gaber@calfoeakes.com, 206-407-2223

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

☐ I received this subpoena for *(name of individual and title, if any)* _____
    on (date)_____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____on *(date)*_____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$_____ .

My fees are $_____ for travel and $_____ for services, for a total of $____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____      _____
*Server's signature*

     _____
*Printed name and title*

     _____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## DOCUMENT SUBPOENA RIDER TO CARMEN BEST

## DEFINITIONS

1. "Plaintiffs," refers to the plaintiffs in this action, i.e. Hunters Capital, LLC, Northwest Liquor And Wine LLC, SRJ Enterprises, d/b/a Car Tender, Onyx Homeowners Association, Wade Biller, Madrona Real Estate Services LLC, Madrona Real Estate Investors IV LLC, Madrona Real Estate Investors VI LLC, 12th And Pike Associates LLC, Redside Partners LLC, Olive St. Apartments LLC, Richmark Company, d/b/a Richmark Label, Bergman's Lock And Key Services LLC, Matthew Ploszaj,  Argento LLC, Rancho Bravo, Inc., Sway And Cake LLC, and Shuffle LLC d/b/a Cure Cocktail.

2. "City" shall refer to the defendant in this action, the City of Seattle, including all its agencies, subdivision, departments, contractors and/or agents.

3. "Communication" includes any oral or written statement, any in-person or telephonic communication between two or more persons, and any analysis, summary, note, comment, document, or other description of a communication or conversation, regardless of its form, including email, text message, voicemail, or other electronic form of communication.

4. "Concerning" means constituting, containing, discussing, embodying, reflecting, identifying, stating, supporting, contradicting, alluding to, referring to, relating to, or confirming that which is pertinent to a matter.

5. "Document(s)" is used in the broadest sense and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any other mechanical or electronic process or writing, or produced by hand, namely:  email, hard-drive, electronic and hard-copy versions of agreements, communications, including intracompany communications, correspondence, telegrams, memoranda, records, books, summaries of records of personal conversations or interviews, diaries, forecasts, statistical statements, accountants' work papers, graphs, charts, accounts, analytical records, minutes or records of meetings or conferences, reports and/or summaries of negotiations, brochures, pamphlets, circulars, trade letters, press releases, contracts, notes, projections, drafts of any documents, working papers, securities ledgers, checks (front and back), check stubs or receipts, any other documents or writings of whatever description including but not limited to any information contained in or accessible from any computer although not yet printed out within your possession, custody or control or the possession, custody or control of any agent, employee (including without limitation, attorneys, accountants and investment bankers and advisers), or other person acting or purporting to act on your behalf.

6. "Each" shall be construed to include the word "every," and the word "every" shall be constructed to include the word "each."

7. "Electronic Devices" means personal computing devices such as a computer, tablet, phone, iPhone, Apple Watch, smart watch, online database, or iCloud, whether they were City-issued or personally owned.

8. The "Individuals" shall be construed as the following individual persons: Jenny Durkan, Carmen Best, Harold Scoggins, Shannon Anderson, Valerie Anderson, Idris Beauregard, Christopher Fisher, Eric Greening, Kenneth Neafcy, or Deanna Nolette, and any other individual for whom the City is missing text messages or other electronically stored data.

9. "Lawsuit" is defined as the case titled *Hunter's Capital, et al. v. City of Seattle*, case no. 20-cv-00983 TSZ, proceeding in the United State District Court for the Western District of Washington.

10. "Or" and "and" shall be inclusive and shall be used conjunctively and disjunctively as is necessary to bring within the scope of these requests any information that might otherwise be outside their scope.

11. "Person" means any individual, corporation, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, or other entity.

12. "CHOP" refers to the areas occupied by protestors in the Capitol Hill neighborhood of City of Seattle, Washington beginning in early June 2020, which have been variously described as the "CHAZ," standing for the "Capitol Hill Autonomous Zone," or "CHOP" for "Capitol Hill Organized Protest" or "Capitol Hill Occupying Protest."

13. The "CHOP zone" refers to the area of the Capitol Hill neighborhood in the City of Seattle in and around the areas occupied by CHOP participants, which is the area bound by the following streets: Denny Way, Union Street, Thirteenth Avenue, and East Broadway, as well as the areas within three blocks of the area bounded by those streets.

14. "CHOP participant" refers to any person who participated in and advocated for the existence of CHOP and/or the occupation of the CHOP zone, any person who camped out in or otherwise resided overnight (excluding the area's permanent residents) in the CHOP zone, and/or any person who was present in the CHOP zone for purposes of protesting or expressing solidarity with protestors.

15. "SPD" refers the Seattle Police Department, a division of Defendant.

16. "SFD" refers the Seattle Fire Department, a division of Defendant.

17. "SDOT" refers the Seattle Department of Transportation, a division of Defendant.

18. "SPU" refers to Seattle Public Utilities, a division of Defendant.

## **INSTRUCTIONS**

1. This subpoena calls for the production of all responsive documents and communications in your actual or constructive possession, custody, or control.  Such documents and communications include information in your personal possession, in your personal email accounts, or on your personal smart phones or other personal devices.

2. Each requested document shall be produced in its entirety, along with any attachments, drafts, and non-identical copies, including without limitation copies that differ by virtue of handwritten or other notes or markings.

3. All documents maintained or stored electronically should be produced in any of the following formats: as native files, single page or multi-page TIFFs (with a companion OCR or extracted text file).  Text messages should be produced in *.csv and *.pdf format. Plaintiff's document vendor could assist in performing an extraction of Ms. Best's text messages if Ms. Best requires assistance.  Unless otherwise agreed, files that are not easily converted to image format, such as spreadsheets, database, and drawing files, should be produced in native format.  When a text-searchable image file is produced, the integrity of the underlying electronically stored information (including, but not limited to, the original formatting, the metadata, and, where applicable, the revision history) should be preserved.

4. To the extent any request is objected to in whole or in part, state with specificity all grounds for objection, state which documents will be withheld and which documents will be produced notwithstanding such objection, and produce all documents and things responsive to those parts of the request as to which no objection is made.

5. With regard to objections to the production of documents based on attorney-client privilege and work-product protection, you are requested to prepare an index listing each and every document withheld, stating the document date, preparer, intended recipient(s), subject matter(s), persons who have received the document or have knowledge regarding the contents thereof, and the basis for withholding the document.

6. Unless otherwise noted, each request seeks documents concerning the time period from January 1, 2019 to the present.

## **DOCUMENTS TO BE PRODUCED**

1. All text messages between you and any of the Individuals from June 8, 2020 to the present.

2. All communications concerning CHOP or the CHOP zone between Ms. Best and any member of SPD, SFD, SDOT, SPU, or any City of Seattle employee, representative, or agent, including, but not limited to, all text messages between or among Ms. Best, Jenny Durkan, Harold Scoggins, and/or Idris Beauregard.

3. All documents concerning CHOP or the CHOP zone.

4. All communications and documents concerning preservation or collection of evidence, including, but not limited to, text messages, relating to the Lawsuit.  This request includes, is not limited to, any litigation hold notices issued by the City of Seattle.

5. All communications and documents reflecting any archiving, saving or backup of Ms. Best's Electronic Devices while she was employed by SPD.

6. All communications and documents concerning the Lawsuit.

7. All documents and communications concerning any injury, harm, property damage done to or complaint by any individual, resident or business within the CHOP Zone.

# EXHIBIT 29

| | |
|---|---|
| **From:** | Denise Ashbaugh <dashbaugh@aretelaw.com> |
| **Sent:** | Monday, October 18, 2021 9:17 AM |
| **To:** | Gabe Reilly-Bates |
| **Cc:** | Tyler Weaver; Janet Fischer |
| **Subject:** | RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best |

We, at our office, first looked to see if there was a back-up of Chief Best's personal phone and did not see anything. We also retained a computer forensic professional who confirmed that there is no back up of her personal phone. I wanted to advise you of that information prior to her deposition.

Thank you.
Denise

---

**From:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Sent:** Wednesday, September 15, 2021 4:35 PM
**To:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Cc:** Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Hi Denise,

   Thank you.  We would like to know if there is a back-up of Chief Best's personal phone prior to her deposition, please.

   To date, the City has pointed the finger at Chief Best, suggesting that she is responsible for the disappearance of the text messages on her work issued phone.  However, the City claims its investigation has not been completed.

   We do not have any text messages from the CHOP period from Chief Best's personal or work phones, and it sounds like you were not able to search for messages for that time period.  Since we have some time before the deposition, we would like to address these issues on the front end, so we do not have to bring Chief Best back for a second day of questioning in the event that additional text messages or emails are discovered.

Regards,

Gabe


Gabe Reilly-Bates
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808
T: 206 407 2223 | F: 206 407 2278 | **www.calfoeakes.com**

*NOTICE:  This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

---

**From:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Sent:** Wednesday, September 15, 2021 4:22 PM

**To:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Cc:** Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Gave:

At this point, I am going to have you ask Ms. Best these questions during her deposition. She will be able to provide testimony on them at that time.  We have provided the texts that she has and we are working to see if there was a backup done on any earlier text messages for her personal phone. I will advise you of that when I have more information.

Thank you.
Denise

---

**From:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Sent:** Wednesday, September 15, 2021 4:18 PM
**To:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Cc:** Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Hi Denise,

 I had some follow up questions for you about the issues below:

1. I understand that Chief Best was unaware of a factory reset on her City issued phone.  I just want to confirm that she didn't take any actions to delete all of the text messages that existed on her City issued phone prior to turning it in.  The City has not provided an explanation for why there the text messages on Chief Best's phone were deleted.

2. Concerning the issue with her personal phone locking up, when did Chief Best take the phone to have it fixed?  Did she take it to an Apple store? When is the earliest date that Chief Best has text messages?   Did the Apple store fix the issue by performing a factory reset on the phone?  If Chief Best took the phone to the Apple Store, does she have any emails / text messages concerning those appointments?

Thanks,

Gabe


Gabe Reilly-Bates
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808
T: 206 407 2223 | F: 206 407 2278 | **www.calfoeakes.com**

*NOTICE:  This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

---

**From:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Sent:** Thursday, September 9, 2021 8:55 AM
**To:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer

<jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Chief Best is unaware of a factory reset on her City issued phone. Other questions on that should again go to the City as she doesn't have insight into what happened with the phone after she turned it in.

On her personal phone, Chief Best had an issue with it locking up and she did take it in to someone to fix the issue. It is unclear what they did when that happened.

On the issue of her availability, she could do November 9, at 10:30 am for her deposition.

We are still working on the forensic expert issue and will advise when we can.

Denise

---

**From:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Sent:** Thursday, September 9, 2021 8:45 AM
**To:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Dear Denise,

   I'm writing to see if you have any additional updates on the points below.  In particular, we are interested in No. 2, whether Chief Best's city-issued phone was factory reset before it was turned in on September 2, 2020.

Thanks,

Gabe

Gabe Reilly-Bates
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808
T: 206 407 2223 | F: 206 407 2278 | **www.calfoeakes.com**

*NOTICE:  This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

---

**From:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Sent:** Thursday, September 2, 2021 4:13 PM
**To:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

1. We are going to work with a forensic expert on the issue for her personal phone on back-up. We will advise you what we learn and if there is backup on it. I don't believe this is a new phone or there was a factory reset, but we will inquire with Chief Best.

2. I can't provide an explanation on Chief Best's city-issued cell phone. I will ask her about a "factory reset" but have not heard of that either.

3. I have again inquired about availability in November for Chief Best's deposition and will let you know.

Denise

---

**From:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Sent:** Thursday, September 2, 2021 4:07 PM
**To:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Hi Denise:

Thank you for the email below.  I wanted to follow-up on a couple of issues.  Were you able to uncover any back-up data for either Chief Best's personal or her work cellphones? Also, we would like some more information about why Chief Best does not have text messages available on her personal cellphone from prior to May 2021.  Can you please provide us details as to whether the lack of text messages is a result of Chief Best's purchase of a new phone or a factory reset performed on the phone?

Second, the City has explained in their discovery responses that Chief Best's City-issued phone that was turned in to the City on September 2, 2020, that it had no text messages from before September 2, 2020 on it when they imaged it and conducted a forensic analysis.  The City has not provided us with the results of its forensic analysis of Chief Best's phone yet.  Can you provide us with any explanation as to why Chief Best's city-issued phone contained no text messages earlier than September 2, 2020?  Can you please confirm whether or not Chief Best performed a "factory reset" on her phone before she turned it in to the City?

Finally, do you have any available dates in November for Chief Best's deposition yet?

Thanks,

Gabe

Gabe Reilly-Bates
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808
T: 206 407 2223 | F: 206 407 2278 | **www.calfoeakes.com**

*NOTICE:  This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

---

**From:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Sent:** Wednesday, August 25, 2021 9:19 AM
**To:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>; Janet Fischer <jfischer@aretelaw.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Gabe:

I have spoken to Chief Best and have some responses to your email on August 6, 2021.

1. Additional Proposed Search Terms:  As noted, we ran each individual search term on the text messages that we have and there is nothing responsive to the subpoena to Chief Best and her personal phone.
2. Chief Best's Book:  The publication date of Chief Best's book is October 25, 2021. I think there was a misunderstanding of Chief Best's thoughts on a "draft." First, there is nothing like a "draft" of the book that Chief Best has. It is much like working with an expert where it is live working document that is kept by the publisher and written over.  Thus, she does not have a draft/notes to the extent that I believe you think there is. She does, as you know from her production, have an earlier version of some chapters that were sent to Becca Boatright. Chief Best is willing to have that draft reviewed by the City for A/C Privilege redactions (as there are likely to be some) and then produce the draft to you after the book is published and before her re-noted deposition. She does not have a concern with the City seeing the draft, and indeed it needs to reviewed by them first for A/C privilege issue. Additionally, given the move of Chief Best's deposition, there should be no need for a second day beyond that allowed by the Court rules. We will get back to you soon on available dates for her deposition – likely in November. (Also, just to note, not all of the book is relevant to this lawsuit. Thus, not all portions of the book would be open for production either and contain some personal aspects of Chief Best's life).
3. Back-up Files:  We have done an initial look for a back-up file for Chief Best's personal phone and have not seen it.  But we are still reviewing and will let you know if we find anything.  We will not use your computer forensic person but will do an appropriate search to make sure we can answer anything affirmatively nor not.

Denise

---

**From:** Gabe Reilly-Bates <GabeR@calfoeakes.com>
**Sent:** Thursday, August 19, 2021 11:24 AM
**To:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>
**Subject:** RE: Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Hi Denise,

    I hope that your time away from the office was restful and restorative.  I wanted to follow up on my email below as we had made some additional proposals and requested some additional information about Chief Best's production.  Please let me know when you think you will be in a position to respond to my email below.

    Regarding the request relating to evidence of iPhone backups, you can look for that by going to settings → then clicking on the first line for "Apple ID, iCloud, Media & Purchases" → then clicking on iCloud → then scrolling down to find iCloud Backup.  If the toggle switch has been turned "on," then there should be information about the last backup that is available.  Usually this will state "Last successful backup: _____ ___ a.m."  There is probably also a way to look at the metadata from the phone's image, but this is the easiest way that I am aware of.

Kind Regards,

Gabe

Gabe Reilly-Bates
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808
T: 206 407 2223 | F: 206 407 2278 | www.calfoeakes.com

*NOTICE: This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

---

**From:** Gabe Reilly-Bates
**Sent:** Friday, August 6, 2021 8:23 AM
**To:** Denise Ashbaugh <dashbaugh@aretelaw.com>
**Cc:** Patty Eakes <pattye@calfoeakes.com>; Tyler Weaver <TylerW@calfoeakes.com>
**Subject:** Hunters Capital v. City of Seattle: Subpoena to Carmen Best

Dear Denise,

Thank you for speaking with me the other day.  Below are the proposed additional search terms that we would like Chief Best to use (hopefully with text messages going back to June 2020), as well as a couple of loose ends that we would like to button up.

- **Additional proposed search terms**.  protest*, antifa*, barrier*, barricade* ((deny OR denied OR bar* OR block*) /3 (access OR ingress OR egress)), (lane /5 access*), fortification*, shooting*, assault, violen*, Riveter, BLM, (east /3 precinct), (capitol /3 hill), ((red OR yellow OR hot OR warm OR autonomous OR no-cop) /3 zone), Durkan, Mayor, death, homicide, rape, checkpoint, ((harm OR damage OR hurt) /3 business*), (Horace OR Lorenzo OR Anderson), (Marcel OR Levon), (Antonio OR Mays), (fire /3 (tool* OR extinguisher*)), ("summer of love"), (Cal /2 Anderson), Oddfellows, (Rancho /2 Bravo), (black /3 bloc*), (open /3 carry), ((arm* OR gun* OR firearm*) /3 (men OR people OR protest* OR demonstrate* OR mob OR group)), (Hunter* /4 Capital), ((Pine OR Pike OR Olive OR Denny) /5 (10th OR 11th OR 12th OR 13th)), (express* /5 (concern* OR complaint OR condition)), (electric /4 company), ((carmen OR Chief) /4 best), (board* /3 up), graffiti, (clear /5 obstruction*), (preserv* /5 (mural OR art OR graffiti)).

- **Chief Best's book**.  We understand that Chief Best has concerns about producing notes / drafts of her book prior to its publication.  She may wish to restrict the City's access to drafts / notes.  We believe that we would ultimately be entitled to these documents, but we are willing to seek a compromise in this area. Our first proposal that we would prefer is that we could allow the drafts / notes to be produced under the protective order with the "Attorney's Eyes Only" designation, so no one in the City could have a chance to review it.  Alternatively, we would request that Chief Best produce the notes / drafts after the book is published with the additional caveat that we would be allowed to renote Chief Best's deposition for a second day to cover any of the topics in the book and/or the notes.  Please let us know if either proposal is acceptable to Chief Best.

- **Messages from June 2020 – May 2021** (the time period most relevant to CHOP / CHAZ).  We are hoping that Chief Best has a backup file on iCloud or iTunes that contains her earlier messages.  If Chief Best has an iCloud storage account, then there is a good chance there is a backup file that our forensic expert could help find.  His name is Brandon Leatha, and he specializes in recovering data from Mac based devices.

- **Evidence of Backup Files.**  These would be files stored on Chief Best's iPhone if she has an iCloud account for her iPhone, or in her Mac device if she has a MacIntosh Computer.  Brandon Leatha can assist in helping locate those files.

Please let me know if you are willing to allow an expanded search for older text messages on Chief Best's phone and whether Chief Best will be willing to produce additional materials relating to her book under the alternative proposals outlined above.  Mr. Leatha is available to assist with the recovery of text messages.

If there are search terms that are generating a large number of false positive hits, then we would consider revising our terms.

Kind Regards,

Gabe


Gabe Reilly-Bates
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101-3808
T: 206 407 2223 | F: 206 407 2278 | **www.calfoeakes.com**

*NOTICE:  This internet e-mail message contains confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us (collect, if necessary) immediately at (206) 407-2200 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

# EXHIBIT 30

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| Carmen Home | 7/31/2020 8:39:04 AM | | https://www.usatoday.com/story/news/politics/2020/07/31/defund-police-covid-19-force-deepest-cop-budget-cuts-decade/5538397002/ |

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| Amy Clancy | 9/11/2020 6:19:31 PM | | Yup - that guy! |
| CHRISTOPHER FISHER | 9/11/2020 6:17:40 PM | The car dealership guy | |
| CHRISTOPHER FISHER | 9/11/2020 6:10:17 PM | https://twitter.com/dea dlinewh/status/1304551 387867602945?s=21 | |
| Carmen Home | 9/11/2020 6:24:56 PM | | |
| Carmen Home | 9/11/2020 6:24:56 PM | | It doesn't take long to be a distant memory :-) |
| CHRISTOPHER FISHER | 9/11/2020 6:18:18 PM | Who was the chief who came and spoke to us? 😂 | |
| Amy Clancy | 9/11/2020 6:11:23 PM | | Yeah - I emailed Don yesterday just to say stay safe! |
| Amy Clancy | 9/11/2020 6:25:41 PM | | That will be your love life too - NEXT! 😊 |
| Carmen Home | 9/11/2020 6:18:30 PM | | Oh yeah.  Duh🤦 |
| Carmen Home | 9/11/2020 6:17:06 PM | | Crazy and so scary.  Who is Don? |
| CHRISTOPHER FISHER | 9/11/2020 6:10:13 PM | Wow. Ashland. OR. | |
| Carmen Home | 9/11/2020 6:30:05 PM | | Laughed at "Who was the chief who came and spoke to us? 😂" |
| Carmen Home | 9/11/2020 6:26:04 PM | | 😂 |
| Carmen Home | 8/2/2020 12:01:06 PM | | Ok |
| Amy Clancy | 8/2/2020 10:59:59 AM | | It's chris Ingalls who had the domestic terrorism issue -  not Chris Daniels. So I'm contacting Ingalls. I like him better anyway. |
| Carmen Home | 7/18/2020 9:22:11 AM | | https://www.westsideseattle.com/robin son-papers/2020/07/17/herbold-2020-budget-rebalancing-deliberations-no-call-sw-precinct |
| Carmen Home | 7/18/2020 9:22:11 AM | |  Want to counter this now! |
| Amy Clancy | 7/18/2020 9:27:41 AM | | How would you like to counter? Do you want to make a statement or do an interview? |
| CHRISTOPHER FISHER | 7/18/2020 9:30:44 AM | I am working | |
| CHRISTOPHER FISHER | 7/18/2020 9:30:53 AM | Also where did sir conversation wind up | |

| | | | |
|---|---|---|---|
| Amy Clancy | 7/18/2020 9:40:31 AM | | The PA officers expressed concerns that releasing SIRs would appear to be fear mongering. I think we need to have more conversations on which SIRs to release and how. |
| Carmen Home | 7/18/2020 9:49:42 AM | | **REDACTED - ATTORNEY CLIENT / WORK PRODUCT PRIVILEGE** |
| CHRISTOPHER FISHER | 7/18/2020 9:49:50 AM | Agreed | |
| Amy Clancy | 7/18/2020 9:50:36 AM | | I'm just passing along the concerns. But I agree. They are the records of what public employees are responding to. |
| Carmen Home | 7/18/2020 9:50:53 AM | | Honestly, doing our job and talking about what we're doing is not fear mongering in my view. |
| Amy Clancy | 7/18/2020 9:51:00 AM | | I agree. |
| Amy Clancy | 7/18/2020 9:51:13 AM | | Especially now |
| Carmen Home | 7/18/2020 9:51:20 AM | | Well, you know where I stand and I am the boss. |
| Amy Clancy | 7/18/2020 9:51:28 AM | | Yes you are. |
| Amy Clancy | 7/18/2020 9:53:43 AM | | **REDACTED - ATTORNEY CLIENT / WORK PRODUCT PRIVILEGE** |
| Carmen Home | 7/18/2020 9:57:27 AM | | **REDACTED - ATTORNEY CLIENT / WORK PRODUCT PRIVILEGE** |
| Amy Clancy | 7/18/2020 9:58:18 AM | | Got it. Now or first thing Monday? I'm happy either way. |
| Carmen Home | 7/18/2020 9:58:59 AM | | Next week is fine… I got a little fired up this morning :-) |
| Amy Clancy | 7/18/2020 9:59:26 AM | | I can understand why. |
| Amy Clancy | 7/12/2020 10:00:31 AM | | FYI - they're asking for tomorrow morning. |
| Amy Clancy | 7/12/2020 9:58:24 AM | | The segment would be at 8a EST (5a our time!) and hosted by Steve Doocy. They said she can do via Skype if preferred. |
| CHRISTOPHER FISHER | 7/12/2020 9:55:44 AM | Yeah figured they'd bring that up which is good | |
| Amy Clancy | 7/12/2020 9:54:10 AM | | Checking on interviewee. Segment: to discuss the budget cuts that would lead to major layoffs in Seattle. |
| Amy Clancy | 7/12/2020 9:43:32 AM | | Good morning Chief and Chris! Fox & Friends just requested an intvw. Your thoughts? |

| | | | |
|---|---|---|---|
| Carmen Home | 7/12/2020 9:59:20 AM | | Stand by for a phone call. |
| Amy Clancy | 7/12/2020 9:55:49 AM | | I'm waiting for an answer on which block. |
| CHRISTOPHER FISHER | 7/12/2020 9:54:58 AM | Which block? | |
| Amy Clancy | 7/12/2020 9:59:32 AM | | 👍 |
| CHRISTOPHER FISHER | 7/12/2020 9:57:07 AM | My personal pref would be to do hemmer if doing Fox. But if it's right Fox and friends that could work. Chief would just need to be ready to only comment on policing. They will bring up political stuff. | |
| Amy Clancy | 7/12/2020 9:55:29 AM | | The producer also wrote: "I know Chief Best previously declined an interview with our show because of content posted on digital (the doctored images from CHOP) but we'd like to invite her to come in again to correct the record." |
| CHRISTOPHER FISHER | 7/12/2020 9:51:05 AM | Who would be doing the interview and what segment? | |

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| Tricia | 8/17/2020 5:28:01 PM | | Janie Schutz, CPE, Wanted all three of you to be aware that they have a meeting with Pete Holmes tomorrow at about 3:30 PM, and also Timothy Mygatt and Christina Fogg early Friday morning.<br><br>Chris, she said she left you a voicemail and would like a call back when you get the chance, ahead of tomorrow's meeting.<br><br>Janie's number 828-442-6155 |

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| Carmen Home | 7/20/2020 7:04:47 AM | | Did you see this article that is basically calling you out about your comments in regards to Mostly white people were causing vandalism , was no extortion to shop owners and response times were not three times longer. This so called journalist needs to be corrected! |
| Truscott | 7/20/2020 7:11:51 AM | | Copy |
| Carmen Home | 7/20/2020 7:04:45 AM | | Someone sent this to me. I'd like to correct it today- |
| Carmen Home | 7/20/2020 7:04:46 AM | | https://www.seattletimes.com/seattle-news/stories-the-police-tell-and-how-to-resist-them/ |

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| CHRISTOPHER FISHER | 7/17/2020 6:52:21 PM | FYI. Just heard that SPD amendments won't be heard until the 29th. | |

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| CHRISTOPHER FISHER | 7/4/2020 10:18:57 PM | Ok nevermind | |
| CHRISTOPHER FISHER | 7/4/2020 10:15:44 PM | Are we holding a lot of calls? Lapd was chasing a stolen ambulance and was getting g hammered. | |
| Truscott | 7/4/2020 10:14:34 PM | | Not active shooter call... just occured |
| CHRISTOPHER FISHER | 7/4/2020 10:09:45 PM | | |
| CHRISTOPHER FISHER | 7/4/2020 10:09:45 PM | Should we do similar. It's bananas out there | |
| Truscott | 7/4/2020 10:16:16 PM | | I don't know |
| Truscott | 7/4/2020 10:15:11 PM | | We put messaging out yesterday joint with fire. |
| Truscott | 7/4/2020 10:13:58 PM | | We have an active shooting call and demonstration |
| Clancy Work | 7/4/2020 10:10:53 PM | | Sure - wouldn't hurt. |
| Truscott | 7/4/2020 10:16:53 PM | | Our messaging earlier in the week was do not call 911 or non emergency number |
| Truscott | 7/4/2020 10:15:21 PM | | And earlier in the week |
| Clancy Work | 7/4/2020 10:14:31 PM | | Good lord |

| Conversation with | Date | Sent messages | Received messages |
|---|---|---|---|
| CHRISTOPHER FISHER | 6/10/2020 7:56:09 PM | Ok | |
| CHRISTOPHER FISHER | 6/10/2020 7:57:10 PM | Kiro says they are on scene and see it | |
| CHRISTOPHER FISHER | 6/10/2020 7:51:51 PM | Have request from jic to confirm media reports | |
| Mahaffey | 6/10/2020 8:05:05 PM | | Might have been when Scoggins fixed on obstruction on the Pine St sallyport a few hours ago |
| Mahaffey | 6/10/2020 7:55:42 PM | | We aren't seeing that although we think they are calling into 911 to see if we will respond |