# EXHIBIT 1

Michael Malone                                      August 22, 2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

HUNTERS CAPITAL, LLC, et al.,   )

                    Plaintiffs,     )

        vs.                         ) No. 20-cv-00983-TSZ

CITY OF SEATTLE,                    )

                    Defendant.      )

--------------------------------------------------------

ZOOM VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL MALONE

--------------------------------------------------------

ATTENDANCE OF ALL PARTICIPANTS VIA

ZOOM VIDEO CONFERENCE

--------------------------------------------------------

9:00 a.m.

August 22, 2022

REPORTED BY:  Lauren G. Harty, RPR, CCR #2674

Michael Malone                                    August 22, 2022

Page 27

1    it's a -- it's a trust structure between managing the

2    trust properties.  I -- the holdings I believe is --

3    is the ownership, which is the trust, myself, and a

4    couple other minority shareholders.

5         Q.    So are you a member in -- in that, an owner

6    of -- of that holding company in those buildings?

7         A.    You know, I'm just -- I -- I can't answer

8    that.

9         Q.    Okay.

10             Are your children owners through various

11   trusts of that -- of those buildings?

12        A.    Yes.  I mean, to -- to be clear, I mean,

13   the -- the trust -- my children's trust is a 49

14   percent owner of all the business.

15        Q.    Okay.

16             And if they're a 49 percent owner, who owns

17   the remainder?

18        A.    Myself and Mike Oaksmith and Jill Cronaeur.

19        Q.    And what percentages do they own, if you

20   know?

21        A.    Yeah.  I -- I don't know, but I would say

22   Oaksmith is approximately 6 percent and Jill is 3 or 4

23   percent.

24        Q.    And how did they come to be owners of the --

25   the Hunters Property properties?

Michael Malone                                    August 22, 2022

Page 50

```
 1     A.    Yes.

 2     Q.    And did she have anybody that assisted her?

 3     A.    Yes.

 4     Q.    And who were -- who was that?

 5     A.    I can't remember their names, but it -- a

 6  couple of people that -- that, you know, will operate

 7  the building and -- and deal with specific

 8  relationships.

 9     Q.    And -- so would Kayla have been the point

10  person for the residential tenants in the Broadway

11  Building then?

12     A.    Yes.

13     Q.    Okay.

14           And does that include the students too or is

15  that different?

16     A.    That's different.

17     Q.    Okay.

18           And would that include the tenant -- the

19  residential tenants in the Dunn Automotive Building as

20  well?

21     A.    Yes.

22     Q.    Okay.

23           And -- was there a separate set of people

24  who managed the commercial tenants under Jill?

25     A.    Jill manages the commercial tenants.  I
```

Michael Malone                                    August 22, 2022

Page 51

1    mean, commercial tenants are -- you know, there's --

2    there's fewer of them.  You know, they're on longer

3    leases.  It's a different kind of relationship.

4        Q.   And then who's the -- the CFO at -- at

5    Hunters?

6        A.   Lindsey Jensen.

7        Q.   And who was the CFO before her?  Was that

8    Sandy Allen?

9        A.   Sandy Allen.

10       Q.   And when did Ms. Allen leave?

11       A.   About three and a half years ago.

12       Q.   Do you recall whether Ms. Allen was in that

13   role during the summer of 2020?

14            MR. REILLY-BATES:  Object to the form.

15       A.   I don't -- I don't recall.

16       Q.   (By Mr. Cramer)  But she was directly

17   replaced by Lindsey Jensen?

18       A.   Correct.

19       Q.   And what -- what is --

20            MR. CRAMER:  Strike that.

21       Q.   (By Mr. Cramer)  What was Ms. Allen's role at

22   Hunters Capital?

23       A.   CFO.

24       Q.   And so what was she responsible for?

25       A.   Financials, banking relationships.

Michael Malone                                          August 22, 2022

Page 150

```
1              A F T E R N O O N   S E S S I O N

2                        1:15 p.m.

3                    August 22, 2022

4              P R O C E E D I N G S

5         THE VIDEOGRAPHER:  The time is 1:15 p.m.  We

6   are back on the record.

7              E X A M I N A T I O N

8                       (Continued)

9   BY MR. CRAMER:

10       Q.    Mr. Malone, you understand you're still

11  under oath, correct?

12       A.    I do.

13       Q.    Okay.

14             A couple of questions I forgot to ask you

15  earlier today.  What is your title with Hunters

16  Capital?

17       A.    Chairman and CEO.

18       Q.    Okay.

19             And so you don't report to anyone, correct?

20  You're --

21       A.    Yes.

22       Q.    Okay.

23             And does your wife have --

24       A.    I'm --

25       Q.    -- any --
```

Michael Malone                                          August 22, 2022

Page 232

1       Q.      Okay.

2               But -- but that's an accurate statement of

3    what she told you.

4       A.      Oh, I -- yes.  I -- I repeated it.

5       Q.      Okay.

6       A.      However, you would have to question the

7    credibility of my wife.

8       Q.      If you'd scroll down to -- to row 659.

9       A.      Yep.  Got --

10      Q.      Okay.

11      A.      -- it.

12      Q.      So this is another text from you to Jill and

13   Oaksmith, and it says, "Hi Mike it's Ron Amundson.

14   Just wanted to let you know that there are people down

15   behind our building on 10th.  They've taken a ladder

16   and climbed the fence on the Poquito side.  I think it

17   would be a good idea to board up access.  I'm afraid

18   some bad actors might break in to your windows that

19   are down low.  Call if you want.  Thanks."

20              And then there's a space, and then you say,

21   "Oak, just got this from Ron.  Not sure what it means.

22   So FYI!"

23              So I -- I just -- the -- the format of this.

24   So is -- are you cutting and pasting a text you got

25   from Ron Amundson and sending it to Oaksmith and Jill?

Michael Malone                                    August 22, 2022

Page 233

1    Is that what this is?

2         A.    Yes.

3         Q.    Okay.

4               And -- and then the next line is Oaksmith's

5    response.  "If they get into the glossier space/pike

6    basement they are going to get the shit beat of them

7    by the gun carrying crew from Idaho building that

8    place out!!  I'll warn rusty and his guys anyhow and

9    check out that back area in the am!!"  And then Jill

10   loves that message.

11              What's the -- do you -- do you see that?

12        A.    Yeah.

13        Q.    Okay.

14              What's the -- what's the Glossier space?

15        A.    Glossier is a -- was a retailer that was in

16   the midst of putting about a million dollars' worth of

17   tenant improvements into a space before COVID and CHOP

18   started, and they -- the contractor, who happens to be

19   from Idaho, was in there working and -- and that's --

20   you know, he's a cowboy with a gun, so --

21        Q.    And there was never an incident in the

22   Glossier space/Pike basement, right?

23        A.    No.

24        Q.    Okay.

25              Scroll down to line 673.  And this is

Michael Malone                                           August 22, 2022

Page 246

 1      Q.    Go down to 733.  This is a text from you to
 2   Jill and Michael Oaksmith from 12/14/2020.  The body
 3   of the text looks like a message to someone named
 4   Mark.  Is this another one, like you described
 5   earlier, that's a cut and paste of a text that was
 6   with someone else that you were sharing with Mike and
 7   Jill?
 8              MR. REILLY-BATES:  Object to the form.
 9   Objection to the extent it misstates the -- the
10   record.
11              You can answer if -- if you understand the
12   question.
13      A.    I -- I don't understand the question.
14      Q.    (By Mr. Cramer)  Okay.
15              Who is -- who is Mark in -- in the body of
16   the text at line 735?
17              MR. REILLY-BATES:  Oh.  I'm sorry.  We
18   thought you said 733.  Okay.
19              THE WITNESS:  So it's this one?
20              MR. REILLY-BATES:  This one, yeah.
21      A.    Well, I don't know, but I think they own a
22   building up on -- up on Broadway on -- that is on
23   Nagle --
24      Q.    (By Mr. Cramer)  Okay.
25      A.    -- because it's a -- Mill Creek is their

Michael Malone                                    August 22, 2022

Page 247

1    partner.

2        Q.    And so this is a text that you sent to that

3    person, Mark, that you have cut and pasted into a text

4    to Jill and Oaksmith; is that --

5              MR. REILLY-BATES:   Object --

6        Q.   (By Mr. Cramer)   -- correct?

7              MR. REILLY-BATES:   Object to the form; calls

8    for speculation, foundation.

9        Q.   (By Mr. Cramer)   Is -- is that correct?   Is

10   that what this is?

11       A.    I think so, yes.

12       Q.    Okay.

13             And now we'll go up to 733.   Is 733 a cut

14   and paste of a text message that you exchanged with

15   Mayor Durkan that you are sharing with Michael

16   Oaksmith and Jill Cronaeur?

17       A.    Yes.

18       Q.    Okay.

19             And going back to line 735, Mark is who do

20   you believe with res -- with --

21       A.    I --

22       Q.    -- relation to --

23       A.    I --

24       Q.    -- the Mill Creek company?

25       A.    I -- I think he's with Gerding Ell -- Eden,

Michael Malone                                    August 22, 2022

Page 251

1        A.     No.

2        Q.     Okay.

3               And then it references -- I assume you are
4   MM?  Is that how --

5        A.     Yes.

6        Q.     Okay.

7        A.     Yes.

8        Q.     "MM said something about a table at car
9   barn.  I would hate for him to appear tone deaf by
10  showing cars and not abiding by covid... gathering
11  rules."

12              What -- what kind of table at car barn were
13  you contemplating?

14              MR. REILLY-BATES:  Objection; assumes facts
15  not in evidence, calls for speculation, foundation.

16       A.     Yeah.  I have no idea what she's talking
17  about, so it's very difficult, impossible for me to
18  answer your question.

19       Q.     (By Mr. Cramer)  Okay.

20              Scroll down to 866.  This is an email --
21  or -- I'm sorry.  It's not an email.

22              MR. CRAMER:  Strike that.

23       Q.     (By Mr. Cramer)  This is a text message you
24  sent to Jill and -- just Jill on October 2nd, 2020.
25  The body looks like it's addressed to Liz.  Do you

Michael Malone                                      August 22, 2022

Page 252

1    know who Liz is?

2          A.    Liz Dunn, a building owner in the Pike-Pine.

3          Q.    Okay.

4                So is this another example of a cut and

5    paste of a text that you would have sent to Liz Dunn

6    that you're sharing with --

7          A.    That's correct.

8          Q.    -- Ms. Cronaeur?

9                MR. REILLY-BATES:   Objection; foundation,

10   calls for speculation.

11         Q.   (By Mr. Cramer)   And do you recall whether

12   Ms. Dunn responded to the text message that you sent

13   to her?

14         A.    I -- I don't remember.

15         Q.    Okay.

16         A.    This -- this is all part of an effort for us

17   to try to kind of activate the neighborhood after

18   CHOP; you know, get people to take the boards off

19   their windows and make it look more like a

20   neighborhood to, you know, open things back up.

21         Q.    Now, scroll down to 868 and -- and tell me

22   what the -- what the message that you were sending

23   in -- in 868 was regarding.

24         A.    Well, I -- I think it's --

25                MR. REILLY-BATES:   Ob- --

Michael Malone                                    August 22, 2022

Page 258

1        A.     I -- I -- you're asking if it was -- if the

2    lawsuit was my idea or -- or Oaksmith's idea?

3        Q.    (By Mr. Cramer)   Yes.

4        A.     There -- it was definitely the community's

5    idea to how -- how do we -- how do we accelerate the

6    end to this madness, and so it wasn't very difficult

7    getting a group together.   And -- and the question

8    was, you know, how -- how do you -- how could we have

9    an effective lawsuit.

10       Q.     And your testimony earlier today was that --

11   that the idea started with you or you and Mr. Oaksmith

12   and -- and Ms. Cronaeur.   Is that -- is that accurate?

13   And then you brought it to the community?

14            MR. REILLY-BATES:   Object to the form;

15   mischaracterizes the pri -- earlier testimony.

16            THE WITNESS:   So I should --

17            MR. REILLY-BATES:   You can -- you can

18   answer.

19            THE WITNESS:   Yeah.

20       A.     I -- yeah.   I think it was -- it was a group

21   effort and -- and -- and I think we probably

22   spearheaded it.

23       Q.    (By Mr. Cramer)   Okay.

24            And my question is did -- did you spearhead

25   it and is that what you're referencing when you say,

Michael Malone                                    August 22, 2022

Page 281

1    2020?

2         MR. REILLY-BATES:  Objection; foundation.

3    You haven't established that Mr. Malone was involved

4    in those decisions.

5         A.    Again, I -- I -- I -- I think it's

6    understood when you -- when you go into a lawsuit that

7    you -- you have to preserve everything.  And -- that's

8    one.  And two, there's absolutely nothing we have

9    reason to hide and -- and so it wasn't of a concern or

10   issue.

11        Q.    (By Mr. Cramer)  Okay.

12              So you understood going into the lawsuit

13   that you had an obligation to preserve your text

14   messages.

15        A.    I already said that.

16        Q.    Did you ask anyone to assist you in making

17   sure that you didn't lose your text messages?

18        A.    I did not.

19        Q.    Did you work with Mike Oaksmith or Jill

20   Cronaeur to make sure that you didn't lose your text

21   messages from June of 2020?

22        A.    I did not.

23        Q.    Did you work with anybody to make sure

24   that -- that everyone with relevant text messages knew

25   that they were not to delete them?

Michael Malone                                      August 22, 2022

Page 282

 1            MR. REILLY-BATES:  Objection; vague,
 2    foundation, vague as to everyone.
 3       A.    Yeah.  I -- no.
 4       Q.    (By Mr. Cramer)  Did you collect Kayla's text
 5    messages before she left?
 6            MR. REILLY-BATES:  Objection; foundation.
 7    You haven't established if this -- this witness has
 8    had any interaction with that.
 9       A.    Yeah.  Kayla didn't report to me.  I -- I
10    have -- no, I did not.
11       Q.    (By Mr. Cramer)  And -- but you testified
12    earlier -- what's -- what's Kayla's last name, Miller?
13       A.    No.
14       Q.    I'll refer to her as Kayla.
15            -- that Kayla --
16            MR. CRAMER:  Strike that.  Let me start
17    over.
18       Q.    (By Mr. Cramer)  You testified earlier that
19    Kayla was the point person for the residential tenants
20    when she worked at Hunters Capital; is that correct?
21       A.    Right.
22       Q.    Okay.
23            And are you -- do you know whether Kayla
24    communicated with those tenants via text?
25            MR. REILLY-BATES:  Objection; foundation.

Michael Malone                                    August 22, 2022

Page 286

1      Q.    (By Mr. Cramer)   Regardless of -- of what you

2   thought might happen on the back end, is it correct

3   that you periodically swiped to delete texts on your

4   phone?

5      A.    Yeah.

6      Q.    Okay.

7            And did you do that routinely?

8      A.    I just -- just clean out my phone, but I --

9   but -- I don't know.

10     Q.    And did you do that in 2020?

11     A.    I -- yeah.  I don't -- you -- I don't

12   even text that much under certain circ -- most

13   circumstances.

14     Q.    We've -- we've reviewed today a number of

15   texts that you sent --

16     A.    Right.

17     Q.    -- correct?

18     A.    And emails.

19     Q.    Okay.

20            And -- and so -- you do text, correct?

21     A.    Yes.

22     Q.    Okay.

23            And you did text in June of 2020, correct?

24     A.    Somewhat, yeah.

25     Q.    And you texted in July of 2020, correct?

Michael Malone                                    August 22, 2022

                                                        Page 287

     1        A.     Yes.
     2        Q.     Okay.
     3               And August of 2020 and September of 2020,
     4     correct?
     5        A.     Yeah.
     6        Q.     Okay.
     7               And did you text in those time periods about
     8     what was going on at Cal Anderson Park?
     9        A.     I don't recall.
    10        Q.     Did you -- well, we've -- we've reviewed
    11     texts here today where you texted about Cal Anderson
    12     Park, correct?
    13        A.     Okay.
    14        Q.     Okay.
    15               Did you send -- did you send texts with
    16     other people during that time period about Cal
    17     Anderson Park?
    18               MR. REILLY-BATES:  Object to the form; vague
    19     as to other people.
    20               MR. CRAMER:  I'd be more precise, but he
    21     deleted his texts.
    22        Q.     (By Mr. Cramer)  Mr. --
    23        A.     Okay.
    24        Q.     -- Malone, did you text with anyone else
    25     other than Ms. Cronaeur and Mr. Oaksmith about what

Michael Malone                                          August 22, 2022

```
 1      A.    I left them in my Inbox.

 2      Q.    So you -- why weren't they there on -- in --

 3 on May 3rd, 2021?

 4      A.    I -- I --

 5            MR. REILLY-BATES:  Objection; asked and

 6 answered.  He already testified he doesn't know.

 7            MR. CRAMER:  Well, he's now changed his --

 8 his testimony, so --

 9      Q.    (By Mr. Cramer)  I want to be real clear.

10 You're under oath, Mr. Malone.

11      A.    Yeah.  Right.

12      Q.    Is -- is it your testimony that you

13 periodically cleaned out your message history --

14      A.    No.

15      Q.    -- on your phone?

16      A.    No.  I -- I have never cleaned out my

17 history.  I'll go sometimes and clean out text

18 messages because I think I'm, you know, improving the

19 power of my phone or something, but it's -- but

20 they're random messages.

21      Q.    Okay.

22            So you did periodically swipe to delete the

23 text messages from the message app on your phone.

24      A.    Yes.

25      Q.    Okay.
```

Michael Malone                                    August 22, 2022

1       A.      Just the iCloud, as --

2       Q.      And --

3       A.      -- mentioned here.

4       Q.      So you were -- you did back up to iCloud?

5       A.      No.

6               MR. REILLY-BATES:   Objection; misstates his

7       testimony.  He just said that he searched iCloud.

8       Q.   (By Mr. Cramer)   And there was nothing

9       located on your -- your iCloud account?

10      A.      Yeah.  It wasn't me, so I -- I mean, I

11      wasn't searching, so -- I'm just reading the letter.

12      Q.      Do you know who did the searching?

13      A.      I do not.

14      Q.      And then it says, "Mr. Malone avers that

15      he did not intentionally delete any communications

16      relating to this case..."

17      A.      Correct.

18      Q.      Okay.

19              But I -- I want to -- I want to make clear,

20      you did, however, occasionally swipe to delete the

21      copy of the messages on your phone, correct?

22              MR. REILLY-BATES:   Objection; misstates the

23      witness' prior testimony.  He testified that he did

24      not do that with any documents relevant to this case.

25      Q.   (By Mr. Cramer)   Did you do --

Page 303

 1      A.      Correct.

 2      Q.      -- that --

 3              Go ahead.

 4      A.      That's correct.

 5      Q.      Okay.

 6              So when you were -- did you do that with --

 7      with other text messages that weren't -- that you

 8      didn't feel were relevant to this case?

 9      A.      Sorry?

10      Q.      Did -- did you clean your Inbox with

11      messages that you didn't think were relevant to this

12      case?

13      A.      I didn't -- I didn't clean any messages that

14      would be relevant to this case.

15      Q.      Did --

16      A.      I --

17      Q.      -- you --

18      A.      -- think the issue is there was no history

19      from March 26 back.  And I certainly did not at any

20      time take my phone and -- and -- and delete all my

21      history.

22      Q.      Okay.

23              But you did periodically swipe to delete

24      individual messages on your phone, right?

25      A.      Sometimes, yeah.

Michael Malone                                    August 22, 2022

Page 315

 1                    C E R T I F I C A T E

 2   STATE OF WASHINGTON      )
                              )   ss.
 3   COUNTY OF KING           )

 4         I, the undersigned Washington Certified Court

 5   Reporter, hereby certify that the foregoing deposition

 6   upon oral examination of MICHAEL MALONE was taken

 7   before me on August 22, 2022, and transcribed under my

 8   direction;

 9         That the witness was duly sworn by me pursuant

10   to RCW 5.28.010 to testify truthfully; that the

11   transcript of the deposition is a full, true, and

12   correct transcript to the best of my ability; that I

13   am neither attorney for nor a relative or employee of

14   any of the parties to the action or any attorney or

15   counsel employed by the parties hereto, nor am I

16   financially interested in its outcome;

17         I further certify that in accordance with

18   CR 30(e), the witness was given the opportunity to

19   examine, read, and sign the deposition within 30 days

20   upon its completion and submission, unless waiver of

21   signature was indicated in the record.

22         IN WITNESS WHEREOF, I have hereunto set my hand

23   this 29th day of August, 2022.

24

25                         LAUREN G. HARTY, CCR #2674