# EXHIBIT 13

BILL DONNER
11/16/2021

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
          Plaintiffs,           )
                                )
     vs.                        ) No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
          Defendant.            )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

BILL DONNER - RICHMARK LABEL
_____

CONTAINS CONFIDENTIAL PORTIONS

DATE:  Tuesday, November 16, 2021

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Electronically signed by Mindy Suurs (101-257-931-8021)                834cc13c-c5d2-4cbd-8245-3b3bc0b4be28

Page 195

1  for production in this case?
2       A.   None.
3       Q.   Who at your office was responsible for that?
4       A.   The person that collected it all from every
5  source was Barry Cosme, our CFO.
6       Q.   Did you receive a litigation hold notice in this
7  case?
8            MR. WEAVER:  Objection.
9       A.   I don't --
10           MR. WEAVER:  I just want you to not talk about
11 any communications or the context of communications that --
12 you know, that we have had with you or Barry about
13 documents.
14      A.   I can't answer that question.
15 BY MR. CRAMER:
16      Q.   Okay.  So you are refusing to answer whether you
17 received a litigation hold notice in the case?
18      A.   I don't remember seeing one.  But if I did, it
19 would have been passed on to Barry.  He was the collection
20 point for all of it.  I'm not saying it didn't come; I
21 would not have dealt with it.
22      Q.   Do you know whether a litigation hold notice was
23 issued to Richmark employees telling them to hold onto
24 documents relating to CHOP?
25      A.   No, I don't know.  Can I ask counsel something?

BILL DONNER
11/16/2021

Page 196

1   Or not?

2           MR. WEAVER:  No.

3   A.   No, okay.  All right.  No, we were -- we held
4   every -- nothing got thrown away.  I've not been to court a
5   lot; I just know you just don't -- nothing relevant to
6   anything was thrown away.  I mean whatever we stored, we
7   stored.  We didn't dump anything, if that's what you're
8   asking.

9   BY MR. CRAMER:

10  Q.   Do you have a cell phone?

11  A.   Yes.

12  Q.   What kind of cell phone do you have?

13  A.   iPhone.

14  Q.   Do you have it with you?

15  A.   Yeah.

16  Q.   Okay.  Can you open your iPhone and tell me when
17  the earliest text message on your iPhone is?

18           And do you know what the messages icon looks
19  like?  It's the green one with the little --

20  A.   Okay.  Hang on just a second.  I have 10 -- there
21  are only 10 messages there.  Just a second.  Okay --

22  Q.   And really I'm thinking if you just scroll --

23  A.   The last one is 10/21, and usually I cross
24  everything off when it's done or I don't need it.  So I've
25  got -- the oldest one is 10/21, and there have been some

```
 1   since I've been here today.
 2       Q.   Okay.  10/21 of '21?
 3       A.   Yeah.
 4       Q.   Of 2021?  Okay.
 5       A.   Yeah.
 6       Q.   And it's my understanding that you texted with
 7   people about CHOP?
 8            MR. WEAVER:  Objection.
 9       A.   I probably did with friends.  I don't use --
10   rarely if ever use my texting for business.  I'm not in
11   sales.  I don't have a lot of people calling me.  I've got
12   a couple machinery manufacturers.  I don't deal with
13   salespeople.  I would text friends.  I had -- CHOP was on
14   the news a lot.  I got a lot of phone calls from friends or
15   text messages, which I would answer.  But if it was -- it
16   related to CHOP, as you saw with Malone, the e-mails that
17   you brought up -- I e-mail that stuff.  I don't do business
18   texts of any consequence.
19   BY MR. CRAMER:
20       Q.   But you did text with friends, family about CHOP?
21       A.   Oh, yeah.
22       Q.   And you then deleted those texts; is that
23   correct?
24       A.   Correct.  As I did all other texts.
25       Q.   Were you -- did you know when you were deleting
```

BILL DONNER
11/16/2021

Page 198

1  them that you were supposed to retain them for purposes of
2  the lawsuit?
3              MR. WEAVER:  Objection.
4        A.   Oh, no, this was all done well prior to this.  I
5  delete things frequently during the day, so this -- I did
6  not go back and -- no, I did not delete anything having to
7  do with CHOP after -- after I had the messages with them.
8  The suit is long after that, so -- I think I know what
9  you're getting at, and the answer is no.
10 BY MR. CRAMER:
11       Q.   But the text messages that you sent were during
12 CHOP?
13       A.   Sure, yeah.  I got lots of calls from people and
14 texts -- pardon me, calls, texts -- I'm old-fashioned --
15 texts from friends:  What's going on up there, we saw the
16 news.  I said, yeah, they're having a street fair -- just,
17 you know, it's conversational.  It was not business.
18       Q.   And at that point had you received a litigation
19 hold notice telling you to hold on to documents relating to
20 CHOP?
21       A.   No.
22       Q.   And you're confident of that?
23       A.   Oh, yeah, absolutely.
24       Q.   And you guys -- you filed the lawsuit while
25 CHOP -- on June -- in June 2020; correct?

BILL DONNER
11/16/2021

Page 199

1        A.    I don't remember.
2        Q.    Did you file it before the park was cleared out?
3        A.    I don't remember.
4        Q.    Did you text with anyone about CHOP after
5   June 11th, 2020, so in the latter part of June when the
6   protest was ongoing?
7        A.    Oh, absolutely.  I would have friends, family
8   text me how's it going up there.  I mean, again, we were --
9   we were a very big item in Seattle, and I'm in the center
10  of it, as you know where the building is.
11       Q.    And you deleted those texts after -- at some
12  point?
13       A.    Just like I do normally with all texts, or
14  virtually all texts.
15       Q.    What type of things did you text with friends and
16  family about?
17       A.    What's going on up here.  How is it -- is it --
18  okay, are you worried, are people safe, what's going on, we
19  saw on the news such-and-such.  I probably talked to a
20  couple people and said -- when -- that I got, you know,
21  threats.  How's it going up there?  Well, we let the police
22  on the roof and we got threats from it.  To me, that's like
23  conversation.
24       Q.    And have you taken any steps to see if any other
25  people that you texted with might have copies of those

Page 200

```
 1   texts still?
 2        A.   No.  I have no idea who I texted, what -- I could
 3   guess.  I know a number of people.  What would I be asking
 4   them about?  It would never have occurred to me.
 5        Q.   Okay.  So they --
 6        A.   -- special information.  Nobody -- I mean why
 7   would I save them?
 8        Q.   Okay.  You didn't think that you needed to save
 9   them?
10        A.   No.  There was no information in it other than
11   what was going on outside the building.  Remember, I've
12   already testified or mentioned to you that nobody from the
13   City told me anything.  I asked a lot, but I never got any
14   information.  So what can I pass on to anybody, other than
15   I don't know what's going on.  Bill, when's it going to
16   end?  I don't know, they won't tell me, nobody knows.
17        Q.   So you were talking a little bit ago about when
18   the police came in at 5:00 a.m. to clear out the area, and
19   that was the day -- you continued to work that day; right?
20   The office didn't close down?
21        A.   Some of us get there very early, as I mentioned
22   before, staggered times depending on when people come in.
23   There were several of us -- the exact number I can't tell
24   you -- that were in the building.  We started to do what we
25   normally did, and then another person -- one person walked
```

BILL DONNER
11/16/2021

Page 215

1                    REPORTER'S CERTIFICATE

2

3        I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:

5

6        That the foregoing testimony of BILL DONNER was given
    before me at the time and place stated therein and
7   thereafter was transcribed under my direction;

8        That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision, to the best of my ability;

10       That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;

12
         That the witness, before examination, was by me duly
13  sworn to testify the truth, the whole truth, and nothing
    but the truth;

14
         That I am not a relative, employee, attorney, or
15  counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
    thereof;

17

18  DATE: November 23, 2021

19

20

21

22

23                         _____
                           Mindy L. Suurs
24                         Certified Court Reporter #2195

25

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427  3515 SW Alaska St Seattle WA 98126