# EXHIBIT 14

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiffs,         )
                                )
         vs.                    )   No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

WADE BILLER - ONYX HOMEOWNERS ASSOCIATION
_____

DATE:  Friday, December 10, 2021

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Page 9

1    Q.   Do you typically -- so in the pre-COVID time, did
2  you work from home or did you work at a T-Mobile office?
3    A.   It was in the office prior to COVID.
4    Q.   And during the summer of 2020 time period, were
5  you working at home or in the office?
6    A.   At home.
7    Q.   And are you still working at home?
8    A.   We began last month going in once a week, so I've
9  been going in on Wednesdays.  That's optional.  There are
10 folks that are still working primarily at home.
11   Q.   Tell me where you live.
12   A.   I live at 1125 East Olive Street in Seattle.
13   Q.   Is that the Onyx?
14   A.   Correct.
15   Q.   And how long have you lived at the Onyx?
16   A.   Since 2008, early -- first of 2008.
17   Q.   Is that when the Onyx was built?
18   A.   No, that's after it was converted into condos.
19 It was converted in 2007 from apartments.  It was built in
20 2001.
21   Q.   Okay.  And are you currently on the homeowner's
22 association board of the Onyx?
23   A.   Correct.
24   Q.   And how long have you been on the board?
25   A.   Since 2013.

Page 11

 1    A.   That's the first name.
 2    Q.   And when -- can you recall when the elections for
 3 directors are?
 4    A.   It's once a year, and it changes depending on,
 5 you know, ongoing events that particular year.  This year
 6 it's in December.  Typically it's -- we have it the first
 7 quarter, so typically it's by March, but the board can
 8 decide to have it after that.
 9    Q.   And are the five directors whose names you
10 provided me, which includes you -- are those the same five
11 directors who were in place in June 2020?
12    A.   No, we've picked up two directors since then:
13 The Clint Zaner and the gentleman I mentioned as his first
14 name being Demas.
15    Q.   So prior to the three directors, were you, Devin
16 Wakefield, and Faizel Khan?
17    A.   Faizel Khan.
18    Q.   Faizel Khan?
19    A.   Correct.
20    Q.   And what's your role on the board?  Do you have
21 positions?
22    A.   We do have positions:  Secretary, president, and
23 treasurer currently.
24    Q.   What is your your role?
25    A.   My role is president.

WADE BILLER
12/10/2021

Page 60

1   the barricades and the ongoing nightly noise and random
2   gunfire, but I don't have a date.
3        Q.   Do you know --
4        A.   Sorry, a lot of those conversations were just
5   kind of ad-lib; they weren't like a meeting of businesses
6   at all; we were more or less just trying to string together
7   a group at that time.
8        Q.   And were those -- where did those -- how did
9   those conversations occur?  In person?  Over e-mail?  By
10  text?
11       A.   They took place in person or over text or over
12  Signal.
13       Q.   Okay.  And the ones that were in person -- do you
14  recall how many of those there were?
15       A.   No.  They were sporadic.  It was anytime we had a
16  chance to meet them, if they were on a corner.  You know,
17  we didn't constantly talk to each other via text; it was
18  more like we're outside, we bump into each other, or we're
19  potentially going outside to see what's going on or we
20  would go out to -- to try to understand with more clarity
21  and if other people were having the same concerns.
22            So it wasn't like -- it wasn't -- we were texting
23  around telling people we had concerns.  It was trying to,
24  you know, gauge -- gauge the circumstances to understand
25  if -- what -- if we were being reasonable or our concerns

Page 63

1      A.    It's an encrypted message service on -- that is
2  in application form for mobile devices.
3      Q.    Okay.  And is that a -- so it's like a secure
4  text messaging kind of?
5      A.    Right, it does not go through -- it goes through
6  secure servers that are not open to the telecom, and it has
7  nothing to do with the telecom SMS text messages; it's an
8  encrypted data service that provides a similar message
9  capability to end users.
10     Q.    And is that an application that -- well, you
11  obviously use, since you mentioned it?
12     A.    Correct.
13     Q.    And did you -- do you recall communicating with
14  anybody about CHOP or CHAZ or the issues going on in June
15  2020 using that application?
16     A.    We were -- there was a lot of duress at that
17  time, and I joined that group potentially towards the very
18  end of CHOP.  I didn't become aware of it until right up to
19  the -- possibly right after the group got together -- the
20  businesses and owners got together to discuss a possible
21  lawsuit or joining that, and it was after that time that I
22  was made aware of the Signal group.  And I don't know if
23  that was -- I don't know if that was during CHOP or after
24  CHOP, to be honest with you.
25     Q.    Okay.  But it involved some of the same folks who

Page 64

1  are the litigants in the lawsuit, that group?
2       A.   Yes, exactly, yep.
3       Q.   And who invited you to join the Signal group?
4       A.   I sent a text to LaRisa.  She had been one of the
5  folks that was talking to people in her role at the liquor
6  store.  That was one of the places where we had all shared
7  FaceTime, and the fact that the liquor store remained open
8  during that time for the most part, it was definitely a
9  business that we would frequent if not for just to see how
10 people were doing.
11      Q.   Okay, not for the liquor?  I was laughing because
12 I would frequent it for the waiters on the shelf.
13      A.   Well, I think anyone in their right mind would be
14 certainly looking for a mental break.
15      Q.   Was the -- I know about the liquors -- you know,
16 the liquor store is in the same building that the Richmark
17 label is in.
18      A.   Right --
19      Q.   Were you guys meeting in like a Richmark label
20 office or someplace in the liquor store that was available?
21      A.   It was at the liquor store.  The bathroom area
22 there -- just open space to the liquor store.
23      Q.   Do you remember anybody else besides LaRisa who
24 was a participant in the Signal group?
25      A.   I know John was.  I -- you know, the extent of

```
 1   who was on that Signal, I don't recall.  A number of
 2   people, but as far as the cross -- you know, the
 3   cross-pollination of the litigants and who were in
 4   Signal -- some people came and gone, and I don't recall.
 5        Q.   Would the -- were there other people in the
 6   neighborhood in the Signal group as well, you know, that
 7   aren't the litigant group?
 8        A.   Right, exactly, exactly.
 9        Q.   Do you use Signal for other communications not
10   related to this as well?
11        A.   Could you ask that question again?  I just --
12        Q.   Sure.  Is Signal something that you already had
13   or something you downloaded because of this?  Did you have
14   it before, or is it something you downloaded because you
15   were told about the group by LaRisa or someone else?
16        A.   This -- I downloaded it for this sole purpose.
17        Q.   Do you use it for any other purposes that aren't
18   related to CHOP or this lawsuit?
19        A.   No.
20        Q.   Were there any -- did you communicate with --
21   strike that.  Do you have a Facebook account?
22        A.   I do not.
23        Q.   Do you have a Twitter account?
24        A.   I do not.
25        Q.   Do you have a Instagram account?
```

```
 1       A.   No.
 2       Q.   Have you communicated with anyone about the CHOP
 3  or CHAZ using any other network or internet-based
 4  communications application?
 5       A.   No.
 6       Q.   Do you have a Reddit account?
 7       A.   I do not.
 8       Q.   Okay.  Okay, we can go off.
 9            THE VIDEOGRAPHER:  The time is now 11:04 a.m.,
10  and we are going off record.
11                 (Recess taken.)
12            THE VIDEOGRAPHER:  The time is now 11:15 a.m.,
13  and we are back on record.
14  BY MR. CRAMER:
15       Q.   Mr. Biller, do you have Signal on your -- strike
16  that.  What phone did you have during June 2020?
17       A.   I had a android Avante (phonetic).
18       Q.   And at some point is it correct that you got a
19  different kind of phone?
20       A.   I got a newer phone.  I got an Apple i12 Mini, I
21  believe.
22       Q.   And when did you get your new phone?
23       A.   Oh, I would say around Christmastime in December,
24  I believe.
25       Q.   What did you do with your old phone?
```

Page 69

1       A.    I turned it off and stowed it in my drawer.
2       Q.    Okay.  Do you still have it?
3       A.    I have turned that in for -- to our lawyers to
4    have them retrieve information from it.
5       Q.    And when did you give it to the lawyers?
6       A.    It seems like -- gosh, I don't know.  I honestly
7    don't remember.
8       Q.    Do you have Signal on your iPhone?
9       A.    I do.
10      Q.    Do you still use it to communicate with the
11   litigants in the case?
12      A.    There are some litigants I still speak to over
13   Signal, yes.
14      Q.    Are the -- what are the setting -- strike that.
15            Do messages on Signal disappear at some point?
16      A.    Only if you set them to.  Default, they do not.
17      Q.    And what are the settings on your Signal app with
18   respect to the retention of those messages?
19      A.    They're -- it's set to -- it's a default setting,
20   I haven't changed it, and so it saves them -- anything that
21   I create on the phone on Signal, they're still on the
22   phone.
23      Q.    Does it include messages from your last phone?
24      A.    No.  They -- if they weren't generated on the
25   phone, they do not cross, they don't transfer.

1    there, but no, I was never made aware that they're on
2    Signal.
3         Q.   Okay, or Michael Oaksmith?
4         A.   He's not on Signal, to my knowledge.  Not our
5    group or not amongst -- yeah.
6         Q.   Understood.  And when you downloaded it, do you
7    remember who told you to download it or, you know, told you
8    that there was the group and that you should download it?
9         A.   I was made aware through LaRisa.  She had created
10   a group and then was adding folks as we came out of the
11   woodwork or, you know, the neighbors in the area for
12   whatever reason, she asked if they were interested and she
13   would add them if they showed interest.
14        Q.   Do you know if any of the lawyers in this case
15   were in this Signal group?
16        A.   No.
17        Q.   No, they weren't or you don't know?
18        A.   They were -- not to my knowledge.  I would not
19   think so, I'm not aware of them being.  I could be wrong,
20   someone could have snuck in, but not to my knowledge.
21        Q.   And did LaRisa indicate why this group was
22   forming on Signal as opposed to some other platform?
23        A.   At the time it was to ensure it was private.
24        Q.   Did anyone tell you or suggest to you that the
25   messages sent on Signal could be or should be retained for

Page 74

1  a certain period of time?
2       A.   No.
3       Q.   Did anyone suggest that anyone not keep their
4  messages or delete the messages after a certain period of
5  time?
6       A.   We were never instructed in that manner, no.
7       Q.   Did anybody ever say anything about having set
8  their settings to not retain the messages on Signal?
9       A.   People did change their settings to shorter
10 settings from time to time depending on their comfort
11 level.  I know LaRisa was one later in the game, just
12 recently.  That was never a concern initially.  It became
13 more of a concern as more people became aware that the
14 information was being shared with attorneys and people had
15 concerns.  Another case would be I think some people were
16 just trying the settings out to see if, you know, you get
17 rid of them after two days.  I don't necessarily want to
18 plug my phone up -- I think there was an attempt to do
19 that.  But it wasn't a practice that everyone was doing.  I
20 think it was a couple one-offs.
21      Q.   And the discussions about changing settings --
22 was that a discussion that occurred on Signal?
23      A.   No.
24      Q.   So how did you learn that LaRisa had decided to
25 change her settings?

1              REPORTER'S CERTIFICATE

2

3        I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:
5

6        That the foregoing testimony of WADE BILLER  was given
    before me at the time and place stated therein and
7   thereafter was transcribed under my direction;

8        That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision, to the best of my ability;

10       That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;
12
         That the witness, before examination, was by me duly
13  sworn to testify the truth, the whole truth, and nothing
    but the truth;
14
         That I am not a relative, employee, attorney, or
15  counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
    thereof;
17
    DATE:  December 20, 2021
18

19

20

21

22  _____
    Mindy L. Suurs
23  Certified Court Reporter #2195

24

25



206.682.1427    fax 206.937.6236

Please record any changes or corrections on this sheet, indicating page number, line number, and reason for the change.

| Page | Line | Correction and Reason |
|------|------|----------------------|
| 10 | 18 | Clint Zaner is correctly spelled Clint Saner |
| 11 | 13 | Clint Zaner is correctly spelled Clint Saner |
| 30 | 4 | Q indicating Question should actully be A indicating Answer |
| 200 | 6 | Bernesta is correctly spelled Vernesta |
| 222 | 10 | oh, Mari is correctly spelled Omari |
| 228 | 15 | Lamon is correctly spelled Malone |

_____
(Signature here and on deposition)

WADE BILLER
12/10/2021

Page 233

1        S I G N A T U R E

2

3            I declare that I have read my within deposition,

4   taken on Friday, December 10, 2021, and the same is true

5   and correct save and except for changes and/or corrections,

6   if any, as indicated by me on the "CORRECTIONS" flyleaf

7   page hereof.

8            Signed in  Seattle                     , Washington,

9   this  27th      day of  December             , 2021.

10

11

12

13

14                       _____

15                       WADE BILLER

16

17

18

19

20

21

22

23

24

25

ROUGH & ASSOCIATES INC
office@roughandassociates.com     206.682.1427   3515 SW Alaska St Seattle WA 98126