HONORABLE THOMAS S. ZILLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC et al,

                    Plaintiffs,

      v.

CITY OF SEATTLE,

                 Defendant.

Case No. 20-cv-00983 TSZ

CITY OF SEATTLE'S MOTION FOR
SUMMARY JUDGMENT

**NOTE ON MOTION CALENDAR:
NOVEMBER 15, 2022**

**ORAL ARGUMENT REQUESTED**

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

**TABLE OF CONTENTS**

I.   RELIEF REQUESTED.................................................................................................. 1

II.  FACTS ........................................................................................................................ 1

     A.   The City Immediately Begins Working to Deescalate Tensions in the Protest Areas.
          .......................................................................................................................... 2

     B.   Plaintiffs Seek to Blame the City for Unconnected Acts After June 2020. ............... 5

     C.   Plaintiffs' Locations Reveal Just How Far Many of Them were From the CHOP. ... 6

III. ARGUMENT ............................................................................................................... 8

     A.   Summary Judgment Standard. ...................................................................... 8

     B.   Plaintiffs' Negligence Claim Fails................................................................. 8

          1.   The City Owed No Duty under Traditional Negligence Principles. .............. 8

          2.   The City has Discretionary Immunity........................................................ 14

     C.   Plaintiffs' Nuisance Claim Fails. ................................................................. 16

     D.   Plaintiffs' Substantive Due Process Claim Fails. ....................................... 17

          1.   The City Did Not Expose Plaintiffs to Any Actual, Particularized Danger
               They Did Not Otherwise Face. ................................................................ 18

          2.   The City Could Not Foresee that Each Plaintiff Would be Harmed........... 20

          3.   The City did not Engage in any "Conscience Shocking" Behavior............. 21

     E.   Plaintiffs' Takings Claim Fails. ................................................................... 23

          1.   Plaintiffs' Access Claim Should be Dismissed........................................... 24

          2.   Plaintiffs' *Per Se* Physical Takings Claim Fails. ...................................... 26

     F.   Plaintiffs' Procedural Due Process Claim Fails........................................... 27

     G.   The City's Actions Did Not Proximately Cause Plaintiffs' Alleged Harms. ......... 28

          1.   Commercial Losses.................................................................................. 30

          2.   Residential Losses................................................................................... 31

          3.   Lost Profits.............................................................................................. 31

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1    IV.    CONCLUSION ................................................................................................... 32

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - ii
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

**TABLE OF AUTHORITIES**

**Page**

*Accord Fabrique v. Choice Hotels Int'l, Inc.,*
    144 Wash. App. 675 (3d Div. 2008) ................................................................. 31

*Alves v. U.S.,*
    133 F.3d 1.454 (Fed. Cir. 1998) ..................................................................... 26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................................... 8

*Atherton Condo. Apartment-Owners Ass'n Bd. of Directors,*
    799 P.2d 250 (Wash. 1990) ................................................... 12, 13, 16, 17

*Baerlein v. State,*
    595 P.2d 930 (Wash. 1979) ............................................................................. 9

*Bailey v. Town of Forks,*
    737 P.2d 1257 (Wash. 1987) ................................................................. 10, 12

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
    239 U.S. 441 (1915) ....................................................................................... 27

*Black Lives Matter Seattle-King Cnty.,*
    466 F. Supp. 3d 1206 (W.D. Wash. 2020) .................................................... 23

*Buchanan-Moore v. County of Milwaukee,*
    570 F.3d 824 (7th Cir. 2009) ......................................................................... 21

*Campbell v. City of Bellevue*
    530 P.2d 234 (Wash. 1975) ........................................................................... 12

*Campbell v. State of Washington,*
    671 F.3d 837 (9th Cir. 2011) ......................................................................... 19

*Cedar Point Nursery v. Hassid,*
    141 S. Ct. 2063 (2021) ................................................................................... 27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................................... 8

*Chicago v. Morales,*
    527 U.S. 41 (1999) ......................................................................................... 20

*Chompupong v. City of Schenectady,*
    No. 17-cv-929, 2019 WL 3321874 (N.D.N.Y. July 24, 2019) .......................... 28

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - iii
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

*Collins v. City of Harker Heights*,
    503 U.S. 115 (1992)............................................................................................ 22

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989)............................................................................................ 17

*Ehrhart v. King Cnty.*,
    460 P.3d 612 (Wash. 2020)........................................................................ 8, 12, 13

*Evangelical United Brethren Church v. State*,
    407 P.2d 440 (Wash. 1965)................................................................................ 14

*F.C.C. v. Florida Power Corp.*,
    480 U.S. 245 (1987)............................................................................................ 27

*Fishburn v. Pierce Cnty. Planning & Land Servs. Dep't*,
    250 P.3d 146 (Wash. Ct. App. 2011).................................................................. 12

*Freeman v. City of Seattle*,
    No. 07-cv-09004 (W.D. Wash. Oct. 17, 2008) .................................................. 11

*Fuda v. King Cnty.*,
    No. 74033-4-I, 2017 WL 4480779 (Wash. Ct. App. 2017) ................................ 14

*Haberle v. Troxell*,
    885 F.3d 170 (3d Cir. 2018)................................................................................ 22

*Halverson v. Skagit Cnty.*,
    42 F.3d 1257 (9th Cir. 1994) .............................................................................. 27

*Harris v. Cnty. of Riverside*,
    904 F.2d 497 (9th Cir. 1990) .............................................................................. 27

*Hartman v. Acton*,
    No. 20-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ............................ 28

*Henry A. v. Willden*,
    678 F.3d 991 (9th Cir. 2012) .............................................................................. 18

*Hernandez v. City of San Jose*,
    897 F.3d 1125 (9th Cir. 2018) ............................................................................ 18

*Hostetler v. Ward*,
    704 P.2d 1193 (Wash. Ct. App. 1985)................................................................ 16

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*,
    542 F.3d 529 (6th Cir. 2008) .............................................................................. 22

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - iv
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

*Johnson v. City of Seattle,*
    474 F.3d 634 (9th Cir. 2007), ....................................................... 19

*Keiffer v. King Cnty.,*
    572 P.2d 408 (Wash. 1977).......................................... 24, 25, 26

*Kelly v. City of Port Townsend,*
    2011 WL 1868182 (W.D. Wash. May 16, 2011).......................... 24

*Ketchum v. Alameda Cnty.,*
    811 F.2d 1243 (9th Cir. 1987) ....................................................... 20

*Kim v. Budget Rent a Car Systems,*
    143 Wn.2d 190 (2001) ................................................................. 32

*Lombardi v. Whitman,*
    485 F.3d 73 (2d Cir. 2007).......................................................... 22

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982).................................................................... 27

*Mackie v. City of Seattle,*
    576 P.2d 414 (Wash. Ct. App. 1978)......................................... 24

*Martinez v. City of Clovis,*
    943 F.3d 1260 (9th Cir. 2019) .............................. 17, 22, 23

*Matican v. City of New York,*
    524 F.3d 151 (2d Cir. 2008)....................................................... 22

*Melville v. State,*
    793 P.2d 952 (Wash. 1990)......................................................... 9

*Monarch Ins. Co. of Ohio v. District of Columbia,*
    353 F. Supp. 1249 (D.D.C. 1973) ............................................. 28

*Munger v. City of Glasgow Police Dept.,*
    227 F.3d 1082 (9th Cir. 2000) .................................................... 18

*Munich v. Skagit Emergency Commc'n Ctr.,*
    288 P.3d 328 (Wash. 2012)..................................................... 8, 9

*Neinast v. Bd. of Trustees of Columbus Metro. Library,*
    346 F.3d 585 (6th Cir. 2003) ..................................................... 28

*Nicholson v. City of Los Angeles,*
    935 F.3d 685 (9th Cir. 2019) ..................................................... 22

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - v
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

*Osborn v. Mason Cnty.*
  134 P.3d 197 (Wash. 2006)...................................................................... 9

*Pande Cameron and Co. of Seattle, Inc. v. C. Puget Sound Regl. Transit Auth.*,
  610 F. Supp. 2d 1288 (W.D. Wash. 2009).............................................. 24, 25, 26

*Patel v. Kent Sch. Dist.*,
  648 F.3d 965 (9th Cir. 2011)) ................................................................ 20

*Porter v. Osborn*,
  546 F.3d 1131 (9th Cir. 2008) ............................................................... 21

*Ravenscroft v. Wash. Water Power Co.*,
  942 P.2d 991 (Wash. Ct. App. 1997)..................................................... 9, 12

*Sinclair v. City of Seattle*,
  2021 WL 6053883 (W.D. Wa. Sep. 21, 2021) ...................................... 20

*Smith v. Preston Gates Ellis, LLP*,
  135 Wash. App 859 (1st Div. 2006) ...................................................... 29

*State v. City of Seattle*,
  242 P. 966 (Wash. 1926)........................................................................ 16

*Tamas v. Dept. of Soc. & Health Servs.*,
  630 F.3d 833 (9th Cir. 2010) ................................................................. 21

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005)................................................................................ 18

*United States v. City of Seattle*,
  474 F. Supp. 3d 1181 (W.D. Wash. 2020).............................................. 28

*United States v. Fla. E. Coast Ry. Co.*,
  410 U.S. 224 (1973)................................................................................ 24

*Vandevere v. Lloyd*,
  644 F.3d 957 (9th Cir. 2011) ................................................................. 23

*Walker v. State*,
  295 P.2d 328 (Wash. 1956)..................................................................... 24

*Washburn v. City of Federal Way*,
  310 P.3d 1275 (Wash. 2013)................................................................... 8, 9, 32

*White v. Minneapolis*,
  2021 WL 5964554 (D. Minn. Dec. 16, 2021) (unpubl.) ....................... 20

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - vi
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

*Williams Place, LLC v. State ex rel. Dept. of Transp.*,
    348 P.3d 797 (Wash. Ct. App. 2015) ................................................................ 24

*Wood v. Ostrander*
    879 F.2d 583 (9th Cir. 1989) ........................................................................... 18

*Yee v. City of Escondido, Cal.*,
    503 U.S. 519 (1992) ......................................................................................... 27

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................... 8

**Statutes**

RCW 7.48.140 ....................................................................................................... 17

RCW 7.48.160 ....................................................................................................... 16

RCW 10.31.100 ..................................................................................................... 11

RCW 35.22.280(7) ........................................................................................... 16, 25

**Other Authorities**

SMC 10.01.010(B) ................................................................................................ 10

SMC 10.01.010(D) ................................................................................................ 10

SMC 10.02 ....................................................................................................... 9, 10

SMC 11.10.040 ..................................................................................................... 10

SMC 10.07.070 ..................................................................................................... 13

SMC 11.25 ....................................................................................................... 9, 10

SMC 15.04 .............................................................................................................. 9

SMC 15.16 .............................................................................................................. 9

SMC 15.17 .............................................................................................................. 9

SMC 15.40 .............................................................................................................. 9

SMC 15.44 .............................................................................................................. 9

SMC 15.46 .............................................................................................................. 9

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

SMC 15.52 ..................................................................................................................... 9, 10

SMC 15.72 ......................................................................................................................... 9

SMC 15.90 ......................................................................................................................... 9

SMC 15.90.00(E) ............................................................................................................. 10

SMC 15.90.004 ................................................................................................................ 13

SMC 15.90.004(C) ........................................................................................................... 10

SMC 18.12 ................................................................................................................. 10, 11

SMC 18.12.020 ................................................................................................................ 11

SMC 22.600.020 .............................................................................................................. 10

SMC 22.600.03202 .......................................................................................................... 10

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1

## I.    RELIEF REQUESTED

2        Plaintiffs filed this lawsuit on June 24, 2020, toward the end of several weeks of protests

3   that began after the murder of George Floyd.  Plaintiffs claim that the City's response to the

4   unprecedented civil unrest was tortious and violated their constitutional rights.  They are wrong.

5   The civil unrest occurred in the midst of a global pandemic and caused upheaval across the

6   country, including in Seattle.  The Capitol Hill Occupied Protest (CHOP) became the focal point of

7   protest activity in Seattle.  The City met these challenges with responses that were designed to, and

8   did, minimize bodily injury and property damage.  The result, which occurred over only three

9   weeks, was to reduce the intensity of protests to a level that allowed the City to safely clear the

10  CHOP as of July 1, 2020.

11       The City's balanced approach worked.  Plaintiffs nonetheless rushed to challenge the City's

12  policies, filing a class action complaint for which certification was denied on May 9, 2022.  Dkt.

13  96.  Six former plaintiffs have abandoned their claims, further highlighting their lack of merit.

14       The remaining plaintiffs' claims all fail as a matter of law for several reasons.  Each

15  plaintiff's negligence claim fails because the City owed plaintiffs no enforceable duty.  Their

16  nuisance claims fail because they are not actionable and simply restate the failed negligence

17  claims.  Each plaintiff's substantive due process claim fails because there is no factual basis to

18  claim that the City acted with deliberate indifference or exposed any plaintiff to an actual,

19  particularized, foreseeable danger that it would not otherwise have faced.  Plaintiffs' takings

20  claims fail because plaintiffs have no property right to the public streets where traffic revisions

21  were made, each plaintiff retained access to its properties, and no plaintiff can show that the City

22  physically invaded any private property.  Finally, each plaintiff's procedural due process claim

23  fails because no process was due to plaintiffs for any of the public actions taken by the City and

24  because each procedural due process claim simply replicates the failed takings claim.

25

## II.    FACTS

26       George Floyd, a 46-year-old Black man, was murdered in police custody on May 25, 2020,

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 1
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

in Minneapolis, sparking protests around the country.  In Seattle, the protest activity began in earnest on Friday, May 29.  Cramer Decl., Exs. 1 & 2.[1]  On May 30, Seattle Mayor Jenny Durkan implemented citywide curfews and proclaimed a state of civil emergency.  Ex. 5.  By the following week, the area around the East Precinct and Cal Anderson Park in Capitol Hill was a focus of nightly protests and demonstrations, leading to violent confrontations between protestors and the police.  Ex. 3 (Durkan Dep. at 96:21-25); Ex. 6 (Mahaffey Dep. at 75:10-23); Ex. 4 (Scoggins Dep. at 129:19-130:2); *see also* Ex. 7 (Ploszaj Dep. at 78:11-13).

**A.    The City Immediately Begins Working to Deescalate Tensions in the Protest Areas.**

On June 7, 2020, the FBI warned the City that the East Precinct was under threat of arson.  Ex. 3 (Durkan Dep. at 105:4-21); Ex. 8 (Formas Dep. at 31:5-12).  By the next day, Monday, June 8, the City concluded that in the interest of public safety it could not allow nightly clashes between the police and protestors on the line at Pine and 11th to continue.  The same day, SPD Command Staff and members of the Mayor's Office formulated a plan to de-escalate these confrontations.  Together, they made a judgment call to remove the police line on Pine, which would allow protesters to march past the East Precinct on the same street.  Ex. 3 (Durkan Dep. at 104:25-105:9); Ex. 6 (Mahaffey Dep. at 73:7-75:5); Ex. 4 (Scoggins Dep. 133:2-20).

SPD identified a risk of an attack on the East Precinct building and the officers in it, based in part on the FBI report of potential arson and the SPD's own experiences over the previous week.  Ex. 6 (Mahaffey Dep. at 74:11-21); Ex. 9 (Best Dep. at 62:8-63:15).  To mitigate that risk, SPD Command Staff decided to remove ammunition, computers, and evidence from the East Precinct and to temporarily vacate the building.  As part of this plan, SPD staged nearby the East Precinct while protestors marched by.  Ex. 6 (Mahaffey Dep. at 73:3-75:5, 80:18-81:6); *see also* Ex. 3 (Durkan Dep. at 105:4-21).

SPD's initial plan was to re-occupy the precinct later that night after the protest march subsided.  Ex. 6 (Mahaffey Dep. at 84:9-18); Ex. 3 (Durkan Dep. at 57:6-10).  Unexpectedly, some

---

[1] All exhibits ("Ex.") referenced herein are attached to the Declaration of Shane Cramer, filed in support of this motion.

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 2
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1   protestors began using fencing, furniture, and other materials to barricade the area around the East

2   Precinct and, later that night, the "CHOP" (at that point, technically the "CHAZ") was formed.

3   Ex. 6 (Mahaffey Dep. at 84:22-85:16, 90:11-16).

4          The City began at once to try to bring the area back to its pre-protest state.  The next

5   morning, June 9, the Mayor's Office, SDOT, SPU, SPD, SFD, and Parks began convening daily,

6   often several times a day, to develop means to resolve the problems in the protest area and Cal

7   Anderson Park.  Ex. 6 (Mahaffey Dep. at 94:5-11); Ex. 10 (Zimbabwe Dep. at 84:15-85:10); Ex. 3

8   (Durkan Dep. at 62:3-6, 162:22-25); Ex. 8 (Formas Dep. 131:18-132:4).

9          That same morning, on June 9, SPD attempted to reenter the precinct.  However, when

10  SPD did so, officers encountered armed protesters.  Ex. 6 (Mahaffey Dep. at 15:10-21).  SPD

11  determined that forcefully reoccupying the precinct would aggravate an already high-risk situation

12  and was likely to lead to more violent confrontations.  *Id.* at 93:7-15; Ex. 3 (Durkan Dep. at 77:6-

13  78:17).  On June 11, SPD made a further effort to reenter the precinct, actually placing a handful of

14  officers in the building, but ultimately decided to retreat when the crowd set fires outside the

15  precinct building with officers inside.  Ex. 6 (Mahaffey Dep. at 97:2-98:11).

16         On June 9, the same day SPD attempted to reenter the precinct, SDOT tried to remove

17  barriers from the area.  But protestors confronted SDOT workers, putting up "substantial

18  resistance" to the effort.  Ex. 10 (Zimbabwe Dep. at 32:11-21, 138:2-11).  As Mayor Durkan

19  testified, "everyone's goal from the beginning was to reduce the number of barriers, to reduce the

20  profile of the area where people were in the protests, and to provide access to that area for

21  businesses, for residents, for first responders and the like."  Ex. 3 (Durkan Dep. at 39:5-9); *see* Ex.

22  6 (Mahaffey Dep. at 25:1-11); Ex. 10 (Zimbabwe Dep. at 31:20-25); Ex. 4 (Scoggins Dep. at

23  170:4-16).

24         By June 10, the second day of CHOP's existence, SDOT had revised traffic patterns to

25  ensure that City services had access to every building and property in the zone.  Exs. 11-12.  By

26  June 17, SDOT had improved that design to provide regular vehicular access to every business and

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 3
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1  resident in the area.  Ex. 13.[2]  Both traffic revisions were limited to the streets closest to the East

2  Precinct:  i.e., areas where most plaintiffs were not located.  (*See* Appendix A; Exs. 12-13).

3  Large crowds created other problems for the City to address.  Thousands gathered in the

4  Cal Anderson Park area, including protestors, tourists, and observers.  Ex. 15 (Hara Dep. 69:5-7,

5  71:20-21).  The resulting health and sanitation challenges were aggravated by the Covid-19

6  pandemic.  The public bathroom in Cal Anderson was out of service, *id.* at 68:20-69:19, and the

7  pandemic led to a severe reduction in the capacity of the few businesses that were open as a result

8  of Governor Inslee's Covid regulations.  The City tried to mitigate the resulting problems by

9  providing port-a-potties and handwashing stations to minimize the spread of disease.  *Id.*; Ex. 3

10  (Durkan Dep. at 198:5-201:10); Ex. 20 (Furuto Dep. 27:4-28:12).  For health and safety reasons,

11  SPU also provided continuous garbage service.  Ex. 15 (Hara Dep. at 26:10-20, 27:10-22, 32:22-

12  33:8); Ex. 16 (McDermott Dep. at 221:15-17); Ex. 17 (Biller Dep. at 56:14-18).

13  SPD and SFD were also working to maintain public safety while avoiding confrontations

14  with anti-police protestors.  *See* Ex. 6 (Mahaffey Dep. at 117:22-118:4, 37:24-38:11, 38:19-23).

15  SFD implemented its standard "Scene of Violence" protocol:  it designated a small area around the

16  East Precinct as an SFD "Red Zone."  Before entering this area, SFD personnel needed a police

17  escort.  Ex. 4 (Scoggins Dep. at 77:7-22, 76:19-23); Ex. 18.  Outside of this roughly four-square-

18  block area, SFD's response protocols were largely unchanged.  *Id.* (Scoggins Dep. at 37:5-13).

19  On June 12, SPD established its own SPD "Red Zone" (not identical to SFD's Red Zone),

20  which included the immediate area around Cal Anderson Park and the East Precinct.  The SPD

21  Red Zone area was intended to maintain the safety of officers answering calls in the area.  They

22  would continue to respond to calls, but the response procedure would depend on the conditions.

23  Ex. 6 (Mahaffey Dep. at 11:12-12:9, 24:13-23); Ex. 19.  When there was no immediate life safety

24  concern, SPD aimed to find out first if callers could be assisted online or could meet officers

25  outside the SPD Red Zone—before sending officers into a potential zone of danger or escalation

26

---

[2] In order to ensure that deliveries and customers could continue to reach businesses within the affected area, SDOT shared the traffic revisions with Google and other online map providers.  Ex. 10 (Zimbabwe Dep. at 90:10-91:14).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 4
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

around the park.  Ex. 6 (Mahaffey Dep. at 115:15-117:17).  By its terms, the Red Zone policy did not impact police investigations, which continued in the Red Zone.  *See* Ex 43 (Malone Dep at 143:20-146:24).  Outside the SPD Red Zone, SPD continued responding to calls for service in largely the same way as it had before June.  Ex. 6 (Mahaffey Dep. at 37:5-38:23).

Overall, the City's goal in its measured responses was to return the area to normal as early as it could safely do so, a goal that was achieved in three weeks.  Ex. 9 (Best Dep. at 199:18-22); Ex. 3 (Durkan Dep. at 57: 11-22, 75:14-76:18).  On June 26, the City tried clearing streets and the park with non-SPD personnel but met "substantial resistance" from protestors, including people lying in front of, or trying to climb into, SDOT's equipment and angry crowds surrounding SDOT employees.  Ex. 10 (Zimbabwe Dep. at 32:8-33:11, 184:20-186:10).  In the meantime, SPD engaged in rigorous training efforts to be ready to take on this task themselves if necessary. Through June, SPD worked to train hundreds of police officers in achieving the delicate balance of clearing the area of protestors, unhoused persons, and other people on site, while neither (1) re-igniting tensions nor (2) violating this court's June 12, 2020 Order in *Black Lives Matter Seattle-King County v. City of Seattle* limiting SPD's use of "less-lethal" force.  Ex. 3 (Durkan Dep. at 184:24-194:7); Ex. 6 (Mahaffey Dep. at 189:24-190:22).

On June 30, Mayor Durkan issued an Executive Order directing City "departments to coordinate the City's response to observed and reported life safety, public health, and property issues in and around the East Precinct and Cal Anderson Park."  Ex. 22.  The next day, July 1, SPD and many other City departments (*e.g.*, Parks, SDOT, and SPU) were able to move in and clear the park and the streets around the park and precinct.  Ex. 6 (Mahaffey Dep. at 189:14-192:14; 193:2-16).  SPD moved back into the East Precinct that same day and has operated from the precinct ever since.  *Id.* at 194:20-195:1.

**B.      Plaintiffs Seek to Blame the City for Unconnected Acts After June 2020.**

While the City worked diligently to restore pre-protest service to the Capitol Hill neighborhood and deescalate tensions amid a nationwide anti-police movement and a surging

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

global pandemic, plaintiffs readied this lawsuit.  Plaintiffs' class action disintegrated when they could not pinpoint commonalities among the putative class.  Plaintiffs were so scattered within the CHOP—and sometimes so distant from the CHOP—that determining a class area was too arbitrary an exercise.  *See* Dkt. 96 ("No evidence, however, shows that every class member found themselves inside the area obstructed by the barriers, or that class members outside the barriers were unable to access their properties.").  The same infirmity exists with respect to the remaining plaintiffs' individual claims.  Most of them are too far from CHOP to have been directly affected by the City's modifications of services, and in fact were not affected.

**C.    Plaintiffs' Locations Reveal Just How Far Many of Them were From the CHOP.**

      **Hunters Capital Plaintiffs:**  the Hunters Capital entities are suing as a property management company and as the owners of seven buildings who allegedly were damaged by the City's actions: the Broadway Building (1620 Broadway); the Ballou Wright Building (1517 12th Ave.); the Chrysler Building (900 E. Pine St.); the Greenus Building (500 E. Pike St); Dunn Motors Building (500 E. Pike St.); the Colman Building (401 E. Pine St.); and the Pike Building (1000 E. Pike St.).  Dkt. 47, ¶¶ 14-16.

      **Madrona Plaintiffs:**  the Madrona entities similarly are suing as a property management company and as the owners of three buildings who allegedly were damaged by the City's actions: Madrona Real Estate Investors IV (1320 E. Pike St.); Madrona RE Investors VI (1312 E. Pike St.); and 12th and Pike (1122 E. Pike St.).  Dkt. 47, ¶¶ 22-25

      **Redside:**  Redside is a property management company with several properties in the Capitol Hill area.  Redside claims economic damages resulting from lost management fees from nine of its Capitol Hill properties: 1821 Harvard Ave.; 219 Harvard Ave. E.; 1718 Summit Ave.; 1726 Belmont Ave.; 1410 Belmont Ave.; 1420 Belmont Ave.; 1810 Boylston Ave., 1717 12th Ave.; and 1715 12th Ave.  *See* Ex. 49 (Van Zandt Rep.).

      **Olive ST Apartments:**  Olive Street Apartments operates two apartments located on Olive Street and 12th Avenue.  Dkt. 47, ¶ 28.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

**Onyx Apartments HOA/Biller:**  The Onyx Apartments are a residential building located on 12th and Olive.  Dkt. 47, ¶ 20.  Plaintiff Biller is both its board president and an individual plaintiff.  *Id.* ¶ 21.

**Shuffle (d/b/a Cure Cocktail):**  Cure Cocktail was a bar formerly located in Hunters Capital's Broadway Building.  Dkt. 47, ¶ 165.

**Bergman's Lock & Key:**  Bergman's is a locksmith and re-keying company that formerly was located on 12th Avenue, between Olive and Howell, at 1714 12th Ave.  Dkt. 47, ¶ 29.

**Car Tender:**  Car Tender is an automotive repair service that had a break-in during the protests in June 2020.  Car Tender alleges that it moved out of Capitol Hill because of CHOP and seeks damages associated with the costs of that move.  Car Tender was located on 12th between Olive and Howell, at 1706 12th Ave.  Dkt. 47, ¶ 17.

**Richmark Label:**  Richmark is a label manufacturing company that owns property on Pine between 11th and 12th, at 1110 E. Pine St.  Dkt. 47, ¶ 18.

**Sway and Cake:**  Sway and Cake is a women's boutique clothing store located in Madrona's building at 1122 E. Pike.  Dkt. 47, ¶ 164.

**Mathew Ploszaj:**  Ploszaj is rents a room in a house at 1210 E. Pine St., between 12th Ave. and 13th Ave.  Dkt. 47, ¶ 30.  Plaintiffs' expert was unable to quantify any economic losses for Ploszaj.  Van Zandt Rep. ¶ 50.

Appendix A depicts the distance between each of the plaintiffs and: (1) the SPD Red Zone; and (2) the traffic barriers the City first put in place on June 10, 2020 in an effort to modify traffic patterns, and which remained in place for approximately one week.  More than half of the properties about which plaintiffs complain are located outside the Red Zone.  *See* Appendix A; *see also* Dkt. 96 at 7 (depicting Red Zone and putative class boundary).  And the majority of the plaintiffs outside the Red Zone are similarly distant from the traffic barriers about which they complain.  Appendix A.  Moreover, by June 17, 2020, the City had rearranged these barriers such that the majority of plaintiffs were nowhere close to the revised traffic pattern.  *Compare* Appendix

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

A & Ex. 12 at SEA_00137345 *with* Ex. 13 at SEA-SPD_006804.

## III.    ARGUMENT

**A.    Summary Judgment Standard.**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If the movant shows the absence of genuine issues of material fact, the opposing party must come forward with specific facts showing otherwise.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 252 (1986).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant.  *Id.* at 248.

Plaintiffs are 12 businesses and residents, including property owners and lessees, who operated or lived in the Capitol Hill area in June 2020.  Each plaintiff fails to show that issues of material fact bar summary judgment on all of their claims.

**B.    Plaintiffs' Negligence Claim Fails.**

**1.    The City Owed No Duty under Traditional Negligence Principles.**

"To prevail on a negligence claim, a plaintiff must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.*"  Ehrhart v. King Cty.*, 195 Wn.2d 388, 396, 460 P.3d 612 (2020) (internal quotations omitted).  Because governments "are tasked with duties that are not legal duties within the meaning of tort law," the public duty doctrine is used as a "focusing tool"—i.e., in determining if an alleged breach entails a duty that is actionable.  *Washburn v. City of Federal Way*, 310 P.3d 1275, 1287 (Wash. 2013) (quoting *Munich v. Skagit Emergency Commc'n Ctr.*, 288 P.3d 328, 332 (Wash. 2012)).  Only duties owed to "a particular individual" are actionable; duties owed "to a nebulous public" are not.  *Munich*, 288 P.3d at 332 (quoting *Osborn v. Mason Cnty.* 134 P.3d 197,

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

202 (Wash. 2006)).

The City owed no duty to the plaintiffs that would support a negligence claim by falling within an "exception" to the public duty doctrine. Only two potential exceptions merit analysis here, each of which "indicate[s] when a statutory or common law duty exists," *Osborn*, 134 P.3d at 202:  the "failure-to-enforce and legislative-intent exceptions." *See* Dkt. 96 (Order Denying Class Cert.) at 23.[3]

*Legislative intent*.  This exception applies when the government has failed to comply with a statute or municipal ordinance that mandates government action.  *Washburn*, 310 P.3d at 1287; *see also Melville v. State*, 793 P.2d 952, 954-55 (Wash. 1990).  Any such statute must "clearly express[]" the government's intent "to identify and protect a *particular and circumscribed class of persons*." *Ravenscroft v. Wash. Water Power Co.*, 969 P.2d 75, 85 (Wash. 1998) (emphasis added); *accord Baerlein v. State*, 595 P.2d 930, 933 (Wash. 1979).

No plaintiff has identified a statutory provision as to which it even claims the City has failed to abide—let alone one that protects "a particular and circumscribed class of persons." *Ravenscroft*, 969 P.2d at 85.  Until the final day of discovery, plaintiffs based their negligence claim on the alleged failure of the City to abide by three Seattle Municipal Code Chapters: SMC 10.02 (Civil Emergencies), SMC 11.25 (Parade Permits), and SMC 15.52 (Crowd Control Events). Ex. 14 at Interrog. 3.  On August 31, 2022, the last day of the discovery period, plaintiffs supplemented their answer to the City's Interrogatory No. 3 (served 664 days ago on November 6, 2020), which asked for the basis on which plaintiffs contended the "legislative intent" exception applied to their negligence claim, to disclose another 12 broad statutory provisions that they allege the City has violated.  Ex. 47.[4]

---

[3] There are two other exceptions to the public duty doctrine but because this Court acknowledged in its Order Denying Class Certification that Plaintiffs raise only the legislative intent and failure to enforce exceptions, this brief does not address the remaining two. Dkt. 96 at 23.

[4] The City requests that the Court strike this belated disclosure and preclude Plaintiffs from relying on any of the following to support its negligence claim: SMC 15.04 Use and Occupation Permits; SMC 15.16, Cafes in the Public Space; SMC 15.17, Vending; SMC 15.40, Warning Lights and Barricades; SMC 15.44 Excavations and Fills; SMC 15.46, Debris in Public Places; SMC 15.72, Sidewalk Maintenance; SMC 15.90, Enforcement; SMC 15.91, Citations;

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1    Regardless, plaintiffs have not identified *any* specific provision in any of these broad

2  chapters that meets the legislative intent test—nor can they, because there are none.  SMC 10.02

3  contains general procedures for civil emergency proclamations but mandates no specific City

4  action, let alone a City action that plaintiffs claim did not occur.  SMC 11.25 governs parade

5  permits and is irrelevant to the CHOP protest activity, which did not involve parades.

6    SMC 15.52 describes the process for obtaining a permit to hold a special event but does not

7  mandate any City action if no permit was requested.  Many of plaintiffs' newly disclosed

8  ordinances also fall within SMC Title 15 ("Street and Sidewalk Use").  As with SMC 15.52, none

9  of them mandate any action by the City or identify any particular class or group of persons the City

10  intended to protect.  In fact, the exact opposite is true.  SMC Titles 10, 11, and 15 each provide that

11  their purpose is to promote general public welfare and "*not* to create or otherwise establish or

12  designate any particular class or group of persons who will or should be especially protected or

13  benefited by the terms of this subtitle."  SMC 11.10.040 (emphasis added); *see also* SMC

14  10.01.010(B) (same), SMC 15.90.004(C) (Street and Sidewalk Code "shall be enforced for the

15  benefit of the health, safety and welfare of the general public, and not for the benefit of any

16  particular person or class of persons"); SMC 10.01.010(D) (stating that nothing in Title 10 is

17  intended to create or form the basis for any liability on the part of the City or its officers).

18    Moreover, the codes plaintiffs cite contain language expressly limiting liability and stating

19  that the provisions do not "impose any duty upon the City or any of its officers or employees

20  which would subject them to damages in a civil action.  SMC 15.90.00(E).  The same is true of the

21  Seattle Fire Code (SMC 22.600.020) upon which plaintiffs newly rely.  The ordinance specifically

22  provides that the "express purpose of this code is to promote the health, safety, and welfare of the

23  general public, and not to create or otherwise establish or designate any particular class or group of

24  persons who will or should be especially protected or benefited by the terms of this code or

25  ordinance."  Ex. 50 (Seattle Fire Code Section 101.3).  The Code also provides that "[n]o provision

26

---

SMC 18.12, Parks Code; Fire Code, SMC 22.600.03202, including sections 105.6, 503.1, 503.4, and 104.11, and Seattle City Charter, Art. V, section 2.

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 10
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

or term used in this code is intended to impose any duty whatsoever upon the City, or any of its officers or employees, for whom the implementation or enforcement of this code is discretionary, not mandatory." *Id.*

Plaintiffs next look to the Seattle Parks Code (SMC 18.12), but do not identify any specific language in any ordinance among the more than 40 in the Parks Code that mandates governmental action or identifies and protects a particular and circumscribed class of persons. To the contrary, the Code says that "its provisions shall be liberally construed for the preservation and protection of the natural environment, public peace, health, safety and welfare" generally, not for any specifically identified class of persons. SMC 18.12.020.

Finally, plaintiffs look to Section 2 of the Seattle City Charter, which describes the Power and Duties of the Mayor:

> The Mayor shall see that the laws in the City are enforced, and shall direct and control all subordinate officers of the City, except in so far as such enforcement, direction and control is by this Charter reposed in some other officer or board, and shall maintain peace and order in the City. He or she may, in any emergency, of which the Mayor shall be the judge, assume command of the whole or any part of the police force of the City; but before assuming such control he or she shall issue his or her proclamation to that effect, and it shall be the duty of the Chief of Police to execute orders promulgated by the Mayor during such emergency. The Mayor shall perform such other duties and exercise such other authority as may be prescribed by law.

Seattle City Charter, § 2.

But this section does not support plaintiffs' claim. It describes the powers and duties of the Mayor as being for the benefit of the public at large. It neither mandates any specific action, nor does it identify any particular class or group of persons who would be especially protected or benefited under the City Charter. This Charter section cannot support a claim for negligence. *See Freeman v. City of Seattle*, No. 07-cv-09004 (W.D. Wash. Oct. 17, 2008) (holding that City of Seattle Charter Section requiring Chief of Police to maintain the peace and quiet of the City" could not support negligence action under public duty doctrine).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 11
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1    None of the municipal laws on which plaintiffs rely contains language identifying and

2 protecting "a particular and circumscribed class of persons," and such language "will not be

3 implied." *Ravenscroft*, 969 P.2d at 85.  In fact, most of the ordinances relied on by plaintiffs

4 specifically disclaim any such intent.  The legislative intent exception does not apply to any

5 plaintiff.  *Id.*

6    *Failure to enforce*.  Plaintiffs next argue that the "failure to enforce" exception applies.

7 This exception is to be "construe[d] . . . narrowly."  *Atherton Condo. Apartment-Owners Ass'n Bd.*

8 *of Dirs. v. Blume Dev. Co.*, 799 P.2d 250, 265 (Wash. 1990).  It applies only if "[1] governmental

9 agents responsible for enforcing statutory requirements possess actual knowledge of a statutory

10 violation, [2] fail to take corrective action despite a statutory duty to do so, and [3] the plaintiff is

11 within the class the statute intended to protect."  *Ehrhart v. King Cnty.*, 460 P.3d 612, 619-20

12 (Wash. 2020) (quoting *Bailey v. Town of Forks*, 737 P.2d 1257, 1260 (Wash. 1987)).  The "statute

13 must create a mandatory duty to take specific action to correct a violation"; there is no duty

14 enforceable in tort if the statute vests the public official with discretion as to whether or how to

15 perform the corrections needed.  *Fishburn v. Pierce Cnty. Planning & Land Servs. Dep't*, 250 P.3d

16 146, 156 (Wash. Ct. App. 2011); *see also Bailey*, 737 P.2d at 1260 (exception applied where

17 statute *requiring* police officer to take publicly intoxicated persons into custody and prohibiting

18 drunk driving created duty breached when police officer ordered drunk to leave the area and saw

19 him get behind the wheel of his truck); *Campbell v. City of Bellevue* 530 P.2d 234, 237 (Wash.

20 1975) (exception applied where code provided building official "shall immediately sever any

21 unlawfully made connection").

22    Plaintiffs identified a grab-bag of more than 30 statutes and ordinances on which they base

23 their claim but have not pointed to a single requirement in any of them that the City allegedly

24 failed to enforce.  Ex. 14 at Interrog. 4.  In fact, none of the statutes or ordinances even includes "a

25 directive to undertake specific corrective action."  *Ravenscroft v. Wash. Water Power Co.*, 942

26 P.2d 991, 998 (Wash. Ct. App. 1997), *aff'd in part, rev'd in part on other grounds*, 969 P.2d 75

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1   (Wash. 1998).

2          Instead, to the extent that these statutes and ordinances deal with enforcement issues at all,

3   they simply confirm that the City has wide discretion regarding enforcement.  *See, e.g.*, SMC

4   15.90.004 (SDOT Director "is authorized to enforce Title 15"); SMC 10.07.070 (SPU Director

5   "may abate the graffiti nuisance property").  Without a directive to take "specific corrective

6   action" (which is absent in each alleged instance), there is no "mandatory duty" to take "specific

7   action."  *See Atherton Condo.*, 799, P.2d at 265 ("plaintiff has the burden of establishing each

8   element of the exception").

9          As the Court recognized in its Order Denying Class Certification, under the failure-to-

10  enforce exception, each plaintiff must show that the City had "actual knowledge of a statutory

11  violation" at each plaintiff's location.  *See* Dkt. 96 at 24 (quoting *Ehrhart*, 195 Wn.2d at 402).  No

12  plaintiff has made any such showing.  Three of Hunters Capital's buildings—the Greenus

13  Building, the Colman Building, and the Dunn Motors Building—are well outside the CHOP

14  area—i.e., outside the area in which a breach is claimed and well outside the epicenter of CHOP,

15  making it very unlikely (and it has not been shown) that the City had "actual knowledge" of a

16  CHOP-related statutory violation occurring there, well beyond the borders of CHOP.  *Ehrhart*, 195

17  Wn.2d at 402.  The only time Madrona called the police about any activities at its one building

18  within the CHOP (12th and Pike), it was to report someone sitting on one of its tenants' stoops.  Ex.

19  41 (A. Augustine Dep. at 93:7-95:16).  Redside's managed properties for which it claims losses

20  were all outside the SPD and SFD "Red Zones" and it has identified no statutory violation at any

21  of these buildings.  The president of the Onyx HOA (Wade Biller) admitted that there was "no

22  impact to our assessments" as a result of CHOP, no reputational damage, and no other harms that

23  might have resulted from the City's alleged failure to enforce.  Ex. 17 (Biller Dep. 131:12-25).

24  Olive ST Apartments, Richmark, Sway and Cake, Bergman's, and Cure Cocktail all have failed to

25  substantiate allegations of a statutory violation at their locations.  Car Tender does not seek

26  damages related to the break-in it experienced, so even if that incident could form the basis of a

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 13
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1    statutory violation (and it does not), Car Tender could not use that violation as a basis for its

2    claimed damages—which are, in any event, related to a move that Car Tender already had planned

3    to make.  Ex. 16 (McDermott Dep. at 16:16-25; 69:6-23; Ex. 48 (Van Zandt Ex. 210).  Mr. Ploszaj

4    has not put forth any evidence of damages actually suffered, so it is impossible to assess whether

5    the City caused his nonexistent damages.  *See* Ex. 21 (Van Zandt Rebuttal Rep. at 14, ¶ 50).  And

6    Mr. Biller's alleged damages stem from an incident that occurred nearly three months after any

7    alleged acts by the City.  Even if Mr. Biller had pointed to a statutory violation by the City, the

8    incident for which he seeks damages is wholly untethered to the CHOP and the CHOP period.

9         In short, the "failure to enforce" exception has no legs.

10        **2.      The City has Discretionary Immunity.**

11        Plaintiffs' entire negligence claim fails under the doctrine of discretionary immunity.  The

12   "act[s], omission[s], or decision[s]" plaintiffs challenge (1) "necessarily involve[d] a basic

13   governmental policy, program, or objective"; (2) "[were] essential to the realization or

14   accomplishment of that policy, program, or objective as opposed to one which would not change

15   the course or direction of the policy, program, or objective"; (3) "require[d] the exercise of basic

16   policy evaluation, judgment, and expertise on the part of the governmental agency involved"; and

17   (4) were made by a "governmental agency [with] the requisite constitutional, statutory, or lawful

18   authority and duty to do or make [it]."  *Evangelical United Brethren Church v. State*, 407 P.2d

19   440, 445 (Wash. 1965) (if "questions can be clearly and unequivocally answered in the affirmative,

20   then the challenged act, omission, or decision can . . . be classified as a discretionary governmental

21   process and nontortious, regardless of its unwisdom"); *see also Fuda v. King Cnty.*, No. 74033-4-I,

22   2017 WL 4480779, at *2 (Wash. Ct. App. 2017) (unpubl.) (applying test).

23        The City was dealing with a complex, explosive situation, which required balancing the

24   interests of several groups, including the safety and security of City personnel and officers, the

25   First Amendment rights of those protesting against police violence elsewhere, and the interests of

26   City businesses and residents.  Testimony from every City official involved, including Mayor

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1   Durkan, Chief Best, Chief Scoggins, and the heads of various involved departments—e.g.,

2   Zimbabwe (SDOT), Nelson (Emergency Management), Hara (SPU)—demonstrates that the City

3   aimed at all times to de-escalate the tensions of the first week of June between the protestors and

4   police, while working to safely shrink, and thereby eventually end, the protest zone, ultimately

5   restoring the neighborhood to its regular state—a goal that was accomplished in three weeks.

6       Experts in this matter agree that the City's response was reasonably designed to de-escalate

7   tensions to a point where services could resume at normal levels. Ex. 33 (Stoughton Dep. 51:5-25)

8   (describing discussions between SPD and City leaders during the CHOP "with the ultimate goal . .

9   . being maintained of reestablishing police control of the East Precinct"). Professor Stoughton, the

10  City's police practices expert, testified that the "decision to evacuate the East Precinct was

11  reasonable, tactically appropriate, and consistent with [] generally accepted principles" of policing.

12  Ex. 33 (Stoughton Dep. 90:10-12). Plaintiffs' argument that the City should have remained in the

13  area in full force, essentially holding the line regardless of the additional injury or property

14  destruction that such tactics might have incurred is unreasonable, unsupported by relevant

15  evidence or expertise, and could have violated this Court's existing order limiting SPD's use of

16  "less-lethal" force. Ex. 34 (Shane Dep. 122:14-24); Ex. 33 (Stoughton Dep. 101:7-102:5); Ex. 3

17  (Durkan Dep. at 184:24-194:7); Ex. 6 (Mahaffey Dep. at 189:24-190:22).

18      Because of the many people in the area either protesting, observing, working, or living, the

19  City was also concerned with avoiding a massive public health emergency—aggravated by sheer

20  numbers and by the Covid-19 pandemic. The City provided port-a-potties, sanitation stations, and

21  garbage services throughout the CHOP period (while working successfully to end it in three

22  weeks). Ex. 20 (Furuto Dep. 27:4-14; 105:17-24; 107:5-14). By late June, the City determined

23  that the need to clear out the area combined with some success in shrinking the problem indicated

24  the time was right to clear Cal Anderson Park. Ex. 6 (Mahaffey Dep. 189:14-191:7); Ex. 33

25  (Stoughton Dep. 179:3-24). This strategy worked because by then the City had laid the

26  groundwork, including reducing the tensions between the police and protestors and enabling SPD

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1   to muster and train enough officers to manage clearing the area.  Ex. 33 (Stoughton Dep. 181:4-
2   22).

3          At bottom, the City's plan, and its actions, were the product of qualified analysis and
4   planning, developed by high-level City officials using their judgment and expertise.  They
5   determined how best to manage the situation, how to de-escalate a potentially explosive situation
6   around the East Precinct and to balance the safety of SPD officers, the community, and the public
7   against preserving the First Amendment rights of the protesters while achieving the goal of
8   returning the area to its pre-protest state.  *See* Ex. 33 (Stoughton Dep. 141:3-22).  The City is
9   insulated by discretionary immunity.  Plaintiffs' negligence claim fails for this reason.

10  **C.     Plaintiffs' Nuisance Claim Fails.**

11         Plaintiffs' nuisance claim is based on two allegations of wrongdoing: (1) blocked passage
12  and (2) unreasonable interference.  Dkt. 47 ¶¶ 219-21.  Neither basis is "supportable by the law"
13  because there is no evidence of City wrongdoing.  *Atherton Condo.*, 799 P.2d at 262; *see also*
14  *Hostetler v. Ward*, 704 P.2d 1193, 1204 n.15 (Wash. Ct. App. 1985) ("RCW 7.48.120 clearly
15  requires proof of wrongdoing to support an action in nuisance.").

16         Plaintiffs' claims of blocked passage fail because "[n]othing which is done or maintained
17  under the express authority of a statute, can be deemed a nuisance."  RCW 7.48.160.  Here, the
18  only blockages that occurred were within the City's streets and sidewalks.  *See* Ex. 43 (Malone
19  Dep. 260:25-262:9).  The City has the "power . . . to regulate and control the use" of "streets, . . .
20  sidewalks, . . . and other public grounds, . . . to vacate the same, . . . and to prescribe the terms and
21  conditions upon which the same may be so used, and to regulate the use thereof."  RCW
22  35.22.280(7).  It cannot be liable for nuisance based on any action (or failure to act) as to these
23  City streets, sidewalks, or public grounds.  *See, e.g.*, *State v. City of Seattle*, 242 P. 966, 969
24  (Wash. 1926) (the City's election not to replace destroyed bridge not actionable nuisance).  This
25  includes any decision by the City to "regulate and control the use" of "streets" even to the extent of
26  vacating them.

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 16
(Case No. 20-cv-00983 TSZ)

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1    Plaintiffs' entire nuisance claim also fails because it is, in substance, a negligence claim.   In

2    fact, Plaintiffs acknowledge that the state nuisance statute is one of the bases for their negligence

3    claim.  Ex. 14 at Interrog. 4 (citing RCW 7.48.140).  When nuisance is so pled, the trial court

4    "properly dismisse[s] [the] nuisance claim" and "applie[s]" the "rules of negligence." *Atherton*

5    *Condo.*, 799 P.2d at 263 (citation omitted).  "[N]uisance dependent upon negligence consists of

6    anything lawfully but so negligently or carelessly done or permitted as to create a potential and

7    unreasonable risk of harm which, in due course, results in injury to another." *Hurley v. Port*

8    *Blakely Tree Farms L.P.*, 332 P.3d 469, 478 (Wash. Ct. App. 2014) (citations omitted) (where

9    nuisance claim "duplicat[es]" negligence claim because it is "grounded in the same facts and

10   allegations as the negligence claim," nuisance claim properly dismissed).

11   Plaintiffs claim that the City's actions "<u>unreasonably</u> interfered" with their "use and

12   enjoyment of their properties" by "blocking and impeding of foot and vehicular traffic" and via

13   "excessive noise, public safety hazards, vandalism, and poor health and sanitation conditions."

14   Dkt. 47 ¶¶ 218, 222 (emphasis added).  These "contention[s] . . . [are] premised on their argument

15   that" the City "was negligent in failing to" ensure "compliance with the" law or to use due care.

16   *Atherton Condo*, 799 P.2d at 263.  But just as in *Atherton Condo*, "even if" those conditions did

17   "constitute a nuisance, the nuisance would be solely the result of" the City's alleged negligen[ce],"

18   requiring dismissal of Plaintiffs' nuisance claims. *Id.*

19   **D.    Plaintiffs' Substantive Due Process Claim Fails.**

20   The government is liable on a substantive due process claim only when it acts with

21   deliberate indifference and thereby creates or exposes the plaintiff to an actual, particularized,

22   foreseeable danger that she would not otherwise have faced. *Martinez v. City of Clovis*, 943 F.3d

23   1260, 1271 (9th Cir. 2019).  The due process clause neither "impose[s] an affirmative obligation

24   on the" government "to ensure that" the "life, liberty, and property of its citizens" do not "come to

25   harm" from third parties nor does it provide "a guarantee of certain minimal levels of safety and

26   security." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  Neither

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 17
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

"the Fourteenth Amendment" nor "§ 1983" creates a framework that would hold government "financially accountable for crimes that better policing might have prevented." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768-69 (2005).

Plaintiffs have not identified any specific "danger" that the City created.  In their complaint, plaintiffs allege that the City: (1) left barricades in the area; (2) adopted and communicated a policy of not responding to all calls for police and emergency assistance; (3) allowed protesters to use Cal Anderson Park and provided sanitation services; and (4) verbally supported protesters.  *See* Dkt. 47 ¶¶ 3, 5, 7, 9-10, 37, 112, 156, 166-67, 170, 172-75.  Plaintiffs suggest that these actions created a situation in which third parties would take action to move the City's barricades to block passageways and would commit crimes.  The allegations, even if true, meet none of the elements required to establish a state-created danger.

### 1.    The City Did Not Expose Plaintiffs to Any Actual, Particularized Danger They Did Not Otherwise Face.

In assessing plaintiffs' substantive due process claim, the Court must "examine whether the" City "left the person in a situation that was more dangerous than the one in which they found him." *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1086 (9th Cir. 2000).  Every case finding a triable claim has found that the state caused the person to be exposed to an actual and particularized danger that the person would not otherwise have faced, hence the doctrinal name "state-created danger."  In *Wood v. Ostrander*, for example, the officer stopped and impounded a car, arrested the driver, and abandoned the passenger alone and without a car in an area with "the highest violent crime rate in the county outside the City of Tacoma" and five miles from her home, leaving her vulnerable to attack.  879 F.2d 583, 590 (9th Cir. 1989).[5]

By contrast, a claim is not viable where the state did not create or expose the plaintiff to the danger and where the danger would have existed had the state never gotten involved.  In *DeShaney*, the Court found that when the state "returned [an abused boy] to his [abusive] father's

---

[5] *See also Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018) (danger: assault; action: affirmatively directed them into the crowd of protesters known to be violent); *Henry A. v. Willden*, 678 F.3d 991 (9th Cir. 2012) (danger: child abuse; action: placed child with foster parents knowing of their past abuse and neglect).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 18
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

custody, it placed him in no worse position than that in which he would have been had it not acted at all." 489 U.S. at 201. It mattered not that the boy had been under the protection of the state and the state then removed that protection. Likewise, where the City switched from a "more aggressive operation plan to a more passive one" in dealing with Mardi Gras riots, the City "did not place [the plaintiffs] in any worse position than they would have been in had the police not come up with any operational plan whatsoever." *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007). And in *Campbell v. State of Washington*, the Ninth Circuit deemed a disabled girl's drowning death was due to her "impairments [and] routine bath," not due to the state having removed the requirement of "close monitoring" during bathing from the care plan it had created for her. 671 F.3d 837, 847 (9th Cir. 2011).

Here, plaintiffs' claims are:

(1) *Allowing use of Cal Anderson Park, providing sanitation services, and verbally supporting protesters.* No plaintiff has articulated a way in which allowing use of a park, providing sanitation services during a pandemic, and verbally supporting protesters' exercise of their First Amendment rights (even if true) created an "actual, particularized danger." To the contrary, the tenants of many of the landlord plaintiffs actively supported the protests and the use of the area as a center of protest activity. For example, the Riveter (a tenant of Hunters Capital) entered into negotiations with the City to allow the City to take over its commercial lease in the Ballou Wright Building so that the City could in turn sublease the space to Black Lives Matter. *See, e.g.*, Ex. 44 (CHOP-0000718). Two out of five Board members of Plaintiff Onyx HOA disagreed with the decision to bring this lawsuit. *See* Ex. 45 (CHOP-0055420). Simply put, plaintiffs were not put in any "actual, particularized danger" by the City's decision to promote hygiene among a large group during a pandemic or support the Constitutional rights of protestors or the ideological ideals they professed.

(2) *Barricades.* The City's decision to implement a revised traffic plan directly around the East Precinct similarly did not create an actual, particularized danger. There is nothing inherently

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 19
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1    dangerous about deploying eco-blocks as part of a traffic revision plan to separate pedestrians from

2    traffic or protect the East Precinct.  To the contrary, doing so actually reduced the danger of

3    pedestrians being hit by vehicles, which happened days earlier, on June 7, 2020, in this exact

4    location.  It also facilitated the regular flow of traffic to and from businesses and residents around

5    the East Precinct.

6        (3) *Modifying police and emergency response.*  It is well-settled that the government's

7    decision not to take law enforcement action or provide emergency services does not constitute a

8    state-created danger.  As the Court held in *DeShaney*, the state is not liable where "the most that

9    can be said" is that the state "stood by and did nothing when suspicious circumstances dictated a

10   more active role."  489 U.S. at 203.[6]  None of these claims constitute a state-created danger.[7]

11        **2.    The City Could Not Foresee that Each Plaintiff Would be Harmed.**

12        Plaintiffs' substantive due process claim also fails because the specific danger that

13   allegedly caused injury to each plaintiff was not foreseeable nor was any plaintiff a foreseeable

14   victim.  Foreseeability requires that state action be directed toward a specific plaintiff or a discrete

15   class of persons—*i.e.*, differentiating the plaintiff "from the general public."  *Wood*, 879 F.2d at

16   590.  Where the "danger" a plaintiff faced was based on his "geographic locale" which was

17   "shared by the thousands of others who lived in that section of town," that "generalized,

18

19   _____

     [6] *See also Chicago v. Morales*, 527 U.S. 41 (1999) ("It is simply 'common sense that all police officers must use some

20   discretion in deciding when and where to enforce city ordinances.'" (citation omitted)); *Ketchum v. Alameda Cnty.*,
     811 F.2d 1243, 1247 (9th Cir. 1987) ("[T]here is no constitutional right to be protected by the state against being

21   murdered by criminals or madmen."); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 968 (9th Cir. 2011) ("[T]he Fourteenth
     Amendment typically 'does not impose a duty on [the state] to protect individuals from third parties.'" (citation
     omitted)).

22
     [7] Other cases arising in the wake of the George Floyd protests have confirmed the City's position.  In *White v.*

23   *Minneapolis*, the District Court of Minnesota granted the city's FRCP 12(c) motion on plaintiffs' substantive due
     process claim in part because plaintiffs failed to substantiate their allegations of a state-created danger.  2021 WL

24   5964554, at *5-*6 (D. Minn. Dec. 16, 2021) (unpubl.).  In that case, plaintiffs were a group of residents and business
     owners in an area that experienced substantial property destruction and violent protests.  The court found that the city

25   was "responding to a volatile situation and did not have sufficient time to deliberate"—absent that time, plaintiffs were
     required to prove the city "inten[ded] to harm" them and could make no such showing. *Id.* at *6.  And in another case
     arising out of CHOP and the Seattle protests, another court in this District dismissed a substantive due process claim

26   brought by the estate of a man shot and killed in the CHOP, finding that the City had not "created an actual,
     particularized danger for" *the victim*. *Sinclair v. City of Seattle*, 2021 WL 6053883, at *3 (W.D. Wa. Sep. 21, 2021)
     (unpubl.).

     CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 20
     (Case No. 20-cv-00983 TSZ)

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

amorphous zone of danger is insufficient" to support a claim under the state-created danger doctrine. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009).

Here, plaintiffs have presented no evidence that it was foreseeable that eco-blocks—the intended purpose of which is to separate cars from people in the area and control traffic—would be weaponized (in fact they were not), or that SPD's decision to temporarily relocate from the East Precinct to a staging area nearby—the intended purpose of which was to de-escalate the violent conflicts of the previous week between the police and protestors, ensure the safety of officers and protestors, and minimize the East Precinct as a target for arson—would lead to protestors claiming an "autonomous zone" in the middle of the city.

Most fundamentally, plaintiffs have no evidence to show that any individual plaintiff was a foreseeable victim. Thousands of people live in the vicinity of the park, and there are hundreds of businesses in it, meaning it has more people than many towns or smaller cities. Dkt. 65 at p. 8. Plaintiffs like Hunters Capital and Redside seek damages arising from buildings a half mile or more away from Cal Anderson Park and the East Precinct, without producing any evidence that those buildings or occupants suffered any differently from others in the general Capitol Hill neighborhood. *See* Appendix A. And they did not. This is exactly the type of very "generalized, amorphous zone of danger" that defeats the substantive due process claim.[8]

### 3.      The City did not Engage in any "Conscience Shocking" Behavior.

"To violate due process, state officials must act with such deliberate indifference to the liberty interest that their actions 'shock the conscience.'" *Tamas v. Dept. of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010) (citation omitted).[9] Deliberate indifference is "a stringent

---

[8] Plaintiffs likely will cite a June 20, 2020 email from Mayor Durkan to Chief Best and Chief Scoggins to argue that the CHOP was "foreseeable and avoidable," but the undisputed evidence is that Mayor Durkan's use of that phrase referred to what she misunderstood to be a failure by SFD to coordinate with SPD in responding to a shooting incident the morning of June 20. She wrote, "as we discussed at the outset of the Cap Hill issues, and as you told the public: there can be no part of the city were SFD and SPD do not respond. What happened this am was foreseeable and avoidable. It cannot be repeated." Ex. 23. After sending the email, Mayor Durkan learned that her initial understanding was incorrect; SFD and SPD had coordinated a response to the incident. Ex. 3 (Durkan Dep. at 65:14-67:2). The email does not create a genuine issue of material fact.

[9] *See also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (deliberate indifference "is one subset" of "shocks

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 21
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1    standard of fault" that is "even higher than gross negligence."  *Patel*, 648 F.3d at 974 (citation

2    omitted).  The plaintiff must prove that the government actor had a "culpable mental state."  *Id.*

3    Specifically, the plaintiff must prove that the "state actor" not only "recognize[d] an unreasonable

4    risk" but "actually intend[ed] to expose the plaintiff to such risks without regard to the

5    consequences to the plaintiff"; merely proving that the state actor missed an obvious risk or

6    exercised poor judgment is insufficient.  *Martinez*, 943 F.3d at 1274 (citations omitted).  Instead,

7    "the state actor must have <u>known that something was going to happen</u>, but '<u>ignored</u> the risk and

8    exposed the [plaintiff] to it anyway.'"  *Id.* (emphasis added) (citations omitted).

9             Accordingly, all federal Courts of Appeal addressing this issue have held that culpability is

10   absent where officials are compelled to balance competing interests, even if their efforts to do so

11   proved to be misguided.[10]  As the Second Circuit held in granting summary judgment against the

12   plaintiffs who claimed that federal government created a state-created danger for lying to them

13   about the dangers of working at Ground Zero:

14            In the apparent absence of harmless options at the time decisions must be made,
          <u>an attempt to choose the least of evils is not itself shocking</u>. . . . The decisions
15        alleged were made by the defendants over a period of time . . . using rapidly
          changing information about the ramifications of unprecedented events . . . .
16        Hurried or unhurried, the defendants were subjected to the 'pull of competing
          obligations.' . . . [A] poor choice made by an executive official between or among
17        the harms risked by the available options is not conscience-shocking <u>merely
          because for some persons it resulted in grave consequences that a correct decision
18        could have avoided</u>.  '[T]he touchstone of due process is protection of the
          individual against <u>arbitrary action</u> of government,' which in the substantive
19        manifestation of due process is exhibited by 'the exercise of power <u>without any
          reasonable justification</u> in the service of a legitimate governmental objective.'"
20

21   *Lombardi v. Whitman*, 485 F.3d 73, 82-85 (2d Cir. 2007) (emphasis added) (citations omitted); *see*

22   *also Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (no deliberate indifference for

23   decision "based on a rational decision making process that takes account of competing social,

24

25   the conscience" standard); *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019) ("To prevail on a
     substantive due process claim under the Fourteenth Amendment, Plaintiffs must show that an officer's conduct 'shocks
     the conscience.'" (citation omitted)).

26   [10] *E.g., Matican v. City of New York*, 524 F.3d 151, 159 (2d Cir. 2008); *Haberle v. Troxell*, 885 F.3d 170, 177-78 (3d
     Cir. 2018); *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535-36, 540 (6th Cir. 2008).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 22
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1   political, and economic forces").

2       Here, the undisputed evidence demonstrates that the City was making an effort to balance

3   several legitimate and competing objectives: (1) providing a forum for the expression of speech as

4   required by the First Amendment; (2) complying with constitutional limitations on the means

5   police could use to respond to protesters under this Court's orders[11]; (3) safely separating

6   pedestrians from vehicular traffic, especially in light of the vehicular assault that had happened on

7   June 7; (4) maintaining the safety and security of its police officers and other employees, as well as

8   City infrastructure like the East Precinct; (5) providing City services to those living and working in

9   the area; and (6) ensuring that the influx of people into the area did not create a public health

10  emergency, especially in the early stages of the pandemic.

11      The City's goal throughout was to maximize protection of everyone's interests.  It is now

12  facing lawsuits from all sides, with claims it deprived people of constitutional rights by elevating

13  one objective over another.  One lawsuit claims that the City's traffic barriers (argued here to have

14  been weaponized against Capitol Hill residents) were insufficient to protect protesters. *See* Ex. 24.

15  Another lawsuit claims the City used unlawful force in responding to criminal activity.  Ex. 25.  In

16  that case, the Court enjoined the City from taking certain action, and the City remains under a

17  consent decree in an earlier lawsuit limiting its power to act.  Exs. 26-27.

18      By contrast, Plaintiffs have no evidence that the City "actually intend[ed] to expose [any]

19  Plaintiff to [unreasonable] risks without regard to the consequences to the plaintiff," let alone

20  "kn[ew] that something was going to happen, but 'ignored the risk and exposed the [plaintiff] to it

21  anyway.'"  *Martinez*, 943 F.3d at 1274.  Plaintiffs' substantive due process claim fails.

22  **E.    Plaintiffs' Takings Claim Fails.**

23      To establish a taking, each plaintiff must demonstrate that they have a property interest that

24  must be protected, which is a question of Washington law.  *Vandevere v. Lloyd*, 644 F.3d 957, 963

25  (9th Cir. 2011).  Only after each plaintiff has done so will the Court analyze whether that right has

26

[11] *See United States v. City of Seattle*, 474 F. Supp. 3d 1181, 1185 (W.D. Wash. 2020); *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d 1206, 1211 (W.D. Wash. 2020).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 23
(Case No. 20-cv-00983 TSZ)

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1    been infringed such that a taking has occurred.  *Id.* at 963-64.

2           Plaintiffs assert two bases for their takings claim.  First, they allege that the City took their

3    properties by "provid[ing CHOP] participants with concrete barriers to use to block the streets,"

4    depriving them of "the ability to use public rights of way, including streets and sidewalks, to

5    access their homes, businesses, and properties."  Next, they allege the City took their property "by

6    affirmatively creating, assisting, endorsing, and encouraging the physical invasion of Plaintiffs'

7    private properties by CHOP participants." Dkt. 47 ¶¶ 7, 70, 205.  Neither claim is viable.

8                        **1.      Plaintiffs' Access Claim Should be Dismissed.**

9           In analyzing plaintiffs' "blocked access" claim, this Court's decisions in *Pande Cameron*

10   *and Company of Seattle, Inc. v. Central Puget Sound Regional Transit Authority*, 610 F. Supp. 2d

11   1288 (W.D. Wash. 2009), and *Kelly v. City of Port Townsend*, No. 10-cv-5508, 2011 WL 1868182

12   (W.D. Wash. May 16, 2011), are instructive.  In both cases, the Court rejected the plaintiffs'

13   claims that they had property rights in some specific access to the abutting right of way, or that any

14   such right was taken.  In *Kelly*, the Court recognized that under Washington law, "the owner of

15   property that abuts a public street or highway has an easement for access for ingress and egress to

16   and from such roadways."  2011 WL 1868182 at *5.  However, this property right has limits:

17           The right of access is not the right to the most direct, quickest, or established
18           route to the public right of way.  Rather, the property owner is entitled to modes
             of egress and ingress which makes "the premises accessible to patrons, clients,
19           customers and visitors generally with a degree of convenience and ease which in
             the circumstances are reasonable."

20   *Id.* (citation omitted); *see also Walker v. State*, 295 P.2d 328 (Wash. 1956) (no taking where

21   installation of curb required traffic to take a more circuitous route to business); *Mackie v. City of*

22   *Seattle*, 576 P.2d 414 (Wash. Ct. App. 1978) (no taking where permanent street closure required

23   plaintiff and its customers to travel seven extra blocks to reach business).

24           It also is well settled that an abutting property owner has no property right in the

25   functioning of the roadway itself under Washington law.  *Williams Place, LLC v. State ex rel.*

26   *Dept. of Transp.*, 348 P.3d 797, 807 (Wash. Ct. App. 2015) (citation omitted); *Keiffer v. King*

---

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 24
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

*Cnty.*, 572 P.2d 408, 410 (Wash. 1977) ("the right of access does not include the right to maintenance of a particular pattern or flow of traffic"); RCW 35.22.280(7) (the City has "power . . . to prescribe the terms and conditions upon which [streets and sidewalks] may be so used").  As this Court has recognized, "closed or blocked lanes of travel" do not implicate "property interests" of abutting owners because they "constituted intermittent inconveniences and annoyances" that "were related to 'regulating the flow of traffic on the public way.'"  *Pande Cameron*, 610 F. Supp. 2d at 1303-04 & n.2 (quoting *Walker*, 348 P.3d 797; *Keiffer*, 572 P.2d 408).

These principles are critical to understanding and analyzing plaintiffs' claims.  Plaintiffs' claims are based on the alleged use of barricades to block the streets, not on plaintiffs' ability to access those streets from abutting property.  Dkt. 47 ¶¶ 7,70.  But, as the City noted, most plaintiffs were not even located within the areas where the barriers were being utilized.  *See* Appendix A; Ex. 13; *see also* Ex. 12.  And even those who were located within the traffic-controlled areas have no property interest in the City's traffic decisions.

There is no evidence that the City blocked access to each of plaintiff's specific properties.  To the contrary, nearly every plaintiff has expressly conceded that it had access to and from its property from June 8 through July 1.  Ex. 28 (Thompson Dep. at 77:4-14) (Bergman's "was not blocked off in front of your door; is that right?" A: "No, it was not."); Ex. 29 (Sheffer Dep. at 193:18-22) ("Between June and July 1st of 2020, were there any instances where access to Nagle Street location was physically blocked? A: "No."); Ex. 17 (Onyx/Biller Dep. at 29:4-12) (confirming that the Onyx Building's parking garage was never blocked); Ex. 30 (Donner Dep. at 53:13-55:5) (acknowledging access to Richmark Label's parking lot on 11th throughout June); Ex. 31 (Kilburn Dep. at 103:12-19) (front door opened on Pike, which was never blocked); Ex. 7 (Ploszaj Dep. at 146:5-15) (barriers impacted access to the area generally; not specifically to his residence); Ex. 32 (Wanagel Dep. at 98:14-25) (no permanent or semi-permanent blockages; only the occasional garbage bin that needed to be moved); Ex. 41 (A. Augustine Dep. at 67:13-68:2; 70:17-71:2; 91:13-96:25; 127:4-7) (no barriers blocking entrances to any of the Madrona entities

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1   three buildings).

2        Moreover, several properties are well outside the traffic-controlled areas.  *See* Appendix A;

3   Ex. 13.  There is no evidence that access to any of these Plaintiffs' buildings was ever blocked.

4   This includes the following Hunters Capital's buildings: (a) Dunn Motors (.5 miles from the East

5   Precinct); (b) Greenus (.5 miles from the East Precinct); and (c) Colman (.5 miles from the East

6   Precinct).  *See* Ex. 43 (Malone Dep. at 168:19-169:18).  All the Redside-managed buildings at

7   issue are outside the traffic modification area, as are the entrances to all three of the Madrona

8   plaintiffs' buildings.  *See* Appendix A; Ex. 12; Ex. 49; Dkt. 47, ¶¶ 22-25.

9        And even if a plaintiff could come forward with evidence that their access was temporarily

10  affected, that does not suffice to create a taking.  In fact, the Court in *Pande Cameron* rejected this

11  exact claim.  610 F. Supp. 2d at 1304 ("[I]ntermittent inconveniences and annoyances that were

12  incidental to the [construction activity], were related to 'regulating the flow of traffic on the public

13  way,' and do not rise to the level of a constitutional taking.").  No plaintiff has provided evidence

14  that its access was ever blocked, and certainly not to a degree that substantially impaired such

15  access.  Plaintiffs' blocked access takings theory should be rejected.[12]

16        **2.     Plaintiffs' *Per Se* Physical Takings Claim Fails.**[13]

17        Plaintiffs' second, and final, takings argument is that the City committed a *per se* taking by

18  enabling third party protestors to "occupy" plaintiffs' properties.  Dkt. 47 ¶ 205; Dkt. 65 at p. 26.

19  It is well settled that, "there clearly can be no taking when whatever acts complained of are those

20  of private parties, not the government."  *Alves v. U.S.*, 133 F.3d 1.454, 1458 (Fed. Cir. 1998).

21        Here, plaintiffs do not claim that the City itself "occupied" their properties.  Instead, they

22  base their claim solely on the supposed occupation of their property by third parties acting with the

23

24  ――――――――――――――――
    [12]  Many of the plaintiffs are lessees or condominium owners. Ex. 29 (Shuffle Dep. at 32:2-5); Ex. 28 (Bergman's
    Dep. at 13:24-14:1); Ex. 16(McDermott Dep. at 48:11-25); Ex. 7 (Ploszaj Dep. at 67:9-16).  And Plaintiff Wade Biller
25  owns a single condo unit in the Onyx building. Dkt. 65 at p. 21.  As none of these plaintiffs owns property "that abuts
    a public street," they have not established how their leases or condominium documents grant them the right to pursue
26  their Takings claims under *Keiffer* and *Pande Cameron*.

    [13]  Plaintiffs do not allege, nor have they come forward with, evidence demonstrating a *Penn Central* regulatory taking.
    *See* Dkt. 47 ¶¶ 203-08; Dkt. 65 at p. 26 (advancing only a *per se* takings claim).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 26
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1   "assistance" of the City.  But plaintiffs have come forward with no evidence establishing that the

2   City provided such assistance.  Plaintiffs' reliance on cases like *Cedar Point Nursery v. Hassid*,

3   141 S. Ct. 2063, 2072-76 (2021) (*see* Dkt. 65 at 19), is misplaced.  These cases involve actions by

4   the government to force a property owner to permit the third party's occupation.  In *Cedar Point*,

5   for example, the Supreme Court held that a *per se* taking occurred where California's "regulation

6   grants union organizers a right to physically enter and occupy the growers' land for three hours per

7   day, 120 days per year."  *Id.* at 2072; *see also Loretto v. Teleprompter Manhattan CATV Corp.*,

8   458 U.S. 419, 421 (1982) (taking occurred where New York passed law *requiring* landlord to

9   permit third party cable company to install a cable facility on property).

10          Where the government has not required that the property owner allow a third party to

11   occupy its property, no taking has occurred.  As the Supreme Court recognized in *F.C.C. v.*

12   *Florida Power Corp.*, "[t]his element of required acquiescence is at the heart of the concept of

13   occupation."  480 U.S. 245, 252 (1987).  "The government effects a physical taking only where it

14   *requires* the landowner to submit to the physical occupation of his land."  *Yee v. City of Escondido,*

15   *Cal.*, 503 U.S. 519, 527 (1992).

16          No plaintiff has presented evidence that would meet their burden of demonstrating that (1)

17   any third parties actually invaded and occupied their properties, or that (2) any such occupation

18   that did occur was compelled by the City.  Plaintiffs' takings claim should be dismissed.

19   **F.      Plaintiffs' Procedural Due Process Claim Fails.**

20          Plaintiffs' procedural due process claims fail because the conduct plaintiffs challenge is not

21   "the type of government action to which due process applies."  *Harris v. Cnty. of Riverside*, 904

22   F.2d 497, 501 (9th Cir. 1990).  "[G]overnmental decisions which affect large areas and are not

23   directed at one or a few individuals do not give rise to the constitutional procedural due process

24   requirements of individualized notice and hearing."  *Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1261

25   (9th Cir. 1994); *accord Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)

26   ("Where a rule of conduct applies to more than a few people, it is impracticable that everyone

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 27
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

1  should have a direct voice in its adoption").  This is true no matter whether the government acts by

2  way of legislation or by way of agency or executive action: so long as the action is prescriptive

3  (*i.e.*, "for the purpose of promulgating policy-type rules or standards") as opposed to adjudicative

4  (*i.e.*, "designed to adjudicate facts in particular cases") and did not target an individual, no process

5  is due.  *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973).  Thus, in *Florida East*

6  *Coast Railway*, no process was due where agency action was applicable "across the board [to] all

7  common carriers" and "[n]o effort was made to single out any particular railroad for special

8  consideration based on its own peculiar circumstances." *Id*. at 246.[14]

9          None of the City's policies or actions was targeted at plaintiffs specifically.  Every policy

10 implemented by the City was applied generally to everyone in the area.  *See, e.g.*, Ex. 6 (Mahaffey

11 Dep. at 101:15-102:15).  Plaintiffs' procedural due process claim should be dismissed.

12         Further, where a procedural due process claim is based on the same alleged interference

13 with their property rights that plaintiffs argue is a taking, it should be dismissed as superfluous.

14 *Monarch Ins. Co. of Ohio v. District of Columbia*, 353 F. Supp. 1249, 1252-53 (D.D.C. 1973).

15 Plaintiffs' pursuit of a takings claim in this action demonstrates that "there is established procedure

16 for seeking just compensation" and that plaintiffs "have this forum and a recognized cause of

17 action that may now be asserted before this Court to provide remedy for precisely this alleged

18 taking" of their property.  *Chompupong v. City of Schenectady*, No. 17-cv-929, 2019 WL 3321874,

19 *11 (N.D.N.Y. July 24, 2019).  Plaintiffs' due process claim is duplicative of its takings claim and

20 should be dismissed for this reason as well.

21 **G.    The City's Actions Did Not Proximately Cause Plaintiffs' Alleged Harms.**

22         Even if plaintiffs could demonstrate a breach by the City, no plaintiff can demonstrate that

23 such a breach proximately caused any claimed injury.  Plaintiffs failed even to demonstrate that

24

25 [14] *See Hartman v. Acton*, No. 20-1952, 2020 WL 1932896, *8 (S.D. Ohio Apr. 21, 2020) (no process due before State
26 issued "Order directing non-essential businesses to cease operating their physical locations;" it was "not a decision
   targeting an individual or single business"); *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 596-
   97 (6th Cir. 2003) (no process was due before library required shoe wearing because "[g]overnmental determinations
   of a general nature that affect all equally do not give rise to a due process right to be heard" (citation omitted)).

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 28
(Case No. 20-cv-00983 TSZ)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

CHOP itself was the "but-for" cause of their alleged damages, let alone that the City's *response* to protest activity before and during CHOP was the proximate cause of their claimed losses.  The City is entitled to summary judgment because "reasonable minds could not differ" as to the lack of proximate cause.  *Smith v. Preston Gates Ellis, LLP*, 135 Wash. App. 859, 864 (1st Div. 2006).

Each plaintiff's claimed damages are below:

| Plaintiff Name | Total Claimed Damages |
|---|---|
| Hunters Capital, LLC<br>Hunters Property Holdings, LLC<br>Greenus Building, Inc. | $2,917,724 |
| Madrona Real Estate Investors IV, LLC<br>Madrona Real Estate Investors VI, LLC<br>12th and Pike Associates LLC<br>Madrona Real Estate Services | $58,214<br>(minus amounts claimed due to Unicorn and Old School Frozen Custard) |
| Olive St. Apartments LLC | $24,046 |
| Redside Partners LLC | $1,818 |
| Onyx Homeowners Association | $9,366 |
| Richmark Label | $89,738 |
| Sway and Cake LLC | $1,543 |
| Shuffle LLC (d/b/a Cure Cocktail) | $11,464 |
| Bergman's Lock and Key Services LLC | $800 |
| SRJ Enterprises, d/b/a Car Tender | $62,123 |
| Wade Biller | $356 |
| Matthew Ploszaj | $50,000 |

To support their theory that the City's actions caused these damages, plaintiffs produced the expert testimony and report of Arik Van Zandt.  But Van Zandt failed to account for the impact of Covid, opting instead to apply an arbitrary multiplier to assume certain Covid impacts.  For example, with respect to vacancies in Hunters Capital's buildings, Van Zandt first asked Hunters Capital how long it estimated that a certain unit would remain vacant.  If Hunters Capital estimated that a newly vacated unit would have been vacant for four months, then Van Zandt assumed "due to the impacts of Covid" that "the vacancy would actually be six months"—i.e., he applied "a 50 percent increase" to Hunters Capital's self-serving vacancy estimate to account for Covid.  Ex. 35 (Van Zandt Dep. 33:2-10).  Van Zandt further assumed that market rental rates were entirely unaffected by Covid, based solely on a quarterly Collier's promotional brochure of the market in

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

Q4 of 2021.  Accordingly, if a plaintiff re-leased vacant space at a lower rental rate, Van Zandt attributed the change in rental rate solely to CHOP—not Covid.  Ex. 35 (Van Zandt Dep. 49:17-50:7).  Van Zandt did not perform any independent market research regarding commercial or residential real estate in the Capitol Hill area; he did not assess market fluctuations for restaurants, retail shops, and other businesses during 2020; and he did not review the voluminous email exchanges between Hunters Capital and its tenants verifying numerous rent reductions given by Hunters to its tenants solely due to the adverse impacts of Covid on the tenants' businesses.  Van Zandt's superficial assessment does not substantiate plaintiffs' allegations that the City's response to CHOP was the "but-for" cause of plaintiff's alleged damages.

### 1.     Commercial Losses.

Several of Hunters Capital's commercial tenants sought rent relief in March 2020 amid store closures and lockdown orders issued by Governor Inslee.  Ex. 36 (CHOP-0027040) (Gamestop seeking relief in March 2020 given the "the devastating effect COVID-19 is having on our business"); Ex. 37 (CHOP-0014726) (White Rabbit owner complaining July 17, 2020 that "[the office] really just sitting and with the spike again this could go on until the end of the year"); Ex. 38 (CHOP-0004594) (tenant unable to pay rent in April 2020); Ex. 39 (Riveter announcing store closure on May 29, 2020—prior to CHOP's formation); Ex. 40 (CHOP-0012168) (restaurant tenant seeking rent abatement due to Covid-19).  Van Zandt opines that, even if these commercial spaces were vacated because of Covid, Hunters Capital was unable to find new tenants because of CHOP—but he does not explain why Covid would not have had the identical effect on prospective new tenants, nor does he offer any basis for his opinion.  Madrona claims commercial losses due to CHOP but without support.

Madrona has acknowledged that Van Zandt's analysis does not support its claim and has recently withdrawn its claims for lost rent from the Unicorn Bar and Old School Frozen Custard. Ex. 41 (A. Augustine Dep. 37:5-10; 171:22-173:12).  The commercial landlord plaintiffs have utterly failed to provide evidence, much less credible evidence, that City conduct caused their

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

losses, entitling the City to summary judgment.  *Accord Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wash. App. 675, 683 (3d Div. 2008) (granting summary judgment in defendant's favor after plaintiff failed to present evidence to support proximate causation claim).

### 2.      Residential Losses.

With respect to the claimed residential losses of Hunters Capital, Redside, and Olive Street Apartments, Van Zandt made no attempt to perform a tenant-by-tenant analysis to determine why plaintiffs' residential tenants terminated their leases or declined to renew.  That is, he has provided no basis for determining whether CHOP, Covid, or some other factor prompted these tenants to move out or to seek rent relief.  In short, plaintiffs have provided no evidence that would even support, much less compel, a conclusion that their residential losses were caused by the City.  Absent such evidence, the City is entitled to summary judgment.

### 3.      Lost Profits.

Those plaintiffs seeking damages for lost profits—Richmark, Shuffle, Bergman's, Sway and Cake, and Car Tender—have produced nothing to connect their losses to City actions and the facts belie any such claim.  Richmark seeks damages related to a single-day business closure during CHOP.  The fact that Richmark remained open for business every other day during the CHOP means that the closure was not caused by the City's response to protests, but rather the City's efforts to clear CHOP.  Richmark cannot claim it was damaged by the City doing exactly what Richmark was requesting it do.  Both Cure Cocktail and Car Tender were experiencing revenue losses prior to CHOP.  In fact, in June 2020 Cure's revenues reached pre-Covid levels.  *See* Ex. 42 (Partin Rebuttal Rep. at 120).  This increase occurred despite the fact that the City's allegedly damage-inducing acts occurred during the month of June.

Car Tender claims lost profits as well as damages related to a need to move from Capitol Hill to Shoreline allegedly because of CHOP.  Yet, Car Tender was planning to leave well before CHOP began.  Ex. 16 (McDermott Dep. 65:23-66:15).  Sway and Cake claimed that it was forced to delay its reopening due to CHOP but has produced no evidence to support its claim.  Bergman's,

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

will be unable to prove that its claimed damages—for the cost of boarding up its storefront—resulted from the City's actions rather than as a preemptive response to pre-CHOP protest activity in the area.

### 4.      Criminal Acts by Third Parties are Intervening Causes and Cut-Off Liability.

A party is only liable in negligence where its actions are the proximate and legal cause of the plaintiffs' injuries. *Kim v. Budget Rent a Car Systems*, 143 Wn.2d 190 (2001); *see also Washburn v. City of Federal Way*, 178 Wn.2d 732, 761 (2013).  Criminal acts of third parties are intervening causes that cut off proximate cause where they lead to injuries that are "not a part of the natural and continuous sequence of events which flowed from" the defendant's acts. *Id.*  In *Kim,* a thief stole a car from Budget's office, where it had been left with a key inside, and later drove drunk and injured Kim.  The Washington Supreme Court held that the car theft by a third party criminal cut off proximate causation, and that legal causation was lacking due to the remoteness of time between the keys being left in the car and plaintiff being injured the next day.

Plaintiffs have come forward with no evidence demonstrating that it was foreseeable that the City's actions in June 2020 would lead to criminals committing crimes against Plaintiffs' specific properties in June or thereafter.  This is especially true for the period after the CHOP was cleared on July 1 and SPD moved back into the precinct.  It was not foreseeable to the City that third party criminals would vandalize buildings in and around the East Precinct after the police had re-established their position there and had begun operating in the same capacity it had prior to CHOP.  It was similarly not foreseeable (and there is no evidence to show) that the existence of the CHOP in June of 2020 would lead to Biller would be attacked by a woman carrying a machete in early September 2020. Ex. 17 (Biller Dep. 134:4-9).  Injuries arising from these post-June crimes are also too remote in time for legal causation to attach.

Plaintiffs cannot prove causation as to any of their claims.  They should be dismissed.

### IV.      CONCLUSION

For the foregoing reasons, the City requests that the Court grant its motion.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

**PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT**

1    DATED this 29th day of September, 2022.

2    ANN DAVISON                          HARRIGAN LEYH FARMER & THOMSEN LLP
     Seattle City Attorney

3

4    By:  *s/ Joseph Groshong*            By:  *s/ Arthur W. Harrigan, Jr.*
         Joseph Groshong, WSBA #41593     By:  *s/ Tyler L. Farmer*
5        Assistant City Attorney          By:  *s/ Shane P. Cramer*
         Seattle City Attorney's Office   By:  *s/ Erica Iverson*
6        701 Fifth Avenue, Suite 2050         Arthur W. Harrigan, Jr., WSBA #1751
         Seattle, WA 98104                    Tyler L. Farmer, WSBA #39912
7        Tel:  (206) 684-8200                 Shane P. Cramer, WSBA #35099
8        Joseph.Groshong@seattle.gov          Erica Iverson, *Pro Hac Vice*
                                              999 Third Avenue, Suite 4400
9                                             Seattle, WA 98104
                                              Tel:  (206) 623-1700
10                                            arthurh@harriganleyh.com
                                              tylerf@harriganleyh.com
11                                            shanec@harriganleyh.com
                                              ericai@harriganleyh.com
12

13                                  *Attorneys for the City of Seattle*

14

15

16

17

18

19

20

21

22

23

24

25

26

CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT - 33
(Case No. 20-cv-00983 TSZ)

PRIVILEGED ATTORNEY CLIENT COMMUNICATION / WORK PRODUCT

# APPENDIX A



**Red Zone and Barriers (June 10-17, 2020)**

1. Redside: Towne Apartments
2. HC: The Ballou Wright Building
3. HC: The Pike Building
4. Redside: 1410 Belmont Apartments
5. Redside: Belboy Apartments
6. Olive Street Apartments
7. Onyx HOA/Wade Biller
8. Matthew Ploszaj
9. Redside: Melmar Apartments (OFF MAP)
10. Richmark Label
11. Madrona (12th and Pike)/Sway and Cake
12. Redside: Crest on Belmont
13. Bergman's Lock and Key Services
14. HC: The Broadway Building/Cure Cocktail
15. HC: The 900 Pine Building
16. Redside: 1715 12th Ave
17. 1718 Summit Apartments
18. SRJ Enterprises DBA Car Tender
19. HC: The Dunn Motors Building
20. HC: The Greenus Building
21. HC: The Colman Building
22. Madrona Real Estate Investors VI
23. Madrona Investors IV/Madrona RES
24. Redside: La Rochelle Apartments
25. Redside: Capitol Ridge Apartments