# EXHIBIT 6

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiff,             )
                               )
    vs.                        )  No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
        Defendant.             )

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION

UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(THOMAS MAHAFFEY)

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  JANUARY 26, 2022
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

## Page 2

A P P E A R A N C E S

FOR PLAINTIFF:

    TYLER S. WEAVER
    Calfo Eakes LLP
    1301 Second Avenue
    Suite 2800
    Seattle, WA 98101-3808
    206.407.2237
    tylerw@calfoeakes.com

FOR DEFENDANT:

    SHANE P. CRAMER
    ARTHUR W. HARRIGAN, JR.
    Harrigan Leyh Farmer & Thomsen LLP
    999 Third Avenue
    Suite 4400
    Seattle, WA 98104
    206.623.1700
    shanec@harriganleyh.com
    arthurh@harriganleyh.com

    JOSEPH G. GROSHONG
    Seattle City Attorney's Office
    701 5th Avenue
    Suite 2050
    Seattle, WA 98104-7095
    206.684.8200
    joseph.groshong@seattle.gov

ALSO PRESENT:  LINDSAY HITCHCOCK, videographer
               Buell Realtime Reporting, LLC

                * * * * *

## Page 3

DEPOSITION OF THOMAS MAHAFFEY
EXAMINATION INDEX

EXAMINATION BY:                              PAGE
30(b)(6) Examination by Mr. Weaver            6
Non-30(b)(6) Examination by Mr. Weaver       73

EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION                  PAGE
Exhibit 1  Amended Notice of Videotaped       8
    Deposition Pursuant to FRCP
    30(b)(6) to City of Seattle
Exhibit 2  Email with attachment;            10
    SEA-SPD_005983-984

Exhibit 3  June 29 Events Incident Action    25
    Plan; SEA_00007766-787
Exhibit 4  June 24 Events Incident Action    32
    Plan; SEA-SPD_007528-550 (CONFIDENTIAL)

Exhibit 5  Email chain; SEA_00020853-858     33

Exhibit 6  Email; SEA_00022828-830           41

Exhibit 7  Seattle PD SuperForm; SEA_00156958-  45
    960
Exhibit 8  Email; SEA_00000868-869           49
Exhibit 9  Printout of details related to    49
    Exhibit 8

Exhibit 10  Excel spreadsheet                51

Exhibit 11  Email chain; SEA_00023588-589    58

Exhibit 12  Executive Order 2020-08;         63
    SEA_00045264-268

## Page 4

EXHIBIT INDEX (Continuing)
EXHIBITS FOR IDENTIFICATION                   PAGE
Exhibit 13  Email; SEA_00036004-005          119
Exhibit 14  Email, July 4 Events Incident    156
    Action Plan; SEA_00007505-545

Exhibit 15  Email chain; SEA-SPD_006803-804  167

Exhibit 16  Email chain; SEA_00028176-177    170

Exhibit 17  Email containing Executive Order 184
    2020-08; SEA_00019316-319
Exhibit 18  Email chain; SEA_00021402-404    185

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 9

1     Q.  Okay.  Is there anything else you understand
2  that you've been designated for, other than those
3  topics?
4     A.  No.  To the best of my understanding, those are
5  what I've been designated to talk about.
6        MR. CRAMER:  And, Tyler, let me clarify
7  something.
8        MR. WEAVER:  Go ahead.
9        MR. CRAMER:  For 36, it's Subsection iii, as
10 that relates to SPD, which I think was probably obvious
11 and what you meant.  We've also designated the chief for
12 37, and specifically each of the subtopics, but
13 primarily Subsection iv.
14       MR. WEAVER:  Okay.  All right.
15       MR. CRAMER:  And that's the extent of it.
16 And I think that covers the topics that you wanted to
17 pursue at this point in the litigation with the City.
18       MR. WEAVER:  Thanks, Shane.  That helps.
19 BY MR. WEAVER:
20    Q.  So I'm going to try to keep this first part,
21 just for subject of -- sake of clarity, to the 30(b)(6)
22 topics.  And can you -- I -- for the purpose -- let's
23 also set this for the purposes of the deposition, just
24 so that we're clear going forward and for the -- for the
25 transcript and the record.

Page 10

1        What is your understanding of the term "CHOP"
2  as it relates to this case?
3        MR. CRAMER:  Objection.  Form.
4     A.  Well, it's an acronym that I understand to mean
5  Capitol Hill -- I think is it occupied protest?  I think
6  then zone was often found on the end of that.  That's
7  what I relate to it as.
8  BY MR. WEAVER:
9     Q.  Let me just go down a different -- a different
10 route.
11       So in June of 2020, you were the -- you were
12 the assistant chief in charge of the patrol operations;
13 is that correct?
14    A.  That's correct.
15    Q.  Do you recall a point at which the
16 Seattle Police Department modified its 911 response
17 procedures within an area on Capitol Hill, roughly
18 around the area of Cal Anderson Park and the East
19 Precinct?
20    A.  I guess I'd ask what you mean by "modified."
21       MR. WEAVER:  Okay.  Let me pull up a
22 document so that we can get on track here.  Bear with
23 me.  My apologies.  I'm having a bit of technical
24 difficulties here.
25       (Exhibit No. 2 marked.)

Page 11

1  BY MR. WEAVER:
2     Q.  Okay.  You should have something that's coming
3  up in the ex- -- that's coming up in the chat that's
4  marked Exhibit 2.  Let me know when you've got it up.
5     A.  I have it.
6     Q.  Okay.  So do you recognize this document?
7     A.  Yes, I do.
8     Q.  Okay.  So was this a policy that you announced
9  for the police department on June 12, 2020?
10    A.  I wouldn't have characterized it as a policy.
11 It was just some direction given to officers.
12    Q.  Okay.  This was a direction you gave to
13 officers in the police department on June 12, 2020; is
14 that right?
15    A.  Yes, that's correct.  That's the date it was
16 sent out.
17    Q.  Okay.  Do -- was -- and was this a modification
18 of -- from -- was this different than the normal
19 operating procedures within the area of Capitol Hill?
20    A.  Yes.  Based on the circumstances we were
21 facing, I felt it was necessary to give some guidance to
22 officers.
23    Q.  What do you mean by the circumstances that you
24 were facing?
25    A.  There had been significant protests for the

Page 12

1  week prior to this.  Now we have an area that has some
2  barricades placed around it.  We're no longer in our
3  precinct.  We had seen, and reports of, armed people at
4  this barricade.
5        We'd actually had a lieutenant and a sergeant
6  that were confronted by armed people early -- earlier in
7  the week as well.  So based on all that was going on,
8  some guidance was required for responses in the area to
9  keep officers and the public safe.
10    Q.  So let me ask you about -- first of all, what's
11 the Edward Sector?
12    A.  That is one of our patrol sectors.  Each
13 precinct is divided into sectors.  Edward Sector is in
14 the East Precinct, and the area generally covers in --
15 the neighborhood we call Capitol Hill.
16    Q.  Okay.  And let me ask you, on this document --
17 first of all, did you -- who's Jason Verhoff?
18    A.  He is a lieutenant on the Seattle Police
19 Department.
20    Q.  And had you written this out for Mr. Verhoff,
21 or had you dictated it to him to be sent out?
22    A.  I don't recall specifically.  So he was part of
23 the group -- command group in our operations center.
24 And as we're recognizing, then formulating plans to deal
25 with issues that come up, that was one of his

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 13

```
 1   responsibilities, so he came up with this document.  He
 2   may have come up with the verbiage, along with some
 3   other commanders -- I don't specifically remember how --
 4   and then it was disseminated.
 5       Q.  Was this consistent with the directive that you
 6   had given him and the other officers?
 7       A.  Sorry.  I'm -- a directive to write this
 8   document?
 9       Q.  Yes.
10       A.  So it was really -- we had a larger planning
11   group there, so it's -- it wasn't just directed from me.
12   So we would have a discussion about what are the
13   circumstances we're facing, what do we have to respond
14   to, and then what are the plans that we put in place to
15   effect that response.
16       So it was collaborative, but I was the incident
17   commander, so I ultimately had the final say on these
18   things when they went out.
19       Q.  Okay.  Who was part of the planning group that
20   you were discussing?
21       A.  There was a lot of people involved.  I mean, a
22   lot of people rotating through, but Lieutenant Verhoff I
23   remember was there, I believe, Captain Grenon was one of
24   the leads, Captain Grossman, Lieutenant Barden.  But we
25   were running the operation 24 hours a day, so we had
```

Page 14

```
 1   shifts of command people coming through, so there was a
 2   lot of people involved.
 3       Q.  Do you -- was Chief Best involved in the
 4   discussions regarding this new directive?
 5       A.  At some point she was.  I don't specifically
 6   remember on the 12th when that may have occurred.
 7       Q.  Okay.  Were the discussions that we talked
 8   about on the 12th, or did they happen before the 12th?
 9       A.  I don't recall specifically when they happened.
10   It appears the 12th is when the written guidance came
11   out.
12       Q.  Had there been guidance that wasn't written
13   prior to the 12th?
14       A.  If there was, I don't recall.
15       Q.  Prior to -- so as I understand it, the police
16   department evacuated personnel from the -- the East
17   Precinct on the evening or afternoon of June 8, 2020; is
18   that correct?
19       A.  June 8th, yes, correct.
20       Q.  So between June 8th and June 12th, do you know
21   what the practice was with regard to responding to 911
22   calls in the Edward Sector?
23       A.  Really, our best recollection is, we were
24   trying to find exactly what was going on and how it was
25   going to impact our responses.  But as I said before, I
```

Page 15

```
 1   don't recall any specific guidance that was given,
 2   just -- this was a situation we'd never faced before, so
 3   I think we were trying to determine appropriate
 4   guidelines as responses as we're going on, based on what
 5   was occurring on the ground.
 6       Q.  You mentioned armed people at some barricades.
 7   Can you describe to me a little bit more about what you
 8   meant about armed people?
 9           MR. CRAMER:  Objection.  Form.
10       A.  Yeah, I meant -- specifically, I recall early
11   on, we're talking about the first days particular stand
12   out in my mind of June 8th, of the event was being
13   livestreamed on video that I and others were watching in
14   our operations center, and they showed people armed with
15   assault weapons on the first night, the 8th, at certain
16   intersections.
17           Then the following morning, I got a briefing
18   from Captain Sano and Sergeant Geoghagan about walking
19   back to the precinct, trying to determine what the
20   situation was, and they were -- had conversation with
21   several people that were armed with handguns.
22   BY MR. WEAVER:
23       Q.  And you mentioned the operations center.  Where
24   is the operations center located?
25       A.  It's located in the West Precinct, which is in
```

Page 16

```
 1   downtown Seattle, around 8th Avenue and Virginia Street.
 2       Q.  And what live feeds were you watching?
 3       A.  They were open source social media feeds.  I
 4   don't know exactly what -- which platform they were
 5   using, but it was livestream broadcast on social media.
 6       Q.  Okay.  So these would have been feeds of
 7   individuals that -- who were at the scene who were
 8   broadcasting it live over the internet?
 9           MR. CRAMER:  Objection.  Form.  Foundation.
10       A.  That would be my understanding of what was
11   happening, yes.
12   BY MR. WEAVER:
13       Q.  So these were not official police feeds of any
14   sort; is that right?
15       A.  Correct.
16       Q.  Going back to Exhibit 2, I'd like to ask you
17   some questions about the paragraph that is -- that
18   starts with "Red zone," and it has that in bold.
19       Do you see that?
20       A.  I do.
21       Q.  Okay.  So red zone a term that's often used
22   within the Seattle Police Department?  Does it have a
23   particular technical usage?
24           MR. CRAMER:  Objection.  Form.
25       A.  No.  This is the first I'm aware of it being
```

4 (Pages 13 to 16)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 21

1  reporter. I'm sorry. Did you say that that didn't involve a
2  firearm?
3         MR. WEAVER: Didn't involve a firearm, yep.
4         THE COURT REPORTER: Okay. Thank you.
5         MR. WEAVER: Same -- I'm.
6     A. In the context of this, no. And again, I would
7  want the officers to not not respond, to consider a plan
8  before responding to that type of event, based on all
9  the factors that they had to deal with during this time.
10  BY MR. WEAVER:
11     Q. How about kidnapping? Would that be a mass
12  casualty event?
13         MR. CRAMER: Same objection.
14     A. No. But again, it would not be something we
15  wouldn't respond to. We'd just want to have a
16  considered and thoughtful response to it.
17  BY MR. WEAVER:
18     Q. How about a firing of a weapon where nobody was
19  hit? Would that be a mass casualty event?
20         MR. CRAMER: Same objection.
21     A. No, it wouldn't.
22  BY MR. WEAVER:
23     Q. How about property damage? Would that be a
24  mass casualty event?
25         MR. CRAMER: Form.

Page 22

1     A. Property destruction, no. Not unless it was
2  putting somebody's -- or many people's lives in danger
3  potentially.
4  BY MR. WEAVER:
5     Q. Okay. How about fires that were not structural
6  fires? Would those be considered a mass casualty event?
7         MR. CRAMER: Same objection.
8     A. Potentially, if it was endangering or -- a
9  significant amount of lives, if there were injuries
10  associated with it, potentially, yes.
11  BY MR. WEAVER:
12     Q. Okay. How about a loud disagreement involving
13  a large group of individuals carrying rifles, but not
14  firing them? Would that be considered a mass casualty
15  event?
16         MR. CRAMER: Objection. Form.
17     A. No. But again, it would still require
18  consideration of how we're going to respond to that,
19  based on what the dynamics of the situation were and
20  what we were learning about it.
21  BY MR. WEAVER:
22     Q. So I'd like to ask you about the next sentence
23  in red zone. If responding to a mass casualty event --
24  incident, sorry -- within the red zone, all responding
25  officers should muster with a supervisor outside that

Page 23

1  zone to evaluate the feasibility of a police response
2  and develop a plan.
3         Do you see that?
4     A. Yes.
5     Q. Okay. So was the plan that when the police
6  department learned of a mass casualty event within the
7  red zone, that there would be -- rather than responding
8  immediately to that call, there would be a gathering of
9  police outside the red zone to discuss whether it was
10  feasible to enter the red zone?
11         MR. CRAMER: Objection. Form.
12     A. Is that discussion whether it's feasible, then
13  to form the response? Could the officers do it with the
14  resources they had there? Did they need more
15  assistance, additional resources? Again, just being
16  thoughtful as to ensure both their safety and the
17  public's safety, which is our critical role.
18  BY MR. WEAVER:
19     Q. So during that period of June 8th to June 30th,
20  was there a particular staging area that the police
21  department was using for this sort of activity?
22     A. No. It was incident dependent on where it was
23  happening, but I think our protocols and the way we
24  train are to determine a staging area that makes it both
25  safe to respond to the event and muster resources as

Page 24

1  well. So it can be fluid.
2     Q. So I think you indicated that you -- you think
3  that this directive changed or was clarified later in
4  the month of June 2020. Is that what I understood you
5  to say?
6         MR. CRAMER: Objection. Form.
7     A. My recollection, I think the wording of -- of
8  mass casualty event was changed to more directly reflect
9  the goals that we were trying to achieve with this.
10  BY MR. WEAVER:
11     Q. What were the goals that you were trying to
12  achieve?
13     A. To respond to events within the red zone, but
14  to do it in a way that ensured that our officers could
15  do so safely, without inflaming any of the groups or
16  factions that were inside the red zone that were opposed
17  to any type of police presence within the area. That
18  had to be a consideration that we -- that we took in,
19  so...
20     Q. Were you concerned that there would be violence
21  that would impact the safety of officers if you
22  responded within the red zone?
23     A. Yes, that was a concern.
24     Q. And what was that -- what was that concern
25  based on?

6 (Pages 21 to 24)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Page 25

1    A.  Everything we went through from probably about
2    May 29th through June 7th:  the nightly protests,
3    assaults against officers, explosive devices, rocks,
4    bottles, assaultive actions towards officers, kind of
5    all that, you know, seven or eight days coalesced in the
6    planning for responses into the CHAZ or CHOP, again, to
7    try and prevent any more interaction in a negative way
8    between police and citizen groups unless it was
9    absolutely necessary, and that we did it in a thoughtful
10   and considerate way, to try and avoid confrontation or
11   use of force.
12        Q.  Okay.  On the second page of Exhibit 2, there's
13   a -- there's a map with a shaded area on it.
14        A.  Yes, I see that.
15        Q.  Is that a depiction of the area that was to be
16   considered the red zone?
17        A.  That's correct.
18        Q.  Do you know whether the boundaries of this red
19   zone changed between June 8th and June 30, 2020?
20        A.  To my recollection, it did not change.  They
21   stayed as is depicted on this map for that period.
22        MR. WEAVER:  Okay.  I'd like to drop another
23   document into the chat.  We'll mark it as Exhibit 3 when
24   I get it up here.
25        (Exhibit No. 3 marked.)

Page 26

1    BY MR. WEAVER:
2        Q.  Do you recognize this document?
3        A.  Yes.
4        Q.  What's an incident action plan?
5        A.  It's the plans that we put out when we have a
6    special event or a significant deployment of police
7    officers, that generally is put together by our
8    operations center, that kind of lays out what the
9    situation is we're addressing for the particular event,
10   and then what some of the objectives are for the
11   incident, and then how the incident is organized, who is
12   in command of various sections or subsections of the
13   event for the response to it.
14        Q.  Are these typically put out every day by the
15   police department as a matter of regular course?
16        A.  No.  As I said, they're really just for special
17   occurrences or events.
18        Q.  Okay.  I'd like you to go down to -- let me
19   find the page here -- Page 15 of the PDF.  It has a
20   Bates number of 7780 at the bottom.
21        A.  I am on that page.
22        Q.  Okay.  Now, it appears that the wording as of
23   this June 29th document had changed from "mass casualty
24   event" to "critical life safety emergency"; is that
25   correct?

Page 27

1        A.  Yes.
2        Q.  What is your understanding of the difference
3    between a mass casualty event and a critical life safety
4    emergency?
5        MR. CRAMER:  Objection.  Form.
6        A.  Again, I don't know if it's so much a
7    difference, the two events.  I think it's just
8    clarifying the -- you know, like I said before, I think
9    the wording before, I think we were trying to give an
10   example of what people go to.
11        I think we're just trying to clarify it better,
12   that if anybody or any individual's safety or life was
13   in danger, that we had to again think thoughtfully about
14   how we were going to respond into the zone to that
15   situation, to render police assistance.
16   BY MR. WEAVER:
17        Q.  Okay.  So in Exhibit 2, which refers to a mass
18   casualty event, it says, "e.g., active shooter incident
19   and structural fire likely to endanger human lives,
20   etc."
21        Do you see that?
22        A.  Yes.
23        Q.  Is it your understanding that that was meant to
24   define what a mass casualty event was?
25        MR. CRAMER:  Objection.  Form.

Page 28

1        A.  That was meant to provide a couple of examples,
2    and was not meant to be all-inclusive.
3    BY MR. WEAVER:
4        Q.  Okay.  So if you go to Exhibit 3, Page 15, it
5    looks like we have the same two examples as -- examples
6    of a critical life safety emergency; is that correct?
7        A.  Yes, that's correct.
8        Q.  So I want to go through this again.  And let me
9    ask, you know, whether you understood these to be
10   critical life safety emergencies within the meaning of
11   this directive.
12        Kidnapping, was -- would that be considered a
13   critical life safety emergency?
14        MR. CRAMER:  Objection.  Form.
15        A.  Potentially, yes.  I mean, kidnapping's going
16   to be a very serious crime, and something that we need
17   to definitely look at formulating a response to and
18   addressing.
19   BY MR. WEAVER:
20        Q.  How about rape?
21        MR. CRAMER:  Same objection.
22        A.  Again, just depending on the particular
23   circumstances.  Of course, race is a -- rape is a very
24   serious crime and something that we would need to
25   determine the appropriate response to, based on what the

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

---

Page 33

1  specified -- specific?  I don't who it was sent to
2  directly.
3        MR. WEAVER:  Okay.  I'm going to drop
4  another document in the chat.  We're getting -- we're
5  getting fast and furious on the -- on the documents
6  already, so...
7        (Exhibit No. 5 marked.)
8        THE WITNESS:  Okay.
9  BY MR. WEAVER:
10       Q.  All right.  So is this an email you sent on
11  June 16th?
12       A.  Just blow it up here a little bit.
13       Yes.
14       Q.  Okay.  So in the first sentence, you say, "For
15  clarification, this is what I approved and was sent out
16  department-wide last Friday," and then it appears to
17  have the text of the email from Exhibit 2 down below,
18  towards the bottom of the first page.  Is -- am I
19  understanding that correctly?
20       A.  That appears correct, yes.
21       Q.  Okay.  So does that refresh you as to whether
22  the Exhibit 2 was sent out to the entire department?
23       A.  That's what I said in the email.  But like I
24  said, I don't -- specifically I don't recall who it was
25  sent out to, but that's what I'm saying in this email,

Page 34

1  yes.
2       Q.  Okay.  So I'd like to go back to Exhibit 4,
3  which is the June 24th IAP.  And if you could scroll
4  down to -- I think it may be 15 of this one as well.
5  So -- yes, it's 15.  I'm sorry.  It's 16.  Bates
6  No. 7543.
7       This appears to have similar language to what
8  we've been talking about, but it uses the term "mass
9  casualty event" rather than "critical life safety
10  emergency."
11       Do you see that?
12       A.  Yes.
13       Q.  So this was June 24th of 2020.  Does this
14  refresh you at all as to when there might have been a
15  change to the wording of "critical life safety
16  emergency"?
17       MR. CRAMER:  Objection.  Form.
18       A.  Sorry.  You said Exhibit 4 says mass casualty
19  event, or am I on the wrong exhibit or --
20  BY MR. WEAVER:
21       Q.  I believe it does, on Page 16, if you -- you
22  can look at it, yourself.
23       A.  I'm looking at Exhibit 4, and it's -- says
24  "mass casualty event" on Page 16.
25       Q.  Okay.  So it appears that on June 24th there

Page 35

1  were IAPs being sent out with the wording of "mass
2  casualty event."
3       Does that help you remember at all when it
4  was -- when the wording was changed to "critical life
5  safety emergency"?
6       MR. CRAMER:  Objection.  Form.
7       A.  It doesn't.  I will say one thing, with IAPs,
8  especially during this time, we were having -- the
9  operations center was having to produce so many,
10  sometimes getting the language caught up or getting
11  things changed, because of everything else that was
12  going on from the planning perspective, sometimes they
13  weren't as timely as they could have been, with getting
14  changes put into them.
15  BY MR. WEAVER:
16       Q.  Was it your understanding that there was any
17  difference in the -- in the substance of the directive
18  between the directive that used the term "mass casualty
19  event" and the directive that used the term "critical
20  life safety emergency"?
21       A.  Sorry; I'm not quite following your question
22  there.
23       Q.  Okay.  Was the change from "mass casualty
24  event" to life -- "critical life safety emergency" meant
25  to convey a change in department policy or directive?

Page 36

1       A.  No.  Again, I think it was just meant to
2  clarify the wording, and really the -- the premises that
3  we were operating under, I think it just -- and the
4  things that we were briefed kind of every day, I think
5  it was just providing more clarity.
6       Q.  And I'd like you to go to the bottom of the
7  last page on Exhibit 4.  This again is a map showing
8  the -- what's -- what were the boundaries of the red
9  zone; is that right?
10       A.  Correct.
11       Q.  And were those the same that they had been in
12  the directive that went out department-wide on June 12th
13  in Exhibit 2?
14       MR. CRAMER:  Objection.  Asked and answered.
15       A.  Yes.  They -- they look the same.  I don't see
16  any significant changes in either map.
17  BY MR. WEAVER:
18       Q.  Let me ask you, with regard to -- and we can
19  go -- we can go to any -- I guess go back up to 16 on
20  Exhibit 4, Page 16.
21       A.  Okay.
22       Q.  Okay.  So with regard to Edward Sector, it
23  indicates that a required -- requires a four officer
24  minimum response to all Edward Sector calls for service
25  outside the red zone.

9 (Pages 33 to 36)

Hunters Capital, LLC v. City of Seattle                                30(b)(6) Thomas Mahaffey

Page 37

1    What does -- what did that mean?
2       A.  For any response for police service, that we
3    were going to send, again, as it indicates, a minimum of
4    four officers to that call.
5       Q.  So prior to June 2020, what was the minimum
6    response for a call in the Edward Sector?
7       A.  It would depend on the type of call, again,
8    with -- what the actual details of the incident were.
9    But it could be as little as one officer for a
10   nonpriority event with no suspect on the scene, to many
11   multiple of officers for some type of ongoing life
12   safety emergency.
13      Q.  So what -- what was the least number of
14   officers for a particular call that would be a minimum
15   required to respond to a call prior to June 2020?
16      A.  The fewest would be one for a low priority
17   response.
18      Q.  Okay.  And during the -- during the pendency of
19   these directives in June of 2020, those low
20   priority calls would still require a four officer
21   response?  Is that correct?
22      A.  That is correct, yes.
23      Q.  And why was that?
24      A.  Due to just the conditions that we hadn't faced
25   before, based on -- I will describe it as the negative

Page 38

1    feelings and animosity towards Seattle police officers
2    at that time that was particularly concentrated in that
3    area of the city.
4          Officers were going to seemingly routine calls
5    and being accosted by people seeking confrontation even
6    in routine situations.  So again, in just working
7    through some of these unprecedented circumstances that
8    were dealt with, again, officer safety being the most --
9    the thing that was most foremost on my mind during this
10   period, we determined that this was the best course of
11   action to take.
12      Q.  Okay.  So within the Edward Sector, but outside
13   the red zone, were there cases in which there might be a
14   mass casualty event or a critical life safety emergency,
15   that it would be appropriate under your directive for
16   officers not to respond?
17          MR. CRAMER:  Objection.  Form.  Calls for
18   speculation.
19      A.  No.  But again, depending on the criticality of
20   the incident, I want them to formulate a thoughtful and
21   considered response before going in, again, to ensure
22   their safety, de-escalate, minimize the potential use of
23   force, and keep the public safe.
24   BY MR. WEAVER:
25      Q.  So when you indicate that it was -- you were

Page 39

1    trying to keep the public safe by not responding to
2    calls, how was not responding to calls keeping the
3    public safe?
4          MR. CRAMER:  Objection.  Form.
5       A.  That's not what I mean by that.  It's, again,
6    to -- we're responding to calls.  It's just that we're
7    doing it in a way that allows us to provide service in
8    the best way that we can.
9          We're just considering the -- again, the
10   unprecedented circumstances that we were facing at the
11   time, and the scrutiny, and threat to officer safety
12   that we were having to deal with.
13          That's what the -- really considerations that I
14   had to -- to deal with at the time and how we were going
15   to still provide police services while dealing with all
16   these other issues that were swirling around us.
17   BY MR. WEAVER:
18      Q.  So going back to Exhibit 5, in the second
19   paragraph of this email you sent on June 16th, you're
20   asking whether the -- first of all, you sent this to
21   Carmen Best, and then who's Christopher Fisher?
22      A.  He was the chief's -- I believe his title was
23   strategic advisor.
24      Q.  And you say, "Please let me know if this should
25   be altered or clarified in anyway if it is creating a

Page 40

1    messaging issue or confusion internally or externally."
2          Do you see that?
3       A.  Yes.
4       Q.  Do you remember asking for that, for any
5    clarification they wanted?
6       A.  Reading this email, that -- now it's bringing
7    up I did ask that, yes.
8       Q.  Do you recall whether either Chief Best or
9    Officer Fisher indicated that your policy should be
10   altered or clarified in any way?
11      A.  I don't specifically, no.
12      Q.  And you also indicate down below that,
13   "Depending" -- you were going to talk with
14   representatives from the City's department involved in
15   barricade removal, and that, "Depending on how that
16   operation went, I may be able to adjust the current
17   response protocol to the area."
18          Do you recall whether the -- you adjusted the
19   current response protocol to the area after barricade
20   removal?
21      A.  It wasn't adjusted because the barricades -- if
22   this is still June 12th, my recollection, the
23   barricades -- or June 16th, excuse me, the barricades
24   were not removed.  So protocols were not adjusted.
25      Q.  So the protocols were not adjusted until all

10  (Pages 37 to 40)

Hunters Capital, LLC v. City of Seattle                          30(b)(6) Thomas Mahaffey

---

Page 73

1    you, just Chief Mahaffey.
2    BY MR. WEAVER:
3         Q.  So I think we talked just briefly about the
4    evacuation of materials and personnel from the East
5    Precinct on the night of June 8th or the afternoon of
6    June 8, 2020.
7         Was that your decision, to evacuate personnel
8    from the East Precinct?
9         A.  Ultimately, that was my decision, yes.  I made
10   it in -- I had consultation with my commanders I had
11   working that day, but yes, ultimately, that decision
12   was -- was mine.
13        Q.  Did you make any consultation with Chief Best?
14        A.  I did call her and let her know how we'd be
15   proceeding that evening, yes.
16        Q.  And you told Chief Best before you had --
17   before the evacuation; is that correct?
18        A.  Yes.  I -- yes.  Before we implemented the
19   actual plan, yes, I let her know.
20        Q.  Okay.  And what was the basis for your decision
21   to evacuate personnel from the East Precinct?
22        A.  Well, there's a lot that went into that
23   decision.  It was not easily made.  The overarching
24   concern was, the need to de-escalate would have been
25   going on the previous week, which was a constant focus

---

Page 74

1         on the precinct by the protesters, to the point that the
2    precinct had become inoperable.
3         We had nearly nightly clashes with protesters
4    involving significant amounts of -- we had to use force
5    to deal with the crowd.  We had force used against us by
6    the crowd.
7         We had officers injured.  We had members of the
8    protest crowd injured, and it was seemingly not going to
9    end.  So that was the overall goal, was to prevent any
10   further clashes with the crowd and injuries to officers.
11        There was also concerns about the building
12   being attacked and destroyed.  We had information from
13   the FBI.  I knew that a precinct had been burned in
14   Minneapolis, Minnesota, as a result of protests they had
15   there.  I had information other government buildings
16   were being attacked.
17        So I had a great concern that based on what had
18   been occurring the previous weeks, that the East
19   Precinct would be another target, which, based on where
20   it sits on the block, there's really only two ways in
21   and out of it.
22        And overall, the -- that was my greatest
23   concern, was keeping -- keeping people safe, and not
24   being able to keep people in there, as we were not going
25   to be able to use the tactics, which was using police

---

Page 75

1         officers directly to manage and address the crowd.
2         So that was the course of action that I felt
3    was the best to prevent confrontation, to de-escalate,
4    prevent injury, and keep police officers and the public
5    safe.
6         Q.  You said there was force used against officers
7    by people who were protesting or who were mixed in among
8    the protesters.
9         What sort of force was being used?
10        A.  So there was physical body force consisting of
11   pushing, shoving, punching.  We also had objects thrown
12   at us:  rocks, pieces of cement, bottles, garbage.
13   Commercial grade fireworks were used on officers as
14   well.
15        And then we had reports of people in the crowd
16   with Molotov cocktails, which is a bottle filled with
17   gasoline with usually a rag soaked in some type of
18   accelerant on top as well.
19        So those were some of the issues that we
20   were -- we were dealing with.  We'd also get reports of
21   armed people in the crowd from time to time, but we did
22   not have firearms directly used against police officers,
23   thankfully.
24        Q.  And so your expectation on June 8th, that that
25   was probably going to keep happening regularly on the

---

Page 76

1    night of June 8th and later; is that correct?
2         MR. CRAMER:  Form.
3         Go ahead.
4         A.  Continuing with our same deployment model, yes,
5    I felt that was the likely -- likely outcome.
6    BY MR. WEAVER:
7         Q.  So to what extent was the mayor's office or the
8    mayor herself involved in discussions about what to take
9    out of the precinct and when to take it out of the
10   precinct?
11        MR. CRAMER:  Objection.  Form.
12        A.  My recollection, I think sometime --
13        THE WITNESS:  That wasn't me, I hope, on
14   the -- on the --
15        MR. CRAMER:  I think someone -- I think
16   someone joined.
17        Go ahead.
18        I'm sorry.  Tyler, do you want to re-ask it
19   just so we're -- or have the court reporter read it
20   back.
21        MR. WEAVER:  I can ask it again.
22   BY MR. WEAVER:
23        Q.  So to what extent was the mayor herself or the
24   mayor's office involved in discussions about moving
25   materials or people out of the East Precinct on

---

                                         19 (Pages 73 to 76)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 77

1  **June 8th?**
2          MR. CRAMER:  Same objection.
3      A.  I don't know about the mayor's direct
4  involvement.  There was some discussion with some of
5  other staff about having a plan in place, about if we --
6  about moving, what articles would have to be moved out
7  of the precinct potentially.  I think that occurred on
8  June 7th or 8th.
9  BY MR. WEAVER:
10     **Q.  So what were the discussions with the mayor's**
11 **staff about what should be moved out?**
12     A.  I'm sorry; you cut out in the last part of
13 that.
14     **Q.  What were the discussions with the mayor's**
15 **staff about what should be moved out of the precinct, I**
16 **think you said on either June 7th or June 8th?**
17     A.  I don't know if I'd characterize it as a
18 discussion.  I think it was -- my recollection, it more
19 was asking for a plan about what items would have to be
20 taken out.
21     **Q.  Okay.  What do you recall about those**
22 **discussions?**
23          MR. CRAMER:  Objection.  Form.  Misstates
24 testimony.
25     A.  Just we were asked for some plans.  I think it

Page 78

1  was over email.  I don't remember about that particular
2  topic specific face-to-face discussions that I was
3  involved in.
4  BY MR. WEAVER:
5      **Q.  Okay.  Were you in -- were you involved in**
6  **face -- face-to-face discussions on June 8th with**
7  **anybody from the mayor's office about the East Precinct**
8  **and the protests outside?**
9      A.  Yes, I was.
10     **Q.  Can you tell me about the nature of those**
11 **meetings and who was there?**
12     A.  Yes.  There was a meeting in the Seattle
13 Emergency Operations Center at around noon on June 8th.
14 From the police department, Chief Best was there; I was
15 there; Assistant Chief Cordner, Assistant Chief
16 Nollette, Assistant Chief Diaz, Assistant Chief Hirjak,
17 I believe Assistant Chief Greening as well.  So
18 essentially the entire -- we call it the command staff,
19 the sworn command staff, which is the chief and her
20 assistant chiefs.
21     From the mayor's office was Deputy Mayor Fong;
22 Stephanie Formas, who's chief of staff; and Deputy Mayor
23 Sixkiller.  Those are the three I remember.
24     And then I think there were representatives
25 from some other City agencies there.  They may have been

Page 79

1  director level.  I don't remember specifically, but that
2  would have been SDOT, I believe Fire Chief Scoggins was
3  there, potentially somebody from Public Utilities,
4  but -- so it was police, mayor's office, and some other
5  department heads.
6      **Q.  Okay.  What were the nature of those**
7  **discussions?  What was the topic of the discussions that**
8  **was going on there?**
9      A.  So on the night of the 7th, we had had another
10 significant incident involving the -- well, two, really.
11 The -- the evening had started out where a person had
12 driven a car down 10th Avenue from Pike Street, came out
13 of the car -- shot somebody, came out of the car, went
14 through the crowd.  Police took them into custody.  So
15 that started the evening.
16     And then towards the end of the evening, we had
17 a significant removal of barricades that we had -- 11th
18 and Pine Street was kind of where we had the most
19 significant involvement nightly.
20     We had -- I had ordered some better metal
21 fencing, what we thought would be better metal fencing,
22 but really, almost as soon as it was installed,
23 protesters were looking for ways to take it down.
24     They had taken it down.  There was an
25 encroachment on the precinct.  All our attempts to

Page 80

1  de-escalate verbally had failed.  We had reports of
2  people with firearms in the crowd.
3      We ended up using some less lethal munitions to
4  disperse the crowd, making numerous arrests, having
5  officers and members of the public injured.  That's the
6  night of -- into the early morning of June 7th and the
7  early morning of June 8th.
8      And that leads to this meeting on the 12th to
9  discuss really what the plan would be, moving forward,
10 in an effort to avoid further conflict and confrontation
11 with the crowds that were gathering nightly around the
12 East Precinct.
13          THE VIDEOGRAPHER:  Mr. Mahaffey, would you
14 mind either leaning back or pushing your -- the audio on
15 the camera is having trouble.  Thank you.
16          THE WITNESS:  Sure.
17 BY MR. WEAVER:
18     **Q.  So at any point during the conversations on the**
19 **8th that involved the deputy mayors and the chief of**
20 **staff Formas, do you recall there being a suggestion**
21 **from either the deputy mayors or Stephanie Formas that**
22 **the police should be -- the police should evacuate**
23 **personnel from the East Precinct?**
24     A.  No, I don't recall her saying that.
25     **Q.  Do you recall that there were discussions among**

20  (Pages 77 to 80)

Hunters Capital, LLC v. City of Seattle                                    30(b)(6) Thomas Mahaffey

Page 81

1  that group about whether to evacuate materials and
2  evidence from the East Precinct on the -- on June 8th?
3          MR. CRAMER:  Objection.  Form.
4          A.  Not specifically.  But that would have been a
5  concern of mine, that, you know, those items were in the
6  precinct and were potentially vulnerable.
7  BY MR. WEAVER:
8          Q.  Do you recall discussions with -- in these
9  discussions on June 8th, any of the mayor's staff
10 discussing that they wished to have the protesters be
11 able to walk -- march by the East Precinct on the night
12 of June 8th?
13         A.  Yes.  That was their preference, I guess, or
14 how they wanted to proceed.
15         Q.  And was it your concern that by allowing the
16 protesters to walk by the precinct on the night of
17 June 8th, that that would put the East Precinct and
18 potentially officers at risk?
19         A.  Yes.  Based on what had occurred during the
20 previous weeks, it was a -- certainly a significant
21 concern of mine.
22         Q.  Okay.  So you mentioned that there were -- you
23 had metal fencing in the area.  What sort of barriers or
24 barricades had been used in the week or so leading up to
25 June 8th by the police department in that area?

Page 82

1          A.  It started with what we call bicycle fencing,
2  which is really fairly lightweight aluminum fencing.
3  It's really more meant to either let people know, look,
4  you can't come into this area, or to guide people in a
5  certain direction.
6          So we'd start out with that, but it's -- it's
7  very easily moved.  It's -- it's not effective as a
8  permanent or robust barrier.  So we'd started with that,
9  realized that wasn't going to work, and then by Sunday,
10 the 7th, my preference or plan was, what we were
11 scrambling to do was to try and place the more secured
12 perimeter around the precinct, using barricades.  It was
13 just -- turned out to be very difficult to get something
14 on a short notice.
15         So what we came up with on the day of the 7th
16 is -- was some more fencing that was sturdier than the
17 bicycle fencing, that wasn't easily pushed over.  And it
18 was -- it came from a company that does festivals and
19 concerts.
20         So it -- it's only about waist high, but it's
21 just not as movable, so people can't kind of push
22 through it, ideally, in more -- or were -- in less
23 dynamic and volatile circumstances.
24         But the shortcoming was, it -- with it was that
25 it was -- you know, if you had the right tools, that you

Page 83

1  could dismantle it.  So those are really the two types
2  of barricades, physical barricades, that we'd used
3  during the week.
4          Q.  Do you recall whether you had any
5  water-filled -- like large water-filled barriers that
6  had been used either on June 8th -- on June 7th or
7  June 8th by the precinct?
8          A.  I remember those came at some point.  I don't
9  remember specifically when, though.  But I -- at some
10 point they were used.
11         Q.  How about concrete barriers around the
12 precinct?  Do you recall any of those on June 7th or
13 June 8th?
14         A.  I don't.
15         Q.  Were you in discussions with the department --
16 Seattle Department of Transportation on June 7th or
17 June 8th about what sorts of barriers they might be able
18 to provide?
19         A.  I wasn't specifically, no.  I believe -- my
20 recollection is Assistant Chief Hirjak was at times
21 acting as a conduit to them.
22         Q.  And what was Chief Hirjak's position within the
23 department as of June 2020, if you recall?
24         A.  Assistant chief of -- I believe it was the
25 Special Operations Bureau.

Page 84

1          Q.  The Special Operations Bureau, you said?
2          A.  Yes.
3          Q.  What's the Special Operations Bureau?
4          A.  They oversee more specialty response resources,
5  SWAT team, harbor, the traffic unit.  I believe they
6  oversaw the special -- or yeah, police operations
7  center, so SPOC at the time.  That's what was -- example
8  of some of the resources that were under that bureau.
9          Q.  So when you made the decision to evacuate the
10 East Precinct on June 8th of personnel and materials,
11 what was your intent about when personnel and materials
12 would return to the precinct?
13         A.  Later that day or early the next morning.
14         Q.  And was it -- was it your plan that after the
15 protests had subsided on the night of June 8th, that the
16 police department would repopulate, for lack of a better
17 term, the East Precinct?
18         A.  Yes.
19         Q.  Did that happen?
20         A.  No, it did not.
21         Q.  Why not?
22         A.  The protesters surrounded the building, and
23 then stayed there, and then started setting up
24 barricades around the area, without taking any
25 aggressive action against the precinct, so peaceful

21 (Pages 81 to 84)

Hunters Capital, LLC v. City of Seattle                                    30(b)(6) Thomas Mahaffey

Page 85

1  protest at that time.
2       Then later in the evening, some of those
3  barricades started being manned by people who were
4  armed.
5       Q.  What sort of barricades were being used that --
6  that night, the night of June 8th, into June 9th?
7            MR. CRAMER:  Objection.  Form.
8       A.  My recollection is a lot of makeshift
9  barricades.  They'd used some of the fencing that they
10 had -- been taken apart.  I believe dumpsters were used.
11 Kind of anything that could be found was kind of used in
12 the makeshift barricades.
13      Maybe some of our -- I don't know if they had
14 any of our bicycle fencing, but I remember it was a lot
15 of -- they were improvised, for the most part, that I
16 recall.
17 BY MR. WEAVER:
18      Q.  Do you recall seeing any vehicles being used as
19 barriers on that night?
20      A.  I don't know if specifically on that night, but
21 I know certainly at some point, if not that night, but
22 then certainly later on, vehicles were used.
23      Q.  And where -- where do you recall these
24 barricades -- were the barricades in the street?  Were
25 they on the sidewalks?  Where were the barricades on the

Page 86

1  night of June 8th and into June 9th?
2       A.  Mainly my recollection is across the street.
3  They might have covered the sidewalks in some points
4  too.
5       Q.  Do you know what streets were blocked at that
6  point?
7            MR. CRAMER:  Objection.  Form.
8       A.  My memory is the area around the precinct, so
9  12th Avenue, Pine Street, potentially 11th and Pine as
10 well.  There may have been other directions covered as
11 well, but those are -- those are what stand out.
12 BY MR. WEAVER:
13      Q.  And am I correct that at least initially
14 there -- you -- you saw that there were people guarding
15 the barriers, manning the barriers?
16           MR. CRAMER:  Objection.  Form.  Vague.
17      A.  I don't know if I'd classify it as initially,
18 but at some point that -- that did happen.
19 BY MR. WEAVER:
20      Q.  Okay.  And what did -- what did you observe
21 that might be called guarding or manning the barrier?
22      A.  People set up behind -- behind the barriers, I
23 think, monitoring them, and then at some point people
24 with weapons showing up as well.
25      Q.  And just so I -- did you see this -- you were

Page 87

1  watching this on live feedback at the SPOC; is that
2  correct?
3       A.  Yes.
4       Q.  Between June 8th and June 10th -- June 30,
5  2020, did you personally return to the East Precinct at
6  any point?
7       A.  Yes, I did.
8       Q.  When was that, or what times were that, if you
9  know?
10      A.  I believe it was -- the date -- it was either
11 June 11th or 12th, I went back to the East Precinct with
12 Chief Best and some other officers as well.
13      Q.  Was there any other time that you went back
14 there before July 1, 2020?
15      A.  Not that I can recall, no.
16      Q.  During the period of June 8th to June 30, 2020,
17 where were you working from primarily?
18      A.  The Seattle Police Operations Center.
19      Q.  At the West Precinct, I think we established;
20 right?
21      A.  Yes, that's correct.
22      Q.  How regularly were you monitoring live feeds of
23 what was going on in the red zone and around the East
24 Precinct?
25      A.  Only occasionally I might view it, so there --

Page 88

1  there was kind of a larger situation room that would
2  have the feeds up, but I maintained a -- a separate
3  office that I could work out of that didn't have the
4  feeds on them.
5       So if I was passing through the room, I'd take
6  a look at them, but I had others whose responsibility
7  was to monitor those as part of their work.
8       Q.  Okay.  So was there somebody monitoring those
9  feeds pretty much constantly during the period of
10 June 8th through June 30, 2020?
11      A.  That certainly we had access to feeds and
12 knowledge of them, and we would have somebody monitoring
13 them.
14      Q.  What was the situation -- can you just describe
15 for me the situation room you mentioned earlier?
16      A.  It's -- just call it the large room in the
17 operations center, where there's kind of a few rows of
18 workstations where we can put police personnel at to
19 work from.
20       There's some kind of large projection-type TV
21 screens on the walls, where like the social media feeds
22 I'm talking about, or other information can be displayed
23 on them as well.
24       So it's just kind of a large workroom when we
25 have an event going and the operation's occurring, where

Hunters Capital, LLC v. City of Seattle                                30(b)(6) Thomas Mahaffey

Page 89

1    everybody is performing their task out of.
2        Q.  And was that dedicated to looking at the area
3    around the red zone and the East Precinct during this
4    June period, June 2020?
5        A.  Yes.  And it was bigger than that.  I mean, the
6    operations center is the coordination point for all of
7    our operations during this event.  Since this was a
8    significant deployment of personnel and resources, they
9    were in charge of coordinating all of that.
10       Q.  And the live feeds were projected onto the --
11   onto a screen there; is that correct?
12       A.  Generally, yes.  That's when I was aware of
13   them, there was a screen they were projected on.
14       Q.  So when did you -- when did you first learn
15   that protesters had created barriers around the East
16   Precinct and in the streets near the East Precinct on
17   June 8th?
18       A.  When as in the time?
19       Q.  Yeah.
20       A.  My best recollection is that it was after dark.
21   So this is late June, so it's 9:30, 10:00 p.m. is --
22   that's what stands out in my memory, is it was -- the
23   sun had gone down.
24       Q.  That time of year, we get a little -- oh.  I'm
25   sorry.  Go ahead.

Page 90

1           MR. CRAMER:  Can we go off for one minute?
2    There was a note in the chat from the videographer that
3    I want to deal with.
4           MR. WEAVER:  Oh, yeah.
5           THE VIDEOGRAPHER:  Going off the video at
6    11:45.
7           (Discussion off the record.)
8           THE VIDEOGRAPHER:  Back on the record at
9    11:46.
10   BY MR. WEAVER:
11       Q.  Do you recall when you first learned that at
12   least some people had declared an area around the East
13   Precinct to be an autonomous zone?
14       A.  My recollection, hearing those words,
15   autonomous zone, were the next morning, when I got the
16   report from Captain Sano, so the morning of June 9th.
17       Q.  And forgive me for not remembering.  Was
18   Captain Sano one of the officers that went down to look
19   and see what was going on that morning?
20       A.  Correct.
21       Q.  What else did he report to you the morning
22   of June 9th, if you recall?
23       A.  Well, my recollection is, he met with a couple
24   of people that -- that there didn't really seem to be a
25   leader present, and I think they mentioned the person's

Page 91

1    name who was the leader.  I think it was Raz Simone, who
2    would be back later that night.  That's kind of a
3    summary of what I remember that he reported to us.
4        Q.  What do you know or recall about Raz Simone?
5        A.  The night of the 8th -- he drove a very
6    distinctive car.  He had a white Tesla.
7    African-American male.  He showed up that night.  I
8    believe it was that first night, there was a video of
9    him armed and talking about and distributing firearms.
10       Q.  What do you recall seeing about -- seeing with
11   Mr. Simone distributing firearms?
12       A.  My recollection is him taking a firearm out of
13   his car, talking to somebody about it, and hand- -- and
14   handing it to them.
15       Q.  What kind of firearm was it, if you recall?
16       A.  My memory is that it was a -- that they were
17   talking about a rifle, but I don't remember if he
18   actually handed him a rifle or not.  I don't recall the
19   kind of specifics of that.
20       Q.  Do you recall whether it was one gun or more
21   than one gun?
22       A.  My recollection is, it was just one.
23       Q.  Do you recall seeing on any other -- any of the
24   other live feeds distribution of -- distribution of
25   weapons on June 8th or June 9th?

Page 92

1        A.  I don't.
2        Q.  So when was the decision -- well, who made the
3    decision to not try to reenter the precinct on the night
4    of June 8th or the morning of June 9th?
5           MR. CRAMER:  Objection.  Form.
6        A.  I don't know if it's a particular person.
7    Certainly June 8th, the determination was made, the --
8    the crowd was peaceful.  They weren't taking any
9    specific action against the precinct, so the decision
10   was made to let that play out.
11          That's what -- my direction, when I went home,
12   to Captain Sano, who was in command overnight, to make
13   an effort to go back in the following morning to kind of
14   determine what the -- the situation was, and if it was
15   safe and feasible to do so.
16   BY MR. WEAVER:
17       Q.  So on the morning of June 9th, did you make the
18   decision not to move personnel and materials back into
19   the East Precinct?
20       A.  No.  We got the report from Captain Sano, and
21   then we started meeting internally about, you know, what
22   our next steps were going to be.  So if there wasn't a
23   specific decision, other than Captain Sano said, okay,
24   here's -- you know, very early in the morning, here's
25   what we've encountered, here's what's going on, and then

23 (Pages 89 to 92)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 93

1   I took that information back to the chief and others on
2   the command staff and started discussing what our next
3   plans would be.
4       Q.  Okay.  Tell me as much as you can about those
5   discussions that you had with the chief and other
6   personnel about the next steps to take.
7       A.  Well, it was collaborative effort, and
8   ultimately the decision was going to be left to the
9   chief.  And my preference was to gather as much
10  information as we could, determine if it was viable for
11  us to move back in immediately, and then formulate a
12  plan to sustain us being back in there, knowing that
13  there would probably be pushback from crowds again that
14  night on the precinct, so how were we going to sustain
15  it if we got back -- back into the building.
16      So that's kind of what was at the forefront of
17  my mind, that's what we talked about.  And I think it
18  was the chief -- don't remember specifically, but I
19  think it was, you know, going to be in consultation with
20  the executive branch, to start determining the next
21  steps forward.
22      Q.  So by the "executive branch," you mean the
23  mayor's office; is that correct?
24      A.  Yes.
25      Q.  Okay.  Were you involved with discussions

Page 94

1   between the Seattle Police Department and the mayor's
2   office about whether the police department should try to
3   reoccupy the East Precinct on June 9th?
4       A.  Not that I recall specifically on that day, no.
5       Q.  Do you recall having those discussions with the
6   mayor's office at any time after June 9th, during the
7   month of June 2020?
8       A.  Yes.  There was a very regular tempo of
9   meetings involving the mayor's office, police, fire, a
10  lot of other City agencies on a daily basis, and I was
11  involved in many of those.
12      Q.  Okay.  So would you say you were involved every
13  day in those meetings, or was it just periodically?
14      A.  I don't know.  I'm trying to be circumspect.
15  It was certainly more than periodically.  I just don't
16  remember if it was every day, but it was -- I mean, I
17  was working seven days a week, and there were frequently
18  a variety of meetings every day that certainly involved
19  the mayor's staff and others as well.
20      Q.  So who do you recall being in these meetings
21  with the mayor's staff?  I mean, it sounds like, you
22  know, fire department, Seattle Public U-- you know --
23  give me -- I'll give you a list and you can tell me.
24      So was -- was Seattle Public Utilities at this
25  meeting -- at these meetings?

Page 95

1       A.  At many of them, yes.
2       Q.  How about Sam Zimbabwe from the Department of
3   Transportation?
4       A.  I remember either he or a designee were --
5   would be involved in many of them.
6       Q.  And I think you mentioned the fire chief was
7   there?
8       A.  Chief Scoggins, yes.
9       Q.  Okay.  And then representatives from the
10  mayor's office; correct?
11      A.  It seems like who I dealt with, with the
12  mayor's office, was either Deputy Mayor Sixkiller, or
13  Deputy Mayor Fong less so, and then Julie Kline, who was
14  the public safety advisor.
15      Q.  How often were you in communication with Julie
16  Kline during the month of June 2020 about what was going
17  on, on Capitol Hill?
18      A.  Several times a week.
19      Q.  What were the nature of your communications
20  with her during that time period?
21          MR. CRAMER:  Objection.  Form.  Vague as to
22  "nature."
23      A.  Yeah, I don't know if I can generalize about
24  them.  It was just about whatever the issue or topic was
25  that we were having to deal with.

Page 96

1   BY MR. WEAVER:
2       Q.  During these meetings of the group that we
3   talked about, or with Julie Kline specifically, do you
4   recall having discussions about whether the police
5   department could or should return to the East Precinct?
6          MR. CRAMER:  Objection.  Form.  Vague.
7       A.  Yes, I'm sure that came up.
8   BY MR. WEAVER:
9       Q.  What was your personal opinion about whether
10  the police department should attempt to reoccupy the
11  East Precinct in June of 2020?
12          MR. CRAMER:  Objection.  Vague as to time.
13      A.  I was committed to getting us back in the
14  building as soon as it was practical, safe, feasible,
15  and something that we could sustain without having to
16  get back into the tempo or the situation that we were in
17  earlier the month -- earlier in the month.
18      That's the way I thought about it.  Getting
19  back in may have been feasible at some point, but there
20  certainly would have been a force component, I think,
21  associated with that in the early days.
22      And then as we saw, when we went back with
23  Chief Best on June 11th, the sustainment was going to be
24  something we'd have to spend time thinking through.
25  ////

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 97

1   BY MR. WEAVER:
2       Q. What happened on June 11th that you're
3   referring to?
4       A. I believe that's the correct date. Chief Best
5   and some -- myself and some other officers went back up
6   to the precinct. We were able to go inside, inspect the
7   building, make sure that it hadn't been broken into,
8   nothing had been damaged or taken.
9       I think the thought is that we would remain
10  there. We'd put some resources in the building, but
11  then there was an attempt -- there was a fire lit out --
12  outside of the building that made the officers feel
13  unsafe.
14      They left, unfortunately, without notifying
15  anybody until the next morning. And so then we didn't
16  have any more resources in there, so again, it was the
17  sustainment piece that was going to be difficult once
18  we'd lost that foothold.
19      Q. Okay. I just want to make sure I understood --
20  understood what you said. So on June 11th, you went
21  in -- and I think it was June 11th, but -- on June 11th
22  or thereabouts, you went -- you went into the precinct
23  with Chief Best and some other officers, with the goal
24  of leaving some people manned at the precinct; is that
25  correct?

Page 98

1       A. That's accurate, yes.
2       Q. And those officers left sometime thereafter
3   because they were concerned for their safety; is that
4   right?
5       A. Yeah. A different team of officers actually
6   came in late -- later in the afternoon or early evening
7   and replaced those -- myself and others that had already
8   been there throughout the day.
9       And then after midnight the next day, let's say
10  that was the 12th, that's when an incident occurred that
11  caused them to leave the building.
12      Q. Okay. Were there other attempts to move
13  personnel back into the East Precinct prior to July 1,
14  2020?
15          MR. CRAMER: Objection. Form.
16      A. Not -- no, not like that, that we just talked
17  about, or there were no other efforts that I recall that
18  were made after that initial one.
19  BY MR. WEAVER:
20      Q. Okay. I want to go back to the discussions
21  that we talked about earlier on June 8th, and I think --
22  am I correct that you were having discussions between
23  you and some of your subordinate officers about whether
24  to evacuate personnel from the East Precinct? Is that
25  correct?

Page 99

1       A. On the 8th, yes, that's accurate.
2       Q. And was there discussion, either among that
3   group or with your later conversation with Chief Best,
4   about what might happen if officers were not able to
5   return to the East Precinct within 24 hours?
6       A. No. We didn't consider that contingency. The
7   thing -- the things that we thought would happen was,
8   one, the people would march by and that would be it, and
9   we'd move back in; or based on what I spoke to earlier
10  about what had happened in Minneapolis, the information
11  that we received from the FBI about government
12  facilities and the precinct being a target, that there
13  would be an effort to, you know, attack and destroy it
14  potentially.
15      We thought the danger for fire was significant,
16  for lighting it on fire, and that's what we had planned
17  to address, not that the occupation, for lack of a
18  better word, that occurred would happen. We didn't
19  consider that as a contingency plan. So we -- we
20  weren't -- we hadn't thought that through.
21      Q. Were you aware, at the time you made your
22  decision to evacuate the precinct on June 8th, that the
23  mayor was considering whether to give the East Precinct
24  to Black Lives Matter?
25          MR. CRAMER: Objection. Form.

Page 100

1       A. I was not aware of that.
2   BY MR. WEAVER:
3       Q. When did you first become aware of that?
4           MR. CRAMER: Same objection. Assumes
5   evidence.
6       A. Sometime later on. I don't know if it was
7   June or July. Chief Best had told me that there had
8   been -- she was aware of a conversation between Black
9   Lives Matter and the mayor's office about turning over
10  the precinct.
11  BY MR. WEAVER:
12      Q. Okay. What do you -- can you tell me anything
13  else about that conversation you had with Chief Best
14  about that?
15      A. Yeah, I just remember being in her office. I
16  don't know specifically what we were talking about. She
17  told me -- Chief Best is very well connected to many
18  communities in Seattle, especially the African-American
19  community.
20      And she had told me that people that she knew,
21  I believe -- my recollection is in the Black Lives
22  Matter movement, had told her about conversations they
23  had had -- I don't remember specifically with the mayor
24  or her office -- about making the precinct -- turning it
25  over to them and allowing it to be some type of a

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 101

1  community center.  That's my recollection of the
2  conversation.
3      Q.  Were you surprised to hear that?
4      A.  Yes, I could qualify it as surprised.
5      Q.  Okay.  Is there another term you would use
6  rather than "surprised" for your reaction?
7      A.  I mean, there was just so -- there was just so
8  many things going on during this event, that I almost
9  would say I almost was numb during this point, through
10 working all the time and lack of sleep.
11     I don't think anything was surprising me at --
12 at this point, just recollecting on kind of that whole
13 month.  But yes, there was al- -- always seemed to be
14 some type of issue arising, I guess.
15     Q.  Is it safe to say that you were always
16 interested in returning to the East Precinct and
17 returning personnel to the East Precinct as soon as it
18 was safe to do so?
19     A.  Absolutely.  That was my goal from June 8th
20 onwards.  That was what I was focused on doing.
21     Q.  And would you say it was a priority of yours
22 and the police department to move in -- move into the
23 precinct as soon as it was safe to do so?
24     A.  Yes, I would agree with that.
25     Q.  And why was that a priority, to move back into

Page 102

1  the precinct?
2      A.  I mean, that's our facility.  That's for
3  providing public safety services to the community, I
4  mean, not just to Capitol Hill, but to First Hill, the
5  Central District, other parts.  That station had been
6  there since the 1980s, and just a response and public
7  safety component of it.
8      Also my officers were out of -- were out of
9  their home.  We were having to scramble to find them a
10 place to work out of.  So I wanted to do that for them,
11 get them back in as soon as we could do so without
12 hopefully any more conflicts to do it, and no more of
13 the building being surrounded and rendered inoperative.
14     So that was certainly, like I said, a goal from
15 June 8th, to make that a reality and make it happen.
16     Q.  Was that goal made clear by either you or other
17 members of the police department in any of these
18 meetings that you had with the executive branch and
19 heads of other departments?
20     A.  I'm sure it was.  But as far as specific
21 instance or who did that, I -- I don't have any memory
22 of that, but I think that was -- that was everybody's
23 goal too.  At least that's the way I -- I perceived it.
24     Q.  What effect did the evacuation of personnel
25 from the East Precinct have on the police department's

Page 103

1  ability to respond to the areas that were normally
2  covered by officers operating out of the East Precinct?
3      MR. CRAMER:  Objection.  Form.
4      A.  We had to move everybody to the West Precinct,
5  but everybody was still able to cover their districts
6  and respond to calls for service, but just not out of
7  that building.
8  BY MR. WEAVER:
9      Q.  Did the response times increase for calls that
10 were in the Edward Sector?
11     A.  Year over year, I don't recall a -- a specific
12 increase.  We were having increases in response times
13 citywide at this point.  I don't -- can't pinpoint it
14 directly back to Edward Sector having a significant
15 increase in response times.
16     Q.  Were you aware of Chief Best indicating at one
17 point, I believe during the first week after the police
18 had evacuated the precinct, that response times in the
19 area served by the East Precinct had tripled?
20     MR. CRAMER:  Objection.  Assumes evidence --
21 evidence not in the record.
22     A.  Did you ask if I was aware of her saying that?
23 BY MR. WEAVER:
24     Q.  Yes.
25     A.  No.  I don't recall that -- her saying --

Page 104

1      Q.  Do you recall any analysis that was done
2  internally about whether response times had gone up
3  after the evacuation of the East Precinct on June 8th?
4      A.  There may have been one done at that time.  I
5  don't remember ordering one.  And that would have, I
6  guess, not been data I could have collected, but it
7  certainly could have been.  I don't specifically recall
8  it, though.
9      Q.  How would that data be collected, in your
10 understanding?
11     A.  So that would be taken from our -- our computer
12 dispatch system, which was able to collate that data,
13 make comparisons.
14     Q.  Do you recall, during the June 9th, 10th, or
15 11th time period, working with either Deputy Mayor
16 Sixkiller or Department of Transportation director Sam
17 Zimbabwe, or both, to try to move -- remove barriers
18 from around the East Precinct and the red zone?
19     A.  Not on those specific dates.  But I know those
20 were topics that we discussed when it came to how would
21 we make the -- you know, if we -- to re-inhabit the
22 precinct, what were some of the things that had to
23 happen to make that viable.
24     Q.  So do you recall whether, in those first few
25 days after the precinct was evacuated, that there was an

26 (Pages 101 to 104)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

---

Page 113

1  confrontation or escalation, but also trying to provide
2  the service that was requested for us.
3        That's why we had kind of the information in
4  there about, if it wasn't a significant life safety
5  emergency, having people come out of the zone, if
6  possible, to provide their information, if they could.
7  And then if that wasn't, you know, critically thinking
8  of the ways that we could best respond to these service
9  calls.  But yes, definitely concerns for residences,
10 businesses was something that was considered, and we
11 tried to work around that the best we could.
12 BY MR. WEAVER:
13      Q.  So what were the concerns for residents and
14 businesses?
15      A.  Well, we've had a -- to adjust our responses to
16 a certain area, so it's not situation as normal, where
17 we would just be able to get a call, evaluate, you know,
18 what was needed for the response, and then just go in
19 response.
20      Now we've got these extra circumstances of --
21 within the red zone that we -- we have to be mindful of.
22 So I guess it's -- it's just not business as -- as
23 usual.  Right.  It's a significant change in things.
24      So that -- whenever there is a change, there's
25 some issues or situations that go along with that, that

---

Page 114

1  are different than what is normal and what had been
2  previous.
3        Q.  Were you concerned that the result might be an
4  increase in crime in the area where there was a revised
5  response by the police?
6        A.  I don't recall that being a consideration.  I
7  think what we were thinking about was the response
8  guidelines that we've been talking about.
9        Q.  So can you elaborate a little bit more on what
10 your concerns were with regard to businesses and
11 residents and how this modified response might affect
12 them?
13      MR. CRAMER:  Objection.  Form.
14      A.  Elaborate insofar as what?  Anything in
15 specific?  I mean, for me, it's just -- it's something
16 that's beyond the norm.  It's beyond the usual that
17 we're having to adjust to.  So that creates concerns or
18 contingencies that we have to consider.
19 BY MR. WEAVER:
20      Q.  So were you concerned that it would have
21 impacts on residents or businesses in or near the area
22 that -- where there was a modified response?
23      MR. CRAMER:  Objection to form.  Vague.
24      A.  That the area would or that our -- our -- the
25 directive I gave would?

---

Page 115

1  BY MR. WEAVER:
2        Q.  That your directive would.
3        MR. CRAMER:  Same objection.
4        A.  No.  In that I felt that we would -- we still
5  had -- provided information on how we should respond to
6  the area, and again, that we would be continually
7  evaluating that as the circumstances changed.
8        It's not like we were just, you know, this was
9  the situation we had on June 9th, and then we -- that
10 was the only thing we considered in perpetuity.  We were
11 evaluating it every day and trying to consider all the
12 concerns and issues that we could and address them the
13 best that we were able to.
14 BY MR. WEAVER:
15      Q.  So were you -- were you concerned at all, when
16 you issued your directive on June 12th, that certain
17 crimes would not be sufficiently responded to either in
18 the red zone or in areas around the red zone?
19      A.  We've got a situation outside of normal, so I
20 knew there would have to be some adjustments, but we
21 still had a commitment to responding certainly to
22 significant life safety events, and then investigating
23 other crimes as effectively as we could.
24      Q.  Okay.  So with regard to other crimes that were
25 not -- would not have been critical life safety

---

Page 116

1  emergencies or mass casualty events, how was the police
2  department responding to those requests or reports of
3  crime?
4        MR. CRAMER:  Objection.  Form.  Vague as to
5  location.
6        A.  Inside --
7  BY MR. WEAVER:
8        Q.  Within or near the red zone.
9        A.  Right.
10      MR. CRAMER:  Same objection.  Compound.
11      A.  The call would be taken and processed.  And
12 again, the idea was to dispatch the call, but, if
13 possible, have the person meet us outside of the zone,
14 so officers wouldn't have to go in.  If they couldn't do
15 that, then there were other alternative means.
16      If it was a -- not a life safety call, they
17 could do it if -- the person could make the report
18 online, or they could report it over the phone.  Or if
19 they were able to get -- like I said, they could meet
20 with the officer in an area that was not directly inside
21 the impacted red -- red zone, as we called it.
22 BY MR. WEAVER:
23      Q.  So people could either just make the report
24 on -- on the phone, online, or they could walk several
25 blocks to some area outside the red zone; is -- to make

---

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 117

1  a report in person; is that right?
2          MR. CRAMER:  Objection.  Misstates
3  testimony.
4      A.  I mean, they could come out of the red -- the
5  red zone however -- you know, if it was on foot, on a
6  bike, they were able to drive.  I mean, however means or
7  conveyance they can get to meet with the officer, that
8  was the -- the way we were asking for these things to be
9  investigated and for people to meet up with us.
10  BY MR. WEAVER:
11      Q.  So if somebody was raped, but it wasn't a
12  critical life safety emergency, that would be how the
13  report would be taken during this time period in June of
14  2020?
15      A.  Based on the circumstance we were -- we were
16  faced with, that would be the preferred way of handling
17  the investigation, yes.
18      Q.  So did you have -- did you have no concerns
19  that the directive that you issued with regard to the
20  red zone was going to have a -- the impact of increasing
21  crime in the area in and around the red zone?
22      A.  No, that's not accurate.  I mean, I was -- I
23  had a lot of -- lot of concerns.  This is a
24  significantly different way that we -- we had to
25  operate, and it was uncharted territory.

Page 118

1          That's why we were constantly evaluating it.
2  And again, we were making plans, based on the
3  circumstances that we had, to still provide the services
4  in the best way that we could.
5      Q.  So let me ask it the other way.  So were you
6  concerned, at the time you issued the directive, that
7  crime would increase in or around the red zone in June
8  of 2020?
9          MR. CRAMER:  Objection.  Form.
10      A.  I didn't know.  I think really the -- the main
11  concerns were safety of officers, again, preventing
12  confrontation and conflict, and trying to formulate a
13  response the best we could.
14          I don't know if rising crime, especially in
15  those early days, were -- was a consideration at that
16  point.  We just didn't know.
17  BY MR. WEAVER:
18      Q.  Were you concerned, at that point that you
19  issued the directive, on June 12, 2020, that having a
20  red zone with modified response might attract certain
21  criminal elements who might appreciate the modified
22  response area?
23      A.  Well, this information was only supposed to be
24  internal into the department, so I didn't think about it
25  getting out to criminal -- criminal elements or anybody

Page 119

1  else.  This was guidelines for us internally within the
2  department, not meant for dissemination to anybody else.
3      Q.  Are you aware whether the information got out
4  to the public in general?
5      A.  I'm not.
6      Q.  Are you aware of whether 911 operators told
7  people that they would not be responding -- or that
8  police would not -- police and fire would not respond to
9  that area?
10      A.  I am not aware of that in specifics, no.
11          MR. WEAVER:  I'm going to drop Exhibit 13
12  into the chat as soon as I get it going here.
13          (Exhibit No. 13 marked.)
14  BY MR. WEAVER:
15      Q.  I believe we talked before about who Deanna
16  Nollette is.  She -- can you just remind me of what
17  department she was in charge of?
18      A.  She's the assistant chief of the investigations
19  bureau.
20      Q.  Okay.  And it looks like Officer Nollette is
21  sending you a -- on June -- first of all, do you
22  remember this email?
23      A.  No.  Not until I -- I've seen it since, but I
24  didn't remember it until I saw it, preparing for this
25  deposition.

Page 120

1      Q.  Okay.  So how often were you getting updates,
2  either from Ms. Nollette or the gang unit, about what
3  was going on in the area, in the red zone, in June of
4  2020?
5      A.  Specifically from Chief Nollette, not that
6  frequently, but she'd have people under her, in her
7  intel section, that would provide them.
8      Q.  Okay.  Who were those people that were
9  providing information to you?
10      A.  The intelligence lieutenant at the time was
11  Grant Ballingham.
12      Q.  And would he communicate with you directly
13  about what was -- he was observing?
14      A.  Well, I don't know if it was directly
15  observing, but information that he had, yes.  I mean, he
16  would -- he was our intelligence person that we relied
17  upon in the operations center when we were doing our
18  plans and looking at information and contingencies.  He
19  would provide us with --
20      Q.  Okay.  Some -- some of it may have been from
21  informants rather than his personal observations; is
22  that right?
23      A.  That's accurate, yes.  And from people working
24  for him as well too, I would imagine.
25          THE COURT REPORTER:  This is the court

30 (Pages 117 to 120)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 189

1   incidents being brought to our attention"?
2       A.  I'm wondering if that's referring -- and I'm
3   sorry; I'm looking down through these emails, if there's
4   anything specific incident-wise being mentioned in here.
5       So the email from the end from Sergeant
6   Fiorini, who's bringing forth some calls, or a concern
7   to us that people were -- especially at night, were
8   trying to lure police into the area potentially by
9   calling in significant incidents.
10      So I think Lieutenant -- or Sergeant Fiorini is
11  bringing that to our attention, and just that we have an
12  awareness of that, and then plan for that as a
13  contingency to deal with.
14      Q.  What was your involvement, if anything, in the
15  operation on the morning of July 1, 2020, to clear the
16  protest area of people, barricades, and tents?
17      A.  My involvement on that day is that I was the
18  overall incident commander for our response.
19      Q.  Were you present on Capitol Hill for that?
20      A.  Yes.  I made a makeshift field command post at
21  the fire station that's roughly around about 13 or 14th
22  and Pine Street, Fire Station 25.  That's where I was
23  located.
24      Q.  And how many officers were involved in the
25  operation to clear the area?

Page 190

1       A.  A couple hundred officers.
2       Q.  Why was it determined that you should have 200
3   officers?
4       A.  Well, first of all, it was the area that we had
5   to clear was fairly large, and it was kind of a
6   two-pronged approach.  We had -- by that point we had a
7   lot of tents that had established in front of the
8   precincts, which we weren't sure of the exact amount
9   they were occupied.  So that was phase one, so that was
10  going to require a significant amount of officers to
11  manage that.
12      And then the second area or issue that we had
13  to address with -- was Cal Anderson, which had an
14  encampment established as well too, that had an unknown,
15  but we suspected a significant amount of people in it,
16  that would require a good deal of officers to deal with.
17      So it was, again, just to manage those two
18  contingencies, and then just to have enough resources to
19  deal with this event and any eventualities that might
20  pop up.  We just make sure we had enough people to deal
21  with things that we knew we would face and anything that
22  might pop up as a contingency.
23      Q.  So was there a particular order or -- was there
24  a particular place in which the operation first started,
25  as far as police were concerned, in the area to -- to

Page 191

1   clear that area out first, or were they done
2   simultaneously?
3       A.  The area in front of the precinct was the first
4   that we moved on, so that was the primary, but it was
5   fairly soon thereafter.  Once we had started moving on
6   to the precinct, we had that stabilized, under control,
7   that we moved on to Cal Anderson.
8       Q.  And how many people did you have to clear out
9   from the area around the East Precinct and in Cal
10  Anderson?
11          MR. CRAMER:  Objection.  Form.  Foundation.
12      A.  Around the precinct specifically, I -- two,
13  three dozen is my recollection.  More than that in Cal
14  Anderson, but I don't -- I don't recall what the
15  specific number was.
16  BY MR. WEAVER:
17      Q.  How long did the operation take for just
18  clearing the people out of that area?
19          MR. CRAMER:  What area, Tyler?  Both, or one
20  of the two?
21          MR. WEAVER:  East Precinct and Cal Anderson.
22      A.  I think the main portion of that operational
23  phase was done with- -- within two hours.
24  BY MR. WEAVER:
25      Q.  And what was the next phase of the operation,

Page 192

1   from the police standpoint?
2       A.  So then it was getting back into the building,
3   clearing out what needed to be cleared out from around
4   the building, include the tents, which I think the other
5   agency, I think it was Parks took care of, and then
6   removing the barricades from around the precinct, which
7   was SDOT's job with the heavy equipment, taking down
8   some of the -- we had put some fencing and boarding
9   around the precinct.  I think we worked about taking
10  some of that down and getting back into the building.
11      So it was doing all those logistical things,
12  and then the sustainment portion of it, because we did
13  the actual operation, I think we were on-site by 5:00 in
14  the morning.
15      Most of the protest activities in early
16  June would happen in the evening, so the next phase of
17  the plan was preparing for that eventuality, that now
18  we'd moved back into the precinct, that there would be
19  protest activity directed at it later that night, so we
20  had other resources scheduled to come in later in the
21  day to manage that.
22      Q.  So was there protest activity directed at the
23  East Precinct later that night, on the 1st?
24      A.  There may have been, but not -- I don't
25  specifically recall if there was, and what our response

48 (Pages 189 to 192)

Hunters Capital, LLC v. City of Seattle                    30(b)(6) Thomas Mahaffey

Page 193

1   was to it, if there was one.
2       Q.  To what extent was the police department
3   providing backup or assistance to Seattle Public
4   Utilities and the Department of Transportation in their
5   job in clearing out barriers and tents from the area?
6       A.  We were there to provide security for them and
7   safety for their employees, if they -- if they
8   encountered any resistance or -- or aggressive action
9   towards them.
10      Q.  How long did the process of clearing out the
11  barriers and the tents and the materials in Cal Anderson
12  Park take?
13      MR. CRAMER:  Objection.  Foundation.
14      A.  Yeah, I don't -- I don't remember specifically.
15  I think it was several hours, if not a good portion of
16  the day.
17  BY MR. WEAVER:
18      Q.  So were -- were -- were your officers involved
19  with or were you aware of what was going on with regard
20  to restoration of things in Cal Anderson Park?
21      A.  No.  That was not part of our responsibility.
22      Q.  So is it the case that under the mayor's order,
23  that the streets around the area of Cal Anderson and the
24  East Precinct were -- for a period of several days,
25  there was limited access enforced by the police

Page 194

1   department?
2       A.  Is that written in her order or is that the
3   result of it?  I'm trying to clarify --
4       Q.  Well, in the days following the clear-out on
5   July 1st, was there a police presence in the streets and
6   sidewalks around Cal Anderson and the East Precinct to
7   restrict access to that area?
8       A.  I don't know.  I know -- and I don't remember
9   if it was for this one, in December, that we were trying
10  to sustain the park, to not allow the encampment to
11  reconstitute, but I don't think that involved blocking
12  the streets.
13      Q.  What was being done to prevent re-encampment of
14  Cal Anderson Park in July 2020?
15      A.  Just July 1, I think, while the workers were
16  there and clearing it out, and maybe for a time after
17  they had left, a short time, there was a police presence
18  there.  It didn't -- it didn't go on for the entire
19  month.
20      Q.  Were you in the area beyond July 1, 2020,
21  overseeing it as the incident commander?
22      A.  I don't think I was reassigned as a commander
23  after July 1st.  I don't recall exactly what our
24  deployment posture was.  We were back in the precinct,
25  so Captain Grenon would have control over the East

Page 195

1   Precinct area, so he would be responsible for that.
2       I don't know if we set up a more formalized
3   structure or not.  I don't believe we did, though,
4   after --
5       Q.  Do you recall whether you were personally in
6   the area after July 1, 2020?
7       A.  Occasionally I'd go up there, but I didn't have
8   a regular scheduled presence, no.
9       Q.  Did you walk -- now, you were stationed at the
10  fire department station somewhat near the East Precinct.
11  Am I correct, that's -- that's the fire station you're
12  talking about?
13      A.  Yes.
14      Q.  At any point did you walk around the area that
15  had been occupied and had the barricades and the people
16  in it, after it had been cleared?
17      A.  Yeah, I walked down to the area in front of the
18  precinct, and I went inside the precinct.
19      Q.  Did you walk anywhere other than right by the
20  precinct?
21      A.  If I did, I don't remember.  I don't think I
22  did, but I don't recall.  I do recall specifically being
23  in front of and going inside the precinct.
24      Q.  What do you -- what do you recall seeing around
25  the exterior of the precinct when you approached it?

Page 196

1       A.  There were some barricades.  There were tents
2   there being removed.  12th Avenue, there were some
3   portable toilets that had been knocked over during our
4   operation.  That's what I remember from the outside.
5       And then going inside the precinct and walking
6   around in there, seeing what kind of the situation was
7   in there.  I don't remember any -- nothing significant
8   stood out, as far as there being any damage in the
9   precinct, but there was just a lot of the things that we
10  had left behind when we'd been in there that were kind
11  of scattered about in various places.
12      Q.  Do you recall speaking to any residents or
13  business owners or workers in the area around the East
14  Precinct on July 1, 2020?
15      A.  I don't.
16      Q.  Do you have any knowledge of Carmen Best's
17  cellphone and the lack of texts on that cellphone prior
18  to June -- September 2, 2020?
19      A.  I don't.
20      MR. WEAVER:  I don't have any other
21  questions, unless Shane has questions for you that I
22  need to follow up on.
23      MR. CRAMER:  I do not.  So we'll reserve
24  signature if we're done.
25      THE VIDEOGRAPHER:  This deposition is

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Hunters Capital, LLC v. City of Seattle                                    30(b)(6) Thomas Mahaffey

```
                                          Page 197
 1      adjourned at 3:40.
 2              (Deposition concluded at 3:40 p.m.)
 3              (Reading and signing was requested
 4              pursuant to FRCP Rule 30(e).)
 5                      -o0o-
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          Page 198
 1              C E R T I F I C A T E
 2
 3      STATE OF WASHINGTON
 4      COUNTY OF PIERCE
 5
 6          I, Cindy M. Koch, a Certified Court Reporter in
 7      and for the State of Washington, do hereby certify that
 8      the foregoing transcript of the deposition of Thomas
 9      Mahaffey, having been duly sworn, on January 26, 2022,
10      is true and accurate to the best of my knowledge, skill
11      and ability.
12          IN WITNESS WHEREOF, I have hereunto set my hand
13      and seal this 2nd day of February, 2022.
14
15
16      _____
        CINDY M. KOCH, CCR, RPR, CRR
17
18      My commission expires:
19      JUNE 9, 2022
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989