# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
         Plaintiff(s),           )
                                 )
    vs.                          ) 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
         Defendant(s).           )

VIDEOTAPED VIDEOCONFERENCE
DEPOSITION UPON ORAL EXAMINATION OF
CARMEN BEST

Witness located in
Seattle, Washington
(All participants appearing via Zoom videoconference.)

DATE TAKEN:  NOVEMBER 9, 2021
REPORTED BY: PATSY D. JACOY, CCR 2348

Page 2

APPEARANCES

PRESENT VIA ZOOM FOR THE PLAINTIFFS:
    PATRICIA A. EAKES
    TYLER S. WEAVER
    GABE REILLY-BATES
    Calfo Eakes LLP
    1301 Second Avenue, Suite 2800
    Seattle, WA 98101
    206.407.2200
    pattye@calfoeakes.com
    tylerw@calfoeakes.com
    gaber@calfoeakes.com

PRESENT VIA ZOOM FOR THE DEFENDANTS:
    JOSEPH GROSHONG
    Assistant City Attorney
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104
    206.684.8200
    joseph.groshong@seattle.gov

    SHANE P. CRAMER
    TYLER L. FARMER
    ARTHUR W. HARRIGAN JR.
    Harrigan Leyh Farmer & Thomsen LLP
    999 Third Avenue, Suite 4400
    Seattle, WA 98104
    206.623.1700
    shanec@harriganleyh.com
    tylerf@harriganleyh.com
    arthurh@harriganleyh.com

PRESENT VIA ZOOM FOR CARMEN BEST:
    DENISE ASHBAUGH
    Arete Law Group
    1218 Third Avenue, Suite 2100
    Seattle, WA 98101
    206.428.3250
    dashbaugh@aretelaw.com

Page 3

1    A P P E A R A N C E S (cont'd)
2
3    PRESENT VIA ZOOM VIDEOGRAPHER:
4        BROOK YOUNG
         Buell Realtime Reporting, LLC
5
6    ALSO PRESENT VIA ZOOM:
7        NANCY CARRIAGA, Paralegal
         Calfo Eakes LLP

Page 4

DEPOSITION OF CARMEN BEST
EXAMINATION INDEX

EXAMINATION BY:                              PAGE(S)
  BY MS. EAKES                                  8

        EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION                    PAGE
Exhibit 1   Reducing Crime podcast              20
            transcript
Exhibit 2   6/8/2020 email string               69
            SEA_00058827
Exhibit 3   June 2020 email string with         82
            attachments
            SEA_00102554-565
Exhibit 4   6/21/20 email from Durkan           94
            to Fong and others
            SEA_00040208
Exhibit 5   11am Update - E Precinct           123
            SEA_00028170-172
Exhibit 6   Edward Sector Calls for            139
            Service
            SEA_00019917-

Page 61

1   A. It was Chief Cordner and she's a -- she was
2   our primary -- our primary liaison to the EOC,
3   well-experienced, you know, all of those things. At
4   some point during the day she said, "Hey, they're going
5   to need -- they're asking for an evacuation plan," and
6   I was like, "Okay, well, we -- let's -- you know, let's
7   have a plan but, you know, it's not our intent to leave
8   the precinct." At least at that point it certainly
9   wasn't.
10  Q. Was Mayor Durkan involved in any of the
11  discussions where you said you had, you know, kind of
12  pros and cons of moving the barriers and evacuating the
13  precinct?
14  A. She --
15     MR. CRAMER: Objection; form.
16  A. Yeah, she was not physically at the EOC, so,
17  you know, I would -- I'm making a presumption that her
18  staff that was all there was keeping her apprised of
19  everything that was happening.
20  Q. (BY MS. EAKES) Okay. But did you have any
21  meetings directly with the mayor that you can recall
22  about the idea of removing the barricades or
23  abandoning -- or evacuating the precinct?
24  A. On that day I just don't -- I don't know that
25  I spoke to her or that I -- that we sat and talked

Page 62

1   about it that day. I just --
2   Q. What about other days?
3   A. We could have. I certainly was keeping her
4   abreast of what was happening as routinely as I could,
5   so if there was -- if there were things that were
6   happening I would have definitely tried to make sure
7   that she was aware of it.
8   Q. And did you have any information from the FBI
9   about any threats to the precinct?
10  A. I did.
11  Q. Can you tell me about that?
12  A. There was a document that was provided, a
13  confidential form, by the FBI talking about threats to
14  various government facilities up to and including, you
15  know, precincts and other government facilities. I
16  spoke with, you know, our folks about that, you know,
17  and so we were very concerned. They had already at
18  that point I think run a precinct to the ground in
19  Minneapolis, so there was -- but we knew that there was
20  threats not only in Washington, but Oregon and Idaho as
21  well -- maybe not Idaho, but I know Oregon and
22  Washington for sure.
23  Q. Okay. And did you speak to somebody at the
24  FBI also or was it just the confidential document you
25  referred to?

Page 63

1   A. At some point I did. Again, the timeline is
2   going to be murky at this point, but at some point I
3   definitely spoke to the SAC, Ray Duda, of the FBI about
4   these potential -- potential threats and verified
5   because there was -- there were people who were
6   questioning the validity of that, something I had never
7   seen before, like the FBI puts out a confidential
8   statement and folks were wondering if, in fact, it was
9   made up or we just -- just pulled it out of the air,
10  but we did not. It was -- and then I actually spoke to
11  the SAC there who verified that and who verified that
12  publicly, I believe, with one of the news stations that
13  there had been threats to the precinct and it was a
14  viable target. We already knew that it had been
15  demonstrated at for several nights on end.
16  Q. And who was it that was questioning the
17  validity of the FBI's information about the threat to
18  the precinct?
19  A. Well, at some point I know that I was on a
20  conference call with the City council, some City
21  councilmembers who wanted to -- you know, who had
22  concerns about where it came from and --
23  Q. Your light went off?
24  A. Yeah.
25  Q. Mine goes off all the time.

Page 64

1   A. Yeah, it goes back on. So about this to --
2   you know, about what that was, and so we just wanted to
3   make sure -- I think I got a -- a phone call from
4   Representative Jayapal asking about, you know, the
5   potential threats, if they were valid, and so I, you
6   know, let her know that they were from my perspective,
7   and that was essentially it. You know, I definitely
8   briefed the mayor on it at some point just to let her
9   know that that was -- that was out there.
10  Q. Was the mayor or the mayor's office
11  questioning the validity of the FBI information about
12  the threat to the precinct?
13     MR. CRAMER: Objection; form.
14  A. Yeah, well, I wouldn't say -- what I can tell
15  you is that I made sure that -- that -- you know, I
16  showed her or talked to her about it, you know, just so
17  that she could rest assured based on what -- you know,
18  that there was no -- that these were actual legitimate
19  threats that we were receiving from the FBI.
20  Q. (BY MS. EAKES) What was your perception,
21  though, in talking to Mayor Durkan about whether or not
22  she believed those to be credible threats?
23  A. Yeah, you know, far be it for me to, you know,
24  try to guess what's going on in the mayor's head. I
25  can just tell you that I just wanted to make sure

Page 197

1    MR. CRAMER: Objection to the form.
2    A. Yeah, you know, I don't know, to be honest
3    with you. I mean, some of these -- as you saw in the
4    gang report, some of these things were, you know,
5    ongoing beefs that had happened, you know, previously.
6    I don't know the -- I don't remember the specifics of
7    this situation and, you know, what -- what the exact
8    circumstances were, but certainly we did know that we
9    were seeing, you know, higher levels of violent crime
10   that were occurring over time.
11   **Q. (BY MS. EAKES) Okay. And up to that point,**
12   **do you recall, had there been assaults and rapes and**
13   **other violent crimes that had happened prior to the**
14   **murder?**
15        MR. CRAMER: Objection; form, asked and
16   answered.
17        MS. ASHBAUGH: Same objection.
18   A. Yeah, we -- yeah, there were -- there were a
19   variety of different things that were occurring. I
20   don't remember which date each occurred. I do know
21   that, you know, that as we got further into it, this is
22   only on the 20th, you know, things continued to move
23   along and escalate so we -- you know, until we were
24   able to clear it out.
25   **Q. (BY MS. EAKES) And did the -- did this event,**

Page 198

1    **the murder, have any impact as far as you could tell on**
2    **the City's willingness to try to clear the area out?**
3         MR. CRAMER: Objection to form.
4         MS. ASHBAUGH: Objection to form.
5    A. I think we were always willing, you know --
6    speaking from my own perspective, we were always
7    willing to, you know, to clear it out, you know. As
8    you know, it was certainly something that needed to
9    happen. Obviously someone being murdered would
10   exacerbate the sense of urgency that was needed, you
11   know, to -- because things were escalating, so for
12   sure.
13   **Q. (BY MS. EAKES) And -- and just above the part**
14   **about foreseeable and avoidable it says: But as we**
15   **discussed at the outset of the Cap Hill issues and as**
16   **you told the public, there can be no part of the city**
17   **where SFD and SPD do not respond.**
18        **Had the mayor told you whether she believed**
19   **there should be no area in which the SPD and SFD**
20   **didn't -- wouldn't respond?**
21   A. Yeah, I don't recall a specific conversation
22   about that either way.
23   **Q. After this one there were then two more**
24   **shootings, right, and at least one more death as I**
25   **recall, one or two more deaths?**

Page 199

1    A. There was one more death that I recall. I
2    don't remember the number of shootings, to be honest.
3    **Q. Okay. And so from this point, the 20th of**
4    **June when the first murder happened, until July 1 when**
5    **there was actually the clearing out, what was happening**
6    **in terms of the discussions about what, if any, action**
7    **was going to be taken to shut down the CHOP?**
8         MR. CRAMER: Objection to form.
9         MS. ASHBAUGH: Object to form.
10   A. Yeah, you know, to be honest, I don't
11   remember. You know, dates and times at this point, you
12   know, it's in my rearview mirror getting a little
13   murky. I can tell you that there was a increased -- at
14   least on my part an increased level of exigency to --
15   to remove the CHOP and to do so as efficiently as we
16   could without, you know, loss of life or danger to, you
17   know, anybody as a part of the operational plan.
18   ==And so shortly thereafter, and I don't have==
19   ==any dates or -- in hand, but shortly thereafter we==
20   ==were really focused on getting a plan in place to clear==
21   ==it out and to -- you know, and to make sure that we==
22   ==rendered the place as safe as possible.==
23   **Q. (BY MS. EAKES) I'm going to shift topics on**
24   **you and ask you just a little bit about your book that**
25   **I know just came out.**

Page 200

1    A. Okay.
2    **Q. So in your book, did you -- I understand you**
3    **wrote it with another author, a ghost written; is that**
4    **right?**
5    A. Yes, a collaborator.
6    **Q. Okay. Collaborator, sorry, wrong term I used**
7    **there.**
8    A. No worries.
9    **Q. Never written a book. So can you tell me what**
10   **involvement did the City have in reviewing the**
11   **manuscript, editing, etcetera?**
12   A. Yeah, I didn't involve the City in it per se,
13   you know. I think I sent one -- one early draft to
14   Becca Boatwright, you know, because she was involved,
15   you know, peripherally on some of the discussion. I
16   just wanted to make sure that there was a level of, you
17   know, accuracy on that and, you know, that was really
18   it. I wasn't asking her from the -- like as -- from
19   the City perspective, but as a person who was involved
20   in that conversation, does this appear to be correct,
21   you know, that kind of a thing. Didn't really involve
22   anybody else in this, you know.
23   **Q. What you sent to Rebecca Boatwright, was that**
24   **like an entire chapter or was it just a section you**
25   **wanted her to review and did she edit it?**

Page 229

1  questions going back to your phones and text messages.
2  Have you learned anything since you handed your phone
3  in about what might have happened to your text messages
4  on your City phone?
5              MR. CRAMER:  Objection; form.
6      A.  No.
7      Q.  (BY MS. EAKES)  Okay.  And do you know if your
8  assistant might have deleted any messages before you
9  turned in your phone, any text messages, I should say?
10             MS. ASHBAUGH:  Object to form.
11     A.  Yeah, not that I'm aware of.  You know, no.
12     Q.  (BY MS. EAKES)  Do you know if it was her
13 practice to delete things, your text messages from your
14 phone?
15     A.  That was not her practice.
16             MS. EAKES:  All right.  I think that's
17 all I have -- that's all I have.  Thank you very much
18 for your time.
19             THE WITNESS:  Thank you.
20             MS. EAKES:  I don't know if Shane has
21 any questions.  I assume not, but...
22             MR. CRAMER:  I have no questions.  Thank
23 you very much for your time, Chief.
24             THE WITNESS:  Okay.  Thank you all, I
25 appreciate it.

Page 230

1              MR. CRAMER:  Denise, do you want to
2  reserve signature?
3              MS. ASHBAUGH:  Yeah, we're going to
4  reserve.
5              MS. EAKES:  Okay.
6              MR. CRAMER:  Thanks, everybody.
7              VIDEO OPERATOR:  This concludes the
8  deposition of Carmen Best.  The time now is
9  approximately 5:08 p.m.  Going off the record.
10             (Deposition concluded at 5:08 p.m.)
11             (Reading and signing was requested
12              pursuant to FRCP Rule 30(e).)

Page 231

             C E R T I F I C A T E

STATE OF WASHINGTON )
                    )
COUNTY OF KING      )

         I, Patricia D. Jacoy, a Certified
Shorthand Reporter in and for the State of Washington,
do hereby certify that the foregoing transcript of the
deposition of CARMEN BEST taken on November 9, 2021 is
true and accurate to the best of my knowledge, skill
and ability.

             _____
             Patricia D. Jacoy, CSR 2348