# EXHIBIT 10

Page 1

```
           UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
                    AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
        Plaintiff,              )
                                )
   vs.              ) No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
        Defendant.              )
_____

   VIDEOTAPED VIDEOCONFERENCE 30(b)(6) AND INDIVIDUAL

       DEPOSITION UPON ORAL EXAMINATION OF

                 CITY OF SEATTLE

               (SAMUEL ZIMBABWE)
_____


             Seattle, Washington


   (All participants appeared via videoconference.)


DATE TAKEN:  OCTOBER 28, 2021
REPORTED BY: CINDY M. KOCH, RPR, CRR, CCR #2357
```

Page 2

```
 1              A P P E A R A N C E S
 2  FOR PLAINTIFF:
 3       TYLER S. WEAVER
         GABRIEL REILLY-BATES
 4       Calfo Eakes LLP
         1301 Second Avenue
 5       Suite 2800
         Seattle, WA 98101-3808
 6       206.407.2237
         tylerw@calfoeakes.com
 7       gaber@calfoeakes.com
 8  FOR DEFENDANT:
 9
         SHANE P. CRAMER
10       Harrigan Leyh Farmer & Thomsen LLP
         999 Third Avenue
11       Suite 4400
         Seattle, WA 98104
12       206.623.1700
         shanec@harriganleyh.com
13
14  ALSO PRESENT:  CATHY ZAK, videographer
                   Buell Realtime Reporting, LLC
15
16           * * * * *
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        DEPOSITION OF SAMUEL ZIMBABWE
 2             EXAMINATION INDEX
 3  EXAMINATION BY:                         PAGE
 4  30(b)(6) Examination by Mr. Weaver       5
 5  Non-30(b)(6) Examination by Mr. Weaver  53
 6
 7             EXHIBIT INDEX
 8  EXHIBITS FOR IDENTIFICATION             PAGE
 9  Exhibit 1  Amended Notice of Videotaped   8
              Deposition Pursuant to FRCP
10            30(b)(6) to City of Seattle
11  Exhibit 2  5-page Executive Order 2020-08;  9
              SEA_00015070
12
    Exhibit 3  "Re: SFD Protest Zone Response  20
13            Map"; SEA_00020379-384
14  Exhibit 4  Email chain; SEA_00105259     43
15  Exhibit 5  Email chain; SEA_00105029-030  63
16  Exhibit 6  15-page chart titled "Messages" 69
17  Exhibit 7  "11am Update - E Precinct";   84
              SEA_00028170-171
18
    Exhibit 8  Email chain; SEA_00137341-346  111
19
    Exhibit 9  Email chain; SEA-PDR_000398-403 143
20
    Exhibit 10 "2PM Update - E Precinct (see  160
21            notes)"; SEA_00028178-179
22  Exhibit 11 Email chain; SEA_00137366-369 178
23  Exhibit 12 Email chain; SEA_00137350-351 180
24  Exhibit 13 4-page email chain; SEA_00028053  220
25
```

Page 4

```
 1      SEATTLE, WASHINGTON; OCTOBER 28, 2021
 2              9:05 a.m.
 3               -o0o-
 4      THE VIDEOGRAPHER:  Good morning.  This is
 5  the deposition of Samuel Zimbabwe in the matter of
 6  Hunters Capital, LLC, et al., v. City of Seattle, Case
 7  No. 20-cv-00983, in the United States District Court,
 8  Western District of Washington, at Seattle, and was
 9  noticed by Calfo Eakes.
10      The time now is approximately 9:05 a.m. on this
11  28th day of October, 2021, and we are convening via
12  Buell Virtual Depositions.
13      My name is Cathy Zak, from Buell Realtime
14  Reporting, LLC, located at 1325 4th Avenue, Suite 1840,
15  in Seattle, Washington 98101.
16      Will counsel please identify themselves for the
17  record.
18      MR. WEAVER:  This is Tyler Weaver, for the
19  plaintiffs, from Calfo Eakes.  And with me I have Gabe
20  Reilly-Bates, who is also participating, is online
21  today.
22      MR. CRAMER:  And Shane Cramer, Harrigan
23  Leyh, on behalf of the Defendant City of Seattle.
24      THE VIDEOGRAPHER:  Thank you.  The court
25  reporter may now swear in the witness.
```

Page 29

BY MR. WEAVER:
 Q. Okay. Which ones was -- which ones did the City allow?
 A. So there -- there were -- this is not on June 9th. This is -- or June 11th. This was after we regularized a traffic pattern for -- for the area in order to -- to -- to provide a regular, standard traffic pattern.
     There were City-provided barriers, the ecology blocks, some of the other traffic control devices that were present, that we allowed. Other things that were not -- not -- not those regular devices, using things like cars to temporarily block a street or something like that, were not at any point allowed by the City.
 Q. Okay. Did the City remove things such as the cars that were parked in the area?
 A. We did not prohibit any parking in the area.
 Q. Okay. Including in the middle of a street; is that correct?
 A. We did not remove vehicles from the middle of the street.
 Q. Okay. What obstructions of the streets and sidewalks did the City remove?
 A. So we did remove the -- there -- some of those initial items that had been rearranged by protesters,

Page 30

like the water filled barriers and some of the other barricades that had been established in various places. We did remove those -- those items.
     And I would say, when -- if we ever encountered a vehicle that was parked in the middle of the street that was intended to be open for traffic, we did talk with the occupants or -- or talk with protesters about removing that barrier and enabling the free flow of traffic in the places that were intended for -- for vehicular use.
 Q. Okay. And prior to July 1, 2020, the barriers that SDOT removed were removed after agreement with the people in the area; is that correct?
 A. I would say, after communication with the -- the people in the area. There wasn't always full agreement, but there was communication.
 Q. Okay. Why -- why do you say there wasn't agreement?
 A. Well, you know, I felt like our role in that was -- you know, we -- we -- after June 8th, there was a substantial amount of conflict between people who were protesting and -- and the Seattle Police Department.
     And after June 8th, I felt like our role, as -- my role, as the director of SDOT, was to maintain access for people and goods in the -- in the vicinity, but also

Page 31

work on behalf of the City to de-escalate the conflict that was present in order to return to regular operations of all of the streets.
     The -- so in balancing those things, I was continually looking for opportunities to de-escalate the conflict that was -- that was present there.
     So, you know, we would communicate with people present on behalf -- who were representing or on behalf of protesters, but it was -- we weren't seeking their consent. We were still taking our City responsibilities.
     So we were taking the input or the -- the concerns, the feedback, of people protesting, but also the conversations that I was having with residents and businesses around the area as well.
 Q. Okay. But the area wasn't completely cleared of barriers, people, and cars in the street by the City until July 1, 2020; is that correct?
     MR. CRAMER: Objection. Form. Compound.
 A. The area -- the entire area, but we were working continuously from -- from June 9th until that July 1st time to make sure that we had a regular traffic pattern that enabled access for people, goods, and I would say services is part of that as well, and continually de-escalating the conflict.

Page 32

BY MR. WEAVER:
 Q. Okay. When did SDOT finally clear out all the barriers in the streets in and around Cal Anderson and the East Precinct? Was that July 1, 2020?
 A. I believe that it was July 1st. And there may have been a few activities that lasted into July 2nd, but I believe it was July -- mostly July 1st.
 Q. Okay. Was there action taken before then to clear out all the barriers in the streets and sidewalks prior to July 1, 2020?
 A. There were some -- there were efforts as soon as June 9th to remove barriers from -- from that -- that area. And at those -- at various points, we were met with substantial resistance from -- from protesters. So there was an effort on June 9th to remove some of the -- the places where -- where there had been sort of makeshift barricades created by protesters.
     There was another instance after we had provided our regular traffic control where we did intend to reopen streets to traffic and were met with substantial resistance from people protesting.
 Q. I think we'll get into this more later, but what do you mean by "substantial resistance"?
 A. So we had people lie down in front of construction equipment. We had people trying to climb

Page 33

1  into construction equipment that our operators were --
2  were operating.  We had people lie on top of some of
3  those ecology block barriers and -- and sort of block
4  access to what the construction equipment needed to
5  attach to.
6         We had some crowds forming around -- around
7  some of our construction workers seeking to do -- do
8  their work, and they would -- we would sort of get
9  followed around some of the -- the site, being yelled at
10 and things like that.  Not -- not physical assault on
11 our employees.
12    **Q.  So you talked earlier about how there was a**
13 **removal of some barriers and some addition of eco**
14 **barriers to the area by SDOT.**
15       **Do you recall that?**
16    A.  Yes.
17    **Q.  Okay.  What do you recall about that process?**
18    A.  So what I recall is that, the morning of
19 June 9th, myself, Fire Chief Harold Scoggins, the
20 general manager of Seattle Public Utilities Mami Hara,
21 and I, and maybe a few other people sort of all came to
22 the 12th and Pine intersection to survey the -- the
23 area, to understand what was going on, what the
24 conditions were.  That's what led to Chief Scoggins'
25 email, the email that we discussed, Exhibit 3.

Page 34

1         Over the course of the next few days, leading
2  through the weekend, that weekend, we worked to develop
3  a -- what we felt was a traffic control plan that would
4  meet all of the City's and the adjacent property owners'
5  needs for services and property access, but also sort of
6  regularized a protest area that might stay closed to
7  normal street operations for the period that the
8  protests would be active.
9         And at that point we were continually working
10 to -- to de-escalate the conflict, and so we didn't have
11 a fixed timeline of how long that would need to be put
12 in place.
13        So we felt like it was a -- an operation that
14 would need to potentially operate in this form for sort
15 of an indeterminate period of time as we worked on
16 de-escalating the situation.
17        So that plan was developed over the course of
18 that week, and there were a series of meetings that
19 included protest leaders and some conversations with
20 businesses and residents in the area as well.  And there
21 were some informal and formal meetings of those groups.
22    **Q.  Okay.  There was a lot there, so I'm going to**
23 **ask you -- I'm going to ask you a few follow-ups.  Okay?**
24    A.  Yes.
25    **Q.  So about the indeterminate period of time, when**

Page 35

1  **the City went in and changed the footprint of the**
2  **protest area, was there any discussion about how long it**
3  **was anticipated that that might be in place?**
4     A.  I don't recall there being a discussion of
5  that.
6     **Q.  Was there any discussion about a deadline by**
7  **which the barriers that had just been placed would need**
8  **to be removed?**
9     A.  The -- and just to make sure we're on the --
10 we're talking about the same thing, I'm talking about
11 the -- when SDOT provided ecology blocks and sort of
12 regularized the traffic control, we did not have a
13 deadline by which that would be removed.
14       And so in creating that traffic control plan,
15 we worked to make sure that all of the driveways and
16 business access could be maintained without need for any
17 special kind of operations.
18       It was all sort of within a regular -- what we
19 would have determined if -- if there were a need for a
20 long-term closure for construction activities or some
21 other -- some other activity beyond protests, it would
22 have been fine for the streets to operate in that way.
23    **Q.  So I -- yeah, that's what I was talking about.**
24 **And my understanding is that those changes were made on**
25 **June 16th or 17th, or maybe both; is that correct?**

Page 36

1     A.  Yeah, that's -- that's my recollection as well.
2     **Q.  Okay.  And so tell me what that specific**
3  **process of creating that area and -- and those barriers**
4  **on the 16th and 17th, what that entailed, the physical**
5  **process.**
6     A.  The -- maybe -- okay.  Let me make sure I --
7  the physical process.  So we -- you know, what we did --
8  let me -- let me just talk through a little bit of what
9  the traffic pattern was, and then we can talk about how
10 we did it.
11       So when we -- what we regularized still
12 included some street closures.  So Pine Street remained
13 closed between 10th and 11th Avenues.  11th Avenue did
14 not connect across Pine any longer.  It was sort of a
15 temporary blockage of the intersection through.  And
16 then Pine, between 11th and 12th Avenues, was turned
17 into a one-way street westbound, from being a two-way
18 street prior.
19       Other than that, all -- all streets reopened to
20 vehicular access.  In the process of doing that, we --
21 we brought to the site and installed the concrete
22 ecology block barriers.
23       We also installed some new traffic control.  We
24 installed, I believe, a stop sign at 12th and Pine,
25 which previously would have been controlled by a traffic

Page 37

signal, some one-way signs, some other -- other signage that went into the area that regularized that traffic control plan.

Q. Okay. How many ecology blocks did SDOT move into the area on June 16th or 17th?

A. I don't recall the specific number, but it was -- it would have been 50 to 100 ecology blocks.

Q. Okay.

A. I mean, I'm sure we can provide a precise number, but I don't -- I don't recall.

Q. The streets that were one-way in the area and -- were they local access only?

A. We did have signs that said local access only, and those were a standard sign that we provide. It's called a Type 3 barrier, that has -- that says "Street closed" and "Local access only."

And the purpose of that, for us, is to communicate to people driving that they should only go through if they -- if they need to, but if they have business within that area, that's what local access means, that it's open for local access.

Q. Okay. So where were the local access only signs, if you recall?

A. So they were at the perimeter of -- of, you know, where -- where we were -- where we had changed

Page 38

some of the traffic patterns. So I recall them being at -- on the north side, they would have been at Olive, so at 11th and 12th and Olive.

Q. Uh-huh.

A. There may have been one set that was one block farther north. The -- there were some at Pike, at both 11th and 12th. There may have been one at 13th and Pine. And then there may have been one at 10th and Pike as well.

Q. Why -- why was the area declared local access only?

MR. CRAMER: Objection. Form as to "area."

A. So, you know, we were -- what we -- we were trying to limit the amount and the opportunity for vehicle and pedestrian conflict, even after that June 16th timeline.

There were times of day and times of protest activity where there were a lot of pedestrians that were sort of too many people for the sidewalks to contain. And so we -- and we had had an incident, I think before June 8th, where a vehicle had driven into a crowd of protesters.

And so we were trying, again, as part of that approach to de-escalating and reducing some of the conflict, to maintain that separation between vehicles

Page 39

that didn't need to be in the area and those -- those protest activities.

And so the local access was just another way to -- to communicate that to people who maybe didn't know what area of the city they were in, that they didn't -- if they didn't need to come through that way, that they -- they didn't -- they -- that they probably shouldn't. While also saying, if you have something to do here, you're freely welcome to come in.

BY MR. WEAVER:

Q. Okay. So there was a recognition that, despite the footprint of the barrier, there was probably going to be spillover as far as pedestrians and protests outside those barriers at certain times as well; is that correct?

A. That's what we experienced in the days leading up to that -- you know, in that first week, when there were no real traffic control separations, that we -- we did see some of that activity happening. So yes.

Q. Okay. And you were anticipating that was going to continue to happen; correct?

A. That there was the possibility of that, yes.

Q. And did it -- did that in fact happen after the barriers were shuffled around and added on June 16th and 17th?

Page 40

MR. CRAMER: Objection. Form.

A. I mean, you know, I would -- I would come to the site pretty frequently throughout that whole month of June, or for -- starting on June 9th, and there were times when I saw a lot of people there, and there were times when, you know, the -- the areas even that we had set aside for sort of more ongoing protest activities weren't sufficient to contain the number of pedestrians and people protesting.

And so I do think that having the streets be local access only limited the ability for vehicle-pedestrian conflicts.

BY MR. WEAVER:

Q. Okay. Did SDOT also put into place speed bumps in the area in and around the East Precinct and Cal Anderson?

A. We did. They -- you know, they were not traditional speed bumps. They were -- they -- we -- they're what's called a quick curb that served the purpose of what a speed hump would do, but were something that was -- you know, our typical speed humps are done with asphalt and have a more substantial construction impact and eventual removal impact.

We didn't anticipate that those would stay forever, and so we used a sort of temporary approach to

Page 41

1  those, but we did have a few places where we -- we did
2  install those, particularly around the intersection of
3  12th and Pine.
4      Q. Okay. Do you recall other areas where you had
5  temporary speed humps?
6      A. I don't.
7      Q. Okay. Why, in particular, were they around
8  12th and Pine?
9      A. So 12th and Pine has a traffic signal usually.
10 We had put in a stop sign instead. We did see -- and
11 that's where we had the sort of ecology block barriers,
12 and we changed some of the -- the directionality of the
13 streets.
14     We did see some vehicles, as we opened those
15 streets back up to traffic, driving quickly, so we
16 don't -- we didn't need to -- we wanted people to drive
17 slowly and anticipate that there could be more
18 pedestrians that they weren't expecting to be in the --
19 the -- you know, crossing the street. And we had
20 changed the traffic pattern to have that stop sign
21 rather than a -- a traffic signal.
22     MR. WEAVER: Okay. I can't believe it.
23 We've been going about an hour. Want to take a
24 ten-minute break?
25     MR. CRAMER: Yeah. Yeah, let's take ten.

Page 42

1  It did fly by.
2      MR. WEAVER: All right.
3      THE VIDEOGRAPHER: Going off the record.
4  The time is approximately 10:00 a.m.
5      (Recess from 10:00 a.m. to 10:10 a.m.)
6      THE VIDEOGRAPHER: We are back on the
7  record. The time is approximately 10:10 a.m.
8      E X A M I N A T I O N (Continuing)
9  BY MR. WEAVER:
10     Q. So would you agree that -- that SDOT, by moving
11 the barriers into -- by moving the ecology blocks into
12 the area on June 16th and 17th, was creating a protest
13 zone?
14     MR. CRAMER: Objection. Form.
15     A. We were trying to make sure that there were the
16 continued ability for First Amendment activities and
17 have a -- as I mentioned before, a regular traffic
18 pattern as well.
19 BY MR. WEAVER:
20     Q. Is it your understanding, though, that you were
21 creating a protest zone?
22     MR. CRAMER: Objection. Form. Asked and
23 answered.
24     A. We were working to -- to continue to allow the
25 protests that were happening in front of the East

Page 43

1  Precinct and understand that those may continue for
2  certain -- a certain amount of time and -- and, as I
3  mentioned, have a regular traffic pattern.
4      (Exhibit No. 4 marked.)
5  BY MR. WEAVER:
6      Q. Okay. So I'm going to drop into the chat
7  Exhibit 4.
8      A. Got it.
9      Q. So there's an email from you on June 20th --
10 June 29th, I'm sorry, 2020, that was forwarded to
11 Lorelei Williams.
12     Do you see that?
13     A. Yes.
14     Q. Okay. Who's Lorelei Williams?
15     A. Lorelei Williams was a deputy director at SDOT.
16 She was the deputy director for capital project
17 delivery.
18     Q. Okay.
19     A. And she left City employment in, I believe,
20 January of this year, of 2021.
21     Q. Okay. And were you drafting -- had you drafted
22 in your email on June 29th talking points regarding
23 Capitol Hill?
24     A. Yeah. She had -- she was representing SDOT at
25 a -- I don't remember what forum, but she had asked me

Page 44

1  what -- she had not been involved in the -- outside of
2  her area of -- of responsibilities within SDOT, but she
3  was representing SDOT with external stakeholders, and
4  asked me what -- if it came up, what she should say.
5      Q. Okay. And so you drafted these talking points
6  for her; is that right?
7      A. I did.
8      Q. Okay. So in the fourth bullet point of your
9  talking points, you say, "SDOT worked to install
10 barriers to create a protest zone."
11     And then in the sixth bullet point, you say,
12 "Definitely new activities for our crews in terms of
13 creating this zone."
14     What did you mean by "creating this zone" and
15 "create a protest zone"?
16     MR. CRAMER: Objection. Form.
17     A. So I guess, going back to my previous answer on
18 this, we worked to create some additional pedestrian
19 space or -- that was used for protest activities.
20 Again, centered on the East Precinct, but also including
21 some of the areas adjacent to Cal Anderson Park, that
22 were -- that, you know, sort of expanded the -- the
23 pedestrian space, while also creating that separation
24 between vehicular traffic.
25     In terms of the sixth bullet and new activities

11 (Pages 41 to 44)

Page 45

1  for our crews, the -- I don't think that we've done
2  anything similar to this before or since.  Typically,
3  when we've used things like water filled barriers to
4  create some of these separations or we've done temporary
5  street closures or things like that, we've had an
6  expectation that those materials that we use and provide
7  and install will stay in the pattern that -- that we've
8  installed them.
9        What we saw prior to June 16th and 17th was
10 that materials that we had -- had deployed for those --
11 you know, for the -- the crowd control and things like
12 that had moved -- had been moved, and additional
13 materials added.
14       So we didn't want to -- we wanted to -- we --
15 we needed to find some new vocabulary of -- of
16 separation that would be -- would -- would accomplish
17 our -- our goal of de-escalation and creating some of
18 that additional area for protests -- protests to happen
19 without being redeployed and moved in ways that we
20 hadn't intended.
21 BY MR. WEAVER:
22    Q. Okay.  And that -- the moving in area -- in
23 ways that you had not intended, as far as the barriers
24 that were there, that continued after June 16th and
25 17th, as well; correct?

Page 46

1     A. It did at various points, and -- yeah, there --
2  there were some various times when -- when -- when --
3  when that would happen.  You know, I think that the --
4  that is -- you know, that -- that's, like -- that was
5  one of the -- the challenges that we faced in terms of
6  how -- you know, creating that regularized traffic
7  pattern, while -- while we -- you know, so it was really
8  intermittent.
9        I think that this -- this email also sort of
10 highlights some of that, that there were some
11 intermittent challenges that -- that could be resolved
12 with -- with conversation and -- and discussion about --
13 but not -- but that -- that created ongoing operational
14 challenges for us as a department.
15    Q. So there were ongoing operational challenges
16 because at some -- at some points various barriers would
17 show up in areas that they had not previously been
18 placed; is that right?
19    A. Yeah, you know, there would be sort of minor
20 moving of barriers.  The -- the ecology blocks didn't
21 really -- didn't move until sort of the -- the very,
22 very end of the time when the -- they were -- they were
23 deployed out there.  They're very challenging to move.
24 But there were other -- other materials that would get
25 sort of moved around on a -- on a regular basis.

Page 47

1     Q. What were -- what were some of those materials
2  that would get moved around?
3     A. So as part of the installation on June 16th and
4  17th, we also installed some plywood boxes or covers
5  around the ecology blocks, and those were intended to
6  serve a few purposes.
7        The first was that they were -- they were
8  opportunities for art to happen, and sort of canvass, if
9  you will, for some of the -- the protest art.  And that
10 was something that, as we talked to the protest leaders
11 that we -- we were communicating with in the lead-up to
12 that, they felt like the art was a positive aspect of
13 the -- what was -- what was happening in that protest
14 area and was an opportunity.
15       We also -- you know, there had been a lot of
16 graffiti and lots of -- on lots of private buildings,
17 and so this was also part of our attempt to attract some
18 of that activity to -- off of private property and
19 buildings into -- into this.  So those plywood boxes
20 were serving some of that function.
21       The second function is that the -- the easiest
22 way to move an ecology block is, there's a sort of metal
23 ring that's on the top, is set into the concrete, that
24 you attach a chain from a construction -- a piece of
25 construction equipment, and that -- you're able to lift

Page 48

1  it up.
2        So the -- some of the plywood box was intended
3  to limit access to those -- those rings, which are the
4  easiest way to move a -- move an ecology block and make
5  it sort of so that other people couldn't come and access
6  that in a very easy way.
7        And then I think there were -- there were some
8  members of the protest group who were concerned that
9  outside -- outside actors wished them harm, wished --
10 you know, they were -- there was a lot of -- among some
11 of them, there was a lot of concern that people were
12 going to come and try to do harm to the people
13 protesting.
14       And so there was a -- the ecology block
15 barriers are very low.  They're about two feet tall.
16 And so the plywood barriers helped to prevent a little
17 bit of, like, being able to see into the -- into the
18 area where people were -- were protesting and -- and,
19 you know, sometimes sleeping overnight and things like
20 that.
21       So that was the -- the purpose of those.  Those
22 plywood barrier -- plywood components, eventually the
23 protesters sort of figured out how they could remove
24 those from some of the barrier -- the ecology blocks,
25 and -- and those sort of boxes would get moved around at

Page 81

1    Q. Are you aware that there were -- that the
2    police department and the fire department had certain
3    policies about not going into the area except for
4    certain reasons?
5         MR. CRAMER: Objection. Form.
6    A. Yeah, I wasn't aware of -- of that. My
7    conversations with Chief Scoggins centered on -- on
8    how -- how they would respond to various emergencies,
9    and where fire trucks and ambulances would have to
10   access the area.
11   BY MR. WEAVER:
12   Q. Were there lanes that you felt were opened up
13   so that they could -- so that the fire department could
14   access the area completely at any time during June 2020,
15   from June 8th through July 1st?
16        MR. CRAMER: Objection. Form.
17   A. Can I -- can I clarify your question?
18   BY MR. WEAVER:
19   Q. Sure.
20   A. Are you asking, were there -- did we have an
21   understanding of how Fire would respond to incidents?
22   Q. Was it your understanding that Fire would
23   respond to incidents, and they had room to do so, during
24   the entire period of June 9th through July 1, 2020, in
25   the area in and around the East Precinct and Cal

Page 82

1    Anderson Park?
2    A. From a physical access perspective, from how we
3    set our traffic control, how we worked for -- to provide
4    street access, the physical -- I think the physical
5    features that would be necessary for a fire truck or an
6    ambulance to access the area were provided.
7    Q. After June 17, 2020, you mean?
8    A. I think even before -- before that. There
9    were -- you know, there were still -- you know,
10   12th Avenue had access. As I mentioned, I believe that
11   traffic services were provided each and every day.
12   Those same -- you know, trash truck and a fire truck
13   have similar clearance requirements in terms of getting
14   into a -- to an area to access.
15   Q. What do you know about what was required to get
16   trash access into the area on any particular day in
17   June of 2020?
18   A. That's outside of SDOT's area of
19   responsibility, trash collection, so that's really a --
20   a question that SPU would have to speak to.
21   Q. Okay. And what do you know about what SPU had
22   done with dumpsters during this time period of June 9th
23   to July 1, 2020?
24   A. You know, I -- I was aware of some -- some
25   modifications that they'd made, but I couldn't speak to

Page 83

1    specifics.
2    Q. Do you know anything specific about the trash
3    collection in the area in and around Cal Anderson Park
4    from June 9th to July 1, 2020?
5    A. I -- I don't. You know, my conversations
6    with -- with Mami Hara were focused on making sure that
7    we could do that. And -- and as we talked about the
8    traffic patterns, it was my understanding that they --
9    that they could use those traffic patterns and respond
10   and make trash collection.
11   Q. Okay. But you don't know specifically what
12   happened; is that right?
13   A. No.
14   Q. Okay.
15        MR. CRAMER: We've been going for about an
16   hour. I don't know if you're at a --
17        MR. WEAVER: Yeah, we have. If you want to
18   take another ten minutes.
19        MR. CRAMER: Sure.
20        MR. WEAVER: All right.
21        THE VIDEOGRAPHER: Going off the record.
22   The time is approximately 11:13 a.m.
23        (Recess from 11:13 a.m. to 11:23 a.m.)
24        THE VIDEOGRAPHER: We are back on the
25   record. The time is approximately 11:23 a.m.

Page 84

1         (Exhibit No. 7 marked.)
2         E X A M I N A T I O N (Continuing)
3    BY MR. WEAVER:
4    Q. All right. I am going to bring another
5    document into the chat in a second here. This will be
6    Exhibit 7.
7         Let me know when you have it up.
8    A. I have it up.
9    Q. Okay. So first of all, do you recognize this
10   document?
11   A. Yes. I believe this is an email from Laurel
12   Nelson, who was acting director of Office of Emergency
13   Management, including myself and a number of other
14   cabinet members.
15   ==Q. Okay. Around this time, June 9th, June 10th,==
16   ==June 11th, were you involved in regular cabinet meetings==
17   ==with the mayor's office and other department heads?==
18   ==A. Yes.==
19   ==Q. Okay. And about how frequently were you having==
20   ==these meetings in that time period?==
21   ==A. They were -- they would be pretty frequent. I==
22   ==think they were somewhat regular. Then we would have==
23   ==some -- sometimes when -- it wasn't -- wasn't daily==
24   ==always, but there would be some -- some times when it==
25   ==was multiple times a day, even.==

Page 85

1  Q. And so that continued throughout June of 2020?
2  A. Yes.
3  Q. What was your understanding of the purpose of
4  these meetings?
5  A. The purpose of these meetings was to share
6  information and really report out on -- on what
7  activities were going on among -- among all the
8  departments that were responding, and to make sure that
9  there was understanding with the -- with the mayor's
10 office, as well, about what was -- what was happening.
11 Q. Okay. So do you recall being in any meetings
12 in which Mayor Durkan, herself, participated during
13 June 9th to July 1, 2020?
14 A. Yes, I do.
15 Q. Okay. About how many times do you think that
16 was?
17 A. You know, I -- I couldn't -- I don't remember
18 that with that specificity. It was certainly not
19 every -- every meeting that we would have. And, you
20 know, these meetings are very similar to the way that we
21 respond to any kind of citywide emergency, a snowstorm
22 or, you know, things of that nature. So it's a very
23 typical operational strategy that we have as a city.
24 And that includes times when the mayor joins those
25 conversations as well.

Page 86

1  Q. Sure. Can you give me an estimate of how many
2  times you talked to the mayor about things related to
3  the protests and the CHOP area between June 9th and
4  July 1, 2020?
5  A. I would say maybe around a dozen times, if I
6  had to -- if I had to put a number on it.
7  Q. Okay. Did you ever talk to the mayor directly,
8  one-on-one, at any point?
9  A. I did.
10 Q. Okay. What -- what did you talk about with the
11 mayor when you met?
12 A. The few times that I talked to her directly
13 were around the specific SDOT-related actions that we
14 were taking. So I believe on the -- the morning of
15 June 16th, I think I spoke directly with her.
16    There were, you know, a couple of times when we
17 were taking some of those direct actions with, you know,
18 installing the ecology blocks or as -- and when we got
19 to the point of removing them, I did speak directly with
20 the mayor.
21 Q. Okay. Just to let her know what was going on
22 and what was the plan?
23 A. Yes.
24 Q. Okay. Do you recall what her reactions were,
25 for example, about the plan on June 16th?

Page 87

1  A. You know, I think specifically on June 16th, it
2  was -- it was really status updates of when -- when
3  things were going to be happening and when -- when we
4  were -- when we were going to be operating. I don't --
5  I don't recall her reaction to the -- to the plan.
6  Q. Okay. How about, what were your conversations
7  with her later on, after June 16th, about what SDOT was
8  doing in the area?
9  A. You know, I think we were -- we were continuing
10 to -- to keep her abreast of what -- what activities
11 were. I did participate in some of the -- there was,
12 like, conversations about where -- you know, where
13 things were going, what the -- you know, what -- what
14 our activities as a city were. And those tended to be
15 these larger group conversations.
16 Q. Okay. Do you recall talking to her, yourself,
17 about what you'd been hearing from residents and
18 businesses in the area?
19 A. I don't.
20 Q. Okay. Do you recall communicating that to
21 anybody in the mayor's office, what you'd been hearing?
22 A. I know I probably did. There were probably
23 some -- there were some -- some group discussions along
24 with Chief Scoggins and -- and Mami Hara, where we were
25 relating our -- our series of conversations. I don't

Page 88

1  know if I recall specifics of -- of when and how.
2  Q. So let's go -- let's go to Exhibit 7. And do
3  you happen to recall whether there was a phone call of
4  the cabinet at 6:00 a.m. on June 10th?
5  A. Yes, I believe there was.
6  Q. Okay. And was it your understanding that
7  Laurel Nelson was taking notes of those meetings and
8  then distributing them at that time?
9  A. Yes.
10 Q. Okay. So I'd like you to go to Page 2 of this
11 document. I want to ask you about a few things on it.
12    So in the middle in a larger font, it says,
13 "Overall Objectives: Continuing the existing footprint
14 of peaceful demonstration and rights."
15    Do you see that?
16 A. Yes.
17 Q. Okay. Do you recall a discussion about that
18 during this cabinet meeting on June 10th?
19 A. I -- I do. I mean, this -- these notes sort of
20 reflect that, but yes. The -- there was sort of a --
21 a -- this was the day after that June 9th date of -- of
22 being there.
23    And so at that point, you know, there was a
24 sort of regular -- there was a group of people who were
25 pretty committed to staying in front of the East

Page 89

1  Precinct and continuing the protest activities right
2  there.
3      Q. Okay. So whose objective was it to continue
4  the existing footprint?
5      A. I think it was a shared City-wide objective
6  in -- in that conversation of -- in that direction
7  towards de-escalation of making sure the people were --
8  had that continued opportunity for protests, and that
9  we -- that that could be done in a safe way.
10     Q. Okay. Paragraph 1 are -- are a few items here
11 that indicate that it was the lead -- SDOT was the lead.
12         Do you see that?
13     A. Umm --
14     Q. 1.1 and 1.2, paragraphs there?
15     A. Right. So we were the lead on the physical
16 modifications to the footprint as the responsible
17 parties for the right-of- -- you know, the street
18 right-of-way. We were -- we were the lead on those
19 physical modifications.
20     Q. And so was the City's goal at this point to
21 remove the non-SDOT barriers and replace them with SDOT
22 barriers?
23     A. Yes.
24     Q. Okay. And --
25     A. You know, I just -- sorry --

Page 90

1      Q. Go ahead.
2      A. -- if I can just clarify that a little bit, is
3  to say that those non-SDOT barriers were the things that
4  were not typically used as traffic control, but -- and
5  things like the bike rack barriers and other sort of
6  irregular barricades, but to restore a traffic pattern
7  that maintained our core responsibilities around
8  providing public access and -- and ensuring services
9  could be delivered.
10     Q. Okay. What -- 1.2 says, "Pivot this into a
11 street closure."
12         Do you understand what that -- what that meant?
13     A. Yeah. So I think this was -- you know, we
14 had -- we had -- rather than having -- there was --
15 there were these sort of, again, irregular barricades
16 that were blocking off certain streets, while others
17 remained open in certain ways.
18         So we wanted to turn those irregular things
19 into something that was a more regular traffic pattern.
20 And that's -- there's a couple of reasons for that.
21 One, it's the -- the reason why -- you know, we could --
22 we -- sort of standard materials or other ways that we
23 could put -- sort of regularize those -- the -- the
24 traffic pattern.
25         And then also we communicate regularly out to

Page 91

1  the public and -- through things -- platforms like
2  Google Maps and others about when we have a regular
3  street closure, "This street is closed." And so that
4  can go into their routing software, that we can sort of
5  push out that information.
6          And we wanted to have a -- a regularized street
7  closure so that we could do those sorts of things and
8  make sure there was public information available to --
9  to enable residents and businesses to be able to --
10 to -- to function normally.
11     Q. So did SDOT report to Google and other mapping
12 services that there were closures in the area?
13     A. We did. I don't know the exact timing of when,
14 but we did -- we did communicate.
15     Q. Okay.
16     A. And I would say, again, those -- those -- you
17 know, it was important for us, even -- you know, we
18 discussed previously local access. If you had a -- a --
19 an address within that area that was local access and
20 you were putting it into a routing software, you could
21 still -- it wouldn't tell you, you can't get to that
22 site. It would tell you, here's how you get to that --
23 that location.
24         But it also -- in theory, when we -- when we do
25 that, it's not routing people through that area if we've

Page 92

1  made it local access. And we have that sort of ongoing
2  relationship and response- -- you know, working
3  relationship with those software providers.
4          We have a number of streets that, in the midst
5  of the pandemic, we turned into local access only. We
6  called them "Stay healthy streets." We communicate. So
7  those -- those streets are open to people who live on
8  those streets, deliveries and things like that, but
9  they're not -- people aren't routed onto those streets
10 if they're through traffic. So those mapping providers
11 work with us on -- on communicating that information out
12 to users.
13     Q. So I just want to be clear. So if -- with the
14 routing that was done for this particular area in and
15 around East Precinct and Cal Anderson that was local
16 access only, if somebody put in there that they wanted
17 to go to a particular destination, and the normal route
18 would be for them to take 12th Avenue through the Pike
19 and Pine area, the software would route them somewhere
20 else; is that correct?
21     A. If it was outside. If it was just -- if they
22 were just through traffic coming through on 12th, you
23 know, from Olive to Union, it would send -- it would
24 send them up to -- I think it was probably sending them
25 to 13th. But if it was someplace within that area, it

Page 137

1  11th, so go down -- go down to where you're talking to
2  Mr. Sixkiller on the 11th.  Okay?
3       You indicate, "I can have crews within an hour.
4  But SPD needs a strong presence with them."
5       And Mr. Sixkiller says, "First sign of push
6  back equals pull back."
7       Do you see that?
8     A.  Yep.
9     Q.  Okay.  Do you recall where you were and you
10 could have crews there within the hour?
11    A.  Where I was --
12    Q.  Yes.
13    A.  -- personally?
14    Q.  When you texted?
15    A.  I was not there.  I was not on-site there.  I
16 was probably in my house at that point.
17    Q.  Okay.  But you could have crews -- I guess you
18 could have crews where within an hour?
19    A.  I can have crews at the -- at the East
20 Precinct.
21    Q.  And that would have been to remove barriers?
22    A.  Yes.
23    Q.  Okay.  And Mr. Sixkiller responded, as we
24 established, he said, "First sign of push back equals
25 pull back."

Page 138

1       What did you understand that to mean?
2     A.  That -- that some of the -- the thing that we
3  had experienced on the 9th, that -- of -- of conflict
4  around removing barriers, that we would -- if that
5  happened, we would -- we would fall back.  We wouldn't
6  try to escalate that conflict -- conflict.
7     Q.  So that was any kind of -- you understood that
8  to mean any kind of resistance from the protesters to
9  moving or removing a barrier, you would stop; is that
10 correct?
11    A.  That's correct.
12    Q.  Okay.  And that's the direction you gave to
13 people, your -- your team?
14    A.  Yes.
15    Q.  And you -- you don't recall that any barriers
16 were moved or removed on June 11th; is that right?
17    A.  I don't.  And I -- I think that that next text
18 message where it said, "I believe Rodney" -- which is
19 referring to Rodney Maxie, my deputy director -- "and
20 Scoggins" -- Chief Scoggins -- "are in -- in together
21 with protesters discussing.  Our crew is still standing
22 by about a block off."
23      And I don't -- I think that that was -- there
24 wasn't -- from those discussions, there wasn't -- there
25 wasn't a way to get to removing barriers without

Page 139

1  conflict.  And so they made the decision to -- to stand
2  down.
3     Q.  Okay.
4     A.  Without having -- without sending crews
5  actually in to do that work.
6     Q.  So let me ask again about the eco barriers that
7  were discussed on the 9th and didn't get removed.  Do
8  you know why there was a particular interest in getting
9  the eco barriers out, as opposed to the other barriers
10 out?
11    A.  I don't.
12    Q.  So we've kind of touched on a few times your
13 communications with permanent residents and business
14 owners in the area in and around the East Precinct in
15 June of 2020; right?
16    A.  (Witness nods head.)
17    Q.  Do you recall any official meetings that you
18 had where there were representatives of the mayor's
19 group and people from the businesses in the area?
20    A.  Yes.  There was one that I participated in that
21 was inside of Elliott Bay Books that I believe was on
22 the Saturday.  So I think that's the 13th or 14th.  That
23 was with businesses.
24      There was also one that I did not participate,
25 but the head of my Transportation Operations Division,

Page 140

1  Adiam Emery, that she participated on my behalf with
2  some businesses.  I don't recall the exact date of that
3  one.
4     Q.  Okay.
5     A.  And then there were informal conversations on
6  the street.
7     Q.  Sure.  Let's talk about the one -- the first --
8  the one that you sent your representative to.  You say
9  it was Emily?
10    A.  Her name is Adiam Emery.
11    Q.  Okay.  All right.  Okay.  Got it.
12      What did she tell you about that meeting?
13    A.  So she's -- she's the director of my
14 Transportation Operations Division, and is responsible
15 for our traffic signals, and has within her staff our
16 city traffic engineer too, who signs off on traffic
17 control plans and things like that.  So she has a lot of
18 authority for -- for making decisions related to traffic
19 operations and traffic safety.
20      At the time, her -- the -- the deputy director
21 that's responsible for that portfolio was out on
22 parental leave, so Adiam was in -- in practice,
23 reporting directly to me, but usually she would report
24 through a deputy director.
25      So I sent -- I -- I couldn't attend that

35 (Pages 137 to 140)

Page 181

1  BY MR. WEAVER:
2     Q. Technology. You gotta love it.
3        All right. Exhibit 12 I've dropped into the
4  chat. And it looks like the second email down is an
5  email from you to various people, dated June 18, 2020.
6        Do you see that?
7     A. Yes.
8     Q. And was this an update that you drafted to send
9  to these people?
10    A. Was this an update that I drafted --
11    Q. Did you personally -- did you personally write
12 this email?
13    A. I did.
14    Q. Okay. And who was the -- just generally, who
15 is the group that you were sending this to, and why were
16 you sending it to them?
17    A. So this is a group that constitutes our -- our
18 labor representation within SDOT. So the -- the union
19 representation that represents S- -- represents SDOT
20 staff, and my executive leadership team, so the team --
21 so my deputies, chief of staff, and head of -- of HR
22 and -- and then people in culture, that we -- since the
23 start of the pandemic, we started meeting very regularly
24 with the -- with our labor partners because we had a lot
25 of operational issues and challenges that we needed to

Page 182

1  have sort of more consistent broad communication than we
2  had previously. So we -- we would -- we were meeting
3  first every week, and then we moved to biweekly
4  around -- around June.
5     Q. Okay. So in this particular update, you were
6  updating them on what had -- what had happened on
7  June 16th and 17th with the barrier change-out; is that
8  right?
9     A. That's right.
10    Q. Okay. So let me -- go to the second page,
11 first full paragraph. Actually, second full paragraph.
12 You say that your crew had to endure a few tense moments
13 when protesters attempted to provoke reactions and when
14 someone attempted to interfere with their work.
15       What did you mean by that? What were you
16 describing?
17    A. So there were a few incidents over the course
18 of that day. We had somebody try to climb into the cab
19 of a -- of one of our large pieces of construction
20 equipment that was move- -- he was moving the ecology
21 blocks into place, and the -- a guy -- you know, there
22 were a lot of people -- there were people who were
23 protesting, and then there were a lot of people up there
24 who had sort of other, I would say, mental challenges
25 going on. And so this guy was, like, very upset that we

Page 183

1  were moving some things around, and he really was -- was
2  very concerned.
3        And so I -- I tried to de-escalate the
4  situation. I talked to him. I sort of pulled him away
5  so our guy could do -- do this work, but he kept coming
6  back and sort of eventually tried to climb into the cab.
7  We even, like, really got him sort of moved away and
8  enabled our crew to do work.
9        And then there was another case where I think
10 somebody, like, sort of reached out, trying to hit one
11 of our employees, but didn't really -- wasn't successful
12 in doing that.
13    Q. And so you said there were some people with
14 mental challenges. What were your observations that
15 lead you to say that?
16    A. Well, this -- this person in particular, like,
17 wasn't, I think, 100 percent lucid or -- or operating on
18 the same view of reality that I had, and was sort of
19 very concerned about us moving some of the -- the --
20 moving things around out there, and just having a tough
21 time with -- with -- with reality.
22    Q. Okay. How about -- how about the person who
23 tried to hit one of your employees, but failed? What do
24 you recall about that?
25    A. You know, I think they were -- they were sort

Page 184

1  of yelling at us, saying that we should -- we should --
2  we shouldn't be there. We shouldn't be doing this work,
3  and then, like, tried to initiate contact, and our
4  person just sort of moved away, and -- and that was it.
5     Q. Did you -- at other times that you were up
6  there with crews, did you have similar run-ins with
7  people who were mentally unstable?
8     A. Yeah, I think some of it was -- was -- yeah, I
9  mean, I think, when we were then removing the barriers,
10 we made one attempt to remove barriers sort of in the --
11 a couple -- really about a week or a little bit more
12 than a week later, and -- and really were met with a lot
13 of concern and resistance.
14       I think some of those people were very
15 committed to the protest movement and some people had
16 some mental illness con- -- issues going on with them.
17    Q. Okay. So let's talk about that. About a week
18 later, you said you moved in to try to remove barriers
19 without police support; is that right?
20    A. Well, we originally -- so I -- the date -- I
21 don't have the precise date. I think it was -- started
22 around the -- the -- I want to say like the 25th or the
23 26th, where we were going to remove barriers.
24       We had police sort of present, but behind our
25 staff. They were sort of providing support, sort of

Page 185

1  if -- if we felt we needed support. We ended up seeing
2  that resistance from -- from people. We were starting
3  to fall back and -- and sort of de-conflict and move
4  away.
5       And then people saw the police and they became
6  a focal point of some of the -- the protests and
7  concerns and conflict. So we didn't -- we didn't do
8  that work without police support, but we weren't -- it
9  wasn't, I would say, police forward.
10       The police were there in support if we needed
11  it. And we ended up, you know, needing some -- some
12  engagement, but really it was in a de-conflicting, sort
13  of moving away at that point, perspective.
14       Q. Okay. What was the nature of the resistance
15  that you encountered on this later attempt?
16       A. So that was when we had people lying down in
17  front of our construction equipment, lying on top of
18  barriers and sort of blocking access for us to be able
19  to remove them. And then crowds forming around us and
20  sort of shouting down the idea that we would be removing
21  barriers.
22       Q. Were there threats of physical violence made by
23  anybody in the crowd?
24          MR. CRAMER: Objection. Form, foundation.
25       A. Yeah, I don't feel like we were -- I wasn't

Page 186

1  concerned that we were actually going to get to a point
2  of physical violence, and I don't think anybody sort of
3  said things in a -- in such a threatening way that we
4  would credibly believe that they were going to do us
5  harm at that point.
6       If we had proceeded and we had not sort of
7  de-escalated at that point, it's a little bit hard to
8  speculate on what -- what would have happened if we had
9  said, You know what? We're going to do this anyway,
10  over and above everybody's objections.
11  BY MR. WEAVER:
12       Q. So I was going to ask you about that. You
13  backed off because you were concerned that there -- it
14  might lead to violence if you continued to try to remove
15  the barriers at that point; is that right?
16       A. I think that's fair to say, that we didn't want
17  to get into an escalation of -- of conflict. We wanted
18  to de-escalate.
19       Q. Okay. And you said at some point they noticed
20  the police were hanging back behind you at some
21  distance.
22       What changed about the crowd when they saw the
23  police?
24       A. So I think they got a bit more agitated, and
25  they -- more people started coming -- we started this

Page 187

1  very early in the morning, 5:00 or 6:00 a.m. More
2  people started coming towards -- towards us. And then
3  once they saw the police there, they -- you know, even
4  more -- sort of larger crowds started to form. And
5  people took more -- sort of more of a defensive posture
6  around some of the barriers in the -- the area that
7  people had been -- like around the East Precinct.
8       Q. So what were the -- some of the defensive
9  postures that people in the crowd took?
10       A. I mean, they were just like, you know -- like
11  lying down on top of the barriers, trying to block
12  access and -- and things like that.
13       Q. Okay. So were they doing anything to try to
14  block access, other than lying down?
15       A. No, I don't -- I mean, I don't remember them
16  doing anything other than that.
17       Q. Okay. You said you went in at 5:00 or
18  6:00 a.m. Why did you choose to go in at 5:00 or
19  6:00 a.m.?
20       A. That was a time when it was generally quieter.
21  That was the earliest that we could mobilize our -- our
22  staff and recognize that this would be a sort of full
23  department response in terms -- or not full department,
24  but full -- full crew response in terms of accomplishing
25  the activities within the course of a day.

Page 188

1       And whenever we sort of waited until later
2  morning or even into the afternoon to sort of start
3  activities, we would have a hard time having a full
4  complement of staff available, and we'd have sort of
5  more people around.
6       And we'd learned that from the installation of
7  the traffic control plan on June 16th and 17th, we'd
8  sort of learned it throughout our engagement over the
9  month of June.
10       Q. That generally going --
11          (Simultaneous cross-talk.)
12  BY MR. WEAVER:
13       Q. That generally going in early in the morning,
14  you were likely to have less of the conflict that you'd
15  have later in the day or in the night; is that right?
16       A. Right. Right.
17       Q. So --
18       A. Also, in the sense of -- just -- you know, just
19  to clarify that just a little bit, you know, some of
20  this was also that, when there were fewer people there,
21  we had a little bit of an easier time communicating with
22  people that spoke on behalf of the protest organizers;
23  that, when there were more people there, there were more
24  people who would sort of step in and say, well, you
25  didn't talk about this with me. You only talked about

47 (Pages 185 to 188)

Page 237

```
 1      MR. WEAVER:  All right.
 2      THE VIDEOGRAPHER:  Going off the record.
 3  The time is approximately 4:25 p.m.
 4      (Recess from 4:25 p.m. to 4:28 p.m.)
 5      THE VIDEOGRAPHER:  We are back on the
 6  record.  The time is approximately 4:28 p.m.
 7      MR. CRAMER:  And we do not have any
 8  additional questions, but we will -- will reserve
 9  signature.
10      THE VIDEOGRAPHER:  Thank you.  This
11  concludes today's deposition of Sam -- Samuel Zimbabwe.
12  The time is approximately 4:29 p.m.  Going off the
13  record.
14      (Deposition concluded at 4:29 p.m.)
15      (Reading and signing was requested
16       pursuant to FRCP Rule 30(e).)
17              -o0o-
```

Page 238

```
 1          C E R T I F I C A T E
 2
 3  STATE OF WASHINGTON
 4  COUNTY OF PIERCE
 5
 6      I, Cindy M. Koch, a Certified Court Reporter in
 7  and for the State of Washington, do hereby certify that
 8  the foregoing transcript of the deposition of Samuel
 9  Zimbabwe, having been duly sworn, on October 28, 2021,
10  is true and accurate to the best of my knowledge, skill
11  and ability.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13  and seal this 5th day of November, 2021.
14
15
16      _____
        CINDY M. KOCH, CCR, RPR, CRR
17
18  My commission expires:
19  JUNE 9, 2022
```



# ERRATA

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 10/28/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Samuel Zimbabwe

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Sam Zimbabwe (Nov 19, 2021 09:23 PST)

Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# DECLARATION

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 10/28/2021

**WITNESS:** 30(b)(6) and Individual Deposition of Samuel Zimbabwe

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
Sam Zimbabwe (Nov 19, 2021 09:23 PST)

30(b)(6) and Individual Deposition of Samuel Zimbabwe

Signed on the __19th__ day of __November__, 2021.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com