# EXHIBIT 16

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
          Plaintiffs,           )
                                )
     vs.                        )   No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
          Defendant.            )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

of

SRJ dba CAR TENDER - JOHN McDERMOTT
_____

DATE:  Wednesday, January 19, 2022

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Page 16

1  shop, you have to function many different hats.  It's
2  not -- you know, you're dealing with fairly small scale;
3  it's not a large corporation.  So you have to wear many
4  different hats, not one.  Because of the pandemic, because
5  of people not wanting to work, you know, we all fill
6  various roles as individuals at the company.
7      Q.  So did you fill -- well, so first, what is a
8  parts person?  What does that mean?
9      A.  You would acquire parts for the vehicles that
10 need to be repaired and, you know, provide them to the
11 technicians that need to repair the car.  You would order
12 inventory, et cetera.
13     Q.  And is your -- was your role as a parts person a
14 role that you had prior to COVID?
15     A.  No.
16     Q.  Okay.  So prior to COVID, did you focus on the
17 ownership role?
18     A.  So when you take your car to an automotive repair
19 facility, the person that greets you is commonly referred
20 to as a service advisor.  So until we hired a second
21 service advisor, I functioned as a service advisor.  Car
22 Tender's gone through various, you know, iterations of, you
23 know, employees in the 20-plus years that we've owned it.
24 When we -- when Russell and I purchased Car Tender in 2016,
25 the goal was to move it to a different location.

Page 48

1    Q.   So I think you mentioned earlier that in 2016,
2  you started thinking about moving out of Capitol Hill; is
3  that correct?
4    A.   That's incorrect.
5    Q.   Okay.  So in 2016 when you purchased the business
6  from the third partner, did you have any plans to move Car
7  Tender's location?
8    A.   Our plan at that point was to lease the current
9  building until we found a new location on Capitol Hill.
10  Our intent was never to leave Capitol Hill.
11    Q.   Okay.  And before 2016, were you leasing that
12  building?
13    A.   No, we owned it.
14    Q.   Okay.  And how did it get converted from an
15  owner -- property ownership to a lease?
16    A.   In order for the business to continue, if we
17  wanted to maintain it, the property had to be sold in order
18  for Russell and myself to have the funds to purchase the
19  balance of the business from our former partner.
20    Q.   Okay.  So you used the sale of the -- you used
21  the proceeds --
22    A.   Proceeds from the sale.
23    Q.    -- from the sale of the land to acquire the
24  departing owner's ownership stake in Car Tender.
25    A.   Correct.

Page 65

```
 1      A.   I think one of them was -- one of them -- one of
 2   them may have been during it, just for looking for other
 3   options.
 4      Q.   Okay, got it.  And the other one you think was
 5   after?
 6      A.   -- prior to.
 7      Q.   Prior, okay.  And -- okay.  So then other than
 8   those three, were there any other -- any other properties
 9   in the Capitol Hill area that you were looking at?
10           MR. WEAVER:  Objection.
11      A.   I'm not sure, you know, what numbers and where
12   they were specifically, I don't know.
13   BY MS. IVERSON:
14      Q.   Any that you got beyond the drive-by stage?
15      A.   No.
16      Q.   Okay.  And so -- and I know you said you didn't
17   have a sense of exactly when you started the permit process
18   and it was a lengthy process, but any sense of when the
19   process ended?
20      A.   I'd have to look it up.
21      Q.   Got it.  Do you think it was before 2020?
22      A.   It was before 2020.
23      Q.   Was before 2020, okay.  All right.  So at the
24   beginning of 2020 before COVID, were you look at any other
25   properties in Capitol Hill?
```

Page 66

1          MR. WEAVER:  Objection.
2     A.   Don't believe so.
3  BY MS. IVERSON:
4     Q.   Okay.  And were you looking at any other
5  properties in any other neighborhoods?
6     A.   We had looked at a couple other locations, yeah.
7     Q.   Okay.  What other locations?
8     A.   Don't have exact addresses, but geographically I
9  guess you could say SODO.
10    Q.   SODO.  Just in SODO?
11    A.   Yeah.  SODO, Georgetown, somewhere in there.
12 Maybe Beacon Hill.  I think there was one on Beacon Hill.
13    Q.   Okay.  Would you say multiple properties in each
14 of those neighborhoods?
15    A.   Potentially, yeah.
16    Q.   What made you look in the SODO, Georgetown,
17 Beacon Hill area?
18    A.   Ease of access as far as, you know, the freeway,
19 plus, you know, available space.  I mean we had a fairly
20 sizable -- plus there were some other shops down there that
21 were potentially available that could have been potential
22 fits.
23    Q.   Potential fits for what?
24    A.   Car Tender.
25    Q.   But fits in what -- how did they fit with Car

JOHN MCDERMOTT
1/19/2022

Page 69

1  work for you guys so you can get out of the -- where we
2  were.
3      Q.  Got it.  All right.  So -- okay, so the friend
4  fishing in Alaska -- he called you after CHOP had started?
5      A.  Yeah.
6      Q.  Okay.  And when he called you, were you actively
7  looking for a new location?
8          MR. WEAVER:  Objection.
9      A.  I think we already talked about this in that we
10 were ultimately going to move Car Tender somewhere; so I
11 guess you could say we were on some level actively looking,
12 but we were not -- we were not under any pressure, so we
13 kind of stopped looking, you know, maybe around January,
14 December of '19, January of 2020.  We weren't really
15 looking at that point in time just because the pressure was
16 kind of off, and having just dealt with the other stuff,
17 you know, we were kind of trying to decide what we wanted
18 to do.
19 BY MS. IVERSON:
20     Q.  Okay.  So you think you had stopped looking --
21     A.  Yeah.
22     Q.  -- by the end of January 2020?
23     A.  Or probably by the beginning of.
24     Q.  Beginning of, okay.  Okay.  And do you -- I mean
25 did you do a drive-by of any potential properties between

Page 221

1   post and I'd call bullshit on it, but --
2       Q.   Meaning like you would comment on their posts?
3       A.   I'd say bullshit, yeah.
4       Q.   Okay, got it, but you didn't affirmatively post
5   on Facebook about CHOP?
6       A.   No.
7       Q.   Okay.  And did you ever reach out -- you
8   didn't -- did you ever reach out to anyone via --
9       A.   No.
10      Q.   -- (inaudible) or anything like that, okay.  And
11  then just setting aside emergency services for the moment,
12  did you -- did the City provide Car Tender with any other
13  services after June 8th, 2020?
14      A.   Not really.
15      Q.   Okay.  Did you have garbage pickups?
16      A.   That was the one thing that the City did, was
17  they picked up the garbage.
18      Q.   Oh, okay.  And did they do that -- I know it's
19  not every day, but did they do it on schedule?
20      A.   I wouldn't say it was on schedule every time, but
21  they would show up.
22      Q.   They would show up, okay.  Did the frequency of
23  those pickups decrease in June 2020 versus April 2020 when
24  COVID was going on?
25      A.   There was a period of when the CHOP stuff started

JOHN MCDERMOTT
1/19/2022

Page 269

1             REPORTER'S CERTIFICATE

2

       I, Mindy L. Suurs, the undersigned Certified Court
3  Reporter, pursuant to RCW 5.28.010, authorized to
   administer oaths and affirmations in and for the State of
4  Washington, do hereby certify:

5

       That the foregoing testimony of JOHN McDERMOTT
6  was given before me at the time and place stated therein
   and thereafter was transcribed under my direction;

7

       That the sworn testimony and/or proceedings were by me
8  stenographically recorded and transcribed under my
   supervision, to the best of my ability;

9

       That the foregoing transcript contains a full, true,
10 and accurate record of all the sworn testimony and/or
   proceedings given and occurring at the time and place
11 stated in the transcript;

12      That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing
13 but the truth;

14      That I am not a relative, employee, attorney, or
   counsel of any party to this action or relative or employee
15 of any such attorney or counsel and that I am not
   financially interested in the said action or the outcome
16 thereof;

17
   DATE:  January 25, 2022
18

19

20

21

22   _____
     Mindy L. Suurs
23   Certified Court Reporter #2195

24

25

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126