# EXHIBIT 24

FILED
2020 SEP 25 09:11 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 20-2-14351-1 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

The Estate of SUMMER JOLIE WILLIAMS TAYLOR, by and through MATTHEW D. TAYLOR, Personal Representative, DANIEL GREGORY, JASON SCHIERER as guardian ad litem for minor MALICHI HOWE a.k.a. BRYAUNA HOWE, JOHN W. KELLIHER, JENNA KINYON, JORDAN A. PICKETT, DANIEL PIERCE, JOSEPH WIESER, GILLIAN WILLIAMS, and DOES 1-40;

Plaintiffs,

v.

CITY OF SEATTLE, a governmental entity, and STATE OF WASHINGTON, a governmental entity;

Defendants.

No.

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS

Plaintiffs allege:

## I. PREAMBLE

Before Washington was allowed to become a state, it was required to draft and ratify a state Constitution. During the summer of 1889, a group of 75 delegates drafted the Constitution which was then ratified by territorial election. On November 11, 1889, President Harrison approved the Constitution and Washington was admitted to the union.

Though the Constitution of the United States is the supreme law of the land, the Washington State Constitution is the basis for creation and enactment of our local governments.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

In Washington, all political power is inherent within The People. State and local governments obtain their just powers from the consent of The People. And those powers are to be established to protect and maintain individual rights.[1]

City and State governmental entities operating in Seattle are not above the law. Their solemn duties include protecting and serving The People. Even when The People are critical of or peacefully disobedient towards those in power or who have law enforcement authority over them, governments are not allowed to react out of irritation or anger. Governments are not allowed to indiscriminately lash out against The People invoking their Constitutional rights to assemble and protest, even if in disharmony with other laws. Governments are not allowed to create or contribute to situations imperiling The People protesting.

Seattle has a long history of public protests by The People.

After the Kent State Shootings, on May 5, 1970 Interstate 5 was closed with police physically present while 7,000 University of Washington anti-war student protesters marched down the roadway without the police injuring or arresting the protesters.[2]

---

[1] Washington State Constitution, Art. I, Sec. 1.

[2] MOHAI archives.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

By contrast the City's handling of the 1999 WTO protests resulted in adverse rulings from the Federal Courts against the City for its impermissible and excessive use of force against protesters.[3]

ONE WAY
ONE WAY
Profit at what Cost? No to WTO
This Organic Farmer
WTO

[3] Associated Press – Eric Draper photographer

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 3

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

The City demonstrated that it could refrain from improperly harming protesters when, in 2017, more than 100,000 people flooded Seattle streets as part of the global Women's March. The SPD employed no resistance to this political demonstration that was not about the police.

HATE
HAS
NO
HOME
HERE

Following centuries of systemic discrimination and abuse against Black people in America, on May 25, 2020, a 17-year-old teen captured cell phone footage of George Floyd's murder by police. The public horror of watching Mr. Floyd's killing by law enforcement generated a spark that ignited nationwide civil unrest to a degree perhaps not seen in a generation.

This lawsuit is filed on behalf of peaceful protesters in Seattle, all of whom were cloaked within the power of the Washington State Constitution to engage in Freedom of Speech and Assemblage on behalf The Black Lives Matter Movement and George Floyd.

This case alleges that in response to protests against police discrimination and brutality,

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 4

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

the SPD chose to engage in discrimination and brutality. The SPD defied conditions of a Federal Consent Decree and violated its own policies, practices and procedures.

## II. PARTIES

**PLAINTIFFS**

2.1 At all material times The Taylor family resided in Seattle, King County, Washington. Matthew Taylor was appointed the Personal Representative of the Estate of Summer Jolie Williams Taylor, on July 10, 2020, in the Superior Court of King County, Washington, Cause No. 20-4-04028-0 SEA. He brings claims as personal representative of the Estate of Summer Jolie Williams Taylor, on behalf of statutory beneficiaries Matthew D. Taylor (father of Summer Taylor), Dalia Ruth Williams Taylor (mother), and Luke W. Taylor (brother).

2.2 At all material times, Plaintiff Daniel Gregory was a resident of Seattle, King County, Washington.

2.3 At all material times, Plaintiff Malichi Howe a.k.a. Bryauna Howe, a minor, was a resident of Kent, King County, Washington. Their[4] father, Jason Schierer, guardian ad litem brings claims on their behalf.

2.4 At all material times, Plaintiff John W. Kelliher was a resident of Seattle, King County, Washington.

2.5 At all material times, Plaintiff Jenna Kinyon was a resident of Spanaway, Pierce County, Washington.

2.6 At all material times, Plaintiff Jordan A. Pickett was a resident of Seattle, King County, Washington.

[4] Mx. Howe is non-binary and uses they/them pronouns.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

2.7 At all material times, Plaintiff Daniel Pierce was a resident of Seattle, King County, Washington.

2.8 At all material times, Plaintiff Joseph Wieser was a resident of Seattle, King County, Washington.

2.9 At all material times, Plaintiff Gillian Williams was a resident of Seattle, King County, Washington.

2.10 Does 1-40 are peaceful protesters injured by Defendants while exercising their First Amendment rights, who have filed or will file tort claims, and who will be named as Plaintiffs to this complaint after the 60-day waiting period has expired.

**DEFENDANTS**

2.11 Defendant City of Seattle is a first-class city as described in RCW 35.22.010 and is governed and organized in accordance with the Washington State Constitution Article 11, Section 10, Amendment 40. The Seattle Police Department is established according to the City Charter Article VI. The City of Seattle is located in King County, Washington.

2.12 The City of Seattle is vicariously liable for all of its employees' acts and omissions, including but not limited to the acts and omissions of Seattle Police Department officers.

2.13 Defendant State of Washington is a governmental entity that owns and operates Interstate 5 (I-5) in King County. The Washington State Patrol is a department of the state government established according to RCW 43.43 et. seq.

2.14 The State of Washington is vicariously liable for all of its employees' acts and omissions, including but not limited to the acts and omissions of its state patrol officers.

## III. NOTICE OF CLAIM FILING

Plaintiffs filed the following Claims for Damages:

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

3.1 Daniel Gregory: His claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99105. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.2 Malichi Howe a.k.a. Bryauna Howe: Their claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99106. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.3 John W. Kelliher: His claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99107. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.4 Jenna Kinyon: Her claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99108. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.5 Jordan A. Pickett: His claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99109. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.6 Daniel Pierce: His claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99110. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.7 Estate of Summer Jolie Williams Taylor: Their claims were filed with the City of Seattle and the State of Washington on July 13, 2020. Their City of Seattle claim was assigned Claim No. C-99101. More than 60 days have elapsed since these claims were filed before the filing of this plaintiff's complaint against Defendants in the above-entitled court. The filing of these claims properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.8 Dalia Ruth Williams Taylor: Her claims were filed with the City of Seattle and the State of Washington on July 13, 2020. Her City of Seattle claim was assigned Claim No. C-99102. More than 60 days have elapsed since these claims were filed before the filing of this plaintiff's complaint against Defendants in the above-entitled court. The filing of these claims properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.9 Matthew D. Taylor: His claims were filed with the City of Seattle and the State of Washington on July 13, 2020. His City of Seattle claim was assigned Claim No. C-99103. More than 60 days have elapsed since these claims were filed before the filing of this plaintiff's complaint against Defendants in the above-entitled court. The filing of these

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

claims properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.10 Luke W. Taylor: His claims were filed with the City of Seattle and the State of Washington on July 13, 2020. His City of Seattle claim was assigned Claim No. C-99104. More than 60 days have elapsed since these claims were filed before the filing of this plaintiff's complaint against Defendants in the above-entitled court. The filing of these claims properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.11 Joseph Wieser: His claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99111. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

3.12 Gillian Williams: Her claim was filed with the City of Seattle on July 13, 2020. This claim was assigned Claim No. C-99112. More than 60 days have elapsed since this claim was filed before the filing of this plaintiff's complaint against Defendant City of Seattle in the above-entitled court. The filing of this claim properly satisfied the notice and other procedural requirements of RCW 4.96 et. seq.

## IV. JURISDICTION AND VENUE

4.1 The Superior Court of King County, State of Washington, has subject matter jurisdiction over this action pursuant to RCW 2.08.010.

4.2 Jurisdiction and venue are proper in and the Superior Court of Washington King County Seattle Division because the incidents occurred in Seattle, King County, Washington, and because Defendants City of Seattle and County of King are located there.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

## V. FACTS

**Seattle Police Department's Civil Rights and Use of Force History**

5.1 For over 20 years, the Seattle Police Department (SPD) has had many opportunities to learn from its mistakes involving excessive use of force, particularly against People of Color; as well as its indiscriminate and excessive use of "less lethal" Crowd Control Weapons in response to protected speech.

**1999 World Trade Organization Protests**

5.2 In 1999, protests occurred when the World Trade Organization (WTO) Ministerial Conference was held in Seattle. Protesters focused on issues including workers' rights, sustainable economies, and environmental and social issues.[5]

5.3 Both the Mayor of Seattle and the Governor declared a state of emergency in response to the protests. The City was criticized worldwide for mishandling the protests and for being unprepared.[6]

5.4 Months of analysis followed the WTO, exploring issues surrounding the rights of free speech and assembly, abuse by law enforcement officers, and mistreatment of individuals taken into custody.[7] Class action lawsuits resulted in the City agreeing to pay $1,250,000, sealing all the protesters' arrest records, requesting that other government agencies expunge the arrests from their records, and incorporating into its police training the federal court decision holding that police lacked probable cause for the arrests.[8]

---

[5] https://www.seattle.gov/cityarchives/exhibits-and-education/digital-document-libraries/world-trade-organization-protests-in-seattle (accessed August 20, 2020).
[6] *Id.*
[7] *Id.*
[8] https://www.publicjustice.net/case_brief/hankin-v-city-of-seattle/ (accessed August 20, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777



ONE WAY
ONE WAY
Profit at what Cost? No to WTO
This Organic Farmer

**2012 Department of Justice Consent Decree**

5.5 Ten years after WTO, 35 community organizations wrote the United States Department of Justice (DOJ) and United States Attorney Jenny Durkan (current City Mayor), to request investigation of the SPD's use of excessive force, particularly against People of Color.[9]

5.6 The DOJ completed its investigation in 2011 and issued a report documenting a "pattern or practice of constitutional violations regarding the use of force that result from structural problems, as well as serious concerns about biased policing." This report was signed by Jenny Durkan.[10]

5.7 In 2012, the United States and Seattle entered a Consent Decree requiring significant

---

9 http://www.seattle.gov/Documents/Departments/Council/Members/Harrell/DOJ/2012-01aclu_ltr120310.pdf (December 3, 2010).

10 https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf (December 16, 2011).

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 11

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

reforms of the SPD, including new use-of-force policies and trainings that emphasize de-escalation, as well as new supervision and oversight with community involvement.[11]

**2015 Black Lives Matter Protests and May Day 2015**

5.8 In 2015, the Community Police Commission (CPC)[12] made recommendations specifically in response to the SPD's handling of Black Lives Matter marches in the wake of the events in Ferguson, Missouri,[13] as well as the events of May Day 2015.[14] The key issues raised by the CPC included:

- Movement control and permitting selective access depending on perceived affiliation with a demonstration (herding or directing marchers away from their intended destinations, elevating business interests over the free speech rights of demonstrators).
- Inaccurate statements made by SPD leadership that diminished public trust (denying that the movement of marchers was curtailed and inaccurately describing an "assault" on an officer who in fact fell during a march).
- Targeting specific individuals such as leaders of demonstrations (giving the impression that SPD was trying to demobilize the demonstration rather than make enforcement actions based on the alleged criminal behavior of particular individuals).
- Out of policy/harmful use of pepper spray, blast balls and other projectiles (spraying peaceful demonstrators with pepper spray, using blast balls in the immediate vicinity of masses of demonstrators causing significant and painful injury).
- Unnecessary use of intimidating tactics (deploying a disproportionate number of officers in "riot gear" to relatively small events and marches).
- Disparate responses to demonstrators of different racial and perceived political identities (treating white demonstrators differently than People of Color, uttering racial

[11] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 3-1, Settlement Agreement and Stipulated Order of Resolution (July 27, 2012).

[12] The CPC was created by the Consent Decree to "promote greater transparency and public understanding of the Seattle Police Department" and charged with reviewing the police accountability system and making any necessary recommendations. Members are representative of "the many and diverse communities in Seattle, including members from each precinct of the city, police personnel, faith communities, minority, ethnic, and other community organizations, and student or youth organizations."

[13] On August 9, 2014, Michael Brown, an 18-year-old Black male, was shot and killed by police officer Darren Wilson in Ferguson, Missouri. Demonstrations were held in Seattle near the end of 2014, after a Missouri grand jury failed to indict Officer Wilson.

[14] May 1, also known as International Workers' Day, annually draws gatherings, marches, demonstrations, and protests in Seattle. Although many of these events are peaceful, May Day has also resulted in violence.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

slurs against certain demonstrators).[15]

5.9 The Seattle City Council is the legislative body of the city. The Council develops laws and policies intended to promote the health and safety of Seattle's residents. The Council passes all legislation related to the city's police.[16]

5.10 City Council members criticized the SPD's handling of May Day 2015, including an incident where a police officer rode his bike directly into a group of protesters, from behind, tackling one of them. Council Member Bruce Harrell called this: "the first act of violence, the first act of unfairness… that created the melee"). The Council also condemned the SPD's use of "blast balls" causing injuries to protesters and at least two reporters. The SPD's own blast ball training video at the time explicitly warned against throwing them into crowds.[17]

5.11 Two months later, then-SPD Chief Kathleen O'Toole announced the assembly of a group

[15] https://seattlecpc.files.wordpress.com/2020/06/final-re-spd-responsetopost-fergusonblacklivesmatter demonstrations05-19-15.pdf (May 19, 2015).
[16] http://www.seattle.gov/council/
[17] https://www.thestranger.com/blogs/slog/2015/05/07/22176478/city-counc (May 7, 2015).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

of "independent, national experts to review the Seattle Police Department's performance in crowd management," including the Center for Policing Equity[18] and police expert Steve Ijames.[19] However, no recommendations were ever publicly presented.[20]

5.12 While these reports were pending, the Office of Police Accountability (OPA) also made recommendations to the SPD regarding various use-of-force issues in response to May Day 2015, including:

- Re-evaluating how and under what circumstances SPD officers used blast balls as a means of moving or dispersing crowds (noting that contrary to SPD's supposed policy and training, blast balls exploded "in extremely close proximity to people, not all of whom were engaged in destruction of property or posed a threat to public safety" – which put protesters at risk of serious injury or even death).

- Changing how blast balls are inventoried and controlled within the SPD ("These devices are munitions and must be treated as such").

- Reviewing SPD's policy and training with respect to the use of less lethal projectiles in crowd management situations to reduce the chances of them striking the wrong person including people lawfully exercising their constitutional rights, or causing serious bodily injury.

- Curtailing the use of officers from mutual aid agencies in direct crowd management assignments.

- Studying how the SPD documents and investigates the use of force by officers during crowd management situations and demonstrations or protests.

- Making names and/or serial numbers of officers more visible, including when officers are wearing body armor, for better identification in photographs and videos taken during events.

- Rethinking its approach to planning and providing policing services in relation to

[18] A research center founded at University of California-Los Angeles (now at Yale University) that collects data and helps law enforcement agencies identify ways to improve their relationship with the communities they serve.

[19] https://spdblotter.seattle.gov/2015/07/28/chief-otoole-announces-partnership-to-review-crowd-management-practices/ (July 28, 2015).

[20] https://www.kuow.org/stories/unanswered-letters-buried-reports-critics-say-spd-response-on-crowd-control-is-overdue (June 26, 2020). It appears the report by Mr. Ijames ultimately became public record in 2018 as a result of a lawsuit against the SPD for damages caused by the use of blast balls in May Day 2016, and in 2020 the Center for Policing Equity report was released in response to a news inquiry and published online. They may have also been released on an individual basis in response to specific public disclosure or discovery requests.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

protests and demonstrations, specifically by looking beyond sources with military experience in order to search for best practices for supporting the free expression of public protests while limiting the use of force necessary to promote public safety, and by seeking "an effective means by which Seattle's many diverse peoples and neighborhoods can actively participate in this process and communicate to SPD how they want their police service to handle protests and demonstrations in their city."[21]

5.13 Chief O'Toole quickly acknowledged and responded to the OPA's concerns, noting:

> Because we in Seattle, including the SPD, are so committed to supporting First Amendment rights to assemble and be heard, we find ourselves very much at the forefront of developing an approach that will ensure our ability to facilitate demonstrations of this type, while at the same time protecting persons and property from the violence and destruction that, unfortunately, seems to occur each year. We know that the work we are doing now, in collaboration with our federal partners, the Monitoring Team, and a team of nationally recognized experts, may ultimately serve as a model for other agencies around the country, and we take seriously the importance of developing policies and procedures that are well researched, well informed and – importantly – workable in practice.[22]

5.14 Mr. Ijames issued his report to the SPD in April 2016, shortly before May Day 2016. Yet he was not as "independent" as Chief O'Toole led the public to believe. Before he was selected, Mr. Ijames and Chief O'Toole had a prior working relationship. In his initial communications with the SPD, he stated he was "fine working void of payment," noting that "In some cases, payment can impact-most often negatively-how findings are perceived." After Mr. Ijames issued his preliminary report on April 10, 2016, the SPD made numerous revisions to his report based upon documents he had not seen – revisions that he rapidly accepted.[23]

---

[21] http://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/PM-OToole_MA_letter_%202015-0643.pdf (December 10, 2015).

[22] http://www.seattle.gov/documents/Departments/OPA/ManagementAction/COP_Response_2015OPA-0643_MA.pdf (January 8, 2016).

[23] Levine v. City of Seattle, 2:16-cv-01284-TSZ, Doc. 40, 41, Plaintiff's Motion for Relief and Sanctions, Declaration of Dan Kalish in Support of Plaintiff's Motion for Relief and Sanctions (April 26, 2018).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

**May Day 2016**

5.15 In his April 2016 report, Mr. Ijames recommended that the SPD be prepared to conduct an inquiry into its deployment of blast balls, if used, in the upcoming May Day – reiterating the concerns of others like the CPC and OPA that blast balls should never be used "in unreasonably close proximity to a human being," given their explosive nature and their known risk of causing death or serious injury.[24]

5.16 As of June 2020, the Seattle Office of Inspector General (OIG) could not confirm if the SPD had completed the recommended inquiry.[25]

5.17 Mr. Ijames also recommended that the SPD be prepared to conduct an inquiry into "the specific process involving the issuing, deployment, and firing of impact projectile (less lethal projectiles) launchers during May Day 2016…."[26]

5.18 In advance of May Day 2016, the CPC reviewed a draft of the SPD crowd management training material, and suggested changes based upon their observations that: "1) the consequences of using blast balls were minimized, and 2) de-escalation principles in a mass context were not emphasized clearly enough."[27]

5.19 The SPD did not allow the CPC to observe the actual training to confirm whether its recommendations were incorporated.[28]

5.20 By that point the SPD had commissioned, reviewed, and even edited Mr. Ijames' report. The SPD had also received recommendations from CPC, OPA and others. Yet on May Day

---

[24] https://kuow-prod.imgix.net/store/6d06e067760828b0b42b902ffde3eef0.pdf (April 28, 2016).
[25] https://www.seattle.gov/Documents/Departments/OIG/Other/LessLethalWeaponsUsage06122020.pdf (June 12, 2020).
[26] https://kuow-prod.imgix.net/store/6d06e067760828b0b42b902ffde3eef0.pdf (April 28, 2016).
[27] https://seattlecpc.files.wordpress.com/2020/06/final-cpc-letter-to-city-stakeholders-re-blast-balls-6-13-16.pdf (June 13, 2016).
[28] *Id.*

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

2016 just as in the year before, the SPD engaged in similar excessive use of force and excessive use of Crowd Control Weapons.



5.21    After examining SPD's continuation of its prior dangerous tactics, the CPC specifically called for the immediate cessation of blast ball use. The CPC noted that, despite its warnings and recommendations, the injuries incurred by numerous non-violent observers on May Day 2016 demonstrated that "further examination of the use of these tools [was] warranted."[29]

5.22    The SPD never stopped using blast balls during mass protest or crowd control events.

**Disciplinary and Accountability Failures**

5.23    The SPD's problems throughout the past decade are not limited to the excessive use of force, excessive use of Crowd Control Weapons, and disparate treatment of People of

---

[29] *Id.*

COMPLAINT FOR DAMAGES ON BEHALF OF
BLACK LIVES MATTER PROTESTERS FOR
WRONGFUL DEATH, PERSONAL INJURIES, AND
CIVIL RIGHTS VIOLATIONS - 17

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA  98119
Tel: 206-448-1777

Color. The SPD has also experienced significant discipline and accountability failures.

5.24 In 2014, following a scandal caused by a new Interim Chief of Police reversing several findings of officer misconduct and discipline orders, the CPC provided the Mayor, City Council, and City Attorney a thorough set of Accountability System Recommendations developed with input from civilian oversight experts and community leaders.[30]

5.25 In 2017, the City Council unanimously passed, and the Mayor signed, Accountability Ordinance No. 125315, creating an integrated structure of community input and civilian oversight through a new Office of Inspector General (OIG), a strengthened Office of Police Accountability (OPA), and a permanent Community Police Commission (CPC).[31]

5.26 The Accountability Ordinance would have altered the disciplinary appeals process by replacing the existing, officer-biased system with one that heavily deferred to the police chief's disciplinary decision, confining its appeal review to "whether the employee's removal... was made in good faith for cause."[32]

5.27 A couple months later, the City Council also unanimously adopted Seattle Municipal Code 14.11 regarding Bias-Free Policing. The code forbids selective enforcement or non-enforcement, "the effect of which is to adversely affect or differentiate between or among individuals or groups of individuals… because of race… or political ideology." This Code strengthened a policy that had been in place since 2015, meant to encourage police officers to speak out against and report incidents of biased-based policing. The policies place

[30] https://www.aclu-wa.org/pages/timeline-seattle-police-accountability (accessed August 20, 2020).
[31] *Id. See also* https://seattle.legistar.com/LegislationDetail.aspx?ID=3041612&GUID=189886AB-6C46-438A-AB56-DA45AE4FCD7B&Options=&Search=&FullText=1
[32] *Id.*

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

responsibility and accountability not only on officers who engage in discriminatory policing but also on supervisors, commanders, and civilian managers.[33]

5.28 In 2018, six years after the Consent Decree was entered into, United States District Judge James L. Robart found that the City had achieved full and effective compliance. The City then entered a two-year sustainment period. Judge Robart stated: "if collective bargaining results in changes to the accountability ordinance that the court deems to be inconsistent with the Consent Decree, then the City's progress in [the sustainment period] will be imperiled."[34]

5.29 Shortly after the Court's express warning, the City ratified a new contract with the Seattle Police Officers Guild (SPOG). The contract rolled back the reforms established by Accountability Ordinance No. 125315, and reverted back to the officer-biased appeals process.[35]

5.30 Within days of the contract's approval, it was revealed that the SPOG Disciplinary Review Board reversed the firing of an Officer who punched a handcuffed woman seated in the back of his patrol car hard enough to fracture the orbital rim of her right eye. Discipline was reduced to a 15-day suspension and he was reinstated with full back pay (less the suspension period).[36]

**Consent Decree - Ongoing Noncompliance**

5.31 Concerned by these SPOG-related developments, in May 2019, Judge Robart determined

---

[33] http://seattlemedium.com/seattle-city-council-approves-bias-free-policing-law/ (July 19, 2017).
[34] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 439, Order Finding Initial Compliance With the Consent Decree (January 10, 2018).
[35] https://www.aclu-wa.org/pages/timeline-seattle-police-accountability (accessed August 20, 2020); https://www.aclu-wa.org/news/community-groups-urge-seattle-city-council-reject-police-contract-step-backwards-community (November 8, 2018).
[36] https://www.king5.com/article/news/local/seattle-officer-who-punched-woman-in-handcuffs-should-be-reinstated-review-says/281-61630542 (November 20, 2018).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

the City had fallen out of compliance with the Consent Decree. He specifically criticized the SPOG CBA on the basis that it "(1) retains significant attributes of the old appeals system that the parties admit needs reform, and (2) abrogates critical reforms in the Accountability Ordinance that the parties put in place," specifically reforms relating to use-of-force, the supervision of officers, and community confidence.[37]

5.32 On May 7, 2020, shortly before the BLM/George Floyd protests began, the City sought termination of at least some of the Consent Decree sustainment plan provisions despite its continued lack of compliance with the Consent Decree. The City did not address the Court's May 2019 finding that it had fallen out of compliance with the Consent Decree in the areas of discipline and accountability, or the Court's order requiring the City to bring itself back into compliance in these areas. The City simply said it "has taken significant steps to address these concerns and will submit a filing responding to them by August 1, 2020."[38]

5.33 On June 3, 2020, after the OPA had received approximately 12,000 complaints concerning the SPD's response to the first weekend of the BLM/George Floyd protests,[39] the City withdrew its May 7, 2020 Motion seeking termination of the sustainment provisions.[40]

5.34 Given Seattle's long history of mass protests, the SPD's repeated failures in encountering them, including the mis-use of Crowd Control Weapons, and the warnings and recommendations of multiple watchdog and community organizations, the City and SPD

---

[37] https://www.kuow.org/stories/j-judge-seattle-police-fall-out-compliance-with (May 15, 2019); United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 562, Order Finding City of Seattle Partially Out of Compliance With the Consent Decree (May 21, 2019).
[38] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 612, City of Seattle's Memorandum in Support of Parties' Joint, Stipulated Motion to Terminate Consent Decree Sustainment Plan Provisions (May 7, 2020).
[39] http://www.seattle.gov/Documents/Departments/OPA/PressReleases/06-01-20_OPA-Press-Release-Following-Demonstrations.pdf (June 1, 2020).
[40] https://news.seattle.gov/2020/06/03/city-attorney-to-withdraw-consent-decree-motion/ (June 3, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

knew or should have known long before the BLM/George Floyd protests of the need to address law enforcement protest issues through measures such as research, policies/protocols, instruction/training, and discipline/accountability.

**Systemic Racism, Black Lives Matter, and the Importance of the Right to Protest**

5.35 White supremacy is a lethal public health issue.

5.36 The United States Department of Homeland Security has classified white supremacists as the most "persistent and lethal threat" in the United States. The Department predicts an "elevated threat environment" at least through early 2021.[41]

5.37 America's long history of white supremacy has led to systemic racism. Racial stratification, stereotypes, and biases are embedded in American institutions.

5.38 Among the most pernicious contributors to systemic racism is the justice system, and its frontline – American policing, which has long suffered from an epidemic of violence against Black, Indigenous, and People of Color (BIPoCs).[42]

5.39 The Black Lives Matter (BLM) movement has arisen in the past decade as a political and social movement advocating for non-violent civil disobedience in protest against incidents of police brutality and racially motivated violence against Black people.[43]

5.40 Protests, particularly those on issues of civil rights, have played pivotal roles in our nation's history, and are entitled to the fullest extent of First Amendment protections.

**The Spark – George Floyd**

5.41 On May 25, 2020, George Floyd was murdered in Minneapolis, Minnesota by the police.

---

[41] https://www.cnn.com/2020/09/08/politics/white-supremacy-dhs-draft-assessment/index.html (September 8, 2020).
[42] https://www.vox.com/policy-and-politics/2020/7/7/21293259/police-racism-violence-ideology-george-floyd (July 7, 2020).
[43] https://en.wikipedia.org/wiki/Black_Lives_Matter (accessed September 9, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

Mr. Floyd, a Black man, was accused of a non-violent offense – attempting to use a counterfeit $20 bill. During his arrest, while he was lying on the ground, handcuffed and restrained, a police officer placed his knee and the weight of his body on Mr. Floyd's neck. Three other officers at the scene placed their bodies on top of Mr. Floyd and otherwise participated. For nearly nine minutes, Mr. Floyd struggled to breathe and pleaded for mercy, until he lost consciousness and died. Bystanders were warned away, threatened by the police and not allowed to intervene. A 17-year old teenager captured the event on their cell phone.

5.42 George Floyd's murder by police was undisputable due to the video evidence, eyewitness reports, and forensic analysis. Throughout modern history, untold numbers of Black people have been injured or killed by police across the country due to excessive force. But it was George Floyd's horrendous murder that was the final spark that lit the fire causing a nationwide mass protest movement.

5.43 Seattle has been one of the epicenters of the BLM/George Floyd protests. This is in part due to increasing public awareness and condemnation of police shooting cases resulting in the killing of numerous local Black and minority people who either had called for help (as in the case of Charleena Lyles who was having a mental health episode), or who were shot to death on the pretext that they were threatening officers with deadly weapons that did not in fact exist (as in the case of Tommy Le who was holding a pen).

**Proclamation of the Washington State Supreme Court**

5.44 The Washington State Supreme Court is the highest court in the state. Its mission is to uphold the Constitution when called through cases, interpret laws passed by the legislature and enforced by the executive branches of government. It oversees the judicial branch

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

which is responsible for the delivery of justice.[44]

5.45 On June 4, 2020, the Washington State Supreme Court published a letter to the judiciary and members of the Bar, opening as follows:

> We are compelled by recent events to join other state supreme courts around the nation in addressing our legal community.
>
> The devaluation and degradation of black lives is not a recent event. It is a persistent and systemic injustice that predates this nation's founding. But recent events have brought to the forefront of our collective consciousness a painful fact that is, for too many of our citizens, common knowledge: the injustices faced by black Americans are not relics of the past. We continue to see racialized policing and the overrepresentation of black Americans in every stage of our criminal and juvenile justice systems. Our institutions remain affected by the vestiges of slavery: Jim Crow laws that were never dismantled and racist court decisions that were never disavowed.[45]

5.46 The letter includes a call to action for all in the justice system:

> Finally, as individuals, we must recognize that systemic racial injustice against black Americans is not an omnipresent specter that will inevitably persist. It is the collective product of each of our individual actions—every action, every day. It is only by carefully reflecting on our actions, taking individual responsibility for them, and constantly striving for better that we can address the shameful legacy we inherit. We call on every member of our legal community to reflect on this moment and ask ourselves how we may work together to eradicate racism.[46]

**City and State Leadership Statements and Proclamations**

5.47 Since the protests began, the City and State leadership have repeatedly professed support for the demonstrators and their cause.

5.48 **Governor Jay Inslee**

- "I fully support the right to free speech and peaceful assembly. I applaud every Washingtonian standing for what they believe in…."[47]

---

[44] http://www.courts.wa.gov/appellate_trial_courts/supremecourt/
[45] http://www.courts.wa.gov/newsinfo/?fa=newsinfo.pressdetail&newsid=35481 (June 4, 2020).
[46] *Id.*
[47] https://www.governor.wa.gov/news-media/inslee-statement-saturday-protests (May 30, 2020)

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

- "Everyone has the freedom - and the right - to demonstrate and speak their mind."[48]

- "If you choose to protest today, please be safe and peaceful. These are important issues that deserve our full attention, without distraction from violence and destruction. Without solutions to inequity, the long road to justice will run even longer."[49]

- "Thousands were protesting peacefully against an atrocious act of brutality. This cause confronts a different kind of destruction, one that can't be fixed with new windows, graffiti-scrubbed walls or insurance. The message behind the demonstration was compelling and one all of us should share. We will not allow vandalism and destruction to obscure the protest's central call for justice."[50]

- "On behalf of all Washingtonians who believe in justice, I want to thank the protesters who carried a peaceful and important message."[51]

5.49 **Mayor Jenny Durkan**

- "This is an opportunity for community to righteously express anger at the systemic inequities that continue to pollute our society. I support our residents right to assemble and I am glad they are doing so. I am hopeful that through this time of grief and anger, we will be able to channel this energy into sustained, systemic reform across our country."[52]

- "I am grateful for all those who peacefully marched and protested in Othello, and throughout our City, today and every day. By the thousands, we have seen people march in almost every part of town. This has been an incredibly painful week for our City and our country. One that is shining the light yet again on hundreds of years of racism and injustice that has haunted our past and continues to our present. It is a moment that summons all of us – including me – to do more and to do better. Pain and anguish have brought out thousands of our neighbors to protest and demand action. They must be heard. We must act. And we are."[53]

- "Here in Seattle, people are protesting a culture of systemic racism and police actions that exists right in our backyard. There have been black and brown people killed by police here in Seattle. John T. Williams, Che Taylor, Charleena Lyles and so many more. Their lives have been cut short because of an interaction with the police that serve us. Those killings remind us of the profound injustice of how they were failed by

---

[48] *Id.*
[49] *Id.*
[50] https://www.governor.wa.gov/news-media/inslee-statement-protests-and-activation-additional-national-guard-personnel (May 31, 2020)
[51] *Id.*
[52] https://durkan.seattle.gov/2020/06/mayor-jenny-durkan-and-city-attorney-pete-homes-issue-statements-on-president-trumps-illegal-threat-to-deploy-military-forces-in-u-s-cities-and-states/ (June 1, 2020)
[53] https://durkan.seattle.gov/2020/06/transcript-mayor-durkans-remarks-at-sunday-june-7-press-conference/ (June 7, 2020)

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

the city and the system. In Seattle we have to do so much more. And our communities are also protesting the City's management of the demonstrations. They're protesting a culture that can use force before de-escalation, and they're protesting a government and a culture that perpetuates systemic inequities that impact people of color, particularly Black Americans. People are rightfully protesting how we can be better as a City and make real changes."[54]

5.50 **Then-Seattle Police Chief Carmen Best**

- "Our policies and training are built around maximizing the exercise of free speech without officer intervention. The Seattle Police Department will continue to support the peaceful exercise of First Amendment rights."[55]
- "The Seattle Police Department was prepared to facilitate the peaceful exercise of First Amendment rights. In the aftermath of the murder of George Floyd we all are rightfully angry, sad, frustrated, and heartbroken."[56]

5.51 Despite the statements of elected officials and other city leaders, the City and SPD re-enacted their prior haphazard and improper responses during the BLM/George Floyd protests – demonstrating yet again that the SPD's use of force violates the Washington Constitution and tort law.

5.52 The City and SPD deployed a disproportionate number of officers, often in full "riot gear,"[57] in an intimidating and instigating manner, escalating rather than de-escalating conflict.

5.53 The City and SPD have improperly kettled, corralled, and dispersed peaceful protesters without cause or adherence to protocol, frustrating and infringing upon the protester's constitutional rights to speech and assembly.

---

[54] *Id.*
[55] https://spdblotter.seattle.gov/2020/05/30/official-statement-on-use-of-force-during-friday-night-protests/ (May 30, 2020)
[56] https://spdblotter.seattle.gov/2020/05/31/chiefs-statement-on-may-30th-protests-downtown/ (May 31, 2020)
[57] As recognized by the International Association of Chiefs of Police in their April 2019 "Crowd Management Concepts and Issues" paper, "Full civil disturbance gear and related equipment should be staged at key locations—but should not be issued initially in crowd management situations, as it may escalate tensions and anxiety." https://www.theiacp.org/sites/default/files/2019-04/Crowd%20Management%20Paper%20-%202019_1.pdf (April 2019).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.54 The City and SPD have indiscriminately used "less-lethal" force such as "riot" grade OC spray, blast balls, flash-bang grenades, tear gas, shot kinetic impact projectiles, and other physical violence, in excessive, out of policy, and harmful ways.

5.55 The City and SPD have targeted not just protesters, but also legal observers, journalists, medical personnel attempting to render aid to the injured, and in some cases, those who are of advanced age, disabled, and young children.

5.56 The City and SPD have created pretexts to justify the use of force. They have invoked Covid-19 restrictions to impose unwarranted curfews so that at any random hour SPD could feel justified in implementing excessive force to disperse the protesters. Not surprisingly, the force employed put protesters at increased risk of Covid-19 infection by causing them to cry, cough, vomit, rub their faces, remove tear gas and pepper spray-soaked masks, and by exposing their airways to chemical and respiratory irritants.

5.57 The City and SPD have spread other misinformation and disinformation about the protests, painting the protests and protesters in a negative light in order to justify the unconstitutional and improper tactics.[58]

5.58 The City and SPD's response to BLM/George Floyd protests appear to be more negative and violent than before – seemingly because the protesters' messages speak out in favor of the BLM movement, and against police brutality.

**SPD Use of Force Policies**

5.59 The SPD's disparately negative response is evidenced in part by its failure to follow the Department's own policies.

5.60 SPD Manual, Section 8.200 regarding Using Force, provides:

[58] *See* https://mynorthwest.com/1937349/opinion-debunking-myths-capitol-hill-autonomous-zone/? (June 12, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

**1. Use of Force: When Authorized**

An officer shall use only the force objectively reasonable, necessary, and proportional to effectively bring an incident or person under control, while protecting the life and safety of all persons.

In other words, officers shall only use objectively reasonable force, proportional to the threat or urgency of the situation, when necessary, to achieve a law-enforcement objective. The force used must comply with federal and state law and Seattle Police Department policies, and rules for specific weapons and tools. See 8.300 – Use of Force Tools. Once it is safe to do so and the threat has ended, the force must stop.

….

**2. Use of Force: When Prohibited**

- An officer will not use force to punish or retaliate

- An officer will not use force against individuals who only verbally confront them unless the vocalization impedes a legitimate law enforcement function (See 5.160 – Observation of Officers).

….

**3. Officers Should Assess and Modulate the Use-Of-Force as Resistance Changes**

For example, as resistance decreases, the use of force may decrease.

5.61 SPD Manual, Section 8.100 regarding De-Escalation, states:

De-escalation may take the form of scene management, team tactics, and/or individual engagement. Event when individual engagement is not feasible, de-escalation techniques including scene management and team tactics such as time, distance, and shielding, should still be used unless doing so would create undue risk of harm to any person due to the exigency/threat of a situation.

De-escalation tactics and techniques are actions used by officers, when safe and feasible without compromising law enforcement priorities, that seek to minimize the likelihood of the need to use force during an incident and increase the likelihood of voluntary compliance. See definition of de-escalation in 8.050.

When safe and feasible under the totality of the circumstances, officers shall attempt to slow down or stabilize the situation so that more time, options,

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

> and resources are available for incident resolution.
>
> The overall goal of this policy is to promote thoughtful resolutions to situations and to reduce the likelihood of harm to all persons involved.

5.62 Section 8.050 of the Manual defines "De-escalation, as:

> Taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation. The goal of de-escalation is to gain the voluntary compliance of subjects, when feasible, and thereby reduce or eliminate the necessity to use physical force.

5.63 The three primary components of traditional de-escalation are time, distance, and shielding. With time, the situation can be slowed down or even stabilized. Further action may not be necessary or additional resources can be called to assist or reduce the necessity of force.

5.64 With distance, the individual is kept further from the officer and others, lessoning potential safety threats, reducing the need for higher levels of force, and ideally creating more time for thoughtful action.

5.65 Shielding allows officers interacting with an armed individual to have a physical barrier or keep distance so the officer can create space and time to try to resolve the problem peacefully.

5.66 De-escalation tactics, properly employed, are methods by which confrontations can be handled safely and without resorting to violence or weapons.

**Chemical Agents**

5.67 According to the American Lung Association, tear gas is comprised of chloroacetophenone (CN) a toxic air pollutant, chloropicrin (PS), chlorobenzylidenemalononitrile (CS), bromobenzylcyanide (CA) and dibenzoxazepine (CR). Tear gas causes both short- and long-term health conditions, including permanent disability and death. The ALA explains:

> In general, exposure to tear gas can cause chest tightness, coughing, a

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

> choking sensation, wheezing and shortness of breath, in addition to a burning sensation in the eyes, mouth and nose; blurred vision and difficulty swallowing. Tear gas can also cause chemical burns, allergic reactions and respiratory distress. People with preexisting respiratory conditions, such as asthma and chronic obstructive pulmonary disease (COPD), have a higher risk of developing severe symptoms of their disease that could lead to respiratory failure.[59]

5.68 The U.S. Center for Disease Control and Prevention explains that long-lasting exposure or exposure to a large dose of riot control agent, especially in a closed setting, may cause severe effects such as the following:

- Blindness.
- Glaucoma (a serious eye condition that can lead to blindness).
- Immediate death due to severe chemical burns to the throat and lungs.
- Respiratory failure possibly resulting in death.[60]

5.69 In the midst of the Covid-19 global pandemic the SPD indiscriminately deployed toxic chemicals that caused protesters to cry, cough, wheeze, and vomit in a crowded environment. This posed a particularly deadly risk for any persons unknowingly carrying Covid-19.[61]

5.70 Tear gas and other chemical irritants are banned for use in combat by international convention and use of them is considered a war crime.[62]

5.71 Tear gas is not identified as an acceptable use of force tool in SPD's Police Manual, Section 8.300, or in Chapter 14.090 – Crowd Management.

5.72 According to reviews by the Seattle OIG, only SWAT is authorized and trained in

---

[59] https://www.lung.org/clean-air/outdoors/what-makes-air-unhealthy/toxic-air-pollutants/tear-gas (accessed September 9, 2020).

[60] https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp (accessed September 9, 2020).

[61] https://www.newsweek.com/tear-gas-coronavirus-covid-19-human-rights-protests-1509881 (June 10, 2020); https://drive.google.com/file/d/1Jyfn4Wd2i6bRi12ePghMHtX3ys1b7K1A/view (accessed September 21, 2020).

[62] https://ihl-databases.icrc.org/customary-ihl/eng/docs/v2_cha_chapter24_rule75 (accessed September 21, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

deploying tear gas. Also, "[t]he training and certification required of SWAT officers is extensive and not comparable to that required of patrol. Use of less lethal weapons by SWAT in their ordinary operations provides options, other than lethal force, to address incidents like barricaded individuals and hostage situations."[63]

5.73 SPD Manual, Section 8.300 regarding OC Spray (pepper spray), requires:

- It may only be used when such force is objectively reasonable, necessary, and proportional to the threat or resistance of a subject.
- Officers must warn the subject and allow the subject to comply, prior to use.
- Officers must justify each separate application of OC Spray.
- Officers must direct OC Spray only at subjects posing a threat.

5.74 SPD Manual, Section 14.090 regarding crowd management states:

- Officers may only make individual decisions to deploy OC spray when its use is consistent with Title 8 – Use-of-Force.
- Only the Incident Commander has the authority to direct the use of OC Spray to disperse a crowd, after a determination that there are acts or conduct within a group of four or more persons that create a substantial risk of causing injury to any person or substantial harm to property.
  - Before ordering that the crowd be dispersed, the Incident Commander must consider whether less restrictive means of crowd management are available.
  - Upon determining that dispersal is appropriate, the Incident Commander shall ensure that there is an avenue of egress sufficient to allow the crowd to depart.
  - The Incident Commander or designee must issue the order to disperse prior to instructing officers to disperse the crowd, if feasible.
- A lieutenant may authorize the use of OC spray to disperse a crowd, but only if an immediate life safety emergency exists that requires this action be taken and there is insufficient time to obtain incident command approval.

[63] https://www.seattle.gov/Documents/Departments/OIG/Other/LessLethalWeaponsUsage06122020.pdf (June 12, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

**"Less Lethal" Munitions**

5.75 Rubber bullets, plastic bullets, baton rounds, bean bag rounds, and shot pellets, are kinetic impact projectiles used as an alternative to normal ammunition. While they are less lethal than normal bullets, they are hardly safe.

5.76 SPD Manual, Section 8.300, allows use of 40 mm "Less Lethal" Launchers (a.k.a. "Blue Nose" Launchers) only when a subject poses an immediate threat of harm to a person, or "when public safety interests dictate that a subject needs to be taken into custody and the level of resistance… is likely to cause injury to the officer," or if "other force options would be likely to cause greater injury than the 40 mm Less Lethal Impact Munition." Officers must also consider the risk of the 40 mm round causing serious harm when determining whether to deploy the weapon.

5.77 According to reviews by the Seattle OIG, only SWAT is authorized to use the 40 mm "Less Lethal" Launchers in crowd management situations.[64]

5.78 Noise Flash Diversionary Devices (NFDDs or "flash bangs") and blast balls are different forms of less lethal weapons, designed to create diversionary light and sound. Per SPD policy, only SWAT is authorized to use flash bangs, whereas officers are permitted to use blast balls.[65]

5.79 However, as the SPD well knows, blast balls can be just as dangerous as flash bangs.

5.80 The SPD is fully aware of the risks of less lethal weapons, having used them in the past, and having been warned of their risks and potential lethality by multiple sources, including

[64] https://www.seattle.gov/Documents/Departments/OIG/Other/LessLethalWeaponsUsage06122020.pdf (June 12, 2020).

[65] https://www.seattle.gov/Documents/Departments/OIG/Other/LessLethalWeaponsUsage06122020.pdf (June 12, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

the CPC, the OPA, their own expert Mr. Ijames, and their training videos from at least as far back as 2015.

5.81 The main difference between a blast ball and a flash bang is shape. A blast ball is round and made of rubber, while a flash bang is metal and cylindrical.[66]

5.82 SPD Manual, Section 8.300 regarding blast balls, states:

- Officers may use blast balls only when such forces is objectively reasonable, necessary, and proportional to the threat or resistance of a subject.
- When feasible, officers shall avoid deploying blast balls in the proximity of people who are not posing a risk to public safety or property.
- When feasible, officers will not deploy blast balls until a dispersal order has been issued to the crowd, the crowd has been given a reasonable amount of time to comply, and a supervisor has authorized the deployment. The only exception to this is that officers may reasonably deploy blast balls to address an imminent risk of harm to a person or significant property damage.
- Officers must justify each separate blast ball deployment. After the initial blast ball deployment, each subsequent deployment must be reasonable and the officer should reevaluate the situation accordingly.

5.83 SPD Manual, Section 14.090 regarding crowd management states:

- Officers may only make individual decisions to deploy blast balls when its use is consistent with Title 8 – Use-of-Force.
- Only the Incident Commander has the authority to direct the use of blast balls to disperse a crowd, after a determination that there are acts or conduct within a group of four or more persons that create a substantial risk of causing injury to any person or substantial harm to property.
    - Before ordering that the crowd be dispersed, the Incident Commander must consider whether less restrictive means of crowd management are available.
    - Upon determining that dispersal is appropriate, the Incident Commander shall ensure that there is an avenue of egress sufficient to allow the crowd to depart.
    - The Incident Commander or designee must issue the order to disperse prior to

[66] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 637-1, Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons (August 14, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

instructing officers to disperse the crowd, if feasible.

- A lieutenant may authorize the use of blast balls to disperse a crowd, but only if an immediate life safety emergency exists that requires this action be taken and there is insufficient time to obtain incident command approval.

5.84 In response to the BLM/George Floyd Protests, the SPD discarded its lessons from the previous twenty years, its own policies and practices, the mandates of the federal Consent Decree, and the federal and State constitutions.

**Police Response to BLM/George Floyd Protests**

5.85 On May 30, 2020, the second day of the protests, Mayor Durkan spontaneously announced a 5:00 pm curfew – tweeting at 4:46 pm that she would "soon be signing an emergency order."[67] Shortly after 5 pm, despite lack of reasonable notice of the curfew to the protesters, under the pretext of enforcing the "curfew," the SPD forcibly dispersed large groups of people in downtown Seattle using "less lethal" Crowd Control Weapons.

5.86 On May 31, 2020, the third day of the protests, then-Chief Best authorized the use of tear gas by patrol officers who were neither trained nor authorized to use tear gas by standard

[67] https://twitter.com/mayorjenny/status/1266878611669151744?lang=en (May 30, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

SPD policy.[68]

5.87 Chief Best also authorized the use of 40 mm launchers by patrol officers who were normally not authorized to use the launchers during crowd management events.[69]

5.88 The SPD justified these exemptions due to "equipment shortages" of blast balls and OC spray.

5.89 The SPD used so much OC spray and so many blast balls in the first days of the protests, they began to run out. This is why they chose to use tear gas – an indiscriminate weapon outlawed in warfare and condemned by groups like Amnesty International.[70]

5.90 Chief Best's authorization required that these exemptions be applied "consistent with" Title 8 of the SPD Policy Manual governing use of force.[71]

5.91 The SPD has no policies or training on how officers should use tear gas for crowd control. Instead, officers were instructed to use tear gas the same way they would use OC spray[72] – even though the weapons are a completely different both chemically and tactically.

5.92 On June 5, 2020, in a rare joint recommendation, the CPC, OIG, and OPA recommended the SPD immediately stop using tear gas in response to First Amendment activity.[73]

5.93 Also on June 5, 2020, Mariko Lockhart, Director for the Seattle Office of Civil Rights (OCR),[74] wrote an open letter stating that she had "heard from other City leadership and

---

[68] https://www.documentcloud.org/documents/6938577-4860-001.html#document/p1 (May 31, 2020).
[69] *Id.*
[70] *See* https://teargas.amnesty.org/#top (accessed September 21, 2020); https://www.hrw.org/news/2020/06/29/us-commits-same-abuses-it-condemns-abroad (June 29, 2020); https://www.law.utoronto.ca/news/new-ihrp-report-problematic-legality-tear-gas-under-international-human-rights-law (September 3, 2020).
[71] https://www.documentcloud.org/documents/6938577-4860-001.html#document/p1 (May 31, 2020).
[72] *Id.*
[73] https://seattlecpc.files.wordpress.com/2020/06/accountability-mass-demonstration-memorandum-060520.pdf (June 5, 2020).
[74] Seattle Office for Civil Rights (OCR) leads the Race and Social Justice Initiative, a citywide effort to end institutional racism in City government and to achieve racial equity across the community. See http://www.seattle.gov/civilrights/about.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

employees that they fear for their personal safety, not because of other protesters but because of the police." Director Lockhart demanded the City immediately "[c]ease the use of flash grenades, rubber bullets, and tear gas against community protesters."[75]

5.94 That afternoon, Mayor Durkan and Chief Best jointly announced that for 30 days the SPD would stop using tear gas against protesters. Chief Best rescinded her May 31, 2020 exemption order.[76] This declaration did not extend to OC spray, blast balls, or other crowd control tactics.

5.95 On June 7, 2020, over two dozen community leaders signed an open letter condemning "the police tactics used in daily protests," emphasizing their concern that "the response of the Seattle Police Department (SPD) is escalating the conflict in the streets of Seattle, particularly in Capitol Hill and in communities of color, with their inappropriate use of force."[77]

5.96 That same day, at a press conference on June 7, 2020, Mayor Durkan apologized to the peaceful demonstrators for how protests had been handled:

> "I know that safety was shattered for many by images, sounds and gas more fitting of a war zone: I am sorry. To all those who came peacefully and had their constitutional right to protest impacted: I am sorry. To those who have felt their voices and message drowned out by the small fraction of individuals seemingly intent on inciting violence between police and peaceful demonstrators: I am sorry."[78]

5.97 That same night, the City and SPD violated their own moratorium. They blanketed

---

[75] https://www.documentcloud.org/documents/6938155-Lockhart-Letter.html (June 5, 2020).
[76] https://www.q13fox.com/news/seattle-announces-30-day-ban-on-use-of-cs-tear-gas-during-protests (June 5, 2020); https://www.documentcloud.org/documents/6938576-Policy-8-300-POL-5-and-POL-1113-Exemptions.html#document/p1 (June 5, 2020).
[77] https://www.thestranger.com/slog/2020/06/07/43862996/seattle-electeds-to-mayor-durkan-and-chief-best-direct-spd-to-change-their-tactics-immediately (June 7, 2020).
[78] https://durkan.seattle.gov/2020/06/transcript-mayor-durkans-remarks-at-sunday-june-7-press-conference/ (June 7, 2020)

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

protesters near 11th Avenue and Pine Street with tear gas, and copiously deployed blast balls and OC spray.[79]

5.98 The SPD again, as in years past regarding other protests, spread misinformation and disinformation regarding the BLM/George Floyd protests.

5.99 In one tweet, the SPD described broken candles as "improvised explosives."[80]

5.100 After multiple nights of clashes between the police and protesters near the East Precinct in Capitol Hill, on June 8, 2020, the SPD abandoned that location and the surrounding area, leading to the short-lived establishment of "CHAZ" (Capitol Hill Autonomous Zone), later renamed "CHOP" (Capitol Hill Occupied/Organized Protest).

5.101 CHAZ/CHOP was a small area of Seattle's Capitol Hill neighborhood spanning

[79] https://www.thestranger.com/slog/2020/06/08/43864805/cops-deploy-blast-balls-and-chemical-agents-in-longest-confrontation-yet-on-capitol-hill (June 8, 2020).
[80] https://popculture.com/trending/news/seattle-police-claim-improvised-explosives-thrown-broken-candle-photo/ (June 7, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

approximately six city blocks, that grew organically after the SPD boarded up and abandoned the East Precinct. It became the site of food and first aid tents, memorials to Black people killed by police, spirited public discussions, BLM art projects, films about race discrimination, and music.[81]

5.102 Within days, the SPD repeated false and misleading rumors painting CHAZ/CHOP in a bad light, including that there were reports of "armed protesters checking IDs and extorting local businesses."[82]

5.103 On June 12, 2020, United States District Court Judge Richard A. Jones acknowledged the excessiveness of SPD's tactics and granted a Temporary Restraining Order enjoining the SPD for 14 days from "employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations."[83]

---

[81] https://mynorthwest.com/1937349/opinion-debunking-myths-capitol-hill-autonomous-zone/? (June 12, 2020).

[82] *Id.*

[83] Black Lives Matter Seattle-King County v. City of Seattle, 2:20-cv-00887-RAJ, Doc. 34, Order Granting in Part Motion for Temporary Restraining Order (June 12, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.104 Judge Jones wrote:

- "People have a right to demonstrate and protest government officials, police officers being no exception. Their right to do so, without fear of government retaliation, is guaranteed by the First and Fourth Amendments."

- "Since 'time immemorial,' city streets and sidewalks have been deemed public fora, and as such any First Amendment restrictions placed on them are subject to a particularly high degree of scrutiny."

- "Plaintiffs show that they were engaged in the constitutional right to protest police brutality. They exercised their right on public fora."

- "On this record, their protests have been passionate but peaceful, and they must thus be protected even if they stand in opposition to the police. The video and testimonial evidence reveal as much."

- As to the threats posed by non-peaceful protesters, "the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure."

- Rather, "[t]he use of indiscriminate weapons against all protesters—not just the violent ones—supports the inference that SPD's actions were substantially motivated by Plaintiffs' protected First Amendment activity."

- "SPD's actions would chill a person of ordinary firmness from continuing to protest… SPD's use of less-lethal, crowd control weapons have surely chilled speech… The same is true for the projectiles that SPD fires into crowds, which can cause intense pain and bruising."

- "Both testimonial and video evidence establish that SPD likely violated Plaintiffs' Fourth Amendment rights…" "The Ninth Circuit has held that it is unreasonable to use pepper spray, projectile bean bags, and pepper ball projectiles against individuals 'who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others.'"[84]

5.105 Three days later, on June 15, 2020, Seattle's City Council unanimously passed Ordinance No. 126102, banning police from using crowd control weapons, including kinetic impact projectiles and chemical irritants. This Ordinance also placed restrictions on the use of OC

[84] *Id.*

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

spray – that it cannot be used in the setting of a demonstration, rally, or other First Amendment-protected event, and must not land on anyone other than an individual in the process of committing a criminal act or presenting an imminent danger.[85]

5.106 On June 17, 2020, in the federal case before Judge Jones, the City of Seattle entered into a stipulated Preliminary Injunction extending the effects of the Temporary Restraining Order though September 30, 2020. In the injunction, the City agreed to stop indiscriminate use of chemical irritants and projectiles, and promised to only target force at persons at risk of "specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property."[86]

5.107 Despite these orders and the City's promises, the SPD has still had multiple instances of using pepper spray, kinetic projectile rounds, and even blast balls – such as when they forcibly cleared out CHAZ/CHOP in the early morning of July 1, 2020 and in the process made dozens of arrests, some by kneeling on the necks of the protesters.[87]

5.108 The City initially expressed its support for maintaining the Zone – Mayor Durkan called it a "gathering place where community members can demand change of their local, state, and federal government," and worked with members of the CHOP community to maintain this space. For about three weeks, the City encouraged CHOP, and promised not to use police to clear the zone.[88] That is until the early morning of July 1, 2020, when, Mayor Durkan

[85] https://seattle.legistar.com/LegislationDetail.aspx?ID=4564636&GUID=90EDF5B4-7607-43BB-A99C-514C0B51CB56 (June 15, 2020).
[86] Black Lives Matter Seattle-King County v. City of Seattle, 2:20-cv-00887-RAJ, Doc. 42, Stipulated Order Entering a Preliminary Injunction (June 17, 2020).
[87] https://nypost.com/2020/07/03/seattle-cops-caught-kneeling-on-necks-of-chop-protesters/ (July 3, 2020).
[88] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/ (June 16, 2020); https://www.seattletimes.com/seattle-news/seattle-police-will-return-to-east-precinct-where-chop-has-reigned-durkan-says/ (June 22, 2020); https://parkways.seattle.gov/2020/06/30/cal-anderson-park-temporarily-closed-starting-6-30-at-12pm/ (June 30, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

issued an emergency order to clear the Zone.

5.109 The SPD gave the protesters eight minutes to completely clear out before the police advanced, violently cleared anyone who did not have sufficient time to gather their things (arresting some) and destroyed their property.[89]

5.110 On July 24, 2020, Judge Robart granted a Temporary Restraining order enjoining the City Council's Crowd Control Weapons Ban (Ordinance No. 126102) until it could be evaluated and implemented in a manner consistent with the Consent Decree.[90]

5.111 The weekend of July 25th and 26th – on the heels of this Order, and seemingly emboldened by the continued permitted use of crowd control weapons – the SPD engaged in an "all-out assault" on civilians. Protesters were indiscriminately hit with blast balls, pepper spray, and blunt force objects. Journalists and chroniclers were targeted. Medics were maced for attending to patients. Legal observers were struck at close range. In response, a Motion was filed asking Judge Jones to hold the City in contempt of the preliminary injunction he had issued barely one month before.[91]

5.112 On August 10, 2020, and based on the stipulation of the City of Seattle, Judge Jones added protections to the Preliminary Injunction, including prohibitions against:

- Using chemical irritants or projectiles of any kind to re-route a protest, unless such re-routing is necessary to prevent specific imminent threat of physical harm to themselves or identifiable others, or to respond to specific acts of violence or destruction of property.

---

[89] https://spdblotter.seattle.gov/wp-content/uploads/2020/07/Executive-Order-2020-08_Directive-City-Depts_Cal-Anderson-Park-Area.pdf (June 30, 2020); https://spdblotter.seattle.gov/2020/07/01/mayor-durkan-issues-emergency-order-regarding-capitol-hill-protest-zone/ (July 1, 2020); https://komonews.com/news/local/seattle-police-clearing-chop-area-after-durkan-issues-executive-order (July 1, 2020)..

[90] United States v. City of Seattle, 2:12-cv-01282-JLR, Docs. 625-630; https://sccinsight.com/2020/07/24/doj-asks-judge-robart-to-stop-implementation-of-councils-ban-on-crowd-control-weapons/ (July 24, 2020).

[91] Black Lives Matter Seattle-King County v. City of Seattle, 2:20-cv-00887-RAJ, Doc. 51, Motion for Order to Show Cause Why City of Seattle Should Not Be Held in Contempt for Violating the Preliminary Injunction (July 27, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

- Using chemical irritants or projectiles of any kind without, when feasible, first issuing a warning that is reasonably calculated to alert attendees in the area where the weapons are to be deployed and allowing them reasonable time, space, and opportunity under the circumstances to leave the area.

- Targeting with chemical irritants or projectiles any individual displaying clear indicia as a Journalist or Legal Observer, at such times as the individual is acting lawfully and in a capacity such that the City knows or reasonably should know of their status.[92]

5.113 The City agreed to these proposals because they are consistent with the reasonable and constitutional—and therefore lawful—exercise of force. These standards applied long before the incidents described in this Complaint.

**Different Treatment for Different Protests**

5.114 The Women's March in January 2017 drew well over 100,000 people into the streets all over Seattle. The City did not respond with riot gear, weaponry, violence, or strident demands for unconstitutional "compliance" at the expense of lawful free speech.

[92] Black Lives Matter Seattle-King County v. City of Seattle, 2:20-cv-00887-RAJ, Doc. 110, Order Granting Stipulated Clarification of Preliminary Injunction (August 10, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.115 On January 28, 2017, spontaneous protests filled SeaTac International Airport in response to an executive order which abruptly halted immigration and all travel to the United States from a list of Muslim-majority countries. SPD on scene to back up Port police did no more than form bicycle lines. No arrests were made. Chemical agents, munitions, batons, or violence of any kind were not employed by the police. The protests were heated, but the police non-intervention response did not escalate the protests.[93]

5.116 On the second day of mass protests against the travel ban, thousands of people gathered at Westlake Park, spilling into surrounding streets.[94] Again, police presence was minimal. SPD officers appeared in their usual uniforms and did not use riot gear. The crowd chanted and listened to speakers. There were no arrests, no police show of force, and no police violence.

[93] *See* https://spdblotter.seattle.gov/2017/01/29/port-of-seattle-requests-mutual-aid-from-local-police-agencies-at-seatac/ (January 29, 2017).

[94] https://www.seattleweekly.com/news/we-will-fight-thousands-gather-in-westlake-to-protest-immigration-ban/ (January 30, 2017).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777



Y'all Means ALL!
Not My President
PROUD To Be An Immigrant
REFUGEES ARE NOT Terrorists

5.117 The Women's March was repeated in 2018 and again in 2019, again drawing thousands of people into the streets, without police intervention and without police violence.

<u>2018</u>

They tried to BURY US but they didn't know WE WERE SEEDS
MEXICAN PROVERB
As long as women are using CLASS or RACE POWER to dominate other women FEMINIST SISTERHOOD cannot be fully realized.
-bell hooks

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 43

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

2019

5.118 In May 2018, a group of protesters gathered for an open-carry rally in Seattle, many carrying firearms as they marched. The police did not respond with violence.[95]

[95] *See* https://komonews.com/news/local/crowd-gathers-for-open-carry-march-in-seattle (May 20, 2018).

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 44

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.119 Later in August 2018, another right-wing gun reform protest occurred in Seattle, and was met with left-wing counter-protesters. The SPD's response was measured – keeping the two sides separated and out of the streets, which remained open to traffic, and arresting three people for misdemeanor assault.[96]

5.120 These protests have one thing in common: they were not specific to the rights of Black people and police brutality.

5.121 As to political speech against discriminatory and unlawful policing, the SPD responds with discriminatory and unlawful policing.

5.122 The SPD's disparate response to BLM/George Floyd protests reflects the cynical and prejudiced ethos of many of the officers, reflected in their elected leadership.

**Incitement by the Seattle Police Officers' Guild**

5.123 The excessive and unreasonable force used by SPD officers against BIPoCs and those protesting for the rights of BIPoCs is also attributable to the Seattle Police Officers Guild (SPOG) – which instigates officers to treat protesters like enemy combatants,  and then protects those officers from the disciplinary and accountability consequences of their misconduct.

5.124 SPOG membership and leadership – and in particular its President Mike Solan – have demonstrated an animosity towards BIPoCs, BLM protesters in general, and the BLM/George Floyd Seattle protesters in particular. Although SPOG/President Solan claims its members support "peaceful protests,"[97] their actions show otherwise, and that is

[96] https://www.nbcnews.com/news/us-news/protesters-face-seattle-over-gun-reform-initiative-n901966 (August 19, 2018).

[97] https://seattlepoliceofficers.org/spog-response-to-the-ongoing-protests-in-seattle/ (June 4, 2020); https://seattlepoliceofficers.org/seattle-police-officers-guild-open-letter-to-seattle/ (June 4, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

nothing new. The actions of SPOG leadership reflect not just individual animus, but are a reflection of the membership at large – over 1,300 members, including all of the officers and sergeants of the SPD.[98]

5.125 In 2015 – in the midst of federally mandated reforms occurring as part of the Consent Decree and numerous complaints being raised regarding the SPD's handling of multiple mass demonstrations – SPOG's internal newspaper *The Guardian* repeatedly published commentary such as:

- Longtime officer Virgil McDonald's statement in his column called "The Culture Wars," that: "Personally I think that genetically the black humans are genetically superior as they have survived unbelievable circumstances not only in this country but every country on this planet" [Note: Super-humanization of Black people is a well-recognized racist trope].

- Then-editor Tom McLaughlin's dismissive comment about the Consent Decree: "I am just glad we have been 're-educated' and are now doing things correctly."

- McDonald's statement in a later issue: "I hear the 'Black Lives Matter' propaganda every day on the news. If African Americans don't matter to African Americans there wouldn't be drive by shootings of African American children by African American criminals

- Then-President Ron Smith's dismissal of Council Member Harrell and the CPC's concerns about the handling of May Day 2015 protests, calling those concerns "utopian view" of demonstration management, and likening SPD to a band of troops under assault.[99]

5.126 In 2016, Ron Smith resigned from his union position following a controversial Facebook post about the shooting of Dallas police officers by a lone gunman, in which Smith blamed the shooting on "hatred of law enforcement by a minority movement" – which many took as a thinly veiled reference to Black Lives Matter. Smith ended the post with the hashtag

---

[98] https://seattlepoliceofficers.org/# (accessed September 9, 2020).
[99] https://www.thestranger.com/blogs/slog/2015/09/23/22878435/seattle-police-unions-newspaper-continues-streak-of-anti-reform-rhetoric-and-racism (September 23, 2015).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

#WeShallOvercome – co-opting the famous civil rights anthem.[100]

5.127 As noted above, in 2017 SPOG negotiated a police contract with the City that rolled back the stricter appeals reforms established by Accountability Ordinance No. 125315, re-established the prior officer-biased appeals process and ultimately led Judge Robart to rule in 2019 that the City had fallen out of full and effective compliance with the Consent Decree in discipline and accountability.

5.128 On the heels of that order, SPOG had its first contested Presidential election in years, pitting incumbent "soft-spoken moderate" Kevin Stuckey against "vocal hard-liner" Mike Solan.[101]

5.129 Solan ran on the slogan "It's Time to Get Serious," arguing he was the better candidate to lead SPOG at a time when police are "under unreasonable levels of scrutiny both locally and nationally." Solan bragged that he led the statewide campaign against Initiative 940, the police-reform measure overwhelmingly approved by voters in 2018. And he published dramatic campaign videos decrying the "anti-police activist agenda that is driving Seattle's politics."[102]

5.130 In early 2020, Solan was elected president of SPOG by an overwhelming majority of union voters, capturing more than 500 of the 750 votes cast – a large turnout for the union representing at the time over 1,250 officers and sergeants. Former SPOG President Rich O'Neill said to reporters at the time, "From what I'm hearing, it was a lot of younger

---

[100] https://www.thestranger.com/slog/2016/07/12/24337587/seattle-police-guild-president-resigns#:~:text=In%20the%20wake%20of%20another,moving%20down%20the%20reform%20road.%22 (July 12, 2016).

[101] https://www.seattletimes.com/seattle-news/candidates-for-president-of-seattles-police-union-bring-different-styles-to-the-race/ (January 27, 2020).

[102] *Id.*

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

officers" who made the difference.[103]

5.131 In a June 2020 press conference about the BLM/George Floyd protests, President Solan:

- Derisively referred to community concerns over "mourning badges" covering badge numbers of officers as "angst." (This cover-up of badge numbers being a concern that has been raised repeatedly in past years with regard to identifying officers and holding them accountable for their actions in mass protest situations).
- Collectively referred to all individuals who protested "at night" (which he defined as starting around 4pm) in the area of 11th and Pine (the East Precinct in Capitol Hill) as "criminal agitators," even though the vast majority of the protesters were peacefully exercising their rights to free speech and assembly, speaking out against racism and police brutality.
- Expressed hostility towards the protesters' rhetoric (i.e. their free speech), calling it "unconscionable verbiage hurled at our officers."
- Supported and encouraged the use of tear gas, calling it a "less lethal tool that is effective in restoring public order,"[104] describing it as the "the only tool that's effective for us to be able to hold this facility [the East Precinct] and protect our people."
- Dismissively replied to a reporter's question about the propriety of using tear gas in this era of Covid-19, "you're going to have to ask a medical expert about that." [105]

5.132 Regarding the abandonment of the East Precinct by the City and the SPD (and the subsequent formation of CHAZ/CHOP), President Solan has repeatedly described it as a "surrender," even asking "What's to stop these unreasonable activists to take another precinct, say, the flagship precinct of the Seattle Police Department, the West Precinct, which houses the 911 call center?"[106] Mr. Solan was suggesting a danger of mass insurrection that never existed.

---

[103] https://www.seattletimes.com/seattle-news/seattle-police-union-elects-hard-line-candidate-as-president-in-landslide-vote/ (February 4, 2020).
[104] Seattle Police Officers Guild – Press Conference 6.8.20, https://www.youtube.com/watch?v=geKHxXejTTY (June 8, 2020).
[105] Seattle Police Officers Guild – Press Conference 6.8.20, https://www.youtube.com/watch?v=geKHxXejTTY (June 8, 2020).
[106] Seattle Police Officers Guild President Mike Solan, Interviewed on Tucker Carlson Tonight 6.11.20, https://www.youtube.com/watch?v=Q1DDVUdGNBA (June 12, 2020) (emphasis added).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.133 Regarding CHAZ/CHOP – a small area of Seattle's Capitol Hill neighborhood spanning approximately six city blocks, and which had been the site of food and first aid tents, memorials to Black people killed by police, and spirited public discussions[107] – President Solan claimed that "violence has now besieged" the zone, and that officers weren't allowed into the zone to locate or provide aid to individuals who had been injured. These claims were proven to be false.[108]

5.134 Regarding SPD's dismantling of CHAZ/CHOP, President Solan described it as going in to "liberate the City of Seattle who was held hostage by these unreasonable activists."[109]

5.135 President Solan dismisses the message of the protesters, characterizing it as coming from "the far left radical parts of our society," and as using police as "that pawn to divide our nation based upon false narratives."[110]

5.136 President Solan has repeatedly referred to protesters as "Marxists" and "terrorists" and framed the situation as an ideological fight between good and evil.[111]

5.137 President Solan's repeated and aggressive reference to violence and insurrection by Black people—and supporters—is an age-old racist trope.

5.138 President Solan is so consistent in referring to all protesters as "unreasonable activists" on television – most frequently on Fox News – that compilations have been made showcasing his talking points.[112]

---

[107] https://mynorthwest.com/1937349/opinion-debunking-myths-capitol-hill-autonomous-zone/? (June 12, 2020).
[108] https://www.breitbart.com/politics/2020/06/20/seattle-officers-guild-pres-officers-werent-allowed-into-chaz-to-find-victims-and-provide-aid/ (June 20, 2020); https://www.kuow.org/stories/seattle-police-and-fire-confusion-slowed-response-to-chop-shooting-not-protesters (July 26, 2020).
[109] Seattle Police Officers Guild President Mike Solan, interviewed on Fox and Friends 7.4.20, https://www.youtube.com/watch?v=7PHmErKGdO8 (July 5, 2020).
[110] https://mynorthwest.com/2124085/seattle-police-protesters-mike-solan-guild/ (August 28, 2020).
[111] https://southseattleemerald.com/2020/09/10/opinion-spog-head-and-the-spd-are-waging-an-old-propaganda-war-against-protestors-and-the-left-to-thwart-accountability/ (September 10, 2020).
[112] https://twitter.com/spekulation/status/1293782053687660544?s=20 (August 12, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.139 SPOG has repeatedly released publicly viewable videos – most of which are edited, narrated, and set to dramatic and ominous music[113] – that are selectively negative in their portrayal of the BLM/George Floyd protesters.

5.140 One of those videos (about incidents that happened on August 16, 2020), started by describing "A group of approximately 100 masked individuals…" – yet notably omits the fact that citizens are wearing masks because of the Covid-19 pandemic. That same video consisted of quick clips and jump cuts, lacking context, to give an overly negative and chaotic impression of the events of that night.[114] As Seattle University communications professor Victor Evans put it, "we didn't really see what actually took place."[115]

5.141 Recently President Solan publicly intimidated the press by implying they were engaged in criminal acts simply by being present at protest events:[116]

---

[113] Seattle Police Officers Guild – Protest Response. An Open Statement to the Citizens of Seattle. https://www.youtube.com/watch?v=qkd6q78Uxw4 (June 4, 2020); SPOG Headquarters Attacked by Antifa, 6 Officers Injured. Seattle City Council Does Nothing, https://www.youtube.com/watch?v=mgq31LYgySc (August 19, 2020).

[114] SPOG Headquarters Attacked by Antifa, 6 Officers Injured. Seattle City Council Does Nothing, https://www.youtube.com/watch?v=mgq31LYgySc (August 19, 2020).

[115] https://www.king5.com/article/news/local/police-guild-releases-edited-video-from-sunday-riot/281-a7aad7e4-5bb3-4143-9bdc-3c5d2b180687 (August 19, 2020).

[116] https://twitter.com/realmikesolan/status/1303151547291852805 (September 7, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

Mike Solan
@realmikesolan
@MalcontentmentT, unfortunately in your hasty escape from @SPOG1952 a few minutes ago, you dropped your #press pass. Since I have it, does this mean that I'm now part of the #Resistance? Should I put it into @SeattlePD evidence? Please advise.#HOLDTHELINE!
PRESS
David Obelcz
BHG, LLC.
Malcontentment Tango
7:01 PM · Sep 7, 2020 · Twitter for iPad

5.142 SPOG, its members, and its leaders, including President Solan, have repeatedly presented slanted, misleading, or false narratives regarding Black people, People of Color, Black Lives Matter protesters, and BLM/George Floyd protesters specifically, fomenting a toxic us-versus-them, militaristic attitude amongst the Seattle police force. These actions represent unexamined systemic racism throughout the SPD.

5.143 These actions have served to excuse and even encourage the SPD's excessive and unreasonable use of force, as well as discrimination against Black people, People of Color, Black Lives Matter protesters, and BLM/George Floyd protesters specifically, both in the past and in the future.

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 51

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

**Oversight of the SPD's Response to the BLM/George Floyd Protests**

5.144 The full extent of what the SPD did and why during the BLM/George Floyd protests is still unfolding. This office has issued Public Records Requests for documentation such as police reports, body camera videos, etc.; the City has responded that it will take six months to a year before any type of a response will be provided – despite the fact that similar body camera evidence has been released to the public when it suited the police, edited and set to dramatic and ominous music.[117]

5.145 Even so, some preliminary information has come to light, including numerous observations by the various agencies and organizations tasked with monitoring the SPD.

5.146 Observations by the Seattle Office of Police Accountability (OPA):[118]

- The OPA expressed concern regarding "the sheer amount of force used by SPD over the last two months, which appears to represent a significant departure from previous demonstrations."
- "…officers were sent to confront crowds with no clear strategy or plan behind the deployment," which led to a pattern of using force to temporarily remove crowds from certain areas, only for demonstrators to return and for the pattern to repeat itself. "Front-line officers and supervisors sometimes appeared to be improvising their responses to the crowd in the apparent absence of clear directions from an incident commander…. These types of uses of force served no clear law enforcement purpose: they did not prevent property damage, effectively disperse the crowd, or allow peaceful demonstrators their right to protest."
- The OPA expressed concern that the SPD's Incident Action Plans (IAPs), prepared prior to each demonstration to lay out SPD's objectives in responding to the demonstrations, were "too vague and do not provide the guidance officers and supervisors need to handle a demonstration." For example, a recent IAP declared the following objective: "Provide for the safety of the first responders, general public, spectators, and participants by maintaining a police presence that will give officers the ability to respond to any gathering that may impact public safety." The objectives and even "special instructions" for responding officers were frequently copied from one

117 SPOG Headquarters Attacked by Antifa, 6 Officers Injured. Seattle City Council Does Nothing, https://www.youtube.com/watch?v=mgq31LYgySc (August 19, 2020).

118 United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 636-1, Response to City Council Crowd Control Weapons Ordinance Ban (August 14, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

day's IAP into the next, "with no differentiation between them." "The lack of any written contingency plan prevents OPA from evaluating an incident commander's planning for a demonstration and leaves front-line supervisors and officers without clear instructions about what to do if communications with the incident commander break down."

- "…at times, SPD deployed large groups of officers for reasons that are unclear. Not only does this create the risk of unnecessary escalation, it also forces officers into a situation where they become targets for anyone in the crowd who seeks to engage or harm them."

- "…SPD officers at times did not have access to or bring to demonstrations an appropriate public address system." "The absence of an appropriate public address system at a demonstration is problematic because in the event that commanders need to disperse a crowd, they are left with the choice of either waiting for a patrol vehicle to arrive or dispersing the crowd without giving an appropriate public safety order. It also makes it virtually impossible for SPD to give appropriate warnings to demonstrators when unlawful conduct occurs…. The use of force on community members who have not been given an audible dispersal order has the potential to cause physical harm, escalates tensions and undermines public trust."

- "OPA has received numerous complaints from community members who contend that they or others were subjected to the use of less-lethal weapons despite having done nothing wrong. Although these incidents are still under investigation, they highlight the secondary effects that the use of less-lethal tools can have on peaceful demonstrators and on public trust in SPD."

5.147 Observations by the Seattle Office of Inspector General (OIG):[119]

- "Although the SPD crowd dispersal policy is clear as to the conditions under which crowds can be dispersed and less lethal force can be used, the general nature of the policy reduces crowd status to two conditions: lawful, and unlawful. In a very general sense, protestors are allowed to assemble, until they are not. The transition from managing a lawful demonstration to dispersing an unlawful assembly has the potential to be abrupt and confusing to non-violent participants in the crowd who are unaware of violence occurring elsewhere in the crowd, and who then may become understandably angry when subjected to unexpected force."

- "OIG identified that there are limited opportunities for officers to gain proficiency and experience with practice in using [blast balls and the 40mm launcher]. Practice munitions are not available to officers for the 40mm launcher outside of annual qualification requirements, and officers may not have an opportunity to deploy live

[119] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 637-1, Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons (August 14, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

blast balls during annual re-training, depending on supply..”

- “…the Chief of Police made a policy decision to authorize patrol officers to deploy CS without prior training. By default, this means that patrol officers deploying CS did so without the safeguards of training or policy…. [O]fficers not formally trained in use of CS may be unfamiliar with dispersal patterns, as well as proper first aid or decontamination procedures.”

- The SPD recognized in its 2016 ISDM on Crowd Management the many deficiencies related to the use of traditional fixed riot lines. Tactically, fixed lines are “less flexible and ha[ve] a limited ability to de-escalate the crowd. Psychologically, “the appearance and nature of a ‘hard line’ may cause the crowd to be more antagonistic towards the police.” The ISDM acknowledges “the value of perceived legitimacy and procedural justice when managing a crowd,” and that where “the more the police are viewed as legitimate, the less likely there will be conflict.” To that end, the SPD designed its crowd management tactics to avoid fixed lines, create distance, limit physical confrontation between the demonstrators and officers, and emphasize the need for cooperation and engagement with leaders of demonstrations. Yet those tactics were not followed. And although SPD training materials refer to the difficulties of applying these tactics to a confrontational crowd or less mobile crowd (such as the crowds near the East Precinct), “they offer few details on how to resolve these problems.”

- Further, although the SPD has “wrestled with the problem of how to intervene against coordinated individuals who use a larger crowd to conceal acts of violence and property damage for years,” it “has not developed a durable solution other than mobile bike officers. That solution is not workable in a large, fixed crowd as it is almost impossible for officers to safely enter the crowd and extract the individuals in question, especially if they are intent on disappearing into the larger crowd.”

- The events at the East Precinct demonstrated the particular ineffectiveness of the SPD’s de-escalation approaches. “Time did not appear to work, perhaps as SPD itself was the focus of the crowd’s agitation.” Distance was compromised by the nature of the fencing used at the East Precinct, which was “not suitable for enforcing distance between officers and protestors,” or for providing shield. And by “engaging in extended skirmishes with protestors, SPD actually escalated the situation.” For example, “by tossing blast balls and then allowing the crowd to re-approach or move the fencing, SPD de-legitimized its actions by making it appear as if force was used for no reason.”

- “…briefings did not always occur,” and “some briefings were not detailed enough to properly inform officers as to new objectives and situational changes.”

- “Personnel stated it could be very difficult to hear instructions over the radio using existing equipment, particularly when wearing gas masks. If personnel cannot hear instructions clearly, they may misunderstand instructions and take action which unnecessarily or improperly escalates the situation.”

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

- "…the public does not understand why SPD undertook many of its actions during the recent demonstrations and are horrified by the scenes of violence and perceived indiscriminate use of force. These actions have eroded public trust in the department."

5.148 Some of the SPD's conduct during the BLM/George Floyd protests appears to be motivated by animus towards Black people and the Black Lives Matter movement. Information has come to light about SPD officers committing acts such as:

- During a demonstration, stating that "I have a hard on for this shit and, if they cross the line, I will hit them."[120]
- Joking with one another about letting a bus slam into a (protester) bicyclist.[121]
- Recklessly driving up on a sidewalk in pursuit of protesters and calling them "cockroaches."[122]
- While off duty, operating their personal vehicle, to stalk and circle protester pedestrians while yelling racial slurs at them, ultimately causing a collision.[123]
- Sending multiple police vehicles to follow protesters with their lights flashing and their sirens blaring, with the apparent purpose of harassment, intimidation, and/or drowning out the protesters' speech.[124]

5.149 Systemic bias among law enforcement is not limited to SPD. A WSP Trooper was videotaped "motivating" his team by saying "Don't kill them, but hit them hard."[125]

5.150 The disparate treatment of the BLM/George Floyd protests by the SPD has been

---

[120] https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0348ccs08-30-20.pdf (August 30, 2020).
[121] https://southseattleemerald.com/2020/07/25/breaking-scanner-allegedly-captures-disturbing-conversation-among-spd-officers/ (July 25, 2020).
[122] https://www.seattletimes.com/seattle-news/seattle-police-sergeant-placed-on-leave-after-complaints-over-comments-on-video/?utm_source=referral&utm_medium=mobile-app&utm_campaign=ios (August 26, 2020); https://www.kuow.org/stories/seattle-police-sergeant-from-car-attack-investigation-has-spotty-ethics-history (September 1, 2020).
[123] https://www.king5.com/article/news/local/protests/protesters-accuse-off-duty-seattle-officer-of-driving-through-their-crowd/281-d41488b0-7591-48c5-b929-abcc34d55ae5 (July 9, 2020); (https://spdblotter.seattle.gov/2020/07/04/spd-investigating-boren-and-olive-way-collision-involving-off-duty-officer/ (July 10, 2020).
[124] https://twitter.com/spekulation/status/1308654915703586816 (September 22, 2020).
[125] https://www.seattletimes.com/seattle-news/washington-state-patrol-apologizes-after-officer-tells-his-team-dont-kill-them-but-hit-them-hard-in-reference-to-seattle-protesters/ (June3, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

specifically recognized by multiple oversight organizations:

- **CPC**:

> "During discussions with SPD, the Department stated that Seattle boasts an average of 300+ demonstrations each year, with approximately 80 of those mentioned being monitored by police. Presuming purported numbers are correct, 26% of demonstrations are monitored by SPD annually. However, in recent months, the Department has attended a majority of demonstrations that are specifically rallying against police violence and brutality. Moreover, SPD's presence during protests was perceived by community as an intimidation tactic with a looming sense of threatening force, which was actualized.
>
> The unsettling nature of SPD's presence during recent demonstrations is underlined by the way in which officers attended and presented – in riot gear, by the hundreds. It is unclear what intelligence was gathered by the Department to warrant such a response to planned peaceful protests, largely led by young people."[126]

- **OPA**:

> "The recent protests in Seattle have been about police misconduct—not, for example, women's rights or the environment—which has posed a unique challenge for SPD. During protests, the police are generally responsible for protecting the public, preserving property, and mitigating traffic impacts. But when the protests are police-focused, they must also avoid escalating existing tensions with demonstrators unnecessarily.
>
> It appears to OPA that, at times, SPD deployed large groups of officers for reasons that are unclear. Not only does this create the risk of unnecessary escalation, it also forces officers into a situation where they become targets for anyone in the crowd who seeks to engage or harm them. If police presence at a demonstration would not serve any apparent purpose, it may be more appropriate for officers to monitor it from a distance."[127]

5.151 After August 2020, Merrick Bobb resigned after seven years as the court-appointed monitor of the Justice Department-mandated reforms of the Consent Decree. In a letter authored on the eve of this resignation, Mr. Bobb expressed disappointment in the direction the SPD has taken:

---

[126] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 639-1, CPC Recommendations on Seattle's Crowd Control Weapons Ban Ordinance 126102 (August 19, 2020).

[127] United States v. City of Seattle, 2:12-cv-01282-JLR, Doc. 636-1, Response to City Council Crowd Control Weapons Ordinance Ban (August 14, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

> "Let me then first speak soberly about the recent demonstrations and protests. SPD's performance left many observers disappointed and crestfallen, if not disturbed profoundly by what looked like multiple instances of excessive force, as if lessons learned and techniques trained under the consent decree were lost, or, at least, set aside."[128]

5.152 Mr. Bobb described the SPD as currently being "at its nadir":

> "Its performance during the recent demonstrations and protests betrayed a lack of adequate preparation and training, an apparent absence of an overall strategic plan or foreknowledge how to deal with violent interlopers without cutting off legitimate First Amendment activity by peaceful protesters, even if loud and challenging; inadequate subtlety and sophistication about the use of powerful and injurious nonlethal weaponry; a seeming lack at times of sensitivity to the First Amendment role of journalists and the moral and ethical role of medics; a willingness to call something a riot when it might have met some technical definition but was a far cry from a rebellion or stampede or even a melee merely so the SPD could use tear gas, a chemical agent banned for use in warfare after World War I."[129]

5.153 On September 21, 2020, Mr. Bobb issued a formal report to Mayor Durkan and others about the SPD's use of crowd-control weapons.[130] The report concluded that "SPD's crowd management tactics during the recent demonstrations and protests were deficient" for a number of reasons, including:

- "There was an apparent absence of an overall strategic plan to deal with violent individuals without significant prejudice to legitimate First Amendment activity by peaceful protesters. The SPD, like police departments across America, lacked seasoned and well-trained commanders to respond to the novel circumstances of the George Floyd and BLM protests. There also was a seeming lack at times of sensitivity to the First Amendment rights of journalists and the moral and ethical role of medics."
- "In the absence of the strategic plan and well-trained commanders, there was a lack of adequate preparation and training of rank-and-file police officers and their supervisors. Seasoned and well-trained commanders should have been taking the actions of the crowd into consideration and making judgment calls based on the crowd size, actions,

[128] https://www.seattletimes.com/seattle-news/federal-judge-appoints-new-monitor-for-seattle-police-harvard-professor-replaces-merrick-bobb-who-resigned/ (September 9, 2020); https://www.documentcloud.org/documents/7204069-Clean-Final-Version-Bobb.html

[129] *Id.*

[130] https://www.seattletimes.com/seattle-news/report-seattle-police-department-should-ban-tear-gas-remind-officers-to-protect-protesters-rights/ (September 21, 2020); https://www.seattletimes.com/seattle-news/report-seattle-police-department-should-ban-tear-gas-remind-officers-to-protect-protesters-rights/ (September 23, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

environment, and the law enforcement resources available to the commanders to manage the crowd. This is with the understanding that utmost care should be given to supporting constitutional rights."

- "There was a tendency to call something a riot when it might have met some technical definition but was not a rebellion or melee and did not constitute an overall imminent threat of death or serious physical injury. As a result of using the label of "riot," there followed indiscriminate and poorly controlled use of less- lethal tools, particularly tear gas and blast balls as described later in this memorandum."

5.154 The report noted that regardless of how quickly the BLM/George Floyd protests arose after Mr. Floyd's death,

> "from WTO through Occupy to several May Days and other protests in Seattle and elsewhere, the SPD has had opportunities to learn and formulate plans for a variety of scenarios, including ones in which there was significant property destruction, looting, breaking of storefront glass, and attacks on police officers. Likewise, there were instances where persons bent on violence came from elsewhere to Seattle to throw bricks and bottles and be confrontational and provocative. In other words, SPD had seen much of this before and at an earlier time was able to ably manage crowds."[131]

5.155 The BLM/George Floyd protests continue to this day. Without significant changes to how the SPD and its officers operate, there remains an unacceptable risk that peaceful protesters and bystanders will continue to be harmed by the SPD's excessive actions in the future.

**Failure to Protect Protesters From Harm**

5.156 SPD has both engaged in the excessive use of force and failed to exercise its duties to protect and serve the protesters.

5.157 The First Amendment contemplates that protesters may occupy public streets and sidewalks. The City and State may not abandon their legal duties because they disagree with or are irritated with protesters. As Judge Jones explained, once the protesters established their "public fora," officers needed to ensure public safety by cordoning off the

[131] *Id.*

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

area from vehicular traffic.[132]

5.158 For additional detail regarding these claims, see below regarding Summer Taylor and Daniel Gregory.

**The Plaintiffs**

5.159 Plaintiffs were peacefully participating in the protests at the time of the incidents giving rise to this lawsuit.

5.159.1 At all times Plaintiffs were engaged in the exercise of their rights to assemble and engage in free speech on the issues of racism, bigotry, and biased law enforcement against Black people, including the deaths of George Floyd and innumerable others both in state and around the country.

5.159.2 The Plaintiffs did not engage in any criminal behavior. They did not strike nor attempt to strike any person including law enforcement either with their person or any sort of item or weapon. They did not commit any looting. They did not threaten any person or law enforcement officer with bodily harm.

5.160 Peaceful protesters in Seattle seek to raise public awareness and garner political action for the cause of BLM/George Floyd's death. They seek cultural influence – the power of a movement to shape public opinion, language and everyday behavior. They seek disruption – the power of a movement to make it more costly for people to support the status quo. They seek organizational power – the transformation of the movement through change within institutions. It is the element of disruption that bothers most those (police) whom the protesters are protesting against. Yet disruption historically (i.e. sit-ins during the civil

[132] Black Lives Matter Seattle-King County v. City of Seattle, 2:20-cv-00887-RAJ, Doc. 34, Order Granting in Part Motion for Temporary Restraining Order (June 12, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

rights movement) prompted business owners to desegregate from fear of the costs of facing future protesters. Disruption can also signal the depth of participants' commitment to a cause and the movement's capacity to withstand repression.[133]

5.161 The peaceful protester Plaintiffs deserved protection – not violence and disregard.

**Summer Taylor**

5.162 Summer Taylor (24 years), worked in a Veterinary clinic and actively participated in the BLM/George Floyd protests.

5.163 On July 4, 2020, Mx. Taylor was peacefully protesting with a group of protesters on a closed off section of I-5 in downtown Seattle, like they had done multiple times in the past.

5.164 Mx. Taylor was at all times a peaceful protester. They incorporate by reference paragraph

[133] See Kenneth T. Andrews, professor of sociology at the University of North Carolina at Chapel Hill and the author of "Freedom Is a Constant Struggle: The Mississippi Civil Rights Movement and Its Legacy. https://www.nytimes.com/2017/10/21/opinion/sunday/how-protest-works.html (October 21, 2017).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.159, *supra*.

5.165 Protests on I-5 are not new. The day after the Kent State shootings, on May 5, 1970, 7,000 anti-war protesters from the University of Washington marched down I-5 in the middle of the day.

5.166 10,000 protesters followed the next day.

5.167 On May 8, 1970, Seattle Mayor Wes Uhlman closed the I-5 express lanes to allow 15,000 protesters to march from UW to the federal courthouse in downtown Seattle.

5.168 Mx. Taylor's assembly on July 4, 2020 was Constitutionally protected and had been allowed to occur by City and State for 19 days in a row at the time of the incident.

5.169 In mid-June 2020, protesters indicated their intent to protest on the freeway on a nightly basis.

5.170 The City and State knew of the risks posed to protesters, including risks from both unsuspecting freeway motorists as well as drivers targeting protesters.

5.171 In response, the City and State implemented a policy of "full closure" of that portion of I-5 in the downtown Seattle area where the protests were to occur.

5.172 In doing so, the State articulated its priorities as "Safety of our personnel (WSP <u>and</u> IRT) is our overriding priority, as well as the safety of any uninvolved motorists *and then protestors*." (emphasis added).

5.173 The City and State did not achieve "full closure."

5.174 At least twice prior to July 4th, motorists penetrated the closures, putting motorists and protesters alike at risk. In at least one of those incidents, on the night of June 25, 2020, a

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

motorist "busted" through a WSDOT blockade and nearly struck several protesters.[134]

5.175 On June 19, 2020, Captain Ron Mead of the Washington State Patrol wrote: "We are too far into this to have that happen at this stage."[135]

5.176 On some nights, the State relied on livestreamed videos to follow protesters, which often left troopers without solid information about where the protesters were.[136]

5.177 On June 27, 2020, WSP Chief John Batiste publicly stated the position of WSP with respect to permitting protesters to exercise their First Amendment rights on public roadways which included I-5 in downtown Seattle:

> "In a time that requires care and flexibility, we are exercising the safest means possible to avoid injuries or worse to motorists, protesters, WSDOT personnel and our troopers by closing the roadway as needed and separating protestors from vehicular traffic…"
>
> ***
>
> "With no effective way of stopping large crowds from entering its lengthy borders, temporarily shutting the roadway is our best measure to avoid the dangerous mixture of freeway speed, vehicles, and pedestrians, and to end the disruptions as quickly as possible."
>
> ***
>
> "In this unique environment of prolonged and daily protests, our responsibility to keep people safe extends to those who might be endangered by protests on the roadways as well as those who peacefully use the freeway for making public statements…"[137]

5.178 Based upon the express publicized statements of WSP Chief Batiste, Mayor Durkan, Governor Inslee and other government officials, protesters understood that they were

---

[134] https://www.seattletimes.com/seattle-news/ahead-of-deadly-july-crash-state-patrol-emails-show-debate-and-frustration-over-protest-freeway-closures/ (September 16, 2020).
[135] *Id.*
[136] *Id.*
[137] https://www.wsp.wa.gov/2020/06/27/statement-from-chief-john-r-batiste-on-the-need-for-occasional-roadway-closures/ (June 27, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

allowed to protest on I-5, and that their lives and free speech would be protected because the roadways were going to be shut down.

5.179 The City and State did not properly shut down the roadway, only partially shutting down the roadways and means of getting on the freeway.

5.180 Law enforcement parked patrol vehicles in the front of on-ramps but chose not to park any vehicles on the off-ramps.

5.181 The State had previously been discouraging protesters from protecting themselves using "support" vehicles by arresting the drivers, charging them with Disorderly Conduct, and impounding their vehicles.

5.182 Unguarded ramps provided direct access to the freeway by drivers who either intentionally sought to run into the protesters, or drivers who might be impaired or otherwise driving negligently.

5.183 As a result, an impaired driver (Dawit Kelete) who was under the influence of methamphetamines, was able to enter the "closed" section of the freeway.

5.184 Mx. Taylor was protesting in the middle of the road with a group known as the Black Femmes when a car suddenly appeared speeding down the roadway. They and the others attempted to flee the roadway but along with Diaz Love were struck by the vehicle.

5.185 The incident took place near the Yale on-ramp – a location the City and State knew protesters used on a regular basis to access the freeway for protest activities.

5.186 The physical facts are described in the Information Cause No. 20-1-0457-0 SEA – the criminal case against Kelete.

5.187 The Major Accident Investigation Team investigation has not been made available.

5.188 Based upon the description in the Information, the alleged route of Mr. Kelete appears to

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

be as follows:

5.189 The vehicle did not strike any physical barrier prior to striking the protesters. The only barriers on the freeway protecting the protesters were in the form of three "support" vehicles parked by the protesters themselves. The vehicles did not extend the full length of the roadway.

5.190 After this incident, Capt. Mead wrote: "Quite frankly, we anticipated a lot of scenarios, but having a vehicle on a closed exit and reaching the protestors wasn't' among them."[138]

5.191 Capt. Mead wrote: "Did our strategy give the protestors a false sense of security? Perhaps in retrospect it did."

[138] https://www.seattletimes.com/seattle-news/ahead-of-deadly-july-crash-state-patrol-emails-show-debate-and-frustration-over-protest-freeway-closures/ (September 16, 2020).

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 64

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.192 Capt. Mead wrote "…the only truly safe way of protecting protestors is to deny them access to the freeway in the first place…."

5.193 As a direct and proximate result of the City and the State's abandonment of their legal duties of government and law enforcement to protect peaceful protesters from reasonably foreseeable dangers such as vehicular traffic, counter-protesters, or other law breakers, Mx. Taylor suffered damages, including but not limited to: pain, trauma, and death. Mx. Taylor also suffered infringement upon their constitutional rights. Prior to their death, Mx. Taylor was also subjected to physical attacks by the police and has survival claims for violation of constitutional rights and personal injury.

5.194 Following the incident, King County Sheriff Detective Mike Brown and other unknown people believed to be in law enforcement publicly mocked the striking and killing of Mx. Taylor because they were a protester.

5.195 Within hours after the incident, Detective Brown publicly posted on social media:

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777



5.196 He then posted a second time: "I see a couple of people got infected with Covid-19 from the hood of a car on I-5 last night."[139]

5.197 Another post on the same account appeared to mock the death of Lorenzo Anderson, who was fatally shot during the Capitol Hill Organized Protest.[140]

5.198 These statements reflect a callous, jaded, and us-versus-them mentality that is not befitting to a members of law enforcement.

5.199 At the conclusion of statutory notice periods, claims will be added relating to King County officials who assaulted, neglected, and violated the rights of peaceful protesters taken into

---

[139] https://www.king5.com/article/news/local/king-county-sheriffs-detective-on-leave-over-facebook-posts-about-seattle-protest/281-2be784cf-8433-4473-b3f9-9b7d26b40865 (July 6, 2020); https://www.cbsnews.com/news/detective-mike-brown-leave-seattle-protesters-struck-car/ (July 7, 2020).

[140] *Id.*

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

custody.

5.200 King County Councilmember Girmay Zahilay, who chairs the Law and Justice Committee, stated that Brown's behavior, which may be shared by others in local law enforcement, highlights the need for a "new public system for law enforcement."[141]

5.201 The involvement of other officers in the sharing or liking of these posts is currently under investigation.

**Daniel Gregory**

5.202 Dan Gregory is the son of a career Baltimore police officer father and police dispatcher mother. He believes that police should be human first.

5.203 On June 7, 2020, Mr. Gregory joined the BLM/George Floyd protest in Capitol Hill, like he had done on previous days. He chanted with the crowd and encouraged people to harness the energy they felt at these protests to go vote.

5.204 Mr. Gregory was at all times a peaceful protester. He incorporates by reference paragraph

[141] https://www.king5.com/article/news/local/jay-inslee-king-county-sheriffs-detective-protesters-facebook-post/281-453c58e9-e454-41a6-b7df-696f1b159332 (July 7, 2020).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.159, *supra*.

5.205 Sometime after 7 or 8pm, as Mr. Gregory was sitting on the curb eating a hotdog, driver Nikolas Fernandez turned quickly onto 11th Avenue and drove down the street toward Pine – frightening many of the protesters and putting them at risk of being struck.

5.206 The intersection of 11th Avenue and Pine Street and the surrounding streets were crowded with hundreds of protesters. Being near the East Precinct, this area had been a popular protest site for several days.

5.207 SPD made no attempt to prevent drivers from entering the area, or to protect peaceful protesters from reasonably foreseeable dangers such as vehicular traffic, counter-protesters, or other law breakers.

5.208 SPD had erected barriers to protect SPD, but not the protesters.

5.209 The roadway had no guards, barricades, or even signs – allowing unfettered access by any negligent, reckless or criminally minded driver.

5.210 The only thing restricting access down 11th Avenue was a city trash can and recycling bin, which someone had moved to the center of the crosswalk crossing that street.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.211  Mr. Gregory heard people repeatedly shouting, "stop," and quickly realized that the driver was threatening the lives of the protesters with his vehicle. Mr. Gregory was instantly reminded of the Charlottesville car attack of 2017, when a man intentionally rammed anti-racism demonstrators with his car, killing one woman and injuring dozens more. Without a second thought, he dropped his lunch and ran straight for the driver.

5.212  Mr. Gregory caught up to the car and reached through the open driver's side window to grab the steering wheel, shouting "stop" at least twice.

5.213  Mr. Fernandez accelerated, forcing Mr. Gregory to let go of the steering wheel.

5.214  Mr. Gregory caught up with the car again and attempted to stop the driver by force. Mr. Fernandez reached for his gun and shot Mr. Gregory.



5.215  As a direct and proximate result of the City and SPD's failure to protect the protesters by keeping vehicles out of the protest zone, Mr. Gregory suffered pain, trauma, and other damages, including but not limited to: a bullet wound to the arm necessitating surgical removal of the bullet, the implantation of multiple plates and screws, and PTSD.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA  98119
Tel: 206-448-1777

**Bryauna "Malichi" Howe**

5.216 On May 30, 2020, Malichi Howe, a 17-year-old high school student, went to downtown Seattle with their[142] brother Ashton and brother-in-law Thomas, to protest the killing of George Floyd and support the Black Lives Matter movement. They arrived at Westlake Center around 1pm, where they listened to speakers and marched around downtown.

5.217 Mx. Howe was at all times a peaceful protester. They incorporate by reference paragraph 5.159, *supra*.

5.218 Around 4 or 5pm, the crowd they were part of was stopped by a police blockade. Mx. Howe and the group knelt, with their hands up, chanting "hands up, don't shoot."

5.219 Suddenly, one of the officers ripped someone's umbrella from their hands, after which the officers began throwing tear gas into the crowd.

5.220 The protestors, including Mx. Howe, attempted to flee the area. Mx. Howe became

[142] Malichi is non-binary and uses they/them pronouns.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

separated from their family members. They were anxious, fearful, and began to panic.

5.221   Suddenly, while Mx. Howe was running to put distance between themselves and the police, an officer threw an explosive device, striking Mx. Howe in the hand. Mx. Howe felt immediate pain but could not stop to see what happened, as officers were swiftly and forcefully advancing, corralling the crowd out of Westlake Center.

5.222   As the police advanced, an SPD bike officer forcefully shoved Mx. Howe, causing them additional trauma.



5.223   As a direct and proximate result of the City and SPD's explosive device striking Mx. Howe, Mx. Howe suffered pain, trauma, and other damages, including but not limited to: a partially amputated thumb and shattering of the bones of their forefinger. Mx. Howe also suffered infringement upon their constitutional rights.

COMPLAINT FOR DAMAGES ON BEHALF OF
BLACK LIVES MATTER PROTESTERS FOR
WRONGFUL DEATH, PERSONAL INJURIES, AND
CIVIL RIGHTS VIOLATIONS - 71

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA  98119
Tel: 206-448-1777

**John W. Kelliher ("Jack")**

5.224 On May 31, 2020, 23-year-old John W. Kelliher ("Jack"), a recent college grad and business program manager at a large tech company, joined the BLM/George Floyd protests in downtown Seattle and later in Capitol Hill.

5.225 Mr. Kelliher was at all times a peaceful protester. He incorporates by reference paragraph 5.159, *supra*.

5.226 Around 4:30 pm, as Mr. Kelliher was walking on a crowded Capitol Hill sidewalk with other protesters, a line of SPD officers on bicycles approached from behind.

5.227 The pedestrians had the right-of-way on the sidewalk.

5.228 As the officers began to pass, one attempted to pass Mr. Kelliher on his right side where there was very little room to pass, and brushed up against Mr. Kelliher in the process.

5.229 Suddenly and without provocation, the officer jumped on Mr. Kelliher and placed his arm around his neck.

5.230 Mr. Kelliher raised his arms up to show he was peaceful and not resisting, but the officer

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

threw him to the ground.



5.231   Around a dozen other officers on bicycles surrounded Mr. Kelliher while the first officer arrested him.

5.232   When Mr. Kelliher asked the officer why he put him in a chock hold the officer said, "he interpreted the brush-up as a push."

5.233   After his arrest, Mr. Kelliher was taken to a precinct where he was held and interrogated, then later transferred to the city jail.

5.234   Mr. Kelliher was later released on his own personal recognizance and was charged with obstructing a police officer.

5.235   Those charges have been dropped.

5.236   As a direct and proximate result of the City and SPD's excessive use of force and unlawful arrest of Mr. Kelliher, Mr. Kelliher suffered damages, including but not limited to:

COMPLAINT FOR DAMAGES ON BEHALF OF
BLACK LIVES MATTER PROTESTERS FOR
WRONGFUL DEATH, PERSONAL INJURIES, AND
CIVIL RIGHTS VIOLATIONS - 73

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA  98119
Tel: 206-448-1777

infringement upon his constitutional rights, an assault on his person, unlawful detainment, and the effects of being accused of a crime he did not commit.

**Jenna Kinyon**

5.237 28-year-old Jenna Kinyon, a welder who recently moved to the Seattle area, suffered injuries and damages at the hands of the City and SPD on two separate occasions.

5.238 Ms. Kinyon was at all times a peaceful protester. She incorporates by reference paragraph 5.159, *supra*.

5.239 On May 30, 2020, Jenna Kinyon went to downtown Seattle to peacefully protest the murder of George Floyd, and joined the crowds congregating near 4th and Stewart Street.

5.240 At 5:00 pm, Mayor Durkan's hastily announced curfew went into effect.

5.241 The protesters were not given sufficient notice about this curfew – many did not know about it until after it had already gone into effect.

5.242 A bit before 5:00 pm, Ms. Kinyon could see that the police officers were getting antsy,

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

trying to corral people around.

5.243 Public transportation and roads into/out of downtown also began closing prior to curfew, meaning protesters like Ms. Kinyon (who lives in Spanaway) were stuck downtown.

5.244 At 5:00 pm, the police started firing tear gas, flash bang grenades, blast balls, OC spray, and/or rubber bullets.

5.245 Shortly after 5:00 pm, Ms. Kinyon was standing with a group of protesters about 25 feet away from the police, when she was suddenly and without provocation hit in the stomach by a rubber bullet.

5.246 Ms. Kinyon paused briefly to retrieve the bullet that hit her. She then ran away from the police line into the crowd for safety, and then tried to get out of the downtown area, but could not leave due to the shutdown of public transportation and nearby streets.

5.247 As a direct and proximate result of the police shooting Ms. Kinyon with a rubber bullet, she suffered pain, trauma, and other damages, including but not limited to: a large contusion on her stomach. Ms. Kinyon also suffered infringement upon her constitutional rights.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.248 On June 7, 2020, Ms. Kinyon went to Capitol Hill to peacefully protest with the Black Lives Matter movement near the East Precinct barricade. She began playing her drum/bucket and chanting with the crowd over her megaphone.

5.249 Around 7:45 pm, police and National Guard started approaching the barricade and surrounding the protesters.

5.250 Suddenly and without provocation, the police began to throw/fire projectiles into the crowd and pepper sprayed protesters in the face, causing panic within the crowd.

5.251 As this was happening SPD Officer Schoenberg approached Ms. Kinyon, pointed at her, and yelled, "I'm gonna beat the shit out of you." Another officer threatened to pepper spray her in the face.

5.252 After this, Ms. Kinyon continued peacefully protesting. Around 12:00 am, Ms. Kinyon was in the front of the crowd, near the barricade, playing her drum.

5.253 The police attempted to move the protesters back, but Ms. Kinyon couldn't move very far – stuck between a mass of protesters on one side and a line of officers on the other.

5.254 Suddenly, an officer grabbed Ms. Kinyon by the neck/collar and yanked her into the police line, knocking Ms. Kinyon unconscious.

5.255 Ms. Kinyon does not know how long she was out. When she regained consciousness, she was lying on the ground, behind the barricade, missing all of her protest equipment.

5.256 After EMTs provided her with some cursory treatment, the police moved her to a cell.

5.257 Ms. Kinyon was disoriented and on the verge of vomiting from the head injury she sustained, yet she was not provided with further medical treatment.

5.258 While in the cell, an officer ripped away from Ms. Kinyon a blanket she had been provided by the EMTs.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.259 Ms. Kinyon was also placed in handcuffs – while still being held in the cell.

5.260 Eventually Ms. Kinyon was moved to King County and released later in the day on June 8, 2020.

5.261 Ms. Kinyon was charged with failure to disperse and obstructing a public officer. Those charges were dropped.

5.262 As a direct and proximate result of the excessive force used by the City and SPD, Ms. Kinyon suffered pain, trauma, and other damages, including but not limited to: concussion with loss of consciousness, neck pain, back pain, wrist pain, finger numbness, unlawful detainment, and the effects of being accused of a crime she did not commit. Ms. Kinyon also suffered infringement upon her constitutional rights.

**<u>Jordan A. Pickett</u>**

5.263 23-year-old Jordan Pickett is a multimedia journalist for *The Daily* – University of Washington's student newspaper.

5.264 On June 7, 2020, around 7-8:00 pm, Mr. Pickett headed to the Capitol Hill area to

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

photograph the protests.

5.265 Mr. Pickett was at all times peaceful. Mr. Pickett incorporates by reference paragraph 5.159, *supra*.

5.266 Mr. Pickett was clearly visible as media – he had his front "media" tassel, as well as a labeled hat and backpack.

5.267 About 10 minutes after he arrived the police deployed tear gas, dozens of flash bangs and/or blast balls, and started pushing the crowd towards Broadway. Mr. Picket did not see what precipitated this response, but to his eye, the crowds were peaceful.

5.268 Mr. Pickett was about 40-50 feet away from the police when a flash bang or blast ball exploded next to his foot.

5.269 The crowd moved away from the police and Mr. Pickett moved with them, intermittently

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 78

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

taking photographs.

5.270 As he was walking on Pine Street between Broadway and 10th Avenue, Mr. Pickett was suddenly hit from behind by a baton round. At that point, no one was within 4-5 feet around him.

5.271 Mr. Picket fell over in pain and with tear gas in his eyes. Despite his pain, Mr. Picket got up and continued taking photographs, but he kept his distance, wary of getting injured again.

5.272 As a direct and proximate cause of the police chemical weapons, explosives, and impact projectiles at Mr. Picket, he suffered pain, trauma, and other damages, including but not limited to: contusions on his back and chemical irritants in his eyes. Mr. Pickett also suffered infringement upon his constitutional rights, including his rights as a member of the press.

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 79

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

**Daniel Pierce**

5.273 39-year-old Daniel Pierce came to Seattle to pursue his dream of becoming hair stylist in a diverse city. He regularly attended the BLM/George Floyd protests to witness and document the events, suffered injuries and damages at the hands of the City and SPD on three separate occasions.

5.274 Mr. Pierce was at all times a peaceful protester. Mr. Pierce incorporates by reference paragraph 5.159, *supra*.

5.275 Each day followed a similar pattern. Mr. Pierce arrived to the scene of the demonstration, made his way near the front line where protesters were faced with police phalanxes, and began filming/broadcasting via Facebook Live.

5.276 Mr. Pierce mostly stayed quiet – documenting the scene, sometimes joining in chants and expressing his feelings, but never speaking with or agitating police officers.

5.277 On June 1, 2020, just after 9:00 pm, officers suddenly started using OC spray, tear gas, and

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 80

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

flash bang grenades/blast balls.

5.278 After stopping briefly to administer aid to people who were injured, Mr. Pierce ran away, up 11th Avenue toward the north end of Cal Anderson Park.

5.279 Other protesters were around him also running, shouting "rubber bullets" as Mr. Pierce could hear the police firing their weapons.

5.280 Around 9:45pm, Mr. Pierce made his way to the corner of 11th and East Denny Way, where officers once again fired upon the demonstrators.

5.281 On June 2, 2020, around 11:40 pm, Mr. Pierce was again peacefully taking part in the Capitol Hill protests.

5.282 Suddenly, the police began to use tear gas, flash bang grenades/blast balls, and rubber bullets on the crowd.

5.283 While fleeing, Mr. Pierce was exposed to various chemical irritants, which caused him to have difficulty seeing and breathing.

5.284 On June 7, 2020, around 11:15 pm, Mr. Pierce was again peacefully protesting on Capitol Hill, when officers began hosing the front line of protesters with pepper spray.

5.285 Just after midnight, a flash bang grenade/blast ball exploded mere feet in front of Mr. Pierce, stunning him.

5.286 Shortly after that, Mr. Pierce was hit with tear gas that exploded directly in front of him.

5.287 His eyes began to burn and swelled shut, temporarily blinding him. His nostrils and throat burned, and his skin was on fire.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777



5.288 Mr. Pierce blindly ran from the scene, vomiting and shouting, "I can't breathe."

5.289 As a direct and proximate result of the chemical weapons used on him by the SPD, Mr. Pierce suffered pain, trauma, and other damages, including but not limited to: difficulty seeing and breathing including exacerbation of his severe asthma, nausea, chemical burns, and PTSD. Mr. Pierce also suffered infringement upon his constitutional rights.

**Joey Wieser**

5.290 29-year-old Joey Wieser works as a YouTube channel manager for a local company. Outside of work, he has spent the last several months documenting police interactions with

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 82

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

protesters by livestreaming those interactions as a freelance journalist.

5.291 Mr. Wieser was at all times a peaceful protester and a member of the independent media. Mr. Wieser incorporates by reference paragraph 5.159, *supra*.

5.292 On June 1, 2020, around 5:45 p.m., Mr. Wieser joined protesters in a march from Westlake Park to Capitol Hill. By 7:25 p.m. Mr. Wieser made it to the SPD's East Precinct and was peacefully documenting the protests via photo and video.

5.293 At no time did he hear the SPD give an order to disperse or warn of the possible use of tear gas or blast balls.

5.294 Suddenly, around 9-9:30 pm, he was exposed to loud blast balls, tear gas and pepper spray as the police attempted to disperse the crowd.

5.295 On June 2, 2020, Mr. Wieser attended protests in Capitol Hill near the East Precinct. The crowd was large, and although a few isolated people were throwing things like water bottles, it was mostly peaceful. Suddenly, around 11:30 pm, the police indiscriminately fired numerous projectiles including tear gas and blast balls – continuing even after the crowd attempted to retreat.

5.296 On June 7, 2020, Mr. Wieser attended protests in Capitol Hill. Mr. Wieser was near the front of a crowd facing dozens of officers amassed in full riot gear outside of the East Precinct.

5.297 Shortly after midnight, a person from inside the crowd lobbed a water bottle over the protesters in front of him. As the protesters at the front turned to chastise the protester who threw the bottle, multiple officers began spraying OC spray at the numerous peaceful protesters at the front of the crowd, including Mr. Wieser.

5.298 Mr. Wieser and the protesters backed up, some raising umbrellas to shield themselves from

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

the worst of the gas. Within seconds, police began indiscriminately firing numerous projectiles including tear gas and blast balls into the crowd, some of which exploded near Mr. Wieser's arms, head, and feet. Only after this barrage began did the SPD issue a verbal order to disperse.

5.299   Although the protesters backed away from the mass of officers guarding the East Precinct, the SPD continued indiscriminately firing projectiles including blast balls and tear gas, many of which physically struck protesters including Mr. Wieser.



5.300   During this protest, Mr. Wieser witnessed the SPD deliberately fire a blast ball directly into the chest of another protester, Aubreanna Inda, who went into cardiac arrest three times due to her injuries. Later, Mr. Wieser also witnessed an unarmed Black man who was knocked to the ground with a rubber bullet, and Ned Farmer, a member of the media, who was rendered unconscious by a blast ball.

5.301   On July 1, 2020, Mr. Wieser attended protests in Capitol Hill. That morning the SPD had cleared out CHOP and the surrounding area by order of Mayor Durkan.

COMPLAINT FOR DAMAGES ON BEHALF OF
BLACK LIVES MATTER PROTESTERS FOR
WRONGFUL DEATH, PERSONAL INJURIES, AND
CIVIL RIGHTS VIOLATIONS - 84

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA  98119
Tel: 206-448-1777

5.302 That evening lines of officers in full riot gear were enforcing that order at the borders of the cleared out zone – using flimsy yellow caution tape and "No Parking" A-frame signs as the "barrier" between the enforcement zone and the areas where protesters were allowed to assemble, verbally instructing protesters to stay behind the edge of the crosswalk, and periodically advancing and retreating the line of officers in a haphazard and seemingly arbitrary manner.

5.303 During this encounter, Mr. Wieser was exposed multiple times to blast balls launched into and even behind the crowd.

5.304 On July 2, 2020, Mr. Wieser attended protests in Capitol Hill. Like the day before, the protest took place on the edge of the cleared out zone where CHAZ/CHOP had been. And like the day before, the police were enforcing that zone in a similar manner.

5.305 Suddenly and without warning, around 12:30 am, the SPD rushed forward, and Mr. Wieser was sprayed in the face with OC spray.

5.306 On July 25, 2020, Mr. Wieser attended protests in Capitol Hill. This was the weekend the SPD engaged in an "all-out assault" on civilians, and that led to the August 10, 2020 revision of the federal court's Preliminary Injunction, adding to its protections.

5.307 The SPD used blast balls, OC spray, and physical violence to force the protesters to move back, over and over.

5.308 During this process, despite moving back, being peaceful, and announcing himself as media, Mr. Wieser was shoved by an officer, and then hit in the mouth and face with OC spray. Mr. Wieser was also exposed to other chemical irritants used generally on the protesters.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777





COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 86

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.309 As a direct and proximate result chemical weapons used on him by the SPD, Mr. Wieser suffered pain, trauma, and other damages, including but not limited to: intense irritation to his lungs and throat, difficulty breathing, chest pain, skin irritation, burning/watery eyes, temporary blindness and respiratory disfunction, blood in his ear, chemical burns, lacerations, nightmares, loss of sleep, and PTSD. Mr. Wieser also suffered infringement upon his constitutional rights.

**<u>Gillian Williams</u>**

5.310 On June 7, 2020, around 7:00 pm, 35-year-old Gillian Williams attended the George Floyd/Black Lives Matter protests in Capitol Hill at 11th and Pine near the police line. Ms. Williams is a carpenter who teaches carpentry skills to Seattle high schoolers. She saw many of her students of color attending the protest and wanted to support them.

5.311 Ms. Williams was at all times a peaceful protester. Ms. Williams incorporates by reference paragraph 5.159, *supra*.

COMPLAINT FOR DAMAGES ON BEHALF OF BLACK LIVES MATTER PROTESTERS FOR WRONGFUL DEATH, PERSONAL INJURIES, AND CIVIL RIGHTS VIOLATIONS - 87

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

5.312 Around midnight, Ms. Williams heard the police instructing the crowd to disperse.

5.313 Ms. Williams attempted to follow the order, but was confused about where to disperse, as the police did not direct the crowd.

5.314 Ms. Williams was standing on the sidewalk, trying to get her bearing, looking for the best way to leave the area.

5.315 Suddenly, before she could find a path out, the police began to deploy tear gas and other projectiles.

5.316 Ms. Williams was hit multiple times – two projectiles exploded near her legs, one hit her forearm, and she was sprayed with green dye.

5.317 As a direct and proximate result chemical weapons used on her by the SPD, Ms. Williams suffered pain, trauma, and other damages, including but not limited to: a bone contusion, nerve damage, muscle damage, chemical burns, and PTSD. Ms. Williams also suffered infringement upon her constitutional rights.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

## VI. NEGLIGENCE

6.1 Defendants City of Seattle and State of Washington had a duty to exercise ordinary care and to act in a manner that a reasonably careful person would have under the same or similar circumstances. Defendants had duties to use reasonable police practices to protect and safeguard protesters, bystanders, and other members of the public from foreseeable danger, especially when the risk of harm is created and/or increased by Defendants' acts or omissions. RCW 4.96.010; RCW 4.92.090.

6.2 Defendants City of Seattle and State of Washington negligently failed to exercise reasonable care regarding the protection of protesters from reasonably foreseeable dangers such as vehicular traffic, counter-protesters, or others, including but not limited to their failure to:

6.2.1 Block off streets and freeway ramps;

6.2.2 Utilize signage, announcements, or alerts to warn and direct traffic away from known protest areas;

6.2.3 Employ patrol cars with flashing lights, or the manual direction of traffic by officers, to clearly warn any traffic; and/or

6.2.4 Accurately communicate with protesters and/or drivers regarding safety measures taken, or not.

6.3 Defendant City of Seattle (through the SPD) negligently violated its own policies and reasonable police practices regarding the use of force by officers at the protests, including but not limited to the negligent failure to:

6.3.1 conduct appropriate pre-incident planning with clear strategies and objectives;

6.3.2 deploy appropriate equipment and/or personnel to the protests;

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

6.3.3 communicate plans and/or instructions to officers;

6.3.4 de-escalate conflict;

6.3.5 avoid unreasonably escalating conflict;

6.3.6 communicate instructions and/or warnings to protesters;

6.3.7 provide protesters reasonable opportunity to comply with instructions and/or warnings;

6.3.8 ensure all applications of force are reasonable, necessary, proportional and individualized;

6.3.9 prohibit unreasonable methods of force, including but not limited to: using "less lethal" force to reroute and/or disperse crowds without proper determination that dispersal is appropriate, using "less lethal" force in an excessively harmful manner such as by targeting in unreasonably close proximity to people or targeting improper parts of the body, and using "area effect" weapons such as tear gas, blast balls, and OC spray with disregard for the harm caused to peaceful protesters and others in the vicinity of that effect;

6.3.10 render reasonable medical aid to those people injured by the SPD's conduct;

6.3.11 prohibit officers from using methods of force for which they do not have the proper training or instruction;

6.3.12 prohibit the disproportionate use of force against Black people, People of Color, and other historically marginalized people;

6.3.13 prohibit the use of force against or with disregard for protected speech and assembly.

6.4 Defendants City of Seattle and State of Washington negligently failed to properly train

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

officers.

6.5 Defendants City of Seattle and State of Washington negligently failed to properly supervise officers.

6.6 Defendants City of Seattle and State of Washington negligently failed to monitor, investigate, and otherwise prevent the members of its law enforcement forces from harboring implicit bias against BLM/George Floyd protesters, which bias played a role in the actions and misconduct of the police.

6.7 As a direct and proximate result of these violations, Plaintiffs suffered damages.

6.8 The individual officers employed by Defendant City of Seattle were acting within the course and scope of their employment with the City at the time of the above-described acts and omissions, and in furtherance of the City's business. Defendant City of Seattle is vicariously liable for the negligence of the individual officers under *respondeat superior*.

6.9 The individual officers employed by Defendant State of Washington were acting within the course and scope of their employment with the State at the time of the above-described acts and omissions, and in furtherance of the State's business. Defendant State of Washington is vicariously liable for the negligence of the individual officers under *respondeat superior.*

## VII. ASSAULT AND BATTERY

7.1 Defendant City of Seattle (through the SPD) intended to cause fear and apprehension of an imminent harmful or offensive contact and committed acts that resulted in the Plaintiffs' fear or apprehension of such contact.

7.2 Defendant City of Seattle intended to touch Plaintiffs in a harmful or offensive manner and committed acts that resulted in harmful or offensive contact with Plaintiffs.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

7.3 To the extent Defendant argues the force used was reasonable and necessary—that no reasonably effective alternative existed—Plaintiffs assert that Defendant's force was excessive, unnecessarily violent, and unreasonable.

7.4 As a direct and proximate result of these violations, Plaintiffs suffered damages.

7.5 The individual officers employed by Defendant City of Seattle were acting within the course and scope of their employment with the City at the time of the above-described acts and omissions, and in furtherance of the City's business. Defendant City of Seattle is vicariously liable for the negligence of the individual officers under *respondeat superior*.

## VIII. FALSE IMPRISONMENT

8.1 Defendant City of Seattle (through the SPD) unlawfully detained, restrained, and/or imprisoned protesters, through actions including but not limited to physical force, threat of force, and arrest.

8.2 To the extent Defendant City of Seattle argues their actions were justified, Plaintiffs assert that Defendant's actions were unreasonable and lacking probable cause.

8.3 As a direct and proximate result of these violations, Plaintiffs suffered damages.

8.4 The individual officers employed by Defendant City of Seattle were acting within the course and scope of their employment with the City at the time of the above-described acts and omissions, and in furtherance of the City's business. Defendant City of Seattle is vicariously liable for the negligence of the individual officers under *respondeat superior*.

## IX. WA CONST, ART. I, SEC. 7 UNCONSTITUTIONAL EXCESSIVE FORCE

9.1 Under the Washington State Constitution Article I, Section 7, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." This section is the State law equivalent of the Fourth Amendment of the United States Constitution. It

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

guarantees the right to be free of unlawful arrest and excessive force by State and local governments.

9.2 Section 7, however, "provides greater protection to individual privacy rights than the Fourth Amendment." *State v. Phillip*, 9 Wn. App. 2d 464, 474, 452 P.3d 553 (Div. 1 2019) (internal quotations omitted). It "recognizes an individual's right to privacy with no express limitations," and "prohibits any invasion of an individual's right to privacy without 'authority of law." *Id*. (internal quotations omitted). The rights of individuals are" nearly categorical," and there is no "good faith" or "reasonableness" exception. *Id*. at 474-75.

9.3 While Plaintiffs and those around them were peacefully protesting, and without any imminent threat of danger to person or property or probable cause, the SPD repeatedly exercised force through the use of chemical agents such as tear gas and OC/pepper spray; explosive blast balls and flash bangs; kinetic impact weapons such as "rubber bullets" i.e. baton rounds; batons; shields; and physical maneuvers.

9.4 The SPD exercised force without reasonable warnings to peaceful protesters in advance, and without allowing adequate time or avenues for peaceful protesters to vacate the area.

9.5 The SPD exercised force indiscriminately, without directing it at any specific person or people actually posing an imminent threat of danger to person or property (assuming such a person actually existed).

9.6 The SPD arrested, restrained, seized, kettled, corralled, and/or detained peaceful protesters without reasonable grounds to believe, or the actual belief, that a crime was being committed.

9.7 There was no lawful, reasonable, or rational justification for the type and degree of force and/or restraint used on the peaceful protester plaintiffs by Defendant City of Seattle

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

(through the SPD).

9.8 The SPD's widescale use of excessive force and unlawful restraint violated the peaceful protester plaintiffs' rights under the Washington State Constitution Article I, Section 7. As a direct and proximate result of these violations, Plaintiffs suffered damages.

**X. WA CONST, ART. 1, SEC. 4**
**UNCONSTITUTIONAL RESTRAINTS AND PUNISHMENT ON FREE SPEECH AND ASSEMBLY**

10.1 Under the Washington State Constitution Article I, Section 4, "The right of petition and of the people peaceably to assemble for the common good shall never be abridged." This Section is the State law equivalent of part of the First Amendment of the United States Constitution. It guarantees the right to be free of unreasonable restraints on or consequences to peaceful assembly for a cause, such as the anti-racism cause of the peaceful protester plaintiffs.

10.2 While State and local governments are allowed to place reasonable restrictions on protests, subject to arrest and due process, they may not deter or punish constitutionally protected speech with threats or use of violence.

10.3 The peaceful protester plaintiffs were exercising their constitutionally protected rights to assemble in support of anti-racism in policing and the judicial system, as well as anti-police brutality, which our Supreme Court has repeatedly recognized as an ongoing and pervasive threat to the justice system and society as a whole.

10.4 The SPD responded to the peaceful protester plaintiffs' message of anti-racism and anti-police brutality with violence.

10.5 The SPD's unreasonable and disproportionate conduct was motivated by the anti-racism and anti-police brutality viewpoints being expressed by the peaceful protester plaintiffs.

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

10.6 The SPD's conduct had the purpose and effect of chilling plaintiffs and others like them from exercising their rights to peaceful assembly.

10.7 The above-described conduct by Defendant City of Seattle (through the SPD) violated the peaceful protester plaintiffs' rights under the Washington State Constitution Article I, Section 4. As a direct and proximate result of these violations, Plaintiffs suffered damages.

## XI. BIASED POLICING

11.1 Seattle Municipal Code 14.11 prohibits biased policing defined as "selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, by a police officer, the effect of which is to adversely affect or differentiate between or among individuals or groups of individuals, because of race… or political ideology."

11.2 SMC 14.11.050 provides a cause of action against the City when a police officer acts with an intent to discriminate against an individual or group because of race or political ideology.

11.3 The above-described conduct by Defendant City of Seattle (through the SPD) violated SMC 14.11.

11.4 As a direct and proximate result of these violations, Plaintiffs suffered damages.

## XII. COMMUNICATING FALSE OR DEROGATORY INFORMATION

12.1 Seattle Municipal Code 14.12 prohibits "Communicating information known to be false or derogatory with the intention of disrupting any lawful political or religious activity in violation of subsection 14.12.280.B…."

12.2 SMC 14.12.350 provides a cause of action against the City for injuries proximately caused by departmental personnel willfully in the scope and course of their duties violating this

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

code.

12.3 The above-described conduct by Defendant City of Seattle (through the SPD) violated SMC 14.12.

12.4 As a direct and proximate result of these violations, Plaintiffs suffered damages.

12.5 Pursuant to the bargaining agreement between the City and SPOG, 78% of President Solan's salary is paid by the City for "maintaining skills and training as a police officer and all time spent dealing with the City in labor-management meetings, grievances, or other such duties," and 22% by SPOG for "Guild business."[143]

12.6 At all times, Mr. Solan remains a Seattle Police Officer, whose conduct may unlawfully chill free speech (as well as foster systemic racism and excessive force).

12.7 On information and belief, President Solan's false and derogatory remarks as generally described above, occurred during time allotted for, and paid by, the Seattle Police Department.

12.8 President Solan's remarks were intended to disrupt lawful political activity, in violation of SMC 14.12.350.

## XIII. WASHINGTON LAW AGAINST DISCRIMINATION

13.1 The Washington Law Against Discrimination (WLAD) prohibits discrimination and preserves "[t]he right to be free from discrimination." RCW 49.60.030(1). It is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. In enacting this act the legislature found that discrimination threatens not only the rights and proper privileges of this state's inhabitants but menaces

[143] https://www.seattle.gov/Documents/Departments/OPA/Legislation/SPOG_CBA_expires_12-31-20_111418.pdf

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

the institutions and foundation of a free democratic state. RCW 49.60.010.

13.2 "The right to be free from discrimination" includes "[t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." *Id.; accord* RCW 49.60.215.

13.3 In bringing suit under WLAD, the plaintiff "assumes the role of a private attorney general, vindicating a policy of the highest priority."[144]

13.4 Public streets and sidewalks are places of public accommodation and assemblage. RCW 49.60.040(2).

13.5 Defendant City of Seattle deprived Plaintiffs of the "accommodations, advantages, facilities, or privileges of [a] place of public resort, accommodation, assemblage, or amusement," in violation of RCW 49.60.030(1)(b).

13.6 The disproportionate treatment of individuals based upon their race by law enforcement is a discriminatory practice under RCW 49.60 *et seq*.

13.7 Plaintiffs are peaceful protesters engaged in advocacy on behalf of protected classes of people disproportionally impacted by police brutality and killings, specifically Black people and others who are targeted because of their race.

13.8 Under WLAD it is an unfair and discriminatory practice to "otherwise discriminate" or retaliate against any individual opposing any practices forbidden by the chapter. RCW 49.60.210.

13.9 Defendant City of Seattle was prohibited from engaging in retaliation against the peaceful BLM/George Floyd protesters – whether by engaging in excessive force against them, or

[144] *Marquis v. City of Spokane*, 130 Wn.2d 97, 109, 922 P.2d 43, 49 (1996), quoted by *Zhu v. North Central Educational Service District-ESD*, 171, 189 Wn.2d 607, 614 (2017).

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

failing to reasonably protect them.

13.10 Defendant City of Seattle's retaliatory motive was a substantial factor in Defendant's conduct.

## XIV. DAMAGES – WRONGFUL DEATH

14.1 As a direct and proximate result of the above acts, omissions, and other conduct of Defendants, the Estate of Summer Jolie Williams Taylor suffered economic and non-economic damages in amounts to be proven at trial, including all damages as provided under RCW 4.20.046 and RCW 4.20.060. These damages include, but are not limited to:

- All damages described below for claims not resulting in Mx. Taylor's death,
- Past medical bills plus interest in all liquidated amounts,
- Memorial and cremation expenses,
- Pre-death pain and suffering, both mental and physical, including fear of impending death,
- Loss of net accumulations, and
- Other economic and pecuniary damages.

14.2 As a direct and proximate result of the above acts, omissions, and other conduct of Defendants, statutory beneficiaries Matthew D. Taylor, Dalia Ruth Williams Taylor, and Luke W. Taylor, suffered damages in an amount to be proven at trial, including the destruction of their familial relationships, and all other damages as provided under RCW 4.20.010, RCW 4.20.046, and RCW 4.20.060.

## XV. DAMAGES – PERSONAL INJURIES AND CIVIL RIGHTS VIOLATIONS

12.1 As a direct and proximate result of the above acts, omissions, and other conduct of Defendants, The Plaintiffs have suffered and continue to suffer physical injury, pain and suffering, mental and emotional distress, disability, disfigurement, loss of enjoyment of

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

life, loss of liberty, humiliation, fear, and embarrassment, and other general damages in amounts to be proven at the time of trial.

12.2 As a direct and proximate result of the above acts, omissions, and other conduct of Defendants, Plaintiffs have been required to seek various medical treatments and will continue to require medical treatments in the future, in amounts to be proven at the time of trial.

12.3 As a direct and proximate result of the above acts, omissions, and other conduct of Defendants, Plaintiffs have suffered and will continue to suffer lost wages, lost earning capacity, medical expenses, property damage, injury to reputation, financial losses due to wrongful prosecution, and other special damages, in amounts to be proven at the time of trial.

12.4 As a direct and proximate result of the above acts, omissions, and other conduct of Defendants, Plaintiffs have suffered damage to their belief and confidence in the sanctity of their constitutional rights, including but not limited to their rights to free speech and assembly, freedom of the press, and freedom from assault by excessive force, resulting in a chilling effect on the future exercise of their rights, in amounts to be proven at the time of trial.

12.5 Plaintiffs have incurred other damages to be proven at the time of trial.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants jointly and severally as follows:

1. For special and general damages in amounts to be proven at trial;

2. For costs and disbursements;

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

3. For all damages, fees, and expenses, and other relief available under WLAD;

4. For statutory attorneys' fees;

5. For all damages, fees, and expenses, and other relief available under SMC 14.11.

6. For all damages, fees, and expenses, and other relief available under SMC 14.12.

7. For statutory interest on the judgment from the date judgment is entered until paid in full;

8. For prejudgment interest on the special damages;

9. For prejudgment interest on liquidated damages;

10. For an order requiring Defendants to expunge, purge, and/or seal any and all arrest and charging records for the Plaintiffs arising out of the protests;

11. For such other and further relief as the Court may deem just and equitable.

DATED this 25th day of September, 2020.

STRITMATTER KESSLER KOEHLER MOORE

Karen K. Koehler, WSBA#15325
Andrew N. Ackley, WSBA#41752
Lisa Benedetti, WSBA#43194
Melanie Nguyen, WSBA#51724
Fred Rabb, WSBA#56336
Counsel for Plaintiff

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777