# EXHIBIT 27

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Civil Action No. 12-CV- 1282** |
| Plaintiff, | **SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION** |
| v. | |
| CITY OF SEATTLE, | |
| Defendant. | |

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 1
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

I.   INTRODUCTION.................................................................................................. 1

    A.   STRUCTURE OF THE AGREEMENTS ............................................. 1
    B.   COMMUNITY POLICE COMMISSION ............................................ 2
    C.   BACKGROUND ON AGREEMENTS................................................. 4

II.  DEFINITIONS .................................................................................................. 6

III. COMMITMENTS.............................................................................................. 12

    A.   USE OF FORCE ................................................................................. 12
        1.   Use of Force Principles........................................................ 12
        2.   Weapon-Specific Policies .................................................... 14
            a.   Firearms .................................................................. 14
            b.   Conductive Energy Devices (ECD, CED, or TASER)................. 15
            c.   Oleoresin Capsicum Spray ("OC Spray")................................. 16
            d.   Impact Weapons..................................................... 17
        3.   Use of Force Reporting and Investigation ............................ 18
            a.   Type I Reporting and Investigation Requirements .................... 21
            b.   Type II and III Reporting Requirements......................... 22
            c.   Supervisory Investigations of Type II Uses of Force ................. 22
            d.   Supervisor's Force Investigation Report for Type II
               Uses of Force ......................................................... 25
            e.   Type II Report Review by Chain of Command .......................... 26
            f.   Force Investigation Team (FIT) Investigations of Type III
               Uses of Force ......................................................... 28
            g.   Use of Force Committee ("UFC" or "Committee") ................... 33
            h.   Use of Force Reports .............................................. 34
        4.   Use of Force Training ........................................................... 35
    B.   CRISIS INTERVENTION.................................................................. 37
    C.   STOPS AND DETENTIONS .............................................................. 39
        1.   Policy ................................................................................... 39
        2.   Training ............................................................................... 40
        3.   Supervision ......................................................................... 41
    D.   BIAS-FREE POLICING..................................................................... 41
        1.   Bias-Free Policing Policies .................................................. 41
        2.   Bias-Free Policing Training ................................................. 42
        3.   Supervision ......................................................................... 43
    E.   SUPERVISION................................................................................... 44
        1.   Supervision Generally.......................................................... 44
        2.   Early Intervention System.................................................... 45
    F.   OFFICE OF PROFESSIONAL ACCOUNTABILITY ....................... 46
        1.   Reporting Misconduct and Retaliation ................................. 46
        2.   OPA Manual ........................................................................ 47
        3.   OPA Liaison Officers .......................................................... 48

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

**IV.** **MONITORING** ................................................................................................ **48**

    A.    ROLE AND SELECTION OF THE MONITOR ................................................ 48
    B.    GENERAL DUTIES OF THE MONITOR ....................................................... 49
    C.    AGREEMENT MODIFICATION ..................................................................... 50
    D.    DEVELOPMENT OF POLICIES PROCEDURES AND TRAINING ............... 51
            1.    Schedule .................................................................................... 51
            2.    Review ...................................................................................... 51
    E.    DETERMINATION OF FULL AND EFFECTIVE COMPLIANCE.................. 52
            1.    Compliance Reviews and Audits ................................................ 53
            2.    Use of Outcome Assessments .................................................... 54
    F.    COMMUNICATION BETWEEN THE MONITOR AND PARTIES ............... 57
    G.    COMMUNICATION BETWEEN THE MONITOR AND COMMUNITIES .... 58
    H.    SPD COMPLIANCE COORDINATOR ........................................................... 58
    I.    REPORTS AND RECORDS ............................................................................. 59
    J.    ACCESS AND CONFIDENTIALITY ............................................................. 62
    K.    COMPENSATION OF THE MONITOR .......................................................... 64

**V.** **JURISDICTION, TERMINATION AND MODIFICATION OF THE**
**SETTLEMENT AGREEMENT** ...................................................................... **66**

    A.    COURT JURISDICTION, MODIFICATION OF THE SETTLEMENT
            AGREEMENT, AND ENFORCEMENT ........................................................ 66
    B.    TERMINATION OF THE SETTLEMENT AGREEMENT ............................. 70

## I.     INTRODUCTION

The United States and the City of Seattle (collectively "the Parties") enter into a Settlement Agreement and Memorandum of Understanding ("MOU") (collectively, "Agreements") with the goal of ensuring that police services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States, effectively ensures public and officer safety, and promotes public confidence in the Seattle Police Department ("SPD") and its officers.  The United States recognizes that SPD is also committed to these goals and has already taken steps to better effectuate them.  The Parties also recognize that the City's police officers often work under difficult circumstances, risking their physical safety and well-being for the public good.

## A.     STRUCTURE OF THE AGREEMENTS

1.     The Parties intend the Agreements to provide clear, measurable obligations, while at the same time leaving Seattle with appropriate flexibility to find solutions suitable for this community.  The requirements of the Agreements identify the goals that must be achieved, the mechanism to achieve them, and specific elements that must be addressed.  However, within the requirements of the Agreements, Seattle will have the ability to develop local and cost effective solutions.

2.     To achieve the goals described above, the Parties have developed two Agreements.  First, the Parties have agreed to jointly move that this Settlement Agreement be entered as an order of the United States District Court for the Western District of Washington.  Second, the Memorandum of Understanding will be a contract between the City of Seattle and the United States.  In both of these Agreements, the Parties, a jointly selected monitor, and the

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 1
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

Community Police Commission ("Commission") have specific duties, roles, and responsibilities as described.

**B.      COMMUNITY POLICE COMMISSION**

3.      Effective and constitutional policing requires a partnership between the Police Department, its officers, community members, and public officials.  The Parties are committed to developing reform strategies that will work for Seattle and leverage the unique assets of all components of the community.

4.      There is significant community interest in this reform effort.  The community is a critical resource.  Certain aspects of the reform efforts embodied in the Agreements are best developed by dialogue and wide-spread input.  Moreover, ongoing community input into the development of reforms, the establishment of police priorities, and mechanisms to promote community confidence in SPD will strengthen SPD and facilitate police/community relationships necessary to promote public safety.

5.      Police officers also bring an important voice to the reform process.  Their views, whether presented through their labor organizations or through other channels, should inform the development of the reform effort and its implementation.

6.      To leverage the ideas, talent, experience, and expertise of the community, the City of Seattle will establish within 90 days, by executive order, the Community Police Commission.  The Executive Order will establish the number of members, a mechanism to ensure that membership is representative of the many and diverse communities in Seattle, including members from each precinct of the City, police officer unions, faith communities, minority, ethnic, and other community organizations, and student or youth organizations.  The members and the Chair will be appointed by the Mayor and confirmed by the City Council and be

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 2
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

provided such staff support as the City of Seattle deems necessary to perform the duties and responsibilities identified in the Agreements.

7.     The Commission will have the following distinct roles:

a)     The Commission will undertake the responsibilities assigned to the Commission in the Agreements.

b)     The Commission will review the reports and recommendations of the Monitor, described below, and may issue its own reports or recommendations to the City on the implementation of the Settlement Agreement.

c)     The Commission may review and issue reports or recommendations as to the implementation of SPD's 20/20 initiative and other initiatives of SPD and the City to support the reform process.

d)     The Commission may consider other issues as referred by the Parties in Section III.C of the MOU.

8.     The Commission will maintain regular contact with the City to ensure effective and timely communication regarding its responsibilities under the Agreements.

9.     The Commission will hold public meetings at regular intervals to discuss the Monitor's reports and to receive community feedback about SPD's progress or compliance with the Agreements.  The City will provide the Commission with reasonable administrative support as determined by the City, including meeting space.

10.     The Commission's reports and recommendations will be posted to the City's website.  The City will consider and respond to the Commission's recommendations in a timely manner.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 3
12-CV-1282

11.     In the event that a member of the Commission is no longer able to perform his/her functions, the Mayor will appoint a replacement in a timely manner, subject to City Council approval.

12.     The Commission will not review or report on specific cases of alleged misconduct, review or comment on discipline, and will not seek to influence the course or outcome of a specific complaint investigation or the discipline of specific police officers.  The Commission will not have access to any non-public information regarding an individual police officer or allegation of misconduct or disciplinary action.

## C.     BACKGROUND ON AGREEMENTS

13.     In March 2011, the Department of Justice ("DOJ") formally notified the City that it was initiating an investigation of an alleged pattern or practice of excessive force and discriminatory policing in SPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"); the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"); and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d ("Title VI").

14.     The Parties note that DOJ's investigation was conducted in collaboration with and with the full and open cooperation of the City and SPD.  The City timely provided the United States with access to its documents, information, and personnel.

15.     DOJ issued a written report of its findings ("Report") on December 16, 2011.  The Report conveyed DOJ's finding that it had reasonable cause to believe that SPD engages in a pattern or practice of using unnecessary or excessive force in violation of the Fourth Amendment to the United States Constitution and Section 14141.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 4
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

16.     The Agreements are the product of a continued cooperative effort built on the Parties' mutual and deeply-held commitment to constitutional policing.  The Agreements are also the product of input from the many varied communities of Seattle, including police officer unions, community advocacy organizations, and minority and ethnic community organizations, whose input DOJ and the City have solicited and jointly acknowledge has been indispensible to the resolution of this matter.

17.     The City does not admit or agree with DOJ's findings and conclusions.  It enters into the Agreements because it wishes to ensure that its police department is functioning at an exceptional level and that it has positive relationships with all its communities.  To achieve these goals, the City commits to ensuring that its police department's policies, procedures, training, and supervision are based on recognized standards of the policing profession, legal and constitutional standards, research and evidence, department and community values, and internal and external collaboration.  The Parties agree that the reforms contained in the Agreements are intended to reflect those goals and principles in a cost effective, timely, and collaborative manner.

18.     The City enters into the Agreements to avoid the cost, delay, and effect on the City's interests of protracted litigation, noting the general principle that settlements are to be encouraged, particularly settlements between government entities.  Nothing in the Agreements will be construed as an acknowledgment, agreement, admission, statement, or evidence of liability of the City, SPD, or any of its officers or officials under 42 U.S.C § 14141.  Nor will the Agreements constitute or be construed as an acknowledgement, agreement, admission, statement, or evidence of any violation of applicable law or of the existence of a pattern or practice of conduct by law enforcement officers of the City that deprives persons of rights, privileges, and

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 5
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

immunities secured or protected by the Constitution and laws of the United States. The Agreements do not constitute an admission that any individual complaint reviewed by DOJ was meritorious or improperly addressed by SPD.

## II.     DEFINITIONS

19.     "Case Master" means an experienced command-level officer appointed by the Investigations Chief in consultation with the Homicide Commander. When a case is bifurcated due to possible criminal liability on behalf of an officer, the Case Master is responsible for ensuring the Clean Team is not exposed to any information obtained or derived from a compelled statement. The Case Master also controls what information may be shared between the Clean Team and the Exposed Team and how that information is exchanged.

20.     "CED" means Conductive Energy Device, also referred to as ECD (electronic control device) and TASER.

21.     "Chief" means the Chief of Police of SPD.

22.     "CIC" means Crisis Intervention Committee, as described in the MOU.

23.     "CI Team" stands for Crisis Intervention Team.

24.     "CI training" stand for Crisis Intervention training, which is training on how to respond to persons in behavioral or mental health crisis, including persons under the influence of drugs or alcohol. Officers who receive such training are "CI trained."

25.     "City" means the City of Seattle, including its agents, officers, and employees in their official capacity.

26.     "Clean Team" means an investigative team that has not been privy to any information derived from a compelled statement.

27. "Commission" means the Community Police Commission as described above in Section I.B.

28. "Court" means the United States District Court Judge for the Western District of Washington presiding over this case.

29. "De Minimus Force" means physical interactions, for a lawful purpose, between an officer and a member of the public meant to separate, guide, and/or control without resort to control techniques that are intended to or are reasonably likely to cause pain. Examples include using hands or equipment to stop, push back, separate, or escort and the use of compliance holds without the use of sufficient force to cause pain.

30. "Discriminatory policing" and/or "biased policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on membership in a demographic category specified in this Agreement. Discriminatory policing does not include using race, ethnicity, or any other status in any reliable suspect(s) description.

31. "DOJ" means the United States Department of Justice's Civil Rights Division, the United States Attorney's Office ("USAO"), and its agents and employees in their official capacity.

32. "Effective Date" means the day this Agreement is entered by the Court.

33. "EIS" means the Early Intervention System.

34. "Exposed Team" means an investigative team that has been exposed to information that was derived from an officer's compelled statements. To protect the ability of the case to be criminally charged, the Exposed Team can only be responsible for the administrative investigation.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 7
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

35.     "Firearm" means any instrument capable of discharging a bullet or shot as defined in SPD Manual 8.030.

36.     "Firearm Discharge" means each discharge of a firearm by a SPD officer as defined by SPD Manual 8.060.  This term includes discharges at persons where no one is struck.

37.     "Firearms Review Board" or "FRB" means the Board that is described in SPD Manual 11.030.

38.     "FIT" is the "Force Investigation Team," the SPD unit tasked with conducting the investigations of all uses of force by a SPD officer that result in death, Great Bodily Harm, or Substantial Bodily Harm, and other uses of force specified in this Agreement.

39.     "Full Restraint Position" means placing a person with hands secured behind the back, legs secured together, and the legs and hands connected together behind the back of the subject with the subject's legs flexed at the knees.

40.     "Great Bodily Harm" means harm as defined in RCW 9A.04.110 as bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any body part or organ.

41.     "Impact weapons" means any authorized intermediate weapons or objects used to strike, including, but not limited to batons as defined in SPD Manual 9.050.

42.     "Implement" or "implementation" means the development or putting into place of a policy or procedure, followed by appropriate training of all impacted personnel, and ensuring that the policies and procedures are being carried out in practice.

43.     "Injury" means bodily harm beyond temporary transient pain or redness.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 8
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

44.     "LEED" is the "Listen and Explain with Equity and Dignity" training, which focuses on respect, listening skills, and the use of verbal tactics as an alternative to the use of force.

45.     "Less Lethal Device" means a device that is not expected or intended to cause death or Great Bodily Harm.

46.     "Less Lethal Force" means a level of force such that the outcome is not expected or intended to cause death or Great Bodily Harm.

47.     "Lethal Force" means the application of force through the use of firearms or any other means reasonably likely to cause death or Great Bodily Harm.

48.     "Misconduct" means conduct by an officer or other SPD employee that, if proven by a preponderance of evidence, would be a violation of law, SPD policy, procedure, rules, or regulations.  Misconduct excludes minor misconduct as defined in SPD Manual 11.001.IV.A or violations unrelated to the substantive terms of this Agreement.

49.     The "Monitor" means a person who will be selected by DOJ and the City to monitor and report on implementation of this Agreement.

50.     "OPA" means SPD's Office of Professional Accountability.

51.     "Personnel" means SPD officers and employees.

52.     "Police Officer" or "Officer" means any law enforcement agent employed by SPD, including supervisors.

53.     "Policies and Procedures" means regulations or directives, regardless of the name, describing the duties, functions, and obligations of SPD officers and/or employees, and providing specific direction in how to fulfill those duties, functions, or obligations.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 9
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

54. "Precinct" means one of the five police service areas of SPD, which together cover the entire geographic area of the City of Seattle and each of which is led through the chain-of-command by a precinct commander.

55. "PSS" is the Professional Standards Section, the SPD subdivision that, among other functions, is charged with researching, drafting, and revising policy.

56. "Reasonable Force" means force that complies with the Fourth Amendment's requirement of objective reasonableness under *Graham v. Connor*.

57. "SPD" or "Department" means the Seattle Police Department and its agents, officers, supervisors, and employees (both sworn and unsworn) in their official capacity.

58. "Shall" or "will" means that the provision imposes a mandatory duty; "should" does not indicate a mandatory duty.

59. "SPD Manual" refers to SPD's Policy and Procedure Manual.

60. "SPD Unit" or "Unit" means any designated organization of officers within SPD, including precincts and specialized units.

61. "Substantial Bodily Harm" means harm as defined in RCW 9A.04.110 as bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any body part.

62. "Supervisor" means a sworn SPD employee at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers.

63. "Training" means any adult-learning methods that may incorporate role-playing scenarios and interactive exercises that instruct officers about how to exercise their discretion, as

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 10
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

well as traditional lecture formats. Training also includes testing, writings, or other measures that indicate that the officer comprehends the material taught.

64. "Type I use of force" means the use of low-level physical force that is greater than De Minimus Force, is not reasonably expected to cause injury and does not result in an actual injury or complaint of an injury, but causes transient pain and/or disorientation during its application as a means of gaining compliance. Examples of this type of force include disorientation techniques (e.g., open or empty hand strike), weaponless pain compliance techniques while using sufficient force to cause pain (e.g., wrist lock), and "soft" take-downs (e.g., controlled placement of a subject, including on the ground or floor) not included in a Type II use of force. Pointing a firearm at a person is reportable as a Type I use of force. Un-holstering or displaying a firearm without intentionally pointing it at a person, or simply displaying any weapon, is not a reportable use of force.

65. "Type II use of force" means a use of force which causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to the level of a Type III use of force. Examples of this type of force include: a "hard" strike, take-down, or kick; CED deployment of any type against a subject; use of an impact weapon (including batons and flashlights) to strike a subject; deployment of canine that results in an injury or complaint of injury; deployment of Oleoresin Capsicum Spray (OC Spray) at a subject; and placing a subject in a full restraint position.

66. "Type III use of force" means all uses of force by a SPD officer that have the likelihood of significant injuries to a subject including: (1) any use of "Lethal Force;" and (2) any use of force that results in or could reasonably be expected to result in "Great Bodily Harm" or "Substantial Bodily Harm."

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 11
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

67. "Use of force" means any physical coercion used by an officer in performance of official duties including De Minimus, Type I, II, and III uses of force.

68. "Use of Force Committee" or "UFC" is the SPD panel that assists in reviewing Type II and III use of force reports, including FIT investigations. SPD may designate this panel with an alternative name.

### III. COMMITMENTS

**A.    USE OF FORCE**

    **1.    Use of Force Principles**

69. Officers' actions should increase public safety, be effective and constitutional, and embrace principles of procedural justice. In order to achieve this balance in the application of force, the Department commits (a) to maintaining a police force that is highly trained and knowledgeable, not only on matters of law and professional standards on use of force, but also on matters of reporting, investigating, and reviewing uses of force; and (b) to engaging with and educating the public on the appropriate use of force.

70. Although the City and SPD dispute the patterns or practices of excessive force alleged in DOJ's Report, the Parties nevertheless agree that SPD uses of force, regardless of the type of force or weapon used, and consistent with *Graham v. Connor*, should be guided by the following principles.

        a) Officers should use de-escalation techniques, when appropriate and feasible, in order to reduce the need for force.

        b) As a general principle, consistent with law enforcement objectives, officers should de-escalate the use of force as resistance decreases, while staying in control and as safety permits.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 12
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

c)   The number of officers on scene may increase the available force options and may increase the ability to reduce the overall force used.

d)   Officers should use improvised weapons, such as flashlights, only in compliance with a proper policy and training on impact weapons.

e)   Officers should be trained that a hard strike to the head with any impact weapon, including a baton, could result in death, and any strikes to the head should be consistent with policy and training.

f)   Officers normally should not use reportable force against handcuffed or otherwise restrained subjects unless necessary or reasonable under the circumstances to stop an assault, escape, or as necessary to fulfill other legitimate law enforcement objectives.

g)   Officers should not use force against individuals who only verbally confront them and do not impede a legitimate law enforcement function.

h)   As soon as practicable following a reportable use of force, SPD should ensure that the incident is accurately and properly reported, documented, and investigated.

71.   SPD will revise, as necessary, its use of force policies, procedures, and/or training consistent with the principles above.

72.   A fundamental goal of the revised use of force policy will be to account for, and review or investigate, every reportable use of force and, where necessary, to reduce any improper uses of force while serving to direct resources to the most serious uses of force.

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 13
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

73.     Consistent with current practice, when SPD conducts its review of the implementation of the revised use of force policies, it will seek the timely input of the relevant members of the Training Section, line officers, supervisors, and PSS.

**2.      Weapon-Specific Policies**

74.     Revisions to SPD's weapons-specific policies, procedures, and training will be guided by the principles contained in this section.

75.     The use of force policies will address the use and deployment of all authorized force weapons that are available to SPD officers.  The specific policies for each force weapon will provide guidance for each weapon's use.

76.     The weapon-specific policies will continue to include training and certification requirements that each officer must meet before being permitted to carry and use the authorized weapon.  Officers will only carry weapons authorized by the Department.  SPD will consult with the Monitor as to whether and when each uniformed officer should be required to carry at least one Less Lethal Device.

77.     SPD will implement policies for each of the following weapons using these guidelines.

**a.      <u>Firearms</u>**

78.     Officer Discharges of Firearms will continue to be tracked as critical firearms discharges in EIS as uses of force.  SPD will continue to document critical firearms discharges in SPD's annual use of force report.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 14
12-CV-1282

b.    **Conductive Energy Devices (ECD, CED, or TASER)**

79.    The CED policy will continue to contain the training and tactics guidance regarding Less-Lethal Options and SPD's Annual CED Recertification Course, and other sources, and will continue to incorporate the following guidelines:

a)    A verbal warning should be given before use unless it is unsafe to do so or if it compromises a legitimate law enforcement objective.

b)    As with the initial CED application, each subsequent application is a separate application of force that must be individually justified as reasonable.

c)    All CED users will be trained in:  1) the potential risks of prolonged or repeated applications; 2) the appropriate procedures following a CED application; 3) the required documentation of a CED application in a use of force report; and 4) the appropriate use of the CED in drive stun mode.

d)    All CED users will also be trained in the considerations of the additional environmental hazards such as flammable materials or falling hazards that may preclude the use of a CED.

e)    All CED users will also be trained on the consideration of unique characteristics of the subject such as age, frailty, pregnancy and other medical conditions.

f)    CED users will not intentionally target the subject's head, neck, or genital area unless to protect officer or public safety, or to accomplish a legitimate law enforcement objective.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 15
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

80. Officers will continue to receive annual CED certifications consisting of physical competency, weapon retention, SPD policy, including any policy changes, technology changes, and scenario-based training.

81. SPD will continue to implement integrity safeguards on the use of CEDs to ensure compliance with SPD policy, including conducting random and directed audits of CED deployment data. The audits will compare the downloaded data to an officer's reports on use of force. Discrepancies within the audit will be addressed and appropriately investigated.

82. When a supervisor or FIT conduct investigations of CED use in Type II or Type III investigations, the investigator will assure that the use of force report thoroughly describes each CED application and that the CED data is downloaded and that data analysis is included in the use of force report.

83. SPD will continue to track CED applications as uses of force in EIS and continue to include CED data and analysis in its use of force annual report.

**c. Oleoresin Capsicum Spray ("OC Spray")**

84. The OC Spray policy and training will incorporate the evolving guidance contained within the SPD Post-Basic Law Enforcement Academy ("BLEA") course on Less-Lethal Force as well as guidance from the medical community. The policy and training will include at least the following guidelines:

      a) Officers will use OC spray only when such force is reasonable, including when used for crowd dispersal or protection.

      b) Unless it presents a danger to the officer or others, or compromises a legitimate law enforcement objective, officers should use a verbal warning to the subject or crowd that OC spray will be used and defer using

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 16
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

OC spray a reasonable amount of time to allow the subject to comply with the warning.

c)    After the initial application of OC spray, each subsequent spray must also be reasonable and the officer should reevaluate the situation accordingly.

d)    The application of OC Spray on persons in restraints such as handcuffs must be consistent with a legitimate law enforcement objective, or to protect officer or public safety.

85.    Officers will continue to be trained in and follow protocols developed by SPD on their responsibilities following OC Spray use, including minimizing exposure of non-targeted individuals and decontamination of exposed subjects. Officers will continue to request medical response or assistance for subjects exposed to chemical spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by chemical spray.

86.    Officers will use only agency-issued or approved OC Spray.

87.    SPD will continue to maintain written documentation of the number of OC Spray canisters annually distributed to, and utilized by, each officer. Analysis of OC deployments will continue to be included in SPD's use of force annual report and tracked in EIS as a use of force.

**d.    Impact Weapons**

88.    SPD will incorporate in its use of force policies specific provisions concerning the use of impact weapons and guidelines for use. Officers will be trained and certified for department-approved impact weapons before being authorized to carry these weapons. Officers will also be recertified at reasonable intervals. Use of any improvised impact weapons will fall

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 17
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

under the same guidelines and officers will be required to articulate how the use of the weapon was objectively reasonable. Consistent with current policy, impact weapon use will be limited to situations in which such force is reasonable and consistent with training, for example, when it is necessary to protect the officer, the subject, or another party from immediate physical harm.

89.     When a supervisor or FIT conduct investigations of impact weapon use in Type II or Type III investigations, the investigator will assure that the use of force report thoroughly describes each impact weapon strike that the officer recalls. Consistent with current training policy and practice, impact weapons should not be used on persons who are handcuffed and under control or otherwise restrained persons under control, or persons complying with police direction.

90.     Analysis of data regarding the use of impact weapons will continue to be included in SPD's use of force annual report and tracked in EIS as a use of force.

### 3.     Use of Force Reporting and Investigation

91.     Uses of force will be divided into three types for reporting, investigative, and review purposes. The goal is to focus police resources on the most serious cases, while also requiring that all reportable uses of force cases are reported and not under-classified.

92.     The three levels for the reporting, investigation, and review of use of force correspond to the amount of force used and/or the outcome of the force. This Agreement's categorization of these types of uses of force is based on the following factors: degree of injury caused; potential of the technique or weapon to cause injury; degree of pain experienced; degree of disability experienced by the subject; complaint by subject; degree of restraint of the subject; impairment of the functioning of any organ; duration of force; and physical vulnerability of the subject.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 18
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

93.     The three types of force will have different levels of departmental reporting and review that become more rigorous depending on the type of the force used.  Each level will have four essential components:

a)      Initial Reporting:  reporting and documentation requirements that, consistent with this Agreement, include the immediate response to the incident.

b)      Investigation and Supervisory Assessment:  investigation or assessment requirements that detail how the investigation or assessment is conducted and who is responsible for the investigation and assessment as to the use of force.

c)      Review:  for Type II and III uses of force, a review process requiring critical examination of the incident to assess its appropriateness, as well as identify any shortcomings in policy, procedure, training, tactical performance, and supervisory action.  The review process will also consider how information gathered on the incident could be used to increase the effectiveness of the officer and the Department as a whole.

d)      Record Keeping and Follow-up:  the facts regarding the incident will be stored, reported, and analyzed, and any deficiencies or concerns addressed.

94.     Officers will notify their supervisor as soon as practicable following any use of Type I, II, or III use of force.

95.     Consistent with other policies, a supervisor can always opt to require a higher level of response to a given incident.  Factors to consider in determining whether a higher level

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 19
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

response is appropriate include, but are not limited to, the following:  the nature of the resistance encountered; force used against a handcuffed or otherwise restrained, under control, or in-custody subject; force used against pregnant or vulnerable subjects (e.g. age or infirmity); incidents resulting from faulty information or unintentional error; and when it is unclear whether the officer acted consistent with policy or law.

96.     When multiple officers are involved in a use of force incident, the entire incident will be reported and investigated at the highest level reached by any single officer during the incident.  All involved officers will be required to submit statements in accordance with that level's requirements.  For example, if four officers are restraining a subject's limbs and only use Type I force, and a fifth officer uses a CED, each officer must submit a statement as required under at least the Type II protocol.

97.     Each supervisor reviewing the incident is responsible for ensuring a full and accurate account of the incident, and identifying and resolving any inconsistencies or alternatively, bringing them to the attention of OPA or his/her supervisor.

98.     Whenever a supervisor uses, directs, or is otherwise personally involved in any type of force, the investigation will be conducted by a supervisor uninvolved in the use of force unless impractical.

99.     SPD will continue to analyze the force data captured in officers' force reports and supervisors' investigative reports on an annual basis to determine significant trends, to identify and correct deficiencies revealed by the analysis, and to document its findings in an annual public report.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 20
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

### a. **Type I Reporting and Investigation Requirements**

100.    Officers will document a Type I use of force in a searchable and retrievable format that contains the following information:  1) an account of the officer's actions in using force; 2) the suspect's actions that led to the application of force; 3) the identity of the officer who used force; 4) the names of other officers or identified witnesses present; and 5) the name of the supervisor screening the incident.  The officer's immediate supervisor will review the documentation as soon as practicable and direct the officer to supply more information, if needed.

101.    A Type I use of force report must be provided orally and screened in person by a supervisor, unless impractical under the circumstances, prior to the subject being booked, released, or the contact concluded.  If the subject is free to leave, the detention will not be extended to facilitate the screening process; however, the subject may choose to remain at the scene to speak with a supervisor.  If there is any uncertainty or concern about the reason or nature of the force used, or the existence of any injury, the supervisor will immediately roll out to the scene, unless impractical in the circumstances.

102.    The supervisor will determine if the use of force is appropriately classified as a Type I incident.  If the supervisor is unable to make that determination, the supervisor will consult with FIT or his/her direct supervisor to assist in the determination.  The supervisor will also evaluate the incident for any other concerns (tactical, threat assessment, etc.).  The supervisor will address any concerns with the officer involved.  If it appears that misconduct may have been involved in the use of force, the supervisor will ensure that OPA is contacted and consult the FIT team regarding reclassification of the incident as Type II or III.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 21
12-CV-1282

**b.    Type II and III Reporting Requirements**

103.    For Type II and Type III uses of force, all involved officers will complete an officer statement using descriptive language.  The statement will include:  1) the reason for the initial police presence; 2) a detailed description of the incident circumstances, including the words, actions, and/or threat posed by the suspect warranting the need for force; 3) a detailed description of the force used by the officer giving the statement; 4) a detailed description of the force used by other officers if clearly observed; 5) a detailed description of any apparent injury to the suspect, any complaint of injury, or the lack of injury, including information regarding any medical aid or  medical evaluation provided.

**c.    Supervisory Investigations of Type II Uses of Force**

104.    Upon notification of a Type II use of force, a supervisor will respond to the scene and thoroughly investigate all Type II events unless officer or public safety will be compromised as a result.  No supervisor who participated in, or ordered the force, will conduct or be involved in conducting the investigation of the incident.  In thoroughly investigating all Type II events, the investigating supervisor at a use of force incident will:

a)    Respond to the scene, examine the subject of the force for injury, interview the subject for complaints of injury, and where necessary, summon medical aid via SPD Communications.

b)    If the subject does not require medical attention, and probable cause exists for his/her arrest, the supervisor may arrange for transport to a police holding facility or directly to jail.

c)    The supervisor will obtain sufficient basic information to determine if a FIT response is required.  Whether required or not, a supervisor retains the

discretion to refer any use of force to FIT for FIT's determination of whether to take investigatory responsibility over the matter.

d) Whenever there is an indication of possible criminal conduct by an officer, the officer will not be compelled to provide a statement.

e) If a FIT response is not appropriate, the supervisor will conduct the investigation, as an impartial fact-finder and will not be responsible for determining the ultimate disposition of the incident. The supervisor will:

(1) Identify and secure evidence to enable the supervisor to describe in detail the use of force and the facts and circumstances surrounding it.

(2) Ensure collection of evidence sufficient to establish material facts related to the use of force, where reasonably available, including physical evidence, audio and video recordings, photographs, and other documentation of injuries or the absence of injuries.

(3) Make reasonable attempts to locate relevant civilian witnesses including the subject and third parties, and arrange for witnesses to be interviewed. Supervisors should use interview techniques taught in use of force investigation courses, including avoiding leading questions.

(4) Where practicable and warranted in the circumstances, ensure that all interviews with civilian witnesses are recorded. Interviews of the subject, or the subject's refusal to be interviewed, will be audio or ICV recorded, if possible.

(5) As with civilian witnesses, conduct separate interviews of officers involved in a use of force incident, unless unreasonable under the circumstances.

(6) Require each officer at the scene to complete either a witness statement (if they did not use Type II use of force) or a Use of Force Statement (if they did use Type II use of force). Each officer will describe what he/she did and saw as comprehensively and descriptively as possible and in the context of the use of force by other officers, identifying all other officers involved in the incident when possible. The supervisor will assure such statements comply with SPD guidelines.

(7) Review any ICV or holding cell video related to the incident, and red flag for retention ICV that documents contact with the subject.

(8) Canvass the area for privately-owned video that may have captured the contact, and attempt to obtain copies voluntarily. If owner refuses, document the location and/or owner of the video. If no privately-owned video is discovered, document that none was found.

(9) Photograph the location where the incident occurred, to determine damage, and ensure that relevant evidence is collected. Photograph any officer injuries or areas of complained injury, and any damaged government or private property.

(10) Respond to the subject's location, and photograph the subject for identification purposes, and any visible injuries or places where the subject complains of injury.

(11) Consider all relevant evidence, including circumstantial, direct, and physical evidence and make credibility determinations and resolve material inconsistencies in statements, if feasible. When possible, assess the subject's injuries and determine whether the subject's injuries are consistent with the force reported used by the officer(s).

(12) When a supervisor concludes that there may have been misconduct, the supervisor will consult with an on-duty commander of the permanent rank of lieutenant or above and ensure that OPA is notified.

    **d.**    **<u>Supervisor's Force Investigation Report for Type II Uses of Force</u>**

105. An email or other form of notification of a reportable use of force will be forwarded to the supervisor's commanding officer by the end of the shift during which the force occurred. The notification will contain basic information concerning the incident.

106. Each supervisor will complete and document a use of force supervisory investigation using a Supervisor's Force Investigation Report (a revised form 1.40b) within 72 hours of learning of the use of force, unless an extension is approved by the supervisor's commanding officer. The Supervisor's Report will include the following:

a) The supervisor's narrative description of the incident. A supervisor's narrative will summarize the force used by the officers and the subject,

injuries sustained by the subject and the officer, and will describe the sequence of events. Additionally, it will document the supervisor's actions in reviewing or screening the incident. The summary should provide a commander reviewing the supervisor's summary a complete understanding of the incident from beginning to end, including, crucially, when each officer used force, why the force was necessary at each point in time, and how each injury, if any, occurred.

b) The report will be accompanied by the use of force packet which contains documentation of all evidence that was gathered, including physical evidence; photographs; and names, phone numbers, addresses, and summaries of statements by all civilian witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but the author of the report did not determine the identification, phone number, or address of those witnesses, the report will state the reasons why.

c) The names of all other SPD employees witnessing the use of force and summaries of their statements.

d) The supervisor's evaluation of the evidence, including any material inconsistencies in the evidence or statements.

e. **Type II Report Review by Chain of Command**

107. SPD Policy 6.240.XII.B.11 already establishes a process by which the use of force packet is forwarded through the chain of command to the involved officer's bureau

commander. SPD will revise and clarify the process for review of a use of force report to incorporate the process detailed in this section of this Agreement.

108. Upon completion of the supervisor's use of force investigation report and packet, the investigating supervisor will forward the packet through the chain of command. The reviewing lieutenant will review the report packet to ensure it is complete and the investigation was thorough and reach findings as to whether the use of force was lawful and consistent with policy. Each higher level supervisor in the chain will review the packet to ensure that it is complete, the investigation was thorough, and that the findings are supported by a preponderance of the evidence.

109. When it appears to a supervisor that there is additional relevant and material evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings, that supervisor should ensure that additional investigation is completed. When it appears to a supervisor that the findings are not supported by a preponderance of the evidence, that supervisor will modify the findings after consultation with the investigating supervisor and previous reviewers, and document the reasons for this modification, including the specific evidence or analysis supporting the modification. Any supervisor in the chain of command may discuss the modification with the investigating supervisor and/or reviewers. If any investigative deficiencies exist, the reviewer will initiate corrective action where appropriate. Every supervisor in the chain of command is responsible to assure the accuracy and completeness of the Investigation Reports completed by supervisors.

110. When the precinct commander finds that the investigation is complete and the findings are supported by the evidence, the investigation file will be forwarded to the Use of Force Committee.

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 27
12-CV-1282

111.     At the discretion of the officer's chain of command, or OPA in the case of potential misconduct, a use of force investigation may be assigned or re-assigned for investigation to FIT or to another supervisor, whether within or outside of the precinct in which the incident occurred, or may be returned to the Unit for further investigation or analysis. Where, after investigation, a use of force is found to be out of policy, or the investigation of the incident is lacking, the Chief or designee will direct and ensure appropriate corrective action, if warranted. When the use of force indicates policy, training, tactical, or equipment concerns, the Chief or designee will ensure also that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

   **f.     Force Investigation Team (FIT) Investigations of Type III Uses of Force**

112.     FIT will conduct investigations of (1) all Type III uses of force except for firearms discharges (which will continue to be investigated by the Homicide Unit and reviewed by the FRB); (2) any use of force that result in broken bones, loss of consciousness, or an admission to the hospital for treatment; the application of a neck hold (LVNR or Lateral Vascular Neck Restraint); hard strike to the head or neck with an impact weapon (flashlight, baton, or other object); (3) uses of force that potentially involve criminal conduct or misconduct on the part of the officer; and (4) uses of force referred to FIT by any SPD supervisor (and approved by the FIT commander), the Chief, his/her designee, or OPA. Response by FIT to a scene does not assume a criminal or administrative violation has occurred.

113.     Type III uses of force will be investigated and documented by FIT, with assistance from the on-scene sergeant. The FIT response will be tailored to the circumstances but will normally include one to three FIT detectives, the FIT sergeant, a Homicide Unit command level officer, and a Training Section representative. The Training representative will

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 28
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

not have investigative roles at the scene of a use of force, but will attempt to identify any policy or training issues. At least one member of FIT or a homicide supervisor will be available at all times to evaluate potential referrals from SPD supervisors.

114.    If a FIT investigation, at any point, reveals officer misconduct, a FIT supervisor will contact OPA.

115.    SPD will create a FIT training curriculum and procedural manual.

116.    FIT should be staffed with individuals with appropriate expertise and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved; and that its investigations allow the Use of Force Committee to identify trends or patterns of policy, training, equipment, or tactical deficiencies, or positive lessons related to the use of force.

117.    The supervisor will have the following responsibilities in responding to a Type III use of force:

        a)    A sworn supervisor will respond to the scene, and will ensure that appropriate medical aid is summoned for any injured party, either subject or officer. If the subject is transported to a hospital, the supervisor will arrange for a hospital guard for the subject, if appropriate.

        b)    The supervisor will obtain sufficient basic information to determine whether a FIT response is appropriate and contact the FIT sergeant to screen a response.

        c)    Whenever there is an indication of possible criminal conduct involving an officer, the officer will not be compelled to provide a statement.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 29
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

d)      The supervisor will ensure the scene is contained and will turn the scene over to the arriving FIT personnel.  The scene will be left intact and will be processed by FIT personnel.

e)      The supervisor will make reasonable attempts to locate civilian witnesses to the event, and identify and request that the witnesses standby for the FIT personnel's arrival.

118.    FIT will have the following responsibilities in responding to a Type III use of force:

a)      FIT personnel will take control of the use of force investigation upon their arrival.

b)      Where possible, FIT detectives will ensure that all interviews with civilian witnesses are recorded.

c)      FIT personnel will arrange for a canvass for any privately-owned video that may have captured the contact, and attempt to obtain copies voluntarily.  If the owner refuses, they will document the location and/or owner of the video.  If no privately-owned video is discovered, they will document that none was found.

d)      The FIT supervisor will arrange for photographing and processing of the scene.

e)      FIT detectives will respond to the subject's location, and request a medical release if relevant, as well as an audio-recorded interview.  They will also photograph areas of injury or complaint of injury.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 30
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

f)      The FIT supervisor or commander will respond to the FIT office and arrange for ICV downloads as well as witness statements from all witness officers prior to the end of their shift(s) unless impracticable.

g)      When available, the FIT detectives will conduct in-person interviews of the involved officers.

h)      The FIT supervisor or commander will arrange for the involved officers to submit a use of force written statement as soon as practicable.

i)      The FIT sergeant or commander will be responsible for ensuring notification of a FIT investigated use of force, which will be forwarded to the involved officer's chain of command up to the Chief, as well as the Investigation Bureau Commander, no later than 12 hours after learning of the use of force, unless impractical. This notification will contain basic information about the incident.

j)      Within 30 days or as soon as possible thereafter, the FIT commander will present the completed investigation to the commander of the Investigation Bureau for review as to completeness of investigation. This review will normally be completed within three business days. The investigation will then be forwarded to the involved officer's chain of command. After this review has been completed, the FIT commander will be responsible for presenting the investigation to the Use of Force Committee (UFC). Consistent with current officer-involved shooting protocols, any presentations to the command staff will also be the responsibility of the FIT commander.

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 31
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

k)      If at any time during the investigation, information is obtained that suggests either criminal liability on the part of any officer, or misconduct (as defined previously) on the part of any officer, the FIT commander will be responsible for notifying the command staff, and taking one of the two following actions:

    (1)      Criminal Liability – If at any time information is obtained that suggests that an officer may have committed a crime during the use of force incident, the investigation will immediately be referred to the OPA. If OPA agrees that a criminal investigation is appropriate, they will refer the investigation back to the Homicide Unit commander or another investigative body per current practice, for assignment to an uninvolved Homicide sergeant for bifurcated criminal and administrative investigations using a "Clean Team" and "Exposed Team" approach. All information gathered during the administrative investigation to date will be screened through a Case Master, who will ensure no information that would compromise the criminal investigation is passed on to the Homicide sergeant doing the criminal case. Additionally, any compelled interview of the subject officer(s) will be delayed until the end of the investigation. A representative of the King County Prosecutor's Office or the City Attorney's Office will be consulted when necessary during the course of the criminal investigation.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 32
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

While the administrative investigation will continue, the criminal

investigation will have priority over witnesses and evidence.

(2)     Misconduct (as defined in Section II) – If at any time information

is obtained that an officer may have committed misconduct during

the use of force incident, the OPA Director will be advised and the

misconduct investigation referred to their office.  The assigned FIT

investigator will continue to complete the use of force

investigation.

**g.     Use of Force Committee ("UFC" or "Committee")**

119.     SPD has established a use of force committee.  For purposes of this Agreement, this committee is referred to as the Use of Force Committee ("UFC").  SPD may rename the committee.  This committee will conduct timely, comprehensive, and reliable reviews of all Type II and Type III uses of force.

120.     Committee Membership:  The UFC will consist of:  an Assistant Chief or his designee (who will chair the Committee); supervisors from the Training Section; one representative from each involved precinct, selected by each precinct captain; and a representative from the PSS.  The Chair may include any subject matter experts the Chair feels would be helpful in reviewing particular incidents.

121.     Training:  Each member will receive a minimum of eight hours of training on an annual basis, including legal updates regarding use of force and curriculum utilized by the Training Section regarding use of force.

122.     The UFC may consult with other advisors as necessary.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 33
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

123.    Review:  The UFC will review each use of force packet to determine whether the findings from the chain of command regarding whether the force used is consistent with law and policy and supported by a preponderance of the evidence, whether the investigation is thorough and complete, and whether there are tactical, equipment, or policy considerations that need to be addressed.

124.    Review of FIT Investigations:  The review of FIT investigations is the same as for Type II investigations, except the FIT investigation review will be chaired by a Deputy Chief. The Monitor and SPD will explore ways to include others in the review of FIT investigations, including civilian observers.  Consistent with current practice and the provisions above, the UFC will document its findings and recommendations for FIT investigations.  Unless an extension is granted by the Chair, the review should be conducted within seven days of the FIT presentation to the UFC.

125.    Corrective Action:  The UFC will not make recommendations concerning discipline; however, the Chair of the UFC is obligated to ensure a referral to OPA is made if potential misconduct is discovered in the review process.  Should policy, equipment, or training deficiencies be noted in the review process, the UFC Chair will ensure that they are brought to the attention of the relevant commanding officer for appropriate action.  The Bureau Commander of the officer involved with the use of force will have the final responsibility regarding retraining or recommending discipline to the Chief.

### h.    Use of Force Reports

126.    Within 90 days of the Effective Date, the City and the United States will confer and agree on a process to determine what, if any, new policies or procedures regarding *Garrity* are necessary based on the DOJ's technical assistance letter that have not already been addressed

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 34
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

in the Settlement Agreement. This process may include convening a appropriate police, legal, and other experts to examine best practices in providing *Garrity* warnings. At the conclusion of that process, the Parties will meet and confer regarding what, if any, additional policies and procedures should be implemented.

### 4. Use of Force Training

127. SPD currently provides all SPD officers with use of force training based upon applicable law and SPD policy. SPD will review all use of force policies and training to ensure they incorporate, and are consistent with, the Constitution and all provisions of this Agreement. The required use of force training topics identified below will be included, where possible, in SPD's current annual in-service training requirements.

128. SPD's use of force training for all patrol and other relevant officers will address the following use of force topics:

    a)    SPD's use of force policy, use of force reporting requirements, and the mechanics of efficiently writing an informative use of force report;

    b)    proper use of force decision-making;

    c)    the Fourth Amendment and related law;

    d)    role-playing scenarios and interactive exercises that illustrate proper use of force decision-making; and

    e)    the appropriate use of de-escalation techniques.

129. In addition to the topics above, sworn and other relevant SPD supervisors will receive training on the following topics:

    a)    Use of force

        (1)    SPD's use of force policy and use of force reporting requirements;

(2)    conducting use of force investigations, including the supervisory investigatory responsibilities identified in this Agreement;

(3)    evaluation of written reports;

(4)    burdens of proof; interview techniques; and the factors to consider when evaluating officer, complainant, or witness credibility, to ensure that investigative findings, conclusions, and recommendations are unbiased, uniform, and legally sound; and

(5)    LEED leadership training or other similar training, and techniques for de-escalating conflict, including peer intervention when necessary.

b)    Use and analysis of SPD data systems that track officer activity

(1)    EIS;

(2)    ICV; and

(3)    Street Check database.

c)    OPA

(1)    How and when to forward complaints received at precincts to OPA;

(2)    How and when to refer complaints to OPA; and

(3)    Responding to and investigating allegations of officer misconduct not otherwise handled by OPA.

d)    Use of performance impact system in officer evaluations.

**B.      CRISIS INTERVENTION**

130.     SPD will continue its work in providing training in verbal tactics with the goal of reducing the use of force against individuals in behavioral or mental health crisis, or who are under the influence of drugs or alcohol, and to direct or refer such individuals to the appropriate services where possible.  SPD has currently provided Crisis Intervention training to approximately 365 officers.  SPD will continue to provide Crisis Intervention training as needed to ensure that CI trained officers are available on all shifts to respond to incidents or calls involving individuals known or suspected to have a mental illness, substance abuse, or a behavioral crisis ("individuals in crisis").

131.     SPD will maintain its program of dispatching CI trained officers to incidents or calls involving individuals in crisis.

132.     CI trained officers will take the lead, when appropriate, in interacting with individuals in crisis.  If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of CI trained officers on strategies for resolving the crisis event where it is reasonable and practical to do so.

133.     To be considered "CI trained," SPD officers will be required to undergo a 40-hour initial comprehensive CI training, and eight hours of in-service CI training annually thereafter.  SPD's CI training will continue to address field evaluation, suicide intervention, community mental health resources, crisis de-escalation, and scenario exercises.  The training may include on-site visitation to mental health facilities and interaction with individuals with a mental illness.  Additionally, the CI training will provide clear guidance as to when an officer may detain an individual solely because of his/her crisis.  SPD will consult with the Crisis Intervention Committee ("CIC") regarding changes to the curriculum going forward.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 37
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

134.    SPD officers who do not receive the comprehensive CI training will receive basic training on crisis intervention.  This training should include a subset of the topics and training methods included in the CI training, and will also explain the circumstances in which a CI trained officer should be dispatched or consulted, and how situations involving impaired subjects should be addressed when a CI trained officer cannot respond.  SPD will consult with the CIC regarding the curriculum and appropriate number of hours for this training.

135.    SPD, in conjunction with the CIC, will evaluate its current training for dispatchers on identifying calls for service that involve individuals in crisis.  SPD will ensure that all dispatchers are appropriately trained to identify calls for service involving individuals in crisis and dispatch CI trained officers to the crisis event.  SPD will consult with the CIC regarding the curriculum and appropriate number of hours for this training.

136.    SPD will continue and expand its tracking of information regarding SPD's interactions with individuals in crisis and provide this data to SPD's current CI Team.  SPD will consult with the CIC to determine what interactions result in data collection, and the types of information to be collected based on the level of interaction.  Subject to the CIC's review and recommendations, and applicable law, SPD should gather and track the following data:

   a)  date, time, and location of the incident;

   b)  subject's name, age, gender, and address;

   c)  whether the subject was armed, and the type of weapon;

   d)  whether the subject is a U.S. military veteran;

   e)  complainant's name and address;

   f)  name and badge number of officer on the scene;

   g)  whether a supervisor responded to the scene;

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 38
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

h)      techniques or equipment used;

i)      any injuries to officers, subject, or others;

j)      disposition, and;

k)      brief narrative of the event (if not included in any other document).

137.    SPD will review the outcome data generated through the process described above, and may use the data for developing case studies for roll call and CI training, recognizing and highlighting successful individual officer performance, developing new response strategies for repeat calls for service, identifying training needs for the annual in-service CI training, making CI training curriculum changes, or identifying systemic issues that impede SPD's ability to provide an appropriate response to a behavioral crisis event.

## C.    STOPS AND DETENTIONS

138.    The Parties agree that pro-active policing is necessary to accomplish strong community based policing and effective crime control, and that police-community contacts should be conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.  SPD should ensure that investigatory stops and detentions are part of an effective law enforcement objective.  The Commission may make recommendations to the City on any changes to SPD policies, practices, or training regarding stops and detentions based upon community input and best practices.

139.    To achieve these outcomes, SPD will adhere to the requirements below.

### 1.    Policy

140.    SPD will revise, as necessary, the Social Contact, *Terry* Stop, & Arrest Policy, Section 6.220, to ensure that the definitions of Social Contact and *Terry* Stops explicitly conform to constitutional requirements.  Specifically, the policy will (1) define Social Contacts and non-

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 39
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

custodial interviews as encounters that are voluntary and consensual; and (2) prohibit investigatory stops where the officer lacks reasonable suspicion that a person has been, is, or is about to be engaged in the commission of a crime.

141.    SPD will continue to require that officers be able to specifically and clearly articulate reasonable suspicion when they conduct investigatory stops or detentions, or conduct field interviews for *Terry* stops.

**2.    Training**

142.    SPD will provide all SPD patrol officers with in-service training on an annual basis, based on developments in applicable law and SPD policy, sufficient to address the following topics:

    a)    the importance of police-community contacts for effective policing and community relations and trust;

    b)    Fourth Amendment and related law; SPD policies, and requirements in this Agreement regarding investigatory stops and detentions;

    c)    First Amendment and related law in the context of the rights of individuals to verbally dispute officer conduct;

    d)    legal distinction between social contacts, non-custodial interviews, and investigatory *Terry* stops;

    e)    distinction between various police contacts according to the scope and level of police intrusion; and

    f)    the facts, circumstances, and best practices that should be considered in initiating, conducting, terminating, and expanding an investigatory stop or

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 40
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

detention, including when an individual is free to leave, and when an

officer might identify him or herself during a contact.

143. Additionally, SPD will provide all officers with regular roll call trainings

regarding social contacts, non-custodial interviews, and investigatory stops and detentions.

### 3. Supervision

144. Consistent with SPD policies and procedures, absent exceptional circumstances,

by the end of each shift, a supervisor will continue to obtain and review his/her supervisees'

incident reports and any other reports that document the basis for investigatory stops and

detentions to determine if they were supported by reasonable suspicion and consistent with SPD

policy, federal, or state law; and determine if the officer requires review of agency policy,

strategy, tactics, or training.

### D. BIAS-FREE POLICING

145. The Parties agree that SPD should deliver police services that are equitable,

respectful, and free of unlawful bias, in a manner that promotes broad community engagement

and confidence in the Department. Officers should treat all members of the Seattle community

with courtesy, professionalism, and respect, and should not use harassing, intimidating, or

derogatory language.

### 1. Bias-Free Policing Policies

146. SPD will revise, as necessary, the Unbiased Policing policy, in conjunction with

the Commission, to provide the following clear guidance:

a) Clarifying that the policy against biased policing extends to all protected

classes under state, federal, and local laws, including race, ethnicity,

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 41
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

national origin, gender, age, religion, sexual orientation, gender identity, or disability in making law enforcement decisions.

b) Reaffirming that officers may not use race, ethnicity, or national origin in determining reasonable suspicion or probable cause, unless race, ethnicity, or national origin is used as part of a suspect(s) description.

c) Reaffirming that officers will (1) not engage in, ignore, or condone bias-based policing; (2) be responsible for knowing and complying with the policy; and (3) report incidents where they observe or are aware of other officers who have engaged in bias-based policing.

## 2. Bias-Free Policing Training

147. The Parties recognize that training on issues of bias present in our society is complicated and critical. SPD, in conjunction with the Commission, will develop and provide training on bias-free policing for all patrol and other relevant officers, supervisors, and command staff. SPD will develop a training curriculum, with input from the Commission, that builds on existing discriminatory policing training, determine the appropriate modality or combination of modalities (scenario-based, classroom, academy, etc.) and training assessment tools. Training development should consider the following topics.

148. Patrol officers:

a) constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;

b) strategies, such as problem solving policing, procedural justice, and recognizing implicit bias, to avoid conduct that may lead to biased policing or the perception of biased policing;

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 42
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

c)    precinct-level cultural competency training regarding the histories and cultures of local immigrant and ethnic communities.

149.    Supervisors and command staff:

a)    what constitutes discriminatory policing under state, federal, and constitutional law;

b)    how to identify discriminatory practices when reviewing investigatory stop data, arrest data, and use of force data; and how to respond to a complaint of discriminatory police practices, including conducting a preliminary investigation of the complaint in order to preserve key evidence and potential witnesses;

c)    how to evaluate complaints of improper pedestrian stops for potential discriminatory police practices; and

d)    engaging the community and developing positive relationships with diverse community groups.

**3.    Supervision**

150.    SPD leadership and supervising officers will continue to reinforce to subordinates that discriminatory policing is an unacceptable tactic, and officers who engage in discriminatory policing will be subject to discipline.

151.    In consultation with the Commission, SPD should consider whether to revise SPD Manual 5.140 to identify supervisory responsibility in responding to allegations of discriminatory policing.

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 43
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

152.    If an individual affirmatively states that he or she is the subject of discriminatory policing, the officer's supervisor should, where reasonable, respond to the scene and determine if additional action, including a complaint to OPA, is warranted.

# E.    SUPERVISION

## 1.    Supervision Generally

153.    The City will provide and SPD will deploy an adequate number of qualified field/first-line supervisors (typically sergeants) to assure that the provisions of this Agreement are implemented.  SPD will employ sufficient first-line supervisors to assure that first-line supervisors are able to: 1) respond to the scene of uses of force as required by this Agreement; 2) investigate each use of force (except those investigated by FIT) in the manner required by this Agreement; 3) ensure documentation of uses of force as required by this Agreement; and 4) provide supervision and direction as needed to officers employing force.

154.    As a general rule, all operational field officers (including patrol officers) should be assigned to a single, consistent, clearly identified first-line supervisor.  First-line supervisors should normally be assigned to work the same days and hours as the officers they are assigned to supervise.

155.    Sergeant training is central to effective first-line supervision.  The City and SPD will ensure that personnel assigned to a planned assignment of acting sergeant for longer than 60 days will be provided adequate training to fulfill the supervisor obligations under this Agreement, either prior to serving as acting sergeant, or as soon as practicable (and in no event longer than 90 days from the beginning of the planned assignment).

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 44
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

156.     Precinct commanders and watch lieutenants will continue to closely and effectively supervise the first-line supervisors and officers under their command, particularly whether commanders and supervisors identify and effectively respond to uses of force.

## 2.     Early Intervention System

157.     The City's EIS system will continue to be used for risk management purposes and not for disciplinary purposes.  SPD will monitor the EIS to ensure it is meeting its objective of providing SPD with notice before behaviors become problematic.

158.     SPD will review and adjust, where appropriate, the threshold levels for each of the current EIS indicator criteria, and the EIS indicators.  The Monitor will review and approve the revised EIS threshold levels and indicators.

159.     SPD will revise its EIS policy to include a mechanism for review of an officer whose activity has already triggered a threshold for one of the EIS indicator criteria, so that the threshold level is lower if EIS is triggered again, where appropriate.  For example, if an officer has participated in a certain number of uses of force in a six-month period, SPD will design a protocol for lowering the threshold for subsequent review.

160.     SPD will collect and maintain information related to supervisor, precinct, squad, and unit trends, consistent with the provisions in this section.

161.     SPD will collect, maintain, and retrieve information related to the following precinct-level activity:

        a)     uses of force;

        b)     OPA complaints and their dispositions;

        c)     number of individual officers who have triggered EIS reviews; and

        d)     supervisor EIS reviews with officers.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 45
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

162.    Supervisors should periodically review EIS activity of officers in their chain of command.

163.    SPD will revise its EIS policy and procedure, as necessary, so that interventions assist officers in avoiding potentially troubling behavior.  Specifically, SPD policies and procedures will ensure that (1) the intervention strategy is implemented in a timely manner; (2) data regarding the implementation of the intervention is tracked in EIS; and (3) if necessary, the employee's supervisor reviews the progress of the intervention strategy.

## F.    OFFICE OF PROFESSIONAL ACCOUNTABILITY

164.    DOJ found that the OPA system is sound and that investigations of police misconduct complaints are generally thorough, well-organized, well-documented, and thoughtful.  The Parties agree that SPD should continue to strive to ensure that all complaints regarding officer conduct are fully and fairly dealt with; that all investigative findings are supported by the evidence and documented in writing; and that officers and complainants receive a thorough, fair, and expeditious resolution of complaints.  These goals will be advanced both by the following provisions and relevant provisions in the MOU.

### 1.    Reporting Misconduct and Retaliation

165.    SPD will revise its policies, as necessary, to clarify when and how officers must report misconduct.  SPD will explore ways to develop metrics to assess internal reporting of misconduct.

166.    The City and SPD will revise their policies, as necessary, to clarify that prohibited retaliation includes discouragement, intimidation, coercion, or adverse action against any person who reports misconduct, makes a misconduct complaint, or conducts or cooperates with an investigation of misconduct.  Within 180 days of the Effective Date, and annually thereafter, the

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 46
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

City, in consultation with the OPA Auditor, will review SPD's anti-retaliation policy and its implementation.

### 2. OPA Manual

167. OPA will complete an update of its Training and Operations Manual ("OPA Manual") that will formalize OPA's procedures, best practices, and training requirements. The OPA Manual will include the following:

a) Criteria for the staffing of OPA.

b) Written protocols on OPA intake, classification, tracking, assignment practices and procedures, and finding recommendations. These protocols will include, but not be limited to, the following:

1) OPA will investigate allegations of serious misconduct (including, but not limited to, unreasonable use of force and discriminatory policing) and repeated minor misconduct, though it can refer appropriate cases for mediation consideration.

2) SPD will provide clear guidance about when to use Training Referrals, and how to track the remediation recommended for complaints resulting in a Training Referral.

c) Written protocols on OPA's investigative practices and procedures.

d) Written protocols on OPA's case review procedures.

e) Written protocols on OPA's communications with complainants and officers.

f) Initial and in-service training requirements.

g) Written protocols for referral of complaints involving criminal allegations.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 47
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

h) Develop protocols to ensure protection of any *Garrity*-compelled statement taken during an OPA investigation where the officer is also being investigated or prosecuted criminally for the same conduct.

i) Reaffirm that OPA may conduct investigations of complaints referred from FIT.

j) Reaffirm that OPA may, in appropriate cases, and in consultation with the assigned criminal investigator, pursue an administrative investigation parallel to a criminal investigation, and even when an administrative investigation has not begun, nothing precludes SPD from reviewing the incident for training, policy, or other purposes.

### 3. OPA Liaison Officers

168. OPA liaison officers should be identified at each precinct to facilitate matters handled at the precinct level, including those classified for Supervisor Action, to ensure quality and timeliness. OPA will continue to provide final review of all such matters.

## IV. MONITORING

### A. ROLE AND SELECTION OF THE MONITOR

169. The Parties will jointly select a Monitor who will oversee the implementation of the Settlement Agreement and advise on the MOU. The duties and responsibilities of the Monitor regarding the MOU are set forth in the MOU. As described in greater detail below, the Monitor will assess the City's compliance with the Settlement Agreement, report on the status of compliance to the Parties and the Court, work with the Parties to address any barriers to compliance, and assist the Parties to informally resolve disputes or differences should they emerge. The Monitor may also recommend to the Parties voluntary changes to the Settlement

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 48
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

Agreement to better meet its goals. The Parties will meet and confer regarding any such recommendations, and may make changes only with the agreement of both Parties.

170.     The Parties recognize that there may be alternative ways to implement the terms of this Agreement. The City is free to choose implementation strategies it deems appropriate so long as they are not in conflict with the Settlement Agreement terms. The Monitor may provide advice to the Parties regarding her or his views on the most effective strategy, but is not authorized to require implementation in a manner that requires more or different actions on the part of the City than is mandated by the terms of the Settlement Agreement.

171.     No later than 60 days from the Effective Date, the Parties will select a Monitor. Given this Agreement's emphasis on use of force, one qualification the Parties should consider is the Monitor's experience in law enforcement or criminal justice. If the Parties are unable to agree on a Monitor, each Party will submit the names of three candidates, or three groups of candidates, along with resumes and cost proposals, to the Court, and the Court will select and appoint the Monitor from among the qualified candidates/candidate groups.

## B.     GENERAL DUTIES OF THE MONITOR

172.     The Monitor will be subject to the supervision and orders of the Court, consistent with the Settlement Agreement. The Monitor will only have the duties, responsibilities, and authority conferred by the Agreements. The Monitor will not, and is not intended to, replace or assume the role and duties of any City or SPD staff or officials, including the Chief.

173.     The Monitor will have the following overall duties:

        a)     <u>Compliance Review</u>: The Monitor will verify that all of the substantive reform measures included in the Settlement Agreement are implemented as agreed to by the Parties. The Monitor will regularly conduct

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 49
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

compliance and progress reviews to assess the extent to which SPD has

implemented and complied with all of the measures required by the

Settlement Agreement.

b)  Reporting:  The Monitor will issue public reports every six months

detailing the Parties' compliance with the Settlement Agreement.  The

Monitor will also file these reports with the Court.

c)  Technical Assistance:  SPD may request technical assistance from the

Monitor as needed.  The Monitor may provide the requested technical

assistance as long as the requested assistance will not conflict with the

Monitor's duties under the Settlement Agreement and falls within the

Monitor's budget.  SPD has the discretion to decide whether or not to

utilize the Monitor's advice.

## C.  AGREEMENT MODIFICATION

174.  Ninety days after the Effective Date, the Monitor will convene the Parties to

consider any recommendation of a Party to modify the Settlement Agreement to address matters

that have emerged during the initial implementation.  The Parties agree that if a provision as

drafted by the Parties does not further the purpose of the Settlement Agreement or that there is a

preferable alternative that will achieve the same purpose, the Parties and the Monitor may jointly

stipulate to make changes, modifications, and amendments to the Settlement Agreement and will

submit the stipulation to the Court for approval.

175.  The Monitor and the Parties will confer on an annual basis to consider whether or

to what extent the outcomes intended by the Settlement Agreement have been achieved, and any

modifications to the Settlement Agreement that may be necessary for continued achievement in

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 50
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

light of changed circumstances or unanticipated impact (or lack of impact) of the requirement.

This conference will also address areas of greatest achievement and the requirements that appear

to have contributed to this success, as well as areas of greatest concern, including strategies for

accelerating full and effective compliance.  Based upon this conference, the Monitor may

recommend modifications to the Settlement Agreement necessary to achieve and sustain

intended outcomes.  Where the Parties agree with the recommendations of the Monitor, the

Parties will stipulate to modify the Settlement Agreement accordingly.  This provision in no way

diminishes the Parties' ability to stipulate to modifications to the Settlement Agreement, as set

out in Paragraph 225.

## D.   DEVELOPMENT OF POLICIES PROCEDURES AND TRAINING

### 1.   Schedule

176.    Within 60 days after the Monitor's selection and appointment, SPD will develop,

with assistance from the Monitor if requested, a schedule that prioritizes the development and

implementation of policies, procedures, practices, training materials, and training required in the

Agreements.  The City will be deemed in compliance with the Settlement Agreement if it

implements the terms in accordance with the schedule and the Monitoring Plan.

### 2.   Review

177.    SPD will submit the policies, procedures, training curricula, and training manuals

required to be written, revised, or maintained by the Settlement Agreement to the Monitor and

DOJ for review and comment prior to publication and implementation.  The Parties will meet

and confer regarding any comments on the policies, procedures, training curricula, and training

manuals within 45 days of submission if necessary.  The Monitor will approve the materials

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 51
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

unless the Monitor determines that they conflict with the terms of the Settlement Agreement.  If the Monitor disapproves, he or she will state the reasons for the decision in writing.

178.    If either Party objects to the determination of the Monitor the Parties will meet and confer on the objections within 14 days.  If necessary, and consistent with the other deadlines herein, any Party may petition the Court thereafter to resolve the objections.

179.    SPD will begin implementation of policies and procedures within 30 days of Monitor approval or the Court's decision unless otherwise specified or agreed to by the Parties in the Monitoring Plan.  Nothing will prevent DOJ and the Monitor from making non-binding recommendations to the City on alternative approaches that, while not required by this Agreement, may yield a better result.

180.    With the assistance of the Monitor, SPD will review each policy, procedure, training curricula and training manual required by the Settlement Agreement 180 days after it is implemented, and annually thereafter (on a regularly published schedule), to ensure that the policy or procedure continues to provide effective direction to SPD personnel and remains consistent with the purpose and requirements of the Settlement Agreement and current law.

181.    SPD also will review policies and procedures required by the Settlement Agreement as necessary whenever it has notice of a policy deficiency.  Within 60 days of that review, the PSS will revise the policy or procedure and, if necessary, submit it to the Monitor and DOJ for review and approval.

**E.    DETERMINATION OF FULL AND EFFECTIVE COMPLIANCE**

182.    The City may demonstrate "full and effective compliance" with the terms of this Agreement either through Compliance Reviews and Audits, as described in Section IV.E.1 below, or through Outcome Assessments, as described in Section IV.E.2 below.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 52
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

1.     **Compliance Reviews and Audits**

183.    Within 120 days of the Monitor's appointment, the Monitor will develop a monitoring plan setting out deadlines for policy, training, development, and implementation for conducting the compliance reviews and audits ("Monitoring Plan"), and will submit the plan to the Parties for review and approval.  If the Parties do not agree on a Monitoring Plan, all policies and procedures will be developed within 180 days of the Effective Date of this Agreement and all training curricula will be developed within one year of the Effective Date.  The plan will:

    a)    clearly delineate the requirements of the Settlement Agreement to be assessed for compliance, indicating which requirements will be assessed together; and

    b)    set out a schedule for conducting a compliance review or audit of each requirement of the Settlement Agreement within the first year of the Settlement Agreement, and a compliance review or audit of each requirement at least annually thereafter.

184.    "Full and effective compliance" with a material requirement of the Settlement Agreement requires that the City and SPD have:  (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice.  Compliance reviews and audits will contain both qualitative and quantitative elements as necessary for reliability and comprehensiveness.  Noncompliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain full and effective compliance.  At the same time, temporary compliance during a period of otherwise sustained noncompliance will not constitute full and effective

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 53
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

compliance.  If a Party fails to implement any of the measures required by the Settlement

Agreement, the Monitor will work with the Party to achieve compliance.

185.    Where the Monitor recommends and the Parties agree, the Monitor may refrain

from conducting a compliance audit or review of a requirement previously found to be in

compliance by the Monitor pursuant to audit or review.  Thereafter the City will be deemed to

have achieved full and effective compliance on those requirements for purposes of this

Agreement.

### 2.    Use of Outcome Assessments

186.    The goal of the Parties in entering into the Settlement Agreement is to ensure that

that SPD's use of force is consistent with the requirements of the United States Constitution and

42 U.S.C. § 14141.  As more fully described in the section on termination of the Settlement

Agreement, if the City is able to establish, through outcome measures, that the purposes of the

Settlement Agreement have been met, the decree may terminate even if the City is not in full and

effective compliance with the specific process terms.

187.    Three years after the Effective Date of the Settlement Agreement, the City and

SPD may demonstrate "full and effective compliance" by showing that the standard and

established practice of SPD officers is to use force within constitutional limits and that no pattern

or practice of the use of excessive force exists, as demonstrated by the outcome assessments set

forth in the Settlement Agreement.  The Monitor will conduct these outcome assessments to

determine whether SPD is in full and effective compliance by this method.  The Parties may also

use the outcome assessments to consider whether the implementation of the Settlement

Agreement has had any unintended negative consequences on either accomplishing the purposes

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 54
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

of the Settlement Agreement or the ability of SPD to conduct effective and constitutional policing.

188.    During the preparation of the Monitoring Plan, the Monitor will meet with the Parties to determine what outcome measures will be reviewed and how the Monitor will evaluate the outcomes in measuring full and effective compliance.  The Monitor will also set out a schedule for conducting outcome assessments for each outcome measure at least annually, except where otherwise noted, with the first assessment occurring within 18 months of the Effective Date.  After each assessment, the City and the Monitor may agree to modify the assessment plan and schedule.  If the City and the Monitor agree that they no longer wish for the Monitor to conduct outcome assessments, the Monitor will discontinue reviewing outcome assessment data, unless DOJ petitions the Court and the Court determines otherwise.

189.    These outcome assessments may include collection and analysis, both quantitative and qualitative, of the following outcome data as related to the provisions of this Settlement Agreement:

a)    Use of Force Measurements, such as:

(1)    the rate of force used per arrest by SPD; force implement used; geographic data; type of arrest;

(2)    the rate of force complaints that are sustained, overall and by force type; source of complaint (internal or external); type of arrest; type of force complained of;

(3)    uses of force that were found to violate policy overall and by the following subsets: force type; type of arrest; force implement used; and number of officers involved;

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 55
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

(4)    the number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence;

(5)    the number of officers who have more than one instance of force found to violate policy; and

(6)    general quality of use of force investigation and reviews including FIT investigations.

b)    Training Measurements, such as:

(1)    verifications and assessments as incorporated into training modules; and

(2)    modifications or improvements to training resulting from review and analysis required by the Settlement Agreement.

c)    Supervision Measurements, such as:

(1)    effectiveness of supervisory responses to incomplete or insufficient use of force reports, or other inappropriate uses of force by officers.

d)    Accountability Measurements, such as:

(1)    the number of misconduct complaints (broken out by type of complaint), with a qualitative assessment of whether any increase or decrease appears related to access to the complaint process;

(2)    rate of sustained, lawful and proper, inconclusive, and Training Referral misconduct complaints;

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 56
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

(3)    the number of officers who are subjects of repeated misconduct complaints, or have repeated instances of sustained misconduct complaints;

(4)    the number, nature, outcome, and settlement amount, if any, of civil suits against SPD officers related to use of force regardless of whether the City is a defendant in the litigation;

(5)    arrests/summons of officers for on duty conduct related to use of force; and

(6)    criminal prosecutions of officers for on or off duty conduct related to use of force.

190.    In conducting these outcome assessments, the Monitor may use any relevant data collected and maintained by SPD and OPA, provided that it has determined, and the Parties agree, that this data is reasonably reliable, complete, and relevant to determining the standard and established practice of SPD officers is to use force within constitutional limits and that no pattern or practice of the use of excessive force exists. The Monitor may also consider the annual community survey performed by SPD together with the Commission, as set forth in the MOU, in determining whether the implementation of the Settlement Agreement has had any unintended negative consequences on either accomplishing the purposes of the Settlement Agreement or the ability of SPD to conduct effective and constitutional policing.

## F.    COMMUNICATION BETWEEN THE MONITOR AND PARTIES

191.    The Monitor will maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of the City's implementation of and compliance with the Settlement Agreement. To facilitate this communication, the Monitor will

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 57
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

conduct meetings every two months, or as needed, which will include participation by SPD, the Chief, representatives of the City Attorney's Office, and DOJ.

## G. COMMUNICATION BETWEEN THE MONITOR AND COMMUNITIES

192. The Monitor may periodically meet with the Commission and/or other interested community stakeholders to discuss the Monitor's reports, and to receive community feedback about SPD's progress and/or compliance with the Settlement Agreement. The Monitor and the Parties will agree to the parameters of this outreach in the Monitoring Plan.

## H. SPD COMPLIANCE COORDINATOR

193. The Parties agree that SPD will hire and retain, or reassign a current SPD employee for the duration of the Settlement Agreement, to serve as a full-time SPD Compliance Coordinator. The Compliance Coordinator will serve as a liaison between SPD, the Monitor, and DOJ, and will assist with SPD's compliance with the Settlement Agreement. At a minimum, the Compliance Coordinator will:

    a)    coordinate SPD's compliance and implementation activities;

    b)    facilitate the provision of data, documents, and other access to SPD employees, and material to the Monitor and DOJ, as needed;

    c)    ensure that all documents and records are maintained as provided in the Settlement Agreement; and

    d)    assist in assigning compliance tasks to SPD personnel, as directed by the Chief or his/her designee. The SPD Compliance Coordinator will take primary responsibility for collecting the information the Monitor requires to carry out the terms of the Settlement Agreement.

## I.    REPORTS AND RECORDS

194.    On a timetable agreed to between the Parties and the Monitor to facilitate the preparation of the Monitor's reports, the City will file with the Monitor a status report, including any supporting documentation, delineating all steps taken during the reporting period to comply with the Settlement Agreement.

195.    During the term of the Settlement Agreement, the City and SPD will follow its existing record retention requirements, procedures imposed by state and local law, and any relevant collective bargaining agreement, to maintain all records necessary to document compliance with the Settlement Agreement.

196.    The Monitor will publicly issue reports described above every six months detailing the Parties' compliance with and implementation of the Settlement Agreement.  These reports will not include information specifically identifying any individual officer.  Drafts of the status reports will be provided to each of the Parties at least one month prior to publication to afford the Parties an opportunity to identify factual errors.  During the preparation of the Monitoring Plan, the Parties and the Monitor will confer and determine the information to be included in the reports, which may include the following:

a)    a description of the work conducted by the Monitor during the reporting period;

b)    a listing of each Settlement Agreement requirement indicating which requirements have been:  (1) incorporated into implemented policy; (2) the subject of sufficient training for all relevant SPD officers and employees; (3) reviewed or audited by the Monitor to determine whether they have been fully implemented in actual practice, including the date of the review

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 59
12-CV-1282

or audit; and (4) found by the Monitor to have been fully implemented in practice;

c) the methodology and specific findings for each audit or review conducted, redacted as necessary for privacy concerns.  An unredacted version will be filed under seal with the Court and provided to the Parties.  The underlying data for each audit or review will not be publicly available but will be retained by the Monitor and provided to either or both Parties upon request;

d) for any requirements that were reviewed or audited and found not to have been fully implemented in practice, the Monitor's recommendations regarding necessary steps to achieve compliance;

e) the methodology and specific findings for each outcome assessment conducted;

f) qualitative assessment of SPD's progress in achieving the desired outcomes for each area covered by the Settlement Agreement, noting issues of concern or particular achievement; and

g) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Settlement Agreement.

197.    The Monitor's reports will also be posted to the City's public website.  The City will establish an electronic mechanism for receiving public feedback to the Monitor's quarterly reports.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 60
12-CV-1282

198.    The City will provide the Monitor with reasonable administrative support, including office space and supplies, if needed.

199.    The Monitor will not issue statements or make findings with regard to any act or omission of any Party, or their agents or representatives, except as required by the terms of the Settlement Agreement.  The Monitor may testify in any enforcement proceedings regarding provisions of the Settlement Agreement and the Parties' compliance.  The Monitor will not testify in any other litigation or proceeding with regard to any act or omission of any Party, or any of their agents, representatives, or employees, related to the Settlement Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his/her performance under the Settlement Agreement.  This restriction does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring the Settlement Agreement.  Unless such conflict is waived by the Parties, neither the Monitor nor a member of his/her staff will accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under the Settlement Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or its departments, officers, agents, or employees.

200.    The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor will not be deemed public records subject to public inspection.  The Monitor will not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to the Settlement Agreement.

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 61
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

**J.     ACCESS AND CONFIDENTIALITY**

201.    To facilitate his or her work, the Monitor may conduct on-site visits and assessments without prior notice to the City.  The Monitor will have access to all necessary individuals, facilities, and documents, which will include access to Settlement Agreement-related trainings, meetings, and reviews such as FIT, FRC, and OPA reviews.  SPD will notify the Monitor as soon as practicable, and in any case within twelve hours, of any critical firearms discharge, arrest of any officer, or any other potentially high-profile serious incident.

202.    The City will ensure that the Monitor will have timely, full, and direct access to relevant City staff, employees, and facilities that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by the Settlement Agreement.  The Monitor will cooperate with the City to access people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations, and will not compromise the integrity of any ongoing criminal investigation.

203.    The City will ensure that the Monitor will have full and direct access to all City documents and data that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by the Settlement Agreement, except any documents or data protected by the attorney-client privilege.  The attorney-client privilege may not be used to prevent the Monitor from observing reviews, meetings, and trainings such as use of force review boards, disciplinary hearings, or discussions of misconduct complaint investigations.  Should the City decline to provide the Monitor access to documents or data based on attorney-client privilege or because they are open criminal investigative files, the City will inform the Monitor and DOJ that it is withholding documents or data on this basis and will provide the Monitor and DOJ with a log describing the documents or data.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 62
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

204.     For the purpose of implementing the Settlement Agreement, which is related to on-going potential litigation, DOJ and its consultative experts and agents will have full and direct access to all City staff, employees, facilities, documents, and data.  DOJ, and its consultative experts and agents, will cooperate with the City to access involved personnel, facilities, and documents in a reasonable manner that, consistent with DOJ's responsibilities to enforce the Settlement Agreement, minimizes interference with daily operations.  If the City declines to provide DOJ with access to documents or data based on attorney-client privilege, the City will inform DOJ that it is withholding documents or data on this basis and will provide DOJ with a log describing the documents or data.

205.     All non-public information provided to the Monitor or DOJ, whether by the City or SPD, will be maintained in a confidential manner.  Other than as expressly provided in the Settlement Agreement, the Settlement Agreement will not be deemed a waiver of any privilege or right the City or SPD may assert, including those recognized at common law or created by statute, rule or regulation, against any other person or entity with respect to the disclosure of any document.

206.     The Monitor and DOJ will provide the City with reasonable notice of a request for copies of documents.  Upon such request, the City will provide, in a timely manner, usually 30 days, copies (electronic, where readily available) of the requested documents to the Monitor and DOJ.  The City may elect to request reimbursement of costs for DOJ requests that are burdensome.  The Monitor will have access to all records and information relating to closed investigations, administrative or criminal, of SPD officers as permissible by law.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 63
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

**K. COMPENSATION OF THE MONITOR**

207. The Monitor will be funded by the City. During the selection process for the Monitor, the Parties and the Monitor will agree upon a budget for the Monitor for the first year of the Agreements. Future annual budgets for the Monitor will be determined by the Parties in consultation with the Monitor. The budget will be submitted to the Court for approval. Any changes to the Monitor's budget must be approved by both the City and DOJ before submission to the Court.

208. Prior to appointment, the Monitor will provide the Parties with a detailed budget and staffing proposal. The proposal will describe the qualifications of all the persons or entities to be hired or employed by the Monitor as well as the monitoring tasks that they will perform. The Monitor, at any time after his/her appointment, may request to be allowed to hire, employ, or contact such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by the Settlement Agreement provided that those expenditures fall within the approved budget. The Monitor will notify the City and DOJ in writing if the Monitor wishes to select such additional persons or entities. The notice will identify and describe the qualifications of the person or entity to be hired or employed and the monitoring task to be performed. The City and DOJ must both approve of the person or entity before they may be hired or employed, although substantial deference will be afforded to the Monitor's choice. Any person or entity hired or otherwise retained by the Monitor will be subject to the provisions of the Settlement Agreement.

209. The City will deposit $100,000.00 into the Registry of the Court as interim payment of costs incurred by the Monitor. This deposit and all other deposits pursuant to the Settlement Agreement will be held in the Court Registry and will be subject to the standard

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 64
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

registry fee imposed, if any, on depositors. The Monitor will submit monthly statements to the Court, with copies to the Parties, detailing all expenses the Monitor incurred during the prior month. The Court will order the clerk to make payments to the Monitor. Upon receipt of an Order from the Court directing payment, the clerk will ensure timely payment of all approved statements received from the Monitor. Within 45 days of the entry of each Order directing payment, the City will replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $100,000.00.

210.    Before submitting a monthly statement to the Court, the Monitor will submit the monthly statements to the Parties. The Parties will review such statements for reasonableness. Upon completion of the Parties' review, but in no case more than 30 days after submission of the statements by the Monitor, the Parties will notify the Monitor of their approval of the statement. Upon receipt of the Parties' approval, the Monitor may submit the statement to the Court for payment. The statement submitted to the Court will indicate that it was reviewed and approved by the Parties. In the event the Parties cannot agree on approval of a statement, the Parties will notify the Court that there is an objection to the budget. The Parties agree to submit the matter for mediation to resolve the dispute. The mediator will be the one selected by the Parties to assist in mediating the Agreements, unless that mediator is unavailable.

211.    The Monitor will not enter into any contract with DOJ or the City while serving as a Monitor. If the Monitor resigns from his or her position as Monitor, the former Monitor may not enter into any contract with DOJ or the City on a matter related to the Settlement Agreement without the written consent of the other Party while the Settlement Agreement remains in effect.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 65
12-CV-1282

212.     In the event that the Monitor is no longer able to perform his/her functions, within 60 days thereof, the City and DOJ will together select and advise the Court of the selection of a replacement Monitor, acceptable to both.  The Parties' selection of the Monitor will be made pursuant to a method jointly established by DOJ and the City.  If the Parties are unable to agree on a Monitor or an alternative method of selection within 60 days of the Monitor's incapacitation, each Party will submit the names of three candidates, or three groups of candidates, along with resumes and cost proposals, to the Court, and the Court will select and appoint the Monitor from among the qualified candidates/candidate groups.

213.     Should either of the Parties to the Settlement Agreement determine that the Monitor or any member of the Monitor's consulting teams, their agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by the Settlement Agreement, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors.  Any Party bringing such a petition is required to meet and confer with the other Party at least 21 days prior to such a petition in a good faith attempt to resolve the concern.

## V.     JURISDICTION, TERMINATION AND MODIFICATION OF THE SETTLEMENT AGREEMENT

### A.     COURT JURISDICTION, MODIFICATION OF THE SETTLEMENT AGREEMENT, AND ENFORCEMENT

214.     The Settlement Agreement will become effective upon entry by the Court.

215.     The investigation that led to this Settlement Agreement was initiated pursuant to the authority granted to DOJ under Section 14141 to seek declaratory or equitable relief to

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 66
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law.

216.    The Parties agree that nothing in the Settlement Agreement, the United States' Complaint, or the negotiation process will be construed as an admission of wrongdoing by the City or evidence of liability under any federal, state, or municipal law.

217.    This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345.  The United States is authorized to initiate this action pursuant to 42 U.S.C. § 14141.  Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391, because the City and SPD are located in and the claims arose in the Western District of Washington.

218.    The Agreements, which include the policies, supervision requirements, training, and procedures agreed to by the Parties, will constitute the entire integrated agreement of the Parties.  No prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

219.    The Settlement Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors.  If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of SPD or any aspect thereof, the City agrees to ensure these functions and entities are consistent with the terms of the Settlement Agreement and will incorporate the terms of the Settlement Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity as necessary to ensure consistency.  The Settlement Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of the Settlement Agreement for

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 67
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under the Settlement Agreement.

220.     The Settlement Agreement is not intended to impair or expand the right of any person or organization seeking relief against the City, SPD, or any officer or employee thereof, for their conduct or the conduct of SPD officers.  Accordingly, it does not alter legal standards governing any such claims by third parties, including those arising from city, state, or federal law.  The Settlement Agreement does not expand, nor will it be construed to expand, access to any City, SPD, or DOJ documents, except as expressly provided by the Settlement Agreement, by persons or entities other than DOJ, the City and SPD, and the Monitor.  All federal and state laws governing the confidentiality or public access to such documents are unaffected by the terms of the Settlement Agreement.

221.     The City will be responsible for providing necessary support and resources to SPD to enable SPD to fulfill its obligations under the Settlement Agreement.

222.     Unless stated otherwise in the Settlement Agreement, if either party disagrees with any aspect of the implementation of the Settlement Agreement, that party will engage in good faith informal consultation with the other party and the Monitor to attempt to resolve the disagreement.  If the disagreement persists, that party will, within ten days of the apparent impasse, inform the other Parties and the Monitor in writing of the fact of the disagreement.  Within 21 days thereafter, the Parties will meet and confer on the disagreement at a mutually agreeable time.  If necessary, any party may petition the Court thereafter to resolve the dispute pursuant to the provisions below.

223.     To ensure that the requirements of the Settlement Agreement are properly and timely implemented, the Court will retain jurisdiction of this action for all purposes, including

EXHIBIT A (SETTLEMENT AGREEMENT AND STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 68
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

1   but not limited to any disputed changes to policies, procedures, training, and practices, until such

2   time as the City has achieved full and effective compliance with the Settlement Agreement and

3   maintained such compliance for no less than two years. At all times, the City and SPD will bear

4   the burden of demonstrating substantial compliance with the Settlement Agreement. When the

5   United States and the Monitor agree that the City has maintained substantial compliance, the

6   City will be relieved of that portion of the Settlement Agreement.

7       224.    The United States acknowledges the good faith of the City of Seattle in trying to

8   address the remedial measures that are needed to ensure constitutional policing in Seattle. The

9   United States, however, reserves its right to seek enforcement of the provisions of the Settlement

10  Agreement if it determines that the City and SPD have failed to fully comply with any provision

11  of this Agreement. The United States agrees to consult with officials from the City of Seattle

12  before commencing enforcement proceedings, and to provide opportunity to cure consistent with

13  the informal dispute resolution procedure set forth in Paragraph 222.

14      225.    The Monitor, City, and DOJ may jointly stipulate to make changes, modifications,

15  and amendments to the Settlement Agreement. Such changes, modifications, and amendments to

16  the Settlement Agreement will be encouraged when the Parties agree, or where the reviews,

17  assessments, and/or audits of the Monitor demonstrate, that a Settlement Agreement provision as

18  drafted is not furthering the purpose of the Settlement Agreement or that there is a preferable

19  alternative that will achieve the same purpose. The Parties may jointly move for approval of any

20  proposed changes, modifications, and/or amendments, which will become effective upon

21  approval by the Court. No change, modification, or amendment to the Settlement Agreement

22  will have any force or effect if not set forth in writing, signed by all the Parties to the Settlement

23  Agreement, and approved by the Court.

24

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 69
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

226.     The Parties agree to defend the provisions of the Settlement Agreement.  The Parties will notify each other of any court or administrative challenge to the Settlement Agreement.  In the event any provision of the Settlement Agreement is challenged in any state, county or municipal court, removal to a federal court will be sought by the Parties.

227.     The City and SPD agree to promptly notify DOJ if any term of the Settlement Agreement becomes subject to collective bargaining consultation.  DOJ agrees to work in good faith to accomplish the goals through alternate means, if necessary.

228.     All Parties agree that, as of the date of entry of this Agreement, litigation is not "reasonably foreseeable" concerning the matters described in this Agreement.  To the extent that either Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Agreement, the Party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves any Party of any other obligations imposed by this Agreement, including the document creation and retention requirements described herein.

**B.     TERMINATION OF THE SETTLEMENT AGREEMENT**

229.     The Parties anticipate that the City and SPD will have reached full and effective compliance with this Agreement within five years of its Effective Date.  The Parties may agree to jointly ask the Court to terminate this Agreement prior to this date, provided the City and SPD have been in full and effective compliance with this Agreement for two years.

230.     The City may petition the Court to terminate this Agreement or portions of this Agreement at any time.  In the case of termination sought by the City, prior to filing a motion to terminate, the City agrees to notify DOJ in writing when the City has determined that SPD is in full and effective compliance with this Agreement, including through the alternative method of

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 70
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
(206) 553-7970

compliance using outcome assessments, and that such compliance has been maintained for no

less than two years. The Monitor will certify whether he or she agrees that the City is in

compliance with the Settlement Agreement or portions of the Settlement Agreement at the time

of the notification. No later than 21 days thereafter, the Parties will meet and confer at a

mutually agreeable time as to the status of compliance. If, after a reasonable period of

consultation and the completion of any additional audit or evaluation that DOJ and/or the

Monitor may wish to undertake, including on-site observations, document review, or interviews

with the City and SPD's personnel, the Parties cannot resolve any compliance issues, the City

may file a motion to terminate the Settlement Agreement. If the City moves for termination of

the Settlement Agreement, DOJ will have 45 days after the receipt of the City's motion to file an

objection to the motion. If DOJ does not file an objection, the Court may grant the City's motion

to terminate the Settlement Agreement. If DOJ does file an objection, the Court will hold a

hearing on the motion and the burden will be on the City to demonstrate by a preponderance of

the evidence that the City has been in full and effective compliance with the Settlement

Agreement for the preceding two years, unless the Monitor certifies the City is in compliance

with either the full Settlement Agreement or a portion of the Settlement Agreement, in which

case DOJ will have the burden of proving non-compliance.

EXHIBIT A (SETTLEMENT AGREEMENT AND
STIPULATED [PROPOSED] ORDER OF RESOLUTION) - 71
12-CV-1282

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
(206) 553-7970

1    Agreed to this 27th day of ___July_____, 2012.

2    For the UNITED STATES OF AMERICA:

3    ERIC H. HOLDER, JR.
     Attorney General of the United States of America
4

5    _____          _____
     JENNY A. DURKAN                          THOMAS E. PEREZ
6    United States Attorney for the           Assistant Attorney General
     Western District of Washington           Civil Rights Division
7
     Kerry J. Keefe, Civil Chief              Jonathan M. Smith, Chief
8    J. Michael Diaz, Assistant United States Attorney    Timothy D. Mygatt, Special Counsel
     Rebecca S. Cohen, Assistant United States Attorney   Michelle L. Leung, Trial Attorney
9    United States Attorney's Office          Michael J. Songer, Trial Attorney
     Western District of Washington           United States Department of Justice
10   700 Stewart Street, Suite 5220           Civil Rights Division
     Seattle, Washington 98101-1271           Special Litigation Section
11   Phone: (206) 553-7970                    950 Pennsylvania Avenue, NW
     Fax: (206) 553-4073                      Washington, DC 20530
12   E-mail: Michael.Diaz@usdoj.gov           Phone: (202) 514-6255
                                              Fax: (202) 514-4883
13                                            E-mail: Michelle.Leung@usdoj.gov

14

15   For the CITY OF SEATTLE:

16

17   _____          _____
     HON. MICHAEL McGINN                      PETER HOLMES
     Mayor                                    Seattle City Attorney
18
     Carl Marquardt                           Jean Boler
19   Counsel to the Mayor                     Civil Chief
     600 4th Avenue                           Seattle City Attorney's Office
20   Seattle, WA 98124-4769                   PO Box 94769
     Phone: (206) 684-4000                    Seattle, WA 98124-4769
21   Email: mike.mcginn@seattle.gov           Phone: (206) 684-8200
     Email: carl.marquardt@seattle.gov        Fax: (206) 684-8284
22                                            E-mail: jean.boler@seattle.gov
                                                      peter.holmes@seattle.gov
23

24   EXHIBIT A (SETTLEMENT AGREEMENT AND              UNITED STATES ATTORNEY
     STIPULATED ORDER OF RESOLUTION) - 72             700 Stewart Street, Suite 5220
     12-CV-                                           Seattle, WA 98101-1271
                                                      (206) 553-7970