# EXHIBIT 30

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiffs,         )
                                )
         vs.                    )   No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

Of

BILL DONNER - RICHMARK LABEL
_____



CONTAINS CONFIDENTIAL PORTIONS








DATE:  Tuesday, November 16, 2021

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

BILL DONNER
11/16/2021

Page 53

1      A.   I do believe I remember at least once when
2  some -- Department of Transportation truck came in to haul
3  away some garbage, but I can't tell you how many times,
4  what time of day or anything.  That seems to be a
5  recollection I have.
6  BY MR. CRAMER:
7      Q.   And did anyone from the City ever talk to you
8  about how trucks -- the plan for the roads would make it
9  possible for trucks coming to Richmark to go north on 11th?
10          MR. WEAVER:  Objection.
11     A.   No.
12 BY MR. CRAMER:
13     Q.   So how did trucks access Richmark during that
14 time period?
15     A.   Most would come south on 12th Avenue, take a
16 right on Olive, the north corner of our block, a left onto
17 11th, and some also got in from -- on John Street, which is
18 a couple blocks further north at the north end of the
19 park -- no, beyond the north end of the park -- some would
20 come down that for a while.  I could come down that.  I
21 normally would come Pine to come to work, but I switched
22 over to John and could come straight down 11th.
23          So some trucks came down 11th all the way from
24 John, some went 12th, but they all entered going south on
25 11th from Olive, the north corner of the building -- of the

BILL DONNER
11/16/2021

Page 54

```
 1   block, rather.
 2        Q.   And I think you said earlier that there were a
 3   few occasions where trucks couldn't get there, but
 4   generally, trucks were able to access Richmark Label during
 5   the entire time period; right?
 6             MR. WEAVER:   Objection.
 7        A.   Most of the time, yes.
 8   BY MR. CRAMER:
 9        Q.   And were they able to utilize the parking lot on
10   11th?  Is that where trucks come in and out of?
11        A.   At 11th -- you saw the picture of the loading
12   dock.  Okay?  From that picture to the left is where our
13   employees parked.  They come in the driveway to the loading
14   dock.  There were a couple of times -- the trucks would, as
15   I say, come south on 11th and they'd have to go just
16   slightly past the loading dock to back in.  These were
17   fairly substantial trucks.
18             There were some occasions -- I don't remember the
19   number -- where protesters had to help move makeshift
20   barricades so that the trucks coming south could go far
21   enough south to back up, and then it was also awkward for
22   them because sometimes they would have protesters parking
23   right across the street, which made it really difficult for
24   trucks to then get back out again and make the turn.  It
25   always ended up happening that trucks got out, but
```

Page 55

1  ==sometimes it took them a long time, sometimes we had to==
2  ==find people to move a car that didn't belong there -- it==
3  ==was in a no parking area.==  So we made it.  ==We survived.  It==
4  ==was extremely difficult.==  ==Some days were worse than other==
5  ==days.==
6       Q.   What was your sense of what access was like
7  further away from the park?
8            MR. WEAVER:  Objection.
9       A.   I don't know.
10 BY MR. CRAMER:
11      Q.   What was access like on 12th, where the liquor
12 store and the parking garage are?
13      A.   I don't remember the day, but at some point --
14 again, the north end was Olive -- okay? -- that the police
15 blocked off 12th Avenue between Olive and Pine so that,
16 where the liquor store was, that cars could come in and
17 park in their lot, they could not anymore.  Okay.  Our
18 employees couldn't park up there, so we stacked them on
19 11th -- we made as much room anywhere we could because they
20 could get to work; we just had to find spots for them.
21      Q.   And you said that that was at some point during
22 the month of June that you think the police blocked off
23 that --
24      A.   Blocked off -- yeah, 12th Avenue.
25      Q.   And is it your understanding that that

Page 201

1  in, "Bill, have you seen what's going on out there?"
2  Because there are no windows.  Okay?
3           So walked out the door that's next to the
4  overhead doors that you saw for the shipping and receiving
5  for the loading dock, went to 11th Avenue, the street, and
6  saw a whole lot of people.  It looked like armored
7  personnel carriers and guns on the corner.  And we went
8  right back in.  And we're standing and they're walking and
9  we're walking, and some of them were kind of close to us,
10 and we walked back in the building and closed the doors.
11          We got calls -- some employees that were on their
12 way said, "Hey, what's going on?  We can't get there."  I
13 say, Go home if you want, wait, we don't know.
14          We had a couple salespeople that parked several
15 blocks away and waited because I -- I'm trying to remember,
16 but I think by around 11:00, everybody could get in the
17 building and everybody went back to work.  They weren't
18 afraid anymore.  I mean the park -- they did a great job.
19 They cleared the park and the playfield fairly quickly.
20 First the police came in, as I said before, moved people
21 out; then the trucks came and -- to clean up all the
22 garbage.  And they didn't prohibit us from getting into our
23 building.
24     Q.   And you could leave as well?  I mean it was -- at
25 that point you had full unfettered access to the building?

Page 202

1   A.   I do not remember -- as far as I know, yes.  I
2   don't remember any trucks not getting in.  Some
3   employees -- you know, they heard about it, they stayed
4   home.  We told anybody that hey, you don't feel good about
5   coming, don't come in.  Those of us that were there
6   working, we worked.  I mean nobody stormed the building in
7   the month of June.
8   Q.   Other than the -- going back to the damages
9   estimate, does -- Exhibit 92 -- does that fully capture the
10  damages that you are claiming in this lawsuit?
11  A.   I'm a little rattled.  I'm a little rattled at
12  the moment.  Between the two, I'm not nearly as confident
13  as I -- I mean I -- everybody was told Barry is a CFO, he's
14  a bean counter, pardon the expression.  He's good.  He
15  doesn't cheat anybody.  He's honest as the day.
16       Whether he made a mistake or tripped himself up
17  now, I -- you know, I'll fall on my sword for you.  Okay?
18  But I don't know of anything else.  We told him keep track
19  of everything, don't embellish on -- be conservative, I
20  don't want to be in a position of asking for something that
21  we don't have coming.
22       Now, did we misquote -- you know, misitemize some
23  things -- like Northwest Liquor, I used the wrong words,
24  versus, you know, collected the money back from that.
25  That's just an honest mistake.

BILL DONNER
11/16/2021

Page 215

1                REPORTER'S CERTIFICATE

2

3        I, Mindy L. Suurs, the undersigned Certified Court
   Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations in and for the State of
   Washington, do hereby certify:
5

6        That the foregoing testimony of BILL DONNER was given
   before me at the time and place stated therein and
7  thereafter was transcribed under my direction;

8        That the sworn testimony and/or proceedings were by me
   stenographically recorded and transcribed under my
9  supervision, to the best of my ability;

10       That the foregoing transcript contains a full, true,
   and accurate record of all the sworn testimony and/or
11 proceedings given and occurring at the time and place
   stated in the transcript;
12
         That the witness, before examination, was by me duly
13 sworn to testify the truth, the whole truth, and nothing
   but the truth;
14
         That I am not a relative, employee, attorney, or
15 counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
16 financially interested in the said action or the outcome
   thereof;
17

18 DATE: November 23, 2021

19

20

21

22

23       _____
         Mindy L. Suurs
24       Certified Court Reporter #2195

25

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126