# EXHIBIT 33

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiff,             )
                               )
        vs.                    ) No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
        Defendant.             )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

SETH W. STOUGHTON
_____

Columbia, South Carolina

(All participants appeared via videoconference.)

DATE TAKEN: AUGUST 30, 2022
REPORTED BY: CINDY M. KOCH, RPR, CRR, CCR #2357

---

Page 2

                A P P E A R A N C E S
FOR PLAINTIFF VIA VIDEOCONFERENCE:
        TYLER S. WEAVER
        Morgan Lewis & Bockius LLP
        1301 Second Avenue
        Suite 2800
        Seattle, WA 98101-3808
        206.275.0107
        tyler.weaver@morganlewis.com

FOR DEFENDANT VIA VIDEOCONFERENCE:

        ERICA IVERSON
        Harrigan Leyh Farmer & Thomsen LLP
        999 Third Avenue
        Suite 4400
        Seattle, WA 98104
        206.623.1700
        ericai@harriganleyh.com

ALSO PRESENT VIA VIDEOCONFERENCE:
        LINDSAY HITCHCOCK, videographer
        Buell Realtime Reporting, LLC
                * * * * *

---

Page 3

         DEPOSITION OF SETH W. STOUGHTON
                EXAMINATION INDEX
EXAMINATION BY:                          PAGE
Mr. Weaver                                 5

                EXHIBIT INDEX
EXHIBITS FOR IDENTIFICATION              PAGE
Exhibit 1  Expert Report of Seth W. Stoughton    8
Exhibit 2  Email chain; SEA-SPD_006803-804      56
Exhibit 3  Email chain; SEA_00028053            59

---

Page 4

        COLUMBIA, SOUTH CAROLINA; AUGUST 30, 2022
             9:01 a.m. Pacific Standard Time
                        -o0o-
        THE VIDEOGRAPHER:  We are on the record.
This is the deposition of Steth -- excuse me -- of Seth
Stoughton in the matter of Hunter [sic] Capital, LLC, v.
City of Seattle, Cause No. 20-cv-00983-TSZ, in the
United States District Court, Western District of
Washington at Seattle, and was noticed by Plaintiff.
        The time now is approximately 9:01 a.m. on this
30th day of August, 2022, and we are convening
virtually.
        My name is Lindsay Hitchcock, from Buell
Realtime Reporting, LLC, located at 1325 4th Avenue,
Suite 1840, in Seattle, Washington 98101.
        Counsel, at this time please identify
yourselves for the record, and then the witness may be
sworn in.
        MR. WEAVER:  My name is Tyler Weaver.  I'm
with Morgan Lewis & Bockius, in Seattle, for the
plaintiffs.
        MS. IVERSON:  Erica Iverson, Harrigan Leyh,
on behalf of the City of Seattle.
////
////

Page 49

a -- a reentry into the East Precinct and the area around it by the Seattle Police Department?
   A. Specifically, I don't have a ton of information on that. I know that, as of June 11th, the SPD, the police department, had put some officers back into the building.
       That's when they had to leave again because there was a fire outside the building. I don't have a great deal of specific details about that plan, but certainly the -- the verbal and written record suggests that they were doing stuff to get back into the building.
   Q. Okay. Did you ask Chief Mahaffey specifically about any plans or what his plans were that he -- that he told you he had?
   A. Not the details beyond what's documented in the report, no.
   Q. Okay. Any other evidence of a plan that was being devised by the police department between June 8th and June 22, 2020, to retake the East Precinct or the area around it that you're -- that you're -- that you're aware of?
   A. Sure. A great deal of information gathering about conditions in the precinct, about conditions around the precinct, the eventual development of the --

Page 50

what I will refer to for convenience as the red zone, non-uniformed officers going into the red zone later on in that period that you mentioned to gather information.
       The -- I think it was either the June 9th or the June 10th incident action plan that talked about the -- the situation, the establishment of check points, kind of the really -- the real setting up of the red zone, the -- the context of people being confrontational with officers and being armed.
       All of that information gathering is critical to the development and execution of a tactical plan. So it's certainly part of the tactical planning process. You have to have a good understanding of the context in which you're going to be acting.
       So yeah, there was a ton of information that is necessary to develop an operational plan about how they're going to go back into the -- into the -- the area, the red zone or the East Precinct.
   Q. Okay. So you would agree that the police department had a -- a lot of information about what was going on, on June 9th, June 10th, and June 11th, in that area; is that right?
   A. Yeah. Yeah, or at least they -- certainly they were -- they had information monitoring the situation, yes.

Page 51

   Q. Okay. Do you know whether there was any tactical steps taken beyond gathering information to devise a plan for how to reenter the area -- the East Precinct and the area around it prior to June 22, 2020?
   A. The record is pretty rife with descriptions of discussions between the police department and other city agencies about barricades, about how they were maintaining and how they were eventually going to move in on the red zone.
       Again, there's more information gathering. There's criminal information gathering. I think the gang unit is providing information. There are -- in the incident action plans, there are a number of references of resources. And again, I don't have specific details on that, but resources being allocated to or trying to figure out what that path is.
       We have record of discussions at high levels of the police department with Chief Mahaffey, for example, about how to deal with the red zone, setting up -- from the police perspective, setting up the red zone and changing response protocols.
       All of that, I think, is a component of figuring out how to deal with this situation, with the ultimate goal, as I understand it, being maintained of reestablishing police control of the East Precinct.

Page 52

   Q. Okay. Do you know whether the Seattle Police Department was involved in any -- directly involved in any discussions with the people who were occupying the area between June 8th and June 30th of 2020?
   A. Yes. There were comments. I forget -- I think this was Chief Mahaffey's deposition. There was discussion about being in touch with the protest leader and trying to engage in that -- again, that negotiated consent model of protest interaction, only for that protest leader to be -- I believe the word was pilloried by some other protester, and kind of booted out of any type of position of authority.
       At some point, and I would have to look at the -- at the report and record again to remember exactly when. At some point there was a decision that the police department, because of the nature of the protest, was not in the best position to engage in that context specifically, that that's something that other City entities should take the lead on, to avoid acceleration or exacerbating the situation.
       But yeah, my understanding is, there -- there was at least initially contact between the police department and, at least to the police department, identified as protest leaders.
       Later on, shortly before the dissolution of the

Page 89

1   On the other hand, using that as a
2   particularized example of the generally accepted
3   principle of, for example, preservation of human life,
4   is pretty normal.  Right?
5   A police department that evacuates a building
6   because there's a hurricane coming in, the building is
7   unlikely to withstand it, or a police department that
8   evacuates a building because of a bomb threat is
9   responding and is -- is embodying that same generally
10  accepted principle of, how do we balance competing
11  priorities in a high-pressure situation.
12  So I'm not aware of anything that -- that, you
13  know, offers as a detailed list, these are the
14  conditions under which you evacuate a police building,
15  but that's also not the way generally accepted
16  principles work.
17  Generally accepted principles exist and can be
18  used or often -- too often, maybe, ignored in a variety
19  of very specific situations.  But there -- there's no
20  guidebook that tells officers, this is exactly how to
21  deal with every situation.  There is instead these
22  principles that we use to inform police decision-making
23  in these situations.
24  **Q. Okay.  What -- what generally accepted**
25  **principles do you believe lead to the conclusion that**

Page 90

1   **the evacuation of the East Precinct on June 8th was a**
2   **reasonable tactic in accordance with those principles?**
3   A. Like I said, the first one is preservation of
4   human life, risk assessment, balancing competing
5   priorities, understanding what the situation was at the
6   time, and the resources that the police department had
7   to engage in alternative actions.
8   All of those generally accepted principles are
9   at play in the ultimate conclusion that the police
10  department's ==decision to evacuate the East Precinct was==
11  ==reasonable, tactically appropriate, and consistent with==
12  ==those generally accepted principles.==  So I can go into
13  more detail, if you want, on various ones.
14  **Q. How -- how did the -- how did the evacuation of**
15  **the East Precinct promote the preservation of human**
16  **life?**
17  A. Well, if the building had been burned down, a
18  bunch of people might have died in the fire.  Or if
19  officers had to defend a building that in the situation
20  they could not viably defend, the likely escalation of
21  force, or the likelihood, excuse me, of escalation of
22  force was pretty significant, could very easily have led
23  to a deadly force incident.
24  There were materials and equipment in the
25  police department, that, had it not been evacuated,

Page 91

1   would have been very sensitive and unwise to allow
2   protesters unrestricted access to.
3   So now you're almost in this reverse barricade
4   situation, where the police have to hold off people who
5   want to get into a room from getting into that room, and
6   the potential for that to escalate significantly, I
7   think, is -- is pretty obvious.
8   **Q. Do you believe the decision to not reinforce**
9   **the barriers on June 8th promoted preservation of human**
10  **life as well?**
11  A. I don't think that was a police decision, and
12  my focus is on police decision-making.  I am not an
13  expert in and have not looked at political
14  decision-making or what a mayor's office does or does
15  not do.
16  I don't even know what -- what framework you
17  would apply to assess a decision by a mayor's office.
18  But certainly it was not what the police department, or
19  at least what Assistant Chief Mahaffey most wanted to
20  do.
21  **Q. If the police department had made that**
22  **decision, would that have been a decision consistent**
23  **with the preservation of human life?**
24  A. I think it's possible, but it would depend --
25  it -- I don't know without understanding why -- the

Page 92

1   justification and articulation of why they took that
2   particular course of action.
3   I can't look at it in -- in an abstract and
4   say, ah, this is -- this would have been a reasonable
5   decision, without knowing more about why they made that
6   decision.
7   **Q. Okay.  So what you're looking at was after the**
8   **political decision had been made to remove the barriers**
9   **and allow people to walk by, was what the police did**
10  **after that reasonable; is that right?**
11  A. Yeah, that's right.  The -- the police find
12  themselves in the situation of responding to this
13  protest in the context that it now exists in, and that's
14  the barriers have been removed and the protesters are
15  going to be marching by.  So how do you do that, given
16  the situation, given the constraints that you're under.
17  **Q. Would it have been reasonable on June 8th for**
18  **the police to build a wall similar to the one they built**
19  **on June 1, 2020, around the East Precinct?**
20  A. Assuming they had the resources and capability,
21  yeah, I think it probably -- yes, I think that would
22  have been reasonable, assuming, again, that the -- the
23  assessment is, this will allow us to defend the
24  building.  Right?
25  If the assessment is still, we're still not

Page 101

1  goes off.  Well, guess what?  Time to walk out of the
2  building.  Right?
3       So I don't think it's inconsistent at all with
4  police culture to acknowledge that there are
5  circumstances where, consistent with these generally
6  accepted principles, you will evacuate a building.
7       Q.  Okay.  Given everything you know about what was
8  leading up to June 8th and the decision to leave the
9  building, if you subtract the information about a
10 credible threat of a fire, so that information did not
11 exist at the time of the decision to evacuate the
12 precinct, would it still have been a reasonable decision
13 to evacuate the precinct?
14      A.  I think so, yeah.  There was still now a week
15 of violent clashes between officers and protesters,
16 that, as -- as the evidence in the case shows, was
17 seriously impacting the ability of the police to
18 continue to provide operational services in the area
19 around the East Precinct because you had a bunch of
20 officers now on a protest line.
21      There was damage to property.  There were
22 injuries, including serious injuries, to protesters and
23 police.  You have the removal of these barricades that
24 leads the police department to think, we can't keep
25 doing this.  We can't hold the precinct if we have

Page 102

1  another night like the last six or seven or eight nights
2  that we just had.
3       So yeah, I don't think you need to fire to get
4  to tactical withdrawal.  Evacuating the building is a
5  tactically appropriate decision.
6       Q.  Are you aware of any case in which officers
7  have left a building if there wasn't a bomb threat, a
8  fire threat, or some other threat to the building being
9  destroyed, other than the June 8th decision that we are
10 here, where the police department decided to evacuate
11 the building?
12      A.  Yeah.  Oh, yeah.  I mean, substations get shut
13 down.  A precinct house gets moved.  There's asbestos in
14 the precinct building.
15      Q.  Okay.
16      A.  There's a high-priority call that involves a
17 bunch of officers to respond.  Like the -- leaving the
18 building is -- I'm not sure that's where you were going,
19 but --
20      Q.  Have you ever -- are you aware of any
21 situation, without a threat of fire, a bomb, or some
22 other threat to destroy the building, where police
23 officers have evacuated a building in response to a --
24 an anticipated protest?
25      A.  Offhand, no.  Focusing on that evacuated a

Page 103

1  building, certainly I'm aware of buildings that have
2  been left empty because the police department needs to
3  go respond to the protest.
4       But as far as evacuating a building, no,
5  this -- this is the first one with this building being
6  besieged that I'm aware of.  That's part of why I think
7  it's unprecedented, as we talked about.
8       Q.  What is unprec- -- but you're saying that the
9  lead-up to the events were unprecedented; correct?  And
10 also the decision to evacuate the precinct was
11 unprecedented also; is that right?
12      A.  Yes.  I think that's fair, yes.
13      MR. WEAVER:  Let's go ahead and go off the
14 record.  We've been going about another hour.
15      THE VIDEOGRAPHER:  Going off the record at
16 11:28.
17      (Recess from 11:28 a.m. to 11:39 a.m.)
18      THE VIDEOGRAPHER:  Back on the record at
19 11:39.
20      E X A M I N A T I O N (Continuing)
21 BY MR. WEAVER:
22      Q.  With regard to the mayor's order that we've
23 been talking about, to stand down from the barriers and
24 let people walk by the precinct, in your experience, is
25 that typically a tactical decision that would be in the

Page 104

1  purview of the police?
2       A.  It depends.  It certainly can be.  Sometimes
3  police really manage and are the only tactical
4  decision-makers in a protest response situation.  Often
5  not, especially in larger-scale events.
6       There can be an element of -- I'm going to say
7  the word "political."  I don't mean that as derisive or
8  derogatory at all.  Right?  But there can be a little
9  level of political input from elected officials.  There
10 can be input that affects or even dictates the tactical
11 decision-making from other City entities.
12      Going back to an example I think we talked
13 about before, the police department might say, we really
14 want to do this, and the City's streets say, yeah, we
15 don't have the barricades to give you to allow you to do
16 that.  Right?  In that case, you have a tactical
17 decision that is foreclosed by an entity outside of the
18 police department.
19      So it's not at all unusual for entities other
20 than a police department to effect or even in some sense
21 dictate certain aspects of tactical response.  It's also
22 not unusual for a police agency to not have any other
23 outside contact, to, at most, just inform the City
24 manager's office of what's going on, without expecting
25 instruction from them.

Page 141

1  that's what you get with me on the other side of the
2  screen, I suppose.
3      Q.  So I just want to be clear.  I mean, are you
4  giving any opinion that the police evacuation of the
5  East Precinct or the police adoption of the red zone
6  were reasonable because of the existence of First
7  Amendment rights?
8      A.  Phrased that way, no.  What I'm saying is, the
9  First Amendment rights were among the priorities that
10 the police department had to consider in deciding, among
11 all of these many priorities, how to respond to the
12 situation in front of it, and properly so.
13         It would have been problematic, had they not
14 given any thought to whether they were going to run
15 afoul of the constitutional limitations.  But the idea
16 of a direct connection between, you know, there are
17 First Amendment rights; therefore, they had to do this.
18 No, that's not what I'm saying.
19         I'm just saying, they had to balance a bunch of
20 different priorities that include First Amendment
21 rights, but also sanctity of human life, limitation on
22 police resources, and so on.
23     Q.  Would -- would the -- is there any First
24 Amendment requirement or limitation that would have
25 prevented the City from reinforcing the barriers around

Page 142

1  the East Precinct on June 8th?
2      A.  I haven't looked at that particular framework,
3  so I'm -- I'm -- because that's not what happened.  So
4  I -- you know, my focus was on the decision that was
5  made, obviously.
6          No, I don't think so.  I suppose the only way
7  that it would have been problematic is if -- and I don't
8  have any particular facts to point to here -- if the
9  protesters had been granted permission to march, to
10 march down the street, and the barricades were still up,
11 limiting their now -- I'm going to use the term
12 "permitted" -- to limit their permitted exercise of
13 First Amendment rights, then yeah.  But I -- I -- I'm
14 adding facts, as you -- as you can tell here.  Right?
15         As a general matter, if you leave everything
16 else the same, were there -- was there a First Amendment
17 requirement to take the barriers down?  Not that I'm
18 aware of, no.
19     Q.  How about -- I mean, you've given an opinion
20 about -- in your third opinion about the -- about the
21 barrier that was eventually erected around the East
22 Precinct.
23     A.  Yes.
24     Q.  And was there anything about the First
25 Amendment that would have prevented them from building

Page 143

1  that same barrier on June 8th?
2      A.  No, I don't think so.  Not -- not as the
3  situation, as I understand it, no.  And -- again, we'd
4  have to add some facts, like now they have a permit to
5  do the march and protest, so you can't infringe on the
6  exercise of the First Amendment right once it's been
7  permitted.  But without adding those facts, no, I don't
8  think it would have offended the First Amendment to
9  leave the barriers in place.
10     Q.  Do you think there's anything in the First
11 Amendment that either -- that required the adoption of
12 the red zone by the Seattle Police Department in June of
13 2020?
14     A.  No, I don't think that was First Amendment
15 mandated.
16     Q.  Is your opinion that the red zone was
17 reasonable based in any way on the requirements of the
18 First Amendment?
19     A.  Only insofar as we've discussed and is in my
20 report.  The First Amendment is within the scope of
21 priorities that a police agency has to balance in
22 figuring out how to deal with a situation.
23         In this particular case, after the red zone had
24 been identified, it -- the First Amendment played in, in
25 a very peculiar way, a very particular if peculiar way,

Page 144

1  because now the police department was under an
2  injunction, limiting them from using some of the tools
3  and weaponry that they might otherwise use for area
4  denial, for -- to clear a crowd.  That was a First
5  Amendment interest.  Right?
6          So the -- the court order said, thou shalt not
7  use chemical irritants, at least in a number of
8  situations, specifically to protect the rights of
9  peaceful protesters, that is, First Amendment rights.
10 Police department is going to have a problem if it
11 willy-nilly ignores an injunction.
12     Q.  Okay.  Let me ask you -- so the injunction was
13 issued on June 12th; is that correct?
14     A.  Yes.
15     Q.  Okay.  Was there anything about the First
16 Amendment that would have prevented the police
17 department from clearing out the red zone and retaking
18 the East Precinct on June 10, 2020?
19     A.  No.  I don't think there were -- there were any
20 First Amendment problems there, just like the -- the
21 barricades.  I don't think it would have run afoul --
22 again, I'm going to caveat -- assuming that the protest
23 hadn't been permitted in some way that I do not
24 understand it to have been, I don't think it would have
25 violated the First Amendment for the police to -- to

Page 177

1  As of which day?  Did you specify?
2  **Q.  As of July 1st.  They made the decision --**
3  A.  Okay.
4  **Q.  They have the resources and the situation that**
5  **you know about.**
6  A.  Yeah.  Yeah.  So my understanding of the
7  situation, as they were aware of it on July 1, is that
8  the risks of going in had steadily declined.  The
9  benefits of going in, I think, probably remained stable.
10  Right?  They are where they are.
11       But as of July 1, the tactical situation had
12  improved such that they could go in.  They had properly
13  coordinated with all of the other entities in city
14  government.  They had some cooperation, at least from
15  some members of the protest community.
16       So the -- the situation had changed, and to put
17  in kind of dry terms, the costs of attempting to go in
18  no longer outweighed the benefits.  I think, when that
19  situation exists, taking that at face value, saying,
20  well, we're still not going to do it, and we don't know
21  when we will do it probably could have been and would
22  have been unreasonable.
23  **Q.  How about if they had said, as of July 1st,**
24  **well, we want to wait two weeks before we go in?  Would**
25  **that have been reasonable?**

Page 178

1  A.  Again, it depends on where we are in that -- in
2  that comparison of costs and benefits.  Right?  Is
3  your -- is your risk level still high?  What -- where do
4  you foresee that going?  Do you foresee that the risk
5  level is going to drop even further?
6       I think it is often a problem to assign hard
7  deadlines to dynamic situations.  It's -- in policing
8  particularly, officers and agencies are -- are often
9  admonished to not draw a line in the sand because once
10  you draw a line in the sand -- I'm now going to mix my
11  metaphors; I apologize -- you kind of paint yourself
12  into the corner.  Because, when that person steps over
13  your line in the sand, now you have to respond in the
14  way that you've threatened to respond.
15       So saying something like, well, in two weeks
16  we're going to do this, if the situation in two weeks
17  doesn't allow you to do that, and you do it anyway,
18  that's not a great idea.
19       If the situation in two weeks doesn't allow you
20  to do that and you don't do that, well, now you look
21  like an idiot because you said, in two weeks, I gave a
22  date certain, and now I'm -- I'm changing my mind.
23       Often, in tactical operations, it's a -- it's a
24  far better idea to leave it not endless, but at least
25  dynamic.  Right?  I don't know when exactly this is

Page 179

1  happening, but when the situation allows, this is what
2  we're going to do.
3  ==**Q.  Okay.  How about, would it have been reasonable**==
4  ==**on June 1st, given what you know and understand the**==
5  ==**situation -- I'm sorry -- July 1st, given what you know**==
6  ==**the situation to have been, for the police department to**==
7  ==**have said, well, we're -- we're going to look at this in**==
8  ==**another two weeks and make a decision on that date?**==
9  ==**Would that have been reasonable and consistent with**==
10  ==**generally accepted principles of -- in policing?**==
11  ==A.  My understanding is that there was -- that the==
12  ==risk at that point was low enough that they felt==
13  ==comfortable moving.  Again, I -- I -- I don't like the==
14  ==idea of providing hard deadlines.==
15  ==     We'll look again in two weeks, but we're not==
16  ==really going to -- going to check, you know, in the==
17  ==intervening time.  I don't think it would have been==
18  ==necessarily unreasonable for them to say, okay, July 1,==
19  ==the dynamic is not right.  We're not there yet.  We need==
20  ==to continue monitoring.  But I -- I don't -- I don't==
21  ==really like the idea of saying, we're going to -- we're==
22  ==going to not move for two more weeks and figure out what==
23  ==happens.==
24  ==     Does that make sense?==
25  **Q.  Sure.**

Page 180

1  **I mean, is there any -- would any decision,**
2  **other than going in on July 1st, given what you know,**
3  **have been a -- possibly a reasonable decision by the**
4  **police department?**
5  A.  Sure.  Yeah.  Like I said, you know, if they
6  said, okay, we're not going to do it today.  We're going
7  to do it tomorrow, July 2nd.  All right.  That seems
8  reasonable, or we're going to do it, you know, June 30.
9  We're going do it June 30 instead.  All right.  That
10  seems reasonable, if the situation hasn't really
11  meaningfully changed.
12       Or if they said -- I'm just thinking of other
13  examples.  We're still worried about the potential for
14  confrontation with the police, so we're going to ask the
15  fire department to go in, and the fire department's
16  willing to, and they have a great relationship with the
17  protesters because they've been dealing with the medical
18  stuff for them.  So, you know, they'll -- they'll kind
19  of walk through first and clear everyone out, and then
20  we'll come behind them or something.
21       I think there's a whole range of reasonable
22  alternatives, either in the tactics on July 1, or maybe
23  playing with the date a little bit.  Again, I'm often in
24  complex situations, and this, I think, was a very
25  complex situation.

Page 181

    It's -- it's very difficult to identify, and I think wrong to often identify, or it is often wrong to identify a single, this is the only reasonable option.
    Q. What is your understanding -- what is the basis for your understanding that the risk of entering had decreased so significantly that now it would be reasonable to go in on July 1st and clear the area out?
    A. Well, there are a couple of things. The first is my -- my understanding from the facts that the protest had gotten smaller in that amount of time, that the -- there was more communication from protesters about -- I think the phrase was surrendering the protest zone; that there was more coordination with other elements of city government about what they could do to support the operation; that the department had just organized more resources to make that work for them.
    A combination of what the police department could do on July 1 that it couldn't do on June 8th, what other elements of city government could do, and what the protesters appeared ready to allow the police to do without dramatically elevating the potential for violent conflict.
    Q. Do you understand -- what's your understanding of the numbers of people that remained in the area as of June 30, 2020?

Page 182

    A. I believe it was still significant, but smaller than it had been in the initial period. I would have to look at the materials to put any sort of numbers to it. They still had to clear, I think it was, hundreds of people from the red zone area, but it was not, from my off-the-top memory of the facts, it was not the protests of 10,000 that they were dealing with in that initial week.
    Q. Do you -- was it your understanding that there were 10,000 protesters actively protesting in the -- in the CHOP area during the first week of the occupation?
    A. I -- as I recall, the information from the police department is that the crowds grew to over 10,000 people.
    Q. Were all of those people --
    A. I -- I'm sorry?
    Q. Were all of those people protesters?
    A. I -- my understanding is, that was the crowd involved in the crowd control protest response operation that the police engaged in. So I -- I don't know exactly how to -- how to define that.
    You have a crowd of 10,000 people. Whether someone is just there to videotape or whether someone is there to actually protest, I don't think is -- is relevant.

Page 183

    Q. Do you know whether there were movie nights, for example, in CHOP that may have brought people in?
    A. Oh, yeah. There were all kinds of -- I -- I mean, this is not so much from the materials, but just from following the event in the media as it happened, to the extent that I did, yeah, they had like community events and -- like -- I think there was yoga sessions and street art and all kinds of stuff like that.
    Q. Okay. So what's your understanding of whether the number of weapons in the area had decreased as of the last week of June 2020?
    A. I -- I'd have to look at my report. Offhand, I don't -- I don't remember specific information on that.
    Q. Okay. Did you look at anything, whether violent crime in the area had increased during the last week of June of 2020 --
    A. Yes. In the --
    Q. -- in the area -- in the area in question?
    A. Yes. In the -- in the CHOP, there had been a couple of incidents. And I'm using "a couple," I probably should have said "several" because I don't want to indicate it was just two.
    There had been some -- some significant incidents, a couple of homicides for -- again, several homicides, that -- that the situation inside the CHOP

Page 184

was becoming untenable.
    Q. All right. So there had been an increase in shootings and homicides between June 20th and June 30th of 2020 in the area; is that right?
    A. Yes. That's what I understand.
    Q. Okay. And there had been a gang -- and also during that -- in that time period, there had been a -- a gang assessment from the Gang Control Unit that we talked about earlier, that talked about how gang members were being attracted to the area; is that right?
    A. Yes.
    Q. Are you aware of anybody, during that last week of June 2020, whether there was any intelligence that certain people had vowed to fight to the death over keeping CHOP an autonomous area, free of police?
    A. I know -- I don't remember the date on this, but I definitely remember the -- the interviews with protesters. And it was not at the very beginning of CHOP.
    It was -- it was at some point around that -- I don't know if it was the June 20th time -- you know, that day exactly, but it was somewhere around there, where protesters were still talking about, you know, the -- if the police come in, this is -- this is going to get bloody. This is not going to end peacefully. So

Page 189

1  Q. Okay. Do you know how many people were camped
2  out in Cal Anderson Park on June 8, 2020?
3  A. Offhand, no. I do not have an exact number for
4  you.
5  Q. Okay. Is it -- do you have any idea whether
6  the number was greater, as far as people who had
7  established residency in Cal Anderson Park on June 30,
8  2020, than it was on June 8th or 9th, 2020?
9  A. My understanding from the materials is, there
10 were fewer protesters in the red zone at the end than
11 the beginning. But like I said, I -- I'd have to go
12 back to the materials to check to see, you know, exact
13 numbers.
14 Q. Do you know if there were any protesters that
15 had established residency in Cal Anderson Park on
16 June 8th or June 9th of 2020?
17 A. Oh, I have no idea.
18 Q. Okay.
19 A. Off -- offhand, I...
20     MR. WEAVER: Let's go off the record.
21     THE VIDEOGRAPHER: Going off the record at
22 2:06.
23     (Recess from 2:06 p.m. to 2:16 p.m.)
24     THE VIDEOGRAPHER: Back on the record at
25 2:16.

Page 190

1     E X A M I N A T I O N (Continuing)
2  BY MR. WEAVER:
3  Q. So we talked briefly about your third opinion.
4  I don't really have any questions about that, but other
5  than what we have talked about in your third opinion,
6  are there any opinions you're planning to offer in this
7  case that we have not already discussed?
8     MR. WEAVER: Are you not -- are people
9  hearing me, or not?
10    MS. IVERSON: I can hear you.
11    THE WITNESS: Do I not have audio?
12    THE COURT REPORTER: I can hear you.
13    MS. IVERSON: Oh, maybe --
14    MR. WEAVER: I don't think the witness is
15 hearing me.
16    MS. IVERSON: No.
17    THE WITNESS: Can you guys hear me?
18    MR. WEAVER: We can hear you.
19    THE WITNESS: Oh, there we go. Sorry. I'm
20 not sure what happened.
21    MR. WEAVER: All right.
22 BY MR. WEAVER:
23 Q. So other than the third opinion, which we have
24 only briefly discussed, your third opinion regarding the
25 wall, and the other opinions that we've already

Page 191

1  discussed in this case, are there any other opinions
2  that you're planning to offer in this case that we have
3  not yet discussed?
4  A. No, I don't believe so. Only the -- I mean,
5  only the -- the sort of sub opinions that are part of
6  the opinions in the report that -- that are either in
7  the report or that we've already discussed, but no, I
8  don't think so.
9  Q. Any opinions you're planning to give are
10 contained in the -- in the body of your report; is that
11 right?
12 A. Yes.
13    MR. WEAVER: Okay. I don't have any other
14 questions.
15    MS. IVERSON: And I have no questions
16 either.
17    THE VIDEOGRAPHER: This concludes the
18 deposition of Seth Stoughton. Going off the record at
19 2:17.
20    (Deposition concluded at 2:17 p.m.)
21    (Reading and signing was requested
22     pursuant to FRCP Rule 30(e).)
23         -o0o-
24
25

Page 192

1              C E R T I F I C A T E
2
3  STATE OF WASHINGTON
4  COUNTY OF PIERCE
5
6     I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Seth W.
9  Stoughton, having been duly sworn, on August 30, 2022,
10 is true and accurate to the best of my knowledge, skill
11 and ability.
12    IN WITNESS WHEREOF, I have hereunto set my hand
13 and seal this 1st day of September, 2022.
14
15
16    _____
17    CINDY M. KOCH, CCR, RPR, CRR #2357
18
19 My commission expires:
20 JUNE 9, 2026
21
22
23
24
25