# EXHIBIT 35

ARIK VAN ZANDT
9/14/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
            Plaintiff,         )
                               )
       vs.                     )   No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
            Defendant.         )
_____

Zoom Video Deposition Upon Oral Examination

Of

ARIK VAN ZANDT
_____

DATE:  Wednesday, September 14, 2022

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427 3515 SW Alaska St Seattle WA 98126

Page 33

1   start there?
2       A.   So what I did, I think, in simple terms so we can
3   get on the same page here is, if Hunters had estimated that
4   the vacancy of a particular unit would have been -- I'll
5   use just easy numbers here -- would have been four months,
6   I assumed in that but-for scenario that, due to the impacts
7   of COVID, the vacancy would actually be six months.  So
8   again, they assumed four, I applied a 50 percent increase
9   to that to get us to six months.  And that's in the but-for
10  scenario.
11      Q.   Okay.  And if, in fact, they were able to relet
12  that property in three months, then there would have
13  been -- then your six-month period wouldn't have any
14  relevance; right?
15          MR. REILLY-BATES:  Object to the form.  Calls for
16  speculation.
17      A.   Under that hypothetical, it would not.
18  BY MR. CRAMER:
19      Q.   Okay. All right.  And did you -- did you apply
20  any extended vacancy period due to the effects of -- of
21  COVID as well?
22      A.   I'm still misunderstanding.  That's exactly what
23  we're talking about.
24      Q.   Well, okay, so the 50 percent budgeted vacancy
25  period -- it accounts for the market impacts of COVID then;

Page 49

1          MR. REILLY-BATES:  Objection.  Foundation, vague.
2     A.   Yeah, I'm not sure what you mean by "softening."
3  BY MR. CRAMER:
4     Q.   So the real estate market -- was the real estate
5  market in the same spot in the spring of 2020 after the
6  onset of COVID that it was prior to COVID?
7     A.   I don't know what you mean by "spot."
8     Q.   Did COVID have any effect on commercial real
9  estate -- on the commercial real estate market?
10    A.   Well, that's what I've accounted for in my
11 expectation that the vacancy rate would have been increased
12 by 50 percent from what was otherwise expected without
13 CHOP.
14    Q.   So you've accounted for it -- you've assumed that
15 it would take longer to rent; right?
16    A.   That is correct.
17    Q.   But you are also assuming that, once you do rent
18 it, you would receive the same rent that existed under
19 leases signed prior to COVID; right?
20    A.   Yes, assuming the same rental rate itself.
21    Q.   And what is that assumption based on?
22    A.   It's based on my -- my market research of the
23 fact that the rates themselves were not impacted, but this
24 wait-and-see approach caused some entities to I guess delay
25 the signing of a lease, but the rates themselves were

Electronically signed by Mindy Suurs (101-257-931-8021)                                          c273543a-021c-467e-92b9-68d12bc36c85

Page 50

1   unaffected.
2       Q.   Okay.  So it's your opinion that commercial real
3   estate rates were not affected by COVID?
4            MR. REILLY-BATES:  Object to the form,
5   argumentative, misstates witness's prior testimony.
6       A.   It's my understanding that the rates themselves
7   were not affected, correct.
8   BY MR. CRAMER:
9       Q.   And that understanding is based on what?
10           MR. REILLY-BATES:  Objection, asked and answered.
11      A.   I've already answered that question.
12      Q.   Please answer it again.
13           MR. REILLY-BATES:  Same objection.
14      A.   You want me to answer the same question again?
15  BY MR. CRAMER:
16      Q.   Yes.
17      A.   Okay.  It's -- again, it's based on the market
18  research and the expectation from those in the market, such
19  as, you know, Hunters, who is in this market, that the rent
20  rates would have stayed the same.
21      Q.   What market research did you do, other than
22  talking to Hunters?
23      A.   I believe I reference a specific report within
24  my -- my report as well.
25      Q.   And that's a Colliers report from fourth quarter

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Mindy L. Suurs, the undersigned Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to
 4   administer oaths and affirmations in and for the State of
     Washington, do hereby certify:
 5

 6          That the foregoing testimony of ARIK VAN ZANDT
     was given before me at the time and place stated therein
 7   and thereafter was transcribed under my direction;

 8          That the sworn testimony and/or proceedings were by me
     stenographically recorded and transcribed under my
 9   supervision, to the best of my ability;

10          That the foregoing transcript contains a full, true,
     and accurate record of all the sworn testimony and/or
11   proceedings given and occurring at the time and place
     stated in the transcript;
12
            That the witness, before examination, was by me duly
13   sworn to testify the truth, the whole truth, and nothing
     but the truth;
14
            That I am not a relative, employee, attorney, or
15   counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
16   financially interested in the said action or the outcome
     thereof;
17

18   DATE:  September 18, 2022

19

20

21

22

23          _____
            Mindy L. Suurs
24          Certified Court Reporter #2195

25
```