# EXHIBIT 41

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
            Plaintiff,         )
                               )
       vs.                     )   No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
            Defendant.         )
_____

ZOOM Video Deposition Upon Oral Examination

Of

ANDREA AUGUSTINE CURTIS
_____

CONTAINS CONFIDENTIAL PORTIONS

  Page 33 Line 12
  Page 137 Line 12

DATE:  Monday, September 26, 2022

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Page 37

```
 1   BY MR. CRAMER:
 2       Q.   Was one of them Sway and Cake?
 3       A.   Sway and Cake did have a rent forbearance
 4   agreement.
 5       Q.   And was another one The Unicorn?
 6       A.   We are not looking for damages for The Unicorn.
 7       Q.   So the damages amount related to The Unicorn that
 8   is listed on Mr. Van Zandt's report -- Madrona is
 9   withdrawing its claim to those?
10       A.   Correct.
11       Q.   But it's still pursuing damages related to Sway
12   and Cake; is that correct?
13       A.   Correct.
14       Q.   And the management fee -- well, strike that.
15            I'm -- I will -- I'm going to drop a document
16   into the chat.  This was marked as Exhibit 199 to Mr. Van
17   Zandt's deposition.  Let me know when you've had a chance
18   to open it.
19            I'm not asking you to read all 161 pages -- that
20   would be quite the ask -- but if you could flip to
21   Page 161, the last page of the document.  Let me know when
22   you're there.
23       A.   I'm on the document.
24       Q.   Is this a document that you helped Mr. Van Zandt
25   prepare?
```

Page 67

1   around East Precinct were open until June 8th?
2              MR. REILLY-BATES:  Object to the form, calls for
3   speculation, foundation.
4        A.   No, I did not say that I could.  I don't -- so my
5   route to work, I got to work.  I turn right before the
6   street, so I don't know the date the roads were closed.
7   BY MR. CRAMER:
8        Q.   Was Pike Street ever closed?
9              MR. REILLY-BATES:  Object to the form,
10  foundation.
11       A.   I don't know.
12  BY MR. CRAMER:
13       Q.   Was there ever a day when you tried to park in
14  the parking lot at the Madrona Services building and it was
15  blocked?
16       A.   No.
17       Q.   Was there ever a day that Pike Street was not
18  accessible from the east?
19             MR. REILLY-BATES:  Object to the form.
20  BY MR. CRAMER:
21       Q.   In front of your building.
22       A.   In front of my building, no, but a block down
23  12th and Pike, yes.
24       Q.   And 12th and Pike -- the blockages were on
25  12th -- right? -- not Pike?

Page 68

 1            MR. REILLY-BATES:  Object to form.
 2      A.    Correct, but vendors would not come in that area.
 3   Garbage from the Seattle city -- City of Seattle would not
 4   be picked up on that block either.  There was an entire
 5   radius our office was part of that vendors wouldn't come
 6   to.  We were too close to the CHOP zone, if you're
 7   referring to the dates after CHOP.
 8   BY MR. CRAMER:
 9      Q.    No, I'm still talking about that first week.
10            Were there any -- strike that.
11            Do you share a parking -- does the Madrona IV
12   building and the Madrona VI building -- do they share a
13   parking lot?
14      A.    There's no legal line.  There's a property
15   between the two.  So if you go into that block, there's
16   four different parking lots that you could drive through,
17   but they're not shared.
18            MR. CRAMER:  I'm going to mark this as
19   Exhibit 219.  Let me know when you open it up.
20                      (Exhibit No. 219 marked for
21                       identification.)
22      A.    Sure.  Okay, I have it open.
23      Q.    Okay.  So this is just a Google map printout of
24   some of the area around Cal Anderson Park and -- would you
25   agree?

Page 70

1    A.   It's where The Unicorn is displayed.
2    Q.   And on this map is the Trace building something
3    you could point out?
4    A.   Where Katsu Burger and Tavern Lar -- those are
5    two of the buildings.
6    Q.   And how about 1111 Condos?  Are those -- where
7    would those be on here?
8    A.   It's where the "B" is in Plum Bistro.
9    Q.   And Solis -- where is that?
10   A.   The corner of 13th and Pike on our side of the --
11   our corner, Madrona's corner.
12   Q.   So the northeast corner of that intersection?
13   A.   That would be correct.
14   Q.   Okay.  And you said that you live in north
15   Capitol Hill; right?
16   A.   Correct.
17   Q.   What's the route that you take to work every day?
18   A.   I go right onto Aloha from my street, turn into
19   12th.  I turn right onto -- what's that street? -- I guess
20   it would be Olive, and then I turn right -- well, this is
21   my route the last two years -- and then I turn onto 14th
22   and then I would go through -- we have a driveway on 14th.
23   I would go through the driveway to my parking spot.  And my
24   parking spot is located on Investors VI.
25   Q.   And was 14th Avenue ever blocked off during the

Page 71

```
 1   summer of 2020?
 2        A.   I don't think 14th was.  My route home's
 3   different, by the way.
 4        Q.   Okay.  And the barricades that you were
 5   describing on 12th and Pike -- those were on the -- to the
 6   north of Pike blocking 12th; is that right?
 7        A.   The barricades I think were in the middle of 12th
 8   as I recall.
 9        Q.   Okay.  But they were north of Pike; right?
10        A.   Correct.
11        Q.   And were there any barricades that you observed
12   on 12th prior to June 8th?
13        A.   I don't know.
14        Q.   Were there any barricades on Pine prior to
15   June 8th?
16        A.   I don't know the date, but the --
17        Q.   I'm sorry, you froze.
18        A.   I don't know the date, but I know that there were
19   barricades on 13th and Pine because that's my route home.
20        Q.   And the barricades on 13th and Pine that you're
21   referring to -- what street were those blocking?
22        A.   Pine.
23        Q.   Did you ever observe the -- strike that.
24             Did you ever -- prior to June 8th, did you ever
25   observe the protests that were occurring outside the East
```

Page 91

1  be able to do its work the dates that those people were on
2  the stoop?
3           MR. REILLY-BATES:  Object to the form.
4       A.  I don't know.  I'm assuming everyone would go
5  through the front door.
6  BY MR. CRAMER:
7       Q.  And was there any time where someone asked them
8  to leave and they did not leave that you know of?
9           MR. REILLY-BATES:  Object to the form, calls for
10 speculation.
11      A.  I don't know.
12 BY MR. CRAMER:
13      Q.  At any point in June of 2020, was the front door
14 to your space blocked at all?
15          MR. REILLY-BATES:  Object to the form.
16      A.  In June?
17 BY MR. CRAMER:
18      Q.  In June.
19      A.  I don't know the date, but it was blocked before.
20      Q.  Okay.  Blocked by what?
21      A.  Someone lying in front of it.
22      Q.  And when did that occur?
23      A.  I do not know the date.
24      Q.  Did it occur prior to June of 2020 or after June
25 of 2020?

ROUGH & ASSOCIATES INC
office@roughandassociates.com     206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                              9394dc94-aa03-48bf-b4c7-f1b67ab1c4da

Page 92

```
 1      A.   I don't know.
 2      Q.   But at any point were there barricades put in
 3   front of the front door to Madrona's office?
 4      A.   No.
 5      Q.   At any point in time, was the front door to CM
 6   Design blocked by barricades?
 7      A.   No.
 8      Q.   Or was it ever blocked by anything else that you
 9   know of?
10      A.   Besides like a person, no.
11      Q.   Are you aware of any times when CM Design's front
12   door was blocked by a person?
13           MR. REILLY-BATES:  Object to the form, calls for
14   speculation.
15      A.   No.
16   BY MR. CRAMER:
17      Q.   Is it your -- is it Madrona's contention in the
18   case that if a squatter or a homeless person is blocking
19   the entrance to a building in the morning, that the City is
20   liable for that?
21           MR. REILLY-BATES:  Object to the form, calls for
22   legal conclusion, vague, speculation.
23      A.   I'm not sure.
24   BY MR. CRAMER:
25      Q.   Are you aware of any instance where the door to
```

Page 93

```
 1    Old School Custard was blocked by anything?
 2         A.    I don't know.
 3         Q.    Are you aware of any occurrence when the front
 4    door to The Unicorn was blocked by anything?
 5         A.    I am.
 6         Q.    Okay, what?
 7         A.    I called -- it was a person was on there.  I
 8    personally called the police.  The police would not come.
 9         Q.    And when did that occur?
10         A.    After June 8th, 2022 -- or 2020, excuse me.
11         Q.    What number did you call?  Did you --
12         A.    911.
13         Q.    Was the -- what was the person on the steps
14    doing?
15               MR. REILLY-BATES:  Object to the form, calls for
16    speculation.
17         A.    I don't know what they were doing.
18    BY MR. CRAMER:
19         Q.    Did you observe them in front of The Unicorn?
20         A.    Yes, they were on the steps.
21         Q.    Okay.  What were they doing when you saw them?
22         A.    I don't know what they were doing.  They could be
23    doing drugs, they could be hanging out; I don't know what
24    they were doing.
25         Q.    Were they interacting with you at all?
```

Page 94

 1      A.   As I mentioned, I don't interact with those kind
 2   of people.
 3      Q.   Okay.  Were they threatening you?
 4           MR. REILLY-BATES:  Object to the form, asked and
 5   answered.  She said she didn't interact with those people.
 6      A.   I don't interact with them.
 7   BY MR. CRAMER:
 8      Q.   Okay.  Were they doing something that presented
 9   an emergency?
10           MR. REILLY-BATES:  Object to the form.
11      A.   I don't know.
12   BY MR. CRAMER:
13      Q.   Okay.  So it's very possible that 911 didn't send
14   someone out because a person sitting on a stoop is not an
15   emergency; right?
16           MR. REILLY-BATES:  Object to the form,
17   argumentative, calls for speculation, foundation.
18      A.   I would say it's safe to say by the way this
19   person looked, that they're not a random person like you or
20   me sitting on the stoop.
21   BY MR. CRAMER:
22      Q.   Is it your position that 911 should send someone
23   out whenever someone that doesn't look like you or me is
24   sitting on a stoop?
25           MR. REILLY-BATES:  Object to the form,

```
 1   argumentative, calls for speculation.
 2        A.   No.
 3   BY MR. CRAMER:
 4        Q.   Did you stay to observe -- how long did you stay
 5   to observe the person sitting on the stoop in front of The
 6   Unicorn?
 7        A.   I do not engage with them, so I was not going to
 8   stay.
 9   BY MR. CRAMER:
10        Q.   Okay, so you left?
11        A.   Correct.
12        Q.   How long did the person stay on the stoop after
13   you left?
14             MR. REILLY-BATES:   Object to the form,
15   foundation.
16        A.   I don't know.
17   BY MR. CRAMER:
18        Q.   Did the Post Options business -- was it ever --
19   strike that.
20             The Unicorn -- was it ever blocked by anything
21   other than the person you saw on the stoop?
22        A.   As in what?
23        Q.   Were there any barricades in front of The Unicorn
24   blocking access to the building?
25        A.   Not barricades, like not physical barricades, but
```

```
 1   services would not come to that building.
 2        Q.   Okay.  But there was nothing blocking the
 3   building; right?
 4             MR. REILLY-BATES:  Object to the form.
 5        A.   Not that I'm aware of.
 6   BY MR. CRAMER:
 7        Q.   Okay.  And was there anything that blocked access
 8   to Post Options in -- the front door to Post Options in
 9   June of 2020?
10             MR. REILLY-BATES:  Object to the form.
11        A.   Not that I'm aware of.
12   BY MR. CRAMER:
13        Q.   And was there anything that blocked the front
14   door to Sway and Cake in June of 2020 that you're aware of?
15             MR. REILLY-BATES:  Object to the form.
16        A.   Not that I'm aware of.
17   BY MR. CRAMER:
18        Q.   And I think you testified to it earlier, but Pike
19   Street was never barricaded off; correct?
20        A.   Correct.  It was still -- despite not being
21   barricaded, it was still a no zone for (inaudible) people.
22        Q.   Okay.  But there were never any blockages
23   blocking the street; right?  Cars could drive up and down
24   it?
25        A.   Correct.
```

ANDREA AUGUSTINE CURTIS
9/26/2022

Page 127

```
 1      A.   I believe it was me, but I don't recall what it
 2   was.  It could have been myself or someone else in our
 3   office who ordered supplies for an apartment building.
 4      Q.   Did you explain to the -- to Fed Ex that there
 5   was nothing blocking the roads to your building?
 6           MR. REILLY-BATES:  Object to the form.
 7      A.   Correct.
 8   BY MR. CRAMER:
 9      Q.   Okay.  And they still chose not to deliver?
10      A.   Yes, and same with vendors.
11      Q.   Any other vendors besides appliance services
12   company and an unnamed electrician?
13      A.   That's all I can think of.
14      Q.   Did any of the properties that were managed by
15   (inaudible) have security cameras in June of 2020?
16           MR. REILLY-BATES:  Object to the form,
17   foundation.
18      A.   I think Trace, the Trace Condos had security
19   cameras.
20   BY MR. CRAMER:
21      Q.   But did 12th and Pike have security cameras at
22   all?
23      A.   No, and they still don't.
24      Q.   What about Madrona VI?
25      A.   No.
```

Page 171

1  your recollection as to whether you e-mailed with
2  Mr. Van Zandt?
3             MR. REILLY-BATES:  Object to the form.
4        A.   My e-mail.
5  BY MR. CRAMER:
6        Q.   Okay.  Do you know whether you ever e-mailed with
7  Mr. Van Zandt?
8             MR. REILLY-BATES:  Object to the form, asked and
9  answered.
10       A.   I don't know.
11 BY MR. CRAMER:
12       Q.   Did you ever send Mr. Van Zandt documents?
13       A.   I don't know.
14       Q.   Do you know if anybody else from Madrona met with
15 Mr. Van Zandt?
16       A.   I don't know.
17       Q.   Do you know if anybody else from Madrona spoke
18 with Mr. Van Zandt?
19            MR. REILLY-BATES:  Object to the form.
20       A.   I don't know.
21 BY MR. CRAMER:
22       Q.   The next item says:  "Loss of rent, Old School
23 Frozen Custard."  Do you know what that line item is
24 seeking?
25       A.   We're not claiming -- seeking claims for that

```
 1   line item.
 2        Q.   So you're not seeking lost rent for Old School
 3   Frozen Custard anymore; correct?
 4        A.   Correct.
 5        Q.   Is that because the rent relief that you provided
 6   to Old School Frozen Custard was for April and May of 2020,
 7   which predates CHOP?
 8        A.   Correct.
 9             MR. REILLY-BATES:  Object to the form.
10   BY MR. CRAMER:
11        Q.   And that would mean that you're no longer seeking
12   damages in the form of your lost management fee for Old
13   School Frozen Custard as well?
14        A.   Correct.
15        Q.   When did you determine that it would not be
16   appropriate to seek damages for lost rent from Old School
17   Frozen Custard?
18        A.   I'm not sure.
19        Q.   Was it today?
20             MR. REILLY-BATES:  Object to the form.
21        A.   I'm -- I don't know when it was decided.
22   BY MR. CRAMER:
23        Q.   Who told you that you were no longer seeking
24   damages for Old School Frozen Custard?
25             MR. REILLY-BATES:  Object to the form, assumes
```

Page 173

1    facts not in evidence, foundation, calls for speculation.
2    The witness testified she doesn't know.
3    BY MR. CRAMER:
4        Q.   Who told you -- well, you somehow -- you just
5    said that you're not seeking damages for Old School Frozen
6    Custard; right?
7        A.   Brad and I spoke.
8        Q.   Okay.  And when did you speak with Brad about
9    this?
10            MR. REILLY-BATES:  Object to the form, asked and
11   answered.
12       A.   I don't know.
13   BY MR. CRAMER:
14       Q.   Who told you that you were no longer seeking
15   damages regarding The Unicorn's lost rent?
16            MR. REILLY-BATES:  Object to the form, asked and
17   answered.
18       A.   This would have been the same conversation with
19   Brad probably.
20   BY MR. CRAMER:
21       Q.   Are you seeking the reduced rent costs for CM
22   Design that are referenced in the next line?
23       A.   Correct.
24       Q.   You are?
25       A.   Correct.

Page 265

1                    REPORTER'S CERTIFICATE

2

3        I, Mindy L. Suurs, the undersigned Certified Court
   Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations in and for the State of
   Washington, do hereby certify:

5

6        That the foregoing testimony of ANDREA AUGUSTINE
   CURTIS   was given before me via Zoom at the time and place
7  stated therein and thereafter was transcribed under my
   direction;

8
         That the sworn testimony and/or proceedings were by me
9  stenographically recorded and transcribed under my
   supervision, to the best of my ability;

10
         That the foregoing transcript contains a full, true,
11 and accurate record of all the sworn testimony and/or
   proceedings given and occurring at the time and place
12 stated in the transcript;

13       That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing
14 but the truth;

15       That I am not a relative, employee, attorney, or
   counsel of any party to this action or relative or employee
16 of any such attorney or counsel and that I am not
   financially interested in the said action or the outcome
17 thereof;

18

19

20

21

22       _____

23       Mindy L. Suurs
         Certified Court Reporter #2195

24

25