# EXHIBIT 43

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

-----------------------------------------------------------

HUNTERS CAPITAL, LLC, et al.,   )
                Plaintiffs,   )
     vs.                          ) No. 20-cv-00983-TSZ
CITY OF SEATTLE,                )
                Defendant.    )

-----------------------------------------------------------

ZOOM VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL MALONE

-----------------------------------------------------------

ATTENDANCE OF ALL PARTICIPANTS VIA

ZOOM VIDEO CONFERENCE

-----------------------------------------------------------

9:00 a.m.

August 22, 2022

REPORTED BY: Lauren G. Harty, RPR, CCR #2674

Page 143

```
 1             Whose idea was it to -- to look into filing
 2   the lawsuit?
 3             MR. REILLY-BATES:  Object to the form.
 4        A.   Could be my idea.  I think it was a
 5   collective idea.
 6        Q.   (By Mr. Cramer)  Okay.
 7             But -- collective idea meaning you and
 8   perhaps Oaksmith and Cronaeur?
 9        A.   Yes.
10        Q.   And did you -- did you personally ask other
11   businesses in the area if they wanted to join?
12        A.   I didn't, but we did, yes.
13        Q.   Okay.
14             Did you participate in any meetings with
15   the -- the group of business owners about potentially
16   filing a lawsuit?
17        A.   Not that I recall.
18        Q.   Did you participate in any meetings in the
19   back room at the liquor store?
20        A.   I did not.
21        Q.   At some point someone was -- was shot and --
22   and killed around Rancho Bravo.  Do you recall that
23   event?
24        A.   Yes.
25        Q.   Okay.
```

```
 1                What do you recall about that event?
 2        A.      At least one bullet was lodged into our --
 3   our building, one of our buildings.
 4        Q.      Okay.
 5                And -- and that's the -- the building that's
 6   not your building, right; that's the building across
 7   the street?
 8        A.      No.  It's the --
 9        Q.      Okay.
10        A.      -- in the Blick Building.
11        Q.      Okay.
12                So where -- where in the Blick Building?
13        A.      On the corner of Pine and -- East Pine and
14   Broadway.
15        Q.      No.  I -- so where was the bullet lodged?
16        A.      Where was the what?
17        Q.      Oh.  You said there was a bullet lodged
18   in --
19        A.      Yes.
20        Q.      -- your --
21                And I'm just asking where --
22        A.      Second --
23        Q.      -- in the building.
24        A.      Second floor of that building, broke the
25   window and lodged into the -- one or two bullets
```

```
 1        into -- into the beam.
 2        Q.    Okay.
 3              And who rents that space where the bullets
 4   broke the window and -- and lodged into a beam?
 5        A.    A tech company.
 6        Q.    Okay.
 7              And it -- that occurred in the middle of the
 8   night, right?
 9        A.    Correct, about 10:30.
10        Q.    About when?
11        A.    I think it was about 10:30 at night, yeah.
12        Q.    And is this the incident that occurred on --
13   on June 20th?
14        A.    When the -- the kid was killed --
15        Q.    Okay.
16        A.    -- yes.
17        Q.    Was anybody in the -- the tech office when
18   that occurred?
19        A.    No.
20        Q.    Okay.
21              And did the police come out and, you know,
22   retrieve the bullets and that type of thing?
23        A.    They did.
24        Q.    Okay.
25              And did they do that -- when did they do
```

```
 1   that?
 2        A.   After -- after the bullets were shot.
 3        Q.   Okay.
 4             Was it within the -- a day or so?
 5        A.   Yeah, within a day, next day.
 6        Q.   The next day they came out?  Okay.
 7             And that building, remind me, is at the
 8   corner of Nagle and Pine?
 9        A.   Correct.
10        Q.   Okay.
11             So right across the street from the -- the
12   park.
13        A.   Yes.
14        Q.   Okay.
15             Did -- did the police officers talk to you
16   about the incident as the landlord?
17        A.   I -- not me, no.
18        Q.   Okay.
19             Do you know whether they talked to
20   Mr. Oaksmith or -- or Ms. Cronaeur?
21        A.   I think Jill Cronaeur dealt with it.
22        Q.   Did you know whether there were an arrest
23   made as a result of that shooting?
24        A.   I believe so, but I'm not sure.
25        Q.   And did you have any discussions with
```

Page 168

1     A.    Again, I -- I would not know whether it was
2  or was not.
3     Q.    (By Mr. Cramer)  Okay.
4           And like the building across the street,
5  this one is also outside the CHOP?  Is that fair?
6     A.    Correct.
7     Q.    Okay.
8           We don't have a map for the Coleman Auto
9  Building.  That was the one that was at 401 Pine
10 Street.  But looking at this map can you ballpark
11 where the Coleman Auto Building would be?
12    A.    Where -- what -- oh.  Oh, I know what
13 building it is, yes.
14    Q.    And -- and would it be correct if I were to
15 say that it's the building on Crawford and Pine across
16 Crawford from the label there that says, "Plant
17 Shop..."?
18    A.    Yes.
19    Q.    Okay.
20          Are you aware of any barricades that would
21 have prevented access to the Coleman Auto Building in
22 June of 2020?
23    A.    I -- I wouldn't know whether there were or
24 were not.
25    Q.    Okay.

```
 1              And are you aware of any calls for police or
 2   fire service to the Coleman Auto Building that went
 3   not responded to in June of 2020?
 4              MR. REILLY-BATES:  Objection; foundation.
 5       A.    I -- I wouldn't know whether there were or
 6   were not.
 7       Q.    (By Mr. Cramer)  Okay.
 8              And are you aware of any missed City
 9   services that occurred at the Coleman Auto Building in
10   June of 2020?
11              MR. REILLY-BATES:  Objection; foundation.
12       A.    Again, I -- I wouldn't know if there were or
13   were not.
14       Q.    (By Mr. Cramer)  Okay.
15              And as with the -- the Dunn Building and the
16   Greenus Building, you'd agree that the Coleman
17   Building is also outside of the CHOP, correct?
18       A.    Yes.
19       Q.    Okay.
20              We're going to look at 181, if you'll open
21   it.  And is this an offering for the Broadway
22   Building?
23              MR. REILLY-BATES:  We're still opening it.
24       Q.    (By Mr. Cramer)  Sorry.  Not for the whole
25   building.
```

```
 1   our street, but I'm asking you, the -- the street does
 2   not belong to Hunters Capital, correct?
 3            MR. REILLY-BATES:  Object to the form to the
 4   extent it -- you're -- you're not including the all of
 5   ours in that reference.  Mr. Malone is referring to
 6   all of ours as in the community's.
 7            MR. CRAMER:  I think Mr. Malone can testify
 8   for himself.
 9       A.   Well, I -- I don't have to testify.  It's
10   right there in the statement, our -- all of ours.
11       Q.   (By Mr. Cramer)  Okay.
12            But it's not BLM's.
13       A.   It's -- and it's not ours.  It's all of
14   ours.
15       Q.   So --
16       A.   It's --
17       Q.   -- it's -- you say, "It's our street,
18   sidewalk and park, all of ours.  Not" --
19       A.   Yes.
20       Q.   -- BLM's or anyone" --
21       A.   That's --
22       Q.   -- "else's."
23       A.   That's right.
24       Q.   So you're saying that --
25       A.   It's --
```

Page 262

1     Q.    -- it's --
2     A.    -- public.
3     Q.    Okay.
4           So BLM has a right to it.
5     A.    Of course.
6     Q.    Okay.
7           The -- the same right that you would have to
8  it, correct?
9     A.    Yeah.
10    Q.    Okay.
11          And you say, "We pay dollars in taxes to
12 MAINTAIN our streets..."
13          Do members of BLM also pay taxes to maintain
14 the streets?
15    A.    Well, I hope so.
16    Q.    Okay.
17          And those tax dollars that BLM pays, just
18 like you do, also go to maintain sidewalks, right?
19          MR. REILLY-BATES:  Object to the form; calls
20 for speculation, foundation.  How can he possibly know
21 that, Shane?
22    A.    Well, maybe you should identify BLM.
23    Q.    (By Mr. Cramer)  What are you referencing
24 when you're saying, "We pay dollars in taxes to
25 MAINTAIN our streets, sidewalks, safety and freedom of

```
 1                    C E R T I F I C A T E
 2   STATE OF WASHINGTON    )
                            )  ss.
 3   COUNTY OF KING         )
 4         I, the undersigned Washington Certified Court
 5   Reporter, hereby certify that the foregoing deposition
 6   upon oral examination of MICHAEL MALONE was taken
 7   before me on August 22, 2022, and transcribed under my
 8   direction;
 9         That the witness was duly sworn by me pursuant
10   to RCW 5.28.010 to testify truthfully; that the
11   transcript of the deposition is a full, true, and
12   correct transcript to the best of my ability; that I
13   am neither attorney for nor a relative or employee of
14   any of the parties to the action or any attorney or
15   counsel employed by the parties hereto, nor am I
16   financially interested in its outcome;
17         I further certify that in accordance with
18   CR 30(e), the witness was given the opportunity to
19   examine, read, and sign the deposition within 30 days
20   upon its completion and submission, unless waiver of
21   signature was indicated in the record.
22         IN WITNESS WHEREOF, I have hereunto set my hand
23   this 29th day of August, 2022.
24                         _____
25                         LAUREN G. HARTY, CCR #2674
```