# EXHIBIT 6

| | |
|---|---|
| **From:** | Reilly-Bates, Gabe |
| **Sent:** | Wednesday, September 7, 2022 1:38 PM |
| **To:** | Bryn Pallesen |
| **Cc:** | Calfo, Angelo; Eakes, Patty; Weaver, Tyler S.; Carriaga, Nancy; Rubin, Susan; Shane Cramer; Erica Iverson; Kellie McDonald |
| **Subject:** | Hunters Capital, et al. v. City of Seattle, et al.: Follow up on Recap of Meet and Confer Conference re: Chris Fisher |
| **Attachments:** | 2021-09-09 Gabe Reilly-Bates Letter to Cramer and Pratt re Meet and Confer.pdf; Hunters Capital v. City of Seattle: Meet and Confer Conference |

Hi Bryn,

Thanks for your email about Mr. Fisher.  Unfortunately, we have been trying to arrange for him to sit for his deposition since mid-May 2022, without any success.  Over the past four months, the City has constantly dodged and delayed his examination.  We can no longer delay in scheduling his deposition.  Please tell us the dates he is available to sit for a Zoom deposition, this afternoon, or we will be forced to file a motion to compel his deposition, in addition to other materials we have requested from Mr. Fisher.  We will be filing this motion in the WDWA pursuant to both our general discovery requests of the City and the personal subpoena of Mr. Fisher, despite Mr. Fisher's temporary residence in Washington DC, given that he remains a City employee and is represented by City counsel, and that our motion also involves requests of the City itself. This motion will also seek to compel produce all of Mr. Fisher's communications on his personal phone with City employees, and an image of his cell phone. We understand that we are at issue on these points also, unless we hear otherwise from you.

If you *already know* that data has been lost from Mr. Fisher's personal phone, we request you let us know today or tomorrow, and supplement the City's ROG responses to detail what data has been lost.  That may also obviate some of the need to perform a forensic examination, depending on the circumstances.

As for moving the deadline for filing a motion to compel, we do not believe there is a reason to extend the deadline with respect to Mr. Fisher.  As far as we know, we are at issue concerning our demands to (1) produce Mr. Fisher for his deposition, (2) to produce all texts and other communications between Mr. Fisher and City employees on his personal phone, and (3) produce his phone for forensic imaging.  We have steadfastly laid out our proposals for compromise, but you have not even responded substantively.   We had a meet and confer conference about these subjects more than a week ago which was the subject of several detailed emails from us (detailed below in the email chain).  We therefore will not stipulate to move the deadline for filing a motion to compel.  Time is running out.

In addition, almost a year ago, on September 9, 2021, we wrote to Mr. Cramer and your former colleagues asking the City to confirm that the parties are at issue with respect to the City's failure to collect and search employees' personal devices.  A copy of my letter dated September 9, 2021, is attached hereto (p. 4 contains the discussion of the City Employees' Personal Phones).  On September 27, 2021, we held a meet-and-confer conference with Mr. Cramer and some of your former colleagues.  At that time, the City confirmed that we were at issue with respect to the City's failure to preserve, collect and produce ESI from its employees.  Please also see the attached email dated September 28, 2021.  I'm writing you now to confirm that the City's position has <u>not</u> changed, and that the City still refuses to collect, preserve and produce ESI from its employees' electronic devices from this case.  We do not think that the City's position has changed on this issue, given the position it has taken with Mr. Fisher's phone, but let us know if it has.

We note that the evidence that City officials used their electronic devices for City business is plain, as we have received in various productions work related text messages from Jenny Durkan, Carmen Best and most recently Chris

1

Fisher' personal phones. We note that even though you had assured us that the City had asked its City employees to search their phones for documents, the City must not have done so, or Jenny Durkan, Carmen Best and Chris Fisher would have produced their documents by now. We believe we have previously exhausted all avenues of compromise on this subject, and we note that to date, the City has steadfastly refused to collect and search email from its employees' cellphones. If we do not hear from you by the end of the day, we will assume we are at issue and will proceed with our motion to compel. Please contact us at your earliest convenience if the City is willing to search (itself, with no self-collection) all of the City employees' cellphones in this case. If we do not hear from you, we may take all steps necessary.

Kind Regards,

Gabe

**Gabe Reilly-Bates**
**Morgan, Lewis & Bockius LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
Direct: +1.206.274.6429 | Main: +1.206.274.6400 | Fax: +1.206.274.6401 | Mobile: +1.312.714.0330
gabriel.reillybates@morganlewis.com | www.morganlewis.com
Assistant: Lixi Colmenero | +1.206.274.0137 | lixi.colmenero@morganlewis.com

**From:** Bryn Pallesen brynp@harriganleyh.com
**Sent:** Tuesday, September 6, 2022 3:35 PM
**To:** Reilly-Bates, Gabe gabriel.reillybates@morganlewis.com
**Cc:** Weaver, Tyler S. tyler.weaver@morganlewis.com; Carriaga, Nancy nancy.carriaga@morganlewis.com; Rubin, Susan susan.rubin@morganlewis.com; Colmenero, Lixi lixi.colmenero@morganlewis.com; Shane Cramer shanec@harriganleyh.com; Erica Iverson ericai@harriganleyh.com; Kellie McDonald KellieM@harriganleyh.com; Connie Jory conniej@harriganleyh.com
**Subject:** RE: Hunters Capital, et al. v. City of Seattle, et al.: Follow up on Recap of Meet and Confer Conference re: Chris Fisher

[EXTERNAL EMAIL]
Hi Gabe,

Shane would like to be on this call. I'm checking on his schedule, and it may be that we can talk on Thursday since Andrea Augustine's deposition has been postponed. I'll get back to you with some times as soon as I can. In the meantime, we agree that the discovery motion deadline should be continued at least a week for all parties given the amount of discovery that remains outstanding on both sides. Do you want us to put together a stipulation?

Thanks,
Bryn

**From:** Reilly-Bates, Gabe <gabriel.reillybates@morganlewis.com>
**Sent:** Tuesday, September 6, 2022 9:40 AM
**To:** Bryn Pallesen <brynp@harriganleyh.com>; Erica Iverson <ericai@harriganleyh.com>
**Cc:** Weaver, Tyler S. <tyler.weaver@morganlewis.com>; Carriaga, Nancy <nancy.carriaga@morganlewis.com>; Rubin, Susan <susan.rubin@morganlewis.com>; Colmenero, Lixi <lixi.colmenero@morganlewis.com>
**Subject:** RE: Hunters Capital, et al. v. City of Seattle, et al.: Follow up on Recap of Meet and Confer Conference re: Chris Fisher

Hi Bryn,

Thanks for your message.  I'm interested in discussing the subpoena to Mr. Fisher this morning.  Could you please let me know when it would be convenient for me to call this morning?

Thanks,

Gabe

**Gabe Reilly-Bates**
**Morgan, Lewis & Bockius LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
Direct: +1.206.274.6429 | Main: +1.206.274.6400 | Fax: +1.206.274.6401 | Mobile: +1.312.714.0330
gabriel.reillybates@morganlewis.com | www.morganlewis.com
Assistant: Lixi Colmenero | +1.206.274.0137 | lixi.colmenero@morganlewis.com

**From:** Bryn Pallesen <brynp@harriganleyh.com>
**Sent:** Friday, September 2, 2022 12:58 PM
**To:** Reilly-Bates, Gabe <gabriel.reillybates@morganlewis.com>; Erica Iverson <ericai@harriganleyh.com>
**Cc:** Weaver, Tyler S. <tyler.weaver@morganlewis.com>; Carriaga, Nancy <nancy.carriaga@morganlewis.com>; Rubin, Susan <susan.rubin@morganlewis.com>; Colmenero, Lixi <lixi.colmenero@morganlewis.com>
**Subject:** RE: Hunters Capital, et al. v. City of Seattle, et al.: Follow up on Recap of Meet and Confer Conference re: Chris Fisher

[EXTERNAL EMAIL]
Hi Gabe,

I'm emailing in response to both your August 30 email and your email from earlier today.  Chris Fisher has been out of the country since this past weekend and just returned last night.  We were able to connect with him today, and have additional information and thoughts on how to resolve your subpoena requests.  Are you able to discuss now or on Tuesday?

Additionally, I did want to correct one statement I made during our meet and confer.  Mr. Fisher currently is on assignment at the FBI in Washington, DC, but is still a City of Seattle employee.  I apologize for what was my misunderstanding with respect to his employment status.

Thanks,
Bryn

**From:** Reilly-Bates, Gabe <gabriel.reillybates@morganlewis.com>
**Sent:** Friday, September 2, 2022 11:29 AM
**To:** Bryn Pallesen <brynp@harriganleyh.com>; Erica Iverson <ericai@harriganleyh.com>
**Cc:** Weaver, Tyler S. <tyler.weaver@morganlewis.com>; Carriaga, Nancy <nancy.carriaga@morganlewis.com>; Rubin, Susan <susan.rubin@morganlewis.com>; Colmenero, Lixi <lixi.colmenero@morganlewis.com>
**Subject:** Hunters Capital, et al. v. City of Seattle, et al.: Follow up on Recap of Meet and Confer Conference re: Chris Fisher

Dear Bryn and Erica,

This is a follow up email to my email from Tuesday, August 30, 2022, concerning the scheduling of Chris Fisher's deposition and the production of an image of his phone for forensic imaging.

We have not received any dates from you concerning Mr. Fisher's deposition.  When will the City produce Mr. Fisher?  We had noted his deposition for August 30, but you did not produce him on that date.  Please give us several dates to choose from.

Please let us know if you are willing to provide us with an image of Mr. Fisher's iPhone that we could conduct forensic analysis upon, and from which we could extract text messages pursuant to the method suggested in my email below.  For the emails to City employees other than Chief Best and Mayor Durkan (which would be extracted and produced in their entirety), we propose using the search terms outlined in the paragraph below.

Regarding request no. 4, we are willing to propose the following search terms that would be run across Mr. Fisher's communications with all City witnesses: CHOP, CHAZ, protest, Autonomous, occupation, red zone, orange zone, police, police-free, George Floyd, Cal Anderson, violence, National Guard, Inslee, Trump, response time, armed, open carry, guards, Pine, Pike, barricade, barriers, homeless, black bloc, antifa, proud boys, odd fellows, Horace, Lorenzo, Anderson, Antonio, Mays, Durkan, JAD, JAMD, Jenny, Chief Best, East Precinct, Nagle, Broadway, Denny, 12th, 11th 13th, 10th, 14th, 15th, Union, West Precinct, graffiti, broke, fire, dumpster, ecoblock, jersey barrier, portapott, honey bucket, Rancho Bravo, encampment, tent, trash can, block, access, Raz, Omari, Blu dot, poquitos, Hunters Capital, Malone, text message, signal, telegram, spark, delete, wipe, reset, factor reset, 30-day, 30 day, retention settings, disable and delete, Arhu, Regi, Kennedy, Steel, Bashir, Loter, Ginger, Chen, Michelle, Braden, Heil, saltwater, water, tidepool, beach, kamalu, Rodney, homicide, rape, assault, Capitol Hill, Car Tender, Madrona, Oma Bop, Molly Moon's, Olive, Howell, SCC, Harvard, Madison, Unicorn, Elliot Bay Book, Gamestop, Blick, Bobby Morris, Queer Bar, Fleet Feet, Havana, Lost Lake, Café Racer, Momiji, E2, Tear gas, blast balls, flash bang, defund, and pump house.

Regarding request no. 5, are you planning on producing Mr. Fisher's studies and data relating to CHOP and CHAZ by the end of the day today?

Regarding request no. 6, are you planning on producing non-privileged communications about the preservation of Mr. Fisher's text messages today?

Regarding request no. 7, has Mr. Fisher determined whether or not he has any backups of his personal phone from June 2020 – present?

Regarding request no. 8, are you planning on producing a privilege log concerning Mr. Fisher's text messages?  If so, when can you produce it?

Regarding request no. 10, are you planning on producing Mr. Fisher's invoices today?  If not today, then when?

Thanks,

Gabe


**Gabe Reilly-Bates**
**Morgan, Lewis & Bockius LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
Direct: +1.206.274.6429 | Main: +1.206.274.6400 | Fax: +1.206.274.6401 | Mobile: +1.312.714.0330
gabriel.reillybates@morganlewis.com | www.morganlewis.com
Assistant: Lixi Colmenero | +1.206.274.0137 | lixi.colmenero@morganlewis.com



**From:** Weaver, Tyler S. **On Behalf Of** Reilly-Bates, Gabe
**Sent:** Tuesday, August 30, 2022 2:56 PM
**To:** 'Bryn Pallesen' <brynp@harriganleyh.com>; Erica Iverson <ericai@harriganleyh.com>
**Cc:** Weaver, Tyler S. <tyler.weaver@morganlewis.com>; Carriaga, Nancy <nancy.carriaga@morganlewis.com>; Shane Cramer <shanec@harriganleyh.com>; Calfo, Angelo <angelo.calfo@morganlewis.com>
**Subject:** Hunters Capital, et al. v. City of Seattle, et al.: Recap of Meet and Confer Conference re: Chris Fisher

Hi Bryn and Erica,

Here is a recap of our meet-and-confer conference last week regarding our subpoena to Chris Fisher. Please let me know if I have misstated anything at your earliest convenience. Thank you for confirming that Chris Fisher is no longer employed by the City of Seattle.

1. It is our understanding that the City will not produce Mr. Fisher on today, for his deposition, but the City will provide alternative dates by mid-week. I stated our preference to conclude the deposition prior to September 16, to give us plenty of time to incorporate parts of the transcript into our spoliation motion. If we cannot conduct the deposition prior to September 7, 2022, then we will need the City to extend the deadline for which Plaintiffs must file their motion to compel Mr. Fisher's production pursuant to the document requests contained in the subpoena. Please provide us with your dates at your earliest convenience.

2. Regarding request no. 1, Plaintiffs request a forensic image of Mr. Fisher's personal phone that he used for work purposes during June 2020 to the present (and multiple phones if he used more than one). Plaintiffs' expert would prepare a report under the terms of the DEA, but he would also extract any text messages, instant messages, social media messages or personal emails with City employees and produce them to Plaintiffs' counsel. For example, Plaintiff's expert would look at the SMS table to determine whether there have been any manual deletions from Fisher's phone. He would look at the settings history of the phone to determine whether or not Mr. Fisher's personal phone ever had a 30-day delete setting turned "on." We propose that we negotiate search terms that Leatha would use to extract text messages, instant messages etc. that may be on Mr. Fisher's phone that were not produced by him, but we would propose that Mr. Leatha extract all of the communications with former Chief Best and former Mayor Durkan. You said that the City was not willing to allow Plaintiffs to image Mr. Fisher's phone, but that you would consider proposing a search based on a limited scope. You said you would need to discuss that with your team and get back to us this week. We hope that our proposal outlined above offers your client a reasonable compromise. We said that we could use a list of phone numbers that the City has compiled through its text message reconstruction to ensure that only communications with City employees would be captured.

   a. You stated that you didn't understand why Plaintiffs should be entitled to image Mr. Fisher's device given Mr. Fisher's production last week of "all relevant text messages" on his phone. I responded that we are entitled to conduct a forensic image of Mr. Fisher's phone because the City did not search and or failed to search the phone in 2021, when the City had represented to Plaintiffs' counsel that City employees did not use their phones for work purposes and that it could not search employees' personal phones, but had requested that City employees provide responsive documents. Mr. Fisher did not previously provide any documents in 2021. It was only after Mr. Leatha identified Mr. Fisher's extensive use of a personal phone for work purposes that the City agreed to produce any documents from Mr. Fisher's personal phone. In addition, Mr. Leatha has detailed the extensive deletion of text messages on Mr. Fisher's work phone: (1) his phone was set to delete messages older than 30 days, (2) he manually deleted all of the text messages from his phone prior to turning it in, and (3) he factory reset his phone. In addition, I would add that the City initially explained that Mr. Fisher reset his phone on December 3, 2020, but Brandon Leatha uncovered evidence it had been deleted on November 2-3, 2020. Plaintiffs' counsel does not trust Mr. Fisher to be the sole arbiter of what is relevant or

responsive, given his history of missing text messages from his phone.  We need to review all of his previously undisclosed communications with City officials.

3.  Regarding request no. 2, Plaintiffs insist on obtaining Mr. Fisher's iCloud backups and running the same texts / searches as outlined above for any iCloud backup file that contains communications from June 8, 2020 to December 2020.  I believe that your response was the same as with request no. 1, that you would get back to us.  The City's forensic expert, Kevin Faulkner, may be able to easily confirm whether any such files even exist, or not.

4.  Regarding request no. 3, Plaintiffs insist on obtaining all communications, including any text messages, instant messages, social media messages or personal emails, between Fisher and the Individuals (Durkan, Best, Scoggins, Greening, Neafcy, Beauregard, etc.) from June 8, 2020 to the present.  You want to limit the search terms to CHOP, CHAZ and Protest, because now we are also looking at the spoliation issue and whether there was a coordinated effort to delete text messages and/or enable the 30-day delete setting (which Durkan and Best had also enabled).  We are willing to limit the scope of the extraction of Mr. Fisher's communications with the Individuals, pursuant to the terms outlined above, whereby we would provide search terms to our expert, Brandon Leatha, who would then extract the communications that hit up on the search terms.

5.  Regarding request no. 4, Plaintiffs are willing to provide additional search terms for this request, but we would note that that does not affect our request no. 1 to extract all communications between Fisher and Chief Best and Fisher and Durkan.   You said you would consider running broader search terms.

6.  Regarding request no. 5, Plaintiffs ask for all analysis documents created by Fisher relating to CHOP or CHAZ, including any spreadsheets, memoranda or emails.  We believed that a word search would not have a high likelihood of capturing these types of documents, and that Mr. Fisher should have them in his possession.  If he left them at the City, he should be able to point the City to them.  You said you would get back to me.  Can you please provide a response by the end of this week?

7.  Regarding request no. 6, Plaintiffs seek all communications regarding preservation and collection of Mr. Fisher's evidence, and we note that the request is not limited to Mr. Fisher's communications with Counsel for the City, but also includes his communications with other City officials, including Chief Best.  I also requested that you produce a privilege log by the end of this week.  You said you would consider this, but that a week was likely not enough time.  Can you please provide a response by the end of this week?

8.  Regarding request no. 7, the archiving, saving or backup of Mr. Fisher's electronic devices, we request that Mr. Fisher attempt to determine whether there are backups still available of his personal iPhone (preferably with the help of the City's forensic service provider, Kevin Faulkner), in the event that it turns out that there were messages that were manually deleted from Mr. Fisher's iPhone.

9.  Regarding request no. 8, seeking communications regarding this lawsuit, we note that the request is not limited to Mr. Fisher's communications with Counsel for the City, but also includes his communications with other City officials, including former Chief Best and/or former Mayor Durkan, or any of the Individuals.  I also requested that you produce a privilege log by the end of this week.  You said you would consider this, but that a week was likely not enough time.  Can you please provide a response by the end of this week?

10.  Regarding request no. 9, concerning documents concerning injury, harm or property damage done to any individual or resident within the CHOP zone, we will send you specific search terms, but we note that that does not supplant our request to recover all missing communications with City employees that may be recoverable through a forensic analysis.

11. Regarding request no. 10, concerning cellphone invoices from June – December 2020 for business or personal uses, you stated that Mr. Fisher would produce those that he still has access to, but you did not know whether he has access to them, or to what extent the invoices have call and text logs.

Thanks,

Gabe


**Gabe Reilly-Bates**
**Morgan, Lewis & Bockius LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
Direct: +1.206.274.6429 | Main: +1.206.274.6400 | Fax: +1.206.274.6401 | Mobile: +1.312.714.0330
gabriel.reillybates@morganlewis.com | www.morganlewis.com
Assistant: Lixi Colmenero | +1.206.274.0137 | lixi.colmenero@morganlewis.com




DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.



**Gabriel Reilly-Bates**
GabeR@calfoeakes.com
(206) 407-2223

September 9, 2021

<u>*Via Email*</u>

Shane P. Cramer
Kristin E. Ballinger
Caitlin B. Pratt
Ashley D. Burman
Harrigan Leyh Farmer & Thomsen LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104
shanec@harriganleyh.com
kristinb@harriganleyh.com
caitlinp@harriganleyh.com
ashleyb@harriganleyh.com

   Re: *Hunters Capital, LLC, et. al. v. City of Seattle, case no. 20-cv-00983-TSZ*

Dear Shane, Kristin, Caitlin and Ashley:

  We write to you in response to the City's supplemental Responses to Plaintiffs' Second Set of Interrogatories, the City's Responses to Plaintiffs' Third Set of Requests for Production and to follow up on some issues regarding the City's document production relating to Plaintiffs' Second Set of Requests for Production.  We would like to set up a meet-and-confer conference with you to discuss these issues and the bases for your claims of work product privilege over your third-party forensics service provider and the proposed Digital Examination Agreement that we provided to you on July 16, 2021.

***The Digital Examination Agreement***

  During our meet-and-confer conference on August 4, 2021, you indicated you had a redlined draft of the Digital Examination agreement that would be provided to us in the next couple days following the conference.  It has now been over a month.  What is causing the delay?  When can we expect to receive the draft?  We are eager to have our forensic expert examine Mayor Durkan and Chief Best's city-issued and personal electronic devices prior to their depositions. Also, to be clear, we would like access to both the electronic devices and the images collected.

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 2

***Crypsis' Reports, Communications and Documents***

We continue to believe that the City should produce Crypsis' reports, communications and documents for several reasons.  First, documents created in the ordinary course of business (including when required by statute or regulation) are not protected.  *The Universal Church, Inc. v. Standard Constr. Co. of San Francisco, Inc*, 14-CV-04568-RS (KAW), 2015 WL 6167968, at *4 (N.D. Cal. Oct. 21, 2015).   The City had to retain Crypsis in the ordinary course of business in order to comply with the document retention schedules mandated by the Public Records Act.  In fact, the Mayor's missing text messages were first discovered by Michelle Chen, not in the context of collecting evidence relating to this lawsuit, but in the context of responding to public records act requests.

In addition, to the extent that Fed. R. Civ. Proc. Rule 26(b) affords any protection to Crypsis' documents, we believe that "exceptional circumstances" exist that justify the production of Crypsis' documents.  Exceptional circumstances exist where "the condition observed by the expert is no longer observable," *Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 522 (N.D. Ill. 2005), where the costs of an independent examination "would be judicially prohibitive," *Vincent v. Mortman*, 2006 WL 2349448, at *2 (D. Conn. 2006), or where "there are no other available experts in the same field or subject area" *FMC Corp. v. Vendo Co.*, 196 F.Supp.2d 1023, 1046 (E.D. Cal. 2002).

First, due to its ephemeral nature, ESI that existed at the time Crypsis imaged electronic devices may no longer exist.  For example, iCloud backups continuously write over prior iCloud backups, and an iCloud backup obtained today might be quite different from one that could have been obtained last November 2020.

Second, we note that in this instance the cost and duration of Crypsis' investigation satisfy the "exceptional circumstances" standard.  The Seattle Times recently reported that, "The city attorney's office hired the Crypsis Group, a private contractor, last year to conduct a forensic analysis on that question. The work has cost the city **$201,000** as of July 31. The contractor's report, initially expected in late June, has yet to be released."   Kamb, Lewis; Beekman, Daniel; Brunner, Jim, *Mayor's office knew for months Durkan's phone setting caused texts to vanish, emails show*, Seattle Times, (Aug. 20, 2021), https://www.seattletimes.com/seattle-news/mayors-office-knew-for-months-durkans-phone-setting-caused-texts-to-vanish-emails-show/. (emphasis added).  Please let us know as soon as possible if the Seattle Times' figure for the cost of Crypsis is incorrect.  This astronomical sum, which is not even the final tally, is sufficient to satisfy the "judicially prohibitive" standard.

In addition, completing an independent analysis would take an inordinate amount of time. Crypsis started its investigation of the City's electronic devices in November 2020, yet their investigation has still not been completed, despite the passage of 10 months.  In the City's most recent supplemental answers to Plaintiffs' Second Set of Interrogatories, the City noted that "The

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 3

City's forensic review of [Chief Best's] device is ongoing and not yet complete." At the August 4, 2021 meet-and-confer conference you indicated that the investigation of Mayor Durkan's devices was still ongoing. It is simply not fair to Plaintiffs to conceal the massive loss of ESI from Plaintiffs at a late date in the history of the case and then expect Plaintiffs' forensic expert to spend the next 10-12 months attempting to unravel what the City already knows. There simply is not enough time left in discovery for Plaintiffs to spend 11-12 months investigating all of the Individuals' personal and City-issued devices.

Moreover, the City has refused to provide Plaintiffs' access to all of the City's witness' electronic devices. The City has had over a month to review Plaintiffs' proposed Digital Examination Agreement, but has failed to provide any comments to Plaintiffs' counsel. In addition, despite knowing of the potential loss of data in September 2020, the City failed to inform Plaintiffs' counsel of the loss until the spring of 2021, and failed to take appropriate safeguards to protect against the loss of other custodians' data, including the pivotal witnesses Scoggins and Beauregard. This amounted to an effective concealment of the information from Plaintiffs' counsel for months, during which counsel could have conducted its own forensic analysis of the City's electronic devices.

In addition, there may be other bases for showing "exceptional circumstances," such as when the condition observed is no longer observable. To the extent that those electronic devices were altered in any way by the actions of the City or its agents, or are no longer available, that would provide an additional basis for Plaintiffs' discovery of Crypsis's reports, documents and communications.

Please let us know whether we are "at issue" concerning Crypsis's documents. We would be willing to negotiate a production that would stop short of all of Crypsis's documents.

### *Privilege Log for the City's Document Collection and Preservation Efforts*

We recognize that the parties' protective order that was entered last December, as it is currently drafted, does not require the City to provide a log relating to its efforts to preserve documents. However, given the wholesale destruction of key evidence from the City's top decisionmakers, we intend to seek a revision to the protective order to require the City to log documents relating to its efforts to preserve and collect ESI and its forensic ESI efforts. At the time the protective order was entered, the City had not disclosed the problems it was having with Mayor Durkan and Chief Best's electronic devices, and it had not even discovered the loss of other custodians' ESI. This is all despite the fact that Plaintiffs had issued their first set of RFPs in August 2020 which were due at the end of September 2020. Had the City disclosed its problems in recovering the Mayor's ESI prior to the entry of the protective order in December 2020, we would have negotiated a protective order that required the City to provide a log of its efforts to collect and preserve ESI, as that is all relevant for purposes of a potential spoliation motion. Please let us know whether the City would be willing to renegotiate the protective order as it relates to

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 4

the City's efforts to recover the Individuals' ESI.  If the City is not willing to amend its position, then Plaintiffs intend to raise the issue with the Court.

### City Employees' Personal Phones

During our prior meet-and-confer conference, you asserted that the City had no obligation to search its employees' personal devices, and you confirmed that you had not collected ESI from any of the City employees' personal devices, except Beauregard and Scoggins.  Please confirm whether or not we are "at issue" with respect to the City employees' personal electronic devices and that the City does not intend to collect or preserve evidence from any of its employees' personal devices.

We continue to assert that the City is required to produce relevant evidence from the City's employees' personal devices because the City has control over its employees and there is evidence that City employees have used their personal devices for City related communications.  *See, for example, Alter v. Rocky Point Sch. Dist.*, No. 13-1100 JS AKT, 2014 WL 4966119, at *10 (E.D.N.Y. Sept. 30, 2014) (holding that "information should have been preserved on whatever devices contained the information (e.g. laptops, cellphones, and any personal digital devices capable of ESI storage)"); *Shim-Larkin v. City of New York*, 2019 WL 5198792, at *12 (S.D.N.Y. Sept. 16, 2019) (finding that failure to preserve evidence on personal phone constituted spoliation and warranted sanctions).  We also note that it would be incongruent with existing Washington authority which deems communications about City-related business to be a "public record" subject to preservation requirements of the PRA and applicable document retention schedules.

We have already determined that Mayor Durkan used her personal device for City-business related communications, and we have been informed that Chief Best has no text messages prior to May 2021, suggesting that she may have already deleted relevant evidence on her personal phone. While the City may take the position that its employees did not use their personal devices for City-related communications, the City has no way of verifying that as it has not collected or preserved any of its employees' personal ESI.

We request that the City reconsider its position, particularly in light of the wholesale spoliation of the Individuals' ESI on city-issued devices.

### Interrogatories

We have reviewed your supplemental responses with respect to the Plaintiffs' Second Set of Interrogatories. We have  several additional requests with respect to those responses.

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 5

1.      **Interrogatory No. 23**

Identify all of the City's personnel, including, without limitation, any IT staff, any third-party computer forensics vendor, and any staff of a third-party computer forensics vendor, who collected, investigated or reviewed data from Electronic Devices belonging to the Individuals. For each person so identified, state the dates that they were involved with the collection, investigation or review of the Individuals' Electronic Devices.

The City's Response to Interrogatory No. 23 is incomplete because it does not identify all of the persons with knowledge of the City's collection, investigation and review of the Individuals' Electronic Devices, and it does not state the specific dates of any of the individuals' involvement. Notably, the City's Response fails to provide the identities of the names of the employees of Crypsis who have been involved in the City's collection, investigation and review of the Individuals' Electronic Devices. This is basic foundational information.

Part of Interrogatory No. 23 requested that the City state "the dates that they were involved with the collection, investigation or review of the Individuals' Electronic Devices." The City previously listed 15 persons that were involved in the collection of ESI from the Individuals' Electronic Devices. The City's supplemental response only lists the dates that Evan Ward and Braden Heil were involved in the collection of ESI. In a number of instances, the City mentions a persons' involvement without providing the dates of their involvement. For example, on p. 6:2-3 of its Supplemental Responses, the City states "The City also worked with SPD IT personnel, Chris Steele and Brian Kennedy, on multiple occasions as part of its investigation into the missing text messages of SPD employees." The City does not provide any specific dates of the persons who worked on Mayor Durkan's phone. *See* the Supplemental Responses, p. 6:12 – 7:1. The City's response is incomplete in that respect. The interrogatory was designed to inform our decision as to whom we should depose to be more efficient for both sides. Please let us know if the City will provide additional information concerning the dates of individuals' involvement in the collection, investigation and review of the Individuals' Electronic Devices, or if we have reached an impasse.

2.      **Interrogatory No. 24**

Identify from which Electronic Devices the City collected electronically stored information from the Individuals. For each Electronic Device identified, state whether the device is a personal or City-issued device, provide the make and model of the device, the serial number, the date that the data was collected, and the volume of data collected from such Electronic Device.

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 6

In the table created by the City, there were several entries that the City indicated it "will supplement," but no supplemental answer has been provided yet.  Please let us know when the City will update that information.

We note that the City confirmed that it has only collected electronically stored information from the Individuals' City issued Electronic Devices, and not also their personal Electronic Devices.  As stated above, we ask that the City reconsider its position, collect ESI from its employees' personal electronic devices and accounts and supplement this interrogatory with that information.

4.      **Interrogatory No. 26**

Identify whether or not any of the Individuals also used their personal Electronic Devices for communications regarding CHOP and/or the CHOP zone.

The City stated in response to this interrogatory that "to the best of its current information and belief, none of the Individuals regularly or routinely used their personal devices to send or receive written communications relating to the conduct of the City of Seattle or the performance of any function by the City of Seattle. . . ."  Based on Mayor Durkan's document production from her personal electronic devices, we believe that this is not a correct statement.  Furthermore, as the City has admitted that it failed to collect and preserve any of its employees' personal devices ESI, we do not believe that the City has conducted a diligent inquiry.

Please confirm that the City does not plan on revising its response to Interrogatory No. 26 and that the parties are at issue.

6.      **Interrogatory No. 28**

Identify all of the locations and Electronic Devices that the City searched in an attempt to recover the lost text messages and data of Mayor Jenny Durkan, former Police Chief Carmen Best, Fire Chief Harold Scoggins and Idris Beauregard, state the dates upon which the searches were conducted and by whom.

The City's supplemental response to Interrogatory No. 28 states that the City and its litigation consultants searched Chief Best's iPhone "after counsel learned of the missing text messages in March 2021."  Did the City conduct searches on any other devices, such as Chief Best's computers, other electronic devices and/or iCloud account?  In numerous sections of its supplemental responses, the City indicates that its investigation of Chief Best's device is continuing and ongoing.  When will the City complete its investigation?  What other sources is it

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 7

looking at to preserve Chief Best's ESI?  When did the City communicate with Chief Best about whether she had responsive ESI on her personal electronic devices?

9.      **Interrogatory No. 32**

Identify any instant messaging platforms that the Individuals used from June 1, 2020 – July 8, 2020, to discuss any issues relating to CHOP or the CHOP zone.

When Plaintiffs conduct their forensic examinations of the City's employees' electronic devices, we will be looking for any such applications.  Please let us know if the City intends to supplement its response to Interrogatory No. 32 prior to such examinations.

11.      **Interrogatory No. 34**

Identify all of the City and the Individuals' actions taken to preserve evidence relating to the Lawsuit following June 25, 2020, including all efforts to preserve, collect and review any data contained on the Individuals' Electronic Devices. Separate your response by the unique actions taken by City and the Individuals.

Regarding Interrogatory No. 34, please confirm that the City did not instruct its employees to preserve evidence on their *personal* electronic devices, or on instant messaging applications.

12.      **Interrogatory No. 36**

State all actions taken by Mayor Jenny A. Durkan and / or the Mayor's Office's compliance with the PRA since January 1, 2017, including the preservation, collection, archiving and review of electronically stored data on Mayor Jenny A. Durkan's phone and other Electronic Devices. Include in your answer any directions that Mayor Jenny A. Durkan gave concerning the preservation and collection of her electronically stored data.

Please provide more detail relating to Michelle Chen, Kim Ferreiro, Stacy Irwin, Regi Alencastro and Emmanuel Arhu's efforts to investigate and recover Mayor Durkan's text messages.  Please also describe the steps taken by Braden Heil as a forensic analyst and the conclusions he reached concerning the Mayor Durkan's missing text messages.  Did Mr. Heil prepare any report or email detailing his findings concerning Mayor Durkan's electronic devices?

Please identify who specifically in the City's IT department performed a "factory reset" on Mayor Durkan's "cracked screen" iPhone 8 and the date and time that it was performed.  During

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 8

our August 4, 2021, meet-and-confer conference, you indicated that the date that the "factory reset" was performed would be included in the City's supplemental response, but it was not.  If there are any log documents or other records associated with the performance of the "factory reset," please provide that to us.  Also, please provide us with information about whether the "cracked screen" iPhone 8 was repaired and reissued to another City employee.

The City's response to Interrogatory No. 36 does not include any of Crypsis's efforts to recover the Mayor's missing text messages.  Please let us know if the City stands on its prior responses, or whether it will consider supplementing its response.

13.      **Interrogatory No. 37**

Identify all of the applications downloaded on the Individuals' Electronic Devices, including phones, that existed on their phones at any time from June 1, 2020 to the present.

The City's supplemental response is non-responsive to the extent that it states that "it understands that none of the Individuals downloaded and had on their phones other apps where messages would have been backed up."  The agreement was that the City would identify whether or not the Individuals had "file back up" applications on their phones, regardless of whether they could be used to back up messages.  Please confirm whether or not the Individuals had any file backup applications stored on their phones (such as DropBox or OneDrive).

**Document Requests**

Please let us know when you expect to make the City's final production of documents responsive to Plaintiffs' 2nd and 3rd Set of Requests to Produce Documents.

1.      **Request for Production Nos. 35 - 38**

Plaintiffs' counsel have reviewed the City's objections and agree that we should schedule a conference to discuss with the City's data specialists the format and extent of the data available. However, we do have some initial replies to the City's responses.

**RFP No. 35**:  Documents (including any databases) setting forth gross sales amounts and any Business & Occupation ("B&O") and/or sales taxes[1] paid by any businesses within the CHOP Zone, on a monthly basis, from January 2017 through June 2021.

With respect to the City's observation that the "precise extent of the CHOP Zone . . . is not clear,"  Plaintiffs have defined the "CHOP Zone" as "the area bound by the following streets: Denny Way, Union Street, Thirteenth Avenue, and East Broadway, as well as the areas within three blocks of the area bounded by those streets." *See* Plaintiffs' Third Set of Requests for

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 9

Production to Defendant City of Seattle, 6, ¶14.  In addition, the City has objected to Document Request No. 37 on the basis that "there is no reasonable means of limiting documents to 'businesses within [certain] zip codes.'"  In the interest of providing precise geographic areas and appropriate comparators, we suggest using the following geographic boundaries to produce information about taxes paid by individual businesses in these areas:

- Capitol Hill Occupied Protest (CHOP) – E. Broadway to Denny Way to 13th Avenue to E. Union Street to E. Broadway.

- Lower Capitol Hill –  E. Broadway to Madison Street to Boren Avenue to Pine Street to Melrose Avenue to E. Mercer to E. Broadway.

- Upper Capitol Hill – E. Broadway to E. Mercer Street to 15th Avenue E. to E. Roy Street to 23rd Avenue to E. Union Street to E. 13th Avenue to E. Denny Way to E. Broadway.

- Belltown – Broad Street to Denny Way to 4th Avenue to Stewart Street to Western Avenue to Broad Street

- Ballard –  NW 59th Street to 15th Avenue NW to Shilshole Avenue NW to NW Market Street to 28th Avenue NW to NW 59th Street

- Fremont – NW 42nd Street to Woodland Park Avenue N. to N. 42nd Street to Woodlawn Avenue N. to N. 34th Street to N. Canal Street to 1st Avenue NW to NW 36th Street to Leary Way to NW 42nd Street

- Citywide – data for all of the businesses operating within the City of Seattle.

We understand that the City has the capability of running a search based on addresses on a block.  For each street listed above, the area should include the address on both sides of the boundary streets, as well as all of the addresses for the blocks within the bounded areas.  We would like to discuss with the City's data specialists the search capabilities of the database in which the data is stored, and the different categories of data available.

With respect to the City's observation that the "taxes 'paid' by the relevant businesses may be different than taxes owed," we agree that we are more interested in the taxes owed, as a way to understand the gross sales amounts reported by businesses.  The "gross sales amounts" are the key data that Plaintiffs require for their damages analysis.

We should discuss the periodic reporting dates, as it was our understanding that the sales tax is collected on a monthly basis, and that the City has access to that data, even though it is administered by the State of Washington.

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 10

    With respect to the date range selected for RFP Nos. 35-37, we disagree that the time frame is not relevant.  To the contrary, it was selected to provide a comparison time period from both before CHOP and after CHOP.

    We do not understand your objection based upon Fed. R. Civ. P. 26(b)(4) and require clarification.

    **<u>RFP No. 36</u>**:  All reports that analyze or provide amounts of B&O or sales taxes paid citywide within the City of Seattle from January 2017 through June 2021.

    The City has lodged a number of objections.   We assume that the City conducts some review of the tax data that it has access to, and that such analysis is recorded in memoranda and / or reports.  We would invite the City to allow us to confer with the City's tax analysts (if they exist) in order to better understand what types or categories of reports are available.  If the City has a list of its internal reports analyzing tax issues from January 2017 through June 2021, we could identify and select them for production.

    **<u>RFP No. 37</u>**:  Documents (including any databases) setting forth gross sales amounts and any B&O and/or sales taxes paid by any businesses within the following zip codes (or equivalent areas or neighborhoods), from January 2017 through June 2021. . . .

    In lieu of providing data based upon zip codes, Plaintiffs have proposed other comparator areas as set forth above in response to RFP No. 35.

    With respect to the City's objection that it may not legally reveal individual taxpayer information, Plaintiffs do not require any identifying information for individual taxpayers, but request that the City provide the data on an individualized basis *without* identifying information. However, we would like the City to produce any industrial classification code information concerning the type of business to the extent it is available.  (for example, retail, restaurant, bar, etc.).   For example, if the City has a Standard Industrial Classification (SIC) codes, or North American Industry Classification System (NAICS) codes (or some other coding system), then it should produce those codes along with the data.  Again, we believe that a conversation with the City's data specialist could help inform a productive and efficient search.

    To the extent the City is withholding documents responsive to RFP No. 37 over which it asserts a privilege, Plaintiffs request that the City produce a privilege log.

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 11


**RFP No. 41**:  All documents evidencing Michelle Chen's participation in the collection, production and review of electronically stored information collected by the City for this lawsuit, and any disciplinary actions taken with respect to Ms. Chen's involvement in this lawsuit (this request is subject to supplementation in the event the City subsequently takes disciplinary action against Ms. Chen).

Please confirm that the City is (1) not producing any documents subject to this request and (2) not producing a privilege log.  While we understand that the protective order currently entered in this case does not require a privilege log for communications relating to the collection and preservation of evidence, we believe that we should revisit that issue given the City's recent disclosures concerning missing text messages.  Please let us know whether the City would be willing to amend the protective order to require a privilege log relating to the City's preservation efforts.


**RFP No. 42**:  All engagement / retention contracts between the City and Crypsis, and any documents or communication describing the scope of Crypsis's services.

Please confirm that we are at issue with respect to the City's engagement / retention contracts with Crypsis and any communications relating thereto.   We believe that we are entitled to these documents, which might show, for example, that Crypsis was retained in the ordinary course of business by the City relating to its obligations under applicable document retention schedules required by the PRA.  For example, when was Crypsis retained by the City formally?  What department retained Crypsis?  Was Crypsis already providing the City services as of June 2020?  Was Crypsis retained by City personnel for the purposes of recovering documents to be produced pursuant to the document retention schedules required by the PRA?  These documents go to the very existence of the privilege, as the privilege may not exist if the City was attempting to recover the documents in the ordinary course of business.  Moreover, it is highly doubtful that these retention agreements and / or communications contain any attorney-client or work product privileged information.  If the City intends to use Crypsis as a testifying expert witness, it will be required to produce documents responsive to RFP No. 42.


**RFP No. 43**:  All invoices submitted by Crypsis (or any other third-party computer forensic services provider such as Crypsis) from June 2020 through July 2021.

Please confirm that we are at issue with respect to Crypsis' invoices.   We believe that we are entitled to these documents, which might show, for example, that Crypsis was retained in the ordinary course of business by the City relating to its obligations under applicable document retention schedules required by the PRA.  For example, was Crypsis already providing the City services as of June 2020?  Was Crypsis retained by City personnel for the purposes of recovering

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 12

documents to be produced pursuant to the document retention schedules required by the PRA? These documents go to the very existence of the privilege.

**RFP No. 44**: All invoices submitted by any law firm (besides Harrigan Leyh Farmer and Thomsen) that provided legal advice relating to the subject of the City's lost or missing text messages to the City and / or the Mayor's Office from June 2020 through July 2021.

Please confirm that we are at issue with respect to other law firms' invoices relating to lost or missing text messages, or whether the City will consider producing redacted invoices. Not all of the information in an attorney's invoice is protected by an attorney-client or work product privilege. Attorney billing records are generally not protected by the attorney-client privilege insofar as they reveal "the identity of the client, the amount of the fee, identification of payment by case file name, and the general purpose of the work performed." *Arch Ins. Co. v. Scottsdale Ins. Co.*, at *3 (W.D. Wash. Aug. 13, 2010) (citing *United States v. Amlani*, 169 F.3d 1189, 1194 (9th Cir. 1999)); *Avocent Redmond Corp. v. Rose Elecs., Inc.*, 516 F. Supp. 2d 1199, 1202 (W.D. Wash. 2007) (citing *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) (Particular time entries are privileged only if they "reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services rendered, such as researching the particular areas of the law."). To the extent that invoices from other third-party law firms contain privileged materials, they may be redacted.

**Miscellaneous Issues**

*Damage to Mayor Durkan's iPhone 8*

During our August 4, 2021 meet-and-confer conference, we asked you how Mayor Durkan's city-issued iPhone 8 was damaged, and you said that you wanted to confirm those details prior to providing an answer. Can you provide any additional information about the damage done to Mayor Durkan's city-issued iPhone 8? For example, when was the phone damaged? What was the nature of the damage? How did the damage affect the phone's functionality? Where was the phone damaged? Were there any witnesses? Why was the phone replaced rather than being repaired?

*Mayor Durkan's 30-day Text Message Retention Setting*

During our August 4, 2021 meet-and-confer conference, we asked you about the retention setting on Mayor Durkan's city-issued iPhone 8. You indicated that the auto-delete setting had not been set by Mayor Durkan or by someone in the Mayor's office. Can you provide any more information about when and how the 30-day auto-delete setting was turned on for Mayor Durkan's

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 13

city-issued iPhone 8?  You had indicated that the City's forensic service provider was still looking into that issue.

*City-IT Department's Reports / Documents Relating to Mayor Durkan's Cell Phone*

During the meet-and-confer conference, you indicated that you would perform a targeted search for documents and any reports that were created by the City's IT department relating to their efforts to search for and recover Mayor Durkan's texts before Crypsis became involved.  To date, it does not appear that your document production has included contained any such documents.  Can you please let us know whether you intend to produce any documents created by the City's IT department relating to Mayor Durkan's cell phone, outside of those documents that may be recovered through a search of ESI?

*City's Targeted Search for Documents Responsive to RFP No. 26*

During the meet-and-confer conference, you indicated that you would be conducting a targeted search for communications relating to (1) the replacement of Mayor Durkan's iPhone 8 in July 2020 and (2) for Fire Chief Scoggins' visit to the Apple Store in the fall of 2020 to troubleshoot his locked iPhone.  We don't believe that any documents have been produced yet.  Is the City going to produce any documents that it retrieved from its targeted search, or will we only be receiving documents from the City's search for ESI?

*Determinations / Claim Summaries of Claims Submitted to the DFAS*

We received a production which included a number of claims that had been submitted to the DFAS.  We note that the vast majority of the claims the City produced were non-responsive as they were claims made by protestors or demonstrators for personal injuries, while RFP Nos. 29 and 30 asked for claims and determinations of claims made by *residents* or businesses "relating to damage of *property* in the CHOP zone." Only a small handful of the claims you produced were made by residents for damage to property within the CHOP zone.

In addition, it does not appear that you have produced any determinations of claims by third-party adjusters, determination letters, or summaries of claims.   Please let us know whether you are planning on producing them, and if you are going to withhold any documents on the basis of a privilege, then please let us know when you expect to produce a privilege log.

//        //        //

Harrigan Leyh Farmer & Thomsen LLP
September 9, 2021
Page 14


      We look forward to your prompt attention to these issues, and it is our hope that we can find a resolution of these discovery matters without engaging in any motion practice.  Please let me know when you are available to meet and confer on these topics.

      Sincerely,

      CALFO EAKES LLP



      Gabriel Reilly-Bates


cc:    Angelo J. Calfo
        Patricia Eakes
        Tyler S. Weaver
        Andrew DeCarlow
        Henry C. Phillips
        Art Harrigan
        Tyler Farmer