THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

HUNTERS CAPITAL, LLC, et al.,

                    Plaintiffs,

        vs.

CITY OF SEATTLE,

                    Defendant.

Case No. 2:20-cv-00983-TSZ

PLAINTIFFS' OPPOSITION TO CITY OF
SEATTLE'S MOTION FOR
SUMMARY JUDGMENT

**Noted: November 15, 2022**

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR
SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400    FAX +1.206.274.6401

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................... III

II.     BACKGROUND FACTS.............................................................................................. 1

        A.      The City Actively Encouraged and Supported CHOP............................................ 2

                1.      The City had full and immediate knowledge of the problems.................. 2

                2.      With full knowledge of what was going on, the City actively
                        supported the occupation. ...................................................................... 3

                        a.      The City created "Red Zones" for public-safety response............. 3

                        b.      The City provided creature comforts and medical supplies
                                to the occupation. .................................................................... 5

                        c.      The City permitted protesters to occupy public rights of
                                way and provided them enormous concrete blocks to help
                                them do it. ............................................................................... 5

                        d.      The City allowed occupiers to take over Cal Anderson
                                Park. ......................................................................................... 6

                        e.      The City fundamentally changed the delivery of city
                                services to accommodate the protests. .......................................... 6

                3.      The City provided encouragement to CHOP. ............................................. 7

        B.      CHOP Harmed Plaintiffs ......................................................................................... 8

        C.      The City's Map is Misleading at Best...................................................................... 8

III.    ARGUMENT ................................................................................................................ 9

        A.      Standard of Review.................................................................................................... 9

        B.      Summary Judgment is Not Appropriate on Plaintiffs' Negligence Claim .......... 10

                1.      There is at least a genuine issue of fact as to the applicability of the
                        failure-to-enforce exception to the public-duty doctrine. ........................ 10

                2.      The City is not entitled to discretionary immunity on Plaintiffs'
                        negligence claim. ..................................................................................... 14

        C.      Summary Judgment is Not Appropriate on Plaintiffs' Nuisance Claim.............. 15

        D.      Summary Judgment Is Not Appropriate on Plaintiffs' Substantive-Due-
                Process Claim............................................................................................................ 17

                1.      There are genuine issues of material fact as to whether the City left
                        Plaintiffs in a more dangerous situation.................................................. 17

                2.      There are genuine issues of material fact as to whether the risk of
                        harm was foreseeable. ............................................................................. 18

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - i

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

## TABLE OF CONTENTS
(continued)

<div align="right">**Page**</div>

3.    There are genuine issues of material fact as to whether the City was deliberately indifferent.......................................................................... 21

E.    Summary Judgment is Not Appropriate on Plaintiffs' Takings Claim................ 23

1.    Genuine Issues of Material Fact Exist as to Plaintiffs' Access Claim........................................................................................................ 23

2.    Genuine Issues of Material Fact Exist as to Plaintiffs' Pre Se Taking Claim ............................................................................................ 26

F.    Summary Judgment is Not Appropriate on Plaintiffs' Procedural-Due-Process Claim................................................................................................... 27

G.    The City Is Not Entitled to Summary Judgment on the Basis of Causation........ 29

1.    There are genuine issues of material fact preventing summary judgment as to proximate cause........................................................... 29

2.    The acts of third parties were foreseeable............................................... 32

IV.    CONCLUSION.......................................................................................................... 32

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................9

*Atherton Condo.Apartment-Owners Ass'n Bd of Directors v. Blume Dev. Co.*,
155 Wn.2d 506 (1990) ..........................................................................................16

*Attwood v. Albertson's Food Centers, Inc.*,
92 Wn.App. 326 (1998) .........................................................................................30

*Behla v. R.J. Jung, LLC*,
11 Wn.App.2d 329, 334 (2019) .............................................................................13

*Benanav v. Healthy Paws Pet Ins. LLC*,
2022 WL 3577400 (W.D. Wash., Aug. 19, 2022) ..................................................11

*Bernethy v. Walt Failor's, Inc.*,
97 Wn.2d 929 (1982) .............................................................................................30

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915)..........................................................................................28, 29

*Bldg. 11 Invs. LLC v. City of Seattle*,
912 F. Supp. 2d 972 (W.D. Wash. 2012) ...............................................................23

*Bols v. Newsom*,
515 F. Supp. 3d 1120 (S.D. Cal. 2021)...................................................................29

*Buchanan-Moore v. Cnty. of Milwaukee*,
570 F.3d 824 (7th Cir. 2009) .................................................................................20

*Campbell v. City of Bellevue*,
85 Wn.2d 1 (1975) .................................................................................................11

*Campbell v. State of Washington Dep't of Soc. & Health Servs.*,
671 F.3d 837 (9th Cir. 2011) .................................................................................18

*Cedar Point Nursery v. Hassid*,
141 S.Ct. 2063 (2021).......................................................................................25, 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................9

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - iii

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985) ...........................................................................................27, 28

*Collins v. City of Harker Heights*,
  503 U.S. 115 (1992) ..................................................................................................23

*Dep't. of Nat. Res. v .Thurston Cnty.*
  92 Wn.2d 656 (1979) .................................................................................................24

*DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*,
  489 U.S. 189 (1989) ..................................................................................................18

*Donohoe v. State*,
  135 Wn.App. 824 (2006) .....................................................................................13, 14

*Ehrhart v. King Cnty.*,
  195 Wn.2d 388 (2020) ...............................................................................................10

*Emsley v. Army Nat. Guard*,
  106 Wn.2d 474 (1986) ...............................................................................................14

*Evangelical United Brethren Church of Adna v. State*,
  67 Wn.2d 246 (1966) ............................................................................................14, 15

*Fuda v. King Cnty.*,
  2017 WL 4480779 (Wn. Ct. App 2017) ...................................................................15

*Goldmark v. McKenna*,
  172 Wn.2d 568 (2011) ...............................................................................................10

*Gorman v. Pierce Cnty.*,
  176 Wn.App. 63 (2013) .......................................................................................10, 14

*Grundy v. Thurston Cnty.*,
  155 Wn.2d 1 ...............................................................................................................16

*Haberle v. Troxell*,
  885 F.3d 170 (3d Cir. 2018) ......................................................................................23

*Haberman v. WPPSS*,
  109 Wn.2d 107 (1987) ..........................................................................................14, 15

*Halleran v. Nu W., Inc.*,
  123 Wn.App. 701 (2004) ...........................................................................................14

*Halverson v. Skagit Cnty.*,
  42 F.3d 1257 (9th Cir. 1994) ...............................................................................28, 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - iv

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*Harris v. Cnty. of Riverside*,
   904 F.2d 497 (9th Cir. 1990) ...................................................................28, 29

*Hernandez v. City of San Jose*,
   897 F.3d 1125 (9th Cir. 2018) ...........................................................................20

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*,
   542 F.3d 529 (6th Cir. 2008) .............................................................................23

*Johnson v. City of Seattle*,
   474 F.3d 634 (9th Cir 2007) .......................................................................18, 27

*Keiffer v. King Cnty.*,
   89 Wn. 2d 369 (1977) ..................................................................................23, 24

*Kelly v. City of Port Townsend*,
   2011 WL 1868182 (W.D. Wash. May 16, 2011).................................................24

*Kim v. Budget Rent a Car Systems*,
   143 Wn.2d 190 (2001) .......................................................................................32

*Kitsap Cnty. v. Kitsap Rifle & Revolver Club*,
   184 Wash. App. 252 (2014) ...............................................................................16

*Lacey v. Maricopa Cnty.*,
   693 F.3d 896 (9th Cir. 2012) .............................................................................32

*Lewis v. Krussel*,
   101 Wn.App. 178 (2000) ....................................................................................16

*Livingston v. City of Everett*,
   50 Wn. App. 655 (1988) .....................................................................................11

*Lombardi. Guertin v. State*,
   912 F.3d 907 (6th Cir. 2019) .............................................................................23

*Lombardi v. Whitman*,
   485 F.3d 73 (2d Cir. 2007)..................................................................................22

*Londoner v. City & Cnty. of Denver*,
   210 U.S. 373 (1908).............................................................................................28

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982).............................................................................................26

*Mackie v. City of Seattle*,
   19 Wn.App. 464 (1978) .......................................................................................24

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - v

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*Mancini v. City of Tacoma,*
196 Wn.2d 864 (2021) ...........................................................................15

*Martinez v. City of Clovis,*
943 F.3d 1260 (9th Cir. 2019) ...........................................17, 18, 20, 21

*Mason v. Bitton,*
85 Wn.2d 321 (1975) .............................................................................11

*Miotke v. City of Spokane,*
101 Wn.2d 307, 678 P.2d 803 (1984)...................................................15

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
339 U.S. 306 (1950)...............................................................................27

*Mustoe v. Ma,*
193 Wn.App. 161 (2016) .......................................................................16

*Nicholson v. City of Los Angeles,*
935 F.3d 685 (9th Cir. 2019) ................................................................21

*Pande Cameron & Co. of Seattle v. Cent. Puget Sound Reg'l Transit Auth.,*
610 F. Supp. 2d 1288 (W.D. Wash. 2009)............................................24

*Portman v. Cnty. of Santa Clara,*
995 F.2d 898 (9th Cir. 1993) ................................................................27

*Preston v. Boyer,*
2019 WL 8060201 (W.D. Wash. Nov. 27, 2019) ................................15

*Robb v. City of Seattle,*
176 Wn.2d 427 (2013) ...........................................................................32

*Shields v. Spokane Sch. Dist. No. 81,*
31 Wn.2d 247 (1948) .............................................................................16

*Sinaloa Lake Owners Ass'n v. City of Simi Valley,*
882 F.2d 1398 (9th Cir. 1989), *overruled on other grounds by Armendariz v. Penman,* 75 F.3d 1311 (9th Cir. 1996) ..................................................29

*Sun Oil Co. v. United States,*
215 Ct.Cl. 716, 572 F.2d 786 (1978) ....................................................23

*Taggart v. State,*
118 Wn.2d 195 (1992) ...........................................................................14

*Tauscher v. Phoenix Bd. of Realtors, Inc.,*
931 F.3d 959 (9th Cir. 2019) ..................................................................9

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - vi

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*U.S. Oil Trading, LLC v. State, Off. of Fin. Mgmt.*,
  159 Wn.App. 357 (2011) ............................................................................................14

*U.S. v. Causby*,
  328 U.S. 256 (1946) ...................................................................................................26

*Walker v. State*,
  48 Wn.2d 587 (1956) ..................................................................................................24

*Washburn v. City of Fed. Way*,
  178 Wn.2d 732 (2013) ................................................................................................32

*White v. Roper*,
  901 F.2d 1501 (9th Cir. 1990) ...................................................................................32

*Williams Place, LLC v. State ex rel. Dep't of Transp.*,
  187 Wn.App. 67 (2015) ..............................................................................................24

*Wood v. Ostrander*,
  879 F.2d 583 (9th Cir. 1989) .....................................................................................20

**Statutes**

RCW 7.48.160 .................................................................................................................16

Seattle Municipal Code § 15.52 ...............................................................................12, 13

**Other Authorities**

Fed. R. Civ. P. 56 .............................................................................................................9

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - vii

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1

## I.   INTRODUCTION

In June 2020, the City of Seattle did what no other American city has ever done:[1] it allowed a group of armed protesters to occupy a city neighborhood, declared that its police and fire departments would not enter the area unless there was a "mass casualty,"[2] and then physically assisted that occupation and encouraged it to grow and persist.[3] The City aided and abetted that occupation for more than three weeks despite having full knowledge of the anarchy caused by it, who was being harmed by it, and how they were being harmed. The City has never admitted its folly, and now attempts to pawn off its actions on the Court as a triumph.

But the City abandoned its duties to its citizens in favor of a hostile occupation. It had a duty to act under its own Fire Code and its permit-application process, but it chose to shirk it, giving rise to Plaintiffs' claim for negligence. It provided porta-potties, barriers, and other sustenance to the occupation, thereby creating a nuisance for all who lived and worked in the area. And it did it with deliberate and shocking indifference for those afflicted individuals, giving rise to Plaintiffs' substantive-due-process claim. Moreover, this all involved damage to, and invasion of, property and deprivation of liberty and other rights, giving rise to Plaintiffs' taking and procedural-due-process claims. The City's motion tries to ignore and evade the truth and rely on technical legal arguments to dismiss these claims, but the City's arguments fail for the common reason that the City's action in supporting the occupation of Capitol Hill was so complete, pervasive, and damning, that Plaintiffs easily clear every hurdle the City has erected.

## II.   BACKGROUND FACTS

On the afternoon of June 8, 2020, the Seattle Police Department ("SPD") evacuated the East Precinct on the corner of Twelfth Avenue and E. Pine Street. *See* Declaration of Tyler Weaver in Support of Plaintiffs' Opposition to the City's Motion for Summary Judgment ("Weaver Decl."),[4] Ex. 4, 38:9-40:9 (Sixkiller). The SPD left behind barriers in the streets that

---

[1] Ex. 1, 172:20-:23 (City expert) (Stoughton); Ex. 2, pp. 23, 26 (Shane report)
[2] Ex. 3.
[3] §§ II.A.1, *infra*.
[4] All "Ex." references throughout this brief are to exhibits to the Weaver Decl. unless otherwise noted.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 1

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

had been used to protect the Precinct. Ex. 5, 12:23-13:20 (Zimbabwe). These barriers were commandeered by protesters who repurposed them to block streets and sidewalks and manned them with guards who monitored ingress and egress in the area. *Id.*, 15:13-17:22, 27:9-:17. They declared the area to be their sovereign property, and it eventually became known as the Capitol Hill Occupying Protest, or "CHOP." Ex. 6, 33:12-35:1 (Best Dep.). As the City has acknowledged, this had major ramifications for the area bounded by Broadway Avenue, Denny Way, Thirteenth Avenue, and E. Pike Street. Ex. 7, p. 2. This case is about what the City did to assist that occupation, to the detriment of those who lived and worked there.

### A.    The City Actively Encouraged and Supported CHOP

#### 1.    The City had full and immediate knowledge of the problems.

The City knew exactly what was happening in the area. City executives were on the scene daily and reporting back. Starting on June 9, 2020, Fire Chief Harold Scoggins, Transportation Director Sam Zimbabwe and Seattle Public Utilities CEO Mami Hara, and others were in the area every day observing what was going on and working with the occupiers. Ex. 8, 137:19-139:21 (Scoggins); Ex. 9, 94:6-97:18 (Hara); Ex. 5, 33:12-34:21, 58:17-60:9, 213:4-215:3 (Zimbabwe). They shared their observations with the mayor and her deputies. Ex. 8, 141:2-142:5 (Scoggins); Ex. 9 at 98:21-99:24 (Hara); Ex. 5 at 84:4-87:19 (Zimbabwe); Ex. 10 at 92:22-95:2 (Durkan); Ex. 11 at 136:3-:10 (Wells).

Because of this, the City knew immediately, no later than the morning of June 9, that the streets had been blocked off with barriers, dumpsters, and cars, and that armed people had declared the neighborhood an "autonomous zone" that later became known as "CHOP." Ex. 12, 15:6-:21, 90:11-91:22 (Mahaffey); Ex. 8, 191:11-:19 (Scoggins); Ex. 5, 16:15-17:22, 64:5-:23 (Zimbabwe). As early as the night of June 8, Chief Scoggins noted the area had "transitioned from a peaceful protest to an area that is unstable" because of "multiple people [with weapons] on the access and egress points." Ex. 8, 167:8-168:8. *Also* Ex. 13.

The City also knew on June 11, as Chief Best announced, that CHOP "deprive[d] an

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 2

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

entire segment of our community of public-safety services" and caused 9-1-1 response times to triple.[5] The City also knew businesses were reporting reduced business, loss of revenues, customers and employees too frightened to come to work, access problems, intimidation from protesters, broken windows, fires, graffiti, and numerous other ailments as a result of CHOP. Ex. 11, 127:7-131:16, 134:21-135:6, 168:4-:25 (Wells). *Also id.*, 169:2-170:19 (businesses in extreme distress, far in excess of what they felt from COVID). The City was also aware of reports that as night fell, the noise would increase as it turned into a "party environment" with loud music and amplified speeches, Ex. 5, 73:23-74:12 (Zimbabwe), in addition to the events at Cal Anderson Park discussed in § II.A.2.d, *infra*.

> ### 2. With full knowledge of what was going on, the City actively supported the occupation.

Despite being armed with real-time knowledge of what was happening, the City chose to "facilitate" the protests, Ex. 7 at p. 2, with the objective of "[c]ontinuing the existing footprint of peaceful demonstration and rights." Ex. 14 at p. 2. That facilitation included at least the following affirmative acts from the City.

> ### a. The City created "Red Zones" for public-safety response.

In order to protect its employees[6] at the expense of the neighborhood, the City created public-safety "Red Zones" into which police and fire response was essentially nonexistent. Beginning no later than June 12, 2020, the SPD announced it would not enter its Red Zone except in the event of a "mass casualty event (e.g. active shooter, structural fire likely to endanger human lives etc.)." Ex. 3 at p. 2.[7] Thus, except in "mass casualty" incidents,[8] officers

---

[5] https://www.youtube73.com/watch?v=_rE4VMjClqI, at 14:22. (Last visited 10/20/2022.)

[6] Ex. 12, 18:2-:9 (Mahaffey); Ex. 8, 62:9-:21 (Scoggins).

[7] The City claims the SPD "attempted to reenter the precinct" on June 9. That is untrue. On June 9, the SPD sent two officers to see what was going on, they spoke with armed individuals who indicated the area was now an autonomous zone. The officers then simply left. Ex. 12, 15:6-:22, 54:13-:21, 90:11-91:3, 92:2-93:3 (Mahaffey); The only other attempt by police to reoccupy the precinct before July 1 was to send two officers into the precinct. They also left shortly thereafter, without even telling anyone they had done so. *Id.*, 96:9-98.

[8] None of the following were "mass casualty events" requiring an in-person response under this policy: rape, kidnapping, sexual assault, assault with few victims, firing of a weapon where nobody was killed, arson with no

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 3

Morgan, Lewis & Bockius LLP
Attorneys at Law
1301 Second Avenue, Suite 2800
Seattle, Washington 98101
Tel +1.206.274.6400    Fax +1.206.274.6401

did not respond or required victims to leave the area to report it. *Id.* This remained City policy until July 1, 2020. Exs. 12, 40:25-41:14; 15 at pp. 4, 15;

The SPD also modified its response outside this area. All calls in the Class Area required a minimum of 4 officers to respond, Ex. 3, p. 2, and then police still did not respond to incidents outside the Red Zone if there was any chance it would require interaction with the occupiers. *E.g.,* Ex. 12, 38:12-:23 (Mahaffey); Ex. 16, p. 2 (no response because of proximity to zone and "disturbance [with] armed participants). Chief Mahaffey, a 30(b)(6) designee, could not name a single instance in which police had responded in person to a crime in CHOP other than in response to two shootings. Ex. 12, 31:7-32:1.

The Seattle Fire Department ("SFD") had a similar policy and considered the entire Class Area either a "hot/red" or "warm/yellow" zone, where there would be no or significantly modified responses. Ex. 17, p. 3;[9] Ex. 8, 36:5-38:24 (Scoggins). Within the "red" portion of the SFD zone, the SFD would not enter at all without a police escort. Ex. 8, 46:24-47:14 (Scoggins). And in the "yellow" area, the SFD required any team entering the area to include a battalion chief, of which there were only six on duty for the entire City. *Id.*, 43:8-:18, 45:2-46:12. Even then, the SFD still did not enter the yellow zone, even with a battalion chief, if there was spillover from the red area that made it unsafe. *Id.,* 69:3-70:3. So in June 2020, people who lived a block from the Capitol Hill fire station and called 9-1-1 with a stroke or heart attack were told they had to get out of the zone themselves before they could get treatment. *Id.,* 63:1-66:19, 78:9-81:4; Exs. 18, 19. Even in cases where there was an event police and fire would respond to, they often failed to do so because of the presence of "hostile crowds, including armed individuals and obstructions." Ex. 7 at p. 2.

---

threat to life, and a large disagreement involving individuals with weapons who were not firing them. Ex. 12 at 19:18-22:20 (Mahaffey).

[9] The City claims the SFD "red zone" was only four blocks. MSJ at 4. That may have been the original plan, but the eventual area was much larger. *See* Ex. 17, p. 3 . And even then, in practice it was even larger. § II.C, *infra*.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 4

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

**b.      The City provided creature comforts and medical supplies to the occupation.**

The City made the occupiers' stay at CHOP as comfortable as possible. The City provided 21 portable toilets throughout the neighborhood, through outside contractors and at the City's expense, and made sure they were emptied daily. Ex. 9, 70:7-75:17 (Hara); Ex. 20. The City also provided occupiers with wash stations, Ex. 9, 63:25-64:18 (Hara), provided the occupiers with dumpsters and garbage service, *id.*, 27:4-:22, 29:23-30:24, and allowed protesters to use a hose bibb at Cal Anderson Park for an illegal garden and as a source of drinking water. *Id.*, 63:18-65:18. The City kept lights on beyond normal hours to provide additional safety for people camping in the park, *id.*, 67:4-68:1, and allowed occupiers to access power panels for charging cellphones and other uses. Ex. 4, 173:41-174:10 (Sixkiller). The City even provided stretchers, people movers, and fire extinguishers from the SFD to the occupiers to use in their volunteer medical tent. Ex. 8, 9:6-18:20 (Scoggins).

**c.      The City permitted protesters to occupy public rights of way and provided them enormous concrete blocks to help them do it.**

The City actively worked with the occupiers to replace the barriers CHOP had commandeered with larger, heavier concrete barriers on a slightly different layout.[10] City executives worked "to develop … what we felt was a traffic control plan … [that would] sort of regularize[] a protest area that might stay closed" "for … an indeterminate period of time." Ex. 5, 33:12-34:21 (Zimbabwe). To that end, on June 16 and 17, the City moved 50 to 100 "ecology" blocks, weighing several hundred pounds each, into the public streets to mark off territory for the occupation and also installed a new stop sign. *Id.*, 15:3-:12, 35:6-37:7. These barriers were equipped with plywood sheaths intended to give occupiers more surfaces to spray graffiti on. *Id.*, 47:1-:20.

The City also placed signage indicating that the streets were closed and "local access"

---

[10] The City claims that by June 10, the City had established ready to access to every building in the area. MSJ at p. 3. That is untrue. *See, e.g.* Ex. 30 (partial transcript of June 13 meeting in which Chief Scoggins detailed the streets that were blocked, the pervasive access problems, and how any prior attempts to improve the situation were foiled by occupiers who simplify fortified their positions with cars and other barriers).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 5

**Morgan, Lewis & Bockius LLP**
Attorneys at Law
1301 Second Avenue, Suite 2800
Seattle, Washington 98101
Tel +1.206.274.6400   Fax +1.206.274.6401

only "to communicate to people … that … if they didn't need to come in that way, … they probably shouldn't." *Id.*, 37:11-39:9. The City even installed speed bumps to slow traffic and told online map services to indicate the area was closed. *Id.,* 40:14-41:21, 90:10-93:1.

The City also did not move vehicles from the streets when protesters used them to fortify the barriers, allowed tents and makeshift tent vendors to set up shop on public sidewalks, and accepted that protesters and others would regularly congregate in the streets that were supposedly open. *Id.*, 26:20-27:2, 29:15-:21, 39:3-40:12, 44:8-49:20, 120:20-121:14. Indeed, even after the City set barriers to theoretically allow better ingress and egress in the area, protesters regularly moved the barriers around the neighborhood to block additional streets. *Id.*, 45:22-49:10; 118:18-119:23, 211:1-213:3.

> d.     **The City allowed occupiers to take over Cal Anderson Park.**

It was clear from the beginning of the occupation that there was a major, long-term encampment being installed at Cal Anderson Park, and it was not merely the unhoused occupying the park. Notes from a meeting of City executives on the morning of June 10 noted that "there are concerns about the level of permanent activity at the park. There are at least 27 tents on site and a group was digging a community garden." Ex. 21, p. 2. On June 15, the Parks Department lead for the response to CHOP wrote, "over the last week Cal Anderson has completely transformed. It has over 50 tents … graffiti covering every surface, … cars parked on the grass and an accumulation of thousands of pounds of trash everyday." Ex. 22, p. 3. The number of tents in the park ballooned to perhaps 200 at one point. Ex. 4, 188:5-189:8 (Sixkiller).

> e.     **The City fundamentally changed the delivery of city services to accommodate the protests.**

The City also reduced services such as garbage in order to avoid disrupting the occupiers. The modifications to garbage services started almost immediately when the City removed most customers' dumpsters indefinitely out of a fear that the dumpsters would be set on fire or used as barriers. Ex. 9, 22:9-24:11 (Hara). For at least some customers, they were without their

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 6

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

dumpsters until July 1, and had to use one of a few dumpsters that the City had set in the area for everyone (including the occupiers) to use or put their garbage in a designated area where garbage bags would be piled. *Id.*, 24:20-27:22. Even then, there were some days where the City did not empty those dumpsters, or clear the bag piles, or perform standard electrical work because the City determined it was unsafe or would be "disruptive to [CHOP meetings] to have a trash truck rolling through." *Id.*, 16:24-17:24, 27:23-28:20, 137:16-140:22. When trucks did enter the area, Ms. Hara had to negotiate that entry – or, in her words, "concierge" entry – by working with the occupiers. *Id.*, 38:2-43:6 (Hara Dep.).

### 3.    The City provided encouragement to CHOP.

In addition to this direct support, the City also gave the occupiers rhetorical support which conveyed that the City did not believe the occupation was harmful and there was no plan to end it. Foremost in this support was then-Mayor Jenny Durkan. She repeatedly compared the occupation to a "block party"[11] and when asked on national news on June 12 about when the occupation might end, she replied, "I don't know, we could have a Summer of Love."[12] Mayor Durkan's official Twitter account portrayed the situation as a "peaceful expression of … collective grief"[13] featuring "food trucks, spaghetti potlucks, teach-ins, and movies,"[14] and showed her support of the illegal garden that had been dug into the Cal Anderson Park turf.[15]

Meanwhile, at the same time, Mayor Durkan was looking to gift property to Black Lives Matter ("BLM"). The City's initial plan was to gift the East Precinct itself to BLM, Ex. 4, 30:1-36:6 (Sixkiller); Ex. 23, but after BLM rejected that space, the City explored – at the mayor's suggestion – various other options. This included assuming the lease of a shared-workspace business in which Mayor Durkan had been an investor, and then giving the space to BLM. Ex.

---

[11] https://www.youtube.com/watch?v=6YHN4fN0cgA, at 21:00 (most recently visited 10/24/2022); https://www.youtube.com/watch?v=JXjvrkmXd4s, at 3:24 (most recently visited 10/24/2022).

[12] https://www.youtube.com/watch?v=JXjvrkmXd4s, at 9:42 (most recently visited 10/24/2022).

[13] https://twitter.com/mayorjenny/status/1271226494858129409?lang=en (most recently visited 10/24/2022).

[14] https://twitter.com/mayorjenny/status/1271226613170966529 (most recently visited 10/24/2022).

[15] https://twitter.com/mayorjenny/status/1271653002982469632?lang=en (most recently visited 10/24/2022).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 7

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1    10, 123:24-129:2 (Durkan); Ex. 24.

2         **B.    CHOP Harmed Plaintiffs**

3         Although the City's motion does not focus on it, it is important to note that all Plaintiffs

4    were harmed by the City's actions in facilitating CHOP. As the City admits, MSJ at 29,

5    Plaintiffs' expert has documented more than $3 million in collective damages for Plaintiffs. *See*

6    *also* Declaration of Arik Van Zandt; Declaration of Matthew Ploszaj, ¶ 3 (seeking damages for

7    mental distress). Plaintiffs discuss this harm in detail as relevant to the City's motion (*e.g.,* §§

8    III.E.1, E.2, *infra*), but it is important to note here that Plaintiffs' harm is precisely that which the

9    City knew was occurring, and exactly what one would expect given the City's actions: property

10   damage, costs of extra security, reduced revenue, lost revenue from tenants who fled the area,

11   business closure expenses, emotional distress and similar damages.[16]

12        **C.    The City's Map is Misleading at Best**

13        The effects of CHOP did not start and end at the boundaries of the SPD Red Zone, and

14   the barrier placements were not static, contrary to the City's map attached to its brief as App. A.

15   First, the City has admitted that its facilitation of the occupation took place and affected the

16   larger area bounded by Broadway, Denny Way, 13th Avenue, and Pike Street ("the City's

17   Facilitation Area"). Ex. 7, p. 2. That area is depicted on Appendix A to <u>this</u> brief (as borrowed

18   from the City's class-certification opposition).[17]

19        Second, the SPD viewed the Red Zone as more of a minimum, not a maximum. As

20   described in § II.A.2.a, *supra*, the SPD reserved discretion to expand the boundaries of the Red

21   Zone if they concluded it was too risky to report to a crime in progress, and the SPD had

22

23   [16] *See, e.g.,* Van Zandt Decl., Declaration of Wade Biller, ¶¶ 4-7 (also related to Plaintiff Onyx Homeowners Ass'n);
     Ex. 25 at 93:11-95:25, 102:22-104:23, 105:6-106:1 (Sway & Cake) (Kilburn); Declaration of Sean Sheffer (Cure
24   Cocktail), ¶¶ 5-11; Ex. 26 at 168:1-172:6, 180:20-181:2, 189:19-190:8, 193:12-194:2, 227:24-248:6 (Car Tender)
     (McDermott); Declaration of Lonnie Thompson (Bergman's), ¶¶ 7-11; Declaration of Joe Wanagel, ¶¶ 2-5, 10, 11,
25   14 (Olive Street Apts.), Declaration of Brad Augustine, ¶ 3-12 (Madrona Entities and 12th & Pike); Declaration of
     Jill Cronauer (Hunters Capital, Hunters Investments, and Greenus Building), ¶¶ 12-20, 23-25; Declaration Bill
     Donner (Richmark Label), ¶¶ 4-11.
26   [17] Appendix A, originally submitted by the City refers to the "Class Area"; that area is contiguous with the area
     listed in the City's emergency order (Ex. 7 at p. 2). It also lists two former plaintiffs – Northwest Liquor and Café
27   Argento – who are not part of this lawsuit or this motion.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S            **MORGAN, LEWIS & BOCKIUS LLP**
MOTION FOR SUMMARY JUDGMENT                                       ATTORNEYS AT LAW
(Case No. 2:20-cv-00983-TSZ) **- 8**                          1301 SECOND AVENUE, SUITE 2800
                                                                SEATTLE, WASHINGTON 98101
                                                          TEL +1.206.274.6400   FAX +1.206.274.6401

modified its response protocols for the entire area that includes Capitol Hill. And it often did so. *Id.* and § III.E.2 (Car Tender incident).

Third, as is to be expected when an area is declared a "no-police" area and allowed to descend into chaos, CHOP did not keep itself contained to a box on a map. Occupiers could, and did, walk outside the Red Zone and cause chaos, property damage, and financial harm at Plaintiffs' buildings outside of CHOP. Augustine Decl., ¶¶ 11, 12; Cronauer Decl., ¶¶ 18, 19, 26, 27. *See also* Van Zandt Decl., ¶ 9 (Plaintiffs documented CHOP damages for Redside Partners). *See also* § III.E.2, *infra* (Car Tender incident outside Red Zone).

Fourth, the City offers no support for its representation of the placement of barriers as of the stated time period of June 10-17. Barrier placement changed every day as occupiers moved them to block new areas. Ex. 5., 45:22-49:10; 118:18-119:23, 211:1-213:3 (Zimbabwe); Ex. 11, 109:1-12 (Wells); Ex. 8, 195:21-196:13 (Scoggins); Ex. 4, 93:10-94:12 (Sixkiller); Ex. 27, 78:7-:21 (Furuto). Any attempt to map precise barrier locations should not be taken seriously.

## III.    ARGUMENT

### A.    Standard of Review

Summary judgment must be denied if there are genuine issues of material fact when evidence is viewed in the light most favorable to the nonmoving party. *See* Fed. R. Civ. P. 56. The moving party bears the burden of identifying the absence of facts necessary for essential elements of a claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Even if the moving party meets that burden, the motion is defeated if the nonmoving party can set out facts showing a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue exists "if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party." *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 9

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

**B.      Summary Judgment is Not Appropriate on Plaintiffs' Negligence Claim**

**1.      There is at least a genuine issue of fact as to the applicability of the failure-to-enforce exception to the public-duty doctrine.**

The City argues it cannot be held liable for its negligence because it did not owe Plaintiffs a duty under the public-duty doctrine. However, the City owed Plaintiffs a duty pursuant to the failure-to-enforce exception to that doctrine.

The public-duty doctrine does not apply where "government agencies responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to corrective action despite a statutory duty to so, and the plaintiff is within the class the statute intended to protect." *Ehrhart v. King Cnty.,* 195 Wn.2d 388, 403 (2020). In determining whether a particular statute requires a municipality to act when it has knowledge of a violation, courts often look to whether the law states a municipality "shall" take certain actions. *Gorman v. Pierce Cnty.,* 176 Wn.App. 63, 79 (2013); *Goldmark v. McKenna*, 172 Wn.2d 568, 575–76, (2011).

There are two City ordinances that give rise to a duty under this rule.[18] One is the Seattle Fire Code (relevant portions attached as Ex. 28), which provides in various provisions that the City has an affirmative duty to clear its streets of obstructions: §§ 503.1 ("Fire apparatus access roads ***shall be*** provided and ***maintained*** in accordance with Sections 503.1.1 through 503.1.3"), 503.4 ("Fire apparatus access roads ***shall not be obstructed*** in any manner, including the parking of vehicles"); 104.11.2 ("***Persons shall not obstruct*** the operations of the fire department in connection with extinguishment or control or investigation of any fire"). Fire Chief Scoggins testified this "requires" the City "to open the roads for access." Ex. 8, 185:17-:20 (Scoggins).

Chief Scoggins admitted this on video on June 13, 2020, when he confirmed not only the duty but also the City's knowledge of the violation and the harm it was causing:[19]

---

[18] The City incorrectly claims Plaintiffs listed items related to their failure-to-enforce argument in their response to the City's Interrogatory No. 4. MSJ, p. 12. That interrogatory response listed all laws that went unenforced in the area. *See* City Ex. 14. Plaintiffs listed in response to the City's Interrogatory No. 3 all laws they believe the City was "affirmatively required to act" pursuant to but under which the City nonetheless "failed to act." Ex. 29 (supplemental response to Interrogatory No. 3).

[19] The City may argue this meeting is evidence that Chief Scoggins was doing what the code required him to do. But Chief Scoggins and other City officials were not attempting to clear streets; they were exploring a different layout of

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

[W]e have 10th and Pike, 11th and Pike, and 12th and Pike that are clearly obstructed. We have 13th and Pine is clearly obstructed. We have 12th and Olive that's clearly obstructed.  We have 11th and Pine that's clearly obstructed and then we have 11th and Olive ….

\*\*\*

I've spoken to a number of [businesses…. ***They're trying to survive right now and we're not allowing traffic through here so they can survive***.

\*\*\*

***503.4 obstructions to fire … access roads.  It says no obstructions. It's very clear in that***.

\*\*\*

***You know, 503.1 we're required***. Fire apparatus access roads shall be provided and maintained with these sections.

\*\*\*

***The fire code requires us to open up the roads***.

Ex. 30 (partial transcript) and https://www.youtube.com/watch?v=8fGzRtX9ujY.[20]

Given this statutory requirement of action and knowledge of a violation, all that is necessary to establish that the duty was owed to Plaintiffs under the failure-to-enforce exception is that they were "within the ambit of risk created by the officer's negligent conduct." *Livingston v. City of Everett*, 50 Wn. App. 655, 659 (1988)*, citing Mason v. Bitton*, 85 Wn.2d 321, 325-26 (1975). *See also Campbell v. City of Bellevue*, 85 Wn.2d 1, 13 (1975).

Plaintiffs, all of whom were located in or next to a neighborhood with obstructed and occupied streets that the City admits facilitated CHOP, Ex. 7, p. 2, were within the ambit of the danger created by the City's knowing failure to follow its duties.[21] Moreover, the Fire Code is

---

the barriers. Ultimately, the City modified that layout, but that placement never held, barriers blocked streets, and there was no change to the City's red-zone policies, and the occupation continued. § II.B.2.c, *supra*.

[20] The City has requested that the Court strike Plaintiffs' reliance on these sections of the Fire Code, on the apparent basis that it was prejudiced by Plaintiffs' inclusion of the Fire Code in their supplementation of a contention interrogatory response near the end of discovery. MSJ at 9, p. 4. The City cannot legitimately claim prejudice over disclosure of the City's own ordinances, especially given that the Fire Chief cited these provisions in June 2020 and was asked about these provisions and the June 2020 video in deposition in September 2021. Ex. 8 at 184:5-185:20 (Scoggins dep.). In any event, it is entirely appropriate to answer a contention interrogatory at the end of discovery. *Benanav v. Healthy Paws Pet Ins. LLC*, 2022 WL 3577400, \*4 (W.D. Wash., Aug. 19, 2022).

[21] The City may claim that certain buildings related to certain Plaintiffs are not within the "ambit of risk" because they were a few blocks from CHOP's epicenter. However, at a minimum, there are genuine issues of material fact on that issue. As discussed elsewhere in this brief, the SPD and SFD recognized that the expansive Red Zone was in fact just a guideline and that there was significant spillover outside those boundaries that potentially rendered the entire neighborhood of Capitol Hill unsafe. *See* § II.B.2.a, *supra*. Moreover, as discussed in greater length in § II.C, *supra*, the City's breaches directly affected properties outside of the Red Zone.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

intended to protect buildings affected by obstructed access, as well as those who inhabit those buildings. Ex. 28, §§ 101.3 ("The purpose of this code is to establish the minimum requirements consistent with nationally recognized good practice for providing a reasonable level of life safety and property protection from the hazards of fire, explosion or dangerous conditions"); 503.1.1 (fire access roads required for all facilities and buildings).

The City also owed a duty to Plaintiffs pursuant to Seattle Municipal Code § 15.52, which **requires** a special-event permit for "an event to be held in a park, other City-owned property, or public place [that is] … reasonably expected to cause or result in more than 50 people gathering … [and] have a substantial impact on the [place where it is held and is] expected to require provision of substantial public services; and … require temporary closure or exclusive use of a public place." SMC §§ 15.52.005 ("special event" defined); 15.52.040(A) (permit required).[22] The Code further provides that failure to get a permit is a violation of the Seattle Street Code, SMC § 15.90.002, and that the City "**shall** enforce" the Street and Sidewalk Use Code, SMC § 15.90.005(C) (emphasis added). As Chief Scoggins testified, it is a "requirement" that events such as CHOP allow for open access for all fire and police response. Ex. 8, 187:11-188:11 (Scoggins dep.). As he further stated in his taped June 13, 2020, meeting:

> The rules are the normal rules. ***So, even when the Capital Block Party takes place, these are the rules, they pull a permit, they have access points, we do all of these things every event we have in the city. This is the only thing that happens in the city that this environment has taken place. These are the rules.*** … ***The last week? We're not playing by the rules.***

Ex. 30 (partial transcript) and https://www.youtube.com/watch?v=8fGzRtX9ujY.

The City was aware a "special event" was occurring without a permit. *Id. Also, e.g.*, Ex. 5, 60:20-61:12 (Zimbabwe); Ex. 8, 153:24-154:3, 188:12-15 (Scoggins). As a result, it was clear that Plaintiffs – who all lived, operated businesses, and/or owned property in the immediate vicinity of this unpermitted occupation – were within the ambit of risk. Indeed, the City's code

---

[22] CHOP was likely a "mixed free speech event" under this ordinance, as it had both expressive and non-expressive elements. SMC § 15.52.005 (definition of "Special Event Types").

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 12

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

explicitly recognizes that one of the factors to be considered in issuing any permit is whether "the proposed event would unreasonably disrupt the orderly or safe circulation of traffic; would present an unreasonable danger to the health or safety, or present an unreasonable risk of injury …; or would present an unreasonable risk of damage to property" – in other words, whether it would affect people such as Plaintiffs. SMC § 15.52.060(D)(4). The City owed a duty to Plaintiffs under SMC § 15.52, or there is at least a genuine issue of material fact on that point.

To the extent the City claims Plaintiffs cannot establish a duty under the failure-to-enforce exception because they cannot show "actual knowledge of a statutory violation at each plaintiffs' location," MSJ, p. 13, the City is simply wrong.[23] The question as to causation on any negligence claim is whether the identified breach of duty caused the claimed harm. *See, e.g., Behla v. R.J. Jung, LLC*, 11 Wn.App.2d 329, 334 (2019) (alleged harm must be tied to the defendant's alleged act or omission). Here, Plaintiffs can and will prove that it was the City's failure to clear the streets and allowance of an unpermitted, weeks-long occupation of public area, in dereliction of its duties, that led to the harm Plaintiffs suffered. While the City has not moved on causation issues specific to the negligence claim, Plaintiffs address the City's other arguments about causation and foreseeability at §§ III.<u>D.2</u> and III.G, *infra*, and discussions of Plaintiffs' damages can be found at § II.A.2, *supra*, and §§ III.E.1 and E.2, *infra*.

The City's primary argument against the application of the failure-to-enforce exception is based on its erroneous belief Plaintiffs were arguing that the City had not, for example, enforced the graffiti or noise ordinances at a particular location. MSJ at pp. 12-13.[24] That is not the case.

The City may claim that despite what the Fire Code and SMC § 15.52 say on their face,

---

[23] The City cites the Court's order on class certification as the only support for its argument. MSJ at p. 13. However, in that order, the Court was not addressing the specific substantive arguments Plaintiffs set forth here. Instead, the Court was considering whether common issues predominated. Dkt. 96 at 24.

[24] This, in turn, seems based on an incorrect assertion Plaintiffs indicated they were using those statues to support their failure-to-enforce argument. The City asked, in its amended Interrogatory No. 4, for each statute Plaintiffs contended "was not enforced by the City." City Ex. 14. It did not ask for all statutes Plaintiffs contended supported the failure-to-enforce exception, so that is not what Plaintiffs responded with. Plaintiffs responded, accurately, that "the City did not enforce *any* laws in the area" and then tried to provide an exhaustive list of crimes that had gone unchecked. *Id.* This is not, and was never, a list of statutes supporting the failure-to-enforce exception.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

they cannot be used to create a duty because the City has inserted into them boilerplate disclaimers of liability. *See, e.g.,* SMJ, pp. 10-11. The language would be relevant to the *legislative-intent* exception, which looks at what the government *intended*. *See, e.g., Donohoe v. State*, 135 Wn.App. 824, 844-848 (2006). That is not the case with the failure-to-enforce exception, which looks at whether a statute requires action, without regard to intended purpose. *See, e.g., Donohoe*, 124 Wn.App. at 848-50 (analyzing failure-to-enforce without reference to statutory purpose addressed in legislative-intent analysis); *U.S. Oil Trading, LLC v. State, Off. of Fin. Mgmt.*, 159 Wn.App. 357, 365 (2011) (same); *Halleran v. Nu W., Inc.*, 123 Wn.App. 701, 715 (2004) (cases analyzing one exception are not relevant to analysis of the other).

### 2. The City is not entitled to discretionary immunity on Plaintiffs' negligence claim.

The City also argues it is entitled to discretionary immunity. MSJ at p. 14.  It is not. Discretionary immunity is a "narrow" rule that serves to ensure that state courts are not violating notions of separation of powers; "to be protected by such immunity, … [t]he [challenged] activity must involve basic policy discretion rather than the implementation of policy. … [O]nly high level discretionary acts exercised as a truly executive level are protected." *Haberman v. WPPSS*, 109 Wn.2d 107, 157 (1987) (citations omitted). *Also Gorman*, 176 Wn.App. at 76 (discretionary immunity is based on "the separation of powers").

The City's argument falls apart at the most basic level, because *discretionary* immunity requires a demonstration that the challenged acts were *discretionary*. *E.g.*, *Emsley v. Army Nat. Guard*, 106 Wn.2d 474, 480 (1986) ("the *Evangelical* exception includes only basic policy discretion"); *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 255 (1966) (immunity requires that "the governmental authority had the authority and duty" to do what it did); *Taggart v. State*, 118 Wn.2d 195, 214 (1992) (only discretionary acts are subject to immunity). But Plaintiffs' negligence claim is based on two statutes which eliminate any discretion and instead *required* the City to clear the streets under the Fire Code and enforce

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 14

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

permit requirements. § III.B.1, *supra*. If the Court finds that the failure-to-enforce exception applies, it has necessarily concluded the City lacked discretion to ignore those rules.

The City's argument also fails because the challenged actions are not the sort of "high level discretionary acts" that the doctrine protects. Plaintiffs are not challenging a high-level decision to "de-escalate"; Plaintiffs are challenging how any such decision was implemented. *Haberman* is instructive here. In that case, Plaintiffs challenged the state's actions in selling bonds to finance the construction of nuclear facilities. The defendant claimed immunity over the way they were sold, and the Supreme Court rejected the argument:

> Arguably, the … decision to build the [plants] is immune as a discretionary act. However, intervenors challenge the means by which that decision was carried out. … Thus, the acts complained of by intervenors do not involve discretionary acts …; rather they involve the mechanism by which [defendant] implemented its decision to build the project.

109 Wn.2d at 158. *See also Preston v. Boyer,* 2019 WL 8060201, at *6 (W.D. Wash. Nov. 27, 2019); *Mancini v. City of Tacoma*, 196 Wn.2d 864, 884 (2021); *Miotke v. City of Spokane*, 101 Wn.2d 307, 337, 678 P.2d 803 (1984). This is a precisely analogous situation.[25]

The City has notably not demonstrated otherwise, has not identified a policymaker or an allegedly discretionary decision that person made, and has not even made clear what "government program, policy, or objective" (*Evangelical*'s first required prong) was being served. The City is not entitled to discretionary immunity.

### C. Summary Judgment is Not Appropriate on Plaintiffs' Nuisance Claim

The City offers no substantive challenge to Plaintiffs' nuisance claim. Instead, it seeks to avoid liability via two technical arguments, neither of which succeed.

Those arguments are based on an inaccurately narrow construction of the claim. Plaintiffs claim everything the City did came together to create a nuisance that included not just access issues but excessive noise, public safety hazards, vandalism, excessive noise. Dkt. 47, ¶¶ 217,

---

[25] The City's only cited case other than *Evangelical* itself is easily distinguished, because in that case, the claim challenged King County's high-level decision to use of a ranking system to decide where to spend its limited resources for erecting guardrails. *Fuda v. King Cnty.*, 2017 WL 4480779, at *2 (Wn. Ct. App 2017) (unpubl.).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 15

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

220. That includes, for example, the establishment and maintenance of the Red Zone, providing larger and stronger barriers, the physical support of encampments on the streets and sidewalks and at Cal Anderson Park, and other facilitations detailed above. § II.A., *supra*.

Based on its narrow reading of Plaintiffs' claim, the City first claims it falls under a statutory exception which bars nuisance claims challenging acts "under the express authority of a statute." RCW 7.48.160. But this statute means what it says: an act falls under this exception ***only*** if the act is explicitly and directly authorized by statute. *E.g., Kitsap Cnty. v. Kitsap Rifle & Revolver Club*, 184 Wash. App. 252, 280–81 (2014), *citing Grundy v. Thurston Cnty.*, 155 Wn.2d 1, 8 n. 15 ("RCW 7.48.160 requir[es] a direct authorization of action…."). Thus, even if a public entity has discretion to act, it is not exempt from a nuisance suit unless the action is expressly authorized. *Shields v. Spokane Sch. Dist. No. 81*, 31 Wn.2d 247, 256–57 (1948). The City has cited nothing other than a generalized statute of what first-class cities can do. It is not direct authorization of the City's acts; the exception does not apply.[26]

The City also argues that the nuisance claim must be dismissed because it overlaps Plaintiffs' negligence claim. But Washington courts hold only that where a nuisance claim is so indistinguishable from a negligence claim that it is a "negligence claim presented in the garb of nuisance," it cannot be pursued as a claim in addition to negligence itself. *Atherton Condo.Apartment-Owners Ass'n Bd of Directors v. Blume Dev. Co.*, 155 Wn.2d 506, 527 (1990). This necessarily requires that "the alleged nuisance is the result of defendant's alleged negligent conduct." *Id.* Thus the doctrine has only been applied in where the alleged negligent conduct is identical to the conduct allegedly causing a nuisance, typically in cases involving construction and neighbors' trees. *See, e.g., Atherton*, 115 Wn.2d at 527-28; *Mustoe v. Ma*, 193 Wn.App. 161, 163, 169-70 (2016); *Lewis v. Krussel*, 101 Wn.App. 178, 179-80, 183 (2000).

That is not the case here. As explained in § III.B.1, *supra*, Plaintiffs' negligence claim is based on the City's ***failure to enforce*** two statutes mandating the clearing of obstructions from

---

[26] The City has cited one case on this point. It addresses neither nuisance nor the claimed exception. *State v. City of Seattle*, 137 Wn. 455 (1926).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 16

Morgan, Lewis & Bockius LLP
Attorneys at Law
1301 Second Avenue, Suite 2800
Seattle, Washington 98101
Tel +1.206.274.6400   Fax +1.206.274.6401

streets and requiring permits for special events. Plaintiffs' nuisance case, meanwhile, is focused on what the City **did** do – the affirmative steps it took to encourage and assist the occupation of the neighborhood, resulting in a nuisance. Plaintiffs' nuisance claim is entirely separate from its claim of negligence and should not be dismissed.

### D. Summary Judgment Is Not Appropriate on Plaintiffs' Substantive-Due-Process Claim

The City's seeks judgment on Plaintiffs' substantive-due-process claim but fails to acknowledge the Court ruled in Plaintiffs' favor on most of what the City is arguing about, in the Court's order on the City's motion to dismiss. Dkt. No. 23, 17-20. Plaintiffs have proven every allegation in their complaint that the Court relied on for its rulings – and much, much more – and summary judgment must be denied accordingly.

### 1. There are genuine issues of material fact as to whether the City left Plaintiffs in a more dangerous situation.

Under the first prong of a claim for violation of substantive due process, Plaintiffs must establish only that the City left them in "a situation that was more dangerous than the one" they would have been if the City had not acted as it did. *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). This requires only that the City took some affirmative action that increased the risk that Plaintiffs would be harmed. *See id.*

On the motion to dismiss, the Court ruled that Plaintiffs had successfully established this element by alleging the City had encouraged the occupation and adopted a policy of not responding to 9-1-1 calls in the area. Dkt. 23, 19. Plaintiffs have proven these allegations beyond any dispute, and more. As set forth in greater detail in §§ II.A. and II.B., *supra*, discovery has shown that with full knowledge of what was going on in the neighborhood and the attendant and increasing risks, the City adopted official police and fire polices to not respond in person to any crimes in the area other than "mass casualties," provided encouragement that the occupation could be indefinite, provided support to the occupation through portable toilets, water, and daily

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 17

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

garbage service, allowed hundreds of tents to be erected in the middle of the neighborhood, provided larger and stronger barriers to protect the protests, and declared the area "local access."

The City cannot dispute this, so instead it tries to break down these facts and indicate there was nothing about small aspects of its actions that would have made any person's situation worse. MSJ at pp. 19-20.[27] But it is the entirety of the City's conduct, taken as a whole, that placed Plaintiffs and others like them at a greater risk of vandalism, violence, property damage, harmed businesses, reduced profits, and psychological harm. And this is not simply Plaintiffs' allegation; a peer-reviewed study concluded that the City's actions with CHOP definitively led to an increase in all types of crimes in the area. Ex. 31 pg.3 (Piza report). There is at least an issue of fact as to whether the City's actions placed Plaintiffs at a greater risk of harm than they would have faced if the City had not acted as it did.[28]

### 2. There are genuine issues of material fact as to whether the risk of harm was foreseeable.

The Court also previously ruled that Plaintiffs' allegations regarding the City's encouragement of CHOP and creation of the Red Zone were sufficient to establish that an inference that the harm to Plaintiffs was foreseeable. Dkt. 23 at 19. Again, Plaintiffs have proven these allegations to be true and this is enough on its own to defeat the City's motion.

However, even if it was not, the evidence of foreseeability here is copious. The foreseeability prong "does not mean that the exact injury must be foreseeable. Rather, the state actor is liable for creating the foreseeable danger of injury." *Martinez v. City of Clovis*, 943 F.3d 1260, 1273-74 (9th Cir. 2019). Here, it was eminently foreseeable (and foreseen) that residents,

---

[27] The City remarkably claims that the fact that the City was in negotiations to assume the lease of the Riveter is evidence of a lack of harm, as was the fact that a minority of the Onyx HOA board voted to not join this litigation. MSJ at 19. This is nonsensical. Plaintiffs are not alleging a harm to their viewpoints, they are alleging harm to themselves and their livelihoods.

[28] The City again relies on *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir 2007), which the Court previously found "unpersuasive" because there was no affirmative conduct in that case. Dkt. 23 at 19 n. 5. The case remains inapposite for the same reason. The same is true of *Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 847 (9th Cir. 2011) (no defendant "acted affirmatively"), and *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 200-01 (1989) (no affirmative act placed plaintiff at greater risk of harm)

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 18

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

businesses, and property owners would be harmed by the City's actions.

Two experts agree: after reviewing historical evidence and the available literature, that "it was foreseeable that declaring the area off-limits to direct response from police that property crime and violent crime would spike in the area." Ex. 2, p. 25, ¶ 7. (Shane report). *Also* Ex. 31, p. 3 ("most reasonable hypothesis would have been that … removing police presence and response … would lead to a significant crime increase") (Piza report).

And the City itself foresaw that crime and violence would spike, and that there would be harm to businesses and residents in the area. Chief Best was concerned from the outset of CHOP that crime would increase and people and businesses would be harmed, and she shared her views with anyone who would listen, including the Mayor. Ex. 6, 107:11-110:10, 115:12-117:8, 196:1-:23 ("certainly foreseeable that there was increased violence and crime") (Best). Others expressed concern on the first morning after police left that it would become a long-term occupation. Ex. 5, 78:7-79:8 (Zimbabwe). The Fire Chief testified it was foreseeable that there would be problems with access and egress in the area, and that as crowds continued to increase, violence would also increase. Ex. 8, 136:24-137:14, 212:3-213:11 (Scoggins dep.). The City's economic development office and mayor's office also foresaw, almost immediately, that businesses in the area would suffer lost profits, decreased safety, and increased graffiti and other property damage. Ex. 11, 88:4-90:12 (Wells); Ex. 4, 96:21-98:5 (Sixkiller), Ex. 32 at p. 2 ("I think we will see a surge of concerns and requests by impacted businesses"). It was also foreseen, and discussed among the City's executives, that providing services to occupiers such as porta-potties, garbage service, and water, would attract people to the area, encourage them to stay longer, and exacerbate the problem. Ex. 6, 117:15-118:19 (Best); Ex. 4, 145:17-147:2 (Sixkiller); Ex. 9, 72:14-73:2 (Hara dep.); Ex. 5, 165:12-166:13 (Zimbabwe). Indeed, the likelihood of crime, violence, and other harm occurring in the area was so obvious that Mayor Durkan stated at the time that the homicide of a teenager in the area that it was "foreseeable and

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 19

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

avoidable." Ex. 33.[29] And all of this that the City knew about and foresaw, moreover, lines up with the type of harm that Plaintiffs suffered. *E.g.,* § II.B, *supra* and fn. 37-41 and 43, *infra*.

This evidence, on its own, is more than sufficient to raise a genuine issue of issue of material fact as to the foreseeability of Plaintiffs' harms. However, even if it was not, this was a ***more-than-three-week*** occupation, and the City knew in real time what was going on. § II.A., *supra*. It no longer had to be foreseen– it was certain and known that absent fundamental change, the harm the City knew about would continue. Yet the City continued to assist CHOP.

The City also contends the City had to foresee that each particular Plaintiff would be injured. MSJ, p. 21. But that is not the test. It is not the specific injury that has to be foreseen; there must only be a foreseeable danger of injury. *Martinez*, 943 F.3d at 1273-74. All that is required is that there is something that differentiates Plaintiffs "from the general public." *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989). *See also Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018) (foreseeable that releasing a group of pro-Trump rally attendees into a group of anti-Trump protesters would result in injuries). Here, there was a clear group subject to foreseeable harm based on the geographic location of the City's actions. It is no defense that it was foreseeable a large number of people would be harmed.[30] And in any event, the City *was* aware of harm being caused to Plaintiffs yet did nothing to alleviate it. *E.g.*, fn. 42, *infra*.

The City also claims that even if it could have foreseen some of this harm, it could not have foreseen harm at Hunters and Redside buildings a few blocks outside of the City's area of facilitation. MSJ, p. 21. However, it was foreseeable and foreseen that CHOP would devolve into violence, crime, and harm to businesses and residents. It was foreseeable that those problems would not be limited to artificial boundaries, and the evidence shows they were not. § II.C.,

---

[29] The City points out that Mayor Durkan has since tried to explain this email away. MSJ at p. 21 n. 8. The Court can reach its own conclusion about the credibility of her explanation.
[30] The City cites *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824 (7th Cir. 2009), as requiring specific knowledge of who the victim would be. But that case involved one mentally ill individual released into the public who eventually hurt someone, *id.* at 828-29, as opposed to this case where the zone of danger was relatively large, yet readily obvious because of the nature of what the City did. Indeed, *Buchanan-Moore* specifically distinguished cases where there were numerous possible victims of a government's actions among the public but they were a readily identifiable group. *Id.*

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 20

*supra*. There are genuine issues of material fact as to whether harm to all Plaintiffs, and all locations at issue in this issue in this suit, was foreseeable.

### 3. There are genuine issues of material fact as to whether the City was deliberately indifferent.

The third element of Plaintiffs' substantive-due-process is whether the City acted with "deliberate indifference"; that is, whether the City "disregarded a known or obvious consequence of his action." *Martinez*, 943 F.3d at 1274. This is the applicable standard as recognized even by cases which state that conduct that must "shock[] the conscience." *E.g., Nicholson v. City of Los Angeles*, 935 F.3d 685, 692-93 (9th Cir. 2019). There are genuine issues of material fact on this issue that preclude summary judgment.[31]

Plaintiffs have demonstrated in the immediately prior section of this brief that it was both *foreseen* and *known* that CHOP would cause the harm it caused, and that the City nonetheless pressed on with its facilitation of the occupation. That on its own is evidence of deliberate indifference barring summary judgment. But there is, of course, much more than that.

From the very outset, the City consciously preserved the occupation at the expense of people who would be foreseeably harmed. At a June 10, 2020, meeting of City executives about CHOP, it was determined that the City's "overall objective[]" was to "continu[e] the existing footprint of peaceful demonstration and rights." Ex. 14, p. 2. *Also* Ex. 8, 149:13-:16 (Scoggins dep.); Ex. 5, 88:13-89:5 (Zimbabwe).

This objective drove the City's approach. The City avoided sending service trucks into the area other than during the early morning hours because it did not want to disrupt the events and discussions going on that were being held in the middle of the street. Ex. 9, 16:24-17:24, 59:19-61:16 (Hara dep.). The Mayor visited the area and made public statements in support of an indefinite occupation. § II.B.3, *supra*. The Parks Dept. allowed an illegal garden to remain because workers agreed with the creators' viewpoints. Ex. 27, 50:5-52:8 (Furuto dep.).

---

[31] The Court also ruled on this issue in Plaintiffs' favor on the motion to dismiss, on the basis of alleged facts that have been proven. Dkt. 23 at pp. 19-20.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 21

The City also actively facilitated CHOP in a myriad of ways, from providing portable toilets to supplying CHOP's medical tent. § II.A.2, *supra*. Despite knowing what was going on, the City provided stronger concrete barriers to the occupation on June 16, with no timeline for removing them. § II.A.2.c, *supra*. The support was so complete that then-deputy mayor Sixkiller texted "we're doing all the giving and they aren't doing shit." Ex. 4, 179:21-184:13 (Sixkiller).

As if that was not enough, the City also kept police and fire out of the neighborhood for more than three weeks. § IIA.2.a, *supra*. The parties' police-practices experts agree that this is unprecedented in the history of policing; no police department has ever taken a similar approach to handling an occupation. Ex. 1, 172:20-:23 (City expert) (Stoughton); Ex. 2, pp. 23, 26 (Shane report). That they did so is enough, on its own, to shock the conscience.

But perhaps the most telling sign of the City's deliberate indifference is that it did not send its own employees into the area out of safety concerns but left Plaintiffs to live and work there. The SPD and SFD adopted their red zones to keep City employees safe. Ex. 12, 18:2-:9 (SPD) (Mahaffey); Ex. 8, 62:9-:21 (SPD) (Scoggins). Other City departments similarly kept most of their employees out of the area entirely or kept them out when it seemed especially unsafe. Ex. 27, 65:10-68:23, 86:6-:23, 165:13-166:4 (Parks Dept.) (Furuto); Ex. 5, 23:24-25:9, 71:6-77:18, 187:15-189:6 (SDOT) (Zimbabwe); Ex. 34, 21:15-22:1, 53:11-55:4, 77:20-78:18 (SPU) (Beauregard). This is knowing, callous indifference.

The City claims none of this matters because its deliberative indifference was only instituted after a deliberative process that tried to "deescalate" the conflict. MSJ at 22-23. The argument is based largely on one case from the Second Circuit, *Lombardi v. Whitman*, 485 F.3d 73, 75 (2d Cir. 2007), where plaintiffs alleged that they had cleaned up the 9/11 wreckage because of misrepresentations of the air quality at the scene. The real issue was that the plaintiffs were challenging a decision to not disclose information, and not an affirmative act that worsened the situation. *Id.* at 79-81 (noting problem but not ruling on that basis). Because that was all the plaintiffs had, the court's decision necessarily turned on whether that decision, with nothing

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 22

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

more, constituted deliberate indifference. *Id.* at 82-85. It has no applicability here where Plaintiffs are not challenging the City's decision to "deescalate." Instead, Plaintiffs challenge the City's extensive affirmative acts.[32] There are genuine issues of material fact precluding summary judgment on the issue of deliberative indifference.[33]

### E.   Summary Judgment is Not Appropriate on Plaintiffs' Takings Claim[34]

#### 1.   Genuine Issues of Material Fact Exist as to Plaintiffs' Access Claim

The City conflates the "two-step process" for determining whether Plaintiffs are entitled to compensation for impeded access. *Keiffer v. King Cnty.*, 89 Wn. 2d 369, 372 (1977). "The first step is to determine if the government action in question has actually interfered with the right of access as that property interest has been defined by our law." *Id.* The second is to determine "the degree of damage." *Id.* at 373. There are issues of material fact as to both.

Under the first step, the fundamental inquiry is whether the government's actions restrict access, which satisfies the first step, or instead "simply regulate the volume or flow of traffic on a public way … pursuant to the police power for the purpose of regulating the flow of traffic…." *Id.* at 372. And what the City did here to "modify[] streets and pedestrian access routes" was not to regulate traffic flow, but rather "facilitate the exercise of First Amendment rights" by people occupying the neighborhood. Ex. 35, p 2. It avoided confrontation with armed individuals who were blocking streets with barriers and cars. §§ II.A, II.B., *supra*. It allowed and encouraged individuals to occupy the streets and sidewalks at all hours, sleep in tents on the sidewalks, and erect stores in public ways, and chose not to enforce most laws in person in CHOP for three weeks. § II.A.1, A.2, *infra*. It even placed 50 to 100 barriers in the streets not for traffic flow but

---

[32] The City claims every circuit that has considered the concepts in *Lombardi* has concluded that as long as a decision was carefully considered it can never serve as the basis for substantive due process. MSJ at p. 21 n. 8. But not only does *Lombardi* not state such a rule, neither has any other circuit. One of the circuits the City claims is in agreement with this principle is the Sixth Circuit, but that court specifically refused to follow such a reading of *Lombardi*. *Guertin v. State*, 912 F.3d 907, 929 (6th Cir. 2019). *See also Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 536 (6th Cir. 2008) (longer time to make decision results in less deference to government actor). The Third Circuit has also not adopted any such standard. *Haberle v. Troxell*, 885 F.3d 170, 177-78 (3d Cir. 2018) (applying "hurried deliberation" standard from Third Circuit law to facts of case).

[33] *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) also was decided on the basis of an omission – a failure to train or warn employees – and therefore does not apply here in face of the City's affirmative actions.

[34] Plaintiff Redside Partners LLC does not oppose summary judgment on its takings claim.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1   to protect the people occupying the area and did nothing when those barriers were used to block

2   streets that had been open. § II.A.2.c, *supra*. All of this, at a minimum, creates an issue of

3   genuine material fact as to whether access was interfered with within the meaning of *Keiffer*.[35]

4       There are also issues of material fact as to the second step, the amount of any harm

5   caused, which is a question for the trier of fact. *Pande Cameron & Co. of Seattle v. Cent. Puget*

6   *Sound Reg'l Transit Auth.*, 610 F. Supp. 2d 1288, 1303 n.2 (W.D. Wash. 2009) ("*Keiffer* held

7   that the second step should be determined by the trier of fact.") The issue under this step is

8   whether the loss of access was "substantial." *Id.*; *Keiffer*, 89 Wn.2d at 372. The test is not

9   whether the loss of access was complete, as the City apparently contends; indeed, in *Keiffer*, this

10  prong was satisfied where instead of regulating traffic, the municipality had created a curb that

11  made plaintiff's property still accessible, but substantially diminished. *Id.* at 371.[36]

12      There are numerous issues of fact as to whether the access issues created by the City were

13  substantial. Richmark Label, for example, had problems every day during CHOP with access to

14  its loading dock, had to negotiate with protesters every morning to move barriers that had been

15  placed to block the road, required suppliers who were not afraid to enter the area to back into

16  their dock after bypassing barriers, and had occasional blockage of its employee parking, all with

17  knowledge of City officials who. Donner Decl., ¶¶ 6-8; Ex. 36, 46:21-52:22, 53:13-56:21, 58:6-

18  59:2 (Donner). Plaintiffs who lived in the area had safe access to their residences choked and

19

20  [35] The City claims, in a footnote and without legal citation, that because some Plaintiffs are or were lessees, they do not have a property interest that can be the subject of a takings claim. MSJ, p. 26 fn. 12. That is wrong. "As a

21  general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for value thereof*." Bldg. 11 Invs. LLC v. City of Seattle*, 912 F. Supp. 2d 972, 981 (W.D. Wash. 2012), *quoting Sun*

22  *Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978). *See also Dep't. of Nat. Res. v .Thurston Cnty.* 92 Wn.2d 656, 668 (1979) (lessees have a real property right in their leaseholds). And apartments and condominiums obviously require access to public streets and sidewalks just like any other property.

23  [36] None of the City's cases stand for such a proposition and all of them are readily distinguishable from this case because they involved decisions to change traffic flow rather than a decision to support an occupation. *Pande*, 610

24  F.Supp.2d at 2009 (challenge to temporary changes in traffic flow to accommodate light rail construction); *Kelly v. City of Port Townsend*, 2011 WL 1868182 (W.D. Wash. May 16, 2011) (challenge to installation of roundabout

25  after public hearings; no *Keiffer* analysis); *Williams Place, LLC v. State ex rel. Dep't of Transp.*, 187 Wn.App. 67 (2015) (issue was whether landowner had right to an easement); *Walker v. State*, 48 Wn.2d 587 (1956) (addressing

26  effects of a centerline curb in middle of four-lane highway); *Mackie v. City of Seattle*, 19 Wn.App. 464 (1978) (plaintiff lacked standing in case challenging decision to close street allowing industrial traffic in residential

27  neighborhood after full public hearing).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 24

denied by crowds in the street, essentially having to run a gauntlet of hostile occupiers to get into their buildings.[37] Some retailer Plaintiffs had to shut their businesses, or had no business at all, because of nearby barriers, park occupations, and a lack of safety for themselves and customers to the point that one of them kept watch in his car most nights until 3:00 a.m..[38] Other retailers managed to stay open despite having barriers in the nearby streets but were overrun by mobs in the streets and their businesses, had customers (who faced altered access) avoid them due to conditions in the area, and had to fundamentally alter their operations due to the lack of safety and security caused by CHOP.[39] And several Plaintiffs are owners of commercial and residential buildings where access was either completely blocked at times, or they had to regularly deal with protesters on the streets and sidewalks making access unsafe, difficult, or impossible for their tenants and customers.[40]

The City also argues that because there was supposedly a static barrier configuration that any problems or City malfeasance were contained within the artificially designated "Red Zone." MSJ, p. 25. That is fiction, as explained in § II.C, *supra*. It is clear that despite what the City wants to say now about the scope and effect of its actions, it admitted at the time that its actions and its effects were broader than the City's current map. *Id.*, Appx. A, and Ex. 7, p. 2. This is an admission obviously preventing summary judgment as to any property in the admitted area, and there are genuine issues of material fact as to whether a handful of properties outside of the City's area of admission suffered substantial harm.[41]

---

[37] Ex. 37 at 139:19-146:12 (Ploszaj) (Ploszaj dep.); Declaration of Wade Biller, ¶¶ 4-7 (this is also evidence of blockages related to Plaintiff Onyx Homeowners Association).
[38] Ex. 25 at 93:11-95:25, 102:22-104:23, 105:6-106:1 (Sway & Cake) (Kilburn dep.); Declaration of Sean Sheffer, ¶¶ 5-11.
[39] Ex. 26 at 168:1-172:6, 180:20-181:2, 189:19-190:8, 193:12-194:2, 227:24-248:6 (Car Tender) (McDermott dep.); Declaration of Lonnie Thompson, ¶¶ 7-11.
[40] Declaration of Joe Wanagel, ¶¶ 2-5, 10, 11, 14 (Olive Street Apartments), Declaration of Brad Augustine, ¶ 4-12 (Madrona Entities and 12th & Pike); Declaration of Jill Cronauer, ¶¶ 12-27 (Hunters Capital, Hunters Investments, and Greenus Building).
[41] Declaration of Brad Augustine, ¶¶ 11, 12 (Madrona Entities and 12th & Pike); Declaration of Jill Cronauer, ¶¶ 18., 19, 26, 27 (Hunters Capital, Hunters Investments, and Greenus Building).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 25

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

2.   **Genuine Issues of Material Fact Exist as to Plaintiffs' *Pre Se* Taking Claim**

The City's arguments about Plaintiffs' *per se* takings theory are also incorrect. The City first claims no *per se* taking can occur where government action results in invasion by a third party. MSJ at p. 26. But any such notion was rejected by the Supreme Court in *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021), which held that when the California granted the right for union organizers to enter private farmland, it committed a *per se* taking because it had "appropriate[d] for the enjoyment of third parties the owners' right to exclude."

The City is also misplaced in its argument that it cannot be held liable unless it "compelled" occupiers to harm Plaintiffs' properties. MSJ, p. 27. At most, *Cedar Point* and other cases hold only that the Plaintiffs must establish that there was a "government-authorized invasion." *See, e.g., id.* at 2073; *U.S. v. Causby*, 328 U.S. 256, 263-64 (1946) (taking where government allowed planes to fly over plaintiffs' property); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36 (1982) (issue is whether law affects owner's right to exclude).

There are genuine issues of material fact as to whether the City's actions authorized an invasion or required Plaintiffs to allow invasions of their property. A striking example of this is the events at Plaintiff Car Tender on June 14, 2020, when an individual broke into the property after business hours and later set fire to it. The owner called 9-1-1 upon learning of this while he was leaving his home, and then other times while *en route* and after arriving. Ex. 26, 226:8-231:18, 236:4-238:4, 244:17-246:20 (McDermott). He and others reported to 9-1-1 that he had apprehended the man and had him custody, that there was a fire, that the suspect had tried to cut someone with a knife, and that there was a large mob of people from CHOP swarming the property. *Id.,* 241:19-247:2; Biller Decl., ¶ 11; Ex. 38. He was eventually forced by the mob, which broke through Car Tender's fences, to release the suspect under threat of death.[42] Ex. 26, 247:3-248:9 (McDermott). The City's response was to place officers a few blocks away and not show up to the scene of the crime until the next day when firefighters came to apologize, and a

---

[42] The suspect was later brutally beaten by CHOP occupiers in unchecked mob justice. Ex. 38.

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

couple days later when police took a statement. *Id.*, 219:12-220:11, 246:21-23. Officers and firefighters were in the area because of the 9-1-1 calls but chose to not engage because the business was (a) near the Red Zone and (b) there was an armed mob involved. Exs 16, 39.

And this is only one of numerous documented instances of invasions by CHOP occupiers of Plaintiffs' properties during June 2020, including physical break-ins and graffiti, that the City encouraged through its actions and did absolutely nothing to stop, even though most of them were accompanied by futile calls to 9-1-1.[43] There is an abundance of genuine issues of material fact as to whether Plaintiffs were forced to contend with a City-authorized invasion of their properties.

### F.  Summary Judgment is Not Appropriate on Plaintiffs' Procedural-Due-Process Claim

Plaintiffs' claim for procedural-due-process claim has three elements: (1) a liberty or property interest protected by the constitution; (2) a deprivation of the interest by the government; and (3) a lack of adequate pre-deprivation process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). For the purposes of their motion for summary judgment, the City does not even contend that there not genuine issues of material fact on all of these elements. MSJ, p. 27-28. Instead, the City simply contends Plaintiffs were not entitled to due process of ***any*** kind before the City made a series of policy decisions that facilitated a hostile takeover of their neighborhood. That is not only dubious on the face, it is not the law.

As the Supreme Court stated in *Loudermill*, "an essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing

---

[43] *See* fn. 37-41, *supra*. *See also* Donner (Richmark) Decl., ¶¶ 4, 5 (extensive graffiti on building); Ploszaj Decl., ¶¶ 12-21 (multiple instances of invasions and calls to 9-1-1 with no response); Ex. 37 (Ploszaj), 147:2-153:17; Biller (Onyx) Decl., ¶¶ 6, 7 (regular harassment; invasion of condominium and assault with no response after calling 9-1-1); Wanagel (Olive Street) Decl, ¶¶ 13-16 (calls to all manner of city representatives with no response; numerous attempted break-ins, excessive graffiti, and theft of dumpsters); Augustine (Madrona entities/12th Steet) Decl., ¶¶ 4-8 (numerous occupations of exteriors, calls to 9-1-1 unanswered); Cronauer (Hunters entities/Greenus) Decl., ¶¶ 12-18, 23 (camping in front of buildings, broken windows, bullet holes, graffiti); Exs. 40, 41, and 42 (example emails from Hunters to City regarding property invasion and damage to buildings); Sheffer (Cure Cocktail) Decl., ¶¶ 5-11 (graffiti).

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 27

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

appropriate to the nature of the case.'" 470 U.S. at 542, *quoting Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950). When the government decision deprives an individual of a property interest, "the Due Process Clause requires … that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Id.*

The City claims no due process of any type was due to residents when it assisted a takeover of their neighborhood. But the City's cases demonstrate notice and a hearing are required when an action will affect a narrow, easily identified group of individuals harmed. In *Harris v. Cnty. of Riverside*, 904 F.2d 497, 499, 500-01 (9th Cir. 1990), the court held that where a County zoning regulation affected only a few properties (that of the plaintiff and surrounding properties), and there had been no advance notice or a hearing, there had been a violation of due process. *See also, e.g., Halverson v. Skagit Cnty.*, 42 F.3d 1257 (9th Cir. 1994) (notice and hearing required when deprivation will affect "a few individuals."). The question is whether there is an identifiable group of "exceptionally affected people." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915), *discussing Londoner v. City & Cnty. of Denver*, 210 U.S. 373 (1908). *See also Harris*, 907 F.2d at 502 (same).

The City knew precisely what neighborhood was affected by its actions, knew it was a relatively small corner of Seattle, and knew of the impacts the occupation was having on people in the affected area. *See* § II.A, *supra*. The City admitted it "facilitated" protest an area bound by four specific streets (Ex. 7, p. 2, emergency order), and when it was advantageous to do so, described CHOP as "a few blocks in a City that is 84 square miles." Ex. 43 (SEA_00040390). By the City's own metric, the area within the specified streets constitutes just 0.094% of the physical area of the City. Weaver Decl., ¶ 46. And by Plaintiffs' estimation, the population in that area was just 0.54% of the City's total population. *Id.*, ¶ 47. Those affected by the City's actions were a small, easily identifiable group that was exceptionally affected by the City's actions. Thus, there is at least an issue of fact as to whether those affected should have received notice of the City's policies and a right to be heard.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 28

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

The City contends this was a legislative act that does not require individual notice. That argument does not carry the day for two reasons. First, it was not a legislative act. Legislative acts are deliberative acts of general applicability affecting wide swaths of cities or counties, or groups of people that are essentially unidentifiable. *E.g.*, *Halverson*, 42 F.3d at 1259 (challenging lack of notice to entire possible flood plain of a river); *Bi-Metallic Inv. Co.*, 239 U.S. at 443 (1915) (challenging tax increase for all of Denver). And this was a purely executive act, and therefore not legislative. *Bols v. Newsom*, 515 F. Supp. 3d 1120, 1129 (S.D. Cal. 2021).

Second, even if the City's actions were a legislative act, even legislative acts require *some* due process, and there was none at all. Due process for a legislative act is only "satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law." *Halverson*, 42 F.3d at 1261 (citation omitted).  But as already explained in § III.A.1, *supra*, the City has a process specifically designed for dealing with events such as this that the City follows in every other comparable situation but not here. Even if the City's actions were legislative, they still violated Plaintiffs' rights to due process.

The City is also wrong that a procedural-due-process claim cannot co-exist with a takings claim if they have overlapping facts. "It is of no moment that [a procedural due process claim] is based on factors that also form the basis of an alleged taking. Two or more legal theories may cover the same conduct and a plaintiff is entitled to prove each claim according to its terms." *See Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1404 (9th Cir. 1989), *overruled on other grounds by Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996). *Also Halverson*, 42 F.3d at 1261 (same); *Harris*, 904 F.2d at 501 (procedural due process claim allowed to proceed even though it shared factual basis with dismissed takings claim). The City is not entitled to summary judgment on Plaintiffs' claim for lack of procedural due process.

### G.     The City Is Not Entitled to Summary Judgment on the Basis of Causation

#### 1.     There are genuine issues of material fact preventing summary judgment as to proximate cause.

The City has taken a scattershot approach to expressing doubt about aspects of Plaintiffs'

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 29

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

damages, MSJ, p. 29, but has failed to demonstrate it is entitled to summary judgment on any of the challenged items. Genuine issues of material fact exist as to all of them.

"The question of proximate cause is for the jury [and it] is only when facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion that it may be a question of law for the court." *Attwood v. Albertson's Food Centers, Inc.*, 92 Wn.App. 326, 330 (1998), *citing Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935 (1982). That is clearly not the case here. At most, the City presents disputes with some aspects Plaintiffs' damages, without even citing any support in most instances, and does not carry its heavy burden.

The City's primary argument seems to be that it believes that Plaintiffs' damages expert, Arik Van Zandt, did not adequately control for COVID. However, the City does not claim that Mr. Van Zandt is not qualified to offer his opinions, or that his opinions should be excluded; it does not even explain why his opinions are allegedly wrong. The City is also wrong about his analysis. In all of his damages calculations, Mr. Van Zandt controlled for the effects of COVID. Declaration of Arik Van Zandt, ¶¶ 3-8. With retail establishments claiming lost profits, he analyzed annual, monthly, and daily financials both before and after CHOP, including during the pre-June 2020 months of the pandemic, and based on that analysis and discussions with the owners of those businesses, conservatively estimated damages caused by CHOP. *Id.* ¶ 4.

As to losses suffered by owners of commercial buildings (the Hunters and Madrona entities), Mr. Van Zandt's analysis controlled for COVID by looking at financials for the specific buildings in question, speaking to the real-estate professionals who operate and lease spaces in those buildings, and making determinations based on all available evidence as to how to account for any effects of COVID. *Id.* ¶ 7. Mr. Van Zandt did not assume COVID would have no impact on commercial tenants and leases; all his calculations account for COVID. *Id.* ¶¶ 3,8.

As to losses suffered by owners and leasers of residential buildings (Hunters, Redside Partners, and Olive Street), Mr. Van Zandt reviewed rent rolls and financials to determine what was happening at the specific buildings in question to assess the effects of COVID. *Id.* ¶¶ 9, 10.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S
MOTION FOR SUMMARY JUDGMENT
(Case No. 2:20-cv-00983-TSZ) - 30

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

His analysis also included reviewing testimony of owners of the properties about the effects of COVID and CHOP were based on what they had heard from their tenants. *Id.* at ¶ 9.

As such, there are clearly issues of fact about which reasonable minds can differ about the effects of COVID on Plaintiffs' damages. And the City's one-off arguments about individual Plaintiffs fare no better. The City argues Richmark cannot seek damages related to reduced productivity on June 26, 2020, because it managed to stay open other days. But Richmark sent most of its employees home that day because CHOP had become so large and violent that employees and managers were concerned about possible violence. Donner Decl., ¶ 9; Van Zandt Decl., ¶ 6. The City claims that the fact that Cure Cocktail and Car Tender were experiencing losses prior to CHOP must mean that they could not have had losses related to CHOP. That proves nothing; Mr. Van Zandt controlled for that reality in his analysis. Van Zandt Decl., ¶ 5. *See also* Ex. 26 at 180:13-190:12 (Car Tender suffered significant downturn in business because of CHOP) (McDermott); Sheffer Decl., ¶¶ 9-13 (Cure Cocktail's business was virtually nonexistent after a shooting in the CHOP). The City also claims Car Tender cannot claim partial expenses due its move because it had plans to move, but the actual evidence is that Car Tender had no plans to move as soon as it did, and would have stayed in its Capitol Hill location far longer if CHOP had not forced its hand. Ex. 26, 76:23-81:4 (McDermott). The City is also wrong there is no evidence Sway & Cake was going to open until CHOP appeared; the business posted on June 8 (the day police left the East Precinct) that it would be opening on June 11 thanks to relaxed COVID rules. Ex. 44 (ex 27 to Kilburn dep) And with Bergman's,[44] the claimed costs related to boarding up the facility was entirely due to CHOP. Thompson Decl., ¶ 7.[45] These are damages issues that are more appropriate for a jury to decide.

---

[44] Contrary to the City's assertion, Bergman's does not claim lost profits.
[45] Even if the Court were to grant summary judgment on the items listed in the City's motion, that would not resolve this case. Plaintiffs have unchallenged out-of-pocket damages, Van Zandt Decl. at ¶ 11, and would still have claims for nominal damages.

PLAINTIFFS' OPPOSITION TO CITY OF SEATTLE'S MOTION FOR SUMMARY JUDGMENT (Case No. 2:20-cv-00983-TSZ) - 31

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1

2        **2.      The acts of third parties were foreseeable.**

3        In another reprise of an argument raised in its the motion to dismiss,[46] the City contends

4   it cannot be held liable for the acts of third parties. The Court rejected this before, based on clear

5   law. Dkt. 23, at pp. 13-14. *See also, e.g., White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990)

6   (foreseeable intervening acts of others do not defeat causation); *Lacey v. Maricopa Cnty.*, 693

7   F.3d 896, 915 (9th Cir. 2012) ("The requisite causal connection can be established not only by

8   some kind of direct personal participation in the deprivation, but also by setting in motion a

9   series of acts by others which the [government] actor knows or reasonably should know would

10  cause others to inflict the constitutional injury.")

11       To the extent the City claims a standard exists under state law that knocks out Plaintiffs'

12  negligence claim, the City is wrong. The Washington Supreme Court has stated that "[t]he duty

13  to protect against the criminal acts of third parties can arise where the actor's own affirmative act

14  has created or exposed the other to a recognizably high degree of risk of harm through such

15  misconduct." *Washburn v. City of Fed. Way*, 178 Wn.2d 732, 757-58 (2013), *citing Robb v. City

16  of Seattle*, 176 Wn.2d 427, 429-30 (2013).[47] As already stated repeatedly, that is what Plaintiffs

17  have demonstrated here. §§ III.D.1, *supra*. And Plaintiffs have extensive evidence that the harm

18  caused to them was foreseeable and foreseen that the City's actions would result in exactly the

19  harm that Plaintiffs suffered. §§ III.D.3, *supra*.[48]

20                        **IV.    CONCLUSION**

21       For the reasons stated above, the Court should deny the City's Motion for Summary

22  Judgment.

23  ────────────────────

[46] *See* Dkt. 11, pp. 7-8.

[47] The City's case recognizes the same rule and is distinguishable because there was no *affirmative act. Kim v. Budget Rent a Car Systems*, 143 Wn.2d 190, 196 (2001).

[48] In the last sentence of its brief, the City contends Mr. Biller's September 2020 injury could not have resulted from its actions. MSJ, p. 32. But there are at a minimum issues of fact as to whether it was foreseeable that once the City had allowed the neighborhood to be occupied, and did not clear it out, that there would be additional harm created by the interaction of occupiers with the public, including Mr. Biller. And the City allowed the occupation of Cal Anderson Park (a block from Mr. Biller's condo) to continue after July 1 and considered the neighborhood so dangerous that there was a bunker erected around the East Precinct. Ex. 4, 205:7-208:2, 209:12-210:19 (Sixkiller); Ex. 5, 134:10-136:24, 174:9-176:8 (Zimbabwe); Cronauer Decl., ¶¶ 21-22, 24.

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400    FAX +1.206.274.6401

DATED this 28th day of October, 2022.

**MORGAN LEWIS & BOCKIUS LLP**

By */s/ Angelo Calfo*
    Patricia A. Eakes, WSBA #18888
    Angelo J. Calfo, WSBA #27079
    Tyler S. Weaver, WSBA #29413
    Gabe Reilly-Bates, WSBA #52257
    Andrew DeCarlow, WSBA #54471
    Henry Phillips, WSBA #55152
    1301 Second Avenue, Suite 2800
    Seattle, WA  98101
    Phone:  (206) 274-6400
    Fax:     (206) 274-6401
    Email:
        angelo.calfo@morganlewis.com
        tyler.weaver@morganlewis.com
        gabriel.reillybates@morganlewis.com
        andrew.decarlow@morganlewis.com
        henry.phillips@morganlewis.com

*Attorneys for Plaintiffs*

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# APPENDIX A

## SPD Red Zone and Named Plaintiffs' Locations

### Locations Inside the Red Zone

1. Argento LLC
2. HC: The Ballou Wright Building
3. HC: The Pike Building
4. 12th & Pike Associates LLC
5. Northwest Liquor and Wine LLC
6. Olive Street Apartments LLC
7. Onyx Homeowners Association
8. Matthew Ploszaj
9. Redside: Oddfellows Building
10. Richmark Company DBA Richmark Label
11. Sway and Cake LLC
12. Wade Biller

### Locations Within Class Area but Outside Red Zone

13. Bergman's Lock and Key Services LLC
14. HC: The Broadway Building
15. HC: The 900 Pine Building
16. Redside: 1715 12th Ave
17. Shuffle LLC DBA Cure Cocktail
18. SRJ Enterprises DBA Car Tender

### Locations Outside the Class Area

19. HC: The Dunn Motors Building
20. HC: The Greenus Building
21. HC: The Colman Building
22. Madrona Real Estate Investors VI LLC
23. Madrona Real Estate Investors IV LLC
24. Madrona Real Estate Services LLC
25. Redside: 1323 E. Pine Street

