# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff,           )
                                 )
        vs.                      ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

CASEY SIXKILLER

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  OCTOBER 12, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 30

1    Q.   Do you recall talking to Mayor Durkan about

2  this -- these documents and this idea of transferring

3  the east precinct to the ownership of Black Lives

4  Matter?

5    A.   I do.

6    Q.   Okay.   What do you remember about that

7  conversation?

8    A.   I -- sorry, I'm just looking at the document.

9  I -- I remember expressing to her that while she may

10  have a strong desire to put this on the table as a

11  conversation point with folks, that it's not ready.

12  That these memos show that this is a really complicated

13  transaction, and that we could not just operationally,

14  you know, snap our fingers and all of a sudden we had

15  the square footage and the equipment that we need to

16  house -- to provide the level of -- of public safety

17  service in that part of the city.

18         You know, and -- and I don't remember if I

19  flat-out opposed continuing this conversation or not,

20  but I do remember being pretty firm in my -- expressing

21  my concern that the timeline that was -- that she wanted

22  to be able to discuss this was -- was challenging.

23    Q.   Was it your understanding that she wanted to

24  transfer it effective July 1, 2020?

25    A.   No.   And, you know, looking at that in this

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 31

1   resolution that you shared, that -- I -- that -- I mean,

2   it's even highlighted.  I think the -- the -- I don't

3   know where that date comes from, other than, you know,

4   I -- Director Goings is a very -- he takes his job very

5   seriously, and he's the ultimate professional and, you

6   know, he's -- he's the one who's the can-do spirit,

7   like, we will figure it out.

8           So it doesn't -- frankly, I can't imagine that

9   anybody actually asked for a resolution to be drafted at

10  the same time.  It doesn't surprise me, coming from

11  Director Goings, that they went that extra step to put

12  it in the -- in the ether for conversation.

13          So I -- that's a long way of saying I don't

14  know where the date July 1st comes from.  As I said, all

15  of this was sort of in the much more longer-term view

16  of, like -- you know, no one wants to go into a

17  conversation and suggest, hey, here's a potential

18  solution, and then it turns out not to be true and it's

19  just -- you know, it's just bad faith.

20      Q.  Do you recall having any discussions with the

21  mayor about why she thought transferring ownership of

22  the east precinct to Black Lives Matter was an option

23  that should be explored?

24      A.  As I said earlier, I think, you know, Mayor

25  Durkan has, you know, been part of -- you know, part --

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 32

1    has been in the city for a long time and has -- has seen

2    different efforts by certain members, communities of

3    color in Seattle who have worked with the City on

4    property transfer, disposal.  And again, I use, you

5    know, the -- Daybreak Star as -- as an example of that,

6    and I think she was sort of thinking about, again, the

7    origin of the east precinct and whether that was

8    something that we should make a commitment to -- to do.

9            But again, I -- the timing is -- just given all

10   the other events at this time -- same time period, I

11   think is purely coincidental.

12   Q.   I'm sorry.  You think the timing was

13   coincidental?

14        A.   In terms of -- yes, in terms of, you know,

15   related operational decisions that the Seattle Police

16   Department made about the east precinct, they are not

17   related to this different thread of conversation, in my

18   view.

19        Q.   Okay.  I just -- so this proposal would have

20   had the police evacuating and leaving permanently the

21   east precinct; is that right?

22             MR. CRAMER:  Objection.  Form.

23        A.   Yeah, I don't agree with the -- with the

24   suggestion -- I don't agree with the word "evacuating."

25   I think what this proposal clearly articulates is that,

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 33

1   you know, we would need to have, you know, done several

2   things, including identifying an alternative location,

3   making sure that location was suitable, making sure we

4   entered into a legal agreement with the property owner

5   if we didn't own it or if we had to lease it.

6          So that -- that's a very -- I mean, this is

7   government, man.  We don't move fast.  So I think we

8   would -- it would take some time.

9          And I think, you know, again, for me it was,

10  you know -- setting aside whether I thought it was a

11  good idea or a bad idea, it was just a -- I just want us

12  to be -- I wanted to make sure, and I think this memo

13  helps underscore that this is a very complicated idea,

14  and it would be a complicated transaction for us to pull

15  off.

16  BY MR. WEAVER:

17      Q.   Okay.  Well, part of the -- part of the

18  resolution that was drafted indicates that the City of

19  Seattle agrees to vacate the property and remove all law

20  enforcement and materials in police-related facilities.

21          Did you see that when you reviewed it?

22      A.   Yeah.  I mean, that's standard; right?

23  Standard -- I mean -- right?  I mean, standard -- I

24  presume is standard language in any real estate

25  transaction; right?  We are relinquishing fee simple

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 34

1   title.

2       Q.   Okay.   So it was going to -- it was also going

3   to remove all the holding cells and take down all law

4   enforcement -- law enforcement insignia; is that right?

5              MR. CRAMER:   Objection.   Form.

6       A.   Yeah, I mean, again, as I said, I don't

7   think -- there had been -- as far as I recall, there had

8   been no sort of firm discussion of what all of this

9   could entail; right?   As I said, it could -- could have

10  been, do you want to explore some sort of new,

11  re-imagined east precinct?   Do you want to explore a --

12  you know, a transfer to your organization or

13  organizations for the future of the east precinct?   And

14  again, this points out that there's a process and it's

15  going to take time, and blah-blah-blah.

16          So I think it would -- I don't -- I don't

17  recall it going much further than that, you know,

18  like -- and again, I think this -- unfortunately, this

19  draft resolution suggests otherwise, but it's not my

20  recollection of the -- of the conversations that were --

21  that were happening at this time.

22  BY MR. WEAVER:

23      Q.   What do you recall about whether this proposal

24  remained in play during the period of June 2020?

25      A.   I -- I couldn't tell you the time frame, but I

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 35

1    recall that at some -- well, number one, I should say I
2    was not involved in any of the conversations with
3    community organizations.  So I -- I can't provide
4    context for those discussions.
5            But two is, at some point, I believe it was
6    Black Lives Matter, or maybe others that -- that -- who
7    were engaged with the City about the east precinct, made
8    it clear that they didn't want the east precinct.  And
9    so there was a point where, you know, the conversations
10   pivoted away from, you know, let's figure out something
11   for the east precinct first, and turned to, all right,
12   we need -- let's figure out an alternative that might
13   make sense as a new commun- -- some sort of community
14   gathering place, whatever that may be.
15       Q.  Okay.  So your understanding was that was
16   because Black Lives Matter indicated they did not want
17   the east precinct.  Is that what I heard?
18       A.  That's my -- that's my recollection, yes.
19       Q.  Okay.  Do you recall what alternatives were
20   explored at that point, once it -- once Black Lives
21   Matter made clear they didn't want the east precinct?
22       A.  I -- if I -- if I remember correctly, I think
23   the -- I think the City volunteered to look at other
24   potential spaces in and around the area that could be
25   used either for, I don't know, office, community

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 36

1   gathering, what have you.

2       Q.   Do you know what other spaces were looked at?

3       A.   I think there was one that was adjacent to the

4   east precinct, but I can't -- I could not tell you if it

5   was on the same block, if it was across the street.   I

6   just don't remember.

7       Q.   Do you recall anything -- any -- by the way,

8   was the mayor involved in these discussions about

9   looking for alternatives?

10      A.   She was being briefed, yes.

11      Q.   Okay.  Do you know whether she was directly

12  involved in any of these transactions to look for

13  alternatives to the east precinct?

14              MR. CRAMER:  Objection.  Form.

15      A.   I -- I have -- my -- I don't know.  I have no

16  knowledge of that.

17  BY MR. WEAVER:

18      Q.   Do you recall anything about a space that was

19  previously leased by an entity known as the Riveter?

20      A.   That name -- yeah, that name sounds familiar.

21      Q.   Okay.  Was that one of the alternatives to the

22  east precinct transfer?

23      A.   Boy, I -- you know, I'd have to see a record

24  to -- I mean, I -- I say that because I -- I remember

25  hearing the Riveter, and there used to be a Riveter up

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 38

1    discussions with Black Lives Matter?

2         A.  Other mayor's office staff, but I -- but again,

3    I don't -- I just can't remember.

4         Q.  Sure.

5         A.  Yeah.  Sorry.  I just don't --

6         Q.  That's okay.

7         A.  So many other things going on at the same time.

8         Q.  I understand.  You weren't involved.

9              So going back to the date of this document,

10   which -- Exhibit 1, which was June 8th, in the

11   afternoon, do you recall anything else that was going on

12   with the east precinct on the afternoon of June 8, 2020?

13        A.  If I -- if I recall, June 8th is -- is when the

14   Seattle -- is right around the time that the Seattle

15   Police Department began leaving the east precinct, but I

16   don't have a -- I'm sorry, I've not committed these

17   dates to -- to memory.

18        Q.  Well, I think -- and, you know, Shane can tell

19   me if we can't, but I think we can agree that June 8th

20   was the day that --

21        A.  Okay.

22        Q.  -- they were moving.

23             What do you recall about -- when did you first

24   learn that the -- the Seattle Police Department was

25   moving materials out of the east precinct?

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 39

1      A.   At some point on the 8th of June, when I was
2  standing in the Emergency Operations Center.
3      Q.   Okay.   And did that come as a surprise to you,
4  that they were moving ammunition and evidence and that
5  sort of thing out of the precinct?
6      A.   Yeah, it did.   Yes, it did.
7      Q.   Okay.   And so you think you learned that
8  after -- after they had done it, sometime in the
9  afternoon or evening of June 8th?
10      A.   Can you -- can you ask that question again?
11      Q.   So do you think you learned about -- when were
12  you in the Emergency Operations -- when -- at what time
13  of day were you in the Emergency Operations Center, that
14  you found out that they were moving ammunition and
15  evidence and other documents and materials out of the
16  precinct?
17      A.   Well, I was in the Emergency Operations Center
18  for, I don't know, several hours on that day.   I was
19  there quite a bit during this period of time.   And if I
20  remember correctly, I -- you know, the Emergency
21  Operations Center has a lot of different monitors, and
22  we were monitoring that -- you know, including traffic
23  cams and news sources and other things.   And I
24  remember -- if I remember correctly, I remember standing
25  in the -- in the Emergency Operations Center and seeing

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 40

1    a van or a truck or something outside of the -- or

2    adjacent to the east precinct and saying, "What are they

3    doing?"

4        Q.   So was that in the afternoon or evening hours,

5    or do you recall what time of day that was?

6        A.   I would -- I would say it's probably in the

7    afternoon.   I remember it still being daylight.

8        Q.   All right.   And when -

9        A.   Which is long at that time of year.

10       Q.   It is.   When do you recall learning that they

11   were going to evacuate all personnel from the east

12   precinct?

13            MR. CRAMER:   Objection.   Form.

14       A.   I don't ever remember the Seattle Police

15   Department informing me that they had made a decision to

16   do that.   I remember learning of it, both by what I saw,

17   you know, on these monitors, and two of my colleagues

18   literally going up to the east precinct with their own

19   eyes and going, "What are you guys doing?"

20            So, you know -- yeah.   So I don't -- I was

21   never given a memo that said on this time we're going to

22   do blah-blah-blah.   I -- I saw it in real time.

23   BY MR. WEAVER:

24       Q.   So you learned sometime on June 8th that that

25   was what they were doing; is that correct?

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 93

1    street permit, street use permit?

2         A.   I don't remember.

3         Q.   Any attempt to get them to apply for a parks

4    permit?

5         A.   I don't -- I don't remember.

6         Q.   You talked about how there was no -- there were

7    no organizational leaders of the protesters, or at least

8    that it kept switching.  Is that -- is that correct?

9         A.   That's what I stated, yes.

10        Q.   Did that make it hard to have discussions

11   about -- that would stick as far as what the City and

12   the protesters might agree to?

13             MR. CRAMER:  Objection.  Form.

14        A.   Yeah.  Of course.  You know, you -- you -- we

15   would -- I remember in one -- you know, in one instance

16   we thought we had an agreement about having a -- a -- a

17   vehicle removed and a barrier removed, and when we got

18   there it was a different group of people, and we

19   referenced -- I was not there, I was not present, but

20   this individual was referenced as this is who we worked

21   with in good faith, and we're -- when we were going to

22   come and what we could do, and we were -- and then that

23   effort was -- was unsuccessful as a result.

24   BY MR. WEAVER:

25        Q.   And were there agreements about the placement

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 94

1    of certain barriers that some people would agree to, and

2    then other -- other people would then move those

3    barriers, or use other means to block the streets where

4    the barriers were not placed?

5         A.   I seem -- I remember by that time shifting

6    landscape of barriers, yes.

7         Q.   And it was the protesters who were shifting the

8    landscape?

9         A.   Pardon me?

10        Q.   It was the protesters who were shifting the

11   landscape, versus the City, of the barriers?

12        A.   That's my recollection, yes.

13        Q.   Okay.

14        A.   Someone other than the City.  I couldn't tell

15   you if it was the protestors or not.

16             (Simultaneous cross-talk.)

17             MR. CRAMER:  -- to take lunch.

18             MR. WEAVER:  Yeah, let's go off the record.

19             THE VIDEOGRAPHER:  Going off the record.

20   The time now is approximately 12:01 p.m.

21             (Recess from 12:01 p.m. to 12:46 p.m.)

22             THE VIDEOGRAPHER:  Going back on the record.

23   The time now is approximately 12:46 p.m.

24   ////

25   ////

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 96

1    concern that fire and police would not be able to access

2    the area if the barriers were there?

3             MR. CRAMER:  Objection.  Foundation.

4        A.  Was there -- was there a concern that -- that

5    first responders wouldn't have access?  Is that what you

6    asked me?

7    BY MR. WEAVER:

8        Q.  Yes.  Was that one reason that you and others

9    at the City were eager to move the barriers?

10       A.  I don't know that I recall it being stipulated

11   that way, as much as it was just, you know, we wanted to

12   make sure that, you know, cars could move in and out

13   freely out of that area, and by extension, certainly

14   police and fire as well.

15       Q.  So as of June 9th, 10th or 11th, in that

16   general time period, was there concern that the area

17   might become unsafe if it was allowed to persist in its

18   current form?

19       A.  I -- I don't -- I don't recall.  I don't recall

20   having that kind of specific discussion.

21       Q.  Was there any discussion at the mayor's office

22   about -- in the range of June 9th, 10th and 11th, 2020,

23   any concern that the blocked-off streets and people in

24   the area might have on businesses or permanent residents

25   of the area?

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 97

1    A.   We had -- the City had heard concerns from, you

2    know, residents and -- and -- and businesses about

3    potential impacts to their -- to -- you know, just given

4    their location and the location of these activities,

5    yes.

6    Q.   What were some of the impacts that the City had

7    heard about in that time range?

8    A.   Well, first I want to just stipulate that I

9    only heard these -- I didn't hear these directly from --

10   from folks.  But, you know, I think general, you know,

11   can we access a parking garage?  And, you know, things

12   like -- things like that, or not being able to drive

13   through an intersection.  But more of a -- an annoyance

14   than something else.

15   Q.   Do you recall hearing concerns that it was not

16   safe to operate a business or live in the area in

17   June of 2020, or do you recall that being a concern that

18   made it to the mayor's office?

19   A.   You know, I think, again, through this --

20   through this entire period there were, you know,

21   residents and others who, you know -- you know, raised

22   concerns about -- whether it was just the existence of

23   nightly protests or, you know, impact to access and

24   egress and -- you know, and -- so yeah, we -- we

25   certainly had been aware of -- of some of those concerns

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 98

1    that were raised by folks.

2        Q.   And just to be clear, we're talking -- you're

3    talking about the area in and around Cal Anderson Park

4    and the east precinct in June of 2020; is that correct?

5        A.   Yes.

6              (Exhibit No. 4 marked.)

7    BY MR. WEAVER:

8        Q.   Okay.  I'm going to drop into the chat

9    Exhibit 4.  It should be coming your way.

10             Do you recognize this document?

11       A.   I don't know what you mean by "recognize," but

12   I can see the document, yes.

13       Q.   Okay.  Do you know whether the attachment to

14   this document is minutes of a meeting that was held on

15   the morning of June 10, 2020?

16       A.   Yes.  This looks like a read-out from a --

17   yeah, from a -- a -- a check-in phone call of some kind.

18       Q.   Okay.  So I want to go under Point 1, which

19   says "Pursue physical modifications to

20   barriers/footprint."

21             Do you see that?

22       A.   Yes.

23       Q.   Do you recall that there was an attempt on

24   June 10th to remove some of the non-SDOT barriers, but

25   that the group leaders changed their minds?

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 145

1    time, and ability to have clean hands, was a really

2    important thing.  So trying to balance all of those

3    pieces, you know, was -- was -- was challenging.

4        Q.  Do you recall that more porta-potties and hand

5    washing facilities were moved to the park on or after

6    June 10th of 2020?

7        A.  I remember more porta-potties moving into the

8    park at some point, but I could not tell you what day

9    that was.

10       Q.  Do you know how often they were serviced?

11       A.  I believe we serviced them every day, or

12   whatever the schedule -- whatever the normal schedule is

13   for -- for servicing them and, you know, that usually

14   comes in the form of a recommendation from the service

15   provider who tells us, you know, based on the level we

16   need to come more often or less often.

17       Q.  Do you recall there being any discussion among

18   you and the parks or Seattle Public Utilities about

19   whether providing additional porta-potties would make it

20   more likely that more people would show up and camp in

21   Cal Anderson and remain in the area?

22       A.  Yeah, I do remember having a conversation along

23   those lines.

24       Q.  Okay.  What do you recall that conversation

25   being?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 146

1      A.   Again, trying to -- the need to attempt to

2   achieve a balance between, you know, what the literal

3   human needs are, realizing that, again, also in a global

4   pandemic, not a lot of restaurants were letting folks

5   use their bathrooms, and so from a -- you know, from a

6   public health perspective we needed to be responsive to

7   that, plus COVID.

8           And then, you know, I think another element was

9   just, you know, from my perspective, you know, trying

10  not to -- trying not to do anything that would encourage

11  the growth of the encampment.

12     Q.   So you were concerned that providing

13  porta-potties would encourage growth of the encampment;

14  is that right?

15          MR. CRAMER:   Objection.   Form.

16     A.   I -- I was -- I was -- I raised concerns about

17  us -- about needing to have a -- a more comprehensive

18  strategy for how we were going to deal with the

19  encampment.

20  BY MR. WEAVER:

21     Q.   Okay.   Specific to the porta-potties, what was

22  your concern about how the number of porta-potties might

23  increase the size of the encampment?

24     A.   You know, it -- it -- in my view it had the

25  potential to suggest that -- to support folks wanting to

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 147

1   stay than saying, jeez, I can't even go to the bathroom.
2   We've got to go.
3       Q.   Okay.  How about -- I believe you said Seattle
4   Public Utilities was under your supervision as well; is
5   that correct?
6       A.   Yes.
7       Q.   Okay.  So were you aware that there were
8   dumpsters provided at Cal Anderson Park for use by any
9   members of the public during the -- during June 2020?
10      A.   I don't remember specifically having dumpsters
11  placed in Cal Anderson Park, but I do -- I do, you
12  know -- I do remember having conversations about the
13  need for us to make sure we could keep up with, you
14  know, trash -- meet the trash and needs of just -- the
15  trash needs of the area.
16      Q.   Okay.  So do you recall them being placed in
17  areas around or near Cal Anderson Park in June of 2020,
18  dumpsters, that is.
19      A.   No, not specifically.
20      Q.   Do you recall any similar conversation around
21  dumpsters that might be available to the public, and a
22  concern that that might also encourage more people to
23  come to the area to have garbage service?
24      A.   You know, again, I would just stress that, you
25  know, it's all a balancing act; right, of -- of in

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 173

1        Q.   Okay.   Page 43, Exhibit 5, just the next text
2   from you in this chain.
3        A.   Yes, I see it.
4        Q.   Okay.  Why were you considering shutting off
5   the power that may have been supplied to people in Cal
6   Anderson Park?
7        A.   First, I don't recall us supplying power.  I
8   believe what happened is -- and unfortunately this
9   happens in many parts of the city.  People had accessed
10  the power panel on -- on the lights in the park and were
11  using it to charge cellphones and other things.
12           You know, my recollection is this piece is --
13  is very similar to turning the water off, is it's --
14  it's time to go.  It's like, please, just go.  We
15  don't...
16       Q.   Okay.  So did you -- did you feel that having a
17  power source, whether it was jerry-rigged or not,
18  available to people, was encouraging them to stay
19  longer?
20       A.   Again, it is an unfortunate situation across
21  our city that people are -- use these power sources not
22  for their intended use.  You know, whether that
23  encouraged people to stay or not, I couldn't speak to
24  that, but I -- I just know, you know, sort of in my
25  head, at least, you know, making clear that these things

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 174

1   were -- were going away was, I thought, an important
2   signal to folks that it was time to go.
3        Q.   You thought if you turned off the power it
4   would be more likely that people would leave the area
5   and the park; is that right?
6        A.   That was our hope, you know, or at least it
7   would encourage some people to leave.
8        Q.   Okay.
9        A.   While we then focused in on what we would need
10  to do to help others leave.
11       Q.   In your next text, at 8:13 a.m., you say, "SPU
12  also held on porta-potty servicing and trash removal."
13            Do you see that?
14       A.   Yes.
15       Q.   Was that also part of your plan to get -- tell
16  people it was time to go, you were going to stop
17  servicing the porta-potties and removing the trash?
18       A.   That's my recollection, yes.
19       Q.   I'd like you to go to Page 51, and on to
20  Page 52, there's a text chain, 2542 between you and Mami
21  Hara later on the day of June 23rd.
22       A.   Uh-huh.
23       Q.   I take it from this and some other documents
24  that you ended up turning the water back on in Cal
25  Anderson that day; is that right?

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 179

1    out of the park is so that permanent residents and

2    businesses in the area could live in peace?

3        A.  What I wanted to do was to, you know, help

4    facilitate a process that allowed us to restore, you

5    know, some sort of, quote/unquote, normalcy to the area.

6    That was what I was focused on.

7        Q.  And so you knew that one way to restore

8    normalcy to the area would be to clear out Cal Anderson

9    Park; is that right?

10       A.  In my -- yeah, that was -- in my belief, yes, I

11   thought that was a component of that strategy.

12       Q.  Okay.  And moving the barriers out of the area

13   would also have helped return the area to normalcy; is

14   that correct?

15       A.  You know, as I -- yes, as I said earlier, I

16   think, you know, ensuring that we had -- you know, that

17   we could, you know, restore and facilitate, you know --

18   you know, clear access across all -- through all of our

19   streets, I thought was really -- was really important,

20   and we'd been trying to do it.

21       Q.  I want you to go further down on the 2542 chat.

22   You say at 12:43 p.m. on June 23rd, "Turn it back on,

23   but I want to be -- it to be -- I want to be

24   acknowledge -- I want it to be acknowledged that it's

25   the time to go, and we will work with Parks to make sure

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 180

1    the garden is watered."

2          Mami says, "Yes, great idea."

3          And then you say, "But there needs to be

4    something from them.  So far we're doing all the giving

5    and they aren't doing shit."

6          Do you see that?

7    A.  I do.

8          MR. CRAMER:  Tyler, is there a question?

9          MR. WEAVER:  I asked him if he sees it.

10         MR. CRAMER:  Oh, he said yes.

11         MR. WEAVER:  Oh, okay.  Sorry.  I -- I

12   didn't hear it.  I don't know if it's the --

13   BY MR. WEAVER:

14   Q.  So why did you say it's your perception that

15   the City was doing all the giving and the other side was

16   doing nothing?

17   A.  You know, as I've said several times today, you

18   know, there was no centralized structure of folks who

19   were in and around this area for us to -- to -- to try

20   to work with to address the range of issues that people

21   were expressing or experiencing, as the case may be.

22   And, you know, if I -- if I remember correctly, I think

23   the farmers had presented us with, like, a 25 list --

24   point list of demands, and I believe we were working

25   through some of those things.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 181

1          So I think what you're seeing from me is a
2    frustration that, you know, we'd -- every -- at every
3    turn it seemed that some -- I shouldn't say at every
4    turn.  There were times when it felt like the goalposts
5    were always getting moved.  You know, here we are trying
6    to do this peacefully and respectfully and -- and the
7    goalposts keep getting moved on us.
8          Q.  So you were frustrated that the City was doing
9    what it could to make this a peaceful transition, and
10   you felt like you were getting nothing back from the
11   people you were trying to transition out of the area; is
12   that correct?
13         A.  Yeah, I -- I think that we -- again, it just
14   was a level of frustration that we -- you know, that the
15   goalposts continued to move on us, you know.
16         Q.  Okay.  So what was your perception of what the
17   City had been giving to this process?
18         A.  I think in this context it was, you know, to
19   try to continue to support that garden being there and,
20   you know, talking with them about how we could
21   memorialize it, support it, create ways to honor that
22   moment in time.  I think it was probably as -- you know,
23   that was kind of the gist of it, if I remember
24   correctly.
25         Q.  Okay.  So the City had indicated that the

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 182

1   garden that had been dug in the -- in the park would

2   re- -- you had indicated -- the City had indicated that

3   that would be allowed to remain permanently at that

4   point; is that correct?

5       A.   I don't know if -- I think what we had talked

6   about -- and again, I was not in these meetings, but I

7   think, you know, it had been discussed what were the

8   ways that we could preserve and/or support the efforts

9   by the individuals who -- who had started and maintained

10  that garden.

11      Q.   Also on June 23rd, the City had also started

12  doing the homeless and relocation outreach that we had

13  talked about earlier; correct?   That was also happening

14  in the park on the 23rd?

15      A.   Yes, based on that email from Director Johnson.

16      Q.   And at that point there were still port-a-

17  potties in the park; right?

18      A.   That's correct, yes.

19      Q.   Okay.   And there was still -- there was still

20  litter being picked up around the area; right?

21      A.   That's my -- yes, that's my recollection.

22      Q.   Okay.   And the power was still on, even though

23  they'd jerry-rigged it; correct?

24      A.   Correct.

25      Q.   Okay.   Did you feel that those were all things

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 183

1    that the City was giving to the protesters in return for

2    nothing?

3         A.   I don't know.  I -- to be honest, I -- I don't

4    know what I -- what I meant in that -- in that moment in

5    time when I sent that text.  I just knew it was my job

6    to try to figure out how to get folks out of Cal

7    Anderson Park.

8         Q.   Okay.  You were -- I mean, the wording was

9    pretty strong that the City was giving them everything

10   and they weren't doing shit.  I mean, I'm not -- that's

11   not an exact quote, but would you agree that that's

12   pretty strong language?

13        A.   Yes, it is very strong language.

14        Q.   You were -- you were very frustrated at that

15   point; correct?

16        A.   That is correct, yes.

17        Q.   And you felt that you were -- that whatever you

18   had negotiated and agreed with with the protesters was

19   never enough; that the City could never please them

20   completely; right?

21              MR. CRAMER:   Objection.   Form.

22        A.   I don't know that I would characterize it that

23   way.  I think it was more of a -- you know, the -- not

24   having clarity on what all the things are that we could

25   have done to -- you know, to resolve the encampment was

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 184

1    frustrating.  I mean, it was -- you know, and -- but I'm

2    glad that's why we had, you know, the Human Services

3    Department fire up its stuff and try to think outside

4    the box of who we could bring to the table to try to

5    help engage, you know, folks who were -- were in the

6    park.

7    BY MR. WEAVER:

8         Q.  Do you know whether at this point the City had

9    also indicated to people in the area that they would

10   preserve the artworks that had been created during the

11   CHOP period of June 8th through the end of June 2020?

12        A.  Yeah, I am aware that there was an effort to

13   store the art.

14        Q.  Okay.  And -- I mean, as of June 23rd, when you

15   wrote this, had the City -- do you know whether the City

16   had been -- had offered that as well to the protesters?

17        A.  I don't remember.

18        Q.  Okay.  Okay.  Going further down this text

19   chain with Mami Hara, on the next page, Page 52, at

20   12:46 p.m., you indicate that -- you say, "I mean, we're

21   offering to store their plants in our greenhouses and

22   water their," all caps, "illegal garden."

23             What was -- what were you -- what was the offer

24   to store plants in the City's greenhouses?

25        A.  It was just that.  We were offering to -- to

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 188

1          MR. CRAMER:  Objection.

2    BY MR. WEAVER:

3        Q.  Go back to Exhibit 5, and Pages 9 to 10.

4        A.  Okay.

5        Q.  And at the bottom there's a text from Mami Hara

6    to a group that includes you, indicating that as of

7    June 24th, tent count was 30 on the play field, 75

8    around the bathrooms, garden, and play structure, 35 on

9    the north side of the park, and 10 tents re-camped

10   around the precinct, and then the next one looks like 50

11   less overall.

12          Do you see that?

13       A.  I do, yes.

14       Q.  Okay.  So my count is that as of June 24th

15   there were -- you'd think I would have done this before,

16   but about 150 tents; is that right?

17       A.  You're better at quick math than I am.

18       Q.  All right.  I mean, do you recall that there

19   were at some point 200 or more tents in and around Cal

20   Anderson and the east precinct towards the end of

21   June 2020?

22       A.  I'm not going to speculate about the -- the --

23   the -- the number of tents, but there -- but there

24   were -- there were a lot of tents in the park, and as

25   indicated here, as well as near the -- near the precinct

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 189

1   itself.
2       Q.  Mami was there every day; right?
3       A.  Mami was there, I think, every day or so, and
4   other folks.  And by this point, on the 24th, right, I
5   believe our -- the navigation team was also on site as
6   well, the Human Services Department's navigation team
7   was on site, which specifically engages in
8   encampments -- in encampment work.
9       Q.  Okay.  Going down further -- actually, it's on
10  the next page, it's actually Text Chain 794, on Page 10.
11      A.  Oh.
12      Q.  Text from Mayor Fong -- or sorry, Mike Fong.
13  It's been a long day.  Saying "The mayor just called and
14  wants the newly constructed barriers up on 12th
15  removed."
16          Do you see that?
17      A.  Yes.
18      Q.  Okay.  What do you recall about during this
19  week, after the mayor said it was time to go home, that
20  there were still new barriers showing up in the area?
21          MR. CRAMER:  Objection.  Form.
22      A.  Can you -- can you ask me that again, please?
23  I'm sorry.
24  BY MR. WEAVER:
25      Q.  During the week of June 22nd, do you recall

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 205

1    that -- you know, that kind of after action sort of

2    thing.  So I guess that would suggest I was there fairly

3    soon after the -- the 1st.

4        Q.  Do you know how long it took to clean up the

5    debris and the graffiti in the park after July 1st?

6        A.  No, I don't remember, but Parks would probably

7    remember that and -- and Parks -- Parks would -- and SPU

8    would remember that.  It's their team.

9        Q.  Do you recall, or do you know whether sometime

10   after police cleared the area out, that encampments

11   returned to Cal Anderson Park for the remainder of the

12   2020 calendar year?

13              MR. CRAMER:  Objection.  Form, assumes

14   evidence.

15       A.  Can you ask me that again?

16   BY MR. WEAVER:

17       Q.  Were you ever involved in monitoring or

18   responding to encampments that occurred in Cal Anderson

19   Park after July 1, 2020, up until December 2020?

20       A.  Yes.

21       Q.  Okay.  What was your involvement with those

22   encampments?

23       A.  You know, as -- as deputy mayor, overseeing the

24   Department of Human Services, I was, you know, closely

25   involved in monitoring all of our encampments across the

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 206

1  city of which, you know, there are many, and -- and

2  since I also oversaw the Parks Department, you know, was

3  pretty acutely aware of, you know, encampments that

4  existed in our park system as well.

5       Q.  Okay.  What do you recall the size of the

6  encampment being at Cal Anderson Park in the period of

7  July 2020 through December 2020?

8            MR. CRAMER:  Objection.  Form.

9       A.  I -- I -- I don't remember.  I really don't.

10 BY MR. WEAVER:

11      Q.  Okay.  Do you recall any problems with violence

12 or dangerous conditions related to the encampment in Cal

13 Anderson Park after July 2020 until December 2020?

14           MR. CRAMER:  Same objection.

15      A.  I -- I -- I -- I recall there being at least --

16 at least one incident where a Parks employee was injured

17 while servicing the park, but I can't tell you when

18 that -- when that was.  But I believe that occurred

19 sometime between July and -- and December.

20 BY MR. WEAVER:

21      Q.  Do you recall, in your role in the mayor's

22 office, being aware of complaints from residents or

23 businesses in the area around Cal Anderson or the east

24 precinct about ongoing problems related to the

25 encampment in Cal Anderson Park from July to December of

Hunters Capital, LLC v. City of Seattle                                     Casey Sixkiller

Page 207

1    2020?

2        A.   I re- --

3              MR. CRAMER:   Objection.   Form.

4        A.   Yeah, I -- I -- you know, I recall getting

5    complaints from, you know, residents in Capitol Hill,

6    residents from every neighborhood in our city about the

7    presence of encampments in their parks or in their

8    neighborhoods.   You know, specifically on Capitol Hill

9    there were, you know, a number of encampments, including

10   one just down the street in -- is it Thomas Park?   I

11   can't remember.   It's, you know, not that far from --

12   from this area.   So, you know, sadly and unfortunately

13   being the recipient of those complaints and frustrations

14   was part and parcel to my role at the City.

15   BY MR. WEAVER:

16       Q.   Do you know why the City decided to remove the

17   encampment from Cal Anderson Park in December of 2020?

18       A.   We had a number of larger encampments that

19   were -- we have a number of large encampments across the

20   city.   As I recall, we had new shelter capacity that was

21   coming online, and that gave us the ability to address

22   some of those encampments, including the encampment that

23   had -- that had re-emerged at Cal Anderson.

24       Q.   Do you know whether there has been an

25   encampment that has re-emerged in Cal Anderson in 2021?

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9

Hunters Capital, LLC v. City of Seattle                          Casey Sixkiller

Page 208

1    A.  No, I'm not aware of -- I'm not aware of a

2  sustained encampment in Cal Anderson in 2021.

3    Q.  All right.  In 2021, are you aware of

4  encampments in other parts of the city?

5    A.  Yes.

6    Q.  Do you know why those encampments have been

7  allowed to remain, but the encampment in Cal Anderson

8  Park has not?

9    A.  Well, Cal Anderson was on the front end of a

10  new approach that we began to implement toward the end

11  of 2020, and it carried forward in 2021, where, you

12  know, when we are successful in -- in being able to

13  tran- -- to making sure that we can offer folks services

14  and the opportunity to come inside, that we are -- do

15  that.  And then once that -- once that park has been --

16  been cleared and remediated, we have initiated a process

17  to keep those parks encampment free, meaning that under

18  our -- under our regulations, we'll treat any new tent

19  or structure that pops up as an obstruction and work to

20  have it removed.  So Cal Anderson was part of that.

21  University Playfield is another example, as is Gilman

22  field over in the Ballard neighborhood.  Gilman Field

23  was a very large encampment that we worked with service

24  providers to resolve, and have kept encampment free

25  since that time.

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 209

1      Q.  Do you know why Cal Anderson Park was among the

2  first under the new approach, why that particular

3  encampment was chosen?

4      A.  Well, one, it met our criteria, which I -- I

5  cannot go into specifics of all the criteria off the top

6  of my head, but it met criteria, which included -- we

7  had -- we had conducted a site visit, and -- and -- so

8  that's one thing, is it met our criteria for us to -- to

9  be engaged there and make it a -- a priority park for

10  remediation.  Yeah.  Yeah, I think that was the gist of

11  it.

12     Q.  I know you said you can't list all the

13  criteria, but can you tell me generally the areas that

14  you're looking at as part of the criteria, as far as

15  what you're going to do with a particular park?

16     A.  You know, in that instance, at Cal Anderson, is

17  the park -- the encampment had begun to prohibit the use

18  of the park.  I remember going up there, as an example,

19  you know, and the play structure was damaged and

20  compromised, the field -- the turf north of the -- Bobby

21  Moore's field had been completely destroyed.  There had

22  been, as I recall, at least an incident of somebody

23  breaking into or attempting to break into SPU's

24  pumphouse that was on -- that's adjacent to or shares

25  that property.  And as we talked about earlier, that's a

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 210

1    critical asset for the City.

2          So there were -- there were a number of factors

3    that were going on up there at that time.  And I'm

4    really proud of that work.  We got, I think, 62 or 65

5    people inside as a result of that engagement.

6          Q.  So that was -- was that the total -- was that

7    sixty -- were there 62 or 65 people there total, or was

8    there more than that, but you got 62 or 65 into housing

9    from that encampment?

10         A.  As I -- as I recall, on the day of the

11   remove -- on the day of the removal, I would say there

12   probably were less than ten people that did not accept

13   placement into a -- into some form of shelter.

14         Q.  Did the particular location of that encampment,

15   in terms of the neighbor- -- surrounding neighborhood,

16   play a factor in deciding to clear Cal Anderson out as

17   one of the top priorities?

18         A.  No, I don't -- you know, I -- I don't think so.

19   It was -- it was a big encampment.

20         Q.  Did -- did the -- were there any changes in the

21   laws, or was it just a different change -- that led to

22   the approach you've been talking about, or was it just a

23   difference in the City's policy in terms of what it did

24   at Cal Anderson and a couple other places at the end of

25   last year?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Casey Sixkiller

Page 218

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Casey

9    Sixkiller, having been duly sworn, on October 12, 2021,

10   is true and accurate to the best of my knowledge, skill

11   and ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 22nd day of October, 2021.

14

15

16   _____

17        CINDY M. KOCH, CCR, RPR, CRR #2357

18

19   My commission expires:

20   JUNE 9, 2022

21

22

23

24

25

c82e3d59-f647-4f84-89f1-dc5c13c9c4d9