# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,     )
                                  )
              Plaintiff,          )
                                  )
         vs.                      ) No. 20-cv-00983-TSZ
                                  )
CITY OF SEATTLE,                  )
                                  )
              Defendant.          )
_____


 VIDEOTAPED VIDEOCONFERENCE 30(b)(6) AND INDIVIDUAL

        DEPOSITION UPON ORAL EXAMINATION OF

              CITY OF SEATTLE

              (SAMUEL ZIMBABWE)

_____



              Seattle, Washington




   (All participants appeared via videoconference.)




DATE TAKEN:  OCTOBER 28, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Page 12

1          The -- after -- and as part of the crowd
2     control approach, prior to June 8th, there were some
3     typical traffic control barriers, what we call water
4     filled barriers.
5              They're the generally orange and white barriers
6     that we use on a regular basis.  And they're plastic,
7     they get filled with water, and they become sort of
8     immovable.  They can -- they can help separate vehicles
9     from pedestrians.
10             So those were -- SDOT had provided those,
11    worked with -- with Seattle Police Department to provide
12    those as part of the crowd control approach prior to
13    June -- June 8th.
14             After June 9th, there were -- and really there
15    were -- not for another few days, we did provide some
16    other barrier -- barriers that were intended to provide
17    some regular traffic patterns between the area that
18    people were protesting and areas that were open for
19    vehicular traffic.
20             And those included some concrete blocks that we
21    commonly refer to as ecology blocks, and then some other
22    traffic control devices.
23         Q.  Okay.  So there were -- there had been some
24    protests prior to June 8th or June 9th in the area
25    around the East Precinct in Cal Anderson Park; right?

6402ce53-89af-4e06-b574-53dbb844f256

Page 13

1       A.   That's right.

2       Q.   Okay.   And there had been some barriers that

3   had been used by the City and the police department in

4   that area as well with relation to those prior protests;

5   right?

6       A.   That's right.

7       Q.   Okay.   And those included -- those included the

8   water filled barriers that you were talking about?

9       A.   Yes.

10      Q.   So were those -- are those large orange

11  barriers that are filled with water typically?

12      A.   Yes.

13      Q.   Okay.   About how big are there?

14      A.   They're about six feet long each, and about

15  two and a half to three feet tall.

16      Q.   Okay.

17      A.   They're similar in size to what a Jersey

18  barrier -- you know, a concrete Jersey barrier would be,

19  but they are more easily moved.   And then once they're

20  filled with water, they're generally not as movable.

21      Q.   Okay.   What's the difference between a Jersey

22  barrier and an ecology block?   I've been trying to

23  figure this out, but you're the man, so --

24      A.   Yeah.   Sure.   So Jersey barriers are -- are

25  concrete barriers that are often used in a highway

Hunters Capital, LLC v. City of Seattle          30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 15

1   each other and used as sort of a retaining wall sort

2   of -- part of a retaining wall deployment.

3       Q.   Okay.   How -- how large and heavy are the

4   ecology blocks?

5       A.   So the ecology blocks are -- they come in some

6   different sizes, but they're typically about two feet

7   tall, three feet long, and two feet deep.

8       Q.   Okay.   Do you know how heavy they are?

9       A.   They're multiple hundred pounds.   I mean, we --

10  when we move them, we use a piece of construction

11  equipment to move them.   They're not something that

12  individuals can move.

13      Q.   Okay.   Okay.   So going back to before we were

14  clarifying what kind of barriers we're talking about,

15  so -- so prior to the evening of June 8th, were -- there

16  were -- were there -- were there Jersey barriers in the

17  area of the East Precinct?

18      A.   You know, I believe that there were a few

19  ecology blocks that had been provided by SDOT very close

20  to the precinct itself, but not as part of the crowd

21  control approach.

22      Q.   Okay.   What were they -- what were they there

23  for?

24      A.   You know, I'm -- I'm not exactly sure what they

25  were there for.   But they were, you know, very close to

6402ce53-89af-4e06-b574-53dbb844f256

Page 16

1  the precinct itself.

2      Q.   Okay.   And were there other things that had

3  been used as barriers that were in the area on the night

4  of June 8th, like bicycle racks and that sort of thing?

5      A.   Yeah, I believe that there had been some what

6  are commonly called bicycle rack barriers.   Those are

7  the sort of metal fencing that I think are -- are pretty

8  standard crowd control -- also used in crowd control

9  situations, but they can be used as bicycle racks as

10  well.

11          And then I believe that there were some other

12  sort of black metal concert -- barriers that are

13  typically used for concert fencing, that were not SDOT

14  provided, but they were -- they were present there.

15      Q.   Okay.   And on the night of June 8th into

16  June 9th, those barriers that were there had been moved

17  by people in the area; is that correct?

18      A.   That's correct.

19      Q.   And they were blocking certain streets and

20  sidewalks at that point, on the morning of June 9th?

21      A.   Yeah.   So at -- at the point -- you know, I --

22  I went to that area for the first time on June 9th.

23  When I arrived there, there were all sort of -- all sort

24  of manner of barricades that had been set up by -- by

25  both protest groups and individuals.

6402ce53-89af-4e06-b574-53dbb844f256

Page 17

1          And they included the materials that we've

2    talked about, and then they included some other -- other

3    things as well.  I think there were some bleachers from

4    Cal Anderson Park that had moved -- been moved into

5    various places.

6          There were some dumpsters that had been moved

7    around.  There was a variety of different things that

8    were -- had been moved into -- into creating sort of

9    barricades that blocked different places within the --

10   that area.

11       Q.  Okay.  So there were streets -- areas that were

12   blocked off included streets and sidewalks; is that

13   right?

14       A.  Yeah, I -- you know, I don't remember there

15   being sidewalks that were blocked off.

16       Q.  Okay.

17       A.  And there were certain -- certain streets that

18   were blocked off, and then there were certain streets

19   that were -- remained open.

20       Q.  And we're -- we're still talking about the

21   morning of June 9th; right?

22       A.  Yes.

23       Q.  Okay.  At some point did -- were there

24   blockages of sidewalks in the month of June, between

25   June 9th and July 1, 2020?

6402ce53-89af-4e06-b574-53dbb844f256

Page 23

1    requirements get applied to -- to temporary blockages in

2    particular.

3          And so the -- it -- we close sidewalks at

4    various points for construction activities or things

5    like that.  And we -- we put out a sign that says

6    "Sidewalk closed," and use the sidewalk -- use the

7    crosswalk here, and we provide a path of travel.  But a

8    sidewalk can be blocked for -- for a temporary period or

9    for a permanent period.  I mean, we can have a sidewalk

10   blocked.

11   BY MR. WEAVER:

12        Q.  Do you know why you would have said that we

13   need all sidewalks open and free of barriers to meet ADA

14   requirements?  What did you understand that -- what was

15   your understanding of what ADA requirements required in

16   this particular circumstance?

17        A.  Yeah, so I -- you know, if we were -- if we

18   weren't doing that, if we weren't setting up and saying

19   "Sidewalk closed," and -- and providing an alternative

20   path of travel, then we needed to have those sidewalks

21   open.  And it wasn't our intention to officially close

22   the sidewalks, and so therefore we needed to maintain

23   access.

24        Q.  Okay.  Were there -- were there any street

25   inspectors assigned to the area around the East Precinct

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 24

1    and Cal Anderson Park in the period of June 8th to

2    July 1, 2020?

3              MR. CRAMER:   Objection.   Form.

4         Go ahead.

5         A.   We do have street use inspectors assigned to

6    every part of the city, and they go and visit regularly

7    permitted activities.   And then they also, as part of

8    their role, look for potentially unpermitted activities

9    as well.

10             We had -- you know, there were a series --

11   leading up to June 8th, there were a series of -- of

12   protests that were occurring in that general area at

13   various times of day.

14             And so we had asked our -- a lot of our staff,

15   who were doing regular activities within the

16   right-of-way, to pull -- to -- to not go there just

17   because of the unpredictability of the -- of when the

18   protests would -- would happen.   And there would

19   sometimes -- there would sometimes be temporary

20   blockages of streets with the protest activities.

21             So people were still taking care of our basic

22   responsibilities, but we -- if -- if they didn't need to

23   be there, we were asking them not to be there on a

24   regular basis.

25   ////

6402ce53-89af-4e06-b574-53dbb844f256

Page 25

1    BY MR. WEAVER:

2        Q.  Why were you asking them not to be there on a

3    regular basis during that time?

4        A.  Because their activities could be -- their

5    activities could be interrupted by some of the protest

6    activities.  And so, you know, just as a way to not have

7    them have their daily work interrupted by -- by being in

8    the midst of a -- of a protest, we sort of re- --

9    reallocated what they were asked to do.

10       Q.  Okay.  In addition to the barriers that we

11   already talked about and things that were obstructing

12   the area at that time, do you recall there being -- do

13   you recall there being barriers such as cars that were

14   added to the area?

15              MR. CRAMER:  Objection.  Form.

16   BY MR. WEAVER:

17       Q.  Do you recall there being cars parked in the

18   street, that were blocking the streets?

19       A.  Not by the City.  There were --

20       Q.  No, I'm -- I'm not talking about from -- by the

21   City.

22       A.  Okay.  Yeah, there were times when there were

23   cars put in -- in the way of street traffic by the -- by

24   the folks protesting.

25       Q.  By the way, who -- who were the -- do you know

6402ce53-89af-4e06-b574-53dbb844f256

Page 26

1   who the street inspectors were that were assigned to the

2   Cal Anderson and East Precinct area in the month of June

3   2020?

4        A.  I don't.  But -- I -- I don't recall.  It's a

5   regular assignment.  It wasn't anything unusual.  And

6   they're -- just to make sure I clarify, our inspectors

7   are not assigned to parks facilities.  So our inspectors

8   are responsible for the SDOT right-of-way, the

9   transportation right-of-way, not for any park

10  activities.

11       Q.  Sure.  So when I -- when I talk about the area

12  around the East Precinct and the -- and Cal Anderson

13  Park, I'm not -- you know, I'll -- I understand -- thank

14  you for the clarification -- that doesn't -- your

15  jurisdiction doesn't include the park, but there's

16  obviously streets around the park as well.  So that --

17       A.  Sure.

18       Q.  -- that's included when I'm saying that,

19  just -- just to be clear.

20           So do you -- do you recall also seeing, during

21  the month of June 2020, what I guess I will say are

22  market booths that had been set up, private market

23  booths on the streets and sidewalks in that area?

24       A.  Yes, I do.

25       Q.  So those were in the streets and the sidewalks

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 27

1    as well?

2         A.   Yes.

3         Q.   Okay.  Do you recall there being people around

4    these various barriers in the streets and sidewalks as

5    well?

6              MR. CRAMER:  Objection.  Form.

7         A.   I do.  There were people that -- yes, I do.

8    BY MR. WEAVER:

9         Q.   Do you recall that there were people who

10   appeared to be appointed as guards of the various

11   barriers in the area?

12        A.   I think there were -- yes.  I would say there

13   were people who were assigned as sort of -- to -- to

14   watch what had been established by a protest group as

15   sort of a -- an area around the East Precinct.  "Guards"

16   is maybe a little bit of an overstatement, from what I

17   saw.

18        Q.   Okay.  Were some of them armed, that you saw?

19        A.   I don't recall if they were armed.  You know,

20   I -- there were a few times when I did see firearms in

21   the -- in the area that we're talking about, but not --

22   not brandished in any way.  So -- but there were --

23   there were times when people were open carrying.

24        Q.   Okay.  What sort of weapons did you see open

25   carried in the June 2020 --

6402ce53-89af-4e06-b574-53dbb844f256

Page 29

1    BY MR. WEAVER:

2        Q.  Okay.  Which ones was -- which ones did the

3    City allow?

4        A.  So there -- there were -- this is not on

5    June 9th.  This is -- or June 11th.  This was after we

6    regularized a traffic pattern for -- for the area in

7    order to -- to -- to provide a regular, standard traffic

8    pattern.

9            There were City-provided barriers, the ecology

10   blocks, some of the other traffic control devices that

11   were present, that we allowed.  Other things that were

12   not -- not -- not those regular devices, using things

13   like cars to temporarily block a street or something

14   like that, were not at any point allowed by the City.

15       Q.  Okay.  Did the City remove things such as the

16   cars that were parked in the area?

17       A.  We did not prohibit any parking in the area.

18       Q.  Okay.  Including in the middle of a street; is

19   that correct?

20       A.  We did not remove vehicles from the middle of

21   the street.

22       Q.  Okay.  What obstructions of the streets and

23   sidewalks did the City remove?

24       A.  So we did remove the -- there -- some of those

25   initial items that had been rearranged by protesters,

Page 33

1    into construction equipment that our operators were --

2    were operating.  We had people lie on top of some of

3    those ecology block barriers and -- and sort of block

4    access to what the construction equipment needed to

5    attach to.

6          We had some crowds forming around -- around

7    some of our construction workers seeking to do -- do

8    their work, and they would -- we would sort of get

9    followed around some of the -- the site, being yelled at

10   and things like that.  Not -- not physical assault on

11   our employees.

12       Q.   So you talked earlier about how there was a

13   removal of some barriers and some addition of eco

14   barriers to the area by SDOT.

15            Do you recall that?

16       A.   Yes.

17       Q.   Okay.   What do you recall about that process?

18       A.   So what I recall is that, the morning of

19   June 9th, myself, Fire Chief Harold Scoggins, the

20   general manager of Seattle Public Utilities Mami Hara,

21   and I, and maybe a few other people sort of all came to

22   the 12th and Pine intersection to survey the -- the

23   area, to understand what was going on, what the

24   conditions were.   That's what led to Chief Scoggins'

25   email, the email that we discussed, Exhibit 3.

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 34

1    Over the course of the next few days, leading

2    through the weekend, that weekend, we worked to develop

3    a -- what we felt was a traffic control plan that would

4    meet all of the City's and the adjacent property owners'

5    needs for services and property access, but also sort of

6    regularized a protest area that might stay closed to

7    normal street operations for the period that the

8    protests would be active.

9            And at that point we were continually working

10   to -- to de-escalate the conflict, and so we didn't have

11   a fixed timeline of how long that would need to be put

12   in place.

13           So we felt like it was a -- an operation that

14   would need to potentially operate in this form for sort

15   of an indeterminate period of time as we worked on

16   de-escalating the situation.

17           So that plan was developed over the course of

18   that week, and there were a series of meetings that

19   included protest leaders and some conversations with

20   businesses and residents in the area as well.  And there

21   were some informal and formal meetings of those groups.

22       Q.  Okay.  There was a lot there, so I'm going to

23   ask you -- I'm going to ask you a few follow-ups.  Okay?

24       A.  Yes.

25       Q.  So about the indeterminate period of time, when

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 35

1   the City went in and changed the footprint of the

2   protest area, was there any discussion about how long it

3   was anticipated that that might be in place?

4        A.  I don't recall there being a discussion of

5   that.

6        Q.  Was there any discussion about a deadline by

7   which the barriers that had just been placed would need

8   to be removed?

9        A.  The -- and just to make sure we're on the --

10  we're talking about the same thing, I'm talking about

11  the -- when SDOT provided ecology blocks and sort of

12  regularized the traffic control, we did not have a

13  deadline by which that would be removed.

14         And so in creating that traffic control plan,

15  we worked to make sure that all of the driveways and

16  business access could be maintained without need for any

17  special kind of operations.

18         It was all sort of within a regular -- what we

19  would have determined if -- if there were a need for a

20  long-term closure for construction activities or some

21  other -- some other activity beyond protests, it would

22  have been fine for the streets to operate in that way.

23        Q.  So I -- yeah, that's what I was talking about.

24  And my understanding is that those changes were made on

25  June 16th or 17th, or maybe both; is that correct?

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 36

1    A.   Yeah, that's -- that's my recollection as well.

2    Q.   Okay.   And so tell me what that specific

3  process of creating that area and -- and those barriers

4  on the 16th and 17th, what that entailed, the physical

5  process.

6    A.   The -- maybe -- okay.   Let me make sure I --

7  the physical process.   So we -- you know, what we did --

8  let me -- let me just talk through a little bit of what

9  the traffic pattern was, and then we can talk about how

10  we did it.

11        So when we -- what we regularized still

12  included some street closures.   So Pine Street remained

13  closed between 10th and 11th Avenues.   11th Avenue did

14  not connect across Pine any longer.   It was sort of a

15  temporary blockage of the intersection through.   And

16  then Pine, between 11th and 12th Avenues, was turned

17  into a one-way street westbound, from being a two-way

18  street prior.

19        Other than that, all -- all streets reopened to

20  vehicular access.   In the process of doing that, we --

21  we brought to the site and installed the concrete

22  ecology block barriers.

23        We also installed some new traffic control.   We

24  installed, I believe, a stop sign at 12th and Pine,

25  which previously would have been controlled by a traffic

Page 37

1   signal, some one-way signs, some other -- other signage

2   that went into the area that regularized that traffic

3   control plan.

4        Q.  Okay.  How many ecology blocks did SDOT move

5   into the area on June 16th or 17th?

6        A.  I don't recall the specific number, but it

7   was -- it would have been 50 to 100 ecology blocks.

8        Q.  Okay.

9        A.  I mean, I'm sure we can provide a precise

10   number, but I don't -- I don't recall.

11        Q.  The streets that were one-way in the area

12   and -- were they local access only?

13        A.  We did have signs that said local access only,

14   and those were a standard sign that we provide.  It's

15   called a Type 3 barrier, that has -- that says "Street

16   closed" and "Local access only."

17            And the purpose of that, for us, is to

18   communicate to people driving that they should only go

19   through if they -- if they need to, but if they have

20   business within that area, that's what local access

21   means, that it's open for local access.

22        Q.  Okay.  So where were the local access only

23   signs, if you recall?

24        A.  So they were at the perimeter of -- of, you

25   know, where -- where we were -- where we had changed

Page 38

1    some of the traffic patterns.  So I recall them being

2    at -- on the north side, they would have been at Olive,

3    so at 11th and 12th and Olive.

4         Q.  Uh-huh.

5         A.  There may have been one set that was one block

6    farther north.  The -- there were some at Pike, at both

7    11th and 12th.  There may have been one at 13th and

8    Pine.  And then there may have been one at 10th and Pike

9    as well.

10        Q.  Why -- why was the area declared local access

11   only?

12             MR. CRAMER:  Objection.  Form as to "area."

13        A.  So, you know, we were -- what we -- we were

14   trying to limit the amount and the opportunity for

15   vehicle and pedestrian conflict, even after that

16   June 16th timeline.

17             There were times of day and times of protest

18   activity where there were a lot of pedestrians that were

19   sort of too many people for the sidewalks to contain.

20   And so we -- and we had had an incident, I think before

21   June 8th, where a vehicle had driven into a crowd of

22   protesters.

23             And so we were trying, again, as part of that

24   approach to de-escalating and reducing some of the

25   conflict, to maintain that separation between vehicles

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 39

1   that didn't need to be in the area and those -- those

2   protest activities.

3           And so the local access was just another way

4   to -- to communicate that to people who maybe didn't

5   know what area of the city they were in, that they

6   didn't -- if they didn't need to come through that way,

7   that they -- they didn't -- they -- that they probably

8   shouldn't.  While also saying, if you have something to

9   do here, you're freely welcome to come in.

10  BY MR. WEAVER:

11      Q.  Okay.  So there was a recognition that, despite

12  the footprint of the barrier, there was probably going

13  to be spillover as far as pedestrians and protests

14  outside those barriers at certain times as well; is that

15  correct?

16      A.  That's what we experienced in the days leading

17  up to that -- you know, in that first week, when there

18  were no real traffic control separations, that we -- we

19  did see some of that activity happening.  So yes.

20      Q.  Okay.  And you were anticipating that was going

21  to continue to happen; correct?

22      A.  That there was the possibility of that, yes.

23      Q.  And did it -- did that in fact happen after the

24  barriers were shuffled around and added on June 16th and

25  17th?

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 40

1            MR. CRAMER:  Objection.  Form.

2        A.  I mean, you know, I would -- I would come to

3    the site pretty frequently throughout that whole month

4    of June, or for -- starting on June 9th, and there were

5    times when I saw a lot of people there, and there were

6    times when, you know, the -- the areas even that we had

7    set aside for sort of more ongoing protest activities

8    weren't sufficient to contain the number of pedestrians

9    and people protesting.

10           And so I do think that having the streets be

11   local access only limited the ability for

12   vehicle-pedestrian conflicts.

13   BY MR. WEAVER:

14       Q.  Okay.  Did SDOT also put into place speed bumps

15   in the area in and around the East Precinct and Cal

16   Anderson?

17       A.  We did.  They -- you know, they were not

18   traditional speed bumps.  They were -- they -- we --

19   they're what's called a quick curb that served the

20   purpose of what a speed hump would do, but were

21   something that was -- you know, our typical speed humps

22   are done with asphalt and have a more substantial

23   construction impact and eventual removal impact.

24           We didn't anticipate that those would stay

25   forever, and so we used a sort of temporary approach to

6402ce53-89af-4e06-b574-53dbb844f256

Page 41

1    those, but we did have a few places where we -- we did

2    install those, particularly around the intersection of

3    12th and Pine.

4         Q.   Okay.   Do you recall other areas where you had

5    temporary speed humps?

6         A.   I don't.

7         Q.   Okay.   Why, in particular, were they around

8    12th and Pine?

9         A.   So 12th and Pine has a traffic signal usually.

10   We had put in a stop sign instead.   We did see -- and

11   that's where we had the sort of ecology block barriers,

12   and we changed some of the -- the directionality of the

13   streets.

14        We did see some vehicles, as we opened those

15   streets back up to traffic, driving quickly, so we

16   don't -- we didn't need to -- we wanted people to drive

17   slowly and anticipate that there could be more

18   pedestrians that they weren't expecting to be in the --

19   the -- you know, crossing the street.   And we had

20   changed the traffic pattern to have that stop sign

21   rather than a -- a traffic signal.

22             MR. WEAVER:   Okay.   I can't believe it.

23   We've been going about an hour.   Want to take a

24   ten-minute break?

25             MR. CRAMER:   Yeah.   Yeah, let's take ten.

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 44

1    what -- she had not been involved in the -- outside of

2    her area of -- of responsibilities within SDOT, but she

3    was representing SDOT with external stakeholders, and

4    asked me what -- if it came up, what she should say.

5         Q.   Okay.   And so you drafted these talking points

6    for her; is that right?

7         A.   I did.

8         Q.   Okay.   So in the fourth bullet point of your

9    talking points, you say, "SDOT worked to install

10   barriers to create a protest zone."

11            And then in the sixth bullet point, you say,

12   "Definitely new activities for our crews in terms of

13   creating this zone."

14            What did you mean by "creating this zone" and

15   "create a protest zone"?

16                MR. CRAMER:   Objection.   Form.

17        A.   So I guess, going back to my previous answer on

18   this, we worked to create some additional pedestrian

19   space or -- that was used for protest activities.

20   Again, centered on the East Precinct, but also including

21   some of the areas adjacent to Cal Anderson Park, that

22   were -- that, you know, sort of expanded the -- the

23   pedestrian space, while also creating that separation

24   between vehicular traffic.

25            In terms of the sixth bullet and new activities

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 45

1   for our crews, the -- I don't think that we've done

2   anything similar to this before or since.  Typically,

3   when we've used things like water filled barriers to

4   create some of these separations or we've done temporary

5   street closures or things like that, we've had an

6   expectation that those materials that we use and provide

7   and install will stay in the pattern that -- that we've

8   installed them.

9           What we saw prior to June 16th and 17th was

10  that materials that we had -- had deployed for those --

11  you know, for the -- the crowd control and things like

12  that had moved -- had been moved, and additional

13  materials added.

14          So we didn't want to -- we wanted to -- we --

15  we needed to find some new vocabulary of -- of

16  separation that would be -- would -- would accomplish

17  our -- our goal of de-escalation and creating some of

18  that additional area for protests -- protests to happen

19  without being redeployed and moved in ways that we

20  hadn't intended.

21  BY MR. WEAVER:

22      Q.   Okay.  And that -- the moving in area -- in

23  ways that you had not intended, as far as the barriers

24  that were there, that continued after June 16th and

25  17th, as well; correct?

Page 46

1      A.   It did at various points, and -- yeah, there --

2   there were some various times when -- when -- when --

3   when that would happen.   You know, I think that the --

4   that is -- you know, that -- that's, like -- that was

5   one of the -- the challenges that we faced in terms of

6   how -- you know, creating that regularized traffic

7   pattern, while -- while we -- you know, so it was really

8   intermittent.

9          I think that this -- this email also sort of

10  highlights some of that, that there were some

11  intermittent challenges that -- that could be resolved

12  with -- with conversation and -- and discussion about --

13  but not -- but that -- that created ongoing operational

14  challenges for us as a department.

15     Q.   So there were ongoing operational challenges

16  because at some -- at some points various barriers would

17  show up in areas that they had not previously been

18  placed; is that right?

19     A.   Yeah, you know, there would be sort of minor

20  moving of barriers.   The -- the ecology blocks didn't

21  really -- didn't move until sort of the -- the very,

22  very end of the time when the -- they were -- they were

23  deployed out there.   They're very challenging to move.

24  But there were other -- other materials that would get

25  sort of moved around on a -- on a regular basis.

Page 47

1     Q.    What were -- what were some of those materials

2  that would get moved around?

3     A.    So as part of the installation on June 16th and

4  17th, we also installed some plywood boxes or covers

5  around the ecology blocks, and those were intended to

6  serve a few purposes.

7        The first was that they were -- they were

8  opportunities for art to happen, and sort of canvass, if

9  you will, for some of the -- the protest art.  And that

10  was something that, as we talked to the protest leaders

11  that we -- we were communicating with in the lead-up to

12  that, they felt like the art was a positive aspect of

13  the -- what was -- what was happening in that protest

14  area and was an opportunity.

15        We also -- you know, there had been a lot of

16  graffiti and lots of -- on lots of private buildings,

17  and so this was also part of our attempt to attract some

18  of that activity to -- off of private property and

19  buildings into -- into this.  So those plywood boxes

20  were serving some of that function.

21        The second function is that the -- the easiest

22  way to move an ecology block is, there's a sort of metal

23  ring that's on the top, is set into the concrete, that

24  you attach a chain from a construction -- a piece of

25  construction equipment, and that -- you're able to lift

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 48

1    it up.

2            So the -- some of the plywood box was intended

3    to limit access to those -- those rings, which are the

4    easiest way to move a -- move an ecology block and make

5    it sort of so that other people couldn't come and access

6    that in a very easy way.

7            And then I think there were -- there were some

8    members of the protest group who were concerned that

9    outside -- outside actors wished them harm, wished --

10   you know, they were -- there was a lot of -- among some

11   of them, there was a lot of concern that people were

12   going to come and try to do harm to the people

13   protesting.

14           And so there was a -- the ecology block

15   barriers are very low.  They're about two feet tall.

16   And so the plywood barriers helped to prevent a little

17   bit of, like, being able to see into the -- into the

18   area where people were -- were protesting and -- and,

19   you know, sometimes sleeping overnight and things like

20   that.

21           So that was the -- the purpose of those.  Those

22   plywood barrier -- plywood components, eventually the

23   protesters sort of figured out how they could remove

24   those from some of the barrier -- the ecology blocks,

25   and -- and those sort of boxes would get moved around at

6402ce53-89af-4e06-b574-53dbb844f256

Page 49

1    various points.

2        Q.  So those boxes would be used as barriers.  Is

3    that what you're saying?

4        A.  Yeah.  They were then -- you know, it was a --

5    a couple sheets of plywood that were about two feet --

6    you know, two feet by three feet by another two or --

7    two feet tall or so.  And so those are pretty easily

8    movable to move into a place and then to also move out

9    of a -- you know, move away from -- from any kind of

10   obstruction.

11       Q.  Okay.  So I just want -- just want to be clear

12   for the visual aspect of it.  Okay?  So when the ecology

13   blocks were moved in on June 16th and 17th, they also

14   had plywood sheaths over the top of them; right?

15       A.  That's right.

16       Q.  And that was a constructed box that had four

17   sides around it, and then a -- another piece of plywood

18   on top?

19       A.  Most of them had a top on them.  Some of them

20   did not.

21       Q.  Okay.  And was that the protesters' suggestion,

22   or was it the -- was it SDOT's recommendation, that

23   those be placed there?

24       A.  I think we came to that through some

25   conversations.  I think it was -- it was -- as I

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 58

1    is that right?

2        A.  That's right.

3        Q.  What had changed that made it so that you went

4    to the area that you had not been to previously?

5        A.  You know, I think I was -- I was monitoring the

6    protest activities and the -- and sort of what was going

7    on, but the -- you know, what I -- what I read and --

8    and heard in sort of the news reports and some of the

9    responses was that the protests had -- protesters had

10   taken over streets, and I felt like it was my -- part of

11   my responsibilities, as the director of SDOT, to have a

12   firsthand account of that and understand what the

13   situation was on the ground.

14       Q.  So did anybody from the mayor's office or

15   anybody else in the City ask you to go down there?

16       A.  I don't believe so.

17       Q.  So what did -- what did you do -- what did --

18   for -- what did you do when you went to the area on --

19   on the morning of June 9th?

20       A.  So I went there and walked into the -- the area

21   that had sort of been occupied by protesters overnight,

22   June 8th to June 9th, and tried to get a sense for what

23   was -- what was going on.

24           I believe that Fire Chief Harold Scoggins and

25   SPU general manager Mami Hara and I all sort of got

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 59

1   there around the same time, and we connected with each

2   other.

3            You know, we are the three -- three agencies

4   that are the largest set of public responsibilities in

5   terms of services and access and emergency response.

6   And so I think the three of us all felt like it was

7   something -- something important for us to understand.

8            This was a -- you know, not something that any

9   of the three of us had had to -- well, I can't speak for

10  them, but not something that I had had to experience

11  in -- in my previous experience with the City or even

12  in -- in some of my previous employment.  I've dealt

13  with a lot of First Amendment activities and -- and

14  protests and various things, but not something of this

15  nature.

16       Q.  Okay.  What did you see that was different than

17  what you had dealt with previously in your career?

18       A.  So the use of -- you know, the use of

19  improvised barricades to block off streets was -- was

20  something that was very new.  You know, my experience

21  with protest activities in particular has been that

22  there's a -- you know, a designated route or

23  communication about where those -- where those

24  activities are going to be, and then sort of a temporary

25  accommodation of those, sometimes with traffic control

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle          30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 60

1   devices and sometimes not, that provides some regularity

2   and predictability.

3          And this was improvised and -- and sort of

4   not -- wouldn't have met our -- what our -- what our

5   standard response was to a -- to a protest.  And the --

6   again, I'm specifically talking about like the morning

7   of June 9th.

8       Q.   What would your standard response to a protest

9   would have been?

10      A.   Yeah, so, you know, I think we -- if -- if we

11  are aware of where a protest is going to happen, then

12  we -- you know, we can work with -- and there's a sort

13  of organized leadership of a protest, we could work with

14  that.

15          We do -- we permit street closures very

16  frequently for community gatherings or events or things

17  like that.  So we could work with that entity in sort of

18  providing that regular -- more regular approach to

19  traffic control.

20      Q.   So there was no permitting process for the

21  blockage of the streets on June 9th through July 1,

22  2020; is that right?

23      A.   That's correct.

24      Q.   Okay.  Was there ever any discussion of

25  requiring the people in that area to have a permit to

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 61

1    protest and occupy the area?

2                   MR. CRAMER:   Objection.   Foundation.

3        A.   I don't -- I -- I did not participate in any

4    conversation like that.

5    BY MR. WEAVER:

6        Q.   Okay.   Were you involved in any permitting

7    process in that time period for this area?

8        A.   (No verbal response.)

9        Q.   Just so you -- just so you know, you have to --

10   you have to actually speak it so the court reporter can

11   get it.

12       A.   No, I was not.

13       Q.   Okay.   I'm going to pull up an exhibit.   Just

14   give me a minute.

15            While I'm doing that, did you talk to anybody

16   on the -- on the morning of the 9th who was a -- who you

17   considered to be a protester?

18       A.   I believe I did, yep.   Yes.

19       Q.   Okay.   What did you talk to them about?

20       A.   You know, I -- my purpose in those

21   conversations from June 9th, anytime I was there

22   throughout the month of June, was making sure that we

23   had streets open and that people, goods, and services

24   could access that area.

25            And then communicating my desire for continued

Page 64

1    access, service access, people and goods to move freely

2    throughout the area, but also set some -- you know,

3    modify traffic patterns in a way that also worked with

4    the protest organizers.

5         Q.   So on June 9th, when you first went and saw it,

6    would you agree that there were -- there was blocked

7    access to a number of roads in the area?

8              MR. CRAMER:   Objection.   Form.   Vague.

9         A.   So there were -- yeah, you know, as I said,

10    when I got there on June 9th, I walked into the area

11    unimpeded.   I did see places where streets were either

12    completely or partially blocked with that sort of debris

13    and improvised -- improvised barricades.

14    BY MR. WEAVER:

15         Q.   Okay.   So the streets were blocked to vehicular

16    traffic; is that correct?

17              MR. CRAMER:   Objection.   Form.

18         A.   Yeah, and I would say that it was -- it was --

19    I don't -- you know, I'm not sure I recall exactly the

20    traffic pattern at the time, but there were some streets

21    that were completely blocked, and there were others that

22    were partially open or -- or completely open.

23    BY MR. WEAVER:

24         Q.   Okay.   I don't think we talked about it before,

25    but were there dumpsters that were also being used at

Page 71

1      Q.   Okay.  So I'd like you to look at a text that

2  you sent at 8:03 p.m. on June 9th.

3           Hold on just a minute.

4           (Pause in proceedings.)

5  BY MR. WEAVER:

6      Q.   Okay.  You said here that you don't want to put

7  anyone in an unsafe situation.  Did you consider, on

8  June 9th, that the area in and around the East Precinct

9  and Cal Anderson might be an unsafe situation for SDOT

10  workers?

11      A.   Well, I guess I would go to the previous text

12  message that Rodney sent to me, that said that some

13  employees expressed concern to us about the lack of SPD

14  presence as on-site security.

15           And so I don't think that I would have -- I did

16  not consider it to be unsafe.  That's why I was there

17  personally, and I was present throughout this -- this

18  time.

19           But I also respected the feelings of the -- the

20  people that I was asking to do this work.  I think in

21  that text message that you reference, the 8:03 p.m. one,

22  I said, "I recognize that Otis and Spencer" -- who are

23  two of these -- two of the -- our crew members --

24  "almost got into it with that one guy."

25           So that was a back-and-forth, and sort of what

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 72

1    I mentioned about the escal- -- potential escalation of

2    the situation rather than the de-escalation.  And my

3    goal -- our goal was to -- to reduce those points of

4    conflict.

5             And so during that -- the day on -- on

6    June 9th, we were seeing some of that interaction, some

7    of which had carried over from -- from previously and

8    some of the -- the hostility, and really that led to --

9    that was like taunts and abuse, you know, verbal abuse

10   that some of our staff had -- had experienced.

11            So I didn't -- I didn't perceive it to be an

12   unsafe situation.  I wouldn't have been there myself.  I

13   wouldn't have asked our staff to go.  But I also had to

14   respect and understand what Rodney -- the feedback

15   Rodney was giving me, that he was starting to get

16   from -- from that group of staff that he manages, that

17   people were starting to feel concerned about the lack of

18   SPD presence at that point.

19        Q.  Okay.  When you were -- when you were in the

20   area in June of 2020, around the East Precinct, Cal

21   Anderson, what time of day were you typically there?

22        A.  I was there at lots of different times of day,

23   and I would -- I made a point of it to -- to try to be

24   there at various points.  Sometimes I would be there

25   very early in the morning.  Sometimes I would be there

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 73

1    in the middle of the day.  Sometimes I'd be there

2    relatively late into the evening.  So, you know, it was

3    a -- it -- it was a range.

4        Q.  Okay.  So did you notice that the area had a

5    different feel to it at different times of the day?

6        A.  I did.  I think during the -- you know, during

7    the early morning hours, it was pretty quiet.  There

8    were, you know, people sleeping, very -- very few people

9    walking through the area.  And, you know, early morning,

10   I was there as early as 4:00, 5:00, 6:00 in the morning

11   sometimes.

12           In the middle of the day, it was much more

13   active.  There were lots of stuff going -- like regular

14   neighborhood things going on at that point.  There were,

15   you know, people commuting to work.  There were people

16   going to -- to do what they needed to do, and they would

17   go through that area.

18           On the weekends in particular, but also during

19   the week, there would be people coming to -- to visit.

20   They might have heard about what was going on, on the

21   news, and they would come and see -- see it for

22   themselves.

23           And then, you know, sort of late afternoon into

24   evening, it would become a bit more active as a protest

25   area, and there would be more people coming for the

Page 74

1    purposes of protesting.

2          And then later into the evening, I think it

3    would sometimes get louder and sort of more focused

4    on -- on protests -- protest activities as well.

5       Q.   Okay.  What do you mean by getting louder in

6    the -- in the later evening and into the night?

7       A.   You know, I think people would play music --

8          MR. CRAMER:  Form.

9       A.   People would play music.  They would -- there

10   would be speeches with -- with amplifiers and things

11   like that.  There was, you know, sort of a bit more of

12   a -- of a protest/party environment.

13   BY MR. WEAVER:

14      Q.   Okay.  Did you perceive that the area became

15   less safe as -- as the evening and night wore on?

16      A.   You know, I -- I wouldn't want to speculate on

17   that.  I -- we weren't having our -- our crews go and do

18   any work sort of from the afternoon.  That's partly due

19   to their crew schedules, their -- their typical

20   deployment.

21          So I was a little bit -- I was really focused

22   on our -- our -- the safety of our workforce, and so it

23   was mostly focused on the time of -- from that early

24   morning period through sort of midafternoon.

25      Q.   Okay.  So did SDOT typically send in its

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 75

1   workers in the early morning and up to the afternoon?

2        A.   Yes.

3        Q.   Okay.  And was that to avoid conflict with

4   people in the area?  Is that why you would --

5             (Simultaneous cross-talk.)

6        A.   Yeah --

7   BY MR. WEAVER:

8        Q.   -- that time?

9        A.   No.  That was -- well, that was primarily due

10  to their existing crew schedules, you know, that

11  people -- we have people coming on-site, and especially

12  last summer, as we were responding to the COVID

13  pandemic, we had people coming on-site to start work as

14  early as 5:00, 6:00 in the morning, and -- and that

15  typical sort of eight-hour shift is going until then

16  2:00, 3:00 in the afternoon.

17       Q.   Okay.  I'd like you to look back at Exhibit 4,

18  which I previously dropped in and marked.

19       A.   Yep.

20       Q.   And in the fifth bullet point of your email of

21  talking points, you talk about how there's a very

22  different feeling to the area during the day versus at

23  night when, quote, there is a different feeling of

24  access and, quote, security, unquote.

25            What did you mean by a different feeling of

Page 76

1    access and security at night?

2          A.   Well, I think this email, Monday, June 29th, I

3    think would have been -- that was after the two -- I

4    think both of the shooting incidents, at least the

5    first -- the first incident that had happened.

6          And so there was -- but I think some of the --

7    what we had seen -- what I had seen in the -- portrayed

8    in the media as -- as being that this area was closed

9    and inaccessible and taken over by protesters, was

10   also -- was not accurate.

11         And so I was, I think, relaying my experience

12   in some of those things.  I think the -- the -- my

13   quotes around the word "security" is sort of a

14   perception around -- of -- of individuals and -- and

15   their perception of security.  Didn't reflect my

16   experience, but I recognize that people have lots of

17   different experiences.

18         Q.   Were you ever there in the early morning hours

19   of, like, 1:00 a.m. to 2:00 a.m., around that time

20   period?

21         A.   I was not present as -- as -- around 1:00 a.m.

22   I think the earliest I was ever there, I think one

23   morning I got there around 4:00, 4:30.

24         Q.   Okay.  And what was the latest that you recall

25   being there at night?

6402ce53-89af-4e06-b574-53dbb844f256

Page 77

1    A.   Yeah, I don't think that I was there after

2  probably 6:00 or 7:00 in any evening.

3    Q.   Okay.  Do you recall talking to residents or

4  business owners in the area in June of 2020 -- and by

5  the "area," I mean the area around the East Precinct and

6  Cal Anderson Park -- where they told you that the

7  situation was different at night?

8    A.   I do.

9    Q.   Okay.  What do you recall --

10    A.   I do --

11    Q.   -- about those situations?

12    A.   So I recall that there were, you know,

13  people -- people expressed concern about whether there

14  were armed individuals in the area in particular.  That

15  was -- that was most of what I remember there being

16  expressed as concern.

17    Q.   Okay.  Do you re- -- do you recall talking to

18  any residents or businesses in June of 2020 who

19  expressed that they did not feel safe being there during

20  the night hours?

21    A.   I mean, I don't -- I don't recall specific

22  instances, but I -- you know, I -- I think those were --

23  that was part of what -- what I heard in some of those

24  various -- those various conversations, was sort of a --

25  a different -- a sort of different feeling in the

Page 78

1   evening.  I think that's reflected in -- in some of

2   these -- this message as well.

3       Q.  Okay.  These are actually talking points,

4   again, that you drafted to be given out publicly;

5   correct?

6       A.  That's right.

7       Q.  Okay.  Going back to Exhibit 6, and your text

8   from June 9, 2020, at 8:03 p.m. -- whoops.  I just lost

9   it.

10      Okay.  So you indicate that, We do not -- we

11  don't want to get into a, quote, occupy, unquote,

12  situation.

13      Do you see that?

14      A.  Yes.

15      Q.  What did you mean by "occupy situation"?

16      A.  I think Rodney and I had talked about the

17  concerns with, you know, recalling back to Occupy New

18  York or Occupy Wall Street, where there was sort of a

19  longer-term protest occupation, quote -- and again, I

20  used occupy with -- with quotes, where there were --

21  were streets that were blocked off.

22      And -- and I -- you know, I was -- had no

23  involvement in the Occupy Wall Street sort of operations

24  and -- and management, but I think neither of us wanted

25  to get into a situation sort of, of what we understood

6402ce53-89af-4e06-b574-53dbb844f256

Page 79

1  that to have been, where there were -- where, you know,

2  there was a longer-term -- longer-term occupation of

3  streets that then required some police activity to -- to

4  clear out.

5      Q.  So you were concerned, on the morning of -- or

6  I'm sorry -- on the evening of June 9th, that there

7  was -- that this was turning into a long-term occupy

8  situation; is that right?

9          MR. CRAMER:  Objection.  Form.

10      A.  I think we -- I -- I think we wanted to -- we

11  wanted to avoid that that -- that could become the

12  long-term situation, not that -- not that it was at that

13  point.

14  BY MR. WEAVER:

15      Q.  Did you -- do you feel that it became that sort

16  of situation later on?

17      A.  I don't.  I feel like the continuous engagement

18  from that very first day of June 9th through the end of

19  June meant that it was a very different sort of -- it

20  was very different from -- from -- from that.

21          I was present, sort of leadership from various

22  City departments was present throughout and made --

23  established an understanding and relationships with

24  people that were -- were leaders on the protest side

25  that helped express the public responsibilities and the

6402ce53-89af-4e06-b574-53dbb844f256

Page 84

1          (Exhibit No. 7 marked.)

2        E X A M I N A T I O N (Continuing)

3   BY MR. WEAVER:

4       Q.  All right.  I am going to bring another

5   document into the chat in a second here.  This will be

6   Exhibit 7.

7           Let me know when you have it up.

8       A.  I have it up.

9       Q.  Okay.  So first of all, do you recognize this

10  document?

11      A.  Yes.  I believe this is an email from Laurel

12  Nelson, who was acting director of Office of Emergency

13  Management, including myself and a number of other

14  cabinet members.

15      Q.  Okay.  Around this time, June 9th, June 10th,

16  June 11th, were you involved in regular cabinet meetings

17  with the mayor's office and other department heads?

18      A.  Yes.

19      Q.  Okay.  And about how frequently were you having

20  these meetings in that time period?

21      A.  They were -- they would be pretty frequent.  I

22  think they were somewhat regular.  Then we would have

23  some -- sometimes when -- it wasn't -- wasn't daily

24  always, but there would be some -- some times when it

25  was multiple times a day, even.

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 85

1    Q.   And so that continued throughout June of 2020?

2    A.   Yes.

3    Q.   What was your understanding of the purpose of

4    these meetings?

5    A.   The purpose of these meetings was to share

6    information and really report out on -- on what

7    activities were going on among -- among all the

8    departments that were responding, and to make sure that

9    there was understanding with the -- with the mayor's

10   office, as well, about what was -- what was happening.

11   Q.   Okay.  So do you recall being in any meetings

12   in which Mayor Durkan, herself, participated during

13   June 9th to July 1, 2020?

14   A.   Yes, I do.

15   Q.   Okay.  About how many times do you think that

16   was?

17   A.   You know, I -- I couldn't -- I don't remember

18   that with that specificity.  It was certainly not

19   every -- every meeting that we would have.  And, you

20   know, these meetings are very similar to the way that we

21   respond to any kind of citywide emergency, a snowstorm

22   or, you know, things of that nature.  So it's a very

23   typical operational strategy that we have as a city.

24   And that includes times when the mayor joins those

25   conversations as well.

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 86

1        Q.   Sure.  Can you give me an estimate of how many
2   times you talked to the mayor about things related to
3   the protests and the CHOP area between June 9th and
4   July 1, 2020?
5        A.   I would say maybe around a dozen times, if I
6   had to -- if I had to put a number on it.
7        Q.   Okay.  Did you ever talk to the mayor directly,
8   one-on-one, at any point?
9        A.   I did.
10       Q.   Okay.  What -- what did you talk about with the
11  mayor when you met?
12       A.   The few times that I talked to her directly
13  were around the specific SDOT-related actions that we
14  were taking.  So I believe on the -- the morning of
15  June 16th, I think I spoke directly with her.
16            There were, you know, a couple of times when we
17  were taking some of those direct actions with, you know,
18  installing the ecology blocks or as -- and when we got
19  to the point of removing them, I did speak directly with
20  the mayor.
21       Q.   Okay.  Just to let her know what was going on
22  and what was the plan?
23       A.   Yes.
24       Q.   Okay.  Do you recall what her reactions were,
25  for example, about the plan on June 16th?

Hunters Capital, LLC v. City of Seattle                 30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 87

1      A.  You know, I think specifically on June 16th, it
2  was -- it was really status updates of when -- when
3  things were going to be happening and when -- when we
4  were -- when we were going to be operating.  I don't --
5  I don't recall her reaction to the -- to the plan.
6      Q.  Okay.  How about, what were your conversations
7  with her later on, after June 16th, about what SDOT was
8  doing in the area?
9      A.  You know, I think we were -- we were continuing
10 to -- to keep her abreast of what -- what activities
11 were.  I did participate in some of the -- there was,
12 like, conversations about where -- you know, where
13 things were going, what the -- you know, what -- what
14 our activities as a city were.  And those tended to be
15 these larger group conversations.
16     Q.  Okay.  Do you recall talking to her, yourself,
17 about what you'd been hearing from residents and
18 businesses in the area?
19     A.  I don't.
20     Q.  Okay.  Do you recall communicating that to
21 anybody in the mayor's office, what you'd been hearing?
22     A.  I know I probably did.  There were probably
23 some -- there were some -- some group discussions along
24 with Chief Scoggins and -- and Mami Hara, where we were
25 relating our -- our series of conversations.  I don't

Page 88

1    know if I recall specifics of -- of when and how.

2        Q.  So let's go -- let's go to Exhibit 7.  And do

3    you happen to recall whether there was a phone call of

4    the cabinet at 6:00 a.m. on June 10th?

5        A.  Yes, I believe there was.

6        Q.  Okay.  And was it your understanding that

7    Laurel Nelson was taking notes of those meetings and

8    then distributing them at that time?

9        A.  Yes.

10       Q.  Okay.  So I'd like you to go to Page 2 of this

11   document.  I want to ask you about a few things on it.

12           So in the middle in a larger font, it says,

13   "Overall Objectives:  Continuing the existing footprint

14   of peaceful demonstration and rights."

15           Do you see that?

16       A.  Yes.

17       Q.  Okay.  Do you recall a discussion about that

18   during this cabinet meeting on June 10th?

19       A.  I -- I do.  I mean, this -- these notes sort of

20   reflect that, but yes.  The -- there was sort of a --

21   a -- this was the day after that June 9th date of -- of

22   being there.

23           And so at that point, you know, there was a

24   sort of regular -- there was a group of people who were

25   pretty committed to staying in front of the East

Page 89

1    Precinct and continuing the protest activities right

2    there.

3        Q.   Okay.   So whose objective was it to continue

4    the existing footprint?

5        A.   I think it was a shared City-wide objective

6    in -- in that conversation of -- in that direction

7    towards de-escalation of making sure the people were --

8    had that continued opportunity for protests, and that

9    we -- that that could be done in a safe way.

10       Q.   Okay.   Paragraph 1 are -- are a few items here

11   that indicate that it was the lead -- SDOT was the lead.

12            Do you see that?

13       A.   Umm --

14       Q.   1.1 and 1.2, paragraphs there?

15       A.   Right.   So we were the lead on the physical

16   modifications to the footprint as the responsible

17   parties for the right-of- -- you know, the street

18   right-of-way.   We were -- we were the lead on those

19   physical modifications.

20       Q.   And so was the City's goal at this point to

21   remove the non-SDOT barriers and replace them with SDOT

22   barriers?

23       A.   Yes.

24       Q.   Okay.   And --

25       A.   You know, I just -- sorry --

6402ce53-89af-4e06-b574-53dbb844f256

Page 90

```
 1        Q.  Go ahead.
 2        A.  -- if I can just clarify that a little bit, is
 3   to say that those non-SDOT barriers were the things that
 4   were not typically used as traffic control, but -- and
 5   things like the bike rack barriers and other sort of
 6   irregular barricades, but to restore a traffic pattern
 7   that maintained our core responsibilities around
 8   providing public access and -- and ensuring services
 9   could be delivered.
10        Q.  Okay.  What -- 1.2 says, "Pivot this into a
11   street closure."
12             Do you understand what that -- what that meant?
13        A.  Yeah.  So I think this was -- you know, we
14   had -- we had -- rather than having -- there was --
15   there were these sort of, again, irregular barricades
16   that were blocking off certain streets, while others
17   remained open in certain ways.
18             So we wanted to turn those irregular things
19   into something that was a more regular traffic pattern.
20   And that's -- there's a couple of reasons for that.
21   One, it's the -- the reason why -- you know, we could --
22   we -- sort of standard materials or other ways that we
23   could put -- sort of regularize those -- the -- the
24   traffic pattern.
25             And then also we communicate regularly out to
```

Page 91

1    the public and -- through things -- platforms like

2    Google Maps and others about when we have a regular

3    street closure, "This street is closed."  And so that

4    can go into their routing software, that we can sort of

5    push out that information.

6          And we wanted to have a -- a regularized street

7    closure so that we could do those sorts of things and

8    make sure there was public information available to --

9    to enable residents and businesses to be able to --

10   to -- to function normally.

11        Q.  So did SDOT report to Google and other mapping

12   services that there were closures in the area?

13        A.  We did.  I don't know the exact timing of when,

14   but we did -- we did communicate.

15        Q.  Okay.

16        A.  And I would say, again, those -- those -- you

17   know, it was important for us, even -- you know, we

18   discussed previously local access.  If you had a -- a --

19   an address within that area that was local access and

20   you were putting it into a routing software, you could

21   still -- it wouldn't tell you, you can't get to that

22   site.  It would tell you, here's how you get to that --

23   that location.

24          But it also -- in theory, when we -- when we do

25   that, it's not routing people through that area if we've

Page 92

1    made it local access.  And we have that sort of ongoing

2    relationship and response- -- you know, working

3    relationship with those software providers.

4           We have a number of streets that, in the midst

5    of the pandemic, we turned into local access only.  We

6    called them "Stay healthy streets."  We communicate.  So

7    those -- those streets are open to people who live on

8    those streets, deliveries and things like that, but

9    they're not -- people aren't routed onto those streets

10   if they're through traffic.  So those mapping providers

11   work with us on -- on communicating that information out

12   to users.

13        Q.  So I just want to be clear.  So if -- with the

14   routing that was done for this particular area in and

15   around East Precinct and Cal Anderson that was local

16   access only, if somebody put in there that they wanted

17   to go to a particular destination, and the normal route

18   would be for them to take 12th Avenue through the Pike

19   and Pine area, the software would route them somewhere

20   else; is that correct?

21        A.  If it was outside.  If it was just -- if they

22   were just through traffic coming through on 12th, you

23   know, from Olive to Union, it would send -- it would

24   send them up to -- I think it was probably sending them

25   to 13th.  But if it was someplace within that area, it

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 93

1    would send them to that area.

2         Q.  Okay.  I'd like you to go down to the second

3    page, and -- where it says, "Stated Department Desired

4    Goals."

5              And it says a couple things by SDOT, which is

6    the first bullet point.

7              Do you see that?

8         A.  Yep.

9         Q.  Okay.  Were these concerns that you stated at

10   this meeting on behalf of SDOT?

11        A.  Yes.

12        Q.  Okay.  So you were a little concerned about

13   sending the teams back in without having a game plan.

14             Do you see that?

15        A.  Yes.

16        Q.  Okay.  What do you recall about that at this

17   point?

18        A.  So on the -- this goes back to some of what we

19   had experienced on June 9th, in going to take out some

20   of the barricades, and then being met with some -- some

21   resistance from folks involved with the protests.

22             So I think we wanted -- and again, some of what

23   we were starting to hear from some of our -- our

24   represented employees through their labor representation

25   around concerns related to -- to not having SPD present

Page 118

1    vehicles.

2    BY MR. WEAVER:

3        Q.  Okay.

4        A.  Yeah.

5        Q.  So you say regular traffic pattern.  So even --

6    you're talking about after June 16th and June 17th;

7    right?

8        A.  Yes.

9        Q.  Okay.  So the -- the area we had talked about

10   earlier was local access only; correct?

11       A.  Yes.

12       Q.  There were signs up saying "Local access only"?

13       A.  Yes.

14       Q.  And there were -- there were still lanes of

15   traffic blocked off; is that correct?

16       A.  There were -- on -- in certain places, yes,

17   there were.

18       Q.  Okay.  And the protesters were periodically

19   moving barriers, especially at night, to areas where

20   they had not previously been put; is that correct?

21       A.  That was -- yes.  That was my experience.

22       Q.  And -- lost my train of thought.  Sorry.

23           But you -- you considered that to be regular

24   access to the area?

25       A.  You know, I think my goal in -- in -- over the

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 119

1    course -- between the 9th and when -- until we got to

2    the 16th, was to try to find a way for there to be

3    regular access.  Was there unimpeded, 24/7, complete,

4    you know, normal access?  I -- I don't -- I think it

5    was -- it was a more fluid situation on the ground than

6    that.

7            I think that there were -- my goal, in talking

8    with protesters, in trying to move barricades, in trying

9    to set up what we eventually did install on the 16th,

10   was to preserve those important property access, goods

11   movement, service -- services, and have a -- a sort of

12   predictable, regular pattern that people could know what

13   to expect when they -- when they came to that area.

14           Because it was -- you know, it was -- before

15   that point, on the 16th, it was -- it was sort of

16   constantly changing, and it was hard to know, as a

17   resident, as a business, exactly what to expect.

18           That said, I don't know that -- I don't -- I

19   don't know personally that people didn't have access.

20   I -- it just wasn't -- it wasn't what I would consider

21   to be regular and sort of typical of how we would -- we

22   would set that up if it was a -- a -- an ongoing

23   activity.

24       Q.  Okay.  And even with the barriers that had been

25   put in place, protesters were still periodically in the

Page 120

1    streets outside the area that had been designated by

2    the -- by the eco barriers; is that right?

3              MR. CRAMER:  Objection.  Vague.

4         A.   There were -- there were a lot of people there

5    at various points especially.  And so -- I mean, the --

6    there were people that would be walking or -- but, you

7    know, people are also sort of allowed to cross the

8    street in various places.  Once the signals weren't

9    operating, people can cross in the midpoint of the

10   block.  It's not -- it's not jaywalking at that point.

11             So yeah, there were people -- there were a lot

12   of people there at various points, and there were people

13   sort of in -- in various places.  I'd say once we had

14   a -- a more regular traffic pattern, it was -- it was --

15   it was more predictable for how it -- how it was all

16   operating.  But it was a -- you know, it was a pretty --

17   it was a pretty fluid situation for, I'd say, the whole

18   month of June, or in that area.

19   BY MR. WEAVER:

20        Q.   Okay.  Just as an example, you mentioned a

21   press conference that you were at with Carmen Best.

22             Do you recall talking about that?

23        A.   I was -- I was nearby.  I wasn't --

24        Q.   Okay.

25        A.   -- with her.  She -- she talked to the -- she

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 121

1    talked to some members of the media.  I was nearby --
2        Q.  Okay.
3        A.  -- not part of the -- not part of the --
4        Q.  You were present for her press conference;
5    right?
6        A.  Yes.
7        Q.  Okay.
8        A.  Yeah, that's correct.
9        Q.  And you said that was at 12th and Pine.
10           Do you remember that?
11       A.  Yes.
12       Q.  Okay.  Do you recall that it was outside the
13   barriers, but in the middle of the street?
14       A.  Yeah, I -- I believe so.
15           MR. WEAVER:  We've been going about another
16   hour, so let's go -- let's go ahead and go off the
17   record.
18           THE VIDEOGRAPHER:  Going off the record.
19   The time is approximately 12:19 p.m.
20           (Recess from 12:19 p.m. to 1:05 p.m.)
21           THE VIDEOGRAPHER:  We are back on the
22   record.  The time is approximately 1:05 p.m.
23             E X A M I N A T I O N (Continuing)
24   BY MR. WEAVER:
25       Q.  So I want to ask you, with regard to anything

Page 134

1    with SPD.

2            You know, that -- that lasted until, I think,

3    into the spring, until there was able to be put -- some

4    fencing put up around the -- the East Precinct.  So

5    there were -- we put up some of those -- we reutilized a

6    lot of the ecology blocks that we had put out in

7    creating that traffic pattern.  We -- we used those

8    in -- in creating that wall between the precinct and the

9    street.

10        Q.  Okay.  Let me ask you about the wall, while

11   we're on it.

12            So SDO- -- SDOT built that wall sometime --

13       A.  Yes.

14       Q.  -- after July 1, 2020; right?

15       A.  Yep, yep.

16       Q.  When do you recall that wall going in around

17   the East Precinct?

18       A.  It was right in that period, the first week of

19   July.

20       Q.  Okay.  So am I correct in describing it as the

21   wall was on the outside perimeter of the sidewalk around

22   the East Precinct?  Is that correct?

23       A.  Yes.

24       Q.  And it consisted of three or four layers of eco

25   blocks at the bottom; correct?

6402ce53-89af-4e06-b574-53dbb844f256

30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 135

1   A.  I think -- I think there were two thick and
2   three or four tall.
3   Q.  Okay.
4   A.  Four, I think -- four, maybe even five, tall.
5   Q.  So it was two blocks deep; is that right?
6   A.  Yes.
7   Q.  And then four or five tall.  And then on top of
8   that, there was a chain-link fence that went up --
9   A.  Yeah.
10   Q.  How high was the chain-link fence, if you
11   remember?
12   A.  I think it was ten -- you know, the whole --
13   the whole thing would have been up to a height of about
14   ten to twelve feet.
15   Q.  Okay.  And it blocked off the sidewalk at both
16   sides of that wall; correct?
17   A.  It did.
18   Q.  And it wrapped around the corner of 12th and
19   Pine?
20   A.  It did.
21   Q.  What was the purpose of that wall?
22   A.  So the purpose was, you know, part of that
23   continued de-escalation, I would say, that same
24   trajectory, that after the -- the protest area was
25   removed, after the police went back into basing

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 136

1    operations out of the East Precinct, I think nobody --

2    we, they, the whole city, didn't want to create another

3    flash point for further protests between -- you know,

4    sort of focused on SPD, but using the street.

5            So we -- we did install that wall as a way to

6    sort of create that separation.  They'd had some

7    concerns, and I think some evidence of people attempting

8    to burn down the precinct or throw incendiary devices

9    toward the precinct, and so the wall really limited the

10   ability to do that.

11           We eventually removed the wall after police

12   were -- was able to install a fence right up against

13   the -- the precinct that provided some of that same

14   separation.

15       Q.  Okay.  So it -- that wall that you're talking

16   about, before they got the fencing right next to the

17   building, the wall that took up the sidewalk, that was

18   in place until about April of 2021?

19       A.  Yes.

20       Q.  Okay.  And your understanding was, that was

21   because the police department thought there were threats

22   to the building of the East Precinct during that time

23   period?

24       A.  Yes.

25       Q.  Okay.  Going back to June 9th and 10th and

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 165

1    A.  I think -- you know, I -- I recall there being

2    more -- more concern about the -- the level of damage

3    than that it would be something that people would be

4    sort of ongoing.

5         So I think maybe -- maybe permanent in this

6    regard was referring to sort of the -- the permanency of

7    the damage, but it may have been about -- other people

8    may have had a -- a concern about the long-term

9    residential activity within the park.

10   Q.  Meaning the tents in the park?

11   A.  Yeah.

12   Q.  Okay.  Do you recall there being discussion

13   about whether to provide porta-potties to the park?

14   A.  I do, as -- as indicated here in the notes.  I

15   remember there being some discussion about porta-potties

16   versus -- both within the park and in the vicinity

17   because there were a lot of people out for long periods

18   of time, and a lot of businesses closed.

19   Q.  What do you recall the discussions being about

20   whether to provide or not provide porta-potty service to

21   the area?

22   A.  You know, I don't remember a whole lot about

23   that, but I remember there being some -- some questions

24   about -- about providing porta-potties versus, you know,

25   what -- what it would mean from a -- from a waste

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 166

1    perspective if we didn't provide porta-potties.

2         Q.   Okay.   Do you recall anybody expressing

3    concerns about what a -- about what message it might

4    send to provide porta-potties to the area?

5         A.   Yeah, I remember some -- some concerns.   And

6    again, this is similar to some of the other areas where

7    there wasn't -- there wasn't unanimity of all opinions

8    at all times.

9         Q.   Okay.

10        A.   There were some folks who felt like that that

11   could -- could encourage people to stay longer than they

12   might otherwise.   I don't remember who took which

13   positions, though.

14        Q.   Okay.   So you don't recall who was talking

15   about them potentially being a problem for long-term

16   residency?

17        A.   I -- I -- I --

18             MR. CRAMER:   Objection.   Form.

19        A.   Yeah.   I don't.   It was a little bit out of

20   my -- my area of expertise, so was maybe not paying as

21   close attention to that as I could have.

22   BY MR. WEAVER:

23        Q.   Okay.   Did you ever tour the area in and around

24   Cal Anderson and East Precinct in June of 2020 with

25   Mayor Durkan?

Page 174

1    There also -- we really didn't talk about

2  timeline for when that would -- when that would happen,

3  when it would be removed.  And I think there was a -- it

4  felt, to me, like there was a shared understanding that

5  immediately removing that wall could have some

6  problematic effects in terms of re-creating that focal

7  point for those protests.

8  BY MR. WEAVER:

9       Q.  Okay.  So you talked about rolling protests

10  that occurred for several months after CHOP in the

11  Cal -- I'm sorry, in the -- yeah, the Cal Anderson and

12  East Precinct area.

13       Did I -- did I hear that correctly?

14       A.  Yes.

15       Q.  Okay.  Did those --

16            MR. CRAMER:  Objection.

17  BY MR. WEAVER:

18       Q.  Did those continue until about the end of the

19  year of 2020?

20       A.  I -- that's -- that's probably a fair

21  assessment of how long they continued.

22       Q.  Okay.  Was there any discussion that you're

23  aware of at the City as to why those protests were

24  continuing in that particular area through 2020?

25            MR. CRAMER:  Objection.  Form, foundation.

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 175

1      A.   Yeah, I don't remember speculating on that.   I

2   think that it -- because of the -- the summer protests,

3   it became -- it was still a place where people would

4   sort of organize and -- and depart from.

5           I think throughout, both in the midst of the

6   summer and through the -- through the rest of the summer

7   and the fall, people would come from citywide to -- to

8   Capitol Hill for those protest activities, even in the

9   midst -- even when there was -- in June, you know, it

10  wasn't that everybody who was protesting was -- also had

11  a tent in Cal Anderson Park.

12          It was -- people would come there at various

13  points of the day and then leave at various points of

14  the day.  And some people would stay there 24 hours a

15  day, but some people would arrive and -- and depart as

16  they're able to do.

17          So it was not sort of a -- it wasn't solely

18  self-generated of being from within the park and in

19  front of the precinct.  It was -- it -- I think it was

20  more of a citywide and even regional thing, that people

21  would come to Capitol Hill for -- for some of those

22  protest activities.

23  BY MR. WEAVER:

24      Q.   Okay.  Do you -- do you know whether there was

25  any discussion about whether the protest activity in

Page 176

1   that area around Capitol Hill and Cal Anderson was

2   related to the ongoing encampment in Cal Anderson Park?

3            MR. CRAMER:  Objection.  Form, foundation.

4       A.  I -- I don't remember there being that -- that

5   conversation.  It felt, as we got into the later summer,

6   into the fall, that those were sort of two separate sets

7   of issues.  They may have been related, but they were

8   two separate sets of issues.

9   BY MR. WEAVER:

10      Q.  Do you -- were you parti- -- were you involved

11  in any discussions about whether the -- whether Cal

12  Anderson Park should be cleared out again in December of

13  2020?

14      A.  I was not involved in those discussions in --

15  in -- later in 2020.

16      Q.  Were you aware of them in -- later in 2020?

17      A.  Yeah, I -- I -- I was sort of aware that they

18  were happening.  SDOT has a -- has a role, along with

19  Parks, in addressing some of our issues stemming from --

20  from homeless encampments.

21           And we have a long working relationship with

22  Parks on how to do some of the -- the major sort of

23  initiatives that happen at -- related to homeless

24  encampments.

25           And that's primarily because we have some

Hunters Capital, LLC v. City of Seattle          30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 187

1   very early in the morning, 5:00 or 6:00 a.m.  More

2   people started coming towards -- towards us.  And then

3   once they saw the police there, they -- you know, even

4   more -- sort of larger crowds started to form.  And

5   people took more -- sort of more of a defensive posture

6   around some of the barriers in the -- the area that

7   people had been -- like around the East Precinct.

8       Q.  So what were the -- some of the defensive

9   postures that people in the crowd took?

10      A.  I mean, they were just like, you know -- like

11  lying down on top of the barriers, trying to block

12  access and -- and things like that.

13      Q.  Okay.  So were they doing anything to try to

14  block access, other than lying down?

15      A.  No, I don't -- I mean, I don't remember them

16  doing anything other than that.

17      Q.  Okay.  You said you went in at 5:00 or

18  6:00 a.m.  Why did you choose to go in at 5:00 or

19  6:00 a.m.?

20      A.  That was a time when it was generally quieter.

21  That was the earliest that we could mobilize our -- our

22  staff and recognize that this would be a sort of full

23  department response in terms -- or not full department,

24  but full -- full crew response in terms of accomplishing

25  the activities within the course of a day.

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 188

1           And whenever we sort of waited until later

2    morning or even into the afternoon to sort of start

3    activities, we would have a hard time having a full

4    complement of staff available, and we'd have sort of

5    more people around.

6           And we'd learned that from the installation of

7    the traffic control plan on June 16th and 17th, we'd

8    sort of learned it throughout our engagement over the

9    month of June.

10       Q.  That generally going --

11           (Simultaneous cross-talk.)

12   BY MR. WEAVER:

13       Q.  That generally going in early in the morning,

14   you were likely to have less of the conflict that you'd

15   have later in the day or in the night; is that right?

16       A.  Right.  Right.

17       Q.  So --

18       A.  Also, in the sense of -- just -- you know, just

19   to clarify that just a little bit, you know, some of

20   this was also that, when there were fewer people there,

21   we had a little bit of an easier time communicating with

22   people that spoke on behalf of the protest organizers;

23   that, when there were more people there, there were more

24   people who would sort of step in and say, well, you

25   didn't talk about this with me.  You only talked about

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 189

1    it with that person over there.  You didn't talk -- you
2    know, that there was a much more decentralization of
3    decision-making, and so that made it harder to sort of
4    move things forward.  When we could do some of that
5    earlier in the morning, there was a bit -- we could have
6    a bit more focus.
7        Q.   Okay.  I want to go back to Exhibit 12, which
8    deals with the 16th and the implementation of the
9    barriers.
10            Towards the end of that same -- second full
11   paragraph on Page 2, you indicated that, "More than once
12   I communicated the need for us to pause and prepare to
13   withdraw if necessary."
14            Do you see that?
15       A.   I do.
16       Q.   And can you describe to me what you were
17   communicating and why you were communicating it?
18       A.   Well, you know, I think, as we saw some of
19   those reaction- -- those -- those reactions and those
20   interactions, like I -- I just -- I really wanted to
21   make sure that our staff was able to do their work and
22   was able to do the other work that they would need to do
23   the next day citywide.
24            And if we had -- if we got to the point of
25   conflict, we would have a labor problem overall, and we

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle          30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 211

1          Q.   I just want to make sure you're on -- okay.   So

2     you indicated this about 7:00 in the morning on

3     June 19th, that they had a couple water barriers across

4     Pine between 11th and 12th.

5               What were you referring to there, if you

6     recall?

7          A.   So yeah, this is something that would -- would

8     happen occasionally, sort of that there would be some

9     things sort of moved in the -- in -- into -- in the way

10    of traffic.

11              And -- and it was like -- you know, I think I

12    say, that last sentence, "They are still soft closing

13    streets overnight."   And I think this would be -- you

14    know, people would put some things into the street.

15              You could -- you could move them -- like, I

16    could walk up and just move them out of the way.   But

17    they -- they could have been perceived as -- as not

18    allowing access.

19              But they weren't -- they weren't act- -- they

20    were not filled with water.   They were -- I could move

21    them out of the way myself.   But that would happen in

22    different places at different times, and it would tend

23    to happen when it was -- in the sort of overnight hours.

24         Q.   So it was typically overnight that they would

25    do these soft closings?

6402ce53-89af-4e06-b574-53dbb844f256

Page 212

1      A.   Yes.

2      Q.   Okay.   And -- I mean, if somebody didn't go up

3  to the barrier and try to move it, they wouldn't

4  understand that it could be moved; is that right?

5           MR. CRAMER:   Objection.   Form.   Speculation.

6      A.   That's -- that's probably right.   You know, it

7  also was -- they sometimes would -- you would -- you

8  could drive through, but you had to sort of be a bit

9  more circuitous.

10          So I don't -- I don't remember exactly how

11  they -- like what the configuration was of -- of some of

12  those things, but -- and it -- it was different in

13  different places at different times.

14  BY MR. WEAVER:

15     Q.   Did you find that typically, when they were

16  moved overnight, they would be into lanes of traffic

17  that had previously been attempted to be open?

18     A.   Sometimes, and sometimes it would be over one

19  lane, but not the second lane, or one direction, but not

20  the other direction of travel.   I -- it was -- it was

21  a -- I think it was a consistently evolving situation

22  through that whole week.

23     Q.   Okay.   And so we talked about the plywood too.

24  Would the plywood be basically placed in the same areas

25  that the orange water barriers might?

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 213

1      A.   Yep.   Yes.

2      Q.   And again, typically at night?

3      A.   Yes.

4      Q.   At some point there was a switch from keeping

5  the modified footprint that existed on June 16th and

6  17th, that you installed on those days, and moving a

7  couple weeks later to move everything out.

8           Do you recall what the impetus was for that

9  movement?

10     A.   I don't know if there was a -- I don't know

11 what -- if there was a specific thing that happened.

12 You know, I think some of -- some of this, the -- the

13 sort of continued shifting of things, you know, it -- it

14 felt like, from my perspective -- I can only speak for

15 myself at this point, but it felt from my perspective

16 like it was un- -- unlikely that we would ever in -- in

17 this -- so this approach reach enough stability and

18 predictability that me, Mami, Chief Scoggins, like we

19 would be able to not engage at the level we were

20 engaging.

21           And the level we were engaging in order to

22 ensure public services was, from my perspective, not

23 sustainable in the long term, that the -- that the level

24 that we were spending -- level of time meant that it was

25 challenging to do the rest of our jobs because we were

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 214

1    committed to ensuring public services and access in

2    Capitol Hill.   There's a whole city that I'm responsible

3    for, not --

4         Q.   Sure.

5         A.   -- three blocks.

6         Q.   So Chief Scoggins is the fire chief for the

7    entire city; right?

8         A.   Right.

9         Q.   And Mami Hara was -- was the director -- I

10   think she's left -- for all of Seattle Public Utilities;

11   right?

12        A.   Right.

13        Q.   And you were the head department -- head of the

14   SDOT for the entire city; right?

15        A.   That's right.

16        Q.   And all three of you were spending either all

17   day or a good portion of your days for about three or

18   four weeks in the Capitol Hill neighborhood around Cal

19   Anderson Park; right?

20        A.   That's right.

21        Q.   And you felt that was necessary to keep

22   services at -- at some sort of reasonable level in the

23   neighborhood; right?

24             MR. CRAMER:   Objection.   Form.

25        A.   I felt like it was important to -- to -- yeah,

6402ce53-89af-4e06-b574-53dbb844f256

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Samuel Zimbabwe

Page 215

1    to preserve our -- our public responsibilities of -- of

2    access and -- and services and movement of people and

3    goods.

4    BY MR. WEAVER:

5        Q.  Okay.  And did you notice a change in the shift

6    of the priority to clear out the area after shootings

7    that occurred in the area on June 20th and June 21,

8    2020?

9        A.  I think that that potentially played into it.

10        Q.  How do you think that played into it, and what

11    was your perception of why it played into it?

12        A.  You know, I -- I don't want to -- I don't want

13    to speculate on -- on why it played into it for others.

14    I -- it -- to me, it felt like things at that point --

15    you know, I've talked about how our goal was to -- was

16    continued de-escalation of conflict and looking for sort

17    of a return to regular operations.

18            I think some of those -- there -- there

19    became -- or it seemed like we were heading towards an

20    inflection point where we would not be successful in

21    de-escalating, and there could be opportunities for

22    escalating conflict, whether between -- you know, it

23    started out as between protesters and police.

24            It seemed like perhaps that was changing into

25    among protesters, or a lot of uncertainty about what was

6402ce53-89af-4e06-b574-53dbb844f256

Page 238

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Samuel

9    Zimbabwe, having been duly sworn, on October 28, 2021,

10   is true and accurate to the best of my knowledge, skill

11   and ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 5th day of November, 2021.

14

15

16   _____
     CINDY M. KOCH, CCR, RPR, CRR

17

18   My commission expires:

19   JUNE 9, 2022

20

21

22

23

24

25

6402ce53-89af-4e06-b574-53dbb844f256