# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff(s),        )
                                 )
    vs.                          )   20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant(s).        )
_____

VIDEOTAPED VIDEOCONFERENCE

DEPOSITION UPON ORAL EXAMINATION OF

CARMEN BEST

_____

Witness located in

Seattle, Washington

(All participants appearing via Zoom videoconference.)

DATE TAKEN:   NOVEMBER 9, 2021

REPORTED BY:  PATSY D. JACOY, CCR 2348

1  Kerlikowske came, when he came on board at the
2  department because he's the one who brought me up to be
3  a supervisor and -- in public affairs, but I'm -- I
4  can't quite remember the year that that was, to be
5  honest with you.
6      Q.  Okay.  How many years were you there as a
7  sergeant do you think?
8      A.  Well, maybe about three.
9      Q.  Three?
10     A.  Oh, East Precinct, yeah, probably -- yeah,
11 probably about a couple years, couple three years.
12     Q.  Okay, great.  All right.  So can you just tell
13 me from your perspective, I mean, what -- what were the
14 events that kind of led to the creation of what
15 ultimately became the CHOP, officially CHAZ?
16              MS. ASHBAUGH:  Object to the form.
17              MR. CRAMER:  Same objection.
18     A.  Go ahead and answer, though?
19     Q.  (BY MS. EAKES)  Yeah.
20              MS. ASHBAUGH:  Yes.
21     A.  So, you know, what I can tell you is that we
22 were -- we had a number of demonstrations that had been
23 going on, and then at some point, you know, we --
24 eventually we -- the precinct was evacuated, the East
25 Precinct was evacuated with the purp -- intent of

1  having it be a temporary evacuation.  The next -- I
2  don't remember the date exactly, but the next day, as
3  we were trying to come back into the precinct, the
4  people who were entering -- were trying to enter the
5  area were stopped by folks who had removed the police
6  barricades -- or the police barricades -- or had put
7  barricades around the precinct and told them
8  essentially to leave the area and leave their sovereign
9  property as I recall.
10         So we really didn't know what it was at that
11 point, but, you know, as far as I can tell therein lied
12 the beginning of the -- what was at that time was known
13 as the Capitol Hill Autonomous Zone, so I believe it
14 was one captain and acting lieutenant.  I was later
15 notified -- when I went in it was still dark in the
16 morning.  I was later notified of the encounter, but
17 really didn't know, you know, what to make of it, to be
18 honest with you.
19         We later -- and I don't remember the exact
20 time frame were -- it was determined that they were
21 there and they were -- had created an autonomous zone.
22 I really wasn't sure what that was.  We were trying to
23 figure out what we were dealing with, but I would say
24 it was right after that last set of demonstrations.
25 And so therein lied that zone and then -- then we

Hunters Capital, LLC v. City of Seattle                          Carmen Best

Page 35

1  started working to see what it was we had really.
2      Q.  Great.  So let me -- let's start by talking
3  about the protests before the precinct -- before you
4  left the precinct.
5      A.  Sure.
6      Q.  Do you remember -- so I think the date that
7  you left the precinct was June 8th, if that helps, of
8  2020.
9      A.  Okay.
10     Q.  So prior to that I understand there were a
11 number of protests up in and around the East Precinct
12 following George Floyd's death and then after the
13 protests.  Were you -- were you up at the East Precinct
14 at any point prior to the abandonment of the precinct
15 for those protests?
16     A.  Yes, I was.
17          MR. CRAMER:  Object to the form.
18          THE WITNESS:  Oh, I'm sorry.
19          MR. CRAMER:  I'm going to object to the
20 form; misstates testimony.  Go ahead.
21     Q.  (BY MS. EAKES)  You were --
22          MR. CRAMER:  Go ahead, you can answer.
23     A.  I'm sorry. Okay.  So, yes, I -- I had been at
24 the precinct, you know, during the protest time.
25     Q.  (BY MS. EAKES)  Tell us about that.  What was

1  Q.  Were you concerned about the safety of the
2  people, the businesses and people who lived in this
3  zone once the police were excluded from it?
4          MR. CRAMER:  Objection; form.
5  A.  I think it's safe to say that I was concerned
6  about the safety of everyone whether it's officers, the
7  businesses, the residents, the people coming into the
8  area for the entire time, not just on this one occasion
9  but literally, you know, from the beginning of when all
10 of the demonstrations and occupations occurred until we
11 finally were able to clear out the CHOP.  It remained a
12 concern at all times.
13 Q.  (BY MS. EAKES)  And what was your concern
14 specifically?  What was -- what were you concerned
15 about or what was foreseeable to you?
16         MR. CRAMER:  Objection; form.
17         MS. ASHBAUGH:  Object to form.
18 A.  Yeah, pretty broad question there, but what I
19 would say is that, you know, ultimately what was most
20 paramount was any sort of life safety issues.  We
21 really, as I mentioned, before were very concerned
22 about, you know, the potential for problems, we didn't
23 know.  We were dealing with an unprecedented event.  We
24 just didn't know for sure what we were going to be
25 coming up against and how we were going to make sure

1  that we could protect the life safety and the property
2  of everyone that was involved, each and every
3  stakeholder.
4          I mean, we had a pandemic.  People weren't
5  going to work.  People weren't going -- you know, there
6  was -- there was a lot more folks that were attending
7  these demonstrations and had the availability to do so.
8  Additionally emotions were running high behind the
9  murder of George Floyd.  The police were a target.
10 Unprecedented numbers of people in and around the
11 precinct.  So the level of concern for everybody
12 involved was paramount.
13      Q.  (BY MS. EAKES)  So it sounds like your concern
14 was not just about the people inside the barrier but
15 people outside the barrier as well in the surrounding
16 area?
17      A.  Absolutely.
18      Q.  Okay.  And if I heard you correctly, you were
19 concerned not just about the people that lived there or
20 the businesses that were there, but also harm to
21 protesters, harm to others that were there for whatever
22 purpose.  Is that -- is that right?
23      A.  Yeah, that's fair to say.
24      Q.  And given what you knew, were you concerned
25 that there could be violence in that area?

```
 1        A.   Could you be more specific.  What do you mean?
 2        Q.   Well, were you concerned that people could be
 3   hurt or harmed or have crimes committed against them?
 4             MR. CRAMER:  Objection; form.
 5        A.   Sure.  Oh.
 6             MR. CRAMER:  No, go ahead.
 7        A.   Yeah.  Certainly --
 8        Q.   (BY MS. EAKES)  Go ahead.
 9        A.   Yeah, I was trying to, you know, to -- to say
10   that earlier.  We were definitely concerned about
11   anybody being harmed.  I mean, again, unprecedented,
12   thousands of people showing up.  Some of the folks in
13   the crowd, as I mentioned earlier, you know, were --
14   had ill intent.  Some of the folks were throwing rocks
15   and bottles.  You know, there's always -- some of the
16   people appeared to be, although I have nothing to
17   confirm it, you know, to be maybe on some substances.
18             And so there was a lot of things that were
19   happening there that we were very concerned about.  We
20   were trying to maintain the safety of both the
21   officers, the protestors.  As you know, there were some
22   that were injured, you know, through other means.  And
23   so it was very, very dynamic and we were always
24   concerned about every -- you know, about every
25   individual involved, whether they be cops, protesters,
```

1  observers, residents, business owners.  I mean, the
2  whole -- anybody -- any stakeholder was a concern.
3      Q.  And did you share your concerns about
4  potential harm that could come to all those folks you
5  just mentioned with the mayor's office?
6      A.  Yeah, of course I shared every concern I had,
7  you know, with others or with the mayor's office and
8  other city agencies and -- about some of the things
9  that we were concerned about happening -- that
10 potentially could happen in the area.
11     Q.  And do you recall if you specifically spoke to
12 Mayor Durkan herself about your concerns?
13     A.  You know, I can't dredge up the exact -- an
14 exact conversation, but we were in routine
15 communication with each other and I tried to keep the
16 mayor updated and apprised, you know, of whatever was
17 happening, you know, when I could.
18     Q.  And it sounds like after the decision to
19 evacuate you at least thought that the police
20 department would be able to go right back in on the
21 next day; is that right?  Or that's what you intended?
22     A.  That was the intention, yes.
23     Q.  Did you convey to the mayor's office that you
24 thought the precinct should be reoccupied the following
25 day?

1      Q.   (BY MS. EAKES)  Yes.  And you might want to
2  look at the one right above that.
3      A.   Okay.  (Witness reading document.)
4           MR. CRAMER:  And can you re-ask your
5  question on this page, Patty?
6      Q.   (BY MS. EAKES)  Just let me know when you're
7  done reading it.
8      A.   Sure will.  Just give me one second.
9      Q.   Sure.
10     A.   (Witness reading document.)  Okay, I've read
11 it.
12     Q.   So in the first section that says Carmen Best
13 you said:  I got to tell you, though, we were pretty
14 clear.  I just thought it was terrible and that we had
15 a real problem and we needed to get on this and figure
16 this out.
17          What -- tell me what you meant by that.  What
18 was terrible?  What was the big problem that you saw?
19     A.   Well, from my own perspective I was extremely
20 concerned about people coming into a neighborhood and
21 occupying the neighborhood and claiming it as their
22 sovereign property, so I was very concerned about it,
23 you know, and so that was a real problem.  I thought it
24 was a real problem and definitely wanted to understand
25 where we were with this and what was happening and

```
 1   figure out what people were doing and why they were
 2   there and what their intention was, what the public
 3   safety aspects of people being there in that capacity
 4   and what it might entail for others in the area.
 5        Q.   And did you think that -- that it could
 6   potentially lead to violence and problems for the
 7   businesses and the residents of that area that had been
 8   occupied?
 9        A.   Well, I thought that the potential was there
10   for -- you know, who knows how it could come out, but
11   there was obviously potential for it to go bad.  There
12   was also the potential for it to go well, but, you
13   know, as a police chief you're much concerned about the
14   contingencies for a negative -- for a negative outcome
15   than anything -- more so than anything else, you know,
16   planning for the worst but hoping for the best so to
17   speak.
18        Q.   And in the second paragraph that says Carmen
19   Best it says:   And there was no one that I could really
20   turn to and say, "Does anybody see how bad this is and
21   how this is going to be a problem?"
22             Tell me about that.   What -- what were you
23   trying to convey there?
24        A.   Well, you know, I would say this:   There was
25   obviously a difference of opinion about the approach,
```

```
 1   my interpretation and you'll have to talk to others
 2   about what -- you know, was that -- it was more of a
 3   wait-and-see approach and clearly, you know, I had some
 4   concerns about it.  You know, I think everybody was
 5   concerned about what was happening, but how to approach
 6   it was -- we weren't all on -- you know, fully on the
 7   same page about that, but I recognize that, you know,
 8   there's compromising too in these situations.
 9        Q.   Were you and the mayor on the same page in
10   terms of how to approach it?
11             MR. CRAMER:  Objection; form,
12   foundation.
13        A.   Yeah, give me -- give me a little more there.
14   What do you mean?
15        Q.   (BY MS. EAKES)  Well, I mean, you said there
16   was a difference of opinion and I'm -- as to how to
17   approach it, so was your opinion different from -- I
18   mean, did you and the mayor have different opinions
19   about how to approach the problem?
20             MR. CRAMER:  Objection to form.
21        A.   Well, the reason I'm saying that, you know,
22   I'm not delineating that to one person, but clearly I
23   go on to talk about the fact that, you know, I was not
24   necessarily in agreement with some of the responses
25   about -- you know, about the porta potties and that
```

1  sort of thing.  I think that, you know, I had some
2  concern there and I think that, you know, the City
3  wanted to take a more measured approach than I did.
4      Q.  And what were your concerns about the porta
5  potties and those other things that you referred to
6  later?
7          MR. CRAMER:  Objection; form, vague.
8      A.  Yeah, just generally speaking I thought that
9  that might be something that would entice people to
10 stay rather than leave.
11     Q.  (BY MS. EAKES)  Okay.  So you were concerned
12 that the City was -- by doing some of those things was
13 signifying or endorsing that people should stay in the
14 area as opposed to leave; is that right?
15         MR. CRAMER:  Object to form.
16     A.  Yeah, I thought that might be an outcome if we
17 brought -- if the City brought in porta potties that
18 some would take that as an invitation to stay longer
19 because they have facilities there.
20     Q.  (BY MS. EAKES)  So you said that, you know,
21 SPD's plan was to reoccupy the East Precinct following
22 the next -- the next day basically after the
23 evacuation, right?
24     A.  Yes.
25     Q.  When did that plan change?

Hunters Capital, LLC v. City of Seattle          Carmen Best

Page 196

1    Q.   -- that, just to be clear, Carmen.  I just
2  want to know do you agree with what she says here.  I
3  mean, the email says what it says.  Do you agree with
4  her statement that it was foreseeable and avoidable?
5    A.   Well, I think --
6         MR. CRAMER:  Objection to form.
7    A.   Yeah, I think she's talking about the murder
8  that happened that morning, right?
9    Q.   (BY MS. EAKES)  Right, right.
10   A.   So, you know, I don't know that we could
11 foresee a murder happening of a -- of a young man, but
12 we certainly could see the escalation, you know.  We
13 knew there had been escalation in -- in crime and
14 activity, hence trying to make sure that we were able
15 to get back into the precinct and have a -- you know,
16 and mitigate the circumstances.
17   Q.   So if I understand you correctly, maybe not
18 foreseeable a specific murder of this person, but
19 certainly foreseeable that there was increased violence
20 and crime going on?
21   A.   Yes.
22         MR. CRAMER:  Object to the form.
23   A.   Sorry.  Yes.
24   Q.   (BY MS. EAKES)  And what about the statement
25 that it was avoidable, do you agree with that?

```
 1                    C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON  )
                          )
 4   COUNTY OF KING       )
 5
 6            I, Patricia D. Jacoy, a Certified
 7   Shorthand Reporter in and for the State of Washington,
 8   do hereby certify that the foregoing transcript of the
 9   deposition of CARMEN BEST taken on November 9, 2021 is
10   true and accurate to the best of my knowledge, skill
11   and ability.
12
13
14                    _____
15                    Patricia D. Jacoy, CSR 2348
```