# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,      )
                                   )
              Plaintiff,           )
                                   )
         vs.                       ) No. 20-cv-00983
                                   )
CITY OF SEATTLE,                   )
                                   )
              Defendant.           )
_____


VIDEOTAPED VIDEOCONFERENCE 30(B)(6) AND INDIVIDUAL

DEPOSITION UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(HAROLD SCOGGINS)

_____


***PORTIONS OF THIS TESTIMONY ARE DESIGNATED

CONFIDENTIAL AND ARE SEALED

UNDER A SEPARATE COVER.***




Seattle, Washington

(All participants appeared via videoconference.)


DATE TAKEN:   SEPTEMBER 14, 2021

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Page 9

1    A.  As far as I know, that's the full scope.

2    Q.  Okay.  All right.  Great.  I mean, I will ask

3    you about other things, but this is what you've been

4    designated for specifically as the representative of the

5    City.

6           So first I'd like to ask you about what

7    materials the fire department provided to protesters

8    during the -- during the CHOP time period that we'll

9    refer to as June 8th through July 10th, 2020.

10          What materials do you recall that the fire

11   department provided to protesters or the medics in the

12   CHOP zone area during that time period?

13   A.  Sure.  And just for a point of clarification.

14   Q.  Sure.

15   A.  I don't know for volunteer EMS personnel, I

16   don't know if they were medics, paramedics or EMTs --

17   Q.  Okay.

18   A.  -- or some other sort of medical professionals.

19   They were just identified as volunteer EMS.

20   Q.  Okay.

21   A.  So we provided fire extinguishers, stokes

22   baskets with wheels on it, and also canvas letter

23   carriers, for lack of a better term.

24   Q.  So -- so fire extinguishers, what -- can you

25   describe to me the fire extinguishers.

Page 10

1    A.   Sure.   When you say -- well, I'm not sure --
2    when you say describe to you the fire extinguishers,
3    what exactly do you mean?
4    Q.   Well, how many fire extinguishers?   Were they
5    just standard, like, kitchen variety fire extinguishers?
6    What kind of fire extinguishers were they, and how many?
7    A.   I don't know the exact number.   There's
8    probably several, maybe around three or four.   They were
9    at least, you know, 2A, 10BC type extinguishers that we
10   carry, you know, but the exact model number, I can't
11   speak to that.
12   Q.   Okay.   And who did you give those to
13   specifically, the fire department?
14   A.   The volunteer EMS personnel.
15   Q.   And so the volunteer EMS personnel, as I
16   understand it, those were people who were -- had a --
17   I'll call it an improvised medic station on -- was it
18   Pine?   Is that -- is that correct?   Is that who you were
19   referring to?
20   A.   Yeah, I think it was at 10th and Pine, in the
21   parking lot of the Mexican restaurant.   I think that's
22   where it was.
23   Q.   Rancho Bravo Tacos?
24   A.   Yes.
25   Q.   Okay.   Just across the street from Cal Anderson

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 11

1    Park?

2         A.   Correct.

3         Q.   Okay.   And why did the fire department provide

4    the fire extinguishers?

5         A.   We were getting reports of small fires in the

6    park.   It could have been a garbage fire or -- you know.

7    So we were getting those reports, and so when we talked

8    to them about it, they wanted to assist with problem

9    solving, and we knew it would be a bit of a challenge to

10   navigate through all the people to get to a small trash

11   fire.

12        Q.   Okay.   So it was so that they could put out

13   fires that had been started within the CHOP area that

14   the fire department was not going to be able to put out;

15   is that correct?

16             MR. FARMER:   Objection.   Objection.

17   Misquotes testimony.

18   BY MR. WEAVER:

19        Q.   You can answer unless Mr. Farmer tells you you

20   can't.   So --

21        A.   Oh, okay.   There were -- you know, we get

22   reports of fires every day, you know, sometimes they're

23   in encampment, sometimes they're in a trash can.   It was

24   these types of fires.   It wasn't, you know, building

25   fires or vehicle fires or anything like that.

Page 12

1      Q.   Is it common practice for the Seattle Fire
2  Department to provide fire extinguishers to groups of
3  protesters to put out fires?
4      A.   It's not a common practice, but it is a common
5  practice for events and -- and different things like
6  that, for us to help with supplies if they need them.
7  It's a common practice for the fire department to
8  provide fire and life safety for the entire city,
9  whether it's mount your fire extinguisher in your
10 apartment building or your business, or things -- things
11 like that, so that is a common practice for us.
12     Q.   Okay.  So these fire extinguishers were owned
13 by the City of Seattle; is that correct?
14     A.   Yes.
15     Q.   Okay.  And can you think of another time that a
16 City of Seattle-owned fire extinguisher was given to a
17 group of protesters to put out fires in a park?
18     A.   I can't.
19     Q.   So you mentioned a -- and I'm just trying to
20 remember -- a basket -- did you say you also provided
21 a -- baskets?
22     A.   Stokes.  It's a Stokes basket.
23     Q.   A Stokes basket.  Okay.  What is a Stokes
24 basket?
25     A.   A Stokes basket is a tool that we use to

fde9268f-5984-4105-96c9-722fce47c32c

Page 13

1    package a patient if we need to transition them to a

2    location where they can be received by our EMS

3    personnel.

4        Q.   And --

5        A.   This particular basket had wheels on the side

6    so you can roll it.

7        Q.   Okay.  So is that -- what's the difference

8    between a Stokes basket and a stretcher?

9        A.   A stretcher is -- goes in the back of our aid

10   cars and medic units.  It has mounting mechanisms.  It's

11   able to go up and down.  It can, you know, have a lot

12   more weight on it.  So it's a tool that's used in all of

13   our aid cars and medic units, and it locks in for

14   transport.

15       Q.   Okay.  So the Stokes basket, again, it was

16   owned by the City of Seattle; is that correct?

17       A.   Yes.

18       Q.   And trying to -- I'm trying to picture the

19   Stokes basket.  So is it -- is it -- is it big enough to

20   lay somebody down on -- and then wheel them out of an

21   area?  Is that what we're talking about?

22       A.   Yes.

23       Q.   Okay.  Is it the same or different from a

24   MegaMover?

25       A.   Different.

Page 14

1    Q.  What's a MegaMover?

2    A.  If you can imagine the -- you go to Home Depot

3  and you see like a 4-by-4 canvas tarp, and it has -- but

4  the MegaMover has -- MegaMover has a handle on each end.

5  So four firefighters, one can -- they can grab each

6  handle to move a person in a rapid manner, but you're

7  carrying them physically.

8    Q.  Okay.  So the main difference is it doesn't

9  have wheels?  Is that the main difference --

10   A.  No.

11   Q.  -- between a MegaMover and a Stokes basket?

12   A.  No.

13   Q.  Okay.

14   A.  No.  A Stokes basket -- let's see.  Let me see

15  if I can help here.  There was a rescue this past

16  weekend, and they showed it on the news, and they

17  hoisted the lady who was injured up in a basket to the

18  helicopter and they rescued her off of a mountain trail

19  where she were -- was injured.

20   Q.  Okay.

21   A.  So it's a -- it's a wire frame, it's

22  structurally sound, it's used in rescues like that.  So

23  it's -- it's more stable, and it's -- and it's a framed

24  basket.

25        The MegaMover is more of a canvas -- you fold

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 15

1  it up when you're done, throw it in the compartment, you

2  know, so -- am I helping there?

3       Q.  That helps a lot.   That helps a lot.

4           Okay.  Did you also provide -- did the fire

5  department also provide MegaMovers to the protesters?

6       A.  Yes.

7       Q.  Okay.  So how many Stokes baskets did the

8  volunteer EMS people get from the fire department?

9       A.  I think it was at least two.   I'm not exactly

10  sure on the number.

11       Q.  And about how many MegaMovers?

12       A.  It was probably at least two.   I'm not exactly

13  sure on the numbers.

14       Q.  And why did the fire department give City-owned

15  Stokes baskets and MegaMovers to the volunteer EMS

16  people?

17       A.  Well, our goal was to help facilitate patient

18  care, and these would be tools that these volunteer EMS

19  personnel could use to transport someone who was injured

20  to a location where we could receive the patient.

21       Q.  Okay.  So is it fair to say that it was so that

22  the -- the volunteer EMS people could move them to an

23  area where the Seattle Fire Department felt comfortable

24  receiving that patient?

25       A.  Where it was safe for the Seattle Fire

fde9268f-5984-4105-96c9-722fce47c32c

Page 16

1   Department to receive the patient.  It wasn't a matter

2   of comfort.  I think it was a matter of safety.

3        Q.  Okay.  So the fire department didn't feel safe

4   bringing its own Stokes baskets and MegaMovers into the

5   area where the volunteer EMS was during --

6             MR. FARMER:  Objection.  Vague.

7             (Simultaneous cross-talk.)

8             MR. WEAVER:  -- in 2020; is that correct?

9             MR. FARMER:  Objection.  Vague.

10            You can answer, Chief.

11            THE WITNESS:  Oh, okay.

12       A.  Well, it depends.  This was an area that

13  evolved over the time period you just mentioned.  So

14  there were -- there were areas where the fire department

15  needed to focus on safety of our personnel, and so

16  that's why we gave them the tools to help facilitate the

17  patient care.

18  BY MR. WEAVER:

19       Q.  Okay.  Do you know when the fire department --

20  what date the fire department gave the volunteer EMS

21  people the Stokes baskets?

22       A.  I don't remember the exact date.

23       Q.  Okay.  Was it early June, mid-June?  Do you

24  remember?

25       A.  It was mid to late June.

fde9268f-5984-4105-96c9-722fce47c32c

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 17

1      Q.  Okay.

2      A.  The items that have been mentioned, the fire

3   extinguishers, the MegaMovers, and the Stokes basket,

4   they weren't transitioned all on the same date.  This

5   was an evolving situation, I think, as you know.  So as

6   reports of fire calls came in, small trash fires and

7   things like that, then we met with them and we said,

8   hey, what can we do to reduce the number of fires.  So

9   the fire extinguishers.

10          And then the second piece of equipment was the

11   MegaMovers.

12          And then the third -- these are all different

13   times, but along that 22-day period, that's when these

14   transitions took place.

15      Q.  Okay.  So can you think of another instance in

16   which the City has provided Stokes baskets or MegaMovers

17   to a group of private individuals to move patients out

18   of an area?

19      A.  I -- I can't.  The context becomes important.

20   We hadn't had another situation where we couldn't have

21   complete access to the scene.  So that kind of played a

22   part in the decision making.  So we hadn't been faced

23   with that scenario before.

24      Q.  Okay.  Have you been faced with one since then?

25      A.  You mean like the CHOP last summer?  No.

Page 18

1      Q.   Okay.   Well, a situation where you -- you

2   provided MegaMovers or Stokes baskets to the -- to a

3   group of private individuals to move them out of the

4   area.

5      A.   We -- we hadn't been faced with one since then,

6   but on the fire extinguisher front, we have had

7   conversations over the last several years about

8   deploying fire extinguishers into the encampments so

9   the -- the large encampments, so individuals, if there

10  is a fire there, they can use them.   Because we go on a

11  lot of those fires.   So we have had similar type

12  discussions with a different layout, but not for the

13  MegaMovers or the Stokes baskets, but we have had

14  conversations for the fire extinguishers.

15     Q.   Okay.   So you say you've had conversations.

16  Have you actually provided them, the Seattle Fire

17  Department, in those situations?

18     A.   We have not.

19     Q.   Okay.

20     A.   We have not.

21     Q.   Do you recall whether the City refilled the

22  fire extinguishers for the -- for the people who were

23  occupying the area in and around Cal Anderson Park?

24     A.   I don't.

25     Q.   Okay.   I think you mentioned in the first --

Page 36

1  different types of BLS, ALS, and fire calls.  SPD --

2  protest response zone, SPD to secure the area, SPD to

3  escort SFD.  So it's a -- it's a quick overview of how

4  we would respond in and around this area.

5      Q.  Okay.  So is this what we were talking about

6  before, this is the actual depiction on a map of the

7  yellow or warm zone, and the red or hot zone?

8      A.  Yes.

9      Q.  And this was as of June 8th; is that correct?

10     A.  Yes.

11     Q.  Okay.  So what was the process by -- by which

12  it was determined that this should be the warm and hot

13  zone for this particular event?

14     A.  Sure.  There were physical barriers preventing

15  access and egress in and around the red zone.

16     Q.  Okay.  And how about the -- how about the size

17  and boundary of the yellow zone?

18     A.  I think what our team put together was an area

19  that made sense, where responding to any call in the

20  yellow zone we need to have situational awareness

21  because of the activities in the red zone.

22     Q.  Okay.  So I mean, that area depicted on this

23  map is bounded by Denny, Union, Broadway, and 13th; is

24  that correct?

25     A.  Yes.

Page 37

1      Q.   And on the left part of this slide, it

2   designates that area as the protest response zone; is

3   that correct?

4      A.   Yes.

5      Q.   Okay.  And so on June 8th, within that area, is

6   this slide indicating that anywhere in that area, that

7   the SPD had -- that the SFD had to wait for the Seattle

8   Police Department to secure the area before they would

9   enter?

10     A.   Anywhere in the red zone.

11     Q.   Okay.  That didn't include the yellow area; is

12  that correct?

13     A.   It did not.

14     Q.   Okay.  I understand this slide as defining the

15  protest response zone as the yellow area.

16          Do you feel -- do you feel otherwise?

17     A.   I do.  The yellow identifies the warm zone.

18  The protest response zone is the red, and it's written

19  in there, "protest hot zone."

20     Q.   Okay.  I'd like you to look at the left where

21  it says "Protest response zone," colon, and then it has,

22  Denny, Union, Broadway, and 13th.

23          Do you see that?

24     A.   Yes.

25     Q.   Okay.  I understand that as indicating that the

Page 38

1  protest response zone was that area, Denny, Union,

2  Broadway, and 13th.

3          Do you have a different understanding?

4      A.  I do.  That's our warm zone, and this gave our

5  folks situational awareness for this protest hot zone.

6  And so here's some of the challenges, for example, and

7  reason why we have to lay this out a little wider.  Just

8  navigating around that area in our vehicles are very

9  challenging just when you look at the red zone that's

10 outlined there.  So all of our folks need to have

11 situational awareness for a larger area.

12     Q.  Okay.  And that larger area was Denny, Union,

13 Broadway, and 13th; is that right?

14     A.  Yes.

15     Q.  And why -- why do they need to have additional

16 situation -- why do they need to have additional

17 situational awareness within that area?

18     A.  Because one never knows what spills outside of

19 the hot zone.  So our folks need to really be paying

20 attention.  This was on June 8th, so this is the first

21 day that the landscape kind of changed for us.  So our

22 folks needed to have situational awareness because you

23 never know what you're going to, you know, come upon in

24 any of these streets around -- around there.

25     Q.  It potentially could be unsafe within that --

Page 43

1    most of June 2020, because the protests from May 30th up

2    to June 8th, they happened, and then they kind of stood

3    down, you know, the crowds dissipated.  And then we

4    stand our resources down.  So that's how it normally

5    works.  But June 8th, we maintained, I believe, a higher

6    level of staffing for the balance of the month.  And I

7    can follow up there to be sure.

8        Q.  Okay.  Do you know how many battalion chiefs

9    were on duty during that staffed-up period in June of

10   2020, at any given time?

11       A.  For field operations I believe we staffed up

12   one additional battalion chief.

13       Q.  Okay.

14       A.  So there's five -- like on duty today, for

15   example, there's five on duty today.

16       Q.  Sure.

17       A.  During this period I believe we staffed up one

18   additional one.

19       Q.  Okay.  What is the difference between basic

20   life support and advanced life support?

21       A.  Sure.  So basic life support is for minor

22   medical emergencies that may require a transport to an

23   emergency room.  You broke your leg, maybe your stomach

24   hurts, or maybe your back went out.  Maybe you have a

25   laceration, but it's -- it hasn't hit any arteries or

fde9268f-5984-4105-96c9-722fce47c32c

Page 45

1    there.

2          Q.   So you're talking about the difference between

3    typical protocol and what the protocol was for this

4    yellow zone on Slide 10 of Exhibit 5 -- or Slide 9 of

5    Exhibit 5, sorry.

6          A.   Correct.

7          Q.   Okay.   And it was all basic life support within

8    that area on July 8th that required an aid car, engine,

9    and a battalion chief; is that correct?

10         A.   That is correct.

11         Q.   Okay.   And then for advanced life support

12   within the yellow area on June 8th, required an aid car,

13   a medic, an engine, and a battalion chief; is that

14   correct?

15         A.   That's correct.

16         Q.   Okay.   And this has the addition of a medic for

17   advanced life support.   What -- what is a medic, and do

18   they have their own vehicle?

19         A.   Yes.   Our paramedics, that's the higher level

20   of EMS training that I spoke to earlier, and they do

21   have their own vehicle.   It's an ambulance with two

22   paramedics inside.

23         Q.   And how was the -- how was the response

24   different for the area within the yellow zone, as

25   opposed to other areas of Seattle on that same day for

fde9268f-5984-4105-96c9-722fce47c32c

Page 46

1    an advanced life support situation?

2         A.   Sure.   So outside of this area that we're

3    talking about, if a person was having a cardiac arrest,

4    that would be a defined set of units to go and help that

5    person because that's an ALS call.   If a person is

6    having a stroke -- you wouldn't have a battalion chief

7    tied to a medic -- an ALS call.   That is one of the --

8    the biggest differences in all of these protocols right

9    here, is the battalion chief, and having a manager,

10   having a chief on scene who's paying attention to

11   situational awareness and can immediately call for

12   additional resources if they were needed.

13        Q.   And it's the case that even within this yellow

14   zone there were certain areas where there might be, for

15   example, somebody having a heart attack, where the --

16   the fire department would not even send the enhanced

17   team to respond; is that correct?

18             MR. FARMER:   Objection.   Vague and assumes

19   facts not in evidence.

20        A.   So --

21   BY MR. WEAVER:

22        Q.   Let me ask -- let me ask another -- I can tell

23   I confused you.

24             So within this area, within the yellow area,

25   were there some areas where the fire department on

Page 47

1    June 8th, for example, was -- would not respond to an

2    advanced life support situation even with the -- the --

3    the addition of a battalion chief, if they were

4    responding to an advanced life support situation?

5              MR. FARMER:   Objection.   Incomplete

6    hypothetical.

7              You may answer.

8              THE WITNESS:   Sure.

9        A.   So in the area between Olive and Pike and 13th

10   and 11th, for example, that would be a response inside

11   of that red zone that we would rendezvous or meet up

12   with SPD, and we would need an escort.   But any of those

13   other areas in the yellow area, the warm zone, our units

14   could respond to on June 8th.

15   BY MR. WEAVER:

16       Q.   Okay.  So I think that's all the questions I've

17   got on this slide.  We've been going about an hour.  I'm

18   happy to keep going, but I want to ask whether you want

19   a break, or whether you want to keep pushing through.

20   It's up to you.

21       A.   It's up to the team.  Do we need a break?

22             MR. FARMER:  Keep going.

23             THE WITNESS:  Okay.  Let's keep -- let's

24   keep going.

25   ////

Page 62

1   people within the red or warm area could -- could see

2   the fire department; is that correct?

3       A.  Not just see.  Because Fire Station 25 was on

4   the edge --

5       Q.  Sure.

6       A.  -- throughout the entire situation.  But the

7   aggressiveness became more when there was a -- an

8   incident unfolding.

9       Q.  Okay.  And you wanted to -- the fire department

10  wanted to reduce the possibility that there was going to

11  be conflict between the fire department and the people

12  inside the warm and red -- warm and hot areas; is that

13  correct?

14      A.  We wanted to get our people to a safe area

15  where they can stage until we got information from PD

16  that the scene was secure for us to go in.  So we made

17  adjustments as -- as the days went on here.

18      Q.  Okay.

19      A.  It was all about safety.

20      Q.  I'm sorry; what?

21      A.  It was all about safety.

22          MR. WEAVER:  Okay.  Are we on Exhibit 8?

23          THE COURT REPORTER:  Yes.

24          MR. WEAVER:  Okay.  So I've dropped this one

25  into the chat.

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 63

1              (Exhibit No. 8 marked.)

2    BY MR. WEAVER:

3         Q.   Let me know when you have it.

4         A.   Uh-huh.   It's up.

5         Q.   Okay.   So what do you understand this page to

6    be?

7         A.   It looks like the details from one of our

8    incident reports, Incident 58386 in 2020, on June 14th.

9         Q.   Okay.   And where do you understand that this

10   incident report would have been printed from?   Is there

11   a particular database that it might have come from?

12        A.   This probably came from our CAD system,

13   computer-automated dispatch center system.

14        Q.   Okay.   So I want you to look at the initial and

15   final location, up near the top, on the left.

16        A.   1221 East Olive Street, Apartment 203.   And

17   final location, Senia -- 12 --

18        Q.   The initial is the same as the final.

19        A.   Oh, okay.

20        Q.   So the -- do you recall whether 1221 Olive

21   Street was in the yellow area or the red area, or was

22   outside both?

23        A.   You know, it's probably right on the fringes

24   because 12th and Olive, there on that -- let's see.   On

25   the eastern side, southeast corner, there's a pretty

Page 64

1    large residential -- I don't know if it's apartments or

2    condos.  And then across the street there are also

3    units.  But it's right on the fringes, is what I think.

4    I'm not 100 percent sure unless I looked at a map.

5        Q.  So I'd like you to go down to the dispatcher

6    comments.  And would these be comments that were

7    transcribed by the 911 dispatcher, to your knowledge?

8    Is that typically where these come from?

9        A.  Yes, that's where this would come from.

10       Q.  Am I reading this correctly, that there was an

11   adult male with stroke symptoms that was calling to

12   report that their arm was numb?

13       A.  That's -- yes.  Uh-huh.

14       Q.  Okay.  And No. 4 seems to indicate that the

15   dispatcher believed it was in the red zone.  Is that

16   your understanding as well?

17       A.  That's what it says right there.

18       Q.  And -- well, first of all, let me -- how far is

19   1221 Olive from the -- from Fire Station 25?

20       A.  It's -- so Fire Station 25's on 13th and Pine.

21   So if you went one block north and one block west,

22   you're at 12th and Olive.

23       Q.  Okay.  And it seems to indicate here that the

24   patient was told or indicated that they would try to

25   walk to Station 25; is that correct?  Is that what you

Page 65

1    read this to say?

2        A.  Let's see.  "In red zone.  Patient to try to

3    walk to Station 25 or get a ride in about a half hour."

4    That's what it says.

5        Q.  So if the dispatcher was correct and this was

6    in the red zone, would the Seattle Fire Department on

7    June 14, 2020, have responded to this call on -- on 12th

8    and Olive?

9        A.  I -- I guess it would depend on situational

10   awareness, but it looks like the dispatcher gave the

11   caller instructions, and by reading this, it seems to be

12   the patient was alert and oriented times four.  They

13   were able to communicate that they had arm numbness, so

14   this is a snapshot of the call, but it looks like there

15   was a conversation taking place.

16       Q.  Okay.  So if the caller was in the red zone,

17   and if the caller was having -- had had a recent stroke

18   and had a right -- had a right arm that was numb, and

19   the dispatcher told the person to walk outside the red

20   zone to Station 25, would that have been consistent with

21   the policies that were in place on June 14, 2020?

22           MR. FARMER:  Objection.  Vague, and assumes

23   facts not in evidence.

24       A.  Yeah, and I'm just taking an assumption that

25   the dispatcher was trying to provide as much information

Page 66

1   to the caller as possible to get them help.  And here's

2   an example:  Many times we'll get a 911 call from a

3   person, whether it's an encampment or in an apartment

4   building, and based on what the caller says, our

5   dispatcher may say, "Well, can you go out to the street

6   and meet our folks when -- when -- so when they arrive

7   on scene they will see you," or things like that.  So

8   that's not uncommon for our dispatchers to try to give

9   instructions to the person based on the conversation

10  they're having.

11  BY MR. WEAVER:

12      Q.  On June 14, 2020, was it the policy of the fire

13  department to have people who were inside the red zone

14  walk outside the red zone before they could get

15  treatment from the fire department?

16      A.  Well, it looks like that this was the

17  instructions that we were given, that we gave a caller.

18  I wouldn't say it was our policy.  Our dispatcher was

19  trying to facilitate care to the patient.

20      Q.  Okay.  So is it safe to say that it was --

21  there were a lot of changes going on in areas that were

22  being responded to and not over the period of June 8th

23  through June 30, 2020?

24          MR. FARMER:  Object to the form of the

25  question.

Hunters Capital, LLC v. City of Seattle                    30(b)(6) and Individual Deposition of Harold Scoggins

Page 69

1   writing this email?

2        A.   Yes, I think I do.  It's from me.  Yes.

3        Q.   Okay.  So you indicate that you looked up the

4   address of Car Tender, and that it was outside the red

5   zone.

6             Is that what this says?

7        A.   That's pretty much what it says.

8        Q.   And -- so outside the red zone, but inside the

9   yellow zone, it was the policy that the -- that the fire

10  department could go in without waiting for the police;

11  is that correct, at this time?

12       A.   That is correct.

13       Q.   Okay.  Were you surprised to find out that even

14  though it was outside the red zone, that the Seattle

15  Fire Department had not responded?

16       A.   Initially, I was.

17       Q.   Okay.  When did that change?

18       A.   When I talked to the business owner and they

19  explained to me the large crowd of people that was there

20  while they were there and how aggressive they were, so

21  that would change the dynamic of the layout for our

22  folks.  That's not something that we do, is go into

23  hostile crowds.  That -- that's -- it's not a safe place

24  for our folks.  So when the business owner explained

25  that to me and how hostile the crowd was, then the --

fde9268f-5984-4105-96c9-722fce47c32c

Page 70

1   the situational awareness comes into play.  That becomes

2   very important.  Because we can't put our folks in the

3   middle of a hostile crowd.

4        Q.  Okay.  Did you, as part of your investigation

5   and talking to Car Tender, figure out whether the police

6   department responded?

7        A.  Well, for clarity, I didn't do an

8   investigation.  I had a conversation to understood what

9   happened.  But I don't think they told me that PD

10  responded.  I don't think they told me that.  And I

11  don't know if I asked that, but I don't think they told

12  me that.  I mean, clearly from my email, I was concerned

13  about why we didn't respond because I said it's an area

14  outside of the red, where we should have.  So I went

15  down there, myself, and talked to the business owner,

16  and when they explained to me the situational awareness,

17  then I had more understanding.  I can't speak to whether

18  the PD responded or not.

19       Q.  Okay.  So I just want to be clear.  Did you do

20  anything to look into this, other than talk to the owner

21  of Car Tender?

22       A.  I know I communicated with my team in a

23  conversation because I had clarity now on the why.  But

24  anything other than that, no, I don't think I did.

25       Q.  Okay.  What did you --

fde9268f-5984-4105-96c9-722fce47c32c

Page 78

1    June 8th to June 30, 2020, that it was the policy of the

2    Seattle Police -- Fire Department to not enter the area

3    unless the Seattle Police Department accompanied them?

4              MR. FARMER:  Objection.  Asked and answered.

5              Chief, you may answer again.

6        A.  Oh, yes, that was our operational plan.

7              (Exhibit No. 11 marked.)

8    BY MR. WEAVER:

9        Q.  And -- all right.  I'll leave it there for now.

10   So if you could go to what I've introduced as

11   Exhibit 11.  It's in the chat already.

12       A.  11.

13       Q.  So do you have it up?

14       A.  Yes.

15       Q.  Okay.  So there was an email that was written,

16   that was then forwarded to you.

17             Do you recall the incident discussed in this --

18   in this email from Dale Watanabe?

19       A.  Right.  I'll take a look.

20       Q.  Okay.

21       A.  Yes, I've -- I've read that.

22       Q.  Okay.  Do you recall that incident?

23       A.  I don't recall the incident, but after reading

24   it, it does hit the refresh button a bit.

25       Q.  Okay.  So what was your understanding of what

Page 79

1    an MI is?  There's a reference to an MI.

2         A.  Myocardial infarction.

3         Q.  Okay.  So a heart attack?

4         A.  Yes.

5         Q.  Was what was -- is what's described in this

6    email from Dale Watanabe, and the directions that were

7    given to the person who reported they were having a

8    myocardial infarction, consistent with the policy that

9    was in place on June 20, 2020?

10              MR. FARMER:  Object to the form of the

11   question.

12         A.  Well, this is a real-time situation that the

13   dispatcher -- because Dale Watanabe is one of our

14   dispatchers -- gave a caller in the 911 system

15   information to get to fire station one block east of

16   your location, Fire Station 25.

17              So I don't know what else was said on that

18   call.  I don't know what other ailments the individual

19   may have had.  But the dispatcher apparently felt

20   comfortable enough to ask the person to walk to the fire

21   station one block away.  But that's all I'm seeing here.

22   That's not the situation we wanted.

23   BY MR. WEAVER:

24         Q.  Okay.  So Dale Watanabe is a dispatcher, you

25   said.  Is he -- okay.

Page 80

1          So do you read his email as saying that --

2    indicating that he was comfortable telling the person to

3    walk to the fire station?

4          MR. FARMER:  Objection.  Sorry.  Objection.

5    Calls for speculation.

6      A.  No, I don't read that statement in his email,

7    no.

8    BY MR. WEAVER:

9      Q.  Okay.  What is your understanding of what the

10   policy would be today if somebody at 6 -- 1660 12th

11   Avenue called the fire department, indicated that they

12   were having symptoms of a cardiac arrest -- is it your

13   understanding in that situation that it would have been

14   consistent with the current policy, today, to tell them

15   to walk to Fire Station 25?

16     A.  No.

17     Q.  And why is that?

18     A.  Today?  We wouldn't have any obstructions

19   blocking our units from actually making it to this

20   address location, 1660 12th Avenue.  What is it, just

21   north of the east precinct.  So this is probably the

22   building that is right on 12th, on the east side of the

23   street there.  But we wouldn't have any obstructions

24   blocking our units from getting there.

25     Q.  Okay.  So your understanding is that in this

fde9268f-5984-4105-96c9-722fce47c32c

30(b)(6) and Individual Deposition of Harold Scoggins

Page 81

1    case the same -- if you got the same call today, it

2    would be the policy of the fire department to go to this

3    person's apartment; is that correct?

4         A.   Correct.

5         Q.   So part of the 30(b)(6) notice talks about --

6    that you've been designated to talk about is how -- how

7    response times to events were -- by the Seattle Fire

8    Department in the area were affected or changed during

9    the period of June 8th through June 30, 2020.  And do

10   you -- is there any study or analysis that has been done

11   to indicate how those response times changed for

12   addresses within the warm or yellow area during that

13   period?

14        A.   There hasn't been a study done.  I know our

15   team has looked at the response times, and it's been

16   difficult to discern for this reason:  Our response time

17   stamps -- the call comes through the dispatch center;

18   when the unit is dispatched; when the unit actually hits

19   a button inside of the fire engine, ladder truck, or aid

20   or medic unit -- when they go en route, they're actually

21   driving to the call; and then when they're on scene, so

22   they get on scene.  They're not necessarily at the

23   patient.

24             So even today, if we're at 999 Third Avenue,

25   for example, if we had a full fire response that came

fde9268f-5984-4105-96c9-722fce47c32c

Page 136

1    again.

2          So what did you mean by that it was a tipping

3    point when they left the precinct?

4        A.   Sure.  So when they left the precinct, the

5    protesters initially marched by the precinct, and many

6    of us thought, okay, well, that -- they'll just have a

7    new route.  But at some point they made a U-turn and

8    came back into the space, and the tipping point was

9    repurposing the water barriers and the gate barriers,

10   and staying in the space.  So that changed the landscape

11   immediately.

12       Q.   Okay.  What did they repurpose the barriers

13   for?

14       A.   To not -- to not allow traffic north, south,

15   east, or west on the streets around the east precinct.

16              MR. WEAVER:  Can we go off the record for a

17   minute?

18              THE VIDEOGRAPHER:  Going off the record.

19   The time is approximately 1:54 p.m.

20              (Pause in proceedings.)

21              THE VIDEOGRAPHER:  We are back on the

22   record.  The time is approximately 1:55 p.m.

23   BY MR. WEAVER:

24       Q.   When you saw that the protesters had repurposed

25   the barriers, did you have any concerns as a -- as the

Page 137

1   chief of the fire department about what that might mean

2   for access to the area?

3        A.   I did.

4        Q.   And what were those concerns?

5        A.   Access and egress in the area.

6        Q.   Okay.  Were you con- -- were you concerned that

7   you weren't going to be able to get in -- your fire

8   trucks or any response equipment into the area, past

9   those barriers?

10       A.   Yes.

11       Q.   Did you have any concern at that point about

12  what it might mean for businesses or residents who lived

13  or operated in that area?

14       A.   Yes.

15       Q.   What were those concerns?

16       A.   Well, from the fire department perspective was

17  how were we -- how were we going to navigate the

18  landscape to serve those in that part of the community.

19       Q.   At some point did you become part of a team of

20  people who were going to the area around the east

21  precinct and Cal Anderson on a daily basis?

22       A.   Yes.

23       Q.   Was one of the people you traveled there with

24  regularly Mami Hara?

25       A.   Yes.

fde9268f-5984-4105-96c9-722fce47c32c

Page 138

1      Q.  Was another person you regularly traveled with
2  there Sam Zimbabwe?
3      A.  Well, let me provide a little clarification.
4      Q.  Okay.  Go ahead.
5      A.  We didn't travel there together.
6      Q.  Okay.
7      A.  We organically met there.  So we were there
8  pretty much daily together, but we didn't travel there
9  together.
10      Q.  All right.  Poor questioning on my part.  Thank
11  you.
12          What time of day were you typically in the
13  area?
14      A.  A lot.  I -- during that period of time, I
15  would go there.  You know, on the first day that this
16  was formed overnight, June 9th, I went there.  I didn't
17  go to the office.
18      Q.  You were there for the full day?
19      A.  Pretty much.
20      Q.  Okay.  At any point were you personally there
21  overnight?
22      A.  No.
23      Q.  Okay.
24      A.  You mean did I sleep there?
25      Q.  Were you in the area during the night hours?

fde9268f-5984-4105-96c9-722fce47c32c

Page 139

1    A.   Oh, I was in the area during the night hours.

2  Not -- not a lot, but yeah.

3    Q.   Okay.  So the first day you went there,

4  June 9th, had you -- had you been appointed as a liaison

5  to the area by the mayor, or how did that come about?

6    A.   No, I wasn't appointed as a liaison to the

7  area.  It came about because I saw a need, that we had

8  to figure out a way to navigate this landscape in case

9  there was an emergency and we needed to get our

10  resources in there.

11    Q.   So what did you do on that first day to try to

12  navigate the area to figure out that situation?

13    A.   Well, the first thing I did was I walked the

14  area.  I needed to survey it, myself, you know, with

15  boots on the ground.  So I walked the entire area, and

16  talking to people, trying to understand who -- who

17  was -- who was moving the crowd, you know, who was the

18  person in charge.  And that first morning is when Mami

19  Hara showed up down there, and Sam Zimbabwe also.  But I

20  think we all had concerns that focused on the services

21  that we provide to the community.

22    Q.   So did you -- so you talked to the protesters

23  in the area.  I'm using "protesters" to mean the people

24  generally in the area, who didn't -- who weren't

25  residents or businesses there.  I'm just going to use

fde9268f-5984-4105-96c9-722fce47c32c

Page 141

1    A.   Yes.

2    Q.   Okay.  Do you think you were there every day

3    from June 8th -- I'm sorry -- June 9th through July 1,

4    2020?

5    A.   Probably so.

6    Q.   Okay.  And what communications did you have

7    back with the mayor's office about what you were seeing

8    and experiencing and hearing in that area during that

9    time period?

10   A.   We had our -- our check-in calls or in-person

11   meetings.  So that's where we relayed information.  And

12   generally that information showed up in the daily

13   snapshot reports.

14   Q.   Okay.  So that communication would have been

15   with the mayor's executive staff and with the mayor,

16   herself?

17   A.   Yes.

18   Q.   Okay.  And that would have -- that would have

19   included information that you were hearing from

20   protesters; right?

21   A.   Yes.

22   Q.   And information that you were hearing from

23   residents; right?

24   A.   Yes.

25   Q.   And information that you were hearing from

Page 142

1   businesses; right?

2       A.   Yes.

3       Q.   And property -- and also property owners;

4   correct?

5       A.   Yes.

6       Q.   Okay.  Was one of your goals on June 9th to try

7   to keep protesters from fortifying the area with

8   stronger barriers and more defined boundaries?

9            MR. FARMER:  Objection.  Vague.

10           You may answer, Chief.

11      A.   I think the goal was to try to create an access

12  path for our resources.

13           MR. WEAVER:  Okay.  I'm going to mark an

14  exhibit, 15.

15           (Exhibit No. 15 marked.)

16  BY MR. WEAVER:

17      Q.   All right.  It should be coming up shortly.

18  Let me know when you have it open.

19      A.   Yes, it's open.

20      Q.   Okay.  So are these minutes from a meeting that

21  you had with the mayor's office, and the cabinet that we

22  talked about earlier, on June 9?

23      A.   Yes.

24      Q.   I'd like you to scroll down to the

25  objections -- objectives for de-escalation.  And under

Page 149

1    of each call or if it was stated at some defined point

2    in time.

3    BY MR. WEAVER:

4         Q.  Okay.  So I'd like you to go back to

5    Exhibit 14, Slide 21, the notes for Slide 21.  It looks

6    like it's on Page 4.

7         A.  Got it.  Uh-huh.

8         Q.  And underneath Slide 21 it says, "Focus at

9    first was" protesting -- "protecting," sorry --

10   "protecting first amendment rights and protecting

11   protesters from vehicles being driven into the crowds."

12        A.  Yes, I see that.

13        Q.  And do you see that?  Is that accurate, that

14   the focus at first was on protecting first amendment

15   rights and protecting protesters?

16        A.  It was.  And context, once again, becomes

17   important.

18             So as we were navigating the space, I was

19   observing vehicles being driven into protests around the

20   country.  So that's one of the things that was actually

21   happening, that people were driving their vehicles into

22   the protest crowds.

23             So having a fire and life safety mentality is,

24   well, you have to try to protect the protesters also

25   because you don't want anyone driving a vehicle to harm

fde9268f-5984-4105-96c9-722fce47c32c

Page 153

1   there was concerns about someone driving through the

2   middle of this and hitting a bunch of people.  That was

3   a part of their mindset also, which played into trying

4   to fortify the edges.

5       Q.  Do you recall discussions with the protesters

6   that they should clear the streets on -- on or about

7   June 10th?

8       A.  I'm sure that was a part of the discussions

9   every day we were in there.

10      Q.  Okay.  Pivoting into a street closure, do you

11  recall whether that was -- the plan was to continue to

12  have the streets closed, but maybe convince them they

13  didn't need to guard the barriers.  Was that the plan?

14      A.  I think Sam may be best to answer that

15  question.  I don't deal in street closures every day --

16      Q.  Sure.

17      A.  -- so trying to understand the mentality of a

18  driver when they see a street closure is out of my lane,

19  so to speak.

20      Q.  I'm just asking because I know you were in

21  these meetings, and I want to get -- you know, see

22  whether you recall.  We definitely have Sam coming up

23  next week, so...

24          Do you recall whether there was any attempt by

25  the fire department, the mayor's office, or anybody else

Page 154

1  to get the protesters to apply for a permit for a street

2  closure?

3       A.   I don't think so.

4       Q.   Okay.  I'd like you to scroll down to Item 3,

5  which is, "Encourage conversations between protest

6  groups and/or the City."

7            It seems that the lead designated on most of

8  these topics is somebody, Casey.  Do you understand that

9  to refer to Casey Sixkiller?

10      A.   Yes.

11      Q.   3.2 says, "Identify clear parameters for City's

12 position to negotiate."

13           Do you see that?

14      A.   I do.

15      Q.   Okay.  And you were involved in the -- you were

16 directly involved in the negotiations between the City

17 and the protesters; is that right?

18      A.   I was.

19      Q.   Did you ever get clear parameters on what the

20 City's position would be in those negotiations?

21      A.   We wanted to get the area reopened.  I don't

22 know what Casey Sixkiller was given as parameters.

23      Q.   Okay.

24      A.   But our overall goal was to get the area

25 reopened.

Page 167

1    know if you reviewed this one, but at the bottom of the

2    second page it's actually an email that you sent, and

3    then you replied all to that email with more comments.

4    So I want to ask you first about the one June 11th at

5    8:57 in the morning.

6              Do you see it?

7        A.  Yes.

8        Q.  So you state here that you're -- you were

9    concerned knowing there were individuals in the crowd

10   with weapons, and that you see that this has

11   transitioned from a peaceful protest to a different

12   situation that is unstable, and this could compromise

13   the safety of your personnel.

14             At what point did you -- did you notice that

15   the protest had transitioned?

16       A.  When people showed up with weapons and were not

17   allowing access to the area.

18       Q.  Okay.  And that had happened -- that had -- did

19   that happen on like the 9th or the 10th of June?

20       A.  I believe it happened on June 8th.

21       Q.  Okay.  And it continued -- that -- those

22   particular aspects continued through the month of June;

23   is that right?

24       A.  Correct.

25       Q.  What do you mean by the situation was unstable?

Hunters Capital, LLC v. City of Seattle                30(b)(6) and Individual Deposition of Harold Scoggins

Page 168

1    What did you mean by that?
2         A.  When people are in the area with weapons, not
3    just one person, multiple people, and they're on the
4    access and egress points of a geographical area, and not
5    allowing people in or out, or vehicles in and out --
6    because there was a lot of foot traffic actually walking
7    in and out all day long, but not allowing vehicles in or
8    out, to me that is an unstable situation.
9         Q.  Okay.  So going back to your -- up above, the
10   email you sent -- you replied all to your own email
11   about an hour later, on June 11th, at 9:14 in the
12   morning.  And the second sentence talks about, "If the
13   City is to allow this group to continue to protest," and
14   I want to ask you about -- was it your perception that
15   the City was allowing the group to continue to protest
16   throughout June 2020?
17        A.  It was my perspective.
18        Q.  Okay.  And you believed at that point that
19   certain conditions needed to be met if that was going to
20   happen; is that right?
21        A.  I did.
22        Q.  And why did you believe that certain conditions
23   needed to be met if the City was going to allow the
24   protest to continue?
25        A.  Because from fire's perspective, trying to

fde9268f-5984-4105-96c9-722fce47c32c

Hunters Capital, LLC v. City of Seattle                 30(b)(6) and Individual Deposition of Harold Scoggins

Page 184

1    combination of both.

2         Q.  Do you recall having a list of -- of fire codes

3    that had been violated in the area?

4         A.  It sounds familiar.

5         Q.  Do you recall having somebody walk around the

6    area and document the fire -- the fire code violations

7    that were happening in the area?

8         A.  It sounds familiar.

9         Q.  I'm going to fast forward and see if the sound

10   is better at this point, later in the video.  We're at

11   the 34:23 mark.

12              (Video played.)

13   BY MR. WEAVER:

14        Q.  All right.  Could you hear that?

15              MR. FARMER:  Objection.  Vague as to what

16   "that" refers to.

17              MR. WEAVER:  The section that we just

18   played.

19        A.  I did make out bits and pieces.  I didn't make

20   it all out with clarity.  But I did recognize that I was

21   reading different sections of the fire code.

22   BY MR. WEAVER:

23        Q.  Okay.  What -- what is Fire Code 102.9?

24        A.  Oh, I -- I could not tell you --

25        Q.  Okay.

Page 185

1      A.   -- that offhand.

2      Q.   Okay.  Would you -- how about 503.4.2?

3      A.   I couldn't tell you that offhand.

4      Q.   Do you believe the -- the Seattle Fire

5  Department has the authority to identify blocked access

6  under the fire code and to remedy that problem?

7      A.   I believe the Seattle Fire Department has the

8  authority to identify the problems, but we don't have

9  the enforcement arms to -- for all of the remedies that

10  could be needed.

11          The remedies in this situation is different

12  than our fire inspectors going into a building and doing

13  an inspection where there's noncompliance, and there

14  would be a fine.  This requires a different level of

15  enforcement to remedy the situation, and we don't have

16  those means in the Seattle Fire Department.

17      Q.   Is it your understanding that the fire code

18  requires the police department -- or the fire department

19  to open the roads for access for fire vehicles?

20      A.   Yes.

21      Q.   Do you recall telling this group of protesters

22  that -- after they refused to give up the barricades and

23  barriers that were around the east precinct, that if

24  they didn't want people to get run over they should get

25  out of the street?

Page 187

1    into the park?

2        A.  It is my -- it is and probably was, because

3    that would have got the streets opened.

4        Q.  And it would have resolved some of the safety

5    issues for them as well; is that right?

6        A.  It would have.

7        Q.  So do you recall talking to these protesters at

8    this meeting about the block party, the Capitol Hill

9    block party?

10       A.  I don't recall that.

11       Q.  Do you recall talking to these protesters, or

12   any other group of protesters, that you met with during

13   this time in June of 2020, about how the City always

14   requires rules of access for any event that is partially

15   or completely occupying the streets?

16       A.  I don't recall that, but if I used the Capitol

17   Hill block party as a reference point for that last

18   statement, that -- that would make sense because we do

19   have requirements.

20       Q.  I'm sorry; you have requirements for what?

21       A.  We have requirements for access and egress.

22       Q.  Okay.  So typically -- would you agree that

23   typically as part of the permitting process for public

24   events that would occupy the streets, there's a

25   requirement that the streets be open at least partially

fde9268f-5984-4105-96c9-722fce47c32c

Page 188

1  for fire and police response?

2      A.  There is a requirement, and it's -- it's agreed

3  upon during the permitting process, but -- a for example

4  would be if there's an event that's going to take place

5  on Pine, from Broadway to 13th, as an example, we may

6  not require a fire lane that goes north and south -- I'm

7  sorry, east or west, but we may require access points

8  through all the arterials, where we can still serve the

9  communities.  But there's an agreement that's generally

10  made through the permitting process so we can gain

11  access.

12      Q.  Okay.  And there was no permitting process with

13  this particular group of people that were occupying the

14  streets in June of 2020; is that right?

15      A.  To my knowledge, there was no permitting

16  process.

17      Q.  Okay.  Was there ever any discussion in any of

18  the meetings you had with the mayor about whether they

19  should go through the permitting process?

20      A.  I don't recall that.  I mean, it could have

21  been, but I don't recall that.

22      Q.  Do you recall telling these -- this group of

23  protesters that one of the reasons you needed to open up

24  the area was that businesses in the area had expressed

25  significant concern over the barricades, that they're

Page 191

1   fortified where the protesters had placed those

2   barriers?

3           MR. FARMER:  Object to the form of the

4   question.  Assumes facts not in evidence.

5           Chief Scoggins, you may answer.

6       A.  Okay.  I do agree that more obstacles appeared

7   to show up around the intersections where the initial

8   water barriers and the gate-type barriers and bike racks

9   were, as the days continued to tick on.  So yes.

10  BY MR. WEAVER:

11      Q.  Do you recall the protesters started fortifying

12  the barriers with vehicles that were parked near or in

13  front of the barriers?

14      A.  I do agree that that occurred.

15      Q.  Okay.  And when did you notice that beginning

16  to occur?

17      A.  I think that occurred pretty early on.

18      Q.  Like in the first few days of the occupation?

19      A.  I think so.

20      Q.  Do you recall at this meeting on June 13th a

21  discussion of changes to the placement and type of

22  barriers that might be provided to the protesters?

23      A.  I missed the first part of what you said.  It

24  was something and type of barriers.

25      Q.  The placement and type of barriers.

Page 195

1    machinery; right?

2         A.  Yes.

3         Q.  And so the Department of Transportation

4    provided those blocks and brought those blocks into the

5    area; is that correct?

6         A.  That is correct.

7         Q.  And the barriers that had been drawn with

8    the -- pursuant to the agreement reached with the

9    protesters, did those barriers -- did those barriers --

10   revised barriers -- well, let me try again.

11            So you had an agreement to change the footprint

12   with the protesters; right?

13               MR. FARMER:  Objection.  Misstates prior

14   testimony.

15        A.  We worked through changing the landscape with

16   the protesters.

17   BY MR. WEAVER:

18        Q.  Okay.  And at some point, certain portions of

19   certain roads were opened up one way; is that correct?

20        A.  That is correct.

21        Q.  Okay.  Did those openings hold, or did the

22   protesters move some of the barriers again following the

23   opening up of those areas?

24        A.  The landscape that we shifted held for a number

25   of days.  I can't tell you how many.  Because one of the

Page 196

1   things we were trying to accomplish was if we were going

2   to open up these lanes for vehicle traffic, we needed to

3   create, lack of a better term, a barrier between the

4   vehicles and where people were going to be.  So that was

5   a part of the mindset, and when we shifted the landscape

6   and how we shifted it.

7       Q.  Okay.  But at some point after several days

8   that -- that all changed again because the protesters

9   moved some barriers and blocked things that had

10  previously been open; is that correct?

11      A.  That is correct.  It was dynamic.  I don't know

12  exactly how many days.  But I know it was an ongoing

13  work in progress.

14      Q.  Okay.  I'd like to go back to Exhibit 19.  It's

15  the first text in that chain.  And it's a text from you

16  that is simply a YouTube link.  And I can tell you that

17  there's -- there's no text before or after it indicating

18  why you were sending this link.

19          This was sent on, it looks like, 2:00 on

20  June 15, 2020.  The link goes to -- and you might be

21  able to hit the hyperlink there and see what I'm talking

22  about.  The link goes to footage of what had happened at

23  Car Tender on the night of the 14th.

24      A.  Do you want me to hit the link?

25      Q.  You can hit the link if you want, just to see

Page 212

1          A.  I don't know.

2     BY MR. WEAVER:

3          Q.  Okay.  I'd like to go back to the email which

4     is Exhibit 24, and the middle of this email Mayor Durkan

5     says, "What happened this morning" -- she says

6     "this a.m." -- "was foreseeable and avoidable."

7               Do you agree that what had happened that

8     morning was foreseeable and avoidable?

9               MR. FARMER:  Objection.  Vague.

10         A.  I don't know.  For a young man to lose his

11    life, I would never like to think that I saw that

12    coming.  Was this a -- a very different situation?  It

13    was.  But I can't say that I saw this young man getting

14    ready to lose his life.  I cannot say that.

15    BY MR. WEAVER:

16         Q.  Do you believe it was foreseeable that there

17    would be increased violence in an area where there was

18    modified police and fire response for a period of weeks?

19               MR. FARMER:  Objection.  Object to the form.

20          You may respond, Chief.

21         A.  I think as the days went on, we started to

22    learn more.  So we became more informed of the

23    situations on the ground, and we were better able to

24    understand how this was going to challenge our

25    resources.

Page 213

1   BY MR. WEAVER:

2       Q.   What do you mean by you started to learn more?

3       A.   Well, this was a pretty violent event.   The

4   crowds were growing significantly, and we had challenges

5   reaching this patient.   We learned a lot in this event,

6   so we learned a great deal.   So we modified our plans a

7   bit more, we tried to become better coordinated.   But as

8   the crowd size grew, that was a part of the learning.

9       Q.   What were you learning from the fact that the

10  crowds -- the crowd size was growing?

11      A.   The potential of violence was escalating.

12      Q.   I'm getting close, but I need to take a break.

13  Can we go off the record, please?

14          THE VIDEOGRAPHER:   Going off the record.

15  The time is approximately 4:29 p.m.

16          (Recess from 4:29 p.m. to 4:41 p.m.)

17          THE VIDEOGRAPHER:   We are back on the

18  record.   The time is approximately 4:41 p.m.

19          E X A M I N A T I O N (Continuing)

20  BY MR. WEAVER:

21      Q.   So Chief, are the cabinet meetings with -- that

22  we've talked about with the mayor's office and the other

23  chiefs of staff, are they ever recorded in any way that

24  you know of?

25      A.   I don't think so.

Page 224

1                          C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Harold

9    Scoggins, having been duly sworn, on September 14, 2021,

10   is true and accurate to the best of my knowledge, skill

11   and ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 23rd day of September, 2021.

14

15

16

17   _____

18        CINDY M. KOCH, CCR, RPR, CRR

19   My commission expires:

20   JUNE 9, 2022

21

22

23

24

25

fde9268f-5984-4105-96c9-722fce47c32c