# EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
          Plaintiff(s),          )
                                 )
   vs.                           )   20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
          Defendant(s).          )
_____

   VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

                      MICHAEL WELLS

_____

(All participants appearing via Zoom videoconference.)

                  Witness located in

                  Seattle, Washington




DATE TAKEN:   MARCH 30, 2022

REPORTED BY:  PATSY D. JACOY, CCR 2348

Page 88

1  I think that was my primary concern.  I don't recall
2  thinking, oh, now it's getting bad.  I -- I didn't -- I
3  wasn't thinking about that.
4       Q.   Did you believe, though, that the protesters
5  kind of camping indefinitely at 11th and Pine was going
6  to impact the businesses?
7       A.   I did.  I was concerned about the effect and I
8  didn't know what the resolution was going to look like.
9       Q.   Okay.  What impact did you think or were you
10 concerned about, what kind of impacts?
11            MR. CRAMER:  Objection; form.
12      A.   I was concerned about economic loss certainly.
13 I was concerned about their profits and I was concerned
14 about their safety and I was concerned, I think, about
15 their -- just their well-being in general.  They were
16 in a very difficult situation.  They had previously
17 been in a difficult situation unimaginable to all of us
18 about what happened during COVID, and this was another
19 situation overlaid on top of that, I was very concerned
20 about all of them.  I was very concerned about the
21 neighborhood in general.
22      Q.   (BY MS. EAKES)  Okay.  Did you think that
23 there would be im -- impacts, including things like
24 continued graffiti?
25      A.   Yeah, I was, I was concerned about more action

1  by the protesters.
2      Q.  Okay.  And what about property damage to the
3  businesses?
4              MR. CRAMER:  Objection; form.
5      A.  I think that was probably one thing in the
6  bucket of things that I was concerned about.  I was
7  concerned about -- I had heard about broken windows and
8  graffiti.  I know that clean and safe issues are
9  paramount in neighborhood business districts, so I'm
10 sure that I was thinking about property damage too.
11     Q.  (BY MS. EAKES)  Okay.  And it sounds like you
12 were concerned with the protesters now established, you
13 know, CHAZ that -- that there was going to be safety
14 issues for the small business owners and their
15 employees; is that fair?
16     A.  That's fair.
17     Q.  I take it you understood that that could be a
18 consequence of these people up there kind of camped out
19 indefinitely; is that right?
20             MR. CRAMER:  Objection; form.
21     A.  I don't think I was as concerned about that as
22 I was about the notion of outside agitators with guns,
23 so the Proud Boys conversation and the other folks that
24 were being attracted to the area, I think that was my
25 primary concern on safety issues at the time.

1   Q.   (BY MS. EAKES)   Okay.
2   A.   The crowd control is always something to be
3   aware of when it comes to safety issues and there were
4   a lot of people there in a small space, and so I think
5   I was concerned about everyone's safety on a lot of
6   levels, but the most concerning thing to me was about
7   the people with guns and ammunition who were coming to
8   the area.
9   Q.   Okay.   And it sounds like you were concerned
10  for the businesses in terms of their revenue or their
11  profit, the impact it was going to have on that?
12  A.   Yeah, I was worried about that.
13  Q.   Okay.
14  A.   They had already suffered a great deal because
15  of COVID obviously.
16  Q.   Yeah.
17  A.   They were struggling so...
18  Q.   And at least Bobby in this email says that
19  they're going to be there indefinitely.  Is that what
20  your understanding was at that point as well as of June
21  10th?
22          MR. CRAMER:  Objection to form.
23  A.   I don't think I had any understanding of what
24  was going to happen next.  I think that was part of the
25  challenge of the time was that I didn't know when it

1  Q.  Okay.  And tell me just kind of globally
2  what's your memory about the barrier issues throughout
3  the time of CHOP in terms of -- and even if the City
4  moved them, do you recall that they were being moved
5  back by the protesters or there was pushback?
6      A.  I do recall the protesters --
7          MR. CRAMER:  Objection; form.  Go ahead.
8      A.  I recall the protesters pushed back the
9  barriers and that there was sort of continual moving of
10 the barriers during the time period, and that was
11 something I think the City was trying to deal with to
12 my recollection.
13     Q.  (BY MS. EAKES)  And is it your memory that
14 there continued to be access issues or complaints from
15 businesses about access issues based on the protesters'
16 use of the barriers, changing the locations of the
17 barriers?
18     A.  I don't recall those conversations.  I recall
19 lots of general concerns about access to the area, but
20 I don't recall specific conversations about the barrier
21 movement.  I -- in my -- I'm recalling more worries
22 about fires or vandalism with dumpsters and things --
23 the dumpsters, I think, is the thing that I was
24 remembering.
25         At one point some dumpsters were set on fire

1  through a list of things and see based on now I'm
2  taking the totality of your conversations, so not just
3  one specific person, but from the time of CHOP so which
4  we're defining as June 8th until at least it was
5  officially cleared out meaning, you know, the day July
6  1 where they came in and moved everything out.
7          Over that period of time, did you hear from
8  businesses -- and I'm going to ask you just a series of
9  things and tell me if you recall hearing those -- that
10 they had a reduced amount of business during that time
11 period?
12     A.   I did hear that.
13     Q.   That they felt unsafe to open?
14          MR. CRAMER:  Objection to form.
15     A.   I -- I heard safety concerns.  I heard safety
16 concerns about employees' safety.
17     Q.   (BY MS. EAKES)  Okay.  And are you drawing a
18 distinction between employee safety and unsafe to open?
19     A.   I suppose that there would be a difference
20 between daily operations and concerns about safety and
21 transportation or employees coming to and from work.  I
22 heard primarily about concerns about safety for
23 employees travelling to and from work.  That was
24 highlighted.
25          I also heard concerns about -- concerns about

1  not being able to operate fully, but that would be hard
2  for me to pull apart from the phasing and the COVID
3  which is all happening at the same time, so I would say
4  my primary concern is people concerned about the safety
5  of their employees and themselves.
6        Q.  Okay.  But do you recall any -- any businesses
7  reporting to you that they were unable to open because
8  it was unsafe in their estimation?
9              MR. CRAMER:  Objection; form, vague.
10       A.  I -- I don't recall that specifically.
11       Q.  (BY MS. EAKES)  Okay.  What about complaints
12 from any businesses about lost revenues?
13       A.  Yes, that I heard about.
14       Q.  Did businesses complain that their customers
15 were too worried about the area to come into the area?
16       A.  Yes, I heard that as well.
17       Q.  Did any of the businesses tell you that they
18 were forced to close because of events that were
19 happening, you know, within the CHAZ/CHOP zone?
20             MR. CRAMER:  Objection; form.
21       A.  I don't recall hearing that from businesses
22 specifically.
23       Q.  (BY MS. EAKES)  What about did you hear
24 complaints that there were -- that there was noise at
25 all hours of the day?

1    A.   I don't recall that, no.
2    Q.   Do you recall any complaints about the ability
3 of tenants to access apartments?
4    A.   I did hear that complaint.
5    Q.   Did you hear complaints about the inability of
6 people to access businesses?
7    A.   I did hear that.
8    Q.   Did you hear anything about the inability to
9 open businesses because of the people in the CHOP or
10 the CHAZ?
11           MR. CRAMER:  Objection; asked and
12 answered.
13    A.   Yeah, I couldn't -- I couldn't -- I don't
14 recall that.  There were so many conversations around
15 the phasing issues at the time that that's all rolled
16 up to me.
17    Q.   (BY MS. EAKES)  Okay.  Did you have -- hear
18 any complaints about the streets being barricaded?
19           MR. CRAMER:  Objection; asked and
20 answered.
21    A.   I heard concerns about the barricades, yes.
22    Q.   (BY MS. EAKES)  And did you hear complaints
23 about the barricades being constantly moved or daily
24 moved, even after the City put them in different
25 places?

```
 1              MR. CRAMER:  Objection; asked and
 2    answered.
 3         A.   I did.
 4         Q.   (BY MS. EAKES)  Did you hear complaints about
 5    intimidation by the protesters?
 6         A.   I did.
 7         Q.   Did you hear concerns about the protesters
 8    potentially retaliating against the complainants, the
 9    people complained about them?
10         A.   I did.
11         Q.   Did you hear complaints about being -- the
12    residents or the businesses being asked for
13    identification and to, you know, state their purpose
14    for entering the CHOP zone?
15         A.   I did.
16         Q.   And did you recall hearing complaints about
17    noise during really late hours of the night?
18         A.   I did hear that specifically from Hunters
19    Capital.  I think they were the people I heard that
20    from, yeah.
21         Q.   And what did you hear -- what do you recall
22    hearing specifically about the retaliation complaint or
23    the concern about retaliation?
24         A.   I heard from the businesses that protesters
25    were making statements about -- about the businesses
```

1 should be supporting the protest action and that if
2 they didn't they would pay for it down the line or I
3 heard -- again, and this was all hearing from
4 businesses, they told me that someone said, "Tomorrow
5 we're going to come over and torch your place," or I
6 heard those kind of statements being made and
7 businesses were communicating to me that protesters
8 were saying that to them.
9        Q.   Anything else specifically that you recall
10 about those kinds of threats from the protesters?
11             MR. CRAMER:   Objection; foundation.
12        A.   I recall protesters telling the businesses
13 they should be on the protesters' side and they should
14 come out and denounce SPD and the mayor.   I remember
15 hearing those conversations or that being reported to
16 me I guess.
17        Q.   (BY MS. EAKES)   Okay.   Anything else that you
18 recall?
19        A.   I think that's it.
20        Q.   Okay. And what did -- what do you recall
21 hearing with respect to the demands for identification?
22        A.   I think honestly -- I think that was a minor
23 annoyance for folks, but they did report it to me.   I
24 think there was a general understanding of why that was
25 happening, that -- who had access in and out, and I

1  remember hearing.
2      Q.  All right.  That -- that's what I was trying
3  to winnow out.
4      A.  Right.
5      Q.  So your understanding was that the ID issue
6  was the police asking, but did you understand that
7  protesters were asking for ID?
8      A.  I -- I don't recall that.  I do recall
9  intimidation by the protesters and that could have been
10 part of it, I guess, but I -- I don't recall hearing
11 that specifically.
12     Q.  And when you talked about how you personally
13 were asked to show your ID, was that by law
14 enforcement?
15     A.  Yes, SPD, yeah.
16     Q.  Okay.  Got it.  All right.  What about
17 complaints about late night parties in Cal Anderson
18 Park?
19     A.  I did hear that specifically, again, from
20 Hunters Capital.
21     Q.  How about did you hear complaints about there
22 being increased violence?
23     A.  Yes.
24     Q.  Did you hear complaints about there being
25 inconsistent garbage service?

```
 1        A.   Yes.
 2        Q.   Did you hear complaints about vandalism?
 3        A.   Yes.
 4        Q.   Did you hear complaints about offensive
 5   graffiti?
 6        A.   Yes.
 7        Q.   Did you hear complaints about the lack of
 8   police in the zone?
 9        A.   I guess I don't recall specific complaints
10   about lack of police.  There were a lot of unknowns,
11   people were asking questions about that, but I don't
12   recall -- I don't recall specific complaints about lack
13   of police.
14        Q.   Okay.  Do you recall hearing complaints about
15   a lack of medic response, medical response to the area?
16        A.   I saw that referenced in Tracy's earlier
17   email.  I recall that now after seeing that, yeah.
18        Q.   Did you hear complaints about the lack of a
19   911 response to calls from the zone?
20        A.   I did not.
21        Q.   Did you hear complaints about or concerns that
22   the occupation would be indefinite?
23        A.   Not specifically.  I heard -- I heard
24   frustration with the unknowns.  I didn't hear
25   specifically people saying this will go on forever or
```

1   will this go on forever.  I just heard concern about
2   the situation.
3       Q.  And of the complaints that we just kind of
4   went through that you did hear, did you relay those
5   complaints to the mayor's office?
6           MR. CRAMER:  Object -- go ahead.
7       A.  I believe I relayed everything I heard to the
8   mayor's office during that time, or at least to Bobby
9   Lee to communicate to the mayor's office if not
10  directly to the mayor's office.
11      Q.  (BY MS. EAKES)  And who directly in the
12  mayor's office would you have been communicating with?
13      A.  Sabrina Bolieu, yeah.
14      Q.  Anybody else besides Sabrina that you would
15  have shared these complaints with?
16      A.  No, Sabrina was my primary contact in the
17  mayor's office.
18      Q.  And did you, as you received the emails from
19  the businesses, did you forward those to the mayor's
20  office?
21      A.  I don't recall.
22      Q.  You mentioned complaints from Hunters Capital.
23  Who were you hearing complaints from at Hunters
24  Capital?
25      A.  I think I was hearing from Mike Oaksmith,

1  me to navigate through that sometimes to try and get
2  the answers I wanted or to try to be as effective as I
3  wanted, and that was a hard position for me to be in.
4       Q.   And what -- in terms of, you know, what you
5  were able to offer from the office at OED, what did you
6  feel like you were able to provide to these businesses
7  that were, for want of a term -- better term, under
8  fire up in the CHOP zone?
9            MR. CRAMER:  Objection; form.
10      A.   I was able to elevate what they were saying to
11 people who had the -- the ear of the highest officials
12 in the City.  I was able to elevate their voices and
13 their concerns and I was able to point them to a
14 conversation about resources, meaning the damages claim
15 process.  I was taking their concerns back to
16 higher-ups and trying to sort through what services we
17 could offer them.
18           I was hearing about graffiti, I was hearing
19 about broken windows, I was hearing about fires, I was
20 hearing about guns, I was hearing about outside
21 agitators.  That was a lot to take in, and I was trying
22 to find ways to support the folks in that Pike/Pine
23 corridor, trying to find ways to alleviate some
24 pressure for them and I didn't -- often didn't have
25 adequate tools to be able to do that.

Page 169

1  Q.  (BY MS. EAKES)  Did you feel like you had --
2  that you were able -- that you had enough at your
3  disposal to really be able to provide them with
4  support?
5           MR. CRAMER:  Objection; form.
6  A.  I don't know that I -- I was not in a position
7  of making yes or no decisions for the City.  I was only
8  in a position to be able to elevate issues.  So I never
9  had access to final decision-making about sources, so I
10 was in a position of being a liaison, and that was
11 frustrating because that meant I didn't have final
12 decision-making power when it came to their asks.  So
13 that was a hard place to be.
14          I did the best I could at the time to try and
15 make sure that city leaders were hearing everything
16 adequately and accurately and that they were hearing
17 the intensity of the situation for the businesses in
18 the corridor and that they were taking it seriously,
19 but at the end of the day the services rendered were
20 what the City could or could not offer and those
21 conversations were happening in rooms that I wasn't in
22 and so that was frustrating.
23 Q.  (BY MS. EAKES)  Did you -- I mean, was it
24 intense in terms of what you were hearing from the
25 businesses?  Did you feel that their intensity was real

1  and accurate from what you could tell?
2              MR. CRAMER:  Objection; form, calls for
3  speculation.
4      A.  I was hearing from them their frustration and
5  their -- and their frayed nerves.  I could tell because
6  I had spoken to these people in time of relative calm,
7  I had spoken to them when business was bad, I had
8  spoken to them when business was good.  I knew these
9  people and I was hearing a very different tone from
10 them during CHOP than I normally heard from them and
11 that was really a lot of anxiety and fear.
12     Q.  (BY MS. EAKES)  A more distressed tone, fair
13 to say?
14     A.  More distressed, yes.
15     Q.  Than you had heard them at any point in the
16 past?
17     A.  Yeah.  They were very distressed when COVID
18 started, but there was a different kind of distress
19 with CHOP, yeah.
20     Q.  Okay.  And did you -- you said in this that
21 your nerves were frayed.  Did it actually take a
22 personal toll on you, Mr. Wells?
23     A.  Yeah, I believe -- I believe it did.
24     Q.  How so?
25     A.  Well, I noticed that that email to Amanda was

```
 1                   C E R T I F I C A T E
 2
 3    STATE OF WASHINGTON   )
                            )
 4    COUNTY OF KING        )
 5
 6              I, Patricia D. Jacoy, a Certified
 7    Shorthand Reporter in and for the State of Washington,
 8    do hereby certify that the foregoing transcript of the
 9    deposition of MICHAEL WELLS taken on March 30, 2022 is
10    true and accurate to the best of my knowledge, skill
11    and ability.
12
13
14                          _____
                            Patricia D. Jacoy, CSR 2348
15
16
17
18
19
20
21
22
23
24
25
```