# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff,           )
                                 )
         vs.                     ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION

UPON ORAL EXAMINATION OF

CITY OF SEATTLE

(THOMAS MAHAFFEY)

_____


Seattle, Washington


(All participants appeared via videoconference.)




DATE TAKEN:   JANUARY 26, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 15

1    don't recall any specific guidance that was given,

2    just -- this was a situation we'd never faced before, so

3    I think we were trying to determine appropriate

4    guidelines as responses as we're going on, based on what

5    was occurring on the ground.

6        Q.  You mentioned armed people at some barricades.

7    Can you describe to me a little bit more about what you

8    meant about armed people?

9            MR. CRAMER:  Objection.  Form.

10       A.  Yeah, I meant -- specifically, I recall early

11   on, we're talking about the first days particular stand

12   out in my mind of June 8th, of the event was being

13   livestreamed on video that I and others were watching in

14   our operations center, and they showed people armed with

15   assault weapons on the first night, the 8th, at certain

16   intersections.

17           Then the following morning, I got a briefing

18   from Captain Sano and Sergeant Geoghagan about walking

19   back to the precinct, trying to determine what the

20   situation was, and they were -- had conversation with

21   several people that were armed with handguns.

22   BY MR. WEAVER:

23       Q.  And you mentioned the operations center.  Where

24   is the operations center located?

25       A.  It's located in the West Precinct, which is in

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 18

1    area.

2        Q.   Okay.   So the directive -- was the directive

3    for them not to respond to 911 calls unless they met

4    certain criteria?

5        A.   No, that wasn't the overall direction.   I just

6    wanted them to be thoughtful about that area, what the

7    potential implications were for them and their safety,

8    that they witnessed the area before going into it.

9    That's what was behind this directive.

10       Q.   Do you know whether, during the period of

11   June 8th to June 30, 2020, in the area that was

12   designated the red zone, any officer responded within

13   the red zone to a call that was not what is defined here

14   as a mass casualty event?

15            MR. CRAMER:   Objection.   Form.

16       A.   Yes.   There were responses into the red zone to

17   other than the mass casualty event.

18   BY MR. WEAVER:

19       Q.   What were those?

20       A.   I remember at least one shooting where officers

21   went in.   They formulated a plan and the team met with a

22   supervisor, took the direction that was on here, and

23   went in to respond.   That's a specific example that

24   sticks out in my mind.

25       Q.   Okay.   So I think we need to get into the

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 19

1   definition of what a mass casualty event is.  What's

2   your understanding of a mass -- what a mass casualty

3   event is?

4           MR. CRAMER:  Objection.  Form.

5       A.  To me, I would define it as an event where you

6   have more than one person that has been injured or

7   potentially killed.

8   BY MR. WEAVER:

9       Q.  Okay.  In the shooting you were talking about,

10  do you know whether there were multiple individuals

11  shot?

12      A.  There was just one shot that -- the incident

13  that I was recalling.

14      Q.  All right.  So let me ask whether any of the

15  following were considered a mass casualty event in

16  the -- in the meaning of this directive that was sent

17  out.

18          Would rape be considered a mass casualty event?

19          MR. CRAMER:  Objection.  Form.

20          Are you talking about as related to the term

21  used in this paragraph, or generally the term "mass

22  casualty event"?

23          MR. WEAVER:  As used in this -- in this

24  document and subsequent documents, but I'm asking about

25  this document first.

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle        30(b)(6) Thomas Mahaffey

Page 20

1    A.   Would rape be considered a mass casualty event?

2  BY MR. WEAVER:

3    Q.   Yes.

4    A.   No.

5    Q.   How about assault?

6    A.   Potentially.  Depends on the amount of victims,

7  but I think -- I mean, we -- we clarified this wording

8  later on, and also during briefings with people.  I

9  think maybe the wording used here is unfortunate, and I

10  think we came to recognize that.

11        So the idea is not that we were not responding;

12  that we're giving examples of when officers would go in

13  more immediately than at other times.  That's what the

14  idea behind this -- this concept was.

15    Q.   Okay.  Well, is it your understanding that an

16  assault would be a mass casualty event as it's used in

17  this document?

18    A.   If it endangered a significant amount of

19  people, yes, it would be.

20    Q.   Okay.  How about a one-on-one person

21  interaction where there was an assault that didn't

22  involve a firearm?  Would that be considered a mass

23  casualty event?

24         MR. CRAMER:  Objection.  Form.

25         THE COURT REPORTER:  This is the court

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 21

1    reporter.  I'm sorry.  Did you say that didn't involve a
2    firearm?
3              MR. WEAVER:  Didn't involve a firearm, yep.
4              THE COURT REPORTER:  Okay.  Thank you.
5              MR. CRAMER:  Same -- form.
6         A.  In the context of this, no.  And again, I would
7    want the officers to not not respond, to consider a plan
8    before responding to that type of event, based on all
9    the factors that they had to deal with during this time.
10   BY MR. WEAVER:
11        Q.  How about kidnapping?  Would that be a mass
12   casualty event?
13             MR. CRAMER:  Same objection.
14        A.  No.  But again, it would not be something we
15   wouldn't respond to.  We'd just want to have a
16   considered and thoughtful response to it.
17   BY MR. WEAVER:
18        Q.  How about a firing of a weapon where nobody was
19   hit?  Would that be a mass casualty event?
20             MR. CRAMER:  Same objection.
21        A.  No, it wouldn't.
22   BY MR. WEAVER:
23        Q.  How about property damage?  Would that be a
24   mass casualty event?
25             MR. CRAMER:  Form.

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 22

1      A.   Property destruction, no.   Not unless it was

2   putting somebody's -- or many people's lives in danger

3   potentially.

4   BY MR. WEAVER:

5      Q.   Okay.   How about fires that were not structural

6   fires?   Would those be considered a mass casualty event?

7            MR. CRAMER:   Same objection.

8      A.   Potentially, if it was endangering or -- a

9   significant amount of lives, if there were injuries

10  associated with it, potentially, yes.

11  BY MR. WEAVER:

12     Q.   Okay.   How about a loud disagreement involving

13  a large group of individuals carrying rifles, but not

14  firing them?   Would that be considered a mass casualty

15  event?

16           MR. CRAMER:   Objection.   Form.

17     A.   No.   But again, it would still require

18  consideration of how we're going to respond to that,

19  based on what the dynamics of the situation were and

20  what we were learning about it.

21  BY MR. WEAVER:

22     Q.   So I'd like to ask you about the next sentence

23  in red zone.   If responding to a mass casualty event --

24  incident, sorry -- within the red zone, all responding

25  officers should muster with a supervisor outside that

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle           30(b)(6) Thomas Mahaffey

Page 31

1   when the wording was changed.

2   BY MR. WEAVER:

3       Q.  Can you -- so earlier you mentioned that there

4   were times that there were shootings that the police

5   responded to in the red zone during the period of

6   June 8th to June 30th of 2020.

7           Do you know of any other instances, other than

8   shootings, where the Seattle Police Department responded

9   within the red zone to a 911 call?

10      A.  Other than --

11          MR. CRAMER:  Objection.  Form.

12      A.  Other than the one shooting I mentioned?

13  BY MR. WEAVER:

14      Q.  Yes.

15      A.  I remember one other shooting that I actually

16  went to, was later in June, that was on 12th Avenue, by

17  the East Precinct.

18      Q.  Can you think of anything, other than a crime

19  involving a shooting, in which the Seattle Police

20  Department responded inside the red zone during that

21  time period?

22          MR. CRAMER:  Objection.  Form.  Outside the

23  scope of the 30(b)(6).

24          You can answer.

25      A.  Okay.  I know we responded to incidents.  Not

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 32

1    that I can think of specifically offhand.

2              MR. WEAVER:  I'm going to drop Exhibit 4

3    into the chat.

4              (Exhibit No. 4 marked.)

5    BY MR. WEAVER:

6         Q.  Do you recognize this document?

7         A.  It's just downloading.  Give me a moment.

8         Q.  Okay.  Yep.

9         A.  It's an action plan for June 24th --

10        Q.  Yes.

11        A.  -- 2020.

12        Q.  So I don't think I asked before, but how was

13   the incident action plan distributed to the police

14   force?

15        A.  They were published and then our general

16   practice is that they will distribute them to the people

17   that are in command for the day, and then there are

18   other copies available in the operations center as well.

19        Q.  Okay.  While I'm still thinking about it, if

20   you could tell me, for Exhibit 2, what's your

21   understanding of who received that document?

22        A.  That was sent out in an email, but I'm -- I'm

23   looking at who it's sent -- a sent line.  I don't see

24   one, so I -- I don't know who it was distributed to via

25   email.  Like, was it a wide distribution, or was it

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 38

1  feelings and animosity towards Seattle police officers

2  at that time that was particularly concentrated in that

3  area of the city.

4          Officers were going to seemingly routine calls

5  and being accosted by people seeking confrontation even

6  in routine situations.  So again, in just working

7  through some of these unprecedented circumstances that

8  were dealt with, again, officer safety being the most --

9  the thing that was most foremost on my mind during this

10  period, we determined that this was the best course of

11  action to take.

12     Q.  Okay.  So within the Edward Sector, but outside

13  the red zone, were there cases in which there might be a

14  mass casualty event or a critical life safety emergency,

15  that it would be appropriate under your directive for

16  officers not to respond?

17          MR. CRAMER:  Objection.  Form.  Calls for

18  speculation.

19     A.  No.  But again, depending on the criticality of

20  the incident, I want them to formulate a thoughtful and

21  considered response before going in, again, to ensure

22  their safety, de-escalate, minimize the potential use of

23  force, and keep the public safe.

24  BY MR. WEAVER:

25     Q.  So when you indicate that it was -- you were

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 40

1  messaging issue or confusion internally or externally."

2          Do you see that?

3      A.  Yes.

4      Q.  Do you remember asking for that, for any

5  clarification they wanted?

6      A.  Reading this email, that -- now it's bringing

7  up I did ask that, yes.

8      Q.  Do you recall whether either Chief Best or

9  Officer Fisher indicated that your policy should be

10  altered or clarified in any way?

11     A.  I don't specifically, no.

12     Q.  And you also indicate down below that,

13  "Depending" -- you were going to talk with

14  representatives from the City's department involved in

15  barricade removal, and that, "Depending on how that

16  operation went, I may be able to adjust the current

17  response protocol to the area."

18          Do you recall whether the -- you adjusted the

19  current response protocol to the area after barricade

20  removal?

21     A.  It wasn't adjusted because the barricades -- if

22  this is still June 12th, my recollection, the

23  barricades -- or June 16th, excuse me, the barricades

24  were not removed.  So protocols were not adjusted.

25     Q.  So the protocols were not adjusted until all

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 41

1    the barricades were removed on the morning of July 1,

2    2020; is that right?

3              MR. CRAMER:  Objection.  Form.

4       A.  To the best of my recollection, that's correct.

5              MR. WEAVER:  We've been going an hour.  I

6    don't know if you want to take a break or -- Shane,

7    or --

8              MR. CRAMER:  Yeah, that works.

9              MR. WEAVER:  Okay.

10             MR. CRAMER:  Come back in ten?

11             THE VIDEOGRAPHER:  Going off the record at

12   10:01.

13             (Recess from 10:01 a.m. to 10:11 a.m.)

14             THE VIDEOGRAPHER:  We are back on the record

15   at 10:11.

16             E X A M I N A T I O N (Continuing)

17   BY MR. WEAVER:

18       Q.  So do you recall an incident involving a

19   business called Car Tender on, I believe it was,

20   June 14, 2020?

21       A.  I don't.

22             MR. WEAVER:  I'm going to pull something up

23   here, in case you're wondering.

24             THE WITNESS:  Okay.

25             (Exhibit No. 6 marked.)

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 54

1              MR. CRAMER:  Object to form.
2    BY MR. WEAVER:
3         Q.  -- from the June 8th to June 11th time period?
4              MR. CRAMER:  Asked and answered.
5         A.  No.  We actually had some officers go in on the
6    9th.  There were some other times that we went in it as
7    well.  We were kind of just determining that that was
8    the most appropriate way to do that, expecting people to
9    use their best judgment based on the particular
10   circumstances of the event that had been brought to our
11   attention.
12   BY MR. WEAVER:
13        Q.  So the officers who went in on the 9th, who
14   were they and what were they doing?
15        A.  I talked about that earlier.  That was
16   Captain Sano and Sergeant Geoghagan that went in on the
17   morning of the 9th to kind of determine what the actual
18   situation was within the area and what -- again,
19   providing us with some information on what the
20   circumstances were at the time that we were dealing
21   with.
22        Q.  Okay.  So were they responding to a 911 call or
23   a report of a crime?
24        A.  No, not in that particular instance.
25        Q.  Okay.  Do you know of any officers who

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle        30(b)(6) Thomas Mahaffey

Page 90

1        MR. CRAMER:  Can we go off for one minute?

2   There was a note in the chat from the videographer that

3   I want to deal with.

4        MR. WEAVER:  Oh, yeah.

5        THE VIDEOGRAPHER:  Going off the video at

6   11:45.

7        (Discussion off the record.)

8        THE VIDEOGRAPHER:  Back on the record at

9   11:46.

10  BY MR. WEAVER:

11      Q.  Do you recall when you first learned that at

12  least some people had declared an area around the East

13  Precinct to be an autonomous zone?

14      A.  My recollection, hearing those words,

15  autonomous zone, were the next morning, when I got the

16  report from Captain Sano, so the morning of June 9th.

17      Q.  And forgive me for not remembering.  Was

18  Captain Sano one of the officers that went down to look

19  and see what was going on that morning?

20      A.  Correct.

21      Q.  What else did he report to you on the morning

22  of June 9th, if you recall?

23      A.  Well, my recollection is, he met with a couple

24  of people that -- that there didn't really seem to be a

25  leader present, and I think they mentioned the person's

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 91

1  name who was the leader.  I think it was Raz Simone, who

2  would be back later that night.  That's kind of a

3  summary of what I remember that he reported to us.

4      Q.  What do you know or recall about Raz Simone?

5      A.  The night of the 8th -- he drove a very

6  distinctive car.  He had a white Tesla.

7  African-American male.  He showed up that night.  I

8  believe it was that first night, there was a video of

9  him armed and talking about and distributing firearms.

10     Q.  What do you recall seeing about -- seeing with

11 Mr. Simone distributing firearms?

12     A.  My recollection is him taking a firearm out of

13 his car, talking to somebody about it, and hand- -- and

14 handing it to them.

15     Q.  What kind of firearm was it, if you recall?

16     A.  My memory is that it was a -- that they were

17 talking about a rifle, but I don't remember if he

18 actually handed him a rifle or not.  I don't recall the

19 kind of specifics of that.

20     Q.  Do you recall whether it was one gun or more

21 than one gun?

22     A.  My recollection is, it was just one.

23     Q.  Do you recall seeing on any other -- any of the

24 other live feeds distribution of -- distribution of

25 weapons on June 8th or June 9th?

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 92

1          A.   I don't.

2          Q.   So when was the decision -- well, who made the

3    decision to not try to reenter the precinct on the night

4    of June 8th or the morning of June 9th?

5                    MR. CRAMER:   Objection.   Form.

6          A.   I don't know if it's a particular person.

7    Certainly June 8th, the determination was made, the --

8    the crowd was peaceful.   They weren't taking any

9    specific action against the precinct, so the decision

10   was made to let that play out.

11          That's what -- my direction, when I went home,

12   to Captain Sano, who was in command overnight, to make

13   an effort to go back in the following morning to kind of

14   determine what the -- the situation was, and if it was

15   safe and feasible to do so.

16   BY MR. WEAVER:

17          Q.   So on the morning of June 9th, did you make the

18   decision not to move personnel and materials back into

19   the East Precinct?

20          A.   No.   We got the report from Captain Sano, and

21   then we started meeting internally about, you know, what

22   our next steps were going to be.   So if there wasn't a

23   specific decision, other than Captain Sano said, okay,

24   here's -- you know, very early in the morning, here's

25   what we've encountered, here's what's going on, and then

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 93

1   I took that information back to the chief and others on
2   the command staff and started discussing what our next
3   plans would be.
4        Q.  Okay.  Tell me as much as you can about those
5   discussions that you had with the chief and other
6   personnel about the next steps to take.
7        A.  Well, it was collaborative effort, and
8   ultimately the decision was going to be left to the
9   chief.  And my preference was to gather as much
10  information as we could, determine if it was viable for
11  us to move back in immediately, and then formulate a
12  plan to sustain us being back in there, knowing that
13  there would probably be pushback from crowds again that
14  night on the precinct, so how were we going to sustain
15  it if we got back -- back into the building.
16           So that's kind of what was at the forefront of
17  my mind, that's what we talked about.  And I think it
18  was the chief -- don't remember specifically, but I
19  think it was, you know, going to be in consultation with
20  the executive branch, to start determining the next
21  steps forward.
22        Q.  So by the "executive branch," you mean the
23  mayor's office; is that correct?
24        A.  Yes.
25        Q.  Okay.  Were you involved with discussions

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 96

1    BY MR. WEAVER:

2        Q.  During these meetings of the group that we

3    talked about, or with Julie Kline specifically, do you

4    recall having discussions about whether the police

5    department could or should return to the East Precinct?

6                MR. CRAMER:  Objection.  Form.  Vague.

7        A.  Yes, I'm sure that came up.

8    BY MR. WEAVER:

9        Q.  What was your personal opinion about whether

10   the police department should attempt to reoccupy the

11   East Precinct in June of 2020?

12               MR. CRAMER:  Objection.  Vague as to time.

13       A.  I was committed to getting us back in the

14   building as soon as it was practical, safe, feasible,

15   and something that we could sustain without having to

16   get back into the tempo or the situation that we were in

17   earlier the month -- earlier in the month.

18               That's the way I thought about it.  Getting

19   back in may have been feasible at some point, but there

20   certainly would have been a force component, I think,

21   associated with that in the early days.

22               And then as we saw, when we went back with

23   Chief Best on June 11th, the sustainment was going to be

24   something we'd have to spend time thinking through.

25   ////

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 97

1    BY MR. WEAVER:

2        Q.  What happened on June 11th that you're

3    referring to?

4        A.  I believe that's the correct date.  Chief Best

5    and some -- myself and some other officers went back up

6    to the precinct.  We were able to go inside, inspect the

7    building, make sure that it hadn't been broken into,

8    nothing had been damaged or taken.

9            I think the thought is that we would remain

10   there.  We'd put some resources in the building, but

11   then there was an attempt -- there was a fire lit out --

12   outside of the building that made the officers feel

13   unsafe.

14           They left, unfortunately, without notifying

15   anybody until the next morning.  And so then we didn't

16   have any more resources in there, so again, it was the

17   sustainment piece that was going to be difficult once

18   we'd lost that foothold.

19       Q.  Okay.  I just want to make sure I understood --

20   understood what you said.  So on June 11th, you went

21   in -- and I think it was June 11th, but -- on June 11th

22   or thereabouts, you went -- you went into the precinct

23   with Chief Best and some other officers, with the goal

24   of leaving some people manned at the precinct; is that

25   correct?

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 98

1      A.   That's accurate, yes.

2      Q.   And those officers left sometime thereafter

3   because they were concerned for their safety; is that

4   right?

5      A.   Yeah.   A different team of officers actually

6   came in late -- later in the afternoon or early evening

7   and replaced those -- myself and others that had already

8   been there throughout the day.

9           And then after midnight the next day, let's say

10  that was the 12th, that's when an incident occurred that

11  caused them to leave the building.

12     Q.   Okay.   Were there other attempts to move

13  personnel back into the East Precinct prior to July 1,

14  2020?

15           MR. CRAMER:   Objection.   Form.

16     A.   Not -- no, not like that, that we just talked

17  about, or there were no other efforts that I recall that

18  were made after that initial one.

19  BY MR. WEAVER:

20     Q.   Okay.   I want to go back to the discussions

21  that we talked about earlier on June 8th, and I think --

22  am I correct that you were having discussions between

23  you and some of your subordinate officers about whether

24  to evacuate personnel from the East Precinct?   Is that

25  correct?

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

b1c107f9-ed1e-449a-b5a3-f0d2997637ca

Hunters Capital, LLC v. City of Seattle          30(b)(6) Thomas Mahaffey

Page 198

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Thomas

9    Mahaffey, having been duly sworn, on January 26, 2022,

10   is true and accurate to the best of my knowledge, skill

11   and ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 2nd day of February, 2022.

14

15

16

17

18   My commission expires:

19   JUNE 9, 2022

20

21

22

23

24

25

b1c107f9-ed1e-449a-b5a3-f0d2997637ca