# EXHIBIT 26

JOHN MCDERMOTT
1/19/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiffs,          )
                                 )
        vs.                      )   No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

ZOOM 30(b)6 Deposition Upon Oral Examination

of

SRJ dba CAR TENDER - JOHN McDERMOTT

_____

DATE:  Wednesday, January 19, 2022

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 76

1       A.   Again, I don't recall.  If you need me to get

2  that information for you, I can.

3       Q.   Okay.  And then let's see, so did you notify your

4  landlord of the -- did you notify your landlord that you

5  were discussing putting an offer on the Shoreline property?

6       A.   We did, but I'm not sure at what point that was.

7       Q.   Okay.  Do you think -- would it have been after

8  you visited the property?

9       A.   It would have been somewhere in August.

10      Q.   Okay.

11      A.   But again, I don't have that date.  I can

12 obviously find that information if you need it.

13      Q.   Okay.  And so after you visited the Shoreline

14 property sometime in June of 2020, did you visit any other

15 properties?

16      A.   In that year, other than the things that we

17 discussed, maybe doing a drive-by of something in the SODO

18 area prior to January, not that I recall.

19      Q.   Okay.  So after -- right, we're after June 2020,

20 after you saw the Shoreline property, did you look at any

21 other properties?

22      A.   No.

23      Q.   Okay.  And then so why did you decide not to look

24 at any other properties after seeing the Shoreline

25 property?

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 77

1              MR. WEAVER:   Objection.

2         A.   I think I -- I think I stated pretty clearly we

3    weren't really under any pressure to move at that point in

4    time, and I'm not really sure what relevance that has to

5    anything that we're talking about here, and it's getting a

6    little frustrating.

7              The whole reason that we moved Car Tender

8    because -- was because of all the garbage going on in our

9    city and because our lack of representation and our lack of

10   ability to be protected and to be treated like normal human

11   beings, and I'm not sure how any of this stuff -- the only

12   reason we moved Car Tender was because of the complete

13   dysfunctionality of the city -- the police department and

14   the state's ability to protect me as a citizen and to

15   protect us as a business.  And had CHOP not happened, Car

16   Tender would probably still be in its location on Capitol

17   Hill functioning, with happy customers, with happy people.

18   And I'm not really sure how any of -- looking at any other

19   properties has any relevance to us moving.

20             The reason we moved was to get the hell out of

21   there, to stop having guns pointed at me, and to stop being

22   threatened every single day.  That is the reason we moved

23   Car Tender.  We had customers that stopped coming to our

24   business because they were afraid for their lives, afraid

25   for their property, afraid to come to our business because

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 78

1   of where it was located.

2        Q.   Got it.  Well, I -- I'm really sorry about what

3   you went through while you were in CHOP, so I'm just asking

4   about before the CHOP period, so in 2016 --

5        A.   This is part of the CHOP period, June 24th.

6        Q.   Oh, yeah, no, so I think you said -- so you said

7   you didn't look at any other properties in June 2020 once

8   you looked at the Shoreline property; correct?

9        A.   There really wasn't anything else out there that

10  we were looking at because, if there was something else

11  that was out there that was going to fit, like I stated

12  before, we probably would have engaged the process.  You

13  know, we were, again, under no pressure to move our

14  business at any point in time during those leases.  But we

15  can't stay there forever, and it takes more than a day to

16  move a business, and we have a responsibility to our

17  customers, family members, et cetera, that if we're going

18  to move, to be able to communicate to them that, you know,

19  you don't just show up one day and we're not there.

20       Q.   Right.  So you had been looking to move for

21  several years starting in 2016 --

22       A.   Yeah.

23       Q.   -- earlier; right?

24       A.   As we've already discussed, yes.

25       Q.   So you had looked at several properties and

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 79

1   you -- you intended to move out of that location; correct?

2        A.   We sold the property.  Best use for the property

3   was to build a different building on it, so ultimately we

4   were going to have to move.  But again, as I stated before,

5   we were under no pressure to move from either landlord.

6   Ultimately something was going to happen and ultimately,

7   yes, we were going to have to move.

8        Q.   Okay.  So --

9        A.    There's absolutely no relevance whatsoever other

10  than we moved because CHOP was a complete disaster and we

11  didn't have protection.  We didn't -- our civil rights were

12  violated by the City, by the police department, by the fire

13  department, by the mayor, by the governor of Washington

14  state.  You can take it all the way to the president of the

15  United States if you want.

16       Q.   Okay.  So in June of 2020 when you looked at the

17  Shoreline property and you went there, you checked it out,

18  and you thought that it would be a good fit for Car Tender?

19       A.   It was a -- it was the best option that we had so

20  that we could move posthaste to get the hell out of Capitol

21  Hill.

22       Q.   Okay.  Got it.  Okay.  And you -- and so I think

23  my initial question was just why you decided not to look at

24  any other properties in June of 2020.

25            MR. WEAVER:  Objection.

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 80

1        A.    Again, it was our best option that we had so that
2   we could get out of there quickly.
3   BY MS. IVERSON:
4        Q.    Got it, but -- and just to --
5        A.    Daily -- just so you're aware, I get up and go to
6   work at 7:00 in the morning-ish.  Often 6:30.  I usually
7   stay til 6:30, 7:00 before I go home.  I don't have a whole
8   lot of time to spend looking at properties.  You know,
9   whether it's the weekend -- oftentimes I work on Saturdays,
10  sometimes I even work on Sundays.  So I don't have a whole
11  lot of options of looking at property.  So I do the best I
12  can with the ability I have and the time I have.
13       Q.    Yeah, understood.  Did you forward the Shoreline
14  property -- did you forward information about the Shoreline
15  property to your broker?
16       A.    I did not.
17       Q.    Okay.  Did you contact them after looking at the
18  Shoreline property?
19       A.    I did not.
20       Q.    Okay.  All right.  And then so I understand that
21  you, you know, wanted to leave your Capitol Hill location,
22  but I'm just --
23       A.    (Inaudible) I didn't want to leave my Capitol
24  location -- Hill location; I was forced to leave my Capitol
25  Hill location because it wasn't safe.  Wasn't safe for me,

Electronically signed by Mindy Suurs (101-257-931-8021)                        0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 81

1   wasn't safe for my customers, wasn't safe for my customers'

2   cars, it wasn't good for Car Tender, it wasn't good for my

3   employees.  My employees didn't want to come to work.  They

4   felt threatened.

5        Q.   Okay.  Well, did they -- did they stop coming to

6   work?

7        A.   We had one of our employees was deeply concerned,

8   and when they gave us the all clear to come back to work,

9   when she had the option to come back to work was right at

10  the beginning of the CHOP stuff, whatever it was, May 29th,

11  she was afraid to come back to work.

12       Q.   Okay.  Did she come in?

13       A.   She did ultimately, but we provided her a parking

14  spot on our lot so that she could park on our lot and so

15  that we could escort her to and from the building.

16       Q.   Did any other employees request that?

17       A.   No.

18       Q.   Okay.  And she -- sorry, so at that point,

19  May 29th, your operating hours in Capitol Hill were 8:00 to

20  5:00?

21       A.   Yeah.

22       Q.   Okay, got it.  And would this employee come in

23  right at 8:00?

24       A.   Usually five minutes before.

25       Q.   Okay.  And just -- what kind of protest -- so now

JOHN MCDERMOTT
1/19/2022

Page 168

1        Q.    And who is "they"?  Is that the police?

2        A.    I believe it was the Department of

3    Transportation, being a division of the City of Seattle.

4        Q.    Okay, you saw Department of Transportation

5    workers doing that?

6        A.    Yeah, yeah, so -- so the Department of

7    Transportation -- yeah, I watched them violate my rights as

8    a human being.

9        Q.    How did you know at the time that they were

10   Department of Transportation workers?

11       A.    Because they were all wearing hardhats, vests,

12   driving Department of Transportation vehicles.

13       Q.    Okay.  And so you saw DOT workers put up ecology

14   blocks.  And where did they put those up?

15       A.    Put them up all over the place.

16       Q.    Okay.  Well, let's go ahead and --

17       A.    Specifically affected me, they put them up at the

18   corner of 12th and Olive.

19       Q.    Okay, the corner of -- so if we could just go

20   over to Exhibit 125 again.

21       A.    The map?

22       Q.    The map, yep.

23       A.    The corner of my parking lot.

24       Q.    Okay.  So where was the barrier in relation to

25   your parking lot?

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 169

1        A.    Right at the corner of 12th and Olive.

2        Q.    Okay, was it perpendicular to the parking lot, as

3   in did the barrier stretch across --

4        A.    It was -- it was -- they did stretch across 12th

5   Avenue and they were perpendicular to one edge of the lot

6   or parallel to one edge as well.

7        Q.    Perpendicular to --

8        A.    So this is perpendicular.

9        Q.    Uh-huh.

10       A.    This is parallel.  And I think my lot parallels

11  Olive, one edge of my lot parallels 12th, so it was equally

12  perpendicular and parallel.

13       Q.    Okay.  So it was more than one barrier?

14       A.    There was multiple barriers, yeah.

15       Q.    Do you know how many?

16       A.    I believe there was two.  There may have been

17  three.

18       Q.    Okay.  So one of them was in the intersection

19  of --

20       A.    Yeah, I didn't take pictures of them, so I can't

21  remember how many.

22       Q.    Oh, okay.  But you observed them being put up;

23  right?

24       A.    Yep, yep.

25       Q.    -- were there every day from that point forward;

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 170

1    right?  Okay.

2         A.    Yep.

3         Q.    And so -- but you just -- you don't know how many

4    it was?

5         A.    I don't.

6         Q.    Okay.  And so they were -- but there were at

7    least two?

8         A.    I believe it was three, minimum two.

9         Q.    Okay.  So two to three?

10        A.    Yep.

11        Q.    Okay.  And was one of them in the intersection --

12   were they in the crosswalk?  Where were they placed?

13        A.    They were before the crosswalk.

14        Q.    Okay, before the crosswalk.  And did they stretch

15   from the west to the east side of the street?

16        A.    Yep.

17        Q.    On 12th Avenue?

18        A.    Yep.

19        Q.    Okay, and they stretched from the north to the

20   south side of the street on Olive?

21        A.    They did not on Olive.  They did not.  They did

22   not put them on Olive.

23        Q.    They were not on Olive, okay.  So the barriers

24   that you're talking about were only on 12th Avenue.

25        A.    Yeah.

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 171

1     Q.   Okay.  And so did the barriers in front of Car

2  Tender block access to Olive street at all?

3     A.   Yes, I mean if -- have you looked at a map where

4  they placed the barriers?

5     Q.   I -- I am asking --

6     A.   Do you have access to that?

7     Q.   I'm just asking for your description of where the

8  barriers were placed.  If you can't answer it, that's fine,

9  just let me know.

10     A.   I can, it's just -- I mean -- anyways, yes, they

11  were on 12th Avenue.

12     Q.   Okay.  They were on 12th Avenue, but they weren't

13  on Olive Street?

14     A.   At my location.

15     Q.   Sorry.

16     A.   At my location.

17     Q.   Olive Street at Car Tender's location, okay.  And

18  so once those barriers were -- once the 12th Avenue barrier

19  was put up --

20     A.   Once the main access to Car Tender was blocked

21  off, yeah.

22     Q.   Uh-huh, so did you change the access point to the

23  parking lot?

24     A.   No.

25     Q.   Okay.  So how -- how did customers get into --

Electronically signed by Mindy Suurs (101-257-931-8021)                                      0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 172

1    drive -- sorry, did customers then drive their cars into
2    Car Tender's parking lot?
3        A.    Yes, only way they could get there was from the
4    north.
5        Q.    Okay.  So from the north on 12th Avenue?
6        A.    Yes.
7        Q.    Okay.  And then so when that -- at that point, so
8    June 8th, you watched the barriers get put up; is that
9    right?
10       A.    Yes.
11       Q.    Okay.  And then did you at any point after that
12   change your store hours?
13       A.    No, we were still there normal hours.
14       Q.    Okay, normal hours.  So normal at that time
15   was --
16       A.    8:00 to 5:00.
17       Q.    Okay, got it.  And then I know -- so you talked
18   about some customer -- customer impacts.  At that point,
19   June 8th and beyond, did any customers come to your store
20   in the month of June?
21            MR. WEAVER:  Objection, asked and answered.
22       A.    After the 8th, yes.
23   BY MS. IVERSON:
24       Q.    And what about in July?
25       A.    I mean you can see obviously in July customers

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 180

1      A.   Whose cars I delivered?

2      Q.   Right.

3      A.   No.

4      Q.   Okay, so how would you go about checking that

5   information?

6      A.   I could go through the customer list, the ledger,

7   the people that came in during that month, and depending on

8   who he is, I may remember delivering their car.

9      Q.   Okay.  And I suppose then by the same token,

10   there could be people on that list that you don't think did

11   deliver their car to but you don't remember; is that right?

12      A.   Correct.

13      Q.   Okay.  And then, you know, I know you mentioned

14   that you had fewer customers coming to Car Tender in June

15   and July of 2020 than came to Car Tender in March, April,

16   and May of 2020?

17           MR. WEAVER:   Objection.

18      A.   I believe that's correct.

19   BY MS. IVERSON:

20      Q.   Okay.  So in the June time frame, did you ever

21   get a call from a customer saying, "I need my car fixed,

22   but I don't want to come to your shop"?

23      A.   We had appointments set up.   Many people called

24   and said that yeah, not coming.

25      Q.   Okay.  So you had appointments booked during June

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 181

1  that people canceled?

2     A.   Yes.

3     Q.   Okay.  And they -- and so how many appointments

4  were canceled in June?

5     A.   Don't have an answer for you on that one.  I can

6  potentially get it, but I would have to go into the

7  software and look.

8     Q.   Okay, so you'd have a record of canceled

9  appointments?

10    A.   I would have appointments that would be on the

11 record with no document -- it wouldn't necessarily -- we

12 don't have a function where it shows the appointment was

13 canceled.  I'd have to go through and see if the car had a

14 repair document generated from the date their appointment

15 was scheduled.

16    Q.   Okay.

17    A.   Are you with me?

18    Q.   So the repair document be generated regardless

19 of -- so would a repair document be generated on the day of

20 a person's appointment?

21    A.   If the car was repaired, it would be generated

22 the day of their appointment.

23    Q.   The day of their pickup appointment?

24    A.   When they dropped the car off, repaired, there

25 would be a document generated that's called a repair order.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 182

1       Q.    Okay, so that --

2       A.    If I have ten appointments on a day and I go to

3   that day and none of those appointments line up with the

4   documents that were generated that day and I can look in

5   their history and it will basically show me that they did

6   not show up for their appointment.

7       Q.    Okay.  So you have a record of all appointments

8   that were made on a particular day?

9       A.    Generally speaking, that's true.

10      Q.    And you have that record regardless of whether

11  the person showed up that day?

12      A.    It will be sitting there in an appointment, yes.

13      Q.    Okay.  So if I book -- if it's -- I just want to

14  make sure that I understand.  So if it's today, whatever

15  today is -- January 19th -- and I've magically acquired a

16  car and my car needs service, if I make an appointment for

17  tomorrow, January 20th, that shows up in your system?

18      A.    Yep.

19      Q.    As Erica Iverson has an appointment on

20  January 20th.

21      A.    Yep.

22      Q.    Okay.  And then if I cancel that appointment, do

23  you still have a record in your system that I made an

24  appointment for January 20th?

25      A.    Yep.

JOHN MCDERMOTT
1/19/2022

Page 183

1    Q.   Okay.  And so then you would compare the record

2  of appointments made against these -- I can't remember the

3  names of the documents --

4    A.   Repair order.

5    Q.   Repair orders, okay.  And you try to reconcile

6  those?

7    A.   I would have to do that, yeah.  Have I ever done

8  that?  No.

9    Q.   Fair enough.  Is it possible that a repair

10  order -- that someone could have an appointment on one day

11  but the repair order could be generated on the next day?

12    A.   It's certainly possible.

13    Q.   So there wouldn't be a way to account for that in

14  your system of figuring out canceled appointments?

15    A.   Well, there would be based on the fact that -- i

16  mean you're not going to have somebody make an appointment

17  for one day and they may show up the next day, which is

18  perfectly fine, but it's not really -- it doesn't really

19  come into play.

20    Q.   But -- I'm sorry, so --

21    A.   I can look at their history and see all the days

22  that they've had their cars repaired and if they had an

23  appointment for, you know, say a Thursday and showed up on

24  a Friday.  I mean that's one appointment.  That's not a

25  common thing.  That would be very infrequent.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 184

1        Q.    So is the repair order generated at the -- when

2   the vehicle is dropped off or when --

3        A.    At write-up.

4        Q.    It is generated when the vehicle is dropped off?

5        A.    Yes.

6        Q.    Okay, got it.  Okay.  That makes sense.  I

7   thought you said earlier it was generated at pickup.  So --

8   okay.  All right.

9             So that's how you would go about figuring out

10  cancellations if you were to do that, which I understand

11  you haven't done, and so do you -- do you recall anyone

12  calling you up and saying, "I'm going to cancel my

13  appointment"?

14       A.    Sure, but I don't recall who it was and what day

15  it was.

16       Q.    Okay, but you recall that happening --

17       A.    It happened many times.

18       Q.    -- in June 2020?

19       A.    In June, July.  Some people didn't realize what

20  was going on until, you know, different -- different things

21  happened.

22       Q.    Okay.  So -- but you think that happened -- I

23  don't know -- a dozen times?

24       A.    More than that, but I don't have a number for

25  you.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 185

1        Q.    A couple dozen?

2        A.    Probably more than that.

3        Q.    Okay, of people calling the store and saying,

4    "I'm not going to come in for my appointment today"?

5        A.    Correct.

6        Q.    And did all of those dozens of people give a

7    reason for why they weren't coming in?

8        A.    The only reasons I was ever given was because of,

9    you know, fear of coming to the city because of the CHOP

10   thing, and they were concerned for their safety as well as

11   the safety of their vehicle.

12       Q.    Okay.  And that happened dozens of times?

13       A.    I'm not trying to put a number on it.  It

14   happened a lot.

15       Q.    Okay.  Well, I'm just trying to -- you know, "a

16   lot" could be many different --

17       A.    Yeah, I work on 177 cars in a month.  Cut it in

18   half; right?  So what's half of 177?

19       Q.    Okay, and that's just -- but half of 177 --

20   that's the number of cars that you worked on in the month

21   of June, let's say?

22       A.    Again, I don't know what the exact numbers are,

23   but I know that they were down.  I would have to look and

24   see.  If you want the numbers, I can get them for you.

25       Q.    Okay, but I guess I'm --

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 186

1      A.   I don't want to play with the numbers game, I
2   don't want to play games with the numbers, I don't want to
3   make fictitious numbers up; I'm just trying to tell you the
4   truth of what the matter is.  You're asking me to put a
5   number on something that I have no idea what the number is,
6   and if I give you a number and it's not the right number,
7   then all of a sudden I'm trying to hide something, and
8   that's not the case.  It's just -- it is what it is and the
9   numbers are what the numbers are, and if you want the
10  numbers, I'll get them for you; but I'm not going to sit
11  here and try and guess what the numbers are.
12      Q.   I'm not trying to have you guess, I'm not trying
13  to play games, I'm trying to understand just what you
14  remember of your interactions with your customers who are,
15  you know, like family to you.  So I just want to make sure
16  that I understand --
17      A.   All I know is that they didn't want to come
18  because they didn't feel and they didn't feel that their
19  car would be safe --
20      Q.   Okay, and I --
21      A.   -- and I don't know what the numbers are.
22      Q.   Fair enough.  So you know that they didn't come
23  in because they didn't feel safe, so I just want to
24  understand how you obtained that knowledge.
25      A.   By them calling me on the phone and telling me

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 187

1    that they're not coming.

2         Q.    Okay.   And so every person who did -- withdrawn.

3               Okay.   So you think or your dozens of customers

4    in the month of June called you and said they weren't

5    coming for car repairs because of CHOP?

6         A.    And it probably happened in July as well.

7         Q.    Okay, but it happened in June.   That's --

8         A.    And in July.

9         Q.    Okay.   So dozens of people called and canceled

10   their appointments in June --

11        A.    You're putting "dozens" on the number.   I'm

12   saying that many people.   I'm not trying to put a number on

13   it.

14        Q.    Okay.

15        A.    Dozens equates to, you know, dozens, and I don't

16   know what the number is.   I'm just telling you --

17        Q.    Okay.   I'm not asking for a number; I'm just

18   trying to get a sense for what "a lot" or what "many" means

19   to you in this context; right?   So if it's not dozens,

20   that's fine.   If it's -- is it fewer than dozens?   Is it

21   10?

22        A.    I don't know --

23              MR. WEAVER:   Objection.   I think he's really

24   trying to answer your questions as accurately as he can,

25   Erica.   I don't know what else he has to say.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 188

1              MS. IVERSON:  I mean, you know, I think that --
2        A.   Like I stated, if you want me to get you the
3   numbers, I'll get you the numbers.  I just don't know, and
4   I'm not guessing.
5        Q.   Well, the numbers -- I just want to make sure
6   that we're on the same page because maybe --
7        A.   We're on the same page.
8        Q.   Well, so but I think the numbers you're talking
9   about, when you say "I can get you the numbers," you mean
10  the number of customers who walked through the door in June
11  2020?
12       A.   Okay.  If you take a typical month and say it's
13  177 people, you take the number of people that walked
14  through the door in June, that's going to give you an idea.
15  Obviously it's going to be jaded by the whole CHOP thing,
16  and so what that actual number is I don't know.
17       Q.   Right.  But so -- so I understand that.  I'm not
18  asking you for the actual number of customers who came and
19  dropped off cars during CHOP.  That's not what I'm asking
20  about.
21       A.   Okay.
22       Q.   Okay?  So we were talking about customers who had
23  appointments to drop off their cars at Car Tender in June.
24       A.   Correct.
25       Q.   Okay.  So I'm asking, of those people -- sorry.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 189

1    We'll add another step in there.  We talked about people

2    who had appointments in June.  Then I asked if people

3    canceled those appointments in June.

4        A.   And I answered yes, they did.

5        Q.   You answered yes, they did, and I understand that

6    that there's no record of the cancellations.  That's fine.

7    I'm just trying to get a ballpark from you if you -- you

8    know, from you being at the business there, do you recall

9    around how many people canceled their appointments in June?

10       A.   I do not.

11            MR. WEAVER:  Objection.

12   BY MS. IVERSON:

13       Q.   Okay.  And -- you don't.  And so setting aside

14   the number, would you say -- withdrawn.

15            So then the people who canceled their

16   appointments in June -- some of them called you and told

17   you they were cancelling their appointments.

18       A.   Correct.

19       Q.   Okay.  And you don't know -- and of those people

20   who called you and told you they were canceling their

21   appointments, some of them gave you a reason for why they

22   were doing that; right?

23       A.   Most customers gave us a reason for it and the

24   reason being they didn't feel safe, they didn't feel that

25   their vehicle was safe.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 190

1        Q.    Okay.  And so we're talking about most of the

2   people who called you to cancel appointments in June.

3        A.    Correct.

4        Q.    And so most -- is that more than half of the

5   people who canceled --

6        A.    I'd say 99.999 percent of the people that called

7   and canceled was because they didn't feel that their car

8   was safe or that they were safe.

9        Q.    Okay.  And we don't -- and you don't know how

10  many people called and canceled at all.  So we don't know

11  99.9 percent of what; right?

12       A.    Correct.

13       Q.    So it could be four?

14            MR. WEAVER:  Objection.

15       A.    It couldn't be four.

16  BY MS. IVERSON:

17       Q.    Why not?

18       A.    It would have to be a larger number than that.

19       A.    Okay.  So you have some sense of the number of

20  people we're talking about.

21       A.    You're asking me about dozens and you're asking

22  me about four.  I know that I have more than four customers

23  that did it.  If my memory was fresh, I could probably name

24  their names right this moment, but that wouldn't be fair to

25  them.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 193

1      Q.   Okay.  What about at any point in the month of

2   June?

3           MR. WEAVER:  Objection.

4      A.   No.  We were still trying to function as a

5   business.

6   BY MS. IVERSON:

7      Q.   Okay.  And same for July?

8      A.   Yep, August, September, October.

9      Q.   Okay.  And so your hours stayed the same in June,

10  July, and August 2020?

11     A.   Yep.

12     Q.   And then so when you had customers calling and --

13  to cancel their appointments, what did you do, if anything,

14  to try to increase sales during that time?

15          MR. WEAVER:  Objection.

16     A.   Well, at that point we were trying to, you know,

17  do damage control.  It's pretty difficult to come up with a

18  marketing campaign, "Come to CHOP, your car might get

19  broken into or you might be harmed on your way into Car

20  Tender."  It's not going to really make people want to come

21  and get their car repaired at Car Tender.  So I'm not

22  really sure how you would market that.

23          Or actually, I suppose we could have said, you

24  know, Come see the summer of love where people get killed

25  and people get shot and there's people with -- walking

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 194

1   around open carrying AK-47s and maybe you'll get shot,

2   maybe you won't.

3   BY MS. IVERSON:

4        Q.    So what kind of damage control did you do?

5             MR. WEAVER:  Objection.

6        A.    Damage control -- we did hire a security firm to

7   come and protect our property and the customers' cars and

8   to protect our building and keep it from getting burned

9   down after it had already been attempted to get burned

10  down.

11       Q.    And what date did you hire the security firm?

12       A.    Well, first night that they showed up was the

13  morning of the 15th.

14       Q.    Okay.  And you said "they showed up."  Did you

15  ask them to come?

16       A.    That particular morning I did not.  They happened

17  to be one of my customers, and he saw all the shit going

18  down on the worldwide web and on all the live video feeds

19  all over the world, and he drove over to see if there was

20  anything he could do to help.

21       Q.    He drove over the morning of the 15th?

22       A.    Yeah, about 1:00 or 2:00 in the morning,

23  something like that.

24       Q.    Okay.  And he -- so he asked you if he could do

25  anything to help you out?

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 219

1      Q.   Okay.  So but I'm just asking about your outreach

2   to the City.

3      A.   I'm telling you my outreach would fall on deaf

4   ears because they had no intent to do anything to protect

5   the citizens of Seattle or to uphold the Constitution of

6   the City of Seattle or the state of Washington or the

7   United States of America.

8      Q.   Okay.  So did you reach out to them?

9      A.   I may have, but I do not recall.

10     Q.   You don't recall if you reached out to them,

11   okay.  So do you -- did -- do you recall ever -- withdrawn.

12          Did you ever have any meetings -- attend any

13   meetings where City officials were present?

14          MR. WEAVER:  Objection.

15     A.   I had the fire department show up at my place of

16   business after, you know, I put the fire out myself the

17   following day about --

18   BY MS. IVERSON:

19     Q.   Is that a meeting though?

20     A.   I don't know if I'd call it a meeting.

21     Q.   All right, you called 911; right?

22     A.   I called 911 a bunch of times, but they never

23   showed up.

24     Q.   Okay, so you're saying the fire department --

25     A.   Showed up the following day --

Electronically signed by Mindy Suurs (101-257-931-8021)                                      0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 220

1      Q.   Following day, okay.

2      A.   -- to let me know how sorry they were that they

3   didn't show up to put the fire out.

4      Q.   Okay.  So other than meetings about the June 14th

5   incident, did you attend any other meetings where city

6   officials were present?

7      A.   I did not.

8      Q.   Okay.  Any meetings --

9      A.   I had the police department show up a couple days

10   after it happened and, you know, get the details of what

11   happened, but, you know, that's two days late and $5 short.

12      Q.   Okay.  So just -- yeah, just setting aside the

13   June 14th incident, so you said you don't remember if you

14   ever reached out to the City.  Do you have a Twitter

15   account?

16      A.   I do have a Twitter account.

17      Q.   Would you tweet at any City officials?

18      A.   I'm not a tweeter.

19      Q.   Okay, me neither.  A stealth reviewer of tweets?

20      A.   Right.

21      Q.   Okay.  Any other social media accounts?

22      A.   I have Facebook and Instagram, but I didn't use

23   that for any of that either.

24      Q.   Okay, so you didn't post on Facebook about CHOP?

25      A.   No.  I mean I had friends and stuff that would

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 226

1      A.   Yeah.

2      Q.   And so who did you see removing them?

3      A.   SDOT.

4      Q.   SDOT, okay.  And so I just want to talk a bit

5   about the night of June 14th.  I know we've been referring

6   to the incident that night.  So if you could just go ahead

7   and kind of describe (inaudible) of the night.

8           So at some point did you receive a phone call

9   about a break-in at Car Tender?

10     A.   I did.

11     Q.   Okay.  And who called you and told you about

12  that?

13     A.   My business partner.

14     Q.   And is that Mr. Kimble?

15     A.   Yep.

16     Q.   Okay.  And did he tell you how he knew about the

17  break-in?

18     A.   Yes, he did.

19     Q.   Okay.  And what did he say?

20     A.   He said one of the neighbors called and said

21  somebody had hopped the fence, had a hammer in his hand,

22  and was moving about the cars in the parking lot.

23     Q.   And was this in the evening of June 14th?

24     A.   Yes.

25     Q.   Would you say was it dark at that point?

JOHN MCDERMOTT
1/19/2022

Page 227

1        A.    No.

2        Q.    No.   It was still light out when he called you?

3        A.    It was -- I don't know the exact time frame.   It

4    was probably in the 6:00 or 7:00 hour, so it was --

5        Q.    Got it, okay.   And then what did you do after

6    he -- right after he called you and told you about this?

7        A.    I'm sorry?

8        Q.    What did you do right after he called you and

9    told you about the incident?

10        A.    In the process of him telling me, I grabbed my

11    guns and put them in the car and my son drove me down

12    there.

13        Q.    Okay.   And so you were at home when he called

14    you?

15        A.    Yep.   I'd just literally walked in the door.

16        Q.    Oh, you walked in the door of your house?

17        A.    Yep.

18        Q.    Okay.   Had you been at Car Tender earlier that

19    day?

20        A.    No.

21        Q.    Okay.

22        A.    It was the day after my wedding anniversary, and

23    we'd just gotten home.   Great anniversary gift, huh?

24        Q.    So then -- so you'd just gotten home on Sunday

25    night and you got this call, and while you were on the

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 228

1   phone, is that when you decided to go down to Car Tender?
2       A.   Well, he told me somebody was breaking into my
3   business and that he was not in town and that we needed to
4   deal with it, so obviously who's going to go?  I've got the
5   key.
6       Q.   Okay.  Did you consider calling the police while
7   you were at home and asking if --
8       A.   I did call the police when I was at home and I
9   told them that I was on my way there and I told them that
10  there was a break-in in process and I told them that I was
11  armed.
12      Q.   Okay, so when you called the police -- and just
13  to clarify, you called 911; right?
14      A.   Yes.
15      Q.   Okay.  And you dialed 911 while you were still at
16  home?
17      A.   Yes.
18      Q.   Okay.  So did you -- so had you -- before you
19  called 911, had you already decided that you were going to
20  go down to Car Tender yourself?
21      A.   I think I stated that I grabbed my guns, yes.
22      Q.   Okay.  So did you consider calling 911 and asking
23  them to go check it out?
24          MR. WEAVER:  Objection.
25      A.   Okay, you're gonna have to work with me a little

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 229

1  bit here.  You already know I called 911 and asked them to

2  go and they did not respond.

3  BY MS. IVERSON:

4      Q.   Well, I knew you called 911, but what I'm asking

5  is whether --

6      A.   I called 91 and asked them to respond.  It was 16

7  miles away from my place of business.

8      Q.   Okay --

9      A.   So yes, I called 91 and asked them to respond.

10  And they asked me if I was going there, and they asked me

11  if I was armed and I said, yes, I'm armed, and they asked

12  me how tall I am and how much I weigh and what I was armed

13  with and they asked me if I had body armor, and I said yes.

14      Q.   Okay, and while they were asking you these

15  things, so, you know, were you --

16      A.   They alluded to the fact that they were going to

17  show up every time I called them until finally at the very

18  end after calling them probably the 35th time, I asked

19  them, "Are you guys even going to show up?"  And the 911

20  operator said, "No, we're not going to show up, you're on

21  your own."

22      Q.   Okay, so did you leave your house while you were

23  on the phone with them?

24      A.   I did.

25      Q.   And how many minutes into the conversation would

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 230

1    you say it took before you left your house?

2         A.   I have no idea.  From the time I got the call to

3    the time I got to Car Tender was roughly 16 minutes.

4         Q.   Okay.  So did you -- sorry, so by the time you

5    got the call from Russell --

6         A.   Yep.

7         Q.   -- to the time you got the call from Car

8    Tender -- or sorry, the time you arrived at Car Tender was

9    approximately 16 minutes?

10        A.   Yep.

11        Q.   Okay, and how long does it normally take you to

12   get from home to Car Tender?

13        A.   It depends on what the traffic's like.

14        Q.   Well, what was the traffic like that night?

15        A.   I don't recall exactly.  There was cars on the

16   road, but I don't know.  I know we passed a couple of state

17   patrols along the way and blah, blah, blah.

18        Q.   It was not a heavily trafficked night?

19        A.   No.

20        Q.   Okay.  So on a typical night when there's not a

21   lot of traffic, how long does it take you to get from your

22   home to Car Tender?

23        A.   I don't know exactly.  It might be 16, 17

24   minutes.

25        Q.   Okay.  So were you at -- was this sort of a you

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 231

1    dial up 911 as you're rushing out the door type of

2    situation?

3        A.    Yes.

4        Q.    Okay.  So I guess what I'm trying to understand

5    is did you ever consider calling 911 from home and waiting

6    to see what they said before you went down there.

7        A.    No.

8        Q.    Okay.  So you get the call from Russell, you grab

9    your guns, and how many guns did you bring?

10        A.    A few.

11        Q.    A few.  Two?  Three?

12        A.    I don't know what the exact number was.

13        Q.    Okay.  And why did you decide to bring your guns

14   with you?

15        A.    Protection.

16        Q.    Protection from what?

17        A.    I didn't know what I was going to find when I got

18   there.

19        Q.    Okay.  So did Russell -- so Russell just called

20   you and said they're breaking in?

21        A.    Yep.

22        Q.    And did he say it was one person?

23        A.    He didn't -- he did not tell me how many people

24   it was.

25        Q.    He didn't tell you how many people it was, so he

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 232

1    just said, "There's a break-in"?

2         A.    Yep.

3         Q.    Okay.  Did you ask him, "How many people is it?"

4         A.    Erica, I did not not.

5         Q.    Okay.  Did you ask him anything else about what

6    he saw going on there so you could be prepared?

7         A.    He could see and the other guy could not see

8    other than that there was somebody rumbling around in the

9    parking lot with a hammer.

10        Q.    Oh, got it, okay.  So there was somebody, one

11   person roaming around the parking lot with a hammer?

12        A.    I didn't know if it was one person or multiple

13   people.

14        Q.    Okay, so but he said there's somebody in the

15   parking lot with a hammer?

16        A.    Yep.

17        Q.    Okay.  And so you learned that there was someone

18   in the parking lot with a hammer, and you -- so you decided

19   to bring your three guns with you or however many guns?

20        A.    Yep.

21        Q.    Okay, got it.  And so were you just trying to

22   protect yourself against the person breaking in?

23        A.    That was the only thing that I knew was going on

24   at the moment.

25        Q.    Okay.  Were you aware of any employees at Car

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 233

1   Tender on that day?

2        A.   I know that there were none in there on that day,

3   yeah.

4        Q.   Okay.  And I -- so this is June 14th; it's about

5   halfway through the month of June; right?

6        A.   Well, it depends on how many days are in the

7   month if it's halfway or not.

8        Q.   About.

9        A.   Sure.

10        Q.   Okay.  And so I think you were talking earlier

11   about how you've lost a lot of customers in the month of

12   June; is that right?

13        A.   Yeah.

14        Q.   Okay.  So did you have a lot of customer cars on

15   the Car Tender lot that night in June?

16        A.   I don't know what the number is, but I'm sure

17   that there were many out there.

18        Q.   There were many out there, and were they out in

19   the parking lot?

20        A.   Yep.

21        Q.   Okay.  Any in the nine bays?

22        A.   Yes.

23        Q.   Were the bays full?

24        A.   They were probably double stacked.

25        Q.   Okay.  So there -- each of the nine bays -- oh, I

Electronically signed by Mindy Suurs (101-257-931-8021)                                              0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 234

1   think you said only eight of the nine bays can double

2   stack; is that right?

3        A.   Correct.

4        Q.   Okay.  Those were full, and then the ninth bay

5   also had a car?

6        A.   Yeah.

7        Q.   Okay, so about 17 cars parked in the bays?

8        A.   Probably.

9        Q.   Okay.  And then more customer cars in the parking

10  lot; right?

11       A.   Yep.

12       Q.   Okay.  So would you say it was -- there were --

13  was it a pretty full --

14       A.   The parking lot holds approximately 65 cars.

15       Q.   Okay.  And about how full was it?

16       A.   To be honest, I don't know how full it was on

17  that particular day --

18       Q.   Okay.

19       A.   -- because it was a weekend, they usually come in

20  on Monday and they usually try to -- you know, usually are

21  gone by Friday.  So it might be 20, might be 25 outside,

22  the rest inside.

23       Q.   Maybe less than half, but in that range of the --

24       A.   Give or take 20, 25.

25       Q.   Okay.  And so I think you said people normally

Electronically signed by Mindy Suurs (101-257-931-8021)                              0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 235

1   come by on Monday, so would these have been cars --

2       A.   Cars that were in process.

3       Q.   That were in process, okay.  All right.  Okay.

4   And then let's see, so -- okay, so -- and the person that

5   Russell told you about -- he said that person was roaming

6   around in the parking lot?

7       A.   Correct.

8       Q.   Okay.  Did he tell you that he'd seen the person

9   break through the fence?

10       A.   So Russell wasn't at the place of business;

11   Russell was listening to a tip that was called in by a

12   customer.  Customer called Russel and told him because he

13   had a relationship with Russell and said, "Hey, there's

14   somebody in the parking lot."  Russell called me.  After we

15   hung up, I called 911, didn't really discuss what was going

16   on.  The main -- most important thing was to try and get to

17   Car Tender, prevent any damage from happening to any

18   people's cars or the building, which is typically what the

19   police department's supposed to do --

20       Q.   Okay.

21       A.   -- but when you dial 911 and they don't show up,

22   I guess they're not going to offer you any protection.

23       Q.   Okay.  So were -- you got the call from Russell

24   and you decided to leave your home to protect the customer

25   cars and the building?

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 236

1        A.    Correct.

2        Q.    Okay.  So at that -- at the time -- so when

3   Russell told you this news, what -- withdrawn.

4             So when you called 911, did you have any

5   expectations about how they would respond?

6             MR. WEAVER:   Objection.

7        A.    I expected fully when I called 911 that they

8   would be there before I got there.

9   BY MS. IVERSON:

10       Q.    Okay.  And that was your expectation before you

11   called 911?

12       A.    Okay, my expectation is if you dial 911 and you

13   tell them that your house is on fire or your buildings's on

14   fire, that they're going to show up and put the fire out.

15   My expectation is if I dial 911 and I've got an emergency,

16   my expectation is that they're going to show up because

17   traditionally that is how police departments and that's how

18   fire departments acted.  And if you are a citizen of a city

19   that you pay taxes, tens of thousands of dollars of taxes

20   to, I would fully expect them to honor what they're

21   supposed to do.  And they didn't.

22       Q.    Okay, so before you left your house, you expected

23   911 to show up at Car Tender?

24       A.    When I call 911, I expect them to show up.

25       Q.    Right, but so when you called 911 that night, you

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 237

1  expected them to show up at Car Tender that night.

2        A.   Once they got the call that I had a problem at my

3  place of business, yes, I would expect the police

4  department to show up.

5        Q.   And -- but did you expect them to show up that

6  night?  That's all I'm asking.

7        A.   What?  Did you not hear the answer to my

8  question?  If you dial 911, you expect the person on the

9  other end of the phone to get the police and get them to

10  whereever the emergency is.

11        Q.   Yep, so that's --

12        A.   That is what any person in the United States of

13  America would expect to have happen.

14        Q.   Okay.  So is it what you expected to happen that

15  night when you called.

16        A.   Yes.

17        Q.   Yes, okay.  So then you expected them to show up

18  at Car Tender, but you went and -- went --

19        A.   I expected them to beat me there.  That is why I

20  called them and told them and answered all the questions

21  that they had asked of me -- because if I was a police

22  officer and I was responding to a call and I knew that

23  somebody was coming and that they were armed and had body

24  armor, I'd want to know what they looked like, I would want

25  to know how big they are and I would want to know what kind

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 238

1   of guns they had and I would want to know when they

2   expected to be there; and I gave them all that information

3   on the 911 call.  And you probably have it in some sort of

4   a document.

5       Q.   Okay, so right, so you were giving them the

6   information that they were asking you on the 911 call about

7   you and your appearance, et cetera  --

8       A.   Yep, what I was driving, et cetera.

9       Q.   Yes, okay.  So then -- but you expected them to

10  beat you there; right?  That was --

11      A.   My expectation was that if they didn't beat me

12  there or meet me there, that they would show up.

13      Q.   Okay, that they would show up.  Okay.  And then

14  so it took you about 16 -- or and sorry, let me just

15  withdraw.

16          I just want to make sure, you never had a

17  break-in at Car Tender before that night; right?

18      A.   Prior to that, the building had not been broken

19  into while I had owned it.

20      Q.   While you had owned it, okay.  Were you aware of

21  break-ins prior to your --

22      A.   On the night of the Rodney King riots, there was

23  a break-in into Car Tender, but that was before it was

24  under my possession.

25      Q.   Okay, got it.  So --

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 239

1      A.    Imagine that, the protesters broke into the
2   building.
3      Q.    Okay.   So then do you remember on that first 911
4   call if they said they were going to beat you there?
5      A.    That was what was implied.
6      Q.    It was implied, okay, but they didn't say we'll
7   be right there or --
8      A.    She implied that they would meet us there.
9      Q.    Okay, so -- okay, so you thought they were going
10  to meet you there.
11     A.    I fully expected that they were going to beat me
12  there.
13     Q.    Got it, yeah, okay.   And then so you arrived, and
14  what happened when you arrived?
15     A.    Unlocked the gate, drove the car in the gate,
16  closed the gate, opened the front door, and realized that
17  they had broken into the -- unlocked the front door,
18  realized they had broken into the windows through the other
19  door, went in through that door, and started clearing the
20  building and went back into the front door and found that
21  the service writeup counter was on fire; so I ended up
22  putting the fire out and threw the things that they'd put
23  on there that were on fire out into the parking lot and
24  made sure the fire was out and then went and found my son,
25  who was being assaulted by the guy that broke in.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 240

1      Q.   Okay.  So I just want to break that down a little
2    bit.  So you -- after you unlocked the parking gate, you
3    saw -- or you went to the front door?
4      A.   Yep, unlocked it.
5      Q.   And unlocked it, and did you go in?
6      A.   I did not go in through the front door.  At that
7    point we saw that the other door was open, so we went in
8    that door.
9      Q.   Okay.  But could you see the service counter from
10   the front door when --
11     A.   I didn't open it.  All I did was unlock it.
12     Q.   Okay, so you -- I see, you unlocked it only,
13   didn't open it.  Got it.  Did you smell smoke?
14     A.   I didn't.
15     Q.   Okay.  And then you said you went to the other
16   door.  Where on the property is the other door?
17     A.   It's on the south of the L.
18     Q.   The south of the L, okay.  And so then once you
19   did that, you went from the other door, the south of the L
20   door back to the service counter?
21     A.   Once -- once we got the guy detained -- I don't
22   remember exactly how it all went down -- whether I put the
23   fire out before we detained the guy or what.
24     Q.   Okay.  Did you see him light the fire?
25     A.   No.

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427  3515 SW Alaska St Seattle WA 98126

JOHN MCDERMOTT
1/19/2022

Page 241

1      Q.   Okay.  And about -- I mean how big was the fire?

2      A.   He spread alcohol-based hand sanitizer on the

3  counter and lit it on fire, so the flames hadn't quite

4  reached the top of the window, so he had to have just --

5  literally just lit the fire.  So, you know, it was -- call

6  it a minute or two away from, you know, being beyond, you

7  know, control.

8      Q.   Okay, it was on the service desk?

9      A.   Yep.

10     Q.   Okay, and had it spread anywhere beyond the

11  service desk?

12     A.   Hadn't.

13     Q.   Okay.  And so -- okay, so you put the fire out --

14     A.   Right.

15     Q.   -- and then how did -- then did you hear the

16  suspect?

17     A.   I heard the commotion between my son and the

18  suspect, yeah.

19     Q.   Okay.  And so what happened when you got to the

20  area where your son and the suspect were?

21     A.   He was trying to stab and cut my son, and he

22  wrestled him to the ground, I drug him out of the building

23  in front of a Jeep so they were still covered -- because

24  they were -- a group of people had appeared at the fence,

25  and I don't know if they were part of the break-in or not,

Electronically signed by Mindy Suurs (101-257-931-8021)    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 242

1   and -- yeah.

2        Q.   Okay.  So you and your son had to wrestle the

3   suspect to the ground?

4        A.   My son wrestled him to the ground; I drug the

5   both of them out through the door.

6        Q.   Oh, you dragged them from the --

7        A.   Inside the building out.

8        Q.   Oh, okay, into the parking lot, got it.  And --

9        A.   -- in the parking lot, but right at the front by

10  the door.  There's kind of a little cubby hole.

11       Q.   Got it.  And I mean I know it's -- these things

12  are -- you know, happen really fast, but do you have any

13  sense of just how long the interaction was?

14       A.   No.  It was long enough that he cut him from his

15  groin down to his knee.

16       Q.   Oh, did he make skin contact?

17       A.   He did, but fortunately he was wearing multilayer

18  cards and then he was trying to stab him with a spike.

19       Q.   Oh, a spike -- was that something he picked up in

20  the garage?

21       A.   In the building, yep.

22       Q.   Okay --

23       A.   It was the our -- the stack -- the spike that we

24  put receipts on.

25       Q.   Yeah.  The -- oh, okay.  So -- and that would

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

1    have been -- so that was on the service desk normally?

2         A.   Yep.

3         Q.   Got it, okay.   And so -- so the knife that the

4    guy -- the suspect used -- what kind of knife was it?

5         A.   It's a box knife.

6         Q.   Box knife, okay.   And he tore your son's clothes?

7         A.   Cut him.

8         Q.   Cut him, okay.   Did your son have any like

9    physical cuts from that?

10        A.   He had a surface cut in his leg from his groin to

11   his knee.

12        Q.   Okay, and the surface cut was all the way from

13   the groin to the knee?

14        A.   Yep.

15        Q.   Was it bleeding?

16        A.   Oh, it bled a little bit, but it wasn't like --

17   the guy's goal was to try and get his femoral artery.

18        Q.   Okay.   So the cut was not bleeding?

19        A.   It was like -- imagine if you scraped yourself

20   with the tip of a razor blade on the surface of your skin.

21        Q.   Okay.   And then so you're -- you're able to

22   wrestle the guy to the ground, and then you said you

23   dragged them out.   How did you do that?   You grabbed the

24   suspect?

25        A.   I grabbed his feet, yeah.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 244

1        Q.   Okay, and was he hanging onto your son?

2        A.   Yes.

3        Q.   So you were able --

4        A.   Dragged them both out the door.

5        Q.   Got it.  And then were you able to -- were you

6   able to apprehend the suspect?

7        A.   We detained them while we were waiting for the

8   police to show up.

9        Q.   Okay.  So you were able to -- you were able to

10  detain him in the parking lot?

11       A.   Yep.

12       Q.   Okay.  Did you ever bring him back into the

13  building, or did you stay in the parking lot?

14       A.   No.

15       Q.   And all of this lasted five, six, ten minutes?

16       A.   Don't know the time frame.

17       Q.   Okay.  And you -- so were you on the phone with

18  911 the whole time?

19       A.   Once we detained him, I went inside and called

20  multiple different times.

21       Q.   Okay.  So did you hang up with 911 before you

22  arrived at Car Tender?

23       A.   Yeah.

24       Q.   Okay.  And then did you call 911 again before

25  detaining the suspect?

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 245

1      A.    I called 911 when the building was on fire.

2      Q.    Okay.  So when you saw the -- that was the fire

3  on the service counter, you called 911 again?

4      A.    Yep.

5      Q.    Okay.  And then you apprehend the suspect and

6  then you called 911 again?

7      A.    Yep, told them I got the fire out and the police

8  still hadn't showed up and why the fuck they hadn't showed

9  up.

10     Q.    Okay.  So you asked them why the police didn't

11  show up.  Did they give you an answer?

12     A.    No, they just kept alluding that they were going

13  to show up.  And I told them that I had the suspect

14  detained.

15     Q.    Okay.  Do you --

16     A.    Would have been nice if they would have just

17  said, well, you know, we're not coming, so you might as

18  well let the guy go because protesters are going to show up

19  and break your fence down and, you know, point guns at you

20  and all kinds of fun stuff like that.

21     Q.    Did you ask them what they wanted you to do with

22  the guy?

23     A.    I told them I had him detained.  I didn't ask

24  them what they wanted me to do with him.  I told them I was

25  waiting for them to arrive.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 246

1      Q.   Okay.  And then how -- I think, you know, you

2   mentioned it took 16 minutes to drive there, unknown number

3   of minutes for this interaction.  Do you have a sense of

4   timing from the point when you first called 911 to the

5   point when you had apprehended the suspect and

6   called again?

7      A.   I don't.

8      Q.   Would it have been like an hour?

9      A.   It was too long.

10      Q.   Okay.  Over an hour?

11      A.   Well, if I called 911 and I drove for 16 minutes

12   and I got to Car Tender, get in a scuffle with the guy,

13   apprehend him, pin him to the ground, I go in and call 911

14   again, you know, what are we talking here?  Half an hour's

15   period of time?  I don't know.  I didn't record the amount

16   of time -- the amount of times that I called 911; all I

17   know is it took way too long and that they didn't show up

18   and that they didn't provide me with the services that they

19   were contracted to provide to me as a citizen of the United

20   States, the City of Seattle, the State of Washington.

21      Q.   Okay.  So did they -- they did not show up at all

22   that night?

23      A.   Still they did not show up at all that night.

24      Q.   Okay.  And then so I'm -- so I know you were

25   there all night and you didn't leave until late the next

Electronically signed by Mindy Suurs (101-257-931-8021)                                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 247

1    day; right?

2         A.   The next night, yes.

3         Q.   The next night, okay.   So what happened with the

4    suspect after you were able to detain him?

5         A.   The protesters said that if they -- if I didn't

6    let him go, they were going to kill me.   And I told them

7    okay, we're going to let him go.   So as soon as I turned

8    the dude loose, then they blew the fence down and I had

9    whole number of jackasses pointing guns at me, et cetera.

10        Q.   Okay.   And I know you had your guns with you.

11   Did you -- did you point any of your guns at the suspect at

12   any point?

13        A.   No.

14        Q.   Okay, any --

15        A.   Well, at any of the suspects that broke down the

16   fence, et cetera?   No.

17        Q.   No.   What about the guy that you detained --

18        A.   I did have my gun pointed at him, yeah.

19        Q.   Okay.   And that was while you were detaining him?

20        A.   Only at the very beginning part of it.

21        Q.   Okay.

22        A.   Not while he was, you know, on the ground

23   subdued.

24        Q.   I think you said other protesters came in.   Was

25   it a pretty large group?

Electronically signed by Mindy Suurs (101-257-931-8021)                              0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 248

1      A.   Depending on who you talk to, you hear all kinds

2  of crazy different numbers.  My estimate was probably 500

3  to a thousand, but you listen to the City of Seattle's

4  numbers, they'll probably tell you it was three or four.

5  If you look at any of the videos, you can see clearly there

6  was a ton of people there.

7      Q.   Okay.  And while that group of protesters was

8  around you, were you still on the phone with 911?

9      A.   No, I was trying to protect myself.

10      Q.   Okay.  All right.  So -- yeah, I mean obviously

11  it sounds like a extremely harrowing experience for you,

12  and, you know, I'm just wondering in the aftermath of

13  that -- so, you know, the next day -- did you talk to the

14  other business owners in the area about what had happened?

15      A.   Many of them came to talk to me, yeah.

16      Q.   Okay.  Oh, so they approached you?

17      A.   Yeah.

18      Q.   Okay.  And did they --

19      A.   Everybody in the city saw all the bullshit that

20  went down on the videos.

21      Q.   Okay.  So the people who approached you saw

22  videos of what had happened?

23      A.   Yeah.

24      Q.   Okay.  And did -- and they told you that?

25      A.   Yeah.

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8

JOHN MCDERMOTT
1/19/2022

Page 269

1                    REPORTER'S CERTIFICATE

2

3        I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
    administer oaths and affirmations in and for the State of
4   Washington, do hereby certify:

5

6        That the foregoing testimony of JOHN McDERMOTT
    was given before me at the time and place stated therein
    and thereafter was transcribed under my direction;

7

8        That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
    supervision, to the best of my ability;

9

10       That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
    proceedings given and occurring at the time and place
11   stated in the transcript;

12       That the witness, before examination, was by me duly
    sworn to testify the truth, the whole truth, and nothing
13   but the truth;

14       That I am not a relative, employee, attorney, or
    counsel of any party to this action or relative or employee
15   of any such attorney or counsel and that I am not
    financially interested in the said action or the outcome
16   thereof;

17

    DATE:   January 25, 2022
18

19

20

21

22   _____
    Mindy L. Suurs
23   Certified Court Reporter #2195

24

25

ROUGH & ASSOCIATES INC
office@roughandassociates.com       206.682.1427   3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                    0d2c8c2d-1a4c-47a8-bb60-54cc0e30f4a8