# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

HUNTERS CAPITAL, LLC, et al.,  )
                               )
       Plaintiffs,          )
                               )
  v.                           ) Case No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
       Defendant.           )

---

VIDEOCONFERENCE VIDEOTAPED DEPOSITION UPON ORAL
EXAMINATION

OF

JOEY FURUTO

---

(All participants appearing via Zoom videoconference.)


Taken at

Seattle, Washington




DATE TAKEN:  March 18, 2022

REPORTED BY: KATHLEEN HAMILTON, RPR, CRR, CCR 1917

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

1  Did you -- did you speak with Mr. Henderson
2  about the gardens and what he was doing when you first
3  learned about them?
4     A.  Yes.
5     Q.  What was your discussion with Mr. Henderson?
6     A.  To please stop.
7     Q.  Why did you ask him to stop?
8     A.  Because I considered it vandalism in the park,
9  and that that was a dedicated event space.
10    Q.  And what did Mr. Henderson tell you?
11    A.  He said that they wouldn't stop, and that they
12 were planting food to feed the community with.
13    Q.  And did you attempt to enforce your directive to
14 stop the gardens growing?
15    A.  No, at that --
16         MR. CRAMER:  Go ahead.
17         THE WITNESS:  No, at that point I did not.
18 BY MR. WEAVER:
19    Q.  Why not?
20    A.  Because of the circumstances surrounding the
21 garden and the purpose of the garden.
22    Q.  So what were the -- I'm sorry, go ahead.
23    A.  The garden was a -- you know, being built to
24 honor Black lives, and at that time for me to want to
25 come in and enforce the removal of that when we were in

Page 51

1   the middle of a racial reckoning wouldn't have been, I
2   think, fit the values of the -- of the protest that was
3   happening all around the park at that time.
4       Q.   So your decision not to enforce the rules
5   against gardening in a public park was because you did
6   not want to interfere with the purpose of the garden?
7               MR. CRAMER:  Objection.  Form.
8               THE WITNESS:  Yes.  I did negotiate with
9   Marcus to stop the -- that location, and that if he was
10  going to continue, to put it in raised built beds around
11  the area on the exterior, and that part we negotiated on
12  and he started that process.
13  BY MR. WEAVER:
14      Q.   Was the creation of planter boxes, would that
15  have also been a violation of park rules and
16  regulations?
17              MR. CRAMER:  Objection.  Form.  Calls for
18  legal conclusions.
19              THE WITNESS:  Yes.
20  BY MR. WEAVER:
21      Q.   But you allowed it because you agreed with the
22  purpose of the protest; is that right?
23              MR. CRAMER:  Objection.  Form.  Misstates
24  testimony.
25              THE WITNESS:  Yes.  My team that does park

1  maintenance is made up of 70 percent BIPOC, and so I am
2  trying to represent my team as well at the same time,
3  and using them as my inspirations to continue to do work
4  in this area.
5           I'd also felt that at that time, at that
6  moment, which was chaotic and no -- no -- no playbook
7  for, I was making the best decisions for the park at
8  that time.
9  BY MR. WEAVER:
10     Q.   Were you concerned that if you tried to enforce
11 the regulation against gardening in a public park that
12 there would be a reaction from the people in the park?
13     A.   Yes, absolutely.
14     Q.   What were you concerned that reaction might be?
15     A.   That my team who would come to do that
16 enforcement would be, not heckled, but might not be in
17 the safest place.
18     Q.   And why did you feel that the -- it might
19 compromise their safety?
20     A.   Because my team is small.  My team is not large.
21 And at that point there was consistently upwards of 50
22 people on site, you know, milling about that I didn't --
23 wasn't gonna send my team of five people in to do.
24          Again, my team is primarily made up of people of
25 color, and so I'm not gonna send in my team of color to

Hunters Capital, LLC v. City of Seattle                    Joey Furuto

Page 65

1   A.   No.  I -- because of my frequency on site, I
2   knew people who were working there and I worked without
3   anyone causing me any -- no verbal conversations with
4   very, very few people at that -- at that time.  I
5   also --
6   Q.   Okay.
7   A.   -- walked into the park.  I did not attempt to
8   drive into the park as my staff were attempting to do.
9   Q.   Okay.
10      Did you or Mr. Aguirre agree that you needed to
11  keep staff out of the area, out of Cal Anderson on June
12  11th?
13            MR. CRAMER:  Objection.  Foundation.
14            THE WITNESS:  Yes.
15  BY MR. WEAVER:
16  Q.   And why was -- why did you make that decision?
17  A.   Because they brought up safety concerns.
18  Q.   And were you concerned that if your -- if your
19  staff went into Cal Anderson Park, that their --
20  their -- their safety would be in jeopardy?
21  A.   That was hard to determine, because of my
22  experiences, I was not feeling in that sense, but,
23  again, I was not stopped and asked who I was and what am
24  I doing here.
25  Q.   Okay.  So why did you make the decision to not

1  have your staff go in to the park on June 11th?
2      A.    Because they had expressed safety concerns.
3      Q.    And you felt those concerns were valid?
4      A.    Yes.
5      Q.    Based on what you had seen in the area; is that
6  correct?
7             MR. CRAMER:  Objection.  Form.
8             THE WITNESS:  Yes.
9  BY MR. WEAVER:
10     Q.    Did your concerns about the safety of your staff
11 at Cal Anderson Park continue for the duration of June
12 2020?
13     A.    Yes.
14     Q.    And why was that?
15     A.    Just the level of uncertainty in the park.
16     Q.    What do you mean by "uncertainty"?
17     A.    Of not knowing what was -- what could happen.
18     Q.    What were you concerned could happen to your
19 staff?
20     A.    My biggest fear was that my team working there
21 would somehow injure someone in the park.  We do our
22 best to not drive through a park, but on some level, in
23 order for us to be efficient, driving through the park
24 is a necessity.  And driving through the park at -- with
25 our big pieces of equipment and trying to navigate that

1  through people and through tents is dangerous.  And I
2  had wanted our team to actively not do that.  And so
3  that was my hesitation.
4       Q.   Were you concerned about any sort of retaliation
5  against your workers by the people in the park?
6            MR. CRAMER:  Objection.  Form.
7            THE WITNESS:  Yes.
8  BY MR. WEAVER:
9       Q.   What sort of retaliation were you concerned your
10 workers might be subjected to?
11           MR. CRAMER:  Same objection.
12           THE WITNESS:  Probably the same treatment
13 that SPD was getting.
14 BY MR. WEAVER:
15      Q.   So this is what we talked about before, you were
16 concerned there might be a violent reaction to what your
17 workers were doing?
18      A.   Yes.
19      Q.   At some point did -- was there a decision made
20 to not have Parks and Rec people in the park at all for
21 an extended period of time?
22           MR. CRAMER:  Objection.  Vague as to
23 "extended period of time."
24           THE WITNESS:  Yes.
25 BY MR. WEAVER:

Hunters Capital, LLC v. City of Seattle                                Joey Furuto

Page 68

1    Q.   Okay.  How -- how long did you keep all of your
2    employees out of Cal Anderson Park in June of 2020?
3    A.   There was a time, I would say maybe up to a
4    week, that we did not send our staff into the park.
5    However, we did always service the exterior of the park
6    for litter pickup and for trash.  I never stopped going
7    to the park.
8         So in essence, we never stopped service to the
9    park.  There were some days that I actively emptied
10   trash cans and dragged the bags from the interior of the
11   park to the exterior where my team now came to pick up
12   the bags.
13        So on some level we're not servicing inside the
14   park, but we never stopped servicing the exterior of the
15   area.  Or at least we did our best to not be inside of
16   the park, or my team did.
17   Q.   And why -- why was that?  Why did you do your
18   best to keep people from Parks and Rec out of the park
19   for that week or so?
20             MR. CRAMER:  Objection.  Misstates
21   testimony.
22             THE WITNESS:  Just because of the potential
23   of violence.
24   BY MR. WEAVER:
25   Q.   In fact, one of your employees was assaulted

Hunters Capital, LLC v. City of Seattle						Joey Furuto

Page 78

1    Q.   Okay.  Did you ever notice barriers or
2  barricades across the streets in that area?
3              MR. CRAMER:  Objection.  Vague.
4              THE WITNESS:  Yes.
5  BY MR. WEAVER:
6    Q.   Okay.  What did you notice -- I don't want to
7  limit it to your visits in the evening with your
8  partner, but what did you notice generally about
9  barricades and barriers that were in the streets in June
10 of 2020 near -- near Cal Anderson Park or the East
11 Precinct?
12             MR. CRAMER:  Form.
13             Go ahead.
14             THE WITNESS:  That they were moved on a
15 frequent basis.
16 BY MR. WEAVER:
17   Q.   What do you mean by "moved"?
18   A.   Sometimes they would be blocking entrances to
19 the park.  Sometimes blocking entrances to Pine.
20 Sometimes blocking 11th.  They just kind of moved around
21 at night.
22   Q.   Okay.  And it was particularly at night that
23 they'd be moved?
24             MR. CRAMER:  Objection.  Foundation.
25 BY MR. WEAVER:

6f0c9f73-19fb-4c69-8c23-d4e9edcee3af

Hunters Capital, LLC v. City of Seattle                          Joey Furuto

Page 86

1  some operational changes, not just for Cal Anderson, but
2  throughout the city to focus on, you know, making sure
3  that parks were, you know, litter -- litter-free is what
4  we were going for, as well as cleaning restrooms where
5  they were open.
6      Q.   Okay.  Well, you told 'em in here to not worry
7  about litter that was in the park, and not to pick up
8  litter in the park; is that correct?
9      A.   Correct.  Because at that point, I think at this
10 point we were having people drag the bags out to the
11 Dumpsters.
12     Q.   And that was due to safety concerns inside the
13 park?
14     A.   It was just something that I was trying to --
15 because my team could no longer drive -- I didn't want
16 them driving through the park.  I was negotiating with
17 people to bring their trash out.
18          So the -- the work was still being done, but I
19 didn't want my team to have to focus on grabbing a
20 litter stick and going to pick up cigarette butts inside
21 of the park.  We weren't at that level of -- of fine
22 litter pickup.  We were just getting big stuff
23 throughout the entire city.
24     Q.   Okay.  So there was so much trash that it didn't
25 make sense -- is it fair to say that there was so much

1    A.    I do not.
2    Q.    All right.  Exhibit 13 should be there.
3          (Exhibit No. 13 marked.)
4  BY MR. WEAVER:
5    Q.    And these are emails between you and Rachel
6  Schulkin -- I think I have it pronounced right, but let
7  me know if I don't -- on June 19th at about noon.  Do
8  you see those?
9    A.    Yes.
10   Q.    Who is Rachel Schulkin?
11   A.    She is our director of communications.
12   Q.    Okay.
13         So in the middle of this email you indicate on
14  the 19th, "Jesus made the call that our staff should NOT
15  be onsite until we can determine the location is safe
16  for our staff to enter.  This goes for all SPR staff."
17         Do you recall Mr. Aguirre making the decision on
18  either the 18th or 19th of June that it was -- that no
19  staff should go in there until -- until you determined
20  it was safe to do so?
21   A.    I don't remember the specific date, but it was
22  right in that time where he did make that decision.
23   Q.    And how long did that decision remain in effect?
24  Was it for a week or was it until the park was cleared
25  on June -- July 1st?

1          MR. CRAMER:  Objection.  Form.
2          THE WITNESS:  I don't remember.  But I know
3  that we did go into the park at some point in between to
4  re -- not reestablish, but to redo trash.
5  BY MR. WEAVER:
6     Q.   Okay.  Did you go in there or did people join
7  with you to go get the trash?
8     A.   I went in by myself.
9     Q.   And was that the sort of situation where you
10 were dragging bags out to the corner?
11    A.   That's one of, yes.
12    Q.   How many times did you personally go to the park
13 after the -- all the other staff had been told not to go
14 in?
15    A.   I don't recall.  I don't remember going every
16 day though.  That's what I do.  I do remember not going
17 every day.
18    Q.   Okay.  And why was that?
19    A.   I'm not sure.
20    Q.   Were you -- were you affected by the fact there
21 was a shooting and a homicide the next day on June 20th?
22           MR. CRAMER:  Objection.  Form.
23           THE WITNESS:  No.  Most likely not.
24 BY MR. WEAVER:
25    Q.   Okay.  Were you aware -- were you aware of that

1        C E R T I F I C A T E
2
3   STATE OF WASHINGTON
4   COUNTY OF KING
5
6        I, Kathleen Hamilton, a Certified Shorthand
7   Reporter and Notary Public in and for the State of
8   Washington, do hereby certify that the foregoing
9   transcript of the deposition of JOEY FURUTO, having been
10  duly sworn, on MARCH 18, 2022, is true and accurate to
11  the best of my knowledge, skill and ability.
12       IN WITNESS WHEREOF, I have hereunto set my hand
13  and seal this 29TH day of MARCH, 2022.
14
15
16  _____
17       KATHLEEN HAMILTON, RPR, CRR, CCR #1917
18
19
20
21
22
23
24
25