# EXHIBIT 34

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
            Plaintiffs,        )
                               )
     v.                        ) Case No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
            Defendant.         )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
EXAMINATION

OF

IDRIS BEAUREGARD
_____

(All participants appearing via Zoom videoconference.)


Taken at

Seattle, Washington




DATE TAKEN:   July 14, 2022

REPORTED BY: KATHLEEN HAMILTON, RPR, CRR, CCR 1917

1  A. Typically in the morning, and probably later on
2  in the afternoon.
3  Q. Was there any particular reason you chose those
4  times of day to be up there?
5  A. The morning is when we've had services that were
6  coming in to -- our contractor services, that we were
7  coming in to provide trash collection.
8       And then in the afternoon hours -- it depends
9  and varies, you know. But in the afternoon hours,
10 that's typically when more trash, actual physical trash
11 on the ground and, you know, them type of issues were
12 accumulating. So I also met the contractors, different
13 set of contractors, there in the afternoon hours.
14 Q. Okay.
15    Was it generally the case that you tried to have
16 contractors -- SPU tried to have contractors come in the
17 morning rather than the afternoon or the evening hours?
18 A. Yes. In the morning, yes.
19 Q. Okay. Why -- why was the morning the preferred
20 time for contractor work?
21 A. It was just less people. Less people in the
22 area, so they had better access to the roads and the
23 streets where they didn't have to drive through crowds.
24 Q. Okay. So, I mean, it was often the case that
25 there were crowds in the streets when you were up there?

1   A.   Yes.
2   Q.   Were you ever there in that area, in June of
3   2020, during the nighttime?
4   A.   Probably on a few occasions, yes.
5   Q.   What do you recall the times you were up there
6   in the nighttime?
7   A.   What -- could you -- what -- what do I recall?
8   Q.   Do you recall any specific times that you were
9   up there in the nighttime?
10           MR. CRAMER:  Are you -- are you asking about
11   specific dates or something else?
12           MR. WEAVER:  Well, if -- if Mr. Beauregard
13   has dates, that's fine.  But I'm asking about any
14   incidents he recalls when he was there in person,
15   whether we have a date or not.
16           MR. CRAMER:  Objection.  Form.
17           Go ahead.
18           THE WITNESS:  There's one thing I -- I
19   recall when there was an incident with SPU's pump house.
20   You know, there was a break-in or something.  And I live
21   a couple minutes away from the area.  So I went ahead
22   and went up there to check on the pump house, along with
23   some others that were called in to look at the pump
24   house.
25   BY MR. WEAVER:

1   A.   I -- had we -- I heard -- there was discussions,
2   yes, about the need to clean them out because of the
3   amount of waste that was in them.
4       Q.   Okay.  So was it your understanding that these
5   were generally cleaned out daily during the time of June
6   2020?
7       A.   That was my understanding, yes.
8       Q.   And also, the garbage was collected daily, was
9   that correct?
10      A.   From the best to my knowledge, yes.
11      Q.   Okay.  Were there certain days where SPU
12  employees and contractors were instructed not to enter
13  the area to perform regular services?
14      A.   I wouldn't -- it's hard for me to say.  I know
15  that if there was some -- like some certain issues that
16  we weren't -- if there was concerns about safety, I'm
17  sure that we were -- we were instructed.  It's just
18  blurry to me, so honestly I wouldn't be able to say.
19      Q.   Were you involved in giving daily assessments to
20  SPU with regard to whether it was safe to enter the area
21  on a particular day?
22      A.   Yeah, we were -- I communicated frequently about
23  if they had needs to come in and do things of that sort.
24  It generally was safe to come in.  It wasn't, like, an
25  everyday thing that I had to give the green light to

1  come in.
2      Q.   Do you recall whether there were daily updates
3  on whether it was okay to come into the area or not sent
4  out to the SPU employees?
5      A.   Again, I can't recall if it was daily updates,
6  it's safe to come, everyone come in.
7      Q.   Okay.
8           Do you know who Chad Buechler is?
9      A.   Yes.
10     Q.   Who is Chad Buechler?
11     A.   Chad is an SPU employee.
12     Q.   Okay.  Do you recall any conversations with him
13 around this time about conditions in the area and
14 whether it was safe for SPU employees or contractors to
15 enter the area?
16     A.   Yeah, there were times that he was working on
17 the emergency operation center.  So he works with other
18 City departments and assesses risk and emergencies.  So
19 I'm sure that we had -- were in conversation.
20     Q.   Do you recall any specific conversations with
21 him?
22     A.   Not specific conversations, but I -- like I do
23 mention -- I do remember there were times where, for
24 whatever reason, the City deemed it not to probably be
25 safe to go in the area.

Hunters Capital, LLC v. City of Seattle         Idris Beauregard

Page 55

1    Q.   Okay.  What do you recall about those decisions?
2    A.   I don't know the details, but they -- if we were
3 told it's not safe to go into the area, then we would
4 just not go in the area.
5    Q.   Okay.  Do you recall how many times that
6 happened?
7    A.   No, not off the top of -- I wouldn't have an
8 accurate number for you.
9    Q.   Okay.
10        I mean, do you know whether it was more than
11 five times?
12            MR. CRAMER:  Objection.  Asked and answered.
13            Go ahead.
14            THE WITNESS:  I wouldn't know.  Like, again,
15 we just were taking directives.
16 BY MR. WEAVER:
17    Q.   Do you recall any discussions about whether...
18 it was a good idea or not to provide Porta Potties and
19 garbage services to the people who were occupying the
20 area in Cal Anderson and around the East Precinct?
21            MR. CRAMER:  Objection.  Form.  Assumes
22 facts.
23            THE WITNESS:  Amongst who?
24 BY MR. WEAVER:
25    Q.   Amongst the City of Seattle employees that you

Hunters Capital, LLC v. City of Seattle                                    Idris Beauregard

Page 77

```
 1  city, it comes back.
 2  BY MR. WEAVER:
 3       Q.   Was it -- do you remember whether it was
 4  particularly the case in the area around Cal Anderson
 5  and the East Precinct in June of 2020 that graffiti was
 6  coming back very quickly?
 7       A.   I wouldn't... there was a lot of graffiti there
 8  during it, so I wasn't monitoring the how fast it came
 9  back.
10       Q.   I'm dropping another exhibit, Exhibit 4, into
11  the chat.
12                (Exhibit No. 4 marked.)
13  BY MR. WEAVER:
14       Q.   Let me know when you've had a chance to look at
15  it.
16       A.   (Reviews exhibit.)
17            Okay.
18                (Inaudible due to crosstalk.)
19  BY MR. WEAVER:
20       Q.   There's a -- there's an indication here that
21  this was -- you know, the portion of this starting "Good
22  Morning" was -- was something written by you.  Do you
23  recall that email?
24       A.   I would assume -- reading it now, yeah, I would
25  assume I wrote that.
```

Page 78

1    Q.   Okay.  So you indicate that when conditions are
2    safe -- determined to be safe, we will prioritize hate,
3    race, and vulgar graffiti directly in the CHOP zone.  Do
4    you see that?
5    A.   Yeah.
6    Q.   How did you determine that conditions are safe
7    for teams to do that?
8    A.   Just based on the same assessments that I was
9    taking in the morning for -- to access.  That's what I
10   mentioned daily.
11   Q.   Yeah.  And I guess were there times you
12   determined it to be unsafe for people to go in and abate
13   graffiti?
14   A.   With the -- again, I mentioned there was a few
15   times where things got contentious.  And I'm sure that
16   during them times -- I don't have the dates and times,
17   but I'm sure there was a few times I was, like, Yeah,
18   you might not want to go in today.
19   Q.   Okay.  And then you indicate: Unfortunately,
20   graffiti reappears within -- I think you meant "within"
21   instead of "withing" -- hours after abatement making it
22   difficult to contain the issue.
23        Does that reflect -- does that refresh you at
24   all as to whether you thought it was appearing hours
25   after abatement?

```
 1                  C E R T I F I C A T E
 2
 3   STATE OF WASHINGTON
 4   COUNTY OF KING
 5
 6        I, Kathleen Hamilton, a Certified Shorthand
 7   Reporter and Notary Public in and for the State of
 8   Washington, do hereby certify that the foregoing
 9   transcript of the deposition of IDRIS BEAUREGARD, having
10   been duly sworn, on JULY 14, 2022, is true and accurate
11   to the best of my knowledge, skill and ability.
12        IN WITNESS WHEREOF, I have hereunto set my hand
13   and seal this 22ND day of JULY, 2022.
14
15
16
17
18                                                  R #1917
19
20
21
22
23
24
25
```