# EXHIBIT 37

MATTHEW PLOSZAJ
6/10/2021

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,      )
        Plaintiffs,                )
  vs.                                ) No. 20-cv-00983-TSZ
CITY OF SEATTLE,                   )
        Defendant.                 )
_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

MATTHEW PLOSZAJ
_____

10:30 a.m.

June 10, 2021

*** This transcript is marked confidential. ***

REPORTED BY:  Pat Lessard, CCR #2104

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427  3515 SW Alaska St Seattle WA 98126

1  previously emailed counsel about videos that
2  Mr. Ploszaj has testified about that we have not
3  received.
4          We also haven't received pay stubs or W-2s
5  and we will have to keep the deposition open for that
6  reason.
7          MR. REILLY-BATES: Okay. Are you done with
8  your questioning?
9          MS. PRATT: No.
10     Q.  (By Ms. Pratt) Other than providing pay
11 stubs -- actually, what were the pay stubs related to?
12     A.  Gee, I think work at Tillicum Place Cafe. I
13 don't know.
14         I guess I'm not clear on what pay stubs
15 you're referring to.
16     Q.  The same ones you referred to.
17         So which W-2s did you provide?
18     A.  I don't know specifically.
19     Q.  Were there barriers or barricades blocking
20 any of your access to your building during the CHOP
21 period?
22     A.  Yes.
23     Q.  Where were they?
24     A.  At 13th and Pine at -- I think it's Olive
25 Street that is parallel and north of Pine and 12th, at

MATTHEW PLOSZAJ
6/10/2021

Page 140

1    12th and Pike.
2             Further down the way there's some other
3    streets on Pine but I would not feel confident saying
4    the names of those streets without looking at a map
5    and seeing the name of them.
6             There were physical concrete barricades also
7    in the street along 12th and various times moved up in
8    along Pine Street at various locations.
9        Q.   The barricades on Pine, when to the best of
10   your recollection were they in place and specifically
11   where on Pine?
12       A.   The earliest I can remember when the police
13   left CHOP at, give or take, the corners of 13th and
14   Pine.  And the concrete barriers, somewhere between --
15   maybe halfway between 12th and 13th on Pine.
16       Q.   And during what period of time were the
17   concrete barriers present?
18       A.   I don't know the specifics of that but I'm
19   sure we could look that up.
20       Q.   How would you look it up?
21       A.   How would I look that up?  Like a reasonable
22   person.
23       Q.   What does that mean to you?
24       A.   Well, a reasonable person, if asked that
25   question, would do reasonable things.  I don't know.

Electronically signed by Pat Lessard (601-142-526-6610)                    72496f8b-e6f9-4b75-88ac-1c19f363e4b2

MATTHEW PLOSZAJ
6/10/2021

Page 141

```
 1   You could Google it.  You could -- there's many ways
 2   to look it up.
 3        Q.   Do you have any personal knowledge or any
 4   document personal to you that you could reference to
 5   know specifically when concrete barriers were in
 6   place?
 7        A.   Do I have documents known to me?
 8        Q.   Specific to you.
 9        A.   Specific to me.  Meaning I own them?  I
10   believe I have some of that, yeah.
11        Q.   What documents do you have?
12        A.   I believe I have video.  I believe I have a
13   photo.  I also believe there's news articles that also
14   document that so that could easily be in my possession
15   with a swipe of the phone.
16        Q.   Are they the same videos and photos that you
17   produced in this matter?
18        A.   To the best of my knowledge.
19        Q.   Okay.  So you don't know specifically when
20   concrete barriers were in place on Pine, right?
21             MR. REILLY-BATES:  Objection; misstates the
22   witness's prior testimony.
23        Q.   (By Ms. Pratt)  Is that right?
24        A.   How specific would you like me to get?
25        Q.   As specific as you can.
```

MATTHEW PLOSZAJ
6/10/2021

Page 142

1      A.   In the morning of June-ish week-ish into
2  CHOP.
3      Q.   So the morning about a week into CHOP in
4  June, is that what you said?
5      A.   That sounds roughly correct.
6      Q.   And those were the concrete barriers between
7  12th and 13th on Pine?
8      A.   That sounds accurate.
9      Q.   Where do you believe the concrete barriers
10 were on Pine that were installed approximately the
11 morning a week into CHOP in June?
12           MR. REILLY-BATES:  Objection; asked and
13 answered.
14      A.   Where do I think were the barriers that were
15 installed on Pine?  I don't think they were installed
16 on Pine.
17      Q.   (By Ms. Pratt)  Okay.  So where were there
18 barriers on Pine?
19      A.   Are you talking about the concrete barriers?
20      Q.   You said there were barriers at the corner
21 of 13th and Pine, right?
22      A.   Okay.  Those are not the concrete barriers,
23 but those were there from day one.
24      Q.   Okay.  And then you talked about the
25 concrete barriers.

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Pat Lessard (601-142-526-6610)                                      72496f8b-e6f9-4b75-88ac-1c19f363e4b2

Page 143

```
 1        A.    Yes.
 2        Q.    Those are the ones that were in place
 3   approximately one week into CHOP in June, right?
 4        A.    Correct.
 5        Q.    Okay.  Where were those?
 6        A.    When?
 7        Q.    When they were installed where were they?
 8        A.    When they were installed they were installed
 9   on 12th Avenue, and I believe on Pine Street west of
10   the median of 12th.
11        Q.    Did that change?
12        A.    Yes.
13        Q.    Where did they go to next?
14        A.    I don't know where all of them went, but I
15   know a good portion of them were moved onto --
16   perpendicular of where they were onto Pine Street, in
17   between 12th and 13th.
18        Q.    When did that happen?
19        A.    Oh, perhaps a week or two later.  I don't
20   remember specifically.
21        Q.    There were also barriers you said on Pike,
22   correct?
23        A.    I don't know if they actually hit Pike
24   Street but roughly to the cross section.  They might
25   have stopped shy.
```

Page 144

1           I'm sorry, I keep getting confused between
2    concrete and regular barriers.  I don't think there
3    were regular barriers on Pike Street but I think they
4    got up to Pike Street.
5        Q.   You say they got up to Pike Street, so where
6    were they?
7        A.   The regular barriers were on 12th Avenue
8    roughly up to Pike Street.  And I believe some of the
9    other streets parallel and west of 12th Street.
10       Q.   Will you open the exhibit that you have
11   already looked at marked 55, I think.
12       A.   Okay.  Opening 55, the map.
13       Q.   Yeah.  Okay.  I'm thinking of any type of
14   barrier using the streets on the map as reference.
15       A.   Yes.
16       Q.   Can you tell me each area where you remember
17   there being barriers during CHOP?
18       A.   Roughly on Pike Street, around Pike and
19   Broadway, roughly around that spot.  Roughly around
20   13th and Pike -- I'm sorry, not Pike, Pine and
21   Broadway, as well as 13th and Pine.
22            On 12th Avenue roughly halfway between Pine
23   and the street north of Pine, which it may be Olive --
24   I can't remember the name of the street -- or Howell,
25   but the next street north of Pine.  As well as south

Page 145

1  onto Pike -- again, somewhere along that stretch
2  closer to Pike.
3           Now following Pine from 12th Avenue we go
4  looking left or west there were barricades on that
5  street before you hit Pike and at some point going
6  into paralleling Cal Anderson.  I can't remember the
7  specific location but that one street that is north
8  one block of Pine.
9           And then I believe there was another barrier
10 that I recall moving west, so now two blocks west of
11 12th Avenue.  Again, in between Pine and Pike I
12 believe there was another barrier.
13      Q.   Which barriers affected your access to your
14 building?
15      A.   All of them.
16      Q.   How did the barrier at Pine and Broadway
17 affect your access to your building?
18      A.   There was no way I could go around it.
19      Q.   Could you access your building by car?
20      A.   No.
21      Q.   Could you access your building by foot?
22      A.   Sometimes.
23      Q.   When couldn't you access your building by
24 foot?
25      A.   When a handful of occurrences within CHOP at

MATTHEW PLOSZAJ
6/10/2021

Page 146

1  times.
2       Q.   What prevented you from accessing your
3  building by foot?
4       A.   CHOP security.
5       Q.   Your testimony is that on a handful of
6  occasions CHOP security prevented you from entering
7  your building?
8       A.   That is correct.
9       Q.   When did that occur?
10      A.   Roughly the night someone jumped on my
11 building.  Perhaps a week into CHOP, maybe two weeks
12 into CHOP.
13      Q.   Did anyone from the City ever prevent you
14 from accessing your building?
15      A.   No.
16      Q.   Was your trash picked up during the time
17 period of CHOP?
18      A.   Never, that I recall.
19      Q.   Did you have electrical service during the
20 time period of CHOP at your building?
21      A.   Yes.
22      Q.   Did you have other utilities in your
23 building during the time period?
24      A.   Did I have other utilities?
25      Q.   Yes.

ROUGH & ASSOCIATES INC
office@roughandassociates.com     206.682.1427  3515 SW Alaska St Seattle WA 98126

MATTHEW PLOSZAJ
6/10/2021

Page 147

1      A.   Yes.
2      Q.   You mentioned contacting law enforcement
3  during the CHOP time period.
4           Can you tell me each time you contacted law
5  enforcement during that period?
6      A.   Roughly three days into CHOP, I believe it
7  was a Sunday, perhaps at five-ish in the morning, when
8  protestors broke into the East Precinct I called
9  roughly --
10     Q.   Sorry.  I'm going to stop you.
11          And what was the substance of your
12 communication when you called about the East Precinct
13 incident?
14     A.   Communicating the events that took place.
15     Q.   Did the dispatcher say anything to you?
16     A.   Of course.
17     Q.   And what did the dispatcher say to you?
18     A.   I don't remember the specifics.
19     Q.   Do you remember anything that the dispatcher
20 said?
21     A.   Roughly "Thank you for the information."
22     Q.   When was the next time you contacted law
23 enforcement during the CHOP time period?
24     A.   I think within about a week, the first --
25 within a week of CHOP starting.

Page 148

1  Q. Why did you call law enforcement on that
2  occasion?
3  A. We had a burglar break into our building.
4  Q. And what was the substance of your
5  communication with law enforcement on that occasion?
6  A. There was someone who had broken into our
7  building and they have our property and communicating
8  that with them.
9  Q. And do you recall any communication from the
10 dispatcher to you on that occasion?
11 A. They offered to send a cop out several
12 blocks from CHOP that I could meet at some point in
13 time.
14 Q. Do you recall where they offered to send the
15 police officer to?
16 A. No.
17 Q. And did you take the dispatcher up on the
18 offer to send out a law enforcement official?
19 A. I believe so.
20 Q. Did you ever meet with the police officer
21 about the break-in at your apartment?
22 A. No.
23 Q. Why not?
24 A. I believe in this instance I never got a
25 call back.

Page 149

```
 1      Q.   Did you call from your cell phone?
 2      A.   Yes.
 3      Q.   What's your cell phone number?
 4      A.   (419)306-3536.
 5      Q.   Did you also call from your cell phone when
 6   you reached out about the break-in in the East
 7   Precinct?
 8      A.   Yes.
 9      Q.   Did you call from your cell phone every time
10   you contacted law enforcement?
11      A.   Yes.
12      Q.   What was the next time that you called law
13   enforcement related to the CHOP?
14      A.   I believe it was either later that day or
15   the next day.  The same person broke into our property
16   again, and I called the police immediately, this time
17   during the break-in.
18      Q.   What was the substance of your communication
19   with law enforcement that time?
20      A.   Just that.
21      Q.   And what were you told in response?
22      A.   There's no one, they can't send anyone in.
23   I believe roughly along the lines of they may have
24   offered to have a cop meet me outside of CHOP.
25           I can't remember if that was specific to
```

MATTHEW PLOSZAJ
6/10/2021

Page 150

1  that time or not.  If it was, I would have accepted.
2      Q.   Did you ever meet with a law enforcement or
3  a police officer about the second break-in at your
4  property?
5      A.   No, I don't believe so.
6      Q.   Do you know why?
7      A.   I never got a follow-up call as far as I
8  remember.
9      Q.   When was the next time you called law
10 enforcement in the CHOP time period?
11     A.   I believe that was the night someone had
12 jumped on top of our roof, which I believe was a few
13 days before the end of CHOP.  I think that was a
14 Thursday evening.
15     Q.   And the person on your roof, what were they
16 doing?
17     A.   Yelling, screaming, threatening to kill
18 others and threatening to kill themselves.
19     Q.   And you took video of this?
20     A.   Yes.
21     Q.   And you called law enforcement on that
22 occasion?
23     A.   Yes.
24     Q.   What was the specific nature of the threat
25 to you in that instance?

Page 151

 1         A.    More specific than what I've already
 2   mentioned?
 3         Q.    Yeah.  You said he threatened to harm you,
 4   correct?
 5         A.    Correct.
 6         Q.    How did he threaten to harm you?
 7         A.    Screaming at the top of his lungs.
 8         Q.    I mean what?
 9         A.    "I'm going to fucking kill you" is what he
10   said.
11         Q.    Was it directed at you or what was it
12   directed at the crowd?
13         A.    It sounded directed at me.
14         Q.    How did it sound directed to you?
15         A.    There was no crowd.
16         Q.    Was there anyone else there?
17         A.    Eventually.
18         Q.    Was there anyone else there at the time that
19   he yelled that he's going to fucking kill you?
20         A.    It's possible.  It's a dense area.
21         Q.    What was the substance of your communication
22   with law enforcement on that estimate?
23         A.    Roughly this that we've been talking about.
24         Q.    What were you told by law enforcement?
25         A.    "Thank you for the update.  There's nothing

MATTHEW PLOSZAJ
6/10/2021

Page 152

```
 1   we can do."
 2        Q.    Do you recall being told anything else?
 3        A.    Not specifically, no.
 4        Q.    How many times did you call during that
 5   incident?
 6        A.    Three times.
 7        Q.    Were you told the same thing each time you
 8   called?
 9        A.    Roughly, correct.
10        Q.    Did you call law enforcement on any other
11   occasion during the CHOP time period?
12        A.    I believe a few days later I called.
13        Q.    What was occurring at that time?
14        A.    We just had another break-in.
15        Q.    Was that before Cal Anderson was cleared
16   out?
17        A.    No.  This was during CHOP, during those 23
18   days.
19        Q.    And what were you told by law enforcement on
20   that occasion?
21        A.    We were told to meet someone at roughly 20th
22   or 19th and Madison.
23        Q.    Did you meet someone?
24        A.    Not me specifically, no.  We never did.  We
25   did have someone out there to meet them.
```

MATTHEW PLOSZAJ
6/10/2021

Page 153

```
 1      Q.   Who was out there to meet them?
 2      A.   Johnny Catchings.
 3      Q.   Johnny Catchings?
 4      A.   Yes.
 5      Q.   Would you spell Catchings?
 6      A.   I believe it's C A T C H I N G S.
 7      Q.   Who is Johnny Catchings?
 8      A.   Who is Johnny Catchings?
 9      Q.   Yes.
10      A.   He was my neighbor who lived underneath me
11   at 1210 East Pine.
12      Q.   And was Mr. Catchings the only person who
13   met with law enforcement?
14      A.   He never met with law enforcement.  He went
15   out to meet law enforcement.
16      Q.   And why didn't he meet with law enforcement?
17      A.   They never showed.
18      Q.   During the CHOP time period did you stay
19   anywhere other than your apartment?
20      A.   Yes.
21      Q.   When?
22      A.   I don't remember specifically but a week or
23   two in on a couple different nights, maybe even that
24   last week one or two nights.
25      Q.   Where did you stay?
```

Page 161

1                C E R T I F I C A T E

2    STATE OF WASHINGTON  )
                          ) ss.
3    COUNTY OF KING       )

4          I, the undersigned Washington Certified Court

5    Reporter, hereby certify that the foregoing deposition upon

6    oral examination of MATTHEW PLOSZAJ was taken

7    stenographically by me on June 10, 2021, and transcribed

8    under my direction;

9          That the witness was duly sworn by me pursuant to

10   RCW 5.28.010 to testify truthfully; that the transcript of

11   the deposition is a full, true, and correct transcript to

12   the best of my ability; that I am neither attorney for nor

13   relative or employee of any of the parties to the action or

14   any attorney or counsel employed by the parties hereto, nor

15   am I financially interested in its outcome.

16          I further certify that in accordance with

17   CR 30(e) the witness was given the opportunity to examine,

18   read and sign the deposition within 30 days upon its

19   completion and submission, unless waiver of

20   signature was indicated in the record.

21          IN WITNESS WHEREOF, I have hereunto set my hand this

22   15th day of June,

23

24                        pat@court-reporter.com

25