HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,

Plaintiffs,

v.

CITY OF SEATTLE,

Defendant.

Case No. 20-cv-00983

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY OF SEATTLE'S OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS

I, Shane P. Cramer, declare as follows:

1.    I am one of the attorneys representing the City of Seattle in this action.  I am over age 18, competent to be a witness, and make this declaration based on facts within my own personal knowledge.

A.    **The City Took Reasonable Steps to Preserve Documents.**

1.    Plaintiffs filed this lawsuit on June 24, 2020.  In July 2020, the City sent litigation holds to employees who Plaintiffs identified and also those the City believed at the time might have relevant information.

2.    The City sent litigation holds to 59 employees in this case and provided Plaintiffs with a list of those employees who received the notice.  *See* Attachment A to the City's August 31, 2021 Objections and First Supplemental Responses to Plaintiffs' Second Set of Interrogatories, a

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 1
(Case No. 20-cv-00983)

true and correct copy of which is attached hereto as Exhibit 1.  That litigation hold contained a description of the case, and listed categories of documents that each recipient needed to preserve. Among the types of documents the litigation hold instructed employees to preserve were text messages, emails, memoranda, and meeting minutes.  The litigation hold also included an FAQ attachment instructing employees not to delete documents, including text messages, on employees' work and personal mobile devices.  The litigation hold also directed employees to search devices and locations where potentially relevant documents might exist, including their city-issued cell phones, to determine whether any such responsive documents existed on the various devices or in those locations.  Ex. 1, at p. 24-26.

3.      The City also sent litigation holds to more than 450 additional custodians in other pending litigation arising out of the Summer of 2020 protests.  A list of the employees who received those litigation holds as of August 31, 2021 is included in Attachment A to Ex. 1.

4.      Plaintiffs served their first set of discovery on August 31, 2020.  Shortly thereafter, the City's attorneys began to identify and collect responsive documents.  The City, in consultation with Plaintiffs' counsel, identified potential custodians and developed search terms to use in identifying and reviewing potentially responsive documents.

5.      As part of the City's efforts to respond to discovery, our firm worked with the City and City custodians to obtain their mobile phones.  We were able to obtain some phones directly from the City.  For example, former Seattle Police Chief Carmen Best's phone had been in the possession of the Seattle Police Department's Legal Unit since she turned it in on September 2, 2020.  Retrieving phones from other City employees was complicated, primarily because of the Covid-19 pandemic.  We had to coordinate and retrieve phones from people's homes and other

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 2
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717

meeting spots.  Ultimately, most of the phone collection and imaging occurred during the last part of February and March of 2021.

6.     In connection with the imaging of these phones and our initial efforts to begin reviewing text messages, we discovered that Police Chief Carmen Best, Fire Chief Harold Scoggins, Idris Beauregard, Eric Greening, Kenneth Neafcy, and Christopher Fisher (along with Mayor Durkan, the "Individuals") were missing their text messages from June 2020.

7.     The City disclosed this information, and the loss of Mayor Durkan's text messages, to Plaintiffs' counsel on March 26, 2021.  From that point forward, the City provided regular updates to Plaintiffs' counsel regarding the status of efforts to recover these messages in various ways, including on April 30, 2021; May 6, 2021; July 13, 2021; July 30, 2021; August 31, 2021; and at regular intervals thereafter.  On May 7, 2021, the City asked Plaintiffs for a device examination proposal for the Individuals' devices.  Plaintiffs sent a draft proposal on July 16, 2021.  Thereafter, the parties exchanged a number of draft revisions before filing their Stipulated Device Examination Agreement on October 8, 2021, which the Court entered on October 19, 2021. (Dkt. Nos. 49 & 50).

8.     Plaintiffs attempt to tie the City's disclosure of lost text message on March 26, 2021 to an unrelated internal whistleblower investigation involving Public Records Act compliance. Plaintiffs are incorrect; the two were not connected in any way.  We disclosed the missing text issues to Plaintiffs in March 2021 because that is when we imaged most of the Individuals' phones and discovered their texts were missing.

**B.     After Discovering the Lost Text Messages, the City Undertook to Reconstruct the Missing Messages to the Maximum Extent Possible.**

9.     Since learning that the Individuals were missing text messages during the relevant time period, the City has done its best to collect as many texts as possible from other City sources,

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 3
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

with the goal of recovering as many of the Individuals' missing messages with other City

employees as possible.  The process the City undertook is explained in more detail in the

Declaration of Martha Dawson filed herewith.

**C.      The City Had Recommended Against Using iCloud as a Document Retention System
for Security Reasons.**

          10.     Plaintiffs deposed the City's Records Manager, Jennifer Winkler, on January 6,

2022.  A true and correct copy of excerpts from Ms. Winkler's deposition is attached hereto as

Exhibit 2.  Ms. Winkler testified regarding the City's records retention program.  With regard to

text messages, specifically, Ms. Winkler testified: "[T]ext messages are considered a record and

therefore will follow the same retention policy that exists for other types of similar records within

the department." *Id.*, at 17:20-23.

          11.     The City's primary method of retaining text messages was to direct employees to

preserve them in place, similar to other how other documents created by employees would be

maintained.  Ex. 1, at p. 9, 26.  Ms. Winkler testified that City Records Management did not advise

or recommend iCloud or other individualized cloud-based technologies as appropriate for use by

City employees:

> Q.   Are you aware that public records could reside on a cloud-based storage
>       program such as iCloud or Google Docs or some kind of Google backup
>       database?
>
> A.   I am aware that there could be some departments that use iCloud for backing
>       up cellphones.  The records management program does not advise or
>       recommend using cloud-based solutions such as Google Docs for any type of
>       public record storage.
>
> Q.   And why is that?
>
> A.   We do not own Google Docs.
>
> Q.   Okay.  Any other reasons?

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 4
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

…

    A. The City records management program feels it is best that City records be on City-stable platforms, such as Microsoft 365 or network files and drives, in order to best ensure the integrity and stability of the records for long-term or storage for retention policies.

Ex. 2, at 33:7-34:1 (Objections omitted).

    12.    One department that did use iCloud was the Mayor's Office, which did utilize iCloud backups, for at least certain employees like Mayor Durkan and the deputy mayors.  A true and correct copy of excerpts from the March 3, 2022 deposition of Regi Alencastro in this matter is attached hereto as Exhibit 3, at 20:4-25.

    13.    Plaintiffs also deposed Chris Steel, who is a Strategic Advisor 2 within the Seattle Police Department, as well as one of the SPD mobile phone coordinators.  The mobile phone coordinators assist SPD employees with any issues regarding their mobile phones.  A true and correct copy of excerpts from Mr. Steel's March 9, 2022 deposition is attached hereto as Exhibit 4. With regard to the use of iCloud as a mobile phone back up, Mr. Steel testified:

    Q. Okay.  Can you tell me why the City did not set up iCloud accounts for Apple users prior to August 2020?

    A. My personal knowledge is that it was a – it was because of security concern— concerns with iCloud.

    Q. And what – what are those security concerns?

    A. I don't know specifics on them.  Just my – [] in some discussions I had, why we – [] why an iCloud wasn't being used or – by the City, was – the feedback I'd received was due to security issues with – with the access.

    Q. And can you tell me more about those discussions?  Who was involved?

    A. It would have been with Seattle IT.

Ex. 4, at pp. 46:16-47:6. (Objections omitted).

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

14.     Mr. Steel then explained why having his department maintain a comprehensive list of passwords created an issue:

> Q.  So you saw that as a problem, individuals having to retain user account information, didn't you?
>
> A.  It's an issue.
>
> Q.  Why didn't you, Brian Kennedy, or anybody from City IT take any actions to help save password information for Seattle Police Department employees users?
>
> A.  It's – it's just not part of our process.  It's never – we don't – we don't maintain passwords of other individuals.
>
> Q.  Has that ever been something that you or your colleagues have considered?
>
> A.  No.  Mainly for privacy and security issues.
>
> Q.  What privacy and security issues were you concerned about?
>
> A.  Having someone else's password.

*Id.,* at pp. 48:2-49:1 (Objections omitted).

15.     Attached hereto as Exhibit 5 is a true and correct copy of the "About us" page for the Center for Internet Security, which describes the entity as "a community-driven nonprofit, responsible for the CIS Controls and CIIS Benchmarks, globally recognized best practices for securing IT systems and data."  This exhibit was collected from the website, https://www.cisecurity.org/about-us by me on October 27, 2022.

16.     A true and correct copy of an excerpt from the Center for Internet Security's CIS Apple iOS 14 and iPadOS 14 Benchmark is attached hereto as Ex. 6, which I downloaded from the CIS website on October 23, 2022.  With respect to iCloud, the Benchmark recommends at pages 75-78, to "Ensure 'Allow iCloud backup' is set to 'Disabled'" and "Ensure 'Allow iCloud documents & data' is set to 'Disabled'" because of the potential for "data leakage."

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 6
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

17.     Plaintiffs' forensic expert, Brandon Leatha, posited that any time a City employee experienced a locked phone, the City should have sent the phone to a third-party vendor to try to access or jailbreak.  Mr. Faulkner explained in his rebuttal report that such a process is unreliable and costly.  Most vendors must have the passcode to access the phone. More advanced tools are not widely available, work with only a limited variety of phones, can be very expensive, and cannot reliably gain access to a locked phone.  Ex. 7 (June 3, 2022 Rebuttal Report of City's Forensic Expert Kevin Faulkner) at 4.

**D.     Facts Relevant to The Individuals' Missing Messages.**

      **1.     Facts Relevant to Mayor Durkan's Phones.**

            **a.     Mayor Durkan Experiences Issues with her Phone in July 2020.**

18.     Mayor Durkan took office in November 2017.  After taking office, Mayor Durkan received a City-issued iPhone to use for work purposes.  She periodically received new iPhones thereafter.  The below image, which is a true and correct excerpt from page 5 of the Expert Report of Kevin Faulkner, depicts when Mayor Durkan used each of her iPhones during the relevant time period:



Figure 1 - Timeline of Durkan Mobile Device Usage

A true and correct copy of Mr. Faulkner's February 11, 2022 Expert Report is attached hereto as Exhibit 8.

19.     As depicted in the above illustration, Mayor Durkan used an iPhone 8 Plus with Verizon cellular service from April 10, 2018 until October 30, 2019.  From October 30, 2019

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

through July 9, 2020, the Mayor used an iPhone 8 Plus with AT&T/FirstNet cellular service.  This is the phone that Mayor Durkan testified fell in the water on July 4, 2020, as described below.  On July 9, 2020, Mayor Durkan's iPhone 8 Plus (AT&T/FirstNet) was replaced with an iPhone 11 (FirstNet).  This was the phone that the Mayor had in August 2020, when the Mayor's Office reported discovering that texts were missing.  Mayor Durkan provided that phone to the City's forensic expert, Kevin Faulkner, on November 19, 2020, at which point she received a new phone.

20.     I understand that at some point prior to the relevant time period, Mayor Durkan's iPhone 8 (AT&T/FirstNet) was damaged, causing significant cracking of the phone's screen and body.  This phone is sometimes referred to as the Mayor's "cracked-screen" phone due to its condition.

21.     A true and correct copy of excerpts from the December 8, 2021 deposition of Mayor Jenny Durkan in this matter is attached hereto as Exhibit 9.

22.     A true and correct copy of excerpts from the March 1, 2022 deposition of Mayor Jenny Durkan in *Seattle Times v. City of Seattle*, No. 21-2-07268-9 SEA (King Cnty Sup. Ct.), is attached hereto as Exhibit 10.

23.     A true and correct copy of excerpts from the February 28, 2022 deposition of Mayor Jenny Durkan in *Estate of Taylor, et al.  v. City of Seattle*, No. 20-2-14351-1 SEA (King Cnty Sup. Ct.), is attached hereto as Exhibit 11.

24.     On July 4, 2020, Mayor Durkan was with her family at their cabin on a beach on Puget Sound.  That morning, she left her cabin to walk on the beach while making calls.  At some point during her walk, her phone fell out of her pocket and into a saltwater pool on the beach.  Ex. 9, at 255:7-12; Ex. 10, at 83:9-12.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 8
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

25.     Mayor Durkan did not immediately notice that her phone had fallen out of her pocket and into the water.  When, sometime later, the Mayor discovered her phone was not in her pocket she retraced her steps and found it submerged in the water.  Ex. 10, at 82:21-83:2

26.     After picking her phone out of the water, Mayor Durkan checked to see if it was still working.  She noticed that the phone was "pixelated" and had a "kind of fuzzy" look, so she powered it down, took it back to the cabin, and put it in a bag of rice to dry out.  Ex. 9, at 255:13-20; Ex. 10, at 82:25-83:2.

27.     She left it in the bag of rice for a couple of hours.  At some point later in the afternoon, she got it out of the bag of rice and tried to power it on.  Ex. 9, at 255:21-256:4.  At that point, the phone reset.  She did not recall at her deposition whether she initiated the reset or it occurred on its own.  Ex 9 at 256:5-12.  Mayor Durkan recalls the phone being in a factory reset state that asked her whether she wanted to set it up as a new phone or restore it from the cloud. Mayor Durkan chose to restore it from the cloud, instead of setting it up as new phone.  *Id.*

28.     After she restored it using her Apple ID and an iCloud backup, she observed that data, including her texts, started appear on her phone:

Q. [] And as far as you know, you were able to get all of your messages –

A.  Yes

Q.  –restored from the cloud onto your phone?

A.  Yes, as far as I know…. And the messages were on there.  I mean, I tend to look just at the top messages.  But it took a while for the phone to update to get the messages and the mail.  The calendar, I had a little bit more difficulty with because I had to get a password from another assistant, but finally got the calendar to load too.

Ex. 9, at 256:13-24.

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

29.     This recollection is consistent with Mr. Faulkner's finding that "artifacts indicate that approximately 5,911 messages were synchronized from iCloud onto the iPhone 8 Plus (AT&T/FirstNet) when it was restored on July 4, 2020." Ex. 8, at p. 29.

30.     That night, Mayor Durkan sent several emails to her staff seeking help with various aspects of her phone that she could not get working properly.  At 6:13 she emailed her administrative assistant, Colleen O'Reilly Bernier:

> Do you have an email or contact for Regi[] – or whoever is 'on call' with IT?
> My work phone crashed and I want to restore data and settings.  But I do not have
> the pw [password] to the MOS [Mayor of Seattle] calendar.  Do you have it – can
> you get it, please.  Thanks.

A true and correct copy of this email, which was marked as Exhibit 7 to the July 27, 2022 deposition of Colleen O'Reilly Bernier in this matter, along with several other emails, is attached hereto as Exhibit 12, at page 2.

31.     When Ms. O'Reilly Bernier did not respond, Mayor Durkan sent an email to a broader group of Mayor's Office staff, including her Chief of Staff, Stephanie Formas, her scheduler, Laura Benbow, her director of administration and scheduling, Andrea Friedhoff, and Ms. O'Reilly Bernier at 8:52 pm on July 4, asking, "Can one of you send me the password for the MOS calendar account[?]  My phone died but I was able to reset and backup from cloud.  But don't have that pw." *Id.*, at p. 3.  Ms. Benbow responded a few minutes later, at 8:56 pm, with the Mayor's password for her calendar.  *Id.*, at p. 4.

32.     Even after she received the password for her calendar, Mayor Durkan continued to report issues with her phone.  On the morning of July 5, 2020, she emailed Deputy Mayor Mike Fong and Ms. Formas that, "[m]y phone is not working, so I cannot read official email unless at my computer.  So if you need me – text." *Id.*, at p. 6.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 10
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

33.     Mayor Durkan explained in her deposition, "part of what I was trying to do was, you know, get the phone to limp along.  I knew I'd be back in Seattle, and that IT could either see if the phone was suitable or I needed a new one."  Ex. 9, at 259:11-14.

34.     A true and correct copy of excerpts from the June 30, 2022 deposition of Andrea Friedhoff in this matter is attached hereto as Exhibit 13.

35.     After Mayor Durkan returned to Seattle, Mayor's Office staff and Seattle IT began working to determine how to fix or replace the Mayor's phone.  Mayor Durkan provided her phone to Ms. Friedhoff on the morning of Monday, July 6.  Ex. 13, at 57:10-58:2.  Ms. Friedhoff then provided it to one of the Seattle IT employees assigned to the Mayor's Office, Regi Alencastro. Ex. 13, at 58:12-14.

36.     A true and correct copy of excerpts from the text messages of Regi Alencastro, which were marked as Exhibit 2 at his deposition, are attached hereto at Exhibit 14.  This exhibit has been formatted for legibility, but none of the relevant substance has been altered or removed.

37.     Ms. Friedhoff also asked Mr. Alencastro to work with the City's cell phone carrier liaison, Susy DeMers, to get the Mayor a new phone.  *See* Ex. 14, which is a true and correct excerpt of a spreadsheet containing text messages extracted from the phone of Regi Alencastro, and which was marked as Ex. 2 to Mr. Alencastro's deposition, at Row 8262 (communicating with Mssrs. Arhu and Alencastro, "Let's get the back up from Suzi" at 9:31 am on July 6).  After Mr. Alencastro was done looking at the Mayor's phone, it was returned to her.  Mr. Alencastro put his phone case on the Mayor's phone so she would not cut herself on the cracked glass screen.  Ex. 3, at 92:3-13; Ex. 14, at Row 8315.

38.     Contrary to Plaintiffs' statement that Mayor Durkan never told anyone about her phone falling in the water, Mr. Alencastro testified at his March 3, 2022 deposition that he

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 11
(Case No. 20-cv-00983)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

remembered hearing that her phone had been submerged in saltwater and that it had caused the phone to crash, but that he could not recall the details of the conversation since it "was almost two years ago." Ex. 3, at 58:16-59:9.  Plaintiffs also quibble about the Mayor's Office staff and IT employees' inability to recall the details of exactly who decided to order the Mayor's new phone, but do not dispute that someone other than the Mayor made the decision.

39.     Consistent with Ms. Friedhoff's request that Seattle IT get a new phone, the City's cell phone carrier liaison, Suzy DeMers, ordered a new iPhone 11 for the Mayor, which arrived the next day, July 7.  *See* Ex. 15 hereto, which is a true and correct copy of an email marked as Exhibit 6 at the deposition of Andrea Friedhoff in this matter.

40.     Mayor Durkan brought her cracked screen iPhone 8 Plus to the office on July 9, 2020, to be replaced.  The Seattle IT employee on staff that day was Emmanuel Arhu.  A true and correct copy of excerpts from the March 3, 2022 deposition of Emmanuel Arhu in this matter is attached hereto as Ex. 16.  Mr. Arhu testified that he intended to follow the Mayor's Office protocols for replacing a Mayor's Office employee's phone.  *Id*., at p 62:16-63:16.  He testified that he remembered starting an iCloud backup of the Mayor's old iPhone.  However, he could not recall whether the backup process completed, which would be required for a backup to have been made.  *Id.*  Because no July 9, 2020 backup existed when he and Mr. Alencastro were trying to locate Mayor Durkan's texts later that summer, it appears that the backup process he initiated on July 9 did not run to conclusion.

41.     After initiating the iCloud backup, Mr. Arhu testified that he then moved forward with a "Quick Start" phone-to-phone set up, which was successful.  *Id.*  "Quick Start" is an Apple feature that transfers data from one iPhone to another placed next to it. Ex. 8, at 11-12.  Mr. Arhu testified that after performing the Quick Start transfer, he checked various settings and content on

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 12
(Case No. 20-cv-00983)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1   the Mayor's new iPhone 11 to ensure that the transfer was successful and the new phone was

2   properly set up.  Ex. 16, at 16:8-17:20; 26:24-29:9; 65:8-66:22.  After completing Mayor Durkan's

3   phone replacement on July 9, 2020, Mr. Arhu, gave the new phone to the Mayor's Administrative

4   Assistant, Colleen O'Reilly Bernier, to give back to Mayor Durkan.  *Id.*, at 72:8-22.

5          42.    Mayor Durkan continued to have problems with her new iPhone 11 throughout the

6   month of July 2020.  On approximately July 20, the Mayor observed that her new phone did not

7   have the contact information of the FBI Special Agent in Charge for the Seattle Field Office in it.

8   Attached as Exhibit 17 is a true and correct copy of an email dated July 20, 2020 between Mayor

9   Durkan and Ms. O'Reilly Bernier.  This document has been produced in this matter with Bates

10  number SEA_00145710.  This document was produced to plaintiffs without redactions.  Mr.

11  Duda's contact information has been redacted for public filing.  Mr. Arhu and Ms. O'Reilly

12  Bernier helped to resolve the issue.  Ex. 16, at 69:4-21.

13         43.    Then, on July 24, 2020, the Mayor observed that her phone did not have contact

14  information in it for another individual whose information should have been in her phone.  She

15  recalls again asking for IT's assistance to resolve the issue.  Ex. 9, at 271:9-272:4.

16         44.    Mr. Arhu testified that it was Mayor's Office IT's standard practice to hold on to a

17  Mayor's Office employee's old phone for approximately four weeks after it has been replaced, so

18  that if something did not work correctly with the data transfer, the old phone would still be

19  available.  Ex. 16, at 71:11-72:7; 73:6-22.  Mr. Arhu testified that he followed this practice with

20  respect to Mayor Durkan's cracked-screen iPhone 8 Plus, keeping it at his desk in the Seattle

21  Municipal Tower for approximately four weeks, before factory resetting it in early August 2020.

22  *Id.*

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 13
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2

   **b.    The Mayor's Office Discovers that Mayor Durkan's Messages are not Available on her Phone and Begins Trying to Recover Them.**

3

4       45.    On August 21, 2020, Michelle Chen, the Mayor's Office legal counsel, backed up

5   the Mayor's iPhone 11 on Ms. Chen's work computer.  Ex. 1, at 29.  Because Chen's work

6   computer needed updates to both iTunes and iExplorer, she asked one of the Mayor's Office IT

    staff, Regi Alencastro, to assist her in facilitating this back up.  *Id.*

7       46.    While backing up the Mayor's phone, Ms. Chen discovered that it had only texts

8   from June 25 forward on it.  Ms. Chen, along with the Mayor's Office Public Records officers Kim

9   Ferreiro and Stacy Irwin, and Mssrs. Alencastro and Arhu, spent the next several weeks

10  investigating and trying to recover the pre-June 25 texts.  *Id.*

11      47.    Mr. Arhu and Mr. Alencastro tried to locate the Mayor's pre-June 25, 2020 texts

12  from other sources. Ex. 16, at 77-78.  They tried to see if copies of messages were still available on

13  the Mayor's old iPhone 8 (FirstNet) phone with the cracked screen, but Mr. Arhu had already

14  restored it to its factory settings.  *Id.*  They looked at the Mayor's iCloud account but found no

15  backups there.  Ex. 3, at 113:18-114:23.  There was no July 9 backup in iCloud.  They worked with

16  Braden Heil, one of the City's internal forensic investigators.  Ex. 16, at 79:19-25; Ex. 3, at

17  131:10-24.

18

19      48.    The forensic artifacts of the Mayor's cracked-screen iPhone 8 indicate that it started

20  up after a factory reset on September 17, 2020.  Ex. 18, at 13; Ex. 7, at 4.  Mr. Faulkner concluded

21  that there could be at least two possible explanations for the existence of those forensics.  First, if

22  the iPhone 8 had been powered down during the August reset or before it restarted, then it would

23  have shown September 17, 2020 as the restart date if it was next powered on that day.  Ex. 19, at

24  151:9-152:19.  Attached as Ex. 19 is a true and correct copy of excerpts from the August 17, 2022

25  deposition in this matter of Kevin Faulkner.  Second, that the phone was reset again on September

---

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 14
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

17.   At least one Mayor's Office IT employee recalled working with test phones and the Mayor's cracked-screen phone on September 17 to try to see if they could locate a backup of Mayor Durkan's old phone or texts in iCloud, but neither could recall whether they performed a factory reset the Mayor's phone as part of their efforts.  Ex. 19, at 213:19-218:16.  Artifacts of a September 17, 2020 factory reset do not mean that an earlier, August reset could have occurred as Mr. Arhu testified.  The phone could have been reset both in early August and again on September 17 and the forensic artifacts would be the same as if only one reset occurred on September 17, because a subsequent reset deletes all artifacts of an earlier reset. Ex. 7, at 4.

49.   One of the City's internal forensic investigators, Braden Heil, imaged the cracked-screen iPhone 8 Plus on September 18, 2020, to see if he could find any of the missing texts.  He was not able to find any. Ex. 1, at 29.

50.   The City Attorney's Office became aware that texts were missing from Mayor Durkan's phone in October 2020. Ex. 1, at 11.

### c.   The Forensic Experts' Analysis of Mayor Durkan's Devices.

51.   The City retained its forensic expert in this matter, Kevin Faulkner of Crypsis (now Palo Alto Networks), on November 5, 2020. Ex. 19, at 56:6-9.  Mr. Faulkner's initial scope of work was to "see what text message information could be recovered from the mayor's cellphone or any other data sources.  And to the extent it couldn't, try to understand what had happened."  Ex. 19, at 56:18-24.  His scope of work expanded once the City discovered that the other Individuals were missing messages.  Ex. 8, at 3.

52.   Mr. Faulkner's efforts and conclusions are contained in his February 11, 2022 Expert Report and his June 3, 2020 Rebuttal Expert Report, true and correct copies of which are attached hereto as Exhibits 8 & 7.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 15
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

53.     Mr. Faulkner was not able to identify any direct forensic evidence conclusively establishing the cause of the Mayor's loss of texts from prior to June 25, 2020.  Based on the available forensics, Mr. Faulkner was able to rule out that Mayor Durkan manually deleted all of her pre-June 25, 2020 texts.  Ex. 19, at 84:10-22.

54.     Mr. Faulkner found artifacts indicating that the "disable and delete" function was enabled on Mayor Durkan's phone on July 4, 2020.  If selected by a user, the "disable and delete" function will download a copy of all of the messages that currently exist in iCloud onto the user's device, stop the phone from synchronizing its messages to iCloud going forward, and delete the copy of the texts that exist in iCloud 30 days after the function was selected.  Ex. 19, at 125:10-126:4; 129:15-130:1.  The selection of "disable and delete" has no effect on the copies of the messages that exist on the user's iPhone.  *Id.,* at 128:8-19.

55.     Mayor Durkan testified at length about the steps she took to restore her iPhone on July 4, 2020, that her focus was on getting her phone working again, and that she has no recollection of seeing or selecting the "disable and delete" function on her iPhone on July 4, 2020.  Ex. 10, at 92:17-95:9.

56.     As noted in paragraph 54 above, the "disable and delete" function would cause messages to be deleted from the iCloud if the sync "Messages in iCloud" setting is not re-enabled sometime within a 30-day period after "disable and delete" was selected.  Ex. 19, at 93:19-96:18.

57.     Here, Mr. Arhu testified that he specifically recalled enabling "Messages in iCloud" as part of his replacement of Mayor Durkan's iPhone 8 Plus (AT&T/First) with her iPhone 11 on July 9, 2020.  Ex. 16, at 17:16-18 and 66:19-22.

58.     Both sides' forensic experts agree that enabling sync "Messages in iCloud" on Mayor Durkan's phone, as Mr. Arhu testified he did, would have cancelled out or undone the

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 16
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

selection of "Disable and Delete" on July 4, 2020; messages would no longer have been deleted from her iCloud 30 days after July 4. Ex. 19, at 95:16-96:18, and Ex. 20, at 156:24-157:23. A true and correct copy of excerpts from the September 16, 2022 deposition of Brandon Leatha in this matter is attached hereto as Exhibit 20. Instead, a copy of any particular text message would stay in the iCloud so long as the same message was not deleted from the user's phone.

59. Mr. Faulkner also observed that certain forensics were consistent with the retention setting on either her cracked-screen iPhone 8 Plus (AT&T/FirstNet) or the iPhone 11 she received on July 9 being changed from "forever" to "30 days" to "forever" at some point between July 4, 2020 and the window of July 22-26, 2020. Ex. 8, at 33.

60. While a 30-day retention setting change is the only explanation that the experts explicitly identified in their reports, neither expert rules out the possibility that some other cause of the lost text messages could have occurred. For example, one of the main artifacts that the experts relied on was the numeric value (i.e., 0, 1, 2, etc.) that appears in the "KeepMessagesVersionID" field of a forensic image of an iPhone. Mr. Leatha testified that to his knowledge Apple does not "release a sheet that describes every different manner or setting on the phone that could cause that [artifact] to iterate one more number." Ex. 20, at 116:16-21. He also testified that while he was aware of other iPhone configuration changes that could cause the numeric value in the "KeepMessagesVersionID" field to increase by one or more, he did not do any specific testing related to them. *Id.,* at 80:1-7.

61. Both experts also testified that it is possible to change the text message retention setting on one iPhone using a different device that is linked to the same user's AppleID. This could be a user's iPad or another iPhone. Ex. 19, at 85:1-23; Ex. 20, at 67:17-68:2.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 17
(Case No. 20-cv-00983)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

62.     Both parties' experts also testified that there was no forensic evidence from which to determine who might have made any changes to settings on the Mayor's phones.  Ex. 20, at 160:2-12; Ex. 19, at 104:22-105:22.

63.     Mayor Durkan has testified that she never changed the retention setting on her phone and that she has no knowledge of anyone else having done so.  Ex. 9, at 261:25-262:20; Ex. 10, at 78:9-12; 88:3-5; Ex 11, at 191:3-22.

   **d. The City Locates Mayor Durkan's iPhone 8 Plus (Verizon), Which Contains Some of Mayor Durkan's Previously Missing Texts.**

64.     In July 2021, Ms. O'Reilly Bernier located the Mayor's old iPhone 8 Plus (Verizon), which the Mayor had used from April 2018 through October 29, 2019, in an envelope in a file drawer in her office.  A true and correct copy of excerpts from the July 27, 2022 deposition of Colleen O'Reilly Bernier in this matter is attached hereto as Ex. 21, at pp. 41:23-43:16.  The City was able to collect 3,845 text messages from this phone covering the time period of November 18, 2017 through October 30, 2019, reducing the number of pre-June 25, 2020 messages that had been lost.  Ex. 8, at 26.

   **2. Facts Relevant to Chief Best's Lost Messages.**

65.     Chief Best was hired by the Seattle Police Department in January 1992.  A true and correct copy of excerpts from the November 9, 2021 deposition of former Police Chief Carmen Best in this matter is attached hereto as Exhibit 22 (at 11:1-4).  She became Seattle Police Department Police Chief in August 2018.  *Id.*, at 12:1-5.  Her last day as police chief and as a City employee was September 2, 2020.  *See Id.*, at 209:16-22, 218:16-20; Ex. 1, at 19.

66.     Chief Best turned in her City-issued phone on September 2, 2020.  At that point, the phone was preserved by the Seattle Police Department Law Unit for purposes of various ongoing lawsuits.  Ex. 1, at 19.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 18
(Case No. 20-cv-00983)

67.     The City imaged Chief Best's phone around the same time it was imaging other custodians' phones for purposes of discovery.  It was at that time that we learned that Chief Best's phone had no texts on it pre-dating September 2, 2020.  Ex. 1, at 20.  The City disclosed that fact to Plaintiffs' counsel on March 26, 2021.

68.     Chief Best has testified at length about the circumstances surrounding her lost text messages, both in this case (Ex. 22) and in *Estate of Taylor v. City of Seattle*.  A true and correct copy of excerpts from the May 24, 2022 deposition of former Police Chief Carmen Best in the *Taylor* matter is attached hereto as Exhibit 23.

69.     Plaintiffs' counsel asked Chief Best a number of questions about her deleted texts:

Q. Did you delete any texts from your phone before you turned it in?

A. Yeah, I can tell you that, you know, I periodically would go in and delete transitory messages.  You know, my understanding was that the City was holding on to all that stuff anyway so it wasn't like I was conducting any – you know, other than transitory stuff mostly on my phone, so if the implication is that there was, you know, some – it was just on time periodically I would delete stuff from my phone, you know.  It was like I do, you know, my personal phone from time to time.  I imagine everybody does that.

Q. Sure.  Well, and just to be more specific, did you – when you said that it was your understanding that the City kept those things or had those things, what did you mean by that?

A. I really mean that I thought that there was some sort of record that they could go in and get, you know, old messages and stuff off of the phone if they needed to.  Obviously we deal with a number of cases, you know, homicides and others where we pull up old messages and look at what gang members were saying to one another.  So I assume the City had that same capability of doing that, especially with a litigation hold and the holds they had on really all of our communications.

Ex. 22, at 212:13-213:16 (Objections omitted); *see also* Ex. 23, at 369:7-370:13.

70.     When Plaintiffs' counsel followed up with additional questions on this topic, Chief Best explained further:

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 19
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

Q. And where did you think they could get the messages from?

2

A. You know, from the phones.  They often – I turn my phone in and people –
you know, for – for people to review text messages or whatever, there's a
PDR request, so maybe incorrectly, but I believed the City could always get
messages that they wanted from any apparatus that they needed to get it from.

3

4

5

Ex. 22, at 216:17-24.

6

71.     Plaintiffs' counsel again followed up, leading to the following exchange:

7

8

Q. You mean even if it's deleted they could go in and recover it?  Is that what
you're – is that what you mean?

9

A. If they needed to, yeah, I thought that – that was just my understanding all that
was held.  The same with our email, you can delete an email, but I mean, I
know all that stuff is – is being, you know, held.  I'm just not going to hold on
to, you know, all the emails when I know they can recreate those, you know,
from my email.

10

11

12

*Id.*, at 219:6-15.

13

72.     Finally, Plaintiffs' counsel asked whether Chief Best had intentionally deleted her

14

texts:

15

Q. Okay.  So I guess just be clear, it sounds like you did not intentionally delete
text messages with people who were involved or that might have related to
CHOP; is that right?

16

17

18

A. Yeah, that is correct, absolutely not.

19

*Id.*, at 216:25-217:4.

20

73.     Mr. Faulkner reviewed an image of Chief Best's phone and concluded that artifacts

21

on her phone were consistent with her testimony that she deleted her texts periodically, and not all

22

at once right before turning her phone in on September 2.  Ex. 19, at 158:24-159:10.

23

**3.     Facts Relevant to Chief Scoggins' Phone.**

24

74.     Chief Scoggins testified that he got locked out of his phone on October 8, 2020,

25

when his phone required that he change his passcode and he could not recall his prior one to

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

initiate the process.  A true and correct copy of excerpts from the September 14, 2021 deposition of Chief Harold Scoggins in this matter is attached hereto at Exhibit 24, at 98:9-102:17.  Chief Scoggins confirmed that he usually used his thumbprint to bypass the passcode screen on his iPhone, but that his phone would not allow him to bypass the screen using his thumbprint on this occasion.  *Id.*

75.     Mr. Kennedy, the SPD's Management Systems Analyst and one of the SPD mobile phone coordinators, testified that a Seattle security protocol will periodically prompt users of City-issued phones for a passcode change sometimes.  Ex. 28, 127:15-128:13.

76.     Chief Scoggins explained during his deposition that his "phone is [his] primary communication devices, not just for phone calls, but for our emergency responses.  So [he is] notified when there are larger responses or significant responses 24/7."  Ex. 24, at 98:13-16.

77.     Chief Scoggins testified that in the early morning hours of October 8, 2020, he was awakened by an emergency notification.  When he tried to access his phone, he could not get past the passcode screen.  He tried inputting his passcode a few times, but then got a notification on his phone that his phone would be locked for an hour.  *See Id.*, at 98:9-102:17

78.     Later that morning, Chief Scoggins began working with SFD employees to try to gain access to his phone.  A true and correct copy of an email thread dated October 8-9, 2020 between Chief Scoggins, Melodi Drake, SFD's Administrative Specialist III, and others, regarding Chief Scoggins' phone, and which was marked as Exhibit 215 to the deposition of Brandon Leatha, is attached hereto as Exhibit 25.

79.     Ultimately, Chief Scoggins went to the Apple Store at University Village to see if they could help him access his phone.  Ex. 24, at 98:9-100:15; 109:6-16.  They could not bypass the lock screen and performed a factory reset.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 21 (Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

80.     At his deposition, Chief Scoggins explained why he was so concerned about not being able to access his phone:

> …I did not want to go a night without having my phone.
>
> And the reason why this becomes very important for me as a person is the last time when I didn't have my phone at night was the night of the Greenwood explosion.  Many of you may remember here in Seattle we had a building that exploded in the middle of the night on Greenwood.  That night I didn't have my phone.  I dropped it that day, and it actually broke that day.  So I gave it to IT, I think it's not a big deal, they'll give me a new phone tomorrow.  2:00 or 3:00 in the morning there's a fire engine outside of my house, knocking on my front door saying, 'Chief, we had an explosion.  Twelve firefighters are in the hospital….'
>
> They couldn't call me, even on my personal phone.  I set that to do not disturb at night, so I get no phone calls on my personal phone.  So I thought, one night, not a big deal.  We have an explosion.
>
> That's what was playing in my mind.  So when I went to the Apple store and – and this is during COVID, so, you know, you wait in line, and, you know, he takes your phone inside, they go look at it, and they said the only thing we can do is – is a hard reset.  I said ok.  So they did the hard reset.  I reconnected up with our dispatch center so I can get our emergencies sent to me.

*Id.*, at 99:11-100:15.

81.     Both experts agree that Chief Scoggins' artifacts on his phone are consistent with his phone having been reset on October 8, 2020.  Ex. 18, at 23; Ex. 7, at 8-9.  Mr. Leatha also testified at his deposition that he did not have sufficient information to determine when Chief Scoggins' phone was first set up to create backups in iCloud or whether any such backups might have been created prior to October 8, 2020.  Ex. 20, at 212:10-213:1.

### 4.     Facts Relevant to Idris Beauregard's Phone.

82.     In June 2020, Idris Beauregard was the Director of the Clean Cities Division of Seattle Public Utilities.  A true and correct copy of excerpts from the July 14, 2022 deposition of Idris Beauregard in this matter is attached hereto as Exhibit 26, at 7:9-12.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 22
(Case No. 20-cv-00983)

LAW OFFICES
HARRIGAN LEYH FARMER & THOMSEN LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

83.     On or about October 9, 2020, Mr. Beauregard attempted to access his phone using
what he believed to be his current passcode but could not get past the lock screen of his phone.  He
testified that he could not recall whether he typically used his fingerprint to access his phone or
whether he used the numeric passcode to access his phone, but that on the day he was locked out, it
required him to use his numeric passcode.  *Id*., at 108:18-25.

84.     Mr. Beauregard tried multiple times to access his phone using what he believed to
be his passcode from the sticky note on his computer.  However, despite Mr. Beauregard's belief
that he had the correct passcode, his iPhone would not accept it as such.  Ultimately, after several
attempts to try to access his phone using the passcode he had on the sticky note, his iPhone
displayed a message telling him that he had been locked out.  *Id.* at 111:6-8.

85.     Mr. Beauregard then contacted Seattle IT to see if IT could help him access his
phone.  *Id.*, at 111:15-112:6.  IT told him that they were going to try to work with Apple and see if
there was some way to gain access to his phone.  *Id.*, at 111:20-25.  Mr. Beauregard testified he
also spoke with his executive assistant, who suggested he call Apple directly.  Mr. Beauregard then
called Apple to see whether someone there could help him access his phone again.  The Apple
technician suggested that Mr. Beauregard try changing his AppleID.  *Id.*, at 113:10-114:18.
Beauregard tried following the steps that Apple gave him, but he was not able to access his phone.
*Id*.  Sometime after Mr. Beauregard was locked out, he noticed that the screen on his phone lit up
and his phone began to reboot.  *Id*., at 121:21-122:3.  After the reboot, he was able to use his phone
again.

86.     Both parties' forensic experts agree that Mr. Beauregard's phone was reset on
October 9, 2020, which is consistent with the time period during which Mr. Beauregard testified he
had been locked out.  Ex. 18, at 25; Ex. 7, at 9.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 23
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2     **5.     Facts Relevant to Assistant Chief Greening's Phone.**

3         87.     Assistant Chief Eric Greening is an Assistant Chief of Police for the Seattle Police

4     Department.  Chief Greening was not deposed in the case.  He has submitted a declaration in

5     support of the City's Opposition to Plaintiffs' Motion for Spoliation Sanctions.

6         88.     Chief Greening's declaration explains how he was locked out of his City-issued

7     phone while on vacation in Michigan, how he called his assistant, Celina Villa, on October 20,

8     2020 to let her know he was locked out of his phone, and how he provided his phone to Ms. Villa

9     when he returned to Seattle on the morning of October 26, 2020 so she could work to resolve the

10    issue with the Seattle Police Department's phone coordinators.  *See* Declaration of Chief Greening

11    filed herewith.

12        89.     Attached hereto as Exhibit 27 is a true and correct copy of an email thread between

13    Celina Villa and Brian Kennedy dated October 26, 2020, which was marked as Exhibit 6 during

14    the deposition of Brian Kennedy in this matter.  The thread reflects that Ms. Villa worked with Mr.

15    Kennedy to get Chief Greening's phone so he could try to resolve Chief Greening's lock-out.  *Id.*

16    A true and correct copy of excerpts from the March 9, 2022 deposition of Brian Kennedy in this

17    matter is attached hereto as Exhibit 28.  Mr. Kennedy could not specifically recall whether he reset

18    Chief Greening's phone.  Ex. 28, at 115:9-18.  But when Chief Greening received the phone back,

19    he was able to access his phone.

20        90.     Chief Greening did not direct Ms. Villa or Mr. Kennedy to delete his messages or

21    reset his phone.  Greening Declaration, ¶ 10.  Assistant Chief Greening and Mr. Kennedy did not

22    interact at any point during the process.  *Id.*, ¶ 12; Ex. 28, at 115:19-22, 125:20-23.

23

24

25

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2    **6.    Facts Relevant to Kenneth Neafcy's Phone.**

3        91.    Mr. Neafcy is the Operations Coordinator for the City's Office of Emergency

4    Management.  Mr. Neafcy was not deposed in this matter.  He has submitted a declaration in

5    support of the City's Opposition to Plaintiffs' Motion for Spoliation Sanctions.

6        92.    Mr. Neafcy's declaration explains and attaches contemporaneous emails describing

7    that he was locked out of his City-issued phone on October 26, 2020, and that he reached out

8    Seattle IT and to an SPD phone coordinator for assistance the following day, October 27, 2020.

9    Mr. Neafcy did not reset his phone himself.  Rather, on the morning of October 28, 2020, Mr.

10   Neafcy noticed that his phone had been reset, writing to Mr. Steel that, "[i]t looks like Seattle IT

11   remote wiped it."  Neafcy Dec., Ex. 1.

12       93.    At around noon on October 28, 2020, Mr. Neafcy reached out to multiple people at

13   the City about his phone.  As he wrote to Ms. DeMers and Lutu Smith:

14       I am neck deep in dealing with EOC election response activation and am getting
         considerable heat from the Mayor's office and others who are unable to reach or
15       text me on my work phone.  I really need this phone up and running tonight and if
         that can't be done then I need a new phone with a new number tomorrow.  I really
16       need some help here…please.

17   *Id.*, Ex. 2.

18       94.    Based on guidance from Seattle IT, Mr. Neafcy then removed the SIM card from

19   the phone that Seattle IT had reset and inserted it into an old iPhone 6s that had been his primary

20   City-issued phone before he started using the iPhone XS in March 2020.  *Id.*

21       95.    Mr. Neafcy began using his iPhone 6s again starting on October 28, 2020.  Mr.

22   Neafcy's text messages from October 28, 2020 forward have been retained and were preserved on

23   his iPhone 6s, as were the messages he sent and received using the iPhone 6s prior to receiving his

24   iPhone XS in March 2020.  Ex. 18, at 21.

25

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 25
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

96.      Both experts' analyses, which show that he was missing texts from March 19, 2020 through October 27, 2020, and that his iPhone XS was reset on October 27, are consistent with Mr. Neafcy's explanation and the contemporaneous documents.  Mr. Leatha also testified that he had no knowledge or information regarding whether Mr. Neafcy's phone was ever backed up to iCloud, including prior to October 27, 2020.  Ex. 20, at 208:12-24.

**7.      Facts Relevant to Chris Fisher's Phone.**

97.      Dr. Christopher Fisher ("Fisher") joined SPD in April 2016; in December 2021 he was loaned to the Department of Justice.  During the relevant time period, he served in the civilian position of chief strategy officer.  A true and correct copy of excerpts from the September 23, 2022 deposition of Christopher Fisher in this matter is attached hereto as Exhibit 29, at p. 30:22-31:8.

98.      Dr. Fisher used an iPhone 7 from prior to the summer of 2020 through December 9, 2020, when he received an iPhone XR.  Ex. 7, at 7.

99.      On March 26, 2020, more than two months before CHOP, Dr. Fisher forgot his passcode and was locked out of his phone.  Dr. Fisher explained that he had a practice of not writing his passcodes down because "[o]ur department phones … could contain FBI-related data that were supposed to be pretty secure, so I – best practice was you don't write down your passwords."  Ex. 29, at 196:21-197:2.

100.     On March 26, 2020, he emailed Jon Engstrom in SPD's intel unit, asking him for advice on how to get into his phone.  A true and correct copy of Dr. Fisher's email thread with Mr. Engstrom, which was marked as Exhibit 19 at Dr. Fisher's deposition, is attached hereto as Exhibit 30.  As a follow-up to his email, Dr. Fisher spoke with one of the individuals on the thread, who told him that he did not have the ability to bypass the passcode, and that the only way to get in was to type in incorrect passcodes until the phone reset.  Ex. 29, at 194:6-198:25.  Fisher did so.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 26
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

101.    Dr. Fisher experienced another lock-out on approximately November 3, 2020.  Ex. 18, at 18; Ex. 7, at 6.  Relying on the advice and instructions that he had been given in March 2020, Dr. Fisher reset his phone.  Ex. 29, at 231:11-24.  Early discovery responses served by the City estimated the date of this reset as "approximately December 3, 2020" based on information provided by Dr. Fisher and the fact that December 3 was the date of the earliest message that we had discovered on his phone at the time we responded to discovery.  Based on the experts' forensic analyses, which were not available at the time, and Dr. Fisher's deposition testimony, it is clear that the date he was locked out and reset his phone was November 3, not December 3, 2020.  Ex. 19, at 184:15-185:15.  There was no lock-out or reset on December 3, 2020.  *Id.*

102.    Forensic artifacts from Dr. Fisher's iPhone 7 indicate that he may have inadvertently restored his phone from an iCloud back-up of his personal phone after he reset it on November 3.  When the City collected Fisher's work-phone in February 2021 for purposes of this lawsuit, it was logged in to his personal AppleID and iCloud account.  The experts found evidence that photos taken by his personal phones had been synced to his City-issued phone, likely via iCloud syncing.

103.    Plaintiffs' expert also identified artifacts indicating that 15,843 messages may have synced down from his iCloud along with the photos from his personal phone and then deleted.  Ex. 20, at 201:25-202:4.  The inference from Mr. Leatha's conclusions is that the messages that synced down on November 2, 2020 were not messages from his City-issued phone, but rather texts from his personal phone.  Mr. Leatha also testified that the alleged loss of the 15,843 texts likely was due to a 30-day retention setting, and not a manual text-by-text deletion.  *Id.*, 195:24-196:15.  Given that the 15,843 texts were likely his personal texts, and he has produced thousands of texts

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

from his personal phone going back to prior to 2020, it is not clear that any spoliation occurred as a result of the 15,843 messages being deleted.

104.    Dr. Fisher testified that, like Chief Best, he had previously set his work iPhone to retain messages for only 30 days.  Dr. Fisher testified that he implemented this retention setting change before CHOP, and possibly prior to Covid-19.  Ex. 29, at 224:16-225:4.  He also testified that he "assume[d] the City had ways to get messages back on a device it owned." *See Id.*, 191:16-18.

105.    We were not aware until Mr. Leatha issued his expert report that forensics from Dr. Fisher's iPhone 7 indicated that Dr. Fisher had sent work-related texts from his personal phone. Once we became aware, we worked with Dr. Fisher to collect his non-privileged work-related texts from his personal phone.

106.    This involved obtaining a third-party forensic tool for Dr. Fisher to use to extract texts from his phone.  The tool could not be run without a computer, and Dr. Fisher did not have one.  Ultimately, he purchased a computer to do this collection.  Utilizing the tool, Dr. Fisher searched his phone for relevant, responsive texts and provided them to us for review.  Once we had completed our review, we provided them to Plaintiffs.

107.    Plaintiffs also served Dr. Fisher with a document and deposition subpoena, seeking, among other things, a complete image of his personal phone, which was not something that the parties had ever agreed to with respect to any of the other City employees whom Plaintiffs had subpoenaed months earlier, and without a Device Examination Agreement in place that would have established a protocol or covered Dr. Fisher's personal phone.  The City lodged a number of objections to Plaintiffs' subpoena.  Ultimately, the parties were able to resolve their issues and

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 28
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

reached agreement on the scope of Dr. Fisher's production.  Dr. Fisher's text messages were timely produced on the agreed-upon schedule, prior to his deposition.

108.    Mr. Leatha testified that he could not conclude that any iCloud backup that had existed on December 2, 2020 would have included any text messages because Mr. Leatha had found artifacts showing that Dr. Fisher had "Messages in iCloud" enabled at some point after November 3, 2020 on his iPhone.  Ex. 20, at 202:20-203:1.

109.    Mr. Faulkner testified that he did work with Dr. Fisher to try to gain access to Dr. Fisher's iCloud account, but that they ultimately could not gain access.  Ex. 19, at 32:9-18.  To date, none of the City's and Dr. Fisher's efforts to access Dr. Fisher's iCloud account have been successful.

110.    Plaintiffs' counsel states at Paragraph 98 of his declaration that "Leatha could 'not locate recoverable messages or other forms of communication sent or received by the Microsoft Teams application" on Dr. Fisher's phone.  Teams messages would have been collected by the City's collection of emails at the beginning of the case, as they are a Microsoft product and are stored centrally by the City.  Any relevant, responsive, non-privileged Teams messages would have been produced in the case in the same manner as email months ago.

**E.     Facts Relevant to Plaintiffs' Manual Deletion Argument.**

111.    In his report, Mr. Leatha identifies certain forensics that indicate certain City employees manually deleted text messages after the litigation was filed.  The City has gone to great lengths to reconstruct text messages, including manually deleted texts, as described in the Declaration of Martha Dawson filed herewith.  *See also* Ex. 7 (describing reconstruction process and manual deletions).  Individuals testified as follows regarding manual deletions.

112.    Mayor Durkan testified in the *Seattle Times* Public Records Act lawsuit that it was her general practice to keep all substantive and non-substantive texts related to City business,

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 29
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

although she allowed that there could be occasions where a scheduling or other transitory texts might be deleted.  She also testified that when she receives phishing (not "phishy," as Plaintiffs claim) or scam texts, she deletes them.  Ex. 10, at 72:15-73:11; 76:9-17.

113.    Mr. Beauregard testified that he did not manually delete any messages that would have been covered by the litigation hold in this case. Ex. 26, at 132:1-5. When asked about the type of texts he might have deleted that were not covered by the litigation holds that he might have deleted, Mr. Beauregard provided as an example that he might delete texts from a co-worker talking about football. *Id.*, at 132:22-133:20.

114.    Dr. Fisher also testified that he never manually deleted any text messages from either his work phone or his personal phone that pertained to this case, whether intentionally or unintentionally.  Ex. 29, at 192:19-193:10.

115.    Plaintiffs also admitted to deleting documents that they believed were not relevant to the lawsuit, notwithstanding having received litigation holds.

116.     For example, Joseph Wanagel, owner of Plaintiff Olive ST Apartments, admitted that he has deleted texts "like sales stuff" and emails since June 2020, though "nothing pertaining to CHOP."  A true and correct copy of excerpts from the May 21, 2021 deposition of Joseph Wanagel in this matter is attached hereto as Exhibit 31, at pp. 189-91.

117.    Tamara Kilburn, owner of Plaintiff Sway and Cake, likewise admitted that she deleted all of her emails with her landlord, Andrea Augustine of Plaintiff Madrona Real Estate Services, such that "those emails don't exist anymore."  A true and correct copy of excerpts from the May 13, 2021 deposition of Tamara Kilburn in this matter is attached hereto as Exhibit 32, at 53:21-54:25.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 30
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

118.    Plaintiff Matthew Ploszaj testified that, like Mayor Durkan, he also deletes suspicious text messages from his phone.  A true and correct copy of excerpts from the June 10, 2021 deposition of Matthew Ploszaj in this matter is attached hereto as Exhibit 33, at 134:24-135:10.

119.    Plaintiffs' motion also includes a discussion of the City's statutory records retention obligations that is factually inaccurate.  Ms. Winkler, the City Records Manager, testified that text messages are treated the same as any other record "and therefore will follow the same retention policy that exists for other types of similar records in the department."  Ex. 2, at 17:20-23.

120.    Ms. Winkler also described an advice sheet for text message retention that her department had issued.  *Id.*  The City Records Management Program's Advice Sheet for text messages describes employees' obligations for preserving text messages as follows:



A true and correct copy of the City Records Management Program's Advice Sheet for Text Messages, which was marked as Exhibit 2 to the deposition of Jennifer Winkler, is attached hereto as Exhibit 34.

121.    The Advice Sheet also defines "transitory text message" under the City's statutory records retention obligation:

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 31
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700    FAX (206) 623-8717



**What is a transitory text message?**

"Transitory" text means a text message that only documents information of temporary, short-term value, and that is not needed as evidence of a business transaction. Examples of transitory texts include:

- Texts that set work meetings or request job-related phone calls.
- Texts that are akin to voice mail messages.
- Texts noting the sender has completed a simple task (e.g. "I returned the call to Mary Smith," "The broken water main has been repaired," or "The suspect has been apprehended.")
- Texts informing a coworker/supervisor that the sender will be late to work, late to a meeting, is taking the day off, or another similar message.
- Texts that ask another employee to take some form of simple action (e.g. "Can you please take your City vehicle to the shops," "I need you to call Frank about the sewer line on 256th," or "You are needed in court at 11:00 a.m.")
- Texts that contain information that is later included in another City record. Examples include:

Phone (206) 684-8154   Email: LEG_CRMP@seattle.gov

SEA

○ A Street Supervisor receives a text from a coworker informing him of a fallen tree on 256th Street. The Supervisor later prepares a work report noting the fallen tree on 256th, and that he sent a crew to clean up the tree. Once the work report is prepared, the text becomes transitory.
○ A Police Detective receives a text from a Sergeant explaining that she talked with a witness in an investigation and asking the Detective to follow up and take a statement from the witness. The Detective then takes a statement from the witness. Once the statement is taken, the text becomes transitory.

Transitory texts may be deleted by the user once the texts have served their purpose.

*Id.*

**F.      The City's Production of Documents to Date.**

122.    To date, the City has produced over 40,000 emails and (non-text message) documents in this matter. These include thousands contemporaneous emails and other documents from City employees (including the Individuals), that detail every decision that was made by the City in dealing with the CHOP.  The City also has produced tens of thousands of texts from other employees' devices, including texts from those employees who worked most closely with the Individuals: *e.g.*, Deputy Mayors, the Mayor's Chief of Staff; then-SPD Deputy Chief Adrian Diaz; multiple SPD assistant chiefs; the Deputy Fire Chief; and many others.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 32
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

123.    Plaintiffs also have taken 21 depositions of current and former City officials and employees, including one deputy mayor and multiple department heads.  During their depositions of Mayor Durkan, Chief Best, or Chief Scoggins, Plaintiffs opted to not ask specifically what, if anything, they discussed one-on-one about CHOP over text.  Ex. 22, at 205:7-208:16; Ex. 24, at 107:6-21; Ex. 9, 28:4-25, 31:6-32:2.  The City produced text reconstructions for Chief Best and Mayor Durkan before their depositions.  Plaintiffs did not mark Best's text reconstruction as an exhibit to her deposition and asked no questions about it.  Mayor Durkan's reconstruction was marked, but she was asked only about certain texts describing the City's discussions with Plaintiff Hunters Capital about a potential lease to Black Lives Matter.  Ex. 9, at 132:6-137:3.

**G.    Settlement in the *Seattle Times* Case and the City's Adoption of its Current Text Message Retention Program.**

124.    On June 3, 2021, the Seattle Times filed a Public Records Act lawsuit against the City over certain requests that it had made to the City in the 2020.  The Parties settled the lawsuit on May 5, 2022.  One of the terms of the settlement was that the City take certain steps in connection with its policies, practices, or procedures for collecting or preserving public records:

   a.    The City agreed to enroll all of its City-issued mobile devices into a data archiving program that would preserve all text messages sent or received by the device.  The Parties agreed that 60 percent of all City-issued phones, including those of the City Council, Mayor's Office, and City Attorney's Office employees would be enrolled by December 31, 2022, and that enrollment of all City-issued devices would be completed by July 1, 2023.

   b.    The City agreed to provide updated training to all employees regarding the PRA, retention practices, and the use of personal devices for City communications, including text messages; and

   c.    The requirement that all City-issued mobile phones initially be programmed to retain text messages permanently.

125.    Julie Kipp, the City's Public Disclosure Program Manager, has submitted a declaration in support of the City's Opposition that describes the City's progress toward getting all

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 33 (Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

1    of its City-issued devices enrolled.  According to Ms. Kipp, the City is ahead of schedule and will

2    be able to meet the July 2023 deadline.

3
     **H.    Plaintiffs' Third-Party Discovery to Chief Best is Not Relevant to Spoliation Against
4            the City.**

5          126.    In his declaration, Plaintiffs' counsel describes Plaintiffs' interactions with Chief

6    Best's counsel months after she was no longer employed by the City.  Calfo Dec., ¶¶62-65.  The

7    City was not a party to most of those interactions.

8          127.    The City provided notice to Chief Best of her litigation preservation requirements in

9
10   July of 2020.

11         128.    In Paragraph 62 of his declaration, Plaintiffs' Counsel points to Plaintiffs' Exhibit

12   30 for the proposition that Chief Best sent work texts from her personal phone.  None of the texts

13   between Dr. Fisher and "CARMEN HOME" appear to have been sent during June 2020.

14         129.    Chief Best's last day in City employment was September 2, 2020.  The parties

15   began serving and responding to discovery in Fall 2020.  Attorneys from my firm disclosed to

16   Plaintiffs' counsel on March 26, 2021 that the City was missing text messages from Chief Best's

17   phone.  Based on Plaintiffs' Exhibit 28, it appears Plaintiffs executed a subpoena for Chief Best

18   two months later, on May 24, 2021, although the version of Plaintiffs' subpoena that was served on

19   our firm was dated, signed, and served on May 27, 2021, not May 24, 2021.

20         130.    Chief Best produced a set of text messages in this case pursuant to Plaintiffs'

21   subpoena.  The earliest dated text message she produced is dated May 15, 2021, 12 days before

22
23   Plaintiffs served a Notice of Intent to Subpoena Chief Best on our office.  I am unaware of any

24   efforts by Plaintiffs' counsel directed at our firm to accept service on behalf of Chief Best, who

25   was not our client, prior to that time.

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 34
(Case No. 20-cv-00983)

LAW OFFICES
**HARRIGAN LEYH FARMER & THOMSEN LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL (206) 623-1700   FAX (206) 623-8717

131.     Plaintiffs Counsel notes that Mr. Faulkner did not examine Chief Best's personal cell phone.  Mr. Faulkner was not hired until after Chief Best had left City employment.  And according Exhibit 29 to Plaintiffs' Counsel's declaration, Chief Best's counsel appears to have hired its own forensic examiner in connection with Plaintiffs' subpoena to Chief Best.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this 28th day of October 2022, at Seattle, Washington.


*s/ Shane P. Cramer*
SHANE P. CRAMER

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF CITY'S
OPPOSITION TO MOTION FOR SPOLIATION SANCTIONS - 35
(Case No. 20-cv-00983)