# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff,           )
                                 )
       vs.                       ) No. 20-cv-00983
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

MAYOR JENNY A. DURKAN

_____

Seattle, Washington

(All participants appeared via videoconference.)

DATE TAKEN:   DECEMBER 8, 2021
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

Page 28

```
 1   thinking about and addressing the public safety issues,
 2   and Chief Best would, you know, talk about those things
 3   as well.
 4        Q.   Did you ever have direct text conversations
 5   between you and Chief Best?
 6        A.   So we would -- our usual practice, if you would
 7   call it a practice, but just -- I think what we would do
 8   is first we spoke mostly in person.  That was our
 9   preferred method of communication.
10             Other times we would speak by phone.  If we had
11   something significant to talk to each other about, it
12   would be either in person or by phone usually.  If we
13   had text communications, usually we would include a
14   staff member on the text as well, just to make sure
15   everyone had the heads-up, and it usually would be
16   something like, we need to schedule X or do Y.
17        Q.   Were there some text conversations you had with
18   Carmen Best that would have been just you and Carmen
19   Best on the text?
20        A.   It's possible, I -- that there would be texts
21   between Carmen Best and myself that would be just the
22   two of us on the chain.  But again, you know, the normal
23   process, if it was something significant, we would
24   include other staff or we'd just pick up the phone and
25   call each other.
```

1  impacts, and we were fighting against the health
2  impacts.  We had no access to testing, and so we really
3  were trying to build a system to respond to that, and --
4  and we used our fire department and our medics as the
5  first line.
6         Q.   In June of 2020, do you -- would you have ever
7  texted Chief Scoggins in a communication that was just
8  you and Chief Scoggins?
9         A.   Would I ever have done it?  It is -- I -- I
10 would say that, again, you know, the practice would be
11 to not communicate things of substance by text, or he
12 would include someone.
13             But it's -- and -- and we were, you know,
14 talking and in a room, and he would call me through
15 those period of times, but it's possible that there
16 could have been some text messages, yes.
17        Q.   Some text messages that would have been just
18 you and Chief Scoggins on the text?
19        A.   Yeah.  And again, just to emphasize, I mean, I
20 think that, you know, as you -- and you've seen my
21 calendar and the like, and -- and Chief Scoggins and I
22 were again in a room, our first line would be to talk to
23 each other or talk to each other on the phone.
24             He would usually include other people on the
25 text messages.  But I can't exclude the possibility that

1   there could be a text from Chief Scoggins to me during
2   that time frame.
3       Q.   I don't know if I've seen your calendar, by the
4   way, but anyway.
5            So during this deposition, I'm going to -- I'm
6   going to use the term CHOP, and I want to see if we can
7   agree on kind of what the definition of CHOP is.  I'm --
8   when I talk about CHOP, I'm talking about the events and
9   the protests that were around Cal Anderson Park and the
10  East Precinct from the night of June 8th to the morning
11  of July 1st, 2020.
12           Is that an acceptable definition of CHOP for
13  you?
14           MR. HARRIGAN:  Objection.  Vague.
15           Counsel, I think you can define the term and
16  then ask the question based on that definition.
17  BY MR. WEAVER:
18      Q.   If I ask -- if I use CHOP with that
19  terminology, will you understand what I'm referring to,
20  Mayor?
21      A.   I will.  I will -- I will -- for me, it's the
22  Capitol Hill and Cal Anderson area, but I'll understand
23  what you are saying.
24      Q.   Okay.  So are you aware of any actions that
25  were taken during that time period with regard to CHOP

Hunters Capital, LLC v. City of Seattle          Mayor Jenny A. Durkan

Page 132

1   Q.  And did you also speak to Jill Cronauer, who
2   worked for him?  Were you on that call?
3   A.  I don't recall having conversations with her,
4   but it's -- it -- I don't recall having conversations
5   with her, but it's possible she was on a call.
6           MR. WEAVER:  Okay.  Hold on here.  Whoops.
7   Okay.  That will be -- what I dropped in there, Court
8   Reporter, that should be marked as Exhibit 6.  It's a
9   spreadsheet.  I can renumber it if we need to do that,
10  but -- okay.
11          (Exhibit No. 6 marked.)
12  BY MR. WEAVER:
13      Q.  So if you can open this, this is an Excel
14  spreadsheet that we received of some of our texts that
15  were recovered from other custodians.  And it's pretty
16  cumbersome to go through.  I'm not going to lie.
17          So this is not every text that we got.  I mean,
18  that was -- went back to 2017, I believe.  This is
19  everything we got from the first production of recovered
20  emails, just so Counsel knows, for the period of
21  June 8th through, I believe, of mid-July.
22          And if you could go to the -- if you look at
23  Column I, which is the time of the various texts, and if
24  you could go down to -- or up to, depending on how it
25  is, to June 21st?

1    A.  It will take a minute just to scroll there.
2    Q.  Believe me, I get it.  I'm not even there yet,
3  so...
4            MR. CRAMER:  Tyler, can you direct us to the
5  row when you get there?  I think that might be the
6  easiest way to --
7            MR. WEAVER:  Yeah, it looks like it's 126,
8  127, 128, in there.
9            MR. CRAMER:  And that was Shane Cramer, for
10 the court reporter.
11           THE COURT REPORTER:  Thank you.
12 BY MR. WEAVER:
13   Q.  Have you found the spot, Mayor?
14   A.  I think so.  I think I've found that.  It's
15 hard for me to see.  I've got the date and the -- is
16 this the mayor in chief?  Is that the one you're
17 referring to?
18   Q.  Yeah.  That's --
19   A.  And it's from Mike Fong to me and Carmen Best;
20 is that correct?
21   Q.  Yes.
22   A.  All right.  So -- and it's on June 21st.  This
23 appears to have it at 11:21 a.m., but that's UTC, so I
24 think that's seven hours ahead of Pacific Daylight Time.
25 So it would be -- I'm not sure -- I won't vouch for the

1  timestamp on this --
2       Q.  Okay.
3       A.  -- because it usually indicates -- I don't
4  know.  Is it universal something?  It's like Greenwich
5  Mean Time or something --
6       Q.  Yeah.
7       A.  -- like that.
8           But UTC, I think, is seven hours ahead of
9  Pacific -- and I don't know if it's seven hours ahead of
10 Pacific Daylight Time or Standard Time, so -- but I see
11 the email.
12      Q.  Okay.  This is a text actually, but --
13      A.  Oh, it's a text.  Thank you.
14      Q.  Yeah, in this not very handy spreadsheet.
15          So --
16      A.  They're doing --
17      Q.  -- at what -- go ahead.  What?
18      A.  I said, they're doing the best they can.
19      Q.  Yeah.  Well, we've had the same issue, so, I
20 mean, I'm not complaining.
21          So on -- at 1:59, regardless -- you know,
22 whether that is UTC time or Pacific time, you indicate
23 that, "Risk of not acting greater than risk of acting."
24          Do you recall what you meant there?
25      A.  I must be looking at a different thing.

```
 1        Q.  So that is Line 130.  There's a -- so there's a
 2   conversation.  "Mayor and Chief."  Conference number.
 3            "Her name is Jill.
 4            "I'm hopping on now."
 5            Then, risk of acting not greater than -- "Risk
 6   of not acting greater than risk of acting," from you to
 7   Mike Fong.
 8        A.  I -- yeah, I -- I don't know from reading
 9   these, are those the same text thread, in the same area
10   of discussion?
11        Q.  This is how they were produced to us.
12        A.  I don't -- I don't know in isolation what that
13   means or whether it's related.
14        Q.  Do you know whether you perceived a risk of not
15   acting to -- to figure out a way to give The Riveter
16   space to Black Lives Matter?
17        A.  No, I don't -- I don't recall that.  And I'm --
18   I'm trying to read the thing in -- in -- together.  I'm
19   sorry; I don't know what that refers to.
20        Q.  Okay.  If you could go down to Line 137, which
21   is --
22        A.  And I'll say, the text -- the -- the text that
23   you said before, the one that was copied to the chief --
24        Q.  Uh-huh.
25        A.  -- I think that's consistent with my
```

Hunters Capital, LLC v. City of Seattle                Mayor Jenny A. Durkan

Page 136

1  recollection that she was aware of it, but she was not
2  involved in the various details.
3          Q.   Yeah.  I think she indicated that she was not.
4               So Line 137 appears to be a text from you to
5  several members of your staff.  The date on it is --
6          A.   Yep.  That's the one I was talking about.
7          Q.   Okay.  So -- and that was -- that was the phone
8  call you were talking about earlier with Mike Malone?
9          A.   Yeah, as I -- as -- my rec- -- my best
10 recollection is, there was a -- and I'd have to look at
11 all the documents again, was, okay, we can't -- we don't
12 want to -- we can't use the East Precinct.  We have both
13 this demand and growing community ask, maybe supported
14 by city council, that the East Precinct be turned into a
15 community center.
16              We're trying -- we know that can't happen from
17 an operational standpoint in terms of serving the people
18 of Seattle and the East Precinct.  And what is an
19 alternative that can address what the community wants to
20 do and creates something that really would be unique and
21 leading in the country.  And so what space is available?
22              I described how we came up with The Riveter.
23 And the introduction was made, I think, to Amy Nelson,
24 who then talked to the -- I think must be Jill, and they
25 were having a conversation with her, and my -- my

1  recollection is, is that everything -- nothing could
2  happen unless Mike Malone was persuaded it was a good
3  thing for the City and -- to move forward.
4      Q.  And so you called Mike Malone to try to
5  persuade him that it would be a good thing for Hunters
6  and the City?
7      A.  I wouldn't say -- I wouldn't say necessarily
8  persuade, but to tell him what the purpose was.  Again,
9  my under- -- my recollection is -- there's kind of two
10 parts to it.
11          One is, you know, it was a really difficult
12 time for everyone in the City, and it was a really
13 difficult time for people in and around Capitol Hill.
14 And Mike Malone has done tremendous amounts over a
15 period of many years to rebuild that Pike/Pine corridor.
16 And it's not just his investments.  It's kind of what he
17 has done for the improvement of our city.
18          And -- you know, he owns the Sorrento Hotel,
19 and all these things have been this investment in the
20 city.  And he saw that some of this -- that things were
21 really different and impactful, and he wanted to be able
22 to know that there's a plan to go forward, that we
23 really are going to be able to, you know, restore this
24 area and -- and -- and recognize the value of -- not
25 just the financial investment, but the investment in the

1  but we -- typically, in the City of Seattle, there will
2  be a litigation hold that comes if it involves me, or my
3  office comes to me, and I believe there's a litigation
4  hold that I received about this case.
5     Q.  Okay.  Do you recall when you received it?
6     A.  I don't know the exact date.
7     Q.  What happened to your phone on July 4, 2020?
8     A.  So the short answer is, I was out of the city
9  for -- and -- and we have a small cabin near a beach,
10 and I was walking on the beach.  The phone fell out of
11 my pocket and became -- into some saltwater on the
12 beach.
13    Q.  So I take it you retrieved it from the
14 saltwater, and was it working at that point?
15    A.  No, I -- I got it out of the saltwater.  It
16 was -- it was pixilated, for lack of a better
17 description.  It gets that kind of fuzzy look.  So I
18 immediately powered the phone down.  And then was able
19 to go back to the cabin, and I threw it in a bag of
20 rice.
21    Q.  Okay.  At some point did it start working
22 again?
23    A.  Yeah.  I took it -- it was there for -- I left
24 it in the rice for a little while, and then after I got
25 it out of the rice, I had to restore it.  So I restored

Hunters Capital, LLC v. City of SeattleMayor Jenny A. Durkan

Page 256

```
 1  my data from the iCloud, but had a hard time restoring
 2  my calendar.  So I was able to get the messages, had
 3  some problems with the mail, but got the mail on there,
 4  and -- but had trouble getting the calendar to load.
 5       Q.  Did you reset your phone?
 6       A.  I don't recall whether I reset it or whether
 7  it -- because if it crashed, it reset, but my
 8  recollection is, there's that screen where you can say,
 9  you know, do you want to start your phone as a new phone
10  or restore it from the cloud, and I chose from the
11  cloud, and then restored it from the iCloud backup for
12  the phone.
13       Q.  Okay.  And as far as you know, you were able to
14  get all of your messages --
15       A.  Yes.
16       Q.  -- restored from the cloud onto your phone?
17       A.  Yes, as far as I know.
18       Q.  Did you --
19       A.  And the messages were on there.  I mean, I tend
20  to look just at the top messages.  But it took a while
21  for the phone to update to get the messages and the
22  mail.  The calendar, I had a little bit more difficulty
23  with because I had to get a password from another
24  assistant, but finally got the calendar to load too.
25       Q.  So who did -- who did you talk to at the City
```

1   And -- and like I said, it was Fourth of July,
2   so I was cooking dinner.  We did fireworks, and I don't
3   remember the exact time that I got the password to it,
4   whenever I -- I think there's an email they sent it to
5   me by, and whenever they sent it, but when I read it, I
6   was able to enter it, and then the calendar was able to
7   load too.
8       Q.  Okay.  At some point did you get a replacement
9   phone for the phone that had been dropped in the
10  saltwater?
11      A.  I did.  So, you know, part of what I was trying
12  to do was, you know, get the phone to limp along.  I
13  knew I'd be back in Seattle, and that IT could either
14  see if the phone was suitable or I needed a new one.
15      They made the decision to replace the phone.
16  The phone that I dropped in the water, also the screen
17  had cracked on it.  And so they issued a replacement
18  phone for me.  I think it was around July 9th.  There
19  was a little bit of a delay be- -- getting the phone
20  ordered, and then they gave me the new phone.
21      Q.  Okay.  So did the phone crack at the same time
22  you dropped it into the water?
23      A.  No.  We'd already had a cracked screen, and I
24  don't remember how it got there.
25      Q.  Okay.  So when you got your new phone, what

1  to get those contacts loaded on there.
2      Q.  At some point did you discover or hear that
3  your phone had a 30-day delete -- your new phone had a
4  30-day delete setting that had been turned on, for
5  messages?
6      A.  I did hear that after this whole issue had
7  developed.
8      Q.  Okay.  When did you hear that, and who told
9  you?
10     A.  To the best of my recollection, I heard it --
11 I -- to the best of my recollection, I wasn't aware that
12 there was an issue with -- related to the -- the text
13 messages not being on the phone until probably, I want
14 to say it was September or October.
15         I knew that they needed my phone, and I knew
16 that they -- that there were texts they were looking
17 for, but it was not until that later time frame that I
18 realized that there were a greater number of text
19 messages that were not on my phone.
20         And it wasn't until, I think, much later,
21 probably the spring, that it was identified that the
22 issue could have been that the -- the retention setting
23 for messages on the phone was set, for some period of
24 time, to 30 days instead of infinity.
25     Q.  Do you know or have you heard who turned on the

Page 262

1   30-day delete function on your new phone?
2       A.  No, I do not, and have not heard.
3       Q.  Do you know who discovered that it was on and
4   turned it off?
5       A.  No.  I'm not sure -- I'm not sure what you're
6   asking.
7       Q.  My understanding is that you have texts from
8   June 25th onward, but that the texts before that date
9   have been deleted, apparently due to the 30-day
10  function, although I don't know exactly what the
11  official story is right now, which leads me to conclude
12  that somebody determined in late July that there was a
13  30-day -- 30-day delete and turned it off.
14          Are you aware of that?
15      A.  Oh, if that's -- do I know that in July who may
16  have done something with the retention settings?
17      Q.  Yeah.  Do you know who may have turned the
18  30-day settings off, or who first discovered that it was
19  on in the first place?
20      A.  No, I do not.
21          MR. HARRIGAN:  Objection.  Assumes facts not
22  established.
23          Go ahead.  But you can -- sorry.  I overrode
24  your answer, so you probably should say it again.
25      A.  Sorry.  Sorry.  No, I do not.

9b7a8e41-89c8-48e2-9cbb-848326c1cb99

1  A.  Correct.  But was -- the August collection that
2  you talked about, I think that may have been the first
3  time after the pandemic that they collected it.
4       Now, there could have been another one in
5  there, but again, you know, people were working from
6  home, and -- and my best recollection is, that may have
7  been one of the first times they did it during the
8  pandemic.
9  Q.  Okay.  In late July 2020, do you recall whether
10 your phone was in anyone's possession other than yours
11 during that time period, whether the City or somebody
12 personally?
13 A.  Late July, meaning like the 30th or thirty --
14 Q.  Last couple weeks of July.
15 A.  So after I got the phone, again, I think we
16 talked about that, when I -- when I got the new phone
17 issued, I still had some problems with that phone, and
18 the -- the contacts were not on the phone.
19      And so we gave the phone back to IT that week.
20 I think that was sometime around the week of the 20-ish.
21 They gave it back to me.  I was using it again to make
22 some phone calls.
23      I went to get a phone number and again a person
24 wasn't in my contacts.  So at the end of that same week,
25 I think around the 24th, we gave it back to IT to see if

Hunters Capital, LLC v. City of Seattle　　　　　Mayor Jenny A. Durkan

Page 272

1　they could get all the contacts to load.
2　　　Q.　Okay.　Those transfers to IT would have been
3　through your assistant, as they were earlier?
4　　　A.　Correct.
5　　　　　　MR. WEAVER:　Okay.　I think -- is that --
6　okay.　I don't have any further questions --
7　　　　　　THE WITNESS:　All right.
8　　　　　　MR. WEAVER:　-- unless your counsel has
9　something they want to ask you.
10　　　　　MR. HARRIGAN:　No.　We'll refrain.
11　　　　　MR. WEAVER:　Okay.
12　　　　　MR. CRAMER:　We'll reserve --
13　　　　　THE COURT REPORTER:　It's only 4:55.
14　　　　　MR. WEAVER:　No, I don't --
15　　　　　MR. CRAMER:　We'll reserve signature.
16　　　　　MR. WEAVER:　I don't -- the people on this
17　case don't believe it, but I -- anyway --
18　　　　　THE VIDEOGRAPHER:　I'll sign off for the
19　day?
20　　　　　MR. WEAVER:　We can go off the record.
21　　　　　THE COURT REPORTER:　Oh, sorry.　The video's
22　still going, isn't it?
23　　　　　THE VIDEOGRAPHER:　No problem.
24　　　　This marks the end of the deposition of
25　Mayor Jenny A. Durkan.　We are off the record at

C E R T I F I C A T E

STATE OF WASHINGTON

COUNTY OF PIERCE

    I, Cindy M. Koch, a Certified Court Reporter in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of Jenny A. Durkan, having been duly sworn, on December 8, 2021, is true and accurate to the best of my knowledge, skill and ability.

    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 29th day of December, 2021.

_____
CINDY M. KOCH, CCR, RPR, CRR

My commission expires:
JUNE 9, 2022