# EXHIBIT 16

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,      )
                                   )
              Plaintiff,           )
                                   )
          vs.                      )  No. 20-cv-00983
                                   )
CITY OF SEATTLE,                   )
                                   )
              Defendant.           )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

EMMANUEL ARHU

_____


Seattle, Washington


(All participants appeared via videoconference.)




DATE TAKEN:  MARCH 3, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 16

1   don't know which particular settings you're asking

2   about.

3        Q.  Okay.  Well, I'm asking, first of all, whether

4   before you transferred the data over to the new phone,

5   whether you checked any -- any of the settings that were

6   on -- on the phone.

7        A.  No.

8        Q.  Okay.  And after you transferred the data over

9   to the new phone, did you check any of the settings on

10  the new phone?

11       A.  Yes.  Some of the settings, I checked settings,

12  making sure that the backup was turned on, if -- because

13  there are certain settings that we think it's helpful

14  for the user, so we would check that, and that backup is

15  one of them.

16       Q.  So -- so you checked the backup -- whether the

17  backup was turned on when -- when the phone was restored

18  in July of 2020 --

19       A.  If --

20              (Simultaneous cross-talk.)

21       A.  -- over, I-- yeah, I did that.

22       Q.  I'm sorry --

23              THE COURT REPORTER:  I'm sorry.  You're

24  speaking at the same time.  So --

25              MR. REILLY-BATES:  Yeah.  Let me --

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 17

1           THE COURT REPORTER:  -- I don't have the

2    full question, and I don't have the beginning of the

3    answer.

4    BY MR. REILLY-BATES:

5        Q.  Yeah.  Let me -- let me rephrase the question.

6            So -- so in July of 2020, when you replaced the

7    phone, after you transferred the data over, you made

8    sure that the iCloud backup setting was turned on on the

9    mayor's phone?

10       A.  That's correct.

11       Q.  And did you also make sure that the Messages in

12   iCloud setting was turned on?

13           MR. CRAMER:  Objection.  Form.

14       A.  Sorry.  The Messages in iCloud setting?

15   BY MR. REILLY-BATES:

16       Q.  Yes.  Did you -- did you also make sure that

17   the Messages in iCloud setting was turned on --

18       A.  Yes.

19       Q.  -- before you gave the phone back to the mayor?

20       A.  Yes.

21       Q.  And I apologize, Mr. Arhu -- or Emmanuel.  I

22   should have given you this instruction before we got

23   started, but it's important, because of the remote

24   technology, that we make sure not to speak over each

25   other.  And so I will try to -- to -- to not talk while

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 26

1   something that we used to help ourselves and update as

2   we go on, but I don't -- I don't know if you would call

3   that policy, something that we put together ourselves.

4   BY MR. REILLY-BATES:

5       Q.   Okay.   Was that something that was written down

6   in a -- a checklist or a document?

7       A.   Yeah.

8       Q.   Yes?   Okay.

9            And where -- where would that have been kept?

10  Was that something on ShareFile, or SharePoint?

11      A.   Yes.

12      Q.   Okay.   And can you recall, as best as you can,

13  what -- what that policy required regarding replacement

14  of a phone or a mobile device?

15      A.   Again, so that's a -- I'll say it's a standard

16  operating procedure.   So it helps us with pretty much --

17  it's updated -- we keep updating that, but it was a

18  process of how to do things, so how to do something -- a

19  backup, or how to restore a phone from one device to

20  another.

21      Q.   Okay.

22      A.   And as our technology changes, we keep that up

23  to date as we can.

24      Q.   In 2020, in July of 2020, to the best of your

25  recollection, can you tell me what -- what that

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 27

1    checklist or policy had in it?  What were the steps that

2    you should -- were required to take?

3         A.  In what scenario?

4         Q.  Regarding the replacement of -- of an iPhone.

5         A.  So -- okay.  That would require have -- if you

6    have both devices, having -- creating a -- maybe a

7    backup for us to start with so as to have something to

8    fall back on.  And then --

9              THE COURT REPORTER:  I'm sorry.  I didn't

10   understand a word there.

11        A.  I'm saying creating a backup to have something

12   to fall back on, and then with -- since we're dealing

13   with Apple devices, Apple has a built-in tool that helps

14   to copy content from one device to another.

15             Pretty much you turn on the new phone, and then

16   there's a prompt that comes on.  You can hold it over

17   the old phone, and that begins -- there's prompts to

18   follow on the screen, of course.  I can't remember all

19   of that.

20        Q.  Okay.  What next?

21        A.  So when the copy completes, there's also a

22   process of checking to make sure that the data is

23   correct and you have both -- the application that you

24   want to check on both phones, just make sure the

25   applications match up, and then also there are a few

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 28

1   contents that you check from -- with -- in that respect

2   you just have to -- what we do is we put the phones side

3   by side, and then check to make sure that the contents

4   on each device is the same.

5        Q.  Okay.  So yeah, how do you -- how do you --

6   what -- what types of data do you check and what -- what

7   content do you check typically, or -- as part of this

8   policy?

9             MR. CRAMER:  Objection.  Form.

10            Go ahead.

11        A.  So what type of data specifically would be

12   con- -- contacts and photos, videos, text messages, and

13   whatever applications that the user has.

14   BY MR. REILLY-BATES:

15        Q.  Okay.  With the text messages, do you -- do you

16   look at the oldest message and the most recent message

17   to confirm that you have the full range?

18        A.  That's correct because, for example, the

19   contact will give you a number, you can see that there

20   is 500 contacts, for example, and you can match up to

21   the other one.

22            But for text messages, the only way is to look

23   at the actual messages, matching the first, which is one

24   on the top, and then the last one at the bottom.

25        Q.  Okay.  Are there any other steps that you can

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 29

1    think of that you would take before you give the phone
2    back to the user?
3         A.  Any other steps -- enabling the backup, iCloud
4    backup.
5         Q.  Okay.  Would you also enable Messages in
6    iCloud?
7         A.  Yes.  But again, that's also -- because that
8    requires Wi-Fi to be on.  So if you're on your -- what
9    is it? -- the mobile data, that would not back up.
10        Q.  Okay.  So tell me about the early July of 2020,
11   what -- when you first learned that the mayor was having
12   a problem with her phone.  How did you learn that the
13   mayor was having a problem with her phone?
14        A.  So I believe Regi put in the order because the
15   mayor had dropped her phone.  The screen cracked.  And
16   so the order came in to our supply room, and then they
17   called me to issue the new phone to the mayor.
18            So my process would be calling Colleen, or
19   getting in touch with Colleen to set up a date or a time
20   that I could pick up the phone.  So that was the time
21   that I came in to pick up the phone to do the restore
22   for her.
23        Q.  Okay.  So -- so did -- did Regi make the
24   decision to -- to replace the -- the old iPhone, or was
25   that something that you also participated in?

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 62

1    messages on -- on July 7th and July 8th?

2         A.  Yes.

3         Q.  Scroll -- please scroll down to the bottom of

4    the first page of SEA_00145708, where Regi writes, "It

5    has arrived - please let us know when she can give up

6    her phone for a few hours so we can back up/restore data

7    to the new phone."

8              Do you see that?

9         A.  Yeah.

10        Q.  So was July 7th when -- when you received the

11   new phone?

12        A.  Yeah, so I don't -- I don't have the exact

13   timeline or remember, but yeah, according -- according

14   to this, it -- that's about when the phone came in,

15   yeah.

16        Q.  And so your plan was to -- to back up and

17   restore this phone per the usual procedures that were

18   followed by you and Regi; right?

19        A.  That's correct.

20        Q.  And did you, in fact, make a -- a backup of --

21   of the mayor's phone?

22        A.  I remember starting -- starting a backup.

23   Again, with the -- the phone that she has is a -- I

24   think it was 128 gig, but iCloud backup storage is also

25   5 -- just 5 gig.  So I remember starting a backup.  I

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 63

1    can't tell whether that completed or not.  But I didn't

2    end up using that backup because I did the direct

3    phone-to-phone copy.  So, yeah, I didn't need a backup,

4    so I can't tell if that completed or not.

5        Q.  So -- but before you -- you -- you used the

6    phone-to-phone contact, did you make a backup of the

7    cracked screen iPhone 8 Plus to make sure that there

8    would be a copy of the mayor's data after you

9    transferred it to the new phone?

10            MR. CRAMER:  Objection.  Form, asked and

11   answered.

12       A.  No, not that I recall.

13   BY MR. REILLY-BATES:

14       Q.  Okay.  So you don't recall making a backup

15   before you did the transfer; correct?

16       A.  I don't recall that correctly.

17       Q.  Did you -- have you ever made a -- a backup

18   using iTunes, like a computer iTunes, for the mayor's

19   phone?

20       A.  No.

21       Q.  Do you know whether the mayor ever made a

22   backup of her phone using iTunes?

23       A.  Not that I'm aware of.

24       Q.  Okay.  So describe to me what the process --

25   what you did once the new phone came in on July 7th,

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 65

1   which is the -- it's called the quick start, which

2   allows you to directly copy a phone -- one from -- one

3   phone to another.  And that -- we found that option to

4   be more reliable because it copies everything from the

5   phone, including the settings.  And so that's the option

6   that I used to do the copy.

7   BY MR. REILLY-BATES:

8       Q.  So -- so before -- before you did the quick

9   start, did you check to make sure -- did you examine

10  the -- the old iPhone 8 Plus with the cracked screen to

11  make sure that it had everything on it, or did you just

12  assume that it had everything that it needed to on it?

13          MR. CRAMER:  Objection.  Vague as to

14  "everything."

15      A.  So whatever that was on the phone, I guess

16  my -- my goal that day was to give the mayor a copy of

17  whatever that was on her old phone.  So apps that gets

18  installed, that's her apps, nothing that we adding to,

19  with the exception of what's the City of Seattle

20  applications that she uses.

21          Yeah, besides that, we just -- that's why we --

22  I go through to make sure that, for example, email, she

23  has email access, her emails are coming through; maybe

24  Teams to make sure that those apps all work on her

25  phone.

804f7233-7f14-4d77-93c9-2abeb59b73d9

BY MR. REILLY-BATES:

Q. Okay. And so after you did the quick start and transferred the data, what -- what did you do to make sure that everything had transferred over and that the settings were all correct?

MR. CRAMER: Objection.

A. So --

MR. CRAMER: Objection. Asked and answered. Go ahead.

A. So after the transfer, I would go through the standard things that we checked, again, which is the contact; messages, making sure that was there; look at the gallery, the pictures. That actually gives you a number, so you can tell the number of pictures on here, number of pictures on there. Yeah, those were the physical -- visible things that I checked before handing it back.

BY MR. REILLY-BATES:

Q. And I believe that you mentioned that you checked to -- to make sure that iCloud backup was turned on and that Messages in iCloud was turned on; correct?

A. That's correct.

Q. All right. Let's go back to Exhibit 2, the Celebrite report, and we're going to go to Line 8562, and I will share my screen so that you can get there,

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 69

1   having with -- with that new iPhone 11 that you had

2   helped her set up?

3        A.  Not that I remember.

4        Q.  Okay.  So what is -- what -- what do you recall

5   about this particular issue that Regi was emailing you

6   about?

7        A.  Yeah, it -- it looks like a contact issue

8   because we do have active sync, which is our City of

9   Seattle contacts.  So her contacts are managed within

10  her email, and there's an option to change that to the

11  built-in phones contact or the active sync.

12         So I think on that day it was -- I think it was

13  not on the active sync, which is the contact that's

14  managed by Colleen for her.  So it was switched.

15       Q.  I see.

16       A.  So I -- yeah, because I spoke to Colleen over

17  the phone and had her check that setting.

18       Q.  So on July 21st you didn't actually go and take

19  a look at the phone, did you?

20       A.  Not that I recall, no.  It looks like, yeah, I

21  did talk to her on the phone.

22       Q.  In --in late July 2020, did you have any

23  occasion to actually go and -- and look at the mayor's

24  phone and adjust any of the settings on the phone?

25       A.  No, I don't recall ever going back for the

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 71

1   settings on the phone?

2       A.  Not that I recall, no.

3       Q.  Did she -- did anybody in the mayor's office

4   ever mention to you that -- in late July that somebody

5   had turned the 30-day keep message retention setting on

6   so that messages were being deleted?

7           MR. CRAMER:  Object -- objection.  Asked and

8   answered.

9       A.  Not that I recall.

10  BY MR. REILLY-BATES:

11      Q.  Okay.  So now I'd like to switch gears and --

12  and talk about the -- the iPhone 8 Plus that you had

13  replaced.  After you did the restore, what did you do

14  with the old iPhone with the cracked screen?

15      A.  So I'm -- for our -- our policy, I guess --

16  yeah, our standard operating procedure, I just hold on

17  to it, and that's what we do pretty much with everyone

18  else in the City that we work on their devices.  We hold

19  on to it for a few weeks just to make sure that

20  everything works for them, so -- in case they come back

21  to ask for something, we can go back and verify.

22          So I held on to it for, I believe, about four

23  weeks.  That's what we normally do before wiping them.

24      Q.  Okay.  And so before you wiped it, did -- did

25  you ask for any permission to -- to wipe that phone?

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 72

1      A.  No, I did not.

2      Q.  Did you tell anybody that you were going to do

3  that?

4      A.  No, but when -- when I gave them the new phone,

5  I let them know that we -- we going to hold on to it for

6  a couple of weeks, so if they need anything they should

7  let us know.

8      Q.  Okay.  So -- so you told -- and who -- who did

9  you give --

10      A.  Colleen.

11      Q.  -- the new phone?  Was that --

12      A.  Colleen.

13      Q.  -- Colleen?

14          MR. CRAMER:  Wait.  Let -- let him ask the

15  full question.  I think you knew where he was going, but

16  let him get it out for --

17          THE WITNESS:  Okay.

18          MR. CRAMER:  -- the record.

19  BY MR. REILLY-BATES:

20      Q.  So who did you give the new phone to in the

21  mayor's office?

22      A.  I gave it to Colleen.

23      Q.  And during this time period did you ever have

24  any direct communication with the mayor about any of

25  these phones?

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 73

1      A.  No.

2      Q.  And did Colleen tell you, when you gave her the

3  new phone, that -- that you needed to -- to hold on to

4  the -- the old phone?

5      A.  No.

6      Q.  And you told her that you were going to do a

7  factory reset of the old phone?

8      A.  I did told her that, yeah, I'm going to have it

9  for a while, so if anything -- just to give them some

10  comfort that we holding on to it at least so they don't

11  feel like they're losing anything.

12      Q.  Okay.  And the decision that you made to

13  factory reset the phone, that wasn't pursuant to any

14  policy that the mayor's office has; that was just your

15  own personal decision; correct?

16      A.  That's --

17            MR. CRAMER:  Objection.  Form.

18            Go ahead.

19      A.  Yeah, that's not from the mayor's office.

20  That's our standard operating procedure how we -- before

21  we recycle a device we have to make sure that it's

22  wiped.

23  BY MR. REILLY-BATES:

24      Q.  Okay.  But normally you -- you give the --

25  the -- the person who had the phone the option of

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 77

1          Objection.  Foundation, calls for speculation.
2              MR. REILLY-BATES:  Thank you, Mr. Arhu.
3    BY MR. REILLY-BATES:
4      Q.  Okay.  Now, I think we just touched on briefly
5    the fact that in -- in August of 20 -- August 21st of
6    2020, Michelle Chen started looking into the issue of
7    whether there were text messages on the mayor's phone.
8    And I'm not asking you to tell me anything that -- that
9    Michelle Chen told you because that -- that is
10   privileged, but do you recall her looking into that
11   issue?
12     A.  Yes.
13     Q.  And did you have any direct communication with
14   her?
15     A.  Yes.
16     Q.  Okay.  And -- and how about, was Regi aware of
17   that issue?
18     A.  Yes.
19     Q.  Okay.  Tell me about your conversations that
20   you had with Regi only about what the concern was about
21   the mayor's text messages.
22     A.  So when we got to know that the messages were
23   not there, initially we just went through -- we thought
24   about if we -- could it have been something that we did
25   wrong, I in particular, because I did the back -- I did

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 78

1    the restore.

2            So we did some tests just to make sure that the

3    process that we've been using did not fail.  And also we

4    started looking at efforts to try to recover anything

5    that was lost.  And that included contacting Susy, who's

6    our wireless coordinator, to contact the carrier, the

7    mobile carrier, to see if they can recover any messages.

8            We also tried to back up and restore.  That's

9    when we noticed there was no backup.

10           And also we did check with some of the people

11   in the mayor's office that do PDR requests to see if

12   they've ever connected the mayor's phone to their

13   computer to do a backup before.

14       Q.  Okay.  Anything else that you can remember?

15       A.  And also, I guess, our in-house forensics

16   person also did try to do a recovery before Crypsis came

17   in.

18       Q.  Gotcha.  Tell me about the PDR folks.  That

19   would be Stacy Irwin and Kim Ferreiro; right?

20       A.  Yes.

21       Q.  And what -- what did you talk to them about?

22   What was your conversation with them about?

23       A.  I asked them if they've ever connected the

24   mayor's phone to their computer, or if they've ever

25   done -- they used an application to extract text

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 79

1  messages from -- they don't do a full backup, but they
2  use that application, which I believe the application
3  does a backup.  So we asked them if they have any
4  recollection of having ever done that for the mayor's
5  phone between that time frame, and they said no.
6        I believe we also checked on their computers
7  for backups, and we didn't find any.
8     Q.  Were you surprised that, as PDR officers, that
9  they hadn't looked for text messages from the mayor's
10  office in June and July of 2020?
11           MR. CRAMER:  Objection.  Form.
12     A.  I don't know what the frequency of -- how often
13  they do backups for the mayor's phone.  So yeah, that
14  could have been why they didn't have backups, but I
15  didn't -- I don't -- I don't know what their -- their
16  process is, how often they go back to take the mayor's
17  phone to do that work.
18  BY MR. REILLY-BATES:
19     Q.  Okay.  And tell me about your conversations
20  with Braden Heil, the in-house forensic investigator.
21  What did you discuss with him?
22     A.  So we actually consulted him to help us to see
23  if he can recover anything from the deleted phone, the
24  wiped phone.  And so, yeah, that's -- that's about it.
25  And we gave him the device.

804f7233-7f14-4d77-93c9-2abeb59b73d9

Hunters Capital, LLC v. City of Seattle                    Emmanuel Arhu

Page 108

                        C E R T I F I C A T E

STATE OF WASHINGTON

COUNTY OF PIERCE


        I, Cindy M. Koch, a Certified Court Reporter in
and for the State of Washington, do hereby certify that
the foregoing transcript of the deposition of Emmanuel
Arhu, having been duly sworn, on March 3, 2022, is true
and accurate to the best of my knowledge, skill and
ability.

        IN WITNESS WHEREOF, I have hereunto set my hand
and seal this 9th day of March, 2022.



        _____
        CINDY M. KOCH, CCR, RPR, CRR #2357


My commission expires:
JUNE 9, 2022



# E R R A T A

**CASE NAME:**   Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 3/3/2022

**WITNESS:**   Emmanuel Arhu

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_emmanuel Arhu_
_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**  Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 3/3/2022

**WITNESS:**  Emmanuel Arhu


I declare under penalty of perjury under the laws of the State of

Washington that I have read my within deposition, and the same is true and

accurate, save and except for changes and/or corrections, if any, as indicated by

me on the ERRATA flyleaf page hereof.



_____*emmanuel Arhu*_____
_____
Emmanuel Arhu


Signed on the __05th__ day of _____April_____, 202_2_ .


1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com