# EXHIBIT 19

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
          Plaintiff,             )
                                 )
          vs.                    ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
          Defendant.             )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

KEVIN T. FAULKNER

_____

New York, New York

(All participants appeared via videoconference.)

DATE TAKEN:  AUGUST 17, 2022

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 32

1      Q.  Did you learn that information in 2022, or was
2  it as early as 2021?
3      A.  Other than knowing it must have been before my
4  rebuttal report, I don't recall the date.
5      Q.  Can you recall whether -- whether you had this
6  conversation before or after you saw the Brandon Leatha
7  report, which was issued on April 28th of 2022?
8      A.  I don't recall.
9      Q.  Other than the issue of the two phone numbers,
10  what else did you talk with Mr. Fisher about?
11      A.  I recall asking about credentials to get access
12  to his iCloud account, and that he could not -- the City
13  iCloud account, and that he could not recall those
14  credentials.  So I was not able to collect data from the
15  account.
16      Q.  Did he ever provide the credentials for his
17  iCloud account for you?
18      A.  Not to me, no.
19      Q.  Did you make any follow-up requests to him or
20  to the City attorneys for that information?
21          MR. CRAMER:  You can testify as to inquiries
22  you made to Mr. Fisher, but communications with Counsel
23  would be privileged and work product.
24      A.  I did not follow up with Mr. Fisher to request
25  that, no.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 56

1          MR. CRAMER:  Objection.  Form.

2      Go ahead.

3      A.  Again, I'm not -- I'm not sure what document

4  you're referring to.  I'm sorry.

5  BY MR. REILLY-BATES:

6      Q.  Okay.  Now, I think you mentioned that Palo

7  Alto Networks was retained by the City in November of

8  2020.  Is that correct?

9      A.  Yes.  I believe it was November 5, 2020.

10     Q.  And you were retained pursuant to a statement

11 of work; correct?

12     A.  I believe that's right, yeah.  A statement of

13 work and master services agreement, or something along

14 those lines.

15     Q.  And were you involved in the negotiation of

16 that statement of work?

17     A.  I don't believe so, no.

18     Q.  To the best of your recollection, can you

19 recall what the scope of your initial engagement was

20 with the City?

21     A.  Generally, to see what text message information

22 could be recovered from the mayor's cellphone or any

23 other data sources.  And to the extent it couldn't, try

24 to understand what had happened.

25     Q.  Okay.  At that time your -- the scope of your

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 84

1       A.  Yes, it is.

2       Q.  And this is a true and correct copy of your

3  expert report in this case; correct?

4       A.  I haven't verified that, but I have no reason

5  to doubt it.

6       Q.  Okay.  Are all the factual statements contained

7  in this report still accurate statements today?

8       A.  I'd say, for the most part, yes.  But there are

9  a few points I would probably clarify.

10      Q.  Okay.  Let's talk about those.  What -- what

11  issues would you clarify with Exhibit 2?

12      A.  Let's see.  On -- on Page 25, there is a

13  Footnote 17, and Footnote 17 talks about how messages

14  that were deleted by the retention settings on a phone

15  may be difficult to tell apart from messages that were

16  manually deleted.

17          That is still true.  It may be difficult.  But

18  in this case, I came to realize, in preparation for this

19  deposition, that it's not difficult to tell them apart

20  for the mayor's phone, and that the artifacts are not

21  consistent with a manual deletion.  That's -- that's not

22  really a possibility in this case.

23      Q.  Okay.  And does that change any of the other

24  conclusions contained in -- in your expert report,

25  Exhibit 2?

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 85

1      A.   That -- I don't believe that changes anything
2  else that I have listed here, and -- but again, there is
3  one other thing I would clarify.
4      Q.   Okay.   And what's that?
5      A.   When I talk about the enabling of retention
6  settings, changing retention settings to 30 days, or
7  changing retention settings back to forever, I use terms
8  like -- that one of those changes may have -- may have
9  occurred on one of the mayor's phones.
10      The change back to forever would -- you know,
11  would -- would have occurred on the iPhone 11.   And
12  in -- again, in preparation for this deposition,
13  reviewing the information that I previously considered,
14  and doing some additional testing, I came to learn that
15  you can actually change the retention settings to 30
16  days, to one year, or back to forever, not just on the
17  physical phone in your hand, but also on any other phone
18  that is on the same iCloud account, where all -- where
19  the phones have messages in iCloud enabled.
20      Basically if you -- if you set 30 days on one
21  phone, any other phone on the account will automatically
22  change to that same retention setting without you having
23  to do anything on that additional phone.
24      Q.   I see.   And have you then followed up with any
25  research or investigation to determine whether there

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 93

1   Do you mind if we just finish out this line of

2   questions?

3            MR. CRAMER:  That's fine.

4            MR. REILLY-BATES:  But I'll be pretty quick.

5   BY MR. REILLY-BATES:

6       Q.  Exhibit 4 is the expert report of Brandon

7   Leatha regarding the inspection of certain City-issued

8   cellular telephones used by specific City of Seattle

9   officials, and it's dated, I think, April 28, 2022.

10           Mr. Faulkner, do you have Exhibit 4 up?

11      A.  I do, yes.

12      Q.  And have you had a chance to review Exhibit 4

13  before today?

14      A.  Yes.

15      Q.  And in fact, Exhibit -- you reviewed Exhibit 4

16  while you were creating your rebuttal report, Exhibit 3;

17  correct?

18      A.  Yes, that's right.

19      Q.  Okay.  Now, take a look through Exhibit 4, and

20  please let me know if there are any other conclusions or

21  factual statements that aren't mentioned in your

22  rebuttal report, Exhibit 3, that -- that you would still

23  take issue with today?

24      A.  Okay.  I will take a look.  I've come across

25  one example.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 94

1          Q.   Okay.  Which page are you on?

2          A.   I am on Page 3 of Mr. Leatha's report.

3          Q.   Okay.

4          A.   And I see, in his summary of findings, under

5    the third bullet point, related to Mayor Jenny Durkan,

6    Mr. Leatha states, "All of Mayor Jenny Durkan's text

7    messages were deleted from her iCloud account using the

8    disable and delete function on July 4, 2020."

9          Q.   Okay.

10         A.   And I would say that we don't -- he and I both

11   do not know that to be the case.  They -- while the

12   disable and delete function will delete messages after

13   30 days, it only does so if it remains enabled, and we

14   don't know whether it remained enabled or not.

15         Q.   Okay.  So if it had remained enabled, it would

16   have deleted all of her messages on -- 30 days later,

17   correct, on August 4, 2020?  Is that a fair statement?

18              MR. CRAMER:  Objection.  Incomplete

19   hypothetical.

20              Go ahead.

21         A.   No.  I would say, if the disable and delete

22   function was allowed to continue and was on the last

23   device connected to the iCloud account, then it would

24   delete just the copy of messages in iCloud after 30

25   days.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                Kevin T. Faulkner

Page 95

1          But if there are other phones connected to the
2    account or if you reconnect a phone to the account
3    within that 30 days, it cancels off that process.
4    BY MR. REILLY-BATES:
5          Q.  Okay.  So do you have any evidence that another
6    phone was connected to Mayor Jenny Durkan's iCloud
7    account within 30 days?
8          A.  I don't know one way or the other.
9          Q.  And are there any tests that you could -- you
10   could run to -- to discover that information, that you
11   can think of today?
12         A.  Not that I can think of today, no.
13         Q.  And there are no -- there are no sources of
14   information that you could look -- look at to -- to find
15   that information; correct?
16         A.  I mean, source of information, perhaps.  I
17   recall the deposition transcript from Emmanuel Arhu
18   where he testified that, after transferring the data
19   over to the mayor's iPhone 11, he then re-enabled
20   messages in iCloud.
21              So that -- that's a source of information to
22   look at, is that -- that deposition transcript.  If he
23   indeed did that, that would have the effect of canceling
24   the disable and delete function.
25         Q.  Okay.  So it's your testimony today that if he

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 96

1   had, in fact, re-enabled the messages in iCloud, that
2   that could have canceled the disable and delete and
3   would have prevented the messages from being deleted
4   after 30 days; correct?
5                MR. CRAMER:  Objection.  Incomplete
6   hypothetical.
7            Go ahead.
8       A.  What I'm saying is that, if he re-enables
9   messages in iCloud on the phone he testified he did, or
10  any other phone, it would have the effect of canceling
11  off the disable and delete, and the copy of messages in
12  iCloud then would not be deleted 30 days later.
13  BY MR. REILLY-BATES:
14      Q.  Okay.  So as you're sitting there today, do you
15  know whether or not the messages in iCloud were, in
16  fact, deleted 30 days after July 4, 2020?
17      A.  I would say, sitting here today, you can't tell
18  one way or the other.
19      Q.  Do you -- do you know when those messages were
20  deleted, if they weren't deleted by the disable and
21  delete that was selected on July 4, 2020?
22      A.  If they weren't deleted by the disable and
23  delete, then they could have been deleted by the -- by a
24  30-day retention setting.
25      Q.  And -- I see.  So do you plan on -- on issuing

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 104

1    I believe I reported upon that in my next report, the
2    rebuttal report.  But this is the -- the goals of the
3    investigation within the scope of my opening report.
4         Q.  And -- but at the time of your opening report,
5    you were already looking into whether those individuals
6    were missing text messages; right?
7         A.  I believe that's right, yes.  Had started.
8         Q.  Okay.  Why didn't you include that as one of
9    the goals of your investigation in your initial report?
10             MR. CRAMER:  Objection.  I believe that
11   that's outside the scope of permissible testimony.  I
12   mean, what are -- what we may or may not have asked him
13   to testify to is protected work product under Rule 26.
14             MR. REILLY-BATES:  And, Shane, if you could
15   limit your -- your objections so that they're not
16   speaking objections, I would appreciate that, please.
17   BY MR. REILLY-BATES:
18        Q.  You may answer the question.
19        A.  As I testified before, the work on the other
20   custodians was not yet complete, and -- yeah, it was --
21   it was still in progress.
22        Q.  Now, immediately below these two goals, there's
23   a sentence that states, "One aspect that was not a focus
24   of this investigation was to assess who made any changes
25   to settings on the mobile phones of Mayor Durkan and

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 105

1       Chief Best that may have been made."

2             Do you see that?

3       A.   I see that sentence, yes.

4       Q.   Why was that not a focus of the investigation?

5       A.   Well, generally, the data on a device doesn't

6   tell you who made a change to that device.  The device

7   records information about configuration and data

8   transmitted and received, but it doesn't know who's

9   holding it or, in the case of a laptop, whose hand is on

10  the keyboard.

11            So my focus was on the technology and what the

12  technology shows and what different actions might be

13  consistent with data found on the devices.

14      Q.   So is it your belief that the technology does

15  not show or could not show who made changes to settings

16  on the mobile phones of Mayor Durkan and Chief Best?

17      A.   I would say that, generally, any device doesn't

18  record who is using it.  You have to -- you would have

19  to combine that with some other source of information to

20  try to piece that together.  The phone doesn't take a

21  picture of who's changing the settings as they change it

22  or anything like that.

23      Q.   And you did look at testimony; for example, I

24  believe you cited Emmanuel Arhu's statements about

25  setting up messages in iCloud for other situations.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 125

1   have been overwritten.

2   BY MR. REILLY-BATES:

3       Q.  Okay.  And normally iCloud -- or Apple only

4   stores an iCloud backup for 180 days; is that correct?

5       A.  Generally, yes.

6       Q.  Are you aware of any exceptions that apply in

7   this case, to your knowledge?

8       A.  That apply in this case?  No, none that I'm

9   aware of.

10      Q.  Can you explain the messages disable and delete

11  function that's described in your report on Page 28, the

12  next page of Exhibit 2?

13      A.  I'm -- oh, there it is.  I just found the

14  mention of it on Page 28.

15      Q.  Yes.  It's the third paragraph down, I believe,

16  yes.

17      A.  But I -- sorry; what's your question?  About --

18      Q.  Sure.  Can you explain -- can you explain that

19  function, messages disable and delete function, what it

20  is?

21      A.  Certainly.  Disable and delete will --

22  specifically for messages in iCloud will stop a phone

23  from synchronizing its messages to iCloud, which, of

24  course, means that it must have first been synchronizing

25  in order to use that function.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 126

1    When you use disable and delete, it stops that

2    synchronization process, and if it is the last device on

3    the account, it then will delete the copy up in iCloud

4    after 30 days from when that function was used.

5        Q.   Okay.   What reasons would a user change this

6    setting on their phone for?

7             MR. CRAMER:   Objection.   Form.   Outside the

8    scope of his expertise and expert opinions.

9        A.   I mean, I would say that the -- the function to

10   stop synchronizing messages and remove the copy of data

11   from iCloud -- copy of messages in iCloud would be why

12   someone would use that function, to -- to -- to make

13   that -- that happen, I suppose.

14   BY MR. REILLY-BATES:

15       Q.   All right.   So it would -- selecting the

16   disable and delete function can eventually lead to

17   removing all of the synchronized messages that are in

18   the iCloud, to have them delete -- be deleted; correct?

19       A.   It can do that, yes.   So if a user wanted to

20   delete those, if they wanted to reclaim space or just

21   remove that additional copy, they could use this

22   function to do so.

23       Q.   And did Jenny Durkan ever tell you that she

24   used this function in order to get a copy of her text

25   messages back onto her phone after she installed a

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 128

1        A.   I see Figure 13.

2        Q.   And is this a figure showing how a user would

3    select the disable and delete function on an iPhone?

4        A.   This is a figure showing a few different

5    setting screens to get to the disable and delete

6    function, and then the message that it displays if you

7    were to choose it.

8        Q.   Okay.   So -- so there are four arrows shown on

9    this page.   So a user would have to make four separate

10   selections to finally delete the messages on their

11   iPhone; correct?

12              MR. CRAMER:   Objection.   Form.

13       A.   No, that's incorrect.

14   BY MR. REILLY-BATES:

15       Q.   Okay.   How is it incorrect?

16       A.   You said to delete the messages on their

17   iPhone.   The disable and delete function has no bearing

18   on the messages on their iPhone.

19       Q.   My apologies.   Yeah.

20              So a user would have to select -- click through

21   each one of those four arrows to delete the messages in

22   iCloud through the disable and delete function; correct?

23       A.   They would have to click through these

24   selections to initiate the disable and delete process,

25   but again, it doesn't then immediately delete anything

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 129

1   from anywhere.

2        It then starts a -- a countdown to delete the

3   copy up in iCloud if it's not otherwise canceled by

4   re-enabling messages in iCloud.

5        Q.  Okay.  And the countdown is a 30-day countdown;

6   correct?

7        A.  That's correct, yes.

8        Q.  So after the 30 days, if -- if the countdown is

9   not canceled, then the messages in iCloud would be

10  deleted.  Is that a fair statement?

11       A.  I believe so.  They're around.  I don't know if

12  it ever spills over to 31 or not, but it's -- it should

13  be about 30 days, yes.

14       Q.  Okay.  And let's go to the fourth image there

15  at the top of Page 18, the message -- the warning

16  message.  It says, "Disable and delete.  This will

17  disable messages in iCloud and delete all your messages

18  stored in iCloud.  You have 30 days to undo this action.

19  Your device will automatically download your messages."

20       Is that a fair reading of that -- that warning?

21            MR. CRAMER:  Objection.  Misstates testimony

22  as to the use of the word "warning."

23       A.  Yeah, I believe you read the message correctly,

24  but I see no word like "warning," colon, on top of it or

25  anything like that, but I do see the message, and I

2ac29120-0136-4c4c-90b7-fabf50578964

Page 130

1   believe you read the text of the message accurately.

2   BY MR. REILLY-BATES:

3       Q.  Okay.  And in July of 2020, if a person had

4   selected disable -- the disable and delete function,

5   would they have received a message identical to this or

6   similar to this, to the best of your knowledge?

7       A.  I believe they would receive a message similar

8   to this.

9       Q.  Now, would you agree that the disable and

10  delete function was completed at 5:19 Pacific Daylight

11  Time on July 4, 2020?

12      A.  I would have to double check the time in my

13  report.

14      Q.  Okay.  Let's look at Page 28 then.

15      A.  I'm on 28.

16      Q.  Okay.  Second paragraph from the bottom.

17      A.  I see the time listed there as 5:19:44 Pacific

18  Daylight Time, p.m.

19      Q.  Okay.  And -- so -- so you were able to

20  determine that somebody did select the disable and

21  delete function at 5:19 Pacific Daylight Time on July 4,

22  2020; correct?

23          MR. CRAMER:  Objection.  Misstates earlier

24  testimony.

25      A.  I would say the artifacts are consistent with

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 151

1      Q.  Braden --

2      A.  -- his first name.

3      Q.  Okay.  And so just to be clear, you did not

have any forensic artifacts to suggest that there was a

factory reset in August of 2020.  That was solely based

on the testimony that you heard, that it was the

customary practice to reset a phone; correct?

8      A.  Yes, I believe that's fair.  Correct.

9      Q.  Okay.  Now, were you aware that on

10  September 18th Emmanuel Arhu delivered the mayor's

11  iPhone 8 Plus FirstNet to Braden Heil to conduct a

12  forensic examination of -- of the mayor's phone?

13      A.  I recall that the phone was delivered to

14  Mr. Heil on September 18th.  I don't recall who

15  delivered it, sitting here today.

16      Q.  Okay.  Do you think it's unusual that the phone

17  was factory reset on September 17th, a day before it was

18  to be delivered to the City's information security

19  engineer?

20          MR. CRAMER:  Objection.  Form.  Outside the

21  scope, calls for speculation.

22          Go ahead.

23      A.  I would say that the phone, you know, may have

24  been additionally reset and -- on September 17th, or

25  that may have been the final completion of the reset

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                Kevin T. Faulkner

Page 152

1   that occurred in August.  I can't tell.

2        The forensic artifacts just show me basically

3   when the phone started up after a reset occurred.  It

4   doesn't actually say when the reset was initiated.

5   Typically, you reset a phone, and then it reboots

6   immediately, but if for any reason it didn't, that could

7   be the startup.  I can't say.  All I can see is the

8   reset that occurred on the 17th.

9   BY MR. REILLY-BATES:

10       Q.  Okay.  And would you admit that you're

11  speculating when you state that the reset that occurred

12  on September 17th might have been caused by an earlier

13  reset that restarted up when the phone was turned on

14  again?

15            MR. CRAMER:  Objection.  Form.

16       A.  No.  I said it could be, and technically, it

17  can be.  It's the -- you get the date when it started

18  up, but beyond that, I don't know if it was or wasn't,

19  just that it can be.

20  BY MR. REILLY-BATES:

21       Q.  Okay.  So you have no -- no forensic evidence

22  or no other evidence -- well, I should say you have no

23  forensic evidence from the device or from any data

24  extracted from the device or iCloud backups or iCloud

25  accounts that would substantiate the claim that the

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                Kevin T. Faulkner

Page 158

1    Q.  Okay.  Well, maybe you could tell me -- tell me
2    what the row numbers on the left-hand column mean then.
3        A.  Those are the row IDs being tracked in the
4    messages table within the sms.db database.  So I believe
5    this is all of the rows that exist in that table, and
6    this is just select columns.  There are more columns
7    going out to the right, but no more rows.
8        Q.  I see.
9            So -- so from this -- from this Figure 29, are
10   you able to infer that earlier numbered rows once
11   existed, but have been deleted from the column?
12       A.  I would say that, from these numbers, you can
13   infer that earlier row IDs, or lower row IDs, once did
14   exist on this phone or its prior phones.  As you move
15   from phone to phone, over time, if you move your text
16   message data along with you, those row ID numbers are
17   retained and continue to increment.  They don't reset to
18   zero again.
19       Q.  Okay.
20       A.  So that would be messages that were once on
21   this phone or any of her prior phones from which a
22   backup and restore process moved that data from one
23   phone to another.
24       Q.  Okay.  What did you mean on Page 43, when you
25   state that, "In contrast, the artifacts reviewed on Best

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 159

1    iPhone XS Max are consistent with periodic deletion over

2    time rather than a bulk deletion"?

3         A.   I recall analyzing Chief Best's phone to try to

4    figure out whether or not text messages were deleted

5    periodically versus could they have been all deleted,

6    for example, on the last day.

7              And looking at the artifacts in the sms.db, in

8    this messages table that we discussed in Figure 29, as

9    well as the chats table, the artifacts are consistent

10   with deletion over time, not all in one day at the end.

11        Q.   Okay.  Did you talk to any other

12   representatives or employees at the City who offered any

13   evidence as to Chief Best's practices with respect to

14   deleting text messages on her phone, besides Chief Best?

15        A.   I don't recall speaking with any City employees

16   about Chief Best's practices.

17        Q.   Okay.

18        A.   I don't recall that, no.

19        Q.   And did you ever learn that anybody else could

20   have or did make any deletions to text messages on

21   Chief Best's phone?

22        A.   I would say that I don't know one way or the

23   other.  I don't have any information on that.

24        Q.   Do you know when Chief Best received a

25   litigation hold in this case?

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 184

1    received for Chief Best included duplicates.

2         Q.  Okay.  So you're unable to determine the exact

3    number of actual text messages that were -- the City was

4    able to reconstruct, based on the uncertainty caused by

5    those duplicates.  Wouldn't that be a fair statement?

6         A.  Yes, I think that's fair.

7         Q.  Okay.  Let's go to Chris Fisher on Page 6.

8    Now, what did you mean when you state, "I understand the

9    date reported by the City to have been approximate"?

10        A.  That I -- I -- from memory, that Mr. Fisher

11   said something about, like, the -- the fall or winter or

12   something, and the date reported by the City was based

13   on that.  But then later, analyzing the data, we were

14   able to see a more precise date.

15        Q.  Okay.  So were you, in fact, able to determine

16   that -- whether or not there was a factory reset that

17   was performed on Mr. Fisher's phone on December 3, 2020?

18        A.  Let me see if my report reflects that date.  I

19   believe what I had seen was artifacts consistent with a

20   restore from an iCloud backup specifically.

21             Sorry.  Is the audio cutting out?

22        Q.  No, no, no.  I can hear you.  I'm sorry.  Did

23   you hear a sound?

24        A.  Yes.

25        Q.  Okay.

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 185

1    A.   I was saying I thought artifacts related to a
2    restore from an iCloud backup on November 3rd of 2020.
3         Q.   Okay.   So Mr. Leatha's conclusion that a reset
4    occurred on November 3, 2020, was -- was accurate?
5         A.   I believe that was accurate, yes.   The restore,
6    yes.
7         Q.   And did you ever learn why or how the City had
8    inaccurately stated that a factory reset occurred on
9    December 3rd of 2020?
10        A.   As reflected in my report, I understand that,
11   you know, as I said, the date was approximate, and that
12   basically he initially believed it was December 3rd, but
13   given the fact that it was restored on November 3rd,
14   it's more likely that -- well, it would have had to have
15   occurred before the restore.
16        Q.   Okay.   So was the -- was the described --
17   described reset -- factory reset on December 3, 2020,
18   was that information that was provided by Mr. Fisher,
19   himself?
20        A.   I don't know.
21        Q.   Did you know about this discrepancy in the
22   reset date prior to issuing your report in February of
23   2022?
24        A.   I'm not sure.   It's possible, but I -- I don't
25   recall.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 213

1   R next to it, so it says, "So should have the text with
2   Michelle."
3           Do you see that?
4       A.  "Should have the text."  I -- oh, yes, I see
5   the "should have the text with Michelle," yes.
6       Q.  So -- and he's referring to Michelle Chen;
7   correct?
8       A.  That's my understanding, yes.
9       Q.  And have you seen the text message that he --
10  that he's referring to?
11      A.  I don't know if I have or haven't.  I -- I've
12  looked through the text messages included as an exhibit
13  to Regi's deposition, but I didn't specifically look if
14  there were any with Michelle or not.
15      Q.  Have you ever seen any text messages with
16  Michelle that you relied upon for any of your opinions
17  in this case?
18      A.  I -- nothing I recall, no.
19      Q.  Okay.  Let's flip over to the next page.
20          Now, actually, at the very bottom of
21  Faulkner_10, it says, "September 17, 18.  Tried to
22  restore but found not backups."
23          Who made that comment?
24      A.  I'm sorry; who made what?
25      Q.  Who made the comment that they tried to

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 214

1    restore, but found no backups?  I'm assuming that's a

2    typo.

3           A.   That is, I'm sure, indeed, a typo.  I -- I

4    don't recall specifically if it was Regi or Emmanuel,

5    but I -- I believe it was one or the other or both of

6    them.

7           Q.   So they tried to restore the phone on

8    September 17th.  Is that what they were telling you

9    during this meeting?

10          A.   My understanding is, they were telling me that

11   on September 17th, they sought to see if a backup

12   existed in the mayor's iCloud account that could be

13   restored onto a blank phone.

14          Q.   Okay.  And did they tell you whether they were

15   successful in that effort?

16          A.   My understanding is, they were successful in

17   the effort of connecting a phone to the mayor's iCloud

18   account and looking to see whether or not any backups

19   were available to restore, but they found that there

20   were no backups available in the iCloud account at that

21   time.

22          Q.   Okay.  And in the next paragraph, the first

23   line is, "R has 9/17 as iCloud restore date."  And then

24   he writes -- or you wrote, "He thinks that attempt was

25   before giving the phone to Michelle.  Thinks it was an

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 215

1   old phone - surplus or test phone."

2          What is he referring -- what are you referring

3   to there?

4       A.   I was digging in with more questions about how

5   they performed this check, to see whether or not there

6   were any backups present in the mayor's iCloud account,

7   and I was asking, you know, when they believed that

8   happened, if they had any specific recollection of a

9   date, or if they had any recollection of it happening

10  before or after certain events, and I was asking about

11  what phone they used to do that process, whether they

12  procured a new phone or used a test phone or reused the

13  iPhone 8 Plus FirstNet to connect and attempt to

14  download backups.

15      Q.   And do you think it's possible that they --

16  they used the iPhone First- -- iPhone 8 Plus FirstNet

17  phone to -- to perform the backups for the restore and

18  backup?

19          MR. CRAMER:   Objection.   Form.   Foundation.

20      Go ahead.

21      A.   I mean, I would say that I think anything's

22  possible, but looking at my notes, at what I asked them,

23  you know, Regi responded that he thought it was an old

24  phone, surplus phone, or test phone.

25          And I believe elsewhere in the notes here,

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 216

1  there's more related to that -- that question.  Emmanuel

2  said he thought it was possible it was the cracked

3  screen phone.  That refers to the iPhone 8 Plus

4  FirstNet.  But he didn't see any backups available.  I

5  think there may have even been more here on that.

6  BY MR. REILLY-BATES:

7      Q.  Okay.  So it was possible that Regi and

8  Emmanuel had attempted to restore an old backup using

9  the mayor's iPhone 8 Plus FirstNet with the cracked

10 screen?

11             MR. CRAMER:  Objection.  Form.

12     A.  I'd say my recollection of the discussion with

13 them was, they -- they were unsure what phone it was,

14 and thought it might have been a test phone, at one

15 point thought it might have been the cracked screen

16 phone, at other points thought it was not the cracked

17 screen phone.

18             They -- they -- I did not get a clear and

19 specific answer as to exactly which phone it was.  It

20 was a bit unclear.

21 BY MR. REILLY-BATES:

22     Q.  Okay.  And let's see here.  One, two, three,

23 four, five, six -- seven lines down from the top of that

24 paragraph, there's a comment from -- attributed to

25 Emmanuel.  It says, "Don't recall wiping the phone, but

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 217

1    remembers trying to process on some phone."

2          When he's talking about not recalling wiping

3    the phone, is he referring to the iPhone 8 Plus

4    FirstNet, or is he referring to some other phone?

5          A.   I believe, given the -- the fact that that's

6    right under the previous answer we were just talking

7    about --

8          Q.   Yeah.

9          A.   -- that I likely described the process in order

10   to restore a phone, means you first must wipe the -- the

11   phone if it's not new out of the box.  And I asked, does

12   Emmanuel recall on 9/17 wiping the phone, and then

13   attempting to restore, and that he does not recall that.

14         Q.   Okay.  Now, at the bottom of this paragraph,

15   the last four lines state -- attributes a statement to

16   Emmanuel.  It says, "Says Braden was aware the phone was

17   wiped, that they would have communicated this to him."

18         And Regi wrote -- writes, "Braden not given

19   dates, just that it had been wiped."

20         And then Regi also writes, "Info to Braden may

21   have happened in phone conversation, but can check Regi

22   to Braden SMS messages."

23         So the question there is, Braden wasn't given

24   the dates of the -- the fact that the iPhone 8 Plus

25   FirstNet had been factory reset on September 17th; isn't

Hunters Capital, LLC v. City of Seattle                      Kevin T. Faulkner

Page 218

1    that correct?

2               MR. CRAMER:   Objection.   Form.

3          Go ahead.

4      A.   I think -- I believe what I was asking, and the

5    responses I was getting, I believe what that pertained

6    to was when the iPhone 8 Plus FirstNet had been wiped

7    more broadly.   For example, if, as claimed, it was wiped

8    in August, was there any communication about that.

9               You know, if they don't remember the date, did

10   they perhaps send the date to Braden before sending him

11   the phone?   And the answer was that, you know, no, that

12   they -- they disclosed to Braden that the phone had been

13   wiped, and, you know, I understand he was receiving it

14   to try to recover data, but there wasn't anything that

15   documented the date -- any dates of any wipes that was

16   sent to Braden, that Regi or Emmanuel was aware of.

17              MR. REILLY-BATES:   Okay.   All right.   One

18   second here.   I'm going to drop another document into

19   the chat that we'll mark as Exhibit 9, please.

20              (Exhibit No. 9 marked.)

21              MR. REILLY-BATES:   And let the record

22   further reflect that this is an email containing call

23   notes dated October 28, 2021, and further identified as

24   Faulkner_15 through Faulkner_16.

25   ////

2ac29120-0136-4c4c-90b7-fabf50578964

Hunters Capital, LLC v. City of Seattle                    Kevin T. Faulkner

Page 227

1                    C E R T I F I C A T E

2

3   STATE OF WASHINGTON

4   COUNTY OF PIERCE

5

6        I, Cindy M. Koch, a Certified Court Reporter in

7   and for the State of Washington, do hereby certify that

8   the foregoing transcript of the deposition of Kevin T.

9   Faulkner, having been duly sworn, on August 17, 2022, is

10  true and accurate to the best of my knowledge, skill and

11  ability.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13  and seal this 18th day of August, 2022.

14

15

16

17

18       _____
         CINDY M. KOCH, CCR, RPR, CRR
19

20  My commission expires:

21  JUNE 9, 2026

22

23

24

25

2ac29120-0136-4c4c-90b7-fabf50578964