# EXHIBIT 22

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiff(s),       )
                                )
    vs.                         )  20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant(s).       )
_____

VIDEOTAPED VIDEOCONFERENCE
DEPOSITION UPON ORAL EXAMINATION OF
CARMEN BEST

_____

Witness located in
Seattle, Washington
(All participants appearing via Zoom videoconference.)

DATE TAKEN:   NOVEMBER 9, 2021
REPORTED BY:  PATSY D. JACOY, CCR 2348

1    Q.   Okay, great.  So can you tell me when did you
2    start working for the Seattle Police Department?
3    A.   My hire date was January 1st -- or
4    January 2nd, 1992.
5    Q.   19 -- I'm sorry, I missed the date.
6    A.   1992.
7    Q.   '92, okay.  And prior to hiring on at the
8    Seattle Police Department, can you just walk us through
9    what your background was in terms of prior jobs,
10   education.
11   A.   Yeah, I -- I served in the -- let's see, I
12   served in the military for three years and then I
13   worked at AEtna Life & Casualty for a few years as a
14   claims -- account claims processor in their financial
15   department, and then I came on to the Seattle Police
16   Department.
17   Q.   Okay.  So it sounds like you didn't have any
18   prior law enforcement experience before Seattle Police?
19   A.   No.
20   Q.   And it's my understanding that you became the
21   police chief on January 1st, 2018; is that right?
22   A.   Yeah, the interim chief January 1st, 2018.
23   Q.   Okay.  And how long -- did you go straight
24   from interim chief to becoming the chief?
25   A.   Yes.

334bfd08-a328-4547-9c6b-4745f62726ec

1    Q.   What was the date that you were officially
2  named as the chief?
3    A.   You know, that's funny, I don't remember, but
4  it was in August of 2018.  I just don't remember the
5  day.
6    Q.   No problem.  And then what was the date of
7  your retirement?
8    A.   It was -- let's see, I think I retired in
9  August of 2020.  My official date, you know, let me
10 think about that.  I think my official date might be
11 September of 2020.  I took some time off in between.  I
12 mean, I wasn't -- you know, I was in and out so to
13 speak because I was leaving.
14   Q.   Okay.  And can you tell me what did you do to
15 prepare for the deposition today?
16   A.   Well, I had a couple of meetings with Attorney
17 Ashbaugh just to go over like documents and, you know,
18 just to prepare my statement, you know, what -- you
19 know, my account of what happened and that was
20 essentially it.
21   Q.   Okay.  Did you meet with any of the lawyers
22 from the City?
23   A.   Yeah, I think we did meet with a couple of
24 City attorneys, but it wasn't the person that's on the
25 call now.

Page 205

```
 1            VIDEO OPERATOR:  Going off the record.
 2   The time now is approximately 4:26 p.m.
 3            (A break was taken from
 4            4:26 p.m. to 4:32 p.m.)
 5            VIDEO OPERATOR:  Back on the record.
 6   The time now is approximately 4:32 p.m.
 7       Q.  (BY MS. EAKES)  Carmen, I want to ask you
 8   about your devices and your phones.  It sounds like
 9   from what you testified earlier that you communicated
10   with Mayor Durkan via phone calls, in-person meetings,
11   emails; is that right?
12       A.  Yes.
13       Q.  And text messages you mentioned earlier; is
14   that right?
15       A.  On occasion, yes.
16       Q.  Okay.  And did you also communicate with
17   Harold Scroggins [sic] in all those forms?
18       A.  Chief Scoggins, yes, in all forms, but yeah.
19       Q.  Okay.  And what about Chris Fisher, did you
20   communicate with him in all of those forms also?
21       A.  Yes.
22       Q.  Okay.  What about -- I think it's Idris
23   Beauregard, did you ever communicate with her?
24       A.  Yeah, I can't remember exactly.  Idris doesn't
25   work for the department or anything, but I gave the
```

1  graduation speech for Garfield High School, so I
2  probably might have texted him then because his
3  daughter, I think she graduated summa cum -- whatever,
4  second in her class or first, so they asked me to do
5  that so there may be a couple messages there, but he's
6  not somebody I routinely spoke to really at all.
7       Q.  What about Assistant Chief Greening, did
8  you -- how did you communicate with him?
9       A.  Probably all forms.  Typically -- you know,
10 I -- I typically respond to people usually in person.
11 I mean, Greening was on my command staff, Chris Fisher
12 was on my command staff, we met literally every single
13 day of the week in the morning meetings and then often,
14 you know, periodically even between those meetings
15 depending on what was happening, and then sometimes,
16 you know, sometimes by text or sometimes by email or on
17 a phone call.  So, you know, all those mechanisms can
18 be used at different times.  Typically I like to
19 respond and talk to people in person when it's -- when
20 we can do that.
21      Q.  Okay.  Did you -- and all the people I just
22 mentioned, did you communicate with all those folks
23 about CHOP during this time frame in May, June, July of
24 2020?
25           MR. CRAMER:  Objection; form.

1   A.  I'm sure there were conversations.  I don't
2   remember if I talked to Idris specifically about CHOP,
3   but I may have.  He was working for I think SDOT, so he
4   was in charge of some of the cleanup.
5   Q.  (BY MS. EAKES)  Okay.  And other than the
6   methods we've talked about, did you ever use any sort
7   of messaging apps to communicate with other people in
8   the police department?
9   A.  No.
10  Q.  Like WhatsApp or a service called Spark, did
11  you use that?
12  A.  I don't -- well, not knowingly.  I don't even
13  know what that is, so not that I recall.
14  Q.  Okay.  All right.  So other than texting,
15  using your City phone, did you use any other kinds of
16  messaging services?
17  A.  Messaging services?
18          MR. CRAMER:  Object to form.
19  A.  Not that I'm aware.
20  Q.  (BY MS. EAKES)  Okay, all right.  So your
21  phone, when you retired from the police department I
22  understand you turned in your City-issued phone; is
23  that right?
24  A.  Yes.
25  Q.  Okay.  And when you're communicating with

334bfd08-a328-4547-9c6b-4745f62726ec

1  people about the CHOP, were you doing that from your
2  City-issued phone?
3       A.   Not very often.  I mean, issues around the
4  CHOP and CHAZ as you know were pretty dynamic.  Mostly
5  there were a lot of meetings.  If there was something
6  immediate that I needed to get ahold of somebody for I
7  would, you know, call them for the most part, but
8  that's not to say there weren't -- you know, there
9  weren't any texts that happened during that time frame,
10 but that was not my primary source of communication.
11 You know, it was usually in person or on a phone call.
12      Q.   Okay.  Understanding that it may not be a huge
13 volume, but it sounds like there were some text
14 messages with the folks that I talked about CHAP --
15 about CHOP?
16      A.   Sure.  Yeah, should have been, yeah.
17      Q.   And so did you also use your personal device,
18 your personal phone to communicate with folks about the
19 CHOP issues back in May, June, July of 2020?
20           MS. ASHBAUGH:  Objection.
21      A.   Yeah, not that I -- not that I recall, you
22 know, not that I'm aware of, you know.  Yeah, I
23 typically tried to keep, you know, most things off of
24 text, but if I was going to, it would have been
25 typically on the -- on my work phone.

1    Q.  (BY MS. EAKES)  Okay.  And why did you try to
2  keep things off of text?
3    A.  I wasn't trying to keep things off of text.
4  It's just a preferred communication is going to be --
5  you know, why would I sit there and burn my thumbs out
6  when I could just pick up the phone and dial seven
7  numbers and talk to somebody, and so that's typically,
8  you know, the way I like to handle business.  I don't
9  even like to send emails if I didn't have to, but
10 that -- you know, sometimes you do need to, but often
11 that was the preferred method or, you know, we're --
12 we're a police department.  I would just pick up my
13 radio and also -- you know, if I needed to get
14 something really quick to somebody who was at a
15 distance who was on air so -- yeah.
16   Q.  Now, you said that you left -- you physically
17 left the job it sounds like sometime at the end -- or
18 sometime in August, but you officially retired, I think
19 you said, beginning of September of 2020; is that
20 right?
21   A.  Excuse me.  That's my recollection.  I don't
22 even have an exact date in mind, you know.
23   Q.  Okay.  Do you remember when you turned in your
24 phone to the City?
25   A.  Sometime around that time frame, I don't know

1  provide any responsive texts, how did that work?
2              MR. CRAMER:  Objection to form.
3      A.  I usually just -- yeah, I usually just gave it
4  to my assistant to pull the messages out, whatever was
5  there.
6      Q.  (BY MS. EAKES)  Okay.  And I'll represent to
7  you that -- that we have been told by the City that the
8  phone that you turned in when you retired had zero, no
9  texts on it at all.  Do you know why that would be?
10             MR. CRAMER:  Objection; misstates
11 evidence and facts.
12     A.  Yeah, I don't know.
13     Q.  (BY MS. EAKES)  Did you delete any texts from
14 your phone before you turned it in?
15             MS. ASHBAUGH:  Object to form.
16             MR. CRAMER:  Objection; form.
17     A.  Yeah, I can tell you that, you know, I
18 periodically would go in and delete transitory
19 messages.  You know, my understanding was that the City
20 was holding on to all that stuff anyway so it wasn't
21 like I was conducting any -- you know, other than
22 transitory stuff mostly on my phone, so if the
23 implication is that there was, you know, some -- it was
24 just on time periodically I would delete stuff from my
25 phone, you know.  It was like I do, you know, my

1  personal phone from time to time.  I imagine everybody
2  does that.
3       Q.  (BY MS. EAKES)  Sure.  Well, and just to be
4  more specific, did you -- when you said that it was
5  your understanding that the City kept those things or
6  had those things, what did you mean by that?
7       A.  I really mean that I thought that there was
8  some sort of record that they could go in and get, you
9  know, old messages and stuff off of the phones if they
10 needed to.  Obviously we deal with a number of cases,
11 you know, homicides and others where we pull up old
12 messages and look at what gang members were saying to
13 one another.  So I assume the City had that same
14 capability of doing that, especially with a litigation
15 hold and the holds they had on really all of our
16 communications.
17      Q.  So I guess -- and to be clear, what we were
18 told by the City was that you had -- on your phone that
19 there were no texts dated prior to September 2nd, so do
20 you -- meaning there are no texts from you, and you've
21 probably read this in the paper also -- during the time
22 frame of CHOP that there are no texts on your phone
23 from that time frame.  Were you aware of that?
24      A.  When I read it in the paper.
25      Q.  Okay.  And what was your reaction to that,

Hunters Capital, LLC v. City of Seattle | Carmen Best

Page 216

1  the text messages were really inconsequential to the
2  level of communication that I was having on a daily
3  basis with a whole host of people.
4      Q.   What about with Chief Scroggins, did you go in
5  and delete any texts you might have had with him?
6           MS. ASHBAUGH:  Object to the form.
7           MR. CRAMER:  Objection to form.
8      A.   I have to -- I -- I'm not sure what was --
9  what was there, you know, and -- or any of that.  I
10 don't even know if I texted with him during that time
11 frame.  I do know that, you know, periodically I
12 would just reduce or delete the transitory messages.
13 You're asking me to remember the -- a text message from
14 July 2020.  I don't have it.  And my understanding is
15 they could go -- they could go in and get those
16 messages anyway.
17     Q.   (BY MS. EAKES)  And where did you think they
18 could get the messages from?
19     A.   You know, from the phones.  They often -- I
20 turn my phone in and people -- you know, for -- for
21 people to review text messages or whatever, there's a
22 PDR request, so maybe incorrectly, but I believed the
23 City could always get messages that they wanted from
24 any apparatus that they needed to get it from.
25     Q.   Okay.  So I guess just to be clear, it sounds

1  like you did not intentionally delete text messages
2  with people who were involved or that might have
3  related to CHOP; is that right?
4       A.  Yeah, that is correct, absolutely not.
5       Q.  Okay.  And it sounds like you don't know why
6  the City is reporting that your phone doesn't have any
7  text messages on it prior to September 2nd?
8            MR. CRAMER:  Objection; form.
9       A.  Yeah, the -- the first I heard of it was
10 after -- you know, in the paper or whenever, wherever
11 it was there, my understanding was that, you know, they
12 could, you know, get messages if they needed them, you
13 know, and so -- and I was in the habit of only deleting
14 periodically, no particular cadence or, you know,
15 transitory messages from my phone.
16      Q.  (BY MS. EAKES)  Did you ever talk to Jenny
17 Durkan about the articles in the paper about the
18 missing texts?
19      A.  You know, not really.  I mean, I can say that,
20 you know, I did say to her, you know, "I don't know why
21 this is such a big deal."  We -- you know, if anything
22 we need to say to each other we were talking about it,
23 but, you know, other than that we didn't -- there was
24 no real conversation about it at all and that was me
25 just in passing saying that.

Hunters Capital, LLC v. City of Seattle                Carmen Best

Page 218

1   Q. And when was that that you talked to her about
2   it that you said that?
3   A. Oh, I don't know, during one of our, you know,
4   eight or so conversations.
5   Q. After you retired?
6   A. Yes, after.
7   Q. Do you -- I mean, you may not remember this,
8   but from June to September of 2020, to your memory did
9   SPD respond to any PRA requests seeking your text
10  messages?
11  A. I don't know.
12  Q. Who would have been your assistant during that
13  time?
14  A. Tricia Colin -- or Tricia Fuentes now, but she
15  was Tricia Colin.
16  Q. Okay. And just so we're clear, did you make a
17  point of deleting all of your texts before you turned
18  your phone in on September 2nd or prior to
19  September 2nd?
20  A. I did -- I did not.
21  Q. Okay. So you turned it in with whatever was
22  on it at the time; is that right?
23  A. Yes, that's my recollection. I mean,
24  there's -- I just -- I turned my phone in, I turned my
25  laptop in, I turned -- you know, everything was there

1  and, you know, I went on my merry way and didn't hear
2  anything more about it until much later when I was
3  asked about -- you know, asked about it.  And honestly,
4  my understanding was that, you know, they could -- they
5  could get all this information if they needed it.
6      Q.  You mean even if it's deleted they could go in
7  and recover it?  Is that what you're -- is that what
8  you mean?
9      A.  If they needed to, yeah, I thought that --
10 that was just my understanding all that was held.  The
11 same with our email, you can delete an email, but I
12 mean, I know all that stuff is -- is being, you know,
13 held.  I'm just not going to hold on to, you know, all
14 the emails when I know they can recreate those, you
15 know, from my email.
16     Q.  Okay.  Do you know if the text messages and
17 the information on your phone was being backed up by
18 any sort of an iCloud account?
19     A.  Not that I'm aware of.  I don't know, I have
20 no idea.
21     Q.  Tell me, has the City reached out to you at
22 all to ask you about the phone and the texts?
23     A.  Yes, they have.  At some point I got a call
24 about, you know, the text messages and if I -- you
25 know, what my understanding was of the policy way

Page 231

1         C E R T I F I C A T E
2
3   STATE OF WASHINGTON  )
                         )
4   COUNTY OF KING       )
5
6           I, Patricia D. Jacoy, a Certified
7   Shorthand Reporter in and for the State of Washington,
8   do hereby certify that the foregoing transcript of the
9   deposition of CARMEN BEST taken on November 9, 2021 is
10  true and accurate to the best of my knowledge, skill
11  and ability.
12
13
14                     _____
15                     Patricia D. Jacoy, CSR 2348