# EXHIBIT 26

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
        Plaintiffs,            )
                               )
   v.                          ) Case No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
        Defendant.             )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON ORAL
EXAMINATION

OF

IDRIS BEAUREGARD
_____

(All participants appearing via Zoom videoconference.)


Taken at
Seattle, Washington




DATE TAKEN:   July 14, 2022

REPORTED BY:  KATHLEEN HAMILTON, RPR, CRR, CCR 1917

1  A.  The opioid producers.
2  Q.  Okay.
3      What is your current position at the City of
4  Seattle?
5  A.  I'm a deputy director at Seattle Public
6  Utilities, SPU.
7  Q.  And when did you start that position?
8  A.  January of 2021, yep.
9  Q.  Okay.  And so immediately before that, what was
10 your position at the City?
11 A.  I was a division director for the Clean Cities
12 division.
13 Q.  And when did you -- when did you start that
14 position?
15 A.  Probably 2018.
16 Q.  Okay.  And what did you do as division director
17 of Clean Cities?
18 A.  So I was responsible for managing, coordinating,
19 creating strategies for activities such as illegal
20 dumping, litter cleanup, graffiti removal, sharps
21 removal, public place litter, and recycling cans.  Just
22 all the services that SPU provided relating to cleaning
23 up communities.
24 Q.  Okay.
25     And so how -- were you at the City of Seattle

Hunters Capital, LLC v. City of Seattle                    Idris Beauregard

Page 108

1   Q.   And that was your City-issued phone; right?
2   A.   Yes.
3   Q.   What can you tell me about what you remember
4   about it resetting?
5   A.   I remember it not letting me go in the phone,
6   and it said that I was locked out.
7   Q.   Okay.  And did you -- did you have fingerprint
8   identification enabled on your phone?
9   A.   The finger --
10              (Inaudible due to crosstalk.)
11              THE WITNESS:  I'm not -- it's difficult to
12  say if I had it or not.
13              (Inaudible due to crosstalk.)
14              THE WITNESS:  What I did have was I knew I
15  wrote -- I had my password written down on paper, on a
16  sticky note taped to my computer.
17  BY MR. WEAVER:
18   Q.   Okay.  Do you recall if you ever, in October
19  2020 or before then, had used your fingerprint to enter
20  your phone?
21   A.   I don't recall.  I know I have it now, so
22  it's -- it's hard for me to say if I had it then or now.
23   Q.   So you don't recall whether you tried to use
24  your fingerprint at that point?
25   A.   No, I don't.

Page 111

1   Q.  Okay.  So that was after you had put the code
2   in, gotten some delays, and then kept putting it in
3   until it told you you had no more attempts; is that
4   right?
5   A.  Yes.
6   Q.  All right.  How did you -- how did you know that
7   you were locked out?
8   A.  Whatever on the screen said I was locked out.
9   Q.  Okay.  What time of day was that, if you know?
10  A.  I was in the office, so it was in the day -- I
11  don't know the exact time.
12  Q.  Do you know if it was in the after- -- a Friday
13  afternoon?
14  A.  It could have been.
15  Q.  Okay.  Do you know if it was October 9th?  Does
16  that ring a bell?
17  A.  I had provided some information -- it might have
18  been.  I know I called IT the same day.  So if there's
19  an IT ticket on the 9th, then that was the day.
20  Q.  Okay.  So what happened when you contacted IT?
21  A.  IT just gave me some feedback.  And they said,
22  We're gonna work with Apple.
23      And they tried to do whatever IT does in order
24  to see what the issue was and if we can do a
25  work-around.

Hunters Capital, LLC v. City of Seattle						Idris Beauregard

Page 112

1   Q.   And do you recall who you talked to at IT?
2   A.   No.
3   Q.   What... did your phone reset at any point --
4   A.   Yes.
5   Q.   -- before you talked to IT?
6   A.   No.
7            MR. CRAMER:  Yeah.
8            THE WITNESS:  No.
9   BY MR. WEAVER:
10  Q.   Okay.  Did you -- do you know if your phone had
11  been set so that, if you had a certain number of false
12  inputs, it would automatically reset?
13  A.   No.
14  Q.   Had you recently changed your password?
15  A.   On my phone now?
16  Q.   No.  As of the time this happened in October of
17  2020, you said you had your password written down on a
18  sticky note that was on your computer; right?
19  A.   I could have.  When it prompts me to change my
20  password, I change my password.  It might have been.
21  Q.   Okay.  But as far as -- had you been able to get
22  into your phone earlier that day?
23  A.   I would assume, yes.
24  Q.   And you don't know if you used your fingerprint
25  or if it was the pass code that you used; is that right?

a963f83a-34b3-4bf5-b971-b66661f9845d

1  A.   That's correct, because I use the fingerprint
2  now, so...
3  Q.   Okay.  So you don't -- do you remember -- do you
4  remember if it was right after you got locked out that
5  you called IT?
6  A.   I don't remember if it was right after.
7  Q.   Could it have been later that day?
8  A.   It could have been, yes.
9  Q.   Okay.
10      Do you recall talking to anybody else other than
11 IT about the fact that you'd been locked out of your
12 phone?
13 A.   I think I called -- like I mentioned, I talked
14 to admin, someone -- an admin about the lockout and what
15 options do I have, and that's partly -- I think they
16 also mentioned call -- I could call Apple directly.
17 Q.   So who in admin do you -- did you talk to, if
18 you remember?
19 A.   I believe it was my senior EA at that time.
20 Q.   Who's -- what's a senior EA?
21 A.   That's an administrative assistant.
22 Q.   Okay.  And that might have been -- I think you
23 said you think it might have been, at that time,
24 Ms. Chow?
25 A.   Yes.

Hunters Capital, LLC v. City of Seattle                               Idris Beauregard

Page 114

```
 1    Q.   And did you call Apple?
 2    A.   I did.
 3    Q.   When did you call Apple?
 4    A.   Probably that same day.
 5    Q.   What did Apple say?
 6    A.   They gave me some options about... it was just a
 7  little bit, something about going onto my Apple ID and
 8  changing it.  I don't know off the top of my head what
 9  their instructions were, but they had a few instructions
10  that I should do in order to retrieve the pass code.
11    Q.   And did you -- did you follow the steps that
12  they told you to take?
13    A.   I did.
14    Q.   And did it work?
15    A.   No.
16    Q.   At that point, had you already been locked out
17  of your phone?
18    A.   Yes.
19    Q.   So then what happened after you talked to IT,
20  Apple, and Mrs. Chow?
21    A.   Well, I made the initial -- I put an IT ticket
22  in.  First, when I called IT, it was a ticket.  And then
23  they eventually called me back.  And, again, nothing --
24  there was nothing that would -- that happened to resolve
25  the issue.  So the phone was still locked out.
```

Page 121

1   Q.   Do you know whether there were any pictures from
2   2020 on your phone when it reset?
3   A.   Not that I can remember.
4   Q.   Okay.
5        Aside from your contacts and some photos, what
6   other information or data showed up after the reset on
7   your phone?
8   A.   That's all I can remember.  It's usually the two
9   things that I would use is the contacts, the photos, and
10  there's not too much I would use else for the phone for.
11  Q.   Okay.  Any apps that you had on your phone at
12  all, did they come back?
13  A.   They may have.  I -- I wasn't being extra
14  attentive to everything when the -- I was just happy
15  that my phone unlocked at that point.
16  Q.   Okay.  Did you have to put in a pass code for
17  it before it reset?
18  A.   I had to create a new pass code.
19  Q.   After it had reset?
20  A.   Uh-huh.
21  Q.   Tell me everything you can remember about you
22  seeing -- when you noticed it was resetting.  What first
23  gave you the indication that it was resetting?
24  A.   It was a -- it was more of the screen.
25  Something was happening with the screen that caught my

1  eye, because the phone was sitting next to my computer.
2  And I started paying attention, and that's when I
3  noticed that it was resetting.
4      Q.   Were you at home when this happened?
5      A.   No, I was at work.
6      Q.   So you were at work when it reset?
7      A.   Yes.
8      Q.   Is that right?
9      A.   Yes.
10     Q.   Do you know whether you -- have you ever given
11 access to your -- your iCloud account to anybody at the
12 City to try to see what they can recover from your
13 phone?
14     A.   I may have when I called IT, and we -- I talked
15 to IT, I may have gave them access so they could walk
16 through it with me.
17     Q.   How about anybody after that?
18     A.   Only the attorneys that were trying to piece
19 together information for this.
20     Q.   You gave them access to your iCloud account?
21     A.   Yes, we -- whoever.
22          THE WITNESS:  Who was that?  Shane?
23          MR. CRAMER:  I'm going to ask that you not
24 testify to anything that you talked to the attorneys
25 about.

Page 132

1      Do you recall manually deleting any messages
2  during that time period?
3            MR. CRAMER:  Objection.  Form.
4            THE WITNESS:  I don't recall deleting any
5  messages that were sensitive to the litigation hold, no.
6  BY MR. WEAVER:
7      Q.   Okay.  Were there messages that you deleted,
8  whether they were sensitive to the litigation hold or
9  not, between October 9th, 2020, and March 2021?
10     A.   There could have been.
11     Q.   What sort of messages would you have possibly
12 deleted from your phone during that time period?
13           MR. CRAMER:  Objection.  Form.
14           Go ahead.
15           THE WITNESS:  Just casual -- like just
16 general messages that were... simple.  They're just --
17 it's hard to think about them now at the moment, but
18 yeah, just general simple messages that didn't have --
19 pertain to anything that had to do with work or
20 something as sensitive as that I felt I needed to keep.
21 BY MR. WEAVER:
22     Q.   Do you know what the City policy was at that
23 time about whether you should keep all messages or
24 whether you should keep only certain messages that you
25 believe were important?

Page 133

1      A.   Not... not on those type of messages, no.
2  Sometimes they have to do with a football game or
3  something.  No, so I didn't know what the City policy
4  was to that.
5      Q.   Okay.  Why would you delete messages about a
6  football game from your phone?
7      A.   It just -- they were just general messages that
8  I felt like weren't needed.
9      Q.   Well, do you think -- do you delete messages,
10 other than personal messages, from your work cellphone?
11     A.   No.  What do you mean "personal messages"?
12     Q.   Okay.  I assume the messages about the football
13 games -- were those personal messages or were those
14 work-related messages?
15     A.   Well, they --
16          MR. CRAMER:  Objection.  Form.
17          Go ahead.
18          THE WITNESS:  Well, they might have came
19 from somebody in the City that I work with, so they
20 weren't necessarily in the topic of work.
21 BY MR. WEAVER:
22     Q.   Okay.  So there might have been communications
23 between you and other City -- City of Seattle employees
24 that you would have deleted from your phone between
25 October and March of 2020; is that right?

Page 178

1              C E R T I F I C A T E

2

3  STATE OF WASHINGTON

4  COUNTY OF KING

5

6      I, Kathleen Hamilton, a Certified Shorthand

7  Reporter and Notary Public in and for the State of

8  Washington, do hereby certify that the foregoing

9  transcript of the deposition of IDRIS BEAUREGARD, having

10 been duly sworn, on JULY 14, 2022, is true and accurate

11 to the best of my knowledge, skill and ability.

12      IN WITNESS WHEREOF, I have hereunto set my hand

13 and seal this 22ND day of JULY, 2022.

14

15

16

17

18  _____
    KATHLEEN HAMILTON, RPR, CRR, CCR #1917

19

20

21

22

23

24

25



# ERRATA

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 7/14/2022

**WITNESS:** Idris Beauregard

## CORRECTIONS

NONE NEEDED.

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
|      |      |           |             |

_Idris Beaure___
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# DECLARATION

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 7/14/2022

**WITNESS:** Idris Beauregard

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
Idris Beauregard

Signed on the __16__ day of __August__, 202_2_.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com