# EXHIBIT 3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff,           )
                                 )
        vs.                      ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

KEVIN T. FAULKNER

_____

New York, New York

(All participants appeared via videoconference.)

DATE TAKEN:  AUGUST 17, 2022
REPORTED BY: CINDY M. KOCH, RPR, CRR, CCR #2357

1  Q. Okay. And just to be clear, that
2  reconstruction would not have any messages that were
3  solely between Mayor Durkan and Chief Best from June 1,
4  2020, through June 25, 2020, would it?
5        MR. CRAMER: Objection. Asked and answered.
6  A. Yeah, I would say that I infer that it
7  wouldn't, because I believe I have all of the sources
8  for those two custodians, and I didn't recover any text
9  messages at all for that time period for either of them.
10 BY MR. REILLY-BATES:
11 Q. Okay. And you'd have the same answer for
12 Mayor Durkan and Chief Scoggins, for messages that were
13 solely between those two individuals; correct?
14 A. Same answer, yes.
15 Q. And same answer for any of -- any of the -- the
16 individuals who have lost all of their text messages
17 that we've been talking about: Beauregard, Greening,
18 Neafcy, Best, Durkan, Scoggins.
19       Any messages that were solely between those,
20 you would infer that they would not be in the
21 reconstruction because they don't have text messages
22 from June 1st through June 25th of 2020; right?
23       MR. CRAMER: Objection. Form. Assumes
24 facts.
25       Go ahead.

1  A.  Yeah, I'd say assuming that they don't have any
2  messages in that reconstruction from that time period,
3  from -- specifically from devices associated with those
4  custodians, then I would infer that they couldn't have
5  messages solely between any two of those custodians in
6  that time frame.
7  BY MR. REILLY-BATES:
8     Q.  Did you -- did you undertake any analysis to
9  test the quality of the reconstruction that was created?
10    A.  No.  I don't think any of my analysis would be
11  considered related to that.
12    Q.  Okay.  And you mentioned -- we spoke earlier
13  about the duplicate issue, and at the bottom -- or the
14  bottom of that first paragraph of Page 5, you state, "As
15  stated above, the reconstruction does not -- does
16  include duplicates when the messages were reconstructed
17  from more than one mobile device that was involved in
18  the same text message exchange."
19        And I believe it's your testimony earlier that
20  you are unable to determine exactly how many duplicates
21  there were in any given --
22        MR. CRAMER:  Sorry.  Can you say the last
23  part over, Gabe?  You trailed off.
24        THE COURT REPORTER:  Yeah.  Thank you.
25        MR. REILLY-BATES:  Sure.  Sorry.

```
 1        Q.  Okay.  So when you -- when you use that number,
 2   1,562 entries, that -- that's actually just a guess;
 3   it's not a -- the actual number of text messages that
 4   were reconstructed.  Correct?
 5            MR. CRAMER:  Objection.  Form.
 6        A.  I don't think that's fair.  I didn't say there
 7   were 1,562 text messages.  I said there were 1,562
 8   entries in the reconstruction.
 9   BY MR. REILLY-BATES:
10        Q.  Okay.  Gotcha.
11            So -- so it would be incorrect to assume that
12   there were 1,562 text messages recovered by the
13   reconstruction efforts; correct?
14            MR. CRAMER:  Objection.  Form.
15        A.  Yes, I think that's right -- I think that's
16   incorrect.  There were, you know, many more than that
17   from Mayor Durkan's older phones, and then there were
18   the 1,562 entries that would de-duplicate down to some
19   lower number.
20   BY MR. REILLY-BATES:
21        Q.  Okay.  But sitting there today, you can't --
22   you can't give us an exact number of the text messages
23   that were recovered from Mayor Durkan's reconstructions;
24   is that fair?
25        A.  I would say, from other custodians, that's
```

```
 1   fair.  From her devices, that's reflected in my report.
 2        Q.  Okay.  So let's go down to Page 5, third
 3   paragraph from the bottom, please.
 4        A.  I'm on Page 5.  Sorry; third paragraph from the
 5   bottom?
 6        Q.  Right.  It's starting with, "With respect to
 7   the sms.db on Mayor Durkan's iPhone 11."
 8        A.  I see that paragraph.
 9        Q.  Okay.  And it continues, "The Leatha report
10   states, 'My analysis of the ROWID gaps in the message
11   table shows that an additional 191 messages were
12   manually deleted between June 25, 2020, and
13   November twenty -- I'm sorry -- November 16, 2020.'
14   (Leatha report, Page 14)."  There are one hundred-- and
15   then you say, "There are 191 ROWID gaps in the 'Message'
16   table, but this statement is misleading."
17            My question is -- so you concede that there are
18   191 row ID gaps in the message ID table; correct?
19        A.  I believe there are that many gaps in row IDs,
20   yes.
21        Q.  And those -- those gaps correspond to messages
22   that once existed on Mayor Durkan's phone; correct?
23        A.  I believe that's fair.
24        Q.  Now, you have conducted an analysis and
25   determined that 131 of these 191 messages are available
```

Page 183

1   Q.  Okay.  And again, that is a reconstruction that
2   you were not personally involved in; correct?
3   A.  I believe that's fair, yes.
4   Q.  I'm sorry.  I didn't catch that last part.
5   A.  I said I believe that's fair, yes.
6   Q.  And you can't personally verify that -- that
7   there were 1,697 text messages that had been
8   reconstructed in that 33-day window from June 8th
9   through July 10, 2020; correct?
10  A.  I believe I can say that I've seen that many
11  records listed in the reconstruction spreadsheet that
12  was provided to me, and I listed on my materials
13  considered.
14  Q.  Well, you can't say that you -- you personally
15  determined that there were -- that there were 1,697
16  messages that were reconstructed.  You're relying on --
17  on the reconstruction by the City; correct?
18  A.  I would say that I'm relying on the
19  reconstruction provided by the City, and I'm -- I don't
20  believe I'm saying there were 1,697 messages, but again,
21  records in that reconstruction.
22  Q.  Right.  And again, like as we discussed before,
23  the records include duplicates, don't they, for
24  Chief Best's records?
25  A.  Yes, that's correct.  The reconstruction that I

1  received for Chief Best included duplicates.
2       Q.  Okay.  So you're unable to determine the exact
3  number of actual text messages that were -- the City was
4  able to reconstruct, based on the uncertainty caused by
5  those duplicates.  Wouldn't that be a fair statement?
6       A.  Yes, I think that's fair.
7       Q.  Okay.  Let's go to Chris Fisher on Page 6.
8  Now, what did you mean when you state, "I understand the
9  date reported by the City to have been approximate"?
10      A.  That I -- I -- from memory, that Mr. Fisher
11 said something about, like, the -- the fall or winter or
12 something, and the date reported by the City was based
13 on that.  But then later, analyzing the data, we were
14 able to see a more precise date.
15      Q.  Okay.  So were you, in fact, able to determine
16 that -- whether or not there was a factory reset that
17 was performed on Mr. Fisher's phone on December 3, 2020?
18      A.  Let me see if my report reflects that date.  I
19 believe what I had seen was artifacts consistent with a
20 restore from an iCloud backup specifically.
21          Sorry.  Is the audio cutting out?
22      Q.  No, no, no.  I can hear you.  I'm sorry.  Did
23 you hear a sound?
24      A.  Yes.
25      Q.  Okay.

Hunters Capital, LLC v. City of Seattle                           Kevin T. Faulkner

Page 191

1  to you?
2     A.  I don't remember the exact words, but
3  generally, I remember asking about the models of phones
4  that he used at different points in time, and the -- the
5  process by which he switched from, you know, one phone
6  to another, and things related to that.
7     Q.  Okay.  And did he describe the incident in
8  which his phone was reset?
9     A.  I'm trying to remember any other details around
10 the reset.  Yeah, nothing -- nothing's coming to mind
11 right now, sitting here today.
12    Q.  Okay.  Now, Neafcy and Scoggins and Beauregard
13 and Greening, they have all -- the City has prepared
14 reconstructions for all of those individuals; correct?
15    A.  I would have to check my materials considered
16 to see if I've received them for those individuals.
17    Q.  But the same -- the same restrictions would
18 apply to those reconstructions, in that -- that they --
19 they contain duplicate records, so you would be unable
20 to determine the exact number of actual text messages
21 that have been reconstructed from each one of those
22 individual's reconstructions; correct?
23          MR. CRAMER:  Objection.  Form.
24       Go ahead.
25    A.  I would say my understanding of each of the

Page 192

```
 1    reconstructions is that they do include duplicates.
 2    Whether or not you would be able to get to an exact
 3    number of text messages, I think one could try.
 4             As I said before, there is not a unique
 5    identifier, so some of the messages are easily
 6    identifiable as duplicates.  Other ones, it's difficult
 7    to tell.
 8             But if your question is, you know, could it be
 9    done, I think someone could try to do it and could make
10    some progress.  I don't know if they could get to an
11    exact answer or not.
12    BY MR. REILLY-BATES:
13        Q.  But sitting there today, you haven't attempted
14    to do it yet, and you're not aware of anybody in the
15    City who has also tried to do that analysis; correct?
16        A.  As I think I -- I discussed before, I did try
17    to do such an analysis, but because I couldn't get to an
18    exact number, decided not to -- not to rely on an
19    analysis that was incomplete, and instead just list the
20    number of records.
21             I have no information whether or not anyone
22    within the City or any of their attorneys or vendors
23    have undertaken such an analysis.  I haven't heard
24    anything either way on that.
25        Q.  Okay.  Turning now to Exhibit 4, the Leatha
```

1        C E R T I F I C A T E

3  STATE OF WASHINGTON
4  COUNTY OF PIERCE

6        I, Cindy M. Koch, a Certified Court Reporter in
7  and for the State of Washington, do hereby certify that
8  the foregoing transcript of the deposition of Kevin T.
9  Faulkner, having been duly sworn, on August 17, 2022, is
10 true and accurate to the best of my knowledge, skill and
11 ability.
12       IN WITNESS WHEREOF, I have hereunto set my hand
13 and seal this 18th day of August, 2022.

                    _____
                    CINDY M. KOCH, CCR, RPR, CRR

20 My commission expires:
21 JUNE 9, 2026