1          UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                    )
4                                   )
     HUNTERS CAPITAL, LLC, a        )  C20-00983-TSZ
5    Washington limited liability   )
     company, et al.,               )  Seattle, Washington
6                                   )
                    Plaintiffs,     )  December 13, 2022
7                                   )  9:31 a.m.
     v.                             )
8                                   )  Pretrial Motions
     CITY OF SEATTLE,               )
9                                   )
                    Defendant.      )
10   _____

11             VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE THOMAS S. ZILLY
12             UNITED STATES DISTRICT JUDGE

13   _____

     APPEARANCES:
14
      For the Plaintiffs:      ANGELO J. CALFO
15                             TYLER S. WEAVER
                               GABRIEL REILLY-BATES
16                             Calfo Eakes, LLP
                               1301 Second Ave., Ste. 2800
17                             Seattle, WA 98101

18
      For the Defendant:       SHANE PATRICK CRAMER
19                             ARTHUR W. HARRIGAN, JR.
                               ERICA R. IVERSON
20                             Harrigan Leyh Farmer & Thomsen
                               999 Third Avenue, Suite 4400
21                             Seattle, WA 98104

22                             JOSEPH G. GROSHONG
                               Seattle City Attorney's Office
23                             701 Fifth Avenue, Suite 2050
                               Seattle, WA 98104

24
          Proceedings stenographically reported and transcript
25             produced with computer-aided technology

1            DECEMBER 13, 2022

2                 *   *   *   *   *   *

3         THE DEPUTY CLERK:  We are here on the matter of

4    Hunters Capital, LLC, et al. versus City of Seattle, Case

5    Number C20-983, assigned to this Court.

6      Counsel, will you please rise and make your appearances

7    for the record?

8         MR. CALFO:  Good morning, Your Honor.  Angelo Calfo,

9    Tyler Weaver, and Gabe Reilly-Bates for plaintiffs.

10         THE COURT:  Good morning, Counsel.

11         MR. CRAMER:  Good morning, Your Honor.  Shane Cramer,

12    Art Harrigan and Erica Iverson, and with us today is Joe

13    Groshong from the City Attorney's Office for Defendant City

14    of Seattle.

15         THE COURT:  Good morning, Counsel.

16      This matter comes before the Court on the three motions

17    that we are going to hear oral argument on this morning.  The

18    first is a motion for summary judgment that the City has

19    brought to dismiss the five causes of action which the

20    plaintiffs have brought in this action.

21      We're going to hear oral argument first on that, and I've

22    told the lawyers we hope to limit the argument to 30 minutes

23    per side.  We'll take a short break, and then we will hear

24    the motions on spoliation.  We have one from each side.  The

25    plaintiffs have moved against the City on spoliation,

1 │ alleging that documents were not kept properly, were not

2 │ disclosed properly, and that the case should be dismissed on

3 │ that basis alone, or other sanctions should be imposed.

4 │     The City, of course, has also moved for spoliation, saying

5 │ that representatives of the plaintiff -- and I think there

6 │ are approximately 16 plaintiffs remaining; is that right,

7 │ Mr. Calfo?

8 │           MR. CALFO:  That's about right, Your Honor.

9 │           THE COURT:  All right.

10 │           MR. CALFO:  There are some plaintiffs that have

11 │ multiple entities involved, so...

12 │           THE COURT:  Well, I understand, but this started out

13 │ as a proposed class action.  The Court denied the class

14 │ motion and entered an order previously, so we're down to

15 │ approximately 16 businesses or individuals that have

16 │ businesses in the CHOP area, as it was referred to.

17 │     All right.  I think we're ready for oral argument, and we

18 │ will hear from the City first.  You may proceed.  As I

19 │ indicated, 30 minutes a side, and you can reserve anything

20 │ you wish.

21 │           MR. CRAMER:  Thank you, Your Honor.  I'll reserve

22 │ five minutes, if I may.

23 │     The plaintiffs set out and summarized exactly what this

24 │ case is about and, critically, what it's not about on page 2

25 │ of their opposition to the City's motion for summary

1   judgment.  Importantly, the case is not about SPD's decision

2   to vacate the East Precinct on June 8th.

3        THE COURT:  Get a little closer to that mic so we can

4   all hear you.

5        MR. CRAMER:  It's also not about the formation of

6   CHOP in the immediate aftermath or the protesters' use of

7   makeshift barricades to establish the CHOP, block of traffic,

8   post armed guards at barriers.

9        Instead, it's only about the high-level, inherently

10  discretionary governmental actions the City took over the

11  next three weeks to try and balance the safety, rights,

12  interests of stakeholders, like business owners, residents,

13  First Amendment protesters, and city personnel in trying to

14  deal with the CHOP, all of which was occurring against the

15  backdrop of the first three months of COVID, the Governor's

16  stay-at-home mandate, the George Floyd protests that sparked

17  around the country.  Everyone agrees that this was an

18  unprecedented situation.  It was also one that the City

19  managed well within its obligations under the law.

20       As you noted earlier, the plaintiffs have five claims for

21  relief, none of which can withstand summary judgment.  First

22  as to the plaintiffs' negligence claim, the City has asserted

23  the Public Duty Doctrine defense, and no exception has been

24  identified that applies.  What started off with plaintiffs

25  listing a litany of statutes that they allege the City failed

```
1   to enforce for the provided legislative intent has now been
2   whittled down to two City ordinances that they claim that the
3   City has failed to enforce.
4           THE COURT:  Why don't you just explain what the
5   Public Duty Doctrine is --
6           MR. CRAMER:  Sure.
7           THE COURT:  -- so we have it in focus.
8           MR. CRAMER:  The Public Duty Doctrine is a focusing
9   lens that identifies and tries to make clear that cities can
10  only be held negligent when they have a duty, and there are
11  only certain times and certain ways in which that duty can
12  arise.  Here, in order to establish such a duty, plaintiffs
13  either needed to identify legislation that intended to
14  protect them, which they've abandoned, or statutes or
15  ordinances that they claimed that the City failed to enforce,
16  and they are proceeding --
17          THE COURT:  And this is solely based on state law?
18          MR. CRAMER:  That's correct.  This is just their --
19          THE COURT:  And the Public Duty Doctrine, the only
20  exception to that which is in focus here is the failure to
21  enforce two city ordinances; is that where we are?
22          MR. CRAMER:  That's where we are, Your Honor, and
23  both of them can be easily dispatched.
24          THE COURT:  And this is the negligence claim that the
25  plaintiffs bring that has been now narrowed to these two
```

1    codes, if you will.

2         MR. CRAMER:  That's right, Your Honor, the fire --

3         THE COURT:  One's the fire code, and one's the street

4    traffic code.  Why don't they apply?

5         MR. CRAMER:  Because neither of them mandate that the

6    City take any specific corrective action to cure or correct

7    the regulatory violations that they've identified in those

8    two municipal ordinances.  They gave you a handout.  The fire

9    code sections that are at issue here are behind the first

10   tab.  And all the Court needs to do is to look to the

11   highlighted language on the first page where the fire code

12   specifically says that no provision or terms used in it is

13   intended to impose any duty whatsoever upon the City, and

14   importantly, or any of its officers or employees for whom the

15   implementation or enforcement of this code is discretionary,

16   not mandatory.  That, alone, defeats the claim under the fire

17   code.

18      Similarly, the same language in the special events code,

19   which is put behind Tab 2, which is listed on the first page,

20   which is SMC 15.02.025, indicates that nothing in the special

21   permitting section in the Seattle Street Use Code is intended

22   to impose any duty whatsoever on the City.

23         THE COURT:  And the point of theory here is that the

24   City didn't issue the protesters a permit so that they could

25   have their activities in the park with a permit in place; is

1  that right?

2           MR. CRAMER:  That's correct.  And there's no --

3           THE COURT:  Can you imagine what the plaintiffs would

4  be arguing if you had issued them a permit?

5           MR. CRAMER:  You're right, Your Honor, yes.

6           THE COURT:  I mean, we'd be here on the same claim,

7  wouldn't we, except that now Mr. Calfo and his team would be

8  arguing that you should never have issued the permit.  The

9  City can't win on that one, can it?

10          MR. CRAMER:  So, Your Honor, for both of those

11  reasons, the negligence claim should be dismissed.

12      The nuisance claim, as well, can't survive summary

13  judgment for several reasons.

14          THE COURT:  Let me --

15          MR. CRAMER:  Yes.

16          THE COURT:  Let me just ask you, before we get to

17  nuisance, the City makes another argument in connection with

18  the negligence claim, and that is that the Discretionary Duty

19  Doctrine applies and what you were doing was discretionary

20  and you can't be liable in negligence.  Are you abandoning

21  that argument or --

22          MR. CRAMER:  No, Your Honor.  I think, on that one,

23  the difference and where plaintiffs miss the mark is in

24  mischaracterizing what were policy decisions and trying to

25  cloak them as implementation of the ordinances.  What's clear

1    is that the steps that the City took were all taken at

2    high -- among high department-level or higher individuals.

3    The policy decisions to provide porta-potties in the middle

4    of a pandemic was debated, pros and cons were discussed.  The

5    creation of barricades -- not the creation of barricades, but

6    the decision to provide access, to regularize open access

7    undertaken, Sam Zimbabwe, directors of public transportation,

8    in conjunction with other city leaders, this isn't

9    implementation.  Those are the policy decisions that are

10   entitled to discretionary immunity here.

11       If plaintiffs were claiming that one of the porta-potties

12   that the City provided was set on a slope in Cal Anderson

13   Park and had fallen over on somebody, that would be, you

14   know, a ministerial frontline act that would not be subject

15   to discretionary immunity, but that's not the claim that's

16   here.  The claim is that the big-picture decisions were

17   negligent, and that's classic discretionary immunity.

18       The nuisance claim, as well, should be dismissed, because

19   they can't get past the specific authorization in

20   RCW 7.48.160, that an authorized act can't be a nuisance.

21   And --

22            THE COURT:  And a nuisance, under Washington law, is

23   codified so that we start with the statute, itself; is that

24   right?

25            MR. CRAMER:  That's correct, Your Honor.

1    THE COURT:  And that's 7.48.

2    MR. CRAMER:  Yes.

3    THE COURT:  How is the nuisance claim different than

4  the negligence claim?  I know you make the argument that

5  they're basically the same, and if I dismiss negligence, I

6  should dismiss nuisance, but aren't there differences between

7  the nuisance claim and the negligence claim?

8    MR. CRAMER:  There really aren't.  I think that the

9  *Hostetler* case about providing alcohol at Evergreen Point

10  Park is really on point here.  It's what did the -- the

11  allegations here are, what did the City do to create this

12  nuisance?  What unreasonable acts did the City take to create

13  this nuisance?

14    And what they've attempted to do in their summary judgment

15  briefing, for the first time, is distinguish between

16  affirmative acts versus failure to enforce, but if you look

17  back at the history of this case, all of the items that they

18  claim constitute the nuisance are all of the things that they

19  were alleging were statutory violations until they realized

20  that those statutory violations, if pursued as negligence,

21  couldn't defeat the -- overcome the Public Duty Doctrine.

22  And so they recloaked it as a nuisance claim, but the

23  *Fishburn* case demonstrates that that's not -- that's not

24  appropriate and that the nuisance claim also gets dismissed

25  under the Public Duty Doctrine because it is just a recloaked

1   negligence claim.

2       THE COURT:  Well, but the negligence claim is --

3   they've limited it considerably to these two ordinances, the

4   fire code and the street code, but their negligence -- their

5   nuisance claim is broader than that; is it not?  Don't they

6   allege -- they've got other causes of action, but basically,

7   they're alleging a lot of other activities by the City that

8   constituted a nuisance, causing them damage.  Now, that's

9   another issue, but isn't it broader?  Isn't nuisance broader?

10      MR. CRAMER:  Not in the way that it's been framed

11  here.  The acts that they allege that the City took were acts

12  that only created the nuisance because they were unreasonably

13  implemented, enforced, et cetera.

14      THE COURT:  And how does the *Atherton* case play in

15  here?  Because it deals with this issue of whether a nuisance

16  claim can be dismissed if it's identical, similar to the

17  negligence claim.

18      MR. CRAMER:  I think it's -- the *Atherton* case, I

19  think, supports the argument that we've been making, that

20  when it's just a dressed-up negligence claim, it can't

21  survive on its own.

22      But the nuisance claim also can't survive, because the

23  City has the specific authority to regulate and control

24  parks, sidewalks, streets, and the nuisance -- and that's

25  under RCW 35.22.280.  And that express grant of authority to

1    regulate and control streets and parks and sidewalks, up to

2    and including vacating them permanently, takes this out of

3    the nuisance framework altogether.

4          THE COURT:  Well, but let me -- the plaintiffs allege

5    in their Amended Complaint, at paragraphs 217 through 222,

6    that there was a nuisance created that included access

7    issues, excessive noise -- we haven't talked about noise --

8    public safety hazards, vandalism, all things which were, in

9    the plaintiffs' view, a nuisance, causing them damage.  Now,

10    those are not included, are they, in the negligence claim, as

11    the plaintiffs have narrowed their negligence claim?

12          MR. CRAMER:  But they still come down to the same

13    facts.  The failure to enforce is also -- if you look at it a

14    different way, it's a failure to enforce clearing

15    obstructions, which is the same thing as there being

16    obstructions and leaving obstructions.  They first

17    articulated these under the affirmative -- as affirmative

18    duties of the City.

19      If you look back at the motion for class cert. briefing,

20    that's how all of this was styled.  It's just they know that

21    they can't meet that standard, so it's the still the same

22    underlying facts and unreasonable conduct by the City that is

23    at issue here.  It's not like the rifle range case where it's

24    the -- you know, there's nothing negligent that created -- or

25    no unreasonable acts that created the nuisance on the

 1  property.  It was a zoning expansion and overuse.  That's not

 2  what we're talking about here.

 3          THE COURT:  Do you know of any case in Washington

 4  that would support a claim of nuisance for graffiti that

 5  would be put on buildings, with the theory being that the

 6  City isn't enforcing their graffiti ordinances?

 7          MR. CRAMER:  No, Your Honor, because that would come

 8  back to the Public Duty Doctrine, and there is no such case

 9  that I'm aware of.

10          THE COURT:  All right.  Well, let's move on, then.  I

11  understand your arguments there.

12      Let's talk about substantive due process.

13          MR. CRAMER:  So this Court recognized in its class

14  cert. order that the due-process clause is a limitation on

15  state action and is not a guarantee of certain minimal levels

16  of safety or security.  It also does not confer any

17  affirmative right to governmental aid, even where such aid

18  may be necessary to secure life, liberty, property interests,

19  and that government actors are usually not required to

20  protect individuals from third parties.

21      Now, this is where it's important to go back to what the

22  plaintiffs are actually alleging here.  The plaintiffs are

23  not alleging that the vacation of the East Precinct on

24  June 8th created -- is a part of their claim.  That is a

25  preexisting event.  They're not claiming that the protesters

1  or whomever that established barricades after that vacation

2  is a state-created --

3       THE COURT:  Well, Counsel, they are claiming the

4  exception of a state-created danger, and part of that

5  state-created danger would necessarily include abandoning the

6  precinct and not having police enforce the activities in the

7  CHOP area for about three weeks; isn't that true?

8       MR. CRAMER:  So it's actually -- it's not true, Your

9  Honor.  It's two different issues.  The plaintiffs are taking

10  the state of the world and the state of Capitol Hill as it

11  existed after the police vacated the precinct, after

12  protesters had established barricades, armed them with armed

13  people, and it's only then that they're claiming that the

14  affirmative acts of the City helped facilitate the existence

15  of it from that point forward.

16    So it is like *Johnson* in that when the -- the status quo

17  is after the protest has begun, after you have armed guards,

18  barricades.  And this is -- they say this on page 2 of their

19  motion, and it's not an accident.  I mean, it is repeated

20  throughout.  The affirmative acts that they're talking about

21  are the provision of porta-potties, the provision of lights,

22  the provision of -- and the resetting of barricades to

23  establish a regularized path, and because those are the

24  actions, none of them create an actual particularized harm.

25       Now, they also try to characterize the City's modified

1   response protocol, the SPD and SFD's modified response

2   protocols, as affirmative acts, but they're not.  They're the

3   exact type of passive response protocol changes that were

4   approved in *Johnson*.

5       Now, they --

6           THE COURT:  Well, and *Johnson* involves the City of

7   Seattle; did it not?

8           MR. CRAMER:  Yes.

9           THE COURT:  The riots, the Mardi Gras riots, and

10  that went up to the Ninth Circuit, and there was no liability

11  on the claims that were made; is that right?

12          MR. CRAMER:  That's correct.

13          THE COURT:  And the theory there was that there was

14  no liability because there was nothing that placed the

15  plaintiffs there in danger, different than if there had been

16  no plan at all.  I mean, it was -- it was the -- there was

17  nothing that happened there.

18      Let me ask you this:  You cite in your briefs, at some

19  point -- and you've got a mountain of briefs -- but a case

20  called *White v. Minneapolis*, which involved the riots in

21  Minneapolis right after the George Floyd murder.  Can you

22  tell me about that case?  Because it looks like it's a case

23  that has most of the claims that we have in this case.

24          MR. CRAMER:  It --

25          THE COURT:  And that court -- and I think it went up

 1    to the circuit, the Eighth Circuit -- but found no liability;

 2    did they not?

 3              MR. CRAMER:  That's correct, Your Honor.

 4              THE COURT:  And how is that case different than this

 5    case?

 6              MR. CRAMER:  The case is not different than this

 7    case.  The claims in that case are remarkably similar to the

 8    claims here.  And on foreseeability, especially, they make --

 9    they are clear to note that -- you know, that case involved a

10    restaurant near the Third Precinct Police Department in

11    Minneapolis that burned down, and it's a claim based on

12    property ownership rights and being a resident around a

13    protest area.  And the court noted that there's no right to

14    police protection, there's no right -- that the city's

15    decision not to provide 911 services didn't create any

16    affirmative act that gave rise to liability under the

17    substantive due process claim.  So that claim -- that case is

18    one that we believe strongly supports your grant of summary

19    judgment here.

20              THE COURT:  Now, the elements of the claims there

21    dealt with Minnesota law, and there were some differences,

22    were there not, in terms of what had to be proved?  I mean,

23    it's not directly on point, because it doesn't involve

24    Washington law, and there were some differences, I believe,

25    that needed to be proved or not proved there.

1    MR. CRAMER:  Yeah, Your Honor --

2    THE COURT:  It's a fairly close case, isn't it?

3    MR. CRAMER:  It's a fairly close case.  I think

4    that -- yes, yes.

5    THE COURT:  Well, Mr. Calfo or someone from the

6    plaintiffs can, I'm sure, explain to us the difference, but

7    it's a very key case, I think, in connection with this

8    substantive due process.

9    MR. CRAMER:  On the substantive due process claim, so

10   you've got to then look at the affirmative acts that they

11   allege were -- created particularized harm to them.  And

12   really, what plaintiffs point to are things like the

13   provision of porta-potties, the provision of lights, none of

14   which create a particularized harm to each of these

15   plaintiffs, in particular.

16   And that's the stage that we're at here.  This is no

17   longer a class -- a proposed class action.  These are 16-ish

18   individual plaintiffs with several buildings, each of whom

19   have their own distinct claims that they need to prove up,

20   and they don't try to do that, because the claims -- and what

21   they're alleging -- are harms to the public, harms to the

22   general public, the neighborhood.  That doesn't give them a

23   right under the substantive due process clause to a claim for

24   relief.

25   The foreseeability element there was addressed by the

 1   court in *White* and is key here, because here you even get --

 2   and this is behind the third tab in our outline.  You've got

 3   plaintiffs with buildings half a mile away from Cal Anderson

 4   Park, and there's no evidence that those buildings suffered

 5   any particularized harm that wouldn't have been felt by

 6   anyone else in that half-mile, two-mile range.

 7        THE COURT:  Well, is this a claim where the Court

 8   needs to parse the ones that are so far away that there

 9   couldn't be, as a matter of law, any particularized harm and

10   that those that are right in the CHOP area might have a

11   claim?

12        MR. CRAMER:  No, Your Honor, I think that *White* deals

13   with that.  But, to the extent that the Court did believe

14   that viable claims exist with respect to some, those that are

15   further away would have a tougher time establishing any right

16   to relief.

17        THE COURT:  All right.  Let's turn to the taking

18   claim, which I think is --

19        MR. CRAMER:  Okay.

20        THE COURT:  -- the most fascinating claim, frankly.

21        MR. CRAMER:  So, then -- go ahead, I'm sorry.

22        THE COURT:  And we do have an amicus brief here, and

23   I know that each side has filed a response to the amicus

24   brief.  The amicus brief has been considered by the Court,

25   but the authors of that brief are not permitted under our

1   procedures to argue themselves, but let me hear your take on

2   taking.

3         MR. CRAMER:  Okay.  So the -- they have two takings

4   claims related.  They have a loss-of-access claim and a

5   per-se taking claim.  The loss-of-access claim is dealt with

6   by the *Pande Cameron* case, which is -- it doesn't involve --

7         THE COURT:  They've got a per-se claim --

8         MR. CRAMER:  Yes.

9         THE COURT:  -- which I'm trying to understand.  And

10  they rely on *Cedar Point* and *Loretto* and *Arkansas Game*.  What

11  do you think about those cases?

12        MR. CRAMER:  So none of them have any -- none of them

13  stand for the proposition that would support plaintiffs'

14  case.  In *Loretto* and in *Cedar Point*, what you have is a

15  formal entitlement, I think is how the court refers to it in

16  *Cedar Point*, that allows the physical invasion of the

17  grower's land.  And the Arkansas case is, you know, a flood

18  case that is under totally different circumstances.

19   Plaintiffs point to the *Cosby* case as supporting their

20  position, but the *Cosby* case, which involved military fights,

21  is kind of -- it's a direct takings claim.  That's not

22  allowing third parties or specific -- or statutorily

23  requiring that property owners provide access to third

24  parties.  This -- to adopt the theory would broaden takings

25  claims well beyond where they are now.

1       On the --

2              THE COURT:  So in the right -- and I agree with you;

3    those cases don't stand for the proposition plaintiff is

4    urging the Court to adopt.  But they've also got a right of

5    access.  That seems to be where they've landed in terms of

6    their taking claim.  Is that individual to each of the

7    plaintiffs?

8              MR. CRAMER:  Yes, I think it's individual to each of

9    the plaintiffs.  It's --

10             THE COURT:  And is it factual?

11             MR. CRAMER:  No, not under these --

12             THE COURT:  Well, in *Keiffer v. King County*, which is

13   kind of the leading Washington case, two questions are asked:

14   Did the government action interfere with the right of access,

15   and second, if so, was the degree of impairment sufficient to

16   create a taking claim?  Now, both of those seem to be fairly

17   factual.  I mean, I've gone through the record with respect

18   to each of these plaintiffs.  Some of them indicate that they

19   didn't have access problems, and would clearly not have a

20   claim.  Others say that they were severely -- their access

21   was severely limited.

22      Now, your position is the City can do anything they want

23   in the streets and limit access?  Is that your position?

24             MR. CRAMER:  So I think the *Pande* -- if it's

25   temporary, then, yes, because the *Pande Cameron* case deals

1    with this question specifically.

2           THE COURT:  Well, I drive down Madison every day, and

3    the City's done a nice job of blocking the street and the

4    businesses.  Do those property owners have a claim?

5           MR. CRAMER:  They do not, Your Honor, because --

6           THE COURT:  And that's because the City can do --

7    they can make those temporary -- they can interfere with your

8    access to your property on a temporary basis in the street;

9    is that right?

10          MR. CRAMER:  In and on the sidewalks, yes, Your

11   Honor.

12          THE COURT:  For how long can you do that?  I mean,

13   for a year?  Would the property owner have a claim if it was

14   blocked for a year?

15          MR. CRAMER:  I -- that's not the circumstances here,

16   Your Honor.

17          THE COURT:  I understand, but isn't it all factual in

18   terms of whether and to what extent what the City did in the

19   streets in the CHOP area interfered with to a degree that

20   crosses the threshold between interference, which is

21   noncompensable, and a taking claim?

22          MR. CRAMER:  Any access that was lost here was

23   temporary.  There's no allegation otherwise.  The allegation

24   is -- and there's no evidence otherwise.  The evidence, also,

25   is that everyone had access to and from their property.  What

1  they talk about is diminished access based on activities

2  occurring in the streets and sidewalks, which under, I think,

3  the *Williams* case, they also have no right to.  There's no

4  cause of action for having to take a longer road or a longer

5  way around.

6        THE COURT:  So someone who -- let's see if I can find

7  one.  The Cure Cocktail plaintiff, no time during CHOP where

8  access to the business was physically blocked; the Sway and

9  Cake people agreeing that Pike Street was not blocked; the

10  Olive Street Apartments, no physical barriers in the street,

11  other than an occasional dumpster.  That's not going to do it

12  for them, is it?

13        MR. CRAMER:  That's correct, Your Honor.

14        THE COURT:  And your time is just about up.  I think

15  that's probably the note you got.

16        MR. CRAMER:  Thank you very much, Your Honor.

17        THE COURT:  I don't need to hear from you on the

18  procedural due process, which is the other claim, which I

19  will hear from the plaintiffs about.  If I hear anything that

20  surprises me, you'll have an opportunity to respond to that.

21     But this taking claim is troubling, because the City's

22  position is you can do pretty much anything you want on a

23  temporary basis in the streets -- block access, interfere

24  with access to businesses -- and it's not a taking.  That's

25  your position?

1          MR. CRAMER:  Yeah, based on the *Pande Cameron* case,

2    that's the position, yes, Your Honor.

3          THE COURT:  All right.  Thank you.  I understand your

4    position.

5          MR. WEAVER:  Thank you, Your Honor.  Tyler Weaver for

6    the plaintiffs.

7          THE COURT:  Hello, Mr. Weaver.

8          MR. WEAVER:  Hello.  I want to make sure that, in my

9    time, I have enough time to get to the questions you have,

10   Your Honor, but I think it's worth remembering what exactly

11   we're talking about here.  We're talking about an

12   unprecedented event in, basically, American history about

13   what happened here in Seattle in June of 2020.

14         THE COURT:  But it happened in lots of cities; did it

15   not?

16         MR. WEAVER:  Not in this --

17         THE COURT:  Well, there were riots in the streets --

18         MR. WEAVER:  Yes.

19         THE COURT:  -- as a result of the George Floyd

20   murder, right?

21         MR. WEAVER:  There were protests around the United

22   States that were violent, that's correct, but what the other

23   cities did not do was they did not allow an occupation of a

24   neighborhood for three weeks, where they knew what was going

25   on, they were actively aiding it, getting on the news and

1   encouraging it.

2         THE COURT:  Well, you say they were "aiding it."

3         MR. WEAVER:  Yes.

4         THE COURT:  What would have happened had they not

5   done something to essentially placate these protesters and

6   provide them with a place and with sani-cans and with food

7   and with garbage pickup and the like and blockaded the

8   streets in a way to keep as many cars and other people out of

9   the area?  We'd be having the same argument, would we not,

10  the City didn't do enough?

11        MR. WEAVER:  No, I don't think we'd be having the

12  same argument, Your Honor, because, I mean, the claims are

13  based on what the City did do versus what --

14        THE COURT:  Well, I understand --

15        MR. WEAVER:  But that was an issue about what would

16  have happened if they hadn't done what they did.  The City --

17  that's a -- there's a ton of questions of fact about that,

18  Your Honor, and that's an issue the City wants to raise at

19  trial, but there's no way to know exactly what would have

20  happened.

21      But what was happening before was there were --

22        THE COURT:  Well, your position -- your brief,

23  basically, for almost all of these claims, says it's a

24  factual issue --

25        MR. WEAVER:  That's correct.

1        THE COURT:  -- can't decide it now.  Is that your

2  position?

3        MR. WEAVER:  Not on all the issues, but that is

4  primarily -- yes.

5        THE COURT:  All right.  Let's start with negligence.

6  Let's just go through the claims.

7        MR. WEAVER:  All right.  So, on negligence, Your

8  Honor, we are talking about a failure-to-enforce exception to

9  the public duty Mr. Cramer talked about.  And with regard to

10  the failure to enforce, when you look at -- the elements that

11  you look at for that exception are, is there something

12  mandating something to happen, a use of the word "shall" or

13  "require" or something in the statute that requires a city

14  action.  The second element is whether there was knowledge of

15  a violation, and the third element is whether or not the

16  plaintiffs were in the ambit of risk.

17     Mr. Cramer has talked about what the statute says as far

18  as intent and what the Legislature and the City intended when

19  they passed these statutes, but there's actually another

20  exception under the Public Duty Act that deals with

21  Legislature intent, and that's the legislative intent

22  exception, which we are not claiming applies here.

23        THE COURT:  Well, then, we don't need to talk about

24  it, do we?

25        MR. WEAVER:  All right.  I'm just bringing it up

1    because --

2           THE COURT:  What do we do with the city ordinance --

3    I have two problems with your fire code exception.  First is,

4    the fire code, itself, specifically says it's not intended or

5    enacted to the benefit of specific individuals.  You can't

6    bring a claim, can you, under that code?

7           MR. WEAVER:  That's why I'm talking about the

8    legislative intent exception, Your Honor.

9           THE COURT:  Well, but you just said it didn't apply.

10          MR. WEAVER:  Well, because if you -- when you look at

11   -- the legislative intent is the exception that looks at what

12   the statute says about who it intends to cover and who it

13   intends to protect.  That language is not looked at in the

14   cases which deal with failure to enforce.

15      Your Honor, we actually cite in our briefs --

16          THE COURT:  Here's what it says.  I am going to read

17   from the fire code.  And incidentally, in your brief, the

18   plaintiff cited the wrong fire code.  I hope you understand

19   that there was a different fire code in effect at the time of

20   the CHOP in 2020.

21      But, in any event, Section 103 says, "Nothing contained in

22   this code is intended nor shall be construed to create, form

23   the basis for any liability on the part of the City, its

24   officers, employees, for any injury or damage resulting from

25   the failure of the owner or the occupied business to comply

1    with the code."

2        Why doesn't that answer the question with respect to the

3    fire code?

4            MR. WEAVER:  It would answer the question if we were

5    trying to assert the legislative intent exception, Your

6    Honor.

7            THE COURT:  Okay.  Well, let me ask you another

8    question:  Is there any of these 16 plaintiffs that had a

9    fire during this period of time where the fire department did

10   not respond?  I mean, there were no fires that were not

11   responded to; is that right?

12           MR. WEAVER:  One of them definitely did have a fire

13   that was not responded to.

14           THE COURT:  Who was that?

15           MR. WEAVER:  That was the SB -- Car Tender.  I

16   believe it's SBR (sic) Enterprises, but they do business as

17   Car Tender.  And what happened in that case, Your Honor, was

18   there was a fire.  Our client was told about it.  He called

19   911 from his house, said he was on his way.  There were a

20   number of 911 calls about this particular incident, not only

21   from my client, but also from other people, including some of

22   our other clients.  The fire did not respond at all, and

23   neither did the police.

24           THE COURT:  And tell me the name of that plaintiff.

25           MR. WEAVER:  That is SBR or A Enterprises, d/b/a Car

1   Tender.

2       But, Your Honor, the statutes do not necessarily protect

3   just people who are dealing with a fire.  If you can -- the

4   question under the negligence and the failure to enforce

5   statute is whether -- when there's a violation and a known

6   violation, if the people who are harmed are within the ambit

7   of risk or danger -- so, for example, there's the Bellevue

8   case involving an electrical wire that was, you know, that

9   was faulty.  An inspector came out, knew about it.  The --

10          THE COURT:  So in this ambit of responsibility that

11  you are referring to, how broad is that?

12          MR. WEAVER:  It's what's foreseeable, Your Honor.

13  Let me talk about the case of *Bailey v. Forks*.

14          THE COURT:  Well, and I'm familiar with *Bailey v.*

15  *Forks*.  It's a very individualized situation; was it not?

16          MR. WEAVER:  Not necessarily.  Basically, anybody on

17  the roads or in the city at that point would have been within

18  the ambit of risk for that particular drunk driver hitting

19  them.  It could have been somebody down the road.

20          THE COURT:  Well, as it turned out, there was -- the

21  police allowed that one drunk driver --

22          MR. WEAVER:  Sure.

23          THE COURT:  -- to continue to drive.  He hits the

24  plaintiff, tragically.  The question is, does the City of

25  Forks have responsibility?  That's a lot different than your

1   situation where maybe just one of your plaintiffs had any

2   fire that would be affected.  I think we're spending way too

3   much time on your negligence claim --

4        MR. WEAVER:  Okay.

5        THE COURT:  -- which I think is not going to survive

6   summary judgment, so I'm going to --

7        MR. WEAVER:  Okay.  Let me say one more thing.

8        THE COURT:  Give me your last shot, and then, let's

9   move on.

10       MR. WEAVER:  Okay.  So the -- this goes to the

11  question of what was foreseeable, and if you go and look at

12  what Chief Scoggins said about the fire code and the video

13  and the partial transcript we gave you, which I believe is

14  Exhibit 30, you will see that he says, "We have to clear the

15  roads," and then he goes on and talks about who's being hurt

16  by them not clearing the roads:  "It's the businesses who are

17  just trying to survive."  It's in his own words.  That's the

18  fire chief talking about who's being affected and who was in

19  the ambit of risk for the --

20       THE COURT:  But don't you need to go beyond the ambit

21  of risk and say, all right, causation, was there any fire

22  that any of these plaintiffs had?  You've indicated there was

23  one.

24       MR. WEAVER:  Sure.

25       THE COURT:  But other than that, if there's no

1  damage, you don't have a negligence claim, do you?  Isn't

2  that a part of the element of the claim?

3      MR. WEAVER:  Does the harm flow from the breach, and

4  the breach is not clearing out the streets, Your Honor.  And

5  that is not just going to be damages from fire, it's going to

6  be damages from what happens when you block the streets.

7      But I hear Your Honor, and I will move on to the nuisance

8  claim.

9      THE COURT:  All right.  How is the nuisance claim

10  different?

11     MR. WEAVER:  Okay.  So, first of all, with regard to

12  the claim that, you know, there can't be a nuisance unless

13  there's express authority under a statute, none of what the

14  City did is under the express authority of any statute.  I

15  think that's clear.

16     But on the issue of whether or not this is a negligence

17  claim in hiding, essentially, I think it's clear when you

18  look at the cases, such as *Atherton Condo*, the case that Your

19  Honor talked about, cases are dismissed due to this, you

20  know, basically, hidden negligence claim only when they are

21  indistinguishable from each other, the nuisance claim and the

22  negligence claim.

23     As Your Honor talked about in your questions earlier,

24  there are differences here.  First of all, you know, our

25  negligence claim, as we have discussed, is very narrow, based

1    on two statutes.  Our nuisance claim is broader.  It goes to

2    a far broader set of City actions that were undertaken and a

3    far broader set of damages, Your Honor.

4            THE COURT:  So let's move on to substantive due

5    process.

6            MR. WEAVER:  All right.  Substantive due process.

7            THE COURT:  Most of these cases are cases where

8    there's a specific individual that is calling for help, if

9    you will, or getting help and then is abandoned.  I'm having

10   trouble with the concept that you've got a substantive due

11   process claim, and I think the *Johnson v. City of Seattle*

12   case is very close.  How do you distinguish that case?

13           MR. WEAVER:  Well, *Johnson v. City of Seattle*, as you

14   noted earlier, Your Honor, was the Pioneer Square incident

15   back in about 2001 where police just decided not to go into

16   an area, and it was -- and the Ninth Circuit held that, you

17   know, that was holding back, and so they didn't increase any

18   risk of danger.

19       The difference here is that, while we do have an element

20   of the police not going in, we have numerous other instances

21   of affirmative City action.  As the Court already found on

22   the motion to dismiss ruling, specifically distinguishing

23   *Johnson*, you know, I could go on for quite a while about what

24   they are, but the provision of barriers, the news

25   conferences, you know, it goes on and on what happened, the

1    porta-potties, the letting people live in the park, the la

2    garden.

3            THE COURT:  Well, wouldn't you be here -- if the City

4    had not put up any barriers, if the City had not put the

5    porta-potties in Cal Anderson Park, if the City hadn't done a

6    lot of the things that it did do to try and essentially calm

7    the problems and get the rioters to not be more destructive

8    than they were, wouldn't you be here arguing -- you'd be

9    standing here still telling me that it was substantive due

10   process and these claims.

11           MR. WEAVER:  Actually, Your Honor, I will be honest

12   with you.

13           THE COURT:  I hope so.

14           MR. WEAVER:  When this case was first brought to me,

15   and all I heard was that there were -- the police weren't

16   going in, I said, "We don't have a case for substantive due

17   process."  Then, over subsequent days and learning more about

18   it, I found out more and more what was going on, and I think

19   the cases are clearly distinguishable on that basis,

20   including the *White v. Minnesota* (sic) case.

21           THE COURT:  Well, that was -- there was a substantive

22   due process claim there, was it not, and wasn't it dismissed?

23           MR. WEAVER:  Yes, but there was not --

24           THE COURT:  And --

25           MR. WEAVER:  There was not -- I'm sorry, Your Honor.

1   There was not the same allegation of active city conduct.  My

2   understanding of what they were alleging in that case was

3   that, in fact, the -- they were just saying that they should

4   have come in and given fire and police protection to the

5   area.  They were not --

6        THE COURT:  Well, isn't that part of what you're

7   arguing?  You're saying they put these barriers there, they

8   wouldn't let the police come, they wouldn't let the fire

9   department come in when people had medical emergencies, they

10   wouldn't allow the people to come in.  Isn't that --

11        MR. WEAVER:  That's part of it, but it's not all of

12   it.

13        THE COURT:  -- part of your claim?

14        MR. WEAVER:  But, also, another factor -- and this

15   clearly distinguishes it -- is the City has admitted in the

16   emergency order issued by the Mayor on June 30th -- you can

17   read what they say in there.  It's Exhibit 7 to our papers.

18        THE COURT:  I've read it.

19        MR. WEAVER:  Okay.  It says, "We facilitated this

20   protest by, among other things, restricting fire and police

21   access."  I'm not getting the quote direct, Your Honor, but

22   it wasn't just that they didn't go in.  They specifically

23   facilitated what was going on by not going in.

24      And again, that is just part of our case.  If it was the

25   only part of our case, I admit we'd have a more difficult

 1 | argument.  I think we'd still have a case, but we also
 2 | have -- you know, we also have affirmative actions that the
 3 | City took, affirmative statements that the City made that
 4 | assisted, perpetuated, and encouraged this occupation,
 5 | despite the fact that they knew and they had predicted it was
 6 | going to increase violence, it was going to draw more people
 7 | to the area, it was going to, you know, encourage -- the
 8 | businesses were going to have problems.  That's all in the
 9 | record, Your Honor.
10 |         THE COURT:  Well, I understand it's in the record.
11 | Chief Best said it was certainly foreseeable that there would
12 | be an increase in violence and crime --
13 |         MR. WEAVER:  That's correct, Your Honor.
14 |         THE COURT:  -- as a result of what they do.  And
15 | Mayor Durkan said in an email, I believe, which is Docket 125
16 | at 33, "What happened was foreseeable and avoidable."
17 |         MR. WEAVER:  Yes.  In fact, that was a --
18 |         THE COURT:  Those words.
19 |         MR. WEAVER:  And that was a homicide that was
20 | foreseeable and avoidable, Your Honor.
21 |         THE COURT:  Right.  No, I understand.
22 |         MR. WEAVER:  And despite the fact that that was
23 | foreseeable and avoidable, the City still wasn't taking
24 | action, even though that was foreseeable and avoidable and
25 | actually foreseen, if you go and look at the record.

1        THE COURT:  But one of the elements of substantive

2    due process is deliberate indifference --

3        MR. WEAVER:  That's correct.

4        THE COURT:  -- and culpable mental state.  I mean,

5    the City, with all the issues that were going on, is there

6    any evidence that they were culpable, mentally intending to

7    do this to cause this alleged harm?

8        MR. WEAVER:  There are absolutely issues of fact

9    regarding that, Your Honor.

10      Now, first of all, the standard -- we can meet any

11   standard, including if they had to intentionally do this, but

12   the standard is whether they disregarded a known or obvious

13   consequence of their actions.  That's set forth in *Martinez*

14   *v. City of Clovis*, the Ninth Circuit's most recent, kind of,

15   dissertation on substantive due process.

16      And there is certainly -- nobody has admitted that they

17   intended to cause harm, but certainly, it can be inferred

18   from what happened.

19      THE COURT:  Well, but the *Martinez* case you just

20   referenced --

21      MR. WEAVER:  Yes.

22      THE COURT:  -- there's a 911 call, and the City is

23   liable because they affirmatively put the plaintiff in a

24   vulnerable situation.

25      MR. WEAVER:  Well --

1      THE COURT:  How is that -- I mean, that seems to be

2   quite different than this type of state-created danger, which

3   you say applies to all of these businesses in this,

4   essentially, 10-block area.

5      MR. WEAVER:  Well, let me talk about *Martinez v. City*

6   *of Clovis* just for a minute.  What happened in that case was

7   there was a woman who had an abusive relationship.  The

8   police showed up to a call that she'd been abused.  The

9   police said, "Oh, you know" -- they're kind of hands off --

10  "we don't really -- we don't really see anything here," and

11  that, alone, just those statements, were enough for the Ninth

12  Circuit to find that they had affirmatively increased the

13  risk of her being harmed.

14     Now, it's not just individual cases, by the way.  If you

15  look at the *Hernandez v. City of San Jose* case -- this was

16  the Trump rally case that I believe happened in 2016 where

17  there was a Trump rally, and outside the Trump rally, there

18  were a bunch of anti-Trump protesters.  Now, the existence of

19  a potential violent situation existed regardless of what the

20  city did, but what the city did was it required the people to

21  go out a certain door into that crowd where it was -- it was

22  much more likely that they were going to be harmed.

23     That is what happened here, Your Honor.  We have a very

24  set neighborhood.  Now, the City foreseeably and knowingly

25  caused harm to that large neighborhood, but because it's a

1  neighborhood of 10 blocks, that doesn't mean that they didn't

2  know that they were putting our clients and other people in

3  the path of harm, Your Honor.  It was foreseeable, and they

4  knew about it.

5          THE COURT:  Is the City liable for a third party that

6  might beat up somebody in that neighborhood during that time?

7          MR. WEAVER:  Possibly, Your Honor.  It depends on the

8  circumstances.

9          THE COURT:  What do you mean "possibly"?  I mean, the

10 City's not responsible for someone that goes and shoots or

11 stabs somebody, are they?

12         MR. WEAVER:  I don't know.  That's not this case,

13 Your Honor.

14         THE COURT:  Okay.  All right.

15         MR. WEAVER:  Okay.  So what we have is the City

16 foreseeably saw what happened here, that it was going to harm

17 businesses, it was going to harm residents, it was going to

18 cause access problems.

19         THE COURT:  So is the City liable or responsible when

20 someone goes into that area or into any other area of the

21 City and does graffiti all over the building?

22         MR. WEAVER:  We are alleging that graffiti was part

23 of the property crimes, and there was the increased graffiti

24 and the increased risk of graffiti that caused liability,

25 yes.

1        THE COURT:  And I think it's the Richmark plaintiff,

2   there's graffiti on that property to this day, but do you

3   know of a case where a City has been liable for a graffiti

4   put on there by a third party?

5        MR. WEAVER:  I don't know, Your Honor, but that's an

6   issue of -- but that's --

7        THE COURT:  Well, you don't know.  No case has been

8   cited to me -- and you've cited a lot of cases -- that would

9   support a claim against a city because graffiti has been put

10  on a building by a third party; is that right?

11       MR. WEAVER:  That's correct, but that's an issue of

12  proximate cause, Your Honor.  Did the violation of

13  constitutional rights result in that particular application

14  of graffiti?  And I can tell you from having talked to the

15  owner of Richmark Label numerous times, he has had that mural

16  up for -- it was about seven years before CHOP came in.

17       THE COURT:  And your claim --

18       MR. WEAVER:  And he had never had this level of

19  damage, Your Honor, so --

20       THE COURT:  But we don't know who did the damage to

21  the mural.  We don't know who put that graffiti that's there

22  today on the building, but it wasn't -- the City didn't do

23  that.  It was a third party, right?

24       MR. WEAVER:  That's correct, Your Honor, and

25  substantive due process, necessarily, I think, as *Martinez*

1   talks about, necessarily anticipates that the harm is going

2   to be caused by a third party.  The question is whether the

3   City increased the risk that that harm would occur.  And our

4   allegation -- and I think the facts show that there are at

5   least questions of fact about whether the City's actions, in

6   basically turning over the neighborhood to an occupation and

7   then allowing them to keep doing it, was foreseeable.

8           THE COURT:  All right.

9           MR. WEAVER:  And --

10          THE COURT:  I think I understand your position.

11      I want to move on to taking, because that's, I think, the

12  most difficult of all these claims to sort out.  But I don't

13  believe you have a per-se claim based on *Cedar Point* and

14  Loretto and *Arkansas Game*.  So, if you think you've got a

15  claim there, other than the access claim, this is the time to

16  tell me.  How --

17          MR. WEAVER:  Under the per-se theory, Your Honor, the

18  question is whether there was a government-authorized

19  invasion.  And in this case, that's basically a question of

20  fact as to whether there was a government-authorized

21  invasion.

22          THE COURT:  Well, but let's look at the facts.  I

23  mean, *Cedar Point*, it was a California regulation allowing

24  the union representatives to go on private property.  It's

25  kind of a totally different kind of case, isn't it?  Loretto

1  was a statute allowing the cable company to go and hook up

2  cable boxes on people's property.  Totally different type of

3  case.  How would those cases support your claim here for a

4  per-se claim?

5          MR. WEAVER:  Well, Your Honor, again, you know, the

6  facts of this case are that the City authorized and

7  encouraged this occupation, knowing that people were going to

8  have to deal with people coming onto their property, knowing

9  that there was going to be extensive graffiti, knowing that

10 there were going to be broken windows, knowing that people

11 and customers were going to have a hard time getting into

12 their businesses and places.

13         THE COURT:  Well, wasn't that going to be true

14 regardless of what the City did, almost?  I mean, they were

15 rioting in the street, and the City took some action.  Now,

16 people will have different views on whether that action was

17 good or bad or whether it helped or hindered the problem, but

18 you were going to have broken windows, and you were going to

19 have graffiti, and you were going to have traffic problems,

20 and you were going to have vandalism.  It was going on.  They

21 were trying to do something about it.  How is --

22         MR. WEAVER:  There was some of it going on, Your

23 Honor, but was it going on at the same levels?  No, it was

24 not.

25         THE COURT:  Well --

1          MR. WEAVER:  Was it going on all day?  No, it was

2    not.  The protests that happened before were happening at

3    night for several hours, and I'm not saying they weren't

4    disruptive, but that's not the same thing as having 200

5    people living in the park across the street from your

6    business or your home who are basically unchecked by police

7    and who you have the Mayor encouraging to stay there

8    indefinitely.  It's just not -- it's just not the same thing,

9    Your Honor.

10          THE COURT:  You don't make a regulatory claim of

11    taking, so --

12          MR. WEAVER:  No, we don't.  We don't, Your Honor.

13          THE COURT:  -- your other claim is one of access.

14          MR. WEAVER:  Yes.  And on the access claim --

15          THE COURT:  Tell me about the access claim.

16          MR. WEAVER:  All right.  On the access claim, first

17    of all, the City has taken the position that, essentially,

18    there has to be a complete blockage of access under *Keiffer*.

19    That's not the case.  *Keiffer* says, specifically, that you

20    can have a violation even if there is not a complete block of

21    access.  In fact, in that case, there was not a complete

22    block of access.

23       Second, *Keiffer* says the first question under the *Keiffer*

24    test is whether or not there was just a standard, you know,

25    right-of-way traffic flow, kind of an remote action by a

1    municipality, and if it's not, then you have, you know, a

2    potential takings claim.  And then, the second factor is

3    whether it caused substantial harm, and *Keiffer* pretty

4    clearly says that is a question of fact.

5            THE COURT:  And you've given me many declarations and

6    exhibits.  I'm trying to understand what I do with them in

7    connection with this motion.  For example, the Bergman's Lock

8    and Key declaration said the front door was not blocked.

9    Cure Cocktail said at no time during CHOP was access to the

10   business physically blocked.  What do I do with -- so some of

11   these businesses don't have an access claim, do they?

12           MR. WEAVER:  They do.  If you also look at the other

13   evidence, they're also talking about how people were having a

14   hard time getting in, that there were people actually

15   invading their properties, customers were not coming to the

16   area.  The blockages were on the adjacent streets in both the

17   case of Cure and Bergman's, Your Honor.

18           THE COURT:  Well, some of these businesses were two

19   or three or four blocks away from Cal Anderson Park; are they

20   not?

21           MR. WEAVER:  That's correct.

22           THE COURT:  And what was happening at Cal Anderson

23   didn't affect their access to their properties, did it?

24           MR. WEAVER:  It did, Your Honor.  If you look at, for

25   example, Hunters Capital and Madrona -- first of all, let me

1   talk about the Madrona entities.  They were technically not

2   within the Red Zone created by the police department, by the

3   City of Seattle, but they were right there.  They were a half

4   block away.  And the problems that were created internally to

5   the area, internally in that area, were -- you know, when you

6   abandon an area, you don't necessarily have those people

7   staying in that area.  They're going to walk.  They're going

8   to have -- you know, and you can see from Hunters Capital,

9   they, in fact, did.  They walked to those buildings and

10  graffitied them, broke their windows, were walking by,

11  creating access problems even at those buildings that were a

12  few blocks outside of the area that the City has admitted it

13  facilitated actions in.

14          THE COURT:  Well, tragically, on a regular basis,

15  we're finding that there's vandalism in the downtown core

16  area, and there's graffiti.  Now, is the City liable for all

17  of that, even though it's done by third parties?

18          MR. WEAVER:  Not all of it, Your Honor.  I think --

19          THE COURT:  Well, are they liable for any of it?  I

20  mean, is your theory broad enough to pick up and say that the

21  City should be enforcing the graffiti laws, they should be

22  avoiding vandalism?  I mean, do you have a cause of action

23  for everything?

24          MR. WEAVER:  Your Honor, we are basing it based on

25  what the City did in this case that is unique.  I mean, the

1   City has admitted they've never done it before.  I don't

2   think any city has ever done it before with regard to

3   creating a zone for a protest that was essentially an

4   occupation of the neighborhood.  And the question is --

5           THE COURT:  Well, in the *White v. Minneapolis* case,

6   the city did it there; did they not?

7           MR. WEAVER:  They did not do the same thing, Your

8   Honor.  If you go and look at the facts of the case, the

9   plaintiffs there are talking about -- basically, they're

10  asserting a right to have a police response.  We are talking

11  about far more here in terms of the affirmative acts of the

12  City that we allege created this.  And then, you know, how

13  far those damages went, whether they went three or four

14  blocks out, you know, that is an issue of -- issue of fact.

15          THE COURT:  Well, you've got, for example, the

16  Coleman building is about five or six blocks from Cal

17  Anderson Park; is it not?

18          MR. WEAVER:  I believe that's correct, Your Honor.

19          THE COURT:  And the Belmont Apartments is about the

20  same distance away.

21          MR. WEAVER:  I believe the Belmont Apartments are run

22  by Redside, which has abandoned its takings claim, Your

23  Honor.

24          THE COURT:  All right.  I think we've taken on the

25  takings claim.  I understand your position.

1           MR. WEAVER:  I will just add --

2           THE COURT:  Now, do you want to be heard on the

3   procedural due process?  We didn't talk about it with the

4   City.  Do you have a claim for procedural due process?  If

5   so, why?

6           MR. WEAVER:  We do, Your Honor.  I think the main

7   argument that the City has raised is that the area would be

8   too large for a procedural due process claim.  And, Your

9   Honor, I think this is a fairly well-defined area of people

10  who they knew were going to be affected.  We've talked about

11  that.  They knew they were going to be affected.  They

12  foresaw that they would be affected by what the City -- by

13  the City's policies that they adopted.  And --

14          THE COURT:  Do -- you have to have some sort of

15  executive or high-level policy implemented to handle these

16  protests in a large neighborhood.  It's kind of an emergency

17  rule.  I mean, what about the *Flint* case out of the District

18  of Hawaii?  There was no procedural due process there because

19  there was an emergency rule that limited access during

20  flooding.  I mean, the City limited access here because of

21  protests.  How is it different?

22          MR. WEAVER:  The *Flint* case deals with response to a

23  natural disaster, Your Honor.  Here, we had -- and I think

24  the Court actually decided in that case that the class of

25  people was too large for a procedural due process claim.  I

1    think there is -- I think there's a grey area under the law

2    with regard to how large the area or how small the area has

3    to be for a procedural due process claim, but fundamentally,

4    this was a small corner of the city, and we contend that our

5    clients should have gotten notice and due-process rights to a

6    hearing.

7         THE COURT:  Well, how about the *Hotel Motel*

8    *Association of Oakland* case out of the Ninth Circuit where

9    the city ordinance against nonconforming hotels targeted

10   drugs and prostitution, and the Ninth Circuit said it's not a

11   procedural due process because they didn't target a single

12   property, but an entire class of people because of the

13   circumstances.  How is that different?

14        MR. WEAVER:  You have the regional and geographical

15   boundaries of the area that were clear to the City that they,

16   themselves, defined as the area in which they facilitated the

17   protests between Denny, Broadway, 13th, and Pike.  It's a

18   circumscribed area, Your Honor.

19        THE COURT:  Well, but you had a circumscribed area in

20   the *Sampson v. City of Bainbridge* case where it had an

21   emergency ordinance over on Bainbridge Island in an area

22   because of shoreline development and flooding.  There was a

23   moratorium.  They couldn't build, and there were a lot of

24   people that were unhappy in that area.  They didn't have a

25   procedural due process claim.  Why do you have one?

 1          MR. WEAVER:  I hear you, Your Honor, and again -- I

 2   mean, I don't know how many times you want me to say it, but

 3   it has to do with the fact that we have a defined area of

 4   relatively small scope within the City.

 5          THE COURT:  All right.  I've heard you.  Thank you.

 6   Your time is up.

 7          MR. WEAVER:  All right.  Thank you, Your Honor.

 8          THE COURT:  Thank you.  I think we'll take about a

 9   10-minute recess, ladies and gentlemen, and then we'll come

10   back and hear about spoliation.  We'll be in recess.

11                      (Recess taken.)

12          THE COURT:  As I indicated earlier, we're going to

13   now hear argument on the plaintiffs' motion relating to

14   spoliation, which is Docket 104.  We will hear from

15   Mr. Calfo, and again, I think we're going to try and limit it

16   to a half hour.

17          MR. CALFO:  That should be no problem, Your Honor.

18          THE COURT:  All right.

19          MR. CALFO:  Thank you.  Your Honor, I'd like to

20   reserve a couple of minutes, four minutes, for rebuttal if

21   that's -- if the Court feels it would be helpful.

22       Your Honor, on this motion, plaintiffs are requesting the

23   Court to enter a judgment of liability, and we're asking that

24   judgment to be entered against the City because it engaged in

25   extraordinary, obviously-intentional, and highly-prejudicial

1   destruction of evidence.

2       Your Honor, it's our position that without a judgment of

3   liability, we are going to be left without highly-critical

4   evidence that would rebut the City's defenses and ensure that

5   the trial evidence in this case is not going to be distorted,

6   because we won't have access to critical communications

7   between top city officials who are making the decisions that

8   led to, Your Honor, what was an abandonment, an abandonment

9   of civil authority over a whole neighborhood.  And not only

10  did they abandon the neighborhood, they supported the people

11  who were in control of it and allowed them to police

12  themselves, block streets, cause harm, property damage, and

13  loss of business revenue.

14      It's an extraordinary event, but what's more

15  extraordinary, Your Honor, is that all of the top City

16  officials' texts from the relevant time frame between and

17  among each other are gone.  They will never ever be

18  recovered.

19      Now, these issues, Your Honor, I think go to the heart of

20  our case.  They go to issues such as foreseeability, which

21  was just discussed on summary judgment.  And I'd note, Your

22  Honor, that at the same time the City is coming up here and

23  arguing that there's no evidence of foreseeability and

24  there's no evidence of deliberate indifference and that we

25  were justified in taking these actions, at the same time

1   they're doing that, we've been denied access to the critical

2   information that could rebut those claims.

3       Now, Your Honor, I do have slides that I am going to show

4   throughout this argument.  Excuse me, Your Honor, Murphy's

5   law.

6               THE COURT:  Well, it was a nice start there, Counsel.

7               MR. CALFO:  Beautiful start, Your Honor.

8               THE COURT:  Nice picture.

9               MR. CALFO:  I'm not sure why it's not working.

10      Your Honor, may I approach?  I have a PowerPoint I want to

11  use during my argument.

12              THE COURT:  Well, I could call IT.

13              MR. CALFO:  Your Honor, I do have to admit that it

14  would be quite helpful to be able to use the PowerPoint.

15              THE DEPUTY CLERK:  I'll call IT.

16              MR. CALFO:  This was working before you came out.

17              THE COURT:  Well, you've given me -- I have your

18  declaration here and all of the exhibits, and I assume, in

19  part, you were going to go through some of that.  Perhaps you

20  could at least start, and we'll -- let's see if we've got

21  help on the way.  I think it's a compatibility of your

22  computer with our system, which normally gets tried out.

23      All right.  We've got someone coming.

24              MR. CALFO:  Okay.

25              THE COURT:  Take the time, if you would, to walk

1   through what notices you gave and what's missing.  What do

2   you believe is missing based on what the experts have told

3   you?

4            MR. CALFO:  Yes, Your Honor.

5            THE COURT:  Let's see if we can't make some progress.

6   We do have an IT person coming.

7            MR. CALFO:  Thank you, Your Honor.  Your Honor, that

8   was exactly what my next slide was going to show was, well,

9   look, we are sitting here thinking, you know, are these texts

10  important?  Are they important?  Well, the day we filed the

11  lawsuit, we drafted a letter to the City, and we said, you

12  know, what we want to know right away, we want to know what's

13  in the Mayor's texts, and we want to know what's in the chief

14  of police's texts, and we want to know what is in the fire

15  chief's texts.  You know, that wasn't brain science, Your

16  Honor.

17           THE COURT:  And that was June 27th of 2020,

18  Exhibit 4.

19           MR. CALFO:  That's right, Your Honor.

20           THE COURT:  I know, I've read it.

21           MR. CALFO:  The point being, it's not as though we

22  decided this was going to be important after we learned the

23  texts were gone.  We knew the day we filed the lawsuit, the

24  critical evidence that we need to rebut any claim by the City

25  that this was innocent is the text information between the

1   top policymakers of the City, and we wrote to them and said,

2   "Keep it."  And we wrote to them again, and we wrote a more

3   detailed one the next day, where we said, look, if we weren't

4   clear the day before, because interestingly, when we called

5   the City Attorney and said, "Make sure the texts are

6   preserved," they said, "Don't worry, we have a 30-day hold on

7   all email."  Well, we were, like, "Well, that's not what

8   we're asking for."  We're asking for their phones, we're

9   asking for their text conversations, because texts are

10  conversations that occur like conversations, oral

11  conversations.  People are more candid, and we wanted them.

12  And the City said nothing in response to our requests, but we

13  now find out, of course, that, indeed, these texts are all

14  gone.

15      Your Honor, I passed up the PowerPoint, which I can start

16  to use while we're waiting.  On the second page, I've

17  highlighted what our expert created, which is what he called

18  a "spoliation chart."

19          THE COURT:  And I would prefer if we could -- because

20  I've gone through your records, and it would be helpful if we

21  could put on the table, if you will, the number of messages

22  from each of the seven people that you say they're lost.

23      So let's start with Mayor Durkan.  As I understand it,

24  there were originally 191 messages, but some of them were

25  recovered; is that right?

1          MR. CALFO:  Well, Your Honor, I --

2          THE COURT:  And then there were 5,937 texts that were

3   deleted; is that right?

4          MR. CALFO:  Well, Your Honor, here's the thing.

5          THE COURT:  Give me the numbers.

6          MR. CALFO:  Well, we don't know the numbers.

7          THE COURT:  Well, you know, you spent a lot of money

8   on your expert.  Tell us what you do know.

9          MR. CALFO:  What we do know, if you look at the

10   spoliation chart, look at Mayor Durkan, okay, and on the

11   spoliation chart, it shows that during the period of CHOP and

12   prior, that black line on the spoliation chart shows there

13   are no messages from Mayor Durkan's phone in that time

14   period, because she deleted them all.

15      And when you look -- and so, can we tell how many messages

16   she deleted?  No, we can't, not through --

17          THE COURT:  But there was the Martha Dawson

18   declaration, and her report reflects that there were, like,

19   2,800 texts recovered from others that got copies of them, so

20   your universe, at least of what was deleted, has been

21   partially recovered; is that right?

22          MR. CALFO:  Well, it has, Your Honor, and I think the

23   City has spent a lot of time talking about how much

24   reconstruction it has done.  The point of this chart that we

25   are looking at here is that if you wanted to find a text

1  between Mayor Durkan and Carmen Best between April and July

2  of 2020, you will never find it for that period of time,

3  because --

4          THE COURT:  None have been recovered?

5          MR. CALFO:  They can't be.

6          THE COURT:  So here's my question:  You've taken the

7  Mayor's deposition, and you've taken these others.  Let's

8  deal with Mayor Durkan first.  Did she testify about whether

9  she did, in fact, text, individually, the police chief or the

10  fire chief or others in this group?

11          MR. CALFO:  We know that she did, Your Honor, because

12  with respect to texts that were available later or were

13  otherwise recovered, there were texts between them.  And I

14  wish I could show you my PowerPoint, Your Honor, but, for

15  example, on June 24th --

16          THE COURT:  Just a moment.

17                  (Pause in proceedings.)

18          MR. CALFO:  Your Honor, I won't go over the --

19          THE COURT:  Take your time and start over, Mr. Calfo.

20          MR. CALFO:  Well, Your Honor, I think where we

21  started, we were talking about the fact we wrote the note to

22  the City to preserve the texts, and the Court even identified

23  where in the record our letter was, and we wrote more than

24  one.

25          THE COURT:  I've read your declaration and all of the

1  exhibits.

2      MR. CALFO:  Yes, Your Honor.

3      THE COURT:  I have them right here.

4      MR. CALFO:  Great.  Well, they're telling, Your

5  Honor.  And one of the things they show here is that, if you

6  look at the screen, you see you have seven city officials,

7  all of whom destroyed their texts for the relevant time

8  period of CHOP.  They did it in a variety of ways, which

9  we'll go over, but it's really quite shocking to see that any

10 text, no matter what the City says it's done in terms of

11 reconstruction, any texts between and among these people

12 only, during the time frame, are gone.  We'll never get texts

13 from Jenny Durkan and Carmen Best during the CHOP that were

14 sent just to each other or just to Chief Scoggins or maybe to

15 Chris Fisher.  We'll never get them back, Your Honor.

16 They're gone.

17     THE COURT:  And my question to you -- I just want to

18 be sure -- that during your discovery, you specifically asked

19 the Mayor:  "Did you send individual texts to the police

20 chief?"

21     MR. CALFO:  Well, Your Honor --

22     THE COURT:  During that time.

23     MR. CALFO:  Your Honor, we know that they did,

24 because we have individual texts.  For example -- and I'll

25 show you, Your Honor, when we go through the PowerPoint here.

1   This is a timeline of what we know about Mayor Durkan's

2   deletion of material.

3           THE COURT:  All right, go ahead.  You've got to --

4           MR. CALFO:  So, when you look at the timeline, we

5   know that she had an iPhone back in October of 2019.  She got

6   a new one, and she was -- the old one was backed up pursuant

7   to normal City policy, right?  Then you have the CHOP, and

8   then you have the lawsuit.

9       On June 25th, we know, because this was a time period for

10  which we could actually pull some messages off of Mayor

11  Durkan's phone, she texted on June 25th to one of her

12  associates and said, "Which judge got the lawsuit?"  The

13  response is, "Judge Zilly."  And guess what, Your Honor?

14  Those are deleted.  Those were manually deleted from her

15  phone.

16      Now, next, the letters that we've gone over, Your Honor,

17  that we sent to the City saying, "Preserve all the texts,"

18  CHOP is cleared on or about July 1st, and on July 4th -- and

19  I'll just go back, Your Honor.  You can see here that there

20  is a text between the Mayor and Chief Best's personal phone,

21  but before I go to that, on July 4th, the Mayor factory

22  resets her phone.  Now, when she's asked about this at her

23  deposition, she says it just started -- it did it itself, she

24  did not actually initiate the factory reset.  She claims it

25  happened on its own, which our expert says is not credible.

1   And then, Jenny Durkan uses the disable and delete function

2   to permanently delete her messages in the iCloud.

3           THE COURT:  And as I understand it, she set it for

4   30-day delete so that they were going to delete over the next

5   30 days; is that right?

6           MR. CALFO:  Not yet.  This is on July 4th, where she

7   decides to factory reset the phone, which is going to delete

8   the messages on her phone.  She goes in and loads an old

9   backup from the iCloud for unexplained reasons and then uses

10  the disable and delete function to permanently delete the

11  messages that are in iCloud.

12      Now, at that point, the phone had the text messages from

13  iCloud downloaded onto it, okay, so that's where we are on

14  July 4th.  The evening of July 4th, she texts Chief Best's

15  personal phone and asks for a phone call, on July 4th, the

16  day she deletes all this stuff.

17      Now, this is to go to Your Honor's question.  So sometime

18  between July 4th and July 22nd, somebody turns the 30-day

19  delete feature on her phone.  What that does is delete not

20  only the messages in the iCloud, but also the messages on the

21  phone.  And there is no explanation from the City about who

22  else could have done this to their phone, other than Mayor

23  Durkan, and even though Mayor Durkan says, "On July 4th, I

24  don't remember using the disable and delete function on the

25  phone," no one else had access to the phone on that day.  She

1    admitted that in her deposition.  So unless this phone was

2    spoliating its own messages, Mayor Durkan deleted the

3    material on that phone.

4       The Mayor received litigation hold notices in July, and

5    then, on July 9th of 2020, her old phone is replaced with an

6    iPhone 11, and for reasons that are not explained, the City

7    does not make a backup of the old phone.

8            THE COURT:  That's the normal procedure that the City

9    follows, to make the backup?

10           MR. CALFO:  Well, they say different things, Your

11   Honor, but what we know is, on October 31st, 2019, on my

12   screen, they did back up the phone and they let her keep the

13   old phone.  This time, they didn't back up the old phone and

14   they got rid of the old phone.

15           THE COURT:  What was the procedure in place, if you

16   know, as of July 9?

17           MR. CALFO:  I haven't seen any official policy, Your

18   Honor, but what I do know is that, on previous occasions, the

19   Mayor's phone was backed up, and it makes perfect sense.

20   Remember, Your Honor, on July 9th of 2020, we had no idea the

21   Mayor was deleting her phone.  If we had been given notice,

22   we could have said, "Hey, guys, we want you to keep that old

23   phone, because there could be metadata on it, there could be

24   information on it," but they didn't tell us.  The Mayor did

25   not tell people she was doing this, and so we weren't able to

1  intercept this effort on their part to get rid of the old

2  phone, and our ability to get that information was forever

3  lost.

4      Here's what's curious, again, Your Honor, again on the

5  screen.  So I mentioned the fact that the 30-day delete

6  feature is turned on sometime between July 4th and July 22nd.

7  Well, then, somebody turns it off on July 22nd.  So now,

8  again, nobody's taking responsibility for this, but the

9  phone's reset, the iCloud is erased, the disable and delete

10  function is used on July 4th.  The old phone is not backed

11  up.  The 30-day delete function goes on in July, and then

12  somebody magically turns it back on, so that, now, as of the

13  date that it's turned off, the Mayor is now keeping her

14  texts, but what's never going to be available are the texts

15  from the CHOP time period.

16          THE COURT:  When is it when Mayor Durkan or her

17  counsel learned of the problem of the missing texts?

18          MR. CALFO:  Well, I would submit, Your Honor, the

19  Mayor knows the problem when she's deleting them.

20          THE COURT:  Well, all right, but when anyone else in

21  the Mayor's Office --

22          MR. CALFO:  Well, Your Honor, on August 21st, looking

23  at the screen, the Mayor's Office determined that the Mayor's

24  text messages before June 25th --

25          THE COURT:  And that's because her legal counsel --

1          MR. CALFO:  Yes, Your Honor.

2          THE COURT:  -- becomes aware of it --

3          MR. CALFO:  Exactly.

4          THE COURT:  -- on August 21.

5          MR. CALFO:  Yes, Your Honor.

6          THE COURT:  And when is it that -- so would it be

7   fair to, then, conclude that the City knew, on August 21,

8   2020, that these texts had all been deleted?

9          MR. CALFO:  Depending on how you define "the City,"

10  Your Honor, I do.  I think the Mayor is the City, I think the

11  Mayor's Office is the City.  Certainly, by August 21st, yes,

12  Your Honor.

13         THE COURT:  All right.  And how did she learn?  Who

14  was the person who alerted her to the problem?

15         MR. CALFO:  They had a PRA request that they needed

16  to respond to, and Michelle Chen, who is in the City

17  Attorney's Office, identifies that the texts are missing.

18         THE COURT:  And was she the legal counsel for the

19  Mayor?

20         MR. CALFO:  She's the -- yes, Your Honor, she's in

21  the Mayor's Office.

22         THE COURT:  She was in the City Attorney's Office?

23         MR. CALFO:  In the Mayor's Office, Your Honor.

24         THE COURT:  Yes, all right.

25         MR. CALFO:  Yeah.

1          THE COURT:  Now, fast forward, when is it that your

2    office learned of these problems?

3          MR. CALFO:  Your Honor, in approximately March or

4    April of 2021.  So we had a full six months before we ever

5    heard anything about it, and it wasn't like they decided to

6    come clean.  They knew it was going to become public shortly

7    before they notified us.

8          THE COURT:  And was that the result of other

9    litigation or --

10          MR. CALFO:  It was the result of whistleblower

11    efforts and media attention to the -- and media knowledge of

12    what was going on.

13      Your Honor, when you look here, the City Attorney, in

14    September 2020, is still keeping the information about the

15    Mayor's texts secret, and they hire -- you know, the City's

16    own forensic examiner is going to look at the Mayor's phone

17    on September 18th.

18      And here's another shocking incident:  The day before they

19    factory reset the old iPhone again, and so, you know, the

20    forensic examiner, the next day, could never get access to

21    that old phone to see if there was any information on it.

22    That's a very shocking and stunning combination of events.

23      Here, on October 6th, 2020, Your Honor, is when the City

24    Attorney is informed that the Mayor's texts are missing.  We

25    have outstanding requests for production that, when they're

1  responded to, we are not told that there are any missing

2  texts.  We are told that the Mayor's texts and the Mayor's

3  documents will be produced.  That's what we're told.

4      Your Honor --

5          THE COURT:  So, what is -- there's been a lot of

6  expert reports and estimates.  What is your best estimate of

7  the number of texts that were deleted, if you know?

8          MR. CALFO:  Your Honor, it's an untold number.  It

9  really is.  How many texts -- you know, we know that they

10  texted thousands of times, as you've identified, so they're

11  actively using their texts to communicate with each other,

12  and what the City officials did is made sure nobody could

13  find out what they were texting to each other during CHOP.

14      I mean, if I may continue, Your Honor, you are going to

15  see how the concert of action when it comes to the deletion

16  of the texts is, as I mentioned, stunning.  This is when they

17  provide their interrogatory response in August of 2021, not

18  -- a supplemental one, again not disclosing that the Mayor

19  has manually deleted texts.

20      Your Honor, I, unfortunately, skipped over something I

21  want to show.  I mentioned that the City Attorney knows about

22  the missing texts in October.  In November, they retain a

23  Kevin Faulkner, who forensically examines the Mayor's phone.

24  And, Your Honor, this is when the City identifies the fact

25  that not only has the Mayor wiped her phone of texts prior to

1    June 25th, 2020, but she has also manually deleted messages

2    from her phone.  The expert knows this.  The expert issues a

3    report, and guess what the expert doesn't say in the report?

4    That he found missing, deleted texts on the phone.  He

5    doesn't tell us, and he doesn't put it in his report.  And

6    that's why, on the next page, when we get the interrogatory

7    responses, supplemental ones, we're not told that the City's

8    expert has identified 191 manually-deleted texts on the

9    phone.

10   They released the report, Your Honor, in February of 2022.

11   It is not disclosed in the report.  It wasn't until our

12   expert identified the phone, Mayor Durkan's phone, that he

13   told us that there were these deleted texts.  So the City is

14   concealing the fact that there were manual deletions.

15   The discovery closes on September 1st, and we file our

16   motion for spoliation.  And the first time the City produces

17   any of these manually-deleted texts is after we file our

18   motion for spoliation, but the important point is, they did

19   try to go back and get texts that were manually deleted, but

20   they don't have all of them.  And we know there are texts,

21   for example, on June 30th, way back near the CHOP time

22   period, there's a whole week's worth of texts that cannot be

23   recovered.  They were manually deleted by the Mayor.

24   Your Honor, I think it's important when we think about,

25   like, intent to deprive to visualize what the Mayor needed to

1   do in order to disable and delete the messages on her phone.

2   This is a snapshot of what it would look like, you know, when

3   you are going to go through this process.  On the left-hand

4   side, it says, "Manage storage," and so someone would have to

5   click that.  Then, the next slide is "Messages."  Someone's

6   going to have to click "Messages."

7        The next slide is a notice that says "Disable and Delete,"

8   so if you want to disable and delete your phone, you have to

9   press that button too.  Then you get a warning, Your Honor,

10   the last screenshot:  Do you want to delete your messages?

11   This is going to disable, the warning says, the messages in

12   your iCloud and delete all your messages stored there.  "You

13   have 30 days to undo this."

14        So, on July 4th, when the Mayor's phone is disabled and

15   deleted, these messages would have been shown, do you want to

16   delete the messages, in red, and the button would have had to

17   have been pushed.  And this is the warning in that last

18   blowup -- version of that warning in that last slide, Your

19   Honor.

20        Now, Your Honor, you will recall from the timeline that

21   after the phone was disabled and deleted, somebody put in

22   this 30-day delete.  Again, in order to do that, you have to

23   go into the phone, and you have to press or check one of

24   three things:  30 days, one year, or forever, and so somebody

25   pressed 30 days.

1     And then, the next message is going to show, do you want

2   to delete these messages prior to the 30 days, and it says,

3   "This will permanently delete all text messages and message

4   attachments from your device that are older than 30 days,"

5   and it was this pushing of this button in July of 2020 where

6   we lost all of the Mayor's text messages prior to June 25th.

7     Your Honor, the police chief, you know, has a very simple

8   and shocking story.  You've got the -- on the timeline I'm

9   showing Your Honor, I'm showing the time that CHOP began,

10  that Chief Best received litigation holds, that we had sent

11  our letter asking for preservation of texts, that the Mayor

12  had texted Mayor (sic) Best's personal phone on July 4th

13  asking to be contacted.

14    She retires on September 2nd, 2020.  When she turns her

15  phone in, Your Honor, there are no text messages on it.

16  There are none.

17    At her deposition, she said she didn't delete all of her

18  texts, that she would sometimes or periodically delete texts,

19  but when her phone is turned into the City, all of them are

20  gone, and the 30-day automatic delete setting is turned on.

21          THE COURT:  And I think your expert concluded that

22  there were, like, 27,000 texts?

23          MR. CALFO:  I think they -- yes, Your Honor.

24          THE COURT:  And 17,000 may have been recovered from

25  third parties, and so you've got -- and all of them were

1   manually deleted?  Is that --

2       MR. CALFO:  Your Honor, we don't know how they were

3   deleted, but they were either deleted because of the 30-day

4   automatic delete or they were manually deleted.

5       But, Your Honor, the Chief didn't just delete her work

6   phone messages, she also deleted all the messages on her

7   personal phone.

8       When we got wind of the fact that personal phones were

9   likely used by these City officials, one of the things we did

10  was contact Chief Best's personal counsel.  We let them know

11  we were going to issue a subpoena for the texts.  At this

12  point, the media disclosed that there were issues about Chief

13  Best's texts being deleted.

14      Right around the time that we are contacting her counsel

15  to obtain the personal phone, she claims, in May of 2021,

16  that her personal phone stopped working.  She took it to the

17  Apple store.  It was factory reset, and all the text messages

18  were deleted.

19      And we know both from the texts that we have from Mayor

20  Durkan, but also from Chris Fisher, who is the chief police

21  strategist and was advising Chief Best during CHOP, that he

22  and her texted on her personal phone, as well.

23      Then, Your Honor, you have the other officials, and this

24  is -- this relates to Chief Scoggins, the head of the fire

25  department, Idris Beauregard, who was negotiating with CHOP

1   participants and was with Seattle Public Utility.  You have

2   Ken Neafcy, who, Your Honor, was a high City official

3   involved in the CHOP.  You have Assistant Police Chief

4   Greening and Chris Fisher, who were both high-level police

5   officers who advised Carmen Best, and each of these

6   individuals, as the screen shows, Your Honor, received

7   litigation hold notices.

8        But, in October of 2020, each one of these individuals

9   claimed to have forgot the passcode on their phone, went to

10  the Apple store or themselves reset their phone and, as a

11  result, deleted virtually all texts that were on their phone.

12  October 8th, Scoggins forgets his passcode, goes to Apple,

13  gets the phone reset.  Beauregard forgets her passcode the

14  next day.  Her phone is reset.  Neafcy's phone is factory

15  reset after he tries too many times to enter his passcode,

16  just two and a half weeks later.  Same with Assistant Police

17  Chief Greening.

18       And with respect to Chris Fisher, who's the chief strategy

19  officer for the police, he already had a 30-day delete

20  setting on his phone, but then, on November 2nd, he turned

21  the phone in.  He reset the phone himself, again saying that

22  his passcode was not working.

23       Your Honor, I think this shows a concert of action not

24  only between and among these different people, but with the

25  Mayor and with the chief of police.

1        And again, Your Honor, it's important to note that the

2   Mayor's Office tells the City Attorney in October of 2020,

3   when all these folks' phones are reset and texts are lost,

4   that's when the Mayor's Office tells the City Attorney about

5   the missing texts that the Mayor had.

6        Now, Your Honor, I'm going to go off this screen for a

7   second.  So, Your Honor, I think the question here in terms

8   of how the Court is to decide what to do about this depends

9   on, I think, two issues.  One of them is what the case law

10  calls "intent to deprive."  In other words, did the City

11  officials intend to deprive the plaintiffs of the use of the

12  information that was destroyed?  And the other issue, of

13  course, is prejudice.  How were the plaintiffs prejudiced, if

14  at all, from the loss of this information?

15       And when it comes to intent to deprive, I think one need

16  only look and review the materials that I've just put on the

17  screen.  These individuals all knew about the litigation.

18  They all knew that there were litigation holds, and they went

19  ahead and did voluntary things, like press disable and delete

20  on their phones, press 30-day deletions, take their phones to

21  the Apple store and get them reset.  All of this was

22  intentional, and it was done at a time when they clearly knew

23  that there was information on the phone that was relevant to

24  the litigation.

25       Another, I think, factor in terms of intent to deprive,

1    Your Honor, was mentioned by Your Honor, and that is, how

2    about the lack of transparency from the City about this?  In

3    August of 2020, the Mayor's Office knows about the deletions.

4    We don't hear about it until the spring of 2021, and that's

5    only because of the whistleblower complaint that was made

6    within Jenny Durkan's office.

7         And then the City releases to the press the notion that

8    the lost information was due to an unknown technology issue.

9    There was nothing unknown about the fact, which they did

10   know, that the Mayor's 30-day auto-delete feature had been

11   turned on, and that was a reason for the missing texts.

12        THE COURT:  You say they leaked to the press.  Where

13   do we have that?  And are you relying on what the press,

14   then, reported?

15        MR. CALFO:  Well, Your Honor, I think the City is the

16   one who made the statement about there being an unknown

17   technology issue.

18        THE COURT:  And where is that in the record?

19        MR. CALFO:  Your Honor, I can follow up and let you

20   know, Your Honor, but I do believe it's in our brief, and I

21   can follow up with that exhibit.  It looks like it's at

22   Exhibit 24, Your Honor.

23        THE COURT:  Exhibit 24 of what --

24        MR. CALFO:  Of my declaration.  Then --

25        THE COURT:  Do you have the docket number for

1    Exhibit 24?  You've got a lot of exhibits in this case, as

2    you know.

3             MR. CALFO:  It's the Calfo declaration, Your Honor.

4             THE COURT:  Oh, it's your declaration?

5             MR. CALFO:  Yes, Your Honor.

6             THE COURT:  Well, I have it right here.

7             MR. CALFO:  Yes.  May I -- should I wait, Your Honor,

8    for you to --

9             THE COURT:  Go ahead.

10            MR. CALFO:  Your Honor, after this disclosure, the

11   City didn't turn over the phone data until October 31st,

12   2021, and that's the first time we were able to evaluate the

13   deletions with our own expert.

14       Now, Your Honor, in terms of prejudice, it seems pretty

15   obvious that a lot of these issues on our, for example,

16   substantive due process claim go to what the City was

17   thinking and what it knew or should have known.  We've talked

18   about foreseeability.  We've talked about deliberate

19   indifference to the harms that were being suffered by the

20   people within the CHOP.

21       But when you read the City's summary judgment motion, the

22   first several pages are all about the justifications for what

23   the City was doing, that the police department was making

24   decisions based on X, Y, and Z, that the City policy was

25   based on this.  And it does seem to me, in both evaluating

1   summary judgment, but also just our request for a finding of

2   liability, that every time the City says something, "This is

3   what the police department was doing and thinking at the

4   time," I think we have to say to ourselves, "We don't know."

5   We don't know, because we don't have Chief Best's texts with

6   the Mayor.  We don't have Chief Best's texts with her chief

7   strategy officer.  We just don't know.

8       And all these other folks who were involved in the CHOP,

9   every time the City says, "The Seattle Police Department did

10  this," "The City did that," we have to say to ourselves,

11  "That may be true," but if we really wanted to know the

12  truth, we would have to have access to this information, and

13  these people intentionally got rid of that information.

14      The City needs to be held accountable here, Your Honor.

15  Have you heard of one City official being reprimanded, of a

16  note going to their personnel file, of anything?  And yet you

17  have people deleting messages with reckless abandon, knowing

18  they have litigation hold notices, and are we just going to

19  say, "Fine, we believe you, Seattle Police Department, when

20  you tell us why you were making these decisions," "We believe

21  you, Jenny Durkan, even though you say to us that your phone

22  was dropped in water, and yet you never told anybody that.

23  You didn't tell your IT people that when you brought the

24  phone to them, seven people who you work with on the phone,

25  IT people, your close advisors, nobody."  It's not credible,

1   Your Honor.

2       And then, for her to say, "I didn't reset the phone, it

3   reset itself; I didn't disable and delete on the phone on the

4   day I'm the only one who had it; I didn't change the 30-day

5   text settings," I mean, if there's not honesty and

6   transparency about things that are objectively the case, how

7   are we to believe what the City says its policy was based on?

8   How are we to believe what the City knew was going on within

9   the CHOP?  How are we to believe any of their justifications?

10  And this is why a judgment of liability is so important, Your

11  Honor.

12      But now I am going to go back to the screen, because I do

13  think this is a concrete example of why we are prejudiced,

14  and it's just an example, Your Honor.  But here is a text, an

15  email, from Jenny Durkan to the chief of police and the chief

16  of the fire department and to two of her advisors, and this

17  was a text that was written after the young man was shot in

18  the CHOP.  And what the Mayor says here -- and I'm reading

19  down to the sentence that begins, "What happened this a.m.,"

20  Your Honor.  She says, "What happened this a.m. was

21  foreseeable and avoidable.  It cannot be repeated."

22      Now, I don't think anyone could read this email and say,

23  what the Mayor is saying is that this is -- the death of this

24  child, this kid, was foreseeable and avoidable and it cannot

25  be repeated.  But guess what?  When the Mayor is deposed, she

1    denies it.  We asked, "What did you think was foreseeable and
2    avoidable?" and she said it had nothing -- "It had to do with
3    the response, not with what occurred to the victim.  What was
4    foreseeable and avoidable is that they didn't have
5    coordination."
6         Now, I think, you know, a jury can come to their own
7    conclusions about this.  Obviously, it was a very important
8    email to the plaintiffs' case, but you can take an isolated
9    document like this, and the Mayor can explain it away the way
10   she tries to here, but what if we had all of her texts?  What
11   if we had all of her texts during the CHOP?  She says she
12   told the police in that email before, she said, "I told you
13   before -- " and I'm looking at the second -- where it says,
14   "But as we discussed."  She says, "But as we discussed at the
15   outset of the Cap Hill issues, and as you told the public:
16   there can be no part of the city where the police do not
17   respond."  What a phenomenal statement for the Mayor to make
18   at that point, where we know the fire department and the
19   police are not going into the neighborhood, and she's
20   disavowing responsibility for that.
21        But if we had the texts between the chief of police and
22   the Mayor or between the chief strategy officer for the
23   Seattle Police Department and the Mayor and the chief of
24   police and these other folks who all got rid of their texts,
25   we would have more information about this.  We would have

1   more information to impeach the Mayor's claim that when she

2   wrote "foreseeable and avoidable," she didn't mean it as to

3   the death of the young man, or that when she said there can

4   be no part of the City where the City -- where the fire

5   department and police department don't respond, if we had her

6   texts, we'd have much more information that we could use to

7   present our case, but they're all gone, Your Honor.  They're

8   all gone.

9       So, Your Honor, we think a judgment of liability is the

10  fair thing to do here, because what the court cases say is

11  that when the destruction of the evidence is going to distort

12  the presentation of the truth, that's when a judgment of

13  liability is appropriate.

14          THE COURT:  Who's got the burden to show prejudice

15  here?  Does Rule 37 tell us the answer, or does it depend?

16          MR. CALFO:  I think it depends, Your Honor, but we're

17  happy to take it on.  I don't think there's a question here.

18  You know, all the City can say is, what, that we don't know

19  what's in the texts, so you can't say there's prejudice.

20  Well, the Court --

21          THE COURT:  How do you respond to the City's

22  submissions and the expert -- and the report of Martha

23  Dawson, who says we've done all these retrievals based on

24  texts that we got from others whose phones weren't dropped in

25  the water or passwords weren't lost, whatever, and we've

1   retrieved thousands of these texts and we have a much better

2   idea of exactly what was said and what was lost and you have

3   it?  How do you respond to that?

4           MR. CALFO:  Too little, too late, Your Honor.  I

5   mean, first of all, you've got to look at what the obvious

6   intent was of these individuals: to get rid of information,

7   right?  And then, after all the City did to try to

8   reconstruct its efforts -- and I don't mean to sound like a

9   broken record -- we do not have, and we never will have, what

10  the Mayor and the chief of police were saying to each other

11  in texts, or any of these seven people, what they were saying

12  to each other in texts, unless some other City employee who

13  didn't destroy their information kept that text.  So there's

14  a whole swath of critical information we will never ever,

15  ever have, no matter -- the City can spend another year

16  trying to reconstruct texts, and they're never going to get

17  that back.

18      So I think, you know, sure, it's great that the City went

19  back and did this.  They do have PRA obligations, Your Honor,

20  so they needed to do it.  There's other litigation; they

21  needed to do it.  I think it's great they did it.  I'm happy

22  we have the information, but we don't have the critical

23  information.

24      I want to know what Mayor Durkan was saying by text when

25  this was all happening.  I want to know what Chief Best was

1   saying.  We know there was conflict between them.  Chief Best

2   went on -- you know, made public statements about the

3   increase in crime.  She talked about rapes and murders and

4   property crimes, and she talked about the increase.  She

5   mentions that Mayor Durkan doesn't want the East Precinct

6   anymore.  But we don't have the information that would have

7   been contained in their private text communications that

8   would have identified exactly what Mayor Durkan was saying in

9   response to these concerns that the chief of police had.

10       But let's face it, Your Honor, this was a calculated

11  decision by these folks.  They had to make a decision: is it

12  worse to keep our texts and maintain what's in them, or are

13  we going to be better off getting rid of them and taking

14  whatever lumps have to come our way as a result?  And I think

15  they decided they were going to take their lumps, and I think

16  the Court should give them their lumps now.

17          THE COURT:  What case or cases do you think are

18  closest here that would support your view?

19          MR. CALFO:  Well, I have my favorite one, Your Honor,

20  which is *Leon v. IDX*, because I was the lawyer in that case.

21  You know, I think it is analogous, because in that case, the

22  plaintiff wiped his computer after having received -- we

23  wrote a note at the beginning of the case.  We said,

24  "Maintain your laptop, preserve everything on it," and the

25  plaintiff went ahead and wiped it.  And we were able to show

1    that there were files that remained after wiping it that

2    referenced things that were relevant to the case.  And Judge

3    Pechman first found that that intentional conduct forever

4    destroyed evidence that would have been valuable to our

5    claims, our defenses, and the Ninth Circuit did the same

6    thing.

7         And it's very similar here.  You've got -- you know,

8    you've got the same conduct: intentional deletion of phones

9    that contained texts during the very relevant time period

10   between the most important individuals within the City that

11   are making the policy decisions that they are now using to

12   justify their conduct.  There's really no difference.

13        And what *Leon* talked about is you show intent to deprive

14   by demonstrating a conscious disregard for the evidence.

15   We've got that here.  You show the prejudice by showing that

16   the truth will be distorted when you don't have access to the

17   critical information.  We've got that here.  There are many

18   other cases that we cite in our brief, Your Honor, that are

19   like this.

20        THE COURT:  How do you draw the distinction between a

21   finding of liability versus an adverse inference instruction?

22        MR. CALFO:  Well, Your Honor, I guess, if I were

23   making the decision, what I'd say --

24        THE COURT:  I don't think you're making the decision.

25        MR. CALFO:  I'm not.  I'm not, but I'm offering my

1    humble advice.  Your Honor, I think, the way I'd look at it

2    is, how bad was it?  You know, how offended am I at the

3    conduct?

4         THE COURT:  The problem is, we don't know how bad it

5    is, do we?

6         MR. CALFO:  Well, I think what the cases say, Your

7    Honor, is when you look at the intentional nature of the

8    deletion of information, it's fair to presume that the reason

9    they wanted to get rid of it was because they knew it would

10   be bad.  And they also say it's not my burden, as the

11   plaintiff and a non-spoliator as to this information, to show

12   that it was even relevant.  We have to presume relevance.

13       And here, I think, not only do you have that presumption,

14   but you have the fact that the chief -- you know, the

15   decision-makers at the City are all destroying their texts

16   between and among each other.  I mean, the fact that they

17   reconstructed it, the City spent all this money and has

18   reconstructed thousands and thousands of texts because these

19   people deleted everything.  I mean, it's not really a

20   justification.  It's a symptom of a really serious problem

21   that they had to reconstruct all of these texts.

22       But, Your Honor, I think --

23       THE COURT:  Well, Ms. Dawson tells us in her

24   declaration that their efforts, to date, in the imaging and

25   the lawyer fees is $841,000.

1          MR. CALFO:  I can rival that, Your Honor.  You know,

2    we had to hire an expert to find out that the Mayor deleted

3    texts.  The City didn't tell us.  They hired -- part of that

4    $840,000 went to an expert who hid in his report that the

5    Mayor manually deleted texts.  I mean, that's outrageous.

6    They were hoping we didn't find out.  We asked him during the

7    expert testimony, his deposition, "Why didn't you put in your

8    report that you had determined the Mayor deleted texts?" and

9    he said, "It, technically, wasn't my job."

10         So we had to hire our own expert.  These people are

11   expensive, and he's the one who told us, "Look, I looked at

12   the phone, and she's manually deleted 190-some texts."  We

13   would never have known that.  So thank you for doing the

14   $840,000, but no, thank you, for effectively lying to us in

15   the report by not giving us all the information.

16         And we had to depose the City IT people about what they

17   knew about the Mayor's phone.  We've had to go through these

18   reconstructions and see if they're accurate.  You know, we've

19   spent a lot of money, Your Honor, and we're asking for that

20   as a part of this motion.  We shouldn't have to pay for a

21   computer expert to tell us things that their expert hid from

22   us or to determine the extent of the spoliation.  We should

23   be compensated for that, our attorneys' fees that we've

24   spent.  This is already a complicated case.  This has made it

25   vastly more complicated.  We had to run down all this

1   information, run down all these deleted texts, run down

2   everything that these guys did with their phones.  We should

3   be compensated for that.

4        But, Your Honor, an adverse inference, obviously, would be

5   positive, but I really don't think it's enough, because at

6   that point, you have the problem of the Mayor dissembling as

7   she did about her phone, dissembling as she did about

8   whether, when she said foreseeable and avoidable, it meant

9   foreseeable and avoidable.  You have the chief of police

10  deleting all of her texts, getting rid of her personal phone

11  when we are trying to subpoena it.

12       I mean, really, Your Honor, I just think there's a point

13  at which the conduct is so outrageous that doing anything

14  other than imposing liability isn't holding them accountable

15  for what they did.  They made a conscious decision, Your

16  Honor, to get rid of that information.  They knew there was

17  going to be lumps that were going to be taken, and it's time

18  to hold them accountable.

19       And the only way to fairly hold them accountable is to

20  enter judgment, enter judgment and let our clients, who

21  suffered through their abandonment of civil authority over

22  this area, knowing that it was increasing crime, knowing that

23  it was blocking access to our clients' businesses, knowing

24  that they were losing business revenue -- they abandoned

25  civil authority.  They said we're not going -- we are going

1  to yield it over to these people, who are going to just

2  trample on our clients' rights.  And then, when we bring the

3  lawsuit, we find out they destroy everything and hide stuff

4  from us and delayed notification to us.

5         THE COURT:  All right.  I think you're repeating

6  yourself, Mr. Calfo.

7         MR. CALFO:  I am, Your Honor.  Thank you very much,

8  Your Honor.

9      In closing, Your Honor, I just think, given the conduct

10  that we've outlined here, we do believe that the Court should

11  enter judgment and order the City to pay our costs and fees

12  relative to their spoliation.  Thank you.

13         THE COURT:  What do you estimate those costs and fees

14  to be?

15         MR. CALFO:  Your Honor, I'd estimate about $200,000.

16         THE COURT:  All right.  Thank you.

17      Let's hear from the City.

18         MR. CRAMER:  Good morning again, Your Honor.  Shane

19  Cramer on behalf of the City.

20      Rule 37(a) does not demand that the City's efforts be

21  perfect, and I am not claiming that they were perfect.  It

22  requires that parties take reasonable steps to preserve

23  electronically-stored information by sending out

24  comprehensive litigation holds, which the City did, directing

25  everyone with relevant information to the lawsuit to recover

1    both -- or not recover, but retain texts on both their

2    personal devices, their City devices.  Implementing

3    litigation holds on --

4           THE COURT:  Well, that didn't happen, did it?  After

5    notice -- I mean, you don't quarrel with the fact that

6    Mr. Calfo's office gave the City notice?

7           MR. CRAMER:  I do not.

8           THE COURT:  All right.  And that notice, at least by

9    June 27th or June 30th, Exhibits 4 and 5 to his declaration

10   gave your firm notice, and the City and its lawyers know that

11   you have an obligation, even without that notice, to retain

12   this; isn't that true?

13          MR. CRAMER:  As soon as the City employees received

14   that litigation hold, they know that they need to do their

15   best to preserve evidence, and we think --

16          THE COURT:  And does the City concede that there are

17   no text messages during the CHOP period between these

18   players, the seven representatives of the City who were key

19   to the decisions?

20          MR. CRAMER:  No, Your Honor, not entirely.  The idea

21   that all of these people are key to the CHOP is not entirely

22   accurate, and the idea that there would be --

23          THE COURT:  Well, all right, let's just take the fire

24   chief and the Mayor and the police chief.  Let's just go with

25   those.

1          MR. CRAMER:  Mayor --

2          THE COURT:  There are no text messages during the

3    CHOP period; is that right?

4          MR. CRAMER:  That's not actually accurate.  Mayor

5    Durkan's texts exist from June 25th forward.  So for -- so

6    just so we're all on the same page, so CHOP started June 8th,

7    was cleared July 1st.  Mayor Durkan's texts start on

8    June 25th.

9          THE COURT:  All right.

10         MR. CRAMER:  And so we --

11         THE COURT:  And each of these individuals caused to

12   be deleted texts that they should have retained; is that

13   fair?

14         MR. CRAMER:  We don't know, because they were

15   asked --

16         THE COURT:  Well, Chief Best testified in a

17   deposition that she deleted texts periodically, and when she

18   turned in her phone, there were no texts.  I mean, that's

19   pretty easy, isn't it?

20         MR. CRAMER:  That's right.  I'm sorry, I thought you

21   were saying texts between the three of them.

22         THE COURT:  No, no.

23         MR. CRAMER:  So for Chief --

24         THE COURT:  Chief Best, no texts.

25         MR. CRAMER:  Yes, and I would say --

1    THE COURT:  And she was told -- your office told the

2  police chief and others to retain their ESI information;

3  isn't that right?

4    MR. CRAMER:  She received a litigation hold, and I

5  think what's important for Chief Best is to review her

6  deposition testimony, which I'm sure you've already done.  It

7  comes through compellingly and credibly that Chief Best

8  believed, just like with email, that if you do anything with

9  your email on your phone, the City's got a copy of it in the

10  cloud, and she believed that she could get rid of the

11  messages on the phone and they would still be retained

12  offline.  And it wasn't a practice that she picked up during

13  CHOP, it was her longstanding practice.

14    And while that practice wasn't -- or her belief, her

15  good-faith belief, wasn't accurate, it goes to the mental

16  state that we're talking about here when you're talking about

17  intent.  And --

18    THE COURT:  Well, if Chief Best was the only person

19  whose texts got deleted, you might have a strong position,

20  but you've got seven people here, all of whom delete texts

21  after they get notice; is that fair?

22    MR. CRAMER:  I don't think that it's fair to call

23  the -- any of the -- any of them deletions by the individuals

24  with a requisite mental state, with --

25    THE COURT:  All right.

1          MR. CRAMER:  For Scoggins and the others who had

2     password issues, the issue was that the City's security

3     protocol requires that you change your passcode.  They got

4     locked out and --

5          THE COURT:  Well, is it credible -- is it credible

6     that Chief Scoggins forgot his password on October 8th; that

7     Idris Beauregard forgot the password on October 9, the next

8     day; that Kenneth Neafcy forgot the password on October 26th;

9     that the assistant police chief forgot the password on

10    October 26th; and Chief Fisher, chief strategy officer,

11    forgot the password on November 2?  And all of those phones

12    were reset, and all of those texts are missing.  Now, it's

13    not credible that they all did it within a week or two, is

14    it?

15         MR. CRAMER:  It is, Your Honor, because there's no

16    evidence that any of them had any communications with each

17    other about deleting text messages.  There's no hint of a

18    conspiracy.  It's not at all like the *First Financial* case

19    where there was an agreement that everyone keep everything

20    off of text.  That doesn't exist here.

21         What you have is a rolling password program, and these

22    folks get locked out.  And they go to different IT people,

23    because they're desperate to get back into their phones so

24    that they can do public work, and the IT people tell them, in

25    some instances, there's no way to work around it, you need to

1  reset your pass -- your phone.  Some of them go to the Apple

2  store.

3      Chief Scoggins testified that he first tried to work with

4  the folks in SFD.  When they couldn't help him, he went to

5  the Apple store and gave it to them, hoping that they could

6  get in, because he needed his phone.  And when they told him

7  that they couldn't, they reset his phone.  And the reason why

8  he cared so much and was so desperate to get back into it is

9  because, as he testified at his deposition, the last time

10  he'd been without his phone for a day was in 2016 when he

11  missed the Greenwood natural gas pipeline explosion that sent

12  12 firefighters to the hospital.  And so his focus was not on

13  depriving plaintiffs of evidence, but of getting back into

14  his phone so that he could use it again to make calls.

15          THE COURT:  All right.  Let me change gears a little

16  bit.  I'm very troubled that, regardless of what happened,

17  the Mayor's counsel learned on August, I think, the 21st of

18  2020, August 21st, that emails had been deleted; is that

19  right?

20          MR. CRAMER:  They learned on August 21st that text

21  messages didn't exist.

22          THE COURT:  Yes.  And --

23          MR. CRAMER:  And --

24          THE COURT:  -- when is the first time the City

25  notified plaintiffs' counsel that there were missing texts,

1   the first time?

2        MR. CRAMER:  And can I explain?  But it was

3   March 26th, 2021.  And the reason, Your Honor, the reason was

4   because when they discovered that the Mayor's texts from

5   before June 25th were missing, it was an all-hands-on-deck

6   not to cover something up, but to try to find them.  It was,

7   okay, let's go see if we can get that back.

8        THE COURT:  Don't you have an obligation to tell the

9   other sides in litigation that we've got a problem, Houston?

10        MR. CRAMER:  And I don't want to get into tit for

11   tat, but it's very akin to Mr. Malone, and I don't --

12        THE COURT:  I think it's --

13        MR. CRAMER:  No, no.

14        THE COURT:  -- night and day between the plaintiffs'

15   spoliation problems, which they have, and what's going on

16   here in the city.

17        MR. CRAMER:  On the merits or on the -- I don't want

18   to get into the merits.  I just want to say that, for the

19   same reason that their main plaintiffs' owner, Mike Malone,

20   lost his text messages, they discovered it in May of 2021,

21   and they said --

22        THE COURT:  No, no, we're not talking about --

23        MR. CRAMER:  I know, but --

24        THE COURT:  We're not talking about Mr. Malone.

25   We're talking about the City.

1      MR. CRAMER:  I understand.

2      THE COURT:  The City's got -- how many lawyers do you

3  have in the City Attorney's Office?

4      MR. CRAMER:  I do not know the answer.

5      THE COURT:  Well, give me an estimate.

6      MR. CRAMER:  I'm outside counsel.  I honestly don't

7  know the estimate.

8      THE COURT:  Oh, that's right, you don't work for the

9  City Attorney's Office.

10      MR. CRAMER:  I take --

11      THE COURT:  I mean, it's a big office, you would

12  agree?

13      MR. CRAMER:  I take your point --

14      THE COURT:  Lots of good lawyers.  The City hid the

15  ball for at least nine months; did it not?

16      MR. CRAMER:  I don't believe that it did, because it

17  was trying to find them.  It wasn't sure that they didn't

18  exist.

19      THE COURT:  Well, they didn't take the ball and give

20  it to Mr. Calfo, did they?

21      MR. CRAMER:  We did not inform Mr. Calfo until

22  March 26th of --

23      THE COURT:  And what is the responsibility of a

24  lawyer in litigation after getting a notice and learning that

25  evidence has been destroyed?  What's the obligation to tell

1    the other side?

2         MR. CRAMER:  But that's -- that is what -- or that is

3    what the City was trying to do.  The City was trying --

4         THE COURT:  And you hired an expert to do that.

5         MR. CRAMER:  Yes.

6         THE COURT:  But the expert -- then, when the expert's

7    report was prepared, it doesn't disclose this, does it?

8         MR. CRAMER:  The expert's initial analysis was

9    focused on what happened to her phone.  The expert's analysis

10   was not focused on manual deletions.  We didn't know that

11   there were manual deletions.  That wasn't what we were

12   looking at.

13       The expert's report -- in fact, we provided it two months

14   early before the deadline, because we were trying to be

15   transparent.  We were trying to let them know as soon as we

16   could what the -- what we understood had happened.  And so

17   the deadline, I believe, was April 20th or something, and we

18   provided it in early February, because we wanted -- we knew

19   that they wanted the information, and so we provided it.

20       And the messages that counsel says weren't provided until

21   October, the manually-deleted messages, the ones that are in

22   his exhibit, they've had those for years, since at least, in

23   some instances, July of 2021.  We provided all of those

24   messages.  There were three messages only that were provided

25   for the first time in October.  One of them is a disputably

1   privileged message that we provided, you know, in an effort

2   to be transparent.  The other two were two -- I don't know

3   why they didn't go out earlier, but they weren't even

4   deleted.

5       Everything else in their list they've had for a year and a

6   half.  They've had it for seven or so months before they

7   deposed Mayor Durkan.  They had it months before they deposed

8   Chief Best.  They had the opportunity to ask her -- to ask

9   all of them about all of these issues at their depositions,

10  whether they texted each other, and they chose not to.

11      They had the opportunity on this avoidable and foreseeable

12  email --

13          THE COURT:  You don't deny that the Mayor, during the

14  CHOP period, had texts where she would text the police chief

15  or the fire chief and that those are not available now?

16          MR. CRAMER:  The -- excuse me, Your Honor.  The Mayor

17  could not state with confidence that one-on-one texts with

18  either of those two did not exist.

19          THE COURT:  What does that mean?

20          MR. CRAMER:  It means that she --

21          THE COURT:  "The Mayor could not state with

22  confidence"?

23          MR. CRAMER:  She couldn't recall --

24          THE COURT:  I mean, it's not believable, is it, that

25  the Mayor would not know whether she sent a text to the

1    police chief during that period of time, one-on-one?

2         MR. CRAMER:  Her testimony is that she likely did,

3    but she could not remember exactly.

4         THE COURT:  All right.  Was that question asked of

5    the police chief?

6         MR. CRAMER:  I believe so.

7         THE COURT:  What did the police chief say?

8         MR. CRAMER:  I don't have her testimony --

9         THE COURT:  What about the fire chief?  What did the

10   fire chief say?

11        MR. CRAMER:  I don't have his testimony in front of

12   me, but I can direct Your Honor to it.

13        THE COURT:  Well, I mean, the bottom line in this

14   motion, really, is it not, is what's the sanction?  Isn't

15   that where we are?  And when you get all through, it's not

16   possible to come away from this motion without a pretty firm

17   conviction that some sort of sanction is appropriate.

18        MR. CRAMER:  The -- if a sanction is appropriate, it

19   needs to take into account all of the -- it needs to take

20   into account all of the evidence that plaintiffs have, all of

21   the evidence that the City has provided.  The City has

22   provided more than 45,000 emails, including thousands of

23   emails to and from these specific individuals that discuss

24   all aspects of the case.

25        Mr. Weaver testified that they had a complete record for

1    the summary -- or didn't testify, but earlier said he had a

2    complete record --

3            THE COURT:  You cited in one of your briefs the

4    *Youngevity* case out of the Southern District of California.

5    Are you familiar with that case?

6            MR. CRAMER:  Yes.

7            THE COURT:  All right.  And one of the things that

8    court said was that, basically, the fact that you've gone and

9    found other text messages from others can't excuse the fact

10   that you've destroyed, intentionally, a lot of other

11   documents.  Why isn't that true here?  I mean --

12           MR. CRAMER:  I think you have to look to Rule 37's

13   discussion.  If something isn't there, if it's unimportant or

14   duplicative, then that ratchets down the consequences, it

15   ratchets down the least-severe sanction.

16           THE COURT:  Well, we don't know how significant it

17   is, do we, because they're all missing during this period of

18   time --

19           MR. CRAMER:  But --

20           THE COURT:  -- and intentionally deleted during this

21   period of time.

22           MR. CRAMER:  I would like the opportunity, at some

23   point, to walk through Mr. Calfo's timeline, because it omits

24   very key events, and it describes things that didn't happen.

25           THE COURT:  Well, this would be a good time to do it,

1  then.

2         MR. CRAMER:  Okay.  So if you take a look at page 3

3  of the timeline.

4         THE COURT:  Just a moment.  I have it.

5         MR. CRAMER:  The first thing, July 4th, her phone

6  falls in the water.  Mr. Calfo says she didn't tell anybody;

7  there's no evidence of her telling anybody.  It's

8  specifically refuted by Regi Alencastro's testimony at

9  paragraph 38 of my declaration, where he testified that she

10 told people two years ago that that happened.

11    Then, the --

12         THE COURT:  Say that again.  She told people --

13         MR. CRAMER:  That her phone fell in the water.  This

14 idea that --

15         THE COURT:  When did she -- she didn't tell anybody

16 at the time.

17         MR. CRAMER:  He testified that she did.

18         THE COURT:  All right.  Where is the Alencastro -- is

19 that in your declaration?

20         MR. CRAMER:  Yes, paragraph 38.

21         THE COURT:  All right, paragraph 38.

22         MR. CRAMER:  And even setting that aside, she sent

23 emails immediately after telling everyone that her phone had

24 crashed, that her phone had died, so it's a known fact that

25 something is wrong with her phone.  Then, it's a known fact

1    that she gives it to her staff to work on.

2        Now, on the night of July 4th, when she's trying to get

3    her emails to load and get her phone back working, the

4    indications are that someone selected "disable and delete" on

5    the phone, and Mr. Calfo's description of what that does is

6    not right.

7            THE COURT:  Who did make that selection?  It had to

8    be done manually; is that right?

9            MR. CRAMER:  It did, and --

10           THE COURT:  Who had the phone at that time?

11           MR. CRAMER:  And Mayor Durkan says that she had the

12   phone.

13           THE COURT:  All right.  And it had to be done

14   manually, so she either did it or who?  What are the other

15   alternatives?

16           MR. CRAMER:  And she doesn't remember exactly what

17   she did while she was fixing the phone, but what she does

18   know is that on July 9th, when she gives the phone to IT,

19   that IT tried to take the backup and tries to take the backup

20   the day that --

21           THE COURT:  And when she got the new phone, IT did

22   not make up or back up the phone.  Wasn't that the City's

23   normal practice at the time?

24           MR. CRAMER:  They tried to take the backup, but they

25   don't need -- they tried to take the backup.  The backup

1    didn't stick, and then they don't use the backup, and so he

2    continued on.  But then he also selected messages in iCloud,

3    okay, which moots out any of the issues that happened on 4th

4    of July.

5        It's also important to know that there's -- that the --

6    none of the experts can conclude that the 30-day setting is

7    definitively what happened.  That's what's uncertain here,

8    too; that there are artifacts on the phone that could lead to

9    a 30-day deletion.

10            THE COURT:  Well, do we have to have a hearing with

11   these experts?

12            MR. CRAMER:  I don't think you need to have a hearing

13   with the experts.  They've told us that that's what is

14   consistent, but that --

15            THE COURT:  Well, haven't they both agreed that, more

16   likely than not, that's what happened?

17            MR. CRAMER:  I think they've both said that it's

18   consistent.  Mr. Allen -- or Mr. Arhu's testimony indicates

19   that different artifacts might, then, be affected, but again,

20   there's no testimony and there's no evidence --

21            THE COURT:  Go ahead.

22            MR. CRAMER:  -- there's no evidence as to who would

23   have made the selection.  There is evidence that her phone

24   was in the possession of several people.

25       Both experts also agreed that any selection might not have

1   even had to have been made on that phone.  Apparently, if you

2   have the old phone and the new phone, the old phone could

3   have also done it, so there's -- her testimony is consistent,

4   and it's credible.  We really don't know exactly what

5   happened with the phone.  All we know about the phone is it

6   had issues beginning July 4th through the end of July.

7       Then, we know that --

8           THE COURT:  Well, we know that the 30-day delete

9   setting was on during that period; do we not?

10          MR. CRAMER:  I'm sorry?

11          THE COURT:  Weren't messages deleted over that 30-

12  day period because of the settings on the phone?

13          MR. CRAMER:  No.

14          THE COURT:  None?

15          MR. CRAMER:  No.  The -- all of the messages exist

16  from June 25th forward, with the exception of -- none of them

17  were affected by any 30-day issue.

18      But what's more important here is the individuals whose

19  texts were lost.  Aren't the individuals who made the

20  decisions that plaintiffs complain about on their summary

21  judgment motion or in the case, the provision of barricades,

22  the porta-potties, lights, et cetera, those are for --

23          THE COURT:  Wait a minute.  I don't quite understand

24  what you're saying.  I mean, these are the key players, are

25  they not, at the time?  You've got the Mayor, the police

1   chief, the fire chief, and the others that Mr. Calfo has

2   identified.

3           MR. CRAMER:  The key players at the time, Sam

4   Zimbabwe, head of SDOT, in charge of all the --

5           THE COURT:  You may have a different list of key

6   players, but Mr. Calfo says, look, I want to see the texts

7   from these people who we think -- who plaintiffs think are

8   the crucial, very important players -- and "players" is the

9   wrong word -- City officials involved in the CHOP operation,

10   if you will.

11          MR. CRAMER:  And all of the evidence indicates that

12   the key players were the department heads and that any of the

13   decisions that were made would have been with them and would

14   have been made by them, with them.

15       Plaintiffs claim that all of these are administrative

16   functions and that's why discretionary immunity doesn't

17   apply, but at the same time, it's the department heads who

18   were in charge, and we have thousands of their emails.  We

19   have thousands of their text messages.  We have their text

20   messages with Mayor Durkan, with Chief Best, with Chief

21   Scoggins.  There's no reason --

22          THE COURT:  So how many don't we have during the

23   period?  During the CHOP period, how many texts from the

24   Mayor -- we'll just take the Mayor, the police chief, the

25   fire chief -- how many texts have you not been able to

1   recover?

2           MR. CRAMER:  You can't get a precise number.

3           THE COURT:  You can't get any number, can you?  It's

4   not "a precise."  You don't know; isn't that fair?

5           MR. CRAMER:  It's -- you -- yes.

6           THE COURT:  Okay.  All right.  That wasn't so hard,

7   was it?  I mean, we don't know.

8           MR. CRAMER:  But what we do know is that there's

9   sufficient evidence in the record for their -- for them to

10  demonstrate what they think they need to prove.

11      The foreseeable and avoidable email, that's an email, not

12  a text.  They say that that's what they -- that's what they

13  want to go to trial on, and that's -- they have that email.

14  And that email shows that it wasn't just sent to Chief Best

15  and Chief Scoggins, but to two --

16          THE COURT:  They've got a few emails or texts, but

17  the point is that they're missing an unknown amount of

18  evidence that would be crucial, important, for determining

19  whether there was deliberate indifference on the part of the

20  City --

21          MR. CRAMER:  That's --

22          THE COURT:  -- in terms of determining what the City

23  knew or didn't know about what was happening.

24          MR. CRAMER:  That's the burden that they haven't met.

25  That's the burden of articulating a concrete, plausible

1   suggestion of what it is, especially in light of -- I think

2   the UPS or the postal service case, *Perez v. USPS*, is really

3   on point here where they say that, in light of the thousands

4   of documents that were produced, that we did have, the 15

5   depositions, it's impossible for -- that we cannot conclude

6   that we would be forcing -- that the plaintiff would be

7   forced to have a spotty record and a distorted trial, because

8   you've got to look at the whole thing.  You've got to look at

9   what they have.

10   They have all of the emails, all of the texts from all of

11   the decision-makers who made all of the decisions with

12   respect to CHOP.  They had the opportunity to depose Mayor

13   Durkan and Chief Best about anything, and there wasn't

14   anything there.  They have what they need.  There's -- and

15   the City went to great extent to provide that.

16   Now, with respect to the remaining plaintiffs -- or not

17   plaintiffs -- the remaining City employees, there's no

18   evidence that any of them had an intent to deprive the

19   plaintiffs of evidence, which is the standard.  There's --

20   you can't reach intent based on behavior that's negligent,

21   grossly negligent, even sloppiness.

22   And if there's a credible explanation, which all of them

23   presented, that's corroborated and supported by

24   contemporaneous emails where what's reflected is a desperate

25   intent to get into their phones to keep doing their jobs,

1    that level is not met.

2         THE COURT:  All right.  I think we've heard enough on

3    this subject.

4       In light of the hour, it being 12:15, and we have one more

5    motion, we can take about a 10-minute recess.  I don't really

6    expect to hear more than about 10 minutes a side on this.

7    Perhaps we should do that, and then we can wrap it up.  Why

8    don't we take a 15-minute recess, and then we'll deal with

9    the other motion.  And I'm thinking 10 minutes a side, so be

10   on notice as to how much time we're going to have.

11      All right.  We're going to be in recess.

12                   (Recess taken.)

13        THE COURT:  Please be seated.  We have one last

14   motion to address, and that's the City's motion for

15   spoliation, Docket 107.  I've indicated that I've read all

16   the briefs and all the declarations.  Let me hear from the

17   moving party first.

18        MR. CRAMER:  Thank you, Your Honor.  Shane Cramer.  I

19   will try to be quick.

20        THE COURT:  We're all getting worn out here.

21        MR. CRAMER:  With respect to Richmark Label and Mike

22   Malone of Hunters Capital, they just deleted all their texts.

23   They got litigation holds, and they ignored them, and they

24   continued to manually delete all of their texts for months

25   and months after the lawsuit started.  They admit it.  They

1    don't make an excuse for why it happened.  They have no

2    credible explanation for why they didn't retain it; they just

3    deleted it.

4        And they deleted texts, at least in Mr. Donner's case, for

5    months after receiving two litigation holds, after learning

6    about the City's issues, and just continued on.  And the

7    texts are directly relevant.  We asked Mr. Donner at his

8    deposition, "What did you text about?"

9              THE COURT:  And refresh my memory.  Donner is with --

10             MR. CRAMER:  He's Richmark Label.

11             THE COURT:  Richmark.  There are a lot of individuals

12   here, so --

13             MR. CRAMER:  Yes, yes.

14             THE COURT:  -- he's Richmark Label.

15             MR. CRAMER:  Yes, he's Richmark Label, the building

16   that you acknowledged earlier having graffiti.

17             THE COURT:  Yes.

18             MR. CRAMER:  And that's why -- one of the reasons why

19   his texts would have been so important, because we asked him,

20   "What did you text about?" and he stated -- among other

21   things, he said that he texted with people about how they

22   were having a street fair up there, which is a descriptor of

23   the CHOP that plaintiffs criticized Mayor Durkan for, for --

24             THE COURT:  Well, he testified in his deposition that

25   his practice was to delete texts as soon as he read them.  I

1   kind of relate to that, because I get a text, I look at it,

2   and it's gone.  That's a lot different, is it not, than

3   what's going on with the City?

4        MR. CRAMER:  I don't think so.  In fact, it's the

5   same thing that plaintiffs poke at Chief Best for, but Chief

6   Best had the belief that they were being saved.  Both parties

7   had the same litigation hold obligations, and Mr. Donner,

8   who's seeking, you know, a hundred thousand dollars or so in

9   damages from the City, has an obligation to retain evidence.

10  And these are the text messages that he sent to and from

11  friends about what was happening to him at that time.

12     He wants 50,000 --

13        THE COURT:  Well, what is the nature -- he's

14  claiming, I think, $90,000.

15        MR. CRAMER:  Sure.

16        THE COURT:  What are the nature of his damages?  Are

17  they dealing with this mural that was destroyed?

18        MR. CRAMER:  Yes.

19        THE COURT:  A $50,000 mural?  But that was done by

20  third parties.  The City didn't go -- I hope the City didn't

21  go and destroy the mural.  It was a very nice mural, as I

22  recall.

23        MR. CRAMER:  I would agree with you on the merits.

24  Mr. Donner is claiming that the City is responsible for

25  paying him for the mural.  So, among the things that are

1  relevant, there are, when did it get graffitied?  There's

2  evidence that the graffiti was happening before CHOP.  What

3  was he complaining about?  Was he saying that he wasn't

4  experiencing it?

5     THE COURT:  It would be likely that any missing texts

6  would relate to -- that would benefit the City -- would

7  relate to damages; is that right?

8     MR. CRAMER:  I would guess, yes.  And if you look --

9  go ahead.  I'm sorry.

10     THE COURT:  No, go ahead.

11     MR. CRAMER:  With Mr. Malone, the same thing.

12  Mr. Malone acknowledges that he received a litigation hold in

13  June.  He and Mr. Donner began discussing the filing of the

14  lawsuit on June 11th, so their litigation hold obligations

15  started at least that early, and yet, he won't explain what

16  happened to his.  At his deposition, he said that, yes, he

17  deleted text messages, and then he clarified that he only

18  deleted some text messages, but he did swipe to clean out the

19  text messages.  And then, when we got his declaration in

20  opposition to the motion, he's very careful to say that he

21  never intentionally deleted any text messages.

22    But what we do know is that he started saving his text

23  messages beginning March 26th, 2021, which is the day that

24  the City voluntarily and unilaterally told plaintiffs that

25  they were experiencing their own text-message issues.

1    There's nothing else that's special about March 26th of 2021.

2    And so the obvious implication is that he realized that he

3    didn't want to have the same problem, but by that point, it

4    was too little, too late.

5             THE COURT:  And we have the same issue with Malone's

6    missing texts, and that is that we do have from other sources

7    some of those texts; do we not?

8             MR. CRAMER:  We do.  You know, we got 150

9    manually-deleted, relevant, responsive texts.  Plaintiffs

10   didn't provide us with the ones that Malone sent that he had

11   manually deleted that weren't relevant, because under

12   *Zubulake*, you don't -- neither the Mayor, nobody at the City,

13   nor plaintiffs, have an obligation to retain irrelevant

14   documents, whether they're texts or anything else.

15        But those texts that we did get, at least some of them

16   really do tell you what we would want to hear from the other

17   messages that Malone admits to sending to third parties.  And

18   I don't have a copy for you, but I'll direct you to Docket

19   Number 180-3 (sic).  It's the Jill Cronauer collection, and

20   it's entry 697, where Mike Malone texts that he doesn't know

21   whether the City -- he has a question about whether the City

22   knows what or how to force change in CHOP, because it's in a

23   no-win negotiation with few leaders in a, probably, small,

24   demanding group that wants open conflict.  It goes right to,

25   somewhat, what they knew was happening at the time.

1    He talks about how his wife was there on 6-14 and saw that

2    it was a lively, peaceful block party up there.  That's the

3    Oaksmith collection, 180-4.  Then, Oaksmith agrees, in

4    another text that Malone is not on, where he says, "The

5    nights in the zone are dangerous, because no cops.  Thugs

6    take advantage of the area.  That said, during the days, it's

7    never been cleaner, and I'd take my kids there, no problem."

8    And then he sends another text where he talked about

9    dropping a box of bees, maybe 75,000, to fly around and sting

10   the shit out of everyone, little Trump bees.  These are the

11   types of things that -- you know, that one's not -- that one

12   is from his partner, not him, but these are the types of

13   things that would be helpful and that it would be good to

14   know about, and we wish that we had Malone's texts to be able

15   to have those.

16         THE COURT:  All right.  And as I understand it, the

17   others deal with the use of the Signal app and --

18         MR. CRAMER:  Right.  And they are, again -- without

19   arguing it, I would just point the Court to the FTC versus --

20   there are too many last names in my head -- the FTC case

21   involving Signal.  We think that's, you know, on point.

22   And then the only other person -- he dropped his phone in

23   the lake.  He testified that the contents of his phone would

24   have had, you know, discussions with his employees about

25   everything that was going on at Bergman's during CHOP.  They

1   didn't produce any texts from the employees.  They deleted

2   them, as well, and they didn't have any emails, so those

3   would have been the only contemporaneous documents.  We're

4   taking him at his word that he dropped his phone in the lake.

5          THE COURT:  We have the same issue here.  A lot of

6   texts have been retrieved from others.  I think the number

7   is, like, 8,866.

8      But your main complaint is against Hunters Capital, which

9   has got the largest claim in the case, and Richmond Label; is

10  that where we are?

11         MR. CRAMER:  Yes, Your Honor, that's right.

12         THE COURT:  All right.  Thank you.

13     Let's hear from Mr. Calfo.

14         MR. CALFO:  Thank you, Your Honor.  Your Honor, the

15  City takes a cynical path here to defend its own egregious

16  destruction of evidence, and that is to go after the victims

17  and people that it caused harm to.  And I will --

18         THE COURT:  Let's just talk about your clients, and

19  they were under a litigation hold, just like the City.

20         MR. CALFO:  Well, it's very different, Your Honor.  I

21  think what we've got here are three lost phones and some

22  Signal messages that were not retained.  That's what we've

23  got.  And we've got one person who, as you said,

24  periodically -- well, deleted every text that he ever got.

25  That's what we've got.  This is not a big deal.  This wasn't

1  perfect.  We're not going to claim perfection, but it's

2  nothing like what we just heard.

3       And the thing that really bothers me as I listen to the

4  City's lawyer talk is the outright misrepresentations about

5  the prejudice, and I want to talk about those in my

6  10 minutes, Your Honor.  Because when the City filed its

7  motion, one of the big points it made is that our client,

8  Jill Cronauer, at Hunters Capital, destroyed four

9  documents -- destroyed documents -- and this is outrageous,

10 and it shows how horrible it was.  Well, they didn't even do

11 any investigation into that, and we found out during the

12 briefing that, those four documents, three of them were not,

13 in fact, destroyed, and one of them wasn't even in the time

14 frame requested by the City.

15      Now, then, I just heard Mr. Cramer say that our client,

16 Lonnie Bergman (sic), testified that he texted all of his

17 employees about everything that was going on in CHOP.  Your

18 Honor, that's a misrepresentation of the evidence.  What he

19 said in his testimony -- and this is --

20           THE COURT:  And that's Lonnie Thompson, is it, or --

21           MR. CALFO:  Lonnie Thompson, Your Honor.  What he

22 said in his testimony is that he would text about what was

23 happening right there, and then, when asked to explain, he

24 said, "No, the only texting that would have been done would

25 have been, 'Don't bother coming to the shop, I'll get this to

1  you this way' or 'Coast is clear, things are looking good,'

2  kind of thing."  "But it wouldn't be of any relevance.  Would

3  have been, 'Shop's open, don't worry about it,' kind of

4  thing."

5      And yet, the City is basing -- I mean, it took the time

6  during its 10 minutes to argue that this is evidence of

7  prejudice to them, and that kind of thing sort of boils my

8  blood.  That's not it, Your Honor.  That's not it.

9          THE COURT:  Mr. Calfo, you've been in my court many

10  times, and your blood normally boils.

11          MR. CALFO:  Well, this is -- as you can see, I'm

12  boiling right now at a higher level.

13      Here, we've got -- the other one here, John McDermott, at

14  Car Tender, Your Honor, they say he stopped -- he testified

15  he stopped using Signal in November 20th, 2020.

16          THE COURT:  I don't need to hear about the Signal

17  plaintiffs, but Hunters Capital is a major plaintiff here.

18          MR. CALFO:  Yes.

19          THE COURT:  And Mr. Malone doesn't seem -- well, his

20  texts are gone, aren't they?

21          MR. CALFO:  His texts are gone, Your Honor.

22          THE COURT:  None before March 26th of '21.

23          MR. CALFO:  Right.  And if we could have gotten his

24  phone back, we could have done an analysis of the phone, but

25  it was lost.  I mean, it was just completely inadvertent, and

1    what can we say?  Frankly, if they want to ask Mr. Malone

2    about his phone at trial, go right ahead.  I mean, this isn't

3    going to make an impact.

4        If they want to talk to Mr. Donner about the fact that he

5    deleted his texts -- and what he said is, "I sent friends and

6    family texts about the news articles that were going on in

7    CHOP."  That's what he testified to.  The jury can hear that.

8    Those are the two most egregious examples of what they call

9    spoliation.  Let the jury hear it.  I don't care.  The other

10   stuff is ridiculous.

11        THE COURT:  So you are conceding the motion?  I

12   should grant it; is that what you are saying?

13        MR. CALFO:  No, I'm not, Your Honor.  I'm saying, if

14   you think it's important to the truth, to get to the truth,

15   the fact that these people deleted the texts or the phone was

16   lost, fine.  But that pales -- you know, let's face it.  I

17   mean, that's sort of like a David and Goliath type evidence

18   situation we've got here, when we've put in evidence, if we

19   have to -- we don't think we should have to -- about what the

20   City did here.

21        Your Honor, I do think it's important that I point out

22   something, because it goes to this issue of being straight

23   with the Court.  Mr. Cramer told you that an IT person at the

24   City testified that Jenny Durkan told him that her phone went

25   into the water.  That's not true.  At Exhibit 3, page 58 --

1          THE COURT:  Just a moment.  Exhibit --

2          MR. CALFO:  Exhibit 3 of my declaration, page 58.

3          MR. WEAVER:  I think it's Shane's declaration.

4          MR. CALFO:  Shane's declaration, Your Honor, I

5     apologize.  He testifies -- Shane Cramer's declaration.  He

6     testifies that he heard something like that, "but I don't

7     remember.  I don't remember that being told to me."

8         That's very different than getting up here and saying,

9     "Mr. Calfo's wrong, I did tell people at the time -- that

10    Jenny Durkan did tell people at the time that there was an

11    incident with the phone."

12        The fact of the matter is, her emails don't mention

13    anything about the phone going in the water, and she never

14    told any of the other people that she communicated with about

15    the phone that it went into the water.

16        So, Your Honor, we don't have to talk about the Signal

17    messages.  That's a large portion of what we had to hear

18    about in the spoliation motion.  We do know that -- with

19    respect to Hunters Capital, we do know that Mr. Malone's

20    phone was lost and we can't get ahold of those texts, but

21    what we also know is that Mr. Malone testified that when he

22    talked about business when it came to CHOP, he emailed or

23    texted Jill Cronauer and Mike Oaksmith, who were the two

24    operational people at the company.  We've produced hundreds

25    of texts and emails between Mike Malone, Jill Cronauer, and

1   Mike Oaksmith.

2       And I would say, like, Mike Malone is kind of akin to the

3   Mayor, and Jill Cronauer could be the chief of police, and

4   Mike Oaksmith could be the fire chief, and in my case, the

5   City has all the texts between the three decision-makers,

6   right?  In the City's case, we don't got nothing when it

7   comes to texts between those people.

8                THE COURT:  We're finished talking about the other --

9                MR. CALFO:  But my point, Your Honor, is it's a very

10  different -- my point is it's a very different type of

11  spoliation, where, here, my three -- the three leaders of the

12  organization at Hunters Capital, we do have the texts, and I

13  think that goes to the issue of whether or not there's been

14  spoliation.

15      Your Honor, I want to point out that we have eight

16  plaintiffs that have no text issues at all, no spoliation

17  issues at all.  You know, obviously, at trial, I think it's

18  important to be careful about what we're going to let in

19  about the spoliation of some plaintiffs and not others,

20  because it could improperly affect the non-spoliator cases.

21      But, in the end, I think what we've got, as I said, Your

22  Honor, is not intentional spoliation.  We don't have an

23  intent to deprive.  We may have an inadvertent loss of

24  information, and the best example of there not being any real

25  impact is the failure of the City to actually point out

1  evidence of prejudice that's consistent with the record and

2  the failure of the City to really rebut the fact that, with

3  respect to the information that they do have from the

4  clients, they have the information that they need and are not

5  prejudiced by the loss of information.

6       So there's no intent to deprive, and there's no prejudice,

7  and we ask that the Court deny the motion.

8            THE COURT:  Thank you.

9       All right.  I'm going to take the matter -- you want to be

10  heard on the one thing you got called out on?

11           MR. CRAMER:  I would love to, if that's okay.  I

12  would just love -- may I just read the next question in the

13  deposition transcript?

14           THE COURT:  Tell me where you are so I can look at

15  it.

16           MR. CRAMER:  It's page 58 of Exhibit 3 to my

17  declaration --

18           THE COURT:  Do we have that?

19           MR. CRAMER:  -- on spoliation.

20           THE COURT:  We're at page 58 of the deposition; is

21  that right?

22           MR. CRAMER:  Yes.  And the important part is the last

23  sentence there where -- Mr. Calfo left off where he said, "I

24  don't remember the incident."

25       Then, we followed up:  "And who -- what is the basis of

1   your vague memory?  Who did you hear that from?"

2       Answer:  "See, I don't -- I don't remember.  I mean,

3   this -- this was almost two years ago."

4       The deposition, I believe, was taken in June-ish of this

5   year, and two years ago would be July, when it fell in the

6   water.

7           THE COURT:  Well, you've got to read all of it, don't

8   you, because it goes on.  So it goes on to say:  "See, I

9   don't remember.  It was two years ago for that.  I'm just

10  having trouble remembering the details of that particular

11  crashed phone."

12      Question:  "Do you believe that that is a true explanation

13  of what happened?"

14      "Objection."

15      The answer:  "Yeah, if -- if that's what they report, I

16  would, you know -- I would believe that personally."

17      So he doesn't have any personal knowledge.  He's believing

18  something he heard from someone else.

19          MR. CRAMER:  To -- I agree.

20          THE COURT:  I don't know that that is very helpful to

21  anybody.  All right.

22          MR. CRAMER:  Agree, Your Honor.

23          THE COURT:  Thank you.  We'll, not surprisingly, take

24  all of these motions under advisement, and we'll issue orders

25  when we can.

1      Happy holidays to all of you.

2      Mr. Harrigan, you've been very quiet this morning, but

3   it's nice, always, to have you in my court.

4          MR. HARRIGAN:  Thank you.  Pleasure to be here.

5          THE COURT:  All right.  Have a nice day, folks.

6   Thank you.

7                    (Adjourned.)

8

9

10

11

12                C E R T I F I C A T E

13

14

15      I certify that the foregoing is a correct transcript from

16   the record of proceedings in the above-entitled matter.

17

18

19

20   */s/ Sheri Schelbert*

21   SHERI SCHELBERT
     COURT REPORTER

22

23

24

25