1

2

3

4          UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
5                   AT SEATTLE

6   HUNTERS CAPITAL, LLC; HUNTERS
    PROPERTY HOLDINGS, LLC; GREENUS
7   BUILDING, INC.; SRJ ENTERPRISES d/b/a
    CAR TENDER; THE RICHMARK
8   COMPANY d/b/a RICHMARK LABEL;
    ONYX HOMEOWNERS ASSOCIATION;
9   WADE BILLER; MADRONA REAL
    ESTATE SERVICES LLC; MADRONA
10  REAL ESTATE INVESTORS IV LLC;
    MADRONA REAL ESTATE INVESTORS
11  VI LLC; 12TH AND PIKE ASSOCIATES           C20-0983 TSZ
    LLC; REDSIDE PARTNERS LLC; OLIVE
12  ST APARTMENTS LLC; BERGMAN'S              ORDER
    LOCK AND KEY SERVICES LLC;
13  MATTHEW PLOSZAJ; SWAY AND CAKE
    LLC; and SHUFFLE LLC d/b/a CURE
14  COCKTAIL,

15                      Plaintiffs,

16      v.

17  CITY OF SEATTLE,

18                      Defendant.

19       THIS MATTER comes before the Court on a motion for summary judgment,

20  docket no. 111, filed by defendant City of Seattle (the "City").  Having reviewed all

21  papers filed in support of, and in opposition to, the motion, and having considered the

22  oral arguments of counsel, the Court enters the following Order.

23

ORDER - 1

**Background**

This lawsuit arises from the City's alleged "support, encouragement, and endorsement" of the Capitol Hill Occupied Protest ("CHOP") from June 8, 2020, until July 1, 2020.  *See* Third Amended Complaint ("TAC") at ¶¶ 10, 36, 52 (docket no. 47). Plaintiffs are local property owners, businesses, and residents who allege that the City's response to CHOP violated their legal rights.  The City considered CHOP as occurring within the approximately 16-block area in Seattle's Capitol Hill neighborhood bounded by East Denny Way (to the north), Thirteenth Avenue (to the east), East Pike Street (to the south), and Broadway (to the west).  Weaver Decl. at ¶ 46 (docket no. 125); Executive Order 2020-08, Ex. 7 to Weaver Decl. (docket no. 125-7).

**1.      CHOP's Formation**

Following George Floyd's murder by Minneapolis police, Seattle, like many cities across the country, experienced a combination of peaceful and destructive protests.  *See* Evan Bush et al., *Sparked by Death of George Floyd, Seattle Protesters Clash with Police*, SEATTLE TIMES, May 29, 2020, Ex. 1 to Cramer Decl. (docket no. 112-1).  In the evening hours of May 29, 2020, a demonstration that began in Seattle's Chinatown-International District turned violent when some protesters "wound through downtown streets, smashing windows and hurling debris and fireworks at [Seattle Police Department ("SPD")] officers."  *Id.*; Durkan Dep. at 97:1–98:5, Ex. 3 to Cramer Decl. (docket no. 112-3) (explaining that the City experienced "thousands of peaceful protesters" and "incredibly destructive anti-government actions").

ORDER - 2

1      On May 30, 2020, in response to the protests, the mayor of Seattle at the time,

2  Jenny Durkan, proclaimed a state of civil emergency premised on large numbers of

3  protesters which presented "an unacceptably high risk of serious injury to innocent

4  people including lawful protesters and police, as well as significant property damage."

5  Mayoral Proclamation of Civ. Emergency, Ex. 5 to Cramer Decl. (docket no. 112-5).  In

6  the following days, protesters began to focus their activity around Cal Anderson Park and

7  SPD's East Precinct in the Capitol Hill neighborhood, resulting in a significant number of

8  "clashes" between police and protesters near the East Precinct.[1]  Mahaffey Dep. at 74:3–

9  6, Ex. 6 to Cramer Decl. (docket no. 112-6); Durkan Dep. at 96:21–25 (docket no. 112-

10  3); Scoggins Dep. at 129:19–130:2, Ex. 4 to Cramer Decl. (docket no. 112-4).



18  App. A to Def.'s Mot. (docket no. 111) (showing the location of Plaintiffs' properties and

19  the East Precinct).  On June 7, 2020, the Federal Bureau of Investigation informed the

21  _____

[1] The East Precinct is located at 1519 12th Avenue in Seattle's Capitol Hill neighborhood and became a
focus of protesters' activities following the May 30, 2020, proclamation.  *See* Mahaffey Dep. at 73:20–
74:10, Ex. 6 to Cramer Decl. (docket no. 112-6).

1   City of a threat to set fire to the East Precinct.  Scoggins Dep. at 133:2–20 (docket

2   no. 112-4); Durkan Dep. at 104:25–105:9 (docket no. 112-3); Best Dep. at 62:8–63:15,

3   Ex. 9 to Cramer Decl. (docket no. 112-9).  On June 8, 2020, in an attempt to deescalate

4   the situation and prevent further confrontation between police and protesters, SPD

5   evacuated all personnel from the East Precinct.  Mahaffey Dep. at 73:7–75:5 (docket

6   no. 112-6).  SPD personnel intended to return to the building later that day or the

7   following morning.  *Id.* at 84:9–18.

8            After SPD left the East Precinct, protesters surrounded the building and began to

9   barricade the area using items such as nearby dumpsters, bleachers from Cal Anderson

10  Park, and metal fencing that SPD had left behind.  *Id.* at 84:22–85:4; Zimbabwe Dep. at

11  16:2–17:10, Ex. 5 to Weaver Decl. (docket no. 125-5).  In addition to these makeshift

12  barriers, SPD officers encountered armed protesters when they attempted to reenter the

13  East Precinct the next day.  Mahaffey Dep. at 15:10–20 (docket no. 112-6).  Some

14  protesters declared the area around the East Precinct to be an "autonomous zone," *id.* at

15  90:11–16, and resisted efforts by the Seattle Department of Transportation ("SDOT") to

16  remove the barriers, Zimbabwe Dep. at 32:8–21, Ex. 10 to Cramer Decl. (docket no. 112-

17  10).  Initially called the Capitol Hill Autonomous Zone ("CHAZ"), the area was later

18  referred to as CHOP.  *See* Best Dep. at 33:12–35:1, Ex. 6 to Weaver Decl. (docket

19  no. 125-6).

20  **2.      The City's Response to CHOP**

21           During the CHOP period (June 8 – July 1, 2020), City officials, including Seattle

22  Fire Department ("SFD") Chief Harold Scoggins, SDOT Director Samuel Zimbabwe,

23

and Seattle Public Utilities ("SPU") General Manager Mami Hara, visited the area daily.

Scoggins Dep. at 141:2–5, Ex. 8 to Weaver Decl. (docket no. 125-8); Zimbabwe Dep. at

214:16–215:3 (docket no. 125-5); Hara Dep. at 94:6–95:8, Ex. 9 to Weaver Decl. (docket

no. 125-9).  Mayor Durkan and members of her staff also visited the area multiple times

between June 8 and July 1, 2020.  *See* Durkan Dep. at 92:22–93:9, Ex. 10 to Weaver

Decl. (docket no. 125-10).  According to Mayor Durkan, "everyone's goal from the

beginning was to reduce the number of barriers, to reduce the profile of the area where

people were in the protests, and to provide access to that area for businesses, for

residents, for first responders and the like."  Durkan Dep. at 39:5–9 (docket no. 112-3).

The City's goal was "to de-escalate the situation" and "balance the public interest

of . . . protecting business and residents[,] . . . protecting the First Amendment rights of

people[,] protecting the first responders, and do it all during a global pandemic."  *Id.* at

57:16–20.  The City also desired to maintain "the existing footprint of peaceful

demonstration and rights."  Ex. 14 to Weaver Decl. (docket no. 125-14).

On June 10, 2020, SDOT revised traffic patterns around the East Precinct so that

City services could access buildings in the affected area.  *See* Ex. 11 to Cramer Decl.

(docket no. 112-11); Ex. 12 to Cramer Decl. (docket no. 112-12).  SDOT also worked to

develop a traffic control plan "that would meet all of the City's and the adjacent property

owners' needs for services and property access."  Zimbabwe Dep. at 34:1–8 (docket

no. 112-10).  Some streets near the East Precinct and Cal Anderson Park, however,

remained closed to vehicular traffic between June 8 and July 1, 2020.  *See id.* at 36:11–18

(explaining that East Pine Street remained closed between 10th and 11th Avenues for the

duration of CHOP).  To maintain separation between vehicles and protesters, SDOT

placed between 50 and 100 concrete ecology blocks along the streets and sidewalks.[2]  *Id.*

at 37:4–10.  SDOT also installed plywood covers over the ecology blocks to provide a

"canvas" for protesters' art and prevent protesters from tampering with the metal rings

used to lift the blocks.  Zimbabwe Dep. at 47:1–48:20 (docket no. 125-5).



Ex. 40 to Weaver Decl. (docket no. 125-40) (showing the placement of some SDOT

ecology blocks in the area).  SDOT designated some streets as "Local Access Only" to

further limit the "opportunity for vehicle and pedestrian conflict."  Zimbabwe Dep. at

37:11–40:12 (docket no. 125-5).

---

[2] Ecology blocks are typically "two feet tall, three feet long, and two feet deep" and weigh "multiple hundred pounds."  Zimbabwe Dep. at 15:3–12 (docket no. 125-5).

1      Many protesters camped in the CHOP area and some even established a

2  community garden in Cal Anderson Park.  Ex. 21 to Weaver Decl. (docket no. 125-21);

3  Furuto Dep. at 50:1–52:8, Ex. 27 to Weaver Decl. (docket no. 125-27).



13  TAC at ¶ 52 (showing tents and gardens in Cal Anderson Park).  As of June 24, 2020, the

14  City observed approximately 150 tents in the CHOP area.  Sixkiller Dep. at 188:5–189:8,

15  Ex. 4 to Weaver Decl. (docket no. 125-4).  Given the large number of people

16  congregating in Cal Anderson Park, the City operated playfield lights beyond their

17  normal hours.  Hara Dep. at 67:4–68:2 (docket no. 125-9) (explaining that the playfield

18  lights were left on for "safety reasons"); *see also* Zimbabwe Dep. at 74:2–12 (docket

19  no. 125-5) (describing the area as a "party environment" in the evenings).

1        Because "hundreds, if not thousands of people" continued to protest in Cal

2   Anderson Park, SPU placed approximately 21 portable toilets in the area.[3]  Hara Dep. at

3   68:20–69:19, 70:7–20, Ex. 15 to Cramer Decl. (docket no. 112-15).  Some City officials

4   were concerned that providing portable toilets for public use would encourage protesters

5   to remain in and around Cal Anderson Park.  Sixkiller Dep. at 145:17–147:2 (docket

6   no. 125-4); Zimbabwe Dep. at 166:2–8 (docket no. 125-5).  To prevent the spread of

7   diseases, such as COVID, the City also provided handwashing stations to the protesters.

8   *See* Durkan Dep. at 199:1–4 (docket no. 112-3) ("[H]aving the ability both to have places

9   for people to go to the bathroom and places for them to wash their hands was a really

10  important public health requirement during that period of time.").  SPU also collected

11  garbage in the area and provided multiple dumpsters for public use.  Hara Dep. at 26:10–

12  20, 27:10–22, 32:22–33:8 (docket no. 112-15).

13       To avoid further confrontation with protesters, SPD and SFD designated the area

14  around Cal Anderson Park and the East Precinct as a "Red Zone" on or about June 12,

15  2020, and changed their respective response protocols.[4]  *See* Scoggins Dep. at 76:19–23,

16  77:7–22 (docket no. 112-4); Ex. 18 to Cramer Decl. (docket no. 112-18 at 13); Ex. 19 to

17  Cramer Decl. (docket no. 112-19); Best Dep. at 24:13–23 (docket no. 112-6).  SFD

18  would not enter the Red Zone without a police escort, Scoggins Dep. at 77:7–22 (docket

19

20  ─────────────────────

21  [3] The public bathroom in Cal Anderson Park was out of service during CHOP.  Hara Dep. at 68:20–69:19 (docket no. 112-15).

22  [4] A visual representation of SPD's Red Zone can be seen in the map on page 3 of this Order.

23

1   no. 112-4), and SPD would enter the Red Zone only under limited circumstances, Ex. 3

2   to Weaver Decl. (docket no. 125-3 at 3).  Specifically, SPD personnel would respond to

3   calls for service within the Red Zone only to address "mass casualty" events or "critical

4   life safety" emergencies such as active shooter incidents and structural fires likely to

5   endanger human life.  *See id.*; Mahaffey Dep. at 26:1–27:15 (docket no. 112-6).  For

6   other service calls within the Red Zone, the City directed communications section

7   personnel to coordinate officer contact outside the zone.  Ex. 3 to Weaver Decl. (docket

8   no. 125-3 at 3).  SFD also provided "volunteer medical staff" in the area with portable

9   stretchers to move those in need of aid outside the Red Zone.  Ex. 39 to Weaver Decl.

10  (docket no. 125-39); Scoggins Dep. at 9:6–23 (docket no. 125-8).

11        Some property owners, businesses, and residents in the area reported increased

12  graffiti, property damage, excessive noise, and repeated intimidation by protesters.  *See*,

13  *e.g.*, Wells Dep. at 129:2–131:16, Ex. 11 to Weaver Decl. (docket no. 125-11); Ploszaj

14  Decl. at ¶ 13 (docket no. 136); Wanagel Decl. at ¶¶ 4–5 (docket no. 130); Cronauer Decl.

15  at ¶ 12 (docket no. 134); Thompson Decl. at ¶ 7 (docket no. 135).  Some property

16  owners, businesses, and residents also experienced difficulty accessing their respective

17  properties, businesses, and homes.

 

1  TAC at ¶ 45 (showing graffiti in the area).

2        In response to deteriorating conditions in the area and multiple instances of gun

3  violence, including two fatal shootings, the City closed Cal Anderson Park on June 30,

4  2020, and began clearing the area the following day.  *See* Executive Order 2020-08, Ex. 7

5  to Weaver Decl. (docket no. 125-7).  The Executive Order ending CHOP recognized that

6  the City had "reasonably facilitated" the exercise of First Amendment rights by

7  "[p]roviding basic hygiene, water, litter and garbage removal, and electricity,"

8  "[t]emporarily allowing obstructions of public parks, streets, and sidewalks," and

9  "modifying streets and pedestrian access routes."  *Id.*

10  **3.     Plaintiffs' Claims**

11        Plaintiffs Hunters Capital, LLC ("Hunters Capital"), Hunters Property Holdings,

12  LLC ("Hunters Property Holdings"), Greenus Building, Inc. ("Greenus Building"), SRJ

13  Enterprises d/b/a Car Tender ("Car Tender"), the Richmark Company d/b/a Richmark

14  Label ("Richmark Label"), Onyx Homeowners Association ("Onyx HOA"), Wade Biller,

15  Madrona Real Estate Services LLC ("Madrona Real Estate Services"), Madrona Real

16  Estate Investors IV LLC ("Madrona Investors IV"), Madrona Real Estate Investors VI

17  LLC ("Madrona Investors VI"), 12th and Pike Associates LLC ("12th and Pike

18  Associates"), Redside Partners LLC ("Redside Partners"), Olive St Apartments LLC

19  ("Olive St Apartments"), Bergman's Lock and Key Services LLC ("Bergman's Lock and

20  Key"), Matthew Ploszaj, Sway and Cake LLC ("Sway and Cake"), and Shuffle LLC

21

22

23

1  d/b/a Cure Cocktail ("Cure Cocktail") (collectively "Plaintiffs")[5] assert five causes of

2  action against the City for allegedly facilitating CHOP.  Plaintiffs bring claims for:

3  (i) violation of procedural due process, TAC at ¶¶ 188–96, (ii) violation of substantive

4  due process, *id.* at ¶¶ 197–202, (iii) unlawful taking, *id.* at ¶¶ 203–08, (iv) negligence, *id.*

5  at ¶¶ 209–15, and (v) nuisance, *id.* at ¶¶ 216–22.[6]  During the CHOP period (June 8 –

6  July 1, 2020), Plaintiffs allege that the constitutional and other legal rights of businesses,

7  employees, and residents in and around the CHOP area were violated, and that these

8  entities were subject to "extensive property damages, public safety dangers, and an

9  inability to use and access their properties."  TAC at ¶ 2.  Under Federal Rule of Civil

10  Procedure 56, the City now moves for summary judgment on all of Plaintiffs' claims.

11  **Discussion**

12  **1.     Summary Judgment Standard**

13         The Court shall grant summary judgment if no genuine issue of material fact exists

14  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

15  The moving party bears the initial burden of demonstrating the absence of a genuine issue

16  of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if

17

18

19  [5] Hunters Capital, Hunters Property Holdings, and the Greenus Building are referred to collectively as the "Hunters Capital entities."  Madrona Real Estate Services, Madrona Investors IV, Madrona Investors VI, and 12th and Pike Associates are referred to collectively as the "Madrona entities."

20
21  [6] Plaintiffs previously sought class certification for the property owners, business owners, and residents in the area bounded by East Denny Way, Thirteenth Avenue, East Pike Street, and Broadway.  The Court denied class certification in this action because the particular issues Plaintiffs desired to certify did not satisfy the commonality and typicality requirements of Federal Rules of Civil Procedure 23(a)(2) and (3), or the predominance and superiority requirements of Rule 23(b)(3).  *See* Order (docket no. 96).

22

23

ORDER - 11

1   it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty*

2   *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the

3   adverse party must present affirmative evidence, which "is to be believed" and from

4   which all "justifiable inferences" are to be favorably drawn.  *Id.* at 255, 257.  When the

5   record, however, taken as a whole, could not lead a rational trier of fact to find for the

6   non-moving party, summary judgment is warranted.  *See Beard v. Banks*, 548 U.S. 521,

7   529 (2006) ("Rule 56 'mandates the entry of summary judgment, after adequate time for

8   discovery and upon motion, against a party who fails to make a showing sufficient to

9   establish the existence of an element essential to that party's case, and on which that

10  party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

11  **2.      First and Second Causes of Action:  Due Process**

12          The Fourteenth Amendment to the United States Constitution "protects individuals

13  against the deprivation of liberty or property by the government without due process."

14  *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993); U.S. Const.

15  amend XIV.  The Due Process Clause does not create substantive rights in property.

16  Rather, the property rights are determined by reference to state law.  Plaintiffs allege in

17  this case that the City caused them a deprivation of liberty and property rights under

18  Washington law, and they make their due process claims under 42 U.S.C. § 1983 and the

19  United States Constitution.  Plaintiffs seek recovery under both the (a) procedural and

20  (b) substantive components of the Due Process Clause.

21

22

23

1

### a.   Procedural Due Process

2    Plaintiffs' first cause of action relates to an alleged violation of procedural due

3 process.  Plaintiffs claim that the City violated their procedural due process rights by

4 depriving them of constitutionally protected interests without first providing them notice

5 or an opportunity to be heard.  TAC at ¶¶ 188–96.  Plaintiffs contend that the City

6 infringed on their constitutionally protected interests in the "right of free movement and

7 the right to remain in a public place of one's choosing" by granting "*de facto* autonomy

8 over the CHOP area" to the protesters.  TAC at ¶¶ 191–92.

9    To prevail on a procedural due process claim, a § 1983 plaintiff must establish

10 (i) "a liberty or property interest protected by the Constitution," (ii) "a deprivation of the

11 interest by the government," and (iii) "lack of process."  *Portman*, 995 F.2d at 904.  The

12 City argues that Plaintiffs' procedural due process claim fails because the conduct they

13 challenge, an executive policy implemented in response to protests throughout the

14 Capitol Hill neighborhood, is not "the type of government action to which due process

15 applies."  *See Harris v. County of Riverside*, 904 F.2d 497, 501 (9th Cir. 1990).  Indeed,

16 "[w]here a rule of conduct applies to more than a few people, it is impracticable that

17 everyone should have a direct voice in its adoption."  *Bi-Metallic Inv. Co. v. State Bd. of

18 Equalization*, 239 U.S. 441, 445 (1915).

19    In *Harris*, for example, a county zoning change affected only plaintiff and the

20 adjacent landowner.  904 F.2d at 502.  The Ninth Circuit explained that procedural due

21 process was required because the county "specifically targeted" plaintiff's property.  *Id.*

22 (explaining that the zoning change "concerned a relatively small number of persons").  In

23

contrast, in *Halverson v. Skagit County*, 42 F.3d 1257, 1258 (9th Cir. 1994), the Ninth

Circuit recognized "that governmental decisions which affect large areas and are not

directed at one or a few individuals do not give rise to the constitutional procedural due

process requirements of individual notice and hearing; general notice as provided by law

is sufficient." *Id.* at 1261; *see also Flint v. County of Kauai*, 521 F. Supp. 3d 978, 994

(D. Haw. 2021) (finding no procedural due process violation when county enacted an

"emergency rule" temporarily limiting access to a particular area which had been

damaged by flooding).

In this case, Plaintiffs have not provided any evidence showing that they were

specifically targeted by the City's conduct in response to CHOP.  Although Plaintiffs

estimate that the CHOP area (bounded by East Denny Way, Thirteenth Avenue, East Pike

Street, and Broadway) comprises only 0.094% of the City's total physical area and 0.54%

of the City's population, Weaver Decl. at ¶¶ 46–47 (docket no. 125), Plaintiffs do not

dispute that thousands of people lived in the CHOP area in 2020, *id.* at ¶ 47.  Despite

Plaintiffs' argument that the City's actions in response to CHOP affected a small, easily

identifiable group, some plaintiffs, such as the Hunters Capital and Madrona entities,

claim damages for buildings several blocks away from the CHOP area.  *See* App. A to

Def.'s Mot. (docket no. 111).  The record demonstrates that the City's executive actions

in response to CHOP do not give rise to the constitutional requirements of individual

hearing and notice because the actions were of general applicability and not directed at

one or a few individuals or businesses.[7]  Accordingly, the City's motion for summary

judgment is GRANTED as it relates to Plaintiffs' procedural due process claim and

Plaintiffs' first cause of action is DISMISSED with prejudice.

### b.    Substantive Due Process

Plaintiffs' second cause of action alleges a violation of the Due Process Clause's

substantive component.  Substantive due process prohibits "certain arbitrary, wrongful

government actions 'regardless of the fairness of the procedures used to implement

them.'"  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citation omitted).  The right to

substantive due process protects individuals from arbitrary and irrational government

interference with their property rights.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528,

544 (2005).  Plaintiffs contend that they have a right "to be protected from state-created

dangers" and the City's assistance and encouragement of CHOP "greatly increased the

likelihood of property damage, loss of business revenue and rental income, personal

injury, loss of use of property, and other damages."  TAC at ¶¶ 198–99.  Importantly,

however, "nothing in the language of the Due Process Clause itself requires the State to

protect the life, liberty, and property of its citizens against invasion by private actors."

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  Rather,

---

[7] The parties agree that the City's CHOP-related actions were executive and not legislative acts. Nevertheless, the distinction between legislative and executive action does not demand a different result in this matter.  *See Calm Ventures LLC v. Newsom*, 548 F. Supp. 3d 966, 982–83 (C.D. Cal. 2021) (finding that the California Governor's COVID-related executive orders were "precisely the types of government action permitted in response" to a public health emergency and were of general applicability).

1  the Due Process Clause "is a limitation on state action and is not a 'guarantee of certain

2  minimal levels of safety and security.'" *Martinez v. City of Clovis*, 943 F.3d 1260, 1271

3  (9th Cir. 2019) (quoting *DeShaney*, 489 U.S. at 195). The government's mere failure "to

4  prevent acts of a private party is insufficient to establish liability." *Id.*; *see also Patel v.*

5  *Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011).

6      Plaintiffs rely solely on one exception to this general rule, the "state-created

7  danger" exception. *See* Pls.' Resp. (docket no. 124 at 25–31). Under the state-created

8  danger exception, the government is liable on a substantive due process claim when it

9  "affirmatively places" a plaintiff in danger by acting with "deliberate indifference" to a

10 "known or obvious danger." *Martinez*, 943 F.3d at 1271 (citing *Patel*, 648 F.3d at 971–

11 72). To prevail under this exception, Plaintiffs must show (i) the City's affirmative

12 actions created or exposed them to an actual, particularized danger that they would not

13 otherwise have faced, (ii) they suffered a foreseeable injury, and (iii) the City was

14 deliberately indifferent to the known danger. *See id.* For the reasons discussed below,

15 Plaintiffs fail to make this showing.

16         **i.      Actual, Particularized Danger**

17      Plaintiffs allege that the City's action, assistance, endorsement, and

18 encouragement of CHOP exposed them to the dangers of "property damage, loss of

19 business revenue and rental income, personal injury, and loss of use of property." TAC

20 at ¶ 199. In determining whether the City exposed Plaintiffs to an actual, particularized

21 danger they would not have otherwise faced, the Court considers "whether [the City] left

22 [Plaintiffs] in a situation that was more dangerous than the one in which [the City] found

23

[them]." *See Martinez*, 943 F.3d at 1271 (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)).  For example, in *Munger*, police officers left a man in a more dangerous position than the one in which they found him when they ejected him from a bar, wearing only jeans and a t-shirt, into subfreezing winter weather, where he later died of hypothermia.  227 F.3d at 1085, 1087.  Similarly, in *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989), a state trooper placed a woman in a position of danger when he impounded the vehicle in which she was a passenger and abandoned her in a high-crime area where she was subsequently raped.

In contrast, in *Johnson v. City of Seattle*, 474 F.3d 634, 637 (9th Cir. 2007), defendant police officers did not expose plaintiffs to a danger they would otherwise not have faced.  There, plaintiffs were injured in a large crowd during a Mardi Gras celebration in Seattle that turned violent.  *Id.* at 636–37.  The Ninth Circuit concluded that the stated-created danger exception did not apply because plaintiffs had not shown that defendants "engaged in affirmative conduct that enhanced the dangers [plaintiffs] exposed themselves to by participating" in the celebration.  *Id.* at 641.  The *Johnson* Court explained that the City's decision during the Mardi Gras celebration to switch from an aggressive to a passive operational plan did not place plaintiffs "in any worse position than they would have been in had the police not come up with any operational plan whatsoever."  *Id.*

*White v. City of Minneapolis*, No. 21-cv-0371, 2021 WL 5964554 (D. Min. Dec. 16, 2021) is also instructive.  There, residents and business owners in Minneapolis's Third Precinct alleged that municipal defendants failed to sufficiently deploy law

1    enforcement personnel in response to large protests following George Floyd's murder,

2    resulting in significant property damage and civil unrest.  *Id.* at *1.  The district court

3    granted judgment on the pleadings in favor of defendants, explaining that plaintiffs had

4    failed to plausibly establish that they were members of a "limited, precisely definable

5    group."[8]  *Id.* at *6.  The district court in *White* concluded that a group consisting of

6    "residents and business owners in the Third Precinct" was "fairly understood to be the

7    general public," *id.*, however, the "general public is not a limited, precisely definable

8    group" for the purposes of the state-created danger exception, *id.* (quoting *Glasgow v.*

9    *Nebraska*, 819 F.3d 436, 442 (8th Cir. 2016)).

10          In this case, Plaintiffs have produced no evidence that the City exposed them to

11    any actual danger they would not have otherwise faced.  The City's decision to provide

12    sanitation services, *see* Hara Dep. at 26:10–20, 27:10–22, 32:22–33:8, 70:7–20 (docket

13    no. 112-15); Durkan Dep. at 199:1–4 (docket no. 112-3), and establish a traffic plan in

14    the area, *see* Zimbabwe Dep. at 34:1–8 (docket no. 112-10), did not place Plaintiffs in a

15    more dangerous situation than they would have faced had the City not intervened.

16    Indeed, the record demonstrates that police and protesters in the area engaged in violent

17    "nightly clashes" immediately before CHOP's formation.  *See* Mahaffey Dep. at 74:3–6

18

19    _____

      [8] The Eighth Circuit employs a five-part test to determine whether the state-created danger exception

20    applies.  A plaintiff must prove (i) "that she was a member of a limited, precisely definable group,"
      (ii) "that the municipality's conduct put her at a significant risk of serious, immediate, and proximate

21    harm," (iii) "that the risk was obvious or known to the municipality," (iv) "that the municipality acted
      recklessly in conscious disregard of the risk," and (v) "that in total, the municipality's conduct shocks the

22    conscience."  *White*, 2021 WL 5964554, at *5 (quoting *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir.
      1996)).

23

      ORDER - 18

1    (docket no. 112-6); Durkan Dep. at 96:21–25 (docket no. 112-3).  Moreover, Plaintiffs

2    have presented no evidence that the danger to which the City allegedly exposed them was

3    particularized.  Ninth Circuit cases finding triable issues of state-created danger involve

4    state actors increasing the risk of harm for particular individuals.  *See Martinez*, 943 F.3d

5    at 1272; *Munger*, 227 F.3d at 1085; *Wood*, 879 F.2d at 586.  The evidence in this case

6    demonstrates that the City took affirmative actions with respect to a dynamic situation

7    occurring in Seattle's Capitol Hill neighborhood, *i.e.*, a situation affecting the general

8    public.  Plaintiffs have presented no evidence that the City's affirmative conduct created

9    or exposed them to an actual, particularized danger they would not have otherwise faced.

10           **ii.**        **Foreseeability**

11          In the context of the state-created danger exception, foreseeability "does not mean

12    that the exact injury must be foreseeable."  *Martinez*, 943 F.3d at 1273.  "Rather, 'the

13    state actor is liable for creating the foreseeable danger of injury given the particular

14    circumstances.'"  *Id.* at 1273–74 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055,

15    1064 n.5 (9th Cir. 2006)).  The state-created danger exception typically involves state

16    actors, such as law enforcement personnel, increasing the risk of harm for certain

17    individuals.  *See Martinez*, 943 F.3d at 1272; *Munger*, 227 F.3d at 1085; *Wood*, 879 F.2d

18    at 586.  Phrased differently, cases finding triable issues of state-created danger involve

19    governmental conduct that distinguishes a plaintiff from the general public.  *See Wood*,

20    870 F.2d at 590 ("The fact that [the state trooper] . . . apparently stranded [plaintiff] in a

21    high-crime area at 2:30 a.m. distinguishes [plaintiff] from the general public and triggers

22    a duty of the police to afford her some measure of peace and safety.").

23

1    Plaintiffs have presented some evidence that the City's actions in response to

2  CHOP increased criminal activity in the CHOP area.  Chief Best, for example, agreed

3  that it was "certainly foreseeable that there was increased violence and crime" and that

4  the provision of portable toilets and other services would entice individuals to stay near

5  the East Precinct and Cal Anderson Park.  *See* Best Dep. at 196:10–23, 117:15–118:1

6  (docket no. 125-6).  Mayor Durkan also expressed her thoughts concerning foreseeability

7  in an email she sent to Chiefs Best and Scoggins following the shooting death of a

8  teenager in the CHOP zone.[9]  *See* Ex. 33 to Weaver Decl. (docket no. 125-33) ("What

9  happened this am [sic] was foreseeable and avoidable.").  Thus, Plaintiffs have

10  demonstrated some factual issues regarding foreseeability.

11        **iii.        Deliberate Indifference**

12    Deliberate indifference is "a stringent standard of fault," *Patel*, 648 F.3d at 974,

13  requiring proof of a culpable mental state, *Martinez*, 943 F.3d at 1274.  Proof of gross

14  negligence is insufficient to establish deliberate indifference.  *Id.* (citing *Patel*, 648 F.3d

15  at 974).  Plaintiffs must show that the City recognized "an unreasonable risk" and

16  "actually intend[ed] to expose" Plaintiffs "to such risks without regard to the

17  consequence" to them by providing services to CHOP participants for a three-week

18  period.  *See Patel*, 648 F.3d at 974 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir.

19  1996)).  "In other words, the defendant 'knows that something *is* going to happen but

20

21  [9] The parties dispute the meaning of this email.  Mayor Durkan alleges that her statement in the email
    refers to her understanding at the time that SPD and SFD did not have a joint plan to respond to the
22  shooting, not that the shooting itself was foreseeable.  Durkan Dep. at 65:14–67:2 (docket no. 112-3).

23

ORDER - 20

ignores the risk and exposes [the plaintiff] to it.'"  *Id.* (alteration and emphasis in original,

quoting *L.W.*, 92 F.3d at 900).

Notably, this action does not fit the framework of a typical state-created danger

case, where state actors select a bad option despite the availability of better alternatives.

*See*, *e.g.*, *Munger*, 227 F.3d at 1084–85 (ejecting man from a bar into subfreezing winter

weather instead of taking him into custody); *Wood*, 870 F.2d at 590 (abandoning woman

in a dangerous area instead of ensuring her ability to get safely home).  Unlike the typical

state-created danger case, the record in the present matter shows that the City made a

conscious effort to balance multiple competing objectives for the duration of CHOP, such

as protesters' First Amendment rights, public safety in the area, and sanitation services to

combat the spread of COVID and other diseases.  *See* Durkan Dep. at 75:6–13, 199:1–4

(docket no. 112-3); Zimbabwe Dep. at 37:11–40:12 (docket no. 125-5); Hara Dep. at

26:10–20, 27:10–22, 32:22–33:8, 70:7–20 (docket no. 112-15).  Plaintiffs have presented

no evidence from which a reasonable jury could conclude that the City acted with

deliberate indifference to expose Plaintiffs to certain unreasonable risks, and actually

intended to expose them to such risks, without regard to the consequences to them.  Thus,

the City's motion for summary judgment is GRANTED as it relates to Plaintiffs'

substantive due process claim and their second cause of action is DISMISSED with

prejudice.

**3.     Third Cause of Action:  Taking**

The Takings Clause of the Fifth Amendment, which applies to local governments

through the Fourteenth Amendment, provides: "[N]or shall private property be taken for

public use, without just compensation."  U.S. CONST. amend. V.  To prove a taking, each

plaintiff must establish a protected property interest under Washington law.[10]  *See*

*Vandevere v. Lloyd*, 644 F.3d 957, 963 (9th Cir. 2011).  In this case, Plaintiffs have

limited their takings claims to two theories of liability:  (a) the City temporarily deprived

them of the right to exclude others from their properties (the *per se* taking claim); and

(b) the City temporarily deprived them of the right to access their properties (the right of

access taking claim).[11]

> **a.   *Per Se* Taking**

The right to exclude is a "fundamental element of the property right," *Kaiser*

*Aetna v. United States*, 444 U.S. 164, 179–80 (1979), and not "an empty formality,

subject to modification at the government's pleasure," *Cedar Point*, 141 S. Ct. at 2077.

Because physical invasions of property constitute "the clearest sort of taking," *Palazzolo*

*v. Rhode Island*, 533 U.S. 606, 617 (2001), the government has a "categorical duty to

compensate" a property owner when it "physically takes possession of an interest in

property for some public purpose," *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan.*

*Agency*, 535 U.S. 302, 322 (2002).  Importantly, "[a] physical appropriation is a taking

---

[10] Plaintiff Redside Partners does not oppose the City's motion for summary judgment as it relates to Redside Partners' taking claim.  Pls.' Resp. (docket no. 124 at 31 n.34).  Accordingly, the motion is GRANTED as it relates to Redside Partners' third cause of action for taking, and the cause of action is DISMISSED with prejudice.

[11] Plaintiffs conceded during oral argument that they do not allege a "regulatory taking."  A regulatory taking occurs when the government "imposes regulations that restrict an owner's ability to use his own property," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021), such as the New York City Landmarks Preservation Law at issue in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978).

ORDER - 22

1  whether it is permanent or temporary," *Cedar Point*, 141 S. Ct. at 2074, and "[t]he

2  duration of an appropriation . . . bears only on the amount of compensation," *id.*

3        The Supreme Court has recognized that the government might be liable for a

4  physical taking if it authorizes a third-party physical invasion of property.  *See Cedar*

5  *Point*, 141 S. Ct. at 2072–76.  But Plaintiffs' heavy reliance on *Cedar Point* is misplaced.

6  In *Cedar Point*, a California regulation granted union organizers the right to enter private

7  farmland.  *Id.* at 2072.  In holding that the state had effected a temporary physical taking

8  of the grower's property, the Supreme Court confirmed that "[w]henever a regulation

9  results in a physical appropriation of property, a *per se* taking has occurred."  *Id.*; *see also*

10  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (holding that

11  a statute effected a taking where it authorized a third party to install cable equipment on

12  private apartment buildings).  The government, however, cannot be held liable for a

13  taking "when whatever acts complained of" are the independent actions of private parties.

14  *Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998).

15        Here, Plaintiffs do not allege that the City itself physically invaded their

16  properties.  Rather, Plaintiffs contend that the City authorized third-party physical

17  invasions.  *See*, *e.g.*, Augustine Decl. at ¶¶ 7, 10 (docket no. 132) (explaining that

18  squatters resided in one of the Madrona entities' buildings until August or September

19  2020); Thompson Decl. at ¶¶ 7, 10 (docket no. 135) (alleging that a protester entered

20  Bergman's Lock and Key to defecate); McDermott Dep. at 226:8–248:9, Ex. 26 to

21  Weaver Decl. (docket no. 125-26) (describing how a protester unlawfully entered Car

22  Tender's property).  Plaintiffs have presented no evidence that the City expressly

23

1   authorized any of the third-party physical invasions at issue in this case.[12]  Unlike in

2   *Cedar Point* and *Loretto*, the City did not adopt a regulation or ordinance granting

3   protesters a "formal entitlement" to enter Plaintiffs' properties.  *See Cedar Point*, 141 S.

4   Ct. at 2079–80 ("Unlike a mere trespass, [California's] regulation grants a formal

5   entitlement to physically invade the growers' land.").  Accordingly, the City's motion for

6   summary judgment is GRANTED as it relates to Plaintiffs' *per se* theory of liability.

7           **b.**     **Right of Access Taking**

8          An owner's right of access to his or her property is recognized in Washington.

9   *Keiffer v. King County*, 89 Wn.2d 369, 372–73, 572 P.2d 408 (1977) ("The right of

10  access of an abutting property owner to a public right-of-way is a property right which if

11  taken or damaged for a public use requires compensation.").  To establish a taking under

12  this theory of liability, Plaintiffs must show that access to their properties was eliminated

13  or substantially impaired.  *Pande Cameron & Co. of Seattle, Inc. v. Cent. Puget Sound*

14  *Reg'l Transit Auth.*, 610 F. Supp. 2d 1288, 1303 (W.D. Wash. 2009) (citing *Keiffer*, 89

15

16  _____

17  [12] In its amicus brief, Pacific Legal Foundation ("PLF") argues that a governmental entity is liable for a taking when it "knows or should know that its actions would result in third-party damage to, or trespass against, private property."  Amicus Curiae Br. (docket no. 148-1).  In support of this proposition, PLF

18  relies on *Arkansas Game & Fish Commission v. United States*, 736 F.3d 1364 (Fed. Cir. 2013).  There, the Army Corps of Engineers temporarily increased the amount of water it released from a dam, causing flooding in a particular wildlife management area.  *Id.* at 1367–69.  Although the United States did not

19  intend to flood the wildlife management area, the Federal Circuit explained that a taking occurs if a physical invasion is the "foreseeable or predictable result" of the government's conduct.  *Id.* at 1372.

20  Notably, *Arkansas Game & Fish Commission* involves direct government action (releasing water from a dam).  The case does not address whether the government is liable for third-party physical invasions which it did not expressly authorize, and PLF has not cited any authority that would support the City's

21  liability for a *per se* taking under the circumstances in the present matter.  Similarly, Plaintiffs have not cited any cases that support their *per se* theory of taking liability, and, despite the opportunity to do so,

22  *see* Minute Order (docket no. 150), Plaintiffs did not submit any brief in response to PLF's amicus brief.

23

ORDER - 24

1    Wn.2d at 373).  In Washington, courts employ a two-step process to determine whether

2    government impairment of access requires compensation.  The first step "is to determine

3    if the government action in question has actually interfered with the right of access as that

4    property interest has been defined by" Washington law.  *Keiffer*, 89 Wn.2d at 372–73.

5    The second step is to determine whether the degree of impairment was substantial; a

6    question of fact.  *Id*. at 373–74.

7            Importantly, a right of access taking claim is not without limit.  Government

8    actions "taken pursuant to the police power for the purpose of regulating the flow of

9    traffic on the public way itself are generally not compensable."  *Id.* at 372.  Plaintiffs

10   must show "more than mere inconvenience at having to travel a further distance to [their]

11   business facilit[ies]."  *See Union Elevator & Warehouse v. State*, 96 Wash. App. 288,

12   296, 980 P.2d 779 (1999).  If "the landowner still retains an alternate mode of egress

13   from or ingress to his land, even if less convenient, generally speaking he is not deemed

14   specially damaged."  *Hoskins v. City of Kirkland*, 7 Wn. App. 957, 960–61, 503 P.2d

15   1117 (1972); *see also Pande Cameron*, 610 F. Supp. 2d at 1303–04 (holding that

16   "intermittent inconveniences" related to a tunnel construction project did not rise to the

17   level of a constitutional taking).

18           In this case, the parties do not dispute that some plaintiffs were able to access their

19   properties during CHOP.[13]  *See*, *e.g.*, Thompson Dep. at 77:4–14, Ex. 28 to Cramer Decl.

20

21   [13] In contrast, other plaintiffs contend that access to their properties was temporarily eliminated.  *See*, *e.g.*,
     Ploszaj Dep. at 145:13–20, Ex. 7 to Cramer Decl. (docket no. 112-7) (explaining that he could not access
22   his building by car). The City argues in a footnote, without citation to any authority, that lessees such as
     Ploszaj do not have a property interest for the purposes of a "right of access" taking claim because they

23

1    (docket no. 112-28) (Bergman's Lock and Key) (explaining that the storefront was not

2    physically blocked); Sheffer Dep. at 193:18–22, Ex. 29 to Cramer Decl. (docket no. 112-

3    29) (Cure Cocktail) (agreeing that the storefront was not physically blocked); Donner

4    Dep. at 53:13–55:5, Ex. 30 to Cramer Decl. (docket no. 112-30) (Richmark Label)

5    (describing how delivery vehicles and employees accessed the business during CHOP);

6    Wanagel Dep. at 98:14–25, Ex. 32 to Cramer Decl. (docket no. 112-32) (Olive Street

7    Apartments) (describing no physical barriers in the street other than occasional dumpsters

8    and garbage cans).  Plaintiffs allege, however, that access to their properties was

9    significantly diminished or impaired during the CHOP period.  *See*, *e.g.*, Wanagel Decl.

10   at ¶¶ 2–3 (docket no. 130) (Olive St Apartments) (explaining that access to the building

11   was diminished due to the placement of barriers in the area); Augustine Decl. at ¶ 3

12   (docket no. 132) (Madrona entities) (explaining that the streets adjacent to the Madrona

13   entities' properties had diminished access); Sheffer Decl. at ¶¶ 4–6 (docket no. 133)

14   (Cure Cocktail) (explaining that, at times, the only way to access Cure Cocktail was to

15   drive through an allegedly unsafe alley); Donner Decl. at ¶¶ 6–8 (docket no. 137)

16   (Richmark Label) (explaining that some third-party delivery drivers refused to come to

17   the CHOP area and how Richmark Label employees often had to negotiate with

18   protesters to move barriers in the street).[14]

19   _____

20   do not own property abutting a public right-of-way.  But, "[l]easehold interests, in addition to ownership
     interests, are protected property interests under the Takings Clause."  *Martell v. City of St. Albans*, 441 F.

21   Supp. 3d 6, 21 (D. Vt. 2020) (citing *Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 303 (1976)).

22   [14] The City argues that the Court should not consider certain plaintiffs' declarations, docket nos. 130
     through 138, to the extent that the declarations contradict these plaintiffs' prior deposition testimony.  *See*

23

1   This action does not involve the typical exercise of police power to regulate the

2   flow of traffic in the Capitol Hill neighborhood, such as for routine road maintenance or

3   construction.  Further, Plaintiffs have presented evidence that the City's actions actually

4   interfered with or prevented their access to their properties.  Drawing all justifiable

5   inferences from the evidence in Plaintiffs' favor, the Court concludes that genuine

6   disputes of material fact preclude summary judgment on Plaintiffs' right of access theory

7   of liability.  The Court therefore DENIES the City's motion as it relates to Plaintiffs'

8   right of access taking claim.  Whether Plaintiffs can present sufficient evidence at trial to

9   support the City's liability for a taking under these circumstances is a factual issue that

10  cannot be resolved on a motion for summary judgment.

11  **4.      Fourth Cause of Action:  Negligence**

12          The City argues that Plaintiffs' negligence claim fails as a matter of law because

13  the City did not owe them a duty under traditional negligence principles.  Under

14  Washington law, a plaintiff must prove four elements to prevail on a negligence claim:

15  (i) "the existence of a duty"; (ii) "a breach of that duty"; (iii) "a resulting injury"; and

16  (iv) "the breach as the proximate cause of the injury." *Ehrhart v. King County*, 195

17  Wn.2d 388, 396, 460 P.3d 612 (2020).  "When the defendant in a negligence action is a

18  governmental entity, the public duty doctrine provides that a plaintiff must show the duty

19  breached was owed to him or her in particular, and was not . . . an obligation owed to the

20  _____

21  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  The declarations, however, do not appear to
    conflict with any plaintiffs' prior deposition testimony.  Rather, the declarations clarify the extent of
22  CHOP's alleged interference with certain plaintiffs' ability to access their properties.

23

ORDER - 27

public in general." *Munich v. Skagit Emergency Commc'n Ctr.*, 175 Wn.2d 871, 878, 288 P.3d 328 (2012).  In essence, "a duty owed to all is a duty owed to none."  *Id.*  The public duty doctrine serves as a "focusing tool" to ensure that governmental entities are "not held liable in tort for duties owed solely to the general public."  *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 549, 442 P.3d 608 (2019).  Washington courts recognize four exceptions to this doctrine, *see Ehrhart*, 195 Wn.2d at 400, but Plaintiffs rely only on the "failure-to-enforce" exception.  *See* Pls.' Resp. (docket no. 124 at 18–22).

The failure-to-enforce exception "recognizes that some statutes impose on [the] government a duty owed to a particular class or category of individuals, such that the failure to enforce those statutes breaches a duty that can sustain an action in tort." *Ehrhart*, 195 Wn.2d at 402.  To prove that this narrow exception applies, *see Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs.*, 115 Wn.2d 506, 531, 799 P.2d 250 (1990), a plaintiff must show that (i) "governmental agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation," (ii) "fail to take corrective action despite a statutory duty to do so," and (iii) "the plaintiff is within the class the statute intended to protect," *Ehrhart*, 195 Wn.2d at 402 (citing *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987)).  In this case, Plaintiffs' negligence claim is based solely on two ordinances that purportedly give rise to a duty under the

ORDER - 28

1    failure-to-enforce exception:  (a) the Seattle Fire Code,[15] and (b) Seattle's Street Use

2    Ordinance.

3           a.      **Seattle Fire Code**

4           Plaintiffs argue that three Seattle Fire Code[16] provisions impose an affirmative

5    duty on the City:  (i) § 503.1 ("Fire apparatus access roads shall be provided and

6    maintained in accordance with Sections 503.1.1 through 503.1.3."); (ii) § 503.4 ("Fire

7    apparatus access roads shall not be obstructed in any manner, including the parking of

8    vehicles."); and (iii) § 104.11.2 ("No person shall obstruct the operations of the fire

9    department in connection with extinguishment, or control or investigation of any

10   fire . . . .").[17]  These provisions, however, do not require the City to take any specific

11   corrective action in the event of a known violation.  *See Donohoe v. State*, 135 Wn. App.

12   824, 849, 142 P.3d 654 (2006) (explaining that the failure-to-enforce exception applies

13

---

14   [15] The City's motion to strike Plaintiffs' answer to the City's Interrogatory No. 3 (requesting that
     Plaintiffs identify each statute or ordinance that the City "failed to abide") is DENIED.  *See* Def.'s Mot.

15   (docket no. 111 at 18 n.4).  On August 31, 2022, the final day of the discovery period in this action,
     Plaintiffs supplemented their answer to Interrogatory No. 3 to include the Seattle Fire Code, and eleven

16   other statutory provisions that are not at issue.  *See* Ex. 47 to Cramer Decl. (docket no. 112-47).  The
     Court concludes that the City was not harmed by this disclosure because the City questioned Chief

17   Scoggins about the Seattle Fire Code during his deposition on September 14, 2021.  *See* Scoggins Dep. at
     184:5–185:20 (docket no. 125-8).  Moreover, as the City explains in its motion for summary judgment,
     Interrogatory No. 3 concerns the legislative intent exception to the public duty doctrine.  *See* Def.'s Mot.

18   (docket no. 111 at 18).  Because the legislative intent exception is no longer at issue in this case, any
     response to the interrogatory is irrelevant.

19   [16] The Court relies on the version of the Seattle Fire Code in effect during CHOP, namely the 2015
     International Fire Code, as amended by the City and adopted by Ordinance No. 125392 in August 2017.

20   *See* Ex. 57 to Cramer Supplemental Decl. (docket no. 152-7).

21   [17] A fire apparatus access road is defined as a road "that provides fire apparatus access from a fire station
     to a facility, building or portion thereof."  Seattle Fire Code § 202.  The term is "inclusive of all other

22   terms such as fire lane, public street, private street, parking lot lane and access roadway."  *Id.*

23

ORDER - 29

1    only "where there is a mandatory duty to take a specific action to correct a known

2    statutory violation").  Thus, Plaintiffs cannot, as a matter of law, meet the second element

3    of the failure-to-enforce exception (failing to take corrective action despite a mandatory

4    duty to do so).

5           Moreover, the failure-to-enforce exception does not apply because Plaintiffs are

6    not within a class the Seattle Fire Code is intended to protect.[18]  *See Ehrhart*, 195 Wn.2d

7    at 402.  Rather than designating a protected class, the Seattle Fire Code provides that its

8    express purpose "is to promote the health, safety, and welfare of the general public, and

9    not to create or otherwise establish or designate any particular group of persons who will

10   or should be especially protected or benefited" by its terms.  Seattle Fire Code § 101.3.

11   The code is also intended to "provide a reasonable level of safety to fire fighters and

12   emergency responders during emergency operations" and to provide "a reasonable level

13   of life safety and property protection from the hazards of fire."  *Id.*  With respect to the

14   Seattle Fire Code, Plaintiffs (property owners, businesses, and residents) are merely

15   members of the general public, and the City cannot be held liable in tort for duties owed

16   solely to the general public.  *See Beltran-Serrano*, 193 Wn.2d at 549.  Accordingly,

17

18

---

19   [18] Plaintiffs argue that they can satisfy the third element of the failure-to-enforce exception by showing
     that they were "within the ambit of risk" created by the City's conduct.  Pls.' Resp. (docket no. 124 at 19).

20   But Plaintiffs' reliance on the ambit of risk test is misplaced.  Courts utilize the ambit of risk test to
     determine the scope of a governmental entity's duty of care.  "When a governmental agent knows of [a]

21   violation, a duty of care runs to all persons within the protected class, not merely those who have had
     direct contact with the governmental entity."  *Bailey*, 108 Wn.2d at 269–70.  In this case, Plaintiffs have

22   failed to show that they are in the protected class.

23

1    Plaintiffs cannot, as a matter of law, meet the third element of the failure-to-enforce

2    exception.

3            b.       **Seattle Municipal Code § 15.52**

4            Plaintiffs also argue that the City owed them a duty under Seattle's Street Use

5    Ordinance, which governs permit requirements for certain "special events."  SMC

6    § 15.52.005 defines a "special event" as "an event planned to be held in a park, other

7    City-owned property, or public place" that is reasonably expected to (i) "cause or result

8    in more than 50 people," (ii) "have a substantial impact" on the area, (iii) "require the

9    provision of substantial public services," and (iv) "require the temporary closure or

10   exclusive use" of the area.  Pursuant to SMC § 15.52.040, "[a] special event permit or

11   authorization from the Special Events Committee is required for any special event."

12           Like the Seattle Fire Code, Seattle's Street Use Ordinance does not impose on the

13   City a mandatory duty to take corrective action in the event of a known violation.  *See*

14   *Donohoe*, 135 Wn. App. at 849 (explaining that "a mandatory duty to take a specific

15   action to correct a known statutory violation" does not exist "if the government agent has

16   broad discretion about whether and how to act" (citation omitted)).  The permitting

17   provisions give the City's Special Events Committee discretion to deny permit

18   applications, SMC § 15.52.060(B), revoke permits, *id.* at § 15.52.060(C), and determine

19   whether a special event permit is even required, *id.* at § 15.52.030(A).   Plaintiffs have

20   not cited, however, any provision in Seattle's Street Use Ordinance that requires the City

21   to take specific action if an individual fails to obtain a permit or authorization.  SDOT's

22   Director is authorized to enforce Seattle's Street Use Ordinance and "may call upon the

23

police, fire, health or other appropriate City departments to assist in enforcement," SMC § 15.90.004(A), but the provision is not "intended to impose any duty upon the City," *id.* at § 15.90.004(E).  Plaintiffs therefore cannot, as a matter of law, meet the second element of the failure-to-enforce exception.

Plaintiffs also fail to meet the third element of the failure-to-enforce exception because they are not within a class the Street Use Ordinance is intended to protect.  SMC § 15.90.004(C) provides that "[t]he Street and Sidewalk Use Code shall be enforced for the benefit of the health, safety and welfare of the general public, and not for the benefit of any particular person or class of persons."  Plaintiffs have not shown that the duty purportedly breached by the City was a duty owed to them as individuals and not an obligation owed to the general public.  *See Ehrhart*, 195 Wn.2d at 408.

Because Plaintiffs cannot meet the elements of the failure-to-enforce exception with respect to the Seattle Fire Code and Street Use Ordinance, they have not established that the City owed them a duty under traditional negligence principles, an essential element of their negligence claim.  *See Ehrhart*, 195 Wn.2d at 396.  Accordingly, the City's motion for summary judgment is GRANTED as it relates to Plaintiffs' negligence claim, and Plaintiffs' fourth cause of action is DISMISSED with prejudice.[19]

---

[19] The City also argues that the Court should dismiss Plaintiffs' negligence claim on the basis of the City's discretionary immunity.  The Court questions whether the City's actions at issue in this case are protected under discretionary immunity.  Although the Washington State Legislature abolished the doctrine of sovereign tort immunity "on a broad basis," *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 252, 407 P.2d 440 (1965), the Washington Supreme Court has "recognized that, as a matter of public policy, not every act, omission or decision of government should subject the governmental unit to potential liability," *Stewart v. State*, 92 Wn.2d 285, 293, 597 P.2d 101 (1979) (citing *Evangelical*, 67 Wn.2d at 255).  Discretionary immunity is "an extremely limited exception," *id.*, and

ORDER - 32

1    **5.      Fifth Cause of Action:  Nuisance**

2            "A nuisance is a substantial and unreasonable interference with the use and

3    enjoyment of another person's property."  *Kitsap County v. Kitsap Rifle & Revolver Club*,

4    184 Wn. App. 252, 276, 337 P.3d 328 (2014) (citing *Grundy v. Thurston County*, 155

5    Wn.2d 1, 6, 117 P.3d 1089 (2005)).  In Washington, an actionable nuisance is defined by

6    statute as "whatever is injurious to health or indecent or offensive to the senses, or an

7    obstruction to the free use of property, so as to essentially interfere with the comfortable

8    enjoyment of the life and property."  RCW 7.48.010.  A nuisance "which affects equally

9    the rights of an entire community or neighborhood" is a public nuisance, RCW 7.48.130,

10   whereas "[a]ny nuisance that does not fit the statutory definition of a public nuisance is a

11   private nuisance," *Grundy*, 155 Wn.2d at 7 (citing RCW 7.48.150).  Plaintiffs allege that

12   the City "directly participated" in the creation of a nuisance by blocking access to streets

13   and sidewalks in the Capitol Hill neighborhood and maintaining a series of unreasonable

14   conditions such as "excessive noise, public safety hazards, vandalism, and poor health

15

16   _____

17   applies only to "basic policy decisions made by a high-level executive," and not to "ministerial" or
     "operational" acts, *see Taggart v. State*, 118 Wn.2d 195, 214–15, 822 P.2d 243 (1992).  For example, "the
18   decision whether to dispatch a police officer to the scene of a crime" is not protected under discretionary
     immunity because it is "not a basic policy decision by a high-level executive" and is operational in nature.
     *Id.* at 215 (citing *Chambers–Castanes v. King County*, 100 Wn.2d 275, 282, 669 P.2d 451 (1983)).
19   Similarly, discretionary immunity does not shield parole officers from claims of negligent supervision
     because supervisory decisions, "however much discretion they may require," are ministerial in nature and
20   not basic policy decisions.  *Id.*  The City contends that it has discretionary immunity for its CHOP-related
     policy decision to deescalate tensions in the area.  Plaintiffs, however, do not challenge that policy, but
21   rather the manner in which it was implemented.  The City's decision to provide portable toilets,
     handwashing stations, and dumpsters to protesters appears to be operational in nature, and the Court
22   cannot "clearly and unequivocally" conclude that the City's provision of these items was essential to the
     realization of its stated objective.  *See Evangelical*, 67 Wn.2d at 255.

23

ORDER - 33

1  and sanitation conditions."  TAC at ¶¶ 217–20.  The City argues that Plaintiffs' nuisance

2  claim should be dismissed because (a) the claim is not actionable, and (b) it is dependent

3  upon the City's alleged negligence.

4         a.      **Actionable Nuisance**

5        The City contends that Plaintiffs' nuisance claim is not actionable because they

6  have presented no evidence of City wrongdoing.  Pursuant to RCW 7.48.160, "[n]othing

7  which is done or maintained under the express authority of a statute, can be deemed a

8  nuisance."  But "a lawful action may still be a nuisance based on the unreasonableness of

9  the locality, manner of use, and circumstances of the case."  *Kitsap Rifle & Revolver*

10  *Club*, 184 Wn. App. at 281 (citing *Grundy*, 155 Wn.2d at 7 n.5).  The City asserts that,

11  because it has statutory authority to regulate streets, sidewalks, and other public areas, it

12  cannot be liable for a nuisance arising from its activities in and around Cal Anderson

13  Park.  *See* RCW 35.22.280(7) (providing that any city with a population of 10,000 or

14  more, *see* RCW 35.01.010, shall have the power . . . "to regulate and control the use" of

15  "streets . . . sidewalks, . . . and other public grounds, . . . to vacate the same, . . . and to

16  prescribe the terms and conditions upon which the same may be so used, and to regulate

17  the use thereof").  Washington courts, however, "interpret RCW 7.48.160 as requiring a

18  direct authorization of action to escape the possibility of nuisance."  *Kitsap Rifle &*

19  *Revolver Club*, 184 Wn. App. at 281 (citing *Judd v. Bernard*, 49 Wn.2d 619, 621, 304

20  P.2d 1046 (1956)).  In *Judd*, for example, the state game commission's decision to kill

21  fish in a certain lake was not an actionable nuisance because the commission was

22  authorized by statute to kill fish for game management purposes.  49 Wn.2d at 621.  In

23

ORDER - 34

1  contrast, although RCW 35.22.280(7) provides the City with general power to regulate its

2  streets and sidewalks, it does not directly authorize all of the City's acts in response to

3  CHOP.

4            Further, Plaintiffs' nuisance claim is not limited to allegations of blocked access.

5  Plaintiffs allege that the City maintained certain unreasonable conditions such as

6  excessive noise, public safety hazards, and vandalism during the CHOP period.  The

7  undisputed evidence shows that some City officials were concerned that providing

8  portable toilets, handwashing stations, and dumpsters for protesters' use would encourage

9  those individuals to stay in the area.  *See* Sixkiller Dep. at 145:17–147:2 (docket no. 125-

10  4); Zimbabwe Dep. at 166:2–8 (docket no. 125-5).  The record also demonstrates that the

11  City was aware of property damage resulting from the large number of protesters

12  congregating in and around Cal Anderson Park, such as increased graffiti.  For example,

13  the City covered its ecology blocks not only to provide a canvas for protesters' art, but to

14  "attract" some of the graffiti away from local buildings.  *See* Zimbabwe Dep. at 47:1–

15  48:20 (docket no. 125-5).  The City was also aware of excessive noise coming from Cal

16  Anderson Park and the surrounding area.  *See* Zimbabwe Dep. at 74:2–12 (docket

17  no. 125-5) (describing CHOP as a "party environment" in the evenings).  The City's

18  argument that Plaintiffs have presented no evidence to support an actionable nuisance is

19  unpersuasive.  Whether Plaintiffs' evidence is sufficient to support a jury verdict on their

20  nuisance claim must await trial.

21

22

23

ORDER - 35

1       **b.     Overlap Between Nuisance and Negligence Claims**

2           The City also argues that the Court should dismiss Plaintiffs' nuisance claim

3   because it is duplicative of their negligence claim.  "In Washington, a 'negligence claim

4   presented in the garb of nuisance' need not be considered" separately.  *Atherton*, 115

5   Wn.2d at 527 (quoting *Hostetler v. Ward*, 41 Wn. App. 343, 360, 704 P.2d 1193 (1985)).

6   In situations "where the alleged nuisance is the result of the defendant's alleged negligent

7   conduct," courts will apply the rules of negligence.  *Id.*  In *Atherton*, a condominium

8   owners association alleged that a developer's failure to comply with applicable building

9   code fire resistance standards created a nuisance.  *Id.*  Because the condominium owners

10  association's nuisance claim was premised on its argument that the developer was

11  "negligent in failing to construct [the condominium building] in compliance with the

12  applicable building code," the Washington Supreme Court concluded that the trial court

13  properly applied negligence principals.  *Id.* at 528 ("[E]ven if [the condominium

14  building] does constitute a nuisance, the nuisance would be solely the result of [the

15  developer's] alleged negligent construction.").  Likewise, in *Hostetler*, plaintiff alleged

16  that "because of [a county's] negligence in permitting minors and others to consume

17  liquor in [a public park], the park constituted a nuisance under RCW 7.48."  41 Wn. App.

18  at 355.  The Washington Court of Appeals applied the rules of negligence to plaintiff's

19  claim because the nuisance at issue was the result of the county's alleged "negligence in

20  failing to enforce the laws and ordinances prohibiting such drinking."  *Id.* at 360.

21          Unlike *Atherton* and *Hostetler*, the Court cannot conclude that the purported

22  nuisance in this matter is premised solely on the City's alleged negligence in failing to

23

1    enforce Seattle's Fire Code or Street Use Ordinance.  Plaintiffs have significantly

2    narrowed their negligence claim, and, as discussed above, argue only that the City owed

3    them a duty under those provisions.  In contrast, Plaintiffs' nuisance claim is based on the

4    City's affirmative actions in support of CHOP, such as the provision of portable toilets,

5    handwashing stations, and dumpsters which might have encouraged protesters to remain

6    in the area for a three-week period.  Although some of this evidence appears contrary to

7    Plaintiffs' argument that the City encouraged "poor health and sanitation conditions" in

8    and around Cal Anderson Park, TAC at ¶ 220, it presents a factual issue that cannot be

9    resolved at this stage of litigation, and the City's motion for summary judgment is

10   DENIED as it relates to Plaintiffs' fifth cause of action.

11   **6.    Proximate Cause/Damages**

12         Finally, the City argues that certain causation deficiencies require dismissal of

13   Plaintiffs' claims.  "Generally, the issue of proximate causation is a question for the

14   jury."  *Attwood v. Albertson's Food Ctrs., Inc.*, 92 Wn. App. 326, 330, 966 P.2d 351

15   (1998) (quoting *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935, 653 P.2d 280

16   (1982)).  The City takes issue with Plaintiffs' damages expert Arik Van Zandt for

17   allegedly failing to account for the effects of the COVID pandemic when calculating

18   Plaintiffs' economic damages.  In response, Van Zandt has submitted a declaration

19   explaining how he considered the effects of COVID in his damage calculations.  *See* Van

20

21

22

23

1    Zandt Decl. at ¶¶ 3–11 (docket no. 131).  The City's arguments about damages present

2    factual disputes that preclude summary judgment on the issue of proximate causation.[20]

3    **__Conclusion__**

4            For the foregoing reasons, the Court ORDERS:

5            (1)      The City's motion, docket no. 111, to strike Plaintiffs' answer to the City's

6    Interrogatory No. 3 is DENIED.

7            (2)      The City's motion for summary judgment, docket no. 111, is GRANTED in

8    part and DENIED in part as follows:

9                    a.      The motion is GRANTED as it relates to Plaintiffs' first cause of

10   action for violation of procedural due process, second cause of action for violation

11   of substantive due process, and fourth cause of action for negligence, and these

12   causes of action are DISMISSED with prejudice.

13                   b.      Without opposition, the motion is GRANTED as to Redside Partners

14   LLC's third cause of action for taking, and the cause of action is DISMISSED

15   with prejudice.

16                   c.      The motion is GRANTED in part as it relates to the remaining

17   plaintiffs' third cause of action for taking under a *per se* theory of liability, and

18

19

20   _____

21   [20] For example, the City challenges Car Tender's claim for lost profits because the business was planning to relocate from its Capitol Hill location prior to CHOP.  But, as Car Tender's owner explained during his deposition, Car Tender experienced reduced business because of CHOP.  McDermott Dep. at 180:13–

22   181:2 (docket no. 125-26) (explaining that some customers canceled their appointments during CHOP).

23

1    DENIED in part as it relates to the remaining plaintiffs' third cause of action for

2    taking under a "right of access" theory of liability.

3           d.     The motion is DENIED as it relates to Plaintiffs' fifth cause of

4    action for nuisance.

5           (3)    The following causes of action remain for trial:  Plaintiffs' (excluding

6    Redside Partners LLC's) third cause of action for taking under a "right of access" theory

7    of liability and Plaintiffs' fifth cause of action for nuisance.  The Court concludes that

8    material issues of fact preclude summary judgment on these remaining causes of action.

9    Whether the City's alleged support, encouragement, and endorsement of CHOP from

10   June 8 to July 1, 2020, will support a finding of liability on Plaintiffs' taking and

11   nuisance claims, or whether the City's actions caused Plaintiffs' damages under all of the

12   circumstances, must await trial.

13          (4)    The Clerk is directed to send a copy of this Order to all counsel of record.

14   IT IS SO ORDERED.

15   Dated this 13th day of January, 2023.

16

17

18                                              Thomas S. Zilly
                                                United States District Judge
19

20

21

22

23

ORDER - 39