1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

HUNTERS CAPITAL, LLC; HUNTERS
PROPERTY HOLDINGS, LLC; GREENUS
BUILDING, INC.; SRJ ENTERPRISES d/b/a
CAR TENDER; THE RICHMARK
COMPANY d/b/a RICHMARK LABEL;
ONYX HOMEOWNERS ASSOCIATION;
WADE BILLER; MADRONA REAL
ESTATE SERVICES LLC; MADRONA
REAL ESTATE INVESTORS IV LLC;
MADRONA REAL ESTATE INVESTORS
VI LLC; 12TH AND PIKE ASSOCIATES
LLC; REDSIDE PARTNERS LLC; OLIVE
ST APARTMENTS LLC; BERGMAN'S
LOCK AND KEY SERVICES LLC;
MATTHEW PLOSZAJ; SWAY AND CAKE
LLC; and SHUFFLE LLC d/b/a CURE
COCKTAIL,

Plaintiffs,

v.

CITY OF SEATTLE,

Defendant.

C20-0983 TSZ

ORDER

21

22

THIS MATTER comes before the Court on cross-motions under Federal Rule of

Civil Procedure 37(e) for spoliation sanctions filed by plaintiffs Hunters Capital, LLC

23

("Hunters Capital"), Hunters Property Holdings, LLC ("Hunters Property Holdings"),

Greenus Building, Inc. ("Greenus Building"), SRJ Enterprises d/b/a Car Tender ("Car

Tender"), the Richmark Company d/b/a Richmark Label ("Richmark Label"), Onyx

Homeowners Association ("Onyx HOA"), Wade Biller, Madrona Real Estate Services

LLC, Madrona Real Estate Investors IV LLC, Madrona Real Estate Investors VI LLC,

12th and Pike Associates LLC, Redside Partners LLC, Olive St Apartments LLC,

Bergman's Lock and Key Services LLC ("Bergman's Lock and Key"), Matthew Ploszaj,

Sway and Cake LLC, and Shuffle LLC d/b/a Cure Cocktail (collectively "Plaintiffs"),[1]

docket no. 104, and defendant City of Seattle (the "City"), docket no. 107.  Having

reviewed all papers filed in support of, and in opposition to, the motions, and having

considered the oral arguments of counsel, the Court enters the following Order.

**Plaintiffs' Motion for Sanctions (docket no. 104)**

**1.      Background**

        This matter arises from the City's alleged support and encouragement of the

Capitol Hill Occupied Protest ("CHOP") from June 8 to July 1, 2020 (the "CHOP

period").  Plaintiffs are local property owners, businesses, and residents who allege that

the City's response to CHOP violated their constitutional and other legal rights.  *See*

Third Amended Complaint ("TAC") at ¶ 2 (docket no. 47).  Plaintiffs commenced this

action on June 24, 2020, and allege that the City's "unprecedented decision to abandon

---

[1] Hunters Capital, Hunters Property Holdings, and the Greenus Building are referred to collectively as the "Hunters Capital entities."

and close off" an approximately 16-block portion of Seattle's Capitol Hill neighborhood "subjected businesses, employees, and residents of that neighborhood to extensive property damage, public safety dangers, and an inability to use and access their properties." *See id.* After Plaintiffs initiated this action, the City and certain of its high-level officials, including then Seattle Mayor Jenny Durkan, then Seattle Police Department ("SPD") Chief Carmen Best, and Seattle Fire Department ("SFD") Chief Harold Scoggins, deleted thousands of text messages from their City-owned phones.[2]

Plaintiffs seek spoliation sanctions against the City for the destruction of thousands of the following officials' text messages: (i) Mayor Durkan, (ii) Chief Best, (iii) Chief Scoggins, (iv) Seattle Public Utilities ("SPU") employee Idris Beauregard, (v) Assistant SPD Chief Eric Greening, (vi) SPD's Chief Strategy Officer Chris Fischer, and (vii) Operations Coordinator for the City's Emergency Operations Center Kenneth Neafcy. As set forth in this Order, the City failed to timely notify these officials of their duty to preserve CHOP-related messages, City officials deleted thousands of text messages from their City-owned phones in complete disregard of their legal obligation to preserve relevant evidence, and the City ignored litigation holds and multiple letters from Plaintiffs requesting that it preserve all CHOP-related communications between high-level City officials such as Mayor Durkan, Chief Best, and Chief Scoggins. Further, the City significantly delayed disclosing to Plaintiffs that thousands of text messages had

---

[2] Plaintiffs also allege that Chief Best deleted relevant text messages from her personal phone.

been deleted.[3] Notably, all text messages sent directly between these officials during the CHOP period cannot be reproduced or recovered. As a result, substantial evidence has been destroyed by the City and is unavailable to Plaintiffs to support their positions in this litigation.

**a. The City's Duty to Preserve CHOP-Related Text Messages**

On June 9, 2020, the organization Black Lives Matter sued the City for its allegedly violent response to local protests. *See Black Lives Matter Seattle-King Cnty. v. City of Seattle*, No. 20-cv-887-RAJ (W.D. Wash.). On June 19, 2020, Mayor Durkan's office sent a memorandum to its employees informing them of their responsibility to retain public records such as text messages on their "City-owned or personal smartphones and mobile devices." Ex. 2 to Calfo Decl. (docket no. 105-1).

On June 24, 2020, Plaintiffs commenced this action and sent a letter to Mayor Durkan informing her of the complaint that Plaintiffs had filed, Ex. 3 to Calfo Decl. (docket no. 105-1). In a second letter dated June 27, 2020, Plaintiffs' Counsel reminded the Seattle City Attorney's Office of the City's legal obligation to preserve relevant evidence, including "text messages on the business or personal phones of the Mayor and

---

[3] On November 5, 2020, the City retained Kevin Faulkner, a digital forensics expert, to attempt to recover or otherwise locate missing text messages from Mayor Durkan's and Chief Best's phones. *See* Faulkner Report at 1–3, Ex. 8 to Calfo Decl. (docket no. 105-1). The City, however, did not disclose to Plaintiffs that any officials' text messages were missing until months later, on March 26, 2021. Cramer Decl. at ¶¶ 7–8 (docket no. 140). Following the City's disclosure, Plaintiffs retained their own digital forensics expert, Brandon Leatha, who analyzed information collected from Mayor Durkan's, Chief Best's, Chief Scoggins's, Beauregard's, Fisher's, Assistant Chief Greening's, and Neafcy's City-owned cellphones. *See* Leatha Report at 1–5, Ex. 6 to Calfo Decl. (docket no. 105-1). Leatha determined that these officials deleted thousands of text messages through a combination of manual deletions, factory resets, and changes to their text-message-retention settings. *See id.* at 5.

1    her staff, the Chief of Police and other high-level managers of the police department, the

2    head of the Seattle Department of Transportation and its high-level managers, and the

3    Fire Chief and high level managers of the fire department."  Ex. 4 to Calfo Decl. (docket

4    no. 105-1).  In a third letter dated June 30, 2020, Plaintiffs' Counsel specifically

5    requested that the City preserve electronically stored information ("ESI") "contained on

6    both personal and City-owned emails and cell phones (such as voice mails and text

7    messages)" of numerous City officials and employees, specifically including Mayor

8    Durkan, SPU Director Mami Hara, Chief Best, Chief Scoggins, and their staff and

9    employees.  Ex. 5 to Calfo Decl. (docket no. 105-1 at 41).  Despite these unambiguous

10   preservation requests, and a well-established legal duty to preserve all text messages

11   relevant to the litigation, City officials deleted several thousand text messages from the

12   CHOP period.

13           **b.      Mayor Jenny Durkan**

14           Despite being named in Plaintiffs' preservation letters, Exs. 4–5 to Calfo Decl., the

15   City failed to issue Mayor Durkan a litigation hold in this matter until July 22, 2020.

16   Attach. A to Def.'s 1st Suppl. Answers to Pls.' 2d Set of Interrogs., Ex. 7 to Calfo Decl.

17   (docket no. 105-1 at 97).  By that time, Mayor Durkan had already deleted thousands of

18   text messages from her City-owned phone.  As set forth in this Order, Mayor Durkan's

19   various reasons for deleting her text messages strain credibility.

20

21

22

23

On July 4, 2020, Mayor Durkan claims that she dropped her City-owned iPhone 8 Plus into the water while she was visiting a beach.[4]  *See* Durkan Dep. at 255:7–12, Ex. 9 to Cramer Decl. (docket no. 140-9).  The phone's screen appeared "pixilated" after she retrieved the device from the water, so Mayor Durkan turned it off and placed it in a bag of rice.  *Id.* at 255:13–20.  At some point, her phone started to work again.  *Id.* at 255:21–256:24.  Because she was experiencing difficulty getting her calendar to load on the device, Mayor Durkan, despite having already received a letter from Plaintiffs regarding the preservation of her CHOP-related communications, reset her phone and restored its data using an iCloud backup.  *Id.* at 256:5–12.  Mayor Durkan testified during her deposition that all of her text messages were still saved on the device at that time.  *See id.* at 256:13–24.  While resetting her phone on July 4, 2020, however, Mayor Durkan selected a "Disable and Delete" setting that stopped her phone from synchronizing text messages to iCloud and set all text messages stored in iCloud to be automatically deleted in 30 days.[5]  Faulkner Report at 29, Ex. 8 to Calfo Decl. (docket no. 105-1).  In an email

---

[4] At the time, the "Messages in iCloud" setting on her iPhone was enabled, meaning that her text messages were set to be automatically saved in iCloud.  *See* Faulkner Report at 25, 29.  Additionally, Mayor Durkan's iPhone was set to retain her text messages forever.  *Id.*

[5] Faulkner's forensic examination of Mayor Durkan's iPhone shows that on July 4, 2020, at 4:51 p.m. Pacific Daylight Time ("PDT"), the device was restored using an iCloud backup file from "early-to-mid February 2020."  Faulkner Report at 27.  In order to restore an iPhone from an iCloud backup, the device must first be factory reset (erased).  Leatha Report at 13.  At 5:19 p.m. PDT, the "Disable & Delete" function was selected, which caused Mayor Durkan's iPhone to "stop synchronizing messages to iCloud and set all messages stored in iCloud to be deleted from iCloud (but not from the iPhone itself) in 30 days, on August 4, 2020."  Faulkner Report at 29.  During his deposition, Faulkner explained that he was unaware of any way to select the "Disable & Delete" function remotely.  Faulkner Dep. at 131:5–10, Ex. 9 to Calfo Decl. (docket no. 105-1).  According to Mayor Durkan, nobody else accessed her phone that day.  Durkan Dep. at 95:10–12, Ex. 12 to Calfo Decl. (docket no. 105-1).  Nevertheless, Mayor Durkan

1  to her staff dated July 4, 2020, Mayor Durkan confirmed that she reset and restored her

2  phone using an iCloud backup.  *See* Ex. 10 to Calfo Decl. (docket no. 105-1).  The email

3  stated that her phone had "died," but did not disclose that her phone allegedly fell into the

4  water.  *Id.*

5       On July 7, 2020, Mayor Durkan's IT staff obtained a new City-owned iPhone 11

6  for her official use.  *See* Ex. 18 to Calfo Decl. (docket no. 105-2).  Although this

7  litigation had already commenced weeks earlier, when a City IT staff member transferred

8  the data on Mayor Durkan's iPhone 8 Plus to the new iPhone 11, he failed to make a

9  backup of the old device.[6]  *See* Arhu Dep. at 63:5–16, Ex. 14 to Calfo Decl. (docket

10  no. 105-1).  Further, at some point between July 4 and July 26, 2020, "someone" selected

11  the "30-day delete" setting on Mayor Durkan's new iPhone 11.  Faulkner Report at 33–

12  34; Leatha Report at 3, 14, Ex. 6 to Calfo Decl. (docket no. 105-1).  Consequently,

13  Mayor Durkan's iPhone 11 began deleting, on a rolling basis, all text messages older than

14  30 days.  Leatha Report at 3, 7–8, 14.

15       Between July 22 and July 26, 2020, "someone" changed the text message retention

16  setting on Mayor Durkan's iPhone 11 from 30 days back to forever, which coincides with

17  Mayor Durkan's receipt of the litigation hold in this matter on July 22, 2020.  Faulkner

18

19  _____

20  testified that she has no recollection of selecting the "Disable & Delete" function.  Durkan Dep. at 93:1–5, 95:10–12, Ex. 10 to Cramer Decl. (docket no. 140-10).

21  [6] The employee testified during his deposition that the City's practice at the time was to make a backup of

22  an old phone before transferring data to a new one.  *See* Arhu Dep. at 27:4–8, Ex. 14 to Calfo Decl. (docket no. 105-1).

23

1    Report at 3 n.2, 33–34; Leatha Report at 14; Attach. A to Def.'s 1st Suppl. Answers to

2    Pls.' 2d Set of Interrogs. (docket no. 105-1 at 97).  The damage, however, had already

3    been done.  Switching to the 30-day delete setting caused the loss of 5,746 of Mayor

4    Durkan's text messages from before June 25, 2020.  Leatha Report at 14.  In addition to

5    the text messages that were deleted as a result of her phone's retention settings, Mayor

6    Durkan manually deleted 191 messages from her new iPhone 11 between July 4 and

7    November 19, 2020.  Leatha Report at 14–15.[7]  Mayor Durkan admits that she

8    occasionally deleted text messages which contained "phishy things" such as apparent

9    spam messages.  Durkan Dep. at 72:15–25, Ex. 12 to Calfo Decl. (docket no. 105-1).

10         On or about August 21, 2020, Michelle Chen, Mayor Durkan's counsel and a

11   Seattle City Attorney's Office employee, discovered that Mayor Durkan was missing all

12   text messages from before June 25, 2020.  Def.'s 1st Suppl. Answer to Pls.' Interrogs.

13   (docket no. 105-1 at 85, 86 n.1).  Despite Chen's discovery that a significant number of

14   text messages were missing from the Mayor's phone, the City now contends in this

15   litigation that the Seattle City Attorney's Office did not learn of Mayor Durkan's deleted

16   text messages until October 2020.  Def.'s 1st Suppl. Answer to Pls.' Interrog. No. 27

17   (docket no. 105-1 at 86).  On September 17, 2020, despite the Mayor's and her counsel's

18   knowledge of the missing text messages, a member of the Mayor's IT staff factory reset

19

20

21   ─────────────────────

22   [7] Faulkner's report does not address any manually deleted text messages because the City did not ask him to do so.  *See* Faulkner Dep. at 175:16–21, 176:1–5 (docket no. 105-1).

23

the iPhone 8 Plus she allegedly dropped in the water on July 4, 2020.[8]  Leatha Report at

13; Arhu Dep. at 75:2–17 (docket no. 105-1).  The City did not notify Plaintiffs until

March 26, 2021, that Mayor Durkan was missing text messages.  Cramer Decl. at ¶ 7

(docket no. 140).  Importantly, Plaintiffs contend that during the CHOP period and

thereafter, Mayor Durkan frequently texted Chief Best, Chief Scoggins, and other high-

level City officials regarding the City's response to CHOP.

### c.      SPD Chief Carmen Best

Although she was named in Plaintiffs' preservation letters, Exs. 4–5 to Calfo

Decl., the City did not issue Chief Best a litigation hold in this matter until July 27, 2020,

Attach. A to Def.'s 1st Suppl. Answers to Pls.' 2d Set of Interrogs. (docket no. 105-1 at

97).  Despite the litigation hold and her legal obligation to preserve any CHOP-related

text messages, Chief Best's City-owned iPhone did not contain any text messages dated

before September 2, 2020, which is the day she returned her phone to the City following

her resignation.  Def.'s 1st Suppl. Answer to Pls.' Interrog. No. 31 (docket no. 105-1 at

88–89).  During her deposition, Chief Best admitted that she deleted text messages from

her phone periodically.  Best Dep. (Nov. 9, 2021) at 212:17–19, Ex. 26 to Calfo Decl.

(docket no. 105-2).  According to Chief Best, her understanding was that, like her official

emails, the City was automatically saving all of the text messages on her City-owned

phone.  *Id.* at 212:19–20.  Chief Best explained that, when she deleted text messages, she

---

[8] Mayor Durkan's iPhone 8 Plus was reset on two occasions, once on July 4, 2020, and again on
September 17, 2020.  Leatha Report at 13.

ORDER - 9

1   was not targeting any specific person, and that she deleted messages "in bulk."[9]  Best

2   Dep. (May 24, 2022) at 372:1–8, Ex. 27 to Calfo Decl. (docket no. 105-2).  Chief Best

3   did not recall deleting all of her text messages before returning her phone to the City on

4   September 2, 2020, *see* Best Dep. (Nov. 9, 2021) at 218:16–20, but Plaintiffs' expert

5   Leatha found that 27,138 text messages were manually deleted from Chief Best's City-

6   owned phone before she returned the device, *see* Leatha Report at 16.  Despite receiving

7   her phone in September 2020, the City claims it first became aware that text messages

8   were missing from the device in March 2021, and blames the delay on COVID work

9   requirements.  Def.'s 1st Suppl. Answer to Pls.' Interrog. No. 27 (docket no. 105-1 at 86);

10  Cramer Decl. at ¶ 5 (docket no. 140).  The Court seriously questions why the City took

11  until March 2021 to discover that Chief Best had deleted thousands of messages when the

12  City was in possession of her phone beginning in September 2020.[10]

13          After Plaintiffs learned in March 2021 that text messages were missing from

14  Chief Best's City-owned phone, Plaintiffs' Counsel issued a subpoena to Chief Best in

15  May 2021, seeking CHOP-related documents and text messages on her personal phone.

16  Ex. 28 to Calfo Decl. (docket no. 105-2).  Chief Best, however, had already reset her

17

18  _____

19  [9] Like Mayor Durkan, Chief Best's phone was also set to delete text messages after 30 days.  Faulkner
    Report at 42–43; Leatha Report at 16.  Nevertheless, "[i]t appears that nearly all the 27,138 messages
20  deleted from [Chief] Best's iPhone XS Max were deleted manually."  Leatha Report at 16.

21  [10] Faulkner, the City's expert, was retained in November 2020, in part, to attempt to recover or otherwise
    locate missing text messages from Chief Best's City-owned phone.  *See* Faulkner Report at 1–3.
    According to Faulkner's report, the initial scope of his work was to locate only Mayor Durkan's missing
22  text messages.  *Id.* at 3 n.1.

23

ORDER - 10

1  personal phone at an Apple Store because it "[j]ust stopped working."  Best Dep. (Nov. 9,

2  2021) at 224:20–225:21 (docket no. 105-2).  Chief Best's attorney confirmed that

3  Chief Best did not have a backup file of her personal phone.  Ex. 29 to Calfo Decl.

4  (docket no. 105-2).  Some text messages produced from an SPD employee's personal

5  phone show that Chief Best sometimes used her personal phone to discuss official issues,

6  such as potential interviews with news agencies and releasing certain incident reports

7  during CHOP.  *See* Ex. 30 to Calfo Decl. (docket no. 105-2).  As a result, Plaintiffs

8  contend they have been deprived of many relevant text messages that were on Chief

9  Best's personal phone.

10      **d.    SFD Chief Harold Scoggins**

11      Chief Scoggins was also named in Plaintiffs' preservation letters.  Exs. 4–5 to

12  Calfo Decl.  The City, however, did not issue Chief Scoggins a litigation hold in this

13  matter until July 22, 2020.  Attach. A to Def.'s 1st Suppl. Answers to Pls.' 2d Set of

14  Interrogs. (docket no. 105-1 at 98).  Despite his duty to preserve all CHOP-related text

15  messages, Chief Scoggins has no text messages from before October 8, 2020, because on

16  that day he reset his phone at an Apple Store after he allegedly forgot his numeric

17  passcode.  Def.'s 1st Suppl. Answer to Pls.' Interrog. No. 31 (docket no. 105-1 at 88);

18  Scoggins Dep. at 99:1–100:15, Ex. 31 to Calfo Decl. (docket no. 105-3).

19      On October 8, 2020, Chief Scoggin was allegedly locked out of his City-owned

20  phone after he input an incorrect passcode too many times.  Scoggins Dep. at 98:17–25,

21  101:1–102:9, Ex. 24 to Cramer Decl. (docket no. 140-24).  Chief Scoggins notified City

22  IT personnel that he was locked out of his phone, but their suggestions did not resolve the

23

ORDER - 11

1    issue.  *Id.* at 99:1–16.  Because he did not want to spend an evening without access to his

2    phone, and without first confirming that his CHOP-related communications were

3    preserved, Chief Scoggins took his phone to an Apple Store where an employee reset the

4    device, deleting all prior text messages.  *See id.* at 109:6–16.  The City contends it

5    became aware that text messages were missing from Chief Scoggins's phone in late

6    February 2021.  Def.'s 1st Suppl. Answer to Pls.' Interrog. No. 27 (docket no. 105-1 at

7    86).

8            e.    **Idris Beauregard**

9            Beauregard was employed by Seattle Public Utilities during CHOP.  As a member

10   of SPU's leadership, Beauregard was included in Plaintiffs' preservation letter dated June

11   30, 2020.  Ex. 5 to Calfo Decl.  Inexplicably, the City did not issue Beauregard a

12   litigation hold in this matter until October 20, 2020.  Attach. A to Def.'s 1st Suppl.

13   Answers to Pls.' 2d Set of Interrogs. (docket no. 105-1 at 97).  By that time, Beauregard

14   had already deleted messages from his City-owned iPhone.  On October 9, 2020,

15   Beauregard had factory reset his iPhone, deleting all text messages prior to that day.  *See*

16   Ex. 32 to Calfo Decl. (docket no. 105-3); Leatha Report at 25–26.  Like Scoggins,

17   Beauregard testified that he became locked out of his phone after he forgot his passcode.

18   Beauregard Dep. at 111:1–112:6, Ex. 26 to Cramer Decl. (docket no. 140).  Despite his

19   litigation hold, Beauregard also manually deleted 388 text messages between October

20   2020 and March 2021.  Leatha Report at 26–27; Beauregard Dep. at 132:7– 133:20

21   (admitting that he might have manually deleted some personal text messages from his

22   phone).

23

1          **f.      Chris Fisher**

2          Fisher was employed as SPD's Chief Strategy Officer during CHOP, Calfo Decl.

3   at ¶ 86 (docket no. 105), and was therefore included in Plaintiffs' preservation letter dated

4   June 30, 2020, Ex. 5 to Calfo Decl.  The City issued Fisher a litigation hold in this matter

5   almost one month later, on July 27, 2020.  Attach. A to Def.'s 1st Suppl. Answers to Pls.'

6   2d Set of Interrogs. (docket no. 105-1 at 97).  Despite his litigation hold, Fisher reset his

7   City-owned iPhone 7 on or about November 2, 2020.  *See* Leatha Report at 18.  All but

8   16 of the 15,859 messages on Fisher's phone were deleted before Fisher returned the

9   phone to the City in December 2020.  *Id.* at 18–19.  The City became aware that text

10  messages were missing from Fisher's phone in March 2021.  Def.'s 1st Suppl. Answer to

11  Pls.' Interrog. No. 27 (docket no. 105-1 at 86).

12         **g.      Eric Greening**

13         Greening is an Assistant SPD Chief, Calfo Decl. at ¶ 83 (docket no. 105), and was

14  therefore included in Plaintiffs' preservation letters, Exs. 4–5 to Calfo Decl.  The City

15  issued Assistant Chief Greening a litigation hold in this matter on July 27, 2020.  Attach.

16  A to Def.'s 1st Suppl. Answers to Pls.' 2d Set of Interrogs. (docket no. 105-1 at 97).

17  Around October 26, 2020, Assistant Chief Greening allegedly forgot the passcode to his

18  phone and became locked out of the device.  Def.'s 1st Suppl. Answer to Pls.' Interrog.

19  No. 31 (docket no. 105-1 at 89).  Despite its duty to preserve Assistant Chief Greening's

20  CHOP-related communications, the City caused his phone to be reset on October 26,

21  2020, deleting all prior text messages.  *See* Leatha Report at 27; Def.'s 1st Suppl. Answer

22  to Pls.' Interrog. No. 31 (docket no. 105-1 at 89).

23

1          **h.     Kenneth Neafcy**

2          Kenneth Neafcy was employed as the Operations Coordinator for the City's

3    Emergency Operations Center during CHOP.  Calfo Decl. at ¶ 79 (docket no. 105);

4    Neafcy Decl. at ¶ 1 (docket no. 143).  From March 2020 until October 26, 2020, he used

5    a City-issued iPhone XS.  Neafcy Decl. at ¶ 2.  On October 26, 2020, Neafcy received an

6    alert on his iPhone directing him to reset his passcode.  *Id.*  After resetting his passcode,

7    he tried to access his phone but was unable to unlock the device.  *Id.*  When he could not

8    unlock his phone the following day, he contacted multiple City employees in an attempt

9    to resolve the issue, including SPD's mobile phone coordinator.  *Id.* at ¶ 3.  On

10   October 28, 2020, Neafcy learned that the City had reset his phone.  *Id.*

11         The City issued Neafcy a litigation hold in this matter on September 29, 2020.

12   Attach. A to Def.'s 1st Suppl. Answers to Pls.' 2d Set of Interrogs. (docket no. 105-1 at

13   98).  Nevertheless, Neafcy's phone was factory reset on or about October 27, 2020.

14   Def.'s 1st Suppl. Answer to Pls.' Interrog. No. 31 (docket no. 105-1 at 89–90); *see also*

15   Ex. 34 to Calfo Decl. (docket no. 105-3) (email from Neafcy dated October 28, 2020, in

16   which Neafcy explains that his "phone is completely wiped and has ZERO

17   functionality"); Leatha Report at 21 (determining that Neafcy's phone was reset on

18   October 27, 2020).  Neafcy also manually deleted 42 messages from his phone between

19   October 27, 2020, and March 1, 2021.  Leatha Report at 21.

20         Based on these officials' deleted text messages, Plaintiffs ask the Court to enter

21   default judgment against the City, or, in the alternative, for an adverse-inference

22

23

1   instruction.  Plaintiffs also request fees and costs incurred as a result of the City's alleged

2   spoliation of evidence.

3   **2.    Discussion**

4         **a.    Applicable Standard**

5         Spoliation is the destruction or significant alteration of evidence, or the failure to

6   preserve evidence, in pending or reasonably foreseeable litigation.  *See United States v.*

7   *Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002); *see also Leon v. IDX Sys.*

8   *Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) ("A party's destruction of evidence qualifies as

9   willful spoliation if the party has 'some notice that the documents were potentially

10  relevant to the litigation before they were destroyed.'" (quoting *Kitsap Physicians Serv.*,

11  314 F.3d at 1001)).  "Federal law governs the imposition of spoliation sanctions as

12  'spoliation constitutes an evidentiary matter.'"  *Estate of Hill v. NaphCare, Inc.*, No. 20-

13  cv-00410, 2022 WL 1464830, at *9 (E.D. Wash. May 9, 2022) (quoting *Ala. Aircraft*

14  *Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 739 (N.D. Ala. 2017)).  "In the Ninth Circuit,

15  spoliation of evidence raises a presumption that the destroyed evidence goes to the merits

16  of the case, and further, that such evidence was adverse to the party that destroyed it."

17  *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, No. C06-3359, 2009 WL 1949124, at

18  *10 (N.D. Cal. July 2, 2009) (citing *Phoceene Sous–Marine, S.A. v. U.S. Phosmarine,*

19  *Inc.*, 682 F.2d 802, 806 (9th Cir.1982)).  In *Dong Ah*, the district court found that a party

20  was entitled to multiple adverse-inference instructions after an opposing party destroyed

21  certain relevant and responsive materials in violation of its own document retention

22  policies.  *Id.* at *3–11.

23

1    Under Rule 37(e), a party seeking sanctions for spoliation of ESI bears the burden

2    of proof, *see Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015), and must

3    show, at a minimum, that (i) the evidence at issue qualifies as ESI, (ii) the ESI is "lost"

4    and "cannot be restored or replaced through additional discovery," (iii) the offending

5    party "failed to take reasonable steps to preserve" the ESI, and (iv) the offending party

6    was under a duty to preserve it. *Gaina v. Northridge Hosp. Med. Ctr.*, No. CV 18-177,

7    2019 WL 1751825, at *2–3 (C.D. Cal. Feb. 25, 2019). If these four criteria are met and

8    the Court determines that the moving party is prejudiced from the "loss of the

9    information," the Court may "order measures no greater than necessary to cure the

10   prejudice." *See* Fed. R. Civ. P. 37(e)(1). For example, in *Gaina*, the district court

11   concluded that plaintiff's failure to preserve relevant text messages prejudiced the

12   defendant and required plaintiff to pay certain monetary sanctions to cure the prejudice.

13   2019 WL 1751825, at *5. Although plaintiff argued that she deleted the text messages

14   pursuant to her practice of "habitually" clearing memory space on her phone, the *Gaina*

15   Court explained that plaintiff was under a duty to preserve her "highly relevant"

16   communications. *Id.* at *4.

17   "Although [Rule] 37(e) does not place the burden of proving or disproving

18   prejudice on either party, if spoliation is proven, the burden shifts to the spoliating party

19   to prove the lost information is not prejudicial." *See Youngevity Int'l v. Smith*, No. 16-cv-

20   704, 2020 WL 7048687, at *3 (S.D. Cal. July 28, 2020) (citing Fed. R. Civ. P. 37(e)

21   advisory committee's note to 2015 amendment). A party is prejudiced when the

22   spoliating party's actions impair the "non-spoliating party's ability to go to trial" or

23

ORDER - 16

threaten to "interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (citation omitted). If the Court finds that the offending party "acted with the intent to deprive" the moving party "of the information's use in the litigation," the Court may "presume that the lost information was unfavorable" to the offending party, "instruct the jury that it may or must presume the information was unfavorable" to the offending party, or "dismiss the action or enter a default judgment." *See* Fed. R. Civ. P. 37(e)(2). "Intent may be inferred if a party is on notice that documents were potentially relevant and fails to take measures to preserve relevant evidence, or otherwise seeks to keep incriminating facts out of evidence." *Estate of Hill*, 2022 WL 1464830, at *11 (citation omitted).

Rule 37(e) creates a "uniform standard in federal court" and rejects the notion that, when ESI is spoliated, adverse-inference instructions may be predicated on a finding of mere negligence or gross negligence, as opposed to an "intent to deprive another party of the information's use in the litigation." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Whether the offending party "acted with the intent to deprive" the moving party "of the information's use in the litigation," *see* Fed. R. Civ. P. 37(e)(2), is a question for the Court. *See Mannion v. Ameri-Can Freight Sys. Inc.*, No. CV-17-03262, 2020 WL 417492, at *4 (D. Ariz. Jan. 27, 2020) (explaining that judges make discovery-related factual findings). For the purposes of Rule 37(e), intent can be proven through direct or circumstantial evidence. *See Estate of Hill*, 2022 WL 1464830, at *12 ("Courts have found the requisite 'intent to deprive' when a litigant fails to provide a credible explanation for departing from standard operating procedure and intentionally failing to preserve ESI."); *see also Colonies Partners, L.P. v. County of San Bernadino*,

No. 18-cv-00420, 2020 WL 1496444, at *11 (C.D. Cal. Feb. 27, 2020) ("Courts also

consider the timing of the document loss when evaluating intent."). Further, "an

employee's misconduct with regard to spoliation can be imputed to an employer."

*Colonies Partners*, 2020 WL 1496444, at *10.

In *Estate of Hill*, the district court held that a municipal defendant intentionally

spoliated "six hours of highly relevant video [surveillance] evidence" from a county jail.

2022 WL 1464830, at *13. In finding that the defendant acted with the requisite intent to

avoid its litigation obligations, the court explained that the defendant provided "no

explanation—credible or otherwise—about why someone" at the jail made the intentional

choice to permanently destroy a portion of the relevant surveillance video. *Id.* at *12.

Similarly, the *Colonies Partners* Court found that a defendant, a former district attorney

"who had the assistance of experienced civil litigation counsel" acted with the requisite

intent under Rule 37(e)(2) when he deleted certain text messages and emails. 2020 WL

1496444, at *10.

**b.    Whether the City Spoliated Evidence**

**i.    The City's Duty to Preserve ESI**

As an initial matter, neither party disputes that all of the text messages at issue in

this action constitute ESI for the purposes of Rule 37(e). *Gaina*, 2019 WL 1751825, at

*3 (applying Rule 37(e) to text messages). Similarly, the parties do not dispute that the

seven above-referenced City officials were under a duty to preserve their text messages.

Clearly, the parties had a duty to preserve relevant evidence, including text messages, as

soon as a claim was identified. *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976,

990–91 (N.D. Cal. 2012) (citing *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d
1060, 1067 (N.D. Cal. 2006)); *see also Akiona v. United States*, 938 F.2d 158, 161 (9th
Cir. 1991) (concluding that a duty to preserve information arises when the party has
"some notice that the documents are potentially relevant").  The Court therefore turns to
whether the text messages are lost and cannot be replaced through additional discovery
and whether the City took reasonable steps to preserve the text messages.  *See* Fed. R.
Civ. P. 37(e).

> ii.      **Whether the Text Messages are Lost and Cannot be Replaced
>          Through Additional Discovery**

The City argues that it has produced tens of thousands of text messages from other
employees' devices, such as deputy mayors, Mayor Durkan's Chief of Staff, and multiple
SPD officials, and has successfully recreated thousands of the officials' deleted text
messages by obtaining the messages from other sources.  Indeed, the City has recreated
over 161,000 of these officials' deleted text messages.  *See* Dawson Decl. at ¶ 6 (docket
no. 141).[11]  The City has recreated 2,868 of Mayor Durkan's, 9,348 of Chief Best's, and
15,414 of Chief Scoggins's deleted text messages.  *Id.* at ¶ 42.  The City also contends
that Plaintiffs have provided no evidence supporting the notion that Mayor Durkan, Chief
Best, and Chief Scoggins "texted alone as a group at any time."  *Id.* at ¶ 44.

---

[11] Martha Dawson is a partner at the law firm K&L Gates, LLP, which represents the City in other
litigation arising from protests occurring in the summer of 2020.  Dawson Decl. at ¶ 14 (docket no. 141).
Dawson collaborated with the City's Counsel in this action to develop and implement a methodology to
recreate deleted text messages.  *Id.* at ¶ 15.

The City, however, ignores that it has not recovered *any* deleted text messages exchanged directly between Mayor Durkan and Chief Best, Mayor Durkan and Chief Scoggins, or Chief Scoggins and Chief Best, during the CHOP period.[12]  *See* Faulkner Dep. at 109:3–12, Ex. 9 to Calfo Decl. (docket no. 105-1).  The parties do not dispute that these high-level officials communicated directly with each other via text message during the CHOP period.  *See* Best Dep. (Nov. 9, 2021) at 205:7–208:16, Ex. 22 to Cramer Decl. (docket no. 140-22); Scoggins Dep. at 107:6–21 (docket no. 140-24).  The Court therefore concludes that a substantial number of the deleted text messages are lost and cannot be restored or replaced through additional discovery.  *See Youngevity*, 2020 WL 7048687, at *4 ("[S]ome of the [defendants] have spoliated text messages over the same time periods, thus it is not possible to obtain text messages that may have been exchanged between them during these periods because both the sender and receiver have lost all text messages.").

### iii.       The City's Failure to Preserve the Text Messages

The City argues that it took reasonable steps to preserve ESI and that Rule 37(e) "does not call for perfection."  *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Although the City issued a significant number of litigation holds, officials at the highest levels of City government completely disregarded these holds and deleted thousands of relevant text messages.  *See* Dawson Decl. at ¶ 42 (explaining that

---

[12] The City conceded at oral argument that it does not know exactly how many of the deleted text messages are still missing.

the City has produced thousands of responsive text messages as a result of its efforts to

recreate the deleted messages, which demonstrates that the City deleted thousands of

relevant messages).  Given the scope of the loss, the Court cannot conclude that the City

took reasonable steps to preserve the messages. *See First Fin. Sec., Inc. v. Freedom*

*Equity Grp., LLC*, No. 15-cv-1893, 2016 WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016)

("[Defendant] took no reasonable steps to preserve text messages, and those messages

cannot be restored or replaced through additional discovery.").  The City's failure to

timely notify these officials of their obligation to preserve ESI, its failure to follow its

own protocols to maintain City text messages, and its long delay in notifying Plaintiffs of

the deleted messages after Michelle Chen first discovered the issue (with respect to

Mayor Durkan's messages) on August 21, 2020, lead the Court to conclude that the

City's spoliation was much more egregious than a failure to achieve "perfection."   The

City cannot reasonably dispute that significant evidence is missing in this action and can

never be recovered.

### c.    Whether Sanctions are Appropriate

#### i.    Prejudice

Having found that the City spoliated the officials' deleted text messages, the Court

may impose sanctions against the City if Plaintiffs are prejudiced by the loss of the

messages.  *See Youngevity*, 2020 WL 7048687, at *4 ("Only upon a finding of prejudice

may sanctions be issued."); Fed. R. Civ. P. 37(e)(1).  As discussed above, the City bears

the burden to show that Plaintiffs have not been prejudiced by the City's conduct.  *See*

*Youngevity*, 2020 WL 7048687, at *3.  In this case, the City has not met its burden and

1  the Court finds that Plaintiffs have been prejudiced by the City's spoliation of the

2  officials' text messages.  The City's reconstruction of thousands of missing text

3  messages, although helpful, cannot replace the text messages that it has not recovered.

4  *See id.* at *4 ("Plaintiffs are still likely prejudiced because the ESI produced is no

5  substitute for the potentially relevant information within lost text messages."); *see also*

6  *Leon*, 464 F.3d at 959 (explaining that an offending party cannot assert a "presumption of

7  irrelevance" as to destroyed material because the relevance of destroyed documents

8  "cannot be clearly ascertained" (citation omitted)).  Moreover, the missing text messages

9  at issue in this action are not from low-level City employees.  Rather, Plaintiffs have been

10  deprived of text messages from multiple officials representing the highest levels of City

11  government and those responsible for establishing and implementing the City's response

12  to CHOP.  Of great significance is the fact that any direct messages between these

13  officials, such as those between Mayor Durkan and Chief Best or between Mayor Durkan

14  and Chief Scoggins, cannot be recovered.  The Court finds that the deleted text messages

15  threaten to interfere with the rightful decision in this case, *id.*, and sanctions against the

16  City are clearly warranted.

17            **ii.      Intent**

18            Plaintiffs request entry of default judgment against the City, thereby raising the

19  issue of whether the City acted with intent to deprive Plaintiffs of the information's use in

20  this matter.  *See* Fed. R. Civ. P. 37(e)(2).  Only upon a finding of intent may the Court

21  impose severe sanctions such as an adverse-inference instruction or default judgment.

22  *See id.*  In *Youngevity*, for example, the district court found that defendants did not act

23

with the requisite intent under Rule 37(e)(2) when they deleted text messages relevant to

litigation.  2020 WL 7048687, at *4.  There, plaintiffs failed to show that the defendants'

"conduct surpassed gross negligence," *id.* at *4,  in part because the parties' independent

forensic expert "could not distinguish between intentional deletions and deletions caused

by unintentional technological malfunctions,"  *id.* at *1.  On this record, however, the

Court finds substantial circumstantial evidence that the City acted with the requisite

intent necessary to impose a severe sanction and that the City's conduct exceeds gross

negligence.

This case does not involve a single high-level City official inadvertently allowing

his or her phone to be reset.  *See Stevens v. Brigham Young Univ.–Idaho*, No. 16-CV-

530, 2019 WL 6499098, at *2 (D. Idaho Dec. 3, 2019).  Instead, Mayor Durkan, Chief

Best, Chief Scoggins, and other key City officials purged (through factory resets,

changed retention settings, or manual deletions) thousands of CHOP-related text

messages from their phones *after* they were under a clear legal obligation to preserve

such information and without confirming that all of their text messages had been

preserved through other means.[13]  *See, e.g., Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d

---

[13] The City speculates that the timing of Chief Scoggins's, Assistant Chief Greening's, Fisher's, Neafcy's, and Beauregard's factory resets, which all occurred between October and November 2020, might be explained by a City security protocol.  Brian Kennedy, one of SPD's mobile phone coordinators, explained during his deposition that a preexisting City security protocol will periodically prompt users of City-issued phones to change their passcodes.  Kennedy Dep. at 127:15–128:13, Ex. 28 to Cramer Decl. (docket no. 140-28).  The record, however, is unclear as to whether this protocol was responsible for the issues experienced by all five of these officials.  Regardless of the circumstances that led to Chief Scoggins, Assistant Chief Greening, Fisher, Neafcy, and Beauregard being locked out of their phones, all of their phones were purposefully reset in blatant disregard of the City's duty to preserve all CHOP-related text messages.  Importantly, the City failed to ensure that these officials' relevant messages were

1   410, 431 (W.D.N.Y. 2017) ("While knowing they had a duty to preserve the event

2   recorder data, defendants allowed the original data on the event recorder to be

3   overwritten, and destroyed or recycled [an employee's] laptop without ever confirming

4   that the data had been preserved in another repository.").  The City cannot reasonably

5   dispute that these officials were aware of their obligation to preserve all CHOP-related

6   communications.  Mayor Durkan, an experienced attorney, was certainly aware of her

7   duty to preserve evidence relevant to this action.  Although the City argues that many of

8   the deleted messages are not likely relevant, its efforts to recover the messages have

9   resulted in the production of thousands of responsive communications, *see* Dawson Decl.

10  at ¶ 42, leading the Court to conclude that many relevant text messages remain missing.

11      The City's failure to respond once it learned of Mayor Durkan's missing text

12  messages supports a finding of intent.  Although the City attempts to argue that it did not

13  learn of Mayor Durkan's missing text messages until October 2020, Def.'s 1st Suppl.

14  Answer to Pls.' Interrogs. No. 27 (docket no. 105-1 at 86 n.1), the City does not dispute

15  that Mayor Durkan's counsel was employed by the City Attorney's Office and learned of

16  the Mayor's missing text messages on August 21, 2020, Def.'s 1st Suppl. Answer to Pls.'

17  Interrogs. (docket no. 105-1 at 85).  Despite this knowledge, the City did not take any

18  action to ensure that other officials' text messages were preserved, which is demonstrated

19

20

21  preserved before resetting their phones months after litigation had commenced in this action, and the
    Court finds that the City's conduct far surpasses gross negligence.

22

23

ORDER - 24

1  by the conduct of six officials who deleted their text messages and/or reset their phones

2  after August 21, 2020.  The Court is also troubled by the fact that on September 17, 2020,

3  a City employee factory reset the iPhone 8 Plus that Mayor Durkan had allegedly

4  dropped into the water without first creating a backup of the device, further frustrating

5  the recovery of any of the Mayor's deleted text messages.  Leatha Report at 13; Arhu

6  Dep. at 75:2–17 (docket no. 105-1).

7        The City's delay in notifying Plaintiffs about this issue is also circumstantial

8  evidence that the spoliation was intentional.  The record reflects that the City "hid the

9  ball" until forced to disclose the missing text messages in March 2021.  On November 5,

10  2020, the City retained its own digital forensics expert to attempt to recover missing text

11  messages from Mayor Durkan's and Chief Best's phones, *see* Faulkner Report at 1–3

12  (docket no. 105-1), but did not inform Plaintiffs that any text messages were missing until

13  March 26, 2021.  Cramer Decl. at ¶¶ 7–8 (docket no. 140).  Plaintiffs then attempted to

14  subpoena any CHOP-related text messages from Chief Best's personal phone, but she

15  had already factory reset the device at an Apple Store.  Best Dep. (Nov. 9, 2021) at

16  224:20–225:21 (docket no. 105-2).  Although the City attempts to blame its delay in

17  discovering the missing messages on the COVID pandemic, Cramer Decl. at ¶ 5, or the

18  length of time it took to image the officials' phones, *id.* at ¶ 8, the City's COVID

19  protocols cannot explain why all of the key City officials' text messages were deleted in

20  complete disregard of their legal obligation to preserve all CHOP-related ESI from the

21  CHOP period.

22

23

1    To be clear, Plaintiffs have not presented sufficient evidence from which the Court

2  could conclude that the seven City officials acted pursuant to some elaborate conspiracy

3  to delete their text messages.  Plaintiffs have, however, presented substantial

4  circumstantial evidence that the City acted with the requisite "intent to deprive," within

5  the meaning of Rule 37(e)(2).  *See Estate of Hill*, 2022 WL 1464830, at *11 (explaining

6  that intent may be inferred "if a party is on notice that documents were potentially

7  relevant and fails to take measures to preserve relevant evidence . . . ").  The Court

8  concludes that the City acted with the intent to deprive Plaintiffs of the text messages'

9  use in litigation.  The Court finds that the deleted text messages were highly likely to

10  have contained relevant communications between high-level City officials discussing

11  ongoing events during the CHOP period.  *See Leon*, 464 F.3d at 960 (explaining how

12  "any number" of the 2,200 files plaintiff spoliated "could have been relevant" to

13  defendant's claims or defenses "although it is impossible to identify which files and how

14  they might have been used.").  Because the Court finds that the City acted with the

15  requisite intent, Rule 37(e)(2) permits the imposition of severe sanctions.

16        **iii.        Appropriate Sanction**

17    When deciding whether to impose a terminating sanction such as entry of default

18  judgment, a court must consider five factors:  (i) "the public's interest in expeditious

19  resolution of litigation," (ii) "the court's need to manage its docket," (iii) "the risk of

20  prejudice to the party seeking sanctions," (iv) "the public policy favoring disposition of

21  cases on their merit," and (v) "the availability of less drastic sanctions."  *Colonies*

22  *Partners*, 2020 WL 1496444, at *11 (alteration omitted, citing *Thompson v. Hous. Auth.*

23

ORDER - 26

1    *of L.A.*, 782 F.2d 829, 831 (9th Cir. 1986)).  "Terminating sanctions may be warranted

2    where a party is no longer able to present its case, spoliation occurs in direct violation of

3    a court order, where a party has obviously engaged in deceptive practices during

4    litigation, or where a court anticipates continued deceptive misconduct."  *Id.*  Although

5    the scope of the City's spoliation in this case is egregious, entry of default judgment

6    against the City is too severe and is not supported by the factors referenced above or the

7    evidence.

8           The Court concludes that a lesser sanction, namely an adverse jury instruction, is

9    appropriate to cure the prejudice in this case.  Plaintiffs request that any adverse-

10   inference instruction clearly identify the elements of their claims that the jury should

11   presume are satisfied, but such a detailed instruction is unwarranted.  Although Plaintiffs

12   have been prejudiced by the destruction of the officials' text messages, whether the

13   spoliated text messages contained evidence supporting particular elements of Plaintiffs'

14   claims is unclear.  Instead, the Court will issue an adverse instruction at trial that the jury

15   *may* presume that the City officials' text messages (deleted after Plaintiffs commenced

16   this action) were unfavorable to the City.[14]  *See* Fed. R. Civ. P. 37(e)(2)(B) (authorizing

17   the Court to "instruct the jury that it may . . . presume the information was unfavorable to

18   the party").  Further, Plaintiffs will be allowed to present evidence and argument at trial

19   about the City's deletion of the text messages.  Plaintiffs are also awarded attorneys' fees

20

21   ───────────────

22   [14] The Court will determine the exact language of the instruction at a later date.

23

1  and costs (including expert-related costs) incurred as a result of the City's spoliation of

2  evidence.  *See Youngevity*, 2020 WL 7048687, at *5.  Accordingly, Plaintiffs' motion for

3  sanctions is GRANTED in part and DENIED in part.

4  **The City's Motion for Sanctions (docket no. 107)**

5  **1.    Background**

6         The City is not the only party missing text messages in this action.  The City

7  alleges that certain plaintiffs, namely the Hunters Capital entities, Richmark Label,

8  Bergman's Lock and Key, Onyx HOA and Wade Biller, Car Tender, and Matthew

9  Ploszaj, also spoliated evidence.

10         **a.       The Hunters Capital Entities**

11         In a letter dated December 23, 2021, Plaintiffs informed the City that they were

12  unable to recover any text messages sent or received by Hunters Capital's founder and

13  CEO Michael Malone from before March 26, 2021, "either from his iPhone or from any

14  other backup source."  Ex. 2 to Cramer Decl. (docket no. 108-2).  During his deposition

15  in this matter, Malone explained that he sometimes deleted "random messages" from his

16  phone, Malone Dep. at 290:12–20, Ex. 2 to Reilly-Bates Decl. (docket no. 123-2), and

17  was aware of his obligation to preserve text messages related to this action, Malone Dep.

18  at 281:12–15, Ex. 1 to Cramer Decl. (docket no. 108-1).  In a declaration dated

19  October 25, 2022, Malone declares that he provided the iPhone he used during CHOP to

20  Plaintiffs' Counsel on May 3, 2021, so the phone could be imaged.  Malone Decl. at

21  ¶¶ 3–4 (docket no. 127).  After Plaintiffs' Counsel returned the phone, Malone lost the

22  device, sometime near the end of May 2021.  *Id.* at ¶ 5.

23

1    Someone later found Malone's phone and shipped it to Hunters Capital's

2    Broadway office in Seattle. *Id.* at ¶ 5. The package containing the phone, however, was

3    stolen after the delivery person left it on the street. *Id.* Malone's attempts to locate the

4    device were unsuccessful, *id.* at ¶ 6, and he later learned that the image of his phone taken

5    in May 2021 contained no text messages older than March 26, 2021. *Id.* at ¶ 7. Malone

6    cannot explain why there were no text messages on his phone prior to March 26, 2021,

7    *id.*, and he claims that he never deleted his entire text message history from CHOP, *id.* at

8    ¶ 8. Although Malone admits that he occasionally deleted marketing and spam messages,

9    he categorically denies deleting any CHOP-related messages. *Id.* at ¶ 9.

10       **b.    Richmark Label**

11    During his deposition, Richmark Label's owner Bill Donner testified that he

12    deleted all of his CHOP-related text messages. Donner Dep. at 197:6–200:11, Ex. 13 to

13    Cramer Decl. (docket no. 108-13). Donner explained that he deleted his CHOP-related

14    messages like he "normally" does with all texts. *Id.* at 199:11–14. According to a

15    declaration dated October 24, 2022, Donner deleted all of his text messages from the

16    relevant time period "during or shortly after CHOP concluded on July 1, 2020, due to

17    [his] normal habit of deleting text messages shortly after they are received." Donner

18    Decl. at ¶ 14 (docket no. 137). Donner declares that all of his deleted text messages

19    "would have only been with personal family and friends." *Id.* at ¶ 16.

20       **c.    Bergman's Lock and Key**

21    Bergman's Lock and Key owner Lonnie Thompson testified during his deposition

22    that he no longer has any CHOP-related text messages because he inadvertently dropped

23

his phone into Lake Washington in October 2020 and lost its replacement while hiking in January 2021.  Thompson Dep. at 104:3–106:13, Ex. 15 to Cramer Decl. (docket no. 108-15).  In a declaration dated October 21, 2022, Thompson explains that he was unable to locate either phone and did not use any form of backup or cloud-based storage. Thompson Decl. at ¶¶ 4–5 (docket no. 135).  Thompson asked his employees if they had any of his CHOP-related text messages, but none had any messages to produce.  *Id.* at ¶ 6.

### d.    Onyx HOA and Wade Biller

Wade Biller, an Onyx HOA board member and individual plaintiff in this action, is also missing CHOP-related text messages.  In December 2020, Biller replaced the Android phone he used during CHOP with a new iPhone.  Biller Dep. at 68:15–69:1, Ex. 14 to Cramer Decl. (docket no. 108-14).  When Biller provided his old phone to Plaintiffs' Counsel in May 2021, it was "no longer functioning properly and [he] could no longer personally access" any messages on the device.  Biller Decl. at ¶ 16 (docket no. 138).  According to Biller, Plaintiffs' "tech consultants" have been unable to turn on the phone.  *Id.* at ¶ 17.

### e.    The Signal Plaintiffs

Beginning in June 2020, several plaintiffs and/or their representatives began using the "Signal" messaging application to discuss the protests occurring in and around Cal Anderson Park.  Biller Dep. at 63:1–64:2 (docket no. 108-14).  Signal is known for "disappearing messages," which can be automatically erased from every participant's phone after a period set by the sender.  Ex. 16 to Cramer Decl. (docket no. 108-16).

1   These plaintiffs include Hunters Capital's co-owner Jill Cronauer, Wade Biller, Matthew

2   Ploszaj, Richmark Label's sales and marketing manager Elle Lochelt, Hunters Capital's

3   residential leasing manager Kayla Stevens, and Car Tender co-owner John McDermott

4   (collectively the "Signal Plaintiffs").

5          Cronauer declares that she participated in the Signal group "mostly passively for

6   only a couple of days" and stopped using the application altogether in late June 2020.

7   Cronauer Decl. at ¶ 6 (docket no. 134).  Similarly, Ploszaj, McDermott, Lochelt, and

8   Stevens allege that they participated passively in the Signal messaging group and

9   discontinued use of the application in November 2020, January 2021, August 2020, and

10  July 2020, respectively.  Ploszaj Decl. at ¶ 5 (docket no. 136); McDermott Decl. at ¶ 4

11  (docket no. 129); Lochelt Decl. at ¶ 3 (docket no. 126); Stevens Decl. at ¶ 3 (docket

12  no. 128).  Biller's Signal messages cannot be recovered because they are saved to his

13  earlier-discussed, inoperable Android phone.  Biller Dep. at ¶ 16.  All of the Signal

14  Plaintiffs declare that they never used the application's "disappearing messages" feature.

15  Cronauer Decl. at ¶ 10; Ploszaj Decl. at ¶ 9; McDermott Decl. at ¶ 9; Lochelt Decl. at ¶ 7;

16  Stevens Decl. at ¶ 7; Biller Decl. at ¶ 21.

17         The City asks the Court for an adverse inference instruction, exclusion of

18  evidence, and an award of fees and costs as to the Hunters Capital entities, Richmark

19  Label, Car Tender, and Ploszaj.  The City requests only fees and costs as to Biller, Onyx

20  HOA, and Bergman's Lock and Key.

21

22

23

1    **2.    <u>Discussion</u>**

2         **a.    Whether Plaintiffs Spoliated Evidence**

3              **i.    Plaintiffs' Duty to Preserve ESI**

4         As discussed above, the parties agree that text and/or Signal messages qualify as

5    ESI under Rule 37(e), and Plaintiffs do not dispute that they were under a duty to

6    preserve their messages.  Instead, Plaintiffs argue that Wade Biller of Onyx HOA and

7    Lonnie Thompson of Bergman's Lock and Key took reasonable steps to preserve their

8    ESI.

9              **ii.    Reasonable Steps to Preserve**

10         With respect to Biller, the available evidence indicates that his old phone stopped

11   working through no fault of his own.  Biller Dep. at 68:15–69:1 (docket no. 108-14).

12   According to Biller, he placed his old phone in a drawer after he acquired a new phone in

13   December 2020.  *Id.*; Biller Decl. at ¶ 15.  When he turned his old phone over to

14   Plaintiffs' Counsel in May 2021, "it was no longer functioning properly" and he could

15   not access the text or Signal messages on the device.  Biller Decl. at ¶ 16.  Unlike the

16   City officials' conduct, which involved factory resetting phones or manually deleting text

17   messages without ensuring that messages were preserved elsewhere, Biller stored his

18   phone in a drawer for safekeeping.  The City has not provided any evidence

19   demonstrating that Biller failed to take reasonable steps to preserve his messages.

20         Similarly, the City has failed to show that Lonnie Thompson of Bergman's Lock

21   and Key failed to take reasonable steps to preserve his messages.  Thompson

22   inadvertently lost the phone he used during CHOP while boating on Lake Washington in

23

1    October 2020, *see* Thompson Dep. at 105:17–106:13 (docket no. 108-15); Thompson

2    Decl. at ¶¶ 3–4, and lost its replacement in January 2021 while hiking in the Cascades.

3    *See* Thompson Dep. at 105:17–106:13 (docket no. 108-15); Thompson Decl. at ¶ 5.

4    Although Thompson did not save his text messages to any external source, the City has

5    cited no authority requiring individuals to back up their text messages to iCloud or an

6    equivalent service.  Accordingly, the Court concludes that Biller (Onyx HOA) and

7    Thompson (Bergman's Lock and Key) did not spoliate evidence in this case.

8            **iii.       Whether Plaintiffs' Messages are Lost and Cannot be Replaced
                      Through Additional Discovery**

9

10          Plaintiffs also argue that the Signal Plaintiffs' messages are not lost because they

11   have provided the City with over 8,866 Signal messages collected from a third-party

12   participant who was involved in the neighborhood chat, *see* Reilly-Bates Decl. at ¶ 14

13   (docket no. 123).  All of the Signal Plaintiffs, with the exception of Biller (who took

14   reasonable steps to preserve the phone he used during CHOP), have reviewed the

15   messages collected from the third party and do not recall sending any other messages

16   using the Signal application.  *See* Cronauer Decl. at ¶ 8; Ploszaj Decl. at ¶ 10; McDermott

17   Decl. at ¶ 10; Lochelt Decl. at ¶ 6; Stevens Decl. at ¶ 5.  Likewise, all of the Signal

18   Plaintiffs deny using the "disappearing messages" feature.  Cronauer Decl. at ¶ 10;

19   Ploszaj Decl. at ¶ 9; McDermott Decl. at ¶ 9; Lochelt Decl. at ¶ 7; Stevens Decl. at ¶ 7;

20   Biller Decl. at ¶ 21.  Because the Signal Plaintiffs' messages are not lost, the Court

21   concludes that the Signal Plaintiffs did not spoliate their messages.

22

23

1    Plaintiffs, however, appear to concede that Michael Malone of Hunters Capital

2    and Bill Donner of Richmark Label spoliated their CHOP-related text messages, and they

3    argue only that (i) the loss is not prejudicial to the City, and (ii) Malone and Donner did

4    not act with the requisite intent.  Malone does not dispute that he no longer has any text

5    messages predating March 26, 2021, Malone Decl. at ¶ 7 (docket no. 127), or that he

6    sometimes texted about business-related matters, *see* Malone Dep. at 232:1–233:25,

7    246:1–247:25, 251:1–252:25 (docket no. 108-1).  Donner testified that he knowingly

8    deleted all of his CHOP-related text messages pursuant to his habit of deleting text

9    messages shortly after he receives them.  Donner Dep. at 197:6–200:11 (docket no. 108-

10    13); Donner Decl. at ¶¶ 12–14 (docket no. 137) ("Ever since I have used a cellphone, I

11    have had a habit of deleting every text message in a conversation as soon as the

12    conversation is completed.").  Accordingly, the Court concludes that Malone and Donner

13    spoliated their CHOP-related text messages.

14         **b.    Whether Sanctions are Appropriate**

15    The City asks the Court for an adverse inference instruction as to the Hunters

16    Capital entities and Richmark Label, and argues that Malone (Hunters Capital's CEO)

17    and Donner (Richmark Label's owner) deleted their text messages with the intent to

18    deprive the City of evidence in this matter.  The Court disagrees.  Although Malone no

19    longer has any text messages predating March 26, 2021, the day the City informed

20    Plaintiffs' Counsel that some of the City's employees' text messages were missing, *see*

21    Cramer Decl. at ¶ 4 (docket no. 108), Malone declares that he did not learn of issues with

22    the City officials' text messages until after his phone was imaged on May 3, 2021.

23

1  Malone Decl. at ¶ 12.  Malone contends that he "never intentionally deleted text

2  messages that would be relevant to this case or regarding CHOP or that would have been

3  relevant to the Hunters Capital business."  Malone Decl. at ¶ 9.  Although Malone admits

4  that he sometimes deleted random marketing or spam messages, he denies ever clearing

5  out his "entire text message history" on the phone he used during CHOP.  *Id.* at ¶¶ 8–9.

6  The City's speculation concerning the coincidental date of March 26, 2021, standing

7  alone, is insufficient to establish intent.

8       Similarly, the City has not shown that Donner acted with the requisite intent to

9  deprive the City of evidence.  Donner testified during his deposition that because he

10  deletes messages frequently, he deleted any CHOP-related text messages during the

11  protest or shortly after it concluded on July 1, 2020.  Donner Dep. at 197:9–198:9 (docket

12  no. 108-13).  Donner claims that he deleted these messages not to deprive the City of

13  evidence, but pursuant to his longstanding habit.  Donner Decl. at ¶¶ 12–14.  Moreover,

14  the City has not been prejudiced by Donner's deleted text messages.  Donner contends

15  that all of his deleted text messages "would have only been with personal family and

16  friends," Donner Decl. at ¶ 16, and that he does not use text messages for any business

17  purpose at Richmark Label, *id.* at ¶ 15.  Importantly, Richmark Label is a plaintiff in this

18  action, not Donner, and how Donner's text messages about CHOP with his personal

19  family and friends would support the City's defense against Richmark Label's claims is

20  unclear.  Thus, sanctions for Donner's missing messages are not appropriate.

21       The City, however, has been prejudiced by Malone's missing text messages.

22  Although some of Malone's messages about CHOP included messages with Hunters

23

ORDER - 35

Capital's co-owner Jill Cronauer and Hunter Capital's employee Michael Oaksmith, *see* Malone Decl. at ¶ 10 (docket no. 127), both of whom produced text messages in this case, *id.*, only some of Malone's text messages from before March 26, 2021, have been recreated.  The Court cannot ignore that many of Malone's messages are still missing. Further, the Hunters Capital entities claim $2.9 million in damages in this action.  *See* Def.'s Mot. (docket no. 107 at 5).  Because of Malone's missing text messages, the Court finds that the City will have to rely on "incomplete and spotty" evidence at trial with respect to the Hunters Capital entities' claims.  *See Skyline Advanced Tech. Servs. v. Shafer*, No. 18-cv-06641, 2020 WL 13093877, at *10 (N.D. Cal. July 14, 2020) (quoting *Leon*, 464 F.3d at 959).  Because the City has suffered prejudice with respect to Malone's text messages, the City's motion for sanctions is GRANTED in part, and the Court will permit the City to present evidence and argument at trial about Malone's missing text messages.  The City is also awarded attorneys' fees and costs incurred as a result of Malone's spoliation of evidence.[15]

**Conclusion**

    For the foregoing reasons, the Court ORDERS:

---

[15] The City's request that the Court re-open discovery for a limited period is DENIED.  The City initially alleged that Hunters Capital's co-owner Jill Cronauer failed to produce certain emails and text messages. Because Plaintiffs have since produced responsive messages and emails, the City has withdrawn the portion of its motion related to Cronauer.  *See* Def.'s Reply (docket no. 153 at 4 n.1).

ORDER - 36

(1)     Plaintiffs' motion for spoliation sanctions, docket no. 104, is GRANTED in part and DENIED in part.  The Court will instruct the jury that it *may* presume that the City officials' text messages (deleted after Plaintiffs commenced this action) were unfavorable to the City, and Plaintiffs will be allowed to present evidence and argument at trial regarding the City's deletion of the text messages.  Plaintiffs are AWARDED attorneys' fees and costs (including expert-related costs) incurred as a result of the City's spoliation of evidence.  Except as GRANTED, Plaintiffs' motion and all other requested remedies are DENIED.

(2)     The City's motion for spoliation sanctions, docket no. 107, is GRANTED in part and DENIED in part.  The City will be allowed to present evidence and argument at trial regarding Malone's missing text messages, and the City is AWARDED attorneys' fees and costs incurred as a result of the Hunters Capital entities' spoliation of evidence. Except as GRANTED, the City's motion and all other requested remedies are DENIED.

(3)     On or before Thursday, February 16, 2023, the parties shall file (i) declarations reciting the amount of attorneys' fees and costs incurred in seeking the spoliated text messages, and (ii) the documentation necessary to support such amounts, and they shall note their filings for the Court's consideration no later than the third Friday thereafter.[16]  The parties may file any responses or replies in accordance with LCR 7(d).

(4)     The Clerk is directed to send a copy of this Order to all counsel of record.

_____

[16] The City's declaration shall be limited to the amount it incurred seeking missing text messages from Hunters Capital's founder Michael Malone.

ORDER - 37

1    IT IS SO ORDERED.

2    Dated this 13th day of January, 2023.

3

4                                        _____
                                         Thomas S. Zilly
5                                        United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 38