# EXHIBIT 1

# McKee Appraisal
### Real Estate | Consulting

April 28, 2022

Arthur W. Harrigan, Jr.
Harrigan Leyh Farmer & Thomsen LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104

RE:     Expert Report of Bates McKee, MAI
        *Hunters Capital LLC et al v. City of Seattle, Case No. 2:20-cv-00983 TSZ*

Mr. Harrigan:

You have asked me to study the events and circumstances related to the case referenced above, which involves claims from property owners, tenants, businesses and individuals that they experienced legally compensable harm as a result of alleged actions and decisions by the City of Seattle. Each of the plaintiffs essentially claims that the City caused economic harm by making certain decisions regarding protest activities and violence in the CHOP area. It is my understanding that the period I am to focus on is between June 8, 2020 and July 10, 2020, a total of 33 days (1.08 months).

I am a real estate valuation expert and have extensive knowledge regarding the issues of market rent, vacancy and market value, including significant work over many years in the Capitol Hill neighborhood and in nearby downtown Seattle and extending to many other nearby or otherwise comparable Seattle neighborhoods. I have also been observing these neighborhoods for professional purposes in valuation throughout the coronavirus pandemic era beginning in March, 2020, with particular focus on the subject properties and the claim period starting with my engagement for this assignment in May, 2021. The scope of my work also included:

• Review of the original complaint and amended complaint;
• Brief review of various documents and discovery material provided by your firm, including transcripts of depositions taken in the case, for the purpose of identifying specific information that may be relevant to this expert report (list of documents provided attached);
• Review of the damages worksheet produced by plaintiff Hunters Capital LLC ("CHOP-0007739.xls"), identifying specific subject properties, tenants and damage claims;
• Several visits to the CHOP claim area, in conjunction with visits to other nearby or comparable neighborhoods, to assess both the specific claims and the relative real estate activity in the subject neighborhood.
• Independent interviews of market participants (landlords, property managers, tenants and businesses) in the Seattle market regarding the impact of Covid, protests, and other factors on the performance of the CHOP real estate market compared to other similar neighborhoods and markets in Seattle.
• Independent investigation of the claimant properties and their tenancies and markets;

CONFIDENTIAL

Case 2:20-cv-00983-TSZ    Document 170-1    Filed 02/02/23    Page 3 of 72

- Independent investigation of the performance of the CHOP real estate market compared to other similar neighborhoods and markets in Seattle.

I employed several professional appraisers to assist with the analysis, including Jacki Johnson, MAI; Mari Sorenson, MAI; Amy Bradley and Austin Kinzer, all employees of my company. The following expert report is submitted based on analysis of the Plaintiffs' claims as of the date of publication.

**Background and Timeline, Covid and CHOP**

Putting aside some of the individual plaintiff claims for emotional distress, the claims were submitted for several broad categories: some claims relate to alleged physical and economic damage to plaintiffs' real estate; some claims relate to the business of owning real estate (mortgage payments and tenant turnover costs); and some relate to alleged tenant business losses (alleged losses in revenues or profits incurred by tenants). Our expert investigation addresses these topical categories, focusing in particular on the real estate and tenancy claims, which are our area of expertise.

In analyzing any particular claim allegedly arising during the 33-day period beginning on June 8, 2020, it is imperative to understand the state of the real estate and business market in Seattle, including on Capitol Hill, as of June 2020.

The CHOP events unfolded in the midst of an unprecedented pandemic which began in February 2020, or more than 3 months prior to CHOP. The Covid pandemic crisis had severely impacted real estate, tenants and citizens almost immediately—i.e., well before CHOP--as illustrated in the following timeline.

## Covid/Chop Timeline

| | |
|---|---|
| **Feb. 29, 2020** | Governor Inslee declares a state of emergency in response to the coronavirus pandemic. |
| **March 1, 2020** | Executive Costantine signed proclamation of Emergency for King County. |
| **March 11, 2020** | Emergency proclamation limiting large events in Snohomish, King County (250 max) |
| **March 13, 2020** | Statewide expansion of 250-person maximum ban for large events. WA State orders schools closed. |
| **March 16, 2020** | Gatherings of 50 or more prohibited; restaurants, bars, clubs, theatres, and fitness facilities ordered to close. " All social and recreational establishments". Grocery stores, drug stores, and essential services can remain open. |
| **March 23, 2020** | Inslee signs Stay Home, Stay Healthy order which requires every Washingtonian to stay home unless they need to pursue an essential activity. |
| **May 12, 2020** | Counties with no new coronavirus cases and less than 75k residents can have restricted indoor dining. A 25% capacity limit and other restrictions apply. |
| **May 25, 2020** | George Floyd is killed. |
| **May 29, 2020** | George Floyd protests begin in Seattle, concentrated in downtown. Broken windows, car fires, protesters marching on Interstate-5, and unrest cause city-wide curfews and state-wide activiation of the National Guard. |
| **May 29, 2020** | Inslee announces Safe Start Program with four phases with varying rules and methods for each county. King County was in Phase I. |
| **May 31, 2020** | Protesting begins in front of East Precinct |
| **June 5, 2020** | Pierce and Snohomish counties move to Phase 2, which allows 25% occupancy in restaurants. King goes to a modified Phase 1, and 14 other counties move into Phase 3. King County approves modified phase I reopening:<br>_**In-store retail**_ - All non-essential retail activities may operate subject to Phase 2 guidance with the exception that at no time may an establishment's occupancy be higher than 15% and indoor services are limited to 30 minutes.<br>_**Personal services**_ - All activities may operate subject to Phase 2 guidance with the exception that at no time may the number of customers be more than 25% the number capable of being served at any one time, or 1 person if it is a single bed/chair studio.<br>_**Professional services**_ - Activities may operate subject to Phase 2 guidance with the exception that at no time may an establishment's occupancy be higher than 25% and indoor services are limited to 30 minutes.<br>_**Restaurants**_ - All outdoor dining activities may operate subject to Phase 2 guidance at 50% outdoor capacity with all tables and chairs maintaining 6 feet of distance. Additional or new outdoor seating allowed subject to maintaining 6 feet of distance between tables and chairs, as well as receiving a city permit as is typically needed. All indoor dining services may operate subject to Phase 2 guidance with the exception that at no time may the number of customers be more than 25% of the tables provided such tables and chairs are more than 6 feet away from each other. |
| **June 8, 2020** | SPD temporarily vacates the East Precinct |
| **June 19th** | King County enters Phase 2: _Phase 2 allows for twice the capacity in retail, restaurants, and other businesses previously allowed in King County's modified Phase 1 and goes into effect immediately...the operating capacity has doubled for those able to reopen. For example, restaurants can now operate with 50% of indoor capacity, and retail with 30% capacity._ |
| **June 23, 2020** | Statewide mask mandate – guidance clarifying use in restaurants issued on July 7. |
| **June 27, 2020** | All counties barred from moving to Phase 4. |
| **July 1, 2020** | City implements broad plan to restore CHOP neighborhood to normal |
| **July 2, 2020** | All counties cannot advance beyond their current phase. Bar service is removed from phase 3. Benton, Franklin and Yakima counties can enter a modified phase 1 which allows outdoor seating at 50% capacity. |
| **July 10, 2020** | End of court-designated damages period |
| **July 30, 2020** | Indoor dine-in for tables at restaurants limited to members of the same household, and restaurants must close any game areas (like pool and darts). Alcohol service cutoff at 10 p.m. and indoor bar service is prohibited. Both bars and restaurants can serve people from the same family inside at 50% capacity. |
| **Aug. 6, 2020** | For weddings and events, maximum capacity set at 20% or 30 people, whichever is fewer. Six feet of social distance maintained at all times. |
| **Oct. 6, 2020** | Alcohol cutoff moves from 10 p.m. to 11 p.m. for Phases 2 and 3. Indoor household member restriction for indoor dining eliminated. Additionally, the guidelines allow for the increase of table size to six in Phase 2 and eight in Phase 3. Benton, Franklin and Yakima counties remain in modified phase 1. |
| **Nov. 13, 2020** | Inslee announces travel advisory encouraging Washingtonians to avoid non-essential travel, asking out-of-state travelers to self-quarantine for 14 days |
| **Nov. 18, 2020** | Restaurants and bars close again for indoor dining. Takeout service and outdoor dining allowed with limitations — no more than five people per table and adhering to current guidelines on outdoor dining spaces. |
| **Jan. 11, 2021** | Inslee signs proclamation 20-25.12 Healthy Washington – Roadmap to Recovery. All counties enter Phase 1 of the region-specific plan. Phase 1 prohibits indoor dining and allows outdoor dining, but alcohol service and delivery must end by 11pm. Table sizes limited to six and there is a maximum of two households per table allowed. Indoor wedding receptions remained prohibited and ceremonies are limited to a total of no more than 30 people. |
| **Feb. 1, 2021** | Pierce, Snohomish and King County move to phase 2. Restaurants can now offer indoor dining at 25% capacity. Other rules stay the same. |
| **Feb. 13, 2021** | All but western Washington counties move to Phase 2 and allowed to operate at 25% indoors. Tables must still be kept at 6-foot distances, maximum six people per table and two households per table. Alcohol service ends at 11 pm. The counties that were held back at phase 1 were: Kittitas, Yakima, Benton, Franklin, Walla Walla and Columbia counties. |
| **March 22, 2021** | All counties move to Phase 3 of the latest reopening plan. Indoor dining to increase from 25% to 50% capacity. In addition, table size limits increase from six to 10 people maximum (with no same household rule). Sales of alcohol extended from 11 p.m. to midnight. |
| **April 12, 2021** | Pierce, Whitman and Cowlitz counties move back to Phase 2; all other counties in Phase 3 allowing restaurants to operate at 50% |
| **May 13, 2021** | All counties move to Phase 3. Governor Inslee declares the state will fully reopen by June 30, 2021, or when 70% of Washingtonians over the age of 16 get their first vaccination, whichever is sooner. |
| **June 30, 2021** | Washington state fully reopened and all industry sectors previously covered by the Roadmap to Recovery Phased Reopening (with limited exceptions for large indoor events) returned to usual capacity and operations. |

*Capitol Hill Organized Protest* (vertical label spanning June 8, 2020 – July 10, 2020)

CONFIDENTIAL

The timeline is clear: all social and recreational facilities were essentially fully closed from at least March 16, 2020 to June 5, 2020 (3 days before the start of the claim period), including restaurants, bars, clubs, theaters, fitness facilities, hair and beauty salons and most non-essential businesses. Grocery stores, drug stores and "essential services" could remain open in a limited fashion, but all Washingtonians were ordered to "stay home" unless they needed to pursue an essential activity.  Full and absolute closure began to wane to some extent after June 5 when King County moved to a modified Phase 1 reopening, but significant constraints on business operations continued until well after June 5 and many businesses decided not to reopen considering the limited business opportunity with reduced customer demand, high costs and employee shortages.

As the timeline demonstrates, even as Covid restrictions lessened slightly, the killing of George Floyd sparked nationwide protests. By early June more than 200 cities in the U.S. had imposed curfews and more than 30 states and Washington, D.C. activated nearly 100,000 National Guard and other service members. The protests were the largest in US history, with thousands of protests involving an estimated 15 million to 26 million participants. In Seattle protests started downtown on May 29, leading to broken windows, car fires, and marching on and closure of Interstate 5. These events led to a citywide curfew and to Governor Inslee activating the National Guard.

In the meantime, Covid restrictions caused most residents to stay home, and created severe impact to many businesses. For instance, in June 2020 the following potential economic impact of Covid was documented:

| Potential Economic Impact of Coronavirus Outbreak by Sector, with King County Employment and Wages (based on Seattle Times reporting an ESD Data) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sector | Industries | Jobs | % of Labor Market | Payroll 2018 ($Bn) | % of Wages | Average Wage | Comment by Jacob Vigdor, UW Economist (3/23/2020) |
| Public Facing | Hotels, food services, arts, entertainment, recreation | 140,000 | 9.8% | $4.5 | 3.6% | $32,143 | "So far, impacts have been felt most heavily in [this] sector... which consumers began avoiding early on out of fear." |
| Brick & Mortar Retail | Malls & retail stores | 100,000 | 7.0% | $4.0 | 3.2% | $40,000 | "In this next wave of impacts more closures and layoffs can be expected in other sectors." |

As of June 2020, we assessed Covid-caused economic impacts as follows:

*The recent worldwide outbreak of coronavirus will likely have a negative impact on the value of most real estate in the near future, including the subject property. Simply stated, the demand will be diminished due to uncertainty regarding pricing and future need, and supply may increase due to a slower transaction pace and possibly an increased need for liquid capital due to recessionary factors, likely resulting in a lower price.*

*This expected impact is consistent with both economic supply and demand theory, and with our observation of pricing impact during prior crises.*

*Since the crisis is just now unfolding, we have few direct indications of value or rent impact today: there are few contemporaneous transactions that reflect current conditions. Recent closings were generally negotiated in the past, prior to the advent of the rapidly escalating outbreak, at a time when concern was minimal or nonexistent. For most property types, if a typically motivated and well-informed buyer and seller were to negotiate a transaction today, the negotiation and resulting price would reflect concern and uncertainty regarding the future course of events.*

*In response to these valuation issues, we have surveyed knowledgeable market participants. We have also analyzed real estate pricing behavior in past crises and/or rapid repricing events such as the Savings and Loan crisis of 1990, the dot-com bubble in 2000, 9/11 in 2001, and the 2008 financial crisis leading to the Great Recession. Finally, we have observed very current pricing in the context of transactions underway today, including lease and sale transactions. While these transactions are not yet closed, they provide valuable insight into the most current state of the market. When it is possible to do so some lease and sale transactions are being renegotiated; closing may be delayed, or properties may transact at lower than original pricing, or fall out. The most probable price in the near future will reflect some of this new transaction environment. Both short- and long-term price and value expectations are variable according to property type, and to the specific circumstances, use and tenancy of each property. In this appraisal we therefore examine the subject property specifically through this lens.*

There is no doubt that, as of June 2020, the pre-existing Covid pandemic impact to both residents and real estate sectors was severe and was continuing. The slight lifting of restrictions in King County on June 5 (3 days before CHOP) allowed some retail businesses to operate at 15%-25% capacity, but in many cases this relief was not meaningful because the potential returns were outweighed by the restart costs, not to mention continued uncertainty.

Restaurants were allowed to resume dining at 50% capacity but only for outdoor dining (where the facility had potential outdoor dining), and at 25% capacity for indoor dining. These were not profitable configurations for many establishments, and at best it took some time and investment to hire staff and reconfigure outdoor spaces (if available at all), and reopening even at these reduced levels was generally gradual. Overall no significant increase in revenue occurred on June 5, as the gradual planning and reopening took time to implement for most businesses, and as many businesses did not attempt to reopen at that time. In Seattle and in the CHOP zone protests had already begun in late May.

In summary, by my observations as a professional real estate appraiser and as well documented in our practice of appraising Seattle properties throughout this period, the residents and markets were in unusual and significant turmoil, with many experiencing unprecedented impact, before the events of CHOP unfolded. Any impacts that are claimed to be CHOP related should be viewed through the lens of pre-existing and unprecedented demand and supply disruption from the coronavirus pandemic.

**Real Estate Claims – Claimed Taking of Access**

The claims appear to be largely based on an assertion that the alleged restriction of access to the CHOP area was facilitated by the City with results that allegedly amounted to a temporary "taking". In a hearing in this case held on April 20, 2022 I heard from attorneys representing the Plaintiffs that their claims included an allegation that there was a constitutional taking of access to the real estate inside of the CHOP area, resulting in harm to up to 5,000 members inside of the area.

According to the Amended Complaint:

> 7. The City's conduct resulted in CHOP being blocked off from public access. Among other conduct detailed below, the City provided the participants with concrete barriers to use to block the streets, which CHOP participants indeed used to barricade the streets and create borders. These borders, at times, were guarded by armed CHOP participants who oversaw who could or could not enter CHOP. As a result, the streets were barred to most all vehicular traffic, making it virtually impossible for residents and businesses to access their buildings, receive deliveries, and provide goods and services to the few customers willing to enter CHOP.

This claim appears to be a condemnation claim related to an alleged partial blocking of access to plaintiffs' properties. Plaintiffs' takings claim does not appear to arise out of any allegations that there was a complete blocking of access for any significant duration. In my professional practice I frequently appraise public acquisitions for eminent domain, including many access restrictions. There are a number of required considerations in the appraisal and valuation of restrictions of access, as outlined in the Washington Pattern Jury Instructions which I am required to consider for my work:

> WPI 151.01 Access, Light, View, and Air — Abutting Public Way
> Owners of property abutting upon an existing public way have rights of [access] [light] [view] [and] [air] to and from such public way. [The right of access means that an owner is entitled to reasonable ingress and egress to the property. However, an owner is not necessarily entitled to access at all points along the boundary between the property and the existing public way.][Unless such rights of [access] [light] [view] [and] [air] are substantially impaired, such owner has suffered no compensable damage in regard to these rights.]

An owner has a right to "*reasonable*" access; unless there is "*substantial impairment*" there is no compensable damage. Means of access include both pedestrian and vehicular access. While each owner's claim would require evaluating the facts specific to its situation, based on the information we have reviewed it appears that almost all, if not all, of the subject properties within the CHOP zone were in fact accessible by various means and at various times, if not the entire time. While there may have been some intermittent impairment of certain types of access to some areas due to periodic vehicular restrictions, there was nothing approaching a taking of all, or even a significant part, of access to and utility of the properties.

Some additional instructional guidance is provided in the WPI commentary:

> Right of access. On the reasonableness of access and restrictions of access, see TT Properties v. City of Tacoma, 192 Wn.App. 238, 366 P.3d 465 (2016) (abutting owner has the right of access to the property but not to a particular street); also see Pande Cameron & Co. of Seattle, Inc. v. Central Puget Sound Regional Transit Authority, 610 F.Supp.2d 1288 (W.D. Wash. 2009) (no authority under Washington law for a temporary "right of access" or a temporary "right to light, air, and view" takings claim); Kieffer v. King County, 89 Wn.2d 369, 572 P.2d 408 (1977) (whether there is a "substantial" impairment of access is a question of fact); State v. Williams, 64 Wn.2d 842, 394 P.2d 693 (1964); Lenci v. City

There can be no consequential damages or business loss for the alleged temporary takings claim. But such claims are a major part of the complaint and monetary claim. They must be eliminated from any appraisal of the alleged damage from the takings claim.

While Plaintiffs have not provided a specific factual basis for any of their claims, each claim is for temporary impairment of access—i.e., not a permanent taking. Temporary occupancy takings (if they occur) are not akin to permanent takings. Permanent takings are compensated as the loss in <u>value</u> to a property, measured by valuing the property before and after the taking. Temporary occupancy is compensated as the loss in fair market <u>rent</u> during the term of occupancy only – since the access or property can be restored to its original condition at the termination of the temporary occupancy there is no presumption of, or basis to claim damages for, a permanent taking after occupancy and property restoration.

If there had in fact been a compensable temporary taking at all, the next question is how it should be measured. The WPI is very specific in this instruction:

> WPI 150.06.02 Just Compensation—Temporary Occupancy:
> Just compensation for temporary occupancy of property means the reasonable cost of restoring the property to a condition equally valuable as the condition before the occupancy, plus the fair market rental value of the occupied property for the term of the occupancy[, plus any appropriate reduction in rent during the occupancy on contiguous property in the same ownership and devoted to the same use,] [plus any permanent loss in the value of the occupied property, or contiguous property in the same ownership and devoted to the same use, caused by the temporary occupancy]. [If the occupied property can be rented for a lesser use during the term of the temporary occupancy, the measure of damages is the difference in the fair market rent before the occupancy and the fair market rent during the occupancy.]

> Measuring compensation. The measure of compensation in a case involving temporary, rather than permanent, injury is well settled: compensation consists of the reasonable expense of restoring the land and the loss of income pending such restoration within a reasonable time. Colella v. King County, 72 Wn.2d 386, 433 P.2d 154 (1967) (trespass case); Keesling v. City of Seattle, 52 Wn.2d 247, 253, 324 P.2d 806 (1958) (for both trespass and eminent domain cases, the recovery for temporary injuries is the cost of restoration

and loss of use); Harkoff v. Whatcom County, 40 Wn.2d 147, 153, 241 P.2d 932 (1952) (trespass case); Songstad v. Municipality of Metro. Seattle, 2 Wn. App. 680, 690, 472 P.2d 574 (1970) (trespass case). The term "fair market rental value" is what is meant by the phrases "loss of use" or "loss of income" in the cases, as distinguished from impacts to the income generated by businesses conducted on the affected property or the consequential damages to those businesses as a result of the temporary occupancy.

The above instruction further clarifies that any compensation must be limited to the fair market rental value of the real estate for the period of occupation, and not to income or profits from businesses operated on the property.

In summary the claim that compensation should be paid for the alleged temporary taking, if it is found that the access was unreasonably impaired and not reasonably maintained, should be evaluated based on the fair market rental value of the impacted real estate before the alleged taking, minus the fair market rent for the real estate during the period access to the property was taken: the diminution in the fair market rental rate is the measure of damage for compensation.

**Access Impacts were Variable, Not Uniform, and Did Not Occur at all for Most Properties**

Plaintiffs' claim that potential access impairment was in any way uniform for the 5,000 potential claimants in the zone is incorrect. In most locations there was no impairment. Where there was some impairment, it was highly variable for individual properties and residents, and was centered around the East Precinct vicinity. There was none at all in other parts of the CHOP zone. I.e., if one were to predicate a "class" claim on a factual assertion that nearly all CHOP residents suffered the harm of access impairment, there is simply no factual basis for such a claim.

This is illustrated for instance from a Reddit post of the situation in the zone on June 16, 2020:



The photograph frames the CHOP zone. For the vast area, near the peak of activity, only a small portion near the East Pricinct is significantly access-impaired. Other portions of the 16-block zone may have been impacted by construction and homeless encampments in the Park, typical situations in Seattle and many metropolitan areas across the country. Use of the majority of streets and blocks in the zone was not significantly impaired. Whatever impact there may have been to individual properties was highly variable depending on property location and situation, on the particular day during the period in question, and often there simply was no impact.

**What was the Fair Market Rent for the subject real estate in June 2020?**

On the dates of the alleged temporary takings, the Covid-19 pandemic had already severely impacted the fair market rental value of Seattle area real estate, especially for close-in and retail-activated locations such as CHOP. On March 15, 2020 Governor Inslee banned indoor restaurant dining and gatherings and on that same day Tom Douglas permanently shuttered 12 of his 13 restaurants. On March 23 Inslee unveiled the Stay Home, Stay Healthy order that prohibited all nonessential in-person activities and businesses. On June 5 King County entered "Modified Phase 1" and some restaurants and stores began to partially reopen. However, the streets remained mostly quiet, and retail sales were severely impacted. Almost all office workers had adopted work-from-home initiatives. Since it was no longer necessary to be near the office, and since rent was high in the close-in Seattle neighborhoods like Capitol Hill, there was pressure on both apartment rents and vacancies. Likewise, the CHOP zone caters to students as residents, providing easy access to the University of Washington via light rail, and with portions of Seattle Central Community College actually in the zone. According to The Seattle Central Griot on June 12, 2020:

> *Seattle Central College remains closed to the public, following the guidelines from Gov. Jay Inslee's office to mitigate the COVID-19 pandemic. The only persons with access to our buildings include:*

- *Staff who perform essential functions*
- *Staff who have made appointments in advance to retrieve materials or equipment from their offices*
- *Students and faculty who participate in a small number of programs that require face to face instruction*

With in-person learning virtually halted, many students and other young people in the neighborhood moved out, sometimes home or sometimes to more affordable distant locations. This neighborhood, like many others including nearby Seattle CBD, were not only devoid of daytime office workers, but also of residents. This created low demand for businesses and for real estate, impacting demand and rents well before CHOP.

The short- and long-term real estate concerns in this period were nationwide and not particular to the CHOP area, but the CHOP neighborhood was particularly impacted because its character includes significant street-level retail activity. The subject claims relate largely to retail, office and apartment spaces. In my observation, street-level activity with pedestrians and workers was diminished everywhere, but particularly in the previously-vibrant close-in neighborhoods such

as the CBD, Capitol Hill, Pioneer Square and South Lake Union. The absence of pedestrian activity was particularly noticeable for these neighborhoods and tenants in these neighborhoods, as the empty streets signaled a troubled and unpredictable real estate environment.

Fair Market Rent is measured without regard to specific tenancy, and is the rent that a willing and knowledgeable tenant would pay to a willing and knowledgeable landlord, considering all conditions present at the valuation date. In this kind of environment, in June 2020 many businesses had already had their offices or retail stores closed or restricted due to the pandemic and due to local restrictions.  Market rent was lowered due to lack of demand. Neither tenants nor landlords were confident of the future.  Market rent expectations diminished significantly. Many tenants were unable or unwilling to pay rent for space because it could not be profitably operated.  Landlords throughout the City were delaying, abating or forgiving rents for their retail tenants in particular for these reasons, all of which were the direct result of the pandemic.

As a further consequence of the pandemic, in our appraisal experience, parking revenues are significantly impacted by any downturn.  Here, there was less commuting, mobility and shopping. Office landlords fared better because office tenants were already subject to leases and were obligated to pay, and more capable of paying the rent – it was the office tenants who were suffering with the requirement to pay rent but with little or no ability to use the office space.

In summary, market rents and rent expectations had already significantly diminished for more than two months before CHOP occurred. The appraisal analysis of a constitutional loss for alleged access taking should reflect the actual market conditions at the date of alleged taking. If one assumes that the CHOP events had some effect on access (which is not the same question as whether the City's actions even contributed to that effect), that effect pales in comparison to the devastating effects of COVID on real estate.  In any event, access was not eliminated by the CHOP itself but merely temporarily impaired and only for areas central to the CHOP events.  Most residential and commercial spaces were still accessible and had utility and value. An apartment unit could still be rented and most of course were still occupied. If CHOP further diminished market rent beyond the impact already in place from the pandemic, the value question is how much the rental value was further diminished during some or all of the 33-day damage period. The answer is that very large areas within the CHOP suffered no marginal impact beyond what COVID had already delivered.  Any effect would be highly variable depending on the specific location, nature of the real estate or tenant, duration of alleged impairment, and whether the real estate was occupied or used at all.

**Survey of Seattle Real Estate Market Participants on the Impacts of Covid and Protests on Properties and Businesses**

In order to gain a deeper understanding of the real estate landscape in Seattle during the summer of 2020, we conducted an informal survey of market participants within comparable Seattle area neighborhoods. Market participants included landlords, tenants, tenant representatives, commercial brokers, developers, and property owners. Comparable neighborhoods included North Capitol Hill, Ballard, Freemont, CBD, Waterfront, Belltown, Queen Anne, Greenlake, and U district. We did not survey market participants involved within the CHOP zone as it is defined for the purposes of this report, but instead focused on the actual claims of these participants,

using the survey to characterize what conditions and situations were normal in similar neighborhoods without the CHOP activities.

Our survey followed a general script which aimed to ask questions in order to gather anecdotal evidence relating to the drivers of real estate value during June 2020. We focused mostly on retail and mixed use buildings, representing the majority of potentially relevant claims, but also observed indications from those in residential and hotel markets. The insight we gained generally concerned, but was not limited to:

- Business challenges/solutions during June 2020
- Business status during June 2020
- Covid-19 Impacts
- State/Local Mandates, and their effect on revenue and rent
- Civil unrest and its effect on revenue and rent
- Rent Concessions (Rent forgiveness and delayed rent)
- Development/Investment

*Rent Concessions*

In talking with local market participants within the Seattle area, we found that rent concessions were a key issue cited by landlords, tenants, and tenant representatives. During the month of June 2020, rent concessions were common amongst retail tenants, diverse in structure, and were seen by all as due almost entirely to the effects of the COVID-19 pandemic.

According to Howard Wright, executive at Seattle Hospitality Group and Tenant Representative for 29 Seattle restaurants, the timeline of the Covid-19 government-imposed restrictions forced landlords to start considering rent relief as early as the beginning of April, with many of his Pandemic related concessions being agreed to by mid-May. Of his 29 landlords, Mr. Wright stated that 28 were willing to work with tenants to help them get through horrifically low revenues caused almost exclusively by the Covid-19 pandemic and the related government mandates restricting operations. This idea that most Seattle landlords and building owners were willing to work with tenants during this difficult time was echoed by every property owner, landlord, and tenant I spoke with. Property manager Jay Azoze of Azose properties stated that as a landlord, he and his company quickly realized that the effects of the Pandemic were going to require some kind of rent relief for certain tenants, and around May 2020 many of his tenants were not paying rent with the understanding that somewhere down the road they would hopefully pay it back.

These concessions were always structured on a case-by-case basis. Owner of Nells Restaurant, Philip Mihalski, stated that amongst his peers within the industry, few rent concessions were structured alike. Having worked on 28 rent concession agreements with property owners, Howard Wright cited many different concession structures, including deferred rent paid back in future installments, deferred rent paid back in a balloon payment, forgiven rent, reduced rent, and modified rent schedules. This was said to be consistent throughout all parts of Seattle. For some tenants such as hotel owner Ed Kim of BMI Hospitality group, concessions were not given due to their ability to continue operations and produce revenue. In summary, rent concessions were on a case-by-case basis, and the qualifier for receiving rent concessions was almost

exclusively based on the impact of the Covid-19 pandemic and government-imposed restrictions on a business's inability to operate.

Retail power broker Paul Sleeth of Newmark stated that, during the month of June in 2020, there were many complex factors that shook up retail tenants all over Seattle, but when it came to giving rent concessions, the only clear reason was that many businesses were unable to operate at a viable capacity, or in any capacity at all, due to government mandates and drastic losses in demand directly related to COVID. Among the 20+ contacts surveyed, none stated that rent concessions were given due to any reason more than Covid-19. Howard Wright represents a tenant on 14th and Pine, just outside the stipulated subject zone. In talking about the concessions agreed to by the landlord in this area, he stated that while the CHOP zone may have brought business challenges, rent concessions were given exclusively for the reason that the business was unable to operate at a viable capacity due to the Covid-19 pandemic.

_Business Status/challenges during June of 2020_

Business owners/landlords reflected that during June 2020, though government mandates loosened, and retail business were allowed to operate in limited fashion, many remained closed. For those who reopened, very few were able to operate at enough capacity to remain financially successful. Of those surveyed, the most stated reason for business challenges during June 2020 was a business's inability to operate effectively because of Covid-19. Other challenges included staffing shortages, customer fear, and public safety. Please refer to the timeline exhibit for more details on state and local mandates.

_Civil Unrest in June 2020_

Following the death of George Floyd at the hands of Minnesota police, protestors gathered in marches and demonstrations throughout the United States.  Many of these events turned violent and several, including those in Seattle's Central Business District, degenerated into arson, looting, and related unrest.  These events became a center of attention throughout the City. In talking to market participants, many diverse opinions were conveyed regarding the impact of protests as a modifier of business profitability and property values. Though these opinions were diverse in nature, we consistently found that when asked market participants were unable to confidently quantify any effects from the protests on businesses or property values.

Retail/multi-family broker Tim McKay of Colliers stated that throughout the Seattle real estate market, public safety and heightened civil unrest was a factor in the eyes of property owners, tenants, and outside investors. During June 2020, he states that the attention paid to these issues was heightened, and businesses and properties throughout Seattle likely could have taken a hit from this. However, McKay also mentioned that these factors very much existed before June 2020 by reason of Covid and other pervasive factors and continue to exist today.

_Conclusion_

In conducting this survey, we spoke to a diverse group of market participants within the Seattle real estate market. Our focus was primarily on those involved with retail properties, who do business in neighborhoods that are comparable to the subject area, comparable in zoning, density, property type mix, and accessibility. We also focused our conversations on the month of June, 2020.

Our main findings from this survey were that during the month of June 2020, many extraordinary challenges existed which adversely affected tenants within many neighborhoods throughout the city of Seattle. These challenges included civil unrest and crime, but all of these challenges were nominal compared to the problems presented by the Covid-19 pandemic. According to those surveyed, rent concessions and dips in revenue were very prevalent among retail tenants during the months leading up to June 2022, and many months after June 2020. These impacts were consistently attributed to the inability of businesses to operate normally due to the Covid-19 pandemic. Multiple landlords, tenants, and property owners stated that the pandemic was the sole reason for rent concessions. Furthermore, in many neighborhoods throughout the city, Covid-19 staffing shortages, public safety, and civil unrest presented significant and measurable challenges in many neighborhoods both near and far from the CHOP area. These challenges were significant and measurable in the months leading up to June 2020 and continued to be significant for many months after.

Please see the table below for details regarding the relevant contacts made during this survey.

| | | | | | Survey of Seattle Real Estate Market Participants on the impacts of Covid and protests on properties and businesses |
|---|---|---|---|---|---|

| First Name | Last Name | Title | Company | Property Type | Notes |
|---|---|---|---|---|---|
| Howard | Wright | Tenant Rep/Executive | Seattle Hospitality Group | Hospitality | -of 29 landlords, 28 answered the calls and were willing to work with tenants on some sort of rent adjustment<br>-Usually looking for a 3-5 year adjustment after all was said and done<br>-All sorts of different rent adjustments, some forgiven, some not<br>-Many of these negotiations and adjustments were made before or around May of 2020.<br>-some forgiven and then balloon tacked onto , deferred rent, % rent for next 2 years, then back to base, Ect. All sorts of different rent adjustments to fit tenant<br>-Very challenged at the Sheraton hotel, (conventions, reputation, lost 1 million $ airline contract to an eastside hotel, safety issues) |
| Phillip | Mihalski | Restaurant Owner | Nells Restaurant | Retail | -Paid no rent for most months from April 2020-march 2021, gradually built back to full rent. Unpaid rent was forgiven<br>-Lakeshore investments, Strickland family trust<br>-Closed march 15th-June 4th, then opened indoor outdoor and takeout dining.<br>-PPP funding in order to get it, you had to loose 25% revenue in a quarter,<br>-Somewhat back to normal business volume, but still affected by case #'s and covid.<br>-Willing to share financial documentation showing revenues for 2019 & 2020 to reaffirm claims. |
| Jay | Azose | Owner | Azose Commercial Properties | Retail | -"unrest not our cause of grief"<br>-"Restaurants closing down due to the pandemic was the hard part<br>-Concessions were given, on a case by case basis.<br>-Take out business kept going, but sometimes these were the companies that ended up hurting because PPP loans given to those who lost the most revenue<br>-We put tenants on some sort of Schedule. Most part differed, some was forgiven.<br>-No tenants lost, worked with all of them |
| Paul | Sleeth | Broker | Newmark | Retail | -Necessity based retail did better(drug, grocery)<br>-Inequitable amongst Necessity based retailers and none<br>-Cap hill hit harder, but due to many factors<br>-Crime/fear issue<br>-Significant rent concessions given on case by case basis all over city, due mainly to covid and inability to operate<br>-regency reit, Melrose market place, few blocks from chop, hit hard, chophouse (La speiga) also hit hard.<br>-not as much of an issue in Fremont, Ballard during that time. Westlake likely the worst hit. Maybe Cap Hill |
| Damian | Sevilla | Broker/Developer | Kidder Mathews/Bridge33 capital | Retail/ residential | -Helped run retail brokerage at JLL pre-pandemic, then moved on to development at Bridge 33 capital. Got to see both sides during this interesting time.<br>-Retail is often a loss leader that is required by the zoning, so need to keep that in mind for rent concessions given to retail tenants |
| | McKay | Broker | Colliers | retail, residential | -Hard to distinguish effects of chop from effects of covid<br>-SLU heavy supply of residential coming on board during that time, so concessions were heavy, 2.5 months rent free sometimes. |

| Survey of Seattle Real Estate Market Participants on the impacts of Covid and protests on properties and businesses | | | | |
|---|---|---|---|---|
| First Name | Last Name | Title | Company | Property Type | Notes |
| Art | Langley | Property Owner | Salvation Army | All | -Property owner/Investor. Salvation army,  ex-mayor candidate, Grandfather was the mayor of Seattle years ago<br>-Permanent values not impacted by City administration.<br>-Investors might have been scared during the events |
| | | | REDACTED | | |
| Marcelo | Garcia | Broker | JLL | Biotech/industrial | -Flex space went crazy in markets out side of Seattle<br>-Flex leases from 2020 go from 19ish to 22NNN, now even going for 29<br>-Leases for biotech/engineering in the city went crazy during this time. Up to $80NNN by now |
| Spencer | Hansen | Property Manager | JSH Properties | Retail | -Concessions made on a case by case business.<br>-Non essential businesses with heavy potential human contact hit the hardest.<br>-Cap hill may have been hit harder, but would have to be essential business in order to really convince me of any adverse effects. |
| Phillip | Mihalski | Resturant Owner | Nell's Resturant Seattle | Hospitality | -Paid no rent for most months from April 2020-March 2021, gradually built back to full rent. Unpaid rent was forgiven.<br>-Lakeshore investments, strickland family trust<br>-Closed march 15th-June 4th, then opened indoor outdoor and takeout dining. Business in person dining business still very slow at open.<br>-Willing to submit tax documents that reflect ~$0 revanue for March 15-June 4th 2020<br>-PPP funding: in order to get it, you had to loose 25% revanue in a quarter, so many business that tried to stay open got hurt<br>-Somewhat back to normal business volume presently, but still affected by case #'s and covid.<br>-There's a clear negative and linear relationship between case numbers and revanue |
| Hal | Griffith | Property/Business Own | Pier 57 | Retail (Resturant/ Attractions) | -Owner of many retail locations on the pier, including the Seattle wheel<br>-Business/revanues on the waterfront were severely affected by Covid-19<br>-Pier 57 Retail revanue was down 91% in June of 2020.<br>-Pier 57 Resturaunts revanue was down 98% in June of 2020.<br>-Pier 57 Attractions revanue was down 100% in June of 2020 (Includes great wheel, wings over washington, Ect.)<br>-According to Hal, COVID-19 and Resulting Government actions were the main causes of downturns |
| Ed | Kim | Owner | BMI Hospitality Management | Hospitality | -Gave little rent forgiveness to hotels, as business was hurt but not totally depleted.<br>-Some hotels have done better since<br>-Has little idea of how CHOP would have effected business, would not have been to the point of giving rent forgiveness. |

McKee Appraisal, Inc.

**Observations Within CHOP**

In addition to examining real estate trends and market behavior outside of the CHOP area, we have also made our own observations and reviewed discovery documents that shed light on the state of the market within the CHOP boundaries during the time period at hand. Essentially, we have looked at various examples of what was going on with businesses and tenants in the CHOP area, including plaintiffs in this case, as part of our examination of what if any damage can be attributed to the City's response to the protests prompted by George Floyd's death.

As previously discussed, by the second quarter of 2020 the Covid-19 pandemic had clearly affected Seattle area real estate and the economy at large. The impacts were felt broadly, but applied quite differently in different locations and for different types of real estate. And while the short- and long-term real estate concerns were not particular to the CHOP area, the CHOP neighborhood was particularly impacted because its character includes significant street-level retail activity. In my observation, street-level activation with pedestrians and workers was diminished everywhere, but particularly in the previously-vibrant, close-in neighborhoods such as Capitol Hill and the like. The removal of pedestrian activity resulting from Covid was particularly noticeable in these neighborhoods, as the empty streets signaled a troubled and unpredictable real estate environment.

_GameStop_

The pandemic greatly accelerated the distress that was already afflicting many retail establishments. For instance, one of the subject claims relates to the tenant GameStop in the Broadway Building owned by Hunters Capital. By 2019 GameStop was in financial trouble, having incurred a $673 million loss in 2018, and with the company announcing a failed attempt at a buyout. GameStop was actively closing stores prior to CHOP, with 321 closed in 2019, and 402 additional stores closed by October 2020, with an expectation of over 500 closures for the year.

According to a note from the Hunters claim spreadsheet, "_Gamestop – was going to renew at end of lease term, but after looting decided not to renew. Expect to take until September 2021 to release. They would have stayed until January 31, 2021._" While the owner links the tenant's choice to vacate the space to "looting" that it claims was due to CHOP activities, it is clear from the company's financial performance and market actions that closing this store fit a pattern occurring throughout the country. Considering that the well-publicized retail problems for this tenant had nothing to do with CHOP, it is our conclusion that Gamestop's decision not to renew its lease with Hunters Capital was not related to what happened in the CHOP during the period in question.

_The Riveter_

The GameStop example is not isolated, but rather typical of the claims. For instance, The Riveter space in the Ballou Wright Building was configured for flexible co-working spaces as a business model for the tenant, similar to the WeWork concept. According to GeekWire on May 29, 2020, "_Seattle-based startup The Riveter, which set out to build a national network of women-oriented co-working spaces, is shutting down all nine of its locations due to the ongoing uncertainty caused by the COVID-19 pandemic._" The article goes on to say, "_The dramatic shift is bad news for co-working companies such as The Riveter and industry giant WeWork, which is also struggling as companies rethink their return to the office amid health and safety concerns._"

While The Riveter space was located in the Ballou Wright Building, immediately adjacent to the East Precinct, the business shut down the location a week prior to the inception of CHOP; logically, the closure of this location could not have been related to or caused by CHOP. One other Seattle area location of The Riveter that was closed at the same time was in Bellevue, an area that is clearly outside of the CHOP boundaries and even outside the City of Seattle, again reinforcing the conclusion that this tenant's decision to close its doors had absolutely nothing to do with CHOP activities or the City's actions.

*Cure Cocktail*

As previously discussed, the restaurant/bar business was hard hit by the pandemic. This happened throughout the country and the world, and was no different for restaurant businesses within the CHOP area. Different establishments experienced varying levels of losses, and those that could adapt to takeout or other models seemed to have survived better than others; but both inside the CHOP area and outside, no restaurants/bars were spared from pandemic-induced business difficulties.

Cure Cocktail operated as a restaurant and bar on the backside of the Broadway Building facing Nagle Place for nearly 10 years prior to the pandemic. The tenant continued its lease through the end of the term in March 2021, though business operations ceased at this location in late December 2020 when vandalism occurred at its storefront. Prior to closure of the Nagle Place location of Cure, the owner opened a second location at 15th and Pine in May 2020. The new location opened as Remedium Island Grill with Cure operating a cocktail bar inside the same space. In an online posting published October 24, 2020, the team behind Cure Cocktail said on its website:

> "*Covid-19 has affected all our friends and family in the hospitality industry. In March, right when we adjusted to to-go cocktails and take-out, we got news from our family in Las Vegas. Our parents were laid off as casinos shut down. Even worse, employers in Vegas used this opportunity to layoff senior staff and only re-hire new employees at lower wages.*
>
> *Like many of you we were at a crossroads – bar and restaurant closures, takeout models, social distancing, rising cases – no end in sight. But we knew two things – that the Cap Hill community would take care of it's own, and that we could make a damn good cocktails and charcuterie/cheese boards.*
>
> *So with our lease expiring in March, our desire to get a full service kitchen, and our parents passion to bring the recipes from our family gatherings and reunions – we found a bigger home.*"

The new location is noted on the website to be a, "*larger venue right down the street [from the existing location] on the corner of 15th and Pine.*" The fact that Cure opened a second location on Capitol Hill in May 2020, prior to the arrival of CHOP, is attributed in the above quotation to the desire for a full kitchen and a larger space. The author acknowledges the difficulties brought on by the pandemic and the need to adapt to new ways of serving their customers (takeout, delivery), and the location on Nagle Place had previously struggled to support these alternative dining options based on statements from the deposition of the owner, Sean Sheffer. Ultimately, the apparent

Case 2:20-cv-00983-TSZ   Document 170-1   Filed 02/02/23   Page 19 of 72

facts associated with this tenant/business are that the Nagle Place location struggled significantly during the early days of the pandemic, but remained open throughout the period of CHOP, and closed down only after vandalism occurred in late December 2020, long after CHOP related activities. The opening of a new location in May 2020 was conceived prior to the onset of the pandemic, occurred prior to the formation of CHOP, and because of the cited desire for a full kitchen and larger space.

_Glossier_

Another good example exemplifying the Covid situation relative to CHOP is Glossier, a skincare and makeup company with traditional direct to consumer marketing. They leased space in the Pike Building (owned by Hunters) at a strong base rent of $47/sf/year net. They shuttered all spaces in March 2020 at the start of the pandemic, clearly unrelated to CHOP. In August 2021, they opened up their first store in Seattle, at the center of the CHOP area and near the East Precinct, to be followed by openings in New York and London. According to the founder and CEO Emily Weiss:

> _And then, suddenly, our world flattened. We closed all our doors on March 13, 2020 to support public health, hoping the pandemic would run its course in a matter of weeks… and then months. Our team turned their attention to the digital spaces where we could still connect with our customers, and slowly faced the reality that Glossier retail, a communal experience that often drew lines down the block, wouldn't reopen until being together was safe again._
>
> _Now, as parts of the world begin to emerge from the worst of the pandemic, the world of Glossier is ready to exist again in 3D. I'm excited to share that we'll be opening three all-new, permanent stores, starting in Seattle this August, followed by Los Angeles in the fall, and London in the winter. This is just the beginning: we have an exciting retail roadmap to bring Glossier to many more places, including our home base of New York City, in 2022._
>
> _Our first three stores are the culmination of everything we've learned from our prior offline experiences, and like these experiences, they look at each city through Glossier-colored glasses. We're returning to places and communities we know and love: our new home in Los Angeles isn't far from our former location on Melrose Place. In Seattle, a city of forests and lakes, our store design plays with the juxtaposition of nature and technology. In London, we'll be following our most successful temporary store of all time with our first-ever permanent international flagship. Each of these stores is designed to inspire everyone to find joy and confidence in their personal beauty style, with a customer journey centered around self-discovery and belonging. People first, products second._

When I visited the neighborhood in the fall of 2021, there was a long line of customers along the sidewalk just to get into this store. Clearly the events of CHOP did not impact this tenant and the rental value of this space would be considered strong, despite the fact that the Covid pandemic caused them to not open for business in 2020.

_Sway and Cake_

Sway and Cake is a clothing and accessories retailer located at the corner of 12th and Pike. The business was established in 2002 with a single location in Downtown Seattle; the 12th and Pike

boutique opened in April 2019 as its third Seattle store. As with the others, this business suffered significant losses due to the pandemic, with the owner, Tamara Kilbun, citing the following in an email dated February 3, 2021 to her landlord, Madrona Real Estate (also a Plaintiff in this case):

> "The store was down a steady 50% for all of 2020
> The in store business was down overall 60%
> I was closed for 3 ½ months starting March 13th to July 1st
> I paid 75% of my Rent and all 3rd party costs while still operating at 50% loss
> I would like my 2020 back rent forgiven
> Moving Forward I would be able to pay all third party monthly costs and 50% of base rent from January-June 2021
> After June, I will re access the financial position the store is in.
> I have been getting my 2020 numbers together for the PPP 2nd round, if I Get approved there will be a portion allotted for rent payments.
> This month February 2021, I am prepared to pay my 3rd party costs and 50% of my base rent.
> I will also figure out a payment plan to cover the 50% base rent for January 2021.
> We all know this year will be very challenging with Covid, I don't want to expose myself daily to the public and go home to my family. Clearly this is not an option for me. Please understand there is more at stake other than just business."

These were not uncommon requests made by tenants to landlords during the pandemic, but it is notable that this request occurred in February 2021, seven months after the CHOP period ended. Clearly, the pandemic not only served as a backdrop leading up to the events of CHOP, but the pandemic persisted as a challenge for some businesses following the end of CHOP. While the previous example from Glossier shows that some businesses were able to open with great success in 2021, others continued to suffer due to the pandemic.

*Hunters Capital*

Hunters Capital owns many properties on Capitol Hill and in other areas of Seattle, serving as landlord to dozens of businesses/tenants. A number of documents produced by Hunters in this matter show email exchanges related to individual tenant situations and requests for rent relief.

As demonstrated by our survey and validated by data obtained from our frequent appraisal work throughout 2020, owners of real estate had a highly variable experience throughout the year. For retail, many tenants or businesses were either closed or so economically impacted that they were unable or unwilling to pay rent by June 2020, regardless of whatever contract rent they had bargained for, or whatever market rent may have been perceived. Owners had to work with these tenants to come to financial arrangements, which typically included delaying rent or restructuring leases, "kicking the can down the road" in the face of unprecedented retail disruption. In our appraisal experience we frequently concluded that no rent would be received in mid-2020 for many retail or parking operations. Landlords, however, most frequently delayed rent that was due in the context of discounting or eliminating any expectation of immediate payment.

In a situation that may seem similar but highlights the variability of different types of real estate and tenancy, office tenants mostly completely vacated their offices as a result of the public mandates and as a factor that employees were not willing or able to work in enclosed offices. However, rent was collected, not forgiven for office tenants (who more frequently are well-capitalized compared to small retail tenants, and who were able to continue to operate their businesses profitably as they adopted work-from-home policies for their employees). Office building owners were not significantly impacted as they received the rent for their empty office spaces, and concessions were not given. Tenants may have suffered from paying full contract rent for space with little utility to them, but clearly this was not a function of CHOP or protests, but rather a function of Covid and work-from-home issues.

As office residents vacated their spaces and working neighborhoods other issues emerged, including the lack of street activation leaving an unappealing physical environment, with issues of public safety and homelessness causing increasing concern. Downtown Seattle suffered not because of the protests but rather due to the lack of office workers and residents, as people moved out to work from home. Weyerhaeuser vacated their new Pioneer Square office due to Covid in early 2020, but delayed bringing workers back pending *"significant and sustained improvements in neighborhood safety.,"* These causes are external to CHOP and have impacted office and retail demand significantly. However, landlords and property owners have not generally suffered as the office businesses have paid their rent.

*Conclusions*

In summary the pandemic caused turmoil, the result was significant diminution in demand, rent reduction, loss of customers and many other adverse effects on businesses and business activity in Seattle and in the Capitol Hill area including what later became known as the CHOP.  When the CHOP began in response to events elsewhere in the country, it added to the negative effects of COVID, but it did not create them.  Neither of these damaging events was created by the City of Seattle.  We have found no reliable evidence that actions of the City of Seattle materially affected business activity or property values in the zone called the CHOP over and above the extreme impacts of Covid followed by the impacts of protests. The tenants and residents of the neighborhood are not referencing CHOP as causing disruption today, and it has not prevented a return to normal once it was over.

The Plaintiffs' claims for an increase (beyond Covid effects) in disrupted rent during the period of CHOP related activities may or may not have merit, but we have found no evidence that any such disruption arose from City of Seattle actions vs. the mere existence of the CHOP situation. Many businesses were already totally disrupted by the time CHOP arose and any impact to property access was highly variable.

In any event, claims that CHOP caused later market rent loss are not correct. By my observation of many similar neighborhoods there was nothing fundamentally different in the subject neighborhood post-CHOP compared to other similar neighborhoods. The significant majority of the Hunters Capital claim is for post-CHOP economic disruption dating into 2021, often based on forecasts of future events made at the time of the claim filing in late 2020. These "future" claims are inconsistent with the reality of the Capitol Hill neighborhood today, where the pandemic is still a factor but the events of June 2020 are not.

Ultimately, as we review the evidence produced in this case and reflect on our own market observations as of June 2020, it is impossible to deny the pandemic as the primary backdrop for the real estate environment in the CHOP area and elsewhere. The question of whether or not the Plaintiffs in this case were harmed (in a real estate sense) by other events cannot be answered without first looking at the real estate environment that existed just prior to the existence of CHOP and during the period at hand.  Further, if there was a marginal effect on real estate economics of the CHOP (beyond those of the pandemic), we have seen nothing to suggest that actions of the City contributed to any such effect as opposed to the mere existence of the protests and associated activities.

Also, considering the individual situations and specific differences as to whether and how much rent was paid, largely dependent on the type and use of the real estate in addition to the financial capabilities of the tenants to pay contract or market rent, individual examination of individual claims is imperative. Overall, based on our review of the many individual situations, it is clear that alleged harm caused by the City's response to the protests giving rise to CHOP, if any, is not easily isolated or discernible from pandemic-induced effects, which were the primary and most severe effects on real estate occurring at the time.

## Comparison of CHOP zone with other Similar Neighborhoods

We next examine real estate conditions in the CHOP zone in and around June 2020, compared to other comparable neighborhoods, in an attempt to find whether there was any discernable difference in market performance as a result of the CHOP overlay on the Covid pandemic impacts. In this study we cover the areas of small apartments, large apartments, retail and office, comparing the subject CHOP zone to other similar neighborhoods including lower Capitol Hill, Upper Capitol Hill, Belltown, Ballard and Fremont. We find that there is no clear or discernable difference in the CHOP zone relative to neighborhood counterparts.

### Subject and Areas of Comparison

The subject area is approximately 15.5 blocks of commercial, multifamily, and single family real estate, and four and one half block Cal Anderson Park. In general, the properties are evenly split between small apartment and mixed use buildings, and newer multifamily properties with street retail.

Located to the east of the downtown core, beyond Interstate 5, Lower Capitol Hill and the subject area have both continued to grow vertically and in density over recent years as rezoning has continued to raise the allowable building heights to encourage greater density in the city. Upper Capitol Hill, east of the subject, has been affected by the process as well, but with a less well defined commercial area; the mix of buildings is substantially less volatile to economic pressures. Fremont and Ballard, both traditionally 'bedroom communities' to downtown Seattle, have also expanded and redeveloped much of their traditional retail footprint into mixed use office/retail/multifamily buildings. However, both Ballard and Fremont have benefited from larger institutional tenants with longer term leases. With both new and older mixed use properties, hotels, and tourist centered retail catering to the nearby cruise ship terminal and Pike Place Market visitors, Belltown provides a representation of the greater downtown core.

*Multifamily Data Sources*

There are few condominiums in the CHOP zone, and residential multifamily analysis relates primarily to apartments. Close-in urban residents tend to be younger, including students and others without well-established careers or finances. With the high rents that are prevalent in close-in desirable neighborhoods such as the subject, neighborhoods like these witnessed gradual but ongoing out-migration as many moved to more cost-effective situations such as living with parents, or moving to more suburban locations with lower rents (or larger spaces for similar rents, allowing for more accommodative and economical work-from-home or study-from-home situations).

To analyze Multifamily properties, we used two separate resources – Yardi Matrix and Commercial Analytics (CA). These two resources use slightly different methodology and have slightly different primary data sources. This allows for a broader extrapolation of the provided data. Yardi Matrix data relies solely on properties over 50 units, where Commercial Analytics dataset includes buildings 5 units or larger. In addition, Yardi Matrix is an international corporation with a variety of services offered to larger multifamily ownership groups. This allows for a more fluid relationship between data provided and aggregator and thus a high return rate in that property type. Commercial Analytics is a Seattle based company whose sole focus is multifamily data within the region. Relationships are built with local ownership groups and with the local representatives of larger owners. That said, the process of data collection, using regular surveys to established participants, is largely the same, supported by similar methodology.

There are some dissimilarities to note. First, where Yardi offers building by building data allowing for precise area selection, Commercial Analytics anonymizes data using pre-established market areas. Secondly, Commercial Analytics does not collect any rent or vacancy data on a monthly basis. Like Yardi, CA sends detailed surveys a few times a year, but only infills vacancy information during the intervening months. Therefore, Market Rent information is limited to the twice-yearly detailed survey and vacancy provides more data points for comparison. Yardi conducts a comprehensive survey of all contacts three times a yearly, and relies on a smaller, handpicked panel for monthly infill data. Since the two services use slightly different terminology for the same metrics, we'll use the term Occupancy in lieu of Occupancy/Vacancy.

*Multifamily Findings*

During the defined period, the Seattle apartment market was affected by a number of emergency legislative actions. On March 16 of 2020, the city of Seattle enacted an eviction moratorium that would freeze evictions, and essentially freeze in place rents through February 28, 2022. Changes in occupancy reflect the occupant leaving at the end of their lease term, or exercising a vacation clause in their rental agreement. Market Rents would then only be affected when a new leasing contract was penned. In addition, the US Postal Service reported a 7% net migration out of Seattle, with the majority of new households reconstituting in neighboring cities such as Shoreline, Kirkland, and Bellevue. We generally find that there is no discernable difference between the overall performance of the subject CHOP area, relative to other similar neighborhoods in Seattle.

*Multifamily Occupancy*

As the city of Seattle grew in popularity and city government adopted policies to encourage urban density, typical occupancy has been normalized between 94 and 97 percent. Where in previous

decades the rate has been steady year round, a wave pattern has emerged in recent years with optimal high occupancy in the summer and low occupancy between September and October.

Overall, occupancy rates through most Seattle neighborhoods followed a predictable U-shaped curve, with the highest possible occupancy presenting in March of 2020. The lowest occupancy begins to present in September in some neighborhoods, and during the fourth quarter in others. It would be easy to link this to geography, but Greenlake and Lake City share a similar occupancy curve to the subject, where Interbay, First Hill, Fremont, and Shoreline all present with fourth quarter surges and significantly different geography. In addition, occupancy can sometimes be accounted for with slow lease-up (first time leasing in a new property), but these neighborhoods did not universally experience completions during this period.

*Multifamily Market Rents*

Market Rents are the terms being offered via new lease contracts and by their very nature are reactionary. The wide range of rental rates can vary based on location, quality, layout, square footage, view, parking, in-unit amenities, and community amenities. As a general rule, properties with fewer units have less community amenities. In addition, almost 60% of the multifamily inventory in Seattle was constructed after 1990. Almost seventy percent of buildings with fewer than 50 units were built before 1990, while 40% of buildings with more than 50 units were built between 2010 and 2019. These newer units in larger communities will often be of higher quality and offer more desirable community and in-unit amenities. All neighborhoods experienced a decline in market rents between June and July of 2020. The recovery of market rents has been slow as rental increases could only be made with new lease contracts during the eviction moratorium, and in-city demand was low in 2021.

*Commercial Data Sources*

Commercial data is primarily provided by CoStar, an international data resource and marketing platform based in Washington, DC. CoStar.com serves as a subscription-based data hub for commercial leases, sales, and some commercial auction activities. This data is collected using a variety of resources; however the majority of the lease data is provided by brokers and asset owners who have a CoStar subscription. Data outliers are reviewed by research staff, and the specific data points are used in a larger algorithm to normalize the data.

When investigating commercial lease data in any area the two main points of comparison are rent and vacancy. Ideally, the rent information used to make comparison would be the effective rent – that is the amount of rent paid over the term of the lease divided by the length of the lease. This accounts for discounts, scheduled increases, and additional charges. However, the details of individual deals are more often than not closely held by all parties. The landlord may give preference to one commercial tenant over another based on a variety of factors such as an existing relationship, or the landlords desire to attract a specific type of tenant. Since the detail of these deals are often not available, we rely on Market Rents as an indicator of effective rents, as typically practiced in our business and industry.

Vacancy is defined within the CoStar system as space is both vacant and actively being advertised. This includes space that has already been occupied, and space in a new property that did not lease up prior to completion.

*Commercial Findings*

Market Lease rates in the subject neighborhood were generally flat for office around mid-2020, and generally increasing for retail. Vacancy increased for office between Q1 and Q2 2020, pre-CHOP, and continued to increase at a more gradual rate thereafter. Retail vacancy was exceptionally low in Q2, and increased to more normal levels thereafter for the rest of 2020.

*Overall Study Findings*

A detailed comparison of the CHOP neighborhood to the other neighborhoods is presented in the following charts. The overall comparison of both spot rates and trends is somewhat variable, and overall very comparable in both rate and trend to the other neighborhoods studied. Based on this analysis we find no evidence that the CHOP zone fared differently than counterpart neighborhoods. Specific factors including neighborhood demographics, fundamental mix and nature of properties sampled and differences in regional situation as previously discussed are also variable, and some differences are expected. Overall the data indicates that there is no discernable or systematic difference between the subject neighborhood real estate performance, relative to other similar Seattle neighborhoods.

**Expert Report Conclusion**

In summary this report outlines our investigation of relevant issues covering a broad array of issues and analysis. Our purpose is to provide relevant information relative to the current and potential future claims as we understand them today. Our findings to date are that in narrow and limited areas there may have been temporary impact to access to specific properties arising from the overall conditions in the CHOP but we have found no evidence that these conditions were more than temporary or were brought about by the City. In any event, each such claim is individual and should be examined individually relative to property location, tenant profile, specific date, property use and sector, and the many other factors external to a location within the defined boundaries of CHOP. Major impacts as a result of Covid well preceded the CHOP events, and in aggregate the data does not support an overall impact in the CHOP area that is discernably different from other similar neighborhoods or individual real estate situations.

We anticipate that we may receive more focused or relevant claims or analysis from the other expert reports that are to be submitted, and as this current examination was based on limited specific claim evidence we are prepared to analyze additional information if and when it becomes available.

Respectfully Submitted,

*Bates McKee*

Bates McKee, MAI, CRE, AI-GRS
WA State-Certified General Real Estate Appraiser (1100228)

# Multifamily – Less than 50 Units



Provided by Commercial Analytics



Data provided by property and owners and managers and anonymized by using market areas.



Vacancy based on surveys sent to program participants and known market actors as a snapshot on 30-day period.

CONFIDENTIAL

# Multifamily Vacancy - Under 50 Unit



| | Capitol Hill | Central District | First Hill | Ballard | Fremont | Shoreline | Lake City | Green Lake | Interbay |
|---|---|---|---|---|---|---|---|---|---|
| 2020.03 | 3.3% | 1.4% | 6.5% | 3.5% | 5.3% | 2.3% | 3.5% | 2.4% | 1.9% |
| 2020.06 | 5.9% | 4.2% | 6.0% | 3.8% | 4.5% | 2.7% | 4.1% | 4.9% | 3.5% |
| 2020.09 | 7.9% | 6.2% | 8.2% | 5.4% | 6.5% | 3.6% | 5.3% | 5.3% | 6.8% |
| 2020.12 | 7.8% | 5.6% | 9.3% | 8.3% | 11.9% | 4.7% | 4.7% | 4.4% | 11.2% |
| 2021.03 | 6.1% | 5.2% | 7.4% | 6.3% | 2.2% | 3.6% | 5.0% | 4.7% | 6.2% |

CONFIDENTIAL

# Multifamily Rents - Under 50 Unit



| | Capitol Hill | Central District | First Hill | Ballard | Fremont | Shoreline | Lake City | Green Lake | Interbay |
|---|---|---|---|---|---|---|---|---|---|
| 2020.03 | $2,206 | $2,240 | $2,330 | $2,234 | $2,053 | $1,715 | $1,639 | $2,183 | $1,987 |
| 2020.09 | $1,925 | $1,937 | $1,941 | $2,042 | $1,928 | $1,708 | $1,551 | $1,996 | $1,707 |
| 2021.03 | $1,978 | $1,972 | $1,896 | $1,937 | $2,000 | $1,721 | $1,561 | $2,122 | $1,698 |

CONFIDENTIAL

## Multifamily – 50+ Units

**Provided by Yardi Matrix**

**Info provided by Apartment management companies, via the Yardi Management suite of tools, and normalized by three times yearly suveys.**

**Properties divided into categories; Discretionary, High-Mid Range, and Low-Mid Range.**

**Vacancy is as reported by USPS mail forwarding notices.**

CONFIDENTIAL

|  | **Discretionary** | **High Mid-Range** | **Low Mid-Range** |
|---|---|---|---|
| **Definition** | Renters by choice. Attracted to the extreme upper end of the apartment market; properties generally of resort quality, clearly appealing to households capable of owning a residence, but choosing to rent, or households with substantial incomes, but without wealth. The luxury rental category primarily focuses on empty nester households, or more particularly, high net worth households. The renter-by-choice household is demanding; finishing detail and amenities included in properties appealing to this category must be of exceptional quality. | "Lifestyle renters." The high mid-range category appeals to double-income-no-kids ("DINK") households holding income status like that typically required of discretionary property positioning, but not in possession of the wealth more probably associated with the renter-by-choice rental household category. Properties holding high mid-range status typically offer excellent finishing quality, and attractive common area facilities, and typically focus on an environment providing a more social experience. | Working professionals. The low mid-range household is typically composed of working professional, "gray collar" households (i.e. policemen, firemen, teachers, technical workers). These households, while renters-of-necessity, are inclined to apply some discretion regarding rental environment quality and will opt for "adequate" quality of improvements offering reasonably attractive amenities in a good/convenient location. |
| **Included Improvement Ratings** | A+ / A | A- / B+ | B / B- |

# Multifamily 50+

YARDI MATRIX DEFINITION OF PROPERTY TYPES

CONFIDENTIAL

# Subject Area



# Subject Area

## RENTS



## OCCUPANCY



CONFIDENTIAL

# Subject

INVENTORY

CONSTRUCTION ACTIVITY





Provided by Yardi® Matrix – www.yardimatrix.com

Provided by Yardi® Matrix – www.yardimatrix.com

CONFIDENTIAL

# Lower Capitol Hill



CONFIDENTIAL

# Lower Capitol Hill 50+ Multifamily

### RENTS



### OCCUPANCY



# Lower Capitol Hill

INVENTORY



CONSTRUCTION ACTIVITY



# Upper Capitol Hill



CONFIDENTIAL

# Upper Capitol Hill

### RENTS



### OCCUPANCY



# Upper Capitol Hill

### INVENTORY



Provided by Yardi® Matrix – www.yardimatrix.com

### CONSTRUCTION ACTIVITY

Provided by Yardi® Matrix – www.yardimatrix.com

CONFIDENTIAL

# Belltown



# Belltown

RENTS

OCCUPANCY





# Belltown

## INVENTORY

CONSTRUCTION ACTIVITY



Provided by Yardi® Matrix – www.yardimatrix.com

Provided by Yardi® Matrix – www.yardimatrix.com

CONFIDENTIAL

# Ballard



# Ballard- Vacancy

OCCUPANCY
RENTS





# Ballard

INVENTORY



CONSTRUCTION ACTIVITY



# Fremont



# Fremont

## RENTAL RATE PER UNIT



## OCCUPANCY



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2020 | | | | | | | | 2021 | |
| Subject | 95% | 95% | 95% | 94% | 92% | 92% | 91% | 90% | 89% | 89% | 89% | 90% | 91% | 92% | 93% |
| Fremont | 96% | 95% | 95% | 95% | 95% | 94% | 94% | 94% | 93% | 93% | 92% | 93% | 93% | 93% | 94% |

CONFIDENTIAL

# Fremont

INVENTORY

OCCUPANCY



Provided by Yardi® Matrix – www.yardimatrix.com

Provided by Yardi® Matrix – www.yardimatrix.com

Hunters Capital LLC v. Seattle: McKee Expert Report - April 28, 2022

## Commercial Vacancy and Lease Information

Provided by CoStar, Inc

Data based on listings and completed lease information provided by market participants, confirmed by professional research staff, and normalized using algorithm.

Vacancy rate - it identifies the amount of New/Relet/Sublet space vacant divided by the existing RBA.

Market Rent - The rental income that a property would most probably command in the open market.

CONFIDENTIAL

Hunters Capital LLC v. Seattle: McKee Expert Report - April 28, 2022

# Subject



# Subject - Vacancy

OFFICE



RETAIL



CONFIDENTIAL

# Subject – Market Rents

OFFICE



RETAIL



CONFIDENTIAL

Hunters Capital LLC v. Seattle: McKee Expert Report - April 28, 2022

# Notes

Construction is completed at Kelly Springfield Building (1525 11th Ave) end of 2019 opens at 100% vacant. Lease rates at $53/sf at opening and stabilizes to 13.8% by Q2 with rates of $49 until full occupancy Q3 2021.

Office Vacancy climbs steadily in 2020, culminating in Q4 2020, then stagnates in 2021.

Building inventory leans heavily toward smaller low-rise buildings

Quarter over quarter vacancy increases approximately 5% between Q1 and Q2 in office space and Q2 and Q3 in retail space, with changes in subsequent quarters indicating that retail vacancy lags but mirrors office vacancy.

Rents generally rise over the indicated period, despite the upward trend in vacancy.

CONFIDENTIAL

# Greater Capitol Hill

## LOWER CAPITOL HILL



## UPPER CAPITOL HILL



CONFIDENTIAL

# Greater Capitol Hill - Vacancy

OFFICE



| | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 | 2021 Q2 |
|---|---|---|---|---|---|---|---|
| Subject | 18.7% | 3.9% | 9.0% | 10.3% | 12.6% | 12.7% | 10.0% |
| Upper Capitol Hill | 3.1% | 1.1% | 1.1% | 4.6% | 4.6% | 4.5% | 3.1% |
| Lower Capitol Hill | 0.5% | 1.5% | 2.1% | 3.1% | 6.1% | 7.0% | 9.1% |

RETAIL



| | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 | 2021 Q2 |
|---|---|---|---|---|---|---|---|
| Subject | 2.8% | 1.5% | 1.0% | 5.0% | 6.9% | 6.9% | 5.8% |
| Upper Capitol Hill | 0.7% | 1.6% | 2.3% | 2.3% | 2.3% | 1.9% | 1.9% |
| Lower Capitol Hill | 0.1% | 0.4% | 0.8% | 1.7% | 1.7% | 2.2% | 2.1% |

# Greater Capitol Hill – Market Rents

OFFICE

RETAIL



| OFFICE | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q2 |
|---|---|---|---|---|---|---|
| Subject | $32.18 | $35.44 | $38.00 | $37.61 | $38.38 | $37.24 |
| Upper Capitol Hill | $23.23 | $24.56 | $17.47 | $18.81 | $19.06 | $19.06 |
| Lower Capitol Hill | $30.66 | $31.34 | $35.05 | $29.28 | $26.86 | $23.24 |

| RETAIL | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q2 |
|---|---|---|---|---|---|---|
| Subject | $25.19 | $25.55 | $27.99 | $27.99 | $32.51 | $31.05 |
| Upper Capitol Hill | $32.85 | $32.85 | $32.23 | $32.91 | $35.16 | $33.41 |
| Lower Capitol Hill | $28.13 | $25.22 | $30.99 | $28.39 | $28.39 | $30.29 |

# Notes

Upper Capitol Hill - 1601-1609 19th Ave – Vacated by tenants Q2-Q3 – purchased by multifamily developers in 2019, but no permit activity during 2020. In comparison, Madison Ridge carried 25% vacancy from Q4 2019 until Q2 2021.

Building inventory leans heavily toward smaller low-rise buildings.

Offices leases executed during mid to late 2020. Often in buildings with lower market rents.

Retail vacations include daycare and restaurant space.

CONFIDENTIAL

# Ballard/Fremont

## BALLARD

## FREMONT



# Ballard/Fremont- Vacancy

OFFICE

RETAIL



| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 |
|---|---|---|---|---|
| Subject | 3.9% | 9.0% | 10.3% | 12.6% |
| Fremont | 4.6% | 4.6% | 5.3% | 8.7% |
| Ballard | 3.0% | 2.1% | 1.8% | 2.1% |

| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 |
|---|---|---|---|---|
| Subject | 1.5% | 1.0% | 5.0% | 6.9% |
| Fremont | 3.1% | 2.6% | 2.6% | 2.8% |
| Ballard | 2.7% | 3.0% | 2.8% | 2.8% |

CONFIDENTIAL

# Ballard/Fremont – Market Rents

OFFICE



| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 |
|---|---|---|---|---|
| Subject | $35.44 | $38.00 | $37.61 | $38.38 |
| Fremont | $33.04 | $37.27 | $36.21 | $36.28 |
| Ballard | $39.56 | $39.56 | $40.89 | $39.11 |

RETAIL



| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 |
|---|---|---|---|---|
| Subject | $25.55 | $27.99 | $27.99 | $32.51 |
| Fremont | $33.39 | $31.30 | $32.63 | $32.33 |
| Ballard | $24.48 | $24.26 | $24.12 | $26.94 |

Hunters Capital LLC v. Seattle: McKee Expert Report - April 28, 2022

# Notes

Ballard and Fremont submarkets have more properties in their sample, with a larger average square footage.

Tenants in core areas include more institutional employers, more likely to have long leases.

No construction completion during 2020.

CONFIDENTIAL

# Belltown



CONFIDENTIAL

# Belltown - Vacancy

OFFICE

RETAIL



| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 |
|---|---|---|---|---|
| Subject | 3.9% | 9.0% | 10.3% | 12.6% |
| Belltown | 5.3% | 6.7% | 8.6% | 13.6% |



| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 |
|---|---|---|---|---|
| Subject | 1.5% | 1.0% | 5.0% | 6.9% |
| Belltown | 2.4% | 2.7% | 12.6% | 12.8% |

CONFIDENTIAL

# Belltown – Market Rents

OFFICE

RETAIL



| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 |
|---|---|---|---|---|---|
| Subject | $35.44 | $38.00 | $37.61 | $38.38 | $38.66 |
| Belltown | $36.54 | $38.01 | $34.69 | $32.82 | $31.98 |

| | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 |
|---|---|---|---|---|---|
| Subject | $25.55 | $27.99 | $27.99 | $32.51 | $31.05 |
| Belltown | $29.49 | $29.84 | $28.54 | $25.55 | $25.72 |

CONFIDENTIAL

# Notes

Building inventory leans heavily toward smaller low-rise buildings.

Offices leases executed during mid to late 2020. Often in buildings with lower market rents.

"Modern" at Third & Lenora completed in early 2020. WeWork was preleased main tenant, but agreement was mutually terminated August 2019. Most of the office space is still available for lease.

Heavy in walking traffic from residents and visitors to Pike Place Market and the Seattle Cruise Terminal.

CONFIDENTIAL

# Summary – As of 6.30.2020

| | SUBJECT | LWR CAP | UPR CAP | BELLTOWN | BALLARD | FREMONT |
|---|---|---|---|---|---|---|
| **Multifamily -50** | | | | | | |
| *Vacancy* | *5.9%* | Included in Subject Area | Included in Subject Area | No Data Available | *3.8%* | *4.5%* |
| Rents | $2,065 | | | | $2,138 | $1,990 |
| **Multifamily 50+** | | | | | | |
| *Vacancy* | *8%* | *7%* | *5%* | *7%* | *5%* | *6%* |
| Rents | $2,334 | $2,114 | $1,930 | $2,282 | $2,070 | $2,101 |
| **Office** | | | | | | |
| *Vacancy* | *9.0%* | *2.1%* | *1.1%* | *6.7%* | *2.1%* | *3.8%* |
| Rents | $38.00 | $35.05 | 17.47 | $31.88 | $35.72 | $37.87 |
| **Retail** | | | | | | |
| *Vacancy* | *1.0%* | *0.8%* | *2.3%* | *2.7%* | *3.0%* | *2.6%* |
| Rents | $27.99 | $30.99 | $31.45 | $29.84 | $24.27 | $31.27 |

CONFIDENTIAL

Hunters Capital LLC v. Seattle: McKee Expert Report - April 28, 2022

**List of Documents Provided**

**Bates Numbered Documents (all documents in this list begin with CHOP prefix)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 52481 | - | 52482 | 801 | - | 807 | 4717 | 3910 | 4725 |
| 27255 | - | 27257 | 576 | - | 585 | 219 | 3918 | 8739 |
| 26532 | - | 26535 | 20468 | - | 20481 | 268 | 3921 | 4724 |
| 26539 | - | 26545 | 13268 | - | 13273 | 481 | 3924 | 4804 |
| 27289 | - | 27292 | 13266 | - | | 482 | 3927 | 6370 |
| 27307 | | | 13241 | - | 13255 | 492 | 3929 | 4881 |
| 27310 | - | 27312 | 1070 | - | 1071 | 493 | 3932 | 4968 |
| 26553 | - | 26554 | 21391 | - | 21395 | 511 | 3933 | 4900 |
| 26565 | - | 26568 | 5260 | - | 5263 | 520 | 3940 | 4916 |
| 28425 | - | 28431 | 5264 | - | 5267 | 596 | 3986 | 4925 |
| 28070 | - | 28080 | 21750 | - | 21752 | 597 | 3988 | 8068 |
| 28591 | - | 28595 | 8852 | - | 8855 | 602 | 4005 | 8554 |
| 28097 | - | 28099 | 11210 | - | 11214 | 606 | 4032 | 8228 |
| 26467 | - | 26468 | 54762 | - | 54981 | 618 | 4035 | 8239 |
| 26948 | - | 26952 | 54982 | - | 54993 | 633 | 4051 | 7744 |
| 26469 | - | 26476 | 55041 | | | 840 | 4062 | 7752 |
| 28403 | | | 55064 | - | 55280 | 841 | 4063 | 4976 |
| 28380 | - | 28384 | 55281 | - | 55283 | 842 | 4065 | 5255 |
| 28240 | - | 24241 | 55284 | - | 55286 | 942 | 4069 | 9062 |
| 26482 | - | 26484 | 55290 | - | 55298 | 1013 | 4126 | 6423 |
| 26435 | - | 26461 | 55411 | - | 55416 | 1096 | 4128 | 8300 |
| 26898 | - | 26904 | 55287 | - | 55289 | 1097 | 4202 | 5270 |
| 28245 | - | 28255 | 55426 | - | 55475 | 1099 | 4203 | 8833 |
| 26923 | - | 26928 | 55506 | | | 1310 | 4240 | 9018 |
| 28532 | - | 28539 | 55559 | - | 55560 | 1552 | 4246 | 5389 |
| 26411 | - | 26414 | 55510 | - | 55521 | 1553 | 4248 | 8241 |
| 26732 | - | 26766 | 55522 | - | 55558 | 1554 | 4257 | 5391 |
| 27579 | - | 27584 | 8662 | - | 8704 | 1566 | 4270 | 8247 |
| 26415 | - | 26416 | 1 | | | 2578 | 2499 | 8656 |
| 26777 | - | 26778 | 2 | - | 5 | 2579 | 4303 | |
| 2882 | - | 2886 | 7 | - | 13 | 2848 | 4589 | |
| 2775 | - | 2776 | 6493 | - | 6496 | 2959 | 4716 | |
| 3872 | - | 3877 | 8707 | - | 8710 | 3515 | 7739 | |
| 4300 | - | 4301 | 14 | - | 23 | 3752 | 7740 | |
| 19968 | - | 19971 | 6497 | - | 6754 | 3823 | 7741 | |
| 1843 | - | 1845 | 7714 | - | 7738 | 3825 | 8711 | |
| 4594 | - | 4606 | 8571 | - | 8655 | 3890 | 4723 | |
| 12433 | - | 12435 | 4305 | - | 4410 | 3891 | 8763 | |
| 687 | - | 693 | | | | | | |
| 12308 | - | 12316 | | | | | | |

**Deposition Transcripts & Exhibits**

Thompson, Lonnie Ex 1-9 (05-04-21)

Kilburn, Tamara Ex 10-27 (05-07-21)

Sheffer, Sean Ex 28-39 (05-18-21)

Wanagel, Joseph Ex 40-47 (05-21-21)

Augustine, Bradford (01-31-22)

Oaksmith, Michael (01-20-22)

CONFIDENTIAL

**Exhibits only**
Swanson Ex 50-53
Ploszaj Ex 54-55
Cronauer Ex 56-82
Donner Ex 83-106
Biller Ex 107-124
Best, Carmen Ex 1-18
Durkan Ex 1-15
Hara, Mami Ex 1-16
Scoggins, Harold Ex 1-24
Sixkiller, Casey Ex 1-13
Winkler Ex 1-6
Zimbabwe, Sam Ex 1-13

**Other Documents**
2020-09-28 City Initial Disclosures
2020-09-28 Plaintiffs Initial Disclosures
2020-10-29 Dkt 27 Order Set Trial and Related Dates
2020-10-30 City Resp to Pltf 01 ROG RDP vF
2020-10-30 Dkt 28 Second Amd Class Action Complaint
2020-11-13 Dkt 34 City Answer to Second Amended Class Action Complaint
2021-01-07 (12th and Pike) Responses to ROGS and RFPs
2021-01-07 (Argento) Responses to ROGS and RFPs
2021-01-07 (Bergman's Lock and Key) Responses to ROGS and RFPs
2021-01-07 (Hunter's Capital) Responses to ROGS and RFPs
2021-01-07 (Madrona IV) Responses to ROGS and RFPs
2021-01-07 (Madrona V) Responses to ROGS and RFPs
2021-01-07 (Madrona) Responses to ROGS and RFPs
2021-01-07 (Matthew Ploszaj) Responses to ROGS and RFPs
2021-01-07 (NW Liquor) Responses to ROGS and RFPs
2021-01-07 (Olive St Apts) Responses to ROGS and RFPs
2021-01-07 (Onyx) Responses to ROGS and RFPs
2021-01-07 (Rancho Bravo) Responses to ROGS and RFPs
2021-01-07 (Redside Partners) Responses to ROGS and RFPs
2021-01-07 (Richmark Label) Responses to ROGS and RFPs
2021-01-07 (Shuffle dba Cure Cocktail) Responses to ROGS and RFPs
2021-01-07 (SRJ Enterprises--Car Tender) Responses to ROGS and RFPs
2021-01-07 (Sway and Cake) Responses to ROGS and RFPs
2021-01-07 (Wade Biller) Responses to ROGS and RFPs
2021-05-10 FINAL Plaintiffs' Responses to Def's Second Request to Each Plaintiff
2022-01-13 Dkt 65 Pltfs Motions for Class Cert
2022-01-13 Dkt 65-1 Pltfs Motion for Class Cert - Prop Order
2022-01-13 Dkt 66 Pltfs Motions for Class Cert - Decl Weaver w Ex 1-37
2022-01-13 Dkt 67 Pltfs Motions for Class Cert - Decl McDermott
2022-01-13 Dkt 68 Pltfs Motions for Class Cert - Cronauer
2022-01-13 Dkt 69 Pltfs Motions for Class Cert - Decl Augustine
2022-02-07 Dkt 75 City Class Cert Opp - Decl Farmer w Exhs - REDACTED
2022-02-07 Dkt 76 City Class Cert Opp - FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 11 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 12 FILED UNDER SEAL

2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 15 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 17 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 18 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 20 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 39 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 86 FILED UNDER SEAL
2022-02-07 Dkt 77 City Class Cert Opp - Decl Farmer - Ex 91 FILED UNDER SEAL
2022-02-07 Dkt 79 City Class Cert Opp - Decl Farmer - Ex 88 FILED UNDER SEAL

CONFIDENTIAL

# McKEE APPRAISAL

## REAL ESTATE SERVICES & CONSULTING, INC.

1200 Sixth Avenue, Suite 1805, Seattle, Washington 98101

Telephone   (206) 343-8909

## EXPERIENCE & QUALIFICATIONS

## BATES MCKEE, MAI, CRE, AI-GRS

Mr. McKee co-founded the firm McKee Appraisal in 1990. McKee Appraisal specializes in the economic analysis of real estate, employing valuation professionals and providing critical analysis and information to corporate, government and private clients nationwide. Mr. McKee graduated from the Massachusetts Institute of Technology (MIT) where he received a Bachelor of Science Degree in Earth & Planetary Sciences, with a Minor in Writing. He also completed the O-Degree program in Geology at Edinburgh University, Scotland, in 1978.

Mr. McKee received the MAI (Member of Appraisal Institute) designation in 1988, after employment with the Seattle firm of Shorett & Riely in 1984. Mr. McKee is a Certified General Real Estate Appraiser, and adheres to the standards and ethics of the Appraisal Institute. Mr. McKee is past Chair of the Seattle Chapter Education Committee, and was elected as Regional Director for the Appraisal Institute in 2005. Mr. McKee was awarded the Counselors of Real Estate (CRE) designation in 2008 and the Appraisal Institute – General Review Specialist (AI-GRS) designation in 2016. He served as the Chair of the Pacific Northwest Chapter of the Counselors of Real Estate from 2011 to 2013. He currently serves on the Valuation Committee of the National Council of Real Estate Investment Fiduciaries (NCREIF).

In his appraisal experience, Mr. McKee has appraised and analyzed a wide variety of commercial property types, and provided critical consultation and litigation services to a diversified range of clients. In addition to managing operations and education at McKee Appraisal, he frequently represents both property owners and governmental agencies in appraisal and litigation. Project appraisal work includes acquisition for all segments of Sound Transit Link light rail, the Alaskan Way Viaduct replacement project, the Yellowstone retail stores, Interstate 90 and the Seattle Waterfront project. He has particular expertise in institutional portfolio valuation, leased fee and leasehold financial valuation, consulting, mediation and dispute resolution, and the valuation of tunnels and easements. He is a frequent educational speaker and lecturer for attorneys, appraisers and real estate consultants.

Mr. McKee was previously employed as a geologist with Roger Lowe Associates, Bellevue, Washington. His work included site evaluation of geologic and hydrologic conditions and hazards, economic feasibility analysis, and construction inspection. Mr. McKee was employed as a physical oceanographer with the research company SAIC. Mr. McKee was an independent investment manager and analyst. He authored Optival, a computer program for analyzing and valuing stock options, and was also employed as an investment software developer with Expert Systems, Inc., Redmond, Washington.

CONFIDENTIAL

**4-year history of trial and deposition testimony of Bates McKee, MAI (as of 4/28/2022)**

| Date | Regarding | Client | Description | Venue | Cause No. |
|---|---|---|---|---|---|
| 5-Nov-21 | Sound Transit v. MGRM LLC | Sound Transit, Matthew Hansen (Miller Nash Graham & Dunn, attorneys) | Deposition | King County Court | 21-2-03017-0 SEA |
| 20-Sep-21 | Sound Transit v. Car Wash Enterprises, Inc. | Sound Transit, Peter B. Dolan (Ellis Li McKinstry, attorneys) | Deposition | King County Court | 20-2-07440-3 SEA |
| 4-May-21 | Aminpour v. Englund | Rouzbeh & Maryam Aminpour, Andrew DeCarlow (Calfo Eakes, attorneys) | Trial | King County Court | 19-2-33904-7 SEA |
| 26-Feb-21 | Aminpour v. Englund | Rouzbeh & Maryam Aminpour, Andrew DeCarlow (Calfo Eakes, attorneys) | Deposition | King County Court | 19-2-33904-7 SEA |
| 16-Nov-20 | Sound Transit v. Marino, et al | Sound Transit, Matthew Hansen (Miller Nash Graham & Dunn, attorneys) | Trial | King County Court | 16-2-02235-9 SEA |
| 12-Nov-20 | Sound Transit v. Marino, et al | Sound Transit, Matthew Hansen (Miller Nash Graham & Dunn, attorneys) | Deposition | King County Court | 16-2-02235-9 SEA |
| 23-Sep-20 | Sound Transit v. Nijjer Holdings LLC, et al | Sound Transit, Jeffrey Beaver (Miller Nash Graham & Dunn, attorneys) | Trial Testimony | King County Court | 19-2-23361-3 KNT |
| 25-Aug-20 | Sound Transit v. Alaska Airlines, Inc., et al | Sound Transit, Matthew Hansen (Miller Nash Graham & Dunn, attorneys) | Trial Testimony | King County Court | 19-2-32968-8 KNT |
| 6-Aug-20 | Sound Transit v. Nijjer Holding, LLC, et al | Sound Transit, Jeffrey Beaver (Miller Nash Graham & Dunn, attorneys) | Deposition | King County Court | 19-2-23361-3 KNT |
| 29-Jul-20 | Sound Transit v. Alaska Airlines, Inc., et al | Sound Transit, Matthew Hansen (Miller Nash Graham & Dunn, attorneys) | Deposition | King County Court | 19-2-32968-8 KNT |
| 17-Jul-19 | City of Kent v. AMB-SGP CIF-California, LLC | AMB, Arley Harrel (Williams, Kastner & Gibbs PLLC, attorneys) | Deposition | King County Court | 18-2-58191-5 KNT |
| 28-Jan-19 | Neighbors et al v. King County | King County, Emily Harris (Law Offices of Corr Cronin, attorney) | Deposition | King County Court | 15-2-20483-1 SEA |

# Statement of Compensation

These all-inclusive rates for professional services are inclusive of labor, overhead costs, and profit:

| Inidividual | Hourly Rate |
|---|---|
| Bates McKee, MAI, CRE, AI-GRS | $350 |
| Mari Sorenson, MAI | $350 |
| Jacki Johnson, MAI | $350 |
| Ken Barnes, MAI, CRE | $350 |
| Matt Lange | $290 |
| Charlie McKee, MA | $290 |
| Amy Bradley | $160 |
| Austin Kinzer | $160 |
| Haile Freeman | $110 |