# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiffs,          )
                                 )
     vs.                         ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

BATES McKEE

_____


Witness located in Seattle, Washington

(All participants appearing via videoconference.)




DATE TAKEN:  AUGUST 24, 2022

REPORTED BY:  CARLA R. WALLAT, CRR, RPR

WA CCR #2578; OR CSR #16-0443; CA CSR #14423

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 35

1          Q.  (BY MR. REILLY-BATES)  Let's take a look at

2     the page 1, the end of the first paragraph.  It says "I

3     have been -- also been observing these neighborhoods

4     for our professional purposes in valuation through the

5     work-from-home era spawned by the coronavirus pandemic

6     with particular focus subject properties and claims

7     starting with my engagement for this assignment in

8     May 2021, including several comprehensive comparative

9     visits.  And the scope of my work included," et cetera,

10    et cetera.

11              So the question is:  Your engagement was -- by

12    the City was in May of 2021, correct?

13          A.  Correct.

14          Q.  And you weren't working on this -- this

15    project before May of 2021, correct?

16          A.  Correct.

17          Q.  And this may seem obvious, but you didn't

18    start observing any of the neighborhoods that you

19    mentioned at the end of this paragraph before May of

20    2021, correct?

21          A.  Oh, no.  Certainly, I observe all the

22    neighborhoods that I can.  So that's not correct.

23    That's my -- that's my job to observe real estate in

24    the Seattle area.  So -- so I'd say that's not correct.

25          Q.  Okay.  When you say "I've observed

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                     Bates McKee

Page 44

1    plaintiffs' claims have damages that could extend into
2    the future past July 10th of --
3          A.  Well, it would be presumptuous for me to say
4    when damages claims would extend.  That's -- that
5    probably would be a legal concept.  So I simply was --
6    part of my investigation was not limited to -- you
7    know, to a period of time.
8          Q.  Okay.  And you don't want to offer any legal
9    opinions in this case, do you, correct?
10         A.  No.
11         Q.  You're -- because you're not qualified as --
12   as an attorney, correct?
13         A.  Is that an expert?  I don't know.  But
14   certainly not in my area of expertise other than, you
15   know -- other than I am qualified as an expert in
16   real estate appraiser -- as a real estate appraiser in
17   real estate related legal cases.
18              So I'm expected to understand, of course,
19   the -- and to -- and to appraise to a legal fabric
20   that's acceptable in -- by the courts.  So I'm -- my
21   expertise does extend into the -- for instance, the
22   compensability, you know, issues.
23              I have to -- I have to read and understand at
24   a -- I guess you would say a layperson's legal level
25   but a high layperson's legal level the restraints on,

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 45

1    you know -- on compensation, for instance.

2        Q.  Okay.  But you understand that you're not able

3    to offer a legal opinion that the Court can consider in

4    this case, correct?

5        A.  That's right.  That's correct.  Well, I think

6    the Court can consider it, you know.  When I cite, for

7    instance, the legal standards that I appraise to, I

8    wouldn't suggest that the Court doesn't consider it.

9    If the Court finds something flawed, the Court would,

10   you know -- it's -- it's frequent that I need to

11   testify to such things, for instance, what's -- you

12   know, when I -- what's the legal fabric for appraisal

13   and valuation.

14        So -- so while I'm not, you know -- while I'm

15   not -- while I wouldn't tender a legal opinion myself,

16   I would cite things such as, you know, jury

17   instructions and even case law.

18        Q.  So is it possible that events that occurred

19   during CHOP could have caused damages that happened

20   after July 10th, 2020?

21        A.  Well, I don't know what "damages" mean.  That

22   means different things to different people.  So I -- I

23   usually deal in the world of compensation as opposed to

24   damages.  So I -- I guess I don't have an opinion about

25   that.

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                          Bates McKee

Page 60

1    the attorneys.

2          Q.  Okay.  Mr. McKee, can you answer this question

3    "yes" or "no," please:  You are not qualified to offer

4    a legal opinion in this case, are you?

5          A.  To -- I'm not sure I can answer that "yes" or

6    "no."

7          Q.  A "yes" or a "no."

8          A.  I'm not sure I can.  I think I've tried to

9    answer that.  I have to -- you know, I have to -- I

10   have to deal with -- with legal conclusions and with

11   the legal fabric when I -- when I address the appraisal

12   of, you know, temporary or permanent taking.

13          So I don't -- that's not an oppositional, you

14   know, level of understanding.  And so my opinions show

15   up in the context of my real estate appraisals, not as

16   a pleading to the Court.

17          So I would say that I'm not qualified to

18   provide a legal pleading or, you know, to provide an

19   interpretation for the purpose of a Court

20   interpretation.  That's in the domain of attorneys.

21   But I am required to -- to appraise legally under

22   the -- the fabric that's well established in eminent

23   domain.

24          So I have to -- those opinions or -- it's not

25   really my opinions.  My conclusion -- my reading of

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 61

1   the, you know, laws and, you know, informed by the

2   interpretation of case law is central to the work that

3   I do.

4          And so always subject to -- to legal

5   instruction myself, and I wouldn't tender an opinion to

6   the courts.  But I -- but I would be expected to -- to,

7   you know, to appraise in a legal manner subject to my

8   interpretation.

9          It's like driving on the street.  It's like --

10  I can't tell you, you know, about the nuances of the

11  enforcement of the speed limit or something, but I'm

12  expected to follow the speed limit and to understand

13  it.

14         So it's a -- of course, I would do things

15  legally to the best of my understanding, and in the

16  specific case of appraisals, then I'm, you know, -- I'm

17  required to -- to carefully follow the law.

18     Q.  Mr. McKee, that was a "yes" or "no" question.

19     A.  I'm sorry, I couldn't answer it.  I -- again,

20  yes, I am not -- I am not qualified to tender an

21  opinion to the -- for the Court to find or for a trier

22  of fact to find.  That is the domain of the attorneys.

23     Q.  So you're unable to answer my question "yes"

24  or "no" whether you are qualified to offer a legal

25  opinion in this case; is that a correct statement?

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 62

1     A.  Well, I'm asking who are we offering it to;

2   the reader of the appraisal report or to -- or to the

3   courts?

4          And so I'm saying I -- I am required to

5   interpret it for the purpose of documenting my

6   appraisals, and I am not qualified to submit pleadings

7   to, you know, a court or a trier of fact.  So I --

8   that's a "yes" and a "no," I think.  Sorry.

9     Q.  Let's go to the last paragraph of page 6.  It

10  starts with "an owner has" a reasonable -- "a right to

11  'reasonable' access."

12         Do you see that?  Could you take a moment to

13  review that paragraph, and let me know when you're

14  done?

15    A.  Okay.

16    Q.  Okay.  And the last sentence of that paragraph

17  states, "While there may have been intermittent

18  impairment of certain types of" some access -- or, I'm

19  sorry, "of access to some areas due to periodic

20  vehicular restrictions, there was nothing approaching a

21  taking of all, or even a significant part, of access to

22  and utility of the properties."

23         Do you see that?

24    A.  Yes.

25    Q.  And did you personally draft this?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 75

1   population of the subject area were students, can you?

2       A.  Correct.

3       Q.  Let's take a look at page 9, the last

4   paragraph, you state, over -- "In my observation,

5   street-level activity with pedestrians and workers was

6   diminished everywhere, but particularly in the

7   previously-vibrant close-in neighborhoods such as the

8   CBD, Capitol Hill, Pioneer Square and South Lake Union.

9   The absence of pedestrian activity was particularly

10  noticeable for these neighborhoods and tenants in these

11  neighborhoods, as the empty streets signaled a troubled

12  and unpredictable real estate environment."

13          Do you see that?

14      A.  Yes.

15      Q.  Now, what is the basis of your observations

16  here?

17      A.  Constantly observing.  So a -- it's, you know,

18  virtually daily or weekly observation of street-level

19  activity in various neighborhoods as I appraise

20  properties.

21      Q.  So -- so is that only your -- you're

22  physically going out to neighborhoods and -- and

23  looking at particular streets?

24      A.  Yes, that's my job.  It's only that.  So

25  anyway, that's what I -- that's -- that's central to --

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 76

1    you know, to -- my observations are, you know -- are

2    the basis for my work typically, so I don't mean to

3    make light of it.

4            Yes, it's my observations.

5        Q.   Okay.   So there's -- there's no -- no data in

6    support of -- to support those statements that there

7    was an absence of pedestrian activity in any of those

8    neighborhoods, correct?

9        A.   Oh, no, I think there is data.   There's quite

10   a wide variety of data that's available.   There's, you

11   know -- there's cell phone data.   There's sidewalk and

12   downtown, you know, DSA data.   There's quite a variety

13   of data, so it -- you know, including published data

14   and what have you.

15           So while my observations provide the key for

16   the statement that you see there, you know, the data

17   certainly exists.   I -- I -- I didn't attempt to

18   present all of the data.   It wasn't necessary.

19       Q.   And, in fact, you didn't actually review any

20   data, cell phone data, did you?

21       A.   Oh, that's not true, so, I don't know -- I

22   don't know why you would say that.   I constantly review

23   data.

24       Q.   Well, you did not review any data relating to

25   the level of pedestrian activity in any Seattle

4876e839-3c94-4488-9aea-5aa2c4b042c0

Page 77

1  neighborhoods?

2       A.  No, that's not true.  I don't know why you're

3  saying that.  I -- I -- again, it's a daily or weekly,

4  you know -- it's constant.  I'm constantly observing

5  the data.  That's not correct.

6       Q.  Okay.  So what -- what data do you review

7  that -- that provides you a basis to say that there was

8  an absence of pedestrian activity in these

9  neighborhoods?

10      A.  Yeah, I mean, I'm -- again, I read all the

11  published reports.  There's data that's written, you

12  know -- there's -- there are published reports every

13  day about level of activity and level of occupancy.  I

14  shouldn't say every day, but it's quite frequent in the

15  Puget Sound Business Journal and the Daily Journal of

16  Commerce and CoStar's reporting and, you know, data

17  that's cited by the Downtown Seattle Association and

18  the, you know -- there's -- there's a lot of data.

19          So, you know, it's not -- you know, it's not

20  accumulated in this report, but that doesn't mean I --

21  I don't have any data.  It just means -- it just means

22  it wasn't necessary to include it.

23      Q.  Okay.  And -- and you, in fact, did not cite

24  any data or data sources that you relied upon in -- in

25  your report, did you?

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 78

1    A.  I cited specifically my observation which is a
2    data point.  But, you know, I don't know if you would
3    invalidate my observations, but it's -- that's --
4    that's what I'm hired to do usually is to observe
5    things.
6          So those -- my citation was my observations,
7    but it's -- my observations include an observation of
8    the data on an ongoing basis.  So it's not just the
9    streets.  It's all the data.
10    Q.  Can -- can you sit here -- as you sit here
11    today, can you tell us any of the publications that you
12    reviewed that support your statement that there was a
13    particular noticeable lack of pedestrian activity in
14    these neighborhoods?
15    A.  I think I've said it.  Downtown Seattle
16    Association provides data on -- you know, on pedestrian
17    count, for instance.  The -- you know, the retail
18    facilities and the parking facilities that we appraise
19    provide very tangible data.
20          So I didn't cite the data here, but I observed
21    a lot of data, and it's broad.  It's not a -- you know,
22    again, I think we get, you know, weekly at this point,
23    you know, here's -- here's what the percentage of
24    office data is.
25          There was a -- recently published in the Puget

4876e839-3c94-4488-9aea-5aa2c4b042c0

Page 85

1          But the -- the issue at hand for -- at least
2    for, you know, compensation is fair market rent, which
3    does not premise the tenant.  So it's very specific to
4    the issue at hand.
5          Q.  And did you study any of the -- the leases of
6    the -- the plaintiffs' properties between the
7    plaintiffs and their tenants after June 2020 in this
8    case?
9          A.  I was not provided with any leases.
10         Q.  Okay.  Do you know whether or not Hunters
11   Capital entered into it -- leases with its tenants
12   at -- in arm's length negotiations?
13         A.  I'm not sure I understand.  Is -- what is the
14   question?  Is Hunters Capital a market participant that
15   would engage in arm's length negotiations; is that the
16   question?
17         Q.  The question is -- strike that question.
18         Do you know whether or not the plaintiffs --
19   plaintiffs entered into leases with their tenants in
20   arm's length transactions?
21         A.  No.
22         Q.  Okay.  And -- but you're not aware of any
23   facts that would suggest that they -- they did not
24   enter into any leases with their tenants for less than
25   fair market value; is that correct?

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                          Bates McKee

Page 87

1  are significantly impacted by any downturn."

2          What specific analysis did you conduct with

3  respect to parking revenues for your work?

4      A.  Many, many properties that we appraised.  That

5  properties have, you know, parking as a revenue

6  component.  Many -- many urban properties do.

7      Q.  Okay.  And -- go ahead.

8      A.  In -- go ahead.

9      Q.  I -- I interrupted.  I'm sorry.

10      A.  No.  In appraising the urban properties that

11  we appraise, we observe parking frequently.

12      Q.  Okay.  And how did you analyze the -- the

13  parking revenues that were from the subject area?

14      A.  I don't believe I did.

15      Q.  Okay.  Did you conduct any specific analysis

16  with respect to the -- the parking rates within the

17  subject area?

18      A.  Sure.

19          My observation, that includes an --

20  observations of, you know, of pedestrian activity, of

21  vehicle parking, of rates, so, you know, in -- in my

22  observation, absolutely.  That's just part of it.

23      Q.  What did you look at to study the parking

24  activity parking rates within the subject area?

25      A.  Surface parking, occupancy and use of surface

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 88

1  parking areas for, for instance, restaurants as opposed

2  to cars, the actual rates as published, which, you

3  know, I didn't find -- I didn't find it changed, but

4  that's not unusual.  You don't stimulate demand when

5  there isn't a market by dropping rates.

6          So I found that the rates were, you know, were

7  similar as far as the asking rates go, but that the

8  occupancy in terms of occupancy, particularly a --

9  transient surface, you know, lots was diminished

10  commensurate with, you know -- commensurate with the

11  quieter overall environment and the lessened activity,

12  so...

13      Q.  So my question was specifically about the

14  subject area --

15      A.  Yes.

16      Q.  -- around --

17      A.  Yes.

18      Q.  -- CHOP.  What did you look at to -- to study

19  the occupancy rates in the subject area?

20      A.  The -- the -- the surface parking lots as I

21  said.

22      Q.  And where did you get that information?

23      A.  That -- my personal observation.

24      Q.  Okay.  So you're talking about driving by a

25  parking lot and seeing that it's full or half -- half

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 89

1    empty or empty, correct?

2        A.   That's what we do, or walking by, both.

3        Q.   And so -- but you'll admit that you -- you

4    couldn't have made any of those observations prior to

5    your engagement in May of 2021, correct?

6        A.   Not for the subject properties, no, because I

7    didn't have a -- specific eyes on that.  But -- but the

8    issue relates to the broader urban fabric that is not

9    just the subject neighborhood but the surrounding, so

10   lots of observation.

11           But relative to the subject neighborhood, no.

12   That was started in May of 2021.

13       Q.   Okay.  Let's scroll down to the bottom of

14   page 10 where it refers to a "Survey of Real Estate

15   Market Participants on Impacts of COVID and Protests on

16   Properties and Businesses."

17           Do you see that?

18       A.   Yes.

19       Q.   Now, why did you decide to conduct the survey

20   as part of this analysis?

21       A.   It was -- it -- it seemed relevant.  The issue

22   at hand was, you know, complex, and it was -- it was to

23   try to discriminate, you know, additional impact, if

24   any, of -- of a specific set of events relative to the

25   broader, you know, real estate context of what was

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 97

1  are well known -- you know, these are well-known
2  commercial real estate people.  So I -- I don't have --
3  you know, I'm not friends with any of them.  I wouldn't
4  call them acquaintances.  Professional acquaintances, I
5  guess.
6      Q.  So you've worked with -- with some of these
7  individuals, correct?
8      A.  Yes.
9      Q.  Have -- have any of these individuals hired
10 your business or you to perform any work for them?
11     A.  Oh, gosh.  Often -- usually, if we're hired to
12 do work on property valuation, it's usually by the
13 financial institutions.  It would be less normal to be
14 hired by the individuals.
15          Let me take a quick look on this.  We did some
16 work indirectly for Art Langley who owns the -- you
17 know, Salvation Army.  But again, that wasn't -- that
18 wasn't Art who hired us to do that.
19          We've appraised properties in the past owned
20 by Hal Griffith and owned by Ed Kim.  And, again, I
21 don't believe we've worked directly for them.  Or as a
22 company, we may have, but I -- I haven't.  And, again,
23 in 31 years of business, a lot of these guys have been
24 around a long time.  So they're familiar to us.
25          I probably appraised some of Wright's, you

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                     Bates McKee

Page 98

1   know, restaurants in the past, but, again, I don't
2   think directly for him.  So -- so I would say -- I'm --
3   well, I'm not certain.  I would say that we -- we
4   probably appraised properties that they own or manage
5   and -- and probably not for them.  There may be
6   exceptions.
7        Q.  Okay.  Now, did you rely upon this survey at
8   all to reach your conclusion at the end of this section
9   that COVID had a greater impact than CHOP did on -- on
10  rents?
11       A.  Yes, to some extent, uh-huh.
12       Q.  And what did you do to ensure that the people
13  you were surveying owned property that was located
14  within the subject area?
15       A.  We weren't necessarily trying to find owners
16  within the subject area.  That would have, I think,
17  been potentially, you know, improper for us.  So we
18  were -- we were not targeting the subject area
19  specifically.
20       Q.  And were any of these people you surveyed
21  people or -- people that owned businesses or operated
22  businesses that were located in the subject area?
23       A.  Possibly.  I don't know where all the
24  restaurants, you know, are.  There's -- you know, some
25  of these people own or manage, you know, many

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 99

1    properties.  So I -- it was -- you know, we weren't

2    trying to prompt a response.  So we were throwing in

3    the various issues including, you know, sort of civil

4    unrest and to the -- you know, into the equation of

5    things we were interested in, what was influencing

6    properties in, you know, in mid 2020.

7           So, again, we -- due to confidentiality, we

8    were not identifying, you know, who we were working

9    for, what we were doing.  So we weren't directly

10   soliciting that.

11       Q.  So as you sit here today, you can't identify a

12   single property that was within the subject area that

13   was owned or managed by one of the individuals listed

14   on pages 14 and 15 of Exhibit 1?

15       A.  That's correct.  These are simply people who

16   have a broad spectrum of -- you know, of knowledge,

17   ownership and management through the metro area and

18   were, you know, actively involved in the commercial

19   real estate market in the urban areas.  So it's -- it

20   was not targeted towards the subject, you know,

21   neighborhood.

22       Q.  Okay.  Now, the word "CHOP" only appears --

23   is -- is only referenced by four individuals.

24           Did you realize that?

25       A.  Did I realize what?

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 100

1      Q.   That the word "CHOP" is only referenced by

2   four of the individuals that you surveyed.

3           Are you aware of that?

4      A.   I suppose so.   I've read the survey results.

5      Q.   Okay.   Well, you have no reason to doubt that

6   the word "CHOP" only appears in four --

7      A.   Right.

8      Q.   Correct?

9      A.   Correct.

10      Q.   And we can assume that if there's nothing

11   about CHOP in the other entries that they didn't talk

12   about CHOP, correct?

13      A.   Or didn't respond or didn't have an opinion,

14   correct.

15      Q.   Okay.

16      A.   And, again, we were interested in civil unrest

17   in general and, obviously, Capitol Hill was not the

18   only place that that had happened.   That was also a

19   factor in downtown Seattle.   So it was -- our attempt

20   to -- to find what was sort of -- the cause and effect

21   of the various factors that were at hand was fairly

22   broad.   So I think that's not surprising, you know.

23           Many people wouldn't have an opinion about

24   that or wouldn't have been in the neighborhood.   So --

25   or wouldn't have been familiar -- as familiar with the

4876e839-3c94-4488-9aea-5aa2c4b042c0

Bates McKee

Page 107

1    is really -- you know, if you ask somebody what is
2    Capitol Hill, you'll get quite a different variety of
3    responses depending upon how they think about it.
4    Most -- most real estate participants would think of
5    Capitol Hill as starting on the east side of probably
6    I-5.
7           So here we're not -- you know, we're focused
8    on some zone that's sort of a subset of Capitol Hill, I
9    guess you would say.  And, you know, the -- the
10   Pike/Pine corridor, obviously, was, you know -- was hit
11   hard.  And is not part of CHOP.
12          But I think he's -- you know, I think he's
13   referring to -- you know, and again, that was -- that
14   was noticeable as was downtown.  A lot of the
15   activation comes from the, you know, interplay between
16   downtown and the Pike/Pine corridor which is really an
17   extension of downtown.  So I don't think he's saying
18   anything surprising there.
19       Q.  So -- and -- and from your personal
20   experience, you're aware that protesters would often go
21   between CHOP and downtown using the Pike/Pine corridor.
22          Is that a fair statement?
23       A.  Oh, I don't know.  That's a common way to walk
24   between the two.  That's a question -- my -- my
25   impression is that it was a -- you know, it was a

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 122

1    instances or four individuals as you state.
2         Q.  Okay.  Okay.  And were -- were there any
3    instances where Cap Hill was mentioned that they were
4    actually referring to CHOP that you're aware of?
5         A.  Well, of course, you know, CHOP is in, you
6    know, Cap Hill.  So, I don't want to, you know,
7    speculate what somebody means when they say
8    "Capitol Hill," other than it includes CHOP, right.
9         Q.  Okay.  You wouldn't speculate that because
10   somebody referred to Capitol Hill that they're
11   referring to CHOP, correct?
12        A.  Well, I think I said the opposite.  Cap Hill
13   does include CHOP.  So I would think they were talking
14   about, you know, CHOP and other locations when they
15   said "Cap Hill."
16        Q.  Now, did any of these individuals say anything
17   else about CHOP that's not reflected in -- on pages 14
18   or 15 of your expert report?
19        A.  Not to the best of my knowledge.
20        Q.  And you chose these individuals because they
21   had expertise -- some form of expertise in -- in the
22   real estate market, correct?
23        A.  I asked Austin to interview individuals who
24   would be knowledgeable about the -- the close-in urban
25   real estate market.

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 123

1      Q.   Okay.   Did you give a him a list of people to
2   interview?
3      A.   No.
4      Q.   How did he pick -- do you know how he -- he
5   determined people to pick?
6      A.   Well, he had a long list.   He had a -- the --
7   you know, of people that he had previously interacted
8   with or that he was comfortable calling and he -- I
9   don't know, he called about, you know, 30 people, I
10  think, and was, you know, again, in a -- in a context
11  of -- of a, you know, an overall survey where we're
12  trying to determine what's happening mostly with retail
13  space, you know, in the urban areas.   I -- you know, I
14  think that's what he wanted to concentrate on.
15          And obviously, you know, that's a -- when we
16  look at the claims, it was all about, you know,
17  restaurants and, you know, and street-level businesses,
18  you know, a lot of it was.   So I think that was his
19  focus was people who were knowledgeable about urban
20  street-level business.
21      Q.   Okay.
22      A.   And -- but I didn't -- I didn't guide him
23  on -- I didn't -- I didn't tell him who or didn't --
24  didn't really give any other boundaries to that.   So,
25  people that -- people that would talk to him, you know,

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                     Bates McKee

Page 132

1      A.  Yes.  I think you can see the boundaries here
2   that were used for that, so...
3      Q.  Okay.  So am I to understand that the subject
4   area that you used for your study is from Denny in the
5   north to Union in the south and Broadway in the west to
6   14th in the east?
7      A.  For the Yardi -- sorry, for the -- for the --
8   for the Yardi portion of the study, 50 plus unit
9   apartments, I believe, yes.  The other -- you know, the
10  boundaries are mostly imposed by the data providers, so
11  they were various -- and I think there's maps of the
12  other ones.
13         And so that was just one part of the study, of
14  course.
15     Q.  So are you saying that you used different --
16  different boundaries for the subject area based on the
17  different providers that you used?
18     A.  Yes, that -- that the providers have their
19  own, you know, boundary rules and that we didn't go and
20  individually isolate properties one by one and study
21  them ourselves.  We used -- you know, we used the
22  providers, Commercial Analytics and Yardi and -- and
23  CoStar, so...
24     Q.  Okay.  So for Commercial Analytics, what were
25  the boundaries that you used?

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 133

1    A.  I believe Commercial Analytics has the
2    distinction of -- of Capitol Hill at large, and I think
3    that's probably discussed in the report.  Do you want
4    me to look at that?
5         So let's see.  They have different
6    methodologies and data sources.
7    Q.  What page are you referring to?
8    A.  I'm looking at page 21.
9    Q.  Okay.  Okay.  Does it tell us what boundaries
10   Commercial Analytics used for the boundaries for the
11   subject area on page 21?
12   A.  I was thinking that it did, but I don't see it
13   in here.
14   Q.  Okay.
15   A.  So my understanding is that Commercial
16   Analytics includes sort of all Capitol Hill and their
17   boundaries, so this is an examination of Capitol Hill
18   including, you know, the CHOP area but not excluding
19   other areas of Capitol Hill.  And that's -- that's
20   their boundary conditions.
21   Q.  So if -- if I understand the data that comes
22   from Commercial Analytics that refers to the subject
23   area refers to the entire area of Capitol Hill?
24   A.  Yes.
25   Q.  Okay.  And --

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 135

1    page 30.  Would -- wouldn't you agree?
2         A.  It looks like it goes to 13th instead of 14th.
3         Q.  That's correct.  So the eastern boundary is --
4    is -- is 13th instead of 14th on this map on page 49,
5    correct?
6         A.  Yes.
7         Q.  So -- so, in fact, you're -- you're getting
8    data from two different subject areas, wouldn't you
9    agree, even though there's just a slight difference?
10        A.  Three -- three different subject areas, but
11   each of the -- each of these is different.
12        Q.  Correct.
13        A.  Yeah.
14        Q.  And wouldn't that make a difference in the
15   analysis that -- that you're conducting of the data to
16   have different subject -- different boundaries drawn
17   for the -- the subject areas?
18        A.  It might slightly change the specifics.
19   Really, the purpose of this analysis is to see if you
20   can discriminate, you know, a difference that's not
21   explained by other factors such as outmigration, and
22   so, you know, the attempt is sort of a statistical
23   attempt that is not, you know, seriously impacted in my
24   opinion by slightly different boundaries.
25            I think the Commercial Analytics boundary,

Page 138

1   You know, Yardi allows -- you know, has individual, you
2   know, buildings as data points, so I'm -- I'm sure
3   that's available.  But obviously I don't have it here.
4   It wasn't something that was of a consideration to me
5   or that wasn't important.
6       Q.  And where -- where would that data be
7   available?
8       A.  Through Yardi.
9       Q.  But did you retain any of the data relating to
10  these specific locations depicted on page 30?
11      A.  No, I believe Amy simply printed the maps that
12  were associated with them.  So we weren't -- we weren't
13  interested in the specifics.  We just wanted to give
14  good disclosure on the boundaries.
15      Q.  So these balloons do not represent any
16  specific properties that you relied upon for data in
17  your study, does it?
18      A.  We're relying on the aggregated data,
19  obviously.  We -- we weren't looking at specific
20  properties.
21      Q.  So -- but were you relying at -- upon
22  aggregated data for these specific -- these properties
23  depicted in -- with -- by these balloons here?
24      A.  These are all the properties tracked by Yardi.
25  So it's -- we didn't select the buildings.

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 139

1    Q.  Are there no other buildings that are tracked

2  by Yardi within this location that was --

3    A.  That's right.  Yes.  My understanding is this

4  is comprehensive.

5    Q.  And so you didn't undertake to understand the

6  exact address of each one of these buildings, did you?

7    A.  Correct.

8    Q.  You didn't undertake to understand the -- the

9  nature of the -- the tenant that was located at any of

10 these specific addresses, did you?

11   A.  No, certainly not.  That would not be in the

12 scope of even an appraisal, and this was -- this was

13 broad analysis.  This wasn't an appraisal.  So

14 that definitely -- definitely we're not trying to

15 understand the specific tenants.  At best we talked

16 about before -- would probably have been inappropriate

17 for us to -- they're in the claimant area.

18   Q.  And you didn't -- you didn't seek to -- to

19 survey, for example, any of the -- of the properties

20 that are listed here in the subject area depicted on

21 page 30 to determine what their experience was in CHOP,

22 did you?

23   A.  That's correct.  We did not -- we were not

24 provided with that information, and it was not within

25 our scope to do that, so we -- we did not do that.

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 154

1        A.  Yes.

2        Q.  And is there -- is there an ability to display

3    the -- the -- and collect the address information of

4    the properties that was used in -- in the data points

5    for your CoStar data?

6        A.  I believe you can export, you know, by

7    property record probably.  So -- or the -- at least to

8    some limited extent.  They're -- they don't want -- you

9    know, they don't want -- they don't want people

10   exporting everything because it's their proprietary

11   data.  But -- but I believe you can export individual

12   property records if you were to be granular.

13       Q.  Okay.  So if you could take a look at page 49,

14   I would appreciate that.

15       A.  Okay.

16       Q.  Okay.  And page 49, again, is a map of the

17   subject area that was used for the CoStar data,

18   correct?

19       A.  Yes.

20       Q.  And page 49 does not show any locations on the

21   map of -- of where the specific properties were from,

22   correct?

23       A.  Correct.

24       Q.  And as you sit there today, you have no idea

25   which properties -- which addresses you used for your

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 155

1  study, correct?

2       A.  Well, I think they're depicted here, but I

3  don't have a list of addresses or properties.

4       Q.  Okay.  You don't have -- you don't have a list

5  of addresses and there aren't any dots or indications

6  on this map that show us where the properties are,

7  correct?

8       A.  Correct.

9       Q.  And in fact, there's not any other map in your

10  report that would show us that information, correct?

11       A.  Correct.

12       Q.  So there's no -- no map or address information

13  that would show us, for example, how close any of these

14  properties were to the East Precinct.  Is that fair?

15       A.  I'm not sure I understand the question.  The

16  East Precinct has a specific location.  So you could

17  take any other location and say, Here's where it is

18  compared to that location.

19           Are you saying by address search or by

20  geocoding or something -- some --

21       Q.  Let -- let me ask the question again.  Your

22  report does not have any address information or maps

23  depicting the property -- property addresses of the

24  CoStar data that you used for your study that would

25  show us the proximity of any specific property that was

Page 156

1    used in relation to the East Precinct, correct?

2        A.   Yes.

3        Q.   Okay.  All right.  What -- now, let's turn to

4    page 28 of your report, please.

5                MR. FARMER:  Gabe, before you ask this

6    question, I was just going to note that I need to leave

7    for my hearing, so Ms. Iverson will take over defending

8    the deposition until I'm able to return.

9                MR. REILLY-BATES:  Okay.

10               MR. FARMER:  Thanks very much.

11       Q.   (BY MR. REILLY-BATES)  Okay.  Are you on

12   page 28?

13       A.   Yes.

14       Q.   So this is a page describing what the Yardi

15   matrix is, correct?

16       A.   Yes.

17       Q.   And it states that the Yardi matrix only

18   gathers data three time a year, correct?

19       A.   Normalized data three times a year.  I think

20   they're probably gathering all the time, but that's

21   right.

22       Q.   Okay.  Do you know what specific time points

23   those are during the year?

24       A.   Not offhand.

25       Q.   And would you agree that the specific time --

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 162

1      Q.   Okay.   Let's turn back to page 25 when you get
2  a chance.   And we're on page 25 of Exhibit 1 which is a
3  page regarding Commercial Analytics data.   And it says,
4  "Data provided by property and owners and managers and
5  anonymized by using market areas."
6           Do you see that?
7      A.   Yes.
8      Q.   Is that a fair statement of the data that you
9  received from Commercial Analytics?
10      A.   Yes, to the best of my knowledge, that's
11  what -- that's what they say it is.
12      Q.   Okay.   So -- so you have no way of determining
13  who -- where the property locations are in the data
14  that you received from Commercial Analytics, do you?
15      A.   Only in the product boundaries that they
16  defined.
17      Q.   Right, which means --
18      A.   Within the boundary of each neighborhood that
19  they define, that's right.
20      Q.   Right.   So you have -- you have no idea within
21  the boundaries that they've defined where the data
22  points are located, correct?
23      A.   Well, as we sit here, of course not.   But, I
24  mean, you know, we could go look for the -- you know,
25  the data that would fit their criteria.   So I don't

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 163

1  want to say that we -- it couldn't be done.  But that's

2  not normally something we would do and not something

3  that we have in this file.

4       Q.  Well, if your report says this data is

5  anonymized --

6       A.  Right.

7       Q.  -- so doesn't that mean that you cannot go

8  back in and figure out who -- who the data is linked

9  to?

10      A.  No.  It means that the individual data points

11 are not reported, so, you know, they're anonymous by

12 individual points, unlike -- for instance, I said at

13 CoStar, you could go in and look at the actual, you

14 know, here's the property or something like that.

15          But it's -- portion of the data points with

16 Commercial Analytics you cannot do that.  Again, the --

17 they just define their survey as such that they tell

18 people, "Hey, we won't tell them about your specific

19 property, we'll just group it with a lot of other

20 properties, so that, you know -- so that you're part of

21 the statistical average."

22          And again, this is -- appraisers and market

23 analysts are using these for trends in this case,

24 not -- you know, not for the specific data points.

25 We're usually looking at what are the trends.  We're

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 164

1   making adjustments for time and doing things like that.

2          So this is not a -- that's not an impediment

3   from an appraisal viewpoint.  It's just different than

4   going out and doing a rent survey which would -- which

5   we would actually select the comparable properties and

6   try to solve the value of any one property.

7          So this is for market analysis purposes, not

8   for -- not for appraisal purposes.

9       Q.  Okay.  And just to be clear, you didn't -- you

10  didn't conduct a -- a market survey where you looked

11  for comparable properties in this case to use, you

12  know, to analyze the rent rates in the subject area,

13  correct?

14      A.  Correct.  We didn't really have specific

15  subject properties.  We just had a defined, you know --

16  or a sort of defined area, right?  So it's not -- you

17  know, the -- the plaintiffs' specific claims, you know,

18  were -- you know, were properties but not a

19  comprehensive list of properties or anything.

20         So we didn't -- we didn't have a -- and we're

21  not -- and we weren't appraising anything, so we -- we

22  didn't attempt to do that level of sampling.  We were

23  simply looking at the trends.

24      Q.  Okay.  And so the Capitol -- the Capitol Hill

25  area used by Commercial Analytics is -- is much larger

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 176

1    the vacancy rate in the subject area was higher than

2    Belltown, wouldn't you?

3        A.  Well, it went up less than, but started out

4    higher, yes.  But, again, that's -- that pre- -- that

5    mostly predates the claim period here.

6        Q.  Now, are you aware of whether or not Amazon --

7    Amazon's headquarters downtown are located within

8    Belltown?

9        A.  Some of them are, yes.  In the Belltown

10   market.  That's --

11       Q.  And are you aware that Amazon employs over

12   75,000 employees in the Seattle area?

13       A.  Yeah.  I mean, the Seattle area, I think

14   that's more like -- more like 50,000 in Seattle, but,

15   yes.

16       Q.  And do you have any general idea as to the

17   number of -- of office employees that are working at

18   Amazon -- or were working in Amazon's headquarters in

19   Belltown at the beginning of the pandemic in

20   March 2020?

21       A.  Yes.

22       Q.  And how many approximately within --

23       A.  Maybe 40,000.

24       Q.  And --

25       A.  That's between all of their buildings, so...

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                          Bates McKee

Page 177

1      Q.   So do you think that -- well, do you know
2    whether Amazon had a work-from-home policy once the
3    pandemic started?
4      A.   Oh, yes.
5      Q.   And in fact, they continued their
6    work-from-home policy throughout all of 2020 and
7    through most of 2021, correct?
8      A.   That is correct.  But that doesn't affect the
9    vacancy rate.  Right.  That just means that the
10   majority of the market is occupied.
11     Q.   So --
12     A.   Vacancy is -- is by other tenants.  That's not
13   Amazon.
14     Q.   Wouldn't that affect -- well, wouldn't --
15   it wouldn't affect Amazon directly, but wouldn't it
16   affect other businesses that rely upon Amazon employees
17   to be in the neighborhood, shopping and buying things?
18   Wouldn't you agree with that?
19     A.   Well, that's retail effect.  That's not what
20   we're looking at here.  Right?
21     Q.   Well, the -- the map on the right are -- are
22   retail?
23     A.   Oh, I thought you were talking about the left
24   on that.  Yeah.
25     Q.   So it would have -- Amazon work-from-home

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                        Bates McKee

Page 226

1    you know, to cure concrete on one part of a driveway or

2    something, and the mere inconvenience of having to go

3    through a bit of a construction zone would not be, you

4    know, legally compensable probably.

5              So it's -- it's very difficult because I think

6    the different accounts that you see, you know, I don't

7    have video accounts.  I don't have -- I don't have the

8    level of detail that might be appropriate for a

9    specific property investigation.

10             The statement here is relative certainly to

11   the 5,000 property owners that were allegedly, you

12   know -- you know, within the CHOP zone that, you know,

13   and obviously that was highly variable and was -- you

14   know, there was concentration of -- you know, access

15   issues that affected certain streets which, you know, a

16   street being blocked on its own is not an

17   unreasonable -- you know, there's a standard of -- you

18   know, of circuity access also, which is another jury

19   instruction standard.

20             So, you know, merely being circuitous to have

21   to get places may or may not be -- you know, rise to a

22   level.  Also, I think there's a distinction to be made

23   between vehicular access and pedestrian access, and

24   that's an important distinction and, you know, both

25   accesses are -- you know, are legitimate to talk about

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 261

1                    REPORTER'S CERTIFICATE

2          I, CARLA R. WALLAT, CCR, CSR, RPR, CRR, the undersigned

3    Certified Court Reporter, authorized to administer oaths and

4    affirmations in and for the states of Washington (2578),

5    Oregon (16-0443), and California (14423) do hereby certify:

6          That the sworn testimony and/or proceedings, a

7    transcript of which is attached, was given remotely before me

8    at the time and place stated therein; that any and/or all

9    witness(es) were duly sworn to testify to the truth; that the

10   sworn testimony and/or proceedings were by me stenographically

11   recorded and transcribed under my supervision.  That the

12   foregoing transcript contains a full, true, and accurate

13   record of all the sworn testimony and/or proceedings given and

14   occurring at the time and place stated in the transcript; that

15   a review of which was requested; that I am in no way related

16   to any party to the matter, nor to any counsel, nor do I have

17   any financial interest in the event of the cause.

18         WITNESS MY HAND AND DIGITAL SIGNATURE this 31st day of

19   August, 2022.

20

21

22    _____

23   CARLA R. WALLAT, RPR, CRR
     Washington CCR #2578, Expires 1/5/2023
24   Oregon CSR #16-0443, Expires 9/30/2024
     California CSR #14423, Expires 1/31/2023

25

4876e839-3c94-4488-9aea-5aa2c4b042c0