# EXHIBIT 4



**McKee Appraisal**
REAL ESTATE | Consulting

June 3, 2022

Tyler L. Farmer
Harrigan Leyh Farmer & Thomsen LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104

RE: Evaluation of Expert Report of Arik Van Zandt (dated April 28, 2022)
*Hunters Capital LLC et al v. City of Seattle, Case No. 2:20-cv-00983 TSZ*

Mr. Farmer:

At your request I have evaluated the opinions expressed in the April 28, 2022 Expert Report of Arik Van Zandt in the above referenced case. As detailed further in my opening report dated April 28, 2022 (Opening Report), I am a real estate valuation expert and have extensive knowledge regarding the issues of market rent and market value, including significant work over many years in the Capitol Hill neighborhood, and in nearby downtown Seattle and many other nearby or otherwise comparable Seattle neighborhoods. I have also observed these neighborhoods for professional valuation purposes throughout the work-from-home era spawned by the Covid-19 pandemic. As of my engagement for this assignment in May, 2021, my research and observations of Capitol Hill and comparable neighborhoods have focused particularly on the subject properties and claims in this lawsuit.

The scope of my work in this matter has also included extensive research, analysis and documentation of Plaintiffs' claims as set forth in my Opening Report. My expert investigation focused in particular on the real estate economic claims, which are my area of expertise, and my rebuttal to Mr. Van Zandt's report is similarly focused on the narrow real estate issues raised in his report. The Plaintiffs' basic claim is that the City caused them economic damage as a result of its response to the anti-police protests that began after the police murder of George Floyd on May 25, 2020. The City's allegedly damage-inducing response included members of the Seattle Police temporarily relocating from the East Precinct Building between June 8, 2020 and July1, 2020 and the City modifying services to the CHOP area.[1]

Plaintiffs' claims can be placed into several broad categories: some claims relate to real estate damage (physical damage and rental rate damage); some claims relate to the business of owning real estate (mortgage payments and tenant turnover costs); and some relate to tenant business losses (loss in revenues or profits incurred by tenants), all allegedly a result of the City's response to CHOP.

---

[1] The specific "Adapted Services" the City adopted are described in further detail in the City of Seattle Executive Order 2020-08, beginning on page 2.

Evaluation of Expert Report of Arik Van Zandt (dated April 28, 2022)
Hunters Capital LLC et al v. City of Seattle
June 3, 2022
Page 2

**Real Estate Claims – Taking of Access**

Plaintiffs have not substantiated any losses resulting from a taking of "access" to their respective properties. A property owner has a property right to "*reasonable*" access; unless there is "*substantial impairment*" there is no compensable damage. Means of access to Plaintiffs' property include both pedestrian and vehicular access, and it appears that the subject properties were in fact accessible by various means and at nearly all times. Van Zandt appears to identify only one instance of a plaintiff suffering from lack of access, describing Richmark Company's need to "negotiate with protestors" to access its building at one point. Van Zandt Report at 25. Van Zandt does not say whether the Richmark employees were in fact prevented from accessing the subject property or whether their access issue resulted from any particular City action or adapted service. Further, impairment of access, if any, would depend on the location of each property and the distance said property was from the East Precinct Building or from any barricades in the street. While there may have been some limited, periodic access impairment to some properties, it is not the case that all access to the subject properties was blocked and in many cases there was no access impact at all from the barricades or from the City's other adapted services. Augustine Dep. 44:13-45:6 (tenants complained about homeless individuals temporarily impeding access to entryway that was then cleared). The evidence we have reviewed does not establish that there was an unreasonable impairment of access rising to the level of legally compensable damages to Plaintiffs' real estate.

In paragraph 1 of his report, Van Zandt states that "*The City's decision*" caused "*an inability to use and **access** property*" (emphasis added). However, Van Zandt's report provides no meaningful evidence or analysis regarding restriction of access of specific properties; his only subsequent mention of "access" is in paragraph 63, stating that at the peak of the protests a business owner had to negotiate with protestors to access one property. Even in that context, access was not removed and there is no allegation that the City took any action causing an "*inability to use and access property*". A general conclusory statement regarding restricted access cannot be used to support a takings claim of a single property, much less all the properties for which Plaintiffs assert a takings claim. If there was any impact to access, that impact would have been property specific and would have depended on both timing and the proximity of the property to the East Precinct or to any barricades that allegedly formed the basis of an access issue. Van Zandt's report provides no analysis and presents no further evidence for any of these critical issues.

The only viable form of recoverable damages in a real estate temporary takings claim is lost rental income. A plaintiff is not entitled to recover alleged lost income or profits from businesses operated on the property where access was allegedly temporarily restricted. *See* Washington State jury instruction *WPI 150.06.02 Just Compensation – Temporary Occupancy*. Here, Van Zandt's report fails to analyze this issue at all and does not make any linkage between alleged restricted access and lost rental value for the period of the alleged temporary taking.

In summary, the Van Zandt report fails to analyze or provide any further evidence as to whether there was any unreasonable impairment of access to plaintiffs' particular properties at any time during the period the City modified services in the CHOP area from June 8, 2020 to July 1, 2020.

---

**McKee Appraisal**
Real Estate Services & Consulting, Inc.

CONFIDENTIAL

Case 2:20-cv-00983-TSZ   Document 170-4   Filed 02/02/23   Page 4 of 7

Evaluation of Expert Report of Arik Van Zandt (dated April 28, 2022)
Hunters Capital LLC et al v. City of Seattle
June 3, 2022
Page 3

This failure alone is fatal to any recovery for damages allegedly related to plaintiffs' takings claims. Further, even if there was an unreasonable temporary restriction of access, the measure of damages would be limited to the difference between the fair market rental value for the impacted real estate without the access restriction less the fair market rental value for the real estate with the access restriction for the period access was unreasonably restricted.

**Real Estate Claims – Covid and Other Impacts**

In paragraph 8 of his report, Van Zandt correctly notes that "*The outbreak of COVID-19 caused significant disruption and financial harm to the global economy and the Washington State economy*". He further states "*The economic impact of the COVID-19 pandemic was not uniform, however, as the severity of the impact ranged from catastrophic to immaterial, with some business and industries actually performing better as a result of consumer behavior shifts and overall economic demands.*" The statement that some businesses performed better is non-specific as to business type or industry and would certainly not apply to most street level retail, hospitality, office or residential businesses (the primary businesses claiming damage here), and appears to be an attempt to blame any rent or business loss on the City's response to the CHOP anti-police protests, not on the obvious effects of Covid-19 acknowledged in Van Zandt's report.

As I discussed in my Opening Report, very few businesses on Capitol Hill benefited in any way from the Covid-related government-imposed restrictions. *E.g.*, Opening Report at 4-6. Retail was particularly hard-hit as was hospitality. If a restaurant was already furnishing take-out, or could transition to take-out or outside dining during the significantly limited reopening starting during June 2020, then at best some revenue and staff retention might have occurred. Likewise, some office businesses (such as accounting, legal or some financial services) were active and minimally impacted during more recent periods of the Covid pandemic; however, these tenants generally were not occupying their offices and were instead employing work from home policies (although many office tenants were financially capable of paying their contract rent, unlike small retail tenants, so the property owners generally received rent for leased office space and did not have to resort to rent abatements for such space – see abatement discussion below). The Plaintiffs' claims discussed in the Van Zandt report generally involve the types of businesses and rental spaces that were impacted City-wide and worldwide by the Covid pandemic and related government restrictions.

The Van Zandt report mentions a Colliers survey of the commercial real estate market in Puget Sound and relies on that survey to opine that "rental rates for Class B commercial properties . . . were largely unaffected" by the Covid-19 pandemic. *See* Van Zandt Rep. at 10. The Colliers survey Van Zandt cites is from Q4 2021 (more than 1.5 years after Covid, and about 1.5 years after CHOP) and is no longer available online, nor does Van Zandt present the portions of the Colliers survey that he claims support his conclusion that rental rates for properties like Hunters Capital's were not affected by Covid. Even if a survey reflecting market conditions more than a year after CHOP ended was a valid way to assess Covid's impact on Plaintiffs' properties specifically, my analysis and market research in my Opening Report leads to the opposite conclusion.

Case 2:20-cv-00983-TSZ   Document 170-4   Filed 02/02/23   Page 5 of 7

Evaluation of Expert Report of Arik Van Zandt (dated April 28, 2022)
Hunters Capital LLC et al v. City of Seattle
June 3, 2022
Page 4

One claim in paragraph 60 is that storefront traffic did not pick up until December 2020, when "*Cal Anderson Park was cleared*". Thee Van Zandt report appears to attempt to link the homeless encampment in Cal Anderson Park to Plaintiffs' supposedly CHOP-related damages claims, but homeless encampments are entirely irrelevant to the question of whether the City's CHOP response caused any damage to Plaintiffs' real estate. Even if encampments had some relevance, in my experience Capitol Hill has not suffered losses in property value as a result of homeless encampments in the same way many other nearby neighborhoods have. At a minimum, the lack of analysis or separation of these other impacts in the Van Zandt report is a significant deficiency.

**Real Estate Claims – Rent Abatement**

In the Van Zandt report there are many instances claiming specific loss of business profits or loss of speculative (i.e., "potentially receivable") rents through "rent abatements." Rent abatement accounts for $648,343 of the Hunter's Capital claim. There is no independent analysis of claimed lost rent in the Van Zandt report—Van Zandt simply accepts the lost rent analysis provided by plaintiffs or includes any rent concessions granted to tenants in the calculation of plaintiffs' lost rent without regard for the reasons why the rent concession was granted (Covid, CHOP, or otherwise). *E.g.*, Van Zandt Report ¶ 18 (accepting Hunters Capital rental loss calculation without independent analysis); ¶ 74 (accepting Richmark's concessions as of June 2020 without further analysis); ¶ 84 (same cursory analysis for Redside); ¶ 98 (same cursory analysis for Madrona). While business losses may be a separate issue altogether, voluntary rent abatement was a frequent and common mechanism used by tenants and property owners over the course of the Covid 19 pandemic, implemented to address the Covid impacts, especially for retail tenants such as those for which lost rent is claimed in this case. Street-level retailers were generally significantly impacted by the pandemic. In my Opening Report I documented numerous instances of pandemic-related rental income losses outside of the CHOP-influenced area and throughout Seattle. My analysis was based on surveys with experts and was entirely consistent with my direct experience of appraising properties in Seattle throughout the last 2+ years. None of the rent abatements provided by the landlord plaintiffs in this case were unusual. Rent abatement has been the most frequent mechanism used for landlords to retain struggling retail tenants in the last 2+ years, due to Covid, not due to CHOP.

An example of an effort by a plaintiff to recover from the City for the cost of a Covid-related rent abatement provided to a tenant is Hunters Capital's damages claim related to a restaurant tenant, Poquitos. On page 124 of Van Zandt's report, he describes Hunters' claim related to Poquitos as "Rate Change per CHOP" totaling $203,712. This claimed loss appears to be the result of a voluntary rent reduction to a large restaurant tenant with mostly indoor dining. On page 132 the rent abatement is clarified to some extent with the note "*Abate 50% of charges from 04/20-09/20 per amendment.*" Based on this clarification, it appears Poquitos was given a rent abatement for 6 months, starting in April 2020, more than 2 months before CHOP. This was a typical rent abatement for restaurant tenants and the abatement was a result of Covid, not CHOP.

Another claim (in this case for business loss) is on page 159 for Car Tender. The documented history of business revenue loss spans a period including monthly revenues from 2019. In the 3-

Case 2:20-cv-00983-TSZ   Document 170-4   Filed 02/02/23   Page 6 of 7

Evaluation of Expert Report of Arik Van Zandt (dated April 28, 2022)
Hunters Capital LLC et al v. City of Seattle
June 3, 2022
Page 5

month period from March 2020 – May 2020 (after Covid but before CHOP) the average monthly revenue declined 32% relative to the same months in 2019. Conversely, in the 5 months starting with CHOP (June 2020 – October 2020), the revenue was only down by 17% relative to 2019. It does not appear from this analysis that CHOP caused any further decline. In fact, Car Tender's revenue had previously been declining before Covid and CHOP: 2019 revenue was down over 16% relative to 2018, without these influences.

**Real Estate Claims – The Riveter, and GameStop**

The Riveter space in the Ballou Wright Building was configured for flexible co-working workspaces as a business model for the tenant, similar to the WeWork concept. According to GeekWire on May 29,2020, "*Seattle-based startup The Riveter, which set out to build a national network of women-oriented co-working spaces, is shutting down all nine of its locations due to the ongoing uncertainty caused by the COVID-19 pandemic.*"; and "*The dramatic shift is bad news for co-working companies such as The Riveter and industry giant WeWork, which is also struggling as companies rethink their return to the office amid health and safety concerns.*" The Riveter claim from Hunters Capital seeks damages from the City of $419,268 for lost rent and turnover costs (pages 95-105) related to the Riveter's decision to close; yet the business shut down the location a week prior to the inception of CHOP, and in fact CHOP did not cause any vacancy of The Riveter space.

The claim for GameStop is $146,313 (pages 67-74). By 2019 GameStop was in financial trouble, having incurred a $673 million loss in 2018, and with the company announcing a failed attempt at a buyout. GameStop was actively closing stores across the country prior to CHOP, with 321 individual stores closed in 2019, and 402 additional stores closed by October 2020, with an expectation of over 500 closures for the year. GameStop leased space at the Broadway building and the lease was scheduled to expire in January 2021. Hunters' claim is equivalent to more than $82/sf for this small 1,780 sf tenant, equivalent to about 18 months of alleged lost rent and expenses. Since GameStop was apparently already going to vacate notwithstanding CHOP, the claim for future rent loss and turnover cost appears to be yet another attempt to collect compensation for events that did not cause the loss and were unrelated to the CHOP.

**Evaluation of Expert Report of Arik Van Zandt (dated April 28, 2022)**
Hunters Capital LLC et al v. City of Seattle
June 3, 2022
Page 6

**Conclusion**

For the reasons set forth above and in my Opening Report, I have concluded that the opinions expressed in the Van Zandt report that are discussed herein are not logical, not supported, and erroneous. Moreover, nothing in the Van Zandt report alters my overall conclusions and opinions, as described in my Opening Report and in this rebuttal report.

Respectfully Submitted,

*Bates McKee*

Bates McKee, MAI, CRE, AI-GRS
WA State-Certified General Real Estate Appraiser (1100228)

**McKee Appraisal**
Real Estate Services & Consulting, Inc.

CONFIDENTIAL