# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, a Washington
limited liability company, et al., on behalf of
themselves and others similarly situated,

                    Plaintiff,

   vs.

CITY OF SEATTLE,

                  Defendant

Case No. 2:20-cv-00983 TSZ

**EXPERT REPORT OF
SETH W. STOUGHTON**

**Expert Report of Seth W. Stoughton**

I was retained by counsel for the defendant, City of Seattle, to review aspects of the Seattle Police Department's response to protest activity between May 2020 and May 2021. Specifically, I was asked to evaluate the decision to evacuate the East Precinct on June 8, 2020; the decision to modify police response in a geographic area referred to as the "Red Zone" until July 1, 2020; and the decision to employ a passive barrier system around the East Precinct between summer 2020 and May 2021. I was not provided with and did not review any materials related to, and I have not developed any opinions about, any specific use-of-force incident in that time period that may be the subject of any other litigation.

This report is based on the materials reviewed to date. Should any subsequent information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Please note that this report may include citations to and discussion of information and documents that may be considered confidential, subject to a protective order, or otherwise not suitable for public release.

## Table of Contents

Table of Contents ................................................................................................................ 1

Background and Qualifications .......................................................................................... 2

Compensation...................................................................................................................... 5

Methodology ....................................................................................................................... 5

Understanding of Facts....................................................................................................... 10

Opinions .............................................................................................................................. 24

    1.   The initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing ................................................................................................ 25

    2.   The decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing.......................................................................... 34

    3.   Deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing...................... 38

Submission ........................................................................................................................... 39

## Background and Qualifications

My opinions are based, in part, on my training, professional experience, education, and academic research. My background and qualifications are set forth in the curriculum vitae attached to this report. I highlight and supplement that material here with information relevant to my review and evaluation in this case.

I served as an officer in the Tallahassee Police Department in Tallahassee, Florida. The city of Tallahassee is located in northern Florida; it encompasses over 90 square miles and has a city population of over 180,000 and a metropolitan-area population of over 375,000. The Tallahassee Police Department employs over 350 sworn officers.

I was employed as an officer for a total of five and a half years, serving as a full-time officer from March 2001 until October 2005, and as a reserve (part-time) officer from November 2005 until June 2006. During the course of my service with the department, I was assigned to the Uniform Patrol Division. As a full-time officer, I earned and maintained multiple operator and instructor certifications beyond my state certification as a police officer. I also had a wide range of duties beyond my standard duty assignment. Those duties included serving as a founding member of our Special Response Team, a tactical team with advanced training in crowd control and riot response operations. I was also tasked with teaching report writing, establishing and teaching community self-defense courses, and serving as an acting supervisor as needed.

I served as an investigator in the Florida Department of Education's Office of Inspector General. The Florida Department of Education has state-wide authority related to education, including providing technical assistance and support to 67 local school districts, the Florida School for the Deaf and the Blind, and 28 state and community colleges; the management of statewide education funding and teacher certifications; the administration of private school tuition voucher programs; and the operation of Florida's Division of Blind Services and Division of Vocational Rehabilitation. The Florida Department of Education has more than 2,500 employees and has an annual budget of more than $20 billion, roughly a quarter of Florida's total budgetary expenditures. The Office of Inspector General is responsible for, *inter alia*, conducting and coordinating investigations into allegations of waste, fraud, abuse, and financial mismanagement within or related to the Florida Department of Education. This includes investigating certain allegations that Florida Department of Education employees engaged in misconduct. In this respect, the Office of Inspector General serves an equivalent function to a police agency's Internal Affairs or Bureau of Professional Standards unit.

I was employed as an investigator for more than two and half years, serving from November 2005 until July 2008. In that time, I earned and maintained several professional certifications related to investigations. As an investigator, I conducted investigations into a wide variety of alleged criminal and administrative violations, including leading multi-agency criminal investigations. I was assigned to handle several particularly sensitive or complicated investigations, including a

whistleblower allegation that the state had improperly garnished millions of dollars in wages from hundreds of individuals who had defaulted on their student loans. In 2007, I was recognized with a Meritorious Performance Award for the quality of my investigations. In 2008, I was given a statewide commendation for the number of my fraud investigations that led to arrest and prosecution. Beyond my investigative duties, I trained new investigators, drafted investigative policy, and reviewed investigative reports.

I have conducted academic research on policing since 2012. I am a tenured Professor at the University of South Carolina School of Law, where I teach in the area of criminal law, criminal procedure, and policing. I also hold, by courtesy, an appointment as a Professor in the University of South Carolina's Department of Criminology and Criminal Justice. My research focuses on the regulation of policing, including the use of force, police investigations, agency policies, and industry practices. My previous academic appointment was a two-year teaching fellowship at Harvard Law School, where I researched the same topics.

I have published extensively on policing, including on tactical decision making and the use of force. I am the principal author of *Evaluating Police Uses of Force*, a book published by NYU Press in May 2020. My academic articles have been published or are scheduled for publication in the *Emory Law Journal*, the *Harvard Law Review Forum*, the *Minnesota Law Review*, the *North Carolina Law Review*, the *Tulane Law Review*, the *Virginia Law Review*, the *Wake Forest Law Review*, and other prestigious journals. I have published, or have forthcoming, book chapters in *Rethinking and Reforming American Policing: Leadership Challenges and Future Opportunities*; in *Evidence Based Policing: An Introduction*; in *Legal Issues Around the Globe* (Vol. I); and in *Critical Issues in Policing* (8th ed.). A complete list of my publications is provided in the curriculum vitae that accompanies this report.

My work is widely relied upon in the field. Electronic versions of my work have been downloaded thousands of times, and my published research has been broadly cited by legal scholars in top journals including the *Yale Law Journal*, the *Harvard Law Review*, the *California Law Review*, the *Duke Law Journal*, the *Columbia Law Review*, the *N.Y.U. Law Review*, the *Georgetown Law Journal*, and the *Cornell Law Review*, just to name a few. My work has also been cited by scholars in other disciplines, most prominently in criminology (e.g., in *Criminology & Public Policy*, *Police Quarterly*, and *Journal of Research in Crime and Delinquency*) but also in geography (e.g., in *Political Geography*) and psychology (e.g., in *Psychonomic Bulletin & Review*). It has also been cited in textbooks, casebooks, treatises (e.g., in Wayne LaFave's *A Treatise on the Fourth Amendment*), and both popular books and academic texts (including in James Forman, Jr.'s *Locking Up Our Own*, Barry Friedman's *Unwarranted: Policing Without Permission*, Stephen Rushin's *Federal Intervention in American Police Departments*, Chris Hayes' *A Colony in a Nation*, and Norm Stamper's *To Protect and Serve*). Further, my academic research has been featured in national and international media, including in *The New York Times*, on National Public Radio, and in a host of other publications.

I am active in policing beyond publishing academic research. I am a Member of the American Law Institute and an Adviser to the ALI's *Principles of the Law, Policing*. I am a Fellow of the American Bar Foundation. I was retained by the City Council of Hammond, Louisiana to conduct an independent use-of-force investigation and issue a report documenting findings, conclusions, and recommendations. I have provided use-of-force investigations training to the City of Chicago's Civilian Office of Police Accountability on multiple occasions. I have served as a subject matter expert in multiple capacities, including for CNA Analysis & Solutions, which received a Bureau of Justice Assistance grant to develop technical assistance related to police body-worn cameras; in that capacity, I provided verbal and written consultation, as well as presented, by invitation, a keynote address on using police body-worn cameras to investigate and evaluate officer actions with an emphasis on the use of force. I also served as a subject matter expert in the OIR Group review of the Madison Police Department. I currently serve, by appointment, on the Citizen Advisory Council of the Columbia Police Department in Columbia, South Carolina, a department of approximately 350 sworn officers serving a city with a population of over 130,000 and a metropolitan-area population of over 800,000. I was appointed as one of the original members of the council and have served in that capacity since 2015.

As a policing expert, I am regularly invited to speak about various aspects of policing to legal, law enforcement, and academic audiences. To date, I have formally presented on policing issues well over 100 times to audiences that include the Fourth Circuit Judicial Conference; the American Judges Association; the Conference of Chief Justices; the National Conference of State Courts; state judicial conferences in Indiana, Kansas, Missouri, New York, North Dakota, Ohio, South Carolina, and Tennessee; the Federal Law Enforcement Training Center; federal Inspectors General & Inspectors General Investigators; the Senior Executive Staff of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the National Association of Women Law Enforcement Executives; the Peace Officers' Association of Georgia; the South Carolina Police Chiefs Association; the Command Staff of the Kansas City (Missouri) Police Department; the Washington State Criminal Justice Training Commission; and a host of others.

I have testified before or consulted with legislators, legislative committees, and public task forces or task force members in California, Massachusetts, North Carolina, Pennsylvania, South Carolina, and Virginia. I have filed or joined multiple briefs *amicus curiae* to the Supreme Court of the United States and United States Courts of Appeals related to police procedure, including tactics and the use of force. I have written about policing for *The New York Times*, *The Atlantic*, *TIME*, and other media publications. Either I or my work on policing has appeared on or been featured in domestic and international print, radio, and television media on more than seven hundred occasions.

I am regularly retained to provide expert review and testimony related to police litigation. I have been retained as an expert witness in state and federal court in the course of both civil and criminal litigation, and testified in deposition, grand jury, and trial. A list of cases is provided in my curriculum vitae that accompanies this report.

– 4 –

**Compensation**

My fee for analysis in this case is $485 per hour, billed in 0.25-hour increments, as well as reimbursement for any expenses incurred. On days when I am expected to testify (in deposition or trial), I bill a minimum rate of 8 hours.

**Methodology**

To ensure my methodology was reliable, I did not assign credibility to any witness or source of information prior to a comprehensive review of provided materials, I developed my understanding of relevant facts only after a review of all materials provided, and I assumed those facts to be true solely for the purpose of analysis. In sum, I reviewed sufficient information to reach conclusions to a reasonable degree of professional certainty. I then analyzed those facts against a backdrop of the professional standards for police officers and the practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident. The methodology is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

My testimony regarding police procedures, tactics, and the use of force are relevant areas of testimony that would assist a jury in understanding the evidence presented to them.

Before developing the opinions reflected in this report, I reviewed the following materials:[1]

- Deposition Transcripts
    - o  Sam Zimbabwe, Oct. 28, 2021
    - o  Harold Scoggins, Sept. 14, 2021
    - o  Carmen Best, Nov. 9, 2021
    - o  Jenny Durkan, Dec. 8, 2021 (with Exhibits)
    - o  Thomas Mahaffey, Jan. 26, 2022 (with Exhibits)
- City of Seattle
    - o  Email Correspondence
        - ▪  Email from Harold D Scoggins to Casey Sixkiller *et al.*, June 11, 2020, 08:57
        - ▪  Email from Harold D Scoggins to Casey Sixkiller *et al.*, June 11, 2020, 09:14:14
        - ▪  Email from Jason Verhoff to Unknown Recipients, June 12, 2020, 16:29:43
        - ▪  Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34

---

[1] Documents are identified by title where possible and by description when a title is inapposite.

- Email from Jenney Durkan to Carmen Best et al., June 20, 2020, 08:34:28
- Email from Casey Sixkiller to Adrienne Thompson, June 22, 2020, 14:26:40
- Email from Andrew Lee to Sam Zimbabwe, June 25, 2020, 15:15:30
- Email from Mike Solan to Carmen Best, June 30, 2020, 18:16:42
- Email from Thomas Mahaffey to SPD Events et al., June 25, 2020, 11:51:28
- Email from spd_patrol_portal to SPD_SIR et al., June 25, 2020, 18:15:06
- Email from spd_patrol_portal to SPD_SIR et al., June 26, 2020, 14:20:01
- Email from Carmen Best to Carmen Best, June 26, 2020, 15:40:09
- Email from spd_patrol_portal to SPD_SIR et al., June 26, 2020, 15:50:06
- Email from Ernesto Apreza to Stephanie Formas et al., June 26, 2020, 21:42:56
- Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 02:10:11
- Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 18:45:01
- Email from spd_patrol_portal to SPD_SIR et al., June 28, 2020, 06:10:06
- Email from spd_patrol_portal to SPD_SIR et al., June 29, 2020, 03:00:11
- Email from Sam Zimbabwe to Lorelei Williams, June 29, 2020, 10:49:00
- Email from Thomas Yoon to Carmen Best et al., June 30, 2020, 05:11:27
- Email from Thomas Mahaffey to SPD Events et al., June 30, 2020, 17:24:42
- Email from Ernesto Apreza to Daniel Beekman et al., June 30, 2020, 09:32:55
- Email from Vanessa Misciagna to Kamaria Hightower, June 30, 2020, 14:31:32
- Email from SPD Events to SPD Events, June 30, 2020, 21:31:06
- Incident Action Plans
  - May 30, 2020
  - June 2, 2020
  - June 8, 2020
  - June 8, 2020, with addendum
  - June 9, 2020
  - June 10, 2020
  - June 11, 2020
  - June 12, 2020
  - June 13, 2020
  - June 14, 2020
  - June 15, 2020
  - June 16, 2020
  - June 17, 2020
  - June 18, 2020
  - June 19, 2020
  - June 20, 2020
  - June 21, 2020
  - June 22, 2020
  - June 23, 2020

- June 24, 2020
- June 25, 2020
- June 26, 2020
- June 27, 2020
- June 28, 2020
- June 29, 2020
- June 30, 2020
- July 1, 2020
- July 2, 2020
- July 3, 2020
- July 4, 2020
- July 5, 2020
- July 6, 2020
- July 7, 2020
- July 8, 2020
- July 9, 2020
- July 10, 2020

o Orders
- Mayoral Proclamation, May 30, 2020 (Contracting and borrowing authority)
- Civil Emergency Order, Establishing Prohibited Items, May 30, 2020
- Civil Emergency Order, Imposing a General Curfew, June 2, 2020,
- Executive Order 2020-07, Directing SPD Officers to Record Body-Worn Video During Protests, June 8, 2020,
- Executive Order 2020-08, June 30, 2020 (Coordinating the City's response to East Precinct and Cal Anderson Park)

o Seattle Fire Department
- Tactical Emergency Casualty Care (TECC) Guidelines, June 2015
- Policies and Operating Guidelines, Volume 1, Nov. 27, 2019
- Policies and Operating Guidelines, Volume 1, Sept. 2, 2020
- Standard Operating Guideline, Scene of Violence, Aug. 3, 2020
- Standard Operating Guideline, Scene of Violence Reference Document, Aug. 5, 2020
- Scenes of Violence Scene Diagram
- Scenes of Violence PowerPoint

o Seattle Office of Police Accountability
- OPA Case Number 2020OPA-0354
  - Case Summary – Report of Investigation, Aug. 8, 2021
  - Closed Case Summary, Sept. 30, 2021
  - Director's Certification Memo, Oct. 1, 2021
  - Statements

– 7 –

- - - Statement of Assistant Chief Thomas Mahaffey, Oct. 28, 2020
    - Statement of Deanna Nollette, Oct. 29, 2020
    - Statement of Lieutenant Marc Garth Green, Dec. 9, 2020
    - Statement of Captain Todd Kibbee, Jan. 27, 2021
    - Statement of Assistant Chief Bryan Grenon, Feb. 2, 2021
    - Statement of Chief of Staff Stephanie Formas, Mar 2, 2021
    - Statement of Deputy Mayor Michael Fong, Mar. 3, 2021
    - Statement of Assistant Chief Thomas Mahaffey, Mar. 13, 2021
    - Statement of Former Police Chief Carmen Best, Mar. 31, 2021
    - Statement of Captain Stephen Hirjak, July 8, 2021
  - Seattle Police Department
    - SWAT Team Policy and Procedure Manual
    - Orientation Packet, Regular Employee
  - Text Messages
  - Miscellaneous
    - NHSC Presentation, August 2021, Seattle Fire Dept. Response to Protests and CHAZ/CHOP (PDF)
    - Seattle Police and Seattle Fire Department, Scenes of Violence Concept of Coordination, Nov. 13, 2014
    - Transcript of Press Conference, June 22, 2020
    - Transcript of Press Conference, July 1, 2020
- King County
  - Fire Model Procedure, Section 19 – Scenes of Violence, Oct. 18, 2018
  - Fire Model Procedure, Section 19 – Scenes of Violence, July 8, 2020
  - Fire Resource Plan, Model Procedure Definitions, June 19, 2020
- Litigation Documents
  - Second Amended Class Action Complaint, Oct. 30, 2020
  - City of Seattle's Answer to Second Amended Class Action Complaint, Nov. 11, 2020
  - Plaintiff's Motion for Class Certification, Jan. 13, 2022
  - City of Seattle's Opposition to Motion for Class Certification, Feb. 7, 2022
  - Plaintiff's Reply in Support of Motion for Class Certification, Feb. 18, 2022
- Miscellaneous
  - Order Granting in Part Motion for Temporary Restraining Order, *Black Lives Matter Seattle-King County* et al. *v. City of Seattle, Seattle Police Department*, Case No. 2:20-cv-00887-RAJ (U.S. Dist. Ct. W. Dist. Wa. at Seattle)
  - Settlement Agreement and Stipulated [Proposed] Order of Resolution, July 27, 2012
  - Paige Cornwell, *Seattle's CHOP Shrinking, but Demonstrators Remain*, THE SEATTLE TIMES (June 24, 2020)
  - Mike Lindblom, *Seattle adds a concrete wall around Capitol Hill police precinct after protests*, SEATTLE TIMES (Aug. 28, 2020)

- o Nick Bowman, *SPD installs large concrete barriers surrounding East Precinct*, MYNORTHWEST (Aug. 31, 2020)
- Other materials not specifically identified

Additionally, on April 27, 2022, I conducted an interview, via videoconference using Microsoft Teams, of Seattle Police Department Assistant Chief of Patrol Operations Thomas Mahaffey, in the presence of attorney Shane Cramer.

---

This space intentionally left blank.

**Understanding of Facts**

On May 25, 2020, four officers employed by the Minneapolis Police Department sparked nationwide—and, indeed, international—protests after killing George Floyd.[2] Some of those protests evolved into unlawful gatherings or involved unlawful acts, including destruction of property and violence against persons.

Protests in Seattle began on May 29.[3] The Seattle Police Department ("SPD") responded to the various protests, which "resulted in property damage to businesses in the downtown core and the arrests of several individuals."[4] "[T]he area around SPD's East Precinct . . . was the focus of nightly protests."[5]

On May 30, "thousands [of people] came to downtown Seattle to participate in unpermitted protests and marches. Throughout the day and night, protesters committed violent acts and assaults, mainly targeting police officers and destroying property to include citizen and police vehicles."[6] During the demonstrations that day, "Seattle Police Officers were assaulted with rocks, bottles, and other projectiles, Seattle Police Patrol cars were set on fire, a Seattle Police rifle [was] stolen from a police vehicle and fired, . . Molotov cocktails were made and objects thrown at Seattle Police [headquarters] that smelled of accelerant, followed by flares."[7] Seattle Mayor Jenny Durkan concluded that the situation "constitute[d] a civil emergency with a high degree of risk of injury to persons" and proclaimed a state of emergency.[8]

On June 1, "there were several hostile marches and protests. Several officers were injured and there were several arrests. Protests and property destruction continued through [3:00am] despite the Mayor's curfew."[9]

Over the next week, "there [were] large demonstrations of thousands of participants on every day and it [was] unknown when the protest activity [would] end."[10] The SPD mobilized "the entire police department as crowds grew to over 10,000 people with incidents of increasing violence."[11]

---

[2] Disclosure: I was retained by the Office of Minnesota Attorney General as a use-of-force expert and testified in the state prosecution of Derek Chauvin, one of the Minneapolis Police Department officers involved in the incident.
[3] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.
[4] City of Seattle, Mayoral Proclamation of Civil Emergency, May 30, 2020.
[5] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.
[6] Seattle Police Department, Incident Action Plan, June 2 Events, BATES SEA-SPD 303.
[7] City of Seattle, Mayoral Proclamation of Civil Emergency, May 30, 2020.
[8] City of Seattle, Mayoral Proclamation of Civil Emergency, May 30, 2020.
[9] Seattle Police Department, Incident Action Plan, June 2 Events, BATES SEA-SPD 303.
[10] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3909.
[11] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3909.

Additionally, "more than 400 personnel from outside agencies . . . including 300 National Guard troops" had come to assist. "From late May into early June, SPD closed off street access with different types of fencing to create 'standoff distance' between the protesters and the East Precinct and SPD officers. However, these barricades were ineffective and repeatedly dismantled by protesters."[12] During these weeks, SPD was not able to "run any operations out of" the East Precinct; it was "basically inoperable . . ., for the most part, because of the demonstrations."[13]

According to SPD Assistant Chief of Patrol Operations Thomas Mahaffey, the agency attempted to identify and engage with protest leaders, but made no lasting progress:

> [W]e could not identify leaders, and if we even—we had tried to a—approach people and some of the commands had and were rebuffed[. A]t times…some people would talk to us. We'd get an agreement for a short period that they would stop taking whatever…action they were taking, but then that person who talked to us would be immediately pilloried by somebody else in the crowd, and then they would, you know, walk away, or they would lose any authority that they had amongst the crowd. It was very difficult for us to engage in any type of meaningful dialogue to try and reach solutions.[14]

Leading up to June 8, 2020, SPD documentation reflects that most of the demonstrations throughout the city were "peaceful," but "those at East Precinct have continued to involve confrontational crowds who have engaged in assaulting and destructive behavior and have resisted efforts by the Seattle Police Department to avoid confrontation and de-escalate the situation."[15] "Numerous protesters and SPD members were injured during the ongoing demonstrations, some seriously. By early June, there was significant political pressure for SPD to change their tactics in order to de-escalate tensions and to avoid large scale crowd dispersals and the use of less-lethal tools, including chemical agents."[16] The pressure for SPD to change tactics came, in part, from two City Council members "in the front of the crowd" at the East Precinct and criticizing the agency.[17]

On June 7, 2020, Asst. Chief Mahaffey had the light aluminum fencing replaced with heavier metal fencing, but as he later said, "[I]mmediately we started seeing on social media posts about . . . the

---

[12] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.

[13] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149576.

[14] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149586.

[15] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[16] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149243.

[17] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149584.

protesters were bringing engineers and they were going to defeat that fencing that night, and they did. I mean, they came in with tools, within two or three hours they had defeated the fencing, were using for their own purposes, for blockades, and started slowly advancing on officers over several hours."[18]

A Seattle Office of Police Accountability report reflects that

> demonstrators dismantled the fencing [around the East Precinct] and the standoff again escalated into violence. One person was shot by an individual who drove a car into a group of protesters. The crowd was dispersed that evening with the deployment of a significant number of less-lethal tools. A number of community members suffered injuries, some serious. SPD employees also sustained injuries from projectiles thrown by the protesters, including rocks, bottles, and fireworks. The crowd dispersal and the use of less-lethal tools was again met with an uproar from community and elected officials.[19]

Asst. Chief Thomas Mahaffey advocated for fortifying the East Precinct using more secure fencing instead of officers, but the Mayor's Office did not support that plan.[20] On June 8, 2020, "the Mayor's Office ordered SPD to remove the barricades surrounding the East Precinct, open the street, and permit protesters to pass by the East Precinct. However, the Mayor's Office did not direct SPD on the operational details of managing the 'open street' scenario. These decisions were left to the discretion of SPD command staff."[21]

In its Incident Action Plan for June 8, 2020, the SPD documented:

> The violent actions of the demonstrators at this location have resulted in injuries to twenty-five officers and have necessitated the use of force in order to protect life safety and property.

> Officers have been able to maintain control of the East Precinct facility[] but only through the use of less-lethal tools such as blast balls, OC spray, and CS gas in response to hostile actions from protesters to engage in violence towards officers. The continued presence of the protesters at the East Precinct and the continuing need to protect the facility has resulted in the need for a large police presence creating a

---

[18] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149585.

[19] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149243.

[20] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149587-88.

[21] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149244.

significant negative impact on the ability to provide effective police services from that location.[22]

According to Asst. Chief Mahaffey, he and other officers agreed that "the continual line formation" that the agency had been using "was not feasible for us to do any longer"[23] and that there were not "viable options to defend the precinct."[24]

SPD had operational intelligence from both the Federal Bureau of Investigation and from the SPD Criminal Intelligence Unit[25] that the protesters' "goal was to . . . somehow take over that facility [the East Precinct] and potentially damage it significantly."[26] One intelligence estimate found it "[i]ndisputable that protesters are intent on gaining direct access to precinct building. Open source social media postings have indicated their goal is to burn the precinct to the ground."[27] Unauthorized access to the precinct building was a substantial concern because, as Asst. Chief Mahaffey later said, "[F]irearms are kept in there, there's investigative units on the second floor of the building that have sensitive files, . . . a unit running informants had their files up there, . . . police vehicles in the facility, [and] access to criminal justice systems through a computer."[28]

The available evidence reflects that this was an unprecedented situation. Asst. Chief Mahaffey later stated,

> I've never been involved in any level of sustained confrontation like we had over a week that was directed specifically at police officers and a police facility. . . . We had dozens and dozens of officers hurt. We had been involved in hundreds of uses of force[]. It just seems unrelenting and not stopping.
>
> . . .

---

[22] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[23] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149590.

[24] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149559.

[25] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149584.

[26] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

[27] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149572.

[28] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

So, I mean, I'd never thought that I would be placed in a position of deciding what's the safest option, and that was that I can't have anybody in one of my buildings because of the unknown of what could possibly occur if I leave them there, based on the volatility of the crowd. And the options that I thought tactically were the best to defend it, I'm being told that I can't -- can't utilize.[29]

Asst. Chief Mahaffey made a similar point in a later interview, saying that he had been involved in "hundreds" of protests in his time at SPD and calling the scope, "sustained pace," and "focus" of the on-going protests "a generational event" that was "just unprecedented."[30]

He therefore decided that the safest option was to remove sensitive items and evacuate officers from the East Precinct.[31] Other ranking SPD officers, including Captain Todd Kibbee[32] and Lieutenant Marc Garth Green,[33] concurred with that decision. The evacuation was conducted quickly because of the "time pressure" that the agency was under.[34] The exact timing of the decision is described in detail the Seattle Office of Police Accountability report.[35]

There is some disagreement about whether then-SPD Chief Carmen Best was aware that Asst. Chief Mahaffey was going to withdraw from the East Precinct. According to Asst. Chief Mahaffey, he "told her example what we were going to do. That we were going to get the sensitive items out of the precinct . . . and then secure the building the best that we could."[36] According to Chief Best, however, she was not aware that officers had been withdrawn from the East Precinct.[37] Although Chief Best stated that she would have preferred to have been made aware, she acknowledged Asst. Chief Mahaffey was the incident commander and could make operational decisions without her.[38]

---

[29] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149563-64.

[30] Interview with Thomas Mahaffey, Apr. 27, 2021.

[31] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149590-92.

[32] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Captain Todd Kibbee, BATES SEA 149735.

[33] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Lieutenant Marc Garth Green, BATES SEA 149876.

[34] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149595.

[35] Seattle Office of Police Accountability, 2020OPA-0354, Case Summary – Report of Investigation, BATES SEA 149120.

[36] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149561.

[37] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Former Chief Carmen Best, BATES SEA 149622.

[38] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Former Chief Carmen Best, BATES SEA 149622.

For his part, Asst. Chief Mahaffey indicated that the "whole week was extremely chaotic" and that he was sure Chief Best was "taking a lot of different phone calls with different people," suggesting that she simply may not recall their conversation.[39]

There is no indication that Asst. Chief Mahaffey or other SPD commanders ever intended to abandon the East Precinct for a prolonged length of time. Indeed, the available evidence suggests that the SPD's strategic goal was to retain control of the East Precinct after a short period for the evacuation; as Asst. Chief Mahaffey later said, "[T]here was never a question that . . . the police would be returning to that facility. It was just a matter of when we could make it happen,"[40] and indicated that he originally thought that officers would "be back in [the East Precinct] that night."[41] In his later deposition testimony, Asst. Chief Mahaffey stated that he intended for officers to return to the East Precinct "[l]ater that day or early the next morning."[42]

In a later interview, Asst. Chief Mahaffey indicated that his team started "making plans" to reoccupy the East Precinct starting on June 9, 2020.[43] SPD sent personnel to obtain information about conditions around the East Precinct so that the SPD command staff could make informed tactical decisions.[44] At the time, the crowd was "peaceful," so while the agency began to develop plans to re-enter the precinct, they decided against taking action that could provoke confrontation with otherwise peaceful protesters.[45] There was also some concern, given events that led to the evacuation of the East Precinct, about the agency being able to safely maintain a presence there after reentering it.[46] On June 11, 2020, for example, SPD had "put some resources in the building," but the officers left when a fire lit outside the building "made the officers feel unsafe."[47]

The Incident Action Plan for June 12 stated, "As of Thursday[,] June 11, East Precinct Command is attempting to re-establish operations at the East Precinct. Resources have been assigned to facilitate this mission on Friday[,] June 12."[48]

---

[39] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149563.

[40] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149601.

[41] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149576-77.

[42] Mahaffey Dep. 84:9-13, Jan. 26, 2022.

[43] Interview of Thomas Mahaffey, Apr. 27, 2022.

[44] Mahaffey Dep. 92:11-93:3, Jan. 26, 2022.

[45] Mahaffey Dep. 92:2-10, Jan. 26, 2022.

[46] Mahaffey Dep. 96:9-97:18, Jan. 26, 2022.

[47] Mahaffey Dep. 97:2-18, Jan. 26, 2022.

[48] Seattle Police Department, Incident Action Plan, June 12 Events, BATES SEA-SPD 6023.

Notwithstanding the intentions of SPD commanders to return to the East Precinct as soon as it was "practical, safe, feasible, and something [the agency] could sustain,"[49] protesters—including armed protesters—quickly "set up check points and they slowly started to expand the perimeter."[50] According to one of SPD's Incident Action Plans, "As of June 9th[,] a group of people have established check points and road blocks to keep people out of a zone they have created around the [East] Precinct. Some of these people are armed and have been confrontational with Officers."[51] The protesters did not loot or burn the East Precinct building; some of the protesters apparently wanted the building converted into a community center.[52] Instead, the protesters set up a "'police-free' autonomous zone—widely referred to as either 'CHOP' [for Capital Hill Organized Protest] or 'CHAZ' [for Capital Hill Autonomous Zone]."[53] As is relevant for purposes of this report, the SPD identified a portion of this area as the "Red Zone," which is the terminology that will be used in this report.

The available evidence suggests that the prolonged occupation of the Red Zone was unanticipated; there was no intelligence indicating that protesters would engage in an occupation protest and they had not done so in other cities.[54] As a Seattle Office of Police Accountability report concluded, "There is no indication that anyone anticipated the possibility that protesters would attempt to establish an autonomous zone in response to a temporary withdrawal from the area by police."[55]

Over the days and weeks following the evacuation of the East Precinct, some protesters remained generally hostile to the SPD, even when SPD had been called about or was attempting to respond to a significant incident. As Asst. Chief Mahaffey described, the Red Zone became "a place that was very hostile to any intervention from or response from City government."[56] He provided an example, saying: "When [officers enter the Red Zone] during a shooting incident, . . . officers formed a contact team, they had ballistic shields, they wore their protective helmets, they went with

---

[49] Mahaffey Dep. 96:13-15, Jan. 26, 2022.

[50] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149595.

[51] Seattle Police Department, Incident Action Plan, June 10 Events, BATES SEA-SPD 5259.

[52] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149596.

[53] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.

[54] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149578.

[55] Seattle Office of Police Accountability, 2020OPA-0354, Case Summary – Report of Investigation, BATES SEA 149163.

[56] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149598.

rifles, and they were still pushed back by a crowd and were not able to get to a person that had been shot."[57]

Because of the hostility of some protesters, SPD determined shortly after the establishment of the Red Zone that police resources would only be deployed "as needed based on an assessment made by the Operations Section Chief or on-scene commander. If there is any danger to public safety risk or significant property destruction being caused, we will muster sufficient resources and formulate a plan in accordance with our incident objectives and my commander's intent."[58] Asst. Chief Mahaffey directed that "officers would have to form contact teams . . . [to] go in to address violent incidences."[59] On June 12, 2020, Asst. Chief Mahaffey directed officers not to enter the Red Zone in response to "calls for service within the Red Zone, unless the response is to a mass casualty event . . . . If responding to a mass casualty event within the Red Zone, all responding officers should muster with a supervisor outside that zone to evaluate the feasibility of a police response and develop a plan."[60]

According to Asst. Chief Mahaffey's later testimony, the wording of his email was "unfortunate"; what he meant, and what he said he later clarified in briefings, was that there were "examples of when officers would go in more immediately than at other times."[61] The terminology was changed from "mass casualty" to "life-safety emergency," with a later Incident Action Plan indicating that SPD would "not deploy police resources to demonstration or protest-related events except to address a life-safety emergency."[62]

He testified that calls for service "would be taken and processed. [T]he idea was to dispatch the call, but, if possible, have the person meet us outside of the zone[] so officers wouldn't have to go in. If they couldn't do that, then there were other alternative means."[63] Officers could potentially enter the Red Zone when responding to calls involving mass casualty or a "critical life safety emergency," but they were "to formulate a thoughtful and considered response before going in . . . to ensure their safety, de-escalate, minimize the potential use of force, and keep the public safe."[64]

---

[57] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149597.

[58] Seattle Police Department, Incident Action Plan, June 11 Events, BATES SEA-SPD 5714.

[59] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149597.

[60] Email from Jason Verhoff to Unknown Recipients, June 12, 2020, 16:29:43.

[61] Mahaffey Dep. 18:25-20:14, Jan. 26, 2022.

[62] Seattle Police Department, Incident Action Plan, June 29 Events, BATES SEA-SPD 8013.

[63] Mahaffey Dep. 116:11-15, Jan. 26, 2022.

[64] Mahaffey Dep. 38:12-23, Jan. 26, 2022.

According to a email from Asst. Chief Mahaffey, this decision was based on "validated information at the time that a coordinated plan put in place [by protesters], especially during overnight hours, to have armed people man the barricades if police were seen approaching them."[65] He went on, "While my intent is not to prevent or restrict a response to the defined protest zone, any response must be done in a careful and deliberate manner. I believe that is being done by patrol as exemplified by recent police responses to in[-]progress events."[66]

While the Red Zone was in operation, the SPD "had plainclothes people going in regularly to provide . . . situational assessments [about] what's going on" inside.[67] The uniformed presence, however, was modified as described above, and the agency did not make any immediate effort to forcibly reoccupy the East Precinct or regain unrestricted access to the Red Zone.

The tactical options that SPD had available to address the protesters were limited. On June 12, 2020, the United States District Court for the Western District of Washington enjoined the City of Seattle and SPD as follows:

> The City of Seattle, including the Seattle Police Department and any other officers, departments, agencies, or organizations under the Seattle Police Department's control (collectively, "the City"), is hereby enjoined from employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations. This injunction includes: (1) any chemical irritant such as and including CS Gas ("tear gas") and OC spray ("pepper spray") and (2) any projectile such as and including flash-bang grenades, "pepper balls," "blast balls," rubber bullets, and foam-tip projectiles. This Order does not preclude individual officers from taking necessary, reasonable, proportional, and targeted action to protect against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property. Further, tear gas may be used only if (a) efforts to subdue a threat by using alternative crowd measures, including pepper spray, as permitted by this paragraph, have been exhausted and ineffective and (b) SPD's Chief of Police has determined that use of tear gas is the only reasonable alternative available. The Chief of Police may only authorize limited and targeted use of tear gas and must direct it to those causing violent or potentially life-threatening activity. To the extent that chemical irritants or projectiles are used in accordance with this paragraph, they shall not be deployed indiscriminately into a crowd and to the extent reasonably possible, they should be

---

[65] Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34.
[66] Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34.
[67] Mahaffey Dep. 64:18-20, Jan. 26, 2022.

– 18 –

targeted at the specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property.[68]

According to Asst. Chief Mahaffey, the order "would limit our ability to use less-lethal weapons that we would certainly need if we were to move back into the [East] Precinct."[69]

Over the course of the protest, there was a concern within SPD and the Seattle city government that having the SPD lead the effort to regain control over the Red Zone and reoccupy the East Precinct would lead to additional confrontations with protesters.[70] There was also a concern about whether the agency would be able to safely maintain a presence in the East Precinct, given the circumstances that led to the original evacuation.[71] There was a decision made to "try different avenues" rather than having the police department lead an effort to "get back into the [East] Precinct."[72] In essence, this involved relying more heavily on city entities other than SPD, although SPD remained actively involved in operational and contingency planning.[73]

The available evidence reflects that operational planning to regain access to the East Precinct and the Red Zone was continuous. According to a June 16, 2020, email, for example, Asst. Chief Mahaffey had spoken with the city Department of Transportation director about removing the barricade, explaining that the updated "'protest zone' . . . still does not give us access to the precinct and still leaves a zone that we will still need a conscientious and deliberate plan for patrol response to [sic].[74] On June 18, Asst. Chief Mahaffey provided a list of steps that would need to be accomplished "for us to have an orderly move back into our East Precinct."[75] On June 19, Mayor Durkan indicated in an email that multiple agencies—SPD as well as "SDOT, FAS, SPU, SFD, MO"—were continuing to work on "an overall operational plan"[76] and Chief Best, the mayor, and "the teams" needed to continue doing "community work."[77] And in a June 22, 2020, press conference with Mayor Durkan, Chief Best, and Chief Scoggins, and other community leaders,

---

[68] Order Granting in Part Motion for Temporary Restraining Order, *Black Lives Matter Seattle-King County et al. v. City of Seattle, Seattle Police Department*, Case No. 2:20-cv-00887-RAJ (U.S. Dist. Ct. W. Dist. Wa. at Seattle).
[69] Interview with Chief Mahaffey, Apr. 27, 2022.
[70] Interview with Chief Mahaffey, Apr. 27, 2022.
[71] Mahaffey Dep. 96:9-97:18, Jan. 26, 2022.
[72] Interview with Chief Mahaffey, Apr. 27, 2022.
[73] Interview with Chief Mahaffey, Apr. 27, 2022.
[74] Mahaffey Dep. Exhibit 15, Jan. 26, 2020.
[75] Mahaffey Dep. Exhibit 16, Jan. 26, 2020.
[76] Mahaffey Dep. Exhibit 16, Jan. 26, 2020.
[77] Mahaffey Dep. Exhibit 16, Jan. 26, 2020.

Mayor Durkan stated that "it's time for people to go home. It is time for us to restore calm on Capitol Hill so it can be a vibrant part of the community."[78]

As of June 22, multiple offices within the City of Seattle continued coordinating to develop a plan to regain access to and control over the Red Zone.[79] This would have involved providing public notice, referring occupants "to resources for on-site support," being "ready to provide logistical support to transport belongings to alternate locations," and then reducing the infrastructure (such as water and porta potties) to clear the area.[80]

This multifaceted planning continued over the next several days, with written communications on June 25 indicating that the operational planning had evolved.[81] Efforts to begin restoring access to the Red Zone were unsuccessful. According to a June 26, 2020, email from Chief Best, several city agencies "went to the CHOP and attempted to remove the barriers that had been established by the demonstrators . . . to open the streets to facilitate traffic flow and access to businesses and residences. . . . SDOT was not able to remove the barriers this morning."[82]

During the period in which the Red Zone was occupied by protesters, there were multiple high-priority incidents in and around the Red Zone, including several shootings with gunshot victims. Information provided by SPD Gang Intelligence on June 29, 2020, stated in part:

> The CHOP has become a center of lawlessness for our gang members. They all want to go and check it out. They want to see what it is like to be in an area without any police. A number of them are bringing guns with them. The problem is that existing beefs between groups out on the street still exist within the CHOP. Now there are different rival groups that might not come across each other are running into each other in a confined geographic area. This is causing some of the shootings and other crimes that are occurring within the CHOP. Since there are no officers in the area, there is nothing to stop explosions of violence between rival gangs.[83]

There were also incidents directed at SPD facilities. On June 27, for example, the SPD provided a Significant Incident Report Summary about three individuals throwing rocks at and breaking several windows in the West Precinct during a "nightly march from the 'CHOP' to the West

---

[78] Transcript of Press Conference, June 22, 2020.
[79] Email from Casey Sixkiller to Adrienne Thompson, June 22, 2020, 14:26:40.
[80] Email from Casey Sixkiller to Adrienne Thompson, June 22, 2020, 14:26:40.
[81] Email from Andrew Lee to Sam Zimbabwe, June 25, 2020, 15:15:30; Text messages (various).
[82] Email from Carmen Best to Carmen Best, June 26, 2020, 15:40:09.
[83] BATES SEA 36005.

Precinct."[84] According to that summary, "The second window almost ended in a complete breach until OC was deployed at the involved suspects."[85]

In the evening of June 29 or morning of June 30, a protest "leader . . . called 911 to discuss a peaceful surrender of the CHOP."[86]

On June 30, 2020, Asst. Chief Mahaffey sent an email summarizing the agency's intent to "move in a safe and coordinated manner to establish police control" over the Red Zone.[87] At the time, there was still concern that attempting to reenter and regain control over the Red Zone would endanger officers and community members. As the President of the Seattle Police Officers Guild communicated in an email sent less than an hour after Asst. Chief Mahaffey's email,

> People that occupy and control CHAZ/CHOP are heavily armed and are on record stating that police are not allowed inside. If this recent plan to retake control of CHAZ/CHOP commences tomorrow, I fear there may be numerous injuries sustained by officers . . . and injuries to community members. I believe that the likelihood of this operation and its optics could be unpleasant and lead to additional community outrage.[88]

A mayoral declaration issued on June 30, 2020, summarized a number of criminal behaviors, including violent criminal acts, committed in and around the Red Zone, including "three incidents of firearms violen[ce]" that resulted in two individuals killed and several injured, as well as "rape, robbery, assault, and increased gang activity" and "incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic."[89]

On July 1, 2020, SPD officers, supplemented by personnel from other agencies, cleared the Red Zone. Chief Best later referred to it as "a tremendous city-wide effort" involving "[h]undreds of police officers from Seattle and our mutual aid partners from Bellevue and from the Washington State Patrol."[90] It also involved "35 to 40" people from the Seattle Department of Transportation and staff from the city Human Services Department the city Parks and Recreation.[91]

---

[84] Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 02:10:11.

[85] Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 02:10:11.

[86] Email from Thomas Yoon to Carmen Best et al., June 30, 2020, 05:11:27

[87] Email from Thomas Mahaffey to SPD Events et al., June 30, 2020, 17:24:42.

[88] Email from Mike Solan to Carmen Best, June 30, 2020, 18:16:42.

[89] City of Seattle, Executive Order 2020-08, June 30, 2020, BATES SEA 45265-6.

[90] Transcript of Press Conference, July 1, 2020.

[91] Transcript of Press Conference, July 1, 2020.

Later that day, Mayor Durkan gave a press conference that reiterated "public safety threats in recent weeks."[92] In her remarks, Mayor Durkan indicated that it had become clear "over the weekend [presumably Saturday, June 27, and Sunday, June 28] that many individuals would not leave and that the impacts to the community could not be improved until they did leave."[93] She indicated that she "fully support[ed] SPD's operations" that morning.[94] She also stated that "an operation of this scope and magnitude takes very careful planning across many departments, and with the number of people who'd been in that area previously, we would not have been able to do this operation."[95] Mayor Durkan reiterated in her later deposition that the planning process to create an operational plan "to successfully move people from the area" was complicated and involved the input of multiple agencies.[96] In her deposition, Mayor Durkan also described how the operational planners were cognizant of "the reception the police got" and that there had to be "few enough people in the park" for the clearing operation "to be successful."[97]

The protests continued after the occupation of the Red Zone ended. Asst. Chief Mahaffey later said, "All of our facilities were attacked in that May, June, July timeframe," but that the East Precinct was a frequent target.[98] Asst. Chief Mahaffey described "numerous" attacks on the East Precinct, including dumpsters being pushed down the hill, trash thrown into the lobby, graffiti, and windows being "broken regularly."[99] Even more seriously, he described the building being targeted by an "explosive device" that caused "significant" damage.[100] He also described an incident in which individuals attempted to burn the building down after sealing a door with quick-setting concrete.[101] News reports from August 2020 corroborate the attempted arson.[102] This was despite the chain-link fencing that the SPD had deployed around the East Precinct, which was repeatedly cut-through or damaged.[103]

After the attempted arson, SPD had the city Department of Transportation stack large concrete blocks around the East Precinct to make it harder to target. According to Asst. Chief Mahaffey, the

---

[92] Transcript of Press Conference, July 1, 2020.

[93] Transcript of Press Conference, July 1, 2020.

[94] Transcript of Press Conference, July 1, 2020.

[95] Transcript of Press Conference, July 1, 2020.

[96] Durkan Dep. 70:6-71:22, Dec. 8, 2021.

[97] Durkan Dep. 70:16-20, Dec. 8, 2021.

[98] Interview with Thomas Mahaffey, Apr. 27, 2022.

[99] Interview with Thomas Mahaffey, Apr. 27, 2022.

[100] Interview with Thomas Mahaffey, Apr. 27, 2022.

[101] Interview with Thomas Mahaffey, Apr. 27, 2022.

[102] See Mike Lindblom, *Seattle adds a concrete wall around Capitol Hill police precinct after protests*, SEATTLE TIMES (Aug. 28, 2020); Nick Bowman, *SPD installs large concrete barriers surrounding East Precinct*, MYNORTHWEST (Aug. 31, 2020).

[103] Interview with Thomas Mahaffey, Apr. 27, 2022.

installation of the concrete blocks improved officers' sense of security and were effective in keeping protesters further away from the building, reducing the need to deploy officers.[104]

After some period of time, there was what Asst. Chief Mahaffey described as a "significant decrease in activity."[105] According to Asst. Chief Mahaffey, the agency considered removing the concrete blocks over the winter of 2020, but decided to wait until the existing windows could be replaced with more protective enhancements, which took some time.[106] Asst. Chief Mahaffey indicated that the agency sought to have the barriers removed as soon as the enhanced windows were installed, and that it took "a couple of weeks" for the city Department of Transportation to remove them.[107]

This space intentionally left blank.

---

[104] Interview with Thomas Mahaffey, Apr. 27, 2022.

[105] Interview with Thomas Mahaffey, Apr. 27, 2022.

[106] Interview with Thomas Mahaffey, Apr. 27, 2022.

[107] Interview with Thomas Mahaffey, Apr. 27, 2022.

**Opinions**

I was retained by counsel for the City of Seattle to review aspects of the Seattle Police Department's response to protest activity between May 2020 and May 2021. Specifically, I was asked to evaluate the decision to evacuate the East Precinct on June 8, 2020; the decision to modify police response in a geographic area referred to as the "Red Zone" until July 1, 2020; and the decision to employ a passive block-and-fence barrier system around the East Precinct between summer 2020 and May 2021. I was not provided with and did not review any materials related to, and I have not developed any opinions about, any specific use-of-force incident in that time period.

I hold the opinions below to a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training, and experience in law enforcement; my knowledge and research as a policing scholar; my knowledge of law enforcement standards, analysis, and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of the relevant actions, policies, and procedures; and my understanding of the facts of this case based upon a comprehensive review of the materials listed above. My opinions and any related testimony are relevant areas that concern issues of which lay jurors are unaware or about which they frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

My opinions in this case are as follows:

1. The initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing;

2. The decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing; and

3. Deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing.

The justifications for my opinions are laid out on the following pages.

This space intentionally left blank.

### 1. The initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing

The operational realities of policing require officers to manage an array of risks and threats. To manage those risks and threats, officers use tactics, which one source has defined as "a sequence of moves that limit the suspect's ability to inflict harm and [that] advance the ability of the officer to conclude the situation in the safest and least intrusive way."[108] "Tactics are the techniques and procedures that officers use to protect themselves and community members by reducing risks, mitigating the likelihood that risks will become threats, and preventing threats from manifesting into harms."[109] As they determine which tactical techniques and procedures are appropriate, officers must balance different and often shifting priorities in dynamic situations. While there is no way to completely ensure safety, police tactics seek to appropriately balance preserving the safety of officers, subjects, and bystanders and protecting property in light of those priorities.

Police tactics and tactical decision making are highly contextual; an approach that may be entirely appropriate in one context may be entirely inappropriate in another. To use a simplified example, the tactics that officers might use to address an armed, barricaded subject are generally inappropriate in an active shooter situation and *vice versa*. Context is key, with context being highly dependent on the situation, including officers' reasonable perceptions, available resources, imminent threats, etc.

Further, it is generally accepted within policing that there may be a range of reasonable responses in any given situation. Tactical decision-making can be fairly thought of as a spectrum with a number of specific points that individually represent the different ways that various priorities may be balanced. To use a simplified example, an officer may be safer from being physically assaulted if they stand farther away from the subject but may have more opportunity to prevent the subject from fleeing if they stand closer, so there may be a range of reasonable distances at which an officer could stand depending on their assessment of the risk of potential assault or potential flight. Analyzing police tactics, then, is not a matter of identifying whether officers adopted the *best possible* tactics, but whether their chosen tactics can be considered reasonable under the circumstances. The determination of whether tactics are reasonable under the circumstances is, in essence, a matter of weighing the foreseeable risk profile of various options against the potential benefits.

Perhaps the most straight forward example of this type of balancing can be seen in the determination of evaluating an individual officer's tactical approach. As an officer manages the risks and threats

---

[108] Jeffrey J. Noble & Geoffrey P. Alpert, *State-Created Danger* in CRITICAL ISSUES IN POLICING: CONTEMPORARY READINGS at 568 (Roger Dunham and Geoffrey P. Alpert, eds., 7th ed., 2015).
[109] SETH W. STOUGHTON ET AL., EVALUATING POLICE USES OF FORCE 155 (2020).

of any given situation, they may expose themselves to potential harm and, by doing so, increase the likelihood that they will use force to address the threat of harm. In some circumstances, this exposure can be warranted. On other occasions, however, an officer's decision to affirmatively create or passively accept a particular threat is unjustified in light of the availability of other tactical options that would avoid or minimize the threat.

"Officer-created jeopardy" refers to situations in which officers affirmatively create or passively accept *unjustified* risks or threats that otherwise could have, and should have, been avoided.[110] Officer-created jeopardy is, in essence, a manner of describing unjustified risk-taking that can increase the likelihood of injury to officers and can, correspondingly, increase the likelihood that officers will use force to protect themselves from a threat of physical harm that they were, in part, responsible for creating.

> An officer who successfully manages potential threats early in an encounter is less likely to be physically threatened—and thus less susceptible to harm—later in the encounter. In the same vein, the officer is also less likely to perceive any need to use force to address a threat of harm, which increases the *subject's* physical safety. The opposite is also true; an officer's poor tactics can expose them to an otherwise avoidable threat, which increases the likelihood that they will use force to address that threat.[111]

Poor tactics—which, again, are situationally dependent—can predictably and significantly increase the likelihood of a suboptimal outcome by provoking avoidable resistance or introducing avoidable constraints on police decision-making or actions. On an individual basis, for example, "police tactics often seek to 'create' time in which officers can assess or respond to the situation" as a way of improving the accuracy of an officer's perceptions and the quality of an officer's decision-making."[112] "A poor tactical decision . . . can deprive the officer of time in which to safely make a decision about how to act, forcing the officer to make a seat-of-the-pants decision about how to respond." For that reason, it is no exaggeration to say that the majority of police tactics are designed to avoid, to the extent possible, putting officers into the position of having to make truly split-second decisions.

The basic principle that officers must assess the risk-profile of different tactical options and adopt an approach that reasonably balances the objective (or potential benefit of action) against the

---

[110] See Jeffrey J. Noble & Geoffrey P. Alpert, *State-Created Danger: Should Police Officers Be Accountable for Reckless Tactical Decision Making?*, *in* CRITICAL ISSUES IN POLICING: CONTEMPORARY READINGS 481, 493 (Roger G. Dunham & Geoffrey P. Alpert eds., 6th ed. 2010).

[111] SETH W. STOUGHTON ET AL., EVALUATING POLICE USES OF FORCE 155 (2020).

[112] Brandon Garrett & Seth Stoughton, *A Tactical Fourth Amendment*, 103 Va. L. Rev. 211, 253 (2017)

foreseeable risk of that action is applicable not just to individual officers, but also to squad, unit, or agency-level tactical decision making.

Importantly, reliably analyzing an officer's tactical decision-making requires recognizing and avoiding the potential for erroneously relying on *hindsight bias*.[113] Hindsight bias is the tendency for people to exaggerate, after a particular event, the predictability of that event occurring.[114] In short, knowing that something *did* happen can lead people to think, after the fact, that the event was more likely to happen than it actually was. Consider a simplified example: prior to a sporting event, people might report that they believe there is a 50% probability of a particular team winning. After that team wins, hindsight bias may lead people to report that they believed (beforehand) that there was a substantially greater than 50% probability that the winning team would ultimately win. In short, the after-the-fact information that the team won tends to lead people to exaggerate the extent to which it seemed beforehand as if the team would win.

Minimizing or avoiding hindsight bias requires reviewing the relevant decisions at the time they were made without regard for the ultimate outcome. A decision that was unreasonable at the time does not become reasonable because it contributed to a positive outcome. Similarly, a decision that was reasonable at the time it was made does not become unreasonable because it contributed to a negative outcome. Put simply, whether a particular decision or set of decisions was reasonable or unreasonable depends on, and only on, the facts reasonably available at the time the decision was made.

Over time, policing has developed tactical options for many—although certainly not all—situations that officers may encounter. For example, there are a set of generally accepted practices for officers conducting a traffic stop, initiating a "felony" or "high-risk" stop, responding to an active shooter, working as "contact" and "cover" officers, and so forth. The precise manner in which any given tactic may apply will depend on the circumstances, of course. For example, the circumstances of a traffic stop—including time, location, and how a motorist pulls over—will determine how an officer positions their vehicle and whether they approach from the driver or passenger side or call the stopped driver back.

Some situations, however, are so uncommon that policing has not developed a set of tactical precepts to guide officer decision-making. Under such circumstances, officers must balance competing priorities by referring not to specific tactical procedures, but rather to generally accepted tactical principles. To use a simplified example, officers may learn a variety of specific tactical options that they can use to stop a vehicle from behind but not learn any specific tactics for stopping

---

[113] Hindsight bias is also referred to as the *knew-it-all-along phenomenon* and as *creeping determinism*.

[114] See Rüdiger F, Pohland Edgar Erdfelder, *Hindsight Bias*, in Cognitive Illusions: Intriguing Phenomena in Judgment, Thinking, and Memory (Rüdiger F. Pohl ed., 2d ed. 2017)

a vehicle that has backed into a parking spot. In such a situation, the officer must still employ applicable tactical principles—such as time, distance, cover, concealment, and communication—in a way that properly balances the potential risks of the situation against the objective of addressing the underlying traffic violation.

This case presents an unprecedented tactical situation: a police precinct besieged by confrontational protesters over a prolonged period. There simply are no generally accepted tactical protocols to guide police decision-making under such circumstances. Instead, Asst. Chief Mahaffey and other SPD commanders had to identify the relevant priorities and assess the relative risks of various options to advance those priorities consistent with generally accepted principles.

There were multiple priorities in this case. The first and most important is the preservation of human life. It is well known and generally accepted in policing that the sanctity of human life is and must be the highest priority in policing. In 2015, the President's Task Force on 21st Century Policing called for a "'sanctity of life' philosophy . . . [to] be in the forefront of each officer's mind."[115] In the Police Executive Research Forum's 2016 *Guiding Principles on Use of Force*, the very first policy recommendation is that "[t]he sanctity of human life should be at the heart of everything an agency does."[116] And as the United States Conference of Mayors put it more recently, "Police departments' policies should consistently emphasize that the sanctity of life is a central principle of policing."[117]

This generally accepted principle is reflected in the Seattle Police Department. In an Incident Action Plan for June 8, 2020, the Seattle Police Department reiterated the following:

> Priorities of the Seattle Police Department include preservation of life and preservation of property. In support of these priorities, the Department has a stated goal of providing thoughtful resolutions to situations and reducing the likelihood of harm to all persons involved through the application of de-escalation principles.[118]

Further, the "General Control Objectives for the Incident" prepared by the SPD included, as the first objective, "Provide for the safety of the general public, spectators, first responders, and participants during this statewide COVID-19 state of emergency which does not permit public gatherings."[119]

---

[115] Final Report of the President's Task Force on 21st Century Policing, 19 (2015).
[116] Police Executive Research Forum, Guiding Principles on Use of Force, 34 (2016).
[117] United States Conference of Mayors, Report on Police Reform and Racial Justice, 18 (2020).
[118] Seattle Police Department, June 8 Events, Incident Action Plan, Addendum, BATES SEA-SPD 3946.
[119] Seattle Police Department, June 8 Events, Incident Action Plan, June 8, 2020, BATES SEA-SPD 3911.

Former Chief Best reflected this generally accepted principle in a later interview, stating, "[O]ur general operating philosophy is life safety, incidents, stabilization and…protection of property. . . . And sometimes, you know, the policy part of that is going to be secondary to protecting life. And in stabilizing an incident, and then [protecting] property, you want to protect it, but ultimately, not at the risk of injury or danger to other people."[120]

The tactical concepts of withdrawal and stabilization are well known and generally accepted in policing. Although the Mayor's Office had "ordered SPD to remove the barricades surrounding the East Precinct, open the street, and permit protesters to pass by the East Precinct" on June 8, 2020,[121] it would have been reasonable for the agency to have made that decision—with the contingent evacuation of the East Precinct—to remove one focal point for protesters and reduce the potential for confrontation.

Maintaining the integrity of police information and equipment—including weapons, police vehicles, and access to sensitive intelligence—was also a significant priority in this case. As Asst. Chief Mahaffey later said, "[F]irearms are kept in there, there's investigative units on the second floor of the building that have sensitive files, . . . a unit running informants had their files up there, . . . police vehicles in the facility, [and] access to criminal justice systems through a computer."[122]

The continued delivery of police services was also a priority, if one that had been substantially impacted by the on-going protests. As the SPD's Incident Action Plan for June 8, 2020, stated:

> The continued presence of the protesters at the East Precinct and the continuing need to protect the facility has resulted in the need for a large police presence creating a significant negative impact on the ability to provide effective police services from that location.[123]

The preservation of protesters' statutory and constitutional rights was also a priority. It is well known and generally accepted in policing that officers and agencies must respect civil rights and facilitate, *inter alia*, the freedom of expression protected by the First Amendment. It is well known and generally accepted in policing that individuals and groups have a First Amendment right to assemble on public areas—streets, sidewalks, parks, etc.—for the purposes of making public statements or engaging in expressive conduct, subject only to reasonable restrictions designed to protect public safety and property. For example, police agencies can impose narrowly drawn time,

---

[120] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Former Chief Carmen Best, BATES SEA 149631.

[121] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149244.

[122] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

[123] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

place, and manner restrictions, but cannot use such restrictions to significantly interfere with the protesters' ability to effectively communicate with the intended audience. In short, it is well known and generally accepted in policing that agencies and officers must not only respect the exercise of First Amendment rights, including by respecting the physical space that the protesters use, they must also avoid taking actions that could unreasonable deter (or "chill") the exercise of First Amendment rights.

There is ample evidence that the SPD acknowledged the need to preserve protesters' First Amendment rights and facilitate the exercise thereof. In the SPD Incident Action Plans, the second General Control Objective was provided as "Facilitate citizen's right to peacefully express their First Amendment free speech rights within the parameters set forth by the Washington State Governor's Stay at Home proclamation and the suspension of permitted events."[124] Both Mayor Durkan and Chief Best later spoke about the importance of respecting protesters' First Amendment rights.[125]

In assessing how best to preserve and facilitate protesters' exercise of statutory and constitutional rights while also balancing other priorities, police agencies must make a series of decisions about how to manage the physical space that protesters use, how to staff the protest (e.g., how many officers will be assigned); how to equip the officers (e.g., whether they should wear standard uniforms or protective gear); the degree of officer visibility; where officers should be visibly placed or staged (that is, positioned nearby but not visible from the protest location); what the span of control and command structure should look like; whether to use barricades and, if so, what type; and so on based on the specific circumstances of the protest. This requires agencies to consider a range of factors including, but not limited to, the nature and context of the protest activity, the characteristics of the area in which such activity is taking place, the ability to communicate cooperatively with protesters and other stakeholders, the likelihood of counter-protesters. To use a simplified example, a police agency may facilitate a climate change protest very differently than a police protest because of the higher likelihood for conflict (between protesters and officers) presented by a policing protest; the agency may adopt a higher visibility approach using officers in standard uniforms for the climate change protest but a lower visibility approach using officers in protective gear for the policing protest.

In essence, over the course of the protest, Asst. Chief Mahaffey and other SPD officials had to assess the relative risks of various options—including maintaining a significant police presence in the East Precinct or evacuating property and personnel from the East Precinct—and determine which option best advanced agency priorities. The efforts that SPD took to facilitate the protests

---

[124] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3911.
[125] Transcript of Press Conference, July 1, 2020.

prior to evacuating the East Precinct—specifically, the command structure, the use of barricades, the placement and equipping of officers, and the use of various less-lethal weaponry—were consistent with tactics adopted by various police agencies addressing confrontational protests.

The risks of maintaining a police presence in the East Precinct without the ability to significantly fortify the building were significant. Maintaining control of the East Precinct had *already* resulted in "injuries to twenty-five officers and have necessitated the use of force in order to protect life safety and property," including "the use of less-lethal tools such as blast balls, OC spray, and CS gas in response to hostile actions from protesters to engage in violence towards officers."[126] There was operational intelligence from both the Federal Bureau of Investigation and from the SPD Criminal Intelligence Unit[127] that the protesters' "goal was to . . . somehow take over that facility [the East Precinct] and potentially damage it significantly."[128] One intelligence estimate found it "[i]ndisputable that protesters are intent on gaining direct access to precinct building. Open source social media postings have indicated their goal is to burn the precinct to the ground."[129]

Further, there is a significant body of both anecdotal and empirical evidence that confrontational police tactics—both aggressing and maintaining a position against aggressing protesters—can escalate tense, complex situations, dramatically increasing the likelihood of physical violence and arrest. Academic work on crowd psychology in the context of protests and police response has found that "ill-advised actions by police can instigate or escalate conflict and violence in crowds" by fostering "an increased willingness to defy, rebel against, or use violence against the police."[130] The protests that following the shooting of Michael Brown in Ferguson, Missouri, for example, were exacerbated by "ineffective and inappropriate [police] strategies and tactics" that had the "unintended consequence of escalating rather than diminishing tensions."[131] The Final Report of the President's Task for on 21st Century Policing advised, *inter alia*, "Law enforcement agencies should create policies and procedures for policing mass demonstrations that employ a continuum of managed tactical resources that are designed to minimize the appearance of a military operation and avoid using provocative tactics and equipment that undermine civilian trust."[132]

---

[126] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[127] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149584.

[128] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

[129] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149572.

[130] Edward R. Maguire, *New Directions in Protest Policing*, 35 ST. LOUIS U. PUB. L. REV. 67, 94 (2015).

[131] OFFICE OF COMMUNITY ORIENTED POLICING SERVICES, U.S. DEP'T OF JUSTICE, AFTER-ACTION ASSESSMENT OF THE POLICE RESPONSE TO THE AUGUST 2014 DEMONSTRATIONS IN FERGUSON, MISSOURI xiv (2015)

[132] *Final Report of the President's Task Force on 21st Century Policing*, U.S. DEP'T JUST. 25 (2015).

Based on the information available to a reasonable officer at the time, it was entirely reasonable to conclude that maintaining a police presence at the East Precinct would result in escalating confrontations between protesters and officers that were highly likely to result in the use of significant force by and against officers. Further, it was entirely reasonable to conclude that should protesters make a concerted effort to force entry into the East Precinct and "burn [it] to the ground,"[133] officers may be confronted with imminent threats of death or great bodily harm that could result in the application of deadly force.

At the same time, the foreseeable risks of evacuating the East Precinct were less substantial. The loss of the building would hamper extent agency operations, but this effect was mitigated, in part, by the observation that agency operations out of the East Precinct were already limited by the protest. As the SPD assessed, "the continuing need to protect the facility has resulted in the need for a large police presence creating a significant negative impact on the ability to provide effective police services from that location."[134]

Further, the evacuation was intended and predicted to be short-lived. The SPD's strategic goal was to regain and retain control of the East Precinct; as Asst. Chief Mahaffey later said, "[T]here was never a question that . . . the police would be returning to that facility. It was just a matter of when we could make it happen,"[135] and indicated that he originally thought that officers would "be back in [the East Precinct] that night."[136] No reasonable officer in Asst. Chief Mahaffey's position could have anticipated that the protesters would set up a long-term occupation protest. As the Seattle Office of Police Accountability described, "There is no indication that anyone anticipated the possibility that protesters would attempt to establish an autonomous zone in response to a temporary withdrawal from the area by police."[137]

Under the circumstances, a reasonable officer could have concluded that the high likelihood that a continued police presence in the East Precinct would result in violence and that while evacuating property and officers from the East Precinct could increase the likelihood of property damage and diminish the agency's ability to respond, it would significantly mitigate the risk of violent confrontation between officers and protesters, including armed protesters. Under such

---

[133] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149572.

[134] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[135] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149601.

[136] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149576-77.

[137] Seattle Office of Police Accountability, 2020OPA-0354, Case Summary – Report of Investigation, BATES SEA 149163.

circumstances, concept of tactical repositioning—that is, moving back to a position that either provides additional tactical advantages or alleviates an existing tactical disadvantage—is entirely consistent with police practices.

Under such circumstances, it is eminently reasonable for an officer to accept the risk of property damage to avoid increasing risks to the lives and physical safety of officers and protesters alike.

For the foregoing reasons, the initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing.

---

This space intentionally left blank.

– 33 –

**2. The decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing**

The framework for evaluating tactical decisions is laid out above.[138] After evacuating the East Precinct, SPD officials had to determine when and how to regain access to the Red Zone and how to respond to calls for service and other activity in the Red Zone in the meantime.

As with the initial decision about how to respond to the protests and the decision to evacuate the East Precinct on June 8, 2020—not to mention the agency's initial approach to the protests prior to June 8—the determination of when and how to regain access to the Red Zone required SPD officials to balance multiple priorities.

As discussed above, fully restoring and delivering of police services in the Red Zone was a priority, primarily because of the significant risks that accompanies the loss of access to the Red Zone. Between June 8, 2020, and July 1, 2020, there were multiple high-priority incidents in the Red Zone. A mayoral declaration identified "three incidents of firearms violen[ce]" that resulted in two individuals killed and several injured, as well as "rape, robbery, assault, and increased gang activity" and "incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic."[139] Further, the information obtained by SPD Gang Intelligence reflected that rival gangs were "running into each other in a confined geographic area" of the Red Zone, which was "causing some of the shootings and other crimes that are occurring."[140]

However, as before, the preservation of protesters' statutory and constitutional rights was also a priority. SPD Incident Action Plans continued to include, "Facilitate citizen's right to peacefully express their First Amendment free speech rights within the parameters set forth by the Washington State Governor's Stay at Home proclamation and the suspension of permitted events" as a General Control Objective.[141] The facilitation of peaceful protester's rights is "most essential" when "parts of a crowd become violent or destructive," because history, research, and experience reflect that *failing* to facilitate peaceful protesters' rights increases the likelihood that formerly peaceful protesters will engage in violent or destructive behavior.[142]

At the same time, however, the tactical risk of reentering, let alone reestablishing full access to, the Red Zone remained high, as demonstrated by the identification of "check points and road blocks"

---

[138] See Opinion 1.

[139] City of Seattle, Executive Order 2020-08, June 30, 2020, BATES SEA 45265-6.

[140] BATES SEA 36005.

[141] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3911.

[142] Edward R. Maguire, *New Directions in Protest Policing*, 35 St. Louis U. Pub. L. Rev. 67 (2015).

that protesters, including some who were "armed and have been confrontational with Officers" established "around the [East] Precinct,"[143] and by the officers who returned to and then evacuated the East Precinct on June 11, 2020, after a fire was lit outside the building.[144] Further, when officers attempted to enter the area after a shooting incident, "officers formed a contact team, they had ballistic shields, they wore their protective helmets, they went with rifles, and they were still pushed back by a crowd and were not able to get to a person that had been shot."[145] Additionally, the SPD had what Asst. Chief Mahaffey described as "validated information at the time that a coordinated plan was put in place [by protesters], especially during overnight hours, to have armed people man the barricades if police were seen approaching them."[146]

The perspective that police reentry would provoke violence does not appear limited to the SPD; one media report published on June 18, 2020, stated:

> Nobody inside the protest zone thinks a police return would end peacefully. If cops show up, protesters say, they plan to block the precinct with their bodies, with white activists pledging to stand up front as a symbolic shield for black and brown comrades. Small teams of armed anti-fascists are also present — self-proclaimed community defense forces that say they're ready to fight if needed but that de-escalation is preferred.[147]

These concerns persisted during the occupation of the Red Zone. The day before the Red Zone was cleared, the President of the Seattle Police Officers Guild sent Chief Best an email expressing concern about some Red Zone occupiers being "heavily armed and . . . on record stating that police are not allowed inside," such that "[i]f this recent plan to retake control of Red Zone commences tomorrow, I fear there may be numerous injuries sustained by officers . . . and injuries to community members. I believe that the likelihood of this operation and its optics could be unpleasant and lead to additional community outrage."[148]

Additionally, research and experience reflect that an aggressive or overly broad police response can provoke, rather than prevent, confrontation. As one researcher has written, "When police treat moderate crowd members as radicals, the moderates begin to identify with the radicals to a much greater extent than they did before. Support for challenging or pushing back against the police can

---

[143] Seattle Police Department, Incident Action Plan, June 10 Events, BATES SEA-SPD 5259.

[144] Mahaffey Dep. 97:2-18, Jan. 26, 2022.

[145] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149597.

[146] Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34.

[147] Hannah Allam, *'Remember Who We're Fighting For': The Uneasy Existence of Seattle' Protest Camp*, NATIONAL PUBLIC RADIO (June 18, 2020).

[148] Email from Mike Solan to Carmen Best, June 30, 2020, 18:16:42.

spread quickly under such conditions."[149] In short, there was not only a reasonable fear of confrontation, there was a legitimate concern that certain police actions would escalate the potential for confrontation.

Notably, the tactical options that SPD had available to address the protesters were limited. On June 12, 2020, the United States District Court for the Western District of Washington enjoined the City of Seattle and SPD from using "any chemical irritant such as and including CS Gas ("tear gas") and OC spray ('pepper spray') and (2) any projectile such as and including flash-bang grenades, 'pepper balls,' 'blast balls,' rubber bullets, and foam-tip projectiles" against "persons peacefully engaging in protests or demonstrations."[150] The City recognized that many of the Red Zone occupiers were peaceful, as acknowledged by the mayor's office prior to the Red Zone being cleared, stating that "[m]ost individuals previously participating in the Capitol Hill demonstrations have been peaceful,"[151] and in Mayor Durkan's statements during a press conference after the Red Zone was cleared, stating, "While thousands have peacefully protested in that area of over the last weeks, the public safety threats in recent weeks have been well documented."[152]

The use of chemical munitions to clear or control a crowd is a common policing technique, but such weapons cannot be individually targeted; the injunction combined with the observation that there were peaceful occupiers in the Red Zone effectively removed the SPD's ability to employ common crowd-control and crowd-clearing tactics. As Asst. Chief Mahaffey later said, the court order "limit[ed] our ability to use less-lethal weapons that we would certainly [have] need[ed] if we were to [have] move[d] back into the [East] Precinct."[153]

Further, the planning that led up to the reentry into the Red Zone was significant; various Seattle and external agencies had to coordinate to conduct a multifaceted operation that could provide appropriate notice, reduce infrastructure that supported the occupation of the Red Zone, provide infrastructure to support clearing the Red Zone, and physically enter and clear the Red Zone.[154]

At the same time, as contemporary media accounts reflect, the size and impact of the Red Zone was reduced over time.[155] Under such circumstances, it was reasonable to exercise tactical restraint by

---

[149] Edward R. Maguire, *New Directions in Protest Policing*, 35 ST. LOUIS U. PUB. L. REV. 67, 95 (2015).

[150] Order Granting in Part Motion for Temporary Restraining Order, *Black Lives Matter Seattle-King County et al. v. City of Seattle, Seattle Police Department*, Case No. 2:20-cv-00887-RAJ (U.S. Dist. Ct. W. Dist. Wa. at Seattle).

[151] Email from Ernesto Apreza to Daniel Beekman et al., June 30, 2020, 09:32:55.

[152] Transcript of Press Conference, July 1, 2020.

[153] Interview with Chief Mahaffey, Apr. 27, 2022.

[154] Transcript of Press Conference, July 1, 2020.

[155] Paige Cornwell, *Seattle's CHOP Shrinking, but Demonstrators Remain*, THE SEATTLE TIMES (June 24, 2020).

waiting until conditions improved before mobilizing a large number of officers—not to mention other city workers—to reenter and reestablish unrestricted access to the Red Zone.

While not assertively moving to clear the area earlier may potentially have had some negative effects, a reasonable police commander assessing the situation could have fairly concluded that moving in more quickly was highly likely to result in a significant physical conflict that could foreseeably escalate. Indeed, a reasonable police commander would have been concerned about the potential that an aggressive, rapid response could result in a prolonged gun battle with entrenched, armed protesters. In short, a reasonable officer could have concluded that the foreseeable risks of exercising tactical restraint, although potentially substantial, were significantly outweighed by the foreseeable and more likely risks of precipitous police action.

For the foregoing reasons, the decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing.

---

This space intentionally left blank.

### 3. Deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing

It is well known and generally accepted in policing that crowd control and security operations can include area denial tactics, which seek to prevent, discourage, or limit access to the protected area. Area denial tactics can be active (e.g., officers physically preventing entry or using chemical munitions to encourage people to leave or stay out of an area), or passive (e.g., fencing). According to Asst. Chief Mahaffey, the SPD makes "fairly frequent" use of passive barriers during a range of operations.[156]

In this case, the SPD used chain-link fencing during the initial protests "from late May into early June," but those "barricades were ineffective and repeatedly dismantled by protesters."[157] After regaining access to the East Precinct and the Red Zone, the SPD again used chain-link fencing to protect the East Precinct building, but it was "cut through or damaged."[158] Even after the occupation protest in the Red Zone was disbanded, there was "additional property destruction or confrontations," including "numerous" attacks on the East Precinct, such as dumpsters being pushed down the hill, trash thrown into the lobby, graffiti, windows being "broken regularly," at least one instance in which the building was targeted with an explosive device, and an attempt to start a fire after quick-setting concrete had been applied in an attempt to block a door.[159]

In light of these attacks, the SPD had the city Department of Transportation stack large concrete blocks around the East Precinct building. According to the available information, doing so both improved officers' perceptions of safety in the East Precinct and mitigated the attacks on the building.[160] The concrete barriers were left in place until the East Precinct could be fortified with the installation of more protective windows, at which point the city Department of Transportation was asked to remove them.[161] They did so within a few weeks.[162]

Under the circumstances, the decision to deploy concrete blocks as a passive barrier to help protect the East Precinct and the duration of their deployment improved officer safety and reduced the potential for confrontation inherent in more active countermeasures.

---

[156] Interview with Thomas Mahaffey, Apr. 27, 2022.
[157] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.
[158] Interview with Thomas Mahaffey, Apr. 27, 2022.
[159] Interview with Thomas Mahaffey, Apr. 27, 2022.
[160] Interview with Thomas Mahaffey, Apr. 27, 2022.
[161] Interview with Thomas Mahaffey, Apr. 27, 2022.
[162] Interview with Thomas Mahaffey, Apr. 27, 2022.

For the foregoing reasons, deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing

**Submission**

The preceding constitutes my report regarding the Seattle Police Department's response to an occupation protest between June 8, 2020, and July 1, 2020. This report is based on the materials reviewed to date. Should any subsequent information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Please note that the preceding report may include citations to and discussion of information and documents that may be considered confidential, subject to a protective order, or otherwise not suitable for public release.

Respectfully Submitted,

Seth Stoughton
April 28, 2022

# SETH W. STOUGHTON

315 Running Fox Rd.
Columbia, SC 29223
SWStough@law.sc.edu
434-262-2484

---

**ACADEMIC APPOINTMENTS**

**University of South Carolina School of Law**
*Professor*, January 2022 – Present
*Associate Professor* (with tenure), August 2018 – December 2021
*Assistant Professor*, July 2014 – August 2018

Courses:  Criminal Law, Criminal Procedure, Police Law & Policy, Regulation of Vice, Advanced Topics in Criminal Law

Awards:  Best Classroom Teacher Award, 2016 and 2021
Outstanding Faculty Publication Award (Book), 2021
Eboni S. Nelson Award, 2015 and 2018

Service:  Faculty Selection (2021-present)
Academic Responsibility Committee Chair (2018-2019) & Member (2019-2021)
Diversity, Equity & Inclusion Committee (2020-present)
Rule of Law Collaborative, Core Faculty (2014-present)
Faculty Senator (2014-2015; 2016-2019)
Advisory Committee (2016-2018)
Faculty Awards Committee (2016-2017)
Curriculum Committee (2015-2016)
Safe Zone Training Facilitator (2015)
Academic Technology Committee (2014-2015)
Academic Self-Study Committee (2014-2015)

**University of South Carolina College of Arts & Sciences, Department of Criminology and Criminal Justice**
*Professor (by Courtesy)*, January 2022 – Present
*Associate Professor (by Courtesy)*, November 2020 – December 2021

**Harvard Law School**
*Climenko Fellow & Lecturer on Law*, August 2012 – June 2014
Courses:   Legal Research & Writing, Regulation of Vice

**APPOINTMENTS**

**American Law Institute,**
*Member*, 2021-present
*Adviser (Principles of the Law, Policing)*, 2018-present

**American Bar Foundation**
*Fellow*, 2021-present

**ABA Legal Education Police Practices Consortium**
*Research Advisor*, 2021 – Present
*Interim Director*, 2021

Stoughton
*Curriculum Vitae*

| | |
|---|---|
| **APPOINTMENTS (CON'T)** | **Columbia Police Department**<br>*Civilian Advisory Council Member*, 2015-2021 |
| **EDUCATION** | **University of Virginia School of Law**<br>J.D., Order of the Coif, 2011<br>    Articles Editor, Virginia Law Review (Managing Board)<br>    Thomas Marshall Miller Prize<br>    Elsie Hughes Cabell Scholar<br><br>**Florida State University**<br>B.A. English (Literature), 2008<br>    Rohrmann Scholar<br>    Certificates in Emergency Management and Public Administration |
| **BAR ADMISSIONS** | Virginia (Associate Member) |
| **PROFESSIONAL EXPERIENCE** | **The Honorable Kenneth F. Ripple, United States Court of Appeals for the Seventh Circuit**<br>*Clerk*, August 2011 – August 2012<br><br>**McGuireWoods**, Charlottesville, Virginia<br>*Legal Intern (Part Time)*, February 2010 – May 2010; June 2011 – July 2011<br><br>**Brooks Pierce**, Greensboro, North Carolina<br>*Summer Associate*, July 2010 – August 2010<br><br>**Jones Day**, Atlanta, Georgia<br>*Summer Associate*, May 2010 – July 2010<br><br>**Charlottesville Public Defender's Office**, Charlottesville, Virginia<br>*Pro Bono Intern*, January 2010<br><br>**McKenna Long & Aldridge**, Atlanta, Georgia<br>*Summer Associate*, May 2009 – July 2009<br><br>**Florida Dept. of Education, Office of Inspector General**, Tallahassee, Florida<br>*Investigator*, November 2005 – July 2008<br>    <u>Activities</u><br>        Conducted complex criminal and administrative investigations<br>        Directed multi-agency investigations into tuition voucher fraud<br>        Led a state Whistle-Blower investigation into the state's garnishment of $10<br>            million from student loan borrowers in default<br>    <u>Awards</u><br>        Prudential–Davis Productivity Commendation, 2008<br>        Meritorious Performance Award, 2007<br>    <u>Certifications & Specialized Training</u><br>        Certified Fraud Examiner, Ass'n of Certified Fraud Examiners, 2007<br>        Certified Inspector General Investigator, Ass'n of Inspectors General, 2007 |

Stoughton
*Curriculum Vitae*

| | |
|---|---|
| **PROFESSIONAL EXPERIENCE (CON'T)** | **Tallahassee Police Department**, Tallahassee, Florida<br>*Police Officer,* March 2001 – June 2006 |

        Activities
            Uniformed Patrol Division, March 2001 – October 2005
            Special Response Team member, 2003 – 2005
            Reserve Officer, November 2005 – June 2006
            Taught report writing and other topics to sworn and civilian employees
            Developed policies related to new technologies
            Established, coordinated, and taught community self-defense courses
            Developed and implemented a children's abduction/molestation prevention program

        Awards
            City of Tallahassee Formal Achievement Award, 2004

        Certifications & Specialized Training
            Instructor Certifications:
                Baton, Chemical Aerosol Projector, Specialty Impact Munitions, Chemical Munitions, and Riot Response/Crowd Control
            Operator Certifications (selected)
                Patrol Rifle, PepperBall, and Breath Alcohol Testing

| | |
|---|---|
| **BOOKS** | EVALUATING POLICE USES OF FORCE (NYU Press 2020) (with Jeffrey J. Noble and Geoffrey P. Alpert) |

| | |
|---|---|
| **BOOK CHAPTERS** | *A Taxonomy of Plural Policing in the United States*, in PLURAL POLICING FROM AN INTERNATIONAL PERSPECTIVE ( Nathalie Hirschmann, Tobias John, Frauke Reichl, and Jacqueline Abigail Garand, eds.) (forthcoming 2022) |

        *Compliance and Development: The Dual Objectives of Use-of-Force Review*, in RETHINKING AND REFORMING AMERICAN POLICING: LEADERSHIP CHALLENGES AND FUTURE OPPORTUNITIES (Joseph Shafer & Richard Myers, eds., 2022)

        *The Regulation of Police Violence*, in CRITICAL ISSUES IN POLICING: CONTEMPORARY READINGS (8th ed., Kyle McClean, Roger G. Dunham, & Geoffrey P. Alpert, eds., 2020)

        *The Legal Framework for Evidence-Based Policing in the United States*, in EVIDENCE BASED POLICING: AN INTRODUCTORY READER (Renée J. Mitchell & Laura Huey, eds., 2018)

        *Police Misconduct*, in LEGAL ISSUES ACROSS THE GLOBE 125 (Thomas Riggs, ed., 2018)

| | |
|---|---|
| **ACADEMIC ARTICLES & ESSAYS** | *Policing Suspicion: Qualified Immunity & "Clearly Established" Standards of Proof*, 112  J. CRIM. L. & CRIM. 37 (2022) (with Kyle McLean, Justin Nix, and Geoff Alpert) |

        *How the Fourth Amendment Frustrates the Regulation of Police Violence*, 70 EMORY L. J. 521 (2021)

Stoughton
*Curriculum Vitae*

**ACADEMIC ARTICLES & ESSAYS (CON'T)**

*Police Body-Worn Cameras*, 96 N.C. L. REV. 1363 (2018)

*The Blurred Blue Line: Reform in an Era of Public & Private Policing*, 44 AM. J. CRIM. L. 117 (2017)

Terry v. Ohio *and the (Un)Forgettable Frisk*, 15 OHIO STATE J. CRIM. L. 19 (2017)

*Moonlighting: The Private Employment of Off-Duty Officers*, 2017 U. ILL. L. REV. 1848 (2017)

*A Tactical Fourth Amendment*, 102 VA. L. REV. 211 (2017) (with Brandon Garrett)

*Principled Policing: Warrior Cops & Guardian Officers*, 51 WAKE FOREST L. REV. 611 (2016)
- Reprinted as Chapter 5 in THE CIVIL RIGHTS LITIGATION & ATTORNEY FEE ANNUAL HANDBOOK (2017).

*Law Enforcement's "Warrior" Problem*, 128 HARV. L. REV. FORUM 225 (2015)
- Cited by the U.S. Department of Justice, Civil Rights Division, in their Investigation of the Chicago Police Department

*Evidentiary Rulings as Police Reform*, 69 MIAMI L. REV. 429 (2015)

*The Incidental Regulation of Policing*, 98 MINN. L. REV. 2179 (2014)

*Policing Facts*, 88 TUL. L. REV. 847 (2014)
- Featured and reviewed by Elizabeth Joh, *Influential But Uninformed: What SCOTUS Knows About Policing*, JOTWELL (Oct. 1, 2014)

*Note: Modern Police Practices: Arizona v. Gant's Illusory Restriction of Vehicle Searches Incident to Arrest*, 97 VA. L. REV. 1727 (2011)

**OTHER PUBLICATIONS**

*Ahmaud Arbery Murder Trial Will Scrutinize The Use—And Abuse—Of 'Outdated' Citizen's Arrest Laws*, THE CONVERSATION, Oct. 17, 2021

*Evaluating the Police Shooting of Ashli Babbitt*, LAWFARE, Sept. 9, 2021 (with Jeffrey J. Noble and Geoffrey Alpert)

*Should Police Be Able to Review Their Body Cam Footage?*, SMERCONISH, May 14, 2021

*Addressing Misconduct Will Require A Change in Police Culture. Is Police Leadership Up To The Challenge?*, TALKING POINTS MEMO, June 28, 2020 (with Karen Rice)

*The Unnecessary Protection of Qualified Immunity*, JUSTIA VERDICT, June 26, 2020 (with Joanna Schwartz)

*How to Actually Fix America's Police*, THE ATLANTIC, June 3, 2020

*Commentary: All Options are Bad in a Protest; Charleston Police Picked Least-Bad One*, THE POST & COURIER, June 3, 2020

Stoughton
*Curriculum Vitae*

**OTHER PUBLICATIONS (CON'T)**

*George Floyd's Death Shows Exactly What Police Should Not Do*, WASHINGTON POST, May 29, 2020 (with Jeffrey J. Noble and Geoffrey Alpert)

*Ahmaud Arbery's Killing Puts a Spotlight on the Blurred Blue Line of Citizen's Arrest Laws*, THE CONVERSATION, May 29, 2020

*Police Training in South Carolina is Dangerously Deficient*, THE POST & COURIER, Feb. 25, 2020 (with Geoff Alpert)

*Well-Intentioned AB 931 Comes with Fatal Flaws*, SAN FRANCISCO EXAMINER, June 3, 2018 (with Arif Alikhan)
- Republished as *Well-Intentioned AB 931 Comes with Fatal Flaws*, SAN FRANCISCO EXAMINER, June 3, 2018

*Deadly Force Proposal Needs Work*, CAPITOL WEEKLY, May 29, 2018 (with Arif Alikhan)
*Regulating the Reasonableness of Police Violence*, THE REGULATORY REVIEW, Feb. 14, 2017

*Understanding the Practical Aspects of Interpreting Video Footage*, U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE ASSISTANCE, BODY-WORN CAMERA TRAINING & TECHNICAL ASSISTANCE, EXPERT COMMENTARY, Jan. 2017

*Is the Police-Community Relationship in America Beyond Repair?*, THE WASHINGTON POST, Jul 8, 2016

*Why Police Need Constructive Criticism*, THE ATLANTIC, DEC. 23, 2015 (with Geoffrey Alpert & Jeff Noble)

*Why Are Police Disciplining Students?* THE ATLANTIC, Oct. 29, 2015 (with Josh Gupta-Kagan)

*Better Information is the Key to Policing Reform,* THE ATLANTIC, Sept. 24, 2015 (with Geoffrey Alpert & Jeff Noble)

*Deus ex Canini: Drug Dogs & Probable Cause*, CASETEXT, Aug. 16, 2015

*Cop Expert: Why Sandra Bland's Arrest Was Legal But Not Good Policing,* TALKING POINTS MEMO, July 24, 2015

*What A Police Expert Calls The Most Ignored Cause Of Cop Violence*, TALKING POINTS MEMO, June 15, 2015

*A Former Cop On What Went Wrong in McKinney*, TALKING POINTS MEMO (cover feature), June 9, 2015

*8 Things We Still Get Wrong About Policing,* TIME, May 15, 2015
*Police Warriors or Community Guardians?* WASHINGTON MONTHLY, Apr. 17, 2015

*Police Shouldn't Ask if a Shooting is Justified, But If It's Avoidable*, THE NEW YORK TIMES, Apr. 9, 2015

Stoughton
*Curriculum Vitae*

| | |
|---|---|
| **OTHER PUBLICATIONS (CON'T)** | *How Police Training Contributes to Avoidable Deaths*, THE ATLANTIC, Dec. 12, 2014 |

*Trust Is a Police Officer's Greatest Protection*, THE NEW YORK TIMES, Nov. 26, 2014

*A Windfall for the Government, Take 2: Seth Stoughton on* Arizona v. Gant, EVIDENCEPROGBLOG, Oct. 6, 2014

*What Would a Better Ferguson Response Have Looked Like?*, VERDICT JUSTIA, Sept. 12, 2014

*Supreme Court Has Myopic View of Police Chases*, BRENNAN CENTER FOR JUSTICE, June 16, 2014

**SELECTED SERVICE AS SUBJECT MATTER EXPERT**

City Council of the City of Hammond, Louisiana
- Investigation, Conclusions, and Recommendations

National Police Foundation on National Institute of Justice grant 2019-R2-CX-0025, 2021
- Constitutional policing (Fourth Amendment)

Polis Solutions on Chicago Police Department training contract, 2021
- Constitutional policing (Fourth Amendment)

OIR Group on review of the Madison, WI, Police Department, 2017
- Training, agency culture, police body-worn cameras

CNA Solutions on Bureau of Justice Assistance grant 2015-DE-BX-K002, 2015
- Police body-worn cameras

**SELECTED EXPERT CONSULTING: REPORTS, DEPOSITIONS & TRIALS**

In re: Philadelphia Police Department Use of Force Incident
- Retained by the Philadelphia State Attorney's Office
- Tactics, use of force
- Testimony (grand jury)

Lance v. City of San Antonio et al., Civil Action No. 5:21-CV-837, United States District Court for the Western District of Texas
- Retained by the plaintiff's attorney: Law Offices of Maloney & Campolo
- Use of force
- Report

In re: Shooting of Ma'Khia Bryant
- Retained by the Franklin County, Ohio Prosecuting Attorney's Office
- Tactics, use of force
- Testimony (grand jury)

Stoughton
*Curriculum Vitae*

**SELECTED EXPERT CONSULTING (CON'T)**

Stapleton v. City of Springfield
- Retained by the plaintiff's attorney: Murray & Murray Co. LPA
- Emergency vehicle operations
- Report

Floyd v. Knight et al.,  2:21-cv-03288-RMG-MGB, United States District Court for the District of South Carolina
- Retained by the defendant's attorney (civil): Hood Law Firm, LLC
- Use of force, police procedure, investigations
- Report

In re: Providence Police Department Use of Force Incident, Providence, Rhode Island
- Retained by the Rhode Island Attorney General's Office
- Tactics, use of force
- Report, testimony (grand jury)

South Carolina v. Bailey
- Retained by the First Circuit Public Defender's Office
- Police procedure, investigations
- Report

James Montiel Officer-Involved Shooting, Orange County, Florida
- Retained by the Office of the State Attorney, Ninth Judicial Circuit
- Use of force
- Report, testimony (grand jury)

Alexander Paul Officer-Involved Shooting, Broward County, Florida
- Retained by the Office of the State Attorney, Seventeenth Judicial Circuit
- Use of force
- Report

Doe v. City of Myrtle Beach et al., 4:21-CV-00635-JD, United States District Court for the District of South Carolina
- Retained by defendant's attorney: Battle Law Firm, LLC
- Police procedure; investigations
- Report

James v. Davies, Case No. 2:19CV341-HCN-DBR, United States District Court for the District of Utah
- Retained by defendant's attorney: Battle Law Firm, LLC
- Emergency vehicle operations (pursuit), tactics, use of force
- Report

Ondrej et al. v. Perry et al., 5-21-cv-281-JKP, United States District Court for the Western District of Texas
- Retained by plaintiff's attorney: The Cortez Law Firm
- Use of force, tactics
- Report

Stoughton
*Curriculum Vitae*

**SELECTED
EXPERT
CONSULTING
(CON'T)**

Sanders v. Rutherford County Sheriff's Office et al.
- Retained by plaintiff's attorney: Grimes Teich Anderson, LLP
- Police procedure
- Report

State of Minnesota v. Potter, 27-CR-21-7460
- Retained by the Office of the Minnesota Attorney General (prosecution)
- Use of force, police procedure
- Report, trial testimony

State of Minnesota v. Derek Chauvin (27-CR-20-12646), J. Alexander Kueng (27-CR-20-12953), Thomas Lane (27-CR-20-12951), and Tou Thao (27-CR-20-12949)
- Retained by the Office of the Minnesota Attorney General (prosecution)
- Use of force, police procedure
- Report, trial testimony in *State of Minnesota v. Chauvin*

State of Ohio v. Coy
- Retained by the Office of the Ohio Attorney General (prosecution)
- Use of force, tactics
- Report

Hartsfield v. Gunn et al., Case No. 4:19-CV-341-JM, United States District Court for the Eastern District of Arkansas
- Retained by plaintiff's attorney: Laux Law Group
- Use of force; tactics; investigations
- Report

State of Minnesota v. Potter
- Retained by the Office of the Minnesota Attorney General (prosecution)
- Use of force
- Report

Doe v. North Charleston Police Dept., et al., Case No.: 20-cv-02202-DCN-MHC, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: Joye Law Firm
- Police procedure, investigations
- Report, deposition

Jones et al. v. County of Pinal et al., No. 2:20-cv-00714-GMS-CDB, United States District Court for Eastern District of Arkansas
- Retained by plaintiff's attorney: Richardson & Richardson, P.C.
- Use of force
- Report

Walls v. Starks et al., No. 19-CV-398, United States District Court for the Eastern District of Arkansas
- Retained by plaintiff's attorney: Loevy & Loevy
- Use of force; tactics; agency policy and custom
- Report

– 8 –

Stoughton
*Curriculum Vitae*

**SELECTED EXPERT CONSULTING (CON'T)**

Morris v. Town of Bonneau, et al., CA No. 2018-CP-08-01844, Court of Common Pleas for the Ninth Judicial Circuit of South Carolina
- Retained by plaintiff's attorney: Uricchio, Howe, Krell, Jacobsen, Toporek, Theos & Keith, PA
- Police procedure, investigations
- Report; deposition

Russ v. City of Hartsville et al.,  2020-CP-1600478, Court of Common Pleas for the Fourth Judicial Circuit of South Carolina
- Retained by plaintiff's attorney: Thurmond Kirchner & Timbes, P.A.
- Use of force; agency policy
- Report, deposition

Franklin v. City of Charlotte and Wendy Kerl, 3:20-cv-330, United States District Court for the Western District of North Carolina
- Retained by plaintiff's attorney: Tin Fulton Walker & Owen, PLLC
- Use of force; tactics
- Report, deposition

Campbell v. City of North Charleston et al., 2:20-cv-00959, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: Allen Law
- Use of force; tactics
- Report, deposition

Rhynes v. City of Myrtle Beach, et al., 4:19-cv-2478, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: Law Office of Walter S. Ameika
- Use of force; tactics
- Report

Duran v. United Tactical Systems et al., 1:18-cv-01062 MV/LF, United States District Court for the District of New Mexico
- Retained by plaintiff's attorney: Fine Law Firm
- Training provided by private weapons vendor
- Report; deposition

Rhines v. State of New Jersey, Docket No. ESX-L-580-19, Superior Court of New Jersey, Essex County
- Retained by plaintiff's attorney: The Donnelly Law Firm
- Police procedure
- Report

Ellis v. Kirkman, et al., United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: The Bax Law Firm, PA
- Use of force
- Report

Stoughton
*Curriculum Vitae*

**SELECTED**
**EXPERT**
**CONSULTING**
**(CON'T)**

Hein v. Gunnison County Sheriff's Office, et al., 1:19-cv-01520-WJM-GPG, United States District Court for the District of Colorado
- Retained by plaintiff's attorney: Sagal Law, LLC
- Use of force; tactics; police procedure
- Report

Use of Force Review: Jamee Johnson
- Retained by the Office of the State Attorney, Fourth Judicial Circuit of Florida (Jacksonville)
- Use of force; tactics
- Report

Shooting of Jamarion Robinson
- Retained by the Office of the Fulton County (GA) District Attorney
- Use of force; tactics
- Report

Dalonte White v. City of Cleveland et al., 1:17-CV-1165, United States District Court for the Northern District of Ohio)
- Retained by plaintiff's attorney: The Chandra Law Firm, LLC
- Investigative procedure
- Report

Clifford Blake v. City of North Charleston et al., Civil Action No: 2019-CP-10-3774, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: Uricchio Howe Krell PA
- Use of force; police procedure
- Report

Barbara Elifritz v. City of Portland et al., 3:18-cv-00903 HZ, United States District Court for the District of Oregon
- Retained by defendant's attorney (civil): Portland City Attorney's Office
- Tactics; use of force
- Report

Jordan Gantlin v. Dante Ghi et al., Civil Action No: 2:18-cv-02063-DCN-MGB, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: McLeod Law Group
- Investigations; police procedure; private security
- Report

Heyward v. Keith Tyner et al., C/A No.: 2:17-cv-01545-DCN-MGB, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: Bamberg Legal, LLC
- Use of force; tactics; investigative procedure
- Report; deposition

Stoughton
*Curriculum Vitae*

**SELECTED**
**EXPERT**
**CONSULTING**
**(CON'T)**

Fried v. City of Strongsville, Case No. 1:18-cv-00139, United States District Court for the Northern District of Ohio
- Retained by defendant's attorney (civil): Mazanec, Raskin & Ryder
- Emergency vehicle operations (pursuit); use of force
- Report; deposition

Norton v Rosier, Case No. 7:14-CV-260-FL, United States District Court for the Middle District of North Carolina
- Retained by plaintiff's attorney: Brooks, Pierce, McLendon, Humphrey & Leonard LLP
- Police procedure; traffic stops
- Report; trial testimony

Matusiewicz v. Florence County Sheriff's Office et al., Case No. 4:16-cv-01595-RBH-KDW, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: McLeod Law Group
- Investigative procedure; service of arrest warrant
- Report; deposition

Murray v. City of North Charleston, et al., Case No. 2:17-cv-01508, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: Weston, Craig, & Anthony
- Use of force
- Report

Carr v. Johnson, Case No. 1:17-CV-620, United States District Court for the Northern District of Ohio
- Retained by plaintiff's attorney: Patituce & Associates
- Investigative procedure; service of search warrant
- Report

Dekany v. City of Akron, et al., Case No. 5:16-cv-01829, United States District Court for the Northern District of Ohio
- Retained by defendant's attorney: Mazanec, Raskin & Ryder
- Investigative procedure
- Report

Smith v. Charleston County, et al., C/A/ No.: 2:16-cv-655-PMD-BM, United States District Court for the District of South Carolina
- Retained by plaintiff's attorney: McLeod Law Group
- Investigative procedure; canine track; home entry
- Report; deposition; trial testimony

Garnet v. City of Norfolk, Civil Action No. 3:15-CV-01585, United States District Court for the District of Connecticut
- Retained by plaintiff's attorney: Garrison, Levin-Epstein, Fitzgerald, & Pirrotti
- Arrest; use of force
- Report

Stoughton
*Curriculum Vitae*

| | |
|---|---|
| **SELECTED EXPERT CONSULTING (CON'T)** | State of Georgia v. Christopher Calmer, No. 2015CR111, Monroe County Superior Court, Forsyth, GA<br>• Retained by defendant's attorney (criminal): Georgia Capital Defenders<br>• Police tactics and use of force; home entry; crisis intervention<br>• Trial testimony<br><br>Clint Lee Gulledge v. Chesterfield County et al., C/A #: 4:16-cv-00440-RBH-KDW, United States District Court for the District of South Carolina<br>• Retained by  plaintiff's attorney: Rikard & Protopapas<br>• Investigative procedure; arrest warrant<br>• Report<br><br>De-Vaunte Taylor v. James E. Holtmeyer et al., 4:14-cv-3127, United States District Court for the District of Nebraska<br>• Retained by  plaintiff's attorney: Fraser Stryker<br>• Police tactics; use of force<br>• Report<br><br>Alan G. Cox v. Berkeley County Sheriff's Department & South Carolina Law Enforcement Division, Court of Common Pleas for the (South Carolina) Ninth Judicial Circuit<br>• Retained by defendant's attorney (civil): Hood Law Firm<br>• Investigative procedure; arrest decisions<br>• Report; deposition |
| **SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS** | *Civil Rights Panel*, South Carolina Bar Association Conference, Greenville, SC, Jan. 20, 2022<br><br>*Evaluating Police Uses of Force,* Florida 4th Judicial Circuit State Attorney's Office, Jacksonville, FL, Dec. 10, 2021<br><br>*Video Footage & Investigations*, Florida 4th Judicial Circuit State Attorney's Office, Jacksonville, FL, Dec. 10, 2021<br><br>*Keynote Address*, South Carolina Black Lawyer's Association, Charleston, SC, Oct. 29, 2021<br><br>*Evaluating Police Uses of Force*, South Carolina Judicial Conference and Clerks Conference, Columbia, SC, Oct. 5, 2021<br><br>*Police Investigations*, South Carolina Public Defender's Conference, Myrtle Beach, SC, Sept. 28, 2021<br><br>*Shooting to Incapacitate*, Peace Officer Association of Georgia, Savannah, GA, Aug. 17, 2021<br><br>*Gender Equity in Policing*, California Community Colleges, Aug. 17, 2021<br><br>*Dismantling Racism, Sexism, and Inequities in Policing Panel*, 20th Annual Social Equity Leadership Conference, June 11, 2021 |

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Language Shapes Experiences*, California Community Colleges, June 8, 2021

*I Have a Problem With That: Race and the Justice System Panel*, Richland County Library, May 18, 2021

*The Point: Know Justice, Know Peace* Panel, South Carolina Fifth Circuit Solicitor, May 3, 2021

*General Police Accountability* Panel, The Criminal Justice System in Review: Accountability, Reform, & Policy, Loyola University Chicago Law Journal, April 9, 2021

*Police Violence: The Legalities Behind Police Use of Force*, University of Wisconsin, Platteville, Apr. 8, 2021

*Policing from an (Inter)National Perspective; Public and Private Policing*, University of Münster, Mar. 29, 2021

*Police Reform: From Prisons to the Streets, How Far We Have Come and How Far We Still Have to Go* Panel, No Justice, No Peace: Finding Justice in American Policing Symposium, Indiana Law Review, Mar. 26, 2021

*Qualified Immunity in Practice* Panel, Journal of Criminal Law and Criminology, Mar. 25, 2021

*Evaluating Police Body-Worn Cameras*, Justice Day, Leadership Jacksonville, Mar. 4, 2021

*Evaluating Police Uses of Force,* Novel Justice (Book Talk series), Wilson Center for Science and Justice, Duke Law School, Feb. 23, 2021

Guest Speaker, Policing the Police, Columbia Law School, Feb. 16, 2021

Guest Speaker, Health Impacts of Immigration Law Enforcement in the United States, University of Maryland, Dept. of Health Behavior and Health Education, Feb. 12, 2021

*Qualified Immunity: History, Current Application, and Uncertain Future*, Maros Inn of Court, Feb. 2, 2021

*Who is the Reasonable Person?*, SC Bar Convention, Jan. 20, 2021 (online

*A User's Guide to South Carolina Criminal Practice: the 2021 Pandemic Edition, Social Justice Panel*, South Carolina Bar, Jan. 8, 2021

*Evidence-Based Policing: The Use of Force*, California Community Colleges, Dec. 10, 2020

*Eyewitness: Police Reform*, North Carolina Public Defender's Office, Nov. 16, 2020

*Police Use of Force*, Policing Los Angeles Forum, Loyola (LA) Law School, Nov. 9, 2020

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Police Culture*, Addressing the Crisis in Policing Today: Race, Masculinity, and Police Use of Force in America Symposium, George Washington Law School, Oct. 22, 2020

*Handling Police Brutality Cases in 2020: An "A to Z" Guide for Identifying, Evaluating and Litigating Civil Rights Cases Involving Police Brutality,* Connectionology, Oct. 8, 2020

*Evidence-Based Policing: Training*, California Community Colleges, Oct. 5, 2020

*Police Unions*, Conversations on Race and Policing Series, California State University San Bernardino, Oct. 7, 2020

*Evidence-Based Policing: Fundamentals and Concepts*, California Community Colleges, Sept. 29, 2020

*Eyewitness: Police Reform*, North Carolina Public Defender, Sept. 21, 2020

*The High Risks, Liabilities, and Costs of Secondary Employment*, ODM, Sept. 3, 2020

*Policing & Police Reform*, Grand Strand Action Together, August 12, 2020

*Policing & Police Reform*, Progressive Democrats of Buncombe County (NC), August 10, 2020

*Warrior Policing*, "Reimaging/Reinventing Police," University of Chicago, July 30, 2020

*Evaluating Police Uses of Force*, NY Judicial Conference, July 8, 2020

*We the People*, National Constitution Center (via Internet), June 15, 2020

*Policing and Police Reform*, South Carolina for Criminal Justice Reform, June 11, 2020

*Constitutional and Administrative Standards Regulating the Use of Force*, National Association for Civilian Oversight of Law Enforcement, Austin, TX, Mar. 6, 2020

*Police Body-Worn Cameras*, Crown Defense Conference, Winnipeg, Manitoba, Dec. 4, 2019

*Fourth Amendment Flaws & the Regulation of Police Violence*, Vanderbilt Criminal Law Roundtable, Nashville, TN, Nov. 8-9, 2019

*Policing*, Critical Inquiry Speaker Series, University of South Carolina, Aiken, Oct. 28, 2019
*De-Escalation Summit*, California Peace Officer Standards and Training Officer Commission, San Diego, CA, October 14, 2019 (invited participant)

*When Justice Prevails*, Alpha Phi Alpha, Columbia, SC, Oct. 6, 2019

– 14 –

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Inaugural National Symposium on Police Academies & Training*, Washington, D.C., October 7, 2019 (invited participant) (facilitator)

*The Regulation of Police Uses of Force*, Media Law School, Columbia, SC, Sept. 20, 2019

*Fourth Amendment Flaws & the Regulation of Police Violence*, CrimFest!, Brooklyn, NY, July 15, 2019

*Principled Policing: Warrior Cops & Guardian Officers*, 2019 Cultural and Linguistic Competency Conference, Columbia, SC, June 20, 2019

*Police Body-Worn Cameras: Interpretive Challenges*, Investigative Reporters & Editors Conference 2019, Houston, Texas, June 13, 2019

*Segunda Conferencia Internacional Seguridad Ciudadana: La Vía Civil*, Ibero Ciudad de Mexico, Mexico City, Mexico, May 21, 2019 (panel discussant)

2019 Neighborhood Criminal Roundtable, University of North Carolina, Chapel Hill, May 13-14, 2019 (invited participant)

*Body-Police Worn Cameras: Legal, Practical, and Policy Challenges*, Federal Bar Association, Jacksonville, FL, Apr. 29, 2019

*Principles of the Law, Policing, Advisor Meeting*, American Law Institute, Philadelphia, PA, Apr. 4, 2019

*The Law of the Police Conference*, University of South Carolina School of Law, Feb. 28-Mar. 2, 2019 (organizer)

*Use-of-Force Investigations: Body-Worn Camera Footage*, Chicago Civilian Office of Police Accountability, Jan. 23, 2019

*Crisis Intervention Team Training*, Focus on the Facts Training, Georgia Capital Defenders, Atlanta, GA, Dec. 18, 2018

*Police Misconduct*, Focus on the Facts Training, Georgia Capital Defenders, Atlanta, GA, Dec. 18, 2018

*Talkback: The Hate U Give*, The Nickelodeon Theater, Nov. 15, 2018

Class Speaker (via Skype) in Seeing Criminal Justice: Examining the Interplay of Visual Media, Storytelling and Criminal Law, Harvard Law School, Nov. 13, 2018

*Police Body-Worn Cameras: Interpretative Issues*, Florida 4th Judicial Circuit State Attorney's Office, Jacksonville, FL, Nov. 5, 2018

*Guardian Policing*, TEDx UofSC, Columbia, SC, Oct. 9, 2018

*#EndMoneyBail For a Better Hawai'i and a Better Nation*, ACLU, Honolulu, HA, Sept. 27, 2018 (panelist)

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Body-Police Worn Cameras: Legal, Practical, and Policy Challenges*, American Judges Association Conference, Kauai, HA, September 26, 2018

*Interpreting Police-Body Worn Footage*, Media Law School, Columbia, SC, September 20, 2018

*Contemporary Issues in Policing*, South Carolina Advisory Committee to the United States Commission on Civil Rights, Aug. 13, 2018 (via telephone)

*Guardian Policing*, Washington State Criminal Justice Standards Commission, Law Enforcement Academy, Sea-Tac, WA, July 30, 2018

*Close Encounters of the Police Kind: Interaction, Over-reaction, and Inaction*, Fourth Circuit Judicial Conference, The Greenbrier, WV, June 29, 2018 (panelist)

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Arizona Judicial Conference, Tucson, AZ, June 21, 2018

*Testimony in Support of Assembly Bill 931*, California Senate Committee on Public Safety, Sacramento, CA, June 19, 2018

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Tennessee Judicial Conference, Memphis, TN, June 13, 2018

*Testimony in Support of Assembly Bill 931*, California Senate Committee on Public Safety, Sacramento, CA, June 19, 2018

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Tennessee Judicial Conference, Memphis, TN, June 13, 2018

*Reimaging the Police Role,* University of Michigan, Dearborn, March 8, 2017, (first workshop in the sixth Alternatives to Violent Force series)

*Reimaging the Police Role,* University of Michigan, Dearborn, March 8, 2017, (last workshop in the fifth Alternatives to Violent Force series)

*How Perspective Impacts Perception: Body-Worn Cameras & Interrogation Videos*, Virginia Bar Association, Indigent Defense Counsel, Richmond, VA, May 3, 2018 (with Harlan Yu)

Class Speaker (via Skype) in Seeing Criminal Justice: Examining the Interplay of Visual Media, Storytelling and Criminal Law, Harvard Law School, Apr. 3, 2018

Keynote Speech, *Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Body-Worn Camera Training & Technical Assistance National Meeting, Mar. 28, 2018

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Florida 4th Judicial Circuit State Attorney's Office, Jacksonville, FL, Mar. 16, 2018

*Use-of-Force Investigations: Body-Worn Camera Footage*, Chicago Civilian Office of Police Accountability, Mar. 7, 2018

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Delaware, OH, Feb. 2, 2018 (two separate presentations)

*Terry at Fifty: On the Books and On the Ground*, AALS Conference, San Diego, CA, Jan. 6, 2018

*AALS Hot Topic Panel: The Promise & Pitfalls of The Marijuana Justice Act of 2017*, AALS Conference, San Deigo, CA, Jan. 3, 2018

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, New Mexico Defense Lawyers Association Civil Rights Seminar, Albuquerque, NM, Dec. 8, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, North Dakota Judicial Conference, Bismarck, ND, Nov. 20, 2017

*Police Body-Worn Cameras*, North Carolina Law Review Symposium on "Badge Cams as Data and Deterrent: Law Enforcement, the Public, and the Press in the Age of Digital Video," Chapel Hill, NC, Nov. 3, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, South Carolina Police Chiefs Association, Annual Training Conference, Columbia, SC, Oct. 13, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, National Conference of State Courts, Court Technology Conference, Salt Lake City, Utah, Sept. 13, 2017

*Use-of-Force Investigations: Body-Worn Camera Footage*, Chicago Civilian Office of Police Accountability, Aug. 10, 2017

*Policing First Principles*, Southeastern Association of Law Schools Conference, Boca Raton, FL, Aug. 1, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Command Staff Training, Kansas City (Missouri) Police Department, June 30, 2017

*Use-of-Force Investigations: Body-Worn Camera Footage*, Chicago Civilian Office of Police Accountability, June 1, 2017

*Lights, Camera, Courts, and Cops: Living in the Age of Body Cameras*, National Consortium on Racial & Ethnic Fairness in the Courts, St. Louis, MO, May 17, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Legal Liability & Risk Management Institute, Cape Coral, FL, Apr. 18, 2017

*Police Body-Worn Cameras: Opportunities & Challenges*, William & Mary Law School, Apr. 13, 2017

*Alternatives to Violent Force: Workshop 1,* University of Michigan, Dearborn, March 8, 2017

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Police Body-Worn Cameras: Practical Implications for Investigations*, United States Inspector General Investigators Training, Shepherdstown, WV, March 2, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Conference of Chief Justices, Phoenix, AZ, Jan. 31, 2017

*Police Body-Worn Cameras: Practical Limitations*, The Defense Research Institute, Civil Rights & Governmental Liability Section Conference, Nashville, TN, Jan. 26, 2017

*Alternatives to Violent Force: Workshop 1*, University of Michigan, Dearborn, January 4, 2016

*Senior Executive Training Session: Principled Policing*, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Washington, D.C., Dec. 1, 2016

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, North Dakota Judicial Conference, Bismarck, ND, Nov. 20, 2017

*Police Body-Worn Cameras*, North Carolina Law Review Symposium on "Badge Cams as Data and Deterrent: Law Enforcement, the Public, and the Press in the Age of Digital Video," Chapel Hill, NC, Nov. 3, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, South Carolina Police Chiefs Association, Annual Training Conference, Columbia, SC, Oct. 13, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, National Conference of State Courts, Court Technology Conference, Salt Lake City, Utah, Sept. 13, 2017

*Use-of-Force Investigations: Body-Worn Camera Footage*, Chicago Civilian Office of Police Accountability, Aug. 10, 2017

*Policing First Principles*, Southeastern Association of Law Schools Conference, Boca Raton, FL, Aug. 1, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Command Staff Training, Kansas City (Missouri) Police Department, June 30, 2017

*Use-of-Force Investigations: Body-Worn Camera Footage*, Chicago Civilian Office of Police Accountability, June 1, 2017

*Lights, Camera, Courts, and Cops: Living in the Age of Body Cameras*, National Consortium on Racial & Ethnic Fairness in the Courts, St. Louis, MO, May 17, 2017
*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Legal Liability & Risk Management Institute, Cape Coral, FL, Apr. 18, 2017

*Police Body-Worn Cameras: Opportunities & Challenges*, William & Mary Law School, Apr. 13, 2017

Stoughton
*Curriculum Vitae*

**SELECTED PRESENTATIONS & SPEAKING ENGAGEMENTS (CON'T)**

*Reimaging the Police Role*, University of Michigan, Dearborn, March 8, 2017, (first workshop in the third Alternatives to Violent Force series)

*Police Body-Worn Cameras: Practical Implications for Investigations*, United States Inspector General Investigators Training, Shepherdstown, WV, Mar. 2, 2017

*Police Body-Worn Cameras: Legal, Practical, and Policy Challenges*, Conference of Chief Justices, Phoenix, AZ, Jan. 31, 2017

*Police Body-Worn Cameras: Practical Limitations*, The Defense Research Institute, Civil Rights & Governmental Liability Section Conference, Nashville, TN, Jan. 26, 2017

*Reimaging the Police Role*, University of Michigan, Dearborn, January 4, 2016 (first workshop in the second Alternatives to Violent Force series)

*Senior Executive Training Session: Principled Policing*, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Washington, D.C., Dec. 1, 2016

*Senior Executive Training Session: Police-Body-Worn Cameras*, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Washington, D.C., Dec. 1, 2016

*Police Body-Worn Cameras*, International Association of Privacy Professionals, Columbia, SC, Nov. 7, 2016

*Alternatives to Violent Force: Workshop 1,* University of Michigan, Dearborn, Nov. 1, 2016

*Perspectives on Police Body-Worn Cameras*, Summit on Trending Issues in Policing, Federal Law Enforcement Training Center, Brunswick, GA, Sept. 28, 2016

*Police Body-Worn Cameras: Practical Limitations*, South Carolina Solicitors' Conference, Myrtle Beach, SC, Sept. 25, 2016

*Police Body-Worn Cameras: Practical Limitations*, Ohio Judicial Conference, Columbus, OH, September 15, 2016

*Police Body-Worn Cameras: Practical Limitations*, Missouri Judicial Conference, Columbia, MO, Aug. 21, 2016

*Police Body-Worn Cameras: Practical Limitations*, Media Law School, Columbia, SC, Aug. 18, 2016

*Executive Training Session: Police-Body-Worn Cameras*, Peace Officers' Association of Georgia, Savannah, GA, Aug. 22, 2016

*Police Body-Worn Cameras: Practical Limitations*, South Carolina Judicial Conference, Columbia, SC, August 18, 2016

*Moonlighting: The Private Employment of Off-Duty Police*, CrimFest, Cardozo School of Law, July 11, 2016

Stoughton
*Curriculum Vitae*

**SELECTED**
**PRESENTATIONS**
**& SPEAKING**
**ENGAGEMENTS**
**(CON'T)**

*A Tactical Fourth Amendment*, University of Virginia School of Law, June 28, 2016

Police *Body-Worn Cameras: Practical, Policy, and Legal Challenges*, Indiana Bench/Bar Conference, French Lick, IN, June 17, 2016

*Police Body-Worn Cameras*, National Association of Criminal Defense Lawyers Body Camera Task Force, June 14, 2017 (teleconference)

*Police Body-Worn Cameras: Practical, Policy, and Legal Challenges*, Kansas Judicial Conference, Wichita, KS, June 9, 2017

*Video Analytics in Public Safety: Legal, Ethical, and Social Concerns*, National Institute of Standards & Technology, San Diego, CA, June 6, 2017

*Exploring the Relationship Between the Rule of Law & Violent Extremism in the Middle East*, Justice Sector Training, Research and Coordination Program; Dubai, United Arab Emirates, June 1-3, 2016

*Principled Policing,* Wake Forest School of Law, Implementing De-Incarceration Strategies Symposium, Apr. 1, 2016

*Police Body-Worn Cameras: Practical and Policy Implications*, Savannah Law School, Feb. 12, 2016

*A Tactical Fourth Amendment*, Savannah Law School, Feb. 12, 2016

*Principled Policing: Warriors & Guardians*, Columbus (OH) Bar Association, 4th Annual Martin Luther King, Jr. Memorial Civil Rights Symposium, Columbus, OH, Jan. 29, 2016 (6 CLE hours offered for event)

*The Crisis in Policing: Violence, Race, and Community Relations*, University of Florida School of Law, Nov. 13, 2015

*Police Body-Worn Cameras: Practical and Policy Implications*, The Midwest Conference of Chief Justices and State Court Administrators, Columbus, OH, Oct. 16, 2015 (7.5 CLE credits offered for event)

*Principled Policing: Warriors & Guardians*, National Association of Women Law Enforcement Executives, Hartford, CT, Aug. 6, 2015

*Police Officer Use of Deadly Force & Shootings: Analysis of Training, Investigation, and Review*, Cuyahoga County Prosecutor's Office, Mar. 12, 2015 (6 CLE hours offered for event)

*Tactical Fourth Amendment*, Law of the Police Works-in-Progress Roundtable, University of Virginia School of Law, Mar. 5-6, 2015

*Law Enforcement's "Warrior" Problem*, The Thin Blue Line: Policing Post-Ferguson, St. Louis University School of Law, Feb. 20, 2015 (4.5 CLE hours)

*And Justice For All*, Martin Luther King Day Commemoration Panel Discussion, University of South Carolina School of Law, Jan. 15, 2015

Stoughton
*Curriculum Vitae*

*Policing & Immigration Colloquium*, University of South Carolina College of Social Work, Oct. 10, 2014

*Evidentiary Rulings as Police Reform*, CrimFest Conference, July 2014

*Domestic Policing & the Rule of Law*, Emerging Scholars in Rule of Law Workshop, University of South Carolina School of Law, April 2014

*From Below: Trial Courts & Criminal Procedure Symposium*, University of Miami School of Law, February 2014

|  |  |
|---|---|
| **SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT** | Ken Kolker, *Use of Force Expert: GRPD Footage Raises 'Red Flags'*, WLNS, Apr. 13, 2022 |

Soreath Hok *et al.*, *Bakersfield Police Department Fails to Identify People in Crisis, Thwarting Reform*, KVPR, Apr. 12, 2022

Stephen Fastenau, *Video Released as Family Argues Cops Escalated Deadly Fight with Mentally Ill Columbia Man*, THE POST & COURIER, Mar. 23, 2022

Anthony Ocampo, *Jaxon Sales' Family Says Authorities Ruled His Death An Accidental Overdose Because He Was Gay*, BUZZFEED NEWS, Mar. 18, 2022

Fola Akinnibi & Sarah Holder, *NYC Businesses Hire Off-Duty Police to Blunt Uptick in Violent Crime*, CITYLAB, Feb. 23, 2022

Television Interview, *Fatal Shooting by Deputies into Car Highlights Differences in JPSO, NOPD*, WDSU, Feb. 16, 2022

Indira Eskieva, *Advocates Push for Police Use of Force Legislation in South Carolina*, WCNC, Jan. 31, 2022

Riley Yates, *Is It Cheaper to Hire A New Cop or Pay Huge Overtime Costs?*, NJ.COM, Jan. 24, 2022

Tony Bartelme, *Uncovered: Shining a Light on South Carolina Corruption and Misconduct.*, THE POST & COURIER, Jan. 23, 2022

Heather Bair, *3 Officers Fired After Firing Into Crowd Leaving Football Game, Killing 8-Year-Old*, NEWSWEEK, Jan. 21, 2022

Riley Yates *et al.*, *The True Cost of Policing*, NJ.COM, Jan. 20, 2022

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Vinny Vella, *The Sharon Hill Officers Charged with Killing Fanta Bility May Have Acted Against Department Policy*, THE PHILADELPHIA INQUIRER, Jan. 19, 2022

Katja Ridderbusch, *Revolution in den USA: Polizisten lernen jetzt, zu schießen ohne zu töten*, DER TAGESSPIEGEL, Jan. 3, 2022

Stoughton
*Curriculum Vitae*

Connor Sheets & Robert J. Lopez, *Decades Before LAPD Killed Girl, a Wild Shootout Blocks Away Helped Militarize Police*, LOS ANGELES TIMES, Dec. 30, 2021

Akela Lacy, *Two Companies Fight to Corner the Police Body Camera Market*, THE INTERCEPT, Dec. 8, 2021

Timothy Bella, *A Black Teen Died in Custody While Being Restrained Facedown. Now the Prone Position is Again Under Fire*, WASHINGTON POST, Dec. 29, 2021

Virginia Bridges, *15 Men Went to Jail on False Charges. Should NC Officer Who Arrested Them Be Charged?*, THE NEWS & OBSERVER, Dec. 23, 2021

Vinny Vella, *Fanta Bility Was Killed by Police. So Why Were Two Teens Charged with Murder?*, PHILADELPHIA INQUIRER, Nov, 21, 2021

Robin Stein et al., *Before the Final Frame: When Police Missteps Create Danger*, THE NEW YORK TIMES, Oct. 31, 2021

Jamie Thompson, *A 'shoot to incapacitate' policy puts Georgia police chief and town in the spotlight*, THE WASHINGTON POST, Oct. 24, 2021

Hayley Smith and Richard Winston, *Shooting of Unarmed Teen by Long Beach School Police Sparks Outrage, Questions*, LOS ANGELES TIMES, Oct. 1, 2021

Gerard Albert, *Cracked Windshield, Confusing Laws Surround Death of Man Shot by Trooper in Horry County*, MYRTLE BEACH ONLINE, Oct. 1, 2021

Richard Winston and Hayley Smith, *'No Justification' for Shooting by Long Beach School Safety Officer, Experts Say*, LOS ANGELES TIMES, Sept. 30, 2021

*The Lawfare Podcast: Seth Stoughton on the Shooting of Ashli Babbitt*, LAWFARE, Sept. 20, 2021

Television Interview, CNN, Sept. 13, 2021

*Real Sports*, HBO, Aug. 25, 2021

Madison Martin*, In Focus: What Experts Think Is and Isn't Working to Help Police in South Carolina*, WMBF NEWS, Aug. 19, 2021

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Max Hauptman, *'Warrior Mindset' Police Training Proliferated. Then, High-profile Deaths Put it Under Scrutiny.*, THE WASHINGTON POST, Aug. 12, 2021

Oliva Diaz, *BolaWraps Rope into Lowcountry Police Departments*, THE POST AND COURIER, Aug. 9, 2021

Paul Cuno-Booth, *KSC Security Officer Used Knee on Neck to Restrain Man in 2017 Incident*, SENTINEL SOURCE, Aug. 4, 2021

Shelby Grad, *A Troubling Video Captures L.A. Sheriff's Deputies' Deadly Use of Force*, LOS ANGELES TIMES, Aug. 3, 2021

Stoughton
*Curriculum Vitae*

Leila Miller & Richard Winton, *Video of Deputies Killing Suicidal Man Shows Multiple Failures, Experts Conclude*, LOS ANGELES TIMES, Aug. 3, 2021

Andrew Boryga, *This Was the Biggest, Loudest Cop Union in America. Then Came Jan. 6.*, DAILY BEAST, July 28, 2021

Corey Jones, *Video Shows OHP Pursuit Involving Spike Strips that Ended in Fatal Crash but Wasn't Considered a Use of Force*, TULSA WORLD, July 28, 2021

John Kennedy, *'It's a New Day': In the Wake of Floyd Killing, Florida Looks to Change Police Culture*, HERALD-TRIBUNE, July 9, 2021

Will Wright, et al., *Protesters Decry Meck DA Decision to Not Charge Deputy US Marshal in Jennings Killing*, THE CHARLOTTE OBSERVER, July 6, 2021

*Will US Justice System be Tougher on Police After George Floyd Case?*, TIMES OF MALTA, June 27, 2021

Clark Merrefield, *'Defund the Police': What It Means and What the Research Says on Whether More Police Presence Reduces Crime*, THE JOURNALIST'S RESOURCE, June 29, 2021

Corey Jones, *Highway Patrol Protocols for Reporting Serious Encounters and Deadly Force Leave Gaps*, TULSA WORLD, June 27, 2021

Lisa Pickoff-White et al., *Bakersfield Police Broke 31 People's Bones in Four Years. No Officer Has Been Disciplined for It*, LAIST, June 16, 2021

Ion Meyn, *The Invisible Rules that Govern Police Use of Force*, LAWFARE, June 8, 2021*Tennessee Cops Mocked Dying Man's Plea: 'I Can't Breathe'*, BBC NEWS, May 22, 2021

Christoph Koettl & Caroline Kim, *Andrew Brown Jr. Shooting: Videos Cast Doubt on Police Use of Force*, NEW YORK TIMES, May 22, 2021

David Nather*, The Slow Moves to Improve Police Training*, AXIOS, May 18, 2021

Byrhoonda Lyons & Laurel Rosenhall, *Is California's New Police Deadly Force Law Making a Difference?*, CALMATTERS, May 12, 2021

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Richard Winton, *Family Wants Federal Inquiry of Alameda Police in Death of Mario Gonzalez*, LOS ANGELES TIMES, May 11, 2021

Noah Robertson, *Policing Has Changed Over the Last Year. Here's How*. CHRISTIAN SCIENCE MONITOR, April 30, 2021

Richard Winston & Lila Seidman, *Outrage Grows as New Video Shows Latino Man Dying after Bay Area Police Pin Him for 4 Minutes*, LOS ANGELES TIMES, Apr. 28, 2021

Maria Iati, *Body-Caemra Video Shows Officer Kneeling on Man for Five Minutes Before He Dies*, WASHINGTON POST, Apr. 28, 2021

Stoughton
*Curriculum Vitae*

David D. Kirkpatrick, *Split-Second Decisions: How a Supreme Court Case Shaped Modern Policing*, THE NEW YORK TIMES, Apr. 25, 2021

Zoe Tillman et al., *Hundreds of People Who Joined the Capitol Riot May Never Face Charges*, BUZZFEED NEWS, Mar. 16, 2021

Eric Westervelt et al., *What Went Wrong: Analysis of Police Handcuffing, Pepper-Spraying 9-Year-Old Girl*, NATIONAL PUBLIC RADIO, Mar. 9, 2021

Josh Kelety, *Maricopa County Sheriff's Deputy Cleared After Siccing Dog on Cuffed Inmate in Cell*, PHOENIX NEW TIMES, Feb. 24, 2021

Radio Interview, *Training And Accountability In The Capitol Police Investigations*, ALL THINGS CONSIDERED (NATIONAL PUBLIC RADIO), Feb. 21, 2021

Michael Barajas, *The 'Culture of Violence' Inside Austin's Police Academy*, TEXAS OBSERVER, Feb. 15, 2021

Dustin Patar, *Increasing Trust and Transparency Requires More Than Just Cameras, Says Rcmp Inspector*, NUNATSIAQ NEWS (Iqaluit, Nunavut, Canada), Jan. 27, 2021

Tate Ryan-Mosley, *Police Are Flying Surveillance Over Washington. Where Were They Last Week?*, MIT TECHNOLOGY REVIEW, Jan. 18, 2021

David Z. Morris, *Wht Did Police Fail to Protect the Capital?*, FORTUNE, Jan. 8, 2021

David Travis Bland & John Monk, *What if DC Rioters Were Black, SC Rep Asks. USC, Law Experts Speak on Police Response*, THE STATE, Jan. 8, 2020

Caitlin Byrd, *Charleston Sheriff Cuts Ties With Ice, Calls Policy 'Legal Racial Profiling'*, THE STATE, Jan. 5, 2021

*Watchdog Report on NYPD Protest Response First Step in Long Road to Meaningful Change, Experts Say*, NBC (New York), Dec. 19, 2020

Majlie de Puy Kamp, *The Year Of Reckoning: How 2020 Revealed The Fault Lines In American Policing*, CNN, Dec. 18, 2020

Bert Roughton & Hannah Knowles, *Body Cam Video In Ahmaud Arbery Shooting Raises Familiar Concerns About Unequal Police Treatment*, THE WASHINGTON POST, Dec. 18, 2020

SELECTED MEDIA
INTERVIEWS &
APPEARANCES
2018-PRESENT
(CON'T)

Jordan Smith, *How the Criminal Justice System Fails People with Mental Illness*, THE INTERCEPT, Nov. 26, 2020

Alana Semuels, *As Police Departments Outsource Officer Training to Save Money, Society May Be Paying the Price*, TIME, Nov. 20, 2020

Hady Mawajdeh, *Bodycams Haven't Stopped Police Shootings. Releasing The Footage May Be A Start*, GUNS & AMERICA,  Nov. 4, 2020

Stoughton
*Curriculum Vitae*

Christina Maxouris, *These Mental Health Crises Ended in Fatal Police Encounters. Now, Some Communities Are Trying a New Approach*, CNN, Oct. 10, 2020

Rich Lord, *Police Chase Settlement Would Push Lawsuit Payouts Beyond $12 million Since 2009*, PUBLIC SOURCE, Sept. 29, 2020

Michael Wilson, *Did This Police Maneuver Lead to Daniel Prude's Death?*, THE NEW YORK TIMES, Sept. 15, 2020

Arthyr Rizer and David Franco, *How 'Warrior Policing' Undermines U.S. Law Enforcement*, THE CRIME REPORT, Sept. 8, 2020

Alanna Durkin Richer and Claudia Lauer, *Were They a Threat? Police Shootings Reignite Legal Debate*, ASSOCIATED PRESS, Aug. 30, 2020

Scottie Andrew, *Why Police Shoot So Many Times to Bring Down a Suspect*, CNN, Aug. 26, 2020

Jamiles Lartey, *Why It's Not So Simple To Arrest The Cops Who Shot Breonna Taylor*, THE MARSHALL PROJECT, Aug. 8, 2020

Margo Gontar, Экс-полицейский о реформе полиции, Voice of America, July 14, 2020

Bill McCarthy, *Ad Watch: Super PAC Attacks Biden in Misleading 'Defund the Police' Ad*, PolitiFact, July 29, 2020

William Finnegan, *How Police Unions Fight Reform*, THE NEW YORKER, July 27, 2020

*Candice Norwood, Can Use of Force Restrictions Change Police Behavior? Here's What We Know*, PBS NEWSHOUR, July 23, 2020

Curtis Bunn, *Lawyers Struggle to Keep Up with Civil Rights Cases Amid America's Racial Reckoning*, NBC NEWS, July 23, 2020

Eric Litke, *Unions Limit Police Accountability, But Moore Claim Exaggerates Impact*, POLITIFACT, JULY 10, 2020

Janet Nguyen, *Police Departments Have Spent Millions in Overtime During Protests*, MARKETPLACE (NATIONAL PUBLIC RADIO), July 3, 2020

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Jena McGregor, *Top CEOs Endorse Calls for Police Reform, Another Sign of Momentum on the Issue*, THE WASHINGTON POST, June 30, 2020

Radio Interview, ON POINT, NATIONAL PUBLIC RADIO, June 25, 2020

Television Interview, *Seth Stoughton - "Evaluating Police Uses of Force" and Reimagining the Culture of Policing*, THE DAILY SHOW WITH TREVOR NOAH, June 23, 2020

Stoughton
*Curriculum Vitae*

Ted Hesson *et al.*, V*ideos of Alleged Police Misconduct Went Viral. Then What Happened?*, REUTERS, June 23, 2020

Lynne Peeples, *What the Data Say About Police Bruality and Racial Bias – and Which Reforms Might Work*, NATURE, June 19, 2020

Richard Fausset and Shaila Dewan, *Police Decisions are Scrutinized After Rayshard Brooks' Fatal Encounter*, THE NEW YORK TIMES, June 18, 2020

David Brooks, *The Culture of Policing is Broken*, THE ATLANTIC, June 17, 2020

Anne Kim, *A Simple Way to Demilitarize the Police*, WASHINGTON MONTHLY, June 17, 2020

Rick Rojas and Richard Fausset, *Police Killings Prompt Reassessment of Laws Allowing Deadly Force*, THE NEW YORK TIMES, June 14, 2020

Alana Abramson, *'We as Professionals Are Under Assault.' How The George Floyd Protests Are Shifting Power Away From Police Unions*, TIME, June 11, 2020

Jon Jamp and Scott Calvert, *More Cities Ban Chokeholds, Similar Restrains in Wake of George Floyd Protests*, THE WALL STREET JOURNAL, June 10, 2020

Rajshree Agarwal, *Creating Dialogue in Light of Oppression*, FORBES, June 8, 2020

Alanna Vagianos, *Police Budgets Have Long Been Untouchable. That Could Change.*, HUFFINGTON POST, June 4, 2020

Amelia Thomson-DeVeaux et al., *Why It's Still So Rare for Police Officers to Face Legal Consequences for Misconduct*, FIVETHIRTYEIGHT, June 4, 2020

Television Interview, AMERICA'S NEWS HQ, FOX NEWS, May 31, 2020

Radio Interview, *Minneapolis Police Were Sued a Decade Ago in Similar Restraint Case*, ALL THINGS CONSIDERED, NATIONAL PUBLIC RADIO, May 29, 2020

Patrick Jonsson & Henry Gass, *Despite Furor, Accountability Lags For Police. Here's Why It Might Change*, THE CHRISTIAN SCIENCE MONITOR, May 29, 2020

Scottie Andrew, *The Move Used to Restrain George Floyd is Discouraged by Most Police. Here's Why*, CNN, May 28, 2020

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Neil MacFarquhar, *In George Floyd's Death, a Police Technique Results in a Too-Familiar Tragedy*, THE NEW YORK TIMES, May 29, 2020

Radio Interview, *How Police Officers Are Trained To Use Their Guns*, THE TAKEAWAY, NATIONAL PUBLIC RADIO, Mar. 23, 2020

Alanna Vagianos, *Bloomberg's Stop-And-Frisk Was 'State Sanctioned Sexual Assault' of Men of Color*, HUFFINGTON POST, Mar. 2, 2020

Akilah Wise, *The Hidden Cost of 'Stop-and-Frisk'*, BOSTON GLOBE, Feb. 21, 2020

Stoughton
*Curriculum Vitae*

Gaby Del Valle, *Cops are Swarming TikTok to Try to Destigmatize Law Enforcement*, MEDIUM, Jan. 2, 2020

Fleming Smith, *Lawsuits Against SC Law Enforcement are Becoming More Successful*, THE POST AND COURIER, Dec. 22, 2019

Andrew Boryha, *Cops Bring up Parkland to Justify Deadly Miramar Shootout. But Experts Say That's Wrong*, SUN SENTINEL, Dec. 14, 2019

Alisa Roth, *A Cry for Help Summoned the Police – And Ended in His Death*, MINNESOTA PUBLIC RADIO, Nov. 21, 2019

Milad Emamian et al, *Regulating Police Body-Worn Cameras*, THE REGULATORY REVIEW, Nov. 23, 2019

Alanna Berger, *American Police Are Not Equipped for Mental Illness*, THE MICHIGAN DAILY, Oct. 28, 2019

Television Interview, PBS NEWSHOUR, Oct. 15, 2019

*Investigation Details Shootings by South Carolina Officers*, ASSOCIATED PRESS, Oct. 4, 2019

Daniel J. Gross, *Lethal Force (Series)*, THE GREENVILLE NEWS, Sept. 30, 2019

Jessica Pishko, *How Sheriffs' Power and Autonomy Make Them Central Players for Policing Reform*, THE APPEAL, Sept. 26, 2019

Television Interview, *Patriot Act with Hasan Minhaj*, NETFLIX, Sept. 8, 2019

Lynne Peeples, *What The Data Say About Police Shootings*, NATURE, Sept. 4, 2019

Radio Interview, *Law Professor on California's New Police Use-of-Force Law*, ALL THINGS CONSIDERED, NATIONAL PUBLIC RADIO, Aug. 24, 2019

Jake Brook, *Shock Treatment in Court*, THE MARSHALL PROJECT, July 29, 2019

Jacob Sullum, *When Is Violating the Constitution by Pulling Over Motorists With No Legal Justification 'Not a Bad Thing'?*, REASON, July 29, 2019

Matt Keely, *Why is #CircleK Trending? Cops in Arizona Accused of Wanting to Pull Over Safe Drivers*, NEWSWEEK, July 29, 2019

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Antonia Noori Farzan, *A Police Department is Handing Out Coupons, Not Tickets, to People Who Follow the Law. Not Everyone is Thrilled.*, WASHINGTON POST, July 29, 2019

Matthew Richmond, *Moonlighting Cops: Frequently Allowed, Often Lightly Regulated*, KUNC, July 29, 2019

Laurel Rosenhall, *California's Attempt to Reduce Police Shootings, Explained*, CALMATTERS, July 18, 2019

Stoughton
*Curriculum Vitae*

Richard Winton & Hannah Fry, *Costco Shooting: Did LAPD Officer Face 'Imminent Threat' When He Opened Fire?*, LOS ANGELES TIMES, June 20, 2019

Uriel J. Garcia & Bree Burkitt, *Phoenix Police Shot at More People Than NYPD Did in 2018. Will That Change?*, ARIZONA REPUBLIC, June 20, 2019

Uriel J. Garcia & Bree Burkitt, *Every 5 days, an Arizona Officer Shoots Someone, a Republic Analysis Finds*, ARIZONA REPUBLIC, June 19, 2019

Marie Myung-Ok Lee, *It's Not Just the Costco Shooting. Disabled People are Often Killed by Police*, LOS ANGELES TIMES, June 19, 2019

Hannah Fry, et al., *At Cosco Food Sample Line, Gunfire, Death, and Unanswered Questions*, LOS ANGELES TIMES, June 18, 2019

Andrew Wolfson, *Failing the Sniff Test? Narcotics Searches Spurred by Drug Dogs Often Come Up Empty*, LOUISVILLE COURIER JOURNAL, June 13, 2019

Samantha House & Douglass Dowty, *4 Experts on Justification for Forceful Arrest: A 'Tad Fictional' or No Other Choice?*, SYACRUSE.COM, June 13, 2019

Andrew Wolfson, *'You're Going to Do What I Tell You.' Stats Don't Lie, Black Louisville Drivers Get Searched More Often,* LOUISVILLE COURIER JOURNAL, June 7, 2019

Sheila Dewan and Richard A. Oppel, Jr., *We Expect Police to Be Brave For Us. But What Happens When They're Not?*, THE NEW YORK TIMES, June 5, 2019

Radio Interview, BBC WORLD SERVICE, June 5, 2019

Laurel Rosenhall, *Deal: California Poised to Pass One of the Nation's Toughest Police Use-of-Force Standards*, CALMATTERS, May 23, 2019

Don Thompson, *APNewsBreak: Police Won't Fight California Use-of-Force Bill*, THE WASHINGTON POST, May 23, 2019

Marco della Cava, *Fatal Police Shootings Could Become a Crime Under Proposed California Law*, USA TODAY, May 18, 2019

Rafael Olmeda & Juan Ortega, *Cops Crossed the Line in Teen's Brutal Arrest, Experts Say*, SUN SENTINEL, May 11, 2019

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Brooke Baitinger, *Sanibel Officer Remember as Excellent Officer, Better Person, Chief Says*, FORT MEYERS NEWS-PRESS, May 10, 2019

Samira Sadeque, *This Database is Tracking Police Brutality Across the U.S.*, THE DAILY DOT, Apr. 26, 2019

Dana Sharif, *Policing the Police: Database of Corrupt Cops Opened to Public View*, THE ROOT, Apr. 25, 2019

Stoughton
*Curriculum Vitae*

John Kelly and Mark Nichols, *We Found 85,000 Cops Who've Been Investigated for Misconduct. Now You Can Read Their Records.*, USA TODAY, Apr. 25, 2019

Ames Alexander and Anna Douglas, *Under Criticism, Charlotte Police Push to Get Faster Medical Help to Shooting Victims*, CHARLOTTE OBSERVER, Apr. 25, 2019

Steve Harrison, et al., *CMPD Releases Full 11-Minute Video of Danquirs Franklin Shooting*, WFAE (NPR), Apr. 24, 2019

*Was Charlotte Officers' Fatal Shooting of Man Justified?*, THE CRIME REPORT, Apr. 16, 2019

Ames Alexander, *For Years, CMPD Has Pledged Improved Training.  It Hasn't Been Enough, Activists Say*, CHARLOTTE OBSERVER, Apr. 16, 2019

*Raw Body Cam Video of Burger King Shooting in Charlotte*, WCNC (NBC), Apr. 15, 2019

Ames Alexander, *CMPD Shooting is Legally Justified, Some Experts Say, But Raises 'Serious Question'*, CHARLOTTE OBSERVER, Apr. 15, 2019

Meg Anderson, *How One Mother's Battle is Changing Police Training on Disabilities*, ALL THINGS CONSIDERED, NATIONAL PUBLIC RADIO, Apr. 13, 2019

Andrew Wolfson, *LMPD Handcuffed a Black Teen for a Wide Turn, Then Told Him to 'Quit With the Attitude*, LOUISVILLE COURIER JOURNAL, Apr. 4, 2019

*Cracking Down on Deadly Force: How 3 California Police Departments Overhauled Their Policies*, GOVERNING, Mar. 27, 2019

Tony Bartelme & Joseph Crannery, *SC Sheriffs Fly First Class, Bully Employees and Line Their Pockets with Taxpayer Money*, THE POST & COURIER Mar. 16, 2019

John Woolfolk and Nice Savage, *Would Changes to California Law Alter How Police Use Deadly Force?*, MERCURY NEWS, Mar. 6, 2019

Angela Rogers, *Excessive Force in Question: Florence County Sheriff Says, "Our Officers Did Nothing Wrong"*, ABC COLUMBIA, Mar. 1, 2019

Tom Lyden, *Minute by Minute: Anatomy of a Use of Force Incident*, FOX 9 (Minnesota),  Feb. 25, 2019

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Tom Lyden, *Ramsey County Jailer Accused of Excessive Force to Resign*, FOX 9 (Minnesota),  Feb. 25, 2019

Cheryl Hinneburg, *Video Released: AZ Cop Tases Man 11 Times, Including His Bare Testicles*, AMERICAN MILITARY NEWS, Feb. 12, 2018

Dave Biscobing, *Abuse of Force: Body Camera Video Shows Man Tased 11 Times by Glendale Officers*, ABC NEWS 15 (Arizona), Feb. 8, 2019

Stoughton
*Curriculum Vitae*

Dave Biscobing, *Experts Break Down Glendale Officer's Body Camera Footage Obtained by ABC15*, ABC News 15 (Arizona), Feb. 8, 2019

Tanvi Misra, *The Suburbanization of American Arrests*, CITYLAB, Feb. 4, 2019

Mark Pace & Rosana Hughes, *Two Chattanooga Police Officers Fired for Misconduct, Third Resigns During Disciplinary Hearings*, TIMES FREE PRESS, Jan. 31, 2019

Bree Burkitt, *14-Year-Old Tempe Police Shooting Victim Youngest in Nearly a Decade*, ARIZONA CENTRAL, Jan. 18, 2019

Jordan Heller, *Seeking Charges for Crime 'Witnessed' Via a Social Media Posting*, WASHINGTON POST, Jan. 4, 2018

Isidoro Rodriguez, *How to Find the Cops America Needs*, THE CRIME REPORT, Jan. 3, 2019

*FBI Database to Track Deadly Encounters with Police*, LOS ANGELES SENTINEL, Dec. 20, 2018

Karen Savage, *Sheriff's Deputies Protect Corporate Interests in Bayou Bridge Case*, TRUTHOUT, Dec. 12, 2018

Maya Lau et al., *A Killing at a Gas Station, a Videotape and an Extraordinary Prosecution Against a Deputy*, LOS ANGELES TIMES, Dec. 12, 2018

Craig McCarthy and S.P. Sullivan, *N.J. Rocked by Release of Police Force Records, Spurring Town Meetings, Calls for Action and Promises of Reform*, NJ.COM, Dec. 6, 2018

Breanna Edwards, *FBI To Create National Database To Track Deadly Police Encounters*, ESSENCE, Dec. 2, 2018

Shenequa Golding, *The Federal Government to Launch Database Tracking Deadly Police Encounters*, VIBE, Dec. 2, 2018

Star Ledger Editorial Board, *Who Are the Roughest Cops in N.J.? Red Flag Them Before They Cost Us*, NJ.COM, Dec. 2, 2018

Lana Ferguson, *One Bluffton Cop Used Drugs, Another Gave a Minor a Beer. They Might Not Be Hired Today*, THE ISLAND PACKET, Dec. 1, 2018

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Jay Connor, *Black Lives Finally Matter? The FBI Will Launch a Database to Keep Track of Deadly Police Encounters*, THE ROOT, Dec. 1, 2018

*FBI Database to Track Deadly Encounters with Police*, ASSOCIATED PRESS, Nov. 30, 2018

Craig McCarthy & S.P. Sullivan, *For 17 Years, N.J. Had the Chance to Stop Potentially Dangerous Cops. The State Failed to Do It.*, NJ.COM, Nov. 29, 2018

– 30 –

Stoughton
*Curriculum Vitae*

Cody Dulaney, *Walmart Calls Columbia Police Nine Times a Day.  You Pay the Bill*, THE STATE, Nov. 15, 2019 (front-page article)

The Times-Union Editorial Board, *Police Body Cameras are a Plus, Not a Panacea*, THE FLORIDA TIMES-UNION, Nov. 15, 2018

Uriel Garcia et al., *Mesa Officers Rarely Disciplined in Excessive-Force Investigations, Police Data Show*, ARIZONA REPUBLIC, Nov. 13, 2018

Melissa Ross, *Professor Says Use of Body Cameras is Expanding Fast*, WJCT (Jacksonville NPR Affiliate), NOV. 6, 2018

Anne Shindler, *Expert: Body Cams 'Just a Tool,' Not a Perfect Source of Information*, ABC NEWS (FIRSTCOAST), Nov. 6, 2018

Jenna Bourne, *Body Camera Expert Trains Jacksonfille Prosecutors on How to Interpret Footage*, CBS 47/FOX 30 (Jacksonville, FL), Nov. 5, 2018

Erick Avanier, *Police Body Cameras: Do They Tell the Whole Story?*, NEWS4JAX, Nov. 5, 2018

*Several JSO Officers Now Wearing Body Cameras*, NEWS4JAX, Nov. 5, 2018,

Radley Balko, *'If You Don't Get at That Rot, You Just Get More Officers like Josh Hastings'*, THE WASHINGTON POST, Nov. 2, 2018

Candice Norwood, *2 Cop Convictions in 2 Months: Is This a Tipping Point in Police Accountability?*, GOVERNING, Oct. 16, 2018

Amir Vera, *Should Police Use of Force be Regulated? The Answer Isn't Simple, and That's a Problem*, CNN, Sept. 30, 2018

Marsha McLeod, *Police Policy Seen as Lacking on De-Escalation*, INVESTIGATIVE POST, Sept. 19, 2018

Kathryn Varn & Zachary T. Sampson, *Why Video Makes this Florida Stand Your Ground Debate Different*, TAMPA BAY TIMES, Aug. 24, 2018

Martha Waggoner & Jonathan Drew, *Confederate Toppling Looms Over Debate about Other Statutes*, ASSOCIATED PRESS, Aug. 21, 2018

**SELECTED MEDIA INTERVIEWS & APPEARANCES 2018-PRESENT (CON'T)**

Tess Owen, *When Can Cops Legally Shoot Someone Running Away from Them?*, VICE NEWS, Aug. 2, 2018

Joseph Serna *et al.*, *A Wild Chase, a Gun Battle, then Tragedy as Officer's Bullet Kills Trader Joe's Employee*, LOS ANGELES TIMES, July 25, 2018

Capital Center for Law & Policy, *University of South Carolina Law Professor Seth Stoughton Points Out Ways to Strengthen AB 931*, CAP IMPACT, July 6, 2018

Debra Erdley, *Why Police Officers are Rarely Convicted in Shootings*, TRIBUNE REVIEW, July 1, 2018

Stoughton
*Curriculum Vitae*

Sara Libby & Andrew Dyer, *Sacramento Report: Police Shooting Bill Moves Forward, With Some Changes*, VOICE OF SAN DIEGO, June 22, 2018

Michael Balsamo, *LAPD's Highly-Produced Body Camera Video Draws Scrutiny*, THE SEATTLE TIMES, June 21, 2018

Annie Ourso Landry*, Crime Prevention Districts are Popular in Baton Rouge, But Do They Work?*, BUSINESS REPORT, Apr. 25, 2018

Teddy Kulmala, *6 Shooting Victims in 6 Years. What More Can Be Done to Make Five Points Safer?*, THE STATE, Apr. 13, 2018

Sarah Burns, *South Carolina Won't Release Names of Killer Cops – Unless They're Charged with a Crime*, RAWSTORY, Apr. 4, 2018

Alan Greenblatt, *Why There Are So Many Bad Sheriffs*, GOVERNING, Apr. 2018

Jessica Mendoza, *At Stephon Clark Funeral, a Familiar Story Amplifies Drumbeat for Change*, THE CHRISTIAN SCIENCE MONITOR, Mar. 30, 2018

Amir Vera, *Officers Muted Body Cameras in Stephon Clark Shooting. Why?*, CNN, Mar. 26, 2018

Jonathan Drew, *Despite Arrest, Police Beating Shows Technology Shortcomings*, WASHINGTON POST, Mar. 10, 2018

Jonathan Drew, *Police Beating Case Shows Body Camera Use Shortcomings*, FOX NEWS, Mar. 9, 2018

Jim McKay, *Does Arming Police with Semi-Automatic Rifles Make a Community Safer?*, EMERGENCY MANAGEMENT, Mar. 8, 2018

Ian Duncan & Luke Broadwater, *Baltimore Might Not Be Able to Avoid Paying for Lawsuits Linked to Corrupt Gun Trace Task Force Squad*, BALTIMORE SUN, Feb. 15, 2018