# EXHIBIT 2

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
              Plaintiff,         )
                                 )
         vs.                     ) No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
              Defendant.         )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

SETH W. STOUGHTON
_____

Columbia, South Carolina


(All participants appeared via videoconference.)




DATE TAKEN:   AUGUST 30, 2022
REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 32

1       A.   Oh, not off the top of my head, no.

2       Q.   Do you recall -- do you know what kind of

3   neighborhood there was around the Zuccotti Park protest?

4       A.   I believe it's a financial work district, but I

5   will admit that my knowledge of New York geography is --

6   is limited.

7       Q.   Okay.  I guess generally, what -- what is

8   your -- what is your -- have you -- have you personally

9   studied protests and anti-police protests and police

10  responses to those protests?

11      A.   Yeah.  First as an officer.  I spent two years

12  on my department's special response team, which was our

13  riot response and crowd control team.  So we got

14  advanced training in the strategy and tactics of crowd

15  control and riot response.

16           Then as an academic, although I haven't written

17  extensively on the topic, it's certainly been within my

18  field of study, focusing on police tactics and use of

19  force.

20      Q.   Well, have you specifically gone back and

21  looked at large-scale protests and police responses to

22  those protests?

23      A.   Yes.  Some of the -- the debriefing reports,

24  including the ones recently, after the 2020 protests,

25  the sort of collective George Floyd protests, some of

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 33

1   the historical reports, yes.

2        Q.   Other than twenty -- other than the 2020

3   reports, what -- what sort of investigation or study

4   have you done of protests prior to 2020 and police

5   responses to those protests?

6        A.   Oh, boy.   I've read a pretty good amount on

7   protest policing as it is written about in academic

8   circles, scholars like Ed McGuire, for example.   I've

9   also read about some specific protests just kind of

10  offhand:   the police response to the WTO protests, the

11  police response to Rodney King, police response to

12  Ferguson, police response to Overtown, or Overton -- I

13  think it's Overtown, police response to a number of the

14  civil rights protests, police response -- this is now

15  backing up even further -- police response to labor

16  protests in the organized labor movement around the turn

17  of the last century, police response to some of the race

18  protests, and now we're talking about eighteen -- 1860s

19  to 1880s, and the reconstruction era.

20             I -- I'm sure there are some specific others,

21  but those are all ones that I've -- I've read about or

22  studied whatever materials are available.

23        Q.   Okay.   We've mentioned a few times the WTO

24  protests in Seattle, and they were in November and

25  December of 1999.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 34

1      What do you know specifically about those
2  protests?
3      A.  Oh, offhand?  I mean, I haven't -- I haven't
4  reviewed any materials about them specifically in
5  preparation for this, but the WTO protests were an
6  interesting -- now, in retrospect.  At the time they
7  probably were not particularly interesting.
8         But in retrospect, they're interesting because
9  they mark one of the first large-scale protests where
10 you have such a broad diversity of interests in the
11 people who are protesting.
12        So this really marked, I think, the first
13 large-scale protest where negotiated consent failed as a
14 matter of strategy in dealing with protesters.
15 Introduced policing, for example, to an anarchist
16 protest movement that's now referred to as the
17 black bloc.  I think at the time it was referred to as
18 the black bloc.
19        And police officers and the agency, as a whole,
20 had to really distinguish between different -- let's
21 say -- different groups of protesters is a little hard,
22 but protesters who were engaged in legally different
23 behavior or who were protesting for very distinct
24 reasons.
25        The -- how much do you want me to get in -- I'm

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 35

1    speaking totally off the cuff about this.  I really have
2    not prepared a lecture on the WTO protests specifically,
3    but that's what sticks out at me first.
4         Q.  Well, first of all, we should just establish
5    for the record, those protests were in Seattle; right?
6         A.  Yes.
7         Q.  And you -- would you agree --
8         A.  At the --
9         Q.  -- they happened in the late part of 1999?
10        A.  That sounds right.  I mean, if -- if -- yes,
11   I -- offhand, I think that's certainly within the realm,
12   but I don't remember exactly when.
13        Q.  And would you agree that at least some of
14   the -- some of the elements in the protests that you
15   described were anti-police in nature?
16        A.  I don't think the sources I'm familiar with
17   suggest that there were a whole lot who were
18   specifically anti-police.  There were a number who were
19   anti-government or anti-organized government, and I
20   would include the police in that.
21             That's sort of the anarchist black bloc
22   movement.  I think they -- they would probably be
23   protesting any exercise of government control, including
24   police exercise of government control.
25        Q.  Do you remember, during the WTO protests, there

Hunters Capital, LLC v. City of Seattle                     Seth W. Stoughton

Page 37

1   to -- as opposed to doing what a number of agencies had

2   previously done, which is just throw a bunch of officers

3   into the field and put them on a line.

4        Q.  Now, you said earlier you thought maybe they

5   had ceded territory during the WTO protests.  Do you

6   know specifically whether they did?

7        A.  Offhand, I -- I don't.  I'm pretty sure that

8   with the -- I'm pretty sure that I remember that there

9   was an ebb and flow of where the police were engaging

10  protesters, and that they had to reengage protesters at

11  the same location several times, but I -- I don't

12  remember offhand.

13       Q.  Do you remember whether the Seattle Police

14  Department abandoned any precincts during that period?

15       A.  I don't believe the precincts were targeted by

16  the protesters in the protest.  I'm pretty sure they did

17  not evacuate any of the precincts.  They might have been

18  empty because they had all of the officers on the line,

19  but I -- I don't believe that they were evacuated

20  because of the protests.

21       Q.  So do you know -- do you know anything that was

22  going on with the WTO and the West Precinct -- the WTO

23  protests and the West Precinct and the location of the

24  West Precinct at that time?

25       A.  Offhand, no.  Like I said, I didn't -- I didn't

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 38

1    prepare any of that specifically for the deposition, so

2    offhand, no.

3         Q.  Well, aside from the deposition, have you

4    looked at that at all?

5         A.  I -- I'm sure I have as part of reading about

6    and studying the -- the incident.  I just don't remember

7    it offhand.

8         Q.  Okay.  Do you know whether the Seattle Police

9    Department stopped providing services to the portion of

10   downtown Seattle that was occupied by protesters during

11   the WTO?

12        A.  I'm sorry; whether they stopped -- say again,

13   please?

14        Q.  Providing services.

15        A.  I'm -- offhand, again, I do not.  I suppose it

16   depends on -- on what we mean by that, but no, I --

17   offhand, I don't.

18        Q.  Do you know whether they created anything

19   similar to the red zone in 1999 in response to the WTO

20   protests?

21        A.  Oh, there were definitely protest lines, but

22   I -- how do you mean, similar to the red zone?

23        Q.  Do you know whether they were restricting

24   in-person responses by police to certain crimes that

25   might have been occurring in the red zone in 1999?

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 87

1      Q.   Now -- actually, I'll get to that later.

2           So I'd like to go to your opinions that start

3   on Page 24.

4      A.   Okay.

5      Q.   And I want to ask you first about your -- your

6   first numbered opinion, which is that the initial

7   decision to evacuate the East Precinct was reasonable

8   and tactically appropriate and consistent with generally

9   accepted principles in policing.

10     A.   Yes.

11     Q.   What -- what is the -- what generally accepted

12  principles in policing are you referring to and relying

13  on with regard to this opinion?

14     A.   Oh, there are a number of them, as I -- as I

15  lay out in the opinion.  One of them is the -- the sort

16  of priority list.  Right?  Preservation of human life,

17  both the officers and -- well, in priority order,

18  innocent bystanders first, officers second, and criminal

19  suspects a somewhat distant third.

20          Another of which is what is now probably

21  50 years of tactical principles, everything from

22  conflict avoidance to tactical withdrawal to really the

23  theory of how police officers and agencies manage risk.

24          Another generally accepted practice is -- or

25  principle, excuse me, is just working within the

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 88

1   constraints that you have.  Police departments have to

2   be very practically minded.  They -- you know, you may

3   want the world to be a -- a particular way, but as I

4   believe a military general said, you fight the war with

5   the resource- -- no, I'm sorry.  That was Rumsfeld,

6   wasn't it?  You fight the war with the resources you

7   have, not the -- or the Army you have, not the Army you

8   wish you had.

9          There -- there are probably more particular

10  principles that we can get into, concepts of imminent

11  threat, for example.  But at a broad level, the concepts

12  are how to balance -- or the principles, the generally

13  accepted principles, is how police departments should

14  think about balancing different competing priorities in

15  high-pressure incidents.

16      Q.  Okay.  So in any of those sources that you've

17  talked about, is there anywhere where evacuation of a

18  police facility has been used or suggested to be used as

19  a way to manage risk of harm to either the public or to

20  officers?

21      A.  No.  So that's -- I'm distinguishing here

22  between generally accepted principles and practices,

23  like specific things that you do.  I'm not aware of any

24  resource that talks about the generally accepted

25  practice of evacuating a police department.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle            Seth W. Stoughton

Page 94

1    protesters over a prolonged period.  There are no

2    simply -- there are no generally accepted tactical

3    protocols to guide police decision-making under such

4    circumstances."

5              Do you see that?

6        A.  Yes.

7        Q.  And I think we talked about the first sentence

8    already, unless you have something you want to add.  But

9    my question is this:  So you're saying there's no

10   generally accepted tactical protocols to guide police

11   decision-making in these circumstances; is that correct?

12       A.  Yes.

13       Q.  And yet you're able to reach the conclusion

14   that the police department acted in -- consistently with

15   generally accepted police practices; is that right?

16       A.  No.  With principles.

17       Q.  With principles.  Okay.  Just so --

18       A.  Yes.

19       Q.  Elaborate on that for me, please.

20       A.  Yeah, so what I'm --

21       Q.  How those are not inconsistent?

22       A.  Yeah, so what I'm talking about, when I say

23   generally accepted police principle, it's a -- it's --

24   it's abstract.  It's conceptual.  It's, you know,

25   something like preservation of human life is our highest

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 95

1   priority.

2        That isn't a guide that specifies in any given

3   situation how to act.  It's instead a principle that, in

4   any given situation, you can refer to, to assess, okay,

5   how should we be reacting.  Right?  We should be

6   responding according to this generally accepted

7   principle.

8        A practice or a protocol is specific.  It's

9   granular.  So for example, in a felony stop situation or

10  a high-risk stop situation, like when an officer pulls

11  over a car that he believes to be occupied by an armed

12  robber or something like that, there is a set of

13  generally accepted protocols or practices that tell an

14  officer in some degree of detail, not exhaustive detail,

15  but in some degree of detail, step one, do this; step

16  two, do that; step three, do this other thing.

17       Now, those protocols are written with those

18  tactical principles in mind, but instead of being as

19  amorphous or as abstract, is really a better word, as

20  the principles, they are specific guidance.

21       Now, again, in any given situation, maybe you

22  can't employ the specific guidance and you have to fall

23  back on the principles, but as a general matter, we have

24  situations where there are specific protocols or there

25  are specific practices that we expect officers to engage

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 96

1   in.

2          When those are lacking, when you don't have

3   specific guidance, this is exactly what you're supposed

4   to do.  We instead say, okay, so what are the principles

5   that should guide your decision-making?

6          I'll take a very simple example.  An officer is

7   trying to arrest someone who pulls away from them.

8   There are a lot of protocols.  You can do an arm bar

9   takedown or a foot sweep takedown, or you can allow the

10  person to run and you can chase them while you call in

11  other officers, all kind of depending on -- on which

12  situation presents itself.

13         But in the absence of that specific protocol,

14  this is what you should do, you say, okay, well, what am

15  I supposed to do here?  I'm supposed to try and preserve

16  life, apprehend criminal offenders.

17         So I want to do the thing that will minimize

18  the amount of harm while still allowing me to engage in

19  the law enforcement objective of apprehending this

20  person.

21         So just think of generally accepted principles

22  and specific protocols or practices as different levels

23  of abstraction.  I think that -- that's a little

24  academic, I apologize, but I -- I think that's the most

25  hopeful way to think about it.

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 97

1       When you look at policy papers, like what the
2   I -- sorry -- the International Association of Chiefs of
3   Police puts out in their policy papers, it's often
4   principle.   When you look at some of their model
5   policies, sometimes that's principle.   Sometimes it's
6   practice or protocol.
7       In this case, we don't have any protocols or
8   practices.   You can't go to the police manual, whatever
9   that would look like, and, you know, flip to the, my
10  precinct is being besieged by confrontational protesters
11  page and just follow the step-by-step instructions.   So
12  you have to fall back on the principles.
13       Q.   Okay.   So are these principles -- are these
14  principles you're talking about ever informed by what
15  police -- police have done in the past, as far as their
16  practices?
17       A.   Sure, in part.   Often it's the protocols that
18  are -- that are most specific in drawing lessons from
19  specific past actions.   How we call in a traffic stop,
20  or how you respond to an active shooter.   There was
21  something that went bad, and we learned a lesson from it
22  and we adapted the protocol.
23       The principles can -- can be, so a lot of
24  tactical principles, for example, without getting to
25  level of practice, a lot of tactical principles are

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 98

1    built on now 50 years of both study and field experience

2    in the field of police tactics.  So I -- I give -- I'm

3    giving you the -- the -- I'm giving you the traditional

4    law professor answer of, it depends.

5         Q.   Okay.  So you talked about the principle of

6    risk priority.  Where is that principle embodied?  Is it

7    written down anywhere?  What's -- what's my under- --

8    what's my understand- -- what's your understanding of

9    where that principle comes from?

10        A.   Sure.  So principles, I think, arise

11   organically from the profession itself, although they

12   are often written down in some way, shape, or form, and

13   a number of -- so it -- with risk priority, and

14   particularly, let's take that first priority is the

15   preservation of human life.  That's now written down

16   kind of all over the place, in -- in -- in a -- a big

17   picture way by organizations like the Police Executive

18   Research Forum or the International Association of

19   Chiefs of Police; in a more granular way by individual

20   police departments in the form of policy statements in

21   their policy and procedure manuals; sometimes in -- even

22   things like social media statements, or the slogans on

23   the side of an officer's car, right, to serve and

24   protect communicates in some way the principles of an

25   agency.

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 99

1        Other principles are -- you know, how we
2   prioritize things, like let's go back to the -- the, you
3   know, innocent bystander's life first, officer's life
4   second, suspect -- criminal suspect's life third.
5        That will be communicated in training.  It's
6   certainly a well-established part of the culture of
7   policing.  I don't know that you would find it in a
8   policy manual.  Maybe, but I -- I -- I would tend to
9   doubt it.
10       It's one of those principles that underlie
11  policing without being specifically written down in
12  the -- you know, the 600-page policy manual that an
13  officer operates under.
14       Q.  Are you aware of anywhere where it is taught
15  that abandonment of a police precinct should be
16  considered as a tactical response to a protest?
17       A.  No.  I think it's too granular.  I'm not
18  familiar with -- with anything like that, but I'm also
19  not familiar of anywhere where it's written that, you
20  know, an officer should jump out of their car at a given
21  situation.
22       However, there are definitely situations where
23  you want an officer to jump out of their car.  I -- I
24  think it's -- it's a -- what you're asking for is a
25  search for granular practice that doesn't exist because

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 102

1   another night like the last six or seven or eight nights

2   that we just had.

3          So yeah, I don't think you need to fire to get

4   to tactical withdrawal.  Evacuating the building is a

5   tactically appropriate decision.

6          Q.  Are you aware of any case in which officers

7   have left a building if there wasn't a bomb threat, a

8   fire threat, or some other threat to the building being

9   destroyed, other than the June 8th decision that we are

10  here, where the police department decided to evacuate

11  the building?

12         A.  Yeah.  Oh, yeah.  I mean, substations get shut

13  down.  A precinct house gets moved.  There's asbestos in

14  the precinct building.

15         Q.  Okay.

16         A.  There's a high-priority call that involves a

17  bunch of officers to respond.  Like the -- leaving the

18  building is -- I'm not sure that's where you were going,

19  but --

20         Q.  Have you ever -- are you aware of any

21  situation, without a threat of fire, a bomb, or some

22  other threat to destroy the building, where police

23  officers have evacuated a building in response to a --

24  an anticipated protest?

25         A.  Offhand, no.  Focusing on that evacuated a

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 103

1   building, certainly I'm aware of buildings that have

2   been left empty because the police department needs to

3   go respond to the protest.

4           But as far as evacuating a building, no,

5   this -- this is the first one with this building being

6   besieged that I'm aware of.   That's part of why I think

7   it's unprecedented, as we talked about.

8       Q.   What is unprec- -- but you're saying that the

9   lead-up to the events were unprecedented; correct?   And

10  also the decision to evacuate the precinct was

11  unprecedented also; is that right?

12      A.   Yes.   I think that's fair, yes.

13           MR. WEAVER:   Let's go ahead and go off the

14  record.   We've been going about another hour.

15           THE VIDEOGRAPHER:   Going off the record at

16  11:28.

17           (Recess from 11:28 a.m. to 11:39 a.m.)

18           THE VIDEOGRAPHER:   Back on the record at

19  11:39.

20           E X A M I N A T I O N (Continuing)

21  BY MR. WEAVER:

22      Q.   With regard to the mayor's order that we've

23  been talking about, to stand down from the barriers and

24  let people walk by the precinct, in your experience, is

25  that typically a tactical decision that would be in the

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 109

1     A.  It would, yes.

2     Q.  I think, but I was writing as fast as I could,

3  you were talking also about the generally accepted

4  principle of alternative actions.

5         Did I get that right?

6     A.  Yeah.  So the idea here is, you look at the

7  various actions that are available.  What do your

8  resources allow you to do.  Right?  What are the

9  realistic constraints that you have and what do your

10  resources allow you to do.

11        And then it's a matter of choosing from those

12  available alternatives which one best balances or, for

13  my purposes, among the ones that reasonably balance the

14  competing priorities in any given situation.

15        Does that make sense?

16     Q.  I think so.

17        So what alternative actions did the police

18  department have, other than evacuating the precinct, in

19  your view?

20     A.  You mentioned one earlier.  Assuming the

21  resources were available, and I'm going to make some

22  assumptions here, bringing in barricades and walling off

23  the precinct and potentially staying in it.  Even

24  assuming that the barricades weren't available, just

25  staying in the building.

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 110

1          Now, to say that an option is available is not
2     to suggest that -- that it was a -- a good option or a
3     reasonable option.  It may be; it may not be.  If the
4     police thought that they could defend the building, then
5     I think it -- as we talked about before, I think it
6     would have been among the reasonable options for them to
7     potentially do so, or attempt to do so.
8          The -- maybe the best way to think of options
9     is really -- and I mentioned this idea of the spectrum
10    of reasonableness.  It's really on a -- on a spectrum.
11    Right?
12         What are all of the things that we can imagine
13    the police doing?  Well, we can -- we can probably
14    ignore the ones that are facially immoral, unethical,
15    illegal.  We can just grant that those ones are -- are
16    unreasonable.
17         So then we're left with some other set of
18    options, and we're trying to figure out what's the line
19    between the reasonable options and the unreasonable
20    options.
21         I -- sorry; I got abstract again.  Your
22    question was very specific.  What were the other
23    reasonable options that they could have done.
24         Depending on how they balanced priorities,
25    bring everyone over from the West Precinct and reinforce

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                  Seth W. Stoughton

Page 111

1    the East Precinct.  That was an available option, as I
2    understand it.
3              You know, maybe -- I don't know.  I'm kind of
4    thinking my way through this on the fly a little bit,
5    but see about skeleton sched- -- staffing, or skeleton
6    crewing the East Precinct.  Right?  Have a -- have a --
7    a good evacuation plan set up for the folks who stay in
8    the building, but don't completely evacuate it.
9              Kind of like what they did later, after the
10   July 8th decision, where they had some folks go back in
11   and were monitoring and working within the building.  So
12   a whole -- a whole kind of range of options.
13        Q.  All right.  So --
14        A.  A menu, if you will.
15        Q.  Okay.  You talked about finding the line
16   between reasonable options and unreasonable options.
17   Where do you think that existed on June 8th with regard
18   to the options about what to do with the East Precinct
19   and evacuating it or fortifying it or other options?
20        A.  Yeah, I can't -- I can't offer a specific line
21   to draw there because obviously they made the decision
22   they made, and I'm really only analyzing the decision
23   they made and not all of the decisions that they could
24   have made, but didn't.
25              But at least as a general matter, you look at

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 162

1    consideration of the evidence.

2        Q.  Well, what evidence do you believe indicates

3    that it was not foreseeable?

4        A.  Everything in the Understanding of Facts

5    section, along with, I suppose, any tidbits that I --

6    that I didn't include there, although I certainly tried

7    to include everything that I thought was relevant.

8            The -- the previous seven days of protests,

9    which did not have indications of occupation protest, or

10   did not set up an occupation protest.  Protests

11   elsewhere in the city, which were distinct from the East

12   Precinct.  And the specific actionable intelligence

13   available to the police, which focused on entering,

14   serious or significant damage to, or burning down the

15   East Precinct building.

16       Q.  Okay.  I'd like to go to your -- your next

17   opinion, which has to do with the modified police area

18   and the red zone, and whether that was consistent with

19   generally accepted principles in policing.

20       A.  Sure.

21       Q.  Starting on Page 34.  Are there any generally

22   acceptable -- generally accepted principles in policing

23   that you're relying on for this opinion that are

24   different from the principles we discussed with regard

25   to your first opinion?

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 163

1        A.   I think there is more of an emphasis on

2   principles of conflict avoidance in this opinion than

3   there are in the -- in the first opinion, but I think

4   largely the underlying principles are the same.

5        Q.   Okay.   To what extent --

6        A.   The detail and application may be a little

7   different, but I think largely they're the same.

8             Sorry.  I did the pause thing again.

9        Q.   That's all right.  I do the same thing.

10            To what extent do you think the red zone

11   decision was consistent with the policy of preserving

12   human life?

13        A.   So this is where conflict avoidance comes in.

14   Given multiple alternatives, right, as officers or as an

15   agency is considering how they're going to approach

16   something, you generally want to approach a situation in

17   a way that is likely to minimize, if not eliminate, the

18   potential for conflict.

19            Conflict is in some cases unavoidable in

20   policing, and police should not close their eyes to that

21   or plug their ears or run away or anything like that,

22   but when you can fairly avoid it, you should.  That's a

23   significant part of what police tactics are all about.

24        Q.   Okay.  I'm not 100 percent confident you

25   answered my question, so I'm going to ask it again.

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 165

1   there were protesters there.  They were peaceful,

2   although I think the -- the perception, and I think this

3   is a reasonable perception, is, they were peaceful

4   because the police were not there.

5            When you introduce the police to that -- that

6   currently peaceful protest, you end up just setting the

7   dial back a day to the violent protest, the violent

8   interaction between the protesters and the police.

9        Q.   So is it your -- is -- are you offering the

10  opinion that there was nothing the police could have

11  done to move into the area and move back to the East

12  Precinct on June 9th that would not have provoked a

13  violent response?

14       A.   No.  My opinion is that not moving back on

15  June 9th was reasonable.  Now, might it have been

16  reasonable to move back on June 9th, given appropriate

17  circumstances?  Sure.  But there can be more than one

18  reasonable option available to officers in any given

19  situation.

20            So I -- I don't think that saying that, you

21  know, it -- it was reasonable for them to take the

22  approach that it did necessarily rules out arguments

23  that other approaches were also reasonable.

24            But by the same property, the identification

25  that another approach might also have been reasonable

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 166

1    doesn't rule out the fact that this was reasonable too.

2        Q.  Other than I think when you talked about as the

3    obviously immoral-type decisions that a police

4    department could make, what would been -- have been an

5    unreasonable response on June 9th, to the people who had

6    set up the barriers and were blocking entrance to the

7    East Precinct?

8        A.  What would have been -- I mean, again, I can

9    spin out a range of hypotheticals.  You know, bringing a

10   bunch of cars up and, you know -- I don't know.

11   Again -- well, let's use the same example that I used

12   before.

13           Sending a bunch of ill-equipped officers out to

14   deal with this crowd that they now don't even have the

15   benefit of barricades to deal with.  Right?  That

16   probably would not have been a reasonable approach.

17   Sending -- well, that takes me back to reasonable.

18           You know, I think there are a range of -- of

19   possibilities.  I'll use another one that I used before.

20   Right?  Pulling a helicopter in to hover over the head

21   of the -- of the crowd and try and drive them out that

22   way probably would not have been reasonable, given what

23   I understand about the -- the -- the geography of the --

24   the location.

25           Pulling all of the officers out of the West

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle                Seth W. Stoughton

Page 167

1    Precinct and in other areas of the city so that you

2    are -- are truly unable to provide any police --

3    delivery of police services citywide because you're

4    focused on this micro incident, right, this very

5    specific location, that probably would not have been

6    reasonable.

7            I -- I can keep going as they -- as they come

8    to me, but there are a whole range of things that they

9    could have done that -- that were not reasonable, and a

10   whole range of things they could have done that were.

11       Q.   Okay.   And within the range of things that

12   would have been reasonable, there would have been some

13   responses that involved going in and retaking the East

14   Precinct that would have been reasonable and consistent

15   with generally accepted principles in policing; is that

16   right?

17       A.   Potentially, sure.   A group of well-equipped

18   officers at a time of day when there isn't a significant

19   crowd, who had the tools they need to properly, say,

20   barricade the -- the East Precinct building, to fortify

21   it the way they did later, sure, perfectly reasonable.

22           Sending in a small group of officers to surveil

23   the situation, as I understand they did, perfectly

24   reasonable.   Potentially bringing in a large group of

25   officers if the situation -- if the assessment had

dd62d62b-83ec-4de7-945d-abadf92b8181

Hunters Capital, LLC v. City of Seattle          Seth W. Stoughton

Page 168

1    changed.  Right?  Okay.

2           Now we've -- the FBI has come out and said that

3    we've debunked that whole fire thing, and the chatter

4    about destroying the East Precinct, it's from people

5    over in New Jersey, so we don't even have to worry about

6    that.  Right?  We don't have credible intelligence that

7    the -- the building itself is in danger.

8           Well, that changes the context of the

9    situation.  So sure, go back in.  Yeah, there are a

10   range of options under the precise circumstances, or as

11   we manipulate variables, that very well could have been

12   reasonable.

13       Q.  Okay.  Is this occupation protest another

14   situation where you would say that there is no generally

15   accepted -- no generally accepted tactical protocols to

16   decide police decision-making in these circumstances?

17       A.  Occupation protests are really tough.  I think,

18   again, there are principles, but not protocols, except

19   in the tactical communication world.  So for example,

20   how you set about trying to negotiate.  Not always

21   successful, but how you set about doing so, there are

22   some -- some good protocols for that.

23           But occupation protests are either really old,

24   think of like the student occupation protests in the

25   Vietnam war era, or they are relatively new, like the

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 172

1    the interaction with occupation protesters.

2          I would have to look more extensively at

3    specific occupation protests to identify how -- how

4    strong or how weak the analogy is, but offhand, I'm not

5    aware of any that -- that took this exact approach.

6          In part, that's because of lack of highly

7    detailed familiarity with the police response to some of

8    those protests.  What I -- when I have read about or

9    studied some of the police responses, it wasn't -- yeah.

10   What protocols did they come up with, with answering

11   calls for service?  It's really more, you know, where

12   were they positioned, what were the communication

13   strategies, what worked and what didn't.

14         Q.  Okay.  So you're not aware -- you're not aware

15   of any place that has -- any other department that has,

16   in response to an occupation protest, decided not to

17   respond to calls for service other than for critical

18   life safety emergencies, at least respond in person to

19   the point of the call; is that right?

20         A.  Offhand, I am not.  I'm certainly aware of

21   changes to the way that they provide policing services,

22   the way they deliver policing services, but not any that

23   mirror the changes in Seattle.

24         Q.  Okay.  Does that play in at all to your de- --

25   into your consideration of whether this is in acceptance

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Hunters Capital, LLC v. City of Seattle          Seth W. Stoughton

Page 173

1  with generally accepted principles in policing?

2      A.  Sure.  It's certainly relevant.  What have

3  other agencies done in light of the circumstances that

4  they've faced, as I understand them.  It -- it -- I

5  mean, it's all kind of relevant.  What happens in the

6  industry?  What is the generally accepted approach here?

7  And what are the principles that underlie the generally

8  accepted approach, if there is a generally accepted

9  approach?

10      Q.  If a police policy is unprecedented, does that

11  make it more or less likely that it's in accordance with

12  generally accepted principles in policing?

13      A.  Oh, I don't think I can fairly answer that

14  question.  It really depends on the nature of the policy

15  and the situation in which it's been adapted, or

16  adopted, depending on whether the policy is an adaption

17  of what you're already doing or whether you're really

18  adopting an entirely new thing.

19          I -- I don't think anyone could say, oh,

20  they're doing something different, so it is likely to

21  not be or it is likely to be consistent with policing

22  principles.  It kind of depends on the specifics.

23      Q.  Okay.  And again, I just want to make clear

24  that you're not giving the opinion that the First

25  Amendment required the adoption of the red zone in order

Hunters Capital, LLC v. City of Seattle                    Seth W. Stoughton

Page 192

C E R T I F I C A T E

STATE OF WASHINGTON

COUNTY OF PIERCE


        I, Cindy M. Koch, a Certified Court Reporter in

and for the State of Washington, do hereby certify that

the foregoing transcript of the deposition of Seth W.

Stoughton, having been duly sworn, on August 30, 2022,

is true and accurate to the best of my knowledge, skill

and ability.

        IN WITNESS WHEREOF, I have hereunto set my hand

and seal this 1st day of September, 2022.




        _____

        CINDY M. KOCH, CCR, RPR, CRR #2357


My commission expires:

JUNE 9, 2026