# EXHIBIT 1

# EXPERT OPINION REGARDING THE ACTIONS OF THE SEATTLE POLICE DEPARTMENT REGARDING THE EAST PRECINCT AND THE OCCUPATION OF CAPITOL HILL IN JUNE 2020

**SUBMITTED TO:**  Mr. Tyler S. Weaver
Calfo Eakes LLP
1301 Second Avenue, Suite 2800
Seattle, WA 98101

June 2, 2022

**PERTAINING TO:**  HUNTERS CAPITAL, LLC, *et. al.*,

Plaintiffs

 v.

CITY OF SEATTLE,

Defendant.

Case No.: 2:200-cv-00983-TSZ

United States District Court
For The Western District of Washington

**PREPARED BY:**  Dr. Jon M. Shane
jmsnpd@gmail.com

STATEMENT OF QUALIFICATIONS AND BASIS OF OPINION

*Employment Record*

My name is Jon M. Shane. I am a professor of criminal justice at John Jay College of Criminal Justice, which is located at 524 W. 59th Street, New York, NY, 10019. I have been a member of the faculty in the Department of Law, Police Science and Criminal Justice Administration since January 2009. I teach graduate and undergraduate courses related to criminal justice with a concentration in policing. I also conduct research on policing. My expertise is police policy and practice and the theoretical underpinnings of the police, which are reflected in my teaching and research. My other teaching and research interests are situational crime prevention, social disorganization theory, routine activities theory, violent crime and criminal justice statistics, particularly how statistics are used in criminal justice. In my capacity as a professor, I regularly consult with attorneys and law enforcement agencies around the country and internationally on police policy and practice issues and training programs.

Prior to my faculty appointment I had a career in law enforcement in both civilian and sworn capacities from December 1985 to December 2005, retiring at the rank of captain from the Newark (NJ) police department. I began my law enforcement career on December 2, 1985 as a police dispatcher for the Clifton, New Jersey police department. On March 20, 1989, I became a police officer for the Newark, New Jersey police department. I held several positions throughout my career in both operational and administrative assignments. I was promoted to sergeant in June 1995; lieutenant in July 1998; captain in September 2000. On January 21, 2005, I was notified by the New Jersey Department of Personnel that I was eligible and qualified to be promoted to deputy chief according to state standards (certification # PL050068, January 14, 2005). The majority of my career was spent in both operational and administrative assignments drafting, reviewing or implementing policy for the Newark Police Department. In these roles I created, revised or reviewed policies and implementation orders governing the administration and operations of the Newark Police Department. I also provided direct advice and consultation with the Police Director, Chief of Police and other command staff members regarding agency policy that was based on research, trends and best practices in U.S. law enforcement. Throughout my career I supervised or managed police officers and other supervisors as they conducted criminal investigations, including homicide cases.

I began my research and teaching career in 2005 as a lecturer and an adjunct professor of criminal justice at Rutgers University and Fairleigh Dickinson University. Table 1 is a summary of

my employment from 1985 to present; table 2 is a summary of my training, education and professional development, and table 3 is a summary of my related employment and experience. My curriculum vitae is attached as Appendix A.

**Table 1**
*Summary of Employment Record*

| Date | Agency | Assignment | Position |
|---|---|---|---|
| January 2009 Present | John Jay College of Criminal Justice, New York City | Department of Law and Police Science | Associate Professor |
| 2005/2008 | Rutgers University, Newark, NJ | Newark College of Arts and Sciences | Lecturer |
| Spring 2005 | Fairleigh Dickinson University, Teaneck, NJ | School of Administrative Science, Petrocelli College | Adjunct Professor |
| August 2004 December 2005 | Newark (NJ) Police Department | Office of the Chief of Police, Command Operations Center | Command Staff |
| April 2004 August 2004 | | Operations Bureau, North District Station | Commanding Officer |
| August 2002 April 2004 | | Office of the Police Director, Office of Policy and Planning | Commanding Officer |
| June 2002 August 2002 | | Operations Bureau, East District Station | Commanding Officer |
| January June 2002 | | Office of the Police Director, Office of Policy and Planning | Commanding Officer |
| April 2000 January 2002 | | Office of the Police Director, Office of Policy, Planning and Technology | Commanding Officer, Management Information Systems |
| July 1999 April 2000 | | Operations Bureau, North District Station | Tour Commander |
| July 1998 July 1999 | | Office of the Police Director, Office of Policy and Planning | Executive Officer |
| September 1997 July 1998 | | Office of the Police Director | Special Assistant to the Police Director |
| May 1997 September 1997 | | Criminal Investigation Bureau, Violent Crime Division | Homicide Section Supervisor |
| June 1995 September 1995 | | Field Operations Bureau, East & West District Police Stations | Field Supervisor |
| August 1994 September 1997 | | Field Operations Bureau, Emergency Response Team | Operator and Team Supervisor |
| March 1993 May 1997 | | Office of the Police Director, Research, Analysis and Planning | Detective |

**Table 1**
*Summary of Employment Record*

| Date | Agency | Assignment | Position |
|------|--------|------------|----------|
| | | Division | |
| November 1992 March 1993 | | Special Investigation Bureau, Special Projects Section, TARGET Team | Police Officer |
| August 1989 November 1992 | | Field Operations Bureau, South District Station | Police Officer |
| March 1989 August 1989 | | Office of the Chief of Police, Police Academy | Police Recruit |
| December 1985 March 1989 | Clifton (NJ) Police Department | Communications Division | Police Dispatcher |

*Education and Professional Development*

I hold a baccalaureate degree (October 2002), Master of Arts degree (January 2005) and doctoral degree (October 2008) in criminal justice from Rutgers University. I also hold a certification in non-profit management (August 2004) from Rutgers Graduate School of Public Administration. During my law enforcement career, I attended three senior management programs for police leadership: 1) 193rd Session of the FBI National Academy (April 5 – June 19, 1998); 2) 25th Session of the Senior Management Institute for Police (June 21, 2001); and 3) Police Foundation Visiting Police Fellowship program, Washington, D.C. (January – June 1997).

The FBI National Academy is a professional course of study for U.S. and international law enforcement leaders that serves to improve the administration of justice in police departments in the United States and abroad and to raise law enforcement standards, knowledge, and cooperation worldwide. The Senior Management Institute for Police (SMIP) is a program of the Police Executive Research Forum that provides senior police executives intensive training in the latest management concepts and practices used in business and government. SMIP promotes general management theory, policy development, planning processes, organizational structure and behavior. The Visiting Police Fellowship program at the Police Foundation affords police leaders the opportunity to work with nationally recognized experts in policing, police policy, and research. The program allows the fellow to benefit from the specialized skills of individual relationships and exposure to state-of-the-art ideas that promote professional growth through research, training and technology.

During my tenure in the Newark Police Department, I was a state certified police academy instructor (April 15, 1993 – December 31, 2004) and a member of the Newark Police Emergency

Response Team (December 1994 – September 1997).  In my capacity as a police academy instructor, I taught various courses to recruit-level and in-service personnel including agency rules and policy, search and seizure, use of force, chemical agents and tactics.  In my capacity as an ERT member and supervisor I was trained as a chemical agents instructor by the FBI and taught recruit-level and in-service personnel on the types, effects and consequences of chemical agents.

My training sessions often combined classroom and practical exercises to add dimension and depth to the classroom material.  Practical exercises allow trainees to directly apply the knowledge, skills and abilities they acquired in the classroom to live sessions in a supervised manner.  This gives the trainee immediate feedback and critique about the consequences and effects of their actions through a range of simulations that are designed to add as much realism and literal truth as possible to the exercise.  Table 2 is a summary of my professional development.

**Table 2**
*Summary of Education and Professional Development*

| Date | School | Degree or Certificate |
|---|---|---|
| October 1, 2008 | Rutgers School of Criminal Justice, Newark, NJ | Doctorate, criminal justice |
| January 17, 2005 | Rutgers School of Criminal Justice, Newark, NJ | Master of Arts, criminal justice |
| August 31, 2004 | Rutgers Graduate School of Public Administration, Newark, NJ | Certificate, non-profit management |
| October 1, 2002 | Rutgers University, University College, Newark, NJ | Bachelor of Science, criminal justice |
| June 21, 2001 | Police Executive Research Forum, Harvard University John F. Kennedy School of Government, Senior Management Institute for Police—Session 25, Boston, MA | Certificate of completion |
| November 3, 1998 | Value-Centered Leadership: Ethics, Values and Integrity, International Association of Chiefs of Police, Newark, N.J. | Certificate of completion |
| April  5, 1998 June 19, 1998 | Federal Bureau of Investigation, FBI National Academy, 193rd session, Quantico, Va. | Certificate of completion |
| July 1997 | Practical Homicide Investigation, Vernon J. Geberth, Newark, NJ | Certificate of completion |
| January 1997 June 1997 | Police Foundation, Visiting Police Fellowship Program, Washington, D.C. | Certificate of completion |
| April 1995 | Chemical Agents in Law Enforcement Instructor, Federal Bureau of Investigation, Ft. Dix, NJ | Certificate of completion |
| June 25, 1993 | Advanced Criminal Investigations, Essex County Police Academy and Federal Bureau of Investigation, Cedar Grove, NJ | Certificate of completion |
| April 21, 1993 | Methods of Instruction, Newark Police Academy, New Jersey Division of Criminal Justice, Newark, NJ | Certificate of completion |
| April 15, 1993 | State Certified Police Academy Instructor, Newark Police | Certificate of completion |

**Table 2**
*Summary of Education and Professional Development*

| Date | School | Degree or Certificate |
|---|---|---|
| December 31, 2004 | Academy, Newark, NJ | |
| November 18, 1992 | New York-New Jersey Anti-Car Theft Committee, National Insurance Crime Bureau, Tarrytown, NY | Certificate of completion |

*Related Employment and Experience*

In addition to my law enforcement career and my research and teaching career, I have related experience in police administration, criminal justice and research. Table 3 summarizes my employment and related experience.

**Table 3**
*Related Employment and Experience*

| | |
|---|---|
| March 2006 July 2006 | Consultant to Essex County College, Newark, NJ to assist with design and implementation of a geographic information system (GIS) training program for law enforcement and homeland security initiatives |
| February 2005 September 2005 | *Staff Member*, NJ Attorney General's Office - Camden Commission for Public Safety. Final report accessible at http://www.state.nj.us/lps/com-report-camden.pdf |
| | *Research Associate, Rutgers Police Institute.* Conducted public safety research and a police management study in Camden, NJ as a staff member of the *Camden Commission for Public* Safety. Research included a management study on efficiency and recommendations on best practices for organizational change, deployment and sustained crime control initiatives. |
| May 2004 Present | *Senior Research Associate, Police Foundation Washington, D.C.* Currently, serving as a senior research associate to the Police Foundation on a variety of topics related to policing. |
| October 2003 May 2004 | *Research Team Member, Rutgers Center for Mental Health.* Conducted research on police interactions and responses to persons with mental health issues. Study included conducting on site interviews with police officers as well as calls for service data analysis. |
| September 2003 September 2004 | *Differential Police Response: Neighborhood Social Disorganization and Police Response Time to Domestic Violence Calls.* Principal investigator and author of explanatory research on police response time to domestic violence calls in Newark, New Jersey. The objective was to explain the relationship between indicators of social disorganization and police response time to domestic violence calls for service. |

On the basis of my research, teaching, education, training and experience, I am therefore familiar with the policies, practices and customs associated with policing, including the risks, vulnerabilities and uncertainties, as well as how police officers are trained, the importance of policy and how policy is developed and implemented at the line level.

*Publications*

My publications are listed on my CV (attached).

*Basis of Opinion*

 In preparing this report and expressing my opinion, I relied on the knowledge I have acquired through research, teaching, education and professional development that other experts in my field would consider reliable.  I also relied on my experience in criminal justice, police operations and police administration on the accepted standards of care recognized by police organizations and officials throughout the United States as the custom and practice for the administration, management and supervision of police agencies and police personnel.  In this regard, I am an active member of the American Society of Criminology (ASC), the Police Executive Research Forum (PERF) and the Academy of Criminal Justice Sciences (ACJS).  These organizations are dedicated to improving and promoting criminal justice policies, practices, education and professional standing for criminal justice educators and practitioners through a national and international research agenda that is multidisciplinary and focused on crime, delinquency, public policy analysis and debate.

 My professional opinion and police expertise are sought after through various invited lectures, training workshops, research grants and presentations at local, national and international venues on crime, police management, police performance and police policy and practice issues:

1. Harris County Constable, Precinct 1, Houston, Texas (with Justice System Partners, South Easton, MA), May 2021.
2. Police policy advisor, Guatemala Public Ministry, June 2016.
3. Panelist, National Association for Civilian Oversight of Law Enforcement (NACOLE) and John Jay College of Criminal Justice, academic conference series - Building Public Trust: Generating Evidence to Enhance Police Accountability and Legitimacy, April 22, 2016.
4. United States Commission on Civil Rights, Office of Civil Rights Evaluation, panel on Police Practices and Prosecution of Police Deadly Force, invited panelist. Panel presentation, April 20, 2015.
5. Panel moderator, Bridging the Great divide: Can Police-Community Partnerships Reduce Crime and Strengthen Our Democracy? *Building Police Legitimacy with Community Stakeholders,* September 5, 2014.
6. Invited training workshop, Uruguayan National Police, Basic Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, June 9 to June 20, 2014.
7. Police Foundation, National Institute of Justice and US Department of Justice, COPS Office, Sentinel Events Initiative on Wrongful Convictions, Washington, D.C., February 7, 2014.
8. Inter-American Development Bank policing presentation on policing and the expectations for developing countries, Washington, D.C. , December 3, 2013.
9. Scholarship Program for Training in Advanced Criminal Investigations for Uruguay Police, (practice grant, Ministry of the Interior, Uruguay), October 18, 2013.
10. Invited training workshop, Uruguayan National Police, Advanced Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, October 8-18, 2013.
11. Invited training workshop, Uruguayan National Police, Basic Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, August 20 to September 5, 2013.

12. Invited training workshop, U.S. Army 89th Military Police Brigade, performance management training workshop, Ft. Hood, TX, July 29-30, 2013.

13. U.S. Department of Justice, National Institute of Justice roundtable on "sentinel events initiative" to uncover criminal justice system weaknesses that lead to organizational accidents, Washington, D.C., May 21-22, 2013.

14. Maritime Piracy: A Situational Analysis (research grant, PSC CUNY Award # 66767-00 44), May 15, 2013.

15. U.S. Army Military Police, Senior Leader Conference and Military Police 2020 Strategic Planning Session, National Conference Center, Lansdowne, VA, May 6-9, 2012.

16. Amendola, K., Hulcher, D. & Koval, K. *with* Heitman, A., & Shane, J. M.  (2012).Personnel reallocation and scheduling: *Final report staff scheduling options,* Atlantic City, NJ Police Department.  Washington, D.C: Police Foundation.

17. Amendola, K.A., Weisburd, D. Hamilton, E., Jones, G., Slipka, M., Shane, J.M & Ortiz, C[1]. (2012).  The impact of law enforcement shift practices and extra-duty employment on various health, safety, performance, and quality of life measures. Washington, D.C: Police Foundation.

18. Invited panel participant, providing commentary on Roger Graef's *When Cops Kill,* to explore police shootings and what really happens to the brain and body of police officers when they pull the trigger.  Moderated by President Jeremy Travis, John Jay College, April 22, 2013.

19. Panel moderator, 23rd Annual Problem-oriented Policing Conference, *Houston Police Department: Back from the Brink:  Reducing Crime and Disorder in the Antoine Corridor,* Presenters:  Michael Hill, Ryan Watson and Chris Schuster., October 22-23, 2012.

20. University of New Haven, Center for Advanced Policing, Innovations in Police Management Course, New Haven, CT., August 6-10, 2012.

21. Research and teaching agenda Bramshill Police College (U.K.) January 2012 – April 2012.

22. Presentation to the Chinese People's Public Security University, Police Security Bureau, on creating a nexus between police workload and budget, police policy and practice issues, Beijing, China, November 27- December 3, 2011.

23. Deterrence or System Overload?  The Effect of Imprisonment and Clearance Rates on Auto Theft in the United States, Annual Meeting American Society of Criminology, Washington, D.C., November 17, 2011.

24. Open Society's Roundtable on Current Debates, Research Agendas and Strategies to address racial disparities in police-initiated stops in the U.K. and U.S.A., *Panel Moderator,* John Jay College of Criminal Justice, New York, August 10-11, 2011.

25. U.S. Department of State and FBI, *Panel Moderator,* Community Policing and Conflict Resolution, Federal Plaza, New York City, May 4, 2011.

26. Lexis/Nexis Government 2011 Insight Conference, *Panel Member,* moderated by Chuck Wexler, Executive Director Police Executive Research Forum (PERF), April 5, 2011.

27. New Haven (CT) Police Department, Investigative Training Course, West Haven, CT, November 9, 2010.

28. U.S. Department of Justice COPS Office National Leadership Roundtable, *Leadership For Public Safety II,* with the Community Policing Leadership Institute (CPLI) at the John Jay College of Criminal Justice Office of Continuing and Professional Studies, April 29-30, 2010;

29. The Impact of Organizational Stress on Police Performance (research grant, PSC CUNY Award # 63310-00-41), April 15, 2010.

---

[1] This research report received the 2012 Outstanding Experimental Field Trial Award from the Division of Experimental Criminology/American Society of Criminology (ASC). The award was presented to Dr. Karen Amendola et al. at the 68th annual meeting of the ASC in Chicago on November 14, 2012.

30. Benjamin Cardozo Law School lecture on police accountability, Professor Ellen Yaroshefsky, March 10, 2010.
31. Jamaica Constabulary Police Force, Leading Police Performance and Accountability Symposium 2010, training workshop, Kingston, Jamaica, March 30–April 2, 2010.
32. The Myth of The American Police Quasi Military Model, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA, February 26, 2010.
33. Rethinking Police Use of Confidential Informants, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA, February 23, 2010.
34. Performance Management in Police Agencies: A Conceptual Framework, Annual Meeting American Society of Criminology, Philadelphia, PA, November 5, 2009.
35. Crime Track: A Statewide Crime Data Collection System, with Christopher Andreychak, Rutgers University—School of Criminal Justice, Annual Meeting American Society of Criminology, Philadelphia, PA, November 5, 2009.
36. Implementing and Institutionalizing Compstat in Maryland Police Agencies, with the University of Maryland, Institute for Governmental Service and Research, September 24-25, 2009; October 22-23, 2009; November 20, 2009.
37. Ohio Association of Chiefs of Police, 2008 in-service training conference, Deer Creek, Ohio, April 22, 2008.
38. Florida Police Chiefs Association 56th Annual Summer Training Conference, Palm Beach Gardens, FL, June 23, 2008.
39. Virginia Association of Chiefs of Police, Annual Conference, Hot Springs, VA, August 19, 2008.
40. The Houston Area Police Chief's Association, Woodlands Public Safety Training Center, Conroe, Texas, October 28, 2008.
41. Ottawa Association of Law Enforcement Planners, Algonquin College, Ottawa, Ontario, Canada, May 5, 2007.
42. Louisiana Attorney General's Command College, Baton Rouge, Louisiana, August 8, 2007;
43. IMPACT Users Technology and Performance Conference, Saratoga Springs, NY, September 17, 2007.
44. International Association of Law Enforcement Planners, Calgary, Alberta, Canada, October 16-17, 2007.

I am also a senior research associate at the National Policing Institute (formerly Police Foundation) Washington, D.C. and I have been empaneled by the Center for Problem-Oriented Policing to conduct research on behalf of the U.S. Department of Justice, COPS Office, where I am active in police research that has national and international implications.

My research, participation in national forums and broad reading in policing and criminology have given me the theoretical and empirical grounding for examining the impact of police operations on the community. On January 24, 2011, I was named the "highly commended award winner" by the 2010 Emerald/European Foundation for Management Development, Outstanding Doctoral Dissertation Research Award. This international competitive award is conferred upon those whose dissertation research makes a significant contribution to the field. I received the award under the

*Leadership and Organizational Development* category.  To broaden my perspective on crime, criminology and policing issues, I serve as an occasional peer-review member for several national and international criminal justice and policing journals, including: Crime Science (2015), Criminology (2014); Criminology & Public Policy (2012); Sociological Quarterly (2012); Police Quarterly (2011); Criminal Justice Review (2011); International Journal of Police Science and Management (2011; Criminal Justice & Behavior (2010); Journal of Criminal Justice (2010); Taylor-Francis Publishing (2010); Thompson-Wadsworth Publishing ; Police Practice & Research: An International Journal (2010); Policing: An International Journal of Police Strategies & Management (2009, 2012); *Environmental Criminology and* Crime Analysis abstract review (2011, 2012 conferences); and International Journal of Comparative and Applied Criminal Justice (2010).  On August 20, 2011, I accepted appointment as an *Editorial Advisory Board Member* to the International Journal of Emergency Services published by Emerald.

My teaching and course design experience has provided me first-hand knowledge of the ways police operations and policies impact the community in a pluralistic society governed by the rule of law.  My teachings at the undergraduate level are: 1) Police and the Community; 2) Introduction to Criminal Justice; 3) Introduction to Law Enforcement; and 4) Criminology.  My teachings at the graduate level are: 1) Contemporary Issues in Community Policing; 2) Police Ethics; 3) Problem-Oriented Policing; 4) Issues in Criminal Justice—Police and Corrections; 5) Using Computers in Social Science—Statistics; and 6) research methods and design.  On January 14, 2011, I was appointed a member of the doctoral faculty in the criminal justice program, where I am responsible for teaching and mentoring students and serving the general needs of the doctoral program.  Since my appointment at John Jay College, I have won various awards and been included on the Dean's List (2008-2009; 2009-2010; 2013-2014), a status conferred by the CUNY Office of Graduate Studies in recognition for faculty members who mentor or substantially influence a graduate student's academic success.  On August 25, 2011, I was named "Mentor of the Year" by the American Society of Criminology, the leading organization for practitioners and academicians from the many fields of criminal justice and criminology.  On December 9, 2013, I was named the "2014 Outstanding Mentor of the Year" by the Academy of Criminal Justice Sciences.

Directly related to my teaching experience is my participation on the curriculum committee in the Department of Law, Police Science and Criminal Justice (LPS) Administration at John Jay College. The curriculum committee is responsible for: 1) creating proposals for a contemporary curriculum; 2) identifying standards for the discipline; 3) aligning the curriculum with Middle States

accreditation standards; 4) developing measurable objectives for courses; 5) identifying course-appropriate resource materials and textbooks; and 6) identifying linkages with the college mission. As part of the LPS curriculum committee, I participated in revising the criminal justice bachelor of science degree (CJBS, 2013) and the police studies degree (PS, 2014).  I revised the introductory course on law enforcement, a key foundational course, and created a new course on police use of force for the Police Studies degree.

My administrative experience in policing has provided me with an understanding of the manner in which police policy and practice occurs on a daily basis, from the policy level to the line level.  As a command-rank officer in a major urban police department I had a unique opportunity to gain rare insight into police administration, operations and organizational culture, something that is difficult to observe in most other ways and often hidden from outsiders.  In addition to the aforementioned experience, I also relied on the data presented in the documents that are listed under exhibits in this report to formulate my opinion.

*Previous Opinions*

I have either testified as an expert at trial or by deposition listed in CV (appended). I have been compensated for my work on this matter.

CONCLUSIONS AND OPINIONS

Based on the available evidence, within a reasonable degree of professional certainty, I conclude that both: 1) the decision to evacuate the East Precinct and 2) the decision to create and perpetuate the Red-Zone policy were inconsistent with generally accepted principles in policing.  My opinions are based on my education, training, experience in law enforcement and the standards set by the City Charter of Seattle, and are offered to rebut the opinions stated by Professor Seth Stoughton in his April 28, 2022 report.  My opinions, and the justifications for them, are as follows:

1.  **Did the Seattle Police Department violate generally accepted police practices for delivering police service and the City Seattle charter when it (1) evacuated the Seattle Police Department's East Precinct on June 8, 2020, with known dangerous elements in the area and with no plan for reoccupying the precinct, and (2) decided they would provide limited police services to area around and near the precinct?**  Yes.  The City of Seattle and the Seattle Police Department had a duty to provide police service to the general public throughout the City of Seattle, consistent with the City's Charter and generally-accepted police practices.  When the City of Seattle and the Seattle Police Department limited police service to the general public between June 8, 2020 and July 1, 2020, they were not authorized to do so.  The City of Seattle and the Seattle Police Department's actions were not consistent with:

    a.  Seattle City Charter, Article V -  Executive Department, Powers and Duties of Mayor;

    b.  Seattle City Charter, Article VI - Department of Police, Section 1. - Organization of Police Department.

    c.  Generally accepted police practices for delivering police service.

2.  **Justification for opinion.**  My justification for opinion is set forth below.

    a.  *Basis for Evacuating the East Precinct and Creating the "Red Zone."*[2]  In the days prior to June 8, 2020, the Seattle Police Department ("SPD") had a number of heated interactions with anti-police demonstrators in the streets near the East Precinct in Seattle's Capitol Hill neighborhood that resulted in injuries to some officers and the dismantling and movement of barriers that were erected near the East Precinct to serve as a line between officers and protesters.[3]  At times, this involved protesters pushing and shoving officers, as well as

---

[2] I am aware of the following facts that both supplement and rebut the facts referenced and relied upon by Professor Stoughton.
[3] Stoughton report, pp. 11-12.

throwing projectiles such as rocks, garbage, cement, and bottles.[4] The SPD's response to these protests and other demonstrations in Seattle were being assisted at the time by more than 400 personnel from other jurisdictions.[5]

On June 8, 2020, the Seattle Mayor's office directed the SPD not to attempt to fortify the East Precinct further, but instead to stand down from the barriers and allow protesters to freely march to and past the East Precinct,[6] despite concerns among SPD leadership that it could jeopardize the safety of officers and the building itself.[7] The clear preference of SPD leadership was to further fortify the building with stronger, bolted fencing with officers behind it, but the Mayor's office ordered them not to do so, apparently out of a concern for the "optics" of defending the East Precinct.[8] The Mayor's office expressed that it believed protesters wanted to simply walk by the precinct, but as SPD Assistant Chief Thomas Mahaffey stated: "they had no information to support [that notion] whatsoever," and there was no reason to assume that the previously violent protests "would suddenly change to peaceful."[9]

After being directed to stand down outside the East Precinct during protest that were expected to occur on the evening of June 8, 2020, Assistant Chief Mahaffey made the decision to evacuate all materials and personnel from the East Precinct, after consulting with command staff, including SPD Chief Carmen Best.[10] That decision was not based on what was happening at the time of that decision, but rather on concerns about what might happen later that evening and night, especially given the directive of the Mayor's office to stand down from the barriers. Assistant Chief Mahaffey felt the SPD's "hand was forced by us not being allowed to use the tactics that I suggested to better fortify and secure the building."[11] As he further explained the reasoning behind the decision:

> The overarching concern was, the need to de-escalate would have been going on the previous week, which was a constant focus on the precinct by the protesters, to the point that the precinct had become inoperable. We had nearly nightly clashes with protesters involving significant amounts of -- we had to use force to deal with the crowd. We had force used against us by the

---

[4] Deposition of Thomas Mahaffey, 75:6-:23.
[5] Stoughton report, p. 11.
[6] Stoughton report, p. 12. Deposition of Thomas Mahaffey, 81:8-:14.
[7] Deposition of Thomas Mahaffey, 80:25-81:6; 81:15-:21.
[8] SEA_00149588.
[9] SEA_00149593-0014954.
[10] Deposition of Thomas Mahaffey, 73:3-:19.
[11] SEA_00148592.

crowd. We had officers injured. We had members of the protest crowd injured, and it was seemingly not going to end. So that was the overall goal, was to prevent any further clashes with the crowd and injuries to officers. There was also concerns about the building being attacked and destroyed. We had information from the FBI. I knew that a precinct had been burned in Minneapolis, Minnesota, as a result of protests they had there. I had information other government buildings were being attacked.

So I had a great concern that based on what had been occurring the previous weeks, that the East Precinct would be another target, which, based on where it sits on the block, there's really only two ways in and out of it. And overall, the -- that was my greatest concern, was keeping -- keeping people safe, and not being able to keep people in there, as we were not going to be able to use the tactics, which was using police officers directly to manage and address the crowd.

So that was the course of action that I felt was the best to prevent confrontation, to de-escalate, prevent injury, and keep police officers and the public safe.[12]

At the time the decision was made to evacuate all personnel from the East Precinct, the SPD had the intent and goal of reoccupying the East Precinct in a day or two; however, there is nothing in discovery to indicate a planning effort or a completed plan had been contemplated or formulated for doing so.[13] Assistant Chief Mahaffey testified that his parting orders on June 8, 2020, were to send the night-duty captain to the area on June 9 "to make an effort to go back in the following morning to kind of determine what the … situation was, and if it was safe and feasible [to reoccupy the East Precinct]."[14] There is no evidence in discovery that there was any consideration of the possibility that even though protesters had previously dismantled and moved barriers around the East Precinct that they might do so again on the night of June 8, 2020, when there were no officers present.

On the night of June 8, 2020, protesters did not attack or attempt to burn or otherwise destroy the East Precinct as had been predicted by police personnel, but they did commandeer the barriers the SPD had left behind after their evacuation and used them, and other materials, to block streets and sidewalks in the vicinity of the precinct.[15] These barriers

---

[12] Deposition of Thomas Mahaffey, 73:20-75:5.
[13] A plan is different from an idea. A plan is a written document specifying the technical details of how a police operation will be executed. An idea is the underlying abstract archetype of the operation. The Seattle police may have contemplated what they wanted to accomplish (an idea), but there is no evidence they had a plan.
[14] Deposition of Thomas Mahaffey, 92:11-:15.
[15] Deposition of Thomas Mahaffey, 84:14-86:11.

were then staffed with "guards" to monitor entry into the area that had been declared an "autonomous zone."[16]

Although on June 9, 2020, the SPD concluded that "the crowd was peaceful [and] weren't taking any specific action against the precinct," the SPD concluded that they would not attempt to clear the streets and sidewalks of barriers or people, nor fully reoccupy the precinct building or the area around it on June 9, 10, or 11.[17] This decision was despite the fact that officers were aware that individuals occupying what was then known as the Capitol Hill Autonomous Zone, or "CHAZ," were armed and hostile or potentially hostile to City employees and individuals living and working in the area.[18] This was also despite the knowledge of the SPD that response times throughout the areas served by the East Precinct had tripled since the evacuation of the precinct.[19] This was also despite the opinion of some SPD leaders that returning to the precinct "may have been feasible [in the early days of the occupation], but there certainly would have been a force component."[20]

After June 8, 2020, and before July 1, 2020, there was only one attempt to place a few officers at the East Precinct, which was June 11, 2020. This effort ended in the early morning hours of June 12, 2020, when those officers evacuated the building a second time out of concern for their safety.[21] There is no evidence in discovery of any other attempt by SPD to reoccupy the building until July 1, 2020.[22]

Professor Stoughton refers to an assignment of SPD resources on June 12, 2020 to fully reoccupy the East Precinct, but does not cite any actual operation to do that, and there is no evidence in discovery to support his claim.[23] Indeed, on June 11, 2020, while the SPD was considering attempting to move some of the occupation's barriers away from the East Precinct with the assistance of the Seattle Department of Transportation ("SDOT"), it was under the express direction of the Mayor's office to "fallback" at the "first sign of resistance or push back" because "everything you do will be live streamed."[24]

---

[16] Deposition of Thomas Mahaffey, 86:12-87:4, 90:16.
[17] Deposition of Thomas Mahaffey, 92:8-:10. Also Stoughton report, p. 15.
[18] Deposition of Thomas Mahaffey, 15:17-:21, 66:2-:18, 90:21-91:9, 105:7-106:9.
[19] https://www.youtube.com/watch?v=_rE4VMjClqI at 14:02, (Chief Best news June 11, 2020, news conference).
[20] Deposition of Thomas Mahaffey, 96:9-:24.
[21] Deposition of Thomas Mahaffey, 97:19-98:11.
[22] Deposition of Thomas Mahaffey, 98:12-:18.
[23] See, e.g., Stoughton report, p. 15.
[24] Deposition of Casey Sixkiller, 106:18-109:12.

The decision not to occupy the East Precinct was made for an indeterminate period of time. The SPD made clear that re-occupation of the precinct was contingent upon a number of factors, including the SDOT's removal of the barriers that were in the streets.[25] And as of June 16, 2020,  SDOT removed some barriers in the streets and replaced them with larger, heavier, concrete "ecology blocks," and the plan was that those blocks would remain indefinitely.[26] The SPD concluded that it would not attempt to fully reoccupy the East Precinct for that same indefinite period of time,[27] and the SPD did not participate in any attempt to fully reoccupy the East Precinct or clear the area until July 1, 2020.[28] Indeed, it appears that there was no specific plan devised to clear the area until gun violence in the area in late June served as a "catalyst" for actually taking some sort of action.[29]

Instead of attempting to reoccupy the East Precinct shortly after evacuating it, or clear the surrounding neighborhood of barriers and protesters, the SPD adopted a policy of avoiding the East Precinct and the surrounding neighborhood. The first official pronouncement of this policy appears to have been on June 12, 2020, when Assistant Chief Thomas Mahaffey made the following announcement to the entire SPD:[30]

---

[25] Deposition of Thomas Mahaffey, 179:24-180:5.
[26] Deposition of Samuel Zimbabwe, 34:22-37:7, 198:8-199:13.
[27] Deposition of Thomas Mahaffey, 174:8-181:5.
[28] Deposition of Thomas Mahaffey, 96:9-98:18.
[29] Deposition of Thomas Mahaffey, 178:3-181:5.
[30] SEA-SPD_005983, Ex. 2 to Mahaffey deposition. Although this was first pronounced on June 12, 2020 it appears the SPD was *de facto* following similar protocols from June 9, 202 to June 12, 2020. Deposition of Thomas Mahaffey, 53:2-55:11.

**From:** Verhoff, Jason
**Sent:** Fri 6/12/2020 11:29:43 PM
**Subject:** FW: Edward Sector Calls for Service

Per Assistant Chief Tom Mahaffey:

The map below provides clarity on the boundary established by the group occupying the "Capitol Hill Autonomous Zone" (C.H.A.Z.). My direction for police response within Edward Sector is as follows:

  • **Red Zone:** Officers should not respond to calls for service within the red zone, unless the response is to a mass casualty event (e.g. active shooter incident, structural fire likely to endanger human lives etc.). If responding to a mass casualty incident within the red zone, all responding officers should muster with a supervisor outside that zone to evaluate the feasibility of a police response and develop a plan.
    ○ *For all other calls originating from within the red zone, Communications Section personnel should attempt to coordinate officer contact outside the red zone boundary.*

  • **Edward Sector:** I'm requiring a four-officer minimum response to all Edward Sector calls for service outside the red zone.

**Officers should continue to document calls for service that originate from within the red zone, even under circumstances where complainant/victim contact isn't possible.

This communication also included a map of several blocks of a mixed-use neighborhood and a multi-block public park that he designated as the "Red Zone."

Sometime in the last week of June 2020, part of the wording of this policy was changed from "mass casualty event (e.g., active shooter incident, structural fire likely to endanger human lives, etc.)" to "critical life safety emergency (e.g., active shooter incident, structural fire likely to endanger human lives, etc.),"[31] but this change in wording was not meant to indicate a change in the substance of the policy.[32] Assistant Chief Mahaffey testified that the goals of the policy were to ensure officer safety and avoid inflaming anti-police sentiment that might exist among people who were occupying the streets, sidewalks,

---

[31] June 29, 2020, Incident Action Plan, SEA_00007766, page SEA_0007780, Ex. 3 to Mahaffey deposition. The threshold of injured people to trigger a "mass casualty event" is not defined in any discovery documents. For example, the rape of assault of a single individual is not necessarily a "mass casualty event" (Mahaffey deposition, 19:18; 20:6), even though a rape is felony.
[32] Deposition of Thomas Mahaffey, 35:23-36:5.

and parks in the area. He also testified that his concerns about officer safety were based on past interactions between protesters and police between May 29, 2020, and June 7, 2020.[33]

None of the following crimes constituted crimes that the SPD would physically respond to in the Red Zone while this policy was in place: 1) rape; 2) assault that did not "endanger a significant number of people;" 3) kidnapping; 4) discharge of a firearm not resulting in injuries; 5) property destruction that did not put "many people's lives in danger;" 6) fires that did not endanger "a significant number of lives;" and 7) a large disagreement involving individuals carrying rifles but not firing them.[34] If anyone was a victim of such a crime and wanted to report it or any other public disturbance inside the Red Zone, officers would not report to the scene of the incident. Citizens had to make their report on the phone, online, or walk several blocks to try to meet an officer in person.[35]

Even for "mass casualty events" or "critical life safety emergencies" inside the Red Zone, the SPD still maintained a modified position that did not involve a direct response. As the policy itself states, officers would first stage somewhere outside the Red Zone and consult with a supervisor about decide whether to respond to the event.[36]  It was also consistent with the policy not to respond in-person to events that were outside the Red Zone if officers determined consistent with the Red-Zone policy there should be no such response at the outside location.[37] It was apparently due to this policy that on the night of June 14, 2020, that the SPD did not respond to an incident outside but near the Red Zone in which a business owner responded to a break-in and fire at his business and detained the offender while repeatedly calling 9-1-1, until a crowd of hundreds of people forcibly entered the business' parking lot and threatened the life of the owner until he released the offender.[38] It was also the case under the Red-Zone policy that for the entirety of the Edward Sector, an area that includes all of the Capitol Hill neighborhood in which the Red Zone was located, that even calls that routinely would be responded to by a single officer required a minimum of four-officers.[39]

---

[33] Deposition of Thomas Mahaffey, 24:11-25:11.
[34] Deposition of Thomas Mahaffey, 18:25-22:20, 27:3-30:12.
[35] Deposition of Thomas Mahaffey, 115:24-117:17.
[36] Deposition of Thomas Mahaffey, 22:22-24-:1.
[37] Deposition of Thomas Mahaffey, 45:2-47:12.
[38] SEA_00156958; Deposition of Thomas Mahaffey, 43:20-49:7.
[39] Deposition of Thomas Mahaffey, 12:10-:15, 36:22-38:11.

The Red-Zone policy remained in effect until the early morning hours of July 1, 2020, despite the City and the SPD having full intelligence of what was happening in the neighborhood during June 2020. I was informed by counsel that the City had the following individuals in the Red Zone nearly every day from June 9, 2020 to June 30, 2020: the chief of the Seattle Fire Department, the head of the Seattle Department of Transportation, the head of Seattle Public Utilities, a representative from the Seattle Parks and Recreation Department, and a representative from the Mayor's office. There is no evidence in discovery the SPD had personnel positioned inside the Red Zone, nor was SPD involved in any attempts to negotiate with the occupying protesters.  However, as Professor Stoughton has made clear, the SPD had plainclothes detectives on site, was aware of and monitoring the presence of gangs, violence against City employees in the area, and a sharp increase in violent crimes, including homicides.[40] It was also known from the very start of the occupation on June 9, 2020 that weapons were being brought to the area, that there were barriers in the streets intended to block entry of vehicles, and that these barriers were staffed by armed individuals who declared the area to be autonomous.[41] It was also known that as time went on there was a large number of people who had started living in Cal Anderson Park and the sidewalks around the East Precinct.[42] Some of the problems and crimes that had occurred in the area during the time that the SPD maintained its Red-Zone policy are also documented in the Mayor's June 30, 2020, Executive Order.[43]

b. *Propriety of the City of Seattle and the Seattle Police Department's Actions.*  The powers and duties of the Seattle Mayor are governed by the City's Charter (Article V - Executive Department, Powers and Duties of Mayor).  The Mayor's power to usurp the Seattle Police Department's authority to deliver police service is limited to instances when an emergency has been declared *and* when the Mayor has first issued a proclamation.[44]  Neither of these two

---

[40] Staughton report, pp. 18, 20-21.
[41] Deposition of Thomas Mahaffey, 15:6-:21; 64:24-67:3, 84:14-87:3, 90:11-91:22.
[42] Deposition of Thomas Mahaffey, 129:13-131:1.
[43] SEA_00045264, Ex. 12 to Deposition of Thomas Mahaffey.
[44] "He or she may, in any emergency, of which the Mayor shall be the judge, assume command of the whole or any part of the police force of the City; but before assuming such control he or she shall issue his or her proclamation to that effect, and it shall be the duty of the Chief of Police to execute orders promulgated by the Mayor during such emergency" (Article V - Executive Department, Powers and Duties of Mayor).  By way of contrast, during the 1999 World Trade Organization riot:  "In response to this situation and based on the recommendations of police commanders, the Mayor declared a Civil Emergency at 1532 hours. The Proclamation of Civil Emergency included an Emergency Order imposing a curfew with criminal sanctions and allowing for arrests of curfew violators. The curfew included the area bounded by Denny Way on the north, Yesler Way on the south, the I-5 freeway on the east, and Elliott Bay on the west, and was in effect between 1900 hours Tuesday and 0730 hours Wednesday. Shortly after the Mayor's

conditions of the City's Charter were satisfied when the Mayor ordered the Seattle police department not to fortify the East Precinct, to "stand down"[45] amid officers' concerns for safety[46] and to "fallback."[47]   Therefore, the Mayor knew or should have known that she issued an illegal order to the Seattle Police Department, one that was not consistent with the City's Charter and that interfered with police operations.  When the Mayor acted outside the scope of her authority, she improperly directed and controlled the Seattle Police Department, she was not authorized to do so and her decision led directly to the improper denial of the benefit of the SPD in around the East Precinct and CHOP.[48]

The City of Seattle and the Seattle Police Department had a duty to maintain adequate police protection in each district of the city, consistent with the City's Charter.[49] When Assistant Chief Mahaffey decided to evacuate the East Precinct, he left a portion of this district of the city without adequate police protection and modified the Seattle Police Department's response, which violated the City's Charter. Even prior to evacuating the East Precinct, Assistant Chief Mahaffey knew there were armed protestors in the area and he

---

action, the Governor authorized deployment of the National Guard" (The Seattle Police Department After Action Report World Trade Organization Ministerial Conference Seattle, Washington November 29 – December 3, 1999, issued April 4, 2000, p. 41).  A similar proclamation was not issued in the instant case.

[45] Stoughton report, p. 12. Deposition of Thomas Mahaffey, 81:8-:14.

[46] Deposition of Thomas Mahaffey, 80:25-81:6; 81:15-:21.

[47] Deposition of Casey Sixkiller, 106:18-109:12.

[48] As a matter of public duty, it is generally accepted that a municipality performs a governmental function when it provides police protection to the general public. Public duty is based on the premise that a governmental entity, such as the City of Seattle, owes a duty to the general public for the performance of certain government functions, police protection being one. Under this doctrine, the municipality's duty is to provide police protection to people, which is considered to be a duty owed to the general public.  The purpose of the Seattle Municipal Code (SMC) is to exercise "…the police power of Seattle to *protect and preserve the public peace, health, safety, and welfare*. Its provisions shall be liberally construed for the accomplishment of these purposes" (emphasis mine) (SMC, Title 10, section 10.01.10). Furthermore, the SMC notes "It is expressly the purpose of Title 10 to *provide for and promote the health, safety and welfare of the general public, and not to create or otherwise establish or designate any particular class or group of persons who will or should be especially protected or benefited* by the terms of Title 10" (emphasis mine) (SMC Title 10, section 10.01.01.B). When the Mayor denied the Seattle Police Department the opportunity to fortify the East Precinct and ordered the officers to "stand own" and "fallback," she denied the general public the benefit of the Seattle Police Department. She also enabled a particular group of people (i.e., the CHOP participants) to benefit from the absence of police by enabling criminal activity, avoiding arrest and potentially criminal conviction and punishment for the crimes they perpetrated inside and around the CHOP. The Seattle Office of Police Accountability confirmed in its report of the instant case: "It is undisputed that the CHOP/CHAZ area did not, for a period of time, receive regular police services. This undoubtedly resulted in detrimental effects to residents of the immediate area and businesses in the vicinity" (OPA CASE NUMBER: 2020OPA-0354, September 30, 2021, p. 22 of 26).  The OPA and the Mayor knew or should have known that issuing an order for the officers to "stand down" and "fallback" violated the City's Charter.  These decisions reflect OPA's and the Mayor's lack of knowledge, skills and abilities regarding the duty to provide police protection for the general public.

[49] "There shall be maintained adequate police protection in each district of the City" (Article VI, Section 1 – Organization of the Police Department).

failed to act in the public's best interest by sending officers to investigate.[50] Therefore, Assistant Chief Mahaffey knew or should have known that his decision was not lawful and was neither consistent with the City's Charter nor an accepted police practice. When the Mayor issued an unlawful order, neither Chief Best nor Assistant Chief Mahaffey were obligated to comply.

It is correct in a general sense that in any particular tactical situation that an individual officer can and must make decisions about what is appropriate for that officer's safety, as well as the appropriate level of force (if any) to apply to resolve an actual or potential conflict. It is also correct that there may be a range of appropriate responses to any particular threat. However, every decision must be analyzed based on the full circumstances presented to that officer at the time they make their decision. Further, a decision to withdraw from a particular conflict to preserve officer safety must be based on an imminent threat[51] of officer harm, and is only reasonable if it the totality of the circumstances indicate such a threat. There is no evidence in discovery to indicate that the totality of the circumstances in the instant case ripened into an imminent threat to the Seattle police officers stationed at the East Precinct when Assistant Chief Mahaffey decided to evacuate the facility on June 8, 2020. Assistant Chief Mahaffey's decision was not consistent with the City's Charter and was not consistent with generally accepted principles of policing. The totality of the circumstances that were derived from discovery indicate:

1. At the time of the decision to evacuate personnel, there was no officer under direct threat of harm, and there were no protesters threatening officers or the building;

2. SPD leadership's preferred approach was to fortify the building further before another nightly protest, but chose not to, apparently following the unlawful orders from the

---

[50] Deposition of Thomas Mahaffey, 15:6-21. Chief Mahaffey testified at deposition that Washington is an open-carry state and that carrying a weapon is not necessarily illegal (Mahaffey deposition, 29:14-23). However, as a matter of public safety, given the CHOP and its disorderly nature, Chief Mahaffey should have initiated and ensured Seattle police officers were sent to investigate the circumstances surrounding those people he observed carrying weapons consistent with field interview procedures. Any field interview should have been documented and archived as a matter of crime analysis and criminal intelligence and retained for future use. If probable cause for an arrest developed, then an arrest should have been effected. This did not occur.

[51] An imminent threat or imminent danger is threatened action or outcome that is immediately likely to occur during an encounter absent action by the officer. The period of time involved is dependent on the circumstances and facts evident in each situation and is not the same in all situations. Assistant Chief Mahaffey testified at deposition that the "overarching concern" was the "need to de-escalate" (Mahaffey deposition, 73:20-24). Assistant Chief Mahaffey never mentioned an imminent threat to any officers or the East Precinct facility. The words "imminent threat," "imminent danger" or their equivalent do not appear in Chief Mahaffey's deposition, which indicates there was no imminent threat to the East Precinct or its personnel. Assistant Chief Mahaffey also testified at deposition that the East Precinct did not sustain any damage and nothing had been taken (Mahaffey deposition, 97:6-8).

Mayor rather than exercising their independent judgment consistent with the City's Charter;[52]

3. The SPD had more than 400 additional officers from outside agencies available but chose not to use them to retain control and occupancy of the East Precinct;[53]

4. The decision to evacuate all personnel from the East Precinct was the result of an order from the Mayor's Office those officers "stand down" from the previously erected barriers and allow protesters to freely march past the precinct, which the SPD believed placed officers and the building at risk;[54]

5. The SPD knew from prior interactions with protesters in the same location in early June 2020 that protesters could and would dismantle and repurpose barriers that police had used to separate themselves and the precinct from protesters;

6. While the SPD evacuated the precinct, it left behind in the streets and sidewalks around the precinct various barriers that could and eventually were used to fortify the CHOP;

7. The SPD evacuated the precinct despite having received intelligence suggesting that it could be set on fire that night;

8. The evacuation occurred with no tactical plan for reoccupying or attempting to reoccupy the building beyond planning to send an officer back to the area to reassess the situation the next morning;[55]

---

[52] Via Seattle City Charter, the Seattle Mayor delegates the power and authority for law enforcement in Seattle to the Seattle Chief of Police ("The Chief of Police shall manage the Police Department, and shall prescribe rules and regulations, consistent with law, for its government and control; provided, that the Chief of Police shall be responsible to the Mayor for the administration of the Police Department and the enforcement of law" Article VI, Section 4, Chief to Manage Police Department), except after the Mayor declares an emergency and after the Mayor first issues a proclamation.  I have been instructed by plaintiff's counsel to assume that neither of these Charter provisions occurred.

[53] The Seattle Police Department could have mobilized these officers to fortify the East Precinct. The decision not to do so reflects a lack of knowledge, skills and abilities in executing police operations.

[54] The Mayor's order was unlawful and violated the City's Charter ("He or she may, in any emergency, of which the Mayor shall be the judge, assume command of the whole or any part of the police force of the City; but before assuming such control he or she shall issue his or her proclamation to that effect, and it shall be the duty of the Chief of Police to execute orders promulgated by the Mayor during such emergency" (Article V - Executive Department, Powers and Duties of Mayor).  The Seattle Police Department, through Chief Best and/or Assistant Chief Mahaffey, knew or should have known that the Mayor issued an illegal order and that they were not obligated to comply with an illegal order.  By following the Mayor's unlawful order, the Seattle Police Department was complicit in denying the general public the benefit of adequate police protection afforded by the City's Charter.

[55] There is no evidence in discovery that the SPD prepared a plan to reoccupy the East Precinct, or how they would address any perceived or real vulnerabilities that existed before or after they evacuated the precinct.  The City of Seattle and Seattle Police Department should have been aware how to develop a plan that accounts for vulnerabilities and worst-case scenarios since planning is a common and accepted command staff function and was a specific recommendation following the World Trade Organization riot in 1999 (The Seattle Police Department After Action Report World Trade Organization Ministerial Conference Seattle, Washington November 29 – December 3, 1999, issued April 4, 2000:  "This after action report recommends that the City undertake a careful assessment of the effects of

Restated, the totality of the circumstances demonstrate that there was an insufficient basis for evacuating the East Precinct and doing so was not in keeping with generally accepted policing practices since an imminent threat to officer safety had not materialized. Doing so was against the better judgment of the commanding officer who ordered the evacuation instead of implementing his preferred plan of fortifying the building and remaining in place. Any suggestion by Chief Best or Assistant Chief Mahaffey that they were just following orders (from the Mayor) does not absolve them from the duty imposed by the City's Charter to provide adequate police protection in each district. Assistant Chief Mahaffey issued the order to evacuate the precinct and he was in the position of making the judgment as to whether such a response was justified based on the totality of the circumstances. It was not.

Professor Stoughton's analysis falters primarily because he relies on principles that apply primarily to policing decisions made in the heat of battle about whether to engage with an offender, and if so, how best to engage with that offender. Those principles cannot be extended to justify a policy decision to evacuate an entire precinct out of concern that there might be a confrontation in the coming hours and leaving the general public without adequate police protection, which is required by the City's Charter.[56] The instant case is not, as Professor Stoughton suggests, so unusual that the extraordinary decision to evacuate a precinct building can be considered a reasonable or acceptable decision. In particular, he is incorrect that "[t]his case presents an unprecedented tactical situation" of anti-police protests having occurred in the area in and around a police precinct over the course of several days. Anti-police protests are hardly unique or unprecedented, in Seattle or elsewhere, including protests focused on a specific building or location.[57]

---

its Investigations Ordinance and that SPD commanders include a credible worst case scenario in planning for future events," p. 5).

[56] "There shall be maintained adequate police protection in each district of the City" (Article VI, Section 1 – Organization of the Police Department).

[57] Professor Stoughton characterizes the event as "unprecedented." This is inaccurate. The Seattle Office of Police Accountability used the word "unprecedented" four times in their report to characterize the event in the instant case (OPA CASE NUMBER: 2020OPA-0354, September 30, 2021, see pp. 2, 20, 22, 26). This too is inaccurate. Assistant Chief Mahaffey testified at deposition that he had never experienced anything similar to the instant case (Mahaffey deposition, 111:24-25). This is also inaccurate. The World Trade Organization riot in 1999 was an event of similar dimension that was subjected to an after action report that recommended the Seattle police prepare for similar riots in the future. The City of Seattle and the Seattle Police Department knew or should have known how to address the event in the instant case and it was not unprecedented (see The Seattle Police Department After Action Report World Trade Organization Ministerial Conference Seattle, Washington November 29 – December 3, 1999, issued April 4, 2000, p. 41). By way of similar example, in July 1967, the Newark Police Department's Fourth Precinct Station began receiving rocks and bottles that injured several police officers and also received gun fire through the front-facing windows of 17th

Professor Stoughton has not pointed to any other incidents, and I am not aware of one, in which a police department evacuated a precinct building in anticipation of possible crimes that might be committed, much less with no tactical plan for reoccupying that precinct to ensure adequate police protection. This on its own indicates that the decision was contrary to generally accepted principles of policing.

Professor Stoughton also suggests that the decision to evacuate the East Precinct and the surrounding neighborhood was at least in part justified, or perhaps required, to avoid deterring the First Amendment rights of the protesters (see p. 30 of his report). I am not aware of any generally accepted police practice or any requirement in First Amendment law, that would justify evacuating a police facility or ceding an entire neighborhood to known or potential armed criminals to preserve First Amendment rights. The First-Amendment protects the right of the people to peaceably assemble; it does not permit armed protestors to coerce, intimidate, create tumultuous conditions, or interfere with a police department's duty to provide police service, nor does it provide a police department with an excuse to abrogate its duty to provide police protection to the general public, which is what occurred in the instant case.

In addition to allowing the protestors to create CHOP, the Seattle Police Department's policy of not responding to all but the most serious crimes in and around the CHOP, for an indeterminate amount of time, was not consistent with generally accepted principles in policing.  Professor Stoughton is incorrect that the SPD's adoption of the Red-Zone policy, in lieu of attempting to reoccupy the precinct and clear the surrounding area, was consistent with generally accepted policing principles. It is not consistent with any accepted policing principle to indefinitely declare that a city neighborhood will not receive any in-person responses to anything other than crimes that endanger multiple lives, with no

---

Avenue during the riot that unfolded.  The Police Department maintained its position and countered the 300 protesters that gathered outside. The Newark Police Department never evacuated any police facility during the riot.  During the 1992 Los Angeles riots, following the Rodney King trial, the LAPD never evacuated any police facility, including Police Headquarters where protestors gathered and tried to push past police officers and enter the building.  On June 16, 2005, an offender about to be placed under arrest opened fire inside the West Police District Station in Jersey City, New Jersey, wounding a sergeant and an officer before he was stopped by gunfire from other officers inside the station. The officers never evacuated the precinct.  On January 24, 2011, an offender entered the 6th precinct in Detroit and opened fire with a shotgun wounding four officers.  The officers never evacuated the precinct. On February 9, 2020, an offender entered the 41st precinct in New York City and shot an officer before being taken into custody.  The officers never evacuated the precinct. Evacuating a police precinct and ceding the area to protestors or rioters is not an accepted industry practice.  The police officers in the aforementioned examples faced conditions worse than the SPD in the instant case, yet they stood their ground and repelled an imminent threat, which was not the case for SPD.

tactical plan for addressing the situation, all based on a concern that the criminals in question do not like the police.  The following contextual facts support my position:

1.  The SPD made no attempt between June 8 and July 1, 2020, to fully reoccupy the East Precinct or clear the streets of all barriers and people, or otherwise abate the conditions that it used to justify the adoption of the Red-Zone policy, despite its duty via City Charter to provide adequate police protection. This included June 9, 2020, when the SPD had originally hoped to reoccupy the East Precinct, and when the area had only a relatively few occupants who appeared to be peaceful and not attacking the precinct building. At that stage, the SPD still had more than 400 additional officers and National Guard troops available to assist in any operation;

2.  Although the SPD had a desire and a general idea to eventually clear the area and reoccupy the East Precinct, there was no tactical operation to actually take any steps toward those goals until there was a "catalyst" of escalated violence in the area in late June 2020. Even when the City finally began to formulate a plan on June 22, 2020 to finally clear the area,[58] the SPD refused to participate in any operations.[59] This was certain to fail, as Professor Stoughton acknowledges it did;[60]

3.  The justification for the Red-Zone policy from June 12, 2020 to June 30, 2020, was based not on contemporary or ongoing conflicts with individuals in or near the Red Zone. Instead the policy was based instead on what had happened near the East Precinct on June 7, 2020, and in earlier interactions with protesters, and a generalized concern that the Red Zone was populated at least in part by individuals who held anti-police viewpoints;

4.  The actions of the SPD and the Mayor suggest that the tactics adopted by the SPD adopted were intended to avoid confronting the numerous crimes and blockages of rights-of-way that they were aware of; instead of enforcing the law, their position was to "stand down" and "fallback" at the "first sign of resistance or push back;"[61]

5.  The "catalyst" for the SPD's decision to assist in clearing the area and the reoccupation of the East Precinct was a massive spike in violent crime. This significantly undercut the suggestion of the City and Professor Stoughton that the Red Zone was necessary to

---

[58] Staughton report, p. 20
[59] SEA_00028053 (Chief Best email, June 22, 2020).
[60] Staughton report, p. 20.
[61] Deposition of Casey Sixkiller, 106:18-109:12.

"deescalate" the Red Zone. In fact, violence in the Red Zone only escalated further as time went on,[62] and it was at the zenith of that violence that the Red-Zone policy finally ended, in an operation that was met with little meaningful resistance;

6. The area declared to be the Red Zone encompassed a large area of several blocks of what I am told was a vibrant multi-use urban neighborhood with numerous residential buildings, small businesses, and a large public park with playfields and a playground. This area was denied adequate police protection as defined by the City's Charter;

7. It was foreseeable that declaring the area off-limits to direct response from police that property crime and violent crime would spike in the area. Professor Stoughton quotes from the SPD's own gang intelligence that "CHOP [became] a center of lawlessness for our gang members [who] all want to go and check it out. They want[ed] to see what [was] like to be an area without any police."[63] This, and other public-safety problems created by the Red-Zone policy, were and should have been easily predicted;[64]

8. The SPD and the City were aware of the increased crime in the area, and the increased time it was taking to respond to crime in the area, as it was happening;

9. The conditions that gave rise to the Red-Zone policy were largely a direct result of the SPD's decision to evacuate the East Precinct and leave movable barriers behind.

The fundamental reality of policing worldwide is that police officers have a duty to confront individuals who dislike them, some of whom may be armed and prepared to injure or kill them. Police officers worldwide voluntarily assume this risk when they accept the job and they are duty-bound to confront dangerous circumstances on the public's behalf to ensure peace and safety in a community. It is not uncommon or unprecedented, as discussed

---

[62] See Staughton report, pp. 20-21 (listing and discussing violent incidents all of which occurred during the last week of June 2020).

[63] Staughton report, p. 20.

[64] Refer to the work of Dr. Eric L. Piza, as set forth in his separate report in this case. Also, refer to the 1992 Los Angeles riots following the Rodney King verdict. Protestors gathered at Florence and Normandie in Los Angeles. Los Angeles Police Lieutenant Michael Moulin of the 77th Street Division, the person in charge at Florence and Normandie, said that he ordered 25 officers to withdraw from that location because "I didn't want them killed." Los Angeles police withdrew and never regrouped to take control of this vital and violent intersection, an action that Police Chief Daryl F. Gates conceded was a serious mistake. When the police officers withdrew and failed to develop a plan to regroup and return to the area, the damage quickly escalated and spread and became one of the deadliest and costliest riots in U.S. history (see Lou Cannon, May 10, 1992, "When the Thin Blue Line Retreated, L.A. Riot Went Out of Control," *Washington Post,* retrieved on May 20, 2020 from https://www.washingtonpost.com/archive/politics/1992/05/10/when-thin-blue-line-retreated-la-riot-went-out-of-control/2ccf3e5c-c03b-4d82-bce1-0ea43bc30cd3/).

above, for police to confront large groups of such individuals, some of whom may be armed. There is no generally accepted police practice to simply avoid any and all contact with such individuals in a neighborhood for an indefinite period of time, with no plan to engage with those individuals for several days, much less several weeks as they violate the law.

If Professor Stoughton was correct that the presence of weapons, violent crime, and anti-police sentiment in a specific area of a city could justify police refusing to respond in person to reports of small fires, rapes, kidnappings, assaults, firearm discharges, and property crimes, then it would be justified and reasonable for police to *de facto* evacuate precisely the areas and neighborhoods most in need of public safety. There are many such areas of U.S. cities—Newark, Chicago, Detroit, Los Angles, New York, Miami, Washington, D.C. to name a few—and Seattle is not unique in this regard.  No legitimate and accepted police principle justifies such a decision.[65]

Restated, Professor Stoughton has not pointed to another case, and I am not aware of one, where a police department made a policy decision to evacuate its primary service delivery center (i.e., East Police Precinct), not to respond in person, for an indefinite time, to any crimes in a neighborhood other those that have already endangered lives, and to delay its response for even those crimes. This again, on its own, indicates that the decision was contrary to generally accepted principles of policing.[66]∎

---

[65] Professor Stoughton suggests that evacuating the East Precinct was a necessary preemptive move.  Based on the totality of the circumstances, police officers facing hostile people are expected to stand their ground, not to retreat, and press forward to achieve a lawful objective. There is no evidence in discovery to indicate the East Precinct officers were facing an imminent threat to justify evacuating the precinct.

[66] I am aware Professor Staughton offered an opinion on a third topic, which is whether SPD erecting a barrier of concrete blocks around the East Precinct on July 1, 2020 was consistent with generally accepted policing practices.  I offer no opinion regarding the creation of that barrier.

**ACKNOWLEDGEMENT**

This report provides my opinion on police policy and practice based on the available information at this time. I presume the information provided to me is accurate and correct. If additional information becomes available at a later time, then I may submit a supplemental report. Depending on the new information, my opinion in this report may or may not change. My opinion is based upon a reasonable degree of professional certainty. My comments on the appropriateness and standards of care are professional opinions based upon on the facts of this specific case and should not be generalized to the wider policing community. The opinion I expressed does not constitute a recommendation for policy changes or other administrative action.

*Dr. Jon M. Shane*