EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HUNTERS CAPITAL, LLC, a Washington
limited liability company, et al., on behalf of
themselves and others similarly situated,

                                 Plaintiff,

        vs.

CITY OF SEATTLE,

                                 Defendant

Case No. 2:20-cv-00983 TSZ

**EXPERT REPORT OF
SETH W. STOUGHTON**

### Expert Report of Seth W. Stoughton

I was retained by counsel for the defendant, City of Seattle, to review aspects of the Seattle Police Department's response to protest activity between May 2020 and May 2021. Specifically, I was asked to evaluate the decision to evacuate the East Precinct on June 8, 2020; the decision to modify police response in a geographic area referred to as the "Red Zone" until July 1, 2020; and the decision to employ a passive barrier system around the East Precinct between summer 2020 and May 2021. I was not provided with and did not review any materials related to, and I have not developed any opinions about, any specific use-of-force incident in that time period that may be the subject of any other litigation.

This report is based on the materials reviewed to date. Should any subsequent information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Please note that this report may include citations to and discussion of information and documents that may be considered confidential, subject to a protective order, or otherwise not suitable for public release.

### Table of Contents

Table of Contents ......................................................................................................... 1

Background and Qualifications ..................................................................................... 2

Compensation ............................................................................................................... 5

Methodology ................................................................................................................. 5

Understanding of Facts ............................................................................................... 10

Opinions ..................................................................................................................... 24

    1.  The initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing ................................................................................................. 25

    2.  The decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing ................................................................................... 34

    3.  Deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing ...................... 38

Submission .................................................................................................................. 39

**Background and Qualifications**

My opinions are based, in part, on my training, professional experience, education, and academic research. My background and qualifications are set forth in the curriculum vitae attached to this report. I highlight and supplement that material here with information relevant to my review and evaluation in this case.

I served as an officer in the Tallahassee Police Department in Tallahassee, Florida. The city of Tallahassee is located in northern Florida; it encompasses over 90 square miles and has a city population of over 180,000 and a metropolitan-area population of over 375,000. The Tallahassee Police Department employs over 350 sworn officers.

I was employed as an officer for a total of five and a half years, serving as a full-time officer from March 2001 until October 2005, and as a reserve (part-time) officer from November 2005 until June 2006. During the course of my service with the department, I was assigned to the Uniform Patrol Division. As a full-time officer, I earned and maintained multiple operator and instructor certifications beyond my state certification as a police officer. I also had a wide range of duties beyond my standard duty assignment. Those duties included serving as a founding member of our Special Response Team, a tactical team with advanced training in crowd control and riot response operations. I was also tasked with teaching report writing, establishing and teaching community self-defense courses, and serving as an acting supervisor as needed.

I served as an investigator in the Florida Department of Education's Office of Inspector General. The Florida Department of Education has state-wide authority related to education, including providing technical assistance and support to 67 local school districts, the Florida School for the Deaf and the Blind, and 28 state and community colleges; the management of statewide education funding and teacher certifications; the administration of private school tuition voucher programs; and the operation of Florida's Division of Blind Services and Division of Vocational Rehabilitation. The Florida Department of Education has more than 2,500 employees and has an annual budget of more than $20 billion, roughly a quarter of Florida's total budgetary expenditures. The Office of Inspector General is responsible for, *inter alia*, conducting and coordinating investigations into allegations of waste, fraud, abuse, and financial mismanagement within or related to the Florida Department of Education. This includes investigating certain allegations that Florida Department of Education employees engaged in misconduct. In this respect, the Office of Inspector General serves an equivalent function to a police agency's Internal Affairs or Bureau of Professional Standards unit.

I was employed as an investigator for more than two and half years, serving from November 2005 until July 2008. In that time, I earned and maintained several professional certifications related to investigations. As an investigator, I conducted investigations into a wide variety of alleged criminal and administrative violations, including leading multi-agency criminal investigations. I was assigned to handle several particularly sensitive or complicated investigations, including a

whistleblower allegation that the state had improperly garnished millions of dollars in wages from hundreds of individuals who had defaulted on their student loans. In 2007, I was recognized with a Meritorious Performance Award for the quality of my investigations. In 2008, I was given a statewide commendation for the number of my fraud investigations that led to arrest and prosecution. Beyond my investigative duties, I trained new investigators, drafted investigative policy, and reviewed investigative reports.

I have conducted academic research on policing since 2012. I am a tenured Professor at the University of South Carolina School of Law, where I teach in the area of criminal law, criminal procedure, and policing. I also hold, by courtesy, an appointment as a Professor in the University of South Carolina's Department of Criminology and Criminal Justice. My research focuses on the regulation of policing, including the use of force, police investigations, agency policies, and industry practices. My previous academic appointment was a two-year teaching fellowship at Harvard Law School, where I researched the same topics.

I have published extensively on policing, including on tactical decision making and the use of force. I am the principal author of *Evaluating Police Uses of Force*, a book published by NYU Press in May 2020. My academic articles have been published or are scheduled for publication in the *Emory Law Journal*, the *Harvard Law Review Forum*, the *Minnesota Law Review*, the *North Carolina Law Review*, the *Tulane Law Review*, the *Virginia Law Review*, the *Wake Forest Law Review*, and other prestigious journals. I have published, or have forthcoming, book chapters in *Rethinking and Reforming American Policing: Leadership Challenges and Future Opportunities*; in *Evidence Based Policing: An Introduction*; in *Legal Issues Around the Globe* (Vol. I); and in *Critical Issues in Policing* (8th ed.). A complete list of my publications is provided in the curriculum vitae that accompanies this report.

My work is widely relied upon in the field. Electronic versions of my work have been downloaded thousands of times, and my published research has been broadly cited by legal scholars in top journals including the *Yale Law Journal*, the *Harvard Law Review*, the *California Law Review*, the *Duke Law Journal*, the *Columbia Law Review*, the *N.Y.U. Law Review*, the *Georgetown Law Journal*, and the *Cornell Law Review*, just to name a few. My work has also been cited by scholars in other disciplines, most prominently in criminology (e.g., in *Criminology & Public Policy*, *Police Quarterly*, and *Journal of Research in Crime and Delinquency*) but also in geography (e.g., in *Political Geography*) and psychology (e.g., in *Psychonomic Bulletin & Review*). It has also been cited in textbooks, casebooks, treatises (e.g., in Wayne LaFave's *A Treatise on the Fourth Amendment*), and both popular books and academic texts (including in James Forman, Jr.'s *Locking Up Our Own*, Barry Friedman's *Unwarranted: Policing Without Permission*, Stephen Rushin's *Federal Intervention in American Police Departments*, Chris Hayes' *A Colony in a Nation*, and Norm Stamper's *To Protect and Serve*). Further, my academic research has been featured in national and international media, including in *The New York Times*, on National Public Radio, and in a host of other publications.

I am active in policing beyond publishing academic research. I am a Member of the American Law Institute and an Adviser to the ALI's *Principles of the Law, Policing*. I am a Fellow of the American Bar Foundation. I was retained by the City Council of Hammond, Louisiana to conduct an independent use-of-force investigation and issue a report documenting findings, conclusions, and recommendations. I have provided use-of-force investigations training to the City of Chicago's Civilian Office of Police Accountability on multiple occasions. I have served as a subject matter expert in multiple capacities, including for CNA Analysis & Solutions, which received a Bureau of Justice Assistance grant to develop technical assistance related to police body-worn cameras; in that capacity, I provided verbal and written consultation, as well as presented, by invitation, a keynote address on using police body-worn cameras to investigate and evaluate officer actions with an emphasis on the use of force. I also served as a subject matter expert in the OIR Group review of the Madison Police Department. I currently serve, by appointment, on the Citizen Advisory Council of the Columbia Police Department in Columbia, South Carolina, a department of approximately 350 sworn officers serving a city with a population of over 130,000 and a metropolitan-area population of over 800,000. I was appointed as one of the original members of the council and have served in that capacity since 2015.

As a policing expert, I am regularly invited to speak about various aspects of policing to legal, law enforcement, and academic audiences. To date, I have formally presented on policing issues well over 100 times to audiences that include the Fourth Circuit Judicial Conference; the American Judges Association; the Conference of Chief Justices; the National Conference of State Courts; state judicial conferences in Indiana, Kansas, Missouri, New York, North Dakota, Ohio, South Carolina, and Tennessee; the Federal Law Enforcement Training Center; federal Inspectors General & Inspectors General Investigators; the Senior Executive Staff of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the National Association of Women Law Enforcement Executives; the Peace Officers' Association of Georgia; the South Carolina Police Chiefs Association; the Command Staff of the Kansas City (Missouri) Police Department; the Washington State Criminal Justice Training Commission; and a host of others.

I have testified before or consulted with legislators, legislative committees, and public task forces or task force members in California, Massachusetts, North Carolina, Pennsylvania, South Carolina, and Virginia. I have filed or joined multiple briefs *amicus curiae* to the Supreme Court of the United States and United States Courts of Appeals related to police procedure, including tactics and the use of force. I have written about policing for *The New York Times*, *The Atlantic*, *TIME*, and other media publications. Either I or my work on policing has appeared on or been featured in domestic and international print, radio, and television media on more than seven hundred occasions.

I am regularly retained to provide expert review and testimony related to police litigation. I have been retained as an expert witness in state and federal court in the course of both civil and criminal litigation, and testified in deposition, grand jury, and trial. A list of cases is provided in my curriculum vitae that accompanies this report.

**Compensation**

My fee for analysis in this case is $485 per hour, billed in 0.25-hour increments, as well as reimbursement for any expenses incurred. On days when I am expected to testify (in deposition or trial), I bill a minimum rate of 8 hours.

**Methodology**

To ensure my methodology was reliable, I did not assign credibility to any witness or source of information prior to a comprehensive review of provided materials, I developed my understanding of relevant facts only after a review of all materials provided, and I assumed those facts to be true solely for the purpose of analysis. In sum, I reviewed sufficient information to reach conclusions to a reasonable degree of professional certainty. I then analyzed those facts against a backdrop of the professional standards for police officers and the practices, principles and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident. The methodology is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

My testimony regarding police procedures, tactics, and the use of force are relevant areas of testimony that would assist a jury in understanding the evidence presented to them.

Before developing the opinions reflected in this report, I reviewed the following materials:[1]

- Deposition Transcripts
  - Sam Zimbabwe, Oct. 28, 2021
  - Harold Scoggins, Sept. 14, 2021
  - Carmen Best, Nov. 9, 2021
  - Jenny Durkan, Dec. 8, 2021 (with Exhibits)
  - Thomas Mahaffey, Jan. 26, 2022 (with Exhibits)
- City of Seattle
  - Email Correspondence
    - Email from Harold D Scoggins to Casey Sixkiller *et al*., June 11, 2020, 08:57
    - Email from Harold D Scoggins to Casey Sixkiller *et al*., June 11, 2020, 09:14:14
    - Email from Jason Verhoff to Unknown Recipients, June 12, 2020, 16:29:43
    - Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34

---

[1] Documents are identified by title where possible and by description when a title is inapposite.

- Email from Jenney Durkan to Carmen Best et al., June 20, 2020, 08:34:28
- Email from Casey Sixkiller to Adrienne Thompson, June 22, 2020, 14:26:40
- Email from Andrew Lee to Sam Zimbabwe, June 25, 2020, 15:15:30
- Email from Mike Solan to Carmen Best, June 30, 2020, 18:16:42
- Email from Thomas Mahaffey to SPD Events et al., June 25, 2020, 11:51:28
- Email from spd_patrol_portal to SPD_SIR et al., June 25, 2020, 18:15:06
- Email from spd_patrol_portal to SPD_SIR et al., June 26, 2020, 14:20:01
- Email from Carmen Best to Carmen Best, June 26, 2020, 15:40:09
- Email from spd_patrol_portal to SPD_SIR et al., June 26, 2020, 15:50:06
- Email from Ernesto Apreza to Stephanie Formas et al., June 26, 2020, 21:42:56
- Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 02:10:11
- Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 18:45:01
- Email from spd_patrol_portal to SPD_SIR et al., June 28, 2020, 06:10:06
- Email from spd_patrol_portal to SPD_SIR et al., June 29, 2020, 03:00:11
- Email from Sam Zimbabwe to Lorelei Williams, June 29, 2020, 10:49:00
- Email from Thomas Yoon to Carmen Best et al., June 30, 2020, 05:11:27
- Email from Thomas Mahaffey to SPD Events et al., June 30, 2020, 17:24:42
- Email from Ernesto Apreza to Daniel Beekman et al., June 30, 2020, 09:32:55
- Email from Vanessa Misciagna to Kamaria Hightower, June 30, 2020, 14:31:32
- Email from SPD Events to SPD Events, June 30, 2020, 21:31:06

- Incident Action Plans
  - May 30, 2020
  - June 2, 2020
  - June 8, 2020
  - June 8, 2020, with addendum
  - June 9, 2020
  - June 10, 2020
  - June 11, 2020
  - June 12, 2020
  - June 13, 2020
  - June 14, 2020
  - June 15, 2020
  - June 16, 2020
  - June 17, 2020
  - June 18, 2020
  - June 19, 2020
  - June 20, 2020
  - June 21, 2020
  - June 22, 2020
  - June 23, 2020

- June 24, 2020
- June 25, 2020
- June 26, 2020
- June 27, 2020
- June 28, 2020
- June 29, 2020
- June 30, 2020
- July 1, 2020
- July 2, 2020
- July 3, 2020
- July 4, 2020
- July 5, 2020
- July 6, 2020
- July 7, 2020
- July 8, 2020
- July 9, 2020
- July 10, 2020

- o Orders
  - Mayoral Proclamation, May 30, 2020 (Contracting and borrowing authority)
  - Civil Emergency Order, Establishing Prohibited Items, May 30, 2020
  - Civil Emergency Order, Imposing a General Curfew, June 2, 2020,
  - Executive Order 2020-07, Directing SPD Officers to Record Body-Worn Video During Protests, June 8, 2020,
  - Executive Order 2020-08, June 30, 2020 (Coordinating the City's response to East Precinct and Cal Anderson Park)
- o Seattle Fire Department
  - Tactical Emergency Casualty Care (TECC) Guidelines, June 2015
  - Policies and Operating Guidelines, Volume 1, Nov. 27, 2019
  - Policies and Operating Guidelines, Volume 1, Sept. 2, 2020
  - Standard Operating Guideline, Scene of Violence, Aug. 3, 2020
  - Standard Operating Guideline, Scene of Violence Reference Document, Aug. 5, 2020
  - Scenes of Violence Scene Diagram
  - Scenes of Violence PowerPoint
- o Seattle Office of Police Accountability
  - OPA Case Number 2020OPA-0354
    - Case Summary – Report of Investigation, Aug. 8, 2021
    - Closed Case Summary, Sept. 30, 2021
    - Director's Certification Memo, Oct. 1, 2021
    - Statements

– 7 –

- o Statement of Assistant Chief Thomas Mahaffey, Oct. 28, 2020
- o Statement of Deanna Nollette, Oct. 29, 2020
- o Statement of Lieutenant Marc Garth Green, Dec. 9, 2020
- o Statement of Captain Todd Kibbee, Jan. 27, 2021
- o Statement of Assistant Chief Bryan Grenon, Feb. 2, 2021
- o Statement of Chief of Staff Stephanie Formas, Mar 2, 2021
- o Statement of Deputy Mayor Michael Fong, Mar. 3, 2021
- o Statement of Assistant Chief Thomas Mahaffey, Mar. 13, 2021
- o Statement of Former Police Chief Carmen Best, Mar. 31, 2021
- o Statement of Captain Stephen Hirjak, July 8, 2021
  - o Seattle Police Department
    - § SWAT Team Policy and Procedure Manual
    - § Orientation Packet, Regular Employee
  - o Text Messages
  - o Miscellaneous
    - § NHSC Presentation, August 2021, Seattle Fire Dept. Response to Protests and CHAZ/CHOP (PDF)
    - § Seattle Police and Seattle Fire Department, Scenes of Violence Concept of Coordination, Nov. 13, 2014
    - § Transcript of Press Conference, June 22, 2020
    - § Transcript of Press Conference, July 1, 2020
- • King County
  - o Fire Model Procedure, Section 19 – Scenes of Violence, Oct. 18, 2018
  - o Fire Model Procedure, Section 19 – Scenes of Violence, July 8, 2020
  - o Fire Resource Plan, Model Procedure Definitions, June 19, 2020
- • Litigation Documents
  - o Second Amended Class Action Complaint, Oct. 30, 2020
  - o City of Seattle's Answer to Second Amended Class Action Complaint, Nov. 11, 2020
  - o Plaintiff's Motion for Class Certification, Jan. 13, 2022
  - o City of Seattle's Opposition to Motion for Class Certification, Feb. 7, 2022
  - o Plaintiff's Reply in Support of Motion for Class Certification, Feb. 18, 2022
- • Miscellaneous
  - o Order Granting in Part Motion for Temporary Restraining Order, *Black Lives Matter Seattle-King County* et al. *v. City of Seattle, Seattle Police Department*, Case No. 2:20-cv-00887-RAJ (U.S. Dist. Ct. W. Dist. Wa. at Seattle)
  - o Settlement Agreement and Stipulated [Proposed] Order of Resolution, July 27, 2012
  - o Paige Cornwell, *Seattle's CHOP Shrinking, but Demonstrators Remain*, THE SEATTLE TIMES (June 24, 2020)
  - o Mike Lindblom, *Seattle adds a concrete wall around Capitol Hill police precinct after protests*, SEATTLE TIMES (Aug. 28, 2020)

- o Nick Bowman, *SPD installs large concrete barriers surrounding East Precinct*, MYNORTHWEST (Aug. 31, 2020)
- Other materials not specifically identified

Additionally, on April 27, 2022, I conducted an interview, via videoconference using Microsoft Teams, of Seattle Police Department Assistant Chief of Patrol Operations Thomas Mahaffey, in the presence of attorney Shane Cramer.

---

This space intentionally left blank.

**Understanding of Facts**

On May 25, 2020, four officers employed by the Minneapolis Police Department sparked nationwide—and, indeed, international—protests after killing George Floyd.[2] Some of those protests evolved into unlawful gatherings or involved unlawful acts, including destruction of property and violence against persons.

Protests in Seattle began on May 29.[3] The Seattle Police Department ("SPD") responded to the various protests, which "resulted in property damage to businesses in the downtown core and the arrests of several individuals."[4] "[T]he area around SPD's East Precinct . . . was the focus of nightly protests."[5]

On May 30, "thousands [of people] came to downtown Seattle to participate in unpermitted protests and marches. Throughout the day and night, protesters committed violent acts and assaults, mainly targeting police officers and destroying property to include citizen and police vehicles."[6] During the demonstrations that day, "Seattle Police Officers were assaulted with rocks, bottles, and other projectiles, Seattle Police Patrol cars were set on fire, a Seattle Police rifle [was] stolen from a police vehicle and fired, . . Molotov cocktails were made and objects thrown at Seattle Police [headquarters] that smelled of accelerant, followed by flares."[7] Seattle Mayor Jenny Durkan concluded that the situation "constitute[d] a civil emergency with a high degree of risk of injury to persons" and proclaimed a state of emergency.[8]

On June 1, "there were several hostile marches and protests. Several officers were injured and there were several arrests. Protests and property destruction continued through [3:00am] despite the Mayor's curfew."[9]

Over the next week, "there [were] large demonstrations of thousands of participants on every day and it [was] unknown when the protest activity [would] end."[10] The SPD mobilized "the entire police department as crowds grew to over 10,000 people with incidents of increasing violence."[11]

---

[2] Disclosure: I was retained by the Office of Minnesota Attorney General as a use-of-force expert and testified in the state prosecution of Derek Chauvin, one of the Minneapolis Police Department officers involved in the incident.
[3] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.
[4] City of Seattle, Mayoral Proclamation of Civil Emergency, May 30, 2020.
[5] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.
[6] Seattle Police Department, Incident Action Plan, June 2 Events, BATES SEA-SPD 303.
[7] City of Seattle, Mayoral Proclamation of Civil Emergency, May 30, 2020.
[8] City of Seattle, Mayoral Proclamation of Civil Emergency, May 30, 2020.
[9] Seattle Police Department, Incident Action Plan, June 2 Events, BATES SEA-SPD 303.
[10] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3909.
[11] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3909.

Additionally, "more than 400 personnel from outside agencies . . . including 300 National Guard troops" had come to assist. "From late May into early June, SPD closed off street access with different types of fencing to create 'standoff distance' between the protesters and the East Precinct and SPD officers. However, these barricades were ineffective and repeatedly dismantled by protesters."[12] During these weeks, SPD was not able to "run any operations out of" the East Precinct; it was "basically inoperable . . ., for the most part, because of the demonstrations."[13]

According to SPD Assistant Chief of Patrol Operations Thomas Mahaffey, the agency attempted to identify and engage with protest leaders, but made no lasting progress:

> [W]e could not identify leaders, and if we even—we had tried to a—approach people and some of the commands had and were rebuffed[. A]t times…some people would talk to us. We'd get an agreement for a short period that they would stop taking whatever…action they were taking, but then that person who talked to us would be immediately pilloried by somebody else in the crowd, and then they would, you know, walk away, or they would lose any authority that they had amongst the crowd. It was very difficult for us to engage in any type of meaningful dialogue to try and reach solutions.[14]

Leading up to June 8, 2020, SPD documentation reflects that most of the demonstrations throughout the city were "peaceful," but "those at East Precinct have continued to involve confrontational crowds who have engaged in assaulting and destructive behavior and have resisted efforts by the Seattle Police Department to avoid confrontation and de-escalate the situation."[15] "Numerous protesters and SPD members were injured during the ongoing demonstrations, some seriously. By early June, there was significant political pressure for SPD to change their tactics in order to de-escalate tensions and to avoid large scale crowd dispersals and the use of less-lethal tools, including chemical agents."[16] The pressure for SPD to change tactics came, in part, from two City Council members "in the front of the crowd" at the East Precinct and criticizing the agency.[17]

On June 7, 2020, Asst. Chief Mahaffey had the light aluminum fencing replaced with heavier metal fencing, but as he later said, "[I]mmediately we started seeing on social media posts about . . . the

---

[12] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.

[13] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149576.

[14] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149586.

[15] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[16] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149243.

[17] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149584.

protesters were bringing engineers and they were going to defeat that fencing that night, and they did. I mean, they came in with tools, within two or three hours they had defeated the fencing, were using for their own purposes, for blockades, and started slowly advancing on officers over several hours."[18]

A Seattle Office of Police Accountability report reflects that

> demonstrators dismantled the fencing [around the East Precinct] and the standoff again escalated into violence. One person was shot by an individual who drove a car into a group of protesters. The crowd was dispersed that evening with the deployment of a significant number of less-lethal tools. A number of community members suffered injuries, some serious. SPD employees also sustained injuries from projectiles thrown by the protesters, including rocks, bottles, and fireworks. The crowd dispersal and the use of less-lethal tools was again met with an uproar from community and elected officials.[19]

Asst. Chief Thomas Mahaffey advocated for fortifying the East Precinct using more secure fencing instead of officers, but the Mayor's Office did not support that plan.[20] On June 8, 2020, "the Mayor's Office ordered SPD to remove the barricades surrounding the East Precinct, open the street, and permit protesters to pass by the East Precinct. However, the Mayor's Office did not direct SPD on the operational details of managing the 'open street' scenario. These decisions were left to the discretion of SPD command staff."[21]

In its Incident Action Plan for June 8, 2020, the SPD documented:

> The violent actions of the demonstrators at this location have resulted in injuries to twenty-five officers and have necessitated the use of force in order to protect life safety and property.

> Officers have been able to maintain control of the East Precinct facility[] but only through the use of less-lethal tools such as blast balls, OC spray, and CS gas in response to hostile actions from protesters to engage in violence towards officers. The continued presence of the protesters at the East Precinct and the continuing need to protect the facility has resulted in the need for a large police presence creating a

---

[18] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149585.
[19] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149243.
[20] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149587-88.
[21] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149244.

significant negative impact on the ability to provide effective police services from that location.[22]

According to Asst. Chief Mahaffey, he and other officers agreed that "the continual line formation" that the agency had been using "was not feasible for us to do any longer"[23] and that there were not "viable options to defend the precinct."[24]

SPD had operational intelligence from both the Federal Bureau of Investigation and from the SPD Criminal Intelligence Unit[25] that the protesters' "goal was to . . . somehow take over that facility [the East Precinct] and potentially damage it significantly."[26] One intelligence estimate found it "[i]ndisputable that protesters are intent on gaining direct access to precinct building. Open source social media postings have indicated their goal is to burn the precinct to the ground."[27] Unauthorized access to the precinct building was a substantial concern because, as Asst. Chief Mahaffey later said, "[F]irearms are kept in there, there's investigative units on the second floor of the building that have sensitive files, . . . a unit running informants had their files up there, . . . police vehicles in the facility, [and] access to criminal justice systems through a computer."[28]

The available evidence reflects that this was an unprecedented situation. Asst. Chief Mahaffey later stated,

> I've never been involved in any level of sustained confrontation like we had over a week that was directed specifically at police officers and a police facility. . . . We had dozens and dozens of officers hurt. We had been involved in hundreds of uses of force[]. It just seems unrelenting and not stopping.
>
> . . .

---

[22] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[23] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149590.

[24] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149559.

[25] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149584.

[26] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

[27] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149572.

[28] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

So, I mean, I'd never thought that I would be placed in a position of deciding what's the safest option, and that was that I can't have anybody in one of my buildings because of the unknown of what could possibly occur if I leave them there, based on the volatility of the crowd. And the options that I thought tactically were the best to defend it, I'm being told that I can't -- can't utilize.[29]

Asst. Chief Mahaffey made a similar point in a later interview, saying that he had been involved in "hundreds" of protests in his time at SPD and calling the scope, "sustained pace," and "focus" of the on-going protests "a generational event" that was "just unprecedented."[30]

He therefore decided that the safest option was to remove sensitive items and evacuate officers from the East Precinct.[31] Other ranking SPD officers, including Captain Todd Kibbee[32] and Lieutenant Marc Garth Green,[33] concurred with that decision. The evacuation was conducted quickly because of the "time pressure" that the agency was under.[34] The exact timing of the decision is described in detail the Seattle Office of Police Accountability report.[35]

There is some disagreement about whether then-SPD Chief Carmen Best was aware that Asst. Chief Mahaffey was going to withdraw from the East Precinct. According to Asst. Chief Mahaffey, he "told her example what we were going to do. That we were going to get the sensitive items out of the precinct . . . and then secure the building the best that we could."[36] According to Chief Best, however, she was not aware that officers had been withdrawn from the East Precinct.[37] Although Chief Best stated that she would have preferred to have been made aware, she acknowledged Asst. Chief Mahaffey was the incident commander and could make operational decisions without her.[38]

---

[29] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149563-64.

[30] Interview with Thomas Mahaffey, Apr. 27, 2021.

[31] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149590-92.

[32] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Captain Todd Kibbee, BATES SEA 149735.

[33] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Lieutenant Marc Garth Green, BATES SEA 149876.

[34] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149595.

[35] Seattle Office of Police Accountability, 2020OPA-0354, Case Summary – Report of Investigation, BATES SEA 149120.

[36] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149561.

[37] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Former Chief Carmen Best, BATES SEA 149622.

[38] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Former Chief Carmen Best, BATES SEA 149622.

For his part, Asst. Chief Mahaffey indicated that the "whole week was extremely chaotic" and that he was sure Chief Best was "taking a lot of different phone calls with different people," suggesting that she simply may not recall their conversation.[39]

There is no indication that Asst. Chief Mahaffey or other SPD commanders ever intended to abandon the East Precinct for a prolonged length of time. Indeed, the available evidence suggests that the SPD's strategic goal was to retain control of the East Precinct after a short period for the evacuation; as Asst. Chief Mahaffey later said, "[T]here was never a question that . . . the police would be returning to that facility. It was just a matter of when we could make it happen,"[40] and indicated that he originally thought that officers would "be back in [the East Precinct] that night."[41] In his later deposition testimony, Asst. Chief Mahaffey stated that he intended for officers to return to the East Precinct "[l]ater that day or early the next morning."[42]

In a later interview, Asst. Chief Mahaffey indicated that his team started "making plans" to reoccupy the East Precinct starting on June 9, 2020.[43] SPD sent personnel to obtain information about conditions around the East Precinct so that the SPD command staff could make informed tactical decisions.[44] At the time, the crowd was "peaceful," so while the agency began to develop plans to re-enter the precinct, they decided against taking action that could provoke confrontation with otherwise peaceful protesters.[45] There was also some concern, given events that led to the evacuation of the East Precinct, about the agency being able to safely maintain a presence there after reentering it.[46] On June 11, 2020, for example, SPD had "put some resources in the building," but the officers left when a fire lit outside the building "made the officers feel unsafe."[47]

The Incident Action Plan for June 12 stated, "As of Thursday[,] June 11, East Precinct Command is attempting to re-establish operations at the East Precinct. Resources have been assigned to facilitate this mission on Friday[,] June 12."[48]

---

[39] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149563.

[40] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149601.

[41] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149576-77.

[42] Mahaffey Dep. 84:9-13, Jan. 26, 2022.

[43] Interview of Thomas Mahaffey, Apr. 27, 2022.

[44] Mahaffey Dep. 92:11-93:3, Jan. 26, 2022.

[45] Mahaffey Dep. 92:2-10, Jan. 26, 2022.

[46] Mahaffey Dep. 96:9-97:18, Jan. 26, 2022.

[47] Mahaffey Dep. 97:2-18, Jan. 26, 2022.

[48] Seattle Police Department, Incident Action Plan, June 12 Events, BATES SEA-SPD 6023.

Notwithstanding the intentions of SPD commanders to return to the East Precinct as soon as it was "practical, safe, feasible, and something [the agency] could sustain,"[49] protesters—including armed protesters—quickly "set up check points and they slowly started to expand the perimeter."[50] According to one of SPD's Incident Action Plans, "As of June 9th[,] a group of people have established check points and road blocks to keep people out of a zone they have created around the [East] Precinct. Some of these people are armed and have been confrontational with Officers."[51] The protesters did not loot or burn the East Precinct building; some of the protesters apparently wanted the building converted into a community center.[52] Instead, the protesters set up a "'police-free' autonomous zone—widely referred to as either 'CHOP' [for Capital Hill Organized Protest] or 'CHAZ' [for Capital Hill Autonomous Zone]."[53] As is relevant for purposes of this report, the SPD identified a portion of this area as the "Red Zone," which is the terminology that will be used in this report.

The available evidence suggests that the prolonged occupation of the Red Zone was unanticipated; there was no intelligence indicating that protesters would engage in an occupation protest and they had not done so in other cities.[54] As a Seattle Office of Police Accountability report concluded, "There is no indication that anyone anticipated the possibility that protesters would attempt to establish an autonomous zone in response to a temporary withdrawal from the area by police."[55]

Over the days and weeks following the evacuation of the East Precinct, some protesters remained generally hostile to the SPD, even when SPD had been called about or was attempting to respond to a significant incident. As Asst. Chief Mahaffey described, the Red Zone became "a place that was very hostile to any intervention from or response from City government."[56] He provided an example, saying: "When [officers enter the Red Zone] during a shooting incident, . . . officers formed a contact team, they had ballistic shields, they wore their protective helmets, they went with

---

[49] Mahaffey Dep. 96:13-15, Jan. 26, 2022.

[50] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149595.

[51] Seattle Police Department, Incident Action Plan, June 10 Events, BATES SEA-SPD 5259.

[52] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149596.

[53] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.

[54] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149578.

[55] Seattle Office of Police Accountability, 2020OPA-0354, Case Summary – Report of Investigation, BATES SEA 149163.

[56] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149598.

rifles, and they were still pushed back by a crowd and were not able to get to a person that had been shot."[57]

Because of the hostility of some protesters, SPD determined shortly after the establishment of the Red Zone that police resources would only be deployed "as needed based on an assessment made by the Operations Section Chief or on-scene commander. If there is any danger to public safety risk or significant property destruction being caused, we will muster sufficient resources and formulate a plan in accordance with our incident objectives and my commander's intent."[58] Asst. Chief Mahaffey directed that "officers would have to form contact teams . . . [to] go in to address violent incidences."[59] On June 12, 2020, Asst. Chief Mahaffey directed officers not to enter the Red Zone in response to "calls for service within the Red Zone, unless the response is to a mass casualty event . . . . If responding to a mass casualty event within the Red Zone, all responding officers should muster with a supervisor outside that zone to evaluate the feasibility of a police response and develop a plan."[60]

According to Asst. Chief Mahaffey's later testimony, the wording of his email was "unfortunate"; what he meant, and what he said he later clarified in briefings, was that there were "examples of when officers would go in more immediately than at other times."[61] The terminology was changed from "mass casualty" to "life-safety emergency," with a later Incident Action Plan indicating that SPD would "not deploy police resources to demonstration or protest-related events except to address a life-safety emergency."[62]

He testified that calls for service "would be taken and processed. [T]he idea was to dispatch the call, but, if possible, have the person meet us outside of the zone[] so officers wouldn't have to go in. If they couldn't do that, then there were other alternative means."[63] Officers could potentially enter the Red Zone when responding to calls involving mass casualty or a "critical life safety emergency," but they were "to formulate a thoughtful and considered response before going in . . . to ensure their safety, de-escalate, minimize the potential use of force, and keep the public safe."[64]

---

[57] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149597.
[58] Seattle Police Department, Incident Action Plan, June 11 Events, BATES SEA-SPD 5714.
[59] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149597.
[60] Email from Jason Verhoff to Unknown Recipients, June 12, 2020, 16:29:43.
[61] Mahaffey Dep. 18:25-20:14, Jan. 26, 2022.
[62] Seattle Police Department, Incident Action Plan, June 29 Events, BATES SEA-SPD 8013.
[63] Mahaffey Dep. 116:11-15, Jan. 26, 2022.
[64] Mahaffey Dep. 38:12-23, Jan. 26, 2022.

According to a email from Asst. Chief Mahaffey, this decision was based on "validated information at the time that a coordinated plan was put in place [by protesters], especially during overnight hours, to have armed people man the barricades if police were seen approaching them."[65] He went on, "While my intent is not to prevent or restrict a response to the defined protest zone, any response must be done in a careful and deliberate manner. I believe that is being done by patrol as exemplified by recent police responses to in[-]progress events."[66]

While the Red Zone was in operation, the SPD "had plainclothes people going in regularly to provide . . . situational assessments [about] what's going on" inside.[67] The uniformed presence, however, was modified as described above, and the agency did not make any immediate effort to forcibly reoccupy the East Precinct or regain unrestricted access to the Red Zone.

The tactical options that SPD had available to address the protesters were limited. On June 12, 2020, the United States District Court for the Western District of Washington enjoined the City of Seattle and SPD as follows:

> The City of Seattle, including the Seattle Police Department and any other officers, departments, agencies, or organizations under the Seattle Police Department's control (collectively, "the City"), is hereby enjoined from employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations. This injunction includes: (1) any chemical irritant such as and including CS Gas ("tear gas") and OC spray ("pepper spray") and (2) any projectile such as and including flash-bang grenades, "pepper balls," "blast balls," rubber bullets, and foam-tip projectiles. This Order does not preclude individual officers from taking necessary, reasonable, proportional, and targeted action to protect against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property. Further, tear gas may be used only if (a) efforts to subdue a threat by using alternative crowd measures, including pepper spray, as permitted by this paragraph, have been exhausted and ineffective and (b) SPD's Chief of Police has determined that use of tear gas is the only reasonable alternative available. The Chief of Police may only authorize limited and targeted use of tear gas and must direct it to those causing violent or potentially life-threatening activity. To the extent that chemical irritants or projectiles are used in accordance with this paragraph, they shall not be deployed indiscriminately into a crowd and to the extent reasonably possible, they should be

---

[65] Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34.
[66] Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34.
[67] Mahaffey Dep. 64:18-20, Jan. 26, 2022.

– 18 –

targeted at the specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property.[68]

According to Asst. Chief Mahaffey, the order "would limit our ability to use less-lethal weapons that we would certainly need if we were to move back into the [East] Precinct."[69]

Over the course of the protest, there was a concern within SPD and the Seattle city government that having the SPD lead the effort to regain control over the Red Zone and reoccupy the East Precinct would lead to additional confrontations with protesters.[70] There was also a concern about whether the agency would be able to safely maintain a presence in the East Precinct, given the circumstances that led to the original evacuation.[71] There was a decision made to "try different avenues" rather than having the police department lead an effort to "get back into the [East] Precinct."[72] In essence, this involved relying more heavily on city entities other than SPD, although SPD remained actively involved in operational and contingency planning.[73]

The available evidence reflects that operational planning to regain access to the East Precinct and the Red Zone was continuous. According to a June 16, 2020, email, for example, Asst. Chief Mahaffey had spoken with the city Department of Transportation director about removing the barricade, explaining that the updated "'protest zone' . . . still does not give us access to the precinct and still leaves a zone that we will still need a conscientious and deliberate plan for patrol response to [*sic*].[74] On June 18, Asst. Chief Mahaffey provided a list of steps that would need to be accomplished "for us to have an orderly move back into our East Precinct."[75] On June 19, Mayor Durkan indicated in an email that multiple agencies—SPD as well as "SDOT, FAS, SPU, SFD, MO"—were continuing to work on "an overall operational plan"[76] and Chief Best, the mayor, and "the teams" needed to continue doing "community work."[77] And in a June 22, 2020, press conference with Mayor Durkan, Chief Best, and Chief Scoggins, and other community leaders,

---

[68] Order Granting in Part Motion for Temporary Restraining Order, *Black Lives Matter Seattle-King County et al. v. City of Seattle, Seattle Police Department*, Case No. 2:20-cv-00887-RAJ (U.S. Dist. Ct. W. Dist. Wa. at Seattle).
[69] Interview with Chief Mahaffey, Apr. 27, 2022.
[70] Interview with Chief Mahaffey, Apr. 27, 2022.
[71] Mahaffey Dep. 96:9-97:18, Jan. 26, 2022.
[72] Interview with Chief Mahaffey, Apr. 27, 2022.
[73] Interview with Chief Mahaffey, Apr. 27, 2022.
[74] Mahaffey Dep. Exhibit 15, Jan. 26, 2020.
[75] Mahaffey Dep. Exhibit 16, Jan. 26, 2020.
[76] Mahaffey Dep. Exhibit 16, Jan. 26, 2020.
[77] Mahaffey Dep. Exhibit 16, Jan. 26, 2020.

Mayor Durkan stated that "it's time for people to go home. It is time for us to restore calm on Capitol Hill so it can be a vibrant part of the community."[78]

As of June 22, multiple offices within the City of Seattle continued coordinating to develop a plan to regain access to and control over the Red Zone.[79] This would have involved providing public notice, referring occupants "to resources for on-site support," being "ready to provide logistical support to transport belongings to alternate locations," and then reducing the infrastructure (such as water and porta potties) to clear the area.[80]

This multifaceted planning continued over the next several days, with written communications on June 25 indicating that the operational planning had evolved.[81] Efforts to begin restoring access to the Red Zone were unsuccessful. According to a June 26, 2020, email from Chief Best, several city agencies "went to the CHOP and attempted to remove the barriers that had been established by the demonstrators . . . to open the streets to facilitate traffic flow and access to businesses and residences. . . . SDOT was not able to remove the barriers this morning."[82]

During the period in which the Red Zone was occupied by protesters, there were multiple high-priority incidents in and around the Red Zone, including several shootings with gunshot victims. Information provided by SPD Gang Intelligence on June 29, 2020, stated in part:

> The CHOP has become a center of lawlessness for our gang members. They all want to go and check it out. They want to see what it is like to be in an area without any police. A number of them are bringing guns with them. The problem is that existing beefs between groups out on the street still exist within the CHOP. Now there are different rival groups that might not come across each other are running into each other in a confined geographic area. This is causing some of the shootings and other crimes that are occurring within the CHOP. Since there are no officers in the area, there is nothing to stop explosions of violence between rival gangs.[83]

There were also incidents directed at SPD facilities. On June 27, for example, the SPD provided a Significant Incident Report Summary about three individuals throwing rocks at and breaking several windows in the West Precinct during a "nightly march from the 'CHOP' to the West

---

[78] Transcript of Press Conference, June 22, 2020.
[79] Email from Casey Sixkiller to Adrienne Thompson, June 22, 2020, 14:26:40.
[80] Email from Casey Sixkiller to Adrienne Thompson, June 22, 2020, 14:26:40.
[81] Email from Andrew Lee to Sam Zimbabwe, June 25, 2020, 15:15:30; Text messages (various).
[82] Email from Carmen Best to Carmen Best, June 26, 2020, 15:40:09.
[83] BATES SEA 36005.

Precinct."[84] According to that summary, "The second window almost ended in a complete breach until OC was deployed at the involved suspects."[85]

In the evening of June 29 or morning of June 30, a protest "leader . . . called 911 to discuss a peaceful surrender of the CHOP."[86]

On June 30, 2020, Asst. Chief Mahaffey sent an email summarizing the agency's intent to "move in a safe and coordinated manner to establish police control" over the Red Zone.[87] At the time, there was still concern that attempting to reenter and regain control over the Red Zone would endanger officers and community members. As the President of the Seattle Police Officers Guild communicated in an email sent less than an hour after Asst. Chief Mahaffey's email,

> People that occupy and control CHAZ/CHOP are heavily armed and are on record stating that police are not allowed inside. If this recent plan to retake control of CHAZ/CHOP commences tomorrow, I fear there may be numerous injuries sustained by officers . . . and injuries to community members. I believe that the likelihood of this operation and its optics could be unpleasant and lead to additional community outrage.[88]

A mayoral declaration issued on June 30, 2020, summarized a number of criminal behaviors, including violent criminal acts, committed in and around the Red Zone, including "three incidents of firearms violen[ce]" that resulted in two individuals killed and several injured, as well as "rape, robbery, assault, and increased gang activity" and "incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic."[89]

On July 1, 2020, SPD officers, supplemented by personnel from other agencies, cleared the Red Zone. Chief Best later referred to it as "a tremendous city-wide effort" involving "[h]undreds of police officers from Seattle and our mutual aid partners from Bellevue and from the Washington State Patrol."[90] It also involved "35 to 40" people from the Seattle Department of Transportation and staff from the city Human Services Department the city Parks and Recreation.[91]

---

[84] Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 02:10:11.

[85] Email from spd_patrol_portal to SPD_SIR et al., June 27, 2020, 02:10:11.

[86] Email from Thomas Yoon to Carmen Best et al., June 30, 2020, 05:11:27

[87] Email from Thomas Mahaffey to SPD Events et al., June 30, 2020, 17:24:42.

[88] Email from Mike Solan to Carmen Best, June 30, 2020, 18:16:42.

[89] City of Seattle, Executive Order 2020-08, June 30, 2020, BATES SEA 45265-6.

[90] Transcript of Press Conference, July 1, 2020.

[91] Transcript of Press Conference, July 1, 2020.

– 21 –

Later that day, Mayor Durkan gave a press conference that reiterated "public safety threats in recent weeks."[92] In her remarks, Mayor Durkan indicated that it had become clear "over the weekend [presumably Saturday, June 27, and Sunday, June 28] that many individuals would not leave and that the impacts to the community could not be improved until they did leave."[93] She indicated that she "fully support[ed] SPD's operations" that morning.[94] She also stated that "an operation of this scope and magnitude takes very careful planning across many departments, and with the number of people who'd been in that area previously, we would not have been able to do this operation."[95] Mayor Durkan reiterated in her later deposition that the planning process to create an operational plan "to successfully move people from the area" was complicated and involved the input of multiple agencies.[96] In her deposition, Mayor Durkan also described how the operational planners were cognizant of "the reception the police got" and that there had to be "few enough people in the park" for the clearing operation "to be successful."[97]

The protests continued after the occupation of the Red Zone ended. Asst. Chief Mahaffey later said, "All of our facilities were attacked in that May, June, July timeframe," but that the East Precinct was a frequent target.[98] Asst. Chief Mahaffey described "numerous" attacks on the East Precinct, including dumpsters being pushed down the hill, trash thrown into the lobby, graffiti, and windows being "broken regularly."[99] Even more seriously, he described the building being targeted by an "explosive device" that caused "significant" damage.[100] He also described an incident in which individuals attempted to burn the building down after sealing a door with quick-setting concrete.[101] News reports from August 2020 corroborate the attempted arson.[102] This was despite the chain-link fencing that the SPD had deployed around the East Precinct, which was repeatedly cut-through or damaged.[103]

After the attempted arson, SPD had the city Department of Transportation stack large concrete blocks around the East Precinct to make it harder to target. According to Asst. Chief Mahaffey, the

---

92 Transcript of Press Conference, July 1, 2020.

93 Transcript of Press Conference, July 1, 2020.

94 Transcript of Press Conference, July 1, 2020.

95 Transcript of Press Conference, July 1, 2020.

96 Durkan Dep. 70:6-71:22, Dec. 8, 2021.

97 Durkan Dep. 70:16-20, Dec. 8, 2021.

98 Interview with Thomas Mahaffey, Apr. 27, 2022.

99 Interview with Thomas Mahaffey, Apr. 27, 2022.

100 Interview with Thomas Mahaffey, Apr. 27, 2022.

101 Interview with Thomas Mahaffey, Apr. 27, 2022.

102 See Mike Lindblom, *Seattle adds a concrete wall around Capitol Hill police precinct after protests*, SEATTLE TIMES (Aug. 28, 2020); Nick Bowman, *SPD installs large concrete barriers surrounding East Precinct*, MYNORTHWEST (Aug. 31, 2020).

103 Interview with Thomas Mahaffey, Apr. 27, 2022.

installation of the concrete blocks improved officers' sense of security and were effective in keeping protesters further away from the building, reducing the need to deploy officers.[104]

After some period of time, there was what Asst. Chief Mahaffey described as a "significant decrease in activity."[105] According to Asst. Chief Mahaffey, the agency considered removing the concrete blocks over the winter of 2020, but decided to wait until the existing windows could be replaced with more protective enhancements, which took some time.[106] Asst. Chief Mahaffey indicated that the agency sought to have the barriers removed as soon as the enhanced windows were installed, and that it took "a couple of weeks" for the city Department of Transportation to remove them.[107]

_____

This space intentionally left blank.

_____

[104] Interview with Thomas Mahaffey, Apr. 27, 2022.
[105] Interview with Thomas Mahaffey, Apr. 27, 2022.
[106] Interview with Thomas Mahaffey, Apr. 27, 2022.
[107] Interview with Thomas Mahaffey, Apr. 27, 2022.

**Opinions**

I was retained by counsel for the City of Seattle to review aspects of the Seattle Police Department's response to protest activity between May 2020 and May 2021. Specifically, I was asked to evaluate the decision to evacuate the East Precinct on June 8, 2020; the decision to modify police response in a geographic area referred to as the "Red Zone" until July 1, 2020; and the decision to employ a passive block-and-fence barrier system around the East Precinct between summer 2020 and May 2021. I was not provided with and did not review any materials related to, and I have not developed any opinions about, any specific use-of-force incident in that time period.

I hold the opinions below to a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training, and experience in law enforcement; my knowledge and research as a policing scholar; my knowledge of law enforcement standards, analysis, and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of the relevant actions, policies, and procedures; and my understanding of the facts of this case based upon a comprehensive review of the materials listed above. My opinions and any related testimony are relevant areas that concern issues of which lay jurors are unaware or about which they frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

My opinions in this case are as follows:

1. The initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing;

2. The decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing; and

3. Deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing.

The justifications for my opinions are laid out on the following pages.

---

This space intentionally left blank.

1. **The initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing**

The operational realities of policing require officers to manage an array of risks and threats. To manage those risks and threats, officers use tactics, which one source has defined as "a sequence of moves that limit the suspect's ability to inflict harm and [that] advance the ability of the officer to conclude the situation in the safest and least intrusive way."[108] "Tactics are the techniques and procedures that officers use to protect themselves and community members by reducing risks, mitigating the likelihood that risks will become threats, and preventing threats from manifesting into harms."[109] As they determine which tactical techniques and procedures are appropriate, officers must balance different and often shifting priorities in dynamic situations. While there is no way to completely ensure safety, police tactics seek to appropriately balance preserving the safety of officers, subjects, and bystanders and protecting property in light of those priorities.

Police tactics and tactical decision making are highly contextual; an approach that may be entirely appropriate in one context may be entirely inappropriate in another. To use a simplified example, the tactics that officers might use to address an armed, barricaded subject are generally inappropriate in an active shooter situation and *vice versa*. Context is key, with context being highly dependent on the situation, including officers' reasonable perceptions, available resources, imminent threats, etc.

Further, it is generally accepted within policing that there may be a range of reasonable responses in any given situation. Tactical decision-making can be fairly thought of as a spectrum with a number of specific points that individually represent the different ways that various priorities may be balanced. To use a simplified example, an officer may be safer from being physically assaulted if they stand farther away from the subject but may have more opportunity to prevent the subject from fleeing if they stand closer, so there may be a range of reasonable distances at which an officer could stand depending on their assessment of the risk of potential assault or potential flight. Analyzing police tactics, then, is not a matter of identifying whether officers adopted the *best possible* tactics, but whether their chosen tactics can be considered reasonable under the circumstances. The determination of whether tactics are reasonable under the circumstances is, in essence, a matter of weighing the foreseeable risk profile of various options against the potential benefits.

Perhaps the most straight forward example of this type of balancing can be seen in the determination of evaluating an individual officer's tactical approach. As an officer manages the risks and threats

---

[108] Jeffrey J. Noble & Geoffrey P. Alpert, *State-Created Danger* in CRITICAL ISSUES IN POLICING: CONTEMPORARY READINGS at 568 (Roger Dunham and Geoffrey P. Alpert, eds., 7th ed., 2015).
[109] SETH W. STOUGHTON ET AL., EVALUATING POLICE USES OF FORCE 155 (2020).

of any given situation, they may expose themselves to potential harm and, by doing so, increase the likelihood that they will use force to address the threat of harm. In some circumstances, this exposure can be warranted. On other occasions, however, an officer's decision to affirmatively create or passively accept a particular threat is unjustified in light of the availability of other tactical options that would avoid or minimize the threat.

"Officer-created jeopardy" refers to situations in which officers affirmatively create or passively accept *unjustified* risks or threats that otherwise could have, and should have, been avoided.[110] Officer-created jeopardy is, in essence, a manner of describing unjustified risk-taking that can increase the likelihood of injury to officers and can, correspondingly, increase the likelihood that officers will use force to protect themselves from a threat of physical harm that they were, in part, responsible for creating.

> An officer who successfully manages potential threats early in an encounter is less likely to be physically threatened—and thus less susceptible to harm—later in the encounter. In the same vein, the officer is also less likely to perceive any need to use force to address a threat of harm, which increases the *subject's* physical safety. The opposite is also true; an officer's poor tactics can expose them to an otherwise avoidable threat, which increases the likelihood that they will use force to address that threat.[111]

Poor tactics—which, again, are situationally dependent—can predictably and significantly increase the likelihood of a suboptimal outcome by provoking avoidable resistance or introducing avoidable constraints on police decision-making or actions. On an individual basis, for example, "police tactics often seek to 'create' time in which officers can assess or respond to the situation" as a way of improving the accuracy of an officer's perceptions and the quality of an officer's decision-making."[112] "A poor tactical decision . . . can deprive the officer of time in which to safely make a decision about how to act, forcing the officer to make a seat-of-the-pants decision about how to respond." For that reason, it is no exaggeration to say that the majority of police tactics are designed to avoid, to the extent possible, putting officers into the position of having to make truly split-second decisions.

The basic principle that officers must assess the risk-profile of different tactical options and adopt an approach that reasonably balances the objective (or potential benefit of action) against the

---

[110] See Jeffrey J. Noble & Geoffrey P. Alpert, *State-Created Danger: Should Police Officers Be Accountable for Reckless Tactical Decision Making?*, *in* CRITICAL ISSUES IN POLICING: CONTEMPORARY READINGS 481, 493 (Roger G. Dunham & Geoffrey P. Alpert eds., 6th ed. 2010).
[111] SETH W. STOUGHTON ET AL., EVALUATING POLICE USES OF FORCE 155 (2020).
[112] Brandon Garrett & Seth Stoughton, *A Tactical Fourth Amendment*, 103 Va. L. Rev. 211, 253 (2017)

foreseeable risk of that action is applicable not just to individual officers, but also to squad, unit, or agency-level tactical decision making.

Importantly, reliably analyzing an officer's tactical decision-making requires recognizing and avoiding the potential for erroneously relying on *hindsight bias*.[113] Hindsight bias is the tendency for people to exaggerate, after a particular event, the predictability of that event occurring.[114] In short, knowing that something *did* happen can lead people to think, after the fact, that the event was more likely to happen than it actually was. Consider a simplified example: prior to a sporting event, people might report that they believe there is a 50% probability of a particular team winning. After that team wins, hindsight bias may lead people to report that they believed (beforehand) that there was a substantially greater than 50% probability that the winning team would ultimately win. In short, the after-the-fact information that the team won tends to lead people to exaggerate the extent to which it seemed beforehand as if the team would win.

Minimizing or avoiding hindsight bias requires reviewing the relevant decisions at the time they were made without regard for the ultimate outcome. A decision that was unreasonable at the time does not become reasonable because it contributed to a positive outcome. Similarly, a decision that was reasonable at the time it was made does not become unreasonable because it contributed to a negative outcome. Put simply, whether a particular decision or set of decisions was reasonable or unreasonable depends on, and only on, the facts reasonably available at the time the decision was made.

Over time, policing has developed tactical options for many—although certainly not all—situations that officers may encounter. For example, there are a set of generally accepted practices for officers conducting a traffic stop, initiating a "felony" or "high-risk" stop, responding to an active shooter, working as "contact" and "cover" officers, and so forth. The precise manner in which any given tactic may apply will depend on the circumstances, of course. For example, the circumstances of a traffic stop—including time, location, and how a motorist pulls over—will determine how an officer positions their vehicle and whether they approach from the driver or passenger side or call the stopped driver back.

Some situations, however, are so uncommon that policing has not developed a set of tactical precepts to guide officer decision-making. Under such circumstances, officers must balance competing priorities by referring not to specific tactical procedures, but rather to generally accepted tactical principles. To use a simplified example, officers may learn a variety of specific tactical options that they can use to stop a vehicle from behind but not learn any specific tactics for stopping

---

[113] Hindsight bias is also referred to as the *knew-it-all-along phenomenon* and as *creeping determinism*.

[114] See Rüdiger F, Pohland Edgar Erdfelder, *Hindsight Bias*, in COGNITIVE ILLUSIONS: INTRIGUING PHENOMENA IN JUDGMENT, THINKING, AND MEMORY (Rüdiger F. Pohl ed., 2d ed. 2017)

a vehicle that has backed into a parking spot. In such a situation, the officer must still employ applicable tactical principles—such as time, distance, cover, concealment, and communication—in a way that properly balances the potential risks of the situation against the objective of addressing the underlying traffic violation.

This case presents an unprecedented tactical situation: a police precinct besieged by confrontational protesters over a prolonged period. There simply are no generally accepted tactical protocols to guide police decision-making under such circumstances. Instead, Asst. Chief Mahaffey and other SPD commanders had to identify the relevant priorities and assess the relative risks of various options to advance those priorities consistent with generally accepted principles.

There were multiple priorities in this case. The first and most important is the preservation of human life. It is well known and generally accepted in policing that the sanctity of human life is and must be the highest priority in policing. In 2015, the President's Task Force on 21st Century Policing called for a "'sanctity of life' philosophy . . . [to] be in the forefront of each officer's mind."[115] In the Police Executive Research Forum's 2016 *Guiding Principles on Use of Force*, the very first policy recommendation is that "[t]he sanctity of human life should be at the heart of everything an agency does."[116] And as the United States Conference of Mayors put it more recently, "Police departments' policies should consistently emphasize that the sanctity of life is a central principle of policing."[117]

This generally accepted principle is reflected in the Seattle Police Department. In an Incident Action Plan for June 8, 2020, the Seattle Police Department reiterated the following:

> Priorities of the Seattle Police Department include preservation of life and preservation of property. In support of these priorities, the Department has a stated goal of providing thoughtful resolutions to situations and reducing the likelihood of harm to all persons involved through the application of de-escalation principles.[118]

Further, the "General Control Objectives for the Incident" prepared by the SPD included, as the first objective, "Provide for the safety of the general public, spectators, first responders, and participants during this statewide COVID-19 state of emergency which does not permit public gatherings."[119]

---

[115] FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING, 19 (2015).

[116] POLICE EXECUTIVE RESEARCH FORUM, GUIDING PRINCIPLES ON USE OF FORCE, 34 (2016).

[117] UNITED STATES CONFERENCE OF MAYORS, REPORT ON POLICE REFORM AND RACIAL JUSTICE, 18 (2020).

[118] Seattle Police Department, June 8 Events, Incident Action Plan, Addendum, BATES SEA-SPD 3946.

[119] Seattle Police Department, June 8 Events, Incident Action Plan, June 8, 2020, BATES SEA-SPD 3911.

Former Chief Best reflected this generally accepted principle in a later interview, stating, "[O]ur general operating philosophy is life safety, incidents, stabilization and…protection of property. . . . And sometimes, you know, the policy part of that is going to be secondary to protecting life. And in stabilizing an incident, and then [protecting] property, you want to protect it, but ultimately, not at the risk of injury or danger to other people."[120]

The tactical concepts of withdrawal and stabilization are well known and generally accepted in policing. Although the Mayor's Office had "ordered SPD to remove the barricades surrounding the East Precinct, open the street, and permit protesters to pass by the East Precinct" on June 8, 2020,[121] it would have been reasonable for the agency to have made that decision—with the contingent evacuation of the East Precinct—to remove one focal point for protesters and reduce the potential for confrontation.

Maintaining the integrity of police information and equipment—including weapons, police vehicles, and access to sensitive intelligence—was also a significant priority in this case. As Asst. Chief Mahaffey later said, "[F]irearms are kept in there, there's investigative units on the second floor of the building that have sensitive files, . . . a unit running informants had their files up there, . . . police vehicles in the facility, [and] access to criminal justice systems through a computer."[122]

The continued delivery of police services was also a priority, if one that had been substantially impacted by the on-going protests. As the SPD's Incident Action Plan for June 8, 2020, stated:

> The continued presence of the protesters at the East Precinct and the continuing need to protect the facility has resulted in the need for a large police presence creating a significant negative impact on the ability to provide effective police services from that location.[123]

The preservation of protesters' statutory and constitutional rights was also a priority. It is well known and generally accepted in policing that officers and agencies must respect civil rights and facilitate, *inter alia*, the freedom of expression protected by the First Amendment. It is well known and generally accepted in policing that individuals and groups have a First Amendment right to assemble on public areas—streets, sidewalks, parks, etc.—for the purposes of making public statements or engaging in expressive conduct, subject only to reasonable restrictions designed to protect public safety and property. For example, police agencies can impose narrowly drawn time,

---

[120] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Former Chief Carmen Best, BATES SEA 149631.

[121] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149244.

[122] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

[123] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

place, and manner restrictions, but cannot use such restrictions to significantly interfere with the protesters' ability to effectively communicate with the intended audience. In short, it is well known and generally accepted in policing that agencies and officers must not only respect the exercise of First Amendment rights, including by respecting the physical space that the protesters use, they must also avoid taking actions that could unreasonable deter (or "chill") the exercise of First Amendment rights.

There is ample evidence that the SPD acknowledged the need to preserve protesters' First Amendment rights and facilitate the exercise thereof. In the SPD Incident Action Plans, the second General Control Objective was provided as "Facilitate citizen's right to peacefully express their First Amendment free speech rights within the parameters set forth by the Washington State Governor's Stay at Home proclamation and the suspension of permitted events."[124] Both Mayor Durkan and Chief Best later spoke about the importance of respecting protesters' First Amendment rights.[125]

In assessing how best to preserve and facilitate protesters' exercise of statutory and constitutional rights while also balancing other priorities, police agencies must make a series of decisions about how to manage the physical space that protesters use, how to staff the protest (e.g., how many officers will be assigned); how to equip the officers (e.g., whether they should wear standard uniforms or protective gear); the degree of officer visibility; where officers should be visibly placed or staged (that is, positioned nearby but not visible from the protest location); what the span of control and command structure should look like; whether to use barricades and, if so, what type; and so on based on the specific circumstances of the protest. This requires agencies to consider a range of factors including, but not limited to, the nature and context of the protest activity, the characteristics of the area in which such activity is taking place, the ability to communicate cooperatively with protesters and other stakeholders, the likelihood of counter-protesters. To use a simplified example, a police agency may facilitate a climate change protest very differently than a police protest because of the higher likelihood for conflict (between protesters and officers) presented by a policing protest; the agency may adopt a higher visibility approach using officers in standard uniforms for the climate change protest but a lower visibility approach using officers in protective gear for the policing protest.

In essence, over the course of the protest, Asst. Chief Mahaffey and other SPD officials had to assess the relative risks of various options—including maintaining a significant police presence in the East Precinct or evacuating property and personnel from the East Precinct—and determine which option best advanced agency priorities. The efforts that SPD took to facilitate the protests

---

[124] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3911.
[125] Transcript of Press Conference, July 1, 2020.

prior to evacuating the East Precinct—specifically, the command structure, the use of barricades, the placement and equipping of officers, and the use of various less-lethal weaponry—were consistent with tactics adopted by various police agencies addressing confrontational protests.

The risks of maintaining a police presence in the East Precinct without the ability to significantly fortify the building were significant. Maintaining control of the East Precinct had *already* resulted in "injuries to twenty-five officers and have necessitated the use of force in order to protect life safety and property," including "the use of less-lethal tools such as blast balls, OC spray, and CS gas in response to hostile actions from protesters to engage in violence towards officers."[126] There was operational intelligence from both the Federal Bureau of Investigation and from the SPD Criminal Intelligence Unit[127] that the protesters' "goal was to . . . somehow take over that facility [the East Precinct] and potentially damage it significantly."[128] One intelligence estimate found it "[i]ndisputable that protesters are intent on gaining direct access to precinct building. Open source social media postings have indicated their goal is to burn the precinct to the ground."[129]

Further, there is a significant body of both anecdotal and empirical evidence that confrontational police tactics—both aggressing and maintaining a position against aggressing protesters—can escalate tense, complex situations, dramatically increasing the likelihood of physical violence and arrest. Academic work on crowd psychology in the context of protests and police response has found that "ill-advised actions by police can instigate or escalate conflict and violence in crowds" by fostering "an increased willingness to defy, rebel against, or use violence against the police."[130] The protests that following the shooting of Michael Brown in Ferguson, Missouri, for example, were exacerbated by "ineffective and inappropriate [police] strategies and tactics" that had the "unintended consequence of escalating rather than diminishing tensions."[131] The Final Report of the President's Task for on 21st Century Policing advised, *inter alia*, "Law enforcement agencies should create policies and procedures for policing mass demonstrations that employ a continuum of managed tactical resources that are designed to minimize the appearance of a military operation and avoid using provocative tactics and equipment that undermine civilian trust."[132]

---

[126] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[127] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149584.

[128] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149583.

[129] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149572.

[130] Edward R. Maguire, *New Directions in Protest Policing*, 35 ST. LOUIS U. PUB. L. REV. 67, 94 (2015).

[131] OFFICE OF COMMUNITY ORIENTED POLICING SERVICES, U.S. DEP'T OF JUSTICE, AFTER-ACTION ASSESSMENT OF THE POLICE RESPONSE TO THE AUGUST 2014 DEMONSTRATIONS IN FERGUSON, MISSOURI xiv (2015)

[132] *Final Report of the President's Task Force on 21st Century Policing*, U.S. DEP'T JUST. 25 (2015).

Based on the information available to a reasonable officer at the time, it was entirely reasonable to conclude that maintaining a police presence at the East Precinct would result in escalating confrontations between protesters and officers that were highly likely to result in the use of significant force by and against officers. Further, it was entirely reasonable to conclude that should protesters make a concerted effort to force entry into the East Precinct and "burn [it] to the ground,"[133] officers may be confronted with imminent threats of death or great bodily harm that could result in the application of deadly force.

At the same time, the foreseeable risks of evacuating the East Precinct were less substantial. The loss of the building would hamper extent agency operations, but this effect was mitigated, in part, by the observation that agency operations out of the East Precinct were already limited by the protest. As the SPD assessed, "the continuing need to protect the facility has resulted in the need for a large police presence creating a significant negative impact on the ability to provide effective police services from that location."[134]

Further, the evacuation was intended and predicted to be short-lived. The SPD's strategic goal was to regain and retain control of the East Precinct; as Asst. Chief Mahaffey later said, "[T]here was never a question that . . . the police would be returning to that facility. It was just a matter of when we could make it happen,"[135] and indicated that he originally thought that officers would "be back in [the East Precinct] that night."[136] No reasonable officer in Asst. Chief Mahaffey's position could have anticipated that the protesters would set up a long-term occupation protest. As the Seattle Office of Police Accountability described, "There is no indication that anyone anticipated the possibility that protesters would attempt to establish an autonomous zone in response to a temporary withdrawal from the area by police."[137]

Under the circumstances, a reasonable officer could have concluded that the high likelihood that a continued police presence in the East Precinct would result in violence and that while evacuating property and officers from the East Precinct could increase the likelihood of property damage and diminish the agency's ability to respond, it would significantly mitigate the risk of violent confrontation between officers and protesters, including armed protesters. Under such

---

[133] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149572.

[134] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3946.

[135] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149601.

[136] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149576-77.

[137] Seattle Office of Police Accountability, 2020OPA-0354, Case Summary – Report of Investigation, BATES SEA 149163.

circumstances, concept of tactical repositioning—that is, moving back to a position that either provides additional tactical advantages or alleviates an existing tactical disadvantage—is entirely consistent with police practices.

Under such circumstances, it is eminently reasonable for an officer to accept the risk of property damage to avoid increasing risks to the lives and physical safety of officers and protesters alike.

For the foregoing reasons, the initial decision to evacuate the East Precinct was reasonable, tactically appropriate, and consistent with generally accepted principles in policing.

This space intentionally left blank.

2.  **The decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing**

The framework for evaluating tactical decisions is laid out above.[138] After evacuating the East Precinct, SPD officials had to determine when and how to regain access to the Red Zone and how to respond to calls for service and other activity in the Red Zone in the meantime.

As with the initial decision about how to respond to the protests and the decision to evacuate the East Precinct on June 8, 2020—not to mention the agency's initial approach to the protests prior to June 8—the determination of when and how to regain access to the Red Zone required SPD officials to balance multiple priorities.

As discussed above, fully restoring and delivering of police services in the Red Zone was a priority, primarily because of the significant risks that accompanies the loss of access to the Red Zone. Between June 8, 2020, and July 1, 2020, there were multiple high-priority incidents in the Red Zone. A mayoral declaration identified "three incidents of firearms violen[ce]" that resulted in two individuals killed and several injured, as well as "rape, robbery, assault, and increased gang activity" and "incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic."[139] Further, the information obtained by SPD Gang Intelligence reflected that rival gangs were "running into each other in a confined geographic area" of the Red Zone, which was "causing some of the shootings and other crimes that are occurring."[140]

However, as before, the preservation of protesters' statutory and constitutional rights was also a priority. SPD Incident Action Plans continued to include, "Facilitate citizen's right to peacefully express their First Amendment free speech rights within the parameters set forth by the Washington State Governor's Stay at Home proclamation and the suspension of permitted events" as a General Control Objective.[141] The facilitation of peaceful protester's rights is "most essential" when "parts of a crowd become violent or destructive," because history, research, and experience reflect that *failing* to facilitate peaceful protesters' rights increases the likelihood that formerly peaceful protesters will engage in violent or destructive behavior.[142]

At the same time, however, the tactical risk of reentering, let alone reestablishing full access to, the Red Zone remained high, as demonstrated by the identification of "check points and road blocks"

---

[138] See Opinion 1.

[139] City of Seattle, Executive Order 2020-08, June 30, 2020, BATES SEA 45265-6.

[140] BATES SEA 36005.

[141] Seattle Police Department, Incident Action Plan, June 8 Events, BATES SEA-SPD 3911.

[142] Edward R. Maguire, *New Directions in Protest Policing*, 35 ST. LOUIS U. PUB. L. REV. 67 (2015).

that protesters, including some who were "armed and have been confrontational with Officers" established "around the [East] Precinct,"[143] and by the officers who returned to and then evacuated the East Precinct on June 11, 2020, after a fire was lit outside the building.[144] Further, when officers attempted to enter the area after a shooting incident, "officers formed a contact team, they had ballistic shields, they wore their protective helmets, they went with rifles, and they were still pushed back by a crowd and were not able to get to a person that had been shot."[145] Additionally, the SPD had what Asst. Chief Mahaffey described as "validated information at the time that a coordinated plan was put in place [by protesters], especially during overnight hours, to have armed people man the barricades if police were seen approaching them."[146]

The perspective that police reentry would provoke violence does not appear limited to the SPD; one media report published on June 18, 2020, stated:

> Nobody inside the protest zone thinks a police return would end peacefully. If cops show up, protesters say, they plan to block the precinct with their bodies, with white activists pledging to stand up front as a symbolic shield for black and brown comrades. Small teams of armed anti-fascists are also present — self-proclaimed community defense forces that say they're ready to fight if needed but that de-escalation is preferred.[147]

These concerns persisted during the occupation of the Red Zone. The day before the Red Zone was cleared, the President of the Seattle Police Officers Guild sent Chief Best an email expressing concern about some Red Zone occupiers being "heavily armed and . . . on record stating that police are not allowed inside," such that "[i]f this recent plan to retake control of Red Zone commences tomorrow, I fear there may be numerous injuries sustained by officers . . . and injuries to community members. I believe that the likelihood of this operation and its optics could be unpleasant and lead to additional community outrage."[148]

Additionally, research and experience reflect that an aggressive or overly broad police response can provoke, rather than prevent, confrontation. As one researcher has written, "When police treat moderate crowd members as radicals, the moderates begin to identify with the radicals to a much greater extent than they did before. Support for challenging or pushing back against the police can

---

[143] Seattle Police Department, Incident Action Plan, June 10 Events, BATES SEA-SPD 5259.

[144] Mahaffey Dep. 97:2-18, Jan. 26, 2022.

[145] Seattle Office of Police Accountability, 2020OPA-0354, Statement of Assistant Chief Thomas Mahaffey, BATES SEA 149597.

[146] Email from Thomas Mahaffey to Christopher Fisher and Carmen Best, June 16, 2020, 14:27:34.

[147] Hannah Allam, *'Remember Who We're Fighting For': The Uneasy Existence of Seattle' Protest Camp*, NATIONAL PUBLIC RADIO (June 18, 2020).

[148] Email from Mike Solan to Carmen Best, June 30, 2020, 18:16:42.

– 35 –

spread quickly under such conditions."[149] In short, there was not only a reasonable fear of confrontation, there was a legitimate concern that certain police actions would escalate the potential for confrontation.

Notably, the tactical options that SPD had available to address the protesters were limited. On June 12, 2020, the United States District Court for the Western District of Washington enjoined the City of Seattle and SPD from using "any chemical irritant such as and including CS Gas ("tear gas") and OC spray ('pepper spray') and (2) any projectile such as and including flash-bang grenades, 'pepper balls,' 'blast balls,' rubber bullets, and foam-tip projectiles" against "persons peacefully engaging in protests or demonstrations."[150] The City recognized that many of the Red Zone occupiers were peaceful, as acknowledged by the mayor's office prior to the Red Zone being cleared, stating that "[m]ost individuals previously participating in the Capitol Hill demonstrations have been peaceful,"[151] and in Mayor Durkan's statements during a press conference after the Red Zone was cleared, stating, "While thousands have peacefully protested in that area of over the last weeks, the public safety threats in recent weeks have been well documented."[152]

The use of chemical munitions to clear or control a crowd is a common policing technique, but such weapons cannot be individually targeted; the injunction combined with the observation that there were peaceful occupiers in the Red Zone effectively removed the SPD's ability to employ common crowd-control and crowd-clearing tactics. As Asst. Chief Mahaffey later said, the court order "limit[ed] our ability to use less-lethal weapons that we would certainly [have] need[ed] if we were to [have] move[d] back into the [East] Precinct."[153]

Further, the planning that led up to the reentry into the Red Zone was significant; various Seattle and external agencies had to coordinate to conduct a multifaceted operation that could provide appropriate notice, reduce infrastructure that supported the occupation of the Red Zone, provide infrastructure to support clearing the Red Zone, and physically enter and clear the Red Zone.[154]

At the same time, as contemporary media accounts reflect, the size and impact of the Red Zone was reduced over time.[155] Under such circumstances, it was reasonable to exercise tactical restraint by

---

[149] Edward R. Maguire, *New Directions in Protest Policing*, 35 St. Louis U. Pub. L. Rev. 67, 95 (2015).

[150] Order Granting in Part Motion for Temporary Restraining Order, *Black Lives Matter Seattle-King County et al. v. City of Seattle, Seattle Police Department*, Case No. 2:20-cv-00887-RAJ (U.S. Dist. Ct. W. Dist. Wa. at Seattle).

[151] Email from Ernesto Apreza to Daniel Beekman et al., June 30, 2020, 09:32:55.

[152] Transcript of Press Conference, July 1, 2020.

[153] Interview with Chief Mahaffey, Apr. 27, 2022.

[154] Transcript of Press Conference, July 1, 2020.

[155] Paige Cornwell, *Seattle's CHOP Shrinking, but Demonstrators Remain*, The Seattle Times (June 24, 2020).

waiting until conditions improved before mobilizing a large number of officers—not to mention other city workers—to reenter and reestablish unrestricted access to the Red Zone.

While not assertively moving to clear the area earlier may potentially have had some negative effects, a reasonable police commander assessing the situation could have fairly concluded that moving in more quickly was highly likely to result in a significant physical conflict that could foreseeably escalate. Indeed, a reasonable police commander would have been concerned about the potential that an aggressive, rapid response could result in a prolonged gun battle with entrenched, armed protesters. In short, a reasonable officer could have concluded that the foreseeable risks of exercising tactical restraint, although potentially substantial, were significantly outweighed by the foreseeable and more likely risks of precipitous police action.

For the foregoing reasons, the decision to modify police entry into the Red Zone between the evacuation of the East Precinct on June 8, 2020, and July 1, 2020, was reasonable, tactically appropriate, and consistent with generally accepted principles in policing.

---

This space intentionally left blank.

### 3. Deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing

It is well known and generally accepted in policing that crowd control and security operations can include area denial tactics, which seek to prevent, discourage, or limit access to the protected area. Area denial tactics can be active (e.g., officers physically preventing entry or using chemical munitions to encourage people to leave or stay out of an area), or passive (e.g., fencing). According to Asst. Chief Mahaffey, the SPD makes "fairly frequent" use of passive barriers during a range of operations.[156]

In this case, the SPD used chain-link fencing during the initial protests "from late May into early June," but those "barricades were ineffective and repeatedly dismantled by protesters."[157] After regaining access to the East Precinct and the Red Zone, the SPD again used chain-link fencing to protect the East Precinct building, but it was "cut through or damaged."[158] Even after the occupation protest in the Red Zone was disbanded, there was "additional property destruction or confrontations," including "numerous" attacks on the East Precinct, such as dumpsters being pushed down the hill, trash thrown into the lobby, graffiti, windows being "broken regularly," at least one instance in which the building was targeted with an explosive device, and an attempt to start a fire after quick-setting concrete had been applied in an attempt to block a door.[159]

In light of these attacks, the SPD had the city Department of Transportation stack large concrete blocks around the East Precinct building. According to the available information, doing so both improved officers' perceptions of safety in the East Precinct and mitigated the attacks on the building.[160] The concrete barriers were left in place until the East Precinct could be fortified with the installation of more protective windows, at which point the city Department of Transportation was asked to remove them.[161] They did so within a few weeks.[162]

Under the circumstances, the decision to deploy concrete blocks as a passive barrier to help protect the East Precinct and the duration of their deployment improved officer safety and reduced the potential for confrontation inherent in more active countermeasures.

---

[156] Interview with Thomas Mahaffey, Apr. 27, 2022.

[157] Seattle Office of Police Accountability, 2020OPA-0354, Closed Case Summary, BATES SEA 149242.

[158] Interview with Thomas Mahaffey, Apr. 27, 2022.

[159] Interview with Thomas Mahaffey, Apr. 27, 2022.

[160] Interview with Thomas Mahaffey, Apr. 27, 2022.

[161] Interview with Thomas Mahaffey, Apr. 27, 2022.

[162] Interview with Thomas Mahaffey, Apr. 27, 2022.

For the foregoing reasons, deploying stacked concrete blocks as a passive barrier to protect the East Precinct until it could be fortified with enhanced windows was reasonable, appropriate, and consistent with generally accepted principles in policing

**Submission**

The preceding constitutes my report regarding the Seattle Police Department's response to an occupation protest between June 8, 2020, and July 1, 2020. This report is based on the materials reviewed to date. Should any subsequent information cause me to expand, add, or revise any of my opinions, I reserve the right to revise, amend, or supplement this report accordingly.

Please note that the preceding report may include citations to and discussion of information and documents that may be considered confidential, subject to a protective order, or otherwise not suitable for public release.

Respectfully Submitted,

Seth Stoughton

April 28, 2022

– 39 –