# EXHIBIT 4

JON M. SHANE PhD
8/11/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiff,          )
                                )
        vs.                     )   No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )
_____

Zoom Video Deposition Upon Oral Examination

Of

JON M. SHANE, Ph.D.

_____

DATE:  Thursday, August 11, 2022

REPORTED BY:  Mindy L. Suurs, CSR 2195

Page 16

1  offenders in and around the CHOP zone, not responding or
2  slowly responding, delaying the response to calls for
3  service in and around the CHOP zone, the -- the ambiguous
4  nature of the orders that were issued surrounding police
5  response related to the CHOP zone that were issued by Chief
6  Mahaffey.
7      Q.   Any others?
8      A.   There may be others as I go through the report,
9  but that's what I'm thinking of off the top of my head.
10     Q.   Okay.  And are any of these generally accepted
11 police practices that you just listed -- are those
12 contained in any national standards?
13     A.   Well, the American Bar Association in 1979 had
14 set forth the standards for urban policing.  The City of
15 Seattle Charter broadly defines -- and I think the word
16 they use is must be be liberally construed or something to
17 that effect -- about providing adequate police protection,
18 things like that.
19     Q.   Okay.  So --
20     A.   Let me just finish.  There's also a body of
21 national standards called the Commission For the
22 Accreditation of Law Enforcement Agencies, Commission For
23 The Accreditation of Law Enforcement Agencies, and goes by
24 the acronym CALEA, C-A-L-E-A.  And CALEA promulgates a body
25 of national standards about how police practices should be

JON M. SHANE PhD
8/11/2022

Page 17

1  carried out.
2       Q.   And is there a specific provision or -- or policy
3  as pronounced by CALEA that you believe set the standard
4  here that the City of Seattle failed to live up to?
5       A.   Well, one of the things that comes to mind is the
6  way in which they approached -- or if I should say failed
7  to approach -- pedestrian stops.  I think Mahaffey in his
8  deposition said that they were aware through video --
9  through video feeds, live video feeds that there were
10 people in and around the CHOP zone with weapons and that
11 they weren't confronting these folks.  And that's not
12 consistent with established practices for conducting
13 inquiries about suspicious persons, people who are armed,
14 people who may be engaged in criminal behavior.
15      Q.   And so it's your opinion that the Seattle Police
16 Department should stop and interview anyone who is carrying
17 a weapon?
18      A.   It depends -- I think it depends on the totality
19 of the circumstances.  In this situation you had the CHOP
20 zone that was established that was unlawfully developed and
21 people in and around that area with weapons.  I think that
22 would necessitate an inquiry.
23      Q.   And you used the language "totality of the
24 circumstances."  What does that mean?
25      A.   Totality of the circumstances are all of the --

1  all the conditions surrounding a police action and whether
2  or not it amounts to a reasonable inquiry as to whether or
3  not a police officer should take action or not take action.
4     Q.  And if under the totality of the circumstances a
5  police officer determines that it would be unwise to
6  approach an armed person who is not engaged in any criminal
7  activity, that would be reasonable?
8          MR. WEAVER:  Objection, incomplete hypothetical.
9  BY MR. CRAMER:
10    Q.  Go ahead, you can answer.
11    A.  What do you -- what -- so let me ask for clarity
12  just to make sure I'm clear.  Police officer observes
13  someone with a weapon and determines that it's -- did you
14  say unwise to stop them?  What do you mean by unwise?
15    Q.  That they have reason to decide that -- against
16  stopping them, that it may escalate a problem.
17         MR. WEAVER:  Same objection.
18    A.  Well, the answer is it depends.  A police officer
19  is going to have to articulate why they decided not to --
20  why they decided not to call for -- for additional
21  assistance in stopping that person.
22 BY MR. CRAMER:
23    Q.  But your opinion is that it's unreasonable not to
24  stop that person?
25    A.  Well, like I said, it depends on the

JON M. SHANE PhD
8/11/2022

Page 188

1    operations.
2         Q.   So if the nightly protests in front of the
3    precinct which involved uses of force had continued for
4    another three days, would it have been reasonable for Chief
5    Mahaffey to have taken this step of vacating the precinct?
6         A.   Absent an imminent threat to life like we talked
7    about earlier, like somebody setting the building on fire
8    with police officers in it, I can't see them picking up,
9    regardless of how many nights it was.
10        Q.   What if a police officer was shot and killed
11   protecting the -- one of these conflicts?
12        A.   Unfortunate set of circumstances.
13        Q.   But they still, in your mind, would have needed
14   to remain on that barricade every night in conflict with
15   the protesters?
16        A.   I mean if something like that were to happen,
17   that would be even more reason to fortify the building and
18   to take direct action against the protesters from a law
19   enforcement perspective and start to make arrests.
20        Q.   And who would you arrest?
21        A.   Anybody violating the law.
22        Q.   And is protesting necessarily illegal?
23        A.   No, it's not necessarily illegal, no.
24        Q.   And would conducting mass arrests -- would that
25   have deescalated the situation?

Electronically signed by Mindy Suurs (101-257-931-8021)                              3ed6d8b7-a17a-41ed-b92a-30ac51207b48

Page 189

1      A.    It may have.
2      Q.    And it might not have; correct?
3      A.    It may not have either, but the police are not in
4   the business of ceding areas to residents that are not
5   happy with their presence or with them as an institution.
6      Q.    How about if a police officer had shot and killed
7   a protester?  In June of 2020 do you believe that that
8   would have likely caused the nightly conflict to
9   deescalate?
10     A.    That's -- that's very difficult to say.  It's --
11  I think, if -- you know, if the shooting was justified,
12  there's, you know, a distinct possibility.
13     Q.    It's also possible that it would have escalated
14  tensions and brought in more protesters; right?
15     A.    It may have.
16     Q.    And -- and ongoing large protests in front of the
17  East Precinct would have affected the ability of the
18  officers there to provide police protection in their
19  service area; right?
20     A.    Well, it depends on, you know, to what degree
21  they were interfering with police operations.  I mean the
22  police department may have had to expand the perimeter.
23  Instead of the perimeter being out in front of the police
24  department, they may have had to expand it out a block or
25  so on either side to prevent people from coming into the --

Page 215

1                    REPORTER'S CERTIFICATE

2

3       I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:

5

6       That the foregoing testimony of JON M. SHANE, Ph.D.
    was given before me at the time and place stated therein
7   and thereafter was transcribed under my direction;

8       That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision to the best of my ability;

10      That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;

12

    That the witness, before examination, was by me duly
13  sworn to testify the truth, the whole truth, and nothing
    but the truth;

14

    That I am not a relative, employee, attorney, or
15  counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
    thereof;

17

18  DATE:  August 17, 2022

19

20

21

22

23      _____
        Mindy L. Suurs
24      Certified Court Reporter #2195

25



# DEPOSITION SIGNATURE INSTRUCTIONS

TO: Jon M Shane, PhD c/o Tyler Weaver, Esq.

DATE: August 18, 2022

CASE NAME: Hunters Capital LLC, et al v City of Seattle

VENUE: USDC / WESTERN DIST OF WA/ SEATTLE

CASE NO: 20-cv-00983-TSZ

DEPONENT: Jon M Shane, PhD

DATE TAKEN: 08/11/22

The above-named deponent has chosen to exercise signature privilege. Please permit the deponent to read your transcript of his deposition, record any changes over his signature on the Correction Sheet, and sign the last page of the transcript.

**Then please submit these pages to the address below, furnishing other counsel with copies, before September 19, 2022, or trial, whichever is first; at which time the transcript will be sealed. Failure to do so renders signature waived.**

Thank you for your assistance..

By Mindy Suurs, CSR #2195
for Rough & Associates, Inc.

cc: Shane Cramer, Esq.

RA# 104478

office@roughandassociates.com
**206.682.1427**
3515 SW Alaska Street, Seattle Wa 98126

# Rough & Associates
### Incorporated
### COURT REPORTERS

206.682.1427   fax 206.937.6236

Please record any changes or corrections on this sheet, indicating page number, line number, and reason for the change.

| Page | Line | Correction and Reason |
|------|------|----------------------|
| 24 | 24 | The correct term is "exceptionally cleared," not "clear" |
| 25 | 25 | The correct term is "ABA standard," not ADA |
| 44 | 7 | The correct term is "reasonable," not "regional" |
| 77 | 5 | The correct term is "break them up," not "back" |
| 104 | 11 | The correct term in "no one is armed," not "one is armed" |
| 107 | 12 | The correct term is "ceding to the law breakers," not "ceding to the law." |
| 117 | 24-25 | The correct term is "Casey Sixkiller," not "KC6Killer" |
| 118 | 7 | The correct term is "Casey Sixkiller," not "KC6Killer" |
| 118 | 17 | The correct term is "Casey Sixkiller," not "6Killer" |
| 119 | 22 | The correct term is "Casey Sixkiller," not "6Killer" |
| 120 | 7,13 | The correct term is "Casey Sixkiller," not "6Killer" |
| 121 | 15 | The correct term is "Casey Sixkiller," not "6Killer" |
| 131 | 11, 17 | The correct term is "Edward Sector," not "N-word Sector" |
| 144 | 23 | The correct term is "Edward Sector," not "N-word Sector" |
| 155 | 20 | I do not recall saying the word "Hacker." |

Rough & Associates
Incorporated
COURT REPORTERS

_____
(Signature here and on deposition)