# EXHIBIT 7

ARIK VAN ZANDT
9/14/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,  )
                               )
          Plaintiff,           )
                               )
     vs.                       )  No. 20-cv-00983-TSZ
                               )
CITY OF SEATTLE,               )
                               )
          Defendant.           )
_____

Zoom Video Deposition Upon Oral Examination

Of

ARIK VAN ZANDT

_____

DATE: Wednesday, September 14, 2022

REPORTED BY: Mindy L. Suurs, CSR No. 2195

ROUGH & ASSOCIATES INC
office@roughandassociates.com     206.682.1427 3515 SW Alaska St Seattle WA 98126

1   Q.   And does it take into account -- strike that.
2        So if the cause of a lease being terminated is
3   anything but CHOP related, then it would not be a
4   termination caused by CHOP; is that right?
5   A.   I don't have an opinion on the -- the -- I guess
6   the separation of those particular issues.
7   Q.   Did anyone from Hunters Capital ask you to
8   distinguish between the events that occurred prior to CHOP
9   and the effect of CHOP?
10       MR. REILLY-BATES:  Object to the form, vague.
11  A.   No.
12  BY MR. CRAMER:
13  Q.   Okay.  And when did -- when -- what is the --
14  when did CHOP occur?
15  A.   Well, the -- the abandonment of the East Precinct
16  was on June 8th of 2020, and so from that -- you know, from
17  that point forward, there are, I guess, a number of events
18  or circumstances that are categorized related to CHOP that
19  occur for, in many cases, a number of months beyond that
20  point.
21  Q.   But there would be no events prior to June 8th
22  that would be categorized as due to CHOP; correct?
23       MR. REILLY-BATES:  Object to the form.
24  A.   I wouldn't -- I wouldn't think so.
25  BY MR. CRAMER:

ARIK VAN ZANDT
9/14/2022

Page 44

1     Q.   And what specific impacts of CHOP did the
2  representative from Hunters Capital tell you was the cause
3  of Gamestop moving out?
4          MR. REILLY-BATES:  Object to the form.  Calls for
5  speculation, foundation.
6     A.   I don't recall the specific terminology or
7  reasons, I guess, necessarily, but there was a discussion
8  with the representatives of Hunters that they moved out
9  because of CHOP.
10 BY MR. CRAMER:
11    Q.   Did they tell you they moved out because of a
12 looting event at Gamestop?
13         MR. REILLY-BATES:  Objection, asked and answered.
14    A.   I don't recall the -- a specific event or
15 circumstance.
16         MR. CRAMER:  I'll go ahead and mark this as
17 Exhibit 202.
18    A.   Okay, I have that up.
19                    (Exhibit No. 202 marked for
20                     identification.)
21 BY MR. CRAMER:
22    Q.   Have you seen this document before?
23    A.   I don't recall if I saw this specific e-mail.
24    Q.   And who's Jill Cronauer?
25    A.   Well, Jill Cronauer is one of the representatives

1      Q.   Okay.  And what did Hunters Capital rely on, as
2   far as you know, to determine that it would take four
3   months to relet the Hunters -- or the Gamestop space?
4           MR. REILLY-BATES:  Objection, asked and answered.
5      A.   Yeah, I don't know specifically what they would
6   have relied upon except for in my conversations with them,
7   their market knowledge and being intimate with this
8   obviously being their business.
9   BY MR. CRAMER:
10     Q.   And did you do any independent analysis to
11  determine whether their four-month estimate was reasonable?
12          MR. REILLY-BATES:  Objection, asked and answered.
13     A.   Nothing specific to that, no.
14  BY MR. CRAMER:
15     Q.   Did you -- what analysis did you do to determine
16  that a 50 percent extension was reasonable to account for
17  COVID?
18     A.   That's an assumption that I made based on the --
19  one, the Colliers report we talked about, the wait-and-see
20  approach that was being taken by marked participants.  You
21  know, we talked about my background early and working with
22  a number of businesses across my practice and just seeing
23  generally what -- you know, what was being done during that
24  time period; but it was an assumption that I made that I
25  felt was reasonable.

ARIK VAN ZANDT
9/14/2022

Page 61

1    Q.   What did you do to see what was being done in
2    that time period by others?
3    A.   Well, that's just -- it's just my everyday life
4    and the valuation and forensic work that I do working with
5    as many companies as I do, just understand -- and we talked
6    about this a little bit before -- understand the -- you
7    know, the impacts of COVID on various industries and
8    various types of businesses.  For some it had no impact,
9    for some it actually improved, and for others it actually
10   was pretty meaningful on the down side; so, you know, it's
11   just an overall assessment of that, but it's a reasonable
12   assumption based on this wait-and-see-type concept.
13   Q.   And the Colliers report, which I understand
14   you're going to try to get for us -- that -- that was from
15   fourth quarter 2021; correct?
16   A.   That is the time period of that specific report,
17   but it covers -- it covers the periods prior and
18   specifically accounts for, you know, what they saw from the
19   market during COVID.  You know, it's one of those things
20   where you have to -- you have to live it for a little bit
21   to understand what that would be.  You know, you can't have
22   immediate concept of research and expectation in the heat
23   of spring of 2020.  It's something that's informed as you
24   go.
25   Q.   Did you look at anything other than the Colliers

ARIK VAN ZANDT
9/14/2022

Page 62

1  report that contained commercial real estate trends for
2  2020?
3        A.   Again, I've -- I've been living this life of
4  assessing businesses during COVID since it happened, but I
5  don't have another specific report.  That's the report that
6  I have.
7        Q.   And you didn't look at anything that contained
8  vacancy rates across 2020 for the Seattle market?
9             MR. REILLY-BATES:  Object to the form.  Vague as
10 to "thing."
11       A.   Nothing specific.
12 BY MR. CRAMER:
13       Q.   Did you look at any reports showing average time
14 on the market for commercial properties in 2020?
15       A.   Not that I can recall specifically.
16       Q.   And it was your testimony earlier that your
17 analysis assumes that the market rent that Hunters could
18 have charged but for CHOP would have been the same during
19 COVID as it was prior to COVID.  Is that fair?
20            MR. REILLY-BATES:  Objection to the extent it
21 misstates the witness's prior testimony.
22       A.   My assumption is that the market rents themselves
23 would have been the same but for the impacts of COVID and
24 CHOP.
25       Q.   Is that -- what did you do to develop that

1  assumption?
2      A.   Well, there are -- there's research within the
3  Colliers report as a piece to that, and it's also based on
4  discussions with the representatives of Hunters.
5      Q.   Okay.  So it's discussions with Hunters and the
6  Colliers report.  Is that fair?
7      A.   Yeah, largely that's correct, yes.
8      Q.   And are there circumstances or things that could
9  have driven down the fair market rates that you actively
10 considered and ruled out?
11          MR. REILLY-BATES:  Object to the form, vague.
12     A.   No.
13 BY MR. CRAMER:
14     Q.   If Hunters Capital had -- strike that.
15          I will represent to you that the -- strike that.
16          Do you know who the entity that rented the
17 Gamestop storefront after Gamestop?
18     A.   Well, there was a temporary tenant starting in
19 February 2021.  I -- I can't recall the name of the entity
20 that would have started leasing the space on a temporary
21 basis at that point.
22     Q.   Okay. And then the more long-term tenant -- do
23 you know who that is?
24     A.   I cannot recall the name of that, no.
25     Q.   Does Paparepas Venezuelan Food refresh your

Page 189

1   Q.   And what was the -- how did you determine the
2   inside COVID adjustment from the non-CHOP properties?
3   A.   Because I was provided with the rental income
4   from all other parties that are managed by Redside Partners
5   that were not within the locations, if you will, that were
6   impacted by CHOP, so it's a specific assessment of all of
7   the properties.
8   Q.   And here again on this one, did you analyze
9   reasons why there could be -- strike that.
10       Did you analyze unit-based vacancy information?
11   A.   Yes, because the revenue provided to me was on a
12   per unit basis.
13   Q.   But did you look at reasons why any particular
14   tenant might have vacated any of the CHOP properties as
15   part of your analysis?
16   A.   I don't recall specific reference to why an
17   individual unit would have vacated.
18   Q.   And did you -- did you analyze whether any units
19   were being occupied without rent being paid as part of your
20   analysis of the CHOP apartments?
21   A.   Well, that would all be inclusive of the analysis
22   generally, but I'm also looking at the other locations
23   outside of CHOP where I'm -- I'm calling it a COVID impact,
24   but you're bringing up a point that this could have been
25   people that were just not paying rent, I guess, as well

1  because I look now on a revenue basis.  So I would expect
2  that impact to be consistent whether it's within CHOP or
3  not, but its specific reduction in revenue that's over and
4  above that adjustment I'm making is because of the CHOP
5  events.
6       Q.   Why don't we go to the next schedule, which is
7  Car Tender.  For the property damage piece, was your
8  process similar to what we've described with respect to
9  other tenants?  Did you look for invoices or receipts and
10 then, you know, document the cost of those?
11      A.   Yes.
12      Q.   And the moving a new office -- strike that.
13           Are the other damages other than the lost
14 profits, so the other damages contained on Schedule 20 --
15 the moving a new office, equipment expenses, and the
16 marketing expenses and advertising -- are those all
17 associated with the Car Tender move from Capitol Hill to
18 Shoreline?
19      A.   Yes.
20      Q.   Okay, and was Car Tender intending to move from
21 its current location at its then current location
22 regardless of CHOP?  Is that something that you're aware
23 of?
24           MR. REILLY-BATES:  Objection, foundation.
25      A.   It's actually my understanding in discussions

Page 203

1              REPORTER'S CERTIFICATE

2

3      I, Mindy L. Suurs, the undersigned Certified Court
  Reporter, pursuant to RCW 5.28.010, authorized to
4 administer oaths and affirmations in and for the State of
  Washington, do hereby certify:
5

6      That the foregoing testimony of ARIK VAN ZANDT
  was given before me at the time and place stated therein
7 and thereafter was transcribed under my direction;

8      That the sworn testimony and/or proceedings were by me
  stenographically recorded and transcribed under my
9 supervision, to the best of my ability;

10     That the foregoing transcript contains a full, true,
  and accurate record of all the sworn testimony and/or
11 proceedings given and occurring at the time and place
  stated in the transcript;
12
       That the witness, before examination, was by me duly
13 sworn to testify the truth, the whole truth, and nothing
  but the truth;
14
       That I am not a relative, employee, attorney, or
15 counsel of any party to this action or relative or employee
  of any such attorney or counsel and that I am not
16 financially interested in the said action or the outcome
  thereof;
17

18 DATE:  September 18, 2022

19

20

21

22

23 _____

24    Mindy L. Suurs
      Certified Court Reporter #2195
25