THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HUNTERS CAPITAL, LLC, et al., | Case No. 2:20-cv-00983-TSZ |
| Plaintiffs, | **DECLARATION OF TYLER WEAVER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS SHANE, PIZA, AND VAN ZANDT** |
| vs. | |
| CITY OF SEATTLE, | **NOTED ON MOTION CALENDAR:** February 17, 2022 |
| Defendant. | |

I, Tyler Weaver, declare as follows:

1.     I am an attorney with Morgan, Lewis & Bockius LLP and represent Plaintiffs in the above-captioned action.  I am over eighteen years of age and am competent to testify herein.  I make the following statements based on my personal knowledge.

DECLARATION OF TYLER WEAVER
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE
TESTIMONY OF PLAINTIFFS' EXPERTS
SHANE, PIZA, AND VAN ZANDT
(Case No. 2:20-cv-00983-TSZ) – 1

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the Transcript of the Zoom Video Deposition of Jon M. Shane, Ph.D., taken on August 11 , 2022.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the Transcript of the Zoom Video Deposition of Eric L. Piza, Ph.D., taken on August 16, 2022.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the Transcript of the Zoom Video Deposition of Arik K. Van Zandt taken on September 14, 2022.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the Expert Report of Arik K. Van Zandt, ASA, CDBV, dated April 28, 2022.

I declare under the penalty of perjury under the laws of the United States of America and the State of Washington that the foregoing is true and correct.

DATED this 13th day of February, 2023 at Bainbridge Island, Washington.


_____s/ Tyler S. Weaver_____
Tyler S. Weaver

DECLARATION OF TYLER WEAVER
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE
TESTIMONY OF PLAINTIFFS' EXPERTS
SHANE, PIZA, AND VAN ZANDT
(Case No. 2:20-cv-00983-TSZ) – 2

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# EXHIBIT 1

JON M. SHANE PhD
8/11/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
              Plaintiff,         )
                                 )
          vs.                    )    No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
              Defendant.         )

Zoom Video Deposition Upon Oral Examination

Of

JON M. SHANE, Ph.D.

DATE:  Thursday, August 11, 2022

REPORTED BY:  Mindy L. Suurs, CSR 2195

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 14

1        A.    Yes.

2        Q.    Okay.  Do you have any opinions about Dr. Piza's

3   article?

4        A.    Well, I think it's accurate.

5        Q.    Based on what?

6        A.    Based on the data that he collected, based on the

7   methodology that he used.

8        Q.    And is that based on anything other than your

9   review of his article?

10       A.    No.  When I read the article, I understand what

11  it is that he did.

12       Q.    Have you looked at the underlying data or

13  methodology that he relied upon?

14       A.    Well, when you say "looked at the data," what do

15  you mean?  Did I ever have a copy of his raw data?

16       Q.    Correct.

17       A.    I did not, no.

18       Q.    Okay.  So taking a look back at Exhibit 162,

19  which is your report, can you tell me what opinions you're

20  offering in this case?

21       A.    I'm offering opinion as to the generally accepted

22  police practices that occurred at that time regarding the

23  Seattle Police Department.

24       Q.    And -- go ahead.

25       A.    My opinion starts on Page -- Page 11 of the

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 15

```
 1   report, and in Item No. 1, I lay out the two prongs of the
 2   opinion that I'm opining on.
 3        Q.   And those are that the -- that Seattle Police
 4   Department's actions were not consistent with the Seattle
 5   City Charter Article 5, Seattle City Charter Article 6, and
 6   generally accepted police practices for delivering police
 7   services; is that correct?
 8        A.   Yes, that's correct.
 9        Q.   And you're not offering any other opinions in the
10   case; correct?
11        A.   Not at this time, no.
12        Q.   Have you been asked to provide any additional
13   opinions down the road?
14        A.   No, not yet.
15        Q.   So in terms of the generally accepted police
16   practices for delivering police services as referenced on
17   Page 11 of your report, what are the generally accepted
18   police practices that you believe were not followed?
19        A.   Inadequate staffing in the area, not -- not --
20   not breaking up -- are we going to call it CHAZ or CHOP?
21   Does it make a difference, by the way?
22        Q.   We can call it whichever you prefer.  CHOP is
23   fine.
24        A.   Okay.  So allowing the CHOP zone to be
25   established, not dismantling the CHOP zone, not engaging
```

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 16

1    offenders in and around the CHOP zone, not responding or

2    slowly responding, delaying the response to calls for

3    service in and around the CHOP zone, the -- the ambiguous

4    nature of the orders that were issued surrounding police

5    response related to the CHOP zone that were issued by Chief

6    Mahaffey.

7         Q.   Any others?

8         A.   There may be others as I go through the report,

9    but that's what I'm thinking of off the top of my head.

10        Q.   Okay.  And are any of these generally accepted

11   police practices that you just listed -- are those

12   contained in any national standards?

13        A.   Well, the American Bar Association in 1979 had

14   set forth the standards for urban policing.  The City of

15   Seattle Charter broadly defines -- and I think the word

16   they use is must be be liberally construed or something to

17   that effect -- about providing adequate police protection,

18   things like that.

19        Q.   Okay.  So --

20        A.   Let me just finish.  There's also a body of

21   national standards called the Commission For the

22   Accreditation of Law Enforcement Agencies, Commission For

23   The Accreditation of Law Enforcement Agencies, and goes by

24   the acronym CALEA, C-A-L-E-A.  And CALEA promulgates a body

25   of national standards about how police practices should be

Electronically signed by Mindy Suurs (101-257-931-8021)                        3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 17

1    carried out.

2        Q.   And is there a specific provision or -- or policy

3    as pronounced by CALEA that you believe set the standard

4    here that the City of Seattle failed to live up to?

5        A.   Well, one of the things that comes to mind is the

6    way in which they approached -- or if I should say failed

7    to approach -- pedestrian stops.  I think Mahaffey in his

8    deposition said that they were aware through video --

9    through video feeds, live video feeds that there were

10   people in and around the CHOP zone with weapons and that

11   they weren't confronting these folks.  And that's not

12   consistent with established practices for conducting

13   inquiries about suspicious persons, people who are armed,

14   people who may be engaged in criminal behavior.

15       Q.   And so it's your opinion that the Seattle Police

16   Department should stop and interview anyone who is carrying

17   a weapon?

18       A.   It depends -- I think it depends on the totality

19   of the circumstances.  In this situation you had the CHOP

20   zone that was established that was unlawfully developed and

21   people in and around that area with weapons.  I think that

22   would necessitate an inquiry.

23       Q.   And you used the language "totality of the

24   circumstances."  What does that mean?

25       A.   Totality of the circumstances are all of the --

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 20

1    the fact that they have a firearm; correct?

2         A.   Well, again, it would be based on the totality of

3    the circumstances, but just -- just to narrowly construe

4    your question, mere possession of the firearm in an open

5    carry state would not -- would not provide a constitutional

6    basis to make a stop.

7         Q.   The ABA 1979 article -- what standards did it

8    pronounce that you believe that the City of Seattle did not

9    act consistent with?

10        A.   Police protection.  Providing for a variety

11   police protection.  Investigative services.

12        Q.   Can you explain?

13        A.   Some of the fundamental precepts of policing are

14   to provide protection service, generalized police

15   protection.  This is a standard across the country, which

16   is to respond to calls for service, to identify crimes that

17   have occurred, and then to investigate those crimes.

18        Q.   And does the ABA's 1979 article require in-person

19   responses to every alleged crime?

20        A.   I don't think it is that specific.

21        Q.   And you agree that there is more than one way to

22   respond to a report of a crime; right?

23        A.   Well, I guess the answer is it depends.  It

24   depends on, you know, the nature of the circumstances of

25   what's being reported.

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 21

1     Q.   So people can -- strike that.

2         It's not unreasonable for a police department to

3  have an online police report filing system; right?

4     A.   It would not be unusual, no.

5     Q.   And it's not unusual to ask people to come to the

6  precincts to report crimes, to fill out the forms in person

7  at the police precinct?

8     A.   That's correct.

9     Q.   And it's not unusual to take police reports over

10  the phone; right?

11     A.   That's correct.

12     Q.   And all of those things are reasonable ways to

13  provide police services; right?

14     A.   Well, it's a qualified yes.  I mean it depends on

15  the type of crime we're talking about.  You know, you could

16  have somebody come into the precinct to make a report, give

17  one over the phone, do it online reporting form.  If your

18  bicycle was stolen, if you were sexually assaulted or you

19  were shot, you would want police to go to the scene to

20  examine the scene, to process the crime scene, collect

21  evidence, talk to witnesses, canvass the neighborhood.

22     Q.   So if you were sexually assaulted, it would be

23  unreasonable for a police department to not go to that

24  scene?

25         MR. WEAVER:  Objection, incomplete hypothetical.

Electronically signed by Mindy Suurs (101-257-931-8021)        3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page  22

1        A.    Your question was if you were sexually assaulted,

2    it would be unreasonable for police to avoid coming to the

3    scene?

4    BY MR. CRAMER:

5        Q.    Correct.

6        A.    It would be unreasonable, yes.

7        Q.    So it's your opinion that every police department

8    has an obligation to go to the scene of every sexual

9    assault?

10       A.    They do.

11       Q.    And under what standard are you relying on to --

12   to base that opinion?

13       A.    Generally accepted investigative standards about

14   processing crime scenes, collecting evidence, interviewing

15   witnesses, canvassing the neighborhood, generalized

16   investigative responsibilities.

17       Q.    And when must that take place?

18       A.    As soon as possible.

19       Q.    What are the factors that would play into a delay

20   that might occur?

21       A.    Perhaps if the police department didn't have

22   vehicles available at that moment.

23       Q.    What if it was unsafe to go to the scene?

24            MR. WEAVER:  Objection, vague.

25       A.    Yeah, I mean you would need to understand a

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 23

1    little bit more about it.  When you say "unsafe," unsafe in

2    what regard?

3    BY MR. CRAMER:

4         Q.   What if there was a blizzard?

5              MR. WEAVER:  Objection, incomplete hypothetical.

6         A.   Well, I mean if there was -- you're saying if

7    there was snow on the ground that prevented the police from

8    physically going there?

9    BY MR. CRAMER:

10        Q.   Yes.

11        A.   Yeah, that might -- that might qualify as an

12   instance where police might delay their response to the

13   scene.

14        Q.   What if there was a staffing shortage?

15        A.   Well, the -- again, it depends.  When you say

16   "staffing shortage," do you mean staffing shortage in the

17   sexual assault investigative division?  Do you mean

18   staffing shortage in the patrol division?  Where is the

19   shortage?

20        Q.   What if there's a staffing shortage in the

21   investigative unit?

22             MR. WEAVER:  Objection, incomplete hypothetical.

23        A.   If someone has been -- if someone has been

24   assigned that case, the answer is there may be -- there may

25   be a reason why staffing impacts your ability to respond.

ROUGH & ASSOCIATES INC
office@roughandassociates.com    206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 24

```
 1   I mean, you know, it could be vacation as well, you might
 2   be on vacation or somebody might be on vacation.
 3   BY MR. CRAMER:
 4       Q.   So there are circumstances where it would be
 5   reasonable to not provide an in-person response to a sexual
 6   assault?
 7       A.   Well, I'm not talking about not providing
 8   response; I'm talking about delaying a response.  I mean a
 9   blizzard would delay you, staffing shortage might delay
10   you, if you didn't have a vehicle, that might delay you,
11   but that wouldn't prevent you from ever going.  It
12   shouldn't prevent you from ever going.
13       Q.   And in an instance where someone who experiences
14   sexual assault doesn't have a police officer respond ever
15   to the scene, your position is that that would violate
16   generally accepted practices and standards of police
17   practices?
18       A.   Can you say that again?  I'm sorry.
19       Q.   So your opinion is that any decision by a police
20   department to not investigate the scene of a sexual assault
21   is a violation of generally accepted police practices?
22       A.   The only way I can understand that it might not
23   be investigated would be something known as what's called
24   exceptionally clear.
25       Q.   What's that?
```

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 25

1      A.   Okay, so let's say -- this is 100 percent

2   hypothetical, so I'm not using a real example -- woman is

3   sexually assaulted and she knows that it was her brother's

4   boyfriend, and her brother's boyfriend -- so she goes to

5   the police department to report it, and during the report,

6   the police officers are about to go to the scene and they

7   learn that there's been a motorcycle accident, and they

8   respond to the motorcycle accident and they find that the

9   brother's boyfriend who committed the sexual assault is now

10   dead, and there's never going to be an -- there's never

11   going to be a prosecution.  That case is what is known as

12   exceptionally clear, and if the police didn't investigate

13   that crime scene, that would be -- that would be

14   acceptable.

15      Q.   Are you aware of any specific crimes that were

16   not investigated during -- that occurred in the red zone

17   area of Seattle in June 2020?

18      A.   Not specific crimes, no.

19      Q.   Okay.  Any other national standards that you

20   believe that the City of Seattle and the Seattle Police

21   Department failed to abide by in June 2020 in the CHAZ/CHOP

22   area?

23      A.   No -- excuse me -- not off the top of my head,

24   no.

25      Q.   Okay.  And you didn't include the ADA standards

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

JON M. SHANE PhD
8/11/2022

Page 26

```
 1    or the CALEA standards in your report as standards that

 2    were violated; is that right?

 3         A.   No, they're not in there, no.

 4         Q.   Any state-level standards that -- that you

 5    believe that the City of Seattle failed to abide by?

 6         A.   I haven't seen the state-level curriculum for

 7    basic course for police officers, but given my

 8    understanding and my longstanding history of police work

 9    that police officers who were certified in the state of

10    Washington undergo training that is vastly similar to that

11    across the country.  So the standards that are promulgated

12    in the police academy about investigation, patrol,

13    response, and those sorts of things would hold true.

14         Q.   And what are those?

15         A.   Investigating crimes that occur, responding when

16    called.

17         Q.   Does every call to the police necessitate a -- an

18    in-person response?

19         A.   Not necessarily.

20         Q.   Okay.  So there are some crimes that don't

21    necessitate an in-person response by the police?

22         A.   Yes.

23         Q.   And does the -- does the decision whether to

24    respond -- is that something that the police should assess

25    using the totality of the circumstances?
```

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 27

```
 1        A.    Well, we need to qualify your question just a
 2   little bit.  Are you talking about at the policy level
 3   when -- when the chief and the command staff are
 4   undertaking policies of the police department and they're
 5   undergoing a planning process about how they're going to
 6   respond and what they're going to respond to manage
 7   workload and things like that, or are you talking about the
 8   incoming phone call to the call-taker at a call center and
 9   how they prioritize that incoming call?
10        Q.    Well, let's take them in turn.  In -- as a policy
11   level, do the chief and the decision-makers within the
12   police department have discretion in determining what types
13   of crimes get in-person responses?
14        A.    Somewhat.
15        Q.    And what is that based on?
16        A.    Seriousness of the offense.
17        Q.    Okay.  And what crimes do require an in-person
18   response, under your view of generally accepted police
19   practices?
20        A.    Well, I'll use -- I'll just use a broad -- a
21   broad colloquial term and call them felonies.  So every
22   state is slightly different in terms of their wording, but
23   felonies:  Murder, rape, robbery, aggravated assault,
24   burglary, arson, car theft.
25        Q.    Every felony including minor felonies?  Is
```

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 28

1    that -- would you --

2         A.   What do you mean by a minor felony?

3         Q.   Let's say possession of a controlled substance.

4         A.   Well, you would need a little bit more to

5    understand that.  I mean is it -- is it a -- is it a stash

6    house?  Is it a -- are they actively dealing narcotics

7    right now?  Did mom find a small quantity in junior's

8    backpack?

9         Q.   So the answer is it depends?

10        A.   It does.

11        Q.   So --

12        A.   But not violent crime.

13        Q.   So every violent crime requires an in-person

14   response?

15        A.   It does, yes.

16        Q.   And that's based on what?  What -- what standards

17   can I look to that tells me that?

18        A.   Generally accepted police practices about how the

19   police are organized and what it is they do and why they

20   carry out their function and their obligations to

21   provide -- to provide service to the community in terms of

22   law enforcement, prosecution, offender accountability.

23        Q.   Okay.  You keep saying --  go ahead.

24        A.   Reducing harm to the community.

25        Q.   So you keep saying generally accepted police

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 29

1    practices, and I'm asking you what writing can you point me

2    to that articulates that every felony requires an in-person

3    response?

4         A.   Well, I can't -- I can't say definitively if

5    there's something specific that is that narrowly tailored,

6    but I don't think you would find that necessarily anywhere

7    across the country, other than to say that the generalized

8    practice for police officers to provide, the things I just

9    mentioned like protection, investigative services, reducing

10   harm, protecting victims, offender accountability -- all

11   those things are generally accepted practices.  I mean like

12   I said, I can't tell you that there is a specific statute

13   or a specific -- a specific rule or regulation.

14        Q.   Okay.  And I think you just testified to this,

15   but you didn't identify any state-level codified standard

16   that the City of Seattle or the SPD's conduct was not

17   consistent with; correct?

18        A.   Not at the state level.  The city charter,

19   though, mentions the things that I was talking about.

20        Q.   Okay.  And that's where I was going to go next.

21   So in terms of local standards, you've identified the City

22   of Seattle Charter Section Article 5 and the City of

23   Seattle Charter Section 6; is that correct?

24        A.   Yes.

25        Q.   Have you reviewed any other local standards in

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 30

1    connection with this case?

2          MR. WEAVER:  Objection.

3      A.   Not that I can think of.

4    BY MR. CRAMER:

5      Q.   Okay.  And so you're not aware of any other

6    locally set standards that may have been relevant to the

7    conduct of the City of Seattle and SPD in connection with

8    their dealings and operations for the CHOP?

9      A.   There may be some orders that were promulgated by

10   the police department regarding police response or

11   investigative services that may exist that I have not seen.

12     Q.   But you're not relying on any of those; correct?

13     A.   No.

14     Q.   And did you look for any other local standards

15   that may have been applicable?

16     A.   No.

17     Q.   And so what you're comparing the City's actions

18   to here is Charter Section 5, Charter Section 6, and the

19   amorphous generally accepted practices that you have

20   described here today; is that right?

21          MR. WEAVER:  Objection, misstates the testimony.

22          Go ahead.

23     A.   I wouldn't characterize them as amorphous, but

24   the answer is yes, the generally accepted police practices.

25   BY MR. CRAMER:

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page  31

1        Q.    But you can't point me to anything in writing
2    that enunciates those generally accepted practices?
3        A.    Nothing specific.
4        Q.    So I want to take a look at the bottom of
5    Page 11.
6        A.    Okay.
7        Q.    Okay?  And, you know, I'm not going to try to
8    play any tricks on you today; I plan to just walk through
9    your report, so you will figure that out soon enough that
10   we're just going to walk through this systemically.
11           So the contents of this first Paragraph A where
12   it says "Justification for your opinion," the information
13   that you were citing there -- that comes from the materials
14   you considered; is that correct?
15       A.    Yes.
16       Q.    And taking a look at the first sentence of that
17   paragraph, so just tell me what you understand about the
18   heated interactions that occurred outside of the East
19   Precinct.
20       A.    Well, it's my understanding from the documents
21   that I reviewed that there had been some ongoing tension
22   both between the police and the community.  I can't -- I
23   can't -- I can't say with, you know, any certainty what the
24   motivation was.  I know there's been a lot of talk about
25   things like George Floyd and social equity and, you know,

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 32

1   things like that, but I don't know that that's the case.

2        Q.   Okay.  So June 8th, 2020 -- that's approximately

3   10 days after George Floyd was murdered; is that correct?

4        A.   I don't know.  That's a good question.  I don't

5   know when the man lost his life.

6        Q.   Okay.  In the summer of 2020, were you generally

7   aware of protests occurring around the country in the

8   aftermath of Mr. Floyd being murdered?

9        A.   Yes.

10       Q.   And do you have any reason to doubt that the --

11  that the protests occurring outside of the East Precinct

12  were related to or in the aftermath of Mr. Floyd's murder?

13       A.   I -- I don't have anything either way, to be

14  perfectly frank with you.  I don't -- I mean I only know

15  what I generally heard anecdotally, you know, in media

16  reports and things like that.

17       Q.   And describe to me the -- I think you called them

18  heated interactions between police and protesters.  How

19  frequent were those?

20       A.   I don't know the frequency.

21       Q.   And did those involve uses of force by police

22  officers against people in the -- protesters and people in

23  the public?

24       A.   You mean police using force against protesters at

25  that moment outside the East police precinct?

Electronically signed by Mindy Suurs (101-257-931-8021)                          3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page  33

1        Q.    Yes.

2        A.    I didn't see anything relative to police using

3    force.  Not that I remember.

4        Q.    Okay.  So you didn't recall Chief Mahaffey

5    testifying uses of force by the police against protesters

6    outside the precinct?

7        A.    I mean it may be in his deposition; I don't

8    recall.  I remember there was some discussion about he said

9    that there were -- rocks and bottles were thrown and things

10    like that, but that's use of force against the police, not

11    the other way around.

12        Q.    Right.  And so you're aware of force being used

13    against the police outside the precinct that first week of

14    June; right?

15        A.    Yeah, there were a few things in discovery about

16    that, yes.

17        Q.    And was that a nightly occurrence the first week

18    of June?

19        A.    I don't know the frequency.

20        Q.    Would it be important for purposes of your

21    testimony to know the frequency?

22        A.    For what -- for what purpose?

23        Q.    Well, you're opining that the Seattle Police

24    Department didn't act reasonably in -- on June 8th and

25    subsequently; correct?

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

JON M. SHANE PhD
8/11/2022

Page 34

```
 1        A.    I mean in certain instances, yes.
 2        Q.    So wouldn't it be something that would be
 3   important to that opinion what had been going on in that
 4   exact same area as between the police and members of the
 5   public and the protesters in the eight days leading up to
 6   that?
 7        A.    Well, I documented here that there were a number
 8   of heated interactions, so I mean we have some idea of what
 9   was occurring there.
10        Q.    But you concede that there was use of force
11   against police officers that first week of June; correct?
12        A.    There was use of force against the police,
13   correct.
14        Q.    And -- but you don't know whether there was use
15   of force against protesters?
16        A.    Well, I don't recall.  I don't recall if Mahaffey
17   testified to that or not.
18        Q.    Do you recall whether there was tear gas used
19   ever to clear those protests during that first week of
20   June?
21        A.    I don't -- I don't remember if -- if gas was
22   actually deployed.  I remember the chief was speaking about
23   gas, but I don't know if the gas was actually deployed.  I
24   don't remember.
25        Q.    Did the police ever -- well, you might be able to
```

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 35

1   help me with this.  Is tear gas -- what's tear gas?

2       A.   Well, that's a generic -- that's a generic

3   term -- tear gas.  The better way to tell is called

4   chemical munitions.

5       Q.   Is CS a type of tear gas?

6       A.   Yes.

7       Q.   And would the use of tear gas -- would that be a

8   use of force?

9       A.   It's a use of force, yes.

10      Q.   And did the police ever use blast balls in that

11  first week of June?

12      A.   The same answer.  I recall something being talked

13  about that, I believe.  I believe Chief Best in her -- in

14  her video with the mayor discussed something about that,

15  but I don't remember if she said they were actually

16  deployed or if they were ready or if they were withheld.  I

17  don't remember what she said.

18      Q.   And did the police ever utilize pepper spray that

19  first week of June, to your knowledge?

20      A.   I don't recall.

21      Q.   Would pepper spray be a use of force?

22      A.   It is, yes.

23      Q.   And blast balls also use of force?

24      A.   Yes.

25      Q.   Now, when the -- are you aware of or did you look

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 65

1    hypothetical.  Sorry, go ahead.

2         A.   You're -- I guess you're assuming that use of

3    force is going to happen.  We don't know that use of force

4    is going to happen, but police are not in the business of

5    retreating in the face of a threat of someone resisting

6    them or using force; in fact, just the opposite is true.

7    Police officers are empowered to stand their ground and

8    press forward to achieve a lawful objective in the face of

9    threats and resistance.

10   BY MR. CRAMER:

11        Q.   Are you aware of any policies that would require

12   deescalation tactics like withdrawal for a police

13   department?

14             MR. WEAVER:  Objection, vague.

15        A.   Let's -- let's talk about that a little bit.  So

16   first I want to talk about deescalation, then I want to

17   talk about withdrawal.

18             A generalized police practice in terms of

19   police/citizen encounters is always to deescalate.  Even --

20   even at the rudimentary dispute level, police -- again,

21   hypothetical -- police officer responds to a dispute

22   between a customer and a proprietor at a hardware store,

23   you know, over the -- I don't know -- over the -- an

24   incorrect amount of change that somebody -- that the patron

25   offered -- police officers are -- are -- are using

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 66

```
 1   deescalation tactics to assuage that situation.  It's a

 2   natural training element.  It's something that the police

 3   do:  They resolve disputes, day in and day out.  And

 4   deescalation is part of that, in many different respects.

 5   I mean there's all sorts of hypotheticals that we could

 6   think of.

 7   BY MR. CRAMER:

 8       Q.   Let me interrupt you.  You were talking about

 9   deescalation between two individuals in that hypothetical;

10   I'm talking about deescalation as a police tactic to

11   deescalate the likelihood of conflict between the police

12   officer and a -- and a member of the public.

13           Would you agree that deescalation is -- in that

14   respect -- is a reasonable goal?

15       A.   Are you using the example I just gave?

16       Q.   No, I'm asking you to -- whether you agree that

17   deescalation tactics to reduce the likelihood of conflict

18   between a police officer and a member of the public or a

19   suspect is -- is a reasonable goal.

20       A.   I'm sorry, I just want to make sure I'm clear.

21   Is -- is it reasonable for a police officer to use

22   deescalation strategies to -- to deescalate a situation

23   between the officer themself and a member of the public,

24   because there's some heated disagreement over something?

25       Q.   Sure.
```

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 67

1       A.    The answer is yes.

2       Q.    Okay.  Is there -- are there any policies you're

3    aware of that articulate how that deescalation is to be

4    accomplished?

5       A.    Well, when you say "policy," I want to make sure

6    we're clear on that.  I mean generalized police training

7    regarding deescalation strategies include things like --

8    like talking, like offering alternatives, being an active

9    listener, offering up alternatives.  There's -- there's

10   nothing that I've ever seen that says police officers shall

11   withdraw from -- from a particular scene as their primary

12   deescalation strategy.

13      Q.    But is withdrawal a generally accepted

14   deescalation tactic?

15      A.    Again, the answer is it depends.  There's

16   something known as tactical withdrawal.  Okay?  Tactical

17   withdrawal is I think what you're alluding to:  I'm going

18   to drop back and I'm going to withdraw from the

19   confrontation in order to -- to regroup and reassess and

20   then move -- and then press forward again.

21      Q.    Well, but do you necessarily need to press

22   forward again?

23      A.    Yes.  Yes, you would not withdraw and abandon

24   whatever it is that you're abandoning.  You wouldn't

25   abandon the area, the situation.  For example, if I showed

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 68

```
 1   up on a domestic violence call and somebody was really

 2   angry at me because I was a police officer invading their

 3   personal space in their living room and they were trying to

 4   indimidate me, I'd say, okay, well, I'm going to back out

 5   now notwithstanding the crime that has occurred here

 6   because I don't want to escalate things.  That would not

 7   happen.

 8        Q.   And what if you were -- what if a crime had not

 9   yet occurred but you were concerned about escalating the

10   situation such that you might need to use force?  Would

11   utilizing deescalation tactics in that situation be

12   reasonable?

13             MR. WEAVER:  Objection, incomplete hypothetical.

14        A.   All right, so let's break that down a little bit.

15   You arrive at the scene of an incident and you don't know

16   whether or not a crime has occurred yet because you have

17   yet to investigate it, but your presence at that scene is

18   escalating something or -- am I right so far?

19   BY MR. CRAMER:

20        Q.   Your -- whether engagement, further engagement

21   with the person may lead to use of force, are you permitted

22   to instead withdraw and allow time to gain voluntary

23   compliance?

24             MR. WEAVER:  Same objection.

25        A.   Again, the answer is it depends.  It depends on
```

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

Page 69

1    what it is you're investiginging, what's going on, how

2    this person's reacting.  You're not -- a police officer is

3    not going to go to the scene of an incident and back away

4    from someone who is getting louder and louder and louder to

5    the point where you may need to use force.  If that

6    person's going to provoke a physical encounter with you,

7    it's not your obligation to retreat and desist; you have an

8    obligation, just the opposite, to stand your ground and

9    preserve the peace and perhaps protect life, protect

10   property, deescalation strategies while you're doing that.

11   BY MR. CRAMER:

12       Q.   So standing your ground -- you have an obligation

13   to stand your ground as opposed to determining to first use

14   deescalation tactics?  Is that what you're saying?

15       A.   No, I think those things are coterminous.  I mean

16   let me just make sure I'm understanding you.  If police

17   officer arrives at the scene of an incident and they're

18   confronted by someone who's hostile, police officer is

19   automatically right then and there going to use

20   deescalation tactics.  They're going to talk to them,

21   they're going to listen, they're going to calm everybody

22   down.  At the same time, they are standing their ground.

23   They're not leaving.

24           If this particular person that you're interacting

25   with, be it a victim, a witness, an offender -- if that

Electronically signed by Mindy Suurs (101-257-931-8021)                          3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 70

1  person becomes combative to the point where they commit a

2  crime, you're not going to withdraw and allow them to

3  commit that crime; you're going to stand there, press

4  forward, and achieve a lawful objective.

5      Q.   And the deescalation tactics that you were

6  describing -- can those be applied -- strike that.

7           Would it be unreasonable to apply those same

8  deescalation tactics prior to facing an imminent threat?

9           MR. WEAVER:  Objection, incomplete hypothetical.

10     A.   Okay, so what -- what is my hypothetical?

11  Meaning I roll up to the scene of a domestic violence

12  incident --

13  BY MR. CRAMER:

14     Q.   Let's talk about it in terms of -- of June 8th.

15     A.   Okay.

16     Q.   Would -- in your mind, or in your opinion, would

17  it have been reasonable for SPD to have considered

18  deescalation tactics on June 8th when determining what

19  their course of action was going to be for later that

20  night?

21     A.   Yeah, deescalation is always an -- is always an

22  option, yes.

23     Q.   And --

24     A.   What are they deescalating with though?  I just

25  want to make sure because I'm trying to envision the scene.

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 71

1    So you have a police precinct that's -- you know, that's

2    got fencing around it.  Who's conducting the deescalation?

3    Who's outside?  What's being said?  Who's the group leader?

4    Set the scene.  Set -- give me some more context.

5         Q.   Sure.  So every night for the previous week, SPD

6    set up a barricade across Pine Street in front of the East

7    Precinct.  Okay?

8         A.   Okay.

9         Q.   And every night protesters appeared at the

10   barricade and there were, on many occasions, uses of force

11   going both ways.  Okay?

12        A.   Okay, fair enough.

13        Q.   Officers were injured, members of the public were

14   injured, tear gas was used, blast balls were used, pepper

15   spray was used.

16             After seven days of this, would it have been

17   unreasonable for Chief Mahaffey to have utilized or

18   considered deescalation tactics, including removal of

19   police from the barricades in front of the East Precinct?

20             MR. WEAVER:  Objection.  Compound, incomplete.

21             Go ahead.

22        A.   It would be unreasonable for the police

23   department to withdraw from that situation.  I have no

24   problem using deescalation strategies, but one of them

25   would not be abandoning the police precinct.

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 72

1   BY MR. CRAMER:

 2       Q.   Okay.  So withdrawal is not a valid deescalation

 3   tactic in your opinion?

 4       A.    Not based on the things that you just explained

 5   to me, no.

 6       Q.   Did -- was the activity that occurred -- strike

 7   that.

 8            As a result of the police department temporarily

 9   vacating the precinct, did the precinct get burned down?

10       A.   No, it did not.

11       Q.   Did protesters attempt to enter the precinct that

12   you're aware of?

13       A.   No, not that I'm aware of.  I don't think they

14   did.

15       Q.   Okay.  Now, you testified earlier that you think

16   it would have been reasonable for the police to -- instead

17   of withdrawing, to have put up new fencing and stationed

18   officers outside of the precinct.  Is that a fair summary

19   of what you said earlier?

20       A.   That's reasonable, yes.

21       Q.   Okay.  Is it possible that doing that would have

22   led to uses of force as between protesters and the police

23   officers stationed behind the fencing?

24       A.   Well, I hesitate to forecast in that sense.

25   Maybe.  I don't know.

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 85

1        A.    That could happen.

2        Q.    And that's to protect the safety of the officers

3    working there?

4        A.    Anybody going into that facility with asbestos.

5        Q.    Sure, including police officers who are working

6    there?

7        A.    Sure.

8        Q.    And -- and others in the public; right?

9        A.    Witnesses, victims, complainants, arrestees,

10   vendors.

11       Q.    And if they did so, presumably the officers would

12   be operating out of another precinct or different location

13   while the precinct was closed?

14       A.    They probably would be; the question is how far

15   away from everything would they be.  I mean a lot of

16   times -- I'll give you an example.  There was something

17   similar to that in the Newark Police Department and they

18   put trailers up on-site.

19       Q.    But there's no requirement they do so; right?

20       A.    No, it's a policy decision about how -- how they

21   want to deliver police services to the City.

22       Q.    And what available space there probably is at the

23   location where the precinct was located; right?  I mean in

24   Newark I guess you would have -- there would have had to

25   have been space to put trailers is my point.

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 95

1   right?

2        A.   It is, yes.

3        Q.   And they could have been anti-police protesters

4   and still been peaceful if they weren't protesting at that

5   immediate moment; right?

6        A.   They could be.

7        Q.   And if the police were to have reinserted

8   themself, isn't it possible that those people who were

9   peaceful a moment earlier could become hostile?

10       A.   Although that's possible, that's not how police

11  departments operate.  They don't operate on the idea that

12  we can't occupy this police facility because someone might

13  be annoyed with us.  So there's always a segment of society

14  that's annoyed with the police for some reason.

15       Q.   Right, but you understand, having the full review

16  of the record here, that what was going on in this area

17  over the first part of June was more than annoyance; right?

18       A.   Well, it wasn't declared a riot.  There's nothing

19  in the record that indicates it was declared a riot.

20       Q.   So you've not reviewed anything indicating that

21  at any point was declared a riot?

22       A.   I haven't seen anything that said that the mayor

23  issued a declaration of emergency or that there was a riot

24  declared.

25       Q.   Okay.  And if the mayor had issued a declaration

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 96

 1    of emergency relating to the protests that were occurring

 2    outside of the East Precinct in early June, is that

 3    something that would impact your assessment?

 4         A.   Assessment of --

 5         Q.   Of the reasonableness of the police department's

 6    actions.

 7         A.   Well, again, the answer is depends.  It depends

 8    on context.  Just because, you know, a riot is declared in

 9    one particular part of the city doesn't mean you abandon

10    police precincts.  That happened in Newark, New Jersey, in

11    1967.  The city had widespread rioting, well-documented,

12    it's a, you know, historical fact and it's an historical

13    understanding of police work about -- about the

14    relationship between the police and the community.  And the

15    police department never abandoned the police precincts.

16    They took gunfire to the point where they actually bricked

17    up the front-facing windows of the police precinct, but

18    they never abandoned the facility.

19         Q.   Would you agree that policing has evolved since

20    1967?

21         A.   Well, it depends on what you mean by that.

22         Q.   So you can't agree that policing has evolved

23    since 1967?

24         A.   Well, the answer is it depends.  When we talk

25    about "evolved" -- let me give you an example.  The Newark

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page  97

1    police department, one of the oldest police departments in

2    the country -- third oldest behind New York and Boston --

3    has had community substations and police precincts since

4    the late '60s, early '70s and has participated in some of

5    the most foundational studies on police and fear and

6    relationship to the community.

7            Police precincts and community substations have

8    gained widespread acceptance from that, and they still

9    continue in that vein today.  So my point is when you talk

10   about evolving, we're still using things -- when I say

11   "we," the policing industry and the city of Newark -- are

12   still using concepts that they pioneered in the 1960s and

13   1970s.

14           When you talk about the evolution of policing, we

15   have to be more specific.  Training has evolved, technology

16   has evolved.  They're still using police cars.  We've been

17   using police cars since 1950s.

18       Q.   What about concepts around deescalation?  Have

19   those evolved since 1967?

20       A.   They have, yes.

21       Q.   Have they evolved since 1980?

22       A.   I would say -- I would say a qualified yes.  And

23   let me give you an example.  I became a sworn police

24   officer in 1989, so nine years removed from your time frame

25   of 1980, and when I was in the police department, we took a

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 98

1    course called Verbal Judo, and you have to just envision

2    what they're talking about.  Verbal judo, meaning you're

3    trying to disarm people with your words, you're trying to

4    assuage them, you're trying to deescalate things.

5            A lot of the deescalation strategies today are

6    just repackaged under different names, and since at least

7    1989, when I can attest to my training, it has been

8    relatively the same.  There has not been a lot of different

9    things:  Being an active listener, talking, trying to

10   empathize with people, this idea of procedural justice,

11   meaning police officer says to somebody, "I'm here to

12   listen.  Tell me your side of the story.  I want to make --

13   if I'm going to make a decision, I want to make sure I make

14   the best decision possible."  I mean those things have been

15   talked about for 30-plus years, since I became a police

16   officer.

17           Back to your original point about evolving, the

18   answer is it depends on what we're talking about in terms

19   of evolution.  Technology is something that has probably

20   evolved the most.

21      Q.   So going back to your report, so with the

22   existence of armed protesters outside of the precinct,

23   have -- would the existence of those be something the

24   police could reasonably take into consideration in deciding

25   whether to attempt to clear the streets and sidewalks or

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 113

```
 1            MR. WEAVER:  Objection, incomplete hypothetical.
 2       A.   When you say "tools," are you referring to force
 3  options or -- or --
 4  BY MR. WEAVER:
 5       Q.   Yeah, force options.
 6       A.   Well, the answer is it depends on what sort of
 7  resistance they were being met with.
 8       Q.   Okay.  Could they have used -- you said they
 9  could have used verbal commands; is that right?
10       A.   Yes.
11       Q.   And they could have used the types of nonlethal
12  munitions we talked about earlier, including tear gas; is
13  that right?
14       A.   Let's call them less lethal.
15       Q.   Less lethal, sorry.
16       A.   Appropriate term.
17       Q.   Bullet balls, pepper spray, those items?
18       A.   Well, at some point there was a temporary
19  restraining order issued against using tear gas and -- and
20  some of those -- some of the less lethal options that
21  you're talking about.  So I don't remember exactly when
22  that was, but if it was in that window, then they may have
23  been limited as to what their options were, their less
24  lethal options that is.
25       Q.   And would those limitations have been something
```

Electronically signed by Mindy Suurs (101-257-931-8021)                          3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 114

1   the police would have needed to or would have been

2   reasonable for the police to have taken under consideration

3   in assessing their options?

4        A.   Yes.

5        Q.   And if, in taking into consideration the

6   limitation of their ability to use that -- those munitions,

7   they decided it wasn't safe for officers or the public to

8   try to reoccupy the precinct at that point, would that have

9   been a reasonable decision?

10       A.   Well, it depends on what information they had and

11  what they mean by -- what do you mean by "safe"?  There's

12  always the risk that a police officer may be injured

13  carrying out their duty.

14       Q.   Okay.  What about the safety of the public in --

15  in trying to reoccupy the precinct?  Is that something that

16  they can reasonably take into consideration?

17       A.   Who are you referring to when you say "the

18  public"?

19       Q.   Individuals in the area.  Let's say tourists who

20  had come to the CHOP or the CHAZ to -- to see it.

21       A.   Well, the answer is you have to -- you have to

22  account for those sorts of things, but it shouldn't -- it

23  shouldn't get to the point where you can't effectively

24  carry out police operations.  And if the police are in a

25  position where they can't carry out adequate police

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 115

1   services and provide protection to the community, then they

2   have an obligation to the public to move the public before

3   they begin to reoccupy that area.

4        Q.   And in order to move the public, how would they

5   do that?

6        A.   Well, the answer is depends on who's going there

7   and what they're doing and how it's happening.  I mean you

8   could seal off the CHOP zone, you know, a block or two out

9   and prevent people from using it as a tourist attraction.

10       Q.   And would that have been reasonable to do?

11       A.   Well, I don't -- I don't know because I don't

12   know all the details, but I'm just offering that up as a

13   hypothetical.

14       Q.   You don't know whether that would have been

15   reasonable, or you don't have an opinion as to whether that

16   would have been a reasonable course of action?

17       A.   Did somebody say something, other than

18   Mr. Cramer?

19           MR. WEAVER:  That was somebody in the background

20   for me.

21       A.   Oh, I'm sorry.

22           I don't have enough contextual details.

23   BY MR. CRAMER:

24       Q.   Okay.  On the night of June 11th -- strike that.

25   On June 11th are you aware of the attempt by the police

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 126

1        A.    Not that I can think of, no.

2        Q.    And you're not an expert in -- in the Seattle

3    City Charter; correct?

4        A.    I mean insofar as the plain language describes

5    how the mayor carries out his or her duties, how the police

6    department carries out its responsibilities.  As a matter

7    of policy, I can certainly opine on that and I'm familiar

8    with how city charters affect police policy.  For example,

9    the SPD manual, what they -- I think they called it the

10   General Orders Manual -- I'm not sure what the exact

11   terminology is -- but that manual references back to the

12   city charter.

13       Q.    And point that out to me back in Exhibit 163 that

14   you're talking about, the manual that you're referring to.

15       A.    It's not listed in my documents; I'm just

16   generalizing about -- you asked me what I know about city

17   charters and police practices.

18       Q.    And I'm asking what's the policy manual that

19   you're referring to.

20       A.    The Seattle Police Department -- I don't know the

21   exact term.  I think it's called the Seattle Police

22   Department Manual or the Seattle Police Department General

23   Orders Manual, something to that effect.

24       Q.    Is that something you considered in developing

25   your opinions for the case today?

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 136

1        Q.   But do you know whether the existence of COVID

2   altered the SPD's response protocols at all one way or the

3   other?

4        A.   I don't know.

5        Q.   Okay.  Do you know whether COVID altered response

6   protocols for police departments generally around the

7   country?

8        A.   I mean I think it's a qualified answer.  It

9   depends.  Some police departments adopted differential

10  response when they didn't have it before.  So -- but I

11  don't know of any police departments that didn't go to any

12  crimes in progress or things like that, or answer violent

13  calls for service.

14       Q.   Are you aware of any calls for crimes in progress

15  of violent crimes originating from the red zone in June

16  2020 that SPD did not respond to in person?

17       A.   Well, I think on the next page, on 17 you talk a

18  little bit about that.  Let me read it into the record.  It

19  says:  None of the following crimes constituted crimes that

20  the SPD would physically respond to in the red zone while

21  this policy was in place:  "Rape, assault that did not

22  endanger a significant number of people, kidnapping,

23  discharge of a firearm not resulting in injuries, property

24  destruction that did not put many people's lives in danger,

25  fires that did not endanger a significant number of lives,

Electronically signed by Mindy Suurs (101-257-931-8021)                          3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 137

1   and a large disagreement involving individuals carrying

2   rifles but not firing them."

3       Q.   So my question is slightly different.  Are you

4   aware of any calls for those things that did not get

5   responded to in person?

6       A.   Oh, whether or not these resulted in -- these are

7   the crimes.  Are you talking about the calls that may have

8   come in regarding these things?

9       Q.   Yeah, the calls that may have come in.

10      A.   No.

11      Q.   Okay.

12      A.   I shouldn't say no.  I should say I don't recall.

13  It's a better answer.

14      Q.   And as part of the red zone policy -- or I'm

15  sorry, the red zone guidance that was issued by Chief

16  Mahaffey, it still required that calls originating from

17  within the red zone be documented; is that right?

18      A.   Well, they would be documented anyway.  If

19  somebody called, there would be a record of that call

20  coming into the police department.  The phone call would be

21  recorded.  You know, the dispatcher was making what we call

22  a CAD entry, computer-aided dispatch entry.  There would be

23  a record of that.

24      Q.   Sure.  But I guess what I'm saying is that the

25  policy or the guidance directs officers to continue that

Electronically signed by Mindy Suurs (101-257-931-8021)                              3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 138

 1    process; right?

 2        A.   Yes.  I don't think the Seattle Police Department

 3    did not record the calls for service.

 4        Q.   Okay.  And -- and the policy also provided for

 5    personnel trying to coordinate contact if the complainant

 6    wanted it outside the red zone -- right? -- outside the red

 7    zone boundary?

 8        A.   That the police officers were -- I think at one

 9    point there was a four-officer response.  They would meet

10    with a sergeant to determine whether or not they were going

11    to go into the red zone, or into the CHOP zone.

12        Q.   So I guess what I'm talking about is the

13    italicized portion there that a call comes in from the red

14    zone, personnel was directed to try to coordinate officer

15    contact outside the red zone boundary; right?

16        A.   Okay, yes.

17        Q.   And that area was a couple blocks wide; is that

18    right?

19        A.   I -- I don't know.  I don't know what the

20    physical boundaries were.

21        Q.   Okay.  And do you know -- do you know the reason

22    why the communications staff personnel was attempting --

23    should attempt to coordinate officer contact outside the

24    boundary?

25        A.   I don't recall specifically, but I think it was

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 139

1   to -- to avoid -- to avoid inflaming tensions.

2        Q.   Is that an unreasonable policy?

3        A.   I think most definitely.  I mean you're

4   preventing people from going to the crime scene and seeing

5   exactly what happened, denying some of the benefit of an

6   adequate police response.  That includes the response, EMS,

7   canvassing the neighborhood for witnesses, victims,

8   managing the crime scene, collecting evidence, all sorts of

9   things.  Once you leave that crime scene, there's all sorts

10  of things that can happen.

11       Q.   Would you agree that prioritizing life and safety

12  is more important than preserving a crime scene; right?

13       A.   Than preserving a crime scene, of course, yes.

14       Q.   And that life and safety takes precedence over

15  preserving property.  Is that fair as well?

16       A.   Yes, that's fair.

17       Q.   Okay.  And so if the police department determines

18  that inflaming tensions poses a risk to life and safety,

19  then that takes precedence over viewing a crime scene;

20  correct?

21       A.   Well, as long as you have some evidence that it's

22  going to result in a safety issue.  I don't recall seeing

23  anything that dictated the course that there was going to

24  be an imminent threat to anybody's life.

25       Q.   And it's your opinion that they weren't allowed

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 140

1   to take those things into account unless there's an

2   imminent threat?

3       A.   Well, yeah, you have to have some sort of

4   imminent threat.  I mean what else would you doing?  You

5   can't let people coerce your operations.

6       Q.   Okay.  So you can't prioritize life and safety

7   over property preservation or crime scene preservation

8   unless you are facing an imminent threat.

9       A.   Unless you can point to some other indicia of --

10  of risk.  I mean just because someone's annoyed with your

11  presence, that's not sufficient to keep you from carrying

12  out your duties.

13      Q.   And the ongoing existence of protesters who are

14  hostile to the police in the area is -- is such an indicia

15  of risk; right?

16      A.   That's not sufficient to keep you from going to a

17  crime scene to service somebody, no.

18      Q.   Are you aware of the attempt that the police

19  department made on June 20th to enter the red zone?

20      A.   I don't recall specifically.

21      Q.   And the force that they were met with when they

22  attempted to do that?

23      A.   I don't recall that specifically.

24      Q.   And would it have been reasonable for --

25      A.   Were they responding to a call for service?

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 165

1    department to not -- to drop certain kind of charges --

2    yeah?

3         A.   No.

4         Q.   Not aimed at a specific person, but just at a

5    policy level, this type of crime?

6         A.   We're not going to enforce the laws on marijuana.

7         Q.   Sure, as an example.

8         A.   It would -- it would depend on what -- what

9    authority the mayor has as a matter of state law.

10        Q.   And did you analyze as part of coming up with

11   your opinions what state law provides as the mayor's scope

12   of authority?

13        A.   No.

14        Q.   Turning to the -- sorry, hold on -- your

15   conclusion that -- or opinion that the City violated

16   Article 6 regarding the maintenance of adequate police

17   protection --

18        A.   Where are you looking specifically?

19        Q.   It is -- it's Exhibit 166, Section 1.  Is that

20   the section of the charter you believe the City violated?

21        A.   Yes.

22        Q.   And would you agree that whether the City's

23   maintaining adequate police protection is a legal question?

24        A.   What do you mean by a legal question?

25        Q.   Well, it requires adequate police protection is a

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 166

1   legal concept; correct?

2       A.   I guess I'm getting hung up on the word "legal."

3   I mean we -- when I say "we," I mean command staff members,

4   chief of police, people like myself in the research field

5   examine workload and determine whether or not there's

6   adequate staffing in police departments all the time.

7       Q.   And so in that context, what is -- what does

8   adequate mean?

9       A.   Adequate means sufficient to -- to handle your

10  incoming calls for service, provide reasonable response to

11  911 calls, to investigate a follow-up.

12      Q.   And what does police protection mean?

13      A.   Means to provide generalized police service to --

14  to the community.  Unless there, of course, is a special

15  relationship that has been defined where a particular

16  individual is owed a duty, but generally police protection

17  extends to the community in general -- you call, we come,

18  we have a -- we're entitled to -- when I say "we," the

19  public is entitled to a police response for protection

20  purposes.

21      Q.   It's not crime prevention, though; correct?

22  It's -- incorporates responses?

23      A.   Well, let me just make sure I'm clear.  Are you

24  saying that adequate police protection is exclusive of

25  responding to calls for service?

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                      3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 175

1            (Recess taken.)

2            THE VIDEOGRAPHER:  The time is 3:52 p.m.  We are

3    back on the record.

4    BY MR. CRAMER:

5        Q.   I want to ask you about Footnote 48.

6        A.   Okay.

7        Q.   And the first thing I want to ask you is your

8    reference to Title 10 of the Seattle Municipal Code.  I

9    just don't understand why -- why that is relevant to your

10   analysis, and I'm asking you to explain it.

11       A.   All right, so let me just read it, please.

12       Q.   And I can be more specific once you're done.

13       A.   So what I'm suggesting here based on the Seattle

14   Municipal Code is that the mayor denied the benefit of the

15   Seattle Police Department in and around the East Precinct

16   and the CHOP zone, and it says here in Title 10 "to provide

17   or promote the health, safety, and welfare of the general

18   public and not to create or otherwise establish or

19   designate any particular class or group of persons."

20   So what I'm referring to is those in the CHOP zone who will

21   or should be especially protected or benefit.

22            So my reading of that language is that when they

23   failed to take action and dismantle the CHOP zone and

24   prevent it from being erected and then failing to respond

25   to calls within the CHOP zone, that these people benefited

Electronically signed by Mindy Suurs (101-257-931-8021)                              3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 176

1    from that.

2        Q.   Is this a third basis of potential --

3            (Technical issues.)

4            THE VIDEOGRAPHER:  The time is 3:54 p.m.  We are

5    off the record.

6                        (Discussion held off the record.)

7            THE VIDEOGRAPHER:  The time is 3:55 p.m.  We are

8    back on the record.

9    BY MR. CRAMER:

10       Q.   My question is:  What's the relationship between

11   Title 10 and your -- and then the charter provisions that

12   you say are violated, or is a different basis of liability

13   that you are contending?

14       A.   Well, this is the Seattle Municipal Code that I'm

15   referring to here.

16       Q.   Okay.  Would you agree with me that what is

17   required by Title 10 requires -- is a question of law and

18   what is required -- what it means to protect and preserve

19   public space, health, safety, welfare, et cetera, are legal

20   terms of art?

21       A.   No, not necessarily.  I mean I think these are

22   things that police chiefs and command staff members do all

23   the time.

24       Q.   Is this a third thing, a third statutory

25   provision that you contend that the City violated, or is

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 177

1    this a -- something else?

2        A.   I'm not sure what you mean by "third thing."

3        Q.   Well, you say that you believe that the City

4    acted inconsistent with charter Article 5; right?

5        A.   Yes.

6        Q.   And Charter Article 6.  That's two things; right?

7        A.   Yes.

8        Q.   And now we've inserted Title 10 in a footnote.

9    I'm trying to gather whether that's a third statutory

10   provision you think that the City has violated or if you're

11   just providing some sort of context for the other claims.

12       A.   No, I think that the police department and the

13   City did violate this provision, yes.  If you're asking me

14   if it was stated up front, the answer is no, but I mean I

15   don't want you to think that I didn't consider this either.

16       Q.   Okay.  Now, below that, further down, you say --

17   you cite to the Office of Police Accountability's Case

18   Closed Summary.

19       A.   Yes.

20       Q.   And you write:  "It is undisputed that the

21   CHOP/CHAZ area did not for a period of time receive regular

22   police services.  This undoubtedly resulted in detrimental

23   effects to residents of the immediate area and businesses

24   in the vicinity."

25            Do you see that?

Electronically signed by Mindy Suurs (101-257-931-8021)                          3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 178

1      A.   Yes.

2      Q.   And it's your conclusion that that finding means

3   that the City did not provide adequate police protection;

4   right?

5      A.   Yes, certainly, and it's also -- it's also

6   contrary to the provision we were just talking about here

7   in Title 10.

8      Q.   And the Office of Police Accountability analyzed

9   this same exact charter provision and determined that the

10  City and police department did not violate the charter

11  provision requiring the maintenance of adequate police

12  protection; right?

13     A.   I don't know how they arrived at that.  That's

14  not my reading of the material, but you are correct in the

15  outcome, yes.

16     Q.   And they did that in the very next sentence from

17  the one that you quote here; is that right?

18     A.   Yeah, I think -- well, I can't say for sure if

19  it's the next sentence, but -- okay.

20     Q.   Okay.  And they came to that conclusion after

21  interviewing a number of witnesses; right?

22     A.   They did interview people, yes.

23     Q.   And reviewing documentary evidence like text

24  messages and e-mails; right?

25     A.   Yes.

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 179

1      Q.    And interviewing community members; right?

2      A.    Yes.

3      Q.    And interviewing other City officials; right?

4      A.    Yes.

5      Q.    Analyzing state law and policies applicable to

6    the -- to SPD; right?

7      A.    I don't remember if there was any state law

8    involved.

9      Q.    Okay.  And you didn't review anything other than

10   the materials that were provided in Exhibit 163; right?

11     A.    Oh, that's the list of materials?

12     Q.    Yeah, that's the list of materials.

13     A.    Yes, that's correct.

14     Q.    And -- and in fact, the OPA recommended that

15   these allegations were being not sustained because they

16   were unfounded; is that right?

17     A.    I -- I don't know if the disposition was

18   unfounded or not sustained.

19     Q.    But it would be in the OPA report.  That's right?

20     A.    The findings would be, correct.  The disposition

21   would be also.

22     Q.    I'm going to have a question for you on the next

23   page, Page 20.

24     A.    Okay.

25     Q.    So that in the middle of that paragraph you

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 180

1    write:  "Further, a decision to withdraw from a particular

2    conflict to preserve officer safety must be based on an

3    imminent threat of officer harm and is only reasonable if

4    in the totality of the circumstances indicate such a

5    threat."  Do you see that?

6         A.   No, where are you?  Are you in the footnote?

7         Q.   No, on Page 20, first full paragraph, starting

8    with "Further."

9         A.   Okay.  Let me read from the beginning to see what

10   context -- okay.

11        Q.   And it's that sentence that starts "Further," and

12   again, I'll let you just read it to yourself.

13        A.   Okay.

14        Q.   Okay.  So "withdrawal from a particular conflict

15   to preserve officer safety" -- that's a form of

16   deescalation; right?

17        A.   Tactical withdrawal is, yes.

18        Q.   And just withdrawal generally is a form of

19   deescalation; right?

20        A.   No, no, no.  Let's clarify those two things

21   because when you use the word to withdraw, in the policing

22   world, if you withdraw from an area, you're withdrawing --

23   or a situation -- it depends on how we're using it -- but

24   if you withdraw, you have no intent to go back, you have no

25   intent to press forward, you have no intent to take any

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 181

1  action.

2           If you are engaging in what's called tactical

3  withdrawal, you are withdrawing for a limited amount of

4  time for a limited purpose to be able to regroup and to

5  press forward to recapture the situation.

6           So it depends.  If you're telling me that you're

7  withdrawing, that means you're leaving.  That's it, that's

8  the end of the situation.  You're out, you're not coming

9  back, you have no plans to press forward.  If you're

10  talking about tactical withdrawal, taking a step back to

11  deescalate, to regroup, and then to press forward.

12      Q.   Okay.  So with that in mind, it's your opinion

13  that only withdrawal from a particular conflict if -- if

14  it's based on an imminent threat of officer harm?  You

15  can't withdraw prior to the situation escalating to that

16  level?

17           MR. WEAVER:  Objection, incomplete hypothetical.

18      A.   Yeah, so it's context specific.  And I guess what

19  I'm saying here is that, if a police officer is confronted

20  with someone who is presenting an imminent threat, it would

21  not be unreasonable for them to tactically withdraw.

22  BY MR. CRAMER:

23      Q.   Wait, you just said tactically withdraw, but in

24  this it says withdraw, so which is your opinion?

25      A.   Well, if you --

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 182

1      Q.    -- clarify that they're different things.

2      A.    Yes, because if you look at the opening sentence,

3   it says:  "It is correct in a general sense that in any

4   particular tactical situation," so that's what I'm -- I'm

5   talking about tactical withdrawal.

6      Q.    Okay.

7      A.    So if you're confronting someone who's presenting

8   an imminent threat -- like let's say somebody's holding a

9   hostage -- it would not be improper or unreasonable, I

10  guess is the better way of saying -- it would not be

11  unreasonable to withdraw as a matter of tactical

12  consideration and hold the scene and summon additional

13  resources.

14     Q.    But the situation needs to rise to an imminent

15  threat before that decision is reasonable?

16     A.    Because you're not going to withdraw to allow

17  somebody to coerce you into doing something or -- or to

18  take -- or to avoid taking action.

19     Q.    I'm just asking is it reasonable to have a

20  tactical withdrawal from a situation that does not present

21  an imminent threat of officer harm?

22     A.    Again, context specific, but what are you at that

23  moment?  Are you being confronted by someone who's trying

24  to intimidate you from acting?

25     Q.    Is it unreasonable to tactically withdraw from a

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 183

1    situation that does not involve an imminent threat of

2    officer harm?

3         A.   It's context specific.  I mean we would have to

4    define the context in which it occurs.  Generally, no.  If

5    you're confronted with someone who's trying to coerce and

6    intimidate you, you don't withdraw, you stand your ground,

7    you press forward to achieve a lawful objective.  If that

8    person is presenting an imminent threat and the better

9    course of action is for you to back down, such as a hostage

10   situation, that -- that's prudent.  Not to withdraw

11   completely from the scene, but to regroup and to press

12   forward.

13        Q.   So you cannot preemptively withdraw to make sure

14   that you don't actually get into a situation where you're

15   facing imminent threat, if you're a reasonable police

16   officer?

17        A.   Well, I mean it's context specific.  You'd have

18   to know exactly what was occurring at that moment.  I mean

19   I can't think of a situation where a police officer comes

20   to the scene, he's not faced with an imminent threat, and

21   then withdraws for no reason.

22        Q.   So taking a look at the list that starts at the

23   bottom of Page 20, this is a list of the totality of the

24   circumstances that you would think that Chief Mahaffey

25   should have taken into account on June 8th.  Is that fair?

Electronically signed by Mindy Suurs (101-257-931-8021)                                  3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 211

1        A.    What's the modification?

2    BY MR. CRAMER:

3        Q.    Let's say they require additional support, more

4    cars to come than just the one.

5              MR. WEAVER:  Objection.

6        A.    Well, the answer is it depends.  A history of --

7    history of false calls doesn't mean you're not going to the

8    next shots fired call, even though that might be a -- that

9    might be a false call, because you don't know if the next

10   one is the real one or not.

11   BY MR. CRAMER:

12       Q.    And you're not going to modify your protocols for

13   responding?

14       A.    Well, as I was going to say, if your modification

15   is we're going to send two cars, two cars with four

16   officers, but there's not a second car available, you're

17   going to have to send a single car with two officers.

18       Q.    What about if it's a housing development with a

19   history of conflict with the police so that every time

20   you've gone there in the past is, you know, some escalation

21   has occurred?

22             MR. WEAVER:  Same objection.

23       A.    The answer is the same thing:  It depends on what

24   it is that you're responding for.  You're talking about

25   something that we've had -- experienced in Newark.  We had

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

Page 212

1   modified responses to public housing projects, and if

2   somebody reported a bicycle stolen, we might take the

3   report over the phone, we might not send police officers

4   there; but if somebody reported shots fired or that

5   somebody was shot on the 18th floor of a housing project

6   and we couldn't muster two two-officer cars, meaning four

7   officers, we would still send two officers knowing full

8   well that there's been a history of false calls and

9   conflict with the police, because you don't know if the

10  next one is real or not.

11  BY MR. CRAMER:

12      Q.   But is that something you -- you know, you would

13  take into account in formulating the response, is the

14  history of what happened previously with calls from that

15  development in that area?

16      A.   Well, the 911 response would -- I just want to

17  make sure I'm clear.  Are you saying that the history of

18  fictitious calls from a given location --

19      Q.   Yeah, the --

20      A.    -- modified response?

21      Q.   Yes.

22      A.   Yes.

23      Q.   Okay.  Let's go off the record for a couple

24  minutes while I look at my notes.

25          THE VIDEOGRAPHER:  The time is 5:07 p.m.  We are

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

JON M. SHANE PhD
8/11/2022

Page 215

1                    REPORTER'S CERTIFICATE

2

3       I, Mindy L. Suurs, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State of
    Washington, do hereby certify:

5

6       That the foregoing testimony of JON M. SHANE, Ph.D.
    was given before me at the time and place stated therein
7   and thereafter was transcribed under my direction;

8       That the sworn testimony and/or proceedings were by me
    stenographically recorded and transcribed under my
9   supervision to the best of my ability;

10      That the foregoing transcript contains a full, true,
    and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
    stated in the transcript;

12

13      That the witness, before examination, was by me duly
    sworn to testify the truth, the whole truth, and nothing
    but the truth;

14

15      That I am not a relative, employee, attorney, or
    counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
    thereof;

17

18  DATE:  August 17, 2022

19

20

21

22

23                _Mindy L. Suurs_

                  Mindy L. Suurs
24                Certified Court Reporter #2195

25

Electronically signed by Mindy Suurs (101-257-931-8021)                    3ed6d8b7-a17a-41ed-b92a-30ac51207b48

# EXHIBIT 2

ERIC L PIZA, PhD
8/16/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
                  Plaintiff,     )
                                 )
            vs.                  )    No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
                  Defendant.     )
_____


          Zoom Video Deposition Upon Oral Examination

                             of

                  ERIC L. PIZA, Ph.D.

_____


DATE:  Tuesday, August 16, 2022

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

Electronically signed by Mindy Suurs (101-257-931-8021)                           dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 31

1   date is escaping me.

2       Q.   Is that before you put together the research

3   design for the study?

4       A.   For this study, yes.

5           MR. WEAVER:  I think there may need to be some

6   clarification about what you're asking, Erica.  I mean I

7   will submit that we did not retain Dr. Piza in this case

8   until April of this year.

9           MS. IVERSON:  Until April of 2021?

10          MR. WEAVER:  2022.

11          MS. IVERSON:  2022.  It's my own timeline

12  problems.

13      Q.   And so you were not retained in this case until

14  April 2022.  Were you retained at all by the plaintiffs

15  before that?

16      A.   No.

17      Q.   Okay.  Were you in contact with plaintiff's

18  counsel in 2020?

19      A.   No.

20      Q.   Were you in --

21      A.   You're talking about the plaintiffs for the

22  Seattle case, then no.

23      Q.   Were you in contact with plaintiffs for -- in any

24  other case before --

25      A.   Not in 2022.  In 2020 I was obviously in contact

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 32

1    with the counsel for the plaintiff that asked me to write

2    the report for that case in 2020.

3        Q.   Okay.  You were retained -- sorry, so were you --

4    when you say "in 2020," that case, are you talking about

5    the North Carolina case?

6        A.   Yes.

7        Q.   Okay.

8        A.   Yeah, the plaintiffs for Seattle I had not had

9    any prior contact with prior to March or April of 2022.

10       Q.   Okay.  I see.  So you were not in contact with

11   plaintiffs in this case or Plaintiffs' counsel in this case

12   until March or April of 2022?

13       A.   That is correct.

14       Q.   Okay.  So you and I guess Mr. -- or Dr. Connealy

15   designed the research paper or the study, the research

16   paper that's the subject of your expert report in this

17   case -- you designed that in 2020 without any communication

18   or contact with any of the plaintiffs or counsel?

19       A.   We designed it in 2021 without any prior contact

20   with the counsel.

21       Q.   Okay.  As of 2021, what was your familiarity with

22   Seattle -- well, let's start with that, with Seattle?

23       A.   I have visited Seattle on a couple of occasions

24   over time, probably around 10 years ago now.  I went to a

25   conference -- name of the town escapes me, but right east

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

Page 39

1    any other opinions in this case?

2         A.    No.

3         Q.    Turning to the research paper and the design of

4    the study, who had -- sorry, let me back up for a second.

5              This is a paper that you coauthored with

6    Dr. Connealy; correct?

7         A.    Yes.

8         Q.    And as you mentioned earlier, he was one of your

9    Ph.D. students at John Jay?

10        A.    Yes.

11        Q.    And you were his Ph.D. advisor?

12        A.    Yes.

13        Q.    Was this study part of Dr. Connealy's

14   dissertation research?

15        A.    No.

16        Q.    And who had the idea to conduct this study -- you

17   or Dr. Connealy?

18        A.    Me.

19        Q.    And who was primarily responsible for designing

20   the research -- or designing the quasi-experiment?

21        A.    Me.

22        Q.    And who decided to use the synthetic control

23   matching method?

24        A.    Me.

25        Q.    Did you consider applying any other data analysis

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 40

1   technique in this study?

2       A.   No, because all other quasi-experimental

3   techniques wouldn't have even approached the level needed

4   for us to develop a sound control group.  I kind of vaguely

5   mentioned propensity score matching before.  Statisticians

6   have highlighted some issues with that technique, so that

7   wasn't an option, and the only other option was either just

8   measuring crime in the CHOP area and ignoring the rest of

9   the city, which is inappropriate -- you can't even pretend

10  to say anything about causal inference if that's what

11  you're doing -- or just randomly selecting like another

12  neighborhood in Seattle as the control group, and we also

13  felt that that was inappropriate because, again, there are

14  no statistical controls if you do that to have the control

15  group at least resemble the intervention area.

16          So that's the long answer just to say no, we did

17  not consider any other techniques because no other

18  techniques were feasible in this case.

19      Q.   And I think you said "we," and it sounds like you

20  considered some other techniques and then rejected them.

21  Did you discuss that with Dr. Connealy?

22      A.   No, no, I mean by the time -- by the time I

23  approached Dr. Connealy asking if he wanted a partner in

24  the study, I already did some basic research on the

25  situation in Seattle.  I combed through the Seattle open

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 41

1   data web portal just to make sure the necessary data was

2   there to do the analysis.  I kind of thought through the

3   general research design.  And then after -- only after, you

4   know, being sure that this was a study that was actually

5   possible did I reach out to Dr. Connealy.

6       Q.   And after you reached out to him, did you -- the

7   two of you discuss the research design at all, or any of

8   the background research that you conducted prior to

9   reaching out to him?

10      A.   So the first time Nate -- Dr. Connealy and myself

11  applied this technique, it was on an evaluation of the

12  legalization of recreational marijuana in Denver.  On that

13  study, Dr. Connealy in his role as a Ph.D. student at the

14  time was the lead author.  So we had that kind of

15  technique -- so how is this going to be different or

16  similar to what we did in Denver, and if -- you know, if

17  this is important enough -- not sure, but that study of

18  Denver was published in a journal called Justice Evaluation

19  Journal a couple of years ago.

20      Q.   In terms of the design for this study in

21  particular, did Dr. Connealy raise any concerns about the

22  research design?

23      A.   No.

24      Q.   And would you say you went forward and applied

25  the design that you had researched independently and come

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 42

1    up with independently before reaching out to him?

2        A.    Yes.

3        Q.    In terms of the data gathering, who was

4    responsible for that?

5        A.    So Dr. Connealy and I, just to save time, kind of

6    split responsibilities for that and just kind of explained

7    why time was of a factor.  What really motivated the

8    story -- so just a brief explanation about why time was a

9    factor.  I mentioned before that I had a general interest

10   in knowing more about the CHOP and specifically the CHOP

11   occupation's impact on crime, but then I saw in the summer

12   of 2021 the Journal of Criminology and Public Policy put

13   out a call for papers that related in some way to the

14   aftermath of the George Floyd killing.  I found it fairly

15   late, so we didn't have a tremendous amount of time to get

16   the data together in order to do the analysis, so to save

17   time, Dr. Connealy and I shared responsibilities for

18   downloading, cleaning, and preparing the data set that we

19   used for the statistical evaluation.

20       Q.    Was anyone else involved in that process other

21   than you and Dr. Connealy?

22       A.    No.

23       Q.    And then I believe in the paper you go over ten

24   different covariants that you selected to be able to, I

25   guess, apply the microsynthetic control matching technique;

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 43

1  is that right?

2      A.   Yes.

3      Q.   And who selected those ten covariants?

4      A.   I guess myself.  We largely took them from

5  another evaluation that Dr. Connealy, myself, and a couple

6  of other colleagues conducted of a substation in Newark,

7  New Jersey, that was published in Criminology and Public

8  Policy in 2020.  So we essentially borrowed the list from

9  that study that we had used previously for the Seattle

10  example.

11          And in that study we selected those matching

12  covariants just based on what prior policing research that

13  had used similar matching designs had also used.  So this

14  was very much informed by prior research on the topic.

15      Q.   Did you depart at all from the ten covariants

16  used in the prior substation research?

17      A.   A little bit.  So to my knowledge, the substation

18  study, we did not have the concentrated disadvantage index

19  in there only because the substation was in a 100 percent

20  commercial area, so there was no residential population to

21  speak of.  Concentrated disadvantage is based upon

22  residential demographics.  So we added that in only because

23  commercial area obviously doesn't allow for that variable

24  to be used.

25      Q.   Any other differences?

ROUGH & ASSOCIATES INC
office@roughandassociates.com        206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                        dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 44

1        A.    No.

2        Q.    And then in terms of the data analysis itself,

3    who was primarily responsible for analyzing the data?

4        A.    I'd say I was primarily responsible.  So I -- I

5    wrote up the original code in the R package and ran the

6    findings and then, when it was time to revise the article,

7    Dr. Connealy just went in and just added some more

8    description to the code so that when we made it publicly

9    available, anyone who downloaded the code could actually

10   make sense of, you know, computer science programming

11   jargon.  So I would say I had primary responsibility.

12       Q.    And anyone else involved in the data analysis

13   process besides the two of you?  Any other -- any research

14   interns, anything like that?

15       A.    No, not for this project.

16             I do want to add -- maybe you want to ask this

17   later, but I do want to acknowledge that homicide is not

18   available on the Seattle data portal, so I had to put in a

19   request for that data directly to the Seattle Police

20   Department, and they ultimately provided us the data.

21       Q.    They provided you the data in time for you to

22   include it in your study?

23       A.    Not initiallity; right?  So when we first

24   submitted it, we had to do the analysis without homicide

25   only because I hadn't heard back from the Seattle Police

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 45

```
 1   Department in time.  During the revision process then we
 2   were able to use that data because they had gotten it to me
 3   in time for that.
 4        Q.   The revision process that you undertook with the
 5   journal?
 6        A.   Yes.
 7        Q.   And the homicide data -- is that part of the data
 8   that's included in your -- on your website?
 9        A.   Yes.
10        Q.   So you set out three different intervention
11   areas; right?
12        A.   Yes.
13        Q.   Or operationalized three different intervention
14   areas maybe?  Is that the better word?
15        A.   I'm not going to make someone say operationalized
16   outside of a classroom, so you could say set up if you
17   want.
18        Q.   If I use the phrase "treatment area," do you
19   understand that to be interchangeable with "intervention
20   area"?
21        A.   Yes.
22        Q.   And who chose the three intervention areas?
23        A.   I did in my kind of reading of the
24   Seattle-specific media that I discussed before where I
25   originally learned about CHOP, a lot of them included maps
```

ROUGH & ASSOCIATES INC
office@roughandassociates.com     206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)
dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 46

```
 1   that identified the same area as the occupation zone, so

 2   that's essentially -- if you have a color version in front

 3   of you, on Page 43, that's what the red rectangle is.  But

 4   with any policing, just to stick with the word

 5   "treatment" -- right? -- it's important not to just look at

 6   the direct effects, it's important to look at areas that

 7   are close by that may also still experience those types of

 8   effects, so that's where the two-block -- that's the reason

 9   why I selected the two-block area.  And since this was kind

10   of a precinct-specific thing, also thought it made sense

11   to -- and given some of the -- some of the detail that I

12   got from a podcast episode that Carmen Best was on where

13   she kind of also suggested that the CHOP occupation may

14   have had East Precinct-wide implications in terms of the

15   service area of the East Precinct.  So after hearing her

16   say that, I figured maybe it is a good idea to measure

17   effects at that level as well.  So that was the

18   justification for the three different treatment areas.

19        Q.   For the CHOP zone area, the area, as you said,

20   that's in red on Page 43 of the paper, do you remember

21   which specific media reports you pulled that from?

22        A.   The one that I cited in my expert report was BBC,

23   so that was the one that was kind of most clearly, but a

24   lot of articles -- if my memory serves you correctly, a lot

25   of media articles that came out after the BBC report also
```

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 47

1   just kind of linked to that same match, so there did seem

2   to be a general consistency with what everyone considered

3   to be the CHOP area.

4       Q.   Did you look at anything other than media reports

5   to generate the CHOP area?

6       A.   No, only because I just didn't have access to

7   anything else.

8       Q.   And you said I think you were designing the study

9   in 2021; is that right?

10      A.   Yes.

11      Q.   Did you look or find at all the plaintiff's

12  complaint that was filed in this case in 2020?

13      A.   No.

14      Q.   And since your retention in this case, have you

15  looked at the plaintiff's complaint?

16      A.   Yes.  That was the first document that was

17  provided to me when I was retained, so I read it just to

18  get a sense of what the case was all about.

19      Q.   Were you provided with the class certification

20  briefing?

21      A.   I don't know.

22      Q.   Were you provided with any legal briefs that

23  you're aware of?

24      A.   I don't believe so.

25      Q.   Was the Complaint the only litigation document

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 50

1       A.   Yes.

2       Q.   Okay.  And when you say "confined boundaries,"

3   are you aware -- are you talking about physical

4   confined confines, or are you speaking -- is that

5   metaphorically the confined boundary?

6       A.   This is kind of a geography term, or at least a

7   geographic information term.  So within the confines means

8   that we're only looking at the street segments that share

9   the red outline are within it.

10          That's an important distinction for researchers

11   only because the default process in the GIS software that I

12   used to make that map is to just count everything that

13   intersects each other as part of the same thing; right?  So

14   that's not what we did; we didn't look at the street

15   segments that touched the red line, we looked at the street

16   segments that were either identical to the outline or

17   firmly in the red boundary.  So that's all confined

18   boundaries means in this context.

19       Q.   Got it, okay.  So a technical term not related to

20   the existence or nonexistence of physical barriers or

21   boundaries?

22       A.   Correct, correct.

23       Q.   And then I think you said you included the

24   two-block radius outside of the CHOP zone as the second

25   intervention area?

Electronically signed by Mindy Suurs (101-257-931-8021)                                        dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 51

1       A.   Yes, yes.

2       Q.   And the reason for that was to see -- can you

3   explain again just the reason for doing that?

4       A.    It's just -- it's common technique in play space

5   policing research to not only look at the target area, but

6   to look at areas that are outside of the target area but

7   very close to the target area because any policing effect

8   or, in this example, depolicing effects may have wider

9   effects than just where the activity actually took place.

10          And also, to be fair, too, the two-block area

11  also protects against the possibility -- and again, I'm

12  pretty confident that the red square is accurate, but even

13  in the event if the red square is off by a block or two,

14  looking at the two-block area kind of protects any validity

15  concerns from that as well.

16      Q.   And then can you just explain again the rationale

17  for using the entire East Precinct response area as the

18  third intervention area?

19      A.   Yeah, certainly.  So from my understanding from

20  hearing Carmen Best's description of her side of the events

21  on a podcast episode, she said that since the Seattle

22  Police Department did not have the capacity to have roll

23  call out of the precinct or to have officers kind of

24  generally patrolling the immediate area of CHOP, that they

25  had to be -- roll call had to be held elsewhere, they had

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 52

1    to be deployed from elsewhere, and she said that that

2    negatively impacted the Seattle Police Department's ability

3    to provide police service across the whole service area,

4    not just in the confines of CHOP.

5            So again, when I heard that, I figured, you know,

6    it's just adding a third target area, so it's probably

7    something we may as well take a swing at in the analysis.

8        Q.    You mentioned the podcast.  Is that cited in your

9    report?

10       A.    Yes, it's cited as Ratcliffe 2021.  So Jerry

11   Ratcliffe is the podcast's host.  He's also a professor at

12   Temple University.  So Ratcliffe 2021A, to be specific.

13       Q.    And then on Page 44 of the report, so you talk

14   about this -- something called the secondary microsynth

15   model somewhere in the middle of the page there.

16       A.    Yes.

17       Q.    And can you just explain, hopefully in lay terms,

18   what the secondary microsynth model is and what it does?

19       A.    Certainly.  As best I can, so the way the

20   statistical analysis portion of microsynth works is through

21   permutations that kind of mixes and matches intervention

22   area start dates with crime levels just to ensure that the

23   finding that you get isn't just due to like random chance

24   that the control areas that were selected were maybe not

25   the ideal.  So the permutations are used to calculate the

Electronically signed by Mindy Suurs (101-257-931-8021)                                        dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 53

1    statistical analysis.

2            In instances where you have small number of

3    target areas -- and I think this certainly classifies as an

4    instance -- right? -- 36 street segments isn't a terribly

5    large geography -- sometimes to maximize the matches, the

6    microsynth method actually uses some of those permutations

7    to identify the primary matching area.

8            So rather than just doing the matching area once

9    and then using all -- we ran 999 additional permutations --

10   rather than using all 999 for the statistical significance

11   tests, it uses a couple of those to maximize the strength

12   of the control group.  And by "strength of control group,"

13   I mean the similarity between the control group and the

14   treated area.

15       Q.   Okay.  So the other -- when you're running this

16   microsynth matching technique with the non-CHOP zone,

17   you're running 999 permutations, but then with the CHOP

18   zone it's fewer than that?

19       A.   It's still 999 permutations, it's just that some

20   of the permutations had the dual job of interpreting

21   statistical significance and identifying the most

22   appropriate weights for the control street segments.  So

23   that's a tradeoff there; right?  So essentially if you have

24   really small areas that you wanted to match, you don't get

25   the benefit of all of the permutations for the statistical

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 54

1   analysis.

2           Now, importantly, that means it's more difficult

3   to find a statistically significant effect -- right? -- and

4   we still found a statistically significant effect despite

5   those model limitations.

6       Q.   And you ran the secondary technique only for the

7   CHOP zone?

8       A.   Yes, because the other areas were able to be

9   matched with the primary -- the primary algorithm because

10  there were enough free segments in the two-block caption

11  and the precinct; right?  Those are larger areas.

12      Q.   And then just moving to Page 46, and it's the

13  last sentence of the first full paragraph --

14      A.   Okay.

15      Q.   -- where you say "Post hoc descriptive statistics

16  were used to revisit and uncover potential trends in

17  specific types of crime that may have drove the observed

18  shift."

19      A.   That overly, overly technical language is just

20  pretty much just saying that we created the line graphs on

21  Page 49, 50, and 51 so that we could kind of contextualize

22  what the difference in crime across the treatment and

23  control areas mean.

24          Because microsynth -- this technique is -- it's

25  technically measuring differences between treatment and

Electronically signed by Mindy Suurs (101-257-931-8021)                              dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 55

1   controls.  Now, a difference can be an increase, it can
2   being a decrease, crime can stay identical but still be
3   different to a control area, so to kind of peel back the
4   layers of the onion and get a little bit more context about
5   what difference means in this analysis, we created those
6   three figures:  Figure 2, Figure 3, Figure 4.
7        Q.   Okay.  So the trends that you -- or potential
8   trends that you name or you describe on Page 46 -- those
9   are -- can be seen on pages 49, 50, 51?
10       A.   Correct.
11       Q.   All right.  And then I know you talked about --
12  you called it a sensitivity analysis that you ran.
13       A.   Yes.
14       Q.   And is part of that analysis -- was that in
15  response to Dr. Lanfear's critiques?
16       A.   It was, it was.  So Dr. Lanfear made a few
17  substantive recommendations; right?  So one thing is he
18  took contention with our use of all crime sites.  While I
19  disagree and I think we've laid out our rationale pretty
20  well in the journal article about why it made sense to not
21  cherry pick what crime sites to include in the evaluation,
22  we re-ran the analysis -- I re-ran the analysis taking
23  Dr. Lanfear's recommendation to remove fraud.  That
24  actually overall increased the size of the crime difference
25  that we found.

Electronically signed by Mindy Suurs (101-257-931-8021)                                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 64

1    existing research on police protests than it is about

2    anything that specifically happened in Seattle.  I'm not

3    going to pretend like I know anything about the

4    on-the-ground decision-making in Seattle.

5         Q.   That's fair.  I guess I'm just trying to

6    understand if your use of the term "uprising," if that's

7    supposed to be synonymous with the CHOP or if it's

8    referring to something else.

9         A.   I think in this context we used "uprising" as a

10   synonym for occupation.

11        Q.   Okay.  And would you consider the occupation to

12   include ongoing protest activity?

13        A.   I believe so.  I think.  Can you provide a little

14   bit more detail in the question just so I'm clear?

15        Q.   Well, I guess I'd start with just the term CHOP.

16   Do you know what CHOP stands for?

17        A.   Capitol Hill Occupation Protest?

18        Q.   Occupation -- occupied -- sorry, it's not

19   actually a quiz.  Just trying to (inaudible.)  But okay,

20   yeah, so I think Capitol Hill Occupied Protest, I believe.

21        A.   Okay.

22        Q.   So do you understand the CHOP time period to have

23   included protest activity?

24        A.   My understanding and my reading of it is, while

25   there may have been protest activity, the level of protest

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 65

1    activity in CHOP after the abandoning of the East Precinct

2    seemed to be what was, you know, the type of activity seen

3    elsewhere that was being reported by the media.

4           To me, in my opinion, the defining characteristic

5    of CHOP was the occupation component, and that's kind of

6    why I prefer to use that word when I talk about the study

7    is because, you know, what's clear is there were, you know,

8    concrete policy decisions to allow people to set up tents

9    in the park over there, there was concrete policy decisions

10   to provide portable toilets so that people didn't have to

11   leave the area if they didn't want to, concrete policy

12   decisions to place -- pardon the pun -- concrete barriers

13   around the area to make it more difficult for people not

14   existing in the -- or not currently in the area to come in.

15          So to me, all of those characteristics is really

16   when I'm referring to intervention effects, I'm really

17   talking about the police decisions around all of that type

18   of activity and not necessarily the protest activity.

19       Q.   Okay.  And when you say you think or you

20   understand the level of protest activity in the CHOP to be

21   the same as elsewhere, do you mean elsewhere like other

22   cities or elsewhere in Seattle?

23       A.   I think both.  Elsewhere in other cities, you

24   know, from media reports, and, again, all I had to go on

25   was media reports.  The protest activity, the intensity of

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 69

1    policing over the last half century.

2         Q.   Okay.  So just to be clear on -- I understand

3    the -- your difference or the different possible responses

4    to this, but the data that you were working with didn't

5    take into account protest activity in other areas of the

6    city because it couldn't take that into account; right?

7         A.   Yes, yes.  We -- we matched on calls for

8    service -- right? -- so you could make the argument that if

9    there is a large protest, especially if it's one that

10   wasn't previously planned or previously expected by the

11   public, that may generate more calls to the police.  So we

12   do match on calls for service -- right? -- but we do not

13   match on confirmed protest activity only because that data

14   doesn't exist.

15        Q.   Okay.  So if that's the case, then is it also the

16   case that we're not making sort of a true apples to apples

17   comparison between the treatment group and the synthetic

18   control groups?

19        A.   Since we're using statistical matching --

20   right? -- and we're using the most advanced statistical

21   matching method that there is, I do contend that we are

22   comparing apples to apples.  It's just if we had direct

23   measures of protest activity, we'd be comparing the same

24   types of apples to apples; right?  So maybe now we're

25   comparing Golden Delicious with Honey Crisp apples --

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page  70

1    right? -- and if we had the protest's data, we'd be

2    comparing Honey Crisp to Honey Crisp; right?  But we're

3    comparing apples to apples; right?  I would argue pretty

4    hard against this being an apples to oranges comparison;

5    we're looking at the same fruit.

6         Q.   Okay.  So I guess we don't know if the

7    treatment -- well, we don't know if the treatment area --

8    let me withdraw that.

9              Given the inability to just aggregate the protest

10   activity in the control and treatment areas, I guess how do

11   we know whether it's protest activity that's causing this

12   increase in crime or something else?

13        A.   Because I still believe, while acknowledging that

14   this -- there's a little uncertainty in this, because,

15   again, the data doesn't exist, the CHOP area wasn't the

16   only area that had large-scale protests in Seattle; right?

17   And again, it's hard for you and I to debate that because

18   the data just doesn't exist, but it's not like the CHOP

19   area was the only area in Seattle that had possibility for

20   protest; right?

21             George Floyd wasn't killed in Seattle --

22   right? -- so it wasn't like protesters were flocking to the

23   location of the crime and therefore that's really the only

24   possible place where protests can happen.  Protests can

25   theoretically happen anywhere in Seattle; right?  So an

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 71

1    assumption we have to make, because the data doesn't exist,

2    is that protest activity is at least somewhat present or at

3    least could be present across the entirety of Seattle.

4           The only thing different here -- right? -- in the

5    CHOP area is that nowhere else in Seattle, or anywhere else

6    in the world for that matter, decided to completely remove

7    their police responsibilities in a specified geography.  No

8    other place allowed protesters to occupy a location to this

9    level.

10          So to me, that's the real intervention; right?

11   Like the intervention or treatment or whatever word you

12   want to use that we're looking at is not protest activity.

13   I would contend to a certain extent it's not even looking

14   at the abandoning of the police precinct.  To me, it's the

15   conscious decision to remove police presence and stop

16   providing police services that is the defining

17   characteristic of the CHOP area.  So that's why I'm

18   comfortable with the counterfactual condition that we were

19   able to -- to concoct here because, again, it's the best

20   possible thing we could do; right?  It's the best possible

21   thing we could do, and I don't think it's -- I don't think

22   it takes a leap of faith to -- to see why that's an

23   appropriate control condition in this quasi-experiment.

24       Q.   Okay.  So just -- so I think you said -- you used

25   the term "possibility for protest."  So the contention is

Electronically signed by Mindy Suurs (101-257-931-8021)                        dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page  72

1    not that there were protests happening in other areas of

2    the city, but that it's theoretically possible that there

3    were protests happening in other parts of the city?

4         A.   Yes, since there's no existing data on protests,

5    we have to -- like that's one assumption that I contend

6    we're making in our statistical analysis.

7         Q.   And --

8         A.   One thing we did is we removed street segments,

9    for example, that go over waterways -- right? -- because I

10   would contend that the nature of protests that we're

11   talking about can't happen on a waterway -- right? -- and

12   it's likely not going to happen on a high traffic bridge,

13   for example -- right? -- but we're talking about public

14   places -- right? -- especially if you look at the nature of

15   how the national protests were occurring.  And national

16   protests -- right? -- I get that we want to be

17   Seattle-specific, but national protests is kind of the best

18   we could do because the data doesn't exist.  Protests were

19   happening everywhere:  They were happening outside of

20   police precincts, they were happening in public parks,

21   protests would spontaneously pop up.  I know in Chicago

22   this happened a couple times just around areas where

23   officers were walking foot patrols -- right? -- just

24   because there were police officers there.

25              So I disagree that the CHOP area was the only

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page  73

1    possible area in Seattle where protests of that magnitude

2    were possible; right?  To me, again, it's not -- the

3    protest activity to me is not really what this analysis is

4    looking at.  It's looking at the policy decisions that

5    followed the protests.

6        Q.    Right, the policy decisions that were a response

7    to the protest activity happening in the Capitol Hill area;

8    right?

9        A.    Yes.

10       Q.    And there's no documented response to protest

11   activity happening in other neighborhoods in Seattle?

12             MR. WEAVER:  Objection, misstates facts.

13       A.    Yes.  And I think it's pretty clear -- even

14   though the data doesn't exist, I think it's pretty clear

15   that no other neighborhood in Seattle put up concrete

16   barriers and told police officers to not respond to 911

17   calls coming from that area other than CHOP.

18             So to me, again, this isn't a protest analysis.

19   To me, this was a -- to use the academic term, this is a

20   depolicing, watered down police abolition analysis --

21   right? -- because I think that's -- it's -- that's really

22   what happened in CHOP.

23       Q.    And I guess so in your view, it doesn't matter

24   why it happened; right?

25       A.    I think "it doesn't matter" is too strong.  Why

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 74

1    those policy decisions were made to me are secondary.  We

2    would love to isolate them; right?  We would have loved to

3    include data that, you know, kind of links treatment and

4    control areas based upon these annoying conditions, but the

5    explicit decision to turn over a piece of a neighborhood to

6    occupiers -- that's really what our evaluation was about.

7        Q.   Right.  I guess I'm just trying to understand how

8    it is that the protest activity isn't a confounding

9    variable in your experiment.

10       A.   Because theoretically, other protests -- not

11   theoretically -- other protests did happen in Seattle;

12   right?  I mean there's -- again, it's difficult for us to

13   talk about magnitude or frequency, but other protests did

14   happen in Seattle.  Theoretically, at least -- right? --

15   police could have responded to those protests by turning

16   over the geography that the occupiers were in, but they

17   didn't.

18            So while the lack of protest activity could be a

19   confounding variable, I don't think that's a fatal flaw to

20   the research design -- right? -- because the counterfactual

21   does make sense.  There was other protest activity.

22   Theoretically, again, it could have gotten as bad as it did

23   in CHOP, but it just didn't.

24       Q.   Okay.  So -- just so I -- because I feel like

25   that's a slightly different answer, but maybe I'm just

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 75

1    misunderstanding.

2             So is it that the counterfactual in this scenario

3    is areas of the city where protests were happening but the

4    police did not respond in the same way?

5        A.   The counterfactual was police maintaining police

6    responsibilities.  All right?  Because that's literally

7    what police do in -- did in every other part of the city

8    over 2020.

9        Q.   Right, but not --

10       A.   They --

11       Q.   Sorry.

12       A.   They dealt with protests -- right? -- and their

13   response to protests were doing whatever they did to deal

14   with the protesters but also maintaining their police

15   presence, patrol, and response responsibilities.

16       Q.   Okay.  So the counterfactual is both responding

17   to protests and --

18       A.   I think the -- I'm sorry, go ahead.  I thought

19   you were done.  I'm sorry.

20       Q.   No, no, no, I'm just trying to parse the

21   counterfactual.  Is the counterfactual police response to

22   protests in other parts of the city that didn't include

23   withdrawing or drawing down police services?

24       A.   Yeah, the counterfactual is business as usual

25   policing.

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 76

1        Q.    Okay, business as usual policing.  So not --

2        A.    So continuing to patrol, continuing to respond to

3   911 calls during an era or period of time where there were

4   heightened risks for protests throughout the nation.  The

5   counterfactual is just doing what police always do.

6        Q.    Okay.  And the confounding variable of the

7   protest activity is not a problem because the -- you're

8   assuming that in the counterfactual scenario there were

9   theoretically protests, or the theoretical possibility of

10  protests?

11       A.    Yes.  And not just theoretical possibility; I

12  think it's safe to say there were other protests, we just

13  can't measure exactly where they happened.

14       Q.    Okay.  And there were other protests, but you're

15  not aware of any specific protests?

16       A.    No.

17       Q.    Okay.  Does any part of your experiment measure

18  the SPD's response to protest activity before June 8th,

19  2020?

20       A.    Not directly.  It would be captured within the

21  general calls for service data that we had, but not

22  directly because, again, there's -- you know, that data's

23  not systematically collected.  Because even within the

24  calls for service -- right? -- response, a response to a

25  protest event -- that could be any one of a variety of call

Electronically signed by Mindy Suurs (101-257-931-8021)                                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 77

1    types; right?  It could be disorderly conditions; it could

2    be, you know, someone falls during a protest and is

3    injured, it's an injured person call; if it's an officer

4    gets into a scuffle with someone, it's a call for backup;

5    so there's no existing code, you know, within the calls for

6    service data that would allow us to even approximate what

7    the protest conditions are.

8            So again, I disagree that that means that we

9    needed to not make a contribution to social science and

10   public policy, but that's, you know, an issue that I

11   acknowledge.

12       Q.   Right.  And just to be clear, we're not here

13   because of your contribution to the science and -- criminal

14   science and public policy but because you're retained as an

15   expert in this case; right?

16       A.   No, no, I understand, and I didn't mean to sound

17   defensive if that's what I did.  I'm sorry.  No, but to me,

18   I mean that's the whole remaining argument here --

19   right? -- is can you research this problem or not; right?

20   And I acknowledge that there's no way to research something

21   like this and simultaneously rule out 100 percent of the

22   potential cofounders.

23           So the only other argument is that you just don't

24   do this type of research; right?  To me, I mean it's a

25   value judgment at this point.  All of the -- you know,

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

ERIC L PIZA, PhD
8/16/2022

Page 101

1                    REPORTER'S CERTIFICATE

2

3          I, Mindy L. Suurs, the undersigned Certified Court
   Reporter, pursuant to RCW 5.28.010, authorized to
4    administer oaths and affirmations in and for the State of
   Washington, do hereby certify:

5

6          That the foregoing testimony of ERIC L. PIZA, Ph.D.
   was given before me at the time and place stated therein
7    and thereafter was transcribed under my direction;

8          That the sworn testimony and/or proceedings were by me
   stenographically recorded and transcribed under my
9    supervision, to the best of my ability;

10         That the foregoing transcript contains a full, true,
   and accurate record of all the sworn testimony and/or
11   proceedings given and occurring at the time and place
   stated in the transcript;

12

13         That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing
   but the truth;

14

15         That I am not a relative, employee, attorney, or
   counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
16   financially interested in the said action or the outcome
   thereof;

17

18   DATE:  August 22, 2022

19

20

21

22

23              Mindy L. Suurs
                Certified Court Reporter #2195

24

25

Electronically signed by Mindy Suurs (101-257-931-8021)                    dcc21185-2049-4192-96d3-23a839258257

# EXHIBIT 3

ARIK VAN ZANDT
9/14/2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,    )
                                 )
            Plaintiff,           )
                                 )
        vs.                      )    No. 20-cv-00983-TSZ
                                 )
CITY OF SEATTLE,                 )
                                 )
            Defendant.           )
_____

Zoom Video Deposition Upon Oral Examination

Of

ARIK VAN ZANDT

_____

DATE:  Wednesday, September 14, 2022

REPORTED BY:  Mindy L. Suurs, CSR No. 2195

ROUGH & ASSOCIATES INC
office@roughandassociates.com      206.682.1427  3515 SW Alaska St Seattle WA 98126

Electronically signed by Mindy Suurs (101-257-931-8021)                                      c273543a-021c-467e-92b9-68d12bc36c85

ARIK VAN ZANDT
9/14/2022

Page 60

1        Q.    Okay.  And what did Hunters Capital rely on, as

2    far as you know, to determine that it would take four

3    months to relet the Hunters -- or the Gamestop space?

4              MR. REILLY-BATES:  Objection, asked and answered.

5        A.    Yeah, I don't know specifically what they would

6    have relied upon except for in my conversations with them,

7    their market knowledge and being intimate with this

8    obviously being their business.

9    BY MR. CRAMER:

10       Q.    And did you do any independent analysis to

11   determine whether their four-month estimate was reasonable?

12             MR. REILLY-BATES:  Objection, asked and answered.

13       A.    Nothing specific to that, no.

14   BY MR. CRAMER:

15       Q.    Did you -- what analysis did you do to determine

16   that a 50 percent extension was reasonable to account for

17   COVID?

18       A.    That's an assumption that I made based on the --

19   one, the Colliers report we talked about, the wait-and-see

20   approach that was being taken by marked participants.  You

21   know, we talked about my background early and working with

22   a number of businesses across my practice and just seeing

23   generally what -- you know, what was being done during that

24   time period; but it was an assumption that I made that I

25   felt was reasonable.

Electronically signed by Mindy Suurs (101-257-931-8021)                                    c273543a-021c-467e-92b9-68d12bc36c85

ARIK VAN ZANDT
9/14/2022

Page 61

1      Q.   What did you do to see what was being done in

2   that time period by others?

3      A.   Well, that's just -- it's just my everyday life

4   and the valuation and forensic work that I do working with

5   as many companies as I do, just understand -- and we talked

6   about this a little bit before -- understand the -- you

7   know, the impacts of COVID on various industries and

8   various types of businesses.  For some it had no impact,

9   for some it actually improved, and for others it actually

10  was pretty meaningful on the down side; so, you know, it's

11  just an overall assessment of that, but it's a reasonable

12  assumption based on this wait-and-see-type concept.

13     Q.   And the Colliers report, which I understand

14  you're going to try to get for us -- that -- that was from

15  fourth quarter 2021; correct?

16     A.   That is the time period of that specific report,

17  but it covers -- it covers the periods prior and

18  specifically accounts for, you know, what they saw from the

19  market during COVID.  You know, it's one of those things

20  where you have to -- you have to live it for a little bit

21  to understand what that would be.  You know, you can't have

22  immediate concept of research and expectation in the heat

23  of spring of 2020.  It's something that's informed as you

24  go.

25     Q.   Did you look at anything other than the Colliers

Electronically signed by Mindy Suurs (101-257-931-8021)                          c273543a-021c-467e-92b9-68d12bc36c85

ARIK VAN ZANDT
9/14/2022

Page 62

1    report that contained commercial real estate trends for

2    2020?

3         A.   Again, I've -- I've been living this life of

4    assessing businesses during COVID since it happened, but I

5    don't have another specific report.  That's the report that

6    I have.

7         Q.   And you didn't look at anything that contained

8    vacancy rates across 2020 for the Seattle market?

9              MR. REILLY-BATES:  Object to the form.  Vague as

10   to "thing."

11        A.   Nothing specific.

12   BY MR. CRAMER:

13        Q.   Did you look at any reports showing average time

14   on the market for commercial properties in 2020?

15        A.   Not that I can recall specifically.

16        Q.   And it was your testimony earlier that your

17   analysis assumes that the market rent that Hunters could

18   have charged but for CHOP would have been the same during

19   COVID as it was prior to COVID.  Is that fair?

20             MR. REILLY-BATES:  Objection to the extent it

21   misstates the witness's prior testimony.

22        A.   My assumption is that the market rents themselves

23   would have been the same but for the impacts of COVID and

24   CHOP.

25        Q.   Is that -- what did you do to develop that

Electronically signed by Mindy Suurs (101-257-931-8021)                                    c273543a-021c-467e-92b9-68d12bc36c85

ARIK VAN ZANDT
9/14/2022

Page 203

1                    REPORTER'S CERTIFICATE

2

3       I, Mindy L. Suurs, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations in and for the State of
Washington, do hereby certify:

5

6       That the foregoing testimony of ARIK VAN ZANDT
was given before me at the time and place stated therein
7  and thereafter was transcribed under my direction;

8       That the sworn testimony and/or proceedings were by me
stenographically recorded and transcribed under my
9  supervision, to the best of my ability;

10      That the foregoing transcript contains a full, true,
and accurate record of all the sworn testimony and/or
11  proceedings given and occurring at the time and place
stated in the transcript;

12

13      That the witness, before examination, was by me duly
sworn to testify the truth, the whole truth, and nothing
but the truth;

14

15      That I am not a relative, employee, attorney, or
counsel of any party to this action or relative or employee
of any such attorney or counsel and that I am not
16  financially interested in the said action or the outcome
thereof;

17

18  DATE:  September 18, 2022

19

20

21

22

23        _____

24        Mindy L. Suurs
          Certified Court Reporter #2195

25

Electronically signed by Mindy Suurs (101-257-931-8021)                                    c273543a-021c-467e-92b9-68d12bc36c85

# EXHIBIT 4



**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

HUNTERS CAPITAL, LLC, a
Washington limited liability company,
NORTHWEST LIQUOR AND WINE
LLC, a Washington limited liability
company, SRJ ENTERPRISES, d/b/a
CAR TENDER, a Washington
corporation, THE RICHMARK
COMPANY d/b/a RICHMARK
LABEL, a Washington company,
ONYX HOMEOWNERS
ASSOCIATION, a Washington
registered homeowners association,
WADE BILLER, an individual,
MADRONA REAL ESTATE
SERVICES LLC, a Washington
limited liability company,
MADRONA REAL ESTATE
INVESTORS IV LLC, a Washington
limited liability company,
MADRONA REAL ESTATE
INVESTORS VI LLC, a
Washington limited liability company,
12TH AND PIKE ASSOCIATES LLC,
a Washington limited liability
company, REDSIDE PARTNERS
LLC, a Washington limited liability

**Case No. 2:20-cv-00983 TSZ**

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

company, OLIVE ST APARTMENTS
LLC, a Washington limitedliability
corporation, BERGMAN'S LOCK
AND KEY SERVICES LLC, a
Washington limited liability company,
MATTHEW PLOSZAJ, an individual,
SWAY AND CAKE LLC, a
Washington limited liability company,
SHUFFLE LLC d/b/a Cure Cocktail, a
Washington limited liability company,
on behalf of themselves and others
similarly situated,

               Plaintiffs,

   v.

CITY OF SEATTLE,

              Defendant.

**Expert Report of
Arik K. Van Zandt, ASA, CDBV**

**April 28, 2022**

**Page 2 of 38**

CONFIDENTIAL

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

to restrictions in the area resulting from the existence of CHOP, the continued public perception

of the area as dangerous and unstable, and lost business that may never return.  Plaintiffs expressly

reserve the right to seek recovery for such ongoing harm.

## Economic Effects of the COVID-19 Pandemic

8.      The outbreak of COVID-19 caused significant disruption and financial harm to the global

economy and the Washington State economy.  In the first quarter of 2020, COVID-19 impacted

the global economy materially, as cases of the virus exponentially increased.  The economic impact

of the COVID-19 pandemic was not uniform, however, as the severity of the impact ranged from

catastrophic to immaterial, with some business and industries actually performing better as a result

of consumer behavior shifts and overall economic demands.

9.      China was the first adopter of large-scale quarantines, but as the virus spread to the rest of

the world, other economies saw wide-spread shutdowns.  Domestically, nearly all major U.S. states

put "stay-at-home" restrictions in place with the exception of essential travel for food and medical

needs.  Prior to formal quarantine restrictions, many companies shut down operations for multiple

reasons, including the safety of its employees and preventing the further spread of the virus.

10.      On February 29, 2020, Governor Inslee issued Proclamation 20-05, proclaiming a State of

Emergency for all counties throughout the State of Washington due to COVID-19. [3]  On March

16, 2020, Governor Inslee announced a statewide shutdown of restaurants and bars, with take-out

and delivery still being allowed.[4]  On March 23, 2020, Governor Inslee issued Washington's "Stay

---

[3] https://www.governor.wa.gov/sites/default/files/20-05%20Coronavirus%20%28final%29.pdf?utm_medium=email&utm_source=govdelivery
[4] https://medium.com/wagovernor/inslee-announces-statewide-shutdown-of-restaurants-bars-and-expanded-social-gathering-limits-bb19095b2251

CONFIDENTIAL

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

Home, Stay Healthy" order, expanding prior and unprecedented steps taken in February and early March 2020, which included closing schools and restaurants, entertainment venues, and other businesses.[5]   The stay-at-home order was extended multiple times until a multi-phase approach was announced and implemented on May 4, 2020 to slowly open up the Washington economy on a county-by-county basis, depending on the achievement of certain testing, contact tracing, and medical resource availability criteria.[6]

11.     On June 5, 2020, King County was approved for Modified Phase I of Governor Inslee's phased reopening plan.  Based on Modified Phase I, indoor capacity for bars and restaurants was increased to 25 percent of the facility total capacity.   Indoor capacity for in-store retail establishments increased to 15 percent of occupancy.[7]

12.     On June 19, 2020, King County's application to enter Phase 2 of Governor Inslee's Safe Start recovery plan was approved by the Washington State Department of Health.  Phase 2 allowed for bars and restaurants to operate at 50 percent indoor capacity and capacity for in-store retail establishments was increased to 30 percent.[8]

13.     Due to rising COVID-19 cases in the fall of 2020, Governor Inslee announced new restrictions on November 15, 2020, again closing bars and restaurants to indoor seating effective November 18, 2020.   Indoor retail establishments were limited to 25 percent of occupancy effective November 16, 2020.[9]

---

[5] https://medium.com/wagovernor/inslee-announces-stay-home-stay-healthy-order-4891a7511f5c
[6] https://medium.com/wagovernor/inslee-signs-new-covid-19-order-for-phased-re-opening-of-washingtons-economy-ad5ea919ab56
[7] https://kingcounty.gov/elected/executive/constantine/news/release/2020/June/03-modified-reopen-plan.aspx
[8] https://kingcounty.gov/elected/executive/constantine/news/release/2020/June/19-phase-2-reopening.aspx
[9] https://medium.com/wagovernor/inslee-announces-statewide-restrictions-for-four-weeks-c0b7da87d34e

CONFIDENTIAL

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

14.    On February 1, 2021, King County moved back to Phase II, and then moved to Phase III on March 1, 2021, which allowed bars, restaurants, and in-store retail locations to all operate at 50 percent capacity.  All statewide capacity restrictions were lifted on June 30, 2021.[10]

## ECONOMIC DAMAGE ANALYSIS

### Hunters Capital, LLC

15.    Hunters Capital, LLC ("Hunters") is a real estate development, investment, and management company, headquartered near Cal Anderson Park in the Capitol Hill neighborhood, with offices located at 1620 Broadway Street.  Hunters owns and manages a portfolio of commercial, multi-family residential, and mixed-use properties in and around CHOP, including 500 E. Pike Street, 1517 12th Avenue, 401 E. Pine Street, 1000 E. Pike Street, 900 E. Pine Street, 426 15th Avenue East, 415 18th Avenue South, 523 15th Avenue East, 1641 Nagle Place, and 501 E. Pike Street.

16.    Hunters has suffered economic loss from CHOP in the form of property damage, lost income from tenant leases, lost parking revenue, and additional expenses that would not have been incurred "but for" CHOP.  The economic damages that have been incurred by Hunters are based on lost profits and extra expenses.  Any future expected lost income due to reduced long-term lease income have been reduced to present value at a risk-adjusted discount rate.

### Commercial Unit Losses

17.    As a result of CHOP, a number of commercial unit tenants either terminated their lease prior to expiration or did not renew as expected.  It is my understanding that all commercial leases

---

[10] https://www.seattletimes.com/seattle-news/politics/limits-gone-for-bars-restaurants-other-businesses-as-covid-19-restrictions-ease-across-washington-state/

CONFIDENTIAL

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

were on a triple net lease basis. As such, Hunters' damages represent both lost rental income and incurred expenses related to property tax charges, insurance charges, and common area maintenance ("CAM") charges for which tenants of the units would have been responsible. Additionally, as a result of CHOP, Hunters will incur continued economic damages as a result of reduced rental income that Hunters needed to accept in order to fill the vacant units and mitigate any future lost rental income.

18.     To compute the economic damages related to loss of rent and incurred expenses for vacant units, Hunters provided an analysis of the lost rent and incurred expenses over the total number of months the specific unit was vacant.  In instances where a lease term was expiring as of a certain date for a specific tenant, Hunters estimated a period of vacancy in their budget process.

19.     Based on a report of the Puget Sound commercial real estate market prepared by Colliers, the COVID-19 pandemic has created a wait and see approach for commercial tenants.[11]  The Colliers report shows that rental rates for Class B commercial properties, which is a reasonable proxy for the type of commercial properties owned by Hunters, were largely unaffected.  To account for the "wait and see" market caused by these COVID-19 trends, I have extended the budgeted vacancy period by 50.0 percent to account for the market impacts of CHOP.  For purposes of this analysis, I have assumed and increased vacancy period as compared to the budgeted vacancy to account for the impact of COVID-19, since commercial tenants may have been in a "wait and see" period for overall economic improvement, as compared to the remaining

---

[11] "Seattle Office 21Q4," Colliers

CONFIDENTIAL

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

vacant period prior to re-leasing a vacant space being due to the impact of CHOP on Hunters' ability to re-lease units.

20.    For purposes of this analysis, I have made additional adjustments to the calculations of damages incurred by Hunters based on my review of the financial information, discussions with representatives of Hunters, and expectation of commercial practices "but for" CHOP, including the elimination of broker fees and tenant improvements, as these costs would have been incurred at a future date of re-leasing.

21.    As shown in Schedule 1, the calculation of economic damages related to commercial tenants has been conducted on a tenant-by-tenant basis.  Total economic damages for Hunters for the loss of commercial tenant income related to CHOP is $1,419,203.

**Residential Losses**

22.    Hunters owns two residential properties within the CHOP zone that incurred economic damages:  (i) Lots II – The Broadway Building and (ii) the Dunn Automotive Building.  As a result of CHOP, there was a mix of tenants moving out, not renewing leases, and a difficulty in attracting new tenants for an extended period.  Based on Hunters' experience in leasing the residential units, Hunters' management determined that residential rental income loss extends from June 8, 2020 through May 8, 2021.  This 11-month period approximately aligns with the start of CHOP and with the removal of the barricades in front of the East Precinct, which occurred on May 5, 2021.

23.    Hunters prepares monthly budgets on an annual basis, which are finalized in December of each year.  I have reviewed the variance between the budget and actuals for January 2020 through May 2020, which represents the portion of the year prior to CHOP, and accounts for a number of months after the onset of the COVID-19 pandemic.  Hunters outperformed the budget in each

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

month for both the Lots II building and the Dunn Automotive Building despite not being able to foresee the impact of the COVID-19 pandemic at the time the budgets were prepared in December 2019. As such, we determine that COVID-19 did not have an impact on Hunters' residential operations, as evidenced by the outperformance of the actual income compared to the budgeted income during the period from March 2020 through May 2020. Based on the analysis performed by Hunters, which I have found to be reasonable, damages resulting from residential losses totaled $749,480, as shown in Schedule 2.

**Abated Rent**

24.    Hunters incurred damages related to rent abatement for various commercial tenants as a result of CHOP. Based on discussions with their tenants, Hunters' commercial tenants were having a difficult time paying rent as a result of CHOP's interferences with the operations of the commercial businesses. Hunters made the decision to provide rent abatement as a way to ensure that these tenants would remain in place once the CHOP zone returned to a more stabilized level and tenants would once again be able to pay rent. This was a way for Hunters to minimize future damages by not needing to risk evicting commercial tenants and having vacant units with the uncertainty regarding the timing of when future tenants would be willing to move in and the potentially reduced rent that future tenants would demand as a result of CHOP negatively impacting the image of Capitol Hill.

25.    Hunters provided a generated report that tracked accumulated rent abatements for the various buildings they own. I rely on the provided rent abatement report as being accurate. Based on the provided rent abatement report, Hunters incurred damages of $648,343, as presented in Schedule 3.

CONFIDENTIAL

*Expert Report of Arik K. Van Zandt, ASA, CDBV*

property damage, and lost rental income.  Unicorn Bar, a tenant of 12th and Pike, negotiated a rent deferment with Madrona in July 2020, as they would have applied for their restaurant license earlier "but for" CHOP.  As a result, the August 2020 rent was forgiven, and rental income for future months was deferred to a later date.  The total economic damages incurred by 12th and Pike is $14,197.65.  Madrona Services incurred additional security service costs, time spent handling items caused by CHOP events, and loss of management fees from lost rental income.  The economic damages incurred by Madrona Services is $13,071.11.  The total economic damages incurred by the Madrona entities combined is $58,214.16.

**POTENTIAL ADDITIONAL ANALYSES**

I reserve the right to clarify, amend, and/or supplement my opinions based on additional information that may be provided to me and the development of additional information as this matter proceeds.

Dated: April 28, 2022

Arik K. Van Zandt,  ASA, CDBV
Managing Director

CONFIDENTIAL