# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

HUNTERS CAPITAL, LLC, et al.,   )
                                )
            Plaintiffs,         )
                                )
      vs.                       ) No. 20-cv-00983-TSZ
                                )
CITY OF SEATTLE,                )
                                )
            Defendant.          )
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION

UPON ORAL EXAMINATION OF

BATES McKEE

_____


Witness located in Seattle, Washington

(All participants appearing via videoconference.)





DATE TAKEN:  AUGUST 24, 2022

REPORTED BY: CARLA R. WALLAT, CRR, RPR

WA CCR #2578; OR CSR #16-0443; CA CSR #14423

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

4876e839-3c94-4488-9aea-5aa2c4b042c0

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 133

1    A.  I believe Commercial Analytics has the
2  distinction of -- of Capitol Hill at large, and I think
3  that's probably discussed in the report.  Do you want
4  me to look at that?
5         So let's see.  They have different
6  methodologies and data sources.
7    Q.  What page are you referring to?
8    A.  I'm looking at page 21.
9    Q.  Okay.  Okay.  Does it tell us what boundaries
10 Commercial Analytics used for the boundaries for the
11 subject area on page 21?
12   A.  I was thinking that it did, but I don't see it
13 in here.
14   Q.  Okay.
15   A.  So my understanding is that Commercial
16 Analytics includes sort of all Capitol Hill and their
17 boundaries, so this is an examination of Capitol Hill
18 including, you know, the CHOP area but not excluding
19 other areas of Capitol Hill.  And that's -- that's
20 their boundary conditions.
21   Q.  So if -- if I understand the data that comes
22 from Commercial Analytics that refers to the subject
23 area refers to the entire area of Capitol Hill?
24   A.  Yes.
25   Q.  Okay.  And --

1    A.  As -- as labeled I hope.  It says, you know,
2    Capitol Hill there.
3        Q.  And where -- where are you referring to?
4        A.  On page 26 and 27.  And you can see the note
5    on page 25 that says "Data provided by property and
6    owners and managers and anonymized by using market
7    areas."
8            So again, that's, -- so, you know, limitation
9    of the data provider.
10       Q.  Okay.  So -- but this doesn't provide us a --
11   a map of the boundaries for Commercial Analytics'
12   subject area that involves Capitol Hill, does it?
13       A.  No.
14       Q.  Okay.  How about CoStar, is there a -- is
15   there a list of the boundaries that -- that were used
16   for the subject area for CoStar?
17       A.  Well, I think that that is bounded by -- you
18   know, by the maps that are included in the CoStar data.
19   So that -- that shows the boundaries.
20       Q.  And where do you capture those in your report?
21       A.  Oh, I'm sorry, starting on page 49, then on
22   page 53, 57, 61.
23       Q.  Okay.  So going to page 49, on this -- on this
24   map, the -- the boundaries of the subject area are
25   different than they were for the -- the Yardi map on

Hunters Capital, LLC v. City of Seattle                    Bates McKee

Page 140

1   Q.  And surely, you would have included the
2  addresses for these specific locations in your work
3  papers that you provided us, wouldn't you have?
4   A.  No, I wouldn't think so.
5   Q.  Why not?
6   A.  I wouldn't think that that was data that
7  was -- like in the case of Commercial Analytics, it's
8  anonymized, so it wouldn't even have been available.
9  And I just don't think that would have been within the
10 scope of what we were trying to do.
11      Why would we?  Why would we have specific
12 addresses?  It's -- where would you stop, you know?
13 You know, types and sizes and, you know -- and
14 individual characteristics and whether they have
15 balconies and -- you know, that's not the purpose of
16 this analysis, and it's not something that we
17 endeavored to do.
18   Q.  Well, if you wanted to test any of the data
19 that -- that you're being given from Yardi, certainly
20 you would want to have the addresses; wouldn't you
21 agree?
22   A.  We wouldn't normally test Yardi data.  It's --
23 you know, it's a subscription service that has its own
24 methodology and means, and we -- we observe the data.
25 We're not -- you know, we normally would not test any

Hunters Capital, LLC v. City of Seattle                                  Bates McKee

Page 141

1   of the data as you say.
2       Q.   So you specifically did not test any of the
3   data to ensure its accuracy in this case.  Is that a
4   fair statement?
5       A.   Well, I believe its accuracy.  We use -- we
6   use the data all the time.  We understand its sourcing.
7       Q.   I understand that you believe --
8       A.   Why would we -- why would we audit Yardi?  I
9   mean, it doesn't make sense.  So, no, in any case, we
10  did not endeavor to do that.
11      Q.   Thank you.  Thank you.
12           And what data points did you collect for each
13  one of these -- these specific dots included on page 30
14  of -- of Exhibit 1?
15      A.   The average rent and occupancy.
16      Q.   And do you have those -- those figures broken
17  down for each one of these specific data points for the
18  Yardi matrix?
19      A.   As I said, I don't believe so.  It's -- that's
20  not something that we would do.  If they provided that
21  to us on the -- you know, in conjunction with
22  downloading the data, we may have that, but I don't --
23  and, you know, it's certainly possible to go chase it
24  down.  It simply wasn't important to us.
25      Q.   And -- well, you -- but you do have access to

1    Q.  So do you know how your assistant, Amy,
2  obtained the data for -- that she used for the subject
3  area which is depicted in -- in your report for the
4  subject area?
5    A.  Just as we discussed.  Logged on to -- you
6  know, the data services and did a -- a query and -- and
7  gathered the results.
8    Q.  Okay.  And what -- what are the -- the query
9  tools that you're allowed to use to filter your search?
10   A.  CoStar has quite a broad range of tools that
11 one could use.  In this case, you know, you're looking
12 at the entire market.  So they -- they track the
13 properties that they track, again, and have their own
14 criteria for what makes it into their database in terms
15 of size.
16         So other than that, I think it was a
17 comprehensive search.  So, under the, you know, retail
18 classification, they might have subclassifications for
19 different things.  And under office they might have
20 subclassifications and you could probably, you know,
21 query by, you know, size and -- and, you know, age and
22 all kinds of things if that was your intention.
23         And again, for the purpose of market analysis,
24 that's -- that's usually not our intention.  So that's
25 not something that we would be doing.  If we're

1   appraising a property, we would look at specific data
2   points.  And if we're looking at a market, we would
3   look at a -- you know, a summary of -- of data points
4   as we've done here.
5         Q.  So CoStar has a lot more tools that would
6   allow you to filter the -- the data search.
7         Is that a fair statement?
8         A.  Yes, down to the specific property level.
9   But, again, we're not appraising specific property, so
10  we wouldn't have had even a sample to compare that to.
11        Q.  Okay.  What filters did Amy use when she
12  filtered the data for the subject area?
13        A.  Okay.  Go ahead.  Sorry.
14        Q.  What filters did Amy use for the CoStar data
15  that is depicted on the map on page 49 for the subject
16  area?
17        A.  Location and use.
18        Q.  And what were the uses that she filtered for?
19        A.  Office and retail.
20        Q.  And did she make any further filtering of the
21  dataset when she had achieved it, to your knowledge?
22        A.  No.
23        Q.  And CoStar would have different property
24  addresses and different data points for its subject
25  area, wouldn't you agree?

Hunters Capital, LLC v. City of Seattle                                    Bates McKee

Page 261

REPORTER'S CERTIFICATE

I, CARLA R. WALLAT, CCR, CSR, RPR, CRR, the undersigned Certified Court Reporter, authorized to administer oaths and affirmations in and for the states of Washington (2578), Oregon (16-0443), and California (14423) do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given remotely before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision.  That the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 31st day of August, 2022.

_____

CARLA R. WALLAT, RPR, CRR
Washington CCR #2578, Expires 1/5/2023
Oregon CSR #16-0443, Expires 9/30/2024
California CSR #14423, Expires 1/31/2023

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

4876e839-3c94-4488-9aea-5aa2c4b042c0



# ERRATA

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 8/24/2022

**WITNESS:** Bates McKee

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|---|---|---|---|
| 9 | 20 | lease | leased |
| 17 | 15 | the states | estates |
| 25 | 20 | I reviewed | a review |
| 51 | 24 | 2021 | 2020 |
| 60 | 13 | oppositional | optional |
| 79 | 14 | well | real |
| 81 | 16 | faces | facets |
| 82 | 22 | was | was not |
| 84 | 23 | lese via | leased fee |

_____
Signature of Deponent



# ERRATA

**CASE NAME:** Hunters Capital, LLC v. City of Seattle

**DATE TAKEN:** 8/24/2022

**WITNESS:** Bates McKee

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|---|---|---|---|
| 94 | 19 | demain | domain |
| 95 | 19 | knowledgeable | knowledge |
| 118 | 4 | broke | wrote |
| 177 | 9 | Right. | Right? |
| 190 | 20 | high | |
| 199 | 17 | hours | our |
| 221 | 2 | my domain for | eminent domain |
| 221 | 3 | over | for a |
| 228 | 9 | sometimes it | Sound Transit |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com